United States Court of Appeals
Fifth Circuit

**F I L E D**

August 25, 2005

Charles R. Fulbruge III
Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 04-40410

D.C. Docket No. 2:02-CR-216-1

United States Courts
Southern District of Texas
FILED

OCT - 5 2005

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ALFRED BOURGEOIS

Defendant - Appellant

Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi.

Before JOLLY, WIENER, and DENNIS, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the sentence and conviction of the District Court are affirmed.

ISSUED AS MANDATE: SEP 2 9 2005

A true copy
Test

Clerk, U. S. Court of Appeals, Fifth Circuit

By_____
Deputy

New Orleans, Louisiana SEP 2 9 2005

United States Court of Appeals
Fifth Circuit

**F I L E D**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**August 25, 2005**

Charles R. Fulbruge III
Clerk

No. 04-40410

UNITED STATES OF AMERICA,

Plaintiff - Appellee

versus

ALFRED BOURGEOIS,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, WIENER & DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Alfred Bourgeois was convicted of
murdering his two-year-old daughter ("JG") and sentenced to death
under the Federal Death Penalty Act ("FDPA"). Bourgeois challenges
his conviction and sentence on grounds that (1) the government
failed to charge any aggravating factors in the indictment, (2) the
FDPA statutory-intent factor that renders a defendant with a
reckless state of mind eligible for the death penalty violates the
Eighth Amendment, (3) the district court erred when it delegated to
the Director of the Federal Bureau of Prisons supervision over
Bourgeois's execution, and (4) the aggravating factors used in his

1

sentencing were vague and ambiguous.

## I. FACTS AND PROCEEDINGS

### A.    JG's Life Before Bourgeois

JG was born to Katrina Harrison in October, 1999.  For the first two and one-half years of her life, JG lived with her mother and grandmother in Livingston, Texas.  In April of 2002, Harrison petitioned a local court to have JG's paternity determined.  The paternity test showed that Bourgeois, of LaPlace, Louisiana, was JG's biological father.  At the time, he was married to Robin Bourgeois, with whom he had two children ("AB1994" and "AB2001"). Bourgeois also had a child from a previous marriage to whose mother he was paying child support.

In May of 2002, Bourgeois appeared in Texas for a child-support hearing regarding JG.  He brought his niece to Texas with him with the intention of telling the judge that she was his daughter and had kidney problems in the event that the court ordered high child support payments.  Bourgeois, however, was not allowed to take his niece (or any other family member) into the hearing with him.  At the conclusion of the hearing, the court ordered Bourgeois to pay Katrina Harrison $160 per month in child support for JG.  The court also granted Bourgeois's request for visitation rights with JG for the ensuing seven weeks, and he took custody of JG that afternoon.  When JG left her mother and grandmother, she was in good health and free of injuries.

2

## B.   **The Final Weeks of JG's Life**

Initially, JG lived with the Bourgeois family at their home in LaPlace, where they remained until May 28, 2002.  After that, JG accompanied the family on Bourgeois's long-haul trucking route, residing with the other four in his 18-wheel tractor/trailer until her death, approximately one month later.  From the outset, Bourgeois systematically abused and tortured his two-year-old daughter in several ways.  For example, Bourgeois became fixated on JG's toilet training.  Her training potty became JG's primary seat during the day, and Bourgeois even forced her to sleep on it when they were traveling at night.  When she had "accidents," Bourgeois would strike JG and then tell his older daughter, AB1994, that it was her fault.

