# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| _____ | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | |
| Petitioner. | : | |
| _____ | : | |

## PETITIONER'S MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
       May 14, 2007

**PRELIMINARY STATEMENT**

Petitioner was charged with the 2002 beating death of his daughter, JG-1999. On March 16, 2004 he was convicted by a jury of one count of first-degree premeditated murder (18 U.S.C.A. § 1111(a)). Following a sentencing hearing, the jury returned a verdict of death. Petitioner was formally sentenced to death by this Court on March 24, 2004.

In this *Motion*, Mr. Bourgeois moves to set aside his conviction and death sentence as each was obtained in violation of the United States Constitution and federal law in multiple respects.

References to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The opinion of the United States Courts of Appeals rendered on direct appeal is reported at United States v. Bourgeois, 423 F.3d 501 (August 25, 2005). It will be cited as Bourgeois.

Mr. Bourgeois is filing an *Appendix* with this *Motion* containing documents relevant to the claims contained herein. The Appendix will be referred to as *Petitioner's Appendix*, and will be cited as *PA* followed by a number assigned to each document.

Alfred Bourgeois will be referred to by name, or as Petitioner. The United States will be referred to as the Government.

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

**STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT**

In accordance with Rule 2 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, the *Motion* sets forth only the facts and claims entitling Mr. Bourgeois to relief. It does not

contain legal argument or citation.  Petitioner will shortly file a separate motion seeking permission

and a schedule by which to file a *Memorandum in Support* of the *Motion*.

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim I.        Petitioner is a Person with Mental Retardation.  Accordingly, his
                Execution is Prohibited by the Eighth Amendment.  Trial Counsel
                Ineffectively Failed to Present this Claim to the Court . . . . . . . . . . . . . . . . . . . . . 3

        A.      Mental Health Evaluations Demonstrating Petitioner's
                Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Mr. Bourgeois' Adaptive Functioning Is Significantly Impaired and His
                Mental Retardation Was Manifest Prior to Age 18 . . . . . . . . . . . . . . . . . . . . . . 7

                i.      Defining "Adaptive Functioning" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                ii.     Lay Evidence Demonstrating Mental Retardation . . . . . . . . . . . . . . . . . . 9
                iii.    Documentary Evidence Corroborates Petitioner's
                        Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Counsels' Ineffective Failure to Present Petitioner's Mental
                Retardation to the Court and Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.      Even if Counsel is Found to not Have Been Ineffective, the Eighth
                Amendment Prohibition Against Executing Petitioner Cannot be
                Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Claim II.      Counsel Provided Ineffective Assistance During the Penalty Phase . . . . . . . . . . 18

   A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   B.      The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          i.      Government Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          ii.     The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   C.      The Unpresented Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          i.      Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          ii.     Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   D.      Counsels' Deficient Performance and Ensuing Prejudice . . . . . . . . . . . . . . . . . 53

Claim III.     No Reasonable View of the Evidence Existed upon Which a
               Reasonable Fact Finder Could Conclude That the Fatal Injuries Were
               Inflicted Within the Special Maritime and Territorial Jurisdiction of
               the United States in Violation of Due Process. Furthermore, Counsel
               Were Ineffective for Failing to Present Readily Available Evidence
               to Rebut this Element of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Claim IV.      Trial Counsel Were Ineffective for Failing to Present Available
               Expert Testimony That Would Have Undermined the Government's
               Assertion That Petitioner's Semen Was Found in JG-1999's Anus, in
               Violation of Mr. Bourgeois' Rights under the Sixth and Eighth
               Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 62

   A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

   B.      The Testimony and Arguments Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . 63

   C.      Trial Counsel's Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

   D.      Petitioner Was Prejudiced by Counsel's Ineffectiveness . . . . . . . . . . . . . . . . . . 74

Claim V.       Trial Counsel Rendered Ineffective Assistance by Failing to Litigate
               a Daubert Motion Challenging the Scientific and Technical
               Reliability of the Opinions of Dr. Senn and Dr. Chrz Concerning the
               Bite Mark Evidence and for Failing to Rebut this Evidence Once it
               Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

A.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . . 78

B.    The Opinions of Dr. Senn and Dr. Chrz Were Utterly Unreliable . . . . . . . . . . . 83

C.    Trial Counsel Inexplicably Failed to Rebut the Bite Mark Testimony
      Despite Being Aware of an Expert Report That Directly Contradicted
      Dr. Senn and Dr. Chrz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85

D.    Petitioner Was Prejudiced by Counsels' Failures . . . . . . . . . . . . . . . . . . . . . . .  88

Claim VI.    Trial Counsel Rendered Ineffective Assistance of Counsel by Failing
             to Litigate a Daubert Motion Challenging the Scientific and Technical
             Reliability of the Opinions of Dr. Oliver Concerning the Digitally
             Enhanced Autopsy Photographs and for Failing to Object to Their
             Admissibility and for Failing to Rebut this Evidence Once it Was
             Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . . 92

B.    Trial Counsel Inexplicably Failed to Object to the Admissibility of
      this Evidence under Federal Rules of Evidence 901, 1001 and 1002
      and Failed to Rebut this Testimony Once it Was Admitted at Trial . . . . . . . . . 96

C.    Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim VII.    The Government Violated its Obligations under Brady v. Maryland
              by Failing to Disclose to Petitioner Information Material to His
              Ability to Prepare and Present a Defense at Trial and Sentencing
              Denying Petitioner His Rights under the  Fifth, Sixth and Eighth
              Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 98

A.    Adam Longoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

B.    Orlando Campos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

C.    Wiley Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

D.    Darick Moore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

E.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Claim VIII.    Petitioner Is Entitled to Relief from His Conviction and Sentence Because Trial Counsel Labored under a Conflict of Interest That Adversely Affected Their Representation of Petitioner at Trial and Sentencing, in Violation of Petitioner's Sixth Amendment Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Claim IX.    Prosecutorial Misconduct in Closing Argument at Both the Guilt/Innocence and Penalty Phases Denied Petitioner His Constitutional Right to Due Process and His Rights under the Sixth and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . 112

        A.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

        B.    The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

        C.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

        D.    The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

        E.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

        F.    The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

        G.    The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

        H.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos . . . . . . . . . 118

        I.    The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

        J.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Claim X.      Trial Counsel Was Ineffective for Failing to Rebut the Evidence of Petitioner's Indifferent Demeanor at the Guilt Stage of Trial with Mental Health Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Claim XI.      Petitioner Was Denied His Sixth Amendment Right to a Trial and to Counsel When the Government's Mental Health Expert Relied Upon his Interactions with Defense Counsel During the Trial to Formulate Adverse Opinions About Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Claim XII.      Appellate Counsel Were Ineffective in Various Respects . . . . . . . . . . . . . . . . . 123

     A.      This Court Improperly Admitted Inflammatory and Prejudicial Photographs During Both the Guilt/Innocence and the Penalty Stages of Trial. Direct Appeal Counsel Ineffectively Failed to Raise this Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

     B.      Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-social Histories of Others Who Have Been Sentenced to Death. Counsel Was Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

     C.      Counsel Ineffective Failed to Raise All Record Based Errors, Even if they Were not the Subject of a Proper Objection or Where Otherwise Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Claim XIII.      Petitioner is Entitled to Relief Based Upon the Cummulative Impact of the Constitutional Violations Described Herein . . . . . . . . . . . . . . . . . . . . . . 127

Claim XIV.      Petitioner is Entitled to an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . 127

Claim XV.      The Manner in Which the Government Would Carry Out Petitioner's Execution Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . 128

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

## JURISDICTION

1.      This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241.

## PROCEDURAL HISTORY

2.      Petitioner was charged in the United States District Court, Southern District of Texas, Corpus Christi, with the June 27-28, 2002 beating death of his infant daughter, JG-1999.

3.      Following a jury trial before the Honorable Janis Graham Jack (U.S.D.J.) on March 16, 2004 he was convicted of one count of first-degree premeditated murder (18 U.S.C.A. § 1111(a)).  Following a sentencing hearing, the jury returned a verdict of death on March 24, 2004 and he was  formally sentenced to death by this Court on the same date.[1]

4.      Petitioner filed a direct appeal to the United States Court of Appeals for the Fifth Circuit.  On August 25, 2005 the Court affirmed Petitioner's conviction and sentence in all respects. Bourgeois.

5.      A timely *Petition for a Writ of Certiorari* was filed in the United States Supreme Court on January 9, 2006.  Alfred Bourgeois v. United States, 05-8651.

6.      The *Petition* was denied on May 15, 2006.  Bourgeois v. United States, 126 S.Ct. 2020 (2006).

7.      Petitioner was initially represented by the Federal Public Defender for the Southern District of Texas.  The Public Defender was removed owing to a conflict of interest.  Subsequently, and throughout the trial, Petitioner was represented by appointed counsel, John  S. Gilmore, Jr., Esq.

---

[1]Due to a procedural irregularity that is immaterial to any claim made herein, Petitioner's sentence was vacated and reimposed on March 25, 2004.

1

and Joel Douglas Tinker, Esq.  The Government was represented throughout the trial proceedings by Patti Hubert Booth, Esq., Elsa Salinas-Patterson, Esq. and Tony Roberts, Esq.

8.     Petitioner was represented on direct appeal by Mr. Gilmore and Mr. Tinker.  The Government was represented by Mr. Roberts and James Lee Turner, Esq.

9.     Petitioner was represented on certiorari proceedings by Adrienne Urrutia Wisenberg, Esq. and Keith Hampton, Esq. and the Government was represented by the Office of the Solicitor General, Robert J. Erickson, Esq., Deputy Solicitor General.

10.    Petitioner was initially represented in these proceedings by Mr. Hampton and Michael Gross, Esq.

11.    On October 16, 2006, this Court granted Mr. Bourgeois' Motion and appointed undersigned counsel Abreu and Wiseman, and relieved Mr. Gross and Mr. Hampton (document # 380).[2]

12.    Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #98911-079).

## GROUNDS FOR RELIEF

13.    Petitioner herein alleges that his conviction and death sentence were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.  These violations relate to ineffective assistance of counsel,  due process of law, and Petitioner's right to be free of cruel and unusual punishment.  Additionally, his judgment of conviction and sentence must be vacated in view of the newly discovered evidence discussed herein.

---

[2]Wiseman and Abreu have been assisted in preparing this *Petition* by their colleagues in the Capital Habeas Unit, James McHugh, Esq. and Elizabeth Larin, Esq.

14.    Petitioner moves for relief pursuant to 28 U.S.C. § 2255.  However, should it be determined that any of Petitioner's claims are not cognizable under section 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241,which is an instrument for relief as to any claim for which section 2255 is not an effective or adequate mechanism to test the legality of his detention and sentence.

### CLAIMS FOR RELIEF

**CLAIM I.    PETITIONER IS A PERSON WITH MENTAL RETARDATION.  ACCORDINGLY, HIS EXECUTION IS PROHIBITED BY THE EIGHTH AMENDMENT.  TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT THIS CLAIM TO THE COURT.**

15.    Alfred Bourgeois is a person with mental retardation.  Accordingly, his execution is prohibited by the Eighth Amendment to the United States Constitution and by the FDPA.  His deficits in intellectual functioning are apparent and have been apparent his entire life.  Prior counsel were ineffective for failing to bring Petitioner's deficiency to the attention of the Court and jury.

16.    Mental retardation is characterized by: a) significantly subaverage intellectual functioning; b) significantly subaverage adaptive functioning; and c) onset of these limitations before age 18.  Mr. Bourgeois meets all three of these criteria.  As demonstrated below, the evidence establishes Mr. Bourgeois' mental retardation under any constitutionally acceptable burden and under any professionally acceptable definition.

17.    Mr. Bourgeois' mental retardation disqualifies him from his sentence of death.  In support of this claim, Petitioner alleges the following facts, in addition to those that will be presented at an evidentiary hearing.

**A.      Mental Health Evaluations Demonstrating Petitioner's Mental Retardation.**

6.      Petitioner's IQ has been tested on two occasions.  In both cases, Petitioner's intellectual capacity tests in the mental retardation range.

7.      All accepted definitions of mental retardation require "significantly subaverage intellectual functioning."  American Association on Mental Retardation (AAMR)*, Mental Retardation: Definition, Classification, and Systems of Supports,* at 51 (10th ed. 2002) (hereafter *AAMR's Mental Retardation*).[3]  This criteria is measured by the administration of appropriate intelligence tests by qualified professionals.  In order to meet the requirements for a diagnosis of mental retardation, an individual's intellectual functioning as recorded through an appropriate instrument must be "approximately two standard deviations below the mean, considering the SEM [standard error of measurement] for the specific assessment instruments used and the instruments' strengths and limitations." The AAMR and the United States Supreme Court conclude that this measure is approximately 70 to 75 or below.  *AAMR's Mental Retardation*, at 58-59; accord Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002) ("IQ between 70 and 75 or lower, ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition") (citing B. Sadock & V. Sadock, Comprehensive Textbook of Psychiatry 2952 (7th ed. 2000)); American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 41-42 (4th ed. text rev. 2000) (hereafter "DSM-IV-TR").

8.      One week prior to trial, on February 28, 2004, Petitioner was evaluated by Dr. Donald

---

[3] The *AAMR's Mental Retardation* defines "mental retardation" as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18." See *AAMR's Mental Retardation* at 1.

E. Weiner, a neuropsychologist who practices in Corpus Christi. Petitioner obtained a full-scale IQ of 76 with a Verbal score of 76 and Performance score of 76 on this administration of the WAIS-R.[4] See Dr. Weiner's Report of March 3, 2004, attached to his current Declaration, and WAIS score sheet, *PA* documents # 16 & 15, respectively.

9.    Similarly, in preparation for the instant Petition, Dr. Michael Gelbort recently conducted extensive psychological and neuropsychological testing that yielded even further evidence demonstrating Petitioner's mental retardation, including an IQ of 70 (Verbal 67 and Performance 78) on the WAIS-III, which is the current version of the test given by Dr. Weiner.

10.    Although Mr. Bourgeois' results on Dr. Weiner's test administration put him in the range of Mental Retardation, this score overestimates his actual IQ. Dr. Weiner used the WAIS-R in assessing Mr. Bourgeois' intelligence, despite the availability of the re-normed and updated WAIS-III.[5] The WAIS-R was normed in 1978.[6] Because the WAIS-R was normed 26 years prior to its administration to Mr. Bourgeois, Dr. Weiner's evaluation must be adjusted to take into account

---

[4]Dr. Weiner's March 3, 2004 report states that Mr. Bourgeois' IQ tested at a 76. However, a review of his raw data reveals that he actually recorded the IQ as a 75, but apparently made an error in transferring the score to his report. Whether Mr. Bourgeois' IQ actually should be reflected as a 75 or a 76 is actually not important in this case, as Dr. Weiner's scores must only be considered after making a   downward adjustment to compensate for the phenomenon of "IQ gains over time" (discussed below). Either result properly reflects Mr. Bourgeois' significantly subaverage intellectual functioning.

[5]The fact that the WAIS-R had been replaced by the WAIS-III at the time of its administration in this case, does not make it invalid. Rather, the testing was valid but the scoring should have been modified in accordance with the Flynn Effect, described below.

[6]Norming is a statistical term to describe how the creators of a given test are able to assign percentile ranks to given scores.

5

the fact that the population as a whole experiences gains in IQ testing over time.[7]

11.    When Dr. Weiner's scores are adjusted to correct for the IQ gains over time, Mr. Bourgeois' IQ is more accurately reflected by the score of 68.[8]  This result is both congruent with and corroborative of the results of Dr. Gelbort's testing.

12.    Other aspects of Mr. Bourgeois' neuropsychological testing further support a diagnosis of mental retardation.  Both Dr. Gelbort and Dr. Weiner note that Mr. Bourgeois' ability to process new information and comprehend new topics is significantly impaired. Testing of his memory shows mild to moderate impairment. Results on the Halstead-Reitan test battery reveal overall brain impairment.  These results are consistent with mental retardation in that they confirm Mr. Bourgeois' impaired ability to comprehend and process information.  See Declaration of Dr. Gelbort, *PA*, document # 8, and Declaration of Dr. Weiner, *PA*, document # 16.

13.    Jethro Toomer, Ph.D., has had the opportunity to review the available reports by family members, friends and neighbors regarding Mr. Bourgeois' adaptive functioning and behavior. He has also reviewed the results of the neuropsychological testing.  As a result, Dr. Toomer believes

---

[7]The phenomenon of gains in IQ scores over time was first discovered and reported by Dr. James R. Flynn.  For this reason, this phenomenon is also known as the "Flynn Effect." Put simply, the intellectual functioning of the entire nation drifts upward over time.  As a result, IQ test scores rise over time.  In order to accurately reflect the test scores in comparison to the entire population, and to maintain a score of 100 as the mean score, all IQ scores must be adjusted 0.3 points downward for every year that has passed since the test was first "normed."  See "Tethering the Elephant," J. of Psychology, Public Policy and Law, 2006, Vol. 12, No. 2, 170-189; see also Declarations of Jethro Toomer, Ph.D., *PA*, document # 14; Michael M. Gelbort, Ph.D., *PA*, document # 8; and Mark D. Cunningham, Ph.D., *PA*, document # 6.

[8]According to Dr. Gelbort, "The 76 score must be reduced by application of the Flynn effect formula (whereby 0.3 is deducted for each year between the time that the test was normed and the date of administration).  In this instance, the WAIS-R was normed in 1978 and it was administered in 2004.  Therefore, a deduction of 7.8 is required (26 years x .3 per year = 7.8).  Therefore, the 76 is really a 68."  See Gelbort's declaration at ¶ 5.

Mr. Bourgeois is mentally retarded:

> A diagnosis of mental retardation can be made when an individual has substandard IQ testing (which Mr. Bourgeois has) that is accompanied by significant limitations in adaptive functioning. Mr. Bourgeois meets the adaptive deficit criteria. Background information that has been provided to me indicates that Mr Bourgeois has deficient functioning in all three realms of adaptive behavior: conceptual, social, and practical.

See Declaration of Dr. Toomer, ¶10, *PA*, document # 14.

14.     Mental health experts, then, agree that Alfred Bourgeois tests in the Mental Retardation range of intellectual functioning. Dr. Toomer has reviewed the available evidence and concludes that Mr. Bourgeois is in fact mentally retarded, due to both his subaverage intellectual functioning and his poor adaptive functioning.

**B.     Mr. Bourgeois' Adaptive Functioning Is Significantly Impaired and His Mental Retardation Was Manifest Prior to Age 18.**

15.     Evidence of Mr. Bourgeois' retardation has existed since his early childhood. Interviews of people who have known Mr. Bourgeois since childhood reveal that, throughout his youth and into adulthood, Mr. Bourgeois exhibited intellectual and adaptive impairments that affected all facets of his life. He was intellectually impaired and exhibited significant deficits in all three realms of adaptive functioning: conceptual, social and practical. Mr. Bourgeois' mental retardation has been palpable from his childhood years and has remained consistently evident throughout his life.

**i.     Defining "Adaptive Functioning"**

16.     The critical components of mental retardation in all recognized definitions involve intellectual deficits combined with adaptive impairments which manifest during the development period. "Adaptive behavior is the collection of conceptual, social, and practical skills that have been

7

learned by people in order to function in their everyday lives." *AAMR's Mental Retardation*, at 73.

The definition contained in the DSM-IV-TR, elaborates:

> Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

DSM-IV-TR at 42.

17.    "People with mental retardation achieve cognitive milestones at a later age than their normally developing peers, and they are unlikely to ever reach the intellectual level of typical adults." Elaine E. Castles, We're People First: The Social and Emotional Lives of Individuals with Mental Retardation, p. 26 (1996). These cognitive delays also directly affect social, emotional, and life-skills development. Id. p. 27-28. "[A]lthough people with mental retardation must cope with many of the same issues faced by their chronological age-mates, they often have limited cognitive and social resources for confronting these normal development tasks." Id., p. 35-36.

18.    Skills included in the conceptual realm are: language; reading and writing; money concepts; and self-direction. Individuals with significant problems in communication, academics, or handling money, in other words, have deficiencies in their conceptual abilities. *AAMR's Mental Retardation*, at 82. The social realm encompasses skills and characteristics like: interpersonal; responsibility; self-esteem; gullibility; naiveté; following rules; obeying laws; and avoiding victimization. For example, individuals for whom self-awareness, social relationships, and comprehending and following rules are a serious struggle have deficits in the social facet of adaptive functioning. Id. The practical realm refers to skills such as: activities of daily living; instrumental activities of daily living; occupational skills; and maintaining safe environments. Individuals with

difficulty in self-care, job skills, and making safe decisions have deficiencies in the practical aspects of adaptive functioning.  Id.

19.     Assessment of adaptive deficits typically comes from interviews with third party reporters familiar with the individual being assessed, rather than from the individual's own self-reports.  *AAMR's Mental Retardation* at 85.  The AAMR cautions against relying solely on reports of the individual being assessed in order to determine adaptive behavior limitations, as mentally retarded individuals are poor sources of information.  A User's Guide for AAMR's 2002 Definition, Classification, and Systems of Supports: Applications for Clinicians, Educators, Disability Program Mangers, and Policy Makers (2006), at 30 (hereinafter *AAMR User's Guide*).

### ii.     Lay Evidence Demonstrating Mental Retardation.

20.     Witnesses who have known Petitioner throughout his life describe intellectual and adaptive impairments demonstrating mental retardation.

21.     Even as a small child, Alfred exhibited symptomotology consistent with mental retardation.  Family members recall that Alfred was slow to learn and comprehend concepts as a child. He had trouble understanding and following directions.  See Petitioner's Declaration of Michelle Warren, *PA*, document # 39, ¶ 5 ("Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do."); Id. ¶ 6 ("Alfred would have trouble listening to directions, so he would mess up more than the rest of us [his siblings] and get beatings more often."); Declaration of Lloyd Ferdinand, *PA*, document # 25, ¶ 8 ("Alfred was always slow.")

22.     Alfred's neighbor Beverly Frank describes Alfred as a child who could not "catch on to things" and "who had to have the rules explained to him over and over again.":

Growing up, Alfred wasn't a bright child.  His grasp of learning was weaker than the

rest of the children.  People would notice this in conversations with him, in little things he would say.  Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

My grandmother used to sell things out of her house, including candy and frozen treats.  Alfred tried to help her make change.  He had a lot of trouble counting the change.  My grandmother ended up doing that herself.  My grandmother had a lot of patience with Alfred.  She tried to teach him to cook simple things, like frying an egg or frying toast.  He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up.  She was really patient with him.

Declaration of Beverly Frank, *PA*, document #26,  ¶¶ 7-8

23.    His sister Claudia Williams recalls that Alfred "couldn't learn," no matter that his slowness would get him a beating:

[Alfred] didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble.  He would get beat for the same thing over and over like he just couldn't learn.  Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Declaration of Claudia Williams, *PA*, document # 40, ¶ 5

24.    These observations of Alfred's early childhood by neighbors and family members indicate significant adaptive deficits in the practical and conceptual realms – he could not comprehend instructions and new ideas, had difficulty learning simple cooking tasks, and had trouble handling and understanding money.

25.    Childhood playmates recall Alfred Bourgeois' difficulties in the social and practical realms.  His family and neighbors remember Alfred as a slow and awkward child who had difficulty playing with the other children and "fitting in."  See Declaration of Lloyd Ferdinand, *PA*, document # 25, ¶ 8 ("Alfred was always slow.  He had slow reactions."); Declaration of Louis Russell, Jr., *PA*, document # 37, ¶ 3 ("Growing up Alfred had a hard time.  He was a big and awkward kid.  We

10

would all laugh at how he played sports.  He had big feet that he was always falling over.  Alfred always tried to fit in with other kids.  Alfred has always had an awkward nature."); Declaration of Nathaniel Banks, *PA*, document # 18, ¶ 3 ("Alfred was a fragile child.  He spent a lot of time by himself.  People used to pick on Alfred a lot... I just remember Alfred crying at anything.  Someone would tease him and he would break down crying. ... Alfred wasn't any good at sports.  He didn't play sports with us.").

26.     Witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments consistent with mental retardation.  See Castles, We're People First, supra at 87 ("[c]ognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations").  In addition, Mr. Bourgeois' early childhood experience of enduring constant teasing about his impairments laid the foundation for his future life of lying and masking to hide his deficiencies.

