**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

_____  :
                                         :
                                         :
UNITED STATES OF AMERICA,                :          No. Cr-C-02-216
                                         :
            Respondent,                  :      Honorable Janis Graham Jack,
                                         :               U.S.D.J.
      -against-                          :
                                         :      **This is a Capital Case**
ALFRED BOURGEOIS,                        :
                                         :
            Petitioner.                  :
_____  :

### PETITIONER'S APPENDIX IN SUPPORT OF MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
       May 14, 2007

# Index to Appendix

Document     Description
Number

Mental Health Expert Reports and Declarations
1. Interview Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/10/04
2. Mitigation Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/25/04
3. Risk Assessment Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/25/04
4. Mitigation PowerPoint by Mark D. Cunningham, Ph.D., March 2004
5. Risk Assessment PowerPoint by Mark D. Cunningham, Ph.D., March 2004
6. Declaration of Mark D. Cunningham, Ph.D., ABPP dated 5/11/07
7. Declaration of Carlos R. Estrada, M.D. dated 5/14/07 and Curriculum Vitae
8. Declaration of Michael M. Gelbort, Ph.D. dated 5/11/07
9. Letter Report of George W. Holden, Ph.D. dated 12/19/03
10. Letter Report of George W. Holden, Ph.D. dated 2/25/04
11. Declaration of George W. Holden, Ph.D. dated 5/13/07
12. Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W.
13. Declaration of Robert L. Sadoff, M.D. dated 5/12/07
14. Declaration of Jethro W. Toomer, Ph.D. dated 5/9/07
15. Dr. Weiner's Score Sheet from WAIS-R Administered in 2004
16. Declaration of Donald E. Weiner, Ph.D. dated 5/10/07 and attached Report of 3/3/04

Lay Witness Declarations
17. Michelle Armont
18. Nathaniel Banks
19. Isaac Bourgeois, III
20. Murray Bourgeois
21. Wilmer Bourgeois, Sr.
22. Lawanda Cook
23. Anthony Dumas
24. Anita Ferdinand
25. Lloyd Ferdinand
26. Beverly Frank
27. Allen Henry
28. Jersey Henry
29. Yvonne Robinson Joseph
30. Kathleen Kaib (re: Orlando Campos)
31. Adam Longoria
32. Bill May
33. Elnora Bourgeois McGuffey
34. Alton Preston
35. Jevona Jeanette Rixner
36. Keith Rixner
37. Louis Russell, Jr.
38. Ivy Thomas
39. Michelle Warren
40. Claudia Williams

Forensic Expert Reports, Declarations, Curricula Vitae, and Related Court Documents

41.    Curriculum Vitae of Edward T. Blake
42.    Report of Charles Michael Bowers, D.D.S., J.D. dated 5/11/07
43.    Report of Michael Cherry and Manfred Schenk, MAC dated 5/11/07
44.    Letter Reports of Colonel Jon Curtis Dailey, D.D.S. dated 9/29/02 and 7/14/03
45.    Declaration of Colonel Jon Curtis Dailey, D.D.S. dated 5/4/07
46.    Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* dated 10/8/03
47.    Order Granting Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* 10/20/03
48.    Order dated 2/25/04 requiring Defense to provide the Government with written summaries of expert witnesses Rupp, Holden, and Johnson
49.    Report of Elizabeth A. Johnson, Ph.D. dated 3/1/04
50.    Report of Kathleen S. Kagan-Hallet, MD
51.    Curriculum Vitae of Charles Alan Keel
52.    Autopsy Report of Elizabeth Rouse, Maj., USAF, MD, FS dated 1/10/03
53.    Affidavit of Werner U. Spitz, MD dated 5/10/07 and Curriculum Vitae

Records

54.    Lutcher High School Transcript dated 5/24/83
55.    Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85
56.    Psychological Evaluation by Morris & McDaniel, Inc. dated 5/22/85
57.    Louisiana Motor Vehicle Lease Agreement dated 1/10/01
58.    Notice of State Tax Assessment and Lien dated 12/4/02
59.    *Ford Motor Credit Company vs. Alfred Bourgeois* Suit on Net (Closed End) Lease filed 4/25/03
60.    FBI-302 Investigation Report dated 7/1/03 regarding Interview of Ross Griffin on 6/30/03
61.    Transcript of Sentencing in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 4/22/04
62.    Judgment of Sentence in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 4/22/04
63.    Amended Judgment of Sentence in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 12/27/04

1

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958

02-10-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: U.S. v Bourgeois

Dear Mr. Gilmore:

As you are aware, this past Saturday I spent 5.5 hours interviewing your client, Mr. Alfred Bourgeois. In the past several days I have also conducted extended telephone interviews of Mr. Bourgeois' older siblings. In the course of these interviews, a significant neurological history in Mr. Bourgeois has been identified. This history is outlined below:

1.  In approximately 1984, Mr. Bourgeois suffered a serious head injury when a 3-wheeler he was driving collided with a telephone pole. Mrs. Claudia Williams, Mr. Bourgeois' older sister, reported that he was unconscious for a number of hours following this accident – not regaining consciousness until after hospitalization and surgery. Mrs. Williams reported that Mr. Bourgeois "was not the same person" following this injury. She described that since this injury he has been more "nervous," "can't stand too much excitement," and "shakes" when angry.

2.  Mrs. Williams and her husband of 20+ years also described Mr. Bourgeois as experiencing recurrent "rage" episodes. These were observed from his early childhood, but worsened in severity following the above described head injury. Mr. and Mrs. Williams described that during these rages Mr. Bourgeois becomes flushed, "gets a different look in his eyes," and "doesn't seem to hear" attempts to calm him. These rages have been accompanied at times by assaults involving repeated punching and other physical violence, as well as verbal aggression – all well in excess of the provocation. Following these rages, Mr. Bourgeois is reportedly exhausted. Further, Mr. and Mrs. Williams described that while Mr. Bourgeois can typically recall the provoking stimulus, he has fragmented or no memory of his conduct during the rage attack. A very similar description has been

independently provided to a defense investigator by another of Mr. Bourgeois' siblings.

3. According to family members, these rages are quite out of character from Mr. Bourgeois' typical personality, demeanor, and interaction style.

Given the rage implications of the offense that Mr. Bourgeois has been charged with, a neurological basis for rage symptoms could be of significant explanatory value and mitigating impact.

More broadly, there is a growing body of psychological, psychiatric, and neurological literature which identifies that brain damage has a disproportionately high incidence among violent offenders. To illustrate a portion of this literature, Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that one in three killers exhibited clinically significant neuropsychological impairment. Lewis et al. (1986) in a study of 15 death row inmates identified that all 15 had histories of severe head injury. Martell (1992) in a study of 50 randomly selected mentally disordered offenders found at least one indicator of potential brain dysfunction in 84% of the subjects. In those subjects where an organic brain disorder was diagnosed, 75% had been charged with murder, manslaughter, or attempted murder. The remaining 25% had been charged with violent sex offenses. Blake et al. (1995) reviewed the medical records of 31 individuals awaiting trial or sentencing for murder and found abnormal EEG's in 8 of 20 subjects, abnormal MRI's in 9 of 19, evidence of frontal lobe dysfunction in 64%, and evidence of temporal lobe dysfunction in 29% of the subjects. These references are by no means exhaustive of the literature on this subject.

In light of Mr. Bourgeois history as well as research findings demonstrating an association between neurological dysfunction and violent offending, I am strongly recommending that comprehensive neurological and neuropsychological evaluation of Mr. Bourgeois be obtained.

1. Neurological evaluation: Such neurological evaluation should include an EEG, as well as other studies as indicated to illuminate any neurological contributions to Mr. Bourgeois' rage episodes and associated behavioral dyscontrol.

2. Neuropsychological evaluation: Neuropsychology is a sub-specialty within clinical psychology requiring advanced specialized training. Referral to a psychologist specializing in neuropsychological assessment is emphasized.

Finally, I am concerned that medical records that might provide a more definitive description of Mr. Bourgeois' head injury and treatment have not been received. Your efforts to expedite the retrieval of these records would also be much appreciated.

2

Please advise me if I can provide any additional information. Thank you for you consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP (forensic)

2

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas
972 459 0658     Fax:  972 459 0958

02-25-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: <u>U.S. v Bourgeois</u>

Dear Mr. Gilmore:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Alfred Bourgeois relative to the presence of any factors that might be considered mitigating. These findings and opinions are based on interview of Mr. Bourgeois, telephone interview of family members, review of limited records, review of investigation summaries, and review of scholarly literature. I am continuing to actively seek and interview third parties regarding Mr. Bourgeois and his history, and accordingly my findings and conclusions may be modified by additional information that may be made known to me.

Mr. Bourgeois' history includes a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. These include:

> Abandonment of biological father during much of his childhood
> Emotional rejection and abuse
> Physical abuse
> Death of older brother in childhood
> Significant head injury and subsequent rage attacks

Mr. Bourgeois also exhibited a number of pro-social patterns and positive relationship behaviors during his adulthood:

> Maintained continuous employment and was regarded as responsible and
>> hardworking
> Was an involved father who provided economic support as well relationship to his
>> children
> Displayed an ongoing interest in and was a constructive influence on his nieces
>> and nephews

Please advise me if additional information is desired. Thank you for your consideration.


Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

3

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas
972 459 0658     Fax:  972 459 0958

02-25-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: <u>U.S. v Bourgeois</u>

Dear Mr. Gilmore:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Alfred Bourgeois relative to the likelihood that he would commit an act of serious violence while confined for life in the federal Bureau of Prison. These findings and opinions are based on interview of Mr. Bourgeois, telephone interview of family members, review of limited records, and review of investigation summaries. I have relied extensively on scholarly publications regarding violence risk assessment and associated group statistical data. My findings and conclusions may be modified by additional information that may be made known to me.

The first analysis of risk is directed to the likelihood that Mr. Bourgeois would personally assault an inmate or staff member during a capital life term. This assessment is most reliable when based on Mr. Bourgeois pattern of adjustment to confinement to date, and the application of group statistical data. Regarding his adjustment to confinement to date, it is my understanding that Mr. Bourgeois has not engaged in any assaults on inmates or staff and further that he has received few if any disciplinary write-ups. It is further notable that this positive initial response to confinement has occurred in contexts where Mr. Bourgeois has shared a common dayroom or group cell.

A number of group statistics are relevant to Mr. Bourgeois's likelihood of serious violence during a capital life term. First, there is research on the prison adjustment of commuted capital offenders that is informative in evaluating Mr. Bourgeois's risk of committing serious violence in prison. More specifically, multiple group statistical studies indicate that the majority of individuals convicted of capital murder do not represent a disproportionate risk of violence while confined in prison. Second, group statistical analysis also reveals rates of disciplinary infractions and violence in prison are negatively correlated with age, even when the offense of conviction was committed at an older age. Third, long-term inmates have lower rates of disciplinary infractions than short-term inmates. Similarly, recent group statistical data identifies life without parole

inmates as representing better institutional assault risks than inmates serving parole eligible terms.

Utilizing studies of death-commuted and life-sentenced capital offenders as anchors regarding the probability of a serious act of prison violence from a capital offender, there is a 20-30% likelihood of a capital offender committing an act of assautive violence at some time across his capital prison term. There is an approximately 8-10% likelihood that a capital offender would present a more chronic violence problem. Applying group statistical data from an exceptionally large (N=6,390) study of assaultive conduct by convicted murderers in state prison, an offender matching the offense characteristics, demographic features, and incarceration history of Mr. Bourgeois would have the following probabilities of serious institutional violence across a capital life term: 2% any serious assault, less than 1% aggravated assault on staff, and less than .2% homicide of an inmate. Mr. Bourgeois possesses none of the risk enhancing factors identified in this study, but does possess a significant risk reducing characteristic of being over age 35 at the outset of his prison term. A risk scale based on 3,013 inmates who were confined at the Potosi Correctional Center at some time 1991-2002 indicated that the comparison inmate group most similar to Mr. Bourgeois, should he be sentenced to life-without-parole, (over age 30, LWOP sentence, high school equivalency) had a 7.9% prevalence rate of assautive misconduct – the third lowest risk group. The likelihood of homicide of a correctional staff member in BOP is less than 1 per 500,000 inmates annually. Additional characteristics that increase his likelihood of a positive adjustment to prison, and reduce the likelihood of perpetrating a serious institutional assault, include his history of gainful employment in the community and his continuing relationships with family members.

As risk of violence is always a function of context, the above estimates of the risk of serious violence could be markedly reduced by ultra-secure confinement such as in ADX Florence. Should Mr. Bourgeois be identified as suffering from a seizure disorder or other neurological dysfunction that would contribute to explosive violence, medications are available that treat and limit such responses.

A second context of risk involves the likelihood that Mr. Bourgeois could effect violence in the community from prison. It is my understanding that allegations to this effect have been made based on reports of jail informants. It is additionally my understanding that the credibility of these reports has not been determined. Evaluation of the risk of ordering violence in the community from prison involves consideration of whether Mr. Bourgeois has either the economic resources to contract such violence and/or a criminal organization that is responsive to his bidding. Mr. Bourgeois appears to possess neither of these. His pre-arrest occupation was an over the road truck driver, and there is no indication that he had any ties to organized crime or even any regular association with criminal elements. Mr. Bourgeois is apparently without significant financial means of his own. The brother that he allegedly identified as the funding source for the ordered violence is reported to be a law-abiding citizen, whose cooperation in such a scheme would seem improbable. Finally, should the Department of Justice conclude that there is good cause to fear Mr. Bourgeois' violent reach, special conditions of confinement can

be brought to bear that would restrict and monitor his communications so that the risk would be negligible.

Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

4

# U.S. v Alfred Bourgeois

## Capital Sentencing – Mitigation

## March 2004

Damaging Factors

• Overwhelmed family system

Dr. Cunningham, did you investigate Alfred's formative years?

Dr. Cunningham, if you accept the jury's verdict that Alfred is guilty of this offense, are there any factors in his formative years that could help us understand how this tragic offense occurred?

What is the first factor that you identified?

2

## Overwhelmed Family System

- Eunice and Lloyd Ferdinand had three children and then divorced.

- Soon after Eunice had Anthony by another man – Anthony was mentally retarded and hidden in the home.

- Alfred was father in illicit relationship with Alfred Sterling, who abandoned them and provided no support.

- Two more children were born to Eunice and Godfrey Rixner.

- Eunice and Godfrey had weekend conflicts associated with his drinking.

- Eunice hit Godfrey on occasion.

- Older brother Clyde drowned at age 12.

- Claudia sent to live with her maternal grandmother for two years. Alfred sent to live with an elderly woman in the neighborhood.

Dr. Cunningham, please explain this factor – how was the family system that Alfred grew up in overwhelmed?

How does that impact on a child that grows up in a family system that's overwhelmed?

3

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

Dr. Cunningham, what's the next factor that you identified?

## Abandoned by Father

- Alfred Sterling was married and had a family when involved with Eunice.

- In response to request from Eunice's father, Alfred broke off contact.

- Alfred Sterling provided no child support and made no effort to exercise any relationship.

- Alfred Bourgeois sought out his father in adolescence.

Please describe how that occurred and what contact Alfred had with his father growing up.

How does that impact on a child – to grow up without a father?

5

### Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

Dr. Cunningham, what was the next problematic factor that you identified in Alfred's background?

## Childhood Problems
## Putting on the Brakes

- Mischievous and sneaky.
- Did not listen.
- Constant movement — could not sit still and watch television.
- Jumped from one toy or activity to another.
- Always got into things.
- Took things from store.
- Got in trouble at school — frequent fights.
- Tantrums when whipped — reactive and defiant.
- Rage attacks.
- Inferred mental processing deficits in childhood from current neuropsychological testing.

Dr. Cunningham, can you give some examples of the sort of behavior that your talking about when you say that he had problems "putting on the brakes"?

**Neurobehavioral disinhibition:**

- Difficult temperament in early childhood
- Symptoms of conduct disorder, oppositional defiant disorder, and ADHD
- Teacher ratings of disruptive behavior
- Cognitive testing measuring executive functioning

**Attention Deficit Hyperactivity Disorder**

- Excessive motor activity
- Impulsivity
- Inattention

American Psychiatric Association (1994). DSM-IV. Author.

Tarter, R.E., Kirisci, L., Mezzich, A., Cornelius, J.R., Pajer, K., Vanyukov, M., Gardner, W., Blackson, T., & Clark, D. (2003). Neurobehavioral disinhibition in childhood predicts early age at onset of substance use disorder. American Journal of Psychiatry, 160:6, 1078-1085.

