53

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Cause No: CR-C-02-216 (1) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALFRED BOURGEOIS, | ) | |
| | ) | |
| Defendant. | ) | |

---

### AFFIDAVIT OF WERNER U. SPITZ, M.D.

1.     I received my M.D. degree in 1953 and am licensed to practice medicine. I am certified by the American Board of Pathology in Anatomic and Forensic Pathology.

2.     I have spent 54 years of my medical career in the practice of pathology and forensic pathology. My curriculum vitae is attached.

3.     For the purpose of formulating the following opinions I reviewed:

4.     The autopsy report, including the transcript of neuropathology consultation.

5.     Forensic odontology reports of Drs. Senn and Chrz.

6.     The transcript of the jury trial, including testimony of: AB1994, EMT John

1

Burgess, Nurse Carol McLaughlin, FBI Agent Megan Beckett, Drs. Scott Benton, Ronald Kuffel, Elizabeth Rouse (who performed the autopsy), William Oliver, David Senn, Bryan Chrz and Noorullah Akhtar.

7. Several CDs with body photographs and their enhancements of 2 years and 8 months old, African American, deceased minor, **Jakerenn Gunter**.

8. The actual color and black and white photographs, which I reviewed are of acceptable and satisfactory quality to render an opinion.

9. The enhancements are misleading, confusing, exaggerate the findings, and produce artifacts.

10. If the documentation of bruises is at issue, the pathologist performing the autopsy can use their scalpel for such documentation and study.

11. Enhancing the photographs introduces new dimensions, new colors, new uncertainties, in so far as the findings in the enhancements were not present at the autopsy table.

12. The enhancements, in my opinion, are none other than inflammatory, without scientific merit.

13. Dark skinned individuals frequently have variations of skin pigment and tones often mistaken for injuries.

14. Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as, DNA or at least blood type verification.

15. With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had what appeared to be inflammatory changes in the genital area, some six weeks before her death and evidence of apparent bruising at the time of the postmortem examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse who performed the autopsy specifically describes on page three of her report, at the end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down, in the same paragraph, the autopsy report continues "on the upper left buttock, there is a hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in a much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

3

16.    The neuropathology report by Dr. Kathleen Kagan-Hallet indicates mild to moderate cerebral edema with hemorrhagic necrosis of cerebellar tonsilar tips, subdural hematoma of approximately 10 days duration and organized contusion infarcts of 7+ days duration as well as, myelin tearing and axonal bodies. The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts. I disagree with the witness testimony (AB1994) whereby the child's head was struck multiple times on the interior of the vehicle. I am also surprised to see what appear to be fresh bruises of 1 or 2 days in the scalp, while the subdural bleed and contusion infarcts in the white matter show evidence of organization compatible with a week or longer. The findings place in question causation of the injuries and their timing. The scalp injuries in and of themselves would not have been life threatening and there is a question as to the life threatening nature of the cerebral injuries.

17.    I further find it questionable how mild to moderate cerebral edema without other manifestations of brain swelling would cause cerebellar herniation and explain the death. The brain weighed 1000 grams when weighed at the autopsy. This is not a weight that would imply severe brain swelling.

18.    The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts.

19.    All opinions rendered in this affidavit are within a reasonable degree of medical and scientific certainty.

4

20.     My textbook, MEDICOLEGAL INVESTIGATION OF DEATH, 4th edition,

published by Charles C. Thomas, Springfield, Illinois, 2005 discusses in greater

detail many of the issues discussed in the affidavit.

FURTHER AFFIANT SAYETH NAUGHT.

Werner U. Spitz, M.D.

On this 10TH day of May, 2007 before me

personally appeared **Werner U. Spitz, M.D.**

To me known to be the person who executed the

forgoing instrument, and acknowledged that he

executed the same as his free act and deed.

Sworn and subscribed to before me:

Diane L. Lucke, Notary Public
County of Monroe, State of Michigan
Acting in Macomb County
My Commission Expires: October 20, 2011

5

# WERNER U. SPITZ, M.D.

## *Forensic Pathology and Toxicology*
23001 Greater Mack
St. Clair Shores, Michigan 48080-1996

Phone: (586) 776-2060 ■ Fax: (586) 776-8722

**Diane L. Lucke, B.S.**
**Administrative Assistant/Office Manager**

**E-mail:**
**wuspitz@aol.com**

Date of Preparation: March, 2007

Home: 850 Lakeshore
Grosse Pointe Shores, MI 48236

Telephone: (313) 884-0501

**PERSONAL DATA:**

Born: August 22, 1926
Stargard/Pomerania
Germany

Fluent: English, German and French

**EDUCATION:**

| | |
|---|---|
| Geneva University Medical School<br>Geneva, Switzerland | 1946-1950 |
| Hebrew University, Hadassah<br>Medical School - Jerusalem<br>M.D. from same | 1950 - 1953 |

**TRAINING:**

| | |
|---|---|
| Internship and residency in<br>Pathology and Forensic Pathology<br>Hadassah Medical School | 1953 - 1959 |
| Research Fellow, Forensic Pathology<br>University of Maryland<br>Baltimore, Maryland | 1959 - 1961 |

**FACULTY APPOINTMENTS:**

| | |
|---|---|
| Assistant, Dept. of Forensic Pathology<br>Free University of Berlin, West Germany | 1961 - 1963 |

Assistant Professor of Pathology
University of Maryland
School of Medicine                               1966 - 1969

Associate Professor, Forensic Pathology
Department of Public Health Administration
Johns Hopkins University
Baltimore, Maryland                              1967 - 1972

Clinical Associate Professor of Pathology
University of Maryland
School of Medicine                               1969 - 1972

Membership on the Graduate Faculty
University of Maryland
College Park, Maryland                           1970 - 1972

Professor, Department of Pathology
Wayne State University
School of Medicine                               1973-

Adjunct Professor of Chemistry
University of Windsor
Ontario, Canada                                  1978-

## HOSPITAL OR OTHER PROFESSIONAL APPOINTMENTS:

Associate Medical Examiner, Maryland
Medical-Legal Foundation
Baltimore, Maryland                              1963 - 1965

Pathologist, Mount Wilson State Hospital
for Chest Diseases, Maryland                     1964 - 1972

Assistant Medical Examiner
State of Maryland
Baltimore, Maryland                              1965 - 1969

Lecturer in Forensic Pathology
Department of Public Administration
Johns Hopkins University
Baltimore, Maryland                              1966 - 1969

Deputy Chief Medical Examiner
State of Maryland
Baltimore, Maryland                              1969 - 1972

Director of Research and Training
Maryland Medical-Legal Foundation
Baltimore, Maryland                              1967 - 1972

Chief Medical Examiner, County of Wayne

Detroit, Michigan                                    1972 - 1988

Pathologist and Chief Medical Examiner
County of Macomb, Michigan                1972 - 2004

**MAJOR PROFESSIONAL SOCIETIES:**

Michigan Association of Medical Examiners
Member Executive Committee, [1986 - Present]
Wayne County Medical Society

Michigan Society of Pathology,
Chairman, Forensic Pathology Committee

College of American Pathologists, Fellow

American Society of Clinical Pathologists, Fellow

National Association of Medical Examiners,
Board of Directors

American Academy of Forensic Sciences, Fellow,
Pathology and Biology Section, Past Chairman,
Nominating Committee, 1977; Secretary/Treasurer, 1980,
Chairman, 1981

World Congress of Legal Medicine, Vice President, 1986

Detroit Academy of Medicine, Fellow

**LICENSURE:**

License to practice medicine, member countries
of the European Union                           1960

Maryland Board of Medical Examiners         1964

Virginia Board of Medical Examiners         1965

Washington, D.C., Commission on Licensure
to Practice the Healing Art                     1971

Michigan Board of Registration in Medicine   1972

**SPECIALTY BOARDS:**

Certification by The American Board of Pathology:

Pathologic Anatomy                 1961

Forensic Pathology                 1965

**HONORS/AWARDS:**

American Physicians Fellowship Inc., August, 1967

Northern Virginia Arson Seminar - Certificate of Recognition of Attendance, December 2, 1967

National Association of Medical Examiners - Certificate of Membership, 1972
North End Detroit Lions Club - Certificate of Service, March 5, 1974

International Association of Bomb Technicians and Investigators - Certificate of Appreciation, May 24, 1978

The International Reference Organization in Forensic Medicine - for Continuous Support of INFORM and outstanding Contributions to Forensic Medicine, August 1, 1979

The Arizona Department of Public Safety - Certificate of Appreciation, December 7, 1979
University of Detroit - Certificate of Appreciation, February 26, 1981

Kiwanis Club of New Center, Detroit - Certificate of Appreciation, June 17, 1981

Latin American Association of Legal Medicine, May 20, 1982 - Honorary Member

Mid Atlantic Forensic Pathology Association Certificate of Recognition May 2, 1983

The American Academy of Forensic Sciences, February 15, 1983

American Medical Association - Certificate of Member in good Standing, 1984

Crockett Vocational/Technical Center - Certificate of Appreciation, May 15, 1985

Michigan Ontario Identification Association - Certificate of Appreciation, May 17, 1985

British Academy of Forensic Sciences Medicolegal and Odontological Society of Mexico, Honorary Member, 1986

Founder's Award, Michigan Eye Bank and Transplantation Center, June 15, 1986

EL Instituto Politecnico Nacional, 1986

Crockett Vocational/Technical Center - Certificate of Appreciation, June 10, 1987

Resolution for Outstanding Service, handling mass disaster, Northwest Flight 255 plane
crash, City of Romulus September, 1987

Award from Wayne County for handling of Northwest Flight 255 Plane Crash, October, 1987

Michigan Police Chaplains Association - Certificate of Appreciation, March 14, 1988

Wayne County Medical Society - Resolution for Outstanding Service, August 24, 1988

New York State Police - Certificate of Appreciation, October 5, 1988

New York State Police - Certificate of Appreciation, November 8, 1990

International Symposium on Forensic Techniques - Certificate of Appreciation, June 6, 1991

New York State Police - Certificate of Appreciation, October 2, 1991

American Board of Forensic Examiners - Recognizes for High Level of Professional Scientific involvement, December 12, 1994

Special Opportunities for Amputee Rehabilitation - Acknowledgment for Sponsoring an Amputee, 1994

Wayne County Medical Society - Certificate of membership in Good Standing, 1994

New York State Police - Certificate of Appreciation, September 28, 1994

Sterling Heights Citizen's Police Academy - Certificate of Appreciation, March 22, 1995

New York State Police - Certificate of Appreciation, September 20, 1995

American Society of Clinical Pathologists  January 11, 1996

New York State Police - Certificate of Appreciation, October 3, 1996

American Medical Association - Certificate of Member in Good Standing, 1996

Medicolegal Investigation of Death - Certificate of Participation, March 6 & 7, 1997

Investigation for Identification - Certificate of Completion, October 31, 1997

National Association of Medical Examiners - Certificate of Membership, 1999

Turning Point SANE Program - Recognition and Appreciation of Outstanding Effort, June 24,            1999

Dean's Award for 24 years of dedicated service to the medicolegal community and Wayne                   community and Wayne State University School of Medicine, March 6, 1997

National Association of Medical Examiners - Certificate of Membership, 2000

Indiana Division International Association for Identification - Certificate of Appreciation, 11th Annual    Annual Indiana IAI Conference

## SERVICE:

Consultant - Johns Hopkins University, Applied Physics Laboratory, Silver Spring, Maryland, 1968-1972

Consultant - Veterans Administration Hospital
Allen Park, Michigan, 1972

Consultant - Rockefeller Commission on CIA activities
within the United States, investigating the
circumstances surrounding the assassination of
President John F. Kennedy, 1975

Member - Forensic Pathology Panel, Select Committee on
Assassinations, U.S. House of Representatives,
Washington, D.C.,  1978

Consultant - Michigan Department of Labor, Silicosis
and Dust Fund, 1977-1980

Consultant - Pan American Health Organization, November, 1978

Consultant, U.S. Borax and Chemical Company, Los Angeles, California, October
1984-                    Present

Consultant - NBC News for the OJ Simpson Trial, 1994-1995

Editor - Journal of Legal Medicine, Heidelberg,
Germany, New York

Member - Editorial Board, American Journal of Dermatopathology

Member - Editorial Board, Journal of Forensic Sciences

Member - Editorial Board, Excerpta Medica, [Holland],
Forensic Sciences

Member - Editorial Board, Forensic Science, Copenhagen
Denmark, Biomedical Division - Elsevier Science
Publishers, B.V.

Member - Editorial Board, The American Board of
Dermatopathology, Masson Publishing USA, Inc.

Member - Test Committee, American Board of Pathology,
1974-1979

Member - Public Health Committee, Claims Review
Committee, Wayne County Medical Society, 1979

Member - Probus Award Selection Committee, 1979

Listed - American Men and Women of Science, 12th Edition

Listed - Who's Who in America (Life member, 2000)

**TEACHING:**

| | |
|---|---|
| 28 years Professor, Department of Pathology<br>    Wayne State University<br>    School of Medicine | 1973 - |
| 2 years Assistant, Dept. of Forensic Pathology<br>    Free University of Berlin, West Germany | 1961 - 1963 |
| 3 years Assistant Professor of Pathology<br>    University of Maryland<br>    School of Medicine | 1966 - 1969 |
| 5 years Associate Professor, Forensic Pathology<br>    Department of Public Health Administration<br>    Johns Hopkins University<br>    Baltimore, Maryland | 1967 - 1972 |
| 3 years Clinical Associate Professor of Pathology<br>    University of Maryland<br>    School of Medicine | 1969 - 1972 |
| 2 years Membership on the Graduate Faculty<br>    University of Maryland<br>    College Park, Maryland | 1970 - 1972 |
| 21 years Adjunct Professor of Chemistry<br>    University of Windsor<br>    Ontario, Canada | 1978 - |

## GRANT SUPPORT:

U.S. Government (HEW) Institute of Maternal Health, $ 800,000 Grant for Research and Counseling of Sudden Infant Death.  1975-1985.

Grant from Eli Lilly for a study of propoxyphen.  $ 2,500. 1985.

State of Michigan, Office of Substance Abuse Services, Designer Drug grant, $ 3,000.  1986-1987.

Participated in a combined study with Michigan Department of Health, Detroit Health Department to determine the frequency of AIDS in medical examiner cases.  approximately $ 2,000.  1987.


## TESTIMONY IS NOT INCLUDED: LIST IS AVAILABLE UPON REQUEST


## PUBLICATIONS:

1.    A Contribution to Pulmonary Acariasis in Imported
      Rhesus Monkeys.
      *Bull. Res. Council of Israel* **6E** (2):  119-122, (1957).

