**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : |  |
|  | : | Honorable Janis Graham Jack |
| -against- | : | U.S.D.J. |
|  | : |  |
| ALFRED BOURGEOIS, | : | **This is a Capital Case** |
|  | : |  |
| Petitioner. | : |  |
|  | : |  |

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR RELIEF PURSUANT TO
28 U.S.C. SECTION 2255
OR IN THE ALTERNATIVE
PURSUANT TO 28 U.S.C. 2241**

MAUREEN KEARNEY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
October 5, 2007

## PRELIMINARY STATEMENT

On May 14, 2007 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* (hereafter, *Motion*) challenging his convictions and sentence of death related to the 2002 beating death of his daughter, JG-1999.

On July 19, 2007 the Court granted Petitioner's motion requesting an opportunity to file a memorandum of law in support of the *Motion*, and ordered Petitioner to file on or before September 28, 2007 (document # 399).   On September 28, 2007 the Court extended Petitioner's time to file until October 5, 2007 (document # 401).

As in the *Motion*, references to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript), followed by the date of the proceedings and a page citation.  Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation.  Petitioner's *Motion* will be cited as *Motion* followed by a page or paragraph number. The opinion of the United States Courts of Appeals rendered on direct appeal is reported at United States v. Bourgeois, 423 F.3d 501 (August 25, 2005).   It will be cited as Bourgeois.

Mr. Bourgeois filed an *Appendix* with his *Motion* which contained documents relevant to his claims.   Along with this *Memorandum*, he is filing additional documents in a *Supplemental Appendix*, which will be numbered sequentially from the *Appendix*.  References to documents from the Appendix and Supplemental Appendix will be referred to as *PA* or *SPA*, followed by the number assigned to each document.

Alfred Bourgeois will be referred to by name, or as Petitioner.  The United States will be referred to as the Government.

All other citations are either self-explanatory or are explained.  All emphasis is provided unless otherwise noted.

i

## TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.     Review of Claims Due to Counsels' Ineffectiveness  . . . . . . . . . . . . . . . . . . . . . . 1

      B.     Review of Claims Under United States Treaty Obligations  . . . . . . . . . . . . . . . . 2

Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Claim I.     Petitioner's Execution is Prohibited by the Eighth Amendment and
the Federal Death Penalty Act Because He Is a Person with Mental
Retardation.  Trial Counsel Were Ineffective for Failing to Present
this Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.     Petitioner Meets the Definition for Mental Retardation under Atkins
and its Progeny  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           1.     The Definition of Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           2.     Application of the Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.     Trial Counsels' Failure to Investigate, Prepare, and Present this Claim
to the Court Constitutes Ineffective Assistance of Counsel  . . . . . . . . . . . . . . . 11

      D.     This is a Non-Waivable Claim: This Court's Finding that Petitioner
is a Person with Mental Retardation Would Preclude Execution Even
if Counsel were not Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.     Because of Petitioner's Chronic and Severe Mental Illness, His
Execution Would Violate the Eighth Amendment  . . . . . . . . . . . . . . . . . . . . . . 14

Claim II.    Counsel Provided Ineffective Assistance During the Penalty Phase  . . . . . . . . . 17

      A.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.     The Defense Case at Penalty Phase  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. The Unpresented Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D. Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F. Counsel Ineffectively Failed to Move to Strike Dr. Estrada's Opinion that Petitioner Posed a Risk of Future Dangerousness . . . . . . . . . . . . . . . . . . . . 25

Claim III. No Reasonable View of the Evidence Existed upon Which a Rational Fact Finder Could Conclude That the Fatal Injuries Were Inflicted Within the Special Maritime and Territorial Jurisdiction of the United States in Violation of Due Process. Furthermore, Counsel Were Ineffective for Failing to Litigate this Claim and to Present Readily Available Evidence to Rebut this Element of the Offense . . . . . . . . . . . . . . . . 26

A. The Government Failed to Prove by Legally Sufficient Evidence That the Fatal Injury was Inflicted on the Grounds of the Corpus Christi Naval Air Station . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. Counsel Were Ineffective for Failing to Prove that the Fatal Blows Were Inflicted Days Before the Victim's Death . . . . . . . . . . . . . . . . . . . . . . . . 29

Claim IV. Trial Counsel Were Ineffective for Failing to Present Available Expert Testimony That Would Have Undermined the Government's Assertion That Petitioner's Semen Was Found in JG-1999's Anus, in Violation of Mr. Bourgeois' Rights under the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B. The Testimony and Arguments Presented at Trial and at the Penalty Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C. Trial Counsels' Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1. Counsel Ineffective Failed to Counter the Government's Contention that Petitioner's Semen Was Found on the Victim . . . . . . . . . . . . . . . . . . . . . 42

2. Counsel Ineffectively Failed to Counter the Government's Evidence of Sexual Trauma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

D. Petitioner Was Prejudiced by Counsel's Ineffectiveness . . . . . . . . . . . . . . . . . 49

Claim V.        Trial Counsel Rendered Ineffective Assistance by Failing to Litigate a Daubert Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Senn and Dr. Chrz Concerning the Bite Mark Evidence and the Digital Enhancements of the Bite Mark Photographs and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        A.    The Admissibility of Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        B.    Counsel's Duty to Investigate Related to Mounting a Daubert Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        C.    Strickland Deficient Performance: Counsel Failed to Mount a Pretrial Challenge to the Bite Mark and Photographic Enhancement Evidence and Failed at Trial to Rebut this Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        1.    The Enhanced Images of the Bite Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        2.    The Government's Bite Mark Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
        3.    Counsels' Failure to Use the Exculpatory Opinion of a Government Expert Who was not Called by the Government . . . . . . . . . . . . . . . . . . . . . . . . 60

        D.    Strickland Prejudice: Counsels' Deficient Performance Caused Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        1.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . 65
        2.    The Opinions of Dr. Senn and Dr. Chrz Were Also Unreliable . . . . . . . . . . . . . 70

Claim VI.    Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Litigate a Daubert Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Oliver Concerning the Digitally Enhanced Autopsy Photographs, for Failing to Object to Their Admissibility, and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        A.    Counsel Were Ineffective for Failing to Mount a Pretrial Daubert Challenge to the Photographic Enhancement Evidence . . . . . . . . . . . . . . . . . . 74

        B.    Trial Counsel Were Ineffective for Failing to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

        C.    Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Claim VII.    The Government Violated its Obligations under Brady V. Maryland
by Failing to Disclose to Petitioner Information Material to His
Ability to Prepare and Present a Defense at Trial and Sentencing
Denying Petitioner His Rights under the  Fifth, Sixth and Eighth
Amendments to the United States Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    A.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    B.    The Relevant Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    1.    The Prosecutor's Due Process Duty to Disclose Favorable Evidence  . . . . . . . . 81
    2.    Brady Materiality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    C.    The Improper Suppression of Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    1.    Adam Longoria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    2.    Orlando Campos  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
    3.    Darrick Moore  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

    D.    The Suppressed Evidence Should Have Been Disclosed and Was
Material  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

    E.    The Government Knowingly Permitted the Use of False Testimony  . . . . . . . . 100

    F.    Trial Counsel Were Ineffective  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Claim VIII.    Trial Counsel Labored under a Conflict of Interest That Adversely
Affected Their Representation of Petitioner at Trial and Sentencing,
in Violation of Petitioner's Sixth Amendment Right to Counsel  . . . . . . . . . . . 105

    A.    Government Witness, Ross Griffin, Was Represented By Petitioner's
Counsel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

    B.    Government Witness, Adam Longoria, Had Previously Been Called
as a Witness By Petitioner's Counsel on Behalf of Another Client  . . . . . . . . . 108

    C.    Government Witness, Orlando Campos, Had Previously Been Called
as a Witness By Petitioner's Counsel on Behalf of Another Client  . . . . . . . . . 109

Claim IX.    Prosecutorial Misconduct in Closing Argument at Both the Guilt/Innocence and Penalty Phases Denied Petitioner His Constitutional Right to Due Process and His Rights under the Sixth and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . 110

    A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    B.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    C.    The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    D.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    E.    The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

    F.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

    G.    The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

    H.    The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    I.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos . . . . . . . 120

    J.    The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

    K.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Claim X.     Trial Counsel Were Ineffective for Failing to Rebut The Evidence of
             Petitioner's Indifferent Demeanor at the Guilt Stage of Trial with
             Mental Health Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

       A.    The Testimony and Arguments Presented at Trial . . . . . . . . . . . . . . . . . . . . . 124

       B.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

       C.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Claim XI.    Petitioner Was Denied His Sixth Amendment Right to a Trial and to
             Counsel When the Government's Mental Health Expert Relied Upon
             his Interactions with Defense Counsel During the Trial to Formulate
             Adverse Opinions About Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Claim XII.   Appellate Counsel Were Ineffective in Multiple Respects . . . . . . . . . . . . . . . 132

       A.    General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

       B.    Failure to Raise Record-Based Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

       C.    This Court Improperly Admitted Inflammatory and Prejudicial
             Photographs During Both the Guilt/Innocence and the Penalty Stages
             of Trial. Direct Appeal Counsel Ineffectively Failed to Raise this
             Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

       D.    Petitioner's Eighth Amendment Right to Individualized Sentencing
             Was Violated When Testimony Was Elicited That Compared His
             Background to the Psycho-Social Histories of Others Who Have Been
             Sentenced to Death. Counsel Were Ineffective for Failing to Properly
             State the Objection at Trial, and for Failing to Raise this Claim on
             Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Claim XIII.  Petitioner is Entitled to Relief Based Upon the Cumulative Errors
             Identified Above . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Claim XIV.   Petitioner is Entitled to an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . 140

Claim XV.    The Manner in Which the Government Would Carry Out Petitioner's
             Execution Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . 141

Conclusion   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

<strong><small>STANDARD OF REVIEW</small></strong>

28 U.S.C. § 2255 requires that a federal conviction and sentence be vacated if they were obtained in violation of the Constitution or laws of the United States.

Petitioner alleges, inter alia, violations of the right to the effective assistance of counsel at trial and on direct appeal, secured by the Sixth Amendment (trial) and the equal protection component of the due process clause of the Fifth Amendment (direct appeal).

**A.      Review of Claims Due to Counsels' Ineffectiveness.**

Petitioner's claims are reviewable under the following standards governing claims of ineffective assistance of counsel. Such claims are governed by Strickland v. Washington, 466 U.S. 688 (1984). Counsel is ineffective where, as here: 1) his or her performance falls below objective standards of reasonableness, and 2) as a result of that deficiency, the petitioner suffered prejudice. Strickland, 466 U.S. at 694. Prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Wiggins v. Smith, 539 U.S. 510, 534 (2003). Such a probability can be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.

Claims of ineffective assistance of counsel are properly pursued in a section 2255 proceeding and are not waived even though they were not presented on direct appeal. United States v. Massaro, 538 U.S. 500, 509 (2003) ("failure to raise an ineffective-assistance-of-counsel claim on direct

1

appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.")

In many of his ineffective assistance of counsel claims, Petitioner will refer to GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, American Bar Association, Revised Edition, February 2003 (hereinafter, "Guidelines"), as embodying what is expected of capital trial and appellate counsel – indeed,  the Supreme Court has repeatedly cited these standards as a measure of the whether capital counsels' performance was reasonable.  See, e.g. Wiggins, 539 U.S. at 523 ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred as 'guides to determining what is reasonable'") (citing  Strickland and Williams v. Taylor, 529 U.S. 362 (2000)).[1]

**B.      Review of Claims Under United States Treaty Obligations.**

Petitioner submits that all of his claims are reviewable even if they were not presented at trial and/or on direct appeal based upon counsels' ineffectiveness, described herein.  However, even if the Court were to find that counsel were not ineffective for failing to raise or litigate any of the claims addressed herein, the Court would still be obliged to consider these claims on their merits because of United States treaty obligations.

United States international treaty obligations foreclose the application of any procedural rule as a basis to deny substantive review of an alleged federal constitutional violation in a death penalty case.  In its ratification of the International Covenant on Civil and Political Rights ("ICCPR"), 128

---

[1]  The Guidelines are published, 31 Hofstra L.Rev. 913 (2003), and are available on-line at www.ABAnet.org.  Petitioner also makes reference to the 1989 edition of the Guidelines, also available at ABAnet.org.

Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992), the United States Senate indicated that:

> [T]he United States considers itself bound by Article 7[2] to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eight, and/or Fourteenth Amendments to the Constitution of the United States.

*U.S. Reservations, Declarations, and Understandings, International Covenant on Civil and Political Rights* ("ICCPR"), Part I(3), 128 CONG. REC. S4781-01 (daily ed. Apr. 2, 1992).

In its advice and consent on the ICCPR, the Senate further reserved the right under the ICCPR to impose the death penalty provided it was applied "subject to [United States] Constitutional constraints" upon persons "duly convicted" of capital offenses. Id. at Part I(2). The Senate also declared nations party to the Covenant "should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant." Id. at Part III(2).

Similarly, in ratifying the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Senate in giving its advice and consent declared:

> [T]he United States considers itself bound by Article 16[3] to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eight, and/or Fourteenth Amendments to the Constitution of the United States.

*U.S. Reservations, Declarations, and Understandings, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Part I(1), CONG. REC. S17486-01 (daily ed. Oct.

---

[2] Article 7 contains the ICCPR proscription against "cruel, inhuman or degrading treatment or punishment." The Senate accepted without reservation the ICCPR proscription against arbitrary deprivation of life. ICCPR, Article 6, ¶ 1 ("Every human being has the inherent right to life. . . . No one shall be arbitrarily deprived of his life.").

[3] Article 16 contains the Torture Convention's proscription against cruel, inhuman or degrading treatment or punishment.

27, 1990).

Moreover, the Senate expressed its understanding that the Torture Convention does not "restrict or prohibit the United States from applying the death penalty consistent with the Fifth . . . and/or Fourteenth Amendments to the Constitution of the United States." Id. at Part II(4).

In ratifying these treaties, the Senate agreed that under its international human rights obligations, the United States was bound under the treaties to ensure death sentences were not imposed or carried out in contravention of the substantive standards embodied in the Fifth and Eighth Amendments. Procedural rules are not substantive constitutional standards. On the contrary, they are by definition technical hurdles that prevent consideration and application of the very substantive constitutional standards that the United States treaty obligations require courts to apply. Application of technical procedural bars (such as waiver or procedural bar) to block the merits review of Petitioner's claims would violate the international human rights mandate that the death penalty may be administered only if it satisfies substantive constitutional standards. It also violates the Senate's clear declaration that the United States should "refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant." See also ICCPR, art. 2 ¶ 3.

Finally, a party to a treaty may take no actions in derogation of its treaty obligations. On the contrary, "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." Vienna Convention on the Law of Treaties, art. 26;[4] see also Judge v. Canada, CCPR/C/78/D/829/1998 ¶ 10.4. The application of a procedural doctrine to foreclose judicial review of an international human rights treaty obligation is in derogation of the treaty obligation. E.g.,

---

[4] 1155 U.N.T.S. 33, entered into force January 27, 1980.

LeGrand Case (Germany v. United States of America), 2001 I.C.J. 104 (27 June 2001) (United States violated ICCPR obligations when it interposed procedural default doctrine to prevent review of international treaty claim); see also Case Concerning Avena and Other Mexican Nationals (Mexico v. United States), 2003 I.C.J. No. 128, *Order re: Request for Indication of Provisional Measures* (5 Feb. 2003) (granting "provisional measures" – the international equivalent of a preliminary injunction – against application of "various [procedural] rules of United States municipal law" that render ineffective enforcement of human rights treaty obligations in the domestic courts of the United States).

Thus, United States courts may not impose any procedural rule as a basis to deny review of any of the substantive claims presented on behalf of Mr. Bourgeois in these proceedings. Moreover, the appointment of ineffective counsel to Mr. Bourgeois during the penalty phase of his capital trial also violates the United States' international human rights treaty obligations, customary international law, and peremptory international human rights norms.

**ARGUMENT**

**CLAIM I.**      **PETITIONER'S EXECUTION IS PROHIBITED BY THE EIGHTH AMENDMENT AND THE FEDERAL DEATH PENALTY ACT BECAUSE HE IS A PERSON WITH MENTAL RETARDATION.  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT THIS DEFENSE.**

The Eighth Amendment prohibits the execution of a person with mental retardation.  Atkins v. Virginia, 536 U.S. 304 (2002).  Even before Atkins, the Federal Death Penalty Act (FDPA) prohibited the execution of mentally retarded offenders in federal prosecutions: "A sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596©.

Because Petitioner is a person with mental retardation, he may not be executed and is entitled to vacation of his death sentence under Atkins and the FDPA.

**A.      Background.**

Atkins set forth two justifications for the death penalty – retribution and deterrence of future capital crimes – that are not met by the execution of mentally retarded individuals.  Regarding retribution, the Court wrote:

> With respect to retribution – the interest in seeing that the offender gets his 'just deserts' – the severity of the appropriate punishment necessarily depends on the culpability of the offender... If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution.

Atkins, 536 U.S. at 319.

In regard to deterrence, the Court reasoned:

> The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct.  Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable– for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses– that also make it less likely that they can process

6

the information of the possibility of execution as a penalty and, as a result control their conduct based upon that information.

Id. at 320.

The Court's second reason for prohibiting the execution of the mentally retarded – the reduced capacity of mentally retarded offenders – further supports its application in this case. As observed by the Supreme Court, mentally retarded individuals are less able "to make a persuasive showing of mitigation" and "to give meaningful assistance to their counsel." Id. at 320-21. Moreover, their "demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. In other words, Mr. Bourgeois, as a mentally retarded individual, "face[d] a special risk of wrongful execution" because of his mental retardation. Id

Mr. Bourgeois' mental retardation places him in the narrow category of prisoners who cannot constitutionally be executed. Because his execution would not further the penological goals of the death penalty, it would merely be an exercise of "purposeless and needless suffering." Id. at 319 ("Unless the imposition of the death penalty on a mentally retarded person measurably contributes to one of both of these goals, it is nothing more that the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment.") Congruently, Mr. Bourgeois' limitations put him in that class of capital defendants who are less able to advocate for and defend themselves in a criminal trial, warranting added protections against the imposition of a death sentence.

**B.    Petitioner Meets the Definition for Mental Retardation under <u>Atkins</u> and its Progeny.**

**1.    The Definition of Mental Retardation.**

In barring the execution of mentally retarded individuals, the Supreme Court left to individual jurisdictions the task of developing appropriate ways to determine the presence of mental retardation

7

in a capital defendant.  <u>Atkins</u>, 536 U.S. at 317.   However, the Court endorsed the overlapping

definitions for mental retardation propagated by the American Association on Mental Retardation[5]

("AAMR") and the American Psychiatric Association.[6]  The AAMR definition states:

> Mental retardation refers to substantial limitations in present functioning. It is
> characterized by significantly subaverage intellectual functioning, existing
> concurrently with related limitations in two or more of the following applicable
> adaptive skill areas: communication, self-care, home living, social skills, community
> use, self-direction, health and safety, functional academics, leisure, and work. Mental
> retardation manifests before age 18.  <u>Mental Retardation: Definition, Classification,
> and Systems of Supports</u> 5 (9th ed.1992).

<u>Atkins</u>, 536 U.S. at 309 n. 3  The American Psychiatric Association's definition is similar:

> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant limitations
> in adaptive functioning in at least two of the following skill areas: communication,
> self-care, home living, social/interpersonal skills, use of community resources, self-
> direction, functional academic skills, work, leisure, health, and safety (Criterion B).
> The onset must occur before age 18 years (Criterion C).  <u>Diagnostic and Statistical
> Manual of Mental Disorders</u> 41 (4th ed.2000).

<u>Id</u>.[7]

---

[5]  The AAMR has since changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD).

[6]  The definitions are "essentially congruent." <u>United States v. Nelson</u>, 419 F.Supp.2d 891, 895 (E.D. La. 2006).

[7]  <u>Atkins</u> relied on the AAMR 9th edition's definition of mental retardation.  However, in May 2002, the AAMR released a slightly modified definition:  "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." *American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support* 1 (10th Ed.2002).  This new definition does not mark a substantive change: "the ten skills contained in the DSM-IV-TR represent a more specific breakdown, or subset, of the broader categories contained in the [10th edition of] the AAMR... the definitions are consistent, and in fact, the current DSM-IV-TR definition is identical to the 1992 AAMR definition." <u>United States v. Nelson</u>, 419 F. Supp. 2d 891, 895 (E.D. La. 2006).

The federal courts in Texas have adopted the AAMR and the APA definition of mental retardation referred to in Atkins. The Fifth Circuit has noted repeatedly: "[m]ental retardation is a disability characterized by three criteria: significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18." In re Mathis, 483 F.3d 395, 397 (5th Cir. 2007) (internal quotations omitted); In re Salazar 443 F.3d 430, 432. (5th Cir. 2006) (same); United States v. Webster, 421 F.3d 308, 313 n.14 (5th Cir. 2005) (same); Morris v. Dretke, 413 F.3d 484, 490 (5th Cir.2005) (applying the AAMR standard to a section 2254 Atkins claim).

### 2.    Application of the Standard.

The facts proffered by Petitioner meet the definition of mental retardation. Mr. Bourgeois has completed intelligence testing on two occasions. One week prior to trial, on February 28, 2004, Petitioner was evaluated at defense counsels' request by Dr. Donald Weiner, a neuropsychologist who practices in Corpus Christi. Petitioner obtained a full scale IQ score of 75[8] on Dr. Weiner's administration of the WAIS-R (Wechsler Adult Intelligence Scale-Revised). For reasons explained more fully in the *Motion*, this score is actually a 68.[9] Three years later, in preparation for this *Motion*, Mr. Bourgeois was evaluated again, this time with the WAIS-III (Wechsler Adult

---

[8] This score was reported as a 76 in Dr. Weiner's report, however this was a typographical error. The data sheet has the score as 75.

[9] As explained in his *Motion*, Mr. Bourgeois' score on the WAIS-R significantly overestimates his actual IQ. At the time of this administration, the WAIS-R had been replaced with the re-normed and updated WAIS-III. Because the WAIS-R had been normed in 1978, twenty-six years prior to Mr. Bourgeois' evaluation, Mr. Bourgeois' scores must be adjusted under the well-recognized and accepted Flynn effect, to correct for the IQ gains over time achieved by the entire population. This is explained in the *Petition* at ¶10, note 7.

Intelligence Scale-III)[10] instrument, and he achieved an IQ of 70.[11]  Having demonstrated that he has "significantly subaverage general intellectual functioning," scoring at least two standard deviations below the mean, Petitioner *a fortiori* has established "subaverage general intellectual functioning" under Atkins.

Mr. Bourgeois has also alleged facts demonstrating that he has significant limitations in adaptive skill areas across a broad range of domains, including communication, self-care, home

---

[10]  The WAIS-III "is considered the 'gold standard' of IQ tests and is considered to be the most reliable means of assessing a person's intellectual capacity." Rivera v. Dretke, 2006 WL 870927 (S.D. Tex. March 31, 2006).

[11]  It is important to keep in mind that all IQ scores are properly read as estimates.  See e.g. Rivera v. Dretke, 2006 WL 870927 (S.D. Tex.) ("No IQ score is black and white... An IQ score is really more indicative of an estimated range.").  The 2002 American Association on Mental Retardation (AAMR)*, Mental Retardation:  Definition, Classification, and Systems of Supports,* at 51 (10th ed. 2002) (hereafter *AAMR's Mental Retardation*) explains:

> An obtained IQ standard score must always be considered in terms of the accuracy of its measurement.  Because all measurement, and particularly psychological measurement, has some potential for error, obtained scores may actually represent a range of several points... Errors of measurement as well... must be considered in the interpretations of test results  This process is facilitated by considering the concept of standard error of measurement (SEM)."

*AAMR's Mental Retardation* at 57.  The *AAMR's Mental Retardation* goes on to explain:

> Both of the primary American mental retardation diagnosis schemes make reference to significantly subaverage intellectual functioning as a defining characteristic of mental retardation.  The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (American Psychiatric Association, 1994) defined significantly subaverage as an IQ score of about 70 or below and added a statement concerning measurement error and an example of a Wechsler IQ of 70 considered to represent a range of 65 to 75.  The American Association on Mental Retardation defined it as approximately 70 to 75, taking into account measurement of error.

Id. at 58.

living, social skills, community use, self-direction, functional academics, health and safety, leisure, and work. Undersigned counsel have interviewed multiple witnesses who report Mr. Bourgeois' serious deficiencies in all realms of functioning. They have also proffered an opinion from a mental health professional that Mr. Bourgeois evidences these adaptive deficits. See Declaration of Dr. Jethro Toomer at ¶¶ 10-12. *A fortiori* he also has established the presence of significant deficits in adaptive functioning required for a finding of mental retardation.

Finally, Mr. Bourgeois has alleged facts sufficient to prove that these intellectual and adaptive deficits had their on-set before age 18. The evidence strongly suggests that the etiology of his mental retardation is partially pre-natal, and these deficits were exacerbated by a variety of additional contributing causes in early childhood. Whatever the etiology, his adaptive impairments had clearly manifested by childhood. *A fortiori* he also has proven that his mental retardation originated during the developmental period, as required by Atkins and its progeny.

Mr. Bourgeois has mental retardation under any constitutionally acceptable definition. His death sentence must be vacated under Atkins. At a minimum he has pled a *prima facie* case that he is mentally retarded and the Court should afford him an evidentiary hearing at which he can prove these facts. See In re Mathis, 483 F.3d 395, 397 (5th Cir. 2007) (*prima facie* showing made in context of filing of a successive habeas petition when prisoner made a "sufficient showing of possible merit to warrant a fuller exploration by the district court").

### C.    Trial Counsels' Failure to Investigate, Prepare, and Present this Claim to the Court Constitutes Ineffective Assistance of Counsel.

Petitioner references the above described general description of the law of ineffectiveness of counsel. At the time of Petitioner's trail (2004), the law was clear that a person with mental

11

retardation was not eligible for the death penalty.  This prohibition was contained in the Federal Death Penalty Act, and was embodied as an Eighth Amendment protection in Atkins.  Counsel should have properly investigated and pursued this claim, particularly in view of Dr. Weiner's pre-trial IQ testing.  No reasonable counsel would have ignored an IQ score of 75, and would have explored it further for presentation as a complete defense to the death penalty, or at a minimum, as mitigating evidence.[12]

Instead of investigating Mr. Bourgeois' mental retardation, trial counsel affirmatively avoided this issue.  Nearly two months prior to trial, trial counsel inexplicably agreed to delete any reference to mental retardation or learning disability from the jury questionnaire.  PTT 1/16/04, 7.  This was done without having had IQ testing done on Mr. Bourgeois.  Further, despite the repeated urging of mental health experts Dr. Cunningham and Dr. Estrada to the contrary, trial counsel failed to have Mr. Bourgeois evaluated by a neuropsychologist, the only professional qualified to administer full scale intelligence tests, until only one week before trial.  See Estrada Declaration at ¶¶ 16-17 (PA # 7); Cunningham Declaration at ¶¶ 5-6 (PA #6); Weiner Declaration at ¶ 2 (PA #16). Even worse, trial counsel failed to recognize the significance of Mr. Bourgeois' low score on Dr. Weiner's administration of the WAIS-R.

