**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| _____ | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | |
| | : | Honorable Janis Graham Jack |
| -against- | : | U.S.D.J. |
| | : | |
| ALFRED BOURGEOIS, | : | **This is a Capital Case** |
| | : | |
| Petitioner. | : | |
| _____ | : | |

**PETITIONER'S SUPPLEMENTAL APPENDIX**
**IN SUPPORT OF**
**MOTION FOR RELIEF PURSUANT TO**
**28 U.S.C. SECTION 2255**
**OR IN THE ALTERNATIVE**
**PURSUANT TO 28 U.S.C. 2241**

MAUREEN KEARNEY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
October 5, 2007

**Index to Supplemental Appendix**

Document     Description
Number

64.          Declaration of Elizabeth Johnson, Ph.D., dated 9/26/07
65.          Forensic Science Associates Report, dated 9/24/07 and Curricula Vitae of Alan
             Keel
66.          Motions for Continuance in State v. Longoria Nos. 02-CR-3585-E and 03-CR-
             1884-E
67.          Declaration of Darrick Bernard Moore
68.          Declaration of Phillip Jackson
69.          Declaration of Timothy Allen
70.          Declaration of Brenda Goodman
71.          Declaration of Claudia Mitchell

64

## DECLARATION OF ELIZABETH JOHNSON, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Elizabeth Johnson, Ph.D., hereby declare that the following is true and correct.

1.     I am a forensic scientist specializing in forensic biology and DNA issues. Between 1992 and 1996, I established and directed the DNA laboratory at the Harris County Medical Examiner's Office in Houston, Texas.  Thereafter, from 1997 to 2003, I was employed at Technical Associates, a private criminalistics laboratory in Ventura, California.  I currently maintain a solo forensic science practice, based in Thousand Oaks, California, providing testing, review, consultation, testimony, and education to those in need of assistance with forensic DNA.  A copy of my curriculum vitae is attached.

2.     In late 2003, I was retained as a defense forensic expert in the case of the United States v. Alfred Bourgeois, No. Cr-C-02-216 (S.D. Texas).  I was retained by Mr. Bourgeois' trial attorneys and specifically recall communicating with Mr. Douglas Tinker, Esq but do not recall any interaction with Mr. John Gilmore, Esq.  I understand that Mr. Bourgeois was convicted of capital murder and was sentenced to death related to the killing of his daughter on the grounds of the Corpus Christi Naval Air Station.  I have been asked by Mr. Bourgeois' current defense counsel to complete this declaration regarding my involvement with this case.  All opinions herein are stated to a reasonable degree of scientific certainty.  All factual assertions are true to the best of my knowledge.

3.     In February, 2004, in consultation with Mr. Tinker, I arranged to have three rectal swabs (labeled 020718001 NH Q5, Q6 and Q7) collected at the time of autopsy from the rectum of Mr. Bourgeois' daughter, JG-1999, sent to my former laboratory,

Technical Associates. These items had previously been in the custody of the FBI and were alleged to contain semen according to FBI laboratory reports. I directed that these swabs be examined for the presence of spermatozoa and semen, and if found, that DNA typing be performed in an attempt to identify its origin. These swabs were thoroughly examined by chemical and microscopic means and included testing shavings of the stained portion of the wooden swab sticks. Tests were performed for the presence of acid phosphatase (AP) and P30 proteins found in seminal fluid as well as for microscopic detection of spermatozoa.

4.    On March 2, 2004, I faxed Mr. Tinker a synopsis of my findings and conclusions regarding the testing of the items I was provided. That synopsis also outlined the testimony I could present at trial and potential areas for cross examination of the Government's expert witnesses. In that synopsis I stated, in part:

- The FBI did not test the rectal swab with AP reagent or do a sperm search. They only did a P30 test with the ABA card and a DNA test. The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction;

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

5.    I was never called to testify at Mr. Bourgeois' trial. Had I been called as a witness, I would have testified consistent with my findings as outlined above and in the

synopsis I faxed to Mr. Tinker on March 2, 2004. Had I been called as a witness at Mr. Bourgeois' trial I would have testified that there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen, and that four scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA testing) were negative for the presence male fluids or male cells on the rectal swabs. That only the P30 test gave a (weak) positive result and should not be considered conclusive in light of numerous contradictory tests. Accordingly, I would have testified that there was insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was present in JG-1999's rectum.

6.    Mr. Bourgeois' current counsel has provided me with additional information including: the direct appeal opinion, trial transcripts, FBI forensic lab reports and testing data and the conclusions of forensic scientists Dr. Edward Blake and Alan Keel. My review of these documents strongly confirms my original findings and conclusions. My review of these documents also confirms that had I been called as a witness at trial, I would have testified that the Government's evidence at trial regarding the alleged semen was erroneous and scientifically unsubstantiated. I would have specifically addressed the erroneous testimony of Dr. Scott Benton and testified that spermatozoa are very durable and do not easily degrade (they are so durable that an additional chemical is required to break open spermatozoa in the laboratory), that spermatozoa can be easily detected microscopically and their abundance in seminal fluid facilitates microscopic detection even after the tail is lost, and that spermatozoa can be found for up to six days in the vaginal tract of a living female. In summary, I would have

provided scientific evidence and testimony which would have directly contradicted the Government's evidence and theory of prosecution.

I hereby certify and declare under penalty of perjury that the statements contained herein are true and correct.

Elizabeth Johnson, Ph.D.

Dated: September 26, 2007

# Resume

## Elizabeth A. Johnson, Ph.D.
## 1534 N. Moorpark Road, No. 364
## Thousand Oaks, CA 91360
*telephone* 805-553-0445
*facsimile* 805-553-0487
*circej@earthlink.net*

## EDUCATION

College | BS Chemistry, cum laude
Department of Chemistry
Wofford College, Spartanburg, SC
1978-1982

Graduate | Ph.D. -- conferred July, 1987
Department of Microbiology and Immunology
Medical University of South Carolina, Charleston, SC
August 1982 - July 1987

Dissertation | *Production and characterization of a monoclonal antibody to an antigen present on subsets of natural killer cells and human tumor cells.*

## POSITIONS HELD

Private Forensic Consultation May, 2003 - present

Senior Forensic Scientist | Technical Associates, Inc.
4125 Market Street, Suite #3
Ventura, CA 93003
February 1997 – May, 2003

Director | DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
September 1993 - December 1996

Supervisor | DNA Laboratory / Serology Section
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
April 1993 - September 1993

Assistant Toxicologist | DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
November 1991 - April 1993

Post-doctoral Fellow | Department of Molecular Hematology
Advisor: Albert Deisseroth, M.D., Ph.D.
Chairman, Department of Hematology
M.D. Anderson Cancer Research Hospital
Houston, TX 77030
October 1988 - November 1991

Department of Microbiology and Immunology
Advisor: Alfred Tsang, Ph.D.
Medical University of South Carolina
Charleston, SC
September 1987 - September 1988

## CONTINUING EDUCATION - FORENSICS

CLASSES and WORKSHOPS

Y-STR Analysis on Forensic Casework, American Academy of Forensic Sciences, February 2004.

Expert Witness Workshop, Southwestern Working Group on DNA Analysis Methods (SWGDAM), January, 2000.

Mitochondrial DNA Workshop, International Symposium on Human Identification, September, 1999.

FBI/SWGDAM STR Workshop, Austin, TX, 1998.

Statistics Workshop, International Symposium on Human Identification, September, 1996, 2002.

STR Workshop, The Promega Corporation, May, 1995.

Roche Amplitype Workshop, Roche Molecular Systems, December, 1992.

Armed Forces Institute of Pathology DNA Identification Laboratory, visiting scientist to learn methods of mitochondrial DNA sequencing on aged remains, October, 1992.

Advanced Aspects of Forensic DNA Analysis (courtroom testimony), FBI Academy, June, 1992.

CONFERENCES

International Symposium on Human Identification 1992, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2002, 2003, 2004.

American Academy of Forensic Sciences 1992, 1993, 1994, 1995, 2001.

The Future of DNA Technology, Washington, DC, 1996.

CODIS Software Symposium, Quantico, VA, 1995.

Advances in DNA Technology, Bethesda, MD, 1992.

## OTHER INFORMATION

CERTIFICATIONS

Certification of Qualification as Laboratory Director in Forensic Identity by the State of New York Department of Heath, issued August 12, 2002.

## PROFESSIONAL SOCIETIES

Member of American Academy of Forensic Sciences

Association of Forensic DNA Analysts and Administrators (AFDAA)
(formerly Southwest Working Group on DNA Analysis Methods)

## INVITED LECTURES

California Habeas Corpus Resource Center Spring Conference, June, 2007.

Washington State Bar Association, May, 2007.

CACJ/CPDA Capital Case Defense Seminar, February, 2007.

Texas Criminal Defense Lawyers Association, September, 2006.

Rusty Duncan Law Seminar, San Antonio, Texas, June, 2006.

Osgoode Professional Development Center Symposium on Forensic DNA Evidence, Toronto, Canada, April, 2006.

Third Annual Forensic Science Conference DNA Cross-Examination College, Washington, D.C., September, 2005.

Texas Criminal Defense Lawyers Association, September, 2005.

Forensic Bioinformatics 4th Annual Conference, Dayton, OH, August 2005.

CACJ/CPDA Capital Case Defense Seminar, February, 2005.

Texas Criminal Defense Lawyers Association, August, 2004.

California Habeas Corpus Resource Center Spring Conference, May, 2004.

CACJ/CPDA Capital Case Defense Seminar, February, 2004.

Washington State Bar Association, September, 2003.

Texas Criminal Defense Lawyers Association, August, 2003.

Utah Criminal Defense Lawyers Association, April, 2003.

The Innocence Project, March, 2003.

Second Annual Texas Capital Defense Conference, October, 2002.

Guest lecturer, University of Texas Law School, Advanced Criminal Defense class, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2004, 2006.

California Public Defenders Association (CPDA), January, 2001.

Texas Criminal Defense Lawyers Association, October, 1997.

Arizona Public Defenders' Seminar, April, 1997.

The Amersham Corporation, April, 1996.

College of the Mainland, April, 1995.

Southwest Association of Toxicologists, May, 1993.

**BIBLIOGRAPHY**

PUBLICATIONS

1.    Taylor, M.S., A. Challed-Spong, and E.A. Johnson. Co-amplification of the HLA DQα and amelogenin genes: optimization and validation. *J. Forensic Sciences*, 42 (1), 1997.

2.    Johnson, E., W. Henzel, and A. Deisseroth. An isoform of protein disulfide isomerase isolated from chronic myelogenous leukemia cells alters complex formation between nuclear proteins and regulatory regions of interferon-inducible genes. *J. Biol. Chem.*, 267:14412-14417, 1992.

3.    Seong, D., S. Sims, E. Johnson, J. Lyding, A. Lopez, M. Garovoy, M. Talpaz, H. Kantarjian, G. Lopez-Berestein, C. Reading, and A. Deisseroth. Activation of class I HLA expression by TNF-alpha and gamma-interferon is mediated through protein kinase C - dependent pathway in CML cell lines. *British Journal of Haematology*, 78:359-367, 1991.

4.    Deisseroth, A., O.M.Z. Howard, A. Wedrychowski, D. Seong, N. Paslidis, M. Romine, S. Sims, C.V. Herst, T. Yuan, K. Wu, T. Lopez and E. Johnson. Summary and Future Directions, in *Chronic Myelogenous Leukemia: Molecular Approaches to Research and Therapy*; A. Deisseroth and R. Arlinghaus, eds., 1991, pp.469-475.

5.    Wedrychowski, A., D. Seong, N. Paslidis, E. Johnson, O.M.Z. Howard, S. Sims, M. Talpaz, H. Kantarjian, J. Hester, J. Turpin, G. Lopez-Berestein, J. Gutterman, E.J. Freireich and A. Deisseroth. Characterization of nuclear proteins which bind to interferon-inducible transcriptional enhancers in hematopoietic cells. *J. Biol. Chem.*, 265:21433-21440, 1990.

6.    Deisseroth, A., C.V. Herst, A. Wedrychowski, S. Sims, D. Seong, E. Johnson, T. Yuan, M. Romine, N. Paslidis, P. Gao, L. Huston, D. Claxton, S. Kornblau, H, Kantarjian, M. Talpaz and C. Reading. Future directions in molecular and genetic therapy of leukemias and solid tumors. *M.D. Anderson Cancer Bulletin*, 1990.

