IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
          PLAINTIFF,             *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    MARCH 19, 2008
                                 *    1:14 P.M.
          DEFENDANT.             *
                                 *
* * * * * * * * * * * * * * * * * *


          TRANSCRIPT OF TELEPHONE CONFERENCE

     BEFORE THE HONORABLE JANIS GRAHAM JACK
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:         MS. PATTI HUBERT BOOTH
                            OFFICE OF THE U.S. ATTORNEY
                            800 NORTH SHORELINE, SUITE 500
                            CORPUS CHRISTI, TEXAS 78401

                            MR. TONY R. ROBERTS
                            OFFICE OF THE U.S. ATTORNEY
                            P. O. BOX 61129
                            HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:             MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
       CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (Continued)


FOR THE DEFENDANT:         MR. MICHAEL WISEMAN
                          OFFICE OF THE FEDERAL PUBLIC DEFENDER
                          601 WALNUT STREET
                          THE CURTIS CENTER, SUITE 545
                          PHILADELPHIA, PENNSYLVANIA 19106

                          MR. VICTOR JULIO ABREU
                          OFFICE OF THE FEDERAL PUBLIC DEFENDER
                          1701 WEST HIGHWAY 83, SUITE 405
                          McALLEN, TEXAS 78501

(The proceedings began at 1:14 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  This is Patti Hubert Booth for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. WISEMAN:  Good afternoon, Your Honor.  It's Michael Wiseman and Victor Abreu for Mr. Bourgeois.

THE COURT:  All right.  You filed a motion for Mr. Bourgeois, Mr. Wiseman, and I sent it, I made a notice to send it to Ms. Booth to respond, because even though apparently it was noted as unobjected to, there was some history there that I wanted to make sure we didn't miss.

MR. WISEMAN:  Yes.

THE COURT:  And so I didn't know if you still wanted to have your motion heard, and if so, that's what we're doing now.

MR. WISEMAN:  Yeah, I was actually just -- this is Michael Wiseman, for the record.  I was just explaining to Mr. Roberts and Ms. Booth that we didn't know quite as much as we probably should have when we filed the motion.  And I was hoping to lay that out.  The bottom line is I did have a couple of points I wanted to make --

THE COURT:  Sure.

MR. WISEMAN:  -- and some alternative suggestions.

As I indicated in our motion, Mr. Bourgeois, when I visited him in January, was on a hunger strike, and his counselor came in with a copy of the orders in question and asked me if I could intervene in some way to get Mr. Bourgeois to start eating again.  So I discussed it with him.  And long story short, I promised to file this motion in consideration for him eating again, and that seemed to do the trick at the time.

And we do understand now that there's a little bit more to this than we had initially appreciated, and you know, that the proposal we had set forth that we review his correspondence had actually been rejected by the Court pretrial.

My understanding is that since we filed the motion, the BOP has moved Mr. Bourgeois to a completely isolated area. He used to be amongst other prisoners.  So at this point, he's not only not getting incoming or outgoing mail, but he's not even around other people.  And you know, that's pretty, a pretty tough way to go, even for --

THE COURT:  Well, where is he?  Is he in that -- Mr. Wiseman, is he in that new federal death row deal?

MR. WISEMAN:  Yes, he is.  He's in Terra Haute, and he's in the Special Confinement Unit.  My understanding, and

it's a rough one, is that there are certain parts of it that are more or less isolated.  He used to be amongst some other prisoners.  Now he's completely isolated.

I don't know this for sure, but I think what happened was -- and we did do some research on this, it's not an area we have to get into too often -- but we were looking what the Court's authority was as well as the BOP's authority.  And the bottom line seems to be that the BOP actually can do all the things we're complaining of, whether Your Honor ordered it or not.  So your order is more of a recommendation to them, which they take into consideration in addressing what conditions of confinement are appropriate.

I think what happened, I don't know this for a fact, but what I think happened is after we filed the motion, they went back and looked at it and decided, oh, he was in isolation pretrial, so he should be in isolation now.  So our efforts at helping him have actually put him in a, or our attempt to help him have put him in a worse position than he was in before we started poking around.

So what we would propose at this point is to file -- he was in isolation pretrial because there were prisoner witnesses against him who he apparently threatened.  Since he is no longer --

THE COURT:  No, no, no.  No, no, no.

