# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : |  |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | **Capital Case** |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____

### PETITIONER'S *REPLY* TO RESPONDENT'S *ANSWER* TO MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. SECTION 2241

LEIGH SKIPPER, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated:   Philadelphia, PA
         June 26, 2009

### PRELIMINARY STATEMENT

Petitioner filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. Section 2241* on May 14, 2007 (document #396). It will be referred to as *Petitioner's Motion* and will be cited as *PM* followed by a page reference.

On October 5, 2007 Petitioner filed a *Memorandum in Support* of his *Motion* (document # 402). It will be referred to as *Petitioner's Memorandum* and will be cited as *P-Mem* followed by a page reference.

The Government filed *Respondent's Sealed Answer to Section 2255 Motion, Motion for Dismissal and Brief* on October 15, 2008 (document # 442). It will be referred to as *Respondent's Answer* and will be cited as *RA*, followed by a page reference.

As in *Petitioner's Motion* and *Petitioner's Memorandum* the following citations will be utilized: references to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The opinion of the United States Courts of Appeals rendered on direct appeal <u>United States v. Bourgeois</u>, 423 F.3d 501 (August 25, 2005) will be cited as <u>Bourgeois</u>.

i

Petitioner filed an *Appendix* with *Petitioner's Motion* and a *Supplemental Appendix* with *Petitioner's Memorandum.* They will be cited as *PA* and *SPA*, respectively, followed by citation to particular documents. Along with this *Reply* he files a modest number of additional documents in his *Second Supplemental Appendix*, which will be cited as *SSA*, followed by citation to particular documents.

For ease of reference, the claims for relief discussed herein will be referred to by the same numbers as contained in *Petitioner's Memorandum.*

Alfred Bourgeois will be referred to by name, or as "Petitioner." The United States will be referred to as "the Government."

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

## TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Structure of this Reply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Part One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    Counter-Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.    The Government's General Denial . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    C.    Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        1.    Ineffective Assistance of Counsel and Prosecutorial
             Misconduct Overcome Default . . . . . . . . . . . . . . . . . . . . . . . .  5

        2.    United States Treaty Obligations are Enforceable
             by Mr. Bourgeois in this Litigation to Overcome
             Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        3.    Scope of Appellate Review Under the FDPA is
             Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    D.    The Government's "Concerns Regarding Various
        Documents" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

E.     New Procedural Issue: The Government's Use of Mr. Tinker's Answer to Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Part Two, Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Claims I & II.     Petitioner is a Person with Mental Retardation.  Counsel Ineffectively Failed to Investigate and  Present Mental Retardation and Other Extant Mitigating Factors in Capital Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.     The Correct Standard for Adjudicating Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1.     Strickland Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.     The Government's Assertion that "Strickland does not Impose a Constitutional Requirement that Counsel Must Uncover Every Scrap of Evidence that Could Conceivably Help their Client" Is Incomplete and Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.     Petitioner's Alleged "Lie" about Suffering a Brain Injury did not Justify Counsels' Failure to Present Evidence of Petitioner's Impaired Intellectual Functioning or Cognitive Deficits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.     Contrary to the Government's Assertions, the Flynn Effect is Valid and Widely Accepted . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D.     Petitioner Possesses Adaptive Deficits . . . . . . . . . . . . . . . . . . . . . . . 26

E. Counsels' Alleged Tactic – To Obtain Evidence of Petitioner's Childhood Abuse Through Dr. Estrada – Failed Miserably, and Counsel Failed to Regroup . . . . . . . . . . . . . . 29

F. Failure to Call Dr. Holden at the Penalty Hearing . . . . . . . . . . . . . 31

Claim III. No Reasonable View of the Evidence Existed upon Which a Rational Fact Finder Could Conclude That the Fatal Injuries Were Inflicted Within the Special Maritime and Territorial Jurisdiction of the United States in Violation of Due Process.  Furthermore, Counsel Were Ineffective for Failing to Litigate this Claim and to Present Readily Available Evidence to Rebut this Element of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A. The "Ignored" Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . 40

Claim IV. Trial Counsel Were Ineffective for Failing to Present Available Expert Testimony  That Would Have Undermined the Government's Assertion That Petitioner's Semen Was Found in JG-1999's Anus, and that Petitioner Sexually Abused Her, in Violation of Mr. Bourgeois' Rights under the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A. Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1. The alleged "semen" evidence . . . . . . . . . . . . . . . . . . . . . . . 42

v

a. Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

b. Availability of Other Expert Testimony on this Point . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2. The alleged evidence of vaginal and anal trauma . . . . . . . . 51

B. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

C. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Claim V. Trial Counsel Rendered Ineffective Assistance by Failing to Litigate a <u>Daubert</u> Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Senn and Dr. Chrz Concerning the Bite Mark Evidence and the Digital Enhancements of the Bite Mark Photographs and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Claim VI. Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Litigate a <u>Daubert</u> Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Oliver Concerning the Digitally Enhanced Autopsy Photographs and for Failing to Object to Their Admissibility and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Claim VII.   The Government Violated its Obligations under
             Brady V. Maryland by Failing to Disclose to Petitioner
             Information Material to His Ability to Prepare and Present a
             Defense at Trial and Sentencing Denying Petitioner His Rights
             under the Fifth, Sixth and Eighth Amendments to the United
             States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

      A.    The Improper Suppression of Evidence . . . . . . . . . . . . . . . . . . . . . 89

      B.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Claim VIII.  Petitioner Is Entitled to Relief from His Conviction and
             Sentence Because Trial Counsel Labored under a Conflict
             of Interest That Adversely Affected Their Representation
             of Petitioner at Trial and Sentencing, in Violation of
             Petitioner's Sixth Amendment Right to Counsel . . . . . . . . . . . . . 101

Claim IX.    Prosecutorial Misconduct in Closing Argument at
             Both the Guilt/Innocence and Penalty Phases Denied
             Petitioner His Constitutional Right to Due Process and His
             Rights under the Sixth and Eighth Amendments to the
             United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

      1.    The Prejudicial Effect of the Prosecutor's Remarks . . . . . . . . . . . 106

      2.    Cautionary Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

      3.    The Strength of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

### STRUCTURE OF THIS REPLY

*Respondent's Answer* makes many points for which a response is not necessary. Petitioner responds only to those points which are relevant to the resolution of the issues before the Court, and in so-doing, avoids argument for argument's sake.

Generally, the Government asserts procedural arguments and substantive points. Accordingly, this *Reply* is divided into two primary *Parts*. In *Part One*, Petitioner responds to the Government's procedural arguments and arguments unrelated to the merits of his substantive claims.

*Part Two* addresses Petitioner's *Claims for Relief.* In its discussion, the Government has chosen to rearrange Petitioner's *Claims*, separating those related to ineffectiveness from substantive issues. Petitioner herein reintegrates the discussion and uses the same claim numbers as used in *Petitioner's Memorandum*.

### ARGUMENT

### PART ONE

**A.    Counter-Statement of the Facts.**

Petitioner has pled and proffered specific facts and expert opinions in support of his claims. Pretending as if those facts either do not exist or are of no consequence, the Government devotes over one-third of its *Answer* (50 pages of its 143 page document) to a detailed recitation of the trial facts. See *RA*, 7- 58. While

1

these facts are of interest, this stoic and lengthy recitation, which fails to connect the trial facts to the Petitioner's post-conviction allegations, has much the same force as one hand clapping, and adds little to the resolution of the issues before the Court. Petitioner fully expects to prove all of his allegations at a hearing. With those allegations proven, the Government's factual recitation becomes nothing more than a testament to trial counsels'[1] ineffective representation. Effective counsel would have been able to present a strong counter to the Government's facts in both the guilt and penalty phases.

As Petitioner alleges and as he will prove, Petitioner is a victim in his own right. He is a victim of horrendous childhood abuse, and its durable psychological scars. He is a victim of brain dysfunction. He is victim of unrelenting mental health impairments. He is a person with mental retardation, and at least, he is in the borderline range of intellectual functioning. He did not sexually abuse the victim in this case, as the Government's scientific presentation regarding semen and sexual trauma were illusory. The bite marks found on the victim cannot be traced to Petitioner with certainty any greater than guess work. There is a significant likelihood that he is not the killer or did not kill alone. And, there is no question but

---

[1]Petitioner throughout refers to trial counsel in the plural, recognizing, however, that many of the decisions, errors or omissions alleged may actually be attributable separately to either Mr. Tinker or Mr. Gilmore.

2

that – whoever was the killer – the fatal injury occurred outside of the jurisdiction of the federal government, and this prosecution should not have been brought in this Court, as a matter of law.

Ultimately, Petitioner was the victim of poor lawyering. Petitioner does not make that charge lightly, but as he trusts the Court and hopefully even the Government will see, despite their sterling and well-deserved reputations as highly skilled and qualified counsel, Mr. Gilmore and Mr. Tinker dropped the ball in this case.

**B.    The Government's General Denial.**

In a short paragraph the Government asserts a "denial" to "each and every allegation of fact" asserted by Petitioner, except those "supported by the record;" and "demands strict proof thereof." The Government "objects" to the expert opinions presented by Petitioner, absent an opportunity to test them against Daubert. *RA*, 6.

Initially, the Government's general denial of all alleged facts is of little utility. See, Provident Life and Accident Insurance Company v. Goel, 274 F.3d 984, 994 (5th Cir. 2001) ("a general denial in an original pleading is insufficient to create issue of material fact"); Joe Regueira, Inc. v. American Distilling Company, Inc., 642 F.2d 826, 831 (5th Cir. 1981) ("general denial insufficient to overcome specific affidavits"); Landry v. Two R. Drilling Company, 511 F.2d 138, 141, n.2 (5th Cir.

3

1975) (general denial "insufficient to join issue").

Nonetheless, Petitioner does not and has not requested summary relief and therefore at most the Government's general denial of all facts militates in favor of the Court conducting an evidentiary hearing on a number of the issues pled by Petitioner. Petitioner will shortly file a formal motion seeking a hearing on all issues for which there is a dispute of material facts.

Petitioner's to-be-filed request for a hearing will also dispose of the Government's demand for "strict proof," as Petitioner fully intends to prove every fact he has pled. The hearing will also dispose of the Government's "objection" to the expert opinions proffered with his *Motion*. Again, Petitioner intends to present each expert who has proffered an opinion and will demonstrate at a hearing that each opinion not only is <u>Daubert</u>-worthy, but is incontestable.

## C.    **Procedural Default.**

The Government asserts that Petitioner's claims are procedurally defaulted because they could have been raised on direct appeal but were not. *RA*, 60-62. Petitioner is not entirely certain how to untangle the Government's presentation on procedural default, however he discerns the following three points that merit discussion.

**1. Ineffective Assistance of Counsel and Prosecutorial Misconduct Overcome Default.**

Each claim presented in *Petitioner's Motion* sounds in either ineffective assistance of counsel or due process violations owing to prosecutorial suppression of exculpatory information. As the Government appears to acknowledge, ineffective assistance of counsel overcomes any procedural default. See *RA*, 61-62 (acknowledging that generally ineffective assistance of counsel can establish "cause and prejudice" sufficient to overcome a default); Murray v. Carrier, 477 U.S. 478, 488 (1986) ("if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not conduct trials at which persons who face incarceration must defend themselves without adequate legal assistance.").

Although the Government does not acknowledge it, prosecutorial suppression of exculpatory information provides "cause" that overcomes procedural default. See Strickler v. Greene, 527 U.S. 263, 283 (1999) ("As we explained in Murray v. Carrier . . . it is just such [suppression of exculpatory evidence that] ordinarily establish[es] the existence of cause for a procedural default."); Banks v. Dretke, 540 U.S. 668 (2004). Thus, to the extent Petitioner did not previously raise the due process/prosecutorial suppression claims at trial or on direct appeal, the

Government's suppression of the exculpatory evidence provided "cause" for the ostensible default.

As to the "prejudice" prong of the "cause and prejudice" test, it is clear that the prejudice analysis is coextensive with Brady v. Maryland, 373 U.S. 83 (1963) materiality.  Banks v. Dretke, 540 U.S. at 698.  Thus, if Petitioner demonstrates that the suppressed evidence was material either as to guilt or penalty, he establishes "prejudice" for overcoming the default.

### 2.  United States Treaty Obligations are Enforceable by Mr. Bourgeois in this Litigation to Overcome Procedural Default.

In response to Petitioner's assertion that United States international treaty obligations require that this Court overlook any procedural defaults and reach the merits of claims in this capital litigation, the Government contends that these treaties do not vest enforceable individual rights upon Mr. Bourgeois.  *RA*, 62-65.  The Government relies on two Courts of Appeal opinions.  See id., citing United States v. Zabaneh, 837 F.2d 1249, 1261 (5th Cir. 1988) and United States ex rel. Saroop v. Garcia, 109 F.3d 165, 168 (3rd Cir. 1997).

In addition to the contrary authorities and arguments set forth in *Petitioner's Memorandum*, *P-Mem*, 3-5, the Government overstates its position.  Although it cites

Sanchez-Llamas v. Oregon, 548 U.S. 331, 342 (2006),[2] it neglects to mention that while the Court declined to resolve the question whether the petitioners were granted enforceable rights under Article 36 of the Vienna Convention, four members of the Court believe that the treaty **did** provide petitioners with such enforceable rights. While the government argued in Sanchez-Llamas that there is a "long-established presumption that treaties and other international agreements do not create judicially enforceable individual rights[,]" Id. at 377, Justice Breyer, joined by three other Justices, went further than the majority and explicitly rejected that position: "the Head Money Cases make clear that a treaty may confer certain enforceable 'rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other.'" Id. (J. Breyer, dissenting) (citing Head Money Cases, 112 U.S. 580, 598-99 (1884)).   Justice Breyer concluded that the Vienna Convention is such a treaty. Id.

Thus, this is very much an open question, and should this Court not find ineffective assistance of counsel or governmental misconduct sufficient to establish

---

[2]The citation and discussion to Sanchez-Llamas is inapposite to the question here. In Sanchez-Llamas the question of the treaty obligation was itself not presented to the state courts, and therefore it was found procedurally defaulted. Thus, rather than standing for the broad proposition asserted by the Government, in reality, it stands only for the routine habeas corpus proposition that claims not presented to a state in accordance with its rules are defaulted from consideration in federal habeas corpus proceedings.

"cause and prejudice," it should apply the cited treaty obligations to overcome any default.

The Government's "no enforceable individual rights" argument also lacks force as it is supported only by extradition cases, which are quite different from the rights at issue here. *RA*, 63. In those cases, the defendants challenged the jurisdiction of federal courts to try them because they had been abducted from foreign countries by federal officials allegedly in violation of applicable extradition treaties. See e.g. Zabaneh, 837 F.2d at 1261, Chapa-Garza, 62 F.3d 118, 120 (5th Cir. 1995). In these cases, the courts rejected the defendants' claims, relying on long-standing principles holding that the misconduct of a law enforcement official in bringing a suspect to trial is not grounds for dismissing a case. The principle, known as *male captus bene detentus* (improperly arrested, properly detained), was first adopted in the United States in Ker v. Illinois, 119 U.S. 436 (1886).[3] Thus, those cases relied upon by the Government are distinguishable as each rested on a different basis for finding no

---

[3]In that case, the U.S. Supreme Court held that a United States citizen who was abducted by a federal official from a foreign country for trial in a state court could not challenge his indictment or conviction on the ground that he was improperly brought within the jurisdiction of the court. The *male captus bene detentus* rule was affirmed, most recently, in United States v. Alvarez-Machain, 504 U.S. 655 (1992), a case involving an abduction by United States officials in violation of an international treaty provision prohibiting such conduct. The same rule was followed in Attorney-General of the Government of Israel v. Eichmann, 36 I.L.R. 5 (Jm. D.C. 1961) (Isr.).

cause of action for a treaty violation.[4]

### 3.    Scope of Appellate Review Under the FDPA is Irrelevant.

In a rather odd argument, the Government asserts that because of the expansive appellate review conducted by the Court of Appeals in a capital case, it has reviewed and rejected all substantive claims contained in *Petitioner's Motion*.    The Government goes on to say that such review precludes section 2255 review because the claims are previously litigated.  *RA*, 65-66.

This argument fails.  First, the bulk – if not all – of Petitioner's claims were not apparent from the record reviewed on direct appeal.   These claims of ineffective assistance of counsel and Government suppression of exculpatory evidence, are based

---

[4]Even within the context of extradition, international treaties have been held to be a basis for asserting individually enforceable rights.  For example, courts have held that under the doctrine of specialty, an extradited criminal defendant has standing to challenge his trial for an offense for which he was not delivered up by the asylum country.  See United States v. Thirion, 813 F.2d. 146, 151 (8th Cir. 1987) (rejecting as "without merit" the argument that an extradited individual lacks standing to challenge a violation of an extradition treaty), United States v. Diwan, 864 F.2d 715, 721 (11th Cir. 1989) (stating that "the extradited individual . . . can raise only those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty") (citations omitted), cert. denied, 492 U.S. 921, 106 L. Ed. 2d 595, 109 S. Ct. 3249 (1989), United States v. Cuevas, 847 F.2d 1417, 1426 (9th Cir. 1988) (stating that "[a] person extradited may raise whatever objections the extraditing country would have been entitled to raise") (citation omitted), cert. denied, 489 U.S. 1012, 109 S. Ct. 1122, 103 L. Ed. 2d 185 (1989). Again, the Government has overplayed its hand.

