# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

—————————————————————— :

UNITED STATES OF AMERICA,      :       No. Cr-C-02-216

      :

      Respondent,      :       Honorable Janis Graham Jack,

      :       U.S.D.J.

      -against-      :

      :       **Capital Case**

ALFRED BOURGEOIS,      :

      :

      Petitioner.      :

—————————————————————— :

### PETITIONER'S SECOND SUPPLEMENTAL APPENDIX IN SUPPORT OF MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. SECTION 2241

LEIGH SKIPPER, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated:    Philadelphia, PA
          June 26, 2009

**Index to Second Supplemental Appendix**

**Document   Description**
**Number**

72.       Petitioner's Interrogatories Directed to Douglas Tinker
73.       Notice of Service of Petitioner's Interrogatories to Douglas Tinker
74.       Declaration of Victoria Swanson, Ph.D., dated June 8, 2009
75.       Strengthening Forensic Science in the United States: A Path Forward, Report of the National Academy of Sciences
76.       Declaration of Jennifer Lee Valdez
77.       Letter from Adam Longoria to AUSA Booth, dated 5/3/07

72

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :

UNITED STATES OF AMERICA,          :          No. Cr-C-02-216
                                   :          No. Cv-07-223
                    Respondent,    :     Honorable Janis Graham Jack,
                                   :             U.S.D.J.
         -against-                 :
                                   :
ALFRED BOURGEOIS,                  :
                                   :
                    Petitioner.    :
_____     :

**Petitioner's Interrogatories Directed to Douglas Tinker, Esq.**

Pursuant to Fed.R.Civ.P. Rules 26 and 33, and pursuant to the Court's order of August 28, 2008, Petitioner, Alfred Bourgeois, propounds the following interrogatories.

**Interrogatories Related to Claim I.**

1.    A.    When you reported to the Court that mental retardation is not an issue in this case (see PTT, 1/16/04, 7, attached as Exhibit A)[1] had you caused Mr. Bourgeois to be subjected to intelligence testing, or had you reviewed any reports of intelligence testing?

      B.    On what did you base this concession?

2.    A.    Following receipt of the report of Dr. Donald E. Weiner (dated March

_____

[1]Pre-trial and trial transcripts are cited as "PTT" and "TT" respectively, followed by the corresponding date and page numbers.

3, 2004), did you have a follow up meeting or telephone conversation with him?

 B. If so, describe the content of that meeting.

 C. If not, did Mr. Gilmore?

3. At the time of this trial were you aware of the significance of a score on an intelligence test of 75?

4. A. Were you familiar with the so-called Flynn-effect at the time of this trial?

 B. If so, please describe your understanding of it.

5. Did you have a tactical or strategic reason for not calling Dr. Donald E. Weiner, as a witness at the sentencing hearing?  If so, please state it.

6. A. Did you possess a tactical or strategic reason for having Dr. Weiner evaluate Mr. Bourgeois one week prior to the start of trial?[2]

 B. If so, please state the reason(s).

7. Were you aware of the criteria for establishing mental retardation as set forth in <u>Atkins v. Virginia</u>?

8. Describe the steps, if any, taken to determine whether Mr. Bourgeois met the criteria as a person with mental retardation.

9. Did you ever review Dr. Weiner's raw test data, or have another expert do so? If not, did you have a tactical or strategic reason for not doing so?

---

[2]The record reflects that jury selection commenced on February 9, 2004 and testimony began on March 2, 2004.  Dr. Weiner's report indicates he tested  Mr. Bourgeois on February 28, 2004 and issued his report on March 3, 2004.

**Interrogatories Related to Claim II.**

10.   A.   Did you consider that an I.Q. in the borderline range of mental retardation is considered a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase of trial to discuss the results of his I.Q. testing?

11.   A.   Did you consider that the diagnosis reached by Dr. Weiner, that Mr. Bourgeois has a "Cognitive Disorder - Mild cerebral damage with moderate posterior cerebral damage" is considered a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase of trial to discuss the results of his neuropsychological testing and the meaning and significance of this finding?

12.   A.   Did you consider Dr. Weiner's conclusion that "Mr. Bourgeois['] . . . performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions" to be a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase to discuss and explain this conclusion?

13.   Was it your desire to elicit, present and/or otherwise establish before the penalty phase jury that Mr. Bourgeois had a history of childhood abuse, neglect and family dysfunction?

14.   A.   Please indicate whether you agree with Mr. Gilmore's recent statement that you did not call Dr. Cunningham as a penalty phase witness because "Dr. Cunningham's explanation [for Mr. Bourgeois' actions] conflicted with Mr. Bourgeois' defense."

      B.   If you agree, please explain how this guilt-phase "conflict" prevented or

3

impaired you from calling Dr. Cunningham in the penalty phase?

15. In view of Mr. Gilmore's recent statement: "Mr. Tinker informed me that he thought it would be more effective developing mitigation evidence through Dr. Estrada, than through Dr. Cunningham, and in view of the Court's ruling during your trial cross-examination of Dr. Estrada "that no witness here has testified that Mr. Bourgeois was sexually-physically abused or neglected in any way" (TT 3/23/04, 27-29, attached as Exhibit B), please explain the basis for your decision not to call Dr. Cunningham as a mitigation witness to provide evidence about Mr. Bourgeois' history of childhood abuse, neglect and family dysfunction?

16. The record shows that you proffered the testimony of Professor of Psychology George W. Holden (University of Texas) as a guilt phase witness to establish a defense that Mr. Bourgeois did not kill with premeditation.  PTT 3/1/04, 1-72. The Court denied this application, but suggested that the defense consider calling him at a potential penalty phase. Id., at 74 (attached as Exhibit C).  You had previously alerted the Court that you were considering calling him in the penalty phase.  PTT 10/20/03, 11-12 (attached as Exhibit D).

In view of Dr. Holden's potential testimony that "the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions" (Holden Declaration, Exhibit 11, Petitioner's Appendix), please describe your tactical or strategic reason for not calling him as a witness in the penalty phase of trial.

17. A.   Do you disagree with Dr. Estrada's statement that:

"I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. . . While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions."  Declaration Carlos R. Estrada, M.D., dated May 14, 2007 (Exhibit 7, Petitioner's Appendix).

B.   If you agree with Dr. Estrada's assessment, please explain how it came

4

to be that the jury was not provided with an accurate assessment of your client's mental health profile.

C.    If you disagree, please state the basis for your disagreement.

**Interrogatories Related to Claim III.**

18.    Pursuant to 18 U.S.C. §§1111(b) and 3236, the Government was required to prove beyond a reasonable doubt that the fatal injuries were inflicted on the grounds of the Corpus Christi Naval Air Station. Prior to trial the Government provided defense counsel with an autopsy report prepared by Dr. Elizabeth Rouse and a report from Dr. Kathleen Kagan-Hallet, a neuropathologist. Dr. Kagan-Hallet examined the evidence in this case and determined that the fatal injuries were approximately ten days old. Dr. Kagan-Hallet's report was specifically referenced in the autopsy report prepared by Dr. Rouse.

A.    Did you have a strategic or tactical reason for failing to cross-examine the Government's pathologist Dr. Elizabeth Rouse, who performed the autopsy, as to the timing of the infliction of the fatal injuries?

B.    Did you have a strategic or tactical reason for failing to call as a witness Dr. Kathleen Kagan-Hallet, to testify that she thoroughly examined the evidence in this case and determined that the infliction of the fatal injuries was approximately ten days prior to death?

C.    Did you have a strategic or tactical reason for failing to retain and call as a witness a neuropathologist to testify that the infliction of the fatal injuries was approximately ten days prior to the date of death?

19.    The Government called Mr. Bourgeois' wife Robin and his daughter AB-1994 to testify as to what transpired on the day the decedent was found lying on the grounds of the Naval Air Station. Their testimony directly contributed to his conviction and sentence of death. Prior to trial, both Robin and AB-1994 had given various and conflicting accounts as to these events. You were provided with at least some of these statements prior to trial.

A.    Did you investigate Robin and AB-1994's reputation for being truthful,

honest and law-abiding?

B.    Did you have a strategic or tactical reason for failing to confront either Robin or AB-1994 with their poor reputation for being honest, truthful or law-abiding?

C.    Did you have a strategic or tactical reason for failing to call witnesses to testify to the poor reputation in the community of Robin or AB-1994 for being truthful, honest and law-abiding?

**Interrogatories Related to Claim IV.**

20.    At trial, prosecution witness, Dr. Elizabeth Rouse, who conducted the autopsy, testified that she performed a sexual assault examination on the body of the deceased, JG-1999.  See TT 3/8/04, 59-60, Exhibit E, attached.  However, Dr. Rouse did <u>not</u> testify about whether her examination of JG-1999 revealed any evidence of vaginal trauma and no questions were asked on direct or cross-examination regarding those observations.  Morever, in her autopsy report, Dr. Rouse specifically concluded that "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic**.  The back is straight.  The anus unremarkable and atraumatic." See Autopsy Report of Dr. Elizabeth Rouse at p. 3, Exhibit F, attached.  Nevertheless, prosecution witness, Dr. Scott Benson, testified that the autopsy of JG-1999 revealed vaginal trauma.  See TT 3/5/04, 44-46, Exhibit G, attached.

