Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

- It must be led by persons who are skilled and experienced in developing and executing national strategies and plans for standard setting; managing accreditation and testing processes; and developing and implementing rulemaking, oversight, and sanctioning processes.

No federal agency currently exists that meets all of these criteria.

**Recommendation 1:**

**To promote the development of forensic science into a mature field of multidisciplinary research and practice, founded on the systematic collection and analysis of relevant data, Congress should establish and appropriate funds for an independent federal entity, the National Institute of Forensic Science (NIFS). NIFS should have a full-time administrator and an advisory board with expertise in research and education, the forensic science disciplines, physical and life sciences, forensic pathology, engineering, information technology, measurements and standards, testing and evaluation, law, national security, and public policy. NIFS should focus on:**

**(a)** establishing and enforcing best practices for forensic science professionals and laboratories;

**(b)** establishing standards for the mandatory accreditation of forensic science laboratories and the mandatory certification of forensic scientists and medical examiners/forensic pathologists—and identifying the entity/entities that will develop and implement accreditation and certification;

**(c)** promoting scholarly, competitive peer-reviewed research and technical development in the forensic science disciplines and forensic medicine;

**(d)** developing a strategy to improve forensic science research and educational programs, including forensic pathology;

**(e)** establishing a strategy, based on accurate data on the forensic science community, for the efficient allocation of available funds to give strong support to forensic methodologies and practices in addition to DNA analysis;

**(f)** funding state and local forensic science agencies, independent research projects, and educational programs as recommended in this report, with conditions that aim to advance the credibility and reliability of the forensic science disciplines;

**(g)** overseeing education standards and the accreditation of forensic science programs in colleges and universities;

**(h)** developing programs to improve understanding of the forensic science disciplines and their limitations within legal systems; and

**(i)** assessing the development and introduction of new technologies in forensic investigations, including a comparison of new technologies with former ones.

S-14

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

The benefits that will flow from a strong, independent, strategic, coherent, and well-funded federal program to support and oversee the forensic science disciplines in this country are clear: The Nation will (1) bolster its ability to more accurately identify true perpetrators and exclude those who are falsely accused; (2) improve its ability to effectively respond to, attribute, and prosecute threats to homeland security; and (3) reduce the likelihood of convictions resting on inaccurate data. Moreover, establishing the scientific foundation of the forensic science disciplines, providing better education and training, and requiring certification and accreditation will position the forensic science community to take advantage of current and future scientific advances.

The creation of a new federal entity undoubtedly will pose challenges, not the least of which will be budgetary constraints. The committee is not in a position to estimate how much it will cost to implement the recommendations in this report; this is a matter best left to the expertise of the Congressional Budget Office. What is clear, however, is that Congress must take aggressive action if the worst ills of the forensic science community are to be cured. Political and budgetary concerns should not deter bold, creative, and forward-looking action, because the country cannot afford to suffer the consequences of inaction. It will also take time and patience to implement the recommendations in this report. But this is true with any large, complex, important, and challenging enterprise.

The committee strongly believes that the greatest hope for success in this enterprise will come with the creation of the National Institute of Forensic Science (NIFS) to oversee and direct the forensic science community. The remaining recommendations in this report are crucially tied to the creation of NIFS. However, each recommendation is a separate, essential piece of the plan to improve the forensic science community in the United States. Therefore, even if the creation of NIFS is forestalled, the committee vigorously supports the adoption of the core ideas and principles embedded in each of the following recommendations.

*Standardized Terminology and Reporting*

The terminology used in reporting and testifying about the results of forensic science investigations must be standardized. Many terms are used by forensic scientists in scientific reports and in court testimony that describe findings, conclusions, and degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include, but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can and does have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence. Although some forensic science disciplines have proposed reporting vocabulary and scales, the use of the recommended language is not standard practice among forensic science practitioners.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should contain, at minimum, "methods and materials," "procedures," "results," "conclusions," and, as appropriate, sources and magnitudes of uncertainty in the procedures and conclusions (e.g., levels of confidence). Some forensic science laboratory reports meet this standard of reporting, but many do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "the greenish, brown plant material in item #1 was identified as marijuana"), and they include no mention of methods or any discussion of measurement uncertainties.

Many clinical and testing disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. A good example is the ISO/IEC 17025 standard

S-15

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

(commonly called "ISO 17025"). ISO 17025 is an international standard published by the International Organization for Standardization (ISO) that specifies the general requirements for the competence to carry out tests and/or calibrations. These requirements have been used by accrediting agencies to determine what a laboratory must do to secure accreditation. In addition, some SWGs in the forensic disciplines have scoring systems for reporting findings, but these systems are neither uniformly nor consistently used. In other words, although appropriate standards exist, they are not always followed. Forensic reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including measures of uncertainty in reported results and associated estimated probabilities where possible.

**Recommendation 2:**

> **The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.**

*More and Better Research*

As noted above, some forensic science disciplines are supported by little rigorous systematic research to validate the discipline's basic premises and techniques. There is no evident reason why such research cannot be conducted. Much more federal funding is needed to support research in the forensic science disciplines and forensic pathology in universities and private laboratories committed to such work.

The forensic science and medical examiner communities will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, there is an urgent need for collaborative efforts to (1) develop new technical methods or provide in-depth grounding for advances developed in the forensic science disciplines; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile ground for discourse among the communities. NIFS should recommend, implement, and guide strategies for supporting such initiatives.

**Recommendation 3:**

> **Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:**
>
> (a)  **Studies establishing the scientific bases demonstrating the validity of forensic methods.**
> (b)  **The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realistic**

S-16

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

case scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.

(c)   The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.

(d)   Automated techniques capable of enhancing forensic technologies.

To answer questions regarding the reliability and accuracy of a forensic analysis, the research needs to distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry. (Some of the legal issues are addressed in Chapter 3.)

*Best Practices and Standards*

Although there have been notable efforts to achieve standardization and develop best practices in some forensic science disciplines and the medical examiner system, most disciplines still lack best practices or any coherent structure for the enforcement of operating standards, certification, and accreditation. Standards and codes of ethics exist in some fields, and there are some functioning certification and accreditation programs, but none are mandatory. In short, oversight and enforcement of operating standards, certification, accreditation, and ethics are lacking in most local and state jurisdictions.

Scientific and medical assessment conducted in forensic investigations should be independent of law enforcement efforts either to prosecute criminal suspects or even to determine whether a criminal act has indeed been committed. Administratively, this means that forensic scientists should function independently of law enforcement administrators. The best science is conducted in a scientific setting as opposed to a law enforcement setting. Because forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.

**Recommendation 4:**

To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

**Recommendation 5:**

**The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.**

**Recommendation 6:**

**To facilitate the work of the National Institute of Forensic Science (NIFS), Congress should authorize and appropriate funds to NIFS to work with the National Institute of Standards and Technology (NIST), in conjunction with government laboratories, universities, and private laboratories, and in consultation with Scientific Working Groups, to develop tools for advancing measurement, validation, reliability, information sharing, and proficiency testing in forensic science and to establish protocols for forensic examinations, methods, and practices. Standards should reflect best practices and serve as accreditation tools for laboratories and as guides for the education, training, and certification of professionals. Upon completion of its work, NIST and its partners should report findings and recommendations to NIFS for further dissemination and implementation.**

*Quality Control, Assurance, and Improvement*

In a field such as medical diagnostics, a health care provider typically can track a patient's progress to see whether the original diagnosis was accurate and helpful. For example, widely accepted programs of quality control ensure timely feedback involving the diagnoses that result from mammography. Other examples of quality assurance and improvement—including the development of standardized vocabularies, ontologies, and scales for interpreting diagnostic tests and developing standards for accreditation of services—pervade diagnostic medicine. This type of systematic and routine feedback is an essential element of any field striving for continuous improvement. The forensic science disciplines likewise must become a self-correcting enterprise, developing and implementing feedback loops that allow the profession to discover past mistakes. A particular need exists for routine, mandatory proficiency testing that emulates a realistic, representative cross-section of casework, for example, DNA proficiency testing.

S-18

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**Recommendation 7:**

**Laboratory accreditation and individual certification of forensic science professionals should be mandatory, and all forensic science professionals should have access to a certification process. In determining appropriate standards for accreditation and certification, the National Institute of Forensic Science (NIFS) should take into account established and recognized international standards, such as those published by the International Organization for Standardization (ISO). No person (public or private) should be allowed to practice in a forensic science discipline or testify as a forensic science professional without certification. Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories and facilities (public or private) should be accredited, and all forensic science professionals should be certified, when eligible, within a time period established by NIFS.**

**Recommendation 8:**

**Forensic laboratories should establish routine quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners. Quality control procedures should be designed to identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement.**

*Codes of Ethics*

A number of forensic science organizations—such as AAFS, the Midwestern Association of Forensic Scientists, ASCLD, and NAME—have adopted codes of ethics. The codes that exist are sometimes comprehensive, but they vary in content. While there is no reason to doubt that many forensic scientists understand their ethical obligations and practice in an ethical way, there are no consistent mechanisms for enforcing any of the existing codes of ethics. Many jurisdictions do not require certification in the same way that, for example, states require lawyers to be licensed. Therefore, few forensic science practitioners face the threat of official sanctions or loss of certification for serious ethical violations. And it is unclear whether and to what extent forensic science practitioners are required to adhere to ethics standards as a condition of employment.

**Recommendation 9:**

**The National Institute of Forensic Science (NIFS), in consultation with its advisory board, should establish a national code of ethics for all forensic science disciplines and encourage individual societies to incorporate this national code as part of their professional code of ethics. Additionally, NIFS should explore mechanisms of enforcement for those forensic scientists who commit serious ethical violations. Such a code could be enforced through a certification process for forensic scientists.**

S-19

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

*Insufficient Education and Training*

Forensic science examiners need to understand the principles, practices, and contexts of scientific methodology, as well as the distinctive features of their specialty. Ideally, training should move beyond apprentice-like transmittal of practices to education based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and instruction on how to document and report the analysis. A trainee also should have working knowledge of basic quantitative calculations, including statistics and probability, as needed for the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. Legitimization of practices in forensic disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role, and under no circumstances can it supplant the need for the scientific basis of education in and the practice of forensic science.

In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted between experts in the forensic science disciplines and law schools, legal scholars, and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in the forensic science disciplines, by offering credit for forensic science courses taken in other colleges, and by developing joint degree programs. And judges need to be better educated in forensic science methodologies and practices.

**Recommendation 10:**

> **To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and develop graduate education programs designed to cut across organizational, programmatic, and disciplinary boundaries. To make these programs appealing to potential students, they must include attractive scholarship and fellowship offerings. Emphasis should be placed on developing and improving research methods and methodologies applicable to forensic science practice and on funding research programs to attract research universities and students in fields relevant to forensic science. NIFS should also support law school administrators and judicial education organizations in establishing continuing legal education programs for law students, practitioners, and judges.**

S-20

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*The Medicolegal Death Investigation System*

Although steps have been taken to transform the medicolegal death investigation system, the shortage of resources and lack of consistent educational and training requirements (particularly in the coroner system)[26] prevent the system from taking full advantage of tools—such as CT scans and digital X-rays—that the medical system and other scientific disciplines have to offer. In addition, more rigorous efforts are needed in the areas of accreditation and adherence to standards. Currently, requirements for practitioners vary from nothing more than age and residency requirements to certification by the American Board of Pathology in forensic pathology.

Funds are needed to assess the medicolegal death investigation system to determine its status and needs, using as a benchmark the current requirements of NAME relating to professional credentials, standards, and accreditation. And funds are needed to modernize and improve the medicolegal death investigation system. As it now stands, medical examiners and coroners (ME/Cs) are essentially ineligible for direct federal funding and grants from DOJ, DHS, or the Department of Health and Human Services (through the National Institutes of Health). The Paul Coverdell National Forensic Science Improvement Act is the only federal grant program that names medical examiners and coroners as eligible for grants. However, ME/Cs must compete with public safety agencies for Coverdell grants; as a result, the funds available to ME/Cs are inadequate. The simple reality is that the program has not been sufficiently funded to provide significant improvements in ME/C systems.

In addition to direct funding, there are other initiatives that should be pursued to improve the medicolegal death investigation system. The Association of American Medical Colleges and other appropriate professional organizations should organize collaborative activities in education, training, and research to strengthen the relationship between the medical examiner community and its counterparts in the larger academic medical community. Medical examiner offices with training programs affiliated with medical schools should be eligible to compete for funds. Funding should be available to support pathologists seeking forensic fellowships. In addition, forensic pathology fellows could be allowed to apply for medical school loan forgiveness if they stay full time at a medical examiner's office for a reasonable period of time.

Additionally, NIFS should seek funding from Congress to support the joint development of programs to include medical examiners and medical examiner offices in national disaster planning, preparedness, and consequence management, involving the Centers for Disease Control and Prevention (CDC) and DHS. Uniform statewide and interstate standards of operation would be needed to assist in the management of cross-jurisdictional and interstate events. NIFS should support a federal program underwriting the development of software for use by ME/C systems for the management of multisite, multiple fatality events.

NIFS should work with groups such as the National Conference of Commissioners on Uniform State Laws, the American Law Institute, and NAME, in collaboration with other appropriate professional groups, to update the 1954 Model Post-Mortem Examinations Act and draft legislation for a modern model death investigation code. An improved code might, for example, include the elements of a competent medical death investigation system and clarify the jurisdiction of the medical examiner with respect to organ donation.

The foregoing ideas must be developed further before any concrete plans can be pursued. There are, however, a number of specific recommendations, which, if adopted, will help to modernize and improve the medicolegal death investigation system. These recommendations deserve the immediate attention of Congress and NIFS.

---

[26] Institute of Medicine. 2003. *Workshop on the Medicolegal Death Investigation System.* Washington, DC: National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

**Recommendation 11:**

To improve medicolegal death investigation:

(a)  Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to states and jurisdictions to establish medical examiner systems, with the goal of replacing and eventually eliminating existing coroner systems. Funds are needed to build regional medical examiner offices, secure necessary equipment, improve administration, and ensure the education, training, and staffing of medical examiner offices. Funding could also be used to help current medical examiner systems modernize their facilities to meet current Centers for Disease Control and Prevention-recommended autopsy safety requirements.

(b)  Congress should appropriate resources to the National Institutes of Health (NIH) and NIFS, jointly, to support research, education, and training in forensic pathology. NIH, with NIFS participation, or NIFS in collaboration with content experts, should establish a study section to establish goals, to review and evaluate proposals in these areas, and to allocate funding for collaborative research to be conducted by medical examiner offices and medical universities. In addition, funding, in the form of medical student loan forgiveness and/or fellowship support, should be made available to pathology residents who choose forensic pathology as their specialty.

(c)  NIFS, in collaboration with NIH, the National Association of Medical Examiners, the American Board of Medicolegal Death Investigators, and other appropriate professional organizations, should establish a Scientific Working Group (SWG) for forensic pathology and medicolegal death investigation. The SWG should develop and promote standards for best practices, administration, staffing, education, training, and continuing education for competent death scene investigation and postmortem examinations. Best practices should include the utilization of new technologies such as laboratory testing for the molecular basis of diseases and the implementation of specialized imaging techniques.

(d)  All medical examiner offices should be accredited pursuant to NIFS-endorsed standards within a timeframe to be established by NIFS.

(e)  All federal funding should be restricted to accredited offices that meet NIFS-endorsed standards or that demonstrate significant and measurable progress in achieving accreditation within prescribed deadlines.

(f)  All medicolegal autopsies should be performed or supervised by a board certified forensic pathologist. This requirement should take effect within a timeframe to be established by NIFS, following consultation with governing state institutions.

*AFIS and Database Interoperability*

Great improvement is necessary in AFIS interoperability. Crimes may go unsolved today simply because it is not possible for investigating agencies to search across all the databases that might hold a suspect's fingerprints or that may contain a match for an unidentified latent print from a

S-22

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

crime scene. It is also possible that some individuals have been wrongly convicted because of the limitations of fingerprint searches.

At present, serious practical problems pose obstacles to the achievement of nationwide AFIS interoperability. These problems include convincing AFIS equipment vendors to cooperate and collaborate with the law enforcement community and researchers to create and use baseline standards for sharing fingerprint data and create a common interface. Second, law enforcement agencies lack the resources needed to transition to interoperable AFIS implementations. Third, coordinated jurisdictional agreements and public policies are needed to allow law enforcement agencies to share fingerprint data more broadly.

