Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

*Frye* standard, while others have adopted *Daubert* or some version of the *Daubert* test.[43] Considering the patchwork of state standards and the fact that "[s]tate courts receive 200 times more criminal prosecutions than federal courts," because "[f]orensic science is used most commonly in crimes of violence, and most crimes of violence are tried in state court,"[44] a comprehensive overview would be difficult to create.

The focus of this section and succeeding sections of this chapter will be on judicial dispositions of *Daubert*-type questions in criminal cases in the federal courts. The reason for this is that, although not every state has adopted the *Daubert* standard, there is little doubt that *Daubert* has effectively set a norm that applies in every federal court and in a great many state jurisdictions. It cannot be ignored, and the reported federal cases give the best evidence of how *Daubert* is applied by the judiciary.

Judicial dispositions of *Daubert*-type questions in criminal cases have been criticized by some lawyers and scholars who thought that the Supreme Court's decision would be applied more rigorously to protect the rights of accused parties:

> [*Daubert*] obligated trial court judges to assume the role of "gatekeepers" and to exclude proffered scientific evidence unless it rested on scientifically valid reasoning and methodology. Many thought *Daubert* would be the meaningful standard that was lacking in criminal cases and that it would serve to protect innocent defendants.
>
> . . .
>
> [However, a]n analysis of post-*Daubert* decisions demonstrates that whereas civil defendants prevail in their *Daubert* challenges, most of the time criminal defendants almost always lose their challenges to government proffers. But when the prosecutor challenges a criminal defendant's expert evidence, the evidence is almost always kept out of the trial. . . . In the first 7 years after *Daubert*, there were 67 reported federal appellate decisions reviewing defense challenges to prosecution experts. The government prevailed in all but 6, and even among the 6, only 1 resulted in the reversal of a conviction. In contrast, in the 54 cases in which the defense appealed a trial court ruling to exclude the defendant's expert, the defendant lost in 44 cases. In 7 of the remaining 10, the case was remanded for a *Daubert* hearing.[45]

This critique of reported federal appellate decisions cannot be the end of the analysis, however. First, there are two sides to any discussion concerning the admissibility and reliability of forensic evidence: (1) enhancing the ability of law enforcement to identify persons who commit crimes and (2) protecting innocent persons from being convicted of crimes that they did not commit. It is easier to assess the latter than the former, because there are no good studies indicating how many convictions are lost because of faulty forensic science evidence. Second, if one focuses solely on federal appellate decisions, the picture is not appealing to those who have preferred a more

---

[43] See generally D.E. Bernstein and J.D. Jackson. The *Daubert* trilogy in the states. 44 JURIMETRICS J. 351 (2004).

[44] P.J. Neufeld. 2005. The (near) irrelevance of *Daubert* to criminal justice: And some suggestions for reform. *American Journal of Public Health* 95(Supp. 1):S107, S110.

[45] Ibid., p. S109. See also P.C. Giannelli. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

rigorous application of *Daubert*. Federal appellate courts have not with any consistency or clarity imposed standards ensuring the application of scientifically valid reasoning and reliable methodology in criminal cases involving *Daubert* questions.[46] This is not really surprising. The Supreme Court itself described the *Daubert* standard as "flexible." This means that, beyond questions of relevance, *Daubert* offers appellate courts no clear substantive standard pursuant to which to review decisions by trial courts.[47] As a result, trial judges exercise great discretion in deciding whether to admit or exclude expert testimony, and their judgments are subject only to a highly deferential "abuse of discretion" standard of review.[48]

To get a clearer picture of judicial dispositions of *Daubert*-type questions, we need to know how these matters are handled by trial courts. Unfortunately, the picture is unclear. There are countless *Daubert*-type, evidentiary challenges in criminal cases, some resulting in formal *Daubert* hearings, and many others not. There is no way to know with any degree of certainty how many of these challenges are entirely or partially sustained, because many trial court judgments on evidentiary matters are issued without published opinions[49] and with no appeal. If a defendant's challenge is sustained and is followed by an acquittal, no appeal ensues and the matter is over. If a defendant's challenge is sustained and is followed by a conviction, the defendant obviously will not appeal the favorable evidentiary ruling. If a defendant's challenge is rejected and is followed by an acquittal, no appeal ensues and the matter is over. *Reported* opinions in criminal cases indicate that trial judges sometimes exclude or restrict expert testimony offered by prosecutors;[50] *reported* opinions also indicate that appellate courts routinely deny appeals contesting trial court decisions admitting forensic evidence against criminal defendants.[51] But the reported opinions do not offer in any way a complete sample of federal trial court dispositions of *Daubert*-type questions in criminal cases.[52]

---

[46] See, e.g., *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005); *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001). The *Havvard* decision has been described as "[a]n excellent, albeit deeply troubling, example of a court straining scientific credulity for the sake of a venerable forensic science." See 1 Faigman et al., op. cit., *supra* note 1, § 1:30, pp. 85-86.

[47] As noted above, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 153.

[48] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997); see also H.T. Edwards and L.A. Elliott. 2007. *Federal Standards of Review*. St. Paul, MN: Thomson/West, pp. 72-74 (explaining that when a trial judge acts pursuant to broad discretion, appellate court scrutiny is necessarily very limited).

[49] See, e.g., *Hoult*, 57 F.3d at 5 (district courts are not required "to make explicit on-the-record rulings regarding the admissibility of expert testimony"); *United States v. Locascio*, 6 F.3d 924, 938-939 (2d Cir. 1993) ("We decline . . . to shackle the district court with a mandatory and explicit trustworthiness analysis. . . . In fact, we assume that the district court consistently and continually performed a trustworthiness analysis *sub silentio* of all evidence introduced at trial. We will not, however, circumscribe this discretion by burdening the court with the necessity of making an explicit determination for all expert testimony.").

[50] See, e.g., *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) (toolmark analysis); *United States v. Mikos*, No. 02-137, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003) (expert testimony relating to comparative bullet lead analysis); *United States v. Horn*, 185 F. Supp. 2d 530 (D. Md. 2002) (evidence of defendant's performance on field sobriety tests); *United States v. Rutherford*, 104 F. Supp. 2d 1190 (D. Neb. 2000) (handwriting analysis).

[51] See, e.g., *United States v. Ford*, 481 F.3d 215 (3d Cir. 2007); *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006); *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005); *United States v. Davis*, 397 F.3d 173 (3d Cir. 2005); *United States v. Conn*, 297 F.3d 548 (7th Cir. 2002); *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001); *United States v. Malveaux*, 208 F.3d 223 (9th Cir. 2000); *United States v. Harris*, 192 F.3d 580 (6th Cir. 1999).

[52] In 2000, Michael Risinger published a study in which he found that, "as to proffers of asserted expert testimony, civil defendants win their *Daubert* reliability challenges to plaintiffs' proffers most of the time, and that criminal defendants virtually always lose their reliability challenges to government proffers. And, when civil defendants' proffers are challenged by plaintiffs, those defendants usually win, but when criminal defendants' proffers are challenged by the

3-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY

The situation is very different in civil cases. The party who loses before the trial court in a nonfrivolous civil case always has the right and incentive to appeal to contest the admission or exclusion of expert testimony. In addition, plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, whereas prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically, the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases.[53]

## SOME EXAMPLES OF JUDICIAL DISPOSITIONS OF QUESTIONS RELATING TO FORENSIC SCIENCE EVIDENCE

### Judicial Dispositions of Questions Relating to DNA Evidence

DNA typing has been subjected to the most rigorous scrutiny by the courts, presumably because its discriminating power is so great and so much is at stake when a suspect is associated to a crime scene only through DNA typing. Or perhaps because (at least some) modern courts or lawyers are more literate about science than they were in the past.[54]

Unlike many forensic techniques that were developed empirically within the forensic community, with little foundation in scientific theory or analysis, DNA analysis is a fortuitous byproduct of cutting-edge science. From the beginning, eminent scientists contributed their expertise

---

prosecution, the criminal defendants usually lose." D. M. Risinger Navigating expert reliability: Are criminal standards of certainty being left on the dock? 64 ALB. L. REV. 99, 99 (2000). However, the sample of federal district court decisions included "only sixty-five . . . criminal cases, and only fifty-four dealt with dependability issues in a guilt-or-innocence context . . . . These fifty-four cases represented *twelve opinions on defense challenges to prosecution proffers*, and forty-two opinions on government challenges to defense proffers. Of the twelve defense challenges, the government's challenged evidence was fully admitted eleven times, and admitted with restrictions once." Ibid., p. 109 (emphasis added) (footnotes omitted). The study did not include any sample of trial court dispositions of *Daubert*-type claims in which no opinion was issued, which might explain why the study included only 12 dispositions of defense challenges to prosecution proffers. The author speculated that "one can be relatively confident that virtually any decision totally excluding government proffered expertise on dependability grounds would have been the subject of some sort of opinion, at least the first time the decision was made in regard to a particular kind of proffer." Ibid. But there is no reason to believe that this assumption is correct. Trial judges routinely issue evidentiary rulings without reported opinions, and many such rulings might implicate *Daubert*-type questions. Merely because a defense attorney fails to state "I object on *Daubert* grounds" says very little about whether the objection raises an issue that is cognizable under *Daubert*.

[53] See, e.g., *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000); see also 1 Faigman et al., op. cit., *supra* note 1, § 1:35, p. 105 (discussing studies suggesting that courts "employ *Daubert* more lackadaisically in criminal trials—especially in regard to prosecution evidence—than in civil cases—especially in regard to plaintiff evidence"); Risinger, op. cit., *supra* note 52, p. 100 ("The system shipwreck I fear is that in ten years we will find that civil cases are subject to strict standards of expertise quality control, while criminal cases are not. The result would be that the pocketbooks of civil defendants would be protected from plaintiffs' claims by exclusion of undependable expert testimony, but that criminal defendants would not be protected from conviction based on similarly undependable expert testimony. Such a result would seem particularly unacceptable given the law's claim that inaccurate criminal convictions are substantially worse than inaccurate civil judgments, reflected in the different applicable standards of proof.").

[54] 4 Faigman et al., op. cit., *supra* note 1, § 29:35, p. 41.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

to ensuring that DNA evidence offered in a courtroom would be valid and reliable,[55] and by 1996 the National Academy of Sciences had convened two committees that issued influential recommendations on the use of DNA technology in forensic science.[56] As a result, principles of statistics and population genetics that pertain to DNA evidence were clarified, the methods for conducting DNA analyses and declaring a match became less subjective, and quality assurance and quality control protocols were designed to improve laboratory performance.

Although some courts initially refused to admit the results of DNA testing because of perceived flaws,[57] DNA evidence is now universally admitted by courts in the United States. When 2 profiles are found to "match" in a search of the Federal Bureau of Investigation's (FBI's) Combined DNA Index System (CODIS) database using 13 short tandem repeat (STR) loci, the likelihood that the profiles came from different people is extremely small. In other words, assuming the samples were properly collected and analyzed, an observer may state with a high degree of confidence that the two profiles likely came from the same person.

Among existing forensic methods, only nuclear DNA analysis has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between an evidentiary sample and a specific individual or source. Indeed, DNA testing has been used to exonerate persons who were convicted as a result of the misapplication of other forensic science evidence.[58] However, this does not mean that DNA evidence is always unassailable in the courtroom. There may be problems in a particular case with how the DNA was collected,[59] examined in the laboratory,[60] or interpreted, such as when there are mixed samples, limited amounts of DNA, or biases due to the statistical interpretation of data from partial profiles.[61]

---

[55] See, e.g., *United States v. Yee*, 134 F.R.D. 161 (N.D. Ohio 1991) (hearings held over 6 weeks featuring a total of 12 expert witnesses on the admissibility of DNA evidence); *People v. Castro*, 545 N.Y.S.2d 985 (N.Y. Sup. Ct. 1989) (hearings held over 12 weeks featuring a total of 10 expert witnesses on the admissibility of DNA evidence).

[56] National Research Council, Committee on DNA Forensic Science. 1996. *The Evaluation of Forensic DNA Evidence*. Washington, DC: National Academies Press; National Research Council, Committee on DNA Technology in Forensic Science. 1992. *DNA Technology in Forensic Science*. Washington, DC: National Academies Press.

[57] See *Castro*, 545 N.Y.S.2d at 999 (finding after a pretrial hearing that the "DNA identification evidence of inclusion" was inadmissible because "[t]he testing laboratory failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty"). Decided a few years before the *Daubert* decision was handed down, *Castro* applied a modified *Frye* standard to determine the admissibility of DNA evidence. Later federal cases, both pre- and post-*Daubert*, held that alleged errors in handling and interpreting specific DNA samples would not render the evidence inadmissible as a matter of law, but should instead be raised at trial as factors for the jury to weigh in determining the credibility of the DNA evidence. See, e.g., *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992); *United States v. Trala*, 162 F. Supp. 2d 336, 349 (D. Del. 2001), *aff'd*, 386 F.3d 536 (3rd Cir. 2004), *vacated on other grounds*, 546 U.S. 1086 (2006); *United States v. Shea*, 957 F. Supp. 331, 340-41 (D.N.H. 1997), *aff'd*, 159 F.3d 37 (1st Cir. 1998).

[58] According to The Innocence Project, there have been 220 postconviction DNA exonerations in the United States since 1989. See The Innocence Project, Fact Sheet: Facts on Post-Conviction DNA Exonerations. Available at www.innocenceproject.org/Content/351.php; see also B.L. Garrett. Judging innocence. 108 COLUM. L. REV. 55 (2008) (discussing the results of an empirical study of the types of faulty evidence that was admitted in more than 200 cases for which DNA testing subsequently enabled postconviction exonerations); but see J. Collins and J. Jarvis. 2008. *The Wrongful Conviction of Forensic Science*. CRIME LAB REPORT. Available at www.crimelabreport.com/library/pdf/wrongful_conviction.pdf (contesting the percentage of exonerated defendants whose convictions allegedly were based on faulty forensic science).

[59] See, e.g., W.C. Thompson. DNA evidence in the O.J. Simpson trial. 67 U. COLO. L. REV. 827 (1996) (detailing the defense counsel's theory that proper procedures were not followed in the collection or handling of the DNA samples at various points in the murder investigation).

[60] See, e.g., L. Hart. 2003. "DNA Lab's Woes Cast Doubt on 68 Prison Terms." *Los Angeles Times*. March 31, at 19; A. Liptak. 2003. "Houston DNA Review Clears Convicted Rapist, and Ripples in Texas Could Be Vast." *New York Times*.

3-12

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

Courts were able to subject DNA evidence to rigorous evaluation standards from the beginning,[62] because scientific groundwork for DNA analysis had been laid outside the context of law enforcement. The National Institutes of Health (NIH) and other respected institutions funded and conducted extensive basic research, followed by applied research. Serious studies on DNA analysis preceded the establishment and implementation of "individualization" criteria and parameters for assessing the probative value of claims of individualization. This history stands in sharp contrast to the history of research involving most other forensic science disciplines, which have not benefitted from extensive basic research, clinical applications, federal oversight, vast financial support from the private sector for applied research, and national standards for quality assurance and quality control. The goal is not to hold other disciplines to DNA's high standards in all respects; after all, it is unlikely that most other current forensic methods will ever produce evidence as discriminating as DNA. However, using *Daubert* as a guide, the least that the courts should insist upon from any forensic discipline is certainty that practitioners in the field adhere to enforceable standards, ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

**Judicial Dispositions of Questions Relating to Drug Identification**

Over the years, there have been countless instances in which trial judges have assessed the admissibility of expert testimony relating to drug analyses, either *sua sponte* or pursuant to objections raised by defense counsel. Because trial court decisions in these matters often are resolved without published written opinions and with no challenges on appeal, there is no sure way to know how often trial judges deny the admissibility of the evidence. Trial judges may sometimes sustain challenges to the admissibility of expert testimony, especially in instances where the defense can show defects in the foundational laboratory reports.[63] But there are very few such reported cases.

In addition to alleged defects in laboratory reports and sampling procedures, trial courts routinely consider whether experts possess the necessary qualifications to testify and, more generally, whether expert testimony is sufficiently reliable to be admitted under *Daubert* and Federal Rule of Evidence 702. However, in published opinions addressing expert testimony based on drug identification, federal appellate courts rarely reverse trial court decisions rejecting *Daubert* challenges.[64] Why? First, as noted above, in cases where the evidence is excluded at trial, no appeal will be taken. Second, the scientific methodology supporting many drug tests is sound. This means that, regardless of the standard of review, most decisions by trial courts will withstand scrutiny. Finally, courts of appeals owe great deference to trial court judgments on questions relating to the admission of evidence.[65]

---

March 11, at A14; R. Tanner. 2003. "Crime Labs Stained by a Shadow of a Doubt." *Los Angeles Times.* July 13, at 18.

[61] See, e.g., *Coy v. Renico,* 414 F. Supp. 2d 744, 761-63 (E.D. Mich. 2006) (rejecting habeas petitioner's claim that he was denied a fair trial because the statistical techniques used to evaluate mixed DNA samples were insufficiently reliable); see also B.S. Weir. 2007. The rarity of DNA profiles. *Annals of Applied Statistics* 1(2):358-370 (suggesting that wholesale searches of large DNA databases for solving cold cases might yield false positives with some regularity).

