Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

1. Microscopy (reflected light)
2. Polarized light microscopy/fluorescence microscopy
3. Infrared microscopy (to determine man-made fiber composition, such as nylon, polyester)
4. Solubility in a medium
5. Melting point
6. Cross-sectional shape
7. Pyrolysis GC
8. Microspectrophotometry (MSP)
9. Raman spectroscopy

The last of these, Raman spectroscopy, often can provide additional information on polymer chain length (short, medium, long) and branching. Its use in forensic laboratories is rare, although research is under way to develop possible applications. A good overview of fiber evidence is provided by Grieve and Robertson.[91]

**Summary Assessment**

A group of experienced paint examiners, the Paint Subgroup of the Scientific Working Group on Materials Analysis (SWGMAT), has produced guidelines,[92] but no set standards, for the number and quality of characteristics that must correspond in order to conclude that two fibers came from the same manufacturing batch. There have been no studies of fibers (e.g., the variability of their characteristics during and after manufacturing) on which to base such a threshold. Similarly, there have been no studies to inform judgments about whether environmentally related changes discerned in particular fibers are distinctive enough to reliably individualize their source, and there have been no studies that characterize either reliability or error rates in the procedures. Thus, a "match" means only that the fibers could have come from the same type of garment, carpet, or furniture; it can provide only class evidence.

Because the analysis of fibers is made largely through well-characterized methods of chemistry, it would be possible in principle to develop an understanding of the uncertainties associated with those analyses.[93] However, to date, that has not been done. Fiber analyses are reproducible across laboratories because there are standardized procedures for such analyses. Proficiency tests are routinely provided and taken annually, and the reports are available from Collaborative Testing Services.

## QUESTIONED DOCUMENT EXAMINATION[94]

Questioned document examination involves the comparison and analysis of documents and printing and writing instruments in order to identify or eliminate persons as the source of the handwriting; to reveal alterations, additions, or deletions; or to identify or eliminate the source of typewriting or other impression marks. Questions about documents arise in business, finance,

---

[91] M. Grieve and J. Robertson. 1999. *Forensic Examination of Fibres*. London: Taylor and Francis Ltd.

[92] SWGMAT, op. cit. Available at www.fbi.gov/hq/lab/fsc/backissu/april1999/houcktoc.htm.

[93] Some relevant questions to be addressed are identified in Bresee, op. cit.

[94] This discussion is primarily based on *Standard Descriptions of Scope of Work Relating to Forensic Document Examiners (ASTM Designation E 444-98), Standard Guide for Test Methods for Forensic Writing Ink Comparison (ASTM Designation E 1422-01), Standard Guide for Writing Ink Identification (ASTM Designation E 1789-04),* and *Standard Guide for Examination of Handwritten Items (ASTM Designation E 2290-03).*

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

and civil and criminal trials, and in any matter affected by the integrity of written communications and records. Typical analyses include:

- determining whether the document is the output of mechanical or electronic imaging devices such as printers, copying machines, and facsimile equipment;
- identifying or eliminating particular human or machine sources of handwriting, printing, or typewriting;
- identifying or eliminating ink, paper, and writing instrument;
- establishing the source, history, sequence of preparation, alterations or additions to documents, and relationships of documents;
- deciphering and restoring obscured, deleted, or damaged parts of documents;
- recognizing and preserving other physical evidence that may be present in documents; and
- determining the age of a document.

Questioned document examiners are also referred to as forensic document examiners or handwriting experts; questioned document examination includes the field of handwriting identification, while handwriting includes cursive or script style writing, printing by hand, signatures, numerals, or other written marks or signs. Forensic document examination does not involve a study of handwriting that purports to create a personality profile or otherwise analyze or judge the writer's personality or character.

### Analyses

Equipment used in questioned document examination includes microscopes and other optical aids, photographic and other imaging devices, and a wide variety of imaging materials adaptable for use with numerous lighting methods, including those involving ultraviolet, visible, and infrared light, and other regions of the electromagnetic spectrum. Software tools recently have become available for the analysis of handwriting.[95] The analysis of papers and inks is similar to other forensic chemistry work. The principal procedures used for ink examination are nondestructive optical examinations and chemical examinations. Optical examinations include those that use visible and alternative light sources—for example, determining whether the class of ink is ballpoint pen; using ultraviolet examination to reveal indications that a document has been stained by chemicals; and employing reflected infrared to observe luminescence at different wavelengths. Chemical examination includes spot testing during which solvents are applied in small amounts to the ink line. For example, ballpoint inks, which are either oil based or glycol based, are highly soluble in pyridine. Inks formulated for fountain pens, porous point pens, and roller pens generally are water soluble in ethanol and water. Indelible markers are solvent based and generally would be soluble in pyridine.

Ink examination can have one of two objectives: class identification—for which the intention is to identify the ink formula or type based on a reference library of samples of inks—and comparison, for which the goal is to compare two ink samples to determine whether they are of common origin. Ink comparisons usually are performed to answer four basic categories of questions: (1) whether an ink is the same (in formula) as that on other parts of the same

---

[95] For an overview, see S.N. Srihari and G. Leedham. 2003. A survey of computer methods in forensic document examination. *Proceedings of the 11th International Graphonomics Society Conference*, pp. 278-281. Available at www.ntu.edu.sg/sce/labs/forse/PDF/docExam_7.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

document or on other documents; (2) whether two writings with similar ink have a common origin (e.g., the same writing instrument or ink well); (3) whether the ink of entries over a period of time is consistent with varying ages or indicates preparation at one time; and (4) whether ink is as old as it purports to be.

Most problems with ink examinations arise from confounding factors that interact with the ink. These can be part of the writing process, such as blotting wet ink; variations in the papers; various forms of contamination on the document; or a combination of these factors. Most ink examinations must be performed on paper and without defacing the handwriting, and this creates a number of sampling and analytical challenges.

The examination of handwritten items typically involves the comparison of a questioned item submitted for examination along with a known item of established origin associated with the matter under investigation. Requirements for comparison are that the writing be of the same type (handwritten/cursive versus hand printed) and that it be comparable text (similar letter/word combinations). Special situations involving unnatural writing are forgery (an attempt to imitate/duplicate the writing of another person) and disguise (an attempt to avoid identification as the writer). The basis for comparison is that handwriting/handprinting/numerals can be examined to obtain writing characteristics (also referred to as features or attributes). The characteristics are further classified into class characteristics (the style that the writer was taught), individual characteristics (the writer's personal style), and gross/subtle characteristics.

Specific attributes used for comparison of handwriting are also referred to as discriminating elements, of which Huber and Headrick have identified 21.[96] Comparisons are based on the high likelihood that no two persons write the same way, while considering the fact that every person's writing has its own variabilities. Thus, an analysis of handwriting must compare interpersonal variability—some characterization of how handwriting features vary across a population of possible writers—with intrapersonal variability—how much an individual's handwriting can vary from sample to sample. Determining that two samples were written by the same person depends on showing that their degree of variability, by some measure, is more consistent with intrapersonal variability than with interpersonal variability. Some cases of forgery are characterized by signatures with too little variability, and are thus inconsistent with the fact that we all have intrapersonal variability in our writing.

## Scientific Interpretation and Reporting of Results

Terminology has been developed for expressing the subjective conclusions of handwriting comparison and identification, taking into account that there are an infinite number of gradations or opinions toward an identification or elimination. Several scales, such as a five-point scale and a nine-point scale, are used by questioned document examiners worldwide. The nine-point scale is as follows:

1. Identification (a definite conclusion that the questioned writing matches another sample)
2. Strong probability (evidence is persuasive, yet some critical quality is missing)
3. Probable (points strongly towards identification)
4. Indications [that the same person] did [create both samples] (there are a few significant features)

---

[96] R.A. Huber and A. M. Headrick. 1999. *Handwriting Identification: Facts and Fundamentals.* Boca Raton, FL: CRC Press.

5-29

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

5. No conclusion (used when there are limiting factors such as disguise, or lack of comparable writing)
6. Indications [that the same person] did not [create both samples] (same weight as indications with a weak opinion)
7. Probably did not (evidence is quite strong)
8. Strong probably did not (virtual certainty)
9. Elimination (highest degree of confidence)[97]

**Summary Assessment**

The scientific basis for handwriting comparisons needs to be strengthened.[98] Recent studies have increased our understanding of the individuality and consistency of handwriting and computer studies[99] and suggest that there may be a scientific basis for handwriting comparison, at least in the absence of intentional obfuscation or forgery. Although there has been only limited research to quantify the reliability and replicability of the practices used by trained document examiners, the committee agrees that there may be some value in handwriting analysis.

Analysis of inks and paper, being based on well-understood chemistry, presumably rests on a firmer scientific foundation. However, the committee did not receive input on these fairly specialized methods and cannot offer a definitive view regarding the soundness of these methods or of their execution in practice.

## ANALYSIS OF PAINT AND COATINGS EVIDENCE

Paint is a suspension of solid pigments in a polymeric binder that, after application by brushing, spraying, dipping, or other means, forms a protective and/or decorative coating. When two objects come in contact with one another and at least one of these objects is painted, a transfer of paint may occur. This transferred paint can be compared to the paint located near the point of damage to determine if the two samples have a common origin. Painted surfaces tend to be repainted over time, providing a characteristic history of layer sequence. Painted surfaces are encountered frequently at crime scenes in the form of vehicles, architectural structures, tools, bicycles, boats, and many other items. The results of the examinations often are valuable both during the investigation and as evidence if a trial results. Paint examinations by their nature can be useful in suggesting possible connections of evidence from the crime scene to its source and therefore are helpful in narrowing or excluding possible witnesses and suspects as well as in providing useful information for investigative leads.

---

[97] *Standard Terminology for Expressing Conclusions of Forensic Document Examiners, ASTM Designation E 1658-04.*

[98] M. Kam, G. Fielding, and R. Conn. 1997. Writer identification by professional document examiners. *Journal of Forensic Sciences* 42(5):778-786, reports on proficiency tests given to more than 100 questioned document examiners and to a control group of individuals with similar educational backgrounds. Each subject made 144 pair-wise comparisons. Although the study showed that document examiners are much more accurate than lay people in determining whether or not two samples "match" (based on the "identification" and "strong probability" definitions of ASTM standard E1658), professionals nonetheless declared an erroneous match in 6.5 percent of the comparisons. A similar, more recent study, focusing on whether individual signatures were genuine, is reported in J. Sita, B. Found, and D. Rogers. 2002. Forensic handwriting examiners' expertise for signature comparison. *Journal of Forensic Sciences* 47:1117. That study found that professional handwriting examiners erred in 3.4 percent of their judgments.

[99] E.g., S.N. Sargur, S.-H. Cha, H. Arora, and S. Lee. 2002. Individuality of handwriting. *Journal of Forensic Sciences* 47(4):1-17.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

## Sample Data and Collection

There are many different types of paint and other coatings, including architectural, vehicular, and marine. Evidence collected from the crime scene may include painted surfaces such as automotive panels, tools, or victims' or suspects' clothing, or spray paint, smears, chips, or flakes. After documentation at the scene, the damaged painted surface is protected and preserved and then submitted to the laboratory. When it is not possible to bring the painted item or a portion of it to the laboratory, paint samples may be removed in such a way that the entire layer sequence is captured intact.

## Analyses

The proper recognition and collection of paint evidence at the scene precedes the comparison of evidence occurring at the laboratory. The color, texture, type, layer sequence, and chemical composition of known and questioned paints are compared, and a conclusion is rendered. Additionally, in cases for which no suspect vehicle and questioned paint are available, it may be possible to provide at least an investigative lead based on the color and metallic/nonmetallic type of paint present. If appropriate, the Royal Canadian Mounted Police's PDQ (Paint Data Query) database may be searched, and vehicular information may be provided regarding the possible makes, models, and year range of vehicles that used the questioned paint system.

The examination and comparison of paint evidence requires microscopic and instrumental techniques and methods. The examination of questioned and known samples follows an analytical process that identifies and compares the class (or group) characteristics of the evidence.[100] Occasionally, identifying characteristics exist across edges that allow edge or piece fitting. These characteristics include irregular borders, brush stroke striations, polish mark striations, or surface abrasion markings. When paint fragments physically fit back to a sample from a known source, the fragments are identified as having come from that specific source. Only when physical fitting is possible can an individualized source determination be made

Examiners involved with the analysis of paint evidence in the laboratory typically possess an extensive scientific background, because many of the methods and analyses rely heavily on chemistry.[101] The suggested minimum education requirement is a bachelor's degree in a natural[102, 103] or applied science,[104] with many candidates possessing a graduate degree. Coursework needs to include one year (or equivalent) of general chemistry with laboratory, organic chemistry with laboratory, analytical/instrumental analysis, and light microscopy to include basic polarized light microscopy—the latter obtained through structured coursework if it is not available at the graduate or undergraduate level.[105] On-the-job training continues in the laboratory, with its length depending on the examiner's experience. Before examiner trainees can work cases independently, they must observe and work under the supervision of an experienced

---

[100] SWGMAT. 1999. Forensic paint analysis and comparison guidelines. *Forensic Science Communications* 1(2): available at www.fbi.gov/hq/lab/fsc/backissu/july1999/painta.htm.

[101] SWGMAT. 2000. Trace evidence quality assurance guidelines. *Forensic Science Communications* 2(1): available at www.fbi.gov/hq/lab/fsc/backissu/jan2000/swgmat.htm.

[102] G.S. Anderson (ed.). Canadian Society of Forensic Science. 2007. *CSFS Careers in Forensic Science*, p. 15. Available at www.csfs.ca/contentadmin/UserFiles/File/Booklet2007.pdf.

[103] SWGMAT 2000, op. cit.

[104] Ibid.

[105] Ibid.

5-31

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

examiner. The completion of a laboratory's training program in paint analysis can range between 12 to 18 months.[106]

**Scientific Interpretation and Reporting of Results**

SWGMAT sets guidelines for this field, but it has not recommended report wording, and there are no set criteria for determining a conclusion, although a range of conclusions may be used to show the significance of the examination results. The strength of a conclusion depends on such variables as the number of layers present, the sample condition, and the type of paint (vehicular or structural). Terms such as "matched," "indistinguishable," "consistent," or "similar" are used along with the properties of the paints that were compared in stating the results of the comparison.

If there are no significant differences in the properties compared, the examiners may conclude that the paint or coating samples could have had a common origin. This does not mean they came from the same source to the exclusion of all others, but rather that they may have originated from the same source or from different sources that were painted or coated in the same manner. As the number of different layers associated increases (e.g., multiple different layers on a repainted surface), it may be concluded that it is unlikely that the questioned paint originated from any source other than that of the known paint.

