Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

programs. These were provided in a 2004 report.[32] In 2002, the American Academy of Forensic Sciences created an ad hoc committee, the Forensic Education Program Accreditation Committee, to look into issues regarding an accreditation system. The committee was made a standing committee in 2004, at which time the name was changed to the Forensic Science Education Program Accreditation Commission (FEPAC). FEPAC is made up of five forensic science educators, five crime laboratory directors, and one public member. FEPAC created a process for accrediting undergraduate and graduate forensic science programs using the TWGED standards.[33]

FEPAC standards are divided into three parts (see Table 8-2). There are general standards that all programs must meet and then additional standards for undergraduate and graduate programs.

---

**Table 8-2. Major Areas of FEPAC Standards**

**General Standards for All Programs**
- Eligibility
- Planning and Evaluation
- Institutional Support
- Student Support Services
- Recruiting and Admissions Practices, Academic Calendars, Catalogs, Publications, Grading, and Advertising
- Record of Student Complaints
- Distance Learning and Other Alternative Delivery Mechanisms

**Undergraduate Program Standards**
- Mission, Goals, and Objectives
- Undergraduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

**Graduate Program Standards**
- Mission, Goals, and Objectives
- Graduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

SOURCE: www.aafs.org.

---

[32] Technical Working Group for Education and Training in Forensic Science. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions and Students,* Special Report. Washington, DC: U.S. Department of Justice, National Institute of Justice. NCJ 203099.
[33] See FEPAC Accreditation Standards, available at www.aafs.org/pdf/FEPAC%20Accreditation%20Standards%20_082307_.pdf.

8-7

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

An important note regarding the accreditation process is that the program must award at least a bachelor's degree in either forensic science or a natural science with a concentration in forensic science at both the bachelor's and master's levels. Programs that award certificates or associate degrees are ineligible for accreditation in this system. Additionally, at this time only U.S. programs are eligible for accreditation.

To summarize the general standards, such programs shall:

- have an explicit process for evaluating and monitoring its overall efforts to fulfill its mission, goals, and objectives; for assessing its effectiveness in serving its various constituencies; for modifying the curriculum as necessary, based on the results of its evaluation activities; and for planning to achieve its mission in the future;
- have adequate institutional support in the form of financial resources, facilities, instructional, and support services;
- provide adequate student support services, such as mentoring, advising, and career placement;
- have policies and procedures for student recruitment and admissions, with advisers to students regarding requirements for employment;
- have procedures for handling student complaints; and
- consider the use of distance learning as an instructional technique, demonstrating that all required laboratory experiences are hands-on for all students.

Concerning the undergraduate curriculum, it should, at a minimum, ensure that each student (1) obtain a thorough grounding in the natural sciences; (2) build upon this background by taking a series of more advanced science classes; and (3) develop an appreciation of issues specific to forensic science through course work and laboratory-based instruction.

Forensic science undergraduates in the chemistry track should take, at a minimum, chemistry courses required for chemistry majors—general chemistry, organic chemistry, physical chemistry, analytical chemistry, instrumental analysis, and biochemistry. Forensic science students in the biology track should take those chemistry courses required for biology majors and biology courses for biology majors, including general biology, biochemistry, instrumental analysis, genetics, molecular biology, and population genetics. All forensic science students should, at the earliest point possible, take a hands-on crime scene investigation course that teaches the principles of evidence, including its collection, preservation, and value. Additionally, the forensic science courses in drug analysis, criminalistics, and forensic biology (including DNA analysis) should be at the highest level. All forensic science majors should take a capstone course.

For graduate programs, the curriculum should, at a minimum, ensure that each student (1) understand essential issues in the forensic science disciplines, including the reduction of error rates; (2) develop an understanding of the areas of knowledge that are essential to forensic science; (3) acquire skills and experience in the application of basic forensic science concepts and of specialty knowledge to problem solving; (4) be oriented in professional values, concepts and ethics; and (5) demonstrate integration of knowledge and skills through a capstone experience, such as a formal, objective tool (e.g., the American Board of Criminalistics Forensic Science Aptitude Test) or another comprehensive examination or a thesis and/or research project.

Depending on the specialty track of interest, graduate students should take advanced courses in specialty areas of interest—drug analysis, toxicology, criminalistics, forensic biology, and forensic DNA analysis (including mtDNA sequencing, low copy number techniques, and

8-8

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

SNPs). The criminalistics and forensic biology courses should be advanced beyond those seen at the undergraduate level. If the student has not had those lower-level courses, they should be taken first. Graduate students also should take a hands-on crime scene investigation class that covers investigation techniques and evidence association, including its examination, collection, and preservation. In addition, in-service work with a collaborating institution can provide significant practical training.

Finally, the standards lay out a suggested curriculum for forensic science education programs. At the undergraduate level, coursework includes several classes in the natural sciences (with a focus on chemistry); specialized science courses (e.g., microbiology, genetics, biochemistry); forensic science courses—which cover courtroom testimony; introduction to law; quality assurance; ethics; professional practice; evidence identification, collection and processing; a survey of the forensic science disciplines; and additional courses in the student's area of specialization. Laboratory work must be complemented with hands-on training that closely mimics the experiences of the crime laboratory. At the graduate level, students should take core forensic science topics, such as physical evidence concepts and ethics and professional responsibilities; courses in specialized areas; and a graduate seminar—all aimed at developing skills for conducting independent research.

FEPAC began a pilot accreditation program in the fall of 2003, accrediting five programs,[34] and the number of accredited programs has continued to grow (see Table 8-3). As of January 2008, 16 programs have met FEPAC's rigorous standards and accordingly have been accredited by FEPAC.

Accredited forensic science programs are listed on the AAFS website. Accreditation is seen as providing a "seal of quality to an institution;" helping faculty to improve their curricula; creating a standard for measuring the quality of forensic science programs; and benefiting laboratories by reducing the need for in-house training.[35] Accreditation should become the norm. The committee believes that, to encourage accreditation, a mechanism could be developed whereby only accredited programs would be eligible to receive certain federal grants and/or scholarships for its students. If the forensic science disciplines are to grow in stature and be recognized for their scientific rigor and high standards of quality, their research base must be broadened and strengthened. This will occur only if significant federal research funds are made available to universities by scientific granting agencies such as the National Institutes of Health and the National Science Foundation. Crime laboratories would be the beneficiaries of a wave of well-educated workers who would elevate the scientific standards of the field. The forensic science degree programs that are not sufficiently rigorous eventually would disappear, because their graduates would not be competitive in the employment arena. Consequently, employers would be more confident in the capabilities of graduates of forensic science programs and hence would be more inclined to hire them.

---

[34] Cedar Crest College (Allentown, Pennsylvania), Eastern Kentucky University (Richmond, Kentucky), Florida International University (Miami, Florida), Metropolitan State College of Denver (Denver, Colorado), and Michigan State University (East Lansing, Michigan).
[35] NIJ, 2000, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

| Table 8-3.  FEPAC Accredited Programs, 2008 | |
|---|---|
| **Programs** | **Degree Program** |
| Albany State University | Bachelor of Science Degree in Forensic Science |
| Arcadia University | Master of Science Degree Program in Forensic Science |
| Cedar Crest College | Bachelor of Science Degree Program in Chemistry, Biochemistry, Biology, and Genetic Engineering, with a concentration in Forensic Science |
| Eastern Kentucky University | Bachelor of Science Degree Program in Forensic Science |
| Florida International University | Certificate Programs in Conjunction with the Bachelor of Science in a Natural Science such as Chemistry or Biology |
| Florida International University | Master of Science Degree Program in Forensic Science |
| Marshall University | Master of Science Degree Program in Forensic Science |
| Metropolitan State College of Denver | Bachelor of Science Degree Program in Chemistry with a concentration in Criminalistics |
| Michigan State University | Master of Science Degree Program (biology and chemistry tracks) |
| University of Mississippi | Bachelor of Science Degree in Forensic Chemistry |
| Ohio University | Bachelor of Science Degree in Forensic Chemistry |
| SUNY at Albany | Master of Science Degree in Forensic Molecular Biology |
| Virginia Commonwealth University | Bachelor of Science Degree in Forensic Science |
| Virginia Commonwealth University | Master of Science Degree in Forensic Science |
| West Chester University | Bachelor of Science Degree Program In Forensic and Toxicological Chemistry |
| West Virginia University | Bachelor of Science Degree - Forensic and Investigative Science Program |
| SOURCE: www.aafs.org. | |

## RESEARCH AS A COMPONENT OF FORENSIC SCIENCE EDUCATION PROGRAMS

Student research and exposure to research is a critical component of an appropriate forensic science education.[36] Research funding supports both faculty and graduate student research. Funding also supports the acquisition and maintenance of equipment and major research instrumentation and laboratory renovation.[37] As noted in Chapter 2, the level of funding for forensic science research programs is seen by many observers as inadequate. Fisher notes that "labs are looking for more forensic scientists at the master's and doctorate level. For universities to run graduate-level programs in the science, research dollars must be made available. However, the amounts of such R&D funds available to support forensic science at the National Institute of Justice are small and are all but non-existence [sic] from the National Science Foundation, and other funding sources."[38] Likewise, NIJ reported in 2004 that, "Currently, no sustainable source of State or Federal funding exists to support graduate education or research in forensic science.

---

[36] To receive accreditation by FEPAC, a graduate program must include a component in which each student completes an independent research project leading to a thesis or written report, presented orally in a public forum for evaluation.

[37] NIJ, 2004, op. cit., p. 23.

[38] B.A.J. Fisher. 2003. Field needs adequate funding, national forensic science commission. *Forensic Focus*. See http://forensicfocusmag.com/articles/3b1persp1.html.

8-10

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**EDUCATION AND TRAINING-PREPUBLICATION COPY**

Nor should state and local governments fund research, as their funds have to support the service mission of the laboratories. The National Institute of Justice has traditionally provided virtually all federal research funding for forensic science, but additional funding from alternative sources is essential."[39]

Many forensic degree programs are found at small colleges or universities with few graduate programs in science and where research resources are limited. The lack of research funding has discouraged universities in the United States from developing research-based forensic degree programs, which leads to limited opportunities to attract graduate students into such programs. Only a few universities offer Ph.D.-level education and research opportunities in forensic science, and these are chemistry or biology programs with a forensic science focus. Most graduate programs in forensic science are master's programs, where financial support for graduate study is limited.

In addition, the lack of research funds means that universities are unlikely to develop research programs in forensic science. This lack of funding discourages top scientists from exploring the many scientific issues in the forensic science disciplines. This has become a vicious cycle during which the lack of funding keeps top scientists away and their unavailability discourages funding agencies from investing in forensic science research. Traditional funding agencies have never had a mission to support forensic science research.

## STATUS OF TRAINING

Continuing education and in-service training in forensic science have been significant issues for many years. Funding programs initially were offered in the early 1970s through the Law Enforcement Assistance Administration. As forensic science grew, the needs for ongoing training and continuing education also grew. Several studies funded by NIJ have been undertaken since 1999—*Forensic Sciences: Review of Status and Needs* (1999); [40] *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students* (2004),[41] developed by TWGED; and a report prepared by ASCLD for NIJ, published in May 2004, which has become known as the *180-day Study Report: Status and Needs of United States Crime Laboratories*.[42]

The issues addressed in all of these reports are the same ones confronting this committee today, namely the need for continuing education and the ongoing training of working examiners in the various disciplines:

> Prior to conducting analysis on evidence, forensic scientists require both basic scientific education and discipline-specific training. To be in compliance with widely-accepted accreditation standards, scientists in each of the disciplines must have, at a minimum, a baccalaureate degree in a natural science, forensic science, or a closely-related field. Each examiner must also have successfully completed a

---

[39] NIJ, 2004, op. cit., p. 22.
[40] National Institute of Justice. 1999. *Forensic Sciences: Review of Status and Needs*. Washington DC: National Institute of Justice.
[41] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students*. Washington DC: National Institute of Justice.
[42] American Society of Crime Laboratory Directors (ASCLD). 2004. *180-day Study Report: Status and Needs of United States Crime Laboratories*. Largo, FL: ASCLD.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

competency test (usually after a training period) prior to assuming independent casework.[43]

After the initial training period, continuing training is necessary to maintain and update knowledge and skills in new technology, equipment, and methods.

Accreditation and certification programs require some type of continuing education, and the various Scientific Working Groups (SWGs) recommend such programs (see Chapter 7). Continuing professional development also is a means of expanding one's expertise and career advancement.

### Training Needs

As described by ASCLD:

When a new analyst or examiner is hired, usually a recent university graduate, that individual requires initial training to build competency. The length of the initial training provided to an analyst depends upon the laboratory specialty area the trainee will enter.

For example, controlled substance analysts may require only six to twelve months of training. Those training in experience-based disciplines such as latent prints examinations, firearms and toolmarks analyses, and questioned documents examinations may require up to three years of training before being permitted to perform independent casework. During their training period, individuals in experience-based disciplines serve much like an apprentice to a senior examiner.[44]

NIJ describes a variety of training needs for forensic scientists in crime laboratories by position.[45] For operational scientists, training is needed to stay up to date in theoretical and practical issues (such as applying methods and performing analyses). Everyone in a laboratory needs orientation in such topics as the criminal justice system, the legal system, ethics, professional organizations, the basic philosophy of forensic science, overview of disciplines of forensic science, quality control (e.g., good laboratory practice), effective expert testimony, and safety. First-line supervisors need training in quality assurance, case file review, and basic supervision skills; and managers need training in fiscal management, quality systems management, leadership, project management, human resource management, and customer service. Training can be done in-service or through short courses. The 1999 NIJ report identifies a number of examples of such courses.

On-the-job training involves specific challenges; it is labor intensive and can be expensive.[46] The costs of training include the salary of the trainee as well as the opportunity cost of the lost productivity of the trainer. Moreover, there are no uniform recommendations on the content of training in the forensic science disciplines. ASCLD has suggested some examples of efforts to make training more efficient, including conducting some training in conjunction with

---

[43] Ibid., p. 12.
[44] ASCLD, op. cit., p. 15.
[45] NIJ, op. cit., 1999.
[46] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

universities (essentially conducting training while forensic scientists are students and before they are full-time employees), and some laboratories have tried collaborating to train employees.

**Continuing Education**

Continuing education is critical for all personnel working in crime laboratories as well as for those in other forensic science disciplines, such as forensic pathologists or anthropologists. Some commonly used approaches to continuing education are instructor led, professional conferences/seminars, distributed learning, apprenticeship, residency, internship, teaching and presentations by trainee/employee, and independent learning.[47]

The greatest issue for continuing education is quality. TWGED has provided guidelines for training courses. First, there should be specific eligibility requirements. Specified minimum and experiential requirements should be consistent with recognized, peer-defined standards (e.g., SWGs, ASCLD/Laboratory Accreditation Board). Factors such as drug use, credit and criminal history, and personal references may affect career opportunities. Second, the structure of the training programs should include: learning objectives; instructor qualifications; student requirements; a detailed syllabus; performance goals; periodic assessments; and competency testing. Third, program content can include a mix of discipline-specific and core elements. Core elements are essential topics that lay the foundation for entry into professional practice, regardless of the specialty area. They include the following:

- Standards of conduct—includes professional ethics training.
- Safety—includes biological, chemical, and physical hazards.
- Policy—includes such administrative and laboratory policies as standard operating procedures, quality assurance, accreditation, and security.
- Legal—includes expert testimony, depositions, rules of evidence, criminal and civil law and procedures, and evidence authentication.
- Evidence handling—includes interdisciplinary issues; recognition, collection, and preservation of evidence; and chain of custody.
- Communication—includes written, verbal, and nonverbal communication skills; report writing; exhibit and pretrial preparation; and trial presentation.

