

**The University of Texas**
**Health Science Center at San Antonio**
Mail Code 7919
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

David R. Senn, DDS, DABFO
Forensic Odontology
Director
Center for Education and Research in Forensics (CERF)

| Forensic Services | 567-3379 |
| Education & Research | 567-1755 |
| TeleFAX | 567-1965 |

senn@utshscsa.edu

April 20, 2010

RE:  US District Court Case C-02-216

Patti Booth, US Attorney
One Shoreline Blvd.
Suite 500
Corpus Christi, Texas 78401



GOVERNMENT
EXHIBIT
4|20|10
CASE
NO. 2:02 cr 216
EXHIBIT
NO. 1

Ms. Booth:

I have reviewed the material relating to the Bourgeois case that you sent to me by FedEx on July 30, 2008. The major objections to the dental testimony in the original trial seem to revolve around the use of the images enhanced by Dr. Oliver. Although I viewed and used the enhanced images from Dr. Oliver, for my analysis of the patterned injuries I primarily used the original NCIS images and the enhancements to those images that I myself made.

I cannot critique any of Dr. Oliver's enhanced images of injuries other than those of the patterned injuries on the right forearm and the lower left back of     JG          , DOB     /99. Those injuries were labeled by me in my report as injuries A and B. Although I reviewed all of the images, the following are the images I used as a basis for my analysis.
> Injury A: Images S, U, V, X, AA, DD, KK
> Injury B: Images PP and SS

Some confusion may have been caused by the following wording in my report describing the images used:
> *Each of these images was examined in the original form and in enhanced forms. The images were enhanced by William Oliver, MD at Armed Forces Institute of Pathology. The enhancement protocols are explained in a cover letter received with the images from Dr. Oliver.*

The "*in enhanced forms*" meant that in addition to the images enhanced by Dr. Oliver, I also adjusted and enhanced the images for analysis using Adobe Photoshop tools including but not limited to the "Levels" and "Brightness and Contrast" tools. I analyzed each image in original form and in both my own enhanced form and in the form enhanced by Dr. Oliver. I should have

made this clearer in the original report. I utilized the Oliver enhanced images in the written report and the courtroom presentation because I believed those enhanced images would be more readily visible to attorneys, jurors and others.

I cannot discuss or critique the enhancements of other injuries but I disagree with the critics of Dr. Oliver's enhanced images of the two patterned injuries that I analyzed. Every feature that is visible in Dr. Oliver's enhancements of these two injuries is also visible in the original images and in the images that I personally enhanced. As I understand the concept, there is no basis here for a "fruit of the poisonous tree" argument when considering the two bite mark injuries.

Before the original trial I requested and received a copy of Dr. Oliver's enhancement protocol. This protocol was also included as part of Dr. Oliver's PowerPoint presentation. The text of that protocol is copied below in italics:

*Image Enhancement Protocol*
*William R. Oliver, MD*
*Armed Forces Institute of Pathology*

1.  *Basic image adjustment*
    1.  *Color balancing*
    2.  *Cropping*
    3.  *Standard digitization parameterization*
2.  *Contrast Enhancement*
    1.  *Histogram stretch*
    2.  *Histogram equalization*
    3.  *Contrast Limited Adaptive Histogram Equalization (CLAHE)*
    4.  *Wavelet packet-embedded contrast enhancement, consisting of*
        1.  *CLAHE of first level blur component, with arithmetic (x4) increase in detail component*
        2.  *CLAHE of second level blur component with unsharp mask of second-level detail (of first-level blur component) and arithmetic (x4) increase of first-level detail component.*
        3.  *All wavelet decompositions were performed using a Daubechies 6 wavelet in a modified version of the UB wvlt library, modified for use in the AVS/Express and/or AVS 5 development environment.*
5.  *Glare estimation and flattening.*
6.  *Unsharp masking*
7.  *Blind deconvolution*

