IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,    )    CRIMINAL ACTION
                             )
             PLAINTIFF,      )    CR-C-02-216(1)
                             )
VS.                          )    CORPUS CHRISTI, TEXAS
                             )    APRIL 20, 2010
ALFRED BOURGEOIS,            )    1:26 P.M.
                             )
             DEFENDANT.      )
.............................)

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:              MS. PATTI HUBERT BOOTH
                             MR. TONY ROBERTS
                             MR. MARK DOWD
                             MS. ELSA SALINAS
                             ASSISTANT U.S. ATTORNEYS
                             800 N. SHORELINE, STE 500
                             CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:               MR. MICHAEL WISEMAN
                             MR. VICTOR J. ABREU
                             ASSISTANT FEDERAL DEFENDERS
                             SUITE 545 WEST, CURTIS BUILDING
                             601 WALNUT STREET
                             PHILADELPHIA, PENNSYLVANIA 19106

ALSO PRESENT:                MR. CHRIS CUTLER
                             PRO SE LAW CLERK

(DEFENDANT APPEARING BY TELEPHONE)

THE COURT RECORDER:          MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

(The proceedings began at 1:26 p.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.  Elsa Salinas will be here in just one moment, Your Honor.  She also will be sitting at our table.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

THE COURT:  How are you, Mr. Roberts?

MR. ROBERTS:  Very well, Your Honor.

THE COURT:  How are you, Mr. Dowd?

MR. DOWD:  Very good, Your Honor.  Mark Dowd for the Government.

MR. WISEMAN:  Good afternoon, Your Honor.  It's Michael Wiseman, W-I-S-E-M-A-N, for Mr. Bourgeois.

THE COURT:  Well, nice to meet you.

MR. WISEMAN:  Yes, likewise, Your Honor.

MR. ABREU:  Good afternoon, Your Honor.  Victor Abreu, A, B as in boy, R-E-U, on behalf of Mr. Bourgeois.  Good to see you, Your Honor.

THE COURT:  Thank you.  So, Mr. Wiseman or Mr. Abreu, do you want to begin and talk about what you want to see?

MR. WISEMAN:  Sure.  We have been speaking with Mr. Roberts and I believe by mutual agreement we are going to

want to just bring up some discovery issue regarding some notes, and I think it's Mr. Roberts who wanted to address the Court on that.

THE COURT:  Oh, okay.  Are these notes from the, from Mr. Bourgeois?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  What?

MR. ROBERTS:  The defense has asked for attorney's notes that were taken while we were preparing for the case, and Elsa Patterson took a lot of notes while she was preparing and there are two boxes of these notes that they have asked for in discovery, and our position is that it's work product and that we shouldn't have to give them the notes of one of the attorneys participating in the trial team, and so that's just a matter that we haven't been able to agree upon with what we should do with these notes.  There is nothing, if there was anything in them that was Brady or Giglio, we would certainly turn that over, but there is nothing that I --

THE COURT:  So what's the issue on that?  What are you looking for specifically?

MR. WISEMAN:  Yes, Your Honor.  The reply memorandum that we filed on January 11th, that was a reply with regard to discovery.  We addressed the Government's work product contentions, and we understand that generally speaking notes

of lawyers are protected work product, but the work product privilege is not an absolute privilege, it's qualified.  Our view is that if there are notes in there, for instance, regarding opinions of experts that might be helpful to us or with regard to prisoner witnesses that might be helpful to us or other issues that might be helpful, we would be entitled to that.  Our suggestion to Mr. Roberts was that he provide them in camera to the Court, much as we did with our material that we thought was privileged.

THE COURT:  Well, that can't be much, would it, could it be?

MR. ROBERTS:  Well, Your Honor, what I have seen is two full-size boxes, and what we would have to do is have Ms. Salinas-Patterson, who is here now, we would have to have her go through all of these to make, to divide them out between what she was taking when she had a witness present and what she was actually taking in preparation when no witness was around.

THE COURT:  Okay.  Well, I don't see any reason why you can't do that and let me look at them.

MR. ROBERTS:  Okay.

THE COURT:  I mean, you know, as you can see, I am giving them every possible benefit.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Ms. Salinas, what you missed by being on

time actually, I'm sorry we started early, is that they had made, the movant had made a request to the Government to see their notes.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  In particular your notes.  And I think the notes that you took while you were interviewing an expert, notes you took while you interviewed the prisoner witnesses, could there be much of that?  Can you go through that and just file it under camera?  Is there much of that?

MS. SALINAS:  No, there's not much of that at all, Your Honor.

THE COURT:  Have you got it already divided out, just in case?

MS. SALINAS:  Well, we haven't --

THE COURT:  Not about how you interpreted things but, you know, what you took down when you interviewed the witnesses and that would, that's it.  Not how you spun it when you prepared for trial.  I don't mean that you spin things, but.

MS. SALINAS:  I do.  But we have narrowed it --

THE COURT:  I didn't know lawyers ever did that.

MS. SALINAS:  Well, I, anyway, Your Honor, I -- there are two boxes, Your Honor.  I have gone through one box already.  Most of that is just my getting a summary under each -- that was just my stuff, and so I think it won't take

me very long to go through the second box.

THE COURT:  I think what they are looking for are notes that you took contemporaneous with interviewing the witnesses, both expert and prisoner witnesses.  Is this right, Mr. Wiseman?

MR. WISEMAN:  Your Honor, in addition, lay --

THE COURT:  Oh, don't do that.

MR. WISEMAN:  I'm sorry.  Getting used to the acoustics.  Lay witnesses --

THE COURT:  I know.  Everything, every strange noise goes right into our ear, and sometimes people knock on those microphones, so.

MR. WISEMAN:  Oh, yes, okay.

THE COURT:  And all you have to do is speak normally and she will pick it up.

MR. WISEMAN:  Okay.

MS. SALINAS:  And in his terms, when you stated that those when we interviewed the witnesses --

THE COURT:  Wait a minute.  Is that right, Mr. Wiseman?

MR. WISEMAN:  Yeah, I was going to add lay witnesses as well, Your Honor.

THE COURT:  Interview of witnesses, that's fine.

MR. WISEMAN:  Exactly.

THE COURT:  Contemporaneous notes you made

interviewing witnesses, or something you made immediately thereafter as if you were reciting what they had said to you, not your interpretation.  Do you see what I mean?

MS. SALINAS:  Yes, Your Honor.  And in most of those, the notes, when we interviewed some of the witnesses Megan was there, so Ms. Beckett was the one who took the notes, so there's not hardly anything that I wrote, I was just there listening to it, and Ms. Beckett --

THE COURT:  Well, just whatever you have got, give it to me in camera.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  And if I see anything, and maybe he can do, Mr. Wiseman, if you would like to do an in camera brief, if you expect some amazing thing that you don't want to disclose to them really what you are looking for, do an in camera brief to me --

MR. WISEMAN:  Okay.

THE COURT:  -- about what you are interested in, okay?

MR. WISEMAN:  Very well.

MR. ROBERTS:  And, Your Honor, there was one other thing that -- we did, it's kind of late but I did provide Mr. Wiseman a copy of this today.  I finally got a signed statement from Dr. Senn.  There was some confusion between him and I two years ago, what he had submitted, and I just

wanted to submit that as an additional piece of evidence in support of the response that we had.

THE COURT:  Any objection, Mr. Wiseman?

MR. WISEMAN:  No, Your Honor.

THE COURT:  All right, then that's fine.

MR. ROBERTS:  May I approach the bench, Your Honor?

THE COURT:  Yes.  Well, just mark it as an exhibit for today.  If you can mark it as Government Exhibit 1, how's that?  Unless you have got a string of exhibits.

MR. ROBERTS:  Your Honor, attached to our pleading was A through I, so we can mark it as --

THE COURT:  That would be J.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Or we can do evidentiary hearings for today.  How about we do it for today, Defendant's Exhibit 1 for today?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  What's wrong?

MR. ROBERTS:  She handed me a Government.  Is that fine, Your Honor, Government Exhibit?

THE COURT:  That would be fine.

MR. ROBERTS:  Okay

(Government's Exhibit 1 admitted into evidence)

THE COURT:  I think Mr. Wiseman is part of the Government, too, but that's okay.

MR. WISEMAN:  Oh, absolutely.  Your Honor, how would you like us to address the Court?  Do you want us at the podium or seated or --

THE COURT:  Standing and the podium.

MR. WISEMAN:  Okay, very well.  Shall I proceed?

THE COURT:  I can see you better.  Yes, please.

MR. WISEMAN:  Thank you.  Nice to meet you finally, Your Honor.

THE COURT:  Nice to meet you.

MR. WISEMAN:  And may it please the Court, Mr. Abreu and I are here today for Mr. Bourgeois, who I understand is listening in --

THE COURT:  Do you want to ask him to make sure that he is connected?

