IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF TEXAS
                         CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     MAY 6, 2010
                                   *     1:09 P.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *


                  TRANSCRIPT OF TELEPHONE CONFERENCE

            BEFORE THE HONORABLE JANIS GRAHAM JACK
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77002

                  (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
               MOLLY CARTER, P. O. BOX 270203
          CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)

FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 1:09 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts for the United States.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

THE COURT:  All right.  Y'all had some questions.  Let's start with the testers, the mental health testers.

MR. WISEMAN:  I'm having trouble hearing you, Your Honor.

THE COURT:  Is this better?  Hold up.

MR. WISEMAN:  A little bit.

MR. ROBERTS:  I'm having trouble as well, Your Honor, from Tony Roberts.

THE COURT:  Okay.  Okay.  I got it.  I got it.  Okay.  Is this better?

MR. WISEMAN:  Yes, that's better.

MR. ROBERTS:  Yes.

THE COURT:  Okay.  I had it turned down too far.

Let's start with the mental health provider testing, the evaluators.

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  I've spoken with Dr. Moore.  Mr. Wiseman and myself have been corresponding with regards to how to set this up.  And the two main issues, I think, is one where Mr. Wiseman has asked for the tests, the list of test questions and the list of types of tests that they're going to give before they go in.  And Dr. Moore has informed me that, first of all, he doesn't intend to administer any tests other than the mental status exam, because he's focusing on the adaptive functioning.

So that's the only test that Dr. Moore will be giving.  But he will evaluate Alfred Bourgeois based on the tests.  And as far as I understand, he'll ask him about his past.

On the other side, Dr. Price is going to address the cognitive functioning.  And he said that he would, he will do the evaluation consisting entirely of standardized testings and will not be actually interviewing Alfred Bourgeois about the facts of the case or his life prior to the instant offense.

So the initial question, I think, is whether or not they should be required to give all the list of tests and all the list of questions that might be asked to Mr. Bourgeois before they go into the interview.  They've both told me that they've never had to do that, that that was something that was a new request to them.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.

I'm not interested in the questions they're going to ask. I'm interested in the tests. And I've personally been involved in another case where --

THE COURT: I really just want to hear about this one. Tell me what you want.

MR. WISEMAN: Dr. Price has done this before, is my point. He's provided tests. Obviously, the provision of tests for Dr. Moore is academic. If he's only going to do interviewing and the mental status exam, that's fine. With regard to Dr. Price, I would submit that knowing the tests he's going to administer is appropriate. It's appropriate use of Your Honor's discretion.

THE COURT: Why?

MR. WISEMAN: I would also --

THE COURT: Why is it -- why do you need to know that in advance?

MR. WISEMAN: I'm sorry?

THE COURT: Why do you need to know what tests he's going to be giving in advance?

MR. WISEMAN: Well, Mr. Bourgeois has a right to counsel at this point in the proceedings. And as part of that right to counsel, I have a right to know the scope of the examination. I would cite to Your Honor the case of Buchanan versus Kentucky, 483 U.S. 202 (sic) at 424, where it discusses the case of Estelle v. Smith, a prior Supreme Court case. And

the quote there is discussing the right to counsel, the Sixth Amendment right to counsel in a mental health evaluation.

It says, quote, "Thus, in our view, Smith had not received the opportunity to discuss with his Counsel the examination or its scope."  We have a right to know what kinds of tests they're going to administer, that in the words of Buchanan, we can discuss that with our client, both the examination and the scope.  You know, that just springs from his right to have an attorney.

THE COURT:  Well, what tests did your -- what tests did your examiners give him?

MR. WISEMAN:  I'm sorry?

THE COURT:  What tests did your examiners give him?

MR. WISEMAN:  My examiners?

THE COURT:  Yes.

MR. WISEMAN:  Well, the neuropsychologist gave him the Halstead-Reitan battery, an intelligence test.  There was some personality testing administered as well.  I don't have the list in front of me, but I think those were the general categories of tests that were administered.

