IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

```
UNITED STATES OF AMERICA,      )    CRIMINAL ACTION
                               )
            PLAINTIFF,         )    CR-C-02-216(1)
                               )
VS.                            )    CORPUS CHRISTI, TEXAS
                               )    JUNE 9, 2010
ALFRED BOURGEOIS,              )    12:05 P.M.
                               )
            DEFENDANT.         )
..............................)
```

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES BY TELEPHONE FOR:

THE GOVERNMENT:                MS. PATTI HUBERT BOOTH
                               MR. TONY ROBERTS
                               MR. MARK DOWD
                               MS. ELSA SALINAS
                               ASSISTANT U.S. ATTORNEYS
                               800 N. SHORELINE, STE 500
                               CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:                 MR. MICHAEL WISEMAN
                               ASSISTANT FEDERAL DEFENDERS
                               SUITE 545 WEST, CURTIS BUILDING
                               601 WALNUT STREET
                               PHILADELPHIA, PENNSYLVANIA 19106

FC TERRE-HAUTE                 MS. MARY ELLEN DOUCETTE-LUNSTRUM
BUREAU OF PRISONS:

THE COURT RECORDER:            MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

(The proceedings began at 12:05 p.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. DOWD:  Mark Dowd for the United States.

MR. WISEMAN:  Michael Wiseman for --

DR. PRICE:  Dr. Randall Price --

MR. WISEMAN:  -- Mr. Bourgeois.

DR. PRICE:  Sorry.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MS. BOOTH:  Your Honor?

THE COURT:  Yes?  Yes?

MS. BOOTH:  This is Patti Hubert Book for the United States, and we have our two psychologists, I mean our two experts here, Dr. Price and Dr. Moore, and we would like to put on some evidence from both of these gentlemen as well as our chief of the correctional part of the BOP, but first Mr. Roberts has a couple of remarks he would like to make.

THE COURT:  Okay.  Remark away, Mr. Roberts.

MR. ROBERTS:  Yes, Your Honor.  I, there is also an attorney from BOP with --

THE COURT:  You need to speak up, please.

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette-

Lunstrum, Bureau of Prisons attorney at FC Terre Haute is also present.

THE COURT:  Okay.

MR. ROBERTS:  Thank you, Your Honor.  Tony Roberts for the United States, Your Honor.  This -- first of all, we thank you for giving us an opportunity to have this telephone conference.  This whole, the entire premise of the United States trying, attempting to get an evaluation conducted on Alfred Bourgeois is really premised upon Mr. Bourgeois not having taken the WAIS IV and --

THE COURT:  Not taking what?

MR. ROBERTS:  Not taking the WAIS IV, which is the new version of the IQ testing.  And it has come to our attention that, through a document we received from the Bureau of Prisons, that there was something conducted by the defense, some type of neuropsychological evaluation done in August of 2009, and if in fact Mr. Bourgeois has already been tested it may be a moot point.  And so I am sorry to bring this up at this point in time but I just received the document about within the last hour where a Dr. Victoria Swanson, with a member of the Federal Public Defenders trial team, Elizabeth Boren, had gone to the facility in August 19, 2009 to conduct a neuropsychological evaluation.  And so, I had spoken to Mr. Wiseman at our last hearing when he was here in Corpus and my recollection was that he assured me

that no one had, they had not done additional testing.  We do not have any evidence nor have been given any documentation regarding an August 2009 testing.  Our two experts who are on the phone have assured me that any kind of IQ testing at that time would have been the WAIS IV.  So we are a little bit concerned that maybe there is something we don't know.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor, Michael Wiseman.  Dr. Swanson in August of 2009 administered one instrument, the ADDAS.  I --

THE COURT:  I'm sorry, can you speak up?

MR. WISEMAN:  -- asked her to provide that to --

THE COURT:  Can you speak up, please?

MR. WISEMAN:  I'm sorry?

THE COURT:  Can you speak up?  I can't hear you.

MR. WISEMAN:  Sure.  Dr. Swanson, at our request, administered one instrument in August of 2009, it would be ADDAS, A-D-D-A-S, and that is a test for adaptive deficits, it's not an IQ test.  She did not administer a WAIS IV.  No doctor has administered a WAIS IV on our behalf.

THE COURT:  So what does that mean to you, Mr. Roberts?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  My, Dr. Moore has indicated to me that that's not a problem, that's an adaptive behavior test, and so we

are fine.  I just wanted to make sure, I had just gotten that information, I just wanted to make sure where we stood on the need to even press forward.  So, Your Honor, at this time, what I would like to do is have Mark Dowd introduce Dr. Price to you and have him, have Dr. Price give you his position on the and his objections to having the testing videotaped, and then we will proceed with Dr. Moore and then the Bureau of Prisons objection.

MR. WISEMAN:  Michael Wiseman here, Your Honor.  Is this going to be in the form of question and answer?

THE COURT:  I assume.  Do you want to do it in the narrative, Mr. Dowd?

MR. DOWD:  Your Honor, to save time and because of the electronic difficulties here, I would --

THE COURT:  I'm sorry, are you on a speaker phone, Mr. Dowd?

MR. DOWD:  I am not, Your Honor.

THE COURT:  Okay.  How do you want to do this?

MR. DOWD:  I was going to ask Dr. Price some rather leading questions just to permit him to get his views heard.

THE COURT:  Okay.

MR. DOWD:  I could do it --

THE COURT:  Let's just start it.

MR. DOWD:  -- is what I'm saying.

THE COURT:  Put him under oath, Ms. Scotch.

THE CLERK:  Yes, Your Honor.

RANDALL PRICE, GOVERNMENT'S WITNESS #1, SWORN

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Please.

DIRECT EXAMINATION

BY MR. DOWD:

Q   Dr. Price, would you state your full name for the record and spell your last name, please?

A   Yes.  My full name is Jack Randall Price and my last name is spelled P-R-I-C-E.

Q   Would you briefly advise the Court of your credentials?

THE COURT:  I can't hear you, Mr. Dowd.

