IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *    CRIMINAL ACTION
                                   *
        PLAINTIFF,                 *    CR-C-02-216(1)
                                   *
VS.                                *
                                   *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *    SEPTEMBER 10, 2010
                                   *    2:49 P.M.
        DEFENDANT.                 *
                                   *
* * * * * * * * * * * * * * * * * *


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77002

                  (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
               MOLLY CARTER, P. O. BOX 270203
          CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                            MS. ELIZABETH A. LARIN
                            OFFICE OF THE FEDERAL PUBLIC DEFENDER
                            601 WALNUT STREET
                            THE CURTIS CENTER, SUITE 545
                            PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:               MS. KATHERIN HENNIG, PARALEGAL

(The proceedings began at 2:49 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. DOWD:  Mark Dowd for the United States.

MS. SALINAS:  Elsa Salinas for the United States.

MR. WISEMAN:  Michael Wiseman, good afternoon, Your Honor, for Mr. Bourgeois.

THE COURT:  Good afternoon.

MR. WISEMAN:  Along with Elizabeth Larin --

THE COURT:  Hi.

MR. WISEMAN:  -- L-A-R-I-N, my co-counsel.  If it's all right with the Court, our paralegal, Katherin Hennig, would like to sit at counsel table.

THE COURT:  Absolutely.

MR. WISEMAN:  Thank you, Your Honor.

MR. ROBERTS:  Your Honor, we also have Dr. Roger Moore.  He's a psychologist, and he's been working with us in this case.  And if it's all right, we'd like to have him sit at the table as well.

THE COURT:  Any objections?

MR. WISEMAN:  No, not at all.

THE COURT:  Okay.

MR. ROBERTS:  One statement, Your Honor, that Dr. Moore --

THE COURT:  I'm waiting actually for Ms. Scotch to come back in.  She was going to hook in Mr. Bourgeois by telephone.  Does she know where he is?  He's in Houston, I think.

(Court and Clerk conferring off the record.)

THE COURT:  Okay.  Let's see how we're doing on that.

(PAUSE.)

THE CLERK:  It's going to be another three or four minutes.

THE COURT:  Okay.  Ms. Scotch says it will be another three or four minutes, we've been told, to hook up Mr. Bourgeois.

MR. WISEMAN:  Okay.  Your Honor, I thought Mr. Bourgeois was going to be produced in the courtroom.

THE COURT:  Not for this hearing, no.

MR. WISEMAN:  Not for this hearing, but the next time.

THE COURT:  Absolutely.

MR. WISEMAN:  Okay.  I understand.

THE COURT:  He's already as far as Houston, I've been told.

MR. WISEMAN:  Okay.

THE COURT:  And he's supposed to be here -- I don't know if I'm supposed to say.  Marshals?  When are you going to be in town?

MR. WISEMAN:  We'll be here next Friday afternoon.

THE COURT:  Okay.  Then he'll be here apparently Saturday.

MR. WISEMAN:  Oh, excellent.

THE COURT:  I think that's what I've been told.

MR. WISEMAN:  Excellent.

THE COURT:  Mr. Padilla, could you check with the Marshals and ask -- tell them I've already told them that he'll be here Saturday and make sure that he'll, they'll have access to him?  See if there's any problems.  Thanks.

(PAUSE.)

THE COURT:  Anything you all feel comfortable taking up before Mr. Bourgeois is in attendance?

MR. WISEMAN:  If there's something the Court wants to, I have nothing in particular, other than my witness.  If the Government has anything, I'm happy to discuss it.

MR. ROBERTS:  We don't have anything, Your Honor, not that I can think of at this time.  We're not going to deal with evidence, I don't think, until the 20th.

THE COURT:  Well, today, of course.

MR. ROBERTS:  Yes, Your Honor, from the witness.  But

one thing I did want to note is that Dr. Moore will have to leave at 4:00.  So if he gets up and leaves, you want me to put that on the record?

THE COURT:  He's not leaving till I'm going.  So if he gets to go at 4:00, I do too.

MR. ROBERTS:  That would be fine with us, Your Honor.

THE COURT:  That's fine, Dr. Moore.

MR. ROBERTS:  Thank you, Your Honor.

(PAUSE.)

THE COURT:  Do you know where the plugs are?

MR. WISEMAN:  I'm sorry?  Oh, the plugs, yes.

THE COURT:  You can lift up those things and just pull out, if you want.

MR. WISEMAN:  Ms. Scotch was giving us a tour yesterday.  It was very --

THE COURT:  And you know, we made a video, too, on the Southern District website --

MR. WISEMAN:  Oh.

THE COURT:  -- that shows all the Court, all of the electronic equipment and how we use it.

(PAUSE.)

THE COURT:  Any exhibits?

MR. WISEMAN:  Yes.  I have them marked and ready to go.

THE COURT:  Do you want to offer them now?  Or do you

know if there's a problem?

MR. WISEMAN:  That's fine with me.  I was going to introduce them through Dr. Gelbort.

THE COURT:  Do you want to show them to the Respondent and --

(Counsel conferring off the record.)

(Discussion off the record regarding other matters.)

MR. WISEMAN:  Well, I'm all ready to go.  I guess when the witness takes the stand, I'll just have him identify what it is I'm going to offer.

THE COURT:  That's fine.

MR. WISEMAN:  The Government has seen all these things before.

(PAUSE.)

(Attempting to connect conference call.)

THE COURT:  Is this Lieutenant Hinkel?

THE CLERK:  Not yet.

THE COURT:  Oh.  Sorry.  Just tell me when I'm supposed to say something.

MR. VILLARREAL:  Lieutenant Villarreal.  Hello?

THE CLERK:  Lieutenant Villarreal?

MR. VILLARREAL:  Yes.

THE CLERK:  Okay.  Is Mr. Bourgeois with you yet?

MR. VILLARREAL:  Not yet.  We're getting him out of the cell right now.

THE CLERK:  Please let us know when he's in the room.

MR. VILLARREAL:  Okay.  Stand by.

THE COURT:  Marshal Alvarado, this is Mr. Wiseman.  I don't know if you've met him before.  This is our deputy, head of Marshal Service here.  I went ahead and told him when Mr. Bourgeois would be here because Mr. Wiseman and his group are coming Friday afternoon, and I wanted to make sure -- he will be housed here in the federal courthouse.

MR. ALVARADO:  Oh, he will?  Okay.

THE COURT:  Yes.  So there will be someone here 24/7.  How you contact him, that's -- you'll have to contact Marshal Alvarado and see how to do that.

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.  We can do that.

Because I'm sure they'll want to see him on Saturday and Sunday.

MR. WISEMAN:  Yeah, we'll want to stop in, yeah.  Thank you so much.

THE COURT:  While they're seeing the sights of Corpus.

MR. WISEMAN:  Seen them.

THE COURT:  Five minutes?

MR. WISEMAN:  I've been here a number of times.

THE COURT:  Is that okay?  Did I do anything security

wrong or -- okay.

MR. ALVARADO: He'll be here some time -- well, if you guys are coming in Friday, by Saturday he'll be here.

MR. WISEMAN: That's fine.

THE COURT: Thanks. Thanks, Mr. Padilla.

(PAUSE.)

(Court and Clerk conferring off the record.)

(Connecting conference call.)

MR. VILLARREAL: Lieutenant Villarreal.

THE CLERK: Lieutenant Villarreal, is Mr. Bourgeois there?

MR. VILLARREAL: Ma'am?

THE CLERK: Is Mr. Bourgeois there?

MR. VILLARREAL: He's walking right in. Stand by. I've got you on speaker phone. Stand by.

(PAUSE.)

MR. VILLARREAL: Ma'am, Mr. Bourgeois is here now.

THE COURT: Okay. Mr. Bourgeois, can you hear us?

THE DEFENDANT: Yeah.

THE COURT: Okay. Go ahead, Mr. Wiseman.

MR. WISEMAN: Thank you, Your Honor.

Mr. Bourgeois, this is Michael Wiseman, and we're going to be examining Dr. Gelbort.

THE DEFENDANT: Uh-huh.

MR. WISEMAN: Okay. Your Honor, we'll call

Dr. Gelbort to the stand.

THE COURT: Could you come forward, please, sir.

MICHAEL M. GELBORT, DEFENSE WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q. Good afternoon, Dr. Gelbort.

A. Good afternoon.

Q. What is your profession?

A. I'm a clinical neuropsychologist in private practice.

THE COURT: Could you please state your full name and spell it for the record?

THE WITNESS: Sure. Michael M. Gelbort. The last name is G-E-L-B-O-R-T.

BY MR. WISEMAN:

Q. And you say you're a clinical neuropsychologist --

THE COURT: Wait, don't touch the microphone. Sorry. It hooks right into her ears. So what you need to do, if you could lean your right arm onto that shelf there, then you're in good shape. Okay. Go ahead.

BY MR. WISEMAN:

Q. Can you tell the Court what your qualifications are?

A. I went to college at Grinnell College in Grinnell, Iowa.

THE COURT: Has that been introduced?

MR. WISEMAN: Not yet, Your Honor. I'll have him identify it and proceed that way.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort, if you look on the screen in front of you, do you recognize that document?

THE WITNESS:  Can I move this a little bit, Your Honor?

THE COURT:  Pardon?

THE WITNESS:  Can I just tilt this so I can see it better?

THE COURT:  No.  You have to do it blindfolded and backwards.  No, just tilt it anyway you want to.  It's perfectly all right.

THE WITNESS:  Thank you.

THE COURT:  Is that okay?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   That's P-17.  Do you recognize that document?

A.   I do.

Q.   And what is it?

A.   It appears to be a copy of my vitae.

Q.   And is it an up-to-date copy?

A.   Reasonably so.  There's more things that could be added to it, but it's got the gist of my training and experience.

Q.   And can you give the Court a sense of what that training

and experience is?

A.    I went to college in Grinnell, Iowa.  I finished college in three-and-a-half years with a double major, psychology and general sciences, and I graduated with high honors.  I went to a doctoral program, a Ph.D. program in clinical psychology at Texas Tech University.  Went through that program in a fairly standard fashion.  I had a minor in applied human neuropsychology.

I worked on the side.  I was a counselor at a halfway house for criminals transferring back into the community.  I also spent a couple of years working at the medical school performing neuropsychological evaluations for two neurologists and two neurosurgeons.  And I was responsible for running a developmental disability clinic, where we evaluated children pretty much from under one year up to 15 years of age.

I did a predoctoral internship at Milwaukee County Mental Health Complex.  I was working with inpatients and outpatients with severe psychological issues.  I was also administering neuropsychological testing there and actually teaching some of the staff neuropsychology.  And then --

THE COURT:  You know, I read your vitae, and it's great.  Just introduce it.

MR. WISEMAN:  Okay.  Very well.

THE COURT:  But I have a question about this.  I always get confused about neuro, about neuropsychologists.  I

disqualified somebody -- not him -- one time that was a neuropsychologist that wanted to talk about physiology of the brain, and he had never even had high school biology.

Okay, you obviously are not in that category, but when you diagnosed Mr. Bourgeois with organic brain disorder, I thought that physicians do that and not psychologists.  So explain to me how that works.  I just want to be clear on it.

THE WITNESS:  First off, I didn't necessarily make that particular diagnosis.  But it could be made --

THE COURT:  I thought it was -- I thought there was something in there in his report.

MR. WISEMAN:  Oh, I believe he's going to testify that Mr. Bourgeois has organic impairments.

THE COURT:  Okay.  Good.

THE WITNESS:  And to answer your question, though, physicians can make that diagnosis.  Neuropsychologists can as well --

THE COURT:  Okay.

THE WITNESS:  -- based on our training and hopefully experience.

THE COURT:  Okay.  Are there actual -- I'm going to let him testify.  Never mind.  I just wanted to be clear.

MR. WISEMAN:  I was going to get into all those areas, Your Honor --

THE COURT:  Go right ahead.

MR. WISEMAN:  -- right away.

THE COURT:  I just kind of jump into the --

MR. WISEMAN:  You sure do.

THE COURT:  -- the bottom line.

THE WITNESS:  It's a good question, though, and we'll get there, I hope.

THE COURT:  But you know, this other guy had not ever, you know, and he had not -- and he finally admitted that he made up the diagnosis himself because he thought it was good.

THE WITNESS:  That's an interesting --

THE COURT:  It's one of the few, one of the few experts I ever not allowed to testify.  So --

MR. WISEMAN:  All right.  Well, I'm going to offer Dr. Gelbort as an expert in forensic neuropsychology and --

THE COURT:  Any objection?

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Sure.  Have you looked at his CV?

MR. ROBERTS:  Yes, we have, Your Honor.

THE COURT:  Okay.

(PAUSE.)

MR. ROBERTS:  No objection, Your Honor.

MR. WISEMAN:  Thank you.  Dr. Gelbort, in follow-up to the Judge's questions, could you give the Court a working understanding of what a neuropsychologist is and what the

science of neuropsychology is?

THE WITNESS:  Sure.  You know, I think the definition that is most commonly put out there is that neuropsychology is the study of the relationship between the brain and behavior. And neuropsychologists typically look at both emotional functioning as well as cognitive functioning, cognitive being thinking skills.

Sometimes I liken it to the front and back of a mountain, where when we approach people, we see their personality more often than not.  But behind that, and working in consonance with it, would be their cognitive abilities, how intelligent they are, how well they learn, remember, process information, even basic functions, such as do they perceive accurately.

THE COURT:  Do you also evaluate people like with cognizance disorders, for instance, Alzheimer's or frontal lobe problems?

THE WITNESS:  Absolutely.

THE COURT:  And you work with neurologists on that, too, to come up with a plan and that sort of thing?

THE WITNESS:  Neurologists are probably, if not my first -- they're one of my top three referral sources.  I have --

THE COURT:  Sure.

THE WITNESS:  -- eight different neurologists who

send me patients regularly.  And the diagnoses they're concerned about are anything from someone who's suspected of having a dementing illness, Alzheimer's or vascular dementia or the like; people after closed head injuries, car accidents, bicycle accidents, muggings, that sort of thing; people who have seizure disorders.

I'm getting referrals regularly from neurosurgeons who are seeing brain tumors and are concerned about the effects on cognitive abilities as well as the effects of their intervention.  They're asking me, where's language, where is memory?  Because when they go to do surgery, they don't want to disrupt any more language or memory than they need to.

So if you think about a wagon wheel, the neurologist and psychiatrist are probably on one shoulder, and the other shoulder is the neuropsychologist, at least in a hospital, in an office-based practice.  Physiatrists, people who do physical medicine rehabilitation who help people after strokes, after brain injuries are another major source of referrals.

THE COURT:  I'm familiar with your specialty, because I know that a lot of the big teaching hospitals, when you go to be evaluated for cognitive disorders, there's neuropsychological testing, and there's neurologists and there's CAT scans and MRIs and all these things.

THE WITNESS:  In the more sophisticated centers, the neurologists will employ or bring in a neuropsychologist.  The

psychiatrists will oftentimes do their best job of assessing, and when things don't go the way they expect them to, based on their assessment, they'll say, "I may not be seeing everything, and someone else may be able to see something to help, a neuropsychologist."  That's another major source of my referrals.

THE COURT:  And did Mr. Bourgeois -- speaking of just organic things, because you're going to say this part and this part, you know, I assume, via your psychological testing, that you can pinpoint areas of the brain.  But did he ever have MRIs or CT scans or anything like that?

THE WITNESS:  Not that I'm aware of.

THE COURT:  Okay.  Go ahead.

BY MR. WISEMAN:

Q.   Doctor, I was actually going to ask you:  Could you discuss briefly what the nature of neuropsychological testing is and contrast it to the type of neuroimaging that the Court just referred to?

A.   Let me take the second part of the question first, if I can, because I think it helps for an understanding.  The brain, at least to me and people like me, is a very fascinating organism -- organ, and it works in a variety of ways.  You can talk about it in terms of the structure.  And if there's a problem with the structure, such as a lesion, a tumor growing that's putting pressure on it or eating in the tissue, that

will cause changes in the way the brain functions.  And if it's near the respiratory centers or the centers that control the heart, you could have a problem that way.  But if it's in the cortex area that controls thinking, you may have changes in thinking abilities.  And depending on where it is and what functions are living in those areas, or if it's affecting the whole brain, you'll see changes in the way a person thinks and acts.

THE COURT:  I always think of your specialty and Dr. Moore's as being a more nuanced way of finding, finding things that other people may not, other specialties that are physical specialties may not be able to find.

THE WITNESS:  We may get to a point, and if you look at the literature and read about things like functional MRI, we're moving more in that direction, where, you know, the neuroradiologist looks at the picture, sees the tumor and knows exactly and can measure how many sonometers by how many sonometers.

THE COURT:  Right.  But you can see what it's impacting.

THE WITNESS:  Correct.  And that's really the point, is that the brain is a structural organ.  It also works electrically.  So if you're concerned about electrical dysfunction, you don't do an MRI.  I've been asked that, "Well, why didn't you have an MRI done," for someone who has a seizure

disorder.  They have a problem that's affecting the electrical impulses in the brain.  And the way to look at that is with an electrical study.

THE COURT:  Like an EEG?

THE WITNESS:  Exactly right.  That's exactly right. And when you're concerned about behavioral changes, you certainly can look at the structure and say, "Well, there's a little tumor over there."  But as far as I know in this setting, in a forensics setting, there's no statute that says if you have a tumor, then we do this with you, and if you don't have a tumor, we do that.  But rather, in this setting, we're concerned about, I believe the Court's concerned about behavior and can he control his behavior in a normal fashion, or not well as a normal person, but still reasonably well.

THE COURT:  I saw that the bottom line in your -- that one of -- not the bottom line.  I hate that expression. But one of your conclusions, that he had such a, he had a behavioral disorder where he could not put the brakes on his behavior, that he could not control his behavior.

THE WITNESS:  The frontal lobes are sometimes, in a very crass way, talked about as the gas pedal and the brake pedal of behavior.  And the frontal lobes, another way to think about them, if you've ever seen the little picture of the homunculus, the little man inside the brain who's controlling the rest of the brain, the frontal lobes are really where the

homunculus lives.

So it's kind of the control center and the central processing center. And when people have trouble initiating, the couch potato -- first off, they don't, I don't think, end up in court because they sit on the couch and they don't do much and they don't get in much trouble. That's a problem typically with frontal lobe.

Same token, the ones who have trouble putting on the brakes or put on the brakes too late, quite often that's a frontal lobe problem.

THE COURT: And that's what you think is part of Mr. Bourgeois' presentation?

THE WITNESS: There's a very subtle distinction there. Most neuropsychologists are sensitive to not say there is brain damage. That's something that should be looked at, should be done --

THE COURT: Organ -- I got it.

