IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
        PLAINTIFF,                 *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     SEPTEMBER 22, 2010
                                   *     9:25 A.M.
        DEFENDANT.                 *
                                   *
* * * * * * * * * * * * * * * * *


        PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 3
   (TESTIMONY OF ELIZABETH ANN JOHNSON AND CHARLES ALAN KEEL)

            BEFORE THE HONORABLE JANIS GRAHAM JACK
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

        (APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:              MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 9:25 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 9:28:10 a.m.)

ELIZABETH ANN JOHNSON, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ABREU:

Q.   Ms. Johnson, can you please state your name for the record?

A.   Yes.  It's Elizabeth Ann Johnson.

Q.   Thank you.  Ms. Johnson, how are you employed?

A.   I'm a self-employed forensics scientist.

Q.   And where do you practice?

A.   Southern California, Thousand Oaks.

Q.   I'm going to show you what's been previously marked as Petitioner's 93 and ask you if you recognize that particular document.

A.   Yes.

Q.   What is that?

A.   It's a copy of my CV.

MR. ABREU:  Your Honor, at this time we would offer a copy of Petitioner's 93.

MR. DOWD:  No objection, Your Honor.

THE COURT:  Petitioner's 93 is admitted.

BY MR. ABREU:

Q.   And, Ms. Johnson, how long have you been in private consultation with regard to forensics?

A.   Self-employed for, since 2003.

Q.   And prior to that, what were you doing?

A.   Before that, I worked at a private laboratory in Ventura, California, for six years.  And prior to that, I was with the Medical Examiner's Office in Harris County, Texas.

Q.   And how long were you there, in Harris County, Texas?

A.   Five years.

Q.   Okay.  Have you been qualified as an expert in DNA in the past?

A.   Yes.

Q.   Have you been qualified as an expert in forensic biology?

A.   Yes.

Q.   Have you testified in state court as an expert in those fields?

A.   Yes.

Q.   Approximately how many times?

A.   About a hundred.

Q.   Have you testified in federal court?

A.   Yes.

Q.   Approximately how many times?

A.   It's just an estimate, probably a dozen times.

Q.   Have you ever been denied expert status in a case?

A.   No.

MR. ABREU:  Your Honor, at this time --

THE COURT:  Any objection to her being received as an expert in DNA, Mr. Dowd?

MR. DOWD:  No, Your Honor.

THE COURT:  Then it's accepted.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.   Ms. Johnson, in 2003 were you retained in the case of United States versus Alfred Bourgeois?

A.   Yes, I was.

Q.   And who were you retained by?

A.   Douglas Tinker.

Q.   Do you recall any interactions with Mr. John Gilmore?

A.   I don't.

Q.   So every interaction you had in the case was only with Mr. Tinker?

A.   As I recall, yes.

Q.   And what were you retained to do back in 2003?

A.   To review some documents regarding some testing in the case and to consult with Mr. Tinker.

Q.   Testing by whom?

A.   The FBI.

Q.   Were you directed to conduct any testing of your own?

A.   Eventually, yes.

Q.   Okay.  And in relation to that, to what you were requested

to do, did you receive any evidence?

A.   Yes.

Q.   What did you receive?

A.   I contracted the work to the laboratory Technical Associates that I had just left, and that laboratory received some rectal swabs taken from the victim in the case.

Q.   Did you direct any testing of those rectal swabs?

A.   Yes, I did.

Q.   What tests did you request?

A.   I asked that they be examined for the presence of seminal fluid and spermatozoa, and that would include several, involve doing several tests.  And depending on what was found, we would do a DNA test or not.

Q.   Okay.  Did you actually perform the tests yourself?

A.   I did not.

Q.   Was that unusual for someone else to perform the tests?

A.   It's not unusual, no.

Q.   At the time that you conducted that testing, did Mr. Tinker express any concern about the fact that you were not actually performing the test yourself?

A.   No.  It's pretty typical.

Q.   What two tests again did you perform?

A.   Well, the swabs were examined and tested with acid phosphatase.

Q.   Okay.  Let me stop you right there.  What is acid

phosphatase?

A.    Acid phosphatase is an enzyme that is present in several bodily fluids, but it's present in much higher concentrations in seminal fluid.

Q.    Is acid phosphatase unique to men?

A.    No.

Q.    And is it unique to semen?

A.    No.

Q.    Okay.  And how exactly is that test performed?

A.    That's a very quick color change test.  What's done is typically some portion of the swab is removed and put into a test plate, and the test reagents are dropped onto it.  And if there's a color change within a certain amount of time, it's considered positive.

In this particular case, there was very little cotton left on the swab, so the sticks were shaved and soaked in a very low volume of water, and that low volume wash was then subsequently used for the other test.

Q.    Was the material you received from the FBI sufficient enough to conduct an acid phosphatase test as you conducted?

A.    Well, there was staining on the sticks.

Q.    Right.

A.    And had there been seminal fluid on the sticks, that would have been sufficient to get a test result.  You can always conduct a test.  You just don't know what the result's going to

be.

Q.   What was the result of that particular test?

A.   Negative.

Q.   It was negative for the presence of acid phosphatase?

A.   Correct.

Q.   Okay.  What other testing did you conduct?

A.   The same low volume water wash was used to do a p30 test, using a test card.  And then the --

Q.   Before we get to p30, let me ask you about if you performed a microscopic sperm search.

A.   That's done on the cellular pellet.

Q.   Okay.  Explain to us how that's done.

A.   Okay.  Well, I described the low volume water wash, and then that material is taken out and retained for the test on the soluble proteins.  And then for the microscopic sperm search, what you do is you put the material, the fabric and the stick material into a larger volume of water, and you agitate it thoroughly, and then you spin it down in a way that only the cellular material pellets in the bottom of the tube and in your cotton and your sticks are in a little basket in the top of the tube.  You remove the liquid, and then you re-spin the cellular material in a very small volume of liquid.  You remove about 10 percent of it.  You put it on a microscope slide.  You fix it. You stain it.  You look for the presence of sperm.

     And then in this particular case, the first steps of the

DNA digestion were done, so that any epithelial cells would have been broken up and gone, taken away.  And a second slide is made from the sperm pellet or what would be a sperm pellet.

Q.    Okay.  And those epithelial cells are the cells that would be present at the, on the same slide, and so the reason to remove them is so that they wouldn't interfere with your observation of potential sperm?

A.    Yes.

Q.    And the material you received and the evidence you received from the FBI, was that sufficient to do all those steps that you just described to us?

A.    Given the staining on the sticks, again, you can always do the tests.  And given the staining on the sticks, we did this.

Q.    Okay.  What was the result of that microscopic sperm search?

A.    Negative for spermatozoa on both the slides.

Q.    Okay.  Were you aware at the time that the FBI had also conducted certain testing in this case?

A.    Yes.

Q.    What testing had the FBI done, as far as you knew?

A.    They had done a p30 test.

Q.    Okay.  What else?

A.    And they had examined the smears made from the rectal swab.

Q.    Okay.  And when you say they examined the smears, what

were they examining?  A microscopic examination?

A.    It -- yes, that is.

Q.    Is that different than the microscopic examination that you did?

A.    They're both microscopic examinations.  In our test, we broke open the epithelial cells in case any were interfering with the observation of sperm.

      What they did was they just looked at the slide where the swab was just run across the slide.

Q.    Okay.  Were you aware of what result they obtained using their procedure?

A.    Yes.

Q.    What was that?

A.    They saw no sperm.

Q.    Okay.  And the procedure you used was actually a more specific method of locating sperm?

A.    More efficient.

Q.    And again, what was the result of that?

A.    Negative.

Q.    Okay.

      THE COURT:  Okay.  Nobody found any sperm.  So get to the point of her testimony.

      MR. ABREU:  Yes, Your Honor.

BY MR. ABREU:

Q.    Did the FBI conduct any DNA tests?

A.　Yes, they did.

Q.　Okay.　What two different tests did they conduct?

A.　Well, they conducted themselves one test which was using autosomal STRs.　And then they sent out to a laboratory in Dallas the material for Y chromosome testing.

Q.　Okay.　What were the results of either one of those tests?

A.　Negative --

Q.　Okay.

A.　-- for male DNA.

Q.　Let me ask you specifically about the test conducted by Orchid Cellmark.

A.　Yes.

Q.　What was that test?　What kind of test was that?

A.　It's Y chromosome testing.

Q.　And is there any more significance to a negative Y chromosome testing than the other DNA tests performed by the FBI?

A.　Yes, there is.

Q.　What is that and why is that?

A.　The test performed by the FBI will detect total human DNA, female and male DNA.

　　　MR. DOWD:　Your Honor, could the doctor repeat that? I couldn't quite make that out.

　　　THE COURT:　Would you mind, without touching the microphone, please, putting your right arm on the shelf in

front of you?  It kind of leans you into the microphone a little bit easier.

THE WITNESS:  Okay.  The test that the FBI did was autosomal STR testing.  It detects total human DNA, male and female.  They detected only the DNA of the female victim.  It could be that if there's a male contributor at a very low level, that that male might not be seen in the vast excess of the female DNA.

The test that Cellmark did, the Y chromosome DNA testing targets specifically the Y chromosome only present in males.  You can have a ton of female DNA present in the sample, and it will totally ignore that.  There will be no interference from the female DNA in the Y chromosome testing.  It targets only the male DNA.

It's extremely sensitive testing.  It can detect -- you would see some peaks at 50 to 100 picograms of DNA.  That corresponds to between 15 and 30 sperm cells.

BY MR. ABREU:

Q.    And how many were located in this case?

A.    There was no male DNA detected.

Q.    Okay.  Now, you were aware that the FBI conducted a p30 test.

A.    Correct.

Q.    And you also conducted a p30 test.

A.    Yes.

Q.   What is p30?

A.   P30 is a protein that is found in abundance in human seminal fluid, and it is found in lesser concentrations in some other fluids.

Q.   What other fluids?

A.   Amniotic fluid has been reported, breast milk, urine from men, some serum from men, and some female serum, and some female urine.

Q.   Okay.  And just so --

THE COURT:  What type of female serum?

THE WITNESS:  Well, serum is from the blood.

THE COURT:  Okay.  I know, but is it, could it be from a two-and-a-half year old child?

THE WITNESS:  The literature is not specific on the age range or the details.

THE COURT:  Okay.  Can you tell me, is a Y chromosome subject to denigration over time?

THE WITNESS:  Um --

THE COURT:  Or is it something that should stay around?

THE WITNESS:  Well, all DNA is subject to some degradation, but the advantage of doing the Y chromosome testing is it's only going to target the male DNA, and the female DNA won't be --

THE COURT:  I understand, but how long a time would

it degrade, would it take to degrade the chromosomes?

THE WITNESS:  Any degradative forces is totally dependent on storage and conditions, and it could be anywhere from a few hours in some --

THE COURT:  Okay.

THE WITNESS:  -- circumstances to decades in other circumstances.

THE COURT:  Okay.

BY MR. ABREU:

Q.   And the sample you received, that was received -- the sample that was preserved and sent to you by the FBI.  Correct?

A.   Yes.

Q.   Okay.  And are there -- let me just follow up on the Judge's question.  Are there circumstances where in fact sperm and/or male DNA are located years after an offense -- or years after it's been discovered, let me ask that.

A.   Yes, decades.  Sperm are incredibly tough and durable.

Q.   What do you mean by that?

A.   They are so durable they have an extra reinforcing protein that is so hard to break open that we have to add an extra chemical to the test reaction in the laboratory to break them open.

Q.   Okay.  So --

THE COURT:  But when it's gathered -- I guess, you know, I heard evidence at the trial that they didn't think to

do -- why, I don't know -- but the pediatric hospital where she came for her last hours didn't think to do a rape exam or anything like that.  So it was after she was dead that they took these swabs.

THE WITNESS:  Uh-huh.

THE COURT:  And so someone testified at trial that the sperm would have suffered degradation over that time period.

THE WITNESS:  Okay.  I --

THE COURT:  Is that true or --

THE WITNESS:  I think that was Dr. Benton's testimony.

THE COURT:  Yes.

THE WITNESS:  That was totally erroneous.

THE COURT:  Okay.

THE WITNESS:  Sperm are very durable.  They can be found in decomposing bodies 30 days after, you know --

THE COURT:  Well, I read about how they, you know, the Innocence Project and what have you, and they come up with the old DNA from -- but I guess I assume that that was stored like in a rape kit that was done pretty quickly or --

THE WITNESS:  No.  I mean --

THE COURT:  That's not necessary?

THE WITNESS:  -- there is evidence being analyzed in cold cases that are decades old.  And again, decomposing bodies

that have been burned, sperm have been detected in the vaginal canals of these bodies.

THE COURT:  Okay.  So days isn't old?

THE WITNESS:  Weeks, months --

THE COURT:  Okay.

THE WITNESS:  -- years.

BY MR. ABREU:

Q.   And I was going to ask you about Dr. Benton's testimony specifically.  Was his testimony regarding the persistence of sperm accurate, in your estimation?

A.   No, it was not.

Q.   The survivability of sperm?

A.   No, it was not.

Q.   We were talking a minute ago about the Y chromosome test. Does the Y chromosome, the component, does that degrade any differently than any other part of the sperm or any other part of DNA?

A.   No.  All the chromosomes, including the Y, they're subject to the same degradative forces at the same time.

Q.   Getting back to p30 quickly here, you've identified male urine, some female urine, breast milk, amniotic fluid, male serum and female serum as other fluids where p30 has been detected.

A.   Yes.  And did you say female urine as well?

Q.   Oh, female urine.  I don't know if I said it, but thank

you.  So despite -- is p30 also known as Prostate Specific Antigen?

A.    Yes.

Q.    And despite that name, is it specific to the prostate?

A.    No, because it's found in these other fluids at lower levels.

Q.    And like acid phosphatase, which you testified to earlier, is it specific to semen?

A.    No, it is not.

Q.    And like acid phosphatase, as you testified earlier, is it specific to men?

A.    No.

Q.    Okay.

        THE COURT:  Could two-and-a-half year old children have it, little girls?

        THE WITNESS:  I'm not aware that any children have been included in the studies.

        THE COURT:  Okay.

        THE WITNESS:  So I can't comment one way or the other.

        MR. ABREU:  Okay.

        THE COURT:  Thank you, ma'am.

BY MR. ABREU:

Q.    Which, by the way, which -- how is a p30 test performed, the one that you did, or directed, I should say?

A.   The one that was done at Technical Associates was also done with a test card.  It was done with a different test card called a Seratec card, which is more sensitive than the one, than the ABA card, the ABA card that the FBI used.

Q.   And why is that significant?

A.   Well, Technical Associates obtained a result which they recorded as a weak positive.  It, that test card, that Seratec card has an internal control line, which has a quantitative value to it.  They have an internal control line, which is at the equivalent of a 4 nanogram per milliliter concentration of p30.  And this test result was weaker than that control line.  And unfortunately, the ABA cards do not have that similar --

Q.   And what significance can you draw from the quantitative difference in a test like p30?

A.   Well, any time you have any quantitative data, you can get some idea of how much material you're dealing with, you know, how much -- if it were semen that was causing the reaction, how much semen that you might be dealing with.

Q.   And knowing that information, would that lead you to have some idea about how much sperm you, for instance, might be able to detect?

A.   Yes.

Q.   Okay.  Now, despite the positive p30 by the FBI and the weak positive p30 test that you reported, you did not opine that there was sufficient evidence -- or what was your opinion,

let me ask that, whether there was sufficient evidence to conclude that in fact semen was detected?

A.   Well, I took all of the test results together to make an opinion and not just the p30.

Q.   Okay.

A.   Or I'm sorry, was the question whether there was --

Q.   Right.  What was your opinion regarding whether there was sufficient evidence to conclude that there was semen present?

A.   Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs.

Q.   And when was your testing and review of the FBI testing complete?  Do you recall?

A.   The end of December of 2003.

Q.   Let me show you what I am marking as Petitioner's Exhibit 168.

        MR. ABREU:  Your Honor, this has previously been provided to the Government.

BY MR. ABREU:

Q.   And ask you if you recognize that document.

A.   Yes.

Q.   What is that?

A.   It's a fax that I sent to Douglas Tinker on December 31st,

2003.

Q.   Okay.  And what were you informing him of on December 31st of '03?

A.   That I tried to call him and I couldn't get an answer or a message machine, that I had completed my review on the Bourgeois case and wanted to discuss it with him.

MR. DOWD:  Your Honor, we received that yesterday, and we have no objection to its admission.

THE COURT:  The number is?

MR. ABREU:  Petitioner's 168.

THE COURT:  Petitioner 168 is admitted.

MR. ABREU:  Thank you, Your Honor.

BY MR. ABREU:

Q.   Did you eventually have a conversation with Mr. Tinker about your review of the FBI results and your own testing?

A.   Yes.

Q.   Was that a written conversation -- I mean, I'm sorry -- did you write him, was that a verbal conversation, my question?

A.   We had several conversations.  At that time, at the end of December, the testing had not been done by Technical Associates.  I was advising him that it should be done.  And that was, I believe, completed at the end of January of '04.

Q.   The testing by Technical Associates was completed in January of '04?

A.   Correct.

Q.   Did you subsequently provide Mr. Tinker with a written synopsis of your conclusions?

A.   What I provided him was a handwritten document, because I was in Colorado on another case and didn't have my file, and he kind of caught me off guard needing something.  So I put together a handwritten document for him, to assist him in cross-examination.

Q.   Let me show you what's been previously marked as Exhibit, as Petitioner's Exhibit 92 and ask you if you recognize that particular document.

A.   Yes.

Q.   And what is that document?

A.   It's the document I prepared and faxed to him from Colorado.

Q.   Okay.  That's your handwriting?

A.   Yes.

Q.   And what date is that document dated?

A.   March 1st, '04.

Q.   And does that document, as far as you know, accurately reflect what in fact you had found after your examination, in your review?

A.   Yes, it does.

Q.   Let me ask you what you reported to Mr. Tinker in what appears to be Paragraph 1.  Do you see that?

A.   Yes.

Q.   What did you report to Mr. Tinker in that report?

A.   That the FBI did not test the rectal swab with acid phosphatase reagent or do a sperm search.  And I need to clarify, not a sperm search as part of their DNA digestion. They just looked at the slide, the smear that was made.

They only did a p30 test with an ABA card and a DNA test. The ABA card was positive, but there's no indication of male DNA found in the non-sperm or sperm fraction.

Q.   Okay.  Could you just tell us what the difference is between a sperm and non-sperm fraction, when you use that term?

A.   When you test these samples that possibly contain sperm, it's done by what's known as a differential digestion process. In the first step, all the cells that aren't sperm, whether that's epithelial cells or blood cells, anything that's not a sperm is going to break open and extract into the liquid phase. That phase is removed.  And then the sperm are -- well, it's removed after the sperm are centrifuged and pelleted to the bottom of the tube.  Because the sperm are so tough and durable, they're washed, and then in a second step they are broken open to provide what should be, if all is done efficiently, a clean sperm DNA fraction.

Q.   Okay.  Let me direct you to Paragraph Number 2.  What did you report to Mr. Tinker on March 1st of '04?

A.   We did do an AP test, and it was negative, a p30 test that was weak positive, and a microscopic sperm search negative for

sperm.

Q.    And what did you report in Paragraph 3?  Let me move that up.

A.    Had a P30 positive weak on our test which could be a false positive due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed.  And it goes on to the next page.

Q.    I'm sorry?

A.    And then it continues on the next page, that paragraph.

Q.    Oh, my apologies.  Let me just ask you one question.  Is there -- did you mention that you reported regarding the possibility that bacteria might have led to the positive p30?

A.    Yes.

Q.    And when you say that bacteria might have led to that positive p30 test, what do you mean by that?

A.    It's suspicious because this is a result on a rectal swab. It's extremely weak.  And in light of all the negative tests, that that is something that would have to be considered.

Q.    So you're not saying -- you're not saying the bacteria actually caused the positive p30.  You're saying that that's something that needs to be considered.

A.    That's right.

Q.    Okay.  Had you been called as a witness at trial in 2004, would you have testified consistent with the information that's contained on this Page 1 of the document that you sent to

Mr. Tinker?

A.    Yes.

Q.    Okay.  Let me now refer you to Page 2.  Can you tell us what that information is on Page 2?

A.    Yes.  I take some calculations through that I was -- in an effort to try to educate Mr. Tinker to cross-examine the witness, that also if the p30 -- the p30 test is positive, if it were from semen, then I use the calculation based on the sensitivity of the ABA card and how much sperm is in semen, and I come up with a figure of how many sperm would be expected to have been on that swab or the swabs that they tested.

