IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,      *    CRIMINAL ACTION
                              *
        PLAINTIFF,         *    CR-C-02-216(1)
                              *
VS.                        *
                              *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,        *    SEPTEMBER 24, 2010
                              *    8:26 A.M.
        DEFENDANT.        *
                              *
* * * * * * * * * * * * * * * * * *


PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 5
(TESTIMONY OF JERRILYN CONWAY)

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:      MS. PATTI HUBERT BOOTH
                          MS. ELSA SALINAS
                          OFFICE OF THE U.S. ATTORNEY
                          800 NORTH SHORELINE, SUITE 500
                          CORPUS CHRISTI, TEXAS 78401

                          MR. TONY R. ROBERTS
                          MR. MARK MICHAEL DOWD
                          OFFICE OF THE U.S. ATTORNEY
                          P. O. BOX 61129
                          HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:         MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 8:26 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 9:38:05 a.m.)

JERRILYN CONWAY, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. DOWD:

Q.   Ms. Conway, would you state your full name for the record and spell your last name, please?

A.   My name is Jerrilyn Conway.  My last name is spelled C-O-N-W-A-Y.

Q.   All right.  And how are you employed?

A.   I'm a forensic examiner in the Nuclear DNA Unit at the FBI Laboratory.

Q.   All right.  And what do your duties include there?

A.   As a forensic examiner, I determine what examinations need to be done initially by our unit.  Those examinations are carried out by a biologist.  The biologist then returns their analysis and examination paperwork to me.  I'll review those documents, make conclusions, determine if any additional examinations need to be conducted, and then write a report.

Q.   All right.  And if you would give the Court a highlight of your education, any formal training in this area, any certificates that you hold, any qualifications or certifications that you hold to qualify you in this area.

MR. ABREU:  Excuse me, Your Honor.  If it will help speed things along, I have no objection to her qualifications as an expert in this area.  If he wants to ask specific questions --

THE COURT:  What's the area again?

MR. DOWD:  Evaluation of the semen, Your Honor.

THE COURT:  Okay.

MR. ABREU:  I have no objection to her qualification as an expert.

THE COURT:  Thank you.  She'll be accepted.

MR. ABREU:  Thank you.

MR. DOWD:  In general, it's the blood, DNA semen testing.

BY MR. DOWD:

Q.    Let me just quickly ask if you can recognize Government's Exhibit Number 64.  Do you recognize that?

A.    I do.

Q.    Okay.  And what is this?

A.    This is a copy of my CV.

Q.    All right.  You provided this to the Government?

A.    I did.

MR. DOWD:  We'd offer Number 64 into evidence, Your Honor?

MR. ABREU:  Without objection, Your Honor.

THE COURT:  Government's 64 is admitted.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.   And then Government's Exhibit Number 65, do you recognize this?

A.   I do.

Q.   And what is this?

A.   This is a list of my court qualifications.

Q.   Okay.  These are cases you testified in and was qualified as an expert in?

A.   That's right.

MR. DOWD:  All right.  We'd offer Number 65 into evidence, Your Honor.

MR. ABREU:  No objection, Your Honor.

BY MR. DOWD:

Q.   All right.  And then finally, Exhibit Number 63, do you recognize this document?

A.   I do.

Q.   And what is this?

A.   This is a statement I prepared for this matter.

Q.   All right.

MR. DOWD:  We'd offer Number 63 into evidence as well, Your Honor.

MR. ABREU:  Again, no objection, Your Honor.

THE COURT:  Thank you.

MR. DOWD:  Now, Ms. Conway --

THE COURT:  That's admitted.

MR. DOWD:  Oh, thank you, Judge.

THE COURT:  Sorry.

MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q.   Ms. Conway, we're going to speed right along here.  What is the acid phosphatase test, and what does it test for?

A.   The test that we use to detect acid phosphatase is called a BCIP, which stands for Bromo Chloro Indolyl Phosphate.  It's a test that will detect the high levels of acid phosphatase that are present in semen.

Q.   All right.  And how does that test physically work?  What process is involved?

A.   Generally we use this test for items of evidence such as clothing or bedding, and we'll take a swab, we'll have a moistened swab and we'll rub that swab on the stain to take a little bit of that stain onto the swab.  The swab we'll then put into a test tube, and then our test reagent.  That solution will be put into a water bath for 15 minutes, and we look for a color change.  So the solution is colorless, and when it's acted upon by acid phosphatase, it will turn blue.

Q.   Okay.  And what is the actual mechanics of the underlying reaction, chemical reaction or biological reaction that produces the color change?

A.   Acid phosphatase acts as an enzyme and acts on the

substrate that's in the solution that we add to our test tube. It actually cleaves the phosphate off of that molecule and changes it from a colorless solution to a blue color that's then on the swab.

Q.   All right.  And what --

A.   So it's an enzymatic reaction.

Q.   In what state does the acid phosphatase, the actual substance, have to be in in order to trigger a positive result, test result?

A.   The acid phosphatase has to be active and functioning.  So it has to actually be able to do its cleaving of the substrate. It has to be functioning.

Q.   So the enzyme has to be functioning.

A.   That's right.

Q.   Okay.  And how long will acid phosphatase function under normal laboratory conditions?  If it's preserved in a lab, would you expect the acid phosphatase to continue functioning to the degree it will result in a positive test result?

A.   I would.  If a stain is deposited and then dried, and then that evidence is stored in a dry environment and hopefully refrigerated as well, it could last for many years.

Q.   Okay.  What would -- what about in a live rectum?

A.   Well, the studies that have been done have been on typically vaginal, post-intercourse vaginal swabs.  We found that when -- well, we didn't find, but the studies show that

the acid phosphatase will last for an average of 14 hours when a swab is taken after, after the intercourse.

Q. And after 14 hours?

A. It tends not to be able to be detected.

Q. All right. And what about in a rectum?

A. Well, a rectum --

Q. Would you have an opinion about how long acid phosphatase would remain active, detectable under this test, in a live rectum?

A. It may be similar. It depends on whether the individual has actually defecated. That, of course, would lead to drainage, and as opposed to just being diluted and degraded, it would actually be sort of washed away.

Q. All right. And you say it would be similar, meaning that it would no longer be detectable, after, under this test, after 14 hours?

A. Approximately. That would be my expectation.

Q. All right. Why doesn't the FBI lab conduct AP or acid phosphatase testing in suspected semen samples, especially obtained from intimate body orifices, like a vagina or a rectum?

A. Well, there's two reasons. One is that the vaginal secretions also contain acid phosphatase, so it's possible that a positive result on our AP test would be a result of those vaginal secretions. Rectal swabs, from drainage, could also be

contaminated with vaginal secretions.

And then the other reason is that because of the known degradation rate of acid phosphatase, we know that the AP will actually lose its ability to be detected sooner than our p30 test, which is our PSA test. So we go straight to the p30 test to determine whether semen's present on those swabs.

Q.   All right. Other than degradation of the acid phosphatase, you know, in 14 hours, after 14 hours, are there any other -- do we know if there's anything else that can cause a false negative in an acid phosphatase test?

A.   Well, again, the false negative, I would say that we're just unable to detect semen. It would have been diluted enough. There is, of course, a detection limit. Eventually the concentration of that is so limited that we would not be able to detect a positive result.

Q.   All right. Now, what about the p30 test, or the PSA test? What does that test for?

A.   The PSA test is, we use the, in this case, we used the ABA card to detect PSA, which is a protein that's elaborated by the prostate during ejaculation.

Q.   Okay. And how settled is the science regarding what substances can trigger a positive ABA card test result, positive test result?

A.   There's numerous validation studies that show that this test is very specific, which means that other substances have

not been shown to react positively with this test.  And it's also very sensitive, which means that it will detect PSA at a reasonably low level.

I should say it does have a limit to that sensitivity, which is important, because we don't want for other substances that contain PSA at very low levels to react with this card.

Q.   All right.  And if Mr. Keel said that we just don't know what will trigger a PSA positive test result, would that be accurate?

A.   I don't think that that's accurate.  The literature is filled with validation studies, I think I cited at least five in my statement, that show that the PSA test is both specific and sensitive.

Q.   All right.  And how long has the PSA test been used, have been used to detect semen in, you know, laboratory environments?

A.   In our lab, we started using -- the first PSA test that we started using was an ELISA test, which was brought on line in the early 1990s.  We started using then the ABA card in 1998.

Q.   All right.  What is the, as far as the different types of PSA tests, what is the ABA card PSA test?

A.   It basically looks like a pregnancy, a pregnancy stick. It's actually in a card format, so the solution is added to a well at one end of the card.  There's a membrane that the solution then, by capillary action, is drawn through the card.

It reaches the test region first.  There --

Q.   Well, before you get to that, explain the extraction and dilution process before the actual final substance is tested on the card.

A.   So when we test our -- when we test our swabs, we take a quarter of the swab, we cut that length-wise -- we cut the swab length-wise so that we take a quarter of the swab.  A swab can hold between .1 and .15 milliliters of fluid.  That would be the maximum volume that you would expect to have on that swab.

Q.   Uh-huh.

A.   So we take a quarter of that, and we put it then in a buffer, which is a solution of about a mil.  That effectively --

Q.   A mil?

A.   A milliliter, excuse me, a milliliter.  And that effectively dilutes the original concentration of the substance that was on the swab.  There's also what we call an extraction efficiency dilution --

Q.   Well, before we get to that, in that initial dilution, that is the standard, and that's how the test was designed to be, to test that particular standard at that point?

A.   That is our protocol for detect -- for cutting swabs from sexual assault kits.  That's our protocol.  That's part of our protocol.

Q.   Okay.  And is that how that ABA card test was designed to

test the PSA at that standard level of dilution?

A.    To take a portion.  The manufacturer, depending on how sensitive -- depending on -- the manufacturer designed it so that you could extract the PSA from a stain, either from a swab or from a cutting of fabric, clothing item or bedding, and then extract that into a buffer solution and run it on the card, yes.

Q.    All right.  And you were discussing the next step of dilution.

A.    Right.  So the next dilution that is important is we have, there's an extraction efficiency that is associated with extracting the soluble protein out of the swab, and that's been determined, and the literature supports that that extraction efficiency is only between 1 and 10 percent.

Q.    Okay.

A.    So that effectively dilutes the sample even further, so that then the buffer that is run on the card has a significantly lower level of PSA than the original substance that might have been deposited on that swab.

Q.    Than the actual pure substance --

A.    Exactly.

Q.    -- that was deposited?  All right.

A.    That's right.

Q.    And is that -- and then what happens?

A.    And then a portion of that buffer, that solution, is added

to the card.  The solution is bound by an antibody.  The protein is bound by an antibody, and it goes, it travels up the card and it reaches the test region, where it's bound, if PSA is present, it's bound by an additional antibody that's attached to the membrane.  It continues, the solution continues up to the control region, which gives us a color change to ensure that the test is working properly.

Q.   All right.

A.   And then its read after 10 minutes.

Q.   Okay.  And what's the significance of a finding of a weak positive in a PSA test?

A.   The weak positive result means that there is a limited amount of PSA present, which means there's a limited amount of semen present.  However, this is a qualitative test.  If it's positive, then there is -- then PSA is present, and it's present at a level that semen can be concluded to be on the swab.

Q.   Okay.  So it doesn't question the results, only the amount of semen that is detected?

A.   That's right.

Q.   All right.

A.   And it helps the forensic examiner then determine what stains might be appropriate for further testing.

Q.   And are PSA test results normally quantified?

A.   In the sense that we, we do -- the biologists, when they

run the card, will make a note as to whether they're weak or very weak, or if it's just a positive line, then they won't make a note.

