IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL ACTION |
| | ) | |
| PLAINTIFF, | ) | CR-C-02-216(1) |
| | ) | |
| VS. | ) | CORPUS CHRISTI, TEXAS |
| | ) | SEPTEMBER 20, 2010 |
| ALFRED BOURGEOIS, | ) | 8:23 A.M. |
| | ) | |
| DEFENDANT. | ) | |
| ...............................) | | |

TRANSCRIPT OF EVIDENTIARY HEARING - DAY 1
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:              MR. TONY ROBERTS
                             MS. ELSA SALINAS
                             MS. PATTI HUBERT BOOTH
                             MR. MARK DOWD
                             ASSISTANT U.S. ATTORNEYS
                             800 N. SHORELINE, STE 500
                             CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:               MR. MICHAEL WISEMAN
                             MR. VICTOR J. ABREU
                             MS. ELIZABETH LARIN
                             MR. JAMES McHUGH
                             ASSISTANT FEDERAL DEFENDERS
                             SUITE 545 WEST, CURTIS BUILDING
                             601 WALNUT STREET
                             PHILADELPHIA, PENNSYLVANIA 19106

THE COURT RECORDER:          MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

(The proceedings began at 8:23 a.m.)

(The case was called)

THE CLERK: May I have appearances, please?

MR. ABREU: Good morning, Your Honor. Victor Abreu on behalf of Mr. Bourgeois.

Mr. McHugh: Good morning, Your Honor. Jim McHugh on behalf of Mr. Bourgeois.

MR. ROBERTS: Tony Roberts on behalf of the United States, Your Honor.

MS. BOOTH: Patti Hubert Booth for the United States.

MS. SALINAS: Elsa Salinas on behalf of the United States.

MR. DOWD: Mark Dowd, Your Honor, on behalf of the United States.

THE COURT: Your expert is back?

MR. ROBERTS: Yes, Your Honor, we have Dr. Moore at the table. And I do have one request. He has a, some information on his laptop and he's got it all silenced and everything but it would be all right for him to keep his laptop on the table?

THE COURT: Absolutely.

MR. DOWD: Thank you.

THE COURT: Everybody can use their laptops here.

MR. ROBERTS: Thank you.

THE COURT: As long as they don't make noise. And the late Mr. Wiseman.

MR. WISEMAN: Morning, Your Honor, I apologize.

THE COURT: I started early. No, I started early. Now, I watched 14 hours of the video over the weekend. Let me tell you what the, a technical problem is that you labeled Dr. Price 1 and 2 and it turned out to be Moore 1 and 2, so I had two sets of Moore's Exhibits 1 and 2, which cut my viewing time down to 14 hours, so what I need is Dr. Price's 1 and 2. And then I want to know if I can also watch Dr. Estrada's video on my own, like a night this week.

MR. WISEMAN: I was going to ask Your Honor --

THE COURT: And that gives you more courtroom time.

MR. WISEMAN: Absolutely.

THE COURT: Because I, that will be 16 hours of courtroom time that we have saved by me watching these videos, another probably two, two-and-a-half, for Dr. Estrada's testimony, and another three-and-a-half from having the expert on that Friday.

MR. WISEMAN: Yes.

THE COURT: So we are moving right along.

MR. WISEMAN: Yes, absolutely, and I appreciate that, thank you. Perfect, Your Honor.

THE COURT: Are these exhibits that you offered or were they just for me?

MR. ROBERTS:  We offered them, Your Honor.

THE COURT:  Okay.  Well, they were admitted but just bear in mind that Price 1 and 2 is Moore 1 and 2.

MR. ROBERTS:  We will submit a corrected copy of that exhibit, Your Honor.  Apparently we have it right here, Your Honor.

MS. BOOTH:  We have the -- I would like to substitute --

THE COURT:  Are you sure?  Do you want me, do you want to -- never mind.  I will look at it over lunchtime and make sure, okay?

MR. WISEMAN:  Your Honor, I'm sorry, I was late and I didn't get a chance to introduce you to Mr. McHugh, who is our co-counsel.

THE COURT:  He introduced himself, thank you.

MR. WISEMAN:  He did?  Well, he's an aggressive sort, so I'm not surprised.

THE COURT:  Thank goodness.

MR. WISEMAN:  Okay.

THE COURT:  Ms. Scotch, would you hand this back to Ms. Booth?  That's labeled Price 1 and 2.  That turns out to be Moore 1 and 2, so I got two Moore 1 and 2s.  Good morning, Mr. Bourgeois.

THE DEFENDANT:  Good morning.

THE COURT:  That should say, it should say Price

Exhibits 1, disc 1 and 2, and instead it was Moore 1 and 2, so I had two sets of Moore 1 and 2.  Oh, the exhibits.  Thank you.  All right.  Would you-all like to begin?

MR. WISEMAN:  Yes, Your Honor.  We call Dr. Victoria Swanson.

DR. VICTORIA SWANSON, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE COURT:  Could you tell me how long your experts -- not -- I'm talking about the sentencing experts.

MR. WISEMAN:  Yes.

THE COURT:  The psychologists.  How much time they spent with Mr. Bourgeois?

MR. WISEMAN:  Oh, we will certainly find that out, yes.

THE COURT:  What about the gentleman from the other Friday?

MR. WISEMAN:  Dr. Gelbort?  I believe he testified that he spent between three and four hours.

THE COURT:  Thank you.

MR. ROBERTS:  Your Honor, if I may, before we start, I understand there is another defense witness in the courtroom at the moment and I don't --

THE COURT:  Who do you have?

MR. WISEMAN:  Yes, Dr. Toomer is sitting in the courtroom.  I believe, Your Honor, when we had our April

meeting here you indicated that it would move things along to have experts listening to experts, as they often do.

MR. ROBERTS:  Your Honor, I don't have a problem with their experts listening to our experts testify so that they can respond to them, but I do have a problem with theirs --

THE COURT:  They don't need to be listening to their own experts.

MR. ROBERTS:  To their own experts, yes, Your Honor.

MR. WISEMAN:  Oh, I --

MR. ROBERTS:  I'd move to invoke the rule.

MR. WISEMAN:  I had thought what the Court intended at that time was, for example, Dr. Swanson is going to be talking about mental retardation and Dr. Toomer could also be talking about it at length.  If he listens --

THE COURT:  Talking about what?

MR. WISEMAN:  Mental retardation.  If he listens to Dr. Swanson then we can avoid going through a lot of the same material and move things along.  That's all it's about.

THE COURT:  No.  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  I mean I want to hear their independent --

MR. WISEMAN:  Sure.

THE COURT:  -- testimony.

MR. WISEMAN:  May I proceed?

THE COURT:  Oh, please don't -- be careful of the microphones, please.  Yes, sir, proceed.

MR. WISEMAN:  Thank you.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good morning, Dr. Swanson.  What's your occupation?

A   I'm a licensed psychologist in the state of Louisiana.

Q   And I'm going to put up what has been marked as Petitioner's 36 and ask if you recognize that?

A   Yes.  This is my, this is my curriculum vitae.

Q   Okay.  And it's accurate and up-to-date?

A   Yes.  Yes, that's accurate as of about the end of July.

Q   Okay.  And could you briefly let the Court know what your educational background is and your occupational background?

THE COURT:  Oh, if, you know, why don't you just offer that for admission and then I can read it and you can move on.

MR. WISEMAN:  Oh, okay, very well.  I will offer the CV, Petitioner's 36.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor, and we will --

THE COURT:  Petitioner's 36 is admitted.

        (Defendant's Exhibit P36 admitted into evidence)

MR. ROBERTS:  No objection, and we will stipulate to her expertise and --

THE COURT:   Well, but if he wants it to be --

MR. ROBERTS:  Sure.

THE COURT:  Let me look at it, okay?

MR. ROBERTS:  Okay.

THE COURT:  And if you want to point out particular things like treatises that she has written, that sort of thing, that's fine.

MR. WISEMAN:  That's what I was hoping to do.

THE COURT:  Please.  And I don't want to shorten your testimony.

MR. WISEMAN:  No, I --

THE COURT:  It's just that if I read it, then I will know where she went to school.

MR. WISEMAN:  I appreciate it.

BY MR. WISEMAN:

Q   Dr. Swanson, just tell us briefly where you went to school and what you did immediately after undergraduate school.

THE COURT:  Okay, I don't need to know about the school, I'm reading it.

MR. WISEMAN:  Okay.

THE COURT:  The point is, if you want to tell me about her area of expertise and --

BY MR. WISEMAN:

Q   What is your area of expertise, Dr. Swanson?

THE COURT:  Thank you.

THE WITNESS:  My area of expertise is in the field of mental retardation, working with people with developmental disabilities such as autism, mental retardation and learning disorders.

BY MR. WISEMAN:

Q   And for how long have you done that?

A   I've done that for approximately 35 years at a bachelor's, master's and then a doctoral level.

Q   Okay.  And where did you receive your doctorate?

A   I received my doctorate in 1999 from LSU in Baton Rouge, Louisiana.

Q   And prior to receipt of your doctorate, in what capacity were you working with people with developmental disabilities?

A   Prior to receiving my doctorate, for about 10, 14 years I was the senior master's level associate at a large developmental center for people with master's, with mental retardation, and I worked under a licensed psychologist in that capacity.

Q   And in that capacity did you have occasion to administer standardized testing for measurement of adaptive deficits?

A   Yes, I did.  I did it not only in that capacity but prior to that in Louisiana you could do it at a bachelor's level,

so I did it at a bachelor's level as well.

Q   And approximately how many such tests for adaptive deficits have you administered in your career?

A   I would say in my career it's in the area of 10,000.

Q   And similarly with respect to testing, standardized testing of intelligence, did you have occasion to administer IQ tests?

A   Yes, I have.

Q   And approximately how many have you administered in your career?

A   I would say in the thousands.

Q   And what's your current -- well, withdraw it.  Did there come a time when you left your employment with the state?

A   Yes, there was.

Q   And when was that?

A   In 2003.

Q   And what did you do after that?

A   After that I worked solely as a private practitioner.  I also did that part-time while I was working for the state, but I moved into full practice in 2003 when I retired from the state.

Q   Okay.  And what, for what types of organizations or entities do you currently do consulting work?

A   I work for several agencies.  I work for the Office of Citizens with Developmental Disabilities, which is the

Louisiana Office of Mental Retardation.  I am on two regional offices and I do the testing and sit on their eligibility committees to determine, to review records and determine if people are eligible for services.  I work for a mental health center in, a regional mental health center, and do testing there as well.  I work for a charter school and I am in charge of pupil appraisal there and I provide the psychological services there, and then I do all the testing as needs to be done for the special education that's provided there.  I am the director of psychological services at three residential, private residential facilities.  They are on my vitae.  And I also provide the psychological services for several community home chains in Louisiana, and there is approximately 30, about 33 community homes that I go to monthly and provide the annual assessments and then the entry assessments for those homes.  And I also provide consultation for people with developmental disabilities living in apartments, supportive placements.

Q   Okay, thank you.  What age groups do you currently work with or have worked with in your past career?

A   I think right now the oldest person I work with is around 89, late 80s, and I usually start working with people, I usually see them, probably about a year would be the youngest.

Q   Okay.  And have you held any offices that the Court would

be interested in hearing about?

A    Primarily with the American Association of Mental Retardation that is now known as the American Association for Individuals with Developmental Disabilities.  I have been on the state board for a number of years.  I'm currently off the board, but I also held a national position as the president of the psychology division with the national board, and I went off the board I think around 2003, 2004.

Q    And most of what you have described is a clinical practice.  Do you also maintain a forensic practice?

A    I don't consider myself a forensic psychologist other than I sometimes come into court.  I have been doing work forensically only since Atkins, and that would be since 2003, and I only do it in relation to cases such as this, pre-Atkins hearings or post-Atkins hearings.  The only other time I ever go to court is if I have done a test for an agency and I've court-ordered, been, that agency has been court-ordered to do it.  I may have to go to court to explain the test to the judge.

Q    And approximately how many Atkins or how many Atkins hearings or cases have you testified in?

A    Off the top of my head, I would say about 15.

Q    And has that been for the defense or the prosecution?

A    All of those have been for the defense.

Q    Is there a particular reason why you have not worked for

the prosecution?

A    Nobody from the prosecution has ever asked me.

Q    If you were asked, would you do so?

A    Yes.

Q    In your capacity in working with the, for the State of Louisiana, did you have occasion to become familiar with the school districts around the state?

A    Yes.

Q    Do you have any expertise and experience in the area of applied behavioral analysis for people with developmental disabilities, mental retardation and autism?

A    Yes.  That's a specialty that I got at my doctoral level. I also belong to a nationally recognized association for that, and my dissertation was in the area of severe behavior disorders, and applied behavior analysis is the primary treatment that is used with people with developmental disabilities autism.

Q    Okay.  And have you ever been denied qualifications by any court?

A    No.

Q    And have you ever been retained by a defense lawyer and, for an Atkins setting and not found their client to be mentally retarded?

A    Yes.

        MR. WISEMAN:  All right.  Your Honor, at this time I

would offer Dr. Swanson as an expert in clinical and forensic diagnosis and treatment of people with mental retardation and in the area of --

THE COURT:  They have already stipulated to that, so move on.

MR. WISEMAN:  Oh, he stipulated?

THE COURT:  Yes.

MR. ROBERTS:  Your Honor, I stipulated --

THE COURT:  Before you started the whole thing.

MR. ROBERTS:  I didn't know he was going to go into forensics and I believe she just said she doesn't consider herself an expert in forensics.

THE COURT:  Okay.

MR. ROBERTS:  So I would object to that.

MR. WISEMAN:  All right, that's a fair point.

THE COURT:  Sustained.

MR. WISEMAN:  I will withdraw that.

BY MR. WISEMAN:

Q   All right.  Well, then we will move on with you as an expert, Doctor.  I would like to get some definitions established, if we could.  You mentioned the AAIDD.  Could you tell the Court what that is?

A   The AAID is, and most people are more familiar with it as the American Association for Mental Retardation, it is a collection of disciplines of people that work in the field of

mental retardation, psychiatrists, psychologists, doctors, nurses, social workers, occupational therapists, physical therapists, and the charge of this group is to be the cutting edge for the diagnosis and treatment with people with developmental disabilities, and it has been, it has been an organization for over a hundred years.  It has also been the chief organization chose, charged with defining mental retardation, and as such it puts forth a volume approximately every ten years, and it's now in its eleventh edition, where it defines the current research and criteria for the definition of mental retardation.

Q   Okay.  Is it the authoritative organization for the diagnosis and treatment of people with mental retardation?

A   Yes.

Q   And is its manual that you just described the authoritative source for the diagnosis of people with mental retardation?

A    In my opinion, yes, but I would like to, there is another one, which is the Diagnostic Statistics Manual, Fourth Edition, text revised in 2000, and that manual for the last two editions has based its definition on the AAMR definition, so they kind of go side-by-side, so there's two manuals with the DSM citing the AAMR definition.

Q   Okay.  And is there, just to be clear, the AAIDD is the same organization as the AAMR?

A    That's correct.

Q    And the name just changed recently?

A    That's correct.

Q    Okay.  Are you familiar with the Atkins case?  You have mentioned it?

A    Yes.

Q    Does Atkins refer to the AAMR as an authoritative source on these topics?

A    Yes.

Q    All right.  Where do we find the definitions for mental retardation that have guided your work?

A    The two definitions that I went by were the AAIDD Eleventh Edition.  It's often called the Green Book because they change the color by editions.  It just came out this year, in 2010.  The other one that I went by would have been the DS, that I just mentioned, was the DSM-IV TR that came out in 2000.

Q    Okay.  And how does the AAIDD define mental retardation?

A    The AAIDD latest edition, which is the Eleventh, is the, defines it as having concurrent deficits and intellectual and adaptive abilities, with adaptive ability deficits defined either as global adaptive deficits, usually associated with a global score, that's approximately two standard deviations below the mean, or significant deficits in one of three areas, conceptual, practical and social, and the third

criteria is the deficits or the onset should have been evident prior to the age of 18.

Q    And regarding that last criteria, is there any requirement that the onset be diagnosed before 18?

A    No.

Q    And compare that definition to the DSM-IV TR definition.

A    The DSM-IV TR definition is based on the Ninth Edition of the AMR Diagnostic Manual and at that time they -- it also requires concurrent deficits approximately two standard deviations below in intellectual, and then in adaptive it specifies ten areas and there should be deficits noted in at least two of those areas, and I will try to name as many of the ten off as I can --

Q    That's okay.

A    -- but it is communication, self-direction, social or interpersonal relationships, self-direction, health, home living, work, leisure, and I think maybe play and leisure, would be the ten areas.

Q    Okay.  And, under either of the definitions, does the field recognize that a person with mental retardation can have strengths in particular areas?

A    Yes.  Both of them would recognize strengths, specifically in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone

couldn't have a strength as well.

Q   And when you evaluate and when you evaluated Mr. Bourgeois in this case, did you encounter any strengths?

A   Yes, I did.

Q   And when one encounters strengths in a person that they are evaluating for mental retardation, is there a protocol for probing the particular strengths that you are seeing?

A   That's right.  Well, if you see a strength in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a unique opportunity as a child.  For example, if I was working with someone who did really good landscaping work, it might have been he worked with an uncle from a very early age and learned how to do yard work, how to do all these different things, learn things about fertilizer, et cetera, so that by the time he was in his 30s he could own his own landscaping business and do fairly well.  But there would be an explanation of what within the context of his own environment provided the supports for him to learn this despite the cognitive deficits that he had.

Q   And let's begin to apply these definitions and concepts to the work you did in this case.  Have you done a

comprehensive assessment of Mr. Bourgeois to determine the presence or absence of mental retardation?

A   Yes, I have.

Q   And what did that evaluation consist of?

A   Well, there's two areas, like I said, intellectual and adaptive.  I didn't, intellectual assessments had already been done so I reviewed the intellectual assessments, and then I also considered the different strengths or deficits that I saw there when I was doing my assessment with him and talking to people who knew him growing up.  I looked at school records.  I looked at work records.

Q   Okay.  With regards to records, that's what I was hoping to discuss first.  Let me put up Petitioner's 136 and ask you if you recognize that document?

A   Yes.  I think this document includes the various reports, records that I looked at, medical records, school records, previous reports that had been done with him, testimony that I looked at.

Q   Okay.  And in addition to the materials contained on that exhibit, did you have occasion to watch the 14 hours of Government expert evaluation of Mr. Bourgeois?

A   Yes, I did.

Q   And did you review the Government's exhibits that have been, at least so far been --

THE COURT:  I'm sorry, which?

MR. WISEMAN:  The evaluations of Dr. Moore and Dr. Price.

THE COURT:  Oh, okay.  Did she watch the video, the 16 hours?

MR. WISEMAN:  I --

THE COURT:  It's 16 hours.  I only got 14.

MR. WISEMAN:  Okay.

THE COURT:  But I'm going to have to get the other two.

MR. WISEMAN:  I won't quibble with that.  Sixteen. It felt like more.

THE WITNESS:  Well, I had two, I had, I saw two discs of Dr. Price and several discs of Dr. Moore, so I think I saw them all, yes.

MR. WISEMAN:  Okay.

THE WITNESS:  And if it's 16, 14 hours, 16 hours, I didn't time them, and I didn't watch them in all one setting.

THE COURT:  No, there are more than, there's more than that.

MR. WISEMAN:  We sent it to her in a different format so.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And did you review the Government's exhibits that have been provided to you?

A    Yes, I did.

Q    And did you review Dr. Moore and Dr. Price's reports?

A    Yes, I did.

Q    And did you review any records with respect to Mr. Bourgeois' brother Anthony?

A    Yes, I did.

Q    And, just briefly, what did those records show you?

A    Well, when I visited his sister Claudia, Anthony lives with Claudia, and there is a personal care attendant who comes in the home and mandated that, to receive that service there has to be a book of records kept in the house, and so I reviewed that record that's kept there for the personal care attendant and it has information regarding his IQ, his adaptive skills, and the specific objectives that the personal care attendant works with him in the home as well as the objectives at the date --

        THE COURT:  So that's the one that Mr. Bourgeois says is retarded?

        THE WITNESS:  That's correct.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q    And what is his IQ, according to those records?

A    Well, his IQ was estimated to be 50, and the reason I say estimated is he has cerebral palsy and many of the tests that you give requires the use of hands, so they are estimating

that because they have had to make adaptations in the test. His adaptive skills are in the profound deficit range.

Q    All right.  So he's pretty severely impaired?

A    Pretty much all of his daily needs are met for him by others.

Q    Okay.  And in addition to the materials that you reviewed did --

THE COURT:  I'm sorry, how is he related exactly to Mr. Bourgeois?  What parent do they share?

THE WITNESS:  They share the mother.

THE COURT:  Okay.

THE WITNESS:  He is actually the fourth child of the four oldest children by the first father.

MR. WISEMAN:  And --

THE COURT:  I'm sorry, say that again?

THE WITNESS:  The first four children shared a common father, I think, and he is one of those first four Ferdinands.

THE COURT:  No, that's not right.

THE WITNESS:  There's a Claudia --

THE COURT:  I don't think that's correct.

THE WITNESS:  -- a Lloyd, a Clyde and Anthony, I think.

THE COURT:  No.  That's, I know that can't be right, because Mr. Ferdinand has a different last name.

(Ms. Larin and Mr. Wiseman conferring off the record)

MR. WISEMAN:  Your Honor, my colleague advises me that Mr. Ferdinand's name is, was not actually Ferdinand, and that may be source of the, of our confusion.  His name was changed at some point to Ferdinand.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   In addition to the materials you have reviewed, did you conduct an interview, a structured interview with Mr. Bourgeois?

A   Yes, I did.

Q   And when did that happen and where?

A   That happened in August of 2009 at Terre Haute at the federal penitentiary.

Q   And approximately how long did you spend with Mr. Bourgeois at that time?

A   I would say approximately four hours.

Q   And as part of that encounter did you administer any tests?

A   Yes, I did.

Q   What did you administer?

A   I administered a standardized test, the Woodcock-Johnson, which is a battery of academic tests, as well as tests for listening comprehension, oral expression, and then I also did informal functional assessments with him regarding various

skills, life skills.

Q   We will discuss those more in detail later, but just give the Court a sense now of what you mean by informal assessments, functional assessments.

A   Okay.  In the best possible scenario when you are assessing a person with mental retardation you actually want to assess those skills in the real environment, so you would like to watch them, possibly, while they cook or doing domestic activities, and this gives you a better measure if there's deficits there of where you would want to start treatment or providing supports.  When a person lives in a restricted setting such as an institution, a lot of times you have to simulate these tasks using different things like pictorial cards or an application, to see if they can fill out an application, for example, things like that.

Q   Okay.  And --

A   And it gives you a judge of, well, do they have the basic skills, so if they were living in the community, to apply those.

Q   These informal probes, are they ones that you got out of a book or are they ones that you have derived over your years of experience?

A   They are just ones that I have derived over my years of experience.

Q   In addition to -- well, withdraw it.  Did you also

administer a mental status exam?

A   Yes, I did.

Q   And in addition to the testing that you did and the interviewing, did you have occasion to interview other individuals who knew Mr. Bourgeois throughout his life?

A   Yes, I did.

Q   And were they people who knew him through a range of adaptive domains?

A   Yes.

Q   Did you have occasion to administer any formal standardized testing to any of the people you interviewed?

A   Yes.

Q   And we will talk more about them later in specifics.  Why didn't you, generally though, why didn't you test everyone that you interviewed?

A   Well, there are certain standards in the manuals of these standardized assessments as to who makes a good informant or doesn't make a good informant, so when you start about doing one of these you talk to the person to see how well they know them, and they need to meet certain requirements and if they don't meet those then the standardized assessment is not appropriate to be administered to that person.

Q   As a result of all the work you have done in this case, did you reach a conclusion to a reasonable degree of psychological certainty about Mr. Bourgeois?

A    Yes, I did.

Q    And what is that conclusion?

A    It was my conclusion that he met all three criteria for a diagnosis of mental retardation.

Q    For purposes of your testimony let's, it's complicated enough, let's use the AAIDD definition as we go forward.

A    Okay.

Q    To explore the basis for your conclusions.  Let's discuss intellectual functioning first.  Did you see -- well, before I ask you about the test, tell us what one needs to qualify as, to have a significant intellectual deficit for purposes of this diagnosis?

A    When you are saying significant you are looking at two standard deviations below the mean for that test, and that generally now is a mean of 100, a standard deviation of 15, so for a score of approximately 70.  You need to take into account the standard error of measurement of that test and for that score there is a confidence interval and we can be reasonably sure within that confidence that that score falls, his true score, true ability falls within that confidence interval, and for Atkins hearings that's generally plus or minus five, so you are looking at approximately a score of 70 plus or minus five points, so a 65 to a 75.

Q    And did the Atkins decision endorse that standard error of measurement?

A    Yes, it did.

Q    And does the DSM also endorse the standard error of measurement?

A    Yes, it does.

Q    And how about the AAIDD?

A    Yes.

Q    And what are the criteria, when you are looking at records, in determining whether a particular IQ test is an acceptable one for making this diagnosis?

A    Well, within the field there is an accepted gold standard for intellectual tests and that gold standard would be any of the Wechsler tests and any of the Stanford-Binet tests. Other tests have inherent weaknesses that you, that wouldn't meet quite that standard. You are also looking for a full-scale administration of the test. Abbreviated administrations, prorated administrations, would not be meeting the standard. There are also tests that can be group administered, paper-and-pencil tests that might give you very broad estimate, and it might be helpful to look at it but it would not meet the standard that's required in an Atkins hearing.

Q    Does, do achievement tests meet that standard?

A    Achievement tests aren't used for diagnosing mental retardation. They could possibly be used for determining adaptive deficits. They are really looking more at that

criteria we mentioned earlier of conceptual.  So they are not actually used to diagnose the test, they are just corroborating evidence of adaptive deficits.

Q   Were any such tests that qualify contained in the records you reviewed?

A   Yes.

Q   And could you tell the Court which ones you saw and their significance?

A   The ones that I saw was a Wechsler Adult Intelligence Scale, Revised, that was administered about the time of his trial, and the other one was a Wechsler Adult Intelligence Scale, Third Edition, which I think was administered in 2007.

Q   And just for identification purposes, the earlier one was administered by Dr. Weiner?

A   That's correct.

Q   And the more recent one by Dr. Gelbort?

A   Yes.

Q   And what were the IQ scores recorded in each test?

A   I'm flipping to make sure I don't enter any wrong scores into, and I'm looking -- the first one, the WAIS-R, got a full-scale IQ of 75, and the second one got, the WAIS-III in 2007, got a full-scale IQ of 70.

Q   Did my office provide you the data underlying those two IQ tests?

A   Yes.

Q    And did you have an opportunity to review it?

A    Yes.

Q    Did you reach any conclusion as to the accuracy of the administration and scoring of those two tests?

A    That's, I saw no scoring area -- errors.  If I remember correctly, nothing on their actual protocol where you scored the items.  There might have been a place on, where you take the cumulative scores and add them, they had left a blank, but they got the total correct.  That particular test seemed to have been computer scored and they might have been transcribing scores over.  But as far as the actual administration of the test, there were no errors that I could see.

Q    Did you have occasion to review Dr. Weiner's report?

A    Yes.

Q    And did you notice any error with regard to the report?

A    It seems in the report there might have been a transcription error there from one of the scores being transcribed to the report.

Q    Did you review the -- you have already indicated you reviewed the reports of Dr. Moore and Dr. Price.  Did they, in your view, identify any errors with respect to the scoring or the administration of those IQ tests?

A    I don't remember any errors that they identified.

Q    Did Dr. Gelbort or Dr. Weiner comment in their reports

about the issue of malingering?

A    They noticed no signs of malingering and they felt he had put forth good effort.

Q    And did Dr. Weiner in particular administer any testing for malingering?

A    Yes.  As I remember, I know, I'm fairly certain he administered a TOMMs, which is one of the instruments that has some reliability with people with mental retardation. It's a test for malingering and he passed that test.

Q    And again, referring to Dr. Moore and Dr. Price, did you see any reference in their reports with respect to malingering?

A    No.

Q    I am going to put up for you now what's been marked as Petitioner's 155 and ask you if you can, do you recognize that document and what is it?

A    This document is all the scores of the subtests -- I'm going to get to the microphone -- all the scores of the subtests that were administered in 2004 as well as 2007, and then it also shows you the performance IQ and the full-scale IQ for, and the verbal IQ for both sets of tests.  So what you are looking at here, for example, the vocabulary subtest was administered in 2004 and he made a six, and in 2007 the WAIS-III version of the vocabulary test was administered and he made a four on that same subtest.

Q   Okay.  And what data or what conclusions can you draw from what's on this chart?

A   Well, in the field of mental retardation, I think if you look at the AAIDD guidelines, one of the things that's pointed out is numerous administrations, when you compare them, is often a better measure of malingering or reliability than some of the malingering tests that are not normed for people with low cognitive functioning.  In this particular case what you are looking at are the scores hanging together and where we see strengths in one subtest do we see strengths on the second administration, where we see a weakness do we see it on the second administration.  These two tests were administered four years apart and it would be very hard to malinger, to deliberately give the wrong answer on one version of the test and then to know, well, I really need to score about the same way four years later on a newer version of the test.  So I think if you look there, and specifically what I noted is if you look at the digit symbol, that was a strength for him.  On the subtest the mean is 10, the standard deviation is three, so 10 is considered in the average range.  He scored a 10 the first time, he scored an 11 the second time.  When you look in another area, let's look at, say, similarities, he scored a five the first time and a four the second time, so those scores are fairly consistent across administrations.  Some of the subscales,

subtests on the WAIS-R were not carried over to the WAIS-III

and the WAIS-III introduced some new subtests, so sometimes

you can't get that comparison.

Q    And that would be the matrix reasoning, object assembly?

A    That's correct.

Q    Now, the, I take it from your testimony that one doesn't

expect identical scores in various administrations?

A    No.

Q    And is that related to the whole concept of a standard

error of measurement?

A    Not only that, but in this particular case there could be

more than one thing.  The first time he was given the test,

and we believe that was the first time it was given, every

subtest was novel.  The second time he was given the test he

might have had some memory.  In my own experience, after

giving lots of these, whenever I pull out the red and white

blocks, if they have ever had the test before that's a

reminder to them, oh, yeah, I've had this test before.  The

coding is another one that a lot of times they remember.  A

lot of times when you give an intelligence test, what you are

doing is you are giving a test that you hope is truly novel

and you are explaining something they have never done before,

and part of the test is how quickly can they assimilate the

instructions and perform the task, and that kind of drives

how well they do.  When they have had a little familiarity

with it, they might do a little better the next time.

Q   The --

A   But I think overall these scores show consistency across administrations.

Q   And the overall IQ of 70 and 75 fall within each other's standard error of measurement?

A   That's correct.

Q   Did you recall anything in Dr. Price's report with regard to an observation of unusual scatter in these subtests?

A   What I recall is that the scatter of the subtest he thought was not typical for a person with mental retardation. I think that's what was, the gist of what was said in the report.

Q   And do you see any scatter?  Well, first of all, what is scatter and did you see any?

A   What you are looking at as scatter is how far the scores deviate, and the way I would do that is you get an average, you add up all the subtests so you kind of know what the average subtest is, and if there is a deviation, for example, in digit symbol, there is a 10 and 11 and that's significantly different than the average for all the others, and I gather that's what he was saying is you don't particularly see that large of a scatter in a mental, person with mental retardation.

Q   And what's your explanation, if you have an explanation,

for the sort of different performance on that particular test from the other tests?

A   Well, I have seen scatter like that before in people with mild mental retardation, so I did not make that observation that he did.  Digit symbol is a copying test and he copies very well.  It's trying to write spontaneously that you watch him markedly slow down.  So that's actually one of his strengths and I saw him do that informally when I assessed him as well, and it's not atypical for a person with mental retardation to have a strength, and I have tested other mentally retarded people that do well in one area, so the fact that he had a strength doesn't rule that out.  In my opinion, when you make that statement you are looking more at a discrepancy between verbal and performance being statistically significant and I didn't see that in this test.

Q   We have already heard a bit about the Flynn Effect n this case.  Could you tell the Court where you stand on that topic?

A   Okay.  The Flynn Effect is an accepted statistical phenomenon in the literature, and what we find is that over time norms get soft.  We give a test and over time, when we give the test at the end of that test life the scores tend to go up.  There have been group studies that have been done across tests to show this and these group studies make an estimate of overall what's the average that a score goes up

over a period of ten years.  Some of the earlier tests when they came out stayed out as long as 30 years between administrations, so when you go back and look at these, that's where they started basing this estimate.  But it's done on group studies, it's not done on individual studies.  But we do know that if a test is normed, you do it on the year the test was normed, not the year the test was published.  So the WAIS-R was published in '81 but they started collecting normative data in '78, so when this test was given in 2004 you are looking at a normative table that was 26 years old, so his scores are being compared to norms that are 26 years old.  The norms were soft and therefore you could expect the score to be a little bit higher.  But the way you explain this in the literature is that you have a confidence interval, so it's most likely that his score is at the lower end of that confidence interval because it's been inflated by the age of the norms of the test.  On the second test, which was the WAIS-III, that test was also old, the WAIS-IV came out in August of 2008, so the norms for the WAIS-III, they started collecting those in '95, so you are also getting a little bit of a Flynn Effect.  I don't think it's an issue in this case because the scores are there.  I mean, they are the scores we are looking for in an Atkins case.  So we can discuss Flynn if we want to, but in this particular case I don't know if we need a big debate on it

because it's not relevant.

Q    Okay.  Just bear with me one more moment then before we move on from it.  Part of the dispute or the debate in the literature in the community seems to be whether you adjust the score or explain the Flynn Effect.  How would you express the effect of the Flynn Effect in this case, the impact?

A    There's two large schools of thought on that.  The American Association of Individuals with Developmental Disabilities, most of the folks in the American Psychological Association Division 33, which is the specific division for individuals with developmental disabilities, say you should adjust the individual score.  The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet.  I think what both sides are saying is when you come into court, the court needs to clearly understand what the Flynn Effect is and what age of the norms when those scores were adjusted and the concept of a standard error of measure and a confidence interval and where you would look at that score in relation to its confidence interval.

Q    So applying all that you just said and looking at the two IQ scores we have, the 70 and the 75, and the age of the norms at the time they were administered, how would you express the IQ that you think most accurately reflects Mr. Bourgeois' intellectual ability?

A    In my opinion, his scores at the time they were obtained on those normative tables, I would, and considering the confidence interval, I would say his true score probably falls somewhere between 68 and 70.

Q    The WAIS-R that was given when it was no longer the test that was -- well, let me start over.  When the WAIS-R was given it was an older test.  Would you discount it or would you still consider it despite the fact that its norms were that old?

A    I think what we are specifically saying is at the time the WAIS-R was given the WAIS-III was already available to be used and the examiner didn't use it.  I see that quite frequently in all the records I have reviewed through the years when a neuropsychologist is doing a battery of tests.  They tend to want to use the Wechsler instrument that has the greatest amount of research associated with it at that time.  When you come between tests, the new test doesn't have that accumulation.  A lot of times what a neuropsychologist is looking for is brain dysfunction, and so they are looking at correlating different subtests of this with other tests that they administer, so I believe that's the reason the neuropsychologists, or in the past that has been my experience of why they would have chosen the older test.  I wouldn't discount the data.  I would put more, actually I would weigh more heavily towards the WAIS-III, which is what

should have been administered the first time, but I think that test should be looked at because the subtests do vary consistently with the WAIS-III.

Q   And let's go back to this comparative chart between the two administrations.  To my lay eye it looks like his scores went down a bit from the WAIS-R to the WAIS-III with regard to verbal but they went up a bit with regard to performance. Do you have an explanation for that?

A   Not really, other than, as I said, the performance items are the items you see the most practice effect with because people tend to remember the blocks, they tend to remember the coding test, they don't have to listen as closely for the instructions, their mindset is ready for the response.  But generally there is not a real big statistical, the difference between these are not statistically significant, so I wouldn't put a lot of bearing on that at all.

Q   Let me ask you a hypothetical.  You have done a number of these cases.  If you were hired by a lawyer at the time of a capital trial and you were given an IQ test with a 75, or even a 76 taking into account Dr. Weiner's error in transcription, on a WAIS-R, would you have any recommendations for that lawyer?

A   Yes.  I would recommend that you pursue a full evaluation for mental retardation.

Q   And what is your view of Mr. Bourgeois' intellectual

functioning even aside from the question of whether he has adaptive deficits or not?

A   I think these tests clearly show that Mr. Bourgeois is, functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely low cognitive ability. That criteria I think is clearly met.

Q   And what would his percentile ranking be in terms of IQ among the general population with a 68 to a 70?

A   Oh, with a 68 to a 70 you are looking at approximately a two percentile, so 98 percent of the people in the United States perform better than he does on this test.

Q   All right.  Let's now focus on the question of adaptive deficits, and let me put up for you a slide which is marked as Petitioner's 160.  First of all, what's that first page?

A   That's the first page of the AAIDD Eleventh Edition and it's also known as the Green Book.

Q   Okay.  And it is in fact green.

A   It is in fact green, that's right.

Q   And I am going to turn to page 43 of that volume, and do you see a definition there?  It's a little hard to read on the big screen.

A   Yes.  This is the AAIDD definition of adaptive behavior and I think I mentioned it earlier as a collection of

conceptual, social and practical skills that have been learned and performed by people in their everyday lives.

Q    And this was the definition that guided your assessment?

A    Yes.

Q    How do you assess whether a person in a typical case has adaptive deficits, significant adaptive deficits?

A    Okay.  In a typical case you are trying to make a diagnosis based on their current functioning that day, that time, in their own environment.  You have their care providers that are there, their mother, their father, their brother, their sister.  If I'm doing it in a community home, I have the people that are actually providing care there.  I also have the settings where they typically perform these skills, so if I have any questions I could go and observe those as well.  And then one of the things that you want to look at when you are doing these is the context or the environment in which they are performing these skills on a typical day.  There are cultural expectations of maybe their neighborhood but there are also sometimes hidden supports that guarantee that they do well, and one of the questions you are going to be asking is if those supports weren't there would you still see that same level of performance.

Q    And how does the, what you have described as a typical adaptive deficit assessment differ in the Atkins setting?

A    Well, in the Atkins setting you are always looking back

retrospectively because you are trying to determine if there was evidence of mental retardation prior to the age of 18. Even at the time of the offense we are looking back probably 20, 25 years in time to see what was the functioning at that time and would it meet these criteria adaptively.

Q    All right.  Now, in this case we are not going back to the time of the offense quite that far, but the point is the same, you are looking at his pre-18 functioning?

A    His pre-18 functioning, that's correct.

Q    And are there special guidelines applicable to a retrospective evaluation that you have just described?

A    Yes.  I mean retrospective evaluations were being done prior to Atkins because we frequently have people who come to agencies as adults and we have to determine are they eligible for services.  For example, Mr. Bourgeois' brother didn't access services in the state of Louisiana until 2001 and he was middle-aged at least by then, and so then the agency is charged to go back and see is there evidence that these deficits were there prior to the age of 18.  And you often have to look for records, you have to look for people who knew him at that time, you would need to be able to look at the environment, like I said, as much as possible that he lived in and start trying to tease out, well, what were the supports that he had in place, when he did well, to do well.

Q    Did you administer standardized tests in order to

determine adaptive deficits in this case?

A   Yes, I did.

Q   And let me put up for you two different exhibits. Petitioner's 34 is a two-page exhibit.  Do you recognize it?

A   Yes.  This is a Vineland-II that I did, it's a Vineland Adaptive Behavior Scale, Second Edition.  And we mentioned gold standards earlier.  The two gold standards for adaptive assessments are the Vineland Adaptive Behavior Scale, Second Edition, I call it the VABS-II, and the Adaptive Behavior Assessment System, Second Edition, we call that the ABAS-II, and this is one of your gold standard standardized assessments of the test, it's the VABS-II.  I administered this with Ms. Franks and I administered it retrospectively and we looked at him as he was at about the age of seven when we did this.

Q   We are going to get to the specifics of the test.

A   Yeah.

Q   I just want to identify your data for now.  Next, I'm going to put up --

THE COURT:  I'm sorry, how did, how did they, I'm sorry, I'm not understanding this.  She administered something that had to do with Mr. Bourgeois when he was seven?

MR. WISEMAN:  Yes, Your Honor.  We are going to explore that and explain the reasoning.

THE COURT:  That would be good.

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q    Next I am going to put up a Petitioner's 35, which is a 94-page exhibit, and just the top sheet, do you recognize what that is?

A    Okay, that is the ABAS-II.  I administered this same form with Ms. Franks.  It should say five to 21 there.

Q    It's got off track.

A    It's the parent form that I administered with the same informant.  It's just the other gold standard test that I mentioned earlier.

Q    Okay.  And, more broadly, does this exhibit contain all of your data --

A    Yes.

Q    -- for Mr. Bourgeois' evaluation?

A    Yes.  Right there, that's the mental status exam directly behind it I guess.

Q    All right.  So you, this packet contains the rest of your data in the case?

A    It should.  It should contain the Woodcock-Johnson, it should contain the two standardized assessments and then the mental status exam that I give.

Q    Okay.  And we are going to go through that in some detail.  Let's talk first about the Woodcock-Johnson, and

tell the Court initially what is the Woodcock-Johnson, what does it seek to determine and how did Mr. Bourgeois do on it?

A   Okay.  The Woodcock-Johnson is, when we talked, we have talked about gold standards in different types of tests, the Woodcock-Johnson would meet the gold standard of an academic achievement test.  It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas.  The, it is better than say a screening test such as the WRAT which is only assessing one area of reading.

Q   Right, and for the record, the WRAT is the W-R-A-T?

A   Yeah, the WRAT.  The WRAT is a Wide Range Achievement Test, it's now in its fourth edition, I think in this case there were third editions administered, and it's a brief screening instrument.  By brief, you can give it in about 20 minutes, and it gives you a broad indication.

Q   And I am putting up on the screen right now page 13 from Exhibit 35, which is the bigger packet of data, and ask you if you can explain and interpret that particular sheet?

A   Okay.  If I could, I'll just kind of go through the sheet for the Court.

Q   Sure.  And if you want to touch the screen, you can even highlight things.

A   Oh, I can, okay.  If you look right there where it says "Cluster," these are the different tests I give.  At the very

bottom down here are the specific tests that I give and then those are broken down or added together and become the cluster scores that are mentioned in this top section right here. For example, if you look down here you have letter word identification, reading fluency, story recall, and then down here there is a passage comprehension right about there. Those collapse into your broad reading score, which is here. Now, when you look at something like reading, there's actually many skills that are involved in reading. The WRAT primarily looks at word recognition, which is this one here, and if you look at his word recognition it's actually pretty good. The scores that are most relevant to the Court, in my opinion, are these scores right there which are the age equivalent scores, so he is performing in these areas similar to a person who is this age. This score right here that says "SS," that's the standard score he actually obtained on these. And over here is the grade equivalent score for each one of those tests. I think the grade equivalent score is particularly relevant to this because if you look at the DSM-IV, what experts in the field have said is most people with mild mental retardation, we expect them to function overall at about as high as a sixth grade level, which is consistent with where he is functioning here, and he does have some significant strengths and some significant weaknesses. But as I was saying earlier, going back to the first column,

those specific tests are the tests that I looked at for reading, and if we can we will talk about it, and I think when you look at the videos you will see problems that he has with reading and things that he does actually quite well with reading.  The next broad area would be broad math.

Q    Could we talk about it now?

A    Uh-huh.  Sure.

Q    I mean it seems like a good time.  What, you mentioned that he has a relative strength in terms of his word recognition, and what test is that that shows that?

A    That's the letter/word identification on which he made a 90 and he's functioning at about the eighth grade level there.  And I think on the WRAT he scored much higher than that even.  I mean they score him much, a higher grade level than that.

Q    That would have been the reading score of a high school level?

A    I think so.

Q    Okay.

A    And letter/word recognition is not phonetic decoding, it's recognizing words, it's having the ability to look at words over drill over a long period of time and possibly in more complicated words identifying the root words and then guessing from that or the context of the sentence what the word is, and this is a particular strength for him.

Q    And compare that to his ability to understand what he is reading, to comprehend what he is reading.

A    Well, his passage comprehension, which is that last little orange dot I have down there, he's more at the third grade level there, so he can read something.  And if you look at the next one, reading fluency, he's also fairly good at that.  He reads fluently at about the fifth grade level.  But when he has to break down what he reads and remembers it, then you start having problems.  The more particular problem for him is the third one there which is story recall, and in story recall you are reading him stories and then you are immediately asking him to tell you back what he just heard and that's where he really breaks down, so he, it's the more immediate reading that he has problems with in remembering.

Q    And what does the "K" there, is the "K" kindergarten?

A    Kindergarten.

Q    Okay.

A    That's right.  So if he reads something repetitively over time he's going to remember it, but it's going to take him longer to do this.  And I think specifically in the video, and I don't think the Judge saw Dr. Price's video, but if you look at Dr. Price's video there's a place where he is getting him to read the consent form and --

Q    At the beginning of the evaluation?

A    At the beginning of the evaluation.  I even timed, and

since the Judge hasn't watched it she can do the same thing when she watches it, how long it takes him to read it, if you watch his finger, because he is asked to comprehend it and understand it, so --

Q   Okay, let me just stop you.  He's reading this to himself?

A   Well, he reads it out loud, so you can kind of see him, and he moves his finger along and then he stops and he asks a question, and I timed it and it was, it took him an excessive amount of time to read that for comprehension.

Q   Do you have the amount of time it took to read?

A   Huh?

Q   Do you have that handy?

A   I wrote it down.  Let me see, I think I have it somewhere handy.  Let me see.  Without flipping, oh, no.  No, I don't, I don't have that handy.

Q   You don't have any -- okay, well.  Let me just, let's see if I can clarify one point.  Dr. Price, did Dr. Price ask him to read it aloud or did he just give it to him and say, "Read this"?

A   He said to, "Read it and make sure you understand it," and then he had to read it and understand it to sign it, and that was the instruction and that's the approach or the response style that Mr. Bourgeois used.  I thought it was very interesting when Dr. Moore gave it to him, Dr. Moore

asked him to read to him and he fluently read it.

Q    Okay.

A    But then at the end when he started asking questions Mr. Bourgeois got flustered because he couldn't remember what he read.  He's a fluent reader is what, the point I am trying to make, but he doesn't read with good comprehension.  And it was just interesting in watching the two videos, I remember immediately thinking, well, that's exactly what I saw in my Woodcock.  And so, anyway, those four tests are what makes up his overall broad reading which is about the fifth grade level, an 83 percentile, and an 83 percent -- I mean a standard score of 83, and that percentile score would probably be somewhere around 9 or 11 percentile, which would mean about 90 percent of the people his age in the United States read better than he does.

Q    And --

A    Which to me that would show functional academic deficits consistent with a person with mild mental retardation in reading.

Q    And how does that 9th or 10th percentile compare with the 2nd percentile that we typically see with MR, mentally retarded scoring?

A    Well, and I would refer the Court directly to the DSM. It breaks down the different categories and what the academic expectations would be for mild as opposed to moderate, severe

or profound.  But what we usually find with people with mild mental retardation is early on they have significant academic deficits compared to the same age peers but over time they can make up for these and we generally see a raw functioning somewhere around the sixth grade level by the time they reach adulthood, which this is consistent with what we see here.

Q    Okay.

A    But, anyway, if you go through this, for example, with going back to this section, in here you have a broad math and a broad written language and those are broken down in different categories.  The thing that I found most interesting next to the reading with him was his broad written language ability.  His overall ability is at the seventh grade level but this is primarily helped by his very high spelling score, which if you look down here is at the 13th grade equivalency, and this is his most unique strength. For some reason he can spell and he can spell extremely well. Where he breaks down is if you look down here under writing samples and writing fluency, he's much slower there on those tests.  So when he has to write quickly or he has to write spontaneously, it's much harder for him.  And you also get a chance to see that in the videos with Dr. Price for sure, and I do have one of those that I had saved.  There is a paragraph I think that he gets him to write and it's a very brief paragraph and I timed it at six minutes and 11 seconds,

and, about 14 words per minute to write that.

MR. ROBERTS:  Your Honor, the witness is holding up a document.  I'm not sure what she's referring to.

MR. WISEMAN:  Yeah, why don't we put it up on the screen.

THE WITNESS:  Okay.

MR. ROBERTS:  She has also done a number of documents --

THE WITNESS:  I'm sorry, I'm sorry.  There you go.

MR. ROBERTS:  She also has a number of documents in front of her, Your Honor, and I just don't know what she's referring to.

THE COURT:  Have you seen them?

MR. ROBERTS:  I haven't seen, I don't know what she's looking through.

THE COURT:  Okay.  Well, why don't we take a minute and let him look through the documents that you are using?

THE WITNESS:  Okay, sure.  Most of these, actually I'm looking at Dr. Price's document.  I think Dr. Price did a beautiful job of breaking down the adaptive skills and --

MR. ROBERTS:  Your Honor, may I approach?

THE WITNESS:  You can approach and look.

MR. ROBERTS:  May I approach the witness, Your Honor?

THE WITNESS:  Sure.  That's Dr. Price's raw data.  I

really had this open to Dr. Price's report because he did a really good job with that I thought. And these are some of my report and you can just thumb through. I will get this out for you.

MR. ROBERTS: I don't want to ask questions here, Your Honor, but there's a lot of information here, I don't know --

MR. WISEMAN: Well, Your Honor, I can tell the Court that the materials the Doctor has is her raw data which was turned over to the Government pursuant to the Court's direction, so I mean there's nothing new in there. If Mr. Roberts wants to look through it he's welcome to.

THE WITNESS: You're welcome -- it's Doctor, I can go by tabs and just identify it for you very quickly. This is a copy of my declaration, the first two pages. This is a sentence from the raw data of Dr. Price. This is that score sheet we are looking at on the board right now, the Woodcock-Johnson. This is my Woodcock-Johnson data that you-all have a copy of. This is the response sheet. You-all have a copy of that as well. It's a response booklet and the scoring sheet for that. This is the score sheet for the ABAS-II that I administered. This is a letter to the editor from Dr. Moore to the APA, Division 33, on the Flynn Effect which I thought was very interesting. This is a report from Dr. Price. There's more, this is like a, there's two reports

for Dr. Moore, there's a supplemental report and an initial report. Let's see. This I think is Dr. Moore's ABAS data, it's all kind of clipped together. That's his data. And these are just different affidavits or declarations that I was given by the defense. That's a declaration, that's probably family members. (noise) When I'm talking, I have a hard time, I'm just trying to understand which one is Henry --

THE COURT: Please be careful of the microphone.

THE WITNESS: Okay, I'm sorry. So these are different family members right here, as best as I could understand it when I'm reading through when someone identifies themself as Isaac Henry, III, this one was Isaac, II, and so these are scribbles trying to figure out is it his mother's first cousin or his first cousin. If you have read through the declarations you might understand. That was my best guess when I was reading these declarations. This I think we have already looked at, that's my Vineland-II. And this is some kind of something that came out of this previous report or hearing. There you go. And that's it.

BY MR. WISEMAN:

Q   Okay.

A   Excuse me, I have to get this down.

Q   I --

A   Wait, just give me just a minute so I can slide this in

here without hitting that microphone.

Q   I have put up and marked the page that you were discussing just a moment ago and called it Petitioner's 159. Why don't you describe what this is and what significance it has for you.

A   Well, I just really, when I was watching the video, I had also worked with Mr. Alfred Bourgeois in the same setting and done similar things with him.  I had given him a sentence that I dictated to him, it was a nine-word sentence.  I also had him writing things for me on these different tests, and you have copies of my raw data.  And Dr. Price got him to write this and so I just timed it as we went because that was my same impressions when I worked with him.  He copies very quickly but when he has to write spontaneously it takes him much longer to write that.  Also, when I was there with him, there's multitudes of examples of his own written work in various documents that were given with him and I wanted to know how long does it take him to write something like that, and he told me sometimes when he produces a one-page document he may write it and copy it over and over again and it takes him a very long time.  And I just found this very unique because I didn't administer this but when I watched it that is about the same kind of performance that I showed with him.

Q   Okay.  Let me just ask you, the scribbles or the calculations, excuse me --

A    Okay.

Q    -- that are contained down there, are those yours?

A    Those are definitely scribbles, and I was just counting real quickly how many words did we have.  It took approximately six minutes and 11 seconds is what I timed it at, at six words a minute, if I did my math correct.  I figured about 14 words a minute, which is extremely slow.  And when you watch him, he's just extremely slow to write spontaneously and very quick to copy, so copying is a strength for him, writing spontaneously is not.  So that's why when we were talking earlier, and I think we got off on this or I got off on this, talking about his written expression, and I thought that was very interesting.  There actually is one more example that the prosecution just looked at and he asked him to write a sentence and it was, "I'm going to the gym and work out in about an hour," and that took him one minute.

Q    Could I see what you have?  Okay.

A    And I will show you that one, too, and this is in the rough data, the raw data provided by the prosecution's experts.  And I just thought that was interesting because it validated what I had seen as well as the problems that he shows in written expression.

Q    Let me, let me put that up so the Court can see what you were looking at.  I'm calling this Petitioner's 161.  160 had

already been taken.  So how long did it take Mr. Bourgeois to write that sentence?

A   One minute and 16 seconds is what I timed it at when I was watching it.

Q   And what was --

A   And he just --

Q   What was the task asked of him at that point?

A   I think he was just asked to write a sentence.

Q   About anything?

A   Or anything that he wanted to, any thought that he had, and it took him that long to come up with the sentence and that was how long it took him to write it, and I felt that was consistent with a person that would have the academic deficits that I noted on the Woodcock.

Q   Now, looking at the various strengths and weaknesses reflected on the Woodcock, do you see consistencies with the WAIS administrations that you have reviewed?

A   Yes.

Q   And what are those consistencies?

A   Between my Woodcock and the WAIS?

Q   And the WAIS.

A   Well, as I mentioned, the thing that I saw that was the most significant on the WAIS as far as his strength was his ability to copy those symbols.  And I find that as long as it's right there in front of him he does extremely well and

his copying skills are very good.  The problem for
Mr. Bourgeois was when he has to spontaneously think things
through.  Also, when you give him a word, vocabulary he does
a little bit better, but when you start having him analyze
something, for example, in similarities, you generally watch
him slow down.  There are examples of that on the video and I
think it's Dr. Price gives him proverbs, very simple
proverbs, and I also gave him proverbs on my mental status
exam, but I think the only one he got, he had a lot of
trouble trying to analyze these, I think he only got one of
them right and they were just basic simple proverbs that we
all see.  One of the ones I used is what does it mean you
can't see the forest for the trees.  He can't break that down
in the abstract, the underlying meaning of that.  And I
thought the video displayed that extremely well because he is
talking very fluently, he's expressing himself, and then they
switch to that and he doesn't have a clue of how to answer.

Q    And to the consistencies you have observed between the
WAIS-R, the WAIS-III, the Woodcock-Johnson, the proverbs on
the videotape, the writing and reading skills and deficits,
those consistencies, do they also give you information with
respect to malingering?

A    Well, yes, because when you are looking at all of this,
if he had done extremely well in something I need to know,
well, why does he do well and what is there about that.  For

example, he is an extremely good speller and I thought that was very interesting because he doesn't phonetically decode so where is he at that, but he has some ability to do that and that's a unique strength for him.

Q   And finally, before we leave the Woodcock, you mentioned earlier that people with mental retardation can have strengths.  Does the fact that he spells at a 13th grade level preclude a diagnosis of mental retardation?

A   No.

Q   And did you use your Woodcock administration to determine whether or not Mr. Bourgeois meets any of the adaptive deficit domains under the AAIDD?

A   Yes.  I used them in two areas.  One of them was for -- and both of them under conceptual.  In conceptual, one of the areas you are looking for is functional academics, and I think I've given a pretty broad explanation or specific explanation of how I probe for that, and overall he's functioning somewhere 5-8, 4-1 and 7-2 as far as his broad areas in broad reading, broad math and broad written language.  His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation.  I also, in that test you give them oral comprehension and other tests that probe for oral language and listening comprehension.  On

the sheets you had up earlier that was the first two broad cluster scores. And his scores in those were at the third grade level and the fourth grade level. Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual. So I felt, when you are doing this it is kind of nice to have some standardized scores to back up your own clinical judgment that you make in looking through records and talking to people, and I felt we had two standard scores there for conceptual.

Q   Okay. Let's talk briefly about the informal functional assessments that you had mentioned earlier. Tell the Court what precisely you administered and what conclusions you reached.

A   Okay. Well, it's very interesting to do standardized assessments, but what we really need to know is how this person can take his academic skills and function in the real community. I bring maybe a copy of a newspaper article, which most newspapers are written about the sixth grade level, if this person is going to function in the community, and I get them to read that. I want to know how many words per minute it takes for him to read it, and when he gets through can he answer some basic questions about that. I found my reading probes with him were about consistent with the standardized assessments, but I think these video

examples that the Judge can actually look at are even better than the ones I can provide narratively. I got him to write some things for me as well on these different tests. I asked him about the things he can do well. Mr. Bourgeois is, quite frankly, very difficult to interview. He overestimates everything he can do and you have to talk to him an extremely long time before you start finding inconsistencies, and you need to have done a lot of homework before you go in there because he likes to present himself in the best possible manner. So a lot of times what I would say, well, I understand that, now here's some things, can you show me how you would have done that with this. One of the things I really probed was, for example, he said he did a lot of housekeeping and that he knew how to wash his own clothes, but when you really pressed him, these are things that he got girlfriends to do, his wife to do or he left with other people, but then he immediately tells, assures you he knows how to do them. So I have different cards that I use over time in trying to start where I am going to train somebody and so I would get him, okay, well, you explain to me on that shirt, which of these labels would explain, would it be a perma-press shirt, would it be this, so it's the ability to read his label, his ability to determine which wash cycle or which dry cycle to use that, which kind of detergents he would use with different things. When you start pressing him

with those things he cannot give you the answers.

Q    Did you show him any maps?

A    Yes, I did.

Q    And what did you show him a map of?

A    Well, the maps to bring into Terre Haute for me, it might have been different for other folks but I had to bring maps that had no relation to Indiana or pretty much the state of the United States or they wouldn't let me bring them in, so I brought a map of Oslo, where I had been recently, and I brought a map of Hawaii, and specifically also the island of Maui, and so we just worked with those maps because the guard let me get those maps in.  And so we, I tried to get with concepts of east and west and if you were here, you're going there, and what direction would you tell someone to go on different places, and I didn't find he was able to do that on those maps.  If you have good map skills you ought to be able to get a map if you travel to Oslo and figure out where to go and be able to get directions from that map.

Q    And you weren't asking him to interpret -- what language do they speak in Oslo?

A    Norwegian.

Q    Norwegian, okay, you weren't --

A    No, I wasn't asking him to do that.  I was really asking him more things like there's a compass on the map and how would you use that and how does that identify north, south

and east and west, and when you press Mr. Bourgeois he always tells you that what, you just get on the interstate and you follow the signs, and he can identify the colors of the signs, the type of the signs, he can identify which was a U.S. sign as versus an interstate sign, and he relies a lot on that.  He quickly tells you he didn't have to use maps anymore after that because he had a GPS system and the GPS system would tell him, and if he got lost he could always call back to the dispatcher at the trucking station that he worked for and she would give him more specific directions. And he also admitted that he frequently had somebody with him that would help guide his way.

Q    Now, did you see Dr. Price also show some maps to Mr. Bourgeois?

A    Yes.

Q    And those were maps of the United States, weren't they?

A    Yes.

Q    And what did you observe with respect to Mr. Bourgeois' ability to get from, I think it was Louisiana to Chicago?  Do you recall that?

A    It seemed to me he just immediately identified the interstates and just kind of went from there on up.

Q    Okay.

A    I know when I verbally tried to get him to describe how he would get to Kansas or how he would get somewhere, he

always told me he would go up to an interstate and then come over and then come back down. That wouldn't necessarily be the fastest way there but it would be the way that he would go.

Q   And this sort of inability, as you have described, for him to use the directions on the maps you showed him, was that consistent with anything you saw in the video when Dr. Price was asking him about orientation?

A   Yes.

Q   And describe that for the Court. The Court will watch it if she hasn't, but just give us your interpretation of what you saw.

A   Well, what I think Dr. Price was trying to get Mr. Bourgeois to do, and Mr. Bourgeois is extremely hard to interview, is he was trying to get him to explain some kind of directionality or orientation, because if you are a truck driver we are going to assume that you know something about directions and how to get from point A to B, north, south, east, west, some direction where the moon would be. He was asking him a lot of different probes and I thought that was what he was trying to get, get some sense of with Mr. Bourgeois. Mr. Bourgeois gives some fairly long-winded answers and I don't know if he got that, what he was looking for.

Q   All right. And particularly, were there questions about

where a shadow would be cast based on where the sun is and if a flag were blowing one way which way is the wind coming?

A   That's correct.

Q   All right.

A   Because, you know, if you don't really know east or, you know, some people have practical knowledge that they have learned in life so if you don't know it as far as east, north, if you haven't learned it in school, possibly you have learned that from a practical experience.  There's people who have never gone to school and who can go out in the woods and hunt and come home very quickly, so maybe there were some other skills that he had learned that give him his sense of direction that were not academic, and I thought that's where Dr. Moore was going with that.

Q   Dr. Price?

A   But I don't know that Mr. Bourgeois --

Q   You said Dr. Moore, I think that was Dr. Price.

A   Dr. Price.

Q   Okay.  And was Mr. Bourgeois able to answer any of those orientation questions?

A   I think he got confused, as I remember the video.

Q   All right.  Is there anything else about your informal assessment, functional assessment, that you want to bring up, or should we move on to standardized testing?

A   No, not really.  I brought a dictionary, some practical

things that I wanted him to see, and he does have dictionary skills and he has learned these skills, so just functional everyday things that you would use, so I don't really think there was anything else that really I recall to mind.

Q   All right.  And overall did you draw any conclusion about his functional skills on those informal assessments and how they relate to your other adaptive testing?

A   Well, what the literature tells us I think is pretty consistent with Mr. Bourgeois.  All the family members report deficits in his early years.  I think over time there may be some deficits still in the area of conceptual and social, but in practical skills he has made the most mastery, and he demonstrated fairly good knowledge of practical skill areas.

Q   Okay.  Let's now talk about the standardized testing that you administered to the third-party informant, Beverly Frank. First off, why did you select her as opposed to any of the other people you interviewed?

A   Well, the manual gives specific guidelines on who is a good informant.

Q   And which manual are we talking about?

A   We are talking about both manuals.

Q   Okay

A   The VABS-II and the ABAS-II, and it specifies who would be a good informant and who to look for, and you are looking for someone that knew him well over an extended period of

time and you are looking for someone that can, when you are doing something retrospectively can identify a specific point in time when they knew him well.  Because there are some skills you would not expect, say, a seven-year-old to know that you would expect a 16-year-old to know, and even someone with mild mental retardation may not be able to do something at seven and have mastered it at 16.  So you can't float along the continuum, you need to get that person, when you are doing it retrospectively, to be able, I clearly remember that point in time when I knew him well and this is where he was.  Some of the people that I interviewed, for example, siblings, had also left the home at an early age and really couldn't pinpoint a time for me.  They could give me general recollections across the spectrum of time but not anything specific.  And Ms. Franks could specifically remember the time when he came to live with his grandmother.  We had almost an hour --

Q    I'm sorry, what --

A    With her grandmother, I'm sorry.

Q    All right.

A    And we had an almost hour-long conversation where we talked about his skills in different times and then we finally finished down to that was the time she clearly knew him well, so when I administered it we only talked about what he could do at that point in time and in answer to any other

question it was always, are you sure he could do that at seven or was that something that you saw later, and if it was we didn't score it that way.

Q   And what do these manuals tell you about the need for an interview before the administration of the test?  I mean do you just walk up to people and say "Take this test" or do you --

A   Well, you have to establish really good rapport first, so, you know, it involves a point of getting a conversation. I feel that's more important in retrospective because you have to really feel comfortable and confident that you are getting good and unbiased answers of the person that you are interviewing.  It also requires that they really do know across the whole spectrum of the test because you are looking, as we talked about, across maybe ten areas, so they need to know about each of the ten areas.  And if there is a frequent, if they don't -- well, they know, for example, I interviewed people that knew about work but that's all they knew about, so they wouldn't have been a good respondent for the whole scale because they really didn't know about these other areas, they only knew about his work skills.

THE COURT:  Okay.  Well, how did Ms. Frank know about him?

THE WITNESS:  Ms. Frank was the granddaughter of Mrs. Taylor, Mary Taylor, we talk about a Miss Mary.

THE COURT:  Right.  Did she live with her grandmother?

THE WITNESS:  No, one of her jobs, there were family members, Ms. Taylor had family members that came by daily to check on her and that was one of her things.  She was older than Mr. Bourgeois and she came in daily to check with her grandmother.  She sometimes stayed at night with her grandmother.  And Anthony stayed there with her grandmother from the time he was seven until the time of her death.

BY MR. WISEMAN:

Q   I'm sorry, you said Anthony?

A   Not Anthony, excuse me.  Mr. Bourgeois stayed there with them from the time he was seven until the time of Miss Mary's death.

Q   And let me just ask you, you mentioned a Ms. Taylor --

THE COURT:  So Ms. Frank didn't live with her grandmother?

THE WITNESS:  No.  Well, she stayed there with her sometimes, she stayed with her in the summer, but she did not live with her.

THE COURT:  But she didn't live with the grandmother?

THE WITNESS:  No.

BY MR. WISEMAN:

Q   Did she live in proximity to the grandmother?

A    Yes.

Q    And about, you know, was she in the same community?

A    Yes, that's what I understood.

Q    And what's the name of this community that these folks lived in?

A    Okay.  This particular community that Mr. Bourgeois and Miss Mary lived in is called The Bend.

Q    Okay.

A    And it was a lot of land that an ancestor had bought and different family members had come to live on and then I think Miss Mary's family had bought some land there.  She wasn't directly related to Mr. Bourgeois.  And it is in the general area of a very small community in that parish known as Paulina, and the next real city that is of any mention is probably Lutcher.  So it's a very small rural community in Louisiana that immediately borders the Mississippi River north of Louisiana, I mean New Orleans, maybe 30 miles north of New Orleans.

Q    All right.  And I have put up the first page of Exhibit 35 which is, says "parent form," it's a little cut off there, and I think you mentioned this earlier, it says his age is five to -- what's the actual age?  I'm not --

A    Twenty-one.

Q    Twenty-one.  That's cut off, so it's not ages five to two.  And why did you use the parent form in administering

this test to Ms. Frank?

A    Well, the ABAS-II is different from the Vineland in that it has multiple forms, and when they are under the age of 16 -- the adult form starts at 16 -- so when they are under the age of 16, there's forms for under the age of five, I think three to five, there's another form for teachers, but for the child himself at the age of seven and someone that's giving knowledge on the home, this is the only form you can use.

Q    And after you interviewed -- well, why don't you describe how the ABAS is administered and its strengths and weaknesses.

A    Okay.  The ABAS and Vineland are administered in two separately different ways.  The ABAS-II you give to the person, the person reads the instructions and scores them. You ask them to score every single item from the very first item to the end of, to the last item on every subtest.  If there are items to deal with work, we scratch those out if work doesn't apply.  You read them the instructions and there is also a little template at the very front that specifies the different scores, and the person may get a zero, a one, a two, a three or a four I think it goes up to.

Q    Let me just --

A    Yeah.

Q    Let me just put up a representative page.  This is page 4

of Exhibit 35 and --

A    Can you show me the top of that page?

Q    Sure.

A    And that's exactly what I'm looking for, I think, that specifies the different levels.  So you can't read it quite as well but there is a zero, a one, a two, a three and a four, and it specifies with each little bullet, you know, more examples of which each one of those are.  And then if you look at the lower right-hand bottom where the zero, one, two and three is, then that's where you would give those scores there, so those are smaller captions of the top ones.  So there is four possible scores you can give, zero, one, two or three, and if you don't know then you can either mark you don't know or you can leave it blank or you can check that you guessed, which is what the box is for the side.  So when the person gives this test they are asked to give, to answer every single item starting from the first item to the last item of that subtest and they read it to themselves.

        THE COURT:  All right.  So you, this is the test that Ms. Frank took about Mr. Bourgeois?

        THE WITNESS:  That's correct, that's one of them.

        THE COURT:  Even though she never lived with him and wasn't related to him and didn't go to school with him?

        THE WITNESS:  That's correct.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q   Did you in your interview determine whether Ms. Frank had ample knowledge to complete the form?

A   Yes.   That was one of the things I did, as I said, when we started the first hour of the interview in determining that.  Her grandmother, Miss Mary, Mary Clayton (sic), was elderly and I think used a walker to get about and she came over every day to help her grandmother, and frequently Miss Mary asked her to help with Mr. Bourgeois because there were things that he needed to be done with him, or she got to observe her grandmother as she was working with him, so she had direct knowledge on a daily basis of how he met these different skills.

THE COURT:  Now, how old is she in relationship to Mr. Bourgeois?

THE WITNESS:  Judge, I am going to make a guess at this point but I would say six, seven, like when he was six she was a teenager, I think, you know, as I recall.

BY MR. WISEMAN:

Q   And what domains does the ABAS cover?

A   Okay.  The ABAS collapses into conceptual, practical and social, and it gives you a global general adaptive composite, so it gives you a general score and then the three scores that we were speaking of earlier, and you get these three scores based on ten subtests that collapse into this.

Q   Okay.  And how did the administration of the ABAS come out with Ms. Frank?

A   Okay.  And I want to clarify this at the point as the reason I give the ABAS.

Q   Okay.

A   I had a lot of concerns on whether Ms. Franks was a good informant or not and how much she would remember, so when I gave her the ABAS we had a long conversation, we probed all the different areas and then I gave her the ABAS, and my major purpose in giving her the ABAS, after I explained it to her, was I was interested in learning how much she didn't know about him, how many blanks did she leave, how many guesses did she give, because then that generally showed me there was no point in proceeding with the standardized assessment because she didn't have the knowledge skills that I needed.  And when I finished administering the ABAS and I looked at it, she had marked everything, she didn't leave any blanks, and so then I turned around and I administered the Vineland in a semi-structured interview.  And that's my preference of the test to administer because you get to probe each item more and you get to ask them are you sure he couldn't do that at that age, are there things that you could put in place that he would accomplish it, and so actually I gave him the, her the Vineland in a semi-structured interview and scored that.  I feel the Vineland is a more accurate

estimate of where he really is in compared to the ABAS. The other thing about the ABAS is it has what we call a higher floor. The Vineland goes all the way down to the profound deficit range and the ABAS stops at a moderate range, so you don't have as many items on the lower end of that, and I just feel the Vineland gives a better estimate of a person who is functioning in the mild deficit range. There's more items at the lower end of the test to help judge where he is.

Q   The structured interview that was part of the Vineland, is that something that the Vineland manual tells you to do?

A   Yeah, and it's called a semi-structured interview.

Q   Semi-structured.

A   And the reason it's semi-structured is you try to keep it as conversational as possible but you move along topics with the person, and you are asking the specific questions that are on the protocol but at any time you can stop and give more information. So if they say the person couldn't make a bed, for example, you might say, well, tell me what they did, did they pull the sheets up, and so you can ask a lot more questions about that and in asking the questions you may see that the person really does deserve a one rather than a zero because he can do some of the skills with supports.

Q   How, excuse me, how did Ms. Frank score on the Vineland compared to the score on the ABAS?

A   Okay. As I remember, on the Vineland we got scores in

the mild deficit range, if I remember correctly.

Q    Would you like me to put it up for you?

A    Yes, would you please?  We're having to hunt it up.  Yes. So if you look at this, pretty much in communication he got a 69, a 66, a 68, and these skills are in the mild deficit range.  And we are looking at a child who is seven years old. This is the age he was when he came to live with his grandmother and where his skills were at that time.

THE COURT:  It's not his grandmother.

THE WITNESS:  I mean with her grandmother, I'm sorry.  With Miss Mary.

THE COURT:  I'm concerned about your information.

THE WITNESS:  Okay.  It's with Miss Mary Taylor, the grandmother of Ms. Franks and the lady that Mr. Bourgeois came to live with when he was about seven years of age.

BY MR. WISEMAN:

Q    And how did that scoring compare to the scoring on the ABAS?

A    It was higher than the ABAS.

Q    All right.  So he scored in a less impaired way on the Vineland?

A    That's correct.

Q    Than on the ABAS?

A    That's correct.

Q    What --

THE COURT:  I'm sorry, which one did you give to the to Ms. Frank?

THE WITNESS:  I gave both of these to Ms. Franks.

THE COURT:  Okay.  So he didn't score anything, Ms. Frank scored.

THE WITNESS:  That's correct

THE COURT:  I mean let's really keep that straight when you are talking about it, Mr. Wiseman.

MR. WISEMAN:  Sure, that's my --

THE COURT:  Because this is getting to be a little strange.  Keep going.

BY MR. WISEMAN:

Q   The scores that were recorded on each of the instruments you administered to Ms. Frank, were they both in the impaired range, significantly impaired range?

A   Yes.

THE COURT:  Did you give her any test to see how impaired she was?

THE WITNESS:  No, but I --

THE COURT:  Okay.

THE WITNESS:  -- I talked to her.

BY MR. WISEMAN:

Q   Is it typically required or even called for to do such a thing?

A   No.

Q    All right.  And the, both manuals require an interview to see if the person is a reliable informant?

A    Yes.

Q    And a person who has a basis for knowledge for the information they are providing to you?

A    Yes.

THE COURT:  How much time did you spend with Mr. Bourgeois?

THE WITNESS:  About four hours.

THE COURT:  Did you ever ask him if he remembered that lady, Ms. Frank?

THE WITNESS:  Yes.

THE COURT:  And?

THE WITNESS:  Well, he remembered her and we, actually I think the reason I keep her calling her grandmother, he calls Ms. Taylor grandmother, so that's why I keep slipping up.

THE COURT:  Well, in the interviews I saw he called her the old lady.

THE WITNESS:  Well, that's what he called her to me. But he does remember her and he remembers all the people in that community, that community of The Bend.

BY MR. WISEMAN:

Q    And you have talked about how the structured, semi-structured interview of the Vineland is preferable in your

view.  Does it have particular strengths in a retrospective evaluation?

A    I would think it does because it allows you to keep calling the person's attention back to the age at which you are interested in determining how that person was functioning.  When you are dealing with it retrospectively, they tend to bounce across the time they have known the person and if you would allow them they would give you answers of how they were when they were in high school or whatever, so in a semi-structured interview you always get that point to clarify, okay, this is what I think I've heard you say, and remember we are talking at seven, are you certain this is what he could do at the age of seven.

Q    Did you observe in Dr. Moore's report any critique of the scores that were recorded with respect to the administration to Ms. Frank?

A    Yes.

Q    And what was that, generally what was that criticism?

A    As I remember his criticism, I think the major criticism was the difference in the scores, that one was low and the other one was higher and it showed a specific bias.

Q    And did he make any observation with respect to what state or what condition Mr. Bourgeois would have been in if those were his true scores and whether he would have accessed services?

A    Oh, I remember that part.  It was more along the lines of the way a person functions with scores in the 40 is that person would more likely be institutionalized and need, wouldn't be able to function out in the community even with supports.

Q    And did you, are you familiar with the state of services for people with developmental disabilities in that part of Louisiana during the early 1970s?

A    Yes.

Q    And describe it for the Court, as well as your basis for knowing it.

A    Okay.  Well, I have always worked for the division of state government that provides services to people with developmental disabilities, not only in developmental centers, which are the institutions, as well as other types of facilities.  In that particular area, in South Louisiana, people tend to keep their children at home.  There were no services available in the community prior to about 1980 and so they lived at home if they were allowed to go to school.  If they were toilet-trained they would go to school.  If not, up until the time of special education, services were provided in the home.  And there really weren't any personal care attendants or things like that that you get services for to come help you in your home.

Q    And the fact that his brother Anthony, Mr. Bourgeois'

brother Anthony didn't receive services until 2001 as an adult, did that factor into your assessment of the services available at that time?

A    Well, that's consistent with that, because I think that's about the time his mother passed and his sister Claudia assumed some responsibility for his services, and she worked or the family members worked and they were looking for someone that could help provide him services during the day. Even Claudia mentioned the family didn't want to institutionalize him because they had managed to keep him in the community all of this time.  And the services he gets now is the opportunity to go to a day program during the day and then have some people come in and help him, help her with the bathing and the physical lifting, et cetera.

Q    And did you have an opportunity to speak with a woman named Gwendolyn Thomas Smith about services in that part of Louisiana at that time?

A    Yes.

Q    And who is she and what did she describe?

A    Gwendolyn Thomas Smith was an educator in St. James Parish, which is the parish he went to school in.  She always worked in the field of special education, but prior to special education, formal federally funding, funded special education coming to Louisiana, she worked under the Title I program, the ESEA program.  It was a federally funded program

to provide assistance to low-income students and they had reading labs.  It was the early, early stages of special education in rural areas in Louisiana.  So she gave me some history of where the school system was in regard to special education and special education services at the time Mr. Bourgeois was in school.

Q   And did the information she provide you add anything to your evaluation in particular with respect to the fact that Mr. Bourgeois apparently didn't receive any services?

A   Well --

Q   Let me ask it a different way.  Was there a reason for his not receiving services other than the fact that he may not have been mentally retarded?

        MR. ROBERTS:  Your Honor, I would object, that calls for speculation.

        THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Using Anthony's brother, Mr. Bourgeois' brother Anthony as a comparison, did the fact that there was a profoundly impaired person in the home, in your view, impact the information you were getting from the family?

A   In my opinion it does, and I have seen this with another, in other families.  When you have someone with Anthony's impairment, for that family that becomes the definition of mental retardation, and so even though they may have other

children that are struggling academically or also have deficits, that person is far superior to the benchmark person or family member they are looking at and so they wouldn't put him in the same category.  In their opinion Mr. Bourgeois might have been slow in certain areas but he wasn't mentally retarded, Anthony was mentally retarded and there was no way they were the same.

Q   Let's talk now about your other interviews and review of collateral data and let's talk about the data first.  Did you have a lot of collateral data as far as Mr. Bourgeois' background to review in this case?

A   Not very much school information at all.  There were people still living in the community that I could talk to. There were some efforts he had made to make employment with sheriff's departments that I could look at.  And his first long-term employment was with a place named Schwegmann's and there were people there that I could talk to, and I was kind of familiar with that organization.

Q   All right.  So, in addition to talking to Ms. Frank and administering these two tests to her, how many other folks did you talk to?

A   Okay.  Amongst family members I spoke with Claudia, which is an older sister, Claudia Ferdinand.

MR. ROBERTS:  Your Honor, could, I just want to get a time frame for when she was actually speaking with these

individuals because I think it matters with regard to her report and when she did her report.

THE COURT:  When did you talk to them?

THE WITNESS:  Okay.  Ms. Franks was in the spring of 2009, I want to say April, about, maybe March.

BY MR. WISEMAN:

Q   Before your report?

A   Before my report, yes.  Let's see, did I talk to any -- I know I talked to Claudia Ferdinand in the last three months, is off the top of my head.  I talked to -- and that was in person.  I talked to Michelle Armont, who is a half-sister on the father's side of the family.  I talked to her in the last three months.

THE COURT:  After your report was written?

THE WITNESS:  Yes.  Let's see, who else did I talk to?  I talked, I'm trying to think of family members.  I talked to Murray Bourgeois, and he is a, I think, if I've got it correct, he is a cousin of the mother, although I think he refers to Mr. Bourgeois as his cousin.  I talked to him in the last three months.  I, by, I had a phone conversation with Carl Henry, who is a cousin and also was a work supervisor at Schwegmann's.  I talked, I talked to a brother, his brother Lloyd Ferdinand, and that's been fairly, I had a very hard time tracking down Mr. Ferdinand and that's been probably in the last 30 days that I spoke with him.

THE COURT:  Where did you find Mr. Ferdinand?

THE WITNESS:  I had phone numbers that I kept leaving messages at.  And I talked to him once at a place he said was his, a workplace of his, and then he terminated the conversation and then he called me back later that night, and then I had to return him back on his cell phone, so it was always on different, different phone lines that I was talking to him, and I gathered from the phone calls he was traveling about.  I talked to, I'm trying to remember everybody here, I talked to people that worked with him at Schwegmann's.  I talked to a Donald Reese who was a truck driver that worked with him at Schwegmann's and later was a tandem truck driver with him, they went on the same truck route together in the same truck.  I talked --

MR. ROBERTS:  Your Honor, if I may interject again, she's starting to list the people without giving us when.  I think --

THE WITNESS:  Okay, and I would say that's in the last three months.  I'm sorry.

MR. ROBERTS:  -- most have been within the last three months, right?

THE WITNESS:  The last three months.

BY MR. WISEMAN:

Q   With respect to when you spoke to these folks, I want to put up what's been marked as Petitioner's 33, and do you

recognize that?

A    Yes.

Q    And is that your report or your supplemental report in this case?

A    It think that's my supplemental report right there, yes.

Q    Okay.  So you issued a report in 2009?

A    That's correct.

Q    And you did additional interviewing?

A    Yes.

Q    And you issued a supplemental report?

A    That's correct.

Q    And the supplemental report contains the result of your, the interviews you have just described?

A    That's correct.  Now, when I did my initial report and my initial interview, I asked to talk to a lot of different folks, and the legal team was cooperative in trying to find these people for me and to give me phone numbers, et cetera. There was, the last name I was going to mention, and it has been in the last three months, is Fred Tompkins who was a senior truck driver at Schwegmann's that knew Mr. Bourgeois. I also spoke with him.

Q    What, we will get to specific things that were told to you but what generally did you learn about Mr. Bourgeois' background from the various folks that you talked to?

A    Okay.  And starting with family members that I --

Q    Sure.

A    -- spoke to that knew him during the developmental period, there was a history of physical abuse and emotional abuse that he sustained throughout his years.  I think that's well documented in the records.

THE COURT:  Well, it's all by Mr. Bourgeois.

THE WITNESS:  By his mother towards Mr. Bourgeois?

THE COURT:  No, I meant the documentation is all by Mr. Bourgeois after his trial.

THE WITNESS:  Oh, that's right, I guess so.

THE COURT:  Okay.

THE WITNESS:  But, and the people I talked to, they all agreed that that occurred.  Anyway --

THE COURT:  Who agreed that that occurred?

THE WITNESS:  First of all his sister Claudia.

THE COURT:  Okay.

THE WITNESS:  Who is about six years older than he is.  And she'd give instances of when he was beaten by the mother.  Not only was his nose disfigured, and this was a constant thing, he was beaten by the mother with extension cords, belts, things were thrown at him.  She told the story of a meat cleaver that the mother brought down one time and removed the tip of a finger.  She told the story of him being beaten in a bathtub so profusely that blood was running in the bathtub.  And she confirmed that he had, he was treated

differently than all the other siblings in the family.

BY MR. WISEMAN:

Q   In addition to Ms. Williams, did you hear any abuse stories from Mr. Henry?

THE COURT:   Mr. who?

BY MR. WISEMAN:

Q   Henry, Carl Henry?

A   Carl Henry, yes.   Carl Henry was a cousin and later was his, a supervisor of his at Schwegmann's, and he frequently came back to The Bend, which was where his family was, and he played, you know, with all the children in The Bend, and he remembered that Mr. Bourgeois was emotionally and physically abused by his mother.

Q   In addition to the, to the abuse you heard from those folks, did you hear anything relevant to the mother's household while Mr. Bourgeois was a child?

A   Well, I heard more than one thing, but one thing about the mother was she was a fastidious cleaner, she was an obsessive compulsive person.

MR. ROBERTS:   Your Honor, I'm going to object unless they can lay a foundation of who she is hearing this from.

MR. WISEMAN:   Oh, sure.

MR. ROBERTS:   Because it's just so generic, we don't have any idea where this information is, the source of the information.

BY MR. WISEMAN:

Q   Yeah, Why don't, why don't we -- that's a fair point. Why don't we go through some specific folks.  Let's talk about Claudia first.

A   Okay.

Q   Claudia Williams.

THE COURT:  Are these people going to be here?

MR. WISEMAN:  Yes.

THE COURT:  Can't we just hear from them?

MR. WISEMAN:  Sure, but then I'm afraid that I will be confronted with not having had the expert talk about it. I am happy to not talk about it with the expert --

THE COURT:  Well, what can she say other than that she talked to these people and he was abused?

MR. WISEMAN:  All right.  Well, I mean, I just had an objection from Mr. Roberts it's not specific.  If Your Honor wants to overrule that, I will move on.

THE COURT:  No, I want --

MR. WISEMAN:  I'm happy to have her talk generically.

THE COURT:  I was kind of hoping that we could just move on from the hearsay stuff to something that she knows. You know, test results and that sort of thing.

MR. WISEMAN:  Oh, sure, sure.

BY MR. WISEMAN:

Q   Well, Doctor, do people in your line of work rely on third-party reports in assessing whether there is an abuse history?

A   Yes, you have to rely on third-party reports in gathering the evidence in a retrospective diagnosis to see if you have met the criteria prior to the age of 18.

Q   And what relationship is there and why is an abuse history relevant to whether or not Mr. Bourgeois is mentally retarded?

A   Well, it could have been the abuse might be the underlying etiology of the mental retardation.  It could have been because of the abuse he developed certain patterns of emotional behavior that kept him from learning.  And then in this particular case there is a secondary issue of another diagnosis that he most likely has of a personality disorder, and a history of abuse is primary, in my opinion, of giving a personality, the type of personality disorder diagnosis that has been given to him.

Q   And what relevance does an impoverished upbringing have to whether or not Mr., and by impoverished I mean materially impoverished, have with respect to whether he's mentally retarded?

A   Well, some people that come from impoverished environments such as that have the lack of opportunity to

learn, so what you are trying to tease out is was it the lack of opportunity that caused him to be the way he was or was it low cognitive ability and not having any opportunity, he didn't get the supports he needed to achieve at the highest level.

Q   And what relevance, if any, is there to whether Mr. Bourgeois was teased as a child have to your determination of whether he is mentally retarded?

A   Well, it was what he was being teased about, I think was the most important, and he was being --

THE COURT:   Where did you get that information?

THE WITNESS:   I got that from Murray Bourgeois, the cousin.   I got that from my conversation with Lloyd, with Carl, with Claudia and, primarily those.   The other sister that knew him that I talked to that I don't think we have discussed yet knew him more as a teenager.

BY MR. WISEMAN:

Q   And same question for whether or not there was the presence of motor deficits as a child.

A   That's right.

Q   And who did you hear it from and what did you hear?

A   I heard it primarily from Carl, Lloyd and Murray, along the lines of he was much, it took him much longer to learn how to ride a bike, he was not as good as the other children, he was made fun of because he was clumsy and couldn't keep up

in the games, and then even later when he was able to do some of these things he had a harder time remembering the rules for the games.

Q    And same set of questions for the presence or absence of poor social relationships as a child.

A    Well, that's correct.  It was just harder for him to -- he was, when he was much younger he was pretty much silent and non-communicative, and then later on when he grew older he really didn't know how to socially interact with the kids and he was frequently teased or made fun of.

        THE COURT:   Did you know he had a stutter?

        THE WITNESS:  Yes, he had speech therapy when he was young, as I understand it, for stuttering, and -- yes.

BY MR. WISEMAN:

Q    Were you, did you learn from these various interviews whether he ever lived alone for any significant periods of time as a young man?

A    No, I didn't discern where he had ever lived alone. There was one time, according to his sister Claudia, that he lived in a trailer right behind her house, but even then he could rely on her for cooking and washing his clothes and things such as that.

Q    And is that relevant to the assessment of whether his home living, ability to adapt to home living is present in this case?

A   That's right, and it gives you the fact that this person had some knowledge of his home living skills at that age in his life.

Q   Did you notice in Dr. Moore's report his reliance on a fellow named Ralph, Claudia Williams' husband?

A   Yes.

Q   And did you meet Ralph?

A   Yes, I met Ralph.

Q   Describe for the Court what you, how Ralph behaved.

A   Well, when I met Ralph he was pretty disoriented, he appeared to be --

MR. ROBERTS:  Judge, could we find out when she met Ralph and again the context?

MR. WISEMAN:  You know, Your Honor, I'm not sure why this isn't proper cross.  If he keeps interrupting the witness, I'm not sure what the --

THE COURT:  Well, if you want me to get a picture, I'd really like to know when she met him.

MR. WISEMAN:  Oh, well, that's a different matter then.

THE WITNESS:  It's been in the last three months.

THE COURT:  So it's after you wrote your report?

THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q   Before your supplemental report?

A    Yes.

Q    Okay.

A    And it was when I specifically had gone to the Williams home to interview Claudia Williams, he was there.  He appeared intoxicated and he was very disoriented and he kept interrupting the conversation.

Q    What time of day was it that you were there, roughly?

A    Roughly, I'd say around 3:00 o'clock in the afternoon.  So if Claudia and I were talking about Mr. Bourgeois, he would become confused and thinking I was talking about something else and then sidetracked me, and so finally, I was there with a member of the legal team and she steered him to another room and kind of kept him busy so I could conclude my conversation with Ms. Williams.

Q    Did you learn from any of these particular folks about whether Mr. Bourgeois got jobs on his own or whether he got jobs with assistance?

A    Early on he got jobs with assistance.  One of the first jobs that he was able to obtain was at a Market Basket which was a, is a grocery store in Louisiana, a chain, and, as I was told, Miss Mary was able to get him that job because she knew the manager, and he worked there and I think at another grocery store.  He later had relatives that worked with the sheriff's department and he tried to get a job there.  And he went to work at Schwegmann's and he had a relative that

worked there.  Once he established skills at Schwegmann's, he met truck drivers, and when they would move on to another company he would move with them.

Q   And let's talk about Schwegmann's.  You indicated that you had some independent knowledge of what type of company Schwegmann's is.  Could you tell the Court what you know about it --

A   Well, my --

Q   -- and how you know?

A   Okay.  Well, my independent knowledge about Schwegmann's is because Mr. Schwegmann, who is now dead, founded this large supermarket chain in New Orleans and he had a handicapped child, a child that was mentally retarded, and so therefore he was pretty influential in the community in trying to get supports for folks, and he had a policy at his chain that he would hire any handicapped person that would want to work and he would work with the, he would have supports there to work with the person, so I knew a lot of people who had worked with Schwegmann's that I later worked with.  And at one time I worked in New Orleans at Magnolia School, which is a private school, and a lot of the folks that resided at that facility worked at Schwegmann as bag boys or stockers or whatever.  His in-service training actually had a way of working with disabled people that couldn't read or write very well and teaching them how to do

these basic manual tasks.

Q   And when you talked to the gentleman, Fred Tompkins, did you learn facts about Schwegmann's from him that were consistent with what you just described?

A   Yes.  Mr. Tompkins, at the time he worked there, he worked up to the point of being the senior driver, and Mr. Tompkins stated that Mr. Schwegmann was one of the first employers in New Orleans that would hire black men who couldn't read and write.

MR. ROBERTS:  Your Honor, I'm going to object to the relevance of this going down --

THE COURT:  What's the relevance?

MR. WISEMAN:  Well, the relevance is that the very first trucking job Mr. Bourgeois had was in a place that specifically recruited and supported people with disabilities.

THE COURT:  Okay.  Do you have any reason to think, to know, any personal knowledge of the fact that Mr. Bourgeois was recruited because he was mentally handicapped?

THE WITNESS:  No, Mr. Bourgeois --

THE COURT:  Just, this is a yes or no.

THE WITNESS:  No.

THE COURT:  Okay.  Then let's move from something else.

BY MR. WISEMAN:

Q    Okay.  How about whether Schwegmann's supported Mr. Bourgeois while he was working?

THE COURT:  Okay, that, the issue is move on from this.  If she has no personal knowledge that Schwegmann's hired him because --

MR. WISEMAN:  But she does.

THE COURT:  She just told me she didn't.

MR. WISEMAN:  No, but she has knowledge of the supports that were in place.  The Government is arguing he was an accomplished truck driver.  Our view is that he was given supports in the very first place he worked so that he could drive a truck, so he could learn the various skills that were needed.  If he were not given those supports, our position is he would not have achieved those things.  It's highly relevant to whether he was mentally retarded.

THE COURT:  Do you have personal knowledge that he received special supports to become a truck driver?  Personal knowledge?

THE WITNESS:  I only have the knowledge that I obtained in interviewing his supervisor and two of his co-workers.

THE COURT:  That's okay.  Are they going to come testify?

MR. WISEMAN:  Mr. Henry will be here, yes.

THE COURT:  Okay.  Then let him talk about that, okay?

MR. WISEMAN:  Okay.  Can I just ask the question?

BY MR. WISEMAN:

Q   Did he receive supports, to your knowledge?

A   Yes.

Q   Okay.

A   And I think Mr. Reese will be here.

Q   Yes.

A   Okay.  And so I interviewed three and two of them will be here and the Court could hear from them.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q   Very good.  What did you learn from Michelle Armont relative to your assessment?

A   Michelle Armont, he, Mr. Bourgeois --

THE COURT:  Now, is that his, that's his sister Michelle?

MR. WISEMAN:  Yes, half-sister.

THE COURT:  All right, thank you.

THE WITNESS:  His half-sister.  His half-sister by the father.  He came to live with Ms. Armont in his teenage years after Miss Mary died and he lived with her while he attended high school.

BY MR. WISEMAN:

Q    And what did she tell you about his ability to function?

A    When he came to live with her, at the time he was living with her, she was the one who was responsible for taking care of his clothes.  He didn't have any cooking skills.  He continued to have problems with interpersonal social relationships.  He would have girlfriends and they would frequently have spats.  And he had trouble in school.  She tried to help him in school, she tried to get some other folks to work with him, and he frequently had girlfriends that came over and helped him work on academic subjects.

Q    And let's talk about the one page of school records that we were able to provide you.  Did you see anything in there that supported your conclusion about his deficits in academic areas?

A    Well, other than I think he was approximately 20 when he graduated from high school.  We only have verbal reports of Mr. Bourgeois and family members that we believe he was retained.

Q    What do you mean by retained?

A    Well, he failed certain grades.

Q    Okay.  He was left back?

A    Left back, yes.  And then there was, there is a report, and possibly I think Mr. Henry also has knowledge of this, of him failing a grade and then making the grade up by going to

summer school.  Let's see.  The curious thing for me is nobody remembers him graduating, and when you talk to family members they are certain he didn't graduate, but the document says that he does.  I don't know if he accrued them after the time and then it was awarded.  At that time in Louisiana you graduated from high school strictly on the determination of the principal and you could leave school and come back and get the principal to look at your record and determine that you had met the requirements that were needed at that time, and that might have been what he did.

Q   Okay, so --

A   We just don't know.

Q   So that we are clear, there was no standardized method by which one graduated at that time?

A   At that time, no.

Q   Did you learn anything about -- you may have noticed on the tapes of the Government's evaluation of Mr. Bourgeois his claim to being able to fix lawnmowers and cars and things of that nature.  Did you receive contrary information from others that went into your, the formulation of your opinion?

A   Yes, I did, and particularly in talking to Murray Bourgeois.  Is he coming?

Q   Yes.

A   Before I take up too much time.

Q   Yes, he's coming.

A    I think he could address this specifically.  He is a mechanic and that's where his brother learned to do mechanics and that's where Mr. Bourgeois claims he learned, and Mr. Bourgeois can address that in his testimony.

Q    Okay.  And with respect to Carl Henry with the same proviso, that he's coming and he can talk in greater length, did you learn anything from him with respect to how long it took Mr. Bourgeois to learn to drive different types of trucks?

A    Yes.  He, the procedure there is you had to learn to drive five types of trucks before you could make truck driver, and you did this on-the-job training and it took a regular driver two weeks per truck and it would take Mr. Bourgeois maybe six months per truck, and sometimes they had to back him up to other tasks because he couldn't master the second type of truck.  So it took him much, much longer than it did the typical person.

Q    Okay.  And that was at Schwegmann's?

A    And that was at Schwegmann's.

Q    Now, we talked quite a bit about the tapes and we have talked about your interactions with Mr. Bourgeois.  How would you describe the way that he presents himself in the tapes and in your, from a clinical perspective how he presents, presented to you?

A    Well, I think I mentioned that earlier.  He tends to

overestimate his abilities.  He speaks untruths, quite frankly, about things that he can do, and sometimes when you are talking to them you know they are untruths because they don't match other things that you have seen.  But he wants to present well, he presents very well.  I think a recurrent theme in all of this is he tends to want to do as well as his brother did and he tends to try to steer you in the direction of Lloyd did this and I can do it, too.

Q   And is there a concept in the field of developmental disabilities called masking?

A   Yes.

Q   And just describe that for the Court, what that is, and --

A   Well, masking is something that people, particularly people with mild mental deficits do so that you don't recognize, to mask the fact that they are mentally retarded. They may parrot something that they have heard before or they may maintain they can do a skill that they can't do.  And they also just may redirect you so that when you answer (sic) a question, if they don't know it they very quickly start talking about something else in trying to get you distracted to another topic.  And the Judge has looked at a lot of videos and I think she can see that in the videos.

Q   And what's the explanation in your field for why people mask who have mild mental retardation?

A    Well, quite frankly, most people would prefer not to be mildly mentally retarded.  When you are functioning at a lower level it probably doesn't bother you, but when you are mild you have enough cognitive ability to recognize the difference, and it's a self-esteem issue.  You would like to present better and you would like to be like the other people that you know.

Q    And combining that -- well, did you think Mr. Bourgeois was engaged in masking during the videos and your interactions?

A    Yes.

Q    And combining that masking with what you know about his personality disorders, particularly the narcissistic personality disorder and the grandiosity that accompanies it, do you, what's your opinion as to how difficult it is to assess a person with that constellation of problems?

A    Okay, so we are moving into the area of personality disorders?

Q    Yeah, yeah.

A    And more away from the areas in mental retardation. Personality disorders are a pervasive pattern of behavior that you learn through childhood up into early adulthood and so it becomes the way that you behave, the way you act.  It's a maladaptive pattern, but it's also personality traits that you have developed over time because of the way you were

raised and the things you were exposed to.  And I think, for sure there has been some discussion, I think some people put him personality disorder NOS, some put him narcissistic and some people put him borderline.  I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they have and there is definitely mood problems there, there's self-esteem problems there, and this is some of the same problems you have with a person who is mildly mentally retarded as well.

Q   And so I guess my question was does that make it difficult to assess somebody like Mr. Bourgeois who is psychologically invested in looking good?

A   That's correct, but I think what you have to center on on a case like this is was there evidence of that at a younger age, at seven, at eight or at ten, because personality disorders aren't in place there.  They are being exposed to the things that perform that pattern.  So, yes, there is evidence as an adult he has a disorder, but there is also evidence that as a child and going up to the developmental period that he had cognitive and adaptive deficits as well that he was masking even then.

Q   We are almost to the end here.  You reached a conclusion with respect to Mr. Bourgeois' adaptive deficits?

A   Yes.

Q   And what conclusion did you reach?

A    I thought there was clear evidence that there was adaptive deficits prior to the age of 18, which would confirm a diagnosis of mental retardation.

Q    And --

A    The --

Q    Go ahead, I'm sorry.

A    Okay.  The issue with the Court, I think, today is do those adaptive deficits persist into adulthood.

Q    All right.  Before we get to that question, which we are going to get to, could you tell us in what areas you found these deficits?

A    Oh, under the age of 18 I definitely feel he has deficits in the area of conceptual and social.  And there are some practical limitations as well, but I felt the deficits were there in the area of practical and social.

Q    Okay.  And now taking the next question about post 18-and up to the time of the offense, do you have any opinion as to whether any of those deficits continued?

A    I think in early adulthood they continued and he got a lot of supports and he gradually learned to master.  It would be my opinion, I think, and it's only just an opinion, that by the age, the time of the offense, I don't think there were as, there were problems in his practical skill but I don't think there were significant deficits that would qualify in the area of practical.  There are still social limitations,

particularly in the area of interpersonal relationships, that show a lot of deficits in the area of social.  I think it could be argued, well, these are elements of his personality disorder as well.  I think it could reflect both.  I think he has both a personality disorder and he has social deficits. And I definitely think conceptual still persists.  So to my, in my opinion we can be fairly, there's firm evidence of conceptual deficits persisting into adulthood, and this would be deficits in communication that he has.  He may have good expressive language when he is on a familiar topic but he doesn't have a good underlying understanding.  There's problems with self-direction and there's problems in interpersonal relationships.

Q    Now, you --

A    And functional academic skills.

Q    Both you and I have used the term supports.  By supports do you necessarily refer to formal state-implemented supports, a home health aide, someone to help him with his functioning, or are you talking about something else?

A    Well, you can have all kinds of supports.  You know, in the ideal world you have supports that are being given by an agency to make sure this person reaches their maximum potential.  Those weren't there for Mr. Bourgeois at all. Sometimes there are supports within the environment.  I think Miss Mary gave him some supports that helped him do better.

I think if he had stayed in his home with his mother he wouldn't have done as well.  But Mr. Bourgeois has the ability to solicit supports, and that's not uncommon with people with mild mental retardation, they find people that will help them.  And I think when you talk tomorrow to Mr. Henry he can give you examples of things that Mr. Bourgeois did when he worked at Schwegmann's to guarantee success as he became a delivery man and started working at the different stores.

Q    Did you read in Dr. Moore and Dr. Price's reports, I will paraphrase here, sort of chalking up Mr. Bourgeois adaptive deficits to the presence of these various personality disorders?

A    Yes.

Q    And what's your view of that?

A    Well, as I remember them they are saying it could be one or the other, and I am just saying it could be both, I mean he could have both of these.  There is nothing to say that a person with mental retardation cannot also have a personality disorder.  A person with mental retardation can also have an Axis 1 diagnosis, a bipolar, schizophrenia or whatever, and I just think what you are looking at is a characteristic that is related to both.

Q    And is another way of expressing that that mental retardation is not a diagnosis of exclusion?

A    Well, that's right.  If you look at the DSM, it specifically states that there is no exclusionary diagnosis for a, for mental retardation.  A lot of them will say when you cannot diagnose this, if there is also a co-existing disorder of such-and-such, and the specific section of the DSM I'm speaking about, it even mentions in there you could have mental retardation and also have a diagnosis of a learning disorder.  Just having one does not preclude the fact with mental retardation, and what you are looking for is do these significant deficits exist and were they there prior to the age of 18.

Q    And there's something in the latest manual of the AAIDD that addresses the concept of problem behaviors and how they relate to a diagnosis.  Could you explain what a problem behavior is and whether or not that impacts your opinion that Mr. Bourgeois has mental retardation?

A    Okay.  I think that's most specifically addressed in the ninth and the tenth version, I think Dr. Moore mentions it in his report, and in that particular section what they are talking about, there are certain problem behaviors, disorders, behavior disorders that are common to people with mental retardation, self injurious behaviors, for example, or repetitive rocking or hand mouthing or things such as this, and that particular section cites various people who are well known in the field, applied behavior analysis, and when one

of these problem behaviors occur then eliminating that problem behavior might improve their adaptive skills. For example, if someone is always mouthing their hands to the point that they are calloused and they are hard to move, they may not have good fine motor skills. If you can eliminate the fine motor, get mobility back in the hands, the fine motor skills are going to go up. And so that's the particular area of the AAIDD manual that I am familiar with, what you are talking about. Another way of looking at that that I think they went into more detail in the Eleventh is problem behavior or maladaptive behavior and adaptive behavior are really two different continuums. Adaptive behavior are the skills that we have been talking about all day. Maladaptive behaviors may be problem behaviors that you see but it's a separate continuum. People have a tendency, who don't know a lot about mental retardation, to think, well, this is adaptive behavior and maladaptive behavior is at the low end of the adaptive behavior, and they caution you need to look at them at two different continuums. For example, you could have a conduct disorder and also have mental retardation, but they are two separate disorders and you need to diagnose and assess them at separate continuums.

Q    Okay, I think I'm fresh out of questions. Thanks very much.

A    Could I have --

THE COURT:  Then we will take a 15-minute break and then continue on cross-examination.  Thank you.

(Recess at 10:40 a.m. until 10:58 a.m.)

THE COURT:  Begin the cross-examination.

MR. WISEMAN:  Your Honor, before that, if I might, could I move in the exhibits that I have marked or used during the examination?

THE COURT:  Exhibits number?

MR. WISEMAN:  That would be 33, 136, 155, 159, 160, 161, and I believe 34 and 35, and Your Honor --

THE COURT:  I think I admitted 36.

MR. WISEMAN:  That was the CV, that's right.

THE COURT:  Right.

MR. WISEMAN:  Okay.

THE COURT:  Any objections?

MR. ROBERTS:  No objections, Your Honor.

THE COURT:  Those exhibits are admitted.

(Defendant's Exhibits P33, P34, P35, P136, P155, P159, P160 and P161 admitted into evidence)

THE COURT:  Would you give those to Ms. Scotch, please?

MR. ROBERTS:  And, Your Honor, may I, I would like to utilize them.

THE COURT:  Yes, fine.

MR. ROBERTS:  Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q   Good morning, Dr. Swanson.  I'm Tony Roberts.  I represent the United States.  And I wanted to start with the last series of questions that Mr. Wiseman was asking you because he asked you a question very specifically, if it's difficult to assess a person who has things such as narcissism and borderline personality disorders, and you kind of bounced around the question, you didn't actually answer it.

          MR. WISEMAN:  Objection, Your Honor.

BY MR. ROBERTS:

Q   And so --

          THE COURT:  What's the legal objection?

          MR. WISEMAN:  It's a conclusion and I think it's --

          THE COURT:  Overruled.

BY MR. ROBERTS:

Q   I just wanted, I mean it seemed like to me when you got to the end, when you said he still had deficits, was your answer that even though he still has deficits it is difficult to assess someone as complicated or maybe, or somebody that has the personality-type disorders that Alfred Bourgeois has?

A   I think I understood his question different than the way you are asking.  I thought we were --

Q   Okay.  Well, I wrote, I wrote down --

A    I thought the question --

        THE COURT:  Wait a minute.

        THE WITNESS:  This is what I thought, was, is it difficult to assess an adult who might be mentally retarded and have a personality disorder.  I thought that was the question.

BY MR. ROBERTS:

Q    Okay.  Well, let me ask you straight.

A    Okay, ask me your way, please.

        THE COURT:  I'm sorry?

        THE WITNESS:  I asked, if he will ask me the question the way he wants it answered.

        THE COURT:  Okay, this is the way this goes.

        THE WITNESS:  Okay.

        THE COURT:  He asks the questions, you answer.

        THE WITNESS:  Okay.

        THE COURT:  Okay.  There's nothing in between.

        THE WITNESS:  Okay.

        THE COURT:  Okay?  Go ahead.

BY MR. ROBERTS:

Q    It is correct, is it not, to say that in this particular individual and the personality disorders that he has and the deficits that you claim to have observed that it is difficult even for an expert of your caliber to make this assessment?

A    I think it would be a difficult assessment, yes.

Q    Okay.  And so in a trial setting, before we go to a trial, if a trial team goes out and finds a psychologist and obtains a psychiatrist to conduct tests and those psychiatrists or psychologists give advice to the defense counsel on a very difficult assessment, wouldn't it be logical for the defense counsel to rely upon the advice of those experts?

A    Yes.

Q    Particularly when you are dealing with a very difficult assessment?

A    Yes.

Q    Okay.  I want to briefly touch on your report in June. On June 8th of 2009 is when your report is signed.  It's a three-page report, it has seven paragraphs, and I believe -- actually I'm not sure that it was offered.  I'm not sure it was offered into evidence yet but the, you did complete a report in June of 2009?

A    Yes.  Could I have a copy of that report to look at, please?  I didn't bring any of my report.  I don't think I brought that one with me, or not to the stand.

    (Off the record discussion at counsel table)

        MR. ROBERTS:  May I approach the bench, Judge?

        THE COURT:  Yes, sir.

        MR. ROBERTS:  Sorry, Your Honor, if I might have just a moment.  The defense has decided not to offer this so

the United States is going to offer this.

THE COURT:  All right.

(Off the record discussion at counsel table)

MR. ROBERTS:  May I approach the witness, Your Honor?

THE COURT:  Yes.  Well, just, look, this is the way this works, put it on the overhead document camera and move on, please.

BY MR. ROBERTS:

Q    Dr. Swanson, I have what I've marked as Government Exhibit 175.

A    And could I see the second page?

Q    Yes.

A    I had that in front of me but I lost the second page when we were shuffling them, because that goes 1 through 6 and the third page starts maybe with number 7?  Yes, and that's --

Q    The second page that I have starts with 3 --

A    Okay.  I don't have -- okay.

Q    Paragraphs 3, 4, 5 and 6.

A    And the last one goes on to 7 --

Q    And the last paragraph --

A    -- and signed 6-8-09, yes.

Q    Okay.

A    I may have to ask to see page 2 from time to time.  I have page 1 and 2 in front of me.

Q    I understand.  But you do recognize this document?

A    Yes.

Q    What is this document?

A    Okay.  This was an initial declaration that I wrote after I had done my initial assessment which was in the spring of 2009.  I had looked at some records, I had talked to Ms. Franks at that time, and --

Q    Okay.  I have one question with regard to this document. Did you make an assessment under adaptive functioning --

A    Could you --

Q    -- in regard to Mr. Bourgeois?

A    Would you, would you put 2 up there?  I hadn't made an adaptive assessment with Ms. Frank.

Q    Well, let me, let me draw your attention to page 3.

A    Okay, I've got that one.

Q    Which is the end of paragraph 6.  Did you make, my question is not what you -- my question is did you make a mental retardation assessment based on --

A    I made a mental retardation assessment on what I had available at that time, yes.

        MR. ROBERTS:  Your Honor, we would move this exhibit into evidence, offer it.

        MR. WISEMAN:  No objection, Your Honor.

        THE COURT:  And it is number what?

        MR. ROBERTS:  175, Your Honor.

THE COURT:  175.  And that is labeled Defendant's 175?

MR. ROBERTS:  It's --

MR. ROBERTS:  Or respondent's, I'm sorry, or movant's 175, petitioner?

MR. WISEMAN:  No, it's the Government's exhibit.

THE COURT:  Government's Exhibit 175 is admitted.

(Government's Exhibit 175 admitted into evidence)

MR. ROBERTS:  Yes, Your Honor, thank you.

BY MR. ROBERTS:

Q    Now, Dr. Swanson, as I said, as we noted, this is an assessment that you made in June of 2009 and you have already, at that point in time you have found that Mr. Bourgeois is an individual with mental retardation?

A    At that point in time, based on the information I had there, I had found that, yes.  I subsequently did other evaluations as well.

Q    We will come back to that in a few minutes, but the -- now, were you aware, and I know that you testified in Louisiana in June of 2010, this year, in a case of Joseph Smith?

A    Yes.

Q    And you went through a lot of, in that case, your adaptive functioning assessment was challenged pretty hard by the United States in that case, wasn't it?

A    Yes, it was.

Q    In fact, you had spoken to three family members of the defendant Joseph Smith and they challenged your methodology, really, and how you did your adaptive functioning in that, didn't they?

A    Yes.  They challenged how I had marked the protocols, yes.

Q    Okay.  And that was in June of 2010.  Were, you are aware, are you not, that Dr. Moore had gone out to New Orleans to try to locate family members and conduct an adaptive functioning of certain individuals in July of this year?

A    I knew he was there during the summer.

Q    Okay.  In fact, the, you are aware that the defense showed up when he went to interview Michelle Armont, are you not?

A    I was told that.

Q    Okay.  And there was a list of people that the United States were, that Dr. Moore was going to contact.  Do you know who those individuals were?

A    That Dr. Moore was going to contact?

Q    Yes.

A    No, I --

Q    That Dr. Moore was going to interview.

A    No.

Q    So you weren't aware that Dr. Moore was, had planned on interviewing the exact same people that are listed on page 3 of your, of Plaintiff Exhibit 136, the interviews that you completed within the last three months?

A    No, but I'm not surprised because those are the people that live in that community.  He interviewed other folks as well that I didn't interview.

Q    And then in August, and I will show you again Petitioner's Exhibit 33, that is a supplemental report, your supplemental report dated August 12th, 2010.

A    Yes.

Q    This year.

A    Yes.

Q    In which you, on page 2, claim, in the paragraph, let's see, it's under paragraph, section 2 under adaptive deficits, it's the one, fourth paragraph down where you list a bunch of individuals that you spoke to as informants.

A    Yes.

Q    And again, prior to that you had already made an assessment of mental retardation on behalf of Alfred Bourgeois?

A    Well, I had made an assessment based on what I had, but I had asked to see more people.  That was all that was --

Q    But you didn't see more people at that time, did you?

A    There wasn't anybody else for me to see at that

particular point in time.

Q   You spoke with Ms. Frank.

A   Uh-huh.

Q   You did an adaptive functioning assessment by giving her the ABAS and the Vineland?

A   And I interviewed her as well.

Q   And you interviewed her, and you made your assessment that Alfred Bourgeois was mentally retarded in 2009 based on Beverly Frank's information, and other information you saw but based on Beverly Frank's information, that's where you got your adaptive functioning assessment?

A   Well, that and the adaptive functioning information that I got from records that I looked through.

Q   As I have mentioned, I have, I know that you were, you testified in June 2010 in Louisiana.  I know also that you have testified several times in various courts and you were involved in a case in Mississippi involving William Lee Wiley?

A   Yes.

Q   And so we know you are an expert in this area.  What I am curious about is, is there a national organization for psychologists?

A   Yes, American Psychological Association, and then every state has its local chapter as well.

Q   But you are not a member of the American Psychological

Association?

A    I'm not a member of the national one.  I am a member of my own state one.

Q    Okay.  And then you were, the organization of AAMR, that's what you have referenced a couple times, American Association on Mental Retardation, that was, you said that's the name of the organization that -- what was its role, why did it come into being?

A    It's a collection of professionals that work with people with mental retardation, and it came into being to advocate for better diagnosis, better treatment, and to do research in the field to improve the treatment for folks with --

Q    So you would agree it is a kind of an advocacy, it fulfills an advocacy role?

A    It fulfills an advocacy role, yes.

Q    And in that role it filed an amicus brief.  I guess actually before it filed the amicus brief it changed its name, the name was changed, is that correct?

A    It --

Q    They changed it to an AAIDD?

A    I think it's had three or four names through its hundred plus years of existence and the most recent one is AAIDD.

Q    So they moved away from the mental retardation label?  Is that fine, can we use the word label?

A    That's correct.

Q   Okay.  Moved away from the concept of mental retardation as a label and they are adopting a new or advocating for a new label or terminology, and what is that new terminology that they are trying to apply?

A   It's the American Association for Individuals with Developmental Disabilities.

Q   Okay.

A   And most professional organizations --

Q   Let me just stop you there for a minute because you said individual.  Is it actually, is that the name?

A   Intellectual development.

Q   Intellectual.

A   Yeah.

Q   I think several times in your testimony you said individual and development.  Did you mean every time you mentioned that that it was actually intellectual and developmental?  You were talking about the same AAIDD --

A   Yes, intellectual.

Q   -- throughout your testimony, right?

A   Yes, yes.

Q   Okay.  There's not some other organization called the American Association for Individual and Developmental Disabilities, is there?

A   No, and, but I think I frequently referenced individuals with developmental disabilities as well.

Q    Okay.  So the goal or the advocacy is moving towards renaming this to Intellectual and Developmental Disabilities?

A    Well, in an international code it has already been renamed and that is the term that's used in Europe and other countries, and the American Psychological Association has also renamed its division that a way, and I've recently seen a proposal that's being put forth to the Federal Register that Social Security and the Government is also looking at changing the name to be in accordance with all the different codes.

Q    Okay.  And in this advocacy role for the AAIDD, are you aware that they've filed an amicus brief in the Atkins case?

A    Yes.

Q    Okay.  Do you know what the position of the association was?

A    The association was against the death penalty for individuals with mental retardation.

Q    Okay.  How much of your time do you think in the last -- well, how much of your professional time do you deal with being, testifying in criminal cases now?

A    I would estimate ten percent, just off the top of my head.

Q    Okay.  I think earlier you had testified that you thought maybe you had been involved in about 15 cases where you had been asked to come in and do an Atkins type assessment for a

defendant, but --

A   Yeah, I think I've gone to court approximately 15 times.

Q   Okay.  In June 2010, the Joseph Smith case, if you said that you had been, I mean if you said you had been in about 18 or 19 hearings, do you think that would be more accurate?

A   It might be.

Q   Okay.  And you also said earlier that every time you have been called in to make an assessment on a defendant you have found that the defendant is mentally retarded except for one case.

A   Every time I've gone to court.  In those cases that I mentioned, yes.

Q   Okay.  So if it was 19 times then you have got, 18 out of those 19 you have made a finding that the defendant is mentally retarded?

A   That's correct.

Q   And you are doing so in all of those cases in the same way that you approached your assessment in this case?

A   I would say so.  You know, since Atkins came out it's been an evolving science and there has been a lot of research and a lot of guidelines written, and I tried to follow the guidelines that were in existence at that time.  In that June case you mentioned I think I did the interviews in early 2006, which was prior to some of the latest manuals coming out in the ABAS and Vineland, and so therefore when I

administered that I didn't have those manuals, you know, those guidelines available, and that was some of the discussion we were having in that hearing. They have come out, they came out in 2008.

Q   Okay. Let's talk just for a minute about this standard, the mental retardation standard. I think you addressed this on direct but I just want to cover it real quickly. Mental, the diagnosis, or the assessment of someone who is mentally retarded is not just based on IQ scores, is that correct?

A   That's correct.

Q   Would you also agree, though, that some people just don't do well on tests?

A   Yes.

Q   Okay. Adaptive functioning is an important part of this analysis, is it not?

A   Of a diagnosis of mental retardation, yes.

Q   Yes, okay. If someone scored, just hypothetically, if somebody scored a 50 on an IQ test, that would, that would still not qualify them as mentally retarded unless they are also significantly impaired in the adaptive functioning, is that correct?

A   That's correct.

Q   Okay. And, again, it has to be onset by the age of 18, so that's also an important part of the analysis, right?

A   That's correct.

Q    So even if someone scored 50 and they, there was evidence that they were significantly impaired in the adaptive functioning as an adult, unless there is some evidence that this onset before the age of 18, they would not be diagnosed as mentally retarded?

A    There would have to be evidence of onset prior to the age of 18.

Q    Okay.

THE COURT:  Prior to the age of what?

THE WITNESS:  Prior to the age of 18.

THE COURT:  Eighteen, thank you.

BY MR. ROBERTS:

Q    In this case obviously there was a WAIS-IV done, a WAIS-R done by Dr. Weiner, and do you remember what year he did the, that evaluation?

A    I'm fairly certain it's 2004.

Q    You are correct, 2004.  What year was the WAIS-III brought in, what year was it?

A    I'm desperately turning, but I think it was 2007.

Q    You think that the WAIS-III --

A    Oh --

Q    -- became the valid test in 2007?

A    I think 2007 was --

Q    You are guessing what question I am going to ask because you are thinking I am asking about Dr. Gelbort's test.

A   Oh, okay, I'm sorry.

THE COURT:  Okay, wait a minute.  Let her finish answering the question.  So go ahead, thank you.

THE WITNESS:  I'm going to let you restate the question --

MR. ROBERTS:  Okay, because I wasn't --

THE WITNESS:  -- because I got confused there.

BY MR. ROBERTS:

Q   Yes.  My question didn't deal with Dr. Gelbort's testing yet.

A   Okay.

Q   I said Dr. Weiner gave a test in 2004 and it was the WAIS-R.

A   Okay.

Q   What year did the WAIS-III become the normative test, when should he?  When did the WAIS-III come in and the WAIS-R was no longer supposed to be given?

A   As I remember, the WAIS-III was published and available for use in 1997.

Q   '97.

A   Yes.

Q   And Dr. Weiner gave the WAIS-R in 2004.

A   That's correct.

Q   Is that something you would have done?

A   No, I wouldn't have done that.  But I don't do neuropsych

testing either, I primarily do mental retardation testing, and I want the most current test available.

Q   You said in your direct examination that if you had had the information that Dr. Weiner had with regard to the score on the WAIS-R that you would have suggested to the defense counsel that it should pursue mental retardation and do more testing.  Is that an accurate summary of what you said?

A   I thought what I had said was that I felt there was justification to pursue an Atkins claim, to continue an evaluation to see if this individual did qualify for a diagnosis of mental retardation.  Low IQ scores are good indications.

Q   Have you ever advised a defense counsel that -- you said there was one case that you decided that wasn't mentally retarded.  Can you, do you recall the name of that case?

A   Willie Tart.

Q   And did you advise the defense counsel that there wasn't a mental retardation issue there?

A   It's a very complicated case, and once again I was only there for the adaptive component of that, but there's other, there's other problems with brain injury and epileptic seizures, et cetera.  I don't want to go into it but --

Q   Now, Dr. Gelbort has already told us a lot about that, so.

A   Yeah.

Q   But one question I have is that if you give that advice to defense counsel, wouldn't you as the expert expect them to rely upon your expertise?

A   Yeah.  In this particular case there is clear evidence he scored in the mental retardation range prior to the age of 18 due to testing that was done.

Q   Which case are you talking about?

A   Excuse me?  The Willie Tart --

Q   You said this particular?

A   The Willie Tart case.

Q   Oh, thank you, okay.

A   And so really I'm just trying to explain, I'm only in one phase of that, and so that's the only case that's listed that I actually went to court on.

Q   Okay.  Do you know what the American Psychological Association says in their ethical guidance with regard to giving or to using the most current test?

A   Yes, you --

Q   What do they say?

A   You should always use the most current test.

THE COURT:  Should always use the what?

THE WITNESS:  The, you should try to use the most current test that --

THE COURT:  Okay, thank you.

THE WITNESS:  -- you need for that particular

assessment, what's recommended in the field.

BY MR. ROBERTS:

Q    And in 2004 that would have been the WAIS-III?

A    That's correct.

Q    You have done a lot of evaluations, that's clear from your CV, and I think you told us earlier most of what you do is clinical, you are really not in the forensic area that often?

A    That's correct.

Q    Okay.  And in doing evaluations on people, like maybe when we were talking gaining information from raters, what kind of things do you do to seek, to assure that you are getting objective and neutral information from the people that you have decided are raters on the adaptive functioning?

A    On a standardized assessment is what we are talking about here?

Q    I am just curious about your approach.

A    Okay.

Q    What do you do?

A    If I'm doing a standardized assessment, like I say, for adaptive behavior where what you are really doing is an interview, with the Vineland, as I mentioned, you are doing a semi-structured interview, and you are trained to give this in such a way that you can revisit items going forward and backward, and so if a person says someone can't do something

and then later on when you're in a conversation it appears they can, you get to go back and challenge that, give additional probes, et cetera, so in that particular case you have that option.  The way the ABAS-II is set up, it's set up for the person to indicate by checking off things that they are unsure about, and when you finish administrating it you can sit down and say, well, I notice you didn't know a lot about this area or that area and can you explain to me why you were uncertain on this item or another item.

Q   Okay.  You would agree, though, that people closest to a defendant or somebody that's either about to be sentenced or is already sentenced to death, you would agree that they have a vested interest in the diagnosis of mental retardation?

A   Whenever I am doing an adaptive assessment for an eligibility determination or an Atkins, whoever I am interviewing usually has a vested interest, be it a parent who is interested in their child getting Social Security or someone who is interested in getting services, an apartment, entering a community home, there is a vested interest to show that that person does well, so that's why you need to be very careful when you give them.  I give a lot of Vinelands really, though, for treatment as well.  I have to give them every year on the people that I provide treatment for.

Q   I guess I was kind of asking more generally, and that is that people that are close to a defendant have vested

interests in the outcome of the diagnosis?

A   Yes.

Q   Okay.  You mentioned that you viewed the videotapings of, by Dr. Moore and Dr. Price, and looking at your information here it looks like you say that you have viewed a lot of the evidence in this case.  Did you review the extensive handwritings that Alfred Bourgeois wrote and that were offered in his trial?

A   Yes.  As I remember, the Government provided some that I reviewed and there were other ones that I reviewed as well.  I don't know that, it seems like there were other ones at other places as well.

Q   Did --

A   There was numerous documentations of things he's written and then there were things that he had written on that were in his briefcase I think.

Q   And you were aware that he wrote a number of things while he was in, while he was being confined before trial and during trial?

A   Yes.

Q   And you read those?

A   Yes.  I think I read those, yes.

Q   To your knowledge, was anybody around to help him write those or help him figure out the thought process?

A   Not that I'm aware of, no.

Q    Did you read all the transcripts in the case?

A    I read, I don't know that I read every transcript in this case but I read a lot of transcripts.  I read a lot of testimony by different witnesses and there was like four or five days of testimony of different witnesses in the penalty phase that I read.

Q    There's one I'm particularly interested in knowing whether you read and that is on March the 24th when Alfred Bourgeois approached the Judge at the bench and discussed his concerns and wanted to speak to the jury.  Do you remember reading that one?

A    If that's in that same stage there is a long statement in there where he makes a statement, yes, I remember.

Q    Well --

          THE COURT:  Well, not the one to the jury but the one to me.

          THE WITNESS:  I don't recall.  Can I see it to see if it's something I read or not?

BY MR. ROBERTS:

Q    Sure, I can give you a copy of it so --

A    I remember some testimony between where the Judge talks to him and then there is a discussion and he also speaks to the jury, and I don't know if that's the same one or not.

Q    Okay.  Well, generally I was just trying to see if you had read that and --

A    Does that sound like the same one?

Q    It's close.  But what my question really goes toward is that you said that he has a hard time engaging in conversations in your supplemental report, that he has a hard time being a part of a conversation, and so I am just curious whether you observed him in a conversation with the Judge during that particular part of the trial?

A    I did read, I think, I'm pretty certain that I read that testimony.

Q    And he was very capable of discussing with the Judge what he wanted to do and listening to Judge Jack and what she said that, you know, and her questions back to him, wasn't he?

A    Yes, and that's kind of like expressive language and that's more of his strength in communication, yes.

Q    Okay.  Did you also listen to telephone calls that were recorded from jail that went to certain members of his family?

A    I didn't listen to the phone calls but I read numerous phone calls to a Mr. Banks, there were some to his brother Lloyd, there were some to some cousins, there were some to --

Q    Do you remember the one to Uncle --

A    -- Robin Bourgeois' uncle.

Q    Uncle Dumas?

A    Yes, yes.

Q    You only read the transcript, you didn't actually listen

to the conversation?

A    I don't think I had that conversation, no.

Q    Would it be help-, I mean wouldn't it be helpful when you are making an assessment of someone to listen to their voice inflection and how they are interacting with the individual?

A    I guess so.  I didn't get that.  I didn't -- did you provide it, did I overlook it?

Q    I am just asking if it would help, if it would be more helpful to hear the conversation rather than just reading it off a transcript.  I mean you are making a mental retardation assessment and you are helping, you are trying to help the Court understand whether Alfred Bourgeois is mentally retarded, and I'm asking you if you, this was a piece of evidence, did you get a chance to listen to it?

A    I did not listen to it.

Q    Okay.  And so you didn't listen to the one with Nate Banks either?

A    No, I read that one.

Q    Did you look over all the testimony about how he ran his business, his trucking business?

A    Yes.

Q    Did you --

A    I think I did.

Q    Do you remember when he was talking to Dr. Moore on the tape about how he would perceive of a good opportunity to

maybe open a loading opportunity or maybe start another business in different areas and how he thought that would be a good financial opportunity and a good business?  Did you hear him discussing that with Dr. Moore?

A   I heard him discussing that.

Q   Doesn't that show a deliberative process, an understanding of business acumen?  I mean doesn't that tell us that he has some ability to comprehend his surroundings in a working environment?

A   I, you know, I listened to that and he could describe it. He talked about things he was, he could, he wanted to do or he could do.  I don't know if he could do those things.  But I think what you are talking about is his ability to communicate the thought?

Q   Part of that, yes.

A   Yes, I think he demonstrated the ability to communicate the thought.

Q   I think also his ability to understand the basic concepts of business and how a business opportunity can present itself and how someone could go and grab hold of that.

A   Yes.

Q   The, how, just offhand, how quickly do you think he would be able to do a simple two-digit math problem?

A   Well, he did simple two-digit math problems for me.  When he's doing them on paper he does a little better because they

are there.  They are much harder for him to do in his brain. So if you asked to subtract 20, 17 from 25, it takes him much longer if you give him the same problem to work on.  And if you look at my Woodcock-Johnson he actually did some for me.

Q   Let me ask you about this.  This is Petitioner's Exhibit 159, the statement that he asked to write.  Does that look like a statement that somebody that only has a third grade ability could write?

A   (Noise)  I'm so sorry, excuse me.

THE COURT:  Please.  Okay, the reason that we are so careful is that goes directly into her ears.

THE WITNESS:  I am so sorry.

THE COURT:  And it's very painful on her hearing.

THE WITNESS:  Okay.  I'm just going to put my glasses over here.

THE COURT:  So be especially careful, please.

THE WITNESS:  And so they're just out of the way.  I think that's consistent with his abilities, and I think I tried to point out that overall he has some strengths.  His spelling ability is much higher than that.  So, you know, you're judging this.  Overall he functions at about the third or fourth grade level, but he has some other unique strengths in his ability.  His spelling is much better.

BY MR. ROBERTS:

Q   So in answer to my question, this would be above and

beyond a third grade ability to write, correct?

A    There are words in here that would be difficult for a third grader to know, but I think that the overall grammar and syntax of it would be similar to someone who is third grade.

Q    Okay.  Again, kind of going to the aspect of that this assessment is difficult in this scenario, right?  You also mentioned this one sentence.  Did the -- I was just curious, is that one minute and 16 seconds?

A    Yeah, one --

Q    That's --

A    One --

Q    That's listed.  I'm sorry, this is Petitioner's Exhibit 161 that was presented to you and he has got one sentence here, "I am going to the gym and work out in about an hour," and you said it took him one minute and 16 seconds.

A    Yeah, I had started timing it when he started and, writing it, and when he finished.

THE COURT:  Now, those are the things that can be faked.

THE WITNESS:  I guess they could be faked, that's right.  But it was consistent with what I saw on the Woodcock as well.

BY MR. ROBERTS:

Q    Did the timing --

THE COURT:  Well, the reason I, the reason I mention that is that there was a really interesting thing when Dr. Price was giving him some tests and it was very, you know, he was to circle, read through and circle, and then Dr. Price had to go to the bathroom, so he went outside and Mr. Bourgeois is taking the test and he is flying through it. Dr. Price comes back in and it's like in fourth-time slow motion that he begins, he continues to take the test.  I don't know if you-all noticed that on the test or not, but those are things that leapt out to me when I was looking through the tapes.

BY MR. ROBERTS:

Q   Dr. Swanson, did you see that?

A   I remember him going to the bathroom.  I don't know that I recall that or not, no.

THE COURT:  I was so surprised how quickly he was circling those answers and then when Dr. Price came back in, I mean he slowed down like at least four times --

THE WITNESS:  Uh-huh.

THE COURT:  -- the speed.  It was very, very striking.

BY MR. ROBERTS:

Q   You didn't make that observation, Dr. Swanson?

A   I didn't make that observation, no.

Q   You did watch the video?

A    Yeah, I watched the video.

Q    How about while he was talking with Dr. Moore, there were several times that he talked about how he had learned things from other people, do you remember that?

A    I think so, yes.

Q    And I think you have said that he has a hard time learning in a social setting, is that right?

A    I think he does best -- there's ways that you can kind of guarantee more success with him and I think, and I didn't get a chance to address this and possibly you could address this with Mr. Henry, he learns best when he can work with somebody and watch what they do.  He learns best from a visual model.

Q    Okay.  Such as when he was learning how to cook these wild animals that he was talking about?

A    Yes.

Q    Okay.  But he also said that he had to mow the yard and keep up with the yard at the house, didn't he?

A    Yes, I heard him say that.

Q    And remember when Dr. Moore mentioned that he lived in North Carolina and you remember Alfred Bourgeois being able to quickly recall that North Carolina had hills and he remembered Raleigh and do you remember that as well?

A    Yes, I do remember that.

Q    Does that kind of go along with his ability to recall things?

A    Yes.

Q    You said you spoke to Lloyd on the telephone?

A    Yes.

Q    And do you remember what Lloyd's relationship is to Alfred Bourgeois?

A    He's his older brother.

Q    Okay.

A    And it would be his half-brother.  They have different fathers, same mother.

Q    And --

THE COURT:  And that's Lloyd Ferdinand?

MR. ROBERTS:  Lloyd Ferdinand.

THE COURT:  Okay.

BY MR. ROBERTS:

Q    Do you know what Lloyd Ferdinand says about whether Alfred Bourgeois was slow or not slow as a child?

A    I know what's, there are some declarations where he addressed that with me in the declarations, and the way he explained it to me he moved from the home, he also moved from the home, he, Claudia and Mr. Bourgeois all left at an early age, a child age, and lived with other relatives, so he didn't have any personal knowledge in the home of Mr. Bourgeois other than what he saw in The Bend, because they all lived in different houses from the mom.

Q    So you are saying that Lloyd had no personal knowledge

and had no ability to say whether or not Alfred Bourgeois was slow or not slow but Beverly Franks did?

A    Well, Beverly Franks was frequently in the home where he lived and Mr. Ferdinand moved in with an uncle and an aunt.

THE COURT:  Well, the reason he's asking you that is that it's so ridiculous that you rely, frankly, maybe, seems to be ridiculous to rely on Ms. Frank when Lloyd Ferdinand and Claudia and Ms. Frank all lived in different houses than Mr. Bourgeois and Mr. Bourgeois said frequently he looked up to Mr. Ferdinand and saw him frequently as well as Claudia as well as these other people, and so you picked one to rely on and not the others, so that's the point he's making.

THE WITNESS:  Okay.  I --

THE COURT:  Is that right, Mr. Roberts?

MR. ROBERTS:  I was going to make that later, Your Honor, but, in my closing argument.

THE COURT:  Move on.

THE WITNESS:  To clarify, I never could get a face-to-face interview with Mr. Ferdinand, even though I asked frequently and we tried to arrange it, and I got brief phone calls because he kept hanging up and then I had to --

THE COURT:  It's a simple question, did you talk to him about it?

THE WITNESS:  I don't think so.

THE COURT:  Thank you.

THE WITNESS:  I don't we ever had a conversation long enough, no.

THE COURT:  Move on, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q   We'll move to the, to some of these scoring.  You mentioned in the digit symbol, you said it was like a copying.  Isn't the digit symbol more of a learning and kind of how quickly somebody can do the task more than just copying?

A   Yes, but by copying I meant the symbols are at the top of the column and so they are still there, and the idea is you learn the task and you can look at the top and put it to the bottom, so the immediate memory, it's always there, you don't have to put it in your head and remember it in your head without having knowledge of the code.  The code is always present in front of you.

Q   This is Petitioner's Exhibit 155.  The WAIS-R that Dr. Weiner gave, he scored a 76 on the verbal and on the WAIS-III a 67.  That's an astounding drop in the verbal IQ, isn't it?

A   It's ten points, approximately, nine points.  It's statistically significant at 15, I would think.

Q   So you don't think it's significant, a significant drop unless it's 15 points?

A    Well, within the test one standard deviation is 15, but you are looking at two different tests which aren't necessarily the same items and tests, two different tests normed at different times.  So if I was looking at a WAIS-III and a WAIS-III, I would probably give it a little more significance than looking at a WAIS-R and a WAIS-III, is all I was saying.

Q    Isn't it more significant since he also went up two points on the performance IQ?

A    I think I got asked that before.  I didn't see the, I didn't find it statistically significant, no.

Q    If I understand right and this term significant deficit with regard to these two standard deviations below the mean, does that basically mean that like a score of 70 on a standardized test, a 70 would fall at two standard deviations?

A    If the standard deviation is 15 and the mean is 100, exactly two standard deviations would be a 70.

Q    Okay.  And is that, is that the case with regard to the, in the Woodcock where you scored the, you referenced one and I'm looking for their, the -- this is my copy of it.  I'm not finding their exhibit exactly.  Let me just show you my copy of this, the score report.  Does that look, does that look like the test we were talking about earlier?

A    Yes.

Q    Okay.  I've got a couple of areas highlighted there because of, he did poorly on broad math but he did well on calculation, 82.  He did poor on story recall and poor on story recall delay, and I'm looking at these numbers over here.  What's the significance of the SS again?

A    That's the standard score.

Q    Okay.

A    That he obtained on that test, compared to other individuals that were in his age range of 45.

Q    And on a standard score, again, we are looking at two deviations.  Wouldn't we expect, if one were analyzing this, that the score would be around 70 if it was a standard deviation and he was scoring in the, in a deficient way on these?

A    Not necessarily, no.  There are people with mild retardation that would score in that range.

Q    Okay.  But in here, the oral language he gets 80, the listening comp he's got an 85, and he's got a number of 80s, and he's got a 68 there but then he gets 92 on the broad written language, 85, 70 on the brief math but 82 and 85 on the math calc skills and written expression.  He's got a lot of 80s on there, doesn't he?

A    That's correct.

Q    And then even down here he's got several that are 89, 99 on the spelling.  You said he was really good in spelling?

A    That was his significant strength I thought on that test.

Q    And then even on the letter/word identification he's got a 90.

A    Yes.  That's his significant strength in reading, yes.

Q    So he actually scored really well in a lot of areas, didn't he?

A    Yes.

Q    I want to go back for a minute to what makes a good informant.  You talked about this retrospective assessment of adaptive functioning, and in June of 2010 you testified about that a lot, didn't you?

A    Yes.

Q    There were some statements that you were asked about with regard to a, I believe it was a, the publication was Applied Neuropsychology.  Do you recall a, well, it was a Dr. Tassy that they had --

A    Okay.

Q    -- that was being referenced and they, you were asked to agree with or disagree with several quotes.  Do you remember that?

A    Dr. Tassy published an article in a neuropsych journal in January of 2009, I think.

Q    Okay.

A    And it specifically addresses adaptive behavior in Atkins cases.

Q   Okay.  And during that trial you were specifically asked
to either agree with or disagree with several statements that
were put up on the, I guess an overhead where, or maybe you
were shown statements.  What I want to do is read the
statement and ask you if you agree with it or not.

A   Okay.

Q   "The adaptive functioning tests were not normed using
retrospective memories of adaptive behavior."

A   That's true, I agree with that.

Q   "The reliability and validity of the adaptive functioning
measures is unknown."

A   The reliability.  In retrospective, yes.

Q   In retrospective?

A   In retrospective, yes.

Q   Sorry.  In context --

A   I agree with that.

Q   In context, everything that I am going to read is with
regard to retrospective.

A   I agree with that statement.

Q   "Results from a retrospective evaluation should be
interpreted with caution."

A   Yes.

Q   "In the context of a retrospective assessment of adaptive
behavior, the rater must answer questions about how the
defendant functioned at some time in the past, usually around

the time of the crime."

A    Not, I -- that might have been taken out of context.

Q    Okay.

A    I mean, to me it should be about prior to the age of 18 but you might ask, you might want to do an assessment at about the time of the crime because that's the only person, the time that person knew them.  I don't think the article was quite written that way, I think it's, they've taken something out of context there.

Q    In fairness, they did, the next dialog between you and the prosecutor at the time was a discussion that it's only important at the time of the crime if the age is under, 18 or under, and so there was a focus back on this occurring when it would be under the age of 18 or lower.  So let me ask you, let me go on to the next quote, and that is, "The validity of these ratings depends upon the accuracy of the respondent's memory.  This retrospective use of adaptive behavior scales is not the way that the tests were standardized."

A    That's correct.

Q    And so, again, those that are using retrospective assessments have to be very, very cautious about relying too heavily upon them?

A    Not only that, they need to do them exactly the way the authors of the test told them to do them, yes.

Q    In your report in the William Wiley case, you wrote a

detailed report, you discussed this retrospective assessment. If I correctly read that, there were two things that stood out to me. One was you agree that multiple sources are very important, is that correct?

A   Yes.

Q   And then you also agree that you should assess the individual as near the age of 18 as possible.

A   Yes.

Q   But in this case you went to Beverly Frank and you asked her to look back 38 years and assess Alfred Bourgeois at the age of seven.

A   I picked the time she could best answer my questions and remember him clearly.

THE COURT:   What time was that, what are you talking about?

THE WITNESS:   Seven.   Seven.

THE COURT:   She was 13, he was seven?

THE WITNESS:   Yes.

THE COURT:   Okay.

BY MR. ROBERTS:

Q   And you asked her to give an assessment of how he functioned by reflecting back 38 years?

A   Yes.

Q   And you expected her to be able to identify exactly what he was doing when he was seven in order to answer these

questions?

A    Yes.

Q    You said on your direct testimony that you had concerns about the reliability of her.

A    Of --

Q    Of Beverly Frank.

A    -- Ms. Franks?  In testimony I said that today?

Q    You did.

A    Yes, and that was when I was talking about, that's why I give the ABAS-II first to see how clearly, if there were areas she didn't know, because she was in and out of the house and I wanted to be sure she was aware of all the areas. And that's an easy one to give her where she checks off what she doesn't know or she's unsure about, so that's why I administered it.

Q    You said in the William Wiley case that you should use multiple sources.  The AAIDD suggests using more than one rater.

A    Yes.

Q    But you used only one rater in this case.

A    I could only identify one person that could give me a clear time when they knew something well.  The only other one that would have been good was his sister Michelle, his half-sister, and Dr. Moore did her so there was no use doing her over.

Q   And Dr. Moore, so you are aware that Dr. Moore attempted to interview Michelle Armont?

A   Yes.

Q   And that's the one where the defense counsel showed up before, actually was present before the interview even took place?

A   I don't know the con- -- I was aware that the defense counsel was there.

Q   Let me ask you a question.  If you had gone to interview Beverly Frank and an attorney from the other side showed up and wanted to sit in on the interview, would that affect your, would that raise any concerns for you with being able to get a reliable information from the individual?  Is it possible?

A   I wouldn't want the person sitting by me or whatever, I would want her positioned somewhere else, but if she was in the area, could hear what was going on and wasn't interfering, wasn't sitting between us or interfering with the interview, I wouldn't have any concerns with someone listening or being at the other, in another room.

Q   Well, the goal of, the goal of these assessments is to get an objective input from the individual, right?

A   That's correct.

Q   You are not there, hopefully the person is not giving you one side or trying to support one side or the other, correct?

A    That's correct.

Q    I mean if they are there to give you, to support one side of a case, you are not going to get very reliable information, are you?

A    That's correct.  If I had concerns, I just either wouldn't do it or I would ask the person to leave.  I mean, I didn't have those concerns with my person, so I guess --

Q    Because we didn't, the Government didn't show up when you got ready to interview Beverly Franks, right?

A    No.

Q    Okay.

A    But if you had, I would have asked you to sit in the other room, and if you didn't interfere I wouldn't have had any problem with you listening in.

Q    Okay.  Let me ask you a few things.  And I was looking at the defense exhibit, I'm sorry, the Petitioner's Exhibit 35, which is the ABAS, and what I really wanted to do is compare some of Ms. Frank's answers on the Vineland and on the ABAS but what I found out a little bit, a little while ago was that apparently there's some, this is a very thick exhibit and the Vineland, Petitioner's 34, only has two pages, so I believe what I have been told, the Vineland was much thicker than that, is that correct?

A    I thought I furnished the Vineland protocol.

Q    I think you did and so --

MR. WISEMAN:  Your Honor, just for clarity, the Vineland --

MR. ROBERTS:  -- what I was going to clarify --

THE COURT:  I'm sorry, just a moment.

MR. WISEMAN:  The Vineland protocol was provided for the Government in the fatter packet of exhibits, the, I believe it's 35.  Petitioner's 35 has what Mr. Roberts is referring to.

MR. ROBERTS:  That's correct, Your Honor.  I was about to clarify --

MR. WISEMAN:  Dr. Swanson didn't compile the exhibits.

THE COURT:  So what are you interrupting for?

MR. WISEMAN:  To make a point of clarification.

THE COURT:  Okay, thank you.

BY MR. ROBERTS:

Q   And, Dr. Swanson, what I was about to clarify is that I wanted to compare questions from the Vineland and the ABAS but because of the way the exhibit is set up, I was going to hand it to you and ask you to look at the questions, but let me try to do it this way and see if you -- if you can follow me in this, that's fine.  If you need to look at the document I will give it to you, but it's going to be a little more difficult to go back and forth.  You might be able to figure it out better than I can because you deal with these all the

time.

THE COURT: Well, how about we do this question and answer.

MR. ROBERTS: Yes, Your Honor.

BY MR. ROBERTS:

Q   Do you recall, do you -- there are parts in both the ABAS and the Vineland in which Ms. Franks responded inconsistently, is that correct?

A   That's correct.

Q   Okay.  In the ABAS, on page 7, item number 2, she was asked, she responded that Alfred Bourgeois was not able to use a fork to eat solid foods.  So if she answered on the Vineland on page 10, number 23, that he is able to correctly hold a fork, a spoon, fork or knife, that would be inconsistent, wouldn't it?

A   Did she, did I give him a two, a one or a zero on that?

Q   You'll have to --

A   I'm sorry.  Because there's different levels, and so she might have scored he couldn't and when I probed her she might have said he did it sometimes, you know, that's the only reason I ask, so where it may appear a difference, there's two scoring systems between the two that may lead you to think they scored differently.

Q   This is a, I'm going to, I'm going to go -- this is page 3 of the ABAS?

A    Uh-huh.

Q    Question number 6, "Uses sentences with a noun and a verb."  What did Ms. Franks say with regard to Alfred Bourgeois' ability to use sentences with a noun and a verb?

A    On that one there was no conversation, she just circled it herself as she read them, so she didn't say anything at that point.  If I probed that, I probed that on the Vineland, so I would see the Vineland protocol, that's where we had the discussion.  This is the ABAS where she marked it herself.

Q    Well, is it accurate that she said --

A    Oh --

Q    -- she marked it as a zero and said he's not able --

A    That's correct.

Q    -- use sentences with a noun and a verb?

A    That's correct, and if you look at the top it gives you a better explanation of what a zero is.

Q    Okay.  Well, I'm going to show you the Vineland.  This is the page from the Vineland?

A    Uh-huh.

Q    It's page 6, question number 18, "Uses phrases with a noun and a verb, for example, Katy stay, go home, et cetera," she gave him a two.

A    Uh-huh.

Q    What does that mean?

A    That means that in my interview with her she said he

could do that, and when I ask the question I generally give examples like that and we talk about the kind of conversation he has and different kinds of sentences that he could say and she indicated that he could do it.

Q   Well, when you get inaccurate or inconsistent answers on these tests like that, I mean doesn't that start to make you wonder about the reliability of the person taking the test?

A   I think I testified earlier with the ABAS-II is I don't find that it's a good instrument to give retrospectively because you are trying, I always try to center, look, remember we are talking about the time when he first moved to your grandmother's house, blah, blah, blah, blah, blah, and then we center in on that.  On the ABAS-II they seem to lose track of that to me because they are independently going through, you know, a couple of hundred items.  That's why I said I did the Vineland after I ascertained with the ABAS that she was maintaining that there was no area she didn't have any knowledge of.

Q   Okay.  I guess I can agree that it would have been more reliable to use more than just one rater?

A   I would have preferred to have more than one rater, yes.

Q   Okay.  And we can also, do you also agree that it would be more reliable to use people that knew him across a variety of settings and yet had no vested interest in the outcome, you could use those kind of people?

A    That would have been nice if I could have had a teacher or someone that would have known him prior to the age of 18, yes, that would have been great.

Q    Well, not just nice but more reliable, wouldn't it?

A    It would have been more reliable.

Q    And it would have been helpful to have ratings based on more recent contact with Alfred Bourgeois, too, wouldn't it?

A    Well, yeah.  More recent contact prior to the offense, yes.

Q    And it would have been useful to discuss the, or take these tests or at least utilize someone that might have focused or known him closer to the age of 18, wouldn't it?

A    Yes, but we have Dr. Moore's report because he did Michelle Armont and -

Q    We'll get to --

A    -- he lived with her around the age of 18.

Q    Yeah.  But you didn't do Michelle Armont?

A    I didn't do Michelle Armont.

Q    And you made a mental retardation assessment based on Beverly Frank's information, that's the only rater you used when you made your assessment?

A    Based on a rating and then when I do interviews with people I do follow the protocol and ask similar questions through there, so I also interviewed Ms. Williams but I asked her questions about the time he lived with her, which was

from 16 to about the age of 18.

Q   Okay.

A   Or 20.

Q   I want to address some issues in your supplemental report from August 12.  First, I just want to, I just want to touch on the Flynn Effect for a minute because you put a footnote in your report, note 2, addressing the widely accepted and scientifically valid Flynn Effect.  Do you apply the Flynn Effect in your clinic to patients?

A   I think the way I explained that is I implied within the confidence interval and in the narrative to make certain that whoever I am writing the report for understands the age of the norms on which I am basing this score.

Q   And, but is it accurate to say that most of the associations that touch on the Flynn Effect and, that it's primarily used in a courtroom setting?

A   The term Flynn Effect is primarily used in a courtroom setting I would say.

Q   Okay.  In your report, can you just real quickly for me cover the ten, tell me the ten areas where you say that someone in order to be adaptively deficient, what are the ten areas?

A   The ten areas that you are speaking of are those that were listed in the DSM-IV TR, and that was based on the 1992 definition of AAIDD and that would be communication,

functional academic, self-direction, social skills, leisure,

self-care, home living, community use, health and safety and

work.

Q    Okay.  And in your report you've got the, under the

adaptive deficits you mention the Vineland and the, that you

used on Beverly Frank, and then you have this paragraph that

I referenced earlier where you say you have spoken with

several informants and the people were Claudia Williams,

Michelle Armont, Murray Bourgeois, Carl Henry, Lloyd

Ferdinand, Donald Reese, Gwendolyn Thomas Smith and Fred

Tompkins.  Was your first report insufficient?

A    I think the first report didn't include the information I

had gathered from that second group of people, and I don't

think I had all the records in 2009 that I had available by

August.

Q    Okay.

A    I asked for more records.

Q    And, again, you did this after testifying in June 2010

and after learning that Dr. Moore had gone out and

interviewed people, that's when you went and contacted these

individuals, correct?

A    I did contact them after the June testimony and after

Mr., Dr. Moore was there, yes.

Q    Okay.  At the bottom of the page 2, Petitioner's Exhibit

33, bottom of page 2, there's a statement in here where you

say that, "It is apparent from my interviews of

Mr. Bourgeois' family, friends and co-workers that

Mr. Bourgeois relied on support of others in order to perform

routine daily life activities."  You, do you remember in the

video where he talked about how he had to help Miss Mary

getting in and out of the bathtub?

A   Yes, I do remember that.

Q   Do you remember how he talked about being able to cook

all this wildlife stuff and how he learned how to cook from

her?

A   Yes.

Q   And then he would prepare stuff, and he talked repeatedly

about how he had to help Miss Mary, didn't he?

A   I remember that.

Q   Let's look at the third page of your report, under the

deficits in conceptual domain.  First paragraph, you say,

"Mr. Bourgeois is deficient in his ability to absorb and

understand information."  Do you think, do you think that

someone that can understand the criminal process and advance

their own belief in what kind of defense they should present

has the ability to absorb and understand information?

        MR. WISEMAN:  I'm going to object, Your Honor, on a

legal point.  He is essentially asking the witness if a

person with mental retardation is in and of himself, or in

and of itself not competent to proceed.  I think the law is

clear that a person with mental retardation can be competent to proceed, so therefore the question is legally irrelevant.

MR. ROBERTS:  Your Honor, all I am asking her is whether or not someone that has demonstrated on a record, transcript, his ability to understand the charges he has been presented with and able to articulate how he thinks his counsel should be fighting his case better would fit within the deficiency of the ability to absorb and understand information.

THE COURT:  Go ahead.

THE WITNESS:  Okay.  I think that is one, one example that would fall under there, yes.

BY MR. ROBERTS:

Q   So if he is able to understand that and, understand the criminal process and understand how he wants to proceed in the case, that that would still be deficient, his ability to absorb and understand information?

A   I think we spoke earlier that you may have some strengths and you may have weaknesses.  That doesn't offset the other deficits that he has in that area.

Q   How about the ability to write 16-page letters that contain thoughts about how an individual is upset, about what he believes or perceives his wife and family to be doing to him?  I mean you read the letters that Alfred Bourgeois wrote?

A    Yes.

Q    Are you telling us that in those letters that he demonstrates an inability to absorb and understand information?

A    I think that when he writes those letters it takes him much longer than it does someone else of normal intelligence.

Q    Well, you don't know how long it took him to write those letters.

A    I know how long it takes him to write things for me.

THE COURT:  When you were looking at him.

THE WITNESS:  Yeah, when I'm looking at it I have no idea how long it took him.  I think that's an example, if you want -- would you repeat the question so I can say yes or no, please?

BY MR. ROBERTS:

Q    Well, the question is if you look at the letters that he wrote and the train of thought in the letters and the way he applied the grammar and the concepts that existed in those letters, that doesn't support your conclusion that he's, that he has a, that he is deficient in his ability to absorb and understand information.

A    I think that's an example that does not support my conclusion, yes.

Q    I am on this paragraph where it starts, we are still on page 3, "As is typical of individuals with mild mental

retardation," you mention down at the bottom that you have learned that he was provided answers to some written tests required to obtain a driver's license.  Who did you learn that from?

A    Donald Reese, and he'll be testifying tomorrow.

Q    And what answers was he provided?

A    This is a specific kind of test, it's the truck driver's license test that you have to pass to get an endorsement on your regular driver's license in the state of Louisiana, it's a written test, and there's, if you fail it the first time you get to take the alternate form, and over a period of time these truck drivers had figured out the answers, and so you go in and you flunk it, then you go back the next day and you literally know to mark an A, a B, a C or a D.

THE COURT:  What are you talking about?

THE WITNESS:  It's a written test that was given at that time to get a truck driver's endorsement on your driver's license.

THE COURT:  For the hazardous materials?

THE WITNESS:  Huh?

THE COURT:  For the hazardous materials?

THE WITNESS:  No, it's not the -- there's a different one for the hazardous materials.

THE COURT:  Oh, okay.

THE WITNESS:  But just to drive a large truck at

that time, in the 1980s, you had to take a written test. It's different now, there's different federal regulations that have gone in place. And that's how he got his truck driver endorsement and some of the other people in Schwegmann's. Earlier we, I wasn't supposed to testify to this so that's why that didn't come out earlier. And you could get the information from Mr. Reese.

Q   So Mr. Reese has told you that Alfred Bourgeois was given answers and then was able to pass the driver's license test?

A   That's right.

Q   And Mr. Reese had knowledge of that, according to what he told you?

A   Yes.

Q   Okay. You said that --

THE COURT:  You mean to get a commercial driver's license?  I don't know what you are talking about.

THE WITNESS:  You can get a driver's license in Louisiana and at that time to be, to drive certain types of trucks you had to have an A, B, C or D, you know, endorsement, so you had to go back and take an additional written test on how to drive vehicles that had more than one axle.  For example, you take a test to be a school bus driver but then to drive an 18-wheeler it's a different test, and that's how they did it in the 1980s at that time.  And then later on you were grandfathered in if you had already passed

it at the earlier time when new regulations changed.

THE COURT:  I remember he said he was grandfathered for something.

THE WITNESS:  That's right.

THE COURT:  I thought it was a commercial driver's license.

THE WITNESS:  Now, Mr. Reese also was at the same, they were tandem drivers at the hazardous truck driving place, which is the test you are talking about, and he also had to pass that test that Mr. Bourgeois passed, and he can give you some direct information about that since I think it was decided I wasn't supposed to.

BY MR. ROBERTS:

Q   Well, let me ask you about this, your statement that he has difficulty in understanding and managing money.  You saw his -- have you seen his bank account?

A   Yes.

Q   You saw how he managed his bank account?

A   Yes.

Q   You saw the documents from his briefcase?

A   Yes.

Q   And you listened to him talk to Dr. Moore about the, how he would go about being able to run a business, charge a certain amount and only charge the people that were unloading trucks less so he would make money?

A    Yes.

Q    And so your conclusion that he had difficulty understanding and managing money you say is borne out by your interviews with informants and a review of documents regarding his finances.  Which informants?

A    When I, particularly his brother Lloyd provided him a lot of assistance in financial matters.  He had signed a lease that had put him in considerable debt on this truck that he had.  He had fallen behind on paying on his house.  He owed money on credit cards --

Q    Who is telling you all this information?

A    This was in talking to Lloyd.  And it was also, I thought, apparent in the different testimony that, I mean the different records that I reviewed about how far behind he was.  I also --

Q    So when you say informants here, you are just referring to Lloyd?

A    Not only Lloyd but then I also, and Mr. Henry will be here tomorrow and that's what he does is supervise truck drivers, so I asked him to explain this lease to me and the way as I understand it he signed it, it's, you have to, they take out of your earnings money so he's always running behind.  If he's running late, his gasoline comes out it, the maintenance on the truck, et cetera, so you have to --

Q    I'm not actually asking --

A   -- if you sign one of these you need to be a really good business manager or by the time the time is up you still owe almost the total price of the truck.

MR. ROBERTS:  Your Honor, I'm going to object to non-response, I'm just trying to get the names of --

THE COURT:  Sustained.

MR. ROBERTS:  -- people.

THE WITNESS:  Okay, I'm sorry.

MR. ROBERTS:  So the informants --

THE WITNESS:  So Corey --

THE COURT:  So listen, wait a minute, listen to the question, he's going to ask you a question, pay attention to the question and just answer the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q   When you said the informants, this is borne out by my interview with the informants, you said Lloyd and who else did you talk to?

A   Corey Henry and Donald Reese because of knowledge they had about truck driving and these truck driving leases.

Q   And you say, "A review of documents regarding his finances."  Which documents?

A   Primarily the one about the lease that --

Q   So one document?

A   -- that they showed.  That's the primary one that comes

to mind at this time, yes.  Yes.

Q    On the deficits in practicum domain, you say, "Mr. Bourgeois' history is significant for profound delays in learning new practical skills, for example, co-workers revealed," who are the co-workers?

A    That was Donald Reese and Mr. Tompkins and Mr. Henry.

Q    Then you say he was sheltered at one trucking job by a relative who held a supervisory position.  Who was that relative?

A    That was Mr. Henry.

Q    Next paragraph, you say, "However, friends and family report that even after Alfred started driving a truck he continued," and you talk about him having misjudgments and accidents and tickets.  What friends and family told you that?

A    The mailbox one I think is particularly from Mr. Murray Bourgeois who reported that.  The speeding tickets and those incidents, I think Michelle Armont discussed those with me, Murray Bourgeois discussed those with me, Claudia had knowledge of some of those, and so did Lloyd Ferdinand.

Q    Turn to page 4.  You talk about deficits in the social domain.  You indicate that one of the reasons that you found this was, "He is absolutely unable, absolutely unable to participate in two-way conversations."

        THE COURT:  What do you mean by that?  I talked to

him several times back and forth.

THE WITNESS:  And what I was talking about was --

THE COURT:  And we understood each other I thought extremely well, I have to say.

THE WITNESS:  And if you, you will have family members here and you will have Mr. Reese here and he was an incessant talker who pretty much wouldn't let you interrupt is the way that they described him, and Mr. Reese can tell you information as regard to when they drove a truck together and not only did he talk the whole time he drove, when Mr. Reese would try to lay down he talked again and it was, he didn't really want a two-way conversation, he was mainly imparting his own, his own conversation.  Mr. Bourgeois, Murray Bourgeois pointed out that the family had pretty much learned the best thing to do was just let Alfred talk and not interrupt him and not upset him, so that was kind of like the way they, in a way I think they enabled him within his own family by allowing, by never challenging some of the things that he said.

BY MR. ROBERTS:

Q   So this is the basis for your decision or your conclusion that he has deficits in the social domain?

A   That was one of the things, yes.

Q   Now, Dr. Swanson, you have testified in somewhere between 15 and 19, you have been involved in somewhere between 15 and

19 cases, I don't know, have you testified in every single one of those cases where you have given an opinion, an Atkins hearing type opinion?

A    Yeah, I've only listed the ones that I actually went to court for.  I may have done other assessments but people didn't use my work.

Q    You are an extremely experienced psychologist, you know the process for adaptive functioning, and yet you used one individual under the adaptive functioning and asking her to reflect back on 38 years.  Do you --

        MR. WISEMAN:  Objection, asked and answered and argumentative.

        THE COURT:  Move on.

BY MR. ROBERTS:

Q    Who asked you to go back and do the, your August 12th, 2010 report?

A    I asked to interview more people when I went in the spring of 2009 because there was only one available.  There were actually three or four scheduled but when I went those people were not able to see me due to various things that were happening in their lives, so I asked at that time that more people be found.  And at that time I knew he worked at Schwegmann's and, as I mentioned earlier, I was familiar with Schwegmann's, and I specifically --

        MR. ROBERTS:  Objection, Your Honor, nonresponsive.

THE COURT:  Please listen carefully to what he's asking.

THE WITNESS:  Okay.

THE COURT:  Just repeat the question again and listen to the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q   Who asked you to go back and contact these individuals after July 2010?

A   I asked to interview more people and I was notified that there would be people available but I couldn't see them until after Dr. Moore saw them, we couldn't be there at the same time.

Q   When did you ask that question?

A   When did I ask to see more people?

Q   Yes.

A   I asked to see more people in the spring of 2009.

Q   And you weren't given any more information until sometime after July 2010?

A   As I remember what happened, I asked to see more people, by the time they had gathered people for me to interview Dr. Moore was already scheduled to go and they asked me to wait until after he had had a chance to interview everybody he wanted to see.  I had a hearing, as we are talking about, in June and I was out of the state in January, I mean in July

on vacation, so I wasn't available again until August to go and do these.

Q   So is it your professional opinion that your report from 2009 in this case, your declaration, is sufficient to be an assessment of mental retardation?

A   I didn't intend it to be that way, no.

Q   Okay.

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Yes, sir.

MR. ROBERTS:  We have nothing else at this time, Your Honor.

THE COURT:  Thank you.  We will break for lunch then for, come back at 1:15.

MR. WISEMAN:  Thank you, Your Honor.

(Lunch recess at 12:21 p.m. until 1:06 p.m.)

(Off the record discussion at counsel table)

THE COURT:  Is Mr. Roberts with us today?

MS. BOOTH:  Yes, Your Honor, they are.

THE COURT:  He threw you under the bus, huh?

MS. BOOTH:  Ms. Salinas went out to call to get everybody here.

THE COURT:  Any luck, Ms. Salinas?

MS. SALINAS:  Mr. Roberts is on his way, Your Honor, I am not sure where the other two are.

THE COURT:  Mr. Wiseman, I think you were

redirecting, is that right?

MR. WISEMAN:  Yes.

THE COURT:  Thank you, you may proceed.

MR. WISEMAN:  Okay, thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q    Dr. Swanson, I want to show you the one page of school records we previously marked as, moved in as Exhibit 86, and direct your attention to the part where my finger is.  Do you see independent living there?

A    Yes, I do.

Q    And what grade did he achieve in that?

A    A D.

Q    Okay.  And did you --

THE COURT:  And I have already seen all these.

MR. WISEMAN:  You have.  I just wanted to --

THE COURT:  Right, okay.

MR. WISEMAN:  -- the witness to comment on it.

THE COURT:  Those are the only school records she had to look at.

MR. WISEMAN:  Correct, that's right.

BY MR. WISEMAN:

Q    And did the fact that he scored a D in home living influence your opinion as to his adaptive deficits?

A    I thought it was indicative of adaptive deficits, yes.

Q   Mr. Roberts was asking you about the line in your report about his ability, Mr. Bourgeois' ability to handle money.  I wanted to show you -- he asked you if you saw bank accounts, do you recall that?

A   Yes.

Q   I'd like to display for you, if I could, what has been previously marked as Defendant's 59 which is a set of financial records, and it's a large document, it's got 71 pages.  Does this look like the materials that you reviewed?

A   Yes, it does.

Q   Okay.  I am going to ask you some questions about these particular items.  On the first page, when you wrote in your report that he had difficult, a difficult time handling money, were you considering this unpaid, or I should say this lien placed on him by the State of Louisiana for $500 and change?

A   Yes.

Q   Okay.  And did you --

        THE COURT:  Was that Ms., was that Robin Bourgeois' --

        MR. WISEMAN:  The name on it is Alfred Bourgeois, Your Honor.

        THE COURT:  And what was that for?

        MR. WISEMAN:  It says "Motor vehicle sale tax period ended 6/00," and it's got, the amount of the lien is $503.69.

BY MR. WISEMAN:

Q   Did you similarly consider, in regard to his ability to handle money, his wife's income tax or a statement sent to his wife showing an overpayment of $4500 and change in the year 2001 with an income of $39,374?

A   Yes.

Q   And does that seem to you, in your experience, the kind of mismanagement of resources that --

        MR. ROBERTS:  Your Honor, I will object to her, unless she has got some --

        THE COURT:  Do you have some financial expertise?

        THE WITNESS:  No.

        THE COURT:  Okay, then she's not going to be testifying about that.

BY MR. WISEMAN:

Q   If a person making $39,000 overpays their taxes by --

        THE COURT:  Mr. --

        MR. WISEMAN:  -- 4,000 --

        THE COURT:  You are not going to be talking about that.  Go to another subject.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Did you consider this March 2nd, I am sorry, March 27th, 2002 notice from the Monogram Credit Card Bank of Georgia indicating that they were closing his account on account of

past due amounts?

A    Yes, I did.

Q    And did you consider the May 17th, 2002 letter from Hibernia Bank indicating that they were calling in the promissory note on his home?

MR. ROBERTS:  Object, Your Honor, that --

THE COURT:  That was from Ms. Bourgeois.

MR. ROBERTS:  Yes.

MR. WISEMAN:  Well -- well, fine.  I think it's relevant, Your Honor, it's a husband and wife.

THE COURT:  Well, he's, he, the videos I looked at he got, he said he got in financial trouble because Robin Bourgeois overspent without his authority and without his direction, and he started getting collection notices, never had those problems.

MR. WISEMAN:  That's fine.

THE COURT:  And so I don't know what that would have to do with him exactly.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q    Well, how about this credit card statement from Citgo dated August of '02 -- actually that's not a good example.  I will withdraw that one.  And did you see material relevant to a -- well, could I have the computer put on -- relevant to a lease on a 2001 Ford Expedition vehicle?

A   I think I did.  Yes, I looked at this.

Q   Okay.  This is incredibly tiny print so I am going to put it up on the other -- but just for purposes of the record this is page 59 of Exhibit 59.  It's obviously too small to read, so --

THE COURT:  Actually, there is a zoom on there that makes it very easy.

MR. WISEMAN:  I tried that.  I have a, I have it on the computer.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Let me show it to you on the computer.  That's the same page.  Does it appear that this was a, the lease we were talking about, $476 monthly payment, 35 months, for a total of $17,157.96 with $9,000 down.  Did you consider that Mr. Bourgeois put down or committed to paying on a 36-month lease $26,000 of a $40,000 vehicle?

A   Yes, I looked at this document and I considered this.

Q   Okay.  And did you also consider --

THE COURT:  Have you looked at -- I am sorry.  You don't know anything about, you are not an expert on finances?

THE WITNESS:  I think I am just being asked if I looked at it and if I considered it and this was what I did.

THE COURT:  Okay.  Well, how did you, how would you have considered if you don't, if you are not an expert on

finances?

MR. WISEMAN:  Your Honor, may I respond to --

THE COURT:  No, I am asking her.

THE WITNESS:  I guess, I think, I thought what he was addressing was someone said what financial records did you look at and I knew we did, and he said which ones were they and I think we were going through the ones that I looked at, and that's all I think I am doing.

THE COURT:  Okay.  So you didn't use that in coming up with any of your opinions?

THE WITNESS:  I wrote a statement in my report that I looked at these.

THE COURT:  Because you would have had to look at all of his records, all of his tax returns and all these other things.  You didn't do that.

THE WITNESS:  The statement in the report that said I looked at records, these are the records, financial records I looked at, and I, that's --

THE COURT:  Did you use his financial records in any opinion that you came up with?

THE WITNESS:  I, I felt they give evidence of poor management.  He has --

THE COURT:  Did you look at -- okay.

THE WITNESS:  -- basic money skills but the ones I looked at I thought showed that --

THE COURT:  But you didn't look at the overall picture, his trucking records, you know, he had a trucking company?

MR. WISEMAN:  Your Honor, he did not have a trucking company.

THE COURT:  Okay.  He said he did even in the examination about a --

MR. WISEMAN:  Well, he says a lot of things.  He did not have a trucking company.

THE COURT:  Okay.

MR. WISEMAN:  And I think the point from our perspective is that --

THE COURT:  Did you look at his tax returns, has anybody looked at his tax returns?

MR. WISEMAN:  We don't have his tax returns.

THE COURT:  Okay.  Well, I mean, that would give us a better picture, wouldn't it?

MR. WISEMAN:  Well, it would give you a better picture, Your Honor, but I think this is still relevant information.

BY MR. WISEMAN:

Q   And my question, Doctor --

THE COURT:  Well, if I am the fact finder --

MR. WISEMAN:  You are.

THE COURT:  -- then I get to determine that, so

let's move on to something else.

MR. WISEMAN:  Well, but relevance is a legal issue.

THE COURT:  Let's move on, please.

MR. WISEMAN:  I have a question for the witness regarding expert reliance on such information, if I could ask the question to complete the record.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Dr. Swanson, do people assessing MR typically look at financial records as part of the determination of a person's ability to handle money?

THE COURT:  Mr. Wiseman, I will stipulate that that is correct.

MR. WISEMAN:  Okay.  Well then --

THE COURT:  But the point is she didn't look at all of his financial records.

MR. WISEMAN:  Well, that's true, that's true.

THE COURT:  And you take a little bit out of context and it makes no sense, is all I am saying.  So if I am the fact finder, we need to move on to a different subject, one more time.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Just one quick point.  Your CV, which has been received as --

THE COURT:  Exhibit 36.

BY MR. WISEMAN:

Q    36, yes.  I count 15 cases on there, is that accurate?

A    That's accurate, and there would actually be a 16th that I did in August.

Q    Okay.  The Judge has asked questions of you with respect to Mr. Bourgeois' communication with the Court during the trial proceedings, and I wanted to show you a page from the Green Book, this would be page 102, and what would your opinion be as to the statement in there that says, "Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having ID."  There's a citation.  "Discuss two reasons for this guideline, there was not enough available information and there is a lack of normative information."  First of all, do you agree with that statement?

A    Yes, I do.

Q    And how does it relate to Judge Jack's communication with Mr. Bourgeois and whether that speaks to the question of adaptive deficits?

A    I think what that citation is stating, that you can't use an instance of criminal behavior or one comment or one conversation to infer and make a total global assessment of somebody's adaptive abilities.

THE COURT:  But do you understand that he had, we

had several conversations with Mr. Bourgeois and it wasn't a single comment?

THE WITNESS:  And I really, I am just addressing that citation in my testimony.

THE COURT:  Okay, but you just, you actually, you, in contrast to that sentence you used other people's opinions of whether or not he could communicate because he displayed the behavior he wouldn't ever be quiet, he just kept talking and talking, which is also synonymous with a narcissistic person, is it not?

THE WITNESS:  That would be a feature of a narcissistic person.

THE COURT:  And I guess, I don't know if you heard what the last psychologist that Mr. Bourgeois had hired said, that his behavior, his presentation was also symptomatic of a narcissistic, sociopathic person, different etiology but that's what he said, and he also said he wouldn't want him living next door to him.

THE WITNESS:  I understand.  I wasn't aware of all that, no.

THE COURT:  Would you disagree with that?

THE WITNESS:  I think I testified earlier that --

THE COURT:  Just that, what I said --

THE WITNESS:  Borderline is what I would say he was more.

THE COURT:  Would you disagree with what he said?

MR. WISEMAN:  I'm sorry, Your Honor, which part?

THE WITNESS:  I do disagree because I think he's more of a borderline personality disorder than narcissistic.

THE COURT:  Okay.

THE WITNESS:  Borderline have narcissistic features but they are another similar classification under Cluster B.

THE COURT:  And he testified, because he's a forensic psychologist or a neuropsychologist, that he had, he couldn't put the brakes on his behavior, which is also symptomatic of a sociopath.  Did you know that?

THE WITNESS:  Uh --

THE COURT:  Did you know he testified like that?

THE WITNESS:  I haven't, that was in his testimony?

THE COURT:  Yes.

THE WITNESS:  Recently or --

THE COURT:  A week ago.

THE WITNESS:  Oh, well, nobody gave me any testimony from a week ago.

THE COURT:  Okay, thank you.

BY MR. WISEMAN:

Q   And one could be a sociopath that you wouldn't want living next door to you and be mentally retarded?

A   Yes.

THE COURT:  So he could be a narcissistic sociopath

and borderline retarded?

THE WITNESS:  And mildly retarded.

THE COURT:  Mildly.  Mildly retarded, sorry.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q   When I asked you earlier about MR not being a diagnosis of exclusion, could you explain how that relates --

THE COURT:  Would you say that again?

BY MR. WISEMAN:

Q   Mental retardation --

THE COURT:  Okay.

BY MR. WISEMAN:

Q   -- is not a diagnosis of exclusion.  Can you explain again to the Court how that relates to the questions the Court just asked you about the co-morbidity --

THE COURT:  Well, what the point was, you wanted to say you can have all that and still be --

MR. WISEMAN:  Of course, of course.

THE COURT:  Well, we already did that.

MR. WISEMAN:  What's that?

THE COURT:  Don't assume that I also am -- that I cannot, that I don't have basic cognitive understanding of what you are talking about.

MR. WISEMAN:  Oh, Your Honor, your cognitive --

THE COURT:  So please move on.

MR. WISEMAN:  Your cognitive understanding is abundantly apparent.

THE COURT:  So please move on.

MR. WISEMAN:  Okay, I will move on.  I thought the Court needed further clarification.

THE COURT:  I don't think so.

MR. WISEMAN:  Okay, I am happy to move on.

BY MR. WISEMAN:

Q   Mr. Roberts questioned you about page 13, your Woodcock scores?

A   Yes.

Q   And you see where I am putting my finger on the scale scores and he pointed out a bunch of 80s.  My question is, is that 80 out of 100 or is that 80 on a bell curve?

A   That's 80 on a bell curve.  And the SS stands for standard scores.

Q   Standard scores.

A   Eighty on a bell curve and that would be approximately 1.5 standard deviations below the mean.

Q   Okay.  So that doesn't mean he's scoring --

A   Or one and a third.

Q   -- like a B student would score on these tests because he got the 80?

A   No, no, no.  You are looking at the bell curve and you are looking at below the mean, somewhere between one and two

standard deviations below the mean.

Q   Judge Jack observed that on the video Mr. Bourgeois appeared to speed up his responses to one of the psychological tests, and I haven't watched that myself yet, I haven't seen that part, or I haven't noticed that, I should say, but assuming that Judge Jack has told us what she saw, I wanted to ask you about a portion of Dr. Moore's report, I'm sorry, of Dr. Price's report, and I will mark this as Petitioner's 162.  Is this --

          THE COURT:  Do you want to offer that?

          MR. WISEMAN:  Eventually, yes.  Yeah, I will offer it now, sure.

          THE COURT:  Well, I mean I am looking at it, so you want to --

          MR. WISEMAN:  Yeah, yeah.  Yeah, I am offering it all.

          THE COURT:  Okay.  Petitioner's 162 is admitted.

     (Defendant's Exhibit P162 admitted into evidence)

          MR. WISEMAN:  We have nothing to hide, Your Honor.

          THE COURT:  Well, I realize that.

BY MR. WISEMAN:

Q   Is this Dr. Price's report that you reviewed?

A   Yes, it is.

Q   Okay.  Now, I just want to read you a sentence out of it on page 6, under the Personality Assessment Inventory, PAI.

Are you familiar with that test?

A    I am familiar with it, yes.

Q    Okay.  It says, "This administration of the PAI resulted in an invalid profile with no clinical interpretation possible.  The potential reasons for this pattern include reading difficulties, careless or random responding, marked confusion or failure to follow the test instructions," close quote.

THE COURT:  Is that what I was just talking about?

MR. WISEMAN:  Yeah, yeah.

THE COURT:  I wondered why he was zipping through it so quickly, so that would give me an indication, too, that he was doing it on purpose.

MR. WISEMAN:  Well, that may be --

THE COURT:  Because he was very careful when he, when Dr. Price came back into the room to be very slow and deliberate.

MR. WISEMAN:  Right.

BY MR. WISEMAN:

Q    And my, the point of my question is, did the testing catch, assuming he purposely sped up, that he gave an invalid profile?  I mean the test caught that?

A    The test, the test was deemed invalid by the examiner so it must have caught that he sped up.  I am inferring from that that he could have been doing careless or random

responding.

Q   Okay.  And let's assume that he purposely sped up.  Would that also be consistent with a mentally retarded person's masking?

A   It would if he felt he was going too slow on the test, yes.

THE COURT:  You really ought to look at that video.

MR. WISEMAN:  Oh, I'm --

THE COURT:  I mean he was zipping through it.  I didn't think I could have read it that quickly.

MR. WISEMAN:  Okay.

THE COURT:  So that explains it better to me.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Now, just a few more questions.  We had this little examination, cross-examination about whether it's difficult for an expert to make a determination in this case because of Mr. Bourgeois' overall sort of grandiose presentation and all that.  Actually, the question I was interested and which I thought I was asking was does it make it difficult for lay people to judge mental retardation in a person like Mr. Bourgeois?

A   Yes, it does.

Q   And, obvious, his presentation is better than the substance, to put it in layman's terms, he presents better

than he is?

A     He presents better than he is.

THE COURT:  Isn't that one of the tests, though, of retardation is not just how he tests but how he presents?

THE WITNESS:  Well, I am not clear on that question.

THE COURT:  Okay.

MR. WISEMAN:  Well, if I can take a stab at it, is it that as an examiner --

THE COURT:  Are you going to testify?  Why don't you just tell me.

MR. WISEMAN:  I'd love to.  But I think I have to have the witness tell it.

THE WITNESS:  He's trying to get -- I think I don't understand the question.

MR. WISEMAN:  Yeah, let me try to ask the question another way.

THE WITNESS:  To reword it for me?

THE COURT:  And I thought the Fifth Circuit law is that you look not just at their test scores but their adaptive behavior, and when you are saying he looks better than he is, to me that's adaptive behavior and how he does things like running a trucking, you know, driving around, running a business, keeping his bank records.  He said in the video he had a tax consultant.  And he's bought a house, he has these cars, he makes these financial arrangements, and --

THE WITNESS:  Uh-huh.  And I think when you said presentation, and what I was kind of thinking was, he tries to overrepresent his abilities and hide from you what supports he got to make those decisions.  And, as I understood, and I don't know a lot of legal issues, but the issue that the courts have to address is when you don't have standardized assessments, is make a real close look at adaptive behavior and see does it meet a deficit, and if it's there, if it appears to be a strength, is there anything that's supporting him that makes it look like a strength when it's not.

THE COURT:  Thank you.

THE WITNESS:  Okay.

BY MR. WISEMAN:

Q   Let me put up Petitioner's 155 again for you. Mr. Roberts was asking you if you thought it was an extraordinary jump from a 76 verbal to a 67 verbal, and that's a nine point difference in the two tests?

A   Yes.

Q   Okay.  And I don't know if you actually did the Flynn calculation or if you have seen one, but can you explain to the Court what the Flynn calculation would be in this instance --

A   Okay.

Q   -- on an IQ score?

A    The Flynn calculation, based on group statistics, is that you would anticipate that the score goes up .3 points per year --

THE COURT:  Up?

THE WITNESS:  -- over the age of the normative test.

THE COURT:  Okay.

THE WITNESS:  So like if we're looking at, this is 26 years or 24 years, multiply that times .3, and what that's telling you is most people who took the test in 2004, a test that's based on norms from '78, in group statistics that's how much it went up.  That's an average.  So we really don't know how much his score went up, we just know it went up.  It could have gone up .3 --

MR. WISEMAN:  I think we're --

THE WITNESS:  -- a year or it could have gone more.

MR. WISEMAN:  Let me ask a clarifying question.

THE COURT:  But his didn't go up at all.

BY MR. WISEMAN:

Q    Now when you say go up --

THE COURT:  It went down.

BY MR. WISEMAN:

Q    -- you mean the norms go up?

A    Elevated the score, so you really Flynn adjust it down, yes.

Q    Exactly.  So if you did the Flynn adjustment down of 26

years times .3, my arithmetic says 7.8.

A    That's correct.

Q    Okay.  So --

A    A Flynn, you can anticipate a Flynn as much as eight points, or on the average of eight points, that's right.

Q    Okay.  So if you were to apply, if you were to apply, and I will put apply in quotes, Flynn to the verbal score in this test, he is pretty spot on, isn't he?

A    Pretty much.

Q    From a 76 to a 67 verbal.

A    That's correct, if there is -- there could be an increase because of aging norms and it might be that much, yes.

Q    Is the ability to mask an adaptive deficit or an adaptive strength?

A    It's just a characteristic, I think, that's common of people with mental retardation to try to hide what they don't know and to present it in a better light, and there are several different ways that it's commonly done.

Q    There has been a lot of questions put to you about who you chose to give a standardized test to and who you chose not to.  Did you, were you aware at the time you were deciding this question that Mr. Ferdinand, Mr. Bourgeois' brother, had been accused of making threats during the time of the trial proceeding or being involved in threats against witnesses?

A    I read phone calls, transcripts and testimony and a lot of things that indicated that, yes.

Q    All right.  And did that knowledge influence your willingness to rely on him as an informant?

A    I certainly brought that into account, but one of my biggest problems with Mr. Ferdinand is just trying to get him to talk to me.  I couldn't arrange it in 2009 and I had to really work hard to get some conversations with him 2010.

Q    Mr. Roberts used the term inconsistent responses with regard to Beverly Frank's reporting on the ABAS that Mr. Bourgeois couldn't use a fork and on the Vineland that he sometimes could use a fork.  Did you see that as inconsistent?

A    No, it's just the way that, the different ways that they are scored, and that's one of the problems I think with the ABAS is you don't get every time to ask that, where when someone is doing an interview with you I can ask, well, you are saying he never did it or did he sometimes do it, or had he started to learn or did it take a prompt to get him to do it, so you get, to me you get a better answer, particularly on a retrospective diagnosis, on the Vineland than you would on an ABAS.

Q    Now, Dr. Moore -- Dr. Price didn't do any standardized testing of adaptive deficits to your knowledge?

A    No.

Q    Okay.  Dr. Moore did some, do you recall that?

A    Yes.

Q    Okay.  Do you recall if he did any, used any informant who knew Mr. Bourgeois in multiple domains?

A    He did.  The sister.

Q    Michelle Armont?

A    Michelle Armont, and --

Q    Okay, stop.  Stop right there.

A    Okay.

Q    How did Michelle Armont's testing come out in Dr. Moore's testing?

A    In Dr. Moore's testing it came out showing he was deficient.

Q    Okay.  The other people Dr. Moore gave the ABAS-II to were people who knew Mr. Bourgeois from work?

A    Yes.

Q    And a person who knew him during childhood?

A    Yes.

THE COURT:  Aren't all these tests designed, the tests that you are talking about that you gave to Ms. Frank, these are designed to get community help for someone who is mentally retarded, they are not determined, they are not designed to go back in time to determine if somebody was mentally retarded to get the death penalty?

THE WITNESS:  I think what you are asking is they

are designed to determine eligibility right now.

THE COURT:  Right now, for --

THE WITNESS:  And they are also designed to do treatment, and the authors of both tests have published how to use them retrospectively.  The Vineland did that in 2008 --

THE COURT:  But none of them were designed to do --

THE WITNESS:  They weren't designed to do that.

THE COURT:  -- do what you are doing now?

THE WITNESS:  That's right.

THE COURT:  Okay.  I just want to make sure.

THE WITNESS:  But they are recommended by experts in the field.

BY MR. WISEMAN:

Q   Although they weren't initially designed, is --

THE COURT:  They are not now designed for it, is what she just said.

MR. WISEMAN:  Well, I think that's, if I can clear that up.

BY MR. WISEMAN:

Q   When you say the authors have published, does the Vineland now have an addendum to the manual regarding retrospective administration of it?

A   Yes, when they published the expanded manual in 2008 they devoted a whole section on how to use it retrospectively.

Now, I want to be clear.  The normative data is not that based on retrospective but they do, they tell you how to do it and to interpret with caution and to make sure people know that that's the way you did it, which I think is what Dr. Moore and I did.

THE COURT:  But it's not be used in this context.  The whole thing was developed for community services in another context.  Is that not right?

THE WITNESS:  That's correct.

THE COURT:  Okay.  Move on.

MR. WISEMAN:  Yes, ma'am.  Yes, Your Honor.

BY MR. WISEMAN:

Q   When did the Flynn Effect first become published or present in the literature, was it before or after Atkins?

A   Oh, it was before Atkins.

Q   By a good ten years?

A   Yeah, I would say in the 1980s is when you first started seeing the term and the, associated with Dr. Flynn.

Q   Okay.  You watched the tape where Mr. Bourgeois talked about how he was an amazing cook and did all this cooking for Miss Mary when he lived with her and other times.  Did you actually hear him --

THE COURT:  I think he said he learned from her.

MR. WISEMAN:  Right, okay.

BY MR. WISEMAN:

Q   With that correction, did you actually hear him describe how to cook anything?

A   He talked about things he could cook.  I think someone specifically asked him how to treat the game meat and he gave a method that he said she used and that's what he used.  I didn't hear any steps or any recipes.  He certainly couldn't demonstrate that skill to me when I worked with him, and then when I quizzed him --

THE COURT:  Well, did you give him a raccoon to cook?

THE WITNESS:  No.  No, Your Honor, I didn't.

THE COURT:  Okay.  I'm just curious.

THE WITNESS:  Okay.  But we did go over some recipes and we did talk about different things you do and how you brown and how you fricassee and what you do to dice and different things like that.

THE COURT:  I don't think he did that.  What I saw in the video is he was just talking about boiling up a raccoon or a deer --

THE WITNESS:  Yeah.

THE COURT:  -- or squirrel meat, and what you put in it to make it tender and you boil it until you can stick a fork in it and it's tender.

THE WITNESS:  That's right.

THE COURT:  It sounded all pretty forthright to me.

THE WITNESS:  That's right.  That's what I remember him saying, yes.

THE COURT:  So I didn't ask if you, I don't, I'm not going to ask if you duplicated this recipe, I just want to know if there is any exception you take from this recipe.

THE WITNESS:  Oh, from him saying how --

THE COURT:  Yes.

THE WITNESS:  And I don't have any --

THE COURT:  Okay.

THE WITNESS:  I don't, quite frankly, Your Honor, I don't know how to soften up a raccoon at all.

THE COURT:  I would prefer not to learn, actually, but.

THE WITNESS:  It may be the way you do it and it may not be the way you do it, I don't know.

THE COURT:  But we don't, you and I don't have anything to say that that's not correct, we don't have any information.

THE WITNESS:  Yeah, we have no expertise in raccoon cooking, that's true.

THE COURT:  Thank you.  Anything in psychology or law that would tell us?

THE WITNESS:  No, I hope not.

THE COURT:  Okay.

MR. WISEMAN:  Can I be heard about this?

THE COURT:  Go right ahead.

MR. WISEMAN:  I'm just --

THE COURT:  Have you done it, Mr. Wiseman?

MR. WISEMAN:  Okay.  I think that's all.  Thank you again, Doctor.

THE COURT:  I think they get one more, I'm sorry.

THE WITNESS:  You see I'm trying to run.

THE COURT:  Have you got your water?

THE WITNESS:  I just knew I wouldn't need it this time.  I have got it over there.  I'm fine, though.

THE COURT:  Mr. Roberts, anything?

MR. ROBERTS:  I don't think so, Your Honor.

THE COURT:  Now you can go.  Is she excused or do you want her to stay?

MR. WISEMAN:  Yes, she's excused, Your Honor.

THE COURT:  Any, Mr. Roberts?

MR. ROBERTS:  She can be excused as far as we are concerned, Your Honor.

THE COURT:  You might just want to leave them some contact information.

THE WITNESS:  Okay.  And thank you so much.  And I apologize profusely about, I must be losing my peripheral vision in my old age because I just don't see that microphone that I keep bumping into.

THE COURT:  It's very difficult but we have a different kind of court reporting than probably what you are used to.

THE WITNESS:  Uh-huh.

THE COURT:  It's a digital recording.

THE WITNESS:  Uh-huh.

THE COURT:  So the sound goes into Ms. Gano's ears.

THE WITNESS:  And I apologize.  Every time I did it I just cringed.

THE COURT:  And every time I do it, she jumps out of the chair, and I am, unfortunately --

THE WITNESS:  And I want to apologize for that again.

THE COURT:  That's quite all right.  Would you call your next witness, please, sir?

MR. WISEMAN:  Yes, Your Honor.  Dr. Weiner.

THE COURT:  Could you come forward, please, sir?  Would you administer the oath?

THE CLERK:  Yes, Your Honor.

DR. DONALD WEINER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Weiner.  What do you do for a living?

A   I am a licensed psychologist in private practice.

Q   And --

THE COURT:  Would you ask him for his full name, please, sir?

MR. WISEMAN:  Oh, I'm sorry.

BY MR. WISEMAN:

Q   Full name, please?

A   Donald Edward Weiner.

Q   Okay.  And why don't you spell your last name so it's clear for the record?

A   W-E-I-N-E-R.

Q   And do you have any particular specialty?

A   One specialty area I have is the area of neuropsychology.

Q   And I want to put up on the overhead for you what I have marked as Petitioner's 29A and ask you if that's your vitae?

A   Yes, it is.

Q   Okay.

MR. WISEMAN:  Can I hand this up to the Court?

THE COURT:  Wait, wait, wait.  You can offer it and let me just look at it, okay?

MR. WISEMAN:  Okay.  Can I offer this in evidence then, Your Honor?

THE COURT:  Sure.  The number is?

MR. WISEMAN:  29A.

THE COURT:  29A is admitted.

(Defendant's Exhibit P29A admitted into evidence)

BY MR. WISEMAN:

Q   Could you briefly, the Court can see where you went to school and all that, but why don't we focus in particular on how you developed an expertise in neuropsychology.

A   I began getting -- excuse me -- interested in neuropsychology during a pre-doctoral clinical psychology internship and more interested during a post-doctoral fellowship I did at the University of Texas Medical Branch at Galveston. And following that I have been to a number of trainings over the years with Dr. Ralph Raytan, who is one of the world authorities in neuropsychology.

THE COURT: Okay. Do you have any training in neurology?

THE WITNESS: I am not a medical doctor but I have had training in neurophysiology through -- I am board certified by the professional, what's it called, licensed prescribing psychologist register, and I have taken about 350 hours of training and some of that was specific to brain and brain function and brain physiology.

THE COURT: Well, how much of that specific for --

THE WITNESS: Oh, I'd probably say maybe 40 hours of that.

BY MR. WISEMAN:

Q   In your --

THE COURT: Okay, wait a minute. You are not board

certified by any neuropsychology organization?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.  Didn't we have somebody in here that was a neuro, the other guy that was --

MR. WISEMAN:  Dr. Gelbort was also not board certified.

THE COURT:  But he had extensive training in -- actually, never mind.

MR. WISEMAN:  Well, if I could ask some more questions about that?

THE COURT:  Never mind, that's okay.

MR. WISEMAN:  Okay.

BY MR. WISEMAN

Q   In your current practice, approximately how many times a month do you administer neuropsychological tests?

A   Oh, it's probably, averages three times a month or so.

Q   And has that been pretty consistent over the course of your career?

A   Yes.

Q   So you have administered hundred of batteries?

A   Yes, I have.

Q   And --

THE COURT:  Say that again.

MR. WISEMAN:  Hundreds of batteries of tests.

THE COURT:  For neuropsychology?

MR. WISEMAN:  Neuropsychology, yes.

BY MR. WISEMAN:

Q    And your answer for that is?

A    Yes.

Q    And have you testified in courts in Texas as an expert in neuropsychology?

A    Yes, I have.

Q    Approximately how many times?

A    Oh, I'd say probably 40 to 50 times.

Q    And has that been in the State Courts as well as the Federal Courts?

A    Yes.

Q    And have you ever been denied qualifications by any judge?

A    No.

Q    What is the percent of your practice that's devoted to clinical treatment and diagnosing of patients?

A    Well, actually, about 100 percent is clinical direct services, treatment, diagnosis, evaluation, diagnosis and treatment.

Q    Okay.  And, well, I guess then the question is how much of your time do you spend doing forensic work?

A    At any given time I may have about 10 to 15 percent of my caseload involved in forensics cases, but generally with those it's someone that I either do a one-time evaluation of

or it's someone I am doing ongoing treatment that they need and then I am asked to provide expert testimony.

Q    And amongst the forensic cases that you do, how much of it is criminal law cases?

A    A very small percentage.  I'd say less than five percent.

MR. WISEMAN:  Your Honor, at this time I would offer the witness as an expert in neuropsychology.

MS. SALINAS:  I'm not in opposition, Your Honor.

THE COURT:  Sorry?

MS. SALINAS:  I am not opposed to that, Your Honor.

THE COURT:  Thank you.  Then he will be recognized as.

BY MR. WISEMAN:

Q    I want to direct your attention to 2004.  Did you do any work in the case of the United States versus Alfred Bourgeois?

A    Yes, I did.

Q    And how did that come about?  What were you asked to do and who asked you?

A    I was contacted, I believe it was by Mr. Tinker, in February of 2004 and asked to do a neuropsychological evaluation of Mr. Bourgeois.

Q    And I want to put up for you an order signed by Judge Jack, it's Exhibit P157, and it appears that on February 13th, 2004, Judge Jack signed an order appointing you to do

work on this case?

A   That's correct.

Q   And do you recall how much before that day that Mr. Tinker would have contacted you?

A   It was probably at most a couple of weeks before I actually did the evaluation.

THE COURT:  What was the date on it again?

MR. WISEMAN:  February the 13th, 2004.

THE COURT:  Thank you.  And he started, when did we start trial?

MR. WISEMAN:  The jury was sworn on February 25th.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   So you said that Mr. Tinker asked you to do, what, a --

A   A neuropsychological evaluation.

Q   And do you recall the circumstances that you were asked to perform this evaluation under?

A   Well, there was a very tight time line and my schedule was already pretty booked, and so normally I don't do work on the weekends but I did agree to do this evaluation on a Saturday.

Q   And where did the evaluation take place?

(Banging noise)

THE COURT:  Oh.

THE WITNESS:  I'm sorry.

THE COURT:  Okay.

THE WITNESS:  I apologize.

THE COURT:  Okay, nobody gets on the stand anymore from either side that is not instructed to be very careful of the microphone.

MR. WISEMAN:  I'm so sorry.

THE COURT:  Don't touch it.

THE WITNESS: I apologize.  I apologize, Your Honor.

THE COURT:  Don't touch it, don't move it, don't touch it.  Thank you.

THE WITNESS:  The evaluation was done February 28th of 2004.

BY MR. WISEMAN:

Q   And you recall that was a Saturday?

A   Yes.

Q   And where did the evaluation take place?

A   Oh, where did you say?

Q   Where?

A   At the federal courthouse.  He was being held here.

Q   Okay.  This building?

A   Yes.

Q   Okay.  I want to put up for you what's been marked as Petitioner's 29 and ask you if you recognize that?

A   Yes, that's my report based on my neuropsychological evaluation.

Q    And what do you make of the date of the report being 3-3 with the evaluation having been that Saturday?

A    Well, normally, like I said, I don't do work on a weekend and so the earliest date I was able to actually complete the report was on March the 3rd.  It was definitely a rush job.

Q    Okay.  And did you, were you provided by Mr. Tinker or anyone working with him any records with regard to Mr. Bourgeois?

A    No, I was not.

Q    Not a single piece of paper?

A    No.

Q    Is that unusual in a neuropsychological evaluation?

A    Well, particularly in forensic cases it's extremely desirable to have whatever medical records, school records that may be available in aid, and the conclusions based on the testing.

Q    I'd like to put up for you Petitioner's 81, which is a thick packet of records.  Do you recognize those?

A    Well, I'm not sure what is inside the packet.

Q    Right.  Does it look like a packet you have reviewed?

A    Hunter Medical Records.  I don't believe I have received any package --

Q    Well, would it be helpful for me to hand it you to --

A    Yes.

Q    -- look through it?

A    I did receive -- I did not receive any medical records on Mr. Bourgeois until the ones you provided me in 2007 and then the additional ones that I was recently provided, but this --

THE COURT:  Sorry, what, medical records you are talking about?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    And I guess my question is, is the packet you are currently holding are Mr. Bourgeois' medical records?

A    Yes.

Q    And they were provided to you by my office?

A    Yes.

Q    Not by Mr. Tinker's office?

A    That's correct.

THE COURT:  Now, you are not a medical doctor?

THE WITNESS:  No, I am not.

THE COURT:  Okay.  And you haven't had pre-medical courses, chemistry, biology?

THE WITNESS:  I have had -- no, I have not had --

THE COURT:  Okay.

THE WITNESS:  Did not take pre-medical courses.

BY MR. WISEMAN:

Q    I want to turn to a particular page in these records and ask you what relevance, if any, they would have for a person

doing a medical, a neuropsychological study, and this is page 12 of the exhibit and it's a little hard to read. I know you have read it.

A   Yes, I can see it there.

Q   Okay. Can you tell the Court what that line that I pointed to says?

A   It looks like the admission notes and it said, "Restrained driver of 18-wheeler survived and hit another, swerved," I'm sorry, "and hit another 18-wheeler. Hit head on steering wheel. Complained of left shoulder, left neck, left," I believe, "upper neck. No loss of consciousness. Complained of dizziness." And I'm not sure what the abbreviations are after the --

THE COURT:  It's "Complained of left and right" -- let me see it. If you zoom it up I will read it for you.

THE WITNESS:  Okay.

THE COURT:  This is why I don't want a psychologist reading or interpreting medical records. He is not qualified to do that, Mr. Wiseman. It's not going to happen.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Is a report of a head injury something that a neuropsychologist would typically want before doing a battery?

A   Yes.

THE COURT:  Now, a bump on the head is not a head injury, is it?

THE WITNESS:  Well --

THE COURT:  You cannot tell from that that there was any head injury.

THE WITNESS:  Well, all I could tell from that is that his head apparently struck --

THE COURT:  Right, but you can't read any of those medical records to determine there was a head injury?

THE WITNESS:  Not the severity.

THE COURT:  Okay.

THE WITNESS:  Just the blow to the head.

THE COURT:  Is this the one that, are you the one that Mr. Bourgeois said he had been in a coma for three months?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Were you --

THE COURT:  And if you had been called to testify, you would have had to tell the jury that, wouldn't you?

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q   Would you, if you had been provided with these records -- well, let me withdraw that.  What relevance to your

evaluation was Mr. Bourgeois' report that he had been in a coma?

A    Well, at the time it appeared to be the likely cause of the impairment that was evident in the testing.

Q    Okay.  And if you had been provided with these records, would you have seen anything about the coma?

A    If I had been provided with records which I received several years later, I would have been aware that there was no head injury in the 1984 accident that he was referring to.

Q    The coma accident?

A    Correct.

Q    Okay.  But you would have seen that there was another entry regarding striking his head in an 18-wheeler accident?

A    Yes.

Q    And would that also have had relevance to your report if you had been provided the records?

A    It would have been something that definitely would have been noted in the report.

Q    All right.  And if you had had the records in your possession at the time of your evaluation of Mr. Bourgeois, would you have asked him about his claim of a coma?

A    I absolutely would have.

Q    And you would have --

            THE COURT:  Well, you asked him anyway, didn't you?

            THE WITNESS:  Yes, I asked him if he had a history,

as is a routine part of the evaluation, have you ever had any serious illnesses or injuries.

THE COURT:  And he claimed as a part of this whatever it was that he was in a coma for three months.

THE WITNESS:  Yes, he did.

THE COURT:  That turned out to be not correct.

THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q   All right.  And if you had these records with you, would you have showed him the record relevant to the alleged coma and said, "Well, hold it a second, that doesn't show up here"?

A   Yes, I would have.

Q   Okay.

THE COURT:  And what would that, what would that tell us?

BY MR. WISEMAN:

Q   Well, would you have put in your report that he had suffered a coma if you had the medical records that said he didn't suffer a coma?

A   No, I would have put that he initially reported but the medical records showed that that was not the case, and then I would have put whatever he said in response to me asking about it.

Q   But you would have put also that there was a subsequent

potential head injury from striking his head in another automobile or truck accident?

THE COURT: Well, not a subsequent, that's what he's talking about.

MR. WISEMAN: I'm sorry?

THE COURT: What do you mean a subsequent report?

MR. WISEMAN: Another car accident, another truck accident.

THE COURT: When was there another truck accident?

MR. WISEMAN: That's my point, Your Honor, that's what I was trying to show the witness.

THE COURT: When did he claim he was in a coma?

THE WITNESS: From the 1984 accident.

THE COURT: The one you are talking about right here?

THE WITNESS: I believe that I am being asked about a separate accident which took place in 1993.

MR. WISEMAN: There's one accident without a coma and there's a second accident with the head striking.

THE COURT: Okay, but we don't know what kind of head injury that was?

MR. WISEMAN: No, we don't know that.

THE COURT: And no way of knowing and he's not qualified to do it.

MR. WISEMAN: No, I just want to establish the date

of that other accident.

BY MR. WISEMAN:

Q   And the date would be July 7th of '93?

A   Yes.

Q   Okay.  So if counsel had provided you these records, you would have been armed with more information relevant to a potential etiology of the head injury?  Of any organic brain damage, excuse me.

A   Yes.

Q   Okay.  Now, to be clear, the information about the 1993 truck accident wouldn't necessarily account for Mr. Bourgeois' deficits which we'll talk about in a little while?

A   That's correct.

Q   Okay.  There could have been other reasons for his deficits?

A   That's correct.

Q   Okay.  One more thing I want to ask you about, and I know that this isn't something you have seen before but these records appear to have gotten to John Gilmore, who was co-counsel.  Do you remember his name?

A   Yes.

Q   Okay.  They got to him on 2-20-04 invoice date?

A   Yes.

Q   Or thereabouts.  Okay.  And your --

THE COURT:  Can I see, let me see that.  What was the date?

MR. WISEMAN:  2-20-04.

THE COURT:  Okay, I know, but keep going at the bottom.  I'm sorry.

MR. WISEMAN:  Where would you like --

THE COURT:  What, where, what records are we talking about?

MR. WISEMAN:  These are the medical records.  These are --

THE COURT:  From what -- from what, the '94 incident?

MR. WISEMAN:  This is all of Mr. Bourgeois' medical records that Mr. Gilmore obtained.

THE COURT:  Okay, can I look?  Keep going to the middle.  Okay.  See, it says 7-9-64?

MR. WISEMAN:  That's his date of birth.

THE COURT:  That's his birth date?  Okay.

MR. WISEMAN:  I am going to offer these if Your Honor wants to look at them more closely.

THE COURT:  Okay.  And the other medical record that you showed me is the one from the same place?

MR. WISEMAN:  Yes.

THE COURT:  Okay.

MR. WISEMAN:  These all came in the same packet.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  And Mr. Gilmore had them?

MR. WISEMAN:  Mr. Gilmore had them.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Weiner did not.

BY MR. WISEMAN:

Q   Do you recall, did you read any of the transcripts of the trial proceedings in this case?

A   I did review all the records you provided for me, which included the trial transcripts.

Q   And do you recall a portion on the March 24th, 2004 proceedings where Judge Jack was talking to Mr. Bourgeois?

A   Yes, I do recall reading that section.

Q   Okay.  And do you recall Judge Jack saying in effect that Dr. Weiner did an evaluation and he had all this collateral information about you?

A   Yes.

Q   All right.  And with all respect, of course, to the Court, that wasn't in fact the case?

A   That is correct.

Q   You had no information?

A   Yes, I just had --

THE COURT:  What was I talking about, do you know? What was the context of that?

MR. WISEMAN:  I think the context of it was you were trying to express to Mr. Bourgeois that you had given his lawyers much, many resources to pursue his defense.

THE COURT:  I had, and I saw that Mr. Bourgeois had said that at one point Mr. Gilmore told him that the Court was out of money.  I don't recall ever having represented that to anybody.  I gave him every possible expert known to man.

MR. WISEMAN:  And our complaint, Your Honor, is --

THE COURT:  Everything that was requested.

MR. WISEMAN:  Yeah, our complaint is certainly not with the Court funding the defense.

THE COURT:  Okay.

MR. WISEMAN:  We agree that it was well funded. Unfortunately, from our perspective --

THE COURT:  It's what they did with it that you are complaining about?

MR. WISEMAN:  Precisely, precisely.

THE COURT:  Okay, I got it.

BY MR. WISEMAN:

Q   Let's talk about your actual evaluation, Dr. Weiner.

A   Okay.

Q   What did it consist of, given that you didn't have any records to look at?

A   I did a clinical interview with Mr. Bourgeois and then I

administered several tests, the Wechsler Adult Intelligence Scale Revised, the Wide-Range Achievement Test, Third Edition, the Halstead-Raytan neuropsychological test battery for adults, and the Test of Memory Malingering.

Q    Okay.  And this has already been received in evidence as Petitioner's 30.  Why don't we zoom that out a little bit. Oops.  Is this the packet that contains your raw data?

A    Yes.

Q    Okay.  There has been a lot of discussion outside your presence in the court about why you chose to administer the WAIS-R at a time when it was outdated, and I'd like you to tell the Court why you did that.

A    Yes.  The WAIS-R is the test that was used and a lot of the normative data from Dr. Raytan and a scale that he developed called the neuropsychological deficit scale specifically was done with the WAIS-R, and in training workshops that I went to with Dr. Raytan he was still using this test even after the WAIS-III came out because he didn't feel there had been enough research on the WAIS-III at that time to warrant using it.

Q    Okay.

          THE COURT:  It had been out for like seven years when you were using the, an older test?

          THE WITNESS:  Yes.

BY MR. WISEMAN:

Q   Now that the WAIS-IV is out, do you currently use the WAIS-IV?

A   Now I have been using the WAIS-III because there has been enough research on that one, and I am going to wait on using, I do have the WAIS-IV but I am going to wait on using that until there has been enough documented research that it is useful in conjunction with the Raytan battery.

Q   Now, you have mentioned the neuropsychological deficit scale as a measure used in the Halstead-Raytan battery.  I'd like you to explain to the Court what the Halstead-Raytan battery is and what the neuropsychological deficit scale is.

A   Yes.  The Halstead-Raytan battery is a collection of several tests, and I don't know if you want me to go through them and describe them or --

Q   I don't think that's necessary --

A   Okay.

Q   -- just yet, but --

A   But it's used to answer questions of if an individual has brain damage, if so, is it mild, moderate, severe, is one side of the brain more affected than the other, and are there specific parts of the brain that are more affected.

Q   And how did Mr. Bourgeois score on that administration of the WAIS-R?

A   On the WAIS-R?

Q    Yes.

A    He had a verbal IQ of 76, a performance IQ of 76, and my report has a typo, it should have said a full-scale IQ of 75, all of which are in the borderline range.

Q    All right.  And your report, I think you just said, incorrectly listed a 76 full-scale IQ?

A    That's correct.

Q    And how do you account for that error?

A    Well, the, this report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.

Q    Okay.  Did you administer, I think you mentioned the TOMM test.  What is the TOMM test, how does it work and what information does it give you?

A    It is, it stands for the Test of Memory Malingering. It's a test in which the individual is shown a series of simple pictures for three seconds each, 50 pictures, and then they are shown pages that have two pictures on each page and on each page one of the pictures is one they saw before and

the other they haven't seen, and they are asked to point to the one they saw before and then give immediate feedback if they are correct or incorrect.  There is an initial trial administered, the 50 pictures are shown once again and then a second trial is given, and normally on the second trial, unless someone is malingering, they make very few errors.

Q   And I take it, to be effective, the person is not alerted that this a test to detect malingering?

A   That's correct.

Q   All right.  So for all they know it's just another test in the battery?

A   Yes.

Q   Okay.  And how did Mr. Bourgeois score on the TOMM test?

A   He had, his score was, it showed no indications of malingering.  I believe he had only three errors on the initial trial, which is a very good score, and on the second trial he didn't make any errors, he made a perfect score.

Q   And the page I have up on the screen, page 28 of the exhibit, is the first trial you just spoke of?

A   That's correct.

Q   And so he got 47 out of 50?

A   Correct.

Q   And the second trial he got 50 out of 50?

A   That's correct.

Q   So this score of 97 out of 100 you say doesn't show

malingering.  Is that instrument normed to determine when, what number of errors is malingering or potential malingering?

A   It's, yes, and I don't have the manual with me but if you, particularly on the second trial, make more than a certain number of errors, then the odds are very high that the person is malingering.  And the research on the test was done with different populations, including brain damage populations, and people asked to simulate malingering, so.

Q   I notice you didn't administer the third trial.  Was there a reason for that?

A   The third trial was optional and I would only give that if there was just, if it was questionable from the second trial you couldn't quite be sure it was in the -- because you can get results that are in the range of questionable validity but you wouldn't conclude malingering from it.

Q   I want to show you another exhibit, this would be 154.  What is this document?

A   This is a document that shows how scores on the WAIS-III would compare with, for the same person, if they were given the WAIS-IV.

Q   All right.  Now, Mr. Bourgeois scored a 75 on your WAIS-III so there's no --

A   Well, actually mine was a WAIS-R.

Q   I'm sorry, I'm sorry, WAIS-R, my mistake.  He scored a

75, so there's no precise number there for 75.

A    Well, in the --

Q    Oh, I'm, sorry, I have the wrong one up.

A    Yeah.

Q    Okay.  I'm going to withdraw that for now.

A    I think I have the page that --

Q    Yeah, I've got -- okay, here's the correct exhibit.  I'm going to show you 158.  And this is from, where is this document from?

A    This is from the manual for the WAIS-III.

Q    Okay.  So the WAIS-III manual tells you that if a person scores a 70 on the WAIS-R, right, and we recognize he scored a 75 --

A    Yeah.

Q    -- on your WAIS-R, that that would translate to a full-scale IQ of somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And what does that chart tell you in terms of interpreting your administration of the WAIS-R when the norms were no longer the norms, when the WAIS-IV was available, I'm sorry, the WAIS-III was available?

A    Well, it says that the, that his actual level of intellectual functioning is lower than that score would indicate since that WAIS-R has older normative data.

Q    Okay.

A    That his true IQ is probably four or five points lower than that.

Q    Let me go back to the other exhibit that I mistakenly put up.  This is 154.  Where is this chart from?

A    This is from the WAIS-IV manual and it shows how the IQ scores would differ if someone were administered the WAIS-III as compared to the WAIS-IV.

Q    Okay.  And again, Dr. Gelbort's administration of the WAIS-III was a 70?

A    Yes.

Q    Okay.  And that would translate on the WAIS-IV to somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And again, what does that tell you about Mr. Bourgeois' actual intellectual functioning?

A    That it's in the mentally deficit range.

Q    And that would be below 70?

A    Yes.

Q    You have done a comparison between your subscales and Dr. Gelbort's subscales?

A    Yes.

Q    Do you see a consistency or inconsistency between them?

A    There's a great deal of consistency between scores.

Q    Okay.  And does that add to your view as to malingering?

A    It adds to the view that it does not appear that there

was malingering.

Q   A hard question --

THE COURT:  When was that?  When did you think there wasn't malingering?

THE WITNESS:  Oh, I didn't think there was malingering when I gave it.

THE COURT:  Right.

THE WITNESS:  But if --

THE COURT:  But you don't know about the second time?

THE WITNESS:  Well, maybe I will let you, maybe you need to rephrase your question.

MR. WISEMAN:  Sure.

THE COURT:  No, I am just asking you, can you tell, though, if there was malingering the second time when you didn't administer it?

THE WITNESS:  Oh.  Well, I couldn't just based on looking at the sheet.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Can you look at Dr. Gelbort's data and its consistency with what you scored or what you administered and detected no malingering and derive some view as to whether there was malingering on the WAIS administration given by Dr. Gelbort?

A   Yes.  I would say, and I don't know about the other tests

but for this particular test it would be very unlikely that there was malingering and for the results to be so close to the ones that were found when I administered the test.

THE COURT:  Well, I thought they weren't close, I thought they were --

THE WITNESS:  Oh.

THE COURT:  -- far apart.

THE WITNESS:  I'm sorry, Your Honor, they are very similar.  Do you have the --

MR. WISEMAN:  May I approach the witness, if I can put this chart up?

THE WITNESS:  (Noise)  I'm sorry, Your Honor.  I will scoot back here.

BY MR. WISEMAN:

Q   This has been previously marked as --

THE COURT:  Right.

MR. WISEMAN:  -- 154 --

THE COURT:  How is that similar with the verbal IQs?

THE WITNESS:  The, there is a margin of error for each of these and --

THE COURT:  What is it?

THE WITNESS:  Well, I have to pull out the comparison here.  One moment, Your Honor.  The, there's a difference of approximately four points or so from the verbal IQ on the WAIS-R to the WAIS-III, and that 76 actually should

have been a 75, which would bring it down --

THE COURT:  Okay.  So what you are saying, it could be actually the difference between 79 and 63, which would be a big difference, if you do, if you do the four points on the top and four points on the bottom.

THE WITNESS:  Oh, no.  Well --

BY MR. WISEMAN:

Q    Well, is that how you do it?

A    Well, let me explain.  No, the, and I realize this can be pretty confusing, what this table that you had up a minute ago that compares the WAIS-R scores to the WAIS-III scores -- and maybe it would be helpful if you could put that back up.

Q    Sure.

THE COURT:  I'm just --

THE WITNESS:  The scores --

THE COURT:  I'm just trying to compare the two tests that were actually done, not a hypothetical one that was not done.

THE WITNESS:  Right.  So we are, that's what I am trying to explain.

THE COURT:  So that you did the WAIS-R and there was a WAIS-III?

THE WITNESS:  Correct.

THE COURT:  So I am just, I am just asking to compare those two.

THE WITNESS:  Yes, Your Honor.  The scores for the verbal IQ --

BY MR. WISEMAN:

Q   I am going to put this chart back up so you can --

A   Okay.  The scores for the verbal IQ on the WAIS-III are expected to be approximately four points lower than the same person taking the WAIS-R, so --

Q   And that would put it at as high as a 71?

A   Correct, because that 76, that's my typo in there, it should have been --

Q   Well, that's your verbal IQ.

A   Oh, I'm, I apologize, so take it, that would put it to about 72.

Q   Okay.

A   And there is also a margin of error --

THE COURT:  No, I am talking about -- oh, never mind.  I just wanted you to compare the two tests that were given.

MR. WISEMAN:  Well, that's what we are trying to do here.

THE COURT:  Okay.

MR. WISEMAN:  We have the WAIS-R on the left, the WAIS-III on the right.  Let's focus first --

THE COURT:  Well, there's a nine-point difference in the verbal IQ, or an eight-point difference.

MR. WISEMAN:  Right, and I am going to address that right now.  The verbal IQ --

THE COURT:  An eight-point difference in the verbal IQ.

THE WITNESS:  Yes, the raw, the actual, and what I am trying to explain, perhaps not very clearly, is that 76, if you use the tables in the WAIS-III manual, a 76 verbal IQ in the WAIS-R is the same as a 72 verbal IQ on the WAIS-III, so if you were going to do that you would have a 72 versus a 67, and then --

THE COURT:  No, you'd have a 72 versus a 72.

THE WITNESS:  No, you only take the points off the older one to see what it would have been on the newer one.

BY MR. WISEMAN:

Q    All right, so the 76 on the WAIS-R would be a 72, and that's within the margin of error of five points which gets exactly 67?

A    That's correct.  But there's, for any score on this --

THE COURT:  Or 77.

MR. WISEMAN:  Well, sure, we're dealing with statistics.

THE WITNESS:  Right.

THE COURT:  Well, I mean that's the unfortunate thing about statistics is that they are maneuverable for anybody to say anything they want them to say, almost.

MR. WISEMAN: Well, you know, I don't want to argue with that old adage but I think there is a lot of science here.

BY MR. WISEMAN:

Q   I guess the question I am asking you is the fact that this all falls within the statistical range that's spot-on, what does that tell you about malingering?  How hard would it be for a person to take these tests three years apart and score within a statistical range on purpose?

A   I think it would be virtually impossible, particularly if you look at the subtest scores which are very close to each other.  I don't know, I couldn't possibly pull that off and I have been giving these IQ tests for a very long time.

Q   Did you make any observations with respect to whether Mr. Bourgeois appeared to be invested in looking good in his interview with you?

A   It appeared, especially after I was able to get data that I had not available at the time, input from other people, input from school records, that Mr. Bourgeois was attempting to present himself in a much more favorable light in terms of grades, functioning, than actually was the case.

Q   And with regard to school grades, what did he tell you and what did you put in your report about how he did in school?

A   He told me that he made Bs and Cs in school and that he

had gone to college for two months.

Q   And when you reviewed the school records, school record, I should say, the one page we provided to you, did you see Bs and Cs or did you see something else?

A   A preponderance of Cs and Ds.

Q   And did he appear invested in looking good in any other ways?

A   He didn't tell me anything about -- let me look at my report here.  He didn't recount any of the abuse that was documented by several sources in the records that I was recently given.

Q   Anything else that comes to mind?

A   Well, he didn't tell me about his problems that I had learned about in the records.  When he was a truck driver he apparently had a lot of difficulty learning how to do that and had a lot of accidents and --

Q   Dr. Price's report, did you review that?

A   Let's see.  I reviewed so many.  Which one was that?

Q   Would be 162, Petitioner's 162.

A   Can you show me the next page or the report itself?  Yes, I did review that.

Q   And do you recall seeing in there Dr. Price making reference to --

            THE COURT:  I'm sorry, I didn't see that.

            MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  Would you show that again, please?

BY MR. WISEMAN:

Q    Not necessarily on this page but did you see in the report reference to unusual scatter on the WAIS testing?

A    Yes.

Q    And do you agree that there was scatter on this testing?

A    Well, the --

Q    Either yours or Dr. Gelbort's?

A    The only significant scatter was I believe he did within normal limits on digit symbol and all the other scores were very consistent, so I would in no way call his subtest scores a significant amount of scatter.

Q    Let's talk about the Halstead-Raytan battery.  You indicated that it is comprised of a number of different tests?

A    Yes.

Q    All right.  Rather than go through them and then list how he performed, why don't we talk about how he performed as we list them.  On the aphasia screening test, tell the Court briefly what that is and how did he score?

A    Okay, let's find it here.  That is a set of very simple tasks.  The person is shown simple pictures, asked to copy them, identify what they are, spell them, read very simple single words and sentences, repeat words spoken, do simple arithmetic problems, and normal individuals tend not to make

errors or very few errors on that, so if someone does make an error we have our jargon, it's called pathignomonic.  In other words, it's a finding that's not typically found in a normal individual that is generally associated with brain damage, and on --

Q   And how did Mr. Bourgeois score on that?

A   On the aphasia screening test he exhibited something called constructional dyspraxia, he had difficulty copying a geometrical figure, and this points to problems on the right side of the brain.

Q   All right.  And with regard to the category test, what is it and how did he score?

A   This is a, basically a concept formation test where an individual is shown a series of pictures and they are told that each picture will remind them of a number, one, two, three or four, and they have immediate feedback if they are correct or incorrect based on their response.  And there are seven subtests, I believe there's about 208 items, and making 50 errors or more than 50 errors is considered to be in the brain damage range, and Mr. --

Q   And how did Mr. Bourgeois perform on that test?

A   He made 94 errors, which is an extremely poor score.

Q   All right.  And did you administer something called finger tapping?

A   Yes.

Q    And what is it and how did he do?

A    He did adequately on that one.  Finger tapping is there is a little device with a little lever and the person is tapping with the index finger on their dominant hand in ten-second trials and then the same with their non-dominant hand, the index finger for ten-second trials, and his performance was adequate on the finger tapping.

Q    All right.  And you administered something called grip strength?

A    Yes.

Q    And how did he do on that?

A    His grip strength was adequate with his dominant hand. It was, he was weaker than expected with his non-dominant right hand, because normally the non-dominant hand should be about ten percent weaker than the non-dominant hand and there was a bigger discrepancy than that.

Q    Okay.  And did you see any explanation for that deficiency in that performance?

A    Yes, Mr. Bourgeois reported arthritis in both hands with more in his right, so I noted in my report that discrepancy was likely due to arthritis rather than reflecting impairment in that area of brain function.

Q    And on the seashore rhythm test, what is it and how did he do?

A    This is a test where the person listens to a series of

sounds, and there's two groups of sounds, and they are asked to write down whether the two sounds sound the same or different and there's 30 pairs, and Mr. Bourgeois made nine errors, which is in the impaired range.

Q   Okay.   And there's a series of tests called the sensory perceptual examination test?

A   Yes.

Q   And is that comprised of additional subtests?

A   Yes.

Q   What are they, how did he do and what did you make of it?

A   Well, the first section is, the person is presented with bilateral sensory stimulation, so he has his eyes closed, his hands are in front of him, I tell him I am going to touch your right hand or your left hand, tell me which one, without ever telling them in advance sometimes I touch both, and if you don't perceive both and make an error that's called a suppression.   He didn't make any suppressions.   I touched one hand, the opposite side of the face, a series of trials, didn't make any errors.   I do it with auditory function, make sounds behind each ear, no errors.   The visual part, no errors.   But when it came to -- oh, in tactile finger recognition he has his eyes closed and I tell him I am going to touch one of your fingers, one, two, three, four and five, tell me which one, he made no errors.   But when we got to fingertip number writing in which he has his eyes closed and

I tell him I am going to write a number on his fingertip, it will be upside down to him, tell me which one, he had very poor performance on both sides, making a significant number of errors.

Q   Speech sounds perception, how did he do on that?

A   He made nine errors, which with Raytan's newer normative data is actually within normal limits with the -- so he did okay on that.

Q   Okay.  And tactile performance?

A   Tactual performance?

Q   I'm sorry, tactual performance.

A   That is -- do you want me to describe what it is?

Q   Yeah, please.

A   This is a test where he's blindfolded and he's told I am going to, in front of you there's board and there's a series of blocks that go on the board.  He's allowed to feel the board with one hand and then he's asked to place the blocks into the board, it's like a puzzle with ten pieces, first with his dominant hand which for him is his left hand, then with his non-dominant hand and then with both hands.  And then without any advance warning the board is taken away, the blindfold is removed, he's asked to draw the board from memory and put the blocks where they go and he's scored on how many shapes he can remember and how many he gets in the correct location.

Q    Are the initial portions of that subtest timed?

A    Yes.

Q    And how did he do on that?

A    He had a very poor score of almost 27 minutes total time and making, having a score of more than 15 point something minutes is considered to be in the brain damage range, so that was very, very poor.

Q    Okay.  And we have heard about the Trail-making test from Dr. Gelbort.  You administered trails A and B?

A    Yes.

Q    And was he impaired on either of those?

A    He was impaired on the Trail-making test Part B.  His score was in the brain damage range.

Q    Okay.  Now, I want to ask you, you know, about your conclusions regarding that test, but before I do, is the Halstead-Raytan regarded as the gold standard test for neuropsychologists?

A    Yes, at least by many neuropsychologists.  It's had more research by a huge amount than any other neuropsychological test or battery.

Q    And you had mentioned earlier the neuropsychological deficit scale.  Explain how that scale translates all this test information and how Mr. Bourgeois did.

A    Yes.  The neuropsychological deficit scale was developed by Dr. Raytan and it takes the scores on pretty much all of

the parts of the neuropsychological battery and each section is given a score anywhere from zero to three, zero, one if its normal, two or three if its in the brain damage range, and then you get a total score, and if you have more than 26 points on there it's considered to be in the brain damage range and Mr. Bourgeois' total score was 33.

Q    All right.  And just to go back to the reason you gave the WAIS-R, it's, was it because it was normed to this neuropsychological deficit scale?

A    Yes, the neuropsychological scale specifically was researched with the WAIS-R and so a portion that contributes to the total score is based on WAIS-R scores and not from the different IQ tests, even a newer one.

Q    Is there an alternative way of scoring how one would turn out on or how one performed, I should say, on the Halstead-Raytan battery?

A    Well, there's another index called the impairment index which was an older index developed by both Doctors Raytan, Halstead and Raytan, and this takes seven portions of the battery and there is a cutoff score and if a person scores beyond that cutoff score, each test that does that, that would be like one point towards that, so of the seven, let's say someone has five of the seven parts impaired, then their impairment index would be five-sevenths converted to a decimal.

Q   Okay.  And how did Mr. Bourgeois score on the impairment index?

A   His impairment index was .86.

Q   And that's basically seven divided into six impaired tests?

A   Six, right six-sevenths.  Right, seven into six, correct.

Q   Right, okay.  Confusing me.  And is that considered in the impaired range?

A   Yes.

Q   Now, you mentioned he scored particularly poorly on the category test.  Did you make a special note in your report of the implications of that for his legal situation?

A   Well, I made the same observation in my report I would have made with anyone who had an impaired score in the category test and that is to say that someone that has a score similar to Mr. Bourgeois' is likely to have difficulty adjusting to new and unfamiliar situations and may exhibit inappropriate behavior under stressful circumstances without necessarily being aware of the inappropriateness of their actions.

Q   And just to put the final point on that, this is the last page of your report where you actually make that statement?

A   Yes.

Q   Okay.  Well, my colleague points out that you said it in two places, so I guess it was important.  Is it --

THE COURT:  He really, really meant it.

MR. WISEMAN:  What's that, he really meant it?

THE COURT:  He really, really meant it.

MR. WISEMAN:  That's right.

THE WITNESS:  That's in case somebody doesn't want to read my report and they just want to get to the --

BY MR. WISEMAN:

Q   Okay.  So what were your overall conclusions about your testing Mr. Bourgeois?

A   That the test results were valid, that they revealed overall mild cerebral impairment with moderate cerebral damage in the back portion of the brain, the posterior portion of the cerebral cortex.  That there was no evidence of malingering.  That he showed some signs of depression.  And, again, what I said about the category test, about the likelihood of exhibiting inappropriate behavior.

Q   And just to give us a proper perspective, when you use the term mild it doesn't sound so bad, what does mild brain dysfunction mean?

A   Well, there's a range of problems and, again, it's based on the overall results on the neuropsychological deficit scale, and mild impairment is going to cause someone problems.  His impairment on the category test in particular is not mild, it's very significant, but the overall, to kind of put everything together, overall his brain is functioning

in the mild range with some areas that have more impairment than that.

Q   Now, if you were testifying about this at the time of trial, would you have been able to offer any opinions with regard to the impact of the type of brain dysfunction you found in Mr. Bourgeois on issues of cognition?

A   Can you be more specific what you mean by cognition?

Q   His intellectual ability.  His ability to perceive and process information.

A   Yes, that he may at times perceive things in a distorted way and act in an inappropriate manner.

Q   And how would his brain damage affect his ability to control his emotions?

A   Well, brain damage at times can impair a person's ability to deal with emotions and it just depends on what part of the brain has been injured.

Q   And how about impulse control?

A   Same with that.

Q   Okay.  And ability to make judgments?

A   Yes.

Q   And how about judging future consequences of one's actions?

A   Yes, there could also be impairment in that.

Q   Now, I take it at the time of your evaluation you were not able to make any judgment as to whether Mr. Bourgeois

displayed these particular deficits because you didn't have

data given to you?

A    I'm sorry, didn't have?

Q    You weren't given any collateral information?

A    Yes, that's correct.  I only knew what he told me.

Q    All right.  Now that you have received a lot of data, I

assume --

A    Yes.

Q    -- from my office --

A    Yes.

Q    -- are you able to see a larger picture of how

Mr. Bourgeois' brain dysfunction impacts on his actual day-

to-day living in the world?

A    Yes.

Q    And tell the Court something about that.

A    Well, there appears to be a long history, from viewing

the extensive records, of difficulties with impulse control,

poor judgment, not thinking about consequences of actions --

          THE COURT:  Such as?

          THE WITNESS:  Well, such as not -- throughout his

file there were several people that evaluated him and he

consistently told them he was in a coma for three months, so

that suggested either he believes this or, its poor judgment

to, someone that had better judgment would realize that

experts hopefully are going to have access to medical records

and would see that that was not the case, and that would not

be something that would serve Mr. Bourgeois' situation to

make up something like that.

BY MR. WISEMAN:

Q   You were not asked at the time of trial to do any sort of

mental retardation evaluation?

A   No, I was not.

Q   And you were not asked by my office to do that?

A   I was not.

Q   When you saw the IQ score of 75, or with the

transcription error of 76, why didn't you tell the lawyers,

hey, this guy is in the borderline range of mental

functioning on an outdated test, I think you should think

about whether he is mentally retarded?

A   Well, I really had very little opportunity to talk to the

lawyers and the communication I had, which was after they

received my report, was that because Mr. Bourgeois had given

me incorrect, inaccurate and not factual information about

the coma, they felt that my report would not be useful and

weren't going to use it in any way.

Q   All right.  Now, let's talk about that conversation.  Was

it a face-to-face or a phone call?

A   A phone call.

Q   And do you recall if it was, what the duration of the

phone call was?

A    It was very brief.

Q    Okay.  Five minutes, less, more?

A    It may have been less than five minutes.

Q    Okay.  I'm going to mark, I should say display for you Exhibit 156, ask you if you recognize what it is?

A    Yes.

Q    Okay.  And that's initially an invoice you submitted?

A    That's correct.

Q    And is this overall, if I flip through it, your file that you provided to my office?

A    Yes, that's from my file, that's correct.

Q    Okay.

        MR. WISEMAN:  If I could approach the witness and ask the witness to look through this short packet?

BY MR. WISEMAN:

Q    Do you see anything in that file documenting any contact with counsel subsequent to your report?

A    No, and I clearly recall the phone call but because it was so brief, it's nothing that I would have sent a bill for, and, as far as I knew, I was not going to have any further involvement, so I just sent my bill off and filed the chart away.

Q    And did that, did the -- do you remember which lawyer called you?

A    I am not positive.  I think it was probably Mr. Tinker,

but I couldn't say for sure.

Q    All right.  Let's assume for argument's sake it was Mr. Tinker.  Did he, did you perceive it as a discussion as to the meaning of your report, the significance of your report, or was it a statement from Mr. Tinker?

A    It was more of a statement.

Q    That you are not going to be used?

A    Yes.

Q    Okay.  Did he ask you what impact the alleged lie about the three-wheeler coma had on your results?

A    No.

Q    And what would you have told him if he asked you that?

A    I would have said that the actual test results appear to be valid and that there was no evidence of malingering and that the results showed that there was brain damage which was not caused, at the time I didn't know because I thought he had been in a coma, that regardless of what the cause was he has some brain damage.

Q    In your work do you ever see patients who have had -- well, let me withdraw that.  What's a traumatic brain injury?

A    A brain injury that's caused by a blow to the head or --

Q    And --

A    -- the head striking something.

Q    And can a, have you seen in your experience people with traumatic brain injuries who do not suffer losses of

consciousness?

A   Yes, many times.

Q   All right.  If Mr. Tinker had asked you about the -- first of all, if he had provided you with the medical records about the 1993 instance when Mr. Bourgeois apparently hit the --

          MS. SALINAS:  Objection, leads to speculation, Your Honor.

          THE COURT:  Sustained.

          MR. WISEMAN:  Your Honor, I have an obligation to prove counsel's deficiencies and I have to ask hypothetical questions to do that.  It wasn't provided to him.  I have to ask the witness what would you have done if it were provided.  So that's speculation, it's my burden.

          THE COURT:  Well, the reason that it's speculation is, I have already gone over, he can't interpret those medical records, and that didn't mean there was any kind of a head injury but a grazing even, you know, that's the point.

          MR. WISEMAN:  Well, okay --

          THE COURT:  So I don't know how he could have changed, if he couldn't interpret the records how he could have changed his opinion, but you can ask him.

          MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Would you have told Mr. Tinker, if you had the medical

records, that the --

THE COURT:  He couldn't even read them.

MR. WISEMAN:  I'm sorry?

THE COURT:  He couldn't even read them, but that's okay.

BY MR. WISEMAN:

Q   Well, did you read the part about striking his head against the steering wheel?

A   Yes.  The part I, I didn't know those one initial abbreviations were in there.  I was able to read the rest of it.

Q   Okay.  And from your perspective, if you had known about a striking of a head in a truck accident on the steering wheel, would you have told -- what would you have told Mr. Tinker about that?

A   I would have said that it's possible that that could cause brain damage consistent with what my testing showed.

Q   Okay.  And if you had been given more time than you had and if you had been given any records about Mr. Bourgeois and about his deficits and impairments, could you have offered to Mr. Tinker a psychological explanation for this "lie," quote/unquote, about the coma?

A   If I had had an opportunity, yes.  If I had more information available to me and had the opportunity to do more testing, I could have.

Q   After that phone call with, presuming it was Mr. Tinker, when was the next time you discussed this case?

A   I believe it was with you or Ms. Larin in 2007.

Q   And since that time have you met with us on a number of occasions?

A   I believe a total of three times.

Q   All right.  And I take it you didn't come to Philadelphia?

A   No.

Q   Okay.  At least for that purpose.

A   Beautiful city, but no.

Q   Okay.  All right.  I have nothing else.  Thank you, Dr. Weiner.

        THE COURT:  Thank you.  Ms. Salinas?

        MS. SALINAS:  Yes, Your Honor.

        THE COURT:  You may proceed.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q   Good afternoon, Dr. Weiner.

A   Good afternoon.

Q   Back in 2002 when you were contacted to, I mean 2004 when you were contacted to perform a neuropsychological examination on Mr. Bourgeois, did you know Mr. John Gilmore?

A   I don't believe so.

Q   Did you know Mr. Douglas Tinker?

A    Just of him.

Q    Of him, okay.  Had you ever done any work before for Mr. John Gilmore?

A    Not that I can recall.

Q    Had you done any psychological evaluations for Mr. Douglas Tinker?

A    I can't recall if I did.  If I did it would have been some, probably quite a number of years prior to this one, but I don't recall.

Q    Okay.  And you were referred, Mr. Gilmore and Mr. Tinker were referred to you by Dr. Estrada?

A    That's my understanding, yes.

Q    Did you and Dr. Estrada discuss the case before you contacted Mr., or Mr. John Gilmore or Mr. Douglas Tinker contacted you?

A    No.

Q    Who contacted you?

A    I believe it was Mr. Tinker.

Q    Okay.  Now, you stated that you have conducted several, or hundreds of psychological evaluations, is that correct?

A    Yes.

Q    And do you, have you performed some of these evaluations for court settings in State Court?

A    You mean court-ordered or have they been used in cases that end up in State Court?

Q    Both.

A    I don't think I have done any neuropsychological evaluations at the request of the court for a State Court.  I have done many of them for personal injury cases, either being hired by the plaintiff or the defense attorneys, that were State Court cases.  I don't think I've ever --

Q    Okay.  Have you ever stated, testified in State Court for criminal cases?

A    I believe I have, but it has just been a very small number.

Q    Okay.  Now, and, Dr. Weiner, isn't it fair to state that attorneys, whether they are plaintiff attorneys or in civil cases, when they come to you they are employing you because of your expertise in the field of neuropsychology?

A    If, I mean I've been engaged by attorneys for other kinds of cases but more often it's for cases involving neuropsychology.

Q    Okay.  And when you were contacted back in 2004, what were you told by whom you believe was Mr. Tinker about this case?

A    Just that it was a capital murder case that was coming up for trial and that they needed a neuropsychological evaluation and that it was needed very quickly.

Q    Okay.  So you knew what your report was going to be used for?

A    Yes.

Q    Okay.  And we have been shown your psychological evaluation -- well, let me go back.  You were -- you stated that, and I am not quite sure whether I understood your explanation, you stated that when you gave the defendant the neuropsych evaluation back in 2004 you used the WAIS-R?

A    Yes.

Q    And your explanation, again, Dr. Weiner, was, why did you perform a WAIS-R when the WAIS-III had been out for approximately seven years?

A    Because Raytan's research with the neuropsychological deficit scale specifically called for the WAIS-R and the research had been done with that, and in the trainings that I went to, in fact in the initial trainings that I went to starting in the, this was back in the late '70s, he was, for neuropsychs he was saying that people should use the WAIS, even though the WAIS-R had been out for a while, just for that same reason.

Q    And, Dr. Weiner, would you not agree, though, that the protocol is to use the most current examination?

A    Well, I would not agree if specific research in a case like this specifies using that test.  If -- and at the time I did this report I believed that I was going to be called to testify and I would have explained this is the reason I used this one.  And I have the WAIS-III and I was giving the WAIS-

III to non-neuropsych kinds of situations at the time, but that's why I specifically chose the older WAIS-R.

Q    Though the protocol out there really does say that you should use, one should use the most current?

A    Well, again, Dr. Raytan, who is the inventor of this battery, was calling for the WAIS-R to be used.

Q    Okay.  When did you quit using the WAIS-R?

A    It was probably, maybe three years ago.

Q    And did you report anywhere in your report that you were using the -- well, let me retract that.  And in your report that you prepared back in March of 2004, the reason for the referral, you write in your report, was to determine whether or not the defendant had brain damage?

A    Correct.

Q    And when you spoke to Mr. Tinker, was there any indication to you from Mr. Tinker that there might be some suspect that he had some brain damage?

A    I just recall being asked to do an evaluation to determine whether or not he might have brain damage.  I don't remember him telling me whether he suspected it or not.

Q    And you don't recall that Dr. Estrada might have told you that he suspected that there might be or might not be any brain damage?

A    I have not had any communication with Dr. Estrada about this case.

Q    Prior to you conducting the examination?

A    Well, prior or after, other than what I have read from the reports that I was provided.

Q    Okay.  Now, you stated that you conducted a series of examinations on Mr. Bourgeois back in March, I'm sorry, February of 2008, 2004?

A    Yes.

Q    And you were asked about, in particular about the category test, do you recall that?

A    You mean just a little while ago?

Q    Right.

A    Yes.

Q    About his performance on the category test?

A    Yes.

Q    And I believe in your report you state that, "His performance on the category test suggests that he may exhibit inappropriate behavior under stressful circumstances."  Do you recall that?

A    Yes.

Q    And isn't it true, though, the Halstead-Raytan, the category test is a test that is considered the battery's most effective test for detecting brain damage but does not help to determine where the problem is occurring, and --

A    The category test in some specific cases can specifically point to the presence of frontal lobe damage, but barring

that, what it tells you is that there is damage present somewhere and then you have to look at the results to see where it appears that that might be.

Q    And the test also evaluates abstract ability or the ability to draw specific conclusions from general information?

A    Not the category test.  It does involve abstract reasoning but you may be thinking of, I saw in someone's report them saying that about the comprehension subtest of the WAIS.

Q    So you don't agree with that as far as the category test, that it, that the test evaluates abstract ability or the ability to draw specific conclusions from general information?

A    Well, I would say that that second part is a very vague description.  I mean it is a concept formation test and the information is just the feedback on the pictures that they are getting.

Q    Okay.  And that generalization or that description of the Halstead-Raytan battery exams doesn't say anything, does it, about inappropriate behavior under stressful circumstances?

A    That comes directly from Dr. Raytan.  In several of the workshops that I went to that's what he said about the category test.

Q    Okay.  Now, when you are asked to prepare to evaluate an

individual, you give your battery of examinations to the individual and I assume you take some time to read the results and then you prepare your final product, is that correct, which is a report?

A    That's correct.

Q    And when you give this report to the individuals who have requested this from you, they are relying on your expertise?

A    Yes.

Q    And you gave your report after you evaluated Mr. Bourgeois and had gone through the series of examinations?

A    Yes.

Q    And would it be fair to say then that both Mr. Tinker and Mr. Gilmore relied on your report?

A    Well, I can't say that they relied on it because they didn't use it.

Q    Would have relied on it?

A    I don't understand.

Q    Well, you gave them a report.

A    You mean if they had used it would, do I believe they would have relied on it?

Q    Yes.

            THE COURT:  What you can't assume is that they didn't use it for their own strategic reasons.

            THE WITNESS:  Oh, okay.

            THE COURT:  So be careful how you answer.

THE WITNESS:  Okay.  I'm sorry, can you please rephrase your question?

BY MS. SALINAS:

Q   Well, let me ask you this way:  In your -- you had a later conversation, once you gave the report to Mr. Tinker or Mr. Gilmore you had a conversation with them, correct?

A   They, one of them called me after they had received the report.

Q   Okay.  And they informed you why they weren't going to be using your report?

A   Yes.

Q   So you could assume, could you not, that they in fact read your report and knew what your report stated about a coma?

MR. WISEMAN:  Objection to an assumption, Your Honor.

THE WITNESS:  I would hope that they read my report.

MR. WISEMAN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Again, I believe that they surely must have read my report.

BY MS. SALINAS:

Q   And that's what your report is for, for them to read and to rely on it?

A   Yes.

Q   Okay.  And you wouldn't expect anything else other than that for them to rely on it?

A   Yes, I would not expect them to do anything else but to take into consideration that information.

Q   Right, okay.  Now, when you were evaluating the defendant, you, there was nothing told to you about an incident that occurred back in 1994 as far as an accident was concerned?

A   Are you talking about that accident that was in 1993 or --

Q   1993, excuse me.

A   Yes, I was not -- no, I was not told about that.

Q   Okay.  And so there was nothing to relate back to saying, hey, get me some records for a 1993 accident?

A   That's correct.  I didn't know of the existence of that accident.

Q   Okay.  And going back to the defense exhibit, Plaintiff's Exhibit 154, that was the chart regarding -- oh, I'm sorry, Plaintiff's Exhibit 158.  Do you recall this chart?

A   Yes.

Q   And you were asked some specific questions about the difference and the comparisons between the test that you gave in 2004 and the WAIS-III that was given in 2007.  Do you recall those questions?

A   Yes.

Q    And isn't it true that on the verbal skills or verbal performance or verbal test you would normally see in the WAIS-III, you would expect to see no more than a one-level drop?

A    I don't know what you mean by one level.

Q    Well, you would expect the verbal to be lower by about one point?

A    That's not correct.

Q    Okay.

A    There's a range here, for instance, for a WAIS-R score of 70 on the verbal you would expect the score on the WAIS-III to be as low as 66.

Q    But I'm talking about the level, the drop, the not lower than one point.

A    I don't know where you are seeing that.

Q    Well, you know the difference or what kind of variance you should see between a WAIS-R exam and a WAIS-III exam and what the charts would show?

A    Yes.

Q    And isn't it true that on a WAIS-III you would expect to see in verbal only a decrease of one level, whereas the, Mr. Bourgeois had a drop of nine levels?

A    Are you talking about level points?  You are saying one level, I don't, there's no psychological term for --

Q    Level points.

A   This chart, what this chart shows is that on, let's take a WAIS-R verbal IQ of 70, that on the WAIS-III the score could be as low as 66 or it could be as high as 70, so there could be a four-point discrepancy.

Q   Okay.  And it is still your testimony that on performance, when you are comparing a WAIS-III to a WAIS-R that WAIS-III you would expect to see a lowering of no more than four levels?

A   For that score that would be, that would be the expected range, yes.

Q   But, and you are aware that in the performance from Mr. Bourgeois when comparisoned from the 2004 to the 2007 performance actually increased by two levels?

A   Yes, he did do better on, I believe better on -- let me see, do you have the scores there on the --

Q   I need Defense 155.  I've put on the screen Plaintiff's Exhibit 155, and on his performance he had a 76 on the WAIS-R and it increased by, actually by two points in the 2007 exam.

A   Yes.

Q   And that's not what you would normally, the charts that you were shown would normally show?

A   Well, there is a margin of error for test scores so if you, even on the same test, you could give the same test to a person, let's say six months to a year apart, their score could be three points higher, it could be three points lower,

so there could be a range of six points even on the same test, so those two scores are not statistically significantly different from each other.  You really can't draw any meaningful conclusion, particularly since the table that shows the difference for performance IQ shows it could be as few as two points lower, which would make that a 74, but that 74 could correspond to a, what we call the true score, in other words if you test them on different dates, anywhere from a 71 to a 77.  The same with that 78, could be anywhere from a 75 to an 81.  So because there's an overlap there, you really can't conclude anything other than they are in the same ballpark as each other.

Q    So to you they are in the same ballpark.  This falls within the charts that we had seen earlier?

A    Yes.

Q    Okay.  And you stated earlier that, when you were testifying you mentioned some, the defendant had been in several wrecks and that he had, you had seen his driving records.  What are you, what did you see, what did you view?

A    These were I guess collateral statements from people that knew Mr. Bourgeois and one of them I remember was describing that where most people took four to six weeks to learn how to be a --

            THE COURT:  Did you talk with these people?

            THE WITNESS:  No, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Where --

THE COURT:  So where did you get the information?

THE WITNESS:  These were from extensive files that Mr. Wiseman provided to me that I reviewed that I guess they are a collection of all the different people that were interviewed about Mr. Bourgeois.

BY MS. SALINAS:

Q   Do you know if they were family members that were saying that?

A   I probably could find it if you'd give me a few minutes but they -- I am not sure who said that but what I do recall from that is that that person reported that Mr. Bourgeois took, I think, about six months to learn --

Q   Well, I'm, let me just stop you.

A   Okay.

Q   But you were talking about his driving record, that he had lots of accidents and he had gotten several tickets?

A   Yes.  I was basing that on the statement that I reviewed.

Q   A statement you reviewed?

A   Yes.

Q   Whose statement was that?

A   Well, you'll have to give me a few minutes to look through and tell you that.

Q   Go ahead.

THE COURT:  Go ahead.

THE WITNESS:  Okay.  Okay, this was in a letter to Ms. Larin dated August 12th, 2010 by Victoria Swanson, it's a report, and --

BY MS. SALINAS:

Q   By Dr. Swanson?

A   Yes.

Q   So you are relying on Dr. Swanson's report?

MR. WISEMAN:  Your Honor, I am going to object. Dr. Weiner did not rely on it.  He didn't comment on it in his direct exam, direct examination.

THE COURT:  I'm sorry, but this is getting a little far afield.  He didn't hear the people say it, he didn't interview them.

MR. WISEMAN:  I agree.  I didn't ask him about it.

THE COURT:  So I don't know why she's doing it either.

MR. WISEMAN:  Okay.

THE COURT:  But there you have it.

MS. SALINAS:  We'll move on, Your Honor.

THE WITNESS:  Okay.

THE COURT:  Oh, he relied on, I thought he said he relied on this for his answer, but nonetheless.

MS. SALINAS:  Okay.

BY MS. SALINAS:

Q    And, Dr. Weiner, in your report you state that the defendant had cerebral damage?

A    Yes.

Q    He had brain damage?

A    Yes.

Q    And in your report you actually state that the brain damage was likely due to the injuries sustained in the three-wheel accident that took place in 1984?

A    Yes.

Q    Okay.  Which resulted in a coma lasting one to two months?

A    Yes.

Q    And you further state that you believe that the damage he had was to the posterior portion of the cerebral cortex?

A    That it was more significant there, yes.

Q    Okay.  And the 1993 accident that you talked about or testified earlier, that would have put the defendant at what age?

A    Let's see.  '93.  Approximately 29.

Q    And the 1984 accident would put the defendant at what age?

A    Twenty.  Approximately 20.

Q    And, Dr. Weiner, after you interviewed the defendant and you wrote your report, your report that you sent to both

Mr. Gilmore and Mr. Tinker, you did not tell those attorneys that the defendant was mentally retarded?

A    No, I did not.

MS. SALINAS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. SALINAS:  I pass the witness, Your Honor.  I have no further questions.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q    A little bit of follow-up, Dr. Weiner.  You didn't tell the lawyers Mr. Bourgeois was mentally retarded why?

A    I wasn't asked to do an assessment for mental retardation.

Q    And did you --

THE COURT:  What were you asked to do?

THE WITNESS:  To see if he had brain damage or not.

BY MR. WISEMAN:

Q    And what's the difference between those two tasks?

A    Well, just to establish the presence of brain damage.  To do a neuropsychological evaluation to determine whether or not someone is mentally retarded, you would also have to do a measure of adaptive functioning.

Q    The brain damage you identified in Mr. Bourgeois, leaving aside the motor vehicle accidents or accident in his

background, could there have been other causes for his brain damage, based on material that you have now reviewed?

A    Yes.

Q    Such as?

A    Apparently a long history of physical abuse.

Q    The childhood abuse?

A    Yes.

Q    Okay.  What is the --

THE COURT:  Did you ask him if he had any abuse?

THE WITNESS:  No, Your Honor, I did not.

THE COURT:  Okay.

MR. WISEMAN:  I'm sorry, the question was did you ask him?

THE COURT:  I did.

MR. WISEMAN:  Okay.

THE COURT:  That's what I asked him.

BY MR. WISEMAN:

Q    What's the phrase convergence of data mean to a psychologist?

A    I'm sorry, what is --

Q    Convergence of data.

A    Different sources of input are all helping to arrive at the same conclusion.

Q    Okay.  And so, when we look at Mr. Bourgeois' performance on these two tests we see a low and we see a high, we can put

in a margin of error into those scores, so how does a neuropsychologist or any psychologist figure out where the truth is in that range?

A   Well, first of all, we want to see does it look like the results are reliable, and reliable means you are going to get similar performance across test administration, and in this case there were different versions of the same test but when you take that into consideration the scores are within, pretty much in the range of the margin of error, which shows that the results were consistent, which would make them appear to be reliable and valid.

Q   All right.  And just to put a finer point on it, the --

THE COURT:  I'm sorry, wait.  What were you comparing just then?

THE WITNESS:  The scores on the WAIS-R and the WAIS-III --

THE COURT:  Okay.

THE WITNESS:  -- were pretty similar to each other.

THE COURT:  But when you took the scores yourself you did not say anything about mental retardation or --

THE WITNESS:  No.

THE COURT:  Okay.  Why is that?

THE WITNESS:  Why when I administered it did I not say anything about mental retardation?

THE COURT:  Yes.

THE WITNESS:  Well, first of all, I was not asked to do an evaluation for mental retardation so it would not have been possible.  Even if I had found that he had had an IQ of 60 on the IQ test, I could not have concluded that he was mentally retarded without also administering adaptive behavior instruments, which I was not asked to do.

BY MR. WISEMAN:

Q   And would you have had time to do it at that point?

A   I would not have had time to do it.  And I would have needed input from other sources, especially now that I know that I was not given actual, factual information from Mr. Bourgeois about his past.

Q   If counsel had sat down with you and discussed, or even stood up and discussed with you the implications of these scores, would you have explained to them the meaning of a 75 IQ in relation to mental retardation?

A   Yes, and I would have explained, as it states in the diagnostic DSM manual, that you can have a diagnosis of mental retardation with an IQ score as high as 75, because of the margin of error on tests, as long as there is significant deficits in adaptive functioning.

Q   Now, getting back to --

THE COURT:  Such as?

THE WITNESS:  Such as what kind of deficits, is that what you are asking?

THE COURT:  Right.

THE WITNESS:  Impairment in communications skills, impairment in social skills, impairment in --

THE COURT:  Well, you talked to him, didn't you?

THE WITNESS:  I did talk to him, yes.

THE COURT:  Did you see that he had any of those?

THE WITNESS:  Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

BY MR. WISEMAN:

Q    Getting back to the concept of convergence of data, if we put the margin of error on the 70 and it goes down to 65 and if we go on the other end, put the margin of error of five points on the 75, we have a range of 65 to 80, and so I guess my question is, looking at a 65 to 80 with a margin of error, how do you as a psychologist know where the truth lies?

A    Well, if I were doing a mental retardation evaluation, I

would recognize that the 75 on my test would actually correspond more likely to a score of around 70 on the WAIS-III and now you tack on the margin of error and you have got 65 to 75.  And, as I stated, this comes straight from the DSM manual that the diagnosis of mild mental retardation can be made specifically for that reason, that there is a margin of error, as long as there's documentation of adaptive deficits.

MR. WISEMAN:  Your Honor, I am through with my questioning.  I would like to move my exhibits, which I have as, these are the ones that have not been previously moved, 154, 156, 29A the Court's already admitted, and 29.

THE COURT:  Any objection?

MS. SALINAS:  No, Your Honor.

THE COURT:  Those are admitted.  Thank you.

(Defendant's Exhibits P29, P154 and P156 admitted into evidence)

MR. WISEMAN:  Thank you as well, Dr. Weiner.

THE WITNESS:  Do you need this that you handed me?

MR. WISEMAN:  Yes, don't leave with any exhibits.

THE COURT:  Ms. Salinas, anything further?

MS. SALINAS:  Judge, can I have just a quick moment?

THE COURT:  Yes, ma'am.

MS. SALINAS:  No more questions, Your Honor.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you, Your Honor.

MR. WISEMAN:  Could we have a few minutes before our next witness, Your Honor?

THE COURT:  Oh, do you want to take a break?

MR. WISEMAN:  Yes, if that's all right.

THE COURT:  Two or three minutes?

MR. WISEMAN:  Thirty seconds.

MS. BOOTH:  How about five minutes?

THE COURT:  How about 15?

MS. BOOTH:  Okay.  Sold.

(Recess at 3:11 p.m. until 3:24 p.m.)

THE COURT:  Would you administer the oath, Ms. Casey, please?

THE CLERK:  Yes, Your Honor.

DR. JETHRO TOOMER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  Please be seated, sir.  Thank you.

THE WITNESS:  Good afternoon, Judge.

THE COURT:  Good afternoon, sir.

MR. WISEMAN:  Dr. Toomer, I asked you before you took the stand and I will remind you, do not touch the microphone.

THE COURT:  Thank you very much for that.

MR. WISEMAN:  That's all right.  I feel like I'm personally responsible now.  Could you --

THE COURT:  Well, we all are.  I mean, I think they are losing hearing from this kind of stuff.

MR. WISEMAN:  No, I fully understand, believe me.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Could you state your full name for the record, please?

A   Jethro W. Toomer.  J-E-T-H-R-O,  W. Toomer, T-O-O-M-E-R.

Q   And what is your occupation, Dr. Toomer?

A   Presently I am engaged in the private practice of clinical and forensic psychology.

Q   And I am putting up on the overhead your, a document, Petitioner's 28.

A   Yes.

Q   Could you identify it?

A   Yes, that's a copy of my resume.  There has been a slight change since this.

Q   Okay.  Would you tell us what that change is?

A   Since this was done I have retired from the teaching faculty at Florida International University and I am now a consultant with the Florida International University Law School in forensic mental health.

Q   All right.

MR. WISEMAN:  I would offer Dr. Toomer's CV, Your Honor, for the Court.

THE COURT:  Number?

MR. WISEMAN:  28.

MR. DOWD:  No objection, Your Honor.

THE COURT:  28 is admitted.

(Defendant's Exhibit P28 admitted into evidence)

BY MR. WISEMAN:

Q   Dr. Toomer, the Judge can read about your education and such but could you --

THE COURT:  Where is Florida International University?

THE WITNESS:  In Miami.

THE COURT:  Thank you, sir.

BY MR. WISEMAN:

Q   Could you --

THE COURT:  Where is it located in Miami, where?

THE WITNESS:  I beg your pardon?

THE COURT:  Where in Miami?

THE WITNESS:  It's located southwest of Miami en route to the Florida Keys.

THE COURT:  Thank you.

THE WITNESS:  We are due east -- University of Miami is east, we are west.

THE COURT:  Okay, thanks.

BY MR. WISEMAN:

Q   Why don't you tell us a little bit about your background and credentials as it relates to forensic mental health evaluations?

A   I have a bachelor's, master's and PhD degree in

psychology.  I am a, my bachelor's degree is from Morehouse College in Atlanta, Georgia and my master's and PhD degrees are from Temple University in Philadelphia.  I completed a year's post-doc residency at Albert Einstein Hospital in Philadelphia.  I am a diplomate of the American Board of Professional Psychology, a diplomate of the American Board of Forensic Examiners, and I have been engaged in the private practice of clinical and forensic psychology for approximately 30 years.  And, as I have indicated, I recently retired from the teaching faculty in mental health counseling at Florida International University and I now consult in forensic mental health at the Law School at Florida International University.

Q   And what's the breakdown in your practice between clinical and forensic work?

A   Clinical and forensic work, it really depends on the time of the year.  Approximately 50, perhaps 50 percent to 60 percent of my practice is forensic.  The other part of my practice is involved in my private practice.  I am regional treatment consultant for the National Football League and I am regional treatment consultant for the National Basketball Association, so my work --

THE COURT:  Well, you are what for the National --

THE WITNESS:  I beg your pardon?

THE COURT:  What did you say you were?

THE WITNESS:  I am the regional treatment consultant for the National Basketball Association.

THE COURT:  What does that mean, what do you do?

THE WITNESS:  That means I deal with --

THE COURT:  If they've got sports block or something?

THE WITNESS:  Well, yeah, that and when they get in trouble, substance abuse --

THE COURT:  Oh.

THE WITNESS:  -- domestic violence, all those kinds of issues, they have to see me.

THE COURT:  Okay.

THE WITNESS:  And --

THE COURT:  And then you clear them to whatever?

THE WITNESS:  Right, according to the, there's a collective bargaining agreement that sets the criteria in terms of treatment and how long they have to receive treatment before they have a clean slate, so to speak.

THE COURT:  Is it graded for what kind of problems they have, I mean a year for this, two years for that, six weeks for this?

THE WITNESS:  What, no, what, generally what happens is that two years is the period, but it can be adjusted depending upon whether the person does exceptionally well, whether there are periods of relapse or what have you, so

there are adjustments made depending upon the nature of the offense.

THE COURT:  Did you play basketball, too?

THE WITNESS:  Beg your pardon?

THE COURT:  Did you play basketball?

THE WITNESS:  No, I did not.

THE COURT:  Okay.

THE WITNESS:  Not in college or anything like that, no.

BY MR. WISEMAN:

Q    Oh, come on now, Jethro.

A    Huh?  No.

Q    Is the work with the NBA and the NFL the reason for the seasonal adjustment and how much of your practice is clinical?

A    That is correct.

Q    Tend to have a busy time?

A    Yeah, when the season is over things get kind of busy.

Q    Okay.

MR. WISEMAN:  Your Honor, at this time I would offer Dr. Toomer as an expert in clinical and forensic psychology.

MR. DOWD:  No objection, Your Honor.

THE COURT:  He's accept- --

MR. WISEMAN:  Uh --

THE COURT:  I'm sorry?  I didn't hear you.

MR. DOWD:  Oh, I'm sorry, Judge.  I said no objection, Your Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q   Dr. Toomer, you do a lot of work for defense counsel in criminal cases?

A   Yes, I do.

Q   And capital cases in particular?

A   Yes, I do.

Q   And you have done quite a bit of work with my office?

A   That's correct, yes.

Q   And do you have any particular philosophical reason why you work for the defense or is it just who calls you on the phone?

A   I, it's who calls me.  I don't solicit business or anything like that and my philosophy in terms of what I do is guided by the principals of the profession, so it doesn't really matter who calls me, I perform my activities in the same way.

Q   Okay.

THE COURT:  Well, have you testified as the, in similar circumstances has the Attorney General's Office called you?

THE WITNESS:  No, I haven't been called by the Attorney General's Office.  I do, in the Eleventh Judicial

Circuit in Florida I testify for the state in cases of competency, sanity and the like.

THE COURT:  Okay, but not for the federal government ever?

THE WITNESS:  Yes, but not for the federal government, no.

BY MR. WISEMAN:

Q   Did you conduct a forensic evaluation of Mr. Bourgeois at my request?

A   Yes, I did.

Q   And what exactly did that evaluation consist of?

A   That consisted of the administration of several protocols as well as an extensive what we call clinical assessment or psycho-educational assessment.

Q   And did you review any records either before or after you met Mr. Bourgeois?

A   Yes, I did.  There were numerous documents that were reviewed, roughly about 58 separate documents, and they included prior evaluations that had been conducted, trial transcripts and records, examinations that had been conducted by other experts and a variety of --

Q   Okay.  And let me draw your attention --

A   Yes.

Q   -- to the document that's on the screen.  Is that, it's Petitioner's 137, is that a list of the materials you

reviewed?

A    That is correct, yes.

Q    And it's two pages?

A    That's correct.

Q    Actually it's three pages, excuse me.

A    Three pages, yes.

Q    And you relied, reviewed and relied on a number of declarations from lay witnesses?

A    That is correct, yes.

Q    And did you in addition have an opportunity to speak to a number of lay witnesses?

A    I did, yes.

Q    All right.  And would that have been face-to-face or over the telephone?

A    All by telephone.

Q    And, of course, you reviewed all the expert reports on the third page of this document?

A    Yes, I did.

Q    And when and where did you meet with Mr. Bourgeois?

A    At the detention center in Terre Haute.

Q    Okay.  Terre Haute, Indiana?

A    That's correct.

Q    Do you recall approximately when that was?

A    That was on May 2nd of 2007.

Q    And how much time did you spend with him at that point?

A    I believe about four-and-a-half to five hours.

Q    And is that typical for that type of an evaluation?

A    That's about standard.

Q    Okay.

A    Standard time, yes.

Q    And what did you do in that evaluation, did you talk to him?

A    Yes.  The process involves, we mentioned earlier what we call a clinical assessment, clinical evaluation, which is, which involves taking of a developmental history, trying to determine and get some idea as to how the person has evolved from, really from birth up to the particular point in time, and then there is the administration of certain protocols that are designed to assess things such as personality functioning, whether or not, personality functioning, screening for the likelihood of some underlying neurological impairment, academic assessment, substance abuse history and those kinds of things.

Q    And the, you keep referring to protocol --

A    Tests.

Q    Tests, okay.

A    Tests, yes.

Q    And what tests did you administer, what psychological tests did you administer?

A    I administered the Bender-Gestalt designs, which is a

test that's utilized as a screening instrument to point out and to suggest whether or not there might be some problem or some difficulties in terms of, in terms of underlying neurological, neurological, they might have that as their basis, some underlying neurological involvement.  Brain damage, if you will.

Q   Right.

A   It also is a screening instrument as to whether or not there might be some underlying thought process deficiencies and the like.

Q   And in particular did you administer a test called the MCMI?

A   Yes, that's the Milan Clinical Multiaxial Inventory, Third Edition.

Q   And describe for the Court briefly what that test requires of the subject.

A   The Milan Clinical Multiaxial Inventory is an instrument that's designed to assess areas of personality functioning, areas of personality deficits, and the individual is instructed to respond to a series of items that assess various dimensions of functioning.  It assesses, for example, as an example of certain areas of functioning, interpersonal relationships, current and historical mental status functioning, family relationships, substance abuse history, all of those areas and others are covered, in addition to

assessing the person's beliefs regarding religion, regarding, regarding interpersonal interaction with others and the like.

Q   And how does the test get administered?  What does the person do and what do you do?

A   The person, it is a true/false design in terms of how the person responds, and the person is given a booklet and the booklet has a number of items that are listed and the person is to respond according to whether or how the item relates to them as to whether it's true or whether it's false.

Q   Okay.  And then when you get -- how many questions, roughly, are there?

A   There are about, there are approximately, I believe 300 and some items I believe on the --

Q   And --

A   I'm sorry, there are approximately, I believe 170 some items on the instrument, yes.

Q   Okay.  And how does it get scored?

A   It's scored by computer.

Q   Okay.

A   It's a computer-scored protocol that is scored and the results are returned to us.

Q   All right.  And what form do the results take, is it a report?

A   It gives a report and it indicates whether or not and to what degree -- first of all, it describes whether or not the

protocol was valid, in other words, whether the person was responding in a truthful and consistent manner.  And then given that, the next part of the report stipulates whether or not and to what degree there might be some deficiencies in terms of personality functioning or overall functioning.

Q   And if a person malingers on that test, is that reported by the computer?

A   It would be reported and would be reported in that section that I alluded to earlier in terms of whether or not the person responded in a truthful manner.

Q   And --

A   Truthful and consistent manner.

Q   -- in conducting your evaluation would you ever rely just on the results of the Milan?

A   No.

Q   One piece of data in a larger --

A   No.  The overall process in terms of conducting an evaluation requires that you consider all possible, all possible sources of data that are available, so in addition to the evaluation that is conducted face-to-face, you have the protocols, the tests that are administered.  And you also rely upon accounts of individuals who have knowledge of the person for as long as possible, you rely on those reports. And then you also rely on collateral, rely upon collateral data, school records.  If the person has been involved in any

other system, school system, criminal justice system, hospitals or whatever, you rely on that particular source of documentation also. So all of that goes into the rendering of whatever the opinion happens to be.

Q   And in this instance what did the Milan report back about Mr. Bourgeois' personality?

A   Well, it, the Milan reported and indicated that there, that Mr. Bourgeois suffered the effects of a major personality disorder.

Q   And any in particular that are notable?

A   Well, the test itself reported the existence of deficits which were consistent with the diagnosis of a personality disorder. There was indicated in the report results a schizoid-type personality disorder and also there were, there was evidence of a narcissistic disorder, there were elements or traits of those particular disorders, so all of those were indicated as part of the test results.

Q   And let me just ask, the --

A   Yes.

Q   Were the test results valid, did it detect any malingering?

A   No. The test results, the results were considered to be valid and it was based, and based upon the results Mr. Bourgeois responded in an organized fashion and also responded in a truthful and consistent fashion.

Q   Now --

THE COURT:  You didn't test for mental retardation, you just tested for personality problems?

THE WITNESS  I just tested for the personality, yes.

BY MR. WISEMAN:

Q   The, does the Milan give you any information regarding Axis I major mental disorders?

A   Yes, it provides the, it provides a breakdown in terms of disorders that the individual manifests with respect to Axis I and Axis II.

Q   And with regard to Axis I, what information did the report provide you about anything on Axis I?

A   The report reflected that the major issue with regard to functioning had to do with the Axis II diagnosis.

Q   Right.  I am looking at -- well, perhaps I should put it up for you.

A   Yes, uh-huh.

MR. WISEMAN:  And I apologize, Your Honor, I accidentally marked the copy.  I will offer the Court a clean copy.

BY MR. WISEMAN:

Q   But let me show you first the top page.  Does that appear to be your declaration in this case?

A   That is correct.

Q   And that's Petitioner's 26.

A    That's correct.

Q    I want to direct your attention to page 2, and those lines up there are my markings.

A    Correct.

Q    It says here that, "Psychological testing suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder."

A    That's correct, yes.

Q    Okay.  So what does that mean?  Is it diagnosing that or is it giving you information relevant to those conditions?

A    It's saying that with regard to the test results that his, his results are consistent with an individual who is diagnosed as suffering from those particular, those particular disorders, that is, a delusional paranoid disorder and post-traumatic stress disorder.  When we talk about Axis I, what we are talking about and what is reflected on Axis I are disturbances in functioning that differ from action, from Axis II diagnosis in terms of manifestation and in terms of time.  Axis I diagnoses tend to be those diagnoses where, for example, there is a time frame.  In other words, there is, when you talk to individuals, when you look at the individual's functioning, you can say at this particular point in time seems to be when the symptom etiology began to manifest itself in some prominent fashion.

          THE COURT:  When was that?

THE WITNESS:  Beg your pardon?

THE COURT:  When did it begin?

THE WITNESS:  The disorders?

THE COURT:  Right.

THE WITNESS:  The post-traumatic stress disorder and the paranoia, and the delusional paranoia disorder?

THE COURT:  Yes, sir.

THE WITNESS:  Early on individuals began to describe what they considered to be --

THE COURT:  Did you talk to the individuals?

THE WITNESS:  I talked to two of them and I had knowledge through their affidavits and statements from others, yes.

BY MR. WISEMAN:

Q   Dr. Toomer, let me just ask you, in addition to the materials that we put up earlier that you reviewed --

A   Yes.

Q   -- did you watch videos of the Government's experts' evaluation of Mr. Bourgeois?

A   Yes, I observed Mr., Dr. Moore, I believe it is.

Q   Okay.

A   Dr. Moore's interview.

Q   And did you review their reports?

A   Yes, I did.

Q   Dr. Moore and Dr. Price?

A    Yes, I did.

Q    All right.  And did you have an opportunity to speak with Kerry Brown?

A    Yes, I did.

Q    I should say Kerry Brown, Esquire?

A    Esquire, yes.

Q    Okay.  And that was a phone call you had with him?

A    Yes.  By telephone, yes.

Q    And that was recently?

A    That was recently, yes.

Q    Okay.

         THE COURT:  Before or after your report?

         THE WITNESS:  After my report.

BY MR. WISEMAN:

Q    Now, we are going to get more into the, you know, the, what the Milan is showing, but I just want to ask you initially, as a result of all these materials you reviewed and your evaluation and testing, did you reach conclusions about Mr. Bourgeois to a reasonable degree of psychological certainty?

A    Yes, I did.

Q    All right.  I am going to break this down into several categories and I'd like to first talk about the history you reviewed that's relevant to the formation of those opinions. What did you see in Mr. Bourgeois' history that you thought

was noteworthy?

A   I think the one thing that stands out in terms of history is the fact that there was consistency among the informants with respect to their observations.  Those informants described the individual's, the turbulence that characterized his developmental history, and they --

THE COURT:  Who did you talk to about that?

THE WITNESS:  I talked to, well, I saw all of the affidavits that I mentioned before --

THE COURT:  Besides the affidavits, who did you actually talk to about this?

THE WITNESS:  I spoke with, I spoke with Ms. Claudia Williams and I spoke with Mr. Wilmer Bourgeois.

BY MR. WISEMAN:

Q   And Mr. Kerry Brown?

A   And Mr. Kerry Brown, right, the attorney.

Q   All right.  And what were the informants and the declarations consistent with respect to?

A   They all described a turbulent developmental history characterized by fragmentation, if you will, and problems in the familial unit overall, and in addition to that described a pattern of instability, a pattern of abuse and a pattern of neglect that was consistent, that was persistent, and that was reflected upon by individuals who had contact with the family unit and particularly with the mother of

Mr. Bourgeois.

Q   And what did you learn about the mother's ability to sort of cope and the stressors that may have been on her while Mr. Bourgeois was a child?

A   The, Mrs. Bourgeois' ability to nurture as a parent was called into question by the informants that, whose accounts I considered.  There apparently was a great deal of stress that she experienced that was manifested in terms of how she interacted or did not interact with her children.  She was, she had given birth to five children, I'm sorry, to seven children who had four different fathers from the period of roughly '59 through '67 in terms of years.  Mr. Bourgeois' father, a Mr. Sterling, whom she had hoped to marry, was already married at the time that they were, that they were seeing each other, and then at some point he simply left and abandoned that particular unit.

Q   Did you learn anything about how many children Mr. Sterling had fathered?

A   Yes.  I believe he had like around 20 children or something like that.

Q   From different women?

A   Else-, from different women elsewhere.

Q   And did his abandonment of Mr. Bourgeois' mother have an impact on Mr. Bourgeois?

A   Yes, I think his abandonment and the abandonment that he

experienced in the family unit by the mother had significant effect and impact on his overall functioning. He described to me and also to others the fact that the mother basically indicated to him that he would be no good, that he was no good because he was like his father, and in doing so, and given the dynamic that I mentioned earlier in terms of what was going on in the family unit, you had that compounded with other dimensions of abuse, emotional abuse as well as physical abuse, and the abuse that Mr. Bourgeois suffered, especially with regard to abandonment, was probably of the most severe kind.

Q All right. And let's talk about the abandonment for a moment. I think I know what you are referring to but what do you mean when you say he was abandoned?

A Abandonment has to do with a withdrawal or an absence of nurturing and support over time and the abandon- -- it's difficult in a way to describe because I don't want to say that one type of abandonment is better than another, but if abandonment occurs, the idea is that the abandonment should be quick, clean and it should be conclusive. In other words, the person who is the nurturer, the giver of aid, should just leave and no longer be in the picture. The devastation is compounded if you have abandonment and the individual who is the source of the abandonment is still seen, is still observed, there may even be some limited contact. That is

even a more devastating form of abandonment than the previous one that I described.

Q   And we are talking about the latter abandonment in this case?

A   That's correct, yes.

Q   All right.  And factually what was, what leads you to conclude that the abandonment was not clean?

A   Because Mr. Bourgeois has a knowledge that, he believed that his mother did not care for him, wanted to get rid of him, sent him to live with a person by the name of Miss Mary in the neighborhood, and even though that had occurred he still had contact with his mother, visually and otherwise, so she was still around except that he was not part of that, part of that unit.

Q   And when you talk about the devastating impact of that type of abandonment or any abandonment, for that matter, what's going on there, why does, I mean it may seem obvious but why, why is that so devastating to a child?

A   In order for, in order for an individual, any individual, to develop the skills that are necessary in order to function in a structured, organized and productive fashion, in order for an individual to do that, that individual must have, early on, structure, security, saneness, predictability and nurturing.  Without those factors we can almost guarantee that you are going to have an individual who will be impaired

in terms of later functioning.

Q   Now, let me just ask you about that.  You can guarantee almost impairment in function?

A   Yes.

Q   Are you saying that everybody whose mother abandons them turns out to commit murders or leads a criminal life or --

A   No.

Q   You are shaking your head and I think --

A   No, I am not.  No, I am not.

Q   Okay.  Explain, you know, what goes on that causes some people to have more extreme impairment than other people.

A   What goes on is, one, the nature of the dysfunction that we described that we just talked about.  Another factor has to do with the onset.  Another factor has to do with the consistency and the persistence of those particular deficits that we have alluded to in terms of how it occurs, whether it is consistent over time, whether there is any intervention, whether there are any other individuals who are there to counter those particular developmental deficits.  Those are the kinds of factors that go into play that impact on what happens subsequently.  Then you can also have other factors that come into play which may be reflected in issues such as mental illness, other kinds of trauma that the individual may experience, and as a result the, what occurs or what results is going to be impacted upon by those.

Q    Did you see in the materials any reference to any sexual abuse?

A    There was one instance where Mr. Bourgeois indicated that he had been sexually abused by a neighbor.

Q    And was this in your interview with him?

A    Yes, uh-huh.

Q    Okay.

A    And also I believe in the interview with Dr. Moore.

Q    Okay.

A    Where he indicated --

THE COURT:  Who, did he say specifically who it was?

THE WITNESS:  No, he did not.  He did say that he went to his mother to report what had transpired and instead of being supportive he was beaten by his mother and accused of not telling the truth.

BY MR. WISEMAN:

Q    And, again, it may be obvious, what's the impact of something like that happening?

A    What --

Q    First the abuse itself --

A    Yes.

Q    -- and then the reaction to the report of the abuse?

A    What you have here is an exacerbation of the impact of the abuse because what you have now is another example of the abandonment, another example of the isolation, another

example of the nurturer's deprivation and another example of the, another example of the absence of any kind of support mechanisms within that particular, within that particular environment.

Q    And you have talked about the impact of abuse, is there a distinction to be made when the abuser is a caregiver or a parent as opposed to a stranger?

A    The impact in terms of abuse by a caregiver or by a parent is, warrants consideration, because with respect to the parent the impact is devastating because the parent is supposed to be the source of nurturing, is supposed to be the source of stability and predictability and saneness, and when that is absent it simply makes that particular process even that much more difficult to navigate for a youngster, given all of the factors that come with it.

Q    All right.  And abuse such as the type, the severity, the frequency, persistence that you saw in Mr. Bourgeois' history, does that have an impact on, or did it have an impact on his ability to form relationships?

A    Oh, by all means.  The things that we often take for granted that we are able to do in terms of forming positive relationships, in terms of being able to weigh alternatives and project consequences as part of our decision making, in terms of our being able to navigate our environment, in terms of our being able to cope with stressors and to deal with

setbacks, those kinds of skills don't just come by magic, they don't just appear as an individual ages.  They come about as a result of, one, an individual being exposed to a nurturing, caring and supportive environment; they come, two, by individuals having examples that they can follow in this particular regard; and three, by that environment helping to forge a sense of self-worth and self-esteem in the individual.  So when those things are missing, the individual is incapable of and does not have the wherewithal to be able to develop appropriately in terms of the skills that are needed to function later in life, and that's why they have problems in terms of interpersonal relationships and in terms of other aspects of functioning.  There is another factor that comes into play and that is that when an individual experiences the trauma from those deficiencies that we have outlined, what happens is that the individual, as I have indicated, is ill-equipped in terms of navigating life and the events that come, and so what happens is when the individual encounters situations that remind him or her or that serve at catalysts or cues for unresolved emotional issues linked to the aforementioned deficits, it creates a process whereby the individual begins to act impulsively and all of those deficits that we talked about earlier in terms of weighing alternatives, projecting consequences and what have you, all of those particular deficits come to the fore.

Q    Your administration of the Milan identified some paranoia.

A    Yes.

Q    And I wonder if the abuse you have talked about has an impact on a person's ability to trust?

A    Oh, by all means.  If you look at the trauma, if you look at the dynamic that we have described, what you see is a basic scenario where trust is never, trust is never reflected in terms of interaction, very likely trust is never modeled, and as a result the individual, especially growing up in an environment where there is very little in terms of reward, where there is nurturance deprivation, there will be no, the individual has never learned to trust, and the individual, in addition to not learning to trust at a very basic level, remains very suspicious about situations and about people with whom he comes in contact.

Q    You used the term modeled.

A    Yes.

Q    What does that mean in this context?

A    Modeled is, the term modeled in this context goes back to a basic principle.  Most people believe that with children, that children develop and are nurtured by our teaching them directly, you know, you do this, you do that, you do that, you do that and you don't do that.  That's not true. Children learn mainly vicariously.  They learn by what they

observe, they learn by what they see modeled.  They learn to deal with stress by how they see their parents deal and cope with stress.  Men learn how to treat women based upon how their father treats their mother.  So it's a process of modeling and that is how individuals learn, not so much by direct teaching but by what they see modeled.

Q   And are you aware of any correlation between the kind of abuse you have identified in this case with development or brain impairments?

A   Yes.

Q   Explain that.

A   The research shows that individuals do not have to necessarily be traumatized, and when I say, physically traumatized by a blow to the head or what have you. Individuals who are exposed, and when I say exposed I mean they live in an environment that is characterized by unpredictability, instability and the like, where things are precarious, where things are capricious, where you never quite know what's going to happen from one day to the next, where you are never quite sure whether the caregiver today is going to be there tomorrow, individuals who grow up in that type of environment and where they, for example, observe violence, where there is violence going on around them, whether they are the victims or not, what tends to happen is that living in that particular environment over a period of

time causes actual physiological changes in the brain which show up on scans and other types of, other types of assessment tools designed to measure brain functioning.

Q   Okay.  Now, all these things you just told us about the impact of the kind of abuse Mr. Bourgeois suffered, is this some newfangled theory or is this well established in the field, is it controversial?

A   No, it's well established in the field, has been for quite some time.

Q   Now, I want to move from the history to the presence of some of these Axis II disorders that you have already discussed a bit.  First of all, define for the Court what a personality disorder is generally.

A   When we talk about a personality disorder we are talking about an enduring pattern of thinking, feeling, perceiving and behaving with respect to our environment and with respect to the things around us.  With the borderline disorder that we have alluded to here, this is reflected further in an instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image.  So we have this particular phenomenon manifesting itself and it affects all aspects of an individual's functioning.

Q   And what is the notable pattern in a borderline personality disordered person with regard to relationships?

A    Instability, inconsistency are the most prominent factors, and that inconsistency is further exacerbated by the fact that the individual tends to operate along a continuum and that continuum in terms of interpersonal relationships, that continuum begins on the one hand with what we call valuation, on the other hand we call devaluation, where the individual is idealized and then subsequent to that the individual is devalued, and so you kind of, you get that kind of vacillation, that instability along that particular continuum which reflects and which characterizes the interpersonal relationships or the quality of the interpersonal relationships of the individual.

Q    There is a phrase in your declaration at paragraph 6 that I wanted you to discuss.  You indicate, where my finger is, these relationships, meaning those of a borderline --

A    Yes.

Q    -- have a saw-tooth quality.

A    Yes.

Q    Explain what you meant by that?

A    It means that it goes back and forth, where initially it's smooth but then it's raw.  So as you go back and forth like the teeth on a saw, if you go in one direction it's smooth, when you come back in the opposite direction it's rough, and that's the nature of the interpersonal relationships, they vacillate, and they reflect the

instability, the overall instability of the personality functioning.

Q   Now, what's the origins of the name borderline?  What is the reference there to, of the actual word borderline?

A   The borderline personality disorder that we are talking about used to be described as mini-schizophrenia.

Q   Now, just stop right there.  Schizophrenia is a major mental illness?

A   Schizophrenia is a major mental illness.

Q   Axis I?

A   Axis I, characterized by significant deficits in terms of cognitive behavior and psychological functioning that's manifested in a variety of contexts.

Q   All right.  And is it an illness that involves psychosis?

A   Yes.

Q   Breaks with reality?

A   Breaks with reality, psychosis, dissociative behavior and the like, yes.

Q   And so what's the difference then between a borderline personality disorder and the major mental illness of schizophrenia or psychosis?

A   The major difference has to do with what we would call, for want of a better term, consistency.  With a schizophrenic what you have is you have this behavior over time, you have the deficits in terms of functioning, cognitive deficits,

behavioral deficits, emotional deficits that are over time.

Q    And how about the psychosis, does that last --

A    The psychosis, that's over time also.  With the borderline what you basically have is what we indicated in the description, it's instability, which is the characteristic which is the cornerstone of the borderline personality disorder where you have the individual in essence vacillates along a continuum which goes from the one end of the continuum which you call the borderline personality disorder all the way to the other end of the continuum which is the full-blown psychosis.  The borderline vacillates up and down the particular continuum, at times even manifesting what is referred to as and what is described as what are called mini-psychotic episodes, M-I-N-I.  And what we are talking about here is that there are oftentimes brief and reversible periods where the individual loses contact with reality much as a psychotic might do, but the difference is that in the borderline you have, you have the reintegration, which is what you don't have when you are dealing with schizophrenia.

Q    Okay.  And what does the field recognize as one of the -- well, withdrawn.  I take it not all borderlines have these mini-psychotic states?

A    No, because, remember, we have the continuum.

Q    Okay.

A    And the individual vacillates along the continuum.

Q    Okay.

A    From the personality disorder all the way over to psychosis or to the major mental disorder at that end of the continuum.

Q    And for those borderlines that do have these mini-psychotic episodes, what is recognized as a major cause of them?

A    The major cause tends to be, one, stress or stressors.  A second major cause is the existence of cues in the environment that serve as catalysts for unresolved emotional or dormant emotional issues that have not been addressed that are the result of the deficient social environment that we have described.

Q    Did you see evidence in the materials you reviewed and the people with whom you spoke, the lay witnesses, that is consistent with Mr. Bourgeois having undergone such mini-psychotic states throughout his life?

A    Yes.  There were individuals, for example Michelle was one, who described, for example, the mood lability reflected in Mr. Bourgeois' behavior --

          THE COURT:  You talked to her personally?

          THE WITNESS:  Beg your pardon?

          THE COURT:  I want to make sure, you talked to her personally?

THE WITNESS: No, I saw her statement.

THE COURT: Okay.

BY MR. WISEMAN:

Q   That would be Michelle Armont?

A   That's correct, yes.

THE COURT: Could we stick to ones that he actually talked to?

MR. WISEMAN: Oh, sure.

THE COURT: Thank you.

MR. WISEMAN: Okay.

BY MR. WISEMAN:

Q   Did you see any evidence from the people you spoke with, Claudia Williams, Mr. Murray Bourgeois, Kerry Brown, that would support your conclusion that you saw evidence of mini-psychotic states?

A   The individuals that I spoke with, such as Ms. Claudia Williams, describes the abuse, the physical, emotional and verbal abuse that was inflicted on her son --

Q   I'm sorry, you said her son?

A   I'm sorry. I'm sorry, that was inflicted upon Mrs. Bourgeois' son, Alfred.

THE COURT: Who told you that?

THE WITNESS: This is Ms. Claudia Williams.

THE COURT: And you talked to her?

THE WITNESS: Yes, I did.

THE COURT:  Okay, thank you.

THE WITNESS:  And she talked about the fact that, she talked about and described the abuse that the individual suffered at the hands of his mother.  Mr. Wilmer Bourgeois talked about the fact that he believed that the behavior of Mr. Bourgeois' mother, the neglect specifically, had a profound effect on Alfred's overall behavior throughout most of his life.

MR. DOWD:  Judge, I would object to that judgment coming from a non-professional.

THE COURT:  Sustained.

MR. DOWD:  Thank you, Your Honor.

BY MR. WISEMAN:

Q   Did Ms. Williams tell you anything relevant to rages that Mr. Bourgeois may have manifested as a young man?

A   Yes, the fact that, the notion of, without necessarily provocation, adequate provocation, there would be mood swings where the individual would become angry or hostile without provocation or without any identifiable event taking place that would be proportionate to the kind of behavior that was manifested.

Q   All right.  And did she relate to any physical changes she observed during these periods of rage?

A   What she described as blanking out or not appearing to be aware of what is going on and not remembering afterwards what

had transpired.

Q    All right.  And are those consistent, those observations consistent with what you have called a mini-psychotic state?

A    Yes.

Q    Okay.  Would a person like Mr. Bourgeois who has this personality disorder and his history of trauma as you have described, would you consider that person to be significantly impaired?

A    Oh, most definitely, yes.

Q    Okay.  And was that the only set of mental health issues that confront Mr. Bourgeois that you have reviewed?

A    No.

Q    Okay.  So when you say he would be significantly impaired, I know you have kind of touched upon it but just give us a sense in what, we're talking only now about the trauma history and the development of the borderline personality, how would he, or how was he or is he impaired as a result of those two factors?

A    Well, he would be impaired in terms of one that we mentioned in terms of his inability to form significant lasting interpersonal relationships.  He would also be impaired in terms of his own, the management and navigation of his own environment as reflected in, you know, his mood instability, the adverse impact in terms of that particular phenomenon, in terms of his own self-image and self-worth, in

terms of how he functioned, in terms of how he was able or unable to manage some of the regular or normal activities of daily living.  All of those dimensions would be adversely impacted by his, the history that we described.  And as we, you know, as we mentioned earlier, what happens is that when an individual is exposed to that particular climate, environment and set of factors, what occurs is that the, is that the stability and predictability necessary for acquiring a consistent pattern of behaving and thinking is nonexistent. As a result, you have an individual who has significant deficiencies in terms of mastering their environment, reflected in deficits with respect to long-term planning, deficits in terms of consequential thinking, deficits in terms of managing conflictive data, weighing alternatives, all of those particular factors that are so necessary in order to manage effectively and to navigate our environment, all of those are missing, all of those factors are missing.

Q    Did you have occasion to speak with a mitigation specialist named Kathleen Kaib?

A    Yes, I did.

Q    And what if anything did she add to your understanding of Mr. Bourgeois and the personality disorder that you have identified?

A    She described her interactions with individuals, females, who were previously married to Mr. Bourgeois.

THE COURT:  Does she work for you or where did she come into this?

MR. WISEMAN:  She works for my office, she's a mitigation specialist.

THE COURT:  Are we going to hear from her?  Why are we hearing from her from --

MR. WISEMAN:  Well, Dr. Toomer relied on her, and so I --

THE COURT:  He didn't say that.

BY MR. WISEMAN:

Q   Well, did you rely on her?

A   Yes, she provided information that was useful.

THE COURT:  Okay.

THE WITNESS:  In this regard.

BY MR. WISEMAN:

Q   And without going into exquisite detail because it is not firsthand, what did she in sum tell you about her interaction with these women that Mr. Bourgeois was married to?

A   The, what stood out was the fact that at least on two occasions to his wives he had acknowledged that, he had acknowledged a history of abuse at the hands of his mother, and this --

Q   And this would have been pre-offense?

A   Yes, uh-huh.

Q   Okay.  Go ahead.

A    And --

THE COURT:  I'm sorry, who did he, who, I'm sorry, what do you mean, what's pre-offense?

MR. WISEMAN:  The acknowledgement of his abuse history.

THE COURT:  From whom?

MR. WISEMAN:  Well, why don't you answer the Judge's question instead of me.

THE WITNESS:  He acknowledged or he indicated or reported to his wives that he had a history of abuse at the hands of his mother.

THE COURT:  Well, did you talk to any of these wives?

THE WITNESS:  No, I did not.  This was --

THE COURT:  Okay, this is really getting far afield, so we are not going to go there.

MR. WISEMAN:  Okay.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    Dr. Toomer --

A    Yes?

Q    -- do people, professionals like yourself, rely on reports from mitigation specialists?

A    Yes, we do all the time.

Q    And do those reports at times contain descriptions of

their interactions with other people?

A    Yes.

Q    And was Ms. Kaib's report at all out of the ordinary in that regard?

A    No.

THE COURT:  Well, does she work with you?  I mean can you vouch for her work?

MR. WISEMAN:  She works for my office, Your Honor.

THE COURT:  I understand that but I'm, I am not understanding this.  I can see relying on mitigation experts if they are somebody you have worked with and you know them.

THE WITNESS:  Yes, I have worked with her in the past, yes.

THE COURT:  Okay, then go ahead.

MR. WISEMAN:  All right.  I was done with Ms. Kaib for now.

BY MR. WISEMAN:

Q    I wanted to go to the next area of impairment.  Did you review the reports of Dr. Gelbort and Dr. Weiner?

A    Yes.

Q    All right.  And what did you learn from those reports?

A    They reported intellectual, on intellectual deficits reflected in their assessment of the defendant.

Q    And when you say intellectual deficits, give us a little more flavor.

A    They assessed his IQ, intellectual functioning.  I believe in 2004 he was administered the WAIS-R, the Wechsler Adult Intelligence Scale, Revised, and he earned an IQ of 76.

MR. DOWD:  Judge, I would object to the cumulative.

MR. WISEMAN:  All right.  You know what, I think --

MR. DOWD:  We stipulate to the test results.

MR. WISEMAN:  That's fine, that's fine.  We can move on.  He --

THE COURT:  Okay.  I would rather that you didn't bring in eight million experts to testify about what all the others have said, and you are getting way into that.

MR. WISEMAN:  Yeah, I totally, totally agree.

BY MR. WISEMAN:

Q    He had a low intelligence?

A    Yes.

Q    Okay.  And did you learn anything about brain dysfunction?

A    Yes, I did.

Q    All right.  They identified organic brain dysfunction?

A    That is correct, yes.

Q    Okay.  So what I want you to do is I want you to now add on to the deficits you have already described which you already said were, would cause significant disturbance in his functioning, add on to that organic brain dysfunction, low intelligence.  How does that add to the mix?

A    You, when you have those particular elements in addition to what we've indicated earlier, what you have is really a compounding of deficiencies that render the individual even more deficient in terms of trying to cope, in terms of trying to navigate his world, his environment, and to engage in the normal activities of daily living that are required in order to function effectively.

Q    And we have heard the term used prior to your testimony about these dysfunctions somehow inhibiting the brakes that Mr. Bourgeois can put on his behavior.

A    Uh-huh, yes.

Q    How does that add to a person who already has those impairments, the impulsivity, the lack of judgment?

A    Well, it makes that, the situation, the situation is even, is worse as a result of that, because one of the things that you learn, as I mentioned before, in terms of learning how to manage your environment, in terms of learning how to deal with things in your, you know, in your world, weighing alternatives, projecting consequences, all those kinds of behaviors, one of the other things that you learn is you learn emotional modulation, what we call the modulation of emotional expression, which means that we are able to respond affectively, affectively, i.e., emotionally, in appropriate manners, appropriate to the particular situation or appropriate to the precipitating event.  When you have these

deficits that we have described, that particular, that particular process, that particular ability is basically nonexistent, and so what you have is an unpredictability in terms of functioning that is manifest.

Q   Now, when a person with this, you know, the personality disorders, the trauma history, the brain damage, the low IQ, would they be impaired in their functioning in a calm environment?

A   Would they be impaired in a calm environment?

Q   Yes.

A   What would happen is that the individual in that particular environment would function only to the point that stressors, real or imagined, or catalysts were encountered that, as we indicated before, serve as a reminder of the repressed, unresolved emotional issues that are left over from a traumatic past.

Q   Okay.  And that's the last area I want to go into with you.  Let's add stress to Mr. Bourgeois' many deficits.

A   Yes.

Q   Did you learn about various stressors in his life?

A   Yes, I did.

Q   And why don't you describe the most prominent ones, and focus particularly at the time leading up to the offense, what did you know and how do you know it?

A   I spoke with Attorney Brown, who was Mr. Bourgeois'

attorney and had known Mr. Bourgeois for approximately a year-and-a-half prior to the incident and had worked with him on a number of issues.  Prior to this, Mr. Bourgeois was experiencing numerous stressors.  There were financial stressors related to the ownership of his house, there were issues in regard to child custody --

THE COURT:  Sorry, who told you about the ownership of the house?

THE WITNESS:  Attorney Brown.  He was Mr. Bourgeois' attorney.

THE COURT:  For during the divorce?

MR. WISEMAN:  He will be testifying.

THE COURT:  I mean, are we talking about during the divorce, what are you talking about?

MR. WISEMAN:  Well, I think --

THE WITNESS:  These were all stressors --

MR. WISEMAN:  Why don't you --

THE WITNESS:   These were all stressors that Mr. Bourgeois was experiencing prior to the particular incident at hand.

MR. WISEMAN:  I think the Judge is --

THE COURT:  What incident at hand are you talking about, the murder of the child?

THE WITNESS:  The crime, yes.  The murder of the child, yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   I think, what I understood the Judge's question to be was at what point and in what different matters was Mr. Brown representing Mr. Bourgeois?

THE COURT:  Yes.  Thank you.

THE WITNESS:  He was representing him in terms of custody, he was representing him in terms of financial issues related to his home --

THE COURT:  Well, what financial issues are you talking about?

THE WITNESS:  In terms of the possible foreclosure or relating to payment of mortgage on his home.

BY MR. WISEMAN:

Q   All right.  And was --

THE COURT:  And custody issues, are we talking about Ja'Karenn, the baby that was killed?

THE WITNESS:  Yes, yes.

THE COURT:  So we are going to hear from him and so there will be no attorney/client privilege on that?

MR. WISEMAN:  Oh, no, there won't be any.

THE COURT:  Okay.

MR. WISEMAN:  We will be hearing from him and there's no privilege issues.

BY MR. WISEMAN:

Q   Did Mr. Brown tell you, Attorney Brown tell you that he was offering Mr. Bourgeois advice with regard to financial matters and --

A   Yes.

Q   Did you learn anything from Mr. Brown or from others relevant to the difficulties Mr. Bourgeois reported having with his wife at the time, Robin Bourgeois?

A   Yes, one of the major stressors, the major stressor that Mr. Bourgeois was experiencing at the time was the disruption of the marital relationship and the infidelity of his wife at the time.

Q   Now, you used the term at the beginning of this section real or perceived stressors.

A   Yes.

Q   And I'm wondering how the perceived part relates to the infidelity?

A   Well, the, Mr. Brown indicated that Mr. Bourgeois was obsessed with the infidelity, that it permeated every aspect of his functioning, that he was unable to focus, his work suffered, in other words, the work that he was trying to do at the time suffered, and that he was in essence preoccupied with this particular phenomena and betrayal, if you will, that had occurred at this time.

Q   And what does the fact that Mr. Bourgeois himself was

having infidelity, does that add at all to the, to his perception of the stress?

A    I'm sorry, repeat that again for me, please?

Q    Yeah, I, you know, as a layman I think, you know, he's, you know, what's he so upset about, he's doing the same thing.  From a psychological perspective, though, why is that either valid or not valid?

A    Well, if you look at the total picture, the totality of the picture, and focus on the individual, the fact that he may have been doing it himself is not the issue.  The issue is that it serves as a catalyst for dormant, unresolved emotional issues left over from a traumatic past.

Q    Okay.  And would --

A    Once again betrayal, abandonment, all of these are issues, clinical issues and real issues that influence behavior.

Q    Regarding the financial issues, was Mr. Bourgeois, according to Mr. Brown, having to pay legal fees that he couldn't particularly afford?

A    Correct, yeah.  There were legal fees involved, yes.

Q    And did that --

        THE COURT:  Because of what?

        MR. WISEMAN:  Legal fees that he could not afford.

        THE COURT:  Because of?

        MR. WISEMAN:  Because of --

THE WITNESS:  Because of the divorce.

THE COURT:  What divorce?

THE WITNESS:  His divorce.  Reconciliation.

THE COURT:  Did they file for divorce?

MR. WISEMAN:  There was a divorce proceeding that had been started and ended.

THE WITNESS:  There was also, there was also an issue with regard to legal charges involving the third party, Mr. Thibeau, and damage that was done to a, to his property, I believe a limo.

BY MR. WISEMAN:

Q   Was there any stress related to the possibility Mr. Bourgeois was going to lose his house at about that time?

A   Yes, all of that, the foreclosure, possibility of foreclosure, all of those were stressors that impacted him at that particular time.

Q   Now, you read portions of the trial record?

A   Yes, I did.

Q   Okay.  And you are aware that the injuries to the deceased were inflicted over many weeks?

A   Yes.

Q   Okay.  How do you reconcile that with the overall explanation you are offering for Mr. Bourgeois' behavior?  I mean when you talk about mini-psychotic episodes, one thinks of a quick incident, yet this is happening over a period of

time.

A    Because what transpires is that, as we indicated earlier when we talked about the vacillation, what transpires is stressors that occur impact on individual, the individual's functioning, and as a result you have the maladaptive acting-out behavior, you have the mood swings, go from one extreme to the other, and so this particular process in terms of the individual's maladaptive functioning is a continuing process. It occurs, it takes place over time.  Anybody clinically who would have been involved would have said that this is a time bomb waiting to happen.

THE COURT:  Do you do a lot of testing on people on death row?

THE WITNESS:  Yes, I do.

THE COURT:  Have you ever seen one that wasn't in this kind of situation with, that was maladaptive and dangerous and --

THE WITNESS:  That wasn't like this?

THE COURT:  Yes.

THE WITNESS:  Yes, I have.

THE COURT:  Is this --

THE WITNESS:  I have seen those who are not like that.

THE COURT:  Okay.  Is this not unusual for somebody on death row to be in this kind of situation mentally, a time

bomb waiting to happen?

THE WITNESS:  Is it unusual for them not to be?

THE COURT:  No.  You said he was a time bomb waiting to happen.  Is that --

THE WITNESS:  No, what I was saying was if at some point that was, that we are talking about in terms of abuse occurring over time, if someone had gotten involved earlier or at that particular point in time clinically, what have you, they would have been able to predict that this was a time bomb waiting to happen if they had taken into account history and what have you.

THE COURT:  Well, so you are testifying that he was at the time of the murder a time bomb waiting to happen?

THE WITNESS:  And what I mean by that is that you had all of these factors impacting on his functioning.

BY MR. WISEMAN:

Q   Now, Dr. Toomer --

A   Yes?

Q   -- you do a lot of work with capital cases and you are familiar with theories of mitigation?

A   Yes, I am.

Q   And what's typically offered in cases such as this?

A   Yes.

Q   Okay.  Do you have a mental health explanation for why Mr. Bourgeois was this time bomb waiting to happen?

A    Yes.

Q    Okay.  And you have described it for the last hour or so.

A    I described it, yes.  That's what I have been describing, yes.

Q    Okay.  And is it a controversial mental health position you are taking?

A    No, it's very --

Q    Did you read Dr. Moore's report and Dr. Price's report?

A    Yes.

Q    And did they dispute your conclusions in that regard?

A    No.

Q    You take 99 out of 100 psychologists, they are all going to agree time bomb waiting to happen?

A    Yes.

Q    Okay.  And because of that, is this the type of information that in your experience is offered to capital jurors?

A    Oh, by all means, definitely, to help them understand the dynamics that are influencing behavior.

         THE COURT:  Well, how else does somebody, I'm sorry, but how else does someone commit murder as he was convicted of, six weeks of torture, a two-year-old child, and then killing her, how else could you be described but other than a time bomb waiting to happen?

         THE WITNESS:  Well, I'm, that's what I'm saying, I'm

saying if you --

THE COURT:  How is that mitigating?

THE WITNESS:  It's mitigating because the behavior is not necessarily premeditated but is a function of the deficiencies --

THE COURT:  He --

THE WITNESS:  -- that we have described.

THE COURT:  Okay, but how do you put that on when there is evidence of six weeks of torture leading to death?  Six weeks of torture leading to death.  I am not understanding how you put that on, what --

MR. WISEMAN:  Okay.  Let me see if I can ask --

THE COURT:  -- how that mitigates.

BY MR. WISEMAN:

Q   If I could ask the question, Dr. Toomer.  You reviewed the penalty phase transcripts?

A   Yes, I did.

Q   All right. Was the Government's position with regard to this offense is that Mr. Bourgeois is an evil man who did dastardly things?

A   Yes.

Q   Okay.  Does a psychological explanation for why those things happen mitigate in your experience?

A   Yes.

MR. WISEMAN:  Your Honor, I would just point out

that a number of Your Honor's questions, I mean I think Dr. Toomer can answer the psychological ones but a number of your questions, while I think are --

THE COURT: Good.

MR. WISEMAN: -- highly relevant, they are really legal issues.

THE COURT: Okay. I just --

MR. WISEMAN: And we're certainly going to present that authority.

THE COURT: But that's what you are using him to do is say that they should have put this information on. I --

MR. WISEMAN: Well, from a psychological perspective it's mitigating.

THE COURT: I just can't see how that would be beneficial.

MR. WISEMAN: Yeah, well, you know, the Supreme Court has said it's beneficial in five cases over the last nine years.

THE COURT: Not in this circumstance.

MR. WISEMAN: Oh, yes, absolutely. In circumstances worse than this. I have done some of them --

THE COURT: Where there was torture for six weeks?

MR. WISEMAN: Oh, yes.

THE COURT: And then --

MR. WISEMAN: In fact, when it's more horrible the

need to explain it is greater, because if you don't explain

it the person looks like they are an animal, and there is an

explanation for why he is not an animal.  And that's my job,

to convince you, and it was Mr. Tinker and Mr. Gilmore's job

to convince this jury, and they failed miserably, and that's

our case, and we'll prove it to you.

BY MR. WISEMAN:

Q   Dr. Toomer, I just wanted to, for the record, get some of

the larger conclusions out.  Did you draw a conclusion as to

whether Mr. Bourgeois, as a result of all you have testified

about, has an impaired capacity to appreciate the criminality

of his conduct and to conform his conduct to the requirements

of law?

A   Yes.

Q   And what is that opinion?

A   He does.

Q   Okay.  And --

        THE COURT:  Sorry, he has an impaired?

        MR. WISEMAN:  Impaired.

        THE COURT:  Which is the same as a sociopath, isn't

it?

        THE WITNESS:  No.

        THE COURT:  Doesn't a sociopath also have a problem

conforming their behavior to the normal?

        THE WITNESS:  Right, but it doesn't, we aren't

talking about sociopathy here.

THE COURT: Why?

THE WITNESS: Because we are talking about the borderline personality disorder as it reflects, as it has been manifested in Mr. Bourgeois' history. His, what has happened to him and his history and the totality of the data is consistent with a diagnosis of a borderline personality disorder, it is not consistent with a diagnosis of sociopathy.

BY MR. WISEMAN:

Q   And, Dr. Toomer, in your review of the records have you seen any diagnosis of Mr. Bourgeois as a sociopath?

A   No, I have not.

Q   Sociopaths are often described as people without conscience?

A   Yes.

Q   Do you see that as the root of Mr. Bourgeois' behavior?

A   No, I do not.

Q   The last thing I want to talk to you about is this question of mental retardation. You opine in your declaration that Mr. Bourgeois meets the criteria as you saw it when you conducted your evaluation?

A   Yes.

Q   Okay. Was that a provisional observation in any respect?

A   That was a provisional observation based upon what I did

as part of my evaluation.  I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion, and then we subsequently discussed an expert being retained for that purpose.

Q   Okay.  So let's just break it down now.  You saw the IQ scores.  They qualified, in your view?

A   Yes.

Q   Okay.  And you reviewed the background material and you thought he manifested adaptive deficits in the relevant domains?

A   I did, yes.

Q   Okay.  And you saw onset before 18?

A   I did, yes.

Q   Okay.  And in your subsequent discussions with my office about your further role with regard to mental retardation, what was your understanding?

A   Well, that that was going to be done by someone else who was specializing in that particular area.

Q   Okay.  And geographically?

A   And geographically, yes, who was closer to be able to do that.

Q   Okay, I think I am done.  Thank you very much, Doctor.

        THE COURT:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Yes, thank you.

CROSS-EXAMINATION

BY MR. DOWD:

Q    Dr. Toomer, my name is Mark Dowd.  I am going to ask you a few questions --

A    I'm sorry, your last name?

Q    Dowd, D-O-W-D.

A    D-O-W-D, yes.

Q    Now, let me nail down the chronology of your interviews. You -- because you indicated that there was two different time frames.  I understood from your report that you relied in your background evaluation by speaking with Claudia Williams, Mr. Bourgeois' older sister, and is it Wilmer Bourgeois?

A    Wilmer Bourgeois, yes.

Q    Wilmer?

A    My understanding it's Wilmer.

Q    Wilmer, okay.

A    W-I-L-M-E-R, yes.

Q    Okay.  And then I heard discussion about a Carrie Wilson and then a Murray Bourgeois.  What was the chronology of your background investigation?

A    I'm sorry, would you give me those, the names again?

Q    Well, I understood from your report that you gathered

your background information from Claudia Williams, Mr. Bourgeois' older sister.

A    That's correct, yes.

Q    And Wilmer Bourgeois.

A    Correct, uh-huh.

Q    Okay.  So that was -- then I heard you discussing a Carrie Wilson and Murray Bourgeois.  That wasn't part of your background investigation?

A    That wasn't me, no, no.

Q    Okay.  All right.  So you relied strictly on Claudia Williams and Wilmer, is that right?

A    Yes.

Q    Okay.  Is there any reason that you limited your background -- oh, and that was by telephone?

A    I spoke with them both, I spoke with them by phone, yes.

Q    You called them on the phone?

A    Yes.

Q    Is there any reason you limited your background investigation to just those two sources?

A    I had access to statements that were provided by informants that I utilized as part of my evaluation.

Q    And those informants were gathered by Mr. Bourgeois' team, defense team?

A    That is correct, yes.

Q    Okay.  And they simply sent those to you?

A    They provided those to me, yes, as part of my evaluation.

Q    Okay.  Did you ask for those particular individuals or did they decide which statements and individuals to send to you?

A    I asked for all information with respect to informants, all information with regard to the particular defendant's background and history.  I did not request specific persons.

Q    Okay.  You asked for all information, the good, the bad and the ugly, whatever?

A    As is the case.

Q    Whatever they had gathered on Mr. Bourgeois?

A    Yes.

Q    And the background?

A    Background information, yes.

Q    And those are the ones they sent you?

A    Yes.

Q    Okay.  But you will agree that the wider range of your sources gives you a wider range of information and probably more accurate information as well, more reliable information?

A    You try to access as much information as possible, yes.

Q    All right.  And is there any standard in which you are warned to be careful about relying solely on partial informants, people that are partial to the subject?

A    Oh, I mean we always are aware of that, but from the, in terms of what we do, in addition to trying to utilize as much

information as possible we also look for corroboration among all sources of the data, that is, the informant's background data, affiliation with other agencies or institutions, be they criminal, be they correctional, be they mental health, hospital, whatever, so we look for corroboration among all sources of the data, which is a psychological standard in terms of, you know, in terms of rendering an opinion.

Q   All right.  And you had indicated that based on your discussion with Claudia Williams and -- do you remember how long those telephone calls were?

A   I would say roughly 35 minutes, 35 to 45 minutes, something like that.

Q   All right.  And is there a format to this conversation or is it just an informal discussion with them?

A   No, it's not -- if by format you mean like a written format or anything like that?

Q   Uh-huh.

A   No, there's not a written format, but it's not also, but it also is not an unstructured process.  What we are looking for is, one, obviously we have this information, we have the relationship, we are looking at the term of the relationship, we are looking for specific information regarding what the individual was able to observe regarding the defendant in terms of the defendant functioning in that environment and with other individuals in that environment in this case, his

mother and others.  So it's not like there is a structured test or anything but it is not unstructured either.

Q    All right.  And as a result of that you decided, you indicated in your report and you said baseline.  Is that like the bottom line, baseline childhood sexual and physical abuse, even said savage, right, savage?

A    I'm sorry, where are you reading now?

Q    Oh --

        MR. WISEMAN:  Here's the exhibit.

BY MR. DOWD:

Q    Well, anyway, you found, you found -- I want to make sure that's not my word -- you found, you determined that he had suffered childhood sexual and physical abuse on the basis of your reports from Williams?

A    Right, the data that was collected.  Yes.

Q    And that this produced organic brain damage?

A    Well, it didn't necessarily produce organic brain damage, it contributed to that particular, to that particular phenomena, yes.

Q    All right, so explain that.  You had indicated that, I thought I understood your testimony to be that the childhood abuse in itself can actually cause defects in the brain?

A    Changes in the structure of the brain.

Q    Okay.

A    Yeah, that is, that's what happens, yes.

Q    And is that the --

A    So that --

Q    Go ahead.

A    So the, what the person experiences in terms of what we have described, the lack of structure, the lack of nurturants, the turmoil, the capriciousness, all the instability, the characteristic instability --

Q    All those --

A    -- is what produces the changes in the brain, yes.

Q    All of those factors you described?

A    All of those factors, yes.

Q    And did I understand you to say that these, that these defects in the brain on the basis of this child abuse will actually show up --

A    Yes.

Q    -- in brain scans?

A    Yes, yes.

Q    They will actually, they are manifested?

A    Yes.

Q    Identifiable?  Do you know why no brain scan -- do you know if a brain scan was attempted on Mr. Bourgeois?

A    I don't know.

Q    Would that be something that you would have done?

A    That I would have done?

Q    Or recommended?

A     That a brain scan be done?

Q     Yes.

A     I believe that there was, I don't know of any brain scan being done except that I believe that there was one done in, as part of his incarceration, but I don't, I don't know of any other having been done.

Q     Okay.  But that will actually show up on a brain scan?

A     Yes.

Q     You can demonstrate brain damage --

A     Yes.  The research --

Q     -- from childhood abuse on a brain scan?

A     Yes.  The research that has been done shows that if you take an individual who has been exposed to an environment characterized by the instability and the factors that we have described --

Q     And is the --

A     -- over time, and you take that person's brain and you do a scan and you compare it to a child who has not been in that environment, there are significant differences in the brain.

Q     And this signature on this brain scan will be different than if the --

A     The shape.

Q     -- injury was caused by trauma or impact or something like that?

A     Or direct, a direct blow?

Q    Yes.

A    Well, no, there may be some similarity, but the point is that there is a difference in the --

Q    Okay.  And it's identifiable?

A    -- in the brain that can be identified.

Q    All right.  And you -- now, as far as all this abuse, are you aware of any official corroboration of anything, that, you know, he was found with bruising at school or that he reported the sexual assault to the authorities?  I mean is there anything that comes other than from the background informants?

A    I don't recall, if you are speaking specific, of whether there was something reported at school or something of that nature, I don't have any record of that, of anything like that, you know, something being reported at school or an injury being reported at school or anything like that.

Q    All right.  Now, the, you indicated that he was, on the Axis II that he was a combination of schizoid, paranoid and personality, borderline personality disorders?

A    Correct, yes.

Q    Okay.  Now, does the schizoid finding, does that conflict with the borderline personality disorder finding?

A    No, the schizoid finding, the schizoid, once again, as we mentioned before, when you talk about schizoid what you are really talking about is a splitting, in other words, where

there is a process whereby the individual is detached or separated from reality, he is not able to process, to process reality.  The schizoid phenomena tends to be a long-term process.  It tends to be something that lasts when you have that kind of process.

Q    And what are --

A    With the borderline you get the vacillation, and that's a major difference.

Q    Let me stop you there and I'll let you get back to borderline.  What are some of the symptoms or dynamics of a schizoid personality?  How do they display them?  How is that displayed in a personality, in a person's behavior?

A    Well, when a person is schizoid, one of the first things that you observe is that there is a certain detachment, if you will, or lack of congruence between what we call ideation and affect, and what happens is a person who is schizoid can do things like the following:  They can talk about things that are highly emotional, that are emotionally charged, that would be considered emotionally devastating to a particular individual, to a particular individual, and they can talk about it without appropriate affect.

Q    All right.

A    One of the criteria for normalcy is that there is some congruence between our cognition, how we think, our behavior and our affect or our emotions, so if I am talking about

something sad that has occurred, the loss of a loved one, that would be reflected in my behavior, it would be reflected in how I talk, it would be reflected in my observable emotional behavior.  When someone is schizoid, all of that is disrupted.

Q    Let me ask you a couple of symptomatic questions.  Is it true that people with schizoid personality disorder, that they shun close relationships, even family relationships?

A    They can, yes.

Q    They would normally like to live alone?

A    They would, right, yes.

Q    And they wouldn't be interested in any close relationship with say a woman or a family?

A    That's not necessarily a pattern, a pattern of theirs, no.

Q    Okay.  Are they normally not interested in sexual relationships?

A    That can vary.  In my clinical experience that can vary.

Q    And they would normally shun like amusement parks and theme parks and things like that, is that fair to say?

A    Perhaps.  The way I have heard it described, or the way I have seen it described by theorists and others is that individuals who are schizoid tend not to derive satisfaction from the kinds of things that would ordinarily give the bulk of the population satisfaction.  Like you were talking about

going to a park, I think you would probably get agreement from a lot of people that yes, that's an enjoyable kind of thing.  Well, someone who is schizoid might not find that enjoyable.

Q   Going to the beach or pool parties, things like that, that would not be consistent with a schizoid?

A    Perhaps, yeah.  It would really depend, but generally it would not.

Q   Do they, are they also indifferent to praise and criticism?

A   No, not always.  Not always, no.

Q   All right.  And I didn't want to cut you off.  If you wanted to finish your statement about --

A   Yes.

Q   -- how that relates to his borderline personality, go ahead.

A   Yes.  No, the way it relates is that you have this schism, if you will, and you have the same kind of schism or a type of schism with the borderline.  The borderline on one day is composed, calm, if you will, for want of a better term, and at the drop of a hat can become angry, aggressive.  That's a split because there's not, you don't have that congruence that comes with normalcy.  Well, the schizoid is also a split.  It's a different qualitative split but it's a split nevertheless between what should be two congruent

aspects of personality functioning.

Q   All right.  Now, let me explore this rage reaction that you found.  You have indicated that this rage reaction would be consistent with his personality disorders.  Is that fair to say?

A   Well, it's consistent with the personality disorder and it comes about as a result of, as we mentioned before, one, stressors, real or imagined, real or perceived, and also by incidents or issues or situations that serve as a catalyst for unresolved emotional issues that have not been addressed.

Q   But the rage reaction would serve to provide an explanation for Mr. Bourgeois' murder of his daughter, is -- I mean that's, that would be, that's the point of your testimony, that this rage reaction is the explanation for the murder of his daughter, is that right?

A   Well, I am saying he's capable of that.

Q   Okay.

A   And I'm saying that he's capable of that particular phenomena and that that is one way to account for his behavior in terms of how he has functioned over time.

Q   And that's the point of your testimony, that this explanation just provides one explanation for his, for, if Mr. Bourgeois, if that's what you are trying not to say, if Mr. Bourgeois engaged in a rage reaction and killed his daughter?

A    Right, I'm saying that his, the combination of the factors that we have described, the mental health issues related to his overall functioning are consistent with that type of behavior, yes.

Q    All right.  Now, set aside Mr. Bourgeois' IQ --

A    Uh-huh.

Q    -- for a minute.  All this information you gathered, the abusive childhood, the sexual assault, the abandonment, all those factors that you listed, if that's all you knew, would you draw the same conclusions, that these, that this background has produced in Mr. Bourgeois this personality disorder and, with the potential for these rage reactions?

A    And what are leaving out, what did you say?

Q    We are leaving out the IQ.

A    Yes.

Q    So independent of the IQ information you would make the same finding?

A    Yes.

Q    Okay.  And those, that background information and his developed personality disputes would explain those rage reactions?

A    Yes, yes.

Q    Okay.  Whether he was a genius or whether he is mentally retarded?

A    Yes.

Q    Okay.  I want to ask you about this rage reaction or these mini-psychotic episodes.

A    Yes.

Q    They are described in similar terms by different experts in the same case but it's basically the same thing, right?

A    Yes.

Q    Okay.  Now, you are suggesting that he actually, during this mini-psychotic episode he actually doesn't know what he's doing, is that fair to say?

A    No, in, no, in -- with mini-psychotic episodes it is, it's a psychotic, it is a psychotic break.

Q    Okay.

A    The difference is, as I have indicated, the difference is that in a full-blown psychosis it remains.  In other words, the break persists, the break continues.

Q    Uh-huh.

A    The only difference here is that the individual reintegrates.  It's reversible --

Q    And --

A    -- in this particular instance.

Q    And are these more or less spontaneous events?

A    What do you --

Q    In other words, something, you talked about the stressors --

A    Uh-huh.

Q   -- something happens to trigger Mr. Bourgeois and he goes off like that?

A   Oh, yes, yes.

Q   And I'm, you know, imagining, you know, the type of thing like, you know, the shaken baby syndrome where, you know, for a few seconds he shakes the baby and then he realizes what he's doing and he, you know, sets the baby down but it's too late.  Is --

A   Well, I don't know about the example that you are using but I'm --

Q   It's just an example, it has nothing to do with this case.

A   Right, but I'm just saying that what you have is what you have described, that it can be a stressor, it can be a comment, it can be something that is seen and perceived in a particular way that may be different from how everybody else sees and perceives.  It could be a comment that everybody considers to be innocuous, the person may see it in a different way.  That's all it takes.

Q   Right, and he goes --

A   And that's what you --

Q   And normally how, I don't mean to cut you off but normally how long would you extend this episode, would you expect this episode to last?

A   Which episode now?  You mean --

Q    This psychotic rage reaction, psychotic episode.

A    It varies, it varies in terms of the individual, in terms -- there's no particular time limit but it's not prolonged, you are not talking about hours or days --

Q    All right, but --

A    -- in terms of, because when you get over into that arena then you are talking about a full-blown psychosis.

Q    Okay.  And you don't find him in that category?

A    No, I do not.

Q    Okay.  So you would expect the period to be within a few seconds or --

A    I --

Q    -- less than a minute?

A    I, well, I can't say a few seconds or less than a minute, but I am saying that what happens is that it is, the literature uses the term consistently, brief and reversible periods.

Q    All right.

A    That's how the literature describes it.  Now, that can, you know, that can cover a period -- like I said earlier, I would not, I would not consider an hour to be part of that. If you are psychotic for an hour or more you are, that's full-blown psychosis that we are dealing with, yeah.

Q    All right.  Okay.  So, and Mr. Bourgeois, he is capable of doing bad things without having, in other words, when he's

rational, is he not?

A   Oh, sure.

Q   Like any --

A   I'm sure he is.

Q   Like any --

A   I'm sure we all are.

Q   Like any of us.

A   Yeah.

Q   Right.

A   Yes.

Q   And so just because he does something violent or, you know, something bad doesn't necessarily mean that it was the result of his personality disorders?

A   I can't say that, no.

Q   You can't say that?

THE COURT:   You mean every time he gets mad or angry it's the result of a psychosis?

THE WITNESS:   No, he -- would you repeat the question again?

BY MR. DOWD:

Q   Well, I will just defer to the Judge.  Every time he gets mad, is it the result of a psychosis?

A   No, I can't, that's why I answered, I said I can't say that, no.

Q   Oh, okay.

THE COURT:  I thought you said no.

BY MR. DOWD:

Q    You agree with that?

A    No, I said I, right, I said, no, I was saying I --

Q    You agree with that?  Okay.

A    Yes.

Q    And --

THE COURT:  Okay, do you agree with that statement?

THE WITNESS:  Yes, I said I can't say that, yes.  I am agreeing with that statement, yes.

THE COURT:  Okay.

BY MR. DOWD:

Q    Just to make it clear, Mr. Bourgeois is capable of --

THE COURT:  You have been up there a long time.

BY MR. DOWD:

Q    Mr. Bourgeois is capable of, you know, violence which is not the result of his personality disorders?

A    Yes, I am sure that he is.

Q    Okay.  All right.

A    And we all are.

Q    Okay.  So the mini-psychotic episodes could explain an instantaneous action, perhaps a short beating, but it wouldn't explain, let's say, a plan to kill witnesses or the prosecutor, you know, a long, you know, planning that went for weeks and involving other people, that wouldn't be the

result of any psychotic episode?

A   No, I don't see his behavior as being premeditated, you know, I am saying generally.  Most of his behavior, at least according to the records that I have reviewed, most of his behavior appears to be motivated by his own deficiencies.

Q   In other -- most of what behavior?

THE COURT:  I am not understanding that.  What do you mean by that?

BY MR. DOWD:

Q   Yeah, I missed that.

A   It means that when you do something it's not, you aren't -- under ordinary circumstances we say if somebody is going to make, is at a decision point, we say that the person is going to weigh all the alternatives, going to look at possible options --

THE COURT:  Did you read the trial transcript?

THE WITNESS:  Yes, uh-huh.

THE COURT:  Did you read where people testified, I think it was his wife, that he didn't want to pay child support for Ja'Karenn and he wasn't going to bring her back alive and that he was actually going to leave her, if he didn't do what he did he was going to just leave her in a bayou in Louisiana for the alligators?

THE WITNESS:  Yeah, I remember all of that there.

THE COURT:  Isn't that premeditated?

THE WITNESS:  I think --

THE COURT:  You wouldn't call that premeditated?

THE WITNESS:  No, I'd call that someone acting out of --

THE COURT:  Well, he did act out and she died.

THE WITNESS:  Well, I am saying -- no.

THE COURT:  She did.

THE WITNESS:  With regard to the statement.

THE COURT:  Okay.

THE WITNESS:  I'm talking about the statement.  With regard to the statement, his behavior is a reflection of his deficiencies in terms of --

THE COURT:  Isn't that the way we all are, though, our behavior is a reflection of our deficiencies or our assets?

THE WITNESS:  Not always.  Only in some cases.

THE COURT:  Well, how do you, how do we get our behavior if it's not motivated by some lack that we have or some positive, some negative or positive?

THE WITNESS:  Well, I think the point with Mr. Bourgeois is that that is characteristic of his overall behavior over time, not just in one instance as it is with some of us, you know, where we do --

THE COURT:  Did you know how, do you know how long this child was tortured?

THE WITNESS:  Yes.

THE COURT:  That her skin turned to leather over six weeks?

THE WITNESS:  Yeah, that was an extended period, yes.  I am aware of that, yes.

THE COURT:  None of that was premeditated?

THE WITNESS:  No, what, I think the point I am making here with this particular disorder is that, you know, when you have the mini-psychotic episodes that we have talked about, we have one, in one instance we have a situation where the individual is motivated by his deficiencies, impairment in thought, other kinds of things, but let me --

THE COURT:  Well, which of those things were motivated by his deficiency?

THE WITNESS:  Well, first of all --

THE COURT:  Which of the six weeks events were motivated by deficiencies?

THE WITNESS:  I think his overall behavior is motivated by his deficiencies.  I think the things that happened during the six-week period, during that six-week period, may have been the result of the mini-psychotic episodes that we have talked about.

THE COURT:  While he was driving the truck the whole time?

THE WITNESS:  I'm sorry, I don't, I don't follow

you.

THE COURT:  He was truck-, he was on the road.

THE WITNESS:  No, what I'm saying --

THE COURT:  So he was psychotically operating the vehicle?

THE WITNESS:  No, no, I am, I am not following you in terms of --

THE COURT:  Well, we are not communicating so I am going to let Mr. Dowd do it.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  He will figure it out.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q   Doctor, the record demonstrates that the child had a number of injuries, I don't know if it's over 100 but probably well over 100 during the six-week period, and would the psychotic episodes explain each of those -- oh, 300 and, I am told it's 360 injuries.

A   Okay

Q   Maybe multiple injuries in each episode, but would, could mini-psychotic episodes explain all of those injuries over a six-week period?

A   I can't say that mini-psychotic episodes can explain all of those.  What I can say is that he is subject to, has been subject to mini-psychotic episodes that have characterized

his behavior over time.

Q   All right.  And the benefit or the point of this mitigation evidence that you are describing would be to show the jury that the murder was the result of one of these rage events?

A   I believe that there is, yes, that there is a mental health basis for Mr. Bourgeois' behavior.

Q   All right.  And, as the Court indicated, there was testimony that Mr. Bourgeois had actually planned the murder and I think he, there was testimony, if I am not mistaken, that he told his sister to get her black dress ready and he was going to get rid of the child and what not.  I mean doesn't that, I mean doesn't that demonstrate that this was a planned event and not the result of some psychotic episode?

A   I think that, you know, that one could make the statement or make the case that this was a planned event.  When I look at the totality of the data, not just one particular incident or one particular statement, when I look at the totality of the data, this is an individual who is impaired, who is significantly impaired psychologically, and this impairment has influenced his behavior for most of his life and continues to do so.

Q   Well, but --

THE COURT:  I guess my question is, is there anybody that you have examined on Terre, on death row --

THE WITNESS:  Yes.

THE COURT:  -- in the federal system that is not significantly impaired psychologically?

THE WITNESS:  Yes, I think there are variations because that's a continuum, and there are some who are less so, yes.

THE COURT:  But they all have some psychological impairment?

THE WITNESS:  Yeah, some impairment, yes.

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. DOWD:

Q   And what about the fact that there was no evidence of any abuse or any rage event against his seven-year-old daughter, is that Alfredsha, did I --

A   Alfredesha.

THE COURT:  Alfredesha.

BY MR. DOWD:

Q   Alfredesha?

A   Yes.

Q   I mean, what about that factor?  Doesn't that also suggest that the rage event is not an explanation for the murder since he never abused his other daughter?

A   No, I think what it suggests --

THE COURT:  Actually, that's not what the trial

testimony showed.

MR. DOWD:  Oh, well, I stand corrected, Your Honor.
I was --

THE COURT:  So, I mean, I can't forget the times that the mother of Alfredesha testified that though she was not sleeping with her husband that he consistently took Alfredesha to bed at night and locked the bedroom door.

MR. DOWD:  Oh, okay.  I got this secondhand, Your Honor, I apologize.

THE COURT:  Is that not what the testimony showed?

MR. ROBERTS:  There was testimony to that extent, Your Honor, but obviously we had no evidence about what happened behind the door, nor do we offer any.

THE COURT:  I understand that.

BY MR. DOWD:

Q   And --

THE COURT:  But, in any event, that's not a usual kind of thing, is it?

THE WITNESS:  No.

THE COURT:  Okay.  It would cause you concern, would it not?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. DOWD:

Q   And the Judge made the point about the fact that

Mr. Bourgeois was on the road driving, you know, a cross-country 18-wheeler driver, and there is no evidence that he ever had a rage event relating to that activity, which, you know, I just drove down here from Houston and I was ready to run somebody off the road. I mean, if he's going cross-country over a six-week period --

THE COURT: Will you help him, please?

MR. DOWD: Light counseling is all I need.

BY MR. DOWD:

Q   Wouldn't you think that if Mr. Bourgeois was subject to these rage events that they would manifest themselves in his cross-country driving or in other life stress, stresses, but did you find any evidence in the record that he had these rage events in other, you know, in other areas of his life?

A   I recall an incident where he was driving his truck and he attempted to, he left the truck, I mean the truck was driving itself.

Q   Oh, he stepped away from the wheel?

A   While he was, while he was involved with someone else in the front seat of the truck.

THE COURT: Where did you find out about this?

THE WITNESS: If you'll give me just a moment. That was from Lawanda Cook, and she said she never got in the truck again after that.

THE COURT: Did you talk to her?

THE WITNESS:  No, I didn't talk with her, just from her statement.

THE COURT:  Okay.  Be real careful about that.

THE WITNESS:  Okay, I'm just, he asked --

THE COURT:  Also, Mr. Wiseman, I want to make sure, since I misunderstood about your mitigation person, that he should be able to testify if he used that information.

MR. WISEMAN:  Yes, she's the next witness.

THE COURT:  Okay.  But I mean if you want anything from him that's fine, also.

MR. WISEMAN:  Okay.

THE COURT:  Okay.  I was mistaken.

MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q   The, well, that wasn't a rage event, he just stepped away from the wheel to talk to her and he maybe was showing off, showboating in his truck.  That was a safety event, wasn't it?

A   Well, I'm just trying to, I'm responding to the issue of his lack of judgment, lack of premeditation, if you will.

THE COURT:  He was talking about rage.  He said very specifically do you have any other instances besides this Ja'Karenn of rage.

BY MR. DOWD:

Q   Where he would go off on somebody.

A    No.   Only in terms of the emotional anger that individual has indicated but not in terms of actual violence.

Q    All right.

THE COURT:   But, now, in the trial there was the incident where his son, was it his son or a nephew that testified that he hung him upside down by the ankles from a bridge over a river?   Son, nephew?   Nephew.   Did you read about that one?

THE WITNESS:   I don't recall that, no, I don't.

BY MR. DOWD:

Q    In these, in talking to the background -- and I'm going to skip around a little bit, I'm sorry, I took some notes here.   In talking about the background information you had, people had indicated that he had mood swings, angry, hostile?

A    Yes.

Q    And was this, would this have been prior to his abandonment?

A    When you say prior to his abandonment in terms of?

Q    In other words, he was sent to live with Miss Mary?

A    Miss Mary, yes.

Q    And was this mood swings, angry, anger and hostility that Bourgeois exhibited, was that prior to his being sent off to live with Miss Mary?

A    That was across his whole, his whole life in terms of how he has functioned.

Q   Oh.  Even before the abandonment?

THE COURT:  Well, I don't think that anybody has testified that the abandonment occurred at seven years old.

MR. DOWD:  Okay.

THE COURT:  He is talking about, I think you talked about how it's cleaner to have abandonment real quickly?

THE WITNESS:  Yes, uh-huh.

THE COURT:  And his, what the others have testified, that it was over a long period of time, it wasn't just at seven, it was before then.

MR. DOWD:  Yes, Your Honor.

THE COURT:  That he says he was abused from the time he could remember.

MR. DOWD:  Okay.

THE COURT:  And that's certainly a form of abandonment, isn't it?

THE WITNESS:  Yes.

BY MR. DOWD:

Q   All right.  And weren't other siblings also sent away to live with relatives?

A   Yes, I believe that other siblings went to different places to live, reflecting the instability that was characteristic of that environment at the time.

Q   All right.  And you would expect the same type of abandonment reaction by them?

A    Not necessarily, because you would have to have the similar types of dynamics, and from all I can gather from the documents and what have you, Mr. Bourgeois was the subject of more abuse than anyone else in the family, as reflected by his sisters or his siblings.

Q    So it aggravated the abuse?

A    I'm sorry?

Q    It aggravated the abuse, the abandonment?

A    No, no.  He was, that he was the subject of more abuse --

Q    Right.

A    -- than anyone else.

Q    Right.  You said that when you gave him a test he understood 170 questions and responded consistently?

A    No, I was saying that his responses --

Q    Oh.

A    -- on the instruments reflected that he understood and that he responded in a consistent fashion.

Q    And he understood the instructions on the test?

A    Well, I gave it to him.  I was there, yes.

Q    All right, but he followed your instructions and he appeared to understand what you were directing him to do --

A    Yes.

Q    -- in taking the test?

A    Yes.  And I answered any questions that he had, yes.

Q    And how many pages was that test?

A    It's on front and back so it's about, it's three pages.

Q    Okay.  All right.  Now, the, I guess, you know, we are evaluating the performance of the trial lawyers here and why they didn't use mitigation testimony as you have offered here to assist him, but did you understand that Mr. Bourgeois told the psychological expert, Dr. Estrada --

THE COURT:  The psychiatrist.

BY MR. DOWD:

Q    The psychiatrist, Dr. Estrada, that he had an idyllic childhood, that there was no abuse, everything was wonderful?  Were you aware of that?

A    No, I wasn't aware of that but I am not surprised by it.

Q    Okay.  So at that point --

THE COURT:  But at this point, after he gets capital punishment, then he comes forward and tells everybody about the abuse.  I'm just saying that it makes, you know, it's a hard, it's hard, you know?  So it's hard to say the lawyers were incompetent because they went with what they had, you know, they had a psychologist and they had a psychiatrist.

THE WITNESS:  But also I noticed, Your Honor, that, for example, in reviewing some of the, also the later tapes, he was --

THE COURT:  After the conviction?

THE WITNESS:  After, yes, after.

THE COURT:  Right.

THE WITNESS:  That he has done the same thing.  He has, for example, in the tape with Dr. Moore he is very grandiose, he is very expansive, he --

THE COURT:  I agree with you a hundred percent.

THE WITNESS:  Uh-huh.

THE COURT:  But I am just saying if you are the lawyer and you are making a tactical decision, how many different experts do you get for him to say the same thing to before you just have to go with that?  You see what I mean?

THE WITNESS:  Yeah, I understand what you're saying. I am not --

THE COURT:  And that's the difficult.  I don't think, for, it doesn't mean it didn't happen, that the abuse didn't happen or that the other things didn't happen, but the question here for us today really is ineffective assistance of counsel, and post-conviction things that are discovered are a little bit, a little bit different.  And that's not questioning any of the things you have to say.  You understand?

THE WITNESS:  I understand what you're saying, yes.

BY MR. DOWD:

Q   If --

MR. WISEMAN:  Your Honor, I would just point out as a point of clarification that the Government argued that Mr. Bourgeois was abused for their risk assessment, counsel

argued Mr. Bourgeois was abused, so it wasn't that counsel didn't want to offer it, they just didn't support it with evidence.

THE COURT:  Well, that's the problem, because they didn't have evidence.

MR. WISEMAN:  Oh, they did.

THE COURT:  Actually -- well, oh, then they have, and I will hear that coming up.

MR. WISEMAN:  Yes, you will.

THE COURT:  But I am just saying if you have the psychiatrist and the psychologist and nobody brings it to the attorney's attention, it's difficult.

BY MR. DOWD:

Q   Doctor, in addition to this risk assessment --

THE COURT:  And I don't think Mr. Fernand was available to testify.

MR. WISEMAN:  Mr. Ferdinand.

MR. DOWD:  Ferdinand?

THE COURT:  Ferdinand.

BY MR. DOWD:

Q   You also did an adaptive functioning evaluation of Mr. Bourgeois in 2007?

A   No.  I rendered an opinion, I didn't do --

Q   Oh.

A   I didn't, no, I did not.

Q   Okay.  But you gave an opinion about his adaptive functioning?

A   Yes, uh-huh.

Q   Okay.  And again you relied on the affidavits or the declarations provided to you by Mr. Bourgeois' attorneys and you also went back and relied upon the background information you gathered from, what's her name, Claudia Williams and --

A   Yes.

Q   -- Wilmer Bourgeois?

A   Wilmer Bourgeois, yes.

Q   Okay.  And you concluded from that information that he couldn't follow simple rules from childhood through adulthood?

A   I, I, in terms of the opinion that I rendered --

Q   Uh-huh.

A   -- I based that on the documentation that I had that suggested that he had impairment in those areas, as reflected in such things as poor financial management and an inability to manage some of the normal expectations of daily life.

Q   Well --

A   As I indicated, I did not do an adaptive functioning evaluation.

Q   Not a complete evaluation.

A   Yes.

Q   But you gave your opinion on his adaptive functioning.

A    Opinion, right, yes.

Q    And you indicated that he couldn't follow simple rules from childhood through adulthood, and I guess I'm asking was this your conclusion or was this a conclusion that was provided to you?  Did you take that conclusion from the psychologists' reports that were provided to you and --

A    You mean his inability in terms of managing his functioning?

Q    That he couldn't follow simple rules from childhood through adulthood.

A    Where are you, which --

Q    I thought I got that from your conclusions here, and if I paraphrased that I apologize.  Let's see.  Is that in your report of May 9th --

A    Of May --

Q    -- 2007, the adaptive functioning opinion, was that in your original report?

A    With regard to what, his following the rules?

Q    Your, yeah, yes.

A    I don't recall.  That's why I wanted to --

Q    But your adaptive functioning opinion is contained in your original report?

A    Oh, yes, yes.

Q    Okay.

A    Yes, that's contained in the original report, yes.

Q    Well, maybe I can find it real quick.

A    Yes.

Q    Well, I'm not going to waste the Court's time.  Let me go on.  Do you believe that that is the case, from your background evaluation and from reading the statements that were provided and the psychologists', the other psychologists' reports you read?

A    Do I believe that what is the case?

Q    That he couldn't follow simple rules?

A    I'm not, I'm not sure.

Q    Okay.

A    I need to take a look at that because, that he couldn't follow simple rules?

Q    Uh-huh.

A    I was, I think, my opinion as I have expressed it was that he had difficulty managing various aspects of his life.

Q    Okay.

A    And that's reflected in those particular adaptive functioning deficits, yes.

Q    Okay.  And you knew that Mr. Bourgeois was an over-the-road truck driver?

A    That's correct, yes.

Q    Would often be on the road for weeks at a time?

A    Yes.

Q    And often by himself?

A    Yes.

Q    And he would have to negotiate his way from Florida to California and back to North Carolina or wherever his routes took him?

A    Yes.

Q    All right.

A    If he was --

Q    And he'd have to make deliveries?

A    If he was an over-the-road driver he would have to do that, yes.

Q    And arrange pickups, comply with all the Department of Transportation requirements, all the safety rules, all the driving rules?

A    I don't know all of those but I will accept those if that's what you say.  I don't know that.

Q    It's not just a cross-country jaunt, it's a fairly complicated occupation.

A    I assume that there was, there were things that were involved in terms of doing that, that it's not a simple task, yes.

Q    Well, with all his deficits, how was he able to do those things by himself?

A    I don't know that he did them by himself.

          THE COURT:  Do you know that he did not?

          THE WITNESS:  I don't know that he, I --

THE COURT:  Okay.

THE WITNESS:  I am aware of the fact that he had indicated that oftentimes he had people with him because he did not like to be by himself, but I don't know that he was always alone when he navigated those particular, those particular trips that he did.

THE COURT:  Well, being alone and getting help are two different things.  Do you have any, any indication that he had help from other people when he was on the road?

THE WITNESS:  I don't have indication that he had help --

THE COURT:  All right.

THE WITNESS:  -- from people while he was on the road but --

THE COURT:  Thank you.

THE WITNESS:  -- with Dr. Moore he indicated that he had people --

THE COURT:  He did.

THE WITNESS:  -- who taught him how to --

THE COURT:  Because he said he didn't have any support early so he went to people for advice about how to keep records and how to --

THE WITNESS:  Right.

THE COURT:  -- do his tax, he had a tax consultant --

THE WITNESS:  That's what he said.

THE COURT:  -- and he had, you know, these various and other, sundry other people that helped him learn life skills.

THE WITNESS:  That's what he reported, yes.

BY MR. DOWD:

Q   Let me just conclude.  Dr. Toomer, even if there is evidence that the defense attorneys had some indication of childhood abuse or whatever it might be, if they also had the information from Dr. Estrada that Mr. Bourgeois claimed to have an idyllic childhood and also that the one head injury that they had information about, the 1984 accident --

A   Uh-huh.

Q   -- you know, which Dr. Weiner was advised by Mr. Bourgeois about and that turned out to be false, certainly the defense attorneys would have a mixed picture about the viability of putting on some type of mitigation testimony?

MR. WISEMAN:  I am going to object to Dr. Toomer's ability to speak for why the lawyers did or did not do something.

MR. DOWD:  Well, I'm, from a psychological standpoint, Your Honor, I'm just asking if it was a mixed picture.

THE COURT:  If you can answer, that's fine.

THE WITNESS:  Okay.

BY MR. DOWD:

Q   Would you consider that to be a mixed picture?  On the one hand they have their experts providing information that Mr. Bourgeois had an idyllic childhood and the one head injury that they had they learned was false, that it was a made-up story by Mr. Bourgeois, if that was presented, don't you think that's a mixed psychological picture that they would have, psychological evidence to present?

A   Well, if we're talking about suppositions I would say yes, but that's not what I see as being an accurate account of what has existed.

Q   Okay.

MR. DOWD:  Judge, I will pass the witness with that last tortured question.

THE COURT:  Thank you.  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   Dr. Toomer, why aren't you surprised that Mr. Bourgeois reported an idyllic childhood to at least Dr. Estrada?

A   Because oftentimes what you have with this particular disorder is what we call grandiosity where individuals exaggerate certain circumstances, situations and what have

you for a number, a number of reasons.

Q   All right.   And is one of the reasons the concept of denial?

A   Yes.

Q   And just explain briefly what that is and how it applies?

A   Well, the notion is that the individual does not want to acknowledge the reality of what has transpired and in terms of carrying that forth, in carrying that out, what you tend to get is a rejection of the reality in terms of what has taken place and what has occurred, and so you oftentimes get this kind of phenomena occurring and it continues in terms of how the individual presents, how he is capable of managing situations and what situations happen to be.

Q   And an adult survivor of childhood abuse who engages in denial, is an aspect of that related to their management of the psychological pain that the abuse causes them?

A   Sure.   Denial is a useful phenomena.   It has been found to be very useful in terms of individuals protecting themselves from the effects of trauma that they have been exposed to, and it has been found to be a ready, it has been found to be a device that is readily available to the individual in terms of trying to cope with the variety of stressors that he may have encountered or might be encountering at the time.

Q   And finally with regard to denial, from the perspective

of a forensic expert hired by the defense, when you encounter denial and you suspect that there's abuse, how do you break through that?

A   Well, one of the ways that you try to break through that is by getting corroboration of versions of events from a variety of sources and we rely on corroboration as part of the clinical assessment.

Q   Mr. Dowd asked you questions about Mr. Bourgeois' facility with taking the MCMI instrument?

A   Yes, yes.

Q   Is the MCMI a test for mental retardation?

A   No.

Q   And would you ever use it to diagnose the presence or absence?

A   No, you wouldn't.

Q   Do you derive any useful information from the fact that he took the test and it was a valid administration?

A   No.

Q   Mr. Dowd asked you about other siblings who also had abandonment issues in their lives.  Are you aware of any of the other siblings, whether they suffered organic brain dysfunction or a low IQ?

A   No, I am not.

Q   And could those additional factors in Mr. Bourgeois explain why his life might have taken a different course?

A    Yes, you would have to consider the totality of the data with regard to each one.

Q    Mr. Dowd, who I am certainly not going to get next to on the road any time soon --

THE COURT:   Are you driving back to Houston?

MR. WISEMAN:   My son just moved there so I might be someday.

BY MR. WISEMAN:

Q    But the, I think the point of Mr. Dowd's questions was, well, why wasn't he stressed out by someone, you know, cutting him off on the highway or, you know, why didn't he act out then, and I want to read you a couple of sentences from the DSM-IV TR, page 707, which is the section on borderline, and ask you to agree or disagree.  Quote, "The anger of the borderline is often elicited when a caregiver or a lover is seen as neglectful, withholding on caring or abandoning.  Such expressions of anger are often followed by shame and guilt and contribute to the feeling that they have of being evil.  During periods of extreme stress, transient paranoid ideation or dissociative symptoms may occur."  So why doesn't Mr. Bourgeois go into a rage when he gets cut off but he goes into a rage when he thinks his wife is being, is cheating on him?

A    Because, as we indicated before, the event that creates the disruptive behavior is the event that serves as a

catalyst to remind the individual of the unresolved emotional issues that come from his having been brought up in a dysfunctional and traumatic environment.

Q   You were asked whether you saw other instances of violence in his background.  I would ask you about the, and Ms. Kaib is going to be testifying as soon as you are done, did you see violence reported from the women that he was married to?

A   Yes, I did.

Q   Violent rages?

A   Yes.

Q   Followed by periods of tenderness?

A   Yes.

Q   And a cycle that repeated?

A   The cycle was repeated, yes.

Q   You mentioned that brain scans can show the damage that can be caused by the type of abuse Mr. Bourgeois suffered. My question is would it necessarily show up on a brain scan?

A   It doesn't always have to, but it does.

Q   And what types of scans are we talking about here, x-rays, PET scans, functional MRIs, what are we --

A   We're talking about MRIs.

Q   Okay.

A   Yes.

Q   Last, when you talked to Claudia -- withdrawing.

Mr. Dowd asked you about this incident with Claudia Williams getting a phone call about put your black dress on, you know, suggesting that that was evidence of premeditation.  Did you learn anything else about that phone call?

A   I don't recall offhand.

Q   Okay.  You have recalled quite a bit, so I will give you a --

A   Yes.

Q   I'll give you a pass on that one.

A   I don't recall offhand, no, not regarding that.

Q   That's all I have.  Thanks very much.

        THE COURT:  Thank you, sir.

        THE WITNESS:  Thank you.

        THE COURT:  I think you have got round three coming up here.

        MR. DOWD:  Your Honor, I just have a few follow-up questions.

        THE COURT:  Okay.

                  RECROSS-EXAMINATION

BY MR. DOWD:

Q   Doctor, I may not have been fair earlier, I asked you about some factors of schizoid personality disorder.

A   Yes, uh-huh.

Q   And I want to show you something here.  Are you aware, are you familiar with Mental Retardation Definition,

Classification and Systems of Support, Ninth Edition,

American Association of Mental Retardation?

A    Yes, that's the --

Q    Okay.

A    That's not the latest edition, is it, because the name,

the nomenclature has been changed.

        MR. DOWD:  Your Honor, may I have just one second?

        THE COURT:  Yes.

    (Mr. Dowd and Mr. Roberts conferring off the record)

BY MR. DOWD:

Q    All right, let me correct myself.  I am going to show you

what has been marked as part of the DSM-IV, and that

describes -- I hope, this is not a real good copy -- and it's

marked as Government Exhibit Number 201.  I think this is

going to be a court demonstration exhibit, but it shows --

let me see if I can bring this up.  It shows some of the

factors that the DSM-IV describes as typical of the schizoid

personality disorder.

A    Yes.

Q    Do you agree with those?  Do you recognize those as --

A    I recognize these, yes.

Q    -- the accepted --

A    Yes.

Q    -- tendencies of that disorder?

A    These are some of them, yes.

Q   All right.  And you had indicated earlier that, I think on several of those, at least you said not necessarily or --

A   Correct, yes.

Q   But these are actually the accepted tendencies of this disorder, correct, in your field?

A   Well, here's the situation:  Yes, the DSM-IV TR is designed to provide a basis for individuals across mental health professions to communicate with one another.

Q   Uh-huh.

A   But you have to also keep in mind that the DSM-IV TR does not deal with the etiology of the mental illness, it does not deal with the theory of the mental illness --

        THE COURT:  Well, doesn't it have to do with the symptoms?  That's the presentation, I think that's what he's talking about.

        MR. DOWD:  Yes, Your Honor.

        THE WITNESS:  Well, he asked me did I agree with all of them.

        THE COURT:  Well, any of them?

        THE WITNESS:  Because I said, because I said yes and maybe to some of them.

        THE COURT:  Got it.

        THE WITNESS:  And so I am explaining why I said yes and maybe to some of his answers, some of his questions.

BY MR. DOWD:

Q   All right, but those, that presentation that's described there, that's actually the accepted presentation of that disorder?

A   Those are some of the accepted issues --

Q   Okay.

A   -- with respect to that particular disorder.

THE COURT:  Is that going to be admitted?

MR. DOWD:  Your Honor, I'm just going to use it as a trial exhibit, it's Exhibit Number 201.

THE COURT:  Well, are you going to read them off?

MR. DOWD:  Okay.

THE COURT:  I mean shouldn't it be admitted?

MR. DOWD:  I will offer it, Your Honor.  Just --

THE COURT:  Never mind.

MR. DOWD:  It's a sectional thing, I can just offer this one page.  We would offer Government's Exhibit Number 201 so I don't have to read it.

MR. WISEMAN:  No objection.

THE COURT:  Government Exhibit 201 is admitted.

(Government's Exhibit 201 admitted into evidence)

THE COURT:  And, Mr. Wiseman, I don't think you admitted the one you read off also about -- well, yes, you did because you read it, you read it in.

MR. WISEMAN:  We will get you a copy of it as well.

THE COURT:  That's okay, you read it in.

MR. WISEMAN:  Okay.

THE COURT:  It was one of those do you admit or not, do you agree or not agree.

MR. WISEMAN:  Okay.

BY MR. DOWD:

Q   And then, Doctor, you indicated that the MRI was the test that could --

A   It's one, yes.

Q   Oh.  What other tests can they use to demonstrate brain damage on the basis --

A   They could do a --

Q   -- of child abuse?

A   They could do a scan or whatever but the MRI, apparently, that's not a specialty of mine but my understanding from experts that I have spoken with, that the MRI tends to provide the greatest clarity in terms of, in terms of designating areas of change.

Q   All right.  And what is the actual brain structure that is changed or is different in someone with brain damage from child abuse?

A   Oh, it depends on the particular, on the particular individual, but the, my understanding is, from the research that I have read, that the portion of the brain is the, is the portion of the brain that is involved with areas such as

impulse control, frontal, you know, frontal lobe kinds of issues and what have you.

Q   Well, I am really asking more structurally how it appears, what parts of the brain appear to be changed.  I am not talking about how it's developed in, or how it results in behavior change, I am talking about the actual structure of the brain.

MR. WISEMAN:  Your Honor, I am going to object.  I think Dr. Toomer has said he may be at the limit of his expertise, he's read some literature on it.  I don't know that he can really answer those questions.

THE COURT:  Well, let's see if he can.

MR. WISEMAN:  Okay.

THE COURT:  If he can't, if you don't, if you can't answer these, don't answer.

THE WITNESS:  Yeah, I can't answer the question.

THE COURT:  Okay.

BY MR. DOWD:

Q   And so you don't know if there's tests or scans that can be done to determine whether or not there's brain damage on the basis of child abuse?

THE COURT:  I thought you said earlier, I thought he said something earlier it would show up on an MRI or a PET scan or a CAT scan or something.

THE WITNESS:  Yes, yes.

THE COURT:  Okay.  Is that what you asked before?

MR. DOWD:  But, Your Honor, I am trying to figure out the level, his, the level of his limitation.

BY MR. DOWD:

Q   You are convinced that there are tests that do that but you just don't know all the --

A   Oh, no, this is, I think I was misunderstood.  What I am saying is that if you expose an individual, an individual who was exposed to that particular kind of traumatic, erratic, unpredictable environment, that individual lives in a state of hyper-vigilance constantly.  As a result of that, being exposed constantly on an ongoing basis, that results in certain physical changes to the brain --

THE COURT:  That's what I understood you to say.

THE WITNESS:  -- that show up on an MRI.

THE COURT:  Yeah, that's what he said.

BY MR. DOWD:

Q   Right.  That show up on a -- right.

A   But it's, but I don't know of individuals who would use that just to see if someone had been abused as a child.

THE COURT:  The doctor that testified, I don't know about the abuse but the doctor that testified the Friday before said that he worked with neurologists and the like because they would find the lesion and he would say or he would help them determine where the lesion was --

THE WITNESS:  Where the lesion was, yes.

THE COURT:  -- based on various testing.

THE WITNESS:  Exactly, yes.

THE COURT:  So I assume that you would work together with someone like that?

THE WITNESS:  Yes.

MR. DOWD:  That's all I have, Your Honor.  We'll pass the witness.

MR. WISEMAN:  Nothing further.

THE COURT:  Thank you, sir.  Now you can go.

THE WITNESS:  Thank you, Judge.

THE COURT:  How late do you-all want to go?  You want to call your next witness?

MS. LARIN:  We have one more witness.

MR. WISEMAN:  Yeah, that would be helpful.

THE COURT:  Good.  Go right ahead.

MR. WISEMAN:  Tomorrow is a busy day.

THE COURT:  Pardon?  Is it?

MR. WISEMAN:  Oh, yes.

THE COURT:  Okay.  Who is the next witness?

MS. LARIN:  She's coming, Your Honor.  Her name is Kathy Kaib.  She's the mitigation expert.

THE COURT:  Oh, okay.  That works in your office?

MS. LARIN:  Yes.

THE COURT:  Okay, thanks.

MS. LARIN: And if you don't mind, I am going to use my computer.

THE COURT: That's why the podium is there.

MS. LARIN: Okay, great.

THE COURT: And there's an electrical outlet there also and a modem.

MS. LARIN: I won't be here that long. Hopefully we can just rely on the battery and I will be done.

THE COURT: Okay. How many more experts did you want to testify today, do you know?

MS. LARIN: This is it.

THE COURT: This is it? Okay, good, so we're on schedule.

MS. LARIN: Yes.

THE COURT: Okay.

MS. LARIN: We're on schedule for a long day.

THE COURT: Pardon?

MS. LARIN: For a long day.

THE COURT: No, no, I want to make sure that we've got the time that we've given you, all the time you need.

MS. LARIN: We're working on it.

THE COURT: How many tomorrow witnesses do you have?

MS. LARIN: Wait a minute, we've got it. We have Dr. Cunningham. We have Dr. Cunningham. We have many family members.

THE COURT:  Okay.

MS. LARIN:  Probably about eight family members.  Dr. Cunningham.

MR. ABREU:  Elizabeth Johnson is scheduled to testify tomorrow.  Dr. Dailey.

THE COURT:  Could you come forward, please, ma'am.

THE CLERK:  Please raise you right hand.

THE COURT:  How late do you-all want to go tonight?  You want to finish this witness?

MR. WISEMAN:  I think we can finish her.

THE COURT:  Anybody else?

MS. LARIN:  No one else.

MR. WISEMAN:  No, no.

THE COURT:  Okay.

KATHLEEN KAIB, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  And I gave the Government a day and a half?

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Yes.

THE COURT:  But I read, you know, tonight I will do the other two hours of Price 1 and 2.  And would you-all, somebody offer me the Estrada deposition so I can --

MR. WISEMAN:  Yes, we'll do that as soon as Ms. Kaib is done with it, we'll admit that.

THE COURT:  Okay, thanks.

DIRECT EXAMINATION

BY MS. LARIN:

Q   Good evening, Ms. Kaib.  Can you please state your name for the record?

THE COURT:  Finally.

MS. LARIN:  I am a beginner so I do these things.

THE WITNESS:  Kathleen Kaib, K-A-I-B.

BY MS. LARIN:

Q   And, Ms. Kaib, what is your occupation?

A   I am an investigator and a mitigation specialist with the Federal Defender, Capital Habeas Unit in Philadelphia.

Q   And that means you work in my office?

A   Correct.

Q   And how long have you been working there?

A   For seven years, since 2003.

Q   And prior to that where did you work?

A   I worked at the Women's Law Project, which, as a social worker, which is an agency that deals mostly with domestic relations issues such as helping women with domestic violence, child support, divorce issues.

Q   Okay.  And can you just tell us briefly your education history?

A   I have a master's in social work from Bryn Mawr and I also have a master's in law and social policy from the same institution.

THE COURT:  From where?

THE WITNESS:  Bryn Mawr.

THE COURT:  Okay, thank you.

BY MS. LARIN:

Q   And are you a licensed social worker?

THE COURT:  Oh, you know, after all the problems with the microphones, could you actually use a, move a little closer?  Sometimes I find that if you put your right arm on the shelf there it leans you into the microphone.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

BY MS. LARIN:

Q   I am doing the same thing with it.  Would you like me to repeat anything?

A   No.

Q   Okay.

A   I am licensed in the state of Pennsylvania.

Q   As a social worker?

A   Yes.

Q   Okay.  And can you please identify this document?  It's marked as, it will be marked as P24.

MS. LARIN:  I think I do need a marker.

MR. WISEMAN:  I know.

THE COURT:  Do you have a marker for her, Ms. Scotch?

BY MS. LARIN:

Q    This is marked as P24.  Can you identify this?

A    That's my CV.

          THE COURT:  Do you want to offer it?

          MS. LARIN:  I would like to offer her CV and I would --

          THE COURT:  Any objections?  Sorry.

          MR. ROBERTS:  No objections, Your Honor.

          THE COURT:  P24 is admitted.

     (Defendant's Exhibit P24 admitted into evidence)

          THE COURT:  I'm sorry I interrupted you.

          MS. LARIN:  No, thank you.

BY MS. LARIN:

Q    And in addition to your years of experience do you regularly attend trainings in the field of social work?

A    Yes, as well as mitigation training.

Q    Okay.  And have you presented at any conferences about mitigation?

A    I have.

Q    And have you testified in court before?

A    Yes, both in State and Federal Court.

Q    And have you been qualified as a mitigation specialist and as a social worker?

A    Yes.

Q    Or in the field of social work I guess.

MS. LARIN:  Your Honor, I would like to offer Ms. Kaib as an expert in forensic social work and as a mitigation specialist.

THE COURT:  What is -- I don't know what that means, but is there any objection?

MR. ROBERTS:  Yes, Your Honor.  I'm not sure she is qualified to be a forensic anything at this point.

MS. LARIN:  You know, this came up before.  How about just in the field of social work?

THE COURT:  Could you, as a social, as a field of social work --

MS. LARIN:  And as a mitigation specialist.

THE COURT:  Any objection?

MR. ROBERTS:  To social worker, no, Your Honor.

THE COURT:  Okay.  I don't know about mitigation because I don't know what that means.  I mean I know what it means but I don't know if she's -- visit with Mr. Wiseman just for a second.

MS. LARIN:  Okay, thank you.

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  How about we --

THE COURT:  Why don't I accept her as a social worker and then you can talk to her about mitigation and see what --

MS. LARIN:  Okay.

THE COURT:  So then you can help me.

MS. LARIN:  Okay.

BY MS. LARIN:

Q    Maybe we can start there.  Can you please tell us, Ms. Kaib, briefly what is, what does a mitigation specialist do?

A    A mitigation specialist is usually part of the defense team and their job is to, different things but to collect records and things of that nature on the client's life, spend time with the client so they can tell you about their life history, and then go talk to the family members, teachers, and other important people in their life to begin to gather a social history that can be presented to the defense team that can then be given to other experts such as psychologists, psychiatrists and neuropsychologists.

Q    And on that note, are you familiar with Dr. Toomer?

A    Yes, I have worked with him several times.

Q    And has he relied on your work before?

A    Yes.

Q    And you have collaborated together in developing a social history?

A    Yes, several times.

Q    And at our request did you conduct an interview of Mr. Bourgeois' ex-wives and ex-girlfriends?

A    I did.

Q   And what was the purpose of those interviews?

A   Basically to gather, to do a mitigation interview, and what that entails is to ask questions about family violence, childhood functioning, adult functioning, mental health issues, any issues of childhood abuse or childhood neglect, and just daily functioning and also just a general social history.

Q   Okay.  And what in general did you learn from these women?

A   I learned that he had, he had volatile relationships with these women, they --

MR. ROBERTS:  Your Honor, I am going to object. It's hearsay and she's an investigator, she's a member of the trial team.

THE COURT:  Sustained.

MS. LARIN:  Your Honor, if I could just respond. One of the issues of this case is about ineffective assistance of counsel and whether they used their mitigation experts, so in part I would like to present Ms. Kaib to present what she could have provided trial counsel if they had utilized their mitigation experts.  And then the point is you take that information and you follow up and you provide it to a mental health expert.  So it's kind of hard to get that information and if we can't, so maybe it's something like, you know, not offering it necessarily for the substance

but for the process that she went through.

MR. ROBERTS:  Your Honor, she basically went around and interviewed a bunch of witnesses and now she wants to come here and tell the Court what she found out in her investigation and it's all hearsay and it's unreliable and we've got, or at least one of the affidavits that they submitted we found out is not reliable and we are going to be presenting evidence with regard to that, so I would object to her entire testimony.

MS. LARIN:  Can I respond just one more time?

THE COURT:  Okay, let me think, let me think --

MS. LARIN:  Okay.

THE COURT:  -- how to do this.  It's late, I'm tired.

MS. LARIN:  Yeah, I know.

THE COURT:  Okay, so let me think.

MS. LARIN:  I do have one more thing to add, if you --

THE COURT:  Okay, let me think about this, because I understand that -- I wonder if she could just say, if she can form an opinion.

MS. LARIN:  Well, she is a social worker and she did do interviews.  We could go two ways.  She's a social worker, she did interviews, she has been accepted as a social worker and that's what they do, or we could say it's not being

offered for the truth. therefore it's not really hearsay.

THE COURT:  The -- whatever I --

MS. LARIN:  So it's, both accomplish something in this case.

THE COURT:  Whatever I allow in from her I am going to balance it with this:  There was quite a bit of information that several of these witnesses were frightened to come forward at the time of trial that I think was very reliable.

MS. LARIN:  Yes.

THE COURT:  And so if they have something positive to say about Mr. Bourgeois, I am going to view it in that light.  Do you understand?

MS. LARIN:  Yes.  And on the same note, it's another reason why we would rely on Ms. Kaib to present whatever information for whatever value it is rather than asking them to come in today to testify.

THE COURT:  I don't understand why you wouldn't ask them to come in and testify.

MS. LARIN:  Why I would?

THE COURT:  Why you would not.

MS. LARIN:  Well, I thought you just said that they were, might be fearful and --

THE COURT:  Well, are they still fearful?

MS. LARIN:  I don't know.  I was just following up

with you.

THE COURT:  But I mean is this something new that I didn't know at time of trial?  Or that the lawyers would not have known at time of trial, because I knew --

MS. LARIN:  No, the lawyers could have known this. And I think when you hear --

THE COURT:  I mean if I knew it --

MS. LARIN:  -- when you hear --

THE COURT:  -- they had to have known it, right? Because that's where I would have gotten it.

MS. LARIN:  Really, what this, there's many reasons that we wanted Ms. Kaib to testify but part --

THE COURT:  What would they, tell me what the value of it would have been?

MS. LARIN:  Well, one is as an example of what, how a lawyer could have used a mitigation expert, and in this case --

THE COURT:  Tell me how.  Just, why don't you make an argument about it.

MS. LARIN:  Okay.  So Dr. Toomer --

THE COURT:  If she testifies hypothetically the following --

MS. LARIN:  Yes.

THE COURT:  -- that there was a lot of abuse with the girlfriends --

MS. LARIN:  Right.

THE COURT:  -- and the ex-wives --

MS. LARIN:  And it supports a finding of borderline.

THE COURT:  -- what would that mean?  It would what?

MS. LARIN:  It supports Dr. Toomer and Dr. Estrada's testimony about borderline personality disorder.

MR. ROBERTS:  Your Honor, we don't have any problem with borderline personality disorder.

MS. LARIN:  It's not the only evidence, but --

MR. ROBERTS:  In fact, we have acknowledged that that exists, so this is cumulative if that's the purpose of it.

THE COURT:  Then I will accept that proffer.  Is that all right?

MS. LARIN:  Can I just consult with counsel?

THE COURT:  Would you talk with Mr. Wiseman?

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  Thank you.  He missed the whole thing.

MR. WISEMAN:  I'm sorry, Your Honor.

MS. LARIN:  He was so busy thinking, he missed what you said.

THE COURT:  What I, she has been objected to because of hearsay.  I don't have experience with mitigation experts.

MR. WISEMAN:  Right.

THE COURT:  So I don't know if there's a science

that qualifies them to do that.  I don't know if that's a recognized science or if it's a recognized area of expertise.  It seems like a recognized area of kind of hearsay.  So my suggestion to your, for your client was that I would hear a proffer from Mr. Bourgeois that corresponds to what I understood at the trial time that these, that she would testify, if allowed to testify, that these girlfriends and ex-wives would testify about domestic abuse from Mr. Bourgeois.

MS. LARIN:  And volatile relationships.

THE COURT:  And volatile relationships, which I think I know from him and I think I know from the trial.

MR. WISEMAN:  Yes.

THE COURT:  So I will accept that proffer.

MR. WISEMAN:  Okay.  And that's fine.  I would just point out that --

THE COURT:  And that, and the whole reason, then you can argue in your closing arguments what that would have done to benefit Mr. Bourgeois at time of trial.  Isn't that the point of this?

MS. LARIN:  Yes.  I mean there's a little bit more information that she --

THE COURT:  Tell me what it is.

MS. LARIN:   She also --

THE COURT:  What do you want her to say?

MS. LARIN: -- as a proffer, she was also going to testify that some of these women told her that Mr. Bourgeois told them, pre-trial and pre-offense, that he was abused as a child. And also, in her interviewing she noted some evidence of some adaptive deficits that she then brought back to us and encouraged us to retain a mental, an expert in mental retardation. So there were two other areas.

THE COURT: Any objection to this proffer?

MR. ROBERTS: The first part I don't have a problem with, Your Honor. The second part with regard to her having, coming back and giving them information for adaptive functioning, I have a, I do have an objection to, Your Honor.

MR. WISEMAN: And, again, Your Honor, it's not being offered for the truth, this is how mitigation specialists work. They come back -- you look at the ABA guidelines, they say you have a mitigation specialist --

THE COURT: Okay, okay, look, I am just going to accept this proffer as some information that she received, truth or not truth --

MS. LARIN: Right.

THE COURT: -- of the information.

MS. LARIN: Exactly.

THE COURT: That you think that her trial attorney should have found out with proper investigation.

MS. LARIN: Exactly.

THE COURT:  That that's what this is for.

MS. LARIN:  That's exactly what it's for.

THE COURT:  Not for the truth of the matter asserted or that she's an expert in mental health or advising you on whether to get mental health evaluations.

MR. WISEMAN:  Well, I, not to put too fine a point on it but I would quibble a little bit with the last part because in Wiggins v Smith, a 2003 Supreme Court case, they, the Supreme Court relied on and acknowledged the testimony of a mitigation specialist and that was being offered for the truth.  There is an emerging, I should say it's emerged, doctrine that allows such folks to testify.

THE COURT:  Well, okay, let's say, let's say this, that she may be qualified to say to you, "This looks, I have a pretty good suspicion that this may involve some mental retardation."

MR. WISEMAN:  Absolutely.

THE COURT:  And that's what tipped you off.

MR. WISEMAN:  There you go.

THE COURT:  I am just going to accept that.

MS. LARIN:  One of the many things.

MR. WISEMAN:  Okay.

MS. LARIN:  Okay.

MR. WISEMAN:  That's great.

THE COURT:  And then if they want to quibble at a

later date that she's not qualified to do that.  But I really think that each one of us would be qualified to do that.  I am not sure that that's an area of expertise.  I mean having represented almost 150 criminal defendants myself, I was pretty --

MS. LARIN:  And she just gets paid for it.

THE COURT:  I figure I was pretty clever about finding out who I thought was mentally retarded and who ought to be examined.

MS. LARIN:  Uh-huh.

THE COURT:  Or certainly who had a mental health issue as well, so I don't think that that's an unusual thing.

MS. LARIN:  I guess the point is, you know, they had a mitigation expert that they could have relied on if they were helping, if they were working together, and --

THE COURT:  But did they have a mental -- I don't remember saying, authorizing a mitigation expert.

MR. ROBERTS:  Yes, you did, Your Honor.

THE COURT:  I did?

MR. ROBERTS:  You did, Your Honor.

THE COURT:  Well, thank goodness.

MR. ROBERTS:  It's on the record.

MS. BOOTH:  Mr. Bierbaum.

THE COURT:  There you have it.  So I gave them everything they asked for, whatever it was.

MR. ROBERTS:  In fact, Your Honor --

THE COURT:  Even a jury consultant.

MS. BOOTH:  Yes.

THE COURT:  But I kept thinking, gosh, she looks so mature, so she comes up at the end of her thing and said she wanted to talk to me, that she, that her mother went to high school with me and I thought, oh, great.  That was a kick. Anyway.

MS. LARIN:  So, I am not quite sure how to proceed.

THE COURT:  I think you may be done.

MS. LARIN:  I'm done, okay.

THE COURT:  That would be my guess.  What do you think?

MS. LARIN:  So my proffer was sufficient, is that -- okay.  Thank you very much, Your Honor.

THE COURT:  That was excellent.

MS. LARIN:  Good job, Ms. Kaib.  Glad we flew you down here.  And I think we are done for the day.

THE COURT:  Because I --

MR. WISEMAN:  Your Honor, we're done for the day. We would offer up the tape of the Dr. Estrada deposition.  Do you want a transcript as well -- we have that -- or just the tape?

THE COURT:  Could I have the transcript?

MR. WISEMAN:  Oh, absolutely.

THE COURT:  I think I am so tired of the videos.  I spent the whole weekend with the videos and I was so glad that there was a mistake with two of the hours.

MR. WISEMAN:  For the record, though, perhaps we should offer the videotape and Your Honor --

THE COURT:  Absolutely.  I think that I would rather -- is it on a CD?

MS. LARIN:  Yes.

THE COURT:  Let me tell you the problem with the CDs.

MS. LARIN:  I think it's on a CD.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  What I had with the CDs for the Government, I had to get our systems people to come over to my house Saturday.

MS. LARIN:  We had similar problems.

THE COURT:  Yeah, and she, you know, downloaded an application so I could watch it.  I don't want that problem again, I'd rather just read it.

MS. LARIN:  Yeah.  So, I think he's looking for the transcript right now, but we have the, we have it all.

THE COURT:  And we can, I certainly will admit the video.

MS. LARIN:  Okay.

THE COURT:  Is there any objection?

MR. ROBERTS:  None whatsoever, Your Honor.

MR. WISEMAN:  Your Honor, I am going to mark then as --

MS. LARIN:  I have no idea.

THE COURT:  Do you know what number we might be up to?

MS. LARIN:  163?  163.

MR. WISEMAN:  Okay.  I'm going to mark as 163 two DVD discs which comprise the deposition of Dr. Estrada, and I want to extend my thanks to the Government for accommodating that, 160 --

MS. LARIN:  Three.

MR. WISEMAN:  163.  And 164 I will mark as the transcript of his deposition.

THE COURT:  Do you-all ever take cases from your office of the actual trials or do you always do the 2255s?

MR. WISEMAN:  We do post-conviction with a limited exception.

THE COURT:  Okay.

MR. WISEMAN:  We can occasionally.

MS. LARIN:  Very limited.

MR. WISEMAN:  Although I am rather busy at the moment.

THE COURT:  You did the video also?

MR. WISEMAN:  Yes, the video and the deposition.  And the transcript.

THE COURT:  163?

MS. LARIN:  163 and 4.

THE COURT:  Petitioner's 163 and 164 are admitted.

(Defendant's Exhibits P163 and P164 admitted into evidence)

MR. WISEMAN:  Thank you, Your Honor.

(Off the record discussion at counsel table)

THE COURT:  And I will read Dr. Estrada's deposition tonight, but I would rather not be expected to do the other two hours of Price tonight.

MS. LARIN:  That is at your leisure, Your Honor.

THE COURT:  Well, I want to do it before he testifies.  If you can give me sort of a heads up when you expect.

MR. ROBERTS:  Your Honor, I think Dr. Price is not going to be on until Wednesday, so, I mean, depending on what their, the way their case goes, obviously it's not going to be, we won't be putting our case on --

THE COURT:  What, when do you think you will be finished?

MR. WISEMAN:  Well, we will probably be finished at noon on Wednesday and that's what we're shooting for, so tomorrow's a busy day --

THE COURT:  Do I tell them now?

MR. WISEMAN:  I'm sorry?  Uh-oh.  Tell them about what?  There's something.

THE COURT:  She won't let me tell you, so.  We may have found an extra day.

MR. WISEMAN:  Oh, all right.

THE COURT:  But that doesn't mean you can slow up.

MS. LARIN:  Don't worry.

MR. ROBERTS:  Your Honor, there's also the issue of --

THE COURT:  Or an extra half a day anyway.

MR. ROBERTS:  We might ask to have Dr. Senn taken out of order and --

THE COURT:  Doctor who?

MR. ROBERTS:  Dr. Senn.  He testified at trial.  He was the forensic odentologist.

THE COURT:  Oh, right.

MR. ROBERTS:  And the defense this last couple of weeks had sent us a number of odentology documents.  I had exported those in and all of a sudden Dr. Senn is available, so he is actually going to be present when Dr. Bowers and Dr. Dailey testify.

THE COURT:  When are they going to be testifying?

MR. ROBERTS:  Our understanding was that it would be --

MR. WISEMAN:  Tomorrow.

MR. ABREU:  Tomorrow, Your Honor.

MR. ROBERTS:  And so we would like, if possible and Dr. Senn makes it through this storm, we would ask that he be --

THE COURT:  It's nowhere but right here.

MR. ROBERTS:  We would just ask if there would be an opportunity to take him out of order so he can respond.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  And we will take, I will take that out of their day-and-a-half at the end.

MR. WISEMAN:  Oh, okay.

THE COURT:  If you let your odentologist testify tomorrow --

MR. WISEMAN:  Your Honor, I --

THE COURT:  Then Dr. Senn.  That's what you want to do?

MR. WISEMAN:  I think we have some separate objections to Dr. Senn relating to a rather late disclosure.

THE COURT:  Tell me.

MR. WISEMAN:  Well, we --

THE COURT:  Do you not want to talk about it now?

MR. WISEMAN:  Well, we certainly can.  I mean I thought we agreed that we were going to give 30 days notice

of experts and exchange Rule 26 disclosures and we found out about, Dr. Senn is not the Government's witness list, we've gotten no disclosure, we obviously know who he is but we weren't prepared for him, and then I think on Friday we got an email, an updated witness list, and Dr. Senn was on it.

THE COURT:  Okay, well, give me, if you got more tomorrow, because my initial thinking is it seems a matter of fundamental fairness to let the Government expert respond.  I don't know if that's true or not, I have to think about it.

MR. WISEMAN:  Okay.

THE COURT:  Because what your experts are attacking is his testimony at trial by saying, defense counsel, you should have known what they are going to testify to already.

MR. WISEMAN:  And we wouldn't have had a problem with him testifying, it's just that we, you know, we prepared and didn't know he was going to testify.  Mr. McHugh, who is as diligent as the day is long, is staying up nights preparing for him and I just don't know that he's going to be ready to the level that he is used to, so.

MR. McHUGH:  And, Your Honor, they have known about Dr. Bowers and Dr. Dailey for years and they never noticed Dr. Senn as testifying in this hearing until Thursday at the end of the day, and that's when they sent us an updated witness list, at the very end of it was Dr. Senn.  Over the weekend is when we got, Mr. Wiseman got the Rule 26

compliance, which I don't know is even compliant.

THE COURT:  Well, you know what, I can think of a punishment to do then.  You put on one odentologist, Dr. Senn goes next and you save your best shot to attack whatever he says newly.

MR. McHUGH:   Well, we only have one odentologist.

THE COURT:  Oh, okay.

MR. McHUGH:  That's Dr. Bowers.  Dr. Dailey is an odentologist but he was a fact witness at the time of trial that was contacted by the Government and gave an opinion that they could not exclude or include either of the, any of the three.  Our odentologist is Dr. Bowers that was retained by the defense for the purposes of this hearing.  Dr. Dailey will be brief.  The Government is aware of his affidavit, they have had that for years, and he will testify to his opinion, but the Government got that opinion from him.  He wasn't retained by us, he was retained by the Government.  Dr. Bowers is our one odentologist.

THE COURT:  Well, then it might be appropriate to put Dr. Senn before your odentologist.

MR. WISEMAN:  Well, Your Honor, that raises some logistical issues.  We've got an, tomorrow is the longest day for us, we've got oral all-day witnesses, we have Dr. Cunningham, Dr. Johnson, Kerry Brown, Professor Holden, Bowers and Dailey, so I mean we've got, I don't know how

we're going to get them all in to begin with and --

MR. ROBERTS:  Your Honor, this has kind of gotten out of proportion here.  Dr. Senn's only purpose in being here is to respond or rebut anything Dr. Bowers says about him.  He has been --

THE COURT:  Well, that's fair.

MR. ROBERTS:  He submitted --

THE COURT:  I am just giving you an option of when to, you know, if they don't want to take him out of order, if they're not going to let you take him out of order, I can tell you that you can take him out of order.

MR. ROBERTS:  And there's nothing --

MR. McHUGH:  And, Your Honor, if I may --

MR. ROBERTS:  If I can finish, just briefly.

MR. McHUGH:  Sorry.

MR. ROBERTS:  There's nothing substantive new that Dr. Senn is going to bring in.  We have --

THE COURT:  Well, that's good.

MR. ROBERTS:  We brought, we gave his report, we submitted the report, the April 20th statement, and that's his report.

THE COURT:  Okay.

MR. ROBERTS:  And so he's just here in case Dr. Bowers says something that he needs to rebut, particularly from a professional standpoint.

MR. McHUGH: But, Your Honor, Dr. Senn and the Government has had Dr. Bowers' report talking about Dr. Senn for a couple of years and on Thursday night they tell us they are calling Dr. Senn. And over the weekend they provided us with what they purport to be Rule 26. It has no listing of any of his testimony in the last four years, which I understood was the Court's order.

THE COURT: It is.

MR. McHUGH: And I have not got that, and I am supposed to cross-examine Dr. Senn, even though they have had Dr. Bowers' compliance with Rule 26.

THE COURT: And looked up all the depositions and all the other things.

MR. McHUGH: Exactly.

THE COURT: Okay.

MR. ROBERTS: Your Honor, that's not exactly correct. Dr. Senn's CV, his biography that lists all the cases he's testified on, all that was given to them. They are in exhibits that we have given to the other side, we sent them those, and the only reason --

THE COURT: When did you send them those?

MR. ROBERTS: It would have been, it was last week. But the only reason this all came up was because we were given about ten exhibits within the last two weeks that dealt with odentology and when we started looking through them, I

sent them to Dr. Senn and said, "What are these?"

THE COURT: Is this right?

MR. McHUGH: Your Honor, what those exhibits are, are articles that Dr. Bowers will be testifying to that were cited in his report. These are, some of the articles are new that were provided to the Government.

THE COURT: Okay, everybody's doing new stuff, Dr. Senn is going to testify, get ready.

MR. McHUGH: I understand that but, Your Honor, his CV, I don't have it. It's not marked as an exhibit for this hearing, as far as I can see, from the Government. I have not had any opportunity to review any of his transcripts. They have had years to prepare for Dr. Bowers. So I bring that to the Court's attention on Thursday night and now they are asking to take him out of order.

THE COURT: We are not going to take him out of order. He will go with the Government's time, so you have time to prepare.

MR. McHUGH: Thank you, Your Honor.

THE COURT: Are there new updates to his CV?

MR. McHUGH: I don't know what CV they are talking about because it's not listed as an exhibit of the, that the Government has provided us, as far as I know.

THE COURT: Okay, hold on.

MR. ROBERTS: Dr. Senn's CV is at Government Exhibit

173.  Dr. Senn's biography is at 174.  We did provide an additional Rule 26 just to show what information he reviewed in order to get ready for his report but, again, he wasn't being offered as a new witness, and that was in Government Exhibit 171.  So 171, 172 was his report that we offered in April, and then 173 is his CV and 174 is his biography that -- and within that information is listed the cases that he has testified.  And I can go back and pull the emails if the Court's really concerned about when all this information came out, but there's nothing the Government did --

MR. McHUGH:  I have not received them.  I have no, if the emails were sent but I personally did not receive these emails, I don't know when they were sent.  I mean they noticed him Thursday night, so it wasn't sent subsequent to Thursday night?

MR. ROBERTS:  Yes, it was.

MR. McHUGH:  And we traveled on Sunday.

THE COURT:  Don't you travel with your email?  I never go anywhere, I never go anywhere without it.

MR. McHUGH:  It's, the email has been a little spotty because of the storms, I believe, but --

THE COURT:  No.

MR. McHUGH:  If we got it --

THE COURT:  No.

MR. McHUGH:  Well, what I am saying, Your Honor, is

to give me their, his prior testimony, I am preparing for my witnesses and to give me his prior testimony and give me Friday, well, we didn't get it until the weekend.

THE COURT:  When did you send it to them?

MR. ROBERTS:  Your Honor, I am going to have to pull the email up but it was, we sent it to Michael Wiseman and --

MR. McHUGH:  On Saturday.

MR. ROBERTS:  And it was not on Saturday.  It was, the documents were sent --

MR. WISEMAN:  My head's spinning.  I think it was Friday or Saturday, I don't remember exactly.

THE COURT:  Okay.

MR. WISEMAN:  I mean the point is, is that it's been within the last couple of days.  And, you know, I forwarded it to Mr. McHugh and I don't know if he --

MR. McHUGH:  And to be able to pull testimony in that short a time is just not possible.  I respect the Court's ruling that he will not be taken out of order and I will do the best job I can if he's called within the Government's case.

THE COURT:  What is his recent testimony?  What's he done?

MR. ROBERTS:  In fact, Your Honor, most of it's, he travels around teaching and he's not really in court that often.

THE COURT:  Well, what cases has he done since he testified in here?

MR. ROBERTS:  I'm going to have to look it up, Your Honor, I don't have it with me.  At page 19 on his CV, which again is Exhibit 173, he lists Texas versus Comorna in April of '08.  He's got a case in October of '07, Texas versus, that's a lot of names.  And then Texas versus Villa in January of '06.

THE COURT:  Okay, Mr. Roberts, let's see, this is Monday night, you put somebody on that all day tomorrow to get that testimony.  It's easier for you to get it, I think, than the petitioner.  It should be all transcribed somewhere with some district attorney, don't you think?

MR. ROBERTS:  I would think, Your Honor.  Again, he's not coming in to give substantive testimony.

MR. McHUGH:  Your Honor, he's testifying --

THE COURT:  Please, don't argue.  We are all on the same page.  Take a deep breath, and he's going to get the testimony.  Maybe.  What else?

MR. WISEMAN:  That's all, I think.

THE COURT:  Thank you all very much, you are excused.

     (The proceedings adjourned at 6:11 p.m., continued
       to 9-21-10)

INDEX


WITNESSES
FOR PETITIONER/DEFENDANT:

|                       | Direct | Cross | Redirect | Recross |
|-----------------------|--------|-------|----------|---------|
| Dr. Victoria Swanson  | 7      | 110   | 171      |         |
| Dr. Donald Weiner     | 198    | 247   | 263      |         |
| Dr. Jethro Toomer     | 270    | 325   | 364      | 369     |
| Kathleen Kaib         | 379    |       |          |         |


EXHIBITS

|                                                                          | Admitted |
|--------------------------------------------------------------------------|----------|
| Petitioner/Defendant's:                                                  |          |
| P24   CV of Kathleen Kaib                                                 | 381      |
| P28   CV of Dr. Toomer                                                    | 271      |
| P29   Report of Dr. Weiner, 3/3/04                                        | 268      |
| P29A  CV of Dr. Weiner                                                    | 199      |
| P33   Supplemental Report, Dr. Swanson, 8/12/10                          | 109      |
| P34   Raw Data, Dr. Swanson, 3/25/09                                     | 109      |
| P35   Additional Raw Data, Dr. Swanson                                   | 109      |
| P36   CV of Dr. Swanson                                                   | 7        |
| P136  Materials Relied Upon, Dr. Swanson                                  | 109      |
| P154  Chart of Ranges for WAIS-IV/WAIS-III                              | 268      |
| P155  Comparative Chart IQ Testing, Dr. Weiner/ Dr. Gelbort              | 109      |
| P156  Dr. Weiner's File                                                   | 268      |
| P159  Phrase written by Mr. Bourgeois dictated timed by Dr. Swanson      | 109      |
| P160  Intellectual Disability, Definition, Classification and Systems of Support, p43 | 109 |
| P161  Phrase written by Mr. Bourgeois prompted by Dr. Swanson           | 109      |
| P162  Report of Dr. Price                                                 | 184      |
| P163  Oral and Videotaped Deposition of Dr. Estrada                      | 396      |
| P164  Transcript - Deposition of Dr. Estrada                             | 396      |
|                                                                          |          |
| Respondent/Government's:                                                 |          |
| 175   Swanson Report                                                      | 115      |
| 201   Diagnostic Criteria for 301.20 Schizoid Personality Disorder      | 372      |

408

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


    /s/ Judith M. Garcia                    November 5, 2010