IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,     )     CRIMINAL ACTION
                              )
              PLAINTIFF,      )     CR-C-02-216(1)
                              )
VS.                           )     CORPUS CHRISTI, TEXAS
                              )     SEPTEMBER 23, 2010
ALFRED BOURGEOIS,             )     8:53 A.M.
                              )
              DEFENDANT.      )
..............................)

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 4
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:              MR. TONY ROBERTS
                            MS. ELSA SALINAS
                            MS. PATTI HUBERT BOOTH
                            MR. MARK DOWD
                            ASSISTANT U.S. ATTORNEYS
                            800 N. SHORELINE, STE 500
                            CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:              MR. MICHAEL WISEMAN
                            MR. VICTOR J. ABREU
                            MS. ELIZABETH LARIN
                            MR. JAMES McHUGH
                            ASSISTANT FEDERAL DEFENDERS
                            SUITE 545 WEST, CURTIS BUILDING
                            601 WALNUT STREET
                            PHILADELPHIA, PENNSYLVANIA 19106

THE COURT RECORDER:         MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

(The proceedings began at 8:53 a.m., continued from 9-22-10)

MR. ABREU:  Some preliminary motions we'd like to request, but I don't see Mr. Dowd, who I think --

THE COURT:  The other reasonable person?

MR. ABREU:  Who I think will probably be responding.

MR. WISEMAN:  I can, I have something to do.

THE COURT:  Good.

MR. WISEMAN:  We put up on the screen at the end --

THE COURT:  Oh, Mr., here's Mr. Bourgeois.  Okay.

MR. WISEMAN:  At the end of yesterday we put up on the screen an intake sheet from Dr. Estrada showing when the Government retained him and I would like to offer it as Petitioner's 171, a one-page exhibit.

THE COURT:  Ms. Booth?

MS. BOOTH:  Oh, no objection, Your Honor.

THE COURT:  P171 is admitted.

(Defendant's Exhibit P171 admitted into evidence)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. ABREU:  Good morning.  Victor Abreu on behalf of Mr. Bourgeois.

MR. WISEMAN:  Michael Wiseman and Elizabeth Larin

and James McHugh as well.

THE COURT: Thank you. We are awaiting the arrival of Mr. Dowd.

MR. ABREU: Yes, Your Honor.

THE COURT: Who is being reasonably late.

(Off the record discussion at counsel table)

MS. BOOTH: If you want to, Judge, I have a witness here and I can do it by myself without help.

THE COURT: Sure. Go ahead.

MS. BOOTH: The United States would call Mr. Clark to the stand.

THE COURT: Would you administer the oath, Ms. Scotch.

THE CLERK: Yes, Your Honor.

DANNY CLARK, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE COURT: Could you speak up, please, sir?

THE WITNESS: Yes, ma'am.

THE CLERK: Thank you. Please be seated.

MS. BOOTH: And, Mr. Clark, when you get around, do not touch the microphone.

THE WITNESS: Yes, ma'am.

MS. BOOTH: It comes right into the ears of the recorder and a bang is an explosion in her head.

THE WITNESS: Yes, ma'am.

THE COURT: And if you could just lean forward and

put your right arm on that shelf there, then you are right in the microphone.  Thank you, sir.

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION

BY MS. BOOTH:

Q   Good morning, Mr. Clark.  Could you please state your full name for the record?

A   Danny Lee Clark.

Q   And what do you do for a living, Mr. Clark?

A   Truck driver.

Q   How long have you been a truck driver?

A   Twenty-seven years.

Q   And during this 27 years, could you tell me the name of the companies that you have worked for?

A   Hall Systems, U.S. Express, R.E. Garrison.

Q   And when you worked -- do you know a person by the name of Alfred Bourgeois?

A   Yes, ma'am.

Q   And when you worked for Hall Systems, did you work with Alfred Bourgeois?

A   Yes, ma'am.

Q   When you worked for U.S. Express, did you work with Mr. Bourgeois?

A   Yes, ma'am.

Q   When you worked at R.E. Garrison, did you work with

Mr. Bourgeois?

A    Yes, ma'am.

Q    All right.  And what was Mr. Bourgeois' job?

A    A truck driver.

Q    All right.  Did you have an opportunity to observe him during this -- and this period from Hall Systems to R.E. Garrison, was that a period, how many years approximately would that be?

A    Oh, 15, 16 years, I guess.

Q    Okay.  And during that period of time you knew Mr. Bourgeois?

A    Yes, ma'am.

Q    Would you consider Mr. Bourgeois a friend of yours?

A    Yes, ma'am.

Q    And a co-worker?

A    Yes, ma'am.

Q    Did --

        MR. WISEMAN:  Objection to leading, Your Honor.

        THE COURT:  Sustained.  Well, these are kind of preliminary matters but let's stop that, please.

        MS. BOOTH:  Yes, Your Honor.

BY MS. BOOTH:

Q    Did you have an opportunity to observe him driving an 18-wheeler?

A    Different places that we would go.

Q    And did you ever ride with him in an 18-wheeler?

A    Once or twice, down to the store or something like that.

Q    All right.  And let me ask you, you drove an 18-wheeler, would you, did you go the same routes that Mr. Bourgeois or different routes?

A    We went different routes.

Q    And would you at certain times, did you ever meet at different terminals?

A    Yes, ma'am.

Q    And when you would meet at those terminals, did you ever have an opportunity to go eat with Mr. Bourgeois or do something that was kind of like --

          MR. WISEMAN:  Objection to leading, Your Honor.

BY MS. BOOTH:

Q    Did you ever have an opportunity to eat with Mr. Bourgeois?

          THE COURT:  Overruled.

BY MS. BOOTH:

Q    Did you ever have an opportunity to eat --

A    Yes, ma'am.

Q    On one or many or several occasions?

A    Oh, several occasions.

Q    All right.  And how would this happen?  Did you-all go out to eat, did you go buy something to fix, how would that happen?

A    Sometimes we went out, you know, got something, you know, like normal truck drivers will do.

Q    Okay.  Did you ever -- I think I asked you that question -- did you ever have an opportunity to ride with him in an 18-wheeler?

A    Once or twice, down to the store or something.

Q    All right.  Did you fear for your life when he was driving?

A    No, ma'am.

Q    Would you consider him a competent truck driver?

A    Yes, ma'am.

Q    Is this -- and let me ask you, in the world of truck driving do, do truck drivers gossip about each other's abilities?

A    Oh, yes.

Q    And if you were a dud, a loser, always screwing up, would that have gotten around in the truck driving circles?

        MR. WISEMAN:  Objection, Your Honor, that calls for a hearsay response.  She's offering it for the truth.

        THE COURT:  Wait a minute, I'm trying to figure out if that is hearsay.

        MS. BOOTH:  I guess I'm asking --

        THE COURT:  She's not asking for the words, she's asking --

        MS. BOOTH:  Actually, I'm asking a reputation

question, Your Honor.

THE COURT:  A kind of a reputation question.

MR. WISEMAN:  I think it's a reputation built on what was said and she's offering it for the truth, so I think it's hearsay.  I mean she can certainly question this witness about his impressions of Mr. Bourgeois' ability.

THE COURT:  Okay, sustained.

BY MS. BOOTH:

Q   And what was your impression --

THE COURT:  Sorry, I'm slower this morning than I thought.

BY MS. BOOTH:

Q   What was your impression of Mr. Bourgeois as far as a truck driver and his ability?

A   Everything's fine, good person.

Q   And did you ever have an opportunity to be around when he turned in paperwork?

A   No.

Q   Did he ever come to you and say, "I don't understand my paperwork, could you help me do it?"

A   No, ma'am.

Q   If you would have had a question on some of the paperwork that you would have been doing, would Mr. Bourgeois have been a person that you could have gone to to ask?

A   Yes.

Q    All right.  Did you ever have an opportunity to see how Mr. Bourgeois dressed?

A    Yes.

Q    And how did he look?

A    Presentable.

Q    How about his truck?  How did he keep the inside of his truck?  Did you have an opportunity to observe that?

A    Oh, maybe once or twice.  He kept things in good shape.

Q    Okay.  Did Mr. Bourgeois have a sense of humor?

A    Yeah.

Q    Did you enjoy his company?

A    Yes.

Q    Did you ever have a cookout?

A    Sometimes at some of the terminals we would.

Q    Okay.  And did Mr. Bourgeois do some of the cooking?

A    Maybe once or twice.

Q    All right.  Did you --

A    Help out.

Q    Did you have any problem with his cooking?

A    No, ma'am.

        MS. BOOTH:  I pass the witness, Your Honor.

        THE COURT:  Mr. Wiseman?

                CROSS-EXAMINATION

BY MR. WISEMAN:

Q    Good morning, Mr. Clark.

A    Morning.  How you doing?

Q    Good.  You recall we met a couple of weeks back, three weeks or so?

A    Yes, sir.

Q    In Birmingham, Alabama?

A    Yes, sir.

Q    Or actually it may have been the outskirts.  You indicated that you -- well, first of all, when did you first know Mr. Bourgeois?  How old was he, do you think, when you first met him?

A    I don't know how old he was.

Q    He was a grownup?

A    Yes.

Q    All right.  You met him on the job?

A    Yes, sir.

Q    You didn't know him as a child?

A    Sir?

Q    You didn't know him as a child?

A    Oh, no, sir.

Q    And you never socialized with him outside of work, never went to his house?

A    Not at his house, no, sir.

Q    When you had occasion to interact with Mr. Bourgeois, that would have been once every week or two?

A    Yes, sir.

Q    And on those occasions you would maybe at most spend 20 to 30 minutes with him?

A    Give or take.  Sometimes a little bit longer.

THE COURT:  Sometimes what?

THE WITNESS:  A little bit longer, like if we could --

THE COURT:  Thank you.

MR. WISEMAN:  Your Honor, I'm going to mark as an exhibit Petitioner's 172.  I'll offer a copy to Ms. Booth.

BY MR. WISEMAN:

Q    Sir, if you look up on either the screen in front of you or the screen up on the wall, you will see the document that I have put up there.  I'm just going to zoom out so we can see a bunch of it.  That's says "Declaration of Danny Clark." It's two pages.  That's your signature on the back page?

A    Yes, sir.

Q    And it's dated Birmingham, Alabama, September 1st, 2010?

A    Yes, sir.

Q    And it's witnessed by Pamela Tucker, investigator, it says?

A    Yes, sir.

Q    Okay.  You recall when you and I sat down and you gave me this statement?

A    Yes, sir.

Q    Okay.  And just so the Court understands how this came

about, we met, I think it was at the Denny's, at the truck stop?

A    Yes, sir.

Q    And we talked for a while?  You have to answer.

A    Yes, sir.

Q    Okay.  And after we talked for a while you graciously agreed to meet with us again?

A    Yes, sir.

Q    And at that point I presented you with this document?

A    Yes, sir.

Q    And you read the document?

A    Yes, sir.

Q    And in fact on that first page you made a change from what I thought you had said, Alfred had been working at Garrison Trucking for about a year, you changed that to several months and you initialed it?

A    Yes, sir.

Q    Okay.  So you knew this was an important document, you read it carefully and, you know, it's what you told me?

A    Yes, sir.

Q    Okay.  I just want to draw your attention to the last line there, and I'll zoom in a little bit.  The last sentence at the bottom of my finger, it said, "I would say during those times that we would spend between 20 to 30 minutes."

A    Yes, sir.

Q   So your encounters with Mr. Bourgeois while you knew him at that time were once, or once or, every week or two for a maximum of 30 minutes?

A   Yeah.

Q   Okay.

A   Yes, sir.

Q   And during those times when you saw him, you saw him to go out and get a bite to eat?  You would eat with him?

A   Yes, on and off, yes.

Q   So, just so we understand, you would run into him at various terminals?

A   Yes, sir.

Q   And you would have some down time?

A   Yes, sir.

Q   Okay.  And the two of you, and I imagine others, would get together and go out and grab a bite?

A   Yes, sir.

Q   Okay.  And that's really the extent of your interactions with Mr. Bourgeois in that setting?

A   Yeah, at different terminals.

Q   Okay.  You said you were inside his truck once or twice?

A   Yeah.  Yes, sir.

Q   Did you ever go to him to ask about paperwork?

A   No, sir.

Q   How do you know that you would have gone to him?  What

makes you say you would have gone to him?

A   Well, I could have.  I thought he, he's a good person, you know.  I wouldn't have had any problem going to him.

Q   Okay.  But you didn't really know his ability to complete paperwork?  Did you ever see him do paperwork?

A   No, sir.

Q   All right.  So you really don't know if he could do paperwork?

A   No.

Q   Okay.  You drove with him once or twice?

A   Yes, sir.

Q   And there were no incidents in that, in those occasions?

A   No, sir, there wasn't.

Q   And you have no knowledge as to whether he may have had multiple accidents on other occasions?

A   No, sir.

Q   And you don't know if his truck was hanging off a cliff in, or in a ditch in the mountains of Tennessee?

A   No, sir.

Q   Never heard about that?

A   Excuse me?

Q   You never heard about that story?

A   No, sir.

Q   Do you know a Donald Reese?

A   Donald Reese?

Q   Yeah.  I'm just wondering how big the community is of truckers.

A   No, sir.

Q   Okay.

THE COURT:  Is he a friend of yours?

MR. WISEMAN:  Of mine?

THE COURT:  Yes.

MR. WISEMAN:  Oh, no, he was the witness who testified.

THE COURT:  Oh, sorry.

MR. WISEMAN:  Well, he was a very nice fellow and I'm sure we could have been friends, but.

THE COURT:  Sorry.

MR. WISEMAN:  That's all right.

BY MR. WISEMAN:

Q   Do you remember receiving some phone calls from a Dr. Moore working for the Government?

A   Yes, sir.

Q   And he asked you some questions about Mr. Bourgeois?

A   Yes, sir.

Q   Okay.  And that was on the telephone?

A   Yes, sir.

Q   You never met personally, face-to-face, with Dr. Moore, did you?

A   Yes, sir.

Q    You did meet personally?

A    Yes, sir, I met with him.

Q    Okay.  So, would it be fair to say that you had two telephone calls and one face-to-face meeting?

A    Yes, sir.

Q    And would that have been in the beginning to mid July of this year?

A    Yes, I guess it was.

Q    Okay.  And after the first time you spoke with him -- if I told you it was July 7th, would you have any reason to dispute that?

A    No, I wouldn't dispute it.

Q    Where did you meet with him that first time?

A    I met with him at Wood Frutticher Produce Warehouse.

Q    Okay.  And he asked you questions about Mr. Bourgeois?

A    Yes.

Q    All right.  Now, I want to direct your attention to the very first time you had contact with him.  That was on the telephone, right?

A    Yes, sir.

Q    And that was a relatively short call?

A    Yes, sir.

Q    And subsequent, after that you had the meeting with him in person?

A    Yes, sir.

Q    And that was a longer meeting?

A    Yes, sir.

Q    And do you remember he asked you to complete a form or a test relevant to your knowledge of Mr. Bourgeois?

A    Yes, sir.

Q    And did he give you the test and sit down with you while you completed it or did he give it to you and say, "Do it at your leisure and send it back to me"?

A    He gave it to me and he sit over from me while I did it.

Q    All right.  And then you gave it back to him?

A    Yes, sir.

Q    Okay.  And after that, did you get another phone call from him?

A    Yes, sir.

Q    And tell us what happened in that last -- well, that was the last time you had contact with him prior to coming to Corpus Christi?

A    Yes, sir.

Q    Okay.  Tell us what happened in that last telephone contact.

A    Well, the questionnaire that I filled out, I guess I didn't complete it, and he called me and told me that he was going to send it back to me to finish completing.

Q    Okay.  So he explained to you that it was incomplete?

A    Yeah, some parts of it.

MS. BOOTH:  Your Honor, I'm going to object if he tries to offer this declaration.  I was never presented with this declaration until this moment.

MR. WISEMAN:  I'm not offering it, Your Honor.  I'm not offering it.  It's used for impeachment purposes.

BY MR. WISEMAN:

Q   Now, the first time you completed a test with regard to Mr. Bourgeois -- I'm going to put up for you a document.  I guess I'm going to mark it, we'll call it P173.  Does this look like one of the forms that you filled out for Dr. Moore?

A   Yes, sir.

Q   And it's got your name on it?

A   Yes, sir.

Q   And you're the rater, it says "Rater's name."  I'm going to turn --

MR. WISEMAN:  Actually, I'm sorry, Your Honor, that's the wrong document.  I want to mark 174.

BY MR. WISEMAN:

Q   And this looks like the same document, it's got your name on it, Danny Clark?

A   Yes, sir.

Q   I want to turn to the part of the document that says, it's a little hard to see so I'll rip it.  It says "Work." So --

MR. WISEMAN:  Your Honor, I seem to have misplaced

an exhibit.  I'm going to need a minute.

THE COURT:  Take your time.

MR. WISEMAN:  Thank you, Your Honor.  Your Honor, I've got the document I want on my computer so I'm going to plug it in, if that's all right.  Ms. Scotch, how could I get this to project?

THE COURT:  Have you got the -- okay.

MR. WISEMAN:  I apologize for this, Your Honor.  I thought I had this all lined up.

THE COURT:  I knew you could make a mistake from time to time.

MR. WISEMAN:  Okay, now I've got what I want.  I'm going to ask the Court to deem this to be 175 and I will produce a hard copy.  This is, for counsel --

THE COURT:  If it's hooked up, can he run it through our printer or not?

MR. WISEMAN:  Oh, that would be great.

THE COURT:  Ms. Scotch?

(Court conferring off the record with clerk)

THE COURT:  Just fixing up the toner.

MR. WISEMAN:  Should I proceed or wait?

THE COURT:  Yes, please, go ahead.

BY MR. WISEMAN:

Q   Mr. Clark, this is the document on my computer that I was trying to show you.  This is the section where it asks you to

rate Mr. Bourgeois on his activities at work.

A    Okay, yes, sir.

Q    Okay.  And do you remember the rating scale that Dr. Moore explained to you?  The numbers there, 0, 1, 2, 3 or guess?

A    Yes, sir.

Q    Okay.  What was your understanding of, at that time, what those rating scales meant?  In other words, when you said he never did something, is not able or sometimes or always, what did you understand that to mean?

A    Just I guess from me knowing him and being around him, you know.

        MS. BOOTH:  I guess, Your Honor, I'm going to be objecting to the use of the raw data in the courtroom.  This was between a psychologist and an interviewee and this is not information that should be -- he's not an expert, and I just never had this come up, Your Honor.  I'm understanding from our psychologist that this is, it should have been information that he will testify to and not a civilian witness.  It's like he's readministering the test here.

        MR. WISEMAN:  Well, Your Honor --

        THE COURT:  Sustained.

BY MR. WISEMAN:

Q    On this particular page, sir, do you see that you, you rated Mr. Bourgeois with a number of 2s?  One, two, three,

four, five, six, seven, eight.  You rated him with eight number 2s, do you see that?

A    Yes, sir.

Q    Okay.  And the rest you rated as number 3?

A    Yes, sir.

Q    Okay.  And you guessed on a couple of the items?

A    Yes, sir.

Q    After you completed this particular form, Dr. Moore called you again, right, spoke to you on the phone?

A    Yes, sir.

Q    And he told you that you had not completed the form?

A    Yes, sir.

Q    And he asked you if you would do it again and complete it?

A    Yes, sir.

Q    Did he tell you anything in particular with regard to -- and you agreed to do it a second time?

A    Yes, sir.

Q    And you in fact did it a second time?

A    Yes, sir.

Q    And prior to doing it -- he mailed it to you that time?

A    Yeah, he mailed it to me.

Q    Okay.  And prior to completing it he explained --

          THE COURT:  Would you take down the exhibit please.

          MR. WISEMAN:  Oh.

THE COURT:  Thank you.

MS. BOOTH:  Your Honor, could we have just a moment to formulate a -- would it be okay if I have Mr. -- could I just speak to Mr. Roberts just for a moment?

THE COURT:  Yes.

MS. BOOTH:  This raw data that was produced by the psychologist was then sent to the psychologist, Dr. Swanson, for Mr. Wiseman.  The way I'm going to, what I want to object to, and if I misspeak I hope I get a note from my co-counsel, is that this infor-, these, this raw data is sealed and goes from psychologist to psychologist, he has actually said, and should not have been -- but I don't believe that Dr. Swanson should have delivered the raw data to Mr. Wiseman.  That's the way I'm understanding my objection.

THE COURT:  Well, I guess he paid for it, so.

MR. WISEMAN:  Well, Your Honor, it's not sealed in the sense the Court didn't seal it.  It's typically not distributed to the community but certainly as counsel for Mr. Bourgeois I should have an opportunity to question the person who administered the, took the test, to see what he answered.

THE COURT:  That's not, that's not his test.

MR. WISEMAN:  Oh, well, it's his test about Mr. Bourgeois.  He was the responder.

THE COURT:  Oh.

MS. BOOTH:  It's a test that he took with the --

MR. WISEMAN:  Oh, no, it's not about him, it's about his understanding of Mr. Bourgeois.

MS. BOOTH:  Understanding of Mr. Bourgeois.  So --

MR. WISEMAN:  This is the ABAS test, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Can I just say one thing, Your Honor?

MR. WISEMAN:  Your Honor --

THE COURT:  Only one person.

MR. ROBERTS:  I understand.

THE COURT:  I did this with Mr. Wiseman the other day.

MR. ROBERTS:  Yes, Your Honor.

(Off the record discussion at counsel table)

BY MR. WISEMAN:

Q   Mr. Clark, I want to put up before you again the page from the second test.

MR. WISEMAN:  Could we get that up?  How do I get that to display?  Oh, I have to disconnect this or --

MS. BOOTH:  Your Honor, we are asking that this information, this test that was, this psychological examination that was given to Mr. Clark be sealed.  This is something that should be sealed and not part of open records.

MR. WISEMAN:  Your Honor, I have no problem if the Court wants to seal it after I'm done with it.  I don't want

to give out copies on the street.  I mean I just want to use it to examine the witness to see if he answered consistently, to see if Dr. Moore interpreted his scores correctly, to see if Dr. Moore reported his scores correctly.  I need to be able to confront the witness and this could in effect be an inconsistent statement.  We are about to show, in fact, it is an inconsistent response.

THE COURT:  Go ahead.

MR. WISEMAN:  Thank you.

BY MR. WISEMAN:

Q   This is the same section of the test for the second time you completed it and you can see there, Mr. Clark, that you responded to 3 in every single category, is that right?

A   Yes, sir.

Q   And on the first one you indicated you guessed twice and on this one you guessed once.  Do you have any -- let me do a quick comparison here.  You guessed for number 16 on both of them but on the second one you didn't guess for the question, "Starts back to work willingly after taking a break for lunch," but on the first one you guessed.  What information did you come across that caused you to change your response from a guess to a non-guess?  Did you learn something new?

A   No.  I actually read more into the question and that's how I came, I determined my answer.

Q   Now, this test asks you about several areas of

Mr. Bourgeois' abilities.  Do you remember that?

A    Yes, sir.

Q    Okay.  And one of them was community use.  Do you recall that?

A    I think so.

Q    Okay.  Let me put it up and I want to ask that.

A    Okay.

Q    How you guessed.  And there's community use, right?

A    Yes, sir.

Q    Okay.  And you see that you guessed six times with regard to community use?

A    Yes, sir.

Q    All right.  So you really weren't that familiar with how Mr. Bourgeois used the community, were you?

A    Not, not how he used community at home, no.

Q    And in this section, functional academics, which asked 27 questions, you guessed six times?

A    Yes, sir.

Q    And that's out of 27, and I assume where you guessed there you again really didn't know how Mr. Bourgeois functioned academically?

A    No, sir.

Q    The next section is home living, which has nine responses on the first page and then it continues on, you guessed 14 times out of 23, so I take it from that you really didn't

know much about how he functioned at home?

A    No, sir, I didn't.

Q    And that's why you guessed.  Health and safety you guessed four times, is that right?

A    Yes, sir.

Q    And did you ever see Mr. Bourgeois carry scissors?

A    No, sir.

Q    So you were guessing when you checked that he always carries scissors safely?

A    Yes, sir.

Q    Did you ever, do you recall ever seeing him test hot food before he ate?

A    Test hot food?

Q    Yeah.  Do you have a recollection of that?  I'm sorry?

A    No, sir, I didn't.

Q    All right, but you didn't guess on that one, you put that he always tests hot food before eating.

A    Yes.

Q    So why did you, why did you say he always does something that you never saw him do?

A    Well, me knowing him, the kind of person that he were, that's why that I, that's why I put that answer there.

Q    All right.  And in the next section, leisure, you guessed nine times out of 23?

A    Yes, sir.

Q    And then the next section, self-care, you guessed five times out of 25 times.  Is that right?

A    Yes, sir.

Q    Did you ever see Mr. Bourgeois wash his hair?

A    Wash his hair?

Q    Yeah.

A    No.

Q    Under self-direction, looks to me like you guessed 11 times out of 25 times.  Is that right?

A    Yes, sir.

Q    On question number 9, which you did not indicate a guess, you said that he always controls his anger when another person breaks the rules in games and other fun activities. Did you ever --

         THE COURT:  Do you have that same test for the other witness that testified?

         MR. WISEMAN:  For which witness?

         MS. SALINAS:  Beverly Frank.  I'm sorry.

         THE COURT:  Ms. Frank?

         MR. WISEMAN:  Yes, we do.

         THE COURT:  Would you give that to the U.S. Attorney, please?

         MR. WISEMAN:  Okay.

         MS. BOOTH:  No, the problem that we have, Your Honor, is that our, our expert has released these tests and

these evaluations to Dr. Swanson. Dr. Swanson sent her tests and her raw data to our expert. But it is unethical for the psychologist to release the raw data like that and so our expert didn't, did not release Dr. Swanson's to us.

MR. WISEMAN: Your Honor, that's an incorrect statement.

MS. BOOTH: And that is the concern that's at the Government's table.

THE COURT: Okay, well, then what you need to do is make sure you have the raw data.

MR. WISEMAN: And we provided it, I mean they have to get it from their doctor.

MS. BOOTH: Obviously the ethics of the psychologists --

THE COURT: Are different.

MS. BOOTH: Are different, yes, Your Honor.

THE COURT: So then you need to get them from Mr. Wiseman, the raw data. Do you have that with you today?

MR. WISEMAN: Sure. I mean I don't know if we --

THE COURT: Would you provide it?

MR. WISEMAN: If we have the ample copies. I don't want to give them my own copy but we can certainly get copies.

MS. BOOTH: Well, if they give us their copies, Your Honor, I swear that we will copy them and then return them --

MR. WISEMAN:  Okay, that's fine, we can do that.

MS. BOOTH:  -- in the condition in which we got them.

BY MR. WISEMAN:

Q   So my question was, did you ever play any games or other fun activities with Mr. Bourgeois that had rules?

A   That had rules?  No.

Q   All right.  So you really don't know whether he controls his anger when another person breaks the rules, do you?

A   No, I never seen him angry.

Q   Okay.  Now, you did socialize a little bit with Mr. Bourgeois, I imagine, in those instances in which you had meals with him and such?

A   Yes, sir.

Q   Call that socializing.  You guessed in that category seven out of 23 times?

A   Yes, sir.

Q   Do you recall an instance where he stated to you that others seemed happy, sad, scared or angry?  Do you have a recollection of that?

A   Not really.

Q   And by the way, when Dr. Moore gave you this test he asked you to rate Mr. Bourgeois' conduct as you recollected it on March the 1st, 2002?  Do you remember that?

A   Yes, sir.

Q    All right.  And that's where it says "Today's date"?

A    Yes, sir.

Q    So he was asking you to think back eight years and recall how Mr. Bourgeois was on those occasions, right?  Is that right?

A    Yes, sir.

        THE COURT:  How long ago did he take this test?

        MR. WISEMAN:  This would have been taken in July, I believe.

        THE COURT:  Okay.

        MR. WISEMAN:  I think that's all I have, Your Honor. Thank you, Mr. Clark, I appreciate it.

        THE WITNESS:  Yes, sir.

        THE COURT:  Thank you.

        MR. WISEMAN:  Let me just unplug here.

                    REDIRECT EXAMINATION

BY MS. BOOTH:

Q    Mr. Clark, your exposure to Mr. Bourgeois was over, the last time you had contact with him would have been in 2002?

A    Yes, ma'am.

        MR. WISEMAN:  Objection to leading, Your Honor.

BY MS. BOOTH:

Q    When was the last time you had contact with him?

        MR. WISEMAN:  Objection to -- oh.

BY MS. BOOTH:

Q   What year?

A   2002.

Q   And, so 2002 was the last time, and you worked with him at how many different organizations?

A   Three.

Q   And that was over a period of how many years?

A   Altogether, about 15 years.

Q   And so, did you follow him to another job or did he follow you to another job?

MR. WISEMAN:  Objection to the characterization --

MS. BOOTH:  Or to a --

MR. WISEMAN:  -- follow, Your Honor.

THE WITNESS:  No.

MR. WISEMAN:  Objection --

BY MS. BOOTH:

Q   How did that work that you --

MR. WISEMAN:  Objection to the question, Your Honor.

THE COURT:  She just changed the question.

MR. WISEMAN:  Oh, I'm sorry, I didn't hear that.

THE COURT:  Keep up.

BY MS. BOOTH:

Q   How did it work that you two individuals ended up working at three of the same trucking companies?

A   Well, at Hall Systems, sold out part of their business to

U.S. Express, so we all were still there and it was like Hall Systems/U.S. Express.  After that I left and went to R.E. Garrison.  Later, Mr. Bourgeois came to R.E. Garrison.

Q   And were you glad to see him when he showed up at R.E. Garrison?

A   Oh, yes, ma'am.

Q   All right.  And so your contact with him was over, I think you -- what did you testify to, how many years did you get to work with Mr. Bourgeois?

A   On and off, about 15.

Q   All right.  And during that period of time did you ever run, did you ever drive the same routes that Mr. Bourgeois drove?

MR. WISEMAN:  Asked and answered on direct, Your Honor.  He already testified that he --

THE COURT:  Yes, sustained.

BY MS. BOOTH:

Q   How many times do you think in those eight years that you saw Mr. Bourgeois?  Did you see him every week?  Once a week?

A   Maybe once, maybe twice every two weeks, maybe.

Q   Twice every two weeks, so that would be once a week?

A   About once a week, yeah.

Q   So there's 52 weeks in a year?

A   Yes, ma'am.

Q   And 52 times 15 is about how many times you had an

opportunity to observe Mr. Bourgeois?

A    Yes, ma'am.

Q    All right.  And he asked you if you ever got to see him wash his hair and you said no, but did you have an opportunity during these 52 times 15 times to see if Mr. Bourgeois presented himself clean, neat, smelling good?

A    He always was clean and neat.

Q    All right.  Did you have an opportunity to watch his interchange with people that worked at the terminal, with the -- were there any ladies that worked at your terminal?

A    Yes, ma'am.

Q    And did you have an opportunity to see how Mr. Bourgeois would act with the ladies?

A    Maybe once.

Q    Did you ever see him being humorous or entertaining or polite, engaging, with the women that worked at the terminal?

A    Yeah, he's polite.

Q    And was he that way with everybody?

A    Yes.

Q    All right.  Did he ever like offer to buy people a drink or dinner or cupcakes or any attention to birthdays or anything like that that you noticed?

A    I didn't notice.

Q    Okay.  Now, was there ever a time when you-all ended up at the same terminal where you would go with him to purchase

supplies for the trip?

A    Sometimes we would end up at the same terminal but we would go and grab a bite to eat or something like that.

Q    All right.  And did he have any trouble putting food in his mouth?

A    No, ma'am.

Q    All right.  Did you have to hand him his utensils or open his carton of milk or anything so that he could feed himself?

A    No, ma'am.

Q    Did you ever observe him eat anything hot?

A    No, ma'am.

            THE COURT:  When you cooked out did you have hot food?

            THE WITNESS:  Well, when we cooked out we like put stuff in like a container or something like that and then each one of us would go around and get stuff out of the container.

            THE COURT:  Well, it was hot food?

            THE WITNESS:  Well, warm, I guess it had got warm then, Your Honor.

            THE COURT:  Okay.

BY MS. BOOTH:

Q    I guess my question is, if you were barbecuing out did you ever see him run over and take a bite out of the meat there on the fire?

A    Oh, no, ma'am.

Q    All right.  So he knew not to, so you never observed him do anything that stupid, right?

A    No, ma'am.

Q    And when you did this, when you answered this test and did this test, were you trying to, what were you trying to do, were you trying to tell the observer that this is how you remember him from all of your years of exposure to him?

          MR. WISEMAN:  Objection to leading, Your Honor.

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Sustained.

BY MS. BOOTH:

Q    Did you ever go with him to, I mean go with him to, go with him to Florida or end up in Florida at the same time with Mr. Bourgeois?

A    Sometimes, yes, ma'am.

Q    All right.  And what would you-all do in Florida?

A    If we had a layover we would go out and grab a bite to eat or something or sit around like guys and laugh and talk.

Q    And did you ever see him pay for his meal?

A    No, ma'am.

Q    I mean were you ever there when he, when he gave the waitress money or paid at the counter?  Do you ever remember that?

A    No, ma'am.

Q   All right.

MS. BOOTH:   I don't have anything further, Your Honor.

THE COURT:   Thank you, ma'am.   Mr. Wiseman?

RECROSS-EXAMINATION

BY MR. WISEMAN:

Q    Mr. Clark, when you said you were glad to see Mr. Bourgeois when he showed up at one of your jobs, I take it from that you weren't aware that he had a violent background?

A    No, sir.

Q    All right.  Did you know that he engaged in rageful conduct towards people?

A    No, sir.

Q    He was always very pleasant to you?

A    Yes, sir.

Q    Pleasant to those he worked with?

A    Yes, sir.

Q    Did you ever see him fly off the handle at anybody?

A    No, sir.

Q    I just want to clarify this one point.  I thought your declaration said that, "At that time I would see Alfred once every week or two."  That's what you wrote when we spoke, right?

A    Yes, sir.

Q    Okay.  Not what Ms. Booth just asked you about once or twice a week, correct?

A    Yes, sir.

Q    So this is accurate?

MS. BOOTH:  Your Honor, I will agree that maybe it wasn't 780 times, it was only 400 times he had seen Mr. Bourgeois or had an opportunity to observe him.

MR. WISEMAN:  Well, I will take, I will take that concession, Your Honor.

BY MR. WISEMAN:

Q    You saw Mr. Bourgeois looking clean and presentable?

A    Yes, sir.