In addition, Bourgeois constantly beat and otherwise assaulted JG.  He punched her in the face with enough force give her black eyes.  He whipped her with an electrical cord, and he beat her with a belt so hard that it broke.  Bourgeois hit JG in the head with a plastic baseball bat so many times that her head "was swollen like a football."  Later, when he was in jail, Bourgeois laughed to a fellow inmate that "[t]hat f---ing baby's head got as big as a watermelon."  There was also evidence that, before the Bourgeois family left LaPlace, Bourgeois had thrown JG against the wall of the master bedroom.  He scratched and pulled her ears, bit her hands, feet, and forehead, and burned the bottom of her foot with

3

a cigarette lighter.  Bourgeois's wife, Robin, and others noticed that bruises and other injuries appeared on JG's body shortly after she came to stay with the Bourgeois family, and that, between the middle and end of May, JG's hands and feet had become extremely calloused and swollen.  When others tried to clean the sores on JG's feet, Bourgeois would stop them and jam his dirty thumb into the wounds, then force JG to walk on her injured feet.

In addition to physically torturing JG, Bourgeois traumatized her emotionally. For example, on one occasion, Bourgeois decided that it was time for JG to learn how to swim, despite her tender years and fear of the water.  Bourgeois picked up the two-year-old and tossed her several feet in the air and into a swimming pool. He allowed her to sink for several seconds before pulling her out, then repeated the "lesson" for thirty minutes while JG choked and gasped for air.  Similarly, when the family visited a California beach on Bourgeois's long-haul trucking route, he forced JG into the ocean even though she was terrified of the water, holding her under the water and letting the waves roll over her.  By the time they left the beach, JG had swallowed so much salt water that she had difficulty walking and was ill with a swollen stomach.

There was also evidence of sexual abuse.  When the family was staying in LaPlace in May, Bourgeois slept in the master bedroom with JG and AB1994 behind a locked door, while Robin slept in a different bedroom.  Late that month, a family friend noticed blood in JG's diaper and convinced Bourgeois and Robin to take JG to

4

Louisiana Child Protective Services ("CPS") for an evaluation. There, the examining physician concluded that the source of the blood was external irritation to JG's genitalia. Although the doctor determined that the cause of the injury was inconclusive, he noted that it could have been the result of vaginal trauma. The same doctor examined JG after her death and found a similar but more severe irritation to JG's genitalia, this time concluding that the irritation was likely caused by vaginal trauma. Furthermore, after JG's death, rectal swabs revealed the presence of semen.

**C.   Concealed Abuse; Planning for JG's Death**

Bourgeois actively tried to conceal the evidence of his continuous abuse. For example, he covered JG's injured feet with socks, made her wear sunglasses to hide her battered face, and told people that she had been in a terrible car accident to explain her swollen head.

Around the time that the blood appeared in JG's diaper, Bourgeois reported to Texas CPS that JG had been abused while living with Katrina, that Katrina was living with a convicted sex offender, and that the house was unsuitable for a child. CPS investigated Bourgeois's complaint and concluded that it was not only untrue, but also was made "in bad faith." Similarly, Bourgeois told friends along his trucking route that JG's mother had neglected and abused JG and that she had been sexually molested with a finger.

5

Furthermore, Bourgeois fostered the misleading appearance that everything was fine by sending postcards to Katrina, stating that JG was well and having fun on the trucking route/family vacation, and that they had visited, _inter alia_, Disneyland and the Elvis Presley Museum. Bourgeois signed the postcards "JG." None of the information on the postcards, however, was true.

In stark contrast to these postcards' Rockwellian portrayals, Bourgeois told little JG that she made him want to kill her. When Robin asked him what he would do if he killed JG, Bourgeois replied unhesitatingly that he would throw her out of the truck, and they would concoct a story for the police. Specifically, he said that they would stop at a rest stop, where Robin would take the children into the bathroom and then come out and claim that someone had kidnapped JG. Bourgeois added that Robin would then call 911 to report the "kidnapping," and the police would blame the phantom kidnapper for JG's death. Similarly, AB1994 recalled that her father had said that if JG died, he would take her into the swamp and leave her there. On June 23, 2002 — four days before JG's death — Bourgeois called his sister and said, "You get your black dress out. I'm going through a lot. I don't know what I'm going to do."