27.     Thus, consistent with the expert evidence proffered by Petitioner, the lay witness testimony provides significant and compelling evidence of the requisite intellectual and adaptive impairments characteristic of mental retardation and clearly demonstrates that those impairments existed long before Petitioner reached 18 years of age.

28.     Alfred Bourgeois' intellectual and adaptive deficits persisted through adulthood. Mr. Bourgeois' ability to competently function in the world was significantly hampered by his difficulties in all three realms of adaptive functioning as identified by the AAMR.  Multiple witnesses report Mr. Bourgeois' inability to understand and handle money.  In addition, his ability to interact appropriately with others, respond to social cues, and process new information was significantly impaired.  Mr Bourgeois also demonstrates difficulties in understanding and following rules and

laws, including safety rules attached to his job as a truck driver.

29.     Witnesses report that Alfred has significant problems comprehending and problem solving.  See Declaration of Michelle Armont, *PA*, document # 17, ¶ 8 ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends.  His mind just did not work that way.  He could not reason through a problem."); Id. ("Things that would be obvious to a normal person were not obvious to Alfred."); Declaration of Michelle Warren, *PA*, document # 39, ¶ 16("It was like [Alfred] had a block and could not reason things out or change his behavior."); Declaration of Lawanda Cook, *PA*, document # 22, ¶ 4 ("I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him."); Declaration of Ivy Thomas, *PA*, document # 38, ¶ 4 (Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

30.     Mr. Bourgeois' decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions.  In the words of his half-sister, Michelle Armont, "Alfred could not consider the consequences of his actions."  Declaration of Michelle Armont, ¶ 8.  See also Declaration of Lloyd Ferdinand, ¶ 2 ("Alfred has always had a hard time with life. He has tried to do many things, but everything he tried seemed to fail.")

31.     Several reporters recall Alfred's terribly impaired financial abilities. See Declaration of Michelle Armont ¶ 8 ("[Alfred] did not understand that he could not afford the things he bought... He just bought things without understanding how hard it would be to make the payments."); Declaration of Lloyd Ferdinand, ¶ 8 ("[Alfred] would buy cars he could not afford.  He would buy

12

cars for other people that he could not afford to pay for. I helped him with car notes sometimes. I would try and help him but sometimes he got himself in so deep that it was impossible to get him out of the mess he had made."); Id. ("One time [Alfred] signed an agreement with a trucking company that resulted in him working for them and making money for them but not getting paid himself for months. When I looked at the agreement I could tell right off that it was a bad deal for him and I don't even read that well.").

32.    Mr. Bourgeois' deficiencies in social functioning are patent. His inability to control his impulses, problem-solve, and predict the consequences of his actions is demonstrated by his constant philandering and impulsive extra-marital forays with women. Alfred was notorious for his inability to control both his passion and his rage around women. He was unable to maintain a healthy intimate relationship. Declaration of Lloyd Ferdinand, ¶ 2 ("He was never able to maintain healthy relationships with women. His marriages always failed."); See also Declaration of Kathleen Kaib, *PA*, document # 12, ¶ 4 ("Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.").

33.    Mr. Bourgeois' limitations in practical functioning likewise followed him into adulthood. Family members and neighbors recall that as a teenager, Alfred drove a four-wheeler "straight into a pole." Declaration of Louis Russell, Jr., ¶ 4. See also Declaration of Claudia Williams, ¶ 6. Alfred's oblivious attitude towards safety was obvious even to more recent acquaintances. For example, Lawanda Cook remembers Alfred taking "crazy chances in the truck he drove...one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all." Declaration of

13

Lawanda Cook, ¶ 3.

34.    Like many individuals with mental retardation, Mr. Bourgeois tried hard to "mask" his deficits.  These efforts were obvious to observers.  As his brother Lloyd explains, "He tried hard to make it look like he was a success."  Declaration of Lloyd Ferdinand, ¶ 8. Mr. Bourgeois was would lie to cover up his limitations; he didn't want to be revealed as slow or stupid. See Declaration of Michelle Armont ¶8 ("Alfred wanted to be accepted.  Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him.").  Aunt Elnora Bourgeois McGuffy recalls:

> Alfred was not as smart as [his brother] Lloyd, but he wanted everyone to think that he was.  Alfred would brag on himself, even when it wasn't true.  You never know how much Alfred knew about anything because he was always exaggerating so much.  He had a problem with that.  Alfred would try to make himself seem like he was doing better that [sic] he was more successful than he was and smarter than he was.

Declaration of Elnora Bourgeois McGuffy, *PA*, document #33, ¶ 7.  Nathaniel Banks confirms:

> Alfred wanted to impress people.  Alfred lied a lot.  I remember that Alfred would say things that you just knew weren't true.  I used to work for the sheriff's office.  Alfred told people he worked there.  He was never a proper deputy.  Alfred tried to build himself up – present himself as more than he was.  I think Alfred lied so much he started to believe it.

Declaration of Nathaniel Banks, ¶ 4.

35.    These efforts to "mask" his deficits are a trademark characteristic of mental retardation.  Individuals with mental retardation are known to try to hide their deficiencies rather than ask for help.  This is in part a symptom of impaired problem solving skills.  However, it also results from a history of teasing and maltreatment caused by their impairments.  Mentally retarded individuals "are more likely to attempt to look more competent and 'normal' than they actually are," a common phenomena with the mildly mentally retarded which is often referred to as "masking" or

14

the "cloak of competence." AAMR, User's Guide, supra, at 30. See also The Cloak of Competence, by Robert B. Edgerton (revised & updated ed.) (Univ. of CA Press 1993).

36.    As the above-described witness evidence demonstrates, Petitioner is mentally retarded and the onset of his retardation occurred well before the age of 18.

### iii.    Documentary Evidence Corroborates Petitioner's Mental Retardation

37.    In addition to the expert evaluations and witness evidence, educational, employment and court records further corroborate and demonstrate Petitioner's mental retardation.

38.    Mr. Bourgeois' Lutcher High School transcript reveals a child with low intelligence who struggled in school. He achieved poor grades across all subjects in high school, with a median score of C to D. In addition, he attended basic level classes. For example, the highest level of math studied was first year algebra. This was only a half credit course taken in his 3rd year of high school, and he obtained a D score. See attached transcript, *PA*, document # 54.

39.    Due to Mr. Bourgeois' age, no records of elementary school are available. Likewise, there is no record of his achievement on standardized testing. Mr. Bourgeois was raised by a very poor family in a small rural town in Louisiana. There are no records that he was ever tested for special education, or whether such services were even available.

40.    Records from Petitioner's interactions with employers and the court system as an adult also provide indicia of intellectual, emotional, and adaptive deficits.

41.    Mr. Bourgeois' job history corroborates his mental retardation. In 1985, Mr. Bourgeois attempted to qualify for permanent employment with the St. John the Baptist Parish Sheriff's Office, but was unable to pass the necessary examinations. His training instructor, Lt. David M. Wilson, described Mr. Bourgeois' difficulties with practical skills, noting that Mr.

15

Bourgeois was given two opportunities to pass the firearms test, and he participated in fifty-four hours of training in preparation for the test. In Lt. Wilson's view, Alfred's failure on the firearms test, and his "poor performance scholastically," made further training "unfruitful and unwarranted." See attached letter, *PA*, document # 55.

42.    Mr. Bourgeois also underwent a psychological evaluation pursuant to his application to the St. John the Baptist Parish Sheriff's Office. The resulting report points to Mr. Bourgeois' mental retardation. Mr. Bourgeois reported at that time (1985) that he had to repeat a grade in school. The examiner noted that Mr. Bourgeois had problems in evaluating his self-worth and had low self esteem, consistent with deficiencies in social adaptive functioning. See attached 1985 psychological evaluation, *PA*, document # 56.

43.    Mr. Bourgeois had several legal difficulties that demonstrate his adaptive deficits. For example, Mr. Bourgeois was sued for failing to comply with the terms of a lease he had made with the Ford Motor Credit Company. In an illustration of his inability to understand his finances, Mr. Bourgeois agreed to lease a $40,000 Ford Explorer. In addition to the price tag being well beyond his means (as evidenced by his default on the agreement and ensuing law suit), the lease agreement shows that he agreed to put down over $9,000 **on a lease**, and with his monthly payments, he would have paid a total of over $26,000 only to return the vehicle after three years. Similarly, in 2002, the State of Louisiana enacted a lien on Mr. Bourgeois for nonpayment of his 2000 taxes. See attached lease agreement and law suit, *PA*, document # 59.

44.    These records provide compelling evidence of Petitioner's adaptive and intellectual deficits and that these deficits had manifested in childhood and continued through the present, including the time of Petitioner's offense, arrest, and trial in this case.

16

**C.    Counsels' Ineffective Failure to Present Petitioner's Mental Retardation to the Court and Jury.**

45.    At the time of Petitioner's trial, the law was clear that a person with mental retardation was not eligible for the death penalty.  This prohibition was contained in the Federal Death Penalty Act and in Supreme Court case law.  Counsel should have been alert to the significance of Dr. Weiner's testing.  Such alertness would have caused counsel to explore this issue, and to present it to the Court and, if need be, the jury.[9]

46.    Moreover, had counsel been alert to this issue, and had it been determined that Petitioner was not mentally retarded, his status as a person in the borderline of mental retardation would have constituted significant mitigation evidence.   This point is discussed in Claim II, below.

**D.    Even if Counsel is Found to not Have Been Ineffective, the Eighth Amendment Prohibition Against Executing Petitioner Cannot be Waived.**

47.    Petitioner appreciates that this is a legal issue, but he wishes to preserve for future briefing in this Court his contention that Petitioner's status as a person with mental retardation cannot be waived.  Even if this Court finds that trial counsel were not ineffective, his ability to prove mental retardation in these post-convictions proceedings would preclude his execution even if the issue was waived by trial counsel.

---

[9]In a pre-trial appearance before the Court to discuss juror questionnaires, defense counsel inexplicably agreed with the Government that the Court could delete questions regarding mental retardation or learning disability because "they don't have anything to do with this case" PTT 1/16/04, 7.  Notably, this concession was made two months before Dr. Weiner's testing was completed.

**CLAIM II.      COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE.**

> *I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. I do not come to this conclusion lightly. But, he was presented only as an unrepentant and evil man. While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions. Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.*

Declaration of Government and Court expert witness Carlos R. Estrada, M.D., dated May 14, 2007 (copy contained in *PA*, document # 7), at ¶ 18.

### A.      Introduction.

48.      As the above excerpt from the recent declaration of Dr. Estrada shows, the jury in this case was not provided with the true, accurate and available mitigating evidence regarding Mr. Bourgeois' mental health. Dr. Estrada's views in this regard should be accorded great weight. After all, he was the Government's expert, and for at least some of the proceedings, he functioned as the Court's expert (i.e., for competency to proceed and sanity), and therefore there can be no challenge to his bias or his credibility.

49.      As set forth in the remainder of Dr. Estrada's declaration, and in the remaining mental health evidence discussed below, Mr. Bourgeois' "mental health profile" shows him to be a highly disturbed and impaired individual. Although a smattering of evidence was presented to the jury showing that Mr. Bourgeois was abused as a child (evidence that was disputed by the Government), the overwhelming bulk of the abuse evidence was not presented. The jury never heard first hand and detailed accounts of how young Alfred Bourgeois was subjected to merciless, chronic and long-standing physical abuse. The jury never heard how he was subjected to sexual abuse. And, perhaps more importantly, the jury was never provided with any mental health testimony about how such

18

abuse caused psychological damage to Mr. Bourgeois as he grew into adulthood and governed his adult behavior. This unpresented evidence is discussed below.

50.    In addition to not having heard about how the type of abuse suffered by Mr. Bourgeois can damage an individual, the jury similarly did not hear about the actual mental health conditions from which he suffers. Petitioner herein presents the near-unanimous mental health opinions of a number of experienced and skilled forensic evaluators (including Dr. Estrada) who believe that the offense in this case was a direct product of Petitioner's Borderline Personality Disorder, which, as the experts opine, can cause psychotic breaks when the individual experiences sufficient stressors, such as those experienced by Mr. Bourgeois in the weeks leading up to the death of his daughter.

51.    In addition to his impaired psychological makeup, the jury was also not presented with the available evidence showing that Mr. Bourgeois suffers from significant cognitive impairments (i.e., brain damage). Testing available at the time of trial conducted by Dr. Donald Weiner shows that Petitioner has at best an IQ that is in the range of borderline mental retardation. As discussed above in Claim I, Petitioner is mentally retarded and therefore may not be put to death consistent with the Eighth Amendment to the Constitution. However, should this Court find that Petitioner is not mentally retarded, there can be no question but that he is in the borderline range of mental retardation – itself a highly mitigating fact.

52.    In addition to this low IQ, Petitioner also suffers from organic brain deficits that impact upon his ability to control his impulses and engage in executive decision making. Dr. Weiner said so at the time of trial, he repeats his opinion now, and it is supported by the recent neuropsychological testing conducted by Dr. Michael Gelbort.

19

53.     This Court provided defense counsel with the tools to present all of the above information to the jury.  Yet, for reasons that defy understanding, and in advocacy that fell far below what is expected of counsel in capital sentencing, trial counsel ineffectively failed to present this evidence.  As shown below, it was available and it was powerful.  It was the kind of mitigating evidence that counsel is required to present, yet counsel, without sound tactic or strategy, failed to present it.  Counsel were ineffective in violation of Petitioner's right to counsel secured by the Sixth Amendment to the United States Constitution.

**B.     The Penalty Phase.**

**I.     Government Presentation.**

54.     The Government presented a parade of Petitioner's ex-wives, girlfriends, acquaintances, children and jail-house informants to testify to his abusive and violent history.  This cavalcade of aggravation went on for over two hundred transcript pages.  TT 3/22/04, 25-250; TT 3/23/04, 81-87.

55.     The Government capped its presentation with Dr. Carlos R. Estrada.  He was accepted as a Government expert in psychiatry.  TT 3/22/04, 269.  He told the jury that he had observed the entire trial, had observed Mr. Bourgeois throughout, and had conducted an evaluation of him.  Id., at 252, 272.

56.     Dr. Estrada conducted a risk assessment in an attempt to gauge whether Petitioner would pose a risk of future violence.  Id., at 278-286.  He opined that Petitioner "has a much higher tendency toward violence than an ordinary person."  Id., at 285.  He stated:

> [H]e meets a number of specific items that have been found associated with violence, and they include items in his background that we found, sadly enough, repeatedly occurring in children, and then leading to violence as adults.  Particularly, **we've**

20

**found that being a subject of rejection, neglect, and abandonment, being the survivor of actual physical or sexual or emotional abuse have a very high predisposition for violence as adults**.

Id., at 281.  He further opined, using slang, that Petitioner was a "rageaholic," i.e., a person who would be enraged at "minor provocations" or who would have difficulty controlling his impulses. Id., at 283.  He was not asked why this was so, even though the Eighth Amendment requires an answer to that question.

57.    Dr. Estrada went on to diagnose Petitioner as having a Narcissistic Personality Disorder, which is present in "an individual whose basic motivation in life is the aggrandizing of his self-esteem."  Id., at 284.

58.    Following an overnight continuance, defense counsel was afforded an opportunity to cross examine Dr. Estrada.  Prior to the commencement of the cross examination, counsel told the Court:

> It's my attitude, and not necessarily the rest of our group, that we're going to rest depending on how Dr. Estrada goes when – when we question him. . . that's not the consensus, particularly of Dr. Cunnigham, and it's – and it's I don't think maybe of John [Gilmore] or Mr. Bourgeois. . . I met with Dr. Cunningham last night and kind of hinted around, and or course that's what he does and so he wants to do it.

TT 3/23/04, 4-5.  This Court, of course not knowing the background regarding counsels' nascent decision not to call Dr. Cunningham, appropriately observed: "you have to evaluate the pros and cons" of calling Dr. Cunningham.  Id., at 5.  As the following discussion shows, there were no "pros and cons" to evaluate and the "decision" not to call Dr. Cunningham was uninformed and in the context of this case, disastrous.

59.    Counsel started out his cross examination well enough.  He elicited from Dr. Estrada that Mr. Bourgeois was not completely truthful in his responses during his evaluation regarding

21

whether he was abused as a child,  TT 3/23/04, 17, 22, which, he explained is not unusual for a victim of abuse.  Id., at 23.  He then elicited from Dr. Estrada that Petitioner suffered childhood abuse, neglect and rejection.  Id., at 23-24.

60.     The Government then objected, seeking clarification as to the sources of Dr. Estrada's information regarding Petitioner's abuse.  Id., at 25.  When Dr. Estrada indicated that he was relying on information obtained by Dr. Cunningham and Dr. Weiner, the Court conducted a side bar conference and an examination of Dr. Estrada outside the jury's presence.  Id., at 25-31.  The Court explained to Dr. Estrada that: "what's come up . . . is that no witness here has testified that Mr. Bourgeois was sexually – physically abused or neglected in any way, so we want to know where – where you got that information exactly, and where you got Dr. Cunningham's information."  Id., at 27-28.  When Dr. Estrada began to respond that he had heard some witnesses discussing these topics, the Court emphatically and accurately corrected him: "No. You didn't hear that – you didn't hear that here" Id., at 28-29.  When Dr. Estrada indicated that he may have read it in Dr. Weiner's report, the Court correctly pointed out that Dr. Weiner and his report had been "excluded for all purposes" Id., at 29.[10]  After further discussion, defense counsel advised the Court that "None of my questions will be asking [Estrada] to discuss Dr. Cunningham or Dr. Weiner's reports."  Id. 31-32.  The Court pointed out that there was no reason why Dr. Estrada could not at that point refer to Dr.

_____

[10]The record is not clear as to why counsel made a "decision" not to call Dr. Weiner.  In a discussion conducted before the Court following the guilty verdict but prior to the start of the penalty hearing, the Government asked to be provided with Dr. Weiner's test data.  The Court ordered that it be turned over and scheduled a hearing to determine the nature of Dr. Weiner's testing.  The hearing did not take place because counsel apparently decided not to call this witness.  Since counsel did not turn over the test data, did not produce their witness at the hearing, and announced that they would not be calling him, the Court excluded the witness and his report.  See generally TT 3/17/04, 24-49; TT 3/19/04, 14-16.

Cunningham's report (id., at 33), but counsel, perhaps thinking that he was not going to call him as a witness, did not further reference Cunningham through Estrada. When Dr. Estrada responded that he still thought he had heard about abuse from a witness, both the Court and Government quickly corrected him. Id., at 32 (Mr. Roberts: "There's nothing"; The Court: "There was nothing about his childhood at all from anybody.").

61.    Despite the Court and Government's recognition that there "was nothing" about childhood abuse before the jury, counsel ineffectively failed to move to strike Dr. Estrada's opinion regarding risk assessment, as it was based largely on Petitioner's status as a victim of abuse. TT 3/22/04, 281.

62.    Without any recourse to elicit through this witness that Petitioner was abused, counsel was left only asking whether "people who commit that kind of offense [referring to Petitioner's murder conviction] generally were abused themselves." TT 3/23/04, 35. See e.g. id., at 39 ("common profile of characteristics of abusive parents"); 47 ("the way we discipline our children is highly determined by the way we were disciplined ourselves when we were raised as children"); 48 (that Petitioner was harshly disciplined is "one of my impressions").

63.    Counsel also tried to challenge Dr. Estrada's conclusions about his risk assessment of Petitioner by noting that his history of violence was directed toward family members. Id., at 49-51. Dr. Estrada concluded that whether he would be violent in the future would depend greatly on the circumstances of his incarceration. Id., at 50-51 ("whether he would act or not on that violence depends on the circumstances that he would find himself in. And I cannot predict what circumstances he is going to find himself in. The prison circumstances vary very much from time to time and setting to setting, and I wouldn't be able to express a definite opinion one way or another

without knowing those details.").

64.     On re-direct examination, the Government immediately challenged the basis for Dr. Estrada's impression that Petitioner had an abusive childhood. The Government elicited that Petitioner had not made any prior report of his being abused; that he told Dr. Estrada that he was well cared for; and that his father was quite involved with his life (Id., at 54-7). Moreover, the Government did not at any time concede that Petitioner had suffered from an abusive childhood. Rather it argued to the contrary. See TT 3/24/04, 68 (Government arguing that there was no "direct evidence" produced that Petitioner was abused).

65.     In addition, the Government elicited that not every person who is the victim of abuse goes on to become an abuser. Id., at 57.

66.     The Government elicited that sometimes prisoners escape from prison, that Petitioner could manipulate others while in prison and that he might view other prisoners as "family, and therefore more likely to abuse them." Id., at 60-61.

**ii.     The Defense Case.**

67.     Following Dr. Estrada, the defense put on its penalty phase case, such as it was. The case was notable for its brevity. Michelle Armont testified on direct for just 8 transcript pages (TT 3/23/04, 94-102). Two pages into her testimony she indicated that she knew Petitioner, who is her brother. Id., at 96. She described how she and Petitioner shared the same father, who had altogether fathered 22 children; how they came to have a relationship after finding out that they shared a father (id., at 97-98). She provided no information about Petitioner's childhood abuse, but stated only that she was aware that Petitioner and his mother had a "conflict . . . they didn't have a good relationship." Id., at 99. Counsel then elicited that this witness had seen Petitioner get mad: "I've

24

seen him get mad . . . he has a temper . . . he gets red in his face.  Usually I can calm him down.  Id., at 100.  She related that  she had observed the same type of behaviors in her nephew with Attention Deficit Disorder as she observed in Petitioner. Id., at 101.

68.    Ms. Armont was then cross-examined for about 10 pages regarding her knowledge of how Petitioner was abusive and violent towards his wives, girlfriends and children.  Id., at 102-111.  Clearly, the Government obtained more aggravating facts from this witness then the defense obtained mitigating facts.

69.    The defense then called Carl Kevin Henry.  He testified for 5 pages (TT 3/23/04, 111-116).  He is Petitioner's cousin (id., at 112).  They grew up together (id., at 113).  He observed the "relationship" between Petitioner and his mother, which he described as not the "normal mother/daughter relationship" [sic].  He pointed out that Petitioner suffered abuse at his mother's hand and when asked to describe what he witnessed he could only relate that Petitioner's mother "had a tendency" to clean his nose with her "long fingernails" which led to the development of a "real bad sore."  Id., at 113-114.  He also described one instance in which his mother beat him with an extension cord after he was caught stealing cucumbers from a neighbor's field, id., at 114, and another where she hit him with the receiver from a phone, id., at 115.  The remainder of his direct testimony discussed  how Petitioner came to live with the elderly neighbor, Miss Mary.

70.    Counsel was not aware that this witness had prior convictions involving dishonesty and the Government fully exploited that in cross examination.  Id., at 117-120.

71.    The third and final defense witness was the Reverend Herman Clayton, Jr. who provided 5 more pages of direct testimony (TT 3/23/04, 121-126).  He grew up with Petitioner, and he was the grandson of Miss Mary, with whom Petitioner went to live (Id., at 122).  Based upon what

he had learned from his grandmother, aunts and uncles, he testified that Petitioner was abused as a child (Id., at 123). He related that he never saw Petitioner's mother abuse him or any of her children, but he had heard that she did from Petitioner and his siblings (id., at 125).

72.     On cross-examination, the Government elicited that Petitioner wanted to live with Miss Mary and she provided him a "loving home." Id., at 126-27. The Government then sought to minimize the already sparse abuse-testimony by obtaining admissions from this witness that he two had been "whipped" a "couple of times" as a child for things that he did not do (id., at 127-28).

73.     That was all there was. Despite, as shown below, having at their disposal opinions and lay witnesses who could have put Petitioner's violent background into a mitigating context, counsel rested after putting on a mere **18 pages of direct testimony**. The penalty phase was quite literally an unmitigated disaster.