Dr. Cunningham, are there any symptom complexes or diagnoses that these sorts of behaviors in childhood fall under?

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

- Emotional rejection and abuse

Dr. Cunningham, what was the next damaging factor in Alfred's development?

## Emotional Rejection and Abuse

- Eunice treated Alfred different from other children -- he was her scapegoat.
- Appeared to direct her resentment regarding his father toward Alfred.
- Alfred was blamed when children were hurt in playing games.
- Alfred caught more whoppings than the other children.
- Eunice told Alfred that he "wasn't worth nothing."
- Eunice took the other children to the doctor, but refused to seek medical attention for Alfred's nose.
- Sent to live with Ms. Clayton at age 7-8.
- Not allowed to go on family trips or outings.

In what ways was Alfred emotionally rejected and abused?

How does emotional abuse and neglect affect a child?

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

- Emotional rejection and abuse

- Physical abuse

Dr. Cunningham, was there any other kind of maltreatment that Alfred received?

## Physical Abuse

- Eunice whopped Alfred with belt or extension cord.

- Routinely left welts and bruises.

- Eunice threw shoe or other objects at Alfred when he disturbed her television programs.

- Eunice insisted on cleaning Alfred's nose so that it chronically bled.

Please describe his experiences of physical abuse.

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

- Emotional rejection and abuse

- Physical abuse

- Neuropsychological deficits

Dr. Cunningham, what other problematic factors are part of Alfred's background?

## Neuropsychological Deficits

- Moderate cerebral dysfunction

- May exhibit inappropriate behavior when stressed

- Prone to rage attacks

What do you mean by neuropsychological deficits?

Dr. Cunningham, is it customary for clinical and forensic psychologists to rely on the reports from specialized consultants such as neuropsychologists?

What brain processing problems were revealed by that testing and by the history that you obtained from Alfred's family?

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

- Emotional rejection and abuse

- Physical abuse

- Neuropsychological deficits

- Susceptibility to rage attacks

In fact, Dr. Cunningham, are these rage attacks the next factor that you identified?

## Susceptibility to Rage Attacks

- Rage attacks observed by siblings from his early childhood.

- Worsened in severity in teens.

- Becomes flushed, "gets a different look in his eyes," and "doesn't seem to hear" attempts to calm him.

- Trembled when angry

- Accompanied at times by assaults involving repeated punching and other physical violence, as well as verbal aggression – all well in excess of the provocation.

- Would have to be pulled off by others.

- Afterwards appears exhausted.

- Could typically recall the provoking stimulus, but had fragmented or no memory of his conduct during the rage attack.

Please describe what you learned about these attacks from Alfred's siblings.



Dr. Cunningham, have you prepared a model that illustrates how these damaging factors are related to the offense that he has been convicted of?

Please describe this model.





Dr. Cunningham, in terms of your model, how did Alfred function in most areas of his life?



So what's the problem – how did these factors relate to any violent conduct?







Dr. Cunningham, I want you to assume that there have been instances where Alfred was violent with his domestic partners — how do you account for that in your model?



Dr. Cunningham, these are instances of periodic violence against a domestic partner – did you get any indication from anyone of his ever having been abusive of a child?

What happen here then?

How did Alfred handle learning that Robin had been involved in an affair?

Dr. Cunningham, Alfred wasn't being faithful to Robin was he?   Why was he so disturbed by her affair?



Did anything else happen that added flame to this pressure cooker?

Please explain the financial pressures that Alfred faced.



Was there any other heat that was added to Alfred's pressure cooker?

What happened in the face of this?

5

U.S. v Alfred Bourgeois

Violence Risk Assessment

Capital Sentencing

March 2004

•Now Dr. Cunningham, let me turn your attention to another arena — and that is how Robert is likely to adjust to a life term in the federal Bureau of Prisons.

•Are there factors that would illuminate this question for us — that would help us know what to expect from him in prison?

•Is this based on scientific methodology and research data?

•Has that methodology and research been subjected to peer review?

•Does much of the research data comes from the United States Justice Department or other credible sources such as state correctional agencies?

•Are this methodology and associated research findings and statistical data generally accepted by informed forensic psychologists?

•Are you familiar with this scientifically sound methodology and research? In fact, aren't some of your peer-reviewed publications regarding this very subject?

*Why Alfred Bourgeois is likely to make a positive prison adjustment:*

➢ Age

➢ Behavior in pre-trial custody

➢ Continuing relationship and contact with family and friends

➢ History of community stability

What is your conclusion regarding the likelihood that Alfred will make a positive adjustment to a life sentence in the federal Bureau of Prisons?

What factors did you consider that lead you to that conclusion?

Age:

➤ 39 years old

Dr. Cunningham, how old is Alfred?

Why do you consider Alfred being 39 years old as an important factor in Alfred being likely to make a positive adjustment to prison?



Graph reproduced in:

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

Is there any research demonstrates better prison adjustment as inmates get older?

Before you describe this graph, what does the references at the bottom of this slide mean? What is this page taken from?

Please explain this graph.

Why is this area of the graph circled?



Is there any national research that demonstrates the effects of aging on prison misconduct?

Dr. Cunningham, have you ever heard the saying: "You can prove anything with statistics"? Where did these statistics come from?



Dr. Cunningham, Alfred has been convicted of committing offenses in his late 30's – doesn't that make him an exception to this aging trend that you are describing?

Is there any research that supports this conclusion?

Please describe this study.

Do you know how Flanagan –the author of this study – accounts for why the inmates who committed more serious offense in the community and then received long-term sentences have lower rates of discipline problems in prison?

**Behavior in 20 months of pre-trial confinement:**

➤ 4 different facilities

➤ At times sharing common dayroom

➤ No disciplinary write-ups

Dr. Cunningham, you identified Alfred's pre-trial behavior in jail as a factor?

Why is his past behavior in confinement relevant to his future adjustment to federal prison?

Please describe his jail adjustment?

## Continuing Relationships with Family and Friends

➢ Mother

➢ Father

➢ Siblings

➢ Children

Dr. Cunningham, does Alfred have any relationships that have continued in spite of his confinement?

Who does he have continuing contact with?

How is this related to prison adjustment?

**Community Stability**

➢ Continuous community employment

➢ Involved with extended family

➢ Involved as a father

➢ Financially supported children

Dr. Cunningham, you had identified "community stability" as a factor that predicted positive adjustment to prison – what do you mean by community stability in Alfred's history?

What is the relationship between these community stability factors and positive prison adjustment?

## Risk Assessment Scale for Prison

N = 3,013
Violent misconduct 1991-2002
Maximum security prison

| Predictor variable | Weight Assigned |
|---|---|
| Death or LWOP Sentence | -1 |
| Marital Status=Married | -1 |
| Education=high school or equivalent | -1 |
| Prior Imprisonment | 1 |

Age
| | |
|---|---|
| Less than 25 | 2 |
| Age 25-29 | 1 |
| Age 30-39 | 0 |
| Age 40 and over | -1 |

Range = -4 to +3; Average = 0

Dr. Cunningham, have you been involved in any research that examines the likelihood of violence among inmates in a maximum security prison setting?

Please describe this research study.

## Risk Assessment Scale for Prison

Violent Acts

| Risk Level | Prevalence | Average | N size |
|---|---|---|---|
| -4 | 0.0% | .000 | 16 |
| -3 | 3.3% | .047 | 150 |
| -2 | 7.9% | .138 | 340 |
| -1 | 11.5% | .325 | 667 |
| 0 | 14.9% | .462 | 747 |
| +1 | 21.4% | .716 | 627 |
| +2 | 26.9% | .872 | 428 |
| +3 | 28.9% | 1.105 | 38 |
| Total | 15.9% | .491 | 3013 |

Where would Alfred fall on this scale?

What was the incidence of prison violence among this third lowest risk group?

11

## Risk Components

**Will there be violence?**
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

**Will this driver have an accident?**
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what locale?

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior.*

In evaluating the likelihood that Alfred will or will not engage in violence in prison, are there some essential questions to ask?

What are these?

Are these questions unique to violence risk assessment?

How does the automobile insurance industry use these questions?

## Risk Assessment Techniques

*More Scientific*

1. **Group Statistical**

   (insurance company method)

2. **Pattern**

   (using <u>patterns</u> of how the individual behaved in the past to estimate behavior in <u>similar</u> situations)

3. **Intensive clinical evaluation**

   (inferring violence risk from personality characteristics — notoriously unreliable in forecasting long-term violence)

4. **Hypothetical inference**

   (seeing animals in the stars)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research (Vol. 6)* (pp.1-50). Chicago: University of Chicago Press.
Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

Are some risk assessment techniques more scientific or more reliable than others?

Please explain these different ways of doing a violence risk assessment

How would you go about using the insurance company method?

The greater reliability of pattern and group statistical approaches – is this just your pet theory or is this assessment the conclusion of researchers in your field?

## Outcome Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population

2. Assaults by inmates in Federal prisons

3. Homicide of inmates or staff in state and Federal prison

4. Disciplinary infractions of short-term and long-term inmates

5. Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16*, 71-95.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

What outcome rates or group statistics are relevant to a violence risk assessment of Alfred across a life term in the federal Bureau of Prisons?

> ## Why capital offender violence rates apply to capital inmates in BOP
>
> ➢ Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.
>
> ➢ Prison facilities and procedures have broad similarity.
>
> ➢ Consistency of findings
>> diverse geographic regions
>> diverse time periods
>> diverse prison settings
>> diverse capital statutes
>> diverse capital offense characteristics
>
> ➢ Peer reviewed acceptance of broad applications
>
> Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Dr. Cunningham, many of your statistics are drawn from research on inmates outside of the federal Bureau of Prisons - If they aren't from BOP, then how are they relevant to Alfred Bourgeois?

As you have followed this research literature – has there ever been a peer reviewed assertion that these base rates from other prisons were not relevant to capital defendants in federal prison?



What is the first study that provides base rates about the follow-up of capital offenders?

Who were the Furman commutees?

What did this study do? Is this what is called a natural experiment? What is a natural experiment?

Let me see if I understand, there were 533 inmates on death row in 1972? They had their death sentences removed and were placed in the general prison population? Then after 15 years their disciplinary records were reviewed?

How many of these commuted capital offenders did not exhibit serious violations in the general prison population?

What other findings were there?



Dr. Cunningham, isn't it possible that the reason that most of these former death row inmates were not violent is prison is because they had been sentenced to death and that got their attention in a big way – like a life changing experience?

Who was in this study?

Why were rapists included among the life-sentenced inmates?

How did they compare?



**Indiana Commuted Capital Offenders**

- 39 inmates commuted since 1972
- March 1999 review of general population disciplinary records

Never in admin seg

No homicide, assault, fight

Reidy, T.J., Cunningham, M.D., & Sorensen, J. (2001) From death to life: Disciplinary behavior of former death row inmates in Indiana. *Criminal Justice and Behavior.*

Has these finding been confirmed in more recent research?

*Interrupt*

**You collected this research yourself?**

Please describe.



*Prison violence rates:*

**How Do Capital Inmates Compare to General and High Security Inmates?**

(Number of violations* per 100 inmates each year)

*homicide, assault on inmate with weapon, sex by force, assault on staff

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review*, 23(3), 449-468.

Dr. Cunningham, have there been any studies on how the violence rates of capital inmates compare to non-capital inmates?

What was this study measuring?

What did that include?

What groups were compared?

*(interrupt)*

What is the number in parenthesis?    Thanks, please continue.

What were the results?

So, if I'm reading this graph correctly – the capital offenders rather than being more likely to commit serious violence in prison had only a fraction of the rate of violence of those inmates around them?

*More about the capital inmates in this study*

# Most adjusted positively

➢ 2/3 of both groups have never been in solitary confinement (punishment for serious disciplinary infractions).

➢ 90% of both the former death row inmates and the life sentence inmates held trustee status.

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review*, 23(3), 449-468

How did most of the capital inmates in this study adjust to prison?

What is a trustee? What is the risk assessment significance of being a trustee?



Dr. Cunningham, isn't a defendant who is sentenced to life just bound to be violent in prison because he has nothing to lose?

Have there been any studies that speak to that question?

Who did this study compare?

Were the life-with-parole inmates less violent than the other two groups?

How many of these inmates were violent?



Prison Behavior 1924-1972:
## Commuted Texas Capital Offenders

- 100 death row inmates commuted
- Pre-Furman: 1924-1972
- Averaged 12 years in general prison population
- 80 committed no violent infractions

violent offenses
20%

0 inmate/officer violence

no violent
offenses
80%

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press.

Dr. Cunningham, if given a capital life term, Alfred will still be in prison 20-30- even 40 years from now if he lives that long, how do we know that these numbers will remain predictive over time?

Isn't that almost exactly the same results as the Missouri study that compared the LWOP, Life with, and death row inmates?



BOP Assaultive Infractions
## Capital Defendants Convicted
## and Sentenced to Life

- 1995-1998
- 25 capital inmates reported
   2 inmates - aggravated assaults (8%)
   2 inmates - simple assaults (8%)
   1 inmate - weapons contraband charges (4%)

- 11 inmates had no disciplinary write-ups of any sort

*Source of data:* Correspondence of Miles Harer, BOP, 12-14-98

Dr. Cunningham, has there been any follow-up of federal capital offenders who the jury sentenced to life without parole rather than death?

Where did this data come from?

What were the findings?

Did this follow-up include the "Poison Clan" of four drug dealers convicted of multiple murderers in Richmond?

What was their conduct in prison?

## Incarcerated Murderers

Study of 6,390 murderers:
- Admitted to prison between 1990-1998
- Frequency of serious violent offenses in prison reviewed
- Likelihood of a murderer exhibiting a serious act of prison violence across a 40-year capital life term extrapolated.

**Findings:**

Overall risk 16.4%
Incremental increases or decreases in risk relative to the overall risk rate:

| | |
|---|---|
| • Robbery/burglary in capital offense | +7.4% |
| • Multiple murder victims in capital offense | + 5.6% |
| • Attempted murder/assault in capital offense | + 4.0% |
| • Prison gang membership | +10.4% |
| • Prior prison term (unless non-violent record) | + 5.3% |
| • Age less than 21 | + 5.5% |
| • Age 26-30 | - 7.2% |
| • Age 31-35 | -12.3% |
| • Age over 35 | -14.4% |

Risk of aggravated assault on a correctional officer = 1%
Risk of inmate-on-inmate homicide = .2% (2 per thousand)

Sorensen, J. & Pilgrim, R. (2000). An actuarial risk assessment of violence posed by capital murder defendants. *Journal of Criminal Law and Criminology.*

Dr. Cunningham, have there any large research studies that looked at inmates convicted of murder to see how they behave in prison?

Please describe this study.

## The Relationship of Offense History to Prison Adjustment

- ◆ Past violence in the community is not strongly or consistently associated with prison violence.

- ◆ Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

- ◆ Severity of offense is not a good predictor of prison adjustment.

Alexander, J. & Austin, J. (1992). *Handbook for Evaluating Objective Prison Classification Systems.* San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.

National Institute of Corrections, U.S. Department of Justice. (1992) *Jail Classification System Development: A Review of the Literature, revised edition.*

Dr. Cunningham, what about Aaron's past violence in the community or the fact that he has been convicted of such a severe offense -- doesn't that point to his making a poor prison adjustment?

What support do you have for that opinion?

These conclusions come from the U.S. Department of Justice?

What are those Department of Justice conclusions?



*Violence*

Have you prepared a model that demonstrates how factors that resulted in someone being violent in the community aren't the same in prison?

Please describe this model.



How would Alfred's conduct in this offense fit this model?



How could we expect these elements to be different in prison?



Dr. Cunningham, is the likelihood of a serious assault in federal prison the same as the likelihood of a minor assault?

Please explain this.



Dr. Cunningham, do you have any information on the frequency of assaults in U.S. Penitentiaries?

Where did you obtain this data?

Please explain this pie chart.

## Rates of Inmate and Staff Homicide

**Inmate-on-inmate homicide**
    Federal = 6   per 100,000 inmates (2000, 2001)
    State   = 5.6 per 100,000 inmates (1997)

**Inmate-on-staff homicide**
    Federal      = 1 per 500,000 inmates
                    (last in 1997)
    State        = 1 per 1,000,000 inmates

**Comparison** ( Murder & Non-negligent homicide- 2001):

| | | |
|---|---|---|
| United States | = | 5.6 per 100,000 |
| Texas | = | 6.2 per 100,000 |
| Corpus Christi | = | 6.7 per 100,000 |
| Houston | = | 13.4 per 100,000 |

*Source of data:*
Maguire, K. & Pastore, A.L.,eds. (2002). Sourcebook of Criminal Justice
    Statistics – (1999). U.S. Department of Justice, Bureau of Justice Statistics.
    Washington,D.C.
Corrections Compendium, June 1998
U.S. Bureau of Prisons (January 2002)

What about the possibility of a capital inmate killing someone in prison, are there any group rates that assist us in determining that possibility?