Spitz, W.U.

2. Mycetoma Pedis.
*A.M.A. Arch. Dermat.* **75**: 855-863, (1957).
Ziprkowski,L., Altmann,G., Dalith,F. and Spitz,W.U.

3. Mechanism of Death in Fresh-Water Drowning.
*A.M.A. Arch. Path.,* **71**: 661-668, (1961).
Spitz, W.U. and Blanke, R.

4. *Increase of Body Weight as an Additional Criterion in*
*Establishing the Diagnosis of Fresh Water Drowning.*
Newsletter - Am. Acad. Forensic Sci., March-April, 1961.
Spitz, W.U. and Fisher, R.S.

5. Physical Activity Until Collapse Following Fatal Injury
by Firearms and Sharp Pointed Weapons.
*J. Forensic Sci.,* **6**, (3): 290-300, (1961).
Spitz, W.U., Petty, C. and Fisher, R.

6. Subdurale Blutungen aus isolierten Verletzungen von
Schlagadern an der Hirnoberflache durch stumpfe Gewalt.
*Virchows Arch. Path. Anat.* **336**: 87-98, (1962),
Krauland, W., Mallach, H.J., Missoni, L. und Spitz, W.U.

7. Diagnose des Ertrinkungstodes durch den Diatomeen-Nachweis
in Organen.
*Dtsch. Z. ges. gerichtl. Med.* **54**: 42-45, (1963).
Spitz, W.U.

8. Recovery from Drowning.
*Brit. Med. J.,* **5364,** 1678, (1963).
Spitz, W.U.

9. The Significance of Diatoms in the Diagnosis of Death
by Drowning.
*J. Forensic Sci.,* **9**, (1): 11-18, (1964).
Spitz, W.U. and Schneider, V.

10. Befunde bei vorubergehender Wiederbelebung nach
Elektrounfall.
*Munch. Med. Wchschr.* **106.**Jg., (11): 495-498, (1964).
Spitz, W.U.

11. Untersuchungen von Luftfiltrationsstreifen aus
verschiedenen Gebieten der Bundesrepublik auf ihren
Diatomeengehalt.  - Ein Beitrag zum Beweiswert von
Diatomeen fur die Diagnose des Ertrinkungstodes. -
*Dtsch. Z. ges. Gerichtl. Med.* **56**: 116-124, (1965).
Spitz, W.U., Schmidt, H. and Fett, W.

12. Techniques of Identification Applied to 81 Extremely
    Fragmented Aircraft Fatalities.
    *J. Forensic Sci.*, **10,** (2): 121-135 (1965).
    Fisher, R., Spitz, W.U., Breitenecker, R. and Adams, J.

13. Hemorrhagic Pancreatitis Following a Kick in the
    Abdomen - Report of a Case.
    *J. Forensic Med.,* **12** (3): 105-107, (1965).
    Spitz, W.U.

14. Ultrastructural Alterations in Rat Lungs. - Changes
    After Intratracheal Perfusion with Freshwater and
    Seawater.
    *A.M.A. Arch. Path.* **81:** 103-111, (1966).
    Reidbord, H. and Spitz, W.U.

15. Ultrastructural Alteration in Rat Lungs. - Changes
    Following Asphyxiation.
    *A.M.A. Arch. Path.* **82:** 80-84, (1966).
    Reidbord, H. and Spitz, W.U.

16. Weitere Untersuchungen Zur Diagnostik des
    Ertrinkungstodes durch Diatomeennachweis.
    *Dtsch. Z. ges. gerichtl. Med.*, **58**: 195-204, (1966).
    Spitz, W.U. and Schmidt, H.

17. Enzymologic Approach to the Diagnosis of Death by
    Drowning - Preliminary Report.
    *Am. J. Clin. Path.*, **47** (6): 704-708, (1967).
    Spitz, W.U., Burfitt,H., Freimuth,H. and Michaelis,M.

18. *Reconstruction of Accidents:  Integration of
    Pathological Findings and Roadside Evidence.*
    Proceedings of the International Conference on
    Accident Pathology, June 6-8, 1968, Washington, D.C.
    U.S. Government Printing Office.
    Brinkhous, K. (Editor) and Spitz, W.U.

19. Enzymatic Changes in Asphyxia, Experimental
    Pulmonary Edema and Drowning.
    *Am. J. Clin. Path.,* **51** (1): 102-106, (1969).
    Spitz, W.U., Hebel, R. and Michaelis, M.

20. Drowning: Principles of resuscitation differ according
    to whether drowning takes place in fresh water or salt
    water. (Its Pathogenesis, Clinical and Post Mortem
    Aspects). *Hospital Medicine*, **5** (7): 8-18, (1969).
    Spitz, W.U.

21. Rikoschett - oder Kontaktschußverletzung.

*Dtsch. Z. ges. gerichtl. Med.*, **66**: 153-160, (1969).
Spitz, W.U.

22. Histochemical Changes in Experimental Drowning,
Pulmonary Edema and Asphyxia.
*J. Forensic Med.,* **16** (3): 79-85, (1969).
Spitz, W.U., Silverman, B., Michaelis, M.

23. Does Illness Cause Crashes?
3rd. Triennial Congress of Motor Vehicle Accidents,
New York, June, 1969,
*JAMA,* **208** (12): 2257, (1969).
Baker, S. and Spitz, W.U.

24. Stud Gun Injuries.
In: *Internan. Microfilm Journal,* **4** (4) and *J. Forensic
Med.* **17** (1): 5-11, (1970).
Spitz, W.U. and Wilhelm, R.

25. Age Effects and Autopsy Evidence of Disease in Fatally
Injured Drivers.
*JAMA* **214** (6): 1079-1088, (1970).
Baker, S. and Spitz, W.U.

26. *Laboratory Diagnosis of Drowning.* - Werner U. Spitz.
Chapter in - LABORATORY DIAGNOSIS OF DISEASES CAUSED
BY TOXIC AGENTS, Editors - Sunderman and Sunderman,
Warren H. Green, St. Louis, Missouri, 1970.

27. Post Mortem Changes of pH in Rabbits' Vitreous Body
Compared with Brain and Liver.
*Invest. Opthal.* **9**: 158, (1970).
Spitz, W.U., Hebel, R. and Michaelis, M.

28. Injury by Birdshot.
*J. Forensic Sci.,* **15** (3): 396-402, (1970).
Di Maio, V. and Spitz, W.U.

29. Essential Post Mortem Findings in the Traffic Accident
Victim.
*A.M.A. Arch. Path.,* **90**: 451-457, (1970).
Spitz, W.U.

30. Medicolegal Investigation of a Bomb Explosion in an
Automobile.
*J. Forensic Sci.,* **15** (4): 537-552, (1970).
Spitz, W.U., Sopher, I. and Di Maio, V.

31. An Evaluation of the Hazard Created by Natural Death at
the Wheel.
*New Eng. J. Med.,* **283** (8): 405-409, (1970).
Baker, S. and Spitz, W.U.

32.  *Traffic Deaths Due to Blunt Abdominal Trauma.*
     Proceedings of the 14th Annual Conference, AAAM,
     Ann Arbor, Michigan, November, 1970.
     Baker, S., Gertner, H., Rutherford, R. and Spitz, W.U.

33.  Melanosis of the Prostate Gland.
     *Am. J. Clin. Path.*, **56** (6):  762-764, (1971).
     Gardner, W., Jr. and Spitz, W.U.

34.  Exanguinating Hemoptysis due to Ruptured Syphilitic
     Aneurysm.  A Case Report
     *J. Forensic Med.*, **18** (3):  118-121, (1971).
     Sopher, I. and Spitz, W.U.

35.  Endodermal Inclusions of the Heart - So-Called
     "Mesotheliomas of the Aerioventricular Node".
     *A.M.A. Arch. Path.*, **92**: 180-186, (1971).
     Sopher, I. and Spitz, W.U.

36.  Fatally Injured Drivers: Clues from Medical Examiners,
     Police and DMV.
     *Police*, July-August, 67-72, (1971).
     Baker, S. and Spitz, W.U.

37.  Tattoos, Alcohol and Violent Death.
     **J. Forensic Sci.**, **16** (2): 219-225, (1971).
     Baker, S., Robertson, L. and Spitz, W.U.

38.  Problems Encountered in Dental Identification of a
     Mutilated Body.
     *JADA*, **83**:168-169, (1971).

39.  Evaluation of the Management of Vehicular Fatalities
     Secondary to Abdominal Injury.
     *Trauma*, **12**: 425-431, (1972).
     Gertner, H., Baker, S., Rutherford, R. and Spitz, W.U.

40.  Variations in Wounding Due to Unusual Firearms and
     Recently Available Ammunition.
     *J. Forensic Sci.*, **17** (2): 377-386, (1972).
     Di Maio, V. and Spitz, W.U.

41.  *Variations of Shotgun Injuries - An Experimental
     Study.*  Abstracts, 6th International Meeting,
     Forensic Sciences, Edinburgh, September, 1972,
     pp. 88-89.
     Spitz, W.U. and Lipkovic, P.

42.  **MEDICOLEGAL INVESTIGATION OF DEATH - Guidelines
     for the Application of Pathology to Crime
     Investigation.**  Spitz, W.U. (Editor) and Fisher, R.

(Co-Editor). Springfield, Illinois, Charles C. Thomas, 1973.

43. Peculiarities of Certain .22 Caliber Revolvers (Saturday Night Specials).
*J. Forensic Sci.*, **19** (1): 48-53, (1974).
Schmidt-Orndorff, H., Reitz, J.A., and Spitz, W.U.

44. *Determination of Narcotics in Homicides in Detroit.*
Abstracts, 26th Annual Meeting, American Academy of Forensic Sciences, Dallas, Texas, February, 1974.
Monforte, J. and Spitz, W.U.

45. *Hit and Run, Gold Award Exhibit.*
Annual Scientific Exhibit of the American Society of Clinical Pathologists and the College of American Pathologists, Washington, D.C., 1974.
Spitz, W.U.

46. Narcotic Abuse Among Homicide Victims in Detroit.
*J. Forensic Sci.*, **20** (1): 186-190, (1975).
Monforte, J. and Spitz, W.U.

47. Accidental Death with a Tear Gas Pen Gun. A Case Report.
*J. Forensic Sci.*, **20** (4): 708-713, (1975).
Smialek, J. Ratanaproeksa, O. Spitz, W.U.

48. Short Range Ammunition: A Possible Anti-Hijacking Device.
*J. Forensic Sci.*, **21** (4): 856-861, (1976).
Smialek, J. and Spitz, W.U.

49. Important Considerations in the Management of Drowning Victims.
*Hospital Medicine*, June, 1976.
Spitz, W.U.

50. Drug Deaths Involving Propoxyphene - An Assessment in Metropolitan Detroit.
*Preventive Medicine*, **5:** 573-576, (1976).
Monforte, J. and Spitz, W.U.

51. Accidental Bed Deaths in Infants due to Unsafe Sleeping Situations.
*Clin. Pediatrics,* **16** (11):  1031-1036, (1977).
Smialek, J., Smialek, P. and Spitz, W.U.

52. Methadone Deaths in Children.
*JAMA,* **238**:  2516-2517, (1977).
Smialek, J., Monforte, J., Aronow, R. and Spitz, W.U.

53. Rupture of a Subclavian Artery Aneurysm in a Heroin
    Addict.  Report of a case.
    *J. Legal Medicine*, J.F. Springer - Munich, **81**:
    147-149, (1978).
    Whayne, N. and Spitz, W.U.

54. Death Behind Bars - The Jail Scene.
    *JAMA*, Special Communication, **240**: 2563-2564, (1978)
    and The Texas Lawman, 48: 9, (1979)
    Smialek, J. and Spitz, W.U.

55. Cyclohexamine [Rocket Fuel] - Phencyclidine's Potent
    Analog.
    *J. Analytical Toxicology*, **3**: 209-212, (1979).
    Smialek, J., Monforte, J., Gault, R. and Spitz, W.U.

56. *The Gunshot Victim.*
    Annual Scientific Exhibit of the American Society of
    Clinical Pathologists and the College of American
    Pathologists, Las Vegas, 1979.
    Smialek, J. and Spitz, W.U.
    Louisiana, February, 1980.
    Smialek, J., Merchant, M. and Spitz, W.U.

57. The Medicolegal Autopsy.
    *Human Pathology*, **11** (2): 105-112, (1980).
    Spitz, W.U.

58. Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
    Guidelines for the Application of Pathology to Crime
    Investigation.** Second Edition, Spitz, W.U. (Editor). Springfield,
    Illinois, Charles C. Thomas, 1980.

59. *An Analysis of Sudden and Unexpected Deaths in Young
    Adult Females Living in a Metropolitan Area.*
    In Proceedings of the 32nd Annual Meeting of the
    American Academy of Forensic Sciences, New Orleans.

60. Automobile Cigarette Lighter Burns.
    *J. Forensic Sci.*, **25**: 631-633 and 704, (1980).
    Smialek, J., Spitz, W.U. and Sacra, E.

61. Ethanol in Intracerebral Clot - Report of Two
    Homicidal cases with Prolonged Survival After Injury.
    *Am. J. of Forensic Medicine and Pathology*, **1** (2):
    149-150, (1980).
    Smialek, J., Spitz, W.U., and Wolfe, J.

62. Shotgun Wounds - Homicide or Self-Inflicted?
    *Michigan Police Officer,* **8:** (3), 24-27, (1980).
    Spitz, W.U.

63. Heroin Culture.
    *Michigan Police Officer,* **8:** (4), 23-27, (1980).
    Spitz, W.U.

64. Secondary Intracranial Subarachnoid Hemorrhage Due
    to Spinal Missile Injury.
    *J. Forensic Sci,* **26** (2): 431-434, (1981).
    Smialek, J., Chason, J., Kshirsager, V. and Spitz, W.U.

65. Concentration of Alcohol in Delayed Subdural Hematoma.
    *J. Forensic Sci.,* **28** (4): 1013-1015, (1983).
    Cassin, B. and Spitz, W.U.

66. Modernization of a Large Metropolitan Autopsy
    Facility. *Lipshaw Lab Leader,* **1** (2), (1984).
    Spitz, W.U.

67. Suicidal Electrocution in a Bathtub.
    *Am. J. For. Med. and Path.,* **6** (3): 276-278, (1985).
    Lawrence, R., Spitz, W.U. and Taff, M.

68. Intrapleural Golf Ball Size Loose Body:  An
    Incidental Finding at Autopsy.
    *Am. J. For. Med. and Path.,* **6** (4): 329-331, (1985).
    Spitz, W.U. and Taff, M.