Counsels' failure to utilize Dr. Weiner will be discussed more fully in the next section of this brief addressing ineffective assistance of counsel in the penalty phase.  Safe to say, counsel inexplicably failed to utilize the highly relevant evidence arising from Dr. Weiner's testing with

---

[12] At the time of Petitioner's trial, the Supreme Court had specifically identified borderline mental retardation (which is the range into which Petitioner falls if he is not actually mentally retarded) as a mitigating factor.  Williams v. Taylor, 529 U.S. 362, 398 (2000); see, also, Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death.")

regard to this claim, or Claim II, below.

In a similar vein, trial counsel failed to interview Mr. Bourgeois' family and friends regarding his possible mental retardation. Trial counsel failed to personally interview any individuals with background information on their client at all, and they failed to instruct their investigators to seek out information about Mr. Bourgeois' intellectual disability.

Trial counsels' failure to investigate, present and prepare information about Mr. Bourgeois' mental retardation constitutes deficient performance under Strickland. Petitioner was prejudiced as a result of this deficient performance.

Petitioner's mental retardation has been manifest since childhood. Trial counsel were ineffective for failing to investigate, prepare, and present Petitioner's mental retardation to this Court. If trial counsel had done so, Petitioner would have been found ineligible for the death penalty before trial even began. See In re Johnson, 334 F.3d 403 (5th Cir. 2003) (trial judge is the appropriate fact-finder for a determination of mental retardation); United States v. Nelson, 419 F. Supp.2d 891, 892 (E.D.La. 2006) (pre-trial Atkins determination by the Court is appropriate); See also United States v. Webster, 421 F.3d 308, 312 (5th Cir. 1998) (affirming trial court's finding that Defendant was not mentally retarded). Trial counsels' failure to protect their mentally retarded client from an illegal death sentence prejudiced Petitioner.

> **D.     This is a Non-Waivable Claim: This Court's Finding that Petitioner is a Person with Mental Retardation Would Preclude Execution Even if Counsel were not Ineffective.**

Petitioner submits that counsels' failure to develop and present the instant claim was ineffective under the Sixth Amendment. However, even if the Court were to find that counsel were not ineffective, Petitioner submits that the Court would still have to grant sentencing relief. This is

13

because the Supreme Court has held that it violates the Eighth Amendment to execute a person with mental retardation. <u>Atkins</u>. Thus, mental retardation is a status precluding execution and that status cannot be waived.

**E.    Because of Petitioner's Chronic and Severe Mental Illness, His Execution Would Violate the Eighth Amendment.**

Mr. Bourgeois has a long and substantial history of major mental illness. The Eighth Amendment's prohibition on execution of the mentally retarded and underage offenders should be expanded to preclude the execution of the severely mentally ill. Similar to people with mental retardation and juveniles, execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

As discussed in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." <u>Id.</u> at 318.

In <u>Roper v. Simmons</u>, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eight Amendment. Analogous to <u>Atkins</u>, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity....[T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be

14

virtually nonexistent." Id. at 571-72 (internal quotations omitted).

Although neither Atkins nor Roper explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill.  Atkins' and Roper's bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Bourgeois, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis.  ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment.  That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." Atkins, 536 U.S. at 312, 316 n.21.  Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, *or* © to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668.  In addition, nearly every major

15

mental health association in the United States has published a policy statement addressing the issue

of the execution of mentally ill offenders, and all of those organizations advocate either an outright

ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation

system can be implemented.[13]   Moreover, just as in Atkins and Roper, where international law and

opinion weighed against the execution of persons with mental retardation, international law and

opinion weigh against the execution of the mentally ill.[14]

Petitioner does not have, and never has had, an intact brain.  See Claim II, *infra*.  He is

severely brain damaged and suffers from Borderline Personality Disorder.  He cannot think the way

---

[13] *See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States*. Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States*. Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor.  The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[14] The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).  Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid.  Moreover, customary international law also prohibits the execution of Petitioner.  *Id.*

16

that other people think; he cannot experience and interact with the world the way other people do; he cannot conform his behavior to the norms of society or the requirements of the law the way other people can; he cannot act in his own best interest in a rational manner; and he cannot do anything about any of this. Atkins compels that Petitioner's sentence violates the Eighth Amendment.

Because of both his mental retardation and severe mental illness, there is no meaningful way to distinguish Petitioner from the people protected by Atkins. His execution would violate the Eighth Amendment. The holdings of Atkins and Roper should be extended to protect Mr. Bourgeois from a penalty disproportionate to his culpability.

As with mental retardation, Petitioner's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**CLAIM II.     COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE.**

**A.     Introduction.**

Counsel failed to provide Petitioner with effective assistance at the penalty phase in violation of the Sixth and Eighth Amendments. Petitioner was raised in a highly abusive and dysfunctional setting. He was subject to brutal corporal, sexual, and emotional abuse. He is brain damaged, with significantly impaired judgment. He has an IQ in the range of mild mental retardation.[15] He suffers from a delusional paranoid disorder and post traumatic stress disorder, as well as from a combination of schizoid, paranoid, and borderline personality disorders. When subjected to stressors he has little to no control of his impulses and he is subject to dissociative and psychotic breaks.

All of this evidence mitigates. The Supreme Court has said so repeatedly in its modern

---

[15] If the Court finds that Petitioner is mentally retarded, relief would have to be granted under Claim I. If the Court does not so find, his low intelligence unquestionably places him in the borderline range of mental retardation.

jurisprudence. Yet counsel, inexplicably, failed to present this evidence.

The performance of capital counsel must be measured against the fundamental underlying Eighth Amendment principle that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence" available to be presented in his case.  Williams v. Taylor, 529 U.S. 362, 393 (2000).

Eighth Amendment jurisprudence is replete with authority finding the very types of evidence that was not presented in Petitioner's case to be mitigating.  Eddings v. Oklahoma, 455 U.S. 104 (1982) (finding childhood abuse and family dysfunction mitigating); Williams v. Taylor, 529 U.S. 362 (2000) (same, and also finding borderline intelligence mitigating); Wiggins v. Smith, 539 U.S. 510 (2003) (same); Rompilla v. Beard, 545 U.S. 374 (2005), (trial counsel ineffective for failing to present available evidence of mental illness, childhood abuse, fetal alcohol syndrome, brain damage, and childhood poverty); Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death."); Tennard v. Dretke, 542 U.S. 274, 288 (2004) (low IQ scores are important mitigating evidence); Brewer v. Quarterman, 127 S.Ct. 1706 (2007) (jury must be able to give mitigating effect to evidence of mental illness and childhood abuse); Nelson v. Quarterman, 472 F.3d 287, 306 (5th Cir. 2006) ("Nelson's mitigating evidence of borderline personality disorder and abandonment by his mother had relevance ... a reasonable juror could have concluded that, while the murder was deliberate, Nelson was less morally culpable as a result of his borderline personality disorder and abusive childhood than a murderer without such a mental illness and similar upbringing might have been.").

Counsel has a duty to provide the jury with more than just a rudimentary view into the

background of his capital client.  <u>Wiggins</u>, 539 U.S. at 524 (counsel ineffective when they presented only "rudimentary" outline of capital defendant's abusive upbringing).  Here it is indisputable that counsel failed to provide the jury with even a rudimentary picture of Petitioner's life and mental health.  The jury heard nothing of the real and palpable mitigating circumstances in Petitioner's life.  It did not hear about Petitioner's low intelligence.  It heard very little about the abuse that he suffered as a child, and it heard absolutely nothing about the psychological scars that resulted from the abuse.  Shockingly, the jury heard nothing about the multiple and interacting mental illnesses that plague Mr. Bourgeois' life and functioning.  Indeed, one need look no further than Dr. Estrada's declaration to see that the jury was not provided with a complete and accurate picture of the real Alfred Bourgeois.  Dr. Estrada, the Government's expert in the field of psychiatry, observed Petitioner's entire trial, and now states:

> I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions.  Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Declaration of Government and Court expert witness Carlos R. Estrada, M.D., dated May 14, 2007 (copy contained in *PA*, document # 7), at ¶ 18.

### B.     The Defense Case at Penalty Phase.

As outlined more fully in the *Motion*, the defense case at penalty phase was notable for its brevity.  The Defense called only three witnesses.  Michelle Armont, Petitioner's half sister, testified on direct for just 8 transcript pages (TT 3/23/04, 94-102).  She testified to a strained relationship between Petitioner and his mother but provided no information about Petitioner's childhood abuse.

19

The defense's second witness, Carl Kevin Henry, testified for 5 pages (TT 3/23/04, 111-116). He related, in minimal detail, some of the abuse Petitioner suffered at the hands of his mother in childhood. Id., at 113-115. He also told the jury that Petitioner came to live with the elderly neighbor, Miss Mary. The third and final defense witness, the Reverend Herman Clayton, Jr., Petitioner's childhood acquaintance, provided 5 more pages of direct testimony (TT 3/23/04, 121-126). He related that he never saw Petitioner's mother abuse him or any of her children, but he had heard that she did so from Petitioner and his siblings (id., at 125).

This, in sum, describes the entire defense case. Despite, as shown below and in the *Motion*, having at their disposal both expert and lay witnesses whom could have put Petitioner's violent background into a mitigating context, counsel rested after putting on a mere **18 pages of direct testimony**.

### C.    The Unpresented Evidence.

As described in full in the *Motion*, there was a wealth of mitigating information available to the defense that was not presented to the jury.

Petitioner's jury was not told that he had an IQ of 68 to 75 (in the range of mild mental retardation). See Declarations of Dr. Weiner, *PA* document # 16, and Dr. Gelbort, *PA* document #8. They were not made aware of his childhood abuse and abandonment, (See Declarations of Lay Witnesses, discussed in Claim II of *Motion*, and Declaration of Drs. Toomer, *PA* document #14, and Sadoff, *PA* document #13), and the impact of these childhood events on his psychological development. See Declaration of Dr. Estrada, at ¶ 10 ("[N]either I, not any other expert, testified about the significance of childhood sexual and/or physical abuse from a mental health perspective. Yet it is not disputed in the mental health field that the significance is profound."). See also

20

Declarations of Drs. Holden, *PA* document # 11; Cunningham, *PA* document #6; Toomer, supra; and Sadoff, supra. The jury was not told of his brain damage and his multiple mental and personality disorders. See id. and Declarations of Drs. Weiner, supra, and Gelbort, supra.

If the full and true information about Mr. Bourgeois' had been presented at trial, the jury would have heard, for example, that "Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments." Declaration of Dr. Estrada, at ¶9. "The combination of abuse and abandonment have an exponential impact on a child. Each are bad singularly – in combination they cause severe psychological impairments. The effects on Mr. Bouregois' adult behavior from this combination are evident." Declaration of Dr. Toomer, at ¶ 6.

The jury would have also heard about Petitioner's personality disorders: "Mr. Bourgeois has debilitating personality disorders, including Borderline Personality Disorder... [which indicates that he] can decompensate into psychotic states when under significant stress." Declaration of Dr. Sadoff, at ¶ 9. See Declaration of Dr. Estrada, at ¶ 10, ("Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic states.").

Expert testimony could have also educated the jury about Petitioner's significant brain damage, identified through neuropsychological testing. This testing revealed that Petitioner "showed deficits in his ability to function with new information and in unfamiliar settings," Declaration of Dr. Weiner, at ¶ 3. Further, his impairment means he "may and often act[] impulsively and without forethought." Declaration of Dr. Gelbort, at ¶ 9.

Finally, expert testimony would have provided the important mitigating evidence about Mr.

21

Bourgeois low intelligence.  "This finding is mitigating as it reflects his difficulties and impairments in problem solving and making judgments." Declaration of Dr. Sadoff, at ¶ 12.

In sum, the jury was not told about Petitioner's "precarious psychological functioning... due to a constellation of events and conditions.":

> [H]e suffers from the lasting impact of savage childhood sexual and physical abuse. He has impaired intelligence (IQ scores in the mentally retarded range).  He has organic brain impairments which particularly impact on his ability to control impulses, make judgments and predict the consequences of his actions.  His psychological functioning deteriorates dramatically from his already deficient baseline during times of stress.  Psychological testing (MCMI) suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder.  On Axis II, he suffers from a combination of schizoid, paranoid and borderline personality disorders.  It is my opinion that when he has acted in a rageful manner, he is likely acting out of mini-psychotic episodes secondary to his borderline personality disorder.

Declaration of Jethro Toomer, Ph.D. *PA* document # 14 at ¶3.  See also, Declaration of Dr. Holden, at ¶ 23 ("[It is my opinion that] the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions.").

### D.    Deficient Performance.

It is hard to imagine that counsel had a sound tactic or strategy for not presenting the evidence that they had.  With respect to Dr. Weiner, it is apparent that counsel did not arrange his evaluation until the last minute.  This fact is evidenced by the date of his evaluation, and as he indicates in his Declaration, he was required to do it on a Saturday because the trial was starting the next week.  Declaration of Donald Weiner, Ph.D., *PA* document #16, at ¶ 2.

Such last minute searching for mitigating evidence is anathema to the Eighth Amendment requirement that counsel conduct a timely and thorough mitigation investigation.  See e.g. Williams v. Taylor, 529 U.S. at 395 (counsels' investigation "fell short of professional standards" when they

"did not begin to prepare for [the penalty phase] until a week before trial"). ABA Guidelines, Commentary to Guideline 10.7, Investigation ("The mitigation investigation should begin as quickly as possible"). While counsel's last minute decision to have their client receive neuropsychological testing may evidence their lack of appreciation of the importance of such testing (although they were encouraged to have it done by both Dr. Cunningham and Dr. Estrada), the last minute testing may have also prevented counsel from learning about its significance. As noted in the *Motion*, it is not clear why counsel did not call Dr. Weiner. See *Motion* at ¶ 60, n.10. However, it is hard to impossible to imagine that counsel would have had a sound or even rational reason for not using this highly mitigating evidence of low IQ, brain damage, and impaired judgment.

With respect to Dr. Cunningham, counsels' failure to call him is also extraordinary. First, Dr. Cunningham is a nationally known and well-regard forensic psychologist who has special expertise in the area of capital sentencing:

> [Counsel] located and sought to hire Dr. Mark Cunningham, a recognized propensity for violence expert with extensive experience in federal capital cases. When Stitt's family did not have sufficient funds to hire Dr. Cunningham, Malinski instead hired the concededly less expensive and less qualified Dr. Thomas Pasquale. The district court found that "[t]here is no doubt that Dr. Cunningham would have been the stronger expert."

United States v. Stitt, 441 F.3d 297, 302 (4th Cir. 2006). As set forth in the *Motion*, Dr. Cunningham was prepared to provide a comprehensive view of how Petitioner's life and background molded him into an impaired individual. See *Motion* at ¶¶ 84-90. As also noted in the *Motion*, counsel told the Court that they were considering not calling Dr. Cunningham in the hope that they would obtain what they needed from the Government's expert, Dr. Estrada (*Motion* at ¶¶ 58-60). Although this could be a sound tactic in the abstract, it was nonsensical when the reality of Dr. Estrada's testimony

23

came crashing down around counsel.  Counsel obtained virtually nothing useful from Dr. Estrada. They failed to obtain evidence that Petitioner was subjected to an abusive childhood.  They certainly did not obtain any evidence of impaired intelligence or organic brain damage.  Dr. Estrada could have testified to all of this had he been permitted to rely on the work done by Dr. Weiner and Dr. Cunningham, but he was not allowed to do so because the defense indicated that the defense expert witnesses would not be called.

Thus, while counsel articulated a "decision" not to call Dr. Cunningham, this decision simply made no sense and was far from "sound" when one compares what Dr. Cunningham could have said, with what Dr. Estrada actually said.

It is apparent from the recollections of Dr. Weiner and Dr. Cunningham, that trial counsel had not developed a coherent strategy regarding their case at penalty phase prior to trail.  Even on the eve of penalty phase, it seems that trial counsel had not yet determined how to proceed. Declaration of Dr. Cunningham at ¶¶12 and 15.  It is clear, then, that trial counsel had not adequately prepared for penalty phase.  The decisions they made during the penalty phase of trial fall far below the "reasonable professional judgments" mandated by Harrison v. Quarterman, 496 F.3d 419, 424 (5th Cir. 2007) (quoting Strickland, at 690-1 ) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

### E.    Prejudice.

There can be no question but that had the jury heard about Petitioner's horrific childhood, his low IQ, and his cognitive and mental impairments, that there is a reasonable probability that at least one juror would have voted for life – the standard governing prejudice in this context.  Wiggins,

24

539 U.S. at 535 (prejudice found when "there is a reasonable probability that at least one juror would have struck a different balance.").

The testimony of Dr. Cunningham, Dr. Weiner, Dr. Holden, and Dr. Estrada could have made all the difference between life and death in this case. The jury was not provided with an accurate and complete picture of Alfred Bourgeois. Again, Dr. Estrada's current Declaration ends any debate about prejudice.

**F.    Counsel Ineffectively Failed to Move to Strike Dr. Estrada's Opinion that Petitioner Posed a Risk of Future Dangerousness.**

In his direct examination, Dr. Estrada testified that he conducted a "risk assessment" which showed that Petitioner "has a much higher tendency toward violence than an ordinary person" TT 3/22/04, 285. He indicated that this opinion was based on Petitioner's history of sexual and physical abuse, abandonment, neglect and rejection. Id., at 281.

However, on cross examination, defense counsel tried to question Dr. Estrada about Petitioner's history of abuse and dysfunction, and the Government's objection to this line of questioning was sustained. See *Motion* at ¶ 60.

At that point, it was plain that the basis for Dr. Estrada's risk assessment was gutted. Counsel failed to move to strike the opinion, and by so-doing, allowed the Government to have it both ways – Petitioner was abused for the aggravating purpose of risk assessment, but not for the mitigating purposes. This was ineffective.

Petitioner has pled facts which if proven would entitle him to relief. Accordingly, he is entitled, at a minimum, to an evidentiary hearing to prove these facts.

**CLAIM III.    NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A RATIONAL FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS. FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM AND TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

The Government had the burden of proving beyond a reasonable doubt each and every element of murder including that the fatal injuries were inflicted within the special maritime and territorial jurisdiction of the United States, i.e., on the grounds of the Corpus Christi Naval Air Station. No reasonable view of the Government's evidence exists, however, upon which a rational fact finder could conclude that the fatal injuries were inflicted on the Air Station grounds. Accordingly, this court must vacate the judgement of conviction. Moreover, counsel were ineffective for failing litigate this claim previously and for failing to gather and present readily available evidence that would have shown that the fatal blows were struck outside of federal jurisdiction, thus rebutting this element of the charge and to rebut the Government's theory of how the crime took place. Petitioner was prejudiced and his judgment of conviction and sentence must be vacated.

That the Government must prove every element of an offense beyond a reasonable doubt is well-settled and long-standing. Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Gaudin, 515 U.S. 506, 510 (1995); United States v. Booker, 543 U.S. 220 (2005); In re Winship, 397 U. S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

A criminal conviction violates due process of law if the evidence presented at trial was

26

insufficient to convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 313-14, 324 (1979) ("This is the first of our cases to expressly consider the question whether the due process standard recognized in Winship constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt. . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.").

The jurisdictional requirement that the murder be committed "within the special maritime and territorial jurisdiction of the United States" is an element of the federal crime of murder. See 18 U.S.C. §1111(b). Additionally, 18 U.S.C. § 3236 states that murder is "committed at the place where the injury was inflicted . . . which caused the death, without regard to the place where the death occurs." To satisfy these elements of the federal murder statutes, the Government must prove that the murder occurred on the grounds of the Naval Air Station beyond a reasonable doubt and to do so it must prove beyond a reasonable doubt that the fatal blows were struck on the grounds of the Air Station.[16]

In this case, the Government failed to meet its burden of proving that the fatal blows were struck on the grounds of the Air Station and thus failed to prove the element of jurisdiction. The Government's actual presentation of evidence failed to prove this element by legally sufficient

---

[16]   In United States v. Bell, 993 F.2d 427, 429 (5th Cir. 1993), the Fifth Circuit Court of Appeals held that the jurisdiction element of the federal homicide statute had to be proven only by a preponderance of the evidence. This holding, however, has been directly questioned, although not overruled, by three post-Apprendi decisions. See, United States v. Reff, 479 F.3d 396,400 (5th Cir. 2007); United States v. Bailey, 169 Fed. Appx. 815, 821 (5th Cir. 2006); United States v. Perrien, 274 F.3d 936, 939, n.1 (5th Cir. 2001). This is largely an academic point because, as shown below, the Government's proof in this case does not even meet the lower preponderance standard.

evidence in violation of due process of law.  Moreover, evidence in the Government's file – which was shared with defense counsel – showed that the fatal blow was actually struck many days before Petitioner arrived at the Air Station.  However, counsel ineffectively failed to use this evidence to challenge jurisdiction.  Under either analysis, Petitioner is entitled to vacation of his conviction.[17]

> **A.      The Government Failed to Prove by Legally Sufficient Evidence That the Fatal Injury was Inflicted on the Grounds of the Corpus Christi Naval Air Station.**

The only witness presented by the Government who testified that Petitioner struck a blow was Petitioner's then seven year old daughter, AB-1994.  She testified that she recalled the day that her "sister went to the hospital" TT, 3/2/04,  33.  She recounted that her sister tipped over the potty after which Petitioner became enraged and banged the decedent's head against the interior front windshield a number of times.  Id., at 36-39.[18]

There was no evidence offered through this or any other witness to demonstrate that the fatal blows were inflicted on the grounds of the Air Station.  Nor were there any reasonable inferences

---

[17]    This precise issue (the timing of the infliction of a fatal blow relevant to federal jurisdiction) was addressed in United States v. Parker, 622 F.2d 298 (8th Cir. 1980).  In Parker, three defendants appealed their convictions arising from a murder that allegedly took place within the confines of Fort Leonard Wood in Missouri, property of the United States Army.  The Court of Appeals found that the forensic evidence (the autopsy report) as well as the statements of the defendants indicated that the fatal blow to the decedent's head did not take place on Fort Leonard but instead took place at an off base bar.  Id. at 302.  The court further found that the evidence tended to show that the body of the decedent was then dumped on the base.  Id.  The Court reversed the convictions of two of the three defendants finding that there was insufficient proof that the fatal blow was struck on the base (the third defendant gave a statement which provided some proof that it was struck on the base and did not obtain relief).

As set forth below, here, as in Parker, the forensic evidence clearly established that the fatal injury could not have been inflicted on the Corpus Christi Naval Air Station and Petitioner's conviction, like the convictions in Parker, must be vacated.

[18]  As shown below, the testimony of the expert who performed the autopsy did not shed any light on the question of when the fatal injuries were inflicted.

28

to be drawn that this is where these blows were inflicted.

This evidence was insufficient to prove the element of jurisdiction and no reasonable fact finder could have done so.  Counsel ineffectively failed to move for a judgment of acquittal and ineffectively failed to raise this defect on direct appeal.

**B.      Counsel Were Ineffective for Failing to Prove that the Fatal Blows Were Inflicted Days Before the Victim's Death.**

Dr. Elizabeth Rouse, MD, performed the autopsy and testified at trial. TT  3/8/04, 2-67.  She testified that she performed the autopsy two days after the alleged assault.  She found that the cause of death was closed head injury, which she termed a subdural hematoma, on the right side of the head.  She was never asked to testify to the estimated time that the fatal injury occurred.  Id. at 22-23.  Instead the only portion of her testimony related to the timing of any of the injuries related to the victim's "recent" scalp wounds, which Dr. Rouse clearly stated were **not the fatal injuries**. TT 3/8/04, 10-20.

Dr. Rouse also testified that she sent the sections of brain tissue from the area where the fatal subdural hematoma was found to a neuropathologist.  Id. at 59.  Yet neither the Government nor trial counsel questioned her about the results of the neuropathologist's analysis.  In fact, trial counsel's cross-examination of Dr. Rouse took up less than three pages of transcript.  TT 3/8/04, 176-78.

The Government failed to even ask Dr. Rouse the time of the infliction of the fatal wound despite the fact that it knew it had the burden of proving that the fatal injury was inflicted on the grounds of the Naval Air Station.[19]  The Government likely did not ask this question because it had

---

[19]  In its closing argument the Government acknowledged this burden: "The last element that we have to prove is that it happened on a special territorial or maritime jurisdiction of the United States and that was because it was on the Navy base," (TT 3/16/04, 10), but otherwise failed to discuss the evidence supporting its proof of this point.

in its file scientific evidence showing that the fatal wound occurred **a minimum of 10 days prior to the autopsy of the decedent.** This scientific evidence, in the form of a neuropathologist's report, was dispositive: this murder *did not* take place on the Naval Air Station and it *did not* take place in the manner described by AB-1994.

The neuropathologist's report (summarized in the autopsy report, *PA* document #52) clearly and unequivocally found that the fatal injuries to the brain were at a minimum **over 10 days old at the time of the autopsy** – long before Petitioner was alleged to have fatally assaulted the decedent in the truck and long before he was on the Naval Air Station grounds and long before he was even in the state of Texas. Specifically, the neuropathologist, Kathleen Kagan-Hallet, MD, microscopically examined the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately ten days old and the injury to the rest of the brain (cerebral white matter) was over 7 days old. (Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50).

Despite having the neuropathologist's report in their possession, trial counsel never contested the timing of the fatal injury and the related jurisdictional issue. Counsel never even attempted to cross-examine Dr. Rouse on this critical element of the Government's case and failed to confront her with Dr. Kagan-Hallet's findings. Counsel also never interviewed or called Dr. Kagan-Hallet to the stand. Nor did counsel retain a forensic pathologist, which as shown below, could have also demonstrated to the jury the fatal flaw in an essential element of the murder charge and in the Government's theory of the case. Counsel's performance was deficient. See Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (In capital case counsel's performance deficient and conviction reversed - despite confession by defendant – where counsel failed to retain ballistics expert to challenge state's

30

expert.)

Had counsel interviewed Dr. Kagan-Hallet and called her to the stand, counsel could have established – through the Government's own expert – that the infliction of the fatal injury could not have occurred on the Naval Air Station property.  Dr. Kagan-Hallet would have testified that she examined microscopically the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately ten days old and the injury to the rest of the brain (cerebral white matter) was over 7 days old.  (*PA*, # 50).  This scientific evidence from a Government expert, prepared at the request of the Government's expert Dr. Rouse –  had it been presented to the jury – would have devastated the Government's theory of its case against Petitioner and would have rebutted the jurisdiction element of the offense of federal murder.

Undersigned counsel retained  Dr. Werner Spitz, a forensic pathologist with over 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition.  Dr. Spitz examined the autopsy report, the autopsy photographs and Dr. Kagan-Hallet's report and concluded that the fact that the fatal injuries were a week or more old calls into question the causation of the injuries and the timing of the fatal injuries.  (Declaration of Werner Spitz, MD dated 5/10/07, *PA* #53).  Dr. Spitz further concluded that the autopsy results and the neuropathology report do not comport with the testimony of AB-1994.  Id.  The findings of Dr. Kagan-Hallet and the findings of Dr. Spitz establish that Petitioner was prejudiced and vacation of the conviction is required.  See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (conviction reversed since counsel's deficient performance in failing to interview eyewitness prejudiced defendant where state's case rested primarily on eye witness testimony.)

31

CLAIM IV.    TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE
EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S
ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, IN
VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AMENDMENT TO THE
UNITED STATES CONSTITUTION.

A.    Introduction.

The Government presented expert testimony and prosecutorial argument that Petitioner's

semen was detected during the post-mortem rectal examination of JG-1999.  The Government used

this evidence, as well as evidence of alleged trauma to JG-1999's vagina, to argue that Petitioner

sexually assaulted JG-1999.  Despite the extremely inflammatory and prejudicial nature of this

evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and

penalty phases of trial, defense counsel failed to present readily available expert testimony that

would have eviscerated the Government's evidence that semen was present and JG-1999 was

sexually assaulted.