7.    Seong, D.C., S. Sims, E. Johnson, O.M.Z. Howard, J. Hester, M. Talpaz, H. Kantarjian and A. Deisseroth. A phosphatase activity present in peripheral blood myeloid cells of CML patients but not normal individuals alters nuclear protein binding to transcriptional enhancers of interferon-inducible genes. *J. Clin. Invest.*, 86:1664-1670, 1990.

8.    Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia and K.Y. Tsang. Specificity of anti-lymphocyte antibodies in sera from patients with AIDS-related complex (ARC) and healthy homosexuals. *Clin. and Exp. Immunol.*, 73:68-73, 1988.

9.    Tsang, K.Y., E.A. Johnson and M.F. LaVia. Anti-p24 antibody reactivity in Acquired Immunodeficiency Syndrome (AIDS) related complex patients treated with Isoprinosine. *Annals of Internal Medicine*, 107:595, 1988.

10.   Johnson, E., L. Miribel, P. Arnaud and K.Y. Tsang. Purification of IgM monoclonal antibody from murine ascitic fluid by a two step column chromatography procedure. *Immunol. Lett.*, 14:159-165, 1987.


ABSTRACTS

1.    Ballard, K.D., R.S. Orkiszewski, P.R. DeForest, M.S. Taylor, E.A. Johnson, and L. Ragle: EDTA testing in forensics: direct derivatization for GC-MS/MS analysis and the quantity of dried bloodstain analyzed. *Proceedings of the 45th ASMS Conference on Mass Spectrometry and Allied Topics*, Palm Springs, California, June 1-5, 1997, p. 54.

2.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. DNA typing and the determination of EDTA in forensic samples by GC-MS/MS. Presented at the Seventh International Symposium on Human Identification, Scotsdale, AZ, 1996.

3.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. Determination of EDTA in forensic samples by capillary GC-MS and GC-MS/MS. Presented at the 44th ASMS Conference on Mass Spectrometry and Allied Topics, Portland, Oregon, 1996.

4.   Stacy, T., E.A. Johnson, J. Krebsbach, S. Bowne, and R. Cotton. Chemiluminescence of forensic casework: a comparison of the hybridization and detection methods of three independent laboratories. Presented at the Sixth International Symposium on Human Identification, Scotsdale, AZ, 1995.

5.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-$\alpha$ utilizing the Amplitype reaction mix and amplification protocol. Presented at the Fifth International Symposium on Human Identification, Scotsdale, AZ, 1994.

6.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-$\alpha$ utilizing the Amplitype reaction mix and amplification protocol. Presented at the California Association of Criminalists spring meeting, Los Angeles, CA, 1994.

7.   Johnson, E., and M. Pennington. Use of alkaline phosphatase-labeled probes and chemiluminescence detection methods for establishing an RFLP data base and analysis of forensic cases. Presented at the Fourth International Symposium on Human Identification, Scotsdale, AZ, 1993.

8.   Johnson, E., W. Henzel, and A. Deisseroth. Elevated levels of phospholipase C alpha are associated with alteration of complexes formed between interferon-inducible transcriptional enhancers and nuclear proteins in cells of interferon resistant chronic myelogenous leukemia (CML) patients. Presented at the annual meeting of the American Society for Hematology, Denver, CO, 1991.

9.   Johnson, E., D. Seong, A. Wedrychowski, S. Sims, M. Romine, L. Huston, R. Luttrell and A. Deisseroth. A cytoplasmic phosphatase which is elevated in CML myeloid cells alters the binding of nuclear proteins to interferon-inducible transcriptional enhancers. Presented at the annual meeting of the American Society for Hematology, Boston, MA, 1990.

10.  Tsang, K.Y., E.A. Johnson, L. Bishop, M.F. La Via H.H. Fudenberg and M.Arlen. Monoclonal antibodies to human colon carcinoma-associated antigen(s). FASEB, Washington, DC (abstract no.4322), 1987.

11.  Trojanowska, M., K.Y. Tsang, E.A. Johnson, L. Bishop, M. Christian and R.Q. Warren. Expression of *c-myc*, *c-myb* oncogenes and interleukin-2 receptor in human peripheral blood mononuclear cells after treatment with an immunopotentiator (isoprinosine). FASEB, Washington, DC (abstract no. 850), 1987.

12.  Johnson, E.A., J. Minowada, M.F. La Via, and K.Y. Tsang. A monoclonal antibody to human NK cells is reactive with various tumor cell lines. Federation of American Societies of Experimental Biology (FASEB), Washington, DC (abstract no. 956), 1987.

13.  Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia, M.E. Christian and K.Y. Tsang. Analysis of anti-peripheral blood mononuclear cell (PBMC) antibodies in sera from AIDS, ARC, and healthy homosexuals. First Annual Conference of Clinical Immunology Society, Baltimore, MD, 1986.

14.  Johnson E.A., B. Koger, M. La Via and K.Y. Tsang. A shared antigen between human natural killer (NK) cells and various tumor cells is recognized by an anti-NK monoclonal antibody. First Annual Meeting, Clinical Applications of Flow Cytometry, Charleston, SC, 1986.

15.    Johnson, E.A., K.Y. Tsang, B. Koger, B. Ward, R.Q. Warren, M. La Via and H.H. Fudenberg. Production of a monoclonal antibody reactive with human natural killer cells. Federation Proceedings, 44, No. 4, 1330, 1985.

65



3053 Research Drive, Richmond, CA 94806
FAX (510) 222-8887
(510) 222-8883

September 24, 2007

Victor J. Abreu, Esq.
Assistant Federal Defender
Federal Community Defender Office
Capital Habeas Unit
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA  19106

**US v. Alfred Bourgeois
No. Cr-C-02-216
Our File No. 07-227**

**Review of the Government's Proof as to the Presence of Semen
in the Absence of Sperm
offered by the Testing and Testimony of the FBI
and the Testimony of Dr. Scott Benton**

Background

In April of 2002, Alfred Bourgeois of LaPlace, Louisiana was determined through paternity testing to be the biological father of JaKarenn Gunter, a two year old female child of Katrina Harrison.  Gunter and Harrison lived in Livingston, Texas.  At this time Bourgeois was married to Robin Bourgeois and they had two children.  In May, 2002 Bourgeois was ordered to support Gunter. Bourgeois was already supporting a fourth child from a previous marriage.  At the same hearing, Bourgeois was awarded seven weeks visitation and he took custody of the child that same afternoon.  There is no evidence that Gunter was in poor health or injured upon Bourgeois taking custody of her.

The final seven weeks of Gunter's life transpired in LaPlace at the Bourgeois residence or on the road with the Bourgeois family in the cab of a tractor-trailer. The last 22 days of her life were essentially spent living in the truck with the entire family of five on the road. At one point, the child was examined in LaPlace in late May, 2007 by Dr. Scott Benton of Louisiana Child Protective Services. It is alleged that Bourgeois "systematically abused and tortured" Gunter during this seven week period until she sustained head injuries on July 27, 2002 that resulted in her death the next day. At autopsy, Dr. Elizabeth Rouse described "deep tissue bruising" in every area of the child's body along with numerous whip marks, scars, and other injuries. Dr. Rouse concluded that Gunter was a chronically abused or battered child, and that the head injury was the ultimate cause of death. Bourgeois claimed the child fell from the tractor cab to the pavement; the Government claims that Bourgeois essentially beat the child to death in the cab of the truck and faked her fall.

Among numerous items, three rectal swabs, one rectal swab smear slide, three vaginal swabs, one vaginal swab smear slide, and Gunter's clothing including underpants were collected pursuant to investigation of the child's death. Because the child's death occurred on a federal military base (during a delivery by Bourgeois), these items were examined by the Federal Bureau of Investigation [FBI] laboratory at Quantico, Virginia. Some evidence specimens were also examined for the Government by Orchid Cellmark. Autopsy photographs of the child's body were examined by Dr. Benton and compared to his previous examination of the child. Caroline Zervos and Anthony Onorato of the FBI testified that semen, but no sperm, was detected on the rectal swabs from Gunter and nowhere else, and that no DNA potentially attributable to the semen source was detected. Benton testified to the changes to Gunter's body between his examinations and proffered explanations for the absence of sperm and/or sperm DNA on the rectal swabs in the presence of detectable semen.

Our File No. 07-227

Scope of Review

The following documents were reviewed towards the preparation of this report: trial transcript of the testimony of Dr. Scott Benton; trial transcript, bench notes, and report of Caroline Zervos of the FBI; trial transcript, bench notes, and report of Anthony Onorato of the FBI; trial opening and closing statement transcripts of the Government and Defense in this case; the Fifth Circuit United States Court of Appeals decision in this case; an Orchid Cellmark DNA Analysis report; the autopsy examination report of Dr. Elizabeth A. Rouse; and a letter "report" by Dr. Elizabeth Johnson.

This review concerns and focuses **only** on [1] the testing by Zervos and Onorato of the FBI, and by Cellmark, of the autopsy body orifice specimens and clothing of Gunter for semen, their subsequent DNA analyses and trial testimony with regard to the claimed detection of semen in the absence of definitive proof; and [2] the elaborate but erroneous trial testimony of Benton with regard to the constituents of semen, the persistence of semen and sperm in body orifices, especially post-mortem, and the utility of p30 or prostate-specific antigen [PSA] as stand-alone confirmation of the presence of semen. We take no position as to the alleged "systematic abuse and torture" of Gunter, including the possibility of sexual abuse – only that the Government's **proof of the presence of semen** associated with the body of the child was inadequate and flawed, and should never have been offered by the scientists as evidence in this case.

3

## The Forensic Investigation:  Looking for Semen

<u>The Gunter Rectal Swabs and Smear</u>

Jakarenn Gunter died June 28, 2002 after approximately 24 hours of hospitalized life support.  Though not specifically described in the autopsy report of Dr. Elizabeth Rouse, apparently three rectal and three vaginal swabs were collected from her body at autopsy on June 29, 2002.[1]  At least one rectal smear slide and one vaginal smear slide were prepared from the swabs.  Dr. Rouse made the following observations:  "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic.  The back is straight, and the anus is unremarkable and atraumatic."  Gunter's clothing, including underpants, collected by the hospital upon her arrival, was also taken as evidence.  The FBI received these specimens on July 18, 2002 and the examination for semen on the swabs and smears began on August 16, 2002.

The provided FBI analyst bench notes indicate the three rectal swabs Q5, Q6, and Q7 were packaged together within a single white carton, and each was similarly described as stained with reddish brown material covering the swab head and extending about 1.5 inches onto the swab stick.  One-half of each swab was removed at this stage of the examination.  Blood was detected on all three swabs via positive presumptive test with phenolphthalin and positive crystal test for hemoglobin.  No acid phosphatase testing, the routine presumptive test for semen, was conducted on any of the rectal swabs.  Apparently, the sampled portions of each swab were extracted with liquid and tested for p30, or prostate specific antigen (PSA) with Abacus Diagnostics ABAcard commercial assays with positive results for each rectal swab.  No quantitative assessment of the strength of each positive PSA test was described.  No photographic documentation of these PSA results were provided; it is unclear whether such documentation exists.  This sampling consumed a full half of the rectal swab

---

[1] FBI analyst bench notes describe the dates of collection of the body orifice swabs and smears as 6/29/02.

specimens as a whole. There are no bench notes describing any slide preparation or microscopy of the pelleted debris normally of interest and preserved upon making the liquid extract from the swabs.[2] The fate of the particulate material, including the cellular debris, from each sampled half rectal swab is also unclear. One of the remaining half rectal swabs, Q7, was forwarded for DNA analysis.

One smear slide prepared (at autopsy) from one of the anal swabs from Gunter was examined on August 28-29, 2002. A white smear was visible on the slide. Whether and/or how the slide was stained was not described. No spermatozoa were observed on this slide. In fact, there is no notation of the observation of a single sperm cell from any of the specimens examined in this case.

The FBI's DNA analysis of the Q7 half rectal swab specimen began on September 16, 2002. One half of the half swab was removed for testing; according to the bench notes "The rest remains." In light of the positive PSA assay result, this quarter rectal swab was differentially digested to isolate non-sperm cells (blood and epithelial cells from the swab source) from any sperm cells that might be present on the swab. The product of the first digestion is normally called the non-sperm or epithelial or female fraction. The product of the second digestion is called the sperm or male fraction. This process, when done with skill and attention to detail, can result in a cell pellet essentially free of non-sperm cells and a "sperm fraction" essentially free of non-sperm DNA. No notes describing this differential digestion process or the DNA isolation and purification process were provided. No notes describing the volume of the female and male DNA extracts were provided.