MS. BOOTH:  That's not the only reason.

THE COURT: There were witnesses, there were witnesses that he threatened. And it was -- the concern was, because his brother was on the outside and he was on the inside, that there were some witnesses that were concerned. And in fact, one of them was murdered, and one of them had her house burned down the night before she testified.

MR. WISEMAN: Right. I --

THE COURT: So whether there's any connection, I don't know, and I never found there to be. But I'm just saying --

MR. WISEMAN: Right.

THE COURT: -- there were legitimate concerns --

MR. WISEMAN: Yeah.

THE COURT: -- about keeping him in isolation.

MR. WISEMAN: We understand that. And it certainly is a legitimate concern. What I was trying to articulate was that he has no prisoners around him who he has any interest or any motive at this point in threatening, because they're not related to his case.

So what I was going to suggest was if the Court would consider ordering or recommending, or however way the Court would want to do it, that there's no longer a need to keep him isolated from other death row prisoners, and at the same time address the mail as follows: We don't see, you know, even though we don't have the history Your Honor does, we don't see

any threat with him receiving mail.  In other words, if he gets mail from --

THE COURT:  I agree with you.  I don't think I have any problem with his receiving mail.

MR. WISEMAN:  Okay.

THE COURT:  The problem came when I messed up an order early on.

MR. WISEMAN:  Uh-huh.

THE COURT:  I thought I had made it clear that he was to correspond only through his attorneys, and meaning that if they thought the correspondence was all right, they could forward it.

MR. WISEMAN:  Right.

THE COURT:  And what happened was, they mis-understood.  And so Mr. Bourgeois was sending envelopes sealed and addressed inside envelopes --

MR. WISEMAN:  I see.

THE COURT:  -- to his attorney.

MR. WISEMAN:  And they weren't reading it.

THE COURT:  And those witnesses, I think, were contacting the U.S. -- those people that -- somehow there were witnesses that contacted the AUSA that said, you know, we are receiving these communications somehow.

MR. WISEMAN:  Uh-huh.

THE COURT:  One of them, I think, Ms. Booth, was the

brother -- was it Lloyd Bourgeois?  Is that his name?

MR. WISEMAN:  From -- yeah, Lloyd.  Right.

THE COURT:  He was driving around one of the witness's houses frequently, that kind of thing.

MR. WISEMAN:  Yeah, yeah.

MS. BOOTH:  Judge, just one more thing for the record.  One of the -- I tried to have my FBI Agent here, but she's out digging for a body.  One of the witnesses, which was his cousin, called us and said, "Look, I'm afraid that he's going to kill me.  I'm frightened," who had agreed to testify.  Well, the next day they find her dead in her house.

Now, that is separate.  That is separate and apart from his, the woman that had his child who was stabbed 37 times by someone in the, a Black Knight prison gang.  And that is separate and apart from the house that burned down.  So there were several things happening on the outside.

THE COURT:  While he was on the inside.  I think that was the point.

MS. BOOTH:  Right.  Right.

THE COURT:  And there was a legitimate concern at least to restrict that correspondence.  And it was such a concern actually that he was moved into the federal courthouse, which doesn't have those kind of accommodations.

MR. WISEMAN:  Right, right.

THE COURT:  For the entire time of the trial.  And so

the Marshals were with him 24/7, but he got fantastic food. They had, you know --

MR. WISEMAN:  Right.

THE COURT:  And I think he was very -- he was in better circumstances than he would have been in a county jail.

MR. WISEMAN:  Yeah.  Well look, I, you know, none of us on this end are, you know, in a position to, you know --

THE COURT:  You're not in a position to guarantee. That's the problem.

MR. WISEMAN:  Yeah, dispute or guarantee, you know. So we're just trying to figure out a proposal that would, you know, give him some relief from this complete isolation.

And just as an example, his father passed away recently, and he found out from us, because a relative couldn't even send him notice of that.  So I mean, just that kind of basic communication with some people, one-way communication, that is, allowing him to receive mail.

So if he can receive mail from people who want to write to him, and he can't write back, I mean, I think that would, you know, at least in my mind, obviate any concerns about threats.