9

on **extra-record** facts and investigation that were not before the Court of Appeals. Second, even if they were part of the record or were even remotely discernable from the appellate record, the Government's assertion that all record-based claims are procedurally defaulted because they are previously litigated is not the law. Indeed, in the recent decision in Cone v. Bell, 129 S.Ct. 1769, 1781 (April 29, 2009) the Court held that a claim is not barred from section 2254 review based on a state court's contention that it was already presented and reviewed: "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." So, even assuming that the Government's theory of prior review by the Court of Appeals is valid – a dubious proposition at best – this would not preclude merits review of the claim(s) in section 2255 proceedings.

**D.   The Government's "Concerns Regarding Various Documents."**

The Government voices its concern that many of the declarations proffered by Petitioner are "deficient" as they do not comply with 28 U.S.C. § 1746, and therefore could not serve to support or defend a summary judgment motion under Fed.R.Civ.P. 56(e). *RA*, 67-68.

The Government's concerns are misplaced for two reasons. First, Petitioner is not moving for summary judgment, and has never asserted his entitlement to relief

10

based simply on the proffered declarations. Rather, he has always envisioned that these declarations and expert reports would be presented at an evidentiary hearing. See *PM*, ¶ 292 (requesting an evidentiary hearing with respect to "any contested material fact"); *P-Mem*, p. 140-141 (same). Second, even if Petitioner were moving for summary judgment, the alleged deficiencies identified by the Government are illusory. Section 1746 does not require verbatim repetition of the language cited by the Government (*RA*, 68). Rather, the section only requires that the concepts embodied in the statute be communicated "substantially" in the form urged by the Government. Petitioner's documents are in substantial compliance with this statute. In any event, the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, Rule 2 ("The Motion") contains no requirement whatsoever for submission of sworn or unsworn declarations in support of a motion. The Rule simply requires that a prisoner "state the facts supporting each ground" for relief. Petitioner has more than satisfied this requirement. The Government's technical objections do not provide a basis for denying relief as to any claim, and as Petitioner will show herein and in his to-be-filed motion for an evidentiary hearing, he has proffered far more than necessary to obtain a hearing on his claims.

11

**E.    New Procedural Issue: The Government's Use of Mr. Tinker's Answer to Interrogatories.**

Subsequent to the filing of *Petitioner's Motion*, but before the Government filed its *Answer*, it came to Petitioner's counsels' attention that the Government intended to attempt to speak with trial counsel about their representation of Petitioner, *ex parte*. As a result, current counsel wrote to trial counsel to remind them that Petitioner did not waive privileges or confidentiality as to any matter not directly related to claims of ineffectiveness and asking counsel not to speak with the Government until such time as ordered by this Court. See *Letter from Petitioner's Counsel to Trial Counsel*, dated July 17, 2008, attached to *Respondent's Motion Seeking Order for Affidavit from Defense Counsel* (document #435). Petitioner's letter caused the Government to file its *Motion*, which in turn led the Court to convene a telephone conference with the parties and Mr. Gilmore on August 28, 2008.

During that conference Petitioner's counsel proposed that trial counsel be deposed so that current counsel could make objections to any privileged material, thus allowing this Court to supervise proceedings related to privileges and confidences. However, during that conference Petitioner's counsel learned for the first time that Mr. Tinker was gravely ill and that a deposition of Mr. Tinker would

not be appropriate or possible. See Transcript of 8/28/08, 8. In order to do the best it could to preserve Mr. Tinker's testimony, the Court ordered that each side have an opportunity to propound interrogatories to Mr. Tinker. Both sides agreed to that procedure as the best that could be done under the circumstances. Id., at 8-9. The Court also required Mr. Gilmore to complete an affidavit. Id., at 10. The timing for propounding these interrogatories and for submission by Mr. Gilmore of his affidavit were set forth in the Court's order of August 28, 2008 (document # 438).

Pursuant to the Court's order, the Government propounded the first set of interrogatories. Mr. Tinker's responses were filed under seal with the Court on September 22, 2008 (document # 440). The Court's clerk provided copies of this submission to Petitioner's counsel on October 2, 2008 (unnumbered docket entry of October 2, 2008). Petitioner propounded his interrogatories in accordance with the timing set forth in the Court order and filed a notice with the Court that he did so (document # 441) (A copy of *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.* and *Notice of Service* of them, are contained in *SSA*, documents # 72 & 73).

Regrettably, Mr. Tinker's health deteriorated and he was not able to respond

13

to Petitioner's interrogatories.[5]  He since passed away on November 10, 2008.  The

Government has appended both Mr. Tinker's responses to its interrogatories and Mr.

Gilmore's affidavit to its *Answer* as Attachments A & B, respectively.

Through the fault of neither the Court nor the parties, Mr. Tinker's recollection

is only ostensibly preserved in his responses to the Government's interrogatories.

While this is not the fault of anybody, these circumstances disadvantage Petitioner

in that he has not had the same opportunity to obtain answers to his questions that the

Government had to obtain answers to theirs.  Petitioner submits that this presents two

issues for the Court's consideration.

1.    As the Court observed, the interrogatories filed by the Government were

"not too detailed" (Transcript of 10/10/08, 7).  In contrast, Petitioner propounded far

more extensive questions, albeit not as detailed as Petitioner would ordinarily have

desired in view of Mr. Tinker's medical condition.  Given that the Court has only Mr.

Tinker's cursory response to "not too detailed" questions, Petitioner submits that the

Court should not give undue weight to them.

2.    The Government had an opportunity to propound questions that it

---

[5]Mr. Tinker's inability to complete Petitioner's interrogatories was discussed at a phone conference with the Court on October 30, 2008.

believed would lead to evidence supporting its position. Yet, with regard to a number of issues and questions (pointed out within the claim-by-claim discussion, below), it failed to inquire at all, or only superficially. In effect, the Government failed to produce evidence when it had the opportunity to do so. This failure should lead to this Court's drawing of an adverse inference that if the Government had asked it would have received answers unhelpful to its position:

> [T]his circuit has long recognized that a party's failure to call available witnesses **or produce evidence that would clarify or explain disputed material facts** can give rise to a presumption that the evidence, if produced, would be unfavorable to that party. [citing cases]

United States v. Wilson, 322 F.3d 353, 363 (5th Cir. 2003).

**PART TWO**

**CLAIM FOR RELIEF**

**CLAIMS I**

**& II.        PETITIONER IS A PERSON WITH MENTAL RETARDATION. COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE AND PRESENT MENTAL RETARDATION AND OTHER EXTANT MITIGATING FACTORS IN CAPITAL SENTENCING.[6]**

Petitioner's claims that his counsel were ineffective in their failure to thoroughly investigate and present evidence of his mental retardation (Claim I) and his overall mental health impairments, organic brain deficits and traumatic childhood (Claim II), have many points in common. Accordingly, Petitioner addresses these claims together.

The Government's treatment of these claims contains multiple errors of fact, law and reasoning. Petitioner herein addresses the most egregious of those errors.

**A.        The Correct Standard for Adjudicating Ineffective Assistance of Counsel.**

In its general discussion of the law governing evaluation of penalty phase ineffectiveness (including failure to present evidence of Petitioner's mental retardation), the Government makes two significant mistakes, which Petitioner now

---

[6]Because there is significant overlap in Petitioner's responses to the Government's argument in regard to these two claims, Petitioner has combined them for purposes of this Reply.

addresses.

### 1.   **<u>Strickland</u> Prejudice.**

The Governments cites  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993) as

governing prejudice under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984):

> The prejudice prong, however, is more than just an outcome
> determinative test; it requires the petitioner to demonstrate that the result
> of the proceeding was fundamentally unfair or unreliable. "Unreliability
> or unfairness does not result if the ineffectiveness of counsel does not
> deprive the defendant of any substantive or procedural right to which the
> law entitles him."

*RA*, 107, <u>quoting</u> <u>Lockhart</u>, 506 U.S. at 372, and <u>citing</u> <u>Goodwin v. Johnson</u>, 132 F.3d

162, 174 (5th Cir. 1998).

This is in error:  <u>Lockhart</u>'s "unreliability or unfairness" requirement does not

govern <u>Strickland</u> prejudice, as the Supreme Court has stated repeatedly.  In <u>Williams</u>

<u>v. Taylor</u>, 529 U.S. 362 (2000) the Court held that the Virginia Supreme Court's

reliance on <u>Lockhart</u>'s prejudice standard (requiring a petitioner to show "unfairness

and unreliability") was erroneous:

> The Virginia Supreme Court erred in holding that our decision in
> <u>Lockhart</u> [], modified or in some way supplanted the rule set down in
> <u>Strickland</u>. . .  Cases such as . . . <u>Lockhart</u>, do[es] not justify a departure
> from  a  straightforward  application  of  <u>Strickland</u>  when  the
> ineffectiveness of counsel does deprive the defendant of a substantive
> or procedural right to which the law entitles him. In the instant case, it

17

is undisputed that Williams had a right--indeed, a constitutionally protected right--to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

Williams, 529 U.S. at 391, 393.  See also Glover v. United States, 531 U.S. 198, 202 (2001) ("the Seventh Circuit drew the substance of its no-prejudice rule from our opinion in Lockhart . . . our holding in Lockhart does not supplant the Strickland analysis").

Contrary to the Government's assertion, prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).   Such a probability can be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.  Lockhart has no application to prejudice review in this case.

**2.    The Government's Assertion that "<u>Strickland</u> does not Impose a Constitutional Requirement that Counsel Must Uncover Every Scrap of Evidence that Could Conceivably Help their Client" Is Incomplete and Inadequate.**

The Government next asserts that counsel need not conduct a scorched earth policy in search of mitigating evidence, including evidence of mental retardation. *RA*, 113-114.  Notably, the six cases cited by the Government for this proposition all **pre-date** the trilogy of Supreme Court cases which amplify the constitutional requirements for capital counsel to conduct a thorough investigation, initially envisioned in <u>Strickland</u>.    <u>See</u>  <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

The Government's "uncover every scrap of evidence" refrain simply does not respond to the well-recognized imperative that capital counsel must conduct a thorough investigation that cannot be abandoned until it is reasonable to do so. Indeed, the Government's refrain was addressed and rejected in <u>Rompilla</u>.  In <u>Rompilla</u>, the Commonwealth of Pennsylvania sought to excuse counsels' failure to review a prior court file which contained important mitigating evidence, because they had done other investigation:

> At argument the most that Pennsylvania (and the United States as *amicus* ) could say was that defense counsels' efforts to find mitigating evidence by other means excused them from looking at the prior

19

conviction file. . . . And that, of course, is the position taken by the state postconviction courts.  Without specifically discussing the prior case file, they too found that defense counsels' efforts were enough to free them from any obligation to enquire further.

Rompilla, 545 U.S. at 388, 389.  However, the Court explained:

[That such reasoning] is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case.

Rompilla, id.

Thus, the touchstone of reasonable capital preparation and investigation is exactly what is set forth in Strickland – counsel must do what it is reasonable to do, and counsels' so-called strategic choices made in the absence of such thorough preparation and investigation are highly challengeable:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsels' judgments.

20

Strickland, 466 U.S. at 690-91.

**B.     Petitioner's Alleged "Lie" about Suffering a Brain Injury did not Justify Counsels' Failure to Present Evidence of Petitioner's Impaired Intellectual Functioning or Cognitive Deficits.**

Petitioner has an intelligence quotient that has been measured between a high of 75 (Weiner's pre-trial testing) and a low of 70 (Gelbort's post-conviction testing), *PM*, 5. Weiner's result of 75, when adjusted for the Flynn Effect, places Petitioner at an IQ of 68, *PM*, 6 & n.8. Thus, Petitioner's intellectual functioning based on administration of two IQ tests (each of which, as Petitioner will show at a hearing, is a gold standard test) falls in the range of mild mental retardation. Based on Dr. Weiner's testing, counsel had an Eighth Amendment obligation to inquire as to whether Petitioner is a person with mental retardation, and, at a minimum, was obliged to present the IQ score as evidence of borderline intellectual functioning, which the Supreme Court has indicated is, **by itself**, highly mitigating. *P-Mem*, 12 & n.12.

In the same testing, Dr. Weiner provided Mr. Bourgeois with a small number of neuropsychological tests. The most significant finding in that testing was a "significantly impaired" score on the Categories Test. *PA*, document # 16 (Weiner declaration, 1-2). Dr. Weiner noted the significance of this finding in his report to

21

trial counsel and in his post-conviction declaration, specifically noting that this finding was mitigating (id.).

Despite these significant findings of impairment in cognitive functioning and intellectual ability, and the witness' opinion that these findings were mitigating, the Government asserts that counsel made a sound tactical decision not to present these findings because Mr. Bourgeois "lied" when he said that he had been in an accident with a resulting coma, and the Government provided documentation to counsel of this alleged falsehood.  *RA*, 75, 109.

The Government's argument falls utterly flat.  The Government's argument fails to take account of Dr. Weiner's opinion that, "My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage." *PA*, document # 16, 2, ¶ 6.  See also Declaration of Michael Gelbort, Ph.D., ¶ 10 (*PA*, document # 8) (Dr. Weiner's "testing results indicating dysfunction 'stands on their own' . . . I am confident in stating that Mr. Bourgeois' impairments exist, even if the etiology is not completely clear.").

The Government's argument fails to account for the fact that despite the "lie" Dr. Weiner administered an objective test for malingering, which Mr. Bourgeois

22

passed with flying colors.  Therefore, regardless of the etiology of Mr. Bourgeois'

impairments and intellectual deficits, Dr. Weiner's testing shows the existence of

these impairments, and his testing was valid, i.e. not the product of malingering.  Dr.

Weiner specifically reported to trial counsel that he tested Petitioner with the

T.O.M.M. instrument, which is an objective and scientific measure designed to

determine if Mr. Bourgeois was malingering or providing good effort.  Id., ¶ 6.[7]

The Government fails to take into account that, if anything, Mr. Bourgeois was

not faking bad, i.e., malingering, in his pretrial mental health evaluations, but to the

contrary, was attempting to present an untrue, mentally healthy picture of himself.

_____

[7]Mr. Bourgeois' performance on the T.O.M.M. shows that Dr. Kutnick's suggestion that this rather simple – if not mentally retarded – man fooled the tests is way off the mark.  *RA*, 74, 111.  The T.O.M.M. alone shows that he was not malingering.  Moreover, for Dr. Kutnick to be correct, Mr. Bourgeois would have had to be smart enough to know the difference between the T.O.M.M. and the IQ testing and thus know to do poorly on the IQ test, but quite well on the T.O.M.M.  It would also mean that he would have to be smart enough to achieve virtually the same scores (i.e. within the margin of error) on the two IQ tests administered to him years apart (Weiner in 2004 and Gelbort in 2007), while at the same time knowing that he should not score too badly on these IQ tests, in order to allay suspicion that he was faking bad.  For Dr. Kutnick to be correct, he would also have to explain how Mr. Bourgeois knew to do badly only on some of the testing, but not on other testing – such explanation being necessary to account for why he did not tank on all the testing.  While Petitioner imagines it is theoretically possible that Mr. Bourgeois is a diabolical genius who has managed to fool Dr. Weiner, Dr. Estrada and Dr. Gelbort, and all of the testing given to him (some of which is designed and administered for the sole purpose of objectively measuring any efforts at malingering), Petitioner would look forward to Dr. Kutnick's explanation as to how he could achieve this.

23

See e.g. Declaration of Dr. Carlos Estrada, *PA*, document # 7, ¶¶4-5 (indicting how Mr. Bourgeois presented an "idyllic" history which Dr. Estrada did not believe to be accurate). Indeed, Dr. Weiner took account of Mr. Bourgeois' misrepresentations about his history and found them to be relevant to his opinions about Mr. Bougeois. Weiner Declaration, *PA*, document # 16, ¶7.

Finally, the Government fails to take into account that Mr. Tinker ruled out mental retardation well before Dr. Weiner even conducted his testing and before the Government informed counsel of Mr. Bourgeois' lie. *PM*, 17, n.9 (noting that Mr. Tinker ruled out mental retardation months before Weiner's testing). This is another instance of counsel making an ostensible tactical decision without having caused the requisite investigation to be conducted.

In sum, counsels' alleged tactical decision not to present this highly mitigating evidence, **evidence which could have rendered Petitioner ineligible for the death penalty**, was not an informed one. Counsel never spoke to his retained expert about his test results and more to the point about whether the "lie" in any way impacted the reliability of the results. Indeed, both Dr. Weiner and Dr. Estrada have opined that Dr. Weiner should have been called as a witness despite the "lie." Weiner Declaration ¶ 3 (noting that his findings were mitigating); Estrada Declaration, ¶ 17

24

("I was surprised that the defense decided not to call him as a witness, and I was concerned that I could not reference his important findings in my testimony").

## C.    Contrary to the Government's Assertions, the Flynn Effect is Valid and Widely Accepted.

The Government argues that counsel were not ineffective for failing to present evidence of Mr. Bourgeois' mental retardation because his score of 7**6** is above the cutoff for mild mental retardation.[8]  *RA*, 72-73.  In this argument, the Government discounts the Flynn Effect, stating that it is a "controversial theory that is not accepted by many psychologists." *RA*, 74.  This is incorrect.

The Flynn Effect is widely recognized, scientifically valid, and is accepted in forensic matters.  Butler v. Quarterman, 576 F.Supp.2d 805, 815 (S.D.Tex., 2008) (accepts validity of the Flynn Effect); U.S. v. Davis, 611 F.Supp.2d 472, 486 (D. Md. 2009) ("support for the use of the Flynn Effect to adjust IQ scores in the forensic context . . . is widespread.")  Thomas v. Allen, –  F.Supp.2d – , 2009 WL 1353722, at* 15 (N.D.Ala. April 21, 2009) ("[W]hile some psychologists may still ponder the precise cause(s) of the Flynn effect, **no reputable member of the relevant**

---

[8]The Government continues to state that Petitioner scored a 7**6** on Dr. Weiner's IQ testing. *RA*, 72-73.  As noted, however, Petitioner actually scored a 7**5**, but Dr. Weiner erred when he transposed the number from his data to his report.  *PM*, 5, n.4.