A.    Did you consider Dr. Benton's testimony regarding the alleged vaginal trauma to JG-1999 to be highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

B.    Did you have a strategic or tactical reason for not cross-examining Dr. Rouse regarding the conclusions in her autopsy report ("The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic**" – i.e., that there was <u>no</u> vaginal trauma to JG-1999) in an effort to challenge Dr. Benton's conclusions?

6

C.     Did you have a strategic or tactical reason for failing to call Dr. Rouse as a defense witness to testify about her autopsy results and her conclusion that there was <u>no</u> vaginal trauma to JG-1999?

D.     Did you have a strategic or tactical reason for failing to call your own expert to review the autopsy results and testify that the post-mortem examination of JG-1999 revealed <u>no</u> vaginal trauma, particularly in view of the disagreement between Benton and Rouse on this point?

E.     Did you have a strategic or tactical reason for failing to cross-examine Dr. Benton to challenge his testimony that the autopsy revealed vaginal trauma by using Dr. Rouse's actual autopsy report which indicates that there was <u>no</u> vaginal trauma to JG-1999.

21.    At trial, the Government presented expert testimony and argued to the jury that Mr. Bourgeois' semen was detected during the post-mortem rectal examination of the deceased, JG-1999.  As part of your preparation for trial, you retained and consulted with a defense DNA expert, Dr. Elizabeth Johnson.  On March 1, 2004, the day before the start of jury selection, Dr. Johnson provided you with a summary of the testimony she could provide if called to testify to counter the Government's assertions regarding the alleged semen.  <u>See</u> Exhibit H, attached.  In that summary, Dr. Johnson concluded that the FBI did not conduct the full panoply of tests to confirm the presence of semen; the additional AP reagent and sperm search test she conducted were both negative; if the substance recovered from JG-1999 was semen, sperm should have been detected but were not; and, false positives are possible in the only test conducted by the government – the P30 test.  <u>Id.</u>  You have previously stated that you and Mr. Gilmore considered using the testimony of Dr. Johnson at trial but that "[s]he did not do the testing you requested in a timely fashion and, therefore, we did not utilize her services."  Respondents' Interrogatories for Douglas Tinker at 11-14.

A.     Would you agree that the testimony regarding the alleged semen reportedly discovered in the rectum of JG-1999 was highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

B.  Do you acknowledge having received the faxed summary of Dr. Elizabeth Johnson's proposed testimony on March 1, 2004?

C.  Would you agree that Dr. Johnson's conclusions as stated in her March 1, 2004, summary would have been beneficial to the defense in countering the Government's allegations regarding the alleged semen?

D.  If so, did you have a strategic or tactical reason for failing to request relief from the Court's deadline so that you could present the testimony of Dr. Johnson?

E.  Did you have a strategic or tactical reason for failing to request additional time from the Court to consult another expert who could have countered the government's alleged semen evidence?

F.  Was Dr. Johnson the only expert you consulted regarding the alleged semen evidence?

**Interrogatories Related to Claims V & VI.**

22.  At the guilt phase of trial the Government called forensic pathologist Dr. Williams Oliver.  Dr. Oliver did not perform the autopsy in this case and was not present for the autopsy.  Dr. Oliver digitally enhanced the original autopsy photographs and testified to numerous injuries on the decedent's body that he was able to discover but that did not appear on the original autopsy photographs.  Furthermore, the Government's bite mark experts Drs. David Senn and Bryan Chrz utilized these enhanced images in their examination and testimony to the jury.  The findings of Drs. Oliver, Senn and Chrz were utilized by the Government at both the guilt and penalty stages of the trial.

A.  Did you have a strategic or tactical reason for failing to retain an expert in the area of digital enhancements of photographs to rebut the testimony of Dr. Oliver?

B.  Did you have a strategic or tactical reason for failing to litigate a *Daubert* motion prior to the testimony of Dr. Oliver in an attempt to preclude the testimony of Dr. Oliver and the testimony of any experts

8

that relied upon or utilized the digital enhancements created by Dr. Oliver?

C.     Did you have a strategic or tactical reason for failing to object to the admission of these digital enhancements under Federal Rules of Evidence 901, 1001 and 1002?

23.    At trial the Government called forensic odontologists Dr. David Senn and Dr. Bryan Chrz.  Both testified that AB-1994 and Robin could be excluded as the biter of the back of the decedent .  Dr. Senn further testified that Mr. Bourgeois could not be excluded or included as the biter and Dr. Chrz concluded that Mr. Bourgeios was the probable biter.  Prior to retaining these experts, the Government retained Dr. J. Curtis Dailey, DDS, a United States Army Colonel and forensic odontologist.  Dr. Dailey arguably conducted a more thorough examination than did Drs. Senn and Chrz since he was provided with the actual skin of the decedent.  Dr. Dailey concluded that both AB-1994 and Robin as well as the defendant **could not be excluded** as the biter of the back of the decedent.  The Government provided the defense, prior to trial, with the reports of Dr. Dailey which contained his findings.

A.     Did you have a strategic or tactical reason for failing to litigate a *Daubert* motion prior to the testimony of Drs. Senn and Chrz in an attempt to preclude their testimony?

B.     Did you have a strategic or tactical reason for failing to call Dr. Dailey as a witness to rebut the testimony of Drs. Senn and Chrz?

C.     Did you have a strategic or tactical reason for failing to cross-examine Drs. Senn and Chrz with the reports of Dr. Dailey?

D.     Did you consult with a defense expert to rebut the testimony of Drs. Senn and Chrz, and if not, did you have a strategic or tactical reason for not doing so?

Respectfully Submitted,


_____

Michael Wiseman
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545- West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated:       October 14, 2008
             Philadelphia, PA

73

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,          :          No. Cr-C-02-216
                                                    :          No. Cv-07-223
                    Respondent,          :     Honorable Janis Graham Jack,
                                                    :                U.S.D.J.
        -against-                              :
                                                    :      **This is a Capital Case**
ALFRED BOURGEOIS,                      :
                                                    :         Electronically Filed
                    Petitioner.             :
_____    :

### Notice of Service

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I caused to be

served upon Douglas Tinker, Esq. *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.* I

also served a copy on James Gilmore, Esq., so that he might assist in securing Mr. Tinker's response.

The Interrogatories are 23 in number, with additional sub-parts, and are contained on nine pages.

They were served upon both attorneys by fax at their office and by overnight mail.

Respectfully Submitted,

/s/ Michael Wiseman


_____
Michael Wiseman
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545- West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated: October 14, 2008
          Philadelphia, PA

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I served a copy of this Notice of Service upon the following persons in the manner indicted:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

Patricia Hubert Booth
United States Attorney's
Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
Patti.Booth@usdoj.gov

/s/    Michael Wiseman

_____

Michael Wiseman

74

## DECLARATION AND AFFIDAVIT OF VICTORIA SWANSON, Ph.D.
## PURSUANT TO 28 U.S.C. § 1746

Victoria Swanson, Ph.D., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    I am a clinical psychologist. I obtained my doctorate in school psychology from Louisiana State University in 1999. My primary area of practice is providing psychological services and behavioral consultation to individuals with mental retardation and developmental delays, and to public and private providers of services to this population. I also provide services to children and adolescents with severe behavior disorders and significant academic challenges. I have done this work through my private practice since 2000.

2.    For my entire professional career I have been responsible for identifying and providing services to people with mental retardation. Before I entered into private practice, I served as the Director of Psychological Services at Southwest Louisiana Developmental Center in Iota, Louisiana; in that capacity, I managed the delivery of services to approximately 150 mentally retarded individuals living in publicly funded residential facilities and supportive living placements. I have worked with mentally ill and developmentally delayed individuals since 1973. I have worked as a social worker, a psychological examiner, a school psychologist, and an administrator. From 2003 to 2005, I served as the President of the National Psychology Division of the American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly the American Association on Mental Retardation (AAMR)). I have been qualified as an expert in psychology and as an expert in field of Mental Retardation multiple times in several jurisdictions. Most of my forensic practice centers in Louisiana. However, I have also been qualified as an expert in Alabama, Georgia, and Mississippi. My curriculum vitae is attached.

3.    I was asked by counsel to Alfred Bourgeois to conduct testing to determine his level of adaptive functioning as a child and to discern whether he qualifies for a diagnoses of mental retardation.   To accomplish this task, I have reviewed voluminous background materials about Mr. Bourgeois provided to me by counsel, including reports by psychologists and psychiatrists, affidavits by neighbors and relatives, and intelligence testing by Dr. Weiner and Dr. Gelbort.  The most recent neuropsychological evaluation reveals a full scale IQ of 70 on the WAIS-III, and Dr. Weiner's scoring (adjusted for the Flynn effect) also places him in the range of mental retardation.