Given the disparity in resources and information technology expertise available to local, state, and federal law enforcement agencies, the relatively slow pace of interoperability efforts to date, and the potential gains from increased AFIS interoperability, the committee believes that a broad-based emphasis on achieving nationwide fingerprint data interoperability is needed.

**Recommendation 12:**

> **Congress should authorize and appropriate funds for the National Institute of Forensic Science (NIFS) to launch a new broad-based effort to achieve nationwide fingerprint data interoperability. To that end, NIFS should convene a task force comprising relevant experts from the National Institute of Standards and Technology and the major law enforcement agencies (including representatives from the local, state, federal, and, perhaps, international levels) and industry, as appropriate, to develop:**
>
> **(a)    standards for representing and communicating image and minutiae data among Automated Fingerprint Identification Systems. Common data standards would facilitate the sharing of fingerprint data among law enforcement agencies at the local, state, federal, and even international levels, which could result in more solved crimes, fewer wrongful identifications, and greater efficiency with respect to fingerprint searches; and**
>
> **(b)    baseline standards—to be used with computer algorithms—to map, record, and recognize features in fingerprint images, and a research agenda for the continued improvement, refinement, and characterization of the accuracy of these algorithms (including quantification of error rates).**

These steps toward AFIS interoperability must be accompanied by federal, state, and local funds to support jurisdictions in upgrading, operating, and ensuring the integrity and security of their systems; retraining current staff; and training new fingerprint examiners to gain the desired benefits of true interoperability. Additionally, greater scientific benefits can be realized through the availability of fingerprint data or databases for research purposes (using, of course, all the modern security and privacy protections available to scientists when working with such data). Once created, NIFS might also be tasked with the maintenance and periodic review of the new standards and procedures.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

*Forensic Science Disciplines and Homeland Security*

Good forensic science and medical examiner practices are of clear value from a homeland security perspective, because of their roles in bringing criminals to justice and in dealing with the effects of natural and human-made mass disasters. Forensic science techniques (e.g., the evaluation of DNA fragments) enable more thorough investigations of crime scenes that have been damaged physically. Routine and trustworthy collection of digital evidence, and improved techniques and timeliness for its analysis, can be of great potential value in identifying terrorist activity. Therefore, the forensic science community has a role to play in homeland security. However, to capitalize on this potential, the forensic science and medical examiner communities must be well interfaced with homeland security efforts, so that they can contribute when needed. To be successful, this interface will require the establishment of good working relationships between federal, state, and local jurisdictions, the creation of strong security programs to protect data transmittals between jurisdictions, the development of additional training for forensic scientists and crime scene investigators, and the promulgation of contingency plans that will promote efficient team efforts on demand. Policy issues relating to the enforcement of homeland security are not within the scope of the committee's charge and, thus, are beyond the scope of the report. It can hardly be doubted, however, that improvements in the forensic science community and medical examiner system could greatly enhance the capabilities of homeland security.

**Recommendation 13:**

**Congress should provide funding to the National Institute of Forensic Science (NIFS) to prepare, in conjunction with the Centers for Disease Control and Prevention and the Federal Bureau of Investigation, forensic scientists and crime scene investigators for their potential roles in managing and analyzing evidence from events that affect homeland security, so that maximum evidentiary value is preserved from these unusual circumstances and the safety of these personnel is guarded. This preparation also should include planning and preparedness (to include exercises) for the interoperability of local forensic personnel with federal counterterrorism organizations.**

S-24

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

# 1
# INTRODUCTION

The world of crime is a complex place. Crime takes place in the workplace, schools, homes, places of business, motor vehicles, on the streets, and, increasingly, on the Internet. Crimes are committed at all hours of the day and night and in all regions of the country, in rural, suburban, and urban environments. In many cases, a weapon is used, such as a handgun, knife, or blunt object. Sometimes the perpetrator is under the influence of alcohol or illicit drugs. In other cases, no one is physically hurt, but property is damaged or stolen—for example, when burglary, theft, and motor vehicle theft occur. In recent years, information technology has provided the opportunity for identity theft and other types of cybercrime. A crime scene often is rich in information that reveals the nature of the criminal activity and the identities of those persons involved. Perpetrators and victims may leave behind blood, saliva, skin cells, hair, fingerprints, footprints, tire prints, clothing fibers, digital and photographic images, audio data, handwriting, and the residual effects and debris of arson, gunshots, and unlawful entry. Some crimes transcend borders, such as those involving homeland security, for which forensic evidence can be gathered.

Crime scene investigators, with varying levels of training and experience, search for and collect evidence at the scene, preserve and secure it in tamper-evident packaging, label it, and send it to an appropriate agency—normally a crime laboratory, where it may be analyzed by forensic examiners. If a death was sudden, unexpected, or resulted from violence, a medicolegal investigator (e.g., coroner, medical examiner, forensic pathologist, physician's assistant) will be responsible for determining whether a homicide, suicide, or accident occurred and will certify the cause and manner of death.

Crime scene evidence moves through a chain of custody in which, depending on their physical characteristics (e.g., blood, fiber, handwriting), samples are analyzed according to any of a number of analytical protocols, and results are reported to law enforcement and court officials. When evidence is analyzed, typically forensic science "attempts to uncover the actions or happenings of an event . . . by way of (1) identification (categorization), (2) individualization, (3) association, and (4) reconstruction."[1] Evidence also is analyzed for the purpose of excluding individuals or sources.

Not all forensic services are performed in traditional crime laboratories by trained forensic scientists. Some forensic tests might be conducted by a sworn law enforcement officer with no scientific training or credentials, other than experience. In smaller jurisdictions, members of the local police or sheriff's department might conduct the analyses of evidence, such as latent print examinations and footwear comparisons. In the United States, if evidence is sent to a crime laboratory, that facility might be publicly or privately operated, although private laboratories typically do not visit crime scenes to collect evidence or serve as the first recipient of physical evidence. Public crime laboratories are organized at the city, county, state, or federal level. A law enforcement agency that does not operate its own crime laboratory typically has access to a higher-level laboratory (e.g., at the state or county level) or a private laboratory for analysis of evidence.

---

[1] K. Inman and N. Rudin. 2002. The origin of evidence. *Forensic Science International* 126:11-16.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

According to a 2005 census by the Bureau of Justice Statistics (BJS),[2] 389 publicly funded forensic crime laboratories were operating in the United States in 2005: These included 210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories, and they received evidence from nearly 2.7 million criminal cases[3] in 2005. These laboratories are staffed by individuals with a wide range of training and expertise, from scientists with Ph.D.s to technicians who have been trained largely on the job. No data are available on the size and depth of the private forensic laboratories, except for private DNA laboratories.

In general, a traditional crime laboratory has been defined as constituting "a single laboratory or system comprised of scientists analyzing evidence in one or more of the following disciplines: controlled substances, trace, biology (including DNA), toxicology, latent prints, questioned documents, firearms/toolmarks, or crime scene."[4] More recently, increasing numbers of laboratories specialize in the analysis of evidence in one area, for example, DNA or digital evidence. (See Chapter 5 for a more complete description and discussion of the forensic science disciplines.)

The capacity and quality of the current forensic science system have been the focus of increasing attention by Congress, the courts, and the media. New doubts about the accuracy of some forensic science practices have intensified with the growing number of exonerations resulting from DNA analysis (and the concomitant realization that guilty parties sometimes walk free). Greater expectations for precise forensic science evidence raised by DNA testing have forced new scrutiny on other forensic techniques. Emerging scientific advances that could benefit forensic investigation elicit concerns about resources, training, and capacity for implementing new techniques. A crisis in backlogged cases, caused by crime laboratories lacking sufficient resources and qualified personnel, raises concerns about the effectiveness and efficiency of the criminal justice system. When backlogs prolong testing time, issues involving speedy trials may arise. In addition, backlogs discourage law enforcement personnel and organizations from submitting evidence. Laboratories also may restrict submissions of evidence to reduce backlogs. All of these concerns, and more, provide the background against which this report is set.

Finally, if evidence and laboratory tests are mishandled or improperly analyzed; if the scientific evidence carries a false sense of significance; or if there is bias, incompetence, or a lack of adequate internal controls for the evidence introduced by the forensic scientists and their laboratories, the jury or court can be misled, and this could lead to wrongful conviction or exoneration. If juries lose confidence in the reliability of forensic testimony, valid evidence might be discounted, and some innocent persons might be convicted or guilty individuals acquitted.

Recent years have seen a number of concerted efforts by forensic science organizations to strengthen the foundations of many areas of testimony. However, substantial improvement is necessary in the forensic science disciplines to enhance law enforcement's ability to identify those who have or have not committed a crime and to prevent the criminal justice system from erroneously convicting or exonerating the persons who come before it.

---

[2] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[3] Ibid., p. 9. "A 'case' is defined as evidence submitted from a single criminal investigation. A case may include multiple 'requests' for forensic services. For example, one case may include a request for biology screening and a request for latent prints."

[4] Ibid., p. 24.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## WHAT IS FORENSIC SCIENCE?

Although there are numerous ways by which to categorize the forensic science disciplines, the committee found the categorization used by the National Institute of Justice to be useful:

1. general toxicology;
2. firearms/toolmarks;
3. questioned documents;
4. trace evidence;
5. controlled substances;
6. biological/serology screening (including DNA analysis);
7. fire debris/arson analysis;
8. impression evidence;
9. blood pattern analysis;
10. crime scene investigation;
11. medicolegal death investigation; and
12. digital evidence.[5]

Some of these disciplines are discussed in Chapter 5. Forensic pathology is considered a subspecialty of medicine and is considered separately in Chapter 9.

The term "forensic science" encompasses a broad range of disciplines, each with its own distinct practices. The forensic science disciplines exhibit wide variability with regard to techniques, methodologies, reliability, level of error, research, general acceptability, and published material (see Chapters 4 through 6). Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology, and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks). Some activities require the skills and analytical expertise of individuals trained as scientists (e.g., chemists or biologists); other activities are conducted by scientists as well as by individuals trained in law enforcement (e.g., crime scene investigators, blood spatter analysts, crime reconstruction specialists), medicine (e.g., forensic pathologists), or laboratory methods (e.g., technologists). Many of the processes used in the forensic science disciplines are largely empirical applications of science—that is, they are not based on a body of knowledge that recognizes the underlying limitations of the scientific principles and methodologies used for problem solving and discovery. It is therefore important to focus on ways to improve, systematize, and monitor the activities and practices in the forensic science disciplines and related areas of inquiry. Thus, in this report, the term "forensic science" is used with regard to a broad array of activities, with the recognition that some of these activities might not have a well-developed research base, are not informed by scientific knowledge, or are not developed within the culture of science.

---

[5] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## PRESSURES ON THE FORENSIC SCIENCE SYSTEM

As mentioned above, a number of factors have combined in the past few decades to place increasing demands on an already overtaxed, inconsistent, and under resourced forensic science infrastructure. These factors have not only stressed the system's capacity, but also have raised serious questions and concerns about the validity and reliability of some forensic methods and techniques and how forensic evidence is reported to juries and courts.

### The Case Backlog—Insufficient Resources

According to the 2005 BJS census report, a typical publicly funded crime laboratory ended the year with a backlog of about 401 requests for services, received another 4,328 such requests, and completed 3,980 of them. Roughly half of all requests were in the area of controlled substances. The average backlog has risen since the 2002 census,[6] with nearly 20 percent of all requests backlogged by year end. The Department of Justice (DOJ) defines a case as backlogged if it remains in the laboratory 30 days or more without the development of a report or analysis. Federal, state, and local laboratories reported a combined backlog of 435,879 requests for forensic analysis.[7] According to the census, a typical laboratory performing DNA testing in 2005 started the year with a backlog of 86 requests, received 337 new requests, completed 265 requests, and finished the year with 152 backlogged requests.

The backlog is exacerbated further by increased requests for quick laboratory results by law enforcement and prosecutors. Witnesses before the committee testified that prosecutors increasingly rely on laboratories to provide results prior to approving charges and have increased requests for additional work on the back end of a case, just before trial.[8] Backlogs are compounded by rising police agency requests for testing (e.g., for DNA evidence found on guns and from nonviolent crime scenes). Laboratories are thus challenged to balance requests for analyses of "older" and "cold" cases with new cases and must make choices to allocate resources by prioritizing the evidence to be analyzed. In California, voters passed Proposition 69, requiring that a DNA sample be obtained from all convicted felons. This increased the workload and resulted in 235,000 backlogged cases by the end of 2005.[9]

These backlogs can result in prolonged incarceration for innocent persons wrongly charged and awaiting trial and delayed investigation of those who are not yet charged, and they can contribute to the release of guilty suspects who go on to commit further crimes.

### The Ascendancy of DNA Analysis and a New Standard

In the 1980s, the opportunity to use the techniques of DNA technologies to identify individuals for forensic and other purposes became apparent. Early concerns about the use of DNA for forensic casework included the following: (1) whether the detection methods were scientifically valid—that is, whether they correctly identified true matches and true nonmatches and (2) whether DNA analysis of forensic samples is reliable—that is, whether it yields reproducible results under defined conditions of use. A 1990 report by the congressional Office

---

[6] J.L. Peterson and M.J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at: www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf.

[7] Durose, op. cit.

[8] J.L. Johnson, Laboratory Director, Illinois State Police, Forensic Science Center at Chicago. Presentation to the committee. January 25, 2007.

[9] Durose, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

of Technology Assessment concluded that DNA tests were both reliable and valid in the forensic context but required a strict set of standards and quality control measures before they could be widely adopted.[10]

In 1990, the Federal Bureau of Investigation (FBI) established guidelines for DNA analysis and proficiency testing and four years later created the Combined DNA Index System (CODIS), which allows federal, state, and local crime laboratories to exchange and compare DNA profiles electronically, thereby linking crimes to each other and to convicted offenders.

In 1992, the National Research Council (NRC) issued *DNA Technology in Forensic Science*, which concluded that, "No laboratory should let its results with a new DNA typing method be used in court, unless it has undergone . . . proficiency testing via blind trials."[11] In addition, the report cautioned that numerous questions must be answered about using DNA evidence in a forensic context that rarely had to be considered by scientists engaged in DNA research—for example, questions involving contamination, degradation, and a number of statistical issues. While confirming that the science behind DNA analysis is valid, a subsequent NRC report in 1996 recommended new ways of interpreting DNA evidence to help answer a key question for jurors—the likelihood that two matching samples can come from different people.[12] This 1996 report recommended a set of statistical calculations that takes population structure into account, which enhanced the validity of the test. The report also called for independent retesting and made recommendations to improve laboratory performance and accountability through, for example, adherence to high-quality standards, accreditation, and proficiency testing.

Since then, the past two decades have seen tremendous growth in the use of DNA evidence in crime scene investigations. Currently more than 175 publicly funded forensic laboratories and approximately 30 private laboratories conduct hundreds of thousands of DNA analyses annually in the United States. In addition, most countries in Europe and Asia have forensic DNA programs. In 2003, President George W. Bush announced a 5-year, $1 billion initiative to improve the use of DNA in the criminal justice system. Called the *President's DNA Initiative*, the program pushed for increased funding, training, and assistance to ensure that DNA technology "reaches its full potential to solve crimes, protect the innocent, and identify missing persons."[13]

Thus, DNA analysis—originally developed in research laboratories in the context of life sciences research—has received heightened scrutiny and funding support. That, combined with its well-defined precision and accuracy, has set the bar higher for other forensic science methodologies, because it has provided a tool with a higher degree of reliability and relevance than any other forensic technique. However, DNA evidence comprises only about 10 percent of case work and is not always relevant to a particular case.[14] Even if DNA evidence is available, it will assist in solving a crime only if it supports an evidential hypothesis that makes guilt or innocence more likely. For example, the fact that DNA evidence of a victim's husband is found in the house in which the couple lived and where the murder took place proves nothing. The fact that the husband's DNA is found under the fingernails of the victim who put up a struggle may

---

[10] U.S. Congress, Office of Technology Assessment. 1990. *Genetic Witness: Forensic Uses of DNA Tests*. OTA-BA-438. Washington, D.C.: U.S. Government Printing Office, NTIS order #PB90-259110.

[11] National Research Council. 1992. *DNA Technology in Forensic Science*. Washington, D.C.: National Academy Press, p. 55.

[12] National Research Council. 1996. *The Evaluation of Forensic DNA Evidence: An Update*. Washington, D.C.: National Academy Press.

[13] See www.dna.gov/info/e_summary.

[14] The American Society of Crime Laboratory Directors. 2004. *180 Day Study: Status and Needs of U.S. Crime Labs*. p. 7, table 2.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

have a very different significance. Thus, it is essential to articulate the reasoning process and the context associated with the evidence that is being evaluated.