[62] See *supra* text accompanying note 54; see also *Gov't of V.I. v. Byers,* 941 F. Supp. 513 (D.V.I. 1996); *United States v. Jakobetz,* 747 F. Supp. 250 (D. Vt. 1990), *aff'd,* 955 F.2d 786 (2d Cir. 1992).

[63] See, e.g., *United States v. Diaz,* 2006 WL 3512032 (N.D. Cal. 2006).

[64] See, e.g., *United States v. Moreland,* 437 F.3d 424, 430-31 (4th Cir. 2006), *cert. denied,* 547 U.S. 1142 (2006); *United States v. Scalia,* 993 F.2d 984, 988-90 (1st Cir. 1993).

[65] See, e.g., *United States v. Gaskin,* 364 F.3d 438, 460 n.8 (2d Cir. 2004) (holding that "when a party questions whether sound scientific methodology provides a basis for an expert opinion, it may move to preclude the admission of the opinion" under *Daubert*; however, when a defendant makes no such motion and instead stipulates to the admissibility of the expert opinion, "he cannot complain on appeal that the opinion lacks foundation").

3-13

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

The importance of the limited standard of review was clearly explained in *United States v. Brown*:[66]

> Immersed in the case as it unfolds, a district court is more familiar with the procedural and factual details and is in a better position to decide *Daubert* issues. The rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization. And we don't want to denigrate the importance of the trial and encourage appeals of rulings relating to the testimony of expert witnesses. All of this explains why the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*, and why we give the district court considerable leeway in the execution of its duty. That is true whether the district court admits or excludes expert testimony. *Joiner*, 522 U.S. at 141-42 ("A court of appeals applying 'abuse-of-discretion' review to [*Daubert*] rulings may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it."). And it is true where the *Daubert* issue is outcome determinative.[67]

**Judicial Dispositions of Questions Relating to Fingerprint Analyses**

Over the years, the courts have admitted fingerprint evidence, even though this evidence has "made its way into the courtroom without empirical validation of the underlying theory and/or its particular application."[68] The courts sometimes appear to assume that fingerprint evidence is irrefutable. For example, in *United States v. Crisp*, the court noted that "[w]hile the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well."[69] The court went on to say:

> [E]ven if we had a more concrete cause for concern as to the reliability of fingerprint identification, the Supreme Court emphasized in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Ultimately, we conclude that while further research into fingerprint analysis would be welcome, "to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good."[70]

Opinions of this sort have drawn sharp criticism:

> [M]any fingerprint decisions of recent years . . . display a remarkable lack of understanding of certain basic principles of the scientific method. Court after court, for example, [has] repeated the statement that fingerprinting met the *Daubert* testing criterion by virtue of having been tested by the adversarial process over the last one-

---

[66] 415 F.3d 1266 (11th Cir. 2005).

[67] Ibid., pp. 1265-66 (alteration in original) (internal quotation marks, other internal citations omitted).

[68] M.A. Berger. Procedural paradigms for applying the *Daubert* test. 78 MINN. L. REV. 1345, 1354 (1994).

[69] 324 F.3d 261, 268 (4th Cir. 2003).

[70] Ibid., pp. 269-70 (second alteration in original) (other internal citation omitted).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

hundred years. This silly statement is a product of courts' perception of the incomprehensibility of actually limiting or excluding fingerprint evidence. Such a prospect stilled their critical faculties. It also transformed their admissibility standard into a *Daubert*-permissive one, at least for that subcategory of expertise.[71]

This is a telling critique, especially when one compares the judicial decisions that have pursued rigorous scrutiny of DNA typing with the decisions that have applied less stringent standards of review in cases involving fingerprint evidence.

In holding that fingerprint evidence satisfied *Daubert*'s reliability and relevancy standards for admissibility, the Fourth Circuit's decision in *Crisp* noted approvingly that "the Seventh Circuit [in *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001)] determined that *Daubert*'s 'known error rate' factor was satisfied because the expert in *Havvard* had testified that the error rate for fingerprint comparison was 'essentially zero.'"[72] This statement appears to overstate the expert's testimony in *Havvard*, and gives fuel to the misconception that the forensic discipline of fingerprinting is infallible. The *Havvard* opinion actually described the expert's testimony as follows:

> [The expert] testified that the error rate for fingerprint comparison is essentially zero. Though conceding that a small margin of error exists because of differences in individual examiners, he opined that this risk is minimized because print identifications are typically confirmed through peer review. [The expert] did acknowledge that fingerprint examiners have not adopted a single standard for determining when a fragmentary latent fingerprint is sufficient to permit a comparison, but he suggested that the unique nature of fingerprints is counterintuitive to the establishment of such a standard and that through experience each examiner develops a comfort level for deciding how much of a fragmentary print is necessary to permit a comparison.[73]

This description of the expert's equivocal testimony calls into question any claim that fingerprint evidence is infallible.

The decision in *Crisp* also pointed out that "[f]ingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911."[74] The court, however, pointed to no studies supporting the reliability of fingerprint evidence. When forensic DNA first appeared, it was sometimes called "DNA fingerprinting" to suggest that it was as reliable as fingerprinting, which was then viewed as the premier identification science and one that consistently produced irrefutable results. During the effort to validate DNA evidence for courtroom use, however, it became apparent that assumptions about fingerprint evidence had been reached without the scientific scrutiny being accorded DNA. When the Supreme Court decided *Daubert* in 1993, with its emphasis on validation, legal commentators turned their attention to fingerprinting and

---

[71] 1 Faigman et al., op. cit., *supra* note 1, § 1:1, p. 4; see also J.J. Koehler. Fingerprint error rates and proficiency tests: What they are and why they matter. 59 HASTINGS L.J. 1077 (2008).

[72] 324 F.3d at 269 (quoting *Havvard*, 260 F.3d at 599).

[73] *Havvard*, 260 F.3d at 599. The *Havvard* decision is sharply criticized by 1 Faigman et al., op. cit., *supra* note 1, § 1:30, pp. 86-89.

[74] *Crisp*, 324 F.3d at 266. The decision cites a number of other legal references, including, *inter alia*: *People v. Jennings*, 96 N.E. 1077 (1911); J.L. Mnookin. Fingerprint evidence in an age of DNA profiling. 67 BROOK. L. REV. 13 (2001) (discussing history of fingerprint identification evidence).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

began questioning whether experts could match and attribute fingerprints with a zero error rate as the FBI expert claimed in *Havvard*, and whether experts should be allowed to testify and make these claims in the absence of confirmatory studies. As noted above, most of these challenges have thus far failed, but the questions persist.

The 2004 Brandon Mayfield case refueled the debate over fingerprint evidence. The chronology of events in the Mayfield case is as follows:

> March 11, 2004: Terrorists detonate bombs on a number of trains in Madrid, Spain, killing approximately 191 people, and injuring thousands more, including a number of United States citizens.
>
> May 6, 2004: Brandon Bieri Mayfield, a 37-year-old civil and immigration lawyer, practicing in Portland, Oregon, is arrested as a material witness with respect to a federal grand jury's investigation into that bombing. An affidavit signed by FBI Special Agent Richard K. Werder, submitted in support of the government's application for the material witness arrest warrant, [avers] that Mayfield's fingerprint has been found on a bag in Spain containing detonation devices similar to those used in the bombings, and that he has to be detained so that he cannot flee before the grand jury has a chance to obtain his testimony.
>
> May 24, 2004: The government announces that the FBI has erred in its identification of Mayfield and moves to dismiss the material witness proceeding.[75]

In March 2006, the Office of the Inspector General of the U.S. Department of Justice issued a comprehensive analysis of how the misidentification occurred.[76] And in November 2006, the federal government agreed to pay Mayfield $2 million for his wrongful jailing in connection with the 2004 terrorist bombings in Madrid.[77] The Mayfield case and the resulting report from the Inspector General surely signal caution against simple, and unverified, assumptions about the reliability of fingerprint evidence.

In *Maryland v. Rose*, a Maryland State trial court judge found that the Analysis, Comparison, Evaluation, and Verification (ACE-V) process (see Chapter 5) of latent print identification does not rest on a reliable factual foundation.[78] The opinion went into considerable detail about the lack of error rates, lack of research, and potential for bias. The judge ruled that the State could not offer testimony that any latent fingerprint matched the prints of the defendant. The judge also noted that, because the case involved the possibility of the death penalty, the reliability of the evidence offered against the defendant was critically important.[79]

---

[75] S.T. Wax and C.J. Schatz. 2004. A multitude of errors: The Brandon Mayfield case. *The Champion*. September-October, p. 6. The facts of the case and Mayfield's legal claims against the government are fully reported in *Mayfield v. United States*, 504 F. Supp. 2d 1023 (D. Or. 2007).

[76] Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case.* Available at www.usdoj.gov/oig/special/s0601/exec.pdf.

[77] E. Lichtblau. 2006. "U.S. Will Pay $2 Million To Lawyer Wrongly Jailed." *New York Times.* November 30, at A18.

[78] *Maryland v. Rose*, Case No. K06-0545, mem. op. at 31 (Balt. County Cir. Ct. Oct. 19, 2007) (holding that the ACE-V methodology of latent fingerprint identification was "a subjective, untested, unverifiable identification procedure that purports to be infallible" and therefore ruling that fingerprint evidence was inadmissible). The ACE-V process is described in Chapter 5.

[79] Professor Jennifer Mnookin has also highlighted an important concern over "the rhetorical dimensions of the

3-16

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

The same concerns cited by the judge in *Maryland v. Rose* can be raised with respect to other forensic techniques that lack scientific validation and careful reliability testing.

### Judicial Dispositions of Questions Relating to Other Forensic Disciplines

Review of reported judicial opinions reveals that, at least in criminal cases, forensic science evidence is not routinely scrutinized pursuant to the standard of reliability enunciated in *Daubert*. The Supreme Court in *Daubert* indicated that the subject of an expert's testimony should be "scientific knowledge"—which implies that such knowledge is based on scientific methods—to ensure that "evidentiary reliability will be based upon scientific validity." The standard is admittedly "flexible," but that does not render it meaningless. Any reasonable reading of *Daubert* strongly suggests that, when faced with forensic evidence, "trial judge[s] must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." As the reported cases suggest, however, *Daubert* has done little to improve the use of forensic science evidence in criminal cases.

For years in the forensic science community, the dominant argument against regulating experts was that every time a forensic scientist steps into a courtroom, his work is vigorously peer reviewed and scrutinized by opposing counsel. A forensic scientist might occasionally make an error in the crime laboratory, but the crucible of courtroom cross-examination would expose it at trial. This "crucible," however, turned out to be utterly ineffective.

. . .

Unlike the extremely well-litigated civil challenges, the criminal defendant's challenge is usually perfunctory. Even when the most vulnerable forensic sciences— hair microscopy, bite marks, and handwriting—are attacked, the courts routinely affirm admissibility citing earlier decisions rather than facts established at a hearing. Defense lawyers generally fail to build a challenge with appropriate witnesses and

---

testimony . . . provide[d] in court" by members of the fingerprint community:

> At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term "positive" or "absolute" identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it. In fact, if a fingerprint examiner testifies on her own initiative that a match is merely "likely" or "possible" or "credible," rather than certain, she could possibly be subject to disciplinary sanction! Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validated standards for declaring a match, such claims of absolute, certain confidence in identification are unjustified, the product of hubris more than established knowledge. Therefore, in order to pass scrutiny under *Daubert*, fingerprint identification experts should exhibit a greater degree of epistemological humility. Claims of "absolute" and "positive" identification should be replaced by more modest claims about the meaning and significance of a "match."

J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7(2):127; see also Koehler, *supra* note 71.

3-17

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

new data. Thus, even if inclined to mount a *Daubert* challenge, they lack the requisite knowledge and skills, as well as the funds, to succeed.[80]

The reported decisions dealing with judicial dispositions of *Daubert*-type questions appear to confirm this assessment. As noted above, the courts often "affirm admissibility citing earlier decisions rather than facts established at a hearing." Much forensic evidence—including, for example, bite marks[81] and firearm and toolmark identifications[82]—is introduced in criminal trials without any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline. One recent judicial decision highlights the problem. In *United States v. Green*, Judge Gertner acknowledged that toolmark identification testimony *ought not be considered admissible* under *Daubert*.[83] But the judge pointed out that "the problem for the defense is *that every single court* post-*Daubert* has admitted this testimony, sometimes without any searching review, much less a hearing."[84] Judge Gertner allowed the prosecution's expert to describe the similarities between the shell casings at issue, but prohibited him from testifying that there was a definitive match. Obviously feeling bound by circuit precedent, the judge stated:

---

[80] Neufeld, *supra* note 44, at S109, S110.

[81] There is nothing to indicate that courts review bite mark evidence pursuant to *Daubert*'s standard of reliability. See, e.g., *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (denying habeas petition after finding, in part, that the inclusion of bite mark testimony against the defendant had not denied him a fair trial, and stating that "while the science of forensic odontology might have been in its infancy at the time of trial . . . certainly there is some probative value to comparing an accused's dentition to bite marks found on the victim."). Two recent cases might, at first glance, seem to indicate that courts were beginning to seriously evaluate the general credibility of bite mark testimony, but this is not in fact the case. In *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005), the court denied summary judgment to police officers in a 42 U.S.C. § 1983 action where exculpatory DNA evidence that directly contradicted inculpatory bite mark evidence was "intentionally or recklessly withheld from the officer who was actually preparing the warrant application," ibid., p. 84, resulting in petitioner being wrongfully imprisoned for 41 days. However, the *Burke* court rejected the petitioner's claim that the inclusion of bite mark evidence in the arrest warrant had demonstrated "reckless disregard for the truth," because the method was generally unreliable. Ibid., pp. 82-83. In *Ege v. Yukins*, 380 F. Supp. 2d 852 (E.D. Mich. 2005), *aff'd in part and rev'd in part*, 485 F.3d 364 (6th Cir. 2007), the court granted the habeas petition of a defendant whose conviction was based in significant part on bite mark testimony from a later-discredited expert witness. But the disposition in *Ege* rested primarily on the flaws of one "particular witness and his particular testimony," not on a judicial evaluation of "*the* [bite mark] *field's* more general shortcomings." 4 Faigman et al., op. cit., *supra* note 1, § 36:6, p. 662.

[82] There is little to indicate that courts review firearms evidence pursuant to *Daubert*'s standard of reliability. See e.g., *United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) (upholding defendant's conviction after finding, in part, that it was not an abuse of discretion for the court to admit testimony on shell casing comparisons by the Government's firearms expert); *United States v. Foster*, 300 F. Supp. 2d 375 (D. Md. 2004) (denying defendant's motion to exclude expert firearms testimony). Several federal trial judges, however, have subjected expert firearm testimony to rigorous analysis under *Daubert*. In *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006), Judge Saris concluded that toolmark identification testimony was generally admissible under *Daubert*, but excluded the specific testimony at issue, because the experts failed to properly document their basis for identification, and because an independent examiner had not verified the experts' conclusions. Likewise, in *United States v. Diaz*, No. 05-CR-167, 2007 WL 485967, at *14 (N.D. Cal. Feb. 12, 2007), Judge Alsup allowed firearm identification testimony under *Daubert*, but prevented experts from testifying to their conclusions "to the exclusion of all other firearms in the world" and only allowed testimony "to a reasonable degree of certainty." *Cf. United States v. Glynn*, 578 F. Supp. 2d 569 (S.D.N.Y. 2008), where Judge Rakoff precluded testimony that a bullet and shell casings came from a firearm linked to the defendant "to a reasonable degree of ballistics certainty," because "whatever else ballistics identification analysis could be called, it could not fairly be called 'science.'" However, the judge ruled that although inadmissible under *Daubert*, testimony that the evidence was "more likely than not" from the firearm was admissible under Federal Rule of Evidence 401. See also *Green*, 405 F. Supp. 2d 104, discussed in the text.

[83] 405 F. Supp. 2d at 107-08.

[84] Ibid., p. 108.

3-18

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

I reluctantly [admit the evidence] because of my confidence that any other decision will be rejected by appellate courts, in light of precedents across the country, regardless of the findings I have made. While I recognize that the *Daubert-Kumho* standard does not require the illusory perfection of a television show (CSI, this wasn't), when liberty hangs in the balance—and, in the case of the defendants facing the death penalty, life itself—the standards should be higher than were met in this case, and than have been imposed across the country. The more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more.[85]

"[T]he undeniable reality is that the community of forensic science professionals has not done nearly as much as it reasonably could have done to establish either the validity of its approach or the accuracy of its practitioners' conclusions,"[86] and the courts have been "utterly ineffective" in addressing this problem.[87]

## CONCLUSION

Prophetically, the *Daubert* decision observed that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly."[88] But because accused parties in criminal cases are convicted on the basis of testimony from forensic science experts, much depends upon whether the evidence offered is reliable. Furthermore, in addition to protecting innocent persons from being convicted of crimes that they did not commit, we are also seeking to protect society from persons who have committed criminal acts. Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies condoned by the courts before the techniques have been properly studied and

---

[85] Ibid., p. 109 (footnotes omitted). "The case law on the admissibility of toolmark identification and firearms identification expert evidence is typified by decisions admitting such testimony with little, and usually no, reference to legal authority beyond broad 'discretion' and an adroit sidestepping of any judicial duty to assure that experts' claims are valid. Appellate courts defer to trial courts, and trial courts defer to juries. Later appellate courts simply defer to earlier appellate courts." 4 Faigman et al., op. cit., *supra* note 1, § 34:5, p. 589.