SWGMAT has suggested forensic paint analysis and comparison guidelines[107,108] that discuss the examination procedure and instrumentation options, and ASTM has published the general guidelines.[109] However, neither includes report wording suggestions. Additional work should be done to provide standard language for reporting conclusions and sources of uncertainty. Such work has been completed by working groups for other forensic disciplines. Proficiency testing requirements are agreed upon by the predominant accrediting organization, the American Society of Crime Laboratory Directors-Laboratory Accreditation Board (ASCLD/LAB), which requires testing (internal or external) once per calendar year.

**Summary Assessment**

As is the case with fiber evidence, analysis of paints and coatings is based on a solid foundation of chemistry to enable class identification. Visual and microscopic examinations are typically the first step in a forensic examination of paints and coatings because of the ability to discriminate paints/coatings based on properties determined with these examinations. Several studies have been conducted that included hundreds of random automotive paint samples[110] These studies have concluded that more than 97 percent of the samples could be differentiated based on microscopic examinations coupled with solubility and microchemical testing. Another study[111] determined that more than 99 percent of 2,000 architectural paint samples could be

[106] Anderson, op. cit.; SWGMAT.
[107] SWGMAT. 1999. Forensic paint analysis and comparison guidelines. *Forensic Science Communications* 1(2): available at www.fbi.gov/hq/lab/fsc/backissu/july1999/painta.htm.
[108] SWGMAT. 2002. Standard guide for using scanning electron microscopy/X-ray spectrometry in forensic paint examinations. *Forensic Science Communications* 4(4): available at www.fbi.gov/hq/lab/fsc/backissu/oct2002/bottrell.htm.
[109] Ibid.
[110] S.G. Ryland and R.J. Kopec. 1979. The evidential value of automobile paint chips. *Journal of Forensic Sciences* 24(1):140-147; J.A. Gothard. 1976. Evaluation of automobile paint flakes as evidence. *Journal of Forensic Sciences* 21(3):636-641.
[111] C.F. Tippet. 1968. The evidential value of the comparison of paint flakes from sources other than vehicles. *Journal of the Forensic Sciences Society* 8(2-3):61-65.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

similarly differentiated. However, the community has not defined precise criteria for determining whether two samples come from a common source class.

## ANALYSIS OF EXPLOSIVES EVIDENCE AND FIRE DEBRIS

Explosives evidence encompasses a wide range of materials from unburned, unconsumed powders, liquids, and slurries, to fragments of an explosive device, to objects in the immediate vicinity of an explosion thought to contain residue from the explosive. A typical analytical approach would be to identify the components and construction of an explosive device and conduct an analysis of any unconsumed explosives and residues. In addition to the analysis and identification of low and high explosives, chemical reaction bottle bombs are also analyzed. The scene of an explosion can require special investigative attention. What may appear to be a small piece of scrap metal could in fact be an important piece of the device that caused the explosion. The very nature of an explosion has a direct impact on the quality of evidence recovered. Pristine devices or device fragments, or appreciable amounts of unconsumed explosive material, should not be expected.

### Analyses

Generally speaking, laboratories will not accept devices until they have been rendered safe. Examiners involved with the analysis of explosives evidence in the laboratory typically have an extensive scientific background, because the methods used entail a large amount of chemistry and instrumentation. The Technical Working Group for Fire and Explosives (TWGFEX), a group of fire debris and explosives examiners, suggests that an explosives examiner be required to possess a bachelor's degree in a natural or applied science, with recommended coursework in chemistry and instrumental analysis.[112] The group also recommends that the examiner complete a training program that includes the analysis of low and high explosives, instruction in the use of instrumentation used in routine analyses, the construction of explosive devices, and participation in a postblast investigation course. Although there is no official certification program for explosives examiners, TWGFEX has devised a suggested training guide. The guide is divided into seven modules, each with a reading list, practical exercises, and methods of evaluation.[113] To ensure that examiners maintain a level of competency, proficiency testing (internal or external) is required by ASCLD/LAB once per calendar year.[114]

The ultimate goal of an explosives examination is the identification of the explosive material used, whether it is through the analysis of an intact material or of the residue left behind when the material explodes. Intact material lends itself to being more easily identified. The individual components of postblast residue may often be identified (e.g., potassium chloride and potassium sulfate). The training and experience of examiners allows them to deduce what types of explosive material were originally present from possible combinations of explosive materials.

Whether it is a low explosive or high explosive, the analysis of an intact explosive material follows a procedure that begins with a macroscopic and microscopic examination of the

---

[112] TWGFEX Explosive Examiners Job Description. Available at http://ncfs.ucf.edu/twgfex/documents.html.

[113] TWGFEX Training Guide for Explosives Analysis Training. Available at http://ncfs.ucf.edu/twgfex/Documents.html.

[114] American Society of Crime Laboratory Directors International. 2006. *Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories*, p. 20. See www.ascld-lab.org/international/indexinternational.html

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

material, followed by a burn test, when appropriate. The results of the initial observations will dictate how the rest of the analysis will proceed. Typically it will involve the use of instrumentation that provides both elemental and structural information about the material, such as X-ray diffraction, scanning electron microscope-energy dispersive X-ray analysis, or infrared spectroscopy. TWGFEX has devised guidelines for the analysis of intact explosives that categorize the instruments that can be used based on the level of information they provide.[115] The information gathered, if sufficient, can be useful in identifying the material.

The analysis of postblast explosive residues begins much like the analysis of intact explosives, with the macroscopic and microscopic analysis of the evidence submitted (whether it is an expended device, fragments of a device, or debris from near the site of the explosion). If no intact explosive material is found, a sequence of extracts may be used to capture any organic and/or inorganic residues present. These extracts are then analyzed employing the same instrumentation used for intact explosives. However, the results produced differ in their specificity, and it is here that the training and expertise of the examiner plays a large role. To interpret the results properly, the examiner must have knowledge of the composition of explosives and the reaction products that form when they explode. Interpretation can be further complicated by the presence of contaminants from, for example, the device or soil.[116]

Examination conclusions for postblast residues range from "the residue present was consistent with an explosive material" to "the residue is only indicative of an explosive" to "no explosive residues were present." TWGFEX recently has developed a set of guidelines for the analysis of postblast explosive residues,[117] but has yet to make any recommendations for report wording.

The examination of fire debris not associated with explosions often aims to determine whether an accelerant was used. To assess the effects of an accelerant, one might design an experiment, under a range of conditions (e.g., wind speed, temperature, presence/absence of other chemicals) with two groups: one in which materials are burned in the presence of an accelerant ("treatment") and one with no accelerant ("control"). The measured outcomes on the burned materials might be measures that characterize the damage patterns (e.g., depth of char, size of bubbles on surfaces). Differences in the ranges of these measurements from the materials in the two groups (treatment versus control) suggest a hypothesis about the effects of an accelerant. Following this exploration, one should design validation studies to confirm that these measures do indeed characterize the differences in materials treated or untreated with an accelerant.

**Summary Assessment**

The scientific foundations exist to support the analysis of explosions, because such analysis is based primarily on well-established chemistry. As part of the laboratory work, an analyst often will try to reconstruct the bomb, which introduces procedural complications, but not scientific ones.

By contrast, much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite

---

[115] TWGFEX Recommended Guidelines for Forensic Identification of Intact Explosives. Available at http://ncfs.ucf.edu/twgfex/documents.html.
[116] C.R. Midkiff. 2002. Arson and explosive investigation. In: R. Saferstein (ed.). *Forensic Science Handbook*. Vol. 1, 2nd ed. Upper Saddle River, NJ: Prentice Hall.
[117] TWGFEX Recommended Guidelines for Forensic Identification of Post-Blast Explosive Residues. Available at http://ncfs.ucf.edu/twgfex/action_items.html.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set. However, according to testimony presented to the committee,[118] many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., "alligatoring" of wood, specific char patterns) have been shown not to be true.[119] Experiments should be designed to put arson investigations on a more solid scientific footing.

## FORENSIC ODONTOLOGY

Forensic odontology, the application of the science of dentistry to the field of law, includes several distinct areas of focus: the identification of unknown remains, bite mark comparison, the interpretation of oral injury, and dental malpractice. Bite mark comparison is often used in criminal prosecutions and is the most controversial of the four areas just mentioned. Although the identification of human remains by their dental characteristics is well established in the forensic science disciplines, there is continuing dispute over the value and scientific validity of comparing and identifying bite marks.[120]

Many forensic odontologists providing criminal testimony concerning bite marks belong to the American Board of Forensic Odontology (ABFO), which was organized in 1976 and is recognized by the American Academy of Forensic Sciences as a forensic specialty. The ABFO offers board certification to its members.[121]

### Sample Data and Collection

Bite marks are seen most often in cases of homicide, sexual assault, and child abuse. The ABFO has approved guidelines for the collection of evidence from bite mark victims and suspected biters.[122] The techniques for obtaining bite mark evidence from human skin—for example, various forms of photography, dental casts, clear overlays, computer enhancement, electron microscopy, and swabbing for serology or DNA—generally are well established and relatively noncontroversial. Unfortunately, bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and swelling and healing. These features may severely limit the validity of forensic odontology. Also, some practical difficulties, such as distortions in photographs and changes over time in the dentition of suspects, may limit the accuracy of the results.[123]

### Analyses

The guidelines of the ABFO for the analysis of bite marks list a large number of methods for analysis, including transillumination of tissue, computer enhancement and/or digitalization of the bite mark or teeth, stereomicroscopy, scanning electron microscopy, video superimposition, and histology.[124] The guidelines, however, do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what

---

[118] J. Lentini. Scientific Fire Analysis, LLC. Presentation to the committee. April 23, 2007. Available at www7.nationalacademies.org/stl/April%20Forensic%20Lentini.pdf.

[119] NFPA 921 Guide for Explosion and Fire Investigations, 2008 Edition. Quincy, MA: National Fire Protection Association.

[120] E.g., J.A. Kieser. 2005. Weighing bitemark evidence: A postmodern perspective. *Journal of Forensic Science, Medicine, and Pathology* 1(2):75-80.

[121] American Board of Forensic Odontology at www.abfo.org.

[122] Ibid.

[123] Rothwell, op. cit.

[124] American Board of Forensic Odontology, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

degree of probability. There is no science on the reproducibility of the different methods of analysis that lead to conclusions about the probability of a match. This includes reproducibility between experts and with the same expert over time. Even when using the guidelines, different experts provide widely differing results and a high percentage of false positive matches of bite marks using controlled comparison studies.[125]

No thorough study has been conducted of large populations to establish the uniqueness of bite marks; theoretical studies promoting the uniqueness theory include more teeth than are seen in most bite marks submitted for comparison. There is no central repository of bite marks and patterns. Most comparisons are made between the bite mark and dental casts of an individual or individuals of interest. Rarely are comparisons made between the bite mark and a number of models from other individuals in addition to those of the individual in question. If a bite mark is compared to a dental cast using the guidelines of the ABFO, and the suspect providing the dental cast cannot be eliminated as a person who could have made the bite, there is no established science indicating what percentage of the population or subgroup of the population could also have produced the bite. This follows from the basic problems inherent in bite mark analysis and interpretation.

As with other "experience-based" forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases in which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence. Bite marks often are associated with highly sensationalized and prejudicial cases, and there can be a great deal of pressure on the examining expert to match a bite mark to a suspect. Blind comparisons and the use of a second expert are not widely used.

**Scientific Interpretation and Reporting of Results**

The ABFO has issued guidelines for reporting bite mark comparisons, including the use of terminology for conclusion levels, but there is no incentive or requirement that these guidelines be used in the criminal justice system. Testimony of experts generally is based on their experience and their particular method of analysis of the bite mark. Some convictions based mainly on testimony by experts indicating the identification of an individual based on a bite mark have been overturned as a result of the provision of compelling evidence to the contrary (usually DNA evidence).[126]

More research is needed to confirm the fundamental basis for the science of bite mark comparison. Although forensic odontologists understand the anatomy of teeth and the mechanics of biting and can retrieve sufficient information from bite marks on skin to assist in criminal investigations and provide testimony at criminal trials, the scientific basis is insufficient to conclude that bite mark comparisons can result in a conclusive match. In fact, one of the standards of the ABFO for bite mark terminology is that, "Terms assuring unconditional identification of a perpetrator, or without doubt, are not sanctioned as a final conclusion."[127]

---

[125] Bowers, op. cit.

[126] Bowers, op. cit.

[127] American Board of Forensic Odontology, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

Some of the basic problems inherent in bite mark analysis and interpretation are as follows:

(1)     The uniqueness of the human dentition has not been scientifically established.[128]

(2)     The ability of the dentition, if unique, to transfer a unique pattern to human skin and the ability of the skin to maintain that uniqueness has not been scientifically established.[129]

    i.  The ability to analyze and interpret the scope or extent of distortion of bite mark patterns on human skin has not been demonstrated.

    ii. The effect of distortion on different comparison techniques is not fully understood and therefore has not been quantified.

(3)     A standard for the type, quality, and number of individual characteristics required to indicate that a bite mark has reached a threshold of evidentiary value has not been established.

**Summary Assessment**

Despite the inherent weaknesses involved in bite mark comparison, it is reasonable to assume that the process can sometimes reliably exclude suspects. Although the methods of collection of bite mark evidence are relatively noncontroversial, there is considerable dispute about the value and reliability of the collected data for interpretation. Some of the key areas of dispute include the accuracy of human skin as a reliable registration material for bite marks, the uniqueness of human dentition, the techniques used for analysis, and the role of examiner bias.[130] The ABFO has developed guidelines for the analysis of bite marks in an effort to standardize analysis,[131] but there is still no general agreement among practicing forensic odontologists about national or international standards for comparison.

Although the majority of forensic odontologists are satisfied that bite marks can demonstrate sufficient detail for positive identification,[132] no scientific studies support this assessment, and no large population studies have been conducted. In numerous instances, experts diverge widely in their evaluations of the same bite mark evidence,[133] which has led to questioning of the value and scientific objectivity of such evidence.

Bite mark testimony has been criticized basically on the same grounds as testimony by questioned document examiners and microscopic hair examiners. The committee received no evidence of an existing scientific basis for identifying an individual to the exclusion of all others. That same finding was reported in a 2001 review, which "revealed a lack of valid evidence to support many of the assumptions made by forensic dentists during bite mark comparisons."[134] Some research is warranted in order to identify the circumstances within which the methods of forensic odontology can provide probative value.

---

[128] Senn, op. cit.

[129] Ibid.

[130] Ibid.

[131] American Board of Forensic Odontology, op. cit.

[132] I.A. Pretty. 2003. A web-based survey of odontologists' opinions concerning bite mark analyses. *Journal of Forensic Sciences* 48(5):1-4.

[133] C.M. Bowers. 2006. Problem-based analysis of bite mark misidentifications: The role of DNA. *Forensic Science International* 159 Supplement 1:s104-s109.