Discipline-specific elements include such topics as the history of the discipline, relevant literature, methodologies and validation studies, instrumentation, statistics, knowledge of related fields, and testimony. Finally, individuals should be assessed through mechanisms such as oral examinations, written examinations, laboratory practicals and laboratory exercises, mock trials, and the assessment of technical performance by appropriate senior staff.

## EDUCATION IN THE LEGAL SYSTEM

The forensic science community needs to educate those who use their services and therefore needs to understand the services and their terminology. Users of forensic science analyses include law enforcement officers, forensic pathologists, the bar, the judiciary, the general public, and policymakers. This section focuses on education for the legal community of judges, lawyers, and juries.

---

[47] NIJ, op. cit., 2004.

8-13

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

In recent years, some judges have struggled to understand increasingly complex scientific evidence. Sophisticated epidemiology and toxicology studies often are introduced in mass tort litigation. Complex econometric models are common in antitrust cases. Disputes over sophisticated engineering principles often are at the core of patent litigation. Failure to consider such evidence in a thoughtful and thorough manner threatens the integrity and independence of the judiciary. Following the *Daubert* decision, the Federal Judicial Center published the *Reference Manual on Scientific Evidence*, and a second edition was issued in 2000 to "facilitate the process of identifying and narrowing issues concerning scientific evidence by outlining for judges the pivotal issues in the areas of science that are often subject to dispute."[48] In addition, the courts have responded to the growing complexity of evidence by developing science-based judicial education programs that explain scientific issues as they may arise in the context of litigation. However, these courses are not mandatory, there is no fixed routine of continuing education in legal practice with regard to science, and there are no good ways to measure the proficiency of judges who attend these programs.

Pfefferli suggests that it is important to tailor education programs to the needs of judges:

> Forensic educational programs directed towards proficiency in evidence matter must meet the needs of judicial magistrates, which goes beyond a better understanding of the scientific principles and technical methods applied to criminal investigations to demonstrate the existence of a crime. These programs have to look at a variety of different kinds of forensic evidence and their interacting processes, giving special attention to individualization/identification process; evidential value and evaluation of evidence; critical issues and quality assurance, and deterministic versus probabilistic opinions of experts."[49]

Pfefferli further notes that different members of the judicial community should benefit from customized training. For example, prosecutors and defense attorneys might benefit from a focus on the interpretation of and requirements for evidence; and judges may benefit from information on evaluating the scientific rigor of expert testimony and the reliability of forensic evidence.

At the end of the 1990s, NIJ noted that training for the judiciary was sporadic at the federal, state, and local levels and rare in general.[50] Virginia is one state that provides annual seminars for the judiciary, and ASCLD formerly provided training to judges.

Reliance on DNA technology for identification purposes in forensic science spurred the development of judicial education programs. As part of the President's DNA Initiative, the Department of Justice developed a series of publications and online training programs designed for officers of the courts, including judges. The course, "Principles of Forensic DNA for Officers of the Court," released in 2006, is designed "to educate criminal justice professionals and other

---

[48] Federal Judicial Center. 2000. *Reference Manual on Scientific Evidence*. 2nd ed., p. vi.
[49] P.W. Pfefferli. 2003. *Forensic Education & Training of Judges and Law Enforcement Magistrates*. Presentation at the International Society for the Reform of Criminal Law, 17th International Conference, The Hague. Available at www.isrcl.org/Papers/Pfefferli.pdf, p. 2.
[50] NIJ, op. cit., 1999.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

practitioners about the science of DNA analysis and the legal issues regarding the use of DNA in the courtroom."[51] The 15 training modules in the course include:

- information on the biology of DNA;
- the history of forensic DNA analysis;
- how to understand a forensic DNA laboratory report;
- factors in postconviction DNA testing requests;
- information about forensic DNA databases;
- issues involved in presenting DNA evidence in the courtroom;
- information on the admissibility issues regarding the use of DNA evidence; and
- an extensive glossary with basic definitions relating to forensic DNA analysis.

But other than this initiative, judicial education programs have not focused on the forensic science disciplines.

Another avenue for education would be courses taught by forensic science education programs, but geared to continuing education participants rather than full-time students. The University of Florida, for example, offers a distance learning, continuing education course for Florida lawyers that is certified by the Florida Bar Association and that covers a variety of forensic science topics. Professional organizations also have offered courses. For example, the National District Attorneys Association founded the American Prosecutors Research Institute (APRI) as a nonprofit research, technical assistance, and program development resource for prosecutors at all levels of government. In the past, APRI has offered training opportunities in forensic science, although its programs have decreased in recent years. The National College of District Attorneys and the National Association of Criminal Defense Attorneys also periodically offer courses in forensic science. A third option is for law schools to offer more courses in the forensic disciplines, statistics, or basic science methodology, or to provide credit for students wishing to take courses in those fields.

Unfortunately, it might be too late to effectively train most lawyers and judges once they enter their professional fields. Training programs are beneficial in the short term, because they offer responsible jurists a way to learn what they need to know. For the long term, however, the best way to get lawyers and judges up to speed is for law schools to offer better courses in forensic science in their curricula.

**Juries and Scientific Evidence**

Despite common stereotypes about jury incompetence and runaway juries, research has demonstrated a consistency between jury and bench trial verdicts, regardless of the level of scientific complexity involved.[52] Even in cases in which jurors express incomplete and flawed understandings of scientific and technical evidence, researchers have described jury results as generally justified.[53] Moreover, it has been suggested that jurors' errors in interpreting

---

[51] Office of Justice Programs, U.S. Department of Justice. 2006. *Department of Justice Releases Interactive Training Tool on Principles of Forensic DNA*. Available at www.ojp.usdoj.gov/newsroom/pressreleases/2006/NIJ06036.htm.

[52] V.P. Hans, D.H. Kaye, M.B. Dann, E.J. Farley, and S. Albertson. 2007. *Science in the Jury Box: Jurors' Views and Understanding of Mitochondrial DNA Evidence*. Cornell Law School Legal Studies Research Paper No. 07-02; available at http://ssrn.com/abstract=1025582; T. Eisenberg, P.L. Hannaford-Agor, V.P. Hans, N.L. Mott, G.T. Munsterman, S.J. Schwab, and M.T. Wells. 2005. Judge-jury agreement in criminal cases: A partial replication of Kalven & Zeisel's *The American Jury. Journal of Empirical Legal Studies* 2:171-206.

[53] Hans, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

evidentiary information are often traceable in part to misleading presentations and instructions by attorneys and judges.[54]

However, juries have been described as least comfortable and competent with regard to statistical evidence.[55] Interestingly, juries are often hesitant to give as much credence as experts suggest to the statistics associated with DNA evidence.[56] Juries frequently raise concerns about laboratory error and sample contamination, even when opposing counsel does not introduce such issues.[57]

Jurors' use and comprehension of forensic evidence is not well studied. Better understanding is needed in this area, and recommendations are needed for programs or methods that will better prepare juries in appropriate, unbiased ways for trials in which scientific evidence is expected to play a large or pivotal role. However, several studies indicate that trial judges agree with jury verdicts in an overwhelming proportion of criminal cases.[58]

## CONCLUSIONS AND RECOMMENDATION

Despite major strides made in recent years in bringing a measure of standardization to forensic science education programs and boosting their quality, more information is required on the number of programs that are available and the depth and breadth of the course offerings. It appears that there are no formal and systematically applied standards or standardization requirements for forensic science education programs, making the quality and relevance of existing programs uncertain. Moreover, there are no requirements or incentives in place to ensure that forensic science education programs must be accredited in order to receive federal funds.

Current funding is insufficient for developing graduate training programs that cut across organizational, programmatic, and disciplinary boundaries and that can attract students in the life and physical sciences to pursue graduate studies in multidisciplinary fields critical to forensic science. Similarly, too few funding sources exist for research conducted in association with forensic science graduate programs.

In addition, forensic researchers, legal scholars, and forensic practitioners and members of the bench and bar do not have sufficient opportunities and venues for interaction and sharing information. This impedes the translation of advances in forensic science to legal scholars and litigators (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials. The result is needless delay in improvements in criminal and civil laws and procedures, law enforcement practices, litigation strategies, and judicial decisionmaking.

Lawyers and judges often have insufficient training and background in scientific methods, and they often fail to fully comprehend the approaches employed by different forensic

---

[54] Ibid.

[55] Ibid. See also W.C. Thompson and E.L. Schumann. 1987. Interpretation of statistical evidence in criminal trials: The prosecutor's fallacy and the defense attorney's fallacy. *Law and Human Behavior* 11:167-187; W.C. Thompson. 1989. Are juries competent to evaluate statistical evidence? *Law and Contemporary Problems* 52:9-41.

[56] J.J. Koehler. 2001. When are people persuaded by DNA match statistics? *Law and Human Behavior* 25:493-513; D.A. Nance and S.B. Morris. 2002. An empirical assessment of presentation formats for trace evidence with a relatively large and quantifiable random match probability. *Jurimetrics Journal* 42:403-448; J. Schklar and S.S. Diamond. 1999. Juror Understanding of DNA evidence: An empirical assessment of presentation formats for trace evidence with a relatively small random-match probability. *Journal of Legal Studies* 34:395-444.

[57] Schklar and Diamond, op. cit.

[58] Hannaford-Agor, Hans, and Munsterman, op. cit.

8-16

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**EDUCATION AND TRAINING-PREPUBLICATION COPY**

science disciplines and the strengths and vulnerabilities of forensic science evidence offered during trials.

Forensic science examiners need additional training in the principles, practices, and contexts of scientific methodology, as well as in the distinctive features of their specialty. Training should move well beyond intern-like transmittal of practices to teaching that is based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and should also receive instruction on how to document and report the analysis. A trainee in addition should have working knowledge of basic probability and statistics as they relate to the tasks he or she may need to address in the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. The legitimization of practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role; under no circumstances can it supplant the need for the scientific basis of education and of the practice of forensic science. In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the degree of reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony (such as the *Daubert* standards) is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted among experts in forensic science and legal scholars and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in forensic science, by offering credit for forensic science courses students take in other colleges, and by developing joint degree programs.

**Recommendation 10:**

> **To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and develop graduate education programs designed to cut across organizational, programmatic, and disciplinary boundaries. To make these programs appealing to potential students, they must include attractive scholarship and fellowship offerings. Emphasis should be placed on developing and improving research methods and methodologies applicable to forensic**

8-17

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES --PREPUBLICATION COPY

science practice and on funding research programs to attract research universities and students in fields relevant to forensic science. NIFS should also support law school administrators and judicial education organizations in establishing continuing legal education programs for law students, practitioners, and judges.

8-18

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 9

# MEDICAL EXAMINER AND CORONER SYSTEMS: CURRENT AND FUTURE NEEDS

The role of coroner emerged in England in the ninth or tenth century. In the twelfth century, under King Richard I, the role of coroner was formalized in the Articles of Eyre.[1] Coroners or "crowners" were "guardians of the crown's pleas." The office originally was created to provide a local official whose primary duty was to protect the financial interest of the crown in criminal proceedings. On behalf of the crown, the crowner was responsible for inquests to confirm the identity of the deceased, determine the cause and manner of death, confiscate property, collect death duties, and investigate treasure troves. Through the implementation of British Common Law, settlers in North America brought coroner laws to the early colonies.[2] Moreover, early state constitutions explicitly mentioned the position of coroner, often without defining the role.[3] Georgia's state constitution was the first. Article XL stated that, "[i]n the absence of the chief justice, the senior justice on the bench shall act as chief justice with the clerk of the county, attorney for the State, sheriff, coroner, constable, and the jurors."[4]

The first formal acknowledgment of the need for medical training for coroners occurred in 1860, when Maryland passed legislation allowing coroners to require that a physician be present at an inquest. In 1877, Massachusetts became the first state to replace its coroners with medical examiners, who were required to be physicians. Physician medical examiners began performing autopsies for coroners in Baltimore in 1890. In 1918, New York City instituted a medical examiner system.[5]

The National Academy of Sciences first addressed the state of death investigation in 1928. The National Research Council's (NRC's) Committee on Medical Legal Problems, whose members included Roscoe Pound, Dean of Harvard Law School, and John Henry Wigmore, Dean of Northwestern Law School, released a harshly critical report entitled *The Coroner and the Medical Examiner*.[6] In its first four recommendations, the 1928 committee suggested the following: (1) That the office of coroner be abolished. It is an anachronistic institution which has conclusively demonstrated its incapacity to perform the functions customarily required of it; (2) That the medical duties of the coroner's office be vested in the office of medical examiner; (3) That the office of medical examiner be headed by a scientifically trained and competent pathologist, selected and retained under civil service, and compensated by a salary which will attract men of genuine scientific training and ability; and (4) That the office of medical examiner be provided with the services of a staff competent in toxicology, bacteriology and other sciences necessary in the scientific investigation of causes of death, and with adequate scientific equipment . . ..[7]

---

[1] Institute of Medicine (IOM). 2003. *Medicolegal Death Investigation System: Workshop Summary*. Washington, DC: The National Academies Press, p. 8.

[2] Ibid.

[3] Ibid.

[4] GA. CONST. of 1777, art. XL.

[5] IOM, 2003, op. cit.

[6] Bulletin of the National Research Council, No. 64. 1928. *The Coroner and the Medical Examiner*. Washington DC: National Research Council.