*Note that the image processing is performed for image exploration, and all details discussed in the conclusions are present in the original digitized image. Because they are used for image exploration and not the fundamental basis of conclusion, because the parameterization for many of these methods is interactive, and because of file space requirements, intermediate images and images not used in illustration are not necessarily retained. The processed images in this report are all contrast-enhanced.*

Regarding the opinions of Dr. Dailey copied below in italics as stated in his report of 14 July 2003:

> *Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:*
> *1. The diffuse presentation of the bite marks in all of the photographs,*
> *2. The distorted position of the marks, in some of the photographs, at the time of photography.*
> *3. The ruler/scale being in a different spatial plane than the mark being photographed. [however it must be noted that the photographic evidence provide (sic) was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the past seventeen years.]*
> *4. The very similar metric and spatial (pattern) relationships between the three individual's dentition.*

I agree with Dr. Dailey that the marks were difficult to analyze and that there were challenges. For those reasons it was not possible to associate the bitemark on the arm with any of the suspects. I also agree with Dr. Dailey that the photography was quite good. The quality of the photography allowed the exclusion of two suspects and the inability to exclude the third for the bitemark on the lower back. While I agree with Dr. Dailey about the similar metric relationships, the three mouths were similar in overall size, I disagree with him about the spatial relationships...specifically the variations in the positions of specific anterior teeth. This is based on the ability to discern within the overall mark the marks made by at least six upper and six lower teeth, to distinguish the class characteristics of upper and lower teeth, and to visualize their relative positions in the arches. The comparison of these features seen in the bitemark to the exemplars of the teeth of the three subjects emphasized the differences between them. These differences were the bases for my opinions.

Regarding the opinions of Dr. Bowers as stated in his May 11, 2007 letter: Dr. Bowers is an attorney and part of his letter seems to address legal issues that are beyond my area of expertise. I am not an attorney and will not comment on those legal issues. His description of the issues of distortion and perspective in the photography are well founded. Some of those issues are well within the parameters for image adjustments that forensic odontologists often use including, but not limited to, those that are included in the published work, Digital Analysis of Bite Mark Evidence, authored by Raymond J. Johansen, D.M.D. and C. Michael Bowers, D.D.S., J.D.

Dr. Bowers further stated the following concerning Dr. Oliver's enhancements: "*I have not even seen any record of what methods he used. Whatever means he used, his results produced the most overly "enhanced" images I have ever seen used in actual casework.*" As stated previously, the enhancement protocols were available for any and all to see. To criticize work by a board certified forensic pathologist with special skills and knowledge without even knowing much less understanding the nature of that work or the methods used seems ill-advised and bordering on negative expectation bias.

Dr. Bowers' misrepresentation of the 1999 ABFO Bitemark Workshop # 4 as evidence of the statistical validity and error rate inherent in bitemark analysis is well known. He continues to publish articles misrepresenting the issue and continues to quote numerous articles published by others that are based upon his questionable characterization of Bitemark Workshop #4. He almost invariably fails to report the conclusions published following Bitemark Workshop #4. The paper was rejected by the Journal of

Forensic Sciences but was later published in another journal. In their paper Results of the 4th ABFO Bitemark Workshop-1999 published in Forensic Science International, Volume 124, 27 December 2001, pp 104-111, Kristopher L. Arheart and Iain A. Pretty stated the following conclusions copied below in italics: (first sentence bolded by me)

> **The results of the present survey indicate that bitemark examination is an accurate forensic technique, at least with cases such as used in this study.** *However, some might question whether it is accurate enough. According to Swets, a ROC value above 0.9 indicates "high accuracy", 0.7–0.9 means "useful for some purposes", and 0.5–0.7 represents "poor accuracy" [11]. Thus, the overall value in this study (0.86) indicates less than optimal accuracy. Examination of the responses to individual cases (Table 2) reveals that only the value for Case 2 falls into the "high accuracy" category. The Youden's index scores, when weighted, show that the cutoff points can be altered for each individual examiner to minimize either false positives or false negatives. The authors believe that, in the spirit of "innocent until proven guilty", forensic dentists must minimize false positives at all costs. The repercussions of forensic determinations are serious and often intractable, affecting the suspect's life forever.*