MR. WISEMAN:  Yes.  Mr. Bourgeois, are you hearing us?

THE DEFENDANT:  Yes, sir.  Yes, sir.

MR. WISEMAN:  Thank you.  I submitted last evening supplemental authority.

THE COURT:  I saw that.

MR. WISEMAN:  Okay.

THE COURT:  I am going to give you an evidentiary hearing, so you don't need any more authority on it.

MR. WISEMAN:  Okay.  Well I couldn't resist.

THE COURT:  I know.  It was very exciting.  I did

appreciate it.

MR. WISEMAN:  But, you know, that authority I think speaks to the basic rule which is that we are entitled to a hearing on any of the claims that --

THE COURT:  It doesn't say you are entitled to a hearing on any of the claims, but you are entitled to anything that might increase your record and be of benefit to an appellate court or to me.

MR. WISEMAN:  Well, certainly that.  The point I wanted to make, however, was that any claim that is not conclusively decided by the record against us with the --

THE COURT:  And there are some of those in here.

MR. WISEMAN:  Okay.  Well, our view obviously is --

THE COURT:  Different.

MR. WISEMAN:  Is a little different, and that's why we are here.  I was going to suggest to the Court that we proceed in the order of the claims, and I spoke with Mr. Roberts and I think we are in agreement that if the Court wants to, we would be willing to alternate, so I would address Claim 1, he would address Claim 1 and then move to Claim 2, and that way --

THE COURT:  Let me see if I can help you at all.

MR. WISEMAN:  Sure.

THE COURT:  Claim 4.

MR. WISEMAN:  Yes.

THE COURT:  I will give you 30 minutes to present that testimony at the evidentiary hearing.  It looks to me from your briefs that that ought to be concise enough to do that.  And I don't mean cross-examination, just whatever you would like to put on with that.  5, 30 minutes to put on a challenge to the bite mark.  6, 30 minutes to put on a challenge to Dr. Oliver regarding the digitally enhanced autopsy photos.

MR. ROBERTS:  Your Honor --

THE COURT:  Is that okay?

MR. WISEMAN:  In principle it's wonderful.  I think the time frame is a little tight.

THE COURT:  But, you know, just reading through the affidavits it seems pretty clear.  I mean, it's not like we are going before a jury.  You can put on an expert about semen, for instance, and say this test in our opinion is not any good because A, B, C and D.

MR. WISEMAN:  Sure.  I mean we can certainly make it quick.  We have, regarding the sexual trauma we have two experts of our own.  I don't know if the Government is going to want to put on any of its experts.  But I should think putting on two experts is going to take, even moving quickly, more than 30 minutes.  And those experts would be Dr. Johnson and Dr. Blake.

THE COURT:  I'm sorry.  Did I say 30 minutes for

that particular one?

MR. WISEMAN:  Yes, you did.

THE COURT:  Oh, yes, Number 4.

MR. WISEMAN:  Right.

THE COURT:  Okay.  Well, why don't we make that one an hour?

MR. WISEMAN:  Okay.

MR. ROBERTS:  Your Honor, if I might, we are having, we are not real sure because we renumbered the issues, and if we could just --

THE COURT:  Okay.  I have Number 4 issue as the trial counsel provided ineffective assistance of counsel by failing to present evidence available, available expert testimony that would have shown Bourgeois did not sexually abuse, assault the victim.  So I am going to give them 30 minutes per expert, they say they have got two experts, and put them on for a total of an hour.  And then Number 5, I have that trial counsel provided ineffective assistance by not litigating a Daubert challenge to testimony from Dr. Senn and Dr. Kerrs -- I can't remember how to pronounce the name -- concerning the bite mark evidence.

MR. WISEMAN:  That's --

THE COURT:  And I thought you had one affidavit on that.

MR. WISEMAN:  Actually we have several.  We have got

Dr. Cherry, we have got Dr. Dailey.

THE COURT:  Well, if they are all going to say the same thing, pick a couple and tell me what they can, you know, and have them testify.

MR. WISEMAN:  Okay.

THE COURT:  Would that be fair?

MR. WISEMAN:  Yeah, I think that would be fair.  I guess I am, you know, we will do the best we can with what the Court gives us but, you know, again --

THE COURT:  Well, this is my thought.

MR. WISEMAN:  Yeah.

THE COURT:  I don't want to retry it.

MR. WISEMAN:  I understand.

THE COURT:  I am giving you an evidentiary hearing.

MR. WISEMAN:  Yes.

THE COURT:  And you asked for two weeks and, of course, in my opinion that's ridiculous.

MR. WISEMAN:  Right.

THE COURT:  Because that's about the time it took to do the trial.

MR. WISEMAN:  I understand that, and if I can just say, Your Honor, that's a reaction that we frequently see in --

THE COURT:  And I can understand that, too.

MR. WISEMAN:  Yeah.

THE COURT:  But I do think that if we go through this item by item and I tell you -- and this is not including cross-examination or redirect.

MR. WISEMAN:  Uh-huh.

THE COURT:  But if you put on two witnesses that you pick that you think would be most representative, and you can, and I will accept as a proffer that you have four witnesses that will say the same thing.

MR. WISEMAN:  Okay.

THE COURT:  I mean it seems fair to me, instead of hearing the same thing over and over again.

MR. WISEMAN:  Sure, if we can proffer that would be, that would be --

THE COURT:  Well, pick two, then, that you think are most representative and give them, we will give them 30 minutes each for direct for Item Number 5.

MR. WISEMAN:  Okay.

THE COURT:  And I guess I thought I am not reading all your affidavits properly or it has been awhile since I have read them, I now have in front of me a summary, which is what I was using.

MR. WISEMAN:  Right.

THE COURT:  For Number 6, for not having a Daubert challenge for Dr. Oliver concerning the digitally enhanced autopsy, in my, I don't remember those being used anything

but to show the jury.  Right?

MR. WISEMAN:  Correct.

THE COURT:  I mean they weren't used to say we are measuring this on this.

MR. WISEMAN:  They were displayed for the jury, they were part of Dr. Oliver's --

THE COURT:  They were displayed for the jury.

MR. WISEMAN:  -- PowerPoint presentation.

THE COURT:  Right, as representative of her injuries.  So that's the attack that you would want to say, is that it's not representative, it overstated her injuries?

MR. WISEMAN:  Correct.

THE COURT:  Okay.  How many witnesses do you have for that?

MR. WISEMAN:  I just want to be accurate in the -- I know we have Mr. Cherry and his --

THE COURT:  I think I told you two days for a hearing, didn't I?  I am going to give you more than that.

MR. WISEMAN:  Yeah, you told us two-and-a-half.

THE COURT:  Well, then.

MR. WISEMAN:  It's not like one now, but --

THE COURT:  I may give you another day.

MR. WISEMAN:  Okay.  So that's three-and-a-half?

THE COURT:  Because you are so, you are pitiful. Okay, one --

MR. WISEMAN:  We have Dr. Bowers and Mr. Cherry.

THE COURT:  Okay.

MR. WISEMAN:  On the enhancement.  So that's two witnesses.

THE COURT:  How about two, 30 minutes for each of those on direct?

MR. WISEMAN:  I feel like I am bargaining here.  I have 45.

THE COURT:  Look, why don't you try to be as efficient as you can --

MR. WISEMAN:  Yes.

THE COURT:  -- in putting this evidence on, because you are making a record of this.

MR. WISEMAN:  Yes.

THE COURT:  And I don't see that you would have to go on and on about saying these are the problems with Dr. Oliver's testimony.

MR. WISEMAN:  Yes.  Your Honor, I just wanted the Court to know, and I hope it's been evident so far, that we are serious folks and we are not here to waste anyone's time.

THE COURT:  I have never seen anybody more serious.

MR. WISEMAN:  Is that right?  Oh, well.

THE COURT:  I am very impressed --

MR. WISEMAN:  Oh.

THE COURT:  -- with the beauty of your briefs, not

just in the legal argument but the efficiency of words, and I just expect you to be able to put that on in the same way.

MR. WISEMAN:  Yeah, and we intend to.  I just, you know, I don't want to see this, you know, overly cramped and not consult those --

THE COURT:  I think you will find if you prepare as you have been, in the same standard you have been doing, that you will be able to present this to me each witness 30 minutes, and that's not including, like I said, direct, I mean redirect or cross-examination.

MR. WISEMAN:  Okay.  Well, we will endeavor to do that then.

THE COURT:  And Number 7 may not require, I don't think, evidentiary.  I think you have got the affidavits?

MR. WISEMAN:  Well, if the Government will accept the truth of them we certainly don't feel the need to call the witnesses.