I'm not even thinking of objecting necessarily to any of the tests.  I just want the know what they are.  In case there's something there that I think is completely irrelevant, I think I should have a right ahead of time to bring that to the Court's attention.

THE COURT:  Well, I agree with you.  So I don't see anything wrong with disclosing the tests that Dr. Price is going to administer.  You don't need anything further from Dr. Moore.  Is that right, Mr. Wiseman?

MR. WISEMAN:  That's correct.

THE COURT:  What test is Dr. Price going to administer?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.

THE COURT:  I mean, if they're standardized tests, I guess it's no big deal.  You know, if he just lists everything he might do or he's thinking about doing and just say, "He's going to pick from the following exams," I think that's satisfactory.  It gives notice to the Movant.

MR. WISEMAN:  Yeah.  Your Honor, I am relying on the expertise of both Dr. Price and Dr. Moore.  And we've essentially -- we're not going to be present.  We haven't asked them to give us a list --

THE COURT:  Okay.  All I'm saying is that give them the list of tests that they are considering about -- they're considering using, everything they may use, and then they don't have to use them all.

MR. WISEMAN:  Your Honor, with respect to Defense Counsel's presence at the evaluations --

THE COURT:  Wait a minute.

MR. WISEMAN:  -- I understand --

THE COURT:  Are you talking about the Respondent?

MR. WISEMAN:  I'm sorry?

THE COURT:  Are you talking about the Respondent, Mr. Roberts, or --

MR. WISEMAN:  I requested of Mr. Roberts that he agree that a member of my staff can be present --

THE COURT:  I assume he's not agreeing to that.

MR. WISEMAN:  He is not agreeing to that.  In the alternative, I've asked for videotaping, which I understand there may not be agreement on as well.  Again, this is a right to counsel issue.

THE COURT:  Well, hold up.  Hold up.  Can you videotape it, Mr. Roberts -- obviously the Government is going to pay for it, whether I say the Movants pay for it or not.  So can you videotape it where he doesn't know it's being videotaped?

MR. ROBERTS:  I'm sorry.  Can we videotape it where he's what, Your Honor?

THE COURT:  Where he's not aware that it's being videotaped.

MR. ROBERTS:  We could -- we could ask the -- he's going to be at the Terra Haute, at the facility.  It's my understanding he's going to be in a room that -- I don't know how he would be videotaped.  It would have to -- without him

knowing that it was being videotaped.  I can ask --

THE COURT:  Well, I don't think it makes any difference.  I don't see any possible harm to the Government in videotaping the testing, unless there's some problem with Doctors Moore and Price.

MR. ROBERTS:  Well, Your Honor, I didn't have a problem.  I actually -- I mean, from a prosecutorial position --

THE COURT:  I think the more information I have, the better.

MR. ROBERTS:  -- asked the doctors if it would affect the, if it had a potential to affect the outcome.  And I told them that I was going to rely completely on their position.  Because the goal here is to get as accurate an assessment as possible.  Dr. Moore and Dr. Price have both come back with objections to the process.  And both of them, in their history, have gone in and found people mentally retarded and gone in and found others not.  And so they --

THE COURT:  Well, I'm not understanding.  What is their specific objection?

MR. ROBERTS:  Your Honor, their specific objection is -- and I'm going to read what Dr. Moore wrote to me.

THE COURT:  Okay.

MR. ROBERTS:  He said -- he first starts off that "There are numerous articles indicating that a person's

behavior changes during evaluation when observed by a third party.  In this evaluation situation, part of the standardization of our own clinical skills and observations has been honed in a one-on-one, non-observed situation. Introducing the presence of observers or recording equipment introduces unnecessary distractions and potentially affects the examinee's performance and also shifts our attention as evaluators, based on the realization that we are being observed or recorded and evaluated, as opposed to focusing our full attention on the task at hand, which is evaluating the Defendant."

THE COURT:  That's it?  Are you there?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Well, you know, I know as a matter of fact when psychologists are being trained to do testing, they look in a two-way mirror, or they're sitting in a room watching the examinations being given.  There are third parties there not unusually in those circumstances, especially in training institutions.  I don't see why it would be unusual to have in a prison someone else observing it, and therefore videoing it.  I mean, the whole thing is to present to me and to make a record. Why not have a video record of the interviews?