THE WITNESS:  I am a psychologist, a forensic psychologist and neuropsychologist.  I have been practicing psychology in the state of Texas for 26 years and I have been a professor of psychology for 38 years.  I am licensed to practice psychology in the states of Texas and Oklahoma.  I am board certified in forensic psychology by the American Board of Professional Psychology and I am board certified in neuropsychology by the American Board of Professional Neuropsychology.

BY MR. DOWD:

Q   Dr. Price, have you had occasion to be contracted by both the defense as well as the state or the government in offering opinions about psychological testing?

A    I have.

Q    And what would you tell the Court as far as the approximate breakdown between those two parties?

A    Since -- oh, and this is -- I think I am supposed to identify myself each time, is that correct?

Q    That's correct.

A    Okay.  I'm sorry, this is Dr. Price.  Since 1984, which was the first time I testified, I have testified at the request of the defense approximately 60 percent of the time and at the request of the state or the prosecution approximately 40 percent.  In <u>Atkins</u> cases such as this, I have testified five times at the request of the prosecution and three times at the request of the defense.

Q    All right.  Mark Dowd.  Dr. Price, I think you wanted to make three --

            THE COURT:  Mr. Dowd, could you speak up, please?

BY MR. DOWD:

Q    -- points.  The impact of third-party observers, whether they are present or whether it's in the form of a video or audiotaping, could you address your concern on that issue?

            THE COURT:  I, Mr. Dowd, I cannot hear you.

            MR. DOWD:  Oh, you cannot hear me, Judge?

            THE COURT:  No.  Please speak up.

            MR. DOWD:  All right.

BY MR. DOWD:

Q   Dr. Price, I would first like you to address any distinction between third-party observers, whether they are actually present or by virtue of a video or audiotaping.

A   It's -- this is Dr. Price.  The official statement of the National Academy of Neuropsychology holds that observer effects also extend to situations where the person, the observer is not actually present but is present through some sort of electronic apparatus.  At least two empirical studies published in the Clinical Neuropsychologist and in the Journal of Forensic Neuropsychology show that audio and videotaping of psychological testing has the same effect as an, as the actual presence of an observer.

THE COURT:  And what is that?

THE WITNESS:  It is that it -- and this is Dr. Price, I'm sorry -- that the presence of an observer has an effect on the test results in such a way that it prevents us from comparing the examinee's performance to the established norm because the standardization of the test did not include third-party observers.  And any factor that compromises the standard administration of the psychological test jeopardizes the validity and the reliability of the test results due to those.  The presence of an observer is a distraction both external and internal, it interferes with the rapport of the examiner and the examinee and it alters

the behavior of the examinee through what has been studied empirically as the social facilitation effect where observers lower the performance of the examinee on complex test questions and items and may increase the performance on easier, overlearned items.

THE COURT:  Have you ever tested anybody on death row without a guard around?

THE WITNESS:  I have.  Not in the -- on every occasion there has never been a guard in the room when I have tested a --

THE COURT:  Where are the guards?

THE WITNESS:  Excuse me?

THE COURT:  Where are the guards?

THE WITNESS:  They are outside, outside the room.

THE COURT:  Are they looking in?

THE WITNESS:  This is Dr. Price.  Yes, sometimes they will but typically they -- it depends on the prison.  In Texas there is a window and periodically they will look in to see if everything is okay.

BY MR. DOWD:

Q   Mark Dowd, Your Honor.  Dr. Price, did you have occasion to audiotape a psychological test on an Edward Fields?  And if you did, explain to the Court the circumstances of that.

A   Yes.  This is Dr. Price.  In 2005 I conducted a psychological evaluation of Edward Fields in Oklahoma.  It

was pre-trial.  There was, as I recall, a court order for a third-party observer, the defense attorney, and I voiced my concerns about having her in the room while I conducted the evaluation and we compromised and I did make an audio tape of that evaluation and provide it to the defense attorney.  And at that time I agreed to do that, and I wouldn't again but I did it then.

Q   And how far --

THE COURT:  Well, did that compromise your test?

BY MR. DOWD:

Q   -- into the case -- I'm sorry.

THE COURT:  Did that compromise your test?

THE WITNESS:  It -- this is Dr. Price.  In that particular case I didn't think that it did.  The individual was quite intelligent and very assertive and outgoing and I did not think that, in that case, that it did compromise the test results, Your Honor.

THE COURT:  Well, if it does compromise, can you adjust for that?

THE WITNESS:  You -- this is Dr. Price, I'm sorry.  There is no quantitative way to adjust for that.  I would have to simply say that there was an observer either electronically or in person and that may have had an effect on the results.  We don't know how much and on what subtest to make any kind of an adjustment.  There is no, no

scientific procedure for that.

BY MR. DOWD:

Q   Dr. Price -- Mark Dowd here -- do your professional rules or ethical standards dictate whether or not third-party observers may be present?

A   This is Dr. Price.  The various professional organizations of which I am a member have official policy statements some of which explicitly say third-party observers should not be present.  Some have some exceptions for that, that, all say, though, that the psychologist should follow carefully the standardization, the standardized procedures for administering and scoring the test, and that any deviation from that may have an effect on the test results and invalidate them.  These groups that have such statements are the National Academy of Neuropsychology, the American Academy of Clinical Neuropsychology and the Texas Board of Examiners of Psychologists have an admonishment to follow exactly what the procedures are, and the Standards for Educational and Psychological Testing also indicate that it is the ethical and professional obligation of the psychologist to follow those procedures exactly.  In the case of the WAIS III, in the manual it stated that no other person other than you should be in the room during the testing.

Q   Finally, Dr. -- Mark Dowd, Your Honor.  Finally, Dr. Price, do you have a concern about the security of the

future reliability of the psychological testing?

A    This is Dr. Price.  I do.  The, for any test the valid use of that test depends on the examinee's unfamiliarity with the test items, and any procedure that places the test protocols and items in the hands of anyone other than another qualified mental health provider is problematic.  And again, those same professional organizations that I cited earlier all say that it is our ethical obligation to protect the security of the test materials.  And included in that, again, in Texas is the Board of Examiners rules and regulations for psychologists that state that test protocols and data should be kept in a secure manner that does not compromise the validity of that test.

THE COURT:  Well, are you going to give him the same test that he already had with his own psychologist?