THE WITNESS: You can talk about organicity, but --

THE COURT: You don't look at the physical structure. You look at the behavior to try to pinpoint where there may be problem areas.

THE WITNESS: Back to what you said, the nuance. We're looking at a reflection of the integrity of the nervous tissue. When the nervous tissue has problems, it gives rise to aberrant or abnormal behaviors. We can measure that and confer

backwards.  When someone consistently has problems with abilities that arise from frontal lobe, from what research has shown to be frontal lobe functions, then we say this person can't do normal frontal lobe behavior, and hence, more likely than not, there's a frontal lobe abnormality.  But we can't see it, per se.

THE COURT:  Okay.  So you think --

THE WITNESS:  That's where FMRI and PET scan may come in and start saying, there it is.

THE COURT:  The PET scan is pretty good now for doing some Alzheimer's diagnoses, but you can have -- I know this, I should say this, because my brother has Alzheimer's at a very young age.  And he has frontal lobe involvement, frontal lobe dementia, as well as Alzheimer's.  And they've done every possible test that you can, other than biopsy.  That's why I'm familiar, by the way, with your specialty --

THE WITNESS:  Uh-huh.

THE COURT:  -- and your area of expertise, because --

THE WITNESS:  That's too bad.

THE COURT:  That's horrible actually.  It's the worst illness on earth.  But in any event --

THE WITNESS:  I would vote ALS is worse, but that's my personal --

THE COURT:  My aunt had that, so -- and you may be right.

BY MR. WISEMAN:

Q.   Dr. Gelbort, so just to make sure I'm clear now, if a person shows up clean on neural imaging, is it your view that neuropsychology can still identify brain dysfunction?

A.   In the worst case scenario is neuropsychology wouldn't. And I'm harkening back to a study I saw when I was in Medical Center in Houston, an individual who died of traumatic brain injuries in a car accident.  And we couldn't test him because he was dead, but his image, just before he died, the neural imaging was normal.  And you can understand why, if I explain a little bit, you know, why that can happen.

THE COURT:  Well, you know, one of the things -- here I am building your case for you, but, you know, soldiers that are coming back, and I look at this because soldiers that are coming back from war, even though they didn't have a direct hit on their head, have very discrete brain damage that's not, that's behaviorally diagnosed only because of the shaking.  And they may have been half a mile from a rocket.  But just the vibrations alone can cause them discrete brain problems.

THE WITNESS:  And in fact, neuropsychology took off after World War II, when vets were coming back with shell shock, which is what you're talking about.  They were put on the psych units --

THE COURT:  No, this was actually, these people are having dementia.

THE WITNESS:  No, no, that's exactly right.

THE COURT:  Yeah.

THE WITNESS:  But they called it shell shock back then, because they weren't --

THE COURT:  Oh really?  Oh, I see.

THE WITNESS:  They weren't hit by the shells, but they were getting hit by the blast waves of the shell.

THE COURT:  Right.

THE WITNESS:  And they were acting strangely, so they got put on the psychiatric units.  The psychiatrists said there's nothing psychiatrically wrong with them, and they turned it over to the neuropsychologists who these battery of tests said here's the cognitive difficulties that's arising from the impact, the waves, the shock waves that have gone through the air.  Just like the Murrah Federal Building wasn't knocked down by anything that hit it directly, but rather the shock waves of the explosion.  Same concept.

THE COURT:  I'm sorry --

MR. WISEMAN:  Quite all right.

THE COURT:  -- Mr. Wiseman.  You do your case.

MR. WISEMAN:  Okay.

THE COURT:  I shouldn't just be visiting.

BY MR. WISEMAN:

Q.   Doctor, I put up what is marked as Petitioner's 16 and ask if you recognize that document.

A.   It would be helpful to see the top of it.  It looks like it's either the Wechsler Memory Scale or the WAIS-III.  I can't tell from --

Q.   Okay.  I'll move it over a little.

A.   Pull it down, please.

Q.   Oh.

A.   There you go, Wechsler Memory Scale, Third Edition.

Q.   Okay.  And is that the first page of a larger set of documents?

A.   It's part of the test battery that I administered to Mr. Bourgeois.

Q.   Okay.  And so I take it from that answer that you in fact conducted a neuropsychological evaluation of Mr. Bourgeois?

A.   I did.

Q.   All right.  And your notes and data from that are contained in what's been marked as Petitioner's 16?

A.   I believe that's true.  I presented them or gave them to the professionals that you asked me to, and I think they've been collated.  I think you have the packet there.

          MR. WISEMAN:  Your Honor, I'm a little unfamiliar with ELMO technology.  Can I show the witness the document so he can just thumb through it to make sure it's the right --

          THE COURT:  You just did.

          MR. WISEMAN:  Well, I showed him the top page.  This is a 40-page exhibit, and I just want to have the record be

clear that this is --

THE COURT: Okay. Didn't he give it to you? You can go up there.

MR. WISEMAN: Well, he did. I just want to --

THE COURT: Okay.

MR. WISEMAN: -- cover my bases.

THE COURT: The only thing you do, you've got to keep the cap on there because of all my electronic equipment here. Actually, it's your electronic equipment, but in between swigs, put a cap on it. I guess I should say that's Coke, for the record, Coca-Cola.

MR. WISEMAN: I believe it's Dr. Pepper.

THE COURT: Okay, Dr. Pepper.

MR. WISEMAN: Diet Dr. Pepper.

THE WITNESS: This does appear to be the data for my neuropsychological evaluation.

BY MR. WISEMAN:

Q.   And so the record is clear, when did you conduct your neuropsychological evaluation of Mr. Bourgeois?

A.   It was April 27, 2007.

Q.   And where did that happen?

A.   It was at, I think it's called USP at Terra Haute.

Q.   And what are the components of the neuropsychological evaluation you conducted with Mr. Bourgeois?

A.   The way I've been taught and instructed and choose to

proceed with the neuropsychological evaluation, there's three major components.  One is the testing, per se, formal testing and hopefully a useful battery is employed, one that's valid and reliable and is designed to answer the question that's being presented.

The second part would be the interview, where you actually talk to the patient and see how they look or present, see what they, again, look like, how they sound, how they respond, how quick, how slow.  You check their mood, different things that can contribute to the overall diagnosis and understanding of the patient.

And then finally, I believe you should be looking at historical information, something that is more objective and has a greater time span, something that predates the question that you're being asked to entertain.

And the reason being is that each type of data has merit on its own face, and when you put the three together and you find that they agree, then you have a good firm basis of support for any conclusions you can draw.

THE COURT:  Did you do those tests where you can determine if somebody is making up the answers?

THE WITNESS:  Malingering?

THE COURT:  Yes.

THE WITNESS:  I didn't use any of the tests that are considered to be contrived --

THE COURT:  Okay.

THE WITNESS:  -- where you're oftentimes not telling the patient something that's true.  You're setting them up to do something other than what they might normally do.  And there's a couple of reasons.  Probably the first one is that people in his intelligence range who have subnormal intelligence, the research shows that they're not, those tests are not real valid with them.

THE COURT:  But see, one of the things, you're assuming then that his intelligence is low, when in fact he could be malingering on the intelligence test.  And so then you don't give him the malingering test -- sorry.

MR. WISEMAN:  I was just going to say, Your Honor, I've got a whole section devoted to malingering.

THE COURT:  You got that?  Okay.  Go right ahead.

MR. WISEMAN:  Believe me, I've got it covered.

THE COURT:  I knew you would.

THE WITNESS:  But I want to answer that question.

MR. WISEMAN:  And you'll have your chance, I promise.

THE COURT:  Did you look at his letters and things that he sent me?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort --

MR. WISEMAN:  Is there a way I can move this so I can get more of the document on there?

THE CLERK:  Can I show him?

THE COURT:  You can -- please.

(PAUSE.)

THE COURT:  See?  It's magic.

MR. WISEMAN:  Oh, wow.  That's amazing.  I still use a feather pen, so --

BY MR. WISEMAN:

Q.  So, Dr. Gelbort, I've put up what's been marked as Petitioner's 132 --

THE COURT:  Are you going to offer any of these for admission?

MR. WISEMAN:  I'm going to offer them all, yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.  Do you recognize this document?

A.  Yes.

Q.  And what is it?

A.  It's a list of the materials that were provided to me. And it says up at the top, "Background Information."

Q.  Okay.  And did you review some of these materials before your actual meeting with Mr. Bourgeois?

A.  Yes.

Q.  And some of them after?

A.    Correct.

Q.    Okay.  In addition to the materials on that list, did you recently have an opportunity to view videotapes of the Government's expert witnesses evaluating Mr. Bourgeois?

A.    Two different psychologists working with him, yes, I did.

Q.    Okay.  As the Court's already anticipated, you've reached some conclusions to a reasonable degree of neuropsychological certainty.  Why don't you tell us generally what those conclusions are, and then we'll get to the basis for those opinions.

A.    Sure.  You know, the big opinions, or the ones that are further reaching, were that Mr. Bourgeois is of limited intellectual ability.  He comes out -- he tests out pretty much in the borderline to mildly defective range.

He shows indication of difficulties, as we were talking about before, of having frontal lobe impairments, that he did take the tests as requested and put forth good effort.

His learning is problematic, especially when he has to understand conceptually the information being presented to him. So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

He has some relative strengths.  He certainly has adequate or normal spelling abilities, when compared with others in his age bracket.  His basic reading abilities, in other words, his

capacity to look at words and understand what the words are, are fine.

Q.   Okay.  And why don't we jump to the concept of malingering before we discuss your specific test findings.  In a forensic setting, especially a death penalty case, are you particularly on guard with regard to malingering?

A.   I think you have to be.  In fact, I think the concern about the adequacy of the test administration and the adequacy -- let me say it differently.  The way I was taught is there are certain assumptions that need to be met in order to interpret test data.  And one of the assumptions that is very central is that the person put forth reasonable effort.

You don't have to have super human effort.  You don't have to have abnormal effort, but you have to have the person engaged.  So things like, you know, if someone comes in drunk or stoned, you're not going to test them.  They're not going to be able to put forth reasonable effort.

By the same token, if they're not trying, if they're not answering in a way reflective of what they're capable of doing, you're not going to be able to interpret the data properly.  So that's something you have to look at from the get-go.

Q.   And assuming that the person appears to be putting forth reasonable effort, how do you -- with regard to Mr. Bourgeois in particular, how did you know that he wasn't purposely throwing a test?

A.   Well, I'm going to pick on two words.  First off, how did I know?  It's how did I decide.  It wasn't that I knew.

Q.   Okay.

A.   But, you know, looking at the data, I made that decision.  And the other word --

THE COURT:  So what you're saying, this is an educated guess.

THE WITNESS:  Boy, I don't know if I would phrase it quite like that.  There's something --

THE COURT:  Well, it's your opinion.

THE WITNESS:  There's something of a decision tree.

THE COURT:  Okay.

THE WITNESS:  Is there a big book and I can look in the back and find the absolute right answer?  No.  But on the other hand, as I will, I'll try to justify --

THE COURT:  Okay.

THE WITNESS:  -- why I came to the decision I did.

The other thing that, the other word I'll pick on is you said something to the effect of how he looked.  And I'm going to say that how he looks is certainly data.  That's part of the presentation that you look at in the interview.  But it's not just how a person looks or how they strike you, rather how the data lines up.

And some of the malingering tests are designed to collect data specific to malingering.  Before there were the

malingering tests, and there's an industry around the malingering tests, the way the authors of this battery and the way it's been done for a long time is to look within the data for internal idiosyncrasies or the way the data agrees with itself.

And in this case, we have the added luxury of having had two test administrations. He's taken another battery of tests before, so we can compare test/retest patterns of behavior.

BY MR. WISEMAN:

Q. And that would be Dr. Weiner's testing?

A. Correct.

Q. And did you see consistency in the test/retest analysis?

A. Yes, very much so.

Q. All right. And in particular, why don't we talk specifically about the IQ testing. What did he score on your IQ testing?

A. His full scale IQ on my administration of the WAIS-III was a 70.

Q. And what did he score on Dr. Weiner's administration?

A. He gave the precursor to the WAIS-III. He gave the WAIS-R, and Mr. Bourgeois had a 75 Full Scale IQ.

Q. And at the time that Dr. Weiner administered the WAIS-R, was it the standard test to administer?

A. It was an outdated test at that point in time.

Q.   All right.  And what do neuropsychologists do when they encounter an IQ that's obtained as a result of the administration of an outdated test?

A.   Well, I think it's more general issue is any time you look at data, you have to understand the adequacies and inadequacies of it.  Using an outdated IQ test has some inherent issues or problems.  Research has shown that the scores will tend to become inflated as time goes on when you're using an old test. So there's -- formulas have been developed to kind of give you an idea of how much the test score will be inflated or over represent, if you will, the person's ability.

Q.   And does that over-inflation have a name?

A.   It's called the Flynn Effect --

Q.   Okay.

A.   -- when it refers to IQ testing.

Q.   Did you do a calculation applying the Flynn Effect to Dr. Weiner's outdated administration of the WAIS-R?

A.   I did.

Q.   And what does that come to?

A.   If you apply the correction factor, if you will, trying to figure out what the number is more likely to be, it comes out as about an IQ of 68.

Q.   And for purposes of assessing malingering, what does it say to you that someone would have scored a 70 on an IQ test in 2007, and three years earlier score a 68, or even a 75, for

that matter?

A.   Just, you can just say a 75 on the outdated test.  It says that there's good consistency across time.  The importance of that is that if someone is faking or feigning bad in this case -- I guess the best way I can say it is a personal example.  If I was trying to deflate my ability or feign bad on an IQ test and I give them regularly, like every week, I can certainly pull my punch and give you poor answers, and I can probably even get my answers to have the right sort of pattern.

So the tests generally start off easy and get more difficult.  There are certain questions that seem to anecdotally be out of order, so people may miss the earlier ones, even though they're deemed to be or generally construed to be the easier ones.  I could probably get the pattern to pass if someone was reading it blind.  But it would be real tough, two or three years later, to take the test or similar test again and get the same type of pattern and the same type of score.  And that's knowing the test and having hopefully reasonably intellect -- reasonable intellect.

Q.   And the WAIS-III that you administered, does it have a number of subtests to it?

A.   Yes.

Q.   And what's the number?

A.   It's got 14 total, but typically only 11 are used to compute the IQ.

Q.   And did you compare the subscale tests on your WAIS-III to the subscale tests on Dr. Weiner's WAIS-R?

A.   Sure.

Q.   And did you see consistency or inconsistency on that?

A.   The internal pattern, again, the overall flavor and shape of the data was pretty consistent.

Q.   Now, let's look at another test you gave called the Category Test.  And before I ask you questions about it, why don't you give us a working understanding of what the Categories Test asks you to do and what information it provides to the person administering it.

A.   Sure.  The Category Test, based on factoring analytical research has been shown to reflect whole brain functioning.  It focuses more on frontal lobe abilities.  It looks at synthetic reasoning, the ability to generalize from one stimulus situation or configuration to another.  It's typically seen as more of a visual, spatial than a verbal test, but people do it in different fashions, so it really gets at both sides of the equation.

     I liken it to Jeopardy, where you're not necessarily saying, "This is what I want you to do," and then have the person answer the questions based on the question asked, but rather they need to find a pattern within the data.  They need to find a way of thinking about the data where they can reason through, based on hypothesis testing, and come up with the

right approach that gives them the right answer.

So the format of the test is forced choice.  There's four answers.  You've got a 25 percent chance of being right just by simply guessing, even if you didn't know what the question was.  Again, there's seven subparts to it.  The first six have one specific concept.  The last one is a summary, so you go back through and you have to remember what you did on prior tests.

The first two subtests are considered gimmes, in that it's hard to get them wrong if you had some sort of working cognitive ability and you don't over think it.  So we look at those, and when people have problems with those or make mistakes, we always wonder why that is.

The third subtest seems to be the most difficult for most people.  The fourth is unique.  Fifth and sixth have the same concept.  And like I said, the seventh is like a review.

It's, to a neuropsychologist, at least to me, it's, I think, a wonderful test in that there's a lot of information when people make mistakes.  When they're on a roll and doing well and then the configuration of the data changes somewhat and they make a mistake, you can kind of see which way they went off the road, either left or right.  So it's a very nice test, in that it gets the higher cognitive abilities, whole brain abilities.  It's interesting to look at.  It's actually fun to give.

Q.   Okay.  I'm going to put up Page 20 from Exhibit P-16 and

ask you if you can describe --

A.   You've got it upside down.

Q.   I've got it upside down.  There you go.  Is that the score sheet for the Halstead?

A.   That's the data sheet for the Halstead Category Test.

Q.   All right.  And you say that it has seven subtests.  And the first two are gimmes.

A.   I call them gimmes.

Q.   Right.  And by that, you mean they're real easy.

A.   So again, there's cards that are being shown one at a time.  The patient is told, "You get one guess or one chance to answer, and I'll tell you right or wrong, and then we'll go on to the next one, and you can't go back."  The concept for the first subtest is Roman numerals.  We don't say the concept is Roman numerals.  Rather, the first one is the Roman Numeral I.  It's a black number on a white sheet.  And if the person says, "One," you say, "Correct."  You don't tell them why.  You don't say, "That's right, you guessed it, it's a Roman numeral."  They can guess "one" for any reason.  You don't ask them the reason.  The next one is a Roman Numeral III, then you're back to a I, a IV, et cetera.

So sometimes you'll get someone who I said over thinks, and they look at the Roman Numeral I, and they count the corners, and they may say, "Four," or they count the sides and they may say, "Two."  Quickly, people tend to get that one

correct.

The second subtest is a simple counting task, where there's first one circle, second there's three circles, back to one circle, four, and then it will change.  It will go from circles to squares, for example, or bars or letters or words.  But again, it's a counting test.  Most people get them all correct.  And the check mark on the right means he got the right answer.

Subtest three is where things get very challenging.  On each card in subtest three, there's four items.  And three are the same in some fashion, and the fourth one is different.  So it could be three blue and one white.  It could be three triangles and one square.

What gets challenging is now it's a second order solution, in that it's not just counting, but rather you have to figure out which one is different.  So in the second position, or if it's a white circle, a blue circle, a white circle, a white circle, you have to notice which one is different and then try the hypothesis of naming the second, number two, it's in the second position.

People have trouble with it.  And you can see at the bottom, Mr. Bourgeois made 30 errors out of 40.  So he was performing exactly at chance.

When people are malingering and figure it out and say, "Well, I should be getting a bunch of these wrong," that's when

you start getting things like 38 errors out of 40, which by chance would be very difficult to do.  So he's right in the ball park for someone who just didn't get it and kept guessing, kept working at it, but didn't have an idea.