Q.    Okay.  And how many did you determine should have been detected?

A.    Five hundred.

Q.    Okay.  And obviously that assumes that we're not talking about somebody with a vasectomy or something like that.

A.    Correct.

Q.    Okay.

A.    And let me clarify.  Five hundred would have been on the swab.  And even -- when you make the slide, you take 5 or 10 percent.  So even if you took 10 percent, that's 50 that would go on the slide, and that is more than sufficient to detect.

Q.    Had you been called as a witness at trial in 2004, would you have testified consistent with the information that you reported to Mr. Tinker on Page 2 of this document?

A.    Yes.

Q.    Let me refer you now to Page 3.  Can you tell us what that is?

A.    Yes.  This is a page from a publication, and it lists a table with various substances, including semen, but other substances in which PSA has been found, and their concentrations.

Q.    Okay.  And those are some of the same fluids that we've discussed already.  Correct?

A.    Yes, it is.

Q.    And I'm looking at some of those concentrations, and I'm curious about whether the concentrations listed there are sufficient to react and cause a positive p30 test on a card, on a test card.

A.    Well, the limited detection of the ABA card --

Q.    Yes.

A.    -- is 4 nanograms per mil --

Q.    Okay.

A.    -- and 2 nanograms per mil for the Seratec card.  So some of them are.  I mean, some of them are greatly -- breast milk, greater than 101 case.  Some of them are not meeting that limited detection, but some are.

Q.    Okay.  And let me ask you -- well, let me read you something from the results and discussions and ask you if you agree or disagree with that particular statement.  It says, "It

Johnson – Direct                      26

is now quite clear that the term Prostate Specific Antigen is a misnomer.  Although present in great amounts in seminal deposits, its presence has been detected in a variety of other body fluids."  Do you agree with that?

A.    Yes.

Q.    Okay.  You've told us that already.  Down, down to the bottom.  "Of particular concern to this analyst is the detection of PSA in female urine and female serum.  The finding of urine on a pair of underwear from a rape survivor would not be uncommon.  In addition, if trauma is present, or the survivor is menstruating, blood may be present on the vaginal swabs or on the stains in the underwear.  When an extract is prepared from the stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen?  In other words, what is the likelihood that the stain is from female urine or serum?"

Do you agree or disagree with that statement?

A.    I agree that there is cause for concern and to consider these factors.

Q.    Okay.  And had you been called at trial in 2004, would you have testified consistent with the information that's contained on Page 3 of this document that you sent to Mr. Tinker?

A.    Yes.

Q.    Now, we've already said that this original report was dated March 1st of '04.  Correct?

A.    Yes.

Q.    Were you aware at the time that you sent this report that the Court had issued an order indicating that all expert reports had to be submitted by February 26th of '04?

A.    I was not.

Q.    Did Mr. Tinker ever make you aware of that particular deadline?

A.    I don't believe he did.  This is -- if he had, I would have sent a report.  This was something that I had to prepare in a bit of a rush from a different state and send off at his request, because I think the witnesses were going on the next day, or shortly thereafter.

Q.    And you say this is not an actual report?

A.    It's not what I would consider to be a report, no.

Q.    And would you have even sent these conclusions sooner than March 1st had Mr. Tinker made you aware of that particular deadline?

A.    Yes.

Q.    If you had been asked?

A.    Yes.

Q.    Okay.  In 2007, did you, were you contacted by my office in regards to this case?

A.    Yes.

Q.    And what were you asked to do at that time?

A.    I was asked to review some documents and prepare a

declaration.

Q.   Okay.  Do you recall what documents you were asked to review?

A.   The direct appeal opinion and some testimony, trial testimony from Ms. Zervos and Anthony Onorato and Dr. Benton, as well as the FBI notes, re-review the notes and data.

Q.   Okay.  And did you review an autopsy report by Dr. Elizabeth Rouse?

A.   Yes.

Q.   Okay.  Did you also review the conclusions of Forensic Science Associates?

A.   The conclusions at that time, yes.

Q.   Did you prepare an affidavit in connection with what you were requested to do?

A.   Yes, I did.

Q.   Let me show you what's been marked, previously marked as Petitioner's Exhibit 91 and ask you if you recognize that particular document.

A.   Yes.

Q.   What is that document?

A.   That is the declaration I prepared in 2007.

Q.   Okay.  And is that your signature on the last page of that document?

A.   Yes, it is.

Q.   And is the information contained in that particular

document true and correct to the best of your knowledge?

A.   Yes.

MR. ABREU:  Your Honor, at this time we would offer Petitioner's 91.

MR. DOWD:  No objection, Your Honor.

THE COURT:  I'm sorry?

MR. DOWD:  No objection, Your Honor.

THE COURT:  Petitioner's 91 is admitted.

BY MR. ABREU:

Q.   Now, we've already discussed Mr. Benton's -- Dr. Benton's testimony.  Excuse me.  Let me ask you whether you -- and you've already stated that you reviewed Ms. Zervos' testimony.  Is that correct?

A.   Correct.

Q.   And who was Ms. Zervos?

A.   She was the supervisor of the Serology Unit at the time at the FBI that did the work regarding the p30 testing.

MR. ABREU:  May I have a second, Your Honor?

THE COURT:  Yes, sir.

MR. ABREU:  Thank you.

(PAUSE.)

BY MR. ABREU:

Q.   Let me refer you to a specific portion of the transcript, if I may, regarding Ms. Zervos' testimony.  Ask you if you recall reading this, in response to a question from Mr. Tinker.

Question:  "And what kinds of things could you find might -- could you find that might have the same reaction?"

Answer:  "Uh-huh, the protein has been found in male peripheral blood, as well as male urine, at very low concentrations.  Concentrations much lower than we would ever expect from semen."

Question:  "Is there any --"

The Court:  "Can I follow up on that one?  Much lower than --"

Mr. Tinker:  "I'd be afraid to tell you no, Judge."

The Court:  "All right.  No, go ahead."

Mr. Tinker:  "I wasn't sure if that was clear what you were asking for."

Question, a little further down:  "So you're saying that there was, there may be similar proteins in male urine and what else?"

Answer:  "In male peripheral blood."

Did you review that portion of Ms. Zervos' testimony?

A.   Yes, I did.

Q.   Is her testimony regarding where p30 may be located accurate?  Or complete?  Let me ask you that.

A.   It's not complete.

Q.   Okay.  Because you've already testified that it could be found in these other substances.

A.   Yes.

Q.    Had you been called as a witness at the time of trial, would you have been able to address Ms. Zervos' testimony that p30 is only found in male peripheral blood and semen?

A.    Yes, I would have.

Q.    Did you also review the testimony of Mr. Onorato?

A.    I did.

Q.    And who is Mr. Onorato?

A.    He was the FBI examiner in the DNA Unit that performed the DNA tests.

Q.    Let me refer you to a specific portion of that testimony, if I may.

      Question, from Mr. Tinker:  "Are there any other things that have similar or the same protein, like in food or anything else?"

      Answer:  "There are no foods that contain this protein."

      You would agree with that?

A.    Yes.

Q.    Okay.  Question:  "Are there other substances that might --"

      Answer:  "There are other substances, body fluids, that may possess this particular protein.  It's at such low levels, however.  Semen levels of this protein are astronomically high."

      Question, down a little further:  "Okay."

      Answer:  "This protein is astronomically high, compared to

its content in, say, something like blood, male blood.  And generally it's only found in male blood when the individual has prostate malignancy."

At the top.  Do you see that?

A.   I do.

Q.   Was Mr. Onorato's testimony about where p30 might be located complete?

A.   It was not.

Q.   Had you been called as a witness in 2004, would you have been able to address Mr. Onorato's testimony regarding where p30 could be located?

A.   Yes, I would.

Q.   Do you recall Dr. Benton's testimony about where p30 can be located?

A.   Specifically, I recall a discussion about where it's produced.

Q.   I'm sorry?

A.   Where it was produced.  I don't recall the specifics about where he said it was located.

Q.   Let me read you this portion of Mr., of Dr. Benton's testimony.

"And more specific, a confirmatory test is called Prostate Specific Antigen, also known as a p30 assay.  And this is confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily fluids, including animal bodily

products, except in male prostate, and with one exception,

human breast milk."

Do you recall that testimony?

A.   Yes, I do now.

Q.   Okay.  Was Mr. Benton's testimony complete regarding where p30 has been located?

A.   It was not.

Q.   And had you been called as a witness in 2004, would you have been able to testify regarding the accuracy of that testimony?

A.   Yes, I would have.

Q.   Okay.  Did you also have an opportunity to look at the autopsy report of Dr. Elizabeth Rouse?

A.   I did.

Q.   Okay.  I just have a few more minutes.  Let me show you what's been previously marked as Petitioner's Exhibit 153 and ask you if you recognize that particular document.

A.   Yes, I do.

Q.   Let me refer you to page, the third page of that document.

MR. ABREU:  And I apologize for the markings on this, Your Honor.  I didn't have a clean copy of it.  I'm not sure if this was the original trial document that was marked this way or not.

BY MR. ABREU:

Q.   Refer you to the sentence that says, that begins the

bottom of -- let me just point to it, right here. "The external."

"The external genitalia are those of a normal female child, and there is no evidence of any trauma or labia or introitus. The hymen is present, and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic."

Did you read that in Dr. Rouse's report?

A.   Yes, I did.

Q.   Is that the type of evidence that you consider when you make your determinations as a forensic biologist?

THE COURT:  Make a determination in what?  I don't understand.

MR. ABREU:  Of whether in fact this might be semen. My apologies, Your Honor.

MR. DOWD:  Judge, I would -- I don't think she's been qualified as a -- to that extent.

THE COURT:  Sustained.

MR. ABREU:  I'll rephrase the question.

BY MR. ABREU:

Q.   What significance does that particular document have regarding the testing and -- or your conclusions?  Let me ask that.

MR. DOWD:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. ABREU:

Q.   You did review that particular document?

A.   I did.

Q.   Let me ask you about a separate document that's been previously marked as Petitioner's Exhibit 152, and ask you if you recognize those particular documents.

A.   Yes.

Q.   What are those documents?

A.   It's the documentation of the sexual assault exam.

Q.   On what date was that examination?

A.   Looks like it was 6/28/02.

Q.   Okay.  June 28th of '02, and that would have been while JG1999 was still alive?

A.   Yes.

Q.   JG1999?  Okay.  Let me refer you to the four pages in on that particular document and ask you regarding Number 2, the pelvic examination.  Let me see if I can zoom that in a little bit.  Do you see that?

A.   Yes.

Q.   And where it noted that, "The vulva labia major, no trauma.  Vulva labia minor, no trauma.  The hymen, no trauma noted.  Vagina, not visualized.  Cervix, not visualized.  Perineum, no trauma noted.  Anus, no sphincter tone, no trauma noted."  Did you review those?

A.   Yes.

Q.   Let me refer you to, looks like Page 9 of those documents.

And the very top paragraph, which starts, "The hospital SANE department was consulted as well. The patient had a sexual abuse examination that was normal and showed no evidence of any sexual abuse. The patient also had a thorough physical examination documenting ecchymosis and injuries to the child's body. The diagram of this examination is in the patient's chart."

Did you review that document as well?

A. Yes.

Q. Do you know what the SANE unit is? If you do --

A. Uh-huh, yes.

Q. What is that unit?

A. It's a sexual assault -- it stands for Sexual Assault Nurse Examiner.

Q. Okay. Is that, from your understanding, someone who's trained to detect evidence of sexual assault?

A. To collect evidence of sexual --

Q. Okay.

A. -- that might be associated with sexual assault, and make examinations and opinions, yes.

Q. After reviewing the additional testimony, evidence that was, and documents that were sent to you by my office, what is your opinion regarding whether there was sufficient evidence to scientifically conclude that there in fact was semen present in this particular case?

A.   My opinion --

MR. DOWD:  Your Honor, I would object to the relevance.  I think the focus is what Doug Tinker and Mr. Gilmore knew from Dr. Johnson at the time of trial.

MR. ABREU:  If I may, Your Honor?

THE COURT:  Go ahead.

MR. ABREU:  There was also testimony that was presented at trial that this particular witness could have rebutted, and she has testified to date.  So I want to ask her if, in fact, her opinion has changed after reading those documents or after looking at that particular evidence and testimony.

THE COURT:  I think you've already done that.

MR. DOWD:  No objection, Your Honor.

MR. ABREU:  Okay.  I --

THE COURT:  I think --

MR. ABREU:  If we've done it, I don't --

THE COURT:  I think she said, "This is what I would testify to, and these are my differences from what happened at trial."

MR. ABREU:  Okay.  Are the opinions you've given --

THE COURT:  Is that right?

MR. ABREU:  The Judge asked you a question.

THE WITNESS:  I'm sorry.  What was the question?

THE COURT:  No, I was asking you.

MR. ABREU:  Oh, I'm sorry, Your Honor.  Okay.  I think it's covered and we're okay.

BY MR. ABREU:

Q.   Are the opinions you've given here today given to a reasonable degree of scientific certainty?

A.   Yes.

Q.   And were the opinions you could have provided at the time of trial, would those have been given to a reasonable degree of scientific certainty?

A.   Yes.

MR. ABREU:  Your Honor, I have no further questions.

THE COURT:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. DOWD:

Q.   Dr. Johnson, my name is Mark Dowd.  I'm going to ask you a few questions.

A.   Good morning.

Q.   When were you originally hired by Douglas Tinker on this case?

A.   In late 2003.

Q.   What do you mean by late 2003?

A.   Like in the fall of 2003.

Q.   September?

A.   I don't have the appointment order in front of me, but it was in the fall.

Q.   You remember it being in the fall of 2003?

A.   It was in the fall of 2003, yes.

Q.   And what were you asked to do by Mr. Tinker?

A.   I was asked initially to review the work done by the FBI and consult with him, and then based on that I recommended that testing be done, and he agreed.  And then during the course of the case, he did --

Q.   Well, let me stop you there.  What did Mr. Tinker advise you, or what did he send you initially to look at?

A.   Initially, the material from the FBI, and I believe that was the testing material from the FBI is what I recall.

Q.   Did you receive the swab, the swab and the FBI lab reports initially in the fall of 2003?

A.   No, not the swabs initially.  Initially, it was the FBI lab notes and reports, and then I had some discussions with Ms. Booth to get the procedures and operating, standard operating procedures for the lab.

Q.   To obtain a testing swab?

A.   No, no, not that.  Those are the protocols of the lab.

Q.   Oh, okay.

A.   I needed to know some information from the FBI lab protocols.

Q.   How they did the tests?

A.    Correct.  So I needed those.  Those were provided to me later.  And then --

Q.    Do you remember how much later that was?

A.    It was also -- I think it was also in the fall of 2003.

Q.    Okay.

A.    And then based on my conversation with Mr. Tinker after December 31st, I recommended that testing be done.

Q.    And when did that communication occur?

A.    Sometime in early January.

Q.    Okay.  And what was the reason for the delay between the fall of 2003 and January 2004 in your recommendation that testing take place?

A.    Well, it takes a while for any expert to work a case into their case load and complete the, complete the review.  It was quite a lot of material to review.

Q.    So you were busy.

A.    I was, yes.

Q.    Okay.  And when you were initially hired by Mr. Tinker, did you ask Mr. Tinker what the time frame was for the trial and what the time line was going to be for your work?

A.    I may have.  I typically quote everybody six to eight weeks to work the case in and do a review, and longer if it's a large amount of material to review.

Q.    Okay.  But the -- but going from the fall of 2003 to January of 2004, that was beyond your normal six to eight-week

response time?

A.   No, I don't think so.

Q.   No?

A.   I can't recall exactly when the appointment order was signed.  It might not have even been till November.  But -- and then the discovery material, it's from the time I receive the discovery material.

Q.   Okay.  So that would be a typical response time?

A.   Yes.

Q.   Okay.  But you weren't aware of when the trial was scheduled?

A.   It was -- he told me it was scheduled for the spring of 2004.

Q.   He said the spring of 2004?

A.   I don't --

Q.   He didn't give you a date?

A.   I don't recall whether it was an exact date.

Q.   Okay.  Is that important to know when the trial is going to start?

A.   Yes.

Q.   Because you need to get your examination done, your report written.

A.   That's right, yes.

Q.   Right?  And testing may, you may decide that testing requires even further testing.

A.    Yes.  I don't always write a written report.  It's only upon request.

Q.    Oh.  You just show up at court and testify?

A.    I don't show up very often in court and testify.  He did ask that I testify, and there were some circumstances that I asked Mr. Tinker to obtain a court order that specified my rate and amount authorized, because the original order did not specify any details.  I asked him multiple times to provide that, and he never did.

Q.    And, but you say that you sometimes, even though you're hired on a case, you don't always prepare a written report?

A.    That's not only my practice, but for most --

Q.    I'm just asking you.

A.    Yeah.  For the majority of times, I am not asked to prepare a written report.  Sometimes I'm asked not to prepare a written report.

Q.    All right.  But if you're going to testify, you know you have to prepare a written report.

A.    Usually.  Not in every circumstance that I've testified in.

Q.    Hmm.  In federal court, did you have to -- you testified in federal court twelve times?

A.    About twelve times.

Q.    You prepared reports in those cases?

A.    I think I prepared declarations in most.

Q.   Okay.  Declarations, which has all the information. Because this is not simple stuff, is it?  I mean, it's fairly complicated, and you would otherwise relay this information to somebody over the telephone?  Or how would you relay your information if you don't provide a written report?

A.   Usually over the telephone.

Q.   Really?

A.   Yes.

Q.   Okay.

A.   To the attorney who hires me, yes.

Q.   Okay.  And you're not concerned that something could be misunderstood or --

A.   It's a decision between the attorney and myself, what their needs are and what I can provide them.

Q.   All right.  Well, did Mr. Tinker ask you to prepare a report?

A.   I don't recall that he specifically did.  If he had, I would have.

Q.   Okay.  And you knew this was a death penalty case --

A.   Yes.

Q.   -- in federal court?  Okay.  Now, where were you between January of '04 and March of '04?  Were you pretty much at your office in California?  Or were you working on other cases around the country?

A.   Oh, I have other cases all the time.  I can't be specific.

I know I was working --

Q.   Okay.

A.   -- some in Colorado.

Q.   All right.  And at that time that you sent the note --
well, first of all, let's -- there was a fax --

A.   Uh-huh.

Q.   -- to Mr. Tinker?

A.   Yes.

Q.   And that was on New Year's Eve?

A.   Yes.

Q.   On 2003?  Is that right?

A.   Right.

Q.   Now Year's Eve, 2003.  Because you couldn't get ahold of
him by phone that day?

A.   Yes.

Q.   You were working that day, New Year's Eve?

A.   Yes, I often work New Year's Eve.

Q.   You expected Mr. Tinker to be there?

A.   Well, I had -- I believe I had tried previously to get
him.

Q.   Okay.

A.   And with no success, so I finally just faxed him a note.

Q.   So you faxed him.  So you -- at that point, you were
reaching out to Mr. Tinker --

A.   Yes.

Q.    -- to make sure everything was being handled correctly and properly?

A.    Trying to contact him --

Q.    Okay.

A.    -- to let him know I had finished my review.

Q.    All right.  Now, what were you doing on March 1st of 2004?

A.    I was -- apparently, from this fax transmission, I was in Colorado.

Q.    Okay.  And you're referring to the Petitioner Exhibit 92, your written note?

A.    Yes.

Q.    Dated March 1st, 2004.  And you indicate that you're in Colorado, and "so I hope you can read my writing."

A.    Uh-huh.

Q.    And it's, you know, it speaks for itself.  It's not bad handwriting, but it's, there's a couple of words I had trouble with.  Were you concerned that Mr. Tinker would be able to read this?

A.    Well, I typically don't prepare handwritten reports or transmissions, and I was obviously in somebody else's office or some other location, which I didn't have a printer available to me, so I had to handwrite it.

Q.    All right.  But you, I think you'll agree that this is not very professional to send your findings in the form of a handwritten note?

Johnson - Cross                                                    46

A.    I have already agreed to that.

Q.    All right.

A.    I was caught off guard.

Q.    Okay.  And how is it that you were caught off guard?  You were, had no idea when the trial was going to start in this case?

A.    I think he told me that, but I did not know -- I believe -- my recollection is that he called or left a message and said the witnesses were going, from the FBI, were going on the next day or shortly thereafter, and he needed some assistance with those witnesses.

Q.    So you sent this -- you didn't, it didn't occur to you that, you know, this trial, he told me it's in -- you don't remember when he told you it was going to be, but you thought sometime in the spring of 2004?

A.    Uh-huh.

Q.    So it wasn't that you decided that, you know, "I better make contact with him, because it's getting to be the spring of 2004, and I better, you know, send my findings to him"?