Q.   What is the environment within a live rectum on the ability of the PSA test to detect PSA deposits there in the rectum?

A.   Well, once the sample is collected on the swab and then is preserved, that swab can be taken on for testing.  So the environment in the rectum is important because of the amount of time that may have passed between when the semen was deposited there and when the sample was collected.

Q.   All right.  And are there any studies that you're aware of supporting the proposition that bacterial proteins could contaminate a swab and produce a false positive result in a PSA test?

A.   No.  And in fact, there's a validation paper that I presented in my statement that is, that specifically tested six microorganism species to make sure that those didn't react with the PSA test.

Q.   All right.  Can you direct the Court's attention to that particular study?

A.   I can.  The author is Hawkmeister (phonetic), and it was published in 1999 in the Journal of Forensic Science.

Q.   Okay.  What conclusions can you draw from a negative AP test result 18 months after a positive PSA test result on the

same sample?

A.   Well, the negative AP test, as I discussed earlier, the AP is somewhat more fragile than PSA in that it's been shown to degrade faster, at least in the vagina, and therefore likely in the rectum as well.  So my expectation is that this is a very limited sample that has potentially been degraded, that the AP test is unable to detect, but the PSA test is.

Q.   And explain the SRT process that the FBI uses to conduct DNA tests of biological samples.

A.   The extraction process?  Is that what you're asking about?

Q.   Uh-huh.

A.   The differential extraction process is one in which a swab is cut and added to a solution.  Chemicals are added to break apart the non-sperm cells, and then the sample is centrifuged. The centrifugation allows that pellet, a pellet to be formed which would be the sperm fraction or would contain the sperm cells.  That non-sperm fraction is then removed from the pellet, and that's the non-sperm DNA fraction.

Q.   All right.  And does -- so it's designed to separate the female DNA from the male DNA?

A.   Yes.  Yes.

Q.   Okay.

A.   Really more the non-sperm DNA --

Q.   All right.

A.   -- from the sperm DNA.

Q.   And if female DNA is detected within the male fraction, does that always suggest that the test was not done properly or the procedure was not done properly?

A.   No.  The procedure is a delicate procedure.  It does need to be done carefully.  But there are samples that are challenging, and so sometimes after the number of washes -- our typical wash of the pellet is twice.  Sometimes after those two washes, there's still a significant amount of female DNA in that pellet.

Q.   And what are some of the reasons for that?

A.   Well, the sample, as I said, the sample could be just a challenging sample.  It may not have completely broken apart during the, during the initial, the initial step where the non-sperm cells should have been broken apart.  Maybe they weren't completely broken apart.  So it is certainly something that's not ideal, but it's not something that doesn't happen.

Q.   All right.  And did you review Dr. Johnson's statistical sperm calculations --

A.   I did.

Q.   -- in her report?  And do you think those are -- she suggests that there should be 500 sperm on the sample.  Do you think her calculations are correct?

A.   Well, I wouldn't say that her calculations are wrong, but they certainly don't take into account the natural variability of both PSA and sperm within a semen sample.

Q.   All right.  So you have that variability.  She used the mean --

A.   She did, yes.

Q.   -- of sperm --

A.   Well, she used -- exactly.  She used the mean of the PSA amount, which she used one figure, which was 800,000 nanograms per mil.  That number has been shown to be variable between .2 and 3.5 million.

Q.   Uh-huh.

A.   .2 and 3.5 -- oh, now I'm getting my numbers -- so 200,000 nanograms per mil to 350 million nanograms per -- three-and-a-half nanograms per --

Q.   So there's a gross variability in that figure, in that number of sperm?

A.   There is a variability in the amount of PSA that's present in a normal sperm sample.  There's also variability in the number of sperm that can be present in a sperm sample, even in a person that's considered a normal producing sperm donor.

Q.   So the sperm is not equally distributed within the semen?

A.   It's not equally distributed, but it's also not -- it's also not consistently the same amount.  100 million sperm per mil is an average, but it can go to as low as 50 million, up to 150 million, and that can affect the calculation as well.

Q.   All right.  Did she also use the, rely on the PSA test sample or statistics that it has a sensitivity of 4 nanograms

per mil?

A.   Yes, she did.

Q.   And is the PSA test, do you know if this ABA card PSA test is more sensitive than the -- explain to the Court the sensitivity of that test and the meaning of the 4 nanograms per mil as the manufacturer's sensitivity.

A.   The manufacturer guarantees that the card is at least, at least sensitive to 4 nanograms per mil.  In our hands and during our validation, we found that these cards were sensitive down to about .5 nanograms per mil.

Q.   So half a nanogram per mil?

A.   Half a nanogram per mil.

Q.   Okay.  And would that throw off her calculation as well?

A.   Well, it's another factor.  It's another factor of 8.

Q.   In other words, so the sperm would -- her calculation would be reduced by another factor of 8?

A.   That's right.

Q.   All right.  And did you, applying your, these factors you've just discussed, did you come up with a different figure as far as how many sperm could be expected on that sample?

A.   Well, I would expect there would be a range.  So, you know, 1 to 2 to 5 would be the low end of that range.  A higher range, you would even potentially go up to, say, 1,000 or more.  So it just, we really don't know what sort of sample this was.  And again, since we know that there was time that has elapsed,

we know that the sample has been degraded somewhat.

Q.   All right.  Now, in Dr. Johnson's note of March 1st, 2004, she also included a single page from an article --

A.   Yes.

Q.   -- which set out other substances that would trigger a positive PSA result.  I think it said mother's milk, amniotic fluid, female urine, female blood --

A.   That's right.

Q.   -- female serum.  Were you able to obtain that complete article?

A.   I was, yes.

Q.   Okay.  And let me show you what's been marked as Government's Exhibit Number 205, Your Honor.  Do you recognize this?

A.   I do.

Q.   What is this article?

A.   This is the full article of what she had taken the second page from.

Q.   Okay.  And on the second page of this article, it has a page that Dr. Johnson included in her March 1st report?

A.   That's right.

Q.   All right.

          MR. DOWD:  Judge, we'd offer this into evidence, 205.

          MR. ABREU:  Without objection, Your Honor.

          THE COURT:  Government's 205 is admitted.

BY MR. DOWD:

Q.   All right.  And did you -- you have had a chance to review this article?

A.   I have.

Q.   Okay.  And I think Counsel pointed out in Dr. Johnson's testimony, asked her to look at this paragraph here that I'm pointing to on Page 2, under that Table 1, Concentration of PSA in Bodily Fluids, Liquid?

A.   Yes.

Q.   Is this, I mean, does this paragraph discuss the results of the study, or is this more of an anecdotal finding by the authors?

A.   Well, this paragraph seems to be laying out the reasoning behind the study that is then contained in the next several pages.  So this paragraph says that, you know, the analyst is concerned that female urine or female serum, which is blood, might give a positive PSA result.

Q.   All right.  But what was the ultimate conclusion of the authors in this article, as far as the reliability of PSA tests, especially in testing these items listed on Page 2?

A.   They did some experiments to determine that both female urine and female blood would not give a positive result on the PSA test.  And in fact, they can be assured that if the PSA test was positive, that they can be assured that that came from semen.

Q.    All right.  So they were complementary, or they verified the reliability of the PSA test to determine semen and eliminate these substances as potential positive triggers?

A.    They did.  They did not test breast milk or amniotic fluid, but they did test both female urine and female serum.

Q.    Do we know if breast milk ingested and then excreted, or at least received in the rectum, if that would result in a positive PSA finding?  What is the science surrounding that?

A.    Well, there was a study -- or it wasn't a study.  There was a case that, where they postulated that that might be the reason for the positive results on an infant's -- I'm not sure if it was a rectal swab or in a diaper.  But they didn't necessarily -- they just postulated that that might be the reason for it.  And I don't know that they necessarily concluded that that must have been where it came from.

Q.    All right.  Now, in the, on Page 2 here, it gives these particular substances that could, that actually contain PSA at different levels.  And are these concentration levels described in the center section, is this, does this refer to undiluted substances of PSA?

A.    Exactly.  This is the amount of PSA that's in the substance itself.

Q.    Okay.  And is that the dilution level that would be tested in the PSA test?

A.    No, because as I described before, we use -- the maximum

amount that would be on a swab, we take a quarter of that swab. There's an extraction efficiency. So all of those dilution factors add a factor of about 1 to 250 to potentially 1 to 2,500 to these levels.

Q. Okay. So if you took the purities of the undiluted, undiluted concentrations here on Page 2 and you applied the dilution levels that the test requires and that the FBI did in this case, would any of these substances listed produce a positive PSA result?

A. No. The only one that would be close would potentially be the first listing of breast milk, where they say one case it was found at 2100. But even that would be very close to our detection limit.

Q. All right.

A. And I wouldn't expect that to give us a positive result.

Q. And that's what the authors of the article go on to say?

A. Yes.

Q. All right. And in connection with Dr. Johnson, you listened to her testimony?

A. I did.

Q. Okay. And she described the testing done by the Technical Associates, her old lab?

A. Yes.

Q. Okay. In your file, did you find the actual test result or the communication between them and Dr. Johnson?

A.    I did.

Q.    All right.  Let me show you what's been marked as Government's Exhibit Number 206.  And this is a two-page document, and I should show you the second page.  Do you recognize this document?

A.    I do.

Q.    What is this?

A.    Well, this is a page from my file.  This is a summary of the results from Technical Associates that was submitted, I think, to Dr. Johnson.

      MR. DOWD:  Your Honor, we'd offer this into evidence, Exhibit 206.

      MR. ABREU:  No objection, Your Honor.

      THE COURT:  Government's 206 is admitted.

      MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.    And in this exhibit, what does the Technical Associates have to say about the p30 protein test?

A.    Well, in the third paragraph, they describe it as a confirmatory test for semen.

Q.    Okay.  Now, there's an issue regarding the fragility of sperm cells, and that once they lose their tail, they're difficulty to -- they're difficult to identify under a microscope.  Could you speak to that?  Tell the Court your opinion as far as the viability of sperm cells in different

environments --

MR. ABREU:  Your Honor, I would object to the characterization of they're difficult to observe under a microscope once they lose their tails.  I believe the experts who have already testified testified that they can still be identified under a microscope, even if they don't have tails.

MR. DOWD:  I'll ask the witness, Judge.

THE COURT:  Overruled.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Go ahead.

BY MR. DOWD:

Q.   Ms. Conway, can you address the viability of sperm cells in a rectum, a live rectum, as well as the difficulty, if it is difficult, to identify sperm cells once they've lost their tail and/or midsection?

A.   So the FBI protocol is to only identify a sperm cell if it's intact, with the head, the midpiece and the tail all intact.

Q.   So on the smear test, if the FBI looked at the smear slide, the autopsy smear slide from the rectum and found no sperm, what's the significance of that finding?

A.   Well, that's a negative result.  We didn't -- we didn't observe any sperm cells on that slide.

Q.   All right.  And you were going on to say what the FBI protocol was as far as identifying sperm cells.

A.   So the biologist would note if they saw what looked like heads or what looked like tails, though generally the tails don't remain after they've been degraded.  Or if they fall off of the sperm head, then they usually get degraded as well.  So they would note if they had seen any.  They did not.