Q    Do you know who got him that way?  Do you know if he did it himself or someone else assisted him?

A    I'm sure he did it himself.

Q    Why are you sure of that?

A    I mean every time that I talked or met with Mr. Bourgeois his appearance was always good.

Q    I understand that, but my question is how did he get that way?  Did you -- how do you know if someone didn't --

A    I don't know how he got that way.

MS. BOOTH:  He has already testified.

MR. WISEMAN:  No, he hasn't.  Your Honor --

THE COURT:  He --

MR. WISEMAN:  I'm sorry.

THE COURT:  Go ahead.

BY MR. WISEMAN:

Q   Did you ever see Mr. Bourgeois actually groom himself? Did you ever see him take a shower?  Did you ever see him wash his hair?  Did you ever see him cleaning under his fingernails?

A   No, sir.

Q   All right.  So you were assuming that because he looked presentable that he was the one who got himself in that condition, correct?

A   Yes, sir.

Q   Now, Ms. Booth asked you if you ever saw him go and grab a hot dog off the grill and bite into it and you said no. Did you ever see him take a hot dog off the grill and test it to see if it was hot?

A   No, sir.

Q   And getting back to the question of his grooming, I take it you don't know how long it took him to get himself ready in the morning?

A   No, sir, I don't know how long it took him.

Q   You don't know if it took 15 minutes or two hours for him to get presentable, right?

A   No, sir.

MR. WISEMAN:  That's all.  Thank you, sir.

FURTHER REDIRECT EXAMINATION

BY MS. BOOTH:

Q   But you saw him drive an 18-wheeler?

MR. WISEMAN:  Asked and answered, Your Honor.

THE WITNESS:  Yes, ma'am.

BY MS. BOOTH:

Q   And how expensive are 18-wheelers?

A   A tractor and trailer is almost $100,000.

Q   $150,000?

A   About 100,000.

Q   $100,000.

MS. BOOTH:  That's all I have, Your Honor.

MR. WISEMAN:  Nothing further.

THE COURT:  Thank you, sir.  You may stand down.
Call your next witness.

MR. WISEMAN:  Your Honor, before the next witness
may I address the matter I --

THE COURT:  Oh, yes.

MR. WISEMAN:  Is that okay?

THE COURT:  Yes.

MR. WISEMAN:  Or he will.

MR. ABREU:  Your Honor, as you may recall, yesterday
in relation to the testimony regarding whether there was
semen or not there were some questions that came up --

THE COURT:  There was what?

MR. ABREU:  Regarding whether there was semen detected or not.  There were some questions that came up in regards to what information was provided by the FBI about their tests, whether there were photographs or any notes regarding if they were positive, weak positive.

THE COURT:  Right.

MR. ABREU:  Last night Mr. Dowd did provide me with this particular document which I will now show the Court.  It relates to Q5, in particular of note, Q5, Q6 and Q7, which are the three swabs which the FBI alleged had tested positive for semen.  As the Court can note, in their notes and remarks it indicates regarding Q5 that it was very weak, Q6 very weak, Q7 weak.  There certainly was no testimony at trial regarding the strength of those tests.  I can assure Your Honor that I have never seen this particular document and that if I had seen it, I most certainly would have used it and I most certainly would have had our experts address the significance of this particular document.  My request at this time, Your Honor, is, again, I would like -- oh, one other thing, I searched our entire file which was gathered from trial counsel which consists of 12,000 pages, I searched, did an electronic search with the term P30 and I, and this document was not part of those records.  Mr. Dowd also did a search of the files that were disclosed to us in April of this year and that document was not part of those.  They

are --

MR. DOWD:  Well, we are not sure about that.  We are still doing a search on that, Your Honor.

MR. WISEMAN:  One second, Your Honor.

(Mr. Wiseman and Mr. Abreu conferring off the record)

MR. ABREU:  Right, Your Honor, so it's a document, the documents that we searched are the 12,000 pages that we provided to the Government as part of discovery, so if they want to search that they certainly can search it as well for that document.  And Mr. Dowd is actually correct, they are in the process of checking additionally.  However, when that's complete, Your Honor, I suspect that I will have a motion to amend our claim to include a Brady violation.  And let me just make this clear, I am not saying that Ms. Booth or any member of the U.S. Attorney's Office failed to disclose it to trial counsel, because the information that I have here indicates that Ms. Booth turned over everything that she got from the FBI and I will concede that at this point.  My question is whether the FBI actually provided the U.S. Attorney's Office with this particular document which I am saying is particularly relevant.  And I also can't imagine Mr. Tinker, or perhaps I can but Mr. Tinker was certainly trying to dispute the evidence of the semen and here he has, here is a document that indicates very weak, very weak and weak, and I know that that was never used at the time of the

trial.  So, what I am requesting again, Your Honor, is for the FBI to provide me with a copy of every single document in their file related to the testing of these materials.  I would then like to review those documents before Ms. Conway testifies, or any witness for the Government testifies in this particular matter.  I should also note that Ms. Conway is not the person who testified at trial, she has never been a part of this case, so I am not sure that she would even know what was turned over at any point, but I would -- so for that reason I would really like to see that entire file and I think I am entitled to that file, Your Honor.

THE COURT:  Where is the file?

MR. DOWD:  Your Honor, we are making a copy of it right now.

THE COURT:  Okay.

MR. DOWD:  Just to fill the Court in on what I know, the original FBI file was given to us back at the time of the trial.  We made several copies of it.  One of the copies we delivered to Mr. Tinker and we still have, we still believe we have a couple of those copies, and we are going through the copy to see if this particular document is within that, which would indicate that that was part of the documents we sent to Mr. Tinker.  And I will know, I should know more about that shortly.  Then, at the time of the 2255, we digitized one of those copies of the FBI file and that's what

we sent to Mr. Wiseman back in April of 2010.  So I will know more once we look at the copy of the FBI file that we have as to whether or not that would suggest it went to Mr. Tinker or not.

(Ms. Booth and Mr. Dowd conferring off the record)

MR. ABREU:  Your Honor, actually, my request would be to inspect the original file itself, not just a copy of it.

MR. DOWD:  No, no, we are doing that.  No, we are making --

THE COURT:  That's what they are making a copy of.

MR. DOWD:  We are making a copy of the original that came with Ms. Conway, that just got here.

MR. ABREU:  I understand that.  And I think that there might be perhaps a contention by the Government at some point that it went directly also from the FBI to Ms. Johnson back at the time of trial; however, Ms. Johnson testified yesterday that she had never seen any notes regarding the strength of the FBI testing, that that information was not something she had ever seen.  And if you look at her report produced in 2004, she indicates a weak positive on our tests but she never makes any indication at that point about whether their test was weak positive or strong positive because she didn't have that information.

THE COURT:  Okay, so --

MR. ABREU:  I guess the answer to what we are saying is they are checking.  I just wanted to bring it to the Court's attention --

THE COURT:  Okay.

MR. ABREU:  -- that there may be an issue we need to further discuss.

THE COURT:  So we have, it remains to be seen.

MR. ABREU:  Thank you, Your Honor.

MR. McHUGH:  Your Honor, I have one other housekeeping matter.  Yesterday during the testimony of Dr. Bowers I was referencing the National Academy of Science's report, Strengthening Forensic Science in the United States: A Path Forward.  I talked to Mr. Roberts, I have marked as Defendant's Exhibit P141 the cover page of that report and the relevant section -- the report's a couple of hundred pages long -- the relevant section dealing with forensic odentology, and I would ask that that be admitted at this time or move for its admission at this time, and I believe Mr. Roberts has no objection to that.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  Then that's admitted.

(Defendant's Exhibit P141 admitted into evidence)

MR. ROBERTS:  Your Honor, we have several other witnesses that are going to come in here and take the stand and that Dr. Moore had questioned and so we anticipate the

same thing that just happened, we anticipate that the, that Mr. Wiseman or somebody from his team are going to come up and question the witnesses about their raw data.  We, Dr. Moore has not released his testing to us.  Apparently Dr. Swanson has released all of the testing to Mr. Wiseman. We would ask for them to turn over Dr. Moore's testing to us in addition to Dr. Swanson's testing because Dr. Moore will not violate his ethical guideline and give us the documents. And so I'm asking, since they have --

THE COURT:  Okay.  Do you have them right now?

MR. WISEMAN:  I already agreed to do that, we just have --

THE COURT:  Well, they need them right now.

MS. BOOTH:  We need time to look at them.

THE COURT:  Yes.

MS. BOOTH:  We need a break.

THE COURT:  Okay.

MR. WISEMAN:  Okay.

(Mr. Wiseman and Mr. Roberts conferring off the record)

MR. ABREU:  And one last housekeeping matter, Your Honor, if I may.

THE COURT:  Yes.  I don't do windows, but.

MR. ABREU:  Yesterday I neglected to move into, to offer into evidence, I should say, Petitioner's 152, and my understanding, that the Government does not have an objection

to that.  It relates to medical records.

THE COURT:  152?

MR. ABREU:  Yes, Your Honor.

THE COURT:  Is that right?  P152?

MR. ABREU:  Mr. Dowd was just here.  Oh, right.

MR. DOWD:  That's fine, Your Honor, we have no objection.

THE COURT:  P152 is admitted.

(Defendant's Exhibit P152 admitted into evidence)

MR. ABREU:  Thank you, Your Honor.

THE COURT:  Yes, sir?

MR. ROBERTS:  Your Honor, just with regard to the raw data, I have been informed that there is still a need to maintain these copies and make sure that any copies are shredded at the end so that none of this information or data gets outside the courtroom, so I would ask that Mr. Wiseman gather his copies at the end and make sure none of this information goes to anyone else.

THE COURT:  Okay.

MR. ROBERTS:  Thank you.

MS. BOOTH:  One thing more, Your Honor, I would ask that Mr. Clark, he's here, is it, he's -- could he please be excused?  He has already testified.

THE COURT:  Is there any problem with that?

MS. LARIN:  Mr. Wiseman is not here but I don't --

THE COURT:  He just stepped out.  Wait until Mr. Wiseman comes back in.

MR. ABREU:  I don't anticipate a problem with that, Your Honor, but he's not my witness.  If I may go get him?

THE COURT:  Yes.

MS. BOOTH:  So, Your Honor, how long of a break can we have to go through this?  We really need some time.  This is going to be, this --

THE COURT:  Okay.

MS. BOOTH:  We need an hour, Your Honor.

THE COURT:  Okay.

MR. ABREU:  We have no objection to the releasing of Mr. Clark, Your Honor.

THE COURT:  Okay, Mr. Clark is released and we will take -- have you got the documents, somebody is getting the documents?

MS. LARIN:  Your Honor, I'm working on it right now. It's on my computer and I'm putting it on a flash drive.

THE COURT:  Okay.

(Off the record at 9:48 a.m. until 9:49 p.m.)

MS. BOOTH:  Your Honor, we have sort of a reciprocal discovery policy going on here and I would ask the defense if they have prepared any other statements on any witnesses that we plan to call, I would like to have them now so I can look at them before they take the stand.  We have disclosed

everything we have.

MR. WISEMAN:  Your Honor, I'm just --

THE COURT:  That's granted.

MR. WISEMAN:  Does that apply to rebuttal exhibits?

THE COURT:  Absolutely.

MR. WISEMAN:  Things I'm going to use to impeach their witnesses?

THE COURT:  Absolutely.

MR. WISEMAN:  I don't believe they disclosed things to us ahead of time that they used to impeach.  We didn't get articles, we didn't get a variety of material, is my understanding.  In fact, the Court's standing order talks about disclosing exhibits that you are going to use on your direct case, not on your rebuttal or cross-examination case. I looked at that very carefully because I was concerned.

THE COURT:  If you have the documents you need to disclose them.

MR. WISEMAN:  Yes.

THE COURT:  Both sides.

(Off the record at 9:50 a.m. until 9:51 a.m.)

MR. WISEMAN:  Is the Court's direction that we disclose documents of statements or articles?  Because we have got a number of articles.

THE COURT:  Every document you are going to use.

MR. WISEMAN:  Okay.

THE COURT:  Give them to the Government, and the same with the Government to the defendant.  Or, actually --

MR. WISEMAN:  I mean the problem is that --

THE COURT:  -- petitioner/respondent.

MR. WISEMAN:  Yeah, the problem is we are off their case, we are off our case, and they didn't disclose any of this stuff to us until they were using it, in terms of scholarly articles and such, and it seems a little unfair that we are now being required to disclose that to them.  I, you know --

THE COURT:  I'm just, you know what, every time I make an order you want to argue.  You are going to have to stop that.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  That is one of the reasons that you, I find you so abrasive, okay?

(Recess at 9:52 a.m. until 11:23 a.m.)

THE COURT:  Now, where were we?  Are we about to call another witness, was that it?  Were you finished?  We finished that other gentleman, right?

MR. WISEMAN:  Yes, he was completed.

THE COURT:  You were about to call another witness?

MS. BOOTH:  Yes, Your Honor.  Mr. Patterson.

MR. WISEMAN:  Your Honor, can I make some disclosures to the Government?

THE COURT:  Sure.

MR. WISEMAN:  If I can find my file.  I just had my office send me, because my computer file was corrupted, a copy of Dr. Price's data, and I'm giving the Government a copy of that.

THE COURT:  Okay.

MR. WISEMAN:  In addition, in a moment I will turn over to them what I have marked as 176 and 177 which I will respectively --

THE COURT:  I thought I admitted those.

MR. WISEMAN:  Maybe my number is wrong.

THE COURT:  No?

MR. WISEMAN:  I don't think so.

MS. BOOTH:  No, you admitted 176 of the Government's.

THE COURT:  Okay, that's 176 and 177.

MR. WISEMAN:  Right.  And those are, respectively, a declaration from Dr. Oakland and a chart regarding the ABAS test.  I'll give that to the Government in a moment.

THE COURT:  Okay.  Well, you are not offering those for admission, you are just disclosing them?

MR. WISEMAN:  Not at this time.  At some point.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, in an effort to speed things along and get, make sure that our evidence is all

in --

THE COURT:  Sure.

MR. ROBERTS:  We would like to go ahead and offer all the Government's evidence right now and go through the numbers, and if there's --

THE COURT:  Okay.  Who is going to be on the, Mr. Wiseman, are you going to be the point man on this?

MR. WISEMAN:  Sure.  I don't know that we have objections to anything but I will scan it over.

THE COURT:  Well, just look, why don't you look through his numbers, then, before he starts shouting them out.

(Off the record discussion at counsel table)

MR. ROBERTS:  Your Honor, let me give them a chance to look through our exhibit list and then, and so we will do this then after the next witness or two.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, I have some authority I wanted to share with the Court, if that would be appropriate now.

THE COURT:  Sure.

MR. WISEMAN:  On the question of this raw data, and obviously this is just some preliminary research we were able to do.

THE COURT:  Okay.

MR. WISEMAN:  In the case of Rivera versus Cordeman, 06-70022, October 18, 2007, Fifth Circuit decision, at page 20, the Court of Appeals refers favorably to the District Court's review of available test data in a mental retardation case.  There's a slip opinion at 2009 West Law 1117401, and the name is?

MS. LARIN:  U.S. v Davis.

MR. WISEMAN:  U.S. v. Davis, District of Maryland, at page 19 --

THE COURT:  Okay, look, the way you do this is just to file a brief to give it to me, okay?

MR. WISEMAN:  Oh, okay.  I thought the Court might want to see that now, but.

THE COURT:  No, thank you.

MR. WISEMAN:  Okay.

THE COURT:  It's already done, so I don't need any more authority, right?

MR. WISEMAN:  Okay.  I just wanted to, you know, offer it.

THE COURT:  Thank you.  Apparently I was right on line with the Fifth Circuit.

MR. WISEMAN:  You certainly were.

THE COURT:  So there you have it.  Who is calling another witness?

MS. BOOTH:  I am.  Your Honor, would you like me to

start?

THE COURT:  Yes, please.

MS. BOOTH:  Oh, yes.  I would call Robert Patterson.

THE CLERK:  Please come forward.

ROBERT PATTERSON, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MS. BOOTH:

Q   Mr. Patterson, there is a microphone there.  Please do not touch it.

A   Okay.

Q   If you hit it, it goes right into the court reporter's ears.

A   Uh-huh.

Q   Would you please tell us your full name for the record?

A   My name is Robert M. Patterson, known as Pat Patterson.

Q   And how are you employed, Mr. Patterson?

A   I'm retired and at the present time doing some consulting work on DOT compliance.

Q   All right.  And back in 2002 where did you work?

A   I worked at R.E. Garrison Trucking.

Q   And what were you, what was your job at R.E. Garrison?

A   I was director of safety.

Q   Okay.  And what were some of your responsibilities there?

A   Some of the responsibilities was hiring and firing

drivers, different drivers, attended to all the accidents,
claims, and administering workman's compensation insurance,
and --

Q   Did you do driving tests with the people that came to
work there?

A   I did, yes, ma'am.

Q   Did you teach a safety course to the people that were
there?

A   I did.

Q   All right.  Now, I want to ask you if back in 2002 you
knew an individual or you met an individual by the name of
Alfred Bourgeois?

A   I did.

Q   And how was it that you met him?

A   He apparently was called into our office to be hired, for
the orientation, to go through the orientation to see, to
start in.

Q   All right.  And was this in May of 2002?

A   Yes, ma'am.

Q   And when -- did he send an application first?  Did you
ever see an application before he actually showed up?

A   The application first goes to our recruiting office and
after they do certain things to them like check their
background out and their driving history and such, they come
down to my office for approval or disapproval.

Q    All right.

A    To be called in for an orientation.

Q    So an evaluation had already been done, before you got the application, on his driving history and what else?

A    His records of, and his previous employers, what they said, the previous employers' check and a driving record, mainly.

Q    Okay.  And so when it came to you, did you actually meet with Mr. Alfred Bourgeois?

A    I did.

Q    And when is the first time that you met with him?

A    That's pretty difficult.  They first come in our office, and the recruiting office and the safety office is right across the hall from each other, so generally all the new recruits come in, they either come into the safety office or recruiting, and that's the first time they have ever been in R.E. Garrison, so generally I go out there, if it's not me, some other people, to try to tell them and direct them what we need to do, when it's all going to start and what the day will consist of.

Q    All right.  And the first day that you saw Mr. Alfred Bourgeois, was that, what date was that, was that a training day, was that, what was that?

A    That was the first day they come in when we do the paperwork and do the road test and --

Q   Okay.  Now, you said they come in and they do paperwork. What type of paperwork do they do?

A   Well, administrative paperwork that goes into the qualification files, such as a 9I form, immigration form, filling out income tax forms.

Q   Do they have to sign up for insurance there at the company?

A   Yeah, uh-huh.

Q   Do they have to, do they, do you have anything where they have to designate a, designate somebody in case they are hurt in an accident or anything like that?

A   Say that again, please?

Q   Would they have to designate, I'm just asking, give the family and who to call and all those numbers?

A   Right, yes, ma'am.

Q   Okay.  And on that day is there anybody out there that goes from driver to -- and when they show up, when he showed up, was he the only person that showed up on that day?

A   No.

Q   Or was this some kind of scheduled training?

A   Yes, ma'am.

Q   All right.  And so about how many drivers do you know or do you remember showed up, show up for an average training?

A   Average training would be roughly 16, maybe, 17.

Q   Okay.  And is there anybody that's placed out there that

if somebody is having a hard time doing their paperwork will actually take the pencil and help them fill in the form?

A    No.

Q    Now, let me ask you if when a person showed up, if he was handed a stack of paperwork to fill out, if he couldn't fill out the paperwork, would that come to your attention?

A    Yes, ma'am.

Q    So after the paperwork is filled out, what else happened that day?

A    Well, we divide them up, half of them will start, go down to the doctor's office to give a specimen for a drug test.

Q    Uh-huh.

A    And the other half begins a road test, a skills test, in one of our trucks.

Q    Okay.  Now, I want to ask you, did you give Mr. Bourgeois his roads test, his field test?

A    I did.

Q    So you actually -- what truck did he drive?

A    One of our company trucks.

Q    All right.  And these company trucks, what are they, are they 18-wheelers?

A    Yes, ma'am.

Q    They are 18-wheelers?  And do you know approximately the value of the truck?

A    The truck and trailer together would be $100,000 or

upwards.

Q   Okay.  And so did you actually get in an 18-wheeler with him and have him do this?

A   I did, yes, ma'am.

Q   And then were you called upon to evaluate his driving?

A   I fill my form out when I get, when we get back.

Q   Uh-huh.

A   I fill out his, what I observed of his skills.

Q   And, and --

A   That goes in his qualification file if he completes the orientation.

Q   Okay.  Did you make a decision or an evaluation of his driving skills?

A   I did.

Q   And what was that?

A   He passed everything satisfactorily and I made a note on the bottom of the form I fill out on his test, "Good driver."

Q   And is that something you generally put when you are evaluating drivers?

A   Very, very seldom I do that.

Q   Did you make a comment to him orally about his ability?

A   I did, I told him he was a very good, professional driver.

Q   All right.  Now, after that test is done -- first they fill out the paperwork, then they have to do a driver test --

did you send him in for a drug test?

A    Yes, ma'am.

Q    All right.  What do they have to do in this training session after the drug test?

A    Well, we begin the sit-down classroom instruction.

Q    All right.  And did you conduct the sit-down classroom instruction?

A    Yes, ma'am.  We have two days of that and I done about the first three to four hours of it.

Q    All right.  Was Mr. Bourgeois in your class?

A    Yes, ma'am.

Q    Do you remember if he, how he acted when he was in your class?

A    Very cordial, very, very cordial person, easy to approach, easy to engage in conversation, easy --

Q    Did he ask you pertinent questions during the training?

A    Yes, ma'am.

Q    All right.  And did you have an opportunity to observe the way he was dressed and his hygiene?

A    Yes, ma'am.

Q    And how did he appear to you?

A    He was very professionally dressed.  He was an above average driver, in my opinion.

Q    And so after that did you recommend that he be hired?

A    On, upon completion of the orientation, that would be the

drug test being negative and satisfactorily sitting through the orientation.

Q   All right.  Now, tell me, in your job are you in charge of maintaining some kind of vigilance over the daily logs or the logbooks that the drivers must complete?

A   All the record of duty status, of course, known as the driver daily log, comes to the safety department.

Q   And were you, during the time that you were there and Mr. Bourgeois was working for R.E. Garrison, were you the person that supervised his and checked on his daily logs?

A   I did, I supervised.  We had a log clerk that works on the, actually auditing the logs, and she worked directly under me.

Q   All right.  Did you ever have any occasion where you thought his logbook entries were deficient?

A   No.

Q   Did you have any problem with him complying with the requirement of maintaining his logbooks?

A   No, ma'am.

Q   Did you ever have an opportunity to be around him when he was around other drivers?

A   I did.

Q   And when was that?

A   He would come in from a load or something, stop by the dispatch office, and a lot of, he and other drivers would

come by the recruiting office or safety office and talk with us, because we are the first people they get to know when they come in the company.

Q   Uh-huh.

A   And, yeah, I talked with him on several occasions like that.

Q   And what was your opinion of, was he a friendly person, was he a person easy to talk to?

        MS. LARIN:  Objection, Your Honor.

        THE WITNESS:  He was.  My opinion was very highly of him.

        MS. LARIN:  Objection, Your Honor.

        THE COURT:  Yes, ma'am?

        MS. LARIN:  This is an opinion.

        MS. BOOTH:  Right.  I'm asking for his opinion.

        THE COURT:  Overruled, if there's -- I didn't hear a legal objection, so go ahead.

BY MS. BOOTH:

Q   What was your opinion of the way he interacted with the rest of the people in the office and you?

A   He was a very personable guy.  He was the type person you would want to talk with, you know, and engage in conversation.

Q   And did you enjoy his company there?

A   Yeah, I did, uh-huh.

Q    Did you ever see him go into a rage?

A    No.

Q    Did you ever see him scream and holler and have a short temper or anything like that at your place of business?

A    No, ma'am.

Q    If you had to rate him during that period of time of the drivers that came through your class, that first class, what did you say, 16 people, 18, about, with what you knew about how he related to you, how he presented himself and how he drove, what would you, how would you have rated him in that group of people?

A    Above average.  He'd be in the top two or three.  Maybe in the top one, but I'd say he'd have been in the top two or three.

Q    Was there anything that ever came to your attention while he worked there that was negative about Mr. Bourgeois?

A    Nothing come to my attention in a negative manner about Mr. Bourgeois.

Q    Did anybody ever come to you and say that he was difficult to work with or uncooperative, were there any complaints like that?

A    No.

Q    Were there any complaints that he was dangerous?

A    No, ma'am.

Q    Now, is one of the things about keeping your logbooks

keeping them on time?

A    Yes, ma'am.

Q    Do you know the other documents that had to be provided in a timely manner besides the logbooks that drivers had to do?

A    He had to do his trip sheets, daily trip sheets.

Q    Daily trip sheets?

A    Showing his mileage and such, and do his bills to get paid on, and normal truck driver bills.

Q    And let me ask you about the truck that he was actually driving.  Is there a, in this 18-wheeler that he was driving, was there a laptop?

A    It had a computer in it, yes, ma'am.

Q    And did the drivers have to use a laptop to communicate with the dispatcher and with the company?

A    I don't know if you'd call it a laptop or not.  It's a computer there laying on your seat and you put stuff in, in it.  Yeah, he, it could be considered a laptop, yes, ma'am.

Q    All right.  And is that how they communicated with the dispatch?

A    That's one of the ways.

Q    Okay.  And were there other ways to communicate with dispatch?

A    Yes, ma'am.  Calling, calling on the phone.

Q    All right.  Now, when you worked -- after you said that

you approved him as a driver, did you call him in and give him an interview?

A   Yeah, that's the last step in the orientation process, to come through my office where we fill out the identification cards and make, check over their paperwork, make sure everything has been signed that requires a signature.

Q   And was everything signed and in good order?

A   Everything was in good order, yes, ma'am.

Q   All right.  And so what did you issue him on that day?

A   I issued him an identification card certifying he was, he had what we call a certification process certifying he's a legitimate DOT qualified driver for R.E. Garrison Trucking. Then we took him up to get a fuel card from the dispatch office.

Q   So you actually give him a credit card?

A   Uh-huh.

Q   From your company?

A   A fuel card, yes, ma'am.

Q   Okay.  And then did you give him, what else did you give him?

A   His identification card certifying he's a driver.  And, of course, got the keys to the truck, got issued a truck.

Q   He got the keys to a truck that was worth over $100,000?

A   Uh-huh.  And he got --

THE COURT:  I'm sorry, you have to answer in words,

not uh-huh.

THE WITNESS:  Okay.

THE COURT:  It's not usual speech.

THE WITNESS:  Your Honor, I'm struggling.  I'm --

THE COURT:  It's not the --

THE WITNESS:  -- hearing impaired.

THE COURT:  Pardon?

THE WITNESS:  I'm hearing impaired.

THE COURT:  I've got something for you then.  Hold on.  Would you get him a headphones, please, Ms. Scotch.

THE CLERK:  Yes.

MS. BOOTH:  He had told me that, and I told him that there would be this opportunity to use those and he said that he would rather not, he would just rather I speak loudly.

THE COURT:  Well, all the rest of us may not be that good, so.

THE WITNESS:  Okay.

THE COURT:  She speaks loudly ordinarily.  See if that's at all helpful to you.  How is that?

THE WITNESS:  Much better.

THE COURT:  Okay, let's do that.  So I was going to say, you have to speak in words, which is, you know, we all say uh-huh and huh-uh.

THE WITNESS:  Yes, ma'am.

THE COURT:  But in a, because when we take it down

it's got to be words.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you, sir.

BY MS. BOOTH:

Q   Now, does your company cover insurance on these drivers?

A   Yes, ma'am.

Q   All right.  And are you the person that says, "Yes, he's a qualified driver and we want to hire him"?

A   Right.

Q   Now, if he would have looked like he was in any way mentally impaired or couldn't handle a truck, couldn't dress himself, couldn't eat by himself, would you have issued him the keys to a vehicle that was over $100,000?

A   No.  No, ma'am.

Q   Had anybody that worked in your company ever come to you as a security person and say, "I'm worried about Alfred Bourgeois"?

MS. LARIN:  Objection, Your Honor, hearsay.

THE COURT:  Sustained.

MS. BOOTH:  Well, no, I'm not offering this for the truth of the matter asserted that he was impaired because I contend that he's not, but that if anybody observed that he was impaired.

THE COURT:  No, that's hearsay.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Did you have any reason to think he was mentally impaired?

THE WITNESS:  No, huh-uh.

THE COURT:  Okay.  That ought to about do it.

MS. BOOTH:  That's all I have, Your Honor.

BY MS. BOOTH:

Q   Oh, let me just ask you, did Mr. Wiseman show up at your house unannounced?

A   Yes, ma'am.

Q   And did you, did he tell you that there had been some tests given to Mr. Bourgeois?

A   No, ma'am.

Q   Okay.  Did he ask, did you ask him to come on into your house?

A   After I got identification from him, I did.

Q   Okay.  Did he call and make an appointment?

A   No.

Q   All right.

MS. BOOTH:  That's all I have, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. LARIN:

Q   Good morning, Mr. Patterson.

A   Good morning.

Q   My name is Elizabeth Larin.  I represent Mr. Bourgeois.

A    Okay.

Q    So in your testimony you said that you met Mr. Bourgeois in May of 2002?

A    Best of my recollection.

Q    And it was for a training program?

A    Pardon me?

Q    For a, he attended an orientation program with you?

A    Yes, ma'am.

Q    So he was just starting at your company?

A    Yes, ma'am.

Q    And then did you later, about six to eight weeks later, would it surprise you to find out that he actually brutally murdered a little girl?

A    It would have been very, very surprising to hear that.

Q    And when did you hear about that?

A    Heard about it the day it happened.

Q    Because it was for your company --

A    Our truck --

Q    He was working for your company?

A    Our truck was confiscated at that time.

        THE COURT:  Well, he was, he was working for, he was working for this gentleman when it happened?

        MS. LARIN:  Yes.

        THE COURT:  Is that right?

        THE WITNESS:  Uh-huh, yes, ma'am.

THE COURT:  Okay, thank you.

BY MS. LARIN:

Q    Your company doesn't do psychological testing --

A    No, ma'am.

Q    -- does it?

A    No.

Q    Does your company allow truck drivers to bring their family members on the road with them in the truck?

A    With a written permit from me, yes, ma'am.

Q    And do you recall if Mr. Bourgeois had a written permit?

A    He did.

Q    And are you aware that his family was with him on the trip --

A    Yes.

Q    -- for several weeks?

A    Yes, ma'am.

Q    Is that kind of unusual to bring a family with children for several weeks on the road?

A    Would you say that again, please?

Q    Was that unusual for someone to bring their family with small children on the road for several weeks?

A    No, it's not unusual.  It's mostly done when school is out in the summer.

Q    So the family is vacationing or --

A    Uh-huh, right.

Q    Okay.  And did you say that he kept a logbook that someone directly under you supervised?

A    He kept a logbook as part of his duties and turned it in to the safety department and we audit the logbooks once they are turned in.

Q    But did you say something about someone below you, someone you supervised audited it?

A    They do the actual audit.  The computer does the actual audit and they're going to key it in.

Q    Oh.

A    If they don't get a violation form that comes out.

Q    Did that audit involve occasional spot-checking of his log?

A    One spot-checking his log and then checking every one of them.

Q    And did you do that on a daily basis or?

A    Weekly to ten days.  They've got 13 days to get their logs in, so it would have been within a 13-day frame, time frame.

Q    So probably you had looked at his logs like once or twice by the time this incident had happened?

A    Probably.

Q    Did you ever see him use the computer on the truck?

A    No.

Q    Do you recall meeting Mr. Bourgeois' cousin, Carl Henry?

A    No, ma'am.

Q    So if he was at that orientation, you are not sure?

A    No, ma'am.

Q    Okay.  And at some point did you have the opportunity to meet with Dr. Moore?

A    No.

Q    Or talk with a Dr. Moore over the phone?

A    I talked with him over the phone, yes, ma'am.

Q    Okay.  Do you know about how long that conversation was?

A    Very short, three minutes or less.

Q    And did Dr. Moore ask you to fill out any tests or paperwork regarding Mr. Bourgeois?

A    No, ma'am.

         MS. LARIN:  One second, Your Honor.

    (Ms. Larin and Mr. Wiseman conferring off the record)

         MS. LARIN:  No more questions, Your Honor.

         THE COURT:  Thank you.

         MS. BOOTH:  I call Bill Shotts to the stand.

         THE COURT:  Thank you, sir.  You can stand down, thank you.  You can just put them on the counter there, Ms. Scotch will get them.  Thank you, sir.

         THE CLERK:  Would you come forward, please?

    WILLIAM SHOTTS, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

         THE CLERK:  Would you have a seat, please, and watch your step.

DIRECT EXAMINATION

BY MS. BOOTH:

Q    Hello, Mr. Shotts.

A    Good morning.

Q    Could you please state your full name for the record?

A    William D. Shotts, S-H-O-T-T-S.

Q    And how are you employed now, Mr. Shotts?

A    I am a private consultant in the transportation industry.

Q    All right.  And I want to ask you, in that capacity what do you do?

A    Basically transportation analysis for numerous companies. I have a contract with a firm in Nebraska, one in California, one in Utah and one in Alabama and one in Wisconsin, basically to do an ongoing analysis of their operations.

Q    And have you been in trucking for many years?

A    Since 1971.

Q    And I want to ask you if you know a person by the name of Alfred Bourgeois?

A    Yes, ma'am.

Q    And when did you meet him?

A    Probably been about September or October, 1996.

Q    And how was it that you met him in 1996?

A    I was employed by U.S. Express of Chattanooga, Tennessee, and they had purchased a trucking company in Birmingham, Alabama called Hall Systems and it was going to become the

regional operation for U.S. Express, and since I had regional operational experience in the past they asked me if I would go down and head that operation up for them.

Q   So, when you went down there, did you become the boss of Mr. Alfred Bourgeois?

A   Yes, as well as about 200 other drivers.

Q   Now, did -- how long did you work there at Hall?

A   Until 1999.

Q   All right.  And so during that period of time in 1996 to 1999, did you have an opportunity to observe Mr. Bourgeois --

A   When he --

Q   -- there at the terminal?

A   When he would be at the terminal, yes.

Q   Okay.  Do you -- how often do you think that you saw him?

A   It might be once a week, it might be once a month, just depending on how the runs were and when he would have the opportunity to come by the terminal there in Birmingham.

Q   All right.  And did you enjoy seeing Mr. Bourgeois when he would come in?  Was he an employee that you liked to talk to?