**D.   The Murder**

On July 26, 2002, the Bourgeois family stopped by their home in LaPlace get their mail and check on their house. Bourgeois

found a court order directing him to remit $519.99 in child support to his ex-wife. During the brief visit, Bourgeois made JG wait for them in the hot cab of the truck.

Later that afternoon, the family continued on Bourgeois's trucking route, arriving the next morning at the Corpus Christi Naval Air Station to deliver a shipment. While Bourgeois was backing his truck up to the loading dock, JG was sitting on her training potty. When she wiggled and the potty tipped over, Bourgeois became angry and started yelling at JG and spanking her bare bottom. He then grabbed her by her shoulders and slammed the back of her head into the front and side window area around the dashboard four times. Meanwhile, warehouse personnel who were standing in the trailer felt shaking coming from within the cab of Bourgeois's truck.

Robin awakened shortly after this beating and immediately noticed that JG's body was limp, her eyes were closed, and her heart was racing. Robin attempted unsuccessfully to revive JG by administering CPR, then told Bourgeois that the child needed emergency medical attention. Bourgeois replied that he would take JG to the emergency room after he finished unloading his truck. Robin insisted that JG needed help immediately, handing JG to Bourgeois and telling him to get her help. Bourgeois responded that they would just say that JG slipped while following AB1994 out of the truck. Bourgeois then left the cab with JG. After Robin got dressed, she opened the passenger-side door to exit the cab and

7

there, on the ground, lay JG.   Robin again tried CPR while a
passer-by called 911.   After that, Bourgeois came running from
behind the truck, asking what happened.

When the ambulance arrived, Bourgeois and Robin told the
driver, then told both CPS workers and the FBI agent, that JG had
fallen out of the truck.   At the hospital, Dr. Noorullah Akhtar
examined JG and concluded that her brain had hemorrhaged and was
swollen. The doctor ventured that JG's injuries were equivalent to
those of a person who had fallen out a car traveling on the
Interstate.   All of this occurred on June 27, 2002.   The doctors
sustained JG on life support until her mother could get to the
hospital, where the baby died in her mother's arms the next day.

**E.   The Post-Mortem Investigation**

After JG's death, Dr. Elizabeth Rouse, the medical examiner,
conducted an autopsy which she described as one of the most
involved of her career.   This, she explained, was because of the
sheer number and extent of the injuries to JG's body.   Dr. Rouse
observed, <u>inter alia</u>, that JG had (1) a bruised shoulder, (2) human
bite marks on her back and arm, (3) scratch marks and injuries to
her ears, (4) loop marks on her body consistent with an electrical
cord, and (5) a circular hole a quarter of an inch deep on the
bottom of one foot.   When she opened JG's torso for examination,
Dr. Rouse observed deep tissue bruising in every area of JG's body.

All in all, JG exhibited 25 or 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 or 10 abrasions or excoriations, 7 to 9 healing ulcerations, and 3 lacerations. On the basis of JG's injuries, Dr. Rouse concluded that JG was a chronically abused or battered child. She determined that the ultimate cause of death was an impact to the head resulting in a devastating brain injury. The location of the fatal injury was consistent with Bourgeois's holding JG by the shoulders and slamming the right side and back of her head against the window and dashboard of the truck cab.

Just under one year after JG's death, the government filed a second, superseding indictment against Bourgeois. It charged him with unlawfully killing JG with premeditation and malice aforethought by physically assaulting her on June 27, 2002 and causing the injuries from which she died on June 28, 2002. The Grand Jury's indictment specially charged, inter alia, the following FDPA statutory intent factors: (1) Bourgeois intentionally killed JG, (2) Bourgeois intentionally inflicted serious bodily injury that resulted in JG's death, and (3) Bourgeois intentionally engaged in an act of violence, knowing that the act created a grave risk of death to JG and constituted reckless disregard for human life, and JG died as a result of the violent act. The indictment also charged the following FDPA statutory aggravating factors: (1) Bourgeois committed the offense in an especially heinous, cruel and depraved manner in that it

9

involved torture or serious physical abuse to JG, (2) Bourgeois committed the offense after substantial planning and premeditation, and (3) JG was especially vulnerable because of her youth or infirmity. In its notice of intent to seek the death penalty, the government listed all the FDPA intent and aggravating factors from the second, superseding indictment, plus two non-statutory aggravating factors: (1) On the basis of his record of violence, Bourgeois is likely to commit future acts of violence and pose a threat to the lives and safety of others, and (2) JG's murder caused her family severe emotional suffering and irreparable harm.