**C.     The Unpresented Mitigation.**

**i.     Lay Witnesses.**

74.     There was a mitigating story to tell about the life of Alfred Bourgeois through a large number of lay witnesses.

75.     Petitioner was an out-of-wedlock child born to an overwhelmed mother. As recalled by Elnora Bourgeois McGuffey, Petitioner's maternal aunt:

> Eunice was married to a man named Lloyd Ferdinand and had three children by him. . . It seemed like she was happy, but Ferdinand ran around a lot with other women. Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she was never the same after they divorced. It was like she had something on her mind all the time.
>
> After Eunice divorced from Ferdinand, she and her three children moved back into our parent's house on Bend Road in Paulina. She needed extra help with the kids and got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and

26

while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

Declaration of **Elnora Bourgeois McGuffey**, ¶¶ 2-4 (contained in *PA*, document # 33); see also, Declaration of **Claudia Williams** (Petitioner's sister) ¶ 3 (contained in *PA*, document # 40) "We lost [brother] Clyde and then our brother Anthony took a lot of extra care due to his disabilities." ); Declaration of **Jersey Henry**, Petitioner's cousin, ¶ 3 (contained in *PA*, document # 28) "Eunice seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like she was always worried about something." Declaration of **Wilmer Bourgeois**, Petitioner's maternal uncle, ¶¶ 2, 3, 7, 8, 9 (contained in *PA*, document # 21) :

All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward, she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a

27

rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

76.    Petitioner's mother took out her hard life and troubles on her children, with a special focus on Petitioner. There is no question she physically assaulted her children, but had a special fixation on Mr. Bourgeois. See Declaration of **Allen Henry**, Petitioner's cousin, ¶ 3, (contained in *PA*, document # 27): "Eunice used to be rough on Alfred. She used to chastise him more than other kids and used to beat him more than the others"; **Beverly Frank**, granddaughter of Miss Mary, ¶¶ 3-4 (contained in *PA*, document # 26):

> Alfred's mother treated him differently than her other children. She talked to Alfred differently and she treated him differently too. I saw her give her other children money and not give Alfred any money. I also saw her give cookies to her other children and not give Alfred any cookies.

> Eunice whipped all her children. She was a single parent for several years and she disciplined the children herself. Eunice would use a switch or anything else she could get her hands on to whip the children. I know she would whip the children so much that they would have welts on their body. I believe you should never whip a child that much.

**Claudia Williams** further recounts:

> Both those things [sic] [losing one child to drowning and having a second who was disabled]took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.

> Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.

> Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like

28

the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Williams Declaration at ¶¶ 3-5. See also Declaration of **Lloyd Ferdinand**, Petitioner's brother, ¶¶ 4-5 (contained in *PA*, document # 25): "Maybe it was because of who his father was, but our mother was more brutal to Alfred than the rest of us. She gave all of us whippings but Alfred got more whippings than the rest of us. She would pick on Alfred more and grab the belt quicker for him. She would beat him for the slightest thing or for no good reason. Her beatings of Alfred got so bad that he went to live with a very old neighbor, Miss Mary."; **Isaac Bourgeois III**, Petitioner's cousin, at ¶ 3 (contained in *PA* at document # 19): "Eunice was so abusive to Alfred that he was sent to live with a neighbor"; **Jersey Henry** Declaration at ¶ 3 " Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it."; Declaration of **Murray Bourgeois**, Petitioner's cousin, ¶ 3 (contained in *PA*, document # 20) "Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred."; Declaration of **Wilmer Bourgeois**, ¶¶ 4-5:

Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her

29

that the boy should not be ripping and running with just anyone.

See, Declaration of **Yvonne Robinson Joseph**, Petitioner's cousin, at ¶ 3: " Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him 'little yellow bastard' and slap him for nothing."

77.     The abuse and family dysfunction took a toll on Petitioner as a child. Alfred Bourgeois was scape-goated as a child because of his status as an "outside child," his fair skin and lack of intellectual prowess, as the following declarations demonstrate:

> Our father is Alfred Sterling. Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers. Our father had many outside children. I am the oldest of them. We were not raised by our father and we were not treated the same as the children he had with his wife. The children by his wife basically look down on us and try to deny that we are even any relation to them. If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.
>
> Alfred and I both love our father but it is not a nurturing father-child relationship like children need. He did not acknowledge us until we were almost grown. He would say "its their momma's child". Our father's life has been full of lying, cheating and denial of his children. He did not pay child support for any of us but the youngest who is now about 13 years old. He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old. When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble. Being treated like that is hurtful to me and it was hurtful to Alfred.

Declaration of **Michelle Armont**, Petitioner's sister, ¶¶ 2-3 (contained in *PA*, document # 17). See also Declaration of **Michelle Warren**, Petitioner's sister, at ¶ 9 (contained in *PA*, document # 39): "Alfred did not play sports in school. He got teased a lot. Sometimes it was because of his looks. He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes". Alfred could not stand to be teased. He would get very mad when kids teased him." Declaration of

30

**Nathaniel Banks**, Petitioner's childhood friend and current juvenile probation officer, ¶ 3 (contained in *PA*, document # 18) "Alfred was a fragile child. He spent a lot of time by himself. People used to pick on Alfred a lot. Children sometimes do that. I just remember Alfred crying at anything. Someone would tease him and he would break down crying. People used to call him names – they called him "white punk". Alfred has a real light complexion. Kids used the word punk to mean that he was weak. Alfred wasn't any good at sports. He didn't play sports with us."; Declaration of **Lloyd Ferdinand,**¶ 6: "Things were no better at school. The school was also rough, and Alfred got picked on and teased a lot because of his light complexion and green eyes. They said he was a white boy with green eyes. They beat him up and he was helpless. Michael Clayton, one of Miss Mary's relatives, beat him up repeatedly. Alfred was a coward and all he could do was cry when they picked on him. My uncle told me that I should deal with it so I taught him how to fight back." His cousin, **Murray Bourgeois** also observed the results of this abusive and dysfunctional life: "Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life." Murray Bourgeois Declaration at ¶ 5.

78.    This history of abuse also had an obvious emotional toll as Petitioner grew into adulthood:

> One Christmas when Alfred was an adult he got upset over something minor with our mother. He went into a rant about how unloved and mistreated he felt as a child. He brought up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him. We all tried to calm him down and told him to just let it go. Our

31

mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

Declaration of **Michelle Warren**, ¶ 15; Declaration of Alton Preston, Petitioner's friend (who has a Master's Degree in Divinity), at ¶ 2 (contained in *PA*, document # 34):

> Alfred talked to me about his childhood from time to time. Alfred told me that his mother, Miss Eunice Bourgeois, mistreated him. Alfred told me that his mother didn't treat him the same way she treated her other kids. Eunice saw Alfred as an unwelcome reminder of his father. Alfred said that Eunice used to whip him very badly. He told me she beat him for no reason and that it happened quite frequently. Alfred said that he received more whippings than any of his brothers or sisters. Alfred confided in me about his childhood before he was arrested in this case. We talked about this many years ago.

His girlfriend, Ivy Thomas, also tells of how Alfred's childhood haunted him in later years:

> Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood. He told me that his mother kept all his other siblings but gave him away. Alfred said that his mom treated him differently than all the other kids and it depressed him. His mom said he looked just like his father, and that is why she hated him so much. One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

> I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

Declaration of **Ivy Thomas**, Petitioner's one-time girl friend, at ¶¶ 7-8 (contained in *PA*, document # 38); see also Declaration of **Jersey Henry** at ¶ 6: "Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids."; Declaration of **Michelle Armont**, ¶¶ 2-3: " He had a strong bitterness toward his mother because she treated him

32

so badly. Some days he could not say her name. Alfred had some serious problems. Aside from being almost ignored by his father most of his life, he was abused by his mother. She caused him so much pain that he was a damaged person because of the abuse he suffered. It was hard for Alfred to talk about the abuse he went through. Alfred had trouble trusting people."

79.     All of these witnesses whose declarations are cited or quoted were available to testify at trial. Some were interviewed by the defense and/or Government and some were not. Some testified for the Government and some for the defense. Some were even summoned by the defense to Corpus Christi, and were present in the courthouse. However, most were never called and the three who were did not provide the information described above. All were available to speak with Dr. Cunningham.

### ii.     Expert Witnesses.

80.     Trial counsel had consulted with three expert witnesses related to Petitioner's mental health: Mark D. Cunningham, Ph.D; Donald E. Weiner, Ph.D; and George W. Holden, Ph.D. As the record shows, none of these witnesses were called at the penalty hearing, yet each could have provided significant and non-cumulative mitigating evidence.

81.     Dr. Weiner was hired at the suggestion of both Dr. Cunningham and Dr. Estrada (see Declarations of Dr. Cunningham at ¶ 10 and Dr. Estrada at ¶ 17) because each perceived indications of potential brain damage in their evaluations of Petitioner. Dr. Weiner conducted neuropsychological testing of Mr. Bourgeois, albeit on the eve of trial. Nonetheless, his findings were important in two respects. First, he found that Petitioner had an IQ of 75 or 76.[11] This score

---

[11]His trial report (attached to his Declaration, *PA*, document # 16) indicates a 76, however, his score sheet from the IQ test shows a 75 (*PA*, document # 15).

placed Petitioner in the borderline to mild mentally retarded range of intelligence. This is a mitigating fact, and if Petitioner is mentally retarded, he cannot be executed. See Claim I, above.

82.    Second, he found that Petitioner scored in the impaired range on neuropsychological test batteries, and in particular scored in the significantly impaired range in tests effecting his ability to control his impulses and to make decisions. These results are set forth in both Dr. Weiner's trial report, and in his recent post-conviction declaration. See *PA*, document # 16.

83.    Dr. Weiner's testing finds support in the testing recently conducted by Michael Gelbort, Ph.D. He is a psychologist who specializes in neuropsychological testing. His declaration points out that Dr. Weiner's testing shows both mental retardation and frontal lobe impairments:

> Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The 76 score must be reduced by application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration). In this instance, the WAIS-R was normed in 1978 and it was administered in 2004. Therefore, a deduction of 7.8 is required (26 years x .3 per year = 7.8). Therefore, the 76 is really a 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted score of 68 and the score of 70 on my testing.

> Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobes. This is most prominently evidenced by his very impaired performance on the Category Test. This test is one of the most sensitive to both whole brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

Declaration of Michael M. Gelbort, Ph.D. (contained in *PA*, document # 8), ¶¶ 5 & 7.

Dr. Gelbort also explains the behavioral impact of his testing:

> While our tests results are for all intents and purposes congruent, he [Dr. Weiner] concludes that Mr. Bourgeois' brain damage is localized in [the] posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming for argument's sake that Mr. Bourgeois has only damage

34

to his posterior brain, there is still clearly an impact on his executive function. Such impact would be due to his brain's impaired ability to transfer information from the posterior to the frontal. Accordingly, where ever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension and Trails B, demonstrate that his executive function is impaired.

Executive functions act as the "brakes" for a person's actions. When there is impaired executive function, the individual acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one considers the abusive childhood that he experienced. The adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid with his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

Id., at ¶¶ 8-9.

84.    As this Court knows, counsel had arranged to have Dr. Mark Cunningham testify, but at the last minute, counsel decided not to call him. Yet, Dr. Cunningham could have provided the jury with critical information that was not presented through Dr. Estrada's testimony. Rather than guessing, assuming or having impressions about Mr. Bourgeois' life – as Dr. Estrada did – Dr. Cunningham was prepared to set forth a thoughtful, comprehensive and verified history demonstrating the most salient points about Petitioner's abusive background and how they mitigate. Dr. Cunningham arrived at his conclusions after evaluating Mr. Bourgeois, conducting interviews of 14 people familiar with his childhood and upbringing and reviewing scores more interviews conducted by others associated with the defense. He states:

Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred. Mr. Bourgeois was raised in an overwhelmed family system. His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age. Eunice had seven children by four different men. One son was profoundly mentally retarded and kept hidden in the home. One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

35

The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment. Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support. Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock. Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois. The effective abandonment by both parents has a significant impact on early child development. The abandoned child is often unable to trust. The child may grow up with an intense fear of abandonment and be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life. People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age. For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses. Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention. This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother. More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois. Eunice treated Alfred as a scapegoat. Alfred was blamed when children were hurt in the playing field. He was beaten more frequently and more brutally than his siblings. She beat him with belts and extension cords. These beatings were described as routinely leaving welts and bruises. Eunice is also described as throwing shoes and other objects at him. Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

Eunice was also described as emotionally abusing Mr. Bourgeois. Eunice told Alfred that he "wasn't worth nothing." Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois. There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes. At age 7-8, Eunice sent Alfred to

36

live with an elderly neighbor, Ms. Mary Clayton. He was as a result excluded from family outings and trips. After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle. This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

Cunningham Declaration at ¶¶ 18-23, (contained in *PA*, document # 6).

85.     Dr. Cunningham would have explained to the jury the uncontestable point – and one that did not get made through the testimony of Dr. Estrada – that a history of abuse, such as that suffered by Mr. Bourgeois, has a "profound impact" on behavior:

As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor. While behavioral impacts can vary, all such victims suffer from psychological consequences. They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions. Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly. In Mr. Bourgeois' case the abuse was severe and long lasting. It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

Cunningham Declaration at ¶ 24.

86.     Dr. Cunningham could have explained to the jury how Mr. Bourgeois' behavior was severely impacted by his low IQ and brain damage:

Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76. Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an IQ score of 68. I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test). The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ score of 68 in 2004. Both of these scores are in the range of mild mental retardation.

Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning. Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in

37

understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior. Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage. His siblings recalled that he had "rage attacks" even in his early childhood. These attacks worsened in his teenage years. Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged. They reported that he would often tremble when angry. The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation. He would often have to be physically restrained by others. After the attack, Mr. Bourgeois would appear exhausted. He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well. This includes marked changes in his demeanor, disproportionate responses, inability to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

Cunningham Declaration at ¶¶ 25, 27-29.

87.    As Dr. Cunningham further explains, the jury was already made aware of Mr. Bourgeois' explosive nature, and the Government tried to present this as simply the result of his being "an angry person" (TT 3/23/04, 54). In reality, Mr. Bourgeois' "anger" or rage, was the product of the volatile combination of his psychological scars and brain damage:

The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages. It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter. My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence. This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors. His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control. By any measure, this is mitigating in the context of capital sentencing.

Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts, even though the abuse took place over days and weeks. Due to his deficits, he has a low tolerance for frustration, which becomes even worse in stressful situations. When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

Cunningham Declaration at ¶¶ 30-32.

88.    And, Dr. Cunningham was prepared to provide the jury with analytical tools to help

them understand and apply the concepts about which he was prepared to speak, and to provide

an overarching understanding about why this offense occurred:

I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently. I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury. Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring. He was able to maintain almost constant, if not steady, employment. He did his best to provide for his children materially and sometimes even emotionally. However, his background and psychological make-up always made him predisposed toward impulsivity and violence. Generally speaking, he was able to keep the lid on the pot. However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct. These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children. They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.

At the time of the offense, there were many ingredients simmering in the pressure

39

cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

Cunningham Declaration at ¶¶ 33-35.

89.     Dr. Cunningham would have also been able to rebut Dr. Estrada's risk assessment which Dr. Estrada admitted was uncertain because he did not know much about the circumstances under which Petitioner would be incarcerated (TT 3/23/04, 49-51).[12]  Dr. Cunningham, on the other hand, has studied this question, and was prepared to explain to the jury the likely circumstances under which Petitioner would be incarcerated and how these circumstances reduced the chance that he would commit future acts of violence:

I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison. In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence. My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department. The methodology and findings of my research are generally accepted by informed forensic psychologists.

Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his

---

[12]Dr. Estrada specifically noted that his risk assessment was dependent on a "long term prediction . . . which has a very low degree of certainty" because he did not know under what conditions Mr. Bourgeois would be incarcerated.  TT 3/23/04, 50.

behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community.  Alfred is 39 years old. Research demonstrates better prison adjustment as inmates get older.  Rates of prison infractions are highest for inmates in their early 20's.  These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

 This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard, however, that despite this suspicion he at times shared a common day room with other inmates.  Significantly, Mr. Bourgeois had no disciplinary write-ups during that time.  Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison.  Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community.  He has generally been gainfully employed as an adult.  He is involved in an extensive family system.  He attended church.  He was an involved father.  He provided  financial support to his children.

My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors.  These studies  consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education.  The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction;  loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of property; and administrative segregation (solitary confinement).  Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious

violence is markedly diminished.

Cunningham Declaration at ¶¶ 36-41.

90.     When trial counsel alerted the Court that they were considering not calling Dr. Cunningham this Court expressed an appreciation that counsel had to weigh the "pros and cons" of doing so. TT 3/23/04, 5. After the decision was made, this Court expressed a view that counsel had gotten a great deal of benefit from their cross examination of Dr. Estrada (TT 3/23/04, 76 ("I don't think, Mr. Tinker, you could have hired a better witness for your defense than Dr. Estrada"); id., at 135 (noting that counsel "succeeded in getting not only Dr. Cunningham's report in, but Dr. Weiner's")). Petitioner respectfully submits that the facts show differently.

91.     Dr. Cunningham has opined that Dr. Estrada's testimony failed to even begin to address the mitigating points that he was to make. Moreover, in Dr. Cunningham's view, Dr. Estrada's abuse testimony was used to aggravate (showing that Petitioner fit the profile of a dangerous man because of the abuse) rather than to mitgate:

> I attended the Court proceedings the next day and observed the Government's examination of Dr. Estrada. His testimony showed that he recognized that childhood abuse can impact adult behavior. I was concerned, however, because Dr. Estrada's presentation did not address this question as it related to Mr. Bourgeois specifically. It also did not address it from a mitigating perspective. Instead, it focused only on why Mr. Bourgeois' history of abuse made him a continuing danger. This turned the mitigating evidence on its head. Instead of mitigating the offense, Mr. Bourgeois' history of savage abuse was used to aggravate.
>
> On cross-examination the defense did not develop and explain that impact from a mental health perspective. As I recall, his testimony was limited in this regard to stating only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and that his adult conduct was consistent with such abuse. I was quite cognizant that testimony elicited from Dr. Estrada was inadequate for the jury to appreciate the mitigating quality of this history of abuse. Rather, if the jury were to recognize and give informed weight to Mr. Bourgeois' background, it had to hear testimony about these developmental experiences in much greater depth, as well as have the benefit

42

of clear and detailed testimony regarding **why** this history mitigates, including the nexus between this history and Mr. Bourgeois' life adjustment and the instant offense conduct. Had defense counsel dedicated time to conference with me, I would have advised them to anticipate this application of developmental history by a Government-retained mental health expert. I also would have equipped them with an understanding of scientifically-informed perspectives and data on violence risk assessment that would have equipped them to debunk the future danger implications advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

Cunningham Declaration at ¶¶ 13-14.

92.     Indeed, **Dr. Estrada himself**, who observed the entire evidentiary presentation, believes that his testimony was too limited in scope and consequently he does not believe that the jury received a full and accurate picture of Mr. Bourgeois. Dr. Estrada now has more information than he had at the time of trial. This information confirms some of his earlier "suspicions" and "impressions" and accordingly has had an impact on his opinion:

I have now been provided with a wealth of information by Mr. Bourgeois' current counsel. This information includes declarations from those who witnessed his abuse; other mental health reports; and the transcripts of the penalty phase during which short testimony was provided by lay witnesses about the abuse. Based upon what I now know to be the truth of his upbringing, it is evident that in my interview with him, he created an elaborate fantasy life to replace the painful memories of his childhood. In this fantasy world he presents as being far more successful, wealthier and happier than he is in reality. This fantasy presentation, in which he has exaggerated his status, was at the core of my trial-diagnosis that he suffered from a Narcissistic Personality Disorder. Such a disorder is marked by the need of an individual to seek out special attention for achievements in order to compensate for obvious shortcomings. However, now that I know more about Mr. Bourgeois, I can state that this diagnosis, while accurate, failed to reflect the real and mitigating facts about his life.

As noted, Mr. Bourgeois' current counsel have provided me with additional background information about him. I have reviewed the recent declarations of psychologists Jethro Toomer, Ph.D., Michael Gelbort, Ph.D., and Donald Weiner, Ph.D. I have also reviewed the declarations of additional lay witnesses regarding Mr. Bourgeois' childhood and early adult life and the report of social worker Kathleen Kaib reviewing his relationships with ex-wives and girlfriends.

**This new information confirms what I strongly suspected at the time of the trial – namely that Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments.** This new information presents a picture of a man who cannot establish and maintain stable relationships. This history (referenced primarily in the declaration of Kathleen Kaib) is consistent with Borderline Personality Disorder. This diagnosis, which supplements my earlier diagnosis of Narcissistic Personality Disorder, captures Mr. Bourgeois' tumultuous and violent relationships with the many women he befriended and, in some cases, married. In classic Borderline fashion, each new relationship was marked by extreme highs followed by devastating lows. As people with Borderline Personality Disorder are wont to do, Mr. Bourgeois became infatuated over new relationships, only to reject each person as his level of stress or frustration heightened, or as he perceived that he was going to be abandoned. In his case, owing to his status as a victim of abuse, along with his cognitive deficits, the rejection of each relationship was unfortunately marked by violence.

Estrada Declaration at ¶¶ 7-9.

93.    Dr. Estrada now believes that Petitioner suffers from a Borderline Personality Disorder, which he explains is a "debilitating" condition that can cause the type of conduct that was at the core of Petitioner's offense:

Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic-like states. Indeed, the name of the Disorder derives from an earlier belief that such patients were "Borderline Schizophrenics." While I have no direct evidence that Mr. Bourgeois has experienced psychotic states, I am confident in stating that the nature of the offense where he first abused and then killed his infant daughter is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Mr. Bourgeois at the time of the offense.[13]

---

[13]Dr. Estrada's opinion regarding Petitioner's Borderline Personality Disorder is shared by two other mental health professionals. Petitioner has been evaluated by Robert Sadoff, M.D. and Jethro Toomer, Ph.D. Each conclude that he displays classic symptoms of a Borderline Personality Disorder; that this disorder has its origins in his abusive childhood, during which he was abandoned by his mother; and that the offense was the likely result of a psychotic break secondary to the stresses that Petitioner was subjected to. See Declaration of Jethro Toomer, Ph.D. (contained in *PA*, document # 14) at ¶ 7:

Estrada Declaration at ¶ 10.

94.    Dr. Estrada also shows that although there was a smattering of evidence at the penalty hearing about whether Petitioner was abused, there was **no evidence presented** explaining why this was at all important:

> Although I testified at trial that I suspected that he was abused as a child, neither I, nor any other expert, testified about the **significance** of childhood sexual and/or physical abuse from a mental health perspective. Yet, it is not disputed in the mental health field that the significance is profound. Childhood physical or sexual abuse can leave durable psychological scars. Abused children often grow into adults who are significantly impaired. Such individuals have great difficulty establishing and maintaining healthy relationships. They have difficulty trusting others. They also have difficulties making judgments and controlling impulses. These impairments are greater when the abuser was known to the child, and even greater still when the abuser was a parent or care giver. This is because the child's trust is profoundly violated when a parent – who is naturally supposed to care for the child – instead engages in acts that harm the child.
>
> When a child is abused by a parent, it also has the effect of normalizing the behavior. That is, the child sees the behavior as acceptable, and develops a far greater likelihood of becoming an abuser. This appears to have been the case with Mr. Bourgeois. He saw his abuse of his children as a tool in child rearing, such as when

> When the borderline individual is seeking to avoid such abandonment, and is under great stress, they can experience mini-psychotic episodes. In Mr. Bourgeois' case, it is my opinion that his abusive conduct toward the victim, as well as his other relationships occurred during such mini-states. The only thing that separates Mr. Bourgeois from a full blown psychotic disorder is that he is able to reintegrate himself very quickly after the onset of these mini-episodes.

Declaration of Robert Sadoff, M.D. (contained in *PA*, document # 13) at ¶ 9:

> Mr. Bourgeois manifests many of the deficits shown by those who have been abused as children. He has debilitating personality disorders, including a Borderline Personality Disorder. This is a significant disorder in the context of this offense. By their nature, those with Borderline Personality Disorders are impaired in forming stable relationships. They can decompensate into psychotic states when under significant stress. People with Borderline Personality Disorder can have dissociative experiences, where they are not consciously aware of their actions or their surroundings, and may not recall various behaviors when dissociating.

45

he "taught" the victim toileting skills.