First, in terms of one inmate killing another – how often does that happen?

Can you put those rates in some kind of perspective?

So the rate of homicide is lower in prison than in the general community?

What about an inmate killing a staff member – how often does that occur?



Dr. Cunningham, how do you account for the rates of lethal violence in prison being so low – particularly with so many violent felons being concentrated there?



## Summary of Prison Violence
## Base Rate Findings

- Capital inmates have low rates of violence in the general prison population
- Seriousness of offense does not predict prison violence.
- Infraction rates are progressively lower as an inmate ages. This is consistent with multiple studies which demonstrate markedly decreasing rates of criminality and violence with aging.

Anchoring Base Rates (Across capital life sentence):

- Assault                    = 20 - 30% (+ incremental)
- Repetitive assault   = 10%
- Aggravated assault on staff = 1%
- Homicide of inmate = .2 - 1%
- Homicide of staff   = 1 per 1,000,000 annual

Can you summarize this these base rate findings regarding prison violence?



Likelihood of Alfred Bourgeois
Exhibiting Severe Violence in
Prison

*Increased Risk* Relative to Group Rates *Decreased Risk*

**Age**
➢ 39

**Correctional behavior**
➢ No disciplinary incidents in pre-trial custody for 21 months

**Family and visitor contact**
➢ Continued phone contact with family and friends
➢ Continued visitation with family and friends

**Community stability**
➢ School, parenting, family, employment

Relative to these group rates, what factors would we use to individualize these numbers to Alfred?

*Interrupt*

What do you mean – relative to base rates?

What factors would increase his risk as compared to the group rates you just described?

What factors would decrease his risk as compared to the group rates?

On balance, would Alfred's risk of personally enacted violence be above or below that of the anchoring capital offender base rates that you have been discussing?

Individualized Actuarial Likelihood of
Alfred Bourgeois Exhibiting Severe
~~Violence in Prison~~

- 6,390 murderers convicted 1989-1999
- Followed an average of 4.55 years
- Rates of serious violence* extrapolated for life
  sentence

| | |
|---|---|
| 16.4 | Base rate of serious violence |
| [7.4 ] | *Robbery* |
| [5.6 ] | *Multiple murder victims* |
| [ 4.0] | *Attempted murder in capital offense* |
| [5.3 ] | *Prior prison term* |
| [10.4] | *Prison gang membership* |
| - 14.4 | Age over 35 |

2 %  Overall risk rate

*Homicide, attempted homicide, assault with a weapon, fight with a
weapon, sexual assault, robbery on inmate. Aggravated assault on
correctional officer.

Sorensen J.R. & Pilgrim, R.L. (2000). Actuarial assessments of future dangerousness in
the punishment phase of capital trials. *Journal of Criminal Law & Criminology*

Are there any studies that provide a basis for individualizing the assessment on strictly statistical factors?

Please describe the basis of this study?

Please describe the findings, individualizing them to Alfred Bourgeois.

So if we do this strictly by the numbers, there is an 98% likelihood of Alfred adapting to prison without serious violence?

Individualized Actuarial Likelihood of Alfred Bourgeois Exhibiting Severe Violence in Prison:

### *Lifetime risk*

- Any serious violence = 2%

- Aggravated assault on staff = 1%

- Homicide of inmate = .2 %

### *Annual risk*

- Homicide of prison staff = 1 per 500,000

Dr. Cunningham, can this strictly statistical risk assessment be broken down further regarding the risk of particular acts?

What are those more specific percentages?

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary Marion (high security)

U.S. Penitentiary (high security)
    Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

•Dr. Cunningham, are you familiar with the different levels of custody in the federal Bureau of Prisons?

•What are those levels of custody?

## Indicators of Security Level

- Nature of outer wall or fence

- Towers and external patrols

- Perimeter detection devices

- Concentric layers of security

- Type of housing

- Control of movement of inmates

- Intensity of staffing and supervision

Dr. Cunningham, what features distinguish these levels of custody from each other?

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security) general population

U.S. Penitentiary, Marion (high security)

U.S. Penitentiary (high security)
    Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

At what level is an capital inmate housed if sentenced to life without parole?

" A male inmate with more than 30 years
remaining to serve (including non-
parolable LIFE sentences) shall be
housed in a High security level
institution unless the PSF [Public
Safety Factor] has been waived."

*Security Designation and Custody
Classification Manual (5100.07, p. 4)*

Dr. Cunningham, is there a regulation that you are relying on in stating the custody level that a life without parole capital inmate is held at?

What does that regulation state?

## U.S. Penitentiaries

| Unit | Census |
| --- | --- |
| ▪ USP Allenwood | 1104 |
| ▪ USP Atlanta | 2246 |
| ▪ USP Atwater | 1389 |
| ▪ USP Beaumont | 1438 |
| ▪ USP Coleman | 1614 |
| ▪ USP Florence | 932 |
| ▪ USP Leavenworth | 1840 |
| ▪ USP Lee | 1418 |
| ▪ USP Lewisburg | 1208 |
| ▪ USP Lompoc | 1426 |
| ▪ USP Pollock | 1429 |
| ▪ USP Terre Haute | 1163 |
| ▪ USP Marion (mid-level) | 424 |
| | 17,631 |

(12% of BOP inmate population)

Dr. Cunningham, can you identify the U.S. Penitentiaries in the Bureau of Prisons and their approximate census?

Please describe these.



Cell at USP Florence

Source: Bureau of Prisons, Department of Justice

Dr. Cunningham, do you have a diagram of a typical cell in a U.S. Penitentiary?

What is the source of this diagram?

Please describe this diagram.

## Available Measures to Control Disruptive or Violent Inmates

**Treatment**
- Counseling
- Medication
- Education

**Discipline**
- Cell restriction
- Loss of privileges: visitation, commissary, job, recreation
- Fines and loss of property
- Administrative segregation

**Security**
- Move to higher security facility
- Secure Housing Unit (SHU)
- USP Marion
- ADX Florence
- Control Unit, ADX Florence

Dr. Cunningham, are there mechanisms available in the Bureau of Prisons to control disruptive or violent inmates?

Are you familiar with those mechanisms?

Please describe these.

## Common Features of Security Measures

- Single celled

- Very limited movement (23 & 1)

- Meals in cell

- Handcuffed and escorted movement

- Solitary or small group recreation

- Frequent inmate searches

Dr. Cunningham, if an inmate requires greater security than the general population of a U.S. Penitentiary, what are some of the common features of this increased security?

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary, Marion (high security)

U.S. Penitentiary (high security)
Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

•Dr. Cunningham, could we return to the chart of custody options available in the Bureau of Prisons.

•Who determines whether a capitally convicted inmate is placed in a higher level of custody than the general population of a U.S. Penitentiary?

•So if the Bureau of Prisons determined that Alfred Bourgeois represented a disproportionate risk to staff, or other inmates, or the community outside of prison they could escalate the security that he is held at?

•What is ADX Florence?

•Have you toured this facility? When was the last occasion that you had such a tour? What did this tour involve? Are these tours routinely available to the public?

•Do you have photographs of ADX?

•Do these accurately depict the facility?

•Would showing these facilitate your description and increase the jury's understanding of your testimony?



What does this slide depict?



What does this slide depict?



What are we looking at here?

Do you have a diagram that reflects the units that spoke off of this central picket or bubble?



Please describe this diagram.



What are we looking at here?



Dr. Cunningham, do you have a diagram of a typical cell at ADX?

Please describe this diagram and some of the security procedures that are applied in ADX.



What does this diagram depict?



Do you have photographs of a typical cell at ADX as well?

Please describe this photograph and the various features of the cell.



What is this view?

I notice that there is a slot in the sliding grate door — what is the function of this slot?



What does this photograph depict?

Please what the officer in the shirt and tie is carrying?

What is the function of this baton?



What does this photograph depict?



What are we looking at here?

Please describe the covering over this area and its function.

## Assaults in ADX Florence

| Offense | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| *Assaults* | | | | | | | |
| On Inmate w/ weap | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| On Inmate | 5 | 3 | 4 | 3 | 2 | 2 | 2 |
| On Staff w/ weap | 1 | 0 | 2 | 2 | 3 | 0 | 3 |
| On Staff | 25 | 12 | 18 | 13 | 23 | 11 | 39 |
| Total | 27 | 16 | 24 | 18 | 28 | 13 | 44 |
| *Homicides* | | | | | | | |
| Homicide of inmate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide of staff | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Escapes* | | | | | | | |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ave daily census | 342 | 377 | 410 | 371 | 342 | 372 | 412 |

Dr. Cunningham, does violence still occur at ADX?

Do you have statistics regarding the rate of this violence?

ADX Florence
<u>General Population and Step-Down Unit Operations</u>

**General Population Units**

  restraints and two officer escorts when removed from cells
  12 hours weekly of out of cell exercise in small groups
  meals in cell, shower in cell
  *12 month minimum*

**Intermediate Unit**

  restraints and two officer escorts when removed from cells
  several hours daily out of cell on ranges
  meals in common area on range
  out of cell exercise in large outside rec. yard / gymnasium
  *7 month minimum*

**Transitional Unit**

  escorted off unit unrestrained in small groups to
          programming areas
  *5 month minimum*

**Pre-Transfer Unit**

  unrestrained when out of cells and when escorted
  employed in UNICOR for half the day
  meals in institutional dining hall
  *12 month minimum*

Dr. Cunningham, is ADX intended to be a permanent placement for all of the inmates who are sent there?

Please describe what programs the facility has to attempt to return inmates to U.S. Penitentiaries.



What is shown in this photograph?

**PS5212.06 Control Unit Programs**

**541.40, 1.a.**  In an effort to maintain a safe and orderly environment within its institutions, the Bureau of Prisons operates control unit programs intended to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution.

Is there even a higher level of security within ADX?

What is the control unit?

Is there an instruction that addresses the purpose and operation of the Control Unit?

Please describe this purpose as stated in 541.40, 1.a

**541.41, 5.b.** The Warden shall consider the following factors in a recommendation for control unit placement:

(1) Any incident during confinement in which the inmate has caused injury to other persons;

(2) Any incident in which the inmate has expressed threats to the life or well-being of other persons;

(3) Any incident involving possession by the inmate of deadly weapons or dangerous drugs;

(4) Any incident in which the inmate is involved in a disruption of the orderly operation of a prison, jail, or correctional institution;

(5) An escape from a correctional institution;

(6) An escape attempt;

(7) The nature of the offense for which committed [considered only in combination with other factors of this section].

Dr. Cunningham, is there an instruction that delineates what factors go into the consideration of whether to place an inmate on the Control Unit?

Have you placed this instruction on a slide?

What does this instruction state?

## ADX Control Unit

- in cell 23 hours a day

- sliding outer steel door, sliding inner bar door

- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved

- triple escort when out of cell

- 7 hours out-of-cell solitary exercise weekly

- meals taken in cell

- *duration:*
  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution (CFR 541.50)*

Please describe the basic security procedures of the Control Unit.

How long might an inmate remain on the Control Unit?

---

December 1994 to June 2001
## Assaults on Staff in ADX Control Unit

**14 minor assaults on staff:**
- 9 throwing unknown liquid/feces or spitting in face of officer
- 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
- 1 pulling away and then throwing ice tray full of water and carton of milk at officer
- 1 throwing head back against officer's face
- 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's hand
- 1 grabbing officer's shirt and pulling him into the bars

**3 attempted/threatened minor assaults on staff:**
- 2 attempting or threatening to throw liquid
- 1 attempted head-butt

**10 of the above 17 involved a single inmate**
**6 total inmates involved**

---

What about on the Control Unit – do you have information regarding the frequency of assaults by inmates on the Control Unit?

What is the source of this information?

To help understand these numbers, about how many inmates are on the Control Unit at ADX?

So there are 2-3 of these a year involving 6 total inmates, and two thirds of them from one inmate?



Dr. Cunningham, is there an even higher level of security than the Control Unit at ADX?

Please describe these capabilities and how these cells operate.

Conclude

6

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare and certify the following:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in fifteen states including Texas.  I received a Bachelor's degree in Psychology from Abilene Christian College with high honors in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I served as active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981.  I have maintained a private practice in Texas since 1981.  My practice is national in scope.

2.      I am board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP).  This credential signifies the highest level of expertise and practice in forensic psychology.  I have provided forensic evaluation services in over 450 cases.  I have particular expertise in the area of capital sentencing issues, including mitigation and violence risk assessment.  I have testified as a clinical and forensic psychology expert regarding sentencing issues in approximately 75 state capital cases and 50 federal capital cases at trial, and in numerous cases in post-conviction or federal habeas proceedings.  I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in 31 states and Puerto Rico.  I have never been denied qualifications as an expert in clinical or forensic psychology.

3.      I am extensively involved in research and the authoring of scholarly publications relevant to capital sentencing issues and death row populations.  I have authored or co-authored over

30 scholarly and peer-reviewed papers during the past nine years, including six published in 2006 and six others that are currently "in press." I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12 volume *Handbook of Psychology*.

4.      I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred Bourgeois, as a clinical and forensic psychology expert in his capital trial proceedings in the United States District Court in the Southern District of Texas, Corpus Christi venue. I have been asked by Mr. Bourgeois' current federal defender counsel to provide this Declaration outlining my knowledge of Mr. Bourgeois and my involvement with his case at the trial level.

5.      I was first contacted by Mr. Gilmore on June 30, 2003. At that time, he described that the trial was set for mid-September, and that the defense had "developed very little mitigating evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death penalty if convicted if they were not able to present mitigating evidence. I responded on July 1, 2003, and suggested that the defense hire a mitigation specialist. I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line. My own interviews and evaluation could not reasonably begin prior to this investigation. As neither this investigation nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.

6.      Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 2 of 18**

his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

7. A four-month continuance was obtained, and funding for a mitigation specialist was secured, and then I agreed to participate as an expert. I advised defense counsel that the mitigation investigation would have to proceed very aggressively in order for me to complete my evaluation and meet a disclosure deadline of mid-December. I understood my general role to be the provision of opinions regarding extant mitigating evidence, as well as Mr. Bourgeois' potential to make a positive adjustment to incarceration (also known as a risk assessment) – each of which are routine considerations in federal capital sentencing.

8. Gerald Bierbaum and Lisa Milstein were retained as the mitigation specialists. I knew each of them and anticipated that, under the direction and coordination of defense counsel, they would be able to gather the records and conduct the types of third-party interviews that I require. However, it became apparent to me that defense counsel was not adequately monitoring and directing the mitigation investigation. On December 1, 2003, my office advised Mr. Gilmore that I had still not received any records, interview summaries, or investigation reports. Mr. Gilmore responded that he was "really not sure how this works," and did not know if he should be providing me with information or if the mitigation investigators should be providing this information to me directly. This again reflected a lack of familiarity with the functions of defense counsel in preparing for capital sentencing. In my experience, the responsibility for a mitigation investigation cannot be "outsourced" by retaining an investigator. I am also aware that defense counsel customarily reviews

the information gathered by the mitigation investigator prior to providing it to testifying experts to ensure its relevance, reliability and accuracy. Though Mr. Gilmore reported that he was seeking another continuance in the face of the mitigation investigators' report to him that the investigation could not be completed by mid-February, he continued to give little indication of appreciating the time requirements of an adequate capital mitigation investigation.

9.  In my subsequent direct telephone contacts with Gerald Bierbaum in December 2003, I expressed my concern that my own evaluation was being critically compromised by the absence of case information. Mr. Bierbaum indicated that Ms. Milstein had been unable to direct her full attention to the case and that he was having to pick up her slack. Still, interview summaries were not immediately forthcoming. When these summaries were provided and I began to perform my own follow-up interviews by telephone, it quickly became apparent that the history that had been obtained by Ms. Milstein was both inadequate in scope and plagued by fundamental errors of fact. As a result, I could not rely on the investigative memos, and was faced with the necessity of re-interviewing the identified mitigation witnesses and potentially seeking other sources of information as well. Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner, and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred. Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

10.  In addition to conducting interviews and reviewing summaries of interviews, I conducted a clinical interview of Mr. Bourgeois (lasting about 5.5 hours) on February 7, 2004. I

reviewed documentary background material about Mr. Bourgeois and the offense. I was given reports generated by Dr. Carlos R. Estrada (Government-retained psychiatrist) and the defense-retained neuropsychologist, Dr. Donald E. Weiner. I would add that counsel had trouble scheduling Dr. Weiner's evaluation. I had recommended a neuropsychological evaluation, and I believe Dr. Estrada did as well, as there were many red flags indicative of potential brain damage in Mr. Bourgeois' background. On February 18, 2004, Mr. Gilmore informed me that he was unsure if the neuropsychological evaluation would be completed in time for trial, as testimony was scheduled to begin in early March, 2004. Eventually, Dr. Weiner was able to conduct his assessment and he generated a report dated March 3, 2004. The last-minute nature of this evaluation was a further indication to me that counsels' preparation of the fast-approaching penalty hearing was proceeding haphazardly.