69. Sudden Prisoner Deaths and 'Capture Myopathy'. [Letter]
    *JAMA,* **253** (1) 13: 1934, (1985).
    Spitz, W.U.

70. System for Deodorizing and Decontaminating Autopsy
    Rooms.  UNITED STATES PATENT number 4,600,557
    Date of Patent:  July 15, 1986.

71. The Amino Acid Sequence of Human Cardiac Troponin-C.
    *Muscle and Nerve,* **9**:  73-77, (1986).
    Romero, A., Lieska, N. and Spitz, W.U.

72. A Case of Suicidal Hanging in an Automobile.
    *Am. J. For. Med. and Path.,* **6** (4): 362-364, (1986).
    Hardwicke, M.B., Taff, M. and Spitz, W.U.

73. A Work-Related Death Due to a Penetrating Chest
    Injury.
    *Am. J. For. Med. and Path.,* **7** (2): 163-164, (1986).
    Katanick, D., Taff, M. and Spitz, W.U.

74. Sudden Death Resulting from Chicken Bone Perforation
of Esophagus.
*Am. J. For. Med. and Path.*, **7** (3): 263-265, (1986).
Russo, S., Taff, M., Ratanproeksa, O. and Spitz, W.U.

75. Fatal Thyrotoxic Crisis: A Case Report. *Am. J. For. Med.
Path.*, **7** (2): 174-176, (1986). Herman, G., Kanluen, S.,
Monforte, J., Husain, M., and Spitz, W.U.

76. An Unusual Case of Compression Asphyxia and Smothering.
*Am. J. For. Med. and Path.*, **7** (4), (1986).
Wolodzko, A., Taff, M., Ratanaproeksa, O. and
Spitz, W.U.

77. Syncope and Sudden Death Caused by Mitral Valve Myxomas.
*Am. J. For. Med. and Path.*, **7** (1): 84-86 (1986).
Puff, M., Taff, M., Spitz, W.U. and Eckert, W.

78. Scald Burns Complicated by Isopropyl Alcohol
Intoxication: A Case of Fatal Child Abuse.
*Am. J. For. Med. and Path.*, **7** (1): (1986).
Russo, S., Taff, M., Mirchandani, H., Monforte, J. and
Spitz, W.U.

79. Resuscitation and Petechiae.
*Am. J. For. Med. and Path.*, **9** (1): 35-37, (1988).
Hood, I., Ryan, D. and Spitz, W.U.

80. Determining Gender: Examination of Hair. [Letter]
*JAMA*, **260** (6): 851, (1988).
Spitz, W.U.

81. Award Citation: A Tribute to the Late Russell S. Fisher.
*Am. J. For. Med. and Path.*, **9** (4): 355-356, (1988).
Spitz, W.U.

82. The Case of the Sitting Corpse: Accident of Homicide.
*Am. J. For. Med. and Path.*, **10** (3): 242-244, (1989).
Spitz, W. U.

83. Necrotizing Fasciitis: A Fatal Outcome Following Minor
Trauma.
*Am. J. For. Med. and Path.*, **10** (3): 239-241, (1989).
Wojno, K. and Spitz W. U.

84. Fatal Accidents and Blood Ethanol Levels in Adolescents
and Adults - The Wayne County Experience 1978-1988.
*Am. J. For. Med. and Path.*, **10** (3): 187-192, (1989).
Hain, J.R., Ryan, D.M. and Spitz W. U.

85. Postmortem Cerebrospinal Fluid Pleocytosis.
*Am. J. For. Med. and Path.*, **10** (3): 209-212, (1989).

Platt, M.S., McClure, S., Clarke, R., Spitz W.U., and
Cox, W.

86. Killer Pop Machines.
*J. Forensic Sci.*, **35** (2): 490-492, (1990).
Spitz, D. J. and Spitz W. U.

87. Gastrointestinal Hemorrhage from an Internal Jugular
Abscess in an Intra-venous Drug Addict.
Ippolito, S. F. and Spitz, W. U.

88. *The Traffic Accident Victim* - Werner U. Spitz.
Chapter in - **HANDBOOK OF FORENSIC PATHOLOGY.**
Published by: College of American Pathologists.
Expected publication date is January 1990.

89. Sudden Death of an Elderly Man with Multiple
Malignant Neoplasms.
*Am. J. For. Med. and Path.*, 12 (3): 265-271, (1991).
Hardwicke, M.B., Taff, M., Spitz, W.U. and Gordan, R.

**90)** Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
Guidelines for the Application of Pathology to Crime
Investigation.** Third Edition, Spitz, W.U. (Editor). Springfield,
Illinois, Charles C. Thomas, 1993.

91. Spitz, W.U.: **Excited Delirium vs. Positional Asphyxia**,
Michigan Association of Medical Examiners Cross Section,
Summer, 2000.

92. Spitz, W.U.: **FORENSIC PATHOLOGY**,CD-ROM, Universal Multimedia, Inc.,
Costa Mesa, CA, 2000.

93) Spitz, W.U.: **Don't Be Intimidated,**
Michigan Association of Medical Examiners Cross Section,
Summer, 2000.

94. Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
Guidelines for the Application of Pathology to Crime
Investigation.** Fourth Edition, Spitz, W.U. (Editor). Springfield,
Illinois, Charles C. Thomas.


## PRESENTATIONS:

Guest Lecturer - Armed Forces Institute of Pathology
Annual course of forensic pathology - 1970 - 1991

Guest Lecturer - Louis Phillippe Mousseau Memorial
Lecture, Edmonton, Alberta, Canada
October 16, 1974

Guest Lecturer - Israel Association of Forensic Sciences
        Reconstruction of the events surrounding the
        assassination of President John F. Kennedy as
        feasible by analysis of his wounds
        Tel Aviv, Israel, March, 1980

Guest Lecturer - Asociacion Mexicana de Medicina Legal,
        Quinto Symposium International de Graduacion
        en Medicina Legal, Mexico City, August 28-30,
        1980

Guest Lecturer - Sixth South African International
        Conference of Legal Medicine, Johannesburg,
        South Africa, March 17-21, 1981

Guest Lecturer - First Pan American Symposium of Legal
        Medicine, Mexico City, Mexico, May 22-28, 1982

Guest Lecturer - Sociedad Mexicana de Medicina Forense,
        Criminologia y Criminalistica, A.C.
        Estados Unudos de America, Mexico
        July 21 - 27, 1985

Guest Lecturer - Edwin C. Yoder Honor Lecture
        Tacoma, Washington, November 15, 1985

Guest Lecturer - El Instituto Politecnico Nacional
        Mexico City, Mexico, October 12-15, 1986

Guest Lecturer - Primer Curso Internacional De Medicina
        Legal en La Mitad Del Mundo, Quito, Ecuador
        July 18 - 22, 1988

Guest Lecturer - Michigan Insurance Adjusters, Detroit,
        February 18, 1985

Lecturer - University of Windsor, Chemistry Department,
        March 15, 1985

Guest Lecturer - Beaumont Hospital, Royal Oak, Michigan
        March 29, 1985

Guest Lecturer - St. Johns Hospital, Detroit, Michigan
        April 12, 1985

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
        April 30, 1985

Chairman - Annual seminar - Wayne State University Continuing
        Education - Medical Legal Investigation of Death
        seminar.  May 9 - 11, 1985

Guest Lecturer - Detroit Police Seminar, Detroit, Michigan

May 17, 1985

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
October 15, 1985

Lecturer - Wayne County Judges, Detroit, Michigan
November 8, 1985

Lecturer - University of Windsor Law School, Windsor, Canada
December 4, 1985

Lecturer - Detroit College of Law School, Detroit, Michigan
Full day - January 15, 1986

Guest Lecturer - Grace Hospital, Detroit, Michigan
April 12, 1986

Guest Lecturer - Ontario Coroners Association, Niagara on the
Lake, Canada  April 10-11, 1986
Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
April 29-30, 1986

Guest Lecturer - Michigan Prosecutors Coordinating Council,
Shanty Creek, Michigan  May 3, 1986

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  May 8 - 10, 1986

Guest Lecturer - Michigan Insurance Adjusters Assn.,
Southfield, Michigan  May 13, 1986

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
Michigan  November 8, 1986

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
April 27, 1986

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  May 7 - 9, 1987

Guest Lecturer - Michigan/Ontario Identification Association,
Windsor, Canada  June 30, 1987

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
September 14, 1987

Chairman - Illinois Coroner's Association Seminar, Matoon,
Illinois  October 19-20, 1987

Lecturer - St. Clair Medical Examiners, Port Huron, Michigan

September 26, 1987

Guest Lecturer - Insurance Adjusters Assn., Detroit,
Michigan  November 16, 1987

Guest Lecturer - America Society of Clinical Pathologists
Seminar,  Chicago, Illinois  December 1, 1987.

Lecturer - Life, Accident and Health Claim Association,
Detroit, Michigan  January 19, 1988

Lecturer - Police Department Chaplains Assn., Farmington,
Michigan  March 14, 1988

Guest Lecturer - Wayne County Medical Society, Disaster
Planning Seminar, Detroit, Michigan  April 7, 1988.
Guest Lecturer - Michigan Trial Lawyers Association Seminar,
Southfield, Michigan  May 21, 1988.

Guest Lecturer - Wayne County Sheriff's School, Disaster
Planning Seminar, Romulus, Michigan  June 28-30,
1988.

Guest Lecturer - Dearborn Elks Loge 1945, Dearborn,
Michigan  July 27, 1988

Guest Lecturer - New York State Police Annual Seminar,
Albany, New York  October 4, 1988.

Lecturer - Michigan Association of Medical Examiners,
Midland, Michigan  October 14-16, 1988

Guest Lecturer - Douchess County Seminar, New York
November 12-14, 1988

Guest Lecturer - Michigan Trial Lawyers Association,
Southfield, Michigan  November 15, 1988.

Lecturer - Bon Secours Hospital Staff, Grosse Pointe,
Michigan  February 27, 1989

Guest Lecturer - Defense Attorneys Seminar, Lansing,
Michigan  April 21, 1989

Guest Lecturer - Seminar in Homicide Investigation,
Baltimore, Maryland  May 2, 1989

Guest Lecturer - Kiwanis Lecture, Westland, Michigan
May 15, 1989

Guest Lecturer - Macomb County Community College,
June 14, 1989

Guest Lecturer - Pathology Review Course, Lisle, Illinois
September 17-18, 1989

Guest Lecturer - New York State Police Academy, Albany,
New York  September 20-22, 1989

Lecturer - Michigan Association of Medical Examiners,
Midland, Michigan  September 29 to October 1, 1989

Guest Lecturer - Illinois State University, Accident Investigation,
Normal, Illinois  October 5-7, 1989

Guest Lecturer - American Society of Clinical Pathologist
December 4, 1989

Lecturer - St. John Hospital Emergency Room Staff, Detroit,
Michigan  February 28, 1990

Lecturer - University of Windsor, Chemistry Students,
Windsor, Canada  March 9, 1990

Guest Lecturer - Douchess County Seminar, New York
April 9-10, 1990

Guest Lecturer - University of North Florida, Accident Investigators,
Jacksonville, Florida April 17, 1990

Guest Lecturer - Colorado Institute of Criminal Justice,
Medical Legal Investigation of Death Seminar,
Denver, Colorado  April 19-20, 1990

Guest Lecturer - Michigan State Police Arson Investigation,
Tuskin, Michigan  April 23, 1990

Guest Lecturer - Federal Bureau of Investigation, Detroit,
Michigan  April 25, 1990

Guest Lecturer - Ohio Academy of Trial Lawyers, Toledo, Ohio
April 28, 1990

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  May 17 - 19, 1990

Guest Lecturer - University of Michigan, Pathology Course,
Ann Arbor, Michigan  September 11, 1990

Guest Lecturer - Michigan State Police Arson Investigation for Prosecutors,
Tuskin, Michigan  October 15, 1990

Guest Lecturer - University of North Florida, Accident
    Reconstruction, Jacksonville, Florida
    October 22-23, 1990

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
    Michigan  November 3, 1990

Lecturer - St. John Hospital Staff, Detroit, Michigan
    November 29-30, 1990

Guest Lecturer - 9th Annual Advanced Homicide Investigators
    Seminar, Toronto, Canada, February 12, 1991

Guest Lecturer - Macomb Bar Association, February 21, 1991

Guest Lecturer - 6th Medicolegal Investigation of Death Seminar
    Morgantown, West Virginia, April 6, 1991

Lecturer - Federal Bureau of Investigation's Third Annual Violent
    Crime Seminar, Ann Arbor, Michigan, April 24, 1991
Lecturer - Macomb Emergency Response Group, St. Clair Shores,
    Michigan, April 25, 1991

Lecturer - Michigan State Police's Third Annual Prosecutors
    School (Fatal Fire Investigation), Tustin, Michigan,
    April 29, 1991

Guest Lecturer - Grosse Pointe Jewish Council, Grosse Pointe,
    Michigan, April 30, 1991

Guest Lecturer - Michigan Probation Officers, Frankenmuth,
    Michigan, May 23, 1991

Lecturer - Institute of Police Technology and Management,
    Meriden, Connecticut, June 11, 1991

Lecturer - Pathology Review Course, Columbus, Ohio, May 27, 1991

Lecturer - St. John Hospital Emergency Room Physicians, Detroit,
    Michigan, May 29, 1991

Lecturer - Spectrum 91 International Symposium on Forensic
    Techniques, Detroit, Michigan, June 3, 1991

Lecturer - Institute of Police Technology and Management,
    Hartford, Connecticut, June 11, 1991

Guest Lecturer - University of Michigan Pathology Residents,
    Ann Arbor, Michigan, September 24, 1991

Lecturer - 1991 NYPD Colonel Henry F. Williams Homicide Seminar,
    Albany, New York, September 29, 1991

Guest Lecturer - Michigan Corrections Association 59th Annual
Conference, Mackinac Island, Michigan, October 2, 1991

Lecturer - Illinois State University, Accident Reconstruction
Conference, Bloomington, Illinois, October 10, 1991

Lecturer - Institute of Police Technology and Management,
Baltimore, Maryland, October 14, 1991

Guest Lecturer - 8th Israel Medical Week, Jerusalem, Israel,
November 5, 1991

Lecturer - University of Windsor, Chemistry Students,
Windsor, Canada, November 22, 1991

Guest Lecturer - Pontiac General Hospital Surgical Grand Rounds,
Pontiac, Michigan, December 9, 1991

Lecturer - St. John Hospital Staff, Detroit, Michigan
January, 31, 1992

Lecturer - Federal Bureau of Investigation's Fourth Annual Violent
Crime Seminar, Ann Arbor, Michigan, April 15, 1992

Guest Lecturer - Wayne County Medical Society, Detroit, Michigan,
May 5, 1992

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Romulus, Michigan, May 13 and 14, 1992