At the time of trial, counsel could have presented expert testimony indicating that there was

no scientific basis for the testimony of the Government's expert witnesses (Dr. Scott Benton,

Caroline Zervos and Anthony Onorato), that semen was present on the post-mortem rectal swab

taken from JG-1999.  Counsel could have presented expert testimony indicating that if the substance

recovered from the rectal swab of JG-1999 was semen, sperm should have been observed.  Despite

multiple tests, no sperm were ever observed in this case.  Counsel could have presented expert

testimony indicating that, contrary to the testimony at trial, false positives are not uncommon in the

test used by the Government to allegedly identify the substance as semen.  Counsel could have

presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to

identify the alleged semen, has been detected in multiple male and female bodily fluids.  Counsel

32

could have presented expert testimony indicating that, contrary to the testimony at trial, there was

no evidence of trauma to the vagina of JG-1999.

In short, counsel could have refuted the major portions of the Government's presentation

regarding sexual abuse and anal rape of the victim. Trial counsel, however, failed to develop and

present any of this available expert testimony. Trial counsel were ineffective and their deficient

performance prejudiced Mr. Bourgeois at trial and at sentencing, in violation of his rights under the

Sixth Amendment to the United States Constitution.

**B.     The Testimony and Arguments Presented at Trial and at the Penalty Hearing.**

The Government first set forth the evidence of the alleged semen detected in JG-1999's

rectum in its opening statement to the jury:

> Also, there will be testimony that a swab was taken from the bottom, from the rectum
> of the baby, and that swab, even though it was taken two days after this incident
> occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will
> testify that that swab showed that there was seminal fluid in the rectum of the baby.

TT 3/2/04, 42.

In keeping with its promise to the jury, the Government presented the testimony of Dr. Scott

Benton, who was qualified as an expert in child sexual assault. Dr. Benton testified that sexual

assault in children is difficult to detect because children avoid disclosure; perpetrators purposefully

try to avoid injury to the child; and the vagina, anus and mouth of a child heal rapidly. TT 3/5/04,

18. Thus, according to Dr. Benton, it is common to see a child who has been sexually abused display

no physical signs of trauma. Id. at 19.

However, Dr. Benton testified that even in the absence of trauma or a report of assault,

evidence of male sexual assault can also be proven through forensic testing and the detection of

33

semen.  Id. at 22.  He testified that semen is the "product of the prostate gland of men. . . composed

of water and various proteins and enzymes. . . meant to be a vehicle for sperm during ejaculation."

Id. at 49.  Dr. Benton also testified about the different forensic tests used for the detection of semen:

> The two main tests used for that are acid phosphatase, which is produced predominantly in the prostate of men, and with ejaculation or even pre-ejaculation, that can be deposited either on the skin or in the vagina or the anus or mouth of the victim.
>
> **And a more specific or confirmatory test is called prostatic specific antigen, also known as P30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, except in male prostate, and with one exception, human breast milk.**
>
> The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quick enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which will tell you that there was the presence of male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible.
>
> So those are the main trace evidence that we look for, the biological evidence and the physical evidence that we look for to help establish whether or not a sexual assault took place.

Id. at 22-23.  In further discussing the P30 assay, Dr. Benton noted that the test is designed to

specifically confirm the presence of the P30 protein, which, according to him, is found only in the

male prostate gland (where semen is produced) and the lactating breasts of women:

> The P30 is a protein, and we call it the prostate specific antigen.  That's what I was talking about sort of earlier.  It exists or is produced in the human prostate and in the lactating breast of women.  People who are breast-feeding, it can be found in breast milk.  So from the prostate, we know acid phosphatase and P30 can be done.  So I order the acid phosphatase, and then we refer on – because crime labs can do more expensive tests, to do the P30 test. . . . **It is the confirmatory test for the presence of the prostatic specific antigen, also known as PSA or P30**.  These are synonymous terms.  And that's what it tests for.

Id. at 53.

On cross-examination, Dr. Benton stressed the reliability of the P30 test, over other tests, in determining the presence of P30 and semen.

> We then move to the P30 test. This is the second group of tests. Just to reiterate, there's two types of tests. There's a screening test, and there's a confirmatory test. The acid phosphatase is in the screening group. We want to know, is there a possibility that there's semen there, even if it's erroneous. The confirmatory test is different. **The confirmatory test is we don't want to make any mistakes**. We want the most specific test possible. And frequently, it's also a more expensive test. You use the cheapest test you can for screening, because you're doing it to a lot of people. But the P30, you want to put your best stuff on it.
>
> So in confirmatory tests, the profile, the statistical profile of it is that it has the lowest false positive rate of any test. . . .**We know with the acid phosphatase that it's accuracy can sometimes be off, but it's still very good. With the P30, very low levels of false positives are ever reported.** And there's multiple different ways to test for the P30, just to confirm that it is really there. I think that answers your questions.

Id. at 54-55.

According to Dr. Benton it was not unusual to identify semen where no sperm are detected, id. at 23, in part because of the low survivability and rapid degradation of sperm.

> Sperm's survivability usually is only in the cervix or in the womb, the uterus of the woman. In the vagina itself, it usually doesn't live more than 24-48 hours. In a little girl, prepubertal girl, it doesn't live very long, hours. So they will die. They'll lose their little tails. And once they lose their tails, they're very difficult to find, on a rape kit or trace forensic evidence. You'll find evidence of semen much easier than you'll find sperm. Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing. So the sperm can be destroyed in those environments, and you could still detect semen, but not find sperm. So those would be the conditions in which you could see semen, but not sperm.

Id. at 51-52.[20]

Dr. Benton also testified that based on his review of the autopsy photographs, and what in

---

[20] Dr. Benton also opined that it was not uncommon to encounter semen without sperm in men's pre-ejaculate fluid, in men with vasectomies or with "Azoospermia" – low sperm count. TT 3/5/04, 50-51.

35

his opinion was blood outside of blood vessels, JG-1999 suffered trauma to her vagina. Id. at 44-46.

The Government also presented the testimony of FBI forensic serologist Caroline Zervos. Ms. Zervos testified that as part of the FBI's protocol, when sample sizes permit, two tests, presumptive and confirmatory, are usually performed to determine the presence of semen or other serological substances. Id. at 63-64. Ms. Zervos testified that in this case, however, only a confirmatory test for the presence of semen was conducted on the evidence labeled Q5-Q7, the post-mortem rectal swabs taken from JG-1999. Id. at 86. She testified that only the confirmatory test was used in order to avoid the false positives sometimes associated with presumptive tests. Id. at 87. Ms. Zervos also testified that in this case, a P30 test was the confirmatory test used on the rectal swabs, and that it was positive for the presence of semen. Id.[21]

On cross-examination, Ms. Zervos testified that the P30 protein could also be found in male blood and male urine, and thus tests of those substances could also result in a positive P30 test. Id. at 103-04. However, according to Ms. Zervos, no female fluids contain the P30 protein. Id. at 105

The Government also presented the testimony of FBI forensic DNA examiner Anthony Onorato. Mr. Onorato testified that the only DNA present on the rectal swabs, Q5-Q7, was female and belonged to JG-1999. Id. at 118. He also testified that it was not uncommon to have semen where male DNA is not detected. Id.; 127-28.[22] On cross-examination, Mr. Onorato testified that the only place, outside of male semen, where the P30 protein can be found, is the blood of a male

---

[21] Ms. Zervos also testified that testing for the presence of semen on four oral swabs of JG-1999 was negative. TT 3/5/04, 87.

[22] Mr. Onorato also testified that an additional test for the presence of male DNA, performed by Orchid-Cellmark Laboratories, on behalf of the FBI, in this case, was also negative. TT 3/5/04, 132-04.

36

with prostate cancer.  Id. at 128.

During closing arguments of the guilt/innocence phase of trial, the Government seized upon

the testimony of Dr. Benton, Ms. Zervos and Mr. Onorato.  The prosecutor argued:

> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's
> little bottom had semen on them.  There was semen in that baby's bottom.  But the
> swabs were taken at the autopsy and the autopsy was done on June 29th.  The baby
> was thrown on the side of the truck on June 27th and died on the 28th, two days.  Dr.
> Benton testified, the DNA specialist testified that the sperm is very delicate, that it
> degrades quickly.  But when you get a confirmatory test for semen, you've got
> semen.  It's an ejaculate from a man, not from a woman, from a man from sexual
> arousal.  And that's what we know.
>
> The other thing that Dr. Benton told us, as many of the other physicians, is that there
> can be things happen and not show.  You know, I thought it was real interesting
> yesterday when Mr. Bourgeois was testifying because I said, what was that around
> her eyes?  I said, wt (sic) that Vaseline?  No, we don't have Vaseline in the truck.
> What is so bad about having Vaseline?  I thought that was interesting.  It's a
> lubricant.  Why would you have to deny that?

TT 3/16/04, 19-20.[23]

Counsel recognized the impact of this highly prejudicial testimony.  After initially neglecting

to discuss this evidence, (TT 3/16/04, 41) ("Your Honor, this is unusual, may I – something, I forgot

to talk about.  May I do that?"), and without presenting a forensic expert for the defense, counsel

attempted to counteract the evidence of sexual assault.  Despite the testimony that semen was found,

he argued that no evidence of semen or sexual assault existed.

> They say sexually abused.  **And they don't talk about the fact that they found no
> evidence of trauma to the rectum or the genitalia when they examined this child
> at the hospital.**
>
> *                              *                              *

---

[23] The Government's argument regarding petitioner's use of Vaseline to sexually abuse JG-
1999 is based on Dr. Benton's testimony that with lubrication, the rectum of a child is sufficiently
flexible to withstand the trauma of an adult male penis, and quickly heal.  TT 3/5/04, 36-39.

First you learned about DNA, some of you may already have learned a lot about DNA. I know I don't know much about DNA but that you can prove who didn't do something but it's not a sure thing who did it. We learned that.

Secondly, with regard to DNA, we learned that there was a test which was found positive for semen and that the expert who had examined that and talked freely about (inaudible) protein. **He said that there was a better test and so he sent the semen off for a better test. And that test was negative. That test was negative, the better test**. And that was the testimony from the witness.

    *                                   *                                  *

And I suggest to you, if that's going on, that should have no reliability as far your decision making in this case because you'd have none. And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call, was negative. **There's no evidence of semen, I suggest to you, being found on this child.**

TT 3/16/04, 24; 41-42; 43. However, because no evidence was presented to support his argument

that there was no semen found, and based on the allegedly positive P30 test indicating semen was

found, an objection to defense counsel's argument was sustained, and the following exchange took

place:

Ms. Booth:    Your Honor, I have to object. That is a mischaracterization of the evidence.

The Court:    That is sustained.

Mr. Tinker:    The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth:    I have to object, your Honor.

The Court:[24]    Let me see counsel at side bar.

The Court:    **The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was** –

---

[24] The transcript erroneously attributes this comment to Mr. Tinker.

Mr. Tinker:     (Inaudible)

The Court:     It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child.  it was –

Mr. Tinker:     (Inaudible).

The Court:     **That is what the expert testified to, there was seminal fluid found in her anus. What they couldn't identify because it was degraded, was the DNA.  There was no question of the expert testified.  They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:     I didn't do that on purpose – we got over here and I said, I object.  And you said, why do you –

The Court:     What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA.  It was too degraded.

Mr. Tinker:     You said, why do you object that it was negative and so I said, okay, it was negative.  But I didn't know (inaudible).  Well anyway, I'm just saying –

The Court:     (Inaudible) that there was DNA that came back no – they couldn't find DNA.  They could only find JG-1999's DNA.

Mr. Tinker:     But I didn't do that on purpose, Judge.

The Court:     But you've said it several times (inaudible) that there was another test they could have done to identify the seminal fluid.

Mr. Tinker:     (Inaudible).

The Court:     Don't put emphasis on it because they don't have to believe what the experts say.


TT 3/16/04, 43-45.

        Subsequently, during its penalty phase closing argument, the Government used the alleged

semen evidence as a basis for urging the jury to sentence Mr. Bourgeois to death.

        Was he laughing when he beat JG-1999 to death?  Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body?**

39

\*                              \*                              \*

Let's talk about lack of remorse. The Defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. **His signature with his teeth marks and his semen is all in that baby**.

TT 3/24/04, 70; 75-76.

### C.    Trial Counsels' Deficient Performance.

To establish deficient performance, Petitioner must demonstrate that counsels' representation "fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 688, 694 (1984). While the Supreme Court has not set forth a bright line test for reasonable attorney conduct, it has emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Id. at 690.

Courts have long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.[25] Those guidelines dictate that counsel in a capital case should "secure the assistance of experts where it is necessary or appropriate for:

---

[25]    In Wiggins v. Smith, 539 U.S. 510 (2003), the Supreme Court found that the ABA Guidelines constituted "well-defined norms" that are "'guides to determining what is reasonable.'" Id. at 524 (quoting Strickland v. Washington, 466 U.S. 668, 688-89 (1984)). The 1989 ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." Hamblin v. Mitchell, 354 F.3d 482, 487 (6th Cir. 2003).

(A)    preparation of the defense;
(B)    adequate understanding of the prosecution's case; [or]
(C)    rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial ...."

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, § 11.4.1.D.7 at 95 (1989 ed.); ABA GUIDELINES § 10.7 at 80 (2003 ed.), Commentary ("the elements of an appropriate investigation include the following: 4. Physical Evidence: Counsel should make a prompt request to the relevant government agencies for any physical evidence or expert report relevant to the offense or sentencing, as well as the underlying materials.  With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence, and conduct appropriate analysis of all other available forensic evidence").

When a case involves significant forensic evidence, reasonable counsel seek out and utilize experts who will support their defense.  See, e.g., Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (counsel's performance deficient for failing to develop and present expert ballistics testimony that would have provided the jury with conflicting evidence bearing on the defendant's role in the crime); Richey v. Mitchell, 395 F.3d 660, 685 (6th Cir. 2005) (counsel ineffective for failing to present expert testimony offering competing scientific evidence) (rev'd on other grounds Bradshaw v. Richey, 546 U.S. 74 (2005)).

In Soffar, the prosecution's theory – supported by the defendant's confession and a prosecution ballistics expert – was that Soffar and an accomplice had fired five shots at the scene of the crime:  a warning shot and one shot into each of the four victims.  Soffar, 368 F.3d at 472, 476.  Statements by the surviving eyewitness indicated that only four shots were fired, and that the witness was shot in a location different from that in which the witness was found (and where Soffar's

statement placed him).  Accordingly, testimony by a defense ballistics expert, subsequently presented

during post-conviction proceedings, had the potential to support an alternative version of the facts

and discredit the defendant's confession.  Id.  On these facts, the Fifth Circuit found counsel's

performance deficient for failing to develop and present the readily available testimony of a ballistics

expert which would have undermined the state's case.  Id. at 476-77 ("As was made evident during

state habeas proceedings, Soffar's defense counsel would not have had to look far to find a ballistics

expert who could have provided testimony to aid his defense.").

Here, as in Soffar, the Government relied on expert testimony to support its case that semen

was present in JG-1999's rectum and that she was sexually abused.  Here, as in Soffar, defense

counsel were or should have been aware that there were serious questions about the validity of the

expert testimony.  Indeed, as set forth below, counsel in this case, like Soffar, "would not have had

to look hard" to find an expert.  On the contrary, they were in possession of an expert opinion which

completely undermined the Government's allegations.   Here, as in Soffar, counsel's performance

was deficient for failing to develop and present expert testimony which would have undermined the

Government's theory of sexual abuse.

**1.      Counsel Ineffectively Failed to Counter the Government's Contention that Petitioner's Semen Was Found on the Victim.**

On October 8, 2003, counsel filed an *ex parte* motion for the appointment of Dr. Elizabeth

Johnson as a defense DNA expert.  *PA*, document # 46.  On October 20, 2003, this Court granted

that motion. *PA*, document # 47.  On January 16, 2004, counsel informed the Court that contrary to

the Government's assertion that all samples had been consumed during prior testing, Dr. Johnson

had identified an additional biological sample which was available for serological and DNA testing.

42

PTT 1/16/04, 32-34. With the assistance and consent of the Government, the remaining sample was sent to Dr. Johnson. Id. at 34-36.

On February 25, 2004, after counsel had failed to provide the Government with a report from Dr. Johnson and several other defense experts, this Court issued an Order indicating that all expert reports, including Dr. Johnson's, must be turned over by February 26, 2004. PA, document # 48.; PTT 2/25/04, 130-48. If not provided, counsel would be precluded from presenting the testimony of Dr. Johnson. Id. Counsel never proffered a report from Dr. Johnson.

On March 2, 2004, Dr. Johnson provided trial counsel with a two page summary of the testimony she could provide if called to testify. Regarding the Government's conclusion that semen was detected on the rectal swab taken from JG-1999, Dr. Johnson concluded:

- The FBI did not test the rectal swab with AP reagent or do a sperm search. They only did a P30 test with the ABA card and a DNA test. The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction.

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

*PA*, document # 49. Dr. Johnson also provided counsel with an opinion showing that the prostatic specific antigen (PSA) is found in bodily fluids, other than male semen, including: amniotic fluid, breast milk, saliva, female urine and female serum. Id.

Dr. Johnson was not called to testify at Petitioner's trial.

43

Had counsel called Dr. Johnson, the jury would have been presented with scientific evidence that completely undermined the Government's evidence and strongly supported counsel's argument that there was <u>no</u> semen present and JG-1999 had <u>not</u> been sexually abused.  As Dr. Johnson explains:

> Had I been called as a witness, I would have testified consistent with my findings as outlined above and in the synopsis I faxed to Mr. Tinker on March 2, 2004.  Had I been called as a witness at Mr. Bourgeois' trial I would have testified that there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen, and that four scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA testing) were negative for the presence male fluids or male cells on the rectal swabs.  That only the P30 test gave a (weak) positive result and should not be considered conclusive in light of numerous contradictory tests. Accordingly, I would have testified that there was insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was present in JG-1999's rectum.
>
> [H]ad I been called as a witness at trial, I would have testified that the Government's evidence at trial regarding the alleged semen was erroneous and scientifically unsubstantiated.  I would have specifically addressed the erroneous testimony of Dr. Scott Benton and testified that spermatozoa are very durable and do not easily degrade (they are so durable that an additional chemical is required to break open spermatozoa in the laboratory), that spermatozoa can be easily detected microscopically and their abundance in seminal fluid facilitates microscopic detection even after the tail is lost, and that spermatozoa can be found for up to six days in the vaginal tract of a living female.  In summary, I would have provided scientific evidence and testimony which would have directly contradicted the Government's evidence and theory of prosecution.

Declaration of Elizabeth Johnson, Ph.D., *PA*, document # 49, ¶¶ 5-6.

Dr. Johnson is not alone in her view.  Trial counsel could also have presented additional expert testimony which would have supported Dr. Johnson's conclusions and counsels' argument that no semen was found, and would have further undermined the testimony of Dr. Benton, Caroline Zervos and Anthony Onorato.

Undersigned counsel have consulted with Dr. Edward T. Blake and Alan Keel of Forensic

44

Science Associates who have determined that:[26]

- There is no basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.

- Contrary to the testimony at trial, the P30 test is not a stand alone confirmatory test for the presence of semen. Because of the hyper-sensitivity of the P30 assay, false positives are not uncommon. For example, the P30 assay is so sensitive that positive results have been identified in semen free female urine. Thus, contrary to the testimony at trial, the P30 protein has been identified in body fluids other than semen, male blood, and male urine. Without the presence of acid phosphatase and/or sperm, the P30 assay is not and should not be considered a stand alone confirmatory test.

- The presence of sperm is the only confirmatory test for semen. Even then, if there is a low number of sperm, the test may not be confirmatory. There are many scenarios which might lead to the presence of sperm in a substance which is not semen. Finding a low number of sperm does not necessarily mean that there was ejaculate at that location. In this case there were no sperm identified in any of the tests which were performed. Moreover, in this case, if the substance identified by the P30 assay was semen, sperm should have been identified. Because of the high unit volume of sperm in semen the finding of sperm is more sensitive than the P30 assay.

- Dr. Benton's testimony defining semen as the water and protein containing substance which is produced in the prostate gland is incomplete if not erroneous. Semen is the combination of the secretions of the testes, seminal vesicles, prostate, bulbourethral glands and sperm. Moreover, Dr. Benton's testimony regarding the survivability of sperm is completely irrelevant. Indeed, the more important issue is the persistence of sperm. Thus, even if sperm lose their tails or die as easily as Dr. Benton describes, they do not degrade easily or rapidly and DNA from those sperm cells can be identified

---

[26] Dr. Blake and his Forensic Science Associates in Richmond, California, are nationally renowned. Dr. Blake's curricula vitae was included as an exhibit to the *Motion* (*PA*, document # 41). Mr. Keel's curricula vitae is included as part of the Report of Forensic Science Associates, *SPA*, document # 65. Dr. Blake and his firm provide criminalistic and forensic serology services to law enforcement, prosecuting agencies, attorneys, insurance companies and private individuals. As a doctoral student, Dr. Blake assisted in discovering, isolating and identifying the P30 protein. He was also the first scientist in the United States to use polymerase chain reaction (PCR) based DNA testing. Additional information on this celebrated forensic laboratory is available on its web site, www.fsalab.com.

and extracted for decades.  Again, in this case, no sperm were ever identified.
- Dr. Elizabeth Johnson's pre-trial conclusions, contained in her March 1, 2004 summary to trial counsel, are accurate and there is no scientific basis for counsel's failure to present her testimony at trial.

Report of Forensic Science Associates, *SPA*, document # 65 at 3, 17, 19-27.

Counsels' performance was deficient for failing to develop and present the available expert testimony to counter the Government's assertion that semen was present in JG-1999's rectum. See Richey, 395 F.3d at 685 ("[where] there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit testimony rebutting the state's expert testimony") (quoting Knott v. Mabrey, 671 F.2d 1208, 1213 (8th Cir. 1982)); Bower v. Quarterman, 2007 WL 2326065, *8 (5th Cir. 2007) (counsel constitutionally required to seek out expert where crucial legal issue rests on reliability of scientific evidence).

### 2.     Counsel Ineffectively Failed to Counter the Government's Evidence of Sexual Trauma.

Trial counsel also ineffectively failed to challenge Dr. Benton's testimony that the autopsy of JG-1999 revealed vaginal trauma. See TT 3/5/04, 44-46.  While counsel argued that the autopsy of JG-1999 revealed no vaginal trauma, they failed to present any evidence to support their argument.

Government witness Dr. Elizabeth Rouse testified that during her autopsy she performed a sexual assault examination on JG-1999.  TT 3/8/04, 59-60.  In her autopsy report, Dr. Rouse concluded that, "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**."  See Autopsy Report of Dr. Elizabeth Rouse, PA, document # 52, p. 3.  Dr. Rouse, however, did not testify about the results of that examination, id.,

46

and counsel failed to elicit the results during cross-examination.  Id. at 65-67.

Counsel were ineffective for failing to make "efforts to secure information in the possession

of the prosecution" (Dr. Rouse's autopsy report) and to use that information to develop helpful

evidence for the defense.  Rompilla v. Beard, 545 U.S. 374, 387 (2005).   In addition, counsel

ineffectively failed to develop and follow up on this obvious "red flag" in Dr. Rouse's report

(indicating no evidence of trauma), which showed the need for further investigation, development

and presentation of expert testimony to dispute the Government's contention that Petitioner sexually

traumatized the victim.[27]

Had counsel pursued the lead presented by Dr. Rouse's autopsy report they could have

presented their own evidence that Petitioner did not sexually assault the victim.  Undersigned

counsel have done so and the result is exculpatory.  Dr. Werner U. Spitz has determined that:

> With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had
> what appeared to be inflammatory changes in the genital area, some six weeks before
> her death and evidence of apparent bruising at the time of the postmortem
> examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse
> who performed the autopsy specifically describes on page three of her report, at the

---

[27]  See e.g. Wiggins, 539 U.S. at 524 (counsel must "pursu[e] ... leads" created by known information); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (counsel must "follow[] through on" questions raised by mental health evaluation); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (counsel ineffective where he had some "information regarding possible mitigating evidence," and "failed to follow up with further interviews and investigation"); Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (counsel must "follow available leads").  See also Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed"); Driscoll v. Delo, 71 F.3d 701, 707-08 (8th Cir. 1996) (defense counsel has the duty to study and understand lab results and scientific aspects of case);  Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1256 (W.D. Wash. 1994), aff'd, 64 F.3d 1432 (9th Cir. 1995) (counsel ineffective for failing to obtain an independent evaluation of ballistic and forensic evidence that could have showed that co-defendant fired the first, fatal shot); Demarest v. Price, 905 F. Supp. 1432, 1450 (D. Col. 1995) (counsel has duty to investigate scientific aspects of state's case and consult with the appropriate experts to counter state's blood spatter experts).

end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down in the same paragraph, the autopsy report continues "on the upper left buttock, there is hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

Declaration of Werner U. Spitz, M.D., PA document # 53, ¶ 15.

Counsels' performance was deficient. Given the importance of Dr. Benton's and Dr. Rouse's testimony, and especially given counsels' recognition at the time that it was suspect (as evidenced by their unsupported arguments that there was no sexual trauma to JG-1999), counsel were ineffective for failing to obtain defense experts, like Dr. Johnson, Dr. Blake, Alan Keel and Dr. Spitz, who could have assisted counsel in preparing cross-examination of Dr. Benton and Dr. Rouse and affirmatively presenting the exculpatory opinions of these experts.[28]

Counsel's failure to develop and present available expert testimony to rebut the

---

[28] See Rompilla, 545 U.S. at 387 ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case"); ABA GUIDELINE 11.4.1 ("Counsel should secure the assistance of experts where it is necessary or appropriate for," inter alia, "preparation of the defense," "adequate understanding of the prosecution's case," "rebuttal of any portion of the prosecution's case"); Pavel v. Hollins, 261 F.3d 210, 223-25, 227-28 (2d Cir. 2001) (counsel ineffective for failing to seek assistance of medical expert who could have undermined testimony of state's medical expert); Gersten v. Senkowski, 299 F.Supp.2d 84, 103-04 (E.D.N.Y. 2004) (same), aff'd, 426 F.3d 588, 607-11 (2d Cir. 2005) (same); Holsomback v. White, 133 F.3d 1382, 1388 (11th Cir. 1998) (counsel ineffective for failing to investigate, develop and present medical expert testimony that could have undermined state's case); Harris v. Wood, 64 F.3d 1432, 1436 (9th Cir. 1995) (counsel ineffective for failing to obtain "independent evaluation of the ballistic evidence or the forensic evidence"); Troedel v. Wainwright, 667 F.Supp. 1456, 1461 (S.D. Fla. 1986) (counsel ineffective for failing to consult expert to refute prosecution forensic expert), aff'd, 828 F.2d 670 (11th Cir. 1987) (per curiam); Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir. 1983) (counsel ineffective for failing to develop and present expert testimony regarding fatal bullet's trajectory that would have supported self-defense).

48

Government's allegation that semen was found in JG-1999's rectum and that she was sexually abused was deficient. Counsels' performance in failing to present available expert testimony to rebut the testimony of Government witnesses Dr. Scott Benton, Caroline Zervos and Anthony Onorato was deficient. Additionally, counsels' performance in failing to elicit and present expert testimony that there was no trauma to JG-1999's vagina was deficient.