---

[2] The normal practice in sampling body orifice swabs is to remove a portion (half is typical) of the swab, which is then extracted with liquid to recover the soluble material from the swab and to isolate the particulate debris, including epithelial cells and sperm cells, into a pellet, so that each fraction can be tested independently. It is the cellular debris that is now of most utility for any subsequent genetic analysis, e.g., DNA testing.

Nevertheless, the female fraction prepared from this quarter rectal swab contained approximately 100 ng DNA/$\mu$l, a value expected from a sample expected to be rich in DNA from the rectal epithelium and apparent blood of the child.  Unexpectedly, the sperm or male DNA fraction from this quarter rectal swab sample contained approximately 50 ng DNA/$\mu$l extract.  This represents either the presence of abundant sperm in the sperm or male fraction sample or it reflects a very poor removal of non-sperm cells and/or DNA through the sperm pellet isolation process.  No microscopy of the post-digestion cell pellet was done.  PCR-based DNA analysis utilizing the Profiler Plus and Cofiler STR reagent sets for both the female and male fractions from the Q7 rectal swab sample resulted in robust profiles compatible with only the female child Gunter.  No male DNA was detected via amelogenin in either fraction and no alleles foreign to Gunter were detected at any of the thirteen autosomal genes for which robust results were obtained.

Still convinced there was semen, and hence, sperm cells, associated with the Gunter rectal swabs, the FBI sent the remaining two Q5 and Q6 half rectal swabs and the remaining Q7 quarter rectal swab to Orchid Cellmark in Germantown, Maryland for a male-specific Y-chromosome DNA analysis.  No details of the Cellmark work other than their terse report were provided.  In their report of November 14, 2002 to Special Agent Megan Beckett, Cellmark DNA Analyst III Jeffrey Hickey and Laboratory Director Robin Cotton, Ph.D., describe receiving three partial anal swabs from Robert Johnson, and apparently, utilizing all three swabs in a fruitless Y-chromosome PCR based DNA analysis.  They wrote:  "No results were obtained when a DNA extract isolated from the items listed above was tested at the Y-chromosome loci DYS390, DYS19, DYS389 I, and DYS389 II."  Even when the remaining three partial swabs were combined, which represented one and one-quarter whole rectal swabs, no male DNA was detected using a male DNA-specific assay that is, without question amongst the forensic science community, capable of fishing minute quantities of male DNA from a sea of female DNA.  This YSTR analysis essentially completed the consumption of the three Gunter rectal swabs.

However, some small quantity of swab material (cotton) usually persists on the swab sticks after sampling; and, some of the same material that stains the swabs heads usually exists on the swab sticks. This is indeed the case here, in that the FBI notes describe stain material extending about 1.5 inches below the swab head onto the stick of all three swabs. At least one of these rectal swab remnants was ordered on January 16, 2004 to be sent to Dr. Elizabeth Johnson of Thousand Oaks, California. None of Johnson's bench notes or report were provided to us. In a handwritten letter to Doug Tinker, Bourgeois' trial counsel, dated March 1, 2004, Johnson described the thrust of her work and her conclusions regarding the presence of semen on the Gunter rectal swab remnant that was provided to her. Johnson indicates the rectal swab remnant was sufficient for testing for acid phosphatase and PSA, and for microscopy of the cellular debris. She stated her acid phosphatase test was negative; that her PSA test was weakly positive; and, that no sperm were observed from the swab. Johnson further stated that she believed that if the weak positive PSA assay was attributable to semen on the swab that there should be "plenty" of sperm in the sample to observe them microscopically and to detect the male DNA from them in a PCR-based DNA analysis. She also stated that the weak positive PSA result could have resulted from something other than semen (a "false" positive). Apparently, Johnson made no attempt to detect male DNA from the Gunter rectal sample.

### The Gunter Underpants

The underpants worn by Gunter when she presented at the hospital on July 27, 2002 were examined by the FBI beginning on August 19, 2002. This item, Q14, is size 4 Spencer's brand bear motif underpants. The garment was further described as heavily soiled with multiple reddish-brown, brownish, blackish, and yellowish stains. At least five defined stain areas and one general swabbing from the garment were tested. Blood was detected in all five areas, 1B, 2, 3B, 4, and 5 with phenolphthalin, and hemoglobin was detected in areas 1B and 3B. Acid phosphatase was detected in stains 1B, 2, 3B, and 5, but not in stain 4 or the general swabbing sample. Stain 2 was described as the crotch area and the dark

7

Our File No. 07-227

stain material was described as fecal matter.  No PSA was detected from stain 1B, 2, 3B, or 5.  Neither the size of the stain sample cuttings nor the extraction volume was described.  Stain 4 and the general swabbing sample were not tested for PSA.  No microscopy was conducted on the any samples from the underpants, even though it is readily apparent that extracts, suitable for microscopy, were prepared from the four stain areas tested for PSA.  No DNA analysis was attempted on any of the samples from Gunter's underpants.

Zervos' report of her work in this case was published September 25, 2002 and is attached as Exhibit 1; Onorato's report of his work in this case was published January 17, 2003 and is attached as Exhibit 2.  The Cellmark Report of November 14, 2002 is attached as Exhibit 3.  The Johnson "report" of March 1, 2004 is attached as Exhibit 4.

## The Government's Opening Statement

During her opening statement to the jury, U.S. Attorney Patti Booth sets the stage for including alleged sexual abuse of Gunter in the "systematic abuse and torture" that led to the child's death.

> "Also, there will testimony that a swab was taken from the bottom, from the rectum of the baby, and that swab, even though it was taken two days after this incident occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will testify that that swab showed that there was seminal fluid in the rectum of that baby." [TT42:19-24]

In his opening statement, defense counsel Douglas Tinker doesn't address this issue, leaving this allegation completely uncontested before the jury.

8

Our File No. 07-227

## Trial Testimony of Dr. Scott Benton

The Government was in the enviable position of having at its disposal a forensic pediatric physician, Dr. Scott Benton, who had examined JaKarenn Gunter because of perineal blood in her diaper on May 21, 2002, only a short period of time after Bourgeois had taken custody of the child. Benton was unable to make any finding as to the source of the blood; nor was there any evidence of abuse of this child. Benton was retained to compare autopsy photos of Gunter with those he had taken of the child on May 21, 2002 during his examination. At trial, Benton delivered a dramatic and very eloquent description of the physical transformation of this child during the few weeks she was in Bourgeois custody. Also, the prosecutor had reports from the FBI asserting that semen but no sperm was detected on rectal swabs from the female child victim, and no male DNA could be detected from the rectal swabs, even with a sophisticated Y chromosome test which could find and genetically discriminate male DNA from a minute amount of male DNA lost in an overwhelming amount of female DNA. The Government would use Dr. Benton, through false, or at best, erroneous testimony to account for the absence of sperm from the alleged semen on the rectal swabs, and to bootstrap this alleged sodomy of the child at about the time of her death in late August, 2002 to the perineal bleeding for which Benton had examined the child back in late May, 2002.

As revealed in his direct testimony, at the time of this trial Dr. Benton was employed by Children's Hospital of New Orleans where he was the Director of the Children-at-Risk Evaluation Center, and he was also a Clinical Associate Professor at both the Louisiana State and Tulane Universities. Benton testified his current work included the supervision of three clinics in Louisiana: one in New Orleans, one in Baton Rouge, and one in Covington; that he, as the Director of the Pediatric Forensic Medicine Fellowship Program for the LSU School of Medicine also directed the training of new pediatricians in evaluating children suspected of abuse; that he also provided the core lecture series for first year medical students at both LSA and Tulane; that he was in clinic four days per week and that he personally saw about 600 children per year and reviewed over

9

1,500 cases per year, or over 5 per clinic day.  Dr. Benton also testified that he has testified "in court proceedings or trials concerning (his) examinations" on "many occasions".

In an answer that continued for over four pages of transcript, Benton testified that "sexual assault evidence includes things that are specific to men" including semen, and that there are three main tests that are used:  the acid phosphatase test, the "more confirmatory" prostate specific antigen or p30 assay, and the "even more confirmatory" observation of sperm [TT22:6-21].  Benton testified the PSA/p30 assay "is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, including animal products, except in male prostate, and with one exception, human breast milk." [TT22:16-19]

Benton continued his description of the search for evidence of sexual assault:

> A.  The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quickly enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which can tell you that there was presence of a male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible." [TT22:20-25; 23:1-3]
> …
>
> Q.  I want to ask you on the – is it uncommon to have semen and no sperm?
> A.  No, not in my experience.  [TT23:7-9]

In anticipation of her next two witnesses, Zervos and Onorato, towards the end of her direct examination of Benton, the prosecutor returns to the subject of semen, its composition, and how one might have semen without sperm from an otherwise normal sperm-producing male.  Again, Dr. Benton is very eloquent, continuing his answers uninterrupted for page after page of transcript.  And because his answers, especially with regard to the constituents of semen, the persistence of semen and sperm in body orifices, and the utility of p30 or

10

Our File No. 07-227

prostate-specific antigen as stand-alone confirmation of the presence of semen are so far from reality, it is necessary to present a large portion of his voluminous testimony here:

Q. Now, I want to ask you, Doctor, what is semen?
A. Semen, s-e-m-e-n, is a product of the prostate gland of men. And it's composed of water and various proteins and enzymes. It's meant to be a vehicle for sperm during ejaculation.
Q. Okay. And does it always have sperm in it?
A. No. The prostate doesn't make the sperm. The prostate makes semen. It is possible to have semen without sperm in it.
Q. All right. And if you found – let me just give you a hypothetical. If, on a child, semen was found that was taken from a swab from her anus, and there were no sperm in that semen, does that mean that that is not semen?
A. No.
Q. Okay. Can you give us the reasons why there may not be sperm in semen?
A. Yes. Starting at the very beginning, to sort of help understand. Sperm is produced in the testes, or colloquially known as the balls of men. And they are stored in the epididymis or this little sack, this little sack that's above the testes. And during ejaculation, or during the sex act, there is – there can be pre-ejaculation, if you will, where the prostate, which is a gland that surrounds the bladder in men, will deposit some lubricants. Not to be offensive, but in the first part of the sex act, the urethra gets cleansed with these prostatic secretions. So as there's excitement and erection, you will have deposition of this pre-ejaculate, which is all products of the prostate, and that's semen. So it's possible if you're just capturing what happened at that event, that's semen without sperm in it. Until you actually have the orgasm, the sperm is not introduced to that flow. So that's the first reason you can have semen without sperm, is that you're just looking at the pre-ejaculate, not the ejaculate with the sperm in it. [TT49:12-25; 50:1-19]

Benton goes on to describe semen without sperm as the results of vasectomy, illness, the physical inability to produce sperm (azoospermia), and diminished sperm numbers due to multiple ejaculation and stochastic sampling:

"And if the sperm count is so low, it's possible that you're sampling an area that has semen but doesn't have sperm in it, or it never had sperm in it." [TT51:7-10]

11

Finally, Benton describes the loss of sperm in body orifices without the concomitant loss of semen:

> "The other obvious one is that the seminal products, semen, the products of the prostate, are very stable. If they get on clothes and they dry, they can last for years. They are a little less stable in wet environments, like the rectum or the vagina or the mouth. But they're much more stable than sperm is. Sperm's survivability usually is only in the cervix or in the womb, the uterus of women. In the vagina itself, it doesn't live more than 24 to 48 hours. In a little girl, prepubertal girl, it doesn't live very long, hours. So they will die. They'll lose their little tails. And once they lose their tails, they're very difficult to find, on rape kit or trace forensic evidence. You'll find evidence of the semen much easier than you'll find sperm. Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing. So the sperm can be destroyed in those environments, and you could still detect semen but not find sperm. So those would be the conditions in which you could see semen, but not see sperm." [TT51:14-25; 52:1-6]

On cross examination, defense counsel pursues only one line of questioning, dealing with the potential for "false positive" results when testing for the presence of semen. Dr. Benton testifies that the acid phosphatase test can have a "high percentage" of false positives but that with p30 "very low levels of false positives are ever reported". Finally, Benton admits the p30/PSA test is not foolproof:

> Q. The p30 test, there is some chance of that being erroneous, too?
> A. That is true. [TT55:16-18]