And then I would propose that as far as commercial mail, in other words, if he wants to, you know, send away to religious institutions or, you know, educational institutions to take courses or whatever, that there really, I don't see any

reason for there to be any limits on his incoming or outgoing commercial mail.  And that's, you know --

MS. BOOTH:  On the religious, there is a problem.

MR. WISEMAN:  Oh, okay.  What would that be?

MS. BOOTH:  Well, the problem is, and I can't put my finger right now on the name of the people, but there, he was trying to do something through a pastor type situation, trying to do -- and I don't, I can't remember right now exactly what it was, but he had figured out a way to manipulate it that way. And we have some letters somewhere --

MR. WISEMAN:  Uh-huh, uh-huh.

MS. BOOTH:  -- that deal with that --

MR. WISEMAN:  Okay.

MS. BOOTH:  -- exact issue.

MR. WISEMAN:  I was thinking of religious as like, you know, major known churches or, you know, I'm not talking about some guy who might call himself a pastor.

But you know, maybe the solution to this would be if there are some specific folks that we can mutually identify that could cause problems, we'll just, you know, tell the BOP, don't let him receive or send mail to those folks, you know, rather than just making it this global, you know, he can't communicate with anyone.  Because, you know really, I won't go on and on, but it really is just terribly isolating at this point.

We get, you know, we're the only one that he has contact with now. And although we have a significant number of folks working on the case, we don't have time to do all this talking to him, you know. He can go on and on. So we'd like to get a little relief ourselves and get him hooked up with some other folks and distract him a little bit.

So I guess to summarize, the proposal we have is that he not be isolated from other death row prisoners and that he be allowed to receive incoming mail from all the identifiable problematic individuals, and that he be permitted to send and receive commercial mail. And we think that's reasonable and should accommodate any security concerns for folks on the outside.

Judge, that's our position on all this.

THE COURT: Ms. Booth? Mr. Roberts?

MR. ROBERTS: Judge, this is Tony Roberts. I had originally thought that the motion was to be directed at changing the attorneys' names, and only, and that that was the only thing that was going to be, that they were going to do was change that, and I was assured that the Federal Public Defender would do everything the Court instructed them on, on keeping the correspondence, you know, as safe as it was during trial.

So that was the only thing that we really were unopposed to. And it makes sense that obviously if he's got ineffective assistance allegations, that there would be, you

know, direct, that any mail that he sends would go through his current attorneys and not Mr. Gilmore and Mr. Tinker.  So --

THE COURT:  Well, has there been a problem with that?

MR. WISEMAN:  Well, Your Honor -- this is Michael Wiseman.  My understanding, and maybe I'm just confused about it, is that in a pretrial ruling, or pretrial hearing, Your Honor sort of backed off of that idea, because you were concerned that that placed his lawyers in an awkward position of arguably receiving evidence of a crime.  So if Mr. Bourgeois sent us a letter that said, you know, rub out, you know, Mr. X, we would know about it and be under an ethical obligation to do something about it.  And that just opens up all kinds of cans of worms.

So my understanding, and this is, I was explaining to Mr. Roberts before Your Honor got on the phone, we didn't realize that when we made this proposal.  I mean frankly, I think we would be okay with doing that, but I don't think that was something Your Honor was okay with pretrial.  We would be happy to screen his mail and actually read it, and obviously let him know that we're going to be reading it.

THE COURT:  What happened was it put Mr. Gilmore and Mr. Tinker, when we started, I thought we had started a different way, and it turned out that it was not feasible for Mr. Gilmore or Mr. Tinker to do that.

MR. WISEMAN:  Uh-huh.

THE COURT:  They thought they were just supposed to pass through the mail, which made absolutely --

MR. WISEMAN:  Right.

THE COURT:  -- no sense at all.

MR. WISEMAN:  No sense, no, no.

THE COURT:  And so, but you are able to communicate with your client all right.  Is that right?

MR. WISEMAN:  I'm sorry.  I didn't hear you.

THE COURT:  Are you able to communicate with Mr. Bourgeois?

MR. WISEMAN:  Yes, we have been able to communicate with him.

THE COURT:  Okay.

MR. WISEMAN:  That's not been an issue at all for us. This is purely about communicating with others.