25

**professional communities** denies that IQ scores have been increasing at the average rate of 0.30 points a year since the 1930s."); Holladay v. Allen, 555 F.3d 1346, 1358 (11th Cir. 2009) (acknowledging WAIS scores may have been elevated because of the Flynn Effect); Walker v. True, 399 F.3d 315, 322-23 (4th Cir. 2005) (criticizing district court for refusing to consider Flynn Effect and directing the district court to consider its persuasiveness on remand). Neither the Government nor Dr. Klutnick acknowledge or account for these authorities.

**D.    Petitioner Possesses Adaptive Deficits.**

The second prong of the definition of mental retardation requires that an individual have significant limitations in adaptive behavior. The adaptive deficit requirement is designed to make sure that the individual's IQ score is a reflection of a real-world disability. The focus of the clinical inquiry regarding this second prong is to determine whether there are significant things that the individual being evaluated cannot do, that someone without his disability can do. Individuals who have mental retardation – like everyone else – differ substantially from one another. For each person with mental retardation, there will be things he cannot do, but also things he can do. Indeed, one of the fundamental precepts in the field of mental retardation is that "[w]ithin an individual, limitations often coexist with strengths." See *Mental Retardation, Definition, Classification and Systems of Support*, 10th Edition,

26

American Association of Mental Retardation, 2002, (AAMR) at p.1.[9]

Because the mixture of skill strengths and skill deficits varies widely among persons with mental retardation, there is no clinically accepted list of common, ordinary strengths or abilities that preclude a diagnosis of retardation. Thus, the focus in assessing an individual's adaptive behavior must be on deficits in adaptive behavior, rather than strengths.[10]

Ignoring all of this, the Government provides a litany of things that Mr. Bourgeois is capable of doing and based on those strengths, concludes that he does

---

[9] The AAMR was cited with approval in <u>Atkins v. Virginia</u>, 536 U.S. 304, 309, n. 3, n. 5 (2002).

[10] <u>United States v. Davis</u>, 611 F.Supp.2d 411, 475-76 (N.D. Ala. 2009):

The AAMR manual also specified five additional assumptions that should be included as part of the application of the definition of mental retardation. One of these assumptions is particularly salient in the context of this case:

*Assumption 3: "Within an individual, limitations often coexist with strengths.*" This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation. AAMR 2002 at 8.

not have deficits in adaptive functioning. *RA*, 77-78. The Government says that because Mr. Bourgeois operated a truck and car, completed a job application (for a job he did not get because of psychological difficulties), and was able to "callously throw" the victim into the air, he does not possess the requisite deficits. Id. The Government fares no better when it resorts to Dr. Kutnick's opinion that because Petitioner drove a truck, supported himself, and comprehended his legal situation,[11] he is not mentally retarded. *RA*, 79. Clearly, the Government's recitation is not responsive to the requirements of the AAMR.

In any event, to lay some of the Government's arguments to rest, Petitioner has engaged Dr. Victoria Swanson to perform an objective measure of adaptive deficits using a widely recognized and accepted measure, the Vineland-II Adaptive Behavior Scale. She administered this instrument to Beverly Frank, who, after reviewing the background materials provided by counsel, appeared to Dr. Swanson to be a "prime subject to whom to administer" the test. As Dr. Swanson's Declaration indicates, based on the reporting of Ms. Frank, Mr. Bourgeois scored well within the range of mental retardation in this test for adaptive deficits. See Swanson Declaration, *SSA*,

---

[11]This last observation is particularly inapposite, as obviously a person can be mentally retarded and competent to proceed to trial, i.e. comprehend his legal situation. Atkins, 536 U.S. at 317 ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.")

document # 74.[12]

**E.    Counsels' Alleged Tactic – To Obtain Evidence of Petitioner's Childhood Abuse Through Dr. Estrada – Failed Miserably, and Counsel Failed to Regroup.**

The Government argues that counsel had a sound tactic of trying to elicit mitigating evidence through its cross examination of Dr. Estrada. *RA*, 112. While this sounds fine in theory, in practice, it was a terrible failure. And, while such failure would not by itself constitute ineffectiveness, counsel had a chance to regroup, but failed to do so.

Counsels' alleged tactic came to a screeching halt when this Court sustained the Government's objection, thus preventing Dr. Estrada from testifying that Petitioner had an abuse and dysfunctional childhood. *PM*, ¶¶ 58-66. The record demonstrates that faced with the abject failure to adduce the critical evidence of childhood abuse and dysfunction, counsel still had a chance to overcome this problem. He had Dr. Cunningham and Dr. Weiner available, not to mention scores of lay witnesses (see Declarations of lay witnesses contained in *PA*, documents # 17-

---

[12]Dr. Swanson is a career-long expert in diagnosing and providing services to people with mental retardation. Her specific qualifications regarding mental retardation are superior to Dr. Klutnick's, whose curriculum vitae appears to demonstrate no particular expertise in this highly specialized area.

40) all of whom would have testified to the tortuous upbringing that marked Mr. Bourgeois' life.

But, the Government says that this evidence did not exist because Petitioner denied it. *RA*, 112. Yet, any mental health professional worth his or her salt, **including Dr. Estrada, the Government and Court's own witness in this case**, would have testified that such denials from adult victims of childhood abuse are expected, and are easily explained from a clinical perspective. See Estrada Declaration, ¶ 5 (*PA*, document # 7) ("It is not uncommon for even adult victims of childhood abuse to 'deny' that they were abused. This 'denial' phenomenon is largely a psychic defense put up by the victim to normalize the horrors that they suffered. The existence of this phenomenon also makes it particularly important for the mental health practitioner to not rely only on self-reports, particularly in the forensic setting."). Thus, counsel easily could have explained Mr. Bourgeois' denials. The Government's attribution of this tactic to counsel fails.

These facts also rebut the Government's related assertion that "trial defense counsel had no factual basis to inquire or pursue a claim that Petitioner had an abusive childhood other than the speculations of Dr. Estrada." *RA*, 114. This is true except for the 23 lay witnesses and four experts (Cunningham, Weiner, Estrada and Holden) who were prepared to testify to the factual basis.

**F.      Failure to Call Dr. Holden at the Penalty Hearing.**

The Government's response to counsels' failure to call Dr. Holden in the penalty phase is particularly unsatisfying. *RA*, 118.  Nowhere is there support for the proposition that counsel made a tactical decision to not call Dr. Holden because his penalty testimony would have contradicted Petitioner's denial of guilt.  Again, the Government's failure to propound this specific question in its interrogatories speaks loudly.  The Government failed to ask Mr. Tinker why he did not call this witness, and the Government's made-up answer to a question it did not ask, is not persuasive.[13]  As noted above in *Part One*, Section E2, this Court can and should

[13]The Government's failure to ask is contrasted with the specific interrogatory asked of Mr. Tinker by Petitioner's counsel:

16.    The record shows that you proffered the testimony of Professor of Psychology George W. Holden (University of Texas) as a guilt phase witness to establish a defense that Mr. Bourgeois did not kill with premeditation.  PTT 3/1/04, 1-72. The Court denied this application, but suggested that the defense consider calling him at a potential penalty phase. Id., at 74 (attached as Exhibit C).  You had previously alerted the Court that you were considering calling him in the penalty phase.  PTT 10/20/03, 11-12 (attached as Exhibit D).

In view of Dr. Holden's potential testimony that "the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions" (Holden Declaration, Exhibit 11, Petitioner's Appendix), please describe your tactical or strategic reason for not calling him as a witness in the penalty phase of trial.

*Petitioner's Interrogatories Directed to Douglas Tinker, Esq., SSA*, document # 72,

31

draw an inference against the Government for failing to pursue this inquiry.

The Government's made-up tactic – that Holden was contrary to Petitioner's denial of guilt – is true in virtually all capital penalty phases. The Eighth Amendment does not require presentation of mitigating evidence only when a capital defendant admits his guilt. Rompilla v. Beard, 545 U.S. 374 (2005) makes this point quite clearly:

> Rompilla's sentencing strategy stress[ed] residual doubt [as to his guilt] . . . five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man. Rompilla's 14-year-old son testified that he loved his father and would visit him in prison.

Rompilla, id., at 378, 386. Despite this on-going insistence that Rompilla was innocent, the Supreme Court had no difficulty in finding counsel ineffective for failing to investigate and present mitigating evidence which would "have destroyed the benign conception of Rompilla's upbringing" id., at 391.[14]

---

at 4.

[14]Rompilla also puts to rest the Government's related point that counsel had a good reason not to present Petitioner's Borderline Personality Disorder, which it contends was contradictory to his guilt phase defense. *RA*, 109.

32

**CLAIM III.    NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A RATIONAL FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS.  FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM AND TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

The Government concedes, as it must, that under the federal murder statute (18 U.S.C. § 1111), it had the burden at trial of proving that the fatal injury was inflicted on the grounds of the Corpus Christi Naval Air Station.  See *RA*, 81.  The Government also does not dispute the report of its own trial neuropathologist, Dr. Kathleen Kagan-Hallet, which clearly and unequivocally stated that the fatal injury was ten days old, and therefore could not have been inflicted on the grounds of the Naval Air Station.  The Government also does not even attempt to identify any strategy (reasonable or unreasonable) that would justify defense counsel from not using this report at trial. This is discussed in Section "B," below.

Instead, the Government attempts to address the compelling impact of Dr. Kagan-Hallet's report by relying on other evidence which it contends Petitioner has ignored.  However, as demonstrated, Petitioner has not ignored this evidence.  To the contrary, he has discussed it, and as that discussion shows, none of this evidence even addresses, much less militates against Petitioner's salient point: Dr. Kagan-Hallet concluded that the fatal injury was struck ten days before the victim's death on the

33

day the family arrived at the Naval Air Station, and therefore there was no federal jurisdiction.

Under a sufficiency of evidence analysis, the Government's evidence and all reasonable inferences must be taken as true. Jackson v. Virginia, 443 U.S. 307 (1979). Without conceding the validity of the Government's evidence, application of this test shows that Petitioner engaged in a course of assaultive conduct. However, in order to prove the jurisdictional element, the Government was obliged to prove beyond a reasonable doubt where the fatal injury was administered. The Government's *Answer* misses this point. It relies on evidence showing a pattern of assaults and injuries. However, nowhere does the Government rebut Petitioner's two primary points: 1) the fatal injury did not occur on federal lands and therefore the Government did not prove federal jurisdiction; and 2) counsel were ineffective for failing to present the evidence conclusively demonstrating the lack of jurisdiction.

### A.     The "Ignored" Testimony.

The Government contends that Petitioner has ignored the trial testimony of: AB-1994, Dr. Rouse, Dr. Akhtar, Dr. Kuffel, Robin Bourgeois and Petitioner. For the following reasons, these arguments are factually inaccurate.

**AB-1994.**  First, the Government argues that Petitioner "wholly ignores" the

testimony of AB-1994. *RA*, 81, 121. This is simply incorrect. Petitioner specifically addressed the testimony of AB-1994 – as it relates to this claim – in both *Petitioner's Motion* and *Petitioner's Memorandum*. In fact, as Petitioner explained, AB-1994's testimony is exactly what makes trial counsels' failure to introduce Dr. Kagan-Hallet's report so egregious and constitutionally deficient.

Specifically, Petitioner argued: the Government's theory as to when the fatal blows were inflicted rested solely on the testimony of AB-1994;[15] AB-1994 did not testify that the fatal blows were struck on the Naval Air Station base;[16] AB-1994's credibility was always in serious question since this child-witness gave several different accounts as to what happened on the Naval Air Station;[17] that for several months AB-1994 insisted that petitioner never struck the decedent but rather insisted the decedent had fallen from the truck (TT 3/5/04, 56); and, finally that there were several witnesses readily available to testify that AB-1994 had a well known reputation for fabrication.[18]

Clearly, the Government's contention that Petitioner "wholly ignores" AB-

[15]See *PM* at ¶¶110, 117, 118; *P-Mem* at p. 28.

[16]*PM* at ¶110, *P-Memo* at p. 28.

[17]*PM* at ¶117.

[18]*PM* at ¶116.

35

1994's testimony is simply wrong.  Instead, the testimony of AB-1994 is at the heart of this claim.  Her testimony is what makes counsels' failure to present the scientific evidence concerning the time and location of the infliction of the fatal injury constitutionally deficient.  Furthermore, there can be no doubt that defense counsel knew it was critical to discredit AB-1994 in the eyes of the jury.  It is clear from counsels' cross-examination of AB-1994 (TT 3/5/04, 53-56) and their closing arguments (TT 3/16/04, 24-45), that they were urging the jury to discredit AB-1994 and specifically her testimony concerning what took place on the Naval Air Station base.  What better way to do so than to present the **Government's own** scientific expert evidence showing that this witness was wrong?

And, quite aside from any issue related to AB-1994's credibility, even assuming that her testimony clearly showed that Petitioner assaulted the victim on the grounds of the Naval Air Station, this child-witness (nor any lay witness for that matter) was not competent to testify as to which of the blows was fatal.  In this case, with so many alleged assaults, that conclusion required scientific expertise.

There is no reason why counsel –  in possession of the Government's own expert report that unequivocally stated that the fatal injury was 10 days old  – would not use that scientific evidence to impeach the ever changing story of AB-1994 and to rebut, if not eviscerate, the element of jurisdiction.

36

**Dr. Rouse.**   The Government contends that Dr. Rouse testified that there were "recent injuries with 'fresh hemorrhage'" and that she "averred that her findings regarding when the injuries occurred were consistent with the severe injuries occurring on June 27, 2002." *RA*, 83.  This is partially correct, but misses the point.

Dr. Rouse did testify that she observed "recent" bruises and "fresh hemorrhage."  However, all of these injuries were located on the scalp and **were not** fatal.  TT 3/8/04, 14-15, 19-20.  Dr. Rouse clearly and unequivocally testified that the scalp injuries **"did not result in the death."** Id. at 20.  Rather, she testified the injury "within her brain"  the "subdural hematoma" (below both the scalp and the skull) is "what actually resulted in her death."  Id. at 21.  It is this wound – the right subdural hematoma – that Dr. Kagan-Hallet determined was approximately 10 days old.  Not surprisingly, the prosecutor never asked Dr. Rouse about Dr. Kagan-Hallet's findings.

The Government also argues that Dr. Rouse "averred that her findings regarding when the injuries occurred were consistent with the severe injuries occurring on June 27, 2002." *RA*, 83.   This is simply not true.  The Government provides no page citation for this alleged "averment" by Dr. Rouse and for good reason – it does not exist.

**Dr. Akhtar and Dr. Kuffel**.  The Government argues that the testimony of

37

both Dr. Akhtar and Dr. Kuffel "was consistent with a finding that JG suffered the life-threatening injuries on June 27, 2002." See *RA*, 83. Unfortunately for the Government, the testimony of these doctors had nothing whatsoever to do with the timing or location of the infliction of the fatal injury.

Dr. Akhtar was one of the emergency room physicians who treated the decedent on June 27-28, 2002. Dr. Akhtar was never asked, nor did he opine, as to the timing of the infliction of the fatal injury. He did, however, testify that the CT scan revealed that the decedent had a severe brain injury. TT 3/9/04 at 96-97. It is this severe brain injury that Dr. Kagan-Hallet determined was 10 days old.

Dr. Kuffel, an ophthalmologist, performed a posthumous examination of the decedent's retina. Dr. Kuffel was never asked, nor did he opine, as to the timing of the infliction of the fatal injury. He did, however, testify that his examination revealed that the blood behind the decedent's eyes could have been caused by a subdural hematoma. TT 3/8/04 at 88-91. It is this very same "subdural hematoma" that Dr. Kagan-Hallet determined was 10 days old.

**Robin Bourgeois.** The Government also argues that the fatal injuries must have been inflicted on the Naval Air Station base because Robin testified that the family had stopped in Louisiana – and there was no evidence or indication that the

decedent "had suffered any fatal injury prior to them arriving or departing from their Louisiana residence." RA, 83-84. Initially, this argument fails because, as with AB-1994, it pits lay testimony as to cause and time of death against scientific evidence as to cause and time of death.

Additionally, this argument is contradicted by other portions of the Government's presentation. In its closing argument, the Government argued that Petitioner repeatedly and severely beat and abused the decedent every single day for **36 straight days**. The Government called it a "systematic execution" a "systematic dehumanization." TT 3/16/04, 13-14. The Government even presented testimony that the decedent – days prior to arriving at the Naval Air Station – fell 10 feet onto her head causing her head to swell up like a watermelon. TT 3/9/04, 246. It is disingenuous to now argue that the decedent could not have been fatally injured prior to the arrival at the Naval Air Station.

**Petitioner's Trial Testimony.** Finally, the Government argues that Petitioner's own testimony "firmly established that JG was still alive and had not suffered that fatal injury at the time Petitioner's truck was broken down while on Corpus Christi Naval Station." *RA*, 84. Specifically, the Government argues that Petitioner testified that the decedent was "playing and singing her ABCs with him and

39

AB-1994" and Robin was combing her hair while on the Naval Air Station base. Id.

The Government argued at trial that Petitioner's entire testimony including what took place at the Naval Air Station, was a complete lie. TT 3/16/04, 10, 12, 13, 15, 55. To now argue that this fabricated testimony rebuts the scientific evidence of its own expert is beyond the pale – indeed, if Mr. Bourgeois is to be believed, the Government must concede that Petitioner also denied committing the offense. While Petitioner does not expect such a concession, this point does show just how precarious is the Government's position.