4.    After reviewing these materials, in March, 2009, I administered the Vineland-II Adaptive Behavior Scale to Mrs. Beverly Frank.  Based on my review of materials and preliminary interview of Mrs. Frank, I learned that she is the granddaughter of Mary Clayton.  Mary Clayton was not related to Alfred Bourgeois, but was a member of his community and an elder in his family's church.  Due to the mistreatment she witnessed being perpetrated against Alfred at his home, Mrs. Clayton took Alfred into her home and cared for him as if he were her own child.  Mrs. Frank was a young adult at the time and visited her grandmother and Alfred almost daily.  She observed Alfred and several of her nieces and nephews near in age to Alfred, and therefore was able to report both Mr. Bourgeois' adaptive ability and compare his functioning to his peers.   Accordingly, she was a prime subject to whom to administer the Vineland–II instrument.

5.    Mr. Bourgeois scored a 66 on the Vineland- II.  On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization.  These scores place him well within the range of mental retardation in the sphere of adaptive deficits.  They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

6.    Based on my review of the records and my own testing, it is my opinion to a

reasonable degree of psychological certainty that Mr. Bourgeois is an individual with mental retardation.

7. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Victoria Swanson, Ph.D.

DATE: 6/8/09

75

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD

**Committee on Identifying the Needs of the Forensic Science Community**

**Committee on Science, Technology, and Law
Policy and Global Affairs**

**Committee on Applied and Theoretical Statistics
Division on Engineering and Physical Sciences**

## NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

**THE NATIONAL ACADEMIES PRESS
Washington, D.C.
www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

**THE NATIONAL ACADEMIES PRESS**     **500 Fifth Street, N.W.**     **Washington, DC 20001**

NOTICE:   The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.   The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

**This study was supported by Contract No. 2006-DN-BX-0001 between the National Academy of Sciences and the National Institute of Justice.** Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

International Standard Book Number  xxxxxxxxxxxx
Library of Congress Catalog Card Number  xxxxxxxxxxx

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, *http://www.nap.edu.*

Copyright 2009 by the National Academy of Sciences.  All rights reserved.

Printed in the United States of America

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Committee on Identifying the Needs of the Forensic Science Community

**HARRY T. EDWARDS**, (*Co-chair*), Judge, U.S. Court of Appeals for the District of Columbia Circuit

**CONSTANTINE GATSONIS**, (*Co-chair*), Director, Center for Statistical Sciences, Brown University

**MARGARET A. BERGER**, Suzanne J. and Norman Miles Professor of Law, Brooklyn Law School

**JOE S. CECIL**, Project Director, Program on Scientific and Technical Evidence, Federal Judicial Center

**M. BONNER DENTON**, Professor of Chemistry, University of Arizona

**MARCELLA FIERRO**, Medical Examiner of Virginia (ret.)

**KAREN KAFADAR**, Rudy Professor of Statistics and Physics, Indiana University

**PETE M. MARONE**, Director, Virginia Department of Forensic Science

**GEOFFREY S. MEARNS**, Dean, Cleveland-Marshall College of Law, Cleveland State University

**RANDALL S. MURCH**, Associate Director, Research Program Development, Virginia Polytechnic Institute and State University

**CHANNING ROBERTSON**, Ruth G. and William K. Bowes Professor, Dean of Faculty and Academic Affairs, and Professor, Department of Chemical Engineering, Stanford University

**MARVIN SCHECHTER**, Attorney

**ROBERT SHALER**, Director, Forensic Science Program, Professor, Biochemistry and Molecular Biology Department, Eberly College of Science, The Pennsylvania State University

**JAY A. SIEGEL**, Professor, Forensic and Investigative Sciences Program, Indiana University-Purdue University

**SARGUR N. SRIHARI**, SUNY Distinguished Professor, Department of Computer Science and Engineering and Director, Center of Excellence for Document Analysis and Recognition (CEDAR), University at Buffalo, State University of New York

**SHELDON M. WIEDERHORN** (NAE), Senior NIST Fellow, National Institute of Standards and Technology

**ROSS ZUMWALT**, Chief Medical Examiner, Office of the Medical Examiner of the State of New Mexico

**Staff**

**ANNE-MARIE MAZZA**, Study Director

**SCOTT WEIDMAN**, Director, Board on Mathematical Sciences and Their Applications

**JOHN SISLIN**, Program Officer, Board on Higher Education and Workforce

**DAVID PADGHAM**, Program Officer, Computer Science and Telecommunications Board (until 5/08)

**STEVEN KENDALL**, Senior Program Associate

**KATIE MAGEE**, Senior Program Assistant (until 9/07)

**KATHI E. HANNA**, Consultant Writer

**SARA D. MADDOX**, Editor

**ROBIN ACKERMAN**, Christine Mirzayan Science and Technology Policy Fellow

**GEMAYEL JEAN-PAUL**, Christine Mirzayan Science and Technology Policy Fellow

**JOHNALYN D. LYLES**, Christine Mirzayan Science and Technology Policy Fellow

**SANDRA OTTENSMANN**, Christine Mirzayan Science and Technology Policy Fellow

**DEIDRE PARSONS**, Christine Mirzayan Science and Technology Policy Fellow

**SARAH RYKER**, Christine Mirzayan Science and Technology Policy Fellow

**SUNBIN SONG**, Christine Mirzayan Science and Technology Policy Fellow

v

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Committee on Science, Technology, and Law

**DONALD KENNEDY** (NAS/IOM), *(Co-chair)*, President Emeritus and Bing Professor of Environmental Science Emeritus, Stanford University; Emeritus Editor-in-Chief, *Science*

**RICHARD A. MERRILL** (IOM), *(Co-chair)*, Daniel Caplin Professor of Law Emeritus, University of Virginia Law School

**FREDERICK R. ANDERSON, JR.**, Partner, McKenna, Long, & Aldridge LLP

**MARGARET A. BERGER**, Suzanne J. and Norman Miles Professor of Law, Brooklyn Law School

**ARTHUR I. BIENENSTOCK**, Special Assistant to the President for SLAC and Federal Research Policy, Stanford University

**BARBARA E. BIERER**, Senior Vice President for Research, Brigham and Women's Hospital

**ELIZABETH H. BLACKBURN** (NAS/IOM), Morris Herzstein Professor of Biology and Physiology, Department of Biochemistry and Biophysics, University of California, San Francisco

**JOE S. CECIL**, Project Director, Program on Scientific and Technical Evidence, Federal Judicial Center

**RICHARD F. CELESTE**, President, Colorado College

**JOEL E. COHEN** (NAS), Abby Rockefeller Mauzé Professor and Head, Laboratory of Populations, The Rockefeller University and Columbia University

**KENNETH W. DAM**, Max Pam Professor Emeritus of American and Foreign Law and Senior Lecturer, University of Chicago Law School

**ROCHELLE COOPER DREYFUSS**, Pauline Newman Professor of Law and Director, Engelberg Center on Innovation Law and Policy, New York University School of Law

**ALICE P. GAST** (NAE), President, Lehigh University

**LAWRENCE O. GOSTIN** (IOM), Associate Dean for Research and Academic Programs, Linda D. and Timothy J. O'Neill Professor of Global Health Law, Georgetown University; Professor of Public Health, The Johns Hopkins University

**GARY W. HART**, Wirth Chair Professor, School of Public Affairs, University of Colorado, Denver

**BENJAMIN W. HEINEMAN, JR.**, Senior Fellow, Harvard Law School and Harvard Kennedy School of Government

**DAVID BROCK HORNBY**, Judge, U.S. District Court, District of Maine

**DAVID KORN** (IOM), Vice Provost for Research, Harvard University

**RICHARD A. MESERVE** (NAE), President, Carnegie Institution of Washington

**DUNCAN T. MOORE** (NAE), Professor, The Institute of Optics, University of Rochester

**ALAN B. MORRISON**, Visiting Professor, Washington College of Law, American University

**HARRIET RABB**, Vice President and General Counsel, Rockefeller University

**PAUL D. RHEINGOLD**, Senior Partner, Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP

**BARBARA ROTHSTEIN**, Director, Federal Judicial Center

**JONATHAN M. SAMET** (IOM), Founding Director, Institute for Global Health and Chairman, Department of Preventive Medicine, University of Southern California

**DAVID S. TATEL**, Judge, U.S. Court of Appeals for the District of Columbia Circuit

**Staff**
**ANNE-MARIE MAZZA**, Director
**STEVEN KENDALL**, Senior Program Associate

vi

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Committee on Applied and Theoretical Statistics

**KAREN KAFADAR**, (*Chair*), Rudy Professor of Statistics and Physics, Indiana University
**AMY BRAVERMAN**, MISR Co-Investigator, Statistics and Data Analysis, Earth and Space Sciences Division, Jet Propulsion Laboratory
**CONSTANTINE GATSONIS**, Director, Center for Statistical Sciences, Brown University
**MICHAEL GOODCHILD** (NAS), Professor, Department of Geography, University of California, Santa Barbara
**KATHRYN B. LASKEY**, Professor, Department of Systems Engineering and Operations Research, George Mason University
**MICHAEL LESK** (NAE), Professor, Library and Information Sciences, Rutgers University
**THOMAS A. LOUIS**, Professor, Department of Biostatistics, Bloomberg School of Public Health, The Johns Hopkins University
**MICHAEL A. NEWTON**, Professor, Department of Biostatistics and Medical Informatics, University of Wisconsin, Madison
**MICHAEL L. STEIN**, Professor, Department of Statistics, The University of Chicago