**Questionable or Questioned Science**

The increased use of DNA analysis as a more reliable approach to matching crime scene evidence with suspects and victims has resulted in the reevaluation of older cases that retained biological evidence that could be analyzed by DNA. The number of exonerations resulting from the analysis of DNA has grown across the country in recent years, uncovering a disturbing number of wrongful convictions—some for capital crimes—and exposing serious limitations in some of the forensic science approaches commonly used in the United States.

According to The Innocence Project, there have been 223 postconviction DNA exonerations in the United States since 1989 (as of November 2008).[15] Some have contested the percentage of exonerated defendants whose convictions allegedly were based on faulty science. Although the Innocence Project figures are disputed by forensic scientists who have reexamined the data, even those who are critical of the conclusions of The Innocence Project acknowledge that faulty forensic science has, on occasion, contributed to the wrongful conviction of innocent persons.[16]

The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny. Most of these techniques were developed in crime laboratories to aid in the investigation of evidence from a particular crime scene, and researching their limitations and foundations was never a top priority. There is some logic behind the application of these techniques; practitioners worked hard to improve their methods, and results from other evidence have combined with these tests to give forensic scientists a degree of confidence in their probative value. Before the first offering of the use of DNA in forensic science in 1986, no concerted effort had been made to determine the reliability of these tests, and some in the forensic science and law enforcement communities believed that scientists' ability to withstand cross-examination in court when giving testimony related to these tests was sufficient to demonstrate the tests' reliability. However, although the precise error rates of these forensic tests are still unknown, comparison of their results with DNA testing in the same cases has revealed that some of these analyses, as currently performed, produce erroneous results. The conclusions of forensic examiners may or may not be right—depending on the case—but each wrongful conviction based on improperly interpreted evidence is serious, both for the innocent person and also for society, because of the threat that may be posed by a guilty person going free. Some non-DNA forensic tests do not meet the fundamental requirements of science, in terms of reproducibility, validity, and falsifiability (see Chapters 4 through 6).

Even fingerprint analysis has been called into question. For nearly a century, fingerprint examiners have been comparing partial latent fingerprints found at crime scenes to inked fingerprints taken directly from suspects. Fingerprint identifications have been viewed as exact

---

[15] The Innocence Project. *Fact Sheet: Facts on Post-Conviction DNA Exonerations.* Available at www.innocenceproject.org/Content/351.php. See also B.L. Garrett. Judging innocence. 108 COLUM. L. REV. 55 (2008) (discussing the results of an empirical study of the types of faulty evidence that was admitted in more than 200 cases for which DNA testing subsequently enabled postconviction exonerations).

[16] See J. Collins and J. Jarvis. 2008. The wrongful conviction of forensic science. *Crime Lab Report.* July 16. Available at www.crimelabreport.com/library/pdf/wrongful_conviction.pdf. See also N. Rudin and K. Inman. 2008. Who speaks for forensic science? *News of the California Association of Criminalists.* Available at www.cacnews.org/news/4thq08.pdf, p. 10.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

INTRODUCTION – PREPUBLICATION COPY

means of associating a suspect with a crime scene print and rarely were questioned.[17] Recently, however, the scientific foundation of the fingerprint field has been questioned, and the suggestion has been made that latent fingerprint identifications may not be as reliable as previously assumed.[18] The question is less a matter of whether each person's fingerprints are permanent and unique—uniqueness is commonly assumed—and more a matter of whether one can determine with adequate reliability that the finger that left an imperfect impression at a crime scene is the same finger that left an impression (with different imperfections) in a file of fingerprints. In October 2007, Baltimore County Circuit Judge Susan M. Souder refused to allow a fingerprint analyst to testify that a latent print was made by the defendant in a death penalty trial. In her ruling, Judge Souder found the traditional method of fingerprint analysis to be "a subjective, untested, unverifiable identification procedure that purports to be infallible."[19]

Some forensic science methods have as their goal the "individualization" of specific types of evidence (typically shoe and tire impressions, dermal ridge prints, toolmarks and firearms, and handwriting). Analysts using such methods believe that unique markings are acquired by a source item in random fashion and that such uniqueness is faithfully transmitted from the source item to the evidence item being examined (or in the case of handwriting, that individuals acquire habits that result in unique handwriting). When the evidence and putative source items are compared, a conclusion of individualization implies that the evidence originated from that source, to the exclusion of all other possible sources.[20,21] The determination of uniqueness requires measurements of object attributes, data collected on the population frequency of variation in these attributes, testing of attribute independence, and calculations of the probability that different objects share a common set of observable attributes.[22] Importantly, the results of research must be made public so that they can be reviewed, checked by others, criticized, and then revised, and this has not been done for some of the forensic science disciplines.[23] As recently as September 2008, the Detroit Police crime laboratory was shut down following a Michigan State Police audit that found a 10 percent error rate in ballistic evidence.[24]

The forensic science community has had little opportunity to pursue or become proficient in the research that is needed to support what it does. Few sources of funding exist for independent forensic research (see Chapter 2). Most of the studies are commissioned by DOJ and conducted by crime laboratories with little or no participation by the traditional scientific community. In addition, most disciplines in the profession are hindered by a lack of enforceable standards for interpretation of data (see Chapter 7).

---

[17] R. Epstein. Fingerprints meet *Daubert:* The myth of fingerprint 'science' is revealed. 75 *Southern California Law Review* 605 (2002).

[18] S.A. Cole. 2002. *Suspect Identities: A History of Fingerprinting and Criminal Identification.* Boston: Harvard University Press; Epstein, op. cit.

[19] *State of Maryland v. Bryan Rose.* In the Circuit Court for Baltimore County. Case No. K06-545.

[20] M.J. Saks and J.J. Koehler. 2005. The coming paradigm shift in forensic identification science. *Science* 309:892-895.

[21] W.J. Bodziak. 1999. *Footwear Impression Evidence–Detection, Recovery, and Examination.* 2nd ed. Boca Raton, FL: CRC Press.

[22] Ibid. See also NRC, 1996, op. cit.

[23] P.C. Giannelli. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007).

[24] B. Schmitt and J. Swickard. 2008. Detroit Police lab shut down after probe finds errors. *Detroit Free Press* on-line. September 25.

1-7

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

**Errors and Fraud**

In recent years, the integrity of crime laboratories increasingly has been called into question, with some highly publicized cases highlighting the sometimes lax standards of laboratories that have generated questionable or fraudulent evidence and that have lacked quality control measures that would have detected the questionable evidence. In one notorious case, a state-mandated review of analyses conducted by West Virginia State Police laboratory employee Fred Zain revealed that the convictions of more than 100 people were in doubt because Zain had repeatedly falsified evidence in criminal prosecutions. At least 10 men had their convictions overturned as a result.[25] Subsequent reviews questioned whether Zain was ever qualified to perform scientific examinations.[26]

Other scandals, such as one involving the Houston Crime Laboratory in 2003, highlight the sometimes blatant lack of proper education and training of forensic examiners. In the Houston case, several DNA experts went public with accusations that the DNA/Serology Unit of the Houston Police Department Crime Laboratory was performing grossly incompetent work and was presenting findings in a misleading manner designed to unfairly help prosecutors obtain convictions. An audit by the Texas Department of Public Safety confirmed serious inadequacies in the laboratory's procedures, including "routine failure to run essential scientific controls, failure to take adequate measures to prevent contamination of samples, failure to adequately document work performed and results obtained, and routine failure to follow correct procedures for computing statistical frequencies."[27,28]

The Innocence Project has documented instances of both intentional and unintentional laboratory errors that have lead to wrongful convictions, including:

- In the laboratory—contamination and mislabeling of evidence.
- In information provided in forensics reports—falsified results (including "drylabbing," i.e., providing conclusions from tests that were never conducted), and misinterpretation of evidence.
- In the courtroom—suppression of exculpatory evidence; providing a statistical exaggeration of the results of a test conducted on evidence; and providing false testimony about test results.[29]

Saks and Koehler have written that the testimony of forensic scientists is one of many problems in criminal cases today.[30] They cite the norms of science, which emphasize "methodological rigor, openness, and cautious interpretation of data," as norms that often are absent from the forensic science disciplines.

Although cases of fraud appear to be rare, perhaps of more concern is the lack of good data on the accuracy of the analyses conducted in forensic science disciplines and the significant potential for bias that is present in some cases. For example, the FBI was accused of bias in the

---

[25] *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division* (WVa 1993) 438 S.E.2d 501(Zaine I); and 445 S.E.2d 165 (Zain II).

[26] Ibid.

[27] *Quality Assurance Audit for Forensic DNA and Convicted Offender DNA Databasing Laboratories. An Audit of the Houston Police Department Crime Laboratory-DNA/Serology Section, December 12-13, 2002.* Available at www.scientific.org/archive/Audit%20Document--Houston.pdf.

[28] See also M.R. Bromwich. 2007. *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room.* Available at www.hpdlabinvestigation.org.

[29] The Innocence Project. Available at www.innocenceproject.org/Content/312.php.

[30] Saks and Koehler, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

INTRODUCTION – PREPUBLICATION COPY

case of the Madrid bombing suspect Brandon Mayfield (see Box 1-1). In that case, the Inspector General of DOJ launched an investigation. The FBI conducted its own review by a panel of independent experts. The reviews concluded that the problem was not the quality of the digital images reviewed, but rather the bias and "circular reasoning" of the FBI examiners.[31]

---

**Box 1-1  FBI Statement on Brandon Mayfield Case**

"After the March terrorist attacks on commuter trains in Madrid, digital images of partial latent fingerprints obtained from plastic bags that contained detonator caps were submitted by Spanish authorities to the FBI for analysis. The submitted images were searched through the Integrated Automated Fingerprint Identification System (IAFIS). An IAFIS search compares an unknown print to a database of millions of known prints. The result of an IAFIS search produces a short list of potential matches. A trained fingerprint examiner then takes the short list of possible matches and performs an examination to determine whether the unknown print matches a known print in the database.

Using standard protocols and methodologies, FBI fingerprint examiners determined that the latent fingerprint was of value for identification purposes. This print was subsequently linked to Brandon Mayfield. That association was independently analyzed and the results were confirmed by an outside experienced fingerprint expert.

Soon after the submitted fingerprint was associated with Mr. Mayfield, Spanish authorities alerted the FBI to additional information that cast doubt on the findings. As a result, the FBI sent two fingerprint examiners to Madrid, who compared the image the FBI had been provided to the image the Spanish authorities had.

Upon review it was determined that the FBI identification was based on an image of substandard quality, which was particularly problematic because of the remarkable number of points of similarity between Mr. Mayfield's prints and the print details in the images submitted to the FBI."

The FBI's Latent Fingerprint Unit has reviewed its practices and adopted new guidelines for all examiners receiving latent print images when the original evidence is not included.

SOURCE: FBI. May 24, 2004, Press Release. Available at
www.fbi.gov/pressrel/pressrel04/mayfield052404.htm.

---

Parts of the forensic science community have resisted the implications of the mounting criticism of the reliability of forensic analyses by investigative units such as Inspector General reports, The Innocence Project, and studies in the published literature. In testimony before the committee, it was clear that some members of the forensic science community will not concede that there could be less than perfect accuracy either in given laboratories or in specific disciplines, and experts testified to the committee that disagreement remains regarding even what constitutes an error. For example, if the limitations of a given technology lead to an examiner declaring a "match" that is found by subsequent technology (e.g., DNA analysis) to be a "mismatch," there is disagreement within the forensic science community about whether the original determination constitutes an error.[32] Failure to acknowledge uncertainty in findings is common: Many examiners claim in testimony that others in their field would come to the exact same conclusions about the evidence they have analyzed. Assertions of a "100 percent match"

---

[31] U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case*. Also see R.B. Stacey. 2005. *Report on the Erroneous Fingerprint Individualization in the Madrid Train Bombing Case*. Available at www.fbi.gov/hq/lab/fsc/current/special_report/2005_special_report.htm.

[32] N. Benedict. 2004. Fingerprints and the *Daubert* standard for admission of scientific evidence: Why fingerprints fail and a proposed remedy. *Arizona Law Review* 46:519; M. Houck, Director of Forensic Science Initiative, West Virginia University. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

contradict the findings of proficiency tests that find substantial rates of erroneous results in some disciplines (i.e., voice identification, bite mark analysis).[33,34]

As an example, in a FBI publication on the correlation of microscopic and mitochondrial DNA hair comparisons, the authors found that even competent hair examiners can make significant errors.[35] In this study, the authors found that in 11 percent of the cases in which the hair examiners declared two hairs to be "similar," subsequent DNA testing revealed that the hairs did not match, which refers either to the competency or the relative ability of the two divergent techniques to identify differences in hair samples, as well as to the probative value of each test.

The insistence by some forensic practitioners that their disciplines employ methodologies that have perfect accuracy and produce no errors has hampered efforts to evaluate the usefulness of the forensic science disciplines. And, although DNA analysis is considered the most reliable forensic tool available today, laboratories nonetheless can make errors working with either nuclear DNA or mtDNA—errors such as mislabeling samples, losing samples, or misinterpreting the data.

Standard setting, accreditation of laboratories, and certification of individuals aim to address many of these problems, and although many laboratories have excellent training and quality control programs, even accredited laboratories make mistakes. Furthermore, accreditation is a voluntary program, except in a few jurisdictions in which it is required (New York, Oklahoma, and Texas)[36] (see Chapter 7).

**The "CSI Effect"**

Media attention has focused recently on what is being called the "CSI Effect," named for popular television shows (such as *Crime Scene Investigation*) that are focused on police forensic evidence investigation.[37] The fictional characters in these dramas often present an unrealistic portrayal of the daily operations of crime scene investigators and crime laboratories (including their instrumentation, analytical technologies, and capabilities). Cases are solved in an hour, highly technical analyses are accomplished in minutes, and laboratory and instrumental capabilities are often exaggerated, misrepresented, or entirely fabricated. In courtroom scenes, forensic examiners state their findings or a match (between evidence and suspect) with unfailing certainty, often demonstrating the technique used to make the determination. The dramas suggest that convictions are quick and no mistakes are made.

The CSI Effect specifically refers to the real-life consequences of exposure to Hollywood's version of law and order. Jurists and crime laboratory directors anecdotally report that jurors have come to expect the presentation of forensic evidence in every case, and they expect it to be conclusive. A recent study by Schweitzer and Saks found that compared to those who do not watch CSI, CSI viewers were "more critical of the forensic evidence presented at the trial, finding it less believable. Forensic science viewers expressed more confidence in their

---

[33] D.L. Faigman, D. Kaye, M.J. Saks, and J. Sanders. 2002. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* St. Paul, MN: Thompson/West.
[34] C.M. Bowers. 2002. The scientific status of bitemark comparisons. In: D.L. Faigman (ed.). *Science in the Law: Forensic Science Issues.* St. Paul, MN: West Publishing.
[35] M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5):964-967; see also Bromwich, op. cit.
[36] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.
[37] See *U.S. News & World Report.* 2005. The CSI effect: How TV is driving jury verdicts all across America. April 25.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

verdicts than did non-viewers."[38] Prosecutors and defense attorneys have reported jurors second guessing them in the courtroom, citing "reasonable doubt" and refusing to convict because they believed that other evidence was available and not adequately examined.[39]

Schweitzer and Saks found that the CSI Effect is changing the manner in which forensic evidence is presented in court, with some prosecutors believing they must make their presentation as visually interesting and appealing as such presentations appear to be on television. Some are concerned that the conclusiveness and finality of the manner in which forensic evidence is presented on television results in jurors giving more or less credence to the forensic experts and their testimony than they should, raising expectations, and possibly resulting in a miscarriage of justice.[40] The true effects of the popularization of forensic science disciplines will not be fully understood for some time, but it is apparent that it has increased pressure and attention on the forensic science community in the use and interpretation of evidence in the courtroom.

**Fragmented and Inconsistent Medicolegal Death Investigation**

The medicolegal death investigation system is a fragmented organization of state and local entities called upon to investigate deaths and to certify the cause and manner of unnatural and unexplained deaths. About 1 percent of the U.S. population (about 2.6 million people) dies each year. Medical examiner and coroner offices receive nearly 1 million reports of deaths, constituting between 30 to 40 percent of all U.S. deaths in 2004, and accept about one half of those (500,000, or 1 in 5 deaths) for further investigation and certification.[41] In carrying out this role, medical examiners and coroners are required to decide the scope and course of a death investigation, which may include assessing the scene of death, examining the body, determining whether to perform an autopsy, and ordering other medical tests, forensic analyses, and procedures as needed. Yet the training and skill of medical examiners and coroners and the systems that support them vary greatly. Medical examiners may be physicians, pathologists, or forensic pathologists with jurisdiction within a county, district, or state. A coroner is an elected or appointed official who might not be a physician or have had any medical training. Coroners typically serve a single county.