[86] Mnookin, op. cit., *supra* note 79.

[87] Neufeld, op. cit., *supra* note 44, p. S109. In *Green*, 405 F. Supp. 2d at 109 n.6, Judge Gertner also noted that:

[R]ecent reexaminations of relatively established forensic testimony have produced striking results. Saks and Koehler, for example, report that forensic testing errors were responsible for wrongful convictions in 63% of the 86 DNA Exoneration cases reported by the Innocence Project at Cardozo Law School. Michael Saks and Jonathan Koehler, *The Coming Paradigm Shift in Forensic Identification Science*, 309 SCIENCE 892 (2005). This only reinforces the importance of careful analysis of expert testimony in this case.

See also S.R. Gross, *Convicting the Innocent* (U. Mich. Law Sch. Pub. Law & Legal Theory Working Paper Series, Working Paper No. 103, 2008). Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100011 (forthcoming in *Annual Review of Law & Social Science* 2008).

[88] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596-97 (1993).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

their accuracy verified. "[T]here is no evident reason why ['rigorous, systematic'] research would be infeasible."[89] However, some courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely "demand more by way of validation than the disciplines can presently offer."[90]

Some legal scholars think that, "[o]ver time, if *Daubert* does not come to be diluted or distorted, . . . courts will increasingly appreciate its power and flexibility to evaluate proffered expert testimony."[91] However, at least with respect to criminal cases, this may reflect an unrealistic assessment of the problem. "The principal difficulty, it appears, is that many [forensic science] techniques have been relied on for so long that courts might be reluctant to rethink their role in the trial process. . . . In many forensic areas, effectively no research exists to support the practice."[92]

As the discussion in this chapter indicates, the adversarial process relating to the admission and exclusion of scientific evidence is not suited to the task of finding "scientific truth." The judicial system is encumbered by, among other things, judges and lawyers who generally lack the scientific expertise necessary to comprehend and evaluate forensic evidence in an informed manner, trial judges (sitting alone) who must decide evidentiary issues without the benefit of judicial colleagues and often with little time for extensive research and reflection, and the highly deferential nature of the appellate review afforded trial courts' *Daubert* rulings. Furthermore, the judicial system embodies a case-by-case adjudicatory approach that is not well suited to address the systematic problems in many of the various forensic science disciplines. Given these realities, there is a tremendous need for the forensic science community to improve. Judicial review, by itself, will not cure the infirmities of the forensic science community.[93] The development of scientific research, training, technology, and databases associated with DNA analysis have resulted from substantial and steady federal support for both academic research and programs employing techniques for DNA analysis. Similar support must be given to all credible forensic science disciplines if they are to achieve the degrees of reliability needed to serve the goals of justice. With more and better educational programs, accredited laboratories, certified forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. The present situation, however, is seriously wanting, both because of the limitations of the judicial system and because of the many problems faced by the forensic science community.

---

[89] J. Griffin and D.J. LaMagna. 2002. *Daubert* challenges to forensic evidence: Ballistics next on the firing line. *The Champion*. September-October:21.

[90] Ibid. See, e.g., *Crisp*, 324 F.3d at 270.

[91] 1 Faigman et al., op. cit., *supra* note 1, § 1:1, p. 5 n. 9.

[92] Ibid. § 1:30, p. 85 (footnotes omitted).

[93] See J.L. Mnookin. Expert evidence, partisanship, and epistemic competence. 73 BROOK. L. REV. 1009, 1033 (2008) ("[S]o long as we have our adversarial system in much its present form, we are inevitably going to be stuck with approaches to expert evidence that are imperfect, conceptually unsatisfying, and awkward. It may well be that the real lesson is this: those who believe that we might ever fully resolve—rather than imperfectly manage—the deep structural tensions surrounding both partisanship and epistemic competence that permeate the use of scientific evidence within our legal system are almost certainly destined for disappointment.").

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

# 4

# THE PRINCIPLES OF SCIENCE AND INTERPRETING SCIENTIFIC DATA

> Scientific method refers to the body of techniques for investigating phenomena, acquiring new knowledge, or correcting and integrating previous knowledge. It is based on gathering observable, empirical and measurable evidence subject to specific principles of reasoning.
>
> Isaac Newton (1687, 1713, 1726) "Rules for the study of natural philosophy," *Philosophiae Naturalis Principia Mathematica*

Forensic science actually is a broad array of disciplines, as will be seen in the next chapter. Each has its own methods and practices, as well as its strengths and weaknesses. In particular, each varies in its level of scientific development and in the degree to which it follows the principles of scientific investigation. Adherence to scientific principles is important for concrete reasons: they enable the reliable inference of knowledge from uncertain information— exactly the challenge faced by forensic scientists. Thus, the reliability of forensic science methods is greatly enhanced when those principles are followed. As Chapter 3 observes, the law's admission of and reliance on forensic evidence in criminal trials depends critically on (1) the extent to which a forensic science discipline is founded on a reliable scientific methodology, leading to accurate analyses of evidence and proper reports of findings and (2) the extent to which practitioners in those forensic science disciplines that rely on human interpretation adopt procedures and performance standards that guard against bias and error. This chapter discusses the ways in which science more generally addresses those goals.

## FUNDAMENTAL PRINCIPLES OF THE SCIENTIFIC METHOD

The scientific method presumes that events occur in consistent patterns that can be understood through careful comparison and systematic study. Knowledge is produced through a series of steps during which data are accumulated methodically, strengths and weaknesses of information are assessed, and knowledge about causal relationships is inferred. In the process, scientists also develop an understanding of the limits of that knowledge (such as the precision of the observations), the inferred nature of relationships, and key assumptions behind the inferences. Hypotheses are developed, are measured against the data, and are either supported or refuted.

Scientists continually observe, test, and modify the body of knowledge. Rather than claiming absolute truth, science approaches truth either through breakthrough discoveries or incrementally, by testing theories repeatedly. Evidence is obtained through observations and measurements conducted in the natural setting or in the laboratory. In the laboratory, scientists can control and vary the conditions in order to isolate exclusive effects and thus better understand the factors that influence certain outcomes. Typically, experiments or observations must be conducted over a broad range of conditions before the roles of specific factors, patterns, or variables can be understood. Methods to reduce errors are part of the study design, so that, for example, the size of the study is chosen to provide sufficient statistical power to draw

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

conclusions with a high level of confidence or to understand factors that might confound results. Throughout scientific investigations, the investigator must be as free from bias as possible, and practices are put in place to detect biases (such as those from measurements, human interpretation) and to minimize their effects on conclusions.

Ultimately, the goal is to construct explanations ("theories") of phenomena that are consistent with broad scientific principles, such as the laws of thermodynamics or of natural selection. These theories, and investigations of them through experiments and observed data, are shared through conferences, publications, and collegial interactions, which push the scientist to explain his or her work clearly and which raise questions that might not have been considered. The process of sharing data and results requires careful recordkeeping, reviewed by others. In addition, the need for credibility among peers drives investigators to avoid conflicts of interest. Acceptance of the work comes as results and theories continue to hold, even under the scrutiny of peers, in an environment that encourages healthy skepticism. That scrutiny might extend to independent reproduction of the results or experiments designed to test the theory under different conditions. As credibility accrues to data and theories, they become accepted as established fact and become the "scaffolding" upon which other investigations are constructed.

This description of how science creates new theories illustrates key elements of good scientific practice: precision when defining terms, processes, context, results, and limitations; openness to new ideas, including criticism and refutation; and protections against bias and overstatement (going beyond the facts). Although these elements have been discussed here in the context of creating new methods and knowledge, the same principles hold when applying known processes or knowledge. In day-to-day forensic science work, the process of formulating and testing hypotheses is replaced with the careful preparation and analysis of samples and the interpretation of results. But that applied work, if done well, still exhibits the same hallmarks of basic science: the use of validated methods and care in following their protocols; the development of careful and adequate documentation; the avoidance of biases; and interpretation conducted within the constraints of what the science will allow.

**Validation of New Methods**

One particular task of science is the validation of new methods to determine their reliability under different conditions and their limitations. Such studies begin with a clear hypothesis (e.g., "new method X can reliably associate biological evidence with its source"). An unbiased experiment is designed to provide useful data about the hypothesis. Those data—measurements collected through methodical prescribed observations under well-specified and controlled conditions—are then analyzed to support or refute the hypothesis. The thresholds for supporting or refuting the hypothesis are clearly articulated before the experiment is run. The most important outcomes from such a validation study are (1) information about whether or not the method can discriminate the hypothesis from an alternative, and (2) assessments of the sources of errors and their consequences on the decisions returned by the method. These two outcomes combine to provide precision and clarity about what is meant by "reliably associate."

For a method that has not been subjected to previous extensive study, a researcher might design a broad experiment to assist in gaining knowledge about its performance under a range of conditions. Those data are then analyzed for any underlying patterns that may be useful in planning or interpreting tests that use the new method. In other situations, a process already has been formulated from existing experimental data, knowledge, and theory (e.g., "biological markers A, B, and C can be used in DNA forensic investigations to pair evidence with suspect").

4-2

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

To confirm the validity of a method or process for a particular purpose (e.g., for a forensic investigation), validation studies must be performed.

The International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) developed a joint document, "General requirements for the competence of testing and calibration laboratories" (commonly referred to as "ISO 17025"), which includes a well-established list of techniques that can be used, alone or in combination, to validate a method:

- calibration using reference standards or reference materials;
- comparison of results achieved with other methods;
- interlaboratory comparisons;
- systematic assessment of the factors influencing the result; and
- assessment of the uncertainty of the results based on scientific understanding of the theoretical principles of the method and practical experience.[1]

A critical step in such validation studies is their publication in peer-reviewed journals, so that experts in the field can review, question, and check the repeatability of the results. These publications must include clear statements of the hypotheses under study, as well as sufficient details about the experiments, the resulting data, and the data analysis so that the studies can be replicated. Replication will expose not only additional sources of variability but also further aspects of the process, leading to greater understanding and scientific knowledge that can be used to improve the method. Methods that are specified in more detail (such as DNA analysis, where particular genetic loci are to be compared) will have greater credibility and also are more amenable to systematic improvement than those that rely more heavily on the judgments of the investigator.

The validation of results over time increases confidence. Moreover, the scientific culture encourages continued questioning and improvement. Thus, the relevant scientific community continues to check that established results still hold under new conditions and that they continue to hold in the face of new knowledge. The involvement of graduate student researchers in scientific research contributes greatly to this diligence, because part of their education is to read carefully and to question so-called established methods. This culture leads to continued reexamination of past research and hence increased knowledge.

In the case of DNA analysis, studies have evaluated the precision, reliability, and uncertainties of the methods. This knowledge has been used to define standard procedures that, when followed, lead to reliable evidence. For example, below is a brief sample of the specifications required by the Federal Bureau of Investigation's (FBI's) Quality Assurance Standards for Forensic DNA Testing Laboratories[2] in order to ensure reliable DNA forensic analysis:

- Testing laboratories must have a standard operating protocol for each analytical technique used, specifying reagents, sample preparation, extraction, equipment, and controls that are standard for DNA analysis and data interpretation.

---

[1] Quoted from Section 5.4.5 2 (Note 2) of ISO/IEC 17025, "General requirements for the competence of testing and calibration laboratories" (2nd ed., May 15, 2005).

[2] DNA Advisory Board. 2000. *Forensic Science Communications* 2(3): available at www.bioforensics.com/conference04/TWGDAM/Quality_Assurance_Standards_2.pdf.

4-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

- The laboratory shall monitor the analytical procedures using appropriate controls and standards, including quantitation standards that estimate the amount of human nuclear DNA recovered by extraction, positive and negative amplification controls, and reagent blanks.
- The laboratory shall check its DNA procedures annually or whenever substantial changes are made to the protocol(s) against an appropriate and available NIST standard reference material or standard traceable to a NIST standard.
- The laboratory shall have and follow written general guidelines for the interpretation of data.
- The laboratory shall verify that all control results are within established tolerance limits.
- Where appropriate, visual matches shall be supported by a numerical match criterion.
- For a given population(s) and/or hypothesis of relatedness, the statistical interpretation shall be made following the recommendations 4.1, 4.2, or 4.3 as deemed applicable of the National Research Council report entitled *The Evaluation of Forensic DNA Evidence* (1996) and/or a court-directed method. These calculations shall be derived from a documented population database appropriate for the calculation.[3]

This level of specificity is consistent with the spirit of the guidelines presented in ISO 17025. The second edition (May 15, 2005) of those guidelines includes the following minimum set of information for properly specifying the process of any new analytical method:

(a)    appropriate identification;
(b)    scope;
(c)    description of the type of item to be tested or calibrated;
(d)    parameters or quantities and ranges to be determined;
(e)    apparatus and equipment, including technical performance requirements;
(f)    reference standards and reference materials required;
(g)    environmental conditions required and any stabilization period needed;
(h)    description of the procedure, including
   -   affixing of identification marks, handling, transporting, storing and preparation of items;
   -   checks to be made before the work is started;
   -   checks that the equipment is working properly and, where required, calibration and adjustment of the equipment before each use;
   -   the method of recording the observations and results;
   -   any safety measures to be observed;
(i)    criteria and/or requirements for approval/rejection;
(j)    data to be recorded and method of analysis and presentation;
(k)    the uncertainty or the procedure for estimating uncertainty.[4]

---

[3] Paraphrased from Section 9 of the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories.
[4] Quoted from Section 5.4.4 of ISO/IEC 17025, "General requirements for the competence of testing and calibration laboratories" (2nd ed., May 15, 2005).

4-4

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**Uncertainty and Error**

Scientific data and processes are subject to a variety of sources of error. For example, laboratory results and data from questionnaires are subject to measurement error, and interpretations of evidence by human observers are subject to potential biases. A key task for the scientific investigator designing and conducting a scientific study, as well as for the analyst applying a scientific method to conduct a particular analysis, is to identify as many sources of error as possible, to control or to eliminate as many as possible, and to estimate the magnitude of remaining errors so that the conclusions drawn from the study are valid. Numerical data reported in a scientific paper include not just a single value (point estimate) but also a range of plausible values (e.g., a confidence interval, or interval of uncertainty).

*Measurement Error*

As with all other scientific investigations, laboratory analyses conducted by forensic scientists are subject to measurement error. Such error reflects the intrinsic strengths and limitations of the particular scientific technique. For example, methods for measuring the level of blood alcohol in an individual or methods for measuring the heroin content of a sample can do so only within a confidence interval of possible values. In addition to the inherent limitations of the measurement technique, a range of other factors may also be present and can affect the accuracy of laboratory analyses. Such factors may include deficiencies in the reference materials used in the analysis, equipment errors, environmental conditions that lie outside the range within which the method was validated, sample mix-ups and contamination, transcriptional errors, and more.

Consider, for example, a case in which an instrument (e.g., a breathalyzer such as Intoxilyzer) is used to measure the blood-alcohol level of an individual three times, and the three measurements are 0.08 percent, 0.09 percent, and 0.10 percent. The variability in the three measurements may arise from the internal components of the instrument, the different times and ways in which the measurements were taken, or a variety of other factors. These measured results need to be reported, along with a confidence interval that has a high probability of containing the true blood-alcohol level (e.g., the mean plus or minus two standard deviations). For this illustration, the average is 0.09 percent and the standard deviation is 0.01 percent; therefore, a two-standard-deviation confidence interval (0.07 percent, 0.11 percent) has a high probability of containing the person's true blood-alcohol level. (Statistical models dictate the methods for generating such intervals in other circumstances so that they have a high probability of containing the true result.) The situation for assessing heroin content from a sample of white powder is similar, although the quantification and limits are not as broadly standardized. The combination of gas chromatography and mass spectrometry (GC/MS) is used extensively in identifying controlled substances. Those analyses tend to be more qualitative (e.g., identifying peaks on a spectrum that appear at frequencies consistent with the controlled substance and which stand out above the background "noise"), although quantification is possible.

*Error Rates*

Analyses in the forensic science disciplines are conducted to provide information for a variety of purposes in the criminal justice process. However, most of these analyses aim to address two broad types of questions: (1) can a particular piece of evidence be associated with a particular class of sources? and (2) Can a particular piece of evidence be associated with one particular source? The first type of question leads to "classification" conclusions. An example of such a question would be whether a particular hair specimen shares physical characteristics common to a particular ethnic group. An affirmative answer to a classification question indicates

4-5

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

only that the item belongs to a particular *class* of similar items. Another example might be whether a paint mark left at a crime scene is consistent (according to some collection of relevant measurements) with a particular paint sample in a database, from which one can infer the class of vehicle (e.g., model(s) and production year(s)) that could have left the mark. The second type of question leads to "individualization" conclusions—for example, does a particular DNA sample belong to individual X?