[134] I.A. Pretty and D. Sweet. 2001. The scientific basis for human bitemark analyses—A critical review. *Science and Justice* 41(2):85-92. Quotation taken from the abstract.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## BLOODSTAIN PATTERN ANALYSIS

Understanding how a particular bloodstain pattern occurred can be critical physical evidence, because it may help investigators understand the events of the crime. Bloodstain patterns occur in a multitude of crime types—homicide, sexual battery, burglary, hit-and-run accidents—and are commonly present. Bloodstain pattern analysis is employed in crime reconstruction or event reconstruction when a part of the crime scene requires interpretation of these patterns.

However, many sources of variability arise with the production of bloodstain patterns, and their interpretation is not nearly as straightforward as the process implies. Interpreting and integrating bloodstain patterns into a reconstruction requires, at a minimum:

- an appropriate scientific education;
- knowledge of the terminology employed (e.g., angle of impact, arterial spurting, back spatter, castoff pattern);
- an understanding of the limitations of the measurement tools used to make bloodstain pattern measurements (e.g., calculators, software, lasers, protractors);
- an understanding of applied mathematics and the use of significant figures;
- an understanding of the physics of fluid transfer;
- an understanding of pathology of wounds; and
- an understanding of the general patterns blood makes after leaving the human body.

### Sample Data and Collection

Dried blood may be found at crime scenes, deposited either through pooling or via airborne transfer (spatter). The patterns left by blood can suggest the kind of injury that was sustained, the final movements of a victim, the angle of a shooting, and more. Bloodstains on artifacts such as clothing and weapons may be crucial to understanding how the blood was deposited, which can indicate the source of the blood. For example, a stain on a garment, such as a shirt, might indicate contact between the person who wore the shirt and a bloody object, while tiny droplets of blood might suggest proximity to a violent event, such as a beating.

### Analyses

Bloodstain patterns found at scenes can be complex, because although overlapping patterns may appear simple, in many cases their interpretations are difficult or impossible.[135, 136] Workshops teach the fundamentals of basic pattern formation and are not a substitute for experience and experimentation when applying knowledge to crime reconstruction.[137] Such workshops are more aptly applicable for the investigator who needs to recognize the importance of these patterns so that he or she may enlist the services of a qualified expert. These courses also are helpful for attorneys who encounter these patterns in the course of preparing a case or when preparing to present testimony in court.

---

[135] H.L. MacDonell. 1997. Bloodstain Patterns. Corning, NY: Laboratory of Forensic Science; S. James. 1998. *Scientific and Legal Applications of Bloodstain Pattern Interpretation.* Boca Raton, FL: CRC Press; P. Pizzola, S. Roth, and P. DeForest. 1986. Blood drop dynamics–II. *Journal of Forensic Sciences* 31(1): 36-49.

[136] Ibid.; R.M. Gardner. 2004. *Practical Crime Scene Processing and Investigation.* Boca Raton, FL: CRC Press; H.C. Lee; T. Palmbach and M.T. Miller. 2005. *Henry Lee's Crime Scene Handbook.* Burlington, MA: Elsevier Academic Press, pp. 281-298.

[137] W.J. Chisum and B.E. Turvey. 2007. *Crime Reconstruction.* Burlington, MA: Elsevier Academic Press.

5-38

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

Although there is a professional society of bloodstain pattern analysts, the two organizations that have or recommend qualifications are the IAI and the Scientific Working Group on Bloodstain Pattern Analysis (SWGSTAIN). SWGSTAIN's suggested requirements for practicing bloodstain pattern analysis are outwardly impressive, as are IAI's 240 hours of course instruction. But the IAI has no educational requirements for certification in bloodstain pattern analysis.[138] This emphasis on experience over scientific foundations seems misguided, given the importance of rigorous and objective hypothesis testing and the complex nature of fluid dynamics. In general, the opinions of bloodstain pattern analysts are more subjective than scientific. In addition, many bloodstain pattern analysis cases are prosecution driven or defense driven, with targeted requests that can lead to context bias.

**Summary Assessment**

Scientific studies support some aspects of bloodstain pattern analysis. One can tell, for example, if the blood spattered quickly or slowly, but some experts extrapolate far beyond what can be supported. Although the trajectories of bullets are linear, the damage that they cause in soft tissue and the complex patterns that fluids make when exiting wounds are highly variable. For such situations, many experiments must be conducted to determine what characteristics of a bloodstain pattern are caused by particular actions during a crime and to inform the interpretation of those causal links and their variabilities. For these same reasons, extra care must be given to the way in which the analyses are presented in court. The uncertainties associated with bloodstain pattern analysis are enormous.

## AN EMERGING FORENSIC SCIENCE DISCIPLINE: DIGITAL AND MULTIMEDIA ANALYSIS

The analysis of digital evidence deals with gathering, processing, and interpreting digital evidence, such as electronic documents, lists of phone numbers and call logs, records of a device's location at a given time, e-mails, photographs, and more. In addition to traditional desktop and laptop computers, digital devices that store data of possible value in criminal investigations include cell phones, GPS devices, digital cameras, personal digital assistants (PDAs), large servers and storage devices (e.g., RAIDS and SANS), video game consoles (e.g., PlayStation and Xbox), and portable media players (e.g., iPods). The storage media associated with these devices currently fall into three broad categories. The first, magnetic memory, includes hard drives, floppy discs, and tapes. The second, optical memory, includes compact discs (CDs), and digital versatile discs (DVDs). The third, electrical storage, includes USB flash drives, some memory cards, and some microchips. These items are the most commonly encountered in criminal and counterintelligence matters, but laboratories have been asked to examine such items as scuba dive watches in death investigations and black boxes in aircraft mishaps.

The proliferation of computers and related devices over the past 30 years has led to significant changes in and the expansion of the types of criminal activities that generate digital evidence. Initially, computers were either the weapon or the object of the crime. In the early days, most computer crime involved manipulating computer programs of large businesses in order to steal money or other resources. As computers became more popular, they became

---

[138] See"Bloodstain Pattern Examiner Certification Requirements," available at: theiai.org/certifications/bloodstain/ requirements.php.

5-39

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

storage containers for evidence. Drug dealers, book makers, and white collar criminals began to keep computerized spreadsheets detailing their transactions. Digital cameras and the Internet have made child pornography increasingly available, and computers act as a digital file cabinet to hold this contraband material. Finally, digital media have become witnesses to daily activities. Many individuals have two cell phones with text messaging and/or e-mail capability, several computers, a home alarm system, a GPS in the car, and more; even children often possess some subset of these items. Workplaces use magnetic card readers to permit access to buildings. Most communication involves some kind of computer, and by the end of each day, hundreds of megabytes of data may have been generated about where individuals have been, how fast they got there, to whom they spoke, and even what was said. Suicide notes are written on computers. Sexual predators stalk their victims online via e-mail, chat, and instant messaging. Even get-away cars are equipped with GPS devices. Finally, computer systems have become (with ever-increasing frequency) the victims of unauthorized control or intrusions. These intrusions often result in the manipulation of files and the exfiltration of sensitive information. In addition, computers in automobiles that track speed, breaking, and turning are valuable in accident reconstruction. As a result, almost every crime could have digital evidence associated with it.

### Sample Data and Collection

The best practices for the collection of digital evidence most often call for the person at the scene to disconnect the power cord for the computer and related peripheral equipments (e.g., monitor, printer) and seize these items, as well as any loose storage media such as thumb drives and CDs. This method works well in most cases. However, some data (like recently typed passwords, malicious programs, and active communication programs) are volatile and are stored in the electronic chips of the system. In these circumstances, this information is lost when the device is turned off. In intrusion investigations or in cases in which encryption software is being used, this volatile information could be the key to a successful analysis and prosecution.[139]

Recognizing potential sources of digital evidence is also an ongoing challenge. Investigators are likely to seize a desktop computer but walk past a PlayStation. Thumb drives can be fashioned to look like a pocket knife, writing pen, or even a piece of sushi. Cell phones and wireless Internet capability present another challenge: If these devices are turned on while in law enforcement custody, they could be remotely accessed and altered by a suspect.

### Analyses

The typical approach to examining a computer involves two main phases. The first is the imaging phase. During this process, the storage device (most often a hard drive) is fitted with an appliance that prevents any new information from being written. Then, all of the data are copied to a new blank hard drive. The copy is compared with the original, most often by using a mathematical algorithm called Message Digest–5, otherwise known as MD5 Hash. The MD5 Hash value gives a unique series of numbers and letters for every file. In the examination phase, this forensically sound copy is examined for saved computer files with probative value. These so-called logical files often are pictures, documents, spreadsheets, and e-mail files that have been saved by the user in various folders or directories. Logical files are patent evidence. Next, the forensic copy is examined for files that have previously been deleted. The computer files are

---

[139] See W.G. Kruse and J.G. Heiser. 2001. *Computer Forensics: Incident Response Essentials*. Boston: Addison-Wesley.

5-40

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

sometimes called physical, because the data are physically present on the hard drive but they are not logically available to the computer operating system. Such files constitute latent evidence.

Finally, system files that are created and saved by the operating system are examined. These files are analogous to a surveillance tape that shows programs that were running on the computer and files that were changed. The goal of most of these examinations is to find files with probative information and to discover information about when and how these files came to be on the computer.[140]

Digital evidence has undergone a rapid maturation process. This discipline did not start in forensic laboratories. Instead, computers taken as evidence were studied by police officers and detectives who had some interest or expertise in computers. Over the past 10 years, this process has become more routine and subject to the rigors and expectations of other fields of forensic science. Three holdover challenges remain: (1) the digital evidence community does not have an agreed certification program or list of qualifications for digital forensic examiners; (2) some agencies still treat the examination of digital evidence as an investigative rather than a forensic activity; and (3) there is wide variability in and uncertainty about the education, experience, and training of those practicing this discipline.

A publication of the Department of Justice Computer Crime and Intellectual Property Section, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*,[141] describes the challenging legal issues surrounding the examination of digital evidence. For example, sometimes the courts have viewed computers as a piece of evidence that is sent to a laboratory for forensic examination, and as having no special legal constraints, while other times, the courts have viewed computers as a virtual room or filing cabinet.[142] For the latter cases, a warrant must be obtained that specifies how the examination will be conducted and which files can be recovered before the electronic device can be examined.

Finally, the analysis of digital evidence differs from other forensic science disciplines because the examination generates not only a forensic report, but also brings to light documents, spreadsheets, and pictures that may have probative value. Different agencies have handled these generated files in different ways: Some treat them as exhibits, while others treat them as derivative evidence that requires a chain of custody and special protection.

A growing number of colleges and universities offer courses in computer security and computer forensics. Still, most law enforcement agencies are understaffed in trained computer security experts.

---

[140] See E. Casey. 2004. *Digital Evidence and Computer Crime.* Burlington: Academic Press; E. Casey. 2001. *Handbook of Computer Crime Investigation: Forensic Tools & Technology.* Burlington: Academic Press; B. Carrier. 2005. *File System Forensic Analysis.* Boston: Addison-Wesley; S. Anson and S. Bunting. 2007. *Mastering Windows Network Forensics and Investigation.* Indianapolis: Sybex; and H. Carvey and D. Kleiman. 2007. *Windows Forensic Analysis.* Burlington: Syngress.

[141] Available at www.usdoj.gov/criminal/cybercrime/s&smanual2002.htm.

[142] See, e.g., G.R. McLain, Jr., 2007. *United States v. Hill*: A new rule, but no clarity for the rules governing computer searches and seizures. *George Mason Law Review* 14(4):1071-1104; D. Regensburger, B. Bytes, and B. Bonds. 2007. An exploration of the law concerning the search and seizure of computer files and an analysis of the Ninth Circuit's decision in *United States v. Comprehensive Drug Testing, Inc. Journal of Criminal Law and Criminology* 97(4)1151-1208.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## CONCLUSIONS

The term "forensic science" encompasses a broad range of disciplines, each with its own set of technologies and practices. Wide variability exists across forensic science disciplines with regard to techniques, methodologies, reliability, error rates, reporting, underlying research, general acceptability, and the educational background of its practitioners. Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology, and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as fibers, hair, and fire debris). Some methods result in class evidence and some in the identification of a specific individual—with the associated uncertainties. The level of scientific development and evaluation varies substantially among the forensic science disciplines.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 6
# IMPROVING METHODS, PRACTICE, AND PERFORMANCE IN FORENSIC SCIENCE

In a presentation to the committee, Jennifer Mnookin, of the University of California, Los Angeles School of Law, cautioned against yielding to two extremes in developing expectations for the forensic science disciplines. The first is the risk of letting the "perfect" be the enemy of the "good." That is, many forms of forensic investigation and analysis may work relatively well once appropriate tasks have been set for them. "The opposite danger is the risk of overconfidence about what we think we know—the risk of making unjustified inferences on the basis of limited information, or sometimes a resistance to gaining new information that would help us do it better."[1]

Nonetheless, a number of the forensic science disciplines, as they are currently practiced, do not contribute as much to criminal justice as they could. This chapter discusses the improvements that are needed and makes four major recommendations. It does not evaluate the quality of evidence collection and management—steps that provide the inputs to forensic methods—although, obviously, the quality of those steps is critical in maximizing the investigative and probative value of that evidence.

## INDEPENDENCE OF FORENSIC SCIENCE LABORATORIES

The majority of forensic science laboratories are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency. This system leads to significant concerns related to the independence of the laboratory and its budget. Ideally, public forensic science laboratories should be independent of or autonomous within law enforcement agencies. In these contexts, the director would have an equal voice with others in the justice system on matters involving the laboratory and other agencies. The laboratory also would be able to set its own priorities with respect to cases, expenditures, and other important issues. Cultural pressures caused by the different missions of scientific laboratories vis-à-vis law enforcement agencies would be largely resolved. Finally, the forensic science laboratories would be able to set their own budget priorities and not have to compete with the parent law enforcement agencies.

## UNCERTAINTIES AND BIAS

Few forensic science methods have developed adequate measures of the accuracy of inferences made by forensic scientists. All results for every forensic science method should indicate the uncertainty in the measurements that are made, and studies must be conducted that enable the estimation of those values. For the identification sciences (e.g., friction ridge analysis, toolmark analysis, handwriting analysis), such studies would accumulate data about the intraindividual variability (e.g., how much one finger's impressions vary from impression to impression, or how much one toolmark or signature varies from instance to instance) and the

---

[1] J. Mnookin, Professor of Law, University of California, Los Angeles Law School. Presentation to the committee. April 23, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

interindividual variability (e.g., how much the impressions of many fingerprints vary across a population and in what ways). With that information, one could begin to attach confidence limits to individualization determinations and also begin to develop an understanding of how much similarity is needed in order to attain a given level of confidence that a match exists. Note that this necessary step would change the way the word "individualization" is commonly used. The concept of individualization is that an object found at a crime scene can be uniquely associated with one particular source. By acknowledging that there can be uncertainties in this process, the concept of "uniquely associated with" must be replaced with a probabilistic association, and other sources of the crime scene evidence cannot be completely discounted. The courts already have proven their ability to deal with some degree of uncertainty in individualizations, as demonstrated by the successful use of DNA analysis (with its small, but nonzero, error rate).