[7] Ibid., p. 89.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

Additionally, the 1928 committee recommended the development of medicolegal institutes, which would affiliate medical examiners with hospitals and universities.[8] In 1932, another NRC committee produced a review of existing medicolegal collaborations, which were mostly located in Europe.[9] This committee again advised a larger role for medical doctors within forensic science and criminal proceedings.[10]

In 1954, the National Conference of Commissioners on Uniform State Laws issued the Model Post-Mortem Examinations Act (the Model Act).[11] In its prefatory note, the Model Act stated the following:

> The purpose of the Post-Mortem Examinations Act is to provide a means whereby greater competence can be assured in determining causes of death where criminal liability may be involved. Experience has shown that many elected coroners are not well trained in the field of pathology, and the Act should set up in each state an Office headed by a trained pathologist, this Office to have jurisdiction over post-mortem examinations for criminal purposes. The Office would supersede the authority of Coroner's Offices in this field.[12]

Following the release of the Model Act, a number of states implemented the proposed guidelines. Between 1960 and 1979, 12 states converted from coroners to medical examiners.[13] However, in the subsequent decades, updates to death investigation organizations slowed considerably. Between 1980 and 1999, only three states converted from coroner to medical examiner systems.[14] Since then, 11 states with coroners have remained unchanged, and only a handful of individual counties have independently implemented recommendations from the Model Act.[15] Several of the remaining coroner states have provisions in their state constitutions requiring that coroners be elected.[16] Although these provisions may be amended or removed, to do so will require political momentum. However, these provisions do not prohibit the addition of appointed medical examiners. For example, Kentucky has maintained county coroners, as dictated by its constitution, while also implementing medical examiners to serve at the state and district levels.[17]

---

[8] Ibid., p. 90.
[9] Bulletin of the National Research Council, No. 87. 1932. *Possibilities and Need for Development of Legal Medicine in the United States*. Washington DC: National Research Council.
[10] Ibid., pp. 111-112.
[11] The model act has been posted by the National Association of Medical Examiners (NAME) at: http://thename.org/index.php?option=com_content&task=view&id=97&Itemid=41.
[12] Ibid..
[13] Hanzlick, 2003, op. cit.
[14] Ibid.
[15] Ibid.
[16] ARK. CONST. art. VII, § 46; COLO. CONST. art. XIV, § 8; IDAHO CONST. art. XVIII, § 6; IND. CONST. art. VI, § 2; MISS. CONST. ANN. art. V, § 135.
[17] KY. CONST. § 99; KY. REV. STAT. ANN § 72.210 (2007).

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

## MEDICAL EXAMINERS AND CORONERS (ME/C)

About 2,342 medical examiner and coroner offices provided death investigation services across the United States in 2004.[18] Individual state statutes determine whether a medical examiner or coroner delivers death investigation services, which include death scene investigations, medical investigations, reviews of medical records, medicolegal autopsies, determination of the cause and manner of death, and completion of the certificate of death.

## ME/C JURISDICTION

ME/C jurisdiction is determined by each state code and generally extends to deaths that are sudden and unexpected, deaths that have no attending physician, and all suspicious and violent deaths. The actual classes of death over which the ME/C assumes jurisdiction vary from state to state. Classes may include deaths resulting from injury, such as by violence or poisoning; by circumstance, such as related to fire or under anesthesia; by decedent status, such as prisoners or mental health patients; or by timeframe, such as deaths that occur within 24 hours of admission to a hospital. About 1 percent of the U.S. population (about 2.6 million people) dies each year. In 2004, ME/C offices received nearly 1 million reports of deaths, constituting between 30 to 40 percent of all U.S. deaths, and accepted about one half of those (500,000, or 1 in 6 deaths) for further investigation and certification.[19] Depending on the jurisdiction, about 40 to 50 percent of deaths referred to the ME/C will, after investigation and examination, be attributed to natural causes, 27 to 40 percent to accident, 12 to 15 percent to suicide, 7 to 10 percent to homicide, and 1 percent as undetermined.[20]

## ME/C MISSIONS

ME/Cs serve dual purposes. First, they serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses. Second, as public health officers, they surveil for index cases of infection or toxicity that may herald biological or chemical terrorism, identify diseases with epidemic potential, and document injury trends.

Additional ME/C responsibilities include the response to and investigation of all deaths resulting from all hazards, including terrorism and mass fatality events, and the identification of the unidentified dead. In addition, some 13,000 unidentified individuals are currently entered into databases for the unidentified dead, and many thousands more are entered as missing persons, as thousands of families search for them. Accessing these databases and matching them to the many thousands of individuals entered as missing persons is a major challenge for all organizations. Eighty percent of surveyed ME/C systems "rarely or never" utilize the National Crime Information Center Unidentified and Missing Persons (NCIC UP/MP) files to match their dead bodies to those reported as missing by law enforcement agencies, even though NCIC

---

[18] Hanzlick, 2007, op. cit. The Bureau of Justice Statistics omits Louisiana and classifies Texas as a medical examiner state, and accordingly reports the total as 1,998. According to Hanzlick, many of Texas's 254 counties maintain justice of the peace/coroner's offices.

[19] J.M. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2004. *Medical Examiners and Coroners' Offices, 2004*. U.S. Dept of Justice, Bureau of Justice Statistics Special Report NCJ216756.

[20] *Office of the Chief Medical Examiner's Annual Report: 2006*. Available at www.vdh.state.va.us/medExam/Reports.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

recently granted access to the files by ME/Cs. Access, however, is not uniform, and the information that may be available could be limited.[21]

The newly established National Institute of Justice (NIJ) Office of Justice Programs, National Missing and Unidentified Persons System, NamUs, remains underutilized. Identification efforts for either of the national government databases require multiple investigative as well as data entry skills, and they are labor intensive. ME/Cs need a functional death investigation system; staff to develop identification features; and the necessary education, training, and equipment to utilize the multiple databases that are necessary to identify the unidentified dead and to meet the increasing societal expectations that ME/C systems should be able to identify the unidentified.[22] Critically needed is a federal requirement that ME/C systems enter information on the unidentified into federal databases. A later section in this report discusses the medical examiner/coroner role in homeland security.

## VARIATIONS IN ME/C SYSTEMS

As of 2004, administratively, 16 states had a centralized statewide medical examiner system, 14 had a county coroner system, 7 had a county medical examiner system, and 13 had a mixed county ME/C system.[23] Eight states had hybrid arrangements, with coroners and a state medical examiner office that performed medicolegal duties. The District of Columbia relies on a medical examiner system (see Figure 9-1). In large cities and counties, forensic pathologists serve both as medical examiners and pathologists. A few large systems, such as those of Los Angeles, California, and Cuyahoga County, Ohio, bear the historical name of a coroner system, but function essentially under a medical examiner structure. Eighty percent of ME/C offices are run by county coroners.

In total, there are approximately 2,342 separate death investigation jurisdictions.[24] Of 1,590 coroner offices in the United States, 82 serve jurisdictions with more than 250,000 people; 660 medium-sized offices serve between 25,000 and 249,999 people; and 848 offices serve small jurisdictions of fewer than 25,000 people.[25] The hodgepodge and multiplicity of systems and controlling statutes makes standardization of performance difficult, if not impossible. Some observers believe that a revisiting of the model code is required, as has been proposed by numerous study groups over the years, in order to work toward the development of a modern model code for death investigation systems that utilizes new and available technologies that are responsive to the needs of the citizens.[26]

---

[21] J.C.U. Downs, Board Member and Chair, Governmental Affairs Committee, National Association of Medical Examiners; Vice Chair, Consortium of Forensic Science Organizations; Coastal Regional Medical Examiner, Georgia Bureau of Investigation. Presentation to the committee. June 5, 2007.

[22] National Missing and Unidentified Persons System, NamUS. See www.namus.gov.

[23] Downs, op. cit.

[24] R. Hanzlick. "An Overview of Medical Examiner/Coroner Systems in the United States–Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007.

[25] Ibid.

[26] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**



**Figure 9-1. Death investigation systems in the United States, 2004.**

SOURCE: J.M. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2004. *Medical Examiners and Coroners' Offices, 2004.* U.S. Dept of Justice, Bureau of Justice Statistics Special Report NCJ216756. (Note: In 2007, Kentucky became legally a mixed county ME/C system.[27])

## QUALIFICATIONS OF CORONERS AND MEDICAL EXAMINERS

Jurisdictions vary in terms of the required qualifications, skills, and activities for death investigators. Coroners are constitutional officers, with 82 percent being elected and 18 percent appointed.[28] Coroners as elected officials fulfill requirements for residency, minimum age, and any other qualifications required by statute. They may or may not be physicians, may or may not have medical training, and may or may not perform autopsies (see Box 9-1). Some serve as administrators of death investigation systems, while others are responsible solely for decisions regarding the cause and manner of death. Typical qualifications for election as a coroner include being a registered voter, attaining a minimum age requirement ranging from 18 to 25 years, being free of felony convictions, and completing a training program, which can be of varying length. The selection pool is local and small (because work is inconvenient and pay is relatively low), and medical training is not always a requirement. Coroners are independent of law enforcement and other agencies, but as elected officials they must be responsive to the public, and this may lead to difficulty in making unpopular determinations of the cause and manner of death.

---

[27] Constitution of the State of Kentucky, § 99.

[28] P.M. Murphy, Coroner, Clark County Coroner's Office, Las Vegas, Nevada. "The Coroner System." Presentation to the committee. June 5, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

Recently a 17-year-old high school senior successfully completed the coroner's examination and was appointed a deputy coroner in an Indiana jurisdiction.[29] In one state, justices of the peace are charged with determining cause and manner of death, but they are not medical death investigators. Whether coroners refer cases to pathologists for autopsy is largely budget driven (an autopsy costs about $2,000), although access to pathologists may be an issue if regional interjurisdictional arrangements do not exist. Even so, 84 percent of coroner offices see a need for professional standards,[30] and they identify resources for infrastructure, staff, and training as continuing needs.

---

**Box 9-1 What Is an Autopsy?**

An autopsy is the systematic external and internal examination of a body to establish the presence or absence of disease by gross and microscopic examination of body tissues. The pathologist makes a surgical incision from shoulder to shoulder and from the midpoint of the shoulder to shoulder incision to the pubic bone. The skin is reflected, and each organ in the chest, including the neck structures, abdomen, and pelvis is removed and carefully examined. An incision is also made from the mastoid bone on the right to the mastoid bone on the left, and the scalp is pulled forward and the bony cap removed to reveal the brain. The brain is removed and examined. The pathologist takes a small sample or biopsy of all tissues and archives them in formalin to maintain them for future reference. In medicolegal autopsies, all tissues other than the biopsies are replaced in the body, except for perhaps the brain or heart, which may be retained and examined by consultants for diagnoses causing or contributing to death. For hospital autopsies, depending on the list of permissions given by the person qualified to give permission, tissues and organs may be retained for study, research, or other investigations. The pathologist submits small 2 x 2 cm sections of tissue to the histology laboratory, where thin slices a few microns thick are subjected to chemical treatment to preserve them. The tissue blocks are shaved, so that a thin layer can be mounted on a glass slide and stained with dyes to differentiate cells. The pathologist can recognize diseases in the stained tissue. Medicolegal autopsies are conducted to determine the cause of death; assist with the determination of the manner of death as natural, suicide, homicide, or accident; collect medical evidence that may be useful for public health or the courts; and develop information that may be useful for reconstructing how the person received a fatal injury.

---

Options for improving death investigation by coroners include (1) replacing coroner systems with medical examiner systems; (2) increasing the statutory requirements for performance of coroners; or (3) infusing funding to improve the capabilities of coroners.[31]

Some coroners have suggested establishing a "Coroner College."[32] Coroners want grants for equipment, accreditation incentives, and access to forensic laboratories, NCIC, and automated fingerprint identification systems.[33] Lack of direct access to laboratories and insufficient funding for testing impair the expertise of coroners. Some coroners are amenable to protocols that would ensure the use of forensic pathologists for autopsy. However, even with

---

[29] "Teen Becomes Indiana's Youngest Coroner." See http://happynews.com/news/5122007/teen-becomes-indiana-youngest-coroner.htm.
[30] Murphy, op. cit.
[31] Ibid.
[32] Ibid.
[33] Murphy, op. cit.

9-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

these improvements, the assessment of the dead for disease, injury, medical history, and laboratory studies is a medical decision, as opposed to a decision that would be made by a lay person with investigative and some medical training. The disconnect between the determination a medical professional may make regarding the cause and manner of death and what the coroner may independently decide and certify as the cause and manner of death remains the weakest link in the process.

In contrast, medical examiners are almost always physicians, are appointed, and are often pathologists or forensic pathologists. They bring the body of knowledge of medicine to bear when assessing the history and physical findings and when deciding on the appropriate laboratory studies needed to determine the cause and manner of death. In statewide systems, cities and counties have local medical examiners that are physicians trained to receive the reports of death, decide jurisdiction, examine the body, and make a determination of the cause and manner of death. They certify locally many obvious natural and accidental deaths. In statewide and regionalized statewide systems, local medical examiners do not need to be forensic pathologists and do not perform autopsies, but they do refer, according to protocols, deaths from violence—particularly suicides, homicides, and deaths occurring under suspicious circumstances—to a central or regional autopsy facility for autopsy and further follow-up by a forensic pathologist. In hybrid or mixed state systems, coroners may refer cases for autopsy to forensic pathologists, but there is no supervision or quality assurance to ensure that the coroner's certification of the cause of death and manner of death is concordant with the pathologist's conclusions.

## ME/C ADMINISTRATION AND OVERSIGHT

ME/Cs have varying forms of organizational oversight. Forty-three percent of the U.S. population is served by systems that are independent, 33 percent by offices residing administratively in public safety or law enforcement organizations, 14 percent by offices in health departments, and 10 percent by offices within a forensic laboratory. Government reports over the years have recommended that a medical examiner system should be an independent agency or should report to a commission so that it avoids any conflicts of interest and so that it reports directly to the jurisdictional governing body. When this is not possible, incorporation into a health department, instead of into law enforcement agencies, seems to provide the next most compatible location.[34]

## ME/C STAFFING AND FUNDING

ME/C offices serving populations of less than 25,000 people employ 1 to 2 full-time equivalent (FTE) staff members, while offices serving populations of 1 million or more employ an average of 50 FTEs.[35] Competent death investigations require that trained medical death investigators attend scenes; medically credentialed persons perform external physical examinations; and forensic pathologists perform medicolegal autopsies, employ and interpret radiographs, prepare records, maintain databases, and provide competent and credible testimony in courts. Staff requires training and expensive equipment to utilize and integrate new technologies. Efforts are restricted by budgets, and budgets vary widely, ranging from $18,000 to

---

[34] V. Weedn. "Legal Impediment to Adequate Medicolegal Death Investigation." Presentation to the committee. June 5, 2007.

[35] Downs, op. cit.

9-7

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

$2.5 million annually for county systems, depending on the size of the population. A 2007 survey conducted for the National Association of Medical Examiners (NAME) by Hanzlick revealed that county systems' per capita cost ranged from $1.31 to $9.19, with a mean of $2.89. State systems benefit from economies of scale and function more economically at $.64 to $2.81, with a mean of $1.76. [36] The large variation in qualifications, staffing, budgets, and the multiple skills required for competent death investigations, especially in small jurisdictions, has resulted in marked variation in the quantity and quality of death investigations in the United States.

Physical facilities also vary in adequacy. Only one-third of offices have in-house facilities to perform the histology needed to make microscopic diagnoses on tissues sampled at autopsy. Only one-third have in-house toxicology capabilities to identify drugs present in the deceased that either contributed to or were the primary cause of death. One-third do not have radiology services in-house that would allow the identification of missiles, disease, bony injury or identification features in decedents.[37] Some coroner systems do not have any physical facility at all.