Dr. Bowers virtually ignores the position stated by the American Board of Forensic Odontology (ABFO) regarding this exercise. Part of the ABFO position statement is copied below in italics and the full text is attached as an addendum:

> *In conclusion, the ABFO states that due to the limitations imposed by the case material used in Bitemark Workshop #4, one cannot draw accurate statistical conclusions applicable to actual casework. Bitemark Workshop #4 was neither designed as, nor can it be used as, a proficiency test for forensic odontology. Tests of consistency and validity (necessary in a proficiency examination) were neither accomplished nor attempted; and, as subsequent reviewers of the data correctly pointed out, the construction of the examination and the workshop was not designed to produce an examination that had statistical validity and statistical consistency. The ABFO reiterates that it remains the responsibility of each individual examiner to determine if sufficient evidence exists to go forward with a meaningful bitemark analysis.*

Regarding Dr. Bowers' opinions about the quality of the evidence, especially in bitemark B, the bitemark on the back, in his May 11, 2007 report he cites photographic issues in this case as follows in italics:

> **Photographic Issues**
> *The physical details of bitemarks A and B are only reflected by bruising and are not clearly present. The bruising is generalized in nature and possesses poor edge detail. The original image of bitemark B is poorly illuminated. The low light conditions when the picture was taken significantly impeded analysis by the Government's dental experts, since both dentists resorted to using various" enhancement" methods on the original image. The anatomical location of B is a curved surface. A large portion of the bruise is not in the same "plane" nor "parallel" to the camera. This creates "off angle" distortion of the pattern seen on the skin. The Government's experts used this area of distortion in their direct comparison. The only remedy was to have the original evidence photographed in*

> *sections with a ruler in place. This opportunity was obviously lost after the child left the autopsy suite.*

These opinions seem to be in direct conflict with his statements in the work that he co-authored Digital Analysis of Bite Mark Evidence, Chapter 4: Detecting and Correcting Angular Distortion, Page 62, Discussion of Analytical Limitations in Bite Mark Analysis, paragraph 3. That paragraph is copied below in italics:

> *In most cases, the evidence to be reviewed falls somewhere between the ideal and the useless in terms of camera angle, scale placement, and exposure. Photoshop can help in a large number of these cases but, again, it is up to the investigator to understand how much distortion is significant, how it affects the analysis and its impact on the strength of the ultimate opinion.*

Regarding both Dr. Dailey's and Dr. Bowers' opinions that none of the injuries to the hands and feet have characteristics of human bite marks: The photographs below show images of both sides of the right hand of    JG      at autopsy. Without scaled photographs of these injuries no comparison analysis is possible. However, it is still my opinion that the injuries shown are probable human bite injuries. The mechanism would have involved placing the entire hand into a mouth and biting initially at the position of the yellow and black arrows in the lower images. The bitten hand would then have been pulled out of the mouth either by the victim as a reflex to the pain of the bite or by the biter, thereby creating the linear marks and other injuries.





In conclusion, I feel that the petitioners' issues regarding the enhancement of images can be justified and explained to the satisfaction of reasonable persons. I am confident that I followed the protocols and guidelines for bitemark analysis that were in place at the time of my original analysis. I have reviewed the material again and my conclusions regarding this case are unchanged..., AB 1994          and Robin Bourgeois can be excluded as biters for Bitemark B on the back of.      J G      .. Alfred Bourgeois is a possible biter for that same mark and cannot be excluded.

I declare under penalty of perjury that the foregoing statement is true and correct.

David R. Senn, DDS, D-ABFO
April 20, 2010