THE COURT:  Well, the way I remember --

MR. WISEMAN:  Yeah.

THE COURT:  Let me just make sure I have got it right, three -- we are talking about four witnesses?

MR. WISEMAN:  Correct.

THE COURT:  Three of whom were state prisoners.

MR. WISEMAN:  Correct.

MS. BOOTH:  No, two.

THE COURT:  And Ms. Booth had no authority -- did you say two?

MS. BOOTH:  There were two state and two federal.

THE COURT:  Okay, two state witnesses.  They had no authority to make any representations of any kind.

MR. WISEMAN:  Yeah.  I think the issue here is not, if I could say, not express representations, I think it's more tacit agreements, tacit understandings, which Brady and its progeny recognize as being equally problematic, so I think what the witness was actually expecting, based on discussions and conversations --

THE COURT:  I thought they testified about that.

MS. BOOTH:  They testified about that, Your Honor, and I believe that we have submitted the letter by, written by Mr. Longoria after the trial, even writing a letter to the Government saying I know you didn't promise me anything and, but I'd like for you to do this.

MR. WISEMAN:  Your Honor, I mean he has given us statements that contradict that letter, I mean it requires evidentiary resolution.  These would be quick witnesses, I mean ten minutes apiece I would imagine.

THE COURT:  Okay.

MR. WISEMAN:  No more than that.

THE COURT:  I don't mind.

MR. WISEMAN:  Okay.

THE COURT: It's just, it's easier, Ms. Booth, just to put them on and move on.

MS. BOOTH: Right.

THE COURT: Than to try to restrict somebody. I mean, you know, I have the greatest respect for what they are trying to do.

MS. BOOTH: Yes, I do, too, Your Honor.

THE COURT: I have a feeling it may not always be successful when they do their work and it has got to be very frustrating, so, you know, 40 minutes out of our life is not going to be a big sacrifice.

MR. ROBERTS: Your Honor, if I might just --

THE COURT: Four ten-minute witnesses. I know I am cutting you out of the whole deal, Mr. Roberts.

MR. ROBERTS: No, I am not worried about that, Your Honor, I trust your judgment in this, but what I am concerned about with that regard is that Ms. Booth may well be excluded from the case if we handle the Brady issues.

THE COURT: That's not going to work. You know, if she needs to testify as the attorney she can do that. Do you have any problem with that, Mr. Abreu and Mr. Wiseman?

MR. WISEMAN: Oh, no, not at all.

THE COURT: Yeah. I just don't think she not -- we can't exclude her at this point because it's not appropriate for representation of the Government which has been fine for,

you know, she has been outstanding.

MR. WISEMAN:  Yeah, we have no problem with that.

THE COURT:  And if she needs to testify she needs to testify.  There are four of you sitting there, one of them can cross-examine her.

MR. ROBERTS:  Thank you, Your Honor.  That's fine.

THE COURT:  Or put her on as your own witness.  8? Oh, how long -- let me just get this before I forget it -- how many days do you think it's going to take you to do that in camera filing with those documents, Ms. Salinas?  And I will accept your representation when you file that that's all there is, there isn't any more.

MS. SALINAS:  And I believe there might be some from Ms. Booth, Your Honor, so if we could have maybe a week to go through it together?

THE COURT:  Do you think that would work?

MS. BOOTH:  Yes, Your Honor, we could do that.

THE COURT:  Okay.  Is that fine with you?

MR. WISEMAN:  Oh, sure.  I just want to add the Government has been very forthcoming in showing us stuff and we appreciate that, so, yeah, that's fine.  There is one thing they haven't shown us which I will bring to the Court's attention but I --

THE COURT:  What is that?

MR. WISEMAN:  Yesterday the, actually they did show

us about 200 pages of agent notes that were used to compile the 302s, and we started to look at them and asked if we could have copies of them.

THE COURT:  Oh, they don't give out copies.

MR. WISEMAN:  I gathered that.

THE COURT:  But you know what you can do, I don't know if you know how to, if you know about this, you can actually go in with your Dictaphone or your recorder and dictate it word-for-word.

MR. WISEMAN:  Uh-huh.  Yeah, I guess I just wasn't sure why that wasn't discoverable.

THE COURT:  I will tell you why.

MR. WISEMAN:  Yeah.

THE COURT:  We started having people, it was very compromising to everybody involved, those, like DEA forms --

MR. WISEMAN:  Uh-huh.

THE COURT:  -- they would be glued around bathrooms around town with names circled, and in the jail, so they didn't want to be responsible for physically handing out documents that might compromise other people.

MR. WISEMAN:  Yeah --

THE COURT:  So that's why I am saying you can go over there, you can send somebody over, somebody locally, and dictate them for you.

MR. WISEMAN:  Yeah, I guess the thing I was

wondering then is if we agreed to a protective order not to disclose them beyond Mr. Abreu and myself if that wouldn't satisfy that concern.  It's just, it's very difficult to make any sense of them without the 302s and it would take hours to compare and they are statements of witnesses so I would think we would be permitted to see them.

THE COURT:  What do you-all think about a protective order that nobody sees them but these two attorneys?

MS. BOOTH:  Judge, I think that sets a precedent because then every other, all of our other honorable attorneys from down here can come in and make the same argument.

THE COURT:  How about I make -- do you have any, other than the precedent do you have any deep philosophical problem with this, if I say that this is the death penalty exception?

MS. BOOTH:  I don't --

MR. ROBERTS:  Your Honor, I can't think of, I cannot articulate a reason why not.  I guess the other part that may be able to be added to the exception aspect is they are taking these back away from the local area.

THE COURT:  Well, they have to be returned, every single one, and they have to say at the end of the litigation, if it ever comes, that they have returned every single document and give an affidavit to that effect.

MS. BOOTH:  And that they did not copy the documents.

THE COURT:  And that they didn't, that there are no other copies.

MR. WISEMAN:  We will be happy to do that.

MR. DOWD:  Your Honor, if I could make a suggestion?

THE COURT:  Yes, sir, tell me.

MR. DOWD:  The purpose that, as I understand, Mr. Wiseman wants to look, wants to have the 302s, now that he has the agent notes underlying the 302s, is to determine whether or not the 302s are accurately reflected by the notes.

THE COURT:  Right, if there is something left out.

MR. DOWD:  We could have the 302s in the discovery room with the notes, someone could go over them -- because that's the only purpose that the 302s are needed by Mr. Bourgeois.

THE COURT:  I guess it's a matter of expense and time.

MR. DOWD:  Okay.

THE COURT:  You know, these lawyers were found, thank goodness, by the Federal Public Defenders, this is what they do, and they are out of Pennsylvania.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And a person's life is at stake.

MR. DOWD:  I understand, Your Honor.

THE COURT:  In contrast to other cases where we don't really have people coming from that far away, you know. Louisiana, maybe California I guess, but it's unusual.

MR. DOWD:  I was just thinking about Longoria who was stabbed 32 times when they discovered he was cooperating.

THE COURT:  Right.

MR. WISEMAN:  Well, Your Honor, we certainly will not disclose these documents to our client, Mr. Bourgeois.

THE COURT:  Why don't you draft, in the next week, any protective order that you think would satisfy the concerns of the Government.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And submit it to Mr. Wiseman and Mr. Abreu and see if they are satisfied, and if they are I will enter it.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  And then after that you can take two weeks to give them all the copies.  How is that?

MR. DOWD:  That's fine, Your Honor.  Thank you.

MR. WISEMAN:  And that certainly works for us.

THE COURT:  And not your, Mr. Bourgeois is not going to see them.

MR. WISEMAN:  No, not at all.

THE COURT:  Only you-all.

MR. WISEMAN:  Absolutely.

THE COURT:  Okay.  And you don't have any agents or investigators or anybody that's going to look at it?

MR. WISEMAN:  Well, we, we have people working on the case but we will not disclose them to those people.

THE COURT:  Okay, thank you.

MR. WISEMAN:  So, I guess --

THE COURT:  All right, so we are finished with all the discovery issues --

MR. WISEMAN:  Yes.

THE COURT:  -- Mr. Wiseman, Mr. Abreu?

MR. ABREU:  Yes Your Honor.  Thank you.

THE COURT:  Any discovery issues from your point of view, Mr. Roberts?

MR. ROBERTS:  We, Your Honor, you haven't gotten to the mental retardation issue yet but I assume we are heading there and that we are probably having a hearing.

THE COURT:  We are getting there.  That's going to be the big issue.

MR. ROBERTS:  Yes, Your Honor, and we actually --

THE COURT:  That's not going to have a 10-minute or a 30-minute limit.

MR. ROBERTS:  Okay, Your Honor.

THE COURT:  I am going to give that a 45-minute limit.