MR. WISEMAN:  And that's our interest as well, Your Honor.  This is Michael Wiseman.

THE COURT:  I mean, I think that I could learn from

seeing a video of the way he responds.

MR. WISEMAN:  Yeah, I also want to have a record of what was said by him, as well as the doctor.

THE COURT:  Because you know how those things get open to interpretation, even after the tests are made.  So why not record them?

MR. ROBERTS:  Well, I mean, Your Honor, again, I'm deferring to the expertise of my, of the two psychologists. They're telling me that recording it brings distractions in and it could affect their ability to make a pure and accurate assessment.

So I really don't have a -- I don't have a legal response.  I'm not responding from a legal perspective.  In fact, I said -- I told Mr. Wiseman that he could e-mail the doctors directly and ask if they would be willing to accept his, the conditions he wanted to put on the interview, and they contacted me back directly and said they would object because, and gave me these reasons.

So my goal, as always, has been to have him, have Mr. Bourgeois evaluated objectively so that we can assess his mental status.  And if our experts come back and say he's mentally retarded, then we're going to turn around and react as we're supposed to, go up and state that at that point in time we would not be able to go forward with the sentence.

MR. WISEMAN:  And you know, Your Honor, this is

Michael Wiseman.  I don't doubt Mr. Roberts for a moment in that regard, and you know, he's speaking on behalf of these doctors, who I don't know.  And frankly, you know, as former President Reagan once said, you know, "Better to verify --" "Trust, but verify," I believe was the expression.

So I, you know, I can't fathom how having a video camera in the room would in any way significantly impact this, if impact it at all.  And my only thought is that, Your Honor, we would probably need an order for the prison to go forward with the videotaping.

MR. ROBERTS:  That's probably correct, Your Honor. If I could ask -- and Your Honor, you may deem it not even relevant to the analysis, but I'm kind of curious if there were any recordings made of Mr. Bourgeois when he was interviewed and evaluated by the, Mr. Wiseman's experts and whether or not they were actually present when he was evaluated for those tests.

MR. WISEMAN:  We were not present, and there were no recordings.  Of course, there's a very different interest involved here, as --

THE COURT:  I understand that.  We don't need to go down that road.  But of course, I think if there were recordings, that might be another matter.  But I can't imagine that you would have recorded them actually.

MR. WISEMAN:  No.

THE COURT:  Because you can test all you want and not have to disclose.

MR. ROBERTS:  And I don't -- again, Your Honor, Tony Roberts for the United States.  I don't have a legal argument or basis for this.  I'm relying totally on the doctors, and essentially they're telling me that this, these things interject distractions into the process.  So that's all I can tell you is that I'm relying on my expert.  That's what they tell me.  Obviously if you order us to do differently, we'll do as you order.  But I don't have a legal argument for why we need to do it a different way.

THE COURT:  All right.  I'm going to go ahead and order that they be videotaped.  Then who's going to videotape them?  That's another thing.  Mr. Roberts, you want to have the Government do that?

MR. ROBERTS:  We can, Your Honor.  We -- I don't know if the present facility has someone that they worked with before.  Mr. Wiseman said that he knows of this being done before.

MR. WISEMAN:  Yeah.  In that instance, the doctor himself brought in the video camera and set it up and ran it.  You know, we'd be happy to assist in whatever way we can, either by obtaining equipment, you know, hiring a videographer.  I mean we'll accommodate the Government in any way that's needed.  I mean, I'm certain it can be done, with a small video

camera on a tripod.

MR. ROBERTS:  Your Honor, in addition to that, at the point in time when I guess it's recorded, we would -- I guess we would make copies of that and provide it to the parties. But I understand that there's some copyright concerns?

MR. WISEMAN:  Yes, Your Honor.  And I addressed that --

THE COURT:  Oh, yeah, about he said they would do a protective order.

MR. ROBERTS:  I can't hear you, Your Honor.