THE WITNESS:  This is Dr. Price.  No, those tests are old and at this time considered to be outdated.  At least the IQ test, Your Honor.

THE COURT:  Okay.

THE WITNESS:  There are also -- this is Dr. Price. There are also other tests that we give in a forensic evaluation that are very important to assess the individual's effort to see that they are not intentionally trying to do poorly, and those tests, the procedure in them needs to be kept secure so that those tests continue to give us a way to

empirically assess the person's, how hard they are trying and if it's a valid evaluation.  These tests take years to develop.  They have to be standardized.  They take, the IQ tests, the WAIS III took over five years and the WAIS IV closer to seven, in which they have to test, to standardize these tests they have to test over 5,000 individuals across the United States to develop the norms, and if we didn't, if we don't have those tests kept in a secure fashion, that it would lead us to have to assess such things as intelligence in a subjective fashion as opposed to a more --

THE COURT:  Well, there is no reason to think, Doctor, if I enter a protective order that it will be violated.  I have no reason to assume that.  I have entered literally thousands of protective orders without any problem.

THE WITNESS:  This is Dr. Price.  Yes, ma'am.

MR. WISEMAN:  Your Honor, it's Michael Wiseman.  May I ask a few questions?

THE COURT:  Sure.

MR. DOWD:  Your Honor, I just had one final question, if I might.  Mark Dowd.

THE COURT:  Okay, Mr. Dowd, finish up.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q   Dr. Price, would your, any part of your evaluation, would it implicate any comments by Mr. Bourgeois relating to the

facts of the case or how would you react to, how do we keep the facts of the case out of your results?

THE COURT:  Why would you have to?  It's not a confidential examination.

THE WITNESS:  This is Dr. Price.  Your Honor, if I may, I would be assessing his intelligence and would not need to ask and would not ask any questions about the offense, and if he did begin to talk about that for some reason, I would stop him.

THE COURT:  Why?

THE WITNESS:  It is not necessary or relevant to my assessment of his intellectual functioning.

THE COURT:  Okay.

MR. DOWD:  I would pass the witness, Your Honor.

THE COURT:  All right.  Mr. Wiseman, you may proceed.

MR. WISEMAN:  Thank you, Your Honor.  This is Michael Wiseman.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Doctor.

A   This is Dr. Price.  Good afternoon, Mr. Wiseman.

Q   Dr. Price, the guideline that you refer to is the American Psychological Association ethical guidelines of conduct --

A    Yes?

Q    -- regarding test security?

A    This is Dr. Price.  If I understand the question, does the APA Ethical Code speak to test security?

Q    Yes.  You, Doctor, I'm sorry, Mr. Robertson and Ms. Booth in their pleading indicated that you would testify with respect to the APA Ethical Code of Conduct Standard 9.11, and they paraphrased it as saying it requires psychologists to maintain the integrity and security of tests, and my question is did you in fact rely on the APA Ethical Code in your conversation with the Government?

A    This is Dr. Price.  I did.  I told them or I sent them information indicating the various professional organizations and ethical codes, official statements that influence my opinions.

Q    And I just want to read to you a sentence or two from that code of ethics.  This is an accurate reading of Standard 9.1, Maintaining Test Security.  "The term test materials refers to manuals, instruments, protocols and test questions with stimuli, and that includes test data as defined in 9.04.  Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations and in a manner that permits adherence to this ethics code."  Is that an accurate statement of what's contained in that

portion of the code?

A   In 9.04?

Q   No, 9.1.

A   9.1.  This is Dr. Price.  I have the code in front of me and there is a Section 9 on assessment and there is a Section 9.01 and then the 9.04.  I don't see a Section 9.1.

Q   All right.  Doctor, is there a section that's captioned Maintaining Test Security?

A   Yes, sir, that's 9.11.

Q   9.11.  My mistake.  In that section does it say, "Psychologists shall make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations"?

A   This is Dr. Price.  It does, yes, sir.

Q   Okay.  And so there is no prohibition on audio or videotaping in the section on maintaining test security?

A   There -- this is Dr. Price.  There is no prohibition on the audio or videotaping of psychological testing in the APA Code of Ethics, that's correct.

Q   Okay.  And is it your view that if Judge Jack orders the examination to be videotaped that, with a protective order, that you would not be engaged in reasonable efforts to maintain test security?

A   This is Dr. Price.  I think, while I think that would be a reasonable effort to maintain test security, my concern is

more about the test results, reliability and validity.

Q   Okay.  So the ethical issues that the Government maintains that were put in their motion -- did you review that, by the way?

A   I have.

Q   Okay.  The ethical issues in that motion are really not the problem at this point, is that right?

A   This is Dr. Price.  I wouldn't say they are not a problem.  I would still have concerns.  If anybody has the, who is not a qualified mental health professional has the opportunity to review the audio or videotape of the testing, that is still a concern, and if no one was going to view it other than perhaps the Judge, I don't, I wouldn't have a problem with it.  I am still concerned about it, but your question about is that a reasonable effort to protect the security of the test, I do think it's a reasonable effort.  I am --

Q   Okay.  And, Doctor, if you took that reasonable effort, in other words, submitted to the Judge's order that the examination be videotaped, you don't really fear losing your license, do you?

A   This is Dr. Price.  No, I don't fear losing my license under those conditions, no.

Q   Or being otherwise sanctioned?

A   Excuse me?

Q    Or being otherwise sanctioned by the Texas authorities?

A    This is Dr. Price.  It's my -- I don't think so.  I mean, I would hope not.

Q    Nor would we.  Now, with respect to the potential effects of third-party or -- and to be clear, we are not talking about third parties, per se, we are talking about the presence of a videotape which you would operate.  Your view is that there are two empirical studies that show that audio and videotaping has the same effect on testing as the presence of a third-party observer?

A    This is Dr. Price.  I cited my knowledge of two studies that show that audio and videotaping of psychological testing has the effect of altering the performance and, of an examinee, and it's an unnecessary distracter.

Q    And did I understand you to say, Dr. Price, that the, these alleged variances in performance have not been quantified by these studies?