THE COURT:  But if you're a smart malingerer, it seems like you could do -- you could know, "I'm not going to do 38 out of 40 wrong," because everybody's seen my letters and this kind of thing, so you can say, "I'll do about, you know this percentage."

THE WITNESS:  So --

THE COURT:  I'm just saying.

THE WITNESS:  That's exactly right.  I'm thinking of my brother who, you know, took the SAT and got a 1600, and did it again to see if he could, and did it again.  He could figure that out.  But chances are I'm not looking at him and seeing an academic history with D's and C's and someone who was getting into all sorts of trouble.  I see a very different history.

So when I reconcile the history and the way they present and how they sound and all sorts of other things that predate any concern or reason to come under scrutiny, that's when that three-legged stool, the fact that all three prongs need to kind of line up.

It doesn't make sense to say that this gentleman was so clever as to say, "Ah, you know, it's forced choice.  I need to get 30 errors, so I'll keep count as I go through and make

30 mistakes."  That would be impressive.

THE COURT:  He might be.

MR. WISEMAN:  All right.  Well, let's keep going then.

THE COURT:  Right?

THE WITNESS:  Is it absolutely possible?  Sure.  Just like a meteor may hit us in the next ten seconds.  But I'm not going to worry about that.  And, you know, is it possible?  I would have to say it's possible.  Is it at all likely?  No.

BY MR. WISEMAN:

Q.   And putting it in the province of our profession, do you have a reasonable certainty that, as to whether Mr. Bourgeois was malingering?

A.   I have a reasonable guess and -- or a reasonable opinion.  And based on all the data, looking at test/retest over the course of years, looking at the pattern of errors that he's made on various tests, I would say the chance is so slim that it's not really a significant concern at all.  It's not even a concern.

Q.   And what do you take from the fact on the fourth subtest he then only got four errors out of the total?

A.   He got that one.  That one he figured out.

Q.   And if he were malingering, would you expect to see a good score like that?

A.   Well, unless in the course of malingering, he said, "Gee,

I better do well on one of these subtests, otherwise, people will think I'm malingering." At some point, you know, you can come up with -- I can come up with all sorts of hypotheses, and I can over think this, or I can just look at the data and say this comports with someone who -- again, he, I think when he took it for Dr. Weiner, he had like 94 errors, which statistically is in the same ball park as this. He did kind of the same, except for this time he did get number four, whereas on the prior testing, he didn't, as far as I know.

Q. Okay. And you mentioned the number of errors that he attained on that test. What's the cutoff on the Halstead Category Test for a determination of impairment?

A. The general score, if you have to pick one cutoff, is about 51 errors.

Q. And what can you conclude from his score of 80 errors on yours and 94 errors on Dr. Weiner's, as to his brain function?

A. Well, he's clearly into the impaired range. And impaired doesn't mean he's just not very good. Impaired means he's, in this case, probably in the bottom one to two percent of the population. And it may be bottom one percent is more accurate than bottom two percent.

Q. You gave him something called the Wide Range Achievement Test?

A. Yes.

Q. And how did he score on that?

A.    He scored --

Q.    Well, first of all, why don't you tell the Court what that measures?

A.    It's a measure of academic achievement functioning.  It looks at sight reading, not comprehension, but simply can you read words and pronounce them correctly; spelling abilities; and math calculations, using paper and pencil.

Q.    And what were his scores in those three areas on the Wide Range Achievement Test that you administered?

A.    He had a standard score of 85 on the sight reading, a standard score of 100 on the spelling, and a standard score of 74 on the math.  That places him for his age at the 16th percentile, the 50th percentile and the 4th percentile.  The reading and spelling are considered high school level, even though he's at the 16th percentile in the reading, and the math was at a fifth grade level.

Q.    And two sets of questions about that score.  First, what does the disparity between being in the 4th percentile and the 50th percentile tell you about malingering?

A.    In and of itself, I don't know if it says anything about malingering, other than maybe he's a tremendous speller and pulled his punch and went from the 90th percentile down to the 50th, thinking that would make people think that there was something wrong with him.  I don't know.  I don't know how to approach a question like that, other than to say he put forth

adequate effort on spelling, such that he's testing out in the middle of the average range.

Q.    And what does it tell you substantively about his abilities?

A.    His spelling abilities are average.  His ability to sound out or pronounce words are right in the middle of the low average range.  Low average is generally 80 to 89.  His math abilities with a standard score of 74 are in the borderline defective range.  70 to 79 is that level.  It's also consistent, he had said when I took history, that he had always had trouble with math.

Q.    And how do you reconcile a person scoring a 70 on an IQ test and -- well, withdrawn.

      What percentile would a 70 put Mr. Bourgeois in on the IQ testing?

A.    70 is exactly the 2.2 percentile.

Q.    All right.

A.    It's two standard deviations below the mean.

Q.    And how do you reconcile that score with the fact that he was in the 50th percentile in spelling on the WRAT, the Wide Range Achievement Test?

A.    I don't know that there's any reconciliation necessary, other than he's a much better speller than he is intelligent. We all have our strengths and weaknesses.  And, for example, within the subtests, the 70 is computed based on six verbal and

five performance or visual spatial subtests.  Within those subtests from the IQ, he had strengths and weaknesses.  He was weakest on verbal comprehension and abstract reasoning.  And on that score, that was his lowest score across the battery.

Contrary, on a visual spatial motor speed test, how quickly can he assemble electronic radios, he's one notch above the center of the average range.  So he's good with dexterity tasks, even though he's very poor with comprehension.  That's just the way his brain works.

Q.   And going back to the subtests on the WAIS that you administered, did you see a similar difference between his verbal and performance?  And I'm thinking in particular the digit symbol subtest.

A.   Digit symbol, that's the one I just mentioned that he had good dexterity.  Verbally, he was -- his highest score was an 8 on digit span, which is average to low average.  That's verbal attention and concentration.  I mentioned before the dementias.  Quite often people with dementias have good attention and concentration, but they don't form meaningful or lasting memories.

So if you simply hold a brief conversation with them that's based on working memory, can they focus on what you're saying and respond in kind, they look just, you know, they present, they seem okay.  But if you ask them an hour later what the conversation was about or what the conversation meant,

they have grave difficulties.

So we can have, we all do have strengths and weaknesses. His are in terms of attention and concentration and fine motor speed.  His weaknesses are in terms of comprehension, understanding, appreciating social norms and morays, this sort of thing.  That part of his brain doesn't keep up at all.

THE COURT:  So appreciating social morays, it sounds like, with unable to put the brakes on and control his behavior, it sounds kind of sociopathic.

THE WITNESS:  People who are sociopaths are oftentimes described in the same terms.

THE COURT:  Okay.

THE WITNESS:  The difference would be, you know, when I debrief families, I hold up two index fingers, put them together and say, these look the same, but they're coming from very different sides.  So you can have people who look similar to one another, but they may have that sort of behavior for very different reasons.

People who have dementias may have frontal lobe problems and have trouble putting on their brakes and accuse people of stealing from them.  But in this case, it's because they forgot where they put something.  When they don't have something, they don't say, "Well, maybe I forgot."  They say, "Someone must have taken it."  They're making accusations, not that they're mean-hearted people, necessarily -- some of them

may be -- but because they have memory disturbance.  So you could have someone else who's making accusations because they are a mean-hearted person.  Two people making accusations, but for very different reasons.

THE COURT:  So you could be a mean-hearted sociopath and have this same dynamic?

THE WITNESS:  Have the same presentation.

THE COURT:  Same presentation.

THE WITNESS:  I would actually say the dynamic is different, but the presentation -- the behavior may be similar, but the underlying reason, the etiology could be very different.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.    Before we leave the Wide Range Achievement Test, were you aware of any testing administered by Dr. Victoria Swanson in 2009?

A.    My understanding is that Dr. Swanson did a Woodcock Johnson, a psycho-educational battery.

Q.    And how does that compare, just test-wise, with the Wide Range Achievement Test?  Is one more comprehensive than the other or gives you different information?

A.    The Woodcock Johnson is quite a bit more comprehensive.  I would suggest that the analogy would be that the Woodcock-Johnson to the WRAT, the Wide Range Achievement Test,

is much like the neuropsychological battery taking many hours, is to a neurologist's mental status or a neurologist's five-minute screening exam.  One is much more in depth and gets at the same stuff, but with a lot more accuracy and validity, because it's looking at a deeper level.

Q.    Okay.  Did you administer a test called Trails?

A.    Yes.

Q.    And describe what that is and how Mr. Bourgeois scored on those.

A.    Trail Making Test is probably one of the most sensitive tests for cognitive dysfunction for the amount of time it takes to administer.  It resembles what we have all done with our children, I suspect, where you connect the dots.  In this case, it's a standard form, circles, 1 through 25.  It's a timed test.  You give a sample first to make sure the person has the concept.  There are very few individuals of age who can't do the test.  And it's also nice in that it works cross culturally, in that it's the numeric system, at least for -- there are certain cultures that use a different numbering system -- but it works pretty well for all sorts of people.

It's, as opposed to a power test, seeing how much the person knows.  It's a speed test; how quickly can they do it and do it accurately.  Mr. Bourgeois took 30 seconds to complete it.  He made one error in so doing.  Any error is considered problematic, because it's such an easy test.  It

normally means that the person, for lack of a better word, got ahead of themselves.  They raced faster than they could actually do the test accurately.

Q.   And I've put up Page 17 from Exhibit P-16.  Does that depict Mr. Bourgeois' administration of the Trails A Test?

A.   Yes.

Q.   And can you point out where the error is that he made?

A.   You can just follow along, 1, 2, 3, 4, 5, 6, 7, 8, 9.  He missed 10.  That didn't get counted.  11, 12, 13, 14 -- you've got to pull it down, please.  15, 16, 17, 18, 19, 20, 21, and then from, he went from 22 right to 25 and then had to go back.  He was corrected.  He missed a number, go back to 22.

Q.   And let me put up, if I --

THE COURT:  So how many did he miss?

THE WITNESS:  Just one.  There was one error counted against him.

THE COURT:  Okay.  So what does that mean?

THE WITNESS:  It means he was going faster than he could accurately process the information.  That's probably -- in fact, I would say at least --

THE COURT:  Just missing one?

THE WITNESS:  You're not supposed to miss any in that.  You're coached to do it accurately, not to make any mistakes.

BY MR. WISEMAN:

Q.   And let me put up the score sheet from Trails B, which is Page 19 of that exhibit.  Did he make any errors in his administration of Trails B?

A.   No, there were no errors counted against him.

Q.   Okay.  And in both Trails A and B, do you derive any information from the amount of time it takes to complete each task?

A.   Sure.  Like I said, it's a timed test, so you're looking, you're comparing the individual versus the normative sample.  The cutting scores, again, if you have to pick one cutting score, Trails A, it's 40 seconds.  He took 30.  And when you say 40 seconds, the statistic for the most part is 95 out of 100 people, normal adults, should be able to do the task in under 40 seconds.  Now, if you're at 38 seconds, you know, maybe you're at the 10th percentile, but you're not down at the 5th or below.

Q.   Okay.  And on Trails B, what's the time cut-off?

A.   The cutting score there is 90 seconds.

Q.   And what did he score?

A.   He had 78 seconds, no errors.

Q.   Okay.  And so you were talking about on Trails A that he was sort of getting ahead of himself when he made the error.  Is there any information you can take from that and apply it to the other data you have, for instance, the Categories Test?

A.   As the Judge pointed out, "Just one error?"  Well, one

error is considered in the studies and the research to be significant. And the interpretation is that there's some impulsivity or disinhibition. You, I would say never, although there are, I see neuropsychologists doing this, but I would say you don't make a conclusion from one piece of data. Generally, I like to see at least three different bits or types of information to corroborate before I'm willing to draw a conclusion. But this is one of those things that causes you to raise an eyebrow and say impulsivity, disinhibition, trouble keeping his actions in line with reasonable thoughts, someone who benefits from slowing down. Oftentimes you find nervous system dysfunction in people who have this pattern.

Q. Is there any test/retest consistency or inconsistency in Trails A and B, between your administration and Dr. Weiner's administration?

A. I don't recall his data on that offhand. I'd have to look back.

Q. Well, why don't I mark, or not mark, but show you this document. Does that appear to be Dr. Weiner's raw data, the front page of it?

A. That's a page from the WAIS-R from Dr. Weiner.

Q. Okay. And if I could just approach the witness, so he can go through the document.

A. Thank you. Dr. Weiner's Trails A was a score of 32 seconds, zero errors. And B was 93 seconds, zero errors. So

the time was pretty similar on Trails A.  On my administration, Mr. Bourgeois made an error.  Trails B, from Dr. Weiner's administration, he was over the cutoff in terms of time, but again, no errors.

Q.   Did you administer a series of memory tests?

A.   Yes.

Q.   And was it part of a battery?

A.   Yes.

Q.   And what's the name of that battery?

A.   Well, the whole battery is the Halstead-Reitan.  Many of these, or most of these tests come from the Halstead-Reitan. The memory test, the major one that was given in this case were portions of the Wechsler Memory Scale-3.

Q.   And did you notice any impairments in any of the subtests of the Wechsler Memory Scale?

A.   Yes.

Q.   And what does that tell you about Mr. Bourgeois' brain and his functioning?

A.   His scores on tests of conceptual learning and memory for both verbal and visual information were very low.  He had a score of 4 on the Logical Memory One and a score of 2 on the Family Pictures.  So verbal and visual memory for more meaningful or conceptual information were significantly suppressed compared with normals or average people.

On the rote memorization portions, both verbal and

visually, he had scores of 7.  So he's low average on those tasks or those abilities.

Q.   And what does it add to the overall picture of Mr. Bourgeois' ability to function?

A.   That's a useful question from a neuropsychological perspective.  The overall picture, what neuropsychologists do is try to look at the whole pattern.  And what diagnosis neuropsychologically, as well as in other fields of medicine, is we're looking for patterns of data.

What you're seeing or what I'm describing here bit by bit is that things that are more conceptual that require higher level processing, that require him to think about more things at once and then work with them in a goal-directed fashion, as opposed to more concrete tasks or more mechanical tasks, just how quickly he can manipulate objects.  He has trouble on the former.  And those are things that tend to be more frontal lobe related.

So going back to neuropsychology 101, where you take each of these tasks and you look at the research and you say this one largely arises from left frontal abilities, this one is largely occipital right hemisphere, and you put little stars on a picture of a brain, based on -- or you know, pluses or minuses, based on good or bad behavior, we're seeing a series of minuses in the front portion of this man's brain.

Q.   And did you -- you mentioned you had an opportunity to

watch the video of Mr. Bourgeois being evaluated by the

Government doctors.  I want to particularly draw your attention

to the administration of what's called proverbs by Dr. Price.

I believe that was the last disk.  What did you observe with --

first of all, what are proverbs, in this setting, not the

biblical setting, and what information did you derive from his

performance?

A.    I suspect they're somewhat related, biblical to this

setting, but --

Q.    Okay.  I'll stand corrected.

A.    Essentially, the administration of proverbs in psychiatric

or psychological or neuropsychological assessment is to see if

people can abstract and understand things that are similar or

analogous or representational.  It looks for cognitive

complexity.  It kind of delineates or will show when people are

being very concrete or simply can't think beyond the concrete

meaning of the words.

Q.    Now, let me just ask:  Is the distinction between concrete

and abstract a sign or symptom of frontal lobe impairment?

A.    Abstracting ability is generally attributed to frontal

lobe functions.  So if you're having a tendency to be very

concrete, we would say that your frontal lobes are not doing

what they're supposed to do.  They're not helping you.

Concrete thinking is very useful thinking.  Abstract thinking

is also very useful.  You need both in order to get along in

the world.

People who think out of the box all the time and can't see where the box is have trouble. By the same token, people who are stuck in the box and can't think beyond it have difficulty, too. They have different sorts of problems typically. And we're more likely to see the people with abstracting problems, at least in a clinical practice, than those who are having trouble being concrete. I think there's also more of them.

Proverbs by themselves are kind of a difficult test because there's a confound -- if you've heard a proverb before and had it explained to you, and then someone asked you to explain that one and you're simply doing it based on rote memory, we're not testing your abstracting ability. We're testing your memory ability.

By the same token, if you present proverbs that are so esoteric or idiosyncratic that most people haven't heard them, then you can see if the person can wrap themselves around it and figure it out.

Frankly, I prefer to use things like analogies. I think the Miller Analogy Test is a great way to look at abstract reasoning, rather than explaining proverbs, but --

Q. Did you make observations as to whether Mr. Bourgeois, number one, was familiar with the proverbs Dr. Price was asking him about, and two, did he -- was he able to interpret them?

A. He said to most of them that he had not heard them before.

So for the purposes of seeing if he can abstract, that's useful in that he's not just parroting back or repeating something he had remembered from the past, assuming again that he's being straightforward.  And he could have been lying and had heard it and just didn't want to acknowledge that.  I suspect that's not the case.

Based on the ones he said he hadn't heard, he really, he was -- I'm interpreting this, but I would say he was, if not overwhelmed, he wasn't, you know, tearful or anything, but he was like "I have no idea."  He was quite forthcoming, saying, "I really don't know what to do with that.  I don't have any idea what that means."

Q.   And what were just one or two of the proverbs that were administered, just to give the Court a sense of what we're talking about?

A.   Strike while the iron is hot, something like that.  Ones that are somewhat common.  They're not in everyday parlance, but many people certainly of adult age have heard them.

Q.   And the first disk of Dr. Price's evaluation, did you see any type of mental status exam being administered to Mr. Bourgeois?  And if so, what information did you derive from that?

A.    Mr. Bourgeois was asked orientation questions:  "Do you know where you are?"  "Do you know what the date is?"  Various things like that.  He did fine on all those.

Q.   Okay.  And what about the questions in which he was asked, you know, why -- for example, why does the moon appear larger than the stars?  What time of day is your shadow the shortest?  First of all, what are those questions aimed at, and how did he respond?

A.   Most of those are less common, or maybe they're equally common with some of the proverb questions, but they're designed for critical reasoning, critical thinking.  You should be able to figure those out if you have reasonable intellect, if you stop and think about what the question means.  You know, when the flag is blowing to the south, which direction is the wind coming from?  Most people can figure something like that out without too much difficulty.

Q.   And did Mr. Bourgeois perform on those adequately?

A.   No, he didn't.

Q.   And again, does that add information, for your purposes, to how his frontal lobes are functioning?

A.   I would say that that loads largely on intellect.  That that's the first order interpretation, is that those are the responses of someone who's not very bright, assuming they're putting forth reasonable effort.  And the frontal lobes are certainly involved in that sort of problem solving activity.