A.    Well, I had had several phone conversations with him prior to that.

Q.    Okay.  So, but you never discussed when the trial was starting?

A.    I'm sure we did.  I don't have an independent recollection of what date he said.

Q.   All right.  And is there a reason that you waited until March 1st, 2004, to send your report to him, to send this note?

A.   Because he didn't ask for it prior to that.

Q.   Okay.  And it was just, you were -- you only sent it because he prompted -- was it like an urgent phone call you got?

A.   Yes.

Q.   He said --

A.   Urgent call or urgent message.

Q.   -- "We're in the middle of trial, and I need your report"?

A.   "I need --" he said something to the effect, the witnesses were going on, because it specifically refers to these witnesses and the cross-examination.

Q.   Okay.  How long did it take you to jot this note?

A.   I don't recall.  Probably less than an hour to do the research and jot the note.

Q.   To do the research?

A.   Well --

Q.   What was involved?

A.   I attached a page from a publication.

Q.   Oh, you -- on that page that's attached?

A.   Yes.

Q.   Okay.  To find that for him?

A.   Yes.

Q.   And, but otherwise, this was just about five minutes to

write this note?

A.   I don't know, ten or fifteen, something like that.

Q.   Okay.  And what did you have with you?  You were in Colorado --

A.   Yes.

Q.   -- on a different case?

A.   Yes.

Q.   Okay.  So what, did you have your case file on this --

A.   I don't believe I did.

Q.   So you did this note by memory?

A.   I remembered what the FBI had done, and I may have been in touch with Technical Associates by telephone.

Q.   But you don't remember?

A.   I don't recall, but I probably had been.

Q.   Okay.  But you don't really remember what you relied upon in writing this note?

A.   I am pretty certain I didn't have the file, but a lot of the cases that I've recently reviewed are fresh in my memory, and then again whatever testing that might have been done by Technical Associates, I was, it was clearly easy to make contact with them to verify.

Q.   And how many cases do you normally have that you're working on at one time?

A.   You know, that's a tough question to answer, because some cases will stay open for two or three years, where I don't

really do much work on them, but they are open cases.

Q.   They're dormant until something happens?

A.   They're dormant.  They're in formaldehyde until something happens to them.

Q.   Uh-huh.  But you had indicated you're very busy, and you were traveling around the country, so you wrote this from memory?

A.   It's not that complicated, in my opinion.

Q.   All right.  And when did you get the lab results from -- I didn't quite follow that.  At first I thought you said that the testing was concluded from Technical Associates in March, or excuse me, in December of 2003.  Then a little while later, I thought you said the testing was completed in January '04.  What was the December '03 and the January '04 figures, dates?

A.   Okay.  The December '03 was when I tried to make contact with Mr. Tinker about doing independent testing, that fax that says, "Please call me.  I can't reach you."  And so any discussion we had about doing testing would have been done, you know, at that subsequent time.  The lab did the testing, I believe, at the end of January of '04.

Q.   Okay.  So did you get -- so that was to set up the Technical Associates testing?

A.   Yes, for them --

Q.   Okay.

A.   -- to get the evidence and do the testing.

Q.    All right.  And that was December '03, so you had, you had contacted Tinker, and you got authorization to go forward with that?

A.    I don't think I talked to him on that day.  It was sometime after that.

Q.    That's when you were trying to make contact.  And then subsequent to that, you talked to him, and by January of '04 --

A.    Uh-huh.

Q.    -- the Technical Associates had quickly done the testing.

A.    By the end of January, yes.

Q.    Okay.  Oh, the end of January?

A.    I think it was the end of January.

Q.    Do you have a date on that?  They sent you a report or something?

A.    No.  It's based on the notes I reviewed of theirs.  I think it was January 31st or something like that.

Q.    All right.  And is there any reason you didn't generate a report once you received the results from the Technical Associates lab?

A.    Well, they did the testing, so it's their responsibility to generate that.  And again, they don't, they don't always, when I've hired them or anyone else to do some lab work for me, they don't always generate a written report.  It's only upon request.

Q.    So this is all just by phone, the Technical Associates

does their, does their lab work, and then they would call your office, and then you would call Mr. Tinker, and that's it? There's never reports generated?

A.   Unless somebody requests one.  There's a charge for a report, both by myself and the lab, so a lot of times the attorneys don't want one.

Q.   So the reason you didn't do a report after you got the lab results in January of '04, before Tinker called you during trial in March of '04, is that he never asked for one.

A.   From me?

Q.   Yes.

A.   I don't recall that he did.  I would have written one for him.

Q.   Right.  That was the question.  He never -- that's the reason you didn't do it, because he never asked for a report.

A.   That's my recollection, yes.

Q.   Were you going to call him before the trial started to give him the results of this lab results?

A.   I did.  I did.

Q.   Oh, you called him after January '04 --

A.   Yes.

Q.   -- and gave him the results?

A.   I talked to him on several occasions, yes.

Q.   Do you remember the dates of those?

A.   I'm not sure if I have the -- there was one on January

7th, January 15th, January 16th --

Q.   Who instigated the --

A.   Pardon me?

Q.   -- the call on January 7th?

A.   I don't know who instigated.  I just have recorded a phone call.

Q.   Do you remember if you called him or he called you?

A.   I don't.

Q.   Okay.

A.   I have it recorded in my billing --

Q.   All right.

A.   -- as a telephone call.

Q.   That there was a phone call.  And then the 13th?

A.   January 7th, January 15th.

Q.   Oh, 15th?

A.   January 16th, January 20th, January 26th.

Q.   Oh.

A.   February 3rd.

Q.   Okay.

A.   February 4th, February 10th, February 18th.

Q.   Oh.

A.   February 25th.

Q.   Goodness.  Is that it?

A.   Pardon?

Q.   Is that it?

A.    That's all I have.

Q.    February 25th?  And in none of those calls did Mr. Tinker advise you that the trial was starting in February?

A.    I'm sure he did.  As I told you, he asked me to testify.

Q.    Okay.  And he never asked for any, for you to write any of this down until you got the call when he was in trial on March 1st?

A.    That's correct.

Q.    Okay.  Now, during all these calls, ten calls, what was the focus of the calls?

A.    I don't have that information here.  I'm sure we discussed the lab results and what issues he might have at cross-examination.

Q.    Hmm, I thought you could remember --

A.    I'm sorry?

Q.    I thought you could remember your cases.

A.    I remember my cases, but not every single detail.

Q.    Okay.

A.    And as I did testify, I do recall he -- many conversations about testifying, and I asked many times that he provide me with a court order that specified my rate and an amount that would be approved by the Court.

Q.    And that was never done?

A.    It was never done.

Q.    Okay.  Now, in these calls, I mean, you don't remember the

focus of them, but do you recall if Mr. Tinker appeared

well-schooled in this science, semen detection, DNA detection?

A.   He --

Q.   Or did you have to lead him, you know, by the hand from,

you know, primary school to preparation for the trial?

A.   He was not well-versed in --

Q.   He was not well-versed in --

A.   Correct.

Q.   -- in semen detection or DNA detection?

A.   Correct.

Q.   Okay.  And that was because of his questions to you?

A.   Yes.

Q.   Okay.  But did you bring him up to speed?

A.   I tried.

Q.   Okay.  But you explained all these, the different testing,

the significance of the sensitivity and the different testing

to him?

A.   I don't recall exactly what I explained to him.  I did try

to do that in certainly this written fax from Colorado that I

sent.

Q.   Okay.  But this is not an unusual interchange between you

and a trial lawyer.  This would be something that you do for a

living.  Right?

A.   It's pretty typical.

Q.   So what would you, what would be your intent in bringing

the attorney up to speed --

A.    Well --

Q.    -- on the science?

A.    So that they can adequately present the issues or cross-examine the witnesses at trial.

Q.    All right.  And understand the underlying science --

A.    Correct.

Q.    -- of this testing?

A.    Yes.

Q.    So they can cross-examine the FBI lab specialists?

A.    Well, understand what they're being told and cross-examine them, yes.

Q.    All right.  And you're convinced you did your job and you brought Mr. Tinker up to speed?

A.    I tried.  I'm not convinced he was up to speed.

Q.    Okay.  Why is that?

A.    I got the impression he still did not grasp the concepts that well.

Q.    From his conversation with you?

A.    Yes.

Q.    All right.  You didn't know Mr. Tinker?

A.    I did not.

Q.    Okay.  That was your first and only interaction with him?

A.    The only case I've ever had with him, yes.

Q.    Okay.  And if I told you he was kind of a Columbo type,

that he would stumble around the courtroom and inadvertently --

MR. ABREU:  Your Honor, objection.

THE COURT:  The nature of the objection?

MR. ABREU:  I'm not sure this is relevant to what this witness performed, the task she performed and what she was asked to do.

MR. DOWD:  Well, I'm just trying to develop, Your Honor, that the witness is perceiving Mr. Tinker's, you know, ignorance from the way she interacted with him.  But I'm trying to develop that Mr. Tinker -- I'm just trying to lay out that Mr. Tinker was fairly coy in his dealings with witnesses, you know, before the Court.

MR. ABREU:  She's already said she didn't know him, Your Honor.

MR. DOWD:  But she made a conclusion that the way he interacted with her, she concluded that Mr. Tinker was not comprehending, not comprehending the science that she was explaining.

THE COURT:  Sustained -- overruled.  Thank you.  Yes, go ahead.

MR. DOWD:  Thank you, Your Honor.

THE WITNESS:  Could you repeat the question?

BY MR. DOWD:

Q.   If I told you that Mr. Tinker was kind of a Columbo type, and he would appear to be stumbling in the courtroom, yet

uncover, you know, valuable evidence and win most of his cases, I mean, would that change your opinion about whether he was comprehending you?

A.    No.    I mean, I could only judge based on my interactions with him.

Q.    Did you read the part of the transcript in which Mr. Tinker got the FBI specialist, Carolyn Zervos, to admit that she didn't know if PSA was contained in digested food protein that would be contained in the rectum?

A.    I did read that, yes.

Q.    Okay.  And that was a fairly dramatic point in the trial, don't you think?

A.    I wasn't present in the courtroom.  I can't assess the drama.

Q.    Well, I don't mean dramatic in a theatrical sense, but isn't that a critical point that Mr. Tinker was able to elicit from Carolyn Zervos?

A.    He did elicit something that, you know, happens to be, you know, she didn't know.  That's actually a bonus.  But there were other parts of the testimony that --

Q.    Well, no, I'm just asking about that part.

A.    Okay.

Q.    Was that -- you say it was a bonus.  Was that very good evidence that he elicited on behalf of his client from Carolyn Zervos?

A.    Well, I'm not an attorney, but any time you get a witness to admit they don't know something, I would say that that's probably a good thing for the attorney.

Q.    And that the, that a swab taken from the rectum could contain, you know, a sample that could have been, you know, the PSA result could have been the result of digested food protein? Wouldn't that be a dramatic piece of evidence for the Defense?

A.    Well, I think her answer was she didn't know.

Q.    Right.

A.    Uh-huh.

Q.    She didn't know --

A.    Right.

Q.    -- if the PSA could be explained as the result of food protein contained on the rectal swab, digested food protein.

A.    That was her testimony.

Q.    Right, right.  All right.  Would you be surprised if the Defense reported that they had difficulty reaching you during this period?

A.    Given the number of conversations I had with him, I would be surprised.

Q.    Okay.  You said you travel a lot around the country working on cases?

A.    It depends.

Q.    Okay.

A.    Sometimes I don't travel for months at a time.

Q.   All right.  Is your office number, is that cued into your cell phone?  Or how does that work?

A.   My cell phone is, number is listed on my office message machine.

Q.   Oh, okay.  If you call that number, you get your -- you say, "If you need to reach me, call my cell number"?

A.   Sure, yes.

Q.   Okay.  Because it's not on your letterhead.  Right?

A.   Right.

Q.   You just have your office phone?

A.   Correct.

Q.   Now, in your note, you indicate that the FBI did not test the rectal swab with AP reagent, or do a sperm search.

A.   Right.

Q.   But you're aware that there was actually three rectal swabs, not one.  Right?

A.   Correct.

Q.   Okay.  But you have just "rectal swab" in your note.

A.   That's what I say in the note, yes.  I know there was five, six and seven --

Q.   You know that now.  But at the time you wrote this note, were you thinking that there was just one rectal swab?

A.   I don't think so, because I knew that the lab had received three, the Technical Associates lab had received three.

Q.   Why did you write "swab" instead of "swabs"?  And you do

that repeatedly.

A.   Typically, it's treated as one sample, and that's probably why I write that.  Even though there are three, it was collected from one site.  And it was batched and treated as one sample by Technical Associates.

Q.   Now, you indicated in your note that they only did a p30 test with the ABA card and a DNA test.

A.   Right.

Q.   Okay.  But there's more than one type of DNA test.  Right?

A.   There's -- yes.

Q.   There's at least three that I'm aware of.  Right?

A.   I don't know what you're aware of.

Q.   Well, I'm not going to ask you what I'm aware of, but there's at least three.  Right?

A.   There's autosomal testing, there's Y testing, there's mitochondrial testing.  Those are the three typically used in forensics.

Q.   And there was two different types of DNA testing used in this case.

A.   Autosomal and Y chromosome.

Q.   What?

A.   Autosomal DNA testing and Y chromosome DNA testing.

Q.   And the Orchid -- what's the name of that lab, Orchid --

A.   Cellmark.

Q.   -- Cellmark --

A.    Right.

Q.    -- did the Y chromosome?

A.    Yes.

Q.    And did the FBI do the other one?

A.    Yes.

Q.    Okay.  Did you think you needed to explain the difference between those two DNA testing procedures to Mr. Tinker in your note?  Or you were just rushed or --

A.    Well, I probably just discussed it with him over the phone.  These witnesses were the FBI witnesses, and this is -- I was referring to what they had done.

Q.    Did you say "disgusted"?

A.    No, "discussed with."

Q.    Oh, "discussed with."

A.    Sorry.

Q.    I'm sorry.  Okay.  So you think that the reason you left it out of your note is because you must have talked to him on the phone about these matters?

A.    I probably did, and I could only speculate why it's not in the note.

Q.    Okay.  Because you don't know.

A.    I don't know.  We're talking about two specific witnesses going on --

Q.    Right.

A.    -- at that time.

Q. Could it be that you were just rushed and needed to get this note to him and --

A. It might have been.

Q. -- didn't have time to include all your thoughts and comments?

A. It's possible.

Q. Okay. And you indicate that the ABA card was positive, but there was no indication of male DNA in either the sperm or the non-sperm fractions.

A. Yes.

Q. Well, did you find that significant, that you know, when Mr. Onorato found a large amount of female DNA sperm in the male DNA sperm fraction?

A. Yes.

Q. Why didn't you share that with Mr. Tinker?

A. Well, I probably did over the phone.

Q. Okay.

A. What you're looking for here is indication of male DNA, in these circumstances.

Q. All right. And the reason you wrote this note was to prepare Mr. Tinker to cross-examine Mr. Onorato and Ms. Zervos?

A. Yes.

Q. Well, if that was the purpose of the note, why wouldn't you include this -- that would be a good cross-examination question, wouldn't it --

A.   I wasn't --

Q.   -- of Onorato?

A.   I'm not sure that it's clear to me whether the Cellmark person was coming.

Q.   But this was the FBI result.

A.   Right.

Q.   And that was the witnesses you were preparing Mr. Tinker for.

A.   Yes.

Q.   So why wouldn't you include that anomaly or explain to Mr. Tinker that that's significant that Mr. Onorato found a lot of male DNA in the -- or excuse me -- female DNA in the male sperm fraction?

A.   Why wouldn't I have said that to him?

Q.   Yes, in the note.

A.   It's, it's not that significant.

Q.   Oh, it's not?

A.   I mean, the reason the female DNA is there --

Q.   Uh-huh.

A.   -- is they didn't do the procedure very well.  But --

Q.   And you don't think that's significant?

A.   You're still not picking up male DNA.  That's what's really significant.

Q.   Is it significant -- well, you've indicated that that's evidence that they were not doing the procedure very well?

A.   They're not washing that, what we call the sperm pellet. If there is sperm there, they're not washing the pellet very well.

Q.   So that would impugn the FBI's protocol, or at least the lab procedure on this test.  Essentially, they botched this test?

A.   They, in my opinion, didn't do it as well as they could because they clearly got a lot of female DNA carryover into the male fraction.

Q.   All right.  And if you did the test properly, you wouldn't have the female DNA still found with the male DNA fractions?

A.   In a perfect test, in a perfect execution of the test, correct.

Q.   Well, not just perfect, you say that they -- and I don't want to put words in your mouth -- but I think you indicated that this was evidence they didn't do the test properly.

A.   They didn't do it as well as they could have.

Q.   Now you're softening your position.

A.   No, they -- well, let me just put it this way.  I see this sort of thing happen more often than it should happen.  They're not the only people doing it this inefficiently.

Q.   But it's still an indication of inefficiency?

A.   Yes.

Q.   Perhaps improper lab procedures?

A.   In my opinion, yes.

Q.   But you didn't think to alert Mr. Tinker to this significant --

A.   Well --

Q.   -- cross-examination point?

A.   As I've pointed out to you before, I had numerous conversations with him by telephone.

Q.   Uh-huh.

A.   And it wasn't my intent to recapture every point that we made by telephone in this short note.  This was specifically --

Q.   Do you remember for certain that you discussed this with Mr. Tinker on one of these phone calls?

A.   I probably did, in that there was -- that's the kind of thing I would discuss with him.  There was mostly female DNA, with no male DNA detected in that fraction.

Q.   But it wasn't something that you thought to include on the note.

A.   That's correct, it's not on the note.

Q.   And explain to the Court that -- now there's a -- and I don't know all the science, but at some point there's a centrifuge --

A.   Uh-huh.

Q.   -- which is designed to eliminate or to separate the female DNA from the male DNA?

A.   When the differential digestion is done --

Q.   That's what you called it, right.

A.   Uh-huh, and the non-sperm cells, everything that's not sperm --

Q.   Uh-huh.

A.   -- whether it's blood or epithelial cells, those get broken open and taken into the liquid phase.

Q.   Uh-huh.

A.   So the sperm still stay intact as cells.

Q.   Uh-huh.

A.   Those would get centrifuged down to the bottom of the test tube as a pellet.  You draw off the liquid.

Q.   Pellet?

A.   Pellet.

Q.   Uh-huh.

A.   The cell pellet.

Q.   Uh-huh.

A.   You draw off the liquid, and then you're supposed to wash that pellet, which in theory would be sperm, if there were sperm there.

Q.   And you're saying that often female DNA remains with what should be only the sperm?

A.   It's coating the sides of the tube.  And if the analyst doesn't wash that tube and wash that pellet well, they'll have, you'll have, or they will have female carryover or DNA carryover.  If it was a situation where it was only DNA from a male, it would be male carryover.  But it's from the non-sperm

fraction.

Q.   All right.  And then what is this?  Number two, what is that first word?

A.   "We" --

Q.   "You'll"?

A.   "We did."

Q.   Oh, that's a "We."  Okay.  "We did an AP test."

A.   Uh-huh.

Q.   "Negative."

A.   "And a p30 test."

Q.   "And a p30 test."  Now, you say you didn't actually do the p30 test; it was done by Technical Associates?

A.   Yes.

Q.   And that's the lab you used to work at?

A.   Yes.

Q.   I think I read that some place.  And were you in between labs during this period?  Or why did -- you weren't associated with another lab?  Or how does that work?

A.   No.  I had left the lab to do private work and private consultation.

Q.   Okay.

A.   Any lab work that I needed to have done usually was referred back to them, or sometimes I would do the evidence examination myself there.

Q.   All right.  Now, you don't indicate to Mr. Tinker the

Johnson - Cross

sensitivity of the p30 test you used?

A.    On the second page, I --

Q.    Oh, you do?

A.    I indicated to what the FBI's was, not ours.

Q.    Right.  That's my --

A.    Right.

Q.    That's my question.  You didn't indicate to Mr. Tinker the sensitivity of the p30 test that you had Technical Associates do?

A.    Not in this -- not at this time, no.

Q.    Okay.  And do they only do one type of p30 test over there?

A.    At any particular time?

Q.    Well, did you tell them which p30 test to do?  Or did they decide what to do?

A.    No, they, at any given time, and it's changed over the years, but at any given time they'll have a particular procedure validated.  We used to use crossover electrophoresis, then we replaced it with ABA cards, and then it was replaced with Seratec cards.

Q.    And repeat again, which p30 test did they do?

A.    The test cards using Seratec cards.

Q.    Seratec.  Okay.  And the FBI used a different one.  They used the ABA card?

A.    Yes.

Johnson - Cross

Q.   Test, okay.  And these tests are all calibrated to react at a certain level of sensitivity?

A.   They have a reported minimum sensitivity by the manufacturer.

Q.   Okay.  And what was the minimum sensitivity of the Seratec?

A.   The minimum sensitivity of the Seratec, as they, as the manufacturer reported it, was I think 2 nanograms per microliter -- per milliliter.  I'm sorry.  Per milliliter.