Q.   All right.  And what about the survivability of a sperm cell within a live rectum?

A.   Well, it's limited.  The studies, as I -- most of the studies have been done on post-intercourse samples that were taken vaginally.  So most of the studies show that those can only be detected, that sperm cells can only be identified after maybe 24 hours.  Cervical samples, sometimes you can observe a sperm that will last longer.  In the rectum, there's no, there's no cervix where the sperm can hide, so they're subjected to the degradative forces that are in there.

Q.   All right.  Oh, before I forget, this is out of order, but I wanted to broach this.  Dr. Johnson testified that there's no literature, there's no studies which suggest that, as regards to the presence of PSA in female serum, female blood, female urine, she's unaware of any studies that involve children.  Are you familiar with any studies involving whether or not PSA exists in female children, little girls?

A.   I am.  There is a study that was published, I believe his last name is pronounced Antonoir (phonetic), in the British Journal of Urology in 2004, that describes serum levels of PSA

in both boys and girls.  And they determined that the level in girls is --

Q.   PSA in serum?

A.   In serum, that's right.

Q.   Uh-huh.

A.   That the level in girls is .004 nanograms per mil of PSA. In boys, it's also at that level until they hit puberty-ish, and then it starts to rise.

Q.   All right.  And, but the PSA in little girls, in the serum in little girls at .004, would that trigger, or could that trigger a positive PSA result in the one the FBI did?

A.   No.  No.

Q.   Or the one that Dr. Johnson did?

A.   No.

Q.   Because it's too low of a level?

A.   That's right.

Q.   All right.

A.   Even if that were put undiluted on the card, which we know that there's dilution steps that are --

Q.   So even undiluted, it still wouldn't trigger a positive result?

A.   No.

Q.   And is there any significance to the fact that the swab taken from the blood stain from the child's underwear at the same time as the autopsy, as the rectal swabs were done,

that that produced a negative PSA result?

A.    Well, it would have been a cutting that was taken from the underwear.  And that stain was also, had blood identified in that particular area.  So that cutting gave a negative PSA result, which indicates that the blood wouldn't have been the cause of a positive PSA result.

Q.    In other words, we can eliminate the victim's blood as triggering the positive PSA result from the swab from the rectum?

A.    Yes.

Q.    The swabs?  Now, what about pre-ejaculate fluid, are there any studies that you're aware of in which pre-ejaculate fluid has been found to contain PSA and AP?

A.    It has been, yes.  There was a study in 2004.  The author was Dennison.  It's also listed in my statement, that he looked at, among many other things during his specificity studies, pre-ejaculate emission fluid does contain high levels of both PSA and acid phosphatase.

Q.    And what conclusions can you draw from that?

A.    That pre-ejaculate emission fluid -- they also looked for sperm cells in those samples and found that, I think it was only one of the eight samples that they tested contained any sperm cells at all.

Q.    All right.  So pre-ejaculate fluid can also trigger a positive PSA result.

A.   Yes, it can.

Q.   All right.  What about drinking male urine?  Could that trigger a positive PSA result from a rectal swab?

A.   I would not expect that, no.

Q.   Why would that be?

A.   There's too many forces at work.  There's obviously a dilution.  She -- there's other things that she's eating and drinking.  Those are going to dilute the sample.  The sample, I mean, your digestive system is very efficient at breaking down protein and absorbing protein to use as energy, so the protein should be broken down to a point that it would not be detected.  There's no reason to think that that would give a positive result from a rectal swab, no.

Q.   All right.  In this case, assuming that sperm was deposited in this particular rectum, how can you explain two positive test results for semen, the PSA, two positive PSA results, a negative AP result 18 months later, and apparently the inability to identify any sperm cells on the sample that was sent to Dr. Johnson?

A.   My explanation is that this is at the lower level of detection.  We're at the threshold of being able to even detect the PSA.  We know that it's a limited sample.  It's potentially been degraded.  The AP test could have degraded as well to a point that it's not detectable.  The sperm cells either were not deposited in abundance, so depending on the natural

variation in the semen, there could have been a limited number to begin with. And then they would have also been degraded. So I think we're just at the lower limit of detection, and that the PSA test, as a confirmatory test, shows that semen was present on those swabs.

Q. All right. Now, the FBI did a differential extraction. They pelleted the sperm sample. What was the purpose of the FBI doing that?

A. In an attempt to identify the DNA that may have been present in the sperm cells.

Q. Okay. So they didn't do it to identify sperm cells. They did it to identify any DNA present?

A. That's right, yes.

Q. Okay.

MR. DOWD: Your Honor, I'll pass the witness.

THE COURT: Thank you.

MR. ABREU: May I, Your Honor?

THE COURT: Please.

CROSS-EXAMINATION

BY MR. ABREU:

Q. Good morning, Ms. Conway.

A. Good morning.

Q. I'm going to start by showing you what the Government has previously marked and discussed with you, which is Government's Exhibit 206. That would be the report from Technical

Associates.  See that there?

A.   Yes.

Q.   Okay.  You said you found this in your file?

A.   I did.

Q.   You found this yesterday when you were reviewing your file?  And when did you find it?

A.   Well, it was in the file when I reviewed it back in June.

Q.   Okay.  Did you provide it to the Government yesterday?

A.   I did.

Q.   Okay.  And it was then -- do you know if it was provided to me yesterday?

A.   I didn't know.  I assumed that it was.

Q.   Okay.  Is your file with you here today?  Did you bring it with you?

A.   Yes, I did.

Q.   Okay.  Now, for purposes of this, for your testimony today, let's say I agree or we all agree that P, that a positive PSA assay can be confirmatory for the presence of semen.  Let's start with that premise.  Okay?

A.   Okay.

Q.   Do you understand that the question before the Court today is whether p30 tests alone, in the face of a negative AP, a negative DNA test, a negative Y STR test, Y chromosomal testing, two negative sperm searches, and no physical evidence of sexual abuse could be confirmatory for the presence of

semen?  Can we agree that that's -- you understand that that's the question that's before the Court today?

A.   Yes.

Q.   Okay.  And just so I understand the FBI position, the FBI position is that despite all those other negatives which I just listed, the p30 test alone confirms the presence of semen.

A.   Yes.

Q.   Okay.  When did you first -- well, let me, before I move on, let me show you in this same document from Technical Associates -- what day is that document dated, by the way?

A.   The 19th of February 2004.

MR. ABREU:  And for the record, Your Honor, may that reflect that that's approximately seven days before the Court's February 26th, 2004, order for the production of all expert reports.

BY MR. ABREU:

Q.   And just for completeness of the record, I notice that there's a fax number at the top.  What day is that fax date? Can you tell us what date that is?  Can you see that?

A.   February 25th --

Q.   2004?

A.   -- 2004.

Q.   Thank you.  And for the record, I'll note that that's the day before the Court's compliance order, the Court's order for compliance.

In the middle of that particular document, it indicates the three rectal swabs were examined visually.  The major portion of the cotton on all three swabs had been previously removed.  Substantial staining was seen on the wood swab sticks.  The remaining swab material and stain surfaces on the wooden sticks of all three swabs were shaved and collected in a tube to be processed for the presumptive test and spermatozoa search.

How many swabs did the FBI test for sperm?

A.   We didn't test any of the swabs for sperm.

Q.   How many did they do a microscopic sperm search on, or microscopic sperm search on?

A.   We didn't test any of the swabs.

Q.   How many of the swabs were tested for AP?

A.   We didn't test the swabs for AP.

Q.   How many of those swabs were subjected to use for a smear, smear microscopic search?

A.   I don't know.  The smear that was provided to us was provided with the swabs.  So that would have been collected by the nurse examiner.

Q.   How many of those swabs were used for the DNA testing that was used -- that was done afterwards?

A.   One.

Q.   One.  That would be Q7?

A.   That's right.

Q.   So you would agree with me that the microscopic sperm search that Technical Associates undertook was regarding what was the remaining of all three swabs that were collected.  You would agree with me there?

A.   Yes.

Q.   And you would agree with me that the AP test they ran was for all three swabs?

A.   Yes.

Q.   Okay.  When were you first contacted to be involved in this case?

A.   In May of this year.

Q.   You were not the person who testified at trial?

A.   No, I was not.

Q.   Okay.  Carolyn Zervos testified at trial?

A.   That's right.

Q.   Anthony Onorato testified at trial?

A.   Yes.

Q.   Are they still employed by the FBI?

A.   Yes, they are.

Q.   Both of them?

A.   Yes.

Q.   Is there a reason that you know of that they are not here to testify today?

A.   This case was assigned to me when the, when the request was made for our laboratory to provide an expert.  My --

Anthony Onorato is now our unit chief, and so he generally would -- this is something that has taken a lot of time and is not something that he -- that he felt would be more thoroughly handled by another examiner that is normally testifying.

Q.   Did he not think it was important to be here?

A.   Absolutely not.

Q.   He had more important things to do?

A.   He -- he elected to delegate this responsibility.

        MR. DOWD:  Judge, I'm going to object.  I think we've gone through this.  I think this is becoming argumentative.

        MR. ABREU:  I'll move on, Your Honor.

BY MR. ABREU:

Q.   Did you discuss their reports with them before -- their prior reports with them before your testimony today?

A.   I didn't discuss them, no.  I reviewed their files and looked and read through their reports.

Q.   Okay.  Did you discuss any portion of this case with them before your testimony today?

A.   Yes, probably.

Q.   You did?  When did you have discussions with them?

A.   I would have to check my files.  I'm not sure.

Q.   Are you located in the same office as them?

A.   I'm not, no.

Q.   So these conversations would have happened by phone?

A.   Yes.

Q.   And your files that you have reflects when those conversations took place?

A.   My -- I keep that in a log.  It's not part of the -- it's not part of this file.  I just keep a phone log with all my conversations.

Q.   Would you have made any notes regarding your conversations with Mr. Onorato and Ms. Zervos?

A.   No.

Q.   I'll show you --

MR. ABREU:  May I have a second, Your Honor?

THE COURT:  Yes.

MR. ABREU:  Thank you.  I have a bunch of documents here.

(PAUSE.)

MR. ABREU:  I'll come back to that in a second.  I can't find the document.  I'm sorry.

BY MR. ABREU:

Q.   I'll show you your, what's been previously marked as Government's Exhibit 63.  That is your report -- no -- that is your report in this case?

A.   Yes.  It's my statement.

Q.   Okay.  Is this, is the information contained in this report your personal opinion as an expert or the position of the FBI?

A.   I would say that it's my personal opinion, though I would

expect that the examiners at the laboratory would also agree with these statements.

Q.   Is there some reason that your report and opinions are not contained on FBI letterhead?

A.   Well, this is not in the sense of -- it's not a report in the sense that this is a summary of my conclusions that was prepared specifically for this case.  So as it's not a report, I didn't put it on letterhead.

Q.   Okay.  But you work for the FBI?

A.   I do.

Q.   And you were asked to consult on this case as an employee of the FBI?

A.   Yes.

Q.   And your opinions here are regarding information on a case that the FBI has been working on?

A.   Yes.

Q.   But it's not on FBI letterhead?

A.   No.

Q.   Okay.  When was this report provided to the Government for the first time?

A.   August probably the 3rd or the 4th, since I dated this the 2nd.

Q.   Of 2010?  But you all --

A.   Of 2010.

Q.   I'm sorry.  But you all have been in discussions since

May?

A.    That's right.

          MR. DOWD:  Your Honor, discussions with whom?

BY MR. ABREU:

Q.    Well, I'd like to know myself.  Discussions with whom?
You mentioned in your testimony that you had first been
involved in this case since May.