A   Oh, yes, very sociable.

Q   All right.  While he was working there at Hall, did you ever notice him going into any rages or losing his temper or becoming abusive to any of the people that worked there?

A   Never, ma'am.

Q   All right.  Can you describe for the record his demeanor when he was working there at Hall?

A   Well, of course, basically all I would see him would be in an environment, you know, there at the terminal where, you know, I was basically the boss and we had dispatch, customer service, things of that nature, but it was always a very amicable atmosphere, you know.

Q   During that '96 to '99 period of time, did you ever hear any complaints about Mr. Alfred Bourgeois?

A   No, ma'am, not to my knowledge.

Q   Now, after 1999 did you change where you were working?

A   Yes.  They chose to move the regional operation into a corporate environment with U.S. Express in Chattanooga and roll it into that operation, so I at that time left and went with Eagle Motor Lines which was, a gentleman owned by the name of Ken Adams who had owned Hall Systems prior to the U.S. Express acquisition, and he was wanting to start up a regional operation again so he asked me to come over and help him start it up.

Q   And when you went over there, did Mr. Bourgeois ever come over to Eagle Transport?

A   Probably two to three months afterwards when we got some of the trucks in place and things of that nature.

Q   Now, when he came over to Eagle, were you glad to see him?

A    Very much so.

Q    All right.  Did you consider him a valuable employee?

A    Yes, ma'am.

Q    And when he was working for Eagle, do you remember the types of routes that he would take?

A    We were pretty much at that time at the Eagle side southeast regional, which would run from probably Florida to Virginia, maybe Pennsylvania, over through Texas area. Didn't do any what I would consider long-haul or west coast or anything of that nature, it was pretty much of a regional operation.

Q    So it was probably around through four or five states?

A    I'd say closer to 13 or 14.

Q    Oh, 13 or 14 states, I'm sorry.

A    Take into consideration from the, you know, Virginia south to Florida and then come west through the Texas markets, so I mean you've got, you know, pretty much of the southeastern area.

Q    Okay.  And during this period of time, was there ever a time when there were customers that were specifically asking for who they called Bourgeois?

A    That happened on one occasion, as I remember --

           MS. LARIN:  Objection, Your Honor, hearsay.

           MS. BOOTH:  I'm not asking what they said, I'm just asking did they, were there people that wanted to have him

specifically work for them.

BY MS. BOOTH:

Q   Did he --

        THE COURT:  Sustained.

BY MS. BOOTH:

Q   Did you ever have any requests from customers for certain drivers?

        MS. LARIN:  Objection, Your Honor, hearsay.

        MS. BOOTH:  I'm not asking what he said, Your Honor. Well, let me pull this back.

BY MS. BOOTH:

Q   Were there certain drivers that were more popular than other drivers, with different customers that you had?

        MS. LARIN:  Objection, Your Honor, that would be based on hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  Could you repeat the question again, Counselor?

BY MS. BOOTH:

Q   Yes, I will.  Were there drivers that were more popular with your customers than others?

A   To that I would say yes.

Q   All right.  And was Mr. Bourgeois one of those that was more popular?

A   Yes.

Q    All right.  And did you receive compliments, without saying what they were, from --

MS. LARIN:  Objection, Your Honor.

MS. BOOTH:  -- a customer that you might have?

MS. LARIN:  That is also hearsay, I believe.

THE COURT:  Well, let her finish the sentence.

MS. LARIN:  Okay, sorry.

THE COURT:  Overruled.

BY MS. BOOTH:

Q    Did you ever receive compliments on Mr. Bourgeois and his driving from any of your customers?

A    Yes.

Q    All right.  How did that make you feel --

A    Very --

Q    -- about having an employee like that?

A    Very good, because having been in the trucking industry for a number of years and classifying the stereotype truck driver, to hear some, to hear a, have a customer call and appreciate what a driver does in their behalf and your behalf makes you feel pretty good.

Q    Now, did there come a time where you didn't work for Eagle anymore and you changed companies?

A    Yes, I went to work for R.E. Garrison in Cullman, Alabama.

Q    And when was that?

A    2001.

Q    All right, in 2001.  And did there come a time where Mr. Bourgeois applied to that company?

A    It would have probably been early 2002.

Q    All right.  Now, did Mr. Bourgeois call you and tell you that he was going to apply?

A    I believe he called and asked if we were looking for any drivers and I told him he would have to check with the safety and recruiting department.

Q    All right.  And were you pleased at the call?

A    Glad to have him come aboard.  I had no, had no, had encountered no problems with him whatsoever in the past.

Q    All right.  And did he actually get hired by R.E. Garrison?

A    Yes, I believe that would have been in April or May of 2002.

Q    Now, let me ask you about these trucks at that time for R.E. Garrison.  What type of truck did Mr. Bourgeois drive?  Was it an 18-wheeler?

A    Yes.

Q    Was it a vehicle that, I mean a, I guess it's a vehicle, equipped with some kind of keypad to communicate with?

A    You mean a satellite or mobile communications unit from the tractor?

Q    Yes, sir.  I'm just not using the right --

A    The answer to that is yes.

Q    All right.  And how was it that the drivers had to communicate with this equipment on the car?  Did they type in things?  How did that work?

A    You mean from --

Q    Am I being too simple with this?

A    No, no.

Q    Explain, explain what was in the cab of the --

A    Do you want me to physically describe it?

Q    Yeah, physically describe it.  Was it a complicated, sophisticated mechanism?

A    Basically what it is, on the type of unit that he would have in the truck would be a, similar to a laptop keyboard, but it doesn't have a fold-out screen like your, the, you have on your desk there.  It has a small digital readout of about probably three, maybe four lines that data will come in on that then can be scrolled through that will be the information transmitted from the dispatcher or the customer service person that would be sending the driver the load information on where he picks up and where he's delivering to.  And then for communication back to his home terminal or his dispatcher, he can send messages via this keyboard that will be directed to the respective person that happens to be responsible for that driver.  There are also shortcuts, or a couple of different terms are macro or formed messages, which

when a driver arrives at a location where he's going to pick up his load, he would send in a particular macro saying basically, "I have arrived at this particular shipping point." And they are sequenced where you would have to know the sequence of, you know, for instance, if memory serves me correctly, I think 03, if you would press 03 on the keyboard, it would bring up a preform message that says "Arrived at shipper." You would merely hit enter or transmit and that data would go back. Then when you would complete your loading at a shipper, you would probably use, I believe, macro number 4, which you hit 04 on your keyboard and it would bring up information that you would have to fill in pertaining to your load, bill of lading number, perhaps, weight, pieces. And, again, I'm doing this from memory, I apologize for that but. And then you would hit the transmit key again and it would go back to the trucking company. Now, the, this occurs both at point of origin or the shipping point of the load as well as the consignee and, of course, these are different numbered macros. It might be 7 and 8 for your arrival at your consignee and 8 for you're empty at a consignee. And, in addition, if you have any additional pick-ups or stop-offs between your point of origin and your point of destination, they have unique macros also, so you can do an arrival and a departure by the stop number of your dispatch record. Now, this sounds very lengthy and

complicated but I can shortcut it saying that if a driver does these correctly then it saves a phone call to the dispatcher and also eliminates the dispatcher from having to do keystrokes to enter the time of arrival and departure from each one of these particular points, because it will actually, if sent correctly and in the correct sequence, it will actually integrate the trucking company's software system.  And this is something that's pretty much the standard and the norm of the industry today and has been probably back to the late '90s.

Q   Okay.  And do you know what the percentage is of truck drivers that do this correctly?  In your company?

MS. LARIN:  Objection, Your Honor, foundation.

MS. BOOTH:  I'll withdraw the question but --

BY MS. BOOTH:

Q   Now, tell me about these trucks.  How much does the, and I say truck, how much does the tractor cost that you gave to Mr. Bourgeois?

A   If memory serves me right, that was a Kenworth T600, so it was probably, initial purchase price, somewhere between 90 and $125,000.

Q   Okay.  And how about the trailer?

A   A dry van would be in the 12 to $15,000 category.  If it was a reefer it would be in the 40 to $50,000 category.

Q   And how, can you give me a range of what the cost of a

load might be that you would ask one of your drivers -- I know they are not all the same, but don't you have a range of how much cargo is, how much it costs, to make it cost-efficient to use a great big truck to take it?

A    Well, I mean, you know, depending on the type of commodity, you know, it might be worth $10,000 if it was a load of, you know, scrap metal, or it might be worth $300,000 or even more if it was a load of Sony TVs or laptops, you know.  I mean it varies from one truckload to another.  It can be, again, very minimal or very expensive.

Q    Now, do you put insurance on your drivers?

A    Yes.

Q    And if you had a driver -- well, that's all I want to ask about that.  Do you know how many loads that Mr. Bourgeois took during the time that he was working at R.E. Garrison, just from May of 2002 until the time the baby was murdered?

A    Based on probably six to eight, I would say.

Q    And do you have, do you know during that period of time what states or what area R.E. Garrison was working in?

A    Basically, Garrison was a southeast to west coast operation, very heavy with dry freight to the west coast and bringing refrigerated freight back.  One of the major hauls at that time was for HON Industries in Alabama and Georgia taking office furniture, file cabinets, desks, things of that nature, to their distribution centers in California.

Q    All right.  And paperwork, were drivers required to do paperwork when they went out or when they were working?

A    You mean as far as --

Q    Did they have to do a truck sheet?

A    -- company paperwork?

Q    Yes, company paperwork.

A    Could I clarify that just a little bit?

Q    Yes, sir.

A    Do you mean company paperwork in addition to what the DOT would require as far as logs or anything?

Q    Yes.

A    Yes, they had to do a trip sheet, things of that nature, showing what states they went through, what the mileage were in the states, things of that nature, have to turn in their fuel receipts, and their logs, of course, as required by the DOT, and their properly signed bills of lading for their loads that they would be delivering for the company.

Q    All right.

A    And these had to be turned in on a regular basis.

Q    And how was it, if they are out on the road, how would they get their stuff turned in?

A    Most of them used what they call TripPak, which is an overnight service available at truck stops, or they could be dropped off at any terminal, something like that.  They also had prepaid envelopes if, you know, they just wanted to drop

them in a mailbox and have them come in that way.

Q   All right.  Now, what happens if you don't turn your paperwork in and you don't turn it in properly?

A    Well, it's probably not going to be noticed real quickly because logs, you're allowed seven to 14 days to get them submitted, and, of course, if you didn't turn your fuel receipts in, you know, it's probably going to be 14 days before that gets caught.  Of course, they only do the fuel taxes monthly where they would be looking for the actual receipts.  The bills of lading would probably be seven to 14 days before it would be noticed that they weren't in for billing the customers when the accounting people would be running their unbilled load report.  At that point in time, when you would see that you had a particular driver that had missing paperwork or, you know, you usually say, you know, get a hold of the driver manager, get a hold of the driver, find out where the paperwork is, then take it to safety and see if the logs are in, and the next step would be, you know, take a week probably to go through these various aspects of the chain of command there.  But there have been drivers whose pay has been held up until they turn in their paperwork.  Because most drivers, most company drivers, I'll qualify that, are on a mileage scale where they are paid for the amount of miles that they actually drive the vehicle from point A to point B as opposed to -- so they will, they can be

paid based on the mileage they have generated, not

necessarily the paperwork coming in to bill the customer for

the freight.

Q   Okay.  And did you -- and you supervised Mr. Bourgeois at

several different locations, is that correct?

A   About 14 years, I guess.

Q   Did you ever have any problem with him not getting his

paperwork in or not getting his logbook in?

A   Not to my knowledge.  I was never made aware if there was

any problems, and I know the type of operation we were

running and how we had them structured, if there had been a

problem I'm sure I would have become aware of it.

Q   And do you have drivers that you have to speak to about

their personal hygiene?

A   Oh, yes.

Q   Now, Mr. --

A   That is --

Q   Go ahead, explain that, yeah.

A   Can I, can I expand on that just moment?

Q   Go ahead, go ahead, go ahead.

A   Having been in the industry for a number of years, there

are, there are times where, you know, it's notorious, the

drivers are over-the-road, you know, they're going to be away

from home for a week, two weeks, a month at times, but, you

know, now in today's environment and even the last 20 years,

you know, they've got the sleeper berth trucks and things of that nature, but still, you know, there comes a time where when you're fueling the truck you take an extra 15 minutes and grab a shave, get out of the truck and go in and take a shower. I have had in the past drivers that walk into the terminal in Birmingham or in Cullman or even when I was working with U.S. Express in California, that you would swear up and down that, you know, they had been out plowing a field somewhere and, you know, covered with dirt, hair never combed, not shaven, things of that nature, and we have had over the past customers would call and say, "Don't send this person back in," and so, you know, we had, we, you know, I have counseled several people over, you know, you've got to, you know, step back there and take a shower now and then, you know.

Q   Was that ever a problem with Mr. Bourgeois?

A   Never.

Q   Although you never saw him take a shower, did you?

A   No, I never saw him take a shower, never saw him shave or brush his teeth or anything, but, I mean, when, the environment --

Q   But did he present --

A   The environment which I was in, being in, you know, the terminal, and my office was at the very, U.S. Express was at the very back of dispatch, my office was much similar to what

this is, if this would be dispatch out here, and I had a kind of a corner office here that I could see all of my people out there, where I could see everybody that came in or went out. You know, he was always very neat in appearance, very clean-cut.

Q   Would you have, do you consider him a friend?

A   Yes, I do.

Q   And when you heard about what had happened, were you, how did you feel about that?  Were you surprised?

A   Shock is not a strong enough statement.

Q   Would you, besides this capital murder case, would you have hired him back if he would have come back in 2002?

A   In a minute.

Q   Did Mr. Wiseman come to your house?

A   Mr. Wiseman?

Q   The attorney over here.

A   Oh.

Q   Yes.

A   I didn't recognize his name, I'm sorry.  Yes, he did.

Q   And did he make an appointment and come or did he come unannounced?

A   No, he just stopped in one morning.

Q   All right.  And did he tell you that Mr. Bourgeois had been given tests and they were low scores indicating that he might be mentally retarded?

A    Something to that effect, yes.  He said that he had been given, he had, he was basically the defense counsel for Mr. Bourgeois on this pending evidentiary hearing and wanted to know if I had worked with him in the past and I said, "Yes, but I have been under subpoena by the prosecution." And he said, "Can we talk to you for a minute?"  I said, "Yes."  And he said, "Well," he said, "what do you think," it was not the actual comment of mental retardation but the way I interpreted it was there might be a little below average mental ability.  And I said, "I never noticed anything of that nature."  And he said something in the nature of, "Well, we have interviewed and given him a series of tests and find out that there may be some things that may be below average," is the way I interpreted it, but I do not remember the actual terminology being mental retardation.

Q    Were you shocked by that assessment?

A    Yes, I was.

Q    And why is that?

A    Well, again, I was basing my, my opinion on knowledge of Mr. Bourgeois from, you know, 10 years ago, you know.  I mean, all things change and I mean, you know, apparently something has here, but I found it very hard to believe that this could have been something that was developed or could have been an issue that I would have noticed back in the environment in which I was working with him at.

Q    Okay.  Thank you.

A    But again, I did not have daily contact with him, so.

Q    Okay.  Thank you, Mr. Shotts.

         THE COURT:  Yes, ma'am.

         MS. LARIN:  Your Honor, I had to switch to my non-clicking pen.

                          CROSS-EXAMINATION

BY MS. LARIN:

Q    Good morning, Mr. Shotts.

A    Good morning, ma'am.

Q    My name is Elizabeth Larin.  I represent Mr. Bourgeois.

A    Okay.

Q    We have not met, though.

A    No, we haven't.

Q    So, I believe your testimony is that you met Mr. Bourgeois in 1996?

A    Yes, ma'am.

Q    Okay.  And you have worked with him on and off since then, or consistently?

A    Yes.  Yes, ma'am.

Q    Which one, I'm sorry?

A    I didn't hear what you said.

Q    Have you worked with him consistently through the years or --

A    Consistently?  Not day-by-day, but at three different

employers the answer is yes.

Q   Okay.  So, about how often would you see Mr. Bourgeois?

A   Well, again, depending on whether we are talking the U.S. Express days at Birmingham or we're talking the Eagle Motor Line days which was also in Birmingham or the short period he was at R.E. Garrison in Cullman, depending on what his runs were.  I'm sure both the U.S. Express and Eagle Motor Line days in Birmingham, based on the type of operation we were running, there might be times you would see a couple of times a week if he, you know, come in and ran a load to North Carolina and back to Alabama, and there might be times, other times, where you might not see someone for two or three weeks.

Q   Okay.

A   So there was no real consistent pattern in I would see him Monday, Wednesday and Friday or Tuesday and Thursday or anything of that nature.

Q   And what was your position in these companies?

A   I was vice-president of operations at U.S. Express, I was general manager at Eagle Motor Lines, and I was director of operations at R.E. Garrison.

Q   And so what kind of interaction would you have with Mr. Bourgeois, was it a social interaction or a work related interaction?

A   More of a social interaction than anything because of the

fact, you know, I mean usually when I was dealing with people at any of those companies it was that there was a, there was some type of a problem either with a customer or with their equipment or there had been a complaint or they weren't running enough miles or they were running too many miles, and I was kind of, you know, to look after something of that nature.

Q    And you never had to have those conversations with Mr. Bourgeois?

A    No.

Q    So your, so your conversations with him were more, "Hi, how are you doing?"

A    Yeah, you know, "How are things going on the road, anything we can do for you," that kind of thing, "How's your truck doing," and that kind of thing, right.

Q    So in these conversations, were they scheduled, like would he come into your office for a regular meeting?

A    No, no.

Q    What were, where would you talk to him?

A    I would see him out talking to someone in dispatch or something like this, walk out there and say, "Hi," you know, "Al, how are you doing," and this kind of thing, and, "Where you been," and, "Have you been to Texas recently, you been," you know, "where have you been, to Florida," or whatever, you know, and just talk about things in general.  It was not

anything that, you know, I called him into my office or he came into my office or anything of that nature, it was more of a social environment, you know, but, I mean, he never had any problems in either talking to me or talking to other people in the office there.

Q   And when you say -- did you ever actually socialize with Mr. Bourgeois outside of work?

A   No.

Q   You never went to dinner with him, for example --

A   No.

Q   -- or were you ever in his --

A   Well, I'll qualify that.  I think he would probably attend some of the safety breakfasts we might have had or something like that, but as far as socializing as a one-on-one or management with driver or drivers, the answer is no.

Q   And were you -- I take it you were never at his home?

A   No.

Q   Okay.  Were you aware that his wife traveled with him when he worked at R.E. Garrison?

A   I believe that they have to receive a passenger authorization form and it's so noted in the computer.  Yes, I knew his wife was with him.

Q   Now, do you know -- you have heard the term dedicated route?

A   Yes, ma'am.

Q    Do you know if Mr. Bourgeois drove dedicated routes more than other routes or --

A    Do I know or did he?

Q    Did he?  Did Mr. Bourgeois --

A    No.

Q    -- drive dedicated routes?

A    No.

Q    Not in your experience?  Well, maybe you should define a dedicated route.

A    Dedicated route would be where you would run from one point of origin to one destination for a customer and turn around and do the same thing back, usually what they call dedicated service.  There were some consistent runs at Garrison which would have the same origin and the same destination, and I go back to speaking of HON Furniture being a major customer of theirs and there was probably --

Q    Excuse me.

A    -- six loads a week that all went to South Gate, California, but it just happened to be whoever was there to take them.

Q    And that was at Garrison?

A    Yes.

Q    How about in the prior companies, U.S. Express and Eagle?

A    U.S. Express had some dedicated runs but they were not really fitting into the southeastern operation, and we had

some at Eagle with Parisian that were store deliveries that ran the same days every week, and we had a few with Clipper Express.

Q    And how about the concept of consistent runs as well as the dedicated routes?  Do you recall?

A    No, I don't.

Q    Okay.  You discussed the computer system that was on the Garrison truck?

A    Yes, ma'am.

Q    Did you personally train him on that computer system?

A    Did I?

Q    Uh-huh.

A    No, it was part of probably the orientation program.

Q    Did you ever actually see him use that computer, the -- on his end?

A    On his end, no.  On the receiving end as far as the company, the answer is yes.

Q    Yes.  At any of your companies did you provide psychological testing for when you hired new employees?

A    No.

Q    And I imagine you were surprised when you heard about this crime?

A    Again, your question of that earlier, Counselor, the word shocked is not a strong enough statement.  I am still, I still think about this a lot and I'm, I just can't comprehend

it, I still can't comprehend it.

Q   Because you knew Mr. Bourgeois?

A   I agree, you know, and I just, I, you know -- some of these things I think perhaps you can see coming.  I saw, I never saw any hint of this.  I was devastated.

Q   Did you ever see Mr. Bourgeois do paperwork?

A   You mean as far as filling out his logbook or something of that nature?  Yeah.

Q   You saw him do that?

A   Oh, yeah.

THE COURT:  Was he slow or quick at it?

THE WITNESS:  He didn't have any problem, didn't appear to have any problem at all, ma'am.

THE COURT:  Okay.

BY MS. LARIN:

Q   And was that paperwork, the logbook is sort of a template that they fill in?

A   The logbook is kind of a graph, I like to use the term, where, you know, you're off duty here and you go down here and you drive and you're back up here kind of thing where you keep track of your --

Q   Right.

A   -- keep track of your hours.

Q   I believe this is in the trial record but you draw a line --

A     Yes.

Q     -- for when you're driving --

A     Yes.

Q     -- and when you're not driving?

A     Then you put a line down here when you have what they call a change of duty to show where the change of duty took place at.  I'm sure it's all a matter of record.

Q     It's in the record.

A     I'm sure, yeah.

Q     And did you know -- you did not know Mr. Bourgeois prior to his employment?

A     No.

Q     You never knew him as a child or --

A     No.

Q     Are you aware that Mr. Bourgeois had his license suspended in 1995?

A     In 1995?  No.

Q     So it would seem that he, his driving improved by the time you had met him?

A     Apparently so, because I didn't even meet him until 1996.

Q     And then at some point did you have the occasion to speak with Dr. Moore regarding Mr. Bourgeois?

A     We spoke briefly on the phone, yes.

Q     Do you know about how long that conversation, how long --

A     How long ago or how long the conver- --

Q   How long was that conversation?  How long did you speak to him?

A   How long the conversation was?

Q   Yes.

A   Probably 15, maybe 30 minutes at the most.

Q   Did you ever meet with him in person?

A   No.

MS. LARIN:  Thank you, Your Honor.  I have no further questions.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. BOOTH:

Q   You said you never saw him on the computer but from your side you saw the answers or the replies that he put in there?

A   No, I never saw him sit there at a keyboard in his truck, but what I could observe was the information he had done correctly from the truck that would integrate the loads for the customer service and dispatchers.

Q   And compared to the other drivers in your, on your team, was his entry that came from his truck as accurate or more accurate than the group that you were, the team that you were working with?

A   Probably I would say above average.

Q   Okay.

THE COURT:  In a logbook, don't you write things in

besides draw lines?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

THE WITNESS:  Your --

THE COURT:  So, and you observed him writing sentences and things?

THE WITNESS:  It's not necessarily sentences, ma'am, on the logbook, it's --

THE COURT:  It's Ft. Worth at 10:00 o'clock, something like that?

THE WITNESS:  Something like that.  Signature.  And it's more, again, cities and states.

THE COURT:  Uh-huh.

THE WITNESS:  And more, you know, your bill of lading number, your tracking number, you turn in a number of things, but it would be --

THE COURT:  Not a travelogue?

THE WITNESS:  No, you are exactly right, yes, thank you.

THE COURT:  Okay.  Thank you.

MS. BOOTH:  That's all I have, Your Honor.

MS. LARIN:  Just one brief question?

THE COURT:  Sure.

RECROSS-EXAMINATION

BY MS. LARIN:

Q   Regarding the computer on the truck at the Garrison Company?

A   Uh-huh.

Q   You don't know if anyone else might have inputted the information on Mr. Bourgeois' truck that you read the printouts of?

A   I, do I have knowledge if they did?

Q   Right, do you know if someone else put that information in?

A   I have no way of knowing that.

Q   But you are aware that he had family members with him on the truck?

A   According to the information I was provided, he only had families with, family members with him the last week of his, of his employment, and I believe some of the information I believe that was provided, and again I'm speculating here, on the original --

        MS. BOOTH:  Well, Your Honor, I'm going to object if he's speculating to something.

        MS. LARIN:  Right.

        THE WITNESS:  Well -- go ahead.

        THE COURT:  Overruled.  Go ahead.

        THE WITNESS:  What I was saying, what I was saying

was I don't know what information was provided at the original trial but there was, there was, from his very first day of work, when I look back at this years ago, he would, he knew how to use a computer on his very first trip, and I at that time am comfortable that he did not have anyone else there with him.

Q    Why are you comfortable with that?

THE COURT:    He said from the first day of work he could use a computer.

MS. LARIN:    Right.

BY MS. LARIN:

Q    I'm just wondering how he knows there wasn't anyone with him on that first day.

A    Well, when he left, when he left the Garrison yard on his first trip, there was no one in the truck with him.  Now, I'm going way out on a limb saying that he did not pick up someone that knew how to operate that satellite communication before he got to California.  That is the assumption I am making, Counselor.

Q    Okay.  But you were there when he left the first time?

A    Yes, ma'am.

Q    Okay.  And --

THE COURT:    I guess the point is that he knew how to work it so there was no reason for anybody to use it for him.

THE WITNESS:    Thank you very much.

THE COURT:  Is that correct?

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

THE WITNESS:  Yes, ma'am.

MS. LARIN:  Thank you, Your Honor.  No further questions.

THE COURT:  Thank you, ma'am.  What do you-all think for breaking for lunch?

MS. BOOTH:  Yes, that would be nice.

MS. LARIN:  Whatever would --

THE COURT:  You are excused.  Thank you, sir.  How much time, 45 minutes?

MS. BOOTH:  Forty-five minutes.

THE COURT:  Okay, 45 minutes it is.  Thanks.

(Lunch recess at 12:30 p.m. until 1:14 p.m.)

THE COURT:  Thank you, you may be seated.  Did anybody tell Mr. Wiseman -- did you know where the attorney lounge is?

MR. WISEMAN:  Yes, ma'am.

THE COURT:  Okay.

MR. WISEMAN:  We were down there.

THE COURT:  Okay.

MR. WISEMAN:  Thank you.

MS. BOOTH:  I went down there the other day to visit with them and they told me, accused me of being sent down

there to distract them.  I know.

THE COURT:  There's nothing for it, Ms. Booth.

MS. BOOTH:  I know.  I just like to go look at the rug in there, you know?

THE COURT:  Considering I ordered all that stuff myself.

MR. WISEMAN:  I thought the rug was quite lovely, Your Honor.

THE COURT:  Thank you.

MS. SALINAS:  It's a lovely rug, yes.

THE COURT:  It was actually the bankruptcy judge's rug from before we moved in here.  Are you all ready?

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Call your next witness.

MS. SALINAS:  Call to the stand Mr. Key.

THE COURT:  Who?

MS. SALINAS:  Christopher Key.

THE COURT:  Okay.

THE CLERK:  Please come forward.

CHRISTOPHER KEY, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MS. SALINAS:

Q   Good afternoon.  Could you please state your full name for the record?

A    Carlin Christopher Key.

Q    And Mr. Key, how are you employed?

A    Southern Cal Transport.

Q    And what is Southern Cal Transport?

A    It's a trucking company.

Q    And where is it located?

A    Birmingham, Alabama.

Q    And how long have you been in the trucking business?

A    Since '94.

Q    Okay.  And when was the first -- do you know an individual, first of all, by the name of Mr. Alfred Bourgeois?

A    Yes.

Q    And when did you first meet Mr. Bourgeois?

A    I believe the first time that I actually met him was at Eagle Motor Lines, but I knew of him at U.S. Express.

        MR. WISEMAN:  Objection, nonresponsive, Your Honor.

        THE COURT:  Overruled.

BY MS. SALINAS:

Q    Okay.  And when you knew of him in U.S. Express, what year was that?

A    '98.

Q    '98.  And then you said you knew him when you were at Eagle Express, Eagle Motor Lines?

A    Yes.

Q    And what year was that?

A    '99.

Q    Okay.

A    Through 2001.

Q    2001, okay.  And when you were at Eagle Line, Eagle Motor Line, what were you doing for Motor Eagle Line?

A    I was a fleet manager.

Q    And at that time was Mr. Bourgeois a driver for Eagle Motor Line?

A    Yes.

Q    And as a fleet manager, what were some of the responsibilities or the duties that you had?

A    I was responsible for speaking with drivers, letting them know of their load assignments, the details of that; monitoring their progress to make sure that they were delivering on time; also monitoring their productivity to make sure that they were being productive for themselves and for us.

Q    And Eagle Motor Line back in 1999 to the period of 2001, was that a, would you classify that as a large company, a mid-size company?

A    It was relatively small when we started, around 36 trucks when I started there.  Then --

Q    And --

A    -- sometime around the end of '99, beginning of 2000, we

purchased another trucking company.  We were at 92 trucks when we purchased the other trucking company and the two companies merged together I believe was somewhere around 300 trucks.

Q   And the type of trucks that were used at Eagle Motor Line were what kind of vehicles?

A   DOT classified Class A vehicles.

Q   Are those known as 18-wheelers?

A   Yes.

Q   Okay.  And are those expensive pieces of equipment --

A   Yes.

Q   -- tractors and trailers?

A   Yes.

Q   In the range of what amount?

A   A hundred thousand for the truck, roughly 40,000 for a trailer.

Q   Okay.  And when you started at Eagle Motor Line back in, in the period of 1999, were there the same type of communications systems for the drivers that are now in place?

A   No.

Q   And how was it that you were, you had to communicate the information about the loads with the drivers?

A   It was all over the phone.  The only other communication we had was they had pagers, so they were instructed to make a check call first thing in the morning and then again in the

afternoon, and that's in addition to any time they needed information or needed to give information.

Q    Okay.

A    And then the pager was just in case we needed to get in touch with them.

Q    And Eagle Motor Line was located, back in 1999 to 2001 when you were the fleet manager, it was located where now?

A    It was Birmingham, and then after the purchase of Howard Hall Transport it was moved to Trussville.

Q    Trustville?

A    Truss, T-R-S, T-R-U-S-S-V-I-L-L-E.

Q    There in Alabama?

A    Yes.

Q    Okay.

A    A suburb of Birmingham.

Q    And as fleet manager did you have on occasion face-to-face communications with the drivers?

A    Yes.

Q    And you would have face-to-face communications with the drivers on an average how many times per week?

A    On a given -- to a given driver or just the drivers as a group?

Q    Drivers as a group.

A    I would say every day I would see at least three to ten.

Q    Okay.  And the office that you were in, is it, do we call

it a terminal?

A    Yes.

Q    And so when the drivers are through with their loads, do they automatically come into the terminal?

A    No.

Q    Okay.  The kind of loading or the loads that Eagle Motor Lines had, was running at that time, where did Eagle Motor Line drivers travel to in the United States?

A    It was expanded southeast, basically everything east of Dallas.

Q    Dallas, Texas?

A    Yes, that's correct.  And everything east of Chicago for the Midwest.  And that's, that's a vague description.  I'm not going to say that there weren't exceptions but that was primarily what we did.

Q    Okay.  And is that all year round?

A    Yes.

Q    And back, you said, in '90-, back at, when you-all purchased another company, you-all were running about approximately 92 trucks, is that correct?

A    Yes.

Q    So that, does that mean there was 92 drivers or were there more or less?

A    For us, we were a solo operation, so it would have been 92 drivers, yes.

Q    Okay.  And the information you said when you had the interaction with the drivers, what kind of information was being relayed to the drivers?

A    It would have been requirements for pick-up, on-time pick-up, on-time delivery.  If there --

Q    And let me just break that down.  When you say on-time delivery, so is the information like you have to pick up at a particular date?

A    Yes.  There were, there were some loads that would have a specific time appointment that we had to pick up.  There were others that had a window, meaning from maybe 8:00 a.m. to 2:00 p.m. or et cetera.

Q    And let me ask you this:  As a fleet manager, you mentioned just now that sometimes they had specific appointment times that they had to either pick up or deliver, is that correct?

A    Yes.

Q    And what if the drivers were, weren't there at the appointed time, what, if anything, would that do or concerns would that cause?

A    Well, obviously it would be a service failure to the customer, but what it meant to us internally was we tried to alert the customer ahead of time that we would not pick up on time, and we would gain that knowledge through either knowing that we planned it that way, meaning we didn't have a truck

available to pick up on time, or that for some reason or another a driver could not make that commitment, and it was up to them to relay that information to us.

Q   Okay.  And back in 1999 were you delivering or giving that type of information to Mr. Bourgeois yourself?

A   Yes.

Q   And during that time from 1999 to 2000 -- well, let me ask you this:  You mentioned that you were there at Eagle Line in 1999, that's when you first met Mr. Bourgeois?

A   No.  Well, yes, face-to-face, I believe that's correct, yes.

Q   You said earlier that you knew of him --

A   Yes.

Q   -- when he was at Hall Systems?

A   Yes, that's correct.

Q   And how was it that you knew of him?

A   Just word of mouth, you know, other people speaking of him in the office.

Q   Okay.  And during that time when you were working as fleet manager for Eagle Motor Lines, did it ever appear to you that Mr. Bourgeois did not understand the information you were imparting to him regarding the load pick-up dates and delivery dates?

A   No.

Q   Did you ever have to repeat to Mr. Bourgeois the

information that you were giving to him?

A    Not that I can remember, no.

Q    And did you ever have to explain instructions to him about the locations, where these places were, as far as having to give him, take out a map and show him specifically where to go?

A    Nothing outside the ordinary.  I mean, no one actually already knows where customers are.

Q    Okay.

A    So everyone has to be given some information on how to, how to get to where they're picking up.

Q    Okay.

A    But nothing abnormal.

Q    And, well, let me, now that you say that, that's right, they don't know where they're going until you tell them the specifics.

A    That's correct.

Q    Or you give them the bill of lading or, I forget what it's called, a --

A    Pick-up number?

Q    Pick-up number.  And did you have to give him, relay that information to him repetitively on the same load?

A    No, no.

Q    Now, in the trucking business, Mr. Key, there are certain regulations that one has to keep up with as far as the truck

is concerned?

A    That's correct.

Q    And we have heard a lot about the daily driver's logs.

A    Yes.

Q    Are you familiar with those?

A    Yes.

Q    And as a fleet manager did you see those logs on occasion?