After a two-week trial, the jury found Bourgeois guilty of murder. The district court then conducted the sentencing hearing, at which Bourgeois presented nine mitigating factors for the jury's consideration. Six jurors found by a preponderance of the evidence that Bourgeois was under stress from family and economic factors, and all 12 jurors found by a preponderance of the evidence that Bourgeois was driving across the country with three children and one other adult in the cab of an 18-wheel tractor-trailer. No juror found that Bourgeois established any of the other mitigating factors by a preponderance of the evidence. The jury unanimously found the above-listed FDPA intent factors and aggravating factors beyond a reasonable doubt. The jury also unanimously found the non-statutory aggravating factors beyond a reasonable doubt. Finally, the jury unanimously found that the aggravating factors outweighed the mitigating factors, and unanimously recommended that

10

the district court sentence Bourgeois to death, which it did.

We have jurisdiction over Bourgeois's appeal of his judgment of conviction and sentence under 18 U.S.C. §§ 3595, 3742(a), and 28 U.S.C. § 1291.

## II. ANALYSIS

### A.    Standard of Review

Bourgeois raised none of the constitutional challenges in the district court that he now raises on appeal.    Accordingly, we review them for plain error.[1]   Thus, we shall determine (1) whether there is an error, (2) if so, whether the error is plain, (3) if it is, whether it affects the defendant's substantial rights, and (4) if so, whether it seriously affects the fairness and integrity of the district court proceedings.[2]

### B.    Sufficiency of the Indictment

To render a criminal defendant eligible for the death penalty under the FDPA, the government must prove, beyond a reasonable doubt, any one of the statutory intent factors provided in section 3591(a)(2) and any one of the statutory aggravating factors provided in section 3592(c).   Once the defendant is proved to be

---

[1]U.S. v. Miranda, 248 F.3d 434, 443 (2001).   Bourgeois argues that he is entitled to a more stringent standard of review of the constitutional sufficiency of the indictment, citing Sitrone v. U.S., 361 U.S. 212 (1960).   We expressly rejected the same argument in U.S. v. Robinson, 367 F.3d 278, 286 (5th Cir. 2004).

[2]Miranda, 248 F.3d at 443.

11

eligible for the death penalty, the government may present non-statutory aggravating factors, such as victim impact, to argue for the death penalty.[3]  The FDPA requires the government to file a notice of intent to seek the death penalty, informing the defendant of the factors on which the government intends to rely in seeking that penalty.[4]

The FDPA does not expressly require the government to charge any of the statutory factors in the indictment.  In Ring v. Arizona,[5] however, the Supreme Court held that when the finding of an aggravating factor renders a defendant eligible for the death penalty, it is "the functional equivalent of an element of a greater offense."[6]  Consequently, the government is required by the Sixth Amendment to prove the aggravating factor to the jury beyond a reasonable doubt.[7]  Although the Supreme Court has yet to hold that, under the Indictment Clause of the Fifth Amendment, the government must charge the aggravating factors in the indictment, we have interpreted Ring to apply with equal force at the indictment stage of the proceedings.[8]  Accordingly, we require the

_____

[3]18 U.S.C. § 3593(a).

[4]Id.

[5]536 U.S. 584 (2002).

[6]Ring, 536 U.S. at 609.

[7]See id.

[8]Robinson, 367 F.3d at 284.