Childhood abuse fills the abused child with rage, anger and terror. In many instances, the abused child develops into an adult who turns that rage, anger and terror outward. Many adults with abuse histories go through life with their rage and anger on a hair trigger. When such survivors of abuse are subjected to stressors and/or reminders of the abuse they have experienced, the likelihood of their turning their rage outward dramatically increases. This is especially true with survivors of sexual abuse. Those who have been sexually abused as children will frequently come to associate sexual gratification with violence and aggression. As noted, given Mr. Bourgeois' history of such sexual aggression, I strongly suspected that he was sexually abused as a child. When sex abuse survivors, like Mr. Bourgeois, are sexually aroused they will often react by replicating the abuse that they have suffered.

In addition, in Mr. Bourgeois' case the issue of abandonment must be considered. He was not just the victim of abuse, but he was abandoned by his mother when he was made to live with an elderly neighbor. This abandonment multiplied the already significant psychological effects of the abuse that he suffered.

Estrada Declaration at ¶¶ 11-14.

95.    The jury was required to weigh mitigating and aggravating evidence in this case, and

that weighing was unquestionably effected by its perception of "why" Petitioner killed. Again, Dr.

Estrada explains that the Government's explanation of motive was "simplistic" and failed to address

the psychological reasons for Petitioner's conduct:

In this case, there was no apparent motive for the killing. While the Government theorized that Mr. Bourgeois killed the child in order to avoid the financial responsibilities that she represented, I find this explanation wanting from a mental health perspective. If a person wishes to kill a child for financial reasons, there are far more efficient and less gruesome ways to accomplish the task. There are many alternative ways to kill a child that would increase one's chances of "getting away with it." I believe that the Government's proffered motive was, respectfully, somewhat simplistic. As noted, the brutal and bizarre manner in which death was caused, along with Mr. Bourgeois' background and mental health deficits, make another explanation far more satisfactory. This was purely a rage killing. The rage was born of Mr. Bourgeois' own lifetime experience, the psychological effects of those experiences and his cognitive deficits. Added to these historical factors is that Mr. Bourgeois, like many borderline personalities, can decompensate into rageful outbursts in the face of frustration.

46

Estrada Declaration at ¶ 15.

96.     Now that Dr. Estrada is able to rely on the neuropsychological data generated by Dr.

Weiner and confirmed by Dr. Gelbort, he can explain how Mr. Bourgeois' organic impairments

impacted on his behavior – a highly mitigating explanation:

> To be sure, not all abused children grow into abusive adults.  However, the chances that the cycle of abuse will continue dramatically increases if the individual has organic brain deficits.  Although I was aware at the time of my testimony that Mr. Bourgeois has both organic brain deficits and a low IQ (tested at the time of trial at 76 and retested now at 70), I was not able to include these facts in my opinion because the neuropsychological testing conducted on Mr. Bourgeois by Dr. Weiner was not admitted in evidence.

> I sat through the entire trial at the request of the prosecution.  I was quite involved with and made appropriate recommendations to both sides of the case.  For instance, I strongly urged the defense to have Mr. Bourgeois undergo a thorough battery of neuropsychological testing, and suggested Donald. E. Weiner, Ph.D. to conduct this testing.  I have worked with Dr. Weiner on many occasions and have found him to be a reliable, knowledgeable and skilled practitioner.  I was surprised that the defense decided not to call him as a witness, and I was concerned that I could not reference his important findings in my testimony.  Had I been able to do so, I would have explained to the jury that Mr. Bourgeois' cognitive deficits were important factors that mitigate the offense and which went far toward explaining and understanding his violent behavior.

Estrada Declaration at ¶¶ 16-17.  This opinion certainly responds to the Government's redirect

question of Dr. Estrada that sought to make the point that not all abused children go on to become

abusers or killers.  TT  3/23/04, 57.

97.     There is no serious question but that the jury did not receive a full, accurate and

mitigating explanation for Petitioner's actions.  Dr. Estrada says so:

> Having sat through the testimony in this case, and knowing what I now know, and previously suspected, I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there

47

exists a reasonable and not particularly controversial mental health explanation for his actions.

Moreover, Dr. Estrada would have provided all of this information during his testimony: "Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration." Estrada Declaration at ¶ 18.

98.     Counsel also failed to take advantage of other mitigating evidence that was under their noses. The Court will recall that trial counsel proffered the report of University of Texas Psychology Professor George W. Holden. His report was to address an ultimate issue as to whether Petitioner killed with premeditation. The defense proposed to offer this opinion during the guilt phase. See PTT 3/1/04, 1-72. The Court denied this application. However, the Court left open the possibility that Dr. Holden would be admissible in the penalty phase of trial. Id., at 74.[14]

99.     While what defense counsel wished to do with Dr. Holden was inadmissible in the guilt phase, as his current Declaration shows, this witness could have provided valuable penalty phase information about the dynamics of abusive family situations. This testimony could have either stood on its own or complimented the unpresented testimony of Dr. Cunningham and Dr. Weiner. Here is what Dr. Holden could have told the jury:

> I am a tenured full professor of Psychology at the University of Texas at Austin where I have taught and conducted research since the mid-1980s. I received a Bachelor's degree from Yale University in 1977, a Master's degree in Psychology from the University of North Carolina, Chapel Hill in 1982, and a Ph.D. in Psychology from the same institution 1984. My research and teaching focuses on family violence and parent/child relationships. I have published extensively in these fields.
>
> In late 2003 I was retained by John Gilmore and Douglas Tinker, defense counsel for

---

[14]Even before the hearing, counsel alerted the Court that he was considering using Dr. Holden in the penalty phase. See PTT 10/20/03, 11-12.

Alfred Bourgeois, to testify at his capital murder trial in the federal court in Corpus Christi.  I understood that my role was to provide the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter. It was proposed that I offer this opinion during the guilt phase of trial.

In reaching my conclusions, I studied the record of the case up to that date, including many reports produced by law enforcement authorities, autopsy materials, and other documents provided by the Government to defense counsel.  The pattern of abuse that I saw reflected in these materials did not strike me as unusual for a case of severe childhood abuse.  I applied my knowledge of the research in the field of family violence to my review of these documents, and concluded that while brutal, Mr. Bourgeois' actions leading to the death of his daughter were not premeditated.  I set forth my opinion in a letter to counsel dated December 19, 2003, supplemented by a letter of February 25, 2004.

I was summoned to court in Corpus Christi on March 1, 2004, as part of a pretrial conference to determine the admissibility of my opinion that Mr. Bourgeois did not premeditate.  I was sworn as a witness at this conference, and tried to explain the basis for my views.  As I recall the proceedings, the judge repeatedly made the point that I was not permitted under the law to express an opinion on an issue that ultimately had to be decided by the jury, i.e., whether Mr. Bourgeois premeditated. I also recall that the judge asked whether in reaching my conclusions I made the assumption that Mr. Bourgeois committed the actual killing.

I am not a forensic psychologist and have appeared in court on only one other occasion.  Therefore, my experience in such matters is quite limited.  Nonetheless, I was quite surprised that Mr. Bourgeois' lawyers did not alert or prepare me for questions about my assumption that Alfred Bourgeois had committed the crime, which based on the judge's questions, seemed rather important.  Nor did Mr. Tinker seem to have much of a response to the judge's question about whether I could give an opinion on the question of premeditation.

I recall that at the conclusion of the hearing, after the judge ruled that I could not testify about premeditation in the guilt phase, she mentioned that perhaps Mr. Tinker could call me as a witness in the punishment phase of trial, if Mr. Bourgeois was ultimately convicted of capital murder.  Although Mr. Bourgeois was convicted, Mr. Tinker did not ask me to testify at the punishment phase.

I have now been asked by Mr. Bourgeois' current counsel to set forth what I could have testified about had I been called as a witness at the penalty phase of trial.  The following opinions are expressed to a reasonable degree of psychological certainty.

49

As I did in preparing my opinion for my aborted guilt phase testimony, I would have drawn on the extensive research that exists on child fatalities. This research reveals that the majority of "filicides" (death of a child at the hands of a parent) occur at the end of a disciplinary incident. In most cases, the parent does not intend to kill the child.

The pattern of abuse in this case and the ultimate act of violence that led to Ja'Karenn's death fits a pattern described in research about unintended filicide. In this case, the final fatal blow was administered as an act of punishment when the victim spilled the contents of a potty. From a psychological perspective, this was likely a disproportionate rage reaction resulting from stress and frustration.

In my opinion, it's likely that Mr. Bourgeois was in a violent rage during this incident. This rage likely stemmed from three sources: 1) his pathological child rearing; 2) the stressors, both immediate and distal, that he was suffering at the time; and 3) his organic deficits and impaired cognitive functioning. The research indicates that abusers often view violent acts as appropriate disciplinary techniques. I understand that Mr. Bourgeois came from an abusive background, and therefore the violent acts were normative. In other words, he saw what we would consider abuse to be just another tool in a parent's child rearing arsenal.

The final act of abuse in this case centered around a common child rearing incident, that of toilet training. Abusive parents mistakenly believe they are doing the right thing by hitting with the intent to hurt the child in order to teach him or her a lesson. Often, the child's continued failure to "learn the lesson" is perceived as repeated misbehavior, and the severity of the punishment will escalate. Further accidents then lead to increasingly more severe corporal punishment, and, in some cases to serious injury or death.

As noted, most cases of filicide occur in reaction to stressors both immediate and distal. The immediate stressors in this situation stemmed from the victim's potty training accident, along with the close quarters in the truck, Bourgeois' getting lost when trying to deliver a load to the Navy base, and his truck battery dying, making him concerned that he would be late for his scheduled deliveries.

Distal stressors are those more removed from the situation, but still pressing on the actor. At the time of the abuse, the materials reveal that Mr. Bourgeois was feeling overwhelmed by financial stressors. He was behind on his bills, he was engaged in a trucking contract that did not meet his financial needs, and he had two new babies to support (one of which, the victim, he had just learned of a few months prior). His recent discovery of his spouse's affair with another man also weighed heavily on him and raised the specter of yet another failed relationship.

50

As in some other filicide cases with which I am familiar, Mr. Bourgeois did not have the psychological resources to deal with these stressors. Instead, he reacted to a small event with an overwhelming and disproportionate amount of rage.

Bourgeois' current counsel have provided me with additional information that Mr. Bourgeois was abused as a child, and attesting to his impaired psychological and neuropsychological functioning.

That Mr. Bourgeois was himself abused is far from surprising. The offense itself stands as mute testimony to the fact that Mr. Bourgeois experienced violence, most likely by one or more care-givers, as a young child. Usually, abusive parents were at one time abused children. As noted, abused children accept violence as normative. Again, based on the pattern and type of abuse he visited upon his child, it is highly likely that Mr. Bourgeois was raised in and lived in a subculture that accepted a significant level of violence towards children.

Further, information provided to me by current counsel indicates that Mr. Bourgeois suffers from severe personality disorders that are frequently seen in abusers who were abused as children. Clinical psychologists have reported that he has a Borderline Personality Disorder. The disorder is characterized by intense rage episodes and a pathological inability to form healthy attachments to others. In addition, his social history reveals that he was not only an abused child, but that he was also an abandoned/rejected child. Childhood rejection makes it even more difficult for an adult to form healthy bonds, and predicts tumultuous relationships. Psychologically, our ability to form bonds with intimate partners is linked to our ability to form bonds with children. In Bourgeois' case, the ability to relate with others, especially intimate partners and children, is seriously damaged.

Even more significant in this case, it seems that Ja'Karenn became a scapegoat for Mr. Bourgeois. This is a common phenomenon in pathological family relations, where one child is unreasonably blamed by a parent for the family's problems and must suffer the brunt of that parent's rage and frustration. It is likely that Mr. Bourgeois was unable to bond with Ja'Karenn, and she therefore filled the role of scapegoat.

In addition, I have read the declarations of Dr. Gelbort and Dr. Weiner. They report that Mr. Bourgeois has serious neuropsychological deficits. He has a very low IQ (bordering between the mentally retarded and borderline retarded range). His low IQ means that he is less able to effectively problem solve. In addition, he appears to be damaged in those areas of the brain that impact his executive functioning. This testing and the opinions of Dr. Gelbort's and Dr. Weiner's show that he has an impaired ability to control himself and make sound judgments, particularly when under stress.

51

The reports of neuropsychological impairments are not surprising given Mr. Bourgeois' history of childhood abuse. Research shows that the trauma and stress experienced by the abused child can literally rewire the brain. The brain of a victim of severe abuse responds differently to stress, danger, and frustration with consequent deficits in making judgments, forming relationships and controlling impulses.

My testimony could have helped the jury understand that Mr. Bourgeois behavior, sadly enough, fits a common pattern of abuse. The pattern of abuse revealed in Ja'Karenn's autopsy can more readily be interpreted as fitting a pattern of mis-guided parenting than a case of premeditated torture. For example, Ja'Karenn was burned, bitten, hit, and whipped. These acts of violence, although cruel, are actually common in cases of severe child abuse. Often, they mirror the perpetrator's own experience of abuse as a child. In addition, they are often seen as corrective measures or used as instruments in a distorted understanding of "teaching" the child. For example, burning is often mistakenly used to teach the child to avoid hot surfaces. Biting is often intended to teach the child not to bite. Even the final blow that killed Ja'Karenn was in the course of a disciplinary act, where Mr. Bourgeois lost control of his own rage and slammed Ja'Karenn's head against a hard surface.
My testimony at the sentencing phase of trial could have served two purposes. First, it could have helped the jury place this awful crime in the context of family violence. It would have helped mitigate the image of Mr. Bourgeois as a sadistic monster intent on torturing and then murdering his child. Instead, I could have explained family violence as a phenomenon that is unfortunately tied up in our culture, and a pattern that sadly repeats itself through generations. I could have reviewed for the jury research about how difficult it is to break the cycle of family violence. Certain factors have been proven to help mitigate this cycle, including: high intelligence, therapy, and supportive functional (not enabling) spouses. Mr. Bourgeois did not benefit from any of these positive influences. Second, I could have reviewed for the jury the neuropsychological and psycho-social factors that pre-disposed Mr. Bourgeois to violence against children.

Had I been called at the sentencing phase, and provided with the information that I now have, I would have provided an opinion that the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions. These factors had an additive impact: i.e., each alone would have impaired Mr. Bourgeois, but taken together they likely overwhelmed him. I would have been able to provide this opinion, even if I did not state what I still believe to be true in this case, that this was not a premeditated case of murder. Instead, Mr. Bourgeois' actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control.

Declaration of George W. Holden, Ph.D. (contained in *PA*, document # 11) ¶¶ 1-23.

100.     Counsels' failure to utilize this available expert (who the Court had already paid to reach an opinion) was ineffective.  There could have been no tactic or strategy for not calling this witness who could have provided yet another humanizing face on what was otherwise an unmitigated and brutal offense.

**D.     Counsels' Deficient Performance and Ensuing Prejudice.**

101.     It is hard to fathom that counsel had a sound tactical or strategic reason for not putting on the unpresented mitigating evidence described above.  To be sure, counsel articulated that they were making a decision, but that decision cannot be considered sound.

102.     Dr. Cunningham's declaration provides some insight into what may have occurred. He notes that from his first contact with counsel they appeared not to appreciate either the complexity of their task, or some of the substantive issues related to it:

> I was first contacted by Mr. Gilmore on June 30, 2003.  At that time, he described that the trial was set for mid-September, and that the defense had "developed very little mitigating evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death penalty if convicted if they were not able to present mitigating evidence. I responded on July 1, 2003, and suggested that the defense hire a mitigation specialist. I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line. My own interviews and evaluation could not reasonably begin prior to this investigation. As neither this investigation nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.
>
> Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the

53

professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

Cunningham Declaration at ¶¶ 5-6.

103.    That counsel did not appreciate their task is confirmed by the fact that they only managed to arrange Dr. Weiner's evaluation of Petitioner at the very last minute – on the eve of trial. See Weiner Declaration at ¶ 2.

104.    It also appears that counsel were not particularly attentive to the materials forwarded to them by Dr. Cunningham. Counsel never had any telephonic or other contact with Dr. Cunningham (prior to or during trial) prior to his arrival in Corpus Christi to discuss the substance of his opinions. As he relates, this was far different from what he was used to in federal capital trials:

> During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.
>
> In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing. In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial. Normally, counsel looks to me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case. Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

Cunningham Declaration, ¶¶ 11 & 16.

105.    As Dr. Cunningham also relates, this lack of attention to the details of the mitigation

case carried over to the time that he appeared for trial.  It was apparent to him that counsel was not

familiar with the materials he had earlier provided and that they did not seem particularly interested

in preparing:

> The trial commenced in February, 2004 and I recall that the penalty phase started in mid-March.  Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial.  We did plan however for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd.  I arrived at my hotel in the mid-afternoon on March 21, 2004.  I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting.  Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions.  Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone.  However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night.  I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.
>
> *                                          *                                          *
>
> A second appointment was made to meet with Mr. Tinker after court that day [Monday].  Much to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar for about 45 minutes.  Mr. Tinker had a drink.  It was my distinct impression that he was not particularly interested in my analysis of his client's disorders and deficits.  It was obvious from his questions that he had not yet looked at the materials that I sent to him, and he certainly was not familiar with them.  To illustrate, while I was discussing the mitigating evidence, he interrupted me to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series

55

of slides regarding that topic. This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information. Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had provided to him. When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois. It was not in the trial notebooks that counsel had on their table. Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. Further, as evidenced by counsel not having this assessment in their critical records files, counsel apparently had not reviewed it or appreciated its implications. Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

Cunningham Declaration, ¶¶ 12 & 15.

106.    When Mr. Tinker alerted the Court prior to his cross examination of Dr. Estrada, that he was considering not calling Dr. Cunningham, he told the Court that he had "hinted" at it during his meeting the night before with Dr. Cunningham. TT 3/23/04, 4-5. Given that this was the first substantive discussion between counsel and his expert (and that it took place over just 45 minutes in a bar), it would thus appear that Mr. Tinker made his decision without benefit of knowing the scope of his expert's testimony. This is further evidenced by his response to the Court's statement that he had to weigh the "pros and cons" of calling this witness. Id. Mr. Tinker referred only to his discussion with Dr. Cunningham about risk assessment and said nothing about the mental health-related mitigating evidence that he was prepared to discuss:

**The Court:**    But you have to evaluate the pros and cons of what that goes into.

**Mr. Tinker:**    That's right. And I – for instance, let me talk. He would – he would say things – he would talk about how many people are in the penitentiary and how – and that there are only 10 percent commit murders. Well, I think why the hell would I want the jury to know that?

56

**The Court:**    [Indiscernable]

**Mr. Tinker:**    I know.  That's just a poor example.  Maybe it's 3 percent.  But still . . .

Id., at 5-6.  Mr. Tinker of course had it wrong.  Dr. Cunningham was not prepared to testify that 10 percent or 3 percent of people in prison commit murders.  Rather, Dr. Cunningham was prepared to testify, *inter alia*,  that: "Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois was only 2%.") (Cunningham Declaration, ¶ 37).  But this error was the least of Mr. Tinker's oversights.  He apparently failed to appreciate any of the mitigating evidence that Dr. Cunningham could have marshaled and discussed for the jury.

107.    Petitioner will brief the prejudice prong of this ineffectiveness claim in his to-be-filed *Memorandum of Law*.  Safe to say at this juncture, that prejudice in this case is not a close question.  Dr. Estrada's Declaration is the beginning and end of this discussion.  When the Government's own expert witness tells a court that the fact finder was not given a full and accurate picture of a capital defendant's mental health, prejudice is firmly established.[15]

---

[15]The jury was instructed that it could find as many as nine mitigating factors: 1) Petitioner's capacity to appreciate the wrongfulness of his conduct was significantly impaired; 2) he acted under duress; 3) he had no significant prior criminal history; 4) he suffered from extreme mental or emotional disturbance; and 5) any other aspect of his character or circumstances of the offense, including, but not limited to a) he was abused as a child; b) other culpable individuals were not punished; c) he was under stress from family and economic factors and d) he was driving cross county in a truck with four other individuals.  TT 3/24/04, 93-95.  The only mitigation found was that he was under stress from family and financial matters (six jurors found); and all jurors found that he was driving cross country in the cab of the truck.  Id., at 115.

The fact that the jury found no abuse, and no mental-health related mitigating factor is additional significant evidence that counsels' performance caused Petitioner prejudice.

**CLAIM III.**    **NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A REASONABLE FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS. FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

108.    The Due Process Clause of the Fifth Amendment requires the Government to prove every element of the offense charged beyond a reasonable doubt.  In this case the Government had the burden of proving the element that the fatal injuries were inflicted "within the special maritime and territorial jurisdiction of the United States."[16]  Thus, the Government had the burden of proving that the murder took place on the grounds of the Corpus Christi Naval Air Station.  No reasonable view of the Government's evidence existed upon which a reasonable factfinder could conclude that the fatal injuries were inflicted on the Air Station grounds.  Accordingly, this court must vacate the judgement of conviction.

109.    Moreover, trial counsel were ineffective for failing to gather and present readily available evidence to rebut the Government's proof of this element of the charge and to rebut the Government's theory of how the crime took place.  Petitioner was prejudiced and his judgment of conviction must be vacated.

110.    Under the Government's theory of the case, Petitioner was only on the grounds of the Naval Air Station for a short time (less than 1 ½ to 2 hours) before the decedent was discovered on the pavement outside the truck at the loading dock area of building 1218.  It was also the Government's theory that the fatal injuries were inflicted after the decedent tipped over her potty while Petitioner was driving the truck on the grounds of the Naval Air Station heading towards the

---

[16]18 U.S.C. §1111(b).

loading dock of building 1218.  TT 3/2/04, 37-38.  According to the Government's theory, after the potty was tipped over, Petitioner became enraged and banged the decedent's head against the interior front windshield a number of times, eventually causing her death.  The only witness to this alleged fatal act was AB-1994 the seven year old daughter of Petitioner – Robin, the only other adult in the truck, was allegedly asleep. Id.   AB-1994, however, never specifically testified that Petitioner beat the decedent while on the grounds of Naval Air Station.

111.    Dr. Elizabeth Rouse, MD, performed the autopsy and testified at Petitioner's trial. TT 3/8/04, 2-67.  She testified that she performed the autopsy two days after the alleged assault in the truck.  She found that the cause of death was closed head injury, which she termed a subdural hematoma, on the right side of the head.  Incredibly, she was never asked to testify to the age of this fatal injury. Id. at 22-23.  Instead she testified, in response to a question by the prosecutor, that there were "recent" scalp wounds on the decedent –  but Dr. Rouse stated very clearly that these scalp wounds were **not the fatal injuries**. TT  3/8/04, 10-20.

112.    Dr. Rouse testified that she sent the sections of the brain tissue (where the fatal subdural hematoma was found) to a neuropathologist. Id. at 59.  Yet neither the Government nor trial counsel questioned her about the results of the neuropathologist's analysis.  In fact, trial counsel's cross-examination of Dr. Rouse took up less than three pages of transcript.  How could the Government fail to ask the doctor who performed the autopsy the time of the infliction of the fatal wound, when it knew it had to prove the murder took place on the grounds of the Naval Air Station? The answer is: the Government had in its file scientific evidence showing that the fatal wound occurred **a minimum of 10 days prior to the autopsy of the decedent.**  The scientific evidence was dispositive: this murder *did not* take place on the Naval Air Station and it *did not* take place in the

manner that AB-1994 described.

113.   The neuropathologist's report (summarized in the autopsy report, *PA* document #52) clearly and unequivocally found that the fatal injuries to the brain were at a minimum **over 10 days old at the time of the autopsy** – long before Petitioner was alleged to have fatally assaulted the decedent in the truck and long before he was on the Naval Air Station grounds and long before he was even in the state of Texas.  Specifically, the neuropathologist, Kathleen Kagan-Hallet, MD, examined microscopically the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately *ten days old* and the injury to the rest of the brain (cerebral white matter) was over 7 days old.   (Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50).  This scientific evidence prepared at the request of the Government's own expert Dr. Rouse – had it been presented to the jury – would have devastated the Government's theory of its case against Petitioner.

114.   Dr. Werner Spitz, a forensic pathologist with over 54 years of experience, examined the autopsy and the autopsy photographs and concluded that the fact that the fatal injuries were a week or more old calls into question the causation of the injuries and the timing of the fatal injuries. (Declaration of Werner Spitz, MD dated 5/10/07 attached hereto as PA #53).  Dr. Spitz further concluded that the autopsy results and the neuropathology report do not comport with the testimony of AB-1994. Id.