11. During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.

12. The trial commenced in February, 2004 and I recall that the penalty phase started in

mid-March. Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial. We did plan, however, for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd. I arrived at my hotel in the mid-afternoon on March 21, 2004. I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting. Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions. Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone. However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night. I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.

13.     I attended the Court proceedings the next day and observed the Government's examination of Dr. Estrada. His testimony showed that he recognized that childhood abuse can impact adult behavior. I was concerned, however, because Dr. Estrada's presentation did not address this question as it related to Mr. Bourgeois specifically. It also did not address it from a mitigating perspective. Instead, it focused only on why Mr. Bourgeois' history of abuse made him

a continuing danger. This turned the mitigating evidence on its head. Instead of mitigating the

offense, Mr. Bourgeois' history of savage abuse was used to aggravate.

14. On cross-examination the defense did not develop and explain that impact from a

mental health perspective. As I recall, Dr. Estrada's testimony was limited in this regard to stating

only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and had exhibited adult

conduct that was consistent with such abuse. I was quite cognizant that testimony elicited from Dr.

Estrada was inadequate for the jury to appreciate the mitigating quality of this history of abuse.

Rather, if the jury were to recognize and give informed weight to Mr. Bourgeois' background, it had

to hear testimony about these developmental experiences in much greater depth, as well as have the

benefit of clear and detailed testimony regarding **why** this history mitigates, including the nexus

between this history and Mr. Bourgeois' life adjustment and the instant offense conduct. Had

defense counsel dedicated time to conference with me, I would have advised them to anticipate this

application of developmental history by a Government-retained mental health expert. I also would

have equipped them with an understanding of scientifically-informed perspectives and data on

violence risk assessment that would have equipped them to debunk the future danger implications

advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

15. A second appointment was made to meet with Mr. Tinker after court that day. Much

to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar

for about 45 minutes. Mr. Tinker had a drink. It was my distinct impression that he was not

particularly interested in my analysis of his client's disorders and deficits. It was obvious from his

questions that he had not yet looked at the materials that I sent to him, and he certainly was not

familiar with them. To illustrate, while I was discussing the mitigating evidence, he interrupted me

to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series of slides regarding that topic. This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information. Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had already provided to him. When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois. It was not in the trial notebooks that counsel had on their table. Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. As evidenced by counsel not having this assessment in their critical records files, they apparently had not reviewed it or appreciated its implications. Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

16. In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing. In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial. Normally, counsel looks to me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case. Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

17. Despite the brief nature of our hotel-bar "preparations," I was still confident that the

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 8 of 18**

important mitigation and risk assessment perspectives I had developed regarding Mr. Bourgeois would have significant impact on the jury's sentencing determination. Accordingly, I was flabbergasted when, after completing cross examination of Dr. Estrada and after the Government rested, counsel took a break to inform me that they would not be calling me as a witness. This decision was made without consultation or discussion with me.

18. As noted, there was much to say regarding adverse factors in Mr. Bourgeois' background and the mitigating impact of these factors on his life, the vast bulk of which was not covered by Dr. Estrada. Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred. Mr. Bourgeois was raised in a overwhelmed family system. His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age. Eunice had seven children by four different men. One son was profoundly mentally retarded and kept hidden in the home. One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

19. The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment. Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support. Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock. Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois. The effective abandonment by both parents has a significant impact on early child development. The abandoned child is often unable to trust. The child may grow up with an intense fear of abandonment and be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

20.     Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life.  People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age.  For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

21.     These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses.  Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention.  This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

22.     There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother.  More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois.  Eunice treated Alfred as a scapegoat.  Alfred was blamed when children were hurt in the playing field.  He was beaten more frequently and more brutally than his siblings.  She beat him with belts and extension cords.  These beatings were described as routinely leaving welts and bruises.  Eunice is also described as throwing shoes and other objects at him.  Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

23.     Eunice was also described as emotionally abusing Mr. Bourgeois. Eunice told Alfred

that he "wasn't worth nothing." Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois. There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes. At age 7-8, Eunice sent Alfred to live with an elderly neighbor, Ms. Mary Clayton. He was as a result excluded from family outings and trips. After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle. This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

24. As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor. While behavioral impacts can vary, all such victims suffer from psychological consequences. They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions. Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly. In Mr. Bourgeois' case the abuse was severe and long lasting. It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

25. Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76. Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an IQ score of 68. I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test). The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ

score of 68 in 2004. Both of these scores are in the range of mild mental retardation.

26.     Unfortunately, I was not provided with the IQ information in time to interview family members regarding ways in which Mr. Bourgeois' deficient intelligence was reflected in his practical functioning and day-to-day activities, i.e., whether he functions with significant adaptive deficits.

27.     Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning. Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior. Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

28.     Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage. His siblings recalled that he had "rage attacks" even in his early childhood. These attacks worsened in his teenage years. Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged. They reported that he would often tremble when angry. The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation. He would often have to be physically restrained by others. After the attack, Mr. Bourgeois would appear exhausted. He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

29.     The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well. This includes marked changes in his demeanor, disproportionate responses, inability

to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

30. The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

31. As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages. It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter. My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence. This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors. His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control. By any measure, this is mitigating in the context of capital sentencing.

32. Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts, even though the abuse took place over days and weeks. Due to his deficits, he has

a low tolerance for frustration, which becomes even worse in stressful situations. When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

33. I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently. I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury. Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring. He was able to maintain almost constant, if not steady, employment. He did his best to provide for his children materially and sometimes even emotionally. However, his background and psychological make-up always made him predisposed toward impulsivity and violence. Generally speaking, he was able to keep the lid on the pot. However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct. These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children. They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.

34. At the time of the offense, there were many ingredients simmering in the pressure cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

35. During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

36. I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison. In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence. My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department. The methodology and findings of my research are generally accepted by informed forensic psychologists.

37. Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community. Alfred is 39 years old. Research demonstrates better prison adjustment as inmates get older. Rates of prison infractions are highest for inmates in their early 20's. These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

38. This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard,

however, that despite this suspicion he at times shared a common day room with other inmates. Significantly, Mr. Bourgeois had no disciplinary write-ups during that time. Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

39. Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison. Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community. He has generally been gainfully employed as an adult. He is involved in an extensive family system. He attended church. He was an involved father. He provided financial support to his children.

40. My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors. These studies consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

41. Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education. The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction; loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of

property; and administrative segregation (solitary confinement). Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious violence is markedly diminished.

42. As noted above, I have significant experience with capital trials. Drawing on this fund of experience, Mr. Bourgeois' case stands out for the inaccurate and incomplete portrayal of Alfred Bourgeois' functioning presented to the jury. I believe trial counsel did not have an adequate understanding of the significance of mitigating evidence. They did not have a detectable strategy for penalty phase. They did not consult with me, their primary penalty phase witness, to help them develop a strategy or to explain the factors that had been identified from the limited investigation that time press had allowed. In my opinion, the information I would have provided the jury could have significantly impacted their deliberations. Without my testimony, and absent a clear defense strategy at the penalty phase, the jury had virtually no mitigating evidence to consider and no informed mechanism with which to consider his risk of violence in prison in the future.

43. There is much more detail that I can provide about the facts and opinions expressed in this Declaration. This Declaration presents my views in broad strokes and I would be happy to provide additional details at the request of the Court.

I hereby certify that this Declaration is true to the best of my knowledge subject to the penalty for

perjury.

Mark D. Cunningham, Ph.D., ABPP

Dated:         May 11, 2007
               College Station, Texas

7

I, Carlos R. Estrada, M.D., hereby declare that the following is true and correct.

1.      I am a medical doctor who is board certified in psychiatry and neurology. I am licenced to practice psychiatry in the State of Texas. I maintain a clinical and forensic practice in Corpus Christi, Texas. I have appeared as an expert witness in numerous state and federal court criminal proceedings on behalf of the Government, the defense and as a Court expert.

2.      I was retained by the United States as a forensic expert in the case of United States v. Alfred Bourgeois, No. Cr-C-02-216 (S.D. Texas), and was so qualified during Mr. Bourgeois' trial. I understand that Mr. Bourgeois was convicted of capital murder and was sentenced to death related to the killing of his infant daughter on the grounds of the Corpus Christi Naval Air Station. I have been asked by Mr. Bourgeois' current defense counsel to complete this declaration regarding my involvement with this case. All opinions herein are stated to a reasonable degree of psychiatric certainty. All factual assertions are true to the best of my knowledge.

3.      Subsequent to being retained by the Government, I was asked by the Court to conduct a forensic examination of Mr. Bourgeois to determine his competency to proceed and his sanity at the time of the offense. I understood that the defense did not object to my acting as a Court expert in this capacity even though I had already been retained by the

Government. After my evaluation of Mr. Bourgeois, I opined that he was both competent to proceed and was not insane at the time of the offense. Following this evaluation, I resumed my duties as a Government expert. However, with the knowledge and consent of the Government, I communicated with Mr. Bourgeois' defense counsel throughout the pre-trial and trial proceedings.

4. As part of my duties as an expert witness, I reviewed all of the available information regarding the offense. It was readily apparent to me that this was not a "typical" killing. The offense was bizarre in its brutality, savagery, and perversity. This lead me to strongly suspect that Mr. Bourgeois has suffered significant childhood physical and sexual abuse. However, in my clinical interview with Mr. Bourgeois he denied that he suffered abuse of any sort as a child. He presented a rather idyllic vision of his early life, and tried to mask any apparent abnormalities. For instance, he spoke of his father as quite involved in his life and as being emotionally and financially supportive. He denied that his being made to leave home and live with an elderly woman in the neighborhood was the result of any family dysfunction.

5. I strongly suspected at the time, and now know based on additional materials that I have reviewed, that these representations by Mr. Bourgeois were merely rudimentary attempts at masking what was in reality a highly dysfunctional, clinically significant, and painful history of childhood abuse and family dysfunction. It is not uncommon for even adult victims of childhood abuse to "deny" that they were abused. This "denial"

Declaration of Carlos R. Estrada, M.D.<br>
Page 2 of 9

phenomenon is largely a psychic defense put up by the victim to normalize the horrors that they suffered. The existence of this phenomenon also makes it particularly important for the mental health practitioner to not rely only on self reports, particularly in the forensic setting.

6. At the time that I wrote my report (in January, 2004), I did not have any collateral information about Mr. Bourgeois' background. When I received the defense report (written by Dr. Cunningham in February 2004), I finally had some confirmation of my suspicion of abuse. However, I was not permitted to rely on Dr. Cunningham's report during my testimony because of a ruling from the Court. Therefore, I was left to testify only regarding my suspicions regarding his horrific childhood.

7. I have now been provided with a wealth of information by Mr. Bourgeois' current counsel. This information includes declarations from those who witnessed his abuse; other mental health reports; and the transcripts of the penalty phase during which short testimony was provided by lay witnesses about the abuse. Based upon what I now know to be the truth of his upbringing, it is evident that in my interview with him, he created an elaborate fantasy life to replace the painful memories of his childhood. In this fantasy world he presents as being far more successful, wealthier and happier than he is in reality. This fantasy presentation, in which he has exaggerated his status, was at the core of my trial-diagnosis that he suffered from a Narcissistic Personality Disorder. Such a disorder is marked by the need of an individual to seek out special attention for achievements in order to compensate for obvious shortcomings. However, now that I know more about Mr.

Declaration of Carlos R. Estrada, M.D.
Page 3 of 9

Bourgeois, I can state that this diagnosis, while accurate, failed to reflect the real and mitigating facts about his life.

8. As noted, Mr. Bourgeois' current counsel have provided me with additional background information about him. I have reviewed the recent declarations of psychologists Jethro Toomer, Ph.D., Michael Gelbort, Ph.D., and Donald Weiner, Ph.D. I have also reviewed the declarations of additional lay witnesses regarding Mr. Bourgeois' childhood and early adult life and the report of social worker Kathleen Kaib reviewing his relationships with ex-wives and girlfriends.

9. This new information confirms what I strongly suspected at the time of the trial – namely that Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments. This new information presents a picture of a man who cannot establish and maintain stable relationships. This history (referenced primarily in the declaration of Kathleen Kaib) is consistent with Borderline Personality Disorder. This diagnosis, which supplements my earlier diagnosis of Narcissistic Personality Disorder, captures Mr. Bourgeois' tumultuous and violent relationships with the many women he befriended and, in some cases, married. In classic Borderline fashion, each new relationship was marked by extreme highs followed by devastating lows. As people with Borderline Personality Disorder are wont to do, Mr. Bourgeois became infatuated over new relationships, only to reject each person as his level of stress or frustration heightened, or as

he perceived that he was going to be abandoned. In his case, owing to his status as a victim of abuse, along with his cognitive deficits, the rejection of each relationship was unfortunately marked by violence.

10. Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic-like states. Indeed, the name of the Disorder derives from an earlier belief that such patients were "Borderline Schizophrenics." While I have no direct evidence that Mr. Bourgeois has experienced psychotic states, I am confident in stating that the nature of the offense where he first abused and then killed his infant daughter is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Mr. Bourgeois at the time of the offense.

11. Although I testified at trial that I suspected that he was abused as a child, neither I, nor any other expert, testified about the significance of childhood sexual and/or physical abuse from a mental health perspective. Yet, it is not disputed in the mental health field that the significance is profound. Childhood physical or sexual abuse can leave durable psychological scars. Abused children often grow into adults who are significantly impaired. Such individuals have great difficulty establishing and maintaining healthy relationships. They have difficulty trusting others. They also have difficulties making judgments and controlling impulses. These impairments are greater when the abuser was known to the child, and even greater still when the abuser was a parent or care giver. This is because the

child's trust is profoundly violated when a parent – who is naturally supposed to care for the child – instead engages in acts that harm the child.

12. When a child is abused by a parent, it also has the effect of normalizing the behavior. That is, the child sees the behavior as acceptable, and develops a far greater likelihood of becoming an abuser. This appears to have been the case with Mr. Bourgeois. He saw his abuse of his children as a tool in child rearing, such as when he "taught" the victim toileting skills.

13. Childhood abuse fills the abused child with rage, anger and terror. In many instances, the abused child develops into an adult who turns that rage, anger and terror outward. Many adults with abuse histories go through life with their rage and anger on a hair trigger. When such survivors of abuse are subjected to stressors and/or reminders of the abuse they have experienced, the likelihood of their turning their rage outward dramatically increases. This is especially true with survivors of sexual abuse. Those who have been sexually abused as children will frequently come to associate sexual gratification with violence and aggression. As noted, given Mr. Bourgeois' history of such sexual aggression, I strongly suspected that he was sexually abused as a child. When sex abuse survivors, like Mr. Bourgeois, are sexually aroused they will often react by replicating the abuse that they have suffered.

14. In addition, in Mr. Bourgeois' case the issue of abandonment must be considered. He was not just the victim of abuse, but he was abandoned by his mother when

he was made to live with an elderly neighbor. This abandonment multiplied the already significant psychological effects of the abuse that he suffered.

15. In this case, there was no apparent motive for the killing. While the Government theorized that Mr. Bourgeois killed the child in order to avoid the financial responsibilities that she represented, I find this explanation wanting from a mental health perspective. If a person wishes to kill a child for financial reasons, there are far more efficient and less gruesome ways to accomplish the task. There are many alternative ways to kill a child that would increase one's chances of "getting away with it." I believe that the Government's proffered motive was, respectfully, somewhat simplistic. As noted, the brutal and bizarre manner in which death was caused, along with Mr. Bourgeois' background and mental health deficits, make another explanation far more satisfactory. This was purely a rage killing. The rage was born of Mr. Bourgeois' own lifetime experience, the psychological effects of those experiences and his cognitive deficits. Added to these historical factors is that Mr. Bourgeois, like many borderline personalities, can decompensate into rageful outbursts in the face of frustration.