Lecturer - 1992 NYPD Colonel Henry F. Williams Homicide Seminar,
Albany, New York, September 20, 1992

Lecturer - 1er Congreso Nacional De Ciencias Periciales En El
Estado De Mexico, Mexico, September 21 to 23, 1992

Guest Lecturer - Macomb Emergency Response Group, St. Clair
Shores, Michigan, October 8, 1992

Lecturer - Michigan Association of Medical Examiners, Midland,

Michigan, October 17, 1992

Lecturer - Simposium Internacional De Medicina Legal 92,
Guayaquil, Ecuador, October 30, 1992

Lecturer - Harper Hospital Pathology Residents, Detroit,
Michigan, November 11 and 18, 1992

Guest Lecturer - General Motors Research Chapter of Sigma Xi,
Warren, Michigan, December 8, 1992

Lecturer - University of Windsor, Chemistry Students,
Windsor, Canada, February 12, 1993

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
Monterey, California, February 13, 1993

Lecturer - St. John Hospital Staff, Detroit, Michigan
March 29, 1993

Lecturer - Federal Bureau of Investigation's Fourth Annual Violent
Crime Seminar, Ann Arbor, Michigan, April 20, 1993

Guest Lecturer - Wayne County Medical Society, Detroit, Michigan,
April 21, 1993
Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Detroit, Michigan, April 22 and 23, 1993
Guest Lecturer - Criminal Defense Attorneys, Southfield,
Michigan  April 24, 1993

Guest Lecturer - New York Society of Forensic Sciences, Lehman
College, Bronx, New York, April 28, 1993

Lecturer - Grace Hospital Staff, Detroit, Michigan
May 18, 1993

Lecturer - Pathology Review Course, Chicago, IL, May 24, 1993

Lecturer - Traffic Crime Seminar, Toronto, Canada, June 1, 1993

Lecturer - Medicolegal Investigation of Death Seminar, Grand
Junction, Colorado, August 26 to 28, 1993

Lecturer - 1993 NYPD Colonel Henry F. Williams Homicide Seminar,
Albany, New York, September 18, 1993

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
Monterey, California, February 19, 1994

Lecturer - Detroit Academy of Medicine, March 8, 1994

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Detroit, Michigan, March 24 and 25, 1994

Lecturer - Harper Hospital Staff, Detroit, Michigan
March 31, 1994

Lecturer - Detroit Riverview Hospital, Detroit, Michigan

April 15, 1994

Lecturer - Pathology Review Course, Cincinnati, Ohio, May 24, 1994

Guest - CNN, Larry King Live, O.J. Simpson, June 29, 1994

Guest - David Newman Show, WHYZ, Detroit, Michigan  July 6, 1994

Lecturer - CPDA Homicide Seminar, Napa Valley, California,
      August 27, 1994

Guest Lecturer - City of Southfield, Emergency Management
      Director, Southfield, Michigan, September 8, 1994

Lecturer - 1994 NYPD Colonel Henry F. Williams Homicide Seminar,
      Albany, New York, September 27, 1994

Lecturer - 1994 New York Police Department, Pokeepsie, New York,
      October 6 and 7, 1994

Lecturer - Michigan Association of Medical Examiners, Midland,
      Michigan, October 29, 1994

Lecturer - St. John Hospital Staff, Detroit, Michigan
      December 8, 1994

Lecturer - Macomb County Prosecutors and Police, Mt. Clemens,
      Michigan, January 19, 1995

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
      Monterey, California, February 19, 1995

Lecturer - Medical Transcriptionists Assn., Bloomfield Hills,
      Michigan, March 11, 1995

Chairman - Annual seminar - Wayne State University Continuing
      Education - Medical Legal Investigation of Death
      seminar, Detroit, Michigan, March 23 and 24, 1995

Lecturer - Pathology Review Course, Baltimore, Maryland,
      April 2, 1995

Lecturer - Federal Bureau of Investigation's Sixth Annual Violent
      Crime Seminar, Ann Arbor, Michigan, April 11, 1995

Lecturer - Pathology Review Course, Chicago, Illinois
      May 7, 1995

Lecturer - ASCP, Williamsburg, Virginia, June 21, 1995

Lecturer - 1995 NYPD Colonel Henry F. Williams Homicide Seminar,
      Albany, New York, September 17, 1995

Lecturer - Sterling Heights Citizens Police Academy, Sterling
    Heights, Michigan, October 5, 1995

Lecturer - Wayne County Judges, Detroit, Michigan, October 8, 1995

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
    Michigan, November 3, 1995

Lecturer - Medical Examiner's staff, Big Rapids, Michigan,
    November 4, 1995

Lecturer - Detroit College of Law, Detroit, Michigan, November 15,
    1995

Member - Organ Donation Panel, Lansing, Michigan, November 19,
    1995

Lecturer - Grand Rapids Airport Personnel, Grand Rapids, Michigan,
    December 4, 1995

Lecturer - Beaumont Hospital Staff, Royal Oak, Michigan  January
    24, 1996

Chairman - Annual seminar - Wayne State University Continuing
    Education - Medical Legal Investigation of Death
    seminar, Detroit, Michigan, March 21 and 22, 1996

Lecturer - Flight Nurses Assn., Midland, Michigan, March 29, 1996

Lecturer - Pathology Review Course, Chicago, Illinois
    May 13, 1996

Lecturer - Carteret County Medical Society, North Carolina
    May 16, 1996

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
    Michigan, May 28, 1996

Lecturer - Criminal Defense Attorneys, Lima, Ohio, September 20,
    1996

Lecturer - 1996 NYPD Colonel Henry F. Williams Homicide Seminar,
    Albany, New York, September 29, 1996

Guest Lecturer - Forense' 96, International Congress, Sao Paulo,
    Brazil, October 6 to 12, 1996
Lecturer - Death Investigation Seminar, Springfield, Illinois
    October 15-16, 1996

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
    Michigan, November 5, 1996

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
Michigan, February 25, 1997

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Detroit, Michigan, March 6 and 7, 1997

Guest Lecturer - Rush Presbyterian - St. Luke's Medical Center,
Department of Pathology, March 24, 1997

Guest Lecturer - Criminal Defense Attorneys, Novi, Michigan
April 4, 1997

Lecturer – Grosse Pointe Woods Counsel, May 15, 1997

Lecturer – Oakland ANA ER Nurses, May 8, 1997

Lecturer – City of Grosse Pointe Woods Department of Public Safety,
June 19, 1997

Lecturer – Oakland County Emergency Nurses Association,
October 8, 1997

Lecturer – Wayne State University Health Center – ER Residents,
November 20, 1997

Lecturer – Sex, Science and Criminal Defense: A Medical-Legal Seminar –
Ohio Association of Criminal Defense Lawyers,
March 27, 1998

Lecturer – Medicolegal Investigation of Death Seminar -
Robert C. Byrd Health Sciences Center of West Virginia,
April 25, 1998

Lecturer – Death Penalty Seminar, Ohio, May 14, 1998

Lecturer – Osler Toledo, May 16, 1998

Lecturer - Wolfreiser, June 18, 1998

Lecturer – Collinsville, Illinois, August 24-26, 1998

Lecturer – University of Michigan Department of Pathology,
September 22, 1998

Lecturer – Macomb County – Traffic Evidence, October 6, 1998

Lecturer – Michigan State Police Forensic Science Laboratory,
October 21, 1998

Lecturer – Michigan Association of Medical Examiners Annual Conference,

October 23-25, 1998

Lecturer - Pattern Injury – Nurse Examiner Conference, June 28, 1999

Lecturer – Criminal Advocacy Program, September 10, 1999

Lecturer – New York State Police – Colonel Henry F. Williams
    Homicide Seminar, September 18, 1999

Lecturer – Chicago, September 25, 1999

Lecturer – Forensic Investigation: Blueprint for Failure –
    Techniques & Strategies in Forensic Investigation –
    27th Annual Florida Medical Examiners & 7th Annual
    Investigation for Identification Combined Educational Conference,
    October 1, 1999

Lecturer – Port Huron, Michigan, October 19, 1999

Lecturer – Advocates Polish American Bar Association, October 21, 1999

Lecturer – GPJC Adult Cultural October Doubleheader, October 27, 1999

Lecturer – Erie County Bar Association, Sandusky, Ohio, December 10, 1999

Lecturer – American Academy of Forensic Science – Odontology Section,
    February 25, 2000

Lecturer – 17th Annual Emergency & Critical Care Conference –
    Survival Flight – University of Michigan Flight Nurses, March 10, 2000

Lecturer – Life in the Balance 2000: Defending Death Penalty Cases,
    March 25-28, 2000

Lecturer – Cases & O.J. Simpson, Port Huron, Michigan, May 16, 2000

Lecturer – St. John Hospital, November 1, 2000

Lecturer – National Seminar on Forensic Evidence and the Criminal Law –
    Philadelphia, Pennsylvania, November 2-5, 2000

Lecturer – University of Michigan – Department of Pathology,
    December 5, 2000

Lecturer – Balistics & Trauma – St. John Surgical & ER Physicians,
    January 18, 2001

Lecturer – Criminal Defense Attorneys of Michigan – Doubletree Hotel,
    Novi, Michigan March 1-3, 2001

Lecturer – Life in the Balance 2001: Defending Death Penalty Cases –
    National Legal Aid & Defender Association, March 3-6, 2001

Lecturer – Expert of All Sorts seminar – Ohio Association of Criminal
Defense Lawyers, May 4, 2001

Lecturer – Famous Medical Mysteries – The Mamonides Society,
February 28, 2002

Lecturer – Michigan Funeral Directors – Frankenmuth, Michigan, March 7, 2002

Lecturer – 18th Annual Emergency & Critical Care Conference –
Survival Flight – University of Michigan Flight Nurses, March 8, 2002

Lecturer – National Legal Aid & Defender Association – Kansas City,
March 12, 2002

Lecturer – Federal HAT Counsel – New Orleans, April 12, 2002

Lecturer – SANE Nurses – Macomb Community College, May 8, 2002

Lecturer – MESI Class – West Branch, Michigan, May 10, 2002

Lecturer – Bluewaterland Emergency Care Conference – Sarnia,
Ontario, Canada, May 31, 2002

Lecturer – Montpelier, France, September 2 - 7, 2002

Lecturer – Henry F. Williams Homicide Seminar – Albany, New York,
September 22, 2002.

Lecturer – Jahrestagung Deutsche Gesellschaft fur Rechtsmedizin – Ronstock,
Germany, September 24 - 25, 2002.

Lecturer – Advocates, Polish American Bar Association – Hamtramck,
Michigan, February 13, 2003.

Lecturer – 19th Annual Emergency & Critical Care Conference – University of
Michigan Survival Flight Nurses, March 21, 2003.

Lecturer - Medical Examiners Investigators Training -
Genesee & Lapeer County, Michigan, April 14, 2003.

Lecturer - Indiana State Coroner's Association -
Clarksville, Indiana, June 23, 2003.

Lecturer - Accident Reconstruction, Sterling Heights, Michigan,
October 3, 2003.

Lecturer - Osler - Chicago Lecture, November 2, 2003.

Lecturer - Turning Point's Forensic Nurse Examiner Program, -
Macomb County Community College, January 20, 2004.

Lecturer - Funeral Directors Meeting, Patterns of Injury - Frankenmuth,
    Michigan, March 11, 2004.

Chairman - Annual Seminar 28th year - Wayne State University
    Continuing Education - Medical Legal Investigation of Death seminar.
    April 21-23, 2004.

Lecturer - Colonel Henry F. Williams Homicide Seminar -
    Albany, New York, October 4, 2004.

Lecturer - Medical Examiners Investigators Training -
    Port Huron, Michigan, October 6, 2004.

Lecturer - Indiana Division of the International Association for
    Identification - Fort Wayne, Indiana, October 19, 2004

Lecturer - Saint Mary's Emergency Trauma Conference -
    Saginaw, Michigan, October 22, 2004.

Lecturer - Turning Point's SANE nurses seminar, Macomb County
    Community College, November 12, 2004.
Lecturer - Survival Flight - 21 Annual Emergency and Critical Care Conference,
    University of Michigan, March 17, 2005.

Lecturer - Interpretation of injuries - 19th Medicolegal Investigation of Death Seminar,
    University of West Virginia in Morgantown, West Virginia, April 2, 2005.

Lecturer - Wayne State  Wayne State University Continuing
    Education - Medicolegal Investigation of Death
    seminar, Detroit, Michigan, April 20-22, 2005.

Lecturer - Wisconsin Coroner and Medical Examiner Association, Wisconsin - key
note
    speaker for Medical Examiner and Coroners in significance of Forensic
Pathology.
    June 6-7, 2005

Lecturer - New York State Police HFW Seminar - 18th Annual Colonel Henry F.
    Williams Homicide Seminar, Albany, New York, September 18, 2005

Lecturer - 11th Annual Investigation for Identification Educational Conference -
    Patterned Injuries, Tall Tales - Pensacola, Florida, September 30, 2005

Lecturer - Turning Point's SANE nurses seminar, Macomb County
    Community College, November 4, 2005
Lecturer - Survival Flight - 22nd Annual Emergency and Critical Care Conference,
    University of Michigan, March 26, 2006.

Lecturer - Wayne State, Wayne State University Continuing
    Education - Medicolegal Investigation of Death
    seminar, Detroit, Michigan, April 26-28, 2006.

Lecturer - Henry Ford Academy, Introduction to Forensic Investigation, October 30, 2006.

Lecture - Wayne State  Wayne State University Continuing
Education - Medicolegal Investigation of Death
seminar, Las Vegas, Nevada, November 29-December 1, 2006.

Lecture - Survival Flight - 23rd Annual Emergency and Critical Care Conference,
University of Michigan, March 22, 2007.

## COURSES TAUGHT AT WAYNE STATE (1988 to PRESENT)

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  2005 is the 29th year.