Trial counsel could have had no reasonable tactical or strategic reason for failing to challenge the above described testimony and evidence. Indeed, counsel tried to do so. On one occasion counsels' argument was prohibited (with respect to the presence of semen) and in another his argument was simply unsupported by the evidence (with respect to the presence of trauma). But, both arguments demonstrate that this evidence was of concern to counsel and that they felt compelled to address it. However, due to their ineffective performance, counsel were without the ammunition to effectively respond.

### D.    Petitioner Was Prejudiced by Counsel's Ineffectiveness.

In order to establish prejudice Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694; Soffar, 368 F.3d at 478 (prejudice is determined by "whether there is a reasonable probability that counsel's errors affected the outcome of the trial."). "Prejudice" is not an outcome-determinative test. Strickland, 466 U.S. at 693-94. The question is not whether representation by effective counsel would have actually changed the jury's ultimate verdict, nor even whether representation by effective counsel would "more likely than not" have changed the verdict. Id. Instead, prejudice is established when confidence in the outcome is undermined because of counsel's deficiencies. Id. at 694; Williams v. Cain, 125 F.3d 269 (5th Cir. 1997) (citing Strickland).

Moreover, with respect to the penalty phase, prejudice is determined by the impact of counsel's deficient performance on at least one juror. See Wiggins, 539 U.S. at 535 (prejudice found when "there is a reasonable probability that at least one juror would have struck a different balance."); Williams, 529 U.S. at 393-95 (ratifying effect on a single juror standard applied by Virginia trial court); Soffar, 368 F.3d at 479 (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty."). In order to establish prejudice for counsels' failure to call witnesses, the Fifth Circuit requires a petitioner to show that the testimony would have been favorable and that the witness would have testified at trial. Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985).

In finding that the petitioner was prejudiced by trial counsels' failure to develop and present expert testimony, the Soffar Court stated:

> Because of the ineffectiveness of Soffar's defense counsel, the jury never heard the contrary opinions of an available qualified ballistics expert that only four shots were fired (not five as Soffar's statement purported to say), and that the arrangement of bullet holes in the carpet clearly showed that Garner was shot in a different place from where he was found by police (and not where Soffar said he shot him).

> Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result. In particular, had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty.

Soffar, 368 F.3d at 479.

Here, as in Soffar, because of counsels' ineffectiveness, the jury never heard the "contrary opinions of the available qualified expert[s]" that there was no semen present in the rectum of JG-1999 and no physical evidence of sexual assault. Here, as in Soffar, "[h]ad the jury been confronted with this considerable evidence favorable to [Mr. Bourgeois], there is a reasonable probability it

50

would have reached a different result." Accordingly, here, as in Soffar, Mr. Bourgeois was prejudiced because "had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty." Id.

As a result of trial counsels' ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted. This unrebutted evidence impacted the guilt/innocence and penalty phases of Mr. Bourgeois' trial.

Because Mr. Bourgeois was alleged to have been the only person who could have been the source of the alleged semen, the unrebutted evidence of semen and sexual abuse was directly relevant to the identity of the killer and undermined Mr. Bourgeois' defense that he was not JG-1999's killer. Indeed, any argument that Mr. Bourgeois was not the person who killed JG-1999 was apt to carry significantly less weight when the jury was told, without evidence to the contrary, that his semen was present in her rectum and her vagina was traumatized. In addition, the prejudice to Petitioner's defense was compounded by the flawed bite mark evidence counsel ineffectively failed to rebut. See Claim V, below. Had counsel performed effectively, they could have supported their argument that no semen was found and that JG-1999 was not sexually abused, and their argument that Mr. Bourgeois was not JG-1999's killer would have been profoundly more convincing.

Moreover, the unrebutted evidence of semen and sexual abuse was presumably admitted in support of the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner. 18 U.S.C. § 3592(c)(6). As set forth above, this evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**"). This flawed and prejudicial evidence skewed the jury's deliberative weighing

51

process in favor of death.  As a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die.  Petitioner was prejudiced.

Mr. Bourgeois' rights under the Sixth Amendment of the United States Constitution were violated.  He is entitled to a new trial and a new sentencing hearing.  At a minimum he has pled a *prima facie* case that he was denied the effective representation of counsel and the Court should afford him an evidentiary hearing at which he can prove these facts.

**CLAIM V.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND THE DIGITAL ENHANCEMENTS OF THE BITE MARK PHOTOGRAPHS AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

The jury was presented with unreliable and false scientific evidence.  The Government's bite mark experts, Dr. Senn and Dr. Chrz, who testified that Petitioner was the "probable" source of the bite marks found on the deceased, formed their opinions based upon digital photographs that were "enhanced" by another Government expert, Dr. Oliver.  However, Dr. Oliver's methodology was deeply flawed and unreliable.  In addition to relying on the highly inaccurate digital "enhancements," Dr. Senn and Dr. Chrz also utilized untested and invalid odontological identification methods to opine that Petitioner was the likely source of the bite marks.  Based on these inaccurate conclusions, the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent. TT 4/24/04, 76.

Despite the devastating effect of this testimony and its gross lack of a scientific basis, trial counsel did absolutely nothing to preclude it – by way of a pre-trial Daubert motion – or by rebutting

it once it was admitted, by way of expert testimony or an educated cross-examination of the Government's experts. Petitioner was prejudiced and a new trial and penalty hearing are mandated.

###   A.   The Admissibility of Expert Testimony.

It is well settled that Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702 require a trial judge to act as a gatekeeper, excluding scientific and non-scientific opinions or methods that lack sufficient reliability or relevance.[29]   The court must determine at the outset whether the reasoning and methodology underlying the expert testimony is scientifically valid. Simply put, evidentiary reliability and relevancy (and thus admissibility) are based upon scientific or technical validity. In performing this gatekeeper function, a trial court should apply the following factors: 1) whether the theory or technique is generally accepted within the relevant scientific or technical community, 2) whether the theory or technique has been subjected to peer review and publication, 3) whether the theory or technique can and has been tested, 4) whether the known or potential rate of error is acceptable, and 5) whether there are standards controlling the technique's operation. Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir. 2007); See also, Moore v. Ashland Tire Chemical Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en banc).

---

[29]   Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In Kumho Tire Co. v. Carmichael, 526 U.S. 137(1999), the Supreme Court held that the gatekeeper protections of Daubert apply to scientific as well as non-scientific expert opinions. Accord In re Silica Products Liability Litigation, 398 F. Supp. 2d 563, 621 (S.D. Tex. 2005) (Jack, J.).

The expert's testimony "must be reliable at each and every step or else it is inadmissable. 'The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.'" Knight, 482 F.3d at 354-5 (5th Cir. 2007) (quoting Heller v. Shaw, 167 F.3d 146, 155 (3d Cir. 1999)).  Thus, "*any step* that renders the analysis unreliable . . . renders the expert's testimony inadmissable.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In re Silica Products Liability Litigation, 398 F. Supp. 2d 563, 625 (S.D. Tex. 2005) (Jack, J.) (quoting  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994)).

Of course counsel play a role in triggering the Court's gate keeping function.  Absent an application from counsel calling into question the admissibility of the particular evidence, the Court cannot necessarily be expected to know that the evidence is of questionable validity.

The party proffering the expert testimony must establish that "the proffered evidence is *both* 'reliable' and 'relevant.'   Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'  Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" Knight v. Kirby Inland Marine Inc., 482 F.3d at 352 (5th Cir. 2007) (quoting Daubert, 509 U.S. at 589, 593).  In making the reliability inquiry "it is the district court's responsibility to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." In re Silica Products, 398 F. Supp. at 622, quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137,152 (1999); Skidmore v. Precision Printing &Pkg.,Inc., 188 F.3d 6060, 618 (5th Cir. 1999).

In this case the Government's expert bite mark evidence and the digital enhancements of the

bite mark photographs failed to meet *either* the reliability or relevance prongs of Daubert.  This

evidence was admitted, however, because Petitioner's counsel utterly failed in their duty to

investigate and challenge this evidence by way of a pre-trial Daubert motion or by calling expert

witnesses at trial to rebut it.  Counsel's performance was deficient.

## B.    Counsel's Duty to Investigate Related to Mounting a Daubert Challenge.

Trial counsel have a critical duty to conduct an adequate pretrial investigation of the

Government's  scientific evidence.  This duty stems from counsels' general investigative duties in

a capital case.  The Supreme Court has explained the relationship between an attorney's pre-trial

investigation and the choices that he makes with regard to matters of trial strategy:

> [S]trategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices made after less
> than complete investigation are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary. In any ineffectiveness case,
> a particular decision not to investigate must be directly assessed for reasonableness
> in all the circumstances, applying a heavy measure of deference to counsel's
> judgments.

Strickland v, Washington, 466 U.S. 668, 690-91 (1984); Wiggins, 539 U.S. at 526 ("In assessing the

reasonableness of an attorney's investigation, however, a court must consider not only the quantum

of evidence already known to counsel, but also whether the known evidence would lead a reasonable

attorney to investigate further.")  Hence, absent such investigation counsel cannot be heard to say

that they had a tactic or strategy for failing to challenge the evidence in question.

It is long-established that counsel have a duty to conduct a thorough pretrial investigation into

the material aspects of the Government's case:

> A substantial body of Fifth Circuit case law insists, however, 'that effective counsel

55

> conduct a reasonable amount of pretrial investigation.' . . . . this circuit has recognized that, *at a minimum*, counsel had the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, is a proper guide for determining what is reasonable under the circumstances.

Nealy v. Cabana, 764 F.2d 1173, 1177-78 (5th Cir. 1985) (quoting Martin v. Maggio, 711 F.2d 1273, 1280 (5th Cir. 1980)).

In Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004), the Fifth Circuit made clear that the pretrial preparation and investigation responsibilities of counsel in a capital case, including the retention of expert witnesses, applied equally to both the guilt and penalty phases of the trial:

> We recognize that Wiggins was decided in the context of a defense counsel's decision regarding whether to offer a mitigation case during the sentencing phase of a trial. However, this is a difference without distinction. Whether the failure to conduct a reasonable investigation occurs at the sentencing phase or at the guilt phase should warrant no meaningful distinction in defining a person's right to effective assistance of counsel. Id. at 368 F.3d at 477 n. 40.

The United States Supreme Court, like the Fifth Circuit Court of Appeals, has long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.[30]

It is indisputable that at the time of Petitioner's trial, counsel had a pretrial duty to thoroughly examine all of the Government's forensic evidence, with the assistance of appropriate experts. See, e.g., ABA GUIDELINES; Soffar, id. (district court grant of habeas relief in capital case affirmed

---

[30] See ABA PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE DEFENSE FUNCTION § 4.1 (1971); ABA STANDARDS FOR CRIMINAL JUSTICE, THE DEFENSE FUNCTION § 4-4.1 (2D ED. 1980); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN CAPITAL CASES § 10.7(2003).

– despite confession by defendant – where counsel failed to retain a ballistics expert to rebut state's expert and where counsel failed to interview a material witness); Driscoll v. Delo, 71 F.3d 701, 707-08 (8th Cir. 1996) (defense counsel has the duty to study and understand lab results and scientific aspects of case); Demarest v. Price, 905 F. Supp. 1432, 1449-50 (D. Col. 1995) (counsel has duty to investigate scientific aspects of state's case and consult with appropriate experts to counter state's blood spatter experts).  See also Berryman v. Morton, 100 F.3d 1089, 1100-01 (3d Cir. 1996) (counsel ineffective for failing to investigate witness whose testimony would have tended to discredit the complainant's identification); United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989) (counsel must contact known witnesses and attempt to obtain available evidence which diminishes the Commonwealth's case and/or supports the defense).

The Fifth Circuit has not hesitated to overturn convictions where counsel's pretrial investigation was deficient. See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (grant of habeas corpus relief by district court affirmed and new trial granted where counsel failed to interview eyewitnesses prior to trial); Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990) (grant of habeas corpus by district court affirmed and new trial ordered where counsel failed pre-trial to investigate insanity defense since "It must be a very rare circumstance indeed where a decision not to investigate [insanity defense] would be 'reasonable after counsel had notice of the client's mental health problems."); Woodard v. Collins, 898 F.2d 1027 (5th Cir. 1990) (district court's finding that counsel's performance was deficient for failing to investigate all counts of the indictment affirmed.); Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) (district court's denial of habeas corpus petition reversed and new trial ordered where counsel failed to adequately investigate insanity defense prior to trial.); Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985) (district court's denial of petition for

habeas corpus reversed and new trial granted where trial counsel failed to investigate and interview material witnesses prior to trial.).

For the following reasons counsels' pretrial investigation and trial challenges concerning the bite mark evidence were deficient. Moreover, Petitioner was prejudiced at the trial and penalty phases, and accordingly, he should be afforded a new trial and penalty hearing.

**C.     Strickland Deficient Performance: Counsel Failed to Mount a Pretrial Challenge to the Bite Mark and Photographic Enhancement Evidence and Failed at Trial to Rebut this Evidence.**

**1.     The Enhanced Images of the Bite Marks.**

Trial counsel was on notice of the Government's intention to use enhanced images of the bite marks a full year before trial, and was provided, pretrial, with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images ("I want to see how its done"; "I don't understand it"; "I've never seen it" (TT 3/8/04, 15), counsel never even looked at the enhancements until mid-trial, just moments before Dr. Oliver was going to testify before the jury. Id. at 15, 18. Incredibly, counsel advised the court that he was not pursuing a Daubert challenge – *before* he even saw the enhancements. Id. at 14-15.

Then, when counsel was given the opportunity by the trial court to cross-examine Dr. Oliver before trial – concerning his enhancement methodology – counsel asked not a single serious question. Counsel asked if anyone else in the country "do[es] this kind of thing" and when that question was answered in the affirmative, counsel withdrew the question. Then counsel jokingly asked how large a family Dr. Oliver had. TT 3/8/04, 29-30. Counsel did not ask a single question relevant to the Daubert reliability factors. Counsel then made a general objection to the prejudicial nature of the photographs. This objection was summarily denied by the trial court. Id. at 30-31.

58

In front of the jury, counsel did even less. He did not ask a single question of Dr. Oliver concerning his enhancement techniques. In fact, counsel did not ask a single question concerning the bite mark photographs. Instead, counsel's entire cross-examination consisted of two and one half pages of questions concerning whether Dr. Oliver knew where the electrical cord he had examined had come from. TT 3/8/04 at 227-230. Finally, counsel did not present any type of rebuttal testimony – expert or lay witness – to challenge the accuracy of Dr. Oliver's digital enhancements of the bite mark photographs.

Had counsel conducted even a cursory investigation into the methods used by Dr. Oliver they could have precluded the admission of the enhanced photographs (as well as the opinions of Drs. Senn and Chrz to the extent that they relied upon these images to form the basis of their opinions and testimony.) As discussed in Section D(1) infra, reasonable investigation would have revealed that the methods used by Dr. Oliver to enhance the original bite mark photographs were scientifically and technically flawed. Moreover, they were not valid for use at trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community. Moreover, had counsel simply reviewed the reports provided to them by the Government, they could have called their reliability into serious question.

### 2.    The Government's Bite Mark Evidence.

Counsel acknowledged months before trial that rebutting the bite mark evidence was critical to Petitioner's defense. Counsel acknowledged that retaining a bite mark expert was essential to rebut this highly inflammatory and probative evidence, PTT 6/26/03, 8-10, 22-23, and they assured the Court that they intended to retain such an expert. PTT 7/16/03, 47-50; PTT 10/20/03, 13-14;

PTT 10/24/03, 6-7.  Counsel, however, never retained an expert and never challenged the reliability or relevancy of this evidence by way of a pretrial <u>Daubert</u> motion or during trial.   Instead counsel allowed this testimony to come in, unchallenged, and relied solely on an ineffective cross-examination to attempt to challenge this important evidence.

It is well settled in this Circuit that counsel cannot solely rely on even a <u>sound</u> cross-examination to challenge the Government's case – much less a cursory cross.  This point was recently reiterated by the Fifth Circuit Court of Appeals when the court reversed a conviction due to counsel's failure to adequately confront a lay witness:

> [I]n <u>Bryant</u>, we expressly rejected the notion that 'vigorous' cross-examination of eyewitnesses at trial can 'cure' counsel's failure to interview the witnesses before trial.  We pointed to the obvious fact that effective cross-examination 'does not necessarily indicate that a reasonable lawyer, viewing the trial *ex ante*, would have regarded an interview of the eyewitnesses as unnecessary.' . . .  even if cross-examination was effective, 'that is not to say it could not have been improved by prior investigation. . . . The fact that trial counsel was marginally successful in some respects does not excuse his complete failure to investigate and prepare *before* trial.

<u>Anderson v. Johnson</u>, 338 F.3d 382, 391-92 (5th Cir. 2003).  Certainly, if Anderson's counsel was ineffective for failing to interview a *lay* witness pretrial, Petitioner's counsel were ineffective for failing to prepare for and challenge the Government's *expert* witnesses.  <u>Cf.</u> <u>Leal v. Dretke</u>, 428 F.3d 543 (5th Cir. 2005) (counsel fulfilled his investigative duty and was not ineffective where he retained a bite mark expert who conducted an independent review of the state's expert's findings who agreed with the state's bite mark expert's conclusions).

### 3. Counsels' Failure to Use the Exculpatory Opinion of a Government Expert Who was not Called by the Government.

Counsels' failure to retain their own expert was a gross departure from accepted norms. However, counsels' failure even to use a report written by another Government expert, was even

more troubling.   Some eight months before trial the Government provided counsel with two expert reports prepared by United States Army Colonel J. Curtis Dailey, DDS, which completely rebutted the findings of Drs. Senn and Chrz. (Copies of these reports are contained in *PA*, document # 44). Colonel Dailey examined actual excised skin of the bite mark, the original autopsy photographs, as well as Dr. Oliver's enhanced images.  Dr. Dailey then compared this evidence to the stone dental casts of Petitioner, Robin and AB-1994.  PTT 3/20/03, 14.  Colonel Dailey concluded that neither Robin, AB-1994 nor Petitioner could be **included or excluded** as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the bite marks, 3) the ruler was in a different spatial plane than the mark being photographed, and 4) the very similar metric and spatial pattern relationships between the three individuals' dentition.  *PA*, document # 44.

Thus, Dr. Dailey directly contradicted Dr. Senn and Dr. Chrz.  Had trial counsel simply called Dr. Dailey as a witness (at either a pretrial Daubert hearing or at trial) his testimony would have carried great weight.  After all, Dr. Dailey was an active-duty United States Army Colonel at the time he examined the bite marks, and he was the first such expert contacted by the Government. Furthermore, he had the actual excised skin of the bite marks (in addition to the enhanced images) and yet he was still unable to exclude or include any of the potential biters.  His testimony also would have been extremely persuasive with the trial court and the jury since he was the first expert the Government consulted – and presumably the most qualified in the eyes of the Government.  Dr. Dailey's findings (that Robin could not be excluded) also directly support the defense theory that Robin (the step-mother) was the abuser of the child, not Petitioner (the natural father).  See also Claim IV (debunking semen and sexual abuse evidence).  At a minimum, Dr. Dailey's findings

61

would have constituted substantive evidence that Petitioner was not the source of the bite marks and were thus exculpatory at the guilt and sentencing phases of trial.  Id.

Furthermore, had counsel interviewed Dr. Dailey they would have learned from him that AUSA Patti Booth became irate when Dr. Dailey informed her that he could not identify Petitioner as the biter.  Specifically, when Dr. Dailey informed AUSA Booth of his conclusions she angrily told Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she would go out and find an expert who could.  *PA*, document # 45.   This testimony from Dr. Dailey could have refuted the Government's misleading argument that AB-1994 was excluded as the source of the bite marks and that the jury did not hear any evidence of expert "shopping."  TT 3/16/04, 19-20.  AUSA Booth knew when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had not excluded Robin or AB-1994 as a possible biter.  Nonetheless, she was able to make this – no expert-shopping argument –  because counsel failed to present the testimony of Colonel Dailey, DDS, or even consult with this witness.

Finally, counsels' failure to litigate a pretrial Daubert motion – concerning both the bite mark identification testimony and the digital enhancements of the bite mark photographs – was especially unreasonable since such motions were and are routinely successful in this Circuit.[31]  Counsel did

---

[31]   See e.g., United States v. Amador-Velasco, 2007 WL 1655266 (5th Cir. June 2007) (affirming district court's preclusion of expert testimony concerning drug smugglers because, inter alia, such testimony lacked sufficient reliability); Knight v. Kirby Inland Marine Inc., 482 F.3d 347 (5th Cir. 2007) (affirming district court's preclusion of expert testimony concerning causation since, although expert's methodology "unassailable," gap between underlying data was simply too great and was not generally accepted, was not subjected to peer review, publication or testing); Cleveland v. United States, 457 F.3d 397 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning emergency medicine because expert in one medical specialty not qualified to testify as expert in another medical area); Shelter Insur. Co. v. Ford Motor Co., 2006 WL 3780474 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning fire cause and origin because expert, despite impressive credentials and experience, not qualified to opine about precise

cause of fire); United States v. McGinnis, 2006 WL 2828661 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning identification because, although expertise of expert was not challenged, his testimony did not assist the jury); In re Silica Products Litigation, 398 F. Supp. 2d 563 (S.D. Tex. 2005) (Jack, J.) (district court precluded expert testimony concerning diagnosis of silicosis because it failed to satisfy the minimum medically acceptable criteria and because no quality control measures were taken); Guy v. Crown Equip. Corp., 394 F.3d 320 (5th Cir. 2004) (affirming district court's preclusion of expert testimony concerning defective design because, *inter alia*, expert relied on unscientific conceptual sketches and failed to test his designs); Burleson v. Tex. Dept. of Criminal Justice, 393 F.3d 577 (5th Cir. 2004) (affirming district court's preclusion of expert testimony concerning causation of cancer because, *inter alia*, the testimony had never been tested and never been submitted for peer review); United States v. Ramos, 2003 WL 21790181 (5th Cir. 2003) (affirming district court's preclusion of expert testimony concerning voice identification – based on Fed. R. Evid. 702 and Daubert); IQ Products Co. v. Pennzoil,, 305 F.3d 368 (5th Cir. 2002) (affirming district court's preclusion of expert testimony concerning market conditions because it was based on insufficient data and unreliable methodology.); Abdeljalil v. City of Fort Worth, 2000 WL 1568142 (5th Cir. 2000) (affirming district court's preclusion of expert testimony – based on Daubert – because it was not reliable); Hammond v. Coleman, 2000WL 283165 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning condition of product because methodology and basis for opinion too speculative); Seatrax Inc. v. Sonbeck International, 200 F.3d 358 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning damages because expert did not have any formal or professional training in accounting and did not conduct independent examination of sales figures); Munoz v. Orr, 200 F.3d 291 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning discrimination statistics because, inter alia, not in accord with experts in the field); Williams v. Valmet, 1999 WL 1328055 (5th Cir. 1999) (affirming district court's preclusion of expert testimony concerning design defect of hand rail based on Daubert); United States v. Katz, 178 F.3d 368 (5th Cir. 1999) (affirming district court's preclusion of expert testimony in child pornography case concerning age of children because of lack of reliability of images); Black v. Food Lion, Inc., 171 F.3d 308 (5th Cir. 1999) (reversing district court's denial of Daubert motion– because expert's opinion failed to gain acceptance in within medical profession and had no known potential rate of error); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (en banc) (affirming district court's preclusion of expert testimony concerning causation of reactive airways dysfunction because, although expert certified specialist, opinion had no scientific basis and analytical gap was too wide); Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir. 1997) (affirming district court's preclusion of expert testimony concerning design defect because expert qualified in mechanical engineering not civil engineering); Allen v. Pa. Engineering Corp., 102 F.3d 194 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning causation of fatal cancer because not supported by a single scientific study); Barrett v. Atlantic Richfield Co., 95 F.3d 375 (5th Cir. 1996) (affirming district court's preclusion of two expert's testimony concerning toxic chemical exposure because application of studies of cotton rats exposure to chemicals to humans consisted of speculation); Brown v. Miska, 96 F.3d 1445 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning defective car seat because it was based on specious, questionable, and unscientific methodology);

nothing to challenge the reliability of this evidence. For the following reasons Petitioner was prejudiced and a new trial and penalty hearing are mandated.

**D.      Strickland Prejudice: Counsels' Deficient Performance Caused Prejudice.**

Under Strickland, 466 U.S. at 694, in order to prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's deficient performance caused prejudice.  In order to establish prejudice Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694.  The test this court should apply to determine prejudice is "whether there is a reasonable probability that counsel's errors affected the outcome of the trial."  Soffar, 368 F.3d at 478 ("A reasonable probability need not be proof by a preponderance that the result would have been different"); Williams v. Cain, 125 F.3d 269 (5th Cir. 1997).

The Government's bite mark experts, Dr. Senn and Dr. Chrz, formed their opinions and testified using distorted, inaccurate, confusing, misleading, exaggerated and incomplete digital enhancements of the bite mark photographs that had been created by the Government's expert, Dr.

---

Abram v. Reichold Chemicals, Inc., 95 F.3d 48 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning cause of death  because not supported by any medical or scientific literature); United States v. Bratcher, 95 F.3d 49 (5th Cir. 1996) (affirming district court's preclusion of expert polygraph testimony – based on Fed. R. Evid. 702 and Daubert.); Brock v. Wal-Mart, 1996 WL 60595 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning foreseeablity because lacked scientific reliability); Pedraza v. Jones, 71 F.3d 194 (5th Cir. 1995) (affirming district court's preclusion of expert testimony concerning heroin withdrawal because none of Daubert requirements met); Wheat v. Pfizer, Inc., 31 F.3d 340 (5th Cir. 1994) (affirming district court's preclusion of expert testimony concerning causation of death because hypothesis lacked empirical foundation and not subjected to peer review and publication); Marcel v. Placid Oil Co., 11 F.3d 563 (5th Cir. 1994) (affirming district court's preclusion of economic expert testimony because based on study that was outdated and statistically suspect); Rosado v. C.J. Deters, 5 F.3d 119 (5th Cir. 1993) (affirming district court's preclusion of accident reconstruction expert testimony  because expert did not have specialized knowledge in area.).

Oliver. In addition to relying on these inaccurate digital enhancements, Dr. Senn and Dr. Chrz also utilized untested and invalid odontological identification methods to opine that Petitioner was the source of the bite marks. Based on these inaccurate conclusions, the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent. TT 4/24/04, 76.

The inflammatory and inaccurate bite mark evidence was devastating to the defense at both the guilt/innocence stage and the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements. TT 3/2/04, 30-31, 34, 42, TT 3/16/04, 19-20, 48-49 (testimony of bite mark experts used to inculpate Petitioner). The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death. TT 3/24/04, 37, 41, 70, 76. ("His signature *with his teeth marks* and his semen is all in that baby.") For the following reasons there is a reasonable probability that had counsel simply challenged this evidence pretrial or rebutted it at trial the outcome of this case would have been different.