### Trial Testimony of FBI Analysts Zervos and Onorato

Trial Testimony of Caroline Zervos

Zervos began her direct testimony by describing a two-step presumptive/confirmatory test procedure in identifying whether or not blood or semen might be present in a specimen/stain of interest. She describes a process

12

Our File No. 07-227

in which an interesting stain is first tested for the "presumptive" presence of the body fluid, and if positive, it is then tested with a "confirmatory" test and if both are positive, then the presence of the tested for body fluid is confirmed [TT 63:6-25]. She then describes how the confirmatory test may be omitted if the sample size is limiting [TT 64:4-11]. Later in her testimony comes the following exchange in which Zervos unequivocally states that semen was identified on the Gunter rectal swabs:

> Q. All right. What kind of tests did you perform on Q5 through Q7, the rectal swabs?
> A. The serological examinations that we conducted on the rectal swabs, we tested them for the presence of blood and semen. And blood was identified on the rectal swabs, and semen was identified on the rectal swabs. [TT86:14-19]

Zervos then immediately directly contradicts her prior testimony regarding the two-step presumptive/confirmatory testing process:

> Q. What kind of test do you use – did you use to test for the semen on those rectal swabs?
> A. We conducted our, the presumptive and confirmatory tests for blood, and we did our confirmatory test only for the presence of semen.
> Q. Why didn't you do a presumptive test?
> A. On swabs that are taken, recovered from the vaginal area and other intimate orifices, we just conduct a confirmatory semen test, because there are fluids that can react as a false positive nature with our presumptive test for semen. So we bypass the presumptive test and only do a confirmatory test.
> Q. And what confirmatory test did you use?
> A. Its called p30, and it tests for a protein that's a component of semen. [TT86:20-25; 87:1-8]

She then reiterates her unequivocal identification of semen on the rectal swabs:

> Q. Human specific, okay. So now, on Q5 and Q7, you can testify to the presence of semen. Is that right?
> A. That's correct. [TT87:12-14]

On cross examination, defense counsel Tinker attempts to determine how specific the p30 assay is with regard to the unequivocal identification of semen on the Gunter rectal swabs, and the Court steps in to assist him:

> The Court:  He's asking actually, not this – is there anything else that could test positive for a p30 test besides this particular prostate protein?
> The Witness:  Yes.  Yes, there is.
> The Court:  Is that what you're asking?
> Mr. Tinker:  Yes.  [TT103:25; 104:1-5]

Zervos then goes on to describe that p30/PSA is found at low levels in male peripheral blood and male urine, but she is unaware of its existence in any female fluids:

> Q.  And is there anything in the anal passage that would have – that might have that same reaction, other than semen?
> A.  In the rectal area?  I don't think so.  I don't exactly know the answer to that.
> …
> Q.  You might – could – well , if you don't know, that's all right. But we can ask somebody --
> A.  Well, I'm a little confused on your question, but the studies have shown that this protein that we test for can be in low concentrations in other body fluids.  And those are those fluids that I mentioned, in male urine and male peripheral blood.
> The Court.  But not in a female child?
> The Witness.  Not that I'm aware of.

At this point, the Court has recognized that the Government's proof for the presence of semen associated with the Gunter rectal swabs relies solely on the presence of a positive p30/PSA test result which two government witnesses have testified is neither specific for semen or even p30.  As defense counsel concludes his cross-examination of Zervos, the Court realized that defense counsel has not come to the same conclusion, or at least has not fleshed out before the jury the potential uncertainty, if not outright confounding, of that proof by Zervos' revelation that p30/PSA is not entirely specific to semen, as well as Dr. Benton's admission that positive p30 results can be obtained from substances other than

Our File No. 07-227

p30. The Court again attempts to assist defense counsel in developing this impeachment:

> (Bench conference on the record.)
> The Court: Before she leaves for good, I wanted to make sure that you had every possible question you wanted to ask her. It wasn't – what she said, when you said – you were trying to ask if there could be a false positive for something else. But she told you where this same exact prostate protein could be found. Instead of saying, is there anything else that could cause a false positive for this. Do you see what I'm saying? That was what I wanted to clarify, and I thought was what you wanted to know.
> Mr. Tinker: I thought she said that maybe, maybe not. I mean, that's kind of –
> The Court: I don't think you got everything you wanted out of that, is all that I'm saying, Mr. Tinker. Have you got somebody else –
> Mr. Tinker: I got more than I wanted, Judge. My understanding of what she said was that she didn't know whether things in food might cause that or –
> The Court: That's okay. I'll let it go. I just wanted – I was trying to help you. [TT106:20-25; 107:1-14]

Defense counsel did not attempt on cross examination to further impeach Zervos' claim of identifying semen on the child's rectal swabs. He called no defense witness to reveal the slippery slope upon which the Government's proof of semen rested, even when provided with that knowledge by his own expert Dr. Elizabeth Johnson, as described below.

Trial Testimony of Anthony Onorato

On direct, with regard to the presence of semen on the Gunter rectal swabs, Mr. Onorato had little to add to the testimony of Zervos. He testified that he did recover DNA from the rectal swab; that he relied upon the representation of Zervos that the rectal swab had semen on it; and that he was unable to detect any DNA foreign to the child from the rectal swab [TT118:6-11]. When asked if it was "uncommon that when you have semen on a swab that you won't be able to get the DNA off of it?" he testified that he could get the DNA off the swab, but that there was either too little male DNA to detect or any male DNA present was

15

lost in a sea of female DNA from the child [TT118:12-24]. Onorato then described sending the rectal swabs out to a private laboratory for Y STR testing [TT119:1-17] . On cross examination, defense counsel demonstrates his confusion with regard to the potential commingling of semen in a body orifice with fluid and cells from the orifice source and a swabbing of that orifice in an attempt to collect whatever might be available; and Onorato re-affirms his belief that there was semen on the rectal swab:

> Q. And this was the swab that the lady, the serologist, and I would probably mispronounce her name, she -- her test showed that it was semen.
> A. Ms. Zervos had detected semen on that swab, that's correct.
> Q. And the test you did as far as DNA showed that that was consistent with her DNA.
> A. It showed that we only recovered DNA from the person from whom the swab was taken, that's correct.

Later, Onorato acknowledges that p30 is found in other body fluids, but erroneously limits its detection to male blood from those males who have prostate cancer:

> Q. Are there other substances that might (contain p30)?
> A. There are other substances, body fluids, that may possess this particular protein. It's at such low levels, however. Semen levels of this protein are astronomically high.
> Q. In the test sample?
> A. In a semen sample.
> Q. Okay.
> A. This protein is astronomically high, compared to its content in, say, something like male blood. And generally it's only found in male blood when the individual has a prostatic malignancy.
> Q. Has a what?
> A. I'm sorry, prostate cancer.
> The Court: Is that what a PSA is, you mean?
> The Witness: Your Honor, that's exactly – a PSA test tests for the same exact protein. That's correct.

So now, through the testimony of two Government scientists and that of Dr. Benton, the jury is left with the impression that p30/PSA, if not essentially specific to semen, is found only in other male body fluids or breast milk and at

16

Our File No. 07-227

very low levels, and is relied upon by the FBI as stand-alone confirmation of the presence of semen, even for specimens collected from an environment like the human rectum. This notion is left unchallenged by the defense.

The defense calls no witness nor forensic expert to challenge the Government's proof of semen in this case, even though it had retained Dr. Elizabeth Johnson, and she had informed the defense of many of the problems in the Government's semen evidence proof.

## The Government's Closing Argument

Ms. Booth reminds the jury of the evidence of sexual abuse of the child, of how the FBI detected semen on the rectal swabs and how Dr. Benton explained why that semen was void of sperm:

> "The DNA, our DNA, our expert testified that swabs that were taken from [Gunter's] little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June the 29th. The baby was thrown on the side of the truck on June the 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know." [TT20:5-15]

## Defense Closing Argument

In his closing argument defense counsel Tinker does make an attempt to address the lack of proof of the presence of semen on the child's rectal swabs by reminding the jury that the male-specific Y-chromosome test attempted by the Government was fruitless:

> "Secondly, with regard to the DNA, we learned that there was a test which was found positive for semen and that the expert who

had examined that and talked freely about (inaudible) protein. He said there was a better test and so sent the semen off for a better test. And that test was negative. That test was negative, the better test. And that was the testimony from that witness." [TT42:3-9]
…

"And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what its call[ed], was negative. There's no evidence of semen, I suggest to you, being found on this child." [TT43:17-20]

This statement produced sustained objections from the Government that led to a bench conference, in which the Court appears to have lost the reservation expressed previously with regard to the Government's semen evidence proof:

The Court: The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again. There was –
Mr. Tinker: (Inaudible)
The Court: It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of the child. It was –
Mr. Tinker: (Inaudible)
The Court: That is what the expert testified to, there was seminal fluid found in her anus. What they couldn't identify, because it was degraded, was the DNA. There was no question of the expert testified. They don't have to believe it but there's no question that the expert testified that there was seminal fluid – [TT44:6-19]

The United States 5th Circuit Court of Appeals accepted the Government's proof of semen on the child's rectal swab without question. They state:

*504 "There was also evidence of sexual abuse" reiterating the child's unremarkable visit to Dr. Benton in May, 2007 and "Furthermore, after [Gunter's] death, rectal swabs revealed the presence of semen." [423 F.3d 501]

18

Our File No. 07-227

## Setting the Record Straight

The Constituents of Semen

Contrary to the testimony of Dr. Benton, semen is the suspension of sperm cells in seminal fluid, not merely a product of the prostate gland without sperm. Neither is the fluid portion of semen merely a product of the prostate gland, but a complex mixture of fluids from the seminal vesicles, the prostate gland, the bulbourethral glands, and other minor glands (urethral and preputial). Neither does the prostate contribute the majority of the liquid of seminal fluid. The seminal vesicles contribute 65-70%, the prostate 25-30%, and the other contributions are 2-5%. Of the prostate gland's contribution, only about 1% is protein including acid phosphatase and p30/PSA. Semen is produced in a cascade reaction at orgasm. The vas deferens contract forcing sperm, which have been stored in the epididymis, up to the ampullae (top end) of the vas deferens. The sperm then pass through ducts into the urethra where they are mixed with the fluids from the seminal vesicles, the prostate, and bulbourethral glands forming semen which is then ejaculated. [See Boron, et al, 2005; *Medical Physiology*: Elsevier/Saunders]

Also contrary to the testimony of Dr. Benton, "pre-ejaculate" fluid is the product of the bulbourethral glands, not the prostate gland, and it typically comprises less than 1% of semen. As the product of the bulbouretheral glands and not the prostate, it is likely that this fluid does not contain any more p30/PSA than might be detected in the peripheral blood of a male. The claim by Dr. Benton that one might be detecting only "pre-ejaculate" or bulbourethreal fluid as semen, collected from an environment such as the rectum, is patently absurd to a knowledgeable scientist. But this claim went totally unchallenged, thereby misleading the jury. While there is a "cleansing" of the urethra and some potential lubrication for the foreskin/glans penis by this bulbourethral gland product, this "pre-ejaculate" fluid's primary function is to increase the mobility of sperm in the vagina and cervical mucus.

Our File No. 07-227

Dr. Benton described other possible ways in which semen might be void of semen: vasectomy, temporary pathology or illness, or multiple ejaculation. Clearly, vasectomy is not in play here, as Bourgeois had an infant child even younger than Gunter and there is no indication of this surgery after the conception of this child. Also, since Bourgeois had at least three known children, and was apparently healthy at the time of this incident, there is no reason to believe he might be azoospermic or even oligospermic as the result of temporary illness. How often Bourgeois might have ejaculated resulting in a reduced sperm count prior to the alleged sodomy is not known, but the entire family of five had been on the road together in the cab of the tractor-trailer for the last 22 days of Gunter's life. Given that about 2,000 sperm mature every second in normal spermiogenesis, and that the volume of semen is reduced proportionately to the number of sperm per unit volume, Benton's claim of the detection of normal semen void of sperm by chance is also patently absurd.

The Forensic Identification of Semen

The average ejaculate is about three milliliters of semen. This semen contains an average of 300 million sperm, or about 100,000 sperm per microliter of neat semen. A microliter, one-millionth of a liter, of semen, or about one-thirtieth of a drop from a typical eyedropper, a volume that can easily reside on the head of a pin, will contain about 100,000 sperm. Therefore, a miniscule amount of semen should contain an abundant number of sperm. And since sperm are only found in semen, the observation of sperm is proof of the presence of semen. In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen. The relevance of the semen is the only debatable issue given the observation of sperm. Because of the definitive nature of this proof of semen, the recovery and visualization of sperm cells has always been critical in the forensic investigation of alleged sexual assault.