THE COURT:  So has, and I don't want to compromise your position with your client, but has he expressed any -- is there somebody in particular he wants to communicate with?

MR. WISEMAN:  The answer is yes.  I don't have names off the top of my head.  I mean, he'd like to communicate with a lot of people.  I could certainly come up with a list if that would be helpful, but you know, I --

THE COURT:  I don't think so.  I think it's just a problem.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  Because of --

MR. ROBERTS:  And if I remember right, the issue that Ms. Booth raised was there was, you know, there were so many different types of communications going out, and if I remember right, there was something to the nature of him --

THE COURT:  Is this Mr. Roberts?

MR. ROBERTS:  Yes.  I'm sorry.

THE COURT:  Okay.

MR. ROBERTS:  Mr. Roberts, yes.  There was something to the nature of him writing to a pastor and saying he wanted to reconcile with his wife or something, and the pastor was very sympathetic about that and actually was trying to contact the wife before.  So it was that kind of a thing where he just --

THE COURT:  Right.  Right.  She went into the witness protection program or something with her child.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And there was -- it's a huge problem.  He was writing to me for a while.

MR. WISEMAN:  Yes.

THE COURT:  I'm sure those letters are in -- you know, trying to locate his wife, because he thought he was being ripped off in the divorce.  I don't think they had any assets.  So he clearly just wanted to find her.

MR. WISEMAN:  Yeah, this is Mr. Wiseman again.  I

mean, you know, we're happy to serve in that role.  And obviously we would read the letters, and we would let Mr. Bourgeois know that we're going to read the letters carefully, and hopefully that would dissuade him from any silliness, but --

THE COURT:  I just, like you say, that puts you in a very awkward position, because --

MR. WISEMAN:  It does potentially, yes.  It does. And --

THE COURT:  And I just don't think -- I appreciate the offer.

MR. WISEMAN:  Yeah.

THE COURT:  And I'm sure Mr. Bourgeois does, but I think it's just an inappropriate thing for you to --

MR. WISEMAN:  Okay.  Well, I just wanted to clarify that.  So I guess we're back then to, you know, my alternative proposal of, you know, allowing certain communications to go through to him, and allowing all commercial communication.

MR. ROBERTS:  I just want to clarify our -- this is Tony Roberts again.  I just wanted to clarify that, you know, in our non-opposition to the motion, it was really just to change the attorneys' names.  And anything that, any role that Mr. Gilmore and Mr. Tinker were playing during trial would now be converted over to the Federal Public Defender's Office, because obviously they're representing him now.  So perhaps it

was my -- I should have probably written a response stating the limitations of our non-objection.

THE COURT:  Okay.  No, then I misread the motion.  I thought it was completely unopposed, and I thought it was a motion to allow him unfettered communication with the outside world.

MR. ROBERTS:  Yeah.  No, Your Honor.  I definitely did not agree to that.  The United States would not have agreed to that, based on the history.  And it just, I probably -- when I read the motion, I thought -- and I did read the motion after I got it, and I thought it was, I thought it was clear enough in the sense that we were unopposed in that he was trying to change the roles of the attorneys.  But perhaps I misread it as well.

MR. WISEMAN:  Yeah, and I think -- this is Mr. Wiseman again.  I think the fault lies with us, you know, in that we didn't have good information when we started out.  And we thought that's what we were doing was just substituting the names, but we didn't realize that it was something Your Honor had already rejected earlier.  So the whole thing got off on a bad foot, and I think the blame lies with us.  And again, I apologize to Mr. Roberts and the Court for any of that confusion.

THE COURT:  So what, from the Government, what is your recommendation?

MR. ROBERTS:  Well, Your Honor, Ms. Booth filed a response in accordance with the Court's order, and I really think at this time we're so far removed from Mr. Bourgeois and his situation that I don't see how we could give an informed, an informed position, other than what we wrote and filed in response to the Court.

MR. WISEMAN:  Your Honor, this is Michael Wiseman again.  I mean, I guess I appreciate what Mr. Roberts just said, you know, but the idea is that the initial isolation of Mr. Bourgeois within the County Jail, I thought, was to keep him both from being able to write, but also to primarily keep him away from the prisoners who were going to testify against him.