## B.    Ineffective Assistance of Counsel.

While not disputing that it had the burden at trial of proving that the fatal injuries were *inflicted* on the grounds of the Naval Air Station base, and not disputing the report of its own neuropathologist, Dr. Kathleen Kagan-Hallet, which clearly and unequivocally stated that the fatal injuries were 10 days old, the Government's Answer is **notable for what it does not allege**. Nowhere does it offer the slightest tactic or strategy that could even conceivably justify counsels' failure to make use of the jurisdiction-busting report of Dr. Kagan-Hallet.

Here it is also notable that the Government did not ask Mr. Tinker about this issue in its interrogatories. As pointed out in *Part One, Section E 2*, the Court should

40

draw an adverse inference against the Government for failing to pose questions

related to this issue.  In contrast, Petitioner's Interrogatories posed these questions in

a straightforward manner.[19]  Regrettably, due to Mr. Tinker's condition, Petitioner did

not receive answers to these questions.

-----

[19]Petitioner asked the following questions:

**Interrogatories Related to Claim III.**

18.    Pursuant to 18 U.S.C. §§1111(b) and 3236, the Government was required to prove beyond a reasonable doubt that the fatal injuries were inflicted on the grounds of the Corpus Christi Naval Air Station.  Prior to trial the Government provided defense counsel with an autopsy report prepared by Dr. Elizabeth Rouse and a report from Dr. Kathleen Kagan-Hallet, a neuropathologist.  Dr. Kagan-Hallet examined the evidence in this case and determined that the fatal injuries were approximately ten days old.  Dr. Kagan-Hallet's report was specifically referenced in the autopsy report prepared by Dr. Rouse.

    A.    Did you have a strategic or tactical reason for failing to cross-examine the Government's pathologist Dr. Elizabeth Rouse, who performed the autopsy, as to the timing of the infliction of the fatal injuries?

    B.    Did you have a strategic or tactical reason for failing to call as a witness Dr. Kathleen Kagan-Hallet, to testify that she thoroughly examined the evidence in this case and determined that the infliction of the fatal injuries was approximately ten days prior to death?

    C.    Did you have a strategic or tactical reason for failing to retain and call as a witness a neuropathologist to testify that the infliction of the fatal injuries was approximately ten days prior to the date of death?

See *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.*, page 3, included in *SSA* as document # 72.

41

**CLAIM IV.    TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, AND THAT PETITIONER SEXUALLY ABUSED HER, IN VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Trial counsel were ineffective for failing to present readily available expert testimony that would have completely undermined the Government's evidence that semen was present in the rectum of JG-1999 and that she was sexually assaulted. See *PM*, 62-75; *P-Mem*, 32-52. Indeed, the evidence counsel failed to present would have established that the recovered substance was not semen and there was no trauma to JG-1999's vagina or rectum. Id. However, as a result of counsels' deficient performance, extremely prejudicial evidence of an alleged sexual assault went completely unrebutted and severely harmed Petitioner's guilt-phase defense. Id. This incredibly prejudicial evidence also weighed heavily against Petitioner in the penalty phase of trial. Accordingly, counsels' deficient performance caused Petitioner severe prejudice and relief as to each phase of trial is required.

### A.    Deficient Performance.

#### 1.    The alleged "semen" evidence.

Petitioner has broadly argued that counsel were ineffective for failing to present the jury with available expert evidence showing that semen was not found on

42

the victim.  The Government recasts this claim and focuses on the much narrower question regarding Dr. Johnson's alleged tardiness.  *RA*, 123-24, citing *Respondent's Sealed Interrogatories for Douglas Tinker, RA*, Attachment A.  While counsels' interactions with Dr. Johnson are relevant to Petitioner's ineffectiveness claim, the Government's narrow focus on the timing question does not resolve the larger issue. This is so for several reasons.

The ultimate responsibility for the timely presentation of exculpatory material falls on counsel.  Moreover, in this instance, the report was a mere two days late, and despite this Court's earlier statements that it would grant some leeway in this regard, counsel should have, but did not, ask this Court for permission to present this critical expert.  Indeed, because counsels' strategy was to dispute the alleged evidence of sexual assault, even if her report was late, counsel could have had no reasonable strategic basis for failing to seek permission from the Court to present the testimony of Dr. Johnson, who would have provided unequivocal testimony that no scientific basis existed for the Government's allegation that the recovered substance was semen.  Moreover, leaving Dr. Johnson completely aside, there were other experts available who could have debunked the Government's semen theory.  Therefore the Government's narrow focus on the timing issue is not responsive to the broader claim of ineffectiveness relating to counsels' failure to debunk the Government's

43

allegations that semen was recovered from the rectum of JG-1999.

### a.    Timing.

Admittedly, Dr. Johnson's report was submitted to counsel after the Court imposed deadline for disclosing expert reports. *P-Mem*, 43. However, this fact only highlights counsels' deficient performance. Indeed, it was counsels' responsibility to ensure that all expert reports were submitted in a timely manner and Dr. Johnson was not the only expert for which counsel neglected to obtain a timely report. See TT 2/25/04, 135-48 (discussing counsels' failure to secure and disclose expert reports from Dr. Rupp, Dr. Holder and Dr. Weiner); see also *Government's **Third** Motion for Reciprocal Discovery, 2/17/04* (district court document # 187) (requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norton, and Dr. Donald Weiner). Moreover, any allegation that Dr. Johnson is at fault for the late disclosure because she was uncommunicative with counsel is belied by the record. On January 16, 2004, just a month and half before she submitted her report to counsel, Mr. Tinker expressly told the Court that Dr. Johnson has been prompt in her work and good at communicating with counsel. TT 1/16/04, 34-35 ("As soon as she gets it and has an opportunity to test it, and I think she'll be prompt. She's been good about talking to me about

44

issues").[20]

More importantly, regardless of why Dr. Johnson's report was obtained after the Court imposed deadline, counsel should have requested leave of the court to present her critical testimony. Dr. Johnson's report was obtained just **two business days** after the Court imposed deadline, **one day before** the presentation of the Government's case in chief, and **thirteen days before** the presentation of any defense evidence.[21] Counsel also notified the Government and the Court of the substance of Dr. Johnson's testimony as early as February 25, 2004, **four days before** the start of the Government's case and **seventeen days before** the presentation of defense evidence. TT 2/25/04, 145 ("Well the issue, the main issue, is whether or not their

---

[20]As additional evidence of Dr. Johnson's alleged tardiness, the Government points to Dr. Johnson's declaration which was submitted in September 2007, while most other declarations and reports were submitted in May 2007. *RA* at 123-24. This is silly. Dr. Johnson's declaration was timely filed in conjunction with other expert reports, including a report from Forensic Science Associates, as part of the *Supplemental Appendix* (*SPA*) submitted with *Petitioner's Memorandum*. Notably, despite having one year to complete its *Answer*, the Government references a report from Dr. Senn **that it was unable to obtain at the time of its filing and apparently, has still not obtained.** *RA* at 129 n. 35 ("the Governments has been unable to obtain a final version of Dr. Senn's draft"). This irony appears lost on the Government.

[21]The Court imposed deadline for the production of expert reports was Thursday, February 26, 2004. Dr. Johnson's report was prepared on Monday, March 1 and faxed to counsel on Tuesday, March 2, 2004. The Government's presentation of evidence began on Wednesday March 3, and the defense presentation of evidence commenced on March 15, 2004.

findings were of seminal fluid, whether that was seminal fluid").  Moreover, as the record reflects, the Court was prepared to grant the Government additional time to address any of Dr. Johnson's conclusions with its own experts or, if needed, even hire new experts:

MS. BOOTH:    Okay.  And could we do Thursday morning at 10:00 o'clock, Judge, only because whatever this woman [Dr. Johnson] comes back with, we might have to send that back to our DNA specialist.

COURT:        I'm going to give you time to do that.

MS. BOOTH:    Okay.

COURT:        I mean that's understandable to hear from, you know, from both reciprocal discovery.  You may have to re-designate and I'll let you re-designate.  If you need another expert because of the latest disclosure –

MS. BOOTH:    The other problem —

COURT:        But you must supplement it at some point before the witness takes the stand.

TT 2/25/04, 122-33.

Under these circumstances, where: the Court had voiced a willingness to accommodate the Government in anticipation of a last-minute or late submission of Dr. Johnson's report, the Court had authorized expenditures for this expert and

46

despite the production of her report a scant two days after the deadline, there was simply no prejudice to the Government, there really can be no legitimate excuse for counsels' failure to seek permission to use this important witness.

Nevertheless, the Government argues that counsel was not deficient in failing to present the testimony of Dr. Johnson because her report was not "illuminating" and did not "supply a reasonable basis to tactically decide to call her as a live witness."[22]

---

[22]The Government prefers to speculate as to why Mr. Tinker did not request permission to present the witness, instead of posing the question to him when it had the chance. However, Petitioner did the pose all of the relevant questions to Mr. Tinker, as follows:

21.    At trial, the Government presented expert testimony and argued to the jury that Mr. Bourgeois' semen was detected during the post-mortem rectal examination of the deceased, JG-1999. As part of your preparation for trial, you retained and consulted with a defense DNA expert, Dr. Elizabeth Johnson. On March 1, 2004, the day before the start of jury selection, Dr. Johnson provided you with a summary of the testimony she could provide if called to testify to counter the Government's assertions regarding the alleged semen. See Exhibit H, attached. In that summary, Dr. Johnson concluded that the FBI did not conduct the full panoply of tests to confirm the presence of semen; the additional AP reagent and sperm search test she conducted were both negative; if the substance recovered from JG-1999 was semen, sperm should have been detected but were not; and, false positives are possible in the only test conducted by the government – the P30 test. Id. You have previously stated that you and Mr. Gilmore considered using the testimony of Dr. Johnson at trial but that "[s]he did not do the testing you requested in a timely fashion and, therefore, we did not utilize her services." Respondents' Interrogatories for Douglas Tinker at 11-14.

A.    Would you agree that the testimony regarding the alleged semen

47

*RA*, 124-25. According to the Government, because she would have "acknowledged the presence of some semen," it was a "reasonable tactical decision for trial counsel to utilized [sic] Dr. Johnson's expertise in assisting on cross-examination without calling her as a witness to confirm the presence of semen." Id. at 124; 127 (Dr. Johnson "would have had to acknowledge that the swab tested positive for semen"). The Government's argument, however, is patently false and fails entirely to

_____

> reportedly discovered in the rectum of JG-1999 was highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?
>
> B.   Do you acknowledge having received the faxed summary of Dr. Elizabeth Johnson's proposed testimony on March 1, 2004?
>
> C.   Would you agree that Dr. Johnson's conclusions as stated in her March 1, 2004, summary would have been beneficial to the defense in countering the Government's allegations regarding the alleged semen?
>
> **D.   If so, did you have a strategic or tactical reason for failing to request relief from the Court's deadline so that you could present the testimony of Dr. Johnson?**
>
> E.   Did you have a strategic or tactical reason for failing to request additional time from the Court to consult another expert who could have countered the government's alleged semen evidence?
>
> F.   Was Dr. Johnson the only expert you consulted regarding the alleged semen evidence?

*Petitioner's Interrogatories Directed to Douglas Tinker, Esq.*, *SSA*, document # 72, at 7-8.

48

comprehend the nature and import of the testimony Dr. Johnson could have provided.

Dr. Johnson's testing did not "confirm the presence of semen" or "acknowledge that the swab tested positive for semen." On the contrary she would have testified that:

> [T]hat there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen, and that four scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA testing) were negative for the presence male fluids or male cells on the rectal swabs. That only the P30 test gave a (weak) positive result and should not be considered conclusive in light of numerous contradictory tests. Accordingly, I would have testified that there was insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was present in JG-1999's rectum.
>
> **[H]ad I been called as a witness at trial, I would have testified that the Government's evidence at trial regarding the alleged semen was erroneous and scientifically unsubstantiated**. I would have specifically addressed the erroneous testimony of Dr. Scott Benton and testified that spermatozoa are very durable and do not easily degrade (they are so durable that an additional chemical is required to break open spermatozoa in the laboratory), that spermatozoa can be easily detected microscopically and their abundance in seminal fluid facilitates microscopic detection even after the tail is lost, and that spermatozoa can be found for up to six days in the vaginal tract of a living female. In summary, I would have provided scientific evidence and testimony which would have directly contradicted the Government's evidence and theory of prosecution.

Declaration of Elizabeth Johnson, Ph.D., *SPA*, document # 64, ¶¶ 5-6; see also *PA*, document # 49 (3/1/04 report of Dr. Johnson) ("[t]he P30 positive (weak on our test)

49

test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen").

Nothing in Dr. Johnson's report or potential testimony can be construed to "confirm" or "acknowledge" the presence of semen.  Indeed, that counsel found Dr. Johnson's report and conclusions credible and important enough to attempt to use them on cross-examination, only highlights that counsel did not have a strategic reason not to use this witness – to the contrary, it shows that counsel needed.  The same is true for counsels' reliance on this witness in his closing argument.  *P-Mem*, 37-39 (Court precluded counsels' argument that "[t]here's no evidence of semen, I suggest to you, being found on this child" because counsel failed to produce any evidence to support his argument).[23]  Again, it is obvious from this attempt to argue the lack of semen present, that counsel **wanted** to use this evidence.  What is also obvious, is that without calling this witness (or taking the steps discussed below) counsel was without ammunition to do so.

---

[23]Moreover, as the Court instructed the jury, the questions, statements or arguments of counsel are not evidence. See TT 3/2/04, 18 ("The evidence which you are to consider consists of the testimony of witnesses and exhibits admitted into evidence"); TT 3/16/04, 61 ("Remember that any statements, objections, or arguments made by the lawyers are not evidence").

Had counsel called Dr. Johnson, the jury would have been presented with scientific evidence that completely undermined the Government's evidence and strongly supported counsels' argument that there was no semen present and JG-1999 had <u>not</u> been sexually abused.

### b.    Availability of Other Expert Testimony on this Point.

Even if, as the Government now claims, counsel was unhappy about the promptness of Dr. Johnson's work, other expert testimony was available at the time of trial which could have rebutted the Government's contention that the recovered substance was semen.  <u>See</u> Report of Forensic Science Associates, *SPA*, document # 65 at 3, 17, 19-27 (concluding, in part, that there is no scientific basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999); *P-Mem*, 44-46.  Again, given the extreme prejudice to Petitioner from the allegation that semen was present in JG–1999's rectum, counsel should have been mindful of any delay on Dr. Johnson's part (if there was actually a delay) and should have requested the assistance of a new expert.

### 2.    The alleged evidence of vaginal and anal trauma.

The Government asserts that trial counsels' performance was not deficient for

failing to counter Dr. Benton's testimony of alleged vaginal trauma to JG-1999. *RA*, 125. According to the Government, it was "reasonable for counsel to have relied upon the expertise of [Dr. Benton][24] and ultimately decide that there was no need to keep searching for an expert who might eventually provide an opinion that would support an argument that there was no trauma." Id.

The Government's argument runs counter to over two decades of federal jurisprudence. Counsel have a duty to conduct an independent investigation and evaluation of the Government's forensic evidence, including having their own expert evaluate the evidence, advise them and testify, if required. See *P-Mem*, 40-42.[25]

---

[24]The *Answer* mistakenly refers to Dr. Johnson instead of Dr. Benton. *RA*, 125.

[25]See also, Ake v. Oklahoma, 470 U.S. 68, 82 & n.8 (1985) (emphasizing importance of expert assistance to defense, for affirmative presentation of evidence and "to assist in preparing the cross-examination" of prosecution experts; defendant is "at an unfair disadvantage, if he is unable ... to parry **by his own witnesses** the thrusts of those against him" (citations omitted)); Siehl v. Grace, 561 F.3d 189 (3d Cir. 2009) (state court rejection of Petitioner's claim that counsel was ineffective for stipulating to fingerprint evidence without the assistance of a qualified defense expert was an unreasonable application of Strickland); Dugas v. Coplan, 428 F.3d 317, 327-34 (1st Cir. 2005) (counsel ineffective for failing to obtain defense experts to assist in cross-examining prosecution's experts and support defense); Gersten v. Senkowski, 299 F.Supp.2d 84, 103-04 (E.D.N.Y. 2004), aff'd, 426 F.3d 588, 607-11 (2d Cir. 2005) (counsel ineffective for failing to obtain expert assistance where defense expert could have presented testimony and assisted in cross-examination of prosecution expert); Pavel v. Hollins, 261 F.3d 210, 223-25 (2d Cir. 2001) (counsel ineffective for failing to "call a medical expert to testify as to the significance of the physical evidence presented by the prosecution"); Holsomback v. White, 133 F.3d

Moreover, in this case, even without an independent expert evaluation of the Government's evidence, counsel could have presented overpowering evidence, **from the Government's own witnesses,** negating the allegations of vaginal trauma and establishing the lack of rectal trauma. Dr. Elizabeth Rouse, who **performed the autopsy** of JG-1999, specifically found that "[t]he external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**. **The Hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic.**" See Autopsy Report of Dr.