**Staff**
**SCOTT WEIDMAN**, Director
**NEAL GLASSMAN**, Senior Program Officer
**BARBARA WRIGHT**, Administrative Assistant

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# ACKNOWLEDGMENTS

## ACKNOWLEDGMENT OF PRESENTERS

The committee gratefully acknowledges the contributions of the following individuals who made thoughtful presentations before it:

Chris Asplen, *Gordon Thomas Honeywell Government Affairs*; Peter D. Barnett, *Forensic Science Associates*; Richard E. Bisbing, *McCrone Associates, Inc.,* and *Scientific Working Group on Materials Analysis (SWGMAT)*; Joseph P. Bono, *U.S. Secret Service*; Michael R. Bromwich, *Fried, Frank, Harris, Shriver & Jacobson LLP*; Bruce Budowle, *Federal Bureau of Investigation*; James Burans, *U.S. Department of Homeland Security*; Thomas Cantwell, *U.S. Department of Defense*; Larry Chelko, *U.S. Army Criminal Investigation Laboratory*; John Collins, *DuPage County Sheriff's Office Crime Laboratory*; Charles Cooke, *Office of the Director of National Intelligence*; Robin Cotton, *Boston University School of Medicine*; Joseph A. DiZinno, *Federal Bureau of Investigation*; James Downs, *National Association of Medical Examiners* and *Consortium of Forensic Science Organizations* and *Georgia Bureau of Investigation*; Itiel Dror, *University of Southampton*; Arthur Eisenberg, *Forensic Quality Services*; Barry A. J. Fisher, *Los Angeles County Sheriff's Department*; Eric Friedberg, *Stroz Friedberg, LLC*; Robert E. Gaensslen, *University of Illinois at Chicago*; Brandon L. Garrett, *University of Virginia*; Michael D. Garris, *National Institute of Standards and Technology*; Ed German, *U.S. Army* (ret.); Paul C. Giannelli, *Case Western Reserve University School of Law*; Bruce A. Goldberger, *American Academy of Forensic Sciences*; Hank Greely, *Stanford University*; Barbara Guttman, *National Institute of Standards and Technology*; David W. Hagy, *U.S. Department of Justice*; Randy Hanzlick, *Fulton County Medical Examiner's Center* and *Emory University School of Medicine*; Carol Henderson, *National Clearinghouse for Science, Technology and the Law* and *Stetson University*; Matthew J. Hickman, *U.S. Department of Justice*; Peter T. Higgins, *The Higgins-Hermansen Group*; Max M. Houck, *West Virginia University*; Vici Inlow, *U.S. Secret Service*; Jan L. Johnson, *Illinois State Police*; Jay Kadane, *Carnegie Mellon University*; David Kaye, *Arizona State University*; Peter D. Komarinski, *Komarinski & Associates, LLC*; Roger G. Koppl, *Farleigh Dickinson University*; Glenn Langenburg, *Minnesota Bureau of Criminal Apprehension*; Deborah Leben, *U.S. Secret Service*; John Lentini, *Scientific Fire Analysis, LLC*; Alan I. Leshner, *American Association for the Advancement of Science*; William MacCrehan, *National Institute of Standards and Technology*; Bill Marbaker, *American Society of Crime Laboratory Directors*; Kenneth F. Martin, *Massachusetts State Police*; Carole McCartney, *University of Leeds*; Stephen B. Meagher, *Federal Bureau of Investigation* and *Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)*; Jennifer Mnooken, *University of California, Los Angeles Law School*; John E. Moalli, *Exponent*; John Morgan, *U.S. Department of Justice*; Michael Murphy, *Las Vegas Office of the Coroner*; Peter Neufeld, *The Innocence Project*; John Onstwedder III, *Illinois State Police*; Garry F. Peterson, *Hennepin County Medical Examiner's Office* and *National Association of Medical Examiners*; Joseph L. Peterson, *California State University, Los Angeles*; Peter Pizzola, *New York Police Department Crime Laboratory*; Joe Polski, *Consortium of Forensic Science*

viii

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

*Organizations* and *International Association for Identification*; Larry Quarino, *Cedar Crest College*; Irma Rios, *City of Houston Crime Lab*; Michael Risinger, *Seton Hall Law School*; Michael J. Saks, *Sandra Day O'Connor College of Law, Arizona State University*; Nelson A. Santos, *Scientific Working Group for the Analysis of Seized Drugs* (*SWGDRUG*); David R. Senn, *The University of Texas Health Science Center at San Antonio*; Robert Stacey, *American Society of Crime Laboratory Directors, Laboratory Accreditation Board*; David Stoney, *Stoney Forensic, Inc.*; Peter Striupaitis, *International Association for Identification* and *Scientific Working Group for Firearms and Toolmarks* (*SWGGUN*); Rick Tontarski, *U.S. Army Criminal Investigation Laboratory*; Richard W. Vorder Bruegge, *Federal Bureau of Investigation*; Victor W. Weedn, *New Jersey Office of the State Medical Examiner*; and Tom Witt, *West Virginia University*.

## ACKNOWLEDGMENT OF REVIEWERS

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the National Academies' Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the process.

We wish to thank the following individuals for their review of this report: R. Stephen Berry, University of Chicago; Christophe Champod, Universite de Lausanne, Switzerland; William Chisum, Retired, National Crime Investigation and Training; Joel Cohen, Rockefeller University; Peter DeForest, John Jay College of Criminal Justice; Stephen Fienberg, Carnegie Mellon University; Barry Fisher, Los Angeles County Sheriff's Department; Mark Flomenbaum, Boston University; Ross Gardner, Gardner Forensic Consulting; Paul Giannelli, Case Western Reserve University; Randy Hanzlick, Emory University; Keith Inman, Forensic Analytical Sciences, Inc.; Dan Kahan, Yale Law School; Roger Kahn, Harris County Medical Examiner's Office; Elizabeth Loftus, University of California, Irvine; C. Owen Lovejoy, Kent State University; Kenneth Melson, George Washington University; Michael Murphy, Office of the Coroner/Medical Examiner, Las Vegas, Nevada; Hyla Napadensky, Retired, Napadensky Energetics Inc.; Joseph Peterson, California State University, Los Angeles; William Press, University of Texas, Austin; Jed Rakoff, U.S. District Court Southern District of New York; Carl Selavka, U.S. Army Criminal Investigation Laboratory; David Stoney, Stoney Forensic, Inc.; and Charles Wellford, University of Maryland.

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of this report was overseen by John Bailar, University of Chicago, and Royce Murray, University of North Carolina, Chapel Hill. Appointed by the National Academies, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

ix

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Strengthening Forensic Science in the United States: A Path Forward

X

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# CONTENTS

**Preface**      **P-1**

**Summary**      **S-1**
     Introduction
     Findings and Recommendations

**1**    **Introduction**      **1-1**
     What Is Forensic Science?
     Pressures on the Forensic Science System
     Organization of this Report

**2**    **The Forensic Science Community and the Need for Integrated Governance**      **2-1**
     Crime Scene Investigation
     Forensic Science Laboratories and Service Providers
     Case Backlogs
     NIJ's Coverdell Forensic Science Improvement Grant Program
     Forensic Services Beyond the Traditional Laboratory
     Federal Forensic Science Activities
     Research Funding
     Professional Associations
     Conclusions and Recommendation

**3**    **The Admission of Forensic Science Evidence in Litigation**      **3-1**
     Law and Science
     The *Frye* Standard and Rule 702 of the Federal Rules of Evidence
     The *Daubert* Decision and the Supreme Court's Construction of Rule 702
     The 2000 Amendment of Rule 702
     An Overview of Judicial Dispositions of *Daubert*-Type Questions
     Some Examples of Judicial Dispositions of Questions Relating to
         Forensic Science Evidence
     Conclusion

**4**    **The Principles of Science and Interpreting Scientific Data**      **4-1**
     Fundamental Principles of the Scientific Method
     Conclusion

**5**    **Descriptions of Some Forensic Science Disciplines**      **5-1**
     Biological Evidence
     Analysis of Controlled Substances
     Friction Ridge Analysis
     Other Pattern/Impression Evidence: Shoeprints and Tire Tracks
     Toolmark and Firearms Identification
     Analysis of Hair Evidence
     Analysis of Fiber Evidence

xi

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Questioned Document Examination
Analysis of Paint and Coatings Evidence
Analysis of Explosives Evidence and Fire Debris
Forensic Odontology
Bloodstain Pattern Analysis
An Emerging Forensic Science Discipline: Digital And Multimedia Analysis
Conclusions

**6    Improving Methods, Practice, and Performance in Forensic Science**          **6-1**
Independence of Forensic Science Laboratories
Uncertainties and Bias
Reporting Results
The Need for Research
Conclusions and Recommendations

**7    Strengthening Oversight of Forensic Science Practice**          **7-1**
Accreditation
Standards and Guidelines for Quality Control
Proficiency Testing
Certification
Oversight as a Requirement of Paul Coverdell Forensic Science Improvement Grants
Codes of Ethics
Conclusions and Recommendations