Since 1877, in the United States, there have been efforts to replace the coroner system with a medical examiner system.[42] In fact, more than 80 years ago, the National Academy of Sciences identified concerns regarding the lack of standardization in death investigations and called for the abolishment of the coroner's office, noting that the office "has conclusively demonstrated its incapacity to perform the functions customarily required of it."[43] In its place, the report called for well-staffed offices of a medical examiner, led by a pathologist. In strong

---

[38] N.J. Schweitzer and M.J. Saks. 2007. The CSI Effect: Popular fiction about forensic science affects public expectations about real forensic science. *Jurimetrics* 47:357.

[39] See *U.S. News & World Report*, op. cit.

[40] Schweitzer and Saks, op. cit.; S.A. Cole and R. Dioso-Villa. 2007. CSI and its effects: Media, juries, and the burden of proof. *New England Law Review* 41(3): 435.

[41] M.J. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2007. *Medical Examiner and Coroners' Offices, 2004.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/meco04.pdf.

[42] W.U. Spitz and R.S. Fisher. 1982. *Medicolegal Investigation of Death,* 2nd ed. Springfield, IL: Charles C. Thomas.

[43] National Research Council. 1928. *The Coroner and the Medical Examiner.* Washington, D.C.: The National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

terms, the 1928 committee called for the professionalization of death investigation, with medical science at its center.

Despite these calls, efforts to move away from a coroner system in the United States have stalled. Currently, 11 states have coroner-only systems, 22 states have medical examiner systems, and 18 states have mixed systems—in which some counties have coroners and others have medical examiners. Some of these states have a referral system, in which the coroner refers cases to medical examiners for autopsy.[44] According to a 2003 Institute of Medicine report, in addition to the variety of systems in the United States, the location and authority of the medical examiner or coroner office also varies, with 43 percent of the U.S. population served by a medical examiner or coroner housed in a separate city, county, or state government office. Other arrangements involve an office under public safety or law enforcement. The least common placement is under a forensic laboratory or health department.[45]

Variability also is evident in terms of accreditation of death investigation systems. As of August 2008, 54 of the medical examiner offices in the United States (serving 23 percent of the population) have been accredited by the National Association of Medical Examiners, the professional organization of physician medical examiners. Most of the country is served by offices lacking accreditation.[46] Similarly, requirements for training are not mandatory. About 36 percent of the population lives where minimal or no special training is required to conduct death investigations.[47] Recently, an 18-year-old high school student was elected a deputy coroner in Indiana after completing a short training course.[48]

Additionally, funding for programs supporting death investigations vary across the country, with the cost of county systems ranging from $0.62 to $5.54 per capita, and statewide systems from $0.32 to $3.20.[49] Most funding comes from tax revenues, and with such limited funds available, the salaries of medical examiners and skilled personnel are much lower than those of other physicians and medical personnel. Consequently, recruiting and retaining skilled personnel is a constant struggle.

At a time when natural disasters or man-made disasters could create great havoc in our country, the death investigation system is one that is of increasing importance. Deaths resulting from terrorism, with the exception of any suicide perpetrators, are homicides that require robust medicolegal death investigation systems to recover and identify remains, collect forensic evidence, and determine cause of death.

**Incompatible Automated Fingerprint Identification Systems**

In the late 1970s and early 1980s, law enforcement agencies across the Nation began adopting Automated Fingerprint Identification Systems (AFIS) to improve their efficiency and reduce the time needed to identify (or exclude) a given individual from a fingerprint. Before the use of AFIS, the fingerprint identification process involved numerous clerks and fingerprint examiners tediously sifting through thousands of classified and cataloged paper fingerprint cards.

---

[44] R. Hanzlick and D. Combs. 1998. Medical examiner and coroner systems: History and trends. *Journal of the American Medical Association* 279(11):870-874.

[45] Institute of Medicine (IOM). 2003. *Medicolegal Death Investigation System: Workshop Report*. Washington, D.C.: National Academy Press.

[46] Ibid.

[47] R. Hanzlick. 1996. Coroner training needs. A numeric and geographic analysis. *Journal of the American Medical Association* 276(21):1775-1778.

[48] See www.wthr.com/Global/story.asp?S=6534514&nav=menu188_2.

[49] IOM, op. cit.

1-12

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

AFIS was an enormous improvement in the way local, state, and federal law enforcement agencies managed fingerprints and identified people. AFIS searches are much faster than manual searches and often allow examiners to search across a larger pool of candidates and produce a shorter list of possible associations of crime scene prints and unidentified persons, living or dead.

Working with a system's software, fingerprint examiners can map the details of a given fingerprint—by features that consist of "minutiae" (e.g., friction ridge endings and ridge bifurcations)—and ask the system to search its database for other records that closely resemble this pattern. Depending on the size of the database being searched and the system's workload, an examiner often can get results back within minutes.

However, even though AFIS has been a significant improvement for the law enforcement community over the last few decades, AFIS deployments and performance (operational capacities) today are still far from optimal. Many law enforcement AFIS installations are stand-alone systems or are part of relatively limited regional networks with shared databases or information-sharing agreements. Today, systems from different vendors often are incompatible and hence cannot communicate. Indeed, different versions of similar systems from the same vendor often cannot effectively share fingerprint data with one another. In addition, many law enforcement agencies also access the FBI's Integrated Automated Fingerprint Identification System database (the "largest biometric database in the world"[50]) through an entirely separate stand-alone system—a fact that often forces fingerprint examiners to enter fingerprint data for one search multiple times in multiple states (at least once for each system being searched). Additionally, searches between latent print to AFIS 10-print[51] files suffer by not being more fully automated: Examiners must manually encode a latent print before searching the AFIS 10-print database. Furthermore, the hit rate for latent prints searched against the AFIS database is approximately 40 percent (see Chapter 10). Much good work in recent years has improved the interoperability of AFIS installations and databases, but the pace of these efforts to date has been slow, and greater progress must be made toward achieving meaningful, nationwide AFIS interoperability.

**The Growing Importance of the Forensic Science Disciplines to Homeland Security**

Threats to food and transportation, concerns about nuclear and cyber security, and the need to develop rapid responses to chemical, nuclear, radiological, and biological threats underlie the need to ensure that there is a sufficient supply of adequately trained forensic specialists. At present, public crime laboratories are insufficiently prepared to handle mass disasters. In addition, demands will be increasing on the forensic science community to develop real-time plans and protocols for mass disaster responses by the network of crime laboratories and death investigation systems across the country—and internationally. The development and application of the forensic science disciplines to support intelligence, investigations, and operations aimed at the prevention, interdiction, disruption, attribution, and prosecution of terrorism has been an important component of both public health and what is now termed "homeland security" for at least two decades. With the development and deployment of enhanced capabilities came the integration of forensic science disciplines much earlier in the investigative process. As a result, the forensic science disciplines could be more fruitfully leveraged to generate investigative leads to test, direct, or redirect lines of investigation, not just

---

[50] See www.fbi.gov/hq/cjisd/iafis.htm.
[51] AFIS 10-print records the fingers, thumbs, and a palm print on a large index card. These prints are carefully taken, clear, and easy to read, and they make up the bulk of the AFIS data available today.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

in building a case for prosecution. Forensic science disciplines are essential components of the response to mass fatality events, whether natural or man made.

**The Admission of Forensic Science Evidence in Litigation**

As explained in Chapter 3, most forensic science disciplines are inextricably tethered to the legal system; many forensic fields (e.g., firearms analysis, latent fingerprint identification) are but handmaidens of the legal system, and they have no significant uses beyond law enforcement. Therefore, any study of forensic science necessarily must include an assessment of the legal system that it serves. As already noted, and as further amplified in Chapters 4 and 5, the forensic science system exhibits serious shortcomings in capacity and quality; yet the courts continue to rely on forensic evidence without fully understanding and addressing the limitations of different forensic science disciplines.

The conjunction between the law and forensic science is explored in detail in Chapter 3. The bottom line is simple: In a number of forensic science disciplines, forensic science professionals have yet to establish either the validity of their approach or the accuracy of their conclusions, and the courts have been utterly ineffective in addressing this problem. For a variety of reasons—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and the common lack of scientific expertise among judges and lawyers who must try to comprehend and evaluate forensic evidence—the legal system is ill-equipped to correct the problems of the forensic science community. In short, judicial review, by itself, is not the answer. Rather, tremendous resources must be devoted to improving the forensic science community. With more and better educational programs, accredited laboratories, certification of forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. This is particularly important in criminal cases in which we seek to protect society from persons who have committed criminal acts and to protect innocent persons from being convicted of crimes that they did not commit.

**ORGANIZATION OF THIS REPORT**

This report begins with a series of chapters describing the current forensic science system, the use of forensic science evidence in litigation, and science and the forensic science disciplines. It then addresses systemic areas for improvement with the goal of attaining a more rigorous and robust forensic science infrastructure, including standards and best practices, education, and training. Pursuant to its charge, in three chapters the committee addresses special issues in the areas of medicolegal death investigation (Chapter 9), AFIS (Chapter 10), and the interrelationships between homeland security and the forensic science disciplines (Chapter 11).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 2
# THE FORENSIC SCIENCE COMMUNITY AND THE NEED FOR INTEGRATED GOVERNANCE

Forensic investigations involve intelligence and information gathering, crime scene investigation, laboratory analysis, interpretation of tests and results, and reporting and communication with members of law enforcement and the judicial system. Law enforcement agencies within the United States vary in organizational structure regarding how forensic science examinations are conducted and evidence is admitted into court (see Chapter 3). Variations are attributable to the geographical size and population served by the jurisdictional authority, the types and level of crimes encountered, the funding source, and local tradition. In general, however, the forensic science community includes crime scene investigators; state and local crime laboratories; medical examiners; private forensic laboratories; law enforcement identification units; resources such as registries and databases; professional organizations; prosecutors and defense attorneys; quality system providers (i.e., accrediting and certifying organizations); and federal agencies that conduct or support research as well as provide forensic science services and training. This chapter provides an overview of the major components of the forensic science community. Data about laboratories are based largely on two surveys conducted by the Bureau of Justice Statistics (BJS) in 2002 and 2005 of publicly funded crime laboratories[1] and a more recent survey of "nontraditional forensic service providers" conducted by researchers at West Virginia University.[2]

In addition to forensic laboratories, about 3,200 medical examiner and coroner offices provided death investigation services across the United States in 2004.[3] These entities—which may comprise a coroner system, a medical examiner system, or a mixed system at the county or state level—conduct death scene investigations, perform autopsies, and determine the cause and manner of death when a person has died as a result of violence, under suspicious circumstances, without a physician in attendance, or in other circumstances. These offices are described in greater detail in Chapter 9. In addition, standard setting, accrediting, and certifying organizations are described in greater detail in Chapter 7, and education and training programs are described in Chapter 8.

The committee's first recommendation, appearing at the end of this chapter, calls for a more central, strategic, and integrated approach to forensic science at the national level.

---

[1] J.L. Peterson and M.J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at: www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf; M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[2] T.S. Witt, Director, Bureau of Business and Economic Research, West Virginia University. "Survey of Non-Traditional Forensic Service Providers." Presentation to the committee. December 6, 2007.

[3] R. Hanzlick, Fulton County Medical Examiner's Center and Emory University School of Medicine. 2007. "An Overview of Medical Examiner/Coroner Systems in the United States—Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007. The Bureau of Justice (2004) omits Louisiana and classifies Texas as a medical examiner state, and accordingly reports the total as 1,998. According to Hanzlick, many of Texas's 254 counties maintain justice of the peace/coroners offices. The total number includes Justices of the Peace in Texas.

2-1

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

## CRIME SCENE INVESTIGATION

Evidence recovery and interpretation at the crime scene is the essential first step in forensic investigations. Several organizational approaches to crime scene investigation and subsequent forensic laboratory activity exist, sometimes involving a large number of personnel with varied educational backgrounds. Conversely, in some jurisdictions, a single forensic examiner might also be the same investigator who goes to the crime scene, collects evidence, processes the evidence, conducts the analyses, interprets the evidence, and testifies in court. In other jurisdictions, the investigators submit the evidence to a laboratory where scientists conduct the analyses and prepare the reports. Crime scene evidence collectors can include uniformed officers, detectives, crime scene investigators, criminalists, forensic scientists, coroners, medical examiners, hospital personnel, photographers, and arson investigators.[4] Thus, the nature and process of crime scene investigation varies dramatically across jurisdictions, with the potential for inconsistent policies and procedures and bias. Some analysts say that the lack of standards and oversight can result in deliberate deception of suspects, witnesses, and the courts; fraud; and "honest mistakes" made because of haste, inexperience, or lack of a scientific background.[5]

In 1978, the U.S. Supreme Court held for the first time in *Monell v. Department of Social Services of the City of New York*[6] that a municipality can be held directly liable for violating a person's constitutional rights under 42 U.S.C. section 1983. Partly in response to this liability, most large cities and metropolitan areas created their own professionally trained crime scene units. However, in smaller suburban and rural communities, evidence from a crime scene may be collected and preserved by a patrol officer or investigator. Even in large metropolitan areas, most crime scene investigation units are composed of sworn officers.

Recognizing that some agencies did not have the resources to adequately train all personnel in crime scene processing, in 2000 the National Institute of Justice (NIJ) and its Technical Working Group on Crime Scene Investigation (TWGCSI) developed *Crime Scene Investigation: A Guide for Law Enforcement,* which stated that "successful implementation of this guide can be realized only if staff possess basic (and in some cases advanced) training in the fundamentals of investigating a crime scene."[7] However, there remains great variability in crime scene investigation practices, along with persistent concerns that the lack of standards and proper training at the crime scene can contribute to the difficulties of drawing accurate conclusions once evidence is subjected to forensic laboratory methods. (See Chapter 5 for a discussion of methodologies and Chapter 7 for further discussion of standards and ethics.)

## FORENSIC SCIENCE LABORATORIES AND SERVICE PROVIDERS

The configuration of forensic laboratories varies by jurisdiction. Some are located within a state police department as part of a statewide system of laboratories and training programs. For example, in Illinois, state law mandates that the laboratory system provide forensic services to law enforcement agencies in all 102 counties (population 12.7 million). Although the forensic

---

[4] B. Fisher, Director, Scientific Services Bureau, Los Angeles County Sheriff's Department. Presentation to the committee. April 24, 2007.

[5] See J.I. Thornton. 2006. Crime reconstruction—ethos and ethics. In: W.J. Chisum and B.E. Turvey (eds.). *Crime Reconstruction.* Boston: Elsevier Science, pp. 37-50.

[6] 436 U.S. 658 (1978).

[7] Available at www.ncjrs.gov/pdffiles1/nij/178280.pdf, p. 2.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

laboratory system is part of the Illinois State Police, 98 percent of the casework completed is for the 1,200 local and county police agencies across the state.[8]

Not all forensic services are performed in traditional crime laboratories—they may be conducted by a sworn law enforcement officer with no scientific training (e.g., some latent print examiners). Thus, forensic service providers may be located in law enforcement agencies, may be crime scene investigators, or may be a for-profit entity. There are no good data on the entire universe of forensic science entities, although there have been efforts to gather data on publicly funded crime laboratories and nonlaboratory-based providers. The committee could find no data regarding for-profit forensic science service providers, except for DNA laboratories, of which there are approximately 30 in the United States.

**Publicly Funded Laboratories**

BJS has conducted two censuses of publicly funded forensic crime laboratories. The first census, administered in 2002, established baseline information on the operations and workload of the Nation's public crime laboratories.[9] The 2005 census documented changes in workload and backlog that have occurred since the 2002 census. According to the 2005 census, 389 publicly funded forensic crime laboratories were operating in the United States in 2005—210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories. The estimated budget for all 389 crime laboratories exceeded $1 billion, nearly half of which funded state laboratories. The BJS report cites a total of nearly 2.7 million new cases[10] in 2005, including a much larger number of separate requests for forensic services. Some laboratories are full-service facilities; others might conduct only the more common analyses of evidence (see Chapter 5).