Although the questions addressed by forensic analyses are not always binary (yes/no) or as crisply stated as in the previous paragraph, the paradigm of yes/no conclusions is useful for describing and quantifying the accuracy with which forensic science disciplines can provide answers.[5] In such situations, results from analyses for which the truth is known can be classified in a two-way table as follows:

| | Analysis results | |
|---|---|---|
| **Truth** | yes | no |
| yes | a (true positives) | b (false negatives) |
| no | c (false positives) | d (true negatives) |

The conceptual framework and terminology for evaluating the accuracy of forensic analyses is illustrated using a *hypothetical* example from microscopic analysis of head hair. In this situation, multiple features, both qualitative and quantitative, on each sample of hair are assessed. Qualitative features include color (e.g., blonde, brown, red), coloring (natural or treated), form (straight, wavy, curved, kinked), texture (smooth, medium, coarse). Quantitative features include length and diameter. Undoubtedly, these features will vary from hair to hair, even from the same individual, but features that vary *less* for the *same* individual (i.e., within-individual variability) and *more* for *different* individuals (i.e., between-individual variability) are needed for purposes of class identification and discrimination. These features may also be combined in some fashion to result in some overall score, or set of scores, for each sample, and these scores are then compared with those from the target sample. In the final analysis, however, a binary conclusion is often required. For example, "Did this hair come from the head of a Caucasian person?"

As in the case of all analyses leading to classification conclusions (e.g., diagnostic tests in medicine), the microscopic hair analysis process must be subjected to performance and validation studies in which appropriate error rates can be defined and estimated. Consider a hypothetical study in which 100 samples (each with multiple hairs) are taken from the heads of 100 individuals from class C, and another 100 samples are taken from the heads of individuals not in class C. The analyst is asked to determine, for each of the 200 samples, whether it does or does not come from a person in class C, and the true answer is known. The validation study returns the following results:

---

[5] More complete discussion of the questions addressed by forensic science may be found in references such as K. Inman and N. Rudin. 2002. The origin of evidence. *Forensic Science International* 126:11-16; and R. Cook, I.W. Evett, G. Jackson, P.J. Jones, and J.A. Lambert. 1998. A hierarchy of propositions: Deciding which level to address in casework. *Science and Justice* 38:231-239.

4-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

| Hypothetical Hair Analysis Validation Study | | | |
|---|---|---|---|
| | Analysis of Hair Samples Indicates: | | |
| | Class C | Not Class C | Row Total |
| Sample is from Class C Persons | 95<br>True Positive (correct determination) | 5<br>False Negative | 100 |
| Sample is not from Class C Persons | 2<br>False Positive | 98<br>True Negative (correct determination) | 100 |
| Column Total | 97 | 103 | Overall total 200 |

The accuracy of a test (here, microscopic hair analysis) can be assessed in different ways. Borrowing terminology from the evaluation of medical diagnostic tests, four characterizations and their associated measures are given below. Each one is useful in its own way: the first two emphasize the ability to *detect* an association; the last two emphasize the ability to *predict* an association:[6]

- Among samples from persons in Class C, the fraction that is correctly identified by the test is called the "sensitivity" or the "true positive rate" (TPR) of the test. In this table, the sensitivity would be estimated as [95/(95+5)] x 100=95 percent.
- Among samples from persons not in Class C, the fraction that is correctly identified by the test is called the "specificity" or the "true negative rate" (TNR) of the test. In this table, the specificity would be estimated as [98/(2+98)] x 100=98 percent.
- Among samples classified by the test as coming from persons in Class C, the fraction that actually turns out to be from Class C is called the "positive predictive value (PPV)" of the test. In this table, the PPV would be estimated as [95/(95+ 2)] x 100=98 percent.
- Among samples classified by the test as coming from persons not in Class C, the fraction that actually turns out to not be persons from Class C is called the "negative predictive value (NPV)" of the test. In this table, the NPV would be estimated as [98/(5+98)] x 100=95 percent.

The above four measures emphasize the ability of the analysis to make correct determinations.[7] "Error rates" are defined as proportions of cases in which the analysis led to a

---

[6] See, e.g., X-H. Zhou, N. Obuchowski, and D. McClish. 2002. *Statistical Methods in Diagnostic Medicine.* Wiley & Sons, for a general account of methods for diagnostic tests. A series of NAS/NRC reports have applied such methods to the examination of forensic disciplines. See, e.g., NRC. Committee to Review the Scientific Evidence on the Polygraph. 2003. *The Polygraph and Lie Detection.* Washington, DC: The National Academies Press; NRC. 2004. *Forensic Analysis: Weighing Bullet Lead Evidence.* Washington, DC: The National Academies Press; NAS. 2005. *The Sackler Colloquium on Forensic Science: The Nexus of Science and the Law,* November 16-18, 2005.

[7] Each estimate (of sensitivity, specificity, PPV, NPV) is associated with an interval that has a high probability of containing the true sensitivity, specificity, PPV, NPV. The larger the study, the more precise the estimate (i.e., the narrower the interval of uncertainty about the estimate).

4-7

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

false conclusion. For example, the complement of sensitivity (100 percent minus the sensitivity) is the percent of false negative cases in which the sample was from class C but the analysis reached the opposite conclusion. In the above table, this would be estimated as 5 percent. Similarly, the complement of specificity (100 percent minus the specificity) is the percent of false positive cases in which the sample was not from class C but the analysis concluded that it was. In the above table this would be estimated as 2 percent. A global error rate could be defined as the percent of incorrectly identified cases among all those analyzed. In the above table this would be estimated as [(5+2)/200] x 100=3.5 percent.

Importantly, whether the test answer is correct or not depends on which question is being addressed by the test. In this hair comparison example, the purpose is to determine whether the hair came from the head of an individual from class C. Thus, the analysis should be evaluated on the accuracy of the classification. In this example, if the analysis indicated "Class C" but the hair actually came from a "non-Class C" individual, then the analysis returned an incorrect classification. This accuracy evaluation does not apply to other tasks that are beyond the goal of the particular analysis, such as pinpointing the individual from whom the specimen was obtained. In the paint example about paint marks left by a vehicle, if the question is whether a vehicle under investigation was a model A made by manufacturer B in 2000, then a correct answer is limited to only the model, manufacturer, and year.

Although only illustrations, these examples serve to demonstrate the importance of:

- the careful and precise characterization of the scientific procedure, so that others can replicate and validate it;
- the identification of as many sources of error as possible that can affect both the accuracy and precision of a measurement;
- the quantification of measurements (e.g., in the example of GC/MS analysis of possible heroin, reporting peak area, as well as appropriate calibration data, including the response area for a known amount of analyte standard, rather than merely "peak is present/absent");
- the reporting of a measurement with an interval that has a high probability of containing the true value;
- the precise definition of the question addressed by the method (e.g., classification versus individualization), and the recognition of its limitations; and
- the conducting of validation studies of the performance of a forensic procedure to assess the percentages of false positives and false negatives.

Clearly, better understanding of the measuring equipment and the measurement process leads to more improvements to every process and ultimately to fewer false positive and false negative results. Most importantly, as stated above, whether the test answer is correct or not depends on the question the test is being used to address. In the case of microscopic hair analysis, the validation study may confirm its value in identifying *class characteristics* of an individual, but not in identifying the specific person.

It is also important to note that errors and corresponding error rates can have more complex sources than can be accommodated within the simple framework presented above. For example, in the case of DNA analysis, a declaration that two samples match can be erroneous in at least two ways: The two samples might actually come from different individuals whose DNA appears to be the same within the discriminatory capability of the tests, or two different DNA profiles could be mistakenly determined to be matching. The probability of the former error is

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

typically very low, while the probability of a false positive (different profiles wrongly determined to be matching) may be considerably higher. Both sources of error need to be explored and quantified in order to arrive at reliable error rate estimates for DNA analysis.[8]

The existence of several types of potential error rates makes it absolutely critical for all involved in the analysis to be explicit and precise in the particular rate or rates referenced in a specific setting. The estimation of such error rates requires rigorously developed and conducted scientific studies. Additional factors may play a role in analyses involving human interpretation, such as the experience, training, and inherent ability of the interpreter, the protocol for conducting the interpretation, and biases from a variety of sources, as discussed in the next section. The assessment of the accuracy of the conclusions from forensic analyses and the estimation of relevant error rates are key components of the mission of forensic science.

**Sources of Bias**

Human judgment is subject to many different types of bias, because we unconsciously pick up cues from our environment and factor them in an unstated way into our mental analyses. Those mental analyses might also be affected by unwarranted assumptions and a degree of overconfidence that we do not even recognize in ourselves. Such cognitive biases are not the result of character flaws; instead, they are common features of decisionmaking, and they cannot be willed away.[9] A familiar example is how the common desire to please others (or avoid conflict) can skew one's judgment if coworkers or supervisors suggest that they are hoping for, or have reached, a particular outcome. Science takes great pains to avoid biases by using strict protocols to minimize their effects. The 1996 National Academies DNA report, for example, notes, "[l]aboratory procedures should be designed with safeguards to detect bias and to identify cases of true ambiguity. Potential ambiguities should be documented."[10]

A somewhat obvious cognitive bias that may arise in forensic science is a willingness to ignore base rate information in assessing the probative value of information. For example, suppose carpet fibers from a crime scene are found to match carpet fibers found in a suspect's home. The probative value of this information depends on the rate at which such fibers are found in homes in addition to that of the suspect. If the carpet fibers are extremely common, the presence of matching fibers in the suspect's home will be of little probative value.[11]

A common cognitive bias is the tendency for conclusions to be affected by how a question is framed or how data are presented. In a police line-up, for instance, an eyewitness who is presented with a pool of faces in one batch might assume that the suspect is among them, which may not be correct. If the mug shots are presented together at one time and the witness is asked to identify the suspect, the witness may choose the photograph that is most similar to the perpetrator, even if the perpetrator's picture is not among those presented. Similarly, if the photographs are presented sequentially and the witness knows that only a limited number will be presented, the eyewitness might tend to "identify" one of the last photographs under the assumption that the suspect must be in that batch. (This is also driven by the common bias toward reaching closure.) A series of studies has shown that judges can be subject to errors in

---

[8] C. Aitken and F. Taroni. 2004. *Statistics and the Evaluation of Evidence for Forensic Scientists*. Chichester, UK: John Wiley & Sons.

[9] See, e.g., M.J. Saks, D.M. Risinger, R. Rosenthal, and W.C. Thompson. 2003. Context effects in forensic science: A review and application of the science of science to crime laboratory practice in the United States. *Science and Justice* 43(2):77-90.

[10] NRC. 1996. *The Evaluation of Forensic DNA Evidence*. Washington D.C.: National Academy Press.

[11] C. Guthrie, J.J. Rachlinski, and A.J. Wistrich. 2001. Inside the judicial mind. *Cornell Law Review* 86:777-830.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

judgment resulting from similar cognitive biases.[12] Forensic scientists also can be affected by this cognitive bias if, for example, they are asked to compare two particular hairs, shoeprints, fingerprints—one from the crime scene and one from a suspect—rather than comparing the crime scene exemplar with a pool of counterparts.

Another potential bias is illustrated by the erroneous fingerprint identification of Brandon Mayfield as someone involved with the Madrid train bombing in 2004. The FBI investigation determined that once the fingerprint examiner had declared a match, both he and other examiners who were aware of this finding were influenced by the urgency of the investigation to affirm repeatedly this erroneous decision.[13]

Recent research provided additional evidence of this sort of bias through an experiment in which experienced fingerprint examiners were asked to analyze fingerprints that, unknown to them, they had analyzed previously in their careers. For half the examinations, contextual biasing was introduced. For example, the instructions accompanying the latent prints included information such as the "suspect confessed to the crime" or the "suspect was in police custody at the time of the crime." In 6 of the 24 examinations that included contextual manipulation, the examiners reached conclusions that were consistent with the biasing information and different from the results they had reached when examining the same prints in their daily work.[14]

Other cognitive biases may be traced to common imperfections in our reasoning ability. One commonly recognized bias is the tendency to avoid cognitive dissonance, such as persuading oneself through rational argument that a purchase was a good value once the transaction is complete. A scientist encounters this unconscious bias if he/she becomes too wedded to a preliminary conclusion, so that it becomes difficult to accept new information fairly and unduly difficult to conclude that the initial hypotheses were wrong. This is often manifested by what is known as "anchoring," the well-known tendency to rely too heavily on one piece of information when making decisions. Often, the piece of information that is weighted disproportionately is one of the very first ones encountered. One tends to seek closure and to view the initial part of an investigation as a "sunk cost" that would be wasted if overturned.

Another common cognitive bias is the tendency to see patterns that do not actually exist. This bias is related to our tendency to underestimate the amount of complexity that can really exist in nature. Both tendencies can lead one to formulate overly simple models of reality and thus to read too much significance into coincidences and surprises. More generally, human intuition is not a good substitute for careful reasoning when probabilities are concerned. As an example, consider a problem commonly posed in beginning statistics classes: How many people must be in a room before there is a 50 percent probability that at least two will share a common birthday? Intuition might suggest a large number, perhaps over 100, but the actual answer is 23. This is not difficult to prove through careful logic, but intuition is likely to be misleading.

All of these sources of bias are well known in science, and a large amount of effort has been devoted to understanding and mitigating them. The goal is to make scientific investigations as objective as possible so the results do not depend on the investigator. Certain fields of science (most notably, biopharmaceutical clinical trials of treatment protocols and drugs) have developed practices such as double-blind tests and independent (blind) verification to minimize the impact of biases. Additionally, science seeks to publish its discoveries, findings, and conclusions so that they are subjected to independent peer review; this enables others to study biases that may exist

---

[12] Ibid.

[13] R.B. Stacey. 2004. A report on the erroneous fingerprint individualization in the Madrid train bombing case. *Journal of Forensic Identification* 54:707.

[14] I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600-616.

4-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

in the investigative method or attempt to replicate unexpected results. Avoiding, or compensating for, a bias is an important task. Even fields with well-established protocols to minimize the effects of bias can still bear improvement. For example, a recent working paper[15] has raised questions about the way cognitive dissonance has been studied since 1956. Although these results must be considered preliminary because the paper has yet to be published, they do demonstrate that continual vigilance is needed. Research has been sparse on the important topic of cognitive bias in forensic science—both regarding their effects and methods for minimizing them.[16]

**The Self-Correcting Nature of Science**

The methods and culture of scientific research enable it to be a self-correcting enterprise. Because researchers are, by definition, creating new understanding, they must be as cautious as possible before asserting a new "truth." Also, because researchers are working at a frontier, few others may have the knowledge to catch and correct any errors they make. Thus, science has had to develop means of revisiting provisional results and revealing errors before they are widely used. The processes of peer review, publication, collegial interactions (e.g., sharing at conferences), and the involvement of graduate students (who are expected to question as they learn) all support this need. Science is characterized also by a culture that encourages and rewards critical questioning of past results and of colleagues. Most technologies benefit from a solid research foundation in academia and ample opportunity for peer-to-peer stimulation and critical assessment, review and critique through conferences, seminars, publishing, and more. These elements provide a rich set of paths through which new ideas and skepticism can travel and opportunities for scientists to step away from their day-to-day work and take a longer-term view. The scientific culture encourages cautious, precise statements and discourages statements that go beyond established facts; it is acceptable for colleagues to challenge one another, even if the challenger is more junior. The forensic science disciplines will profit enormously by full adoption of this scientific culture.

## CONCLUSION

The way in which science is conducted is distinct from, and complementary to, other modes by which humans investigate and create. The methods of science have a long history of successfully building useful and trustworthy knowledge and filling gaps while also correcting past errors. The premium that science places on precision, objectivity, critical thinking, careful observation and practice, repeatability, uncertainty management, and peer review enables the reliable collection, measurement, and interpretation of clues in order to produce knowledge.

---

[15] M.K. Chen. 2008. *Rationalization and Cognitive Dissonance: Do Choices Affect or Reflect Preferences?* Available at www.som.yale.edu/Faculty/keith.chen/papers/CogDisPaper.pdf.

[16] See, e.g., I.E. Dror, D. Charlton, and A.E. Peron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156:74-78; I.E. Dror, A. Peron, S. Hind, and D. Charlton. 2005. When emotions get the better of us: The effects of contextual top-down processing on matching fingerprints. *Journal of Applied Cognitive Psychology* 19:799-809; and B. Schiffer and C. Champod. 2007. The potential (negative) influence of observational biases at the analysis stage of fingerprint individualization. *Forensic Science International* 167:116-120.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 5
# DESCRIPTIONS OF SOME FORENSIC SCIENCE DISCIPLINES

This chapter describes the methods of some of the major forensic science disciplines. It focuses on those that are used most commonly for investigations and trials as well as on those that have been cause for concern in court or elsewhere because their reliability has not been sufficiently established in a systematic (scientific) manner in accordance with the principles discussed in Chapter 4. The chapter focuses primarily on the forensic science disciplines' capability for providing evidence that can be presented in court. As such, there is considerable discussion about the reliability and precision of results—attributes that factor into probative value and admissibility decisions. It should be recalled, however, that forensic science also provides great value to law enforcement investigations, and even those forensic science disciplines whose scientific foundation is currently limited might have the capacity (or the potential) to provide probative information to advance a criminal investigation.[1] This chapter also provides the committee's summary assessment of each of these disciplines.[2]

Because forensic science aims to glean information from a wide variety of clues and evidence associated with a crime, it deals with a broad range of tools and with evidence of highly variable quality. In general, the forensic science disciplines are pragmatic, with practitioners adopting, adapting, or developing whatever tools and technological aids they can to distill useful information from crime scene evidence. Many forensic science methods have been developed in response to such evidence—combining experience-based knowledge with whatever relevant science base exists in order to create a procedure that returns useful information. Although some of the techniques used by the forensic science disciplines—such as DNA analysis, serology, forensic pathology, toxicology, chemical analysis, and digital and multimedia forensics—are built on solid bases of theory and research, many other techniques have been developed heuristically. That is, they are based on observation, experience, and reasoning without an underlying scientific theory, experiments designed to test the uncertainties and reliability of the method, or sufficient data that are collected and analyzed scientifically.