Finally, as discussed in Chapter 4, the accuracy of forensic methods resulting in classification or individualization conclusions needs to be evaluated in well-designed and rigorously conducted studies. The level of accuracy of an analysis is likely to be a key determinant of its ultimate probative value.

Some initial and striking research has uncovered the effects of some biases in forensic science procedures,[2] but much more must be done to understand the sources of bias and to develop countermeasures.[3] Some principles employed in other fields should be useful, although some (e.g., blinding) may not be feasible for some types of forensics work. The forensic science disciplines are just beginning to become aware of contextual bias and the dangers it poses. The traps created by such biases can be very subtle, and typically one is not aware that his or her judgment is being affected. An overview of the effect of bias in the forensic science disciplines can be found in Risinger et al., 2002.[4] Decisions regarding what analyses need to be performed and in what order also can be influenced by bias and ultimately have the potential to skew results.

Forensic scientists who sit administratively in law enforcement agencies or prosecutors' offices, or who are hired by those units, are subject to a general risk of bias. Bias also is introduced through decisions made about evidence collection, which controls who is listed as a suspect. Evidence collection and crime scene investigation can require scientific knowledge and judgment, and these functions are normally outside the control of forensic scientists.

---

[2] E.g., I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56 (4):600-616; I.E. Dror, D. Charlton, and A Peron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156(1):74-78; D.E. Krane, S. Ford, J.R. Gilder, K. Inman, A. Jamieson, R. Koppl, I.L. Kornfield, D.M. Risinger, N. Rudin, M.S. Taylor, and W.C Thompson. 2008. Sequential unmasking: A means of minimizing observer effects in forensic DNA interpretation. *Journal of Forensic Sciences* 53(4):1006-1007; L.S. Miller. 1987. Procedural bias in forensic science examinations of human hairs. *Law and Human Behavior* 11(2):157-163.

[3] See the discussion of biases provided in Chapter 4.

[4] D.M. Risinger, M.J. Saks, W.C. Thompson, and R. Rosenthal. 2002. The *Daubert/Kumho* implications of observer effects in forensic science: Hidden problems of expectation and suggestion. *California Law Review* 90:1-56; Krane, et al., op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY

## REPORTING RESULTS

There is a critical need in most fields of forensic science to raise the standards for reporting and testifying about the results of investigations. For example, many terms are used by forensic examiners in reports and in court testimony to describe findings, conclusions, and the degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates evidence. Yet the forensic science disciplines have not reached agreement or consensus on the precise meaning of any of these terms. Although some disciplines have developed vocabulary and scales to be used in reporting results, they have not become standard practice. This imprecision in vocabulary stems in part from the paucity of research in forensic science and the corresponding limitations in interpreting the results of forensic analyses. Publications such as Evett et al. [5], Aitken and Taroni[6], and Evett[7] provide the essential building blocks for the proper assessment and communication of forensic findings.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should describe, at a minimum, methods and materials, procedures, results, and conclusions, and they should identify, as appropriate, the sources of uncertainty in the procedures and conclusions along with estimates of their scale (to indicate the level of confidence in the results). Although it is not appropriate and practicable to provide as much detail as might be expected in a research paper, sufficient content should be provided to allow the nonscientist reader to understand what has been done and permit informed, unbiased scrutiny of the conclusion.

Some forensic laboratory reports meet this standard of reporting, but most do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "The green, brown plant material in item #1 was identified as marijuana"). The norm is to have no description of the methods or procedures used, and most reports do not discuss measurement uncertainties or confidence limits. Many disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. Although some of the Scientific Working Groups have a scoring system for reporting findings, they are not uniformly or consistently used.

Forensic science reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including associated probabilities where possible. Courtroom testimony should be given in lay terms so that all trial participants can understand how to weight and interpret the testimony. In order to enable this, research must be undertaken to evaluate the reliability of the steps of the various identification methods and the confidence intervals associated with the overall conclusions.

---

[5] I.W. Evett, G. Jackson, J.A. Lambert, and S. McCrossan. 2000. The impact of the principles of evidence interpretation on the structure and content of statements. *Science and Justice* 40(4):233-239.

[6] C.G.G. Aitken and F. Taroni. 2004. *Statistics and the Evaluation of Evidence for Forensic Scientists*. 2nd ed. V. Barnett, ed. Chichester, UK: John Wiley & Sons Ltd.

[7] I.W. Evett. 1990. The theory of interpreting scientific transfer evidence. *Forensic Science Progress* 4:141-179.

6-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

## THE NEED FOR RESEARCH

Barry Fisher, Director of the Crime Laboratory of the Los Angeles County Sheriff's Department, has said, "We run the risk of our science being questioned in the courts because there is so little research."[8] In 2001 Giannelli wrote, "In many areas [of forensic science] little systematic research has been conducted to validate the field's basic premises and techniques, and often there is no justification why such research would not be feasible."[9] As Smith et al. note, the United States has a renowned higher education system, and many basic research discoveries relating to the forensic science disciplines have been made in academia.[10] However, the forensic science disciplines suffer from an inadequate research base: Few forensic scientists have the opportunity to conduct research, few academics are positioned to undertake such research, and, importantly, the funding for forensic research is insufficient. Others believe that the field suffers because the research initiatives being funded and pursued lack an overarching strategic plan.[11]

There are several explanations for the relative lack of funding for basic and applied research in the forensic science disciplines. First, forensic practice was started in, and has grown out of, the criminal justice and law enforcement systems. Many forensic science techniques were developed to aid in the investigatory phase of law enforcement and then were adapted to the role of aiding in prosecution by providing courtroom testimony. Thus, forensic practitioners who work in public crime laboratories often are seen as part of the prosecution team, not as part of the scientific enterprise. Second, some of the forensic science disciplines rely on an apprenticeship model for training, rather than on codifying their methods in a scientific framework. Third, federal agencies that fund scientific work, such as the National Science Foundation, the National Institutes of Health, and the Department of Defense, generally have not considered forensic science as part of the science base they need to support. It has been only in recent years that the National Institute of Justice has taken interest in funding forensic science research, but the majority of these funds have been awarded to reduce case backlogs, especially for cases that involve the analysis of DNA (see Chapter 2).

The forensic science disciplines need to develop rigorous protocols for performing subjective interpretations, and they must pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from work in other areas, notably from the large body of research that is available on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called upon to address. Thus, although some techniques may be too imprecise to permit the accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on the subpopulation of the individual from which the specimen was derived, even if it cannot associate reliably the hair with a specific individual. However, the definition of the appropriate question is only a first step in evaluating the

---

[8] K. Pyrek. 2007. *Forensic Science Under Siege: The Challenges of Forensic Laboratories and the Medico-Legal Investigation System.* Burlington, MA: Academic Press, p. 231.

[9] P.C. Giannelli. 2001. Scientific evidence in civil and criminal cases. *Arizona State Law Journal* 103:112.

[10] F.P. Smith, R.H. Liu, and C.A. Lindquist. 1988. Research experience and future criminalists. *Journal of Forensic Sciences* 33(4):1074-1080.

[11] IAI Positions and Recommendations to the NAS Committee to Review the Forensic Sciences. September 19, 2007. See presentation by K.F. Martin, IAI President, to the committee. December 6, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY**

performance of a forensic technique. The research design should address the questions that arise in the specific context of forensics.

A complete research agenda should include studies to establish the strengths and limitations of each procedure, sources of bias and variation, quantification of uncertainties created by these sources, measures of performance, procedural steps in the process of analyzing the forensic evidence, and methods for continual monitoring and improving the steps in that process.

## CONCLUSIONS AND RECOMMENDATIONS

Wide variability is found across forensic science disciplines not only with regard to techniques and methodologies (see Chapter 5), but also with regard to reliability, error rates, reporting, research foundations, general acceptability, and published material. Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis, and analyses of fibers and fire debris); others are based on expert interpretation of observed patterns (e.g., of fingerprints, writing samples, toolmarks, bite marks, and hairs). The briefings and materials that informed this report illustrate that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

In most areas of forensic science, no well-defined system exists for determining error rates, and proficiency testing shows that some examiners perform poorly. In some disciplines, such as forensic odontology, the methods of evidence collection are relatively noncontroversial, but disputes arise over the value and reliability of the resulting interpretations.

In most forensic science disciplines, no studies have been conducted of large populations to establish the uniqueness of marks or features. Yet, despite the lack of a statistical foundation, examiners make probabilistic claims based on their experience. A statistical framework that allows quantification of these claims is greatly needed. These disciplines also critically need to standardize and clarify the terminology used in reporting and testifying about the results and in providing more information.

Little rigorous systematic research has been done to validate the basic premises and techniques in a number of forensic science disciplines. The committee sees no evident reason why conducting such research is not feasible; in fact, some researchers have proposed research agendas to strengthen the foundations of specific forensic disciplines.[12] Much more federal funding is needed to support research in forensic science and forensic pathology in universities and in private laboratories committed to such work. The forensic science and medical examiner communities (see Chapter 9) will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, collaborative efforts are urgently needed to: (1) develop new technical methods or provide in-depth grounding for advances developed in forensic science; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile grounds for discourse among the communities. The proposed National Institute of Forensic Science (NIFS) should recommend, implement, and guide strategies for supporting such initiatives.

Although a long-term research agenda will require a thorough assessment of each of the assumptions that underlie forensic science techniques, many concerns regarding the forensic science disciplines can be addressed immediately through studies in which forensic science

---

[12] See, e.g., L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability and Risk* 7(2):87-109.

6-5

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

practitioners are presented with a standardized set of realistic training materials that vary in complexity. Such studies will not explore the components of the decision process, but they will permit an assessment of the extent to which skilled forensic science practitioners will reach the same or similar conclusions when presented with the types of materials that lead to disagreements.

**Recommendation 2:**

The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.

**Recommendation 3:**

Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:

(a) Studies establishing the scientific bases demonstrating the validity of forensic methods.
(b) The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realistic case scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.
(c) The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.
(d) Automated techniques capable of enhancing forensic technologies.

To answer questions regarding the reliability and accuracy of a forensic analysis, the research must distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether or not a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry.

6-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY

**Recommendation 4:**

> To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.

**Recommendation 5:**

> The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 7
# STRENGTHENING OVERSIGHT OF
# FORENSIC SCIENCE PRACTICE

Several commentators appearing before the committee noted that nearly anyone with a garage and some capital theoretically could open a forensics laboratory and start offering services. Although this might be a bit hyperbolic, the fact is that there are no requirements, except in a few states (New York, Oklahoma, and Texas), for forensics laboratories to meet specific standards for quality assurance or for practitioners to be certified according to an agreed set of standards.[1] Well-publicized problems in large crime laboratories have uncovered systematic deficiencies in quality control. For example, in 2002, the Houston Police Department Crime Laboratory and Property Room came under scrutiny because of a range of quality concerns that created "profound doubts about the integrity of important aspects of the criminal justice system in Harris County."[2] Problems included poor documentation, serious analytical and interpretive errors, the absence of quality assurance programs, inadequately trained personnel, erroneous reporting, the use of inaccurate and misleading statistics, and even "drylabbing" (the falsification of scientific results).[3] In most cases, existing efforts to impose standards and best practices in forensic science practice rely on the voluntary participation of some members of the forensic science community working diligently to improve overall quality in the field.

Despite important movement in recent years toward developing and implementing quality control measures in the forensic science disciplines, a lack of uniform and mandatory quality assurance procedures, combined with some highly publicized problems involving large crime laboratories, has led to heightened attention to efforts to remedy uneven quality among laboratories through the imposition of standards and best practices. The American Bar Association has recommended that, "Crime laboratories and medical examiner officers should be accredited, examiners should be certified, and procedures should be standardized and published to ensure the validity, reliability, and timely analysis of forensic evidence."[4]

In *Daubert v. Merrell Dow Pharmaceuticals,*[5] the Supreme Court cited as a relevant factor in assessing expert testimony the "existence and maintenance of standards controlling the technique's operation." Standards and best practices create a professional environment that allows organizations and professions to create quality systems, policies, and procedures and maintain autonomy from vested interest groups. Standards ensure desirable characteristics of services and techniques such as quality, reliability, efficiency, and consistency among practitioners. Typically standards are enforced through systems of accreditation and certification,

---

[1] See N.Y. EXEC. § 995-b (McKinney 1996); (accreditation by Forensic Science Commission); OKLA. STAT. ANN. tit. 74 § 150.37 (requiring accreditation by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board or the American Board of Forensic Toxicology); TEX. CRIM. PROC. CODE art. 38.35 (accreditation by the Department of Public Safety).

[2] M.R. Bromwich. 2007. *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room.* June 13. Available at www.hpdlabinvestigation.org, p. 1.

[3] Ibid.

[4] American Bar Association. 2006. *Report of the ABA Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process. Achieving Justice: Freeing the Innocent, Convicting the Guilty.* P.C. Giannelli and M. Raeder (eds.) Chicago: American Bar Association.

[5] 509 U.S. 579 (1993).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

wherein independent examiners and auditors test and audit the performance, policies, and procedures of both laboratories and service providers. In addition, requirements for quality control can be imposed on entities receiving federal funds, and professional groups can develop codes of ethics and conduct to serve as measures against which performance can be assessed.

This chapter addresses some of the traditional approaches used by technical professions to enhance the quality of performance—accreditation, certification (including proficiency testing), and oversight—tied to federal funding. In each approach, standards are used to measure the quality of institutions or organizations, either in terms of their policies and procedures or in terms of the proficiency and skills of an individual practicing the discipline. However, as mentioned above, with the exception of three states mandating certification (New York, Oklahoma, and Texas), the accreditation of laboratories and certification of forensic examiners remains voluntary.

## ACCREDITATION

Accreditation is just one aspect of an organization's quality assurance program, which also should include proficiency testing where relevant, continuing education, and other programs to help the organization provide better overall services. In the case of laboratories, accreditation does not mean that accredited laboratories do not make mistakes, nor does it mean that a laboratory utilizes best practices in every case, but rather, it means that the laboratory adheres to an established set of standards of quality and relies on acceptable practices within these requirements. An accredited laboratory has in place a management system that defines the various processes by which it operates on a daily basis, monitors that activity, and responds to deviations from the acceptable practices using a routine and thoughtful method. This cannot be a self-assessing program. Oversight must come from outside the participating laboratory to ensure that standards are not self-serving and superficial and to remove the option of taking shortcuts when other demands compete with quality assurance. In addition, accreditation serves as a mechanism to strengthen professional community ties, transmit best practices, and expose laboratory employees directly to the perspectives and expectations of other leaders in the profession.