It is clear that death investigations in the United States rely on a patchwork of coroners and medical examiners and that these vary greatly in the budgets, staff, equipment, and training available to them, and in the quality of services they provide. No matter what the level of quality of other forensic science disciplines that are supported by a particular jurisdiction may be, if the death investigation does not include competent death investigation and forensic pathology services, both civil and criminal cases may be compromised.

All ME/Cs share the following deficiencies to some degree:

- imperfect legal structure/code controlling death investigations;
- inadequate expertise to investigate and medically assess decedents;
- inadequate resources to perform competent death investigations;
- inadequate facilities and equipment for carrying out body views and conducting autopsies;
- inadequate technical infrastructure (laboratory support);
- inadequate training of personnel in the forensic science disciplines;
- lack of best practices and information standards;
- lack of quality measures and controls;
- lack of information systems; and
- lack of translational research and associations with university research.[38]

## THE MOVEMENT TO CONVERT CORONER SYSTEMS TO MEDICAL EXAMINER SYSTEMS

As mentioned above, the movement to improve death investigations by bringing in medical expertise in the form of medical examiner systems is not new. Early NRC reports were followed in 2003 by an Institute of Medicine Workshop on the Medicolegal Death Investigation System, which also concluded that the medical examiner system is the best organizational structure for utilizing medical expertise to assess the presence or absence of disease and injury

---

[36] R. Hanzlick. "An Overview of Medical Examiner/Coroner Systems in the United States–Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007.
[37] Murphy, op. cit.
[38] Downs, op. cit.

9-8

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY

and for correlating the medical findings and investigative information to arrive at a determination of cause of death and manner of death. Progress has been very slow.

Additional impediments to progress include the need for some states to change state constitutions or codes, the political constituent base underpinning local coroners, insufficient population and budget to support a competent independent system in small localities, an unwillingness to develop cooperative regionalization for provision of autopsy services, the shortage of physicians—especially pathologists and forensic pathologists—and lack of interest, advocacy, or the perception of need.[39] To implement such conversions, the United States will require a national vision, a model code, increased numbers of forensic pathologists, and funding for infrastructure, staff, education, training, and equipment.

One possible model for providing incentives for these conversions could be an initiative similar to the Law Enforcement Assistance Administration (LEAA). LEAA was a federal agency operating from 1968 to 1982 with the purpose of funneling federal funding to state and local law enforcement agencies. The agency created state planning agencies and funded educational programs, research, and matching grants for physical plants and a variety of local crime control initiatives. For example, an $8 million grant to Virginia established the Virginia Department of Forensic Science, a premier state forensic laboratory that provides forensic science services to all state agencies and the Medical Examiner System in Virginia. [40] If the capitalization of a medical examiner system is the major impediment to progress, an LEAA model can remove that barrier. However, a Medical Examiner Assistance Administration, or MEAA, would need to be structured so that the medical examiner would not be considered a servant of law enforcement and thus would not be placed in a position in which there is even an appearance of conflict of interest. Sensitive cases, such as police shootings and police encounter deaths, jail and prison deaths, deaths in public institutions, and others, require an unbiased death investigation that is clearly independent of law enforcement. All previous studies have recommended that the medical examiner be independent of other agencies, or if they are to be under the umbrella of a central agency that the reporting chain should be through a health department. The medical examiner is first and foremost a physician, whose education, training, and experience is in the application of the body of medicine to situations that have a legal dimension that must be answered by a practitioner of medicine.

## UTILIZATION OF BEST PRACTICES

The tremendous variation in death investigation systems also impedes interagency and interjurisdictional communication and the development of standardized best practices both in death investigation and in the performance of medicolegal autopsies.

NIJ and NAME have attempted to provide guidance for best practices. The NIJ document *Death Investigation: A Guide for the Scene Investigator; Medicolegal Death Investigator: A Systematic Training Program for the Professional Death Investigator*; the NAME Autopsy Standards and Inspection Checklist; and NAME's Forensic Pathology Autopsy Standards are available, but there is no incentive for death investigation systems to adopt them for use.[41]

---

[39] Downs, op. cit; Weedn, op. cit., Hanzlick, op. cit.

[40] Law Enforcement Assistance Administration, at www.archives.gov/research/guide-fed-records/groups/423.html.

[41] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. *Death Investigation: A Guide for the Scene Investigator.* Available at www.ojp.usdoj.gov; S.C. Clark, M.F. Ernst, W.D. Haglund, and J.M. Jentzen. 1996. Medicolegal Death Investigator: A Systematic Training Program for the Professional Death Investigator. Occupational Research and Assessment. Grand Rapids; NAME Autopsy Standards and Inspection

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

Compliance is further limited because of heavy case loads, deficiencies in trained staff, absence of equipment, nonavailability of required day-to-day and consultative services, and the presence of contradictory policies and practices.

## POTENTIAL SCIENTIFIC ADVANCES THAT MAY ASSIST ME/Cs

In addition to current technologies, which are often unavailable and underutilized, new technologies are on the horizon to assist death investigators, medical examiners, and forensic pathologists.

Computerization of case records and the development of case information databases should be standard in any death investigation office, so that death data may be tracked for trends, response to public health and public safety interventions can be streamlined and accelerated, and continuing quality assurance measures can be implemented. There is no standard method of sample and data collection for ME/C systems. Multiple systems are commercially available that can be structured to meet the particular needs of any death investigation system. The initial cost of such systems is significant, and they require continuing maintenance, which rules out their utilization by small and/or underfunded offices. Even if such computer systems were present in each office, there is no standardization that would allow them to talk to one another, a necessity in a multijurisdictional event such as the Hurricane Katrina disaster, for which databases across states were critical to the identification of the dead and the tracking of survivors.

Laboratory information systems are available for the management of medical evidence, laboratory specimens, laboratory data, forensic samples, and personal effects. Effective database management allows information to be gathered and utilized by staff and analyzed for trends and quality issues. Effective databases are essential for managing any multiple fatality event. Rapid electronic transmission of reports is feasible if encryption software is available. At this time, ME/C information systems are less interoperable than current Automated Fingerprint Identification Systems (see Chapter 10). Although the standard autopsy report generally covers the internal examination by organ systems, reporting formats are not standardized among jurisdictions. And, although the NAME Forensic Autopsy Performance Standards provide a model for reporting autopsy findings,[42] it is not widely used.

Imaging equipment is critical to documenting findings sufficient for courts, for review by outside experts, and for reevaluation as medical knowledge advances. Fluoroscopy is helpful for locating missiles. Computed tomography scanning and nuclear magnetic resonance imaging may often present a better visual picture of some injuries and would likely reduce the number of autopsies carried out to rule out occult injury and to document in greater detail the extent of injury in accidents. The "Virtual Autopsy," or "virtopsy," utilizes multislice computed tomography and magnetic resonance imaging combined with 3-D imaging technology to create vivid images of the interior of the human body.[43]

The advantages of the virtopsy are that it is not invasive or destructive of tissue and can provide dramatic pictures of skeletal and soft tissue injury. It also provides some information when there is a religious objection to autopsy. Virtopsy has the potential to detect internal bleeding, missile paths, bone and missile fragmentation, fracture patterns, brain contusion, and gas embolism, in addition to occult fractures that are technically difficult to demonstrate during

---

Checklist at www.thename.org; and G. Peterson and S. Clark. 2006. Forensic Autopsy Performance Standards at www.thename.org.

[42] G. Peterson and S. Clark. 2006. Forensic Autopsy Performance Standards. Available at www.thename.org.

[43] See www.nlm.nih.gov/visibleproofs/galleries/technologies/virtopsy.html.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

the traditional autopsy. Although a standard forensic autopsy is needed to recover evidence such as bullets or bomb fragments within the body and to collect specimens for testing, virtopsy offers a valuable tool for examination when dissection of the body is not feasible, when evidence is hard to visualize, or when a more complete assessment of injury is desired in noncriminal cases. For example, instead of a simple external examination for an obviously lethal injury in a vehicular violence death, virtopsy would permit more extensive cataloging of the injury to help automotive engineers design safer vehicles. The same technology can enhance bite mark impressions and some patterned injuries. Only a few ME/Cs have access to virtopsy at this time, and very few have the budget to purchase the expensive equipment or to build a suitable facility and staff and maintain it.

Scanning electron microscopy is not new but few ME/Cs have access to it to assist in identifying the metal conductor(s) in electrocution injuries, gunpowder residues in gunshot injuries, and other trace metals on skin or in tissues.

The anthrax bioterrorism attack that occurred in Connecticut, Maryland, New York, Virginia, and Washington, D.C., highlighted the need to have biosafety capability for autopsy facilities. Currently, most autopsy facilities are 20 years old, on average, and are outdated in physical plant, technology, and biosafety capability. One-third of them lack design/airflow control of pathogens, and most function at biosafety level 2 rather than level 3.[44] Upgrading facilities to handle the potential biohazards associated with bioterrorism will require a massive infusion of funds that localities currently are unable or unwilling to provide. Laboratory safety in an era in which bioterrorism is a real threat remains an ongoing issue.

In-house toxicology services utilizing state-of-the-art equipment are essential for identifying drugs, intoxicants, and poisons and for detecting unsuspected homicides, suicides, and child and elder abuse. Yet only 37 percent of systems have in-house toxicology capabilities.[45] The cost for complete toxicology utilizing private sector laboratories for cases is high, resulting in insufficient toxicology screening and minimal testing on cases even when they are clearly indicated.

Molecular diagnosis conducted on blood and tissue samples is routine in hospital laboratories to diagnose disease. Investigations of unexplained sudden deaths, especially in young people and infants, would benefit from greater access to molecular diagnostics. Molecular diagnostic procedures are available, but most ME/C offices cannot afford to conduct these procedures and do not have the medical expertise to request them or the skills to interpret them. For example, testing for inborn errors of metabolism should be a part of any examination of the unexpected death of an infant or toddler, and testing for long QT syndrome is important in determining the cause of cardiac death in young people or in those whose family pedigree discloses other sudden unexpected deaths. Molecular testing is available for the etiology of multiple causes of sudden cardiac death, including abnormalities in ion channels in cell membranes or channelopathies, hypertrophic cardiomyopathy, long QT syndrome, Marfan syndrome, right ventricular cardiomyopathy, dilated cardiomyopathy, and Ehlers-Danlos syndrome.[46]

---

[44] Downs, op. cit.

[45] Ibid.

[46] S.E. Lehnart, M.J. Ackerman, D.W. Benson, R. Brugada, C.E. Clancy, J.K. Donahue, A.L. George, A.O. Grant, S.C. Groft, C.T. January, D.A. Lathrop, W.J. Lederer, J.C. Makielski, P.J. Mohler, A. Moss, J.M. Nerbonne, Y.M. Olson, D.A. Przywara, J.A. Towbin, L.H. Wang, A.R. Marks. Inherited arrhythmias: a National Heart, Lung, and Blood Institute and Office of Rare Diseases workshop consensus report about the diagnosis, phenotyping, molecular

9-11

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

Some testing can be carried out on a dried blood sample long after death has occurred.[47] Some molecular diseases are heritable, and it could be argued that the ME/C has a duty to identify these diseases and alert families about their presence. Many medical examiner offices archive a card with a dried blood sample on decedents, primarily to document personal identification, should the need arise, but also for future study. In the future, kin may request the archived blood cards, as the molecular diagnosis of disease improves and families seek to identify their risk. Thus, ME/Cs need education and training in and access to the specialized laboratory testing available to establish the molecular basis of disease and of sudden unexpected natural death.

## THE SHORTAGE OF MEDICAL EXAMINERS AND FORENSIC PATHOLOGISTS

Medical examiners are physicians who are appointed and charged with determining the cause and manner of death. In some states, medical examiners are forensic pathologists, while in other statewide systems, local, city, and county medical examiners are physicians but do not need to be forensic pathologists. They receive death investigation training and are responsible for examining bodies that do not require medicolegal autopsy and, according to system guidelines, for referring cases that need autopsy to regional offices where forensic pathologists perform the examinations and initiate further investigation as needed. Well-trained local medical examiners keep costs in line by reducing transportation costs to regional or central offices and are more accessible than pathologists in distant offices. Changes in the delivery of health care, increased patient caseloads, the inconvenience of attending scenes, the need for before and after hours examination of decedents, and the level of remuneration have made it difficult for statewide systems to recruit busy physicians to serve as community or local medical examiners. If this trend continues, systems will rely more heavily on lay medical death investigators and will need to develop training programs that assure competency.

Forensic pathology is the subspecialty of medicine devoted to the investigation and physical examination of persons who die a sudden, unexpected, suspicious, or violent death. Forensic pathology derives its name from "forensis" (public), or pertaining to the forum, and "pathos" (suffering), referring to pathos or suffering. The term ultimately evolved to encompass the study of deaths due to injury and disease and of deaths that are of interest to the legal "forum." Forensic pathologists are physicians who have completed, at a minimum, four years of medical school and three to four years of medical specialty training in anatomical pathology or anatomical and clinical pathology, followed by an accredited fellowship year in forensic pathology. They are certified by examination and assessment of their credentials by the American Board of Pathology in, at a minimum, anatomical pathology, and by subspecialty examination, as having special competence in forensic pathology.

As of 2008, approximately 38 forensic pathology residency programs accredited by the Accreditation Council for Graduate Medical Education sponsored approximately 70 training fellowships. Some positions are unfunded, and others did not find suitable candidates. Forty-two candidates were certified in forensic pathology by the American Board of Pathology in January 2008. Pathologists must recertify by examination every 10 years to maintain their certifications, in addition to maintaining a professional license in the state in which they are practicing, by

---

mechanisms, and therapeutic approaches for primary cardiomyopathies of gene mutations affecting ion channel function. *Circulation* 13;116(20):2325-2345.

[47] Personal communication between M.J. Ackerman and Marcella Fierro. June 16, 2008.

9-12

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

---

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

---

submitting a description of practice for pathologists that do not practice as hospital staff and by earning continuing medical education credits.[48]

Forensic pathologists examine the dead to identify specific classes of injury, collect medical evidence, determine the presence or absence of natural disease, and determine the physiological cause of death. They document their findings in reports for the civil and criminal courts and provide information to family members and others who have a legitimate need to know. They may sign the death certificate describing the manner or circumstances under which death occurred (natural, accident, suicide, homicide, or undetermined). The examinations forensic pathologists carry out may be inspections or "views" of the external surfaces of a body or a medicolegal autopsy, which comprises an external and internal examination of the head, thorax, abdomen, and any other body region pertinent to the case. The nature of the death and its circumstances dictate which type of examination the forensic pathologist performs on an individual case. Pathologists who are not certified in forensic pathology perform many of the medicolegal autopsies in the United States.

Forensic pathologists practice in multiple settings. Most operate within death investigation systems and are appointed as civil servants and serve as medical examiner forensic pathologists. Some function as private practitioners, while others serve as consultants. They may operate under a fee-for-service agreement or be under contract to a city or county jurisdiction to provide medical examiner services. Others may serve as coroner's pathologists, and perform autopsies and prepare reports for coroners, who by statute assign the cause and manner of death and sign the death certificate.