MR. ROBERTS:  Thank you, Your Honor.  We, I discussed with Mr. Wiseman and Mr. Abreu just before we came in here that, anticipating that we would have that, we have a, two experts, a Dr. Moore, Dr. Roger Moore, and a Dr. Price, Randall Price, who we would like to have interview Mr. Bourgeois and go through the most recent ways for tests for an IQ, and I have got a letter here from them, from Dr. Moore, and I have got their CDs that I would want to submit.

THE COURT:  Well, am I correct in assuming that there are like three criteria that, I think, to make, to determine whether someone has mental retardation for the purposes of invoking constitutional claims and no execution?

MR. ROBERTS:  That's my understanding.

THE COURT:  One of them is a documented history under the age of 18 of mental retardation.  Now, we have no testing results here for Mr. Bourgeois under 18.

MR. WISEMAN:  That's correct as to the fact that we do not have any documented tests from pre 18.  However, I would differ slightly in the Court's formulation.  I believe that we have to prove onset, we don't have to prove documented onset before age 18.

THE COURT:  All right, thank you.  I think you are right about that.  Then it may not be that those post 18 examinations are going to be that persuasive, but I am going to certainly let you present them.  And if the movant gets to

present them, certainly the Government should have the same opportunity to interview, to send their experts to interview Mr. Bourgeois.  Now, what is the time limit, would you say the next 45 days?  We have got this set in September, time certain.  Forty-five days?  Do you object to it?

MR. WISEMAN:  Your Honor, I don't object.  I would like to discuss, and we could do this --

THE COURT:  Some parameters?

MR. WISEMAN:  Well, just, yes, if we could --

THE COURT:  Why don't you see if you can agree to some parameters on this, and if you cannot, we will do a telephone conference on it.

MR. WISEMAN:  Okay, that's fine, but we don't object in principle to those examinations.

MR. ROBERTS:  And, Your Honor, the reason I brought it up now, you were asking about discovery.  Dr. Moore and Dr. Price have communicated to me that they need the actual test material that the experts utilized in giving the --

THE COURT:  One week.

MR. ROBERTS:  -- particularly Mr., Dr. Gilmore.

THE COURT:  Have you got that?

MR. WISEMAN:  We don't have it but --

THE COURT:  Have you got that stuff?

MR. WISEMAN:  Our experts will certainly be happy to send it to their experts.  I believe psychologists will only

release it to other psychologists, but we certainly don't object to the release of it.

THE COURT:  Okay.  Well, if it doesn't happen in seven days from today, you-all let me know.

MR. ROBERTS:  Well, I will echo Mr. Wiseman's sentiments earlier, we have really been able to work well with the discovery issues and trying our best we can not to bring those to --

THE COURT:  Isn't that what happens with very good lawyers, though?

MR. ROBERTS:  Well, we hope so.

THE COURT:  It's a testament to your, both, of your intelligence and perseverance, both sides.  So we have got that.  I think then we have addressed all the discovery issues?

MR. WISEMAN:  Yes, as far as we know.

THE COURT:  Okay, let's move on then to 8.  What kind of evidence do you anticipate with that or just the fact that it was?

MR. WISEMAN:  That would be a number of questions to Mr. Gilmore, I understand.

THE COURT:  Okay.  So he will be here anyway testifying.

MR. WISEMAN:  In fact, just so the Court knows, as soon as Your Honor set the date I emailed him and asked him

if that was --

THE COURT:  Thank you.  Is that good for him?  I didn't even --

MR. WISEMAN:  He said he would keep it open.

THE COURT:  Okay.  So we don't need anything further, and that will be probably on cross-examination by you of Mr. Gilmore.

MR. WISEMAN:  Correct.

THE COURT:  So 9.

MR. WISEMAN:  Yes, that was really --

THE COURT:  Did you claim, I can't remember now, did you claim that the defense counsel were deficient because they failed to object to these remarks?

MR. WISEMAN:  No, I think it was more along the lines of they failed to present any mental health rebuttal of that line of questioning, but I --

THE COURT:  Okay.  Well, if there is, 9 is by itself, the prosecution engaged in misconduct by making improper argumentative statements in the guilt, innocence and penalty phases, I am going to rule that that's procedurally barred.  You may, however, put on evidence of ineffective assistance of counsel for failure to rebut that.  Is that, that's your argument, is it not?

MR. WISEMAN:  I'm sorry, Your Honor, you are talking now about the prosecutorial statements in closing argument?

THE COURT:  Yes, sir.

MR. WISEMAN:  Yeah, that is a, in our view, an ineffectiveness claim.  That would be --

THE COURT:  I didn't see it stated.  I just may have misread it, but if that's an ineffective for failure to object --

MR. WISEMAN:  Yes, and for failure to raise it on direct --

THE COURT:  And failure to put witnesses.

MR. WISEMAN:  No, I don't think that there are any witnesses that we would need to call on that, other than questioning --

THE COURT:  Mr. Gilmore?

MR. WISEMAN:  -- Mr. Gilmore on it.

THE COURT:  Okay.  So we are okay with that.  10?

MR. WISEMAN:  That, I would submit to the Court, would really be part of the Claim 2, the mitigation claim. It's a separate claim but it's going to involve the same witnesses.

THE COURT:  I, you know, you are at such a disadvantage, and I know that my observations, which will either go on the record now or at the evidentiary hearing or in a written order or maybe all three, are taking in consideration any further appeal, if at all, and I can tell you that it's, you have a severe disadvantage by not have

seen Mr. Bourgeois' demeanor during this trial.  I can tell you on the record that it was unbelievable.  He displayed, what the witnesses said at the scene of the event, if at all, where he was only on the phone while his daughter lay dying on the ground, he was on the phone making plans for a future transportation, and I can tell you that that was the type of demeanor that was shown here.  Have you looked at the movie that the U.S. Attorney showed about the swimming?

MR. WISEMAN:  About the what?

THE COURT:  The movie that was introduced showing him swimming with JaKaren?

MR. WISEMAN:  Yes, yes.

THE COURT:  And while the jurors were weeping during that, he would glance up and look away and smile and he didn't care.  The appearance was that he did not have a care in the world about this.

MR. WISEMAN:  Yeah, and --

THE COURT:  I want to mention this clearly for the record.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  And that was his demeanor during the excruciatingly heartbreaking pictures of his child up there with whip marks and everything else that was testified to. And I know that your psychologist will testify, but they were not here and we all were, and I have never seen that kind of

demeanor on a defendant that was watching pictures of the death of his child --

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  -- and the very graphic pathology pictures of his dead child.

MR. WISEMAN:  I understand exactly what the Court's talking about.

THE COURT:  So I want to make that clear for the record.

MR. WISEMAN:  Yeah.  I --

THE COURT:  And I realize that you can after the fact come in with psychologists and say, well, that is part of his psychological makeup, which cuts both ways, so I just want to mention that to you for the record, but I do have observations of this as well.

MR. WISEMAN:  No, I am sure you do and I think the Court's heartfelt observations are exactly the reason why counsel was duty bound to offer the available mental health explanation.  You know, Mr. --

THE COURT:  What was it?  What was the mental health explanation?

MR. WISEMAN:  Oh, he's --

THE COURT:  His appearance of --

MR. WISEMAN:  Mr. Bourgeois is a victim in his own right of severe, horrific childhood abuse, sexual abuse,

trauma, dysfunction.  We have three to five experts, depending on how many we get to put on, who will put that in context and explain his borderline personality, and so the Court knows I don't want to --

THE COURT:  So that doesn't make him incompetent.

MR. WISEMAN:  No, we are not suggesting he is incompetent to proceed.

THE COURT:  But if they had put on that evidence, just by way of curiosity, if they, if the defendant had put on that way, that type of evidence, would that not have been an even stronger reason to be a predictor of future criminal and violent conduct?

MR. WISEMAN:  Well, the defense had the worst of both worlds, they didn't put that evidence on and they still had their client portrayed as a future danger.  And certainly the jury seeing him in what appeared an indifferent if not cavalier demeanor could have been explained to the jury as the product of a mental illness and, you know, I think counsel's --

THE COURT:  Okay.

MR. WISEMAN:  -- failure to do that is not excusable.

THE COURT:  I wanted to, in case something happened to me in the future, I took senior status before my time or what have you, that those, my observations were clear and on

the record.

MR. WISEMAN:  And I would just suggest to the Court that, you know, your observations are obviously, are valid and legitimate and accurate, but they are made without the contextual mental health explanation.

THE COURT:  Absolutely.

MR. WISEMAN:  Okay.  So, in any event, getting to that claim, we would intend to incorporate that in the presentation of our mental health experts.

THE COURT:  I would appreciate that.

MR. WISEMAN:  Okay.

THE COURT:  And you certainly are allowed to do that.  I understood that -- that was why I was trying to limit some of these things that I thought could be directed very quickly and --

MR. WISEMAN:  Yes.