THE COURT:  I think that Mr. Wiseman, in the memo I have in front of me, a copy of whatever he's sent to Doctors Price and Moore, that he offered to enter into any protective order --

MR. ROBERTS:  Okay.

THE COURT:  -- to cover the copyright problems with the standardized testing.

MR. ROBERTS:  All right.  Well, I will certainly get with Dr. Moore and Dr. Price and ask them their -- ask for their input on how we proceed with videotaping.  And then I do believe that the prison will need that order before they'll allow that in.  I understand that we actually have to give a whole list of -- the expert has to give a whole list of things that he intends to bring in.  And if anything is not on that list, he won't be able to bring it in, or something of that

nature.

MR. WISEMAN:  Your Honor, I also wanted to bring up a question about the pretrial order, if that would be appropriate now.

THE COURT:  Okay.  Have we taken care of the other issue satisfactorily to everybody?

MR. WISEMAN:  I'm satisfied.  This is Michael Wiseman.

MR. ROBERTS:  Your Honor, I understand the, you would like -- you would like Dr. Price to give a list of --

THE COURT:  Of any tests he may contemplate doing.

MR. ROBERTS:  -- to bring with him into the facility.

THE COURT:  Well, I don't know if he brings them in. I don't know if he's committed them to memory or -- no, it's not the list that he's going to use.  It's the list he's going to choose from.

MR. ROBERTS:  Okay.

THE COURT:  I don't think he has to commit till he sees him as to what kind of tests he's going to give.  I think the whole point is Mr. Wiseman wants a list of whatever he may be contemplating giving.  Is that right, Mr. Wiseman?

MR. WISEMAN:  That's correct.

MR. ROBERTS:  Okay.  I'll have Dr. Price provide that.

THE COURT:  And do we need some time lines on this?

MR. ROBERTS: Well, Your Honor --

THE COURT: Like a week before the testing?

MR. ROBERTS: -- all that can be set up. Dr. Price is available and ready to conduct his evaluation on June the 21st.

THE COURT: Mr. Wiseman, is a week in advance enough?

MR. WISEMAN: For the list of tests?

THE COURT: Yes.

MR. WISEMAN: Yeah, that's fine. That's fine. We had already talked about some dates, and I think there was no problem with the dates. The only question was the ones we presented to Your Honor. So I think we could work it out from here, in terms of the logistics.

THE COURT: Okay. And I'll just put in the order that it's been represented that Dr. Moore is not going to be administering any tests, just doing an interview. Is that right?

MR. ROBERTS: He does not intend to administer any tests to Mr. Bourgeois, other than a mental status exam.

MR. WISEMAN: And that's understood, Your Honor, by Petitioner, and that's totally fine.

THE COURT: I guess I'm just going to add in there that if he changes his mind and wants to do some tests, he has to disclose them to you a week in advance.

MR. WISEMAN: Okay.

THE COURT:  So at least we're covered on that.

MR. WISEMAN:  That's fine, Your Honor.  Thank you.

THE COURT:  Okay.  And then before -- before the videotaping of either one of these examinations, Mr. Wiseman is going to enter into a protective order?

MR. WISEMAN:  Yes, Your Honor.  Should I draft that, or does Mr. Roberts want to do that?

THE COURT:  Mr. Roberts, why don't you do that when you consult with your experts and see what they're concerned about.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Now, let's go to the Joint Pretrial Order.

MR. WISEMAN:  Yes, Your Honor.  The question was, I read your preferences, which refers to the form of order that is contained in the local rules.  And you know, at first glance, I just wasn't sure if Your Honor wanted us to actually use this form or not.  I mean, we've -- Mr. Roberts and I have talked about exchanging and pre-marking exhibits and expert reports by, you know, a particular date and all that.  I guess given all the writing we've already done in this case, if Your Honor was interested in us doing more writing.  And so that was the basic question.

(PAUSE.)

MR. WISEMAN:  I'm sorry.  Is everyone there?

THE COURT:  I'm sorry.  I'm thinking.

MR. WISEMAN:  Oh, okay.