A    This is Dr. Price.  No.  If that -- that's not what I testified to.  That they do have, there is empirical evidence that third-party observers and electronic substitutes for that are deviations from the standardization of the test and have an empirical effect on the test results.

Q    Okay.  My question was do they quantify, these studies, the degree of effect?

A    This is Dr. Price.  I'm sorry that I didn't understand

that question.  There is no study that I know of that can reliably quantify how much of an effect that would have in that particular evaluation, no, sir.

Q   What's changed between your evaluation -- oh, before we get to that question, in Mr. Field's evaluation that you spoke about earlier you indicated that you engaged in a compromise and agreed to audiotape rather than have the lawyer present, is that right?

A   That's my -- this is Dr. Price.  Yes, that's my recollection of that case, yes, sir.

Q   Okay.  And what's changed since that evaluation in late 2004 and now that leads you to say you wouldn't agree to such a compromise again?

A   This is Dr. Price.  My further study of the matter, conversations with colleagues, the review and the expansion of this, it's become a more frequent request, and I, my opinion about it has evolved over the last five years.

Q   And would you agree that none of the various associations or societies or academies that you spoke of earlier have an absolute bar on videotaping?

A   This is Dr. Price.  There are no official statements that I know of that say an absolute bar.  They make recommendations for those of us practicing in the field to avoid third-party observers, either actual observers or electronic substitutes.

THE COURT:  Well, you really can't do that in a federal death row, avoid observers at all.

MR. WISEMAN:  I'm sorry?

THE COURT:  I can't imagine you can avoid observers on death row.

MR. WISEMAN:  Well, that's true enough, Your Honor. That was Michael Wiseman, for the record.

BY MR. WISEMAN:

Q   Dr. Price, so absent an across-the-board prohibition in any of the relevant academies or associations governing these issues, you would agree that it's a case-by-case determination to be made by the Court and the forensic evaluator and, of course, the lawyers?

A   This is Dr. Price.  Yes, I would agree that there are exceptions to this and in certain situations a third party is allowed, an interpreter, in other situations like with a child who is afraid and the calming presence of the parent allows for a more valid evaluation, and it's because of those exceptions, that's the reason that these organizations do not have an absolute prohibition on this.

Q   Okay.  Those are not the only exceptions to having an audio or videotape done of an evaluation, would you agree?

A   This is Dr. Price.  I am sure there are other exceptions, yes, sir.

Q   All right.

MR. WISEMAN:  I have no further questions of the witness, Your Honor.

THE COURT:  Thank you.  Do you have another witness?

MR. DOWD:  Nothing further from this witness, Your Honor.

(Sound of voices in background)

THE COURT:  I'm sorry, is somebody speaking?  Hello?  I'm sorry, I cannot hear anybody right now.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  Can you hear me now?

THE COURT:  Yes.

MR. WISEMAN:  I can as well.

MR. ROBERTS:  I'm sorry, I had my phone on mute.  That makes it difficult to communicate with the Court, so.

THE COURT:  It does.

MR. ROBERTS:  But this is Tony Roberts for the United States, Your Honor.  We would like to proceed with Dr. Moore at this time.  And just before I do that, Your Honor, I wanted to clarify something that was insinuated in Mr. Wiseman's questioning of Dr. Price, and that is that the main concern is on the ethical aspect of maintaining the security of the testing.  If I, if my comments on our previous telephone conferences have indicated that, that was just one of the concerns that our experts have voiced, and if I was inarticulate in presenting this, the real concerns, the

biggest concerns that they have voiced --

THE COURT:  Well, you told me he said he was worried he was going to lose his license.  That's about as clear as you can get.  And in fact, if ordered to do, if I ordered a video-conference, videotaping, he wouldn't do it.

MR. ROBERTS:  Yes, Your Honor.  And I believe his position is still that.  He is still on the phone, we can, I mean, certainly ask him if he would do it at this point in time if you ordered it.  I don't think that question, that question was not asked of him.  But the point was that he informed us, Dr. Price did inform us that he had ethical concerns that could affect his license and his practice.

THE COURT:  Right.

MR. ROBERTS:  And I don't think I ever went as far as to say he would lose his license but perhaps I did, and if I did, I misspoke.

THE COURT:  Okay.

MR. ROBERTS:  So --

MR. WISEMAN:  Your Honor, this is Michael Wiseman. I, you know, and I don't think there was any intentionality here but I am feeling a little bit sandbagged when the Government's motion focuses almost entirely with respect to the doctors on the ethical issues.  There is a passing mention, which I actually pointed out in my response, to impact on tests.  I was prepared today to deal primarily with

the ethical issues; now I am told those are small potatoes and it's really the effect.  So I am feeling a little bit sandbagged.  I'm not sure I have any specific application to make but I just thought I would make the Court aware of that view.

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  I don't know if that necessitates a response from the United States or not but I, I simply, my intention in our motion was to request reconsideration so that the experts could better articulate the basis for their positions and that it was clear on, especially on the, on Monday, that I was inarticulate in being able to voice --

THE COURT:  Well, show me in your motion where you talk about a third-party problem.

MR. ROBERTS:  Your Honor, the, any time I mention that the --

THE COURT:  Just show it to me in your motion, just quote it.

MR. ROBERTS:  Your Honor, if you will give me a moment, I have got the motion in front of me.  Yes, Your Honor.  At the bottom of page 5 in our motion, in quoting some of the concerns of the National Academy of Neuropsychology, "The presence of a third-party observer during the testing recognizes the distracting effect of the presence of people other than the examiner and the examinee

in the testing room," and it mentions, "The presence of a third party in the testing room is also inconsistent with the standardization test administration requirements and performance on complex tasks, leading to a seriously flawed picture of neuropsychological defect."  So, there is also, on page 6, a mention of --

THE COURT:  But that has to do with a counsel's presence and that's not going to happen.

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  Well, page 6 has to do with counsel's presence and we are not talking about counsel's presence.

MR. ROBERTS:  Yes, Your Honor.  The entire motion was about reconsidering the videotaping, though.

THE COURT:  Right.

MR. THORPE:  When I mention on page 6 at the very, at the top paragraph with Dr. Moore having similar objections, I mentioned he would testify about the specific concerns he has regarding the negative impact on the validity, liability and objectivity of the test results if the evaluation is videotaped or a third person is present.