Q.   All right.  We're getting down towards the end here.  I just wanted to ask you a little bit about the clinical interview you conducted.  Typically, when you interview a

forensic subject, patient, however you want to call it, how much credence or how much do you believe of what that person tells you?

A.   Well, I listen to everything, hopefully, and I also -- and frankly, this applies in my office or in the hospital or a forensic case -- I understand that people are, to the best of their ability, or to less than the best of their ability, trying to give me information relevant to the question I'm asking, as they perceive the question.  Some people are very good -- and this is where concreteness helps the psychologist, because when I'm asking specific questions, I'm looking for specific bits of information.

Personality and cognitive difficulties enter into answering the question, and sometimes the answers are vague, off the point.  Sometimes they're very specific, concrete and accurate.

I appreciate that nobody is giving me an actual accurate history.  Just like a history book doesn't give you an actual accurate history of what had happened, and how it has been shaded or shaped or changed sometimes has information about the person and their cognitive or emotional condition.

Q.   And what did you learn from what Mr. Bourgeois told you about his background and his histories, as he related it?

A.   I asked him certain particular areas.  I'm always interested in medical history, academic history, family

history.  It's evident, from what he's told me, that he had had some injuries that could have had effect on his cognitive abilities.

THE COURT:  Have you seen any of his school records?

THE WITNESS:  I have subsequently, yes.

THE COURT:  Okay.  Where --

THE WITNESS:  Actually, some -- from what I saw, there's not much.  I think I saw a couple of pages.

THE COURT:  What did you see exactly?

THE WITNESS:  I saw a transcript from high school, which was --

THE COURT:  Do you have that with you?

THE WITNESS:  I think I do.

MR. WISEMAN:  If you want to pull it out, that would be great.

THE COURT:  Can I see it?

THE WITNESS:  Yes.

MR. WISEMAN:  Give the Court some background.  We're going to be introducing --

THE COURT:  Do you have any of the elementary school records?

MR. WISEMAN:  That's just what I was about to say.  We have a single page.  That's all we were able to find.

THE COURT:  That's all what?

MR. WISEMAN:  That's all that remain --

THE COURT:  Okay.

MR. WISEMAN:  -- from his history.

THE WITNESS:  May I, Your Honor?

THE COURT:  Sure.

MR. WISEMAN:  Should I mark that, Your Honor, or --

THE COURT:  Sure.  Why don't you do that.  Have you seen them?

No, give them to Mr. Wiseman to mark, please.  Thank you, Ms. Gano.

Is this your only copy or --

MR. WISEMAN:  No.  I just want to --

THE COURT:  Okay.

MR. WISEMAN:  -- make sure I don't mess up our numbering.

MR. ROBERTS:  Can I go over there and look at his table, Your Honor?  It would be easier for us to just look --

THE COURT:  Have you not seen them?

MR. WISEMAN:  I'll put them up in a moment.

MR. ROBERTS:  Yeah, I've seen them, but I want to make sure it's the exact same things we've --

THE COURT:  That's fine.

(Counsel conferring off the record.)

MR. WISEMAN:  Your Honor, this is in our premarked exhibits.  It's 86.

BY MR. WISEMAN:

Q.   Why don't you tell us what information you think is important on that sheet of paper, Doctor.

A.   I, you know, my first reaction is just looking at the grades -- let me back up.  It says in the upper left-hand corner, I think, "Lutcher High."  And it's my understanding that this is his high school, if not transcript, it's a record of how he did.  Along the left, you can see English, Math, I believe that's Social Studies, Science, Health, et cetera.

THE COURT:  Any indication of a prior IQ test of any kind?

MR. WISEMAN:  No, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   And what grades -- I mean, we can read it, but you see basically C's and D's?

A.   By and large.  There's a few B's up there as well.  Down at the bottom, Beginning Band, I think, is a B.  I can't tell in the Health and Phys. Ed. if the first grade is a B or --

Q.   This is a little like an eye test for you, huh?

A.   I'm sorry.  I think Afro-American History looks like a B as well for half a unit credit.  I don't know if that was a smaller course.

Q.   And do you have any familiarity with the school system in Louisiana at about that time?

A.   I have anecdotal familiarity.

THE COURT:  What time is it?

MR. WISEMAN:  I'm sorry, Your Honor.  This would have been in --

THE COURT:  I can't see the top.

MR. WISEMAN:  Yes.  It says 1983 at the top there.

THE WITNESS:  Yeah, I mean, his date of birth is '64.

MR. WISEMAN:  If you look in the upper right, it says, "5/24/83, Date of --" it says, "Date of Graduation."  I'm not offering it for the truth that he graduated.

BY MR. WISEMAN:

Q.   You were about to say, do you have any sense of what the school district was like then?

A.   You know, I used to -- I worked for four years in Houston, and I had some familiarity, but it was case by case.  I can't tell you what the statistics were, so I don't know that I could do anything other than take a guess or speculate.  That's about as --

THE COURT:  So it appears that he graduated from high school.

THE WITNESS:  Yes.

THE COURT:  And he didn't fail anything.

THE WITNESS:  At least not that's on the transcript. You know, I don't know their system.  There are some places where if you fail or withdraw, it doesn't show up on your transcript.  So I don't know that we can --

THE COURT:  Well, we have no indication that that's the case.

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, just so the Court knows, we'll be offering a witness when we reconvene who's going to be able to offer the Court some insight into the school district at that point in time.

THE COURT:  Was it a teacher of Mr. Bourgeois?

MR. WISEMAN:  No, it's not.  It's Dr. Swanson who worked for the State of Louisiana as a school psychologist.  And she's familiar with this particular school district and what their standards were and what their practices were.  So you'll have more information on that.

BY MR. WISEMAN:

Q.   So you were starting to say that you want to hear about medical, academic and family history.  What else did you --

THE COURT:  What are his -- do you have elementary school?

MR. WISEMAN:  No.  That's the only page we have.  We have found no other record.  We can -- I don't want to testify here.  We were told by the authorities that everything else was simply lost, you know, flooding, Katrina, a bunch of reasons why they don't have material.  This was the only page we were able to find.

THE COURT:  And where did you get that?

MR. WISEMAN:  Lutcher High School, I believe?  Yes, Lutcher High School had that.

THE COURT:  Okay.

MR. WISEMAN:  Yeah.  After repeated visits, stern visits, I would add.

BY MR. WISEMAN:

Q.   What did you learn about his family history from him?

A.   He had, other than a typical or average family history, he described physical abuse from his mother.  There was description of some sexual abuse he suffered at the hands of one or two men, I believe.  He was reared in part by I think it was a neighbor woman, a nice neighbor lady down the street.  It sounded like a very difficult upbringing.  He didn't highlight it, but it sounded like it was rather challenging.

Q.   Was there any consistency between what he told you about his upbringing and other materials that you reviewed?

A.   Yes.

Q.   Background materials?

A.   Well, in fact, I think the other materials, I would say, would amplify that he under-represented the difficult circumstances in which he was reared.

Q.   And describe for the Court how he presented himself.  How did he speak?  How did he appear to the naked eye?

A.   If you were a fly on the wall, you would have seen a

fairly talkative gentleman who certainly wasn't shy.  He was verbose, forthcoming.  I think I was the fortunate one of the psychologists, at least after watching the interview from the other two doctors, that I had much more of a structured interview.  Testing is considered a structured interview.  And it was easier for me to keep Mr. Bourgeois on track and to get my data.  I had more control, because I had questions I had to ask.

He is gregarious.  He is somewhat tangential.  Some of his spontaneous speech kind of lacks focus, goes off in different directions.

Q.   Did you see any information in the materials you reviewed about his narcissistic tendencies or narcissistic personality disorder?

A.   There was description in various materials of him being rather narcissistic.

Q.   And did you see evidence of that in your interview with him?

A.   I would concur.

Q.   Okay.  And so what does that mean in terms of your evaluation of his actual functioning versus the way he presented in that narcissistic sort of way?

A.   Well, concretely, it meant you have to take control of the interview process to keep him focused and to get particular questions answered.  More abstractly, I think I had mentioned

before that personality and cognitive abilities interact.

The narcissism oftentimes coupled with what I'm calling low intellect, because that's what I believe is here, you get individuals who are trying to cover or mask or hide their deficiencies.  And one of the ways they do that, especially when you have a gregarious narcissistic person who talks a lot, is that they try to steer conversations or they tell you what they want to know, or more often than not, they tell you what they know about or what they think they know about, rather than just simply answering questions.

Q.   Did you see Dr. Estrada's report from the time of trial, and in particular, with reference to his assessment of Mr. Bourgeois' intelligence?

A.   Yes.

Q.   And what did Dr. Estrada say?  And why don't you tell us if you agree or not?

A.   There was a line in his I believe written report saying that this gentleman was of average or slightly above average intellect, something to that effect.

Q.   Now, let me just stop you before you go on.  Was there any indication in that report that Dr. Estrada did any type of psychometric testing?

A.   No, there wasn't.  And he being a psychiatrist, I can't speak directly to it, but typically or rarely would a psychiatrist ever do formal psychometric.  I've never seen a

psychiatrist do an IQ test to actually measure it.  Oftentimes
they will do --

THE COURT:  I think, I think he has somebody in his
office that does testing.

MR. WISEMAN:  Well, he -- Dr. Weiner got involved.
That's when Dr. Weiner got involved.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Estrada recommended him, and we'll
tie that all together for the Court.

THE COURT:  Okay.

THE WITNESS:  Well, eventually, not in his report,
but eventually Dr. Estrada made comment in some subsequent
writing saying that he had not been afforded Dr. Weiner's
information, so he didn't have the psychometric data at the
time that he put together that opinion.

BY MR. WISEMAN:

Q.  Okay.  Needless to say -- I guess it's not needless, but I
take it you don't agree with his assessment of a above average
intelligence?

A.  Well, I wouldn't argue him out of his opinion.  On the
other hand, formal psychometric data, which is the way you
assess intellect, says that this man is not of average to above
average intellectual abilities.  I'd rather base my opinion on
formal testing than interview and -- especially with someone
who --

THE COURT: Mr. Wiseman, can I see you over here just a second?

MR. WISEMAN: Yes.

(Discussion off the record.)

THE COURT: In my multitasking, I was looking at -- I pull up my motions as they're being filed, and Mr. Bourgeois filed one for a subpoena for the slides and report for the autopsy. And -- but he filed it under seal, so I thought it was secret, and I didn't know why it was secret. And he said no, it wasn't secret. So is there any opposition to me granting the subpoena? Have you seen it?

MR. ROBERTS: Your Honor, we have not seen it. We were -- the United States was actually contacted and helped him locate where these slides were.

THE COURT: Okay.

MR. ROBERTS: So we don't have any opposition to the motion. And we're trying to help them get the slides ourselves.

MR. WISEMAN: And I apologize to the Government and the Court. That was inadvertently filed under seal. It was our understanding you had no opposition, and we'll certainly get you a copy of that, especially since you don't oppose it.

BY MR. WISEMAN:

Q. Yes, I was going to ask you, Doctor --

THE COURT: Sorry, I did -- sorry.

BY MR. WISEMAN:

Q.    Before we wrap up, ask you if you recognize what's been marked as P-15.

A.    That's the first page of my, the declaration I wrote a couple of years ago.

Q.    And let me switch to Page 5.  Is that your signature?

A.    It is.

Q.    Okay.  And it's dated May 11, 2007?

A.    Correct.

Q.    And I just wanted to ask you about one aspect of the declaration.  In Paragraph 10, which is on Page 5, you said, "I understand there is some disagreement over the etiology of Mr. Bourgeois' impairments.  Dr. Wiener believed they were due to a motor vehicle accident.  There's some question as to whether Mr. Bourgeois actually suffered a head injury in the accident."

From a neuropsychological perspective, of what significance is it to your conclusion that Mr. Bourgeois has brain impairments as to what the etiology of those impairments is?

A.    The presence of impairments is objectively found in the data.  There are times when it's important, in legal settings when it's important to understand what caused the impairments and, or the time frame.  So, for example, in a civil case where someone has had, demonstrated cognitive impairments and they've

been involved in a motor vehicle accident, it's pretty important to figure out were the impairments there prior to the motor vehicle accident, or were they caused by the car accident, if they're bringing suit and looking for damages.

In this type of a forensic setting, it seems to be less important to understand what caused them, but rather to understand when they were caused.  If they occurred after someone is charged with a crime, then they weren't present and wouldn't have been affecting the person at the time of the commission, if that's what happened.  Whereas if they were there lifelong or congenital from before birth or at birth, then they would have been on board or having an effect on the person's behavior.

So for my purposes, the first part of the decision tree is:  Is it a normal functioning brain, or are there impairments?  And if you said it's a normal functioning brain, then it doesn't much matter what happened to the person. They're functioning okay, even if they've had bad accidents or injuries or medical problems.

Once you establish that there's a problem there, then it probably is useful to say how long standing have these problems been?  When did they occur?

Q.   And is the fact, or I shouldn't say the fact, would the assumption that Mr. Bourgeois may not have suffered a loss of consciousness in this three-wheeler accident that Dr. Weiner

spoke about, does that in any way affect the validity or the significance of his testing?

A.   The testing doesn't change.  And just to kind of lend some perspective to that, you don't have to have a loss of consciousness to have suffered a traumatic brain injury.  And that's well documented.  There are many people who have mild traumatic brain injuries, and there was no loss of consciousness.

You know, it's easier to talk about it if there, if someone's in a coma.  You know, it's obvious that something has happened.  There's a lot of people who suffer brain injuries in car accidents and they never had a loss of consciousness.  But oftentimes they're described by EMTs as they were walking around dazed and confused.  Well, that's no loss of consciousness, but there's been something that's happened to affect their cognitive functioning.

Q.   And in terms of etiology, in your experience in forensic neuropsychology, is childhood abuse of the type suffered by Mr. Bourgeois the cause at times of the brain impairments that you've seen here?

A.   It's a twofold answer.  You can have people who are struck in the head in the course of child abuse who suffer brain injuries.  And a shaken baby is the more extreme case where people, children die from it.

THE COURT:  Well, how do you know that happened to

him?

THE WITNESS:  I didn't say that it did.

THE COURT:  Oh, okay.

THE WITNESS:  He's just asking -- my understanding of the question was he was just asking is that the sort of thing that can cause.

THE COURT:  Okay.

THE WITNESS:  And yes, it can.

THE COURT:  Is somebody going to testify that happened to him?

MR. WISEMAN:  Well, certainly abuse.  Not specifically shaken baby, I don't think, but abuse, striking about the head, certainly --

THE COURT:  Who's going to testify about that?

MR. WISEMAN:  We're going to have lay folks testify, relatives.

THE WITNESS:  And I'm sorry if I confused it.

THE COURT:  Who?

MR. WISEMAN:  Family and relatives.

THE COURT:  Oh, family and relatives that saw it?

MR. WISEMAN:  Yeah, absolutely.

THE COURT:  Okay.

THE WITNESS:  Yeah.  I'm sorry if I confused it.  I said shaken baby as the extreme example.

MR. WISEMAN:  As an example, right.

THE WITNESS:  I didn't, you know, I'm not aware --

THE COURT:  I got it.  I'm just -- sorry.  I wanted to make sure.

BY MR. WISEMAN:

Q.   Okay.

A.   The second aspect of that, though, is that there's research that's been coming out for several years now showing that the brain development actually changes as a result of abuse or neglect.  I don't think it's conclusive, and I think some of the newer types of testing of how the brain functions may well -- we couldn't have done it before these sorts of tests.  But they're saying that the brain doesn't develop quite the same way if you're abused at a young age.

Q.   Okay.  And just two more areas I want to touch upon. Looking at Dr. Weiner's data and adding it to your data, looking at it as one big evaluation, what does his data add to yours, in terms of the opinions you've offered?

A.   The data is -- this sounds funny to say it adds something, because it's largely redundant.

Q.   Okay.

A.   So does it change anything?  Does it add any additional or other insights?  No.  But what it does do is say that at one point in time, with one examination, the patient performed with a certain pattern to his data, a certain footprint.  And then a couple of years later, under different circumstances, the same

footprint, by and large, was obtained.  That's probably the strongest indication that the patient was putting forth reasonable effort on both occasions, and that it's actually --

THE COURT:  But these are both post, around, after he's been indicted for capital murder.

THE WITNESS:  Absolutely.

THE COURT:  So it looks like what you're saying is that he presents, not that he is, but he presents with the symptoms of a narcissistic sociopath.

THE WITNESS:  You said narcissistic sociopath.  I --

THE COURT:  You said narcissistic.

THE WITNESS:  I agree with narcissistic.

THE COURT:  And you said a sociopath --

THE WITNESS:  I said --

THE COURT:  He has the same presentation as a sociopath, but a different -- but different origin.

THE WITNESS:  I haven't decided yes or no.  I haven't rendered any opinion about whether or not he's sociopathic or not.  I would absolutely agree that many of the behaviors I've seen described can be caused by sociopathic etiology.  But they can also --

THE COURT:  But he's not -- but your opinion, he's not smart enough to be a sociopath.

THE WITNESS:  Is he smart enough to be?  I would say he's smart -- you know, sociopathic behaviors don't have a

threshold.

THE COURT:  An IQ?  I didn't know.

THE WITNESS:  I mean generally you have people who are of average intellect, but it probably helps if you're being sociopathic to have adequate intellect, because you have to remember things and you have to appreciate, if I do this to this one, you know, I don't want to get caught.  So you have to be able to plan to some degree a little bit more than just the very rudimentary.

THE COURT:  But you did say he did test out as a narcissist, or he presented as a narcissist.

THE WITNESS:  He presents.  I didn't say test.

THE COURT:  And he has the same behavior, many of the same behavioral patterns as a sociopath, but you're not calling him a sociopath.

THE WITNESS:  I would say --

THE COURT:  No brakes on the right and wrong kind of thing and --

THE WITNESS:  He says things to kind of cover for himself at times, from reading the history.  I think more central, I mean, that's a characteristic of people who have sociopathy.  It's also a characteristic, which is I think in this case much more central, to someone who has a borderline personality disorder.

THE COURT:  Okay, neither of which is good.

THE WITNESS:  I don't want them for my neighbor.

THE COURT:  Right.

MR. WISEMAN:  What does it mean "good," Your Honor?

THE COURT:  Pardon?

MR. WISEMAN:  I'm just concerned --

THE COURT:  I guess the point --

MR. WISEMAN:  Good for who and what?

THE COURT:  This is the point.

MR. WISEMAN:  Okay.

THE COURT:  The whole point of this is ineffective assistance of counsel.

MR. WISEMAN:  Sure.

THE COURT:  This is not the kind of testimony one would want to put on as a defense attorney, that he tests as a narcissist.  You don't want him to be living next door, that he's got a borderline personality, he's got tendencies of sociopath, sociopathic behavior.  This presents a future danger to the community.  That's all I'm saying.