Q.   2 nanograms per milliliter.

A.   Correct.

Q.   Okay.  And what was the sensitivity of the FBI test?

A.   Well, they used the ABA card.

Q.   Right.

A.   And the manufacturer's reported sensitivity was 4 nanograms per milliliter.

Q.   Okay.  So that the -- but isn't that the -- isn't the actual functional sensitivity of the ABA card test, you're calling it the ABA card?

A.   Uh-huh.

Q.   That's how you say that -- isn't it a half a nanogram? Won't it pick up semen down to a half a nanogram per milliliter?

A.   That is not what the manufacturer states.

Q.   Uh-huh.

A.   The FBI had procedures to determine what the lot sensitivity for each different lot of cards, but I don't know what they had determined the sensitivity of that lot of cards to be.

Q.   Isn't the 4 nanogram per milliliter sensitivity, isn't that the guaranteed level that the manufacturer guarantees that it will result positive at that level, but it's actually more sensitive than 4 nanograms per milliliter?

A.   Well, they state in their insert that the sensitivity of the ABA card p30 test is 4 nanograms per milliliter.  That's what they state.

Q.   Because that's what the manufacturer guarantees?

A.   It's what they state --

Q.   Okay.  All right.

A.   -- in their insert, yes.

Q.   Are you aware of the guarantee of the manufacturer in these different tests?

A.   I think I've already stated --

Q.   I missed that?

A.   -- what their stated sensitivity is.  4 nanograms per mil for ABA and 2 for Seratec.

Q.   Okay.  But you're not aware that the ABA card test will actually trigger a positive result down to a half a nanogram per milliliter?

A.   It's up to -- if it does, it's up to the laboratory to

establish whether it does or not --

Q.   Okay.  But you're --

A.   -- with each lot of cards.

Q.   You're not aware that it does?

A.   I'm not.

Q.   Okay.  And I mean, is it important to know, you know, if the FBI specialist is testifying and he's saying that it has a 4 nanogram per milliliter and your results come to Mr. Tinker and he doesn't know what your, the sensitivity of the test that you provided?  Did you tell him what the sensitivity of the test you had done at Technical Labs -- Technical Associates?

A.   I don't know if I did or not.  This was -- this communication was all about the FBI's work and cross-examining them on their work --

Q.   Uh-huh.

A.   -- with their cards.

Q.   Okay.  But you sent him the, your test results as well? And I'm talking about the Technical Associates results.

A.   I did inform him of that, yes.

Q.   Okay.  You didn't want him to do any kind of analysis or comparison between the two tests?

A.   I didn't see the need to.  And he, as I said, had difficulty grasping the details sometimes.

Q.   Okay.  And you indicated --

          THE COURT:  Are you talking about Mr. Tinker?

THE WITNESS:  Yes.

THE COURT:  You knew what he was thinking?

THE WITNESS:  I could tell from his responses, he did not appear to be grasping the finer points of the technical issues.

BY MR. DOWD:

Q.   He was sucking you in.

A.   I won't speculate.

Q.   All right.  Does a --

THE COURT:  But you did.

THE WITNESS:  Pardon?

THE COURT:  I said, "but you did speculate."

THE WITNESS:  About whether he was sucking me in or not.  I was working for him.  I don't see the reason why he would.

BY MR. DOWD:

Q.   And how do you distinguish between a, or do you distinguish between a strong positive, positive, weak positive?  You indicated in your note that it was a weak positive from the associate, Technical Associates lab.

A.   Yes.

Q.   And why do you say "weak positive"?

A.   Because the test line was barely visible, and the analyst called it a weak positive.  It's actually very difficult to see on a photograph even.

Q.   So that was the analyst's term?

A.   Yes, that was --

Q.   You just passed that term on to Mr. Tinker?

A.   Yes.  That's her, what she wrote down, "weak positive."

Q.   Okay.  And so as the line -- you do the test, and it's designed so that a line goes up the page, higher and higher as the result gets more positive?

A.   No.

Q.   You said it was just a little line -- see, I don't follow --

A.   No.

Q.   -- how that works.

A.   It's a color intensity is what I'm talking about.

Q.   Oh, it's a color intensity.

A.   Yes.

Q.   Okay.  So a particular color shows up, and that tells you that it's a positive?

A.   No.  The test card is designed like a little pregnancy test card.

Q.   Oh, okay.

A.   And lines will develop.  There's a test line.  If that results in a color change, the test is positive.  And then there's a control line, which always should show up.

Q.   If the test was done properly.

A.   If the card is working right.

Q.    If the card's working.

A.    Yeah, the control line should always show up.

Q.    Okay.  If a control line doesn't show up, you just throw it away and start over, right?

A.    Right.

Q.    Okay.

A.    Now, if the control line is there as it should be, and the test line is not there, then the test is negative.  If the control line is there and then the test line is very, very strong --

Q.    Meaning a deep, rich color?

A.    A deep, rich color, right.

Q.    Uh-huh.

A.    Versus a very faint color, then you would determine that to be a weak --

Q.    What color is it?

A.    It's pink.

Q.    It's pink?  And it could go to like a deep red?

A.    Pretty much, yeah.

Q.    Or pink.  And -- but you still use the word positive.  You still say positive.

A.    Referring to the Technical Associates test?  Is that what you're referring to?

Q.    Yes, yes.  I'm sorry, your test results.

A.    Yes, the analyst recorded it as a weak positive.

Q.   Okay.  Doesn't the weakness or the strength of the coloring of the test, doesn't that indicate the amount of semen that's detected, not either the presence or absence of semen?

A.   It's -- the color reaction is, it's not going to be there.  The line's not going to be there if there's no semen.

Q.   Right.

A.   Okay.

Q.   And if there's a little semen, it will be a weak color?  If there's a lot of semen detected, it will be a strong, deep, rich color?

A.   Yes.

Q.   Okay.

A.   This --

Q.   So it's not telling you that there's no semen.  It's telling you that there's a small amount of detectable semen.

A.   Yes.  And I do have to put in, for the record, the caveat of if you have too much, you can get a false negative.  But that didn't appear to be the case here.

Q.   And if it's too red, then it's --

A.   No.  If the semen in the sample is too concentrated, the test card will appear negative.

Q.   Oh, it won't even detect any semen?

A.   It's overloading the card and blocking the site --

Q.   Oh.

A.   -- for the binding to occur.  It doesn't apply to this.  I

just have to point that out for the record, though.

Q.    And -- but you really didn't share with Mr. Tinker the Technical Associates lab results to compare them with the FBI lab results because that's really like comparing apples and oranges?

A.    No, I did tell him.

Q.    Different sensitivities?

A.    No, I did tell him what the --

Q.    No, but you didn't give him those results for him to compare them with the FBI results.  I think you testified to that earlier, that that wasn't the point of you giving him those results, so he could compare them.  Did I misunderstand that?

A.    I'm not sure I'm understanding your question.  I did tell him what their results were, and I told him what our results were.

Q.    Right.

A.    And --

Q.    And I asked you why you didn't, you know, fill him in on the significance of the sensitivity of the two different tests which are different, and you said that wasn't the purpose that I was giving it to him, to compare --

A.    Right.

Q.    -- to the FBI results.

A.    But his task was to cross-examine their witnesses on their

tests.

Q.    Right, right.  Okay.  Now, you advised Mr. Tinker that the results of the APA test was negative.

A.    AP test, correct.

Q.    What did I say?  AP test was negative.  And which AP test did you administer?

A.    It's an acid phosphatase spot test.

Q.    Is that the same one the FBI administered?

A.    They use a different test chemical and different, slightly different procedure.  It's still a color change catalytic reaction.  It's not exactly the same test.

Q.    Is that significant to let Mr. Tinker know that you gave him a different type of AP test?

        MR. ABREU:  Your Honor, I just want to object.  I believe the testimony on direct was that the FBI did not give an acid phosphatase test.  And I believe that's what that --

        THE WITNESS:  Yeah, they don't -- they didn't do one.  Excuse me.

        MR. DOWD:  Oh, I'm sorry.  I'm sorry.

        THE COURT:  Thank you.  That's sustained.

        MR. DOWD:  I'm sorry.  I stand corrected.

BY MR. DOWD:

Q.    And is it important to know which type of AP test was given?

A.    Not really.

Q.    It's not significant?

A.    No.

Q.    And what was Mr. Tinker supposed to draw from the fact
that your, the FBI had a weak positive on the p30 test?  You
look --

A.    Okay.

Q.    You look surprised.

A.    The FBI did not report a strength of their test.  They
just reported it positive.

Q.    Oh.  Did you look at the -- you didn't look at the FBI raw
data?

A.    There is no raw data on an ABA test card.  They should
have made photographs --

Q.    On a p30?

A.    Right.

Q.    Oh, ABA card.  I'm sorry.  Go ahead.

A.    They -- any decent laboratory would photograph the
results, and they did not.  And there was no way for me to
review the actual test itself.  It's just a notation, a note in
a worksheet.

Q.    So you weren't provided any information regarding the FBI
test which resulted in a weak positive?

A.    They recorded it as positive.  They didn't note that it
was weak.

Q.    Okay.

A.    So I have no way of determining whether it was very positive or weak positive.

MR. ABREU:  Your Honor, may I object at this moment?

THE COURT:  Pardon me?

MR. ABREU:  May I object --

THE COURT:  Sure.

MR. ABREU:  -- and make a request here?  I personally, Your Honor, have not seen the FBI's raw data.  The witness has indicated that she's never seen the raw data.  I want to know if there in fact is raw data that we should be looking at and whether in fact the FBI did have a weak positive.  I know I've made a request for that information, but I have not seen that.

THE COURT:  Is there -- do you have the raw data?

MR. DOWD:  I don't have it in front of me, Your Honor.  I --

THE COURT:  Is it available?

MR. DOWD:  Well, I'll have to look.  My witness --

THE COURT:  Ask the FBI if --

MS. BECKETT:  It's my -- it's my memory that they don't give that out.  They keep it with them and they explain it, but they don't just hand out the raw data.  We had that problem at the time of the trial.

MS. BOOTH:  No, not -- excuse me.  It's Patti Booth for the United States.  And we got every bit -- you ordered us,

Judge.  Mr. Tinker came in here, pitched a fit about the raw data for Dr. Johnson.

THE COURT:  Right.

MS. BOOTH:  And we were able to get, and it was a program that we had to get, which had never been given out before, and we got it and sent it to Ms. Johnson.  Ms. Johnson and I spoke on the phone about that.  We got all the raw data that we, that they had.

THE WITNESS:  That -- Your Honor --

MR. ABREU:  Your Honor, I don't disagree with any of that.  My question is Mr. Dowd is asking questions whether he, whether the witness has seen indications about a, whether it was weak positive or not.  The only thing --

THE COURT:  Did you get the raw data to Ms. Johnson, Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Excuse me, Your Honor.  They're talking about the wrong thing.

MR. ABREU:  Yeah.

THE WITNESS:  Excuse me.

MR. ABREU:  Let me address the Judge.

THE COURT:  Okay.  Well, you know, talk to Ms. Booth and see what you got.

MR. ABREU:  I know we don't have anything that says

weak positive. All we have is a check mark on a test that says it was positive. That's the only thing we've ever seen, the only thing we've ever provided to Ms. Johnson. And if that does exist, I would actually like to see that information, Your Honor. That's my request.

THE COURT: Okay. Where is the raw data? And why is it not given out?

MS. BOOTH: Oh, and I remember now, the FBI Agent just -- it was the protocol that Ms. Johnson, that Dr. Johnson had asked for --

THE COURT: Okay.

MS. BOOTH: -- which we got, and it was on a special program that we had to get, and it was very difficult to get, but we got it and got it to her. Now, the raw data --

THE COURT: Nobody ever asked for it?

MS. BOOTH: Judge, I, you know, I thought that protocol and raw data were the same thing, so I can't tell you that now, unless we go back and just try to --

THE WITNESS: Excuse me, Your Honor --

THE COURT: Yes, ma'am.

THE WITNESS: None of that is correct, pertaining to this. The raw data refers to the DNA.

THE COURT: Okay.

THE WITNESS: What we would need to see here is an actual photograph of the ABA test card. So the raw data has

nothing to do with the ABA test card.

THE COURT:  Oh, so the raw data wouldn't help you at all?

THE WITNESS:  It has nothing to do with it.

THE COURT:  Okay.  So what did you need?

THE WITNESS:  A photograph of the ABA test card.

MR. ABREU:  She's referring to the specific testing information from the person who conducted the ABA test card, which I do recall I specifically requested.  And as a matter of fact, Mr. Dowd was actually kind enough to let me speak to Ms. Conway, Jerrilyn Conway, who is the FBI person who's going to come and testify at some point during these proceedings, Your Honor.  And she told me that everything was sent to Dr. Johnson so that we should have everything.

If they're discussing information that's specific to this p30 test that the FBI conducted, I know for a fact I have never seen it.  I know for a fact I have never provided that to Dr. Johnson because she's never seen it.  We don't have it.  And if that exists, Your Honor, I would like to see that information.  I want to know if they had a weak positive, as opposed to a positive, because they testified it was positive, not weak positive.  I want to know that.

MR. DOWD:  Judge, my understanding is -- I was told that by our FBI lab expert that's coming in this afternoon, and I understood that she sent all that material to -- wasn't there

some stuff that she sent directly to your office?

MR. ABREU:  What she sent directly to me, Your Honor, were the protocols for the FBI testing, which apparently were already previously provided.  I have those, and I appreciated that.  This is a very different request.  So when the tester is actually testing, she's making notes, "I see this."  "I see this as a weak positive."  "I see this as a strong positive." Photographs are often taken of the actual tests, so that when people come to court, you can see what the actual test says.  I have not seen that information.  Our experts have not seen that information.  That's what I'm requesting, Your Honor.

MR. DOWD:  Judge, I can confirm that with Ms. Conway, and we'll try to call her and get that information.

THE COURT:  Okay.  Would it make a difference if you saw that?

THE WITNESS:  Yes, a photograph would be very helpful, of that ABA test card.

THE COURT:  Tell me why.

THE WITNESS:  Because then I could see the intensity of the test line that developed, so that I would know whether or not the note that she made on the worksheet, where she puts, just checks "positive" or writes "positive," or makes the symbol "positive," is, you know, very strong or very weak or moderate.

BY MR. DOWD:

Q.   But again, that was --

THE COURT:  Did you ever ask for Mr. Tinker to get you a photograph of the --

THE WITNESS:  In my discovery request, I always include photographs.  Some laboratories do not photograph those cards, and my --

THE COURT:  Well, do you have a copy of your discovery request?

THE WITNESS:  It's on my laptop in my hotel room, but it's --

THE COURT:  You want to pull it up and see if you did that?  Would that be helpful?

MR. DOWD:  I'm sorry, Your Honor?

THE COURT:  Would that be helpful?

MR. DOWD:  On her program?  I didn't follow that.

MR. ABREU:  She has it on her laptop, Your Honor.

THE COURT:  Yes.

MR. ABREU:  It's in her hotel room.

THE WITNESS:  I don't --

THE COURT:  Oh.  Well, that wouldn't be helpful.

MR. ABREU:  That would not be that helpful at the moment.

THE WITNESS:  It's my understanding that the FBI laboratory probably does not photograph these cards.

MR. DOWD:  Okay.  And the Judge --

Johnson - Cross                                              85

THE COURT:  Where did you get that understanding?

THE WITNESS:  Well, if they're provided discovery for photographs and then they don't provide the photographs --

THE COURT:  Okay.  Do you know if you got, if you asked for that?

THE WITNESS:  I would have given Mr. Tinker my discovery request, which has, from day one, always referred to all photographs pertaining to the testing.  That would have been in the discovery request, had --

THE COURT:  Well, did you talk to him about photographs?  Do you know if you talked to him specifically --

THE WITNESS:  I don't specifically recall.

THE COURT:  I wouldn't -- if I had gotten that as an attorney, I wouldn't have known what that meant.

THE WITNESS:  Well, typically when any laboratory provides you with their case --

THE COURT:  I know.  But did you put "laboratory photographs"?

THE WITNESS:  It is in my test, in my discovery request.

THE COURT:  Okay.

THE WITNESS:  It specifically --

THE COURT:  Over the lunch hour, do you think you can go get that and bring it back?

THE WITNESS:  Yes.  May I add that when a laboratory

makes these photographs, it's part of their case file.  And if it's not in the case notes, it's a pretty good indication they don't take the photographs in the first place.

MR. DOWD:  All right.

MR. ABREU:  May I just add one more thing, Your Honor?

THE COURT:  Sure.

MR. ABREU:  Even if, in fact, the FBI did not photograph these test cards, I don't know if Mr. Dowd is asking questions regarding documents that I still haven't seen, which are whether the FBI recorded a weak positive or a regular positive.  Again, we've presented evidence that a weak positive versus a positive is relevant.  If, in fact, it was a weak positive, I suspect Mr. Tinker would have wanted to use that at trial to say, "This is not necessarily semen because of the weak positive."  I suspect that's what he would have tried to use it for.  If that's information, I would like to see it.  It might implicate Brady.  I think I'd like to see that information, Your Honor, from the FBI, if they have bench notes and specific documents related to the testing and the card.

THE COURT:  Where did you see it, Mr. Dowd?

MR. DOWD:  I was told by Ms. Jerrilyn Conway, Your Honor, our expert witness --

THE COURT:  And she's going to be here?

MR. DOWD:  She's flying in this afternoon.

THE COURT:  Okay.

MR. DOWD:  Will be here at 3:45.  And I understood it was material that had been shared.  But that will, I'll be able to put testimony on on that.

BY MR. DOWD:

Q.  Now, whether it's a weak positive or a strong positive, the test is designed to disclose the presence of semen --

A.  No.

Q.  -- whether it's weak or positive.  Are you --

A.  P30.

Q.  Go ahead.

A.  P30.  Not --

Q.  What did I say?  Semen?

A.  Yes.

Q.  Okay, p30.  I'm sorry.  But a weak positive is still a positive.  That still discloses the presence of p30 in the test result.  Is that right?

A.  The test, the test is designed to detect p30.  But whether or not -- you can make some double-checks and checks and balances based on the intensity of the color reaction, which gives you an idea of concentration or the amount of material you're dealing with.

Q.  So the color, stronger color indicates a larger quantity of p30 than a weaker color?

A.  Correct.

Q.   But it's, a weaker color still discloses the presence of p30?

A.   It is -- yes.  The test is supposed to be specific for p30.

Q.   And have you ever testified that a weak positive result demonstrates the presence of p30?

A.   I can't recall.  May or may not have.  I don't recall specifically.

Q.   Well, would you have?

A.   Whether a weak result would have demonstrated the positive -- the presence of p30?

Q.   Yes.

A.   That would be the kind of thing that I would note, if that was what the test result was, but I would also include the results of other tests that were --

Q.   Sure.

A.   -- designed to be double-checks.

Q.   Sure.  And what was the significance of the negative AP test result that you were sharing with Mr. Tinker?  What was the significance of that, in relation to the positive or weak positive testing that was done on the p30 test?

A.   Well, the AP test is a presumptive test for seminal fluid. Acid phosphatase is contained in high amounts in seminal fluid.

Q.   And how does the AP test work?  What reaction must occur for a positive result to result, positive result to occur?

A.    It's a catalytic change.  There's -- there are different test reagents that can be used.  The test reagent that Technical Associates uses is provided by SERI.  That's a lab, or a vendor.  And you make the test reagent, and it's a liquid. And in the, when you make it up, it's almost colorless, almost. But in the presence of a sample that contains high levels of acid, or acid phosphatase, you take a little bit of that sample and you put it in a test plate, and then you drop the AP reagent on.  That acid phosphatase, if it's present, is going to cause a catalytic change to the components of the reagent and convert that material from a colorless liquid to a very bright pink liquid, if there's a lot of acid phosphatase there. If there's not much acid phosphatase there, it will be slightly pink.  And if there's no acid phosphatase there, it won't change from its original color.

Q.    Is there an enzyme involved in this reaction?

A.    Well, acid phosphatase is the enzyme.

Q.    Oh, it's an enzyme?

A.    Yeah.

Q.    Okay.  And in order for a positive result to occur, that enzyme, acid, AP, acid phosphatase, has to be functional, has to be reactive.  Correct?

A.    Yes.

Q.    If it's dead, if it's no longer sensitive to the test agent, then even, you know, if there was seminal fluid there,

Johnson - Cross

you're not going to get an AP test positive result?