A.    That's right.

Q.    Who were you having suggestions with in May?

A.    Generally with AUSA Mark Dowd.

Q.    Okay.

          MR. DOWD:  Is that satisfactory, Mr. Abreu?

          MR. ABREU:  Thank you.

BY MR. ABREU:

Q.    Have you, or did you review any photographs with the
reportedly positive PSA cards that the FBI reported in this
case?

A.    No.

Q.    Why is that?

A.    We don't obtain -- we don't take photographs of our ABA
cards.

Q.    Is there some reason that the Federal Bureau of
Investigation does not take photographs of ABA cards?

A.    The biologist records their results.  A second biologist
then reads those results and agrees with them.  We don't take

photographs of our ABA cards.

Q.   You would agree with me, however, that the reason you do these tests are generally as part of criminal matters?

A.   That's right.

Q.   And that these matters are going to be relied on by the prosecution?

A.   Yes.

Q.   Relied on by the defense?

A.   Yes.

Q.   Relied on by courts?

A.   Yes.

Q.   But the FBI doesn't think it's important to photograph these cards?

A.   The results are recorded by the biologist and then reviewed by a second biologist, so no.  That information is captured in the notes.

Q.   Is there a specific policy at the FBI regarding photographing of, or nonphotographing of evidence?

A.   Of evidence?  No.

Q.   Is there a written protocol that says you cannot photograph PSA cards?

A.   No.  But the protocol does not contain instructions for the biologist to photograph ABA cards.

Q.   Let me show you, in Paragraph 2 of your report, it indicates the items that you reviewed in this particular

case --

A.   Yes.

Q.   -- in preparation for your testimony and for your report, correct?

A.   Yes.

Q.   And it indicates that you reviewed the DNA files from the FBI Laboratory, and it gives their numbers and the reports of Anthony Onorato and Carolyn Zervos.  Correct?

A.   That's right.

Q.   Did you review that testimony from the trial in 2004?

A.   I did.

Q.   That's not on your report.

A.   It's not, you're right.

Q.   Okay.  But you did review that testimony?

A.   I did.

Q.   Okay.  You mention in -- is there a second page to this report -- I believe it's Paragraph 4 of your report, you list some of the other substances and fluids where PSA has been detected.  Correct?

A.   Yes.

Q.   And those fluids include male urine?

A.   That's right.

Q.   Female urine?

A.   Yes.

Q.   Female serum?

A.    Yes.

Q.    Amniotic fluid?

A.    Yes.

Q.    Breast milk?

A.    Yes.

Q.    The serum of boys?

A.    Yes.

Q.    The serum of girls?

A.    Yes.

Q.    Okay.  Let's go back to Mr. Onorato's testimony which you reviewed.  Let's start with Zervos' testimony.  I apologize. Did you read in Ms. Zervos' testimony where she testified that "PSA or p30 has not been detected in any female fluids that I'm aware of"?  Did you read that?

        MR. DOWD:  Your Honor, could we get a page number?

        MR. ABREU:  Absolutely.  My apologies.  I'm talking about the transcript of March 5th, 2004, at Page 105.

BY MR. ABREU:

Q.    "Not present in any female fluids that I'm aware of."  Did you read that?

A.    Yes.

Q.    That would be incorrect?

A.    It is, yes.

Q.    And in 2004 at the time she testified that "there were no female fluids that I'm aware of," that was also incorrect and

known in 2004?

A.   Well, she wasn't aware of them.  I mean, I don't know if that was correct.  But certainly in 2004, there were studies that show that at very low levels, there is PSA.

Q.   I understand.

A.   But not detectable by our card.

Q.   I understand.  And we'll talk about that.  But the fact that it's been detected in other fluids, including female fluids, was known to the FBI in 2004?

A.   It doesn't seem to have been known to her.

Q.   Okay.  It was known in the scientific community?

A.   There were studies that had already been published, yes.

Q.   Okay.  When you were having conversations with Ms. Zervos about this case, as you told us that you had, did you tell her that her testimony in 2004 was not accurate?

A.   No.

Q.   Did you tell her that her testimony was incomplete?

A.   No.

Q.   Did you urge her to call the Government and tell them that her testimony was incorrect?

A.   No.

Q.   Let me show you, from same transcript, the testimony of Anthony Onorato at Page 128 and 129.  Question from Mr. Tinker, on cross-examination:  "Are there other things that have similar or the same protein, like food or anything?"

Referring to p30.

Answer, from Mr. Onorato:  "There are no foods that contain this protein, no."

We all agree with that.  You agree that's correct, no foods that are known to contain p30?

A.   No.  Right.

Q.   "Okay.  Are there other substances that might?"

Answer:  "There are other substances, body fluids, that might possess this particular protein.  It's at such low levels, however.  Semen levels of this protein are astronomically high."

You would agree with that as well.  Correct?

A.   Yes.

Q.   Okay.  Following page -- or same page, sorry, further down.  Okay.  Answer, at the bottom:  "This protein is astronomically high, compared to its content in, say, something like male blood.  And generally it's only found in male blood when the individual has prostatic malignancy."

"Has what?"

"Prostate cancer."

Did you see that?

A.   Yes.

Q.   That's not a complete listing of all the fluids where p30 has been found either.  Is that correct?

A.   It's not, no.

Q.   Okay.

A.   And I would say that I don't know that I've necessarily listed everything that p30 is necessarily found in.

Q.   Are there other substances as well?

A.   I tried to be complete --

Q.   Okay.

A.   -- but I don't necessarily know.  But if they are at levels, it would be at very low levels.

Q.   I understand that.  We will talk about that, I promise. When you read Mr. Onorato's testimony, who is now the chief of your unit -- I'm assuming you spoke to him as well.  Correct?

A.   I'm not sure that I did.

Q.   Did you call him and say, "Mr. Onorato, your testimony at this trial in 2004 was not accurate"?

A.   No.

Q.   Did you tell the Government his testimony was not accurate?

A.   I don't find that his testimony isn't accurate.

Q.   Is it incomplete?

A.   I don't know that he was --

       MR. DOWD:  Judge, I would object.  I mean, the witness answers the questions that are posed during the trial. So if he can direct her attention to which question was, in which the answer was incomplete.

BY MR. ABREU:

Conway - Cross    44

Q.    Did Mr. Zervos -- did Mr. Onorato, from what you read, ever indicate that p30 had been detected in any female fluids?

A.    I don't know if he was asked that.

Q.    Did he ever say -- did you ever read that he said it?

A.    I don't -- I don't think that he did.  But I don't have that transcript memorized.

Q.    So when Mr. Tinker asked him, as I just displayed on the screen, whether there were foods that contained this protein, or are there other substances that might, and he answers, "The protein is astronomically high compared to its content in, say, something like male blood, and generally only found, it's only found in male blood when an individual has prostatic malignancy," is that a complete answer or a complete description of all the substances where fluids were found?

A.    Well, above that.

Q.    Yes.

A.    Do you mind putting it back up?

Q.    Oh, I'm sorry.

         MR. DOWD:  Your Honor, I would object.  The transcript speaks for itself.

         MR. ABREU:  I would agree with that.

         MR. DOWD:  That's before the Court.

         MR. ABREU:  I would agree with that.

         THE WITNESS:  Above that he -- oh, sorry.

         MR. ABREU:  I would agree with that.

BY MR. ABREU:

Q.   Did you review the testimony of Dr. Scott Benton in this case?

A.   I did.

Q.   I refer Counsel to the transcript from the same day, March 5th of '04, at Page 22, regarding this paragraph noting right here in the middle that starts, "And a more specific."

"And a more specific or confirmatory test is called prostatic specific antigen, also known as a p30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, including animal bodily products, except in the male prostate, and with one exception, human breast milk."

Did you read that testimony?

A.   I did.

Q.   You would agree that that is also incorrect?

A.   It is.

Q.   Did you inform the Government that this testimony was incorrect?

A.   No.

Q.   Is there anything else that you recall about Dr. Benton's testimony that was incorrect?

A.   I read it and I reviewed it, but I couldn't --

Q.   Okay.

A.   -- point out anything specific.

Q.   Maybe we can talk about one or two of those things then. Let me refer you here to Page 51 and 52 of that same transcript, same date, Counsel, regarding sperm.

     "In a little girl, prepubertal girl" --

          THE COURT:  What?

          MR. ABREU:  Prepubertal, I guess, is the term.

          THE COURT:  Prepubescent.

          MR. ABREU:  Well, I'm just reading what's on the transcript, Your Honor.

          THE COURT:  No, that's got to be a mistake in the transcript.

          MR. ABREU:  I understand.  I was just reading what's there.

          THE COURT:  Okay.  That's got to be a mistake in the transcript --

          MR. ABREU:  Okay.

          THE COURT:  -- which happens.

BY MR. ABREU:

Q.   "It doesn't live very long, hours.  So they'll die.  They lose their little tails.  And once they lose their little tails, they're very difficult to find on a rape kit and trace forensic evidence."  Next page, "You'll find evidence of the semen much easier than you'll find sperm."

     Did you read that?

A.   I did.

Q.   That's not correct either, is it?

A.   Well, I wouldn't -- I don't know that sperm would necessarily last any less time than the PSA.  It just depends on the -- it depends on the sample and the situation.

Q.   But even after they're dead and they lose their little tails, you can find sperm.

A.   In our laboratory, we require for them to be intact, but --

Q.   So at that -- I'm sorry.

A.   To identify a sperm.

Q.   Okay.  But you can find evidence of sperm.  Correct?

A.   Potentially.

Q.   Find heads?

A.   It depends on how many there are and whether or not the biologist can recognize those.

Q.   And what about his comment that sperm would be much harder to find than evidence of semen?

A.   As far as a difficulty, I'm not sure that that is something I could answer.

Q.   Okay.  Let's talk about the AP test which Counsel asked you about.  We agree that acid phosphatase is an enzyme?

A.   Yes.

Q.   And that it's found in high levels in semen?

A.   Yes.

Q.   And in significantly lower levels in other substances as

well?

A.   Yes.

Q.   Okay.  Including female substances.

A.   Yes.

Q.   Okay.  Do you know if the FBI manual, the protocol manuals are available online?

A.   They're not, no.

Q.   They're not.  So if yesterday Counsel for the Government asked one of -- or I should say day before yesterday -- asked Mr. Keel why he didn't get the manual online, it's because it's not available online.

A.   It's not online, no.

Q.   Okay.  Thank you.  Let me show you what is, this document is, and see if you can identify that for me, please.

A.   That is the serology procedure manual that was -- I see the 2001, 2002, but --

Q.   Let me slide it up so you can see that --

A.   Okay.

Q.   -- that date as well.

A.   Okay, right.  So this was in effect until between October 31st, 2001, to December 23rd, 2002.

Q.   Okay.  And this is the manual that was in effect at the time that this particular evidence in this case was collected?

A.   When it was collected?  Yes.

Q.   And when the examination in this case took place by the

FBI?

A.    Yes, the serology exams, yes.

Q.    Okay.  Let me show you here, according to the table of contents, Chapter 4 covers the procedure for the presumptive identification of semen?

A.    Yes.

Q.    Okay.  Let me turn to Chapter 4.  And regarding -- let me zoom that in.  Is that too -- is that one out of focus?  "Regarding the Procedure for the Presumptive Identification of Semen."  Because -- or let me read the whole section there.  "Human semen possesses acid phosphatase activity that can be exploited for the presumptive identification of this body fluid.  Because APase activity is not exclusive to human semen, a positive test is only presumptive identification and warrants that the stain should be tested further to conclusively identify semen.  A stain that fails to exhibit APase activity is almost certainly not semen."