A    I did not see them unless there was a problem.

Q    Okay.

A    It was our responsibility, once the safety department approached us, to counsel the drivers when they were having issues.

Q    Okay.  And you are familiar with the regulations regarding how many hours a truck driver can be on the road on a certain period of time, I don't know if it's within a 40- week, a 40-hour week or what not?

A    Yes, yes.

Q    Are, does Eagle Motor Lines impart any sort of instruction or training to the drivers about those requirements?

A    Yes, during orientation there's a, basically it's a short training class, and it's mainly a refresher because everybody that is a CDL holder is tested on logbook laws and regulations, so when they come to us with a CDL already in

hand, we have to expect that they already know something, but just as a safety precaution we do go over it in orientation.

Q   And when Mr. Bourgeois came to Eagle Motor Lines, did he come to you, to Eagle Motor Lines with some prior driving experience?

A   Yes.

Q   And that would have been as a CDL driver?

A   Yes.

Q   Now, in order to keep up or not -- let me ask you this: The safety, the inspect-, there are some inspection stations throughout the interstate, are there not?

A   Yes.

Q   And what, and those inspections or those weight stations, I believe they are called?

A   Yes, that's correct.

Q   Is that sometimes where the daily driver's logs are inspected by the inspectors?

A   Yes.  They randomly will spot-check trucks, walk out, ask for logbooks and permits, all that kind of stuff.  Also, if a driver gets pulled over for speeding they will ask for it sometimes.  And sometimes they just will randomly pull trucks over and just check them to see how they are.

Q   And if a driver indicates in his logbook that he has exceeded the hours of driving time that he's supposed to, that he is mandated not, to drive or not to drive, can they,

can that result in fines to the individual and/or to the company?

A   Yes.

Q   And so there are some, you have, is it fair to say that one has to be able to comprehend and understand the number of hours that one can drive on a given week?

A   Yes, that's true.

Q   Now, the logbooks, how important are those to your company?

A   It's extremely important.  It's kind of difficult to log everything and be productive at the same time, so someone who is excessively productive, an overachiever say, you know, per se, would have to be, they would have to be extremely knowledgeable of logbooks, the logbook hours.  They would also have to be pretty, pretty good at math, because it's, it's difficult to be, to be legal and still get a lot of miles per week.

Q   And you mentioned the word for someone who is an overachiever, and during the time from 1999 to 2001 when you were working with Mr. Bourgeois, would you classify Mr. Bourgeois as an overachiever?

A   Yes.

Q   And can you give us some examples of why you say that?

A   Well, for one thing we had a customer, I believe the customer was Clipper Transport, he ran --

Q    And you say he, who are you referring to?

A    I'm sorry, Mr. Bourgeois ran two or three loads for them
and then they requested him.

        MR. WISEMAN:  Objection, Your Honor, it's hearsay.

BY MS. SALINAS:

Q    Okay.  Let me ask you this:  Were there favorite drivers
that some of the companies had?

A    I'm sorry?

Q    Were there some favorite drivers that some of your
companies had?

A    Favorite drivers in our minds?

Q    Well, that, the different companies that you would
transport for?

A    Yes.

Q    Did they --

A    Yes.

Q    Did they ever have their own special drivers that they
would request?

A    Yes.

Q    And was Mr. Bourgeois one of those individuals?

A    Yes.

        MR. WISEMAN:  Objection, hearsay, Your Honor.

        MS. SALINAS:  I'll move on, Your Honor.

BY MS. SALINAS:

Q    Did Mr. Bourgeois do a drive or a, a particular drive for

a company known as Clipper Transport?

A    Yes.

Q    And did you give Mr. Bourgeois the Clipper Transport route?

A    Yes.

Q    I didn't hear you.

A    Yes.

Q    Okay.  And why was -- and you gave it to Mr. Bourgeois for what reason?

A    Well, let me explain a little bit.  The way it works in the office, in the office with trucking, is you have a CSR, customer service rep, that deals directly with the customer and they relay information to us, us being fleet managers, job manager, dispatcher, and then we relay that to the driver.  So the instructions that we get from the CSR we pretty much take to be the gospel because it's in everyone's best interest that every, all the information be true.  And so when it was relayed to me that he was requested by the customer --

MR. WISEMAN:  Objection, Your Honor, it's hearsay.

BY MS. SALINAS:

Q    Let me just ask you this:  Did you get information about Mr. Bourgeois and Clipper Transport?

A    I'm sorry?

Q    Did you get, receive information?

A    Yes.

Q    And as a result of that information did Mr. Bourgeois then start running specifically for, well, not specifically, not only, but on occasion for Clipper Transport?

A    Yes.

MR. WISEMAN:  Objection, Your Honor, that also calls for hearsay.  She's not saying what the information is but she is conveying that information was provided upon which a decision was made.

THE COURT:  Sustained.

BY MS. SALINAS:

Q    Let me ask you this:  The Clipper Transport route, was that a designated route or was that a multistage route?  Or run, I'm sorry.

A    It was, it was designated but it, sometimes it did have multi stops.

Q    Okay.

A    But the stops were always the same stops, we never had just random stops.

Q    Okay.  And Clipper Transport was located where?

A    Atlanta and Chicago, I believe.  I believe there was also another Illinois location but I don't remember where it was.

Q    Okay.  Now, the, we were going, we were talking about the logbooks.  What is requested, what kind of information is requested for the drivers to put in their logbooks?

A    What status they are as far as on duty not driving, on duty driving, sleeper berth and off duty, as well as pretrips, which is an inspection that has to be done on the truck before their start of day, and then where they stop to fuel, that sort of thing.

Q    Okay.  And does it require them to sign it?

A    Yes.

Q    Are they required to relay the, or coordinate their stops with the bill of ladings whenever they do a pick-up or a delivery?

A    Yes.

Q    Does it include all kinds of stops, whether it's for fuel or for rest?

A    Any, anything that has to do with what they do, any change of duty status, any, anything is supposed to, everything that has anything to do with what they are doing is supposed to be on that logbook.

Q    Okay.  Now, the, Mr. Bourgeois, did he -- let me ask you this:  In your line of business do all the drivers have the same level of motivation as far as driving the most they can?

A    No.

Q    And Mr. Bourgeois, you mentioned that he was an overachiever, did he ever request more hours to drive?

A    More miles?  Yes, he did.

Q    And did he engage in that conversation with you?

A    Yes.

Q    Can you tell us a little bit about that conversation, or those conversations?  Was it on one occasion or more occasions?

MR. WISEMAN:  Could we place this with a time reference, Your Honor?

BY MS. SALINAS:

Q    Can you tell us when this, when you first started noticing that he was requesting more hours?

A    Immediately.

Q    Immediately.

A    And it's miles, not hours.

Q    Miles, I'm sorry.  So, is it fair to say throughout the employment of through 1999 to 2001?

A    Yes.

Q    Okay.  And can you tell us a little bit about these conversations that you would have with Mr. Bourgeois?

A    Yes.  If you consider that a paycheck being from a, on a seven-day period, if it got to the fourth or fifth day of the pay period and he didn't have the amount of miles that he wanted or thought he should have had by that time, he would, he and I would be having a conversation about why was his miles not up, what could we do to get him more miles, et cetera.

Q    And in reviewing his logbooks or the number of hours, was

he running to the top of, or for lack of a better word, to the max of the hours that he could?

A    Yes.  I would say he was maximizing his production, you know, capabilities.

Q    Now, is that a difficult thing to do in order to make sure that you are working the maximum number of hours legally required, is that some --

A    Yes.

Q    A skill that is, that is difficult to do?

A    Yes, it's difficult.  It's difficult to overachieve and maintain legality.

Q    Okay.  And when you gave Mr. Bourgeois a load assignment, did you ever have to worry about whether or not it would be done correctly?

A    No.

Q    And whenever you saw on the computer that you had a difficult customer, it was, did you ever consider putting Mr. Bourgeois on that particular trip?

A    Yes.

Q    And why was that?

A    Because of his track record with being on time, being early in most cases.  And that was driven from his need to get more miles and be more productive.  Because you have a certain amount of people that you have to monitor constantly and worry about and they take up most of your time, and then

when you have a customer whose requirements are heavy, so to speak, meaning that they want more than most customers do, then you typically will find your over performers and put those guys on those loads because you know that you don't so much have to worry about failing service for the customer.

Q   Okay.  And the service on the trucks that the drivers were assigned to, was that responsibility left up to the drivers?

A   Yes, they were responsible for knowing their mileage intervals for when they were due an oil change or a rotation, tire rotation, or something, anything of that nature.  They were responsible for knowing those intervals.

Q   And if they exceeded those intervals or were not meeting the, like the date where the service was up, did those drivers get notified that they had not yet maintained their trucks?

A   No, we did, through the shop.  The maintenance department would let us know that we had a list of drivers or a list of trucks that, you know, were exceeding their mileage intervals or exceeding their time intervals.

Q   And you would get that information?

A   Yes.

Q   Did you ever have to have a conversation with Mr. Bourgeois that he was not keeping and maintaining his truck as required?

A     No.

Q     And you stated that you talked to Mr. Bourgeois, and especially when you were talking about his request for making sure that he got the maximum number of hours that he could. How would you describe his personal hygiene?

A     He was well kept.

Q     Okay.  Did he, did you ever have to counsel him about not maintaining his hygiene?

A     No.

Q     Okay.  The type of trips that these drivers made, and in particular I'm speaking about the type of trips that Mr. Bourgeois would have made, would they require them to be overnight for a day or two or maybe even more to, before they arrived at their point of destination?

A     Yes.  Typically our drivers were, they were home every weekend or every other weekend, and that changed over time. When I started in '99, most everybody was home about every weekend, and as that, as time moved forward, as, just through, for reasons of cost and productivity, we changed our requirements for driver home time, and I believe that when I left in 2001 it was every 10 days.

Q     So they would be on the road for 10 days?

A     Uh-huh.  I'm sorry, yes.

Q     Okay.  So they were responsible for taking enough clothing and taking care of their hygiene and what not?

A   Yes, yes.

Q   Did the terminals, do a lot of these terminals -- well, let me ask you this:  Truck stops, are they equipped with shower services for the drivers and what not?

A   Yes.

Q   And the truck drivers, the 18-wheelers, the trucks that Mr., the truck that Mr. Bourgeois was driving, were they equipped or was it equipped with what's known as a sleeper berth?

A   Yes.

Q   And were they allowed to sleep in the sleeper berth?

A   Yes.

Q   Those sleeper berths are not, do not have shower facilities in there, do they?

A   No, they do not.

Q   Or water to wash your face or anything like that?

A   No.

Q   Okay.  On the times that you communicated with Mr. Bourgeois in the particular, whenever you saw him or talked to him about loads or what not, how would you classify his level of communication?

A   He communicated well.

Q   Okay.  Do you recall during his employment that he was ever late with a load?

A   Not that I recall, no.

Q   And as far as you are concerned did he, did Mr. Bourgeois, was he able to follow through on the instructions given to him about his particular loads and deliveries?

A   Yes.

Q   Now, so you worked with him from '99 to 2001, correct?

A   Yes.

Q   For about two-and-a-half years, is that correct?

A   Yes.

Q   And in that time was there anything about the defendant's, Mr. Bourgeois' interaction -- well, no, I'm going to retract that statement, and that brings me to a different point.  Mr. Key, during those years that you saw Mr. Bourgeois, did you ever see him having a rage attack at the terminal?

A   No.

Q   Did you ever hear him yelling and hollering in an angry manner?

A   No.

Q   And then there's, from 1999 to 2001, did you ever believe or, that Mr. Bourgeois had any mental deficiencies?

A   No.

Q   Did you believe he was mentally retarded?

A   No.

Q   Now, Mr. Key, in the trucking business, when one moves

from one trucking company to another, especially in a management position, do -- well, you moved, did you not?

A    Yes.

Q    Did you ever talk to drivers about moving along with you?

A    Yes, I did.

Q    And usually you would, who did you want to take with yourself, what type of driver?

A    The best drivers, the best performers.

Q    And was Mr. Bourgeois one of those drivers, or would have been one of those drivers?

A    Would have been, yes.

        MS. SALINAS:  May I have just a moment, Your Honor?

        THE COURT:  Yes, ma'am.

        MS. SALINAS:  I have no further questions, Your Honor.

        THE COURT:  Thank you.

                        CROSS-EXAMINATION

BY MR. WISEMAN:

Q    Good afternoon, Mr. Key.

A    Good afternoon.

Q    You started in the trucking business in 1994?

A    That's correct.

Q    And would that have been, not to press your memory too much, about when in '94?

A    I would say August, September.

Q    All right.  So approximately 16 years ago?

A    Yes.

Q    Okay.  And did you start as a manager or did you start in some other capacity?

A    I started as a driver.

Q    And how long were you a driver?

A    Off and on, until '98.

Q    And in 1998 you became a manager?

A    Yes.

Q    And what time of year in 1998?

A    I think it was July.

Q    So roughly 12 years ago?

A    Yes.

Q    And you testified that when you first started at Eagle they had, well, I'm sorry, at U.S. Express, is it, that there were 36 trucks?

A    No, that was Eagle.

Q    Oh, I'm sorry, it was Eagle, okay.  And that went up to 92 trucks?

A    That's correct.

Q    And about when did it go up to 92 trucks?

A    It was gradual from, from August of '99 till the end of the year.

Q    And when you were at Express, how many trucks were you responsible for?

A    U.S. Express?

Q    Yes.

A    Seventy-five.

Q    All right.  So it was 75 trucks until you went to Eagle in what year?

A    '99.

Q    And what's the turnover like among drivers in your business?

A    Turnover?

Q    Yeah.

A    Industry standard is probably somewhere around 110, 115 percent.

Q    What does that mean?  I'm not sure I understand the answer.

A    If you have 100 drivers, in a year's time you will turn over, you will lose 114.

Q    Oh, okay.  So, from 1998 when you first met Mr. Bourgeois, I'm not good in arithmetic, sounds like we're talking about over 1,000 drivers?

A    Depends on how many drivers your trucking company had.

Q    Right.  I'm talking about your experience with the 75 trucks and then it went up to 92 trucks at the other company, we're talking --

A    That's the industry standard, that's not what I experienced.

Q   All right.  Well, I had asked you what the turnover was like, was the turnover like for you, in your experience?

A   I would say mine at U.S. Express was probably somewhere in the 20 percent, 30 percent range, and at Eagle was probably close to zero.  At least until the time, at what time we purchased Howard Hall Transport.

Q   All right.  Well, would you agree, then, that taking a range of 20 to 30 percent at U.S. Express, 100 drivers times the number of years you were there, we're talking about maybe 150, 200 drivers you were responsible for?

A   No.

Q   How many?

A   I would say there was probably no more than 100 from the time that I was at U.S. Express, and at the time I was at Eagle probably no more than 115.

Q   Okay.  So that's 215 drivers.  Now, how about when you left U.S. Express, where did you go?

A   U.S. Express?  I went to Bishop Brothers Hauling.

Q   And how many trucks were you -- well, did you have the same job?

A   It was a trucking company but it was different, it was a heavy haul outfit.

Q   Were you in a managerial/supervisory position?

A   No.

Q   What did you do?

A    I was in the permits department.

Q    What does that mean?

A    You have to have overweight/oversize permits for heavy haul, anything.

Q    Okay.  Were --

A    So that's, I ordered those permits from state offices.

Q    Were you responsible for interacting with drivers in any capacity?

A    Somewhat.

Q    Okay.  How many drivers were you responsible for in that job?

A    Well, I wasn't responsible for any of them, but I did communicate with them, so --

Q    How many did you supervise?

A    I would say probably 20.

Q    All right.  And how many years were you there?

A    Six months.

Q    Okay.  Where did you go after that?

A    Eagle Motor Lines.

Q    Okay.  And where did you go after Eagle?

A    I started my own business.

Q    And what was that business?

A    It was a detail, auto detail business.

Q    Okay.  When did you get back into trucking?

A    2000-, 2001.  No, I'm sorry, that's wrong.  2002.

Q   And where did you work?

A   Land Star.

Q   And what was your position?

A   Driver.

Q   When were you next in a supervisory position?

A   2006.

Q   Where was that?

A   Southern Cal Transport.

Q   And how many drivers are you responsible for in your managerial position at Southern Cal?

A   At that time?

Q   Yeah, at the beginning.

A   Well, when I came back to Southern Cal it was a night dispatch job and you weren't responsible for a fleet of drivers, you were one of two to four people on duty that would just take random calls from whoever called in and handle whatever issue they had.

Q   All right.  Did you --

A   Now, we had around --

Q   Go ahead.

A   I'm sorry.

Q   Go ahead, I'm sorry.

A   We had around 400 trucks at the time and it was a mostly team operation, so I would say there was probably somewhere around 600 drivers.

Q   And I take it you had interaction with dozens and dozens and dozens of drivers?

A   Yes.

Q   Hundreds of drivers?

A   Yes.

Q   Hundreds of interactions?

A   Yes.

Q   How long were you in that position?

A   About four months, three months.

Q   And when you were a driver during the preceding years, did you have interaction with lots of other truck drivers?

A   Some.

Q   When did you start doing -- I'm sorry, what's your current position now at Southern Cal?

A   Director of customer service.

Q   And I take it you were alluding to, on the direct examination, that means you are responsible for communicating with customers about drivers, good and bad?

A   Yes.

Q   And that would involve, I take it, the evaluation of lots of drivers?

A   The job that I was, the role I was in just before this as director of operations was more so that.

Q   Okay.  Tell us --

A   The role I am in now is more directly with the customer.

Q   Okay.  Tell us about director of operations.  How big is Southern Cal now?

A   A thousand employees.

Q   And how many drivers?

A   Probably somewhere around 800, 850.

Q   And how long were you director of operations?

A   Four months.

Q   I mean, it looks like we are not going to get to a precise mathematical calculation, but you would agree from 1998 to date you have dealt with hundreds and hundreds of drivers?

A   Yes.

Q   And you have either known them, worked with them, evaluated them, supervised them?

A   Yes.

Q   Prior to coming here today, did you review the personnel file or any other file on Mr. Bourgeois maintained by any company that he has worked for?

A   No.  We have a new operating system and our old files are archived and without extensive trouble I wouldn't be able to access that.

Q   All right.  So you are testifying today purely out of your memory?

A   Yes.

Q   All right.  Who is the best driver you ever had?

A    Mark and Christine Dennis.

Q    Who is the second best?

A    Jim and Sarah Roaten.

Q    Why are you naming two names?

A    They were teams.

Q    Oh, I see, I see.  Where does Mr. Bourgeois go in that ranking, of all the hundreds of drivers you have been involved in?

A    He was, he would have been in the top 10.

Q    Top 10, as in one, two, three?

A    Top 10, yes.

Q    You testified in response to a question that he was never late.  I wrote down, "Not that I recall."  Is it that he was never late or you don't recall that he was ever late?

A    I don't recall him ever being late.

Q    All right.  Well, that's a hard answer for the record to figure out.  Are you saying he was never late or you just don't, he may have been late but you don't remember?

A    I don't believe he was.  If there was an occasion where he was ever late that was his fault, I absolutely do not remember that being the case.  The way I remember it is he never was late unless it was something that we caused, meaning we put him on a load that he absolutely could not deliver on time.

Q    You said that you never had to repeat any information to

him.  Are we to take that literally, like he never said,

"What did you say," or, "I didn't hear that," or, "Could you

repeat that?"

A   I would say it's possible that there may have been a time

where he didn't hear me and asked me to repeat him, repeat

myself.  There was never a time that he just could not

understand what I was saying to him.

Q   Well, let's break that down now.  Are you saying then

that you would pull out all these instructions,

"Mr. Bourgeois, you have to drive from here to there and you

have to get there in 12 hours and here is the address," and

you pulled out a map?  Did you ever pull out a map and go

over it with him?

A   I've pulled out a map with several drivers.

Q   Okay.  Including Mr. Bourgeois?

A   I don't know that to be true.

Q   You don't remember that?

A   No.

Q   Why don't you remember that?

        THE COURT:  That's not -- Mr. Wiseman, move on.

BY MR. WISEMAN:

Q   During those encounters, is it your testimony that he

never said, "Wait a minute, I don't understand these

directions," he got the directions perfect every time and you

recall that?

A    That's the way I remember it.

Q    Were you responsible for hiring Mr. Bourgeois?

A    No.

Q    In the companies that you were working when he was hired, was there any psychological testing administered?

A    Not that I know of.

Q    You said that he didn't appear to you to be mentally retarded.  Do you know anybody who is mentally retarded?

A    Yes.

Q    Okay.  What does a person who's mentally retarded seem like to you?

A    Are you asking me to explain what I think mental retardation is?

Q    Well, not quite that.  I'm asking, you said he didn't appear to be, I want to know what your understanding is of what a person who is mentally retarded appears like.

A    Someone who had more difficulty understanding reasonable issues, reasonable information, than everyone else.

Q    You said he had no mental deficiencies, or words to that effect.  What kind of mental deficiencies are you including in that statement?  What do you think he didn't have?  He was perfectly fine, perfectly normal?

A    As far as I know, yes.

Q    As far as you could tell?

A    Yes.

Key - Cross

Q   You will have to excuse me because I am not real familiar with some of these trucking issues.  I am not understanding about the whole logging system and the hours and the miles. Are the regulations such that a driver's work in a given period of time is limited by miles?

A   No, it's limited by hours.

Q   Okay.  And I guess the assumption is made that people are going to go no more than the speed limit?

A   You cannot legally log more than the speed limit.

Q   Okay.  And so how is it that a driver, any particular driver, would not log hours, or not work a certain number of hours, how would that come about?

A   Well, if you had a delivery window that was 8:00 a.m. to 8:00 p.m. and because you just didn't feel like working very hard you chose to deliver at 8:00 p.m., then that would be less productive than 8:00 a.m.

Q   Okay.

A   And, understandably, if you delivered at 8:00 a.m. and then got another load, then you would be racking up more miles, more hours, excuse me, than the person that just delivered at 8:00 p.m.

Q   And what are the limits at the time that Mr. Bourgeois worked in your fleet, what were the limits on the amount of hours he was permitted to work?

A   No more than 10 hours without an eight-hour break, no

more than 70 hours in eight days or 60 hours in seven days.

Q   Seventy hours in what?

A   Seventy hours in eight days, 60 hours in seven days.

Q   So, in order to comply with these requirements one has to do arithmetic?

A   That's correct.

Q   Is it more complicated than arithmetic?

A   It's not more complicated than arithmetic but it is, it's almost like trying to be able to dissect a problem, like, like the problem, the math problems you got in school, if Johnny had eight apples and traveled 10 miles, that sort of thing.  It's --

Q   That sounds -- I'm sorry, go ahead.

A   It's kind of like working out a real life math problem.

Q   Okay.

A   It's not just, you know, numbers on paper.

Q   All right.  So, I just want to be clear here, the example you just gave started to sound to me at least like an algebra problem.  Is that what you're talking about?

A   No, not algebra.

Q   Not algebra.  Okay, but you agree it's arithmetic?

A   Yes.

Q   Okay.  And the number of possible entries in the log were on duty, off duty?

A   It's on duty driving, on duty not driving.

Q    How could you be on duty not driving?  What would you be doing?

A    Pretrip inspection, fueling.

Q    Okay.

A    Loading, unloading, standing on the dock having to count product.

Q    So, for example, on duty not driving inspecting, if one did that from 12:00 o'clock to 1:00 o'clock they would write down in their log 12:00 to 1:00 and count that against the hours that you are permitted to work?

A    That's correct.  Not, not against your driving hours, your driving hours were separate at 10 hours, but you couldn't have more than 15 hours on duty, period, accumulative over a 24-hour period.

Q    Okay.  So the on duty hours are more than driving hours?

A    Yes.

Q    And so that had to be kept separate?

A    Yes.

Q    So if Mr. Bourgeois stopped for lunch and spent an hour, his log would have to reflect --

A    Off duty.

Q    -- off duty lunch, one hour?

A    That's correct, and where he was.

Q    The location?

A    Yes.

Q    You mentioned about an orientation program.  Did you conduct that orientation program?

A    No.

Q    Did you attend it?

A    I have attended an orientation program.

Q    I'm talking about the one with Mr. Bourgeois.

A    No.

Q    Did I show up at your place of employment and ask to speak with you?

A    Yes.

Q    And was I accompanied by anyone?

A    Yes.

Q    What was her name?

A    I don't recall.

Q    So, your testimony is that Mr. Bourgeois was ambitious, he wanted to make money?

A    Yes.

Q    Did he ever seem like he needed the money because of pressing financial needs or that he wanted to get rich?

A    I don't believe he ever discussed his reasons for, for that.  I believe it was always just a more miles/more money type of issue.

Q    When he was hired on at the places you worked at and supervised him, were you aware of any prior trucking accidents or suspensions?

A    No.

Q    And, as I understand it from some other witnesses' testimony, there is a, typically a driver record inspection done of some sort?  You guys just don't hire somebody, you check out their record?

A    Yes, yes, MVR.

Q    Do you have any, assuming what I'm telling you is the case, do you have any explanation for why you wouldn't have known about that?

A    That was not, that was not information that I would have needed.

Q    You never visited Mr. Bourgeois' home, did you?

A    No.

Q    Never saw his family, or did you?

A    No.

Q    Ever socialize with him?

A    Outside the office you mean?

Q    Yeah.  Did you ever go the movies with him, a ball game?

A    No, I don't believe so.

Q    So your interactions with him were limited solely to the workplace?

A    Yes.

Q    Okay, I think that's all I have.  Thank you very much, sir.

            THE COURT:  Thank you.  Anything further?

MS. SALINAS:  No, nothing further from this witness, Your Honor.  May this witness be excused?

MR. WISEMAN:  Certainly.

THE COURT:  You are excused, sir.  Thank you.

THE WITNESS:  Thank you.

MS. SALINAS:  Call to the stand -- oh, sorry. Rhonda Davis.

MR. WISEMAN:  Your Honor, while we are waiting for the next witness, could I ask if the Government has obtained any criminal information about any of their civilian witnesses that they could share with us?

MS. SALINAS:  We ran them through on histories, there's nothing but, yeah, we can get that for you.

THE COURT:  Pardon?  Any convictions?

MS. SALINAS:  No, Your Honor.

THE COURT:  Okay.

THE CLERK:  Please come forward.

RHONDA DAVIS, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

MS. SALINAS:  I instructed you about the mike, is that correct?

THE WITNESS:  No, but they told me not to touch it.

DIRECT EXAMINATION

BY MS. SALINAS:

Q   Can you please state your full name for the record?

A    Rhonda Michelle Davis.

Q    And, Ms. Davis, how are you currently employed?

A    I am employed with Buddy Moore Trucking.

Q    And Buddy Moore Trucking is located where?

A    Birmingham.

Q    Alabama?

A    Yes, ma'am.

Q    Growing up, you grew up where, what city, what state?

A    Alabama.

Q    And when you grew up, was your family involved in the trucking business?

A    Yes, ma'am.

Q    Can you tell us a little bit about that?

A    My father was the operations manager for a company called Hall Systems.

Q    And Hall Systems was what kind of business?

A    It was a van trucking business in Birmingham.

Q    Okay.  And when you met Mr. Bourgeois -- did you, do you know somebody by the name of Mr. Alfred Bourgeois?

A    Yes, ma'am.

Q    And when you first met Mr. Bourgeois, where did you meet him?

A    I met him at my father's work.

Q    There at Hall Systems?

A    Yes, ma'am.

Q   And how old were you when you met him?

A   I would say about 12 or so.

Q   And that would have been in, if you can tell us what year?

A   It would be about '88.

Q   Okay.

A   '89, somewhere in there.

Q   And when your dad had Hall Systems, did you ever go to Hall Systems?

A   Yes, ma'am.

Q   Were you there a lot of the time, hardly any of the time?

A   All the time.

Q   And how big was Hall Systems when you were say 10 or 11 years old?

A   It was pretty good size.  It was southeast regional so they had a pretty good, you know, not too many owner/ operators but a good bit of company drivers.

Q   And back in those days did your dad, did Hall Systems have computers to keep track with the drivers?

A   Very, very few computer thing, so my dad had to go usually on a nightly kind of basis.  After we would get through eating and bathing and getting ready for homework, we would go back to work with him.

Q   And when you say we would go back, who would go back with your dad to the terminal?

A    My mother and my sister.

Q    And why would your dad take you-all back there?

A    You know, my mom would cook and so like she would just take food to feed the guard or if somebody was there sitting, you know, a driver or so, and if she had food left over, "Hey, are you hungry?"  "Sure."  "Here's you something to eat."

Q    Is that how you met Mr. Bourgeois?

A    I met him before then but I do recall that he had ate some of my mom's cooking before and --

Q    And did he like your mom's cooking?

A    Yes, yes, ma'am.

Q    And when you saw him eating, did you ever see any problems with him being able to feed himself?

A    Oh, no, ma'am.

Q    And how do you remember Mr. Bourgeois?

A    He was a great guy.  He would --

Q    And --

A    He would always come up to me, he'd call me Boo, and --

Q    He called you Boo?

A    Boo, just commenting, just, "Hey, how you doing?"  He's the type person he would walk in a room and the whole room would just light up, you know.  He just had this charisma about him, just always smiling and those pretty eyes beaming, you know, and.

Q    He's got pretty eyes, didn't he?

A    Yeah, yeah.

Q    Or doesn't he?

A    Yeah.  He would come by my desk, he would give me a hug. He would always, if I wasn't working with my father, you know, because the company split, he would come by and give me kind of a hug and ask me, "How's your pop, how's your dad?"

Q    So you said that you met him when you were as young as, I don't know, 12 years old?

A    That's when I recollect my memory.  I just remember playing games and doing homework and stuff.

Q    Okay.  And you, did you start working for Hall Systems at some point in time?

A    Yes, yes, ma'am.  When I graduated in '95 --

Q    Okay.

A    -- I started working for Hall Systems.  I worked before my senior year during the summer and then I started working full-time after I graduated.

Q    And that would have been in 1995?

A    Yes, ma'am.

Q    Was Mr. Bourgeois still with Hall Systems at 1995?

A    I believe so, yes, ma'am.

Q    And how often would you see him?

A    Pretty frequent, pretty frequent.  We had an office in New Orleans, we had a terminal there, so pretty much every,

everybody kind of said hey, you know.  He was one that you kind over fought over, you know, because he was --

Q    Kind of just like a big family?

A    Yeah, a big family, really, really tight-knit.

Q    Did you-all ever have any cookouts at the, for the company or anything like that?

A    Oh, yeah.

Q    And --

A    We always had like driver appreciation or things like that, you know.

Q    Okay.  When did, when did Mr. Bourgeois leave Hall Systems?

A    I, I cannot recall because when U.S. Express took over he was still working for U.S. Express.

Q    Okay, so that, so Hall Systems got bought out by U.S. Express?

A    Yes, the remaining stocks was bought out by U.S. Express, and then when U.S. Express split I went to another company.

Q    And what company was that?

A    I went to Deaton for the same owner as Hall Systems to take over the van division.

Q    And what was the other split, Deaton's and what?  Oh, it was Deaton and U.S. Express?

A    Hall Systems turned into U.S. Express.  I left U.S. and started at Deaton to start Eagle Motor Lines.

Q    Okay.  And did Mr. Bourgeois follow from Hall's to U.S.
Express to Eagle?

A    Not, not all at once.  We were building up, you know,
clientele and everything.  When I left U.S. Express and then
we started Eagle, later on he came back and worked with,
Eagle was the original owner of Hall Systems so it was back
to the same family and he came back then.

Q    Okay.  So you started Eagle Express in what year?

A    Eagle Motor Lines, let's see here --

Q    Motor Lines, I'm sorry.

A    That's okay.  I think it was like right before 2000.

Q    Right before 2000?

A    Uh-huh.

Q    And do you recall when Mr. Bourgeois went to work for
Eagle Motor Lines?

A    I believe that was going to be about, oh, I guess, about
2001 or say or something like that.

Q    Okay.  And you think he was at Hall's for approximately
how long?

A    Oh, goodness.  Let's see.  From what I recall, I think he
was there probably about, I don't know, I'm just guessing,
about 10 years, I guess.

Q    Okay.

A    I'm not for sure on that.

Q    Okay.  And --

A   You have to understand, is that when you leave a trucking company you still contact somehow through those people, you know, like, "How is so-and-so?"  "Oh, have you heard from Bourgeois, how's he doing," you know, that kind of thing, so it's hard to keep a time line because you still talk about the same people.

Q   Okay.  And Eagle Motor Lines is located where, was located where?

A   It was located in Birmingham.

Q   Okay.

A   And we took over another company in Trussville and moved our offices to Trussville.

Q   Okay.

A   And then moved back to Birmingham.

Q   Now, during the time that you knew Mr. Bourgeois when he was in Hall's, those 10 years in Hall's and then in Eagle Line, did you ever know Mr. Bourgeois to be angry?

A   No, ma'am.

Q   Did you ever notice him to have any outrages?

A   No, ma'am.

Q   Any screaming or yelling fits of anger?

A   No, ma'am.

Q   How would you describe his personality?

A   He's the guy that you would sit down and have lunch with.

Q   Okay.

A    I mean he's just a --

Q    Did you --

A    -- good guy.

Q    Were you able to observe him interacting with other truck drivers?

A    Oh, yes, ma'am.

Q    And how did he get along with the other individuals?

A    I mean he had a laugh that could fill this room.  You knew when he was in the office before he would get to the dispatch room because he would be laughing, cutting up with the other drivers that were around.

        THE COURT:  Did he understand jokes?

        THE WITNESS:  Oh, yes, ma'am.

BY MS. SALINAS:

Q    Did he joke with you?

A    Oh, yes, ma'am.

Q    And how was his appearance?

A    Immaculate.  Let me tell you, there was a girl that I worked with and we always razzed him about how good he smelled, because we always said, "Man, you smell like a million dollars."  I mean everything, the shirt matched the shorts that matched the shoes, you know, it was just perfect.

Q    And what happened if he got dirty?  Do you know what would happen?

A    Oh, it wasn't long and he was finding a shower.  I mean

he just, he was very, he kept a very professional appearance and --

Q    Let me ask you this:  The place, the terminal there where Eagle Motors, Eagle Motor Lines, does it have a washer and dryer?

A    Yes.  Yes, it did.  U.S. Express also had a washer and dryer, yes.

Q    Did you ever see Mr. Bourgeois using a washer and a dryer?

A    Yes, ma'am.

Q    Did you do the laundry for him?

A    No, ma'am.

Q    Okay.  Now, the Eagle Motor Lines, what kind of work were you doing for Eagle Motor Lines?