12

government to charge the statutory factors of the FDPA in the indictment, and we consider the failure to do so to be constitutional error.[9]

Bourgeois contends that the government erred in this case because it failed to charge the statutory and the non-statutory aggravating factors in the indictment.  As for the statutory aggravators, he is simply wrong:  They are expressly charged in the second, superseding indictment.  As for the non-statutory aggravators, he is correct in stating that they were not contained in the indictment, but neither we nor any other circuit court of appeals has ever held that non-statutory aggravating factors must be set forth in the indictment.  As the Supreme Court's decision in Ring and our decision in Robinson highlight, the critical issue is whether a factor will expose a criminal defendant to the death penalty.  Only a factor that renders the defendant eligible for the death penalty must be charged in the indictment.

Significantly, non-statutory aggravating factors do not render a criminal defendant eligible for the death penalty.  As the Supreme Court explained in Jones v. U.S., the findings of the statutory factors of intent and aggravation specified in the FDPA comprise the eligibility phase of death sentencing.[10]  As such, only

---

[9]Id.

[10]527 U.S. 373, 377 (1999)(explaining that the jury's finding of the statutory intent and statutory aggravating factors under the FDPA comprises the eligibility phase of sentencing).

the FDPA's statutory factors expose a criminal defendant to the death penalty. Alone, non-statutory aggravating factors cannot make a defendant eligible for the death sentence. This is because the jury proceeds to consider non-statutory aggravating factors only _after_ the defendant is determined to be death-eligible.[11] Accordingly, it was neither constitutional nor statutory error for the non-statutory aggravating factors to be omitted from the indictment.[12]

## C.   Constitutionality of FDPA Section 3591(a)(2)(D) under the Eighth Amendment

Bourgeois asserts that FDPA section 3591(a)(2)(D) violates the Eighth Amendment by permitting the imposition of the death penalty on a murderer who acts with only a reckless state of mind. The Eighth Amendment prohibits "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged."[13]   Therefore, the punishment imposed must be

---

[11]_See id._ (explaining that once the defendant is death eligible, the jury may consider non-statutory factors in making the "selection decision," i.e., the decision whether to recommend a punishment of life imprisonment or death). _See also U.S. v. Jones_, 132 F.3d 232, 240 (5th Cir. 1998)(noting that the jury may consider non-statutory aggravating factors only after finding the existence of statutory aggravating factors).

[12]_See also U.S. v. Higgs_, 353 F.3d 281, 298 (4th Cir. 2003), _cert. denied_, 125 S.Ct. 627 (2004)(holding that the Fifth Amendment does not require the government to charge non-statutory aggravating factors in the indictment because "[t]he finding of a non-statutory aggravator alone will not support imposition of the death penalty").

[13]_Enmund v. Florida_, 458 U.S. 782, 788 (1982)(internal quotations omitted).

14

proportionate to a defendant's culpability.  Significantly, in
Tison v. Arizona, the Supreme Court held that "reckless disregard
for human life implicit in knowingly engaging in criminal
activities known to carry a grave risk of death presents a highly
culpable mental state... that may be taken into account in making
a capital sentencing judgment when that conduct causes its natural,
though also not inevitable, lethal result."[14]  In other words, the
Eighth Amendment is not a per se bar to imposition of the death
penalty when the murderer possessed only a reckless state of mind.[15]

When a criminal defendant's state of mind was reckless, the
Eighth Amendment inquiry hinges on the degree of his participation
in the acts that ultimately led to death.  As we explained in U.S.
v. Webster, the sentencer must examine "the defendant's 'own
personal involvement in the crimes.'"[16]  A reckless defendant who
is heavily involved in acts that led to the victim's death is
sufficiently culpable to be sentenced to death without violating
the Eighth Amendment.[17]  In contrast, under the Eighth Amendment,
a reckless defendant who is only tangentially involved in the acts

_____

[14]481 U.S. 137, 157-58 (1986).