115.   Trial counsel never even attempted to cross-examine Dr. Rouse on this critical element of the Government's case.  Had counsel either called Dr. Kagan-Hallet to the stand or retained a forensic pathologist, they could have shown the jury the fatal flaw in the Government's theory of the case.  Counsel was ineffective; Petitioner was prejudiced. The judgment of conviction

60

must be vacated.

116. Trial counsel also failed to present readily available evidence through either cross-examination or through the presentation of live witnesses of the bad character and reputation in the community of Robin and AB-1994 for being truthful and honest. The credibility of these witnesses was critical to the Government's case – simply put, if the jury believed either of these witnesses Petitioner was going to be convicted. (Declaration of Anita Ferdinand, *PA* document # 24; Declaration of Michelle Armont, *PA*, document # 17; Declaration of Michelle Warren, *PA*, document # 39).

117. Both Robin and AB-1994 had given a number of different accounts as to what transpired on the day in question. Robin's final version of events is highly questionable – she slept through the infliction of the fatal injuries and then awoke just in time to perform CPR on the decedent in an attempt to save her life. Under Robin's version of events, could Petitioner really have had enough time to concoct a story (that the decedent accidentally fell out of the truck) and share that "story" with Robin and AB-1994, before the discovery of the decedent on the ground outside the loading dock of building 1218?

118. The veracity of Robin and AB-1994 was critical to the outcome of this case. Yet, counsel made no effort to present witnesses who could have testified that both Robin and AB-1994 had a reputation for not being truthful and for being manipulative and dishonest. Counsel was ineffective, Petitioner was prejudiced and the judgement of conviction must be vacated.

**CLAIM IV.  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, IN VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.    Introduction**.

119.    At trial, the Government presented expert testimony and prosecutorial argument that Petitioner's semen was detected during the post-mortem rectal examination of JG-1999.   The Government used this evidence, as well as evidence of alleged trauma to JG-1999's vagina, to argue that Petitioner sexually abused JG-1999.  Despite the extremely inflammatory and prejudicial nature of this evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and penalty phases of trial, defense counsel failed to present readily available expert testimony that would have completely undermined the Government's evidence that semen was present and JG-1999 was sexually abused.

120.    As set forth below, at the time of trial, counsel could have presented expert testimony indicating that there was <u>no</u> basis for the testimony of Dr. Scott Benton, Caroline Zervos and Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.  Counsel could have presented expert testimony indicating that if the substance recovered from the rectal swab of JG-1999 was semen, sperm should have been observed.  Despite multiple tests, <u>no</u> sperm were ever observed in this case. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, false positives are <u>not</u> uncommon in the test used by the Government to allegedly identify the substance as semen.  Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to identify the alleged semen, <u>has</u> been detected in multiple male <u>and</u> female bodily fluids.  Additionally,

Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, there was no evidence of trauma to the vagina of JG-1999.

121.    Trial counsel, however, failed to present any of this available expert testimony. Trial counsel were ineffective and their deficient performance severely prejudiced Mr. Bourgeois at trial and at sentencing, in violation of his rights under the Sixth and Eighth Amendments to the United States Constitution. Mr. Bourgeois is entitled to a new trial and/or sentencing hearing.

**B.     The Testimony and Arguments Presented at Trial.**

122.    The Government first set forth the evidence of the alleged semen detected in JG-1999's rectum in its opening statement to the jury. The prosecutor stated:

> Also, there will be testimony that a swab was taken from the bottom, from the rectum of the baby, and that swab, even though it was taken two days after this incident occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will testify that that swab showed that there was seminal fluid in the rectum of the baby.

TT 3/2/04, 42.

123.    In keeping with its promise to the jury, the Government presented the testimony of Dr. Scott Benton, who was qualified at trial as an expert in child sexual assault. Dr. Benton testified that child sexual abuse was difficult to detect because children seek to avoid disclosure of the abuse; perpetrators purposefully try to avoid injury to the child; and the vagina, anus and mouth of a child heal rapidly. TT 3/5/04, 18. Thus, according to Dr. Benton, it is not unusual to see a child who has been sexually abused display no physical signs of trauma. Id. at 19.

124.    However, Dr. Benton testified that evidence of sexual assault by a male can also be determined through forensic testing and the detection of semen. Id. at 22. He defined semen as the "product of the prostate gland of men. . . composed of water and various proteins and enzymes. . .

meant to be a vehicle for sperm during ejaculation." Id. at 49.  Dr. Benton also testified about the

different forensic tests used for the detection of semen:

> The two main tests used for that are acid phosphatase, which is produced predominantly in the prostate of men, and with ejaculation or even pre-ejaculation, that can be deposited either on the skin or in the vagina or the anus or mouth of the victim.
>
> **And a more specific or confirmatory test is called prostatic specific antigen, also known as P30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, except in male prostate, and with one exception, human breast milk.**
>
> The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quick enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which will tell you that there was the presence of male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible.
>
> So those are the main trace evidence that we look for, the biological evidence and the physical evidence that we look for to help establish whether or not a sexual assault took place.

Id. at 22-23.  In further delineating the P30 assay, Dr. Benton noted that the test is designed to

specifically confirm the presence of the P30 protein, which, according to him, is found only in the

male prostate gland (where semen is produced) and the lactating breast of women.

> The P30 is a protein, and we call it the prostate specific antigen.  That's what I was talking about sort of earlier.  It exists or is produced in the human prostate and in the lactating breast of women.  People who are breast-feeding, it can be found in breast milk.  So from the prostate, we know acid phosphatase and P30 can be done.  So I order the acid phosphatase, and then we refer on – because crime labs can do more expensive tests, to do the P30 test. . . . **It is the confirmatory test for the presence of the prostatic specific antigen, also known as PSA or P30**.  These are synonymous terms.  And that's what it tests for.

Id. at 53.

125.    In addition, on cross-examination, Dr. Benton stressed the reliability of the P30 test,

over other tests, in determining the presence of P30 and semen.

> We then move to the P30 test. This is the second group of tests. Just to reiterate, there's two types of tests. There's a screening test, and there's a confirmatory test. The acid phosphatase is in the screening group. We want to know, is there a possibility that there's semen there, even if it's erroneous. The confirmatory test is different, **The confirmatory test is we don't want to make any mistakes**. We want the most specific test possible. And frequently, it's also a more expensive test. You use the cheapest test you can for screening, because you're doing it to a lot of people. But the P30, you want to put your best stuff on it.
>
> So in confirmatory tests, the profile, the statistical profile of it is that it has the lowest false positive rate of any test. . . .**We know with the acid phosphatase that it's accuracy can sometimes be off, but it's still very good. With the P30, very low levels of false positives are ever reported.** And there's multiple different ways to test for the P30, just to confirm that it is really there. I think that answers your questions.

Id. at 54-55.

126.    According to Dr. Benton it was not unusual to identify semen where no sperm are

detected, id. at 23, in part because of the low survivability and rapid degradation of sperm.

> Sperm's survivability usually is only in the cervix or in the womb, the uterus of the woman. In the vagina itself, it usually doesn't live more than 24-48 hours. In a little girl, prepubertal girl, it doesn't live very long, hours. So they will die. They'll lose their little tails. And once they lose their tails, they're very difficult to find, on a rape kit or trace forensic evidence. You'll find evidence of semen much easier than you'll find sperm. Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing. So the sperm can be destroyed in those environments, and you could still detect semen, but not find sperm. So those would be the conditions in which you could see semen, but not sperm.[17]

Id. at 51-52.

127.    Dr. Benton also testified that his review of the autopsy photographs, and in what in

his opinion was blood outside of blood vessels, JG-1999 suffered trauma to her vagina. Id. at 44-46.

128.    The Government also presented the testimony of FBI forensic serologist, Caroline

---

[17]Dr. Benton also opined that semen with no sperm was not uncommon in pre-ejaculate fluid, men with vasectomies and men with "Azoospermia" – low sperm count. TT 3/5/04, 50-51.

Zervos. Ms. Zervos testified that as part of the FBI's protocol, when sample sizes permit, two tests, presumptive and confirmatory, are usually performed to determine the presence of semen or other serological substances. Id. at 63-64. Ms. Zervos testified that in this case, only a confirmatory test for the presence of semen was conducted on the evidence labeled Q5-Q7, the post-mortem rectal swabs taken from JG-1999. Id. at 86. She testified that only the confirmatory test was used in order to avoid the false positives sometimes associated with presumptive tests. Id. at 87. Ms. Zervos also testified that in this case, a P30 test was the confirmatory test used on the rectal swabs, and that it was positive for the presence of semen. Id.[18]

129.    On cross-examination, Ms. Zervos testified that the P30 protein could also be found in male blood and male urine, and thus tests of those substances could also result in a positive P30 test. Id. at 103-04. However, according to Ms. Zervos, no female fluids contain the P30 protein. Id. at 105

130.    The Government also presented the testimony of FBI forensic DNA examiner Anthony Onorato. Mr. Onorato testified the only DNA present on the rectal swabs, Q5-Q7, was female and belonged to JG-1999. Id. at 118. He also testified that it was not uncommon to have semen where male DNA is not detected. Id.; 127-28.[19] On cross-examination, Mr. Onorato testified that the only place, outside of male semen, where the P30 protein can be found, is the blood of a male with prostate cancer. Id. at 128.

---

[18]Ms. Zervos also testified that testing for the presence of semen on four oral swabs of JG-1999 was negative. TT 3/5/04, 87.

[19]Mr. Onorato also testified that an additional test for the presence of male DNA, performed by Orchid-Cellmark Laboratories, on behalf of the FBI, in this case, was also negative. TT 3/5/04, 132-04.

131.    During closing arguments of the guilt/innocence phase of trial, the Government seized upon the testimony of Dr. Benton, Ms. Zervos and Mr. Onorato.  The prosecutor argued:

The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them.  There was semen in that baby's bottom.  But the swabs were taken at the autopsy and the autopsy was done on June 29th.  The baby was thrown on the side of the truck on June 27th and died on the 28th, two days.  Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly.  But when you get a confirmatory test for semen, you've got semen.  It's an ejaculate from a man, not from a woman, from a man from sexual arousal.  And that's what we know.

The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and no show.  You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes?  I said, wt (sic) that Vaseline?  No, we don't have Vaseline in the truck.  What is so bad about having Vaseline?  I thought that was interesting.  It's a lubricant.  Why would you have to deny that?

TT 3/16/04, 19-20.[20]

132.    Despite the testimony of the Government witnesses that semen was found, and understanding the extremely prejudicial nature of the evidence, in his closing argument, trial counsel attempted to argue that no evidence of semen or sexual abuse existed.

They say sexually abused.  **And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital.**

*                                    *                                    *

First you learned about DNA, some of you may already have learned a lot about DNA.  I know I don't know much about DNA but that you can prove who didn't do something but it's not a sure thing who did it.  We learned that.

Secondly, with regard to DNA, we learned that there was a test which was found

_____

[20]The Government's argument regarding petitioner's use of Vaseline to sexually abuse JG-1999 is based on Dr. Benton's testimony that with lubrication, the rectum of a child is sufficiently flexible to withstand the trauma an adult male penis, and quickly heal.  TT 3/5/04, 36-39.

positive for semen and that the expert who had examined that and talked freely about (inaudible) protein. **He said that there was a better test and so he sent the semen off for a better test. And that test was negative. That test was negative, the better test**. And that was the testimony from the witness.

*                                    *                                    *

And I suggest to you, if that's going on, that should have no reliability as far your decision making in this case because you'd have none. And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call, was negative. **There's no evidence of semen, I suggest to you, being found on this child.**

TT 3/16/04, 24; 41-42; 43. However, because no evidence was presented to support his argument

that there was no semen found, and based on the allegedly positive P30 test indicating semen was

found, an objection to defense counsel's argument was sustained .

133.    Indeed, counsel's argument prompted the following exchange, during which this

Court relied on the allegedly positive test:

Ms. Booth:    Your Honor, I have to object. That is a mischaracterization of the evidence.

The Court:    That is sustained.

Mr. Tinker:    The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth:    I have to object, your Honor.

Mr. Tinker [sic]:    Let me see counsel at side bar.

(Begin bench conference at 9:40 a.m.)

The Court:    **The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was** –

Mr. Tinker:    (Inaudible)

68

The Court:     It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child.  it was –

Mr. Tinker:     (Inaudible).

The Court:     **That is what the expert testified to, there was seminal fluid found in her anus.  What they couldn't identify because it was degraded, was the DNA.  There was no question of the expert testified.  They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:     I didn't do that on purpose – we got over here and I said, I object.  And you said, why do you –

The Court:     What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA.  It was too degraded.

Mr. Tinker:     You said, why do you object that it was negative and so I said, okay, it was negative.  But I didn't know (inaudible).  Well anyway, I'm just saying –

The Court:     (Inaudible) that there was DNA that came back no – they couldn't find DNA.  They could only find JG-1999's DNA.

Mr. Tinker:     But I didn't do that on purpose, Judge.

The Court:     But you've said it several times (inaudible) that there was another test they could have done to identify the seminal fluid.

Mr. Tinker:     (Inaudible).

The Court:     Don't put emphasis on it because they don't have to believe what the experts say.

(Bench conference ends at 9:42 a.m.).

TT 3/16/04, 43-45.

134.    Subsequently, during its penalty phase closing argument, the Government used the alleged semen evidence as a basis for urging the jury to sentence Mr. Bourgeois to death.

69

Was he laughing when he beat JG-1999 to death?  Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body?**

\*                                              \*                                              \*

Let's talk about lack of remorse.  The Defendant spoke to you.  Was there remorse in his voice?  Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't.  Not ever.  He murdered this baby.  **His signature with his teeth marks and his semen is all in that baby**.

TT 3/24/04, 70; 75-76.

### C.     Trial Counsel's Deficient Performance.

135.     Although counsel failed to present the evidence, at the time of trial, expert testimony was readily available which would have supported his arguments and completely undermined the Government's allegations that semen was found and that JG-1999 was sexually abused.

136.     Indeed, on October 8, 2003, counsel filed an *ex parte* motion for the appointment of Dr. Elizabeth Johnson as a defense DNA expert.[21]  PA, document # 46.  On October 20, 2003, this Court granted that motion. PA, document # 47.  On January 16, 2004, counsel informed the Court that contrary to the Government's assertion that all samples had been consumed during prior testing, Dr. Johnson had identified an additional biological sample which was available for serological and DNA testing.  TT 1/16/04, 32-34.  With the assistance and consent of the Government, the remaining sample was sent to Dr. Johnson.  Id. at 34-36.

137.     On February 25, 2004, after counsel had failed to provide the Government with a report from Dr. Johnson and several other defense experts, this Court issued an Order indicating that all expert reports, including Dr. Johnson's, must be turned over by February 26, 2004.  PA,

---

[21]A copy of Dr. Johnson's curriculum vitae is included as an exhibit to this *Motion*. See PA, document # 49.

document # 48.; TT 2/25/04, 130-48.  If not provided, counsel would be precluded from presenting the testimony of Dr. Johnson.  Id.

138.    On March 1, 2004, Dr. Johnson provided trial counsel with a two page summary of the testimony she could provide if called to testify.  Regarding the Government's conclusion that semen was detected on the rectal swab taken from JG-1999, Dr. Johnson concluded:

- The FBI did not test the rectal swab with AP reagent or do a sperm search.  They only did a P30 test with the ABA card and a DNA test.  The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction;

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

PA, document # 49.  Dr. Johnson also provided counsel with documentation of the bodily fluids, other than male semen, where the presence of the prostatic specific antigen (PSA) has been detected, including: amniotic fluid, breast milk, saliva, female urine and female serum.  Id.  Dr. Johnson, however, was never called to testify at Petitioner's trial.

139.    Dr. Johnson was not alone in her view.  Trial counsel could also have presented additional expert testimony which would have supported the conclusions of Dr. Johnson and counsel's argument that no semen was found, and would have further undermined the testimony of Dr. Benton, Caroline Zervos and Anthony Onorato.

140.    Indeed, undersigned counsel has consulted with Dr. Edward T. Blake and Alan Keel

of Forensic Science Associates who have determined that:[22]

- There is no basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.

- Contrary to the testimony at trial, the P30 test is not a stand alone confirmatory test for the presence of semen. Because of the hyper-sensitivity of the P30 assay, false positives are not uncommon. For example, the P30 assay is so sensitive that positive results have been identified in semen free female urine. Thus, contrary to the testimony at trial, the P30 protein has been identified in body fluids other than semen, male blood, and male urine. Without the presence of acid phosphatase and/or sperm, the P30 assay is not and should not be considered a stand alone confirmatory test.

- The presence of sperm is the only confirmatory test for semen. Even then, if there is a low number of sperm, the test may not be confirmatory. There are many scenarios which might lead to the presence of sperm in a substance which is not semen. Finding a low number of sperm does not necessarily mean that there was ejaculate at that location. In this case there were no sperm identified in any of the tests which were performed. Moreover, in this case, if the substance identified by the P30 assay was semen, sperm should have been identified. Because of the high unit volume of sperm in semen the finding of sperm is more sensitive than the P30 assay.

- Dr. Benton's testimony defining semen as the water and protein containing substance which is produced in the prostate gland is incomplete if not erroneous. See TT 3/5/04, 49. Semen is the combination of the secretions of the testes, seminal vesicles, prostate, bulbourethral glands and sperm. Moreover, Dr. Benton's testimony regarding the survivability of sperm is completely irrelevant. Indeed, the more important issue is the persistence of sperm. Thus, even if sperm lose their tails or die as easily as Dr. Benton describes, they do not degrade easily or rapidly and DNA from those sperm cells can be identified and extracted for decades. Again, in this case, no

---

[22]Dr. Blake and his Forensic Science Associates in Richmond, California, are nationally renowned. Dr. Blake's curricula vitae is included as an exhibit to this *Motion* (*PA*, document # 41). Dr. Blake and his firm provide criminalistic and forensic serology services to law enforcement, prosecuting agencies, attorneys, insurance companies and private individuals. As a doctoral student, Dr. Blake assisted in discovering, isolating and identifying the P30 protein. He was also the first scientist in the United States to use polymerase chain reaction (PCR) based DNA testing. Petitioner's allegations are based upon his recent communications with Dr. Blake, and he will shortly be providing a Declaration from Dr. Blake.

sperm were ever identified.

• Dr. Elizabeth Johnson's pre-trial conclusions, contained in her March 1, 2004 summary to trial counsel, are accurate and there is no scientific basis for counsel's failure to present her testimony at trial.

141. Additionally, trial counsel failed to challenge Dr. Benton's testimony that the autopsy of JG-1999 revealed vaginal trauma. See TT 3/5/04, 44-46. While counsel argued that the autopsy of JG-1999 revealed no vaginal trauma, he failed to present any evidence to support his argument.

142. Government witness Dr. Elizabeth Rouse testified that during her autopsy she performed a sexual assault examination on JG-1999. TT 3/8/04, 59-60. In her autopsy report, Dr. Rouse concluded that, "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**." See Autopsy Report of Dr. Elizabeth Rouse, PA, document # 52, p. 3. Dr. Rouse, however, did not testify about the results of that examination, id., and counsel failed to elicit the results during cross-examination. Id. at 65-67.

143. Dr. Rouse's autopsy report does not stand alone in demonstrating the unreliability of Dr. Benton's testimony regarding alleged trauma to JG-1999's vagina. Indeed, undersigned counsel has consulted with renowned forensic pathologist Dr. Werner U. Spitz, who has determined that:

> With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had what appeared to be inflammatory changes in the genital area, some six weeks before her death and evidence of apparent bruising at the time of the postmortem examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse who performed the autopsy specifically describes on page three of her report, at the end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down in the same paragraph, the autopsy report continues "on the upper left buttock, there is hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in much better position to determine if a bruise was

73

present. She examined the entire area, described it, and determined it was normal. Declaration of Werner U. Spitz, M.D., PA document # 53, ¶ 15.

144. Counsel's performance in failing to present available expert testimony to rebut the Government's allegation that semen was found in JG-1999's rectum and that she was sexually abused was deficient. Counsel's performance in failing to present available expert testimony to rebut the testimony of Government witnesses Dr. Scott Benton, Caroline Zervos and Anthony Onorato was deficient. Additionally, counsel's performance in failing to elicit and present expert testimony that there was no trauma to JG-1999's vagina was deficient.

145. Trial counsel could have had no reasonable tactical or strategic reason for failing to present expert testimony to challenge the Government's extremely prejudicial evidence of sexual abuse. Indeed, counsel argued that there was no semen detected and that there was no evidence to support sexual abuse but failed to present any of the readily available evidence to support his argument. Counsel was ineffective.

**D.    Petitioner Was Prejudiced by Counsel's Ineffectiveness.**

146. As a result of trial counsel's ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted. This unrebutted evidence impacted the guilt/innocence and penalty phases of Mr. Bourgeois' trial.

147. Because Mr. Bourgeois was alleged to have been the only person who could have donated the alleged semen, the unrebutted evidence of semen and sexual abuse was directly relevant to the identity of the killer and severely undermined Mr. Bourgeois' defense that he was not JG-1999's killer. Indeed, any argument that Mr. Bourgeois was not the person who killed JG-1999 was apt to carry significantly less weight when the jury was told, without evidence to the contrary, that

his semen was present in her rectum and her vagina was traumatized.  In addition, the prejudice to Petitioner's defense was compounded by the flawed bite mark evidence counsel ineffectively failed to rebut.  See Claim V, above.  Had counsel acted effectively, he could have supported his argument that no semen was found and that JG-1999 was not sexually abused and his argument that Mr. Bourgeois was not JG-1999's killer would have been profoundly more convincing. Petitioner was prejudiced.

148.    The unrebutted evidence of semen and sexual abuse was presumably admitted in support of the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner.  18 U.S.C. § 3592(c)(6).  As set forth above, this evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**.").   Unquestionably, this flawed and extremely prejudicial evidence erroneously skewed the jury's deliberative weighing process in favor of death.  Indeed, as a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die.  As a result of trial counsel's ineffectiveness, the jury that sentenced Petitioner to death was unable to find a redeeming quality in Mr. Bourgeois or a reason to spare his life.  Instead, as a result of counsel's ineffectiveness, the jury that convicted Mr. Bourgeois of murder and sentenced him to death believed that he was the worst of all people – the cruel and calculating, child molesting murderer of his own two year old daughter.    Petitioner was prejudiced.

149.    Mr. Bourgeois' rights under the Sixth and Eighth Amendments of the United States Constitution were violated.  He is entitled to a new trial and a new sentencing hearing.

**CLAIM V.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

150.    Petitioner's right to effective assistance of counsel, guaranteed by the Sixth Amendment to the United States Constitution, was violated when trial counsel failed to challenge via a <u>Daubert</u> motion,[23] and Federal Rule of Evidence 702,[24] the admissibility of the bite mark testimony and opinions of Dr. Senn and Dr. Chrz on the grounds that it was not technically or scientifically reliable.    Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury.

151.    Dr. Senn and Dr. Chrz testified as Government witnesses using digital enhancements of the autopsy photographs of bite marks on the right arm and lower back of the decedent.    TT

---

[23]It is well settled that <u>Daubert v. Merrell Dow Pharmaceutical, Inc.</u>, 509 U.S. 579 (1993) and Federal Rule of Evidence 702 require a trial judge to act as a gatekeeper, excluding expert scientific and technical opinions/methods that lack sufficient reliability.  The court must determine at the outset whether the reasoning or methodology underlying the expert testimony is scientifically valid. Simply put, evidentiary reliability is based upon scientific or technical validity.  In performing this gatekeeper function, a trial court should apply the following factors in determining whether proffered testimony is scientifically or technically valid: 1) whether the theory or technique can be or has been tested, 2) what the known or potential rate of error is, 3) whether standards controlling the technique's operation exist and are maintained, 4) whether the theory or technique is generally accepted within the relevant scientific or technical community, and 5) whether the theory or technique has been subjected to peer review and publication.  The reliability requirements of Rule 702 and <u>Daubert</u> apply not only to novel scientific techniques but to well established propositions as well.