16. To be sure, not all abused children grow into abusive adults. However, the chances that the cycle of abuse will continue dramatically increases if the individual has organic brain deficits. Although I was aware at the time of my testimony that Mr. Bourgeois has both organic brain deficits and a low IQ (tested at the time of trial at 76 and retested now at 70), I was not able to include these facts in my opinion because the neuropsychological

testing conducted on Mr. Bourgeois by Dr. Weiner was not admitted in evidence.

17. I sat through the entire trial at the request of the prosecution. I was quite involved with and made appropriate recommendations to both sides of the case. For instance, I strongly urged the defense to have Mr. Bourgeois undergo a thorough battery of neuropsychological testing, and suggested Donald. E. Weiner, Ph.D. to conduct this testing. I have worked with Dr. Weiner on many occasions and have found him to be a reliable, knowledgeable and skilled practitioner. I was surprised that the defense decided not to call him as a witness, and I was concerned that I could not reference his important findings in my testimony. Had I been able to do so, I would have explained to the jury that Mr. Bourgeois' cognitive deficits were important factors that mitigate the offense and which went far toward explaining and understanding his violent behavior.

18. Having sat through the testimony in this case, and knowing what I now know, and previously suspected, I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. I do not come to this conclusion lightly. But, he was presented only as an unrepentant and evil man. While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions. Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Declaration of Carlos R. Estrada, M.D.
Page 8 of 9

I hereby certify and declare under penalty of perjury that the statements contained

herein are true.

Carlos R. Estrada, M.D.

Dated:      Corpus Cristi, Texas
May ⫯⫯, 2007

8

### DECLARATION OF MICHAEL M. GELBORT, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Michael Gelbort, Ph.D., do hereby declare and verify as follows:

1.     I am a licensed clinical psychologist, specializing in neuropsychology. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology at Texas Tech University in 1984. I completed a post-doctoral fellowship in neuropsychology and medical psychology at the Rehabilitation Institute of Chicago in Chicago, Illinois, in 1985. I subsequently served as the Chief Psychologist, then Director of Psychology at the Institute for Rehabilitation and Research in the Medical Center in Houston, Texas. I was also on staff at Baylor College of Medicine and engaged in private practice, concentrating on psychological and neuropsychological evaluations. After four years in those endeavors I returned to Chicago to pursue private practice with privileges at several hospitals. My current practice concentrates on psychological and neuropsychological evaluation and diagnosis. I also do extensive forensic work in the civil and criminal law fields. I am licensed to practice in three states and have been qualified as an expert in neuropsychology in courts in many states and federal district courts.

2.     I have been asked by counsel for Mr. Alfred Bourgeois to conduct a neuropsychological evaluation of him in connection with federal capital case. In preparation for this evaluation, I was provided with and reviewed extensive background materials, including a report of an evaluation conducted on Mr. Bourgeois by Donald Weiner, Ph.D. in 2004.

3.     I met with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana in April 2007. I administered a number of standardardized intelligence, achievement and neuropsychological tests. The results of my testing shows the following:

**Wechsler Adult Intelligence Scale III** (age corrected subtest-scaled scores)

1

| | | | |
|---|---|---|---|
| Vocabulary | 4 | Picture Completion | 5 |
| Similarity | 4 | Digit Symbol | 11 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 8 | Matrix Reasoning | 5 |
| Information | 4 | Picture Arrangement | 5 |
| Comprehension | 3 | | |

Verbal IQ:          67
Performance IQ:     78
Full Scale IQ:      70

## Trail Making Test

Part A    30 seconds with 1 error    (deficient)
Part B    78 seconds with 0 error    (borderline deficient)

## Lateral Dominance

Left side dominant with some ambidextrous signs

## Grip Strength

Essentially equal bilaterally

## Sensory exam

mild tactile higher level suppressions

## Category Test

80 errors                          (moderate impairment)

Wide Range Achievement Test – III (standard score followed by percentile)

| | Standard Score | Percentile | Grade Equivalent |
|---|---|---|---|
| Reading | 85 | 16 | High School |
| Spelling | 100 | 50 | High School |
| Arithmetic | 74 | 4 | Grade 5 |

**Wechsler Memory Scale - III**

Logical Memory I - mild impairment
Visual Immediate Memorization - mild impairment
Verbal Immediate Memorization - mild/moderate impairment
Visual Memory I - moderate impairment
Logical Memory II - mild/moderate impairment
Visual Long-term recall - moderate/severe impairment

**Conclusions and Analysis**

4.        The testing I administered was valid. Mr. Bourgeois gave a sincere effort. His results on my testing are quite similar to the testing administered by Dr. Weiner, indicating no malingering. His pattern of responses on all of the testing I administered are consistent with valid effort. For example, he performed relatively well in the early rounds of the tests, when the principles are very straightforward. As the tests became more difficult, he began to falter. This pattern reflects valid effort.

5.        Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The score of 76 must be understood and considered in perspective and application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration) is utilized to do so. In this instance, the WAIS-R was normed in 1978 and administered in 2004. Therefore, a "deduction" of 7.8 is warranted (26 years x .3 per year = 7.8). As such, the computed score of 76 would actually reflect in intellectual quotient value of 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted IQ score of 68 and the recent measured score of 70 obtained with the current version of the WAIS on my test administration.

6.        I have not formally assessed Alfred Bourgeois' adaptive functioning. However,

3

my review of Mr. Bourgeois' history shows many of the tell-tale signs of adaptive skills deficits. For instance, he has had difficulty in maintaining social relationships. He has had difficulty with managing the affairs of everyday life, including money issues. He has a skewed view of himself in relationship to the rest of the world. These reports are indicative of impairment in the social and conceptual realms of adaptive functioning.

7.       Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobe abilities. This is most prominently evidenced by his impaired performance on the Category Test. This test is one of the most sensitive to both whole-brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is also supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

8.       I have reviewed Dr. Weiner's report. While our tests results are, for all intents and purposes, congruent, he concludes that Mr. Bourgeois' brain damage is localized in the posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming, for argument's sake, that Mr. Bourgeois has only damage to his posterior brain, there is still clear evidence of impairment of and impact on his executive functioning. Accordingly, wherever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension, and Trails B, demonstrate that his executive function is impaired.

9.       Executive functions act, in part, as the "brakes" for a person's actions. When there is impaired executive function, the individual may and often acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one

4

considers the abusive childhood that he experienced. The adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid with his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

10. I understand that there is some disagreement over the etiology of Mr. Bourgeois' impairments. Dr. Weiner believed that they are due to a motor vehicle accident, and there is some question as to whether Mr. Bourgeois actually suffered a head injury in that accident. In a forensic setting, etiology is sometimes important. For example, in personal injury cases (e.g., subsequent to an auto accident) it is important to know if the damage identified by the neuropsychologist was due to the accident because that determination is relevant to whether the negligent party owes damages. However, in the criminal law setting, what is of significance is whether the deficits predate the event for which the individual has been accused rather than what is the proximate cause of the impairments. To be sure, it is helpful in deciding whether to conduct testing to know whether there are indicators of brain damage, such as child abuse or a head injury. However, neuropsychologoical testing results indicating dysfunction "stands on their own." Even in the absence of a determination of cause, this testing shows whether an individual's brain is intact or impaired. I am confident in stating that Mr. Bourgeois' impairments exist, even if the etiology is not completely clear.

I hereby declare and certify that the above facts and opinions are true and correct under penalty of perjury.

_____
Michael M. Gelbort, Ph.D.

Dated: Chicago, Illinois

11 MAY, 2007

5

9



DEPARTMENT OF PSYCHOLOGY
THE UNIVERSITY OF TEXAS AT AUSTIN

*Seay Building • 512-471-1157 • SPB 4.212 • 108 E. Dean Keeton • Austin, Texas • 78712 • A8000*

December 19, 2003

Douglas Tinker, Esq.
Attorney at Law
622 S. Tancahua
Corpus Christi,
TX  78401

Dear Mr. Tinker:

I've now had a chance to go through the box of material regarding the **Alfred Bourgeois** case. From what was sent, there was only a limited amount of useful information for me to form an impression of the case. In particular, the documents that gave me a (limited) sense of the psychological aspects of the case were a) the Grand Jury synopsis labeled "SPECIAL" and dated 7/15/02; b) the FBI memo concerning the lab report dated 9/03/02; c) the Neuropathology Consultation, dated 9/17/02; and d) the Autopsy Examination Report, dated 1/10/03.

Let me summarize the case as I understand it based on those documents. Mr. Bourgeois took over the custody of the J.G. (Jakereen [Ja'Karenn] Gunter, born on 10/5/99) around May 15th, 2002 following a custody and child support hearing. It was determined that J.G. was Mr. Bourgeois' biological child from a brief affair he had with Katrina Harrison. He had met her in Houston, TX while on the road trip for the trucking company he worked for.

J.G. died on June 28, 2002 from a closed head injury. Based on his wife's (Robin Bourgeois) interview, Alfred became physically abusive to J.G. within days of taking over custody. Some of the abuse was also witnessed by Robin's uncle (who lived with them in La Place, Louisiana) and a friend of hers. Reports of physical abuse also came from the 7-year-old daughter. Mr. Bourgeois denied all abuse.

Here is my analysis. There is no question that J.G. was seriously and repeatedly physically abused. Interview reports revealed the child was repeatedly "slapped, "whipped," and 'beaten." The autopsy report indicated five bite marks, marks from electric cord and belts, bruises and scars, and seven brain hemorrhages. However, there was no evidence of sexual abuse.

The homicidal incident apparently occurred on June 27th. According to the 7-yr-old daughter, J.G. accidentally spilled the contents of her potty in the cab of the truck. Mr. Bourgeois became irate, pulled J.G. over his lap, and repeatedly hit her. One could suppose that he certainly wasn't intending to kill her. Rather he was very upset by the mess and he wanted to punish her and (in a misguided way) to teach

her a lesson so she wouldn't spill the contents of her potty in the future. Apparently, Mr. Bourgeois frequently "beat" J.G. several times a day over potty-training problems, according to the uncle. So his behavior, while probably extreme in reaction to this incident, was his standard way of reacting to potty-training problems.

His degree of upset should be recognized in light of his profession. Mr. Bourgeois was a long distance truck driver and literally lived (part time) in his truck. He drove a 1999 Peterbilt cab, one of the nicer trucks made, and to have a child soil the cab with the contents of her potty (was it just urine?), would be very upsetting to someone who cared about his truck.

In addition, he was probably quite tired that morning after driving some 10 hours (is that legal or did Robin do some of the driving?) and arrived at the delivery site of the naval base at 2:30 a.m. His fatigue and lack of sleep probably contributed to his overreacting and being especially brutal to J.G.

More generally, Mr. Bourgeois was "stressed" by traveling in a confined space with four other people, including three young children. In his words it is "hard to watch three kids." That understatement also speaks to his frame of mind in dealing with the children.

Another important factor that apparently contributed to the homicide of this young child was his lack of attachment to her. Mr. Bourgeois was probably surprised to learn that he had fathered B.G. and likely had little, if any, contact with her for her first 2 1/2 years of life. So it appears he did not develop feelings of love for the child. Subsequently, he was court ordered to pay child support and take over custody (at least temporarily). He did not have a prior history with the child and did not have the opportunity to become attached to her. Rather, he was unexpectedly saddled with dealing with a third young child. Further evidence of his lack of attachment can be found in the reports of this FBI interview. He made the statement regarding J.G.'s critical care in the hospital that he "did not want *it* to suffer" (italics added). Even more incredibly, he asked the interviewing FBI agent what the child's name was. All of this leads one to suspect that he felt no attachment to his daughter.

It appears that at least some (if not much or most) of the abuse resulted from toilet training incidents. This is a very common "cause" of physical abuse. As mentioned above, abusive parents mistakenly think they are doing the right thing by hitting the child to teach them a lesson. When the child continues to have toileting problems, the parent then thinks he needs to hit the child harder so the child remembers better not to have a toilet training accident.

In sum, although this is evidently a case of horrible child physical abuse, it appears to be largely understandable and not uncommon—just a more extreme case with a tragic end.

I have a number of questions that might be helpful to have answered. For example, what kind of childhood did Alfred Bourgeois experience with regard to punishments and abuse. My guess is that he was physically abused as a child and learned that slapping, whipping, etc. is the way a parent punishes a child for misbehavior (e.g., toilet training accidents), and it is the way to teach a child right from wrong. Given that people use terms quite loosely, I would want to know exactly what was meant by such terms as "whipping," and "beating." How did he treat the two other children, the 7 year old daughter (is she his biological daughter?) and the one year old, Alfredesha (I presume Alfred's biological child)? How did he treat his wife, Robin? What was his record as an employee of the trucking firms that he had worked for. What was his driving record? It appears he was conscientious in his job and concerned that he get his truck back after the FBI interview in order to pick up the next load and deliver it to Miami. Did he have a criminal record for aggressive behavior?

I will be out of town from December 25th until January 6th. Please let me know what the next step in this case will be.

Sincerely yours,

George W. Holden, Ph.D.
Professor

10



DEPARTMENT OF PSYCHOLOGY
THE UNIVERSITY OF TEXAS AT AUSTIN

*Seay Building* • *512-471-1157* • *SPB 4.212* • *108 E. Dean Keeton* • *Austin, Texas* • *78712* • *8000*

Via fax on February 25, 2004

Douglas Tinker, Esq.
Attorney at Law
622 S. Tancahua
Corpus Christi,
TX 78401

Dear Mr. Tinker:

This is an addendum to my letter of Dec. 19, 2003 regarding the Alfred Bourgeois case.

You asked me about my opinion regarding the issue of premeditation. In cases where a parent has killed a child, something we label "filicide," there are a number of different "types" of fatalities. Those types can be linked to different motives. In many cases, the homicide is clearly intentional and premeditated. For example, some parents intentionally kill their newborns ("infanticide") because the child was unwanted. Other parents intentionally kill their children as a way of retaliating against another spouse (called the "Medea syndrome"). Still other parents have psychiatric illnesses and they thought about, and clearly intended to kill their children (e.g., Andrea Yates).

On the other hand, other types of filicides are evidently not intentionally or premeditated. This occurs sometimes when child neglect leads to filicide. It can also happen in the course of disciplining a child. A parent may fly into a rage, get carried away in terms of the force they use, and accidentally end up killing the child. For instance, in a relatively large and comprehensive study of filicide, Wilczynski (1997), found that when a parent murders a child while disciplining him/her, parents typically reported they had not meant to inflict serious harm.

The way the child died is another factor in assessing the underlying motive. If a child is held under water and drowned or shot in the head with a gun, there is little question about whether the parent intended to kill the child. However when a child dies during the course of discipline, then it is much more likely that the parent did not intend to seriously injure—let alone kill the child.

This, in my view, is what happened in the Alfred Bourgeois case. It is highly unlikely that Mr. Bourgeois had decided to (or thought about) killing JaKarenn Gunter prior to that incident. Instead, what probably happened was that in a fit of rage over the spilled potty, he lost control of himself and in the course of administering physical discipline, fatally injured JaKarenn.

Please let me know if you would like additional information.

Sincerely,

George W. Holden, Ph.D.
Professor

11

I, George W. Holden, Ph.D., do hereby declare and verify as follows:

1.    I am a tenured full professor of Psychology at the University of Texas at Austin where I have taught and conducted research since the mid-1980s. I received a Bachelor's degree from Yale University in 1977, a Master's degree in Psychology from the University of North Carolina, Chapel Hill in 1982, and a Ph.D. in Psychology from the same institution 1984. My research and teaching focuses on family violence and parent/child relationships. I have published extensively in these fields.

2.    In late 2003 I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred Bourgeois, to testify at his capital murder trial in the federal court in Corpus Christi. I understood that my role was to provide the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter. It was proposed that I offer this opinion during the guilt phase of trial.

3.    In reaching my conclusions, I studied the record of the case up to that date, including many reports produced by law enforcement authorities, autopsy materials, and other documents provided by the Government to defense counsel. The pattern of abuse that I saw reflected in these materials did not strike me as unusual for a case of severe childhood abuse. I applied my knowledge of the research in the field of family violence to my review of these documents, and concluded that while brutal, Mr. Bourgeois' actions leading to the death of his daughter were not premeditated. I set forth my opinion in a letter to counsel dated December 19, 2003, supplemented by a letter of February 25, 2004.