1988    October 5, 12, 19 and 26
November 2, 9, 16, 23, and 30
December 7 and 14
Forensic Pathology course for Pathology Residents

1988    November 4 and 7
Forensic Pathology course for Sophomore Medical
Students

1988    November 3
Forensic Pathology course for Sophomore Medical
Students

1990    October 26
Forensic Pathology Course for Sophomore Medical
Students

1991    October 9
Forensic Pathology course for Pathology Residents

1991    October 16
Forensic Pathology course for Pathology Residents

1991    October 23
Forensic Pathology course for Pathology Residents

1991    October 25
Forensic Pathology Course for Sophomore Medical
Students

1992    October 23
Forensic Pathology Course for Sophomore Medical
Students

1993    March 31
Forensic Anthropology

1994   April 21
    Forensic Anthropology


dk:kb:curriculumv.wpd

54

STATE OF LOUISIANA
## DEPARTMENT OF EDUCATION
BATON ROUGE, LOUISIANA
STATE-APPROVED HIGH SCHOOLS

RTIFICATE OF
3H SCHOOL
EDITS

| ME OF STUDENT (Name in full, including middle name) | | | Date of Birth | Sex | Race | Date of Graduation |
|---|---|---|---|---|---|---|
| Alfred Bourgeois | | | 7/22/64 | M | B | 5/24/83 |

| ME OF SCHOOL | PARISH | ADDRESS | | Zip Code | PHONE NO. |
|---|---|---|---|---|---|
| Lutcher High | St. James | Lutcher, LA | | 70071 | 869-5741 |

**TO THE PRINCIPAL:** Make for each applicant for graduation duplicate certificates (one white, one pink). Seven days prior to graduation, forward both copies to the State Director of Secondary Education. After approval, one copy will be returned. Please use typewriter.

| st each subject separately as indicated in state program of studies giving the ict title of subject) | | Year Credit Earned | Number of Weeks | Minutes per Week | Mark Received | Unit Credit | Remarks: Enter the names of schools in which outside crec were earned. |
|---|---|---|---|---|---|---|---|
| ENGLISH | ENGLISH I | 1 | 36 | 300 | C | 1 | |
| | ENGLISH II | 2 | 36 | 300 | D | 1 | |
| | ENGLISH III | 4 | 36 | 300 | D | 1 | |
| | ENGLISH ( Speech I ) | 3 | 36 | 300 | C | 1 | |
| EE ENTERPRISE | Free Enterprise | 2 | 18 | 300 | C | ½ | |
| MATH | Math I | 1 | 36 | 300 | C | 1 | |
| | Math II | 2 | 36 | 300 | D | 1 | |
| | Algebra I | 3 | 18 | 300 | D | ½ | |
| | Consumer Math | 4 | 18 | 300 | C | ½ | |
| CIAL STUDIES | CIVICS | 1 | 36 | 300 | C | 1 | |
| | AMERICAN HISTORY | 3 | 36 | 300 | C | 1 | |
| | Economics | 2 | 18 | 300 | D | ½ | |
| | Geography | 4 | 36 | 300 | D | 1 | |
| | Afro Am. History | 4 | 18 | 300 | B | ½ | |
| SCIENCE | Gen. Science | 1 | 36 | 300 | C | 1 | |
| | Biology | 3 | 36 | 300 | D | 1 | |
| HEALTH AND PHY. ED. | H. & P. E. I | 1 | 36 | 300 | B | 1 | |
| | H. & P. E. II | 2 | 36 | 300 | C | 1 | |
| | H & PE III | 3 | 18 | 300 | C | ½ | |
| | H & PE IV | 4 | 36 | 300 | C | 1 | |
| OREIGN LANG. | | | | | | | |
| JOURNALISM | | | | | | | |
| SPEECH | | | | | | | |
| AGRICULTURE BUS./OFFICE DIST. ED. HEALTH OCC. HOME ECON. IND. ARTS T. AND I. VOC. TECH. | Agriculture I | 1 | 36 | 300 | D | 1 | |
| | Basic Drafting | 4 | 36 | 300 | C | 1 | |
| | Independent Living | 4 | 18 | 300 | D | ½ | |
| ART MUSIC SAFETY AND OTHER ELECTIVES | Beg. Band | 2 | 36 | 300 | B | 1 | |
| | General Music | 3 | 36 | 300 | C | 1 | |
| | Art 1 | 4 | 36 | 300 | D | 1 | |
| | | | | | TOTAL UNITS | 22 | |

**To the State Director of Secondary Education:**
I hereby certify that the above-named student has successfully completed the high school work shown above, and that he has complied with all the requirement: prescribed by the State Board of Elementary and Secondary Education for graduation from a State-Approved High School, and that there is now in my office or file a complete record of this student's work, including a cumulative record of attendance and scholarship.

JBSCRIBED TO THIS 24th DAY OF May 19 83 AT Lutcher LOUISIANA

PPROVED: DIRECTOR OF SECONDARY EDUCATION

SIGNATURE OF SCHOOL PRINCIPAL

55

# Lloyd B. Johnson

**ST. JOHN THE BAPTIST PARISH**
**SHERIFF AND EX—OFFICIO TAX COLLECTOR**

**P.O. DRAWER Q**                    **PHONE: 652-9581**

**LA PLACE, LOUISIANA 70069-1116**

May 6, 1985

TO:  Sheriff Lloyd B. Johnson
     P. O. Drawer Q
     LaPlace, Loiusiana      70069

RE:  Recruit Alfred Bourgeois

From: Lt. David M. Wilson

    On May 6, 1985, Recruit Alfred Bourgeois failed to meet the
Police Officer Standards and Training (P. O. S. T.) as pertains
to firearms qualifications. Mr. Bourgeois has received fifty-four
hours of training and instruction in the use of his service revolver.
On April 23, 1985, Mr. Bourgeois was given his first opportunity to
qualify. In his effort to qualify Mr. Bourgeois failed to fire the
225 point qualifying average. Mr. Bourgeois score was 178.5 out of
a possible 300 points. After his failure to qualify Mr. Bourgeois
was given eight (8) additional hours of instruction and training in
the use of his service revolver. On May 6, 1985, Mr. Bourgeois was
again given the opportunity to fire the P. O. S. T. course for score.
On this date Mr. Bourgeois fired a 222.75 average out of 300 points.
Note: P. O. S. T. requires a 225 or 75% minimum score to qualify.
Mr. Bourgeois has as of this date May 6, 1985, fired one thousand
one hundred forty (1,140) rounds of ammunition in his practice sessions
and attempts to qualify with his service revolver.
    In addition to the time spent firing on the range Mr. Bourgeois
had been given five examinations. Four of the five examinations
pertained to his firearms training and the fifth test to basic police
procedures. Of these five examinations given, Mr. Bourgeois has failed
to meet a 70% passing score on two of the five examinations.
    Due to Mr. Bourgeois not meeting the P. O. S. T. standards for
firearms qualifications and due to his poor performance scholastically,
it is my belief that further training would be unfruitful and unwarranted.
    It is my opinion that Recurit Alfred Bourgeois not be considered
for permanent employment with the St. John the Baptist Parish Sheriff's
Office at this time.

Sincerly,

Lt. David M. Wilson
P. O. S. T. Firearms
Training Instructor

56

*Morris & McDaniel, Inc.*

MANAGEMENT CONSULTANTS

formerly
THE PSYCHOLOGICAL SERVICE CENTER
OF NEW ORLEANS, INC.

2918 NAPOLEON AVENUE, SUITE B
NEW ORLEANS, LOUISIANA 70115
(504) 897-0640

**MAX H. McDANIEL, Ph.D.**
President

**DAVID M. MORRIS, Ph.D., J.D.**
Vice President

**MARILYN K. QUAINTANCE, Ph.D**
Vice President of Marketing
Director of Washington Office

**THOMAS J. HANNIE, Jr., Ph.D.**
Vice President, Clinical Psychology

**JOE F. NASSAR, M.P.A.**
Vice President of Operations

STAFF CONSULTANTS:
DOUGLAS A. GREEN, M.S.
SHANE PITTMAN
JAN WALKER, M.S.

WASHINGTON D.C. OFFICE:
912 PRINCE STREET
ALEXANDRIA, VIRGINIA 22314
(703) 836-3600

JACKSON OFFICE:
741 NORTH CONGRESS
P.O. BOX 104
JACKSON, MISSISSIPPI 39205
(601) 353-0640

May 22, 1985

## PSYCHOLOGICAL EVALUATION

Name:                           Alfred Bourgeois

Age:                            20 Years

Evaluation Date:                4/12/85

Evaluated By:                   Max H. McDaniel, Ph.D.
                                Douglas A. Green, M.S.

Referred By:                    St. John the Baptist Parish Sheriff's Office

Techniques Utilized:            Background Interview
                                Behavioral Observations
                                Psychological/Social History Questionnaire
                                Minnesota Multiphasic Personality Inventory

### Background Interview and Behavioral Observations

Mr. Alfred Bourgeois was seen at this office for the purpose of determining his psychological adaptability to work as a sheriff's deputy with St. John Parish Sheriff's office. It was learned in a background interview that Mr. Bourgeois was raised by his mother and describes his childhood as happy. He apparently did not get along well with the father. There were six other children in the family.

Mr. Bourgeois reports he graduated from Lutcher High School in 1983. He rates his intelligence as average, but says he did repeat a grade. He says he got mostly C's and does not remember ever getting in trouble while in school.

Mr. Bourgeois says he grew-up in a wealthy family and there was little disagreement in the family about financial matters. He says he currently

makes between $15,000 and $20,000 which is a reduction in income during the past two years.

Mr. Bourgeois is presently unemployed. He worked for several years at Winn Dixie while he was in high school and later worked at Delchamps. After high school he got a job with Louisiana Power and Light Company as a meter reader and was there about five and a half months. At that time he was involved in an accident with a three wheeler and was not able to continue working. He was let go since his six months probationary period was not up. He said he enjoyed his job at LP & L and enjoyed the responsibility he had reporting irregularities to the company.

Mr. Bourgeois says he never used illegal drugs and has never used alcohol. He reports no family history with substance abuse and says that he has never used cigarettes. He reports no past health problems other than the accident he had with the three wheeler where he broke his leg. He is not under a physician's care at the present time and is not taking any medication.

Mr. Bourgeois is single and is presently living with his uncle. His family has helped support him since his unemployment ran out following his lay off from LP & L. He says he has never been married, but is the parent of two children.

Mr. Bourgeois says his interest in police work stems from his belief in right and wrong. He says he likes the social contact in police work and feels very strongly about crime in general.

Mr. Bourgeois was on time for the testing session and cooperated well throughout. He seemed reasonably open in discussing acground kground information and overall made an adequate impression.

Test Results

Results of the Minnesota Multiphasic Personality Inventory indicate for the most part that Mr. Bourgeois' scores fall within the normal or acceptable range with two exceptions. He appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals. He appears to be somewhat anxious and nervous at times and appears to worry excessively. His self-esteem does not appear to be very good. As he indicated during the interview, he presents himself as a very traditional and moralistic individual.

The following rating scales are based on research and standard interpretation of the Minnesota Multiphasic Personality Inventory. These ratings are based on scale elevations and are considered helpful indices when evaluating an applicant's potential occupational adjustment.

```
**********************
* Openness to Evaluation *
**********************
```

| Overly<br>Frank | Quite<br>Open | Adequate | Overly<br>Cautious | Guarded | Indeterminate |
|---|---|---|---|---|---|
| | | ——X——— | | | |

```
**********************
*    Social Facility    *
**********************
```

| Excellent | Good | Adequate | Problems<br>Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
**********************
*   Addiction Potential   *
**********************
```

| Low | No Apparent<br>Problem | Problems<br>Possible | Moderate | High | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
**********************
*   Stress Tolerance   *
**********************
```