### 1. Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.

The original autopsy photographs were taken with a 35mm camera. Dr. Oliver testified that there are two broad categories of image processing techniques: those that attempt to bring out features that are not visible in the original image and those that *actually change* the relative value or prominence of features in the image. TT 3/8/04, 15-18. Dr. Oliver employed the second type of image processing that <u>actually modified</u> the original 35mm autopsy photographs. <u>Id.</u> Specifically, he employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method. <u>Id.</u> at 19. Dr. Oliver admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions

65

(orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

Dr. Oliver also admitted that it was very important when analyzing the newly created images to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  Dr. Oliver emphasized that valid conclusions require "going back to the original image."  TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit into the PowerPoint.  Id. at 19.  In his presentation to the jury and in reaching his conclusions he never went back to the original 35 mm photograph but instead he called the digitized image the "original."  Id. at 26.  In describing his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc.  These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

The digitized/scanned images were found to be "distorted" "inaccurate" "incomplete" and "over-reaching alterations." Report of Mark Cherry and Manfred Schenk, MAC (*PA*, document # 43).  Dr. Oliver's method of converting the original 35mm photographs into digital images with a 600 dpi scanner instead of a 3600 dpi scanner created digital images that had a much narrower color spectrum than the original photographs.  Additionally, the images themselves were distorted (from a 35 mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used  JPEG,  a lossy, *not* lossless, compression program.  The images were then further distorted and further detail was lost

when Dr. Oliver converted them to PowerPoint.

The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere." Id.   The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of "Bayer Pattern Nearest- Neighbor Coloration" or "interpolation."  This problem occurs when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image into a number of smaller ones.  Interpolation is apparent throughout all of Dr. Oliver's enhanced images.  Id.

One could not imagine a more prejudicial and inaccurate enhancement technique when looking for "unseeable" and "unphotographable" injuries than a technique like CLAHE  that allows images to draw colors and shapes from neighboring images.

The methods and techniques utilized by Dr. Oliver failed to comport with Daubert:

- The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

- Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

- The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

- The digital images presented as "original images" were compressed and therefore they lacked original detail.

- There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

67

- One cannot substitute enhancement for details that were lost during the digital conversion. The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

- The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

*PA*, document # 43. Had trial counsel consulted with experts such as those who have been consulted by undersigned counsel, they would have seen the merit to a Daubert challenge.

Werner Spitz, MD, a forensic pathologist with 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition, was also retained by undersigned counsel. Dr. Spitz reviewed the enhanced autopsy images including those of the bite marks. Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate the findings, and produce artifacts." Spitz Declaration, *PA*, document # 53. He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties . . . [and were] without scientific merit." Id. Dr. Spitz also noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*." Id.

Undersigned counsel also provided the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models to Dr. C. Michael Bowers, DDS, JD, a board certified forensic odontologist and expert in the area of forensic dental digital imaging. *PA*, document # 42. Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " **the most overly 'enhanced' images I have ever seen used in actual casework**." Id. Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver introduced "uncontrolled digital noise . . . into the computer-manipulated image that does not reflect

68

the original state of the picture." Id.

Dr. Bowers found that the "ruler" and "injury pattern" in the enhanced bite mark images had "undergone considerable alteration [and] . . . change." The "contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradation of color in the bruise (indicating either less or more pressure by the biter) are lost." Id.

Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation. Dr. Bowers found that the methods of enhancement utilized by Dr. Oliver would not have withstood a Daubert challenge:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . . The Government has no data as to known or potential error rate . . . of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

PA, document # 42.

Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were unreliable. They would have litigated a Daubert motion and Dr. Oliver's enhanced images as well as the conclusions of Dr. Senn and Dr. Chrz would have been precluded. Petitioner was prejudiced.

69

### 2.    The Opinions of Dr. Senn and Dr. Chrz Were Also Unreliable.

Both Dr. Senn and Dr. Chrz relied upon the enhanced images created by Dr. Oliver in presenting their opinions to the jury. For this reason alone, their bite mark opinions were scientifically and technically invalid and should have been precluded. Moreover, even if the significant inaccuracies of the enhanced images are ignored, the opinions of Drs. Senn and Chrz fail to meet the Daubert standards for valid science.

The Government experts' conclusions that Petitioner was the "probable biter" and the prosecutor's argument that Petitioner was the "probable biter" (3/16/04, 49) and had left his "signature" (3/24/04, 76) in the form of his teeth marks went well beyond the boundaries of accepted and valid bite mark identification. Dr. Bowers noted that "the validity, reliability and accuracy of bite mark identification have not improved to the point where it should be used as the sole means of identifying the biter." PA, document #42. Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or 'probably the biter' via teeth marks are not rendering a reliable opinion." Id.

Dr. Spitz agrees with Dr. Bowers that "Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as DNA or at least blood type verification." PA, document # 53.

In this case that is exactly what occurred. The Government specifically did not ask AB-1994 if she saw Petitioner bite the decedent on the lower back despite questioning her extensively about Petitioner's biting of the decedent. The Government also did not ask Robin to identify Petitioner as the biter of the decedent's lower back. When all was said and done the Government relied solely (and improperly) on expert testimony to argue that Petitioner had left his "signature" on the

70

decedent's body in the form of his "teeth marks."

Dr. Bowers, a diplomate of The American Board of Forensic Odontology ("ABFO"), notes that this scientific community "has minimal scientific research supporting reliable positive identifications from bite marks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy." He also noted that the Bite Mark Standards and Guidelines of the ABFO do not delineate a threshold for bite mark evidence below which an opinion may not be rendered. *PA*, document # 42.

An ABFO study completed in 1999 found that the examiners were wrong nearly half the time they tried to identify the source of a bite mark and 63.5% of the examiners committed false positives in some of the test cases. Id. The examiners who participated in this study were not novices but diplomates of the ABFO – the most accomplished in the field. Id. Thus viewed, bite mark evidence is not more reliable than flipping a coin.

A second study was conducted in 2001 and the results were published in the Journal of Forensic Science. This study – which again included experienced examiners – involved pattern detail that exceeded that found in actual bite mark casework, and allowed for controls of variables that are uncontrolled in actual casework. The results still showed a significant error rate of 15.9%.

These studies, the lack of scientific research supporting reliable positive identifications from bite marks in skin, and the failure of the ABFO to delineate a threshold for bite mark evidence below which an opinion may not be given, render bite mark evidence scientifically and technically invalid. Counsel were ineffective for failing to litigate a Daubert challenge to *all aspects* of the bite mark identification evidence in this case.

The importance of Petitioner being the "probable" biter of the lower back bite mark was not

71

lost on the prosecutor at the guilt phase of the trial. ("You have a bite mark identifying that he is the probable biter and Robin is not.") TT 3/16/04, 49. In her closing argument she showed the photograph of this bite mark to the jury and described it as the "only piece of physical evidence" that inculpated Petitioner. TT 3/16/04, 48-49. The prosecutor also emphasized the bite mark evidence in urging the jury to consider Petitioner's brutality: "[t]hey had never seen a bite mark like this before. They had never seen a bite mark with *such force behind it* that would leave this imprint" "the bite is so *incredibly intense*, the force behind the bite is so remarkable . . . this just doesn't happen, except, when you have someone that's so wants to cause the victim so much pain, *wants to see her suffer*." Id. See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (conviction reversed since counsel's deficient performance in failing to interview eyewitness prejudiced defendant where state's case rested primarily on eye witness testimony.)

The Government also recognized the importance of the bite mark evidence at the penalty phase. In support of the argument that the murder was committed in a heinous, cruel or depraved manner, and that it involved torture and serious physical abuse to the decedent, the prosecutor in her closing arguments referred to the bite mark no fewer than four times, and misleadingly argued that Petitioner's "signature with his teeth marks and his semen is all in that baby." TT 3/24/04, 37, 41, 70, 76. Needless to say, the bite mark evidence affected the jury's weighing of the aggravating and mitigating evidence.

For all of the above reasons, trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinions of Dr. Oliver, Dr. Senn and Dr. Chrz on the grounds that it was not technically or scientifically reliable. Trial counsel

was also ineffective for failing to rebut this evidence with an expert of his own, or at a minimum, with the un-called Government expert, Dr. Dailey. Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VI.** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS, FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY, AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

In Claim V, above, Petitioner shows that counsel were ineffective for failing to consult appropriate experts in order to mount a Daubert challenge to the bite mark evidence and Dr. Oliver's "enhancement" testimony. The same failures apply to counsels' failure to challenge Dr. Oliver's enhancement testimony related to the scores of other photos that he used showing a variety of alleged wounds to the victim. The methods used by Dr. Oliver to enhance the original autopsy photographs were scientifically and technically invalid for use in a capital trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community.

As alleged earlier with respect to Claim V, trial counsel had a pretrial duty to investigate the Government's scientific evidence. Trial counsel, however, did nothing prior to trial to investigate this evidence.[32] Trial counsel were also ineffective for failing to object to the admissibility of the

---

[32] Trial counsel were on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and were provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images, counsel never even looked at the enhancements until moments before Dr. Oliver testified. TT 3/8/04, 15, 18. Furthermore, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements. TT 3/8/04, 14-15. The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value. This objection was denied. Id. at 30.

enhanced images on authentication grounds and for failing to rebut this evidence once it was admitted at trial and heard by the jury. Instead, trial counsel sat back and allowed this inaccurate and highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and uncontradicted. Petitioner was prejudiced and a new trial and penalty hearing are mandated.

### A.    Counsel Were Ineffective for Failing to Mount a Pretrial Daubert Challenge to the Photographic Enhancement Evidence.

As discussed in Claim V, Dr. Oliver testified as a Government witness using digital enhancements of the autopsy photographs. TT 3/8/04, 15-18, 183-231. Dr. Oliver was permitted to give highly inflammatory testimony in painstaking detail (taking up over 44 pages of transcript), showing the jury the huge number of alleged injuries his "enhancements" had "uncovered." TT 3/8/04, 30. Trial counsels' cross-examination of Dr. Oliver took up just three pages of transcript. Id. at 227-230. Utilizing these enhancements, Dr. Oliver identified the following injuries on the decedent: "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations." TT 3/8/04, 226. The vast majority of these injuries were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy without resort to such enhancement.[33]

---

[33] As described in Claim V, Dr. Oliver employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method, which actually changed the original 35 mm photographs. Id. at 19. Dr. Oliver admitted that he picked the range of parameters to be used to redistribute the colors and he chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue). Id. at 22, 24-5. Dr. Oliver also admitted that it was very important when analyzing the newly created images to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct. TT 3/8/04, 13-14. However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit onto the PowerPoint. Id. at 19. In his presentation to the jury and in reaching his conclusions he erroneously considered digitized images as the "original." Id. at 26. In describing

The methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of Daubert.[34]  The forensic digital imaging and digital imaging enhancement experts retained by undersigned counsel found that these enhancements were distorted, inaccurate, incomplete and over-reaching alterations.  *PA*, document # 43.

Specifically, the defense experts from Cherry Biometrics, Inc., found that:  1) the numerous layers of modification the original photographs underwent created a situation where the known or potential rate of error is impossible to determine; 2) lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead; 3) the 35 mm pictures were the original or "best" evidence and the technique of not using the "best" is not generally accepted in the scientific/technical community; 4) the digital images presented as "original images" were compressed and therefore they lacked original detail; 5) there are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there; 6) enhancements cannot be substituted for details that were lost during the digital conversion, and 7) the enhancement techniques used are not well-known, regulated, regarded or accepted within the United States or international forensic community and

---

his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

[34] The Dabuert evidentiary reliability and relevancy (and thus admissibility) analysis focuses upon scientific or technical validity.  In performing the gatekeeper function, a trial court applies the following factors in determining whether proffered testimony is scientifically or technically valid: 1) whether the theory or technique is generally accepted within the relevant scientific or technical community, 2) whether the theory or technique has been subjected to peer review and publication, 3) whether the theory or technique can and has been tested, 4) whether the known or potential rate of error is acceptable, and 5) whether there are standards controlling the technique's operation. Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir. 2007).

have not been tested, or subjected to peer review or publication in the forensic community.  *PA*,

document #43.

Dr. Bowers, another defense expert, also concluded that no scientific or technical foundation

existed for Dr. Oliver's analysis and presentation.  Specifically, Dr. Bowers found that the methods

of enhancement utilized by Dr. Oliver did not comport with Daubert:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case.  The only control is the operator's subjectivity.  In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . .  The Government has no data as to known or potential error rate . . .  of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied.  Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

Bowers Declaration, *PA*, document # 42.

Finally, Dr. Werner Spitz, MD a forensic pathologist with 54 years of experience and the

author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition, reviewed the

autopsy report, the enhanced autopsy images, the photographs taken at the time of autopsy, as well

as the testimony of Dr. Rouse and Dr. Oliver.  Dr. Spitz concluded that the enhanced images were

"misleading, confusing, exaggerate[d] the findings, and produce[d] artifacts." Spitz Declaration, *PA*,

document # 53.  He also noted that if "the documentation of bruises is at issue, the pathologist

performing the autopsy can use their scapel for such documentation and study." Id.  He also found

that the enhanced images introduced "new dimensions, new colors, new uncertainties in so far as the

findings in the enhancements were not present at the autopsy table."  Dr. Spitz found that the

enhancements . . . are none other than inflammatory, without scientific merit." Id.  Dr. Spitz also

noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often*

*mistaken for injuries*." Id.

There can be no question that this inflammatory and highly inaccurate evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to convict Petitioner of first degree murder describing the vast number of injuries as evidence establishing – "a systematic execution" "a systematic dehumanization" and "a systematic degradation." TT 3/16/04, 13,16,46, 48, 54.  Based directly on Dr. Oliver's testimony (and his image enhancements), the prosecutor argued that the sheer number of injuries established Petitioner's "relentless cruelty," since, she claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries.  TT 3/24/04, 73.

As discussed in detail in Claim V, counsel's failure to litigate a Daubert motion is especially inexcusable since these motions are routinely and successfully litigated in this Circuit.[35]   Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable.  They would have litigated a Daubert motion and Dr. Oliver's testimony and his PowerPoint presentation with the enhanced images would have been precluded by this court.

---

[35] See note 32, above.

77

**B**.    **Trial Counsel Were Ineffective for Failing to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and for Failing to Rebut this Evidence Once it Was Admitted at Trial.**

It is well settled that Federal Rules of Evidence 901[36], 1001[37] and 1002[38] require the authentication of evidence, and in the case of photographs the original is required to prove its contents.   Dr. Oliver's scanned digital images and his enhanced images were significantly inaccurate, incomplete and overreaching alterations of the original 35mm autopsy photographs. These images were not and could not be properly authenticated and were not and could not be considered admissible copies of the original photographs.  See United States v. Seifert, 351 F. Supp. 2d 926, 928 (D. Minn. 2005), aff'd. 445 F.3d 1043(8th Cir. 2006) (enhanced images admissible only if shown to be accurate, authentic and trustworthy).

Counsel, however, failed to object to the admission of these altered images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and the court admitted this evidence.  Counsel were ineffective.

As discussed in detail in Claim V, counsel had a duty – once the testimony of Dr. Oliver was admitted and heard by the jury – to rebut it.  Had counsel adequately prepared for trial they could have easily marshaled the above described evidence (Cherry Biometrics, Inc., Dr. Bowers and Dr. Spitz) and presented a compelling rebuttal to Dr. Oliver's findings.  Counsel, however, never

---

[36]  Fed. Rule of Evid. 901(a) provides in pertinent part: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

[37]  Fed. Rule of Evid. 1001(2) provides in pertinent part: "**Photographs**.  'Photographs' include still photographs, X-ray films, video tapes, and motion pictures."

[38]   Fed. Rule of Evid.1002 provides in pertinent part: "To prove the content of a . . . photograph, the original . . . photograph is required . . . ."

retained an expert and this inaccurate, invalid and highly inflammatory evidence was submitted to the jury unchallenged, unrebutted and uncontradicted.  Counsel were ineffective.

### C.    Petitioner Was Prejudiced.

There can be no question that Dr. Oliver's findings were devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder.  TT  3/16/04, 13, 16, 46, 48, 54.  The prosecutors also utilized these findings in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.

The Government used the sheer number of injuries found by Dr. Oliver to support its case at the guilt phase of the trial.  "You heard Dr. Oliver testify that she had over 300 injuries on her body.  So you know  . . .  to do that kind of damage, you've got to make at least ten injuries a day.  Ladies and gentlemen, ten injuries a day, a systematic execution of a baby.  And that's what it was.  A systematic execution.  A systematic dehumanization.  A systematic degradation of that child." TT 3/16/04, 13-14.

The importance of the sheer number of injuries found by Dr. Oliver was emphasized by the prosecutor again at the penalty phase of the trial.  The prosecutor argued:

> [T]he injuries to the baby's body, the 360-some injuries on that baby's body, and we knew from the guilt/innocence phase that he was with that child for 36 days , that's when we think the abuse started. So in 36 days we got 360 marks.  That means that we have to do 10 a day.  That means that you would have to . . . 10 hours is longer than what we work a day.  So you're going to have to start before work starts, and you're going to have to work through lunch to get an abuse in every hour; and that doesn't count the abuses that are on top of the abuse.  And so you just count that as one of 360.

TT 3/24/04, 73.

Petitioner was clearly prejudiced by trial counsels' deficient performance, and a new trial and sentencing proceeding are mandated. See Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) and Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003).

Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinion of Dr. Oliver. Dr. Oliver's testimony was not scientifically reliable. Trial counsel were ineffective for not objecting, on authentication grounds, pursuant to Federal Rules of Evidence 901, 1001 and 1002 . Finally, trial counsel were ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury. Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VII.** **THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.      Introduction**

The Government failed to disclose to Petitioner powerful impeachment evidence concerning three of the four jailhouse informants who testified against Petitioner at his trial. Specifically, the Government failed to disclose promises and understandings of favorable treatment concerning the informants' underlying cases that it had with these witnesses prior to their testimony at Petitioner's trial. Each one of these witnesses – after testifying against Petitioner – in fact received benefits both in the cases that were pending at the time of their testimony and in sentences they were serving at the time of their testimony. Further, each one of these witnesses testified falsely – in response to questions posed by the prosecutor – concerning their understanding of future favorable treatment.

80

The Government's failure to disclose these understandings and its elicitation of, and failure to correct, false testimony violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), Napue v. Illinois, 360 U.S. 264, 269 (1959), and their progeny.

    **B.    The Relevant Law.**

        **1.    The Prosecutor's Due Process Duty to Disclose Favorable Evidence.**

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be "deprived of life, liberty or property, without due process of law . . ." The United States Supreme Court has long held that the right to due process requires a federal prosecutor to disclose favorable evidence that is material to either guilt or sentencing. Brady, 373 U.S. at 87; Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995); Banks v. Dretke, 540 U.S. 668 (2004). Accord, Graves v. Dretke, 442 F.3d 334, 339 (5th Cir. 2006); Dickson v. Quaterman, 453 F.3d 643, 646-67 (5th Cir. 2006); United States v. Sipe, 388 F.3d 471, 477 (5th Cir. 2004); Hudson v. Whitley, 979 F.2d 1058, 1062 n.6 (5th Cir. 1992).[39]

The prosecution's "duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently

---

[39] The Fifth Circuit has held that to state a Brady claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, and (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence. See Parr v. Quarterman, 472 F.3d 275, 254 (5th Cir. 2006); Rector v. Johnson, 120 F.3d 551, 558 (5th Cir. 1997). The Fifth Circuit's formulation of the fourth element of a Brady claim may conflict with Supreme Court precedent holding that a criminal defendant is entitled to rely on representations made by a prosecutor that all exculpatory information has been disclosed. See Banks, 540 U.S. at 695 ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed").

associated with the Court's decision in Brady v. Maryland." Kyles, 514 U.S. at 432.  A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  Kyles, 514 U.S. at 422 (in assessing a Brady claim the court acknowledged that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").[40]

The due process requirements of the Brady doctrine also apply to evidence that can be utilized to impeach the prosecutor's theory or witnesses.  Bagley, 473 U.S. at 676 (Brady's disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); Giglio, 405 U.S. 150, 152 (1972) ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule") (quoting Napue, 360 U.S. at 269); Graves, 442 F.3d at 339 ("Brady applies equally to evidence relevant to the credibility of a key witness"); Dickson, 453 F.3d at 647 ("[t]o prevail on a Brady claim, '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching...") (quoting Strickler, 527 U.S. at 282-82).

The Brady obligations of the prosecution do not end with the jury's verdict.  The duty to disclose is ongoing through all stages of the appellate and post-conviction process.  Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing");  Imbler v. Pachtman 424 U.S.

---

[40]  See also Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Caldwell v. Mississippi, 472 U.S. 320 (1985); Ford v. Wainwright, 477 U.S. 399, 414 (1986) (each holding that a capital case requires heightened judicial review and enforcement of procedural safeguards).

409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.") (citing ABA Code of Professional Responsibility § EC 7-13 (1969); ABA Standards for Criminal Justice, Prosecution and Defense Function § 3.11 (1971).[41]

It is also clear under Brady and its progeny that the Government has a duty to provide exculpatory or favorable evidence regardless of whether the defense made a specific request for the item in question. See Banks, 540 U.S. at 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. . . . A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process. Ordinarily we presume that public officials have properly discharged their official duties.") (quoting Bracy v. Gramley, 520 U. S. 899, 909 (1997)); Dickson, 453 F.3d at 647 ("[t]he prosecution has a duty to disclose [Brady] evidence even absent a specific request by the accused") (citing Strickler, 527 U.S. at 280). Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "discharge[] their official duties," United States v. Mezzanatto, 513 U.S. 196, 210 (1995), and that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

---

[41] See also Steidle v. Fermon, 494 F.3d 623, 629 (7th Cir. 2007) (the Supreme Court has reiterated that "the duty to disclose [exculpatory material] is ongoing") (quoting Ritchie, 480 U.S. at 60); Thomas v. Goldsmith, 979 F.2d 746, 750 (9th Cir. 1992) ("We do not refer to the state's duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant [post-conviction] proceeding.").

Finally, the failure to disclose all material evidence favorable to an accused violates due process whether or not the prosecutor acted in good faith. Brady, 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 110 (1976); Dickson v. Quarterman, 462 F.3d 470, 477 (5th Cir. 2006) (to prevail on a Brady claim the "evidence must have been suppressed by the State, either willfully or inadvertently"):

> The duty of a prosecutor, as the representative of the sovereign in a criminal case, is not that it shall win a case, but that justice shall be done. . . .Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when disclosure is required. Accordingly, a prosecutor faithfully discharges his duty where he fully understands his obligations under Brady, not where, as here, he fails to consciously think about it one way or the other.

Dickson, 462 F.3d at 479 (internal quotation marks and citations omitted). Indeed, because "the preservation of our civil liberties depends upon the faithful and ethical exercise of power by [prosecutors] who bear the mantle of public trust ... [w]here the actions of [prosecutors] are contrary to these aspirational principles, whether for improper or guileless reason, courtroom victories are pyrrhic and such conduct 'should attract no courtroom approbation.'" Id. at 480 (quoting Banks, 540 U.S. at 696); Brady, 373 U.S. at 87-88 ("[a] prosecution that withholds evidence ... which, if made available, would tend to exculpate [a defendant] or reduce the penalty helps shape a trial ... that does not comport with standards of justice, even though ... his action is not 'the result of guile[]' ..."); Graves, 442 F.3d at 339 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution") (quoting Brady, 373 U.S. at 87).

### 2.   <u>Brady</u> Materiality.

<u>Kyles v. Whitley</u>, 514 U.S. 419 (1995) sets forth the long-standing and indisputable constitutional standard governing the circumstances requiring a new trial or sentencing based upon withheld exculpatory evidence – that is, when such evidence is "material." The "touchstone of materiality is . . . <u>not</u> whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." <u>Kyles</u>, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict – "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. <u>Id.</u>, at 435 n.8. Instead, materiality is established when a defendant demonstrates:

> [A] 'reasonable probability' of a different result, <u>and the adjective is important</u>. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

<u>Kyles</u>, <u>id.</u> at 434, <u>quoting</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985); <u>Dickson</u>, 453 F.3d at 647 ("Evidence is material under Brady where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different. . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome") (quoting <u>Bagley</u>, 473 U.S. at 682); <u>Graves</u>, 442 F.3d at 339-40 (same); <u>Hudson</u>, 979 F.2d at 1062 n.7 (same).

<u>Brady</u>'s materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel. <u>Gonzales v. Quarterman</u>, 458 F.3d 384, 390

(5th Cir. 2006) ("[th]e test for prejudice under <u>Brady</u> and <u>Strickland</u> is the same").[42]  Accordingly, the <u>Brady</u> materiality inquiry, like the <u>Strickland</u> prejudice inquiry, properly focuses on whether the withheld evidence would have had an effect <u>on even a single juror</u>.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); <u>Williams</u>, 529 U.S. at 393-95 (ratifying effect on a single juror standard applied by Virginia trial court); <u>Soffar v. Dretke</u>, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty").[43]  Thus, if even a single juror reasonably could have found Petitioner not guilty or found a mitigating circumstance that was not found, or might have differently balanced the aggravating and mitigating circumstances, confidence in the outcome is undermined and a new trial and/or penalty hearing is required.  Moreover, like <u>Strickland</u> prejudice, <u>Brady</u> materiality is satisfied by a showing of less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

<u>Strickland</u>, 466 U.S. at 694.

In determining the materiality of suppressed evidence, the Court should not evaluate the

---

[42]  <u>See</u> <u>also</u> <u>Marshall v. Hendricks</u>, 307 F.3d 36, 52 (3d Cir. 2002) ("[t]he standard for materiality is the same as that iterated in <u>Strickland</u>").

[43]  <u>See also</u> <u>Emerson v. Gramley</u>, 91 F.3d 898, 907 (7th Cir. 1996) (Posner, C.J.) (prejudice evaluated in light of "need to convince only one of twelve jurors to refuse to go along with a death sentence"); <u>Kubat v. Thieret</u>, 867 F.2d 351, 371 (7th Cir.) ("even if only one juror had been confused, the reliability of the verdict is undermined"), <u>cert. denied</u>, 493 U.S. 874 (1989); <u>Harris v. Blodgett</u>, 853 F. Supp. 1239, 1270 (W.D. Wash. 1994), <u>aff'd</u>, 64 F.3d 1432 (9th Cir. 1995).

evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial.  Kyles. 514

U.S. at 436 (in determining whether undisclosed evidence is material, the suppressed evidence is

considered collectively, rather than item-by-item, to determine if the "reasonable probability" test

is met.). Sipe, 388 F.3d at 478 ("[w]hen there are a number of *Brady* violations, a court must analyze

whether the cumulative effect of all such evidence suppressed by the government raises a reasonable

probability that its disclosure would have produced a different result") (citing Kyles).[44]

### C.      The Improper Suppression of Evidence.

The Government failed to disclose evidence that could have significantly impeached three

of the four jailhouse informants who testified against Petitioner.

### 1.      Adam Longoria.

Adam Longoria was a jailhouse informant who testified for the Government and against

Petitioner at the penalty phase of the trial. TT 3/22/04, 144-187.  Specifically,  Longoria told the jury

that while he was incarcerated with Petitioner in the Nueces County Jail, Petitioner asked him to kill

three female witnesses that were going to testify against him in this murder trial – Robin Bourgeois

(wife), Lisa Moore (cousin) and Gaynell Collins (ex-wife). Id at 155-62.  Longoria also told the jury

that in return for these murders Petitioner offered to give him an 18 wheeler truck worth $100,000

and drug contacts so he could make drug runs for extra money. Id. at 157.  Longoria testified that

Petitioner admitted to him that he had beaten the decedent with a bat and extension cord and had

thrown these items out the window of the truck, before he got to the Naval Base. Id. at 163-66.