Our File No. 07-227

The fairly recent development of the capability to uniquely identify the sperm source of as few as 100 sperm through DNA analysis has revolutionized the investigation and prosecution of sexual assault offenders. Hence, the recovery and visualization of sperm from forensic specimens has become even more important. Although this sperm recovery and visualization process is not difficult, it does require care and skill and is time consuming. At a minimum it requires: [1] the efficient collection of cellular debris from a specimen sample such as a portion of a swab or garment stain; [2] the differential staining of the various cell populations amongst the recovered debris; [3] and time spent at the microscope carefully examining the stained slides. In order to minimize the amount of time and effort spent preparing and examining specimens microscopically, various other easier and less time-consuming methods of screening potential semen-bearing specimens are generally employed before looking for sperm. Even though these other screening tests are not specific for the presence of semen, they are highly sensitive for soluble components or semen, so they can be useful in eliminating specimens or stains not likely to contain a significant amount of semen, and hence, a useful number of sperm.

In this case, and in most cases nationwide, the presumptive test for semen is an acid phosphatase[3] spot test, which requires only a minute amount of the head of a swab or a ca. 2 mm thread from a fabric stain. This "direct" (and most sensitive) testing of a sample for a quick and vivid color producing reaction provides the presumptive indication of the presence of semen on the parent swab or stain. Because of the sensitivity of the acid phosphatase test, a negative (no color production) result will usually end the search for semen in that specimen. The confirmation of the presence of semen is usually the microscopical observation of sperm cells in the cellular debris recovered from an aqueous extraction of the stain material from a larger portion of the swab/stained fabric. If no sperm are observed and the strength of the acid phosphatase reaction is

---

[3] Acid phosphatase is an enzyme that is present in extremely high amounts in semen and in very low amounts in other body fluids. As such, the test is highly sensitive and when positive is generally indicative of the presence of semen, warranting further investigation of the sample.

21

such that one still suspects that semen is present in the sample, then a p30/PSA assay may be conducted on the aqueous portion of the extract. If the PSA assay is positive in the presence of acid phosphatase but no sperm are observed, the presence of semen is highly likely. This result is somewhat rare, because the incidence of azoospermia, from vasectomy or otherwise, is only about 5% of the population. If the PSA assay is negative in the presence of acid phosphatase, then it is highly unlikely that semen is present.

Recently, PSA assays developed for use as an indicator of benign prostate hyperplasia and prostate cancer have been adopted by large forensic laboratories as a screening tool for the presence of semen. These commercially-sold PSA assays are highly, but not absolutely, specific for human p30 protein. And because they are hypersensitive, detecting human p30/PSA antigen in the one part per 1-10 million dilution range, they are capable of detecting levels of semen at which no forensic significance can be assigned, even though sperm should still be observed. For example, consider a toddler's clothes, especially underpants, machine washed with adult clothes that bear heavy semen deposits as the result of normal sexual activity. More than an adequate amount of semen will be transferred to the toddler's clothing during the wash and survive the rinse and machine drying process to be detected by these commercial PSA assays. Even if the investigation controls for the generalized distribution of semen on the undergarment, such a finding could still result in wrongful criminal charges being brought against the source of the semen. It is recognized that there is likely no innocent explanation for semen being present in a child's body orifice. However, given the explosively inflammatory nature of such a claim, the scientific support of such a claim must be unequivocal.

Given that semen contains an average of 200 million to 500 million sperm per milliliter (ml or thousandth of a liter) and about 820,000 nanograms (ng, or billionth of a gram) PSA per ml, and that these commercial PSA assays claim to detect less than 2ng/ml, then a "positive" result attributable to normal semen should contain at least 450 to 1200 sperm. This is more than an adequate number of sperm to expect to obtain a robust DNA analysis result, especially from a Y-

22

chromosome assay. And even if one utilized as little as 5% of the cell pellet for microscopy, that slide preparation should bear about 22 to 60 sperm. Such a sperm density on a spot slide preparation should never go unobserved, even in the presence of potentially occlusive epithelial cells and fecal material. Assuming the FBI personnel are even marginally competent at recovering, identifying, and isolating sperm from forensic specimens, if the Gunter rectal swab PSA result was due to semen, then not only should the FBI have observed sperm, their DNA test results should have detected ample male DNA to discriminate its source. A failure to recover and observe sperm in the presence of semen most likely reflects poor technique and skill, not aspermic semen.

In this case, and apparently as routine practice according to the testimony of Zervos, the FBI now uses these commercial medical PSA assays when testing female body orifice swabs for semen. The FBI also relies upon these assays, when positive, without any discrimination of the "strength" of the result, even in the absence of (or failure to recover and / or observe) sperm from the same specimen. This is scientifically irresponsible, if not negligent. PSA has been unequivocally shown to be neither semen-specific nor even male specific. PSA has been documented in the scientific literature to be at levels detectable by these hypersensitive commercial assays in breast milk, amniotic fluid, and much more disturbingly, female urine, which was not mentioned by either FBI witness nor Dr. Benton. The reliance by the FBI (and other Government laboratories) on these commercial medical PSA assays in the absence of significant acid phosphatase activity or the observation of sperm is unsound. We do not challenge the Government's right to present PSA assay results to juries as indicative of the potential presence of semen. But to not fully inform the jury as to the limitations of a stand-alone PSA assay result, and, as in this case, to use a pediatric physician to aggrandize that finding, misled the jury.

23

Our File No. 07-227

Review of the provided FBI bench notes reveals the following facts:

[1] While Zervos sampled and extracted half of all three Gunter rectal swabs, she performed no microscopy on any of her samples, relying solely on the previously-prepared rectal swab smear slide as representative of all three swabs, upon which no sperm was observed. In the absence of the predicate/requisite sperm for any probative DNA analysis, she referred the case forward for DNA analysis; a full one-half of the rectal swab evidence was consumed in this screening exercise. This material, rather than any of the remaining rectal swab evidence, could have and should have been utilized for any subsequent in-house DNA analysis. The fate of the cell debris from this half of the rectal swab evidence is unknown. This disjoined sampling of precious evidence reflects a cavalier, if not reckless systematic approach to the examination of body orifice specimens by the FBI.

[2] Onorato performed no examination whatsoever for sperm or even semen on the separate and distinct sample he took from one of the Gunter rectal swabs. Even after, in theory, digesting away the female epithelial cells and producing a cell debris pellet that should be relatively much richer per unit volume in sperm than the undigested cell debris pellet, Onorato made no attempt to demonstrate, through post-digestion microscopy, the presence of sperm in his sample.

[3] Onorato measured 50 ng DNA/$\mu$l in the "male" or sperm DNA fraction[4] he prepared from his one-quarter Gunter rectal swab sample and he measured 100 ng DNA/$\mu$l in the "female" or non-sperm DNA fraction from this same sample. We now know that only female DNA was detected in the male/sperm fraction from the rectal swab. The digestion/washing process used by Onorato should have resulted in the reduction of several orders of magnitude of non-sperm DNA from the residual cell pellet, leaving little to no detectable

---

[4] This represents the DNA equivalent to over 14,000 sperm per microliter of this preparation, or an average semen dilution of only about 1:7

24

female DNA. Onorato reduced the female DNA in the male fraction by only one-half. Such a finding should have compelled Onorato to question his protocol and/or his skill in isolating sperm, particularly from specimens with expected low numbers of sperm. Post-digestion microscopy would have revealed numerous surviving epithelial cells or that Onorato's washing process was severely inadequate. Post-digestion microscopy would have significantly improved the ability to discern/reveal any sperm in this sample. A failure to observe sperm in the post-digestion cell pellet would have further undermined the claimed presence of semen on the rectal swabs.

The absence of sperm from a suspected semen source, who by default had to be Alfred Bourgeois, who by all evidence was a normal semen producer, together with the absence of any male DNA from the suspected semen on the Gunter rectal swabs in separate DNA analyses by the FBI and Orchid Cellmark, should have given any scientist pause in offering this questionable semen finding to a jury. However, this finding was even further perverted before the jury by Dr. Benton's "confusion" of the concept of sperm persistence with viability, a concept in which any physician in his position should be well versed.

The Persistence of Semen: Seminal Fluid versus Sperm

Dr. Benton testified that sperm degrade much more quickly than the fluid component of semen, especially in the rectal environment. This is diametrically untrue. As testified to by Benton, it is true that sperm will lose their motility and cease to respire as living cells within hours of ejaculation. They also easily "loose their little tails". But contrary to Benton's testimony, the persistence, as opposed to viability, of sperm cells is dramatically longer than that of the soluble constituents of semen, including acid phosphatase and p30.

The soluble components of semen are subject to the same diluting forces and environmental conditions as are sperm wherever the semen is deposited. In a dry, cool environment semen (both the fluid and cellular components) will

25

Our File No. 07-227

persist for decades, if not longer. In a moist environment, however, sperm cells will persist much longer than the fluid component of semen. This is because sperm cells are equipped with a specialized cell membrane that makes them much more highly resistant to degradation and assimilation by normal metabolic mechanisms than are free dissolved proteins like acid phosphatase and p30 and even epithelial and white blood cells. As described previously, we exploit the hardiness of the sperm cell membrane and its resistance to degradation. We digest away non-sperm cells and soluble protein with an exogenous proteinase in order to then isolate the sperm from those soluble proteins and non-sperm cells. Further, because they are particulate, we can concentrate them into a small volume via centrifugation, thereby dramatically increasing the opportunity to recover and observe them. We can enhance that observational capacity by staining the cell debris with different stains that not only distinguish sperm from non-sperm cells, but also distinguish the unique morphological characteristics of the sperm cell. Because of this, Dr. Benton's claims that the detection of normal semen in the absence of sperm by mechanisms other than aspermia is most sensitive and uncommon, and that one might be able to detect seminal fluid in one area that is void of sperm because of chance, are ludicrous to any knowledgeable forensic scientist.

The ability to recover semen, and hence, sperm, from body orifices depends on several factors, but mostly on the passage of ante-mortem time and the physical activity of the "victim". Semen will be rapidly cleared from living body orifices by gravity drainage, natural dilution and metabolic mechanisms, and environmental conditions. But semen, and particularly sperm, deposited in a body orifice at about the time of death will persist even beyond initial decomposition stages. Sperm numbers sufficient for robust DNA analysis are recovered from buried bodies and bloated bodies that have washed up on shore. Semen associated with a body in a cold or winter environment will persist even longer.

Thus, completely contrary to Dr. Benton's testimony, it is unexpected to detect semen in the absence of sperm. One should be able to concentrate, isolate,

26

stain, and identify sperm from semen dilutions that are beyond the detectable limits of the soluble protein components; therefore, it is axiomatic that whenever the soluble components of semen are detectable, sperm should be easily detected. While it is possible to have sperm whose DNA is degraded beyond detection limits, the sperm cells themselves will maintain their integrity and be readily identifiable.[5] Assays such as acid phosphatase and p30, which are convenient and relatively specific, are used to focus an investigation for semen. But one should never rely upon any single result except the observation of sperm as an unequivocal identification of semen. If semen was truly detected in this case by PSA assay, sperm should have been observed and a typable quantity of sperm DNA should have been recovered from it.

## Other Considerations Not Explored at Trial

It is true that semen deposited into the rectum of any living person will be fairly rapidly cleared by drainage and natural metabolic processes, particularly defecation. So it is likely that any semen detected on the child's rectal swabs was deposited in the child's rectum after the child's most recent defecation preceding her death. It also appears undisputed that if there is semen on the rectal swabs, then that semen is from Alfred Bourgeois. It is unclear from the portions of the trial transcript provided to us whether or not the opportunity existed for Bourgeois to have sodomized the child in the interval between the child's last defecation and her death, given that the family of five essentially lived in the cab of the truck for the last days, if not weeks, of the child's life. We have no information as to whether this opportunity or its absence was developed at trial. This information, including when the child's underpants were last changed, and whether or not the potty chair and its contents were examined for semen, should have been developed at trial.

---

[5] For example, microscope slide smears with semen that have been treated with caustic dyes during staining and/or excess heat during fixing will reveal  normal sperm cells but the sperm DNA may be degraded.