THE COURT:  No.

MR. WISEMAN:  That's simply not an issue.

THE COURT:  No, no, no.  When he got even further isolated, it was when he tried to hire somebody to allegedly kill some witnesses --

MR. WISEMAN:  Oh, okay.

THE COURT:  -- and work with his brother to do that.

MR. WISEMAN:  I see.  I see.

THE COURT:  And that was another reason.  And that was one of the jailers that was carrying messages back and forth.  So that's what got him finally transferred over to the federal courthouse, because there just seemed to be no way we

could work around this --

MR. WISEMAN:  Yeah, yeah.

THE COURT:  -- incident.  Now, the jury found this to be, I guess, credible, but my concern always was that I didn't find it to be true or not true.  I just found it to be a concern that was worth working with.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  And --

MR. ROBERTS:  Your Honor, there was even one occasion when he put a note, he wrote some information on a court order --

THE COURT:  He did.

MR. ROBERTS:  -- slipped it inside of a Bible -- and this is Tony Roberts again, sorry.  I keep forgetting we're not standing in front of you, Your Honor.  But that he had slipped a note inside of a Bible and asked one of the guards if he could pass the Bible over to another inmate, who had declared to be a part of the Texas Syndicate.  And that was part of the evidence that came out during the sentencing phase, where he was attempting to hire somebody.  He wanted that other prisoner to then send the mail out to his brother.

So that became very disconcerting, because we couldn't even, you know, we couldn't just leave him in the midst of people that actually did have contacts with the outside.

MS. BOOTH:  And the other -- this is Patti Hubert Booth for the United States.  Your Honor, the other, we have letters that we intercepted that he was using another inmate for sending out letters to witnesses.  He wrote the letters, and the inmate had, you know, put his return address and his inmate number, and the letters went out.  And that was another reason we didn't want him around other prisoners, because he's able to manipulate people.  He's one of the smartest and most manipulative prisoners we've ever had in our --

MR. WISEMAN:  Well, Your Honor, I -- Michael Wiseman here. I don't want to, you know, get into a tit-for-tat about how smart he is, because that's a claim in the case.

THE COURT:  Well, I know, I've read --

MR. WISEMAN:  Obviously, we don't agree with that.

THE COURT:  Mr. Wiseman, I read your 2255.

MR. WISEMAN:  Yes, yes, yes.

THE COURT:  And --

MR. WISEMAN:  Right.

THE COURT:  And I'm sure you're aware of the ups and downs of that.

MR. WISEMAN:  Yes.  Well, in any event, you know, I can, you know, the more we go into this, the more regret I have that we brought it up, because it's bringing up all these bad things that happened.  I guess with respect to his isolation, you know, it sounds like the Government has some pretty

legitimate concerns that they've articulated.  I guess then, what about letting him receive mail from people who want to write to him, without allowing him to write back?

THE COURT:  I think, Mr. Wiseman, the best thing I can do --

MR. WISEMAN:  Yeah.

THE COURT:  -- you know, knowing what is going on and the concerns previously, to make sure that the people are protected that need to be protected, is not to enter any change of any kind of order at all.  I'm going to leave whatever it is there.

MR. WISEMAN:  Okay.

THE COURT:  And it's really up to the Bureau of Prisons to make their own determination as to what --

MR. WISEMAN:  Okay.

THE COURT:  -- what he can do and what he can't do.

MR. WISEMAN:  Okay.  Will Your Honor issue an order to that effect then?  Because they may still be acting on their impression of what your position is.

THE COURT:  No, that's -- that order that I entered is still there.

MR. WISEMAN:  Still there, okay.

THE COURT:  And that's what's going to stay there.

MR. WISEMAN:  Okay.  All right.  Well, I appreciate everyone's time in considering this.  Obviously, we felt like

we had to do it.

THE COURT:  You're doing a good job, Mr. Wiseman, both of you.  And you -- well anyway, I think you're doing a fine job for your client.

MR. WISEMAN:  Appreciate that, Your Honor.  Thank you.

THE COURT:  Thank you all very much.

MR. WISEMAN:  Okay.

THE COURT:  You're excused.

(Proceedings concluded at 1:35 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    January 20, 2009
Molly Carter                        Date