---

1382, 1386-89 (11th Cir. 1998) (counsel ineffective for failing to investigate and develop expert testimony); Jones v. Wood, 114 F.3d 1002, 1011-12 (9th Cir.1997) (granting evidentiary hearing on claim that counsel was ineffective for failing to obtain expert testing and evaluation of blood evidence); Driscoll v. Delo, 71 F.3d 701, 707-09 (8th Cir. 1996) (counsel ineffective where his failure to reasonably investigate and develop scientific evidence "allow[ed] the jury to retire with [a] factually inaccurate impression" about that evidence); Harris v. Wood, 64 F.3d 1432, 1436 (9th Cir. 1995) (counsel ineffective when "he did not obtain an independent evaluation of the ballistics evidence or the forensic evidence"); Sims v. Livesay, 970 F.2d 1575, 1579-81 (6th Cir. 1992) (counsel ineffective for failing to investigate and obtain scientific testing regarding gunshot residue); Troedel, 667 F.Supp. at 1461 (counsel ineffective for failing to consult expert to refute prosecution expert testimony regarding gunshot residue), aff'd, 828 F.2d 670; Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir. 1983) (counsel ineffective for failing to develop and present expert testimony regarding bullet trajectory); Williams v. Martin, 618 F.2d 1021, 1025-26 (4th Cir. 1980) (where defense claimed gunshot wounds were not cause of death, "an effective defense ... require[d] the assistance of an expert witness").

53

Elizabeth Rouse, *PA*, document # 52, p. 3. Thus, contrary to the Government's contention, trial counsel would not have needed to do much "searching" to find an expert who would have rebutted the Government's contention of sexual assault. Rather than rely on the erroneous and highly prejudicial testimony of Dr. Benton, counsel could have simply asked Dr. Rouse, **who was present and testified at trial** on behalf of the Government, about her findings regarding JG-1999's vagina and anus. However, neither trial counsel nor, not surprisingly, the Government, asked Dr. Rouse about her observations regarding JG-1999's vagina and anus. See Soffar v. Dretke, 368 F.3d 441, 476-77 (5th Cir. 2004) (finding counsel ineffective for failing to hire a ballistics expert and noting that "Soffar's defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense").

Had counsel questioned Dr. Rouse about the findings contained in her autopsy report, counsel could have argued that had Petitioner, an adult male, actually raped JG-1999, a two-year-old child, evidence of trauma to her vagina or anus would certainly have been observed at autopsy. Counsel could have argued that any rape was highly unlikely because, as Dr. Rouse observed, JG-1999's hymen was "present and [ ] atraumatic." Counsel could have also argued that Petitioner did not sodomize the child because there was no evidence of rectal trauma at autopsy. Moreover,

54

counsel could have argued that Dr. Rouse's conclusion of no anal trauma, proved that no semen was recovered from JG-1995's rectum.  Thus, Dr. Rouse could have single-handedly undermined **all** of the evidence of alleged sexual assault.

Shockingly, the *Respondent's Answer* fails to address Petitioner's claims of ineffectiveness for failing to elicit Dr. Rouse's autopsy findings.  See *RA*,122-27 – this silence speaks volumes.  Equally shocking, in its interrogatories to Mr. Tinker, the Government did not ask whether counsel had any tactical or strategic basis for failing to elicit this testimony from Dr. Rouse.  See *RA* Attachment A, *Respondent's Sealed Interrogatories for Douglas Tinker*; Cf. *Petitioner's [unanswered] Interrogatories Directed to Douglas Tinker, Esq.*  Again, the Government's failure to even seek direct answers to important questions when it had the chance to do so stands in stark contrast to the specific questions Petitioner posited to Mr. Tinker, and requires the Court to draw an adverse inference that had they asked questions such as the following, the Government would have received unhelpful responses.[26]

---

[26]Unlike the Government, Petitioner propounded clear and direct questions on this critical topic:

20. **Interrogatories Related to Claim IV.**

At trial, prosecution witness, Dr. Elizabeth Rouse, who conducted the autopsy, testified that she performed a sexual assault examination on the body of the deceased, JG-1999. See TT 3/8/04, 59-60, Exhibit E, attached.  However, Dr.

Rouse did <u>not</u> testify about whether her examination of JG-1999 revealed any evidence of vaginal trauma and no questions were asked on direct or cross-examination regarding those observations. Morever, in her autopsy report, Dr. Rouse specifically concluded that "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic**. The back is straight. The anus unremarkable and atraumatic." <u>See</u> Autopsy Report of Dr. Elizabeth Rouse at p. 3, Exhibit F, attached. Nevertheless, prosecution witness, Dr. Scott Benson, testified that the autopsy of JG-1999 revealed vaginal trauma. <u>See</u> TT 3/5/04, 44-46, Exhibit G, attached.

A. Did you consider Dr. Benton's testimony regarding the alleged vaginal trauma to JG-1999 to be highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

B. Did you have a strategic or tactical reason for not cross-examining Dr. Rouse regarding the conclusions in her autopsy report ("The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic**" – i.e., that there was <u>no</u> vaginal trauma to JG-1999) in an effort to challenge Dr. Benton's conclusions?

C. Did you have a strategic or tactical reason for failing to call Dr. Rouse as a defense witness to testify about her autopsy results and her conclusion that there was <u>no</u> vaginal trauma to JG-1999?

D. Did you have a strategic or tactical reason for failing to call your own expert to review the autopsy results and testify that the post-mortem examination of JG-1999 revealed <u>no</u> vaginal trauma, particularly in view of the disagreement between Benton and Rouse on this point?

E. Did you have a strategic or tactical reason for failing to cross-examine Dr. Benton to challenge his testimony that the autopsy revealed vaginal trauma by using Dr. Rouse's actual autopsy report which indicates that there was <u>no</u> vaginal trauma to JG-1999.

56

Given counsels' attempt to argue that there was no evidence of sexual abuse, counsels' strategy was clearly to refute and limit the impact of this extremely gruesome and prejudicial evidence. Counsel, however, presented <u>no</u> evidence to support his argument and could have had no reasonable tactical or strategic basis for failing to elicit Dr. Rouse's findings to refute the "semen" and vaginal trauma evidence.

Nevertheless, as the Government concedes, at a minimum, an evidentiary hearing is required on this issue. *RA*, 142 ('"the lack of any response by trial defense counsel regarding their tactical decisions may well warrant an evidentiary hearing").

## B.    Prejudice.

The Government asserts that Petitioner was not prejudiced by counsels' deficient performance because there is no reasonable probability of a different outcome had counsel presented the evidence that no semen was present and there was no evidence of trauma to JG-1999's vagina. *RA*, 125-27. Again, the Government is wrong.

Obviously, the evidence of sexual assault upon this child was highly inflammatory. All things being equal, this evidence would have understandably

---

<u>See</u> *Petitioner's Interrogatories Directed to Douglas Tinker*, Esq., pages 6-7, included in *SSA* as document # 72.

57

turned any jury against Petitioner. However, in addition to the obvious inflammatory nature of this evidence, it caused specific damage to Petitioner's trial defense. Petitioner's trial theory attempted to show that Robin was the perpetrator. See e.g. TT 3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to make it clear. Mr. Tinker and my position is that Alfred Bourgeois did not kill this child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby"). This theory was obliterated by the allegations of sexual assault and presence of semen, which could only have been perpetrated by Petitioner as the only male with access to the child. Thus, the semen/sexual assault evidence all but doomed Petitioner's defense.

The unrebutted evidence of semen and sexual abuse was also highly prejudicial in the penalty hearing. Again, in addition to the generally inflammatory and highly prejudicial nature of such evidence, it also supported the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner. 18 U.S.C. § 3592(c)(6). This evidence was specifically used by the

58

Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").

Finally, in addition to its support for a specific aggravating circumstances, any reasonable jury would have weighted this evidence in its deliberative weighing process. See 18 U.S.C. § 3593(e) (jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death"). Thus, as a result of trial counsels' ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die. This constitutes prejudice, no ifs, ands or buts.

The Government's reliance on Burton v. United States, 237 F.3d 490 (5th Cir. 2000) is misplaced. *RA*, 126. In Burton, the defendant, who was convicted of drug conspiracy charges, alleged that trial counsel was ineffective for failing to present evidence that the lease to a Rolls Royce, alleged to be his, was actually in his sister's name. Burton, 237 F.3d at 494. Evidence of the defendant's guilt included undercover purchases of cocaine, camera surveillance, wiretapping, a paid confidential informant, id. at 491, and six cooperating co-conspirators with direct

59

knowledge of the defendant's responsibility for supplying crack cocaine.  Id. at 494.

Under these circumstances, the Court found that the evidence of guilt was so strong

that "there was no reasonable probability that production of the lease would have

affected the outcome of [the defendant's] trial."  Id.  Moreover, the Court concluded

that because the evidence of guilt was so overwhelming, "trial counsel could have

reasonably concluded that the lease documents would not have undermined the

prosecution's case..."  Id.  Last, Burton found that the unpresented lease documents

were partially incriminating and thus, counsel could not be ineffective for failing to

present evidence that could incriminate their client, especially where that evidence

was cumulative of other admitted evidence.  Id.

Petitioner's case is vastly different.  Whereas the unpresented evidence in

Burton was only a small part of a far larger inculpatory picture, the semen/sexual

assault evidence against Petitioner played a far more significant role.  It all but

determined the identity of the killer.  And, quite apart from that point, it had to have

improperly turned the jury against Petitioner in all other respects.  See *P-Mem*, 49-52

(discussing prejudice); Soffar, 368 F.3d at 478 ("[a] reasonable probability need not

be proof by a preponderance that the result would have been different, but it must be

a showing sufficient to undermine confidence in the outcome") (quoting Williams v.

Cain, 125 F.3d 269, 279 (5th Cir. 1997)).  For these reasons, the Government's

attempt to distinguish <u>Soffar</u> (*RA*, 126) ("[a]pplying <u>Burton</u> and <u>Soffar</u> requires an analysis of how important the evidence of the semen was to Petitioner's conviction for murder and sentence") on the grounds that the unpresented expert evidence rebutting the presence of semen or vaginal trauma would not have affected the outcome of this case, is also unavailing.

The palpable prejudice arising from the evidence in this case, which distinguishes it from <u>Burton</u>, is evidenced by trial counsels' unsuccessful attempts to argue that there was no evidence of semen or sexual assault. <u>See</u> TT 3/16/04, 24, 41-43; *P-Mem* at 37-39. However, while recognizing the importance of rebutting this evidence, counsel, in this case, failed to present any evidence to support his argument of no semen or vaginal/rectal trauma.

**C.    Conclusion.**

This is not even a close issue of counsels' ineffectiveness. Counsel was faced with devastatingly prejudicial evidence of sexual assault. They tried to argue against it, but their argument was not permitted (properly) because they had elicited no evidence to support it. Yet, counsel could have presented expert testimony establishing that there was no scientific evidence to support the semen/sexual assault evidence. <u>See</u> *PA*, document # 49 (3/1/04 report of Dr. Johnson); *SPA*, document #

64 (Declaration of Elizabeth Johnson, Ph.D); *SPA*, document # 65 (Report of Forensic Science Associates). Counsel could have presented expert testimony indicating that if the substance recovered from the rectal swab of JG-1999 was semen, sperm should have been observed. Id. Counsel could have presented evidence that despite multiple tests, no sperm were ever observed in this case. Id. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, false positives are <u>not</u> uncommon in the test used by the Government to allegedly identify the substance as semen. Id.[27] Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to identify the alleged semen, <u>has</u> been detected in multiple male <u>and</u> female bodily fluids. Id. Counsel could also have presented expert testimony indicating that, contrary to the testimony at trial, there was no evidence of trauma to the vagina or rectum of JG-1999. Id. None of this extremely significant, exculpatory, and readily available evidence was presented to the jury that convicted Petitioner and sentenced him to death.

---

[27]Again, as Dr. Johnson would have testified, contrary to the Government's assertion, RA at 127, the existence of a false positive does <u>not</u> confirm the presence of semen. <u>See</u> Declaration of Elizabeth Johnson, Ph.D., *SPA*, document # 64, *PA*, document # 49 (3/1/04 report of Dr. Johnson). Hence the term "<u>false</u> positive."

**CLAIM V.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND THE DIGITAL ENHANCEMENTS OF THE BITE MARK PHOTOGRAPHS AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

The Government's bite mark experts, Dr. Senn and Dr. Chrz, formed their opinions and testimony based upon deeply flawed and unreliable images that were created from the original autopsy photographs. They also utilized untested and invalid odontological identification methods. Based on their unreliable and incorrect testimony, the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent. TT 3/24/04, 7. Trial counsel did nothing to preclude this evidence or to rebut it once it was admitted. Counsel was ineffective, Petitioner was prejudiced and a new trial and penalty hearing are mandated.

The Government first argues that a Daubert challenge to this testimony would have been "misplaced" because the enhancement techniques utilized by Dr. Oliver are sound and are not the type of "scientific" or "medical" evidence that would normally be challenged under Daubert. *RA,*128. Specifically, the Government argues that Dr. Oliver's use of "adaptive histogram equalization" was and is widely accepted. Id. at 129. The Government is wrong. Reliance by forensic odontologists on the enhanced images created by Dr. Oliver falls squarely within the gate-keeping parameters of

63

Daubert and, more important, his methods fail to meet the Daubert standards.

The National Academy of Sciences ("NAS") in its recent comprehensive study on forensic science, *Strengthening Forensic Science in the United States: A Path Forward* (hereafter, *NAS Report*) (copy attached as *SSA*, document # 75) devoted an entire section of its report to forensic odontology.[28] The NAS specifically addressed

_____

[28]As stated on its website, the National Academy of Sciences is the leading governmental entity charged with responsibility for investigating and reporting on the leading scientific issues of the day:

The National Academy of Sciences (NAS) is an honorific society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare.

The NAS was signed into being by President Abraham Lincoln on March 3, 1863, at the height of the Civil War. As mandated in its Act of Incorporation, the NAS has, since 1863, served to "investigate, examine, experiment, and report upon any subject of science or art" whenever called upon to do so by any department of the government. Scientific issues would become even more contentious and complex in the years following the war. To keep pace with the growing roles that science and technology would play in public life, the institution that was founded in 1863 eventually expanded to include the National Research Council in 1916, the National Academy of Engineering in 1964, and the Institute of Medicine in 1970. Collectively, the four organizations are known as the National Academies.

Since 1863, the nation's leaders have often turned to the National Academies for advice on the scientific and technological issues that frequently pervade policy decisions. Most of the institution's science policy and technical work is conducted by its operating arm, the

reliance on computer enhanced photographs, digitalization and histology as aides in

analyzing bite marks – and found this practice wholly lacking in scientific reliability.

_____

> National Research Council, created expressly for this purpose. These non-profit organizations provide a public service by working outside the framework of government to ensure independent advice on matters of science, technology, and medicine. They enlist committees of the nation's top scientists, engineers, and other experts, all of whom volunteer their time to study specific concerns. The results of their deliberations have inspired some of America's most significant and lasting efforts to improve the health, education, and welfare of the population. The Academy's service to government has become so essential that Congress and the White House have issued legislation and executive orders over the years that reaffirm its unique role.
>
> The Academy membership is composed of approximately 2,100 members and 380 foreign associates, of whom nearly 200 have won Nobel Prizes. Members and foreign associates of the Academy are elected in recognition of their distinguished and continuing achievements in original research; election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer. The Academy is governed by a Council consisting of twelve members (councilors) and five officers, elected from among the Academy membership. Dr. Ralph J. Cicerone is the president of the National Academy of Sciences.

See NASonline.org (last visited June 24, 2009).

In 2005 Congress, recognizing that significant improvements are needed in forensic science, directed the NAS to evaluate the state of forensic science in this country. P.L. No. 109-108, 119 Stat. 2290 (2005). The NAS – as a result of this congressional directive – conducted the most comprehensive study of forensic science ever attempted. This study was completed and the report entitled "Strengthening Forensic Science In The United States: A Path Forward" was published in March 2009.

The "adaptive histogram equalization" techniques used by Dr. Oliver fall squarely within the practices reviewed and discredited by the NAS.

The NAS noted that the American Board of Forensic Odontology ("ABFO") lists a large number of methods for analysis of bite marks including computer enhancement and/or digitalization of bite marks and histology. *NAS Report* at 5-35. The NAS found that the ABFO guidelines "do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what degree of probability." Id. at 5-35-36. The NAS also found that "there is no science on the reproducibility of the different methods of analysis that lead to the conclusions about the probability of a match." Id. at 5-36. The NAS concluded that even when following the ABFO guidelines "different experts provide widely differing results and a high percentage of false positive matches of bite marks using controlled comparison studies."[29] Id.

The problems with the reliability of forensic odontology evidence, identified by the *NAS Report*, were exactly the problems Petitioner's experts identified in *Petitioner's Motion*. Specifically, the scientists at Cherry Biometrics found that the

---

[29]This exact problem was identified by Petitioner's forensic odontology expert, Dr. C. Michael Bowers, in his report appended to *Petitioner's Motion*. See *PA, document # 42 at pp 7-9.*

66

techniques utilized by Dr. Oliver were not generally accepted, they were not regulated and they had not been tested nor peer reviewed. *PA*, ¶¶ 161-165. Defense expert, Dr. C. Michael Bowers – whose publications were cited with approval in the *NAS Report* – also warned that Dr. Oliver's enhancement techniques were not supported by a scientific or a technical foundation – the only controls being the "operator's subjectivity." Id. at ¶170.

Petitioner knew this to be true when he pled his claims, and now the most respected government funded and endorsed scientific body – the NAS – has clearly and unequivocally examined and found deficiencies in numerous aspects of the current forensic odontology practice – including reliance on the very type of image enhancement techniques utilized by Dr. Oliver. Furthermore, all of these problems existed at the time of Petitioner's trial. The Government simply cannot credibly argue – as it attempts to do here – that the use of computer enhancements, digitalization and histology techniques like the ones created by Dr. Oliver and utilized here by Dr. Senn and Dr. Chrz do not fall within Daubert's coverage. Reliance by Dr. Chrz and Dr. Senn on Dr. Oliver's enhancement techniques not only fall squarely within the gate-keeping parameters of Daubert, they clearly fail to meet the Daubert requirements for reliability.