**8    Education and Training in Forensic Science**          **8-1**
Status of Forensic Science Education
Challenges and Opportunities to Improve Forensic Science Education
Research as a Component of Forensic Science Education Programs
Status of Training
Education in the Legal System
Conclusions and Recommendation

**9    Medical Examiner and Coroner Systems: Current and Future Needs**          **9-1**
Medical Examiners and Coroners (ME/C)
ME/C Jurisdiction
ME/C Missions
Variations in ME/C Systems
Qualifications of Coroners and Medical Examiners
ME/C Administration and Oversight
ME/C Staffing and Funding
The Movement to Convert Coroner Systems to Medical Examiner Systems
Utilization of Best Practices
Potential Scientific Advances that May Assist ME/Cs
The Shortage of Medical Examiners and Forensic Pathologists
Standards and Accreditation for Death Investigation Systems
Quality Control and Quality Assurance
Continuing Medical Education
Homeland Security
Forensic Pathology Research
Common Methods of Sample and Data Collection
Conclusions and Recommendation

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

**10    Automated Fingerprint Identification Systems                     10-1**
       Interoperability Challenges
       Conclusions and Recommendation

**11    Homeland Security and the Forensic Science Disciplines           11-1**
       Conclusions and Recommendation

**Appendices**

**A     Biographical Information of Committee and Staff                  A-1**

**B     Committee Meeting Agendas                                        B-1**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# PREFACE

Recognizing that significant improvements are needed in forensic science, Congress directed the National Academy of Sciences to undertake the study that led to this report. There are scores of talented and dedicated people in the forensic science community, and the work that they perform is vitally important. They are often strapped in their work, however, for lack of adequate resources, sound policies, and national support. It is clear that change and advancements, both systemic and scientific, are needed in a number of forensic science disciplines—to ensure the reliability of the disciplines, establish enforceable standards, and promote best practices and their consistent application.

In adopting this report, the aim of our committee is to chart an agenda for progress in the forensic science community and its scientific disciplines. Because the work of forensic science practitioners is so obviously wide-reaching and important—affecting criminal investigation and prosecution, civil litigation, legal reform, the investigation of insurance claims, national disaster planning and preparedness, homeland security, and the advancement of technology—the committee worked with a sense of great commitment and spent countless hours deliberating over the recommendations that are included in the report. These recommendations, which are inexorably interconnected, reflect the committee's strong views on policy initiatives that must be adopted in any plan to improve the forensic science disciplines and to allow the forensic science community to serve society more effectively.

The task Congress assigned our committee was daunting and required serious thought and the consideration of an extremely complex and decentralized system, with various players, jurisdictions, demands, and limitations. Throughout our lengthy deliberations, the committee heard testimony from the stakeholder community, ensuring that the voices of forensic practitioners were heard and their concerns addressed. We also heard from professionals who manage forensic laboratories and medical examiner/coroner offices; teachers who are devoted to training the next generation of forensic scientists; scholars who have conducted important research in a number of forensic science fields; and members of the legal profession and law enforcement agencies who understand how forensic science evidence is collected, analyzed, and used in connection with criminal investigations and prosecutions. We are deeply grateful to all of the presenters who spoke to the committee and/or submitted papers for our consideration. These experts and their work served the committee well.

In considering the testimony and evidence that was presented to the committee, what surprised us the most was the consistency of the message that we heard:

> *The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country. This can only be done with effective leadership at the highest levels of both federal and state governments, pursuant to national standards, and with a significant infusion of federal funds.*

The recommendations in this report represent the committee's studied opinion on how best to achieve this critical goal.

P-1

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

We had the good fortune to serve as co-chairs of the committee entrusted with addressing Congress' charge. The committee, formed under the auspices of the National Academies' Committee on Science, Technology, and Law and Committee on Applied and Theoretical Statistics, was composed of many talented professionals, some expert in various areas of forensic science, others in law, and still others in different fields of science and engineering. They listened, read, questioned, vigorously discussed the findings and recommendations offered in this report, and then worked hard to complete the research and writing required to produce the report. We are indebted to our colleagues for all the time and energy they gave to this effort. We are also most grateful to the staff, Anne-Marie Mazza, Scott Weidman, Steven Kendall, and the consultant writer, Kathi Hanna, for their superb work and dedication to this project; to staff members David Padgham and John Sislin, and editor, Sara Maddox, for their assistance; and to Paige Herwig, Laurie Richardson, and Judith A. Hunt for their sterling contributions in checking source materials and assisting with the final production of the report.

Harry T. Edwards and Constantine Gatsonis
Committee Co-chairs

P-2

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# SUMMARY

## INTRODUCTION

On November 22, 2005, the Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006 became law.[1] Under the terms of the statute, Congress authorized "the National Academy of Sciences to conduct a study on forensic science, as described in the Senate report."[2] The Senate Report to which the Conference Report refers states:

> While a great deal of analysis exists of the requirements in the discipline of DNA, there exists little to no analysis of the remaining needs of the community outside of the area of DNA. Therefore . . . the Committee directs the Attorney General to provide [funds] to the National Academy of Sciences to create an independent Forensic Science Committee. This Committee shall include members of the forensics community representing operational crime laboratories, medical examiners, and coroners; legal experts; and other scientists as determined appropriate.[3]

The Senate Report also sets forth the charge to the Forensic Science Committee, instructing it to:

(1)     assess the present and future resource needs of the forensic science community, to include State and local crime labs, medical examiners, and coroners;

(2)     make recommendations for maximizing the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(3)     identify potential scientific advances that may assist law enforcement in using forensic technologies and techniques to protect the public;

(4)     make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners available to work in public crime laboratories;

(5)     disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(6)     examine the role of the forensic community in the homeland security mission;

(7)     [examine] interoperability of Automated Fingerprint Information Systems [AFIS]; and

(8)     examine additional issues pertaining to forensic science as determined by the Committee.[4]

In the fall of 2006, a committee was established by the National Academy of Sciences to implement this congressional charge. As recommended in the Senate Report, the persons selected to serve included members of the forensic science community, members of the legal community, and a

---

[1] P.L. No. 109-108, 119 Stat. 2290 (2005).

[2] H.R. REP. NO. 109-272, at 121 (2005) (Conf. Rep.).

[3] S. REP. NO. 109-88, at 46 (2005).

[4] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

diverse group of scientists. Operating under the project title "Identifying the Needs of the Forensic Science Community," the committee met on eight occasions: January 25-26, April 23-24, June 5-6, September 20-21, and December 6-7, 2007, and March 24-25, June 23-24, and November 14-15, 2008. During these meetings, the committee heard expert testimony and deliberated over the information it heard and received. Between meetings, committee members reviewed numerous published materials, studies, and reports related to the forensic science disciplines, engaged in independent research on the subject, and worked on drafts of the final report.

Experts who provided testimony included federal agency officials; academics and research scholars; private consultants; federal, state, and local law enforcement officials; scientists; medical examiners; a coroner; crime laboratory officials from the public and private sectors; independent investigators; defense attorneys; forensic science practitioners; and leadership of professional and standard setting organizations (see the Acknowledgments and Appendix B for a complete listing of presenters).

The issues covered during the committee's hearings and deliberations included:

(a) the fundamentals of the scientific method as applied to forensic practice—hypothesis generation and testing, falsifiability and replication, and peer review of scientific publications;

(b) the assessment of forensic methods and technologies—the collection and analysis of forensic data; accuracy and error rates of forensic analyses; sources of potential bias and human error in interpretation by forensic experts; and proficiency testing of forensic experts;

(c) infrastructure and needs for basic research and technology assessment in forensic science;

(d) current training and education in forensic science;

(e) the structure and operation of forensic science laboratories;

(f) the structure and operation of the coroner and medical examiner systems;

(g) budget, future needs, and priorities of the forensic science community and the coroner and medical examiner systems;

(h) the accreditation, certification, and licensing of forensic science operations, medical death investigation systems, and scientists;

(i) Scientific Working Groups (SWGs) and their practices;

(j) forensic science practices—
    pattern/experience evidence
    o   fingerprints (including the interoperability of AFIS)
    o   firearms examination
    o   toolmarks
    o   bite marks
    o   impressions (tires, footwear)
    o   bloodstain pattern analysis
    o   handwriting
    o   hair
    analytical evidence
    o   DNA
    o   coatings (e.g., paint)

S-2

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

- o chemicals (including drugs)
- o materials (including fibers)
- o fluids
- o serology
- o fire and explosive analysis

digital evidence;

(k) the effectiveness of coroner systems as compared with medical examiner systems;

(l) the use of forensic evidence in criminal and civil litigation—
- o the collection and flow of evidence from crime scenes to courtrooms
- o the manner in which forensic practitioners testify in court
- o cases involving the misinterpretation of forensic evidence
- o the adversarial system in criminal and civil litigation
- o lawyers' use and misuse of forensic evidence
- o judges' handling of forensic evidence;

(m) forensic practice and projects at various federal agencies, including NIST, the FBI, DHS, U.S. Secret Service, NIJ, DEA, and DOD;

(n) forensic practice in state and local agencies;

(o) nontraditional forensic service providers; and

(p) the forensic science community in the United Kingdom.