*Funding Sources*

According to the 2005 BJS census, in addition to federal, state, or local support, 28 percent of publicly funded laboratories charged fees for service, and 65 percent reported receiving some funding from grants. However, funding for laboratories has not increased with increasing demands. Some laboratory directors appearing before the committee cited budget cuts as high as 22 percent over the past five years.[11]

*Personnel and Equipment*

The 2005 BJS census estimated that publicly funded crime laboratories employed more than 11,900 full-time equivalent (FTE) personnel in 2005. Most crime laboratories are relatively small: the median staff size in 2005 was 16. Distinctly different professional tracks exist within forensic laboratories, ranging from laboratory technicians and general examiners to scientists. According to the census data, analysts or examiners—persons who typically prepare evidence, conduct tests, interpret results, sign laboratory reports, and testify in court—comprised 58 percent of all crime laboratory FTEs in 2005. Technical support personnel, who typically assist analysts or examiners in preparing evidence and conducting tests, accounted for 10 percent of all FTEs. Thirteen percent of FTEs were managerial personnel, 8 percent were in clerical positions,

---

[8] J. Johnson, Illinois State Police Forensic Science Center at Chicago. Presentation to the committee. January 25, 2007.

[9] Peterson and Hickman, op. cit.

[10] Durose, op. cit. "A 'case' is defined as all physical evidence submitted from a single criminal investigation submitted for crime laboratory analysis," p. 9.

[11] Johnson, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

and 6 percent were crime scene technicians. Similar ranges in the distribution of personnel are evident among laboratories by type of jurisdiction served. (The uncertainties in these reported percentages depend on the number of laboratories that responded to the FTE survey questions.) A 2006 NIJ report cited equipment shortages (which may include insufficient equipment maintenance) as a limiting factor in processing cases.[12] It cited equipment needs at the 50 largest laboratories in the disciplines of controlled substances, trace evidence, firearms, questioned documents, latent prints, toxicology, and arson. Evidence submission may or may not be automated, depending on the laboratory. Lack of automation increases the time the laboratory spends on logging in evidence.

A 2005 survey of public crime laboratories conducted by researchers at the State University of New York at Albany found that the number of FTEs in a laboratory ranged from 2 to 280, with an average of 34, the majority of whom have bachelor's degrees.[13] Because of the distinctly different professional tracks within larger laboratories, for example, technicians perform tests with defined protocols, and credentialed scientists conduct specialized testing and interpretation. Unlike many other professions, the forensic science disciplines have no organized control over entry into the profession, such as by degree, boards or exams, or licensure (see Chapter 7). Control mechanisms traditionally have been held through employment and job function.[14]

Of the laboratories surveyed by the State University of New York at Albany, only 21 percent reported having a sufficient number of FTEs to complete their workload. The authors concluded that "as total number of cases increases, scientists do not have proper equipment, enough time, adequate resources, enough information from the DA [district attorney], enough time to prepare for courtroom testimony, and the needed resources to provide courtroom testimony."[15] In addition, "as casework capacity increases, pressure to complete cases too quickly increases significantly, and pressure to extend opinions beyond the scientific method and pressure to get a particular result also increases significantly."[16]

The National Association of Medical Examiners (NAME) also reports acute personnel shortages in the death investigation system, with a critical need for significantly more board-certified forensic pathologists than are currently available. (See Chapter 9 for a discussion of the medicolegal death investigation system.)

*Laboratory Functions*

According to the 2002 BJS data, almost all public crime laboratories examine controlled substances (90 percent). Sixty-three percent examine firearms and toolmarks, 65 percent screen biological samples (usually in preparation for DNA analysis on selected exhibits), and 61 percent examine latent prints.[17] Fifty-nine percent of laboratories examine one or more forms of trace evidence (e.g., hairs, fibers, glass, or paint). Fewer laboratories examine questioned documents (26 percent) or conduct computer crime investigations (11 percent). As would be expected, larger laboratories are able to perform a broader range of examinations.

---

[12] NIJ. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

[13] W.S. Becker, W.M. Dale, A. Lambert, and D. Magnus. 2005. Letter to the editor—Forensic lab directors' perceptions of staffing issues. *Journal of Forensic Sciences* 50(5):1255-1257.

[14] D.S. Stoney. Chief Scientist, Stoney Forensic, Inc. Presentation to the committee. January 26, 2007.

[15] Becker, et al., op. cit., p. 1255.

[16] Ibid., p. 1256.

[17] Peterson and Hickman, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

In terms of crime scene investigation, 62 percent of laboratories report having sent examiners directly to crime scenes, although most forensic examiners did not visit crime scenes. Twenty-five percent of the laboratories reported that laboratory personnel also served as crime scene investigators. However, more than half of laboratories (62 percent) reported that agencies or persons not affiliated with the laboratory handled most major investigations—usually a police unit with specialized evidence technicians or crime scene search officers who go onsite to take photographs and locate, preserve, label, and gather physical evidence.

## CASE BACKLOGS

According to the 2005 BJS data, the Nation's 389 crime laboratories received an estimated 2.7 million new cases during 2005. Almost half were submitted to state laboratories. Laboratories serving local jurisdictions received about 1.3 million cases in 2005, including 727,000 cases received by county laboratories and 566,000 by municipal laboratories.

> An estimated 359,000 cases were backlogged (not completed within 30 days) at the end of 2005, compared to 287,000 at yearend 2002. This represents a 24 percent increase in backlogged cases between 2002 and 2005. State laboratories accounted for more than half of the backlog in both years. Among the 288 laboratories that reported this information, the median number of cases received in 2005 was about 4,100. Overall, laboratories ended the year with a median backlog of about 400 cases. Six percent of laboratories that received cases in 2005 reported having no backlog at yearend.[18]

In 2005, federal laboratories received the fewest cases.

Fifty-one percent of the laboratories reported outsourcing one or more types of forensic services to private laboratories in 2005, primarily DNA casework, toxicology, Combined DNA Index System (CODIS) samples, and controlled substances.

In a communication with the committee, Los Angeles County Sheriff's Department Crime Laboratory Director Barry Fisher warned that to manage backlogs, laboratories triage cases:

> Murders, rapes, aggravated assaults and the like have priority, as do cases going to court, cases where a suspect is being held on an arrest warrant, highly publicized cases, etc. Property crimes, such as burglaries, are often far down the list. This makes the likelihood of examining evidence from property crime cases unlikely. Oddly, the police and prosecutors are rarely consulted about how priorities are determined. The use of triage is the lab's best effort to manage its own scarce resources. Another factor at play in case management is that the "squeaky wheel gets the grease." This means that a persistent investigator who calls the lab often enough will get his case done more quickly than the investigator who just sends the case down to the lab expecting that it will be done.[19]

---

[18] Ibid., pp. 3, 4. The committee notes that the 30-day turnaround metric is an arbitrary metric useful for comparative purposes only.

[19] Letter to the committee from B.A.J. Fisher. June 12, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

Fisher also cautioned that backlog data are not entirely reliable, saying that one of the reasons for the lack of data is that laboratories count backlogs, case submissions, tests, output, and outcomes differently. Additionally, many laboratories lack automated information management systems to "capture the very data that might support their case for more assistance."[20] Finally, it is difficult to track cases for which forensic work has moved all the way through the criminal justice system: Police, prosecutors, and forensic laboratories use different tracking systems.

## NIJ'S COVERDELL FORENSIC SCIENCE IMPROVEMENT GRANT PROGRAM

Through the Paul Coverdell National Forensic Science Improvement Act (P.L. 106-561), the Justice Department operates the Paul Coverdell Forensic Science Improvement Grants Program (the Coverdell program), which awards grants to states and units of local government to help improve the quality and timeliness of forensic science and medical examiner services.[21] The program provides funding for expenses related to facilities, personnel, equipment, computerization, supplies, accreditation, certification, and education and training. In 2004, the Justice for All Act (P.L. 108-405) expanded the Coverdell program, with the aim of reducing the backlog.

A state or unit of local government that receives a Coverdell grant must use the grant for one or more of three purposes:

(1) To carry out all or a substantial part of a program intended to improve the quality and timeliness of forensic science or medical examiner services in the state, including those services provided by laboratories operated by the state and those operated by units of local government within the state.
(2) To eliminate a backlog in the analysis of forensic science evidence, including, among other things, a backlog with respect to firearms examination, latent prints, toxicology, controlled substances, forensic pathology, questioned documents, and trace evidence.
(3) To train, assist, and employ forensic laboratory personnel as needed to eliminate such a backlog.[22]

The expectation for those receiving grants is "demonstrated improvement over current operations in the quality and/or timeliness of forensic science or medical examiner services provided in the state, including services provided by laboratories operated by the state and services provided by laboratories operated by units of local government within the State."[23] The output measures for Coverdell awards are:

(1) Change in the number of days between submission of a sample to a forensic science laboratory and delivery of test results to a requesting office or agency.

---

[20] Ibid.

[21] P.L. 106-561 (December 21, 2000). An Act to improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes and for other purposes. Cited as the Paul Coverdell National Forensic Sciences Improvement Act.

[22] See www.ojp.usdoj.gov/nij/topics/forensics/nfsia/welcome.htm.

[23] Ibid.

2-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

(2) The number of backlogged forensic cases analyzed with Coverdell funds, if applicable to the grant.

(3) The number of forensic science or medical examiner personnel who completed appropriate training or educational opportunities with Coverdell funds, if applicable to the grant.[24]

States may be eligible for both "base" (formula) and competitive funds from NIJ for forensic science programs. Units of local government within states may be eligible for competitive funds and may apply directly to NIJ. The Coverdell law (42 U.S.C. § 3797k(4)) requires that, to request a grant, an applicant for Coverdell funds must submit:

- A certification and description regarding a plan for forensic science laboratories.
- A certification regarding use of generally accepted laboratory practices.
- A certification and description regarding costs of new facilities.
- A certification regarding external investigations into allegations of serious negligence or misconduct.

Program funding was $10 million in Fiscal Year (FY) 2004, $15 million in FY 2005, and $18.5 million in FY 2006. Funds may be used for personnel, computerization, laboratory equipment, supplies, accreditation, education, training, certification, or facilities.

## FORENSIC SERVICES BEYOND THE TRADITIONAL LABORATORY

Many forensic examiners do not work in a traditional crime laboratory. Often they work within law enforcement offices in units called "identification units" or "fingerprint units." For example, a 2004 study conducted by the American Society of Crime Laboratory Directors (ASCLD) for NIJ reported that two-thirds of fingerprint identifications take place outside of traditional crime laboratories.[25] Insufficient data are available on the size and expertise of this population of forensic examiners who are not employed in publicly funded forensic science laboratories. Therefore, in 2006, a survey instrument modeled after the BJS census was developed by researchers at West Virginia University in collaboration with the International Association for Identification (IAI).[26] Its survey was sent to 5,353 IAI U.S. members in April 2007,[27] targeting forensic scientists working outside the crime laboratories surveyed by BJS.

Of the units responding to the IAI survey, most were publicly funded (e.g., city, borough, village, town, county, state, or federal), with half working at the local level. Units at the city, borough, village, or town level had a median annual budget of $168,850, compared to $387,413 at the county level. Half are small units, with one to five full- and part-time employees. The units primarily conduct crime scene investigations, latent print and 10-print examinations, photography, and bloodstain pattern analyses. A smaller number are involved in other forensic functions, such as the analysis of digital evidence, footwear, tire track impressions, firearms, forensic art, questioned documents, polygraph tests, and dental evidence.

---

[24] Ibid.

[25] American Society Crime Laboratory Directors. 2004. *180-Day Study Report: Status and Needs United States Crime Laboratories.* Available at www.ncjrs.gov/pdffiles1/nij/grants/213422.pdf.

[26] Witt, op. cit.

[27] Ibid. Of the 815 surveys returned, 308 represented responses from active forensic service provider organizations (i.e., only 1 response per organization was included) outside of publicly funded crime laboratories.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

For the responding units, the mean number of cases received per year was 2,780. The mean backlog was 9.4 percent of the annual caseload, with the backlog for latent prints being higher, at 12.3 percent of the caseload. More than half of the units report outsourcing work, primarily firearms, latent print, and footwear analyses. Although 69 percent of respondents replied that they had some system for verifying results, only 15 percent are accredited.

## FEDERAL FORENSIC SCIENCE ACTIVITIES

Several federal agencies either provide support for forensic infrastructure, certification, and training, or conduct or fund forensic science in support of their missions. Brief descriptions follow.

**Federal Forensic Science Laboratories**

The largest publicly funded forensic laboratory in the country is the Federal Bureau of Investigation (FBI) Laboratory in Quantico, Virginia. Other federal agencies have smaller crime laboratories, for example, the U.S. Secret Service, the U.S. Army, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (known as ATF), the U.S. Postal Service, the Internal Revenue Service, and the U.S. Fish and Wildlife Service. In addition, the Department of Commerce's National Institute of Standards and Technology (NIST) conducts research in support of standard setting for gunshot residue analysis, trace explosives detectors, DNA analysis, and more. Some of these efforts are described below.

*The FBI Laboratory*

The types of cases investigated by the FBI include terrorism, espionage, public corruption, civil rights, criminal organizations and enterprises, white collar crime, and violent crime. Investigative case work services include those involving:

- chemistry
- cryptanalysis and racketeering records
- DNA analysis
- explosives
- evidence response
- firearms-toolmarks
- hazardous materials
- investigative and prosecutive graphics
- latent prints
- photographic operations and imaging services
- questioned documents
- structural design
- trace evidence
- specialty units

According to the 2005 BJS report, the FBI Laboratory had approximately 600 employees in 2005, and it partners with state and local crime laboratories throughout the country. Its FY 2007 budget was $63 million. The FBI Laboratory provides a full range of forensic services and handles a large volume of fingerprint work, receiving approximately 50,000 fingerprint

2-8

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

submissions every day. In July 1999, the FBI updated its fingerprint databases with the Integrated Automated Fingerprint Identification System (IAFIS). Previously, all prints arrived on paper fingerprint cards that had to be processed by hand. With the introduction of IAFIS, prints and pictures can be submitted electronically.

According to the 2005 BJS census, the FBI laboratory began 2003 with an estimated backlog of 3,062 requests for forensic services. About two-thirds of the backlog was attributable to latent print requests. During 2003, the FBI laboratory received 6,994 new requests and completed 7,403 requests. The estimated year end backlog was 2,653 requests, a 13 percent reduction over the previous year. Latent print requests comprised half of the year end 2003 backlog. No data were provided in the 2005 census.

By the end of the first quarter of 2004, the FBI Laboratory reported a total backlog of 2,585 requests. This included 1,216 latent print requests, or 47 percent of the total. The FBI Laboratory reported a need for additional equipment and 249 additional FTEs in order to have achieved a 30-day turnaround on all 2003 requests. The cost of the additional equipment was estimated to be $40 million. Based on starting salaries for analyst/examiners, the estimated cost of the additional FTEs exceeds $17.5 million.

The FBI Laboratory also has working partnerships with the forensic science community's Scientific Working Groups (SWGs) that are tasked with generating guidelines and standards for specific forensic disciplines (see Chapter 7). The FBI also provides training for the forensic science community and conducts and funds research (see later discussion).

In addition, the FBI collects and maintains data and materials for multiple databases and registries (see Box 2-1). The largest is CODIS, which is composed of three components: the forensic database, the missing persons database, and the convicted felon database. The FBI CODIS Unit is responsible for developing, providing, and supporting the CODIS Program to federal, state, and local crime laboratories in the United States and selected international law enforcement crime laboratories to foster the exchange and comparison of forensic DNA evidence from violent crime investigations. The CODIS Unit also provides administrative management and support to the FBI for various advisory boards, Department of Justice (DOJ) grant programs, and legislation regarding DNA.

---

**Box 2-1  FBI Databases and Reference Libraries**

The CODIS Program consists of the development, enhancement, and support of software that enables forensic DNA laboratories to store, maintain, and search DNA profiles from crime scenes, offenders, and missing persons. Support of the CODIS software includes training for DNA analysts and help-desk services, as well as a yearly national meeting for all CODIS administrators. The unit also provides CODIS software to international law enforcement laboratories to assist them in establishing a DNA database program. Forty law enforcement laboratories in 25 countries now have the CODIS software. CODIS consists of a three-tiered hierarchy of databases: the NDIS [National DNA Index System], the State DNA Index System, and the Local DNA Index System. The highest level in the CODIS hierarchy is NDIS, which contains the DNA profiles contributed by participating federal, state, and local forensic DNA laboratories. There are more than 170 NDIS participating sites across the United States, including the FBI Laboratory, the U.S. Army Criminal Investigation Laboratory, and a laboratory in Puerto Rico.