In the course of its deliberations, the committee received testimony from experts in many forensic science disciplines concerning current practices, validity, reliability and errors, standards, and research.[3] From this testimony and from many written submissions, as well as from the personal experiences of the committee members, the committee developed the consensus views presented in this chapter.

---

[1] For example, forensic odontology might not be sufficiently grounded in science to be admissible under *Daubert*, but this discipline might be able to reliably exclude a suspect, thereby enabling law enforcement to focus its efforts on other suspects. And forensic science methods that do not meet the standards of admissible evidence might still offer leads to advance an investigation.

[2] The chapter does not discuss eyewitness identification or line-ups, because these techniques do not normally rely on forensic scientists for analysis or implementation. They clearly are of major importance for investigations and trials, and their effective use and interpretation relies on scientific knowledge and continuing research. For similar reasons, this chapter does not delve into the polygraph. The validity of polygraph testing for security screening was addressed in National Research Council, Committee to Review the Scientific Evidence on the Polygraph. 2003. *The Polygraph and Lie Detection.* Washington, DC: The National Academies Press. It does not cover forensic pathology, because that field is addressed in Chapter 9.

[3] A complete list of those who provided testimony to the committee is included in Appendix B.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

# BIOLOGICAL EVIDENCE

Biological evidence is provided by specimens of a biological origin that are available in a forensic investigation. Such specimens may be found at the scene of a crime or on a person, clothing, or weapon. Some—for example, pet hairs, insects, seeds, or other botanical remnants—come from the crime scene or from an environment through which a victim or suspect has recently traversed. Other biological evidence comes from specimens obtained directly from the victim or suspect, such as blood, semen, saliva, vaginal secretions, sweat, epithelial cells, vomitus, feces, urine, hair, tissue, bones, and microbiological and viral agents. The most common types of biological evidence collected for examination are blood, semen, and saliva. Human biological evidence that contains nuclear DNA can be particularly valuable because the possibility exists to associate that evidence with one individual with a degree of reliability that is acceptable for criminal justice.

## Sample Data and Collection

At the crime scene, biological evidence is located, documented, collected, and preserved for subsequent analysis in the crime laboratory. Locating and recognizing biological evidence can be more difficult than a layperson would presume. For example, blood is not always red, some red substances are not blood, and most biological evidence, such as saliva or semen, is not readily visible. Crime scene investigators locate biological evidence through tests that screen for the presence of a particular biological fluid (e.g., blood, semen, saliva), and investigators have a choice of techniques.[4] For blood they might use an alternate light source (ALS) at 415nm, the wavelength under which bloodstains absorb light and are thus more visible to the naked eye. Most commonly, though, the screening test for blood is a catalytic chemical test that turns color or luminesces in the presence of blood. Scene investigators may also use Luminol, fluorescein, or crystal violet to identify areas at the scene where attempts were made to clean a bloody crime scene.

These tests for blood may also locate other evidence that should be collected and taken to the laboratory for analysis. Recently, immunological tests that can identify human hemoglobin or glycophorin A have become available. These are blood-specific proteins that can be demonstrated to be of human origin. At some point in the future, these immunological tests may replace standard chemical tests, and, although more expensive, they are more specific because they identify blood conclusively instead of just presumptively. Investigators also have several techniques for locating semen at the crime scene. Commonly they rely on an ALS, under which semen, other biological fluids, and some other evidence will luminesce. More recently, immunological tests can be used to identify seminal plasma proteins, for example, prostate specific antigen (p30 or PSA) or semenogelin.[5]

Finding saliva at the scene is mostly happenstance. Although it luminesces with the ALS at specific wavelengths, the glow is not as strong, and a weaker ALS light source may not highlight it well and possibly not at all. Thus, it can be easily missed. Screening tests for saliva

---

[4] Interpreting the results of any screening test requires expertise and experience. Many crime scene investigators have the requisite experience, but they may lack a scientific background, and it is not always straightforward to correctly interpret the results of screening tests. Crime scene investigations that require science-based screening tools are most reliable if someone is involved who understands the physics and chemistry of those tools.

[5] I. Sato, M. Sagi, A. Ishiwari, H. Nishijima, E. Ito, and T. Mukai. 2002. Use of the "SMITEST" PSA card to identify the presence of prostate-specific antigen in semen and male urine. *Forensic Science International* 127(1-2):71-74.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

are chemical tests that identify amylase, an enzyme occurring in high concentrations in saliva. But the screening is not definitive, because other types of tissue also contain amylase, including the particular type (AMY 1) that is associated with saliva.

### Analyses

Although the forensic use of nuclear DNA is barely 20 years old, DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged. DNA enjoys this preeminent position because of its reliability and the fact that, absent fraud or an error in labeling or handling, the probabilities of a false positive are quantifiable and often miniscule. However, even a very small (but nonzero) probability of false positive can affect the odds that a suspect is the source of a sample with a matching DNA profile.[6] The scientific bases and reliability of other types of biological analysis are also well established, but absent nuclear DNA, they can only narrow the field of suspects, not suggest any particular individual.

Testing biological evidence in the laboratory involves the use of a logical sequence of analyses designed to identify what a substance is and then from whom it came. The sequence begins with a forensic biologist locating the substance on the evidence. This is followed by a presumptive test that would give more information about the substance, typically using the same tests employed by scene investigators: the ALS, enzymatic, chemical, or immunological tests. Once the material (e.g., blood, semen, or saliva) is known, an immunological test or a human DNA test is run to determine whether the sample comes from a human or an animal.

The final step in the analytical sequence procedure is to identify the source of the biological material. If a sufficient sample is present and is probative, the forensic biologist prepares the material for DNA testing. The analyst who conducts the DNA test may or may not be the same person who examines the original physical evidence, depending on laboratory policies.

A decision might be required regarding the type of DNA testing to employ. Two primary types of DNA tests are conducted in U.S. forensic laboratories: nuclear testing and mitochondrial DNA (mtDNA) testing, with several variations of the former. For most biological evidence having evidentiary significance, forensic DNA laboratories employ nuclear testing routinely[7], and testing for the 13 core Short Tandem Repeat (STR) polymorphisms is the first line of attack.[8] The results are entered into the Federal Bureau of Investigation's (FBI's) Combined DNA Indexing System (CODIS) and are searched against DNA profiles already in one of three databases: a convicted felon database, a forensic database containing DNA profiles from crime scenes, and a database of DNA from unidentified persons.

Sometimes the evidence dictates testing just for Y STRs, which assesses only the Y (male) chromosome. In sexual assaults for which only small amounts of male nuclear DNA are available (e.g., a large excess of vaginal DNA), it is possible to obtain a Y STR profile of the male who left the semen. Unlike the 13 core loci used in CODIS searches, where a match of all 13 is a strong indicator that both samples come from the same individual, Y STR testing is not as definitive with respect to identifying a single person. A third nuclear test involves the analysis of

[6] W.C. Thompson, F. Taroni, and C.G.G. Aitken. 2003. How the probability of a false positive affects the value of DNA evidence. *Journal of Forensic Sciences* 48(1):47-54.
[7] T.R. Moretti, A.L. Baumstark, D.A. Defenbaugh, K.M. Keys, J.B. Smerick, and B. Budowle B. 2001. Validation of short tandem repeats (STRs) for forensic usage: Performance testing of fluorescent multiplex STR systems and analysis of authentic and simulated forensic samples. *Journal of Forensic Sciences* 46(3):647-660.
[8] Some laboratories are now using 16 loci, 13 of which are the original core loci.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

single nucleotide polymorphisms (SNPs). Although no public forensic DNA laboratory in the United States is routinely analyzing forensic evidence for SNPs, the utility of this genomic information for cases in which the DNA is too damaged to allow standard testing has garnered attention since its use in the World Trade Center identification effort.[9]

If insufficient nuclear DNA is present for STR testing, or if the existing nuclear DNA is degraded, two options potentially are available. One technique amplifies the amount of DNA available, although this technique is not widely available in U.S. forensic laboratories. A second alternative is to sequence mitochondrial DNA (mtDNA). Since 1996, it has been possible to compare single-source crime scene samples and samples from the victim or defendant on the basis of mtDNA. Four FBI-supported mtDNA laboratories and a few private mtDNA laboratories conduct DNA casework. This technique has been particularly helpful with regard to hairs—which do not contain enough nuclear DNA to enable analysis with current methods unless the root is present—and bones and teeth. Because it measures only a single locus of the genome, mtDNA analysis is much less discriminating than nuclear DNA analysis; all people with a common female ancestor (within the past few generations) share a common profile. But mtDNA testing has forensic value in its ability to include or exclude an individual as its source.

Laboratories entering the results of forensic DNA testing into CODIS must meet specific quality guidelines, which include the requirement that the laboratory be accredited and that specific procedures be in place and followed. In accredited laboratories, forensic DNA personnel must take proficiency tests and must meet specific educational and training requirements. (See Chapter 8 for further discussion.) Laboratory analyses are conducted by scientists with degrees ranging from a bachelor's degree in science to a doctoral degree. Each forensic DNA laboratory has a technical leader, who normally must meet additional experience and educational requirements.

Although DNA laboratories are expected to conduct their examinations under stringent quality controlled environments, errors do occasionally occur. They usually involve situations in which interpretational ambiguities occur or in which samples were inappropriately processed and/or contaminated in the laboratory. Errors also can occur when there are limited amounts of DNA, which limits the amount of test information and increases the chance of misinterpretation. Casework reviews of mtDNA analysis suggest a wide range in the quality of testing results that include contamination, inexperience in interpreting mixtures, and differences in how a test is conducted.[10]

---

[9] B. Leclair, R. Shaler, G.R. Carmody, K. Eliason, B.C.Hendrickson, T. Judkins, M.J. Norton, C. Sears, and T. Scholl. 2007. Bioinformatics and human identification in mass fatality incidents: The World Trade Center disaster. *Journal of Forensic Sciences* 52(4):806-819. Epub 2007 May 25.

[10] Personal communication, Terry Melton, Mitotyping Laboratory. December 2007. See also L. Prieto; A. Alonso; C. Alves; M. Crespillo; M. Montesino; A. Picornell; A. Brehm; J.L. Ramirez; M.R. Whittle; M.J. Anjos; I. Boschi; J. Buj; M. Cerezo; S. Cardoso; R. Cicarelli; D. Comas; D. Corach; C. Doutremepuich; R.M. Espinheira; I. Fernandez-Fernandez; S. Filippini; Julia Garcia-Hirschfeld; A. Gonzalez; B. Heinrichs; A. Hernandez; F.P.N. Leite; R.P. Lizarazo; A.M. Lopez-Parra; M. Lopez-Soto; J.A. Lorente; B. Mechoso; I. Navarro; S. Pagano; J.J. Pestano; J. Puente; E. Raimondi; A. Rodriguez-Quesada; M.F. Terra-Pinheiro; L. Vidal-Rioja; C. Vullo; A. Salas. 2008. GEP-ISFG collaborative exercise on mtDNA: Reflections about interpretation, artefacts and DNA mixtures. *Forensic Science International: Genetics* 2(2):126-133; and A. Salas, L. Prieto, M. Montesino, C. Albarrán, E. Arroyo, M. Paredes-Herrera, A. Di Lonardo, C. Doutremepuich, I. Fernández-Fernández, A. de la Vega. 2005. Mitochondrial DNA error prophylaxis: Assessing the causes of errors in the GEP'02-03 proficiency testing trial. *Forensic Science International* 148(2-3):191-198.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## Reporting of Results

FBI quality guidelines require that reports from forensic DNA analysis must contain, at a minimum, a description of the evidence examined, a listing of the loci analyzed, a description of the methodology, results and/or conclusions, and an interpretative statement (either quantitative or qualitative) concerning the inference to be drawn from the analysis.[11]

## Summary Assessment

Unlike many forensic techniques that were developed empirically within the forensic science community, with limited foundation in scientific theory or analysis, DNA analysis is a fortuitous by-product of cutting-edge science. Eminent scientists contributed their expertise to ensuring that DNA evidence offered in a courtroom would be valid and reliable (e.g., in the 1989 New York case, *People v. Castro*), and by 1996 the National Academy of Sciences had convened two committees that issued influential recommendations on handling DNA forensic science.[12] As a result, principles of statistics and population genetics that pertain to DNA evidence were clarified, the methods for conducting DNA analyses and declaring a match became less subjective, and quality assurance and quality control protocols were designed to improve laboratory performance.

DNA analysis is scientifically sound for several reasons: (1) there are biological explanations for individual-specific findings; (2) the 13 STR loci used to compare DNA samples were selected so that the chance of two different people matching on all of them would be extremely small; (3) the probabilities of false positives have been explored and quantified in some settings (even if only approximately); (4) the laboratory procedures are well specified and subject to validation and proficiency testing; and (5) there are clear and repeatable standards for analysis, interpretation, and reporting. DNA analysis also has been subjected to more scrutiny than any other forensic science discipline, with rigorous experimentation and validation performed prior to its use in forensic investigations. As a result of these characteristics, the probative power of DNA is high. Of course, DNA evidence is not available in every criminal investigation, and it is still subject to errors in handling that can invalidate the analysis. In such cases, other forensic techniques must be applied. The probative power of these other methods can be high, alone or in combination with other evidence. This power likely can be improved by strengthening the methods' scientific foundations and practice, as has occurred with forensic DNA analysis.

## ANALYSIS OF CONTROLLED SUBSTANCES

The term "illicit drugs" is widely used to describe abused substances. Other terms that are used include "abused drugs," "illegal drugs," "street drugs," and, in the United States, "controlled substances." The latter term refers specifically to drugs that are controlled by federal and state laws.[13]

---

[11] DNA Advisory Board. 2000. Quality assurance standards for forensic DNA testing laboratories. *Forensic Science Communications* 2(3). Available at
www.bioforensics.com/conference04/TWGDAM/Quality_Assurance_Standards_2.pdf.
[12] National Research Council. 1992. *DNA Technology in Forensic Science*. Washington, D.C.: The National Academies Press; National Research Council. 1996. *The Evaluation of Forensic DNA Evidence: An Update*. Washington, D.C.: National Academies Press.
[13] See, e.g., 21 U.S.C.A. § 802(6).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

The analysis of controlled substances is a mature forensic science discipline and one of the areas with a strong scientific underpinning. The analytical methods used have been adopted from classical analytical chemistry, and there is broad agreement nationwide about best practices.[14] In 1997, the U.S. Drug Enforcement Administration and the Office of National Drug Control Policy cosponsored the formation of the Technical Working Group for the Analysis of Seized Drugs, now known as the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG). This organization brings together more than 20 forensic practitioners from all over the world to develop standards for the analysis and reporting of illicit drug cases. Their standards are being widely adopted by drug analysis laboratories in the United States and worldwide.

**Sample Data and Collection**

Controlled substances typically are seized by police officers, narcotics agents, and detectives through undercover buys, raids on drug houses and clandestine drug laboratories, and seizures on the streets. In some cases, forensic chemists are sent to clandestine laboratory operations to help render the laboratory safe and help with evidence collection. The seized drugs may be in the form of powders or adulterated powders, chunks of smokeable or injectable material, legitimate and clandestine tablets and capsules, or plant materials or plant extracts.

**Analyses**

Controlled substances are analyzed by well-accepted standard schemes or protocols. Few drug chemists have the requisite botanical background to identify any common illicit plants other than marijuana; thus, in cases that require botanical identification, the assistance of outside experts is enlisted.

Sampling can be a major issue in the analysis of controlled substances. Although sometimes only trace amounts of a drug are present (e.g., in a syringe used to inject heroin), at other times there are hundreds or thousands of packages of drugs or very large bags or bales. SWGDRUG and others have proposed statistical and nonstatistical methods for sampling,[15] and a wide variety of methods are used.

Most controlled substances are subjected first to a field test for presumptive identification. This is followed by gas chromatography-mass spectrometry (GC-MS), in which chromatography separates the drug from any diluents or excipients, and then mass spectrometry is used to identify the drug. This is the near universal test for identifying unknown substances. Marijuana is an exception, because it is identified normally through a sequence of tests—a presumptive color test, followed by low-powered microscopic identification, and finally by thin-layer chromatography.

**Reporting of Results**

Most drug chemists produce terse reports for attorneys and courts. The reports contain administrative data and a short description of the evidence. The weight or number of exhibits is stated and then the results of the analysis. A typical report for a marijuana case might read as follows:

---

[14] See F. Smith and J.A. Siegel (eds.). 2004. *Handbook of Forensic Drug Analysis*. Burlington, MA: Academic Press.

[15] Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) Recommendations. Available at www.swgdrug.org/approved.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

Received:         Item 1 - a sealed plastic bag containing 25.6g of green-brown
                  plant material.
Results:          The green-brown plant material in item 1 was identified as
                  marijuana.

Some laboratories might mention the tests that were conducted, but in most cases the spectra, chromatograms, and other evidence of the analysis and the chemist's notes are not submitted. Likewise, possible sources of error and statistical data are not commonly included. From a scientific perspective, this style of reporting is often inadequate, because it may not provide enough detail to enable a peer or other courtroom participant to understand and, if needed, question the sampling scheme, process(es) of analysis, or interpretation.