An example of a strong accreditation system is that required through the Clinical Laboratory Improvement Amendments of 1988 (CLIA).[6] Through this legislation, the Centers for Medicare & Medicaid Services (CMS) regulates all clinical laboratory testing (except research) performed on humans in the United States. In total, CLIA covers approximately 189,000 laboratory entities (see Box 7-1).

Some key elements of CLIA and of other accreditation programs that might be incorporated into a mandatory accreditation system for forensic science include:

- a national organization that can mediate the accreditation process;
- an application process with criteria by which organizations are eligible to apply;
- a process of self-evaluation;
- an external evaluation process, including site visits by external evaluators;

---

[6] 42 U.S.C. § 263a.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

- an appeals process;
- a repeat cycle of evaluation and external evaluation, and;
- a set of standards by which entities can be evaluated.[7]

---

**Box 7-1 Clinical Laboratory Improvement Amendments of 1988 (CLIA)**

The objective of the CLIA program is to ensure quality laboratory testing. All clinical laboratories must be properly certified to receive Medicare or Medicaid payments. CLIA requires all entities that perform even one test using "materials derived from the human body for the purpose of providing information for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of, human beings" to meet certain federal requirements. If an entity performs tests for these purposes, it is considered to be covered by CLIA and must register with the CLIA program.

CMS and CDC develop standards for laboratory certification (it is actually a certificate of accreditation). In addition, CDC conducts studies and convenes conferences to help determine when changes in regulatory requirements are needed. Oversight is conducted through onsite inspections of laboratories conducted every two years using federal surveyors or surveyors of deemed organizations or state-operated CLIA programs approved for this purpose. Oversight includes a comprehensive evaluation of the laboratory's operating environment and personnel, as well as its proficiency testing, quality control, and quality assurance procedures. The laboratory director plays a critical role in assuring the safe and appropriate use of laboratory tests—he or she must meet required qualifications and must ensure that the test methodologies selected are capable of providing the quality of results required for patient care. Laboratory directors are required to take specific actions to establish a comprehensive quality assurance program.

Six organizations are deemed to offer accreditation of laboratories for CLIA. An accreditation organization that applies or reapplies to CMS for deeming authority, or a state licensure program that applies or reapplies to CMS for exemption from CLIA program requirements of licensed or approved laboratories within the state, must provide extensive documentation of its process. This includes a detailed description of the inspection process, a description of the steps taken to monitor the correction of deficiencies, a description of the process for monitoring performance, procedures for responding to and for the investigation of complaints against its laboratories, and a list of all its current laboratories and the expiration dates of their certification.

CLIA also provides for sanctions that may be imposed on laboratories found to be out of compliance with one or more of the conditions of accreditation (e.g., unsuccessful participation in proficiency testing). These include suspension, limitation, or revocation of the certificate; civil suit to enjoin any laboratory activity that constitutes a significant hazard to the public health; and imprisonment or fine for any person convicted of the intentional violation of CLIA requirements. The regulations also require that the Department of Health and Human Services Secretary annually publish a list of all laboratories that have been sanctioned during the preceding year. Sanctions can be appealed.

SOURCE: www.cms.hhs.gov/clia/.

---

In addition, accrediting organizations typically offer education and training programs to help the participating entities comply with the standards. Accreditation cannot guarantee high quality—that is, it cannot guard against those who intentionally disobey or ignore requirements. However, over time it can reduce the likelihood that violations will occur, and reports of

---

[7] Institute of Medicine. 2001. *Preserving Public Trust: Accreditation and Human Research Participation Protection Programs.* Washington, D.C.: National Academy Press.

7-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

infractions should trigger increased scrutiny by an accrediting body. And, by requiring that education be a standard that must be met as a condition of accreditation, incremental change and quality improvement can be achieved individual by individual.

### Development of Current Forensic Laboratory Accrediting Organizations

In the 1970s, FBI Director Clarence Kelley and FBI Laboratory Director Briggs White organized a group of crime laboratory directors that eventually became known as the American Society of Crime Laboratory Directors, or ASCLD. ASCLD's Committee on Laboratory Evaluation and Standards was focused on developing quality assurance standards, and in 1981 the ASCLD/Laboratory Accreditation Board (ASCLD/LAB) was formed. In 1988, it was officially incorporated as a not-for-profit organization.

In 1994, the passage of the DNA Identification Act established a DNA Advisory Board (DAB) to develop and enforce quality assurance standards for crime laboratories seeking access to the FBI's national database of DNA profiles (see below). The DAB recommended that crime laboratories seek accreditation as quickly as possible. According to the *Crime Lab Report*, "Because ASCLD/LAB policies and procedures would not allow accreditation to be awarded to a single work unit, laboratories that were not prepared to undergo a full ASCLD/LAB accreditation assessment seemed to have no other alternative but to forfeit access to the DNA database until they were ready for a full accreditation audit."[8]

In 1995, the private not-for-profit corporation National Forensic Science Technology Center (NFSTC) was formed by the ASCLD executive board for training, education, and support of accreditation.[9] NFSTC could support and assist crime laboratories preparing for a full ASCLD/LAB accreditation as well as audit and temporarily certify DNA units that complied with DNA-specific quality assurance standards.[10,11] NFSTC subsequently formed a new independent accreditation corporation, Forensic Quality Services (FQS), with the idea that its program would be based on the new ISO/IEC 17025 international standard for testing and calibration laboratories.[12]

In 2003, the ASCLD/LAB Delegate Assembly approved the implementation of an ISO/IEC 17025 program, and ASCLD/LAB began offering these accreditations in April 2004. Accreditations for forensic science laboratories are now conducted using *General requirements for the competence of testing and calibration laboratories 17025 ISO/IEC* (2005),[13] the same requirements under which private and public laboratories are accredited. The international standards are developed through technical committees to deal with particular fields of technical activity. In order for sector specific requirements for forensic laboratories to be addressed, ISO allows for the amplification of requirements or supplemental requirements, such as *ASCLD/LAB-International Supplemental requirements for the accreditation of forensic science testing laboratories* (2006).

ASCLD/LAB's areas of focus are laboratory management and operations, personnel qualifications, and the physical plant. The following must be in place for accreditation:

---

[8] *Crime Lab Report*. December 20, 2007. Available at www.crimelabreport.com/monthly_report/12-2007.htm.

[9] See http://nfstc.org/aboutus/history/history.htm.

[10] Ibid.

[11] DNA procedures are regulated under the DNA Identification Act of 1994. DNA Identification Act of 1994, 42 U.S.C. § 14132 (1994).

[12] See www.forquality.org.

[13] See www.iso.org/iso/catalogue_detail?csnumber=39883.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

- procedures to protect evidence from loss, cross-transfer, contamination, and/or deleterious change;
- validated and documented technical procedures;
- the use of appropriate controls and standards;
- calibration procedures;
- complete documentation of all evidence examination;
- documented training programs that include competency testing;
- technical review of a portion of each examiner's work product;
- testimony monitoring of all who testify; and
- a comprehensive proficiency testing program.[14]

The ASCLD/LAB accreditation cycle is five years, with annual reports required from each accredited laboratory that consist of any changes in management, staff, facilities, methodologies, proficiency testing, and testimony monitoring. All accredited laboratories must maintain written copies of appropriate technical procedures, including descriptions of sample preparation methods, controls, standards, and calibration procedures, as well as a discussion of precautions, sources of possible error, and literature references. In addition, ASCLD/LAB has a policy regarding the reporting of noncompliance with requirements, a portion of which is excerpted below:

> In keeping with the stated objective of 'identifying those laboratories which meet established standards,' the ASCLD/LAB Board has determined that, as an accrediting body, we must be timelier in reviewing instances of significant non-compliance. To further this objective, all accredited laboratories must disclose to ASCLD/LAB all substantive occurrences of non-compliance within 30 calendar days of determining that the non-compliance has occurred.[15]

In addition to this particular requirement, the ISO program has a requirement for an annual surveillance visit. During this site visit, any issues that may have come to the attention of ASCLD/LAB and/or requirements selected by ASCLD/LAB are reviewed. The accreditation programs are managed by a paid staff member working under the direction of a board of directors, which is elected by the Delegate Assembly. The Delegate Assembly is composed of the directors of all accredited laboratories and laboratory systems. Inspectors must complete a training program and must be employed in an accredited laboratory. At any time, if an issue is brought to the attention of ASCLD/LAB, the board of directors can, after determining that the claim is substantive, implement an interim inspection of that particular issue and the entire laboratory. The program also includes a system of sanctions and an appeal process.

**Status of Accreditation**

ASCLD/LAB's international program has accredited 60 laboratories as of April 2008, in addition to 337 laboratories accredited under the original Legacy program.[16] FQS-International (FQS-I) has accredited just over 50 laboratories in 1 or more disciplines; however, FQS-I allows

---

[14] R. Stacey, President, ASCLD/LAB. Presentation to the committee. January 25, 2007.
[15] 2008 version of the ASCLD/LAB Legacy Accreditation Manual.
[16] See www.ascld-lab.org/legacy/aslablegacylaboratories.html.

7-5

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

forensic laboratories to customize their accreditation by phasing in one discipline at a time.[17] A survey of International Association for Identification (IAI) members, who tend to work in settings other than traditional crime laboratories, revealed that only 15 percent of respondents are accredited.[18]

Only a few jurisdictions require that their forensics laboratories be accredited. According to the 2005 census of 351 publicly funded crime laboratories, more than three-quarters of laboratories (78 percent) were accredited by ASCLD/ LAB.[19] Another 3 percent were accredited by some other professional organization, such as the ISO. State-operated laboratories (91 percent) were more likely to be accredited than laboratories serving county (67 percent) or municipal (62 percent) jurisdictions. Among the 230 laboratories providing accreditation information in both the 2002[20] and 2005 censuses, the accreditation rate increased during the three years from 75 to 87 percent.

However, identification units—that is, those forensic entities outside crime laboratories—do not participate in accreditation systems and are not required to do so. Given that some disciplines are practiced largely outside the laboratory environment (e.g., 66 percent of fingerprint analyses are not conducted in crime laboratories), there is a substantial gap in the number of programs participating in accreditation.[21,22]

As mentioned previously, DNA analysis is regulated under the DNA Identification Act of 1994, which created an advisory board on quality assurance, tasked with promulgating standards for proficiency testing of laboratories and analysts. The terms of the original advisory board expired, and now the FBI Quality Assurance Standards apply to DNA laboratories receiving federal funds. The standards require periodic (every other year) audits using the FBI Quality Assurance Standards to ensure compliance. The FBI guidelines require that two proficiency tests be completed annually by DNA examiners as well as by technical support personnel performing relevant analytical techniques. The tests must be administered by a source external to the laboratory. The FBI is responsible for developing and maintaining a DNA audit document for assessing compliance with DNA standards and also provides DNA auditor instruction to all ASCLD/LAB inspectors, in addition to the forensic DNA community, on how to interpret the DNA standards. The FBI also reviews audit findings and remedial action, if any. Once all standards are met, it notifies the laboratory of full compliance.

---

[17] See www.forquality.org/fqs_l_Labs.htm.

[18] T.S. Witt. Director, Bureau of Business and Economic Research, West Virginia University. Presentation to the committee. December 6, 2007.

[19] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[20] J.L. Peterson and M. J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf.

[21] Witt, op. cit.

[22] Accreditation is also available for other more specific forensic science disciplines. For example, the National Association of Medical Examiners (NAME) operates an accreditation program for coroners and medical examiners offices (see Chapter 9). The American Board of Forensic Toxicology accredits toxicology laboratories.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

## STANDARDS AND GUIDELINES FOR QUALITY CONTROL

Standards provide the foundation against which performance, reliability, and validity can be assessed. Adherence to standards reduces bias, improves consistency, and enhances the validity and reliability of results. Standards reduce variability resulting from the idiosyncratic tendencies of the individual examiner—for example, setting conditions under which one can declare a "match" in forensic identifications. They make it possible to replicate and empirically test procedures and help disentangle method errors from practitioner errors. Importantly, standards not only guide practice but also can serve as guideposts in accreditation and certification programs. Many forensic science disciplines have developed standards, but others have not, which contributes to questions about the validity of conclusions.

Several groups produce standards for use in the forensic science disciplines. For example, ASTM International (ASTM), originally known as the American Society for Testing and Materials, is an international standards organization that develops and publishes voluntary technical standards for a wide range of materials, products, systems, and services. In the area of forensic science it offers, for example:

- Standard Guide for Minimum Training Requirements for Forensic Document Examiners
- Standard Guide for Forensic Paint Analysis and Comparison
- Standard Guide for Non-destructive Examination of Paper
- Standard Guide for Forensic Analysis of Fibers by Infrared Spectroscopy
- Standard Terminology for Expressing Conclusions of Forensic Document Examiners

At the federal level, the National Institute of Standards and Technology (NIST) conducts research to establish standards in a limited number of forensic areas, for example, organic gunshot residue analysis, trace explosives detectors, and improvised explosive devices.[23] Its laboratories develop tests, test methods, produce reference data, conduct proof-of-concept implementations, and perform technical analyses. They also develop guides to help forensic organizations formulate appropriate policies and procedures, such as those concerning mobile phone forensic examinations. These guides are not all-inclusive and they do not prescribe how law enforcement and incident response communities should handle investigations. Instead, they provide principles for establishing policies and procedures.[24]

In accordance with ISO/IEC 17025, which states that all technical procedures used by a science laboratory should be fully validated before they are used in casework, the European Network of Forensic Science Institutes has developed a guidance document for its member laboratories to use in validating techniques employed in forensic casework.[25]

---

[23] B. MacCrehan. National Institute of Standards and Technology. Analytical Chemistry Division. Presentation to the committee. September 21, 2007.

[24] B. Guttman. National Institute of Standards and Technology National Software Reference Library. Presentation to the committee. September 21, 2007.

[25] European Network of Forensic Science Institutes Standing Committee for Quality And Competence (QCC). 2006. *Validation and Implementation of (New) Methods.*

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

The FBI initiated the first Scientific Working Groups (SWGs) in the early 1990s to facilitate consensus around forensic science operations among federal, state, and local agencies.[26] Each SWG has a formal structure and functions in accordance with its bylaws. Membership is at the discretion of the chair of the working group. Most SWGs include members from both public and private organizations. Meetings held at least once a year allow SWG members to discuss issues of concern and reach consensus on documents drafted throughout the year. The SWGs create, prepare, and publish standards and guidelines for their constituents in the forensic science community. These documents provide crime laboratories a basis for operational requirements, although the committee found that some standards and guidelines lack the level of specificity needed to ensure consistency. However, enforcement of the guidelines is left to the appropriate governing agency and each group's internal policies. The SWGs generate voluntary guidelines and protocols, which carry no force of law. Nonetheless, the SWGs have been a source of improved standards for the forensic science disciplines and represent the results of a profession that is working to strengthen its professional services with only limited resources.