An estimated 1,300 pathologists have been certified in forensic pathology since the American Board of Pathology first offered the certification in 1959 (about 5,000 medical residents enter internal medicine programs each year). Currently, approximately 400 to 500 physicians practice forensic pathology full time. Although there are only about 70 positions available each year, recent data indicate that only 70 percent of the slots are filled. NAME recommends an autopsy caseload of no more than 250 cases per year. The estimated need is for about 1,000 forensic pathologists; about 10 percent of available positions are vacant because of manpower shortages and/or insufficient funding of pathologist positions.[49] Although many forensic pathologists earn between $150,000 and $180,000 annually, this range is much lower than the average income of most hospital-based pathologists starting at the entry level.

An Association of American Medical Colleges (AAMC) survey indicates that the average medical school graduate in 2006 finished with debt in excess of $130,571 (including premedical school borrowing), with 72 percent having a debt of at least $100,000.[50] Interested pathology residents are less likely to elect to practice forensic pathology as a career if they are already burdened by debt load, and a program of loan forgiveness for years of service in a medical examiner system would be a major enticement to students who are considering a career in pathology. The shortage of qualified forensic pathologists required to staff aspiring medical examiner systems constitutes a major challenge not only for offices that are currently seeking staff, but for the future as well.

---

[48] American Board of Pathology at www.abpath.org/200801newsltr.htm; *ABP Examiner* 39. January 1, 2008 at www.abpath.org/200802newsltr.htm.

[49] Hanzlick, 2007, op. cit.

[50] Association of American Medical Colleges at www.ama-assn.org/ama/pub/category/5349.html.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

## STANDARDS AND ACCREDITATION FOR DEATH INVESTIGATION SYSTEMS

Currently, the standard for quality in death investigation for medical examiner offices is accreditation by NAME. Accreditation attests that an office has a functional governing code, adequate staff, equipment, training, and a suitable physical facility and produces a forensically documented accurate, credible death investigation product. Of all ME/C systems nationally, only 54 are accredited by NAME. The NAME accreditation checklist is available online and describes the requirements for accreditation.[51] Accreditation is for a period of five years. NAME also offers an individualized assessment program to enable jurisdictions to identify what they need to meet accreditation standards. Impediments to developing systems that meet accreditation requirements include the following:

- Most coroner systems cannot qualify for accreditation because of problems related to size, insufficient staff and equipment, and insufficiently trained personnel, which inhibit their ability to perform a competent physical examination, make and/or exclude medical diagnoses on dead bodies, and make determinations of the cause and manner of death. The historic role of the coroner is insufficient to accurately perform the medicolegal and public health functions related to sudden, unexpected, or violent death.
- Many medical examiner systems are constrained by budget, lack of staff, lack of equipment, and insufficient facilities and cannot meet NAME standards.
- The accreditation process requires considerable staff work, including written policies and procedures.
- The process requires renewal.
- There is administrative cost of the process.
- Many offices do not see any benefit to accreditation.

Federal incentives are lacking for states to perform an assessment of death investigation systems to determine status and needs, using as a benchmark and goal compliance with NAME current professional standards, guidelines, and accreditation requirements.

## QUALITY CONTROL AND QUALITY ASSURANCE

Quality control and quality assurance begin with the implementation of standardized policies and procedures by qualified staff. For lay medical investigators, registration and certification by the American Board of Medicolegal Death Investigators requires standard performance procedures as outlined in the NIJ document *Death Investigation: A Guide for the Scene Investigator* and other published education and training documents.[52] For forensic pathologists, basic competence is initially documented by examination and certification and subsequently by recertification by the American Board of Pathology. Written office and morgue policies and procedures with scheduled reviews and updates help ensure consistent performance over time. Professional performance parameters, such as the NIJ investigation guidelines for investigators and the NAME forensic autopsy standards, are offered as national documents that

---

[51] NAME Autopsy Standards and Inspection Checklist at www.thename.org.
[52] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. *Death Investigation: A Guide for the Scene Investigator*. Available at www.ojp.usdoj.gov.

9-14

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

all systems should be able to follow. Professional continuing education must be available and supported, and it should be mandatory.

## CONTINUING MEDICAL EDUCATION

For pathologists to maintain professional standing they must earn Continuing Medical Education (CME) credits in accordance with the number required by their state medical licensing board. Attendance at forensic educational meetings, such as the annual meetings of NAME and the American Academy of Forensic Sciences (AAFS), help keep medical staff current. Other opportunities that offer valuable CME credits are meetings that focus on pediatric forensic issues and general pathology updates. AAFS meetings are multidisciplinary and afford an opportunity for updating in forensic anthropology, forensic odontology, and other forensic disciplines. The American Society of Clinical Pathologists offers CheckSample exercises and quizzes on forensic subjects prepared by experts.[53] Regular in-house training on emerging technologies in pathology and forensic science, and journal clubs covering a broad spectrum of journals, can help educate and reeducate forensic pathologists and investigators. Medical death investigators may attend the same meetings. The College of American Pathologists offers self-assessment programs in anatomical and forensic pathology, as well as a continuing education program of forensic pathology case challenges.[54]

## HOMELAND SECURITY

As part of homeland security, the National Response Plan (National Response Framework as of March 2008) identifies ME/Cs under Emergency Support Function 8 as responsible for management of the dead resulting from any hazardous event.[55] All deaths resulting from any form of terrorism are under the jurisdiction of the ME/C. MED-X, the bioterrorism surveillance program provided by the Centers for Disease Control and Prevention (CDC) for ME/Cs, utilizes syndromic surveillance of primarily out-of-hospital deaths (deaths occurring before the opportunity occurs for hospitalization and medical assessment and testing) to quickly identify deaths resulting from bioterrorism.[56]

With the exception of some large city, county, and state systems, the level of preparedness of ME/C jurisdictions is generally very low. Larger medical examiner systems may be able to manage events causing several hundred simultaneous single-site recoverable bodies with minimal outside assistance. Any event with thousands of fatalities would require federal assistance. Some statewide systems have developed consortia with neighboring states to supplement staff and equipment, but smaller cities and counties will need to rely entirely on federal assets such as Disaster Mortuary Operational Response Teams and the DOD Joint Task Force Civil Support.[57] Homeland security and disaster response would be well served by

---

[53] American Society of Clinical Pathologists CheckSample. Available at www,ascp.org/Education/selfStudyPublications/checkSample/default.aspx.
[54] See http://cap.org/apps/cap.portal?.
[55] Homeland Security National Response Plan (known as the National Response Framework after March 2008) at www.dhs.gov.
[56] Ibid; K.B. Nolte, S.L. Lathrop, M.B. Nashelsky, J.S. Nine, M.M. Gallaher, E.T. Umland, J.L. McLemore, R.R. Reichard, R.A. Irvine, P.J. McFeeley, R.E. Zumwalt. 2007. "Med-X": A medical examiner surveillance model for bioterrorism and infectious disease mortality. *Human Pathology* 38:718-725.
[57] Disaster Mortuary Operational Response Team at: www.dmort.org; Joint Task Force Civil Support at: http://jtfcs.northcom.mil.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

universal improvement in ME/C offices to manage mass fatality events such as the multistate Hurricane Katrina tragedy and the World Trade Center attacks, while also surveilling for the links between bioterrorism deaths. Multiple fatality management across jurisdictional lines, such as was needed in response to Hurricane Katrina, is nearly impossible under current conditions, given the absence of medical expertise in some systems, the absence of standards of performance, and the noninteroperability of systems and procedures. The recent infusion of funds to the states through the Department of Health and Human Services (DHHS) and the Department of Homeland Security (DHS) is of little assistance when there are no competent systems able or willing to employ those funds. Uniform statewide and interstate standards of operation, consolidation of small systems, regionalization of services, and standardization of staff training are needed to assist in the management of interstate and cross-jurisdictional events. A software program is needed that is universally usable and available, and its use should be promulgated by ME/C systems for multiple fatality management. (See also Chapter 11.)

## FORENSIC PATHOLOGY RESEARCH

Currently, little research is being conducted in the areas of death investigation and forensic pathology in the United States. Individual ME/C offices mainly utilize their databases for epidemiological retrospective reviews. Individual forensic pathologists operating in any system carry heavy caseloads and often have no dedicated time, expertise, facilities, or funding for research. Research is further limited because many offices operate training programs independent of university medical schools. Occasionally, a specific case may inspire "litigation research" directed to the elucidation of a specific problem related to a case that is being litigated actively, but this does not replace broad and systematic research of a forensic issue. Few university pathology departments promote basic pathology research in forensic problems such as time of death, injury response and timing, or tissue response to poisoning. In general, research interest often is inspired by a national goal that is funded through grants. A review of the forensic literature for basic research in forensic pathology reveals that efforts are originating largely from Europe, Scandinavia, and Japan. In other countries, universities house a department of legal medicine and/or departments of forensic medicine and pathology where forensic pathologists have the time, expertise, and funding needed to perform basic forensic research.

The Accreditation Council for Graduate Medical Education (ACGME) requires forensic pathology training programs to provide fellows an opportunity for scholarly research or other scholarly activities.[58] These research projects are usually small and limited in scope because of the constraints of a one-year fellowship, legislation that does not permit most basic research on tissues that are available upon autopsy without the permission of next of kin, lack of funding, and lack of space. Historically, the consent issue derives from the fact that forensic autopsies are carried out for medicolegal purposes and thus do not require permission from the next of kin. But without this permission, research that utilizes tissue from medical examiner offices does not take place. The time constraints for the performance of medicolegal autopsies make finding families and obtaining consent difficult. Many projects consist of epidemiological reviews that while of interest are not basic science.

Some U.S. universities may administer some forensic pathology fellowship programs, while others may include forensic pathologists within their departments of pathology. In these

---

[58] Accreditation Council for Graduate Medical Education. Available at:
www.acgme.org/acWebsite/downloads/RRC_progReq/310forensicpath07012004.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

instances, the forensic pathologist usually supervises a departmental autopsy service that performs hospital and forensic autopsies. A university connection usually provides the university with the opportunity to rotate pathology residents and medical students through an ME/C office for a brief period, usually several months, and provides exposure to forensic pathology as part of an overall education program for medical students or as required by ACGME for training residents in general pathology. Even in universities that have a department of forensic science, research is limited to the forensic science disciplines, and little or no research is devoted to forensic pathology or forensic medicine. In some cases, there may be collaborative, ongoing epidemiological activities, such as when forensic pathologists work with members of departments of trauma surgery to develop statistical studies or when a forensic pathologist presents data at surgical or pediatric death review conferences. Of the many impediments to academic research in forensic pathology in the United States, the most significant are the lack of understanding of forensic research challenges, the lack of a perceived need and national goals, the lack of grant funding of any kind to support research, the lack of forensic pathology researchers, and the lack of recognition for efforts directed to forensic pathology research within the university community. Grant funding drives research, but virtually no funding is available to encourage departments of pathology to make forensic pathology research a focus, and there is little tradition of collaboration between academic and forensic pathologists.

Translational research bridges the gap between basic science discoveries and their practical applications. In the case of forensic pathology/medicine, this means taking basic science research knowledge to the autopsy table.[59] Given the large numbers of autopsies performed in the United States in medical examiner offices, there is a great need for new knowledge that will filter down to the autopsy pathologist and for opportunities for practicing forensic pathologists to identify problems that need basic research.

## COMMON METHODS OF SAMPLE AND DATA COLLECTION

State statute determines the sample or collection of cases that ME/Cs investigate and examine. The minimal data collected on each case is demographic and is entered on the certificate of death by the state division of vital records and death statistics, which also maintains the data. The data are reported nationally each year to the National Center for Health Statistics. ME/C offices with databases may keep records pertaining to their particular jurisdiction and collect additional data on specific diagnoses, or classes, of death. They collect useful death data through child fatality review teams, adult fatality review teams, surveillance programs for family and intimate partner violence, and the National Violent Death Review System.[60] None of these data collection projects is federally mandated, and for small systems there is no perceived benefit. ME/C reports are available to next of kin and others as provided by statute. ME/C investigations recognize product and equipment failures leading to death and report them to appropriate agencies. Before 2005, when funding was withdrawn, CDC maintained the Medical Examiner and Coroner Information Sharing Program (MECISP) to receive reports of product-

---

[59]NIH Roadmap for Medical Research: Re-engineering the Clinical Research Enterprise–Translational Research. Available at http://nihroadmap.nih.gov/clinicalresearch/overview-translational.asp.
[60]National Violent Death Reporting System. Available at www.cdc.gov/ncipc/profiles/nvdrs/default.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

associated deaths, which allowed early recognition of problem products.[61] Originally, MECISP was established to obtain data from all deaths investigated by ME/Cs and to share such information with relevant agencies. The major goals of MECISP were to improve medicolegal death investigation and to facilitate the sharing of death investigation information.[62] Many agencies depend on ME/C investigations and autopsies to complete their work, such as the Occupational Health and Safety Administration, social services agencies, victim witness compensation programs, and workers compensation agencies.

Systems with in-house forensic pathologists may collect autopsy data, but often the data are collected in a format that is different from the one used for the underlying (proximate) cause of death data as listed on death certificates. The reporter may use a pathology classification system such as SNOMED (Systematized Nomenclature of Medicine) or an individually devised system that tracks diseases or injuries of personal or system-specific interest.[63] There is no universally accepted or required system for collection or maintenance of autopsy data by medical examiners and coroners. Analysis of data may be local or regional, and it may be conducted by review teams or by national organizations or agencies with interests in specific classes of data.

Scientific interpretation and summaries of the results are included in the reports generated by each ME/C office. Reports by medical death investigators that describe the circumstances of death are descriptive and vary in quality depending on the standards of the office. Pathologists produce the autopsy reports and may or may not provide an interpretive summary of findings. Reports vary from the academic pathology report that lists each organ system and any deviations from normal to the problem-oriented autopsy report that prioritizes diagnoses from the most important leading to death followed by any contributory and then noncontributory pathology of interest. Not all pathologists follow the NAME autopsy standards. The general expectation, at least for the legal forum, is that each autopsy will have documented the findings in sufficient detail through narrative and photographs and that review by another pathologist will confirm the adequacy of the examination.

Requiring the adoption of standards for death investigations and autopsies as well as accreditation of all ME/C offices would benefit all parties, including the recipients of ME/C services. Because the credibility of unaccredited offices is rarely challenged, implementing and enforcing standards will require major incentives as well as negative consequences for nonadherence.

---

[61] Centers for Disease Control and Injury Prevention Medical Examiner Coroner Information Sharing Project. Available at www.cdc.gov/ncphi/disse/nndss/contact.htm#mecisp.

[62] MECISP was established in 1986 by CDC with goals that included improving the quality of death investigation in the United States mainly by achieving uniformity and improving the quality of information obtained during the investigation of deaths by ME/Cs. The program was active and productive and very well received by medical examiners. It constituted the major interface between the public health and the ME/C systems. Approximately 10 years ago, CDC went through a period of internal reorganization and administratively began decreasing the budget for MECISP. MECISP was moved from the CDC National Center for Environmental Health to the CDC Epidemiology Program Office. The budget was eliminated in 2004, despite the efforts of NAME. R. Hanzlick. 2006. Medical examiners, coroners, and public health. *Archives of Pathology and Laboratory Medicine* 130:1247-1282.