THE COURT:  And the points could be made quickly.

MR. WISEMAN:  Yeah.

THE COURT:  Now, I do not think that it's going to be that quick with the mental health experts, because both sides I'm sure will have multiple experts.  I would like to get some idea of how many you expect to have.  And what I expected you to do was to put on mental health experts to address -- oh, and have you seen the -- the letters are part of the record that he wrote me, are they not, post-

conviction?

MR. WISEMAN:  Mr. Bourgeois?

THE COURT:  Yes.

MR. WISEMAN:  We have seen the ones that he has provided to us or that the Court has forwarded.  I don't know if he has sent something that I haven't seen.

THE COURT:  Would you make sure that, Ms. Scotch, would you mind going, getting those from Ms. Hardin?  I just want to make sure that you got them.  So I expect your mental health experts to address the area of mental retardation, and the evidence that you thought should have been presented by way of mitigation as to what his childhood was like, and do you have other -- how many people do you anticipate, by way of mental health care providers, will provide that information?

MR. WISEMAN:  I'm trying to do the tally in my head. I think it's about a half dozen.

THE COURT:  Okay.

MR. WISEMAN:  It might be four, it might be seven but it's somewhere in that area.  I think I just said four to seven.

THE COURT:  Okay.  And how many do you have?  Some will be same, I guess.  Dr. Estrada testified and apparently has given affidavits for both, for, now for the movant.

MR. ROBERTS:  Yes, Your Honor.  We don't intend to,

I mean obviously Dr. --

THE COURT:  Or petitioners, sorry.

MR. ROBERTS:  Yes, Your Honor.  Your Honor, we intend to definitely have Dr. Moore as a witness.  We may only use Dr. Price as a consultant, but if he ends up participating in the examination then he would become a witness.

THE COURT:  Okay.

MR. ROBERTS:  There's at least those two.  We have Dr. Kutnick that provided statements, we have, I believe there's one or two others, so approximately four or five.

THE COURT:  Now, I expect again, like I mentioned with the teeth people and the other people, that you don't have them say the same thing.  They can all sit in here as your experts and they can say, "I adopt the testimony for the same reasons as so-and-so but I have this to add."  Do you see what I mean?

MR. WISEMAN:  Yes, of course.

THE COURT:  I don't want to cut off your record but I don't see why we should hear --

MR. WISEMAN:  You don't want people --

THE COURT:  -- everybody say the same thing over and over again.

MR. WISEMAN:  I certainly understand.  Regarding the Government's experts, could we establish some sort of

schedule for provision of reports, hopefully at least 30 days before a hearing, if not sooner?

MR. ROBERTS:  That's no problem with us, Your Honor.

THE COURT:  And what about your experts' reports?

MR. WISEMAN:  We have turned over declarations and/or reports of all of our experts.

THE COURT:  Well, do you have where, have you given them the information of their prior, the prior testimony and --

MR. WISEMAN:  They haven't asked for that.  If they want that we certainly can endeavor to --

THE COURT:  Well, this is kind of a civil trial.

MR. WISEMAN:  No, it certainly is, isn't it?

THE COURT:  So that, Rule 26 requires that you look at Rule 26 and determine --

MR. WISEMAN:  Yeah.

THE COURT:  -- give those reports in conformance with Rule 26.

MR. WISEMAN:  Okay.  We will certainly do that.

THE COURT:  And so when would you be able to give yours?

MR. WISEMAN:  I would say probably in 30 days to get that information together.  I am just wondering if, would the Court require that if both parties agree amongst themselves not to require the Rule 26 disclosures?  I mean these are all

forensic experts.

THE COURT:  At this point they are required.

MR. WISEMAN:  Okay.

THE COURT:  Now, if you-all want to make some accommodation with each other and change that rule, that's fine.

MR. WISEMAN:  I am just saying that they are all forensic experts who make a living testifying and so, you know, it's not --

THE COURT:  I think usually, you know, when I was doing this, I wanted to see where they had testified before.

MR. WISEMAN:  Sure, sure.

THE COURT:  And look at those transcripts if available.

MR. WISEMAN:  Yeah.  All right.  Well, we will talk about it and we will certainly comply with the --

THE COURT:  Because I always found it interesting, just for instance, for whatever witness, that they always said the same thing every time and never varied.  So that's of interest.  Okay.  So, do you think now that covers what is going to happen at the evidentiary hearing?

MR. WISEMAN:  I think the one big part that has been, well, two parts have been left out so far are the lay witnesses with regard to adaptive deficits as well as the mitigation case.

THE COURT:  Sorry.  I was talking about that all in one group but I started with the expert witnesses and forgot about the lay witnesses.

MR. WISEMAN:  Right.

THE COURT:  How many lay witnesses, those must be identified as well.

MR. WISEMAN:  Yes, they have been, and in fact we have given the Government at their request the last known addresses of the lay witnesses.

THE COURT:  How many are you going to have?

MR. WISEMAN:  We have proffered 23 declarations.  I don't think we have to call 23.  Perhaps we can pick our best ten and proffer the remaining 13.  And we will try to cover different areas so the Court's not seeing the same thing.  And let me actually get with my colleagues and the witnesses, it may be that fewer will do.  I just need to, you know, I don't want to commit to a firm number here.  But I appreciate we don't need 23 witnesses all saying the same thing and we won't do that.  We will --

THE COURT:  How many witnesses are you going to have?

MR. ROBERTS:  Your Honor --

THE COURT:  Are you just going to rely on the record on this part?

MR. ROBERTS:  To a certain extent, but Dr. Moore and

Dr. Price has, again, has communicated to me that there is a need to go beyond what the Federal Public Defender has done and beyond even what the mitigation experts have done at trial, if we are going to actually have some type of adaptive functioning analysis that is relevant to the Court.

THE COURT:  Okay.

MR. ROBERTS:  And the aspect that they are looking at are people that are disinterested giving their understanding at the time Alfred Bourgeois was in front of them, such as teachers or people that existed that are not, that are disinterested.  And so to some extent we are going to ask the psychologists to communicate to the FBI agents what it is they need in trying to locate people, and if we --

THE COURT:  Okay.

MR. ROBERTS:  -- can locate people that have that relevant information then we would like to bring those forward.

THE COURT:  Well then, again, because this is a combined civil/criminal kind of thing, if you find evidence that would benefit Mr. Bourgeois in that search, you need to provide that as well.

MR. ROBERTS:  Certainly, Your Honor.

MR. WISEMAN:  Your Honor, I can -- I appreciate that.  I can tell the Government and the Court that we really beat the bushes to try to find folks who remember Mr.

Bourgeois from when he was a child.  This is a very small rural community.

THE COURT:  A small place, wasn't it?

MR. WISEMAN:  It was, and, you know, there's not a lot of records left.  We have given the Court all that we have.

THE COURT:  You didn't find any school records for him?

MR. WISEMAN:  Not from elementary school.  The earliest we found was high school where he was, you know, Cs, Ds and Fs, basically.

(Off the record discussion at counsel table)

(Court conferring off the record with clerk)

THE COURT:  I am trying to remember why I wrote this letter.  I think, I will tell you what, I think -- this, I am going to show you this letter where I wrote to Mr. Warner.  I think that that is a lawyer out of the Valley who wanted to be on the team.

MS. BOOTH:  Larry Warner.

THE COURT:  Yes.  Isn't that what happened?

MS. BOOTH:  It was in the courtroom when he asked to be placed on the team.

THE COURT:  And that's why that letter is in the record.  You can give it back.  I just couldn't remember what --

MR. WISEMAN:  I thought we had competition.

THE COURT:  Would you hand those -- Mr. Wiseman, I just want to make sure that you have got those documents. Mr. Bourgeois wrote me, as you can see, numerous correspondence, and I think I docketed everything, but just to be on the safe side, that's what I have in my records.

MR. WISEMAN:  Are these for us to keep?

THE COURT:  Are those copies?

(Court conferring off the record with clerk)

THE COURT:  Does that look familiar?

MR. WISEMAN:  Not the most recent one, and I really couldn't say about the older ones.  I mean if Your Honor docketed them, we --

THE COURT:  I am going to have them printed out from the docket for you.  I keep a record of letters that come in to me and I docket them.

MR. WISEMAN:  We have told Mr. Bourgeois not to write to the Court.  I hope he is listening to that.

THE COURT:  Well, I thought it was very illustrative, actually.

MR. WISEMAN:  Your Honor, the last issue I think that needs to be covered is the jurisdiction issue, which we, I can tell the Court, think is a very serious issue.

THE COURT:  I agree with you on that.

MR. WISEMAN:  Yeah, okay.