THE COURT:  I'm reading through the order that I use, the Joint Pretrial Order.

MR. WISEMAN:  I thought maybe I got cut off.  I didn't hear anything.

THE COURT:  Stay with me, Mr. Wiseman.

(PAUSE.)

THE COURT:  I think we'll call it a Joint Hearing Order.  Okay?  And feel free to amend this any way you want when you do it together.  But I want in there just appearance of Counsel -- I've got -- have you got the usual Joint Pretrial Order in front of you?

MR. WISEMAN:  I have it in front of myself, Your Honor.

THE COURT:  Okay.  Paragraph 1, no 2, no 3.  I don't think there will be any motions.  So no 4, unless there are motions.  If there are motions, you can throw that in.  No 5, no 6, no 7, no 8, no 9, but all of 10.

MR. WISEMAN:  Okay.

THE COURT:  And 11.

MR. WISEMAN:  And 11.

THE COURT:  And at the end of Paragraph A, put in Rule 26 disclosures 60 days prehearing.  And we're going to call this a final hearing order.

MR. WISEMAN:  Your Honor, I think Mr. Roberts was going to bring up next the issue of expert reports.  I think the timing may be that he's -- we, between ourselves, talked about August 6th as a date for the exchange of expert --

THE COURT:  You know what, then we'll have all Rule 26 disclosures for experts by what, August what?

MR. WISEMAN:  August 6th was the date we had talked about.

THE COURT:  6th will be fine.

MR. ROBERTS:  Yes, Your Honor.  And with one caveat that Dr. Moore is doing his evaluation after Dr. Price, and he is obviously working on other, another case as well -- maybe not obviously, but, and he has one trip that has already been planned that he can't change, at the end of July.  So he has told me that he's going to work as diligently as possible.  I have an e-mail from him, and it -- that August 6th is very tight for him, but he's going to do his best to work within those deadlines.

THE COURT:  Well, why don't you just do an amendment, do a motion for an amendment if that becomes a problem.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  And Your Honor, just so the Court knows, I told Mr. Roberts we would be fine with reasonable continuances of that date, if his expert makes his best efforts.

THE COURT:  Okay.  So I don't think we need -- I think we're just talking about Paragraphs 10 and 11.  Certainly not 12 and certainly not 13.

MR. WISEMAN:  Okay.

THE COURT:  I don't think we need any of 14 either.

MR. WISEMAN:  Okay.

THE COURT:  And as I say, just cursorily looking through it, I don't think I've ever had but one of these before, and it wasn't my trial.  It was a State habeas.  So you all are probably more familiar with this than I am.  If you can think of other items that should appear in a joint hearing order, please feel free to add them in.

MR. WISEMAN:  Okay.  We'll do that.

THE COURT:  Anything else?

MR. WISEMAN:  Not from Mr. Bourgeois.

MR. ROBERTS:  Not from the United States, Your Honor, unless Ms. Booth or Ms. Salinas has anything.

MS. SALINAS:  No, Your Honor.

MS. BOOTH:  I don't have anything.

THE COURT:  And Mr. Roberts, I'm going to go ahead and issue the order about the videotaping.  But if you take that order to your experts, and there's something really that I haven't thought of or Mr. Wiseman hasn't thought of or you haven't thought of about that particular order that would be of concern to your experts that we might be able to address, you

can put it more specifically in a motion for rehearing. Because they weren't here today, and you just read the paragraph, and there may be something, instead of the general statements, more specific.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  See what I mean?  I don't know what, but I'm not the expert.  So anything else you all can think of?

MR. WISEMAN:  Not from Mr. Bourgeois.

MR. ROBERTS:  No, Your Honor.

MS. SALINAS:  No, Your Honor.

MR. ROBERTS:  Thank you for holding this conference so quickly.

THE COURT:  Oh, no.  That's what I do.  Y'all pay me for that.  All right.  Thank you all -- or the public pays us all for this.  Right?

MR. WISEMAN:  That's true.

THE COURT:  Thank you all very much.  You're excused.

(Proceedings concluded at 1:36 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    May 25, 2010
Molly Carter                        Date