THE COURT:  But you talk about counsel's presence during a mental examination.

MR. WISEMAN:  Your Honor, this is Michael Wiseman. I think that's part of the problem here.  I mean, you know, when I do motions to reconsider I usually attach declarations

from witnesses with specific averments and references.  I mean, I don't know what these studies that the Doctor referenced say.  I don't know if there are counterstudies. And as the Court, I think, points out, the one little paragraph at the bottom of page 5 talks about third-party observers and does not specifically discuss the effect, if any, of videotaping --

THE COURT:  Okay, move on.  Anything, any other examination of Dr. Price?

MR. WISEMAN:  Not from the petitioner, Your Honor.

THE COURT:  Okay.  Do you have anything further from Dr. Price, Mr. Dowd?  Okay, then you want me to hear from -- can I hear from the Federal Bureau of Prisons, the Terre Haute deal?

MR. ROBERTS:  Yes, Your Honor.  Tony Roberts for the United States.  They are on the line as well.  I think their input is going to be short.  But there was one more question that Mr. Dowd would like to ask Dr. Price.

THE COURT:  I would like to hear from the Bureau of Prisons right now, please.

MR. ROBERTS:  Okay.  Your Honor, we have, we have Captain Hector Joyner on the line, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  And --

THE COURT:  Is she an attorney or --

MR. ROBERTS:  Captain Joyner, he is not an attorney, Your Honor, he is the -- in fact, Captain Joyner, are you there?

MR. JOYNER:  Yes, I am.

THE COURT:  Okay.

MR. ROBERTS:  Would you state your name and your position on the record, please?

MR. JOYNER:  My name is Hector Joyner.  I am currently the chief correctional supervisor of the Federal Correctional Complex in Terre Haute, Indiana.

MR. ROBERTS:  It's my understanding we also have an attorney on the line that is the counsel of -- she will not be testifying, though, is that correct?

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette-Lunstrum.  That's correct, I will not be testifying.

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette --

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Bureau of Prisons attorney, and --

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Okay.  Can you hear me now?

THE COURT:  Okay.  I can't hear the counsel, so does somebody else want to speak for the, does Mr. Joyner want to speak?

MR. ROBERTS:  Yes, Your Honor, I will -- Tony Roberts for the United States.  I will, Ms. Mary Ellen Doucette-Lunstrum simply said that she is the counsel, she is counsel participating but will not be testifying, she is just listening.

THE COURT:  Oh, okay.  Then go ahead with Mr. Joyner.

MR. ROBERTS:  Yes, Your Honor.  Mr. Joyner --

THE COURT:  Let me administer the oath to him, please.

MR. ROBERTS:  Yes, Your Honor.

HECTOR JOYNER, DEFENDANT'S WITNESS #2, SWORN

THE COURT:  Okay, go ahead, Mr. Joyner.

THE WITNESS:  Sorry, Your Honor?

THE COURT:  Go ahead, tell me what you want to tell me.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q   Yes, Mr. Joyner, would you please inform the Court of the security concerns that you have with regard to a particular inmate, being allowed to videotape his --

THE COURT:  This is not for the benefit of the inmate.

THE WITNESS:  Okay.  Hector Joyner.  As the complex captain, I am the custodial security expert in relation to --

THE COURT:  For death row there?

THE WITNESS:  -- institutional security, and I am concerned about the delicate balance and the stability within the unit which would create tension within the special confinement unit.

THE COURT:  Well, why would anybody know about it?

THE WITNESS:  Well, there's a couple of reasons, Your Honor.  First of all, the inmates that are pulled, that are removed from the cells within the unit itself, it's a pretty visible unit, Your Honor, and the officers would in fact have to remove him from the rest of the housing units within the cells, and because of some of the other inmates that are in there that are working on their cases, they actually have access to the law libraries and other accesses to their recreational period, so they would in fact see Inmate Bourgeois being removed and extracted from that particular section of the unit and put in a separate section.

THE COURT:  Yeah, well, doesn't that happen any time he has an attorney visit or any time he has his own psychologist come and examine him?

THE WITNESS:  Yes, he does.

THE COURT:  So I am not getting the problem.

THE WITNESS:  Well, it would, I feel that it would elevate him to a certain level of notoriety, thereby giving the appearance of a preferential treatment of one inmate over

the other in relation to a videotape.

THE COURT:  I don't, I don't understand that.  Is there any other concern you have?

THE WITNESS:  Well, we have, in the, that's been requested in the past and due to the security concerns, especially with videotaping with inside a secure facility, we have not allowed that to happen.  There's structures, there's keys, there's  designs, the towers --

MR. ROBERTS:  Your Honor, this is Tony Roberts for the United States.

BY MR. ROBERTS:

Q   Could you inform the Court as to how the inmates interact with each other?  You mentioned, I don't think you explained well enough to --

THE COURT:  Oh, I think I know that, Mr. Roberts.  I believe this is the same security that allowed Mr. Bourgeois to interact with a guard and get messages out to the outside, which is extremely dangerous, so I don't, I am not really impressed with the security there.

MR. ROBERTS:  Yes, Your Honor.  And I think one of the things I would like to --

THE COURT:  So I know how they interact with each other and with the guards, apparently.

MR. ROBERTS:  Yes, Your Honor, and there, and we do have those --

THE COURT:  And if it hadn't been an inmate bringing that to the institution's attention, that guard would still be there passing messages.

MR. ROBERTS:  Yes, Your Honor, and --

THE COURT:  Anything else about the inmates contacting each other?

MR. ROBERTS:  Yes, Your Honor.  There was, I believe Captain Joyner can speak to the fact of an inmate being able to communicate with others that he had received special treatment.

THE COURT:  What is special treatment about having a government-appointed, a government-hired psychologist go in and examine him?  I am not understanding the special treatment there.

MR. ROBERTS:  Well, obviously, Your Honor -- Tony Roberts --

THE COURT:  You are the one who wanted the examination and now I hear from the guard that's special treatment.

MR. ROBERTS:  Not --

THE COURT:  I find this entire conversation absolutely ridiculous.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  It's not --

THE COURT:  So, apparently Terre Haute doesn't allow

videoing so it's just not going to happen?