MR. WISEMAN:  Okay.

THE COURT:  And this is not, you know, this is not something that I would have expected his attorneys to put on at trial.

MR. WISEMAN:  I'm glad Your Honor has clarified that, because I think that's --

THE COURT:  So now, that's where you need to be

headed.

MR. WISEMAN:  Yeah.  And we're going to get there, I promise you.

THE COURT:  Okay.  But not today.

MR. WISEMAN:  Well, certainly not today, no.

THE COURT:  Okay.

MR. WISEMAN:  We need about two weeks for that, but I'll settle for two-and-a-half more days.  That was said with a smile, for the record.

THE COURT:  Thank you.  I can't have a 2255 longer than the trial, I don't think.

MR. WISEMAN:  I'm just --

THE COURT:  Okay.  Thank you.  You're not being mad at me.

MR. WISEMAN:  No, no, of course not.  Goodness gracious.

THE COURT:  Okay.  I feel better.  I can sleep easier tonight.

MR. WISEMAN:  Just on this sociopathic organic impairment question --

THE COURT:  In just a moment, he's going to say we're all narcissistic sociopaths --

THE WITNESS:  Not unless I'm asked.

THE COURT:  Oh.

THE WITNESS:  No, I wouldn't.

BY MR. WISEMAN:

Q.   Dr. Gelbort, are all sociopaths suffering from organic brain dysfunction?

A.   No.

Q.   And some of them are just plain mean and they do wrong things because they choose to?

A.   Some sociopaths?  Yeah, sure.

Q.   Okay.  And does Mr. Bourgeois, in your view, fit into that category?  Or are there organic explanations for some of his bad conduct?

A.   Well, there certainly are organic issues present, based on the testing and his history.  They are the types of problems and issues that contribute to people having trouble acting in an adaptive, effective, goal-directed and proper fashion.  They make it more difficult for someone who has any sort of emotional disturbance.  It's kind of like the gyroscope that's starting to wobble and now you start shaking the table that it's on.  You've got both things working against him.  These are people that we like to see in our clinic or in the hospital as inpatients when they're in their teens and start them on medications to stabilize the behavior and keep them from wobbling so far out of whack.  It keeps them from having trouble going forward and keeps society from having trouble.

Q.   Okay.  Last thing I wanted to ask you about:  Were you asked by my office to assess Mr. Bourgeois for a formal

diagnosis of mental retardation?

A.   No.

Q.   And nonetheless, in your declaration, Paragraph 6, you say that your review of the history shows many of the telltale signs of adaptive skills deficits.  What did you mean by that?

A.   He's had trouble in areas that overlap or are adaptive skills issues throughout his life, based on the history I've seen and what I've come to understand about him.

Q.   And I take it then that the IQ he scored on your administration of the WAIS was within the range of mental retardation?

A.   There's two prongs to a diagnosis of mental retardation.  The IQ is probably -- I'm going to, because I like to be involved in that part, I think it's the easier one.  And my test administration, as well as the prior test administration, even without any manipulation of the numbers trying to account for Flynn Effect, would qualify him.  You know, the current thinking is that you need 70 or less IQ points to be diagnosed.  But because of measurement error, we can go up to a score of 75 and you can still be included in the definition, in the diagnosis.

          MR. WISEMAN:  Okay.  If I could just consult with my --

          THE COURT:  Don't you look at his adaptive behavior, too, outside?  I mean, having a commercial truck driving

license and, you know, owning a home and balancing a checkbook and all those kind of things is certainly not indicia of retardation, at least in my limited opinion.

THE WITNESS:  That's a great discussion.  And the diagnosis of mental retardation is not based on things that you have accomplished, but rather that you have to have -- the score alone, that's the separate issue, that's the first prong. The second prong is that you have to have, generally the diagnosis is two areas that are suppressed or low or impaired. So you can have lots of things that you can do, but if you have at least two areas that you can't do things, then you're eligible and properly diagnosed with retardation.

THE COURT:  Okay.

THE WITNESS:  Most people who are certainly mildly mentally retarded live in the community, have a job, handle money in some rudimentary fashion, ride a bus.  So if you're looking -- best way I can explain it is if you have a chain with 100 links and you've got 97 good links and three bad ones, what's going to limit your behavior is not the 97 good ones. We can talk about those --

THE COURT:  But the way I understand the case law is he has to have been discovered to have had this mental retardation early in life.

THE WITNESS:  Ah.  There's big discussion now, ever since Atkins --

THE COURT:  Right.

THE WITNESS:  -- when all of a sudden it became important to look back and say was the person -- we didn't used to retrospectively try to diagnose mental retardation. Retardation was diagnosed because people needed adaptations and help to get through, the people who didn't have family to help them.  So if you had a functional family, you know, you were sheltered, your family took care of these things --

THE COURT:  Well, I understand.  But I've got to go by the -- I mean I've got to have --

MR. WISEMAN:  Your Honor.

THE COURT:  -- some indication --

MR. WISEMAN:  Yes.

THE COURT:  -- of earlier established mental retardation.

MR. WISEMAN:  Our view on, we think this is borne out by both the case law as well as the sciences, is that there has to be onset before 18, but not diagnosis.

THE COURT:  So you have to look at that anecdotally and not pure test scores --

MR. WISEMAN:  Exactly.

THE COURT:  -- is what you're saying.

MR. WISEMAN:  I mean, obviously if we had a diagnosis pre-18, then we would present that and be very pleased with that.  But absent a diagnosis, we have to show onset.

THE COURT:  But I want to tell you that when I look at it, it's difficult.  It's difficult to say, okay, suddenly he's tested as mentally retarded after he's convicted or shortly before he's convicted of capital murder.  And so you look at that a little bit more carefully, is all I'm saying --

MR. WISEMAN:  I understand.

THE COURT:  -- than if you have absolute proof of early on before any of these bad things started to happen.

MR. WISEMAN:  Sure.  And we will be presenting evidence on that, but as Dr. Gelbort testified --

THE COURT:  But it will be anecdotal, more than --

MR. WISEMAN:  Well, anecdotal, and it will be professional opinions, based on the anecdotal information.

THE WITNESS:  There's a whole new issue -- we didn't used to do retrospective diagnosis, because no one cared.

THE COURT:  It wasn't necessary, yeah.

THE WITNESS:  The question was never asked, so the answer was never attempted.  Now it is, because of criminal legal cases.  It wasn't an issue 20 years ago.  No one ever tried to say, "Now, was that person retarded back then, and are they retarded now?"  It wasn't an issue.

THE COURT:  The only one I had actually before, before the Supreme Court case, that I granted the habeas corpus, was a capital case, and all they had to do was go a block over here next to the County Courthouse actually, is in

the same block as the Corpus Christi Independent School District.  His lawyers only had to walk over there and get the records, and he had --

MR. WISEMAN:  Yeah.  That was a 2254, if I --

THE COURT:  Yes.  54.

MR. WISEMAN:  Yeah, yeah, I read it.

THE COURT:  But then I got reversed because --

MR. WISEMAN:  Procedurally.

THE COURT:  Yes, but --

MR. WISEMAN:  There was a default issue, if I recall.

THE COURT:  So then the Supreme Court, in the interim, came out with this -- and they sent it back to me.  I sent it to the State to determine State values of mental retardation.  And apparently all, even the State's experts came in and testified that he was mentally retarded.

MR. WISEMAN:  Right.

THE WITNESS:  There are some slam dunks, and then there are some that are in the gray zone and --

THE COURT:  Well, this was very difficult, because this man had killed a police officer, and --

THE WITNESS:  It's a terrible thing to try to figure out.  And you folks have --

THE COURT:  But that was easy, because the records were there.

THE WITNESS:  You folks have done it to us.  We

didn't used to have to do this.

THE COURT:  This was an ineffective assistance of counsel claim, just like this one here.  And should it have been presented and -- and I thought it should have been.

THE WITNESS:  And for what it's worth, I stayed out of -- well, that question wasn't asked of me, so I didn't have to address it.

MR. WISEMAN:  I have no other questions on direct examination.  Thank you, Doctor.

THE COURT:  Thank you.

MR. WISEMAN:  Should I leave my exhibits at the Bar of the Court?

THE COURT:  Well, you need to offer them, don't you?

MR. WISEMAN:  Oh, yes, absolutely.

THE COURT:  That would be -- I hate to tell you how to do this, but --

MR. WISEMAN:  No, no, I appreciate those kinds of reminders.  Should I name them, or will the record reflect what's been marked already?

THE COURT:  I think you have called the numbers out --

MR. WISEMAN:  I have.

THE COURT:  -- for each one that you've reviewed.

MR. WISEMAN:  Okay.  So --

THE COURT:  So just give me the numbers.

MR. WISEMAN:  Okay.  That will be P-16, 15, 86, 31, 132, and 17.

THE COURT:  And I think there was a -- was his vitae 16?

MR. WISEMAN:  The vitae was 17, is what I have.

THE COURT:  17, okay.  Any objections to the admission of Movant's 15, 16, 17, 31, 86, and 132?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Those are admitted.  Have you given them to Ms. Scotch?

MR. WISEMAN:  I've just handed them.

THE COURT:  Six exhibits.

(Court and Clerk conferring off the record.)

THE COURT:  Oh, yeah.  Okay.  The most recent one that was filed at 3:00 something this afternoon.  Hand that to Mr. Roberts' table.

Would you read that subpoena and make sure that's okay?

MR. ROBERTS:  I'm sorry, Your Honor, read the subpoena and --

THE COURT:  Yeah, just make sure before you do that. I just want to get that subpoena out.

MR. ROBERTS:  Can we take a brief --

MR. WISEMAN:  Oh, that's our subpoena?

THE COURT:  Pardon?

MR. WISEMAN:  Is that the one that we filed?

THE COURT:  Yes.

MR. WISEMAN:  Oh.

THE COURT:  At 3:00 something or other this afternoon.

MR. WISEMAN:  Oh.

THE COURT:  How did you do that?  Do you have somebody else here?

MR. WISEMAN:  Yeah, we have folks in Philadelphia.

THE COURT:  You know, you must have filed it earlier and it just got docketed at 3:50 --

MR. WISEMAN:  People are back at the office.  We have thousands of folks behind us.

THE COURT:  Massive computer networking.

MR. ROBERTS:  Your Honor, could we take a quick recess?

THE COURT:  Sure.  Do you have a flight out?

THE WITNESS:  It just left.

THE COURT:  Well --

THE WITNESS:  But I'd like to use the bathroom, please.

THE COURT:  Yes, after you fasten your seat belt.

(Recess from 4:44 p.m. to 4:52 p.m.)

THE COURT:  The subpoena?

MR. ROBERTS:  Yes, Your Honor.  I have no problem

with the subpoena.

THE COURT:  Okay.  Can I have it back, and let me sign it.  Thanks.

Are you ready?

MR. ROBERTS:  Waiting for Ms. Booth, Your Honor.

THE COURT:  Okay.  Where did she go?

MR. ROBERTS:  We can address, we can address this real quickly.  We're going to offer the two videotapes that was of the interviews from Dr. Price and Dr. Moore as evidence.  And we're going to get those -- we'd like to offer them today so the Court can have an opportunity to view them if the Court desires to do so, since obviously witnesses are talking about what they've observed and their impressions.  So we've spoken to Mr. Wiseman about that.

THE COURT:  Now, these are your witnesses?

MR. ROBERTS:  These are Dr. Moore and Dr. Price --

THE COURT:  Okay.

MR. ROBERTS:  -- that interviewed Alfred Bourgeois at the prison.  I'm going to offer the entire disk.

THE COURT:  After all that dust up, they did it, with the --

MS. BOOTH:  Yes, they did, Your Honor.

THE COURT:  -- video?

MR. ROBERTS:  Yes, Your Honor, and --

THE COURT:  And it turned out to be helpful to you,

you're assuming.

MR. ROBERTS:  Well, we did note that it made a measurable impression on Dr. Price, who was before quite opposed, and perhaps has changed his opinion of this.  So at any rate, we would like to offer --

THE COURT:  Dr. Price has changed his opinion from what to what?

MR. ROBERTS:  If you recall, Dr. Price was the one that was opposed to having the videotaped interview.

THE COURT:  Yes.  I don't know why, though.  I never understood that.

MR. WISEMAN:  Yeah.

MR. ROBERTS:  They still did not do the WAIS-IV, so they did not, they didn't actually present the WAIS-IV because of copyright concerns.

THE COURT:  Okay.

MR. ROBERTS:  But since that's gone, then there's really nothing in there to be concerned about with the copyright side.  And so we were going to offer those today, and then additionally, we did have Dr. Estrada's deposition this morning.  It's been asked for expedited, so that's going to be presented to you, I believe, next week.

THE COURT:  What did he have to say?

MR. WISEMAN:  Oh, very helpful to the Defense.

THE COURT:  To you?

MR. WISEMAN: Absolutely, yeah. That's not just my opinion. That's a fact.

THE COURT: Ms. Booth is not in agreement.

MS. BOOTH: I am shocked. He said the man was of above average intelligence, was not retarded, and was a violent man.

THE COURT: Well --

MS. BOOTH: There we go. I thought it went well for the United States.

THE COURT: Okay. There you have it.

MR. WISEMAN: Well, I guess that's why Your Honor is in the big chair there, because you get to decide what's helpful and to whom.

Regarding the Government's videos, I have no objection to them being offered out of turn. I would just -- and I know the Court will do this --

THE COURT: Oh, Mr. Bourgeois, are you still on the phone?

THE DEFENDANT: Yes, ma'am.

MR. WISEMAN: I would ask the Court, if you're going to watch them before --

THE COURT: Tell me.

MR. WISEMAN: -- our case is complete, that you obviously keep an open mind.

THE COURT: Would you rather just, that I just saw

them in the case?

MR. WISEMAN:  Well, I would prefer that you hold off watching them until our witnesses have testified about our view of them.

THE COURT:  Okay.

MR. WISEMAN:  Otherwise you're seeing sort of raw data without explanation.  And we have some things we want to point out about them.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  You think you just want to show them as you're going along?

MR. WISEMAN:  Well, we're going to have our own clips that we're going to want to show.  I have no problem at all, obviously if the Court wants to watch all 16 hours of them. I've watched them myself.

THE COURT:  I need to watch 16 hours of them?

MR. ROBERTS:  It's --

THE COURT:  Well, I'll tell you what, probably the only time I have to do that -- because I've got to --

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.

TELEPHONE RECORDING:  If you need help, hang up and then dial your operator.  If you'd like to make a call, please

hang up and try again.  If you need help, hang up and then dial your --

THE COURT:  Could you -- thank you.

THE CLERK:  You want me to try again?

THE COURT:  Yeah, keep trying.

MR. ROBERTS:  We must have lost him.

THE COURT:  We lost him.  Sorry.  But probably the only time I'm going to have to do that is on the weekends, because I've got a jury trial starting Monday.  And then I've got naturalization ceremonies all day Friday, and then we start Bourgeois the next Monday.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  So if I promise not to be prejudiced or preconceived -- you know, the funny thing about being a fact finder is that I watched him, you know, for all these weeks that I had him in trial.

MR. WISEMAN:  Sure.

THE COURT:  I had colloquies with him, so I, you know, I have some basis, too --

MR. WISEMAN:  Yeah.

THE COURT:  -- of coming up with an opinion.  I don't know if it's that good.  But I have to make the fact finding at some point.

MR. WISEMAN:  Yes.

THE COURT:  But I do want the benefit of all this

other information.

MR. WISEMAN:  Right.  And again, we have no opposition to the Court watching them.  We think you should watch them.  You know, there's certain aspects of them that we want to, you know --

THE COURT:  Spin your way, like they want to spin their way.

MR. WISEMAN:  I wasn't going to say spin.

THE COURT:  Sorry.

MR. WISEMAN:  I was going to say elucidate.

THE COURT:  Thank you.

MR. WISEMAN:  And you know, that we think we have some important points about.

THE COURT:  I don't think you all are like Richard Gere in, you know, Chicago, so --

MR. WISEMAN:  My point is made.  Thank you, Your Honor.

MS. BOOTH:  Your Honor, we're going to be asking to admit into evidence the different, the many disks, which we have them marked in our exhibit list as Government's Number 4, 5, 6, 7, 8 --

THE COURT:  Wait a minute.  4, 5, 6, 7, 8 --

MS. BOOTH:  -- 6, 7, 8, 9, 10, 11, 12 and 13 are the videos for the interview conducted by Dr. Price.  And then --

THE COURT:  Any objection?

MR. WISEMAN:  No objection.

THE COURT:  Okay.  4 through 13, Government's Exhibit, are admitted.  We're still trying to get Mr. Bourgeois back.  Is this okay to do this preliminarily?

MR. WISEMAN:  Sure, sure, sure.

THE COURT:  Okay.

MS. BOOTH:  And then Government's 19, 20, 21 and 22, which are the video disks for Dr. Moore's interview.

THE COURT:  Any objection?

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Okay.  19, 20, 21 and 22 are admitted. Would you give them to Ms. Scotch at some point?

MS. BOOTH:  They're being brought over right now.

THE COURT:  Okay.  Now, do you want to examine --

MR. ROBERTS:  Yes, Your Honor, we do have some questions.

THE COURT:  Okay.  Go ahead.

MR. ROBERTS:  Would you like us to wait for Mr. Bourgeois?

THE COURT:  Oh, good point.  We'll wait for Mr. Bourgeois.  Sorry.

(PAUSE.)

THE COURT:  You know, Bureau of Prisons has Mr. Bourgeois on the line in our main line.  Would you go out and -- Mr. Cutler, would you mind telling Ms. Scotch that he's

on one of these lines?

(PAUSE.)

(Court and Clerk conferring off the record.)

THE COURT:  Are you there?

THE DEFENDANT:  (Inaudible.)

THE COURT:  Can you speak up, Mr. Bourgeois?  Are you there?

MR. VILLARREAL:  He's here.

THE DEFENDANT:  Yeah.

THE COURT:  Okay.

THE DEFENDANT:  That's kind of where we got cut off.  Right after you asked me if I was on the telephone, it got cut off.

THE CLERK:  We got cut off.

THE COURT:  Okay.  Now we're back.

THE DEFENDANT:  Sorry.  I'm sorry about that.

THE COURT:  That's quite all right.  Now you're back.  Are you ready?

THE DEFENDANT:  Yes, ma'am.

MR. ROBERTS:  Yes, Your Honor.  I was going to ask for the exhibits, Your Honor, to be able to reference a couple of them.

THE COURT:  We don't have the CDs?

MR. ROBERTS:  No, we don't, Your Honor.

THE COURT:  Oh, we have these other six right here.