A.    Well, what I can tell you is that semen stains that are decades old will test positive with this test reagent.

Q.    Okay.  What would you expect the impact of the environment within a rectum to have on the viability -- and I don't mean just being alive, but I mean being preserved, the AP being preserved and not to trigger a positive test result?  What would the impact of the environment of the rectum -- I'm talking about a live rectum, not a, you know, a dead person.  What impact would that have on the ability of the AP to still be viable and test positive?

A.    Well, there are semen -- I'm sorry -- swabs taken from rectal swabs, vaginal swabs, again, that are decades old that if semen is present, it will be detected.

Q.    But in a live rectum, you know --

A.    Yes.

Q.    -- on a person who's alive, how long would you expect acid phosphatase to survive in a live rectum?

A.    In a living person, all of the forces that influence whether you're going to detect semen, for example, in the vaginal tract or rectal tract, more so have to do with activity and drainage --

Q.    Uh-huh.

A.    -- than decomposition, if that's your point.

Q.    Let's stick to the rectum.

A.    Okay.

Q.    And so that the drainage, gravity, normal evacuation, that would impact the presence or survivability of the AP within the rectum?

A.    Yes.  If there's -- if that is there from seminal fluid.

Q.    Uh-huh.

A.    And then that seminal fluid is draining or removed by defecation, those all -- all those factors influence how much material is left to detect.

Q.    All right.  And what about the bacteria in the rectum?  I mean, would that have any impact on the survivability?  I say survivability, but I mean the viability of the AP contained there to still result in a positive test result?

A.    Not -- not really.  Again, there's bacteria in the vaginal tracts, bacteria in most forensic evidence, and AP tests are routinely positive on samples that are decades old.

Q.    Okay.  And you would equate bacteria in the vaginal tract with the bacteria that may be contained in a rectum?

A.    Different strains, could be some of the same strains of bacteria.

Q.    Okay.

A.    I'm not aware that there's any preferential forces working on acid phosphatase to destroy its enzymatic activity in the rectum versus any place else.

Q.    Okay.  And you indicate that the bacteria on the swab

was -- I want to read this exactly -- "The p30," let's see, this here, "The p30 positive weak on our test could be a false positive, due to bacterial proteins found on the rectal swab."

So the bacteria within the rectum that was transferred onto the swab, in your opinion here, was sufficient to cause a false positive on the p30, but you don't think it would have any impact on the AP test?

A.    No.  Let me explain my, if I may, rationale here.  This test is the only test, amongst many, that was remotely positive.  And I cannot independently evaluate the strength of the FBI's test on the p30.  Only --

Q.    You're talking about your p30 test was remotely positive, you said?

A.    Weak, weakly.  Very weakly positive.

Q.    Oh, weakly?  Okay.

A.    So in, my intent is, with only that result being positive and only weakly positive and everything else being negative, and it is from a rectal swab, it is a possibility that has to be considered.  I'm not saying that it is from a bacterial cross-reaction.  I'm saying -- it's my intent to convey that it's just something that has to be considered in light of all the other negative tests.

Q.    No, that's not what you said.  You said, "The p30 positive weak on our test could be a false positive due to bacterial proteins found on the rectal swab."  You didn't say that that's

something that he might consider.

A.   Well, I do point out above and below that these other tests are negative.

Q.   Right.

A.   As I've told you before, this wasn't meant to be a full-blown comprehensive report.

Q.   Okay.  Now, you know, I noticed on here, you see where it says, "The p30 positive weak on our test," did you write "would" and then you changed it to "could"?  Or did somebody else change that to --

A.   No.

Q.   -- "would" or "could"?  Or how did that happen?

A.   That's my writing.  It's just --

Q.   So even the C and the W, that's you?

A.   I don't know whether it was a slip of the pen or what, but "could" is my intent, and that's what it's written as.

Q.   You meant to say "could," but you first wrote "would"?

A.   I don't know if I first wrote "would" or if that's just a slip of the pen.

Q.   You think, you got your Cs and Ws mixed up?

A.   I can't say at this moment what happened at that moment.

Q.   Doesn't it look like you wrote "would"?  I mean, if you changed it to "C," it looks like you clearly wrote "would," and then you came back.  You didn't stop at the W.  You finished the whole word, and then you came back and changed the "would"

to "could."

A.   I don't know at this moment --

Q.   You don't know?

A.   -- whether that was what happened.  My -- it clearly, in the finished product, says "could," and that is what is consistent with what I would say, what I would testify to.

Q.   All right.  Now, normally you would formulate what you're going to write, you're going to formulate what you're going to write before you actually start writing.  Correct?

A.   I would make some notes, and if I were in my office with my computer, I'd make some notes and do extensive editing.  Again, this was not the circumstance under which I was working.

Q.   And I mean, it's a fairly dramatic change, is it not?  Because if you wrote "would" first, and then came back and changed it to "could," and you say you don't remember when you made that change, you're going from positively to possibly.  Because if you said that this test would be a false positive due to bacterial protein, that's a positive statement.  If you go back and change it to "could," you're just making it a possibility, it could be.  So that's a rather dramatic change in position, isn't it?

A.   I don't know if it's dramatic.  What would be consistent with my thought process and my testimony then and today would be could, a possibility.

Q.   Okay.  But I'm asking you about the "would."

A.   I've already --

Q.   You don't remember even writing it.

        MR. ABREU:  Your Honor, I'm going to object at this time.  I think the witness has answered the question multiple times.

        THE COURT:  Move on to something else, please.

        MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.   Now, you only mentioned the potential for the bacterial protein to trigger a false positive.  Is that the only -- is that the only thing that you could consider or that you understood that would produce a false positive under these circumstances?

A.   Well, no, because I put on this third page a list -- a chart from a publication with other materials that would give a false positive -- I mean, would give a positive reaction --

Q.   Okay.

A.   -- not necessarily a false positive.

Q.   And so you assume, just from normal course, that bacterial proteins would be on the swabs?

A.   It's pretty much a given you're going to have bacteria on a rectal swab.

Q.   Is there a test to determine if there's bacterial proteins on the swab?

A.   Well, you could culture the swab to see if there are

bacteria present, but that's not typically done in the forensics setting.

Q.   But if this is, if this is something that would have produced a false positive, did you think to tell your lab to have that done, to determine if the swabs contained these viable bacterial proteins that could interfere with the test?

A.   They -- I said it was a possibility, not a conclusive situation.

Q.   Yeah, it was the possibility you included in your note.

A.   And the laboratory does not do bacterial cultures.

Q.   Oh, they don't anyway.  Okay.

A.   They don't.

Q.   Okay.

A.   No forensic laboratory does.

Q.   Well, you just described that you could do a culture to determine that, but who would do that?

A.   That would be a microbiology lab.

Q.   Okay.  But you didn't think to have that done?

A.   It's not a typical process, no.

Q.   And what do you think the source of the bacterial proteins that you assumed were on the rectal swabs?  Would this be from digested food protein or protein that lives in the rectum all the time, or what?

A.   Well, bacteria live in the digestive system all the time.

Q.   Okay.

A.    Bacteria produce proteins.

Q.    Okay.  And are these the same as the bacteria found on digesting and digested foods?

A.    Everybody's -- if you took a culture of different people's intestinal bacteria, you'd find a lot in common and probably some in different.  So I really can't be any more specific than that.

Q.    All right.  Now, what is the scientific process in which bacterial protein would interfere with the p30 test, the normal functioning of the p30 test, or cause a false positive?

A.    Well, if any protein caused a false positive, it would be because there is some similarity in its antigenic activity or shape, so that -- see, this test works by an antibody binding to its target.

Q.    Uh-huh.

A.    And its target is supposed to be p30.  But if there were some protein that had a similar --

Q.    Signature?

A.    -- binding, similar signature, so that that antibody bound to it, it could cause a test reaction to behave the same way.

Q.    All right.  And there's evidence and studies that show that certain bacteria have the same signature as p30 and can interfere with the test result?

A.    There are none that specifically say that.  Again, I explained to you my rationale for that is in light of all of

the negative tests, that would be something to consider.

Q.   But there's no scientific basis that, to say that bacterial protein could have the same signature as p30 and fool the p30 test?

THE COURT:  Would you wrap this up --

MR. DOWD:  Oh, yes, Your Honor.

THE COURT:  -- sometime this year?

MR. DOWD:  Yes, Judge, I'll speed it up.

BY MR. DOWD:

Q.   There's no scientific basis for your conclusion that bacterial protein could have been the cause of the false positive?

A.   There's not a specific report in the literature of certain strains causing it, but there have been very limited, very, very limited studies involving bacterial cultures or even rectal swabs.

Q.   Now, your sensitivity, the numbers you used was based on the 4 nanograms per milliliter, the amount of sperm that would be found in a semen sample?

A.   No, that's not the right -- the 4 nanograms per milliliter is the stated limit of detection for the ABA p30 card.

Q.   Right.  And that's the figure you used in your computations?

A.   Yes, because it was that card that the FBI used, and --

Q.   Okay.

A.    -- that's their stated limit.

Q.    And if that card was actually sensitive down to a half a nanogram, then that would throw your numbers off, and your 500 figure would be reduced to, I think, 62.  But don't ask me to do the math.  It would have a dramatic effect on your computations, wouldn't it?

A.    It would cut it eight-fold.  So you would have to divide --

Q.    Okay.

A.    -- 50 by 8.  I'm sorry, 500.  500 by 8.

Q.    And would you suspect that a weak positive, which would suggest a low amount of semen, would also suggest a low amount of sperm in that sample?

A.    Generally a low amount of semen will have a lower amount of sperm.  But sperm are very, very abundant per microliter even.

Q.    All right.

A.    And to answer your question, if that --

Q.    That was the question.

A.    Excuse me.

Q.    That the low amount of semen would suggest a low amount of sperm in that sample.  I think you've indicated that's right.

A.    The lower the amount of seminal fluid, generally the lower, lower amount of sperm than if you had more seminal fluid.  But again, the sperm is very, very abundant.

Q.   Okay.  But that would further reduce your computations?

A.   I was answering your previous question.

Q.   Uh-huh.

A.   If you divided 500 by 8, that would still be -- that should come out to about 60 something sperm on the swab.  And even if you took a few -- even if you took 10 percent of that, put it on a slide, you would still -- you should still be able to detect a few sperm.

Q.   And your testimony is that the, that the PSA found in female urine and female serum are at levels high enough to trigger a positive result on the ABA card test?

THE COURT:  I thought you didn't know whether a two-year-old would trigger anything on that level.

THE WITNESS:  I don't know what's present in the serum and urine of a two-year-old because none of these studies involve children.

BY MR. DOWD:

Q.   Okay.  So this article that you sent to Mr. Tinker wouldn't be -- may not have been applicable in this case, because it's more general than the general population, and not including children it's found?

A.   I don't think that any of these studies include children.  This is demonstrative that this p30 is found in other bodily fluids, not just in the bodily fluids of men.

Q.   And what about the -- I'm going to rush through this.

What about the degradation of sperm cells within a live rectum?

A.    Okay.

Q.    You talked about how indestructible they are.

A.    Yes.

Q.    Would that be true even in a live rectum?

A.    Yes.

Q.    How long would you expect a sperm cell to remain, you know, viable within a rectum, a live rectum, not a decomposing body?

A.    Well, the term "viable" is not appropriate here in the first place.

Q.    I know.  You're right.

A.    And --

Q.    What would be a good word to say that it's still intact, that you could get a DNA sample or identify it?

A.    "Detectable" is a better term.  "Intact" isn't a good term either.

Q.    Okay.

A.    Because that implies the tail is present.  And the answer to the question is, it is a function more of drainage and physical removal rather than any destructive forces of any bacteria or enzyme present in the body cavity.

Q.    So the bacteria wouldn't have any effect on the sperm in the rectum?

A.    Sperm are very tough, and it takes extra steps to crack

them open in the lab.  It's -- it does not have -- the bacteria in the rectal canal does not have an influence over whether they're breaking those sperm open.  Again, it's the physical removal of the material.

Q.   Okay.  And once a sperm breaks down, it breaks apart, the tail falls off, the midsection falls off, and you're kind of left with the head?

A.   Yes.

Q.   Okay.  And does the head of the sperm cell look like a yeast cell?

A.   It can sometimes -- sometimes a yeast can be mistaken if the analyst doesn't really know how to distinguish the two.

Q.   All right.  And you talked earlier about separating sperm from a cotton swab.  Do you know the extraction sufficiency of sperm, separating sperm cells from a cotton swab?

A.   It depends on who's doing it.

Q.   But it can be as low as 1 percent, 1 to 10 percent?

A.   It depends on who's doing it.  Technical Associates is very efficient at extracting sperm.

Q.   And what would you say that their extraction sufficiency level is?

A.   I'd say it's close to 100 percent.

Q.   100 percent, they can get every sperm out of a cotton swab?

A.   They've done studies, using their techniques -- yes.

Q.    100 percent?

A.    It's very close to that.

Q.    Very close to 100 percent.  Okay.  And how would they know that?

A.    By putting, using known amounts of semen on swabs, and then using different techniques.  Again, they do a technique using an extra agitation procedure that some labs don't.

Q.    Uh-huh.

A.    And they're very, very efficient at extracting sperm from any kind of sample.

Q.    Do you know what the FBI protocol is, as far as identifying a sperm?

A.    Yes.

Q.    A sperm cell?  What is that?

A.    They require that the sperm be intact, with a tail attached, to call it a sperm.

Q.    All right.  So earlier when you testified that the FBI did a microscopic examination of the rectal smear and it was negative --

A.    Right.

Q.    -- that just means that there was no intact sperm.  In other words, with a tail.

A.    They won't report a sperm unless it's intact.  They -- I think their protocol says to make notes of components.

Q.    Uh-huh.

A.    Which I saw no indication --

Q.    So that's all that result meant is that they didn't find any complete, intact sperm cells.

A.    No, it doesn't mean that that's all that meant.  It could mean that they saw no components either.  They made no notation in the laboratory notes of seeing any components.

Q.    Well, we don't know that.  In other words, all they're saying is that we didn't find any intact --

        THE COURT:  Okay.  Move on.

        MR. DOWD:  Okay, Judge.

BY MR. DOWD:

Q.    You indicated that everything is subject to the degradation process at the same time.  Did you mean at the same rate?  Everything degrades -- I think you were talking about semen, sperm, DNA.

A.    Oh, I think I was talking -- I believe that was when the Judge asked me if the Y chromosome would degrade faster --

        THE COURT:  I think she just said that everything was subject to degradation, but not at the same rate.

        THE WITNESS:  No, I -- sorry if I misunderstood.  I think I interpreted your question to mean, would the Y chromosome degrade faster than the other chromosomes?

        THE COURT:  Oh, yes, I did ask that.

        THE WITNESS:  And the answer to that is no, the Y chromosome would not degrade faster than the others.

BY MR. DOWD:

Q.   What about p30 and AP?  Will they degrade at the same rate within a live rectum?

A.   I don't know if one protein is more subject to degradation than the other.

Q.   And you indicated you don't know if p30 is present in little girls?  You don't know if there's any presence of p30 in little girls, their fluid, urine, blood?

A.   I'm not aware of any studies involving children.

MR. DOWD:  One second, Your Honor.  Just going over my notes.

BY MR. DOWD:

Q.   Let me ask you this.  They did a p30 test on a swab that they took from dark brown stains in the victim's underwear that they believed was blood.

A.   Okay.

Q.   Do you remember looking at that?

A.   I don't recall the specific result on that, though.

Q.   And that result was negative, FBI result was negative for p30 on the, what appeared to be a blood stain in the child's underwear.  You didn't --

A.   Okay.  I probably -- I reviewed all of the lab notes.  I just don't recall --

Q.   Okay.

A.   -- the result.

Q.   All right.  And I don't have the Q number for you, but if that's true, wouldn't that suggest that the positive p30 test result from the rectal swab was not the result of this little girl's blood, since the blood in the underwear was not, did not trigger a positive p30 test result?

A.   If the blood came back to be hers, I mean -- sorry -- yes, if it came back to be hers from DNA testing, which I think it did, it's an indication that her, again, blood, would not have p30.

Q.   And could we understand from that that if it was -- if the rectal swab -- then therefore, the rectal swab would not have been positive because of contamination by her blood.

A.   Well, there's more going on on a rectal swab than just blood.  There's fecal material and --

Q.   Right.  But we know that it wouldn't have been her blood that triggered the positive result, since her blood didn't trigger a positive result in the swab from the underwear.

A.   It's a good indication.  It wouldn't be from blood, but you're speaking specifically about blood and not the other things that would be --

Q.   Right.  I'm asking you if you can eliminate her blood as triggering the positive PSA result on the rectal swab, since it didn't trigger a positive result in the swab from her underwear, from the blood in her underwear.

A.   Given that all of that is correct, which I don't have the

ability to verify here --

Q.   Assume that's true.

A.   -- I would assume -- yes.

Q.   Then you could eliminate, if that was true, you could eliminate her blood as causing that positive PSA --

A.   Only the blood.

Q.   -- in the rectal, in the rectal swab?  Only the blood --

A.   The blood.

Q.   -- which would leave urine, female urine.  Right?  And amniotic fluid.  Now, we know there's no amniotic fluid in her rectum, and there's no breast milk in her rectum.  Right?  So that leaves urine as the only potential source of that PSA positive result from the rectal swab?

A.   I don't know what this child ingested or didn't ingest, so I don't know what else might have been in her intestinal tract. We were specifically speaking only about the blood.

Q.   Right.  But in the chart that you sent, it had breast milk --

A.   Right.

Q.   -- amniotic fluid, female serum and female blood, right, as other sources of PSA?

A.   Right.

Q.   Right.  And so we know it's not female blood, because her blood didn't trigger a positive PSA in the underwear result. Female serum is still open, female --

THE COURT:  Except for nobody knows whether that female serum of a two-year-old has that in it.

BY MR. DOWD:

Q.   With that proviso, you don't even know if a little girl's urine or blood could trigger a PSA.  Now serum, is that the same as blood?

A.   It's the noncellular component of blood.

Q.   All right.

A.   So it's part of it.  It's not the whole thing.

Q.   Okay.  But if you got a negative result from testing her blood, would that suggest that you'd get a negative result from testing her serum, her blood serum?

A.   The serum would be more concentrated than just testing a blood stain.

Q.   Uh-huh.

A.   So there, you know, you have that condition to consider. But you know, it's likely that you probably wouldn't find it in her serum if it wasn't in her blood.

Q.   You could likely eliminate serum.

A.   Probably.

Q.   You're left with urine, but again we don't know if a little girl's urine has PSA in it.  But you can eliminate breast milk because -- are you saying that breast milk could be digested and still trigger a PSA?

A.   Sure.  Yes, there -- it's actually even --

THE COURT:  Okay.  There's no indication she had breast milk, so --

MR. DOWD:  Okay, Judge.

THE COURT:  -- please move on.

MR. DOWD:  Okay, Judge.

THE COURT:  This is really getting to be absurd.

MR. DOWD:  I'm sorry, Your Honor.  I'm sorry.

BY MR. DOWD:

Q.   So that would just leave female urine.  Right?

A.   Um --

Q.   If she wasn't breast feeding.

THE COURT:  Oh, for goodness sake.

MR. DOWD:  We're done, Judge.

THE COURT:  Are you done?

MR. DOWD:  I'm done.  I pass the witness.

MR. ABREU:  May I, Your Honor?

THE COURT:  Yes, quickly.

MR. ABREU:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. ABREU:

Q.   Ms. Johnson, Mr. Dowd --

THE COURT:  To me, the importance of this is even if she had testified, would it have made any difference?

MR. ABREU:  And I want to get to that point.

THE COURT:  So -- that would be good.  Thank you.

MR. ABREU:  I want to get to that point second.  One quick thing I do want to ask Ms. Johnson about.

BY MR. ABREU:

Q.  Mr. Dowd asked you about the female urine, as he was attempting to do at the end, and whether that could have been in the breast milk.  Are you aware, or were you aware that there was testimony in this particular case that the child had ingested male urine prior to her death?

A.  I wasn't aware of it at the time of trial.  You discussed that with me recently.

Q.  Okay.  Could that have impacted the test in this particular case?

A.  It might have, yes.

Q.  Okay.

THE COURT:  I don't remember if we knew how recently that had happened.

MR. ABREU:  Maybe we can find that testimony.  That will be part of the record, and we can -- I don't have to necessarily address that with this particular witness.

THE COURT:  That would be good.

MR. ABREU:  Okay.

THE COURT:  I mean, I was thinking about that as well.

MR. ABREU:  Okay.  Thank you.

THE COURT:  But I didn't remember if we knew when

that was.

MR. ABREU:  Okay.

THE COURT:  Just from time to time it happened.