     You would agree with that particular statement there.  Correct?

A.    A stain, yes.

Q.    Okay.  But you would agree that a stain that does not exhibit APase activity is almost certainly not semen.

A.    Right.  But this is actually, this is referring to stains that are deposited and then dried.

Q.    And I understand that.  We're going to be talking about

swabs.  But you would agree with this particular statement?

A.    I would.

Q.    Okay.  And part of the reason that acid phosphatase is just a presumptive test is that the substance exists in so many other -- in fluids other than semen.  Correct?

A.    Yes.

Q.    And so a positive doesn't necessarily reflect that it's semen.

A.    That's right.

Q.    It could be reflecting one of these other substances.

A.    That's right.

Q.    And the FBI's policy on not using acid phosphatase tests on, for instance, swabs is they're afraid, or they're worried about potential false positives from other substances.

A.    Well, I wouldn't say that we're worried.  I would say that the positive result isn't necessarily useful.

Q.    Uh-huh.

A.    So it's much more efficient to go straight to our confirmatory test.

Q.    So, for instance, if you had a swab of a vaginal area or an anal or a rectum, you would be concerned, or you would be, I'll say concerned, that any positive acid phosphatase activity might be reflecting some of the other substances in that particular swab, from the vaginal cavity or from the rectal cavity?

A.    I wouldn't say concerned.  I would say that it's not a useful, it's not a useful test.

Q.    Because you might get a false positive?

A.    Or a false negative.

Q.    Okay.  And in this case, you understand in our case here that the acid phosphatase test was actually negative.

A.    I do.

Q.    Okay.  Number 3 of your report, you indicate that with regards to the AP test, the BCIP procedure -- and that's the procedure that you identified as the chemical that you use to react with acid phosphatase --

A.    That's right.

Q.    -- BCIP.  Of course, I can't pronounce the first B, but I'll say BCIP -- "procedure is not routinely conducted on items of evidence likely to have such fluids."

      I'm curious about your use of the word "routinely" in that particular matter.  Does that mean that sometimes it is done?

A.    No, it means that it's routinely not done.

Q.    Is it ever done?

A.    I can't think of a time that it's been done, no.

Q.    And this is --

            THE COURT:  Could we take a morning break?

            MR. ABREU:  That would be fine, Your Honor.

            THE COURT:  Fifteen minutes.  Thanks.

      (Recess from 10:48 a.m. to 11:18 a.m.)

THE COURT:  You may proceed.

MS. BOOTH:  Your Honor, I think there are some issues we need to take up, if that's all right with you.

THE COURT:  Okay.  Sure.

MS. BOOTH:  Promptly, Mr. Wiseman has given me a list of witnesses that he would like to have deposed.  And Your Honor, there are one, two, three, four, five, six, seven, eight names on this list.

My second complaint is that three of these witnesses were not even subpoenaed to be here, were not on the witness list.  The other complaint that I have is one of the people they want to call, Michelle Armont, sat out there for three days and they didn't call her.

THE COURT:  She's not going to be deposed.

MS. BOOTH:  The other comment that I have, Your Honor, they are the Petitioners.  They should have put on evidence as to their case when they were putting on their case. Now they want to depose Bill May, Orlando Campos, Derrick Moore, and Adam Longoria.  That was a major part of their Brady case, and they brought no one.

THE COURT:  Okay.  That's not going to happen.  I thought they were talking about the declarations that they had from the people in Louisiana.

MS. BOOTH:  And Your Honor, I really, I really feel like I have to say this.  They have had three, at least three

years to get ready for this case.

THE COURT:  Ms. Booth --

MS. BOOTH:  Mr. Gilmore --

THE COURT:  I actually told them where they could find Bill May, and they didn't make any effort.  They used the old address.  He is not going to be deposed.  Derrick Moore is not going to be deposed.  Mr. Longoria is not going to be deposed.  The lady who sat out there for three days is not going to be deposed.  So who else is on there?

MS. BOOTH:  Wilmer Bourgeois, who was not on their witness list; Yvonne Joseph, who was not on their witness list; and Jersey Henry, who's not on their witness list.  They want to try another case because they didn't get everything they wanted.  They've had three years to get ready, and they're criticizing -- this case is here because they are saying that Douglas Tinker and John Gilmore did not do a good job.  And they had a quarter of the time that they have had to get ready for trial.

MR. WISEMAN:  I'm not sure why Ms. Booth is screaming.  But in any event, Your Honor, I think it's been very clear that we have been trying to abide by the Court's direction to keep this hearing streamlined.  I believe --

THE COURT:  Look, I'm not going to listen to any more about your streamline nonsense.  You all had all the time in the world to do this.

MR. WISEMAN:  Oh, we did.

THE COURT:  I let you -- let me read, or watched 16 hours of video interviews.  I watched a two-hour video deposition of Dr. Estrada.  You could have deposed any of these people before the hearing, any of them.

MR. WISEMAN:  Your Honor --

THE COURT:  There's no streamline.  I'm not going to hear any more arguments about how I said streamline the case.  What you put on already was not streamlined.

MR. WISEMAN:  Well, that's the point.

THE COURT:  So, so what I'm telling you is that you will not be deposing people that you could have brought before.  It's not going to happen.  You're not going to depose Bill May, when I gave you every opportunity and even told you where you could find him, or Mr. Longoria, or Mr. Moore, just because you didn't ask the Marshal Service for a decent address --

MS. BOOTH:  Or Mr. Campos.

THE COURT:  -- or put your investigator on it.  And certainly not the lady who sat out there for three days.  His sister, Michelle?

MR. WISEMAN:  Yes.

THE COURT:  She's not going to be deposed either.

MR. WISEMAN:  Okay.  So I guess then that leaves the Wanda Cook, Jersey --

THE COURT:  Were they on your witness list?

MR. WISEMAN:  Well, Your Honor, we were told --

THE COURT:  Were they on your witness list?

MR. WISEMAN:  No.  We were told to present four to six lay witnesses.  We brought nine.  We presented seven.  I mean, we could have presented all these folks, but you told us, present four to six.  We presented seven.  We went beyond that.  So, I mean, we are a little bit in a precarious position because you're telling us, you know, to only present a certain number of people.  Michelle Armont was here, and that would have been number eight, and Ms. Booth would have been standing up saying, you know, "What's number eight doing up there when they said they were only going to do four?"

THE COURT:  Okay.

MS. BOOTH:  And Your Honor, I object to that.  I would not.  I would not have objected to him calling as many -- in fact, I didn't even know that you had limited it to four to six.  I thought that when they gave us the thing, there was a notation on there that they were going to call four to six of them, because they gave us a proposed list.  They were going to call four to six.

MR. WISEMAN:  When we were here in April, Your Honor, and I remember standing here, and we were discussing the length of time we'd have to present the case, and you had given me certain directions as to how long you wanted to hear from certain witnesses, and you know, we took it to heart.  I mean,

we did the best we could to work within those constraints.
It's not a matter of streamlining.  You were telling us how to
do it, and we abided by it.

So, I mean, we're talking now about four lay
witnesses.  I mean, I was happy to offer their declarations.
The Government, you know, raised their objection.  Your Honor
said, "Well, depose them if you want to offer their
declarations."  That's all this is about.

I mean, you know, Bill May, we talked to Mr. Roberts
the other day, and he agreed informally to a deposition of Bill
May, if Bill May was physically --

MS. BOOTH:  Oh, wait a minute.

THE COURT:  Mr. Roberts?

MR. WISEMAN:  -- was physically able.

MR. ROBERTS:  I have to respond to that, Your Honor.
I did not informally agree.  I said, "Tell us how you would get
him, where you would contact him.  I'll talk to my team, and
then we'll tell you what our response is," Your Honor.

THE COURT:  So that was a misrepresentation,
Mr. Wiseman?

MR. WISEMAN:  I apparently was.  I misunderstood.
That came from another member of my team, so it may have gotten
lost in the translation.  The point being that, you know, we've
been trying to, you know, to work this out and, you know --

THE COURT:  You can depose, not Michelle, the lady

who was here for three days.  You should have called her. And --

MS. BOOTH:  Judge, there are three people here that he didn't even put on his witness list that now he wants to bring in.  This is trying the case after you've tried the case. All of us, when we -- after, you know, because I'm usually in that position --

MR. WISEMAN:  Your Honor, my ears hurt.  I can't believe how she's standing by my side screaming.

THE COURT:  Mr. Wiseman, she's not standing by your side.  She's about five feet away.  And she's not screaming.

MR. WISEMAN:  All right.  I have sensitive hearing.

THE COURT:  You must.  If you couldn't tell that Dr. Cunningham was angry, then you have real perception problems.

MR. WISEMAN:  Well, that may be.

THE COURT:  Why didn't you -- okay.  Now he's going to blame me for not putting them on the --

MR. WISEMAN:  I'm not blaming you, Your Honor.  You told us how to proceed, and we proceeded that way.  It's not a blaming thing.  I'm not, you know, the Court didn't do anything wrong.  You're trying to run a courtroom, and I understand that.  You know, you told us how you wanted it done, and we tried to comply.  I mean, I don't know what else I can say.

MS. BOOTH:  And, Judge, there was no objection

whatsoever to the seventh witness that was put on. So there's no indication at all there would have been a complaint from the Government about the eighth witness they put on.

MR. WISEMAN: All right. We're done with Michelle. We're not talking about Michelle.

THE COURT: Okay. Now, I just asked my law clerk for confirmation on this, that he said he had 23 declarations, 23 declarations. And I said to him, "Call your best ten witnesses." Not four to six, ten. Now, we can play it again if you'd like to hear it.

MR. WISEMAN: If that's her recollection --

THE COURT: And you didn't do that.

MR. WISEMAN: That was on the April 20th -- Your Honor, my colleague is whispering in my ear that that may have been a reference to all of the issues. I don't have the transcript in front of me, so I'm not --

THE COURT: I said best ten lay witnesses.

MR. WISEMAN: Okay. I didn't recall it that way.

THE COURT: How many -- you put on, how many witnesses did you put on?

MR. WISEMAN: Seven lay witnesses.

THE COURT: How many witnesses altogether?

MR. WISEMAN: Oh, a lot.

THE COURT: Well, there was no way you could have thought I said only ten witnesses, period. You could not have

interpreted that.

MR. WISEMAN:  That's true.

THE COURT:  And now you're trying to go back and redo -- I told you to put on your best ten lay witnesses, because you said you had 23 declarations from all these people in his background.  And I think that that may have been a little too much.  And you only put on six.

MR. WISEMAN:  Seven.

MS. BOOTH:  Seven.

THE COURT:  Seven.  I thought there were six lay witnesses.

MR. WISEMAN:  We count seven, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  It was seven.

MR. WISEMAN:  We may be counting Kerry Brown in that group.

THE COURT:  Okay.  And you had room for three more. And you could have asked for more if you had, if somebody had something extra special to say.  But I certainly never intimated that I would accept declarations --

MR. WISEMAN:  No, you didn't.  Of course not.

THE COURT:  -- instead of live witnesses.

MR. WISEMAN:  You didn't.

THE COURT:  Ms. Gano, you want to go back to that hearing and make sure that my law clerk's not misremembering?

April --

MR. WISEMAN:  May I check my transcript as well?

THE COURT:  Yes.  Oh, have you got a transcript?
Well, if we've got a transcript, we don't have to go back
anywhere.