A    Customer service.

Q    Were you familiar either in Hall's or Eagle Line, Motor Lines, with the paperwork that Mr. Bourgeois would turn in that are related to the trucking business?

A    Yes.

Q    And what would those pieces of papers encompass?

A    When I started out in trucking, they call it gofer work.

Q    They called it what kind of work?

A    Gofer.

Q    Gofer.

A    You know, you just go, you're learning, you're, you go

from one part to another, and so I would go into the billing department and I would strip bills, and so what you do, you open their envelopes that would hold their receipts, truck washes, logs, bill of ladings that were signed, and everything.  Some drivers just kind of --

Q    And you're getting it --

A    -- wadded it up and threw it in there.  Nah, he stapled, everything was with everything, very, there was little staples.  I remember just pulling them out and I'd just fuss at him for just popping so many staples in there, you know.

Q    Okay.  And did you ever have any complaints about his paperwork or him not filling in, you know, the blanks or his signature, the dates or times?

A    No, ma'am.

Q    Now, did he ever speak about his wife or his children?

A    I do recall he used to show pictures, you know, of his children.

Q    Okay.

A    Ever so often, you know, Miss Robin would call in and leave a message for him to call and I would satellite him or something.

Q    Okay.  And Danny Clark, did he know, did you know Danny Clark?

A    Yes, ma'am.

Q    Did you ever engage in conversation with the defendant

about Danny Clark?  Did they get along, do you know?

A    Yeah, I don't, I don't know of anyone that didn't get along with Mr. Bourgeois.

Q    Now, Ms. Davis, does the company or the companies you have worked with, do they ever hire people that have mental handicaps or deficiencies?

A    The company I work with now, they have got a gentleman that just sits in the guard shack and writes down the trailer numbers that come in, but none of the other companies that I worked with, never had anybody with a handicap.

Q    Now, in the years that you have known Mr. Bourgeois, was there anything about his demeanor, the way he appeared, the way he handled the paperwork or the delivery and the pick-ups that, or his interactions with people that caused you to believe that he was mentally retarded?

A    No, ma'am.

Q    Now, did someone from the defense, Mr., go and visit you and interview you back sometime this year?

A    Yes, ma'am.

Q    And who was that?

A    His attorney.

Q    Okay.  You pointed to Mr. Wiseman here?  I don't know if you know his name.

A    Yes, ma'am.

Q    And did he make an appointment to go visit you?

A    No, ma'am.

Q    Can you tell us a little bit about how that encounter occurred?

A    I got a call from Mr. Pena about that I would be receiving some paperwork across the fax to be subpoenaed, and I was like, okay, was talking to him for a little bit, and I hung up the phone and it's just like instantly my phone rang. I mean, bam.  And it come from the lobby.  And I picked up and he says, you know, he, Mr. Wiseman said, "I'm Mr. Bourgeois' attorney and I'd like to speak with you, I'm in the lobby."

Q    At your business?

A    Yes.

Q    In Alabama?

A    Yes.

Q    Okay.  And had he called you prior to that?

A    No.

Q    Okay.  And what happened?

A    Well, I went straight to my boss and I said, "Hey, guys," you know, they were in a meeting, I said, "Hey, I'm sorry to interrupt but I have just been subpoenaed and I hadn't even hung up the phone good and there's someone in the lobby here to speak with me, I don't know what to do, I've never been in this kind of position."  And my boss said, "Rhonda, I wouldn't talk, you know.  If you have been subpoenaed to

court, court is where you handle it, this is a place of

business."

Q    Okay.

A    I said, "Okay."

Q    So did you talk to, did you talk to Mr. Wiseman?

A    I did.

Q    Did he come up to talk to you or did you go downstairs or

to the lobby?

A    No, I went out to the front lobby and I talked to him

and, I don't know the lady's name but she was a mitigation

specialist.

Q    Okay.

A    She's, yeah, she's --

Q    Okay.  Then what happened?

A    Before I went in, I'm kind of picky, I put my iPhone on

record and I slid it in my pocket and I walked out there and

they talked to me, and they wanted to speak with me and I

told them that, "Not at this time, I have been advised, you

know, it wouldn't be a good idea."  And basically said, you

know, "Did you take a test?"  And I said, "Yes."  And he

opened it and said, "Is that it, that's your handwriting?"

And I said, "Yes."  And he said, "I can talk to you at lunch,

I can talk to you on a coffee break," you know.  And I said,

"Well," I thought man, I, how do I get off of this, I mean

because he was real, kind of -- and I said, "Well," and I was

about to say something and then he said, "You know, it's not going to look good on your part if you don't speak with us." I thought what?

THE COURT:  Look good to whom?

THE WITNESS:  Yeah.  I was like what?  I just got, stood back, I said, "Look, I'll tell you what, you call me at 5:00," which I was sick and I had to go like to doc-in-the-box, and they returned my call and I just said, you know, I had spoke with the lady here and I said, you know, basically, "If you would like to speak with me, speak with me there, I've been subpoenaed to court, you know what it says, have a safe trip home and goodbye."

BY MS. SALINAS:

Q   Okay.  And do you know someone by the name of Dr. Moore?

A   Yes, ma'am.

Q   Did you meet Dr. Moore?

A   Yes, ma'am.

Q   Did he go meet with you in person?

A   Yes, ma'am.

Q   And he --

MS. SALINAS:  Your Honor, may I have just a moment?

THE COURT:  Yes.

MS. SALINAS:  I pass the witness, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. LARIN:

Q    Good afternoon, Ms. Davis.

A    Good afternoon.

Q    My name is Elizabeth Larin, I'm one of Mr. Bourgeois' lawyers.

A    Yes.

Q    In the last part you were just talking about the day you got subpoenaed?

A    Yes.

Q    And did you mention that you made a phone call?  You said you spoke to some lady or something?

A    No, after he arrived -- I felt like I was going to be ambushed, you know?

Q    Right, you got the subpoena and you have this visit the same day?

A    No, no.  I felt like I was being ambushed, not by the subpoena and everything in one day.  You know, when the FBI called me they said, "We are going to be in your area at this date, at this time."  They even called and said, "When is a good time for you?  Let me," whatever.  I never got a phone call.  Boom, you're at my lobby, you know.

Q    So when did the FBI call you?

A    A week or so before they had come for the speaking with Dr. Moore.

Q    And then after all that, then you got the subpoena?

A    Yes.

Q    And then you and Mr. Wiseman had that interaction?

A    Uh-huh.  Uh-huh.

Q    Okay.

A    Same day.

Q    So, back to my original question, then you said something about you had a phone call?

A    No.  After he had came, I told him to call back at 5:00 because I was at work, there was no one to cover my desk.

Q    Right, yes.

A    And so I called Officer Pena, I believe it was.

Q    Who's Officer Pena?

A    The gentleman that called me and told me I was being subpoenaed.

Q    Oh, okay.

A    And he told me that I needed to speak with Miss Debbie at the U.S. Attorney's Office, that she would talk to me.

Q    What were you calling about?

A    I have never been subpoenaed, ma'am.

Q    Oh, okay.

A    I didn't know --

Q    I was just trying to clarify.

A    I didn't know what to say, who to say or what to do, you know.

Q   Uh-huh.

A   So I said, "Now, I've been subpoenaed," you know, and she said, "Well, you can, you can speak with them, you don't have to, you can, it's totally up to your decision, or you can wait till court or speak with someone, you know, involved." And I thought, well, if I keep talking about this, I mean it's just, it's draining me.  I mean, I think that test should have said enough if he had a copy of it.  That's my opinions, you know?

Q   Uh-huh.

A   So I just left it like that.

Q   Okay.  And then at any other point, did you talk to anyone after you received the subpoena?  Between you getting on the stand and getting the subpoena?

A   Talking like?

Q   I mean about the Bourgeois case.  I mean not socially to your family or anything like that.

A   Not like talking about Bourgeois' case.  A gentleman that was my boss at the time, Mr. Bill Shaw, you know, I knew that at the time when Mr. Moore and them were here they were talking to the same individuals and --

Q   Uh-huh.

A   I just said, "Hey, have you been subpoenaed?"  "Well, yes, I have."  "Well, me, too."

Q   How about, I meant with the Government, did you have any

other conversations before?

A   Just about flight and when to be ready, how long this will take, you know, take away from my family and my job.

Q   And since you have been at the hotel have you talked to anyone?

A   No.  The only time I talked, excuse me, the only time I talked was late Tuesday, Tuesday night, Wednesday night. Let's see, today's -- I'm sorry, I've been here for so long.

Q   I know the feeling.

A   Yeah.  I think it was Tuesday night that we had talked and, you know, basically said, "Hey, you know, you'll be going," you know, what the whole proceedings is.  Nothing about, like questions about the case or anything.  Just went over what, the notes that Mr. Moore had wrote.  Excuse me, Doctor.

Q   And so you spoke with Dr. Moore sometime this summer then?

A   I believe so.  I particularly don't know the date.

Q   Okay.  And did you meet with him in person?

A   I did.

Q   And that's what you were saying they arranged ahead of time?

A   Yes, ma'am.

Q   Did you ever have a phone call with him or no?

A   He called before and said, you know, "We're going to be,

would you be willing to speak with me?"  I said, "Sure."

Q    And then at some later point you sat down with him somewhere?

A    Some later time they came, they called and said when they was going to be in the area and the date of, "We're going to be here on this day, this day, what day is good for you, what time is good for you," and we set it up.

Q    Okay.  And then in that conversation with Dr. Moore, you talked to him and then you also had a test, did some sort of paper-and-pencil test?

A    Yes, yes, ma'am.

Q    Or evaluation or --

A    Yes, ma'am.

Q    I don't know what to call it.  And did, were you alone when you took, when you filled out that evaluation, or was Dr. Moore with you?

A    Dr. Moore was in the office, it was the same office.  Our office is, it's so full.

Q    It was at your workplace?

A    It was at work.

Q    Okay.

A    And we was in a office and I was on one side of the room on the desk and he was sitting in one chair, like in a chair, like fiddling with his phone or doing stuff.

Q    Okay.  And about how long was your conversation with

Dr. Moore, outside of the evaluation, outside of the paper-and-pencil evaluation?

A   I'd say it was a good about 20 or 30 minutes, something like that.

Q   And do you remember when you heard about Mr. Bourgeois' conviction?

A   Yes, ma'am.

Q   Or even before that, did you hear about the offense before?

A   Yes, ma'am.

Q   Yes.  And were you surprised by that?

A   Yes, ma'am.

Q   Shocked?

A   Yes, ma'am.  I think, I think my dad, my dad was real shocked.

Q   Your dad had known him a long time as well.  And just to clarify, you said you have known him since you were young, Mr. Bourgeois?

A   Yeah.

Q   But you said 1988.  Would it sound correct if I said more like 1991 or '92 or '93?

A   I just remember being really young.

        THE COURT:  You look young now.

        MS. LARIN:  I know.

        THE WITNESS:  I'm 33.

THE COURT:  I don't believe that.

THE WITNESS:  Yeah, 33.  I was real young.  You have to understand, my dad was a diehard.  He, it was our life.  Excuse me.  My dad has had some health problems and --

THE COURT:  I'm sorry.

THE WITNESS:  That's okay.  When you're in trucking it's like a life, it's a family.  You don't have a choice.  It's bred into you.  Either you got it or you don't.  And I took on the family tradition, third-generation being in trucking, you know, so.

THE COURT:  Do you drive?

THE WITNESS:  No, ma'am.  I wouldn't even know how to begin.  But, you know, when you work with someone so long, it's a family.  And my dad, he was just, he was really upset about it.  I got a phone call, and I cannot remember the gentleman's name, he worked for me, and he made the comment that he offered to sell the baby to the gentleman, Bourgeois, and someone else where they were loading, and he said, "Rhonda, I had, I had," he said, "well, I" --

MS. LARIN:  Your Honor, this is very nonresponsive to my question.

THE COURT:  Sustained.  I'm sorry, they made an objection so we will have to move to another question.

THE WITNESS:  Okay.

BY MS. LARIN:

Q   I was actually trying to clarify around what time you might have met Mr. Bourgeois.

A   I just remember that I was very young, you know.  When my dad would come home we would have homework ready, and I just remember --

Q   You were still in school then?

A   Yeah, I was in junior high.

Q   So --

A   Or -- go ahead.

Q   It could be possible that it was more like 1991 or 1992?

A   No.  It was before that because it was at the old Hall Systems building.

Q   So it was definitely at Hall Systems?

A   Oh, yes, ma'am.

Q   So we could look at the Hall Systems records or --

A   Sure.

Q   -- employment he had before to prove --

A   Sure.

Q   Right.

A   I mean you're taking memory of, like, I'm just saying, I just recall being very young.  See, the -- see, what it is, trucking companies move.  As they get bigger they have to have bigger property, bigger buildings, and I just recall it being at this particular building and I recall being that age

and being with my family all together.

Q   Were you familiar with a company called Matlack Trucking
or Matlock Trucking?

A   Huh-uh.

Q   Okay.  So if I told you that he was actually working at
Matlock Trucking in 1991?

A   Unless he left and came back.  I didn't work there, I was
so young.

Q   Right.  Is that --

          THE COURT:  Is it possible, counsel, he worked at
both places?

          MS. LARIN:  Would --

          THE WITNESS:  Drivers move.

BY MS. LARIN:

Q   Not at, at the same time could they work at both places,
or --

A   I've known drivers to quit and come back in two months.
I'm, but I'm not for sure on the time line because I wasn't
working there.

Q   I'll look into my records and see if we can clear it up.
So you have known him a long time.  Were you ever afraid of
Mr. Bourgeois?

A   No.

Q   Did you ever find him to be inappropriate in any way with
you?

A    No.

Q    It seems like you considered him almost a part of your family.

A    He was hilarious.  I mean when he would walk in the room, I have, there was a girl, I have told you, that worked with me, he would come over there and just mess with us, give us a hug, "What you-all got coming out of your area, give me a good load, make sure you get me, get me something good, girl," you know, "Need to get right back, I got to turn it," you know.

Q    And would you try to get him the best loads you could?

A    Yeah.

Q    Were you, was that part of your responsibilities or did you have any control over what kind of loads he had?

A    He's, if you knew, he, the thing about him, he was so good at what he did, period, point blank.  He knew he was good at what he did.  If you had a particular customer or particular thing that most of the time that you would send them through a satellite, you know, information, he would be like, "Nah, girl, just send it to me, you don't have to send me all that stuff, I know exactly what I got to do."  He would be gone.

Q    So you would talk to him more verbally than --

A    Yeah.

Q    And you would just say, "Do this run again," and he would

do it?

A    Oh, yeah.

Q    Would you employ the satellite system to communicate with him on a regular basis?

A    Uh-huh.

THE COURT:  You have to answer with words, I'm sorry.

THE WITNESS:  Oh, excuse me.  Yes, ma'am.

BY MS. LARIN:

Q    Would he ever, would you be the person that if he was having trouble he would call, would you be the person on the phone?

A    It's according if it -- at a certain time line in the company, as it grew it became like driver manager, customer service.  If it had to do with customer service involvement, like a pick-up number or pay or something like that, he would talk to us, or if it had to do with his pay he would talk to the driver manager and such.

Q    And so this is, it's like a whole other world, right? So, when he would get someone --

THE COURT:  We get, in this court we hear about trucking every day.

MS. LARIN:  A lot.  Okay, sorry.

THE COURT:  I appreciate you not understanding it because --

MS. LARIN:  I'm like --

BY MS. LARIN:

Q    When you --

A    It definitely has its own language.

Q    It seems like it does.  When he would arrive someplace would he call you?

A    He, if there was an issue, may it be an odd count, may it be a lump charge, may it be an extra charge for cut-and-shrink, it would be different things, "Hey, Rhonda, get with the customer, they want to charge me 75 but I'll do it for 50," you know?

Q    Uh-huh.  And he would --

A    I can --

Q    He would call you, you would be the person?

A    Yeah, he would call me.

Q    Or would you be one of the people he would call?

A    Anything, I would be one of the people called, but most of the time when it had to do with the customer he would be calling.

Q    Okay.

A    Speaking with me.

Q    So, you say that you worked with him professionally from around, I think you said 1995?

A    Yes, ma'am.

Q    To about 2000?

A    A little bit before 2000 because I, you have to understand that company got completely bought out.

Q    Okay.

A    And they closed that Birmingham office.

Q    And so then you moved on separately?

A    So the gentleman that originally owned Hall, he was going to buy out a company and he placed me there for a buyout.

Q    Okay.  So after 1999, basically --

A    Yes, ma'am.

Q    -- for all purposes, you moved on separate ways?

A    Right.

Q    Okay.  So for about four years you worked with him professionally, no longer, I mean you knew him before then but --

A    Yes.

Q    Okay.  And we are just going to approximate, it sounds like you knew him about 10 years total.

A    Uh-huh.

Q    So could you tell me about how often you would actually see Mr. Bourgeois?  Let's break it up into the two time frames.  From 1995 to 1999 you worked with him.  How often would you see him in that time frame?

A    Let's see, you said in --

Q    In 19-, after you were actually working.

A    Oh, I've worked with him?  Oh --

THE COURT:  I think she's talking about like an average, like once a month, once every six months.

THE WITNESS:  No, no, no.

MS. LARIN:  Exactly.

THE WITNESS:  No, we would see him two, three times a week.

THE COURT:  Okay.

THE WITNESS:  Because we were mostly southeast driven, southeast division, and either he was coming to or going through Birmingham.

THE COURT:  Okay.

BY MS. LARIN:

Q   And whenever he was near Birmingham he would obviously, he --

A   Yeah, check out your, well, while he was there and his truck being maintenanced or something, come in.

Q   Okay.  And prior to that, when he was working for your father's company but you weren't working there yet, how often did you see him?

A   Every, some, couple of times in like two or three months.

Q   Okay.

A   You would see him.  Because he was coming out of the New Orleans office and come through the yard or something and be parked there and come in the office and see our, see our cars and stuff, and he would come in and speak with my family.

Q    Okay.  But on an occasional basis, not a regular basis?

A    No, not a regular basis.

Q    Okay.  And those contacts when you were working with him, the two to three times a week contacts you had, I'm assuming some weeks it's more, some weeks it's less of the --

A    Either it's -- are you talking about visual?

Q    Visual contact.

A    Yes, yes, you would see him like at the window or he would come in and talk.

Q    Okay.  So about how, you know, how long would those interactions be?  Were they at your place of work?

A    Yeah, most of the times he'd stick around for a little bit.  You know, a lot of drivers kind of tend to overstay their welcome in an office and you just, you're overwhelmed, but he never really overstayed his welcome.  He'd come in, "How's your dad?"  "Doing fine."  "Hey, get me a good load." You know, laugh, cut up a little bit, go sit on the couch, wait on his load, because most of the times either they were waiting for their loads to come into Birmingham, like it was preloaded and picked up, or they had to actually go load it in Birmingham.

Q    Okay.  And did you ever have any, I mean it sounds like, you said he would stop by your family's house sometimes, is that right, or your family's work?

A    No.

Q    Prior to when you worked with him?

A    Yeah.  See, what is was, my dad was the operations manager and at the end of the day he would go back after we would eat and shower and get our school stuff --

Q    Homework, yeah.

A    -- and he would go back and go over all his dispatcher stuff, because there was no real computer system.

Q    Right.

A    So he would go over stuff, do OS&D, you know, try to minimize the cost, you know, of hiring other people, so he would just kind of do more stuff there.  And so we would be there with him so the family could be together.

Q    And then you would see Mr. Bourgeois?

A    Yes, ma'am.

Q    And those occasions also were kind of work related?  He was there for work or were you having a --

A    Yeah, he was there, like his truck would be on the yard.

Q    Okay.

A    And he would just come in and say hi, you know, he would see our car and mother would have food, or just, just say hi.

Q    Okay.  It wasn't gumbo, was it?

A    I think at one time it was like red beans or something. I don't --

Q    Okay.  Did you ever, for example, go out to dinner with him?

A    No.

Q    Did you ever --

A    Just if it was, if it was like driver appreciation week they would set out tables and stuff and we would get to sit down and eat with the drivers --

Q    Okay.

A    -- and eat with the personnel and stuff.

Q    Okay.  So you were friendly but you weren't hanging out with him at night or anything on those times?  I mean, he's a little bit older than you.

A    Uh-huh.

Q    Yes.  About 10, 15 years older than you?

THE COURT:  Thirteen years I'm counting.

MS. LARIN:  Thirteen years, thank you.

THE COURT:  He is, Mr. Bourgeois is 46, she's 33.

MS. LARIN:  There you go.  Thank you, Your Honor.

THE COURT:  It was my strong suit, subtraction.

THE WITNESS:  But, you know, you just, I have to say this, some drivers you don't feel very, how can I say it, comfortable in like giving a hug to, because some people see that as vulnerability and they see that they've got you, you're going to do them a favor.  You didn't feel that way with him.  "Girl, come here, um, give me some," I mean he'd get you right in there and give you a big hug, "How's your pop, how's everything going?"  You know, most of the times

you have this barrier, you know, don't let, you know.  He was a really friendly kind of fellow.

BY MS. LARIN:

Q   A friendly person, yes.  Again, you were very surprised that all this happened?

A   Yes, ma'am.

Q   So I'll just briefly move on.  So I would like to mark Petitioner's Exhibit 178, if I can show this to you with this fancy system.  Do you recognize this document?

A   Yes, ma'am.

Q   And can you tell us what this is?

A   It was a test to my ability, to the knowledge that I know of what Mr. Bourgeois, if I ever saw him do the things that I, in this test, or my opinion on what he could possibly do.

MS. SALINAS:  Your Honor, I'm going to lodge the same objection Ms. Patti Booth had to this document, that it not be made public to, made a part of the public record. That it not be made part of the public record.

MS. LARIN:  Your Honor, we have no objection to sealing the transcript or any of the evidence, if you prefer.

THE COURT:  What is that for?  I mean psychologists may have ethics about it but that doesn't necessarily apply to this proceeding, so I am not understanding, I mean we, it's already out.

MS. SALINAS:  Could I just confer for a little bit,

Your Honor?

THE COURT:  Sure.

MS. SALINAS:  Yes, Your Honor, and what I guess we are getting at is that Mr., Dr. Moore's ethics require that he makes an effort to maintain and protect the --

THE COURT:  Okay, I appreciate that.  That is overruled.  There is no trade secret in that or anything, is there?

DR. MOORE:  I'm sorry, ma'am, were you speaking to me?

THE COURT:  No, I was asking Ms. Salinas if there was, and you can confer with Dr. Moore, is there some trade secret in this?  I know we had those WAS or WAIS or something tests that nobody wanted to video because there were trade secrets.  Is this one of those things?  You do better on your own.

MS. LARIN:  I'm learning a lot.

MS. SALINAS:  What I understand, Your Honor, is just that these tests are, they have to be purchased, so they are not available by the doctors and they are not available to the general public and so --

THE COURT:  So you are afraid they, so that's the deal, you are afraid they would be copied and used to the general public to find out how smart the rest of us are?

MR. WISEMAN:  I've got a satchel full of them I'm

ready to --

THE COURT:  You got?  Are you going to sell them on the corner?

MS. SALINAS:  Oh, and I guess it also goes to the fact that you have to have certain qualifications to be able to administer and use those type of, let me think, use them, I guess, and explain them.

THE COURT:  Okay, I'm not -- I don't have any problem sealing it, I'm just not sure why, but I'll do it. Is that all right?

MS. LARIN:  No objection, Your Honor.

THE COURT:  Okay.

MS. LARIN:  So --

THE COURT:  Do you want to offer it?

MS. LARIN:  Oh, yes.  Could I offer this, please?

THE COURT:  Any objection if it's offered and then sealed?

MS. SALINAS:  No, Your Honor.

THE COURT:  Okay, that's P178 is admitted and ordered sealed, after you're finished with it.

(Defendant's Exhibit P178 admitted into evidence)

BY MS. LARIN:

Q   And this is the test that Mr., I mean Dr. Moore gave you sometime this summer?

A   Yes.

Q   And it says here today's date is February 1st, 2002.  Is that the age that he asked you to recollect Mr. Bourgeois' functioning?

A   Yes.

Q   And were you working with Mr. Bourgeois in 2002?

A   I don't -- yes.

Q   You were?  Where were you working?

A   Eagle Motor Lines.

Q   Eagle Motor Lines.  So when, I thought you said that you and he stopped working together in 1999.

A   I stopped working at Hall Systems/U.S. Express.

Q   Okay.  I'm not trying to trick you.

A   Okay.

Q   I'm just trying to --

A   Okay.

Q   In fact, I didn't even notice that till now.

A   Yes.  Just moved on to, you know, another company for the same owner.

Q   Okay.  So in 1999 you moved on and then at some other point Mr. Bourgeois joined you?

A   Correct.

Q   And it was at Eagle Motor Lines?

A   Correct.

Q   Okay.  And so that is, is this kind of the latest date you remember knowing him?

A     Yeah, uh-huh.

Q     Okay.  So at Eagle Motor Lines then, how often did you see him?

A     Weekly.

Q     And what was your position at Eagle Motor Lines?

A     Customer service.

Q     Similar to the prior employment?

A     Yeah.  When we took over that company it was a quick buy-out and it was more like a little bit of manager, customer service kind of slash manager.

Q     And who would you manage?

A     Customer service representatives.

Q     Oh, okay.  So, did you have the same sort of contact with Mr. Bourgeois in your new position?

A     Yes, ma'am.

Q     Would he call from the road and you would talk to him?

A     Uh-huh.

Q     About how often?

A     It's according if he was needing like an advance or if he needed information on a, on an actual customer or something like that.  Most of the times they would talk through their driver manager.

Q     Uh-huh.

A     Which would be like their dispatcher.

Q     Right.

A    Unless he'd come into the office and then he would speak with us.

Q    And he would always, he would make a point probably to say hi or something because --

A    Yeah.  Like I said, there was a young lady that her and I worked and he would always come over there and mess with us.

Q    So was that young lady at Hall or at Eagle Motor Lines?

A    She, I believe she is unemployed and she lives in Tennessee.

Q    No, I mean in 2002.  The young lady that --

A    The lady that was, that worked with me, she worked for Eagle Motor Lines.  We had bought out Howard Hall.

Q    Okay.  And so you said sometimes he would call saying he needed an advance?

A    Yeah, like if he needed an advance on money or something like that.

Q    Do you know about how often that would happen?

A    Not very.

Q    Not very often, okay.

            THE COURT:  Is that, that's not unusual, is it?

            THE WITNESS:  No.

            THE COURT:  For any trucker?

            THE WITNESS:  No.

            THE COURT:  Okay.

            THE WITNESS:  Because they don't want to dip into

their pocket for tolls or --

BY MS. LARIN:

Q   Right.

A   For a lumper.  You know, a lumper is who unloads your truck, so they want you to pay for it so it won't come out of their pocket.

Q   Okay.  So February 1st, 2002, you are still working with Mr. Bourgeois, you see him at least once a week you're saying?

A   Frequently, uh-huh, yeah.

Q   And Dr. Moore advised you to think carefully about your answers and take your time?

A   Uh-huh.

Q   Okay.  So I'm just going to --

        THE COURT:  I'm sorry, you have to answer with words.

        THE WITNESS:  Oh, excuse me.  Yes, ma'am.

        THE COURT:  Thank you.

        THE WITNESS:  Sorry about that.

BY MS. LARIN:

Q   I'm just going to briefly go through this.  So in the area of communication, an area of communication, this first section.

A   Uh-huh.

Q   And it says that you guessed two times, made two guesses.

A    Uh-huh.

Q    Okay.  And the second area, community use -- let me know if you are having trouble seeing this -- said you guessed 13 times.

A    Uh-huh.

Q    So that's 13 out of the 24 questions you made an estimate of what you thought Mr. Bourgeois could do?

A    Uh-huh.

Q    And those are activities that you never actually saw him do?

A    Uh-huh.

Q    And that's why you made a guess?

        THE COURT:  I'm sorry, you have to say --

        THE WITNESS:  I am so sorry.

        THE COURT:  It's not a usual kind of language thing.  I'm sorry, but I have to keep reminding you.

        THE WITNESS:  I am so sorry, I'm so southern.  Yes, ma'am.

BY MS. LARIN:

Q    It's not easy being northern either.

A    Yes, ma'am.

Q    Okay.  So --

        THE COURT:  I feel your pain.  Go ahead.

BY MS. LARIN:

Q    So 13 of use questions you felt the need to make a guess?

A    Yes, ma'am.

Q    Okay.  And then, and then functional academics is the next section and here you, 14 of the 27 questions you had to make a guess?

A    Yes, ma'am.

Q    One of these I was curious about, weighs himself, number 13?  I guess --

A    Yes, ma'am, he has to weigh his truck and sometimes --

Q    Oh, so it's not just your body?

A    -- people want to know a heavy or light weight.

Q    Yes.

A    -- or the weight of the product, and he has to know the weight going down the road or he will get an overweight ticket.

Q    I got it.

A    And then I will be charged, our company would be charged for that.

Q    I guess I read too fast, I was just wondering how you could have seen him weigh his own self --

A    Objects, it said other objects.

Q    Yes.  You read more carefully than I did.

A    Yes, ma'am.

Q    Okay.  So then the next section is home living?

A    Yes, ma'am.

Q    And you had to guess on 16 of the 23 areas and that's

because you had never lived with Mr. Bourgeois, isn't it?

A   No, ma'am, just like it, you know where it says, "Clears the table completely after a meal"?

Q   Right.

A   He's not a messy guy.  I, that's why I said, you know, hey, I would assume he's not a messy person.

Q   Right.

A   Because he was clean with himself.

Q   Right, yeah, I understand those answers.

A   Okay.

Q   I'm just clarifying that you were very careful and you guessed on the things that you didn't know.

A   Yes, ma'am.

Q   Then we move on to health and safety.

A   Okay.

Q   And you guessed 14 of the 20 times.

A   Yes, ma'am.

Q   And then we move on to leisure and you guessed 23 of 23 times, because you knew him in the work environment.

A   Yes, ma'am.

Q   And then we move to self-care and you guessed 17 of 25 times.

A   Yes, ma'am.

Q   And then we move to self-direction, and you guessed 10 times.  And then we move to social and you guessed 11 of the

23 times.  And then in the work, you did not feel a need to guess on the work questions.

A    No, ma'am.

Q    Just a second and I'll check my notes.  Have you ever gone shopping with Mr. Bourgeois?

A    No, ma'am.

Q    Okay.  Have you ever had a conversation about politics with him?

A    No, not that I know of.

Q    Or, or current events?

A    Yeah.

Q    I mean world events?

A    Not, well, we always knew when it was Mardi Gras time.

Q    Okay.

A    Yeah.  He'd make sure.

Q    That's a good point.

A    Like every now and then he'd bring us a king cake or bring us beads or things like that.  You knew when those kind of events were coming around because he would always share it with the office.

Q    So, and I don't know if I can find it right at this moment but if there's a question in here that says that he discussed, he was able to discuss political or current events, is that what you were thinking of?

A    Yeah, current events, yeah, he would most definitely tell

you, "Hey, there's been an accident," or, "I heard that there's something going on, there's going to be something going on in the city, I might have to divert," or something like that.

Q    Mardi Gras.

A    Mardi Gras.

Q    Okay.  But I think there also is a question in here, and I'm going to try to find it, that says something about shopping.  I just want to make sure.

A    I made a comment about how he put his wardrobe together and everything was current.

Q    Right.  No, I'm looking at, in this raw data.

A    Oh.

Q    I mean there's a lot of questions in here, so.

A    That's okay.

Q    I think it's, one of the questions you answered says, "Asks store clerk for help if an item cannot be found."  Did you ever see him interact with a store clerk?

A    No, but I know he had to interact with a store clerk to cash an advance or to pay for his fuel.  If he didn't, we would be charged for the fuel that would be left.

Q    So, but if an item cannot be found.  I know it's kind of a weird question.

A    Yeah, I'm pretty sure he would.

Q    Okay.  You're pretty --

A   I mean if an item couldn't be found, if an item couldn't be found on the actual load slip he would question it.

THE COURT:  Do you have more of these?

MS. LARIN:  That was my last, very last question, Your Honor.

THE COURT:  Okay.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Thank you, ma'am.

MS. LARIN:  Thank you Ms. Davis.

THE WITNESS:  Uh-huh.

MS. SALINAS:  A couple of questions, Your Honor.

REDIRECT EXAMINATION

BY MS. SALINAS:

Q   You were asked, I asked you earlier whether or not, and you testified that in your opinion the defendant, it didn't appear to you the defendant was mentally retarded.  Do you recall that?

A   Uh-huh.  Yeah, I mean, excuse me, yes, ma'am.

Q   And how about slow?  Did you, in your opinion did the defendant ever appear to you to be slow in understanding or in --

A   No, ma'am.

Q   -- in responding to anything?

A   No, ma'am.

THE COURT:  I think I've got some of these clear.

Anything else?

MS. SALINAS:  Okay.  Yes, Your Honor.  I just want to clarify something.

BY MS. SALINAS:

Q   You, a while ago when you were being questioned about why you made your guesses or whether or not you had actually seen the defendant, you actually observed what the question was asking and you said, "Yeah, but I know he had to."  So were you basing, you answered always or sometimes and then you checked guess if you had to, is that based on your observations of him in different settings?

A   Yes, ma'am.

Q   Okay.

MS. SALINAS:  Okay.  I pass the witness, Your Honor. Nothing further.

THE COURT:  Anything else?

MS. LARIN:  One follow-up on that, I'm sorry, to the other.

RECROSS-EXAMINATION

BY MS. LARIN:

Q   So, in different settings, what different settings did you see Mr. Bourgeois in?

A   I saw him when he was through with work or when he was, you know, catching up on his hours and just being relaxed.

Q   Uh-huh.  But in your, in your place of work, right?

A    Yes, yes.

Q    I think we talked about you didn't go outside of work with him.

A    Correct.

Q    Okay.  Thank you.

THE COURT:  Thank you.  Can this witness be released?

MS. LARIN:  Yes, Your Honor.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  You are released.  Thank you, ma'am.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. DOWD:  Your Honor, they're telling me they need a break.

MR. ROBERTS:  Well, Your Honor, the next witness is Dr. Price and it's going to be a long time I think, so.

THE COURT:  God, you-all are such wusses.  Okay, we'll take a 15-minute break.

(Recess at 2:59 p.m. until 3:27 p.m.)

THE COURT:  Would you call your next witness?

MR. DOWD:  We'd call Dr. Moore.  Excuse me, Dr. Randall Price, Your Honor.