[15]See U.S. v. Webster, 162 F.3d 308, 322 (5th Cir.
1998)(observing that the FDPA imposes the death penalty only on
defendants with sufficient culpability, including those who act
in "reckless disregard for human life").

[16]Id.

[17]See id. See also Tison, 481 U.S. at 153 (noting that "the
greater the defendant's participation in the felony murder, the
more likely he acted with reckless indifference to human life").

15

that led to the victim's death is not sufficiently culpable be sentenced to death.[18]

In this case, Bourgeois has demonstrated sufficient culpability to permit the imposition of the death penalty under the Eighth Amendment, even if his mens rea were only reckless disregard and not specific intent. Bourgeois was, after all, the sole participant in the acts that directly caused JG's death, making tangential participation a logical and legal impossibility. Bourgeois's "reckless" state of mind is thus sufficient to render him eligible for the death penalty without implicating the strictures of the Eighth Amendment. As the Supreme Court noted in Tison, "some nonintentional murderers may be among the most dangerous and inhumane of all — the person who tortures another not caring whether the victim lives or dies" is among them.[19]

**D.   The Place, Manner, and Means of Execution**

Bourgeois contends that the district court erred when it delegated to the Director of the Federal Bureau of Prisons the power to determine the place, manner, and means to be used in carrying out his execution, because Congress did not delegate any of its power to the judicial branch to make those determinations. Bourgeois is correct that no provision of the FDPA delegates any such power to the Third Branch.   This is of no consequence,

---

[18]Tison, 481 U.S. at 148.

[19]Id. at 157.

16

however.  In §§ 3596(a) and 3597(a) of the FDPA, Congress expressly delegated such power to the Executive Branch, specifically the Department of Justice in the person of the Attorney General. Section 3596(a) provides that when the death sentence is to be imposed under the FDPA, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  Section 3597(a) authorizes the United States marshal to employ the use of state and local officials and facilities to carry out the execution.  Accordingly, Bourgeois's argument that Congress did not delegate any power to the district court to determine the mode of carrying out a death sentence misses the mark:  All that the district court did was to acknowledge that Congress had validly delegated the requisite authority to the Department of Justice, of which the Federal Bureau of Prisons is an agency.

Furthermore, to the extent that Bourgeois challenges the district court's acknowledgment of the authority of the Director of the Federal Bureau of Prisons to determine the particulars of Bourgeois's execution, his argument is without merit.  Section 3596(a) specifies that Bourgeois's execution is to take place "in the manner prescribed by the law of the State in which the sentence is imposed."[20]  Texas effects the death penalty "by intravenous

---

[20]18 U.S.C. § 3596(a).

17

injection of a substance or substances in a lethal quantity sufficient to cause death until such convict is dead, such execution procedure to be determined and supervised by the Director of the institutional division of the Texas Department of Criminal Justice."[21] Here, the district court ordered that the execution be carried out by lethal injection and acknowledged the authority of the Attorney General, through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise Bourgeois's lethal injection.

Bourgeois fails to demonstrate that the district court's order is inconsistent with Texas law.  The only difference between the Texas law and the district court's acknowledgment is that the district court recognized Congress's delegation to the Department of Justice when the court turned over Bourgeois to the Director of the Federal Bureau of Prisons and not to the Director of the Institutional Division of the Texas Department of Criminal Justice. There is nothing before us, however, to suggest that the Director of the Federal Bureau of Prisons is not the equivalent of (1) the Attorney General, (2) the Department of Justice, or (3) the Director of the Institutional Division of the Texas Department of Criminal Justice.  Therefore, even if the district court's purported "delegation" of power to the Director of the Federal Bureau of Prisons were error (which it was not), such error would

---

[21]TEX. CRIM. PROC. CODE § 43.14 (Vernon 2005).

18

not have been plain.  Furthermore, there is nothing before us to indicate that the difference affects Bourgeois's substantial rights.