[24]Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

3/8/04, 251-52, 282, 310.  Both Dr. Senn and Dr. Chrz concluded that Petitioner could not be excluded or included as the possible biter of the right arm.  TT 3/8/04, 279, 300.   Dr. Chrz concluded that Petitioner was "the probable biter" for the bite mark on the lower back of the decedent and Dr. Senn concluded that Petitioner could not be "excluded" as the biter for this injury. TT 3/8/04, 279, 311, 349.  Based on this expert testimony the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent.  TT 3/24/04, 76.

152.    Dr. Senn further concluded the decedent had a "probable bite mark" on the right hand and that the marks on the left hand and the left foot of the decedent are "possible" bite marks.  TT 3/8/04, 283.  Dr. Chrz did not offer an opinion as to the origin of these additional injuries.

153.    The digital enhancements that both Dr. Senn and Dr. Chrz used in their presentations to the jury were created by Dr. William Oliver.  TT 3/8/04,  14, 249, 299.

154.    The methods used by Dr. Oliver to enhance the original autopsy photographs were scientifically and technically invalid for use in a capital trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community. Consequently, the analysis and conclusions drawn by Dr. Senn and by Dr. Chrz were scientifically and technically invalid and should not have been admissible at Petitioner's trial.  Furthermore, even without the enhanced images, the bite mark testimony and opinions rendered by Dr. Senn and Dr. Chrz were scientifically and technically unreliable, inaccurate and inadmissable.  Trial counsel was ineffective for failing to move to preclude this evidence.

155.    Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury.  Specifically, trial counsel had a duty to rebut it with expert

testimony of its own. Trial counsel – despite repeated representations to the court that it was intending to retain a bite mark expert – never retained or presented such a witness at Petitioner's trial. Furthermore, trial counsel was well aware of the fact that the first bite mark expert that the Government consulted *did not* find that Petitioner was the biter, yet trial counsel inexplicably failed to present this witness on behalf of the Petitioner. Instead, trial counsel sat back and allowed this inaccurate and highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and uncontradicted. Trial counsel's performance was deficient.

156.   There can be no question that the inflammatory and highly inaccurate bite mark evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements. TT 3/2/04, 31-31, 34, 42, TT 3/16/04, 19-20, 48-49 (The bite mark experts did not exclude "that *thing* [Petitioner] that's sitting right there.") The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death. TT 3/24/04, 37, 41, 70, 76. ("His signature *with his teeth marks* and his semen is all in that baby.")   Petitioner was clearly prejudiced by trial counsel's failure to preclude and/or rebut this evidence and a new trial and sentencing proceeding are mandated.

A.   **Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.**

157.   Trial counsel was on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and was provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images ("I want to see how its done"; "I don't understand it"; "I've never seen it"), counsel

78

never even looked at the enhancements until mid-trial, and just moments before Dr. Oliver was going to testify before the jury.  TT 3/8/04, 15, 18.

158.    Incredibly, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements.  TT 3/8/04, 14-15.   The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value.  Id. at 30.  This objection was denied and Dr.  Oliver was permitted to testify.  TT 3/8/04, 30.

159.    The original autopsy photographs were taken with a 35mm camera.  Dr. Oliver testified that there are two broad categories of image processing techniques: those that attempt to bring out features that are not visible in the original image and those that *actually change* the relative value or prominence of features in the image.  TT 3/8/04, 15-18.  Dr. Oliver employed the second type of image processing and actually modified the original 35mm autopsy photographs.  Id.  Specifically, he employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method.  Id. at 19.  Dr. Oliver admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

160.    Dr. Oliver also admitted that it was very important when analyzing the newly created images  to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  Dr. Oliver emphasized that valid conclusions require "going back to the original image."   TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit onto the PowerPoint.  Id. at 19.  In his presentation to the jury and in reaching his conclusions he never went back to the original 35 mm photograph but instead he called the digitized image the "original."  Id. at 26.  In describing his

79

ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

161. Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc. These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

162. Specifically, the digitized/scanned images were found to be "distorted" "inaccurate" "incomplete" and "over-reaching alterations." Report of Mark Cherry and Manfred Schenk, MAC (*PA*, document # 43). Specifically, Dr. Oliver's method of converting the original 35mm photographs into digital images with a 600 dpi scanner instead of a 3600 dpi scanner created digital images that had a much narrower color spectrum than the original photographs. Additionally, the images themselves were distorted (from a 35 mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used JPEG, a lossy not a lossless compression program. The images were then further distorted and further detail was lost when Dr. Oliver converted them to PowerPoint.

163. The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere" Id. The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of "Bayer Pattern Nearest- Neighbor Coloration" or "interpolation." This problem occurs when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image into a number of smaller ones. Interpolation is apparent throughout all of Dr. Oliver's

enhanced images.  Id.

164.    One could not imagine a more prejudicial and inaccurate enhancement technique when looking for "unseeable" and "unphotographable"  injuries than a technique like CLAHE  that allows images to draw colors and shapes from neighboring images.

165.    The methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of Daubert:

I.      The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

ii.     Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

iii.    The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

iv.     The digital images presented as "original images" were compressed and therefore they lacked original detail.

v.      There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

vi.     You cannot substitute enhancement for details that were lost during the digital conversion.  The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

vii.    The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

PA, document # 43.

166.    Werner Spitz, MD a forensic pathologist with 54 years of experience and the author

of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition was also retained by undersigned counsel. Dr. Spitz reviewed the enhanced autopsy images including those of the bite marks. Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate the findings, and produce artifacts." Spitz Declaration, *PA*, document # 53. He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties . . . [and were] without scientific merit." Id. Dr. Spitz also noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*." Id.

167. Undersigned counsel also provided the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models to Dr. C. Michael Bowers, DDS, JD a board certified forensic odontologist and expert in the area of forensic dental digital imaging. *PA*, document # 42. Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " **the most overly 'enhanced' images I have ever seen used in actual casework**." Id. Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver produced "uncontrolled digital noise . . . into the computer-manipulated image that does not reflect the original state of the picture." Id.

168. Dr. Bowers found that the "ruler" and "injury pattern" in the enhanced bite mark images had "undergone considerable alteration [and] . . . change." Specifically, "contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradation of color in the bruise (indicating either less or more pressure by the biter) are lost." Id.

169. Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation. Specifically, Dr. Bowers found that the methods of enhancement

utilized by Dr. Oliver did not comport with <u>Daubert</u>:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . . The Government has no data as to known or potential error rate . . . of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

*PA*, document # 42.

170.    Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable. They would have litigated a <u>Daubert</u> motion and Dr. Oliver's enhanced images as well as the conclusions of Dr. Senn and Dr. Chrz would likely have been precluded.

**B**.    **The Opinions of Dr. Senn and Dr. Chrz Were Utterly Unreliable.**

171.    Both Dr. Senn and Dr. Chrz relied upon the enhanced images created by Dr. Oliver in presenting their opinions to the jury. For this reason alone, their bite mark opinions were scientifically and technically invalid and should have been precluded. However, even if the significant inaccuracies of the enhanced images are ignored, the opinions of Drs. Senn and Chrz fail to meet the <u>Daubert</u> standards for valid science.

172.    The Government experts' conclusions that Petitioner was the "probable biter" and the prosecutor's argument that Petitioner was the "probable biter" (3/16/04, 49) and had left his "signature" (3/24/04, 76) in the form of his teeth marks on the decedent went well beyond the boundaries of accepted and valid bite mark identification. Dr. Bowers noted that "the validity,

reliability and accuracy of bite mark identification have not improved to the point where it should be used as the sole means of identifying the biter." *PA*, document #42. Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or 'probably the biter' via teeth marks are not rendering a reliable opinion." Id.

173.    Dr. Spitz agrees with Dr. Bowers that "Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as DNA or at least blood type verification." *PA*, document # 53.

174.    In this case that is exactly what occurred. The Government specifically did not ask AB-1994 if she saw Petitioner bite the decedent on the lower back despite questioning her extensively about Petitioner's biting of the decedent. The Government also did not ask Robin to identify Petitioner as the biter of the decedent's lower back. When all was said and done the Government relied solely (and improperly) on expert testimony to argue that Petitioner had left his "signature" on the decedent's body in the form of his "teeth marks."

175.    Dr. Bowers, a diplomate of The American Board of Forensic Odontology ("ABFO"), notes that this scientific community "has minimal scientific research supporting reliable positive identifications from bite marks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy." He also noted that the Bite Mark Standards and Guidelines of the ABFO do not delineate a threshold for bite mark evidence below which an opinion may not be rendered. *PA*, document # 42.

176.    An ABFO study completed in 1999 found that the examiners were wrong nearly half the time they tried to identify the source of a bite mark and 63.5% of the examiners committed false positives in some of the test cases. Id. The examiners who participated in this study were not

84

novices but diplomates of the ABFO – the most accomplished in the field. Id. Thus viewed, bite mark evidence is not more reliable than flipping a coin.

177. A second study was conducted in 2001 and the results were published in the Journal of Forensic Science. This study – which again included experienced examiners – involved pattern detail that exceeded that found in actual bite mark casework, and allowed for controls of variables that are uncontrolled in actual casework. The results showed a significant error rate of 15.9%.

178. These recent studies, the lack of scientific research supporting reliable positive identifications from bite marks in skin, and the failure of the ABFO to delineate a threshold for bite mark evidence below which an opinion may not be given, render bite mark evidence scientifically and technically invalid. Counsel was ineffective for failing to litigate a Daubert challenge to *all aspects* of the bite mark identification evidence in this case.

**C**. **Trial Counsel Inexplicably Failed to Rebut the Bite Mark Testimony Despite Being Aware of an Expert Report That Directly Contradicted Dr. Senn and Dr. Chrz.**

179. Counsel acknowledged months before trial that rebutting the bite mark evidence was critical to Petitioner's defense. Specifically, counsel acknowledged that retaining a bite mark expert was essential to rebut this highly inaccurate and inflammatory evidence. PTT 6/26/03, 8-10, 22-23. In fact on numerous occasions counsel assured the Court that they intended to retain a bite mark expert. PTT 7/16/03, 47-50; PTT 10/20/03, 13-14; PTT 10/24/03, 6-7. Counsel, however, never retained an expert and the highly inflammatory and inaccurate bite mark evidence was presented to the jury unrebutted.

180. Incredibly, some eight months before trial the Government provided counsel with not one **but two** expert reports prepared by United States Army Colonel J. Curtis Dailey, DDS, which

completely rebutted the findings of Drs. Senn and Chrz. (Copies of these reports are contained in *PA*, document # 44). Colonel Dailey examined actual excised skin of the bite mark, the original autopsy photographs as well as Dr. Oliver's enhanced images. Dr. Dailey then compared this evidence to the stone dental casts of Petitioner, Robin and AB-1994. PTT 3/20/03, 14. Colonel Dailey concluded that neither Robin, AB-1994 nor Petitioner could be **included or excluded** as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the bite marks, 3) the ruler was in a different spatial plane than the mark being photographed, and 4) the very similar metric and spatial pattern relationships between the three individual's dentition. *PA*, document # 44.

181.   Thus, Dr. Dailey directly refuted Dr. Senn and Dr. Chrz. Had trial counsel simply called Dr. Dailey as a witness, his testimony would have carried great weight with the jury since he was an active-duty United States Army Colonel at the time he examined the bite marks, and was called upon initially by the Government. Furthermore, he had the actual excised skin of the bite marks (in addition to the enhanced images) and yet he was still unable to exclude or include any of the potential biters. His testimony also would have been extremely persuasive with the jury since he was the first expert the Government consulted – and presumably the most qualified in the eyes of the Government. Dr. Dailey's findings (that Robin could not be excluded) also directly support the defense theory that Robin (the step-mother) was the abuser of the child and not Petitioner (the natural father).

182.   Furthermore, had counsel taken the time to interview Dr. Dailey they would have learned from him that AUSA Patti Booth became irate when Dr. Dailey informed her that he could not single out Petitioner as the biter. Specifically, when Dr. Dailey informed AUSA Booth of his

conclusions she angrily told Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she would go out and find an expert who could. AUSA Booth then hung up the phone on Colonel Dailey. *PA*, document # 45. This testimony from Dr. Dailey could have refuted AUSA Booth's misleading argument that the only child (AB-1994) whose bite was analyzed was excluded and that the jury did not "hear" any evidence of forum shopping for experts. TT 3/16/04, 19-20. AUSA Booth knew well when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had *not excluded* AB-1994 as a possible biter. Nonetheless, she was able to make this argument that the jury did not "hear" this evidence because counsel inexplicably failed to present the testimony of Colonel Dailey, DDS, or even consult with this witness.

183. Dr. Bowers, the Board certified forensic odontologist retained by undersigned counsel, reviewed the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models. In addition to concluding that the enhanced images were inaccurate and unreliable, Dr. Bowers concluded that neither Robin, AB-1994 nor Petitioner could be excluded or included. *PA*, document # 42. Dr. Bowers' opinions concurs with those of Dr. Dailey.

184. Specifically, Dr. Bowers found that Drs. Chrz and Senn's methods and conclusions that Petitioner was the biter of the injury on the lower back of the decedent were erroneous.

> Bite mark B is located in a curved area next to the iliac crest (hip). This degree of tissue flexibility in this area is considerable. The evidence of "Langer lines " in the autopsy photograph indicates this flexibility. The static posture of the body on the autopsy table does not mimic, in the least, the posture of the child during life  This means that, in this anatomic location, the shape Bite mark B <u>should not be assumed to be</u> the same shape as during biting. No one knows what position the child was in during biting.  We can safely say, though she wasn't in the position seen in the morgue. This fact of postural change altering the bite mark shape is uncontrollable. The odontology literature supports this opinion. For this and other reasons stated

above, the methods applied by the Government's dental experts are inapplicable for this case.

*PA*, document # 42.

185.    Dr. Bowers also reviewed the injuries to the decedent's left hand that Dr. Senn opined were "probable" bite marks and the injuries to the left foot and hand that Dr. Senn opined were "possible" bite marks. Dr. Bowers concluded again that Dr. Senn's conclusions were inaccurate and unreliable. Specifically, Dr. Bowers found that these injuries "are lacking any dental information. They are ambiguous and indeterminable as to any opinion to cause of origin." *PA*, document # 42.

186.    Had counsel adequately prepared for trial he could have easily marshaled all of the above described evidence and presented a compelling rebuttal to the Government's bite mark evidence. Counsel, however, despite numerous representations to the contrary made to this Court, never retained a bite mark expert and this inaccurate, invalid and highly inflammatory evidence was submitted to the jury unchallenged, unrebutted and uncontradicted.

### D.    Petitioner Was Prejudiced by Counsels' Failures.

187.    There can be no question that the bite mark evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements.  TT 3/2/04, 31-31, 34, 42,  TT 3/16/04, 19-20, 48-49.  The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 37, 41, 70, 76.  Petitioner was clearly prejudiced by trial counsel's deficient performance, and a new trial and sentencing proceeding are mandated.

188.    The importance of Petitioner being the "probable" biter of the lower back bite mark was not lost on the prosecutor at the guilt phase of the trial. ("You have a bite mark identifying that he is the probable biter and Robin is not.") TT 3/16/04, 49.   In her closing argument she showed the photograph of this bite mark to the jury and described it as follows "There is one piece of physical evidence in this case. That is not testimony.   It is not documents.   But it's a physical piece of evidence . . . and it's a bite mark. . . .   who did they not exclude . . . that *thing* [Petitioner] over there." TT 3/16/04, 48-49.   The prosecutor also emphasized the bite mark evidence in urging the jury to consider Petitioner's brutality: "[t]hey had never seen a bite mark like this before.  They had never seen a bite mark with *such force behind it* that would leave this imprint" "the bite is so *incredibly intense*, the force behind the bite is so remarkable . . . this just doesn't happen, except, when you have someone that's so wants to cause the victim so much pain, *wants to see her suffer*." Id.

189.    The Government also recognized the importance of the bite mark evidence at the penalty phase.   In support of the argument that the murder was committed in a heinous, cruel or depraved manner, and that it involved torture and serious physical abuse to the decedent, the prosecutor in her closing arguments referred to the bite mark no fewer than *four* times, and misleadingly argued that the Petitioner's "signature with his teeth marks and his semen is all in that baby."    TT 3/24/04, 37, 41, 70, 76.   Needless to say, the bite mark evidence affected the jury's weighing of the aggravating and mitigating evidence.

190.    Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinions of Dr. Oliver, Dr. Senn and Dr. Chrz

on the grounds that it was not technically or scientifically reliable.  Trial counsel was also ineffective

for failing to rebut this evidence once it was admitted at trial and heard by the jury. Petitioner was

prejudiced and a new trial and sentencing are mandated.

**CLAIM VI.     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A _DAUBERT_ MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS AND FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

191.    Petitioner's right to effective assistance of counsel was also violated when his trial

lawyers failed to challenge via a <u>Daubert</u> motion the scientific and technical reliability of the

testimony and opinions of Dr. Oliver.  Trial counsel was also ineffective for failing to object to the

admissibility of this testimony and for failing to rebut this evidence once it was admitted at trial and

heard by the jury.

192.    As described in the preceding claim, Dr. Oliver testified as a Government witness

using digital enhancements of the autopsy photographs. TT 3/8/04, 15-18, 183-231.  Utilizing these

enhancements, Dr. Oliver identified the following injuries on the decedent:  "between 25 and 26

whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10

abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite

mark, and three lacerations." TT 3/8/04, 226.  The majority of these injuries were not visible on the

autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed

the autopsy.  Based directly on Dr. Oliver's testimony (and his image enhancements) the prosecutor

argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since, she

claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to

accumulate that number of injuries.  TT 3/24/04, 73.

193.    The methods used by Dr. Oliver to enhance the original autopsy photographs were scientifically and technically invalid for use in a capital trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community.  Trial counsel was ineffective for failing to move to preclude this evidence.

194.    Trial counsel was also ineffective for failing to object to the admissibility of the enhanced images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and for failing to rebut this evidence once it was admitted at trial and heard by the jury.  Specifically, trial counsel had a duty to rebut it with expert testimony of  its own.  Instead, trial counsel sat back and allowed this inaccurate and highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and uncontradicted.  Trial counsel's performance was deficient.

195.    There can be no question that this inflammatory and highly inaccurate evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial.  The prosecutors urged the jury to convict Petitioner of first degree murder describing the vast number of injuries as evidence establishing – "a systematic execution" "a systematic dehumanization" and "a systematic degradation."  TT 3/16/04, 13,16,46, 48, 54.  The prosecutors also utilized this evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.  Petitioner was clearly prejudiced by trial counsel's failure to preclude and/or rebut this evidence and a new trial and sentencing proceeding are mandated.

**A.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.**

196.    As alleged earlier with respect to Claim V, trial counsel were on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and was provided pre-trial with a compact disc containing all of the enhanced images.  PTT 3/20/03, 13-14.  Despite being unfamiliar with digitally enhanced images, counsel never even looked at the enhancements until moments before Dr. Oliver testified.  TT 3/8/04, 15, 18.

197.    Incredibly, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements.  TT 3/8/04, 14-15.   The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value.  Id. at 30. This objection was denied and Dr. Oliver was permitted to give highly inflammatory testimony in painstaking detail (taking up over 44 pages of transcript), showing the jury the huge number of alleged injuries his enhancements had uncovered.  TT 3/8/04, 30.  Trial counsel's cross-examination of Dr. Oliver took up just three pages of transcript.  Id. at  227-230.

198.    The original autopsy photographs were taken with a 35mm camera.   As also described in Claim V, Dr. Oliver employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method, which actually change the original 35 mm photographs. Id. at 19.  Dr. Oliver admitted that he picked the range of parameters to be used to redistribute the colors and he chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

199.    Dr. Oliver also admitted that it was very important when analyzing the newly created images  to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized

the original 35mm photographs and then downsized them to fit onto the PowerPoint. Id. at 19. In his presentation to the jury and in reaching his conclusions he erroneously considered digitized images as the "original." Id. at 26. In describing his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

200.    Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc. These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

201.    Specifically, the digitized/scanned images were found to be "distorted" "inaccurate" "incomplete" and "over-reaching alterations." *PA*, document # 43.    Dr. Oliver's method of converting the original 35mm photographs into digital images created digital images that had a much narrower color spectrum than the original photographs. Additionally, the images themselves were distorted (from a 35mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used JPEG, a lossy not a lossless compression program. The images were then further distorted and further detail was lost when Dr. Oliver converted them to PowerPoint.

202.    The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere" Id. The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of Bayer Pattern nearest-neighbor coloration or "interpolation." This problem arises when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image

93

into a number of smaller ones.  Interpolation is apparent throughout all of Dr. Oliver's enhanced images.  *PA*, document # 43.

203.    One could not imagine a more prejudicial and inaccurate enhancement technique when looking for "unseeable" and "unphotographable"  injuries than a technique like CLAHE  that allows images to draw colors and shapes from neighboring images.[25]

---

[25]As also alleged in Claim V, and repeated here, the methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of the <u>Daubert</u>:

i.      The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

ii.     Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

iii.    The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

iv.     The digital images presented as "original images" were compressed and therefore they lacked original detail.

v.      There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

vi.     You cannot substitute enhancement for details that were lost during the digital conversion.  The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

vii.    The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

*PA*, document #43.

204.    Undersigned counsel also provided the enhanced images to Dr. C. Michael Bowers, DDS, JD a board certified forensic odontologist and expert in the area of forensic dental digital imaging. *PA*, document # 42.   Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " the most overly 'enhanced' images I have ever seen used in actual casework." Id.  Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver produced "uncontrolled digital noise . . . into the computer-manipulated image that does not reflect the original state of the picture." Id.

205.    Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation.  Specifically, Dr. Bowers found that the methods of enhancement utilized by Dr. Oliver did not comport with the Daubert:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case.  The only control is the operator's subjectivity.  In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . .   The Government has no data as to known or potential error rate . . .  of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied.  Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

Bowers Declaration, *PA*, document # 42.

206.    Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable.  They would have litigated a Daubert motion and Dr. Oliver's testimony and his PowerPoint presentation with the enhanced images would have been precluded by this court.

95

**B**.    **Trial Counsel Inexplicably Failed to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and Failed to Rebut this Testimony Once it Was Admitted at Trial.**

207.    It is well settled that Federal Rules of Evidence 901, 1001 and 1002 require the authentication of evidence, and in the case of photographs the original is required to prove its contents.   Dr. Oliver's scanned digital images and his enhanced images were significantly inaccurate, incomplete and overreaching alterations of the original 35mm autopsy photographs. These images  were not and could not be properly authenticated and were not and could not be considered admissible copies of the original photographs.  Counsel, however, failed to object to the admission of these altered images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and the court admitted this evidence.   Counsel was ineffective.

208.    Counsel also failed to retain any type of expert to review these images and to rebut their accuracy and admissibility.   Dr. Werner Spitz, MD a forensic pathologist with 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition was retained by undersigned counsel.  Dr. Spitz reviewed the autopsy report, the enhanced autopsy images, the photographs taken at the time of autopsy, as well as the testimony of Dr. Rouse and Dr. Oliver.  Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate[d] the findings, and produce[d] artifacts."  Spitz Declaration, *PA*, document # 53.  He also noted that if "the documentation of bruises is at issue, the pathologist performing the autopsy can use their scapel for such documentation and study." Id.  He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties in so far as the findings in the enhancements were not present at the autopsy table." Dr. Spitz found that the enhancements . . . are none other than inflammatory, without scientific merit."  Id.   Dr. Spitz also noted that "[d]ark

96

skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*."

Id.

209.    Had counsel adequately prepared for trial he could have made the relevant objections and he could have easily marshaled the above described evidence and presented a compelling rebuttal to Dr. Oliver's findings.  Counsel, however,  never retained an expert and this inaccurate, invalid and highly inflammatory evidence was submitted to the jury unchallenged, unrebutted and uncontradicted.

### C.    Petitioner Was Prejudiced.

210.    There can be no question that Dr. Oliver's findings were devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder.   TT  3/16/04, 13, 16, 46, 48, 54.  The prosecutors also utilized these findings in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.  Petitioner was clearly prejudiced by trial counsel's deficient performance, and a new trial and sentencing proceeding are mandated.