4. I was summoned to court in Corpus Christi on March 1, 2004, as part of a pretrial conference to determine the admissibility of my opinion that Mr. Bourgeois did not premeditate. I was sworn as a witness at this conference, and tried to explain the basis for my views. As I recall the proceedings, the judge repeatedly made the point that I was not permitted under the law to express an opinion on an issue that ultimately had to be decided by the jury, i.e., whether Mr. Bourgeois premeditated. I also recall that the judge asked whether in reaching my conclusions I made the assumption that Mr. Bourgeois committed the actual killing.

5. I am not a forensic psychologist and have appeared in court on only one other occasion. Therefore, my experience in such matters is quite limited. Nonetheless, I was quite surprised that Mr. Bourgeois' lawyers did not alert or prepare me for questions about my assumption that Alfred Bourgeois had committed the crime, which based on the judge's questions, seemed rather important. Nor did Mr. Tinker seem to have much of a response to the judge's question about whether I could give an opinion on the question of premeditation.

6. I recall that at the conclusion of the hearing, after the judge ruled that I could not testify about premeditation in the guilt phase, she mentioned that perhaps Mr. Tinker could call me as a witness in the punishment phase of trial, if Mr. Bourgeois was ultimately convicted of capital murder. Although Mr. Bourgeois was convicted, Mr. Tinker did not ask me to testify at the punishment phase.

7. I have now been asked by Mr. Bourgeois' current counsel to set forth what I could have testified about had I been called as a witness at the penalty phase of trial. The following opinions are expressed to a reasonable degree of psychological certainty.

8. As I did in preparing my opinion for my aborted guilt phase testimony, I would have

drawn on the extensive research that exists on child fatalities. This research reveals that the majority of "filicides" (death of a child at the hands of a parent) occur at the end of a disciplinary incident. In most cases, the parent does not intend to kill the child.

9. The pattern of abuse in this case and the ultimate act of violence that led to Ja'Karenn's death fits a pattern described in research about unintended filicide. In this case, the final fatal blow was administered as an act of punishment when the victim spilled the contents of a potty. From a psychological perspective, this was likely a disproportionate rage reaction resulting from stress and frustration.

10. In my opinion, it's likely that Mr. Bourgeois was in a violent rage during this incident. This rage likely stemmed from three sources: 1) his pathological child rearing; 2) the stressors, both immediate and distal, that he was suffering at the time; and 3) his organic deficits and impaired cognitive functioning. The research indicates that abusers often view violent acts as appropriate disciplinary techniques. I understand that Mr. Bourgeois came from an abusive background, and therefore the violent acts were normative. In other words, he saw what we would consider abuse to be just another tool in a parent's child rearing arsenal.

11. The final act of abuse in this case centered around a common child rearing incident, that of toilet training. Abusive parents mistakenly believe they are doing the right thing by hitting with the intent to hurt the child in order to teach him or her a lesson. Often, the child's continued failure to "learn the lesson" is perceived as repeated misbehavior, and the severity of the punishment will escalate. Further accidents then lead to increasingly more severe corporal punishment, and, in some cases to serious injury or death.

12. As noted, most cases of filicide occur in reaction to stressors both immediate and

distal. The immediate stressors in this situation stemmed from the victim's potty training accident, along with the close quarters in the truck, Bourgeois' getting lost when trying to deliver a load to the Navy base, and his truck battery dying, making him concerned that he would be late for his scheduled deliveries.

13. Distal stressors are those more removed from the situation, but still pressing on the actor. At the time of the abuse, the materials reveal that Mr. Bourgeois was feeling overwhelmed by financial stressors. He was behind on his bills, he was engaged in a trucking contract that did not meet his financial needs, and he had two new babies to support (one of which, the victim, he had just learned of a few months prior). His recent discovery of his spouse's affair with another man also weighed heavily on him and raised the specter of yet another failed relationship.

14. As in some other filicide cases with which I am familiar, Mr. Bourgeois did not have the psychological resources to deal with these stressors. Instead, he reacted to a small event with an overwhelming and disproportionate amount of rage.

15. Bourgeois' current counsel have provided me with additional information that Mr. Bourgeois was abused as a child, and attesting to his impaired psychological and neuropsychological functioning.

16. That Mr. Bourgeois was himself abused is far from surprising. The offense itself stands as mute testimony to the fact that Mr. Bourgeois experienced violence, most likely by one or more care-givers, as a young child. Usually, abusive parents were at one time abused children. As noted, abused children accept violence as normative. Again, based on the pattern and type of abuse he visited upon his child, it is highly likely that Mr. Bourgeois was raised in and lived in a subculture that accepted a significant level of violence towards children.

<strong>Declaration of George W. Holden, Ph.D.</strong><br>
<strong>Page 4 of 7</strong>

17. Further, information provided to me by current counsel indicates that Mr. Bourgeois suffers from severe personality disorders that are frequently seen in abusers who were abused as children. Clinical psychologists have reported that he has a Borderline Personality Disorder. The disorder is characterized by intense rage episodes and a pathological inability to form healthy attachments to others. In addition, his social history reveals that he was not only an abused child, but that he was also an abandoned/rejected child. Childhood rejection makes it even more difficult for an adult to form healthy bonds, and predicts tumultuous relationships. Psychologically, our ability to form bonds with intimate partners is linked to our ability to form bonds with children. In Bourgeois' case, the ability to relate with others, especially intimate partners and children, is seriously damaged.

18. Even more significant in this case, it seems that Ja'Karenn became a scapegoat for Mr. Bourgeois. This is a common phenomenon in pathological family relations, where one child is unreasonably blamed by a parent for the family's problems and must suffer the brunt of that parent's rage and frustration. It is likely that Mr. Bourgeois was unable to bond with Ja'Karenn, and she therefore filled the role of scapegoat.

19. In addition, I have read the declarations of Dr. Gelbort and Dr. Weiner. They report that Mr. Bourgeois has serious neuropsychological deficits. He has a very low IQ (bordering between the mentally retarded and borderline retarded range). His low IQ means that he is less able to effectively problem solve. In addition, he appears to be damaged in those areas of the brain that impact his executive functioning. This testing and the opinions of Dr. Gelbort's and Dr. Weiner's show that he has an impaired ability to control himself and make sound judgments, particularly when under stress.

**Declaration of George W. Holden, Ph.D.**
Page 5 of 7

20. The reports of neuropsychological impairments are not surprising given Mr. Bourgeois' history of childhood abuse. Research shows that the trauma and stress experienced by the abused child can literally rewire the brain. The brain of a victim of severe abuse responds differently to stress, danger, and frustration with consequent deficits in making judgments, forming relationships and controlling impulses.

21. My testimony could have helped the jury understand that Mr. Bourgeois behavior, sadly enough, fits a common pattern of abuse. The pattern of abuse revealed in Ja'Karenn's autopsy can more readily be interpreted as fitting a pattern of mis-guided parenting than a case of premeditated torture. For example, Ja'Karenn was burned, bitten, hit, and whipped. These acts of violence, although cruel, are actually common in cases of severe child abuse. Often, they mirror the perpetrator's own experience of abuse as a child. In addition, they are often seen as corrective measures or used as instruments in a distorted understanding of "teaching" the child. For example, burning is often mistakenly used to teach the child to avoid hot surfaces. Biting is often intended to teach the child not to bite. Even the final blow that killed Ja'Karenn was in the course of a disciplinary act, where Mr. Bourgeois lost control of his own rage and slammed Ja'Karenn's head against a hard surface.

22. My testimony at the sentencing phase of trial could have served two purposes. First, it could have helped the jury place this awful crime in the context of family violence. It would have helped mitigate the image of Mr. Bourgeois as a sadistic monster intent on torturing and then murdering his child. Instead, I could have explained family violence as a phenomenon that is unfortunately tied up in our culture, and a pattern that sadly repeats itself through generations. I could have reviewed for the jury research about how difficult it is to break the cycle of family violence.

**Declaration of George W. Holden, Ph.D.**
**Page 6 of 7**

Certain factors have been proven to help mitigate this cycle, including: high intelligence, therapy, and supportive functional (not enabling) spouses. Mr. Bourgeois did not benefit from any of these positive influences. Second, I could have reviewed for the jury the neuropsychological and psycho-social factors that pre-disposed Mr. Bourgeois to violence against children.

23.     Had I been called at the sentencing phase, and provided with the information that I now have, I would have provided an opinion that the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions. These factors had an additive impact: i.e., each alone would have impaired Mr. Bourgeois, but taken together they likely overwhelmed him. I would have been able to provide this opinion, even if I did not state what I still believe to be true in this case, that this was not a premeditated case of murder. Instead, Mr. Bourgeois' actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control.

I hereby certify that the above facts and opinions are true and correct.

George W. Holden, Ph.D.

Dated: Austin, Texas
        May 13, 2007

12

<u>DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB, M.S.S., M.L.S.P., L.S.W.</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Kathleen Kaib, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Kathleen Kaib and I am employed as an investigator/mitigation specialist with the Federal Community Defender Office, Capital Habeas Unit. I graduated from Bryn Mawr Graduate School of Social Work and Social Research with a Masters degree in Social Service (equivalent to a Masters in Social Work) and a second Masters in Law and Social Policy. I am a licensed social worker in the state of Pennsylvania, and I am a certified domestic violence counselor. I have been in professional contact with and counseled many woman who have been the victims of domestic violence. I have extensive experience with diagnosing and assessment of mental health disorders, symptomatology and assessment of individuals with mental health deficits, including individuals with Borderline Personality Disorder. I also have significant experience in generating social histories.

2.     All of the opinions expressed herein are stated to a reasonable degree of psychological certainly, and all facts are true to the best of my knowledge and recollection.

3.     At the request of Alfred Bourgeois' current lawyers, I interviewed the following women about Mr. Bourgeois: Geralyn Dumas, Sheila Bourgeois, Cynthia Bourgeois, Gaynell Collins, Robin Bourgeois, and Ivy Thomas. I also reviewed the notes of an interview with Gaynell Belvin James which was conducted by my colleague Richard Ruffin, MSW, and I have spoken with Mr. Ruffin about his interview with Ms. James.

4.     All of these women were either married to Mr. Bourgeois or were romantically

1

involved with him. Common to each of these relationships was that they were extremely intense and unstable. In the beginning of each relationship Mr. Bourgeois idealized each woman, and treated them wonderfully, but he quickly switched to devaluing them and ultimately became quite violent and abusive with them. It was readily apparent to me based upon my interviews, that Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.

5. Mr. Bourgeois's relationship with Geralyn Dumas was the earliest relationship that I investigated. Geralyn and Mr. Bourgeois began a romantic relationship in 1979 and share a daughter, Bethany. In the beginning of their relationship Mr. Bourgeois was very attentive and kind, but this steadily deteriorated. Eventually Mr. Bourgeois demonstrated enormous rage. Geralyn was engaged to Mr. Bourgeois but never married him because he was constantly cheating on her with other women and he would have uncontrollable outbursts of anger. Geralyn maintained sporadic contact with Mr. Bourgeois long after their romantic relationship ended, because they had a child together. Bethany came home from visiting Mr. Bourgeois and reported that he was having sex with women other than his wife while Bethany was in the house.

6. Gaynell Belvin James was Mr. Bourgeois's next significant relationship after Geralyn. They met in 1982 and she described that the relationship was tempestuous. Soon after they met she got pregnant with their son Anthony. The relationship was very short lived because Mr. Bourgeois became violent and she could not endure his frequent and dramatic mood shifts.

7. Mr. Bourgeois next married Sheila Bourgeois in 1987, after only a few months of dating. When the relationship was in the very early stages Mr. Bourgeois confided in her that his mother was extremely cruel to him and would abuse him. The relationship was very good while

2

they were dating, but after just a week of marriage he became verbally abusive and violent. Sheila stated that Mr. Bourgeois became extremely jealous and angry. To this day Sheila states that she has no idea how the relationship changed so drastically so quickly. One night Sheila was waiting for Mr. Bourgeois to come home from being out on the road as a truck driver. Mr. Bourgeois walked into the house and immediately began to choke her for no reason, and then just as suddenly as the attack began he walked away and went to sleep. This incident was never acknowledged or explained the next day.

8. Sheila left Mr. Bourgeois four months after they married because he pushed her over a chair while she was three months pregnant with their daughter, Sherisha. Sheila stated that Mr. Bourgeois cheated on her during their entire marriage, and he did not seem to care about hiding it from her. Sheila stated that Mr. Bourgeois always had to have what his brother Lloyd had even when he could not afford such things. He would spend money on cars, and then they would not have enough money to buy groceries. She stated that he was very reckless with the way he spent money.

9. In 1991, Mr. Bourgeois married Cynthia Bourgeois. They too only dated for a few months before they were married. During those first few months Mr. Bourgeois "wined and dined her." During this time Mr. Bourgeois confided that his mother physically and verbally abused him. Cynthia never wanted for anything during this period in their relationship and they had a wonderful time together, but after they were married Mr. Bourgeois completely changed. Cynthia said she did not even recognize the man that had, only a few months before, been so good to her. Mr. Bourgeois was extremely verbally abusive to her and he would fly into rages for no apparent reason. When Mr. Bourgeois would start to get upset she could see his eyes

3

cloud over and said it was like she was looking at a different person. Their marriage did not last long because of his rages and jealousy.

10. Mr. Bourgeois was then married to Gaynell Collins from 1993-1995. Once again, they only dated for a few months before they married. During their courtship Mr. Bourgeois treated her very well and took care of all her needs. Shortly after they were married, Mr. Bourgeois became very violent for no apparent reason. Gaynell noted that it was almost like he had a "split personality." During their marriage Gaynell left him about twenty times. Gaynell stated that she always knew when she would have to leave because she would hear a change in his voice. When he was beginning to enter one of his periods of rage his voice became deeper, and he would glare at her.

11. While Gaynell was gone, Mr. Bourgeois would call her and try to convince her to come home. He would be really sweet for awhile, and would be attentive to her needs. The sweetness didn't last long and he would ultimately fly into one of his unexplained rages which caused her to leave again.

12. Gaynell stated that Mr. Bourgeois would blame everyone else for his problems, and he would never take responsibility for anything. One time she said he didn't have enough money to pay the mortgage because he had spent the money on other things. He blamed her for not having enough money and wanted her to get another job. During their marriage Mr. Bourgeois cheated on her with a number of people including his next wife, Robin Bourgeois.

13. Robin became pregnant with Alfredeisha in 1994 while Mr. Bourgeois was still married to Gaynell. Robin describes their relationship as very good in the beginning but soon after that Mr. Bourgeois devolved into periods of violent behavior. Robin stated that sometimes

4

Mr. Bourgeois would be calmly sitting watching television and then he would jump up and beat her. She never knew what sparked these mood changes. These impulsive, aggressive episodes were very common in their relationship.

14. Robin also stated that Mr. Bourgeois was very jealous. He monitored every move Robin made and would have people spy on her so he would always know what she was doing. Robin stated that Mr. Bourgeois always had to have everything that his brother, Lloyd, had even when he could not afford it. It didn't seem to matter to him that the electricity would be off as long as he had the car he wanted. He was very reckless with money and with regard to his family responsibilities.

15. While Mr. Bourgeois was married to Robin he was dating Ivy Thomas who lived in Birmingham, Alabama. He met Ivy while he was on the road as an over-the-road-truck driver. Ivy dated Mr. Bourgeois from 1995 until 1997 when she discovered he was cheating on her. Ivy describes their relationship as very good. Mr. Bourgeois showered her with expensive gifts, but he would lie to her as well. Ivy feels that Mr. Bourgeois thought he was telling the truth even when his lies were obvious. Ivy stated that Mr. Bourgeois saw things as all good or all bad and he didn't seem to see gray areas in his relationships with other people.

16. Ivy recalled that Mr. Bourgeois revealed physical abuse by his mother, and how hurt he was by her. He told her that his mother sent him to live with someone else, and that depressed him. One of the times Mr. Bourgeois came to visit her he sent her out to the truck to get a present. She noticed a picture of a woman and a baby in his truck and asked him about them. Mr. Bourgeois said they were his sister's friends but Ivy confronted him and he ultimately confessed that it was his baby. He stated that he and Robin had a one night stand. Ivy broke up

5

with him because he was unfaithful. Ivy remembered that he called several times to try to win her back but she was adamant she did not want to be with someone who cheated on her.

17.     This history of tumultuous relationships marked by alternating periods of calm and periods of intense violence are indicators of a Borderline Personality Disorder. In these relationships Mr. Bourgeois married the woman only after a courtship lasting a few months. He formed an immediate and intense attachment to each woman. During the short time they dated he adored them but over time he was unable to continue his unabashed devotion. Instead, he entered into dark periods in which he would devalue and degrade them. In each relationship it is clear that Mr. Bourgeois was very impulsive in the areas of sexual relations, which was very damaging to his relationships and played a major role in their dissolution.