| High | Good | Adequate | Problems<br>Possible | Low | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
**********************
* Overall Adjustment *
**********************
```

| Excellent | Good | Adequate | Problems<br>Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

## Summary and Conclusion

In summary, Mr. Alfred Bourgeois is an individual with a short work
experience at Louisiana Power and Light Company as a meter reader who is
interested in becoming a law enforcement officer. He shows some borderline
tendencies toward problems in the psychological area. He seems to be a
rather moralistic individual who believes in right and wrong, however, he
shows feelings of inadequacy and problems in evaluating his self-worth.
He shows very strong ambition, but is not clear about what he wants or how
to get it. These problems are likely to be seem in his behavior as
frequent indecision and an inability to work consistently at one thing.

Recommendations

Mr. Alfred Bourgeois is not recommended for a position with the St. John Parish Sheriff's Office at this time.

Max H. McDaniel, Ph.D.
Industrial Psychologist

MHM:

57

Louisiana
**Motor Vehicle Lease Agreement**

1-800-727-7000

Lessee (and Co-Lessee) – Name and Address (including Zip):
ALFRED BOURGEOIS
3192 BEND LANE
PAULINA, LA 70763 - ST JAMES   Paulina, LA 70763

Lessor – Name and Address:
LAMARQUE FORD, INC
3101 WILLIAMS BLVD
KENNER, LA 70065

"Ford Credit" is Ford Motor Credit Company. The "Holder" is FORD CREDIT, and its assigns.
By signing "You" (Lessee and Co-Lessee) agree to lease this Vehicle according to the terms on the front and back of this lease.

| New/Used/Demo | Mileage to Delivery | Year Make/Model | GVW & Truck (lbs) | Vehicle ID # | Vehicle Use |
|---|---|---|---|---|---|
| NEW | 25 | 2001 FORD EXPEDITION | | 1FMRU17L61LA66100 | P |

**1. Amount Due At Lease Signing or Delivery (Itemized below)** $ 9476.61

**2. Monthly Payments**
Your first monthly payment of $ 476.61 is due on 01/10/01 and was by 35 payments of $ 476.61 on the 10TH day of each month. The total of Your monthly payments is $ 17157.96

**3. Other Charges** (not part of Your monthly payment) N/A

**4. Total of Payments** (The amount You will have paid by the end of the lease) $ 26157.96

**5. Amounts Due At Lease Signing or Delivery:**
a. Capitalized cost reduction $ 9000.00
b. First monthly payment 476.61
c. Refundable security deposit N/A
d. Title fees N/A
e. Registration fees N/A
Total $ 9476.61

**6. How the Amount Due at Lease Signing or Delivery will be paid:**
a. Net trade-in allowance $ N/A
b. Rebates and noncash credits N/A
c. Amount to be paid in cash 9476.61
Total $ 9476.61

**7. Your monthly payment is determined as shown below:**
a. Gross capitalized cost. $ 40000.00 ... $ 49715.50
b. Capitalized cost reduction. 9000.00
c. Adjusted capitalized cost. = 31215.50
d. Residual value. = 20345.00
e. Depreciation and any amortized amounts. = 11370.50
f. Rent charge. + 4664.98
g. Total of base monthly payments. = 16035.48
h. Lease payments. + 35
i. Base monthly payment. = 445.43
j. Monthly sales/use tax. + 31.18
k. N/A +
l. N/A +
m. Total monthly payment. $ 476.61
n. Lease term in months. 36

**10. Purchase Option at End of Lease Term**
$ 20345.00 plus official fees...

**12. OFFICIAL FEES AND TAXES** $ 1837.98

**18. Itemization of Gross Capitalized Cost**

| Agreed Upon Value of the Vehicle | Sales Tax & Other Applicable Taxes | Title Fees | License & Registration Fees | Extended Warranty & Service Contract | Lessor Services | Acquisition Fee |
|---|---|---|---|---|---|---|
| $ 40000.00 | $ 830.00 | $ 26.50 | $ 44.00 | N/A | N/A | N/A |

| Documentation Fee | Life Insurance Premium | Disability Insurance Premium | | | NOTARY FEE | Total Gross Capitalized Cost |
|---|---|---|---|---|---|---|
| $ N/A | $ N/A | $ N/A | N/A | N/A | 15.00 | $ 49715.50 |

**SIGNATURES AND IMPORTANT NOTICES**

Lessee: Alfred Bourgeois
Co-Lessee:

Lessor: LAMARQUE FORD, INC

Questions?? Contact Ford Credit at 1-800-727-7000 or www.fordcredit.com
NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION

FC-1572S-P NOV 00
Previous editions may NOT be used.

## VEHICLE MAINTENANCE, INSURANCE AND USE

**17. VEHICLE USE AND SUBLEASING** You will not use, or permit others to use the Vehicle (a) in violation of any law, (b) contrary to the provisions of any insurance policies covering the Vehicle, (c) outside the state where first titled or registered for more than 30 days without Ford Credit's written consent, (d) outside the United States, except for less than 30 days in Canada or (e) as a private or public carrier. You will keep the lease and Vehicle free of all liens and encumbrances. You will not assign or sublease any interest in the Vehicle or lease without Ford Credit's written consent.

**18. VEHICLE MAINTENANCE AND OPERATING COSTS** Proper Vehicle maintenance is Your responsibility. You must maintain and service the Vehicle at Your own expense, using materials that meet the manufacturer's specifications. This includes following the owner's manual and maintenance schedule, documenting maintenance performed, and making all needed repairs. You are also responsible for all operating costs such as gas and oil. Lessor will provide the service(s), if any, identified in the Lessor Services section under the terms of a separate agreement. The manufacturer will invalidate warranty coverage on parts affected by a failure to maintain the Vehicle as required by the manufacturer. (See Lessor Services on the back of lease)

**19. DAMAGE REPAIR** You are responsible for repairs of All Damage which are not a result of normal wear and use. These repairs include, but are not limited to, those necessary to return the Vehicle to its preaccident condition, including repairs to Exterior Sheet Metal and Plastic Components, and to Vehicle Safety Systems, including air bag, seat belt and bumper system components. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts or those of equal quality. Discuss this replacement with Your insurance company prior to signing a collision repair estimate or before authorizing any collision repair work.

If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

**20. VEHICLE INSURANCE** You must insure the Vehicle during this lease. This insurance must be acceptable to Ford Credit and protect You and Holder with (a) comprehensive fire and theft insurance with a maximum deductible,

amount of $ (    ) (b) collision and upset insurance with a maximum deductible of    and (c) automobile liability insurance with minimum limits for bodily injury or death of $10,000 for any one person and $20,000 for any one accident, and $10,000 for property damage. If the state in which You title/register the Vehicle establishes or changes the minimum automobile liability insurance limits greater than those listed above for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by the state. These amounts may not be sufficient to cover all Your liabilities. You may wish to conduct Your insurance advisor about obtaining additional coverage. You will list the loss payee and additional insured as requested by Lessor. You must give Ford Credit evidence of this insurance.

You authorize Ford Credit, on Your behalf, to receive and endorse checks or drafts, and settle or release any claim under the insurance related to Holder's ownership of the Vehicle. You also assign to Holder any other insurance proceeds related to this lease or Holder's interest in the Vehicle.

If You or Ford Credit obtain a refund for amounts paid to third parties for insurance, service contracts, or any other amount paid to a third party included in the Gross Capitalized Cost of this lease, You must pay to the Holder the entire amount of the refund and You authorize the Holder to subtract the refund from the amount You owe under this lease.

### LESSOR IS NOT PROVIDING VEHICLE INSURANCE OR LIABILITY INSURANCE

YOU ARE REQUIRED TO OBTAIN AND MAINTAIN VEHICLE INSURANCE IN CONNECTION WITH THIS LEASE. YOU MAY PROVIDE THE REQUIRED COVERAGE THROUGH EXISTING POLICIES OF INSURANCE. ANY COVERAGE OR THROUGH ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN LOUISIANA.

If You title/register the Vehicle in, or change the garage location of the Vehicle, to a state where Ford Credit has established minimum automobile liability insurance limits greater than those listed above for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by Ford Credit.

## ENDING YOUR LEASE

**21. TERMINATION** This lease will terminate (end) upon (a) the end of the term of this lease, (b) the return of the Vehicle to Lessor, and (c) the payment by You of all amounts owed under this lease. Ford Credit may cancel this lease if You default.

**22. RETURN OF VEHICLE** If You do not buy the Vehicle, at lease end You must return it to Lessor unless Ford Credit specifies another place. If You fail to return the Vehicle, You must continue to pay the monthly payments plus other damages to Ford Credit, including amounts payable under default. Payment of these amounts will not allow You to keep the Vehicle.

**23. STANDARDS FOR EXCESS WEAR AND USE** You are responsible for all repairs to the Vehicle, that are not the result of normal wear and use. These repairs include, but are not limited to those necessary to repair or replace: (a) Tires which are unmatched, unsafe or have less than 1/8 inch of remaining tread in any place; (b) Electrical or Mechanical defects or malfunctions; (c) Glass, Paint, Body Panels, Trim and Grill Work that are broken, mismatched, chipped, scratched, pitted, cracked, or if applicable, dented or rusted; (d) Interior rips, stains, burns or worn areas; and (e) All Damage which would be covered by collision or comprehensive insurance whether or not such insurance is actually in force. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts or those of equal quality. Your use or repair of the Vehicle must not invalidate any warranty.

If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

**24. ODOMETER STATEMENT** Federal law requires You to complete a statement of the Vehicle's mileage at the end of this lease.

**25. VOLUNTARY EARLY TERMINATION AND RETURN THE VEHICLE** You may terminate this lease early, if You are not in default, by returning the Vehicle to Lessor and paying the following: (a) an early termination fee of $200, plus (b) the difference, if any, between the Unpaid Adjusted Capitalized Cost and the Vehicle's Fair Market Wholesale Value, plus (c) all other amounts then due under this lease. You will never pay more than the sum of the remaining unpaid lease payments, plus any excess wear and use and mileage charges, and all other amounts then due under this lease.

**VOLUNTARY EARLY TERMINATION AND PURCHASE THE VEHICLE** You may purchase the Vehicle from Lessor at any time for the sum of the remaining payments, less any unearned Rent Charges, plus the purchase option price and all other amounts then due under this lease.

Unpaid Adjusted Capitalized Cost is reduced on each payment due date. It is calculated by reducing the Adjusted Capitalized Cost each month by the difference between the Base Monthly Payment and the part of the Rent Charges earned in that month on an actuarial basis. Rent charges are earned when due. Lessor or Ford Credit will provide You with a written explanation of the actuarial method upon Your request.

Fair Market Wholesale Value, at Your option, will be: (a) an amount agreed to by You and the Lessor, or (b) the value which could be realized at the wholesale sale of the Vehicle, as determined by a professional appraisal obtained by You at Your expense within 10 days from termination from an independent third party agreeable to Ford Credit, or (c) if not established by agreement or appraisal, the net amount received by Ford Credit upon the sale of the Vehicle at wholesale.

Please contact Ford Credit at 1-800-727-7000 or www.fordcredit.com if You have any questions regarding terminating Your Red Carpet Lease.

## DEFAULT AND LOSS OF VEHICLE

**26. DEFAULT** You will be in default if (a) You fail to make any payment when due, or (b) a bankruptcy petition is filed by or against You, or (c) any governmental authority seizes the Vehicle and does not promptly and unconditionally release the Vehicle to You, or (d) You have provided false or misleading material information when applying for this lease, or (e) You fail to keep any other agreement in this lease.

If You are in default, Ford Credit may either accelerate the lease payments or cancel the Lease and take back the Vehicle as allowed by law. If Ford Credit accelerates the lease payments, You must pay at once (a) the remaining Total of Monthly Payments less any rebate required under Louisiana law, plus (b) all other amounts then due under this Lease. Upon full payment of all accelerated lease payments and other amounts due, You may retain the Vehicle until the end of the Lease. If Ford Credit cancels this Lease, You must return the Vehicle within the days of the mailing of the notice of cancellation, to the Lessor's address shown on the front or to such other place as Ford Credit may direct. In addition to returning the Vehicle, You shall pay at once (a) liquidated damages in the amount of the difference, if any, between the Unpaid Adjusted Capitalized Cost (see Voluntary Early Termination) and the value which could be realized at the sale of the Vehicle, plus (b) all other amounts then due under this Lease. The value which could be realized at the sale of the Vehicle is Your option

will be: (a) Did not amount received by Ford Credit upon the sale of the Vehicle at wholesale, or (b) as determined by a professional appraisal obtained by You at Your expense within 10 days from default, from an independent third party agreeable to Ford Credit. Ford Credit may sell the Vehicle at public or private sale with or without notice to You. You must also pay all expenses, including actual and reasonable attorneys fees not in excess of 25% of the unpaid obligation at the time of default, payable by Ford Credit to obtain, hold and sell the Vehicle, collect amounts due and enforce Holder's rights under this Lease. You authorize Ford Credit to cancel Your insurance and apply any proceeds to Your obligation. Ford Credit also shall have the right to all other remedies permitted by law.

**27. LOSS OR DESTRUCTION OF VEHICLE** If the Vehicle is stolen or destroyed, You will pay to Ford Credit (a) the Unpaid Adjusted Capitalized Cost, plus (b) all other amounts then due under this lease, minus (c) any insurance proceeds received by Ford Credit. See Value. If You had to obtain the insurance required under this lease and Ford Credit receives the full proceeds, You will pay to Ford Credit (a) any past due monthly lease payments, plus (b) the amount of the applicable insurance deductible, plus (c) all other amounts then due under this lease. Even if the Vehicle is insured, until Ford Credit receives the appropriate amount above, You are responsible for the scheduled monthly payments.

## ADDITIONAL INFORMATION

**28. ASSIGNMENT AND ADMINISTRATION** When You and Lessor sign this lease, Lessor will assign it to Holder. Ford Credit or a substitute will administer this lease. You must then pay all amounts due under this lease to Ford Credit.

If Ford Credit is not the Holder of this lease, Holder has appointed Ford Credit as its agent. As agent for Holder, Ford Credit has the power to act on Holder's behalf to administer, enforce, and collect this lease. If Lessor has agreed to repair or maintain the Vehicle, obtain any insurance or perform any other service, You will look only to the Lessor for those services.

**29. TAXES** You will promptly pay all fees, charges, and taxes relating to the lease or Vehicle (except for Lessor's or Holder's income taxes). You will pay these amounts even if they are assessed otherwise and.

**30. TITLING** The Vehicle will be titled in the name of Holder. You will register the Vehicle as directed by Ford Credit. You will pay all license, title and registration costs.

**31. LIFE INSURANCE** If Ford Credit receives the benefits paid under any life insurance described on the reverse side, this lease will continue if there is a Co-Lessee. Any Co-Lessee will pay when due all amounts not paid by

the insurance. If there is no Co-Lessee, Ford Credit will accept a reasonable replacement designated by Your estate who agrees in writing to perform Your obligations not covered by the insurance.

**32. INDEMNITY** You will indemnify and hold harmless Lessor, Ford Credit and Holder and their assigns from any loss or damage to the Vehicle and its contents and from all claims, losses, injuries, expenses and costs related to the use, maintenance, or condition of the Vehicle. You will promptly pay all fines and tickets imposed on the Vehicle or its driver. If You do not pay, You will reimburse Ford Credit and pay a $20 administration fee, unless prohibited by law, for every such fine, ticket, or penalty that must be paid on Your behalf.

**33. SECURITY DEPOSIT** Your security deposit may be used by Ford Credit to pay all amounts that You fail to pay under this Lease. You will not receive any interest, profits or other earnings on Your security deposit(s).

**34. GENERAL** Except as otherwise provided by the law of the state where You reside, the law that will apply to this lease is the law of the state where the Lessor's place of business is, as set forth on the front of the lease. If that law does not allow any of the agreements in this lease, the ones that are not allowed will be void. The rest of this lease will still be good.

FO - 18725-P NOV 99
Previous editions may NOT be used.    **NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION**

58



9052-L (12/98)

**118589**
State of Louisiana
Department of Revenue
P. O. Box 201
Baton Rouge, Louisiana 70821-0201
## Notice of State Tax Assessment and Lien

| Parish St. James | Date 12/4/02 |
|---|---|
| Serial number 110206041 | |

For use by recording office

Alfred Bourgeois
3192 Bend West
Pauling, LA 70763

:ation address

:ount number   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

s document is recorded in accordance with the provisions of Title 47, Chapter 18, Part III, particularly :tions 1577 and 1578 of the Louisiana Revised Statutes of 1950, as amended, and by virtue of its recorda- i, notice is hereby given to all persons that the taxes, interest, penalties, and attorney's fees owed by the debtor operate as a judgment on all property of the tax debtor, both movable and immovable.

| Kind of tax | Tax period ended | Interest date | Unpaid balance of assessment | For optional use by recording office |