Longoria also testified on direct examination that he had not been promised anything in

----

[44]  See also Schledwitz v. United States, 169 F.3d 1003, 1016-17 (6th Cir. 1999) (granting new trial based on "the total cumulative effect" of the suppressed evidence).

return for his testimony against Petitioner:

> Q.    Okay.  Now, do you and I . . . have I promised you *anything* to come in here
> to testify?
>
> A.    No, ma'am *not a thing.*
>
> Q.    And you understand that there's no way that I can help you in your state case.
>
> A.     I understand fully.
>
> Q.    And I've told you that.
>
> A.     Yes ma'am you have.
>
> Q.     I pass the witness, Your Honor.

3/22/04, 166-67.

On two separate occasions prior to Longoria's testimony, the Government – in response to questions from this Court with defense counsel present – assured the Court and defense counsel that Longoria was receiving no consideration in exchange for his testimony.  TT 3/9/04, 7 ("Adam Longoria is a state prisoner.  We are giving him nothing.  And he knows that we can't give him anything.");  TT 3/19/04, 23 ("There's no promises, nothing.")

On cross-examination Longoria stuck with this story and again insisted he had no understanding, expectations or agreements for favorable treatment from the Government – in his words "none whatsoever." TT 3/22/04, 186.  And on re-direct the Government again asked Longoria "And, you know you're not going to get anything for this, right?" and he responded in the affirmative.  Id. at 187.  This testimony was false.  Longoria understood that he would receive favorable treatment in his open cases in return for his testimony against Petitioner.

At the time he testified against Petitioner, Longoria was facing significant amounts of jail

time.  He was awaiting trial for a May 30, 2003 arrest for bank robbery (03-CR-1884-E) where he was charged as an habitual offender (a charge which carried a mandatory 25-99 year sentence.)  He was also facing the potential violation of a ten year probation sentence he had just received 3 months before the arrest on the bank robbery – for a felony charge of evading arrest as well as endangerment to a child (02-CR-3585-E).  In the evading arrest case, Longoria had avoided a possible mandatory 25 to 99 year sentence when he pled the case out for 10 years' probation on February 4, 2003.  The bank robbery charge was Longoria's second possible mandatory 25 to 99 year sentence in less than 3 months – not to mention that a conviction would also be a  violation of the 10 year probation sentence.  Longoria knew this time the 25-99 year requirement would be applied.  In effect, Longoria was looking at life imprisonment.  Yet, Longoria told Petitioner's jury he did not expect any help on these pending matters.

In fact, Longoria did expect favorable treatment and for good reason.  When he met with AUSA Booth, prior to his testimony against Petitioner, he asked for favorable treatment and was told she could not help him now, but after he testified against Petitioner she would help him.  Longoria recalls this conversation as follows: "I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole." (Declaration of Adam Longoria, *PA*, document # 31).

In a separate due process violation, Longoria also advised AUSA Booth that he was taking anti-psychotic drugs at the time he was housed with Petitioner and at the time he testified against him.  Id.  This fact should have been disclosed.  East v. Johnson, 123 F.3d 235, 238-39 (5th Cir. 1997) (Brady violation where prosecution withheld evidence of witness' mental health problems).

89

Longoria's counsel on the robbery charge and the probation violation was Bill May. At some point in the winter or spring of 2004 Longoria advised Mr. May that he was cooperating in the Bourgeois case. Longoria also told Mr. May that he had spoken to AUSA Booth and was expecting she would help him after his testimony against Petitioner. Mr. May, with this conversation in mind, then filed a continuance of Longoria's robbery trial and probation violation until after he testified against Petitioner. (See Copy of Continuance Motion in *SPA*, # 66).

Longoria testified against Petitioner on March 22, 2004. On May 5, 2004 his bank robbery case and probation violation were listed for trial/disposition in the Nueces County Court. Mr. May asked the state prosecutor Mr. James Sales if he (Sales) had spoken to AUSA Patti Booth. Mr. Sales advised him that he in fact had spoken with her and Sales then dropped the habitual offender mandatory sentence provisions and offered Longoria a plea agreement on his robbery case *and* his probation violation for 7 years' total incarceration. Mr. May knew that Longoria was facing his second mandatory 25-99 year sentence in a little over a year and he knew Longoria would never have received such a lenient disposition if it had not been for his testimony against Petitioner. The main reason Mr. Sales dropped the habitual offender mandatory aspects of the case was because of his (Sales') conversation with AUSA Booth. (Declaration of Bill May dated 5/1/07, contained in *PA*, document # 32)

The favorable treatment did not stop there. Since being sent to prison to serve his 7 year sentence, AUSA Booth has written a letter on behalf of Mr.Longoria to the Texas Parole Board, and in it she mentioned his cooperation and testimony in the Bourgeois trial. (Longoria Declaration). In a May 10, 2007 telephone conversation with undersigned counsel, AUSA Booth acknowledged

that she wrote such a letter on behalf of Longoria.[45]

The understanding of favorable treatment and the favorable treatment actually bestowed on Longoria should have been disclosed to Petitioner and his trial counsel. Additionally, trial counsel should have been told that Longoria was on anti-psychotic medication at the time he was housed with Petitioner and at the time he testified against him. Brady has been violated and a new sentencing proceeding is mandated.

### 2. Orlando Campos.

Orlando Campos was a jailhouse informant who testified against Petitioner at both the guilt/innocence and penalty stages of trial. At guilt/innocence Campos told the jury that he had been incarcerated with Petitioner in the Bee County Jail and during that time Petitioner admitted to him that he had beaten the decedent, killed her and then told his wife to lie about it. He also told the jury that Petitioner spoke with "pride" about beating his wife. TT 3/9/04, 218-20. At the penalty hearing he testified that Petitioner admitted to beating his prior wives and girlfriends, admitted he was going to kill his wife when he got out and admitted to being involved in drug trafficking. TT 3/23/04, 81.

At the time he testified against Petitioner, Campos was serving a 12 year sentence from Bee County that he had received after numerous violations of probation and parole. (B-99-2055-0-CR-B)

On two occasions AUSA Booth assured the court and counsel that Orlando Campos had been promised nothing in return for his testimony against Petitioner. On March 9, 2004 AUSA Booth assured trial counsel and the court that "we are giving him nothing." TT 3/9/04, 7. Then again on March 17, 2004 AUSA Booth stated " I have promised him nothing." TT 3/17/04, 57. In front of

---

[45] Petitioner sought to obtain this letter from the parole authorities, but was advised that such a letter could only be disclosed pursuant to court order. Petitioner will shortly move for such an order.

the jury Campos repeatedly told the jury that no promises had been made to him.  Upon questioning by AUSA Booth, Campos stated that he understood the United States had no power in state court to reduce his sentence and that he hoped that the prosecutor would relay to the authorities that he testified but that he has not been promised anything for his cooperation against Petitioner.  TT 3/9/04, 216.

On cross-examination he stuck with this story and stated that AUSA Booth told him the Government could not reduce his time.  Id. at 224.   Finally, on redirect he reiterated that AUSA Booth told him there was nothing she could do for him except tell the authorities he testified – and was testifying against Petitioner because he should be held accountable.  Id. at 225-26.

Campos' testimony was false.  In fact, prior to testifying against Petitioner he had asked for help in reducing his 12 year sentence.  Either AUSA Booth or FBI Agent Beckett told him that they could not help him at that time but promised to help him with his sentence after the trial was over. (Declaration of Kathleen Kaib dated 5/14/07, contained in *PA*, document # 30).  Campos was paroled after serving less than 3 years of his 12 year sentence.  Id.

### 3.    Darrick Moore.

Darrick Moore, another jailhouse informant, testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both the guilt/innocence and penalty phases of trial.  See TT 3/9/04, 200-215; TT 3/23/04, 86-87.

During the guilt/innocence phase of trial, Moore testified that while they were both incarcerated at the Nueces County Jail, Mr. Bourgeois first told him that JG-1999 died after getting hit on the head during a fight between Mr. Bourgeois and his wife, Robin.  TT 3/9/04, 204. Moore testified that Mr. Bourgeois told him that JG-1999 was a bad child and would "shake her butt" like

an adult. Id. at 205-06. He testified that Mr. Bourgeois told him that he whipped JG-1999 with shower shoes, brushes and extension cords. Id. at 206. He also testified that before Mr. Bourgeois got comfortable in the jail dorm, he originally told Moore that his wife Robin, killed JG-1999. Id. Darrick Moore also testified that Mr. Bourgeois told him that the injuries to JG-1999's ears were caused by his finger nails while the Government thought they were teeth marks. Id. at 207. According to Darrick Moore, Mr Bourgeois told him that he caused those injuries by picking JG-1999 up by her ears. Id. He also testified that Mr. Bourgeois told him that the injuries to JG-1999's feet were caused by a cigarette lighter. Id. at 207-08.

At the penalty phase, Moore testified that Mr. Bourgeois told him he beat his wives; that Mr. Bourgeois said his wife Robin, would "get what she had coming"; and that Mr. Bourgeois said he ran drugs from New Orleans to Miami with his brother. TT 3/23/04, 87.

The Government again capitalized on this highly incriminating and prejudicial testimony to argue in favor of a conviction and a death sentence.

> In this case we have a perfect victim. We have a baby. But you heard testimony that, from Darrick Moore, the Defendant said the baby was bad, was a bad baby, acted like an adult, would wiggle its bottom. I think the evidence supports here, believe the evidence supports here that this was an unlawful, unjustified killing.

TT 3/16/04, 8-9.

> What do we know from the witnesses about Alfred Bourgeois, the real Alfred Bourgeois? We know that he beats, abuses, all of his wives and brags about it.

TT 3/24/04, 69.

At the time he testified on behalf of the Government, Moore believed he was facing a five-to twenty-year prison sentence for possessing 8.5 grams of crack cocaine with intent to sell. TT 3/9/04, 208-09. He testified that he was "hoping" to get a downward departure after cooperating

93

with the Government against Mr. Bourgeois. Id. at 203.  However, Moore was not merely "hoping"

for a reduced sentence, he knew he would be getting a reduced sentence:

> I was an inmate in Nueces County jail along with Alfred Bourgeois.
>
> I was facing 13 years for drug sales [and] delivery.
>
> I spoke with the prosecutor for Bourgeois' case Ms. Patti Booth, about statements that Bourgeois made in prison.
>
> She told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced.
>
> I met with Ms. Patti Booth a second time, before I testified against Bourgeois, and she told me that she had spoken to Lance Duke and they had agreed to reduce my sentence if I agreed to cooperate against Bourgeois.
>
> She also told me if I did good on the stand she would make sure that sentence I was going to get would be reduced even further.
>
> I was concerned and scared that I was going to get 13 years in prison so I agreed to testify against Bourgeois.

Declaration of Darrick Moore, *SPA # 67*, ¶ 1-7.

Consistent with his known agreement, although he was facing 151-188 months in prison,

Moore was sentenced to 65 months incarceration and that sentence was later further reduced to 50

months.  Id. at ¶¶ 8-9 ("I testified against Bourgeois and in fact my sentence was reduced to 65

months because of this testimony ...  A couple of months later as I recall my sentence was reduced

to 50 months because I cooperated with the DEA").  See also Darrick B. Moore, Transcript of

Sentencing, 4/22/04, contained in *PA*, document # 61; Judgment of Sentence, 4/22/04, *PA*, document

# 62; Amended Judgment of Sentence, 12/27/04, *PA*, document # 63.

Thus, contrary to his trial testimony, by testifying on behalf of the Government, Moore was

not just "hoping" for a reduced sentence, he had already entered into an agreement with the

Government and <u>knew</u> he was <u>guaranteed</u> a reduced sentence.  <u>See</u> TT 3/9/04, 203 (testimony of Darrick Moore: "hoping" for downward departure).  As promised, his expectations were met.  The Government violated its obligation under <u>Brady</u> and its progeny.

**D.     The Suppressed Evidence Should Have Been Disclosed and Was Material**.

The evidence about the benefits to Longoria, Campos and Moore could have been used to impeach their credibility and establish a motive for their testimony on behalf of the Government.  As such, <u>Brady</u> mandated its disclosure.  <u>Giglio</u>, 405 U.S. 150, 152 (1972) ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule") (quoting <u>Napue</u>, 360 U.S. at 269); <u>Bagley</u>, 473 U.S. at 676 (<u>Brady</u>'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); <u>Sipe</u>, 388 F.3d at 488-90 (government improperly failed to disclose evidence of additional benefits to cooperating witnesses which prevented defense from effectively attacking the credibility of the witnesses); <u>Graves</u>, 442 F.3d at 339 ("<u>Brady</u> applies equally to evidence relevant to the credibility of a key witness"); <u>Dickson</u>, 453 F.3d at 647 ("[t]o prevail on a <u>Brady</u> claim, '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching...") (quoting <u>Strickler</u>, 527 U.S. at 282-82).

An understanding that a witness will receive a benefit in consideration of testimony, is especially material because it can change the way the jury looks at that witness' credibility.  Thus, the jury is entitled to know about deals, agreements, negotiations, etc. with prosecution witness.  <u>See</u> <u>Giglio</u>, 405 U.S. at 154-55; <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and

95

it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

The improper suppression of evidence about the benefits to the jailhouse informants prejudiced Mr. Bourgeois and thus, was material. At trial, Alfred Bourgeois argued that he did not cause the death of his daughter. See e.g. TT 3/16/04, 35 (defense closing argument) ("I just want to make it clear. Mr. Tinker and my position that Alfred Bourgeois did not kill his child"). Mr. Bourgeois' defense was that his wife, Robin Bourgeois, initially a suspect, committed the assault on his daughter which led to her death. See e.g. Id. at 28-30 (defense closing argument) ("All you folks need to do is look at the evidence. Look at Robin Bourgeois ... She had the motive"). Mr. Bourgeois made no admissions to law enforcement, during or after his arrest for the death of his daughter. The physical evidence admitted at trial of alleged bite marks and sexual assault, if believed, at best, establish an assault – not murder. See also Claims IV, V, and VI (debunking sexual assault and bite mark evidence). Moreover, the evidence admitted at trial regarding the presence of multiple injuries to JG-1999's body, if believed, does not establish who inflicted those injuries and is not inconsistent with Mr. Bourgeois defense that Robin, and not he, caused JG-1999's death. See also Claims V and VI (debunking photo enhancement evidence).

Accordingly, the evidence admitted at trial through the testimony of jailhouse informants was highly prejudicial to Mr. Bourgeois. Indeed, through these jailhouse informants, the Government introduced evidence that: Mr. Bourgeois admitted beating JG-1999 with a bat, extension cord, shower shoes and brushes; he attempted to hire someone to kill potential witnesses; he admitted beating his wife, ex-wives and girlfriends, and did so with "pride"; he was involved in drug and illegal alien trafficking (whom he called "wetbacks"); he picked at JG 1999's ears until they bled and

96

burned her with a cigarette lighter; he constantly changed his story about the circumstances of JG-1999's death; referred to JG-1999 as "that fucking baby" and laughed when retelling a story about JG-1999s head swelling after a beating; he asked for advice on explaining away physical and forensic evidence; and, finally, that he admitted beating JG-1999, killing her, and finally telling his wife to lie about it. See generally TT 3/9/04, 200-15, 218-20 3/22/04, 144-87; TT 3/23/04, 81, 82-87 (testimony of Adam Longoria, Orlando Campos, Wiley Taylor and Darrick Moore).

This evidence presented through the jailhouse informants went directly to the alleged intentionality and maliciousness of the offense and painted a devastatingly harmful picture of Mr. Bourgeois. This evidence completely undermined Mr. Bourgeois' defense and made it highly unlikely, if not impossible, that any juror would believe that Petitioner did not kill JG-1999. Not surprisingly, the Government took full advantage of this testimony in its guilt/innocence and penalty phase closing arguments. See e.g. TT 3/16/04, 17 ("He called it 'it'. The kid that died. The fucking kid"); TT 3/24/04, 70 ("When was the other time he laughed? He laughed when he was – and excuse my language – when he was talking, he said – Wiley Taylor, and he said, "Yeah, that baby's fucking head swelled up like a watermelon, and he laughed." Was he laughing when he beat JG-1999 to death? Was he laughing when he bit her, or he burns her, or he put his filthy semen in her little body").

As a result of the prosecutor's abrogation of duty under Brady, the jury that convicted Mr. Bourgeois and sentenced him to death never heard that three of the four jailhouse informants were testifying in exchange for considerable personal benefit. The jury was left with an inaccurate understanding about a witness' motivation for testifying or the strength of the prosecution's case because of the non-disclosure. Napue, 360 U.S. at 269-70; Giglio, 405 U.S. at 154-55; Pyle v.

97

Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 103, 112 (1935). See also TT 3/22/04, 186 (testimony of Adam Longoria) ("Q[uestion]. So you're just [testifying] so justice can be served. A[nswer]. It's the right thing to do."); TT 3/22/04, 56-58 (prosecutor arguing at penalty closing that Campos' only motivation for testifying was to hold Mr. Bourgeois "accountable").

Had the jury heard this evidence there is more than a reasonable probability that at least one juror would have found the informants' testimony incredible and found that there was insufficient evidence to convict Mr. Bourgeois of murder. In its absence, Mr. Bourgeois did not get a "fair trial" and the verdict is not "worthy of confidence." Kyles 514 U.S. at 434 ("[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty").

Moreover, had the jury heard the evidence about the benefits to the witnesses, there is more than a reasonable probability that at least one juror would have found their testimony incredible and voted to sentence Mr. Bourgeois to life imprisonment. Wiggins, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance"). Indeed, there is more than a reasonable probability that at least one juror would not have believed that Mr. Bourgeois was, as described by the jailhouse informants, the cold, cruel, calculating and child molesting murderer of his own two year old daughter. Id. Moreover, even if they believed he was guilty of killing his daughter, without the testimony of the jailhouse informants, there is more than

98

a reasonable probability that at least one juror would have found that Mr. Bourgeois may have unintentionally killed his daughter and thus, voted to spare his life. Id.

United States v. Sipe, 388 F.3d 471, 477 (5th Cir. 2004) is instructive as to the materiality of the suppressed evidence in this case. In Sipe, a border patrol agent was tried and convicted for using excessive force in the arrest of a Mexican national attempting to enter the United States illegally. Id. at 472. The evidence at trial included the testimony of several other illegal aliens who agreed to cooperate on behalf of the government. Id. In response to the defendant's motion for exculpatory and impeachment evidence, the government informed Sipe that the cooperating witnesses had been allowed to remain and work in the country pending trial, but "no other promises or advantages" had been given. Id. at 475. After he was convicted, Sipe alleged multiple Brady violations including a claim that although he was aware of some of the benefits to the cooperating witnesses, the government had violated its obligations under Brady by failing to disclose additional benefits. Id. at 488. The District Court granted a new trial and the Government appealed.

On appeal, the Fifth Circuit held that government had violated its Brady obligations by failing to provide the defense with the evidence of additional benefits. Id. at 488-90. The Court held that although Sipe did have some information upon which he could impeach the witnesses, the "scope of the additional benefits," when coupled, in part, with the prosecutor's affirmative statement that "no other benefits were given," prevented Sipe from effectively attacking the credibility of the witnesses and thus, established materiality under Brady. Id. at 489.

Here, as in Sipe, "the additional benefits" to Longoria, Campos and Moore (significant reductions in charges and sentences), coupled with the prosecutor's assertions that "[w]e are giving [them] nothing," TT 3/9/04, 7 (Longoria and Campos) or that they were just "hoping" for

99

government assistance (Moore), also prevented Petitioner from effectively attacking the credibility of the jailhouse informants and fully establishing their bias on behalf of the government. The suppressed evidence was material.

The evidence about the benefits to the jailhouse informants was material to Mr. Bourgeois defense and its improper suppression prejudiced him at trial and sentencing. Mr Bourgeois was denied his right to due process and is entitled to a new trial and sentencing hearing. At a minimum he has pled a *prima facie* case that he was denied due process and the Court should afford him an evidentiary hearing at which he can prove these facts.

**E.      The Government Knowingly Permitted the Use of False Testimony.**

In addition to suppressing the disclosable evidence, the Government failed to correct the informants' false testimony. It is long settled that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial, is a denial of due process. Mooney, 294 U.S. at 112; Napue, 360 U.S. at 269 (citing Pyle, 317 U.S. at 216; United States v. Anderson, 574 F.2d 1347, 1355 (5th Cir. 1978) (citing Napue); United States v. Bermea, 30 F.3d 1539, 1565 (5th Cir. 1995). "The same result obtains when the State, although not soliciting false testimony, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269; Anderson, 574 F.2d at 1355; Pyles v. Johnson,136 F.3d 986, 996 (5th Cir. 1998). Due process is violated "where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew *or should have known* was perjured." Kyles , 514 U.S. at 433; Agurs,  427 U.S. at 103-04.

Like the Brady rule, the rule from Napue applies even where, as here, the testimony that the state knows is false goes to an issue affecting a prosecution witness' credibility, rather than directly to the question of the defendant's guilt. As the United States Supreme Court explained in Napue:

100

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend.

360 U.S. at 269; Anderson, 574 F.2d at 1355 ("[t]he same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence").

Here, the government knowingly permitted jailhouse informants to falsely testify that they had no agreed or expected benefit in exchange for their testimony on behalf of the prosecution. As set forth above, this was false and the government took no steps to correct the testimony. Moreover, as set forth above, Mr. Bourgeois was prejudiced by improper admission of the false testimony from the jailhouse informants. Mr. Bourgeois' right to due process was violated. Napue, 360 U.S. at 269.

### F.    Trial Counsel Were Ineffective.

Additionally, trial counsel were ineffective for failing to investigate and present evidence which would have further undermined the credibility of two of the jailhouse informants who testified on behalf of the Government. Petitioner's rights under the Sixth Amendment were violated.

The Supreme Court has explained the relationship between an attorney's pre-trial investigation and the choices that he makes with regard to matters of trial strategy:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments.

Strickland, at 690-91.

The Fifth Circuit has long held that counsel have a duty to conduct a thorough pretrial investigation into the material aspects of the Government's case:

> A substantial body of Fifth Circuit case law insists, however, 'that effective counsel conduct a reasonable amount of pretrial investigation.' . . . . this circuit has recognized that, *at a minimum*, counsel had the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, is a proper guide for determining what is reasonable under the circumstances.

Nealy v. Cabana, 764 F.2d 1173, 1177-78 (5th Cir. 1985) quoting Martin v. Maggio, 711 F.2d 1273, 1280 (5th Cir. 1980).[46]

In this case, counsel abdicated their duty by failing to investigate, develop and present evidence which would have undermined the credibility of two of the Government's jailhouse informants. Timothy Allen and Phillip Jackson, along with Adam Longoria and Darrick Moore, were all housed with Mr. Bourgeois at the Nueces County Jail. Had trial counsel fulfilled their duty to conduct a thorough investigation, Mr. Allen and Mr. Jackson would have provided evidence

---

[46] See also Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (grant of habeas corpus relief by district court affirmed and new trial granted where counsel failed to interview eyewitnesses prior to trial); Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990) (grant of habeas corpus by district court affirmed and new trial ordered where counsel failed pre-trial to investigate insanity defense since "it must be a very rare circumstance indeed where a decision not to investigate [insanity defense] would be 'reasonable' after counsel had notice of the client's mental health problems."); Woodard v. Collins, 898 F.2d 1027 (5th Cir. 1990) (district court's finding that counsel's performance was deficient for failing to investigate all counts of the indictment affirmed.); Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) (district court's denial of habeas corpus petition reversed and new trial ordered where counsel failed to adequately investigate insanity defense prior to trial); Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985) (district court's denial of petition for habeas corpus reversed and new trial granted where trial counsel failed to investigate and interview material witnesses prior to trial).

directly contradicting the testimony of Adam Longoria and Darrick Moore and their claims of

unbiasedness on behalf of the Government.  As Mr. Jackson has stated:

> In the summer of 2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas.  At that time, I was housed with several other inmates including Alfred Bourgeois, Darrick Moore, Adam Longoria and Timothy Allen.
>
> During the time we were incarcerated, Mr. Bourgeois would often tell me that he was being accused of a crime which his wife committed.  He said that his wife had hurt his daughter because she was jealous and angry that Mr. Bourgeois had fathered a child with another woman.  I never heard him admit to hurting his daughter and he did not say anything different to Adam Longoria or Darrick Moore because we were all housed on the same pod.
>
> I specifically heard Darrick Moore say he wanted to testify against someone to get a lesser sentence.  He said he had already given information against someone in his federal drug case but that he needed to do more to help his situation.  Darrick Moore said he needed to figure out who else he was going to tell on.  I also heard Darrick Moore say that he was worried about his girlfriend who was going out to clubs spending his money while he was in jail.  I actually saw him crying because he was so worried about the prison time he was facing on his drug charges.
>
> I remember Alfred Bourgeois and Adam Longoria, who I know as "David", getting into a fight.  Mr. Bourgeois had offered Mr. Longoria some toothpaste and Longoria got insulted by the offer.  After that, I heard Longoria say that anyone, like Mr. Bourgeois, who denies a crime so often must be guilty.  I heard him say "my girl gave me up so why can't I give up someone else."

Declaration of Phillip Jackson, *SPA # 68*, ¶ ¶ 2-5.  Similarly, Timothy Allen states:

> In the summer of 2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas.  I was housed there while awaiting trial on the firearm possession charges.  At that time, I was housed with several other inmates including Alfred Bourgeois, Darrick Moore and Adam Longoria.  For a while, Mr. Bourgeois and I were cellmates.
>
> During the time we were incarcerated, Alfred Bourgeois was very involved in Bible study.  While I frequently heard Mr. Bourgeois discussing the Bible, I never heard Mr. Bourgeois discuss his case with Adam Longoria or Darrick Moore.  The only thing he told me about his case was that his wife was wrongfully accusing him.  I never heard him admit to hurting his daughter and I know that he would not have made that admission to Moore or Longoria.

> Darrick Moore was in jail awaiting trial on an open federal drug charge. I remember he was very concerned and worried about the prison time he was facing. He constantly worried that if he got convicted on the drug charges he was facing, he was never going to get out of jail. He was scared to death about being convicted and sentenced to life imprisonment because of his prior conviction in California. He kept saying there was no way he could handle a long prison term since he had too much going for him on the street.
>
> Darrick Moore was also very worried about his relationship with his girlfriend, Lisa Fernandez. I knew Lisa Fernandez from my time on the street. I told him she was not a trustworthy person. He then became very worried that she would not be faithfully waiting for him if he got a long prison sentence. Several times, I heard Darrick Moore say that he could not afford to get convicted and get a long sentence.

Declaration of Timothy Allen, *SPA # 69*, ¶¶ 2-5.

Mr. Jackson and Mr. Allen were both willing and available to testify at trial. See Declaration of Phillip Jackson, *SPA # 68*, ¶ 5; Declaration of Timothy Allen, *SPA # 69*, ¶ 6 ("Had I been contacted at the time of trial, I would have testified about what I knew and the things I have stated in this affidavit"). Although trial counsel was aware that Mr. Bourgeois was housed with inmates, in addition to those who testified at trial, counsel never interviewed those inmates to determine what they knew about Mr. Bourgeois and his alleged statements to the jailhouse informants. See e.g. TT 3/22/04, 150-51 (testimony of Adam Longoria discussing inmates housed with him and Mr. Bourgeois); Declaration of Phillip Jackson, ¶ 5; Declaration of Timothy Allen, ¶ 6 ("No one has previously contacted me to discuss what I knew about Mr. Bourgeois, Adam Longoria or Darrick Moore").