27

The FBI at least considered the potential for semen to be associated with the child's clothes, and four areas from the child's underpants Q14 were tested for semen and abandoned.  The FBI's reports and notes reveal that no other items of evidence, except the body orifice swabs from the child, were tested for the presence of semen which might be commingled with epithelial cells from the child, including:

Q17 Gunter's shorts;

Q18 Gunter's shirt;

Q19 Alfred Bourgeois' shorts;

Q20 Alfred Bourgeois' shirt;

Q27/Q28 the child's potty seat top and bottom, respectively;

Q29/Q30 a seat cover from the truck;

Q34 syringe with fluid (sample of contents of the potty?);

Q35-Q38 four towels from the truck;

Q39-Q41 three sheets from the truck;

Q42/Q43 two comforters from the truck;

Q44-Q48 pillows and pillowcases from the truck;

Q49 mattress pad from the truck.

An unequivocal finding of semen commingled with biology from the child on any of the above items would have essentially cemented the Government's allegation of sodomy of the child by Bourgeois.  Conversely, the absence of semen commingled with biology from the child would further undermine the alleged act of sodomy of the child by Bourgeois in the obligate time interval between the child's last defecation and her death, and the environment of opportunity during life in the truck.

Our File No. 07-227

It is recommended the items listed above, the body orifice swabs from the child, including the two remnant rectal swab sticks, and the child's underpants, be re-examined.  If you have any questions, please contact us.

Sincerely,

Alan Keel, Criminalist

Our File No. 07-227

## Exhibit 1

FBI Report of Caroline Zervos

Case ID No. 70A-HQ-60227
Lab No. 020718001 NH HZ

Dated:  September 25, 2002

7-1 (Rev. 5-13-99)

△ LABORATORY △
# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

Date:  September 25, 2002

To:     Houston
        Corpus Christi RA

Case ID No.:    70A-HO-60227

Lab No.:    020718001 NH HZ

Reference:  Communication dated July 15, 2002

Your No.:

Title:   ALFRED BOURGEOIS;
         ROBIN BOURGEOIS;
         JA' KARENN GUNTER- VICTIM
         MURDER ON A FEDERAL RESERVATION

Date specimens received:  July 18, 2002

The specimens listed below were submitted under cover of communication dated July 15, 2002 and received in the DNA Analysis Unit I:

## ITEMS LISTED AS FROM JA' KARENN GUNTER:

| | |
|---|---|
| Q1-Q4 | Oral swabs  (1B36) |
| Q5-Q7 | Rectal swabs  (1B36) |
| Q8-Q10 | Vaginal swabs  (1B36) |
| Q11 | Oral smear  (1B36) |
| Q12 | Anal smear  (1B36) |
| Q13 | Vaginal smear  (1B36) |

Enclosure (0)

Page 1 of 4

This Report is Furnished for Official Use Only

Q14          Underpants  (1B117)

Q15-Q16      Socks  (1B117)

Q17          Shorts  (1B117)

Q18          Shirt  (1B117)

## ITEMS LISTED AS FROM ALFRED BOURGEOIS:

Q19          Shorts  (1B37)

Q20          Shirt  (1B37)

Q20.1        Document  (1B37)

Q21-Q22      Shoes  (1B37)

## ITEMS LISTED AS FROM TRACTOR TRAILER:

Q23          Seat cutting  (1B8)

Q24          Seat cutting  (1B16)

Q25          Seat cutting  (1B17)

Q26          Gauze pad  (1B23)

Q27          Toilet seat-top  (1B18)

Q28          Toilet seat-bottom  (1B18)

Q29-Q30      Seat covers  (1B28)

Q30.1        Left arm seat cover  (1B28)

Q30.2        Right arm seat cover  (1B28)

Q31          Portion of door panel  (1B31)

Q32          Swab  (1B34)

Q33          Swab  (1B41)

Q34          Syringe with fluid  (1B50)

Q35          Towel  (1B46)

Q36          Towel  (1B47)

Q37          Towel  (1B48)

Q38          Towel  (1B49)

Q39-Q40      Sheets  (1B60)

Q41          Sheet  (1B62)

Q42          Comforter  (1B64)

Q43          Comforter  (1B65)

Q44          Pillow  (1B61)

Q45-Q46      Pillows  (1B63)

Q47-Q48      Pillow cases  (1B63)

Q49          Mattress padding  (1B68)


## ITEMS LISTED AS FROM RESIDENCE AT 1533 GRANT STREET, LA PLACE, LA:

Q50-Q59.1    Swabs  (1B107)

Q60          Swab  (1B107)

Q61-Q66      Swabs  (1B90)

Q67          Sock  (1B103)

Q68-Q69      Underpants  (1B103)

Q70          Belt  (1B88)

Q71          Belt  (1B100)

Q72          Belt  (1B108)

Q72.1        Belt  (1B108)

Q73          Washcloth  (1B114)

Q74          Towel  (1B115)

Q75          Pillow  (1B85)


Page 3 of 4
020718001 NH HZ

Q76-Q77    Sofa cushion covers  (1B111)

Q78    Plastic wrap  (1B113)

Q79    Plastic wrap  (1B112)

Q80    Doll  (1B101)

Q81    Belt  (1B81)

Q81.1    Belt  (1B81)

K1    Liquid blood sample listed as from ALFRED BOURGEOIS  (1B119)

K2    Dental mold listed as from ALFRED BOURGEOIS  (1B120)

NE1    Control swabs (1B34; 1B42; 1B90)

The results of the serological examinations are included in this report.  The DNA analysis examinations are continuing and you will be notified of the results of these examinations in a separate report.  The submitted items will be returned to you under separate cover by overnight mail service.

## RESULTS OF EXAMINATION

Semen was identified on specimens Q5 through Q7.  Specimens Q1 through Q4 and Q8 through Q14 were examined for the presence of semen; however, none was found.

Blood was identified on specimens Q5 through Q7, Q14, Q29, Q30 and Q52. A chemical test for the possible presence of blood was positive on specimens Q1 through Q4, Q8 through Q10, Q50, Q51 and Q53 through Q60; however, the presence of blood was not confirmed.  Specimens Q19, Q20, Q30.1, Q30.2, Q61 through Q66, Q81 and Q81.1 were examined for the presence of blood; however, none was found.

No other serological examinations were conducted.

Caroline M. Zervos
DNA Analysis Unit I
(202)324-3508

Our File No. 07-227

## Exhibit 2

FBI Report of Anthony Onorato

Case ID No. 70A-HQ-60227
Lab No. 020718001 NH HZ; 020904008 HZ

Dated: January 17, 2003

7-1 (Rev. 5-13-99)

# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

Date: January 17, 2003

To:     Houston

Case ID No.:   70A-HO-60227-92

Lab No.:     020718001 NH HZ
             020904008 HZ

Reference:  Communications dated July 15, 2002 and September 3, 2002

Your No.:

Title:    ALFRED BOURGEOIS;
          ROBIN BOURGEOIS;
          JA'KARENN GUNTER - VICTIM
          MURDER ON A FEDERAL RESERVATION

Date specimens received:  July 18, 2002 and September 4, 2002

The items below were submitted under cover of the communication dated July 15, 2002, assigned Laboratory number 020718001, and subjected to DNA analysis in DNA Analysis Unit I:

Q2          Oral swab (1B36)

Q7          Rectal swab (1B36)

Q21-Q22     Shoes (1B37)

Q29         Seat cover (1B28)

Q30         Seat cover (1B28)

Q31         Portion of door panel (1B31)

Q52         Swab (1B107)

Page 1 of 5

This Report is Furnished for Official Use Only

70A-HO-60227

Q58          Swab (1B107)

K1           Liquid blood sample listed as from ALFRED BOURGEOIS (1B119)

The items below were submitted under cover of the communication dated September 3, 2002, assigned Laboratory number 020904008, and received in DNA Analysis Unit I:

Q82 - Q83    Cords (1B75)

Q84          Cord (1B80)

Q85 - Q89    Autopsy photos

K3           Liquid blood sample listed as from ROBIN BOURGEOIS (1B121)

K4           Buccal sample listed as from ALFREDESHA BOURGEOIS (1B123)

K5           Buccal sample listed as from ALFREDA BOURGEOIS (1B124)

This report contains the results of the supplemental serological and DNA analysis examinations.

**Report of Examinations:**

A presumptive chemical test for the possible presence of blood was positive on specimen Q21; however, the presence of blood could not be confirmed. Specimens Q22 and Q31 were examined for the presence of blood; however, none was detected.

Deoxyribonucleic acid (DNA) was isolated from specimens Q2, Q7, Q21-1, Q29-1 (a bloodstain recovered from this seat cover), Q29-2 (a stain recovered from this seat cover), Q30-1 (a bloodstain recovered from this seat cover), Q31 (a stain recovered from this portion of door panel), Q52, Q58, K1(ALFRED BOURGEOIS), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) and subjected to DNA typing by the polymerase chain reaction (PCR) at the nine (9) short tandem repeat (STR) loci and amelogenin sex typing locus of the AmpFℓSTR® Profiler Plus™ ID Amplification Kit and, sample quantity permitting, the six (6) STR loci and amelogenin sex typing locus of the AmpFℓSTR® COfiler™ PCR Amplification Kit. The STR types detected for these specimens are given by locus in the tables that follow.

It is noted that specimen Q2 is being used as a known specimen from JA'KARENN GUNTER and will be designated Q2(JA'KARENN GUNTER) to further distinguish it from any other questioned (Q) specimen.

No STR typing results unlike Q2(JA'KARENN GUNTER) were obtained from specimen Q7.

Based on the STR typing results, Q2(JA'KARENN GUNTER) is the source of the DNA obtained from specimens Q29-1, Q30-1, Q52, and Q58 to a reasonable degree of

Page 2 of 5
020904008 HZ

scientific certainty. Insufficient DNA was isolated from specimen Q58 for PCR typing at the genetic loci of the COfiler™ Kit.

The STR typing results for specimen Q29-2 indicate the presence of DNA from three or more individuals. Based on this mixture result, K1(ALFRED BOURGEOIS), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) cannot be excluded as potential contributors to the DNA obtained from specimen Q29-2. The probability of selecting an unrelated individual from a general population who could be a potential contributor to the mixture of DNA obtained from specimen Q29-2 is approximately 1 in 14 from the Black population, 1 in 25 from the Caucasian population, 1 in 28 from the Southeastern Hispanic population, and 1 in 33 from the Southwestern Hispanic population. It is noted that Q2(JA'KARENN GUNTER) can be excluded as a potential contributor to the mixture of DNA obtained from specimen Q29-2. Insufficient DNA was isolated from specimen Q29-2 for PCR typing at the genetic loci of the COfiler™ Kit.

The STR typing results for specimen Q31 indicate the presence of DNA from two or more individuals. Based on this mixture result, K1(ALFRED BOURGEOIS) cannot be excluded as a potential contributor to the DNA obtained from specimen Q31. The probability of selecting an unrelated individual from a general population who could be a potential contributor to the mixture of DNA obtained from specimen Q31 is approximately 1 in 4 from the Black population, 1 in 9 from the Caucasian population, 1 in 6 from the Southeastern Hispanic population, and 1 in 6 from the Southwestern Hispanic population. It is noted that Q2(JA'KARENN GUNTER), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) can be excluded as potential contributors to the mixture of DNA obtained from specimen Q31. Insufficient DNA was isolated from specimen Q31 for PCR typing at the genetic loci of the COfiler™ Kit.

Based on the amelogenin typing results, the DNA detected in specimens Q7, Q29-1, Q30-1, Q52, Q58, Q2(JA'KARENN GUNTER), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) is of female origin. The DNA detected in specimen K1(ALFRED BOURGEOIS) is of male origin. A mixture of male and female DNA was detected in specimens Q29-2 and Q31.

Insufficient DNA was recovered from Q21-1 (a stain recovered from this shoe) for PCR typing.

Based on the STR typing results, the DNA obtained from K4(ALFREDESHA BOURGEOIS) and K5(ALFREDA BOURGEOIS) could have originated from a biological offspring of K1(ALFRED BOURGEOIS) and K3(ROBIN BOURGEOIS). The DNA obtained from Q2(JA'KARENN GUNTER) could have originated from a biological offspring of K1(ALFRED BOURGEOIS); however, it is noted that K3(ROBIN BOURGEOIS) cannot not be the biological mother of Q2(JA'KARENN GUNTER).