The Government also argues that Dr. Chrz "merely looked at the images of Dr.

67

Oliver but did not rely upon them for his analysis" but instead relied upon the original autopsy photographs and suggested bite mark guidelines from the ABFO in arriving at his conclusions. *RA*,129. These back tracking assertions do not save Dr. Chrz's scientifically unreliable and erroneous testimony.

There is no dispute that both Dr. Senn and Dr. Chrz utilized the enhanced images created by Dr. Oliver in their trial testimony, as acknowledged by the Government. In discussing Dr. Oliver's enhancements the Government states they were "part of what Dr. Senn and Dr. Chrz utilized in making their analysis." *RA*,128. Why does the Government say in one breath that Dr. Chrz did "utilize" the enhancements and Dr. Chrz in the next breath says he did not "utilize" them? Dr. Chrz' qualification of his testimony – now insisting that he merely looked at the images but did not use them to form his opinion –  leads one to wonder: If Dr. Oliver's enhancements are so reliable and accurate, why does Dr. Chrz now attempt to distance himself from them?

With respect to Dr. Senn, the Government also avers that he did not utilize the enhancements but rather that he too looked at the images but relied only on the original photographs. *RA*, 129 n. 35. This qualification is even more curious than the qualifications with regard to Dr. Chrz, since Dr. Senn specifically testified  that the enhancements helped him to view the bite marks. TT 3/8/04, 249. Dr. Senn,

however, has still not submitted a report confirming his non-reliance on the images.

In any event, even if one assumes that the Government's experts "looked at" but did not "rely" on Dr. Oliver's work, the *NAS Report* unequivocally states that compliance with the ABFO guidelines does not ensure an accurate and reliable analysis. The NAS specifically found that the ABFO guidelines "do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what degree of probability." *NAS Report* at 5-35-36. The NAS also found that, "If a bite mark is compared to a dental cast using the guidelines of the ABFO, and the suspect providing the dental cast cannot be eliminated as a person who could have made the bite mark, there is not established science indicating what percentage of the population or subgroup of the population could also have produced the bite." Id. at 5-36.

This is exactly what Dr. Chrz did here. He compared a dental cast of Petitioner's dentition and determined that he was the probable biter. TT 3/08/04, 311. And this is exactly what Petitioner's experts and now the NAS say is not supported by science – now, or at the time of Petitioner's trial. The NAS specifically concluded that *no scientific studies* support the conclusion that forensic odontologists can make an identification based on a bite mark – regardless of whether the ABFO guidelines were followed. *NAS Report* at 5-37.

69

Here again, the NAS is in complete accord with the opinion of Petitioner's odontological expert, Dr. Bowers. Even before the publication of the *NAS Report*, Dr. Bowers stated: "the validity, reliability and accuracy of bite mark identification have not improved to the point where it should be used as he sole means of identifying the biter." *PA*, document #42. Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or probable biter via teeth marks are not rendering a reliable opinion." Id.

Dr. Chrz also belatedly attempts to clarify his testimony by now stating he did not identify "a particular individual but rather which of the suspects most likely inflected (sic) the patterned injury." See *RA*, Attachment J. This statement is simply untrue. Dr. Chrz testified that Petitioner was the probable biter. TT 3/08/04, 311.

The Government next argues that defense counsel did effectively prepare to meet this evidence since Mr. Tinker met and interviewed Dr. Oliver, Dr. Senn and Dr. Chrz, and had an expert review the evidence. RA,130. The only expert Petitioner is certain that Mr. Tinker met with prior to trial was Dr. Senn.[30] He did not meet with Dr. Oliver prior to trial. If he retained an expert – and Mr. Tinker only said he

---

[30]Since Mr. Tinker is deceased, the only way to conclusively determine the experts seen by Mr. Tinker is to obtain this information from the Government's experts. Petitioner will make this request in his to-be-filed motion for discovery.

believed he did but could not remember the person's name – he certainly did not provide that expert with the materials necessary to provide a reliable opinion. The record in this case is clear; Mr. Tinker was woefully unprepared to challenge this expert evidence.

Mr. Tinker was provided, pretrial, with a compact disc containing all of the enhanced images – including the enhanced bite mark images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images ("I want to see how its done"; "I don't understand it"; "I've never seen it") (TT 3/8/04, 15), Mr. Tinker never even looked at the enhancements until mid-trial, just moments before Dr. Oliver was going to testify before the jury. Id. at 15, 18. Incredibly, counsel advised the court that he was not pursuing a Daubert challenge – before he even saw the enhancements. Id. at 14-15.

When counsel was given the opportunity by the trial court to cross-examine Dr. Oliver – concerning his enhancement methodology – he asked if anyone else in the country "do[es] this kind of thing" and when that question was answered in the affirmative, counsel withdrew the question. Counsel did not ask a single question relevant to the Daubert reliability factors. Had counsel conducted even a cursory investigation into the methods used by Dr. Oliver, the defense could have precluded the admission of the enhanced photographs, as well as the opinions of Drs. Senn and

71

Chrz.

The Government argues that trial counsel did not take " a wholly unreasonable approach" in simply arguing that the opinions of Drs. Senn and Chrz do not identify Petitioner as the biter – since the opinions simply ruled out two of the family members. *RA,*131-32.  This argument flies in the face of the evidence introduced at trial *by the Government*.  Dr. Chrz – relying on scientifically unsound and unreliable methods – testified that Petitioner was the "probable" biter.  TT 3/08/04, 311.  This testimony could not be rebutted by simply arguing that he did not identify Petitioner – since he, in effect, did so.

In an opinion issued just yesterday, the Supreme Court highlighted why counsel were ineffective in this case for failing to subject the Government's highly subjective and unreliable science to adversarial testing. In <u>Melendez-Diaz v.</u> <u>Massachusetts</u>, — U.S. —, 2009 WL 1789468 (June 25, 2009), the Court held that a criminal defendant has a Sixth Amendment right to confront lab technicians who conduct forensic analyses.  In so holding, Justice Scalia, writing the for the Majority, noted that:

> Nor is it evident that what respondent calls "neutral scientific testing" is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation . . . Serious deficiencies have been found in the forensic evidence used in criminal

trials.   One commentator asserts that "the legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics.

Melendez-Diaz, 2009 WL at * 8.[31]

There is no question that this inflammatory and inaccurate bite mark evidence was devastating to the defense at both the guilt and penalty phases of trial. The prosecutors urged the jury to consider bite mark evidence to convict Petitioner in both their opening and closing statements.  TT 3/2/04, 30-31, 34, 42,  TT 3/16/04, 19-20, 48-49.   The Government also utilized the bite mark evidence extensively in its closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  See TT 3/24/04, 37, 41, 70, 76 (prosecutor arguing for death because "[h]is signature with his teeth marks and his semen is all in that baby").

If this inaccurate and unreliable bite mark testimony failed to point the finger at Petitioner – as the Government now contends – then the Government's arguments were improper: is the Government now saying that it went too far when it argued that Petitioner left his *signature with his teeth?*

Finally, the Government argues that trial counsel acted reasonably in not calling Dr. Dailey since his testimony would have "simply been" that he was "unable

---

[31]Justice Scalia also approvingly cited the *NAS Report.*  Id.

73

to exclude or include any of the potential biters" and would not have had any "ascertainable impact on the opinions of Dr. Senn and Dr. Chrz." RA,132. This argument is wanting. Dr. Dailey concluded that he could not "exclude" Petitioner, Robin or AB-1994. Dr. Senn and Dr. Chrz both concluded that they could exclude Robin and AB-1994 – leaving Petitioner as the only possible biter. TT 3/08/04, 245, 311. Dr. Dailey directly contradicts Dr. Senn's and Dr. Chrz' exclusion of Robin and AB-1994,which is why the Government did not call him and exactly why defense counsel should have called him.

Furthermore, had counsel called Dr. Dailey they would have been able to present testimony that AUSA Booth told Dr. Dailey that if he could not help her she would go out and find an expert who could. *PA*, document # 45. Dr. Dailey could have refuted Ms. Booth's misleading argument that AB-1994 was excluded as the source of the bite marks and that the jury did not hear any evidence of expert "shopping." TT 3/16/04, 19-20. AUSA Booth knew when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had not excluded Robin or AB-1994 as a possible biter. Nonetheless, she was able to make her "no expert-shopping" argument because counsel failed to present the testimony of Colonel Dailey, DDS.

74

**CLAIM VI.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A <u>DAUBERT</u> MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS AND FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

Dr. William Oliver testified as a Government witness using digital enhancements that he had created from the autopsy photographs. Dr. Oliver described a multitude of injuries that were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy. Relying on Dr. Oliver's enhanced images, the prosecutor argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries. The methods used by Dr. Oliver were scientifically and technically invalid and trial counsel were ineffective for failing to litigate a <u>Daubert</u> motion to preclude this evidence and for failing to rebut it once it was admitted.

The Government first argues that Petitioner's objections to Dr. Oliver's testimony only go to the weight of the evidence and therefore "under Rule 104(e); it would not render the evidence inadmissible." *RA*, 132. This is incorrect. Dr. Oliver

75

was offered as an expert in the field of forensic pathology and forensic imaging, TT 3/8/04, 191, and accordingly, this Court had a duty to act as a gatekeeper under Daubert, to keep unreliable science from the jury.  Daubert analysis, as this Court well knows, is qualitatively different from admitting evidence for whatever worth the fact finder may give it.  Given the Government's insistence that Petitioner's experts be subjected to the "rigors" of Daubert *RA*, 69 (which Petitioner is happy to do), one would expect the Government to appreciate the difference.

The Government next argues that a Daubert motion would have been denied since "adaptive contrast enhancement" is the subject of many peer-reviewed articles and has been in use in the medical field for over 20 years.  *RA*, 132-33.  In making this argument the Government relies upon a letter from Dr. Oliver wherein he alleges that he did a "quick search" of "adaptive contrast enhancement" in the search engine SCIRUS and located 115 peer-reviewed journals and another search on MEDLINE and found 31 peer-reviewed articles.  See *RA*, Attachment I.  This argument is nothing more than misdirection.

Petitioner has not challenged the **general use** of adaptive contrast enhancement – the Government and Dr. Oliver are well aware of this.  Petitioner has challenged the specific techniques used by Dr. Oliver in this case to create enhancements from autopsy photographs of external injuries.  Specifically, Dr. Oliver employed the

76

Contrast-Limited Adaptive Histogram Equalization contrast enhancement method. TT 3/8/04 at 19. He admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions (orange), whip marks (yellow), and scars (light blue). Id. at 22, 24-5. He also admitted that it was very important when analyzing the newly created images to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct. TT 3/8/04, 13-14. Finally, in describing his ability to identify bruises he conceded "it all sort of boils down to whether you are a lumper or a splitter." Id. at 28.

Not surprisingly, Dr. Oliver's "quick search" fails to unearth a single article – peer-reviewed or otherwise – that discusses his prohibitively subjective techniques. He cannot cite to such an article because none exist. Yet, Dr. Oliver indignantly argues that a challenge to his methods is the equivalent of a challenge to the "fundamental practice of forensic pathology." *RA*, Attachment I at 4. Dr. Oliver doth protest too much. Simply put, Dr. Oliver's methodology has never been peer reviewed and this prong of Daubert cannot be satisfied. That said, it really is extraordinary that trial counsel neglected to mount a Daubert challenge for a scientific opinion that at the time had yet to be peer-reviewed, and which remains so today.

77

Next the Government argues that Dr. Oliver "claims" that his "methodology has withstood a <u>Daubert</u> challenge." *RA*, 133.  In making this "claim" Dr. Oliver cites to three cases but concedes that he is "no lawyer and can't competently discuss the legal aspects of them."  *RA*, Attachment I at 2.  Dr. Oliver's "claim" is misleading.

At the time of Petitioner's trial no court had found that Dr. Oliver's methods and techniques met the <u>Daubert</u> requirements.  Only two of the three cases cited by Dr. Oliver took place prior to Petitioner's trial (<u>State v. Jones</u> (2000) and <u>State v. Bagwell</u> (1999)) and neither case involved a <u>Daubert</u> challenge.  Simply put, a <u>Daubert</u> challenge was not raised, litigated or ruled upon in these two cases.  These two cases are legally irrelevant.

In the third case relied upon Dr. Oliver, <u>North Carolina v. Delgado</u>, the trial took place in June 2008.  In <u>Delgado</u> a limited objection was raised concerning only certain aspects of the methodology utilized by Dr. Oliver.  The objection neither cited nor relied upon the <u>Daubert</u> factors and it specifically did not challenge the technical aspects of Dr. Oliver's methods.  In response to the <u>Delgado</u> court's question as to why he (Dr. Oliver) believed his methods were generally accepted in the forensic community, Dr. Oliver averred that his methods had been peer-reviewed and he had been permitted to testify in courts on prior occasions.  This answer was misleading as Dr. Oliver cannot identify a single article wherein his methods of image

enhancement have ever been peer reviewed.  Further, Dr. Oliver failed to inform the Delgado court that Daubert challenges had not been raised and ruled upon in the proceedings where he had testified previously.  Dr. Oliver was permitted to testify in Delgado, however, the appeal in this matter is presently pending.  Dr. Oliver's misleading statement proffered herein by the Government only casts additional doubt as to the veracity and reliability of his opinions.

Next the Government and Dr. Oliver take issue with the credentials of Petitioner's expert in forensic odontology, Dr. C. Michael Bowers.  Specifically, the Government (based on Dr. Oliver's accusations) alleges that "Dr. Bowers does not appear to have the proper training in image processing and notes that he (Dr. Oliver) has an MS in Computer Science with a concentration on medical image processing." *RA*, 133.  This Court will decide which expert witness is reliable.  Petitioner notes, however, that the NAS agreed with each and every problem that Dr. Bowers raised regarding Dr. Oliver's enhancements in this case.  Furthermore, the *NAS Report* specifically relied upon and cited to publications by Dr. Bowers.

The Government next argues that Dr. Oliver's opinions and his testimony were proper because he always went "back to the original image" in forming his opinions. *RA*, 133. Unfortunately, Petitioner's jury did not have the same option as Dr. Oliver – to go back to the original photographs.  Dr. Oliver's jury presentation did not

include the original photos but instead relied upon extremely distorted images that had been digitized, scanned, compressed and then converted to PowerPoint. That inconvenient fact, however, did not stop Dr. Oliver from repeatedly representing to Petitioner's jury that they must compare his enhancements to the original photographs. TT 3/08/04, 204, 213, 215, 216, 218.

At the time of trial the Government averred that Dr. Oliver's testimony was being presented to help the jury evaluate and determine the extent and number of the external injuries on the decedent's body. TT 3/08/04, 192. Dr. Oliver now insists that his enhanced images were presented in court only as medical illustrations to be used by the jury to make this determination. See *RA*, Attachment I at 2, 4-5. Furthermore, at trial when presenting his "illustrations" to Petitioner's jury, Dr. Oliver repeated that they must look at the original photographs when making their evaluations of the external injuries. TT 3/08/04, 204, 213, 215, 216, 218. Dr. Oliver was insistent on this point because he believed an accurate comparison could not be made between enhanced images and anything other than the original photographs. Yet, Dr. Oliver did not present the original photographs to the jury – instead he concedes, as he must, that he used the digitized images he had scanned, compressed and then converted to PowerPoint. *RA*, Attachment I, at 3.

How was Petitioner's jury supposed to make an accurate evaluation and

80

determination of the extent of the external injuries on the decedent's body if they were never provided with the original photographs? The answer is simple, they could not and they did not. If reliance on the originals was critical for Dr. Oliver to reach a valid conclusion, it was also critical for the jury to reach a valid conclusion. Unfortunately, the jury was never given this opportunity because Dr. Oliver was allowed to make a presentation that did not include the original photographs and trial counsel were ineffective for failing to litigate a <u>Daubert</u> motion to preclude this limited and misleading presentation.

Dr. Oliver characterizes Petitioner's <u>Daubert</u> challenge as a "contrived attack" on his work. <u>Id.</u> at 2. Yet here again we see Dr. Oliver – like Dr. Chrz and presumably Dr. Senn – insisting that he did not rely on the enhanced images, in any way, in order to form his opinion. The question again must be asked: If these enhanced images were so scientifically reliable and accurate, why then does every Government expert – including the expert who created them – insist they did not rely upon them? And if the enhanced images are not reliable or necessary for the experts to form their opinions, why then were they shown to Petitioner's jury in lieu of the original images?

Petitioner was clearly prejudiced by counsels' inaction. Undersigned counsel provided copies of the original autopsy photographs and the scanned and digitized

81

version of the autopsy photographs to its forensic digital imaging enhancement experts employed with Cherry Biometrics, Inc.  These experts found that the digitized/scanned images – that Dr. Oliver represented to the jury were the original photographs – were "distorted" "inaccurate"  "incomplete" and "over-reaching alterations." *PA*, document # 43.  Furthermore, Dr. Oliver's methods and techniques in digitizing and compressing the original photographs were found to be noncompliant with almost every aspect of <u>Daubert</u>.

The Government next argues that counsel was not "constitutionally deficient for failing to challenge Dr. Oliver's methodology" because counsel "did not believe the Government experts were sufficiently conclusive in their opinions and even found their respective opinions to conflict in some regards."  *RA*, 134.  This argument is meritless.  Dr. Oliver was the only expert (defense or prosecution) that testified to his methodology.  His opinions were presented in completely "conclusive" testimony and his opinions did not conflict with any other expert because no other expert was called to support or rebut his methodology.