The testimonial and documentary evidence considered by the committee was detailed, complex, and sometimes controversial. Given this reality, the committee could not possibly answer every question that it confronted, nor could it devise specific solutions for every problem that it identified. Rather, it reached a consensus on the most important issues now facing the forensic science community and medical examiner system and agreed on 13 specific recommendations to address these issues.

**Challenges Facing the Forensic Science Community**

For decades, the forensic science disciplines have produced valuable evidence that has contributed to the successful prosecution and conviction of criminals as well as to the exoneration of innocent people. Over the last two decades, advances in some forensic science disciplines, especially the use of DNA technology, have demonstrated that some areas of forensic science have great additional potential to help law enforcement identify criminals. Many crimes that may have gone unsolved are now being solved because forensic science is helping to identify the perpetrators.

Those advances, however, also have revealed that, in some cases, substantive information and testimony based on faulty forensic science analyses may have contributed to wrongful convictions of innocent people. This fact has demonstrated the potential danger of giving undue weight to evidence and testimony derived from imperfect testing and analysis. Moreover, imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence.

Further advances in the forensic science disciplines will serve three important purposes. First, further improvements will assist law enforcement officials in the course of their investigations to identify perpetrators with higher reliability. Second, further improvements in forensic science practices should reduce the occurrence of wrongful convictions, which reduces the risk that true offenders continue to commit crimes while innocent persons inappropriately serve time. Third, any improvements in the forensic science disciplines will undoubtedly enhance the Nation's ability to address the needs of homeland security.

S-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

Numerous professionals in the forensic science community and the medical examiner system have worked for years to achieve excellence in their fields, aiming to follow high ethical norms, develop sound professional standards, ensure accurate results in their practices, and improve the processes by which accuracy is determined. Although the work of these dedicated professionals has resulted in significant progress in the forensic science disciplines in recent decades, major challenges still face the forensic science community. It is therefore unsurprising that Congress instructed this committee to, among other things, "assess the present and future resource needs of the forensic science community," "make recommendations for maximizing the use of forensic technologies and techniques," "make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners," and "disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques." These are among the pressing issues facing the forensic science community. The best professionals in the forensic science disciplines invariably are hindered in their work because these and other problems persist.

The length of the congressional charge and the complexity of the material under review made the committee's assignment challenging. In undertaking it, the committee first had to gain an understanding of the various disciplines within the forensic science community, as well as the community's history, its strengths and weaknesses, and the roles of the people and agencies that constitute the community and make use of its services. In so doing, the committee was able to better comprehend some of the major problems facing the forensic science community and the medical examiner system. A brief review of some of these problems is illuminating.[5]

**Disparities in the Forensic Science Community**

There are great disparities among existing forensic science operations in federal, state, and local law enforcement jurisdictions and agencies. This is true with respect to funding, access to analytical instrumentation, the availability of skilled and well-trained personnel, certification, accreditation, and oversight. As a result, it is not easy to generalize about current practices within the forensic science community. It is clear, however, that any approach to overhauling the existing system needs to address and help minimize the community's current fragmentation and inconsistent practices.

Although the vast majority of criminal law enforcement is handled by state and local jurisdictions, these entities often are sorely lacking in the resources (money, staff, training, and equipment) necessary to promote and maintain strong forensic science laboratory systems. By comparison, federal programs are often much better funded and staffed. It is also noteworthy that the resources, the extent of services, and the amount of expertise that medical examiners and forensic pathologists can provide vary widely in different jurisdictions. As a result, the depth, reliability, and overall quality of substantive information arising from the forensic examination of evidence available to the legal system vary substantially across the country.

**Lack of Mandatory Standardization, Certification, and Accreditation**

The fragmentation problem is compounded because operational principles and procedures for many forensic science disciplines are not standardized or embraced, either between or within jurisdictions. There is no uniformity in the certification of forensic practitioners, or in the

---

[5] In this report, the "forensic science community," broadly speaking, is meant to include forensic pathology and medicolegal death investigation, which is sometimes referred to as "the medical examiner system" or "the medicolegal death investigation system."

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

accreditation of crime laboratories. Indeed, most jurisdictions do not require forensic practitioners to be certified, and most forensic science disciplines have no mandatory certification programs. Moreover, accreditation of crime laboratories is not required in most jurisdictions. Often there are no standard protocols governing forensic practice in a given discipline. And, even when protocols are in place (e.g., SWG standards), they often are vague and not enforced in any meaningful way. In short, the quality of forensic practice in most disciplines varies greatly because of the absence of adequate training and continuing education, rigorous mandatory certification and accreditation programs, adherence to robust performance standards, and effective oversight.[6] These shortcomings obviously pose a continuing and serious threat to the quality and credibility of forensic science practice.

### The Broad Range of Forensic Science Disciplines

The term "forensic science" encompasses a broad range of forensic disciplines, each with its own set of technologies and practices. In other words, there is wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material. Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as hair). The "forensic science community," in turn, consists of a host of practitioners, including scientists (some with advanced degrees) in the fields of chemistry, biochemistry, biology, and medicine; laboratory technicians; crime scene investigators; and law enforcement officers. There are very important differences, however, between forensic laboratory work and crime scene investigations. There are also sharp distinctions between forensic practitioners who have been trained in chemistry, biochemistry, biology, and medicine (and who bring these disciplines to bear in their work) and technicians who lend support to forensic science enterprises. Many of these differences are discussed in the body of this report.

The committee decided early in its work that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation. However, the committee solicited testimony on a broad range of forensic science disciplines and sought to identify issues relevant across definable classes of disciplines. As a result of listening to this testimony and reviewing related written materials, the committee found substantial evidence indicating that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

### Problems Relating to the Interpretation of Forensic Evidence

Often in criminal prosecutions and civil litigation, forensic evidence is offered to support conclusions about "individualization" (sometimes referred to as "matching" a specimen to a particular individual or other source) or about classification of the source of the specimen into one of several categories. With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source. In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there are important variations among the disciplines relying on expert

---

[6] See, e.g., P.C. Giannelli. 2007. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007); B. Schmitt and J. Swickard. 2008. "Detroit Police Lab Shut Down After Probe Finds Errors." *Detroit Free Press.* September 25.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

interpretation. For example, there are more established protocols and available research for fingerprint analysis than for the analysis of bite marks. There also are significant variations within each discipline. For example, not all fingerprint evidence is equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. These disparities between and within the forensic science disciplines highlight a major problem in the forensic science community: The simple reality is that the interpretation of forensic evidence is not always based on scientific studies to determine its validity. This is a serious problem. Although research has been done in some disciplines, there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods.[7]

**The Need for Research to Establish Limits and Measures of Performance**

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called on to address. Thus, although some techniques may be too imprecise to permit accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on some characteristics of the individual from which the specimen was taken, but it may not be able to reliably match the specimen with a specific individual. However, the definition of the appropriate question is only a first step in the evaluation of the performance of a forensic technique. A body of research is required to establish the limits and measures of performance and to address the impact of sources of variability and potential bias. Such research is sorely needed, but it seems to be lacking in most of the forensic disciplines that rely on subjective assessments of matching characteristics. These disciplines need to develop rigorous protocols to guide these subjective interpretations and pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from other areas, notably from the large body of research on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.[8]

**The Admission of Forensic Science Evidence in Litigation**

Forensic science experts and evidence are used routinely in the service of the criminal justice system. DNA testing may be used to determine whether sperm found on a rape victim came from an accused party; a latent fingerprint found on a gun may be used to determine whether a defendant handled the weapon; drug analysis may be used to determine whether pills found in a person's possession were illicit; and an autopsy may be used to determine the cause and manner of death of a murder victim. In order for qualified forensic science experts to testify competently about forensic evidence, they must first find the evidence in a usable state and properly preserve it. A latent fingerprint that is badly smudged when found cannot be usefully saved, analyzed, or explained. An

---

[7] Several articles, for example, have noted the lack of scientific validation of fingerprint identification methods. See, e.g., J. J. Koehler. Fingerprint error rates and proficiency tests: What they are and why they matter. 59 HASTINGS L.J. 1077 (2008); L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability and Risk* 7(2):87; J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7(2):127.

[8] The findings of forensic science experts are vulnerable to cognitive and contextual bias. See, e.g., I.E. Dror, D. Charlton, and A.E. Péron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156:74, 77. ("Our study shows that it is possible to alter identification decisions on the same fingerprint, solely by presenting it in a different context."); I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600; Giannelli, *supra* note 6, pp. 220-222. Unfortunately, at least to date, there is no good evidence to indicate that the forensic science community has made a sufficient effort to address the bias issue; thus, it is impossible for the committee to fully assess the magnitude of the problem.

S-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

inadequate drug sample may be insufficient to allow for proper analysis. And, DNA tests performed on a contaminated or otherwise compromised sample cannot be used reliably to identify or eliminate an individual as the perpetrator of a crime. These are important matters involving the proper processing of forensic evidence. The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is *science* in any given forensic science discipline.