The NDIS contains 6.2 million offender profiles and 233,454 forensic profiles as of August 2008. Its operation requires determining the eligibility of samples for the National Index in accordance with applicable federal law, developing procedures for laboratories participating in the Index, and monitoring the participating laboratories' compliance with federal law. The CODIS Unit also provides administrative

---

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY**

management and support for the NDIS Procedures Board and other DNA working groups. As of August 2008, CODIS has produced more than 74,500 hits, assisting in more than 74,700 investigations. [28]

The National Automotive Paint File contains entries dating as far back as the 1930s. The Paints and Polymers Subunit also serves as the U.S. repository for the Paint Data Query database, which is a Canadian database. State and local law enforcement agencies investigating hit-and-run homicides rely on both the National Automotive Paint File and the Paint Data Query database.

The FBI Explosives Reference File contains several thousand standards that help examiners identify the components and manufacturers of explosive and incendiary devices. The Explosives Reference Tools database (EXPeRT) combines the text of FBI Laboratory reports with evidentiary photographs from bombing cases and permits the rapid retrieval of information on any aspect of the forensic examination. The database also contains manufacturer data and open-source literature on the construction and use of explosives and explosive devices. An examiner can search EXPeRT, find similar devices, and identify similarities in the components used in the construction of an improvised explosive device.

The Reference Firearms Collection contains more than 5,500 handguns and shoulder firearms; and the Standard Ammunition File, a collection of more than 15,000 military and commercial ammunition specimens from both domestic and international manufacturers.

SOURCE: FBI website at www.fbi.gov/hq/lab/html/ipgu1.htm.

**U.S. Secret Service (Department of Homeland Security [DHS])**

The U.S. Secret Service laboratory examines evidence, develops investigative leads, and provides expert courtroom testimony. As part of the 1994 Crime Bill (P.L. 103-322), Congress mandated that the U.S. Secret Service provide forensic/technical assistance in matters involving missing and exploited children. On April 30, 2003, President George W. Bush signed the PROTECT Act of 2003 (P.L. 108-21), known as the "Amber Alert Bill," which gave full authorization to the U.S. Secret Service in this area. The forensic services utilized by the Secret Service include identification, forensic automation, polygraph, questioned documents, and visual information.

**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)**

The ATF Laboratories reside within DOJ. Currently, the ATF Laboratories have more than 100 employees working in 4 laboratories in 3 cities. In FY 2005, ATF Laboratories performed more than 2,600 forensic examinations with an authorized staff of 106 positions and a budget of approximately $16 million.

In FY 2006, the ATF Laboratories:

- analyzed 64 samples related to alcohol and tobacco diversion;
- processed 3,086 forensic cases;
- spent 171 days providing expert testimony in the courts;
- spent 242 days at crime scenes; and
- spent 371 days providing training to federal, state, and local investigators and examiners.

A new $135 million National Laboratory Center in suburban Maryland was opened in 2003. The National Laboratory Center contains a unique fire testing facility, designed to support fire investigations. Each ATF Laboratory also has a mobile laboratory designed to support the

---

[28] See www.fbi.gov/hq/lab/codis/clickmap.htm.

2-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

examination of evidence at the scene of a fire or explosion. In FY 2006, ATF established a DNA analysis capability at the National Laboratory Center.[29] The Laboratories are ASCLD/Laboratory Accreditation Board (LAB) accredited in the disciplines of trace evidence, biology (serology only), questioned documents, firearms/toolmarks, and latent prints.

In a 2006 semiannual report from the DOJ Office of the Inspector General (OIG), the OIG's Audit Division evaluated whether the ATF Laboratories managed workloads effectively to provide timely services to ATF field divisions. The audit report stated the following:

> Our audit found that processing times have not significantly improved in the past 4 years. Two-thirds of completed forensic examinations continued to take more than 30 days to complete and about one-third of examinations took more than 90 days.
>
> Improvements in the timeliness of laboratory examinations have been limited because ATF has not accomplished actions it committed to in 2001, such as increasing the number of examiner positions in the forensic laboratories, implementing a new priority system, implementing a new information management system, and significantly reducing the size of its backlog of examination requests. Laboratory staffing generally was adequate to manage the incoming workload, but backlogged requests continued to interfere with the timely analysis of incoming examination requests. The audit found that the backlog could increase as a result of unusually resource-intensive cases. We concluded that if these conditions are not addressed serious consequences may result, such as delays in making arrests and bringing offenders to trial.[30]

**Department of Defense (DOD)**

DOD's forensic requirements are growing beyond the traditional realm of criminal investigations, casualty investigations, and medical examiner functions toward more intelligence and counterintelligence functions. DOD's activities are primarily mission oriented, but they also serve specific functional roles in criminal investigations. A DOD Forensic Sciences Committee provides advice on forensic science activities across the department.

Like other crime laboratories, DOD has capabilities in most of the forensic science disciplines. Its major forensic entities include the Criminal Investigation Laboratory, the Armed Forces Institute of Pathology, the Cyber Crime Center ($20 million annually), and the Central Identification Laboratory ($1 million annually), all of which are ASCLD/LAB accredited.[31] The Army also maintains the Armed Forces Repository of Specimen Samples for the Identification of Remains, with more than 5 million DNA samples primarily from military service members. It also maintains a searchable database of DNA profiles from detainees and known or suspected terrorists. The Criminal Investigation Laboratory provides worldwide forensic laboratory services, training, and research and development (R&D) to all DOD investigative agencies.

---

[29] See www.atf.treas.gov/labs/index.htm.

[30] Office of the Inspector General. *Semiannual Report to Congress*, October 1, 2005-March 31, 2006. April 8, 2006. Available at www.usdoj.gov/oig/semiannual/0605/message.htm. Also see U.S. Department of Justice Office of the Inspector General Audit Division, Audit Report 06-15. March 2006. *Follow-Up Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives Forensic Science Laboratories Workload Management.*

[31] L.C. Chelko, Director, U.S. Army Criminal Investigation Laboratory. Presentation to the committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

DOD currently is developing a "Defense Forensic Enterprise System" to more centrally manage, integrate, and coordinate across the Services for both criminal investigation and warfighter operations, as well as to serve homeland security functions.[32] Part of the system is the Joint Expeditionary Forensic Facilities, which are modular by design for deployment purposes but which are also designed for expansion to full-spectrum analyses. The Defense Forensic Network connects all DOD forensic operations virtually and synchronizes worldwide DOD forensic operations. A Forensic Training and Research Academy is responsible for all DOD forensic examiner training and serves as DOD's certification authority. In addition to conducting its own research, DOD partners with academia, industry, and other federal agencies. It is collaborating with the National Forensic Science Technology Center to leverage its work in deployable forensic instrumentation and technologies and with NIJ on technology transfer strategies.

**National Bioforensic Analysis Center (NBFAC), DHS**

NBFAC is a component of the National Biodefense Analysis and Countermeasures Center (NBACC), which is operated by a contractor on behalf of DHS, with a proposed budget of $28.3 million for FY 2009. NBFAC and NBACC are not federal agencies. Their prime customer for their services is the FBI. They do not perform complete forensic analyses on evidence from biocrimes and bioterrorism; they do perform or direct the performance (by one or more of their affiliated laboratories) of analyses targeting biological materials and biotoxins. NBFAC provides the laboratories and training for FBI Laboratory examiners in several disciplines to safely and effectively conduct their standard examinations on contaminated traditional evidence. It is also charged with establishing and maintaining reference collections of biological agents.[33]

**National Counterproliferation Center**

The National Counterproliferation Center, a policy and program oversight organization within the Office of the Director of National Intelligence, is seeking to bring a unified, strategic perspective to microbial forensics (bioforensics) research and development and its application to intelligence purposes. Microbial forensics is a "developing interdisciplinary field of microbiology devoted to the development, assessment, and validation of methods to fully characterize microbial samples for the ultimate purpose of high confidence comparative analysis."[34]

---

[32] R. Tontarski, Chief, Forensic Analysis Division, CID Command, U.S. Army Criminal Investigation Laboratory. Presentation to the committee. September 21, 2007.

[33] J. Burans, Bioforensics Program Manager, National Bioforensics Analysis Center. Presentation to the committee. September 21, 2007.

[34] C.L. Cooke, Jr., Office of the Deputy Director for Strategy and Evaluation, National Counterproliferation Center. Presentation to the committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

## RESEARCH FUNDING

Nearly all forensic science research funds are channeled through DOJ. NIJ and the FBI are the two primary federal sources of funding for forensic science research.

**National Institute of Justice (NIJ)**

NIJ provides the bulk of funds for research. The BJS 2002 census found that of the 12 percent of laboratories that had resources dedicated to research, the primary source of funding for this research was NIJ.

NIJ has two operating offices: (1) the Office of Research and Evaluation develops, conducts, directs, and supervises research and evaluation activities across a wide variety of issues and (2) the Office of Science and Technology manages technology research and development, the development of technical standards, testing, forensic science capacity building, and technology assistance to state and local law enforcement and corrections agencies.[35] NIJ's forensic science programs relevant to research include the President's DNA Initiative; General Forensics R&D; the Forensic Resource Network; and Electronic Crime. These programs vary in their direct support of research. Research decisions are managed through a peer review process.[36] Total expenditures for forensic research were $78 million in FY 2002, but they decreased to $33 million by FY 2009. According to John Morgan, Deputy Director, NIJ, the agency is able to fund 5 to 7 percent of the applications submitted.[37] Commentators have noted that NIJ funds often are not awarded to working members of the forensic science community.[38]

In 2003, the President announced a five-year, $1 billion initiative to improve the use of DNA in the criminal justice system. The President's DNA Initiative pushed for increased funding, training, and assistance to ensure that DNA technology "reaches its full potential to solve crimes, protect the innocent, and identify missing persons."[39] Congress has appropriated more than $300 million to date for the initiative, although only a small fraction is directed toward research. Since 2003, DOJ has made grants in excess of $26 million for new research on forensic tools and techniques,[40] with grants tending to go to population geneticists, medical geneticists, molecular biologists, technology experts, and crime laboratory personnel. The bulk of the funding has gone to state and local law enforcement agencies to support the examination of nearly 104,000 DNA cases from 2004 to 2007 and 2,500,000 convicted offender and arrestee samples, which will be added to the national DNA database. More than 5,000 "hits," or matches to unknown profiles or other cases, have resulted from these efforts. In 2008, NIJ expects to fund the testing of an additional 9,000 backlogged cases and more that 834,000 backlogged convicted offender and arrestee samples.[41]

---

[35] See www.ojp.gov/nij/about_rsrchpri.htm#1.

[36] J. Morgan, Deputy Director National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Presentation to the committee. January 25, 2007.

[37] Ibid.

[38] K. Pyrek. 2007. *Forensic Science Under Siege: The Challenges of Forensic Laboratories and the Medico-Legal Investigation System*. Burlington, MA: Academic Press (Elsevier), p. 448.

[39] See www.dna.gov/info/e_summary.

[40] Morgan, op. cit.

[41] Statement of J.S. Morgan, Deputy Director National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, before the U.S. Senate Committee on the Judiciary concerning "Oversight of the Justice For All Act: Has the Justice Department Effectively Administered the Bloodsworth and Coverdell DNA Grant Programs?" January 23, 2008.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

Under the General Forensics R&D Program, 53 awards have been made through 2007 for the development of "tools and technologies that will allow faster, more reliable, more robust, less costly, or less labor-intensive identification, collection, preservation, and/or analysis of forensic evidence; tools that provide a quantitative measure or statistical evaluation of forensic comparisons; and identification or characterization of new analytes of forensic importance."[42] In FY 2007, solicitations were issued for proposals in Research and Development on Crime Scene Tools, Techniques, and Technologies; Research and Development on Impression Evidence; Research and Development in the Forensic Analysis of Fire and Arson Evidence; and Forensic Toxicology Research and Development.

The size of the NIJ research program warrants comparison with other research programs. In FY 2007, NIJ awarded 21 grants for forensic research and development (not including awards for DNA research) (see Box 2-2). As will be seen in Chapter 5, the number of open research questions about the more common forensic science methods greatly exceeds 21, and none of these open questions appear to be squarely addressed by the projects listed in Box 2-2. The 2007 NIJ awards totaled nearly $6.6 million, with an average award size of $314,000. As a comparison, in the same year, the National Institutes of Health awarded 37,275 research project grants, averaging $359,000, for a total of $15 billion.[43] Also in FY 2007, the National Science Foundation made over 11,500 research project awards for a total of $6.0 billion.[44]

---

**Box 2-2**
**FY 2007 NIJ Awards for Forensic Science Research and Development**

**Biometric Technologies**

Automatic Fingerprint Matching Using Extended Feature Set, Michigan State University, $260,038
Selective Feature-Based Quality Measure Plug-In for Iris Recognition System, Indiana University, $84,858
Site-Adaptive Face Recognition at a Distance, General Electric Co., $496,341

**Forensic DNA Research and Development**

A Low-Cost Microfluidic Microarray Instrument for Typing Y-Chromosome Single Nucleotide
    Polymorphisms (SNPs), Akonni Biosystems, Inc., $448,466
A Rapid, Efficient and Effective Assay to Determine Species Origin in Biological Materials, Bode
    Technology Group, Inc., $170,212
DNA Profiling of the Semen Donor in Extended Interval Post-Coital Samples, University of Central
    Florida, $271,504
Microfabricated Capillary Array Electrophoresis Genetic Analysis for Forensic Short Tandem Repeat DNA
    Profiling, Regents of the University of California, $592,183
National Institute of Justice Forensic DNA Research and Development, Network Biosystems, Inc.,
    $497,346
National Institute of Justice Forensic DNA Research and Development in Vermont for Fiscal Year
    2007,Vermont Department of Public Safety, $112,481
Population Genetics of Single Nucleotide Polymorphisms (SNPs) for Forensic Purposes, Yale University,
    $680,516

---

[42]Morgan, 2007, op. cit.
[43]See http://report.nih.gov/index.aspx?section=NIHFunding.
[44]See www.nsf.gov/news/news_summ.jsp?cntn_id=105803.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

---

Sperm Capture Using Aptamer-Based Technology, Denver, City and County of, $370,813

Tools for Improving the Quality of Aged, Degraded, Damaged or Otherwise Compromised DNA Evidence, Louisiana State University, $580,337

Y Chromosome Whole Genome Analysis Strategies: Improved Detection of Male DNA, University of Central Florida, $324,705


**Research and Development on Crime Scene Tools, Techniques and Technologies**

Detecting Buried Firearms Using Multiple Geophysical Technologies, University of Central Florida, $89,584

Developing Fluorogenic Reagents for Detecting and Enhancing Bloody Fingerprints, Portland State University, $168,904

Electronic Fingerprint Development Device "Fuma-Room," Mountain State University, $61,152

Investigations on the Use of Sample Matrix to Collect and Stabilize Crime Scene Biological Evidence for Optimized Analysis and Room Temperature Storage, California State University, Los Angeles, University Auxiliary Services, $353,449

Rapid Visualization of Biological Fluids at Crime Scenes Using Optical Spectroscopy, University of South Carolina Research Foundation, $382,394


**Research and Development on Impression Evidence**

Analysis of Footwear Impression Evidence, Research Foundation of the State University of New York, $350,172

The Use of Infrared Imaging, a Robust Matching Engine and Associated Algorithms to Enhance Identification of Both 2-D and 3-D Impressions: Phase 1, SED Technology, LLC, $295,247


SOURCE: www.ojp.usdoj.gov/nij/awards/2007.htm#solvingcoldcaseswithdna.

---

NIJ's Forensic Resource Network is a system of four forensic centers whose mission is to assist state and local forensic service providers in achieving their service delivery goals through research and development, testing and evaluation, training, technology transfer, and technology assistance.

The NIJ Electronic Crime Portfolio addresses "the practical needs of the criminal justice community in its efforts to respond to electronic crime, aiding/assisting law enforcement in the discovery, analysis, presentation and preservation of digital evidence of probative value."[45]

In September 2007, NIJ announced the addition of four Technology Centers of Excellence to serve as resources within their respective technology focus areas by providing technology assistance to law enforcement personnel as well as by working with technology developers and users to test and evaluate equipment in operational environments. In addition, NIJ set aside $5 million for grants to support the development of forensic science standards at NIST.[46]


**Federal Bureau of Investigation (FBI)**

The FBI Laboratory also receives roughly $33 million per year for its own research. To set priorities, the laboratory consults with its own staff and with working-level scientists in the SWGs they support.

---

[45] Ibid.