**Summary Assessment**

The chemical foundations for the analysis of controlled substances are sound, and there exists an adequate understanding of the uncertainties and potential errors. SWGDRUG has established a fairly complete set of recommended practices.[16] It also provides pointers to a number of guidelines for statistical sampling, both for illegal drugs per se (created by the European Network of Forensic Science Institutes) and for materials more generally (created by the American Society for Testing and Materials).

The SWGDRUG recommendations include a menu of analytical chemistry techniques that are considered acceptable in certain circumstances. Because this menu was constructed to be applicable worldwide, it includes options that allow laboratories to substitute a concatenation of simple methods if they do not have access to the preferred analytical equipment (e.g., GC-MS). It is questionable, however, whether all of the possible combinations recommended by SWGDRUG would be acceptable in a scientific sense, if one's goal were to identify and classify a completely unknown substance. The committee has been told that experienced forensic chemists and good forensic laboratories understand which tests (or combinations of tests) provide adequate reliability, but the SWGDRUG recommendations do not ensure that these tests will be used. This ambiguity would be a less significant issue if the reports presented in court contained sufficient detail about the methods of analysis.

## FRICTION RIDGE ANALYSIS

Fingerprints, palm prints, and sole prints have been used to identify people for more than a century in the United States. Collectively, the analysis of these prints is known as "friction ridge analysis," which consists of experienced-based comparisons of the impressions left by the ridge structures of volar (hands and feet) surfaces. Friction ridge analysis is an example of what the forensic science community uses as a method for assessing "individualization"—the conclusion that a piece of evidence (here, a pattern left by friction ridges) comes from a single unambiguous source. Friction ridge analysis shares similarities with other experience-based methods of pattern recognition, such as those for footwear and tire impressions, toolmarks, and handwriting analysis, all of which are discussed separately below.

Friction ridge analysis is performed in various settings, including accredited crime laboratories and nonaccredited facilities. Nonaccredited facilities may be crime laboratories, police "identification units," or private practice (consultants). In some instances, the latent print

---

[16] See www.swgdrug.org/approved.htm.

5-7

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

examiner is employed solely to perform latent print casework. Some examiners may also perform other types of forensic casework (e.g., footwear and tire impressions, firearms analysis). In some agencies, fingerprint examiners also are required to respond to crime scenes and can be sworn officers who also perform police officer/detective duties.

The training of personnel to perform latent print identifications varies from agency to agency. Agencies may have a formalized training program, may use an informal mentoring process, or may send new examiners to a one- to two-week course. The International Association for Identification (IAI) offers a training publication, "Friction Ridge Skin Identification Training Manual,"[17] and the Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST) offers a guideline, "Training to Competency for Latent Print Examiners."[18] Although these are excellent resources, they are not required, and there is no auditing of the content of training programs developed by nonaccredited agencies. The IAI also offers a certification test that measures both the knowledge and skill of latent print examiners; however, not all agencies require latent print examiners to achieve and maintain certification.

**Method of Data Collection and Analysis**

The technique used to examine prints made by friction ridge skin is described by the acronym ACE-V: "Analysis, Comparison, Evaluation, and Verification."[19] It has been described in forensic literature as a means of comparative analysis of evidence since 1959.[20] The process begins with the **analysis** of the unknown friction ridge print (now often a digital image of a latent print). Many factors affect the quality and quantity of detail in the latent print and also introduce variability in the resulting impression. The examiner must consider the following:

(1)    Condition of the skin—natural ridge structure (robustness of the ridge structure), consequences of aging, superficial damage to the skin, permanent scars, skin diseases, and masking attempts.

(2)    Type of residue—natural residue (sweat residue, oily residue, combinations of sweat and oil); other types of residue (blood, paint, etc.); amount of residue (heavy, medium, or light); and where the residue accumulates (top of the ridge, both edges of the ridge, one edge of the ridge, or in the furrows).

(3)    Mechanics of touch—underlying structures of the hands and feet (bone creates areas of high pressure on the surface of the skin); flexibility of the ridges, furrows, and creases; the distance adjacent ridges can be pushed together or pulled apart during lateral movement; the distance the length of a ridge might be compressed or stretched; the rotation of ridge systems during torsion; and the effect of ridge flow on these factors.

(4)    Nature of the surface touched—texture (rough or smooth), flexibility (rigid or pliable), shape (flat or curved), condition (clean or dirty), and background colors and patterns.

---

[17] International Association for Identification. *Friction Ridge Skin Identification Training Manual*. Available at www.theiai.org.

[18] SWGFAST. *Training to Competency for Latent Print Examiners*. Available at www.SWGFAST.org.

[19] Ashbaugh, op. cit.; Triplette and Cooney, op. cit.; J. Vanderkolk. 2004. ACE+V: A model. *Journal of Forensic Identification* 54(1):45-52. SWGFAST. 2002. *Friction Ridge Examination Methodology for Latent Print Examiners*. Available at www.SWGFAST.org.

[20] R.A. Huber. 1959-1960. Expert witness. *Criminal Law Quarterly* 2:276-296.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

(5)    Development technique—chemical signature of the technique and consistency of the chemical signature across the impression.

(6)    Capture technique—photograph (digital or film) or lifting material (e.g., tape or gelatin lifter).

(7)    Size of the latent print or the percentage of the surface that is available for comparison.

The examiner also must perform an analysis of the known prints (taken from a suspect or retrieved from a database of fingerprints), because many of the same factors that affect the quality of the latent print can also affect the known prints.

If the latent print does not have sufficient detail for either identification or exclusion, it does not undergo the remainder of the process (comparison and evaluation). These insufficient prints are often called "of no value" or "not suitable" for comparison. Poor-quality known prints also will end the examination. If the examiner deems that there is sufficient detail in the latent print (and the known prints), the comparison of the latent print to the known prints begins.

Visual **comparison** consists of discerning, visually "measuring," and comparing—within the comparable areas of the latent print and the known prints—the details that correspond. The amount of friction ridge detail available for this step depends on the clarity of the two impressions. The details observed might include the overall shape of the latent print, anatomical aspects, ridge flows, ridge counts, shape of the core, delta location and shape, lengths of the ridges, minutia location and type, thickness of the ridges and furrows, shapes of the ridges, pore position, crease patterns and shapes, scar shapes, and temporary feature shapes (e.g., a wart).

At the completion of the comparison, the examiner performs an **evaluation** of the agreement of the friction ridge formations in the two prints and evaluates the sufficiency of the detail present to establish an identification (source determination).[21] Source determination is made when the examiner concludes, based on his or her experience, that sufficient quantity and quality of friction ridge detail is in agreement between the latent print and the known print. Source exclusion is made when the process indicates sufficient disagreement between the latent print and known print. If neither an identification nor an exclusion can be reached, the result of the comparison is inconclusive. **Verification** occurs when another qualified examiner repeats the observations and comes to the same conclusion, although the second examiner may be aware of the conclusion of the first. A more complete description of the steps of ACE-V and an analysis of its limitations is provided in a paper by Haber and Haber.[22]

Although some Automated Fingerprint Identification Systems (AFIS) permit fully automated identification of fingerprint records related to criminal history (e.g., for screening job applicants), the assessment of latent prints from crime scenes is based largely on human interpretation. Note that the ACE-V method does not specify particular measurements or a standard test protocol, and examiners must make subjective assessments throughout. In the United States, the threshold for making a source identification is deliberately kept subjective, so that the examiner can take into account both the quantity and quality of comparable details. As a result, the outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner. In fact, recent research by Dror[23] has shown that experienced examiners do not

---

[21] Ashbaugh, op. cit.; SWGFAST. *Friction Ridge Examination Methodology for Latent Print Examiners*.

[22] L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability, and Risk* 7(2):87-109.

[23] I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600-616.

5-9

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

necessarily agree with even their own past conclusions when the examination is presented in a different context some time later.

This subjectivity is intrinsic to friction ridge analysis, as can be seen when comparing it with DNA analysis. For the latter, 13 specific segments of DNA (generally) are compared for each of two DNA samples. Each of these segments consists of ordered sequences of the base pairs, called A, G, C, and T. Studies have been conducted to determine the range of variation in the sequence of base pairs at each of the 13 loci and also to determine how much variation exists in different populations. From these data, scientists can calculate the probability that two DNA samples from different people will have the same permutations at each of the 13 loci.

By contrast, before examining two fingerprints, one cannot say a priori which features should be compared. Features are selected during the comparison phase of ACE-V, when a fingerprint examiner identifies which features are common to the two impressions and are clear enough to be evaluated. Because a feature that was helpful during a previous comparison might not exist on these prints or might not have been captured in the latent impression, the process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process. For these reasons, population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner. Little research has been directed toward developing population statistics, although more would be feasible.[24]

**Methods of Interpretation**

The determination of an exclusion can be straightforward if the examiner finds detail in the latent print that does not match the corresponding part of the known print, although distortions or poor image quality can complicate this determination. But the criteria for identification are much harder to define, because they depend on an examiner's ability to discern patterns (possibly complex) among myriad features and on the examiner's experience judging the discriminatory value in those patterns. The clarity of the prints being compared is a major underlying factor. For 10-print fingerprint cards, which tend to have good clarity, even automated pattern-recognition software (which is not as capable as human examiners) is successful enough in retrieving matching sets from databases to enjoy widespread use. When dealing with a single latent print, however, the interpretation task becomes more challenging and relies more on the judgment of the examiner. The committee heard presentations from friction ridge experts who assured it that friction ridge identification works well when a careful examiner works with good-quality latent prints. Clearly, the reliability of the ACE-V process could be improved if specific measurement criteria were defined. Those criteria become increasingly important when working with latent prints that are smudged and incomplete, or when comparing impressions from two individuals whose prints are unusually similar.

The fingerprint community continues to assert that the ability to see latent print detail is an acquired skill attained only through repeated exposure to friction ridge impressions. In their

---

[24] See, e.g., E. Gutiérrez, V. Galera, J.M. Martínez, and C. Alonso. 2007. Biological variability of the minutiae in the fingerprints of a sample of the Spanish population. *Forensic Science International* 172(2-3):98-105. For information about the basic availability of data, see C. Champod, C.J. Lennard, P.A. Margot, and M. Stoilovic. 2004. *Fingerprints and other ridge skin impressions*. Boca Raton: CRC Press; D.A. Stoney. 2001. "Measurement of Fingerprint Individuality." In: H.C. Lee and R.E. Gaensslen (eds.). *Advances in Fingerprint Technology*. 2nd ed. Boca Raton, FL: CRC Press; pp. 327-387.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

view, a lengthy apprenticeship (typically two years, at the FBI Laboratory) with an experienced latent print examiner enables a new examiner to develop a sense of the rarity of features and groups of features; the rarity of particular kinds of ridge flows; the frequency of features in different areas of the hands and feet; the degree to which differences can be accounted for by mechanical distortion of the skin; a sense of how to extract detail from background noise; and a sense of how much friction ridge detail could be common to two prints from different sources.[25] From this base of experience, the fingerprint community asserts that the latent print examiner learns to judge whether there is sufficient detail (which varies with image quality) to make a source determination during the evaluation phase of ACE-V.

The latent print community in the United States has eschewed numerical scores and corresponding thresholds, because those developed to date[26] have been based only on minutia, not on the unique features of the friction ridge skin (e.g., lengths of ridges, shapes of ridges, crease lengths and shapes, scar lengths and shapes). Additionally, thresholds based on counting the number of features that correspond, lauded by some as being more "objective," are still based on primarily subjective criteria—an examiner must have the visual expertise to discern the features (most important in low-clarity prints) and must determine that they are indeed in agreement. A simple point count is insufficient for characterizing the detail present in a latent print; more nuanced criteria are needed, and, in fact, likely can be determined.

**Reporting of Results**

SWGFAST has promulgated three acceptable conclusions resulting from latent print comparison: individualization (or identification), exclusion, or inconclusive.[27] Although adherence to this standard is common, some latent print examiners report either "identification" or "negative" results. "Negative" (or sometimes "not identified") is an ambiguous conclusion, and it could mean excluded, inconclusive, or unable to locate after exhaustive search. It is problematic that the meaning of "negative" may be specific to a particular agency, examiner, or case.

Latent print examiners report an individualization when they are confident that two different sources could not have produced impressions with the same degree of agreement among details. This is a subjective assessment. There has been discussion regarding the use of statistics to assign match probabilities based on population distributions of certain friction ridge features. Current published statistical models, however, have not matured past counts of corresponding minutia and have not taken clarity into consideration. (This area is ripe for additional research.) As a result, the friction ridge community actively discourages its members from testifying in terms of the probability of a match; when a latent print examiner testifies that two impressions "match," they are communicating the notion that the prints could not possibly have come from two different individuals.

As noted in Chapter 3, Jennifer Mnookin of the University of California, Los Angeles School of Law summarized the reporting of fingerprint analyses as follows:

[25] T. Busey and J. Vanderkolk. 2005. Behavioral and electrophysiological evidence for configural processing in fingerprint experts. *Vision Research* 45:431-448.
[26] See, e.g., I.W. Evett and R.A. Williams. 1996. A review of the sixteen points fingerprint standard in England and Wales. *Journal of Forensic Identification* 46(1):49-73.
[27] SWGFAST. *Friction Ridge Examination Methodology for Latent Print Examiners*. Available at www.swgfast.org/Training_to_Competency_for_Latent_Print_Examiners_2.1.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term 'positive' or 'absolute' identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it . . . Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validated standards for declaring a match, such claims of absolute, certain confidence in identification are unjustified . . . Therefore, in order to pass scrutiny under Daubert, fingerprint identification experts should exhibit a greater degree of epistemological humility. Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a 'match.'[28]

**Summary Assessment**

Historically, friction ridge analysis has served as a valuable tool, both to identify the guilty and to exclude the innocent. Because of the amount of detail available in friction ridges, it seems plausible that a careful comparison of two impressions can accurately discern whether or not they had a common source. Although there is limited information about the accuracy and reliability of friction ridge analyses, claims that these analyses have zero error rates are not scientifically plausible.

ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of analysis. ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. For these reasons, merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner or producing reliable results. A recent paper by Haber and Haber[29] presents a thorough analysis of the ACE-V method and its scientific validity. Their conclusion is unambiguous: "We have reviewed available scientific evidence of the validity of the ACE-V method and found none."[30] Further, they state:

[W]e report a range of existing evidence that suggests that examiners differ at each stage of the method in the conclusions they reach. To the extent that they differ, some conclusions are invalid. We have analysed the ACE-V method itself, as it is described in the literature. We found that these descriptions differ, no single protocol has been officially accepted by the profession and the standards upon which the method's conclusions rest have not been specified quantitatively. As a consequence, at this time the validity of the ACE-V method cannot be tested.[31]

---

[28] J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7:127. See also the discussion in C. Champod. 2008. Fingerprint examination: Towards more transparency. *Law Probability and Risk* 7:111-118.

[29] Mnookin, op. cit.

[30] Ibid., p. 19.

[31] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

Recent legal challenges, *New Hampshire vs. Richard Langill*[32] and *Maryland vs. Bryan Rose*,[33] have also highlighted two important issues for the latent print community: documentation and error rate. Better documentation is needed of each step in the ACE-V process or its equivalent. At the very least, sufficient documentation is needed to reconstruct the analysis, if necessary. By documenting the relevant information gathered during the analysis, evaluation, and comparison of latent prints and the basis for the conclusion (identification, exclusion, or inconclusive), the examiner will create a transparent record of the method and thereby provide the courts with additional information on which to assess the reliability of the method for a specific case. Currently, there is no requirement for examiners to document which features within a latent print support their reasoning and conclusions.

Error rate is a much more difficult challenge. Errors can occur with any judgment-based method, especially when the factors that lead to the ultimate judgment are not documented. Some in the latent print community argue that the method itself, if followed correctly (i.e., by well-trained examiners properly using the method), has a zero error rate. Clearly, this assertion is unrealistic, and, moreover, it does not lead to a process of method improvement. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g., errors in executing the process steps, as well as errors in human judgment).

Some scientific evidence supports the presumption that friction ridge patterns are unique to each person and persist unchanged throughout a lifetime.[34] Uniqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared.[35]

To properly underpin the process of friction ridge identification, additional research is also needed into ridge flow and crease pattern distributions on the hands and feet. This information could be used to limit the possible donor population of a particular print in a statistical approach and could provide examiners with a more robust understanding of the prevalence of different ridge flows and crease patterns. Additionally, more research is needed regarding the discriminating value of the various ridge formations and clusters of ridge formations.[36] This

---

[32] 157 N.H. 77, 945 A.2d 1 (N.H., April 04, 2008).

[33] No. K06-0545 (MD Cir. Ct. Oct. 19, 2007).

[34] F. Galton. 1892. *Fingerprints.* New York: MacMillan; H. Cummins and C. Midlo. 1943. *Finger Prints, Palms and Soles: An Introduction of Dermatoglyphics.* Philadelphia: The Blakiston Company; A. Hale. 1952. Morphogenesis of volar skin in the human fetus. *The American Journal of Anatomy* 91:147-173; S. Holt and L.S. Penrose. 1968. *The Genetics of Dermal Ridges.* Springfield, IL: Charles C. Thomas Publishing; W. Montagna and P. Parakkal. 1974. *The Structure and Function of Skin.* New York: Academic Press; J. Raser and E. O'Shea. 2005. Noise in gene expression: Origins, consequences, and control. *Science* 39:2010-2013.