The FBI Laboratory currently sponsors the following groups:

- Scientific Working Group for Firearms and Toolmarks (SWGGUN)
- Scientific Working Group for Forensic Document Examination (SWGDOC)
- Scientific Working Group for Materials Analysis (SWGMAT)
- Scientific Working Group on Bloodstain Pattern Analysis (SWGSTAIN)
- Scientific Working Group on DNA Analysis Methods (SWGDAM)
- Scientific Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG)
- Scientific Working Group on the Forensic Analysis of Chemical Terrorism (SWGFACT)
- Scientific Working Group on the Forensic Analysis of Radiological Materials (SWGFARM)
- Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)
- Scientific Working Group on Microbial Genetics and Forensics (SWGMGF)
- Scientific Working Group on Shoeprint and Tire Tread Evidence (SWGTREAD)

Additional SWGs may be sponsored by other FBI divisions or other agencies. For example, the U.S. Drug Enforcement Administration supports the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) (see Box 7-2).

| Box 7-2 A Sampling of SWGs |
| --- |
| **SWGDRUG**[27] |
| In 1997, the Drug Enforcement Agency and the Office of National Drug Control Policy created and sponsored a Technical Working Group for the Analysis of Seized Drugs (TWGDRUG), which was renamed a Scientific Working Group (SWGDRUG) in 1999. The stated objectives of SWGDRUG include the specification of requirements for forensic drug practitioners, the promotion of professional development, the exchange of information within the forensic science community, the promotion of ethical standards of practitioners, the provision of minimum standards for drug examinations and reporting, the establishment of quality assurance requirements, the consideration of relevant |

---

[26] Federal Bureau of Investigation. 2000. Scientific Working Groups. Available at www.fbi.gov/hq/lab/fsc/ backissu/july2000/swgroups.htm.

[27] N. Santos. 2007. "Drug Identification." Presentation to the committee. April 23, 2007.

7-8

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

international standards, and the promotion of international acceptance of SWGDRUG recommendations. Individual subcommittees currently are devoted to evaluating analytical methods, setting standards for quality assurance, estimating uncertainty, formatting draft and final recommendations, and maintaining a glossary. The subcommittee develops recommendations, which the core committee votes to accept or reject. If accepted, draft documents are released for public comment for at least 60 days. Following public comment and possible revision, the core committee holds a final vote. Three-quarters of the core committee must be present, and two-thirds of those present must vote affirmatively in order to confer official status to a proposed recommendation.

SWGDRUG has produced guidelines for quality assurance protocols, methods of analysis and identification of seized drugs, and education and training materials for forensic practitioners. Quality assurance guidelines emphasize the integrity and storage of evidence, the validation and documentation of procedures, and the verification of standards. Among SWGDRUG's recommendations for education is a requirement that entry level forensic drug analysts possess at least a bachelor's degree in a natural science, with coursework in general, organic, and analytical chemistry. Guidelines on methods and analyses categorize analytical techniques into three groups, according to discriminating ability: "A" techniques are deemed the most discriminating, and "C" techniques are considered the least discriminating. For the purposes of identifying substances, SWGDRUG recommends the use of at least one "A" technique and one other additional test for validation. When an "A" technique cannot be used, at least two uncorrelated "B" tests and one additional method are suggested. SWGDRUG also has released supplementary documents to assist in implementing these guidelines.

### SWGGUN[28]

The FBI established SWGGUN in 1998 and has continued to fund the initiative in subsequent years. Subcommittees of a 20-member board draft guidelines in conjunction with external experts. Guidelines are posted on the SWGGUN website for public comment before the board finalizes the recommendations with an affirmative vote by two-thirds of the members present at a meeting.[29] Currently, SWGGUN offers guidelines on trigger pull analysis, education and experience requirements for firearm and toolmark examiners and trainees, laboratory training manuals, laboratory quality assurance programs, the range of possible conclusions when comparing toolmarks, projectile path reconstruction, and the examination of silencers. The SWGGUN website also offers an "admissibility resource kit," which offers arguments intended to satisfy the prongs of the *Daubert* standard.

### SWGMAT[30]

Since 1996, SWGMAT has been issuing voluntary guidelines addressing trace evidence, including hair comparison. Quality assurance guidelines, published in 2000, advise that two examiners separately analyze samples and suggest minimum levels for training and qualifications for examiners and laboratories. Hair comparison guidelines, published in 2005, address techniques for collecting hair samples, examining and interpreting protocols for microscopic examination, and using DNA testing in hair analysis. Notably, the use of DNA testing of hair is advised only after an initial microscopic analysis is conducted. In contrast to the larger forensic science community's recent interest in blind testing and statistical verification, SWGMAT proposes the following approach: The examiner should consider what meaning can be attached to an exclusion or association based upon the known case circumstances. Probabilities and population statistics should not be used in the interpretation of microscopic hair

---

[28] P. Striupaitis, Chair, IAI Firearm/Toolmark Committee, and member, SWGGUN. Presentation to the committee. April 23, 2007.

[29] Ibid.

[30] R.E. Bisbing, Executive Vice President, McCrone Associates, Inc., and member SWGMAT. Presentation to the committee. April 24, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

comparisons. Databases, from which population statistics can be generated (as is done in DNA analysis), are not practical or realistic for hair analysis.

### SWGFAST[31]

In 1995, the FBI created a Technical Working Group on Friction Ridge Analysis, Study, and Technology (TWGFAST). The group was renamed as a Scientific Working Group (SWGFAST) in 1998 and has continued to provide guidelines on fingerprint evidence, with funding from the FBI. Additionally, a National Institute of Justice grant has supported the development of a forthcoming SWGFAST reference manual.

The SWGFAST bylaws allow for up to 40 members and require biannual meetings. Members have included agency employees from federal, state, local, and foreign bodies and from the academic and private sectors. Proposed guidelines are released to the community for comment after receiving an affirmative vote by two-thirds of the SWGFAST members present at a meeting. A draft document is adopted following community review and feedback, if two-thirds of the members present at a meeting again vote in favor of such action. Accepted guidelines are reconsidered five years after adoption. Existing SWGFAST guidelines address automation training, digital imaging, friction ridge analysis for latent print examination, latent print proficiency testing, professional conduct, minimum qualifications and competency for latent print trainees, quality assurance, interpretation and conclusions, and validation research.[32]

Like all other SWG documents, SWGFAST's guidelines have no inherent authority or force of law. However, in collaboration with academic institutions, law enforcement agencies, and industy, SWGFAST has participated in the development of a standard data format for the Interchange of Fingerprint, Facial, & Scar Mark and Tattoo Information, through the American National Standard for Information Systems-NIST (ANSI-NIST-ITL 1-2007). Additionally, crime laboratories have purportedly relied on SWGFAST guidelines in order to meet the ASCLD/LAB accreditation Standards.[33]

Despite the proliferation of standards in many of the forensic science disciplines, their voluntary nature and inconsistent application make it difficult to assess their impact. Ideally, standards should be consistently applicable and measurable. In addition, mechanisms should be in place for their enforcement, with sanctions imposed against those who fail to comply. As such, standards should be developed with a consideration of the relevant measures that will be used to provide a meaningful evaluation of an organization's or individual's level of compliance. Appropriate standards must be coupled with effective systems of accreditation and/or certification that include strong enforcement mechanisms and sanctions.

Individual laboratories undergoing accreditation develop their own laboratory protocols. Whether these protocols adhere to the SWG standards depends on the individual examiners in the discipline in the laboratory in question. Accrediting bodies require that the methods meet a level of acceptable practice. Currently, most of these practices are slight variations of the SWG guidelines, with adjustments to accommodate differences in equipment.

---

[31] S. Meagher, Fingerprint Specialist, Federal Bureau of Investigation, and Vice-Chair SWGFAST. Presentation to the committee. April 24, 2007.
[32] See www.theiai.org/guidelines/swgfast/index.php.
[33] Meagher, op. cit.

7-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

## PROFICIENCY TESTING

Although many forensic science disciplines have engaged in proficiency testing for the past several decades, several courts have noted that proficiency testing in some disciplines is not sufficiently rigorous.[34] ASCLD/LAB's website states that "Proficiency testing is an integral part of an effective quality assurance program. It is one of many measures used by laboratories to monitor performance and to identify areas where improvement may be needed. A proficiency testing program is a reliable method of verifying that the laboratory's technical procedures are valid and that the quality of work is being maintained." [35] Similarly, ISO/IEC 17025 policies state:

> Proficiency testing is one of the important tools used by laboratories and Accreditation Bodies for monitoring test and calibration results and for verifying the effectiveness of the accreditation process. As such, it is an important element in establishing confidence in the competence of Signatories and their accredited laboratories covered by this Arrangement.[36]

There are several types of proficiency tests, with the primary distinction among them being whether the examiner is aware that he or she is being tested (an open or declared test) or does not realize that the sample presented for analysis is a test sample and not a real case (a blind test). Tests can be generated externally, by another laboratory (sometimes called an interlaboratory test), or internally. Another type of testing involves random case reanalysis, in which an examiner's completed prior casework is randomly selected for reanalysis by a supervisor or another examiner.[37]

Interlaboratory testing can be conducted for a number of purposes:

(1)    to determine the performance of individual laboratories for specific tests or measurements and to monitor laboratories' continuing performance;

(2)    to identify problems in laboratories and initiate remedial actions, which may be related to, for example, individual staff performance or the calibration of instrumentation;

---

[34] See *United States v. Crisp*, 324 F.3d 261, 274 (4th Cir. 2003); *United States v. Llera Plaza*, 188 F. Supp. 2d 549, 565, 558 (E.D. Pa. 2002); *United States v. Lewis*, 220 F. Supp. 2d 548, 554 (S.D. W.Va. 2002).

[35] See www.ascld-lab.org/legacy/pdf/aslabinternproficiencyreviewprogram.pdf. It is worth noting that several studies have assessed or published crime laboratory proficiency testing results, which generally reveal the need for improvement: J.L. Peterson, E.L. Fabricant, K.S. Field, and J.I. Thornton. 1978. *Crime Laboratory Proficiency Testing Research Program.* Washington, DC: U.S. Government Printing Office; J.L. Peterson and P. Markham. 1995. Crime laboratory proficiency testing results, 1978-1991, I: Identification and classification of physical evidence. *Journal of Forensic Sciences* 40(6):994-1008; J.L. Peterson and P. Markham, 1995. Crime laboratory proficiency testing results, 1978-1991, II: Resolving questions of common origin. *Journal of Forensic Sciences* 40(6):1009-1029.

[36] See www.iso.org/iso/catalogue_detail?csnumber=39883.

[37] Refer to ISO/IEC Guide 43-1:1997(E) Section 4 for a list of proficiency testing schemes. Refer to ASTM E 1301 Section 6 for an overview of organization and design of proficiency tests. SWGs also provide guidelines for proficiency testing in the relevant discipline.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

    (3)      to determine the performance characteristics of a method and to establish the effectiveness and comparability of new tests or measurement methods; or

    (4)      to assign values to reference materials and assess their suitability for use in specific tests or measurement procedures.[38]

Blind proficiency testing is recommended, but not required, by ASCLD/LAB—not as a way to determine error rates, but as a more precise test of a worker's accuracy. Initially, mandatory blind testing was proposed as part of the federal DNA Identification Act. A Department of Justice (DOJ) panel designed blind tests, evaluated them, and estimated it would cost $500,000 to $1 million annually for one test per laboratory.[39] In appropriate circumstances, proficiency testing should include blind testing.

ASCLD/LAB has a detailed proficiency testing program that requires all active examiners to take at least one proficiency test per year (two tests per year in DNA), that each discipline within the laboratory participate in an external proficiency test that is reviewed by a proficiency test review panel, and that any proficiency test that is not successfully completed be immediately reported to ASCLD/LAB along with a corrective action plan. To retain accredited status for a full five-year term, a laboratory must continue to meet the standards under which it was accredited. One of the means by which ASCLD/LAB monitors compliance is by reviewing proficiency testing reports submitted by approved test providers.

According to the 2002 BJS census,[40] 274 of the 351 publicly funded laboratories were engaged in proficiency testing. Proficiency testing was slightly less common among smaller laboratories and those serving municipal jurisdictions (8 laboratories did not engage in such testing, and 69 did not answer the survey question). Among the laboratories engaged in proficiency testing, almost all use declared tests. Slightly more than half engaged in proficiency testing use random case reanalysis. Twenty-six percent of the laboratories engaged in proficiency testing use blind tests. In addition, the BJS survey reported that almost all laboratories engaged in proficiency testing used tests that were generated externally (thus allowing comparative analysis). In addition to external tests, 74 percent of laboratories engaged in proficiency testing also used internally generated tests. Data on proficiency testing were not collected for the 2005 census.

## CERTIFICATION

The certification of individuals complements the accreditation of laboratories for a total quality assurance program. In other realms of science and technology, professionals, including nurses, physicians, professional engineers, and some laboratorians, typically must be certified before they can practice.[41] The same should be true for forensic scientists who practice and testify. Although the accreditation process primarily addresses the management system, technical

---

[38] European Network of Forensic Science Institutes. 2005. *Guidance on the Conduct of Proficiency Tests and Collaborative Exercises Within ENFSI.* Available at www.enfsi.eu/uploads/files/QCC-PT-001-003.pdf.

[39] J.L. Peterson, G. Lin, M. Ho, Y. Chen, and R.E. Gaensslen. 2003. The feasibility of external blind DNA proficiency testing. Available at www.astm.org/JOURNALS/FORENSIC/PAGES/4241.htm.

[40] Peterson and Hickman, op. cit.

[41] T. Ortelli. 2008. Characteristics of candidates who have taken the Certified Nurse Educator: CNE examination: A two-year review. *Nursing Education Perspectives* 29(2):120; P. Nowak. 2008. Get IT-certified: Having employees with the right certifications can help dealers and integrators qualify for business and gain access to IT networks. *Network Technology* 38(3):123; S. Space. 2007. Investigator certification. *Issues in Clinical Trials Management* 8(2):73.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

methods, and quality of the work of a laboratory (which includes the education and training of staff), certification is a process specifically designed to ensure the competency of the individual examiner.