[63] SNOMED. Available at www.snomed.org.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

## CONCLUSIONS AND RECOMMENDATION

ME/C systems function at varying levels of expertise, often with deficiencies in facilities, equipment, staff, education, and training. And, unfortunately, most systems are under budgeted and understaffed. As with other forensic science fields, there are no mandated national qualifications or certifications required for death investigators. Nor is medical expertise always required. In addition, there is no one recognized set of performance standards or best practices for ME/C systems nor are there incentives to implement one recognized set. Also lacking are universally accepted or promulgated methods of quality control or quality assurance. It is clear that the conversion of coroner systems to medical examiner systems as recommended by many studies has essentially halted and requires federal incentives to move forward.

The Model Post Mortem Examination Act of 1954 needs to be revisited and updated to include the elements of a progressive and responsive death investigation law. The revised code should include standards for administration, staffing, and training. Any changes to the system will require federal incentives to implement the changes in each state.

The shortage of forensic pathologists speaks to the need to provide incentives for young physicians to train in forensic pathology. Systems with authorized positions cannot fill them, because of this shortage and budget deficits. The National Forensic Sciences Improvement Act (NFSIA) must be fully funded to support the core needs of ME/C grantees for equipment and facilities, training and education, and infrastructure.

Many ME/C systems do not utilize up-do-date technologies that would help in making accurate medical diagnoses. Moreover, many are unable to make use of advances in forensic technology because of staff educational deficiencies, untrained staff, and budget stringencies. Basic and translational forensic pathology research are nearly nonexistent.

Homeland security is compromised because operating units related to forensic pathology are not standardized, and the multiplicity of systems precludes meaningful communication among units. Surveillance for bioterrorism and chemical terrorism is not universal, and database systems cannot operate across jurisdictional lines to share data or manage multiple fatality incidents.

Although steps have been taken to transform the medicolegal death investigation system, the shortage of resources and the lack of consistent educational and training requirements prevent investigators from taking full advantage of tools, such as CT scans and digital X-rays, that the health care system and other scientific disciplines offer. In addition, more rigorous efforts are needed in the areas of accreditation and adherence to standards. Currently, requirements for practitioners vary from an age and residency requirement to certification by the American Board of Pathology in forensic pathology.

Funds are needed to assess and modernize the medicolegal death investigation system, using as a benchmark the current requirements of NAME related to professional credentials, standards, and accreditation. As it now stands, ME/Cs are essentially ineligible for direct federal funding and cannot receive grants from DHHS (including the National Institutes of Health [NIH]) and the Department of Justice or DHS. The Paul Coverdell NFSIA is the only federal grant program that names ME/Cs as eligible for grants. However, ME/Cs must compete with public safety agencies for Coverdell grants; as a result, the funds available to ME/Cs have been significantly reduced. NFSIA is not funded sufficiently to provide significant improvements in ME/C systems. In addition to more direct funding, other initiatives could be pursued to improve medicolegal death investigation practices.

9-19

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

AAMC and other appropriate professional organizations might organize collaborative activities in education, training, and research to strengthen the relationship between the medical examiner community and its counterparts in the larger academic medical community. Medical examiner offices with training programs affiliated with medical schools should be encouraged to compete for funds. Funding should be available to support pathologists who are seeking forensic fellowships. In addition, forensic pathology fellows could apply for medical school loan forgiveness if they stay full time at a medical examiner's office for a reasonable period of time.

Additionally, the proposed National Institute of Forensic Science (NIFS) should seek funding from Congress to allow it, CDC, and DHS, jointly, to design programs of interest to medical examiners and medical examiner offices in national disaster planning, preparedness, and consequence management. Uniform statewide and interstate standards of operation would be needed to assist in the management of cross-jurisdictional and interstate events. NIFS also might consider whether to support a federal program underwriting the development of software for use by ME/C systems for the management of multisite, multistate, or multiple fatality events.

NIFS also could work with groups such as the National Conference of Commissioners on Uniform State Laws, the American Law Institute, and NAME, in collaboration with other appropriate professional groups, to update the 1954 Model Post Mortem Examinations Act and draft legislation for a modern model death investigation code. An improved code might, for example, include the elements of a competent medical death investigation system and clarify the jurisdiction of the medical examiner with respect to organ donation. Although these ideas must be developed in greater detail before any concrete plans can be pursued, the committee makes a number of specific recommendations, which, if adopted, will help to modernize and improve the medicolegal death investigation system. These recommendations deserve the immediate attention of NIFS and Congress.

**Recommendation 11:**

**To improve medicolegal death investigation:**

(a) **Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to states and jurisdictions to establish medical examiner systems, with the goal of replacing and eventually eliminating existing coroner systems. Funds are needed to build regional medical examiner offices, secure necessary equipment, improve administration, and ensure the education, training, and staffing of medical examiner offices. Funding could also be used to help current medical examiner systems modernize their facilities to meet current Centers for Disease Control and Prevention-recommended autopsy safety requirements.**

(b) **Congress should appropriate resources to the National Institutes of Health (NIH) and NIFS, jointly, to support research, education, and training in forensic pathology. NIH, with NIFS participation, or NIFS in collaboration with content experts, should establish a study section to establish goals, to review and evaluate proposals in these areas, and to allocate funding for collaborative research to be conducted by medical examiner offices and medical universities. In addition, funding, in the form of medical student loan forgiveness and/or fellowship support, should be made available to pathology residents who choose forensic pathology as their specialty.**

9-20

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY

(c)    NIFS, in collaboration with NIH, the National Association of Medical Examiners, the American Board of Medicolegal Death Investigators, and other appropriate professional organizations, should establish a Scientific Working Group (SWG) for forensic pathology and medicolegal death investigation. The SWG should develop and promote standards for best practices, administration, staffing, education, training, and continuing education for competent death scene investigation and postmortem examinations. Best practices should include the utilization of new technologies such as laboratory testing for the molecular basis of diseases and the implementation of specialized imaging techniques.

(d)    All medical examiner offices should be accredited pursuant to NIFS-endorsed standards within a timeframe to be established by NIFS.

(e)    All federal funding should be restricted to accredited offices that meet NIFS-endorsed standards or that demonstrate significant and measurable progress in achieving accreditation within prescribed deadlines.

(f)    All medicolegal autopsies should be performed or supervised by a board certified forensic pathologist. This requirement should take effect within a timeframe to be established by NIFS, following consultation with governing state institutions.

9-21

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 10
# AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS

In the late 1970s and early 1980s law enforcement agencies across the Nation began adopting Automated Fingerprint Identification Systems (AFIS) to improve their efficiency and reduce the amount of time it took to identify (or not exclude) a given individual from a fingerprint or to conduct a background investigation. AFIS introduced an enormous improvement in the way local, state, and federal law enforcement agencies managed fingerprints and identified people. Before the use of AFIS, the fingerprint identification process involved numerous clerks and fingerprint examiners sifting through thousands of tediously classified and cataloged paper fingerprint cards, while dealing with delays and challenges caused by the realities of exchanging information with other agencies by mail, fax, or other means. With AFIS, fingerprint examiners use computer workstations to mark the features of a scanned fingerprint image (e.g., ridge endings, bifurcations), encode the resulting data in a machine-readable format, and then search for similar fingerprints in an associated database of known fingerprints and records. AFIS searches are fast, and they often allow examiners to search across a larger pool of candidates. Although challenging cases can be time consuming, depending on the size of the database being searched and the system's workload, AFIS often can return results to the examiner within minutes.

AFIS searches today fall into two distinct categories:

**10-print searches**, which typically involve comparing relatively high-quality, professionally obtained fingerprint images—for example, prints taken during an arrest or booking or as part of a background check—with fingerprint records in an agency database, such as the FBI's Integrated Automated Fingerprint Identification System (IAFIS) or a state's criminal fingerprint database; and

**Latent print searches**, which are considerably more complicated than 10-print searches. In a latent print search, a fingerprint examiner attempts to identify an individual by comparing a full or partial latent fingerprint from a crime scene with the records contained in an AFIS database. Latent prints are regularly of poor quality and may be only a partial print, and often fingerprint examiners may not even know from which finger a given latent print came.

A third category (albeit one that includes elements of both categories listed above) might also be called "unidentified burned, decomposed, or fragmented prints," which may be either a complete 10-print card to be compared with known prints on file to confirm identity or partial prints recovered from the skin or dermis of damaged fingers of an unknown decedent to determine identity. This third category can include prints from single individuals recovered from a small single event or victims of a mass casualty event resulting from naturally occurring catastrophes or terrorism. In either case, AFIS systems have reduced the time required to accomplish many identifications from weeks to hours.

Today, the process of populating AFIS systems with records is managed primarily by uploading 10-print records from police bookings and background checks. Because images from these sources are generally of good quality (indeed, poor-quality 10-print records are normally redone at the time they are taken), an automated algorithm is adequate for extracting the features

10-1

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

used to index an image for retrieval. Computer algorithms work well for performing comparisons of 10-print records (e.g., to see if the prints taken when one applies for a security clearance match the prints taken during a previous background check). However, submitting a latent print for comparison is a more customized process, requiring fingerprint examiners to mark or adjust the features manually to retrieve stored prints with the same features in analogous places. Because latent print images normally are not as clear or as complete as images from a 10-print card, the image processing algorithms used for 10-prints are not as good as the human eye in spotting features in poor images.

AFIS has been a significant improvement for the law enforcement community over the past decades, but AFIS deployments today are still far from optimal. Many law enforcement AFIS implementations are stand-alone systems or are part of relatively limited regional networks with shared databases or information-sharing agreements—the Western Identification Network (WIN) is one example of such a regional network (for more information on WIN, see Box 10-1).

---

**Box 10-1 The Western Identification Network**

WIN was formed in May 1988 to facilitate the creation of a multistate AFIS implementation. A year later, the state legislatures of Alaska, California, Idaho, Oregon, Nevada, Utah, Washington, and Wyoming appropriated the necessary funding to begin work on the system.

The initial WIN AFIS was installed in Sacramento, California, with remote subsystems in Cheyenne, Wyoming; Salt Lake City, Utah; Boise, Idaho; Carson City, Nevada; and Salem and Portland, Oregon. Booking terminals also were installed in numerous locations throughout these states, and existing similar stand-alone systems in Alaska, California, and Washington were connected to WIN in 1990 to complete the initial network. At first, WIN's centralized automated database included 900,000 fingerprint records, but after connecting to Alaska, California, and Washington, the number of searchable fingerprint records increased to more than 14 million. Today, WIN members have access to more than 22 million fingerprint records from the western United States.

NOTE: For information about WIN, see
www.winid.org/winid/who/documents/WINServiceStrategyJanuary2008.pdf.

---

Today, AFIS systems from different vendors most often cannot interoperate with one another. Indeed, different versions of similar systems from the same vendor sometimes cannot share fingerprint data with one another. In addition, many law enforcement agencies also access the FBI's IAFIS database[1] through an entirely separate stand-alone system—a fact that often forces fingerprint examiners into entering fingerprint data for one search multiple times (at least once for each system being searched).

There is no doubt that much good work has been done in recent years aimed at improving the interoperability of AFIS implementations and databases (see Box 10-2), but the committee believes that, given the potential benefits of more interoperable systems, the pace of these efforts to date has been too slow, and greater progress needs to be made toward achieving meaningful, nationwide AFIS interoperability.

---

[1] See www.fbi.gov/hq/cjisd/iafis.htm.

10-2

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS ——PREPUBLICATION COPY**

---

**Box 10-2  Working Toward AFIS Interoperability**

As early as 1986, the American National Standards Institute (ANSI) and the National Bureau of Standards (now known as the National Institute of Standards and Technology, or NIST) were working on ways to facilitate the exchange of fingerprint data. Their collaboration produced a standard defining minutiae data and both low- and high-resolution fingerprint images. The standard was not successful, however, because of conflicts with proprietary systems.

In 1993, ANSI and NIST teamed up again to create another fingerprint data standard, a standard later updated in 1997. It defined standards for minutiae data and low- and high-resolution fingerprint images in both binary and grayscale format, as well as methods for compressing and decompressing image data.

In the late 1990s, the International Association for Identification's AFIS Committee successfully demonstrated a method of conducting remote fingerprint searches across jurisdictions and across equipment from different vendors.[2]

In 2003, the ANSI/NIST standard was updated again. It grew to include 16 record types in total, with the addition of standards for such things as palm print data and latent print data.[3]  The standard was recently updated once more and has subsequently been approved by ANSI's Board of Standards Review as an ANSI standard.[4]

The NIST-sponsored Minutiae Interoperability Exchange Test (MINEX) program is an ongoing series of coordinated development efforts aimed at improving the performance and interoperability of fingerprint minutiae standards. In 2004, the original project undertook to determine the feasibility of using minutiae data (rather than image data) as the interchange medium for fingerprint information between different fingerprint matching systems.[5]

---

## INTEROPERABILITY CHALLENGES

Despite the work done to date to achieve broader AFIS interoperability and its potential benefits (i.e., more crimes solved, quicker and more efficient searches, and better use of limited law enforcement resources), several persistent challenges to reaching this goal remain.

### Technical Challenges

The technical challenges to AFIS interoperability involve both those that are encountered and addressed by the information technology community in other disciplines (such as data sharing and algorithmic performance) and those that are specific to AFIS and the sharing of fingerprint information (e.g., feature identification, reliability of latent print comparisons). In addition, systems will need to be designed with the flexibility to handle other kinds of biometric data in the future (e.g., iris and palm scans and possibly genomic data). As these latter challenges are addressed, retrieval algorithms within proprietary AFIS systems also may tend to converge, which could simplify the broader interoperability challenges.

Creating useful technical standards is never a simple undertaking, especially given a diverse array of stakeholders, proprietary systems, and ever-advancing technological capabilities

---

[2] The committee's final report is available at www.onin.com/iaiafis/IAI_AFIS_071998_Report.pdf.

[3] For more information on the ANSI/NIST standards, see P. Komarinski. 2005. *Automated Fingerprint Identification Systems*. Boston: Elsevier Academic Press, pp. 162-166.

[4] This approved revision of the ANSI/NIST-ITL 1-2000 standard is now available as NIST Special Publication 500-271: *Data Format for the Interchange of Fingerprint, Facial, & Other Biometric Information-Part 1* (ANSI/NIST-ITL 1-2007) at http://fingerprint.nist.gov/standard/Approved-Std-20070427.pdf.

[5] More information about the work of the MINEX series is available at http://fingerprint.nist.gov/minexII/.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

(e.g., improved pattern recognition, better hardware, increased data compression). However, the successful interoperability of other distributed information networks—such as modern banking systems (e.g., ATM machines[6]), information sharing networks in the real estate world,[7] the Centers for Disease Control and Prevention's Public Health Information Network,[8] and even the Internet itself, each of which functions only by reliance on a number of finely crafted and agreed standards and protocols—is proof that efforts to develop and implement standards pay off in the end by allowing greater collaboration and sharing of information.