THE COURT:  And, you know, you may be right about where the child died, but all I have to go with is the evidence that was heard at the trial.

MR. WISEMAN:  Well, right.  It's a claim of ineffectiveness.

THE COURT:  Mr., I know, but Mr. Bourgeois testified, and he wanted to testify, that it happened on the Navy base, that the child fell out of the truck.

MR. WISEMAN:  Right.

THE COURT:  His daughter also testified that he bashed her head against the wall while in the Navy base, and then decided she was dead and he had to put her out on the sidewalk and call, somebody called 9-1-1.

MR. WISEMAN:  Right.  Well, it's apparent from the reports that the science says differently and I think --

THE COURT:  No, it doesn't, actually, because that child had been traumatized by somebody for six weeks and she had old subdural hematomas, she had old all kinds of things.  She had leather skin.  The interesting thing about this case is that, you know, when Mr. Bourgeois came for his paternity thing and was given parental rights and support obligations, there were a series of pictures taken of that child right before she headed on the road trip, into the Louisiana trip with Mr. Bourgeois, so it was clear what she looked like at the time and then it was clear what she looked like at death,

and as I think her, there was testimony that her mother came in and said, "No, that's not my baby."

MR. WISEMAN:  Yes.

THE COURT:  And so I just want to mention that because the testimony was very compelling that the child, at the time that she, of course, died in the hospital, and there was compelling testimony at the time of the, at the trial that he had beat her head against the truck wall to finish her off.  I knew she was, we all knew that she had severe damages, probably enough, possibly enough to have killed her in another few days, but the final coup was to smash her head against the wall according to the testimony of the, or the window of the truck, and there was blood on the window, I believe.  Wasn't that the testimony?  No?

MR. ROBERTS:  No, we didn't have any testimony of blood on the window.

THE COURT:  But there was, but then she was found on the ground and 9-1-1 took her to the hospital where she died. And, so whatever you want to make of those records are, you can't change the fact that she died in the hospital after being picked up on the Navy base.

MR. WISEMAN:  No, that's all true.

THE COURT:  And that she had all severe old injuries, including subdural hematomas.

MR. WISEMAN:  That's all true, Your Honor.  I think

the legal claim is that the place where the fatal blow was struck is the proper --

THE COURT:  Ten days earlier?

MR. WISEMAN:  Yes.

THE COURT:  Before she died?  Fatal means dying.

MR. WISEMAN:  Well, the pathologist's report indicates that the subdural hematoma was --

THE COURT:  Was ten days old.

MR. WISEMAN:  Ten days old.

THE COURT:  But that does not mean that she died --

MR. WISEMAN:  That's the cause of death, according to the, to Dr. Rouse.  Dr. Rouse said the subdural hematoma to the right side of the brain is the cause of death.  I can say that, you know, I was curious that the Government has not got a declaration from Dr. Rouse rebutting our claim.  One would have thought, you know, with all the declarations they have proffered, that that would have been one that they would have sought.

THE COURT:  You know, I thought there was testimony of a fresh --

MR. WISEMAN:  All the fresh wounds --

THE COURT:  -- subdural hematoma.

MR. WISEMAN:  There are lots of testimony about fresh wounds and none of them were the fatal wounds.  The fatal wound is the right-sided cerebral hematoma.

THE COURT:  Well, all I know is that she wasn't dead then from it.  She died on the Navy base.

MR. WISEMAN:  Well, correct, but the --

THE COURT:  She died in the Driscoll Children's Hospital.

MR. WISEMAN:  If I shoot somebody off the Navy base and they wander onto the Navy base and collapse and die, there's no jurisdiction there.  If the fatal blow was struck ten days earlier and it takes that long for the person to succumb, the fact that they succumbed on the Navy base does not give the Court jurisdiction, and that's the claim, and we think it's pretty clear.  We are going to present expert testimony, we expect Dr. Rouse will be here.  Dr. Kagen-Hallett, unfortunately, has passed away.

THE COURT:  Who has?

MR. WISEMAN:  Dr. Kagen-Hallett.  That's the neural pathologist who authored the report about the injury being ten days old.

THE COURT:  The woman?

MR. WISEMAN:  Yes.

MR. ROBERTS:  Your Honor --

THE COURT:  The woman who was in the, who was the military, was -- she's alive.

MR. WISEMAN:  That's Dr. Rouse.

THE COURT:  Who?

MR. WISEMAN:  Dr. Rouse testified.  She is still alive.

THE COURT:  Okay.

MR. WISEMAN:  It's the report --

THE COURT:  Well, you, I guess you are more familiar with this than I am but I don't remember the testimony being that way.  Mr. Roberts?

MR. ROBERTS:  Your Honor, I'm holding Dr. Rouse's, the relevant portion of Dr. Rouse's testimony, and it's pages, it's in the transcript, it's March 8th was when she testified, day five of the case, docket entry 354, and pages 19 through 59 pretty much set out her understanding of the recency of the injuries.  She, and I don't want to belabor the point because there's, the real point here is there's no additional evidence that they can bring in that would be useful for this Court in an evidentiary hearing, because the question is whether the medical examiner, Dr. Rouse, was able to identify exactly which blow killed the child and whether that occurred on the base.  That's what they are arguing.  The fact of the matter is Dr. Rouse testified that she was able to determine that the injuries were recent.  She was able to, upon further questioning she was able to say that they had, that the injuries that the child had would be consistent with injuries in the past few days prior, and she didn't get to the autopsy until two days after the death,

that the, what really killed the child was forces that were transmitted to the brain.  And when I then continued to ask her about the methodology of the death, she acknowledged that she had no way of knowing how the child was killed, she just knew the mechanism of the death.  And then she said, when I explained to her how it was described to us by the child witness that the child was slammed against the inside of the cab four times and I asked her, "Would those head injuries that you observed in this autopsy be consistent with such an incident," and she said yes.  So between that and the evidence from Mr. Bourgeois himself about the child being alive and the other circumstances --

THE COURT:  She said, he said at trial that she was bright and vibrant --

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  -- up until she fell out of the truck.

MR. ROBERTS:  And was doing her ABCs in his lap --

THE COURT:  Right.

MR. ROBERTS:  -- while the truck was broken down at the --

THE COURT:  So that's a little hard to controvert.

MR. ROBERTS:  Yes, Your Honor.  So we believe that there's no reason to send that issue to an evidentiary hearing.  We don't, we can't fathom what evidence they could bring in.  And Dr. Rouse, if put on the stand she would not,

her testimony would be the same.  She has, because the child had so many injuries she has no way of identifying which injury occurred in which time frame.  The neurologist said ten-day duration.  The neurologist did not say subdural hematoma occurred ten days prior.  It was a --

THE COURT:  A building thing.  I remember it as being a building thing over a ten-day period.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And that the final blow was the day that she died.

MR. ROBERTS:  And there were at least four head contusions, if I remember correctly --

THE COURT:  That were fresh.

MR. ROBERTS:  That were fresh.

MR. WISEMAN:  Your Honor, Dr. Kagen-Hallett, who was the neural pathologist to whom the sample was sent for her opinion, said, quote, "Right-sided subdural hematoma" -- I'm sorry.

MR. ROBERTS:  Your Honor, I have the neurology report.  I'll hand it to Mr. Wiseman if he would like to read it.

THE COURT:  Would you hand it, let me see it?

MR. WISEMAN:  Yes.  Yes.

MR. ROBERTS:  Yes, Your Honor, if the Court would like --

THE COURT:  Oh, you can give it to him, give it to Mr. Wiseman.

MR. WISEMAN:  Yeah, I was just looking at my notes but, Your Honor, I was going to read it --

THE COURT:  Didn't the retina doctor also testify that she had had acute and sudden detachment of her retina?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And was bleeding behind the retina?

MR. ROBERTS:  Yes, Your Honor, had blood in the eyes.

THE COURT:  To where she couldn't possibly have seen after that?

MR. ROBERTS:  I don't recall the --

THE COURT:  I mean, I am assuming if she had bloody retinas that she can't see.

MR. WISEMAN:  What Dr. Kagen-Hallett says --

THE COURT:  Didn't we have, didn't somebody say that?

MR. ROBERTS:  Yes, Your Honor, we had a doctor that came in and talked about how he looked into her eyes and saw the blood behind her eyes.

THE COURT:  He saw her eyes in Driscoll Children's Hospital.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And he said that was from an acute

trauma.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, for purposes of this claim we are not contesting that this child was obviously severely abused over a course of time.

THE COURT:  No, I know that.

MR. WISEMAN:  That's not the issue.  The issue is --

THE COURT:  But we are talking about where she was killed.

MR. WISEMAN:  Right.  The issue is where was the cause of death inflicted.  What Dr. Kagen-Hallett says is, "Right subdural hematoma, mostly recent, minimal organization (approximately ten days duration}."