MR. ROBERTS:  Yes, Your Honor.  The special treatment is --

THE COURT:  I thought I understood from your motion that they had allowed it in the past.

MR. ROBERTS:  Well, here is the problem, this is one of the things I wanted Captain Joyner to address, and that is that in 2005 a videotaping was allowed under different circumstances because they were in an old, older facility, and in fact Michael Wiseman, it is my understanding, was involved in the case, and so they were allowed to do it at a different time in the facility.  The facility is changed now and it's, and I would like for Captain Joyner to talk a little bit about the difference from 2005 to the present because there is a vast difference in the circumstances surrounding what would happen if we went ahead with the videotaping of Alfred Bourgeois at this time.

MR. WISEMAN:  Your Honor, this is Michael Wiseman. Just perhaps for purposes of expediency, if we could talk about the Government's application made in the Nelson case a couple of months ago to have videotaping done, we can compare apples to apples.

THE COURT:  Yeah, could you tell us about that? What happened with that, was it videotaped at Terre Haute or not?

MR. WISEMAN:  Well, Your Honor, the -- this is Michael Wiseman.  I pulled up the order that the Court entered subsequent to that application and what the Court did was it said because the defense did not want it done -- I will read the order, paragraph 7 of the order dated May the 19th of this year, quote, "In lieu of defense representation during government testing and evaluation," -- I'm sorry, I'm reading the wrong paragraph.  Here it is.  "The Government proposes that the examination be both audio and video recorded.  In support of this the Government cites the ADA mental health standards.  Nelson's counsel opposes this condition and states that this standard was enacted to protect the rights of the defendant and is not" --

THE COURT:  Who was opposed to it?

MR. WISEMAN:  The prosecution.  "The Court, the Court agrees that since the purposes of the recording is to protect the defendant, since Nelson's counsel does not wish the examination to be recorded the Government has no right to insist on this condition.  The Court does also allow counsel to be present via a video feed."  So my point in all this, Your Honor, is that when the Government in April of this year made the application to have videotaping done at Terre Haute, was Captain Joyner involved in that discussion and why was the Government permitted to --

THE COURT:  Was Captain Joyner involved in that

discussion, Mr. Roberts?

MR. ROBERTS:  I am not sure, Your Honor.  I just found out that there was this other scenario yesterday where another Assistant U.S. Attorney's Office had made a request to videotape it, and I have put a request in just this morning to our Capital Crimes Unit in Washington, D.C. asking if we, if there is any type of guidance that they are giving to the Department of Justice employees with regard to videotaping, because it's quite troubling to me that, that there is, you know, that there are different approaches that are being taken here, and I'm just curious whether or not Mr. Wiseman knows whether it's Dr. Martell that is advising that U.S. Attorney or not.

MR. WISEMAN:  Yeah, as I indicated in my response, Dr. Martell is in fact involved in that Nelson case, and that was all in my response.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  What my perception is, is as an Assistant U.S. Attorney I don't have expertise in mental retardation, I rely on my experts.  Mr. Wiseman is exactly correct that we had contacted Dr. Martell in 2008.  I made a proffer to the Court on Monday that the reason that we started using Dr. Price and Dr. Moore is because I got focused on the Flynn Effect issue and, relying upon both Dr. Price and Dr. Moore, I have been told that this adversely affects the validity of the testing.

I inadvertently --

THE COURT:  But, see, if there are guards watching, Mr. Roberts, I don't understand about the third-party effect.

MR. ROBERTS:  Well, Your Honor, Dr. Moore could, if he could just --

THE COURT:  Mr. Joyner, when you have inmates visited on, by their attorneys, is there, are they observed through a window?

THE WITNESS:  Yes, they are, Your Honor.

THE COURT:  Continuously, I would assume?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  And so if they are given testing by, apparently Mr. Bourgeois has had testing by his own psychologist, so they were observed also continuously?

THE WITNESS:  Yes, they were.

THE COURT:  All right.  So, I think we move on from the third-party problem and tell me something else.

MR. ROBERTS:  Your Honor, I guess the problem is that, I mean, the continuous observation is not that they are standing there looking inside and the guards are certainly not listening to what's going on inside, and it's not even apparent that, I mean the guards are around all the time so the, I mean I think in that particular scenario --

THE COURT:  Mr. Roberts, move on to something else.

MR. ROBERTS:  Okay.  Well, Your Honor, I mean I have

Dr. Moore here that can testify about what the national standards and the standardization are and how these psychological industries have determined.

THE COURT:  Well, make it quick.  I have got ten minutes left before my jury comes back.

MR. WISEMAN:  Your Honor, I had a question of Captain Joyner, if I could?

THE COURT:  Yes, sir.

MR. WISEMAN:  I assume that's what the Court is still interested in hearing about?

THE COURT:  Yes, sir.

MR. WISEMAN:  Okay.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Captain Joyner, were you shown the letter of May 7, 2010 from Warden Marberry to counsel Gary Rotherington?

A   Hector Joyner.  Yes, I was.

Q   All right.  And in that letter it indicates that, "Every request for video and audio recording was carefully reviewed and considered on a case-by-case basis.  The decision is based on the individual facts and circumstances of each particular request," close quote.  Have you done a particularized individual determination as to whether video, I'm sorry, videotaping is, raises special security concerns in Mr. Bourgeois' case?

A   Yes, I have, and what I would say is, and I believe Mr. Roberts was wanting, before you-all got back and forth, there was a previous videotaped examination in the special confinement unit but that was back in early 2005 at the old United States penitentiary.  During that transition period, the new United States penitentiary opened in March of 2005. The primary penitentiary inmates at the old facility had been moved to the new facility.  In 2005 when that videotaping was conducted, the special confinement unit inmates, they had not moved over until July of 2005.  Since then, again going back to the structural design, it is completely different design in relation to the pathways and the entries into the particular facilities, and the way design is now it could potentially disrupt institutional operations based on it is, when you talked about apples and apples, Mr. Wiseman, it is truly now structurally apples and oranges in relation to where the special confinement unit is now.