MR. ROBERTS: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q. Dr. Gelbort, as I said before, we're not really, we're not challenging your expertise in this area, but in reviewing through your --

THE COURT: He's going to say they're challenging your conclusions. That would be my guess.

THE WITNESS: I'm on board.

BY MR. ROBERTS:

Q. What I do have some questions about is through your CV, it appears that maybe it's not completely up to date. And so I was kind of curious about such things as: Are you still the Vice Chair of the Brain Injury Association of Illinois? You've been Vice Chair since 1994?

A. After, I think it was nine, ten or eleven years, I stepped down as Vice Chair, and now I'm Emeritus or on the Honorary Board. So I'm still on the board of --

THE COURT: Where do you live?

THE WITNESS: In Evanston, outside of Chicago.

THE COURT: I know where that is. I was there a couple of months ago.

BY MR. ROBERTS:

Q. And so there's some other things that are in here that maybe are kind of dated in the same way through your CV?

A.    I don't think there's too much there that -- that, I would agree, is dated, and it doesn't have an end point on that. That's an error.  I haven't been adding presentations and the like that I've done, for several, several years.

Q.    Okay.  Are you still a consultant at Cornerstone Services?

A.    Yes, I am.

Q.    And you still have a private practice?

A.    Yes, I do.

Q.    And then if I understood right, from 2006, you've actually testified in 11 cases and done approximately 24 depositions?

A.    I would be guessing, but I think my office did put together some statistics and forwarded them to someone.  So I don't know the numbers, but --

THE COURT:  Are you going to ask him if the majority of his income comes from testifying?

MR. ROBERTS:  Not necessarily, Your Honor, but we can ask that question.

BY MR. ROBERTS:

Q.    Does the majority of your income come from testifying?

A.    Four to six percent of my time and income seems to come from legal cases, criminal and civil.  If you followed me around all week, you'd see me in my office or at the hospital pretty much every day, five or six days a week.  The bulk of the work I do is clinical work.  I'm a clinician.  I'm not an academician.  I'm not a researcher.  I see patients on referral

from neurosurgeons, neurologists, physiatrists, psychiatrists, pediatricians, internists, gerontologists.  I do evaluations and then get them reports as to what's right or wrong with their patients and what they should do about it.  That's how I make my living.

Q.   How did you get into the forensics business?

A.   In Houston, when I was Director, I got kind of popular among some of the personal injury attorneys, I think because of my status.  The job title I had was Director of Psychology and Neuropsychology at TIRR.  And in Chicago, my ex-partner had a friend who would do some criminal work and had the probably bad judgment to get into a staring contest with the Judge and wasn't welcomed back in court.  My ex-partner didn't want to do any criminal work, and I was new into the practice, so I got kind of pushed up there.  And a couple --

Q.   So you started doing criminal work on the forensics side in what year?

A.   1990.

Q.   1990.  And during the time that you have been hired in a criminal context, all that work has been on the defense side?

A.   I think it's fair to characterize that 98 percent has been for the defense.  There have been times when State's attorneys or Government attorneys have asked me to look at a case, and I've given them my opinions or I've told them what I see that's right or wrong.  I've been asked by Judges to do some

evaluations as well.  But by and large, most of the work has been done for defense attorneys.

Q.   So this list of cases that you provided to us, you said that was put together by someone in your office?  It wasn't put together by you?

A.   I believe that my assistant went back through my day planner and pulled out cases.  I think the request was for cases I've either testified in in court or by deposition, and I think she just went back through for the past couple of years and pulled out dates where I had been providing testimony.  Some of those I'm pretty sure are going to be civil cases as well.  In fact, probably it's the majority, but I couldn't tell you.

Q.   Okay.  And earlier in your testimony, you were talking a little bit about your background.  You mentioned about running a development disabilities clinic.  Were you the actual one running the clinic?

A.   I didn't do the administrative work.  But in terms of doing the evaluations, I was the one, you know, I was doing all the clinical work from the psychological perspective.  I was supervised by my dissertation adviser, Roger Green, at the time.  So I was charged with doing it, and he would oversee what I was doing.

Q.   Wasn't there a professor who was a psychologist that was actually running the clinic, and you were working for him?

A.   I think it's best characterized that I was doing it.  He would -- I would bring back cases to him in his office and discuss them as we were going on.  When we first started, he was there with me.  And after a couple, three months, he said, "You do it.  You're able to do this."  It was a team.  We had, I think, an occupational therapist and speech pathologist.  We would do an evaluation of children, some under a year of age.  We would put together the evaluation, talk about it.  I'd take my part back and discuss it with him.  He'd say, "Yep," or "Add this to it," or --

Q.   And for the period of time, you were actually having someone else do the evaluations, and you were then reviewing the information?

A.   Not in the developmental disability clinic.  I was doing the neuropsychs.

Q.   When you testified in 1995 in a case out in Pennsylvania, you actually had testified that someone else was doing the evaluations, and then you were reviewing them.  Did you change that process at some time?

A.   You'd have to show me that testimony, make sure we're talking about the same thing.  I certainly don't recall testimony from 1995.

Q.   Do you recall a case of Harrod versus Ruoff?

A.   No.

Q.   Dr. Paul Ruoff?

THE COURT:  Why don't you just show him.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, I'm not sure what document he's showing him.  Could I see a copy?

THE COURT:  Yes, show it -- look at it, Mr. Wiseman.

MR. WISEMAN:  Thank you.

THE COURT:  And then let him show it to him.

(PAUSE.)

MR. ROBERTS:  It's just a minor point, Your Honor. I'm just going to move on.

BY MR. ROBERTS:

Q.   I was just trying to determine really when he -- when you started, Doctor.  If you could just tell us when you started doing the actual evaluations of individuals you were seeing in a criminal context.

A.   As I said, 1990, I think, was the first case.  It was a 29-year-old young man who got into trouble for sexually accosting his six, seven or eight-year-old stepsister.

THE COURT:  His what?

THE WITNESS:  Six, seven or eight.  I can't remember how young she was, but she was under ten, stepsister.

THE COURT:  Okay.  How old was he?

THE WITNESS:  He was 29, I believe.

THE COURT:  Okay.

BY MR. ROBERTS:

Gelbort - Cross
100

Q.    And in the cases that you've been a part of in a criminal context, have you ever found anyone that you've evaluated to have actually been malingering?

A.    Yes.

Q.    And what case was that?

A.    I don't recall the names.  It's been more than one.  It's been several.  I don't recall the names.

THE COURT:  Well, would it be safe to assume that if you do most of your work for criminal Defendants, that they wouldn't be calling you to testify in those?

THE WITNESS:  Oh, they absolutely didn't call me to testify.

THE COURT:  In the malingering ones.

THE WITNESS:  Absolutely not.

THE COURT:  Okay.  So I think that's what you're --that's what you need to know.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  That he never came and testified on behalf of a Defendant that this person was malingering.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  So now the next question would be the percentages, malingerers versus nonmalingerers.

THE WITNESS:  The number of malingerers, or the number of people I find that are malingering --

THE COURT:  In the criminal context.

THE WITNESS:  Right.  I would say the percentage is actually fairly small.  There are many people who don't put forth good effort.  And there are those that are overtly malingering, where the data, you look at it and the pattern is all screwed up, it doesn't make sense compared with what we know about how the brain functions --

THE COURT:  Okay.

THE WITNESS:  -- when you're working or not working. There are more people who don't seem to have put forth as good an effort as they can.  You know, they kind of lighten up.  And in fact, I typically explain to patients in this setting that if you don't put forth good effort, you may have a problem and we'll never know --

THE COURT:  Okay.

THE WITNESS:  -- or we won't be able to talk about it.

THE COURT:  Well, we're talking about criminal Defendants that are going to trial --

THE WITNESS:  Correct.

THE COURT:  -- or after post-conviction problems.  So would it be safe to say then -- I assume this is what you're trying to get at, that the majority of people you examine you do not believe are malingering.

THE WITNESS:  The majority of people, when I examine them, based on my administration of the tests --

THE COURT:  Sure.

THE WITNESS:  -- as well as encouraging them to do what they can, as best as they can, if they want to try to, in effect, help themselves, that not putting forth good effort will ruin the data, and I will have nothing to say.

THE COURT:  Okay.

THE WITNESS:  So based on that set of assumptions and the way I administer the tests, I would say, in my experience, I've had 5 percent, perhaps 4 percent, who were overtly malingering --

THE COURT:  Okay.

THE WITNESS:  -- where just like this person didn't listen at all.

THE COURT:  Okay.

THE WITNESS:  And then there's probably another 10, 15 percent who don't put forth as good an effort as they need to, and the data becomes kind of confused and you can't do anything with it.

THE COURT:  Got it.  That's what you wanted to know?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   Have you ever heard of an article that's entitled Identification of Feigned Mental Retardation Using the New

Generation of Malingering Detection Instruments, Preliminary

Findings?  Have you heard of that?

A.   It's not ringing any bells.

Q.   Do you know of the, a person named Lilly, G-R-A-U-E?  Have

you heard of that name?

A.   G-R-A-U-E?

THE COURT:  Wouldn't it just be better to show it to

him?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And let him look at it and see if he's

familiar with it.

MR. ROBERTS:  May I approach the witness?

THE COURT:  What's the date of the article?

MR. ROBERTS:  The date of the article is 2007.

THE COURT:  Okay.  Do you want to look at it first,

Mr. Wiseman?

MR. WISEMAN:  Yeah, I'd like to see a copy.  I'd

actually like to have a copy, if it's going to be used.

THE COURT:  Do you have a copy?

MR. ROBERTS:  We'll get a copy for him, Your Honor.

THE COURT:  Don't mark on it.

(Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, this one is marked on.

THE COURT:  Who marked on it?

MR. ROBERTS:  Dr. Moore.

THE COURT:  Dr. Moore?

MR. ROBERTS:  Highlighted, Your Honor.  He has a highlight on page, Page 932.

THE COURT:  It's going to make it difficult to copy.

MR. WISEMAN:  I don't have a problem with the -- it's just the highlight.

THE COURT:  If you get the citations, you ought to be able to find it.

MR. WISEMAN:  Yeah, we'll be fine.

THE COURT:  Where was it published?

MR. ROBERTS:  It was published in 2007.

THE COURT:  Where?

MR. ROBERTS:  It was in --

THE COURT:  Readers Digest?

MR. ROBERTS:  Psychology Press, Your Honor.

THE COURT:  Okay.  Have you heard of Psychology Press?

THE WITNESS:  I've heard of it.

THE COURT:  And?

THE WITNESS:  It's not --

THE COURT:  It's not top drawer or anything?

THE WITNESS:  I would tend to agree with that.  It's not citeful or --

THE COURT:  Okay.  I'm just guessing, by your expression.  Okay.

MR. ROBERTS:  I'll show him the article, Your Honor.

(PAUSE.)

BY MR. ROBERTS:

Q.   Doctor, I'm going to refer you to one particular paragraph and ask you if you would agree with this statement.

A.   Forgive me, but procedurally, unless I at least look at the abstract, to take it completely out of context, I mean, you can ask me and I'll say, "I don't know," because that's --

THE COURT:  Is there an abstract printed at the top?

THE WITNESS:  I'm reading the abstract.

THE COURT:  Okay.

THE WITNESS:  I'm halfway through it.

THE COURT:  Okay.  Take all the time you want.

THE WITNESS:  Thanks.

THE COURT:  You're going to be here for the night anyway.

(PAUSE.)

THE COURT:  Is there any way he can get out tonight?  Do you have somebody trying to rebook him?

MR. WISEMAN:  Yeah, we tried.  And unfortunately, the last flight out is not that late.  We're here for the night as well.

THE COURT:  Okay.

MR. WISEMAN:  Although we had planned to leave tonight initially.  And I am missing a baseball game tomorrow.

I was going to go watch my New York Mets in New York City.

THE COURT:  That's no big loss.

MR. WISEMAN:  Oh, my.

MR. ROBERTS:  If we're airing out our differences, I had to call in to my colonel and ask permission to show up late for military duty tomorrow morning.

THE COURT:  Oh, my.

MS. BOOTH:  Okay.  It's my husband's birthday, and --

THE COURT:  Is he home?

MS. BOOTH:  -- he's home from Afghanistan.  He's only been here 39 days in two years.

THE COURT:  How long is he here this time?

MS. BOOTH:  He's going to be home for 27 days.

THE COURT:  Congratulations.

MS. BOOTH:  Thank you.

THE COURT:  Anybody else want to chime in?

THE WITNESS:  I'm missing High Holidays with my family in Toronto.  We went up to be with them.

THE COURT:  Oh, this is --

THE WITNESS:  Rosh Hashanah.

THE COURT:  -- Rosh Hashanah.

THE WITNESS:  Yeah.

THE COURT:  Sorry.

THE WITNESS:  It's okay.  They're annoyed, but I said this comes first.

(PAUSE.)

THE WITNESS:  Forgive me, but just procedurally, this is -- Psychology Press is the publisher.  This is actually from the Clinical Neuropsychologist, which is a decent referee journal.

THE COURT:  Oh, that is a good --

THE WITNESS:  Yeah.

MR. ROBERTS:  I'm certainly not an expert in this area.

THE COURT:  There you go, Mr. Roberts.

MR. ROBERTS:  And unfortunately, Dr. Moore did have to leave, so I don't have his expertise to rely upon.  I apologize.

THE WITNESS:  I'll do my best to help you.  I'm trying to be impartial.

So you wanted me to look at one particular --

BY MR. ROBERTS:

Q.   Actually, yes, I think it was Page 932, or 937.  And it's actually highlighted in yellow, and it is with regard to the Malingered Neurocognitive Deficit Percentage or Base Rate.

A.   Did you -- I'm sorry?  Which page did you say?

MR. ROBERTS:  Your Honor, may I approach one more time?

THE COURT:  Sure.

THE WITNESS:  Okay.  Thank you.

BY MR. ROBERTS:

Q.   You see where they said their Base Rate Malingered Neurocognitive Deficit area is 41 percent?

A.   Forgive me, but I'm going to read the whole paragraph, rather than just the one line.

Q.   Very well.

A.   And I'd prefer to read the whole article.

THE COURT:  Do you want to read the whole article?

THE WITNESS:  That's the proper way to do it.

THE COURT:  Why don't you do that.

(PAUSE.)

THE COURT:  Ms. Booth, you had a sealed motion for continuance?

MS. BOOTH:  Yes, ma'am.

THE COURT:  I just granted it.

MS. BOOTH:  Great, great.  And my FBI Agent has been sent to Washington on that.

THE COURT:  Okay.

(PAUSE.)

THE WITNESS:  Are you planning to ask questions just pertaining to that one spot?  I can -- there's a study here which, if you're not going to ask about the results, I won't waste anyone's time and read.

THE COURT:  Well, you can -- what happens is this, he asks the questions, you answer them.  You can confer with

Mr. Wiseman, and he can clear everything up that you really want to say.

THE WITNESS:  I'm just, if he's asking about what's on this page, I don't need to spend our time and read the study and the results of the study.  If he's asking about -- what he pointed to thus far is just some background --

THE COURT:  You can read the whole page.  You can read the whole article.  You decide how you want to do it.  And if --

MR. WISEMAN:  Why don't we see what the questions are, Dr. Gelbort, and if you can answer them, fine; if not, you can keep reading.

THE WITNESS:  Well, I won't be shy, and if you ask a question that's beyond what I've read, I'll say I need to go on reading then, if that's okay.

THE COURT:  Perfect.

BY MR. ROBERTS:

Q.   My question is not going to involve that chart, and so if you could just tell us, that article that you just read indicates that there's a 41 percent base rate in malingering; is that correct, at least with regard to the part that I referred to?

A.   Well, it says 41 percent, but it's talking about cases -- if you go up above, the 41 percent is referring to cases that have to do with "Undergoing neuropsychological testing," I'm

quoting, "in compensation-seeking circumstances."  So it's referring to, I believe, civil cases here.  It's not necessarily applicable, it doesn't necessarily generalize to criminal cases.

Q.    The --

A.    And for what it's worth, the methodology has not been elucidated.  Several other things that they talked about there, they're generalizing from -- they're not generalizing.  They're presenting bits and pieces of data, and one has to be careful not to generalize beyond what they're talking about, which is I think what -- I'm not going to suggest that you're doing that, but you're taking information pertinent to a civil case, a car accident, for example, or someone saying, "I can't think as well, I can't work as well, so you owe me for my lost wages," versus someone who is in a legal proceeding, but different circumstances.

Q.    All right.  Well, I'm not going to get into an argument with you about the --

A.    I won't get into an argument with you at all.

Q.    -- 41 percent, about the -- I'm not going to get into an argument with you about the 41 percent, how it applies.  But the point that they were making is that there is a higher percentage of malingering in general on these kind of tests.  And so I would ask you --

A.    Excuse me.  I don't understand.  There's a higher

percentage in general on these tests, compared with what?

Q.    The 4 to 6 percent that you just stated from the witness stand.

THE COURT:  Actually, he -- well --

THE WITNESS:  You're comparing apples and oranges, and I can explain why, if you want to know.

BY MR. ROBERTS:

Q.    Okay.  Well, let me just ask you this.  You've mentioned several times that effort is an important part of evaluating how someone's taking a test.  Is that accurate?

A.    Absolutely.  And it says that in this article as well.  Sure.

Q.    Is malingering, to you, is it an all or nothing, where someone is -- is it, in your concept, is it that someone is malingering all the time on, all the way through the test, or is it possible that they're just malingering at certain points?

A.    It's not even that it's all or nothing at certain times or not at other times, but it's the level of investment a person puts in.  I've already explained that.  I've had people, I said 3, 4, 5 percent, I believe, or 4 or 5 percent that I've tested where they were just out and out malingering the whole time.  Then there's others, I said 10 to 15 percent, I believe, if you were listening, who are not putting forth maximal effort.  And hence, there are data -- there may be something wrong with them, but the data is not interpretable.

Q.   Okay.  You said that you did not use contrived tests and that --

THE COURT:  Does somebody have on a phone that's on, not off?

MS. BOOTH:  Judge, I tried to turn it off, because I went to call Debbie, and I couldn't get it to go off, so I made the noise putting it off again.

THE COURT:  It's off?

MS. BOOTH:  I think it's off.  I've been pressing --

THE COURT:  Ms. Hohle, would you help her?  She's challenged.

MS. BOOTH:  I've been pressing it and pressing it, and it won't go off.

THE COURT:  I would fine you, but I'm too tired.