MR. ABREU:  Part of my recollection, Your Honor, is that as a matter of fact in the cab of the truck there was a bottle that she had picked up that was like a road bottle that they used for quick stops and that she had picked that up at some point and consumed some of that.  I have to check the date and the timing of that, but I'm not sure of that, but --

THE COURT:  Well, there's something in the trial that he made her drink his urine out of his urine bottle, and that the final event occurred, according -- I think I'm remembering this right -- when she tipped over her potty seat.

MR. ABREU:  Correct, Your Honor.  And I think there was also some indication, and Your Honor's recollection is likely as accurate as mine, if not more so --

THE COURT:  Probably not.

MR. ABREU:  -- that she also accidentally ingested some also.  But I will check that.

THE COURT:  No, I know that she was -- somewhere along the road somebody testified that he made her drink his urine.

MR. ABREU:  And the only reason I --

THE COURT:  I don't know when.

MR. ABREU:  The only reason I bring that up is

because Mr. Dowd brought that up, Your Honor.

BY MR. ABREU:

Q.    So let me ask you about the Court's question specifically. Even if there are not studies regarding p30 specifically detected in two-year-olds, does that change your opinion about whether there was sufficient evidence presented at trial for the Government to testify that this substance was definitively semen because of a positive p30?  That's a long question.  I apologize.

A.    It is my opinion then and now that there is not sufficient evidence that there was semen present in the rectum of this child.

Q.    Thank you.  The Government asked you what the FBI policy was on intact sperm versus sperm --

THE COURT:  What is -- tell me again what p30 is.

MR. ABREU:  Are you asking me or her, Your Honor?

THE WITNESS:  P30 is a protein.

THE COURT:  Is it a hormonal protein?

THE WITNESS:  It is a protein that is found in very high concentrations in semen, and in other concentrations, lower concentrations in other fluids.

THE COURT:  I ask that because if it's hormonal, you can pretty much assure that it's probably not going to be in a two-and-a-half-year-old naturally.  But I didn't know if you knew what it was.

THE WITNESS:  It -- I can't tell you whether it's naturally occurring in two-and-a-half year olds, because nobody studies these kind of things in children typically.

THE COURT:  Well, there may be a reason for that, because it could be hormonal.

THE WITNESS:  I'm not aware --

THE COURT:  You're describing breast milk, you're describing semen, you're describing all those things that might think it comes in after, as some kind of a hormonal carry.

THE WITNESS:  I don't know the answer to that.  I think it's more because typically clinical studies of this nature don't involve children.

THE COURT:  Well, I mean, there might be a reason for that.

THE WITNESS:  I'm not aware that there -- that the reason that there are no studies is because it's hormonally, or an adult hormonal occurrence --

THE COURT:  Okay.

THE WITNESS:  -- exclusively.

MR. ABREU:  May I, Your Honor?

THE COURT:  Please.

BY MR. ABREU:

Q.   The Government asked you about the intact tails versus -- intact sperm versus sperm with no tails.

A.   Right.

Johnson - Redirect                    114

Q.    And the Government asked you whether you were familiar with the FBI policy on that.

A.    Right.

Q.    And if I understand your testimony, you testified that the FBI does not consider a sperm a sperm unless it's completely intact?

A.    Yes.

Q.    Is that the policy at your lab?

A.    No, it's not.

Q.    Is that your policy?

A.    No.

Q.    So in this particular case, if the FBI had seen sperm or what appeared to be sperm, based on the policy at your lab, would you have called it sperm?

A.    Yes.

Q.    Did you see anything, intact or not intact, that appeared sperm in the microscopic search conducted by Technical Associates?

A.    No.  It was reported as negative, and specifically no sperm.

Q.    And that would have been, also included sperm that was not intact at all?

A.    Even if it was just a sperm head, correct.

Q.    Okay.  The Government asked you about whether the drainage, or perhaps you just testified about drainage being a

factor in this particular case, and whether sperm could be detected.  Do you recall that?

A.    Right.

Q.    Are you aware that the child was in a comatose state or a comatose-like state for the period preceding her death?

A.    Yes.

Q.    And that she was laying on her back during that period?

A.    Yes.

Q.    The Government asked you whether this, in fact document P, I believe it's P-92.  Is that still up here in this book, Mr. Dowd?

MR. DOWD:  Oh, did I walk off --

MR. ABREU:  And Your Honor, if I neglected to offer P-92 specifically, which I believe is her written report to Mr. Tinker, I would offer that --

THE COURT:  Any objection to P-92?

MR. DOWD:  No, Your Honor.

THE COURT:  P-92 is admitted.

BY MR. ABREU:

Q.    Okay.  The Government asked you whether P-92 was created from memory.  Do you recall that?

A.    Yes.

Q.    Is there anything in P-92 that's inaccurate, to the best of your knowledge?

A.    The only thing that is inaccurate was a misprint.  I put

"4 nanograms per microliter" at one place, instead of "milliliter," but all of the calculations are based on 4 nanograms per milliliter.

Q.   And otherwise, the information you were prepared to testify, that you presented to Mr. Tinker, is accurate in that document as well.

A.   Yes.

Q.   Okay.  The Government asked you about the difference between swab versus swabs.

A.   Yes.

Q.   Do you recall how many swabs the FBI did testing on, further testing, including DNA testing?

A.   They did DNA testing only on one.

Q.   That would be Q7.  Is that correct?

A.   Yes.

Q.   Might that also account for the difference between swab versus swabs?

A.   Yes.  It's just a matter of semantics.

Q.   The Government asked you whether you prepared a report in every single case.  Do you recall that?

A.   Yes.

Q.   Are there occasions when the Defense, if you're working for the Defense, asks you not to prepare a report because the information might not be helpful?

A.   Many times.

Q.    And is that, does that account for the reason you sometimes do not prepare a report?

A.    Many times, yes.

Q.    In this particular case, had Mr. Tinker asked you to prepare a formal report, would you have done so?

A.    Absolutely.

Q.    And in fact, your findings are again contained in P-92. Correct?

A.    Yes.

Q.    Okay.  Let me --

MR. ABREU:  I'm going to be very brief again, Your Honor, and I'll be almost done.

BY MR. ABREU:

Q.    Let me ask you, let me put on, ask you to take a look at this portion of testimony here, this exchange between Mr. Tinker, Ms. Booth and the Court on -- let me just get a date -- January 16th of 2004, in a pretrial conference regarding you and your work.

And if you look at the bottom here, where Mr. Tinker starts, "That's my response, though.  As soon as she gets it and she has the opportunity to test it, and I think she'll be pretty prompt, she has been good about talking to me about issues."

Does that conform with your recollection of your responsiveness to Mr. Tinker's requests?

A.    Yes.  I had numerous conversations with him.

Q.    That's on Page 35 and 34 -- 34 and 35 of the January 16th transcript.

      The Government asked you about the cards that you use, the Seratec card.

A.    Right.

Q.    Do you know which card the FBI uses today?

A.    I believe they use Seratec today.

Q.    So they now use the same card that you were using back then.

A.    Yes.

Q.    Okay.  The Government asked you about the sensitivity of the ABA card.

A.    Yes.

Q.    Let me show you what I am now going to quickly mark as Petitioner's -- can I have the number, please -- 169, and ask you if you know what this is.

A.    Yes, I do.

Q.    This is going to be difficult to read.  Can you tell us what that is?

A.    This is the product insert from the ABA test card.

Q.    So this comes along with the test and gives guidance on usage for that particular test?

A.    Yes.

Q.    Okay.  And the Government had asked you about what a

Johnson - Redirect

positive looks like.

A.    Uh-huh.

Q.    And let me just show you this first one here on the left that says "positive," and it has one line that's dark under the test, and one line under the C.  T for test, C for control, I suspect.

A.    Yes.

Q.    And when you have positive for both, that gives you a positive indication for p30?

A.    Correct.

Q.    A negative would give you a control line that's positive, but nothing under the test line.

A.    Yes.

Q.    And an invalid test would give you no line on either.

A.    No line on either, or another situation would be a test line there, but no control line.

Q.    Okay.  Let me refer you to the second page of that product insert, where it talks about the sensitivity of the test.  And let me read something to you, because it might be easier.  "The minimum detection limit of the Abacus ABA card One Step PSA test has been shown to be 4 nanograms per milliliter in 10 minutes."

       Is that the sensitivity at which the manufacturer guarantees the card?

A.    Yes, and the 10 minutes is important, too.

Q.   Okay.  Why is that?

A.   Because these cards have a tendency to develop a positive test line, even if they're negative, and you wait longer than 10 minutes.  They can do that.

Q.   And in this particular case, we have not seen any information regarding how long that particular test that the FBI did, how long it took for them to do it.  Correct?

A.   Well, their protocol says to read it in 10 minutes, but we have not seen any independent verification or a photograph of the card to verify any of that.

Q.   And the Government asked you whether the cards are not in fact sensitive down to .5 nanograms per milliliter.  Do you recall that?

A.   Yes.

Q.   If you were using a card at that rate, would you be using it at a sensitivity that the manufacturer was telling you we cannot guarantee the accuracy of?

A.   They would be exceeding what the manufacturer's sensitivity level is.  And it's not to say that they can't do their own studies and come up with something different.  If it's vastly different, you would have to wonder why it's vastly different.

Q.   And lastly, let me just show you the section where it talks about the limitations of the ABA card and refer you to number 3 in particular, where it says, "Even if the test result

is positive, careful forensic judgment should be made in conjunction with other information available from other testing and diagnostic procedures."  Do you see that?

A.   Yes.

Q.   Do you agree with that?

A.   Yes, I do.

Q.   And in this particular case, some of the other information available from other testing and diagnostic procedures would include the negative AP test?

A.   Yes.

Q.   Would include the negative DNA test?

A.   Yes.

Q.   Would include the negative Y STR chromosomal testing?

A.   Yes.

Q.   Would include the negative smear slide by the FBI?

A.   Yes.

Q.   Would include the negative microscopic search by Technical Associates?

A.   Yes.

Q.   And that's all the information that you considered in making your careful forensic judgment?

A.   Correct.

          MR. ABREU:  I have no further questions, Your Honor.

          THE COURT:  Thank you.

          MR. DOWD:  Nothing further, Your Honor.

THE COURT:  Thank you very much.  You may stand down.

(Excerpt stopping at 11:52:40 a.m.)

* * * * *

(Excerpt beginning at 7:18:35 p.m.)

(Witness sworn.)

MR. ABREU:  And just so the Court is aware, I have already, prior to his entering the room, informed him about the microphone rules, Your Honor.

THE COURT:  In continuing your reasonable behavior, I knew that -- I would expect you to do that.

CHARLES ALAN KEEL, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ABREU:

Q.   Mr. Keel, can you please state your name for the record?

A.   Charles Alan Keel.

Q.   That's K-E-E-L.  Correct?

A.   Correct.

Q.   And how are you employed, sir?

A.   I'm a forensic scientist with Forensic Science Associates in Richmond, California.

Q.   Let me show you what's previously been marked as Petitioner's Exhibit 90 and ask you if you recognize that document.

A.   Yes, I do.  It's my CV.

MR. ABREU:  Your Honor, I offer Mr. Keel's CV,

Keel – Direct                    123

Petitioner's 90.

          MR. DOWD:  No objection, Your Honor.

          THE COURT:  Petitioner's what?

          MR. ABREU:  90.

          THE COURT:  Did you say "No objection"?

          MR. DOWD:  I did, Your Honor.

          THE COURT:  Petitioner 90 is admitted.  Thank you.

BY MR. ABREU:

Q.   And where are you currently employed?

A.   At Forensic Science Associates in Richmond, California.

Q.   I'm sorry.  You mentioned that already.  And what is your
position there?

A.   I'm a criminalist, a forensic scientist.  I specialize in
the identification and genetic characterization of human body
fluid evidence.

Q.   And did you tell us how long you had been working as a
forensic scientist?

A.   Since 1982.

Q.   Okay.  Not the entire time with Forensic Science
Associates?

A.   No.

Q.   Okay.  I won't go into --

          THE COURT:  Did you have a graduate degree?

          THE WITNESS:  No, Your Honor.

          THE COURT:  Okay.

THE WITNESS:  I didn't finish my master's.

BY MR. ABREU:

Q.   Just let me ask you about a couple of things on your CV.
One of them mentions that you have a DNA technical leader.
What does that mean?

A.   That's --

Q.   Or that you are.

A.   -- a credential given by the American Society of Crime
Laboratory Directors to individuals who are qualified to
basically supervise a forensic DNA laboratory according to the
FBI Quality Assurance Guidelines.

Q.   And who do you work with?

A.   I work with Dr. Edward Blake and Peter Barnett.

Q.   And did Dr. Blake consult with you on this particular
case?

A.   Yes, he did.

Q.   And does Dr. Blake have any special knowledge regarding
p30, or interest regarding p30?

A.   Yes.  He was, I think, the first or one of the first
discoverers of p30 when he was at the University of California
at Berkeley.

Q.   Have you been qualified as an expert in the past in
forensic biology and DNA?

A.   Yes, many times.

Q.   In both state and federal court?

A.    I believe so in federal court.  I'm not really sure.  But I think so.

MR. ABREU:  Your Honor, at this time I would offer Mr. Keel as an expert in forensic biology and DNA.

MR. DOWD:  No objection, Your Honor.

THE COURT:  Then he is accepted.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.    In 2007, were you contacted by my office --

A.    Yes, I was.

Q.    -- in regard to the case of United States versus Alfred Bourgeois?

A.    Yes.

Q.    And did you review documents at that time that were provided by my office?

A.    I did.

Q.    Do you recall what documents you reviewed?

A.    Pretty much, yes.  You want me to list them?

Q.    Let me ask you this, are those documents that you reviewed listed in your report?

A.    They are.

Q.    Then no need to list them at this time.  And after your review of those particular documents, did you prepare a report?

A.    I did.

Q.    Let me show you now what has been marked as Petitioner's

Exhibit 88, Your Honor.  And ask you if you recognize that document.

A.    Yes.  That's the front page of my, first page of my report.

Q.    Okay.  I'm going to take you back to Page 29 of that report.  Do you see that?

A.    Yes.  That's my signature.

Q.    Okay.  And did you read this report before you signed it?

A.    I did.

Q.    Is the information in that report true and correct, to the best of your knowledge?

A.    Yes.

        MR. ABREU:  Your Honor, there's been an agreement by and between Counsel that if I were to question Mr. Keel for the next three-and-a-half hours, he would testify consistently with the information contained in his report, and that his report may be admitted for that --

        THE COURT:  P-80?

        MR. ABREU:  P-88, Your Honor.

        THE COURT:  Any objection to the admission of P-88?

        MR. ABREU:  No, Your Honor.

        THE COURT:  P-88 is admitted.

        MR. ABREU:  And that he would testify consistent with the information contained in P-88, Your Honor.

        THE COURT:  Okay.  Thank you.

BY MR. ABREU:

Q.   I have three quick questions.  Did you, as part of your review, look at the 2004 report of Elizabeth Johnson?

A.   I did.

Q.   Did you agree with the conclusions contained in that particular report?

A.   Yes.

Q.   What conclusion did you reach in your report regarding whether there was sufficient evidence for the Government to have proceeded based on a positive p30 with evidence that semen was detected in this particular case?  What conclusion did you reach?

A.   My conclusion is that there's no proof of semen being detected on the, in the evidence that was presented at trial.

Q.   And are all the opinions in your report and that you would have testified to and would testify to here today made to a reasonable degree of scientific certainty?

A.   Yes.

        MR. ABREU:  With that, Your Honor, I would pass the witness.

        THE COURT:  Can I ask about the -- can I ask him some questions?

        MR. ABREU:  Yes, absolutely, Your Honor.

        THE COURT:  Did it test positive for p30?

        THE WITNESS:  I'm sorry?

THE COURT:  Did you do any of your own testing?

THE WITNESS:  No, ma'am.

THE COURT:  Well, where did you get your information?

THE WITNESS:  My information came from the FBI and from Orchid Cellmark and from Elizabeth Johnson.

THE COURT:  Okay.  She didn't do her own testing either apparently.  Is that right?  Ms. Johnson?

MR. ABREU:  That's correct, Your Honor.  If I could just --

THE COURT:  Okay.  So the test -- go ahead.

MR. ABREU:  No, I was just going to say, the way it works, actually the FBI testified this way as well at the time of trial, other people, the biologists do the tests, and then the forensic examiners come in and testify about those tests.  That's what Ms. Zervos did at the time of trial, Ms. Onorato did -- Mr. Onorato did.

THE COURT:  Okay.  But it tested positive for p30.

THE WITNESS:  There was certainly a visible line produced on the assay card, yeah.

THE COURT:  Okay.  So, I mean, you don't disagree with that.

THE WITNESS:  I do not disagree with that.

THE COURT:  But can p30 be in a toddler?

THE WITNESS:  In a toddler?

THE COURT:  Yes.

THE WITNESS:  You mean as a function of their own normal biology?

THE COURT:  Right.

THE WITNESS:  We don't really know the answer to that question.  Every cell in every person's body possesses two copies of the gene that produces p30.  So at least theoretically --

THE COURT:  Okay.  I guess the reason I ask that, I just -- when I was talking to one of the other experts, it seemed to me they said it could be in breast milk, it can be, of course, in semen, and it can be in -- I can't remember what else.  But all of those seem to be a function of maturity.

THE WITNESS:  Well, that's just it.  We don't know when this particular gene may express this particular protein.

THE COURT:  Okay.  But I guess I --

THE WITNESS:  But then again, we don't know that the assay itself is not entirely specific.  It may be an artifactual or an adventitious result, because we don't know everything that might react with the antibodies that are in the assay.

THE COURT:  Okay.

BY MR. ABREU:

Q.   And when you say an artifact, you mean that the positive p30 that was obtained as a result of this test may be a reaction to maybe not even p30?

A.   Oh, absolutely.

THE COURT:  He's saying a false positive.  Is that what you're saying?

THE WITNESS:  Well, it's positive.  It's either positive or negative.  So there's really no such thing --

THE COURT:  So it's positive.

THE WITNESS:  -- as a false positive.

THE COURT:  Okay.

THE WITNESS:  It's whether or not the result is coming from p30 or not.

BY MR. ABREU:

Q.   And for you, the ultimate question was then whether that p30 is definitive of the presence of semen.  And in your opinion, was it or was it not?

A.   Well, it's whether or not the result on the assay card could be attributed to semen.  And it might be --

THE COURT:  Well, you can't rule that out, can you?

THE WITNESS:  No, I can't rule it out.  But it's -- if I had done the testing, I would have ruled it out because I would have expected to find sperm.

THE COURT:  Okay.

THE WITNESS:  And I would have also gone back and probably done some acid phosphatase testing.

THE COURT:  I think it was taken -- I think it was taken like three days after --

THE WITNESS: Absolutely. That's another issue is how could it persist for so long in the rectum of this child.

THE COURT: Was it in or next to? I couldn't remember.

MR. ABREU: It's a rectal swab, Your Honor. So it's not a smear of the rectal area. That's a separate thing that's done. And that was done also. This is a rectal swab.

THE COURT: Okay.

MR. ABREU: So what happens is it's inserted, Your Honor, into the rectum of the child. That's correct.

THE COURT: Okay. So you wouldn't expect sperm to last that long?

THE WITNESS: Oh, no, absolutely you would expect sperm to last. You wouldn't expect --

THE COURT: For how long?

THE WITNESS: -- the soluble --

THE COURT: Oh, I'm sorry. I forgot the other testimony.

THE WITNESS: You wouldn't expect the soluble components of semen to last that long. But sperm are very tough little cells. I mean, they have to be, because they endure --

THE COURT: I know their job. I remember this.

MR. ABREU: Would you have expected --

THE WITNESS: And in fact we --

THE COURT: So they can live externally for --

THE WITNESS: No, no.

THE COURT: -- for several days?

THE WITNESS: No, they don't live, Your Honor. They simply persist.

THE COURT: Okay. So they're dead and lying there.

THE WITNESS: They're dead. They die rather quickly, yes.

THE COURT: Okay. Well, say somebody had had a vasectomy.

THE WITNESS: Well, then there wouldn't be any sperm there.

THE COURT: That's true. Okay.

BY MR. ABREU:

Q. And just because they're dead, would you still find their remnants in a microscopic sperm search, or actually find dead sperm? Let me ask that.

A. You just find the sperm.

Q. Gotcha.

A. I mean, they'd be dead, but you could find them very --

THE COURT: Unless the person had had a vasectomy.

MR. ABREU: That's right.

BY MR. ABREU:

Q. And in this particular case, given --

THE COURT: And I'm not saying -- I don't know

anything about that.  I'm just curious.  I'm not throwing that in.  It's not going to be in the order.  It's not going to be anywhere.