MR. WISEMAN:  Well, it's on my computer.

THE COURT:  Okay.  Go look.

(PAUSE.)

MR. WISEMAN:  Your Honor, at Page 35 of the April 20
proceedings, you and I were discussing the lay witnesses, and
it says -- I'm talking to you and I say, "I'm trying to do a
tally in my head.  I think it's about a half dozen."  I say,
"It might be four, it might be seven."  Obviously, I wasn't
fully prepared, so we're talking four to seven.  And I think at
Page 39, Your Honor said that you didn't want to hear
repetitive lay witnesses.  In other words, you didn't want to
hear lay witnesses coming up --

THE COURT:  Say the same thing.

MR. WISEMAN:  Saying the same thing.  And obviously
if we're putting them up there to talk about abuse, they're
going to be talking about abuse.  So it's -- I think that
informed our decision making in terms of how many to bring.

Now, when we got to the point of -- I mean, we have
to remember how this all got started.  We got to the point of
offering the lay declarations.  It was Your Honor's suggestion

that we depose them if we want to proceed them.

THE COURT:  Well, that's because I thought you had said I had limited your lay witnesses.

MR. WISEMAN:  No, no, I don't feel that we've been limited.

THE COURT:  And apparently I did not.

MR. WISEMAN:  No, I have never thought Your Honor was limited in terms of the number of witnesses.  I think it was, you know, I've had some complaints about the time, which Your Honor has certainly rectified.  You know, but I've never felt that Your Honor has told us we can't call witnesses.

So I think that's how it all got started.  And I really do think that, you know, if we --

THE COURT:  Okay.  At Page 39, let's go right there.

MR. WISEMAN:  Okay.

THE COURT:  Line 12 -- okay.  I'm missing Page 39.

MR. WISEMAN:  Oh, look at that.  I said ten.

THE COURT:  "How many are you going to have?"  We were talking, at their request, the last known address of the lay witnesses.

MR. WISEMAN:  Uh-huh.

THE COURT:  "How many are you going to have?"

"We have proffered 23 declarations.  I think -- I don't think we have to call 23.  Perhaps we can pick our best 10 and offer the remaining 13.  And we'll try to cover

different areas so the Court's not seeing the same thing."

"How many witnesses are you going to have?"

Okay.  You said you were going to offer your best ten witnesses.

MR. WISEMAN:  Yeah, that's true.

THE COURT:  Lay witnesses.

MR. WISEMAN:  That's certainly true.

THE COURT:  So you didn't bring ten.  And I didn't limit you to ten.

MR. WISEMAN:  No, you didn't.

THE COURT:  And you brought seven, and you had another lady sitting out there that you could have called, and now you want to depose her, so that's not going to happen.

MR. WISEMAN:  Right.  We're past that.  We understand the Court's ruling.

THE COURT:  So we're moving on.  So what we're down to is deposing the expert you were concerned about.

MR. WISEMAN:  The two experts.

THE COURT:  Two experts, one about -- something in response to Dr. Price's testimony.

MR. WISEMAN:  Correct.

THE COURT:  And then the other one about digital enhancements.

MR. WISEMAN:  Correct.

THE COURT:  And that's what you can depose.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  And then if they have responsive experts, they can do that.  Next?

MR. WISEMAN:  Your Honor --

THE COURT:  We're back to you.

MR. DOWD:  Judge, could I address the Court?

THE COURT:  Yes.

MR. DOWD:  And the focus of the expert on Dr. Price's testimony are those singular issues, the --

THE COURT:  It was about the organic --

MR. DOWD:  The norms --

THE COURT:  The brain organic thing, and the norms of the --

MR. DOWD:  For the Trail Making Test and the conflict test.

THE COURT:  For those two things.

MR. DOWD:  Okay, the norms that he used, which was elicited.

THE COURT:  Is that right, Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor, it's correct.  It's the two tests.  I may use the word brain, even if it doesn't relate to those two tests, but I assure Mr. Dowd and the Court --

THE COURT:  Okay.

MR. WISEMAN:  -- it's going to be limited to those

issues.

THE COURT:  Those two things.

MR. DOWD:  Yes, Your Honor.

MR. WISEMAN:  Thank you.

THE COURT:  And then the digital enhancement.  Now we're back to you.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  Continue on.

MR. ABREU:  Thank you.

THE COURT:  Is that a flash drive?  What is that?

MR. WISEMAN:  Oh, yeah, I didn't even realize I -- it is actually.

THE COURT: Okay.

MR. WISEMAN:  I didn't realize I was wearing it.

MR. ABREU:  That's how we get him to go where we want him.

THE COURT:  I see.

MR. WISEMAN:  She's noticed that, by the way.

THE COURT:  I did.  You told me in the elevator yesterday his mother did not send him to law school -- well, you said your mother sent you to law school to carry all these bags.

MR. WISEMAN:  I said parking the car, Your Honor, not carrying bags.

CROSS-EXAMINATION (Continued)

BY MR. ABREU:

Q.  Hi, Ms. Conway.

A.  Hi.

Q.  Sorry.  When we took a break, we were talking about whether the AP test is routinely conducted on items of evidence, and you corrected me that your proposition is that it's not routinely done.

A.  That's right.

Q.  And my question to you then was whether that meant that it sometimes is done, and in certain situations may be done.

A.  And I can't think of a situation where it's been done.

Q.  Okay.  And you cite as support for that the DNA Unit Serology Manual, Procedure Manual Number 102.  Is that correct?

A.  Yes.

Q.  And Number 102 refers to the 2009 version of the manual?

A.  The current version that's in use, yes.

Q.  Do you know if that proposition that they're not routinely done on those pieces of evidence existed in the manual that was in effect at the time that this case was investigated?

A.  I don't know that it was laid out in the manual.  I'm not sure.

Q.  So back in 2002, at the time this case was investigated, it's possible that the manual didn't say it, and that therefore it could have been done?

A.  Our practice was still not to do it at that time.

Q.   Even if the manual doesn't say that?

A.   The manual may not have specified.

Q.   All right.  Oh, by the way, that 2002 manual at the time of the investigation, let me refer you to the signature page of that manual.  Who is cited as the preparer of that particular manual?

A.   Carolyn Zervos.

Q.   Uh-huh.  And who is the technical reviewer?

A.   Anthony Onorato.

Q.   And those would be the same Carolyn Zervos and Anthony Onorato who testified in this case?

A.   They are, yes.

Q.   And issuance is signed by whom?

A.   The Unit Chief at the time, Jennifer Smith.

Q.   I'm sorry, the issuance.

A.   Oh, I'm sorry.  That's the approval.  The issuance is also Anthony Onorato.

Q.   And again the same Anthony Onorato.

A.   Yes.

Q.   Okay.  We'll come back to that.  Let me show you what has now been marked as Petitioner's Exhibit 179.  Let me zoom that in and ask you if you recognize that document.

A.   I do.

Q.   And what is that?

A.   This is the p30 test result page that was recorded at the

time that these swabs were tested.

Q.    And has this document been in your file the entire time, as far as you know?

A.    Yes.

Q.    And when was it provided to the Government this week?

A.    Was it provided this week?

Q.    Yeah.  There was an issue a couple of days ago where it was rediscovered and --

A.    I provided it again, though my understanding is that they were able to find it in their file as well.

Q.    In the Government's file?

A.    Yes.

Q.    Do you know if it was located in the file that was made for trial counsel at the time of trial?

A.    I have no knowledge of that.

Q.    Who would?

A.    I don't know.

Q.    Okay.  Regarding the positives that are listed for Q5, Q6 and Q7, which are the swabs in question here, what's listed as the result for Q5?

A.    Positive, and the remark says "very weak."

Q.    Okay.  For Q6?

A.    Also positive.  The result -- the remark says "very weak."

Q.    And Q7?

A.    Positive, and the remark says "weak."

Q.   Do you recall in your review of the trial transcript whether Carolyn Zervos or Anthony Onorato ever mentioned that the results were very weak, very weak, and weak?

A.   I don't think that they did, though I don't know that they were asked.

Q.   Okay.  But you know that it was not said at the time of trial?

A.   I don't think so.

Q.   Okay.  Let me show you what I am marking as Petitioner's Exhibit 180, ask you if you recognize that document.

A.   I do.

Q.   I'm sorry, my Brooklyn accent comes out occasionally when I say "recognizing."  Recognize is what I mean.

A.   I do.

Q.   Okay.  And what is that document?

A.   That is the first page of the Serology Procedures Manual that's in use currently at the FBI Laboratory.

Q.   Okay.  And let me turn to Page 2 -- and when you say "currently in use," it's in use since 2009?

A.   Yes.  I'm not sure if there has been an update in the meantime, but I don't think there has.

Q.   Okay.  And again, let me ask you, whose approval is signed there?

A.   Anthony Onorato.

Q.   Same Anthony Onorato?

A.    Yes, it is.

Q.    Okay.  Let's see if we can zoom this in a little bit.  Are you familiar with this, with this document?

A.    I am.

Q.    And this document is a flow chart of the way evidence is tested in the FBI depending on what kind of evidence it is?

A.    Yes, it is.

Q.    Or particularly serological evidence?

A.    That's right.

Q.    And if we start on the right-hand side, we see what we're talking about in this case, alleged semen.  We're starting right at the top here.  Correct?

A.    Yes.

Q.    And as you've already testified, if we have swabs, as we have in this case, they proceed to the left, which is this way --

A.    Yes.

Q.    -- on the chart.  And as you also testified, the FBI's policy is to move directly to a p30 test.

A.    That's right.

Q.    Okay.  And not conduct an AP test, which is done on the other side.

A.    That's right.

Q.    Okay.  By the way, I do have to ask you a question about the acid phosphatase, one question.  Mr. -- the Government

asked you about an 18-month analysis acid phosphatase test, an 18-month-old acid phosphatase test and what you might expect to find at that point.

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Are you aware that in this case the evidence was collected immediately upon the child's death?

A.    My understanding is the autopsy was a day or two later.

Q.    It was a day later.

A.    A day later.

Q.    And the evidence was collected slightly before the time of the autopsy, or at the time of autopsy?

A.    That was my understanding, yes.

Q.    So we're not talking about an 18-month period of time here.  Correct?

A.    That's right.

Q.    And I'm also assuming that you're not telling us that the FBI did not properly preserve this particular evidence.

A.    No.

Q.    Okay.  And acid phosphatase, in an area when it's properly preserved, can be detected many years later.

A.    Yes.

Q.    And even sometimes not properly preserved.

A.    That's true.

Q.   That's true.  Okay, thank you.  Now, under the "Conduct p30 Test," if it's positive, you finish, you have consult, and you note your results.  Correct?

A.   Yes.

Q.   And that's because the FBI has a policy of positive p30 being definitive for the presence of semen.

A.   That's right.

Q.   If it's negative, it recommends that smear slides be observed.  Correct?

A.   That's right.

Q.   I'm curious, in this particular case, if the result was positive, why Ms. Zervos undertook a smear slide review.

A.   I don't know.

Q.   And she's not here to tell us why that is.

A.   She's not.

Q.   And we can't look at those allegedly positive PSA cards because they were not photographed.

A.   The results from those cards were recorded and put in the notes.

Q.   I understand your point.  But we, myself, Mr. Dowd, the Judge cannot look at those results because they were not photographed.

        MR. DOWD:  Judge, that's been asked and answered about 15 minutes ago, I think.

        THE COURT:  Can you move on a bit?

MR. ABREU:  Absolutely, Your Honor.