MR. ROBERTS:  Your Honor, before he --

THE COURT:  Would you administer the oath.  What?

MR. ROBERTS:  Before he takes the stand, I just

wanted to ask if it was okay with defense if Dr. Moore stays in.  If not, we'll just have him leave.

MR. WISEMAN:  Oh, yeah, that's totally fine.

THE COURT:  Okay.  Would you administer the oath. Thank you.

THE CLERK:  Yes, Your Honor.

J. RANDALL PRICE, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

THE COURT:  You may proceed.

MR. DOWD:  Thank you, Your Honor.  Dr. Price, be very, very careful with the microphone, please, especially with the --

THE COURT:  I think he has been in here listening to that.

MR. DOWD:  Okay.  I just want to be off the hook.

DIRECT EXAMINATION

BY MR. DOWD:

Q   All right.  Now, would you state your full name for the record and spell your last name, please?

A   Yes.  My full and legal name is Jack Randall Price, P-R-I-C-E.

Q   All right.  And how are you employed, Dr. Price?

A   I am a clinical and forensic psychologist and neuropsychologist.

Q   All right.  And how long have you done that work?

A    I have been teaching psychology since 1972 and I have been in the independent practice of psychology and neuropsychology since 1983.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 2 and ask if you can recognize -- did you have a chance to look through this multipage document prior to your testimony today?

A    I did.

Q    All right.  And what is this?

A    It's the most recent copy of my curriculum vitae.

Q    Okay.  Does this accurately reflect your history and your achievements?

A    Yes.

Q    All right.

        MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 2 into evidence.

        MR. WISEMAN:  No objection.

        THE COURT:  Government's Exhibit 2 is admitted.

    (Government's Exhibit 2 admitted into evidence)

BY MR. DOWD:

Q    All right.  And if you could give us the highlights of your, just brief highlights of your education, any professional organizations you belong in, any board certifications you enjoy, how long you have been practicing.  I'll just let you fill that in.

A    Okay.  I have a bachelor's, a master's and a PhD in psychology from the University of North Texas in Denton, Texas, a post-doctoral internship at the Baylor Institute for Rehabilitation, a post-doctoral fellowship from the University of Kentucky.  I am board certified in forensic psychology.  I am board certified in the field of neuropsychology.  I have been in practice since 1983.  I am licensed to practice psychology in the state of Texas and the state of Oklahoma.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 3.

THE COURT:  Where are you teaching?

THE WITNESS:  I am on the faculty at the University of Texas Southwestern School of Medicine as a clinical professor of psychiatry.  I am also a, I have a position on the faculty of the School of Law at Southern Methodist University as a lecturer in law where I team-teach a class in psychiatric and psychological evidence.

BY MR. DOWD:

Q    All right.  And, sir, would you look at the overhead and I'll ask you if you can identify it as Government Exhibit Number 3?

A    I can.  It is a list of all testimony that I have given since 1997 when I began to keep such a file.

Q    All right.  And you reviewed this multipage document

prior to your testimony?

A   I did, yes.

MR. DOWD:  Your Honor, we would offer Government Exhibit Number 3 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry?

MR. WISEMAN:  No objection.

THE COURT:  Government's 3 admitted.

(Government's Exhibit 3 admitted into evidence)

BY MR. DOWD:

Q   And in connection with your past testimony, did you, were you the expert, were you qualified as an expert witness in the Valdez case here in Corpus Christi, the state case that the Court referred to earlier?

A   I was.

Q   And what role did you play in that case?

A   I conducted an evaluation of the defendant at the request of his attorneys and testified in the state case and also in the, in the habeas proceeding after that.

Q   In this court?

A   It was not in this court, as I recall.  But it was, it was on appeal and I testified, but --

Q   Was Judge Jack the judge, presiding judge?

A   I, no, it was a male judge, I know that, and --

Q   Okay.

A    But I don't recall his name.

Q    All right.

THE COURT:  In this case?

MR. DOWD:  In the Valdez case, the state case.

THE COURT:  Oh, sorry.

MR. DOWD:  The state case that the Court had referenced earlier.

THE COURT:  Oh, I had that.  What happened with that case, as you know, it went up, I said it was ineffective assistance of counsel because he was mentally retarded.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And there was no research, no mitigation, no nothing.  So Fifth Circuit reversed me but in the interim the Supreme Court came out with the Atkins case, so, and that case said it should be decided state-by-state, so it went, I think it either went back to me or I sent it over to the State Court to determine the state requirements for mental retardation.  And in fact, everybody's expert apparently testified in that case that he was mentally retarded.

THE WITNESS:  That's correct.

THE COURT:  Including the Government's witnesses.

MR. DOWD:  Yes, Your Honor.  And was --

THE COURT:  So there you have it.

BY MR. DOWD:

Q   Was that the proceeding that you were referring to when you said you testified?

A   It was, yes.

Q   All right.

THE COURT:   But it wasn't a male judge, it was actually Judge Sandra Watts.

MR. DOWD:   Oh, Judge Watts, okay.

BY MR. DOWD:

Q   And, in addition, did you also testify in the Penry case, a significant case in Texas?

A   I did.

Q   All right.  And in what role did you testify in the Valdez and the Penry cases?

A   As an expert in psychology and the evaluation of mental retardation at the request of the defense.

Q   And what would you estimate your practice is, give me a ratio between your work for the prosecution and your work for the defense.

A   Since 1997 it's approximately 55 percent at the request of the defense and 45 percent at the request of the state.

Q   All right.  And how many times have you testified as an expert in neuro and forensic psychology?

A   A total, in the last 13 years since I have kept a file on this, 237 times.

Q    All right.

MR. DOWD:  Your Honor, we would proffer Dr. Price as an expert in neuro and forensic psychology.

THE COURT:  Any objection?

MR. WISEMAN:  Just one question on voir dire, if I may?

THE COURT:  Sure.

                    VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q    Dr. Price, did I hear you say you are a professor of psychiatry or did I mishear that?

A    No, you didn't mishear that.

Q    Okay, you are a professor of psychiatry?

A    Yes, it's, because that's the department at medical school.

Q    I see, okay.

A    And then there is a division of psychology that's under the psychiatry department there.

Q    Okay.  Do you actually teach psychiatry?

A    Well, I don't, no, I teach the field of psychology and forensic psychology, and in the fellowship program for forensic psychiatrists, I've taught classes in that to psychiatrists.

Q    I see.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  All right, then he will be admitted.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Accepted for that.

MR. DOWD:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUES

BY MR. DOWD:

Q    In connection with your duties, Dr. Price, did you have occasion to do a psychological evaluation of Mr. Alfred Bourgeois in this case?

A    I did.

Q    All right.  And in connection with that did you prepare a report?

A    I did.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 1 and ask if you can identify this?

A    Yes.  That is a copy of my report of psychological evaluation in this matter.

Q    All right.  Your Honor, we would -- and is this report accurate, accurately reflect your conclusions and findings?

A    It does.

MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 1 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 1 is admitted.

(Government's Exhibit 1 admitted into evidence)

MR. DOWD:  Thank you, Your Honor.

THE COURT:  You-all have got to stop that.

MR. DOWD:  Don't say thank you?

THE COURT:  Yes.

MR. DOWD:  Yes, Your Honor.

THE COURT:  You're welcome.

BY MR. DOWD:

Q   Dr. Price, let me start with the concept of malingering. Explain what is meant by the psychological term malingering as relates to testing and evaluations.

A   It's defined as intentionally feigning or grossly exaggerating an illness for an external incentive such as compensation, to, possibly to avoid punishment or to lessen punishment in a criminal case, so it's the intentional feigning or gross exaggeration of the disorder.

Q   All right.  And can there be degrees of malingering or feigning?

A   Sure.

Q   All right.  And what is the TOMM test or the Test of Memory Malingering?

A   It is a test that is designed and has been studied to detect or to check to see if someone is feigning amnesia of a type or feigning the poor ability to recall certain kinds of data or information that pertained to them or some event.

Q   So it's designed to see if someone is faking amnesia?

A   Right.

Q   Okay.  And is it a fail-safe method to expose a malingerer in other psychological tests or evaluations?

A   No.  It is a test of effort and it's a very, if a person is faking on that test, it's a pretty good sign that they may be faking in areas other than the memory process, but it's designed to see if they are faking as it relates to their ability to recall information.

Q   All right.  And if someone was found not to be malingering as a result of the TOMM test, would that be proof certain that there is no malingering going on?

A   No.

Q   Why is that?

A   Well, it's one test and to, it's ideal to have several tests that would look at different areas of faking.  It's, it's a pretty transparent test, some people can see through it.  It's very, very easy, and if a person scores much less than chance, they are trying to get the incorrect answer.  So, it's a, it has a, it has a kind of a floor effect that it's for gross exaggeration.

Q   All right.  And as far as obtaining aberrant information or untrue information, is the choice of sources who are providing background history, can that be a further reason for giving an aberrant history of someone?

A    Well, it's a good idea in any forensic evaluation to have collateral information either from the records, if they are, if it's possible to have those, or from talking to other people who are acquainted with the person that you are evaluating to corroborate and to get real world information about how they behave such as, in a case like this, with adaptive behavior.

Q    All right.  And is there a danger or a risk if you limit your background informants to friends and family members?

A    Sure.

Q    And what is that risk?

A    Well, it's common that friends and family have a bias and want to try to help the person, and it can be intentional or it can be just a mindset or response style that they have. Ideally, the people that you talk to as informants are collateral sources, ought to be as objective of individuals as you can find that don't have a reason or don't have the mindset or the response style that can flavor their answers to your questions.

Q    All right.  And if you were told that in Mr. Bourgeois' interview with Dr. Weiner that he had concocted a story about having a head injury from a three-wheeler accident in 1984 which resulted in a coma for one to two months and that his sister, Claudia Williams, corroborated the story and reported to Dr. Weiner that, or, you know, indirectly to Dr. Weiner

that he had been knocked unconscious in that accident and remained in a coma for one to two weeks and only came out of the coma after doctors operated on him, would that suggest an attempt to malinger on the part of Mr. Bourgeois?

MR. WISEMAN:  Your Honor, I'm going to object to the hypothetical as the facts show that Dr. Weiner did not speak with any collateral sources, so it's a hypothetical based on an improper fact or an inaccurate fact.

MR. DOWD:  Your Honor, I said indirectly and it showed up in Dr. Weiner's report.

THE COURT:  Overruled.

THE WITNESS:  Yes, that would be of concern.  In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information.  And it could be a sign that they are trying to present in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

BY MR. DOWD:

Q   All right.  And would that be consistent, would the

ability to make up a story like that and coordinate its telling with another party like his sister, would that be consistent with a diagnosis of mental retardation?

MR. WISEMAN:  Objection to leading, Your Honor.

THE COURT:  Overruled.

MR. DOWD:  Thank you, Your Honor.  Yes, Your Honor.

THE WITNESS:  It would be inconsistent with mental retardation but consistent with a personality disorder or with someone who is attempting to manipulate the results of the evaluation.

BY MR. DOWD:

Q   And what significance would that be as relates to that individual's level of intellectual functioning or adaptive functioning?

A   Well, if it's an informed story or concoction including an accident that resulted in a coma which could be a, certainly a coma for that time period would be a very significant event in a neuropsychological evaluation, because a coma for that long would have a very high probability of ending up in the person having damage to the brain.

Q   All right.  But that, you are assuming that the coma was a reality, that it actually occurred?

A   Right.  And having some knowledge base that that would be interpreted like that would be atypical for someone with low intelligence.

Q   In other words, to understand the effect of the story on the professionals that would hear it?

A   Yes.

Q   Okay.  Now, you also gave Mr. Bourgeois the Mini-Mental Status Examination, the MMSE-II, is that correct?

A   Yes.

Q   And what was his, what was the results of that test?

A   It was a 28 out of a total possible of 30.

Q   And how would you gauge that score as far as his level of intellectual functioning?

A   Well, it's not a test of intellectual functioning.  It's a test of their ability to respond appropriately to questions, they're, if they are in touch with what's going on, if they are alert, if they are oriented, so it doesn't correlate too well with overall intelligence.  The reason for having such a test at the start of an evaluation is to see if they can respond to other things that you're going to do and questions that you're going to ask them.  It's a starting point.

Q   All right.  And what conclusions, if any, did you draw from that test result?

A   Well, that I could proceed with the interview and that he was, he was alert, he was oriented, he could follow directions, instructions, he could respond to questions, he could concentrate, he could pay attention.

Q    All right.  And what was his level of attention and concentration?

A    It was good.  He was certainly -- that he could think about his answers.  He had what I would refer to as a sustained attention and concentration.  The first day was over five hours, the second day close to three hours, and he was there with me mentally the whole time.

Q    All right.  And what conclusions, if any, would you be able to draw from this duration of attention and focus that Mr. Bourgeois demonstrated?

A    Well, he was able to do it.  He was intellectually cognitively able to do that.  He had a lot of energy.  He could persist in being responsive to questions.  And that length of time, to be able to concentrate would be inconsistent with mental retardation.

Q    Okay.  And did you also draw some conclusions regarding his abstract thinking and conceptualization during the interview?

A    During the interview?  Yes.  He was able to conceptualize and to think abstractly about himself, about his legal situation, about his past, present and future, and that was obvious from the interview.

Q    And then, can you compare that to his testing regarding abstraction and problem solving?

A    I can.  In any kind of formal testing, when it was about

something that wasn't personal to him, he was much more concrete in his thinking.  On, proverbs is a part of a mental status exam that we typically give, he was not, he did not give very abstract responses to those, they were concrete. He tended, on questions that were obviously cognitive questions he responded slower, he was more concrete.  He was fairly quick to say that he didn't know, that he had never heard of that.  So novel tasks to him, he was a lot more concrete than as it applied to his own life and his own past, present and future, he was more abstract

Q   And what, if anything, is significant about this inconsistency?

A   Well, it's just good to note that he, like a number of different kinds of people, doesn't test well.  I mean he doesn't, it's harder to get him involved in objective testing.  It's very easy to get him involved in talking about himself, his life, his situation.  It's easy to engage him there.  It's even difficult to, to at times to disengage him from doing that.  But objective testing, he kind of shuts down a little bit.

Q   All right.  Did he discuss the loss of his daughter, the victim in this case?

A   He did.

Q   And what, if anything, did he say about that?

A   Well, he said that it was, it was very sad to him, that,

he told me that he loved her with all of his heart and that he was very upset that she died on his watch.  And he commented that, you know, throughout the interview that, you know, he certainly proclaimed that he was not responsible for it and said that if he did something he did it and that he wasn't going to run away from his responsibility but he didn't in this case.  And that was kind of the flavor of a lot of the interview, to continue to return to the reasons that he was innocent and who was responsible for this, et cetera.

Q   Did he talk about his behavior as a parent?

A   He did.

Q   And what was his reaction with that?

A   Well, he, he said he was a good parent, that he never would abuse any child and he had never abused any child and that he, that his, all of his children, he was close to them and it was very important to him.

Q   And what, if any, significance did you attach to Mr. Bourgeois' discussion of his family and his deceased daughter?

A   Well, and, you know, I can understand his position in this at this time, that he was really, spent a lot of time attempting to portray himself as a good person, and he -- as it related to parenting, as it related to his job, as it related to his spirituality, I mean there was a lot of what I

would refer to and what we call an adult impression management.

Q   Explain to the Judge what you mean by that?

A   Well, he wanted to make a good impression on me.

Q   Okay.

A   And he's, you know, he's very talkative and verbal, as other people have testified to, and he has a certain amount of charm, and he was very cooperative and very pleasant with me the whole, the whole time.

Q   All right.  And is there any, I mean is that consistent with any personality disorders or other psychoses or other --

A   Well, it could be consistent with a lot of things.

Q   Okay.

A   I think that in his case it's, you know, it's kind of a notch above that in that he really portrays himself as a victim and portrays himself as being kind of a special person with a sense of entitlement and with probably, he portrays himself with abilities and accomplishments that are exaggerations.

Q   Okay.  And any conclusions you can draw from that?

A   Well, it, I mean to, you know, to get ahead of your questioning here somewhat I think, but I mean he certainly impresses as having a personality disorder that's longstanding and pervasive.  It has several different features, borderline, antisocial, narcissistic, a certain

amount of paranoia about the legal system, et cetera, that isn't as predominant and is, in my experience, pretty common with a lot of people who are incarcerated.  So, his style in the interview was consistent with that of a personality disorder that's longstanding and pervasive.

Q   All right.  And is this, can you say whether or not this, that presentation is consistent with mental retardation?

A   Well, it is -- his presentation was not consistent with mental retardation.  The most similar thing to that that is talked about in the literature often is this idea of the cloaking of competence or masking where a person with limited intellectual abilities will say they can do things that they can't.  His, in my opinion, really exceeded that and had a different flavor to it in that it was, I mean he would admit when he couldn't do something but he certainly wanted to impress.  And his history and the records, I see that that's been a style of his, to impress others that he's very successful and has been -- even though he has been occupationally.  It was, it went beyond the cloaking of competence.

Q   All right.  Did he admit to you that he was an impulsive person with a bad temper?

A   Yes, he did.

Q   And what's the significance of that?

A   Well, you know, even though he wanted to make a good

impression and he was, you know, had that sort of self-entitlement and grandiosity at times, he also in this interview had times when I thought he was, had some insight into himself and he was being honest.  And he would say things that certainly wouldn't help him in this situation that he's in but he'd say, "Yeah, I am, I am impulsive." He'd say, "You know, I want what I want when I want it." That is how he phrased it.  And he said, "You know, there's a lot of things that make me really angry.  When somebody calls me stupid, when I hear anything about child sexual abuse, I just go off, and I do have that problem."  So, he was variable in that.

THE COURT:  Okay.  I listened to every bit of his interview.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Right?

MR. DOWD:  Yes, Your Honor.

THE COURT:  So why don't we just get to what the problem is.

MR. DOWD:  Get down to the main point?  Okay, Judge.

BY MR. DOWD:

Q    Is that consistent with, that level of introspection consistent with mental retardation?

A    No, it's not.

Q    His relationship with women, sex, what did you draw from,

what conclusion did you draw from that?

A   Well, I think it's part of his personality disorder, that it was narcissistic, it's manipulative and antisocial to a certain extent.

Q   All right.  And as relates to his educational background, did Mr. Bourgeois indicate that he was kind of a self-made man as far as doing schoolwork, things like that?

A   Yes, he, he commented on that he didn't have any help when he was a kid, he had to get it on his own, and, you know, he was proud of that.

Q   Now, he was, he was, do you know if he was ever identified in, as mentally retarded in Louisiana?

A   I found no indication that he was identified as a pupil with mental retardation.  He did receive services that would fall under special education, at least it was in the records from others and he said that he received some speech therapy, so he was identified as needing services but I saw no indication that he was identified as having mental retardation.

Q   All right.  And what about his ability to maintain his finances?  Did he indicate to you he had a secret savings account in Memphis?

A   He did.

Q   And what conclusions, if any, do you draw from that?

A   Well, I mean he was trying to hide some of his funds from

his wife and, who he claimed was the over spender in the family that had caused their financial problems, and so it's, I mean, you know, it was deceitful to her to hide those funds.

Q    Is that consistent with mental retardation?

A    I wouldn't think so, no.

Q    Now, you have touched a little bit about his driving, his work record, and have you thought about that, is his work record consistent with someone with mental retardation?

A    No, it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation.

Q    All right.  Now, you gave him also the Personality Assessment Inventory, the PAI?

A    Yes.

Q    Okay.  But you indicate that this was an invalid profile?

A    Yes.

Q    And why is that?

A    Well, it came out that it was invalid in the scoring due to something, that he didn't pay attention to the items closely, and that gave on the computer interpretation several possibilities, that he didn't understand, that he was confused or disoriented, that he couldn't read the level that's required for the test or that he was careless, and my opinion is that it was carelessness and not paying enough

attention.  He had produced valid personality inventories in the past.  I saw those in the record.  His reading ability is certainly high enough that he could read it.  I timed the test or I went back and analyzed that and he had times that he would speed up and times that he would slow down.  At the first, at the very start of the test, usually people go slower at the very start because they are figuring out kind of how this works with the false, somewhat true, mainly true, true, and they usually go slower as they're figuring that out and getting accustomed to it.  I gave it to him and had to go to the restroom and when I watched the tape he was going very fast at the start.

Q   While you were absent from the room?

A   Right.  He slowed down some but then he sped up at other times, and overall he --

Q   While you were in the room?

A   Yes, yes.

Q   So he was going slow and fast?

A   Yes.  Yeah, he --

Q   Throughout the testing?

A   It was variable but --

Q   Okay.

A   Overall, he only spent an average of seven seconds per item, which just is not paying careful attention to the item and what it's asking you.

Q   All right.  If Dr. Swanson testified that his speeding up on the PAI when you left the room to use the bathroom was evidence of masking, do you concur with that evaluation?

A   No.  I mean he sped up when I was in there, too.  I mean it's -- and he had the ability to read and to respond to those, but for some reason he didn't when I administered this.

Q   Do you attribute that to malingering on his part?

A   The test did indicate that, you know, there were a lot of his answers were on negative impression management, but I don't, I would not say that it's malingering.  I would say that it's not putting forth full effort and carelessness. You know, if he had tried to malinger a mental disorder on the test, it wouldn't look like his did.

Q   Okay.  So you think it's more carelessness and lack of effort?

A   Yes, sir.

Q   All right.  If the test had been performed successfully, what would it have been able to tell you?

A   Well, it would have pointed to if there was a mental disorder such as anxiety, depression, phobias, schizophrenia, and there's personality disorder scales on the PAI --

Q   Okay.

A   -- that could have been, it could have shown or added or taken away evidence from that.

Q    Okay.  Now, you watched all of the, I know you were present when you evaluated and interviewed Mr. Bourgeois, but you went back and watched the video of it?

A    I did, yes.

Q    All right.  Are there any, any segments of the video that you think are significant as far as assisting you in evaluating Mr. Bourgeois?

A    No, I wouldn't point to any particular parts.  I know the, one thing, just his style of interacting at the beginning and then at the end, and I know that when I came back the second day that he had thought about something that I had said and he commented on that and --

Q    Explain that to the Judge.

A    -- I thought it was significant.

Q    Explain that incident to the Judge.

A    Well, the first day I had said something in the interview, that I had seen some testing in the file and that he was a pretty good reader, and he and I discussed, and this was interesting, too, the Bible.  I've had a lot of inmates tell me that they spend a lot of time reading the Bible and I usually ask them questions about that, which I did with Mr. Bourgeois, and he answered them.  He and I talked about how the Bible is organized and the Old Testament and the New Testament and his plan for and how much time he spent on it.  Some of the books of the Bible he quoted some scripture, gave

me the reference.  I checked them that night and he was correct.  He and I talked about the difficulties that both he and I have had with the King James version and how there's versions that are much easier to understand.  So, you know, he had been reading the Bible.  So I --

Q    And comprehending it and remembering it?

A    Yes.

Q    All right.

A    So I commented on that I had seen the test scores, that he was a pretty good reader, and so the next day he commented on that and he had thought about that, that he wasn't really that good of a reader, that it was difficult and that he also wanted me to understand that he had to have help on things at times, had to have help from his brother on projects.  He, when he was going to buy a house or a car he would take somebody or ask somebody to explain things about the financing, or he would take them to help him to understand the contract that he was going to sign.  So he wanted to make sure that I understood that and I wrote that down and --

Q    Did you find that significant, that he would come back the next day and correct any compliments that you gave him?

A    Yes, I did.  It was a, it was a very positive -- I thought, and I believe he did, too, that the first five hours that I spent with him, it went really well except for him being careless on the PAI.  I mean he responded to my

questions.  We, I thought it was a good interview.

Q    Uh-huh.

A    And I did throw in a couple of things like that about the reading, and I think he started thinking about it and when I came back the second day he seemed a little down at first and I asked him, "What's the matter," and, you know, he said he hadn't slept and he had, you know, he didn't like, you know, he didn't like doing this, and that, you know, he, I think he had thought about it and what the purpose of it was and I think it flavored his view of it for a while.  But then, you know, he became engaged again on the second day and we finished up and he was very cooperative and pleasant and got very talkative again.

Q    What, if anything, did you think he was trying to accomplish when he corrected you about his good reading the next day?

A    Well, I think he understands what this is about and was, you know, that he would slip and talk about things that he had done and what he understood and he wanted me to make, I think that he wanted to make sure that I understood that he had to have help on things and he wasn't, you know, as intelligent or accomplished as maybe I thought that he was.

Q    All right.  Now, you also reviewed the WAIS-R that was administered by Dr. Weiner on February 28th of '04, is that right?

A    I did, yes.

Q    All right.  And you, in your report you comment that there was some scatter.  First of all, what is scatter -- among the subtests.  First of all, what is scatter and how is that significant?

A    Well, I did comment in the report there was scatter on the subtests of the WAIS-R.  There is also scatter in the other neuropsychological tests that were administered in 2004.  There are some very low scores, and if we kind of keep this to, either to percentiles or what we refer to as standard scores and you can see, but if you look at the subtests on page 6 of the report, he had some subtests where he scored at the first percentile.  That would mean that 99 percent of the people in the normative samples scored higher than he did.

Q    Uh-huh.

A    And on other subtests he's at the 16th percentile and even the 63rd.  With mental retardation there tends to be more of a flat profile.  While, of course, people with mental retardation can have strengths and weaknesses, on cognitive testing there tends to be a flatter profile.  Comparing, again with the scatter idea, in comparing his performance on the IQ test of 2004 with the other tests that he took, especially those of abstract thinking, his abstract thinking, his ability to plan and think ahead was higher, according to

my analysis of the data. I used more current norms than were used in 2004 by Dr. Weiner, who used some very outdated norms on interpreting that. I used the norms that had been more recently published that break it down to age and education. So if you compare him to people of his age and education, his performance on those tests, the category test, the trails test, it's not, not deficient, in fact it's average to low average on those, which is higher than his IQ. He has the ability to think and cognitive abilities that exceed his intelligence as it's measured here.

Q   Okay. And did you make the same observation in analyzing the WAIS-III that was administered by Dr. Gelbort in 2007?

A   Yes, and you see the same thing, that there are, tend to be lower scores. It's a newer test. He scores lower on verbal tests or subtests than on those that weren't so verbal. His deficient performance was on the verbal subtests and, but you see the scatter from the 1st percentile to the 63rd and the 25th and 16th, and, again, in comparing his performance on the IQ test with the neuropsychological tests that were scores of 85 and 101. So, when you are comparing apples and apples here, his cognitive abilities exceed his measured cognitive intelligence.

Q   All right. And again, is that consistent with mental retardation?

A   It's inconsistent with mental retardation where you would

see more even cognitive abilities across the board.  What it's consistent with is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation.

Q    All right.  Did you compare Dr. Weiner's trailmaking test in 2004 with that given by Dr. Gelbort in 2007?

A    I did.

Q    And do you have any, did you find anything significant about those, the different score he received?

A    No.  They're at the same level.  Again, transferring those to standard scores where the average is 100, so that we can keep this straight, and of course abilities, et cetera, at the mentally retarded level or the impaired level are below 70.  The trails test that he took in '04, the standard scores were in the 90s and in '07 it was at 101.  Those are equivalent, at the same level, at the average level.

Q    All right.  And what about whether or not that suggests, his score suggests organic brain dysfunction?

A    Well, those kind of scores do not suggest organic brain dysfunction.

Q    Or any frontal lobe deficit?

A    No.  Even though there's not really a true

neuropsychological test that isolates the frontal lobe of the brain, some people say that the category test does but it's, it involves all areas, the overall integrity of the brain, as does the trails, but they have been talked about as being mainly frontal lobe controlled.  But his performance, compared to people of his age and education, is low average.

Q    So if we heard testimony that a test can actually suggest to the doctor what part of the brain is suffering the deficit, you are saying that that's not settled science?

A    Well, I was taught that in the '80s and there was a lot of effort put on what we refer to as localization, to take different scores and be able to correlate those to different areas of the brain, but since then we have kind of given up that task in neuropsychology.  Part of the reason is it just didn't hold up scientifically, and there's better ways to localize things in the brain with new medical techniques that can image the brain and that's what they're working on at this time, and people in my field don't turn to the neuropsychological tests except for gross things like language, non-verbal abilities and the two hemispheres of the brain.

Q    But not behavioral?

A    Not the anterior part of the parietal area.  It just hasn't held up.  And for most of the tests we have it requires the whole brain or many parts of the brain.  They

don't isolate.  Our tests require complex abilities that is mediated by the overall integrity of the brain.

Q   All right.  So whether Dr. Gelbort localized the deficit in the frontal lobe and Dr. Weiner localized the deficit in the posterior lobe, your testimony is that you can't localize it anywhere?

A   That's correct.

Q   All right.  Now, you also, you didn't do a complete adaptive functioning evaluation, did you, Doctor?

A   No.

Q   But you did make some observations on adaptive functioning from -- how many hours have you spent with Mr. Bourgeois?

A   Well, approximately eight to nine, although a lot of my observations about adaptive functioning came from the records.  We split up the duties in this case and mine was mainly to look at the cognitive and the neuropsychological aspects.  The adaptive behavior evaluation was to be done by Dr. Roger Moore.  So mine come from the observations in the interview that I conducted and the records as well.

Q   All right.  I'm just going to ask you just a couple of points.  You indicated that, "The mental retardation is not necessarily a life-long disorder.  His adaptive skills may develop to where the subject may no longer have the level of impairment required for a diagnosis of mental retardation,

especially in cases of mild mental retardation." Explain to the Court what you meant by that.

A   Well, it's really important to look at adaptive behavior, everyday tasks, completion of things to adapt to the environment, to live independently at different ages. The reason this is so important is that it used to be not such a part of the definition of mental retardation and so children were identified as mentally retarded on the basis of an IQ score alone. When -- that related so much to their academic abilities and their cultural deprivation, but you put them in their environment that they were used to, that they had to live in, and they didn't have the problems there, they only had the problems in school. And so that really became a social issue to not over identify culturally deprived children as mentally retarded, instead to look at their day-to-day functioning as well, and it continues to be a huge part of the diagnosis of mental retardation to look at adaptive behavior.

Q   All right. And what observations can you make in this case regarding any, in the duration of any adaptive functioning deficits on the part of Mr. Bourgeois?

A   Well, my evaluation of him, I didn't find any significant deficits or impairments in any adaptive behaviors at this time or the time just before he was incarcerated. I mean he certainly, I didn't see any problems with communication,

either verbal or written, with care of himself, personal hygiene, clothing, et cetera, taking care of house and home. With his social skills he's, he has really well developed social skills.  We have heard from people that have interacted with him outside of an evaluation, too.

Q   Did you read any of his writings?

A   I did.

Q   What type of writings did you read?

A   I had a lot of letters, some legal documents that he prepared.

Q   Did you look at those today?

A   I did.

Q   I mean you've seen them before but did you look at them again today?

A   I did, yes.

Q   Is that Government's 23 through 26?

A   Yes.  And they are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes.  He can express himself in complete thoughts, and very detailed complete thoughts.

Q   Did you, did you -- I didn't mean to cut you off but did you also ask him to write a statement on, during the interview?

A    I did, yes.

Q    All right.  Let me show you what's been marked as Government's Exhibit Number 14 and ask if you can identify that?

A    Yes.  That's the paragraph that he wrote when I evaluated him.

Q    All right.  And did you draw any conclusions from watching him write this?

MR. DOWD:  Judge, we would offer 14 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 14 admitted.

(Government's Exhibit 14 admitted into evidence)

THE WITNESS:  Yes.  That, part of the reason for me to do that is that in doing evaluations with individuals who are incarcerated and there's writings in those case files a lot of the time, and the complicating factor that you have to look at is did they have help and how long did it take them. Yes, it may look good but did they, they have plenty of time, obviously, and did they just spend so much time on this that it looks as good as it is.  So, I mean, I thought that he wrote that in a normal amount of time.  His handwriting is good.  It looks, I'm not a handwriting expert but it appears to me to be similar style to the other writings and letters that I examined.  And it's inconsistent with mental retardation to me.

Q   All right.  And how many letters did you read authored by Mr. Bourgeois?

A   I didn't count them.  A lot, though.

Q   A lot?

MR. DOWD:  Judge, we would offer Exhibits 23 through 26, which were the, referenced by the Doctor, the legal writings he reviewed to make his decision.

MR. WISEMAN:  No objection.

THE COURT:  Government's 22 through 26 are admitted.

MR. DOWD:  23, Your Honor.

THE COURT:  I'm sorry, through 23.

MR. DOWD:  23 through 26.  23, 24, 25, 26.

THE COURT:  23 through 26.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Admitted.

(Government's Exhibits 23 through 26 admitted into evidence)

MR. DOWD:  Thank you.  Yes, Your Honor.

BY MR. DOWD:

Q   And can a low score or a low performance in one of these adaptive skill sets be the result of a character trait not related to his level of intellect?

A   Sure.  There's many things that can cause a person, that can lead or be associated with an adaptive deficit. Certainly individuals with a mental illness have problems

with living independently at times.  Certain, as you said, character traits or personality traits by their very nature in a personality disorder are maladaptive.  It's not in the best interest of the person to run up credit cards and to impulsively buy things but that doesn't, that's not, that's a personality disorder trait or it's a maladaptive personality trait in this case and others, in my opinion.

Q   What about impulsivity in general, is that consistent with mental retardation?

A    It can be.  Yes, it can.

Q    Can it be, is that consistent with a number of issues, personality disorders?

A    It sure is.  It's one of those traits or findings that, it can be associated with many things, with mental illness, with personality disorders.  Some individuals with mental retardation are impulsive and aggressive, but that doesn't, it's not exclusive to them by any means.

Q    All right.  Now, Dr. Gelbort has attributed his impulsivity to an organic deficit within Mr. Bourgeois' frontal lobe, Dr. Weiner attributes it to organic brain damage in his posterior lobe, and you are suggesting that it's the result of a, his personality disorder?

          MR. WISEMAN:  Objection to leading, Your Honor.

          MR. DOWD:  This is all in the record, Judge.

          MR. WISEMAN:  Still leading.

THE COURT:  Overruled.

BY MR. DOWD:

Q    That's the million dollar question, Doctor, how can we determine what the source, whether this impulsivity is a symptom of mental retardation or it's the result of a personality disorder?