**E.    The Statutory and Non-Statutory Aggravating Factors**

Bourgeois asserts that all five of the aggravating factors used in his sentencing are vague and overbroad.  As the Eighth Amendment prohibits the arbitrary imposition of the death penalty,[22] an aggravating factor must meet two distinct thresholds to pass constitutional muster.[23]  First, the factor must not be so broad that it could apply to every murderer potentially eligible for the death penalty.[24]  This is because an overbroad aggravator could invite arbitrariness into the capital sentencing decision, in violation of the Eighth Amendment.[25]  Consequently, the factor "must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry."[26]

_____

[22]Jones, 527 U.S. at 381.

[23]Tuilaepa v. California, 512 U.S. 967, 972 (1994).

[24]Id.  See also Jones, 527 U.S. at 402 (noting that an aggravating factor is unconstitutionally overbroad if a jury could consider it to apply to every defendant who is eligible for the death penalty).

[25]See Tuilaepa, 512 U.S. at 973 (noting that the underlying principle in making the capital sentencing decision is that "[t]he State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision").

[26]Jones, 527 U.S. at 381.

Second, an aggravating factor must have "some 'common-sense core of meaning...that criminal juries should be capable of understanding.'"[27] Simply put, an aggravating factor cannot be unconstitutionally vague. "[V]agueness review is quite deferential ...and [the Supreme Court has] found only a few factors vague."[28] As we explain below, none of the aggravators targeted by Bourgeois in this appeal is either vague or overbroad. Thus, the aggravators are valid under the Eighth Amendment.

i.   Victim Impact and Victim Vulnerability

Bourgeois insists that the victim impact and victim vulnerability aggravators are unconstitutionally overbroad because they could apply to any murderer.[29] The Supreme Court has, however, held otherwise. Specifically, the Court has explained that "though the concepts of victim impact and victim vulnerability may well be relevant in every case, evidence of victim vulnerability and victim impact in a particular case is inherently individualized."[30] Accordingly, these aggravating factors are not overbroad.

---

[27]Tuilaepa, 512 U.S. at 973 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976)).

[28]Id. at 973-74.

[29]The victim impact aggravator states that JG's murder caused her family "extreme emotional suffering, and [her] family has suffered severe and irreparable harm." The victim vulnerability aggravator states that JG "was particularly vulnerable due to her youth." The vulnerability aggravator is based on the FDPA section 3592(c)(11).

[30]Jones, 527 U.S. at 401 (emphasis in original).

20

Bourgeois also asserts that the victim impact and victim vulnerability aggravators are unconstitutionally vague.  Again, Bourgeois's argument fails.  The jury could have had no difficulty understanding that it was directed by the victim impact aggravator to consider the particular effect of JG's murder on her family.[31] Neither could the jury have had difficulty understanding that the victim vulnerability aggravator directed it to consider whether JG was especially vulnerable to Bourgeois's attack because she was only two years old and under his care, custody, and control by virtue of court order.[32]  The victim impact and victim vulnerability aggravators are not unconstitutionally overbroad or vague.

ii.  Heinous, Cruel, or Depraved Manner of Committing Offense

Bourgeois likewise contends that the aggravating factor that he "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture and serious physical abuse to JG" is overbroad and vague.  This factor is based on the language of § 3592(c)(6) of the FDPA, which we have consistently

_____

[31]See id. (holding that a victim impact aggravator was not unconstitutionally vague because it directed the jury to consider, inter alia, "the effect of the crime on [the victim's] family").

[32]See id. at 400 (holding that a victim vulnerability aggravator that provided that the adult victim was especially vulnerable to attack because of, inter alia, her slight stature and her youth was not unconstitutionally vague because "the jury should have had no difficulty understanding that [the factor] was designed to ask it to consider whether the victim was especially vulnerable to petitioner's attack").

upheld against such attacks.[33]  We have so held because the factor indisputably narrows the class of murderers who are eligible for the death penalty and is sufficiently specific to pass constitutional muster.