211.    The Government used the sheer number of injuries found by Dr. Oliver to support its case at the guilt phase of the trial.  "You heard Dr. Oliver testify that she had over 300 injuries on her body.  So you know  . . .  to do that kind of damage, you've got to make at least ten injuries a day.  Ladies and gentlemen, ten injuries a day, a systematic execution of a baby.  And that's what it was.  A systematic execution.  A systematic dehumanization.  A systematic degradation of that child." TT 3/16/04, 13-14.

212.    The importance of the sheer number of injuries found by Dr. Oliver was emphasized

97

by the prosecutor again at the penalty phase of the trial.  The prosecutor argued:

> [T]he injuries to the baby's body, the 360-some injuries on that baby's body, and we knew from the guilt/innocence phase that he was with that child for 36 days , that's when we think the abuse started. So in 36 days we got 360 marks.  That means that we have to do 10 a day.  That means that you would have to . . . 10 hours is longer than what we work a day.  So you're going to have to start before work starts, and you're going to have to work through lunch to get an abuse in every hour; and that doesn't count the abuses that are on top of the abuse.  And so you just count that as one of 360.

TT 3/24/04, 73.

213.    Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinion of Dr. Oliver.  Dr. Oliver's testimony was not scientifically reliable.  Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury. Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VII.    THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

214.    The Due Process Clause of the Fifth Amendment to the United States Constitution states that no person may be deprived of life, liberty or property without due process of law.  The Clause requires that a federal prosecutor disclose favorable evidence that is material to either guilt or sentencing.[26]

---

[26]The  prosecution's duty to disclose evidence favorable to a defendant is of course most prominently associated with the Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963).  Because this is not a legal brief, but a factual petition, Mr. Bourgeois does not cite legal authority.  Nonetheless, the undisclosed and exculpatory evidence discussed herein, will be referred

215.    The Government failed to disclose extremely powerful impeachment evidence concerning the four jailhouse informants who testified against Petitioner at his trial.  Specifically, the Government failed to disclose promises and understandings of favorable treatment concerning the informants' underlying cases that it had with these witnesses prior to their testimony in front of Petitioner's jury.  Each one of these witnesses – after testifying against Petitioner – in fact received benefits both in the cases that were pending at the time of their testimony and in sentences that they were serving at the time of their testimony against Petitioner.  Furthermore, each one of these witnesses testified falsely – in response to questions posed by the prosecutor – concerning their understanding of future favorable treatment.   The Government's failure to disclose these understandings and its elicitation of the false testimony violated every aspect of its duty under <u>Brady</u> and its progeny.

### A.    Adam Longoria.

216.    Adam Longoria was a jailhouse informant who testified for the Government and against Petitioner at the penalty phase of the trial. TT 3/22/04, 144-187. Specifically, Mr. Longoria told the jury that, while he was incarcerated with Petitioner in the Nueces County Jail, Petitioner asked him to kill three female witnesses that were going to testify against him in this murder trial – Robin Bourgeois (wife), Lisa Moore (cousin) and Gaynell Collins (ex-wife).  <u>Id</u> at 155-62. Longoria also told the jury that in return for these murders Petitioner offered to give him an 18 wheeler truck worth $100,000 and drug contacts so he could make drug runs for extra money. <u>Id.</u> at 157.  Mr. Longoria also told the jury that Petitioner admitted to him that he had beaten the decedent with a bat and extension cord and had thrown these items out the window of the truck,

---

to by the common usage, <u>Brady</u> material.

before he got to the Naval Base.  Id. at 163-66.

217.    This testimony was devastating to the defense at the sentencing stage of this trial. What could be worse for a jury to hear when deciding whether a defendant's life should be spared than the fact that he was trying to have family members killed **while incarcerated**.  The impact of this evidence was not lost on the Government and they made sure to remind the jury of it in their penalty phase closing argument.  TT 3/24/04, 70.

218.    Mr. Longoria also testified on direct examination that he had not been promised anything in return for his testimony against Petitioner.  TT 3/22/04, 166-67.  In order maximize the dramatic effect of the testimony the prosecutor made this issue the very last thing she covered on direct examination:

> Q.    Okay.  Now, do you and I . . . have I promised you *anything* to come in here to testify?
>
> A.    No, ma'am *not a thing.*
>
> Q.    And you understand that there's no way that I can help you in your state case.
>
> A.    I understand fully.
>
> Q.    And I've told you that.
>
> A.    Yes ma'am you have.
>
> Q.    I pass the witness, Your Honor.

3/22/04, 167.

219.    Furthermore, on two separate occasions prior to Longoria's testimony, the Government – in response to questions from this Court with defense counsel present – represented that Mr. Longoria was getting nothing in return for his testimony.  On March 9, 2004 the

Government assured this Court and defense counsel that Mr. Longoria was promised nothing: "Adam Longoria is a state prisoner. We are giving him nothing. And he knows that we can't give him anything." Id. at 7. Then on March 19, 2004 the Government again assured the Court and trial counsel that nothing had been offered to Longoria: "There's no promises, nothing." Id. at 23.

220.    On cross-examination Mr. Longoria stuck with his story and again insisted he had no understanding or expectations of favorable treatment from the Government – in his words "none whatsoever." TT 3/22/04, 186. And on re-direct the Government again asked Longoria "And, you know you're not going to get anything for this, right?" and he responded in the affirmative. Id. at 187. This testimony was false. Mr. Longoria understood that he would receive favorable treatment in his open cases in return for his testimony against Petitioner.

221.    At the time he testified against Petitioner, Mr. Longoria was facing significant amounts of jail time. He was awaiting trial for a May 30, 2003 arrest for bank robbery (03-CR-1884-E) where he was charged as an habitual offender (a charge which carried a mandatory 25-99 year sentence.) He was also facing the potential violation of a ten year probation sentence he had just received 3 months before the arrest on the bank robbery – for a felony charge of evading arrest as well as endangerment to a child (02-CR-3585-E). In the evading arrest case, Mr. Longoria had avoided a possible mandatory 25 to 99 year sentence when he pled the case out for 10 years' probation on February 4, 2003. The bank robbery charge was Mr. Longoria's second possible mandatory 25 to 99 year sentence in less than 3 months – not to mention that a conviction would also be a violation of the 10 year probation sentence. Mr. Longoria knew this time the 25-99 year requirement would be applied. In effect, Mr. Longoria was looking at life imprisonment. Yet, Mr. Longoria told Petitioner's jury he did not expect any help on these pending matters.

101

222.    In fact, Mr. Longoria did expect favorable treatment and for good reason.  When he met with AUSA Booth, prior to his testimony against Petitioner, he asked for favorable treatment and was told she could not help him now, but after he testified against Petitioner she would help him. Mr. Longoria recalls this conversation as follows: "I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole." (Declaration of Adam Longoria dated 4/24/07, contained in *PA*, document # 31).  Mr. Longoria also advised AUSA Booth that he was taking anti-psychotic drugs at the time he was housed with Petitioner and at the time he testified against him.  Id.

223.    Mr. Longoria's counsel on the robbery charge and the probation violation was Bill May.  At some point in the winter or spring of 2004 Mr. Longoria advised Mr. May that he was cooperating in the Bourgeois case.  Longoria also told Mr.May that he had spoken to AUSA Booth and was expecting she would help him after his testimony against Petitioner.  Mr. May, with this conversation in mind, then filed a continuance of Mr. Longoria's robbery trial and probation violation until after he testified against Petitioner.

224.    Mr. Longoria testified against Petitioner on March 22, 2004.   On May 5, 2004 his bank robbery case and probation violation were listed for trial/disposition in the Nueces County Court.  Mr. May asked the state prosecutor Jimmy Sales if he (Sales) had spoken to AUSA Patti Booth. Mr. Sales advised him that in fact had spoken with her and Sales then dropped the habitual offender mandatory sentence provisions and offered Mr. Longoria a plea agreement on his robbery case *and* his probation violation for **7 years' total incarceration**.  Mr. May knew that Longoria was facing his second mandatory 25-99 year sentence in a little over a year and  he knew Longoria would

never have received such a lenient disposition if it had not been for his testimony against Petitioner. The main reason Mr. Sales dropped the habitual offender mandatory aspects of the case was because of his (Sales') conversation with AUSA Booth. (Declaration of Bill May dated 5/1/07, contained in *PA*, document # 32)

225.   The favorable treatment did not stop there.  Since being sent to prison to serve his 7 year sentence, AUSA Booth has written a letter on behalf of Mr.Longoria to the Texas Parole Board, and in it she mentioned his cooperation and testimony in the Bourgeois trial.  (Longoria Declaration) In a May 10, 2007 telephone conversation with undersigned counsel, AUSA Booth admitted that she wrote such a letter on behalf of Mr. Longoria.

226.   The understanding of favorable treatment and the favorable treatment actually bestowed on Mr. Longoria should have been disclosed to Petitioner and his trial counsel. Additionally, trial counsel should have been told that Mr. Longoria was on anti-psychotic medication at the time he was housed with Petitioner and at the time he testified against him.  Brady has been violated and a new sentencing proceeding is mandated.

**B.   Orlando Campos.**

227.   Orlando Campos was a jailhouse informant who testified against Petitioner at both the guilt/innocence and penalty stages of trial.  At guilt/innocence Mr. Campos told the jury that he had been incarcerated with Petitioner in the Bee County Jail and during that time Petitioner admitted to him that he had beaten the decedent, killed her and then told his wife to lie about it.  He also told the jury that Petitioner spoke with "pride" about beating his wife.  TT 3/9/04, 218-20.  At the penalty stage of the trial he told the jury that Petitioner admitted to beating his wives and girlfriends, admitted he was going to kill his wife when he got out and admitted to being involved in drug

103

trafficking.  TT 3/23/04, 81.    This testimony was also highly prejudicial to the defense at both stages of this trial.

228.    At the time he testified against Petitioner, Mr. Campos was serving a 12 year sentence from Bee County that he had received after numerous violations of probation and parole.  (B-99-2055-0-CR-B)

229.    On two occasions AUSA Booth assured the court and counsel that Orlando Campos had been promised nothing in return for his testimony against Petitioner.  On March 9, 2004 AUSA Booth assured trial counsel and the court that "we are giving him nothing."  TT 3/9/04, 7.  Then again on March 17, 2004 AUSA Booth stated " I have promised him nothing."  TT 3/17/04, 57.  In front of the jury Mr. Campos repeatedly told the jury that no promises had been made to him.  Upon questioning by AUSA Booth, Mr. Campos stated that he understood the United States had no power in state court to reduce his sentence and that he hoped that the prosecutor would relay to the authorities that he testified and that he has not been promised anything for his cooperation against Petitioner.  TT 3/9/04,  216.

230.    On cross-examination he stuck with this story and stated that AUSA Booth told him they could not reduce his time.  Id. 224.  Finally, on redirect he reiterated that AUSA Booth told him there was nothing she could do for him except tell the authorities he testified – and was testifying against Petitioner because he should be held accountable.  Id. at 225-26.

231.    Mr. Campos' testimony was false.  In fact prior to testifying against Petitioner he had asked for help in reducing his 12 year sentence.  Either AUSA Booth or FBI Agent Beckett told him that they could not help him at that time but promised to help him with his sentence after the trial was over.  (Declaration of Kathleen Kaib dated 5/14/07, contained in *PA*, document # 30)    Mr.

Campos was paroled after serving less than 3 years of his 12 year sentence. Id.

232.    The promise of favorable treatment and the favorable treatment actually bestowed on Mr. Campos should have been disclosed to Petitioner and his trial counsel. Brady has been violated and a new trial and sentencing proceeding are mandated.

**C.    Wiley Taylor.**

233.    Wiley Taylor testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both phases of trial. See generally TT 3/9/04, 227-46; TT 3/23/04, 82-86.

234.    During the guilt/innocence phase of trial, Mr. Taylor testified that, while incarcerated with Petitioner at the Bee County Jail, Mr. Bourgeois told him that his wife, Robin, had broken an agreement to say that JG-1999 died falling out of a truck. TT 3/9/04, 230. Mr. Taylor testified that Mr. Bourgeois told him he beat his wife. Id. He testified that Mr. Bourgeois referred to JG-1999 as "that fucking baby" or "the baby that died." Id. at 231. Mr. Taylor also testified that Mr. Bourgeois' story constantly changed and he later said that JG-1999 died after he spanked her at Robin's request, id. at 239; that Robin killed JG-1999 with a hairbrush, id. at 239-40; and that JG-1999 died during a fight between Petitioner and Robin where he was "beating that bitch [Robin] down real good." Id. at 241-42. Mr. Taylor also gave extremely prejudicial testimony that: Mr. Bourgeois told him that he was worried about the DNA evidence, id. at 243; Mr. Bourgeois asked for advice on how to get around evidence of extension cord marks and internal bleeding in JG-1999, id. at 245; and that Mr. Bourgeois laughed when he told him that JG-1999's head got as big as a watermelon after a fall. Id. at 246.

235.    At the penalty hearing, Mr. Taylor testified that Mr. Bourgeois told him he beat all

his wives and girlfriends.  TT 3/23/04 at 82.  He testified that Mr. Bourgeois swore to him he was going to have his wife Robin killed.  Id. at 82-83.  Mr. Taylor also testified that Mr. Bourgeois told him that he and his brother transported illegal drugs and illegal aliens, who Bourgeois called "wetbacks," across the border from Mexico.  Id. at 83.

236.     Not surprisingly, the Government seized upon Mr. Taylor's highly incriminating testimony to argue in favor of a conviction:

> **He called it 'it'.  The kid that died.  The fucking kid** and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

TT 3/16/04, 17.  The Government did the same in the penalty hearing:

> **When was the other time he laughed?  He laughed when he was – and excuse my language – when he was talking, he said – Wiley Taylor, and he said, "Yeah, that baby's fucking head swelled up like a watermelon, and he laughed."**
>
> **Was he laughing when he beat JG-1999 to death?  Was he laughing** when he bit her, or he burns her, or he put his filthy semen in her little body?

TT 3/24/04, 70.

237.     At the time he testified on behalf of the Government, Mr. Taylor was facing a twenty year prison sentence for drug trafficking.  TT 3/9/04 at 235.  He testified that he was "hoping" to get a seven year sentence after cooperating with Ms. Booth in several drug cases and Mr. Bourgeois' case.  Id. at 228, 231, 234-35.[27]

238.     However, at the time of his testimony, Mr. Taylor was more than "hoping" for assistance with the Government.  Indeed, he had already agreed to assistance from the Government

---

[27]Ms. Booth was the same prosecutor handling Mr. Wiley's drug charges.  See TT 3/9/04, 8 ("Ms. Booth: Okay.  But I do want to annotate to that, your Honor, that Wiley Taylor was indicted, I was the prosecutor on that case, on a methamphetamine conspiracy.  He came in, he pled guilty, and he cooperated on that case.").

106

and <u>knew</u> he would be getting a sentence reduction. In fact, Mr. Taylor got more than he was "hoping" for and on April 12, 2004, was sentenced to sixty (60) months incarceration. The Government violated its obligation under <u>Brady</u> and its progeny.

**D.    Darick Moore.**

239.    Like Mr. Taylor, Darrick Moore testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both the guilt/innocence and penalty phases of trial. <u>See</u> <u>generally</u> TT 3/9/04, 200-215; TT 3/23/04, 86-87.

240.    During the guilt/innocence phase of trial, Mr. Moore testified that while they were both incarcerated at the Nueces County Jail, Mr. Bourgeois first told him that JG-1999 died after getting hit on the head during a fight between Mr. Bourgeois and his wife, Robin. TT 3/9/04, 204. Mr. Moore testified that Mr. Bourgeois told him that JG-1999 was a bad child and would shake her butt like an adult. <u>Id.</u> at 205-06. He testified that Mr. Bourgeois told him that he whipped JG-1999 with shower shoes, brushes and extension cords. <u>Id.</u> at 206. He also testified that before Mr. Bourgeois got comfortable in the jail dorm, he originally told Mr. Moore that his wife Robin, killed JG-1999. <u>Id.</u> Darick Moore also testified that Mr. Bourgeois told him that the injuries to JG-1999's ears were caused by his finger nails while the Government thought they were teeth marks. <u>Id.</u> at 207. According to Darick Moore, Mr Bourgeois told him that he caused those injuries by picking JG-1999 up by here ears. <u>Id.</u> He also testified that Mr. Bourgeois told him that the injuries to JG-1999's feet were caused by a cigarette lighter. <u>Id.</u> at 207-08.

241.    At the penalty phase, Mr. Moore testified that Mr. Bourgeois told him he beat his wives; that Mr. Bourgeois said his wife Robin, would "get what she had coming"; and that Mr. Bourgeois said he ran drugs from New Orleans to Miami with his brother. TT 3/23/04, 87.

242.    Again, like the testimony of Wiley Taylor and the other informants, the Government

seized upon Mr. Moore's highly incriminating testimony to argue in favor of a conviction and a

death sentence.

> In this case we have a perfect victim.  We have a baby.  But you heard testimony that,
> from Darick Moore, the Defendant said the baby was bad, was a bad baby, acted like
> an adult, would wiggle its bottom.  I think the evidence supports here, believe the
> evidence supports here that this was an unlawful, unjustified killing.

TT 3/16/04, 8-9.

> What do we know from the witnesses about Alfred Bourgeois, the real Alfred
> Bourgeois?  We know that he beats, abuses, all of his wives and brags about it.

TT 3/24/04, 69.

243.    At the time he testified on behalf of the Government, Mr. Moore believed he was

facing a five to twenty year prison sentence for possessing 8.5 grams of crack cocaine with intent to

sell.  TT 3/9/04 at 208-09.  He, like Mr. Taylor, testified that he was "hoping" to get a downward

departure after cooperating with the Government against Mr. Bourgeois. Id. at 203.  Again, however,

like Mr. Taylor, Mr. Moore was not merely "hoping" for a reduced sentence, he knew he would be

getting a reduced sentence.  Additionally, at the request of the Government, Mr. Moore gave

testimony about Mr. Bourgeois that he specifically knew to be false.  Consistent with his known

agreement, although he was facing 151-188 months in prison, Mr. Moore was originally sentenced

to 65 months incarceration, but that sentence was later reduced to 50 months.  See Darrick B. Moore,

Transcript of Sentencing, 4/22/04, contained in *PA*, document # x61; Judgment of Sentence, 4/22/04,

*PA*, document # 62; Amended Judgment of Sentence, 12/27/04, *PA*, document # 63.  The

Government violated its obligation under Brady and its progeny.

**E.     Materiality.**

244.    Since this is a fact pleading and not a legal brief, Petitioner will not provide the Court with legal argument and authority showing that these due process violations were material to guilty and punishment.  At this juncture, Petitioner is simply make the allegation that each of these due process violations singularly, and certainly in combination, were material to guilt, and to punishment and require vacation of the judgment of conviction.

**CLAIM VIII.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

245.    The constitutional right to counsel carries with it the right to representation that is free from conflicts of interest.   The right to conflict-free counsel applies regardless of whether counsel is appointed by the Court or selected by the defendant.  Representation of a criminal defendant entails certain basic duties.  Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest. Undivided allegiance and loyalty are the hallmark of the Sixth Amendment right to counsel.

246.    Because the duty of loyalty is so fundamental, and because it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, prejudice is presumed when the duty of loyalty is breached. A violation of the duty of loyalty, resulting in the deprivation of the defendant's Sixth Amendment right to counsel, occurs when there exists an actual conflict of interest that adversely affected the assistance of counsel.

247.    From the very beginning of this case, Petitioner was deprived of his right to counsel acting in his interest.  Petitioner was represented at trial, and on direct appeal, by Mr. Tinker and Mr.

Gilmore.    Trial counsel had irreconcilable conflicts from the start of this capital case.    These conflicts adversely affected counsel's performance, depriving Petitioner of a fair trial, a fair sentencing and violating his Sixth Amendment right to counsel. A new trial and sentencing are mandated.

248.    Prior to and during Petitioner's trial, Mr. Gilmore represented an individual by the name of Ross Griffin.  Mr. Griffin was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana.  Mr. Griffin was housed with Petitioner in the Nueces County Jail along with Mr. Adam Longoria[28] and Mr. Darrick Moore.[29]  Mr. Griffin was cooperating with AUSA Patti Booth as a jailhouse informant against Petitioner.  (FBI 302 dated 7/1/03 contained in *PA*, document # 60)  Had trial counsel not been laboring under a conflict of interest they could have interviewed/investigated Mr. Griffin and learned that he had been offered favorable treatment to cooperate against Petitioner and had been provided information about Petitioner's case.  Mr. Griffin could have been called as a witness for Petitioner to testify to these facts and to the fact that the other jailhouse informants that he knew (Longoria and Moore) had received similar treatment in return for cooperating against Petitioner.  Because counsel was laboring under a direct conflict of interest he could not and did not conduct such an interview/investigation and Mr. Griffin was not called as a witness on behalf of Petitioner.

249.    Mr. Gilmore also was laboring under a conflict of interest with regards to jailhouse

---

[28]Mr. Longoria was a jailhouse informant who testified for the Government and against Petitioner at the penalty phase of the trial.

[29]Mr. Moore was a jailhouse informant who testified for the Government and against Petitioner at both the guilt/innocence and penalty phases of the trial.

informant Adam Longoria.  Prior to Petitioner's trial  Mr. Gilmore had actually called Mr. Longoria as a witness on behalf of another one of Mr. Gilmore's clients who had been housed at the Nueces County Jail.  Mr. Longoria was called – by Mr. Gilmore in Mr. Gilmore's other trial –  to testify to matters he had heard while in the same jail (Nueces County Jail) and same cellblock as Petitioner. Furthermore, the prosecutor in this "other" case was the same prosecutor (Jimmy Sales) who offered Mr. Longoria a radically reduced sentence six weeks after he testified against Petitioner – despite Mr. Longoria's testimony to Petitioner's jury that Sales "hates me now."  TT 3/22/04, 186.  Having used Mr. Longoria as a witness to give sworn testimony as to matters he observed in prison on behalf of a client (not Petitioner) Mr. Gilmore was conflicted and prevented  from fully and effectively confronting Mr. Longoria on cross-examination at the penalty phase of Petitioner's trial.    TT 3/22/04 179-80, 186.

250.    Mr. Gilmore was also laboring under a conflict of interest with regards to jailhouse informant Orlando Campos.  Mr. Campos testified as a jailhouse informant for the Government and against Petitioner at both the guilt/innocence and penalty stages of trial. Prior to Petitioner's trial, Mr. Gilmore represented Roel "Dody" Contreras, a co-defendant of Mr. Campos in a Bee County capital murder case.  Mr. Campos originally agreed to testify against Mr. Contreras in return for a plea to reduced charges and a probation sentence.  However, after originally testifying against Mr. Contreras (while Mr. Gilmore represented Mr. Contreras) and after receiving his drastically reduced sentence, Mr. Campos changed his mind and attempted to disavow his prior testimony against Mr. Contreras.  Given this change of events, Mr. Gilmore was conflicted and prevented  from fully and effectively confronting Mr. Campos on cross-examination at the guilt/innocence and penalty phases of Petitioner's trial.   TT 3/9/04, 221-223,   3/23/04, 81.

251.    For all of these reasons Petitioner's trial counsel were laboring under an actual conflict of interest prior to and during their representation of Petitioner and Petitioner was denied his Sixth Amendment right to counsel. As a result of these conflicts, counsel's performance was adversely affected. Petitioner is entitled to a new trial and sentencing proceeding.

**CLAIM IX.    PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

252.    A prosecutor's duty is not merely to seek a conviction, but to seek justice. Part of the duty to seek justice requires a prosecutor to avoid improper argument. The prosecutor's duty to avoid improper argument arises, in part, because prosecutorial comments are cloaked in his or her role as representative of the government, and consequently jurors are predisposed to defer to his or her words. As a result, improper prosecutorial arguments are apt to carry much weight against the accused when they should properly carry none. For this reason, misconduct by the prosecutor must be scrutinized carefully. Moreover, the prosecutor's obligations and the court's scrutiny are never greater than in capital proceedings.