18.     Individuals with a Borderline disorder typically display intense and inappropriate anger directed at loved ones. In almost all of the relationships the women describe Mr. Bourgeois's anger as such. Many of the women stated that they never knew what would set Mr. Bourgeois off and make him so angry. Mr. Bourgeois could not control his anger and would lash out at those closest to him. It is very common in those with Borderline Personality Disorder to have a history of broken marriages because of their inability to have a stable relationship.

19.     A history of abandonment and abuse is often associated with Borderline Personality Disorder. Each of the women relate that Mr. Bourgeois described to them his history of childhood abuse and maternal abandonment. Mr. Bourgeois would tell the women very early on in their relationship and become very emotional as he related the story. Mr. Bourgeois told each woman that his mother hated him because he reminded her of his father, who abandoned her. Mr. Bourgeois stated that he was always treated like an outcast and was eventually sent to

6

live with another woman while the rest of his siblings remained at home. Mr. Bourgeois was abandoned by his father and his mother abused him and then ultimately abandoned him.

20. Individuals with Borderline Personality Disorder typically do not have the capacity to see people as made up of both good and bad qualities. Mr. Bourgeois saw these women as all good and then all bad. All of the women consistently describe how Mr. Bourgeois would suddenly shift from treating them with love and respect to completely devaluing them by cheating on them or becoming abusive to them. Mr. Bourgeois would become angry with them when they would fail to live up to unrealistic expectations. This would leave the women feeling confused because they did not know what angered him and Mr. Bourgeois feeling abandoned by them. Mr. Bourgeois simply does not have the ability to see any of life's gray areas.

21. Another key feature in individuals with Borderline Personality Disorder is their unstable self image or sense of self. Mr. Bourgeois displayed this through mimicking his older brother Lloyd. Many of the women Mr. Bourgeois was involved with noted that whatever Lloyd had Mr. Bourgeois had to have. If Lloyd bought a pool Mr. Bourgeois would buy a pool or if Lloyd would embark on a new career path than Mr. Bourgeois would follow him. It seemed as though Mr. Bourgeois did not know who he was without Lloyd's life as a template.

22. Engaging in risky behaviors is often associated with this personality disorder. I also interviewed, Lawanda Cook, who is the cousin of Ivy Thomas. Lawanda related an experience in which she was riding in Mr. Bourgeois's truck and he got up out of his seat while he was driving to come talk to her. Lawanda completely panicked. Mr. Bourgeois told her that the truck would be fine even though there was no one driving it. She was so afraid that she never got into a truck again. This type of reckless conduct is also indicative of a Borderline Personality

Disorder.

23.     Mr. Bourgeois would also spend money excessively.   He would buy cars that he could not afford, and then need his brother to help him out.  His electricity would frequently be turned off because he spent his money on other things.   One of his wives noted that he would fail to pay the mortgage and then blame others for his inability to pay.  The types of risky behavior recounted above, coupled with the fact that he engaged in frequent sexually risky behaviors, highlights the fact that he is impulsive in extremely self-damaging ways. This is another key feature found in individuals with Borderline Personality Disorder.

24.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Kathleen Kaib, MSS, MLSP, LSW

Dated: 5|4|07

13

I, Robert L. Sadoff, M.D., hereby certify and declare that the following is true and correct.

1. I am board certified in Psychiatry and have been since 1966. I graduated from University of Minnesota School of Medicine in 1959. I am a medical doctor and have been Board Certified in Psychiatry since 1966, and in Forensic Psychiatry since 1979. Although I previously practiced clinical and treatment psychiatry, I have exclusively practiced forensic psychiatry since 1982. I maintain my primary office in suburban Philadelphia, Pennsylvania, although my forensic practice is national in its reach. I am licensed in four states (Pennsylvania, New York, Minnesota and California). During my forensic career I have evaluated innumerable individuals charged with a variety of offenses, including many charged with homicide and capital offenses. I have testified for both the prosecution and defense in all types of criminal matters, and have been a court expert as well. I have authored a great number of articles, reviews and book chapters. I have had academic and hospital appointments, lectured in psychiatry and related forensic areas and have been a consultant to government and institutions.

2. I have been requested by counsel for Mr. Alfred Bourgeois to conduct a forensic psychiatric evaluation of him. As part of this evaluation, I reviewed a substantial body of background information, including documents related to Mr. Bourgeois' capital trial in the federal court in Corpus Christi, Texas. I have reviewed psychological and neuropsychological reports. I also conducted a clinical interview with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana on April 23, 2007. Based upon this review, I have reached a number of opinions and conclusions which are set forth below. I hold each opinion to a reasonable degree of medical and

psychiatric certainty.

3. Mr. Bourgeois has four prominent features affecting his ability to function in the world. First, he has a history of significant childhood abuse. Possibly as a result of this abuse, Mr. Bourgeois suffers from significant personality disorders, is brain damaged, and has an IQ of 70, in the range of mild mental retardation.

4. Materials that I have reviewed confirm what I was able to draw out of him on interview about his childhood: he was beaten brutally by his mother while a small child, and he was sexually abused by at least two individuals. In addition to the abuse, he appears to have grown up in a dysfunctional family unit in which his mother had multiple off-spring by a number of men. Mr. Bourgeois' own father is reported to have had as many as 22 children by different women. Mr. Bourgeois' father played no role in his early years. In addition, Mr. Bourgeois was sent from the family home to live with an elderly neighbor. This is perceived by Mr. Bourgeois as an act of abandonment by the mother that has significant mental health consequences.

5. Childhood abuse and abandonment such as Mr. Bourgeois suffered leave psychological scars. A child who was abused like Mr. Bourgeois will often develop an inability to trust or make sound judgments. This is particularly so because the abuse was visited upon him by a caregiver (his mother), and was unpredictable as to when it would occur. Children who undergo such abuse may develop extremely impulsive conduct, and their ability to form healthy attachments, especially intimate relationships, is often impaired. I observed all of these scars in Mr. Bourgeois.

6. The exposure to violence and abuse as a child has a physiological as well as a psychological impact on the brain. The abused child may be unable to react normally to stress, but will often hyper-react and have difficulty controlling these reactions. This sort of trauma may also

lead to increased impulsive behavior. These children may become both over-reactive and hyper-vigilant.

7.    Alfred's self-reports of childhood abuse have been inconsistent. His tendency to deny or misremember the trauma he experienced as a child is psychiatrically significant – it is a telltale sign of chronic traumatic events. Trauma often affects the brain in profound ways and may disrupt the way the victim processes information. Often the individual is unable to handle the stressors and instead relies on survival techniques, including psychological numbing. Mr. Bourgeois' inconsistent self reports reveal this sort of reaction.

8.    Severe childhood abuse and neglect, of the sort experienced by Mr. Bourgeois, is associated with a wide range of psychological and psychiatric difficulties, including depression, anxiety, impaired self esteem, poor social functioning, self-destructive behavior, and impaired personality development.

9.    Mr. Bourgeois manifests many of the deficits shown by those who have been abused as children. He has debilitating personality disorders, including a Borderline Personality Disorder. This is a significant disorder in the context of this offense. By their nature, those with Borderline Personality Disorders are impaired in forming stable relationships. They can decompensate into psychotic states when under significant stress. People with Borderline Personality Disorder can have disocciative experiences, where they are not consciously aware of their actions or their surroundings, and may not recall various behaviors when dissociating.

10.    Reports by family, ex-wives, girlfriends, and neighbors reveal that Mr. Bourgeois has a pathological inability to make and maintain healthy relationships, especially intimate relationships. His relationship history follows a characteristic Borderline Personality pattern, in which each

relationship starts with idealization of the new partner, fluctuates between the extremes of passionate love and passionate hate, and eventually ends with intense rage and disillusionment. Mr. Bourgeois was a jealous and controlling partner, while at the same time engaging in numerous extra-marital and extra-relationship affairs. This inconsistency is also classic in a Borderline Personality Disorder.

11. In addition, neuropsychological testing confirms that Mr. Bourgeois suffers from clinically significant organic brain damage. This testing confirms what we already know from his psycho-social history: that he has significantly impaired judgment and has difficulty controlling his impulses.

12. Neuropsychological testing also reveals that Mr. Bourgeois has a very low IQ, and psychometrically is mentally retarded. This finding is mitigating as it reflects his difficulties and impairments in problem solving and making judgments.

13. His organic brain impairment is important as it exacerbates Mr. Bourgeois' already pathological limitations in making judgments, controlling his impulses, or trusting others.

14. Impairments such as Mr. Bourgeois' worsen during times of stress. At the time of the crime for which Bourgeois was convicted, he was under a great deal of stress: in an example of impaired decision-making, Mr. Bourgeois chose to "vacation" with his family (his recently estranged wife and three daughters: Alfredesha, age 7; Ja'Karen, age 2.5; and Alfreda, age 1), by driving cross country in the cab of a tractor trailer. Sharing these close quarters with a family of five, including two children still in diapers, created a constantly stressful situation for Mr. Bourgeois. He was undergoing financial stress and was having trouble keeping up with payments on his home and his car. Mr. Bourgeois was also stressed by his wife's recent infidelity. Consistent with his history of childhood abuse and abandonment, and his Borderline Personality Disorder, the troubles in his

marriage likely "triggered" Mr. Bourgeois to make him even more hyper-vigilant and over reactive.

15.     It is clear that as a result of this combination of severe psychosocial stressors and neuropsychological deficits, Mr. Bourgeois has great difficulties coping and he responded with repeated impulsive acts that eventually led to the tragic death of his daughter.

16.     Based on my findings, it is my opinion that Mr. Bourgeois has an extreme mental or emotional disturbance and that his illness renders him substantially impaired in his ability to conform his conduct to the requirements of the law. Additionally the available information about Bourgeois' family life and childhood, as well as his impaired intelligence, constitute significant mitigating factors that should have been considered by the jury.

I hereby declare and certify that the above facts and opinions are true and correct under penalty of perjury.

Robert L. Sadoff, M.D.

Dated: Jenkintown, PA
        May 12, 2007

14

## DECLARATION OF JETHRO TOOMER, PH.D.
## PURSUANT TO 28 U.S.C. § 1746

Jethro Toomer, Ph.D. hereby declares and certifies that the following is true.

1. My name is Jethro Toomer. I am clinical and forensic psychologist. I am licensed to practice psychology in the State of Florida. I graduated from Temple University in Philadelphia, Pennsylvania with a Ph.D. in Psychology in 1972. I have been retained as an expert by the defense and prosecution, and have been selected as a court expert in a variety of criminal law matters in state and federal courts across the Nation. I am a professor of psychology at the Florida International University and have been since 1980. All opinions set forth in this Declaration are stated to a reasonable degree of psychological certainty. All facts set forth are true to the best of my knowledge.

2. I have been asked by counsel for Mr. Alfred Bourgeois to conduct a forensic psychological evaluation of him with respect to his capital murder conviction and death sentence arising out of the United States District Court in the Southern District of Texas. In order to prepare for the evaluation and to generate this report, I have reviewed hundreds of pages of records regarding the offense, trial and appeal, as well as numerous background declarations, mental health reports and hospital records. I also conducted a clinical interview with Mr. Bourgeois at the United States Penitentiary at Terre Haute, Indiana on May 2, 2007. During this interview I spent about 4.5 hours with Mr. Bourgeois, which included the administration of psychological personality testing. As a result of my overall evaluation, I have a number of opinions about Mr. Bourgeois.

3. Mr. Bourgeois is a deeply troubled and impaired individual. He has precarious psychological functioning. His precarious state and deficits are due to a constellation of events and conditions. I will review those in detail, however in sum, he suffers from the lasting impact of

savage childhood sexual and physical abuse. He has impaired intelligence (IQ scores in the mentally retarded range). He has organic brain impairments which particularly impact on his ability to control impulses, make judgments and predict the consequences of his actions. His psychological functioning deteriorates dramatically from his already deficient baseline during times of stress. Psychological testing (MCMI) suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder. On Axis II, he suffers from a combination of schizoid, paranoid and borderline personality disorders. It is my opinion that when he has acted in a rageful manner, he is likely acting out of mini-psychotic episodes secondary to his borderline personality disorder. I will now review the history and testing that supports these conclusions.

4. My review of the background materials and interview reveal that Mr. Bourgeois suffered from clinically significant childhood physical abuse and sexual abuse. The materials present a consistent picture of abuse at the hands of his mother, and sexual abuse at the hands of at least one individual in his neighborhood. He described for me maternal abuse that was notable for its severity and random nature. His mother beat him with skillets and broom handles, and did so for no reason, or even when the "provocation" was minimal. While clinically this abuse is of great significance, it was exacerbated by his effective abandonment by his mother. This occurred when he was made to leave the family home to live with an elderly neighbor, Miss Mary. Although it may be intuitive that being removed from mother's home and abuse would be a relief, in reality, it heightened his psychological trauma. It is not disputed within the mental health field that even abused children still cling to the love that they perceive and desire from their parents. Thus, regardless of the significant abuse that he received from his mother, Mr. Bourgeois unquestionably felt that being made to live with Miss Mary was a profound act of abandonment.

**Declaration of Jethro Toomer, Ph.D.**
**Page 2 of 7**

5. His abandonment was not just physical, but emotional as we l. He related one incident to me when he reported to his mother that he was sexual moleste l by a man in the neighborhood at about age 7. Instead of protecting and nurturing her child, his m other chastised him for lying about this incident and beat him with the skillet and an extension cord. The psychological impact of this event is hard to overstate. At this point, when he quite naturally t rned to his mother to protect him and provide succor, she failed to do so, and instead caused him f irther physical and psychological pain.

6. The combination of abuse and abandonment have an exponential impact on a child. Each are bad singularly – in combination they cause severe psychological impai ments. The effects on Mr. Bourgeois' adult behavior from this combination are evident. His histor y is consistent with that of a Borderline Personality Disorder. This disorder is marked by instability n relationships and impulsive behaviors. There is no question but that Mr. Bourgeois fits this bill. T e Kaib declaration lays out a classic pattern of borderline-type relationships. These relationship s have a saw-tooth quality. They begin with great highs, only to dip to great depths when the borderline perceives a slight or frustration with the object of his affection, or when he perceives that he will be abandoned. In Mr. Bourgeois' case his multiple marriages and relationships have witnessed these highs and lows. In addition, his impulsive conduct is noted in a variety of spheres including with regard to his purchase of material possessions well beyond his means and his extra-marital affairs.

7. In the classic borderline personality like Mr. Bourgeois, the indi idual makes every effort to avoid abandonment, whether it is real or imagined. Significantly to this case, the perception of abandonment can cause severe behavioral reactions. The individual will go to extremes to avoid the abandonment that has caused him such great pains in his own past. They fear loss of control and

will go to extremes to forestall it. When the borderline individual is seeking to avoid such abandonment, and is under great stress, they can experience mini-psychotic episodes. In Mr. Bourgeois' case, it is my opinion that his abusive conduct toward the victim, as well as his other relationships occurred during such mini-states. The only thing that separates Mr. Bourgeois from a full blown psychotic disorder is that he is able to reintegrate himself very quickly after the onset of these mini-episodes.

8. I also believe that Mr. Bourgeois suffers from a schizoid-type personality disorder. This disorder is marked by the same disruption in interpersonal relations as the borderline disorder, but it different in that it also encompasses gross perceptual and cognitive distortions. My review of the historical record reveals that Mr. Bourgeois has constructed an entire fantasy world to replace the one in which he actually lives. Mr. Bourgeois readily acknowledges the traumas that he has suffered in his life. Yet, despite their obvious impact, he denies that they have effected his life or mental health. Such detachment from traumatic events is typical of a schizoid personality. Similarly, he confabulates and simply makes up much about his life and background. For instance, while admitting that his mother beat him, he maintains that he had a "normal" and "loving" childhood. There exists a profound disconnect between what he has experienced and what he makes of those experiences. Many lay people would label Mr. Bourgeois a liar because of this disconnect. In reality, however, his lies and puffing have a deeply rooted psychological base.

9. I understand that Mr. Bourgeois scored a 76 in a standardized IQ test at the time of his trial. This test, the WAIS-R was administered in 2004 – at a point in time when it was outdated and had been replaced by the WAIS-III. The intelligence testing community recognizes that as IQ tests approach the end of their useful life, the population as a whole begin to score higher. In effect,

the population becomes "smarter" on these tests. This effect, known as the Flynn Effect, is widely recognized. Under it, scores are adjusted based on the age of the test that is given. When the Flynn Effect is applied to Mr. Bourgeois' score of 76 in 2004, it should be adjusted down to a full scale IQ of 68, which is within the mentally retarded range. I understand that in recent testing given to Mr. Bourgeois by Dr. Gelbort, he scored a 70 on the current WAIS-III test. This score too is in the range of mild mental retardation.