|---|---|---|---|---|
| Motor Vehicle Sales | 06/00 | 12/4/02 | $ 503.69 | Entry # _____ |
| | | | | Original no. _____ |
| | | | | Bundle no. _____ |
| | | | | MOB _____ |
| | | | | FOLIO _____ |
| | | | | Trans. no. _____ |
| | | | | Date _____ |
| | | | | Filing fee _____ |
| | | TOTAL | $ 503.69 | |

erest as provided by R.S. 47:1601 will continue to accrue on the unpaid tax from the dates listed above until paid. All costs of recording : lien are also due.

Baton Rouge, Louisiana, __December, 4__        __2002__
                                                   Year

Secretary of Revenue
State of Louisiana

By ___Sam Losavio, Director___

SL:RW:db                         Taxpayer Services Division

794

KEPT BY RECORDING OFFICE

59

28927

FORD MOTOR CREDIT COMPANY

FILED FOR RECORD
JAMES PARISH, LA.

03 APR 25 PM 12: 08

VERSUS

EDWARD E. KALER, JR.
CLERK OF COURT

ALFRED BOURGEOIS

NUMBER _____ DIV. "____"

23RD JUDICIAL DISTRICT COURT

PARISH OF ST. JAMES

STATE OF LOUISIANA

SECTION "E"
HON. ALVIN TURNER, JR.
(225) 621-8500

## SUIT ON NET (CLOSED END) LEASE

The petition of **FORD MOTOR CREDIT COMPANY**, a foreign corporation authorized to do and doing business in the State of Louisiana, with respect represents that:

1.

Defendant, ALFRED BOURGEOIS, Social Security No 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, of the lawful age of majority, is presently domiciled in the Parish of St. James, State of Louisiana.

2.

ALFRED BOURGEOIS, made defendant herein, is justly and truly indebted unto FORD MOTOR CREDIT COMPANY, in the full sum of $5,060.19, together with legal interest from   until paid, together with attorney's fees in the amount of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

3.

On January 10, 2001, a Net (Closed End) Lease was entered into between the defendant and the named dealer/vendor, whereby defendant leased, with option to purchase, one certain vehicle more particularly described, and on such terms and conditions as set forth in said Lease, a copy of which is attached hereto and made part hereof by reference.

4.

Said Net (Closed End) Lease was assigned to FORD MOTOR CREDIT COMPANY, plaintiff herein, as shown on the Lease. Said assignment transferred to plaintiff all rights, privileges and remedies available to the original vendor assignor. Lessee, defendant herein, had knowledge of this assignment as evidenced by the Lease.

5.

According to its stated terms, the Net (Closed End) Lease terminates after either a fixed period of time from the date of the Lease if Lessee fails to timely exercise the purchase option, or, upon default of the terms of the Lease. Defendant did not exercise the purchase option and this contract terminated by default.

6.

Despite amicable demand, defendant failed, neglected and refused to make timely payments under this obligation, and the installments are contractually past due, necessitating the placing of this agreement in the hands of an attorney for collection.

7.

Said Net (Closed End) Lease provides that upon default, Lessee, the defendant herein, agreed to "Pay all expenses paid by the Lessor to enforce the Lessor's rights under this Lease, including reasonable attorney's fees as permitted by law..." Reasonable attorney's fee for collection herein is stated to be twenty-five (25%) percent of the principal and interest due and owing.

8.

There is currently due and owing on said account, pursuant to the acceleration clause contained in the Lease, the principal balance of $5,060.19, which may include one or more of the following charges: excess mileage, collision damage, excess wear, unpaid lease payments, unpaid late charges, and/or repossession expenses.  All proper credits have been applied for security deposit, sales proceeds (if applicable), and unapplied credits and/or rebates, if any.

9.

Plaintiff further alleges that, to its knowledge, defendant IS NOT now in the military service of the United States government, including the Army, Navy, Air Force, Marine Corps or Coast Guard; nor is defendant believed to be an officer of the Public Health Service detailed with either the Army or Navy, and therefore, defendant is NOT entitled to any of the benefits of the Soldier's and Sailor's Relief Act of the Congress of the United States of America.

WHEREFORE, plaintiff prays for judgment in favor of **FORD MOTOR CREDIT COMPANY,** and against defendant, **ALFRED BOURGEOIS, Social Security No. 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,** in the full sum of $5,060.19, plus legal interest from  until paid, together with attorney's fees in the sum of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

Plaintiff further prays for all other just and equitable relief as allowed by law.

By Attorneys:

**SHOWS, CALI & BERTHELOT, L.L.P.**
644 St. Ferdinand Street
P.O. Drawer 4425
Baton Rouge, LA  70821-4425
Telephone: (225)-346-1461

By: _____
E. Wade Shows, #7637

**PLEASE SERVE DEFENDANT:**

Alfred Bourgeois
3192 Rev Doc Samuel Jones St
Paulina, LA  70763
Social Sec. # 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

**THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

60

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/01/2003

Ross Griffin, date of birth 08/03/1962, was interviewed, per his request, at the Nueces County Jail Annex, Corpus Christi, Texas, where he is currently incarcerated. Also present during the interview was Assistant United States Attorney (AUSA), Patti Hubert Booth. After being advised of the identity of the interviewing parties, Griffin provided the following information:

John Gilmore was Griffin's attorney on a federal marijuana case in which he had recently been sentenced. Back in December of 2002, Griffin was in a federal courthouse holding cell with a man named Alfred Bourgeois. Griffin was awaiting a hearing about a plea agreement Gilmore had arranged for him. While in the holding cell, Bourgeois began telling Griffin that he was accused of murdering his child when in fact, his girlfriend accidentally killed the child. Bourgeois told Griffin that he was unloading his tractor trailer when his girlfriend, with whom he was traveling, dropped his daughter out of the cab of his truck. Bourgeois said his daughter hit her head and died. Bourgeois also mentioned something about bite marks on the child.

Griffin and Bourgeois were eventually taken from the holding cell to the courtroom where attorney John Gilmore spoke to both of them before the start of proceedings. Griffin, who was unhappy with the representation he was receiving, engaged in a heated discussion with Gilmore. Bourgeois, overhearing the conversation, told Griffin that he was not happy with Gilmore either. In fact, Bourgeois said he was in court that day because he had written a letter to the judge regarding Gilmore's poor representation. Angry, Bourgeois told Griffin that he (Bourgeois) killed his daughter, but could have already been out of jail if Gilmore would have done what he was supposed to do in the beginning. Bourgeois explained that he hated the mother of the child and did not want to pay her child support for the rest of his life. Bourgeois said the reason he hated his ex-wife was because she claimed he physically abused her. Bourgeois told Griffin that he killed his daughter with a blow to the back of her head with a hairbrush. Bourgeois said that the child was always crying and the noise frustrated him. Bourgeois stated that his girlfriend was also frustrated by the child's crying and she once tried to choke

Investigation on   06/30/2003   at   Corpus Christi, Texas

File #   70A-HO-60227                                       Date dictated   07/01/2003

by   Megan Kathleen Beckett

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

70A-HO-60227

Continuation of FD-302 of ___Ross Griffin_____ , On _06/30/2003__ , Page __2____

the child. Bourgeois said that originally he was able to convince his girlfriend to take the rap for the child's death, but she eventually cracked under pressure from police and admitted that she did not do it. Now, even though they were afraid of him, both his ex-wife and his girlfriend were going to testify against him.

Bourgeois told Griffin that he was furious at his ex-wife and if he ever got out of this mess, he would make her pay. Griffin thought Bourgeois told him that his ex-wife lived in Louisiana. Bourgeois said he was going to get his girlfriend too and indicated that anyone who testified against him would pay for it. Bourgeois was outgoing and friendly to the other guys in the jail, but Griffin felt that Bourgeois had major problems and that his threats were valid. Griffin did not think Bourgeois should ever be allowed to walk the streets again.

61

COPY

United States Courts
Southern District of Texas
FILED

MAR 2 7 2007

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIMINAL ACTION |
| | * | |
| PLAINTIFF, | * | CR-C-03-075(1) |
| | * | |
| VS. | * | |
| | * | CORPUS CHRISTI, TEXAS |
| DARRICK BERNARD MOORE, | * | APRIL 22, 2004 |
| | * | 11:03 A.M. |
| DEFENDANT. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:      MR. LANCE G. DUKE
                         MR. MARK W. PATTERSON
                         OFFICE OF THE U.S. ATTORNEY
                         800 NORTH SHORELINE, SUITE 500
                         CORPUS CHRISTI, TEXAS 78401

FOR THE DEFENDANT:       MR. RICHARD W. ROGERS, III
                         ATTORNEY AT LAW
                         1756 SANTA FE
                         CORPUS CHRISTI, TEXAS 78404

ALSO PRESENT:            MS. MICHELLE MORGAN, U.S. PROBATION

COURT RECORDER:          MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

2

(The proceedings began at 11:03 a.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-03-075S, United States of America versus Darrick Moore.  May I have appearances, please?

MR. DUKE:  Lance Duke on behalf of the United States.

MR. ROGERS:  Rick Rogers for Mr. Moore.

THE COURT:  Would you administer the oath, please.

THE CLERK:  Yes, Your Honor.

(Defendant sworn.)

THE COURT:  Your full name, please, sir?

THE DEFENDANT:  Darrick Bernard Moore.

THE COURT:  Are you the same Darrick Moore who entered a guilty plea to Count 1 of this indictment, possession with, distribution of approximately 1.39 grams of cocaine base?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Are you ready for sentencing, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Has anything changed in your mental or physical condition since you entered your plea?

THE DEFENDANT:  No, Your Honor.

THE COURT:  I asked you at the time of your plea if you thought you were mentally competent to proceed, and you told me that you were.  Do you remember that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you still of the opinion that you're mentally competent to proceed?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Rogers, do you share that opinion?

MR. ROGERS:  I do.

THE COURT:  Have you received, Mr. Moore, a copy of your Presentence Investigation Report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Well, I know you've had it for at least 35 days, but I'm going to ask you anyway.  Have you had it for at least 35 days?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you discussed it completely with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Has he answered all your questions?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Does he still come to see you in jail and take your phone calls when you need to talk to him?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you still satisfied with the advice and efforts of your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Is he following your instructions?

THE DEFENDANT:  Yes, Your Honor.

4

THE COURT:  And there are no objections filed, Mr. Rogers?

MR. ROGERS:  No, Your Honor.  The only thing we filed was something called a clarification, just to Paragraph 27 and Paragraph 56, that talked about two non-scoreable offenses. One of them, well actually one of them did score, and it was called a prison escape, and the Defendant absconded from a work-release program.  And I just wanted to point out the question of degree as to what he had done.

Then also it mentions in Paragraph 56 a carjacking, and it infers that perhaps he did receive some kind of court action on it, but --

THE COURT:  It just says, "Other Arrests."

MR. ROGERS:  Yes, ma'am.  I know.  But he just, he did feel it was important to come forward.  And on that one, he said that he was vindicated.  They came and he was not identified, and it never went to court.  He never went into the system, other than an arrest.  But other than that, we have no objections.  And those aren't objections.

(PAUSE.)

THE COURT:  Any objections, Mr. Duke?

MR. DUKE:  No, Your Honor.

THE COURT:  Mr. Moore, you're really best situated of anyone here to tell me if there are any mistakes anywhere in this report, and this is the time for you to tell me.

THE DEFENDANT:  No, Your Honor.

(PAUSE.)

THE COURT:  Well, according to the Presentence Investigation Report, the Total Offense Level is 29, with Criminal History Category VI.  There's a range of imprisonment from 151 to 188 months, three years supervised release range, 15,000 to $1 million fine range, and a $100 special assessment. Is that correctly calculated, Mr. Rogers?

MR. ROGERS:  Yes, Your Honor.

THE COURT:  Mr. Duke?

MR. DUKE:  Yes, Your Honor.

THE COURT:  As far as you know, are these numbers correct, Mr. Moore?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And what are you recommending?

MR. DUKE:  Your Honor, the Government is moving for a downward departure, pursuant to Sentencing Guideline Section 5K1.1.  Mr. Moore has cooperated in two significant cases.  The first case dealt with another crack distributor by the name of Victor Friar, who was previously before this Court.  Mr. Moore, upon his arrest, began immediately cooperating with the authorities.  He enabled the authorities to do a controlled purchase of crack cocaine from Mr. Friar.  Mr. Friar was subsequently arrested, prosecuted and convicted and sentenced before this Court.  Mr. Friar (sic) made telephone calls on

behalf of DEA agents in the case against Mr. Friar, and also provided his vehicle to help further the transaction to go along, and he also provided sort of the modus operandi for how Mr. Friar and Mr. Moore had conducted business in the past, which led to the successful purchase of crack cocaine from Mr. Friar. And I believe, if I recall correctly, Mr. Friar received a 10-year sentence for that case.

Additionally, Mr. Moore cooperated with the Government against Mr. Alfred Bourgeois. Mr. Bourgeois, as the Court I'm sure remembers, was prosecuted for capital murder. He was ultimately convicted and given the death penalty. Mr. Moore testified at the case-in-chief against Mr. Bourgeois, and then also testified at his sentencing.

In speaking to Ms. Patti Booth, who handled the Bourgeois case --

THE COURT: Well, I saw his testimony, and I thought it was very valuable.

MR. DUKE: She also --

THE COURT: And I thought it was, that he was a credible witness.

MR. DUKE: Ms. Booth also agrees with that. She also wanted me to point out to the Court that Mr. Moore received a great deal of coercion and harassment by his fellow inmates for testifying on behalf of the Government. Each and every time he left the cell to meet with witnesses, or excuse me, meet with

the attorneys or agents to help assist in the prosecution, he was harassed by his fellow inmates, in particular, because of the fact that Mr. Moore and Mr. Bourgeois are both African American. And so he, his cooperation in that case was particularly difficult.

And so along those lines, for consideration of both cases, I have received permission to request a 50 percent reduction. And I am therefore recommending a sentence of 75 months.

THE COURT: Mr. Rogers?

MR. ROGERS: Your Honor, we would add to that, Mr. Moore has been incarcerated in our county jails down here for 14 months, and by his own choice, to stay here and give testimony under subpoena. The conditions there were probably not the same as if he had gone to a federal facility. He had difficulty, I think, at some of these facilities, in addition to the fact of his testimony. But he was very stoic about it.

Additionally, his record is lackluster, to say the least, but in dealing with him, he's a very easy person to deal with. His record seems totally inconsistent to the kind of person that I've dealt with throughout his case, where his intentions, I think, have been honorable in all his cooperation. And I've met his grandfather, who's here in court, and his fiancee, and they all speak very highly of him.

We would ask the Court if we -- the 75-month

recommendation is more than fair, but we would like to ask for a departure to 60 months.  He's never been incarcerated for more than 30 months.  He's never had any drug treatment.  We feel that his problems are drug related, and that with his maturity and the 14 months he's already spent in, and the opportunity for drug classes, a 60-month sentence would be fair.

(PAUSE.)

THE COURT:  Mr. Moore, this is your opportunity to tell me anything you'd like to tell me before I sentence you.

(Defendant and Counsel conferring off the record.)

THE DEFENDANT:  I'd like to apologize to the Court, and I'd like to apologize to the peoples of Aransas Pass, and I'd like to apologize to my grandfather, because it's making it hard for me being locked up.  And I know I've been, I've been like in trouble in the past with the authorities, and I did time for it.  My record is bad and everything, but deep down inside, I'm a good person and everything.  And now that I got a little son, I just want to, you know, go up there and get my life together and get back out there and be a father figure to my son.

(PAUSE.)

THE COURT:  Mr. Moore --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- I think you did a good job on your

testimony --

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  -- in that trial.  And I wouldn't imagine that that would be very easy to do.  So I'm going to grant the motion for downward departure to 65 months, followed by three years supervised release.  Downwardly depart to a $100 fine -- a $50 fine, I'm sorry, and a $100 special assessment.

Standard terms and conditions of supervised release, along with firearm prohibition, nighttime restriction of 12:00 midnight to 6:00 a.m.  Drug surveillance, drug and alcohol treatment, mental health care, anger management.  The last four you have to pay for based on ability to pay as determined by the Probation Department.  And zero alcohol.