As a result, counsel, already hampered by the Government's Brady violations, were unable to effectively challenge the credibility and bias of two witnesses who offered extremely damaging testimony against Mr. Bourgeois. Counsel were ineffective and Mr. Bourgeois was prejudiced.

Strickland, 466 U.S. at 694.   Mr Bourgeois was denied his Sixth Amendment right to the effective assistance of counsel and is entitled to a new trial and sentencing hearing.  At a minimum he has pled a *prima facie* case that he was denied effective assistance and the Court should afford him an evidentiary hearing at which he can prove these facts.

**CLAIM VIII.    TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

It is well settled that "[r]epresentation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." Strickland v. Washington, 466 U.S. 668, 688 (1984) (citing Cuyler v. Sullivan, 446 U.S. 335, 346 (1980)); Wood v. Georgia, 450 U.S. 261, 271 (1981); accord Harms v. Quarterman, 2007 WL 1256616 (S.D. Tex. 2007) (Jack, J.).  This "duty of loyalty [is] perhaps the most basic of counsel's duties." Strickland, 466 U.S. at 692(1984).

 "Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer.  It is this kind of service for which the Sixth Amendment makes provision. And nowhere is this service deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is peculiarly abhorrent." Von Moltke v. Gillies, 332 U.S. 708, 725-26 (1948) citing Canons 4 and 15, ABA Canons of Professional and Judicial Ethics.

The right to conflict-free counsel applies regardless of whether counsel is appointed by the court or selected by the defendant. Cuyler, 446 U.S. at 344; See also, United States v. Infante, 404 F.3d 376, 389 (5th Cir. 2005) ("Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of

interest.") quoting United States v. Vaquero, 997 F.2d 78, 89 (5th Cir. 1993).

Because this duty of loyalty is so fundamental, and because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," prejudice is presumed when counsel has a conflict of interest. Strickland, 466 U.S. at 692 (citing Cuyler, 446 U.S. at 345-50); see also Glasser v. United States, 315 U.S. 60, 73 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow the courts to engage in nice calculations as to the amount of prejudice arising from its denial").

In Strickland, the Supreme Court explained the rationale behind this presumption of prejudice:

> [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

Strickland, 466 U.S. at 692.

In a criminal case "[a] conflict exists when defense counsel places himself in a position conducive to divided loyalties." United States v. Medina, 161 F.3d 867, 870, n.1 (5th Cir. 1998); Accord Harms v. Quarterman, 2007 WL 1256616 (S.D. Tex. 2007) (Jack, J.). An "actual conflict of interest" is "precisely a conflict that affected counsel's performance. . . ." Mickens v. Taylor, 535 U.S. 162, 184 (2002).

When presented with a conflict of interest claim the Court "must ask whether [counsel] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict

106

adversely affected the representation." United States v. Infante, 404 F.3d 376, 392 (5th Cir. 2005). Furthermore, "[w]hether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." Id.

From the very beginning of this case, Petitioner was deprived of his right to counsel acting in his interest. Petitioner was represented at trial, and on direct appeal, by Mr. Tinker and Mr. Gilmore. Trial counsel had irreconcilable conflicts from the start of this capital case. These conflicts adversely affected counsels' performance, depriving Petitioner of a fair trial, a fair sentencing and violating his Sixth Amendment right to counsel. A new trial and sentencing are mandated.

### A. Government Witness, Ross Griffin, Was Represented By Petitioner's Counsel.

Prior to and during Petitioner's trial, Mr. Gilmore represented an individual by the name of Ross Griffin. Griffin was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana. Griffin was housed with Petitioner in the Nueces County Jail along with Adam Longoria and Darrick Moore. Griffin was cooperating with AUSA Patti Booth as a jailhouse informant against Petitioner (FBI 302 dated 7/1/03 contained in *PA*, document # 60). Had trial counsel not been laboring under a conflict of interest they could have interviewed/investigated Griffin and would have learned that he had been offered favorable treatment to cooperate against Petitioner and had been provided information about Petitioner's case. Griffin could have been called as a witness for Petitioner to testify to these facts and to the fact that

the other jailhouse informants that he knew (Longoria and Moore) had received similar treatment in return for cooperating against Petitioner. Because counsel was laboring under a direct conflict of interest he could not and did not conduct such an interview/investigation and Griffin was not called as a witness on behalf of Petitioner.

For the above reasons Petitioner's counsel had an actual conflict of interest that adversely affected his representation of Petitioner and a new trial and sentencing hearing are mandated. See United States v. Guidry, 462 F.3d 373 (5th Cir. 2006) (district court disqualified defendant's counsel because he had previously represented a Government witness despite the fact that the court did not rely on this witness' testimony.); United States v. Millsaps, 157 F.3d 989 (5th Cir. 1998) (affirming district court's disqualification of defendant's counsel because counsel represented a potential government witness); Wheat v. U.S., 486 U.S. 153 (1988) (affirming district court's disqualification of defendant's counsel because counsel represented a potential government witness).

**B.      Government Witness Adam Longoria, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client.**

Mr. Gilmore also was laboring under an actual conflict of interest with regard to jailhouse informant Adam Longoria. Prior to Petitioner's trial Mr. Gilmore had actually called Longoria as a witness on behalf of another one of Mr. Gilmore's clients who had been housed at the Nueces County Jail. Longoria was called – by Mr. Gilmore in Mr. Gilmore's other trial – to testify to matters he had heard while in the same jail (Nueces County Jail) and same cellblock as Petitioner. Furthermore, the prosecutor in this "other" case was the same prosecutor (James Sales) who offered Longoria a radically reduced sentence six weeks after he testified against Petitioner – despite Longoria's testimony to Petitioner's jury that Sales "hates me now." TT 3/22/04, 186. Having used

108

Longoria as a witness to give sworn testimony as to matters he observed in prison on behalf of a client (not Petitioner), Mr. Gilmore was conflicted and failed to fully and effectively confront Longoria on cross-examination at the penalty phase of Petitioner's trial.   TT 3/22/04 179-80, 186.

For the above reasons Petitioner's counsel had an actual conflict of interest that adversely affected his representation of Petitioner and a new trial and sentencing hearing are mandated.  See United States v. Infante, 404 F.3d 376 (5th Cir. 2005) (conviction vacated where counsel previously represented two witnesses against his current client); Perillo v. Johnson, 205 F.3d 775 (5th Cir. 2000) (capital conviction vacated where defendant's lawyer previously represented witness against defendant); United States v. Martinez, 630 F.2d 361 (5th Cir. 1980) (a conflict existed when attorney previously represented a witness who testified against current client in a related matter).

**C.      Government Witness Orlando Campos, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client.**

Mr. Gilmore was also laboring under a conflict of interest with regard to jailhouse informant Orlando Campos.  Campos testified as a jailhouse informant for the Government and against Petitioner at both the guilt/innocence and penalty stages of trial. Prior to Petitioner's trial, Mr. Gilmore represented Roel "Dody" Contreras, a co-defendant of Campos' in a Bee County capital murder case.  Campos originally agreed to testify against Mr. Contreras in return for a plea to reduced charges and a probation sentence.  However, after originally testifying against Mr. Contreras (while Mr. Gilmore represented Mr. Contreras) and after receiving his drastically reduced sentence, Campos changed his mind and attempted to disavow his prior testimony against Mr. Contreras. Given this change of events, Mr. Gilmore was conflicted and prevented  from fully and effectively confronting Campos on cross-examination at the guilt/innocence and penalty phases of Petitioner's

trial.  TT 3/9/04, 221-223,  3/23/04, 81.   Mr. Gilmore, however, never confronted Campos with this prior testimony.

For all of these reasons Petitioner's trial counsel were laboring under several actual conflicts of interest prior to and during their representation of Petitioner and Petitioner was denied his Sixth Amendment right to counsel.  As a result of these conflicts, counsels' performance was adversely affected.  Petitioner is entitled to a new trial and sentencing proceeding.

**CLAIM IX.** **PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.     Introduction.**

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935); accord United States v. Corona, 551 F.2d 1386, 1391 (5th Cir. 1978) (quoting Berger, 295 U.S. at 88); United States v. Goff, 847 F.2d 149, 164 (5th Cir. 1988) (same); Dickson v. Quarterman, 462 F.3d 470, 479 (5th Cir. 2006) (same).  Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." Berger, 295 U.S. at 88; Corona, 551 F.2d at 1391; Dickson, 462 F.3d at 479.[47]

As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the Government – and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper

---

[47] See also United States v. Leslie, 783 F.2d 541, 567 (5th Cir. 1986) (Williams, J. dissenting) ("The cherished title "United States Attorney" is not a hunting licence which exempts its holder from the ethical constraints of advocacy") (citing United States v. Becket, 706 F.2d 519, 521 n. 5 (5th Cir. 1983).

prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88; Goff, 185 F.3d 307 at 163 ("[i]n considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give what he says the ring of authenticity"); United States v. Gallardo-Trapero, 185 F.3d 307, 319-20 (5th Cir. 1999) ("[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says") (citing Goff, 185 F.3d at 163).[48]

The United States Supreme Court has subjected closing arguments in capital cases to a greater degree of scrutiny. Caldwell v. Mississippi, 472 U.S. 320 (1985). These principles are particularly important in the penalty phase of a capital case where the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," Woodson v. North Carolina, 428 U.S. 280, 305 (1976), and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury, Gregg v. Georgia, 428 U.S. 153, 189 (1976), together with the "highly subjective" nature of the sentencing decision, Caldwell, at 340-41 n.7 (1985), require that special scrutiny be given to prosecutorial argument. As the Third Circuit has explained:

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system…Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices. [Berger's requirement that the prosecutor refrain from improper argument] applies with particular force to the prosecuting attorney in the penalty phase of a capital case.

---

[48] See also Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.") (citing Berger). "For this reason, misconduct by the prosecutor ... must be scrutinized carefully." Drake, 762 F.2d at 1459 (citing Berger).

Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991); see also Olson v. Shillinger, 861 F.2d 612, 626 n. 12 (10th Cir. 1988) ("the minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase…).

This Court's review of a claim of improper prosecutorial argument involves a two step analysis. First, this Court must decide whether or not the prosecutor made an improper remark. If the Court determines that an improper remark was made, then it must determine if the remark affected Petitioner's substantial rights. Gallardo-Trapero, 185 F.3d 307 at 320; United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000). In determining whether Petitioner's substantial rights have been affected the Court must consider three factors: "(1) the magnitude of the prejudice caused by the argument(s) (2) the efficacy of any cautionary instructions given, and (3) the strength of the evidence of [petitioner's] guilt." Gallardo-Trapero, 185 F.3d 307 at 320; Goff, 847 F.2d at 165; United States v. Tomblin, 46, F.3d 1369, 1389 (5th Cir. 1995).

Where individual remarks by themselves do not create a due process violation, their cumulative effect may. See United States v. Garza, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not, we think it beyond question that the prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant"); Goff, 185 F.3d at 163 ("We do not reach the question whether these other instances of misconduct, taken separately or in the aggregate, also rise to the level of error. The cumulative effect only adds to the prosecutor's

112

misconduct").[49]

During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial and a reliable capital sentencing verdict. The prosecutor's comments, both individually and cumulatively, amounted to prosecutorial misconduct. To the extent that trial counsel failed to object to any of these comments and arguments or request a curative instruction, they were ineffective. The Court's failure to give an immediate curative instruction exacerbated the harm. Petitioner was denied his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

### B.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing."

The prosecutor engaged in misconduct by improperly referring to Mr. Bourgeois as "that thing." During the guilt/innocence phase closing argument, the prosecutor stated:

> The doctors told you they did a test bite mark. And they did a test bite mark that went away in 24 hours. I'm showing you now what's Government's Exhibit 97 and you're going to have all these photos back there. And they told you they analyzed this bite mark. And they did the best they could to determine – to exclude, their goal was to see who they could exclude. And they excluded Robin. But who did they not exclude? They didn't exclude this man, **that thing that's sitting right there**.

TT 3/16/04, 48-49. It is well settled that this type of characterization in highly improper. Indeed, as the Fifth Circuit held in reversing a conviction wherein the prosecutor used the term "hoodlum" to describe the defendant:

---

[49]    See Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense, violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence); Davis v. Zant, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process).

> This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick out in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises – succinct, pithy, colorful and expressed in a sharp break with decorum of which the citizen expects from the representative of his government.

Hall v. United States, 419 F.2d 585, 587 (5th Cir. 1969); Goff, 847 F.2d at 164 (reference to defendants as "crooks" improper) (citing Hall, 419 F.2d at 587).[50]

### C. The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility.

During the Government's guilt/innocence phase closing argument, the prosecutor engaged in misconduct by improperly appealing to the jury's sense of civic responsibility. The prosecutor stated:

> The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen. The arrogance of his cruelty.

TT 3/16/04, 17-18. Appeals to a jury's sense of civic responsibility are improper. Viereck v. United States, 318 U.S. 236, 247 (1943) (holding that the prosecutor's statements, including telling jurors that "[t]he American people are relying upon you ladies and gentlemen for their protection against this sort of a crime" compromised the defendant's right to a fair trial); United States v. Young, 470 U.S. 1, 18 (1985) ("The prosecutor was ... in error to try to exhort the jury to 'do its job'; that kind of pressure ... has no place in the administration of criminal justice, see, e.g., ABA Standards for

---

[50] See also United States v. Cannon, 88 F.3d 1495, 1502-03 (8th Cir. 1996) (reference to defendant as "bad people" improper); United States v. Hands, 184 F.3d 1322, 1332-33 (11th Cir. 1999) (reference to defendant as "wickedly vicious, monster, drug dealer" improper).

Criminal Justice, 3-5.8(c) and 4-7.8(c)."); Handford v. United States, 249 F.2d 295 (5th Cir.1958) (prosecutor's improper argument constituted reversible error when he called on jury's sense of civic duty to convict defendant for unpaid taxes on liquor to remedy problem with alcohol related deaths).[51]

In this case, the prosecutor's argument improperly urged the jury to sentence Mr. Bourgeois to death, not because of the evidence, but because of their civic responsibility. This was highly improper.

### D. The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument.

The prosecutor engaged in misconduct by making an argument she knew to be false. In her guilt/innocence phase closing argument, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks. You didn't hear that. The only child whose bite was analyzed was excluded. He told you that there was forum shopping by the United States on our experts and what did you hear? We sent our teeth to Dr. Senn. Dr. Senn made his analysis and sent it for a second opinion. In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion. Is that expert shopping or is that just making sure?

---

[51] See also United States v. Strode, 229 F.3d 1161 (9th Cir. 2000) (prosecutorial misconduct required reversal where prosecutor told jury that "justice demanded a guilty verdict"); United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999) (vacating conviction where prosecutor argued: "I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty"); United States v. Leon-Reyes, 177 F.3d 816, 822 (9th Cir. 1999) ("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence"); United States v. Manning, 23 F.3d 570, 572 (1st Cir. 1994) (vacating conviction where prosecutor vouched for government's case by telling jury government witnesses were "bound by their oath").

TT 3/16/04, 19-20.    This argument was false and highly improper. It is well established that an argument based on knowingly false evidence violates due process.  See Mooney v. Holohan, 294 U.S. 103, 112 (1935); Napue v. Illinois, 360 U.S. 264, 269 (1959) (citing Pyle v. Kansas, 317 U.S. 213, 216 (1942)); accord United States v. Anderson, 574 F.2d 1347, 1355 (5th Cir. 1978) (citing Napue).

In this case, the Government had engaged in "forum shopping" for favorable bite mark evidence.  As fully set forth in Claim V, before trial the Government consulted with United States Army Colonel J. Curtis Dailey, M.D., who was unable to provide them with favorable bite mark evidence.   Indeed, Dr. Dailey could not single out Petitioner as the alleged biter of JG-1999. Thereafter, when Dr. Dailey informed AUSA Booth of his conclusions, AUSA Booth angrily told Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she would go out and find an expert who could.  AUSA Booth then hung up the phone on Dr. Dailey.  See *PA*, document # 45.  Thus, contrary to her argument to the jury, the Government did "forum shop" and the prosecutor's argument was patently false.

### E.    The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References.

The prosecutor engaged in misconduct by repeatedly making improper biblical references during the guilt/innocence closing argument.  The prosecutor stated:

> Now you've all heard of the Proverb that pride comes before the fall.  With your permission I would like to just change the Proverb just a little bit and speak to arrogance before the fall.

> *                                    *                                    *

> He called it 'it'.  The kid that died.  The fucking kid and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

116

TT 3/16/04, 11, 17, 46.  These comments were highly improper.   Arguments urging the jury to decide a case based upon factors other than the evidence presented or instructions of the court are improper.  Accordingly, such religious arguments have been condemned by virtually every court to consider them.  Sandoval v. Calderon, 231 F.3d 1140, 115051 (9th Cir. 2000) (collecting cases).[52]

**F.      The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations.**

The prosecutor engaged in misconduct when she improperly told the jury that she had five children, has buried family and that her youngest brother was in Iraq.  During the penalty phase closing argument, the prosecutor stated:

Ms. Booth:     Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death.  And he's very wrong.  **I've raised five children, I've buried family** –

Mr. Tinker:    She's outside the record here, your Honor, and I just –

Ms. Booth:     Judge I'm responding to – he opened the door.

Mr. Tinker:    About how many kids she's got doesn't have anything to do with the trial in this case.

The Court:     Go ahead, Ms. Booth

Ms. Booth:     **My baby brother is in Iraq serving his country**.  Things are hard, and this is the hardest thing that I have ever done in my life.

---

[52]   To the extent that any of these improper arguments during the guilt/innocence phase impacted Petitioner's sentence, they also violated Petitioner's right to due process and his rights under the Eighth Amendment to the United States Constitution.  See Chambers v. Mississippi, 486 U.S. 578, 585 (1992) (verdict based on inapplicable aggravating factor violates Eighth Amendment and invalidates death sentence); Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (capital sentencing must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

117

TT 3/24/04, 66-67.  Although defense counsel previously stated that seeking death may be easy for Ms. Booth, id. at 64, the prosecutor's response was highly improper.  If defense counsel's comments were improper, the prosecutor should have objected and requested a curative instruction from the Court.  See Young, 470 U.S. at 11 (it is at least "[c]lear [that] two improper arguments-two apparent wrongs-do not make for a right result").  Instead, the prosecutor improperly diminished the jury's sense of ultimate responsibility for their life or death decision by telling them that she personally believed death was the appropriate sentence, even though seeking death was more difficult than raising five children, coping with the death of family members and living with the constant fear and insecurity of having her youngest brother in a war zone.  Caldwell, 472 U.S. at 328-29 ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

G.     **The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog."**

The prosecutor engaged in misconduct when she improperly described Mr. Bourgeois and his brothers as "attacking like a bunch of dogs."

> You know he was emboldened by the legal system not working.  You know it.  He abused women, he abused – abused babies, and nothing ever happened.  Temporary restraining orders were filed, but he got his wife to pull those back.  Charges were filed on him for taking a gun and putting it in the face of his aunt, widowed aunt, with a dying son inside, pointing guns and saying, "I'm going to kill you," **and biting his cousin and attacking like a bunch of dogs, his brothers.**

Id. at 71-72.  This was extremely improper.  Comparison of the Petitioner to an animal has no place in our criminal justice system.  United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002) (argument that defendant's were "hunting each other like animals" improper); see also Section A,

118

supra (citing cases)  These dehumanizing comments served one purpose: to inflame the passions of the jury, which was about to embark on the most serious of duties – deciding the life or death of the Petitioner.  They were improper and they cannot be condoned.  Indeed, the prosecutor's comments were nothing but a call to the jurors to ignore the evidence and make their sentencing decision on the basis of fear and passion, rather than as a "reasoned moral response" to the "uniquely individual human being" before them.  Penry v. Lynaugh, 492 U.S. 302, 319 (1989).[53]

**H.      The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel.**

The prosecutor engaged in misconduct by improperly disparaging opposing counsel.  During its penalty phase closing argument, the prosecutor stated:

> And do you know why I bring that up, ladies and gentlemen?  Because we brought people in here that were in prison with the defendant; we brought them in here and we didn't bring them in a suit.  We told you right off the bat, they've done bad things, they're convicted.  But that's not what the defense did.  Marched them in here in suits to testify, didn't mention he was a fired policeman, convicted at least three times for fraud.

> Mr. Tinker:      Your Honor, we have no control of what a witness shows up wearing when they're subpoenaed to be here and I object to that line of argument, that we had something to do with that.
>
> *                                    *                                    *

> You know, and I think that maybe even the Defendant has convinced and said it so many times to his Defense counsel, that the baby was an it, because Mr. Gilmore said, "Well, he was happy about it."

---

[53] See also Lesko, 925 F.2d at 1545; Tucker v. Zant, 724 F.2d 882, 886 (11th Cir. 1984) ("A prosecutor may not attempt to inflame jurors faced with this awesome choice [between life and death] by playing on their passions, prejudices, and fears."); Newlon v. Armontrout, 885 F.2d 1328, 1335-38 (8th Cir. 1989) (prosecutorial arguments that appeal to jurors' fears are improper and require that death sentence be vacated); Commonwealth of Northern Mariana Islands v. Mendola, 976 F.2d 475, 486-87 (9th Cir. 1992) (prosecutorial comments that are "designed to appeal to the passions, fears, and vulnerabilities of the jury" are improper).

Id. at 72-73, 77. These comments were highly improper. Indeed, as the Fifth Circuit held in finding that a prosecutor's improper comments on a defendant's right to counsel violated his right to a fair trial: "[n]o prosecutor [ ] may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant." United States v. McDonald, 620 F.2d 559, 562 (5th Cir. 1980); United States v. Frascone, 747 F.2d 953, 957-58 (5th Cir. 1984) (prosecutor's argument that he took an oath to seek justice while defense counsel took an oath to his client was improper because "it seeks to draw the cloak of righteousness around the prosecutor in his personal status as government attorney and impugns the integrity of defense counsel"); see also Buford v. Rowan Companies, 994 F.2d 155, 158 (5th Cir. 1993) (even where no intent to malign counsel is present, comments which impugn the integrity of defense counsel are "difficult, if not impossible, to sanitize [ ] so as to remove the taint") (quoting McDonald, 620 F.2d at 564).

I.      **The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos.**

The prosecutor engaged in misconduct by falsely arguing that Government witness Orlando Campos testified on behalf of the prosecution solely out of a sense of justice. During its penalty phase closing argument, the prosecution argued:

The Defense talked about how you shouldn't believe these guys, these prisoners, because, you know, they're all in here, to be paid. I just want to bring one person to your memory. Remember Orlando Campos? He was the second prisoner we brought in. He was the State – had been convicted on state charges and he told you that he knew that the Government couldn't really help him much. He hoped that we would tell the State prosecutor something and maybe he would get lesser but what did he really tell you. Why did he tell you he came in here? He told you he came in here because the Defendant confessed, said, I killed that child. I can tell God because God will forgive me but I ain't never going to tell a jury – or a judge, he said. One of his letters, one of the defendant's letters talks about the fact that he has given this up to

120

God. But what's really important is Orlando Campos told you the reason he came in here is not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man should be held accountable.

Id. at 57-58. The prosecutor, however, knew this argument was false. The use of false, inaccurate or misleading prosecutorial testimony deprives a defendant of a fair trial. See Mooney, 294 U.S. at 112; Napue, 360 U.S. at 269 (citing Pyle, 317 U.S. at 216); accord United Anderson, 574 F.2d at 1355 (citing Napue).

In this case, Orlando Campos more than "hoped" he would be getting a sentence reduction for his cooperation with the Government, he knew he would be getting a deal. See Claim VII. Accordingly, the prosecutor's argument that Mr. Campos was cooperating solely because he thought Mr. Bourgeois should be held accountable was false and improper. There is a more than reasonable likelihood that this false and improper argument impacted the decision of the jury.

**J.      The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation**.

A defendant's constitutional rights are violated when the state impedes the consideration of mitigating evidence by any means. Mills v. Maryland, 486 U.S. 367, 374-75 (1988). Indeed, a death penalty that is imposed by a jury that has not fully considered and given effect to mitigating evidence is unconstitutional. The Eighth Amendment requires that the sentencer must consider and give full effect to "any aspect of the defendant's character or record ... that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978); accord McCleskey v. Kemp, 481 U.S. 279, 304 (1987); Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Woodson v. North Carolina, 428 U.S. at 280, 304 (1976).

In this case, the prosecutor flouted this fundamental Eighth Amendment principle by

121

improperly disparaging and diminishing the mitigation proffered on behalf of Mr. Bourgeois. The

prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers
> the aggravating factors that he's alleged to, and they are that he was under substantial
> duress, that he was – that he was driving in an 18- wheeler with three children, that
> he had family and economic pressures. You know and I thought, "Oh, well, that's
> just life, that's not mitigation."

Id. at 74. While the jury in this case was certainly free to decide that the mitigation proffered on

behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument

that Mr. Bourgeois' evidence "was not mitigation," improperly prevented the jury from considering

the mitigating evidence. Thus, the jury's weighing process was improperly skewed in favor of death.

> **K.      Conclusion.**

The prosecutor's comments and arguments in this case were not simply isolated instances

of prosecutorial excess. Individually and cumulatively the prosecutor's comments so infected the

trial with unfairness as to make the conviction a denial of due process. See Garza, 608 F.2d at 665

("While any single statement among those we have isolated might not be enough to require reversal

of the conviction and, indeed, some clearly would not we think it beyond question that the

prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant");

Goff, 185 F.3d at 163 ("We do not reach the question whether these other instances of misconduct,

taken separately or in the aggregate, also rise to the level of error. The cumulative effect only adds

to the prosecutor's misconduct"); Lesko v. Lehman, 925 F.2d at 1546 (individually and cumulatively

the prosecutor's comments "so infected the trial with unfairness as to make the conviction a denial

of due process").

Counsels' failure to object, request a limiting instruction, or raise and preserve these issues

at trial or on appeal denied Petitioner his right to effective assistance of counsel. Petitioner's right to effective representation under the Sixth Amendment to the United States Constitution was violated. Strickland v. Washington, 466 U.S. 668 (1984).

Defense counsels' deficiency in failing to object to the prosecutor's arguments was highlighted by the failure of the court to give curative instructions. Corona, 551 F.2d at 1391 n.5 ("the trial judge has an obligation in the interests of fairness and justice to stop the prosecutor from delivering a greatly prejudicial argument *sua sponte*").[54]

Accordingly, Petitioner has established that the prosecutor's remarks were improper and that his substantial rights were violated. Gallardo-Trapero, 185 F.3d 307 at 320. Indeed, these errors undermined the reliability of the verdict and sentence and deprived Petitioner of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Petitioner is entitled to a new trial and sentencing hearing.

---

[54] See Mann v. Dugger, 844 F2d 1446, 1457 (11th Cir. 1988) ("When a trial court does not correct misleading [prosecutorial] comments… the state has violated the defendant's… rights because the court has given the state imprimatur to those comments; the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law."); Lesko, 925 F2d at 1546-1547(trial court's general instruction on closing arguments did not cure due process violation as the instructions were not immediate and did not specifically address the prosecutor's errors); Mahorney v. Wallman, 917 F.2d 469, 473-74 (10th Cir. 1990) (same). While it may be argued that the court gave general instructions to the jury regarding the weight of opening and closing remarks, this does not cure the prejudicial effect of these remarks. Newlon v. Armontrout, 885 F.2d 1328, 1337 (8th Cir. 1989) ("With respect to curing the error by jury instruction, the trial judge made no comment *sua sponte* to the jury and issued no curative instruction after the closing argument was completed. The State's argument that the standard jury instruction that statements made by counsel during opening and closing argument are not evidence cures any error made by the prosecutor is without merit. Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious").