No other serological or DNA analysis examinations were conducted.

AmpFℓSTR® Profiler Plus™ ID

| SAMPLE | D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|
| Q2 (JA'KARENN GUNTER) | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q7 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q29-1 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q30-1 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q52 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q58 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| K1 (ALFRED BOURGEOIS) | 15,16 | 18,18 | 21,26 | 13,14 | 27,32.2 | 18,22 | 12,12 | 12,13 | 8,10 |
| K3 (ROBIN BOURGEOIS) | 15,17 | 16,17 | 22,23 | 14,14 | 29,30 | 12,20 | 11,11 | 11,12 | 10,11 |
| K4 ALFREDESHA BOURGEOIS) | 16,17 | 17,18 | 21,23 | 13,14 | 30.32.2 | 18,20 | 11,12 | 11,13 | 8,11 |
| K5 (ALFREDA BOURGEOIS) | 15,16 | 16,18 | 21,22 | 14,14 | 27,30 | 12,22 | 11,12 | 12,12 | 8,11 |

AmpFℓSTR® COfiler™

| SAMPLE | D3S1358 | D16S539 | TH01 | TPOX | CSF1PO | D7S820 |
|---|---|---|---|---|---|---|
| Q2 (JA'KARENN GUNTER) | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q7 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q29-1 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q30-1 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q52 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| K1 (ALFRED BOURGEOIS) | 15,16 | 10,12 | 6,7 | 8,10 | 11,12 | 8,10 |
| K3 (ROBIN BOURGEOIS) | 15,17 | 12,13 | 7,8 | 8,8 | 10,12 | 10,11 |
| K4 (ALFREDESHA BOURGEOIS) | 16,17 | 10,13 | 7,7 | 8,10 | 12,12 | 8,11 |
| K5 (ALFREDA BOURGEOIS) | 15,16 | 10,12 | 6,8 | 8,10 | 10,12 | 8,11 |

**Remarks:**

Items Q82 through Q89 were returned to you by overnight mail service on October 10, 2002. Items Q5, Q6, Q7, Q12, and K1 were returned to you by overnight mail express on October 21, 2002. The remainder of the submitted items of evidence will be returned to you under separate cover by overnight mail service. In addition to the evidence in the case, any remaining processed DNA from specimens examined by DNA analysis is also being returned to you. The processed DNA can be found in a package marked PROCESSED DNA SAMPLES: SHOULD BE REFRIGERATED/FROZEN. It is recommended that these samples be stored in a refrigerator/freezer and isolated from evidence that has not been examined.

Anthony J. Onorato
DNA Analysis Unit I
(202)324-4581

Page 5 of 5
020904008 HZ

Our File No. 07-227

## Exhibit 3

Orchid Cellmark Report of Jeffrey A. Hickey
and Robin W. Cotton, Ph.D.

Cellmark Case No. F021475

Dated: November 14, 2002



ORCHID
CELLMARK

20271 Goldenrod Lane · Germantown, MD 20876
301.428.4980  800.USA.LABS
301.428.4877 Fax
www.orchidcellmark.com

## REPORT OF LABORATORY EXAMINATION
November 14, 2002

Special Agent Megan Beckett
Federal Bureau of Investigation
800 North Shoreline Boulevard, Suite 1100, North Tower
Corpus Christi, TX  78408

Re: Cellmark Case No. F021475
    Agency Case No. 70A-HO-60227

**EXHIBITS:**

Items of evidence were received for analysis for analysis on October 31, 2002.  Polymerase chain reaction (PCR) testing was performed on the items listed below:

Description
Three partial swabs (identified in the letter dated October 28, 2002, from Robert Johnson, as anal swabs)

**RESULTS:**

No results were obtained when a DNA extract isolated from the items listed above was tested at the Y chromosomal loci DYS390, DYS19, DYS389 I, and DYS389 II.

**CONCLUSIONS:**

Anal swabs:

No conclusion can be made regarding the anal swabs due to an insufficient amount of amplified DNA.

020718001 NH HZ

*Accredited by the American Society of Crime Laboratory Directors / Laboratory Accreditation Board*
**Dallas, TX  ·  Germantown, MD  ·  Nashville, TN**

Report for Case No. F021475
November 14 , 2002
Page Two


EVIDENCE DISPOSITION:

In the absence of specific instructions, evidence will be returned to the submitting agency by
Federal Express or other appropriate carrier.



Jeffrey A. Hickey
DNA Analyst III

Robin W. Cotton, Ph.D.
Laboratory Director


If expert witnesses are needed for depositions or court testimony, please notify us by telephone at
301-515-6155 at least four weeks in advance.


CC:  Mr. Tony Onorato
     Federal Bureau of Investigation
     935 Pennsylvania Avenue, NW
     Washington, DC  20535


020718001 NH HZ

Our File No. 07-227

## Exhibit 4

Letter Report of Elizabeth Johnson, Ph.D.
Two Handwritten Pages and One Page of Copied Text

Dated:  March 1, 2004

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
**Thousand Oaks, CA 91360**
_circej@earthlink.net_

Phone 805-553-0445

Fax 805-553-0487

3/1/04

To Doug Tinker
   Fax - 361-882-3635
   Re: Bourgeois

Doug -
   I'm in colorado so hope you can read my
writing. Issues for cross exam of FBI /
witnesses (both Carolyn + Anthony)

1) FBI did not test the rectal swab with AP
   reagent or do a sperm search. They
   only did a P30 test with the ABA card
   and a DNA test. The ABA card was
   positive but there is _no_ indication of
   male DNA found either in the non-sperm
   or the sperm fraction.

2) We _did_ do an AP test (negative) and
   a P30 test (weak positive) and a
   microscopic sperm search (negative for sperm)

3) The P30 positive (weak on our test) test
   could be a false positive due to bacterial
   proteins found on the rectal swab.
   If there was actually sperm on the
   swab, they should be observed.

✪004
p.2

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
Thousand Oaks, CA 91360
circe@earthlink.net

Phone 805-553-0445

Fax 805-553-0487

_Bourgeois_ continued

②

if the P30 test is positive from semen:

Calculations:

a. Sensitivity of the ABA card = 4ng/ul psA

b. Semen contains a mean of 800,000 ng/ml psA

c. $\frac{800,000}{4}$ = 1/200,000 dilution of semen should be detectable

d. Semen contains on average 100 million sperm per ml of semen

e. A 1/200,000 dilution of semen would then be expected to contain 500 sperm

$$\left[ \frac{100 \times 10^6 \, sperm}{200,000 \, dilution} = 500 \, sperm \right]$$

f) 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not) find male DNA).

Hope this helps I'll be back Wednesday.

Libby Johnson

100 µL of serum was mixed with 100 µL of HEPES (0.24 %, pH 7.2) to facilitate absorption, and added to the membrane. Blood samples from four nursing mothers were collected and dried on DNA cards. The bloodstains were extracted in 1 mL HEPES for two hours. The stains were centrifuged in Spin-Ease and 200 µL of extract was added to Seratec PSA *Semiquant* Kits.

Results of the Seratec PSA *Semiquant* Kits were read after ten minutes

## Results and Discussion

It is now quite clear that the term prostatic specific antigen (PSA) is a misnomer. Although present in great amounts in seminal plasma, its presence has been detected in a variety of other body fluids (Table 1). The greatest concentrations of PSA outside of semen have been in breast milk and amniotic fluid. Generally, the forensic biologist does not encounter these fluids, however, one unusual case of the detection of PSA in a diaper originating from the colostrum in breast milk from a nursing child has been reported [20].

| Fluid | Concentration PSA (ng/mL) | Reference |
|---|---|---|
| Semen | 200,000 to 5.5 million | Sensabaugh [3] |
| Semen | 820,000 (mean) | Lovgren, et.al [21] |
| Amniotic fluid | 0.60 (avg.) 8.98 in one case | Lovgren, et.al [21] |
| Breast milk | 1 (avg.) 2100 in one case | Lovgren, et.al [21] |
| Breast milk | Majority < 1.0; > 100 in one case | Filella, et.a. [22] |
| Breast milk | 0.47 (median) | Yu and Diamandis [9] |
| Saliva | None | Lovgren, et.al [21] |
| Female urine | 3.72 (mean) | Breul, et.al. [11] |
| Female urine | 1.73 (mean) | Breul, et.al. [12] |
| Female urine | 0.12 – 1.06; 0.29 mean | Schmidt, et.al. [13] |
| Female serum | 0.53 (mean) | Breul, et.al. [11] |
| Female serum | Majority < 0.01 | Yu and Diamandis [14] |
| Female serum | Majority < 0.1 | Diamandis and Yu [23] |

**Table 1. Concentration of PSA in various body fluids (liquid).**

Substantial levels of PSA have been found in amniotic fluid and breast milk. Cases involving lactating or pregnant women should be treated with due caution.

Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present or the survivor is menstruating, blood may be present on vaginal swabs or on stains in underwear. When an extract is prepared from a stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the stain is from female urine or serum?

The Abacus Diagnostics *OneStep ABAcard p30 Test* is used quite extensively throughout forensic laboratories in the United States. It has a listed sensitivity of 4 ng PSA/mL.

2

## CURRICULUM VITAE

# Charles Alan Keel

- Employment
- Education
- Professional Affiliations

- Presentations
- Personal
- Contact Information

## EMPLOYMENT

Criminalist, North Louisiana Crime Lab, Shreveport, Louisiana 1982-1984

Criminalist III, Oakland Police Department, Oakland, California 1984-1993

Consultant in Forensic Science, Shreveport, Louisiana, 1994-1996 Death Investigator, Caddo Parish Coroner's Office, Shreveport, Louisiana, 1994-1996

Criminalist, Tulsa Police Department, Tulsa, Oklahoma, 1996

Criminalist, San Francisco Police Department, San Francisco, California, 1996-1999

Criminalist/Consultant in Forensic Science, Forensic Science Associates, Richmond, California, 1999-present

## EDUCATION

Bachelor of Science (Zoology), Texas A & M University, CollegeStation, 1978

Graduate Course Work, Texas A & M University, College Station, 1978-80 in Food Science and Technology/Human Physiology

Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS

The American Academy of Forensic Sciences

The American Board of Criminalistics
- Diplomate in General Criminalistics, 1991
- Fellow in Molecular Biology, 1994
DNA Technical Leader/Manager pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred December, 1999

## PRESENTATIONS

*A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

*A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

*Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

*Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

## CONTINUING EDUCATION

Recombinant DNA Technology, University of California Extension,Berkeley, 1986

Forensic DNA Analysis, University of California Extension, Berkeley, 1989 The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

Instrumental STR Analysis, Perkin-Elmer/Applied Biosystems, Foster City, 1996 Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, 1996

## PERSONAL

Born July 5, 1956 in Lyons Georgia.

## CONTACT INFORMATION

Alan Keel
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806

Case 2:02-cr-00216 Document 402-1    Filed 10/05/07 in TXSD    Page 64 of 87

1-510-222-8883 voice
1-510-222-8887 fax
Email: akeel *at* fsalab *dot* com

---

| FSA Home Page | Introduction | Staff Curriculum Vitae |
| Interesting Cases | | Useful Forensic Links |

66

**ORIGINAL**

CAUSE NO: 02-CR-3585-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

## MOTION FOR CONTINUANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ADAM LONGORIA, Defendant, by and through his attorney of record, BILL MAY, and moves the Court to continue the case for the following reasons:

I.

This case is set for Docket Call on March 25, 2004 at 1:30pm and Jury Trial on March 29th, 2004 at 9:00am.

II.

The defendant currently was a witness for the Federal Government on The United States of America Vs Alfred Bourgeois and testified for the Federal Government in which now the Federal Bureau of Investigations needs to interview him in reference to his testimony. Counsel for the defendant has requested the transcripts on his testimony on March 24th, 2004, in which he will need in order to forego on this case. Counsel respectfully requests that this case be reset until he receives the transcripts to provide adequate representation to the defendant and allow the Federal Bureau of Investigations time to interview the Defendant.



III.

WHEREFORE PREMISIS CONSIDERED, Defendant prays that the Court grant

his Unopposed Motion for Continuance and sets the case for a later date.

RESPECTFULLY SUBMITTED,

BILL MAY
ATTORNEY AT LAW
BAR NO. 13271600
800 N. SHORELINE STE 400 N.
CORPUS CHRISTI, TEXAS 78401
(361)994-0233          994-9285 FAX

## CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of this foregoing Motion has been

hand delivered to the Office of the Assistant District Attorney James Sales, at the Nueces

County Courthouse on 901 Leopard St. Corpus Christi, Texas 78401 on the 23rd, of

March , 2004.