Finally, the Government speculates that defense counsel "perhaps understood better than present counsel that Dr. Oliver's conclusions were based upon the original photographs of the autopsy and that his digital images were simply demonstrative aids." *RA,* 134.  This argument ignores the clear record in this case:  trial counsel did

82

not "understand" anything about Dr. Oliver's testimony let alone the fact that Dr. Oliver was basing his conclusions on the original photographs. Had he understood this, he would have insisted that Dr. Oliver allow the jury to also see the original photographs. Instead, counsel sat back and allowed Dr. Oliver to "illustrate" for the jury the external injuries based on a comparison of unreliable and inaccurate image enhancements and distorted images of the original autopsy photographs that had been digitized, scanned, compressed and then converted to PowerPoint. Any objective review of the original photos versus the distorted images the jury actually viewed, immediately underscores what effective counsel would have done had he actually appreciated the situation. He would have raised a Daubert challenge and insist that the jury see the originals.

Furthermore, trial counsel were on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and was provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being completely unfamiliar with digitally enhanced images, and despite one year's lead time ("I want to see how its done"; "I don't understand it"; "I've never seen it"), counsel never even looked at the enhancements until mid-trial, and just moments before Dr. Oliver was going to testify before the jury. TT 3/8/04, 15, 18. Then counsel advised the court that he was not pursuing a Daubert challenge

83

— before he even saw the enhancements.  TT 3/8/04, 14-15.

It simply is not possible for counsel to conduct adequate preparation in such a complex area mid-trial.  In a capital case, counsels' failure to prepare in advance and be ready to mount the appropriate gate-keeper challenge is even more egregious. Counsels' failure to review the enhanced images prior to trial precludes any credible argument that he somehow conducted an adequate investigation and acted pursuant to a reasonable strategy.  Indeed, Strickland shows the fallacy of this argument when it cautions that so-called strategic calls are only owed deference when they are made after full preparation and investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsels' judgments.

Strickland, 466 U.S. at 690-91.

Counsels' failure to mount the appropriate Daubert challenge caused Petitioner prejudice in the same way that the semen/sexual assault evidence did.  Based on Dr. Oliver's testimony, the jury was able to conclude that Petitioner caused the victim a

84

multitude of injuries – that in reality may not have existed.  Utilizing the enhancements he created, Dr. Oliver identified the following alleged injuries on the decedent:  "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations." TT 3/8/04, 226.  The majority of these "injuries" were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy.  Based directly on Dr. Oliver's testimony –  and the enhancements he created –  the prosecutor argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since, she claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries.  TT 3/24/04, 73.  She also described the decedent's death as a "systematic execution" and a "systematic dehumanization."  TT 3/16/04, 13-14.

This testimony could only have prejudiced the jury against Petitioner as a general matter in both phases of trial.  It doomed his guilt phase defense and unquestionably adversely effected the jury's weighing in the sentencing phase.

85

**CLAIM VII. THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Government failed to disclose to Petitioner powerful impeachment evidence concerning at least three of the four jailhouse informants, Adam Longoria, Orlando Campos and Darrick Moore, who testified against Petitioner at his trial. Specifically, the Government failed to disclose promises and understandings between it and these witnesses that they would receive consideration (favorable treatment in their own criminal matters) in exchange for testimony against Petitioner. Further, each one of these witnesses testified falsely – in response to questions posed by the prosecutor and defense – concerning their understanding of future favorable treatment. The Government's failure to disclose these understandings and its elicitation of, and failure to correct, false testimony violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), Napue v. Illinois, 360 U.S. 264, 269 (1959), and their progeny. See *PM*, 98-109; *P-Mem*, 80-105.

Initially, it is important to note that Petitioner does not impugn the good faith of these prosecutors. After all, decisions about what information a prosecutor is obligated to disclose can be difficult and must be made on a case by case basis. That

86

said, regardless of whether the trial prosecutors' actions were intentional or not – and Petitioner has no reason to believe that these prosecutors intentionally violated Petitioner's due process rights – Petitioner is entitled to relief.  The prosecutor's intent, or bad or good faith, is not a factor to be considered.  See *P-Mem*, 84.

Sometimes, in such situations, the potential consideration is implicit and it may not occur to a prosecutor that she/he is obliged to turn it over to the defense. Nonetheless, a "prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence" Kyles v. Whitley, 514 U.S. 419, 439 (1995).  This is particularly so when, as in this case, a prosecutor deals with tacit, future consideration as opposed to express, written agreements.  The Due Process Clause requires that not only formal plea agreements with a prosecutor be disclosed, but that informal or implicit understandings must also be disclosed:

> [E]vidence of any understanding or agreement is relevant to such witness' credibility and a jury is entitled to consider it . . . Because it is a constitution we deal with, not semantics . . . it makes no practical difference whether the understanding is consummated by a wink, a nod and a handshake, or by a signed and notarized formal document ceremoniously impressed with a wax seal. A deal is a deal.

Rickman v. Dutton, 864 F.Supp. 686, 705 (M.D. Tenn. 1994) (internal quotation marks and citations omitted).  Cases are legion holding that such implicit, informal,

wink and nod, handshake-type deals must be disclosed.[32]

---

[32]See e.g. Douglas v. Workman, 560 F.3d 1156, 1185 -86 (10th Cir. 2009) ("A deal is a deal-explicit or tacit. There is no logic that supports distinguishing between the two"); Bell v. Bell, 512 F.3d 223, 233 (6th Cir. 2008) ("The existence of a less formal, unwritten or tacit agreement is also subject to Brady's disclosure mandate"); Wisehart v. Davis, 408 F.3d 321, 323 (7th Cir. 2005) (if there was a "tacit understanding that if [the witness'] testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge" ... "Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed"); Gilday v. Callahan, 59 F.3d 257, 269 (1st Cir. 1995) (disclosure of "understanding" between defense counsel and prosecutor would have permitted the jury to reasonably infer that, even if the wink and nod deal had not been explicitly communicated to [the witness], he must have been given some indication that testimony helpful to the Government would be helpful to his cause."); Reutter v. Solem, 888 F.2d 578, 582 (8th Cir.1989) ("[t]he fact that there was no agreement ... is not determinative of whether the prosecution's actions constituted a Brady violation requiring reversal.... We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material ... and that petitioner therefore is entitled to relief"); United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986) ("[F]acts which imply an agreement ... bear on [the witness's] credibility and would have to be disclosed"); Brown v. Wainwright, 785 F.2d 1457, 1465 (11th Cir. 1986) ("it is a constitution we deal with, not semantics. The thrust of Giglio and its progeny has been to ensure that the jury knows all the facts that might motivate a witness in giving testimony"); Haber v. Wainwright, 756 F.2d 1520, 1524 (11th Cir. 1985) ("Giglio did not speak in terms of the state's duty to disclose only bona fide enforceable grants of immunity.  Its reach extends to any understandings or agreements") (internal quotation marks and citations omitted, emphasis in original); DuBose v. LeFevre, 619 F.2d 973, 978 (2d Cir. 1980) (informal negotiations and witness' belief that prosecutor would "do the right thing" and that a favorable plea deal was "within the realm of possibility" if she testified, constituted an understanding subject to Brady disclosure rule); Bragan v. Morgan, 791 F.Supp. 704, 715 (M.D. Tenn. 1992) (noting that Giglio did not speak in terms of only *bona fide* enforceable agreements); Duggan v. Texas, 778 S.W.2d 465, 468 (Tx. Ct. of Crim. Apps. 1989) (en banc) ("judicially imprudent to attempt to distinguish express agreements between the State and a testifying accomplice from those agreements which are merely implied, suggested, insinuated or inferred").

**A.     The Improper Suppression of Evidence.**

The Government argues that Petitioner is not entitled to relief because he has not established that either the jailhouse witnesses or the prosecutor "knew" the witnesses would be receiving any benefit "directly attribute[d]" to their testimony in this case. *RA*, 88, 89-90.

However, the Government acknowledges that Petitioner has proffered evidence establishing that each of the jailhouse witnesses, in fact, received "some reduced sentence, dropped charges or early release on parole," after their testimony against Mr. Bourgeois. *RA*, 88. The Government also acknowledges that AUSA Booth provided post-trial assistance to the witnesses. Id. ("Petitioner has not produced any reliable evidence establishing that AUSA Booth 'knew' exactly what, if any, benefit would result for her post-trial efforts to assist or help any particular witness"). AUSA Booth has also candidly acknowledged that she provided assistance. See *P-Mem*, 90-91 (discussing AUSA Booth's letter to the Texas state parole board on behalf of Adam Longoria).

Given the witnesses' and the prosecutor's strident insistence at trial that no benefit was promised or bestowed in exchange for their testimony, this evidence alone should entitle Petitioner, at minimum, to an evidentiary hearing. See TT

3/22/04, 166-67 (testimony of Adam Longoria stating he was promised "not a thing" in exchange for his testimony); TT 3/9/04, 7 (AUSA Booth) ("Adam Longoria is a state prisoner.  We are giving him nothing.  And he knows that we can't give him anything."); TT 3/19/04, 23 ("There's no promises, nothing"); TT 3/22/04, 186-187 (same); TT 3/9/04, 216, 224, 225-26 (testimony of Orlando Campos denying any promises in exchange for his testimony); TT 3/9/04, 7 (AUSA Booth re: Campos) ("we are giving him nothing"); 3/17/04, 57 ("I have promised him nothing"); TT 3/9/04, 203 (testimony of Darrick Moore that he was only "hoping" for a downward departure).

Moreover, the Government ignores Petitioner's proffered evidence of what the witnesses actually "knew" about why they were receiving benefits.  See Affidavit of Adam Longoria, *PA*, Document # 31 ("I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole"); Declaration of Kathleen Kaib, *PA*, document # 30 (interview with Orlando Campos indicating that either AUSA Booth or FBI Agent Beckett promised to help him with his sentence after the trial was over);[33] Declaration of Darrick

[33]In determining if a prosecutor's actions are "knowing," actual knowledge by the trial prosecutor is *not* required.  Knowledge of law enforcement personnel

90

Moore, *SPA* # 67, ¶¶ 4-5 ("[AUSA Booth] told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced. I met with Ms. Patti Booth a second time, before I testified against Bourgeois, and she told me that she had spoken to Lance Duke and they had agreed to reduce my sentence if I agreed to cooperate against Bourgeois. She also told me if I did good on the stand she would make sure that sentence I was going to get would be reduced even further").

Additionally, on May 10, 2007, Petitioner received, via fax from the Government,[34] a letter from Mr. Longoria to AUSA Booth, stating:

> I'm letting you know that since you have never answered any of my letters or have done any of the things that you said you would (one being that you were suppose (sic) to write a letter to the Parole Board, which you never did) do. I'm going to help them with their case. I haven't told them that, but I think I will write them a letter in the next week and let them know. I will say that all the testimony I gave at the trial was false and I was told what to say by you and the F.B.I. agents that you worked with. I did my part and it didn't cost you next to anything and then you go and lie and screw me over. Is that how you treat the people that help you? You acted like a wole (sic) different person when I was with you. Once you got what you wanted, you said to hell with him. You know what I'm going to do, I'll wait for a reply from you and if I get none then

---

involved with the prosecution team is attributed to the trial prosecutor. Giglio, 405 U.S. at 154.

[34]Petitioner appreciates the Government's compliance with its ongoing Brady obligations. See Imbler v. Pachtman, 424 U.S. 409 (1976).

I'll write them lawyers in Philadelphia and work with them. I'll give you till the 11th to respond back.

*5/3/07 Letter from Adam Longoria to AUSA Booth*, *SSA*, document # 77. As Mr. Longoria's letter makes clear, contrary to his trial testimony, **promises were made** and Longoria's testimony on behalf of the Government was given with the **expectation** that the Government would fulfill those promises.[35] Moreover, according to his letter, it appears that Mr. Longoria provided **false** testimony on behalf of the Government in exchange for promised benefits. Id.

Nonetheless, the Government attempts to minimize the significance of its undisclosed promises to witnesses by asserting that even if promises were made, the prosecutor had no control over any state court proceedings and no control over any final sentence in federal court. *RA*, 87, 88. This misses the point.

Even if the Government's assertion were true, it is the **witness' expectation** of some benefit in exchange for their testimony, regardless of whether it is actually received, that creates the prosecution's Brady obligation. Indeed, this expectation creates a bias in favor of the prosecution which can be used to impeach the witnesses

---

[35]As we now know, AUSA Booth did write a letter to the parole board on behalf of Mr. Longoria. See *P-Mem*, 90-91 (discussing AUSA Booth's letter to the Texas state parole board on behalf of Adam Longoria).

92

credibility and thus, the jury is entitled to know about deals, agreements, negotiations with, or expectations of, prosecution witnesses. See Bagley, 473 U.S. at 683-84 (Brady requires the disclosure of "promises of reward" and "inducements" offered to witnesses); Giglio, 405 U.S. at 154-55 ("evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); Napue v. Illinois, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

In this case, the witnesses were not just "hoping" for a benefit or testifying in exchange for "nothing at all," per their testimony. On the contrary, the witnesses **expected** and **knew** that efforts would be made on their behalf in exchange for their testimony. The Government was obliged to disclose this information.

Moreover, any assertion that the recommendation of a respected federal prosecutor has no impact on a state or federal court proceeding is hard to accept and is belied by Petitioner's proffered evidence. See *P-Mem*, 90 (discussing Adam Longoria's reduction of sentence from a possible 25-99 years to 7 years based on

AUSA Booth's conversation with state prosecutor James Sales);[36] id. at

---

[36]The Government asserts that Adam Longoria's March 28, 2004 letter to FBI agent Beckett wherein he states that "you all owe me nothing," "entirely undermines" Mr. Longoria's recent affidavit. See *RA*, 90; *RA, Attachment H*. However, read in conjunction with his post-conviction affidavit, *PA* document # 31 and the Declaration of his attorney, Bill May, *PA*, document # 32, Longoria's statement to FBI agent Beckett can easily be interpreted to read "you all owe me nothing," other than what was previously agreed. That Mr. Longoria was seeking **additional** help from the prosecution to see his new baby is supported by the recent declaration of Jennifer Lee Valdez, his ex-wife who states:

> On January 10, 2003 Adam Longoria and I got married while he was still in the county jail. He got out of jail a few months later and in late May I found out I was pregnant.

> Two days after I found out I was pregnant Adam Longoria got locked up for bank robbery.

> I had my baby on January 21, 2004. Adam was still in jail when the baby was born.

> Detectives on his bank robbery case told me he was a liar and that he had lied to me
> about many things.

> Adam constantly told me that he was facing twenty-five to ninety-nine years but that he had worked out a deal with the prosecutor to get no time in jail at all.

> I remember he told me he and his lawyer had worked with the prosecutor on a deal to get him no jail time at all instead of the twenty-five to ninety-nine years he was facing.

> He constantly told me on the phone and in letters how he was working on this deal so that he could get out of jail and also so that he could hold the baby.

94

92 (discussing Orlando Campos' parole from state prison after serving less that 3 years on a 12 year sentence when he was promised help from AUSA Booth or FBI agent Beckett); id. at 94 (discussing Darrick Moore's reduction of sentence from a possible 151-188 months to 50 months after AUSA Booth spoke with AUSA Lance Duke).[37]

The Government also argues that the failure to disclose Adam Longoria's use of anti-psychotic drugs did not violate Brady because prosecutors may not have known about it, and this was not a "benefit" bestowed on Longoria. *RA*, 90-91.  The Government, however, ignores the affidavit of Mr. Longoria wherein he specifically states that he was on anti-psychotics and Paxil at the time of his involvement in this case and that "**[AUSA] Patti Booth knew about the medication I was on.**" See

---

A couple years, when I was dating another guy, this other guy made me throw out Adam's letters.

Affidavit/Declaration of Jennifer Lee Valdez, *SSA*, document # 76.  At a minimum, Longoria's Letter to Agent Beckett, his recent affidavit and the declarations of Bill May and Jennifer Valdez show that material facts are in dispute and an evidentiary hearing is required.

[37]The Government does not dispute the veracity of Mr. Moore's declaration wherein he indicates that his sentence was reduced based on an agreement between AUSA's Booth and Lance Duke. See *RA*, 88 & n. 32; Declaration of Darrick Moore, *SPA* # 67, ¶ 5.

Affividavit of Adam Longoria, *PA*, document # 31.[38]

Evidence of Longoria's use of anti-psychotic medication was directly relevant to his memory; ability to recall information; ability to perceive information, conversations and events; ability to accurately relay information; and, overall credibility. Thus, regardless of whether it was a benefit bestowed by the Government, the prosecution was obliged to disclose its knowledge of Mr. Longoria's use of anti-psychotic medication and mental state at the time of trial. See *P-Mem* at 89-90.[39]

### B.    Materiality.

---

[38]Anti-psychotic medications such as Clozapine and Risperidone are used to treat schizophrenia, schizoaffective disorders, substance induced psychosis, personality disorders and affective disorders. *Textbook of Pharmacology* 432 (Alan M. Schatzberg, M.D. & Charles B. Nemeroff, M.D., Ph.D. eds., American Psychiatric Publishing, 3rd ed. 2004). Paroxetine (Paxil) has been approved for the treatment of depression, panic disorder, obsessive-compulsive disorder, social anxiety disorder, generalized anxiety disorder and posttraumatic stress disorder. Id. at 259.