Two very important questions should underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Thus, it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support. Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

In 1993, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] the Supreme Court ruled that, under Rule 702 of the Federal Rules of Evidence (which covers both civil trials and criminal prosecutions in the federal courts), a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[10] The Court indicated that the subject of an expert's testimony should be scientific knowledge, so that "evidentiary reliability will be based upon scientific validity."[11] The Court also emphasized that, in considering the admissibility of evidence, a trial judge should focus "solely" on the expert's "principles and methodology," and "not on the conclusions that they generate."[12] In sum, *Daubert*'s requirement that an expert's testimony pertain to "scientific knowledge" established a standard of "evidentiary reliability."[13]

In explaining this evidentiary standard, the *Daubert* Court pointed to several factors that might be considered by a trial judge: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) a scientific technique's degree of acceptance within a relevant scientific community.[14] In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one."[15] The Court expressed confidence in the adversarial system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction

---

[9] 509 U.S. 579 (1993).

[10] Ibid., p. 589.

[11] Ibid., pp. 590 and 591 n.9 (emphasis omitted).

[12] Ibid., p. 595. In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court added: "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

[13] *Daubert*, 509 U.S. at 589, 590 n.9, 595.

[14] Ibid., pp. 593-94.

[15] Ibid., p. 594. *In Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire* importantly held that Rule 702 applies to both scientific and nonscientific expert testimony; the Court also indicated that the *Daubert* factors might be applicable in a trial judge's assessment of the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." Ibid., at 150.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[16] The Supreme Court has made it clear that trial judges have great discretion in deciding on the admissibility of evidence under Rule 702, and that appeals from *Daubert* rulings are subject to a very narrow abuse-of-discretion standard of review.[17] Most importantly, in *Kumho Tire Co., Ltd. v. Carmichael*, the Court stated that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[18]

*Daubert* and its progeny have engendered confusion and controversy. In particular, judicial dispositions of *Daubert*-type questions in criminal cases have been criticized by some lawyers and scholars who thought that the Supreme Court's decision would be applied more rigorously.[19] If one focuses solely on reported federal appellate decisions, the picture is not appealing to those who have preferred a more rigorous application of *Daubert*. Federal appellate courts have not with any consistency or clarity imposed standards ensuring the application of scientifically valid reasoning and reliable methodology in criminal cases involving *Daubert* questions. This is not really surprising, however. The Supreme Court itself described the *Daubert* standard as "flexible." This means that, beyond questions of relevance, *Daubert* offers appellate courts no clear substantive standard by which to review decisions by trial courts. As a result, trial judges exercise great discretion in deciding whether to admit or exclude expert testimony, and their judgments are subject only to a highly deferential "abuse of discretion" standard of review. Although it is difficult to get a clear picture of how trial courts handle *Daubert* challenges, because many evidentiary rulings are issued without a published opinion and without an appeal, the vast majority of the *reported* opinions in criminal cases indicate that trial judges rarely exclude or restrict expert testimony offered by prosecutors; most *reported* opinions also indicate that appellate courts routinely deny appeals contesting trial court decisions admitting forensic evidence against criminal defendants.[20] But the reported opinions do not offer in any way a complete sample of federal trial court dispositions of *Daubert*-type questions in criminal cases.

The situation appears to be very different in civil cases. Plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, while prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically, the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases.[21]

Prophetically, the *Daubert* decision observed that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and

---

[16] *Daubert*, 509 U.S. at 596.

[17] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-143 (1997).

[18] *Kumho Tire*, 526 U.S. at 153.

[19] See, e.g., P.J. Neufeld. 2005. The (near) irrelevance of *Daubert* to criminal justice: And some suggestions for reform. *American Journal of Public Health* 95(Suppl.1):S107.

[20] Ibid., p. S109.

[21] See, e.g., *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000); 1 D.L. Faigman, M.J. Saks, J. Sanders, and E.K. Cheng. 2007-2008. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* Eagan, MN: Thomson/West, § 1.35, p. 105 (discussing studies suggesting that courts "employ *Daubert* more lackadaisically in criminal trials—especially in regard to prosecution evidence—than in civil cases—especially in regard to plaintiff evidence").

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

quickly."[22] But because accused parties in criminal cases are convicted on the basis of testimony from forensic science experts, much depends upon whether the evidence offered is reliable. Furthermore, in addition to protecting innocent persons from being convicted of crimes that they did not commit, we are also seeking to protect society from persons who have committed criminal acts. Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified by the forensic science community. "[T]here is no evident reason why ['rigorous, systematic'] research would be infeasible."[23] However, some courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely "demand more by way of validation than the disciplines can presently offer."[24]

The adversarial process relating to the admission and exclusion of scientific evidence is not suited to the task of finding "scientific truth." The judicial system is encumbered by, among other things, judges and lawyers who generally lack the scientific expertise necessary to comprehend and evaluate forensic evidence in an informed manner, trial judges (sitting alone) who must decide evidentiary issues without the benefit of judicial colleagues and often with little time for extensive research and reflection, and the highly deferential nature of the appellate review afforded trial courts' *Daubert* rulings. Given these realities, there is a tremendous need for the forensic science community to improve. Judicial review, by itself, will not cure the infirmities of the forensic science community.[25] The development of scientific research, training, technology, and databases associated with DNA analysis have resulted from substantial and steady federal support for both academic research and programs employing techniques for DNA analysis. Similar support must be given to all credible forensic science disciplines if they are to achieve the degrees of reliability needed to serve the goals of justice. With more and better educational programs, accredited laboratories, certified forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. The current situation, however, is seriously wanting, both because of the limitations of the judicial system and because of the many problems faced by the forensic science community.

## Political Realities

Most forensic science methods, programs, and evidence are within the regulatory province of state and local law enforcement entities or are covered by statutes and rules governing state judicial proceedings. Thus, in assessing the strengths, weaknesses, and future needs of forensic disciplines,

---

[22] *Daubert*, 509 U.S. at 596-97.

[23] J. Griffin and D.J. LaMagna. 2002. *Daubert* challenges to forensic evidence: Ballistics next on the firing line. *The Champion*, September-October:20, 21 (quoting P. Giannelli and E. Imwinkelried. 2000. Scientific evidence: The fallout from Supreme Court's decision in *Kumho Tire. Criminal Justice Magazine* 14(4):12, 40).

[24] Ibid. See, e.g., *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir. 2003) (noting "that while further research into fingerprint analysis would be welcome, to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good." (internal quotation marks omitted)).

[25] See J.L. Mnookin. Expert evidence, partisanship, and epistemic competence. 73 BROOK. L. REV. 1009, 1033 (2008) ("[S]o long as we have our adversarial system in much its present form, we are inevitably going to be stuck with approaches to expert evidence that are imperfect, conceptually unsatisfying, and awkward. It may well be that the real lesson is this: those who believe that we might ever fully resolve—rather than imperfectly manage—the deep structural tensions surrounding both partisanship and epistemic competence that permeate the use of scientific evidence within our legal system are almost certainly destined for disappointment.").

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

and in making recommendations for improving the use of forensic technologies and techniques, the committee remained mindful of the fact that Congress cannot directly fix all of the deficiencies in the forensic science community. Under our federal system of government, Congress does not have free reign to amend state criminal codes, rules of evidence, and statutes governing civil actions; nor may it easily and directly regulate local law enforcement practices, state and local medical examiner units, or state policies covering the accreditation of crime laboratories and the certification of forensic practitioners.

Congress' authority to act is significant, however. Forensic science programs in federal government entities—whether within DOJ, DHS, DOD, or the Department of Commerce (DOC)—are funded by congressional appropriations. If these programs are required to operate pursuant to the highest standards, they will provide an example for the states. More importantly, Congress can promote "best practices" and strong educational, certification, accreditation, ethics, and oversight programs in the states by offering funds that are contingent on meeting appropriate standards of practice. There is every reason to believe that offers of federal funds with "strings attached" can effect significant change in the forensic science community, because so many state and local programs currently are suffering for want of adequate resources. In the end, however, the committee recognized that state and local authorities must be willing to enforce change if it is to happen.

In light of the foregoing issues, the committee exercised caution before drawing conclusions and avoided being too prescriptive in its recommendations. It also recognized that, given the complexity of the issues and the political realities that may pose obstacles to change, some recommendations will have to be implemented creatively and over time in order to be effective.

## FINDINGS AND RECOMMENDATIONS

### The Fragmented System: Symptoms and Cures

The forensic science disciplines currently are an assortment of methods and practices used in both the public and private arenas. Forensic science facilities exhibit wide variability in capacity, oversight, staffing, certification, and accreditation across federal and state jurisdictions. Too often they have inadequate educational programs, and they typically lack mandatory and enforceable standards, founded on rigorous research and testing, certification requirements, and accreditation programs. Additionally, forensic science and forensic pathology research, education, and training lack strong ties to our research universities and national science assets. In addition to the problems emanating from the fragmentation of the forensic science community, the most recently published *Census of Crime Laboratories* conducted by BJS describes unacceptable case backlogs in state and local crime laboratories and estimates the level of additional resources needed to handle these backlogs and prevent their recurrence. Unfortunately, the backlogs, even in DNA case processing, have grown dramatically in recent years and are now staggering in some jurisdictions. The most recently published BJS *Special Report of Medical Examiners and Coroners' Offices* also depicts a system with disparate and often inadequate educational and training requirements, resources, and capacities—in short, a system in need of significant improvement.