[46] J. Morgan, Deputy Director for Science and Technology, NIJ. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

The FBI's Counterterrorism and Forensic Science Research Unit "provides technical leadership/advancement of counterterrorism and forensic sciences for the FBI as well as for state and local law enforcement agencies through the development and validation of new technologies/techniques by both internal and outsourced research efforts and through advanced scientific training in specialized forensic procedures."[47] It fulfills its research mission through two core programs.

The Research and Development Program creates and coordinates the development of new forensic techniques, instrumentation, and protocols for FBI Laboratory units to use in terrorism and violent crime cases. The program focuses its efforts in the areas of DNA analysis, trace organic chemical analysis, toxicology, explosives, fingerprints, drug and materials analysis (e.g., paints, tapes, inks, glass, and metals), database development, anthropology, microbial forensics, and field instrumentation. The committee was told that the program publishes some of its results in scientific journals. The Research Partnership Program transfers new forensic technologies and procedures to case-working examiners at state and local crime laboratories through collaborative studies and implements SWG-defined protocols and national forensic databases. Workshops include those involving the use of an automotive carpet fiber database, messenger RNA (mRNA) profiling of human semen, the visualization and identification of pepper spray on evidentiary materials, 1-step purification of DNA from different matrices, and the permanence of friction ridge skin detail.

## PROFESSIONAL ASSOCIATIONS

Numerous professional organizations are focused on the forensic science disciplines (see Box 2-3). The Consortium of Forensic Science Organizations, founded in 2000, includes the largest of these organizations—the American Academy of Forensic Sciences (AAFS), ASCLD, ASCLD/LAB, IAI, NAME, and Forensic Quality Services (FQS).

AAFS, with 6,000 members worldwide, was founded in 1948. It created and supports the Forensic Specialties Accreditation Board, which accredits certification organizations.[48] Membership includes physicians, attorneys, dentists, toxicologists, physical anthropologists, document examiners, psychiatrists, physicists, engineers, criminalists, educators, and others. AAFS sponsors an annual scientific meeting, publishes the *Journal of Forensic Sciences*, and promotes research, education, and training. It also operates the Forensic Science Education Programs Accreditation Commission (see Chapter 8 for further discussion).[49]

IAI was founded in 1915 and has 6,700 members worldwide. Its members tend to be involved at the "front end" of the process—crime scene investigation, evidence collection, and evidence preservation.[50] It operates certification programs in seven disciplines and publishes the *Journal of Forensic Identification*. The focus of its activities is pattern evidence—for example, fingerprint, footwear, tire track, questioned documents, forensic photography, and forensic art.

ASCLD/LAB and FQS accredit crime laboratories and are discussed in greater detail in Chapter 7. Chapter 9 describes the activities of NAME.

---

[47] See www.fbi.gov/hq/lab/html/cterror1.htm.

[48] See www.thefasb.org.

[49] B.A. Goldberger, AAFS President-Elect. Presentation to the committee. January 25, 2007.

[50] J. Polski, IAI Chief Operations Officer. Presentation to the committee. January 25, 2007.

2-16

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

---

**Box 2-3 Forensic Associations and Societies**

American Academy of Forensic Sciences
American Board of Criminalistics
American Board of Forensic Anthropology
American Board of Forensic Odontology
American Board of Forensic Toxicology
American Society for Quality
American Society for Testing and Materials
American Society of Crime Laboratory Directors
American Society of Questioned Document Examiners
AOAC International
Association of Firearm & Tool Marks Examiners
Association of Forensic Quality Assurance Managers
California Association of Criminalistics
Canadian Society of Forensic Sciences
Council of Federal Forensic Crime Laboratory Directors
Forensic Science Society
International Association for Identification
International Association of Arson Investigators
International Association of Bloodstain Pattern Analysts
International Association of Coroners and Medical Examiners
International Association of Forensic Nurses
International Association of Forensic Toxicologists
Mid-Atlantic Association of Forensic Scientists
Midwestern Association of Forensic Scientists
National Association of Medical Examiners
National Center of Forensic Science
National Forensic Science Technology Center
New Jersey Association of Forensic Scientists
Northeastern Association of Forensic Scientists
Northwest Association of Forensic Scientists
Society of Forensic Toxicologists
Southern Association of Forensic Science
Southwestern Association of Forensic Scientists
Wisconsin Association for Identification

---

## CONCLUSIONS AND RECOMMENDATION

The fragmented nature of the forensic science community makes it difficult to gather data on the entire universe of forensic service entities and activities, although efforts have been made to collect data on publicly funded crime laboratories and nonlaboratory-based providers. For example, the committee could find no data available on for-profit forensic service providers, other than on DNA laboratories. Thus, attempts to construct effective policies are hampered by the lack of coherent and consistent information on the forensic science infrastructure in the United States. However, the large amount of information provided to the committee by people engaged in the forensic science enterprise and by experts who have studied how well that

2-17

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

enterprise functions all points to a system that lacks coordination and that is under resourced in many ways.

By using the term "under resourced," the committee means to imply all of its dimensions. Existing data suggest that forensic laboratories are under resourced and understaffed, which contributes to a backlog in cases and likely makes it difficult for laboratories to do as much as they could to inform investigations, provide strong evidence for prosecutions, and avoid errors that could lead to imperfect justice. But under resourced also means that the tools of forensic science are not as strong as they could be. The knowledge base that underpins analysis and the interpretation of evidence—which enable the forensic science disciplines to excel at informing investigations, providing strong evidence for prosecutions, and avoiding errors that could lead to imperfect judgment—is incomplete in important ways. NIJ is the only federal agency that provides direct support to crime laboratories to alleviate the backlog, and those funds are minimal. The enterprise also is under resourced in the sense that it has only thin ties to an academic research base that could undergird the forensic science disciplines and fill knowledge gaps. This under resourcing limits the ability of the many hard-working and conscientious people in the forensic science community to do their best work.

Among the various facets of under resourcing, the committee is most concerned about the knowledge base, which is further examined in Chapter 5. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capability of the forensic science disciplines to discern valid information from crime scene evidence. For the most part, it is impossible to discern the magnitude of those limitations, and reasonable people will differ on their significance.

Forensic science research is not well supported, and there is no unified strategy for developing a forensic science research plan across federal agencies. Relative to other areas of science, the forensic science disciplines have extremely limited opportunities for research funding. Although the FBI and NIJ have supported some research in the forensic science disciplines, the level of support has been well short of what is necessary for the forensic science community to establish strong links with a broad base of research universities and the national research community. Moreover, funding for academic research is limited and requires law enforcement collaboration, which can inhibit the pursuit of more fundamental scientific questions essential to establishing the foundation of forensic science. Finally, the broader research community generally is not engaged in conducting research relevant to advancing the forensic science disciplines.

The forensic science community also is hindered by its extreme disaggregation—marked by multiple types of practitioners with different levels of education and training and different professional cultures and standards for performance. Many forensic scientists are given scant opportunity for professional activities such as attending conferences or publishing their research, which could help strengthen that professional community. Furthermore, the fragmented nature of the forensic science community raises the worrisome prospect that the quality of evidence presented in court, and its interpretation, can vary unpredictably according to jurisdiction.

Numerous professional associations are organized around the forensic science disciplines, and many of them are involved in training and education (see Chapter 8) and developing standards and accreditation and certification programs (see Chapter 7). The efforts of these groups are laudable. However, except for the largest organizations, it is not clear how these associations interact or the extent to which they share requirements, standards, or policies. Thus, there is a need for more consistent and harmonized requirements.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

In the course of its deliberations and review of the forensic science community, it became obvious to the committee that truly meaningful advances will not come without significant leadership from the federal government. The forensic science community lacks the necessary governance structure to pull itself up from its current weaknesses. Insufficiencies in the current system cannot be addressed simply by increasing the staff within existing crime laboratories and medical examiners offices. Of the many professional societies that serve the forensic science community, none is dominant, and none has clearly articulated the need for change or presented a vision for accomplishing it. And clearly no municipal or state forensic office has the mandate to lead the entire community. The major federal resources—NIJ and the FBI Laboratory—have provided modest leadership, for which they should be commended. NIJ has contributed a helpful research program and the FBI Laboratory has spearheaded the SWGs. But again, neither entity has recognized, let alone articulated, a need for change or a vision for affecting it. Neither has the full confidence of the larger forensic science community. And because both are part of a prosecutorial department of the government, they could be subject to subtle contextual biases that should not be allowed to undercut the power of forensic science.

The forensic science community needs strong governance to adopt and promote an aggressive, long-term agenda to help strengthen forensic science. Governance must be strong enough—and independent enough—to identify the limitations of forensic science methodologies and must be well connected with the Nation's scientific research base in order to affect meaningful advances in forensic science practices. The governance structure must be able to create appropriate incentives for jurisdictions to adopt and adhere to best practices and promulgate the necessary sanctions to discourage bad practices. It must have influence with educators in order to effect improvements to forensic science education. It must be able to identify standards and enforce them. The governance entity must be geared toward (and be credible within) the law enforcement community, but it must have strengths that extend beyond that area. Oversight of the forensic science community and medical examiner system will sweep broadly into areas of criminal investigation and prosecution, civil litigation, legal reform, investigation of insurance claims, national disaster planning and preparedness, homeland security, certification of federal, state, and local forensic practitioners, public health, accreditation of public and private laboratories, research to improve forensic methodologies, education programs in colleges and universities, and advancing technology.

The committee considered whether such a governing entity could be established within an existing federal agency. The National Science Foundation (NSF) was considered because of its strengths in leading research and its connections to the research and education communities. NSF is surely capable of building and sustaining a research base, but it has very thin ties to the forensic science community. It would be necessary for NSF to take many untested steps if it were to assume responsibility for the governance of applied fields of science. The committee also considered NIST. In the end analysis, however, NIST did not appear to be a viable option. It has a good program of research targeted at forensic science and law enforcement, but the program is modest. NIST also has strong ties to industry and academia, and it has an eminent history in standard setting and method development. But its ties to the forensic science community are still limited, and it would not be seen as a natural leader by the scholars, scientists, and practitioners in the field. In sum, the committee concluded that neither NSF nor NIST has the breadth of experience or institutional capacity to establish an effective governance structure for the forensic science enterprise.

There was also a strong consensus in the committee that no existing or new division or unit within DOJ would be an appropriate location for a new entity governing the forensic science

2-19

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

community. DOJ's principal mission is to enforce the law and defend the interests of the United States according to the law. Agencies within DOJ operate pursuant to this mission. The FBI, for example, is the investigative arm of DOJ and its principal missions are to produce and use intelligence to protect the Nation from threats and to bring to justice those who violate the law. The work of these law enforcement units is critically important to the Nation, but the scope of the work done by DOJ units is much narrower than the promise of a strong forensic science community. Forensic science serves more than just law enforcement; and when it does serve law enforcement, it must be equally available to law enforcement officers, prosecutors, and defendants in the criminal justice system. The entity that is established to govern the forensic science community cannot be principally beholden to law enforcement. The potential for conflicts of interest between the needs of law enforcement and the broader needs of forensic science are too great. In addition, the committee determined that the research funding strategies of DOJ have not adequately served the broad needs of the forensic science community. This is understandable, but not acceptable when the issue is whether an agency is best suited to support and oversee the Nation's forensic science community. In sum, the committee concluded that advancing science in the forensic science enterprise is not likely to be achieved within the confines of DOJ. Moreover, DHS is too focused on national security to embed a new entity within it.

The committee thus concluded that no existing agency has the capacity or appropriate mission to take on the roles and responsibilities needed to govern and improve the forensic science community. The tasks assigned to it require that it be unfettered and objective and as free from bias as possible. What is needed is a new, strong, and independent entity with no ties to the past and with the authority and resources to implement a fresh agenda designed to address the many problems found by the committee and discussed in the remainder of this report.

The proposed entity must meet the following minimum criteria:

- It must have a culture that is strongly rooted in science, with strong ties to the national research and teaching communities, including federal laboratories.
- It must have strong ties to state and local forensic entities, as well as to the professional organizations within the forensic science community.
- It must not be in any way committed to the existing system, but should be informed by its experiences.
- It must not be part of a law enforcement agency.
- It must have the funding, independence, and sufficient prominence to raise the profile of the forensic science disciplines and push effectively for improvements.
- It must be led by persons who are skilled and experienced in developing and executing national strategies and plans for standard setting; managing accreditation and testing processes; and developing and implementing rulemaking, oversight, and sanctioning processes.

No federal agency currently exists that meets all of these criteria.

2-20

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

**Recommendation 1:**

To promote the development of forensic science into a mature field of multidisciplinary research and practice, founded on the systematic collection and analysis of relevant data, Congress should establish and appropriate funds for an independent federal entity, the National Institute of Forensic Science (NIFS). NIFS should have a full-time administrator and an advisory board with expertise in research and education, the forensic science disciplines, physical and life sciences, forensic pathology, engineering, information technology, measurements and standards, testing and evaluation, law, national security, and public policy. NIFS should focus on:

(a) establishing and enforcing best practices for forensic science professionals and laboratories;

(b) establishing standards for the mandatory accreditation of forensic science laboratories and the mandatory certification of forensic scientists and medical examiners/forensic pathologists—and identifying the entity/entities that will develop and implement accreditation and certification;

(c) promoting scholarly, competitive peer-reviewed research and technical development in the forensic science disciplines and forensic medicine;

(d) developing a strategy to improve forensic science research and educational programs, including forensic pathology;

(e) establishing a strategy, based on accurate data on the forensic science community, for the efficient allocation of available funds to give strong support to forensic methodologies and practices in addition to DNA analysis;

(f) funding state and local forensic science agencies, independent research projects, and educational programs as recommended in this report, with conditions that aim to advance the credibility and reliability of the forensic science disciplines;

(g) overseeing education standards and the accreditation of forensic science programs in colleges and universities;

(h) developing programs to improve understanding of the forensic science disciplines and their limitations within legal systems; and

(i) assessing the development and introduction of new technologies in forensic investigations, including a comparison of new technologies with former ones.

The benefits that will flow from a strong, independent, strategic, coherent, and well-funded federal program to support and oversee the forensic science disciplines in this country are clear: The Nation will (1) bolster its ability to more accurately identify true perpetrators and exclude those who are falsely accused; (2) improve its ability to effectively respond to, attribute, and prosecute threats to homeland security; and (3) reduce the likelihood of convictions resting on inaccurate data. Moreover, establishing the scientific foundation of the forensic science disciplines, providing better education and training, and requiring certification and accreditation

2-21

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY**

will position the forensic science community to take advantage of current and future scientific advances.

The creation of a new federal entity undoubtedly will pose challenges, not the least of which will be budgetary constraints. The committee is not in a position to estimate how much it will cost to implement the recommendations in this report; this is a matter best left to the expertise of the Congressional Budget Office. What is clear, however, is that Congress must take aggressive action if the worst ills of the forensic science community are to be cured. Political and budgetary concerns should not deter bold, creative, and forward-looking action, because the country cannot afford to suffer the consequences of inaction. It will also take time and patience to implement the recommendations in this report. But this is true with any large, complex, important, and challenging enterprise.

The committee strongly believes that the greatest hope for success in this enterprise will come with the creation of NIFS to oversee and direct the forensic science community. The remaining recommendations in this report are crucially tied to the creation of NIFS. However, each recommendation is a separate, essential piece of the plan to improve the forensic science community in the United States. Therefore, even if the creation of NIFS is forestalled, the committee vigorously supports the adoption of the core ideas and principles embedded in the additional recommendations that appear in this report.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 3
# THE ADMISSION OF FORENSIC SCIENCE EVIDENCE IN LITIGATION

This chapter describes the legal system's reliance on forensic science evidence in criminal prosecutions and examines the existing adversarial process for admitting this type of evidence. The report describes and analyzes the current situation and makes recommendations for the future. No judgment is made about past convictions and no view is expressed as to whether courts should reassess cases that already have been tried. The report finds that the existing legal regime— including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and judges and lawyers who often lack the scientific expertise necessary to comprehend and evaluate forensic evidence—is inadequate to the task of curing the documented ills of the forensic science disciplines. This matters a great deal, because "forensic science is but the handmaiden of the legal system."[1] As explained in Chapters 4 and 5, there are serious issues regarding the capacity and quality of the current forensic science system; yet, the courts continue to rely on forensic evidence without fully understanding and addressing the limitations of different forensic science disciplines. This profound conjunction of law and science, especially in the context of law enforcement, underscores the need for improvement in the forensic science community. The report concludes that every effort must be made to limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified.