[35] Some in the friction ridge community point to an unpublished 1999 study by the Lockheed-Martin Corporation, the "50K vs. 50K Fingerprint Comparison Test," as evidence of the scientific validity of fingerprint "matchup." But that study has several major design and analysis flaws, as pointed out in D.H. Kaye. 2003. Questioning a courtroom proof of the uniqueness of fingerprints. *International Statistical Review* 71(3):524. Moreover, even if it were valid, the study provides only a highly optimistic estimate of the reliability of friction ridge analyses, biased toward highly favorable conditions.

[36] Haber and Haber also provide a sensible research agenda for enhancing the validity of fingerprint comparisons.

5-13

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

would provide examiners with a solid basis for the intuitive knowledge they have gained through experience and provide an excellent training tool. It also would lead to a good framework for future statistical models and provide the courts with additional information to consider when evaluating the reliability of the science. Recently, research has begun to build some of this basis.[37]

There is also considerable room for research on the various factors that affect the quality of latent prints (e.g., condition of the skin, residue, mechanics of touch). Formal research could provide examiners with additional tools to support or refute distortion explanations. Currently, distortion and quality issues are typically based on "common sense" explanations or on information that is passed down through oral tradition from examiner to examiner. A criticism of the latent print community is that the examiners can too easily explain a "difference" as an "acceptable distortion" in order to make an identification.[38]

## OTHER PATTERN/IMPRESSION EVIDENCE: SHOEPRINTS AND TIRE TRACKS

Other pattern evidence, also referred to as impression evidence, occurs when an object such as a shoe or a tire leaves an impression at the crime scene or on another object or a person. Impressions can be either two dimensional, such as shoeprints in dust, or three dimensional, such as tire track impressions in mud. Shoeprints and tire tracks are common types of impression evidence examined by forensic examiners, but the list of potential types of impression evidence is long. Examples include bite marks, markings on bullets and cartridge cases, ear prints, lip prints, toolmarks, some bloodstain patterns, and glove prints.[39] Although there are general approaches concerning the analytical sequence of various types of impression evidence, each has its own set of characteristics. For example, some types of impression evidence, such as those arising from footwear and tires, require knowledge of manufacturing and wear, while other types, such as ear prints and bloodstain patterns, do not. Because footwear and tire track impressions comprise the bulk of the examinations conducted, the remarks in this section are specifically focused on these analyses. Bite marks, markings on bullets and cartridge cases, and bloodstain patterns are covered in later sections in this chapter.

### Sample Data and Collection

Impression evidence at the scene is generally of two types: latent (invisible to the naked eye) or patent (visible). The quality of impression evidence left at the scene cannot be controlled, but failures in the initial scene work used to collect, preserve, and possibly enhance the evidence will degrade the quality of the evidence eventually used for comparative analysis. After documentation at the scene, the evidence is preserved and possibly enhanced using techniques such as those based on chemistry (e.g., metal detection), physical characteristics (e.g., super glue fuming, powder dusting, casting), or transfer onto a contrasting surface (e.g., electrostatic

---

[37] E.g., C. Neumann, C. Champod, R. Puch-Solis, N. Egli, A. Anthonioz, and A. Bromage-Griffiths. 2007. Computation of likelihood ratios in fingerprint identification for configurations of any number of minutiae. *Journal of Forensic Sciences* 52(1):54-64; N.M. Egli, C. Champod, and P. Margot. 2007. Evidence evaluation in fingerprint comparison and automated fingerprint identification systems—Modelling within finger variability. *Forensic Science International* 167(2-3):189-195.

[38] U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case.* Office of the Inspector General Oversight and Review Division, January.

[39] M. Liukkonen, H. Majamaa, and J. Virtanen. 1996. The role and duties of the shoeprint/toolmark examiner in forensic laboratories. *Forensic Science International* 82:99-108.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

transfer or gel lifting). The quality of the enhanced impression that is used for comparison will depend largely on the experience, training, and scientific knowledge of the scene investigator as well as the agency's resources.

Although some analysis of impression evidence might begin at the scene, the comparison of scene evidence to known exemplars occurs in the laboratory. The educational background of forensic scientists who examine shoeprints and tire track impressions runs the gamut from a high school diploma to scientists with Ph.D.s. Identifications are largely subjective and are based on the examiner's experience and on the number of individual, identifying characteristics in common with a known standard.

**Analyses**

The goal of impression evidence analysis is to identify a specific source of the impression, and the analytical process that this follows generally is an accepted sequence: identifying the class (group) characteristics of the evidence, followed by locating and comparing individual, identifying (also termed accidental or random) characteristics.[40]

Class characteristics of footwear and tires result from repetitive, controlled processes that are typically mechanical, such as those used to manufacture items in quantity. Although defined similarly by various authors, Bodziak describes footwear class characteristics as "an intentional or unavoidable characteristic that repeats during the manufacturing process and is shared by one or more other shoes."[41] For tires, Nause defines class characteristics as, "[p]hysical characteristics acquired during the manufacturing process (made from the same mold) that tires have in common."[42] He continues, "Class characteristics can often be combined to limit a tire impression to a very select group within the overall group bearing similar class characteristics. (In the field of forensic tire evidence, class characteristics often refer to such things as design, pattern, size, shape, mold variations, etc.)."[43] Regardless of the type of impression evidence, class characteristics are not sufficient to conclude that any one particular shoe or tire made the impression. That latter step—which is not always possible—requires comparison of the individual identifying characteristics on the impression evidence with those on a shoe or tire that is suspected of leaving the impression. These individual characteristics occur during the normal use of an item, sometimes called wear and tear,[44] and are created by "random, uncontrolled processes."[45] For footwear, Bodziak writes that "individual identifying characteristics are characteristics that result when something is randomly added to or taken away from a shoe outsole that either causes or contributes to making that shoe outsole unique."[46] Such characteristics might include cuts, scratches, gouges, holes, or random inclusions that result from manufacturing, such as bubbles, and those that result from adherent substances, such as rocks, chewing gum, papers, or twigs.

Following analysis of the impression, an identification is determined or ruled out according to the number of individual characteristics the evidence has in common with the

---

[40] Ibid.

[41] W.J. Bodziak. 1999. *Footwear Impression Evidence–Detection, Recovery, and Examination.* Boca Raton, FL:CRC Press, 2nd ed., p. 329.

[42] Nause, op. cit.

[43] Ibid.

[44] M.J. Cassidy. 1980. *Footwear Identification.* Quebec, Canada: Government Printing Office Centre.

[45] K. Inman and N. Rudin. 2001. *Principles and Practice of Criminalistics.* Boca Raton, FL:CRC Press, p. 129.

[46] Ibid., p. 335.

5-15

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

suspected source. But there is no defined threshold that must be surpassed, nor are there any studies that associate the number of matching characteristics with the probability that the impressions were made by a common source. It is generally accepted that the specific number of characteristics needed to assign a definite positive identification depends on the quality and quantity of these accidental characteristics and the criteria established by individual laboratories.[47] According to Cassidy, many factors and accidental characteristics are required before a positive identification can be established; however, the most important are the examiner's experience, the clarity of the impression, and the uniqueness of the characteristic.[48] Proficiency testing for examiners of impression evidence is available through Collaborative Testing Service, Inc., but the proficiency tests for footwear impressions include samples that are either a match or not a match[49]—that is, none of the samples included in the tests have the sort of ambiguities that would lead an experienced examiner to an "inconclusive" conclusion. IAI has a certification program for footwear and tire track examiners.[50] The group's recommended course of study has 13 segments, and each segment includes a suggested reading list and practical and/or written exercises. The student must pass an examination. This course of study does not require an understanding of the scientific basis of the examinations, and it does not recommend the use of a scientific method. Also, there is no provision or recommendation for proficiency testing or continuing education. SWGTREAD, a group of footwear and tire track examiners formed by the FBI, recommends that a trainee candidate have (1) a bachelor's degree (preferably in a physical or natural science) from an accredited college or university; or (2) an associate degree or 60 college semester hours, plus two years of job-related forensic experience; or (3) a high school diploma or equivalent, plus four years of job-related forensic experience.[51]

**Scientific Interpretation and Reporting of Results**

For footwear evidence, Fawcett[52] and Bodziak[53] have attempted to assign probabilistic or statistical significance to impression comparisons. Generally, shoeprint and tire track examiners prefer nonstatistical language to report or to testify to the result of their findings. Terms such as "positive identification" and "nonidentification" can be used to indicate an identification or nonidentification, respectively, and "nonconclusive" would indicate situations in which the analysis falls short of either of the other two.[54]

In a European survey, examiners were given identical mock cases. Accidental, identifying characteristics were purposely put onto the sole of new shoes, and examiners were asked to make a statement concerning the strength of matches. The results of the survey concluded that there were considerable differences in the conclusions reached by different laboratories examining identical cases."[55] SWGTREAD recommends terminology such as:

---

[47] Liukkonen, Majamaa, and Virtanen, op. cit.

[48] Cassidy, op. cit.

[49] H. Majamaa and Y. Anja. 1996. Survey of the conclusions drawn of similar footwear cases in various crime laboratories. *Forensic Science International* 82:109-120.

[50] Recommended Course of Study for Footwear & Tire Track Examiners. 1995. Mendota Heights, MN: International Association for Identification.

[51] SWGTread. *Guide for Minimum Qualifications and Training for a Forensic Footwear and/or Tire Tread Examiner.* Available at www.theiai.org/guidelines/swgtread/qualifications_final.pdf.

[52] A.S. Fawcett. 1970. The role of the footmark examiner. *Journal of the Forensic Science Society* 10:227-244.

[53] Bodziak, op. cit., pp. 342-346.

[54] Ibid.

[55] H. Majamaa and Y. Anja., op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

- "identification" (definite conclusion of identity)
- "probably made" (very high degree of association)
- "could have made" (significant association of multiple class characteristics)
- "inconclusive" (limited association of some characteristics)
- "probably did not make" (very high degree of nonassociation)
- "elimination" (definite exclusion)
- "unsuitable" (lacks sufficient detail for a meaningful comparison).

Additionally, SWGTREAD discourages the use of once common terminology, such as "consistent with" (acceptable when used to describe a similarity of characteristics), "match/no match," "responsible for/not responsible for," and "caused with/not caused with."[56] Neither the IAI nor SWGTREAD address the statistical evaluation of impression evidence.

**Summary Assessment**

The scientific basis for the evaluation of impression evidence is that mass-produced items (e.g., shoes, tires) pick up features of wear that, over time, individualize them. However, because these features continue to change as they are worn, elapsed time after a crime can undercut the forensic scientist's certainty. At the least, class characteristics can be identified, and with sufficiently distinctive patterns of wear, one might hope for specific individualization. However, there is no consensus regarding the number of individual characteristics needed to make a positive identification, and the committee is not aware of any data about the variability of class or individual characteristics or about the validity or reliability of the method. Without such population studies, it is impossible to assess the number of characteristics that must match in order to have any particular degree of confidence about the source of the impression.

Experts in impression evidence will argue that they accumulate a sense of those probabilities through experience, which may be true. However, it is difficult to avoid biases in experience-based judgments, especially in the absence of a feedback mechanism to correct an erroneous judgment. These problems are exacerbated with the less common types of impression evidence. For example, a European survey found that 42 laboratories conducted 28,093 shoeprint examinations and 41 laboratories conducted 591 tire track examinations, but only 14 laboratories conducted a total of 21 lip print examinations and 17 laboratories conducted a total of 100 ear print examinations.[57] Although one might argue that those who perform the work in laboratories that conduct hundreds or thousands of evaluations of impression evidence develop useful experience and judgment, it is difficult to assert that the field has enough collective judgment about the variabilities in lip prints and ear prints based on tens of examinations. The community simply does not have enough data about the natural variability of those less frequent impressions, absent the presence of a clear deformity or scar, to infer whether the observed degree of similarity is significant.

Most of the research in the field is conducted in forensic laboratories, with the results published in trade journals, such as the *Journal of Forensic Identification*. With regard to reporting, SWGTREAD is moving toward the use of standard language to convey the conclusions reached.[58] But neither IAI nor SWGTREAD addresses the issue of what critical

---

[56] SWGTREAD. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations.* Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

[57] Liukkonen, Majamaa, and Virtanen, op. cit.

[58] SWGTREAD. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations.* Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

research should be done or by whom, critical questions that should be addressed include the persistence of individual characteristics, the rarity of certain characteristic types, and the appropriate statistical standards to apply to the significance of individual characteristics. Also, little if any research has been done to address rare impression evidence. Much more research on these matters is needed.

## TOOLMARK AND FIREARMS IDENTIFICATION

Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used or when the internal parts of a firearm make contact with the brass and lead that comprise ammunition. The marks left by an implement such as a screwdriver or a firearm's firing pin depend largely on the manufacturing processes—and manufacturing tools—used to create or shape it, although other surface features (e.g., chips, gouges) might be introduced through post-manufacturing wear. Manufacturing tools experience wear and abrasion as they cut, scrape, and otherwise shape metal, giving rise to the theory that any two manufactured products—even those produced consecutively with the same manufacturing tools—will bear microscopically different marks. Firearms and toolmark examiners believe that toolmarks may be traced to the physical heterogeneities of an individual tool—that is, that "individual characteristics" of toolmarks may be uniquely associated with a specific tool or firearm and are reproduced by the use of that tool and only that tool.

The manufacture and use of firearms produces an extensive set of specialized toolmarks. Gun barrels typically are rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior. The process of cutting these grooves into the barrel leaves marks and scrapes on the relatively softer metal of the barrel.[59] In turn, these markings are transferred to the softer metal of a bullet as it exits the barrel. Over time, with repeated use (and metal-to-metal scraping), the marks on a barrel (and the corresponding "stria" imparted to bullets) may change as individual imperfections are formed or as cleanliness of the barrel changes. The brass exterior of cartridge cases receive analogous toolmarks during the process of gun firing: the firing pin dents the soft primer surface at the base of the cartridge to commence firing, the primer area is forced backward by the buildup of gas pressure (so that the texture of the gun's breech face is impressed on the cartridge), and extractors and ejectors leave marks as they expel used cartridges and cycle in new ammunition.

Firearms examination is one of the more common functions of crime laboratories. Even small laboratories with limited services often perform firearms analysis. In addition to the analysis of marks on bullets and cartridges, firearms examination also includes the determination of the firing distance, the operability of a weapon, and sometimes the analysis of primer residue to determine whether someone recently handled a weapon. These broader aspects are not covered here.

### Sample and Data Collection

When a tool is used in a crime, the object that contains the tool marks is recovered when possible. If a toolmark cannot be recovered, it can be photographed and cast. Test marks made by recovered tools can be made in a laboratory and compared with crime scene toolmarks.

---

[59] Although the metal and initial rifling are very similar, the cutting of the individual barrels, the finishing machining, and the cleaning and polishing begin the process of differentiation of the two sequentially manufactured barrels.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

In the early 1990s, the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed separate databases of images of bullet and cartridge case markings, which could be queried to suggest possible matches. In 1996, the National Institute of Standards and Technology (NIST) developed data exchange standards that permitted the integration of the FBI's DRUGFIRE database (cartridge case images) and the ATF's CEASEFIRE database (then limited to bullet images). The current National Integrated Ballistic Information Network (NIBIN) includes images from both cartridge cases and bullets that are associated with crime scenes and is maintained by the ATF.

Periodically—and particularly in the wake of the Washington, D.C. sniper attacks in 2002—the question has been raised of expanding the scope of databases like NIBIN to include images from test firings of newly manufactured firearms. In concept, this would permit downstream investigators who recover a cartridge case or bullet at a crime scene to identify the likely source firearm. Though two states (Maryland and New York) instituted such reference ballistic image databases for newly manufactured firearms, proposals to create such a database at the national level did not make substantial progress in Congress. A recent report of the National Academies, *Ballistic Imaging*, examined this option in great detail and concluded that "[a] national reference ballistic image database of all new and imported guns is not advisable at this time."[60]

**Analyses**

In both firearm and toolmark identification, it is useful to distinguish several types of characteristics that are considered by examiners. "Class characteristics" are distinctive features that are shared by many items of the same type. For example, the width of the head of a screwdriver or the pattern of serrations in the blade of a knife may be class characteristics that are common to all screwdrivers or knives of a particular manufacturer and/or model. Similarly, the number of grooves cut into the barrel of a firearm and the direction of "twist" in those grooves are class characteristics that can filter and restrict the range of firearms that match evidence found at a crime scene. "Individual characteristics" are the fine microscopic markings and textures that are said to be unique to an individual tool or firearm. Between these two extremes are "subclass characteristics" that may be common to a small group of firearms and that are produced by the manufacturing process, such as when a worn or dull tool is used to cut barrel rifling.

Bullets and cartridge cases are first examined to determine which class characteristics are present. If these differ from a comparison bullet or cartridge, further examination may be unnecessary. The microscopic markings on bullets and cartridge cases and on toolmarks are then examined under a comparison microscope (made from two compound microscopes joined by a comparison bridge that allows viewing of two objects at the same time). The unknown and known bullet or cartridge case or toolmark surfaces are compared visually by a firearms examiner, who can evaluate whether a match exists.

**Scientific Interpretation**

The task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm.

---

[60] National Research Council. 2008. *Ballistic Imaging.* Washington, D.C.: The National Academies Press, p. 5.