The American Bar Association has recommended that certification standards be required of examiners, including "demanding written examinations, proficiency testing, continuing education, recertification procedures, an ethical code, and effective disciplinary procedures."[42] In addition to improving quality, certification programs can enhance the credibility of certificate holders. An excellent description of the certification process is contained in the following excerpt from the National Association of Medical Examiners (NAME) website:

> In general, certification boards consist of respected professionals in a particular area of professional practice who develop standards for education, training, and experience that are required before one can become 'certified' in a particular professional discipline. Successful completion of a written and/or practical examination is also usually required. In essence, 'certification' usually means that a particular individual has completed a defined course of education, training, and experience, and has passed an examination prepared by peers which demonstrates that the individual has obtained at least the minimum level of competence required to practice the specific discipline. A number of 'Certification Boards' exist for people in various scientific disciplines....[43]

The professional forensic science community supports the concept of certification. ASCLD recommends that laboratory managers support peer certification programs that promote professionalism and provide objective standards. In 2002, the Technical Working Group on Forensic Science Education recommended certification of an individual's competency by an independent peer-based organization, if available, from a certifying body with appropriate credentials. In addition, IAI supports certification of forensic science practitioners.[44]

Some organizations, such as the American Board of Criminalists (ABC), offer examiner certification programs, but some certification organizations appear to lack stringent requirements.[45] In response, the American Academy of Forensic Sciences has formed a Forensic Specialties Accreditation Board to accredit certifying organizations. Organizations are invited to participate if they meet established requirements, such as periodic recertification, a sufficient knowledge base for certification, a process for providing credentials, and a code of ethics.[46] Currently accredited boards include:

- American Board of Criminalistics
- American Board of Forensic Document Examiners
- American Board of Forensic Toxicology

---

[42] American Bar Association, op. cit., p. 7.

[43] See http://thename.org/index.php?option=com_content&task=view&id=80&Itemid=41.

[44] K.F. Martin, President, IAI. Presentation to the committee. September 19, 2007.

[45] See M. Hansen. 2000. Expertise to go. *ABA J.* 86:44-45; E. MacDonald. 1999. "The Making of an Expert Witness: It's in the Credentials." *Wall Street Journal.* February 8, p. B1.

[46] See FABS Standards for Accrediting Forensic Specialty Certification Boards at www.thefsab.org/standards_20070218.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

- American Board of Medicolegal Death Investigators
- Board of Forensic Document Examiners
- International Institute of Forensic Engineering Sciences

IAI also has established certification programs in:

- Bloodstain Pattern Analysis
- Crime Scene Investigation
- Footwear
- Forensic Art
- Forensic Photography/Imaging
- Latent Print
- Tenprint Fingerprint[47]

Other certification programs exist for (but are not limited to) the following forensic science disciplines:

- Document Examination (The American Board of Forensic Document Examiners [ABFDE])
- Drug Analysis, Fire Debris Analysis, Molecular Biology, Trace Analysis, and General Criminalistics (ABC)
- Firearms and Tool Mark Identification (Association of Firearm and Tool Mark Examiners [AFTE])
- Forensic Odontology (The American Board of Forensic Odontology [ABFO])
- Forensic Pathology (The American Board of Pathology [ABP])
- Toxicology (American Board or Forensic Toxicology [ABFT])

Each of these entities has specific educational, training, and experience requirements, including a series of competency tests—both written and practical—and participation in proficiency testing, and provide continuing education/active participation by means of publication, presentation, and membership in professional organizations.

## OVERSIGHT AS A REQUIREMENT OF
## PAUL COVERDELL FORENSIC SCIENCE IMPROVEMENT GRANTS

One way of enforcing quality control is through the conditional funding of programs. The *Justice for All Act of 2004* (P.L. 108-405) that created the Coverdell Forensic Science Improvement Grants required that grant recipients certify that they have a process in place for independent, external investigations if allegations arise of "serious negligence or misconduct substantially affecting the integrity of the forensic results."[48]

In December 2005, the Office of the Inspector General (OIG) of DOJ issued a report of an audit that found that the Office of Justice Programs (OJP), which administers the program, "had not enforced or exercised effective oversight over the external investigation requirement for

---

[47] K.F. Martin, President, IAI. Presentation to the committee. September 19, 2007.
[48] 42 U.S.C. § 3797k(4).

7-14

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

the Fiscal Year (FY) 2005 Coverdell Program."[49] OJP did not require grant applicants to identify the government entities that they certified could perform independent external investigations:

> Our review found that NIJ did not enforce the Act's certification requirement. NIJ's FY 2005 Coverdell Grant Program Announcement did not give applicants necessary guidance on what constitutes an independent external investigation or how to make the required certification. In addition, the announcement did not provide examples of external investigation certifications and did not require an applicant to name the government entity responsible for conducting independent, external investigations. NIJ was aware of the shortcomings in the announcement because of questions it received from potential applicants and concerns expressed by the OIG, but failed to correct them.[50]

The OIG made three recommendations to improve the program announcement and application process (see Box 7-3).

A second audit of the program was released in January 2008.[51] Again, it reported that not all forensic laboratories that had received FY 2006 grant funds were covered by a government entity with the authority and capability to independently investigate allegations of serious negligence or misconduct. "Further, OJP's guidance does not require grantees and sub-grantees (forensic laboratories) to refer allegations of serious negligence and misconduct to entities for investigation."[52] The OIG found that 78 of the 231 entities contacted did not meet the external investigation certification requirement. It also found that "OJP did not adequately review the information it did obtain to ascertain that the certifications submitted by the grantees were properly completed."[53] The OIG made three recommendations to OJP to correct its certification process (see Box 7-3).

---

[49] U.S. Department of Justice Office of the Inspector General. 2005. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program,* Evaluation and Inspections Report I-2006-002. Available at www.usdoj.gov/oig/semiannual/0605/ojp.htm.
[50] Ibid.
[51] U.S. Department of Justice Office of the Inspector General. 2008. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program,* Evaluation and Inspections Report I-2008-001.
[52] Ibid., p, ii.
[53] Ibid., p. iii.

7-15

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES -- PREPUBLICATION COPY

---

**Box 7-3 Recommendations from Two Reviews of the Coverdell Grant Program**

2005 - We believe that Coverdell Grant Program Announcements must provide necessary guidance to applicants and request the information required for NIJ to evaluate the external investigation certifications and conduct effective oversight of the grants. To meet the requirements of the Justice for All Act of 2004, we recommend that OJP, as part of its oversight of NIJ:

1. Require that all Coverdell Grant Program Announcements contain guidance on what constitutes an independent external investigation and examples of government entities and processes that could satisfy the certification requirement.
2. Require that each Coverdell Grant applicant, prior to receiving funds, provide the name of the government entity with a process in place to conduct independent external investigations into allegations of serious negligence or misconduct.
3. Consider requiring each Coverdell Grant applicant, prior to receiving funds, to submit a letter from the government entity that will conduct independent external investigations acknowledging that the entity has the authority and process to investigate allegations of serious negligence or misconduct.

2006 - To improve OJP's administration of the Coverdell Program and better ensure that allegations of negligence or misconduct are subject to independent external investigation, the OIG recommends that OJP take the following actions:

1. Revise the certification template to require that applicants name the government entities and confirm that the government entities have:
   a.      the authority,
   b.      the independence,
   c.      a process in place that excludes laboratory management, and
   d.      the resources to conduct independent external investigations into allegations of serious negligence or misconduct by labs that will received Coverdell funds.
2. Provide applicants with guidance that allegations of serious negligence or misconduct substantially affecting the integrity of forensic results are to be referred to the certified government entities.
3. Revise and document the Coverdell Program application review process so that only applicants that submit complete external investigation certifications are awarded grants.

SOURCE:  U.S.DOJ Office of the Inspector General. 2005. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program*, Evaluation and Inspections Report I-2006-002. Available at www.usdoj.gov/oig/semiannual/0605/ojp.htm. U.S. DOJ OFFICE of Inspector General. 2008. Review of the Office of Justice Programs' Forensic Science Improvement Grant Program, Evaluation and Inspections Report I-2008-001.

---

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## CODES OF ETHICS

A code of ethics is another mechanism for encouraging the development and use of professional standards of conduct. However, there is disagreement about how effective such codes are in achieving that goal.[54] In 1991, Ladd argued that codes of ethics serve no good purpose and that reliance on such codes confuses ethics with law.[55] Some authors have noted that although practicing professionals rarely turn to their codes of ethics for guidance, the adoption of a code of ethics is critical to the professionalization of a group, because it indicates that the group recognizes an obligation to society that transcends its own self-interest.[56] However, codes of ethics can serve to provide rational bases for punishments, such as exiling violators from the community.

In the field of engineering, Davis asserts that codes of ethics should be understood as conventions among professionals:

> The code is to protect each professional from certain pressures (for example, the pressure to cut corners to save money) by making it reasonably likely . . . that most other members of the profession will not take advantage of her good conduct. A code protects members of a profession from certain consequences of competition. A code is a solution to a coordination problem.[57]

Also in the field of engineering, Harris et al. argue that codes can serve as a collective recognition by members of a profession of its responsibilities, creating an environment in which ethical behavior is the norm.[58] Moreover, a code of ethics can serve as an educational tool, providing a starting point for discussion in coursework and professional meetings.

Many forensic science organizations—such as the American Academy of Forensic Sciences, the California Association of Criminalists, and ASCLD—have codes of ethics or codes of professional practice imploring members to act with honesty, integrity, and objectivity; to work within the bounds of their professional competence; to present testimony and reports in a clear and objective manner; and to avoid conflicts of interest and potential bias, among other things. The codes that do exist are generally comprehensive, but they vary in content. As a consequence, there is no single code of ethics to which all members of the forensic science profession subscribe. As the committee concluded its work, it learned of an effort by ASCLD/LAB to develop a uniform code of ethics.

---

[54] A series of articles published in the *Journal of Forensic Sciences* 34(3) (May 1989) addressed a range of ethical dilemmas facing individuals practicing science in the criminal justice system.

[55] J. Ladd. 1991. The quest for a code of professional ethics: An intellectual and moral confusion. In: D.G. Johnson (ed.). *Ethical Issues in Engineering*. Englewood Cliffs, NJ: Prentice-Hall, pp. 130-136.

[56] H.C. Luegenbiehl. 1983. Codes of ethics and the moral education of engineers. *Business and Professional Ethics Journal* 2:41-61; D.G. Johnson (ed.). 1991. *Ethical Issues in Engineering*. 1991. Englewood Cliffs, NJ: Prentice-Hall, 137-154.

[57] M. Davis. 1991. Thinking like an engineer: The place of a code of ethics in the practice of a profession. *Philosophy and Public Affairs* 20(2):150-167, p. 154.

[58] C.E. Harris, M.S. Pritchard, and M.J. Rabins. 1995. *Engineering Ethics: Concepts and Cases*. Belmont, CA: Wadsworth Publishing.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## CONCLUSIONS AND RECOMMENDATIONS

Although some areas of the forensic science disciplines have made notable efforts to achieve standardization and best practices, most disciplines still lack any consistent structure for the enforcement of "better practices," operating standards, and certification and accreditation programs. Accreditation is required in only three states—New York, Oklahoma, and Texas. In other states, accreditation is voluntary, as is individual certification. Certification, while broadly accepted by the forensic science community, is not uniformly offered or required.

Although many forensic science organizations have codes of ethics, these codes can be enforced to regulate only the practices of persons who belong to a given organization. A uniform code of ethics should be in place across all forensic organizations to which all forensic practitioners and laboratories should adhere.

**Recommendation 6:**

> **To facilitate the work of the National Institute of Forensic Science (NIFS), Congress should authorize and appropriate funds to NIFS to work with the National Institute of Standards and Technology (NIST), in conjunction with government laboratories, universities, and private laboratories, and in consultation with Scientific Working Groups, to develop tools for advancing measurement, validation, reliability, information sharing, and proficiency testing in forensic science and to establish protocols for forensic examinations, methods, and practices. Standards should reflect best practices and serve as accreditation tools for laboratories and as guides for the education, training, and certification of professionals. Upon completion of its work, NIST and its partners should report findings and recommendations to NIFS for further dissemination and implementation.**

**Recommendation 7:**

> **Laboratory accreditation and individual certification of forensic science professionals should be mandatory, and all forensic science professionals should have access to a certification process. In determining appropriate standards for accreditation and certification, the National Institute of Forensic Science (NIFS) should take into account established and recognized international standards, such as those published by the International Organization for Standardization (ISO). No person (public or private) should be allowed to practice in a forensic science discipline or testify as a forensic science professional without certification. Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories and facilities (public or private) should be accredited, and all forensic science professionals should be certified, when eligible, within a time period established by NIFS.**

7-18

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

**Recommendation 8:**

Forensic laboratories should establish routine quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners. Quality control procedures should be designed to identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement.

**Recommendation 9:**

The National Institute of Forensic Science (NIFS), in consultation with its advisory board, should establish a national code of ethics for all forensic science disciplines and encourage individual societies to incorporate this national code as part of their professional code of ethics. Additionally, NIFS should explore mechanisms of enforcement for those forensic scientists who commit serious ethical violations. Such a code could be enforced through a certification process for forensic scientists.

7-19

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 8
# EDUCATION AND TRAINING IN FORENSIC SCIENCE

Forensic examiners must understand the principles, practices, and contexts of science, including the scientific method. Training should move away from reliance on the apprentice-like transmittal of practices to education at the college level and beyond that is based on scientifically valid principles, as discussed in Chapter 4. For example, in addition to learning a particular methodology through a lengthy apprenticeship or workshop during which a trainee discerns and learns to copy the skills of an experienced examiner, the junior person should learn what to measure, the associated population statistics (if appropriate), biases and errors to avoid, other threats to the validity of the evidence, how to calculate the probability that a conclusion is valid, and how to document and report the analysis. Among many skills, forensic science education and training must provide the tools needed to understand the probabilities and the limits of decisionmaking under conditions of uncertainty.

To correct some of the existing deficiencies, the starting place must be better undergraduate and graduate programs, as well as increased opportunities for continuing education. Legitimating practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education and training and the proper conduct of research.

Education and training in the forensic science disciplines serve at least three purposes. First, educational programs prepare the next generation of forensic practitioners. The number of secondary and postsecondary students interested in the forensic science disciplines has grown substantially in recent years. In response, colleges and universities have created new certificate and degree programs to prepare students for forensic science careers. There are several types of forensic practitioners, including criminalists (those who work in crime laboratories), who make up a large part of the forensic science workforce and who often enter the profession with a bachelor's degree, and other forensic science practitioners (e.g., pathologists, odontologists, entomologists, toxicologists, anthropologists), who typically have advanced degrees, often Ph.D.s, and who might work part time in forensic science activities. Another group of forensic examiners include crime scene investigators, who usually do not have advanced degrees; many do not have college degrees above the associate level.