One other major area of technical challenge to achieving AFIS interoperability involves the algorithms that systems use to identify features in fingerprint images (e.g., how a system determines that a given pattern of pixels corresponds to a true ridge ending or bifurcation and how it infers what type of feature those pixels actually represent). To date, these algorithms have been largely proprietary and vendor specific (i.e., different for each type of system). In fact, experienced latent print examiners have found that different systems will retrieve different stored prints in response to a given input map of features, and they have learned system-specific ways of annotating features on a latent print in order to maximize the success of each system's (inferred) search algorithms. However, achieving broad-based AFIS interoperability will require baseline standards for these algorithms, so that fingerprint examiners can be assured of consistent feature mapping across systems. As mentioned previously, fingerprint examiners have learned by experience to provide different inputs to different vendors' systems, often purposely leaving out information—knowing that the added input will degrade the search quality:

> The examiner does not necessarily encode every point he can find in the latent print. LPU [latent print unit] examiners have learned through experience with the IAFIS program which types of points are most likely to yield a correct match. LPU Unit Chief Meagher told the OIG [Office of Inspector General] that examiners are taught to avoid encoding points in areas of high curvature ridge flow, such as the extreme core of a print. Unit Chief Wieners and Supervisor Green told the OIG that IAFIS does not do well when asked to search prints in which points have been encoded in two or more clusters separated by a gap. One reason is that IAFIS gives significant weight to the ridge count between points. If the ridge count between two clusters of points in a latent is unclear, IAFIS may fail to retrieve the true source of the print. Thus, an examiner will not necessarily encode every point that can be seen in a latent fingerprint, but rather may limit his encoding to points in a defined area in which the ridge count between points is clear.[9]

---

[6] Indeed, financial card transactions are facilitated by their own ISO standard (ISO 8583-1:2003). For more information, see www.iso.org/iso/iso_catalogue/catalogue_tc/catalogue_detail.htm?csnumber=31628.

[7] See, e.g., the Metropolitan Regional Information System (MRIS) at www.mris.com/about/WhoWeAre.cfm.

[8] CDC's Public Health Information Network is a national initiative to improve the capacity of the public health community to use and exchange information electronically by promoting the use of standards and defining functional and technical requirements. The network employs a messaging system (PHINMS) to rapidly and securely share sensitive health information among CDC and other local, state, and federal organizations over the Internet—information such as HIV records, pandemic information, and information on bioterrorism. Complete information about PHIN and PHINMS is available at www.cdc.gov/phin/.

[9] Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case*, p. 119.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS ——PREPUBLICATION COPY**

The fact that today's systems often do not effectively utilize most of the available feature information and require substantial input from fingerprint examiners suggests that there is significant room for improvement. An ideal, comprehensive AFIS, for example, would be capable of automated:

- reading of latent prints;
- encoding of most features of usable quality, including those features identified as Level 1 (fingerprint classes such as whorl, arch), Level 2 (minutiae), Level 3 (pores, cuts), and ridge paths, together with a provision for including other features that could be defined by the vendor/user;
- recognizing absent, blurred, double/multioverlap, poor-quality sections of an observed print and encoding the system to downweight, or omit entirely, during the search process;
- recognizing any orientation information;
- conducting database searches;
- providing "best matches"; and
- collecting statistical data based on the quality of the print and numbers/types of features.

Other technical challenges might include the development and use of a secure Web interface (or an analogous system) that would permit authorized latent print examiners in any jurisdiction to submit queries to IAFIS and other federated AFIS databases, as well as the development of standard procedures for maintaining AFIS databases securely, removing redundancies, ensuring that fingerprint data are entered properly, and conducting quality control and validation of searches (i.e., ensuring that queries are actually searching an entire database). Although some of the capabilities mentioned here are present in today's commercially available systems, significant improvement still can be realized.

**Support from Policymakers**

Given the complexity of the AFIS interoperability challenge and the large number of players whose contributions and cooperation will be necessary to meet that challenge, it is clear that no effort aimed at nationwide interoperability will succeed without strong, high-level support from policymakers in federal and state government. Resources available to law enforcement agencies for the deployment, use, and maintenance of AFIS systems vary greatly from jurisdiction to jurisdiction, and the considerable expenses associated with purchasing, maintaining, training for, operating, and upgrading an AFIS implementation—which can easily cost millions of dollars[10]—must be well thought out and weighed against other competing costs and interests facing law enforcement.

The committee hopes that this report will help convince policymakers of the benefits to nationwide interoperability and move them to provide much-needed support to law enforcement agencies, vendors, and researchers to help them achieve this goal. Indeed, the committee believes that true AFIS interoperability can be achieved in a timely manner only if policymakers provide a strong, clear mandate and additional funding from federal and state governments—both to support the research and development work necessary to achieve truly interoperable systems and

---

[10] See P. Komarinski. 2005. *Automated Fingerprint Identification Systems*. Boston: Elsevier Academic Press, p. 145.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

to assist law enforcement agencies in purchasing, implementing, and managing systems and training personnel.

## Vendors

As suggested above, AFIS equipment and service vendors must cooperate to ensure nationwide AFIS interoperability. However, to date—and as one could reasonably expect in a technology sector in which product differentiation and the maintenance of competitive advantages are prime concerns—vendors have had little incentive to design their systems to enable them to share information with competitors' systems. The committee believes that increased cooperation among AFIS vendors is a key to achieving meaningful interoperability. For example, one can imagine how it might prove useful if AFIS vendors could collaborate (perhaps through work facilitated by the proposed National Institute of Forensic Science [NIFS]) on developing standard (or baseline) retrieval algorithms. Such a step conceivably could make it less time consuming for fingerprint examiners to run searches on many different systems because they would not have to manually *tune* their searches to work on the systems of different vendors.

## Administrative, Legal, and Policy Issues

As noted earlier, most AFIS implementations are either stand-alone systems or are part of relatively limited regional databases. To achieve truly interoperable systems, jurisdictions must work more closely together to craft acceptable agreements and policies to govern the routine sharing of fingerprint information. NIFS can facilitate the development of standard agreements along these lines, which could include issues such as the extent of system access to other jurisdictions, the management of search priorities, and the recovery of costs associated with processing the requests from outside agencies. In addition, many jurisdictions also might want assurances that they will not be held responsible for any possible misuse of fingerprint information that is provided to other law enforcement agencies.

## CONCLUSIONS AND RECOMMENDATION

Great improvement is possible with respect to AFIS interoperability. Many crimes no doubt go unsolved today simply because investigating agencies cannot search across all the individual databases that might hold a suspect's fingerprints or contain a match for an unidentified latent print from a crime scene. It is possible that some perpetrators have gone free because of the limitations on fingerprint searches.

The committee believes that, in addition to the technical challenges noted above, a number of other critical obstacles to achieving nationwide AFIS interoperability exist involving issues of practical implementation. These include (1) convincing federal and state policymakers to mandate nationwide AFIS interoperability; (2) persuading AFIS equipment vendors to cooperate and collaborate with the law enforcement community and researchers to create and use baseline standards for sharing fingerprint image and minutiae data and interfaces that support all searches; (3) providing law enforcement agencies with the resources necessary to develop interoperable AFIS implementations; and (4) coordinating jurisdictional agreements and public policies that would allow law enforcement agencies to share fingerprint data more broadly.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS —PREPUBLICATION COPY**

Given the disparity in resources and information technology expertise available to local, state, and federal law enforcement agencies, the relatively slow pace of interoperability efforts to date, and the potential gains that would accrue from increased AFIS interoperability, the committee believes that a new emphasis on achieving nationwide fingerprint data interoperability is needed.

**Recommendation 12:**

**Congress should authorize and appropriate funds for the National Institute of Forensic Science (NIFS) to launch a new broad-based effort to achieve nationwide fingerprint data interoperability. To that end, NIFS should convene a task force comprising relevant experts from the National Institute of Standards and Technology and the major law enforcement agencies (including representatives from the local, state, federal, and, perhaps, international levels) and industry, as appropriate, to develop:**

**(a)    standards for representing and communicating image and minutiae data among Automated Fingerprint Identification Systems. Common data standards would facilitate the sharing of fingerprint data among law enforcement agencies at the local, state, federal, and even international levels, which could result in more solved crimes, fewer wrongful identifications, and greater efficiency with respect to fingerprint searches; and**

**(b)    baseline standards—to be used with computer algorithms—to map, record, and recognize features in fingerprint images, and a research agenda for the continued improvement, refinement, and characterization of the accuracy of these algorithms (including quantification of error rates).**

These steps toward AFIS interoperability must be accompanied by the provision of federal, state, and local funds to support jurisdictions in upgrading, operating, and ensuring the integrity and security of their systems; the retraining of current staff; and the training of new fingerprint examiners to gain the desired benefits of true interoperability. Additionally, greater scientific benefits can be realized through the availability of fingerprint data or databases for research purposes (using, of course, all the modern security and privacy protections available to scientists when working with such data). Once created, NIFS might also be tasked with the maintenance and periodic review of the new standards and procedures.

10-7

Copyright © National Academy of Sciences. All rights reserved. .

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 11
# HOMELAND SECURITY AND
# THE FORENSIC SCIENCE DISCIPLINES

In its charge to the committee, Congress raised the question of the role of forensic science in homeland security. The committee recognized that, to address this issue thoroughly, it would need additional expertise and more time to fully undertake an analysis of the role that forensic science currently plays and could possibly play in the future. Such an analysis would require serious study of the current configuration of the Department of Homeland Security (DHS) and its relationships with the forensic science community, law enforcement, and national security. Indeed, as the committee began to explore this issue it became clear that the question of the role of forensic science in homeland security is a study unto itself. Not wanting to ignore this issue, the committee limited its analysis to the presentations made to the committee and the expertise of its membership. Consequently, this chapter should be viewed as a first step in addressing the role of forensic science in homeland security.

The development and application of the forensic science disciplines to support intelligence, investigations, and operations aimed at the prevention, interdiction, disruption, attribution, and prosecution of terrorism has been an important component of what is now termed "homeland security" for at least two decades. Major terrorist bombings in the United States and abroad in the 1980s and 1990s influenced the U.S. government to enhance federal investigative and forensic science entities to be able to respond more effectively. For example, forensic science played an important role in investigating the bombing of Pan Am Flight 103 (1988), the first bombing of the World Trade Center in New York City (1993), the Oklahoma City bombing (1995), the suspected attack or sabotage of Trans World Airline Flight 800 (1996), the bombing of the USS Cole (2000), and the bombings of the U.S. Embassies in Kenya and Tanzania (1998). And even though the identification of the Unabomber (1996) occurred as a result of the cooperation of his brother with the authorities, the forensic evidence against Theodore Kaczynski was substantial and crucial to the case.

The nature of homeland security requires the integration of forensic science into the investigative process much earlier than is the case for criminal justice. That is, for homeland security, forensic science plays not only its traditional role of inferring what happened at a crime scene and who was involved, but also contributes more intensively to generating investigative leads and testing, directing, or redirecting lines of investigation. In this role, forensic science contributes to the gathering of effective and timely intelligence and investigative information on terrorists and terrorist groups. This requires both traditional forensic science tools and enhanced and specialized forensic analysis and information sharing—new tools that are being developed primarily by the intelligence and defense communities in the United States, with each community tailoring the new tools to its specialized needs and missions.

The intelligence and investigative capabilities thus build on a foundation of traditional forensic science expertise that exists in the military and the FBI. The Department of Defense (DOD), for example, includes the U.S. Army Criminal Investigation Laboratory, which, with its 137-member staff, carries out criminal investigations. It also conducts research activities to develop specialized techniques needed by the military. Some of the nontraditional forensic science capabilities available within that laboratory include methods suited to intelligence

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

gathering and counter-intelligence and the ability to make inferences about foreign language documents. Plans for the future include developing capabilities such as increased integration of biometrics (used for security) and forensic science and improved accident investigation and reconstruction.[1]

Other DOD forensic science capabilities are found in the Armed Forces Institute of Pathology (with a staff of 25), the Cyber Crime Center (with a staff of approximately 190), the Joint POW/MIA Accounting Command Central Identification Laboratory (more than 46 staff members), and the Armed Forces DNA Identification Laboratory (with staff of approximately 138).[2] The Joint POW/MIA Accounting Command Central Identification Laboratory bills itself as the largest forensic anthropology laboratory in the world.[3] Also contributing to DOD's forensic science capabilities is its Biometrics Task Force, which leads in the development and implementation of biometric technologies for combatant commands, military services, and other DOD agencies.[4] The DOD forensic science capabilities are not centrally managed.[5]

DOD has a particular interest in DNA identification, both of its own people and of enemies. The department has a repository of five million DNA samples, primarily from military service members, intended mostly for casualty identification. DOD also pools data with intelligence and law enforcement programs to build and maintain the Joint Federal Agencies Intelligence DNA Database, a searchable database of DNA profiles from detainees and known or suspected terrorists.[6]

The DOD forensic science laboratories are relatively well resourced, according to the Director of the U.S. Army Criminal Investigation Laboratory, and DOD personnel are active in professional forensic science organizations, national certification/accreditation bodies, and national scientific working groups. Of particular note is that all of DOD's institutional laboratories are nationally accredited,[7] unlike many civilian law enforcement laboratories.

An example of federal efforts to develop forensic science methods of importance to homeland security is the relatively new National Biodefense Forensic Analysis Center, established by DHS in 2004. The center's mission is to provide a national capability to conduct and coordinate forensic analyses of evidence from biocrime and bioterror investigations. It is supported by DHS research to fill short- and long-term capabilities gaps, but the center itself is devoted to actual casework. Before its establishment, the Nation had no dedicated biocontainment laboratories, staff, or equipment to conduct bioforensic analysis. It had no methods to enable the handling of biothreat agent powders, no methods to support traditional forensic analyses of evidence contaminated with a biothreat agent, and no place in which to receive large quantities or large pieces of evidence contaminated with a biothreat agent. There were no established methods for handling evidence and conducting analysis, no quality guidelines or peer review of methodologies, and no central coordination for bioforensic analyses. These gaps became very apparent during the Nation's response to the anthrax attacks of 2001.[8]

---

[1] L.C. Chelko, Director, U.S. Army Criminal Investigation Laboratory. "Department of Defense Forensic Capabilities." Presentation to the Committee. September 21, 2007.

[2] Ibid.

[3] Ibid.

[4] T. Cantwell, Senior Forensic Analyst, Biometric Task Force and Leader, Forensic Integrated Product Team, Department of Defense, "Latent Print Analysis." Presentation to the Committee. December 6, 2007.

[5] Chelko, op. cit.

[6] Ibid.

[7] Ibid.