THE COURT:  Duration.

MR. WISEMAN:  Right.

THE COURT:  That's how --

MR. WISEMAN:  Right.

THE COURT:  -- long it took to build it up.

MR. WISEMAN:  Right.  Dr. --

THE COURT:  And mostly recent.

MR. WISEMAN:  Dr. Rouse said that the cause of death was a right-sided subdural hematoma.  So, you know, it seems pretty plain to us that at a minimum Dr. Rouse needs to explain why that right-sided subdural hematoma, which she said was the cause of death, didn't, happened on the Naval

base.

THE COURT:  Had what?

MR. WISEMAN:  Happened on the Naval base.  It's contradicting the neural pathologist's report that says it's ten days earlier.  And we --

THE COURT:  No, it doesn't.

MR. WISEMAN:  Let me make one other point.

THE COURT:  That isn't what it says, sir.  Mr. Wiseman, it doesn't say that.

MR. WISEMAN:  That's not what it says.

THE COURT:  It doesn't say that it's ten days old.

MR. WISEMAN:  Approximately ten days duration.  That means it started --

THE COURT:  It started, but --

MR. WISEMAN:  Right, the subdural hematoma started.

THE COURT:  But with each blow to the head, and that was what was discussed at the trial -- I'm not going to give you, let you have evidentiary on that.  I'm sorry, that is way too far-fetched.

MR. WISEMAN:  If I could just make two more quick points about that, I think the relevant --

THE COURT:  No, thank you.

MR. WISEMAN:  I'm sorry.

THE COURT:  Thank you.  That is way too far-fetched. Okay, so moving right along, that takes care of everything

then?

MR. WISEMAN:  That's everything that we have, I think.

(Court conferring off the record with clerk)

THE COURT:  Do you have the letters that I showed Mr. Wiseman from Mr. Bourgeois?  Did you get them out of the -- they are docketed, they are docketed.

MR. ROBERTS:  I don't know if we have them or not, Your Honor.

MS. BOOTH:  We didn't bring them.

THE COURT:  They are all sealed.  Okay, just give those to Mr. Wiseman and get, and I'll take mine back.

MR. ABREU:  May I, Your Honor?

THE COURT:  Yes, sir.

MS. BOOTH:  Judge, we don't know if we have all of them either.

THE COURT:  Make them, just go Xerox a copy, would you?  Mr. Feldman, would you do that?  I just thought that maybe if your psychologist and mental health care evaluators had not seen those letters that might be of some benefit. Okay, what else?

MR. WISEMAN:  I think the Court has covered all of the claims.  So we were talking about giving us an extra day, which would make it three-and-a-half days?

THE COURT:  Yes.

MR. WISEMAN:  You look like you maybe have four in your eyes.

THE COURT:  No.  I am going to give you out of three-and-a-half-days, I am going to give you two-and-a-half of those days to put on your documents, to put on your evidence and to cross-examination, to cross-examine.

MR. WISEMAN:  And what's the other day?

THE COURT:  Sorry?

MR. WISEMAN:  I'm not following.  I thought it was three-and-a-half days --

THE COURT:  Three-and-a-half days total for everybody together.

MR. WISEMAN:  Oh.  When we started it was four for everybody.  It was going to be two-and-a-half for us and a day-and-a-half for them.

THE COURT:  Well, then we just cut it back.  Okay.

MR. WISEMAN:  Are you saying we are going to get --

THE COURT:  No.  Four days.  Four days, we have four days.  Sorry.  I thought we were at four days and you said two-and-a-half, so that's why I said I will give you an extra day.

MR. WISEMAN:  The last time we spoke, Your Honor --

THE COURT:  Four days altogether.

MR. WISEMAN:  Yeah.  The last time we spoke Your Honor said two-and-a-half for us, one-and-a-half for them.

THE COURT:  That's exactly what you get.

MR. WISEMAN:  Okay.  When you said an extra day --

THE COURT:  Now, what I'm going to let you do --

MR. WISEMAN:  Yes.

THE COURT:  -- is use that affidavit for whatever doctor you want to say whatever happened to the child.  Okay?

MR. WISEMAN:  We are getting back to the cause of death?

THE COURT:  Yes.

MR. WISEMAN:  Yeah.  Your Honor, I have a lot more to say about that claim.  I can see Your Honor didn't really want to hear it.

THE COURT:  I think it's absurd.

MR. WISEMAN:  I, I --

THE COURT:  But I understand you have a job to do and I will let you proffer two affidavits from two doctors.  How is that?

MR. WISEMAN:  That sounds acceptable under the circumstances.

THE COURT:  Well, are they going to say anything more in person than they are going to say?

MR. WISEMAN:  I want Dr. Rouse here.  I want to talk to Dr. Rouse.  I want to cross-examine her, as trial counsel should have cross-examined her, about what the cause of death was and when it happened, and I don't see why that should

be --

THE COURT:  Well, the death happened in the hospital.  All we have are witnesses as to what happened when the final blow occurred.  And I, you know, why don't you do this, why don't you send interrogatories -- there's no wrong, there's no reason that you can't do that -- to her and ask.

MR. WISEMAN:  How about a deposition?  Let us take a deposition of her, a two-hour deposition.  We will go to where she is and we won't, we won't burden her with -- I think we can certainly get everything asked in two hours and --

THE COURT:  Do interrogatory, do deposition by written questions.  And if that's not satisfactory I will rethink it, but I still think it's, I still think it's not your best cause of action.

MR. WISEMAN:  Okay.  We will work with that then.

THE COURT:  Because there was just too much, it was too much evidence even from your client saying when the cause of death was and where.  Something else I was going to tell you to do.  Oh.  I don't remember the testimony of the retina doctor.  In fact, if I hadn't talked to him recently I wouldn't have remembered that he had been here on another occasion.  And so I figured if he testified he must have testified about fresh bleeding in the retina.  I didn't ask him, but do you-all remember that?  Somebody that examined

the child, he must have examined her in the hospital?

MR. ROBERTS:  Yes, Your Honor.  And I was looking for his information, but the child was brought to the hospital, the child was still alive, the child was taken by helicopter away and then, but during the time that the child was at the hospital the doctor came in, there were multiple doctors came in.

THE COURT:  Well, she wasn't taken by helicopter.

MR. ROBERTS:  Well --

THE COURT:  She was ambulanced to Driscoll Children's.

MR. ROBERTS:  Well, she was ambulanced to the hospital but there was a -- let me see if I can find in my notes real quick, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  And then she was ambulanced again to another hospital.

(Off the record discussion at counsel table)

THE COURT:  Have we got the transcripts?  Have you-all got the transcripts?

MR. WISEMAN:  Beg pardon?

THE COURT:  Have you got the transcripts ready, got them on --

MR. DOWD:  We have them here, Your Honor.

THE COURT:  I just wanted to, I wanted to see what

the retina doctor said.

(Off the record discussion at counsel table)

THE COURT:  What's his name, Ms. Booth?

MS. BOOTH:  It's Dr. Octar.

THE COURT:  Well, there was another one, though, that said his name was something different that told me he testified in Bourgeois and I didn't remember it at all.  It's not -- it's Kerfole or something like that?  Or maybe that's his first name, Octar.

(Off the record discussion at counsel table)

MS. BOOTH:  It's Noruna.

THE COURT:  Was there a Kerfole or Kerful --

MS. BOOTH:  Yes, there was.

THE COURT:  He's the one who said to me on the phone, "Oh, I remember you from the Bourgeois trial," and I didn't remember him at all.

(Off the record discussion at counsel table)

MR. ROBERTS:  Do you want the testimony, Your Honor, or --

THE COURT:  Can I look at it?

MR. ROBERTS:  Yes, Your Honor.

(Off the record discussion at counsel table)

THE COURT:  And the other ophthalmologist was named what?

MR. ROBERTS:  It was not another ophthalmologist,

Your Honor.  My recollection is it was an emergency room doctor, and I think that was the one that --

THE COURT:  What was his name?

MS. BOOTH:  Dr. Octar.  He was a pediatric intensive care physician.

THE COURT:  Do I have that in this volume?

MR. ROBERTS:  It's in a different binder, Your Honor.

MS. BOOTH:  No, it's right here.

THE COURT:  Did your experts, Mr. Wiseman, look at Dr. Coufal's testimony?

MR. WISEMAN:  I believe they looked at all of the testimony.

THE COURT:  Now, he found retinal hemorrhaging more significant than he had ever seen in a child and the result of a shaken baby syndrome and consistent with blunt recent trauma to the head.  Did you get that?

MR. WISEMAN:  I believe our expert --

THE COURT:  It wasn't --

MR. WISEMAN:  -- Dr. Spitz, reviewed --

THE COURT:  You don't see blood in the back unless it's recent.