Q   All right.  Let me --

THE COURT:  I don't understand why it would interrupt institutional activities any more than an attorney visit or a visit from somebody else, from his own psychologist.  What's the difference?

THE WITNESS:  The difference is before the attorneys --

THE COURT:  I'm talking about right now.

THE WITNESS:  Oh, well, because right now we shut, we basically shut the institution down to allow attorneys or visitors or things of that nature to enter into the new special confinement unit.

THE COURT:  I am not, I am still not understanding why you wouldn't shut it down to bring, to have this psychologist, a government-requested psychologist come visit Mr. Bourgeois.  Why would you mind shutting it down for that?

THE WITNESS:  Well, in order to do it, I mean we would --

MR. WISEMAN:  Your Honor, this is Michael Wiseman --

THE COURT:  Let me hear from Mr. Joyner, please.

THE WITNESS:  Yes, ma'am.  If you, if your, if your order, if the Court orders us to shut down institutional operations --

THE COURT:  I am not ordering you to shut down institutional operations.  I am just amazed that you would let the defendant's psychologist come in and test him and have some objection to the U.S. Attorney's request for coming in and being tested.

THE WITNESS:  Well, Your Honor, we have not --

MR. ROBERTS:  Your Honor, Tony Roberts --

THE WITNESS:  We have not allowed videotaping in the special confinement unit at this new location.

THE COURT:  Pardon?  I can't understand you, what

are you saying?

THE WITNESS:  I said, Your Honor, we have not allowed videotaping in the new special confinement unit since it opened.

THE COURT:  Why is that?

THE WITNESS:  Well, because some of the reasons that I have stated.

THE COURT:  No, I didn't get any of those reasons. What were the reasons?

THE WITNESS:  The reasons were about the structural designs and concerns, the difference between the entry and the pathways, the location of the special confinement unit.

THE COURT:  We are talking a handheld video.  What is the problem?

THE WITNESS:  Well, again, Your Honor, the handheld video, filming inside of the secure special confinement unit would --

THE COURT:  We are talking about the, whatever room you put the attorneys in.

THE WITNESS:  Right, Your Honor, but, again, I know what you --

THE COURT:  Do they see something that threatens your security when an attorney comes in?

THE WITNESS:  Videotaped, yes, Your Honor.

THE COURT:  I'm sorry, when the attorney comes in,

do they scrutinize the area and create some risk to your security?

THE WITNESS:  No, they don't, they don't create any risk, but it's not secure --

THE COURT:  Why?  What's the difference between the defendant's attorney coming in looking and a video?

THE WITNESS:  Well, again, the video potentially could not only give Mr. Bourgeois a little bit of notoriety --

THE COURT:  How?

THE WITNESS:  I understand what you said, Your Honor, about the protective order, but if this video could potentially wind up on a YouTube or some sort of public website --

THE COURT:  Okay, that's your concern.  I just was trying to isolate the concern.

THE WITNESS:  That's main, my main concern, I mean as far as whether or not, again, in respect to your protective orders, I just would, really would not want that video to wind up on a public website and eventually violate, or, you know, decrease the security, potential security within the special confinement unit.

THE COURT:  Well, what would a video see, by the way, inside the attorney visiting room or the psychological examination room?  What would they see that would endanger

your security?

THE WITNESS:  Well, initially they are going to see the actual, the layout of the room itself, whether --

THE COURT:  Well, doesn't everybody that goes into it see the layout?  I mean somebody that goes in and looks at it could draw it out very clearly, couldn't they?

THE WITNESS:  Yes, they can, Your Honor.

THE COURT:  Okay, so what else?

THE WITNESS:  As far as the actual physical design and whether or not, whether you see bars, walls, concrete, steel, mesh --

THE COURT:  Well, isn't that what everybody sees in the room?

THE WITNESS:  Yes, Your Honor.

THE COURT:  What else would be compromised?

THE WITNESS:  Everybody that has access, they can create or draw anything they want as they see it --

THE COURT:  And put it on YouTube.

THE WITNESS:  It could not potentially wind up on some sort of public website.

THE COURT:  Sure.  Okay.  Anything else?  Did you want to put on --

MR. ROBERTS:  -- for the United States.

THE COURT:  Pardon?

MR. ROBERTS:  Tony Roberts for the United States.

THE COURT:  Mr. Roberts, either you want to do this examination or you don't.  I am not understanding where you are coming from.

MR. ROBERTS:  Well, Your Honor, I just want --

THE COURT:  Why you want to actually sink your own examination is beyond me.

MR. ROBERTS:  Well, Your Honor --

THE COURT:  It's clear there are no legitimate concerns by the institution, so either you put them up to this, which is really distressing --

MR. ROBERTS:  Well, Your Honor, I --

THE COURT:  I am just not understanding your interest in this.

MR. ROBERTS:  My interest is obtaining a valid, usable --

THE COURT:  Didn't you hear Dr. Price say that he did one by audio and he didn't think it at all compromised the results of the test?

MR. ROBERTS:  In that case.  In that case, Your Honor, is what he said, and --

THE COURT:  Yeah.  Well, why would you think it would in this?  I mean why not give it a try and he will know if it's compromised and we will talk about it then?

MR. ROBERTS:  First of all, Your Honor, we know, we know some of how Alfred Bourgeois is and what we have seen at

trial.  I think Dr. Moore had some really valid comments to make with regard to the validity of the test both to the defendant and to the United States and to the Court.  I think the Court --

MR. WISEMAN:  Your Honor, Dr. Moore -- this is Michael Wiseman.  My understanding of Dr. Moore's --

MR. ROBERTS:  Your Honor, I think the Court was interested in the truth of whether Mr. Bourgeois is mentally retarded or not and I think maybe we have gotten --

THE COURT:  Don't you know that I have spent days with Mr. Bourgeois and listened to him and read his letters?  I mean this may not even be something for expert testimony, but you are welcome to bring in anybody you want.

MR. ROBERTS:  Yes, Your Honor.  I just, if I could back up for just a minute, I mean this test was, we just, we simply requested that he be tested, we didn't ask the Court to order it.  And Michael Wiseman, the defense counsel, told us that he had volunteered, that Mr. Bourgeois would volunteer to this, so, and then he put the condition of videotaping on it or being present, and all I did is I --

THE COURT:  Actually, I have already got an order to that effect.