BY MR. ROBERTS:

Q.   You said you don't use contrived tests?

A.   I prefer not to.

Q.   And these are -- so what tests did you actually use to evaluate whether Alfred Bourgeois was malingering or not?

A.   You want to define tests?

Q.   I'm asking you what did you use at all, whether tests or not.

A.   Okay, what mechanisms.  Tests, I didn't use any formal tests.  Those are the contrived tests.  I did use the tried and true, as I explained before, way that this has been done since

pretty much 1950, when neuropsychologists were working with war vets, where you look at the internal pattern, as well as whether or not the data makes sense based on the person's presentation and their history.  So, and I've already given examples of that.

The pattern on the category tests, where on the easy tests, where people generally get nothing wrong, only patients don't know that, he got nothing wrong.  On the test which is most difficult, he was absolutely at chance level.  He didn't get it.  And rather than doing better or worse than chance, he performed at chance.

When you look at the test data across time, from Dr. Weiner's evaluation to mine, if you laid it out and graphed it and laid one graph over the other, the similarities are striking.  You could almost call it textbook evidence of someone who's putting forth reasonable effort, because over a two to three-year period, the strengths are still the strengths, the weaknesses are still the weaknesses.

For example, on Dr. Weiner's WRAT-3, he found high school level reading, high school level spelling, sixth grade level arithmetic.  Several years later, I find high school level reading, high school level spelling, fifth grade level arithmetic.  The difference is insignificant.  It's shocking how consistent --

Q.    Let me stop you there for just a minute, because you bring

up a good point.

A.    Sure.

Q.    And that is --

MR. WISEMAN:  Well, Your Honor, I'm going to object if the witness was in the middle of his answer or finishing his answer.  I thought he was in the middle of, or completing his answer.

MR. ROBERTS:  I just -- Your Honor, it was fairly narrative, and I just, I asked him a pretty simple question, so I --

THE COURT:  Well, do you want to object to the non --

MR. ROBERTS:  I will object that it was nonresponsive, Your Honor.

THE COURT:  Okay.  That's sustained.  Now you can cut it off, and you can have him testify any way you want to. Okay?  Because only the questioner can object to nonresponsiveness.  It's true.

MR. WISEMAN:  Okay.

THE COURT:  The nonquestioner objects to narrative, which you're not objecting to.

MR. WISEMAN:  Right.

THE COURT:  He can object to nonresponsiveness.

MR. WISEMAN:  Okay.

BY MR. ROBERTS:

Q.    Dr. Gelbort, there is a -- I'll show you the first page

from Exhibit P-16, so that you know, that's the test that you gave to Alfred Bourgeois.  And then I'm going to put back up here the Trail Test that you indicated where he missed one. You gave him this test in 2007.  Is that correct?

A.    Yes.

Q.    That's a fairly simple test, is it not?

A.    I describe it as a simple test, yes.

Q.    Okay.  Now, for the record, that's Page 17 of this exhibit.  And you're aware that Dr. Weiner gave him the WAIS-R in 2004, and it contained this same test.  Correct?

A.    I don't know what you mean by the same test.

Q.    Okay.  Sorry.  The Trail Making Test.  And I'm showing you what -- let me show you the front, first page, Exhibit P-31, the test that Dr. Weiner gave to Alfred Bourgeois in 2004, and Page 14 of that test is the exact same Trail Test.  Is that correct?

A.    That, for what it's worth, that's not part of the WAIS, either the WAIS-R or the WAIS-III.  But it's the same Trail Making Test.  I trust that there's been a problem with the copying and that 14 has been, and as well as 12, has been cut off.  But yes, it should be the same test.

Q.    Okay.  And at the top, it indicates he had zero that he missed.  Is that correct?

A.    That's right.

Q.    That's a simple test that he took in 2004.  And whether

it's part of the WAIS-IV or WAIS-III, it's part of the exhibit. And this was a test that he was given in 2004 and again when you gave it to him in 2007. And this is an example of a test that he had already taken once?

A.    Yes.

Q.    And then he missed a simple one line, and a few minutes ago in your direct testimony, you mentioned how the one mistake was rather important to you in analyzing his testing ability.

A.    I think if you go back and review what I said, that one instance, I made a point of it, I said I normally like to see three instances of something before I draw a conclusion, but the single instance is something that causes me to raise an eye brow and to look for that type of behavior or be concerned about that type of behavior.

Q.    But something that simple, where someone misses, that's possibly, that could possibly be someone malingering, could it not?

MR. WISEMAN:  Objection to possible, Your Honor. We're not dealing in possibilities here.  Anything's possible, of course.

THE COURT:  Overruled.

THE WITNESS:  Any possibility does exist.  Someone who's malingering can miss one or not miss one.  That in and of itself doesn't indicate malingering or not malingering.

BY MR. ROBERTS:

Q.   Thank you.  Would someone's truthfulness have any impact on your ability to ascertain whether they were malingering?

A.   Whether or not they're being truthful?

Q.   Yes, being truthful --

A.   I mean, malingering -- malingering, by definition, is someone who's not, in a sense, being truthful.

Q.   So when you're evaluating answers to questions, whether it's on the test or whether it's, whether you're asking them direct questions to assess them, make an assessment of them, wouldn't truthfulness be important?

A.   Truthfulness is always important, of course.

Q.   You, in your declaration, you state that you reviewed background material, and you mentioned Dr. Weiner's report. How much of an emphasis did you place on Dr. Weiner's report?

A.   It was a source of data that I reviewed and looked at and thought about in the course of making my own opinions.

Q.   Would you have given a WAIS-R in 2004?

A.   Would I have given a WAIS-R in 2004?

Q.   Yes.

A.   Possibly.

Q.   Even though it was outdated?

A.   I said possibly.

Q.   It's not considered malpractice to give an outdated test?

A.   It's not considered malpractice, no.

Q.   So you would have possibly given a WAIS-R in 2004?

A.    For the third time, possibly I might have.  I probably would have chosen not to, but I possibly could have.  It just depends on the circumstances.

Q.    Were you aware that in Dr. Weiner's report that there, that there was an inaccurate fact from Alfred Bourgeois that Dr. Weiner relied upon when he started talking about the head injury?

A.    I believe that there were some things described or reported that were inaccurate, yes.

Q.    Okay.  Earlier in your direct examination, you mention the fact that there's a difference between someone that might be in a concussion, have a concussion from an injury, you were trying to, it sounded like you were trying to distinguish or say that sometimes people can make a mistake as to whether or not they have a concussion.  It sounds like -- were you aware that Alfred Bourgeois had reported to Dr. Weiner that in 1984 he had a coma lasting one to two months?

A.    I think I read that somewhere.

        THE COURT:  Who?

        MR. ROBERTS:  That Alfred Bourgeois reported to Dr. Weiner before he took -- while Dr. Weiner was doing his report --

        THE COURT:  Okay.

        MR. ROBERTS:  -- that he had had a coma as a result of an accident in 1984.

Gelbort – Cross

119

BY MR. ROBERTS:

Q.    And that played a significant -- that appears to, at least in Dr. Weiner's report, that appears to play a role in his determination that there was a brain injury, does it not?

A.    You'd have to ask Dr. Weiner.

Q.    Okay.  Well, do you recall where Dr. Weiner thought that there was a head injury?  Do you recall if he thought it was frontal or if it was in some other area of the brain?

A.    I don't know that he -- I didn't read it trying to figure -- I can tell you that he was of the opinion that there was more posterior impairment than anterior.  I don't know if he made a correlation between those.  I think he did suggest that one of the proximate causes of his cognitive dysfunction was from the injury he suffered in 1984.

Q.    And were you aware that when confronted with the medical records of that accident, that there was no coma within the medical records?

A.    Who was confronted with them?

Q.    I was asking you if you were aware that when Dr. --

THE COURT:  Actually, apparently the medical records did not reflect he had a coma.

THE WITNESS:  Correct.

THE COURT:  Okay.

THE WITNESS:  Or well, what the medical records reflect is that when he was admitted to the hospital, that he

was alert.  That's what they described in -- it wasn't the EMT.

I think it was the admission note.  For all we know, I suspect

not, but for all we know, he certainly could have had a loss of

consciousness at the scene and recovered.  That happens quite

often.  But in any event, unless it took a long time to

transport, which I doubt, he didn't have a loss of

consciousness lasting more than, I guess an hour.  And probably

didn't have that.

THE COURT:  Well, he didn't have a two-month coma?

THE WITNESS:  No, he did not.

THE COURT:  Okay.

THE WITNESS:  Absolutely not.  In fact, he probably

didn't have a coma at all.  That normally would be reported.

BY MR. ROBERTS:

Q.   Doctor, now, I want to go back for a minute to your

discussion about the conclusions about Alfred Bourgeois'

possible brain -- would you call it damage, brain damage, or

just impairment?

A.   I talked about dysfunction or impairment.

Q.   And you say that it was in the frontal lobe?

A.   The tests that show the most consistent pattern of

suppression or poor performance are things that are typically

attributed to frontal lobe, or largely to frontal lobe

functioning.

Q.   So you use the word "attributed."  So is it correct in

layman's terms to say you observe somebody performing a certain way, whether it's in daily activities or taking these tests that you generate, and if they perform a certain way or act a certain way, you then attribute that to some form of brain injury or brain impairment?

A.    Well, you've mixed the metaphors.  When, for example, if you see someone who is having word salad, who is expressing themselves and the words are coming out in a strange way, there's paraphasic errors, paraphasic distortions, you can't understand what they're saying and they're mixing up their words, and you come up with a hypothesis.

It could be a form of schizophrenia.  That would explain that.  That's what you see in some people with schizophrenia. It could be a Wernicke-Korsakoff psychosis, which is an alcohol related problem.  It could be a Wernicke's aphasia, which is a post-central result typically of a stroke.

And then you go ahead and say there is a pattern of dysfunction or deficits, the behavioral presentation, and you try to figure out why that is occurring.  And that's what I do for a living.  I get asked by doctors, you know, what are the problems and what are those correlated with and what do we do about them.

If you have someone who's having trouble getting their words out, now it's again possibly an aphasic disorder, it could be a major depression.  You go through the differential,

and you do testing.  This is how diagnosis works.

So that's all we actually did with Mr. Bourgeois is, you know, they ask a question, "Is there something wrong?"  We go about testing to see, front to back, side to side, top to bottom, basic abilities --

THE COURT:  So you assume something's wrong before you --

THE WITNESS:  No.  Oh, no.

THE COURT:  Okay.

THE WITNESS:  The question is, is there something wrong?

THE COURT:  Oh, okay.  Thank you.

THE WITNESS:  And the first part of the decision tree is, did the --

BY MR. ROBERTS:

Q.   But you do reach a conclusion?

A.   Pardon me?

Q.   You do reach a conclusion, based on what you believe is happening inside the brain?

A.   No, based on the data, not based on what you assume is happening inside the brain.  You keep turning it around.

Q.   Well, you know that --

THE COURT:  Yeah, but I got it, and I'm the fact finder.

THE WITNESS:  But he keeps asking the questions.

THE COURT:  It doesn't matter.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q.   You are aware that Dr. Estrada has written a report where he has found that Alfred Bourgeois suffers from borderline personality disorder.  Correct?

A.   I think I saw that, yes.

THE COURT:  I think he said the same thing actually. Didn't you say that?

THE WITNESS:  That -- I brought up that borderline -- you were talking about antisocial --

THE COURT:  Right.

THE WITNESS:  -- or sociopathy, and I said borderline is probably more central and first to consider before --

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. ROBERTS:

Q.   And you described this frontal lobe impairment as causing someone to not be able to stop their behavior or hard to put the brakes on, to use your words.

A.   I said frontal lobe impairment can give rise to problems, and I said, you know, using the kind of crass terms, the gas pedal or the brake pedal of behavior, that initiation as well as inhibition is largely rooted in frontal lobe functioning. And when people have impairments in frontal lobe function,

oftentimes it shows up as difficulty initiating or inhibiting behaviors.

I also said that the people who have trouble initiating, the couch potatoes, tend not to come into court, because they're sitting at home on the couch.  The people who have trouble inhibiting or who are slow to inhibit, who have disinhibition syndromes or frontal lobe syndromes, seem to be over-represented in court.  And that's what the research shows, too.

Q.   And, but that same, the same conduct, where they're, maybe they're in a frustrated situation and they can't stop themselves and they move into a violent conduct, that can also be explained by a borderline personality disorder, could it not?

A.   I think I gave that example, too.  I put up two fingers saying you can have similar behaviors coming from very different quadrants, and that the personality of the person, as well as the cognition interact, and that in fact one can exacerbate the other.

It's like the gyroscope winding out of control.  When you have cognitive difficulties, it's harder to deal with personality issues.  If you have personality issues, it's harder to deal with cognitive dysfunction.

I brought in there, too, I think it's important the support of family can keep these people out of harm's way.  In

fact, when we see people in court, more often than not, it's the confluence of not having enough help from the family, having a cognitive problem, having some personality issues, and then possibly drugs and alcohol. And that's the common person who ends up in the courtroom.

Q. Are you -- have you often been hired by defense to come in and evaluate a Defendant before they go into trial?

A. Often? Not in my --

Q. I'm sorry, maybe that's a bad word. Have you been hired by a defense team to come in and evaluate a particular person accused of a crime before a trial occurs?

A. I've been asked at the time of original trial to come in and evaluate someone and say, you know, essentially, are there cognitive deficits, and if there are, what are they, and how do they impact the person's behavior? That's happened, yes.

Q. And when you give an opinion to the defense attorney, do you expect the defense attorney to rely upon your opinion?

A. I don't know that I would expect them to rely on it. I do hope that they listen to it and allow me to educate them and ask enough questions so that they know what they have, from a psychological or neuropsychological perspective, and I expect that they make decisions. I mean frankly, a third to half the cases I do evaluations, the attorneys say that's not going to help us, and we're not interested, or we're not going to use that information. That's not uncommon at all.

Q.    If it doesn't help them, they're not going to use it?

A.    If it doesn't contribute the way they say it, to their legal defense, then they say, "Thank you," and that's the end of our association.

Q.    And you are -- did you get a chance, you said that you reviewed a lot of the evidence and information in this case. Is that right?  You reviewed a lot of documents and a lot of transcripts from this case?

A.    I certainly didn't say the evidence, or I forget the other word you just used.  I'm sorry.  I did read -- well, you've got the list.  It was presented first off.

Q.    Well, the list that you, that's been provided to us of what you actually reviewed includes day one through four of the trial testimony.  Did you read all that?

A.    I skimmed through that.

Q.    And it's the penalty phase, and it includes March 24th --

        THE COURT:  I'm sorry.  Did you read all that or skimmed?

        THE WITNESS:  Skimmed it.  I skimmed it.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q.    Did you read -- how many of Alfred Bourgeois' letters that he wrote that were very lengthy, how many of those did you read?

A.    More than I want to think about.  I probably read five or

Gelbort - Cross

six of them, and I skimmed most of the other ones.

Q.   Can you give us the context of one of those letters?

A.   There was one where he was telling his wife all the things he had done for her and all the things he had paid for and that things were going to change when he was back on the scene. That would be an example.

Q.   Well, that sounds kind of like a nice letter.  Did it end that way?

A.   I wouldn't characterize it like that.

Q.   Did the letter end that way, where it was going to be all nice and everything's fine when he gets back?

A.   I don't recall it ending with everything's going to be all nice when he gets back.  It was more --

Q.   Do you remember about how many pages that letter might have been?

A.   I don't recall offhand.

Q.   Do you remember how it was written?  Was it written, you know, very clearly and within the lines?  Or was it written all over the place or, can you give us some idea?

A.   I don't know what "all over the place" means.

Q.   Well, I'm just trying -- you tell me.  What did the letter look like?

A.   It looked like a letter, I would say, if I had to characterize the style, it was more of a bullet point or a listing of different --

THE COURT:  That was before she testified?

THE WITNESS:  I'm sorry, I don't recall the time frame on it.

THE COURT:  Well, it makes a difference, huge difference actually.

THE WITNESS:  I just remember it being --

THE COURT:  Okay.

THE WITNESS:  -- an upset letter.  He wanted things different.  He was unhappy -- the summary statement I made is that he was unhappy with the way the relationship had gone and he wanted to straighten things out and do things differently.

BY MR. ROBERTS:

Q.   There's a report that, it says in here that you reviewed, mental health report.  It says you reviewed, from a, it says Neurological Evaluation by Frank Bonikowski.  Who is that, and what was that document?

THE COURT:  Do you have all of these documents?

MR. ROBERTS:  We don't have this one, Your Honor. We're kind of interested in what this might be.

THE COURT:  Okay.

MR. WISEMAN:  It's Petitioner's 113 that was premarked.  You should have it, Mr. Roberts.

THE COURT:  Can you show it to him?  Have you got it?

THE WITNESS:  I think you still have my book that has that.

MR. WISEMAN:  Oh, we took your book from you?

THE WITNESS:  Well, you pulled out the page that had the school record.  I don't think you brought --

THE COURT:  Right, the school record, and didn't give it back.

THE WITNESS:  It's Tab 56, I believe.

(PAUSE.)

THE COURT:  Can I see it, too?  Is that it?

MR. WISEMAN:  Sure.

(PAUSE.)

MS. BOOTH:  Your Honor, while we're waiting, is it all right if I tender to the Court the exhibits that we offered?

THE COURT:  Right.  If you would give them to, just lay them in front of Ms. Scotch.

MR. ROBERTS:  Your Honor, would you like me to wait till you finish?

(PAUSE.)

THE COURT:  Thank you.  Did he ever have the MRI?  Do you know?

MS. LARIN:  Not that we are aware of.  We don't know the answer to that.

THE COURT:  When was the trial?

MR. ROBERTS:  2004, Your Honor.

THE COURT:  So this was after -- this was before the

Gelbort – Cross

trial that Bonikowski saw him?

MR. ROBERTS:  Apparently, Your Honor.

MR. WISEMAN:  Your Honor, the history which will hopefully come out through a variety of witnesses is that Dr. Cunningham recommended neurological testing, including neuropsych testing.  Subsequent to that, Dr. Weiner was retained to do the testing, and Dr. Bonikowski also did his neurological evaluation.

THE COURT:  Okay.

MR. WISEMAN:  That's the history.

MR. ROBERTS:  And that was --

THE COURT:  I think I must have signed authorizations for all these things.

MR. WISEMAN:  Oh, I'm sure you did.

THE COURT:  They were probably under seal or something.

MR. WISEMAN:  Yeah, yeah.  And that was done in mid to late February just before trial.

THE COURT:  Right.  Okay.

MR. ROBERTS:  Ready, Your Honor?

THE COURT:  Go ahead.  Thank you.

BY MR. ROBERTS:

Q.   So I was just curious, does that report add or take away anything from your opinion, the report you just read?

A.   It has import in that he underwent what appears to be a

fairly standard neurological examination with EEG.  The EEG

normal awake and asleep was the interpretation, which is a

fairly common or typical suggestion for an MRI and

neuropsychological testing.