BY MR. ABREU:

Q.   Given the smear search by the -- the smear slide search by the FBI and the microscopic sperm search by Technical Associates, would you have expected sperm to have been detected in this particular case?

A.   If the results on the assay card was due to semen, absolutely.

        MR. ABREU:  That's all I have, Your Honor.

        THE COURT:  Thank you.

        MR. ABREU:  Thank you.

        MR. DOWD:  May I proceed, Your Honor?

        THE COURT:  Please.

        MR. ABREU:  I would just interrupt.  The CV, do you need it, P-88?

        MR. DOWD:  Yeah, just in case.

        THE COURT:  Yeah, but don't take it back with you. Because when everybody's done, it stays up here.

                        CROSS-EXAMINATION

BY MR. DOWD:

Q.   Okay.  Doctor, my name is Mark Dowd.  I'm going to ask you a few questions.

A.   It's not "Dr."  It's just "Mr."

Q.   Oh, "Mr."  I'm sorry.  I'm so used to talking to doctors that --

A.   I'm just an Aggie.

THE COURT:  Okay.  I got your point there, Mr. Dowd.

BY MR. DOWD:

Q.   Alan Keel.  Mr. Keel, you started out by saying that there's no evidence of semen, and then you indicated to the Court that you could not rule it out.  Is that fair to say?  That was your testimony?

A.   Well, my testimony was that if the --

Q.   Did I not quote you accurately?

A.   I don't recall.

Q.   Okay.

A.   But my --

Q.   Let me ask you a question.

A.   Okay.

Q.   You've indicated that we don't know what will react with the assay.  And you're talking about the p30 test?

A.   Yes.

Q.   We don't know what -- and the way the p30 test is, and help me with the science, something has to hook onto the protein on two sides of it in order to trigger a positive result?

A.   There are two what are called epitopes --

Q.   Uh-huh.

A.    -- on the protein, the p30 protein.  And each of those has to be recognized in order for this assay to give a positive test.  However, we don't know -- I don't even know if that epitope has been characterized in terms of its amino acid sequence and its confirmation, to be recognized as an epitope.  And we don't know whether or not that particular protein amino acid structure and confirmation could be mimicked in any other protein.  I mean, there are thousands and thousands of other proteins out there.  So --

Q.    So that the p30 test is completely unreliable because we don't know what other things could hook onto the protein and trigger a positive result?

A.    Well, it's certainly reliable in that we can use it as a screening tool, in the same way that we use acid phosphatase.

Q.    Okay.

A.    But because, just like acid phosphatase is found in other body fluids, just like p30, it's only a presumptive test.

Q.    So the best we could do with a p30 test, if you have a positive AP test, acid phosphatase test, is the high likelihood of -- did I read your report to say the high likelihood of semen?

A.    Certainly if you have elevated acid phosphatase levels and elevated p30 levels, then that would be highly likely that that's coming from semen.

Q.    All right.

A.   But then again, I would certainly expect to find sperm in such a situation.

Q.   Right.  Let me clear something up.  You had indicated that you thought that Dr. Benton had provided false testimony in the trial?  Is that your position?

A.   Either false or just completely ignorant.

Q.   Either false or completely ignorant?

A.   That's correct.

Q.   False meaning he knowingly provided false testimony to the Court or to the jury, and ignorant is just that he was just mistaken?

A.   I -- if that's what ignorant means.

Q.   Well, that's your term.  That's the distinction you're making?

A.   Well, ignorant means you just don't know any better.  You just don't know.

Q.   All right.

A.   And you offer an opinion about something you don't know anything about.

Q.   Do you have any evidence that he knowingly provided false testimony to the Court?

A.   Well, I don't know whether or not he knew what he was saying wasn't true or not.  How would I know that?

Q.   Okay.

A.   But certainly a person in his position should have known

that.

Q.   All right.  Well, you used the word false, and I thought you used it rather loosely.

Now, the -- I'm just referring back to your report.  You indicate that blood was detected on all three of the rectal swabs in this case?

A.   That's my understanding.

Q.   And under the phenol --

A.   -- thalein.

Q.   Say that.

A.   Phenolphthalein.

Q.   The phenolphthalein and positive crystal test for hemoglobin?

A.   That's my understanding, yes.

Q.   But doesn't the crystal test test for hemochromogen?

A.   Well, that's the product of the crystal.

Q.   Uh-huh.

A.   Yeah.

Q.   Okay.  Would you expect to get -- let me -- you indicated you agreed with Dr. Johnson's analysis?

A.   Yes.

Q.   All right.  And let me ask you about the, the AP test results, the acid phosphatase test results.  I think it's just late in the day.  I'm having trouble verbalizing.  Would you expect to get a positive test result on the AP test result of a

Keel - Cross

sample that had been in a rectum for three, four, five days?

A.   I wouldn't really have an expectation.  I would simply do the test.  And myself personally, I probably wouldn't do that test at first.  I would simply do the sperm search.  And not finding sperm, I would probably abandon the specimen.  But that's not the sequence that we have here.

Q.   You would have skipped the AP test?

A.   I don't do AP testing on swabs, no.

Q.   Oh, okay.  You go right to the --

A.   Not as a matter of course.

Q.   -- PSA?

A.   I don't use the PSA test either.

Q.   Oh, you don't?

A.   Unless I have some other issue that I need to explore.  No, I -- with swabs, I go straight to the sperm search.

Q.   Okay.  And if you don't find sperm, case closed?

A.   Pretty much, unless there's information that there might be semen from a vasectomized individual.  I've had two such cases in my entire career.

Q.   All right.  And is there any difficulty -- well, what is your process for removing sperm cells from a cotton swab?

A.   Simply taking a portion of the swab, typically half, and solubilizing anything that will dissolve into an amount of buffer, or even water.  Typically that depends upon how much of the swab you take.  I would probably use about a half to a

milliliter of the buffer.  And then I would pellet the

particulate debris and remove the supernatant, remove the

liquid fraction, so that I had a concentrated pellet.  And then

I would resuspend that in about an equal volume of fluid,

typically 20 to 40 microliters, about a drop from a typical eye

dropper.  I would take about two microliters, or about 5

percent of the total suspension, put that onto a microscope

slide, and dry it, fix it, stain it and search it.

Q.    All right.  And what's the sufficiency of removing sperm

from cotton swabs?

A.    You mean the extraction efficiency?

Q.    The rate of sufficiency -- there it is, extraction

sufficiency.

A.    It would vary from person to person.  For me, it's pretty

high.  I can typically predict how much sperm DNA I'm going to

get from a specimen, based upon how many sperm I visualize on

the microscope slide.  I mean, I can extrapolate back fairly

well.  So for me, it's very high.

Q.    And -- 90 percent?

A.    I would say even higher.

Q.    And how do you know if it's 90 percent?  How do you

determine that there's --

A.    I just described that to you.

Q.    -- you got 90 and there's only 10 percent left?

A.    Oh, you mean 10 percent left on the swab?

Q.    On the swab.

A.    Because I just explained to you, sir, I can count just a few microscope fields -- you have to understand, I make a spot on a slide that's maybe 5, 6 millimeters in diameter.  It's very small.  And I might only have to look at five or six fields to get a sense of how many sperm there are per microscope field.  Then I know there are about 100 to 120 fields in that spot, and I know I've used about 5 percent of my total sample.  So it's simply a mathematical determination of how many sperm I should have in my parent sample.  You do the math, how much DNA is in a sperm, you can predict how much DNA you've got in your sample.  It's a very accurate way to quantify how much DNA you have associated with sperm.

Q.    Well, I'm interested in the sperm within the fluid, the seminal fluid.  Did you say there's like 100 fields within your microscopic view?

A.    No, no, there's one field.  But within the spot, I'm --

Q.    What spots?

A.    I'm magnifying this 400 times.

Q.    Uh-huh.

A.    Okay.  Sperm are extremely small.  So --

Q.    How small is a sperm?

A.    I don't really know, just maybe 5 microns.

Q.    100,000 on the head of a pin or --

A.    Oh, absolutely, yeah.

Q.    Okay.  So --

A.    Yeah.

Q.    -- it could be 100,000 on the head of a pin?

A.    Sure.

Q.    Okay.  All right.

A.    Do you understand, sir, how I can arrive at --

THE COURT:  Okay.  This is what happens.  He asks the questions --

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  -- and you answer them.  But thank you.

BY MR. DOWD:

Q.    I'll be honest with you, I didn't understand that last part.  So I don't know that you answered my question.  Would acid phosphatase degrade rapidly within a live rectum to the extent it would not be detectable in the AP test?

A.    That would certainly be my expectation, that proteins that have a function that we depend upon, they do something.  And in this case, we make them produce a color change.  It would be my expectation that not only would the protein itself be diluted, but it would be so insulted by the environment, it would either be chewed up by bacteria or it would be denatured to the point where it couldn't do its job, that it would be difficult to detect it after a couple of days, just -- and the same would go for any protein that's subjected to that kind of insult.

Q.    And you indicated that the seminal fluid as well would not

last long within the environment of a rectum?  I'm talking about a live rectum.

A.    Correct.

Q.    Okay.  But that the -- you would expect to find the sperm remaining in the rectum?

A.    Certainly the sperm would persist much longer than the soluble components of the semen, yes.

Q.    Is there something about the sperm that allows it to stay in the rectum, or would it also be pushed out by gravity and dilution and things like that?

A.    Well, I mean, the sperm are going to be affected by everything, anything else that affects the soluble components as well.  I mean, they're microscopic.  If stuff is going to drain out of the rectum, the sperm are going to drain out with it.  So the conditions are the same, regardless of whether we're talking about the sperm or we're talking about the soluble components.

Q.    All right.

A.    The sperm are simply a much tougher cell, so they're going to persist in an environment where the proteins won't.

Q.    You understood the FBI protocol for identifying sperm only allows them to make a positive identity of a sperm if the entire sperm is there, tail, midsection and head is intact. Did you understand that?

A.    I certainly understand that that's their arbitrary policy.

There's certainly nothing that prevents them from identifying a sperm head as a sperm head.

Q.    So that when the FBI found, or reported no sperm on the rectal smear slide taken at autopsy, they're just saying that they didn't find any complete sperm, intact sperm?

A.    Well, that's an inference you can draw.

Q.    Okay.

A.    But it flies in the face of the rest of their work.  So my inference taken from the fact that they're unable to detect any male DNA associated with the specimen and that Orchid Cellmark was even unable to detect Y chromosome DNA in a much more sensitive assay, that there are no sperm there.

Q.    Uh-huh.  But just to interpret that test result, that's all they're saying when they give a negative result on the, on their sperm search.  They're only looking for intact sperm.

A.    Well, if that's what it means, that's highly misleading.

Q.    Okay.  That's highly misleading?

A.    Absolutely.

Q.    Now, you were critical of the FBI because they didn't include the bench notes when they did the differential digestion to separate the male and the non-male fractions, but isn't that in the FBI protocols, which is public record?

A.    I didn't have them.

Q.    Okay.  Are you aware that the FBI protocols are public record, they're available online?

A.    No, but they weren't even provided when we asked for them, so no, I didn't --

Q.    Oh, you didn't, you never got the FBI protocols?

A.    I never got their DNA protocols, no.

Q.    Oh, okay.  I didn't know that was missing.  Okay.  Now, you were becoming critical of the FBI, their process there. You indicate that the male fraction contained 50 nanograms DNA for each, is that microliter --

A.    Yes, sir.

Q.    -- extract?

A.    Yes, sir.

Q.    This was, you concluded from this that there was either abundant sperm in the male fraction, which you dispute, or a poor removal of non-sperm cells and/or DNA cells through the sperm isolation process.  Is that your conclusion from --

A.    Well --

Q.    -- from that?

A.    -- you've misquoted it slightly, but --

Q.    I kind of summarized it just to fit it into a couple of pages.  But is that a fair --

A.    Well --

Q.    -- representation of your point?

A.    I don't know what you mean by DNA cells.  DNA cells.

Q.    I guess the point is that the, when they did their differential -- what do you call that, differential --

A.    Digestion.

Q.    -- digestion, that they want to remove the, any female cells from what is left with the male fraction?

A.    Well, you want to remove all cells that aren't sperm.

Q.    Okay.

A.    Okay.

Q.    And what happened in this case is after they had done the process, they still had a large amount of female DNA within the male fraction?

A.    Correct.

Q.    Is that right?

A.    Correct.

Q.    And that's the point, that's the criticism you were making, that they must have not have done that process properly, or they would not have been left with so much female sperm?  Or did I misunderstand that in the report?

A.    Well, I'm not sure I understand what you're saying, they must not have done it properly.  The goal of that is to remove virtually all of the female DNA.

Q.    Right.

A.    If you've still got half as much female DNA in there as you started out with, you haven't been very efficient at removing the female DNA.  You want to end up with basically none.  And you only -- excuse me -- you only need about a half a nanogram of DNA to get a robust result.  And if you've got 50

nanograms per microliter, that's 500 times the amount you need. You've got to get rid of that stuff.

Q. But if a large amount of DNA, female DNA is left in the male fraction, would that suggest that the FBI didn't do the extraction properly, didn't separate out the female cells from the male cells?

A. It's one of two things. They either left a lot of female cells behind, in the post-digest pellet, or they simply didn't wash the particulate debris that was left after the digestion enough times to dilute away the female DNA.

Q. Would -- if you were called to testify at the trial in this case in responding to that, would you -- you think that's a critical point to bring up? Critical of the FBI process, of the FBI lab's process in this extraction?

A. Absolutely. I mean, that's -- that is an extremely poor result.

Q. Okay. Done by the FBI lab?

A. Yes.

Q. Okay. And that would be something that you would want to bring up and point out to the jury?

A. Yes, because if that were a result that I had, it would immediately trigger, hey, you know, I've got too much female DNA here. I haven't done this right, because I should be finding male DNA from the semen that's on this rectal swab.

Q. All right.

A.   So I need to go back and either repeat the process, or I need to go back and look to see if, you know, maybe look at some of the cell debris from the three swabs that I've sampled and look to see, do these guys have any sperm in them?  You know, what's going wrong here?  How come I'm not getting any results that's attributable to the sperm?

Q.   Right.  And that would be something that you'd at least want to cross-examine the FBI experts on --

A.   Well, sure.

Q.   -- how they messed this up?

A.   But if I were the FBI expert, I would have already done that.  I mean --

Q.   Done what?

A.   -- that's my duty.

Q.   No, no, no.  I mean, this is a point that the defense attorneys would want to cross-examine the FBI experts on as well.

A.   Well, certainly.

         MR. ABREU:  Your Honor, I want to object at this time.  I don't think he's qualified to testify to what Defense Counsel might be doing or not be doing.

         MR. DOWD:  Your Honor --

         THE COURT:  Sustained.  Just move on, please.

         MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q.    On January 16th of '04, the stained swab remnants were sent to Dr. Johnson for testing.  Do you remember that?

A.    That's my understanding, yes.  Uh-huh.

Q.    All right.  And the AP, her AP test was negative, but her PSA test was weakly positive, and that no sperm were observed from the swab?

A.    You're asking me --

Q.    Yeah, I'm asking.

A.    That's my understanding.

Q.    That's your understanding?

A.    That's my understanding, yes.

Q.    All right.  What was your -- you made a point, you were discussing Dr. Scott Benton's testimony, and you suggested that the Government bootstrapped the alleged, I think that was your word, bootstrapped the alleged sodomy of 2002 to the perineal bleeding of May 12th post-sodomy of, I guess that would be 2004, to the perineal bleeding of May 12th, 2002.  Did I understand that?

A.    Yes.

Q.    That the child had some bleeding some time before, and Scott Benton examined her?

A.    That's my understanding, yes.

Q.    All right.  Did you understand that the Government was trying to tie in the alleged sodomy of, surrounding the case, here in 2004 -- or I guess 2003, right -- with this previous

bleeding?

A.   Well, certainly if I had been on a jury, that would be the impression or the inference that I could have drawn from Dr. Benton's testimony, yes.

Q.   That's how you read that testimony?

A.   Yes.

Q.   Okay.  I want to make sure I have this right.  Dr. Benton described, perhaps over-simply, that semen is a product of the prostate gland in men, meant to be a vehicle for sperm during ejaculation.  But you're saying that that's not right, that sperm is, or that semen is always, always has sperm?

A.   The definition of semen is the suspension of sperm in seminal fluid.

Q.   That's what it is.  All right.  And -- but you can have semen without sperm, as the Judge pointed out, if you have a vasectomy?

A.   No.  Then you have seminal fluid.

Q.   Okay.  So semen and seminal fluid are not synonymous.

A.   No.

Q.   Okay.

     THE COURT:  Semen is the total of the seminal fluid and the sperm.

     THE WITNESS:  Correct.

     MR. DOWD:  Semen is the total, and seminal fluid is what mixes with the sperm.

THE COURT:  But you can also -- there are people that say that semen is also the seminal fluid without the sperm.

MR. DOWD:  Okay.

THE COURT:  So it may be interchangeable.

MR. DOWD:  Okay.

BY MR. DOWD:

Q.   Now, the -- and you've corrected Dr. Benton as well about the source of seminal fluid, or is it semen, seminal fluid, is not the prostate gland?  Or at least not solely the prostate gland, but the seminal vesicles?

A.   Well -- I'm sorry.

Q.   And the bulbourethral glands and other minor glands, that all those glands produce -- is it semen or seminal fluid?

A.   Semen is produced in a cascading reaction at ejaculation.

Q.   Okay.

A.   Okay.  The sperm are forced out of the vas deferens, and they are, then they're commingled with all of these fluids from all these glands.  Dr. Benton simply said that semen is the product of the prostate gland.  And that's nowhere near the truth.  The prostate gland comprise -- the prostate gland secretions comprise only about 25 to 30 percent of the seminal, even the seminal fluid.

THE COURT:  Maybe he meant the p30 comes from the prostate gland.

THE WITNESS:  Well, that's not what he said, Your

Honor.

BY MR. DOWD:

Q.    Talking about Dr. Benton?

A.    Yes.

Q.    Yeah.  You know, I've always heard that if you, if a man has his prostate removed, that he will not be able to produce semen.  And, you know, if he ejaculates, there's not going to be any sperm coming out, there's not going to be anything coming out.  Is that -- did I understand that correctly?

A.    I don't know.  I don't know.

THE COURT:  He's not a doctor.  Don't ask him these things.

MR. DOWD:  Oh, okay.  Okay.

BY MR. DOWD:

Q.    Now, you were critical of the defense attorneys in the case in your report.

MR. ABREU:  Your Honor, I would just object to the characterization until I hear what was actually said.

MR. DOWD:  Well, okay.

MR. ABREU:  Or if he can point us to what he's --

MR. DOWD:  All right.

BY MR. DOWD:

Q.    Defense closing argument on Page 17.  "In his closing argument, Defense Counsel Tinker did not make an attempt to address the lack of proof of the presence of semen on the

child's rectal swabs, reminding the jury that the male specific Y chromosome test attempted by the Government was fruitless," on and on.  On Page 18, there's several other criticisms.

You were critical of the defense team in this case, Mr. Keel?

A.   On Page 17, I actually present the attempt that he did make --

Q.   Uh-huh.

A.   -- to address the lack of proof of the presence of semen.

Q.   Oh.

A.   Not a criticism.

Q.   Uh-huh.  What was the fruitless?

A.   The Y chromosome test.

THE COURT:  I'll just say, Wikipedia says here that semen is an organic fluid, also known as seminal fluid.

MR. DOWD:  That's what I thought, Judge.  I thought it was the same thing.

THE COURT:  I'll just say Wikipedia says that.  Who knows.

MR. DOWD:  Okay.  Okay.  I agree with Wikipedia.

BY MR. DOWD:

Q.   Are you saying that --

MR. ROBERTS:  Could we have just a moment, Your Honor?

THE COURT:  Yes, please.

THE WITNESS:  Could I get some water?

THE COURT:  Yes, sir.

THE WITNESS:  Thank you.

THE COURT:  Could somebody give him some water?  Do y'all have water?  Petitioner's team?

MR. ABREU:  I'm -- we're fine.  I'm fine at the moment.

THE COURT:  No, your --

UNIDENTIFIED SPEAKER:  Thank you for asking.

(Laughter.)

THE COURT:  The most reasonable man in the room doesn't need water.

COURT SECURITY OFFICER:  You want me to get some water out of the --

THE COURT:  Would you, please?  We'll get it.  Thank you very much, Mr. Castillo.

How much more, do you think?

MR. DOWD:  Not much, Your Honor.

THE COURT:  Really?

MR. DOWD:  I just have a few more questions.