THE COURT:  Thank you.

BY MR. ABREU:

Q.   And just to -- so you're not sure why she took that particular approach?

A.   I don't know.  It may be that that was done --

Q.   I don't want you to speculate.  But if you don't know, that's fine.

A.   I don't know.

Q.   Okay.  Thank you.  And it's interesting, or let me just ask this.  It looks like a sperm search is kind of a test of last result -- last resort, I should say?

A.   It is in our lab, yes.

Q.   Is it considered a more sensitive test than a p30 test?

A.   Not more sensitive, but sometimes we would detect sperm when we don't detect p30.

Q.   So sometimes sperm is present when p30 is not?

A.   Sometimes.

Q.   Okay.  And just to clarify, nobody in this case, Ms. Zervos, for instance, did not see any sperm in this particular case when she undertook that smear slide review?

A.   That's right.

Q.   And she did not see any dissociated sperm?

A.   No.

Q.   No sperm heads, nothing of that nature?

A.   No.

Q.   That would have been noted --

          MR. DOWD:  Your Honor, I would object.  The testimony is they didn't do a sperm search on the dissociated fragments or --

          MR. ABREU:  I'm going to -- I can clarify that.

          THE COURT:  Good.

          MR. ABREU:  Thank you, Your Honor.

BY MR. ABREU:

Q.   Ms. Zervos observed the slides?

A.   The -- no.  The biologist would have observed the slides.

Q.   And reported that to Ms. Zervos?

A.   That's right.

Q.   And had the biologist observed sperm heads, would that have been noted somewhere?

A.   It would have, yes.

Q.   Where would it have been noted?

A.   On the serology exam sheet.

Q.   Did you see anything on the serology exam sheet indicating that sperm heads were located?

A.   No, I did not.

Q.   Did you see anything on the serology sheet that indicated that sperm tails were located?

A.   No.

Q.   Did you see anything on that sheet that indicated that any

kind of fragmented sperm part was located on that smear slide?

A.   I did not.

Q.   Okay.  In Paragraph 5 of your report, you also indicated that because p30 is confirmatory for the presence of semen, smear slides are generally not prepared.  Is that true?

A.   That's true.

Q.   Okay.  Here we have smear slides.  Correct?

A.   The smear slides that were prepared by the nurse examiner, yes.

Q.   Okay.  Let me just ask you briefly about the two DNA tests that were undertaken in this particular case.  There was first a, an STR?

A.   Autosomal STRs, yes.

Q.   Autosomal STR taken, and then there was a Y chromosome STR taken as well.

A.   That's right, by a different laboratory.

Q.   That would be Cellmark Laboratories?

A.   It was.

Q.   And Mr. Dowd asked you about what might be expected to be found when you compare the two fractions on, say, the autosomal DNA.

A.   That's right.

Q.   It would be a sperm fraction and a non-sperm fraction.

A.   That's right.

Q.   Was any male DNA detected in either one of those two

fractions?

A.   It was not.

Q.   And then you would agree with me that the Y chromosomal test is specifically -- a significantly more sensitive test for the detection of male chromosomes.

A.   Yes, it can be.

Q.   It can be significantly more sensitive or is significantly more sensitive?

A.   It can be.

Q.   You would agree with me that the FBI was not even doing that test at the time?

A.   We were not.

Q.   Didn't have the capability?

A.   No.

Q.   That's why it went to Orchid Cellmark.

A.   That's right.

Q.   And you would also agree with me that that test that can be more sensitive was also negative.

A.   It was, yes.

Q.   For any male DNA.

A.   Yes.

Q.   Now, if you had semen, without sperm, as you've told us we can have in this particular case, it's possible, though, that one of those two DNA tests might have picked up male DNA in that semen, even if there were no sperm.

A.    It is possible, yes.

Q.    But again, we don't have that in this particular case.

A.    That's right.

Q.    No male DNA in this alleged semen.

A.    That's right.

Q.    Okay.  Does the FBI still use the ABA card, the ABA card?

A.    We do not.

Q.    What card do you use now?

A.    We use a Seratec card.  It's very similar.

Q.    A Seratec, S-E-R-T-A-C?

A.    T --

Q.    S-E-R-A-T-E-C?

A.    Yes.

Q.    Okay.  Thank you.  Just for the record.

      Why did the FBI switch from the ABA card, the ABA card, to the Seratec card?

A.    We were having issues with some of the lots that we received from ABA.

Q.    What kind of issues?

A.    The membrane would be misaligned within the cartridge.  Sometimes the cards were not performing according the our QC requirements.

Q.    Sometimes you were getting ghost lines?

A.    No, we weren't getting ghost lines.  We were getting incomplete lines, which would be an inconclusive result.  We

were getting inconclusive results with some of our positive known samples.

Q.   What's the difference between an incomplete line and a ghost line?

A.   Well, I wouldn't use the term "ghost line."  I'm not sure what you mean by that.  I guess my understanding of that would just be a very weak line.

Q.   A ghost band -- a ghost band?  Maybe I wasn't using the right term.

A.   Band.  I'm not sure what you mean.

Q.   Okay.  Does the FBI conduct validation studies?

A.   We do.

Q.   And they do them every so often to validate the cards they're using and the procedures that they're using?

A.   Well, no.  We generally do a validation study before we bring a new technology on line.  And then any time we get a new lot of cards or reagent from the manufacturer, we'll test it with QC checks to make sure that it's performing properly.

Q.   Okay.  And let me show you what I am marking as Petitioner's Exhibit 181, and ask you what that top page of that document is.

A.   This is a summary of the validation study that was conducted for the p30 cards in our unit.

Q.   Okay.  Let me move ahead to this particular document and ask you if you've seen that particular document before.

THE COURT:  Could you zoom it in just a bit, please, sir?

MR. ABREU:  Absolutely, Your Honor.

THE COURT:  Thank you.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.   Have you seen that before, ma'am?

A.   I have seen it.  It looks familiar, but it's been -- but I didn't remember it saying "ghost bands."

Q.   Okay.  Well, let me just read it for the record.  It says, "Usage of the ABA cards demonstrated lot specific quality control issues, such as incomplete test line," which you've told us about, "misalignment of card components and ghost bands.  Certain lots demonstrated inadequate sensitivity, failed to detect.  Due to these quality control issues with the ABA card, it was deemed necessary to evaluate alternate -- alternative cards."  Do you see that?

A.   I do.

Q.   Now, again, I know it's been asked and answered before, but we ourselves cannot determine what the results of these cards were because we have not seen them.  Is that true?

MR. DOWD:  Judge, I would object to the relevance.  The issue that this relates to is why the defense attorneys didn't use Ms. Johnson as a witness to contest the FBI testimony and Dr. Benton's testimony.  And it seems like we're

retrying the case as far as the viability of the FBI results, which is really not the direct issue here.

MR. ABREU:  Your Honor, if I may respond to the Court?

THE COURT:  Please.

MR. ABREU:  The issue also is whether there was sufficient evidence for the FBI to have testified that in this particular case that positive p30 indicated the definitive presence of semen.  And this goes to that, Your Honor.

MR. DOWD:  Judge, this is an ineffective assistance issue.

MR. ABREU:  We have to prove prejudice, Your Honor.

MR. DOWD:  But the allegation is that they should have called Dr. Johnson.

MR. ABREU:  Not just Dr. Johnson.

MR. DOWD:  And we know what Dr. Johnson would have testified to.

MR. ABREU:  It's not just Dr. Johnson.  The allegation is that the Defense could have presented evidence which would have contradicted the evidence that this was in fact p30 -- semen from this positive p30.  That's the allegation.  It could have been Dr. Johnson.  It could have been -- the reason we presented Mr. Keel was to show that Dr. Johnson was not the only one who had this information, and it could have been presented from other sources as well.

Conway - Cross

MR. DOWD:  But this is outside the allegation, Your Honor.  They're going to the underlying -- attacking the underlying ABA card test.

MR. ABREU:  If the Government is conceding that we don't have to substantiate this issue, I'll move on to something else.

MR. DOWD:  I'm just saying it wasn't part of the allegation, Your Honor.

THE COURT:  Why don't you move on to something else.

MR. ABREU:  Okay.

BY MR. ABREU:

Q.   Let's talk about Paragraph 4 of your report, where you indicate in the last sentence that "The FBI Laboratory's PSA test includes dilution steps to ensure that only semen can produce a positive result, making the test confirmatory for the presence of semen."  Do you see that?

A.   I do.

Q.   And that's consistent with what you testified here today?

A.   It is.

Q.   And the position of the FBI is that their and your dilution process eliminates a possibility of anything else reacting with the card?

A.   That's right.

Q.   Okay.  How do you know the quantity of p30 you're starting with in an unknown sample?

A.   You don't.

Q.   How do you know how far you're diluting an unknown sample?

A.   You know how far you're diluting a sample because you've set up your procedure to include, to basically effectively dilute the sample.

Q.   If you don't know how much you started with, how do you know how far you're diluting it when you add your buffer?

A.   You know how far you're diluting it because you're diluting it by a factor, and that factor is determined by your procedure.

Q.   So your factor of dilution, and your unknown is still an X quantity, unknown quantity.  And you add how much buffer to this unknown quantity?

MR. DOWD:  Your Honor --

THE COURT:  I'm sorry?

MR. ABREU:  How much buffer do you add to this unknown quantity?

MR. DOWD:  Judge, that's two questions.

MR. ABREU:  It's two questions, Your Honor?  I'll try to rephrase it.

MR. DOWD:  He's asking about the factors, and now he's asking a different question.

THE COURT:  Are you almost done?

MR. ABREU:  Not that much more, Your Honor, yes.

THE COURT:  Okay.  Well, move it along, would you

please?

MR. ABREU:  I will.

BY MR. ABREU:

Q.   My question is how much -- how can you tell how far you're diluting an unknown sample?

A.   Well, the dilution factor is consistent, no matter how much -- no matter what the original concentration is.

Q.   The steps you take, how much you add to that unknown is constant.  Correct?

A.   How much you add to it, and the dilution factor is known.

Q.   Okay.  Now, you indicated that, for instance, in Paragraph 4, there are, at an average, 260 nanograms per mil of p30 in, let's say, for instance, male urine.  Correct?

A.   That's right.

Q.   The sensitivity of the cards used by the FBI are sensitive to what level right now?

A.   Approximately half a nanogram per mil.

Q.   Half a nanogram.  How would you make that into a ratio?

A.   A ratio --

Q.   Or display that as a ratio?

A.   A ratio of what?

Q.   Let me locate it quickly.  No, I'll come back to that as soon as I find it.  Let me move on to something, so I don't hold everybody up.

You mentioned that there was a study which showed that

bacteria was unlikely to react to the PSA card.

A.   That's right.

Q.   You would agree with me that that particular study only studied six microorganisms?

A.   It did.

Q.   And you would also agree with me that the rectal cavity contains significantly more than six microorganisms?

A.   It could.  Those are very common microorganisms that can be found, both in the rectum and in other places.

Q.   There could be hundreds of bacteria?

A.   Hundreds -- not hundreds of bacteria types, no.

Q.   How many types of bacteria?

A.   In the rectum?

Q.   Yes.

A.   There would be a limited number.  I don't know exactly.

Q.   Okay.  And that study that you cited was also a study of four people -- of ten people.  I'm sorry, or of ten samples.

A.   I don't think that study was specific as to how many of the bacteria, how many bacteria were tested.  That's a different part of the study.

Q.   Okay.  Let me get back to this particular document, which states the very weak, very weak and weak results.  Would you consider that to indicate a borderline level of p30?