A    Well, you take all the information into consideration, of course, and you look at, if it's an organic problem, if it's brain dysfunction, at least impulsivity, the impulsivity shows up in many areas of their life.  They walk off of jobs, they spend too much money, they get in fights with people, they get mad at people on the highway, they steal things that they want, and it's not, it's discretionary or discriminated in certain areas of their life.  The same with mental retardation, it's going to go to a lot of impulse control problems, not controlling themselves in a wide variety of areas.  You know, his impulsivity relates to certain issues in his life, to the sexual abuse that he experienced, to his problems with women, and so it's, it relates to personality issues.  He has problems, to be sure, and it's related to those but they are personality trait issues, not organic brain dysfunction or retardation.

Q    Okay.  Now, Dr. Gelbort indicated he gave the Halstead category test where Mr. Bourgeois got 30 of 40 wrong which is, he scored at chance, because it's a four-choice multiple

choice test, and he suggested that that was demonstrating that Mr. Bourgeois was not malingering because he scored exactly at chance.  Is that, do you agree with that assessment?

A   Well, it's an unusual way to put that.  If someone, if the mistakes they make on a test exceed chance, in other words, that's really evidence that they are intentionally trying to get things wrong, that's malingering, so I would agree with him on that, but scoring at chance is associated with careless, sub optimal effort, not putting forth good effort, with not trying hard.

THE COURT:  Malingering.  Malingering.

THE WITNESS:  Well, except it's not intentionally trying to get the wrong answer on easy things, it's just not trying, and so it's a form of malingering.

THE COURT:  Okay.

BY MR. DOWD:

Q   Now, the WAIS-R was developed in the 1980s, is that right?

A   The WAIS-R was normed in 1978, '79, published in 1981.

Q   Okay.  When did it become outdated?

A   In 1997 the WAIS-III was published and so certainly by that time.

Q   And why are new tests or newer editions of the test created?

A   Well, things change in our society and updated tests not only are more appealing to people, it gets their interest, but we have discovered that the norms on tests become outdated.  It's happened on the SAT, on the GRE, where they have to come in every so often and re-center it or update it. And it's the same thing here, that older tests, the norms tend to become outdated and inflate the score that the person, or that it might -- it inflates the scores of the group.

Q   All right.

A   That's pretty well established.  Which, as to whether or not it inflates that individual's score or not, there's a lot of people in the group and you don't know that.  But the norms, the way to make them accurate is to --

Q   Revise the test periodically?

A   -- is to revise the test and to re-norm the test.

Q   And would you ever give an outdated WAIS test, the WAIS-R or WAIS-III?

A   I can't think of a reason to do that.

Q   And why is that?  What would be the impact of giving an outdated test?

A   Well, it might affect the results.  It might inflate the results.

Q   All right.  Explain, short version, the Flynn Effect to the Court.

A    That's, actually it's part of what I'm talking about here.  The Flynn Effect is named for actually a political science professor in New Zealand who has studied this inflation of IQ scores over time and has found that in large groups of people on various IQ tests that there has been a relatively consistent trend for the inflation of the IQ in the group to be about three points for ten years after the norming.  So we need, even though it hasn't been consistent on all IQ tests, like the WAIS-III it wasn't consistent, and it's, some have written that it may not continue to do this, they don't know the reasons for it.  I mean, I don't think it's very evident.  In society, I'm not sure that I've noticed that people are smarter than they used to be but IQs, the measurement of intelligence as it's measured on IQ tests, have this trend with outdated --

Q    Are going up?

A    -- norms, yes.

Q    All right.  And do you believe that it should ever be applied in evaluating someone's IQ?

A    Well, I think it should be considered and noted when you are using a test that's older.

Q    Uh-huh.

A    To recognize that that score might be inflated.

Q    May not be reliable.  All right.

A    There is a controversial application that where, that

some people are advocating, especially in high-stakes decisions like this, to actually recalculate that individual's IQ score using the Flynn Effect and how long ago the test was norm.  That's controversial, it's not used other places, others say it's not the standard of practice to change somebody's IQ score, but I think we should consider that and note it in the interpretation of an old IQ score.

Q   All right.  But as far as the actual mathematical formula in which you reduce it according to the number of years the test has been, become outdated, you're saying that's a controversial theory to apply that formula?

A   That's correct, and at this time is not the standard of practice, but it's controversial and some think that it should be, especially in cases like this.

Q   How much credence would you -- you are familiar with Dr. Estrada?

A   Yes.

Q   The psychiatrist, a local psychiatrist here that evaluated Mr. Bourgeois for competence and insanity prior to the trial?

A   Yes.

Q   And you have read his material?

A   Yes.

Q   All right.  And you, he had indicated that he thought Mr. Bourgeois was above average intelligence.  Would you --

but he didn't give any IQ test.  Would you discount Dr. Estrada's opinion or how much credence would you give to Dr. Estrada's opinion?

A    Well, I don't think that he's of above average intelligence, but his clinical presentation, you talk to him and he can come across that way.  His expressive vocabulary, his verbal abilities, his ability, his social skills, et cetera, he certainly comes across as being more intelligent than his cognitive IQ scores show him to be.

Q    All right.  Dr. Weiner concluded from his, from the category test that, a test for new and unfamiliar learning situation, that Mr. Bourgeois' 94 errors, which he characterized as a very low score, indicates a tendency to exhibit inappropriate behavior under stress.  Did you review that finding?

A    I did.

Q    Okay.  And are you, do you concur with that?

A    No, I don't.  His category score, when compared to people similar to him, is equivalent to a score of 78.  Not a good score but not impaired in the borderline range.  But I don't know, I have never seen that interpretation of the category test, that under stress that it can affect a person's behavior like that.  It's a test that can be stressful.  It's something a person has likely never seen before.  It requires abstract thinking.  It requires the ability to problem solve.

It is not an easy test by any means, one of the harder tests that we give in neuropsychology.  But as far as its extrapolation to everyday life, I think it relates more to cognitive intellectual abstract thinking as opposed to the person's day-to-day function.

Q    And do you agree with Dr. Toomer's evaluation that Mr. Bourgeois suffers from a schizoid personality disorder?

A    No, I don't agree with that.

Q    Why is that?

A    I, the only place I saw any indication of that was that he was given an MCMI, which is another personality test, and it suggested that.  Where that came from, I don't know.  Any mental health professional that talks to him, he seems to me to be the opposite of a schizoid.  A schizoid is kind of a loner, quiet, doesn't like social interaction, uncomfortable with other people, far from the way Mr. Bourgeois is.

Q    And Dr. Toomer's evaluation that Mr. Bourgeois suffers rage reactions, acting out mini-psychotic episodes, secondary to his borderline personality disorder, and Dr. Cunningham referring it to his impulsive attacks of rage, do you agree with those assessments?

A    I agree that he has features of a borderline personality disorder, which is an unstable personality.

Q    Uh-huh.

A    I agree that some people with unstable personalities act

out in angry and aggressive ways that are not normal, and I believe Mr. Bourgeois has done that.  I don't, it isn't, though it's directed at certain things it doesn't appear to be, to come out like on the highways, et cetera, just in -- so, you know, I don't think it's organic but I do think it is associated with his unstable personality.

Q   All right.  And finally, would the, Mr. Bourgeois' plan, long-term plan to have witnesses or agents involved in the case killed over a period of time and take steps to attempt to carry that out, would that be consistent with suffering from a rage disorder or a mini-psychotic episode?

A   No, I think that would be consistent with antisocial psychopathic traits and features.

Q   All right.

MR. DOWD:  Judge, I -- oh, one moment, Your Honor. Pass the witness, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Price.

A   Good afternoon.

Q   Where did Mr. Bourgeois get his unstable personality?

A   I think it came from his early childhood experiences.

Q   His abuse?

A   That's usually -- personality disorders start early in

life.  Borderline personality disorder traits are oftentimes associated to childhood abuse.

Q   Neglect?

A   Yes.

Q   His deprivations?

A   Yes.

Q   His abandonment?

A   Yes.

Q   His poverty?

A   Could be.

Q   His impoverishment, cultural, spiritual, economic?

A   That more to his cognitive intelligence, but in general childhood abuse and neglect and abandonment are typically associated with a borderline personality disorder.

Q   So you agree then with Dr. Toomer, Dr. Cunningham, Doctor, I can't remember all the doctors, about those features, about that fact, that his borderline personality derives from his abusive childhood?

A   I do.

Q   I want to actually start at the beginning.  You have given us a lot of information here and I'm trying to organize it in my own mind.

THE COURT:  I'm sorry, are you eating something?

THE WITNESS:  It's a throat lozenge.

THE COURT:  Okay.  Well, why don't we just wait

until he finishes chewing and we will continue.

THE WITNESS:  I'm sorry.  Okay.

BY MR. WISEMAN:

Q   Sir, as part of your Mini-Mental Status Exam you asked Mr. Bourgeois to draw a geometric figure?

A   Yes, that's correct.

Q   All right.  And the instructions from the data say, "Display intersecting pentagons," and those are the two printed pentagons?

A   Yes.

Q   And it says, "Tell the subject to please draw this design, please copy this design," and it says, "Score one point if the drawing consists of two five-sided figures that intersect to form a four-sided figure."  And I just want to, I sort of highlighted all of that.  I myself got outside the lines.  But you will agree that what Mr. Bourgeois drew was a five-sided figure?

A   Yes, it looks like it is a five-sided figure, yes.

Q   So you should have scored him at a zero for that?

A   Probably so.  It did intersect but it does look to be a five-sided figure.

Q   Okay.  And on the score sheet here we can see that you have in fact scored him one.  It should have been a zero?

A   I'll agree with that.

Q   Okay.  Do you have an explanation for that error?

A    No.

Q    You explained to Mr. Bourgeois at the beginning of your evaluation that you were here on behalf of the Government and you basically Mirandized him, as psychologists do in these settings, is that right?

A    Informed consent, yes, sir.

Q    Okay.  And as part of that you started to tell him that if he were to reveal to you any abuse that he committed against others that you would have to be, you were obligated under the ethics of your profession to report that to law enforcement?

A    Yes.

Q    Did he --

A    If it hadn't been previously investigated.

Q    Right.  And he didn't understand that, did he?

A    He had questions about that part, yes, sir.

Q    Okay.  He didn't understand it?

A    Well, I think he came to understand it but he didn't, he had questions about it.

Q    Did he come to understand it because you took some time explaining it to him?

A    I think so, yes.

Q    All right.  But basically when you told him that you would have to report his abusive conduct that was previously undisclosed, he thought you were talking about his abuse, him

being abused as a child?

A   Yes, as I recall, he did, and we discussed that.  And it would have been that, too, I mean, but he did think it was about his abuse as a child and he was explaining that he had told people about it.

Q   Why isn't that in your report?

A   I, after explaining it to him I thought that he understood it.

Q   I want to play an excerpt from your evaluation.  Easier said than done for me.

THE COURT:  What are you -- are you trying to play a part of the video?

MR. WISEMAN:  Yes, Your Honor.  I am not sure how to get this thing started up.  I'm sorry, I just put a DVD in.

(Off the record discussion at counsel table)

THE COURT:  I still haven't watched Price 1 and 2.

MR. WISEMAN:  Well, this is from Price 1 and 2 so you might find it --

THE COURT:  I didn't have time to do it last night.

MR. WISEMAN:  Well, you might find this interesting.

THE COURT:  But I will do it.

MR. WISEMAN:  No doubt.

(Mr. Wiseman conferring off the record with clerk)

MR. WISEMAN:  Now, watch this closely.

(Video playing)

DR. PRICE:  "If there's any discussion or if you were to provide any information about any elder or child abuse that hasn't been previously talked about that was new information, then I would have to report that if it hadn't been investigated already.

MR. BOURGEOIS:  "When you say investigated, you mean prior to trial or after trial?

DR. PRICE:  "Either one.

MR. BOURGEOIS:  "Okay.

THE COURT:  "Either one.  If it was something that there wasn't anybody ever heard of it, you know, and it was new, then I'd have to report it.  Of course, it's going to be on tape anyway, if that were to come up.

MR. BOURGEOIS:  "Okay.  Well, so far as the child abuse, it wasn't reported because the trial counsel that I had, they never talked to me about any of this, you know. All of this is new.  Now, the counsel that I have now of record, when they came down it was a whole different ball" --

(Video stopped)

MR. WISEMAN:  All right.  I --

THE COURT:  I have to tell you, I didn't understand it that way.  I understood that he might be talking about any child abuse, from Mr. Bourgeois or perpetrated by Mr. Bourgeois.

MR. WISEMAN:  And you are the fact finder.

THE COURT:  I didn't understand it.  I may have missed the beginning but I just, I under- --

MR. WISEMAN:  Well, Your Honor can watch.

THE COURT:  Okay.

MR. WISEMAN:  And I think that the Doctor has already agreed that he misunderstood the question initially, or the advisement.

BY MR. WISEMAN:

Q   Regrettably, I didn't include your next comments but Her Honor can watch it.  If I told you that you gave him no further explanation but simply moved on, would you agree that as it stood there he didn't know what you were talking about?

A   No, I wouldn't agree with that.

Q   All right.  What part did he understand?

A   Well, I think he was applying it to his trial and that, to his attorney's not investigating his child abuse and presenting that at his trial.

Q   Right, that's clear, but what you were talking about was if he had committed any unprosecuted or uninvestigated abuse, you would be required to report it to the authorities, if he discussed it with you, as a part of your ethical obligation, isn't that right?

A   Yes.

Q   Okay.  So he didn't, he didn't get that?

A   Well, he applied it to himself and --

Q   Right.

A   -- I thought he understood the idea that --

Q   Really?

A   Yeah, I did.

Q   Okay.

A   I did.

Q   All right.  Fair enough.

MR. DOWD:  Your Honor, may we ask that the witness be permitted to finish his answer?

THE COURT:  Yes.

MR. WISEMAN:  I apologize.

BY MR. WISEMAN:

Q   Were you completed?

A   I thought he understood the idea.

Q   I think in your report you indicate that Mr. Bourgeois' IQ testing is in the borderline to mild mentally retarded range of intellectual functioning?

A   Yes.

Q   And his scores of 70 and 75 put him in that range?

A   Yes.

Q   So, leaving aside the controversy between the parties here as to whether Mr. Bourgeois is entitled to a formal diagnosis of mild mental retardation, you would agree that at best he is borderline deficient in his intellectual functioning?

A    That's the best measurement of his cognitive IQ that we have.  I agree with that, yes.

Q    Okay.  And I don't see in your report any criticism of the adminis- -- you read the data from both doctors?

A    Yes.

Q    Gelbort and Weiner?

A    Yes.

Q    And I don't see any report or critique in your report that they administered the test incorrectly or that they scored it incorrectly?

A    That's correct.

Q    All right.  Aside from the one point of contention about whether Dr. Weiner should have administered the WAIS-R when it was outdated, you would agree that that result still has value in this, in resolving these questions?

A    I do.

Q    So, we have got a person who you would agree suffered from, could we call it a horrific childhood?  Abandonment, abuse, impoverishment, deprivation?

A    Well, I'd rather use those words to describe it, the abandonment, the abuse of several kinds.

Q    All right.

A    Yeah, it was, that's the way it's been presented to me, that's the kind of childhood he had.

Q    And that person also is functioning in the borderline, at

best, the borderline range of intellectual functioning?

A    That's correct.

Q    And that's important in terms of Mr. Bourgeois' ability to manage his personality disorders, right?  I mean being a little smarter can help you maybe navigate some of the aspects, the negative aspects of the personality disorder?

A    It could, yes.

Q    So he really has two strikes against him in his life coming up, he's got the abuse, he's got the low intelligence?

A    I would agree with that.  He had a lot to overcome there.

Q    Okay.  Now, I was impressed with your credentials, your experience, forensic psychologist.  In fact, you co-authored an article in 2003 called Applications of Neuropsychology in Capital Felony Death Penalty Defense in the Journal of Forensic Neuropsychology.  Do you recall that article?

A    Yes.

Q    And who did you write it with?

A    I know Cecil Reynolds, who was at A&M at the time.  John Niland was another of the co-authors.

Q    I want to cover a couple of aspects of that article as they relate to this case.  You say in that article that there is a high incidence of central nervous system dysfunction present in this population, and I think in context you are referring to capital defendants.

A    That's correct.

Q    And why is there such a high incidence of -- what do you mean by central nervous system, for layman's terms, brain damage, organic dysfunction?

A    Yes, that's right.

Q    Okay.  And why, in your view, is there such a high incidence of brain damage, if you will, in this population?

A    That I think that having lower cognitive abilities that are associated with brain dysfunction, having lower intelligence in general is associated with more aggressive criminal actions.

Q    And that is due, possibly, there are a lot of factors but you would agree that one of the associated factors is brain damaged people have a hard time making proper judgments, right?

A    Judgment.  Impulse control can be a factor.

Q    Or impulsivity as we have been discussing it here?

A    Right.  Sure, I agree with that.

Q    And you also said in this article that -- well, withdraw it.  I think the point of the article, and you correct me if I'm getting this wrong, is that in capital litigation, whatever stage it's at, presentation of these types of, of this type of information is critically important, would you agree?

A    I think anything about the person's mental, personality, mental illness present, could be very important, yes.

Q    And in fact you say, quote, "The defense team must present the jurors with an explanation for the client's actions." You go on to say that the neuropsychologist can, quote, "help the trial team and the jury understand the issue of moral culpability," close quote. What do you mean there?

A    Well, I didn't write that part.

Q    Well, your name is on the article, right?

A    Well, that's true, but I didn't write every sentence in the article. That's why there are so many --

Q    Okay. So, is there anything in this article you disagree with?

A    Well, I didn't like the use of trial team and defense team. I have always maintained that as an expert you answer questions but you are not part of the team, you are not part of the defense team, you are not part of the prosecution team, you don't, that the most important thing is objectivity and not being part of the adversarial team, and I didn't like the use of that term, but.

Q    You didn't file a dissent to the article, did you?

A    Oh, I wrote a part of that article about the use of neuropsychology.

Q    Okay. But leaving that use of the word team, let's take the word team out and say the trial lawyer, the defense should present this type of evidence to help the jury understand the issue of moral culpability, that's really the

part I'm interested in, what did you mean by that?  How does presentation of these kinds of issues, Mr. Bourgeois' abusive childhood, his low intelligence, how does that help the jury understand his moral culpability?

A   Well, an expert in psychology or in neuropsychology, if they possess valid data and information about that person's mental abilities and personality traits and disorders, that the jury might find that to be something that would lessen their view of the blameworthiness of the person.

Q   Okay.  Well, I guess the reason that I am asking these questions is Her Honor has asked a number of questions of various witnesses that preceded you, I won't be as eloquent but in effect that, you know, why would you want to tell the jury that this guy can't control his impulses, why would you want to tell the jury that he can't control his relationships because, you know, even if it's due to all this stuff, and that was far less eloquent than the Judge put it, but you understand the point?  I mean why do you, why do you in this article and why do your colleagues around the country do this work and present this evidence to juries in capital cases?

A   Well, because we are asked to do an evaluation and present our findings and the attorney decides if the mitigating aspects of it outweigh the aggravating aspects, and with certain things such as brain dysfunction it can be a double-edged sword, and that's the attorney's decision at

that point, not mine.

Q    All right.  At page 92 of the article, and I guess I don't know which of the three of you wrote this part but we will assume you had some say in it, "The Federal Courts have ruled repeatedly that since the invocation of the death penalty is qualitatively different from any other potential sentence, potentially mitigating factors must be admitted into evidence and considered by the judge or jury.  All of the authors of this article have worked on death penalty appeals that were successful because the evidence of the defendant's brain injury or other central nervous system compromise was not presented to the jury during punishment hearing."  And in the next paragraph you say, "Various court rulings would seem to argue the defense is compelled to identify and put forward such evidence."  I take it since you, we have all three of you, you agree with that, that statement?

A    Oh, that's my understanding of the law, yes.

THE COURT:  Is there, do you have any evidence that he had a brain injury?

THE WITNESS:  No.

THE COURT:  Do you have any evidence that he is mentally retarded?

THE WITNESS:  No.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Well, let's define some terms here.  When we say brain injury, I'm, that would be a traumatic blow to the head, a hard injury?

A   It could be an illness that still would be a --

Q   A disease process?

A   Right.

Q   Okay.  But you would agree that he could have organic brain dysfunction and not fall into those categories?

A   Well, there has to be a reason for it and --

Q   Oh, undoubtedly.

A   And sometimes that's not easy to find, and sometimes just looking at the neuropsychological scores is not enough reason to say, because there can be low scores for a lot of reasons that have to be ruled out, especially in the absence of a defining event, a traumatic blow to the head.

THE COURT:  Can I ask you --

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Mr. Wiseman, you, there may or may not have been blows to the head.  Your experts relied on blows to the head but it appears to be not any real evidence that there was unconscious things, except his sister testified after the three-wheeler, but let me ask you this:  Your, I understand your evidence to be that he has had this whatever it is since he was little, so that a blow to the head or lack

of a blow to the head hasn't changed him at all.

MR. WISEMAN:  Oh, I agree.

THE COURT:  Okay, so --

MR. WISEMAN:  I think it's Your Honor who asked about a --

THE COURT:  Okay, so we don't need to mess with the blows to the head.

MR. WISEMAN:  If Your Honor wants to forget about it, I'm happy to forget about it.

THE COURT:  Okay, we will move on from there and just talk about, because your effort has been to show that whatever has happened, he has been like this since he was --

MR. WISEMAN:  Yeah, I think --

THE COURT:  Early on.

MR. WISEMAN:  Yeah.  Let me just explain briefly why this, the blow-to-the-head part is significant.  When counsel failed to get the hospital records, in our view, in a timely way, they also failed to see that in 1993 he struck his head on a steering wheel.  Forget the coma from the three-wheeler. In our view, that is a red flag that requires counsel to then have this person seen by a neuropsychologist.

THE COURT:  Well, he was seen by a neurologist.

MR. WISEMAN:  Well, right, but that was a week before trial started.

THE COURT:  Okay, but, I understand that but --

MR. WISEMAN:  Okay?  And that's another one of our points.

THE COURT:  But apparently, whatever your red flag is, it wouldn't have made any difference about the blow to the head because your case is that he, that something was wrong with him from the time he was little all the way up.

MR. WISEMAN:  I understand.  It's part of the counsel's deficient performance that they failed to get the record timely, they failed to look at it.  Had they looked at it --

THE COURT:  But it wouldn't have made any difference.

MR. WISEMAN:  It would have made a difference because had they looked at it and gotten Dr. Weiner's evaluation done in a timely way, they would have seen that he had a 75 IQ on an outdated test and, as has been testified to by experts, they would have submitted him to a, would have started an MR investigation, and they would have presented to the jury evidence that he had borderline intellectual functioning at a minimum, but counsel didn't have that information until trial had started, and I could rattle off a half dozen Supreme Court cases that say that's deficient performance.  Don't ask me to do it because I'm a little punchy, but I could if you dare me to.

THE COURT:  Why are you punchy?  I mean you-all are

taking turns, I'm up here the whole time.

MR. WISEMAN:  You are superhuman is all I can say.

THE COURT:  You have just made up for all your deficient --

MR. WISEMAN:  All my abrasiveness?

THE COURT:  All your abrasive comments.

MR. WISEMAN:  I'm sweet as pie, Your Honor.

THE COURT:  We are just starting over.

MR. ROBERTS:  May we respond, Your Honor?

BY MR. WISEMAN:

Q   Dr. Price, you heard what I just said to the Judge.

THE COURT:  You want to outdo Mr. Wiseman?

MR. ROBERTS:  I don't know, let me think about that.

THE COURT:  I guess I'm not getting the point about the head thing.

MR. WISEMAN:  The head thing is a red flag.  It doesn't matter whether he had a coma, it was a reason to get --

THE COURT:  Okay, it doesn't mean he had anything wrong, that he had an injury to his brain.  You're --

MR. WISEMAN:  Oh, he may have or he may not have, not have.

THE COURT:  Okay.  But it doesn't matter if he did or he didn't, what you are saying is that just the fact that he hit his head should have started some other investigation?

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  That's the point.

THE COURT:  Even if it didn't come up with anything --

MR. WISEMAN:  Right.

THE COURT:  -- it should have started an investigation.

MR. WISEMAN:  Now, to be clear, I'm not suggesting, necessarily, that he didn't have a traumatic brain injury.

THE COURT:  I understand, but just for argument's sake let's assume he never had a traumatic brain injury; nonetheless, when they saw, your point is when they saw that he struck his head on the steering wheel, even if it was just like this, and I'm hitting my head, that should have been a red flag for them to look further?

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  All right.

THE COURT:  So you are not saying, you are not necessarily saying he had to have had a brain injury at that time for anything to have changed?

MR. WISEMAN:  Correct.

THE COURT:  I finally got it.  Okay.

MR. WISEMAN:  Okay, good.  Well, I'm glad we had

this talk.

THE COURT:  I am so glad we did, too.  Go right ahead.

BY MR. WISEMAN:

Q   Dr. Price, do you agree with the proposition that if you as a consulting neuropsychologist saw a hospital record of a motor vehicle accident of an 18-wheeler where the admission note said, "Struck head on steering wheel in an accident," that that would be a red flag worthy of investigation, knowing nothing else about the case?

A   Well, I'm not an attorney but from a neuropsychological standpoint I think it would be significant.

Q   Okay.  And --

THE COURT:  Well, if you just asked your client if anything happened and he said no, then what?

THE WITNESS:  If the client said that he didn't hit his head?

THE COURT:  Well, no, if he said it was just a nothing event.

THE WITNESS:  Then, if there wasn't at least an alteration in consciousness --

THE COURT:  Okay.

THE WITNESS:  -- it would be probably an insignificant --

THE COURT:  A non-event?

THE WITNESS:  Yes.

THE COURT:  Okay.  So we don't know if they asked him, right?

MR. WISEMAN:  Well, they didn't have --

THE COURT:  I don't think anybody asked Mr. Gilmore.

MR. WISEMAN:  They didn't have the records until trial had started.

THE COURT:  Nonetheless, they could have still said, We are going to, we ask you, Mr. Bourgeois, and if so we'll go in and ask for a continuance if there is this issue.

MR. WISEMAN:  Well, the truth of the matter is, is that counsel had him evaluated by a neuropsychologist.  Our point is, it was --

THE COURT:  Well, they went to a, took him to a neurologist.

MR. WISEMAN:  Well, to my mind that's almost irrelevant.  The --

THE COURT:  See, I don't think so.

MR. WISEMAN:  Okay.  But neurologists squeeze heads, neuropsychologist gives tests, all right, and that's the difference.

THE COURT:  Yeah, but I heard from your excellent witness that Friday --

MR. WISEMAN:  Dr. Gelbort, right.

THE COURT:  -- about how neurologists work with

neuropsychologists.

MR. WISEMAN:  Uh-huh.

THE COURT:  That they can find, that the neurologist can find if there is anything wrong with the brain but that the neuropsychologist can further hone it down to exactly where the injury is.

MR. WISEMAN:  Precisely.

THE COURT:  But they have to start with an injury.

MR. WISEMAN:  Or a reason to be inquiring.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And my next question, Dr. Price, is in the absence of a formal report of a head injury, is being subjected to a pervasive pattern of childhood abuse reason enough to inquire about cerebral dysfunction, if you're getting beat in the head as a child?

A   If there was trauma to the head as part of the child abuse --

Q   Right.

A   -- and not just trauma in general?

Q   Right.  Okay.

A   Well, if there was evidence of trauma to the head that resulted in at least an alteration of consciousness, then I would say as a neuropsychologist it would be a red flag to investigate.

Q   Okay.  And you would agree that in cases of pervasive childhood abuse such as the one we have here that it's not at all uncommon for the child to receive blows to the head?  I mean people who beat their children don't discriminate necessarily as to where they're beating them?

THE COURT:  Well.

MR. WISEMAN:  In your experience?

THE COURT:  My father did, so.  Not that it was beating but there are some parents from another generation --

MR. WISEMAN:  Yeah.

THE COURT:  -- that whipped just on the rear end and that was it.

MR. WISEMAN:  Okay.  Well, we're not talking about that.

THE COURT:  All right, but let me ask you this: What I need to hear from you, in cross-examination or direct, is to -- what I heard from your witnesses is that they were unwilling to talk about it at the time, what the mother did to Mr. Bourgeois.

MR. WISEMAN:  Well, some of them, and some of them talked about it anyway.

THE COURT:  Some of them -- they didn't really. Like the one gentleman that testified at trial and testified again here, what he said, "I knew it was happening because I saw the bruises on him," but he never saw, he never said that

he saw the mother beating him.  But the ones that have come forward now, the family members that say, "This is what happened to him," they were not going to talk about it before the trial while the mother was still alive.  So I don't really hear that all the mitigation in the world would have found this out until at this point.

MR. WISEMAN:  Well, we are turning --

THE COURT:  I'm concerned about that.

MR. WISEMAN:  We're turning this into an argument rather than an examination, but let me respond and tell you our view on that.

THE COURT:  That's what I'm asking you.

MR. WISEMAN:  Yeah, yeah.  Mr. Bourgeois himself told Mr. Bierbaum in an earlier interview that he had been abused as a child, and --

THE COURT:  Yes, but what they told, what they, what the witnesses told Mr. Bierbaum, besides what Mr. Bourgeois said -- and he didn't say about his mother either, he didn't say the whole deal that we know now, or at least that he is saying happened now -- what we know is that he was the one who was picked on more than the other children.  That was the story that was given of the abuse from the witnesses before trial.  Now that he has gotten the death sentence, they have come back with an entirely different story.

MR. WISEMAN:  You know --

THE COURT:  And the mother is dead and they are willing to talk about it.

MR. WISEMAN:  I think, Your Honor, that we would not agree with that.  You know, obviously you will make your findings but our --

THE COURT:  No, I want you to point that out whenever.

MR. WISEMAN:  Yeah, and I think we can --

THE COURT:  I want you to go through the record and point out --

MR. WISEMAN:  We can do that, we can do that.  I mean I can't do it this moment but we have --

THE COURT:  No, I know that, but I'm telling you as we are going along.

MR. WISEMAN:  That's what you want to know, I understand.

THE COURT:  Not arguing with you, in spite of what you think.

MR. WISEMAN:  All right.

THE COURT:  I want to tell you what my thoughts are so you can address them cogently --

MR. WISEMAN:  No, I --

THE COURT:  -- in final arguments or --

MR. WISEMAN:  I appreciate that.

THE COURT:  A post submission, post-hearing

submission, something along those lines.

MR. WISEMAN:  No, I appreciate that and we will certainly endeavor to do that.

THE COURT:  See, you are starting over again.  After you had a clean slate not ten minutes ago.

MR. WISEMAN:  What did I do?  I said we'll do it.  I'm saying we'll listen to you.

THE COURT:  Go right ahead.

MR. WISEMAN:  You know, Your Honor, I have to say sometimes I feel like I can't win for losing here, you know?

THE COURT:  I know, I know.  It's sad.

BY MR. WISEMAN:

Q   All right.  So, I'll move on then from this article which, you know, is chock full of stuff about how you are supposed to present the stuff.  Let me ask you one more question before I do that.  You have a line in here that says the neuropsychologist can educate the trial lawyers about what they are discovering and how it fits into the picture.  Would you agree, and maybe it's an obvious proposition, that you can't educate a lawyer about this stuff who won't sit down with you and discuss it?  You guys don't do telepathy or anything like that, right?  You've got to have a discussion.

A   Or a report or something.  I mean there's no secrets in the way we can do that, it has to be communicated and --

Q   Right, okay.  And --

A    They have to read it or hear it or something.

Q    I mean a report was written in this case.  I guess my question about that is, you know, the communication, I mean you didn't just give your report to these folks at the table and not talk to them about it, did you?  You had a discussion, you prepped with them, you met with them, isn't that right?

A    Right, I explained my findings and what I thought, yes.

Q    Yes.  All right.  So that's what I mean, you can't educate the lawyers, us dummies, about this important complicated stuff without sitting down and having a discussion about it?

A    That's typically the case, yes.

Q    I want to address this question of malingering that keeps popping up.  I mean you wrote a report in this case.  It's not the longest report I've ever seen, it's not the shortest.  It's shorter than Dr. Moore's, if you guys are in any kind of competition.  But you wanted to include the salient highlights of your findings, is that right?  I mean you are not holding back stuff?

A    I don't think so, no.

Q    Okay.  You have expressed a couple of times here some thoughts about, you know, the possibility that Mr. Bourgeois was malingering.  I actually didn't see the word malinger or malingering in your report.

A    Yeah, I don't think he is malingering.  I think there are some issues about effort, full effort.

Q    Effort.

A    But I didn't put that word in there because I don't have evidence that he's malingering.

Q    Okay.  And I guess the reason I'm asking that is the Court, when you were --

THE COURT:  I used the word.

MR. WISEMAN:  I'm sorry?

THE COURT:  I used the word to ask him.

MR. WISEMAN:  You used the word, right.

BY MR. WISEMAN:

Q    And it was in regard to a lack of effort.

A    Yes.

Q    And I just want to be clear, lack of effort is different than intentional malingering.

A    It's a response style that can invalidate the results.  It's more difficult to assess.  It's less severe.  It's present in a lot of cases for a lot of reasons other than the intentional --

Q    Right.

A    -- feigning or gross exaggeration of a condition for an external incentive.

Q    Right, so we are not dealing --

THE COURT:  You know, I guess, I guess when I asked

him that I thought he said it was, it could be a type of malingering.

MR. WISEMAN: Well, that --

THE COURT: So I don't know if you're clarifying that part or not.

MR. WISEMAN: Well, that's what I'm trying to clarify. I was happy with his answer until you jumped in.

THE COURT: Sorry. That's what stuck in my mind.

MR. WISEMAN: Yeah.

THE COURT: So you may want to make him take that back or whatever.

MR. WISEMAN: Yeah. Well, that's what I'm trying to do.

BY MR. WISEMAN:

Q   Do you know the exchange we're talking about?

THE COURT: Are you taking that back?

BY MR. WISEMAN:

Q   Take it back, make it easy, it's getting late.

A   Effort and response style are on a continuum. At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive. At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be.

Q   Okay.

A    So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end, whether malingering comes closer to that.  Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

Q    Right, okay.  And just to be clear, there's not a degree of intentionality in poor effort that there is in malingering, so it's a lower intent, if you will?

A    That's, I would agree with that.

Q    The Personality Assessment Inventory that you gave that was invalid because of the poor response style, that test permits a finding of malingering.  I mean, in other words, I'm looking at this -- let's just put this up, it will be easier than me characterizing it.  Let me get this guy off. I am not -- let me just -- I got it, I got it.  All right. So this is the report, the computer-generated validity report, and you would agree that it says at the top that such factors for the invalid, invalidity of the test, could include a failure to complete items, carelessness, reading difficulties, confusion, exaggeration, malingering, all right?  And then it goes to say what happened in this case and it doesn't identify malingering.  It identifies confusion, possible reading difficulties.  And in that regard, what grade level is this test geared to?