### iii.  Substantial Planning and Premeditation

Bourgeois also asserts that the substantial planning and premeditation aggravators are unconstitutionally overbroad and vague.  These factors are based on FDPA section 3592(c)(9), and they obviously narrow the class of murderers who could be eligible for the death penalty because not every murder involves substantial planning or premeditation.  Furthermore, we have explicitly held that these aggravators are not unconstitutionally vague.[34]

### iv.  Future Threat

Finally, Bourgeois urges that the future-threat aggravator — that, based on his personal history of violence, he "is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others" — is unconstitutionally overbroad and vague.  It is neither.  It is axiomatic that not every murderer will pose a serious continuing threat to society.  Furthermore, like the victim-vulnerability and

---

[33]U.S. v. Hall, 152 F.3d 381, 414 (5th Cir. 1998)(upholding the factor against a challenge that it was both unconstitutionally overbroad and vague), abrogated on other grounds by U.S. v. Martinez-Salazar, 528 U.S. 304, 316 (2000)(peremptory challenges); Jones, 132 F.3d 232 (upholding the factor against a challenge that it was unconstitutionally vague).

[34]Webster, 162 F.3d at 354 n.70.

victim-impact aggravators, the future-threat aggravator used here channeled the jury's attention to the specific facts of the case, i.e., Bourgeois's individual history of systematic violence.[35] This factor is inherently individualized and thus is not unconstitutionally overbroad.[36]

Neither is the future-threat aggravator unconstitutionally vague. A jury would easily understand that it is directed by this aggravator to consider whether Bourgeois will pose a danger to society in the future. In <u>Jurek v. Texas</u>, the Supreme Court reviewed, <u>inter alia</u>, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[37] In his concurring opinion, Justice White concluded that the factor has "a common-sense core of meaning and that criminal juries should be capable of understanding [it]."[38] The future-threat aggravator here is substantially similar to the one construed in <u>Jurek</u>, and our

_____

[35] <u>Cf. Jones</u>, 527 U.S.at 401 (holding that the victim impact and victim vulnerability aggravators were not overbroad and explaining that "though the <u>concepts</u> of victim impact and victim vulnerability may well be relevant in every case, <u>evidence</u> of victim vulnerability and victim impact in a particular case is inherently individualized").

[36] <u>See Nguyen v. Reynolds</u>, 131 F.3d 1340, 1354 (10th Cir. 1998)(holding with little discussion that the Oklahoma future dangerousness aggravator was not applicable to every murderer and therefore was not unconstitutionally overbroad).

[37] 428 U.S. 262, 277 (1976)(White, J., concurring).

[38] <u>Jurek</u>, 428 U.S. at 279.

conclusion is no different than Justice White's conclusion in
<u>Jurek</u>:  The factor is constitutionally sound.

### III. CONCLUSION

This is not a close case.  Bourgeois fails to prove that there
was any error, much less plain error, in any aspect of his trial.
Bourgeois's conviction and sentence are, in all respects,
AFFIRMED.

24

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

TEL. 504-310-7700
600 CAMP STREET
NEW ORLEANS, LA 70130

September 29, 2005

United States Courts
Southern District of Texas
FILED

OCT - 5 2005

Michael N. Milby, Clerk of Court

Mr Michael N Milby, Clerk
Southern District of Texas, Corpus Christi
United States District Court
1133 N Shoreline Boulevard
Corpus Christi, TX 78401

> No. 04-40410 USA v. Bourgeois
> USDC No.  2:02-CR-216-1

Enclosed, for the district court only, is a certified copy of the judgment issued as the mandate.

Enclosed, for the district court only, is a copy of the court's opinion.

Record/original papers/exhibits to be returned.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: Dawn D. Victoriano, Deputy Clerk
504-310-7717

cc: (letter only)
    Honorable Janis Graham Jack
    Mr John S Gilmore Jr
    Mr Tony Ray Roberts

MDT-1