253.    During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial and a reliable capital sentencing verdict

254.    The prosecutor's actions, both individually and cumulatively, amounted to prosecutorial misconduct. To the extent that trial counsel failed to object to any of these comments and arguments or request a curative instruction, they were ineffective. Appellate counsel was also

112

ineffective to the extent they failed to litigate these issues on appeal. Petitioner was denied his rights

under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

### A.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing."

255.    The prosecutor engaged in misconduct by improperly referring to Mr. Bourgeois as

"that thing." During the guilt/innocence phase closing argument, the prosecutor stated:

> The doctors told you they did a test bite mark. And they did a test bite mark that
> went away in 24 hours. I'm showing you now what's Government's Exhibit 97 and
> you're going to have all these photos back there. And they told you they analyzed
> this bite mark. And they did the best they could to determine – to exclude, their goal
> was to see who they could exclude. And they excluded Robin. But who did they not
> exclude? They didn't exclude this man, **that thing that's sitting right there**.

TT 3/16/04, 48-49. This comment was highly improper. The Constitution requires that the life or

death decision of a capital sentencing jury be based on a reasoned moral response to the aggravating

and mitigating evidence presented at trial. The dehumanizing comment in this case – labeling Mr.

Bourgeois a "thing" – was solely intended to inflame the passions and prejudices of the jury and

distract them from their proper sentencing role.

### B.    The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility.

256.    During the Government's penalty phase closing argument, the prosecutor engaged

in misconduct by improperly appealing to the jury's sense of civic responsibility. The prosecutor

stated:

> The Defendant never dreamed in his arrogance that the CPS would care about that
> baby, that FBI would be called, that FBI would care about that baby, that the United
> States would care about that baby because he saw it as thing for his pleasure.
> Shocked that he couldn't drive away. Shocked that he couldn't have his truck back
> and leave. The arrogance of his cruelty. The arrogance to think that the United
> States would not care about one of its citizens even if it was a little citizen. The

arrogance of his cruelty.

Id. at 17-18.  Appeals to a jury's sense of civic responsibility are improper.  In this case, the

prosecutor's argument improperly urged the jury of U.S. citizens to sentence Mr. Bourgeois to death,

not because of the evidence, but because of their civic responsibility to another U.S. citizen.  This

was highly improper.

### C.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument.

257.    The prosecutor engaged in misconduct by making an argument she knew to be false.

In her guilt/innocence phase closing argument, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be
> testimony that a child could have made those marks.  You didn't hear that.  The only
> child whose bite was analyzed was excluded.  He told you that there was forum
> shopping by the united States on our experts and what did you hear.  We sent our
> teeth to Dr. Senn.  Dr. Senn made his analysis and sent it for a second opinion.  In
> serious and solemn matters of our health, like to get surgery or to do some kind of
> other procedure on us, many times we'll get a second opinion.  Is that expert
> shopping or is that just making sure?

Id. at 19-20.  This argument was false and highly improper.  Indeed, the Government had engaged

in "forum shopping" for favorable bite mark evidence.  As fully set forth in claim V, before trial, the

Government consulted with United States Army Colonel J. Curtis Dailey, M.D., who was unable to

provide them with favorable bite mark evidence.  Indeed, Dr. Dailey could not single out Petitioner

as the alleged biter of JG 1999.  Thereafter, when Dr. Dailey informed AUSA Booth of his

conclusions, AUSA Booth angrily told Dr. Dailey that Petitioner was a "very bad man" and if he

could not help her by finding a match she would go out and find an expert who could.  AUSA Booth

then hung up the phone on Colonel Dailey, MD.  See PA, document # 45.  Thus, contrary to her

argument to the jury, the Government did "forum shop" and the prosecutor's argument was patently

114

false.

**D.     The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References.**

The prosecutor engaged in misconduct by repeatedly making improper biblical references during the guilt/innocence closing argument.  The prosecutor stated:

> Now you've all heard of the Proverb that pride comes before the fall.  With your permission I would like to just change the Proverb just a little bit and speak to arrogance before the fall.

> \*                                        \*                                        \*

> He called it 'it'.  The kid that died.  The fucking kid and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

> \*                                        \*                                        \*

> And Ms. Booth, when she got up here she mentioned a Proverb that talks about pride going before the fall.

TT 3/16/04, 11, 17, 46.  These comments were highly improper.   References to biblical passages introduce extraneous factors for the jury to consider in violation of the Eighth Amendment.  Moreover, the jury's exposure to improper influences from outside sources violates due process and is especially prejudicial because the jury's receipt of such information is not accompanied by procedural safeguards.

258.    The prosecution's duty to refrain from inflaming the passions of the jury is particularly important in the penalty phase of a capital case. The Eighth Amendment's requirements of heightened reliability in the determination that death is the appropriate punishment in a specific case and that the sentencing process must minimize the risk of wholly arbitrary and capricious action

115

by the sentencing jury, require that special scrutiny be given to prosecutorial argument in the penalty

phase. In this case, the prosecutor repeatedly crossed the line of permissible prosecutorial argument.

**E.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations.**

259.    The prosecutor engaged in misconduct when she improperly told the jury that she had

five children, has buried family and that her youngest brother was in Iraq. During the penalty phase

closing argument, the prosecutor stated:

| | |
|---|---|
| Ms. Booth: | Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death. And he's very wrong. **I've raised five children, I've buried family** – |
| Mr. Tinker: | She's outside the record here, your Honor, and I just – |
| Ms. Booth: | Judge I'm responding to – he opened the door. |
| Mr. Tinker: | About how many kids she's got doesn't have anything to do with the trial in this case. |
| The Court: | Go ahead, Ms. Booth |
| Ms. Booth: | **My baby brother is in Iraq serving his country**. Things are hard, and this is the hardest thing that I have ever done in my life. |

TT 3/24/04, 66-67. Although defense counsel previously stated that seeking death may be easy for

Ms. Booth, id. at 64, the prosecutor's response was highly improper. If defense counsel's comments

were improper, the prosecutor should have objected and requested a curative instruction from the

Court. Instead, the prosecutor improperly diminished the jury's sense of ultimate responsibility for

their life or death decision by telling them that she personally believed death was the appropriate

sentence, even though seeking death was more difficult than raising five children, coping with the

death of family members and living with the constant fear and insecurity of having her youngest

brother in a Middle Eastern war zone.

**F.    The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog."**

260.    The prosecutor engaged in misconduct when she improperly described Mr. Bourgeois

and his brothers as "attacking like a bunch of dogs."

> You know he was emboldened by the legal system not working. You know it. He abused women, he abused – abused babies, and nothing ever happened. Temporary restraining orders were filed, but he got his wife to pull those back. Charges were filed on him for taking a gun and putting it in the face of his aunt, widowed aunt, with a dying son inside, pointing guns and saying, "I'm going to kill you," **and biting his cousin and attacking like a bunch of dogs, his brothers.**

Id. at 71-72. This was extremely improper. Comparison of the Petitioner to an animal has no place

in our criminal justice system. An Assistant United States Attorney who has taken an oath to uphold

the laws of the United States and who has been vested with the powers of the federal government

and prosecution must never be allowed to resort to such malicious and unseemly name calling.

These dehumanizing comments served one purpose: to inflame the passions of the jury, which was

about to embark on the most serious of duties – deciding the life or death of the Petitioner. They

were improper and they cannot be condoned.

**G.    The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel.**

261.    The prosecutor engaged in misconduct by improperly disparaging opposing counsel.

During its penalty phase closing argument, the prosecutor stated:

> And do you know why I bring that up, ladies and gentlemen? Because we brought people in here that were in prison with the defendant; we brought them in here and we didn't bring them in a suit. We told you right off the bat, they've done bad things, they're convicted. But that's not what the defense did. Marched them in here in suits to testify, didn't mention he was a fired policeman, convicted at least three times for fraud.

Mr. Tinker:    Your Honor, we have no control of what a witness shows up wearing when they're subpoenaed to be here and I object to that line of argument, that we had something to do with that.

\*                                    \*                                    \*

You know, and I think that maybe even the Defendant has convinced and said it so many times to his Defense counsel, that the baby was an it, because Mr. Gilmore said, "Well, he was happy about it."

Id. at 72-73, 77.   These comments are inappropriate because they divert the jury from its proper sentencing role and prejudice and inflame the passions of the jury against Petitioner.

### H.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos.

262.    The prosecutor engaged in misconduct by falsely arguing that Government witness Orlando Campos testified on behalf of the prosecution solely out of a sense of justice.   During its penalty phase closing argument, the prosecution argued:

The Defense talked about how you shouldn't believe these guys, these prisoners, because, you know, they're all in here, to be paid.  I just want to bring one person to your memory.  Remember Orlando Campos?  He was the second prisoner we brought in.  He was the State – had been convicted on state charges and he told you that he knew that the Government couldn't really help him much. He hoped that we would tell the State prosecutor something and maybe he would get lesser but what did he really tell you.  Why did he tell you he came in here?  He told you he came in here because the Defendant confessed, said, I killed that child.  I can tell God because God will forgive me but I ain't never going to tell a jury – or a judge, he said.  One of his letters, one of the defendant's letters talks about the fact that he has given this up to God.  But what's really important is Orlando Campos told you the reason he came in here is not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man should be held accountable.

Id. at 57-58.  The prosecutor, however, knew this argument was false.  The use of false, inaccurate or misleading prosecutorial testimony deprives a defendant of a fair trial if the false testimony could in any reasonable likelihood have affected the judgment of the jury.  In this case, Orlando Campos more than "hoped" he would be getting a sentence reduction for his cooperation with the

118

Government, he <u>knew</u> he would be getting a deal. <u>See</u> Claim VII. Accordingly, the prosecutor's argument that Mr. Campos was cooperating solely because he thought Mr. Bourgeois should be held accountable was false and improper. There is a more than reasonable likelihood that this false and improper argument impacted the decision of the jury.

**I.      The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation**.

263.    In a capital case, the fundamental respect for humanity underlying the Eighth Amendment to the United States Constitution requires that the sentencer be allowed to hear and consider any mitigating evidence that the defendant proffers as a basis for a sentence less than death. In this case, the prosecutor flouted this fundamental Eighth Amendment principle by improperly disparaging and diminishing the mitigation proffered on behalf of Mr. Bourgeois. The prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers the aggravating factors that he's alleged to, and they are that he was under substantial duress, that he was – that he was driving in an 18- wheeler with three children, that he had family and economic pressures. You know and I thought, "Oh, well, that's just life, that's not mitigation."

<u>Id.</u> at 74. While the jury in this case was certainly free to decide that the mitigation proffered on behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument that Mr. Bourgeois evidence "was not mitigation," improperly prevented the jury from considering the mitigating evidence. Thus, the jury's weighing process was improperly skewed in favor of death.

**J.      Conclusion.**

264.    The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess. Individually and cumulatively the prosecutor's comments so

119

infected the trial with unfairness as to make the conviction a denial of due process.

265.    Moreover, the Court took no steps to cure these errors.  The Court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and enhances the constitutional violations.

266.    Counsel's failure to object, request a limiting instruction, or raise and preserve these issues at trial or on appeal denied Petitioner his right to effective assistance of counsel. These errors undermined the reliability of the verdict determination and deprived Petitioner of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.  Petitioner is entitled to a new trial and/or sentencing hearing.

**CLAIM X.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REBUT THE EVIDENCE OF PETITIONER'S INDIFFERENT DEMEANOR AT THE GUILT STAGE OF TRIAL WITH MENTAL HEALTH EVIDENCE.**

267.    At trial, the Government elicited testimony from several witnesses to show Petitioner's indifferent demeanor to the injuries and death of his daughter.  This evidence was very prejudicial, as it indicated a callous and cruel heart on the part of the Petitioner.  Petitioner's demonstrated lack of feeling about the events of the day could even be seen by the jury as evidence of guilt.  The Government used this evidence to bolster their case against Petitioner.

268.    Indeed, the Government referred to Petitioner's indifferent attitude during opening statements.  TT 3/2/04, 39-41.  AUSA Patti Booth told the jury, "you're going to hear about the callous statements of the Defendant." Id. at 41:

> You'll hear the people testify about the demeanor of the Defendant.  You'll hear how when the ambulance came, it was Robin that went with the child to the hospital at Driscoll.  You're going to hear a Mr. Smith come and testify that he offered to take Mr. Bourgeois to the hospital, and he was more concerned about getting his load than he was about going to the hospital with his child, who is obviously not resuscitating.

120

Id. at 40.

269.    Multiple witnesses testified that they were surprised by Petitioner's lack of emotion on the day of his daughter's injuries.  See e.g. Testimony of Hal Resides, TT 3/2/04, 122-24; Karen Kruger, TT 3/2/04, 158-162; Joni Dee Parker, TT 3/2/04, 202-204; Timothy Darr, TT 3/2/04, 225-227, 236, 239; David Paolette, TT 3/2/04, 276; Michael Brozgal, TT 3/2/04, 289; Michael Guy Smith, TT 3/2/04, 318, 323-4, 330.

270.    Unquestionably, this testimony and the Government's argument about this testimony had an impact on the jury that could easily have been mitigated by defense counsel.  Mr. Bourgeois suffers from several mental disorders that explain his demeanor on that day.  First, Mr. Bourgeois is mentally retarded.  See Claim I, above.  This combined with his other neuropsychological deficits inhibit his ability to process new information, especially in stressful situations. See Claim II, above. Finally, Mr. Bourgeois is known to suffer from Borderline Personality Disorder.  This disorder further damages his ability to react to attachment and loss in a normal manner.  Borderline Personality Disorder can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress.  This sort of "spacing out" is not volitional, but is tied up with the disorder.  The loss of a family member was likely more than Mr. Bourgeois could handle, given his impaired cognitive and emotional functioning.

271.    As demonstrated in Claims I and II, defense counsel had this information at its fingertips and could have presented it at guilt phase to rebut evidence regarding Mr. Bourgeois' demeanor.  In this way, the demeanor evidence, rather than pointing to Mr. Bourgeois' guilt and hardness of heart, could have humanized the defendant in the eyes of the jury.  This information, in the event Mr. Bourgeois was found guilty, could also have tied into the potential penalty phase

presentation and sentencing.  An understanding of Mr. Bourgeois' mental health would have provided the jury with a more mitigating, coherent story of both the offense and the actor they believe committed it.

**CLAIM XI.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A TRIAL AND TO COUNSEL WHEN THE GOVERNMENT'S MENTAL HEALTH EXPERT RELIED UPON HIS INTERACTIONS WITH DEFENSE COUNSEL DURING THE TRIAL TO FORMULATE ADVERSE OPINIONS ABOUT HIM.**

272.    During his penalty phase testimony, Dr. Carlos Estrada opined that Petitioner presented a danger of future violence, he had a Narcissistic Personality Disorder, and he was manipulative of others.  This opinion was based on a number of factors, including the following response to the Government's question about whether Dr. Estrada had an opportunity to observe Mr. Bourgeois during the trial proceeding:

> I would say that in my opinion, Mr. Bourgeois attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim.  He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.
>
> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him.  And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

TT 3/22/04, 286.

273.    Defense counsel did not object to this testimony.

274.    The Government's reliance on a mental health opinion that was based upon Petitioner's participation as "part of the defense team" violated Petitioner's right to participate in his trial and to assist counsel.  In effect, Petitioner was penalized by invoking and exercising these fundamental rights.  Trial counsel ineffectively failed to object to this testimony, or to raise it on

122

direct appeal.  There was no tactic or strategy dictating not raising this obvious claim.

275.    This error is structural as it implicates fundamental rights to counsel and to a trial.

Accordingly, this error must result in the granting of a new trial.

CLAIM XII.    APPELLATE COUNSEL WERE INEFFECTIVE IN VARIOUS RESPECTS.

276.    Appellate counsel failed to raise a number of the record-based claim for relief raised

herein.  As counsel could not have had a sound tactic or strategy for not having raised these claims,

they rendered ineffective assistance.

277.    Appellate counsel is ineffective when he fails to raise a claim for relief that is obvious

in the record and which, if raised, would have resulted in a successful appeal.

**A.    This Court Improperly Admitted Inflammatory and Prejudicial Photographs During Both the Guilt/Innocence and the Penalty Stages of Trial.  Direct Appeal Counsel Ineffectively Failed to Raise this Error.**

278.    The admission of highly inflammatory photographs at both the guilt/innocence and

penalty phases of trial denied Petitioner his right to a fair trial and warrants both a new trial and a

new sentencing hearing.

279.    Throughout the trial, the jury viewed multiple inflammatory photographs of the

victim.  At the guilt stage, the jury was made to view **color** photographs of the victim's autopsy,

including a slide show of autopsy pictures **enhanced** to emphasize the victim's injuries.  The primary

purpose of these pictures was to upset and inflame the jury.  The use of color autopsy photos,

including pictures of JG1999's skin peeled away from her skull, was not necessary to prove the

elements of the Government's case.  See e.g. TT 3/8/04, 22-24.  Without a doubt, however, they did

leave a lasting impression on the jurors' consciousness and prejudiced them against the Defendant.

Further, photographs (Exhibits 150-224) were enhanced to show the victim's injuries in greater

123

relief. While the use of these enhanced photos raises separate constitutional concerns (see Claim V and VI, above), they should not have been admitted as their prejudice outweighed their probative value.

280.    These pictures were also incorporated into the penalty phase of trial, although they were even less relevant at that stage. TT 3/22/04, 13. Additional inflammatory photographs were introduced at penalty phase for the first time, including 17 pictures of the young victim from when she lived with her mother and grandmother. Two of these pictures seem especially inappropriate: Exhibit 410, a picture of the young victim's dead body in her casket and Exhibit 411, a picture of the decedent's grave. TT 3/22/04, 223-241.

281.    The prejudice of the disturbing and gruesome pictures clearly outweighed their probative value. Cumulatively, these pictures could not but help to shock the jurors to their core.

282.    Trial counsel rightfully objected to the admission of all of these photographs. See e.g. TT 3/1/04, 102; 3/8/04, 1-8. However, Counsel's failure to raise this issue on direct appeal was ineffective. The admission of overly prejudicial photographs denied Petitioner due process. Relief should be granted in the form of both a new trial and a new sentencing phase.

**B.    Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-social Histories of Others Who Have Been Sentenced to Death. Counsel Was Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal.**

283.    The right to individualized sentencing in capital cases is protected by the Eighth Amendment, and has been repeatedly upheld by the United States Supreme Court.

284.    Petitioner's right to individualized sentencing was violated when the Government elicited testimony from Dr. Estrada, their mental health expert at penalty phase, a comparison

between Mr. Bourgeois' history of childhood abuse with the histories of other convicted murderers

on Death Row:

**Q:** Do you know much about the background of people that have actually murdered somebody and been given the death penalty? Do you know much about any of that?

**A:** Unfortunately I have been involved in a number of those cases.

**Q:** And there are – are there people that have been abused as children that were ultimately sentenced to death because of their actions?

**A:** Not the majority.

**Q:** Okay. But some have been?

**A:** Yes.

TT 3/23/04, 57.

285.   At trial, defense counsel attempted to object to this testimony and asked for a mistrial:

Mr. Tinker:   Your Honor, during cross-examination of Dr. Estrada, Mr. Roberts asked him about –

\*                              \*                              \*

Mr. Tinker:   Asked him if there were other people who were accused of causing the death of  – in the battery of a child causing the death who had received the death penalty. I didn't object at that time because I didn't want it to disrupt the flow, but I do object at this time and –

\*                              \*                              \*

Mr. Tinker:   I do object at this time. By comparing – by comparing our client and the facts in this case with some other cases in which somebody got the death penalty is prohibited under the law in my view, and I think it's a violation of the Eighth Amendment of the Constitution. I don't think any instruction can cure it, and I do ask for a mistrial at this time. Does the Court recall the testimony?

The Court:   I do.

Mr. Tinker:   You shouldn't ever be able to compare – Mr. Gilmore says Eighth

125

and Fourteenth Amendments –[30]

The Court:   Let's get all the Amendments in there.

Mr. Tinker:   Yes, your Honor.  But anyway, that's my objection and I request a ruling from the court.

The Court:   Response?

Mr. Roberts:   Well, your Honor, it was – it was not comparing the circumstances of this case to any other case, it was merely asking – there was quite a bit of information about whether someone who had gone through abuse and whether those people are going to be able to – you know, whether those people should basically be allowed to just carry out their life in – life imprisonment.  And that was simply – just asked the Doctor if he was aware of anyone that had that kind of background.

The Court:   I don't know the case law, Mr. Tinker.  I'll just have to carry it forward at this point.  I'll do some work on it.

TT 3/23/04, 74-78.

286.   The Government's elicitation of evidence that compared Mr. Bourgeois to other individuals who had been convicted and sentenced to death was unconstitutional because it deprived him of his Eighth Amendment right to an individualized sentence.  The jury was allowed to reason that other individuals who had been abused as children had been sentenced to death, so Mr. Bourgeois could be as well.  It also unfairly lessened the mitigating impact of Mr. Bourgeois' childhood trauma and denied him the right to individualized sentencing.

287.   Mr. Tinker's confusion about the testimony to which he was objecting, and his inability to state a well formed objection prejudiced Mr. Bourgeois.  Further, and more importantly, counsel's failure to raise this meritorious claim at all on appeal denied Mr. Bourgeois his right to

---

[30]Mr. Gilmore's reliance on the Fourteenth Amendment was obviously misplaced as it has no application in a federal criminal prosecution.

effective assistance of appellate counsel.

**C.      Counsel Ineffective Failed to Raise All Record Based Errors, Even if they Were not the Subject of a Proper Objection or Where Otherwise Waived.**

288.    Under the federal "plain error" rule appellate counsel is obliged to raise all record-based claims, even if the question was not properly raised and preserved at trial.

289.    Appellate counsel in this case were ineffective for failing to raise all of the record-based claims discussed herein, which were not properly raised or objected to at trial.

**CLAIM XIII.    PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS DESCRIBED HEREIN.**

290.    Each of the above-described claims of constitutional error stand on their own and independently require relief.  However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cummulative impact of the constitutional violations.

291.    Petitioner will brief for this Court the concept that such violations must be viewed in such cummulative fashion.  For now, Petitioner alleges that the cummulative impact of the errors requires a new trial and sentencing hearing.

**CLAIM XIV.    PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING.**

292.    Petitioner has obviously alleged many facts, and he strongly suspects that the Government will not be in complete agreement with these allegations.  Should the Government contest any material fact, Petitioner is entitled to an evidentiary hearing in order to prove these facts. Although analysis of the scope of such a hearing will have to await the Government's responsive filings, at this juncture and to avoid any claim of waiver, Petitioner requests that he be afforded a hearing on any disputed fact, which, if proven individually or in combination with other facts, would

entitle him to relief.

**CLAIM XV.   THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.**

293.   Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution.  This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

294.   While Petitioner's belief that the execution under the current Bureau of Prison protocols would violate the Eighth Amendment, he believes that for two reasons this challenge is not appropriate at this time, or in this pleading.

295.   First, since Petitioner's execution is far from imminent, the question is not yet ripe.

296.   Second, since the Supreme Court's decision in Hill v. McDonough, 126 S.Ct. 2096 (2006), a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983.

297.   Petitioner will be happy to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate.  It would seem like a waste of resource to litigate it at this time, inasmuch as Petitioner believes he will not be executed, but instead he is entitled to relief.  Petitioner nonetheless raises the claim herein to avoid a later claim of waiver, and he will amend it should either the Court or Government believe it should be litigated now.

128

**REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution, Petitioner, respectfully requests that the Court provide the following relief:

A.     That Petitioner be permitted to file a Brief in Support of this Petition within 120 days;

B.     That the Government be required to answer this Petition and file a responsive Brief;

C.     That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motion for Discovery;

D.     That upon such discovery litigation, that Petitioner be permitted to Amend this Petition;

E.     That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

F.     That the Court permit oral argument as appropriate and required;

G.     That at the conclusion of the proceedings that the Court vacate Petitioner's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted.

Respectfully Submitted,

/s/    Michael Wiseman

_____

Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

*Co-Counsel of Record for Petitioner Alfred Bourgeois

Dated: Philadelphia, Pennsylvania
       May 14, 2007

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 14th day of May, 2007, I caused the foregoing to be served upon the following person by United States Mail, First Class Postage prepaid, and by e-filing:

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

_____    /s/    Michael Wiseman____

Dated: May 14, 2007
       Philadelphia, PA

130