10. A diagnosis of mental retardation can be made when an individual has substandard IQ testing (which Mr. Bourgeois has) that is accompanied by significant limitations in adaptive functioning. Mr. Bourgeois meets the adaptive deficit criteria. Background information that has been provided to me indicates that Mr Bourgeois has deficient functioning in all three realms of adaptive behavior: conceptual, social, and practical.

11. His deficits seem most profound in the social realm. His inability to maintain healthy relationships indicates a significant deficit in his interpersonal functioning. In addition, his wildly inconsistent stories about himself and his own history reveal a deficit in his self-esteem. He has demonstrated difficulty in following simple rules from childhood through adulthood, another aspect of impaired social functioning.

12. Mr. Bourgeois' history reveals deficits in the conceptual and practical realms as well. Specifically, he has difficulty understanding money concepts. He has a long history of living beyond his means and seems unable to understand simple concepts in his monetary transactions. In the practical realm, Mr. Bourgeois seems especially weak in maintaining his personal safety and maintaining safe environments. Multiple reports show that he had a very weak understanding of safety. He reportedly would turn around while at the wheel of the truck, and did not keep his eyes

on the road. His hospital records also report multiple MVA's, a sign that he was unable to maintain safety while driving.

13. I have reviewed the neuropsychological testing done in 2004 and 2007. The results of these batteries demonstrate that Mr. Bourgeois is impaired in the areas of the brain that control impulses and executive decision making. His impaired scores in the Category test in particular demonstrate such impairments.

14. When Mr. Bourgeois' organic brain impairment and mental retardation are added to his already precarious psychological state, the resulting combination creates a highly volatile personality. Even without his organic deficits and low IQ, Mr. Bourgeois would have a difficult time managing his emotions and behavior. When his low IQ and organic deficits are added, his ability to maintain control drops further. When this individual is placed under stress, such as the type that he was under at the time of the offense, is it no wonder that he lashed out in a such a rageful manner.

15. There is no question but that Mr. Bourgeois suffers from significant mental health deficits and disturbances. These disturbances significantly impact on his ability to appreciate the criminality of his conduct and to conform his behavior to the requirements of law. Based upon my forensic criminal law experience, these deficits are of the type that would routinely be presented in the mitigation phase of a capital trial. I have reviewed the transcripts of Mr. Bourgeois' trial, and it is safe to say that with the exception of some testimony that he was subjected to childhood abuse, there was scarcely a flavor presented to the jury as to his overall deficits and impairments.

16. This Declaration contains only a summary of my opinions and findings, and is not exhaustive in that regard.

I hereby certify that certify that the opinion and facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jethro Toomer, Ph.D.

Dated:       Miami, Florida
           May 9, 2007

15

# WAIS-R RECORD FORM

WECHSLER ADULT
INTELLIGENCE SCALE—
REVISED

NAME _AB_ _228-04_

ADDRESS_____

SEX_____ AGE _34_ RACE_____ MARITAL STATUS_____

OCCUPATION_____ EDUCATION_____

PLACE OF TESTING_____ TESTED BY_____

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | RAW SCORE | | | | | | | | | | | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | VERBAL TESTS | | | | | | PERFORMANCE TESTS | | | | | |
| | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | |
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | 32-33 | 57-61 | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | 11-12 | 23-26 | 28-29 | 48-52 | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | 13 | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | 9-10 | 20-28 | 6-7 | 11-13 | 11-13 | 11-12 | 5-7 | 14-19 | 21-23 | 37-43 | 6 |
| 5 | 6-8 | 8 | 14-19 | 5 | 8-10 | 7-10 | 8-10 | 3-4 | 6-13 | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | 5-7 | 2 | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | 6-8 | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

cians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to ject them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

### SUMMARY

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | | | |
| Date of Birth | | | |
| Age | | | |

| | Raw Score | Scaled Score |
|---|---|---|
| **VERBAL TESTS** | | |
| Information | 12 | 5 | 4 |
| Digit Span | | 6 | 7 |
| Vocabulary | | 6 | 6 |
| Arithmetic | | 6 | 6 |
| Comprehension | | 5 | 5 |
| Similarities | 8 | 5 | 6 |
| Verbal Score | | 3? | |
| **PERFORMANCE TESTS** | | |
| Picture Completion | | 4 | 6 |
| Picture Arrangement | | 5 | 5 |
| Block Design | | 4 | 4 |
| Object Assembly | | 2 | |
| Digit Symbol | | | |
| Performance Score | | 25 | |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 33 | 76 |
| PERFORMANCE | 25 | 75 |
| FULL SCALE | 58 | 75 |

THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, INC.

ght © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright ©
by The Psychological Corporation. No part of this form may be copied by any process without
permission. All rights reserved.
Printed in U.S.A.

9-991829

16

I, Donald E. Weiner, Ph.D. do hereby declare and certify that the following is true and correct.

1.  I am a licensed psychologist with a specialty in neuropsychology. I am licensed to practice in Texas, and I maintain an office in Corpus Christi. I was contacted by trial counsel for Alfred Bourgeois and asked to conduct a neuropsychological test battery on him. I recall that my name was given to these lawyers (Mr. Tinker and Mr. Gilmore) by Carlos R. Estrada, M.D., with whom I have worked in the past.

2.  I also recall that there was great time urgency to their request. I was told that the trial had either started or was about to start and that the testing had to be done immediately. Due to the time constraints, I conducted my testing on a weekend (Saturday February 28, 2004), which is contrary to my custom. I gave priority to this request and generated my report on March 3. A copy of my report is attached to this statement. In more ideal circumstances, I would have perhaps conducted more testing and would certainly have sought outside sources to develop Mr. Bourgeois' psycho-social history. This was impossible given my limited time.

3.  As my report indicates, Mr. Bourgeois was impaired on a number of test instruments. The most notable finding was on the Category Test, which is a sub-test of the well known Halstead-Reitan battery. His score of 94 errors is significantly impaired. This score is notable because it shows deficits in his ability to function with new information and in unfamiliar settings. As I noted in my report, "Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions." In fact, I believe given his results that his judgement was

1

significantly impaired. Although I have limited experience with capital sentencing, it would seem to me that this finding is mitigating.

4. I would also note that Mr. Bourgeois scored a 76 on the WAIS-R IQ test. This places him in range of borderline intellectual functioning and is itself a significant finding.

5. Although in my view my report presented important findings regarding Mr. Bourgeois' neuropsychological profile, I was not called as a witness at trial. As I understood the situation, the lawyers were concerned that my conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of my report. From a neuropsychological perspective, the reason that Mr. Bourgeois' brain is impaired is not nearly as critical as the fact that it is impaired. My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage.

6. Even though Mr. Bourgeois may not have been accurate in his factual reporting, there was no sign that he malingered on the testing. Mr. Bourgeois' pattern of responses on all of his tests demonstrate that he was making a valid effort. This was not a "Fake Bad" result. In fact, I administered a standardized test to detect malingering called the Test of Memory Malingering (or TOMM). This test has two trials with 100 total questions. Mr. Bourgeois scored 47 on the first trial and a perfect 50 on the second. Because the test is essentially an easy set of tasks, and the subject is not told that it tests for malingering, it is expected that even impaired individuals will do quite well. When a person does poorly, malingering can be suspected. His scores of 47 and 50 are well within the standardized range showing that there was no malingering. The lawyers did not ask me about the significant finding that he applied a solid effort in the testing.

7. The fact that Mr. Bourgeois misrepresented his own social history is also significant from a psychological standpoint. First, it is an example of his poor social judgment: lying to a

2

defense expert was not in his best interest. Second, it is possible that Mr. Bourgeois actually believed his own stories. This would be a significant finding that would impact my diagnosis. Unfortunately, I was not given very much information regarding Mr. Bourgeois' history or personality. In addition, the time constraints made it impossible for me to do more than administer the battery of neuropsychological tests. I was therefore unable to offer further explanation for Mr. Bourgeois' behavior.

I hereby certify that the above facts and opinions are correct to the best of my knowledge.

Donald E. Weiner, Ph.D.

Dated: Corpus Christi, Texas
May 10, 2007

3

**DONALD E. WEINER, Ph.D., FICPP, FPPR, P.C.**
Psychologist
5934 South Staples, Suite 206
Corpus Christi, Texas 78413

Telephone: (361) 994-0387
Board Certified, Diplomate-Fellow in Psychopharmacology of the
Prescribing Psychologists' Register, Inc. and the International College of Prescribing Psychologists
FACAPP -Founding Fellow of the American College of Advanced Practice Psychologists
FSMI -Board Certified, Diplomate-Fellow in Serious Mental Illness

## NEUROPSYCHOLOGICAL EVALUATION

| | | |
|---|---|---|
| **NAME:** | Alfred Bourgeois | **DATE TESTED:** 2-28-04 |
| **DOB:** | 6-20-64 | **DATE OF REPORT:** 3-3-04 |
| **AGE:** | 39 | |
| **SEX:** | Male | |

### REASON FOR REFERRAL:

Mr. Bourgeois was referred for a neuropsychological evaluation to determine whether or not he has brain damage.

### BACKGROUND INFORMATION:

Mr. Bourgeois is currently being tried for capital murder. The present evaluation was conducted at the Federal Courthouse. The nature and purpose of the evaluation was explained to Mr. Bourgeois, and he consented to be tested. Mr. Bourgeois grew up in Louisiana. He denies any history of serious illnesses. Injuries include a broken nose when he was in elementary school, a three-wheeler accident in 1984 that resulted in his being in a coma for 1-2 months and being out of work for a year after this accident, and a truck accident in 1989 in which he broke his right collarbone and his left arm. Mr. Bourgeois stated that he became aggravated more easily after the 1984 accident, and this problem has continued up until the present. Mr. Bourgeois is not on any medication at the present time.

Mr. Bourgeois completed high school and about two months of college. He worked as an auxiliary deputy for a sheriff's department, and he has worked as a truck driver for the remainder of his work years. He made B's and C's in high school and was in all regular classes. He has three living brothers, one deceased brother, and two sisters. His parents were never married. He has a son 22 and a daughter 20 by two different woman, a daughter 16 by a previous marriage, and a daughter 9 by his current marriage of 7 ½ years. Mr. Bourgeois is charged with the death of his two-year-old daughter by his present marriage.

## TESTS ADMINISTERED:
Wechsler Adult Intelligence Scale – Revised
Wide Range Achievement Test – Third Edition
Halstead-Reitan Neuropsychological Test Battery for Adults
Test of Memory Malingering
Clinical Interview

## MENTAL STATUS:
Mr. Bourgeois was very cooperative during the testing and he appeared motivated to give his best performance. The present test results are believed to be a valid indication of his current level of neuropsychological functioning. His mood was neutral with appropriate affect. He reports some problems falling asleep. He has a history of migraine headaches. His appetite is poor, and he eats because he has to. He reports a 63-pound weight loss since his arrest 20 months ago. He has stomach cramps and diarrhea at times. He reports some dizziness. He denies any perceptual problems. He did not have problems with concentration in the past, but has had concentration problems since his arrest. He has a history of memory problems. He states that his wife has told him that he has sleep apnea. He describes himself as verbally outspoken when upset. He reports having felt depressed since his wife had an affair. He filed for divorce and then came back to his wife. He has been married four times.

Mr. Bourgeois has suicidal thoughts but states that he would not try to kill himself. He stated that he did attempt suicide 3-4 months after his arrest. He worries about his nine-year-old daughter who is in foster care. He denies any auditory or visual hallucinations but after his arrest for a period of time he heard voices and saw things.

Mr. Bourgeois denies any history of alcohol or drug abuse.

## TEST RESULTS AND INTERPRETATION:

### Wechsler Adult Intelligence Scale – Revised:
Mr. Bourgeois achieved a Verbal IQ of 76, a Performance IQ of 76, and a Full Scale IQ of 76, all of which are in the borderline range of intellectual functioning. His subtest scores are as follows: (note that the age equivalent scores are shown in parentheses after each subtest score)

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 5 (4) | Picture Completion | 4 (6) |
| Similarities | 5 (6) | Digit Symbol | 10 (11) |
| Arithmetic | 6 (6) | Picture Arrangement | 4 (5) |
| Vocabulary | 6 (6) | Block Design | 5 (7) |
| Comprehension | 5 (5) | Object Assembly | 2 (3) |
| Digit Span | 6 (7) | | |

When compared with individuals in his age range on the verbal subtests Mr. Bourgeois

exhibited low average abilities in short-term auditory memory and mild deficits in long-range retention for specific facts and information, abstract reasoning, numerical computation, verbal expression, and social judgment. On the performance subtests he exhibited average abilities in visual motor memory and speed, low average abilities in non-verbal concept formation, mild deficits in distinguishing essential from non-essential details and non-verbal visual sequencing, and a significant deficit in assembling an object from its parts.

**Wide Range Achievement Test – Third Revision:**
Mr. Bourgeois achieved the following scores:

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Reading | 96 | high school |
| Spelling | 106 | high school |
| Arithmetic | 81 | sixth |

Mr. Bourgeois is functioning at the expected level for a high school graduate in reading and spelling. Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities.

**Halstead-Reitan Neuropsychological Test Battery for Adults:**
This battery is very sensitive to cerebral dysfunction. It consists of several individual tests which measure the following areas: abstraction and concept formation, motor functions, sensory functions, visual spatial skills, verbal abilities, incidental memory, alertness and concentrated attention, and general indicators of the level of cerebral functioning. A review of Mr. Bourgeois' performance on this battery shows indications of mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex. This cerebral damage is likely due to the injuries sustained in the three-wheeler accident which took place in 1984, resulting in a coma lasting one to two months. Mr. Bourgeois' score of 33 on the neuropsychological deficit scale is in the mild range of impairment. His score of 0.86 on the impairment index indicates that nearly all portions of the battery which contribute to this index were in the impaired range, although some tests were only slightly impaired.

On the Aphasia screening test, Mr. Bourgeois exhibited constructional dyspraxia (having difficulty copying a geometrical design). This is a right cerebral indicator. On the sensory perceptual examination, he made a large number of errors bilaterally on the fingertip number writing perception test. This finding is consistent with bilateral posterior cerebral damage, with greater right posterior cerebral damage, given the fact that he made many more errors with his dominant left hand.

On the strength of grip test, Mr. Bourgeois' grip strength was somewhat weaker than expected with his nondominant right hand. He reports having arthritis in both hands, with more arthritis in his right hand and this finding may be due to his arthritis. His finger tapping speed was adequate bilaterally.

Mr. Bourgeois exhibited impairment on the Seashore rhythm test, which measures alertness and concentrated attention for non-verbal auditory stimuli. He exhibited impairment on two tests which serve as general indicators of the overall level of cerebral functioning. His time of one minute and thirty-three seconds on the Trailmaking test, part B is in the brain-damaged range. He had a very poor score of 94 errors on the Category test, which is a measure of learning in a new and unfamiliar learning situation. Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions.

Mr. Bourgeois had significant impairment on the Tactual Performance Test, which is a spatial problem-solving task. His total time of nearly twenty-seven minutes is well into the brain-damaged range. He had a poor score on a test measuring incidental spatial memory. His performance was slower than expected with his dominant left hand, and his poor performance on the Tactual Performance Test combined with adequate performance on the finger-tapping test indicates greater posterior cerebral damage.

**Test of Memory Malingering:**
Mr. Bourgeois' performance was well within normal limits and shows no indications of malingering.

## DIAGNOSTIC IMPRESSION:

Axis I      :      294.9, Cognitive Disorder – Mild cerebral damage with moderate posterior cerebral damage

## SUMMARY AND CONCLUSIONS:
Mr. Bourgeois is a thirty-nine year old male whose overall level of intellectual functioning is in the borderline range. He shows no indications of having any specific learning disabilities. Neuropsychological test results reveal overall mild cerebral impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident which took place in 1984, resulting in a coma lasting 1-2 months. A test of malingering shows no indications that Mr. Bourgeois was malingering, and the present test results are believed to be a valid indication of his overall level of cerebral functioning. Mr. Bourgeois shows some symptoms of depression, including poor sleep, poor appetite with significant weight loss, a previous suicide attempt, and current suicidal thoughts with no active suicidal intention. Mr. Bourgeois stated that he has become aggravated more easily since the 1984 accident, and his performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions.

Don Weiner, Ph.D.
Psychologist