MR. ROGERS:  Your Honor, could we also ask the Court to recommend that he be allowed to stay in Texas?  He does have a wife and newborn.

THE COURT:  I'll make that recommendation.  Does he also want a recommendation for drug treatment?

MR. ROGERS:  Yes, he does.  He very much would --

THE COURT:  Is that right, Mr. Moore?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I'll make a recommendation for drug and alcohol, the intensive drug treatment program in the Bureau of Prisons.

Do you have the $150 for your fine and special

assessment?

THE DEFENDANT:  No, Your Honor.

THE COURT:  You want to pay it out of your Inmate Trust Account?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Starting 60 days after placement in the Bureau of Prisons, no more than 20 percent of your Inmate Trust Account, until first the special assessment is paid, and then the fine.  In any event, if it's not paid during the term of incarceration, then you can pay it out over supervised release at $25 a month, starting 30 days after placement on supervised release.  Is that all right, Mr. Moore?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And I got your last communications, and hopefully you can be placed quickly by the Marshal Service and designated to a Bureau of Prisons.

I adopt the Presentence Investigation Report as the findings of the Court.  Order the report sealed.  Access allowed Defense Counsel, but not to the recommendation, absent a further hearing.

It's hereby ordered that the Defendant is sentenced as stated and committed to the custody of the United States Marshals.

Thank you for your appearance, Mr. Rogers, Mr. Duke. You're excused.

11

Do you have another count to dismiss?

THE DEFENDANT: Thank you, Your Honor.

MR. DUKE: Yes, Your Honor. The Government moves to dismiss Count 2 --

THE COURT: Just a moment.

MR. DUKE: -- and 3.

THE COURT: Dismissing Counts 2 and 3 of the indictment. If you could run an order through Mr. Rogers, you don't have to file a motion.

MR. DUKE: I will, Your Honor.

THE COURT: Thank you for your appearances. Good luck to you, Mr. Moore.

THE DEFENDANT: Thank you, Your Honor.

(Proceedings concluded at 11:19 a.m.)

(Court re-calls case at 3:06 p.m.)

THE COURT: Mr. Moore, I didn't give you your appellate rights today, and that's in Cause Number --

THE CLERK: Cause Number C-03-075.

THE COURT: And Mr. Rogers is here for Mr. Moore, Mr. Patterson is here for the U.S. Attorney.

Mr. Moore, you have a right to appeal the sentence of this Court by filing a written notice of appeal within ten days of today's date. If you cannot afford an attorney, one will be appointed to represent you. Are you appointed, Mr. Rogers?

MR. ROGERS: Yes, Your Honor.

THE COURT:  Then you don't have to fill out the form again under oath as to your assets and liabilities.  Do you understand this right to appeal, sir?

THE DEFENDANT:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  Thank you very much.  You're excused.

(Proceedings concluded at 3:07 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Molly Carter                               Date  3/27/07

62

AO 245B     (Rev 3/01) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Southern District of Texas

Holding Session in Corpus Christi

United States District Court
Southern District of Texas
ENTERED

## APR 2 8 2004

**Michael N. Milby, Clerk of Court**

UNITED STATES OF AMERICA

v.

## DARRICK MOORE

## JUDGMENT IN A CRIMINAL CASE

(For Offenses Committed On or After November 1, 1987)

Case Number:  **2:03CR00075-S-001**

Richard W. Rogers, III
Defendant's Attorney

☐  See Additional Aliases sheet.

## THE DEFENDANT:

☒  pleaded guilty to count(s)     1 on 04/30/2003

☐  pleaded nolo contendere to count(s)
which was accepted by the court.

☐  was found guilty on count(s)
after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of 1.39 Grams of Cocaine Base | 01/16/2003 | S1 |

☐  See Additional Counts of Conviction.

The defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s) _____

☒  Count(s) S2 and S3 _____   ☐ is ☒ are  dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.:  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

Defendant's Date of Birth:  08/14/1971

Defendant's USM No.:  19499-179

Defendant's Residence Address:

6440 Everhart, #F4

Corpus Christi, TX  78413

Defendant's Mailing Address:

6440 Everhart, #F4

Corpus Christi, TX  78413

April 22, 2004
Date of Imposition of Judgment

Signature of Judicial Officer

**JANIS GRAHAM JACK**

**UNITED STATES DISTRICT JUDGE**
Name and Title of Judicial Officer

4·25·04
Date

28

AO 245B    (Rev 3/01) Judgment in a Criminal Case
           Sheet 2    Imprisonment

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a

total term of _____65 months._____

It is the order of the Court that the PSI in this case is for use by the Bureau of Prisons employees only and **shall not** be
further disclosed to any other party (other than defendant), agency or individual without written permission of this Court, except in
instances of escape or failure to surrender, when the report is needed by the U.S. Marshals.

☐  See Additional Imprisonment Terms.

☒  The court makes the following recommendations to the Bureau of Prisons:
That the defendant participate in a comprehensive drug treatment program while incarcerated.
That the defendant be placed in a facility in Texas as long as the security needs of the Bureau of Prisons are met.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____ on _____

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 pm on _____

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev 3/01) Judgment in a Criminal Case
Sheet 3   Supervised Release

DEFENDANT:   DARRICK MOORE

CASE NUMBER:   2:03CR00075-S-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of  3 year(s).

☐   See Additional Supervised Released Terms Sheet.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

☒   The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

☐   See Additional Mandatory Conditions Sheet

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒   See Special Conditions of Supervision.

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 3/01) Judgment in a Criminal Case
           Sheet 3 — Continued 2 — Supervised Release

Judgment -- Page 4 of 6

DEFENDANT:   DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

## SPECIAL CONDITIONS OF SUPERVISION

**DRUG SURVEILLANCE:** The defendant shall submit to periodic urine surveillance and/or breath saliva and skin tests for the detection of drug abuse as directed by the probation officer. The defendant will incur costs associated with such detection efforts based on ability to pay as determined by the probation officer.

**DRUG TREATMENT:** The defendant shall participate in a program, inpatient or outpatient, for the treatment of drug and/or alcohol addiction, dependency or abuse which may include, but not be limited to urine, breath, saliva and skin testing to determine whether the defendant has reverted to the use of drugs and/or alcohol. Further, the defendant shall participate as instructed and as deemed necessary by the probation officer and shall comply with all rules and regulations of the treatment agency until discharged by the Program Director with the approval of the probation officer. The defendant shall further submit to drug-detection techniques, in addition to those performed by the treatment agency, as directed by the probation officer. The defendant will incur costs associated with such drug/alcohol detection and treatment, based on ability to pay as determined by the probation officer.

**MENTAL HEALTH:** The defendant is required to participate in a mental health program as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such a program, based on ability to pay as determined by the probation officer.

**NIGHTTIME RESTRICTION:** Throughout the period of supervised release, the defendant shall be restricted to his home each night from 12 midnight to 6 am, unless other specific arrangements are made with the probation officer.

**ALCOHOL ABSTINENCE:** The defendant shall abstain from the use of alcohol during the term of supervision.

**ANGER MANAGEMENT:** The defendant is required to participate in anger management counseling as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

AO 245B    (Rev 3/01) Judgment in a Criminal Case
Sheet 5, Part A    Criminal Monetary Penalties

Judgment -- Page 5 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 100.00 | $ 50.00 | $ |

☐ See Additional Terms for Criminal Monetary Penalties Sheet.

☐ The determination of restitution is deferred until _____. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
|  |  |  |  |

☐ See Additional Restitution Payees Sheet.

| TOTALS |  | $0.00 | $0.00 |  |
|---|---|---|---|---|

☐ If applicable, restitution amount ordered pursuant to plea agreement  $_____

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☒ the interest requirement is waived for the ☒ fine and/or ☐ restitution.

    ☐ the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

☐ Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B    (Rev 3/01) Judgment in a Criminal Case
           Sheet 5, Part B    Criminal Monetary Penalties

Judgment -- Page 6 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐  Lump sum payment of _____ due immediately, balance due

     ☐  not later than _____, and/or
     ☐  in accordance with ☐ C, ☐ D, and/or ☐ E, below; or

B ☒  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ E below); or

C ☐  Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐  Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

E ☒  Special instructions regarding the payment of criminal monetary penalties:
     Make all payments payable to: U.S. District Clerk, 1133 N Shoreline Blvd Ste 208, Corpus Christi, TX 78401.

     Payments are to begin 60 days from the date of placement at the Bureau of Prisons at a rate of no more than 20 percent of
     funds in his inmate trust fund. The balance is to be paid at a rate of $25.00 per month beginning 30 days after commencing
     supervised release.

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number (Including Defendant Number) | Defendant Name | Joint and Several Amount |
|---|---|---|
| | | |

☐  See Additional Defendants Held Joint and Several sheet.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

☐  See Additional Forfeited Property Sheet.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

63

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 1                                                                    (NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### Holding Session in Corpus Christi

| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| V. | |
| **DARRICK MOORE** | |

CASE NUMBER: **2:03CR00075-S-001**

☐ See Additional Aliases.

USM NUMBER:   19499-179

**Date of Original Judgment:** _____ April 22, 2004 _____
(or Date of Last Amended Judgment)

Patrick McGuire*
Defendant's Attorney

**Reason for Amendment**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☒ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☐ Correction for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant to ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)

☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☒ pleaded guilty to count(s)   S1 on April 30, 2003

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of 1.39 Grams of Cocaine Base | 01-16-03 | S1 |

☐ See Additional Counts of Conviction.

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s) S2 and S3 _____   ☐ is   ☒ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

December 23, 2004
Date of Imposition of Judgment

Signature of Judge

**JANIS GRAHAM JACK**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

12-27-04
Date

AO 245C     (Rev. 12/03) Amended Judgment in a Criminal Case
            Sheet 2 -- Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 2 of 6

DEFENDANT:  **DARRICK MOORE**
CASE NUMBER:  **2:03CR00075-S-001**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a

total term of _____ 50 months.* _____

   It is the order of the Court that the PSI in this case is for use by the Bureau of Prisons employees only and **shall not** be further disclosed to any other party (other than defendant), agency or individual without written permission of this Court, except in instances of escape or failure to surrender, when the report is needed by the U.S. Marshals.

☐   See Additional Imprisonment Terms.


☒   The court makes the following recommendations to the Bureau of Prisons:
    That the defendant participate in a comprehensive drug treatment program while incarcerated.
    That the defendant be placed in a facility in Texas as long as the security needs of the Bureau of Prisons are met.

☒   The defendant is remanded to the custody of the United States Marshal.


☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐ a.m.  ☐ p.m.  on _____ .

    ☐   as notified by the United States Marshal.


☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.


# RETURN

I have executed this judgment as follows:

_____

_____

_____

   Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.


_____
                                    UNITED STATES MARSHAL

By   _____
                              DEPUTY UNITED STATES MARSHAL

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
              Sheet 3 -- Supervised Release                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 3 of 6

DEFENDANT:  **DARRICK MOORE**
CASE NUMBER:  **2:03CR00075-S-001**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  3 year(s).

☐    See Additional Supervised Release Terms.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. *(for offenses committed on or after September 13, 1994)*

    ☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒    See Special Conditions of Supervision.

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245C       (Rev. 12/03) Amended Judgment in a Criminal Case
              Sheet 3C -- Supervised Release                                              (NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 4 of 6

DEFENDANT:   **DARRICK MOORE**
CASE NUMBER:   **2:03CR00075-S-001**

# SPECIAL CONDITIONS OF SUPERVISION

**DRUG SURVEILLANCE:** The defendant shall submit to periodic urine surveillance and/or breath saliva and skin tests for the detection of drug abuse as directed by the probation officer. The defendant will incur costs associated with such detection efforts based on ability to pay as determined by the probation officer.

**DRUG TREATMENT:** The defendant shall participate in a program, inpatient or outpatient, for the treatment of drug and/or alcohol addiction, dependency or abuse which may include, but not be limited to urine, breath, saliva and skin testing to determine whether the defendant has reverted to the use of drugs and/or alcohol. Further, the defendant shall participate as instructed and as deemed necessary by the probation officer and shall comply with all rules and regulations of the treatment agency until discharged by the Program Director with the approval of the probation officer. The defendant shall further submit to drug-detection techniques, in addition to those performed by the treatment agency, as directed by the probation officer. The defendant will incur costs associated with such drug/alcohol detection and treatment, based on ability to pay as determined by the probation officer.

**MENTAL HEALTH:** The defendant is required to participate in a mental health program as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

**NIGHTTIME RESTRICTION:** Throughout the period of supervised release, the defendant shall be restricted to his home each night from 12 midnight to 6 am, unless other specific arrangements are made with the probation officer.

**ALCOHOL ABSTINENCE:** The defendant shall abstain from the use of alcohol during the term of supervision.

**ANGER MANAGEMENT:** The defendant is required to participate in anger management counseling as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 5 -- Criminal Monetary Penalties                                          (NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 5 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $100.00 | $50.00 | |

☐  See Additional Terms for Criminal Monetary Penalties.

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal payees must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

☐  See Additional Restitution Payees.

| **TOTALS** | $  0.00 | $  0.00 |
|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☒  the interest requirement is waived for the ☒ fine    ☐ restitution.

☐  the interest requirement for the ☐ fine    ☐ restitution is modified as follows:

☐  Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 6 -- Schedule of Payments
(NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 6 of 6

DEFENDANT:   DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A ☐  Lump sum payment of $ _____ due immediately, balance due

      ☐ not later than _____ , or
      ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒  Payment to begin immediately (may be combined with ☐ C,     ☐ D, or ☒ F below); or

C ☐  Payment in equal _____ installments of $ _____ over a period of _____ , to commence _____ days after the date of this judgment; or

D ☐  Payment in equal _____ installments of $ _____ over a period of _____ , to commence _____ days after release from imprisonment to a term of supervision; or

E ☐  Payment during the term of supervised release will commence within _____ days after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒  Special instructions regarding the payment of criminal monetary penalties:
Make all payments payable to: U.S. District Clerk, 1133 N Shoreline Blvd Ste 208, Corpus Christi, TX 78401
Payments are to begin 60 days from the date of placement at the Bureau of Prisons at a rate of no more than 20 percent of funds in his inmate trust fund. The balance is to be paid at a rate of $25.00 per month beginning 30 days after commencing supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

**Case Number**
**Defendant and Co-Defendant Names**
**(including defendant number)**          **Total Amount**      **Joint and Several Amount**      **Corresponding Payee, if appropriate**

☐ See Additional Defendants and Co-Defendants Held Joint and Several.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

☐ See Additional Forfeited Property.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.