**Claim X.** **TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO REBUT THE EVIDENCE OF PETITIONER'S INDIFFERENT DEMEANOR AT THE GUILT STAGE OF TRIAL WITH MENTAL HEALTH EVIDENCE**

**A.**    **The Testimony and Arguments Presented at Trial.**

At trial, the Government elicited testimony from several witnesses to show Petitioner's apparent indifferent demeanor to the injuries and death of his daughter. The Government used this evidence to bolster their case against Petitioner, arguing that Petitioner's seemingly callous attitude pointed to his cruel heart, and by implication, his guilt. In her opening statement, AUSA Patti Booth described Mr. Bourgeois as "callous" (TT 3/2/04, 41), and told the jury:

> You'll hear the people testify about the demeanor of the Defendant. You'll hear how when the ambulance came, it was Robin that went with the child to the hospital at Driscoll. You're going to hear a Mr. Smith come and testify that he offered to take Mr. Bourgeois to the hospital, and he was more concerned about getting his load than he was about going to the hospital with his child, who is obviously not resuscitating.

TT 3/2/04, 40.

In fact, extensive testimony was presented regarding Mr. Bourgeois' inappropriate behavior both at the scene of his daughter's injuries and at the hospital. Several witnesses described Petitioner's lack of emotion. See TT 3/2/04, 159 (Karen Krueger) (Petitioner did not cry or seem excited); id. at 225 (Timothy Darr); id. at 275 (David Paoletti); id. at 320, 323 (William Smith).

In addition, multiple Government witnesses testified that they were surprised by Petitioner's apparent lack of emotion on the day of his daughter's injuries. See e.g. TT 3/2/04, 122, (Hal Resides) ("I ... was surprised by just the matter-of-fact tone in his voice about what had – where his child was... I wouldn't have expected to see him at all. I thought he would have been at the hospital."); id. at 207 (Joni Dee Parker) ("He was really calm. That, you know, surprised me.); id. at 318 (William Smith) ("I was very shocked [by his demeanor]. I would have left the trailer, truck,

124

everything, to be with my daughter.").

Witnesses also reported Petitioner's inaction at the scene. See e.g. id. at 203 (Ms. Parker) ("He was just watching. He was just standing there watching."); id. at 225-7 (Mr. Darr); id. at 158 (Ms. Krueger) ("No. He never did [go to help Robin]. He was in the warehouse on the phone."; id. at 164 (He didn't "even glance toward the child" while they were giving CPR to the child).

Some of the most prejudicial testimony against Petitioner described his inappropriate comments after his daughter was taken by emergency personnel. Joni Dee Parker testified:

Q:     And did the Defendant, the driver, ever say anything or make any comments while he's on the dock with you there?

A:     He just shook his head and said, "Kids."

TT 3/2/04, 204

Michael Brozgal testified, "[T]he guy didn't seem like he was really that concerned. He was like – the comment he made was, 'that's a shame what happened.' And when he said it, there was no concern or anything in his eyes, just like, that's a shame, like I'd say if a I dropped a glass or something, you know, just kind of heartless." Id. at 289. Mr. Darr told the jury:

Q:     So while his child was in the hospital, he was still trying to line up loads?

A:     Yes, ma'am.

Q:     Did that concern or surprise you?

A:     Yes. I mean... why would you be worrying about a load?

TT 3/2/04, 238

According to Government witness William Smith, Mr. Bourgeois apparently even took a phone call from a dispatcher while the doctors were announcing the sad news that the victim would

most likely die.  Id. at 324 ("[The phone call] actually interrupted what the doctors were saying.").

Unquestionably, this sort of testimony about Mr. Bourgeois' behavior in the face of his daughter's passing prejudiced the jury against him in both the guilt and sentencing phase of trial. Evidence of such a callous and indifferent reaction to the serious injuries of a two year old is shocking.  The fact that the victim's parent acted this way is even more appalling.  Absent any evidence to explain and normalize this behavior, the jury could not help but draw negative inferences toward Petitioner, and impute this behavior with both guilty and deserving of the death penalty. Trial counsel was obliged to attempt to mitigate this evidence.

### B.      Deficient Performance.

To establish deficient performance, Petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Id.  "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  Id. at 690.

The ABA Guidelines dictate that counsel in a capital case should secure the assistance of experts to assist in the preparation of the defense and to rebut any portion of the prosecution's case. ABA Guidelines § 10.11 (F).

In this case, defense counsel was obligated to secure expert assistance to rebut the damaging testimony regarding Petitioner's unusual and unexpected behavior on the day of the victim's death. See, e.g., Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (counsel's performance deficient for failing to develop and present rebuttal expert ballistics testimony); Richey v. Mitchell, 395 F.3d 660, 685

126

(6th Cir. 2005) (counsel ineffective for failing to present expert testimony offering competing scientific evidence) (reversed on other grounds Bradshaw v. Richey, 546 U.S. 74 (2005)).

The eyewitnesses' damning descriptions of Mr. Bourgeois' demeanor could easily have been mitigated by expert psychological and psychiatric testimony. Mr. Bourgeois suffers from several mental disorders that explain his demeanor on that day. First, Mr. Bourgeois is mentally retarded. See Claim I, *supra*, and, at a minimum, has borderline intelligence. This combined with his other neuropsychological deficits inhibit his ability to process new information, especially in stressful situations. See Claim II, *supra*. Mr. Bourgeois is also known to suffer from multiple overlapping personality disorders, which further damage his ability to react to attachment and loss in a normal manner. Id. For example, he suffers from Borderline Personality Disorder, which can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress. Id. This sort of "spacing out" is not volitional, but is a symptom of the disorder. A mental health expert could have explained to the jury that Mr. Bourgeois' behavior was typical of someone with his unique constellations of mental illnesses. The loss of a family member was more than Mr. Bourgeois could handle, given his impaired cognitive and emotional functioning.

As demonstrated in Claims I and II, defense counsel had this information at their fingertips and could have presented it at guilt phase to rebut evidence regarding Mr. Bourgeois' demeanor. In this way, the demeanor evidence, rather than pointing to Mr. Bourgeois' guilt and hardness of heart, could have humanized him in the eyes of the jury. This information, in the event Mr. Bourgeois was found guilty, could also have bolstered the defense's penalty phase presentation. An understanding of Mr. Bourgeois' mental health would have provided the jury with a more mitigating, coherent story of both the offense and the actor they believe committed it, allowing the jury to better evaluate Mr.

127

Bourgeois' culpability.

### C.     Prejudice.

Petitioner was prejudiced by trial counsel's deficient performance because there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694.  Prejudice is established when, as here, confidence in the outcome is undermined because of counsel's deficiencies.  Id. at 694.  "There is a reasonable probability that at least one juror would have struck a different balance." Wiggins, 539 U.S. at 535.  In order to establish prejudice for counsel's failure to call witnesses, the Fifth Circuit requires a petitioner to show that the testimony would have been favorable and that the witness would have testified at trial.  Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985).  This test, too, has been met.  See Declarations of Drs. Cunningham, Estrada, Weiner, Gelbort, Sadoff, Toomer, and Holden, *PA* documents #1-16.

As a result of trial counsel's ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted.  This unrebutted evidence impacted both the guilt/innocence and penalty phases of Mr. Bourgeois' trial.  It is unquestionable that evidence of Mr. Bourgeois' odd and uncaring behavior helped convince the jury of Petitioner's guilt.  Without any expert testimony in rebuttal, Mr. Bourgeois appeared callous enough that the jury could have believed he did the crime. The prejudicial evidence also skewed the jury's deliberative weighing process at sentencing phase in favor of death.  As a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die.  See Chambers v. Mississippi, 486 U.S. 578, 585 (1992) (verdict based on inapplicable aggravating factor violates Eighth Amendment and invalidates death sentence); Godfrey v. Georgia, 446 U.S. 420, 428 (1980)

(capital sentencing must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death). Petitioner was prejudiced.

Mr. Bourgeois' rights under the Sixth Amendment of the United States Constitution were violated. He is entitled to a new trial and a new sentencing hearing. At a minimum he has pled a *prima facie* case that he was denied the effective representation of counsel at both trial and on appeal, and the Court should afford him an evidentiary hearing at which he can prove these facts.

**CLAIM XI.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND TO COUNSEL WHEN THE GOVERNMENT'S MENTAL HEALTH EXPERT RELIED UPON PETITIONER'S INTERACTIONS WITH DEFENSE COUNSEL DURING THE TRIAL TO FORMULATE ADVERSE OPINIONS ABOUT HIM.**

As set forth in the *Motion* (¶ ¶ 272-273) the Government elicited testimony from its expert, Dr. Estrada that Petitioner presented a danger of future violence, had a Narcissistic Personality Disorder, and was manipulative of others. Dr. Estrada based these views in part on his observation of Petitioner during the trial proceedings, as follows:

> I would say that in my opinion, Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim. He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.
>
> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him. And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

TT 3/22/04, 286. Counsel failed to object to this testimony.[55]

---

[55] Just before this testimony, Dr. Estrada was discussing Petitioner's Narcissistic Personality Disorder and how it contributed to his overall assessment that Petitioner was a danger of committing future dangerous acts. See TT 3/22/04, 285 (assessing Petitioner as a future danger based on

129

Petitioner, as any criminal defendant, has a constitutionally secured right to attend his trial Illinois v. Allen, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial").  Petitioner, as any defendant, also has a right to counsel.  Gideon v. Wainwright, 372 U.S. 335 (1963).  This right is sacrosanct – thus, if it is determined that a defendant has been denied counsel, he is entitled to a new trial without the need to show prejudice.  United States v. Cronic, 466 U.S. 648 (1984).  The right to counsel and to a fair trial includes the right to "assist" counsel.  Dusky v. United States, 362 U.S. 402 (1960) (defendant who is unable to consult with and assist counsel due to mental disease or defect is not competent to be tried).  It also includes the right to "participate" in one's defense.  Riggins v. Nevada, 504 U.S. 127, 149 (1992).

When the Government uses a criminal defendant's exercise of the right to be present, the right to counsel and the right to assist counsel and participate in his defense against him – as occurred here with respect to Dr. Estrada's testimony – such use encumbers the exercise of those rights and violates the Fifth and Sixth Amendments.  Indeed, the Supreme Court has repeatedly held that constitutional rights are violated when encumbered by adverse inference relevant to their invocation.  See, e.g. Doyle v. Ohio, 426 U.S. 610 (1976) (prosecutor's comment on post-arrest silence violated due process); Griffin v. California, 380 U.S. 609, 614 (1965) (defendant's Fifth Amendment right against self-incrimination was violated when the jury was permitted to draw adverse inferences from the silence noting "a penalty imposed by courts for exercising a constitutional privilege . . . cuts down on the privilege by making its assertion costly.").

Supreme Court precedent also exists condemning the use of mental health evidence secured

---

"background factors and personality factors").

in violation of a constitutional right. In <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), the Court held that the use of comments made by a defendant to a mental health professional during a competency evaluation could not be used against that defendant in the penalty phase of his trial to prove that he was a future danger. Such use constituted a violation of the defendant's Fifth Amendment right to remain silent.[56]

Dr. Estrada's testimony exacted a cost on Petitioner's exercise of his right to attend trial, to consult with and assist counsel, and to participate in his own defense. Petitioner had a constitutionally secured right to do each of these things, yet his invocation of those rights was used against him, thus violating the specific rights in question and due process of law.

Dr. Estrada's testimony in this regard caused Petitioner demonstrable harm. The jury found the non-statutory aggravating factor that Petitioner was "likely to commit future acts of violence and pose a threat to the lives and safety of others" (<u>Bourgeois</u>, 423 F.3d at 506) and balanced this factor with the other aggravating factors against the mitigating factors found in returning the death sentence. <u>Id.</u>

Trial counsel ineffectively failed to object to this improper testimony and appellate counsel also ineffectively failed to raise it on direct appeal. There could have been no reasonable tactic or strategy for not having raised this claim. <u>Strickland</u>.

---

[56] The use also violated the defendant's Sixth Amendment right to counsel, as he was represented by counsel at the time of the interview, but counsel was neither notified of it, nor present.

CLAIM XII.    APPELLATE COUNSEL WERE INEFFECTIVE IN MULTIPLE RESPECTS.

Appellate counsel were ineffective for failing to raise two specific claims that were objected to at trial, but which were not addressed on direct appeal.  They were also ineffective for failing to address all of the above-described record-based claims.

### A.    General Principles.

The Sixth Amendment to the United States Constitution secures Petitioner the right to counsel at trial.  U.S. Const. amend. VI ("In all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense .").  Strickland v. Washington, 466 U.S. 668 (1984);  Gideon v. Wainwright, 372 U.S. 335 (1963); Johnson v. Zerbst, 304 U.S. 458 (1938); Powell v. Alabama, 287 U.S. 45 (1932).  The Sixth Amendment right to counsel includes the concomitant right to the effective assistance of counsel, Strickland v. Washington, id., and the right to effective counsel extends to a criminal defendant's first appeal as of right.  Evitts v. Lucey, 469 U.S. 387 (1985); Roe v. Flores-Ortega, 528 U.S. 470 (2000).

The standard for reviewing claims of appellate ineffectiveness is the same as for claims of trial counsel ineffectiveness. Flores-Ortega, 528 U.S. at 477-78 (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835, 840, n4 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).

### B.    Failure to Raise Record-Based Claims.

Counsel ineffectively failed to identify and litigate on direct appeal each of the record-based claims described herein.  Where, as here, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the

range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992);

Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner"

constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to

raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective

performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel

ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d

1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was

"presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights);

Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and

on direct appeal constituted ineffective assistance); Orazio v. Dugger, 876 F.2d at 1513 (appellate

counsel's failure to raise claim on direct appeal found to violate defendant's right to effective

assistance of counsel); Matire, 811 F.2d at 1435 (where the basis for a claim "was obvious on the

record, and must have leaped out upon even a casual reading of transcript," and the law on the

subject was "known at the time," appellate counsel was ineffective for failing to raise it).

Petitioner asserts that his appellate counsel had no reason to avoid raising all meritorious

record-based claims described above, even if the questions were not properly raised and preserved

at trial.  Thus, appellate counsel in this case were ineffective for failing to raise all of the record-

based claims discussed herein, which were raised at trial.

>   **C.     This Court Improperly Admitted Inflammatory and Prejudicial Photographs
>   During Both the Guilt/Innocence and the Penalty Stages of Trial. Direct Appeal
>   Counsel Ineffectively Failed to Raise this Error.**

The admission of highly inflammatory photographs at both the guilt/innocence and penalty

phases of trial denied Petitioner his right to a fair trial and warrants both a new trial and a new

sentencing hearing.   The trial court improperly allowed into evidence graphic and extensive photographs of the corpse of the decedent as well as a slide show of seventy-five enhanced autopsy photographs.  Petitioner's right to a fair sentencing hearing was also violated when these autopsy photographs were admitted into evidence at the penalty phase, along with highly prejudicial and irrelevant photographs of the decedent in her coffin and the decedent's grave.  This evidence was inflammatory and irrelevant.  The prejudicial effect of its introduction grossly outweighed its probative value.  Petitioner was denied a fair capital trial.  His rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution have been violated.

The Government, over defense objection, was permitted to introduce and publish to the jury photographs depicting the decedent's autopsy.  See TT 3/8/04, 94-178 (testimony of Dr. Rouse).  Also over defense objection, the Government introduced a slide show of the enhanced autopsy photographs. TT 3/8/04, 183-231 (testimony of Dr. Oliver).  The Government also introduced, over objection, photographs of the decedent in her coffin and of her grave.   TT 3/22/04, 223-241.  All of these photographs were displayed on computer screens for the jury to view.  This technology allowed even more graphic displays, including "zoom-in" technology, that was utilized by the doctors.

The Court's decision to admit these photographs constitutes reversible error.  Under Rule 403 of the Federal Rules of Evidence, a balance between must be struck between probative and prejudical value of the evidence.  Many of the photographs had little to no probative value (e.g. the grave site, and the victim in her coffin), while their prejudicial impact was palpable.

The admission of multiple photographs at trial violated Rule 403 because they were 1) altered/enhanced, 2) in color, 3) enlarged/close ups, and 4) served little to no purpose except to

134

inflame the jury's passions. The jury viewed multiple color pictures of the victim's autopsy. These pictures depict such gruesome images as the decedent's head with the scalp retracted (See e.g. Trial Exhibit. 55, 56, 57, 58, and 59; TT 3/8/04,125-128, 143); the decedent's brain being removed from the skull (See e.g. Exh. 61, TT 3/8/04, 134); and a photograph of the decedent's eyes in her eye sockets with the irises removed (Exh. 63, TT 3/8/04, 141-2). The jury viewed autopsy pictures for a second time when Dr. Oliver testified. Dr. Oliver presented several repetitive photographs of the injuries on the decedent's body. These pictures, in addition to being cumulative to Dr. Rouse's testimony, were **enhanced** to further accentuate any injuries on the decedent. These enhancements served to further inflame the jury's senses and prejudice them against Petitioner.

Accepting arguendo that the autopsy photographs and slide show were relevant, their admission was inflammatory, prejudicial and cumulative, in violation of Petitioner's constitutional rights. The Government used multiple means to present the same evidence repeatedly. This excessive presentation of the same images over and over prejudiced Petitioner's right to a fair trial. Because many of the photographs were cumulative, there was no need for the jury to view all of the photographs and the slide show in order to understand the nature of the decedent's injuries and the circumstances of her death, which were the Government's stated reasons for presenting the excessive evidence. Further, a less gruesome and prejudicial means was available to present the same evidence. Dr. Akhtar testified that he had ordered a CT scan of the decedent's brain, which showed "that there was blood in all areas in and around the brain, and the brain was swollen." TT 3/9/04, 96. Instead of showing the inflammatory photos, the CT scan could have been shown.

These autopsy pictures were also incorporated into the penalty phase of trial, although they were even less relevant at that stage. TT 3/22/04, 13. Additional inflammatory photographs were

135

introduced at penalty phase for the first time, including 17 pictures of the young victim from when she lived with her mother and grandmother. Two of these pictures seem especially inappropriate: Exhibit 410, a picture of the young victim's dead body in her casket and Exhibit 411, a picture of her grave. TT 3/22/04, 223-241. These pictures were clearly irrelevant and served no purpose except to prejudice the jury against Petitioner. Even if these photographs were relevant in some way to sentencing, their probative value was overcome by their prejudicial nature. Trial court was in error.

The above-described errors deprived Petitioner of his rights under the Sixth and Eighth Amendments to the United States Constitution. To the extent trial counsel failed to adequately object to the admission of these photographs, they were ineffective. Appellate counsel were clearly deficient for failing to raise these meritorious record based claims. Faith in Petitioner's guilty verdict and death sentence is undermined because it is likely the jury was overly prejudiced by these photographs. A new trial and new sentencing phase are warranted.

> **D.** **Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-Social Histories of Others Who Have Been Sentenced to Death. Counsel Were Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal.**

Appellate counsel also ineffectively failed to raise a patent Eighth Amendment claim that was objected to at trial. Error was committed when the Court permitted the prosecutor to make comparisons between Petitioner and other death-sentenced prisoners.

The Eighth and Fourteenth Amendments to the United States Constitution establish the "constitutional mandate of individualized determinations in capital sentencing proceedings" based upon the character, background, and record of the individual and the circumstances of the offense. Sumner v. Shuman, 438 U.S. 66, 75 (1987); Lockett v. Ohio, 438 U.S. 586, 605 (1978)

("individualized consideration [is] a constitutional requirement in imposing the death sentence");

see also Stringer v. Black, 503 U.S. 222, 231 (1992) (noting the "requirement of individualized

sentencing"); Zant v. Stephens, 462 U.S.862, 879 (1983) (describing requirement of "*individualized*

determination on the basis of the character of the individual and the circumstances of the crimes");

Enmund v. Florida, 458 U.S. 782, 798 (1982) ("we insist on 'individualized consideration as a

constitutional requirement in imposing the death sentence'"(quoting Lockett)).  "[I]n capital cases

the fundamental respect for humanity underlying the Eighth Amendment requires consideration of

the character and record of the individual offender and the circumstances of the particular offense

as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson

v. North Carolina, 428 U.S. 289, 304 (1976).

Petitioner's right to individualized sentencing was violated when the Government elicited

testimony from their mental health expert at penalty phase, Dr. Estrada, that compared Mr.

Bourgeois' history of childhood abuse to the psycho-social histories of others on death row.  TT

3/23/04, 57.  Dr. Estrada conceded on the stand that he knew of death-sentenced inmates who, like

Mr. Bourgeois, had been abused as children.  Dr. Estrada's reference to the social backgrounds of

other inmates under sentence of death lessened the jury's consideration "of compassionate or

mitigating factors stemming from the diverse frailties of humankind." Woodson, 428 U.S. at 304

(mandating that capital defendants be treated as "unique individual human beings" as opposed to

"members of a faceless, undifferentiated mass.").

The Government's elicitation of evidence that compared Mr. Bourgeois to other individuals

who had been convicted and sentenced to death was also unconstitutional because it encouraged the

jury to sentence Mr. Bourgeois to death.  See e.g. Stringer, 503 U.S. at 232 ("[W]hen the sentencing

137

body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."). The jury was allowed to reason that other individuals who had been abused as children had been sentenced to death, so Mr. Bourgeois should be as well. Thus, the Government's use of information about the abuse histories of other capital prisoners "creates the possibility not only of randomness but also of bias in favor of the death penalty," and requires the death sentence to be invalidated. Stringer, 503 U.S. at 236.

Because it violated Mr. Bourgeois' right to an individualized sentencing proceeding, the information presented by Dr. Estrada regarding the psycho-social histories of other inmates on death row should not have been admitted at sentencing phase. The admission of such evidence "allowed the sentencer to consider evidence that would not otherwise have been before it." Brown v. Sanders, 546 U.S. 212, 221 (2006). In such a case, "due process mandates reversal." Id. The Brown case is instructive because it explores the impact different sorts of evidence can have on the jury's deliberative process at sentencing. In Brown, the sentence of death was affirmed even though one of the sentencing factors presented to the jury was later found to be invalid. The sentence was affirmed because it was found that the evidence underlying the invalid sentencing factor would still have been presented to the jury. Id. at 222-3. In Petitioner's case, however, the information presented by Dr. Estrada about the psycho-social histories of other inmates would not have been admitted under any rubric for consideration at sentencing. This information skewed the jury's decision making and invalidates the sentence. See Brown, at 221 ("[S]uch skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.")

138

At trial, defense counsel attempted to object to this testimony and asked for a mistrial. TT 3/23/04, 74-78. Mr. Tinker's confusion about the testimony to which he was objecting, and his inability to state a well-supported objection served Mr. Bourgeois an injustice. Further, and more importantly, counsels' failure to raise this meritorious claim at all on appeal denied Mr. Bourgeois his right to effective assistance of appellate counsel. Petitioner was prejudiced by counsel's deficient performance. Strickland v. Washington, 466 U.S. 668.

**CLAIM XIII. PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE ERRORS IDENTIFIED ABOVE.**

Each of the claims presented herein individually entitles Petitioner to relief from his conviction and sentence. However, even if this Court finds that Petitioner is not entitled to relief based on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair trial and the heightened procedural safeguards constitutionally required in capital cases.

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief.[57] If the court finds cumulative

---

[57] See, e.g., Kyles v. Whitley, 514 U.S. 419, 437-38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); Taylor v. Kentucky, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (the cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); Harris v. Wood, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992) (granting relief for cumulative effect of errors including counsel's failure to present mitigating evidence, the court's refusal to admit exculpatory evidence, and improper sentencing-stage instructions); Kubat v. Thieret, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; Strickland "clearly allows the court to consider the cumulative effect of counsel's

139

error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each error or deficiency.[58]   Moreover, if the court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted.  Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting O'Neal v. McAninch, 513 U.S. 432 (1995)).

The circumstances of this case demonstrate that the cumulative effect of counsels' serious failures, and the constitutional errors committed by the Court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's convictions should be overturned. Alternatively, Petitioner's sentences of death should be vacated. Collectively and cumulatively, these errors denied Petitioner his rights to due process of law and his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

**CLAIM XIV.   PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING.**

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255.  The "standards for § 2255 hearings are essentially the same as for evidentiary hearings under a habeas petition."  Advisory Committee Note to Rule 8 of the Rules Governing Section 2255 Proceedings.

---

errors in determining whether a defendant was prejudiced").

[58]  E.g., Mak, 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [relief]").

In habeas proceedings, an evidentiary hearing is appropriate when the habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts. See Townsend v. Sain, 372 U.S. 293, 312-19 (1963); Goodwin v. Johnson, 132 F.3d 162, 178 (5th Cir. 1998) ("When there is a factual dispute [that] if resolved in the petitioner's favor would entitle [him] to relief . . . a federal habeas petitioner is entitled to discovery and an evidentiary hearing").  "[H]earings are particularly important in capital cases ... where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" Parkus v. Delo, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting Ford v. Wainwright, 477 U.S. 399 (1986)).

Here, the petition alleges colorable Fifth, Sixth and Eighth Amendment claims, including numerous facts outside of the record which, if proved, would entitle Mr. Bourgeois to relief.  Under Townsend and Rule 8, Petitioner is entitled to an evidentiary hearing on all such claims.

### CLAIM XV.   THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.

In his *Motion*, Petitioner alleged that the manner in which the Government would carry out his execution by lethal injection would violate the Eighth Amendment.  He also pled that the litigation of this claim was not appropriate in this *Motion*, or at this time, and that he raised the claim in the *Motion* in order to avoid a later allegation that the claim was waived.

Petitioner stands by those suggestions as to why the so-called lethal injection claim ought not be litigated in this context at this time.

Since the filing of the *Motion*, another reason has arisen which counsels against litigating at this time.  On September 25, 2007 the Supreme Court granted certiorari in Baze v. Rees, 07-5439.  This cert grant addresses the same legal issues that would be presented in Petitioner's challenge to

the lethal injection procedures used by the Bureau of Prisons. Accordingly, even if the Court were inclined to direct litigation of this matter now, it would certainly make sense to await what will likely be a definitive ruling by the Supreme Court on all or most of the claims that would be litigated.

All that said, if the Court believes it more appropriate to litigate these issues now and in the context of this *Motion*, Petitioner stands ready to do so.

## CONCLUSION

For all of the above reasons, those set forth in the *Motion*, and based upon the entire record of these proceedings, Petitioner respectfully requests that the Court grant the relief sought in the *Motion*.

Respectfully Submitted,

/s/ Michael Wiseman

_____
MAUREEN KEARNEY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
       October 5, 2007

142

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 5th day of October, 2007 I served the foregoing upon the following persons by e-file and United States Mail:

| | | |
|---|---|---|
| Patricia Hubert Booth | Tony R. Roberts | James L. Turner |
| United States Attorney's Office | United States Attorney's Office | United States Attorney's Office |
| 800 North Shoreline, Suite 500 | PO Box 61129 | PO Box 61129 |
| Corpus Christi, TX 78401 | Houston, TX 77208-1129 | Houston, TX 77208-129 |
| Patti.Booth@usdoj.gov | Tony.Roberts@usdoj.gov | jim.turner@usdoj.gov |

/s/ Michael Wiseman
_____