Bill May

CAUSE NO: 02-CR-3585-E

| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

ORDER

On this the _____, day of March, 2004, came to be heard the Defendant's

motion for Continuance and it is the ORDER of this court that the motion be:

GRANTED                    DENIED

SIGNED AND ENTERED THIS THE _____ DAY OF _____, 2004.

_____
JUDGE PRESIDING

ORIGINAL

CAUSE NO: 03-CR-1884-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

## MOTION FOR CONTINUANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ADAM LONGORIA, Defendant, by and through his attorney of record, BILL MAY, and moves the Court to continue the case for the following reasons:

I.

This case is set for Docket Call on March 25, 2004 at 1:30pm and Jury Trial on March 29th, 2004 at 9:00am.

II.

The defendant currently was a witness for the Federal Government on The United States of America Vs Alfred Bourgeois and testified for the Federal Government in which now the Federal Bureau of Investigations needs to interview him in reference to his testimony. Counsel for the defendant has requested the transcripts on his testimony on March 24th, 2004, in which he will need in order to forego on this case. Counsel respectfully requests that this case be reset until he receives the transcripts to provide adequate representation to the defendant and allow the Federal Bureau of Investigations time to interview the Defendant.



III.

WHEREFORE PREMISIS CONSIDERED, Defendant prays that the Court grant his Unopposed Motion for Continuance and sets the case for a later date.

RESPECTFULLY SUBMITTED,

BILL MAY
ATTORNEY AT LAW
BAR NO. 13271600
800 N. SHORELINE STE 400 N.
CORPUS CHRISTI, TEXAS 78401
(361)994-0233       994-9285 FAX

CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of this foregoing Motion has been hand delivered to the Office of the Assistant District Attorney James Sales, at the Nueces County Courthouse on 901 Leopard St. Corpus Christi, Texas 78401 on the _23rd_, of _March_, 2004.

Bill May

CAUSE NO: 03-CR-1884-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

ORDER

On this the _____, day of March, 2004, came to be heard the Defendant's

motion for Continuance and it is the ORDER of this court that the motion be:

GRANTED                    DENIED

SIGNED AND ENTERED THIS THE _____ DAY OF _____, 2004.


_____

JUDGE PRESIDING

67

**AFFIDAVIT/DECLARATION OF** Darrick Moore

**PURSUANT TO 28 U.S.C. § 1746**

I, Darrick Moore, hereby swear and affirm as follows: 1.) I was an inmate in Nueces County Jail along with Alfred Bourgedis.

2) I was facing 13 years for drug sales + delivery.

3) I spoke with the prosecutor for Bourgeois' case, Ms. Patti Booth, about statements that Bourgeois made in prison.

4) She told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

MD
_____

**AFFIDAVIT/DECLARATION OF** OArrick Moore (cont.)
**PURSUANT TO 28 U.S.C. § 1746**

5) I met with Ms. Patti Booth a second time, before I testified against Bourgeois, and she told me she had spoken to Lance Lee and they had agreed to reduce my sentence if I agreed to cooperate against Bourgeois

6.) She also told me if I did good on the stand she would make sure that the sentence I was going to get would be reduced even further.

7.) I was concerned and scared that I was going to get 13 years in prison so I agreed to testify against Bourgeois.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

**AFFIDAVIT/DECLARATION OF** Darrick Moore (cont.)
**PURSUANT TO 28 U.S.C. § 1746**

8.) I testified against Bourgeois and in fact my sentence was reduced to 65 months because of this testimony.

9.) A couple months later as I recall my sentence was reduced to 50 months because I cooperated with the DEA.

I, hereby swear and affirm that the above is true and correct under penalty of perjury.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____ 9/18/07

68

## DECLARATION OF PHILLIP JACKSON
## PURSUANT TO 28 U.S.C. § 1746

I, Phillip Jackson, pursuant to 28 U.S.C. § 1746 swear, affirm and depose that the following is true and correct:

1.      My name is Phillip Jackson. I am currently incarcerated at the Texas Department of Criminal Justice, Stevenson Unit in Cuero, Texas. I am currently serving a sentence for aggravated assault and probation violation.

2.      In the summer of 2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas. At that time, I was housed with several other inmates including Alfred Bourgeois, Darick Moore, Adam Longoria and Timothy Allen.

3.      During the time we were incarcerated, Mr. Bourgeois would often tell me that he was being accused of a crime which his wife committed. He said that his wife had hurt his daughter because she was jealous and angry that Mr. Bourgeois had fathered a child with another woman. I never heard him admit to hurting his daughter and he did not say anything different to Adam Longoria or Darick Moore because we were all housed on the same pod.

4.      I specifically heard Darick Moore say he wanted to testify against someone to get a lesser sentence. He said he had already given information against someone in his federal drug case but that he needed to do more to help his situation. Darick Moore said he needed to figure out who else he was going to tell on. I also heard Darick Moore say that he was worried about his girlfriend who was going out to clubs spending his money while he was in jail. I actually saw him crying because he was so worried about the prison time he was facing on his drug charges.

5.      I remember Alfred Bourgeois and Adam Longoria, who I know as "David", getting into a fight. Mr. Bourgeois had offered Mr. Longoria some toothpaste and Longoria got

insulted by the offer.  After that, I heard Longoria say that anyone, like Mr. Bourgeois, who

denies a crime so often must be guilty.  I heard him say " my girl gave me up so why can't I give

up someone else."

6.       No one had previously contacted me to discuss what I knew about Mr. Bourgeois,

Adam Longoria or Darick Moore.  Had I been contacted at the time of trial, I would have

testified about what I knew and the things I have stated in this affidavit.

I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.

_9-19-2007_

Phillip Jackson

TDCJ # 01189921        #1189921

Dated:

69

### DECLARATION OF TIMOTHY ALLEN
### PURSUANT TO 28 U.S.C. § 1746

I , Timothy Allen, pursuant to 28 U.S.C. § 1746 swear, affirm and depose that the following is true and correct:

1.      My name is Timothy Allen.  I am currently incarcerated at F.C.I. Three Rivers in Three Rivers, Texas.  I am serving a 90 month sentence for possession of a firearm.

2.      In the summer of  2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas.  I was housed there while awaiting trial on the firearm possession charges.  At that time, I was housed with several other inmates including Alfred Bourgeois, Darick Moore and Adam Longoria.  I was a trustee at the jail.

3.      During the time we were incarcerated, Alfred Bourgeois was very involved in Bible study.  While I frequently heard Mr. Bourgeois discussing the Bible, I never heard Mr. Bourgeois discuss his case with Adam Longoria or Darick Moore.  The only thing he told me about his case was that his wife was wrongfully accusing him.  I never heard him admit to hurting his daughter and I know that he would not have made that admission to Moore or Longoria.

4.      Darick Moore was in jail awaiting trial on an open federal drug charge.  I remember he was very concerned and worried about the prison time he was facing.  He constantly worried that if he got convicted on the drug charges he was facing, he was never going to get out of jail.  He was scared to death about being convicted and sentenced to life imprisonment because of his prior conviction in California.  He kept saying there was no way he could handle a long prison term since he had too much going for him on the street.

5.      Darick Moore was also very worried about his relationship with his girlfriend, Lisa Fernandez.  I knew Lisa Fernandez from my time on the street.  I told him she was not a trustworthy person.  He then became very worried that she would not be faithfully waiting for him if he got a long prison sentence.  Several times, I heard Darick Moore say that he could not afford to get convicted and get a long sentence.

6.      No one has previously contacted me to discuss what I knew about Mr. Bourgeois, Adam Longoria or Darick Moore.  Had I been contacted at the time of trial, I would have testified about what I knew and the things I have stated in this affidavit.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

#31108-179

Timothy Allen

Dated:  9 - 6 - 07

70

<u>DECLARATION AND AFFIDAVIT OF BRENDA GOODMAN</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Brenda Goodman, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Brenda Goodman. My grandmother was Mary Clayton. Alfred Bourgeois lived with my grandmother when he was a boy. She took him in because of his mother's cruelty.

2.      Alfred was very slow as a child and had lots of trouble with his school work. My grandmother tried to help Alfred, but she could not help him was his school work because she could not read or write. She made an X for her signature all her life.

3.      The community that Alfred grew up in was very poor. Medical care was not adequate. There was one doctor for most of the community and he would often give the same medicine to lots of different people that had different complaints. My grandmother was like many others, using natural medicine. The treatments included using Clorox on bee stings. When Alfred had any problems while living with my grandmother she used those same ways with him.

4.      There was a very high incidence of alcoholism in the community. Kids would sit outside the bar while their parents were inside drinking. Alfred's mother, Eunice was a heavy drinker. She drank most every day. She drank till she became drunk. People did not think about it because it was so much a part of daily life in this poor community. Alfred had to perform many chores for his mother because she was too drunk to do for herself.

5.      Eunice had babies by several different men. She was slow. People would say that Eunice was crazy and that Eunice and all her children were slow. Eunice cussed a lot. It seemed like every other word was a cuss word. Her language to Alfred was abusive and uncaring. She

was very cruel to Alfred and her other children. She showed them little love and was quick to beat them for any small reason or for no good reason.

6.     Alfred's uncle, Isaac, married a woman named Beatrice. Beatrice is stone crazy. She can hardly complete a thought. She can't explain herself. She is known for talking loud and crazy and people that know her don't pay any attention to what she says. Alfred's uncle Isaac was known as one of the worst drunks around. He could work during the day and then drink until he passed out. He would just stay and sleep it off wherever he fell out. He was just another part of the many bad influences that fell upon anybody associated with that family. I feel very sorry for them and all that they went through.

7.     Nobody ever contacted me on Alfred's behalf before his trial. I would have spoken with them and been willing to testify for Alfred if I had been asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Brenda Goodman

Dated: 10/4/07

71

## DECLARATION AND AFFIDAVIT OF CLAUDIA MITCHELL
## PURSUANT TO 28 U.S.C. § 1746

Claudia Mitchell, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Mitchell. Alfred Bourgeois and I have the same father but different mothers.

2. Alfred and I were not raised together and neither of us was raised by our father, Alfred Sterling. I didn't meet my brother, Alfred, until we were teenagers. His mother had basically just thrown Alfred away. Since she had rejected him he was looking for a family where he could be accepted. Our father, Alfred Sterling, was not the answer that Alfred was looking for. Alfred tried to make his way into his father's life but Alfred Sterling was a manipulative, mentally abusive man and could not be the father that Alfred wanted and needed.

3. From the first time I met Alfred I did not think there was anything normal about him. He was being introduced to me as my brother and he walked in the house and said, "can I get the keys to the car?" That was very inappropriate when we had just met. As I got to know him better I realized he had no internal monitor. He just blurted stuff out and that made him come across as bold but it was really that anything he thought just came out of his mouth.

4. Alfred was paranoid. He always believed people were doing him wrong. He was a very troubled person.

5. Alfred would get mentally preoccupied. He was there but not there. He would get detached from what was going on around him. Other times he only addressed what was right in front of his face.

6. Alfred was not very smart and did not understand a lot of things. He was limited

in reading and writing. He tried to function and tried to look good. He was able to hide a lot of his inadequacies. He had a way of connecting with people and then those people would do stuff for him that he was unable to do for himself.

7.    Alfred stayed with me in Texas for a while. When he got here he was wearing clothes that were too small for him. He could not cook at all. He could not really function on his own so he started to feed off my life.  He would ride on my accreditation. I helped him with paperwork. I filled out applications for him. His pattern was to just try to look good and hide his failings, then he could connect with someone who could help him function so that he could continue to try and feel less inferior to everyone else. There were other people at other times that filled this role for Alfred.

8.    At times Alfred let down his guard with me. At those times I could see how really messed up and troubled he was.   He told me once that when he got hurt and angry he could not help but lash out at the person. He said once he hit a person one time he would see darkness and then could not control himself. He was better off when he was off driving his truck by himself. That is why he would stay out on the road for weeks at a time. I told Alfred to get help.

9.    No one working on Alfred's behalf ever asked me about the things in this affidavit prior to Alfred's trial. I would have told them and I would have been willing to testify for Alfred if I had been asked.

10.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Claudia Mitchell

Dated: 9/16/07