[39]See also Wilson v. Beard, 2006 WL 2346277, *12, *17 (E.D.Pa. Aug. 9, 2006), appeal pending, Wilson v. Beard, No. 06-9004 (3d Cir.) (Brady violation where prosecution failed to disclosed evidence or witness' psychiatric history, including schizophrenia and the use of psychotropic an **anti-psychotic** medications, which counsel could have been used to question the witness credibility including: their perception of reality; ability to observe; memories; and ability to tell the truth); United States v. Perdomo, 929 F.2d 967, 971-72 (3d Cir. 1991) (Brady violation where prosecution withheld evidence of witness' prior convictions and psychiatric problems; "Such information would have been critical in presenting the witness' mental state, demeanor and behavior to the jury, and in questioning the witness' credibility"); Chavis v. North Carolina, 637 F.2d 213, 224-25 (4th Cir. 1980) (Brady violation where prosecution withheld evidence of witness' mental health problems).

The Government contends that Petitioner cannot meet the "demanding" legal standards to establish the materiality of the Brady violations. *RA*, 87.  Respondents greatly overstate this burden.  See *P-Mem*, 85-87 (discussing materiality).

Moreover, where, as here, the prosecutor knowingly permits less-than-true information to be conveyed to the jury, an even more defense-friendly materiality standard applies, *P-Mem*, 100-01.  Under these circumstances, the proper materiality standard is that of United States v. Bagley, 473 U.S. 667, 678-79 & n.9 (1985), United States v. Agurs, 427 U.S. 97, 103 (1976) and Giglio v. United States, 405 U.S. 150, 154 (1972), which requires the Government to show that the error is harmless

beyond a reasonable doubt.[40]  Petitioner has met his burden.[41]

The Government states that it is "somewhat difficult to ascertain whether Petitioner is raising a separate claim with regard to alleged false testimony as it is so closely tied to the Brady violations."  *RA*, 91-92.  But, the presentation of false testimony creates a separate ground for relief from Petitioner's Brady claim.  Compare *P-Mem*, 100-01, Claim IV, Section E ("The Government Knowingly Permitted the Use of False Testimony.  In addition to suppressing the disclosable evidence, the Government failed to correct the informants' false testimony"); with *P-*

---

[40]See also Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to Brady claims and claims that the prosecution has knowingly used perjured testimony or false evidence.... If the prosecution has knowingly used perjured testimony or false evidence, the standard is considerably less onerous: the conviction 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict...'" 992 F.2d at 497 (quoting Bagley, 473 U.S. at 682 (1985); Braun v. Powell, 227 F.3d 908, 920 (7th Cir. 2000) ("when the prosecutor knowingly relies on false testimony, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury") (quoting Agurs, 427 U.S. at 103 and noting that "the Agurs standard . . . sets a lower threshold for determining materiality")); United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting Agurs) (when the prosecutor knowingly conveys false information to jury, falsehood is material "if there is any reasonable likelihood" it "could have affected the judgment of the jury," requiring the State to show "harmless[ness] beyond a reasonable doubt").

[41]Once again the Government has greatly overstated the standard of prejudice. See *RA*, 92 (citing cases from the Court of Appeals for the Fourth Circuit for the proposition that Petitioner must meet a "heavy burden" to prevail on a claim that the prosecutor knowingly presented false testimony).

*Mem*, 101 ("[m]oreover, as set forth above, Mr. Bourgeois was prejudiced by improper admission of the false testimony from the jailhouse informants. Mr. Bourgeois' right to due process was violated. Napue, 360 U.S. at 269").

Evidence of the benefits bestowed on the jailhouse witnesses and Mr. Longoria's mental health problems and use of anti-psychotic drugs should have been disclosed to the defense. This improperly suppressed information was material to the guilt/innocence and sentencing phases of Mr. Bourgeois trial. See *P-Mem,* 95-100 (discussing materiality and prejudice to Petitioner from the Government's non-disclosure). For this reason, the Government's contention that any failure to disclose this evidence was harmless, or immaterial, is wrong. See *RA*, 89, 91. But see *P-Mem*, 95-100 (discussing materiality and prejudice to Petitioner from the Government's non-disclosure).

Moreover, as trial counsel have stated, their strategy included ascertaining "what benefit the [jailhouse witnesses] were receiving from the Government" and attempting to "locate witnesses to impeach their credibility." See *Response Affidavit of John Gilmore, Esq.*, *RA*, Attachment B, pp. 3-4. To impeach the witnesses during cross-examination, trial counsel also "used all the information [they] could obtain." Id.; see also *Respondent's Interrogatories for Douglas Tinker*, *RA*, Attachment A, pp. 19-22. Thus, in assessing materiality, this Court must considers how counsel, who

99

sought to "use all information [they] could obtain" to "impeach [the jailhouse witnesses'] credibility," could have used the suppressed information at trial and through pretrial investigation and development of other evidence. See Kyles, 514 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); id. at 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); Bagley, 473 U.S. at 676 (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by the defense, may have made a difference); id. at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled").[42]

Here, trial counsel could have used the suppressed evidence to support their argument that the jailhouse witnesses should not be believed and that their testimony

---

[42]See also Perdomo, 929 F.2d at 971 (materiality "inquiry requires consideration of ... possible effects of non-disclosure on the defense's trial preparation"); Banks v. Reynolds, 54 F.3d 1508, 1519 (10th Cir. 1995) (materiality inquiry must "recognize that evidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories").

in favor of the Government was motivated by more than any alleged desire just do the right thing.  See e.g. TT 3/22/04, 186 (testimony of Adam Longoria) ("Q[uestion]. So you're just [testifying] so justice can be served.  A[nswer].  It's the right thing to do."); TT 3/22/04, 56-58 (prosecutor arguing at penalty closing that Campos' only motivation for testifying was to hold Mr. Bourgeois "accountable").

The duty to enforce Brady "with painstaking care is never more exacting than it is in a capital case."  Kyles, 514 U.S. at 422.  Viewing the Brady material collectively, in this case, as required by Kyles, 514 U.S. at 436, confidence is undermined in the first-degree murder conviction and death sentence.[43]

**Claim VIII.** **PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

Mr. Gilmore's clear strategy during this trial was to discredit Adam Longoria and Orlando Campos who were both testifying as witnesses for the Government.  However, both Mr. Longoria and Mr. Campos were also witnesses for the defense for

---

[43]The Government also argues that even if undisclosed consideration was bestowed on one of the jailhouse witnesses, this would not impact the others in this case. *RA*, 91.  This is incorrect.  Kyles, 514 U.S. at 445 (suppression of evidence that provides "impeachment of one []witness can call for a new trial even though the attack does not extend directly to others.")

two of Mr. Gilmore's other clients.  Thus, in one court proceeding Mr. Gilmore was ethically bound to do everything in his power to discredit these two witnesses (Petitioner's trial) and in the other court proceedings he was ethically bound to do everything he could to vouch for and bolster their credibility.  This conflict of interest became obvious at Petitioner's trial during his cross-examination of Mr. Longoria and Mr. Campos.  Specifically, it was revealed to Petitioner's jury that Mr. Gilmore had proffered Mr. Longoria as a defense witness in another case.  With respect to Campos, Mr. Gilmore had an interest in seeing his credibility unchallenged because he was offering favorable testimony with regard to one of Mr. Gilmore's former clients.   TT 3/9/04, 221-223, 3/22/04, 179.  The Government now argues that this conflict claim is "novel, new and unmoving."  *RA*, 94.   The Government is wrong.

How persuasive and effective could Mr. Gilmore be in convincing Petitioner's jury to disbelieve Mr. Longoria and Mr. Campos when the jury knew that Mr. Gilmore in another proceeding had presented, relied upon and vouched for Mr. Longoria's credibility?  If the jury was going to discredit anything it would have been Mr. Gilmore's fickle arguments concerning whether these witnesses on one day were credible and worthy of believing and on another day were lying snitches.  And how hard did Mr. Gilmore pursue the issue of Mr. Campos' lack of credibility – on behalf of Petitioner – when he knew another client was relying on Mr. Campos being found

102

credible?   Mr. Gilmore was laboring under an obvious conflict of interest that was neither "new" nor "novel", rather it was actual and irreconcilable.

The Government also argues that Petitioner's conflict claim is "substantive . . . rather than being couched in an ineffective assistance claim" and is therefore procedurally defaulted. *RA*, 95. This is not so. Petitioner's claim, like all conflict of interest claims, arises under the Sixth Amendment's right to counsel. The only difference between a conflict claim and an ordinary ineffective assistance of counsel claim is that with a conflict of interest claim prejudice may be presumed. The caption of the claim itself clearly and specifically states it arises under the Sixth Amendment right to counsel. Additionally, Petitioner cites the Sixth Amendment in four of the seven paragraphs that make up this claim. *PM*, ¶¶ 245, 246, 247 & 251. Finally, the first case cited by Petitioner in the conflict of counsel section of *Petitioner's Memorandum* is Strickland – the seminal case on ineffective assistance of counsel claims, which speaks of counsel's "duty of loyalty" to his client. Strickland, 466 U.S. at 688. Petitioner goes on to quote Strickland three more times.

The Government next argues that this claim should be denied because Ross Griffin did not testify. *RA*, 96. Mr. Griffin's failure to testify is exactly why this claim is meritorious. Mr. Gilmore represented Mr. Griffin when he was a cooperating witness against Petitioner. Mr. Griffin could have provided extremely valuable

103

testimony concerning any benefits he was promised or received in return for his agreeing to cooperate against Petitioner. However, because he was represented by Mr. Gilmore this avenue of investigation was never pursued and the testimony never presented.

Finally, the Government speculates that even if Mr. Gilmore was laboring under a conflict of interest, Mr. Tinker could have stepped in and handled these witnesses. *RA*, 96-97. This argument simply ignores the record in this case. Mr. Gilmore – not Mr. Tinker – handled the investigation and cross-examination of the prisoner witnesses. See *RA*, Attachment B. And it was Mr. Gilmore who had a conflict with Mr. Griffin, Mr. Longoria and Mr. Campos. The Government's speculation, in this capital case, of what could have or should have occurred here to avoid this conflict of interest does nothing to remedy the deprivation of Petitioner's Sixth Amendment right to effective assistance of counsel. A new trial and sentencing is the only thing that will remedy this denial of his right to counsel.

**CLAIM IX.  PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial, and a reliable capital sentencing verdict. The prosecutor's comments, both individually and cumulatively, amounted to prosecutorial misconduct. Trial counsels' failure to object to any of these comments and arguments, or request a curative instruction, was ineffective. Moreover, the Court's failure to give an immediate curative instruction exacerbated the harm. Petitioner was denied his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. See *PM*, 112-120; *P-Mem*, 110-123. For the most part, Petitioner relies on the factual and legal arguments set forth in the *Petition Motion* and *Petitioner's Memorandum*, and only addresses the Government's more erroneous arguments.

The Government's Answer correctly identifies the three-part test this Court must employ in determining if a prosecutor's improper remarks have affected Petitioner's "substantial rights," i.e., whether due process has been violated. See *RA*, 98 ("a reviewing court must focus on three factors: (1) the magnitude of the

105

prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction") (citing United States v. Lowenberg, 853 F.2d 295, 302 (5th Cir. 1988)); see also *P-Mem*, 112 (identifying three part test).  However, the Government falters in its application of this three part test to Petitioner's case.

### 1.    The Prejudicial Effect of the Prosecutor's Remarks.

Relying on Lowenberg, the Government argues that the prosecutor's references to Mr. Bourgeois as "that thing" and "dog," were a "fair interpretation of the evidence." *RA*, 98 (quoting Lowenberg, 853 F.2d at 302); see also *P-Mem*, 113-14, 118-19 (alleging misconduct as result of the prosecutor's references to Petitioner as "that thing" and "dog").  The Government is wrong and its reliance on Lowenberg is greatly misplaced.

In Lowenberg, where the defendant was on trial for the facilitation of prostitution, the Court held that the prosecutor's references to the defendant as "pimp" and "filthy pimp," were not unfairly prejudicial.  Id. at 302.   Although the Court found these comments were "clearly inappropriate," id. at 301, and "certainly uncalled for," id. at 302, the Court held that the references were an invited response to the defendant's argument that he was a business man and not a "pimp," a term the

defense first used in their own argument.  Id.  In other words, the Court found that calling the defendant a "pimp," **in a prostitution case**, where the defendant **first** claimed he was not a "pimp," was an invited response.  Id.

On the other hand, in this, a murder case, the prosecutor did not refer to Petitioner as "murderer," "killer," "assassin" "child killer" or some other term reflective of the actual charges.  Instead, the prosecutor called Petitioner "that thing" and "dog" – terms which can be associated with none of the actual charges at trial. Moreover, the prosecutor did not refer to petitioner as "that thing" and "dog" in response to any argument made by the defense wherein they first alleged that he was not a "thing" or a "dog."   Thus, in this case, unlike Lowenberg, the prosecutor's improper comments were not a "fair interpretation of the evidence" and were not invited responses.

The Government also claims the prosecutor's argument to the jury that it did not engage in forum shopping regarding Dr. Dailey was "proper and correct."  *RA*, 100; *P-Mem*, 115-16 (alleging false argument by the prosecutor that no expert forum shopping had occurred on behalf of the Government).  According to the Government, because Dr. Dailey never provided a definitive opinion, their search for a "different" expert opinion did not amount to forum shopping.  *RA*, 100.

107

However, Dr. Dailey did provide a definitive opinion: he concluded that he could not "exclude" Petitioner or Robin or AB-1994 as possible contributors of the alleged bite marks to JG-1999.  See *Declaration of Army Colonel J. Curtis Dailey, M.D. PA*, document # 45; see also *PM*, *P-Mem*, *Reply*, Claim V.  Thus, the Government's search for experts, Dr. Senn and Dr. Chrz, who concluded that they could exclude Robin and AB-1994 – leaving Petitioner as the only possible biter – did amount to forum shopping.  Id.  Dr. Dailey's opinion that neither Petitioner, nor Robin, nor AB-1994 could be excluded did not support the prosecution's theory of the case, and that is why the Government continued "shopping" for another expert opinion.  See *Declaration of Army Colonel J. Curtis Dailey, M.D. PA*, document # 45 (stating that AUSA Booth told Dr. Dailey that if he could not help her she would go out and find an expert who could).  The Government's current and prior assertion that there was no expert forum shopping is false.

## 2.    Cautionary Instructions.

The Government concedes that no immediate or specific cautionary instructions were requested by counsel or given by the Court in response to the prosecutor's improper arguments. *RA*, 104-05.  The Government, however, asserts that the Court's general instructions on the evidentiary value of counsel's argument were adequate to cure the prosecutor's improper comments.  Id. ("the Court arguably

gave a cautionary instruction by giving the standard instructions about the appropriateness of counsel's argument, including that it is not evidence . . . the standard cautionary instruction was sufficient"). The Government is wrong and cites no authority for this proposition and ignores Petitioner's cases establishing that such general instructions are not sufficient to cure improper prosecutorial comment or argument. *P-Mem*, 123 n. 54.[44] Similarly, the Government does not address Petitioner's argument and authority establishing that the Court had an independent obligation, unfulfilled in this case, to *sua sponte*, provide cautionary instructions. Id.

### 3.    The Strength of the Evidence.

The Government also asserts that the strength of the evidence and the nature and character of the charges against Mr. Bourgeois, would have entitled to the prosecution to use "even stronger language" about Petitioner or the case. *RA*, 105. Again, the Government is wrong.

As set forth throughout the *Petitioner's Motion*, *Petitioner's Memorandum* and

---

[44]See also U.S. v. Goff, 847 F.2d 149, 165 (5th Cir. 1988) ("It is doubtful that its general instructions were sufficient to counter the effect of at least some of the prejudicial statements."); U.S. v. McPhee, 731 F.2d 1150, 1153 (5th Cir. 1984) (trial court's later reference in the jury charge that the defendant was "not on trial for any act or conduct or offense not charged in the indictment" was grossly inadequate under the circumstances, where there was no cautionary instruction made after the prosecutor's improper statements).

this *Reply*, the strength of the evidence establishing that Petitioner was responsible, or solely responsible for JG-1999's death is seriously in doubt. See e.g. *PM*, *P-Mem*, Claims IV, V, VI, VII, X, XI. Moreover, Petitioner's right to a fair trial and due process are not diminished because of the nature of the charges or allegations. See e,g. Walbey v. Quarterman, 2009 WL 113778, *8, 309 Fed.Appx. 795 (5th Cir. Jan. 19, 2009) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter . . . To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge . . . Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act"). Similarly, the heinous nature of the charges do not excuse the Government's conduct in this instance.

### CONCLUSION

Petitioner will soon file a motion for discovery and for an evidentiary hearing. He believes that he should obtain both. This case presents meritorious and troubling issues regarding Mr. Bourgeois' right to effective counsel and a fair proceeding. Counsel look forward to moving forward with these issues via an evidentiary hearing, and ultimately to obtaining the relief to which Petitioner is entitled.

Respectfully Submitted,

/s/    Michael Wiseman

_____

Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner Alfred Bourgeois

Dated:    Philadelphia, PA
          June 26, 2009

111

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 26th day of June, 2009 I served the foregoing upon the following persons by e-file and United States Mail:

Patricia Hubert Booth

United States Attorney's Office

800 North Shoreline,

Suite 500 Corpus Christi, TX 78401

Patti.Booth@usdoj.gov

Tony R. Roberts

United States Attorney's Office

PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

James L. Turner

United States Attorney's Office

PO Box 61129
Houston, TX 77208-129
jim.turner@usdoj.gov

/s/ Michael Wiseman

_____

Michael Wiseman