Existing data suggest that forensic laboratories are under resourced and understaffed, which contributes to case backlogs and likely makes it difficult for laboratories to do as much as they could to (1) inform investigations, (2) provide strong evidence for prosecutions, and (3) avoid errors that could lead to imperfect justice. Being under resourced also means that the tools of forensic science—and the knowledge base that underpins the analysis and interpretation of evidence—are not

S-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

as strong as they could be, thus hindering the ability of the forensic science disciplines to excel at informing investigations, providing strong evidence, and avoiding errors in important ways. NIJ is the only federal agency that provides direct support to crime laboratories to alleviate the backlog, and those funds are minimal. The forensic science system is under resourced also in the sense that it has only thin ties to an academic research base that could support the forensic science disciplines and fill knowledge gaps. There are many hard-working and conscientious people in the forensic science community, but this under resourcing inherently limits their ability to do their best work. Additional resources surely will be necessary to create high-quality, self-correcting systems.

However, increasing the staff within existing crime laboratories and medical examiners' offices is only part of the solution. What also is needed is an upgrading of systems and organizational structures, better training, the widespread adoption of uniform and enforceable best practices, and mandatory certification and accreditation programs. The forensic science community and the medical examiner/coroner system must be upgraded if forensic practitioners are to be expected to serve the goals of justice.

Of the various facets of under resourcing, the committee is most concerned about the knowledge base. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capabilities of forensic science disciplines to discern valid information from crime scene evidence. For the most part, it is impossible to discern the magnitude of those limitations, and reasonable people will differ on their significance.

Forensic science research is not well supported, and there is no unified strategy for developing a forensic science research plan across federal agencies. Relative to other areas of science, the forensic disciplines have extremely limited opportunities for research funding. Although the FBI and NIJ have supported some research in forensic science, the level of support has been well short of what is necessary for the forensic science community to establish strong links with a broad base of research universities. Moreover, funding for academic research is limited and requires law enforcement collaboration, which can inhibit the pursuit of more fundamental scientific questions essential to establishing the foundation of forensic science. The broader research community generally is not engaged in conducting research relevant to advancing the forensic science disciplines.

The forensic science enterprise also is hindered by its extreme disaggregation—marked by multiple types of practitioners with different levels of education and training and different professional cultures and standards for performance and a reliance on apprentice-type training and a guild-like structure of disciplines, which work against the goal of a single forensic science profession. Many forensic scientists are given scant opportunity for professional activities, such as attending conferences or publishing their research, which could help strengthen the professional community and offset some of the disaggregation. The fragmented nature of the enterprise raises the worrisome prospect that the quality of evidence presented in court, and its interpretation, can vary unpredictably according to jurisdiction.

Numerous professional associations are organized around the forensic science disciplines, and many of them are involved in training and education (see Chapter 8) and are developing standards and accreditation and certification programs (see Chapter 7). The efforts of these groups are laudable. However, except for the largest organizations, it is not clear how these associations interact or the extent to which they share requirements, standards, or policies. Thus, there is a need for more consistent and harmonized requirements.

In the course of its deliberations and review of the forensic science enterprise, it became obvious to the committee that, although congressional action will not remedy all of the deficiencies in forensic science methods and practices, truly meaningful advances will not come without

S-11

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

significant concomitant leadership from the federal government. The forensic science enterprise lacks the necessary governance structure to pull itself up from its current weaknesses. Of the many professional societies that serve the enterprise, none is dominant, and none has clearly articulated the need for change or presented a vision for accomplishing it. And clearly no municipal or state forensic office has the mandate to lead the entire enterprise. The major federal resources—NIJ and the FBI Laboratory—have provided modest leadership, for which they should be commended: NIJ has contributed a helpful research program and the FBI Laboratory has spearheaded the SWGs. But again, neither entity has recognized, let alone articulated, a need for change or a vision for achieving it. Neither has the full confidence of the larger forensic science community. And because both are part of a prosecutorial department of the government, they could be subject to subtle contextual biases that should not be allowed to undercut the power of forensic science.

The forensic science enterprise needs strong governance to adopt and promote an aggressive, long-term agenda to help strengthen the forensic science disciplines. Governance must be strong enough—and independent enough—to identify the limitations of forensic science methodologies, and must be well connected with the Nation's scientific research base to effect meaningful advances in forensic science practices. The governance structure must be able to create appropriate incentives for jurisdictions to adopt and adhere to best practices and promulgate the necessary sanctions to discourage bad practices. It must have influence with educators in order to effect improvements to forensic science education. It must be able to identify standards and enforce them. A governance entity must be geared toward (and be credible within) the law enforcement community, but it must have strengths that extend beyond that area. Oversight of the forensic science community and medical examiner system will sweep broadly into areas of criminal investigation and prosecution, civil litigation, legal reform, investigation of insurance claims, national disaster planning and preparedness, homeland security, certification of federal, state, and local forensic practitioners, public health, accreditation of public and private laboratories, research to improve forensic methodologies, education programs in colleges and universities, and advancing technology.

The committee considered whether such a governing entity could be established within an existing federal agency. The National Science Foundation (NSF) was considered because of its strengths in leading research and its connections to the research and education communities. NSF is surely capable of building and sustaining a research base, but it has very thin ties to the forensic science community. It would be necessary for NSF to take many untested steps if it were to assume responsibility for the governance of applied fields of science. The committee also considered NIST. In the end analysis, however, NIST did not appear to be a viable option. It has a good program of research targeted at forensic science and law enforcement, but the program is modest. NIST also has strong ties to industry and academia, and it has an eminent history in standard setting and method development. But its ties to the forensic science community are still limited, and it would not be seen as a natural leader by the scholars, scientists, and practitioners in the field. In sum, the committee concluded that neither NSF nor NIST has the breadth of experience or institutional capacity to establish an effective governance structure for the forensic science enterprise.

There was also a strong consensus in the committee that no existing or new division or unit within DOJ would be an appropriate location for a new entity governing the forensic science community. DOJ's principal mission is to enforce the law and defend the interests of the United States according to the law. Agencies within DOJ operate pursuant to this mission. The FBI, for example, is the investigative arm of DOJ and its principal missions are to produce and use intelligence to protect the Nation from threats and to bring to justice those who violate the law. The work of these law enforcement units is critically important to the Nation, but the scope of the work

S-12

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

done by DOJ units is much narrower than the promise of a strong forensic science community. Forensic science serves more than just law enforcement; and when it does serve law enforcement, it must be equally available to law enforcement officers, prosecutors, *and* defendants in the criminal justice system. The entity that is established to govern the forensic science community cannot be principally beholden to law enforcement. The potential for conflicts of interest between the needs of law enforcement and the broader needs of forensic science are too great. In addition, the committee determined that the research funding strategies of DOJ have not adequately served the broad needs of the forensic science community. This is understandable, but not acceptable when the issue is whether an agency is best suited to support and oversee the Nation's forensic science community. In sum, the committee concluded that advancing *science* in the forensic science enterprise is not likely to be achieved within the confines of DOJ.

Furthermore, there is little doubt that some existing federal entities are too wedded to the current "fragmented" forensic science community, which is deficient in too many respects. Most notably, these existing agencies have failed to pursue a rigorous research agenda to confirm the evidentiary reliability of methodologies used in a number of forensic science disciplines. These agencies are not good candidates to oversee the overhaul of the forensic science community in the United States.

Finally, some existing federal agencies with other missions occasionally have undertaken projects affecting the forensic science community. These entities are better left to continue the good work that defines their principal missions. More responsibility is not better for these existing entities, nor would it be better for the forensic science community or the Nation.

The committee thus concluded that the problems at issue are too serious and important to be subsumed by an existing federal agency. It also concluded that no existing federal agency has the capacity or appropriate mission to take on the roles and responsibilities needed to govern and improve the forensic science enterprise.

The committee believes that what is needed to support and oversee the forensic science community is a new, strong, and independent entity that could take on the tasks that would be assigned to it in a manner that is as objective and free of bias as possible—one with no ties to the past and with the authority and resources to implement a fresh agenda designed to address the problems found by the committee and discussed in this report. A new organization should not be encumbered by the assumptions, expectations, and deficiencies of the existing fragmented infrastructure, which has failed to address the needs and challenges of the forensic science disciplines.

This new entity must be an independent federal agency established to address the needs of the forensic science community, and it must meet the following minimum criteria:

- It must have a culture that is strongly rooted in science, with strong ties to the national research and teaching communities, including federal laboratories.
- It must have strong ties to state and local forensic entities as well as to the professional organizations within the forensic science community.
- It must not be in any way committed to the existing system, but should be informed by its experiences.
- It must not be part of a law enforcement agency.
- It must have the funding, independence, and sufficient prominence to raise the profile of the forensic science disciplines and push effectively for improvements.

S-13

Copyright © National Academy of Sciences. All rights reserved.