## LAW AND SCIENCE

Science and law always have had an uneasy alliance:

> Since as far back as the fourteenth century, scientific evidence has posed profound challenges for the law. At bottom, many of these challenges arise from fundamental differences between the legal and scientific processes. . . . The legal system embraces the adversary process to achieve "truth," for the ultimate purpose of attaining an authoritative, final, just, and socially acceptable resolution of disputes. Thus law is a normative pursuit that seeks to define how public and private relations *should* function . . . . In contrast to law's vision of truth, however, science embraces empirical analysis to discover truth as found in verifiable facts. Science is thus a descriptive pursuit, which does not define how the universe should be but rather describes how it actually *is*.

---

[1] 4 D.L. Faigman, M.J. Saks, J. Sanders, and E.K. Cheng. 2007-2008. *Modern Scientific Evidence: The Law and Science of Expert Testimony*. Eagan, MN: Thomson/West, § 29.4, p.6. See also P.C. Giannelli and E.J. Imwinkelried. 2007. *Scientific Evidence*, 4th ed. Albany, NY: Lexis Publishing Co., on the latest forensic techniques and scientific concepts used in collecting and evaluating evidence.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

> These differences between law and science have engendered both systemic and pragmatic dilemmas for the law and the actors within it. . . . Moreover, in almost every instance, scientific evidence tests the abilities of judges, lawyers, and jurors, all of whom may lack the scientific expertise to comprehend the evidence and evaluate it in an informed manner.[2]

Nowhere are these dilemmas more evident than in decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

Forensic science experts and evidence are routinely used in the service of the criminal justice system. DNA testing may be used to determine whether sperm found on a rape victim came from an accused party; a latent fingerprint found on a gun may be used to determine whether a defendant handled the weapon; drug analysis may be used to determine whether pills found in a person's possession were illicit; and an autopsy may be used to determine the cause of death of a murder victim. In order for qualified forensic science experts to testify competently about forensic evidence, they must first find the evidence in a usable state and properly preserve it. A latent fingerprint that is badly smudged when found cannot be usefully saved, analyzed, or explained. An inadequate drug sample may be insufficient to allow for proper analysis. And, DNA tests performed on a contaminated or otherwise compromised sample cannot reliably identify or eliminate an individual as the perpetrator of a crime. These are important matters having to do with the proper "processing" of forensic evidence. The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is *science* in any given "forensic science" discipline.[3]

The degree of science in a forensic science method may have an important bearing on the reliability of forensic evidence in criminal cases. There are two very important questions that *should* underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant:[4] The goal of law enforcement actions is to identify those who have committed crimes and to prevent the criminal justice system from erroneously convicting the innocent. So it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support.

As discussed in Chapters 4 and 5, no forensic method other than nuclear DNA analysis has been rigorously shown to have the capacity to consistently and with a high degree of certainty support conclusions about "individualization" (more commonly known as "matching" of an unknown item of evidence to a specific known source). In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there also are important variations among the disciplines relying on expert interpretation. For example, there are more established protocols and available research for the analysis of fingerprints

---

[2] Developments in the law – confronting the new challenges of scientific evidence. 108 HARV. L. REV. 1481, 1484 (1995) (hereinafter "Developments in the law") (footnotes omitted); see also M.A. Berger and L.M. Solan. The uneasy relationship between science and law: An essay and introduction. 73 BROOK. L. REV. 847 (2008).

[3] Principles of science are discussed in Chapter 4.

[4] Descriptions and assessments of different forensic science disciplines are set forth in Chapters 5 and 6.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

than for bite marks. In addition, there also are significant variations within each discipline. Thus, not all fingerprint evidence is equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. In short, the interpretation of forensic evidence is not infallible. Quite the contrary. This reality is not always fully appreciated or accepted by many forensic science practitioners, judges, jurors, policymakers, or lawyers and their clients.[5]

## THE *FRYE* STANDARD AND RULE 702 OF THE FEDERAL RULES OF EVIDENCE

During the twentieth century, as science advanced, the legal system "attempted to develop coherent tests for the admissibility of scientific evidence."[6] The first notable development occurred in 1923 with the issuance of the landmark decision in *Frye v. United States*.[7] The *Frye* case involved a murder trial in which the defendant sought to demonstrate his innocence through the admission of a lie detector test that measured systolic blood pressure. The court rejected the evidence, stating:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.[8]

The *Frye* decision held that the lie detector test was unreliable because it had not gained "general acceptance" in the relevant scientific community. The meaning of the *Frye* test is elusive. Indeed, "[t]he merits of the *Frye* test have been much debated, and scholarship on its proper scope and application is legion."[9] For many years, the *Frye* test was cited in both civil and criminal cases, but it was applied most frequently in criminal cases.[10] "In the 70 years since its formulation in the *Frye* case, the 'general acceptance' test [was] the dominant standard for determining the admissibility of novel scientific evidence at trial."[11]

In 1975, more than a half-century after *Frye* was decided, the Federal Rules of Evidence were promulgated to guide criminal and civil litigation in federal courts. The first version of Federal Rule of Evidence 702 provided that:

---

[5] See 4 Faigman et al., op. cit., *supra* note 1, §29.3, p. 6 ("Few forensic scientists harbor serious misgivings about the expectation of good science on the part of their clients, be they the police, the prosecution, or the defense bar. . . . The clients want good science and the truth if it will help their case."); S. Scarborough. 2005. They keep putting fingerprints in print. *The CACNews*. California Association of Criminalists, 2nd Quarter. Available at www.cacnews.org/news/2ndq05.pdf, p. 19 ("As scientists we are confident that any 'critic' that tries to prove the fallibility of fingerprints will actually find the opposite. Just as we testify to everyday.").

[6] Developments in the law, *supra* note 2, p. 1486.

[7] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

[8] Ibid., p.1014.

[9] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 586 & n.4 (1993) (citing authorities).

[10] P.C. Giannelli. 1993. "Junk science": The criminal cases. *Journal of Criminal Law and Criminology* 84:105, 111, and n.35.

[11] *Daubert*, 509 U.S. at 585.

3-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[12]

In place of *Frye*'s requirement of general scientific acceptance, mere "assistance" to the trier of fact appeared to be "the touchstone of admissibility under Rule 702."[13]

After the promulgation of Rule 702, litigants, judges, and legal scholars remained at odds over whether the rule embraced the *Frye* standard or established a new standard.[14] There was also much controversy surrounding the application of Rule 702 in civil cases. Most notably, Peter Huber popularized the now well-known phrase "junk science" to criticize the judiciary's acceptance of unreliable expert testimony in support of tort claims.[15] Huber's study was sharply criticized,[16] but it nonetheless spurred a debate over the use of expert testimony in the courts. However, "[d]espite the highly visible efforts to reform the rules governing experts in the civil arena, the 'junk science' debate . . . all but ignored criminal prosecutions."[17] The "neglect of the problems of expert testimony in criminal prosecutions" was seen by some as "deplorable."[18]

## THE *DAUBERT* DECISION AND THE SUPREME COURT'S CONSTRUCTION OF RULE 702

In 1993, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court finally clarified that Rule 702, not *Frye*, controlled the admission of expert testimony in the federal courts.[19] *Daubert* was a civil case brought by two minor children and their parents, alleging that the children's serious birth defects had been caused by their mothers' prenatal ingestion of Bendectin, a prescription drug marketed by the defendant pharmaceutical company. In support of a motion for summary judgment, the drug company submitted an affidavit from a qualified expert, who stated that he had reviewed all the literature on Bendectin and human birth defects and had found no study showing Bendectin to be a human teratogen (i.e., an agent that can cause malformations of an embryo or fetus). The plaintiffs countered with experts of their own, each of whom concluded that Bendectin could cause birth defects. Their conclusions were based on animal studies that found a link between Bendectin and malformations; pharmacological studies of the chemical structure of

---

[12] FED. R. EVID. 702, P.L. No. 93-595, § 1, 88 Stat. 1926 (effective January 2, 1975).

[13] Giannelli, op. cit., *supra* note 10, p. 107.

[14] T. Lyons. 1997. *Frye, Daubert* and where do we go from here? *Rhode Island Bar Journal* 45(5):21 (stating that "the vast majority of federal circuit and other courts adopted *Frye* as the standard of admissibility in their jurisdictions.").

[15] P.W. Huber. 1991. *Galileo's Revenge: Junk Science in the Courtroom*. New York: Basic Books.

[16] See, e.g., K.J. Chesebro. *Galileo's* retort: Peter Huber's junk scholarship. 42 AM. U. L. REV. 1637 (1993); Book Note: Rebel without a cause. 105 HARV. L. REV. 935 (1992).

[17] Giannelli, op. cit., *supra* note 10, p. 110.

[18] Ibid., pp. 110-111. Over time, a number of courts and commentators found the "general acceptance" test seriously wanting. See 1 Faigman et al., op. cit., *supra* note 1, § 1:6, pp. 13-17; P.C. Giannelli. The admissibility of novel scientific evidence: *Frye v. United States*, a half-century later. 80 COLUM. L. REV. 1197, 1207-1208 (1980) ("[T]he problems *Frye* has engendered–the difficulties in applying the test and the anomolous results it creates–so far outweigh [its] advantages that the argument for adopting a different test has become overwhelming."); M. McCormick. Scientific evidence: Defining a new approach to admissibility. 67 IOWA L. REV. 879, 915 (1982) (*Frye*'s "main drawbacks are its inflexibility, confusion of issues, and superfluity."); J.W. Strong. Questions affecting the admissibility of scientific evidence. U. ILL. L.F. 1, 14 (1970) ("The *Frye* standard, however, tends to obscure these proper considerations by asserting an undefinable general acceptance as the principal if not sole determinative factor.").

[19] 509 U.S. 579 (1993).

3-4

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

Bendectin that purported to show similarities between the structure of the drug and that of other substances known to cause birth defects; and the "reanalysis" of previously published epidemiological (human statistical) studies. The district court held that the expert testimony proffered by the plaintiffs was inadmissible, because their scientific evidence was not sufficiently established to have general acceptance in the field to which it belonged.[20] The court of appeals, citing *Frye*, affirmed the judgment of the district court, declaring that expert opinion based on a methodology that diverges significantly from the procedures accepted by recognized authorities in the field cannot be shown to be generally accepted as a reliable technique.[21] The Supreme Court reversed, holding that the trial court had applied the wrong standard in assessing the expert testimony proffered by the plaintiffs. The case was then remanded for further proceedings.

In construing and applying Rule 702, the *Daubert* Court ruled that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[22] The Court rejected the *Frye* test, noting that the drafting history of Rule 702 made no mention of *Frye*, "and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'"[23] The Court indicated that the subject of expert testimony should be "scientific knowledge," so "evidentiary reliability will be based upon scientific validity."[24] The Court also emphasized that, in considering the admissibility of evidence, trial judges should focus "solely" on experts' "principles and methodology," and "not on the conclusions that they generate."[25] In sum, *Daubert*'s requirement that expert testimony pertain to "scientific knowledge" established a standard of "evidentiary reliability."

In explaining this evidentiary standard, the *Daubert* Court pointed to several factors that might be considered by a trial judge: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) a scientific technique's degree of acceptance within a relevant scientific community.[26] In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one."[27] The Court also rejected the suggestion that its liberal construction of Rule 702 would "result in a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions."[28] Rather, the Court expressed confidence in the adversary system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and

---

[20] *Daubert v. Merrell Dow Pharm, Inc.*, 727 F. Supp. 570, 575 (S.D. Cal. 1989).

[21] *Daubert v. Merrell Dow Pharm., Inc.*, 951 F.2d 1128, 1129-30 (9th Cir. 1991).

[22] *Daubert*, 509 U.S. at 589.

[23] Ibid., p. 588 (internal citations omitted).

[24] Ibid, p. 590 and n.9 (emphasis omitted).

[25] Ibid., p. 595. In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court added: "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

[26] Ibid., pp. 592-94.

[27] Ibid., p. 594. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire* importantly held that Rule 702 applies to both scientific and nonscientific expert testimony; the Court also indicated that the *Daubert* factors might be applicable in a trial judge's assessment of the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." 526 U.S. at 150.

[28] *Daubert*, 509 U.S. at 595.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[29]

*Daubert*-type questions may be raised by the parties pretrial,[30] or during the course of trial,[31] or *sua sponte* by the trial judge.[32] Sometimes a trial judge will conduct a formal "*Daubert* hearing" before ruling on a party's objection to expert testimony; sometimes, however, the judge will simply entertain a party's objection, hear arguments, and then rule.[33] Judges sometimes rule on the briefs alone, without the benefit of formal arguments. There are any number of questions that might arise concerning the testimony of a forensic science expert or about the forensic evidence itself. These questions might include, *inter alia*, issues relating to one of the five *Daubert* factors or other factors appropriate to the forensic evidence, the relevance of the evidence, the qualifications of the expert, the adequacy of the evidentiary sample about which the expert will be testifying, and the procedures followed in the handling and processing of the evidence. After considering the matter at issue, a trial judge may exclude the evidence in whole or in part, prevent or limit the testimony of the expert witness, or deny the challenge. The Supreme Court has made it clear that trial judges have great discretion in deciding on the admissibility of evidence under Rule 702, and that appeals from *Daubert* rulings are subject to a very narrow abuse-of-discretion standard of review.[34] Most importantly, in *Kumho Tire Co., Ltd. v. Carmichael*, the Court made it clear that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[35]

## THE 2000 AMENDMENT OF RULE 702

In 2000, Rule 702 was amended "in response to *Daubert*."[36] The revised rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[37]

---

[29] Ibid., p. 596.

[30] See, e.g., *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001). ("[B]ecause *Daubert* generally contemplates a 'gatekeeping' function, not a 'gotcha' junction, [the case law] permits a district court to reject as untimely *Daubert* motions raised late in the trial process.")

[31] See, e.g., *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) (holding trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function under *Daubert* as to expert testimony).

[32] See, e.g., *Hoult v. Hoult*, 57 F.3d 1, 4 (1st Cir. 1995) ("We think *Daubert* does instruct district courts to conduct a preliminary assessment of the reliability of expert testimony, even in the absence of an objection.").

[33] 1 Faigman et al., op. cit., *supra* note 1, § 1.8, p. 23 (stating "[i]n general, most courts considering the matter hold that a separate hearing to determine the validity of the basis for scientific evidence is not required" and discussing cases).

[34] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

[35] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

[36] FED. R. EVID. 702 advisory committee's note (2000 Amendments).

[37] FED. R. EVID. 702.

3-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

The commentary accompanying the revised rule[38] recites the *"Daubert* factors" and then goes on to explain that:

> Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include:
>
> (1)     Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
>
> (2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.[39]
>
> (3)     Whether the expert has adequately accounted for obvious alternative explanations.
>
> (4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
>
> (5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[40]

All of these factors remain relevant to the determination of the reliability of expert testimony under the rule as amended.

The commentary accompanying the revised rule also notes that:

> [T]he amendment [to Rule 702] does not distinguish between scientific and other forms of expert testimony. The trial court's gatekeeping function applies to testimony by any expert. While the relevant factors for determining reliability will vary from expertise to expertise, the amendment rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert

---

[38] FED. R. EVID. 702 advisory committee's note (2000 Amendments) (citations and quotation marks omitted).

[39] The commentary cites *General Electric*, 522 U.S. at 146 (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[40] The commentary cites *Kumho Tire*, 526 U.S. at 150 (*Daubert*'s general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

The amendment requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. While the terms "principles" and "methods" may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge. For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of

Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail). . . . *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct.1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").[41]

Given this view of Rule 702—which makes clear that "technical or other specialized knowledge" may be credited as expert testimony "so long as the principles and methods are reliable and applied reliably to the facts of the case"—it is not surprising that the courts might be hard pressed, under existing standards of admissibility, to hold some forensic science practitioners to the more demanding standards of the traditional sciences.[42]

## AN OVERVIEW OF JUDICIAL DISPOSITIONS OF *DAUBERT*-TYPE QUESTIONS

Assessing the admission of forensic evidence in litigation is no small undertaking, given the huge number of cases in which such evidence is proffered. Moreover, although *Daubert* remains the standard by which admissibility in federal cases is measured under Federal Rule of Evidence 702, states remain free to apply other evidentiary standards. Some states still apply some version of the

---

[41] FED. R. EVID. 702 advisory committee's note (2000 Amendments).
[42] See generally Giannelli and Imwinkelried, op. cit., for thoughtful discussions of the admissibility of some forms of forensic science testimony as technical or other specialized knowledge under Rule 702.

3-8

Copyright © National Academy of Sciences. All rights reserved.