5-19

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

Guidance from the Association of Firearm and Tool Mark Examiners (AFTE)[61] indicates that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a particular bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. The standards then define agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool."[62]

Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same tool, is a challenging task. AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training. In earlier years, toolmark examiners relied on their past casework to provide a foundation for distinguishing between individual, class, and subclass characteristics. More recently, extensive training programs using known samples have expanded the knowledge base of examiners.

The emergence of ballistic imaging technology and databases such as NIBIN assist examiners in finding possible candidate matches between pieces of evidence, including crime scene exhibits held in other geographic locations. However, it is important to note that the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images. The growth of these databases also permits examiners to become more familiar with similarities in striation patterns made by different firearms. Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates.[63] The National Academies report, *Ballistic Imaging*, while not claiming to be a definitive study on firearms identification, observed that, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." That study recognized the logic involved in trying to compare firearms-related toolmarks by noting that, "Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun," but it cautioned that, "A significant amount of

---

[61] Theory of identification, range of striae comparison reports and modified glossary definitions—An AFTE Criteria for Identification Committee report. 1992. *Journal of the Association of Firearm and Tool Mark Examiners.* 24:336-340.

[62] Ibid., p. 336.

[63] Recent research has attempted to develop a statistical foundation for assessing the likelihood that more than one tool could have made specific marks by assessing consecutive matching striae, but this approach is used in a minority of cases. See A.A. Biasotti. 1959. A statistical study of the individual characteristics of fired bullets. *Journal of Forensic Sciences* 4:34; A.A. Biasotti and J. Murdock. 1984. "Criteria for identification" or "state of the art" of firearms and tool marks identification. *Journal of the Association of Firearms and Tool Mark Examiners* 16(4):16; J. Miller and M.M. McLean. 1998. Criteria for identification of tool marks. *Journal of the Association of Firearms and Tool Mark Examiners* 30(1):15; J.J. Masson. 1997. Confidence level variations in firearms identification through computerized technology. *Journal of the Association of Firearms and Tool Mark Examiners* 29(1):42. For a critique of this area and a comparison of scientific issues involving toolmark evidence and DNA evidence, see A. Schwartz. 2004-2005. A systemic challenge to the reliability and admissibility of firearms and tool marks identification. *Columbia Science and Technology Law Review* 6:2. For a rebuttal to this critique, see R.G. Nichols. 2007. Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges. *Journal of Forensic Sciences* 52(3):586-594.

5-20

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."[64]

## Summary Assessment

Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited. For example, a report from Hamby, Brundage, and Thorpe[65] includes capsule summaries of 68 toolmark and firearms studies. But the capsule summaries suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability. Overall, the process for toolmark and firearms comparisons lacks the specificity of the protocols for, say, 13 STR DNA analysis. This is not to say that toolmark analysis needs to be as objective as DNA analysis in order to provide value. And, as was the case for friction ridge analysis and in contrast to the case for DNA analysis, the specific features to be examined and compared between toolmarks cannot be stipulated a priori. But the protocols for DNA analysis do represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science.

---

[64] All quotes from National Research Council. 2008. *Ballistic Imaging*. Washington, D.C.: The National Academies Press, p. 3.

[65] J.E. Hamby, D.J. Brundage, and J.W. Thorpe. The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels—A research project involving 468 participants from 19 countries. Available online at http://www.fti-ibis.com/DOWNLOADS/Publications/10%20Barrel%20Article-%20a.pdf.

5-21

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## ANALYSIS OF HAIR EVIDENCE

The basis for hair analyses as forensic evidence stems from the fact that human and animal hairs routinely are shed and thus are capable of being transferred from an individual to the crime scene, and from the crime scene to an individual. Forensic hair examiners generally recognize that various physical characteristics of hairs can be identified and are sufficiently different among individuals that they can be useful in including, or excluding, certain persons from the pool of possible sources of the hair. The results of analyses from hair comparisons typically are accepted as class associations; that is, a conclusion of a "match" means only that the hair could have come from any person whose hair exhibited—within some levels of measurement uncertainties—the same microscopic characteristics, but it cannot uniquely identify one person. However, this information might be sufficiently useful to "narrow the pool" by excluding certain persons as sources of the hair.

Although animal hairs might provide useful evidence in certain cases (e.g., animal poaching), animal hair analysis often can lead to an identification of only the type of animal, not the specific breed[66]; consequently, most (90 to 95 percent) of hair analyses refer to analyses of human hair. Human hairs from different parts of the body have different characteristics; Houck cautions strongly against drawing conclusions about hairs from one part of the body based on analyses of hairs from a different body part.[67]

Houck and Bisbing recommend as minimal training for hair examiners a bachelor's degree in a natural or applied science (e.g., chemistry, biology, forensic science), on-the-job training programs, and an annual proficiency test.[68]

### Sample Data and Collection

Sample hairs received for analysis initially are examined macroscopically for certain broad features such as color, shaft form (e.g., straight, wavy, curved, kinked), length, and overall shaft thickness (e.g., fine, medium, coarse).

In the second stage of analysis, hairs are mounted on microscopic slides using a mounting medium that has the same refractive index (about 1.54) as the hair, to better view the microscopic features (see next section). One hair or multiple hairs from the same source may be mounted on a glass microscope slide with an appropriate cover slip, as long as each mounted hair is clearly visible. It is most important that questioned and known hairs are mounted in the same type of mounting medium.

During this examination, the hair analyst attempts to identify the part of the body from which the hair might have come, based on certain definable characteristics that distinguish hairs from various body locations. Occasionally, suspects can be eliminated on the basis of these simple microscopic characteristics.

A "control" or "comparison" group of hairs must be collected from a known hair source. A known head hair sample should consist of hairs from the five different areas of the scalp (top, front, back including nape, and both sides). Known hair samples should be obtained by a combination of pulling and combing from the sampled region. Ideally, a total of 50 hairs should be obtained from the scalp. A known pubic hair sample or a sample from any other somatic

---

[66] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.
[67] M.M. Houck and R.E. Bisbing. 2005. Forensic human hair examination and comparison in the 21st century. *Forensic Science Review* 17(1):7.
[68] Ibid., p. 12.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

region should ideally consist of 25 hairs obtained by pulling and combing from different regions. A comparison can still be performed with less than the recommended number of hairs, but this may increase the likelihood of a false exclusion.[69]

Features from human hair analyses can be divided broadly into "major characteristics" and "secondary characteristics." The former category includes features such as color, treatment (e.g., dyed, bleached, curled, permed), pigment aggregation (e.g., streaked, clumped, patchy), and shaft form (e.g., wavy, straight, curly). Other major characteristics may include pigment distribution (e.g., uniform, peripheral, clustered), medulla appearance, if present (e.g., continuous, interrupted, or fragmented—and opaque or translucent), hair diameter, medullary index, and presence or absence of cortical fusi (e.g., root or shaft). Secondary characteristics include cuticular margin (e.g., smooth, serrated, looped, or cracked), pigment density (e.g., absent, sparse, heavy), pigment size (e.g., absent, fine, coarse), tip shape (e.g., tapered, cut, rounded, frayed, split), and shaft diameter (e.g., narrow or wide).[70]

### Studies of Accuracy in Identification

In 1974, investigators Gaudette and Keeping described a system of hair analysis and used it in a study of pairwise comparisons among 861 hairs from 100 different persons.[71] They acknowledged that "the hair samples were not chosen from the population at random, but were selected so that the probability of two hairs being similar would be greater, if anything, than in the population at large."[72] From their assignment of probabilities, the authors estimated that the chance of asserting a difference between two hairs from the same person is small, about 1 in 4,500.[73] This assignment of probabilities has since been shown to be unreliable.[74] Moreover, the study does not confirm the chance of asserting a match between two dissimilar hairs, and the authors acknowledge that, "due to the fact that so many of the characteristics coded are subjective—for example, color, texture—it was not possible to get complete reproducibility between two or more examiners coding the same hair."[75]

Barnett and Ogle raised four concerns with the Gaudette and Keeping study: (1) it relied on idealized (not from real life) test scenarios; (2) there was no objective basis for selecting the features; (3) the statistical analysis of data from the study was questionable; and (4) there was a possible examiner bias.[76] Gaudette attempted to address these concerns through a further study. However, this additional study involved only three hair examiners, in addition to the author. The author concluded that:

> . . . whereas hair is not generally a basis for positive personal identification, the presence of abnormalities or unusual features or the presence of a large number of

---

[69] Scientific Working Group on Materials Analysis (SWGMAT). 2005. Forensic human hair examination guidelines. *Forensic Science Communications* 7(2). Available at www.fbi.gov/hq/lab/fsc/backissu/april2005/standards/2005_04_standards02.htm.

[70] Ibid.

[71] B.D. Gaudette and E.S. Keeping. 1974. An attempt at determining probabilities in human scalp hair comparison. *J. Forensic Sciences* 19(3):599-606.

[72] Ibid., p. 65.

[73] A later study on human pubic hairs (Caucasian only) estimated this probability as "about 1 in 800." B.D. Gaudette. 1976. Probabilities and human pubic hair comparisons. *Journal of Forensic Sciences* 21(3):514-517.

[74] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.

[75] Gaudette and Keeping, op. cit.

[76] Barnett and Ogle, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

different unknown hairs all similar to the standard can lead to a more positive conclusion. The problem, at present, lies in finding suitable additional characteristics [of hair, for effecting individualization]. Although there is basic agreement as to the value of the macroscopic and microscopic characteristics used, other characteristics are either unreliable or controversial. Physical characteristics such as refractive index, density, scale counts, tensile strength, and electrical properties have been proposed by some workers but have been attacked by others, and the general consensus is that they are of little use in hair comparison.[77]

In 1990, Wickenheiser and Hepworth attempted a study to address examiner bias in a small study with only two examiners. They reported that "no incorrect associations were made by either examiner."[78] But a study with only two examiners cannot offer accurate and precise estimates of bias in the population of examiners.

An attempt at an objective system for identifying "matches" among hair samples is presented in Verma et al., based on a neural network.[79] According to the authors of this article, "The system accurately judged whether two populations of hairs came from the same person or from different persons 83% of the time."[80] The article states that 83 percent was obtained by testing the neural network on all possible pairs among 9 samples of hairs from 9 people (i.e., 81 combinations, of which 9 are "true matches" and 72 are "true mis-matches"). Their *Table 3*[81] can be summarized as follows:

|  | System said "same" | System said "different" |  |
|---|---|---|---|
| Same person | 5 | 4 | Total= 9 |
| Different persons | 9 | 64 | Total=73 |

Because the total of these 4 numbers is 82, not 81, one presumes a typographical error in the table; as stated, the number of correct calls is $(5 + 64)/81 = 0.85$, or 85 percent. (If one of the counts, 5 or 64, is off by 1, the percentage would be 84 percent.) However, the table also shows that the neural network claimed 9 of the 73 different pairs as "same," for a false positive rate of $9/73 = 12$ percent, and 4 sets of hairs from the same person as "different," for a false negative rate of $4/9 = 44$ percent. With such high error rates, one would want to study improvements to such systems before putting them into routine practice.

Houck et al. indicate that proficiency testing is conducted regularly for hair experts in crime laboratories.[82] Collaborative Testing Services[83] offers hair and fiber proficiency tests

---

[77] B.D. Gaudette. 1978. Some further thoughts on probabilities and human hair comparisons. *Journal of Forensic Sciences* 23(4):758-763, pp. 761-762.

[78] Wickenheiser and Hepworth, op. cit., p. 1327.

[79] M.S. Verma, L. Pratt, C. Ganesh, and C. Medina. 2002. Hair-MAP: A prototype automated system for forensic hair comparison and analysis. *Forensic Science International* 129:168-186.

[80] Ibid., page

[81] Ibid., page 180.

[82] M.M. Houck, R.E. Bisbing, T.G. Watkins, and R.P. Harman. 2004. Locard exchange: The science of forensic hair comparisons and the admissibility of hair comparison evidence: *Frye* and *Daubert* considered. *Modern Microscopy Journal* Available at www.modernmicroscopy.com/main.asp?article=36&searchkeys=Houck%2BBisbing.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

annually. Unfortunately, mass production of test samples such as hair is problematic. Because known samples exhibit a range of characteristics within each of the major and secondary characteristics, it is not possible to provide comparable samples to multiple examiners.

**Scientific Interpretation and Reporting of Results**

The success of hair analyses to make a positive identification is limited in important ways. Most hair examiners would opine only that hairs exhibiting the same microscopic characteristics "could" have come from a particular individual. Moreover, the "best" or most reliable characteristics will vary by case. For example, "color" may be a critical determinant in a case where it is artificial, because that introduces additional independent variables, such as the time since treatment and the actual hair color, while a natural hair might provide less information.

However, several members of the committee have experienced courtroom cases in which, despite the lack of a statistical foundation, microscopic hair examiners have made probabilistic claims based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial. Aitken and Robertson discuss some probabilistic concepts with respect to hair analysis.[84]

The availability of DNA analysis has lessened the reliance on hair examination. In a very high proportion of cases involving hair evidence, DNA can be extracted, even years after the crime has been committed. Although the DNA extraction may consist of only mitochondrial DNA (mtDNA), such analyses are likely to be much more specific than those conducted on the physical features of hair. For this reason, cases that might have relied heavily on hair examinations have been subjected more recently to additional analyses using DNA.[85] Because of the inherent limitations of hair comparisons and the availability of higher-quality and higher-accuracy analyses based on mtDNA, traditional hair examinations may be presented less often as evidence in the future, although microscopic comparison of physical features will continue to be useful for determining which hairs are sufficiently similar to merit comparisons with DNA analysis and for excluding suspects and assisting in criminal investigations.

**Summary Assessment**

No scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population. There appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a "match." In one study of validity and accuracy of the technique, the authors required exact agreement on seven "major" characteristics and at least two agreements among six "secondary" characteristics.[86] The categorization of hair features depends heavily on examiner proficiency and practical experience.

An FBI study found that, of 80 hair comparisons that were "associated" through microscopic examinations, 9 of them (12.5 percent) were found in fact to come from different

---

[83] See www.collaborativetesting.com.
[84] C.G.G. Aitken and J.A. Robertson. 1986. A contribution to the discussion of probabilities and human hair comparisons. *Journal of Forensic Sciences* 32(3):684-689.
[85] M.M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5): 964-967.
[86] R.A. Wickenheiser and D.G. Hepworth. 1990. Further evaluation of probabilities in human hair comparisons. *Journal of Forensic Sciences* 35(6):1323-1329.

5-25

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

sources when reexamined through mtDNA analysis.[87] This illustrates not only the imprecision of microscopic hair analyses, but also the problem with using imprecise reporting terminology such as "associated with," which is not clearly defined and which can be misunderstood to imply individualization.

In some recent cases, courts have explicitly stated that microscopic hair analysis is a technique generally accepted in the scientific community.[88] But courts also have recognized that testimony linking microscopic hair analysis with particular defendants is highly unreliable.[89] In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value. The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA. Microscopy and mtDNA analysis can be used in tandem and may add to one another's value for classifying a common source, but no studies have been performed specifically to quantify the reliability of their joint use.

## ANALYSIS OF FIBER EVIDENCE

Fibers associated with a crime—including synthetic fibers such as nylon, polyester and acrylic as well as botanical fibers such as ramie or jute, which are common in ropes or twines—can be examined microscopically in the same way as hairs, and with the same limitations. However, fibers also can be analyzed using the tools of analytical chemistry, which provide a more solid scientific footing than that underlying morphological examination. In some cases, clothing and carpets have been subjected to relatively distinctive environmental conditions (e.g., sunlight exposure or laundering agents) that impart characteristics that can distinguish particular items from others from the same manufacturing lot. Fiber examiners agree, however, that none of these characteristics is suitable for individualizing fibers (associating a fiber from a crime scene with one, and only one, source) and that fiber evidence can be used only to associate a given fiber with a class of fibers.[90]

Another type of fiber analysis consists of physically matching two remnants that appear to be torn from one another. By comparing the shapes of the mating edges, and aligning any patterns in the cloth, it can sometimes be possible to associate a fragment with the garment or other item from which it was torn. This is a form of pattern matching, analogous to the matching of shoe and tire prints, but it will not be discussed further here.

### Sample Collection and Analysis

The collection of fibers and of a comparison group follows the same procedures as those for mounting hairs. If a macroscopic analysis (e.g., or color, texture, shape) suggests that the two samples appear to be the same, additional procedures such as the following are pursued:

---

[87] Houck and Budowle, op. cit.

[88] E.g., *State v. West*, 877 A.2d 787 (Conn. 2005); *Bookins v. State*, 922 A.2d 389 (Del. Supr, 2007).

[89] See P.C. Giannelli and E. West. 2001. Hair comparison evidence. *Criminal Law Bulletin* 37:514.

[90] See, e.g., R.R. Bresee. 1987. Evaluation of textile fiber evidence: A review. *Journal of Forensic Sciences* 32(2):510-521. See also SWGMAT. 1999. Introduction to forensic fiber examination. *Forensic Science Communications* 1(1), available at www.fbi.gov/hq/lab/fsc/backissu/april1999/houcktoc.htm, which includes the following summarization in Section 5.4: "It can never be stated with certainty that a fiber originated from a particular textile because other textiles are produced using the same fiber types and color. The inability to positively associate a fiber to a particular textile to the exclusion of all others, however, does not mean that a fiber association is without value."

5-26

Copyright © National Academy of Sciences. All rights reserved.