Second, forensic science practitioners require continuing professional development and training. Scientific advances in forensic science techniques and research in the forensic science disciplines are of interest to practitioners who must be aware of these new developments. Forensic science practitioners also may need to complete additional training for certification purposes or may desire to learn new skills as part of their career development. Training refers to the "formal, structured process through which a forensic scientist reaches a level of scientific knowledge and expertise required to conduct specific forensic analyses."[1] Continuing professional development is the "mechanism through which a forensic scientist remains current or advances to a higher level of expertise, specialization, or responsibility."[2]

---

[1] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students.* Washington DC: National Institute of Justice, p. 25.
[2] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

Third, there is a need to educate the users of forensic science analyses, especially those in the legal community. Judges, lawyers, and law students can benefit from a greater understanding of the scientific bases underlying the forensic science disciplines and how the underlying scientific validity of techniques affects the interpretation of findings. These three objectives are explored in more detail in this chapter.

## STATUS OF FORENSIC SCIENCE EDUCATION

**Demand for Forensic Science Practitioners**

Demand for more and better-skilled forensic science practitioners is rising at both the macro and micro levels. At the macro level, the appropriate question to ask is, what is the need for forensic science expertise in the United States? At the micro level, the question to ask is, what are the needs of a crime laboratory in hiring new forensic science personnel?

As the National Institute of Justice (NIJ) notes:

In recent years, the demand for forensic scientists has increased for many reasons, including population demographics, increased awareness of forensic science by law enforcement, increased numbers of law enforcement officers, database automation in several categories of physical evidence, jury expectations, legal requirements, accreditation and certification requirements of laboratories and personnel, impending retirement of a large number of currently practicing forensic scientists, and increased public awareness of forensic science through the popular media.[3]

One manifestation of the need for more examiners is the backlog of requests for forensic services at crime laboratories. As noted in previous chapters of this report (based on the 2005 Census of Publicly Funded Forensic Crime Laboratories), many forensic laboratories experience large backlogs in requests for forensic services. To achieve a 30-day turnaround on all 2005 requests, the different forensic science disciplines would have needed varying increases in the number of full-time examiners performing that work—ranging from an estimated 73 percent increase in DNA examiners to an estimated 6 percent increase in examiners conducting toxicology analysis.[4]

The most recent *Occupational Outlook Handbook*, prepared by the Bureau of Labor Statistics at the U.S. Department of Labor, found that job growth for forensic science technicians will grow much faster than average, with 13,000 jobs available in 2006 and a projected 31 percent rise, or 17,000 jobs, projected by 2016.[5] Yet one analyst argued that "existing science programs overproduce graduates relative to the actual labor market" in criminalistics.[6] Having an accurate picture of demand—as well as the capacity of employers to absorb new forensic science

---

[3] Ibid., p. 3.

[4] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[5] Bureau of Labor Statistics, Department of Labor. "Science Technicians." In: *Occupational Outlook Handbook, 2008-09 edition*. Available at www.bls.gov/oco/ocos115.htm#projections_data.

[6] R.E. Gaensslen. 2003. How do I become a forensic scientist? Educational pathways to forensic science careers. *Analytical and Bioanalytical Chemistry* 376:1151-1155.

8-2

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

professionals—is important for colleges and universities that are educating and training the future workforce. Additional information on such factors as retirement and attrition rates and on trends in funding for laboratory personnel could assist educational providers in obtaining a more accurate picture of future employment prospects for their students.

The micro level focuses on the skills that individuals need to gain entry into forensic science careers (see Table 8-1). As a starting point, one needs an appropriate degree. The required minimum degree for entry-level forensic science positions ranges from a bachelor's degree to a doctoral or medical degree.[7] Almirall and Furton[8] suggest that it is possible to begin a career as a crime scene investigator or in firearms, documents, or fingerprints with an associate degree.

| Table 8-1 Educational Pathways to Some Forensic Science Careers | |
| --- | --- |
| **Forensic Discipline** | **Educational Requirements** |
| Crime scene investigation | Jobs are typically held by law enforcement personnel. Meet requirements for joining the law enforcement agency. For federal jobs, a college degree is required. |
| Computer crime investigation/ forensic computer science | B.S. in computer science or computer engineering; M.S. may be common. |
| Criminalistics | B.S. in the physical sciences, with background in chemistry |
| Forensic engineering | B.S. in engineering; practitioners may also be licensed as professional engineers (PEs). |
| Forensic pathology | Appropriate college degree; M.D.; internship and pathology residency; and specialized training in forensic pathology; additionally requires state license and board certification. |
| Forensic odontology | Appropriate college degree; D.D.S. or D.D.M.; may include additional specialty training; additionally requires state license and board certification. |
| Forensic entomology | Ph.D. in entomology. |
| Forensic anthropology | M.S. or M.A. at minimum; many have Ph.D.s. |
| Forensic psychiatry | Similar to forensic pathology, with residency in psychiatry. |
| Forensic psychology | M.S.W. or Ph.D. in psychology; often must meet state requirements for clinical practice and may be certified. |
| SOURCE: Gaensslen, 2003. | |

It should be noted that the preferred degree is often higher than an associate degree. Almirall and Furton posit that future trends favor a minimum of a graduate degree in almost all areas of forensic science.[9]

---

[7] Gaensslen, op. cit.

[8] R. Almirall and K.G. Furton. 2003. Trends in forensic science education: Expansion and increased accountability. *Analytical and Bioanalytical Chemistry* 376:1156-1159.

[9] Ibid.

8-3

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

An issue that has received much attention is the degree requirements for positions in crime laboratories. A requirement for an entry-level position in most crime laboratories is at least a bachelor's degree in a natural science or forensic science, and many laboratories require a year or two of experience, with a master's degree. Over the years, most crime laboratory hires have been and continue to be graduates with degrees in chemistry or biology.

Several studies have focused on the needs of crime laboratories. In 1988 Siegel conducted a survey of undergraduate students at Michigan State University, forensic science practitioners employed by the Michigan State Police, and 240 members of the American Society of Crime Laboratory Directors (ASCLD).[10] Survey respondents expressed a strong preference for a master's degree in forensic science and a lack of preference for the B.S. in criminalistics/forensic science. One explanation noted by the respondents was "that too many programs passing themselves off as forensic science programs were actually little more than criminal justice programs with a forensic science internship and a smattering of 'hard' science."[11] Another finding was the importance of chemistry in the backgrounds of prospective forensic science examiners.

Also in 1988, Higgins and Selavka surveyed laboratory managers.[12] Similar to the findings of Seigel, "chemical knowledge was the most important ability they considered when evaluating potential employees...."[13] In 1996, Furton et al. surveyed members of the ASCLD, primarily drug chemists and trace evidence analysts.[14] This survey found that "the majority of crime lab directors responding require applicants to have B.S. degrees with a preference for chemistry/biochemistry, followed by biology and forensic science with a requirement for a substantial number of chemistry and other natural science courses."[15]

## Proliferation of Forensic Science Programs

In recent years, increasing attention has been paid to the forensic science disciplines by the media in the form of many new books, movies, high-profile court cases, and, especially, television shows such as *Crime Scene Investigation* (or CSI).[16] This media attention has resulted in explosive demand by college (as well as primary and secondary school) students for academic courses and degree programs that will prepare them for careers in forensic science that are like those portrayed in the media. Evidence of this is the dramatic rise in enrollments in forensic science courses on college campuses.[17]

---

[10] J.A. Siegel. 1988. The appropriate educational background for entry level forensic scientists: A survey of practitioners. *Journal of Forensic Sciences* 33(4):1065-1068.

[11] Ibid., pp. 1067-1068.

[12] K.M. Higgins and C.M. Selavka. 1988. Do forensic science graduate programs fulfill the needs of the forensic science community? *Journal of Forensic Sciences* 33(4):1015-1021.

[13] Ibid., p. 1017.

[14] K.G. Furton, Y.L. Hsu, and M.D. Cole. 1999. What educational background is required by crime laboratory directors? *Journal of Forensic Sciences* 44:128-132.

[15] Ibid., p. 130.

[16] See, e.g., S. Smallwood. 2002. As seen on TV. *Chronicle of Higher Education* 48(45):A8-A10.

[17] There have been similar increases in demand at the K-12 level. Forensic science has become a popular component of science teaching. An informal survey conducted in 2004 by the National Science Teachers Association found that, "Of the 450 middle and high school science educators who responded to an informal survey, 77 percent indicated that their school or school district is using forensic investigations to teach science. When asked if the popularity of forensic-based TV shows had ignited students' interest in science, the response was a resounding 'yes' (78 percent)." *NSTA Survey Reveals Forensic Science Is Hottest New Trend in Science Teaching*, available at http://science.nsta.org/nstaexpress/nstaexpress_2004_10_25_forensic.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

One issue facing academic forensic science programs is combating Hollywood's version of the career of a forensic practitioner. "Students who enter forensic science programs often expect to work in conditions similar to the television crime shows they watch. Many find they are unprepared for the reality of a career in the field. 'A lot of new students come to our programs looking for an exciting career. Unfortunately, they come with unrealistic expectations,' says Charles Tindall, director of forensic science at the Metropolitan State College of Denver."[18]

Until recently, there were few academic programs in the forensic science disciplines. The earliest forensic science degree programs and the oldest continually functioning educational degree programs in forensic science in the United States were established at Michigan State University in 1946 and the University of California at Berkeley in 1950.[19] A survey conducted in the mid-1970s located 22 colleges and universities in the United States offering degrees (in one case a certificate) in criminalistics/forensic science, although some of these institutions offered multiple degrees.[20]

In the 1980s, a contraction of programs occurred—particularly at the graduate level. Stoney argues that this was because of a lack of financial and administrative support.[21] Higgins and Selavka suggest that the end of funding provided by the Law Enforcement Assistance Administration in 1978 took important federal support away from many institutions.[22] Additionally, they suggest that the then-declining enrollment in graduate programs might have reflected the generally low-paying opportunities available to newly minted graduates.

In recent years, this trend has reversed itself. Many colleges and universities, seeing the potential revenue from increasing numbers of new students, have responded by creating all manner of new academic programs. The American Academy of Forensic Sciences (AAFS) now lists 138 undergraduate, 59 graduate, and 6 doctoral forensic science degree programs in the United States.[23] Not all are science based—many are criminal justice programs. The curricula of these degrees range from rigorous scientific coursework amounting to a degree in chemistry or biology with forensic science content, to little more than criminal justice degrees with an internship.

**Doctoral Programs in Forensic Science**

There is no doctoral program specifically in forensic science; the programs noted by AAFS offer Ph.D.s (mostly in chemistry) with a concentration in that area. Some scholars consider this to be a shortcoming in forensic science education. More than 20 years ago, Kobilinksy and Sheehan conducted a survey of crime laboratories throughout the United States and found that almost 73 percent of those responding believed there was a need for a Ph.D. program.[24] The advantages of a Ph.D. program lie in its positive effect on basic research in the field. Doctoral programs offer more research depth and capacity, have ties to other fields, have

---

[18] National Institute of Justice. 2007. *Addressing Shortfalls in Forensic Science Education*. InShort, NCJ 216886. Washington, DC: U.S. Department of Justice, National Institute of Justice.

[19] A. Vollmer, Chief of Police, Berkeley, California, established the School of Criminology at the University of California at Berkeley.

[20] J.L. Peterson, D. Crim, and P.R. De Forest. 1977. The status of forensic science degree programs in the United States. *Journal of Forensic Sciences* 22(1):17-33.

[21] D.A. Stoney. 1988. A medical model for criminalistics education. *Journal of Forensic Sciences* 33(4):1086-1094.

[22] Higgins and Selavka, op. cit.

[23] See www.aafs.org.

[24] L. Kobilinksy and F.X. Sheehan. 1984. The desirability of a Ph.D. program in forensic science. *Journal of Forensic Sciences* 29(3):706-710.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

high expectations for quality, supply graduate student personnel to question and check past work and challenge conventional wisdom, and inspire more mentoring, which has two-way benefits.

## CHALLENGES AND OPPORTUNITIES TO IMPROVE FORENSIC SCIENCE EDUCATION

The overarching challenges facing forensic science education, since its inception, have been inconsistent quality and insufficient funding. Commentators have noted repeatedly the deficiencies of forensic science education programs.[25] Because, until recently, no nationally recognized, mandated standards existed for forensic science degree programs at any level, consistent quality cannot be achieved. Peterson et al. note that while "the primary objective of all degree programs is similar, the capabilities of graduates from the respective institutions are not uniform. Laboratories are forced to evaluate each graduate student individually to determine his suitability for a given position."[26]

Unevenness in the quality of these programs has caused problems for students and future employers. The Council of Forensic Science Educators stated that, "Students completing these lesser programs expect to find employment in crime labs but are surprised to learn that lab management is not impressed by the curriculum."[27]

Additionally, the lack of applicants with a science or forensic background means that crime laboratories have to spend precious time and resources in the training of new scientists.[28] If forensic science education programs had sufficient rigor in science, law, and forensics, crime laboratories would have to spend less time and money for training,[29] thereby shortening as well the apprenticeship time needed. Forensic science methods should be taught in the framework of common scientific practice (see Chapters 4 through 6). Even if a student graduates with a science degree, he or she often lacks education in issues that are critical to the functioning of crime laboratories, including quality assurance and control, ethics, and expert testimony. Peterson et al. found that, "The faculty surveyed believes their students to be well prepared for entry into the field. This is not totally consistent with the feedback from some laboratories which have been less than satisfied with newly graduated recruits."[30] They continue to recommend that, "Measures should be taken to improve feedback from the laboratories to the schools to insure that the curriculum is not only comprehensive from an academic standpoint but also meets the practical requirements of operating laboratories."[31]

Over the past few years, major strides have been taken in bringing a measure of standardization to forensic science education programs and boosting their quality. The NIJ report, *Forensic Science: Review of Status and Needs,* called in part for an accreditation system for such programs. Following this report, in 2001, NIJ established a Technical Working Group for Education and Training in Forensic Science (TWGED)—consisting of 47 experts, including educators, judges, attorneys, crime laboratory directors, and subject matter scientists—that developed recommended curricular guidelines for undergraduate and graduate forensic science

---

[25] See, e.g., Peterson et al., op. cit; L.W. Bradford. 1980. Barriers to quality achievement in crime laboratory operations. *Journal of Forensic Sciences* 25(4):902-907; Stoney, op. cit.; NIJ, op. cit.

[26] Peterson et al., op. cit., p. 31.

[27] See www.criminology.fsu.edu/COFSE/default.htm.

[28] Stoney, op. cit.

[29] NIJ, 2007, op. cit.

[30] Peterson et al., op cit., p. 32.

[31] Programs accredited by FEPAC are required to complete periodic self-assessments, which include job placement statistics and employer satisfaction surveys.

Copyright © National Academy of Sciences. All rights reserved.