[8] J. Burans, Director, National Bioforensics Analysis Center. "The National Biodefense Analysis and Countermeasures Center." Presentation to the Committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Bioforensics, which is sometimes referred to as microbial forensics, or as forensic microbiology, is a developing interdisciplinary field of microbiology devoted to the development, assessment, and validation of methods for fully characterizing microbial samples for the ultimate purpose of high-confidence comparative analyses. It supports attribution investigations involving pathogens or toxins of biological origin used in a biological attack. The bioforensics toolkit includes diagnostic assay systems that can identify infectious agents rapidly, as well as organic and inorganic analytical chemistry, electron microscopy, and genetic engineering. Much of the work must be conducted according to stringent safety and containment protocols, and dedicated laboratories are now under construction. The center's capabilities enable the identification and/or characterization of biological threats, physical and chemical analyses, and the generation of data that can help in investigations and ultimate attribution. In addition to conducting casework, the center aims to develop and evaluate assays for high-consequence biological agents that threaten humans, animals, and plants, achieve accreditation for bioforensic casework and then continue to expand the scope of accreditation for newly established capabilities, and establish and maintain reference collections of biological agents for comparative forensic identifications.[9]

Another component of forensic science for homeland security is found in the Office of the Director of National Intelligence, which coordinates the various elements of the intelligence community. Within that office is a National Counterproliferation Center that also carries out work in bioforensics.[10] The considerable threat of the acquisition, development, and use of weapons of mass destruction (WMD; chemical, biological, radiological, and nuclear weapons) has led U.S. government agencies to develop new forensic science capabilities. In 1996, this development was begun with the establishment of a specialized forensic hazardous materials unit in the FBI Laboratory, which came at a time of greater awareness of and concern over WMD in the hands of terrorists and in preparing for the 1996 Olympic Games in Atlanta. Interest and investment in this type of capability has diversified and expanded since that time in the FBI as well as in DOD, the Department of Energy, the Intelligence Community, and DHS. The programs described above are visible evidence of the government's commitment to forensic science and infrastructure as integral components of homeland security. At the time of this writing, the importance of forensic science and its potential for improving the attribution of WMD are also active topics in discussions internationally.

The traditional U.S. forensic science community generally has not been included directly in planning, preparedness, resourcing, response, training, and the exercising of large-scale or specialized forensic science capabilities for terrorism and homeland security, although the FBI Laboratory provides a link between homeland security applications of forensic science and traditional uses in criminal justice. One reason for this segmentation is that the traditional community has heavy commitments to day-to-day law enforcement requirements, timelines, and backlogs. Also, many of the homeland security applications of forensic science require specialized expertise and infrastructure that are not widespread, and they might require access to information that is protected by security classification. Although major metropolitan law enforcement agencies and forensic laboratories, such as those in New York City and Los Angeles, have developed some specialized tactical capacities of these types, most of the U.S. forensic science enterprise does not and will not legitimately invest in such capacities and will

---

[9] Ibid.

[10] C.L. Cooke Jr., Office of the Deputy Director for Strategy & Evaluation, National Counterproliferation Center. "Microbial Forensics: Gaps, Opportunities and Issues." Presentation to the Committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

rely instead on agencies such as the FBI and those who are part of the FBI-led Joint Terrorism Task Forces[11] in some 100 U.S. cities.

For the most part, the specialized capacities and capabilities needed for homeland security are not warranted for most civilian forensic science laboratories and medical examiner offices, although there are exceptions, and some of the skills embodied in these new forensic efforts may have direct applicability to traditional forensic science disciplines. However, the skills embodied within the traditional forensic science and medical examiners communities are potentially an important asset for assisting in homeland security. The geographic dispersion of those communities is an additional asset, because a security event or natural disaster can occur anywhere, beyond the quick reach of specialized federal capabilities. In addition, to the extent that members of the forensic science and medical examiners communities might respond to WMD attacks before specialized experts can, it is important to train those local responders sufficiently so that they can properly preserve critical evidence while protecting themselves from harmful exposure. More generally, there would be value in strengthening the links between civil forensic scientists and those affiliated with DOD and DHS, so that all sectors can pool their knowledge.

The medical examiner community, in particular, could be viewed as a geographically distributed and rapidly deployable "corps" that can augment federal experts in efforts to monitor emerging public health threats or respond to catastrophes. When a catastrophic event takes place, whether it is the result of nature or terrorism, a large contingent of medical examiners is sometimes needed on short notice. Yet medical examiners have not been appropriately funded or trained in the management of mass fatality incidents. (See Chapter 9 for a more complete discussion of the medical examiner's role in homeland security.) Plans and policies must be developed that enable this contingent use of medical examiners.

In written input to the committee, Barry A.J. Fisher, Director of the Scientific Services Bureau of the Los Angeles County Sheriff's Department, stated the needs and opportunities as follows:

> . . . [C]onsider a situation where there are multiple events in the US and aboard occurring simultaneously. Resources could be stretched to the breaking point, not to mention the concept of *surge capacity*. There is not an unlimited supply of forensic scientists available to the FBI. But there are probably 5,000+ public forensic scientists at State and local crime labs who could be enlisted to help. Some jurisdictions have plans in place to use local talent. Others do not. It varies from region to region.
>
> Forensic scientists are often called to crime scenes to assist in the collection of evidence. Yet few would recognize that they were looking at a potential improvised explosive lab. There is little training available at the national level. Much of the information is classified. State and local forensic scientists have no need for security clearances but often go through law enforcement background checks. This creates a classic 'Catch 22' situation. State and local forensic personnel can't be given classified information to recognize terrorist devices which they might be able to disable before they and others are injured.

---

[11] *Protecting America Against Terrorist Attack: A Closer Look at the FBI's Joint Terrorism Task Forces.* Federal Bureau of Investigation. December 2004. Available at www.fbi.gov/page2/dec04/jttf120114.htm.

11-4

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

The identification of victims in mass casualties is another area where State and local forensic labs could play a part. (They could, for example, provide fingerprint identification services.) While few labs have the capacity to mount a major DNA testing effort, personnel are knowledgeable in evidence collection and can assist in such efforts. Again there are no consistent plans for using local or regional resources.

Medical examiners and coroners use a system of volunteers called D-MORT (Disaster Mortuary Operational Response Team) to assist in mass casualty events whether natural or caused by terrorist incidents. A similar program could be considered to enlist State and local forensic scientist to assist in major incident situations. [12]

This chapter illustrates the overlap between the capabilities of forensic science and the needs of homeland security, but ideally, the forensic science community and homeland security communities should be more integrated with better communication. However, the committee limited its recommendations on this matter because it recognized two critical factors: (1) the forensic science system is in need of a major overhaul (see Chapters 2 through 8), and until these issues are addressed it makes little sense to expand the efforts of state and local forensic scientists into homeland security operations and (2) many issues that would arise from such integration (e.g., federal jurisdiction, national security issues, restrictions on sharing of information) go beyond the charge and principal focus of the committee.[13]

## CONCLUSIONS AND RECOMMENDATION

Good forensic science and medical examiner practices are of clear value from a homeland security perspective because of their roles in bringing criminals to justice and in dealing with the effects of natural and human-made mass disasters. Forensic science techniques (e.g., the evaluation of DNA fragments) enable the thorough investigations of crime scenes. Routine and trustworthy collection of digital evidence, and improved techniques and timeliness for its analysis, can be of great potential value in identifying terrorist activity. Therefore, a strong and reliable forensic science community is needed to maintain homeland security. However, to capitalize on this potential, the forensic science and medical examiner communities must be well interfaced with homeland security efforts, so that they can contribute when needed. To be successful, this interface will require: (1) the establishment of good working relationships among federal, state, and local jurisdictions; (2) the creation of strong security programs to protect data transmittals across jurisdictions; (3) the development of additional training for forensic scientists and crime scene investigators; and (4) the promulgation of contingency plans that will promote efficient team efforts on demand. Although policy issues relating to the enforcement of homeland security are beyond the scope of this report, it is clear that improvements in the forensic science community and the medical examiner system could greatly enhance the capabilities of homeland security.

---

[12] B.A.J. Fisher. June 12, 2007. "Contemporary Issues in Forensic Science," unpublished paper submitted to the committee.

[13] See Institute of Medicine, 2008, *Research Priorities in Emergency Preparedness and Response for Public Health Systems* and workshop summaries of the Disasters Roundtable, dels.nas.edu/dr/

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

**Recommendation 13:**

> Congress should provide funding to the National Institute of Forensic Science (NIFS) to prepare, in conjunction with the Centers for Disease Control and Prevention and the Federal Bureau of Investigation, forensic scientists and crime scene investigators for their potential roles in managing and analyzing evidence from events that affect homeland security, so that maximum evidentiary value is preserved from these unusual circumstances and the safety of these personnel is guarded. This preparation also should include planning and preparedness (to include exercises) for the interoperability of local forensic personnel with federal counterterrorism organizations.

11-6

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# APPENDIX A

## BIOGRAPHICAL INFORMATION OF COMMITTEE AND STAFF

**Harry T. Edwards (Co-chair)** was appointed to the United States Court of Appeals for the District of Columbia Circuit by President Carter in 1980. He served as Chief Judge from September 15, 1994, until July 16, 2001. Judge Edwards graduated from Cornell University, B.S., 1962, and the University of Michigan Law School, J.D., 1965, with distinction and honors. He was a member of the Michigan Law Review and was elected to the Order of the Coif. Before joining the bench, Judge Edwards practiced law in Chicago from 1965 to 1970. Between 1970 and 1980, he was a tenured Professor of Law at the University of Michigan and at Harvard Law School. He also served as Visiting Professor at the University of Brussels and as a member of the faculty at the Institute for Educational Management at Harvard University. Since joining the bench, he has taught at numerous law schools, including Duke, Georgetown, Harvard, Pennsylvania, Michigan, and New York University, where he has been a member of the faculty since 1990. Judge Edwards is currently a Visiting Professor of Law at the New York University School of Law. During his years as Chief Judge of the D.C. Circuit, Judge Edwards directed numerous automation initiatives at the Court of Appeals; oversaw a complete reorganization of the Clerk's Office; implemented case management programs that helped to cut the court's case backlog and reduce case disposition times; successfully pursued congressional support for the construction of the William B. Bryant Annex to the E. Barrett Prettyman U.S. Courthouse; presided over the court's hearings in *United States v. Microsoft*; established programs to enhance communications with the lawyers who practice before the court; and received high praise from members of the bench, bar, and press for fostering collegial relations among the members of the court. Judge Edwards' many positions have included Chairman of the Board of Directors of AMTRAK; member of the Board of Directors of the National Institute for Dispute Resolution; member of the Executive Committee of the Order of the Coif; member of the Executive Committee of the Association of American Law Schools, and Chairman of the Minority Groups Section; Vice President of the National Academy of Arbitrators; and member of the President's National Commission on International Women's Year. He also has received many awards for outstanding service to the legal profession and numerous Honorary Doctor of Laws degrees. Judge Edwards is a member of the American Law Institute; the American Academy of Arts and Sciences; the American Judicature Society; the American Bar Foundation; the American Bar Association; and the Supreme Court Historical Society. He is director/mentor at the Unique Learning Center in Washington, D.C., a volunteer program to assist disadvantaged inner city youth. Judge Edwards is the coauthor of five books. His most recent book, coauthored by Linda A. Elliot, *Federal Courts—Standards of Review: Appellate Court Review of District Court Decisions and Agency Actions*, was published in 2007. He has also published scores of law review articles dealing with labor law, equal employment opportunity, labor arbitration, higher education law, alternative dispute resolution, federalism, judicial process, comparative law, legal ethics, judicial administration, legal education, and professionalism. One of his most significant publications, "The Growing Disjunction Between Legal Education and the Legal Profession," published in the *Michigan Law Review* in 1992, has been the source of extensive comment, discussion, and debate among legal scholars and practitioners in the United States and abroad.

A-1

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

**Constantine Gatsonis (Co-chair)** is Professor of Biostatistics at Brown University and the founding Director of the Center for Statistical Sciences. He is a leading authority on statistical methods for the evaluation of diagnostic tests and biomarkers and has extensive involvement in research in Bayesian biostatistics, meta-analysis, and statistical methods for health services and outcome research. He is Network Statistician of the American College of Radiology Imaging Network, a National Cancer Institute-funded national collaborative group conducting multicenter studies of imaging in cancer diagnosis and therapy. Dr. Gatsonis has served on numerous review and advisory panels, including the Immunization Safety Review Committee of IOM, the Committee on Applied and Theoretical Statistics of NAS, panels of the Center for Devices and Radiological Health of U.S. Food and Drug Administration, the HSDG Study Section of the Agency for Health Care Policy Research, the Commission of Technology Assessment of the American College of Radiology, the Data Safety and Monitoring Boards for the National Institute of Neurological Disorders and Stroke and the U.S. Department of Veterans Affairs, and several National Institutes of Health grant review panels. He is co-convener of the Screening and Diagnostic Tests Methods Working Group of the Cochrane Collaboration and a member of the steering group of the Cochrane Diagnostic Reviews initiative to develop systematic reviews of diagnostic accuracy for the Cochrane Library. Dr. Gatsonis is the founding editor-in-chief of *Health Services and Outcomes Research Methodology* and serves as Associate Editor of the *Annals of Applied Statistics, Clinical Trials and Bayesian Analysis.* Previous editorial positions include membership of the editorial board of *Statistics in Medicine, Medical Decision Making,* and *Academic Radiology.* Dr. Gatsonis was elected fellow of the American Statistical Association and the Association for Health Services Research.

**Margaret A. Berger** received her A.B. from Radcliffe College and her J.D. from Columbia University School of Law. She is widely recognized as one of the nation's leading authorities on scientific evidentiary issues and is a frequent lecturer across the country on these topics. Professor Berger is the recipient of the Francis Rawle Award for outstanding contribution to the field of postadmission legal education by the American Law Institute/American Bar Association for her role in developing new approaches to judicial treatment of scientific evidence and in educating legal and science communities about ways in which to implement these approaches. Professor Berger served as the Reporter for the Working Group on Post-Conviction Issues for the National Commission on the Future of DNA Evidence. She has been called on as a consultant to the Carnegie Commission on Science, Technology, and Government and has served as the Reporter to the Advisory Committee on the Federal Rules of Evidence. She is the author of numerous amicus briefs, including the brief for the Carnegie Commission on the admissibility of scientific evidence in the landmark case of *Daubert v. Merrell Pharmaceutical, Inc.* She also has contributed chapters to both editions of the Federal Judicial Center's Reference Manual on Scientific Evidence (1994, 2000). Professor Berger has been a member of the Brooklyn Law School faculty since 1973. She has served on the following National Academies committees: the Committee on Tagging Smokeless and Black Powder; the Committee on DNA Technology in Forensic Science: An Update; and the IOM Committee on Evaluation of the Presumptive Disability Decision-Making Process for Veterans. She currently serves as a member of the National Academies Committee on Science, Technology, and Law, on the Committee on Science, Engineering, and Public Policy, and on the Committee on Ensuring the Utility and the Integrity of Research Data.

A-2

Copyright © National Academy of Sciences. All rights reserved.