MR. WISEMAN:  Yeah.  I am not disputing that, I just believe that Dr. Spitz was aware of that.

(Mr. Wiseman and Ms. Booth conferring off the record)

MR. WISEMAN:  Your Honor, I am just looking at Dr. Spitz's declaration right now.  In paragraph 6 he indicates he reviewed the jury trial transcript, including testimony of, among other people, Dr. Octar, so he apparently was aware of that testimony and he nonetheless opined that there were significant questions with regard to the timing of the death, the fatal blow I should say, or the fatal injuries, based on the subdural hematoma, the issue we have been discussing.

MS. BOOTH:  And so that means that he did not review Dr. Coufal's.

THE COURT:  Well, not necessarily.

MR. WISEMAN:  No, he reviewed the trial transcript including, so he named some specific folks but he reviewed the entire trial transcript.

(Off the record discussion at counsel table)

MR. ROBERTS:  Your Honor, if I might, I just found something on Dr. Spitz's, paragraph 16, I mean his, the basis of his opinion is on reviewing all the information and in paragraph 16, I mean one of his disagreements is with the eyewitness testimony of the child's head being struck multiple times on the interior of the vehicle.  I just, that kind of, I mean that just is kind of indicative of maybe what his opinions are based upon.  He is disregarding eyewitness testimony in order to reach the conclusion.  And I just noted that as I was reading Dr. Spitz's statement.

MR. WISEMAN:  Your Honor, I feel a need to respond ever so slightly.

THE COURT:  Do you want to stand up while you are doing that?

MR. WISEMAN:  Sure, sure.  Dr. Spitz literally wrote the book on forensic pathology, he is an expert of the highest national esteem, and I don't know that we can resolve --

THE COURT:  Well, did he look at -- what did he look at?

MR. WISEMAN:  He, he --

THE COURT:  Did he look at her autopsy, did he look at slides or --

MR. WISEMAN:  He looked at the autopsy reports, he looked at the trial transcript --

THE COURT:  But he never examined any physical evidence from the child?

MR. WISEMAN:  Let me, let me be clear and tell you exactly what he says he looked at.  Paragraph 3 of his report says that he reviewed the following information:  The autopsy report including the transcript of neural pathology consultation, the forensic odontology reports of Dr. Senn, Dr. Chrz, a transcript of the jury trial and then he names a number of specific witnesses, several CDs with body photographs and their enhancements of two years and eight

month old African-American deceased minor.  The actual color and black and white photos which are reviewed are of acceptable and satisfactory quality to render an opinion.  He criticizes the enhancements.  And that's what he reviewed.

THE COURT:  So he didn't see any autopsy slides or anything like that?

MR. WISEMAN:  Well, he saw CDs with slides.  I can't say for sure.  Several CDs with body photographs.

THE COURT:  Okay, but that's not slides like autopsy slides.

MR. WISEMAN:  I can't be sure if it is or it isn't.  I don't know from that one --

THE COURT:  Well, I mean he didn't weigh the brain or anything like that?

MR. WISEMAN:  Well, no, I mean he wasn't at the autopsy, obviously.

THE COURT:  Okay.

MR. WISEMAN:  I think what Mr. Roberts was referring to is his view that the lay witness testimony is contradicted by the scientific evidence as to when and where --

THE COURT:  It's not, though.  You are not, we are not reading those documents in the same way.  I will let you proffer his testimony however you want to do it, but I can tell you how far that's going to go.

MR. WISEMAN:  Okay.

THE COURT:  And it will give you a record of it, though, and he can, you can proffer it any way you want to.

MR. WISEMAN:  Okay, and we will certainly submit some interrogatories to the, to Dr. Rouse.

THE COURT:  You may.

MR. WISEMAN:  Thank you.

THE COURT:  Okay.  Anything else?

MR. WISEMAN:  Not from the petitioner.

MR. ROBERTS:  Your Honor, we have, we are sending a number of peer review articles from Dr. Oliver that are, they are very, very large documents, so we will be getting those and those may end up becoming an issue with regard to Dr. Oliver and if necessary we will submit those to the Court.

THE COURT:  What was that?

MR. ROBERTS:  Dr. Oliver was the expert who came in and testified about taking the color out of the photos and made them into black and white, and it's about the imaging and they are challenging the Daubert issue with regard to his methodology.

THE COURT:  Okay.

MR. ROBERTS:  And we are trying to provide those and they have turned out to be quite lengthy.  The last thing I would like to do, Your Honor, if I could, is go ahead and make a, enter into the record Dr. Moore's letter from April the 12th, 2010, Dr. Moore's CV and Dr. Price's CV, if I could.

Those were the experts that we are going to rely upon that we are asking to be able to conduct the evaluation of Mr. Bourgeois.

THE COURT:  Okay.  Well, I don't, they said they didn't have any objections, so.

MR. ROBERTS:  I don't, we don't have anything else, Your Honor.

THE COURT:  Ms. Booth, anything you can think of? Ms. Salinas?

MS. SALINAS:  No, Your Honor.

MS. BOOTH:  No, Your Honor.

MR. DOWD:  Nothing further, Your Honor.

THE COURT:  Okay.  That's it?

MR. WISEMAN:  That's it.  Unless you want more.

THE COURT:  Well, I think you gave me your best stuff, don't you think?  Okay, so four days, two-and-a-half days for Mr. Bourgeois, a day-and-a-half for the Government, and that includes your cross-examination of Government witnesses and vice-versa for the Government.  Your day-and-a-half includes your cross-examination of Bourgeois witnesses.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  For purposes of our planning, what's the Court's day usually look like in term of the length?

THE COURT:  8:30 to 5:30.

MR. WISEMAN:  Okay.

THE COURT: An hour for lunch. We have a mid-morning break, mid-afternoon break. If you need more, that's fine.

MR. WISEMAN: Okay.

THE COURT: But it's straight through.

MR. WISEMAN: Yeah, I know. I get it.

THE COURT: I mean that's why, I mean it's not like if you are, you know, when you are in state court that there's a lot of TROs or something coming up. It's just this.

MR. WISEMAN: Okay.

THE COURT: And I have got the days blocked off just for you-all, nothing else.

MR. WISEMAN: Excellent.

MR. ROBERTS: And, Your Honor, you would just like us to work amongst ourselves to arrange when Mr. Bourgeois can be evaluated by Dr. Moore?

THE COURT: Yes, please. Now, another thing I forgot to bring up, I know what I wanted to bring up, is it is not required that Mr. Bourgeois be here for an evidentiary hearing according to the statute.

MR. WISEMAN: Your Honor, I know what part of the statute you are referring to. I am not sure I read it that way. I think if there is going to be a summary disposition of the case, I would think Mr. Bourgeois has a right to be

here and we would very much like him to be here.

THE COURT:  I was just throwing that out to see if you agreed with it.

MR. WISEMAN:  Yeah, well, no, we require him.

THE COURT:  Because it's a huge expense to have him here.

MR. WISEMAN:  I understand that and, you know --

THE COURT:  We could, I guess, figure it out, Ms. Scotch keeps urging video, with a direct telephone line to just his counsel.

MR. WISEMAN:  Yeah, I mean that's, that would require us to have somebody up there with him and it breaks up our defense team.

THE COURT:  Well, not really.  I mean, if I had a direct telephone line right in here that you could talk to him.  Do you see what I mean?

MR. WISEMAN:  Yeah, I guess I do.  Look, our preference would strongly be to have our client here.  Even though he is, in our view, not fully able to assist and participate because of his mental health deficits, we do think he has a right to be here.

THE COURT:  Well, if he, you know, can't help you, why would he need to be here?

MR. WISEMAN:  Well, I think due process applies even to, you know, people with deficits.  I mean, I am not saying

he is incompetent.  He is competent but he is impaired, and nonetheless he has articulated to us he would like to be here, we would like to have him here.

THE COURT:  May I, I am going to make one requirement about the proffer from your expert that wants to talk about the cause of death and the time of death.

MR. WISEMAN:  Yes.

THE COURT:  That he must review both Coufal's testimony as well as the emergency room doctor.

MR. WISEMAN:  Certainly.

THE COURT:  And I want it to say in whatever proffer that he has done that.

MR. WISEMAN:  Yes.

THE COURT:  And why he thinks that he didn't see new blood in the retina from recent smashing of the head.

MR. WISEMAN:  Okay.

THE COURT:  Thank you very much.

MR. WISEMAN:  Thank you, Your Honor.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Thank you.  You-all, once again, are surprising, you are so good.  Thank you.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Not that I'm surprised that you are good, but it's always a treat to have good lawyers here.

(The proceedings ended at 2:49 p.m.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


____/s/  Judith M. Garcia_____          _May 4, 2010_____