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  I have already got an order to that effect, so please continue on with your presentation, not the

argument.

MR. ROBERTS:  Yes, Your Honor.  Well, will you take testimony from Dr. Moore?

THE COURT:  If you do it very quickly.  I now have three minutes left.

MR. ROBERTS:  I will, Your Honor, very quickly. Dr. Moore, would you please introduce yourself to the Court.

DR. MOORE:  Yes, I'm Dr. Roger Moore.  I am a clinical and forensic psychologist.

THE COURT:  I need you to speak up, please, sir.

DR. MOORE:  I beg your pardon, ma'am.  My name is Roger Moore.  I am a doctoral level psychologist in clinical and forensic.

MR. ROBERTS:  And, Dr. Moore, Tony Roberts --

THE COURT:  Yes, would you give him the oath, Ms. Scotch?

MR. ROBERTS:  You have testified many times --

THE COURT:  Please, just a moment, please.

MR. ROBERTS:  -- in court, is that correct?

THE COURT:  Just a moment, please.

MR. ROBERTS:  Oh, yes, Your Honor.

ROGER MOORE, GOVERNMENT'S WITNESS #3, SWORN

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    Dr. Moore, you have testified many times as an expert in both Federal and State Courts, is that correct?

A    That is correct.

Q    And you have conducted many tests for intellectual functioning assessments, have you not?

A    Yes, that's correct.

Q    Okay.  And you have testified both for the defense and the Government in cases, I believe you said about 60 percent for the Government and about 40 percent for the defense, or am I wrong?

         MR. WISEMAN:  That was Dr. Price.

         THE WITNESS:  That's right, that -- this is Dr. Moore.  That was Dr. Price who had the 60/40.  Mine is about 25 percent for the defense and about 75 percent for the Government in terms of cases where I have worked or consulted with them.

BY MR. ROBERTS:

Q    And can you tell the Court what your biggest concern is with regard to videotaping the assessment in this case?

A    My biggest concern is that having the assessment videotaped or audiotaped or observed violates the testing norms and the manual recommendation and introduces error into the examination.  It tends to decrease the performance of the

examinee on a wide range of tasks -- memory, attention, learning, concentration -- and so it undermines the validity and the reliability of the scores.  And my job in this case, I don't have a dog in the fight, I understand I have been hired by the Government but my job as a psychologist, as a forensic psychologist, is to make the best call that I can, and I want to be able to have data that is as reliable and valid as possible to help me to come up with the most accurate assessment that I can.

Q    And -- Tony Roberts for the United States.  How would the presence of videotaping impact your ability to do your job in evaluating Alfred Bourgeois in this case?

A    This is Roger Moore.  It does a number of things.  It introduces distracters for both.  It interrupts test rapport. It has been shown that examinees tend to perform more poorly when they are under observation in any of these different modes, those being audiotaped, videotaped and observation.

         MR. ROBERTS:  Your Honor, I think that's all I -- Tony Roberts for the United States.  I know the time is short.  Your Honor, I simply am trying to get to the truth here and the, I think Dr. Moore has stated the concerns that he has given to us but --

         THE COURT:  Well, how do you address this, that the guards, that Terre Haute has said that every examination is witnessed from beginning to end through a window?

MR. ROBERTS:  Are you asking me, Your Honor?

THE COURT:  Yes, can you address that?  Do you have an expert that can address that?

THE WITNESS:  This is Roger Moore.  I have done evaluations at many different institutional facilities, super max facilities --

THE COURT:  Have you recorded any of them?

THE WITNESS:  I beg your pardon, ma'am?

THE COURT:  Have you recorded any of them?

THE WITNESS:  No, ma'am.  None, not only have none been audio or video-recorded, none have been observed either. There are not guards in the room.  In fact, in many of these cases there aren't even guards outside the room, when the evaluation is done I have to go about trying to make efforts to get --

THE COURT:  Okay.  Listen, Dr. Moore, what I have heard today is at Terre Haute, if you have not been there, apparently they are outside a window from start to finish.

THE WITNESS:  My request of them would be to not be observing through that window --

THE COURT:  Well, I don't think that's going to happen.  Is that going to happen, Mr. Joyner?

MR. JOYNER:  No, ma'am, they will be outside the room.

THE COURT:  Okay.  So what else do you have to say

about this issue, Dr. Moore?

THE WITNESS:  Then that raises my concerns.  I would want, again, to speak with Terre Haute of whether it will be possible to have someone outside, a guard outside the door but not observing in any sort of a manner.

THE COURT:  That's not going to happen.

THE WITNESS:  -- the door so if I needed them on the --

THE COURT:  It's not going to happen.

THE WITNESS:  I'm sorry, ma'am?

THE COURT:  It's not going to happen.  And, in fact, apparently he has already been examined by his own psychologist with someone watching.

THE WITNESS:  Yes, ma'am, but that would call into question the validity and the reliability of that test.

THE COURT:  Well, that's what you can do.  Is there anything else that you-all want to put on, Mr. Roberts?  This has been very disappointing.

MR. ROBERTS:  Well, Your Honor, I would only, I think it's just a matter of characterizing Captain Joyner's testimony, I mean I don't know --

THE COURT:  He's worried it's going to be on the internet.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Anything else?

MR. ROBERTS:  I don't, I just, I am not sure that he said that someone watches from beginning to end on the --

THE COURT:  Yes, he did.  I asked him with specificity.  Anything else?  Anything else, Mr. Wiseman?

MR. ROBERTS:  The United States would have some briefing --

MR. WISEMAN:  I actually --

THE COURT:  Okay.  The motion to reconsider is denied.  Thank you very much.  You are excused.

MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  Thank you, Your Honor.

(The proceedings ended at 1:15 p.m.)

INDEX

WITNESSES
FOR GOVERNMENT:

|                 | Direct | Cross |
|-----------------|--------|-------|
| Randall Price   | 6      | 14    |
| Hector Joyner   | 27     | 35    |
| Roger Moore     | 44     |       |

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


__/s/   Judith M. Garcia_____          _June 29, 2010__