So I would suggest or I would say that in a typical

clinical setting, this is a reasonable thing to do.  I think in

a forensic setting or where there's this much on the table,

it's a start.  It's consistent with what I see frequently in

patients who have cognitive dysfunction, but no gross physical

problems or severe impairments.  This is common in what you see

with people who have mild or even mild/moderate impairments.

Q.   So all of this analysis, all of these testings, these

neurological evaluations and everything, it all goes to try to

explain someone's behavior.  Is that right?  I know it goes to

understand how the brain's functioning, but in the context of

the criminal aspect, if someone is coming, approaching you and

saying, "I want you to evaluate this Defendant," they're trying

to understand how someone might have, why they might have done

something.  Is that right?

A.   You keep vacillating between two words, and there's --

they sound like a subtle difference, but to me it's important.

Understand versus explain.  I don't know that you can explain

the behavior, but you can certainly understand that a brain

such as Mr. Bourgeois' that has certain limitations and

impairments is imminently more likely to do things that are

strange, bizarre or out of the norm.

A normal functioning brain, understandably, gives rise to normal behavior. People who have impairments, and especially if there's other collateral problems or things that exacerbate their cognitive limitations, or their cognitive limitations are exacerbating other emotional or personality disorder issues, they are much more likely to demonstrate odd behaviors.

Some of it never comes to the light of the Court because it's just strange eccentricities and they live their little lives and they may be withdrawn. They're out there. There's other people who, because of frontal lobe disinhibition syndromes or rages or whatever, end up in the court system.

What I'm saying is that testing shows abnormalities, that the abnormalities appear to be valid. But this is not because he's trying to do this. There's just too much that argues that this is a valid and accurate assessment. And that people who have this pattern of abnormalities are more likely to be found to behave in ways that are not adaptive, not helpful, not appropriate.

Q.   Are you aware of what he was accused of actually doing?

A.   Yes. Convicted of it in fact, right?

Q.   Well, yeah. But at the time before, as we were going towards the trial, I'm just curious if you were aware of the severity of the injuries to the baby.

A.   I, you know, forgive me, but I'd say it's pretty horrible.

Q.   Okay.  Are you also aware that throughout the trial, and even at the end, to the jury, that he continued to profess his innocence, that he said he never committed any of those injuries to the child?

A.   I don't know that that's been consistent, but I've seen that in different places, and I think even subsequent to conviction, he's contended that he wouldn't do such a thing.

Q.   I mentioned a moment ago the transcripts, and you said you skimmed them.  There's one in particular I'd like to know if you had a chance to read, and that's from March 24, where the Defendant, Alfred Bourgeois, actually asked to approach the bench and spoke to the Judge about how he believed his case should have been presented and how he wanted to make a statement to the jury.  And then he ultimately did make a statement to the jury.  Did you get a chance to review how he related to the Court and how he related to the jury?

A.   I skimmed it, and I don't have great recollection.  I'm sorry.

Q.   Do you think that -- I mean, that's a pretty stressful environment, is it not?  You're about to go before a jury and know that someone's going to ask to take your life?

A.   I think it would be for most people.  It probably was for him.

Q.   How he reacted in that situation and his cognitive process through that, don't you think that would have been important to

look at in analyzing whether he's functioning properly?

A.    With all due respect, I missed that class in school.  I never had the class where, when someone's approaching the Judge, how they should or shouldn't, how to assess that.  I just took the ones that had to do with the tests that we use in everyday practice.

I can have my own opinion as to how that affects a person, but when I'm basing an assessment of their intellect, I'm going to use my intellectual tests.

Q.    So you would prefer to use an IQ test over how somebody is --

THE COURT:  How they actually function --

MR. ROBERTS:  Function.

THE COURT:  -- is what he's saying.  Because the Fifth Circuit says you have to look at both.

THE WITNESS:  Well, if I'm asked to assess their IQ level, I'm going to use the IQ test.  And I will take into account collateral behavior, their presentation, which I think the courtroom behavior would be part of that, as well as history.

BY MR. ROBERTS:

Q.    When you gave these tests -- I have Petitioner Exhibit 16 here.  Again, this is your test.  Was there some reason you didn't give him the full test, some reason you didn't require him to answer all of the portions of this test?

A.    Sure.

Q.    There was?

A.    Sure.

Q.    So there was some stuff you just didn't, you didn't think was necessary for him to respond to on this test?

A.    The nature of testing, at least again, the way I was taught, is that every test is designed to answer a question. So --

Q.    I thought it was a standardized test.

A.    It is a standardized test.

Q.    And you've got like, on Page 10, you've got a logical memory test, recognition, that there was no answer at all.  So you didn't think that was pertinent to his, to the evaluation of his IQ?

A.    You're looking at the Wechsler Memory Scale, which doesn't measure IQ.

Q.    Good point.  Not the IQ --

A.    The 11 subtests that are utilized to assess the IQ were all administered.

Q.    And there are some pages that are left blank.  So did you --

A.    Again, are you looking at the Wechsler Memory Scale or the Wechsler Adult Intelligence Scale, Third Edition?

Q.    Well, I'm showing you what's marked as Petitioner Exhibit 16.

A.    And if you look at the top, it says, "Wechsler Memory Scale."

Q.    Wechsler Memory Scale.  And within this document, is Page 10.

A.    That's recognition, logical memory.  I chose not to give that.  That's correct.  That's not part of the IQ test.  It's part of the memory scale.

Q.    Okay.

A.    And --

Q.    You chose not to give that?

A.    That's right.  There's several more parts --

Q.    You also chose not to give this test?

A.    The second part of faces, the long-term recall, that's correct.

Q.    Okay.  No answers on this page either.

A.    That's right.  The second administration of family pictures.  Number one was given.  Number two was not.

Q.    Okay.  So just so I understand correctly, when there are portions of tests that you, as you're testing an individual, you decide that you're just not going to give to that individual?

A.    And there are at least 100 more neuropsychological tests I didn't give either.  Of course.

Q.    Okay.  You mentioned the Flynn Effect briefly.  You didn't really go into it that much, and I'm not going to go into it

much either.  But the Flynn Effect has been used to adjust an

IQ score.  Is that an accurate statement?

A.   I wouldn't use the word "adjust."  You might, but I would

choose not to.

Q.   Okay.  The -- is it accurate to say the Flynn Effect is

generally applied to lower a score?

A.   The Flynn Effect doesn't lower a score, no.  That's not an

accurate statement either.

Q.   That's not accurate either.  Okay.  Have you ever used the

Flynn Effect on a patient that was not in the courtroom?

A.   I don't think you use the Flynn Effect.  The Flynn Effect

is something that has been shown through research to occur and

exist.  And it's something that when you understand

conceptually as well as practically that it exists and that it

occurs, it's something to take into consideration as you

interpret data.

Q.   What is the word you would use in applying the Flynn

Effect?  Do you have a word?  How can I get -- what word can I

use to discuss the Flynn Effect's application with you?

A.   I think you have to pick your own words.  If you want to

ask me a question I can, you know, answer, I would be happy to

do that.

Q.   Well --

A.   But you might have to not be fishing for an answer.  You

might just have to ask me why does it matter or what is the

matter.  Maybe that's the way to do it.

Q.   My question is, is the Flynn Effect applied, used, in any form or fashion, with a patient in a clinical setting, as opposed to in a courtroom?

A.   Well, I don't think it's applied in a courtroom.  The Flynn Effect exists.  It's like gravity.  I'm not applying gravity, but it exists.

Q.   The Flynn Effect exists for the courtroom.  Is that correct?

A.   I don't understand what you're asking.

Q.   Do you use the Flynn Effect in assessing an IQ for any patient that is not involved in a criminal case?

A.   Let me see if I can help you.  The Flynn Effect exists.  And if I have a patient in my office that I have to assess, and all I have is, for example, the WAIS-R, and I need to assess intellect, and I get one chance to do it, I may choose to use the WAIS-R, with the understanding that it's an outdated test.  And it's not malpractice, but it is using a test that doesn't apply specifically.

So it has to be recognized that it's an outdated test, and that the Flynn Effect exists.  So when I get an IQ of 110, I can say, if I had the proper test, an up-to-date test, this patient would probably test out with an IQ of about 100.  So that can happen.

In my office, frankly I don't think we have a WAIS-R on

the shelf any more.  I've got the manual, so I can go back and look at old stuff, but we don't have the test equipment.

Q.    So have you ever applied the Flynn Effect to reduce an IQ for a patient?

A.    I haven't applied it, and I don't reduce IQs.

Q.    Is it true that -- and I think you mentioned this on your direct examination, it was a while ago, but that there are people that present well?  The way that they act and they're adapting to the environment, if someone were to look at them, they would never think that that person was mentally retarded, because of the way they present themselves?

A.    I don't think it applies just to mental retardation.  I see it commonly --

Q.    But that's my question.  My question is with regard to mental retardation, and the question is whether or not it's, the way people present themselves, often in the adaptive nature of how they are dealing with their circumstances.

A.    The adaptive nature?  I think what you can say is that -- first off, you have to recognize that ten people with mental retardation with similar IQ scores are not all going to look exactly the same.

Q.    But some people present so well that there's no -- that someone even of your background, education, experience would look at them and say they're not mentally retarded.  But I know you wouldn't, because you're going to go through all the

testing, but I'm talking about someone of average walk of life.

A.    I think the lay population -- and again, it's my belief, and from I see out around me and what I see in court for that matter, is that people tend to look at folks and make judgments or make decisions.  I've been heard to say that for the most part only dermatologists should be diagnosing based on how a person looks.

That's not entirely true.  For example, Down Syndrome is something that you can have a pretty good accuracy.  You can be pretty accurate in appreciating someone with Down Syndrome, based on their faces, the way they do look.

But mental retardation, if you listen to people who lecture on it, the classic example is they'll show a picture of ten people and say, "Which ones of them are mentally retarded?" and people will say, "Well, that one looks mentally retarded, and that one does.  These people look normal."  Well, in fact, the picture can be all people with mental retardation or all people who are normal.  You can't tell mental retardation based on an appearance or presentation.

Behavior gives you some insight, but typically, it's only if the behavior is really suppressed.  You know, the article you gave me, it talks about just that, that the mildly retarded individuals are most often out in the community working and participating.  But that's -- most people don't understand what mental retardation is.

Q.   The other side of that's true, too, is it not, that there are people that just test poorly, that just, even in taking tests, they get under stress and they just don't test well.

A.   If you test poorly, like you have an IQ of 50, we call that mental retardation.

Q.   So you're just, again, you're just going on the IQ test.

A.   Well, if you have adaptive living skills and there are two or more areas in the impaired range, too, I mean, that's the classification.  The diagnosis is pretty cut and dried.  You read it, you apply it.

Q.   In fact, the DSM-IV speaks to this and says that the measurement of adaptive skills is seen as a check against the over-reliance of IQ scores in a diagnostic -- in the diagnosis of mental retardation.  Does that sound right?

A.   That's right.  I mean, there's been an evolution.  What was it, 35, 40 years ago, you could have an IQ of 85 and be diagnosed with mental retardation.  Conceptually, mental retardation now is seen as something that occurs in the bottom one or two percent of the population, and mild retardation is much more prevalent than moderate, which is more prevalent than severe or profound.  It has to do with people who don't fit into normal society.

     They can go out and be in normal society if they have supports.  And that's kind of the focus of the mental retardation community is to help people adapt.  We talk about

adaptation and providing support so that these people can fit in as best as possible into a normal community.

Q.   Let me ask one more question.  On your report you mentioned that you did not formally assess Alfred Bourgeois' adaptive functioning.  And earlier you said that you weren't even asked to make an assessment of mental retardation.  Those are both accurate statements?

A.   Yes.

Q.   Okay.  So you're not here today to tell us that he's mentally retarded.  You're here today to address his IQ.

A.   I did not perform sufficient evaluation.  I looked at his IQ and measured that, so I can say that based on his IQ score, he qualifies for diagnosis of mental retardation, if he has limitations in the adaptive living skills, and if the onset was before the age of 18.

Q.   Do you think it would be worthwhile to give him a WAIS-IV at this point in time?

A.   As I said before, testing is to answer questions.  If there's a question that can be raised that's relevant that a WAIS-IV would be the answer, then sure.  But if there's not a question that would be addressed by the WAIS-IV, then it's just an academic exercise.

          MR. ROBERTS:  May I have just a moment, Your Honor?

          THE COURT:  Yes, sir.

     (Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, we have no further questions at this time.

THE COURT:  Let me see you up here again.  I forgot to ask a question of you about another deal.

(Discussion off the record.)

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.  Just a few questions on redirect, Dr. Gelbort.  The Bonikowski report, which is Petitioner's 113, remarked, says at the end that, quote, Further, the patient's neuropsychological study should tell whether there are underlying or predisposing factors that would also explain some of his behavior, especially with regards to prior history of abuse by a parent, closed quote.

From your review of Dr. Weiner's report, do you think Dr. Weiner's testing answered those questions or attempted to answer them?

A.  Answered?  No.  Attempted to, probably in some fashion, but I don't think it was -- it was lacking.

Q.  The report itself was lacking?

A.  The report and the interpretation.  There was more that could have been done with that data, if proper questions had been presented and follow-up had occurred.

Q.  Okay.  If instead of calling Dr. Weiner they had called you, and you did the testing in 2004 that you did in 2007, did

your testing answer the question posed by Dr. Bonikowski?

A.    Oh, I think my testing did, but I don't think it's just a question of me versus Dr. Weiner.  I think other neuropsychologists could have done a better job of interpreting what was there.

Q.    Okay.  Just to be clear, you gave the entire WAIS-III.

A.    No, I didn't give the entire WAIS-III.  There are --

Q.    Oh, that's --

A.    There are extra subtests which do not contribute and are not counted and are not used to calculate the IQ.  There are intended to be six specific subtests from the verbal side and five from the performance side that are used to calculate an IQ.  If you spoil a subtest or don't have equipment, you can use one of the other three, in place of.  And then you still have enough subtests to compute a full IQ.  You can, with less accuracy, extrapolate it.  If you want to give five and four, rather than six and five.  But what was given to Mr. Bourgeois are the six verbal subtests and the five performance that are meant to be used to calculate a full scale and performance and verbal IQ.

Q.    And the test that Mr. Roberts was showing you up on the screen relating to the Wechsler Memory Scale, why is it that you didn't give those particular subtests?

A.    There are subtests that provide data that's not very useful or informative.  I mean, as I think I've alluded to,

there are -- when you go to look in the big book of the listing of all the even commonly given psychological or the neuropsychological tests, you know, there are well over a hundred.  Part of the testing process is to construct a battery to answer the question that you're asked.  And just because there may be 15 subtests in the Wechsler Memory Scale doesn't mean all 15 are useful in answering the question.

If you're going to answer the question, "What's his IQ," you need to give those 11 subtests, or you need to try.  The memory scale, I know very few neuropsychologists who ever give the whole thing, in its entirety.  It just provides information that is either irrelevant or not useful.

Q.   Regarding this article about 40 percent of people malingering on neuropsychological testing of some sort, would it be accurate that in your experience and your knowledge of the field that there's not a rate of 40 percent malingering on neuropsychological testing?

A.   I would say that that -- it says 41 percent.  I would say that that's absolutely the truth.

Q.   That what is the truth?

A.   That there's not 41 percent malingering on neuropsychological examinations.

Q.   And would you have a livelihood to go to if almost half the people you tested were malingering?

A.   I might have a different livelihood, but neuropsychology

would be very different than it is today if this was accurate in the clinical population, and even I think in the forensic population.  I mean, you have to read the whole article to understand it in context.  So, I mean, you can grab that sentence, but I think there's a whole lot more going on than just that one sentence.

Q.   And finally, Mr. Roberts was asking you to, whether the impairments explain the offense, that Mr. Bourgeois' impairments explain the offense, and you felt that wasn't quite accurate.  In your experience as a forensic neuropsychologist in capital cases, pretrial, who typically makes that ultimate decision about whether the impairments explain the offense in a penalty phase?

A.   I don't know -- I'm not sure how to answer that.  I think it's the jury and the Judge who get to decide those issues.  The neuropsychologist is simply, I believe, helping people understand who they're looking at in terms of their neurocognitive functioning.  Rather than relying on, he looks this way, it's like we can do better than that.  We can say this is how he tests out on standardized tests that have been shown to indicate in this case intellectual level or frontal lobe functioning or whatever other abilities we're actually able to measure.

Q.   And I guess it's obvious, but if that information isn't presented to the jury, they can't make that decision, can they?

A.   Well, I think they're stuck making the decision based on how the patient looks to them, in their eyes, and what they know.

You know, when I lecture, I oftentimes talk about the guy looking for something underneath the street lamp on a dark night, and the second guy comes up and helps and they don't find it.  And the second guy says, "What did you lose?"  And he says, "I lost my glasses."  And, "Are you sure you lost them here?"  He says, "No, I lost them over there.  But it's dark over there.  I can't see.  I'm looking here."

People tend to make decisions based on what they know.  I don't know too many folks who see like my patient who's talking gibberish and say, "Well, I think they're crazy," but of course there's probably ten other diagnoses that I'm not aware of that can cause you to talk gibberish.  Most people don't go outside of the box there.

So most people look at someone, and we're all -- everybody starts as an amateur psychologist and says I think he's this or I think he's that, and very few people say, "And I bet there's a whole bunch of other things he could be that I just don't know about."  So that's why you bring in -- you know, when you go to your doctor, that's what you're doing.  "I think it's this, but I should probably go see my doctor, because they're the ones with tests."

MR. WISEMAN:  Okay.  Thank you.

MR. ROBERTS:  We don't have anything further either, Your Honor.

THE COURT:  All right.  Anything else?

MR. WISEMAN:  Not from Mr. Bourgeois.

THE COURT:  Thank you, sir.  You may stand down.  So this hearing is concluded.  We'll go off the record, and would you hang up the phone.

(Proceedings concluded at 6:28 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    September 16, 2010
Molly Carter                        Date

INDEX

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL M. GELBORT | 10 | 94 | 143 | |

| EXHIBITS: | ADMITTED |
|---|---|
| P-15: 5/11/07 DECLARATION OF DR. GELBORT . . . . . . . | 84 |
| P-16: WECHSLER MEMORY SCALE, THIRD EDITION . . . . . . | 84 |
| P-17: CURRICULUM VITAE OF DR. MICHAEL M. GELBORT . . . | 84 |
| P-31: DR. WEINER'S 2004 TESTING OF DEFENDANT . . . . . | 84 |
| P-86: RECORD FROM LUTCHER HIGH SCHOOL . . . . . . . . | 84 |
| P-132: LIST OF MATERIALS PROVIDED TO DR. GELBORT . . . | 84 |