BY MR. DOWD:

Q.   The pre-ejaculate, Dr. Benton testified that the positive p30 result from the rectal swabs could possibly have resulted from the presence of pre-ejaculate in the rectum transferred to the swabs.  And you responded, I'll quote from your report --

A.    Could you tell me what page we're on?

Q.    Oh, see, I took notes from it.  Let me see if I can help you.  This would be under the "Setting the record straight."  Do you remember that, that the --

A.    Oh, yeah, I certainly remember it.

Q.    Okay.

A.    I just wanted to be able to follow along with you.

Q.    Okay.  I'm losing my voice here.  Let's see.  That's --

A.    Page 19?

Q.    Page 19, okay.  There it is.  Okay.  So I guess on that bottom paragraph, the pre-ejaculate typically comprises less than 1 percent of the total semen produced.  And you suggest that the, it's likely that the pre-ejaculate does not contain any more PSA than might be detected in the peripheral blood of a male.  You used the word -- your use of the word "likely" struck me.  Is this based on scientific experiments or testing or --

A.    No, no, it's --

Q.    -- is that your opinion?  What --

A.    It's simply based on logic.  The bulbourethral gland, this pre-ejaculate fluid is a product of the bulbourethral glands and not the prostate.  So, I mean, it's the prostate gland that produces the overwhelming majority of p30.

Q.    Uh-huh.

A.    So if the bulbourethral glands are going to be producing

any p30, it's probably going to be about the same amount of p30 as you would normally expect to find circulating in their bloodstream.  I mean, because they don't make p30 as an active function, so --

Q.    But the bulbourethral glands --

A.    I mean, that's just the logical conclusion.

Q.    I'm sorry, but the bulbourethral gland can produce p30?

A.    It, as a tissue, possesses the gene, the p30 gene in every cell.  So theoretically, it could produce it, but --

Q.    At a level that would be picked up on a p30 test?

A.    That's what Dr. Benton's claiming.  I don't know.  I don't think so.  I don't even think it makes p30.

Q.    Well, I'm asking you.  I'm asking you, would -- could PSA be produced in the bulbourethral gland at a level that would be picked up and test positive in a p30 test?

A.    Certainly the levels that are in the normal serum, blood serum of males is detectable by these assays.

Q.    Is that a "yes"?

A.    It's an "I don't know."

Q.    Oh, you don't know?

A.    But it's certainly plausible, yes.  But the fact, the suggestion that you might be detecting only pre-ejaculate fluid in this environment from the rectum is just patently absurd. That would be like --

Q.    That's not my question.  My question is, could the

bulbourethral gland have produced the PSA that was detected in the p30 test?

MR. ABREU:  Your Honor, I'm going to object because I think it's been asked and answered.  And additionally, I think the original question related to Dr. Benton's testimony, which I think the witness was about to answer, how it related to Dr. Benton's actual testimony.

MR. DOWD:  Well, he was going beyond my question, Your Honor.  Nonresponsive.

THE COURT:  Sustained.

BY MR. DOWD:

Q.   So your conclusion that it could not be pre-ejaculate is that most of the pre-ejaculate fluid is generated by the bulbourethral gland, but you're saying you don't know if the bulbourethral gland can produce PSA.  Did I understand that correctly?

A.   I don't understand your question.  You're suggesting that, or Dr. Benton is suggesting that something that comprises less than 1 percent of the total volume of semen is what was actually -- might have been picked up on the rectal swab, and that that's what the p30 result came from.  And that's ridiculous.  That's like taking a drink of coffee and not getting any caffeine.

Q.   Well, I don't think that was the testimony.  But your response is that it couldn't be that the pre-ejaculate could

not have triggered a positive PSA result because the

pre-ejaculate comes from the bulbourethral gland.  That's

what -- isn't that in your report?  And it doesn't come from

the prostate.  Isn't that the point in your report?

A.    But you're taking it out of context.

Q.    Please, please answer my question.

A.    The context is that --

Q.    Sir --

        MR. DOWD:  Your Honor, I would object to the

nonresponsive --

        THE WITNESS:  I'm trying to answer his question, Your

Honor.

        THE COURT:  Sustained.

BY MR. DOWD:

Q.    Would it surprise you to know that pre-ejaculate contains

high levels of PSA and AP?

A.    Yes.

Q.    That would surprise you to know that?

A.    Yes.  It wouldn't -- I don't know if it would surprise me

as much with the acid phosphatase, but it would surprise me

with regard to AP, I mean, with regard to p30.

Q.    And you don't have any scientific basis to suggest that

pre-ejaculate does not contain PSA at levels that will trigger

a positive p30 test?  Are you relying on any studies?

A.    No.  I'm simply drawing an inference that since the

pre-ejaculate is not the product of the prostate gland, which is the primary producer of p30 in males, that it would not contain, necessarily contain any more p30 than the normal circulating blood serum of a male, and that it is absurd to think that they would be detecting something, only something that comprises less than 1 percent of the total volume of semen on this rectal swab that was -- this swab that was inserted into this child's rectum.

I mean, there's not going to be just this little pool of pre-ejaculate fluid sitting there. I mean, that's just ludicrous.

Q. You indicated that the record was clear that Mr. Bourgeois did not have a vasectomy.

A. Well, I think it's pretty clear that he had a one-year-old child, so he's certainly capable of producing sperm a year ago at this time.

THE COURT: Not a year ago. You don't know that.

BY MR. DOWD:

Q. Not a year ago at this time.

A. At that time.

Q. At that time.

A. Right.

Q. Well, there's a fellow in my office that has several kids, and he has a vasectomy.

A. I don't understand your point.

THE COURT:  Well, you don't --

MR. DOWD:  He had the vasectomy after he had the kids.

THE COURT:  The point is you don't know if Mr. Bourgeois had a vasectomy.

THE WITNESS:  No.  No, of course not.  The inference there is that he had just had a child.  And unless he had a vasectomy in the interim, then he's produce -- a normal sperm producer.

BY MR. DOWD:

Q.   You indicate that he was apparently healthy at the time of the crime.  He couldn't be azoospermic or oligospermic as a result of temporary illness.  That was your, another conclusion you drew from the record?

A.   Right.  That's an inference that I'm drawing because he's a working truck driver.

Q.   All right.  And so someone could be without sperm, due to illness?

A.   No.  That's Dr. Benton's testimony.  This is all derived from Dr. Benton's testimony.

Q.   Well --

A.   Dr. Benton is the person who's making these claims.  I don't know.

Q.   Yeah, but you're saying he is, to rebut that, you're saying he was apparently healthy at the time of the crime, so

he couldn't be azoospermic or oligospermic as a result of temporary illness.

A.    Well, if he's not sick, and if -- as Dr. Benton claimed, those conditions might make you produce lower amounts of sperm, then that's not applicable to Mr. Bourgeois, because he wasn't sick, as far as I could tell.

Q.    So you don't know if illness can render you without sperm.

A.    I'm sure there probably are illnesses that can do that.

Q.    All right.  And can you point to any evidence in the record that Mr. Bourgeois didn't have any such illness?

A.    No.  As I explained, that's an inference that's being drawn.  That's not that hard to draw.

Q.    And you also indicate that the presumptive test for semen is the AP test, the acid phosphatase test.

A.    That is a presumptive test for semen, yes.

Q.    It's extremely sensitive, and you go on to say that if the AP test is negative, that usually ends testing.  The observance of sperm is the only confirmatory test.

A.    That's correct.

Q.    All right.  Why wouldn't the negative result on the AP test always end further testing?

A.    Well, it depends upon the context of the sample and the case.  You can't just operate like you're working from a cookbook.

Q.    Uh-huh.

Keel - Cross                161

A.   It depends on the individual specimen that you're testing. For the most part, if I'm testing a huge blanket and I'm looking for semen on this blanket and it's got a number of interesting deposits --

Q.   Uh-huh.

A.   -- that might fluoresce or simply look like they might be a body fluid stain, then I'm going to test them for AP.  If they're negative, I'm going to abandon that stain and go to the next one, because it probably doesn't have a significant level of semen in it that would be useful for any investigative purposes.  So that's how you use AP as a screening tool.

Q.   All right.  And if you had some reason to believe that the AP test wouldn't be reliable, then you might skip it completely or ignore its result, right, and go to the PSA test?

A.   No.

Q.   You wouldn't?

A.   Can you be a little more specific?

Q.   Well, if you had some reason --

A.   What are we talking about?  Are we talking about the blanket?

Q.   If you had some reason not to have confidence in the AP test --

A.   I don't -- I have extreme confidence in the AP test.

Q.   Let's say --

A.   It's the best test I've got.

Q.   Let's say a sample taken from a rectum.

A.   I wouldn't bother.

Q.   Because there's no confidence in the AP results.  Right?

A.   No, because I've got a finite specimen, a little swab. I'm going to cut a portion of that off and look for sperm from it.  I'm going to go right to the heart of the matter.

Q.   Okay.

A.   I'm not going to have to screen 20 stains --

Q.   You're not going to mess around with the AP --

A.   -- on a blanket.

Q.   -- or the PSA, you're going to go right to the sperm search?

A.   Absolutely.

Q.   Okay.  Now, in a sperm search, you actually have to find the sperm.  It's -- you have to visually find, separate it out, that whole differentiation process and actually locate a sperm. Correct?

A.   Correct.  But as I described the process to you, it's very easy.

Q.   Okay.  And the AP test is a simple chemical test.  The PSA test is a simple chemical test.

A.   The PSA test requires the most work of all when you're talking about a garment.

Q.   Uh-huh.

A.   If you're talking about a swab, then it's on par with, in

terms of sample preparation, with the microscopic search for sperm.  The search for sperm would take longer, because you have to prepare the slide and stain it and examine it, spend some time at the microscope.  But both those tests involve removing a portion of the stain material that looks interesting to you off of that and into a liquid environment --

Q.　All right.

A.　-- so that you can then work with it.

Q.　And finding a sperm cell would be much easier?

A.　Is that a question?

Q.　Yes.  Would finding a sperm cell be much easier?

A.　Much easier than what?

Q.　Than going through the PSA testing that you described.

A.　No.  Doing the PSA test would probably be easier.

Q.　Okay.

A.　But it would be much less definitive.

Q.　Okay.

A.　That's why I would simply look for sperm.

Q.　All right.

A.　And not finding any sperm, I would probably abandon that specimen.

Q.　If you don't find sperm, that's it.  It's a negative finding.

A.　It means I didn't find any sperm, yes.

Q.　And you would conclude that any positive semen result

would not be reliable.

A.    I wouldn't have any positive semen result.

Q.    No, but if you were -- let's say another lab did the semen result, they got a positive, you're asked to find sperm like in this case, you find no sperm, then you don't trust the semen result.

A.    Where did the semen result come from?  From what kind of --

Q.    Well, in this case, it was done by the FBI, and again by Ms. Johnson?

A.    No, no, what's the nature of the test you're asking me to accept from some other laboratory?

Q.    Well, the ABA card for the FBI, and I believe Dr. Johnson did the Seratec.  Is that right?

A.    But your hypothetical is some other laboratory has done some work and indicated they believe there's semen on this specimen.

Q.    Uh-huh.

A.    They send the specimen to me.  I examine a portion of it for sperm, and I can't find any sperm.  I'm going to tell them there's no semen here.  If that's your question, then that's correct.

Q.    Okay.  Now, you indicate that the commercial PSA tests are so sensitive that you can actually get a positive result on a toddler's clothes if it is washed with a man's underwear

containing semen?  Did I understand that correctly?

A.  Yes.  I have been involved in such a case from Montana, yes.

Q.  Oh, that was in -- that happened in a particular case? That's where you got that?

A.  Absolutely.

Q.  Okay.  So it's not -- they didn't do a study on that?

A.  No.  No.  This was a specific case that was done by the state of Montana, and then I reworked the case.

Q.  All right.  And how did they decide that that was the source of the sperm?

A.  Because we proved it empirically.  The specimen was a toddler's pair of underpants that they had taken out of the chest of drawers or whatever.  It had been neatly folded after doing laundry and put away.  Because of other allegations that were made against the father of this toddler, they went to other clothing, freshly washed clothing, and examined it for semen.

Q.  Okay.

A.  And got a result.

Q.  So that was a conclusion that was drawn in this particular case, but no studies have been done, no experiments have been done to prove that your theory is correct?

A.  How is that not proof?

THE COURT:  Okay.

BY MR. DOWD:

Q.   Well, has it been repeated?

THE COURT:  Is this going to end up -- excuse me.

MR. ABREU:  Your Honor, I am going to object.

THE COURT:  Oh, well, I'm going to object.  What's going on?

MR. DOWD:  I'll move on.

THE COURT:  Are we almost done?

MR. DOWD:  We're almost done.  I've got like two questions, Judge.

THE COURT:  This is just very argumentative and --

MR. DOWD:  Yes, Your Honor.

THE COURT:  There's nothing --

MR. DOWD:  It just struck me as strange.

THE COURT:  I'm not getting anything out of this, if you want me to get something out of it.

MR. DOWD:  Okay.  Okay.

BY MR. DOWD:

Q.   But even if that was the case, you're not suggesting that if this child's underwear had picked up semen from the wash, that that semen would enter her rectum?  You're not suggesting that that as an explanation here, are you?

A.   By no means.

Q.   All right.

A.   And I state that in my report, sir.

Q.   Oh, it's in there?  Okay.

A.   But I think you're mischaracterizing the, my analogy with regard to the sensitivity of the test to the examination of the child's underpants.  Certainly if there were semen in her rectum, I would expect to find some semen in her underpants as a result of the act of sodomy.  I mean, that goes without saying.

Q.   Okay.

A.   And just like the FBI did, that's why they examined the underpants.  And not finding any semen in the underpants is another red flag that should have gone up.  You know, maybe we need to take another look at these rectal swabs.

Q.   And AP and semen, you would expect that to degrade more rapidly while the child is alive than postmortem?

A.   You mean, you're talking about the soluble components of semen?  Um --

Q.   Well, I really meant the soluble and nonsoluble.  But semen or seminal fluid?

THE COURT:  Okay.  Where -- are you almost done with this?

MR. DOWD:  Yes.  That's my last question, Judge, yeah.

THE COURT:  That's it?  Thank you.

MR. DOWD:  Well, if I can get an answer.

THE COURT:  He's not going to.

MR. DOWD:  He's not going to answer?  Okay.

THE WITNESS:  Oh, yes, I am.

THE COURT:  What's your next --

MR. ABREU:  Very briefly, and this is the last --

THE COURT:  Oh, okay.  Go ahead.  Excuse me.

MR. ABREU:  This is our last witness.

THE WITNESS:  No --

MR. ABREU:  Oh, you are going to answer.  Sorry.

THE WITNESS:  The answer to his question is a person who is dead and not active, not moving around, isn't standing up, they aren't walking, they aren't doing their normal course of life, things aren't flowing out of these body orifices and they're not being diminished and diluted in that fashion, whereas if someone is dead and there's a pool of semen in their vagina on their rectum, it's just going to sit there until the normal decay processes get rid of it.  But you can recover it, you know, a long time after they're dead.

MR. DOWD:  All right.  Thank you, Mr. Keel.

THE COURT:  Okay.  Thank you all very much.  Now you're -- you've got one more?

MR. ABREU:  Thank you.  Just a very -- couple of questions.

                    REDIRECT EXAMINATION

BY MR. ABREU:

Q.   I just wanted to clarify.  I think there was some

169

confusion when there was discussion about the swabs having semen in this particular case, as Mr. Dowd asked some other questions.  Just so we can clarify your opinion, in this particular case, what is your opinion whether semen was detected, based on the evidence that you've reviewed?

A.    In my -- there's no semen on these swabs.  You have two independent laboratories that can't find sperm on the swabs.  You have two independent laboratories who can find no male --

THE COURT:  You know what, I think we've got his opinion very clearly.

MR. ABREU:  That I wanted to make sure, Your Honor.

BY MR. ABREU:

Q.    And just one last question, or two questions related to the same area.  Mr. Dowd asked you, the Government asked you whether you were aware of the FBI manual stating that only a sperm head and tail constitutes finding sperm.  Do you recall that?

A.    Yes.

Q.    Okay.  And they asked you whether you were aware of any bench notes or any notes, notations about whether the smear they observed had just sperm heads, for instance, that they couldn't qualify as full sperm.  Did you hear that?

A.    No.

Q.    Okay.  Have you reviewed anything at any point, any notes indicating that the smear that the FBI observed had any sperm

particles or fragmented sperm?

MR. DOWD:  Your Honor, I would object.  What's his basis for knowing that?

MR. ABREU:  That's what I -- you asked the question. That's what I want to know, what's his basis, what's your basis for the question.

THE COURT:  Wait, wait, wait.

MR. DOWD:  How does he know what else is on the --

THE COURT:  Just ask the question.

MR. DOWD:  -- the smear?

BY MR. ABREU:

Q.   Well, I'm going to ask, have you read any notes related, that have been provided by me to you from the FBI regarding sperm fragments on the smear?

A.   The only note that has been provided to me is a form that has the word "sperm" in a column, and then either a dash meaning negative or the word "NEG" under the word "sperm."

Q.   Let me just show you this one document.

A.   That's all I have.

Q.   I'm sorry.  This will be my last question.  The Government asked you about whether you had seen the FBI protocol manual. I actually happen to have a copy of that right here.  And I'm relating to a chapter, Series 111, 16 pages, and this is Page 12, and 10.3.  And I'll just read it.  "The presence of cellular elements consistent with being either dissociated

human spermatozoa heads and/or tails is not sufficient basis for the conclusive determination that human semen is present on an item of evidence.  The presence of such dissociated cellular components should be recorded in the case notes."  Do you see that?

A.   I do see that.

Q.   Did you read any case notes saying there was dissociated semen in this particular case?

A.   No.

MR. ABREU:  Your Honor, I'm going to again renew my request.  If the FBI has notes that we have not seen regarding what was observed, I would like to see them.

MR. DOWD:  Judge, to that point --

THE COURT:  Please.

MR. DOWD:  -- our FBI expert has now arrived, and if I could have a minute to confer with her.

THE COURT:  Please.  Thank you.

(PAUSE.)

MR. DOWD:  Your Honor, she's going to retrieve the case file.  It's just down the hall.  And --

MR. ABREU:  And I'll just ask, while she's getting them, ask a follow-up question, Your Honor, of the witness.

MR. DOWD:  She's up to testify tomorrow, but we'll straighten this out.

MR. ABREU:  If there were --

THE COURT:  Is there anything not disclosed in the FBI file?

MR. DOWD:  Our expert indicates to me that she has correspondence that shows that it was shared with the Defense at the trial stage.

THE COURT:  Okay.

MR. DOWD:  So I haven't seen it, but that's what she's --

THE COURT:  Photographs?

MR. DOWD:  No, correspondence.

THE COURT:  Correspondence.

MR. DOWD:  That this went to the Defense at the trial stage.

THE COURT:  All right.  I don't know what that means, but --

MR. ABREU:  Mr. Dowd and I will talk, Your Honor.

THE COURT:  You will?

MR. ABREU:  He and I get along just fine.

THE COURT:  You just need to leave by midnight.  Oh, that's right, the two reasonable people in the whole courtroom.

MR. ABREU:  You remembered.

BY MR. ABREU:

Q.   If there were dissociated sperm, would the Y chromosome test conducted by the FBI have picked up male, picked up those particular chromosomes in the dissociated sperm?

A.    Well, the test was done by Orchid Cellmark.

Q.    I'm sorry, Orchid Cellmark.

A.    But if there was a sufficient amount of semen to produce the result on the p30 assay card, then there should have been more than enough sperm present to produce a result that would be detected by that DNA assay, yes.

Q.    And would those dissociated sperm have been visible on the microscopic search conducted by Technical Associates?

A.    Certainly.

        MR. ABREU:  I have no further questions, Your Honor.

        MR. DOWD:  Nothing further, Your Honor.

        THE COURT:  Thank you, sir.  You may stand down.

    (Excerpt concluded at 8:23:25 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    October 12, 2010
Molly Carter                        Date

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ELIZABETH ANN JOHNSON | 3 | 38 | 109 | |
| CHARLES ALAN KEEL | 122 | 133 | 168 | |

| EXHIBITS: | RECEIVED |
|---|---|
| PX-88: REPORT OF CHARLES ALAN KEEL . . . . . . . . . . . | 126 |
| PX-90: CV OF WITNESS CHARLES ALAN KEEL . . . . . . . . | 123 |
| PX-91: 2007 DECLARATION OF ELIZABETH ANN JOHNSON . . . | 29 |
| PX-92: 3/1/94 HANDWRITTEN REPORT OF ELIZABETH JOHNSON | 115 |
| PX-93: CV OF WITNESS ELIZABETH ANN JOHNSON . . . . . . | 3 |
| PX-168: FAX FROM ELIZABETH JOHNSON TO MR. TINKER . . . | 20 |