A.   Near our threshold, yes.

Q.   Okay.  Let me show you the 2002 manual, and show you

Chapter 11, the procedure for the microscopic identification of

spermatozoa, and read to you -- and Your Honor, if I may -- and

again, this is the manual that was in effect at the time of

this particular case.  Correct?

A.    It is, yes.

Q.    And it indicates that "Attempts to identify human semen in

some categories of evidence must be approached through an

identification of spermatozoa rather than detection of human

semen specific proteins such as p30.  These categories would

include smear slide material submitted by contributors, unusual

stain materials that defy attempts towards solubilization, and

protein components and stain extracts that possess borderline

levels of p30."  Do you see that?

A.    I do.

Q.    And you would agree that here we have borderline levels of

p30?

A.    Which might be why she did the sperm search.

Q.    That may be why, which was actually negative.  Correct?

A.    It was.

Q.    So what it's telling us is that when you have borderline

levels of p30, additional testing might be necessary to confirm

the presence of semen.

A.    Not to confirm the presence of semen, no, but to identify

sperm.

Q.    And that was not the case here.

MR. DOWD: What was not the case here?

BY MR. ABREU:

Q. Did they do a microscopic sperm search?

A. Of the slides, yes.

Q. They did -- they did a smear slide or a microscopic, actual microscopic pellet production sperm search?

A. They -- so they did a sperm search of the microscopic slide that came with the evidence.

Q. Okay.

MR. ABREU: I'm almost done, Your Honor.

(PAUSE.)

MR. ABREU: I have nothing further at the time, Your Honor.

THE COURT: Thank you. Mr. Dowd?

MR. DOWD: Just a few questions, Your Honor.

REDIRECT EXAMINATION

BY MR. DOWD:

Q. Ms. Conway, just a few questions. Now, on Ms. Zervos' testimony --

A. Yes.

Q. -- that you looked at a minute ago, I want to provide a little more context, if I can. I believe this is the same page that was, that you were prompted to look at earlier. Page 105, I think that's the same page. And down here -- but not in a female child, this is where you looked earlier on this page,

where you were asked to --

A.   I believe --

Q.   You were prompted to look at this earlier about Ms. Zervos saying that the p30 is not in female fluids.

A.   I believe so.

Q.   All right.  And toward the top of this page, the question is -- well, just immediately above that, the question was, "And is there anything in the anal passage that would have, that might have that same reaction other than semen?"  And is the reaction they're discussing the test reaction, the reaction of the substance to, in the p30 test?

A.   I'm not --

         MR. ABREU:  Your Honor, yes, I would object to leading, Your Honor.

         MR. DOWD:  Well, I'm trying to be quick.  Let me --

BY MR. DOWD:

Q.   What were you going to say?

A.   I was going to say I'm not sure.

Q.   Okay.  Let me go to a previous page, Page 104, and at the top of Page 104, they're discussing that there wouldn't be anything else that could test positive for a p30 test besides this particular prostate protein.  Is that right?

A.   It is.

Q.   Okay.  And so that's -- is that -- well, the record speaks for itself, so I won't ask you that question.  But that's

offered for the context of Ms. Zervos' testimony.

And in Mr. Onorato, on Page 128, you were asked if Mr. Onorato listed the -- Page 128, you were asked if Mr. Onorato had listed all the things that contained PSA. And can you tell if he's asked that question, to list all the substances which contained PSA?

A. It looks like, on Line 16, he says, "Are there other substances that might," and Mr. Onorato's answer is "There are other substances, body fluids, that may possess this particular protein, at such low levels, however."

Q. All right. So Mr. Onorato has conceded that other bodily fluids and other materials can contain PSA?

A. He has.

Q. All right. And he was never asked to list them or to identify them?

A. I didn't see that, no.

Q. All right. At least in the context of that earlier testimony.

A. That's right.

Q. Now, Dr. Benton, you were alerted to part of the testimony which Dr. Benton testified that sperm are difficult to find and that evidence of semen was easier to find.

A. He did say that, yes.

Q. Is that true? Was Dr. Benton correct about that?

A. I don't -- I don't know that he was -- I'm not sure what

he meant by "easier."

Q. All right. Well, let me ask you, how is sperm found or identified?

A. In our laboratory, we look at the slides that are collected at the time of the, by the nurse examiner, and those slides are looked at microscopically. Generally, it takes between two and four hours to search a sperm slide thoroughly to determine whether semen's present, to determine whether --

Q. Two to four hours.

A. That's right.

Q. Okay, because of the size of the cell?

A. It's very small. That's right. So we have to magnify it significantly, and we have to go through the slide frame by frame.

Q. And you have to identify it visually.

A. That's right.

Q. All right. And how is semen identified or detected?

A. Well, the swabs are cut --

Q. Well, not the whole process. But is it a visual?

A. It's not a -- it's not --

Q. Under a microscope?

A. It's not under a microscope. The cards are read. They take about 10 minutes to read. And then they're just looked at and determined whether or not the test line is present or not.

Q. All right. And as far as AP, testing for AP?

A.    The AP test is fairly quick as well.

Q.    All right.

A.    It's a chemical test.  We look for a color change.

Q.    So in that context, what is easier to find or detect, sperm cells, semen, or AP?

A.    I would say the easier test is the AP test, and then the p30 test, for us, and then the sperm search.

Q.    All right.  So in that, to that extent, Dr. Benton was correct that semen is easier to find than sperm?

A.    P30 is easier to find, yes.

Q.    All right.  P30, I'm sorry.  Now, you talked about the FBI protocol on, for the use of the AP test, and you indicated that an AP test is not useful when you're testing a swab.

A.    That's right.

Q.    And why is that?

A.    For two reasons.  One is that the AP test may be positive simply because the vaginal acid phosphatase has reacted with the test.  So a positive result isn't necessarily indicative of semen.  The other reason is that because we know that if time has passed since the semen was deposited, the AP can degrade or be undetectable at a faster rate than p30.  So a negative test result can also not necessarily indicate the lack of semen.

Q.    All right.  Now, in the -- there was a question about the 18-month delay, and that I asked you, and you were cross-examined on the 18-month delay.  Did you understand that,

my question to be if there was an 18-month delay in the collection of the swab or an 18-month delay in Dr. Johnson's performance of the AP test?

A.   Well, the 18-month delay would have been in the performance of the test, not the collection of the swab.

Q.   Is that how you understood my question?  Or did you think I was -- because I may have been inartful in my questioning. Did you understand that I was asking about the 18-month delay in Dr. Johnson's test, from the collection of the swab?

A.   I'm not sure.

Q.   Okay.  Well, let me ask it then.  Does the 18-month delay from the collection of the swab to Dr. Johnson's AP test, would that have any impact on the results of -- the reliability of Dr. Johnson's negative AP result?

A.   Probably not, if the -- assuming the swabs were collected, were preserved appropriately, which I'm, I would assume that they were.

Q.   Okay.  And you understand that the swab was collected at autopsy or immediately after death?

A.   That's right.

Q.   Okay.  Explain the, what search the FBI did for sperm in this case.

A.   The sperm search that was done was done on the microscope slide that was provided and prepared at the time of the autopsy.

Q.   Okay.  And that's sometimes referred to as the smear slide?

A.   The smear slide, yes.

Q.   And how is that slide prepared?

A.   My understanding is that it's prepared from the swabs that were collected.  So the swabs are collected, and then one of them is used to create the smear slide.  Both the swabs and the smear would be dried and then preserved and sent to the laboratory for analysis.

Q.   Is it called a "smear slide" simply because they take the swab and they just smear it across a microscope slide?

A.   They do.

Q.   Okay.  And what is the potential for depositing sperm on a slide when it's done with that method?

A.   Well, if there's a significant amount of sperm present on the swab, it will likely be transferred to the slide.  If it's limited, there may not be effective transfer of it.

Q.   Okay.  Is that the most efficient way to extract sperm on to -- for detection?

A.   Well, it's a useful way to be able to preserve the evidence at the time of collection.  Yes.  But on the other hand, it's not necessarily, if you were trying to identify sperm cells in a limited sample, then it would be more efficient to potentially look at a sperm pellet that was prepared from the swab.

Q.   All right.  And did the FBI do any other search for sperm?

A.   No, we did not.

Q.   Okay.  So there was no search for sperm done on the pelleted material that went off to the Orchid Cellmark lab?  I mean done by the FBI.

A.   Done -- there was no other material looked at for a sperm slide.

Q.   Okay.  I just wanted to clear that up.

        MR. DOWD:  Thank you, Your Honor.  That's all I had.

        MR. ABREU:  Just very briefly, Your Honor?

        THE COURT:  Yes, sir.

        MR. ABREU:  Thank you.

                    RECROSS-EXAMINATION

BY MR. ABREU:

Q.   Were you aware that the child's underpants were also collected?

A.   Yes.

Q.   And they were tested?

A.   They were.

Q.   They were tested for AP activity?

        THE COURT:  For what?

        MR. ABREU:  AP.  I'm sorry.

        THE COURT:  Okay.

BY MR. ABREU:

Q.   Acid phosphatase.  I'm sorry.

A.    There were, portions of the underwear were tested, yes, for AP activity.

Q.    And p30 activity?

A.    Yes.

Q.    And they were all negative?

A.    That's right.

Q.    Those are the -- as far as you know, those are the underpants she was wearing at the time of the incident?

A.    They were the underpants that were collected at the autopsy.

Q.    Okay.  The dilution process which you explained and described to us, the FBI uses that, I assume, because they think it's the most effective process, dilution process?

A.    Yes.

Q.    And that being an effective dilution process for the FBI, I'm assuming you share that with other law enforcement agencies around the country?

A.    We share it with them?  I'm not sure what you mean by that.

Q.    You told other labs around the country that we, the FBI, have this process which prevents p30 cards from reacting with anything but semen.

        MR. DOWD:  Judge, I would object.  This is way beyond any redirect.  I limited myself to just a few questions.

        THE COURT:  Sustained.

BY MR. ABREU:

Q. Would you agree with me that other crime labs around the country do not agree with the FBI regarding whether p30 can be a confirmatory test alone?

THE COURT: Just a moment.

MR. DOWD: Same objection, Your Honor. Same objection, Your Honor.

THE COURT: Sustained.

MR. ABREU: May I just have a second to review my notes, Your Honor? And I will be done.

THE COURT: Thank you.

MR. ABREU: Thank you.

(PAUSE.)

MR. ABREU: That's all I have, Your Honor.

MR. DOWD: Nothing further, Your Honor.

THE COURT: Thank you, ma'am. Is she excused?

MR. DOWD: May she be excused?

THE COURT: You're excused. Thank you.

(Excerpt concluded at 12:13:00 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    October 12, 2010
Molly Carter                        Date

INDEX

| RESPONDENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JERRILYN CONWAY | 3 | 29 | | |
| | | 64 | 85 | 92 |

| EXHIBITS: | RECEIVED |
|---|---|
| GX-63:  STATEMENT OF JERRILYN CONWAY . . . . . . . . . . | 6 |
| GX-64:  CV OF JERRILYN CONWAY . . . . . . . . . . . . . | 4 |
| GX-65:  LIST OF CASES CONWAY HAS QUALIFIED IN . . . . . | 5 |
| GX-205:  FULL ARTICLE RE: JOHNSON'S REPORT . . . . . . | 19 |
| GX-206:  REPORT FROM TECHNICAL ASSOCIATES . . . . . . . | 23 |