A    The fifth or sixth grade level.

THE COURT:  I am having problems with this, the concept of the test versus his functioning, the detailed letters and the spelling, and maybe some syntax problems but they're, they were, you know, he uses, and he used, when he talked to you or either Dr. Moore the word hypothetical and, you know, it seemed very sophisticated and very specific in his writing.  So when you talk about reading at a fifth grade level you've got to realize that he's writing normally.

THE WITNESS:  Yes.

THE COURT:  On what someone else called a twelfth grade level.

THE WITNESS:  I don't think it was his lack of reading ability that invalidated that test, I think it was carelessness.  He spent on average seven seconds per item.

THE COURT:  Okay.

THE WITNESS:  I couldn't complete it in that kind of time period in a careful fashion.

BY MR. WISEMAN:

Q   And, sir, I'm putting up --

THE COURT:  But if he can read well then what does that tell you?

THE WITNESS:  That he didn't pay attention, he didn't try hard on that test, he just --

THE COURT:  So what would you call that?  I mean I wouldn't call that, I mean that seems kind of intentional to

me.  If he can do it and didn't.

MR. WISEMAN:  Your Honor, could I ask a follow-up on that?

THE COURT:  No, wait a minute, I'm asking him this.

THE WITNESS:  Well, not trying hard has intention involved.  If he were malingering he could have tried to, tried --

THE COURT:  To give a wrong answer?

THE WITNESS:  Yes, or answers that would make him appear more disturbed than he is or something.

THE COURT:  Okay.  But he just --

THE WITNESS:  He just didn't try.

THE COURT:  So he intentionally didn't try?

THE WITNESS:  Right.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    And my follow-up to that is, a child who has ADHD who can't tend to a task, would you say that they intentionally aren't tending to the task or do you say they have a psychological impairment that's impacting their ability to attend to the task?

A    Well, of course it would be that, if they have ADHD and can't pay attention, then you wouldn't say they were trying to feign that test.  If a person is able to pay attention, they can sustain attention for five or six hours to other

things, they can read, but they just didn't try on that test, then it invalidates that test.  And tests are not as good as day-to-day real life observations of the person and other forms of data.  That's why we look at everything.

Q   Right.  And you'd certainly agree that Mr. Bourgeois can talk very expressively, very extensively, and he doesn't seem to have trouble saying things?

A   I think that's a very true statement.

Q   Okay.  And --

THE COURT:  Okay.  Is there any, do you have indication that he's got ADD or ADHD?

THE WITNESS:  No.

THE COURT:  Okay.

MR. WISEMAN:  I was using that as an example, Your Honor.

THE COURT:  Okay.  Well, then -- okay.

BY MR. WISEMAN:

Q   All right.  So, if as a result of his personality disorders and his impulsivity he has a hard time tending to written tasks in this setting, that would not, that's analogous, sort of, to the ADHD example I gave, right?  There's a psychological explanation for why he is not necessarily tending to the written task in the way that he's able to stay with you verbally?  Would you agree?

A   If I understand the question, you are saying his

impulsivity invalidated the test, that's your hypothesis that you're asking me?

Q   Well, I, yeah, I guess that's a more refined way of putting it.  I'm just wondering, is there a potential psychological reason that you are aware of in this case that could explain his lack of, or his impairment in sitting through the task short of intentionally not wanting to tend to it?

A   You know, his impulsivity is selective.  It doesn't pervade all areas of his life.  He can discuss things with, and stay on task.  For the most part he can write and stay on task.  If it's about him and things he knows about, that's not going to be that.  But, you know, he, my analysis of how long it took him to do this, in observing him, is that he sped through it, and that's as psychological as I can get about it.

Q   All right.

A   He didn't get involved in taking the test.  He didn't want -- he intentionally didn't get involved in taking the test.

Q   All right.  We will leave that area.  The Court seems to have directed a number of questions to a variety of our expert witnesses, and I'm again going to just paraphrase, you know, how come he can do some stuff and can't do other stuff, you know, he's so verbal, he can write these long letters

which while not perfect in syntax communicate ideas, and yet we are claiming he can't do other things.  And to try to answer that I have put up the score sheet from Dr. Swanson's Woodcock-Johnson.  And before I ask you about the specific findings, you would agree that the Woodcock-Johnson is the, is one of the best, most reliable tests of functional achievement, I mean it's sort of the gold standard test?

A   It is one of the better tests of academic functioning, yes.

Q   Okay.  And it far surpasses the Wide-range Achievement Test in terms of its sophistication and the richness of the data you get from it?

A   Yes.

Q   All right.  Now, let's assume for purposes of going through this that these are valid results.  We have no reason to think they aren't.  I mean look at his grade equivalencies in spelling, he's at a 13th grade level, he's a college level speller.  And he's in kindergarten on story recall.  He's in third grade, he's in third grade in other things.  I mean this is a man who clearly has strengths and clearly has weaknesses, isn't that right?

        MR. DOWD:  Your Honor, could I just ask that the exhibit be identified?

BY MR. WISEMAN:

Q   Oh, I'm sorry.  This is Exhibit 35, page 13.  I believe

it's in evidence.

A    Well, there were several things in your question.

Q    All right.  There usually are.

A    Sorry.  I would agree that he is a person with strengths and weaknesses.  I don't know about the level of effort that was involved in this administration of the Woodcock.

Q    Okay.  Well, let's compare spelling on the Woodcock to, you are familiar on the WRATs, with the Wide-range Achievement Test he took with Weiner and with Gelbort, in both of those he scored also high, in the high school range, on spelling and reading?

A    Yes. that's correct.

Q    Okay, so that's consistent, and I think your article says consistency in psychometric testing indicates validity, isn't that right?

A    Well, it's one factor in looking at validity.

Q    And -- I'm sorry, go ahead.

A    It's one factor, yeah.

Q    Okay.

A    If you find convergence of test data, that increases your confidence in it.

Q    Right.  So if he's taking an IQ test in 2004 and has a statistically identical margin of error three years later on a different test, that tells you that that's likely where his IQ falls, and that's why you said he's at best in the

borderline range of intelligence?

A   Yes, that's, that is correct.  There are other factors but I think as far as the measured cognitive IQ, having two tests three years apart increases your confidence in it.

Q   All right.  So, getting back to this thing, then, the fact that we see patterns in this testing that are quite similar to the WRAT testing given again in 2004, 2007, his same, his same strengths and weaknesses seem to keep coming up whenever he's tested, right?

A   Well, I'm looking at this.

Q   Okay.

A   And if you can make that a little larger for me for just a second.

Q   Sure.  You know, it's on the screen in front of you.

A   Oh, I'm sorry.

Q   Which, you know, I can make a larger image.

        THE COURT:  Could you zoom it up just a little bit, though?

        MR. WISEMAN:  Center it?

        THE COURT:  Zoom it just a little bit.

        THE WITNESS:  Yeah, I'm, I can see it here fine.

BY MR. WISEMAN:

Q   I don't want to lose the information, I don't want to lose the data.

A   His, I'd say this pattern is similar, yes, that the

letter word identification has a standard score of 90 and on the two administrations of the WRAT, the same kind of test was a 96 and an 85. That's, that seems to be consistent. His math is the lowest, it looks like. I don't know about the story recall delayed as being as low as it is. And understanding directions has an 89. You know, I don't have anything to compare that to except that he seemed to be able to follow --

Q    Right. You know, and I guess the reason I think, well, I think it's important, let's see if you do, is that we have had a number of lay witnesses come into court today, people who have known Mr. Bourgeois, and they are all sitting up there saying, "This guy is fine, he can talk a blue streak, he's charming, he's gregarious."

        THE COURT: And use the computer.

BY MR. WISEMAN:

Q    He can use the computer. He can do all these things. You would agree that lay people can't just look at somebody who presents well and make a determination that he's not mentally retarded? That's why we have tests, right?

A    Well, I think a lay person can tell you information about their adaptive functioning, and my observation of him as well, and looking at everything, is that if it's day-to-day practical stuff that he's familiar with and interested in, he has learned how to do it and can do it. School related

academic formal testing he doesn't do as well on.  He has strengths and weaknesses there, but his adaptive behavior is the key here.

Q   Right, the key to the adaptive behavior pronged with mental retardation?

A   That's correct.

Q   But let's expand the universe a little bit because I, my concern is, as counsel, is that these folks have come in and not only say he has adapted well but they are basically saying he's just like you and me.  "He's the best driver I ever had, he's a genius."  He's got a 70 IQ, right?

A   Well, I --

Q   They are not seeing the full picture, wouldn't you agree?

THE COURT:  Well, may I, you are talking about a 70 IQ and if you talk about the range of error from one to another, that may not be exactly correct.  And also, I guess I am concerned about these IQ tests that say he understands instructions very well, he has a high reading level and a spelling level, so on the other parts how could he be doing poorly?  Does that not tell us something?

THE WITNESS:  It does.

THE COURT:  What does it tell us?

THE WITNESS:  Well, it's very unusual to have --

THE COURT:  Isn't it?

THE WITNESS:  Yes, it's very unusual to have --

THE COURT: So what could that mean?

THE WITNESS: It could mean effort. I could mean general cultural deprivation about --

THE COURT: It could be a low effort on that scale?

THE WITNESS: It could be, yes.

BY MR. WISEMAN:

Q   Sir, if he were giving low effort, would you expect to see a consistency and a pattern like you see in this case? I mean if he just wasn't taking these tests with any kind of effort, I mean they'd be all over the place. We wouldn't see the same WRAT scores. We wouldn't see the statistically identical WAIS scores. We wouldn't see the Woodcock-Johnson looking just like the WRATs. We'd see a mess. It would be all over the place. Don't you agree with that?

A   Well, I do see a mess.

Q   You do see a mess?

A   I do see a mess.

Q   In what way?

A   The neuropsychological test scores compared to the IQ score and academic, having academic achievement scores higher than the IQ scores is very unusual.

Q   Not out of the question, though?

A   No, obviously -- (noise). Oh, I'm so sorry. I'm so sorry.

THE COURT: Apologize to Ms. Gano.

THE WITNESS:  I am so sorry.

THE COURT:  Thank you, sir.  That's my concern. When I looked at those things, I didn't understand how that -- you can do a lack of, an intentional lack of effort on the areas you know that you can get away with, just hypothetically, and not on these other ones where you know you can read the instructions, you've got a good reading skill.  It just looked like a red flag to me more than --

THE WITNESS:  You know, I see a mess that it's variable effort and it's variable cognitive ability.  How can he score as high as he does on the academic test and the neuropsychological test and not on the IQ.

BY MR. WISEMAN:

Q   All right.

A   It's difficult to explain.

Q   Yeah, it's, I think you said it was unusual but I guess, you know, we're in a capital proceeding where, you know, every witness who testified today said, "We couldn't believe what happened here, this man was a totally different person." We are dealing with an unusual circumstance so I guess, given that premise -- you're shaking your head yes.

A   Yes.  It is unusual.

Q   Yes.  So given that premise, I think we have to think, you know, think about that a little.  No report you have read -- I mean Mr. Bourgeois has so far, to my knowledge,

been evaluated in 1985 for the sheriff's department, by Dr. Estrada, Dr. Weiner, Dr. Gelbort, Dr. Cunningham, Toomer, Sadoff, Swanson, Moore. Sounds like a law firm. Has any of them ever said he's a malingerer? No. Have you seen the word malingering in any of those things?

A    I don't recall seeing the word.

Q    It's not there, trust me. I wouldn't ask the question if it was there.

THE COURT:  If you didn't know the answer.

MR. DOWD:  Your Honor, I would ask that the witness be permitted to finish his answer.

THE COURT:  Did you have something more to say?

THE WITNESS:  Well, there is some consistency to what all the mental health experts have to say in this case, though.

BY MR. WISEMAN:

Q    Yeah, and that consistency is that he suffers from debilitating personality disorders, a history of child abuse and low IQ.

A    But not mental retardation.

Q    Well, you know, we're talking about a lot of issues here today, all right, and I'm focusing right now on --

THE COURT:  Do you have much more to do?

MR. WISEMAN:  Oh, I do. You know, I was concerned about the start time, you know, and that wasn't my doing,

that was the Government's, but I think I'm asking reasonable questions here.

THE COURT:  Twenty-five more minutes and then we will take it up in the morning?

MR. WISEMAN:  That's fine with me.  I mean, I --

THE COURT:  How much time do you think you will need in the morning?  Because I imagine it will be the same with Dr. Moore.

MR. WISEMAN:  Yeah.

THE COURT:  I want to make sure they get their witnesses on.

MR. WISEMAN:  All right.

THE COURT:  And you still have rebuttal from 4:00 to 6:00.

MR. WISEMAN:  Yeah.  I mean, I can tell the Court I don't think we are going to have rebuttal.  If we do it will be five minutes, so, yeah.

THE COURT:  Okay.  So then we ought to be okay?  Continue on and I will not interrupt you one more time.

MR. WISEMAN:  I appreciate -- well, you can interrupt me any time you want.

THE COURT:  No, no.  You are very kind.

BY MR. WISEMAN:

Q   Your report does not diagnose Mr. Bourgeois as being, having an antisocial personality disorder, isn't that right?

A    That's correct.

Q    All right.  The only mention of sociopathy or psychopathology is you had one mention in your report and I think one mention in your testimony that he has some sociopathic features?

A    That's correct.

Q    All right.  Now, you administered the Structured Interview for DSM-IV Personality?

A    Yes, that's correct.

Q    All right.  And that test has a section that addresses the question of whether a person has sociopathic tendencies?

A    Or antisocial personality disorder, right.

Q    Right.  And Mr. Bourgeois did not come out on that test as presenting sociopathic or antisocial tendencies?

A    He did not, based on his self-report.

Q    Well, you --

A    Which is what this is based on.

Q    All right.

A    He did not.

Q    It's your test, right, you administered it and, I assume, think it has some value, that's why you give it?

A    Sure.

Q    Okay.  He came up clean on sociopathy?

A    On the antisocial personality disorder.

Q    I'm sorry I keep using that word.  I've read Hare and

Psychopaths Among Us.  And again, all those doctors who have ever evaluated him, no one has ever even used the word antisocial.  You are the only one.  This is the first time I have seen that word applied to Mr. Bourgeois as a diagnostic term.  Do you agree?  I mean did you see that in any of the other reports?

MR. DOWD:  Your Honor, I believe, wasn't there some testimony by Dr. Gelbort that he has antisocial --

MR. WISEMAN:  He's not getting paid so why should --

THE COURT:  Yeah, he said that he presented, now, he did his fingers like this, but he, together, and for the record the two index fingers together, that he presented, it's true that he had the symptoms of a sociopath or a psychopath, a narcissistic sociopath or psychopath, but that, he opined that they may have different etiologies than other types of psychopaths.

MR. WISEMAN:  Right.  I mean I took his testimony to mean that he wasn't saying that he was psychopathic or antisocial but that --

THE COURT:  Well, he, I took it --

MR. WISEMAN:  -- there's some overlap in the symptoms.

THE COURT:  I took it that he, that's the way he presented but that he opined that it was a different, that it was a different etiology.

MR. WISEMAN:  Well, I --

THE COURT:  That it was an organic brain etiology or some other etiology.

MR. WISEMAN:  Right.  It's a different diagnosis, I think is the salient point.

BY MR. WISEMAN:

Q   So you gave him, you know, this test, he comes up clean on it -- well, I guess I don't have any other questions about that.  But you agree, you didn't see any other mention in any of the other reports?

A   I don't recall any in the reports.  And, as I said, I think it's part of a disordered, personality disorder, antisocial traits and features, but I did not diagnose him with antisocial personality disorder.

Q   And in fact the Structured Interview for DSM-IV Personality came up with borderline, with I think paranoid ideation.  Or maybe I should be more precise.

A   And some narcissistic.

Q   Ah, narcissistic.  Thank you.  You know, in getting back to the response style, let's talk about the verbal response style.  I mean you would agree that there were times during your interview with him where he was really trying to answer your questions, right, the verbal part?

A   Yes.

Q   Okay.  So, for example, when you asked him how many

stripes there were on the flag -- I didn't know the answer to this myself, actually, I actually had to ask my colleague -- and he said, "I don't know," but he then offered you how many stars there were, right, I mean that's an example of him trying to put forward good effort in his encounter with you?

A    I would agree with that.

Q    Okay.  And that's, at least verbally he was trying to present well and do his best?

A    Well, on that item, and that's, that is an example of something that's really an educational cultural exposure, to know the number of stripes in the flag.

Q    Right, and I'm not asking you about whether he was right or wrong or what that means, I'm just looking at the effort question.  I mean he offered you an alternative, he said, "Look, I don't know that but I know this."

A    Yeah, on that item I agree with that, yes.

Q    Okay.  And that's part of his overall attempt to, what did you call it, manage his image, right, or manage his -- go ahead.

A    It's impression management.

Q    Impression management, thank you.  He wants to look good, right?

A    Yes.

Q    And that's probably what was going on, in your view, when he told Dr. Estrada, at the time of his trial evaluation,

that he had an idyllic childhood, right, he's trying to look good?

A   I think you could fit that in there.  He was trying to put best foot forward at that time.

Q   And that's part of his response style, he wants to look good?

A   I would agree with that.

Q   All right.  Now, you said on your direct examination that you didn't think this was masking, you didn't think that this effort to look good was part of the cloak of competence that people with mental retardation sometimes put out there?

MR. DOWD:  Judge, I don't think that's a correct rendition of the testimony.  The masking I think related to Dr. Swanson's opinion about him speeding up when Dr. Price went to the bathroom during the PAI test, unless I --

MR. WISEMAN:  I think the witness was about to answer yes.

THE COURT:  Well, he's going to remember what it was, I assume, so go ahead.

THE WITNESS:  As I recall, it was when I was discussing the PAI that, but I brought up the impression management as his response style in the interview and his attempts to look good and I said it exceeded that that they discuss the concept of the cloak of competence when somebody tells you they can do something that they can't.  His is

telling you, you know, it's just trying to look good in general about everything.

BY MR. WISEMAN:

Q   Right.  Right, and that was my question, his positive attempt to manage his presentation.

A   It's positive and negative.  I mean it's, for a lot of the time it's so positive that it's narcissistic.

Q   Right.

A   And then at times he certainly wants you to know that he's a victim and that he has been --

Q   Well, hasn't he been a victim?

        MR. DOWD:  Judge, I would ask that the witness be allowed to finish his answer.

        MR. WISEMAN:  I apologize.

        THE COURT:  Please, sir, go ahead and finish.

        THE WITNESS:  Yes, but a victim of the legal system? I don't know.

BY MR. WISEMAN:

Q   Right.

A   I wouldn't think, and that's a --

Q   When we talk about victimization, I mean you would agree that given his childhood that he was a victim in his own right?

A   That's what he appears to be, based on what he's saying, yes.

Q    And what others are saying?

A    Yes.

Q    And so I guess what I'm wondering is, why couldn't it be that we are dealing here with both a need to positively manage his presentation as well as a cloak of competence? Why couldn't it be one exacerbating the other?  Why is it one or the other?

A    There's no reason that it couldn't be both.  It seemed in excess of what I would see with a person that's mentally retarded hiding a weakness.  He's going far beyond that.

Q    Right.  I mean it's, you would expect to see it above and beyond because if it's exacerbating, if you have someone who has got a cloak of competence and a narcissistic need to present well, it's doubled.

A    I have just never seen that.

Q    Well, again, we are dealing with an unusual set of circumstances here.

A    And the term cloak of competence and masking is associated with retardation.

Q    Right.  And I know you don't think he's mentally retarded but, you know, that's what in controversy here.  So, you know, we are really dealing with a person who has got both features going on.

         THE COURT:  Just stick to questions and answers, please, Mr. Wiseman.

MR. WISEMAN:  Yes, Your Honor.

BY MR. WISEMAN:

Q   This whole idea that he is one thing or the other, you would agree that the DSM says that mental retardation is not a diagnosis of exclusion?

A   I would agree.

Q   Okay.  And so that means that you don't say, well, we have to first determine whether he's a borderline personality disordered individual before we can -- you don't have to rule anything out before we say he's mentally retarded?  If he meets the diagnostic criteria for mental retardation.

A   You'll have to repeat that question, I'm sorry.

Q   Sure.  The DSM, when it lists its diagnostic criteria for, you know, all of its illnesses, sometimes it says don't call it this if it could be that, right?  That's a diagnosis of exclusion.  Okay?  When you look at the diagnostic criteria for mental retardation, you don't see that.  Correct?

A   That's correct.

Q   Okay  So if he's got significantly sub-average intelligence and significant adaptive deficits, onset before 18, you stop, correct?

A   Yes, that's --

Q   So --

A   That's correct for this diagnosis, yes, that's correct.

Q    Okay.  So he could be borderline personality disorder, narcissistic personality disorder, brain damage, childhood abuse, all of those things, and he could be mentally retarded?

A    He could.

Q    And the DSM says that, right?  I mean there's a whole section on associated conditions and syndromes and illnesses and he could be a lot of those things and mentally retarded?

A    Certainly mental retardation is not a preventative situation for other things.  They can get sick, they can be depressed, they can be mentally ill, they can have a personality disorder.

Q    Let me ask you just about your report.  I notice that in discussing the definition you cite to the DSM and you cite to the AAMR Tenth Edition.  Is there a reason you didn't use the or cite to the Eleventh Edition of the AAMR which is now the American Association of Intellectual Developmental Disabilities?

A    No, and it's, it's a restatement of the same thing with the collapse of the categories of adaptive behaviors and, but there's, you know, I don't see significant differences.

Q    Right, and -- right.  And so, when we talk about the Green Book, the Eleventh Edition, it's the same as the Red Book in the material aspects of these issues?

A    Could you repeat that?  I'm sorry.

Q   Yeah, you know what, I'll withdraw that.  It's a silly question.  The Red Book, the Eleventh Edition, is the authoritative manual now for dealing with MR issues?

A   It is an authoritative book about MR from the AAMR, but so is the DSM about the diagnostic criteria.

Q   And, you know, I think it was Mr. Dowd who was questioning one of my witnesses about, you know, the AAMR being an advocacy group and there was sort of a hint of like, you know, they are these bomb throwers or something.  I mean, they are a reputable organization?

A   Yeah, it's a reputable organization.  It is an advocacy group but that's not --

Q   Right.

A   It's not a bad thing.

Q   Right, nothing wrong with that, right?

A   Well, no, I mean it's -- no, I don't think there's anything wrong with that at all.

Q   Now, you would agree, I think it's pretty plain, that the diagnostic criteria in the DSM called for two of ten domains of adaptive deficits to qualify for the diagnosis?

A   Yes.

Q   So let's look at those now.  I mean -- the ten of them are listed on page 49.  Let me put it up.  And I know you don't think he has any of these, all right, but let's just go through them.  He could be a good communicator, he could be

good in self-care, home living, social, interpersonal, use of community resources, self-direction, functional academic skills, but he could be deficient in, and I'm just saying hypothetically, work and leisure, and he could be fine in everything else and he would meet the diagnostic criteria under the DSM?

A   Yes, that's correct.

Q   And it doesn't matter, he could be wonderful in everything else, he could be the best truck driver that has ever lived, but if he can't take care of himself at work -- at leisure, or if his self-direction or his use of community resources, if two of those other categories are significantly impaired, he meets the qualifications?

A   Yes, that's correct.

Q   Or I should say the criteria.  You know, we have had some evidence and we may have more about how he learned to drive a truck, started out slow, improved over time, and my question is, isn't the treatment modalities for a person with mental retardation is that nowadays you offer them supports to try to eliminate the adaptive deficits?

A   That's correct.

Q   That's the whole goal of the AAMR, right?

A   Yes.

Q   And so Mr. Bourgeois never had any formal supports that we know of but he, our view, our evidence is that he relied

on folks, so if he relied on people to teach him things and was able eventually to learn to drive a truck and to, you know, handle some financial matters and as an adult to dress himself, that doesn't mean he's not having adaptive deficits as a child, does it, pre-18?  I mean that's the whole point, that we want people to improve, right?

A    That's correct, if they improve, if a person, hypothetically, is mentally retarded, adaptive behavior deficits, with the appropriate supports improves and no longer has the adaptive behavior deficits, they would not be mentally retarded any longer.

Q    Any longer?

A    That's correct.

Q    Okay.  But, that doesn't mean that he wasn't or this hypothetical person wasn't mentally retarded earlier in life?

A    That could be, yes.

Q    Now, you worked on Penry.  I didn't know that.

A    Yes.

Q    Let's assume for our discussion that for Judge Jack to award relief on this claim that he's got to be mentally retarded today.

          MR. WISEMAN:  That's not our view, Your Honor, just to be clear, but let's assume it hypothetically.

          THE COURT:  That he has to be what?

          MR. WISEMAN:  Mentally retarded today, or at the

time of the offense.  Our view is any diagnosis of mental retardation is sufficient to preclude the imposition of the death penalty, but that's a legal argument we can have.  I just want to ask a hypothetical.

THE COURT:  You -- okay.

BY MR. WISEMAN:

Q   And so my hypothetical is, if we had proof at the time of trial that Mr. Bourgeois was mentally retarded as a child but has developed out of it through supports, through prolonged learning processes, would you still consider that to be mitigating evidence to present to a jury in a capital case, that he grew up as a mentally retarded child?

MR. DOWD:  Judge, I would object.  I don't think the Doctor has been qualified as an expert in presentation of mitigating evidence in a trial.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Would you in such a circumstance write in your report --

THE COURT:  In what circumstance?

MR. WISEMAN:  The one I just went through.

THE COURT:  The one I just sustained the objection to?

MR. WISEMAN:  Well, I'm asking a different question about that circumstance.  I'm not asking him to talk about trial strategy.

BY MR. WISEMAN:

Q   Would you tell the lawyer that you were working for that, "In my view," I mean you wrote an article on it, "this is mitigating evidence"?

A   No, I would just tell him what my opinion was about the psychological issues and it would be up to the attorney to decide if he thought that the mitigating aspect of my opinion would help his client.

Q   All right.  I want to shift gears a little bit.  You worked on a case called Eddie Fields, United States versus Eddie Fields?

A   Yes.

Q   And that's out of the Eastern District, I think, of Oklahoma?

A   Yes.

Q   And by coincidence I am involved in that matter as well so we have some common ground here.  Do you recall when you did your evaluation for the Government in that case that -- well, let me withdraw that.  When you did your evaluation for the Government, did you engage in discussions with the trial team of United States Attorneys or did you deal with a segregated team of United States Attorneys?

A   It was, I think they called it a firewall attorney or something like that, that after I finished the evaluation I didn't have any other contact with the attorney for the

United States that had retained me until I showed up to testify. As I remember it, I think that's what happened.

Q  Yeah. No, I think that comports with my recollection. And in your article, at page 118, you have got a series of recommendations and you talk about the report that's done in a capital case and it says, "The report is sealed until the defense calls its examining witnesses and it is then given to the state and to the defense." Next bullet point, "There is no communication between the state and its expert about the exam or any conclusions that were drawn from the exam until the defense witness testifies. And that's an analogous firewall type situation as you just described in the Fields case?

A  That's the way it was in the Fields case. I don't recall that part of that article --

Q  Okay.

A  -- but I trust that you're reading that accurately and completely.

MR. DOWD:  Your Honor, may I inquire into the relevance of those questions?

MR. WISEMAN:  Sure. It's relevant because I take it the Government is going to argue that counsel made a strategic decision not to present some of this mitigating evidence because of the invocation of the name of Park Deets, and my position is that that's, that was improper, and this

is an expert witness who can tell you from a psychological or an expert witness perspective that's not the way it's done in those cases, and that's the relevancy.

MR. DOWD:  I didn't understand the firewall with the prosecution.  I didn't follow that.  Maybe it's just me.

MR. WISEMAN:  No, I mean, you know, we could go back and forth.  It's in the law, it's in the rule.

THE COURT:  You know what, just ask him questions.

MR. WISEMAN:  Okay.

THE COURT:  Because you've got three minutes left tonight.

MR. WISEMAN:  Oh.

BY MR. WISEMAN:

Q   You testified that there was no evidence that he was a student -- that as a student he received any, he wasn't identified as being mentally retarded?

A   I didn't see any evidence of that.

Q   Okay.  I mean, you saw the one page of school records, right?

A   Yes, that's correct.

Q   I mean that's, it's not like there's a big stack of records that you looked through on that?

A   I saw that and I asked him what kind of services he received and that's --

Q   Right, right.

A    That's the extent of my information.

Q    All right.  Are you familiar with the level of services that were available in the 1960s and '70s in that part of Louisiana that he's from?

A    No.

Q    I mean he grew up in a poor area?

A    That's my understanding.

Q    Are you aware that his brother Anthony is profoundly mentally retarded and has cerebral palsy?

A    No.

Q    If I told you that his brother Anthony who has those two diagnoses didn't receive services until he was an adult living in that same area, would that change your reliance on the lack of evidence that Mr. Bourgeois didn't receive services to support your opinion he's not mentally retarded?

MR. DOWD:  Judge, I --

THE COURT:  Just a moment.

MR. DOWD:  I would object.  I think that's a stretch because Anthony --

THE COURT:  Sustained.  If you want to qualify that. See, there's no indication that anybody requested services. I think that's the problem.

MR. WISEMAN:  Okay.  All right, fair enough.

THE COURT:  Because I think what Ms. Booth or someone was pointing out at the time, that if you are cared

for at home and you don't think you need services and you can do, you know, whatever you think is necessary.  But he started receiving services in 2001, I think.

MR. WISEMAN:  Right.

THE COURT:  But I think that was, his mother got ill or something?

MR. WISEMAN:  Yes, yes.

THE COURT:  So.

MR. WISEMAN:  Well.

THE COURT:  If you want to change it around and qualify it, it will be okay.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q   If a child is -- well, children are required to go to school in all the states of the Union, is that right?

A   That's my understanding.

THE COURT:  You know, I don't know anymore.  What is this about home schooling, and I don't even know what all this means.

MR. WISEMAN:  That's fair enough.  They are required to get an education.

THE COURT:  I guess.

MR. WISEMAN:  I don't think Eunice was home-schooling Anthony.

THE COURT:  Pardon?

MR. WISEMAN: I don't think Eunice was home-schooling Anthony.

THE COURT: No, no, but I'm asking, it's just such a strange thing. I don't understand who checks on that kind of thing anymore.

MR. WISEMAN: Yeah. That may be a whole other discussion but --

THE COURT: When I was a kid we had truancy officers that were running around, literally.

MR. WISEMAN: Yeah.

THE COURT: I don't know where they are now.

MR. WISEMAN: In Philadelphia they fine the parents if you --

THE COURT: And that's fair. We always get blamed for the kids anyway, right?

MR. WISEMAN: So -- you're just trying to distract me.

THE COURT: I am not. I'm going to give you another three minutes tonight, I'm sorry.

MR. WISEMAN: Okay. So --

THE COURT: Kids are required to go to school.

BY MR. WISEMAN:

Q   Kids are required to go to school. So, you know, if Anthony was going to school with these conditions and there were any services available, he would have been, he would

have been identified as a profoundly mentally retarded person and given services, right?  I mean.

A    You know, I don't know any of this.  I don't have any other information.  If that's a hypothetical --

Q    Yeah.

A    -- then I would say if a child that was profoundly retarded was going to school, I mean, I would think that they would give him services.

Q    All right.

A    I don't know about that area, that time, or anything about Anthony.

Q    Okay, so that's fair enough.  And I guess the point then is that you can't put a whole lot of stock in the fact that you didn't see evidence that Mr. Bourgeois didn't get services in rendering your conclusion that he's not mentally retarded.  That's the whole point here.  Do you agree with that?

A    Well, I think it's a factor.

Q    Right.  That, I --

A    That he was identified for speech services but he says that's what it was and I don't have any indication.

Q    Well, I mean, we don't have to have a big fight about this.  You would agree that it's not a big factor, it's a small factor.  It's a small, tiny, infinitesimal, insignificant, irrelevant, silly factor.  You can pick any

one of those.

THE COURT:  Or none at all, none of the above.

MR. WISEMAN:  Your Honor, I think maybe this would be a good time to break.

THE COURT:  Might be a good time, I agree with you. We will get our thoughts together tomorrow.  What time?

MR. WISEMAN:  I think early may be better than late, just because we want to get this all done.

THE COURT:  8:00 or 8:30?

MR. ROBERTS:  8:30 should be fine, Your Honor.

THE COURT:  Okay.  All right, then I will see you then tomorrow.  Thank you, sir.

MR. ROBERTS:  I was just going to say, for the Court, we're looking at our witness list and we may have some cuts on it.

THE COURT:  Okay.

   (The proceedings adjourned at 6:04 p.m. until 9-24-10)

INDEX


WITNESSES
FOR RESPONDENT/GOVERNMENT:

|  | Direct | Cross | Redirect | Recross | Further Redirect | Voir Dire |
|---|---|---|---|---|---|---|
| Danny Clark | 4 | 9 | 30 | 36 | 39 | |
| Robert Patterson | 53 | 67 | | | | |
| William Shotts | 72 | 89 | 97 | 99 | | |
| Christopher Key | 102 | 124 | | | | |
| Rhonda Davis | 140 | 155 | 184 | 185 | | |
| J. Randall Price | 187 | | | | | 193 |
| | 194 | 231 | | | | |


EXHIBITS

| | | Admitted |
|---|---|---|
| Petitioner/Defendant's: | | |
| 141 | NAS Report Strengthening Forensic Science in the United States - A Path Forward | 44 |
| 152 | Excerpts of Medical Records re JG | 46 |
| 171 | Coastal Bend Psychiatric Assoc. Forensic Referral Form | 2 |
| 178 | Sealed Exhibit - ABAS-II | 174 |
| | | |
| Respondent/Government's: | | |
| 1 | Report of Dr. Price | 195 |
| 2 | Dr. Price CV | 188 |
| 3 | Dr. Price List of Prior Testimony | 190 |
| 14 | Voluntary Statement of Mr. Bourgeois to Dr. Price | 221 |
| 23 | Legal Correspondence by Mr. Bourgeois from prison (47 pages) | 222 |
| 24 | Legal Correspondence by Mr. Bourgeois from prison (29 pages) | 222 |
| 25 | Legal Correspondence by Mr. Bourgeois from prison (43 Pages) | 222 |
| 26 | Legal Correspondence by Mr. Bourgeois from prison (2 Pages) | 222 |

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


/s/ Judith M. Garcia_____        _November 5,2010_