IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     SEPTEMBER 21, 2010
                                   *     8:00 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 2

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

                   (APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:              MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)

FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 8:00 a.m.)

(Call to Order of the Court.)

THE COURT:  Thank you.  You may be seated.  Are you all ready?

MR. WISEMAN:  Yes, Your Honor.

MS. LARIN:  Good morning, Your Honor.

MS. BOOTH:  I'm having trouble with him, Your Honor.

THE COURT:  I knew you were going to have trouble with him.

MS. BOOTH:  Yeah.

THE COURT:  Ready?

MS. LARIN:  Good morning, Your Honor.  I'd like to call Claudia Williams, please.

THE COURT:  Okay.  Could you come forward, please, ma'am.

CLAUDIA WILLIAMS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Ms. Williams, can you please state your name for the record?

A.   Claudia Williams.

MS. LARIN:  Should she lean forward?

BY MS. LARIN:

Q.   Can you just lean a little forward?  But be careful not to touch the microphone.

A.   Yes.

Q.   And if, maybe if you put your right arm and just lean a little bit.  Okay.

THE COURT:  Thank you, ma'am.

THE WITNESS:  Thank you.

MS. LARIN:  I stole your line.  Sorry.

THE COURT: Perfect.

BY MS. LARIN:

Q.   And how are you related to Mr. Bourgeois?

A.   That's my brother.

Q.   Are you older or younger than him?

A.   I'm older.

Q.   And how many siblings do you have?

A.   Seven.

Q.   There's seven children?  There's seven of you?

THE COURT:  Are there eight of you altogether is what you're saying?

THE WITNESS:  Seven.  My mom had seven children.

THE COURT:  Okay.  You said, "How many siblings?"

MS. LARIN:  Yeah.

THE COURT:  Never mind.

MS. LARIN:  So to clear that up, I have put together this little demonstrative aid.  It's parked P-166.  And I don't think the Government has an objection.

MS. BOOTH:  No, we don't, Your Honor.

MS. LARIN:  And it might just help things move along.

BY MS. LARIN:

Q.   So Claudia, I understand you're the oldest sibling?

A.   Yes.

Q.   Your mother's first child?

A.   Yes.

THE COURT:  Please refer to people by their last names.

MS. LARIN:  Oh, I'm sorry.

BY MS. LARIN:

Q.   Okay.  Let's just go through this quickly.  Ms. Williams, you were born in 1959?

A.   Yes.

Q.   And you have two other brothers by the same father?

A.   Yes.

Q.   Clyde and Lloyd?

A.   Yes.

Q.   Clyde, you're not sure of his date of birth, and we couldn't find any records of his date of birth, but Lloyd is 12/14/1960?

A.   Yes.

Q.   Anthony is also your brother, who has taken your last name, but his father is actually someone named Mr. Baker?

A.   Yes.

Q.   And he was born in 1962?

THE COURT:  We're having trouble hearing you.

THE WITNESS:  Oh, okay.

THE COURT:  Could you speak up or lean into the microphone more.

THE WITNESS:  Okay.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   Then there's Alfred, the Defendant, the Petitioner.  And then Michelle Rixner-Warren and Keith Rixner.  And Michelle -- they both have the same father, correct, Godfrey Rixner?

A.   Correct.

Q.   Michelle was born in 1966, and she's recently passed away?

A.   Correct.

Q.   And Keith Rixner was born in 1967?

A.   Correct.

Q.   So as I understand this birth order, Alfred was the fifth child, and he's born, your mother had five children in five years, or maybe close to six years.

A.   Correct.

Q.   Is that correct?

A.   Correct.

Q.   Thank you.  I'm going to put this away, unless -- or one other thing.  In around, you think, 1972, July 4th, 1972, your brother Clyde was drowned.  Is that correct?

A.   Correct.

Q.   He died by drowning?

A.   Correct.

          MS. LARIN:  I'm going to move on from this.

          THE COURT:  Now, did you have the same mother and father as Mr. Bourgeois?

          THE WITNESS:  No, no, ma'am.

          THE COURT:  Different father?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  And your whole, the siblings that you have that are the same father and mother are the first three, you and Mr. -- and the Clyde Ferdinand and Lloyd Ferdinand?

          THE WITNESS:  Correct.

          THE COURT:  Okay.  And did Anthony Ferdinand have the same father as you?

          THE WITNESS:  No, ma'am.

          THE COURT:  Okay.

BY MS. LARIN:

Q.   And Alfred's father was someone named Alfred Sterling?

A.   Correct.

Q.   Okay.  So there's seven children, but by four different fathers?

A.   Correct.

Q.   Okay.  I'm going to move on.  When did your mother pass --

          THE COURT:  Would you offer that so I can have it?

          MS. LARIN:  Oh, yes.  I'm sorry.  The Petitioner -- I

mean the Government has no objection, I think, so I'd like to offer that.

THE COURT:  What is the number?

MS. LARIN:  It's Petitioner's Exhibit 166.

THE COURT:  That's admitted.  Thank you very much.

MS. LARIN:  Thank you very much.

BY MS. LARIN:

Q.   And when did your mother pass away?

A.   It's been about five years now.

Q.   Okay.  And can you tell me where you all grew up?

A.   In Paulina, Louisiana.

Q.   And was there a more specific name or neighborhood of where you lived?

A.   It was down Bend Lane.

Q.   Bend Lane.  Is that B-E-N-D?

A.   B, as in boy.

Q.   B as in boy, E-N-D, as in --

THE COURT:  Around the bend.

BY MS. LARIN:

Q.   -- dog.  Around the bend?

A.   Right.  Bend Lane.

Q.   A bend in the river?

A.   Right.  Right.

Q.   Okay.  And can you describe that briefly, that neighborhood?

A.   A very good neighborhood, quiet, people get along, you know, everybody communicate with one another.  Very good neighborhood.

Q.   Are you all related in some way, the families that live there?  How many families live there?

A.   About two sets of families.

Q.   Two --

THE COURT:  About what?

THE WITNESS:  About two.

THE COURT:  Two families?

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

BY MS. LARIN:

Q.   Two sets of families?

A.   Uh-huh.

Q.   And Bend Lane is actually a lane, like one street.

A.   Right.

Q.   Correct?

A.   Right.  Correct.

Q.   And what surrounds Bend Lane?

A.   You have fields, cane fields on one side.

Q.   Okay.

A.   Mostly cane fields.

Q.   And then the river on the other?

A.   Right, uh-huh.

Q.   And can you tell me about your brother, Anthony Ferdinand, Anthony Baker Ferdinand?

A.   Okay.  He born -- he has cerebral palsy.  He born like that.

Q.   Okay.  And he's had this problem his entire life.  And can you tell me some of how that affects him, what is he able to do or not do because of his cerebral palsy?

A.   The only thing he can do is feed his self, but he can't bathe his self, he can't put his clothes on --

Q.   Okay.

A.   -- stuff like that.

Q.   Can he walk?

A.   He can walk.

Q.   How old was he when he learned how to walk?

A.   Well, when he was small, he couldn't walk.  My mother used to, like drag him, because he was, he --

        MS. BOOTH:  I hate to interrupt, Your Honor.  I'm just wondering about the relevance of this line of questioning.

        THE COURT:  Could you move along, please?

        MS. LARIN:  Okay.  It is very relevant, though, Your Honor.  I'll get to that.

BY MS. LARIN:

Q.   And who supported Anthony through his childhood?  Did he receive any assistance?

        MS. BOOTH:  And again, my objection, Your Honor, is

to the relevance of this line of questioning.

THE COURT:  Could you respond to that?

MS. LARIN:  Could I respond?  The relevance is two things, the overwhelmed nature of the situation when his mother was also trying to take care of Alfred, and also the comparative disabilities.  And third, the fact, as you will find out, even Anthony wasn't receiving services through his childhood.

THE COURT:  But we know that.  He didn't start receiving services till 2001.

MS. LARIN:  Right.  Okay.  I felt like we had to, you know, support the things the doctor relied on.  But if we can move on from those things, that's fine.

MS. BOOTH:  Well, Your Honor, I think there's an assumption here that just because you don't go to the state or the government to pay for something for you, that needs are not being addressed.  That seems to be the assumption, that just because Anthony wasn't getting state supported help, that he wasn't being taken care of, which --

MS. LARIN:  That's not my assumption.

THE COURT:  Was he being taken care of?

MS. LARIN:  Of course he was being taken care of.

THE WITNESS:  My mother was taking care of him.

MS. LARIN:  Yes.

THE WITNESS:  She's the one who took care of him.

MS. LARIN:  But the point is to help me explain why Alfred was not identified as someone with special needs, as far as we can tell, by the government.

THE COURT:  By the government?

MS. LARIN:  Or by the school.  I mean, even Anthony wasn't identified, so --

THE COURT:  Was there any question in your mind that there was something wrong with Anthony?

THE WITNESS:  He was born (inaudible), he was retarded.

THE COURT:  I mean, I'm not understanding -- she said he was born with cerebral palsy, he was retarded.

MS. BOOTH:  So he was identified by the family.

THE COURT:  So the point is?

MS. LARIN:  I thought the Government was making allegations that Alfred didn't have delays, and part of their proof was that he wasn't identified by the government or the school system.  And I feel like this is evidence --

THE COURT:  They're not proving anything.

MS. LARIN:  Okay.

THE COURT:  You're supposed to be proving that he's mentally retarded.

MS. LARIN:  Okay.  We will move on.

THE COURT:  They've already been through the trial.

MS. LARIN:  Okay.  We will move on.

THE COURT:  Thank you.

MS. LARIN:  Although, I would like to go more into depth about the overwhelmed nature of the early childhood.  Is that okay?

THE COURT:  Why don't you just ask questions --

MS. LARIN:  Okay.

THE COURT:  -- about Mr. Bourgeois.

BY MS. LARIN:

Q.  So was it hard to care for Anthony as a child?

A.  Yes, ma'am.

THE COURT:  Could you please just go into Mr. Bourgeois?

MS. LARIN:  Okay.

BY MS. LARIN:

Q.  What was it like in your mother's home as a child?

A.  It was not good.

Q.  Can you describe that a little bit?

A.  My mother was a person, my mama was a person, she used to treat Alfred real bad.  She abused him real bad.  She used to, she used to -- excuse me -- Alfred was a child, he didn't listen or nothing like that.  I noticed Alfred had problems. He was very slow.  And my mother used to whip him so bad.

I remember when I was small, she took him in the bathroom and took all his clothes off, and she whipped him so bad.  She whipped him with an extension cord.  And she whipped him so

bad, and I walked in the bathroom, I asked my mama what she was doing.  She said, "I'm whipping him."  I said, "Well, why are you whipping him?"  She said, "Because he don't listen."  I said, "Well, he didn't do anything."

     And she whipped him so bad, I have never seen that before.  She whipped him, he was blue black.  And I remember the blood was coming from the side of his legs and his back and stuff like that.  And I was fussing with her, and I said, "Mama, don't do that."  And of course, she knocked me out of the bathroom, told me to get out of the bathroom.  My mother was, she was a disturbed person, to me.

Q.   And did this sort of thing only happen one time, or did it happen more often?

A.   Constantly, when I was small, I remember that.  Constantly.  She used to whip him --

Q.   Can you describe some other things that your mother would do to Alfred?

A.   I remember one night, we was eating supper, and Alfred didn't want to eat the food.  And she said, "Why you not eating?"  And Alfred say, "I don't like that.  I don't like what you cook."  And she say, "Yeah, you're going to eat it."  And I remember, he ate a little bit and he spit it out.  And he had his hand on the table, and she took a meat cleaver and went down on his hand.  And she cut the tip of it.  My mother did Alfred some wrong things, bad things.

Q. Can you describe any more things that she did to Alfred?

A. I remember one time she locked him in the closet. And he had no lights in there, and it was in a closet, and she left him in there a while. I remember those three things.

Q. Did that happen just three times? Or for example, was he locked in a closet one time or more than one time?

A. She used to do it most of the time. She would always abuse him, the time that I could remember.

Q. So at some point, you moved out of your mother's home. Correct?

A. Yeah. Correct.

Q. Do you know around what age you were when you moved out?

A. About nine, about nine.

Q. And you moved to two places. Right?

A. Correct.

Q. When you were nine, you started staying where?

A. First, I started living with Ms. Mary. That was the lady down the street.

Q. And so during that time, you were still spending some time at your mother's --

A. Right.

Q. -- and seeing Alfred?

A. Right. Correct.

Q. And then around -- where did you move next?

A. Then after that, I moved with my grandmother in Lutcher.

Q.   And where does your grandmother live?

A.   She used to stay in Lutcher.

Q.   Which is the next town?

A.   Correct.

Q.   And how old were you when you moved there?

A.   About 12.  About 12 years old.

Q.   Okay.  And you are, let me look at my chart, you are about, almost eight years -- oh, no, I'm sorry -- almost six years older than Alfred.  Correct?

A.   Correct.

Q.   So when you moved away to Paulina, Alfred was about six.

A.   Correct.

Q.   So are you saying that most --

         THE COURT:  Was that your maternal grandmother or your paternal grandmother?

         THE WITNESS:  That was my maternal grandmother.

BY MS. LARIN:

Q.   That was your father's mother or your mother's mother?

         THE COURT:  Mother's.

         THE WITNESS:  My father.

         THE COURT:  Oh, I thought you said "maternal."

         THE WITNESS:  I'm sorry, father.  My father's mother.

         THE COURT:  Your paternal.  Okay.

BY MS. LARIN:

Q.   And so around -- when you saw these beatings and the abuse

by your mother, how old was Alfred?  Was it when you were living at home or in, on the Bend?  Is that when you saw it?

A.    Yeah, I was living at home.

Q.    So Alfred was under the age of six?

A.    Correct.

Q.    You mentioned that Alfred was slow.  Can you describe what you mean by that?

A.    Like learning ability.  You used to show him things, like he couldn't catch on.  He was slow.  You had to constantly show him, you know, over and over what to do.

THE COURT:  Like what?

THE WITNESS:  Like doing his homework, he had problem with his homework.

THE COURT:  Well, you moved out before he started school.

BY MS. LARIN:

Q.    Well, you moved to Ms. Mary's.

A.    I was by Ms. Mary, living with Ms. Mary, but I was back and forth.  But Ms. Mary living, going back to my mother house.

Q.    Where was, just so --

THE COURT:  So you didn't move out completely?

THE WITNESS:  Well --

MS. LARIN:  Can I clarify, Your Honor?

THE COURT:  No, I'd like her to clarify it.

MS. LARIN:  Oh, you'd like to do it.  Okay.

THE COURT:  I think that would be best.  So you didn't move out completely?

THE WITNESS:  Well, what I used to do, we used to stay by Ms. Mary.  Like on the week, during the weekends, we would go back to my mother house, because I was like going to school, living with Ms. Mary.  But I was, like I said, I was back and forth.

THE COURT:  You lived with Ms. Mary?

THE WITNESS:  Uh-huh, I did too, uh-huh.

THE COURT:  Okay.  You didn't live with your grandmother?

THE WITNESS:  After I got 12 years old, then I moved to Lutcher with my grandmother.  I started going to school in Lutcher, uh-huh.

THE COURT:  And where was that in relationship to Ms. Mary?

THE WITNESS:  Well, the grandmother wasn't relation, but my grandmother, that was my daddy grandmother.  Ms. Mary just was a cousin to us, and we went and lived with her.  She was an old lady, and we went and lived with her for a while.

THE COURT:  When did you live with her?

THE WITNESS:  I was around about, about -- I guess it be about ten, ten, eleven years old, we started living with her.

THE COURT:  Who's "we"?

THE WITNESS:  Well, there was another girl, we used to go live with her.  The girl that I went with, that was her grandmother we went and stayed with.

THE COURT:  Who is that?

THE WITNESS:  Her name is Veranice (phonetic) Batiste.  That was her grandmother.

THE COURT:  Okay.

THE WITNESS:  And we lived there.

THE COURT:  And that's -- who all was living in the house while you were there.

THE WITNESS:  It was me, Veranice and -- it just was me and her.  But Alfred was there first before us.  Alfred had been living with her first.

THE COURT:  But if you were ten or eleven --

THE WITNESS:  Uh-huh.

THE COURT:  -- and he was six years younger, so he went, started living there at three or four?

THE WITNESS:  Your Honor, I'm not good with dates and numbers.

THE COURT:  Well, this is kind of important.

MS. LARIN:  Can I --

THE WITNESS:  Right.

THE COURT:  That's what you're here to tell us.

THE WITNESS:  I understand.

THE COURT:  I want to know how it is you observed

Mr. Bourgeois in school if you weren't living with them, all those kind of things.  And this is not making a whole lot of sense.

THE WITNESS:  Well, I mean, I lived --

THE COURT:  You don't appear to be a great historian.

THE WITNESS:  I understand.  When I lived with my mother, you know, when I was younger, as a child, you know, and I --

THE COURT:  Well, how old were you when you moved out from your mother's?  And you moved out for school purposes?

THE WITNESS:  Yes, uh-huh.

THE COURT:  So --

MS. LARIN:  That's actually a question.

THE COURT:  Pardon?

MS. LARIN:  That's actually, I would like to hear why she --

THE COURT:  You want to --

MS. LARIN:  Sorry.

THE COURT:  I'm just -- I'm sorry.  It's never a good idea --

MS. LARIN:  To interrupt.  I'm sorry.

THE COURT:  -- to interrupt the Judge.  Never good.

So you moved out to start school someplace else?

THE WITNESS:  Well, Your Honor, the reason why I moved out with my mother, because I wasn't comfortable living

with my mother.

THE COURT:  Okay.

THE WITNESS:  And I wanted to go stay with Ms. Mary, when I was smaller.  And then that --

THE COURT:  How old were you when you moved to Ms. Mary's?

THE WITNESS:  I was, I had to be around about, about ten, I think.

THE COURT:  About ten?

THE WITNESS:  About ten.

THE COURT:  So Mr. Bourgeois was four?

THE WITNESS:  Uh-huh, I guess.

THE COURT:  Okay.  So you moved in with Ms. Mary when you were ten.

THE WITNESS:  Uh-huh.

THE COURT:  And then when did you move in with your grandmother?

THE WITNESS:  I had to be around about 12.

THE COURT:  Okay.

THE WITNESS:  I started to going to school in Lutcher, in Lutcher, uh-huh.

THE COURT:  Okay.  Did you go to school when you lived with Ms. Mary?

THE WITNESS:  I did, elementary, yes, uh-huh.

THE COURT:  Okay.

THE WITNESS:  Yes, ma'am.

THE COURT:  And then so you really just lived with Mr. Bourgeois for four years or so at the beginning of his life?

THE WITNESS:  Yeah, you could say that.

THE COURT:  No, you say that.  You tell me.

THE WITNESS:  Yeah.  When I was, like I said, when I was coming up small, you know, I remember the things that used to go on in the house and stuff like that, because I was the oldest, you know.

THE COURT:  So he was about birth to four when this stuff was going on.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So he was not in school.

THE WITNESS:  Not at four, no.

THE COURT:  Okay.

THE WITNESS:  Not at four years old.

THE COURT:  So you say you came back from time to time on the weekends to your mother's house?

THE WITNESS:  Yes, ma'am, I came back on the weekends, uh-huh, with my mom.  I came back on weekends to come home.  Because like I was the oldest.

THE COURT:  What does that mean?

THE WITNESS:  I mean, me being the oldest, you know, like I had things I had to do, chores my mother say I had to

do, stuff like that.

THE COURT:  What did you do?

THE WITNESS:  Like clean up the house, cook sometime, fix up beds, stuff like that.

THE COURT:  Okay.  Go ahead.

MS. LARIN:  Thank you.

THE COURT:  Your turn.

MS. LARIN:  Thank you.  I'm sorry for interrupting you, Your Honor.

THE COURT:  That's all right.  It's a good lesson.

BY MS. LARIN:

Q.   Can you tell us how far away Ms. Mary's house was from your mother's house?

A.   From here to, just say like from where the water is out there, right there, walking distance.  It wasn't that far.

Q.   And it was on the same street?

A.   Yes, on the same street, uh-huh.

Q.   Okay.  And so would you see Alfred while you were staying at Ms. Mary's house?

A.   Correct, yes, ma'am.

Q.   About how often would you see him?

A.   When I used to go to Ms. Mary, he used to be back there, I used to go see him.  And like I said, we was back and forth. He used to come home to my mother --

Q.   I meant when you were living at Ms. Mary's house.

A.    Uh-huh.

Q.    Did you go back to your mother's house, or did he come see you at Ms. Mary's house?

A.    I used to go --

Q.    When you were about nine, ten, eleven.

A.    I used to go --

Q.    I mean ten, eleven, twelve.  I'm sorry.

A.    Okay.  Yeah, I used to go back there to, where I was living at with Ms. Mary --

Q.    Uh-huh.

A.    -- and he used to come see us.  We was like back and forth.

Q.    Okay.

A.    Uh-huh.

Q.    And then you moved to your grandmother's house.

A.    Yes.

Q.    And you would still come home to your mother's house?

A.    Right, on weekends.

Q.    And you would see Alfred.

A.    Right.  Correct.

Q.    And at some point Alfred moved into Ms. Mary's house.  Is that correct?

A.    Correct.

Q.    And do you know about how old he was?  If you don't know, that's fine.

A.   I'd say he had to be about seven, about seven years old.

Q.   Okay.

THE COURT:  And who was living at Ms. Mary's house then when Mr. Bourgeois moved in?

THE WITNESS:  Yes, ma'am.

THE COURT:  Who was living there when he moved in?

THE WITNESS:  It was Vera, she was living there, and like I said, I was there, too.  And then Alfred, you know, he came.  Ms. Mary, like, was taking care of us.

THE COURT:  Okay.  But you moved out of Ms. Mary's when you were 12.

THE WITNESS:  Right.

THE COURT:  To your paternal grandmother.

THE WITNESS:  Uh-huh.

THE COURT:  And that's when Mr. Bourgeois moved in apparently.

THE WITNESS:  Okay.

THE COURT:  No, I'm not saying -- I'm asking you.

THE WITNESS:  It's just dates, Your Honor, I'm not good with dates and time too good, you know.

THE COURT:  Well, you said and he said --

THE WITNESS:  Right.

THE COURT:  -- apparently, at least I've heard him say that he moved in with Ms. Mary when he was about seven.

THE WITNESS:  Okay.

THE COURT:  So you were at your maternal grand, paternal grandmother's by then.  Is that right?

THE WITNESS:  Uh-huh.

THE COURT:  So do you know who was living in Ms. Mary's house when Mr. Bourgeois was living there?

THE WITNESS:  Like I said, Vera.  Vera was there.  She was living there with us, Vera.  Her name was Vera.

THE COURT:  Well, you weren't living there when Mr. Bourgeois was there.

THE WITNESS:  No, not at the time, because like I said I had to be about 12 --

THE COURT:  Okay.

THE WITNESS:  -- when I went back over there.  But Vera was there, because that was her grandmother.

THE COURT:  Okay.

THE WITNESS:  She was there first.  And then Alfred.

THE COURT:  And her name is?

THE WITNESS:  Vera.

THE COURT:  Last name?

THE WITNESS:  Batiste.

THE COURT:  Batiste?

THE WITNESS:  Uh-huh.

THE COURT:  And that's who was, when Mr. Bourgeois was living at Ms. Mary's, Ms. Batiste was living there, and Ms. Mary was living there, and Mr. Bourgeois?

THE WITNESS:  Yes, ma'am.

THE COURT:  Anybody else?

THE WITNESS:  That's all.  That's all I remember.

THE COURT:  Thank you.  Go ahead.

BY MS. LARIN:

Q.   Okay.  You described Alfred, you were describing Alfred as slow, and I was wondering if you could give some examples about that.

A.   All I know is when I tried to help him with his homework --

Q.   And so, just to pause, this is where we got sidetracked before.  When would you help him with his homework?  Were you living -- where were you living and where was he living that you would have, you would have helped him with his homework?

A.   At the time he was by Ms. Mary.  I used to go back there and help him with his homework.

Q.   Okay.

A.   And I used to try to help him do his homework, but I seen, what I seen about Alfred, he was very slow.  You had to constantly show him what to do and how to do it.

THE COURT:  What school did you go to?

THE WITNESS:  I went to Lutcher High School.

THE COURT:  Well, what about elementary school did you go to?

THE WITNESS:  I went to, it was Lutcher Elementary.

THE COURT:  Is that where Mr. Bourgeois went?

THE WITNESS:  I'm trying to remember the school.  I think Alfred went to Paulina's school.  I think, I'm not sure, but I think it was Paulina's school, because they had different schools.  But by me moving to Lutcher, I had to go to Lutcher Elementary.

THE COURT:  Right.

THE WITNESS:  It was Paulina.

THE COURT:  So who was living in Lutcher when you started first grade?  Where were you living when you started first grade in Lutcher?

THE WITNESS:  Where was I living?

THE COURT:  Uh-huh, yes, ma'am.

THE WITNESS:  First grade, I'm trying to remember, Your Honor.  First grade, okay, when I was in first grade, I was living with my mama.  It was at Paulina School that first year.

THE COURT:  Okay.

THE WITNESS:  Okay.  It was St. Martin, used to call it St. Martin School, right, because that was first grade.  Right.  Okay.  I was living at my mother at the time when I was going to first grade, because it was called St. Martin Paulina School.  That's where I used to go.

THE COURT:  Okay.  So what grades did you make in elementary school?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  What grades did you make in elementary school?

THE WITNESS:  B's, B's and C's.

THE COURT:  And in high school?

THE WITNESS:  B's and C's.

THE COURT:  Go ahead.

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Is there any other examples that you could tell the Judge about things that Alfred was slow at as a child?

A.   I remember I used to tell him to do things, like one time I told him to go clean up in the bathroom, clean the tubs, the toilets and stuff, and he would go in there.  And I'd say, "Alfred, did you clean up?"  He'd say, "Yes."  I'd say, "Well, it don't look like it, because the bathtub's still dirty."  And he said, "Well, I did it."

THE COURT:  See, my husband does that.

THE WITNESS:  And he say he did it.

THE COURT:  I don't know if that's qualified as slow.

THE WITNESS:  Comprehension, it's just repeating it.

THE COURT:  I see what you mean.

THE WITNESS:  You understand?

BY MS. LARIN:

Q.   Any other examples --

MS. BOOTH:  Excuse me, Your Honor, I'm going to object for the record.  In any way implying that a 7-year-old boy that doesn't clean up the bathroom after he's been asked to do it by his sister is any indication of any kind of mental disability.

THE COURT:  Well, I think --

MS. LARIN:  What age -- I don't know that she's necessarily talking about age.

MS. BOOTH:  I'm taking the youngest possible age it can be, you know, or even younger than that.  But that's no indication of any kind of mental disability.

MS. LARIN:  Why does that --

BY MS. LARIN:

Q.   Okay.  So what age do you think you were trying to ask him to wash the bathroom?

A.   Well, I know he was young.  I can't remember the age.  I'm not good with age.

Q.   Did he seem too young that he shouldn't --

THE COURT:  Were you still living at the house when you did that?

THE WITNESS:  Yeah, because -- yes, at the time.

THE COURT:  So he would have been four or three?

THE WITNESS:  About four or five, I guess.

THE COURT:  About four.

THE WITNESS:  Uh-huh.

THE COURT:  Okay.  Moving on.

BY MS. LARIN:

Q.    Okay.  When you asked -- did you ever -- there were other children in your home.  Correct?  There was Michelle, for example.

A.    Correct.

Q.    Were you around when Michelle was young?

A.    Correct.  Yes, I was.

Q.    So how -- you weren't living there, but you saw Michelle often?

A.    Correct.

Q.    And if you asked Michelle to do -- was there -- could you compare what Michelle could do to what Alfred could do?

MS. BOOTH:  Your Honor, I'm going to object.  She's asking for some kind of retroactive interpretation of a 12-year-old, that's how old she would have been, comparing the difference between two children that were four and six.  I mean, how can that be -- first of all, how can that be relevant to what we're talking about here?  How can she make, how can she make that opinion?  I mean, it's ludicrous, a 12-year-old, from the eyes of a 12-year-old, and what is she now?  At least 39.

THE COURT:  Well, where were you when we were talking about the 13-year-old taking an IQ test for Mr. Bourgeois?

MS. BOOTH:  Exactly, Your Honor.

THE COURT:  Okay.

MS. LARIN:  Can I clarify?

THE COURT:  If you can answer that, fine.  If you don't remember, move on.

BY MS. LARIN:

Q.  Were you 12 years old, when we're talking about -- did you at any point ever stop having a relationship with your younger siblings?  Did you ever stop seeing them altogether?

A.  No.

Q.  How often would you see them?

A.  On a regular basis, you know.

Q.  When you were at your grandmother's, living in Lutcher, how often would you spend time at your mother's house?

A.  We would come home for the weekends and like --

Q.  Every weekend?

A.  Every weekend.

Q.  And you would live at your mother's house, and you said you had chores at your mother's house on the weekends.

A.  Correct, uh-huh.

Q.  And so you saw Alfred, Michelle, Keith and Anthony and Lloyd throughout their childhood?

A.  Correct.

Q.  Into adulthood?

A.  Correct.

Q.  Okay.  Let's pick a time.  Let's say you are 16 years old.

A.    Uh-huh.

Q.    You're living at your grandmother's house.

A.    Okay.

Q.    Alfred is 10.

A.    Okay.

Q.    Michelle is 8.  Can you give us a comparison?  Alfred is 10 years old.  Can you have that picture in your head?

A.    Okay.

Q.    Alfred was living at Ms. Mary's house.

A.    Correct.

Q.    He would also be home with the mother on weekends often?

A.    Some --

Q.    Or you would -- would you see him at Ms. Mary's house?

        THE COURT:  Sometimes?

        THE WITNESS:  Sometime.  Not often.  Because like he was living with Ms. Mary.

BY MS. LARIN:

Q.    By that time?

A.    Right.

Q.    By age ten?

A.    Right.

Q.    Okay.  Would you see him at Ms. Mary's house?

A.    Correct, yes.

Q.    Okay.  Can you offer us any examples from that age when he was living at Ms. Mary's that he seemed slow to you compared to

other children around his age?

A.   Yes.

Q.   Can you please tell the Judge?

THE COURT:  Do you have specific memories of the dates and the ages?

THE WITNESS:  I'm not good with dates.

MS. LARIN:  We're on age ten here.

THE COURT:  Just please --

MS. LARIN:  Okay.  I did it again.

THE COURT:  Don't interrupt me, please.  You said you had trouble with ages, and she's telling you what happened when he was ten.

THE WITNESS:  Right.

THE COURT:  Do you even, are you able to set that in your mind?

THE WITNESS:  Your Honor, I can remember when Alfred was that age, my mother abused him so much.

THE COURT:  Well, he was ten, so he was living with Ms. Mary.

THE WITNESS:  Yeah, but I'm just saying, you know, when he, he still used to go back and forth.  And you know, when we was there sometime, we used to see him still.  She used to abuse him and whip him a lot, and we used to see that.  And I used to ask her why she whipping him, and it's for nothing, for no reason.  I used to ask her that.  And of course, she'll

go off on me.  And that's why he didn't want to live with her, because she used to abuse him so bad.

THE COURT:  Well, I understand that.

THE WITNESS:  Uh-huh, and that's why he didn't feel comfortable --

THE COURT:  Did your mother work outside the home?

THE WITNESS:  No, ma'am.

THE COURT:  How did she live?

THE WITNESS:  Well, she was married.  She was married to my dad, but they divorced.  And then after, she remarried Michelle and Keith daddy.

THE COURT:  She what?

THE WITNESS:  She remarried.

THE COURT:  Okay.

THE WITNESS:  And then after that, well, he left, so she was on her own.

THE COURT:  How old were you when your stepfather left?

THE WITNESS:  I was a little older then.  I had to be -- trying to think.  I had to be around about -- I was like in, had to be around about 20 or something.

THE COURT:  Okay.

THE WITNESS:  Because I was a little older.  Yeah, I was older.

THE COURT:  Okay.

THE WITNESS:  But I remember that.

THE COURT:  So Counsel was asking you to compare the abilities of Mr. Bourgeois with your sister, Michelle.

THE WITNESS:  Uh-huh.

THE COURT:  Can you do that?  And can you remember a specific age for each of them when you're doing that?

THE WITNESS:  All I remember, like I say, to me, Alfred was a person you could try to explain things to him, you know, and show him things, but like to me, he had a comprehension -- he couldn't pick up right away, to me, from what I see.  You had to, you know, constantly show him and explain to him just how this go, and you do it this way, you know.

THE COURT:  Like cleaning the bathroom?

THE WITNESS:  No, not just cleaning the bathroom. I mean like his homework and -- mostly like his homework.  I noticed he had problem in his homework.  He couldn't understand certain things.  You know, you had to constantly show him, you know, what to do and how to do it.  And then --

THE COURT:  So when he started school at six, you were twelve and in, living in another community?

THE WITNESS:  Yeah.  But like I said, when I come home, when I used to come home --

THE COURT:  On the weekends.

THE WITNESS:  -- sometime on the weekends, uh-huh,

and --

THE COURT:  He did homework on the weekends in first grade?  When did you first, in that elementary school, when did you first start doing homework?  I know I was, didn't do much homework at all in elementary school, but --

THE WITNESS:  It was mostly like writing, you know, like you write -- they had them writing, writing their ABC's, stuff like, tracing stuff like that.

THE COURT:  When did you start doing homework?  Can you remember?

THE WITNESS:  When I start doing homework?  Like for myself, you mean?  Well, I mean, when you're in kindergarten, they teach that, you know, you have to do -- not homework, but you have to do like try to learn how to write your name, stuff like that.  Stuff like that, you know.

THE COURT:  Well, he writes very well, Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  I've seen his writing.

THE WITNESS:  Uh-huh.

THE COURT:  He spells well and writes well.

THE WITNESS:  Okay.

THE COURT:  So when did you -- so when you were there on the weekends, what homework was he trying to do and what age are we talking about?

THE WITNESS:  Mostly letters, like that I could

remember, letters, like --

THE COURT:  Writing his letters?

THE WITNESS:  Yeah, like the teacher have like the letter's already there, and you just have to trace it, something like that.

THE COURT:  You're supposed to, okay, or copy it?

THE WITNESS:  Yes, ma'am.  Yes, ma'am.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

BY MS. LARIN:

Q.   Okay.  We're going to fast-forward a few years.  Do you know, how long -- when did Alfred stop living with Ms. Mary?  What happened?  Did he ever stop living with Ms. Mary?

A.   As he got older.

Q.   At some point, Ms. Mary passed?

A.   Yes, ma'am.

Q.   And do you know where he moved after Ms. Mary passed?

A.   I think he went and stayed with his sister, Michelle.  Michelle Omar.

Q.   His sister, not by your mother.

A.   No, not by my mother.

Q.   Okay.

THE COURT:  Who, Michelle was --

THE WITNESS:  Michelle Omar.  That was his stepsister.  That was Alfred daddy child.

THE COURT:  Okay.  Did you know her?

THE WITNESS:  Yes, ma'am.

BY MS. LARIN:

Q.   And then at some point did Alfred stay with you?

A.   Yes, ma'am.

Q.   Can you remember about what age he was when he lived with you?

A.   He had to be a little older.  Alfred had to be a little older.  I'm trying to think of the age.  He had to be probably about 18 or 19, something like that.

Q.   Okay.  When Alfred lived with you, was he able to take care of himself?

A.   No.

Q.   Meaning, you know, did he cook his own food?

A.   No.

Q.   Who cooked for him?

A.   I did.

Q.   And how do you know he couldn't cook for himself?

A.   He thought he could cook.

THE COURT:  What does that mean?

THE WITNESS:  He tried to cook, but it wasn't eatable.  You couldn't eat it.

THE COURT:  Did he eat it?

THE WITNESS:  No.  No.  He tried, but he --

THE COURT:  Well, I hate to say this, but you know,

bad cooking is not a sign of retardation.

THE WITNESS:  Uh-huh.

MS. LARIN:  Well, according to the green book, it actually -- self-care and home living.

THE COURT:  Self-care is something different.  He bathed himself and dressed himself, all those things?

THE WITNESS:  Yeah, he bathed his self and dressed his self.

THE COURT:  Dressed himself?

THE WITNESS:  Uh-huh.

THE COURT:  No trouble with brushing his teeth?

MS. LARIN:  Your Honor --

THE WITNESS:  I'm sorry?

THE COURT:  No trouble with brushing his teeth?

THE WITNESS:  No, not when he was older.

THE COURT:  Now, how many of us here are great cooks?

MS. LARIN:  Could I just --

THE COURT:  There.  Mr. Wiseman.

MS. LARIN:  He is a great cook.  I hear from him all the time that he's a great cook.

MR. WISEMAN:  And a little narcissistic.

MS. LARIN:  Your Honor --

THE COURT:  Mr. Roberts --

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  -- are you a good cook?

MR. ROBERTS:  I am not a good cook, but I have a great wife who's a good cook, Your Honor.

THE COURT:  Is it edible, your food?

MR. ROBERTS:  The food that I cook?  I wouldn't eat it, Your Honor.

THE COURT:  Okay.

(Counsel conferring off the record.)

THE COURT:  I heard him talk about on the video that I saw, Mr. Bourgeois, talk about how he cooked deer meat and raccoons and squirrel.

THE WITNESS:  Uh-huh.

THE COURT:  He learned that from Ms. Mary?

THE WITNESS:  I don't know.  Wildlife?  I don't know.

THE COURT:  Sounded kind of bad to me.

THE WITNESS:  Wildlife, I don't know where that one came --

BY MS. LARIN:

Q.   Okay.  Can you tell us who did Alfred's laundry?

A.   I did.

Q.   And after Alfred moved -- did Alfred leave your house at some point?

A.   Yes, he did.

Q.   And where did he move?

A.   Like I said, he had moved in with Michelle, his other sister.

Williams – Direct

42

Q.   Right.  Then he moved with you?

A.   Right.

Q.   And what happened next after --

A.   And then after he got older, I think he moved away to LaPlace.

Q.   Did he ever live in a mobile home?

A.   Oh, yes, he did, yeah.

Q.   And where was that mobile home?

A.   It was in the same yard that my trailer was.

Q.   So about how many feet away?

A.   Like just in the backyard.

Q.   Like from me to you, or a little further?

A.   From here to the hallway out there, you could say. Because it was in the same yard.

Q.   Okay.  And at that time did Alfred cook for himself, as far as you know?

A.   No, not that I know of.

Q.   Who would feed him?

A.   Well, I would cook.

Q.   Okay.

A.   And bring him the food.

Q.   And the same for his laundry?

A.   Yes, ma'am.

Q.   Do you remember at all any of the jobs Alfred had at that time?

A.    I remember --

Q.    Around, you know, the time he was living with you and in the mobile home in your yard.

A.    Winn-Dixie, he used to work at Winn-Dixie.  I remember that.

Q.    Okay.  And what else?  Anything else?

A.    And Schwegmann he used to work, and then Imperial Sugar.

Q.    Imperial Sugar?

A.    Yes, ma'am.

Q.    What did he do there?  Do you know?

A.    Little packing little sugar.

Q.    Do you know how he got that job?

A.    My husband help him got that job.

Q.    Okay.  Do you know any other jobs he had, like who helped him get other jobs?

A.    No, I don't know who help him.  I can't remember that.

Q.    Okay.  Fast-forward again.

A.    Okay.

Q.    Now you testified at this trial, at your brother's trial. Correct?

A.    Correct.

Q.    And in that testimony, you talked about a conversation you had with Alfred about a phone call you had with him when he was on the truck.

A.    Uh-huh.  Correct.

Q.   Can you describe that conversation, please?

A.   When we was talking, I noticed Alfred, like he was disturbed.  He was nervous.  And I talked to him and I asked him how he was doing, and he say he was tired.  It was stressful.

     And he said, "I don't know what I'm going to do."

     I said, "What you mean?"

     He said, "I don't know what I'm going to do, Sis."

     I said, "Alfred," I said, "I don't know what you're going to do," I say, "but don't do nothing to hurt yourself or hurt your family."  I say, "Don't kill yourself."  I told him that.

     And I said, "Give Robin the phone," and I talked to Robin.  And I asked her what was going on, and she just say, you know, "Everything is all right."  But I could tell in her voice there was something wrong.

Q.   And what did you think he meant?

A.   Well, when he told me that, I said, "Lord," the first thing, I said, "Lord, my brother going to kill his self."  That's what I felt.

Q.   And you also -- I'm going to mark something.  Oh, I'm going to mark Petitioner's Exhibit 56.  This has been previously provided.  Provide it again.  And, Ms. Williams, do you recognize this?

A.   Yes, ma'am.

Q.   And I'm going to turn the page to -- is that your

signature?

A.    Yes, ma'am.

Q.    Okay.  In this -- what is this?

A.    I'm sorry?

Q.    In your own words, what is this piece of paper we're looking at?

A.    That's the family, our family.

Q.    Do you see that -- do you know, do you remember how this document came about?  Did someone from my office come talk to you?

A.    Yes, ma'am, Miss Pam.

Q.    Miss Pam.  Okay.  And did you talk to her about Alfred and Alfred's background?

A.    Yes, ma'am.

Q.    And did she write this up and bring it back to you for you to read over?

A.    Correct.

Q.    And is everything in this document true and correct, to the best of your knowledge?

A.    Yes, ma'am.

Q.    Okay.  And in this document, you talk about how sometimes Alfred would go into a rage.

A.    Correct.

Q.    Can you describe that a little bit?

A.    Alfred used to get temper fits.  He used to get angry.

Like he'd turn red.  His features would change.  And he was,
like to me, he would, like he just would go in a bad, bad rage.
And I think Alfred was like that because how my mother used to
treat him, the abuse that, how she used to whip him and stuff
like that.  And I think that affect him a lot.

Q.   And was this, would this happen when he was an adult?

THE COURT:  The whippings or the rages?

MS. LARIN:  The rages.  I mean -- sorry.  Thank you.

BY MS. LARIN:

Q.   Would he have these rage episodes -- how old was he when
these things would happen?

A.   Well, when he was young, when my mother was abusing him, I
remember --

Q.   He would --

A.   -- he had -- yes.

Q.   And then how about when he was older, did it ever happen
when he was older?

A.   Yeah, when he was older, yeah.

Q.   Okay.  Now --

MS. LARIN:  Could I have one minute, Your Honor?

THE COURT:  Pardon?

MS. LARIN:  Could I have a minute?

THE COURT:  Yes, ma'am.

MS. LARIN:  Thank you.

(PAUSE.)

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Ms. Williams.

A.   Yes, ma'am.

Q.   Do you remember before your brother's trial talking to an investigator for, who worked for Mr. Bourgeois's lawyers?

A.   Correct.

Q.   Can you tell me, can you describe him to -- where did you talk to him?  On the phone?  In person?  Do you remember?

A.   Who?

Q.   The investigator for Mr. Bourgeois.  His name was Mr. Bierbaum.  Do you remember speaking to a Gerald Bierbaum?

A.   Okay, yeah.

Q.   You do remember that?

A.   Uh-huh.

Q.   And do you remember if you told him that your brother was abused by his mother?

A.   Yes, I did.

Q.   You did tell him?

A.   Yes, ma'am.

Q.   And if the lawyers had asked you to testify about your child, your brother Alfred's childhood, would you have done so?

A.   Yes, ma'am.

Q.   And you would have answered as you did today about the abuse that you witnessed?

A.    Yes, ma'am.

Q.    And his slowness?

A.    Yes, ma'am.

        MS. LARIN:  Thank you, Your Honor.  I have no further questions.

        THE COURT:  Thank you, ma'am.  Ms. Booth?

        MS. BOOTH:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good morning, Ms. Williams.

A.    How you doing?

        THE COURT:  Just a second.  What do you need?

        MS. LARIN:  I'm sorry.  I didn't offer the affidavit.

        THE COURT:  Number what?

        MS. LARIN:  It's number, Petitioner's Number 56, Your Honor.

        THE COURT:  Any objection?

        MS. BOOTH:  No, Your Honor.

        THE COURT:  Petitioner's 56 is admitted.

BY MS. BOOTH:

Q.    Ms. Williams, this is not the first time that you've testified in the case involving your brother, is it?

A.    Yes, ma'am.

        THE COURT:  I'm sorry?

        THE WITNESS:  Yes, ma'am.

THE COURT:  Is it -- no, you testified at trial, didn't you?

THE WITNESS:  At the trial, I did.

THE COURT:  Right.

MS. BOOTH:  Uh-huh.

THE COURT:  So you've testified twice in this courtroom.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you, ma'am.

BY MS. BOOTH:

Q.   And you were interviewed by Mr. Bierbaum, you testified a minute ago, and you were talked to by the FBI.  Do you remember talking to the FBI?

A.   Yes, ma'am.

Q.   In fact, then you talked to Dr. Moore.  Isn't that right?

A.   The guy right there?

Q.   Yes.

A.   Okay, yes, ma'am.

Q.   And in fact, when you talked to Mr. Bierbaum, you talked to him more than one time, didn't you?  Didn't you talk to the Defendant's investigator more than one time, maybe two or three times?  Do you remember?

A.   Two or three times?  I'm trying to --

Q.   Yeah.  Well, do you remember if you were interviewed on November the 25th of 2003?  And then again on February the 25th

of 2004?

A.    Okay.

Q.    And again on March the 2nd of 2004?

A.    Okay.

Q.    And that was by the Defense.  Is that correct?

A.    Uh-huh, correct.

Q.    Okay.

            THE COURT:  Can you hear her, Ms. Gano?  She said,
"Correct."  You need to speak up, please, ma'am.

            THE WITNESS:  Oh, okay.

            THE COURT:  Thank you.

            THE WITNESS:  Okay.

            MS. BOOTH:  Judge, do you think it would help if I
moved the microphone up just a little bit?

            THE COURT:  Let Ms. Gano do it.

            MS. BOOTH:  Okay, because it's kind of slumped down,
so she has to bend.

            THE WITNESS:  Thank you.

            THE COURT:  People before you were fiddling with it
and moving it around, so --

            THE WITNESS:  Oh, okay.

            THE COURT:  Okay.  That should be better.

BY MS. BOOTH:

Q.    So we have those three dates before and during the trial
that you spoke to the investigators of the Defense.  Now, I

want to ask you if you ever told them that Mr. Bourgeois was hit with a meat cleaver on his hand by his mother. Did you ever tell that story to them?

A.   Not at the time, I didn't.

Q.   All right. Did you tell them -- and I know these are horrible memories, Ms. Williams.

A.   Oh, yes, ma'am.

Q.   Did you tell them that he was whipped in the tub and that there was blood in the water?

A.   No, not at the time I didn't.

Q.   Okay. And basically what you told them is that your, like you did in, when you were interviewed by the investigator that came for this case, the Government -- I mean Defendant's Exhibit that was just admitted that you were speaking about, when you talked to them, you told them that Alfred got whippings, more whippings than the rest of the kids in the family. Is that right?

A.   Correct.

Q.   And, but you didn't go into, even in this affidavit that you gave on May the 10th of '07, you didn't say anything about the meat cleaver on the hand, did you?

A.   Well, Ms. Patti, the reason why I didn't say, because it was sad. I was ashamed of my mother.

Q.   Right.

A.   I was --

Q.   And during the time of the trial, your mother was alive, wasn't she?

A.   Yes, ma'am.

Q.   And during the time of the trial, your mother, didn't you tell me your mother said that he was no good, and she knew this was what was going to happen with him?

A.   Well, I don't remember saying that he, that that was going to happen to him.  I don't remember my mother --

Q.   What did you tell me that your mom said?

THE COURT:  Was this in the trial?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

THE WITNESS:  I'm sorry.  Repeat yourself, Ms. Patti.

BY MS. BOOTH:

Q.   During the period of the trial, your mother was still alive, wasn't she?

A.   Yes, ma'am.

Q.   And so you didn't tell these three stories that you've now disclosed at that time.  Right?

A.   Yes, uh-huh.

Q.   And in fact, most of the family were very closed about the abuse of your mother, of your mother to Alfred during that time.  Isn't that right?

A.   Correct.  Correct.

Q.   So if this horror information was not given to the

investigator, then it couldn't have gotten to the attorneys. Correct?

A.    Correct.

THE COURT:  Speak up, please.

THE WITNESS:  Correct.

MS. LARIN:  Objection, Your Honor.  She can't know what the lawyers knew or didn't know.

THE COURT:  Well, she's just finding out.  That's the point, isn't it?  Overruled.

BY MS. BOOTH:

Q.    And Ms. Williams, coming into this case and testifying against your brother was a very difficult thing, wasn't it?

A.    Yes, ma'am.

Q.    Because you were the last person from the family that spoke to Mr. Bourgeois and to Robin before JG1999 was murdered, weren't you?

A.    Yes, ma'am.  Yes, ma'am.

Q.    All right.  Now, in the statement that you gave to the FBI on September the 4th of 2002, I believe you were talking -- do you remember Ms. Beckett, the FBI Agent, Ms. Beckett, Megan?

A.    Yeah, correct.  I remember.

Q.    All right.  And do you remember talking to her?

A.    Yes, ma'am.

Q.    And do you remember telling her that you had seen bruises on Robin, and that you knew that Robin was very afraid --

A.   Yes.

Q.   -- of Alfred?

          THE COURT:  You need to speak up.

          THE WITNESS:  Yes.  Yes, ma'am.

BY MS. BOOTH:

Q.   And that you knew that he had abused children that belonged to other wives that he had had.

A.   Yes, ma'am.

Q.   And that you knew that he was capable of this kind of violence.

A.   I wouldn't say capable.

Q.   Did you tell him that -- did you tell the FBI Agent that you often thought that Robin's life was in danger when Robin was with Alfred?

A.   Yes.

Q.   All right.  And that Williams also stated, and that's you, that you were pretty sure that your brother was capable of killing Robin.  Do you remember making that statement?  I have your 302, if you'd like to --

A.   Okay.

          THE COURT:  Would you like to look at it?

          THE WITNESS:  No, I don't have to look at it, Your Honor.

          THE COURT:  Okay.

BY MS. BOOTH:

Q.   And you told Megan Beckett at that time that Alfred knew the difference between right and wrong, and he made the choice to kill JG1999.  Do you remember making that statement?

A.   I don't remember saying he made a choice.  I don't remember that.

Q.   Would you like to see your --

A.   No, ma'am.  I don't have to -- I don't have to see it.

Q.   Do you just not remember making the statement?  Or are you saying --

A.   Some things I --

Q.   -- that you didn't make the statement?

A.   Some things I don't remember, but I don't have to see it.

Q.   All right.  Now, when you -- and I want to draw you back in time now when you were a child with your brother.  And from zero to four, y'all lived together in your house with your mother and the rest of your siblings that were born at that time.  Right?

A.   Yes, ma'am.

Q.   And when he was four, that's when you moved to Ms. Mary's, which was right down the street.  Correct?

A.   Correct.

Q.   So you were, if you were six years older, you were ten when you were at Ms. Mary's.  Right?

A.   Correct.

Q.   Now, how long did you stay at Ms. Mary's?

A.   Till I got older, till, like I say, I got 12, and then I moved into Lutcher with my grandmother.

Q.   Now, let's talk about Ms. Mary.  Was Ms. Mary a person that had some type of disability with one of her legs?

A.   Yes, ma'am.

Q.   And when you moved in with Ms. Mary, wasn't it part of your living there that you were going to help her with a few things?  Did you help her there at the house?

A.   With a few things.

Q.   Yeah.  Did she need help, a little bit of help getting around?

A.   Yes, ma'am.

Q.   And did she bake and make cookies and things that she would sell in the community?

A.   Yes, ma'am.

Q.   And did you help with that?

A.   No, not help -- no.  She used to do that herself.

Q.   Okay.  And were there great big pans that were used to make these cookies and these different things that she would sell?  Do you remember that?

A.   Yes, ma'am.

Q.   All right.  And so did Ms. Mary have any boys?  Did she have male children?

A.   Oh, yeah, she did have a lot of children, a lot of older, yeah, she did.

Q.  Okay.  And was there any particular male child that would come and stay at Ms. Mary's house?

A.  Not to stay.  I don't remember that.

Q.  Like would come and spend the night or anything like that?  You don't remember that happening?  I mean, I'm just asking you.

A.  Yeah, I know --

Q.  I don't know the answer to the question.

A.  I understand.  I'm trying to remember.

Q.  Yes, ma'am.

A.  One time Ms. Mary had her son came, Leroy.  He came, stayed one time I think.

Q.  When you were there?

A.  I think so, uh-huh.

Q.  Was Leroy ever inappropriate with you, sexually?  And I realize that's a really blunt question, but --

A.  Not to me.

Q.  Okay.  Now, when you were there with Ms. Mary, you were going to Paulina School.  Is that correct?

A.  Yes, ma'am.

Q.  And what grade did -- do you remember what grade Alfred went to school?  Was he four or was he five when he went to school?  Or six or seven?  Did they have kindergarten in Paulina?

A.  Yeah, at the time they did.

Q.    Okay.  And what grade was it?  Do you remember what grade kindergarten was?

THE COURT:  What what?

BY MS. BOOTH:

Q.    I mean, do you remember --

MS. BOOTH:  Gah, I'm sorry, Judge, I've kind of lost my mind.

BY MS. BOOTH:

Q.    Do you remember how old the -- because some kindergartens start at four, some kindergartens start at five.

A.    Right, correct.  Probably five, because like I -- I think five.  I'm not sure.

Q.    Okay.  So at five, you would have been -- if he would have been five and going to kindergarten, you would have been eleven.

A.    Uh-huh.

Q.    Is this the period of time when you were 11 that you were tutoring Mr. Bourgeois?

A.    Yeah, trying -- yes, ma'am.

Q.    All right.  Now, tell me what subjects you were tutoring him in.

A.    Mostly like reading, reading.

Q.    With a five-year-old program, you were tutoring in reading?

A.    Mostly like, like I say, it was mostly like letters and

stuff I used to help him with, trace his name and stuff like that.

Q.   Okay.

A.   I remember.

Q.   And he was five years old, and he was having a little difficulty with that?  Is that what you --

A.   For what I see, yeah.

Q.   Okay.  What other subject did you tutor him in?

A.   Like numbers, like counting.

Q.   Okay.

A.   Okay.

Q.   And this was in the five-year-old program?

A.   Yes, ma'am.

Q.   Okay.  Now, when was the next time, if there was a next time that you tutored him, and in what subject?

A.   As go on, it was like math, and then I remember like tests, he try -- I tried to, like for the tests he had to study for, I tried to help him.

Q.   Uh-huh.

A.   Like I would, I would like --

Q.   What test?  What subject?

A.   Okay, like math.

Q.   Okay.  And what -- where were you living when you tutored him?

A.   Okay, I was at -- I was at my mother at the time.  Okay.

Q.   Okay.  So you were living with your mother when you were tutoring him.

A.   Well, like I said, we was back and forth with my mother, then after that, you know, I was living with Ms. Mary.

Q.   Right.

A.   Uh-huh.

Q.   But you went to Ms. Mary when you were ten years old.

A.   Okay.

Q.   So at nine years old, you were tutoring your brother?

A.   Yeah, trying to help him with his homework.

Q.   Okay.  So he would have been three at that time.  So you were tutoring your brother when he was three?

A.   No, not three.

Q.   Okay.

A.   He had to be, like I said, like five or something.

Q.   Right.  So that would have put you at 11, and you would have been at Ms. Mary's.

A.   Right.  Right.

Q.   Okay.  So when you left to go live in Lutcher?

A.   Yes, ma'am.

Q.   How far is Lutcher from Paulina?

A.   About a 15-minute drive.

Q.   15-minute drive.  And when you moved, you moved and you went to school in Lutcher.  Did you, when you were 12, have a driver's license or --

A.    No, ma'am.

Q.    Or a car or anything?

A.    No, ma'am.

Q.    So you didn't -- to get back to Paulina, you would have had to have been driven.  Is that correct?

A.    Correct.

Q.    Okay.  So did you -- you're saying that you came home every weekend?

A.    Yeah, every weekend just about.

Q.    Okay.  And who brought you home?

A.    My daddy was living at the time.  My daddy used to take me some time, come get me.

Q.    Okay.  And he would take you where?

A.    To my mother.

Q.    To your mother.  And that was during the period of high school.  Is that correct?  Middle school through high school?

A.    Yeah, middle -- yeah, middle school.

Q.    Middle school through high school.  And when you were living in Lutcher, were you tutoring your brother?

A.    When I used to come home?

Q.    Uh-huh.

A.    Yeah.  Like I say, for the weekend, I used to help him with his homework and stuff like that.

Q.    Okay.  So, but you said that was letters and some math.  So as you got older, what were you working with him in?

A.   What you mean?  Oh, what you mean at the time?

Q.   Well, when you were living in Lutcher.

A.   Well, like I said, when I used to come home, I used to help him with his homework, you know --

Q.   In what?

A.   Reading, math, stuff like that.

Q.   Okay.  Now, you said your grades were B's and C's.  Were they B's and C's and D's?

A.   I had a few D's.  A few F's, too.

Q.   And a few F's.

A.   I'm not ashamed to say it.

Q.   And did you know that your brother didn't have any F's --

A.   No.

Q.   -- in high school?  Did you know that Mr. Bourgeois had no F's in high school?

A.   I didn't know that, Your Honor.

Q.   Okay.  So you had B's and C's and D's and F's in high school.

A.   Uh-huh.

Q.   Okay.  All right.  Now, on from that, you said that he had difficulty, you would explain things.  Besides cleaning the bathroom, what is it that he had difficulty understanding?

A.   Comprehension.  Like you try to explain to him something, directions like on a paper, to me he was, he couldn't catch it fast, to me.

Q.   And in what time period was this that you're talking about?

A.   Constantly, from what I see.  You know, from what I could see, I was trying to help him to do.

Q.   Okay.

A.   To me, he just was slow in some things.

Q.   And did you ever mention that when you were interviewed on the 25th of 2003, on the 25th of 2004, on March the 2nd of 2004, in September of 2003?  Did you ever mention any of that to anybody that spoke to you?

A.   What you mean?  What do you mean, "anybody"?

Q.   Did you mention that to anybody that spoke to you?

A.   I let them know that, you know, my brother was slow and he had problems in learning, you know.

Q.   And when was it that you mentioned that?  Wasn't that when you spoke to the investigator from the Public Defender's Office that's here now in May of 2007?

A.   I did what?  I'm sorry.

Q.   In May of 2007, didn't you tell them then, did you tell them then?

A.   Tell them what, Ms. Patti?

Q.   That he was having trouble in school.

A.   I think I did.

Q.   Or maybe you didn't.

A.   I don't remember them asking me about that.

Q.   Okay.  Now, when he lived in the trailer behind you, do you remember how old he was?

A.   He was a little older.  I'm not --

Q.   Was he still in school?

A.   No, he wasn't in school, not at the time.

Q.   He was out of school.  Okay.  And let me ask you this, do you have -- do you do the laundry for your husband?

A.   Do I do laundry for my husband?

Q.   Uh-huh.

A.   Yeah, uh-huh.

Q.   All right.  And do you cook for your husband?

A.   Yes, ma'am.

Q.   Okay.  And when there are family gatherings, do the women cook pretty much and control how things are going to happen --

A.   No, we all --

Q.   -- in your family?

A.   We all do.

Q.   Now, did you ever -- I want to jump ahead now.

A.   Uh-huh.

Q.   After you talked about the job that your brother, I mean your husband secured for Alfred, did he have other jobs after that that you didn't have anything to do with him getting?

A.   Yeah.

Q.   Do you know if he worked for R. E. Garrison?

A.   No.  I don't know.  I don't know all the jobs he had.  I

don't know that.

Q.   Okay.  So after that initial job that your husband got for him, or helped him get --

A.   Yes, ma'am.

Q.   The jobs after that, did anybody from your family get those jobs for him?  Or did he get them for himself?

A.   No, people helped him get jobs, that I know.  I know my husband helped him get the job at Imperial Sugar.

Q.   Okay.  Did you help him get the job at R. E. Garrison?

A.   No.

Q.   All right.  And was there a time that he moved away from the trailer that was there and he actually purchased a house?

A.   Yeah.

Q.   And did you ever visit his house?

A.   Yes, I did.

Q.   And where was his house?

A.   It was in Reserve.

Q.   Okay.  And was it a nice house?

A.   It was nice.

Q.   How many bedrooms did it have?

A.   Three.

Q.   How many bathrooms did it have?

A.   Two.

Q.   And did he have a pool?

A.   Yeah, a round pool, uh-huh.

Q.   And did you go to parties at his house?  Barbecues?

A.   Yeah, sometime.

Q.   And did Mr. Bourgeois enjoy having these parties and inviting his family?

A.   Yes.

Q.   And at these parties, would he barbecue?

A.   He try.

Q.   Okay.  So he's not a very good cook?

A.   Not to me.

Q.   Okay.  But he did barbecue for you.  Right?

A.   He try.

Q.   And would he have drinks there, and would he have -- and not necessarily alcoholic, but there was alcohol there, wasn't there?

A.   Yes, ma'am.

Q.   And would people bring different dishes?  Or did he provide all the food when you would go over to his house?

A.   No, he didn't provide that, no.  We used to bring some things down.

Q.   Okay.  And did he have a video camera?

A.   I'm not sure now.  I don't remember a video camera.

Q.   Do you ever remember being at a party and him going around and videoing everybody?

A.   Okay, I remember -- yes, ma'am.

Q.   And he was running the video camera, walking around,

talking to everybody?

A.    I remember having a video camera, but you know, I can't remember, you know, what all he did with it.

Q.    And when you would go there, did y'all enjoy going and being with the family and letting the kids swim and eating barbecue?

A.    Did we enjoyed it?

Q.    Uh-huh.

A.    Yes, ma'am.

Q.    All right.  And did Mr. Bourgeois seem to enjoy being the host?

A.    Not really a host, you could say.  You know --

Q.    What do you mean?

A.    I mean, you know, to me, you know, when we would be with Alfred, he -- I don't know, he was just -- it was like a, I don't know, a distance between him.  You know, he was, I don't know, it's kind of hard to explain.  But you know, he treat us well.  You know, but you could see like his mind was, you know.

Q.    Okay.  Now, so he would invite you over for barbecues, and everybody's kids would swim.

A.    Uh-huh.

Q.    And did he have a motorcycle?  Did he have a three-wheeler?  Did he have things that the kids, he would take them rides on?

A.    He had a motorcycle, uh-huh.

Q.   Uh-huh.  And would he take the kids out and ride them around for fun?

A.   Where?  At the house?

Q.   Just around the neighborhood.  Just around the neighborhood.  Do you remember that?

A.   Well, I never seen him took the children when we were there, you know, to ride on the thing, you know.

Q.   Uh-huh.  Have you ever seen him ride his motorcycle?

A.   Yeah, one time.

Q.   Okay.

A.   When he had that accident, yeah.  He was on that four-wheeler.

Q.   On a four-wheeler.  But I'm talking about his motorcycle that he had there at the house.

A.   Okay.

Q.   Did you ever see him ride his motorcycle?

A.   Yeah, I seen him a couple of times.

Q.   And sometimes when he'd ride his motorcycle, he'd even have his dog on his lap, or carrying his dog.  Right?

A.   I didn't seen all that.  I don't know all that.

Q.   Okay.  Now, the three-wheeler accident, let's talk about that.  That wasn't when he had his house, was it?  When did the three-wheeler accident happen?

A.   I don't remember if he had the house.  I can't remember that.

Q.  Okay.  So, but he was older when he had the three-wheeler accident?

A.  Yeah, he was older.

Q.  All right.  And -- okay.  Now, did you ever see him drive a great big truck?

A.  Yeah.

Q.  A great big 18-wheeler.  Did you ever see him, did he ever drive up to your house or drive up to anything that y'all were having where you would see him actually driving this great big truck?

A.  Yes, ma'am.

Q.  And did you know that he was a cross-road, cross-country driver for probably 15, 17 years?

A.  Yes, uh-huh.

Q.  And did you ever go with him on any of these cross-country trips?

A.  No, ma'am.

Q.  All right.  Do you know, did you ever speak to any of his employers and hear what they had to say about his ability or about his job performance or anything?

        MS. LARIN:  Your Honor, we're going really far afield of time frame we were talking about on direct, and I don't know that she has any basis --

        THE COURT:  Overruled.

BY MS. BOOTH:

Q.    Did you ever talk to any of his employers?

A.    What, drives -- huh-uh, no.

Q.    After all, even through all of this, is it -- it's fair to say, Ms. Williams, isn't it, that you love your brother, you love your sister-in-law, Robin, that you don't have any -- that you love AB1994 and his other daughter AB2001?

A.    Correct.

Q.    Have you had any contact with them since this has been over?

A.    No.  No.

Q.    All right.  Now, I want to go back to, skip back again in time when you were young.  I believe that you made the statement in a couple of your statements that Mr. Bourgeois would not mind your mother.

A.    I'm sorry?

Q.    Mr. Bourgeois would not, your brother, Alfred, would not mind, and so he would get himself in trouble.  And it didn't take much to set your mother off with him.  Is that correct?

A.    What you mean "in trouble"?  I mean, explain yourself.

Q.    Well, that he would get whippings because he wouldn't mind.  Like he refused to eat, so he got in trouble.  The punishment as you say, it was way out of line, but that he was an average child that just would refuse or be insolent and --

A.    No.

        MS. LARIN:  Objection, Your Honor, to the word

"average."

THE WITNESS:  He's not -- to me, what I see, he was not an average child.  The way my mother used to abuse him, how she used to whip him, that would cause any child to be insane, to me.

BY MS. BOOTH:

Q.   All right.

A.   And that's how I feel.  I mean, I seen my mom, how she used to treat him.

Q.   Uh-huh.

A.   And that, to me, being a child seeing this young, if you had a mother who would whip you and abuse you like my mother did, that's enough to make anybody insane.

Q.   Right.  But you never --

A.   That's how I feel.

Q.   -- told that to anybody.

A.   Well, no, I know I never told that --

Q.   Yes.

A.   -- because I was --

MS. LARIN:  Objection, Your Honor.  We already went through that she did in fact --

THE COURT:  Overruled.

MS. LARIN:  -- tell people.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  That's all right.

BY MS. BOOTH:

Q.   Now, you were -- I believe we've had conversations about this many years ago.  You were very proud of what your brother, Lloyd and your brother Alfred were able to accomplish when they started these, either a trucking company or staying employed.  Lloyd seemed to do a little better financially, but Alfred was able to buy a house and a car and a motorcycle.  And at one point, did you know whether or not he purchased his own truck and was trying to start his company that way?

A.   I don't know that.  I don't know that.

Q.   All right.  But you assumed that he was doing well because of the house that he purchased --

         MS. LARIN:  Objection, Your Honor, to "assume."

         THE WITNESS:  I'm not going to assume that, because I don't know that.

         THE COURT:  Sorry?

         MS. LARIN:  Objection to, she's asking her to find out what she assumed.

         MS. BOOTH:  Several years ago --

         THE COURT:  Overruled.

BY MS. BOOTH:

Q.   -- weren't you, didn't you tell me that you had been proud of the fact that he had been able to do so well, coming from the background that he had come from, that he had been able to buy a house, and those things you were proud of for him?

MR. WISEMAN:  Your Honor, I'm going to object to this.

THE COURT:  Excuse me.  This is not your witness. Sit down.

MR. WISEMAN:  Oh, I'm sorry, Your Honor.

THE COURT:  Yes, sir.

BY MS. BOOTH:

Q.  Were you proud of your brother when he was able to maintain a job and have a home?

A.  I was glad for him.

Q.  Okay.  And you had told that to the prosecution team years ago, hadn't you?

MS. LARIN:  Your Honor, could I object?  She's really testifying about the things that she heard.

MS. BOOTH:  This is cross-ex.

THE COURT:  This is cross-examination.

MS. LARIN:  You can testify about what you heard as a witness?

THE COURT:  Overruled.

BY MS. BOOTH:

Q.  Now, I need just a second.

A.  Okay.

Q.  Now, let's talk about the fact that at Ms. Mary's house again that the person that would come and stay was Leroy.  Is that right?  Leroy.  And what was his last name?  Was it

Taylor, like Ms. Mary's name?

A.    Clayton.  Clayton.

Q.    Clayton.  Oh, I'm sorry, Clayton.  That's right, Ms. Mary
Clayton.

A.    Yes, ma'am.

Q.    And do you know whether or not Leroy was a pedophile?

A.    A what?

Q.    A pedophile.  Abused children.

A.    I don't know that part.  I don't know that.

Q.    Okay.  Do you know whether or not he would go there and
rape your brother when your brother was staying there?

A.    I don't know that.

Q.    Okay.  You've never heard that?

A.    No, not that -- no, I never heard that of him.

Q.    All right.  During this period of time when Mr. Alfred
Bourgeois lived with Ms. Mary, and you say the reason that he
left Ms. Mary was because he got older?  Is that what you
testified to?

A.    As far as I know, that's what I think, but I don't know.

Q.    Okay.  You think it was because he got older.  And the
older -- okay.  I forgot where I was going.  That happens
sometimes.  And so the -- during this period of time when
Mr. Bourgeois lived with Ms. Mary, were y'all attending a
certain church?

A.    Yes, ma'am.

Q.   Okay.  And what church was that?

A.   Evergreen Baptist Church.

Q.   Evergreen Baptist Church.  Who was the choir teacher or the choir master for that church?

A.   At the time?

Q.   Uh-huh.  Do you remember?

A.   I think it was a lady named Brenda, and Ms. Liddy, I think.

Q.   Oh, okay.  So it wasn't a male that was the leader.

A.   We had male Sunday school teachers.

Q.   Male Sunday school teachers.

A.   Yeah.

Q.   And who taught Sunday school?

A.   They had this guy, Raymond Adam.  I remember him.

Q.   Raymond Adam.

A.   Uh-huh.

Q.   And did he teach Mr. Bourgeois?

A.   Yeah.

Q.   Okay.  And was he raping Mr. Bourgeois?

A.   I know he was a faggot.

Q.   Okay.  But did you ever hear that he raped Mr. Bourgeois?

A.   Yes, I did.

Q.   Where did you hear that?

A.   After, I heard.

Q.   Okay.  After -- I'm sorry.  You're going to have to give

me better than "after."

THE COURT:  After the trial?

THE WITNESS:  It was before then I had heard.

THE COURT:  From whom?

THE WITNESS:  It was from a family member.

BY MS. BOOTH:

Q.   Which family member?  Who told you that Mr. Raymond was --
was it that you found out that he was a faggot -- I'm using
your words, not mine --

A.   I understand.

Q.   -- okay, or that you found out that he was raping
Mr. Bourgeois?

A.   I didn't know if he was raping him, but I know, like I
say, he was a Sunday school teacher, and he used to teach those
little boys.  I remember that in Sunday school.

Q.   Okay.  He taught the little boys, but do you have any
other knowledge about this?

A.   About him raping Alfred?

Q.   Uh-huh.

A.   No, not, you know, not that he raped him, no.  I'm not
sure.

Q.   Was this guy a violent man?  Do you know if he had a gun?

A.   No, he wasn't violent.

Q.   Okay.

A.   But he was disturbed, for what I see.

Q.   Okay.

A.   He had problems.  He had issues, for what I see, going to Sunday school.

Q.   Okay.  And how old were you when you saw these issues?

A.   Oh, going to Sunday school?  We was young.  Like nine, ten years old we used to go to Sunday school.

Q.   Okay.  So you were nine or ten.  You were nine or ten, so that made Mr. Bourgeois four, or even less.  Three.  So was he going to Sunday school at three?

A.   No, not at three.

Q.   Okay.

A.   It was, like I say, he would have to be a little older.

Q.   Okay.

A.   But we all used to go to Sunday school together.

Q.   Okay.  So when you lived in Lutcher, did you go to Sunday school with Mr. Bourgeois?

A.   Yeah, I used to come up here and go to our church, yeah.

Q.   Oh, okay.  So it was Mr. Raymond that we're talking about.  Raymond -- and what was his name?  I'm sorry.  I didn't write it down right.

A.   His name Raymond Adam.

Q.   Adam?

A.   Yes, ma'am.

Q.   Okay.  So Raymond Adam and Leroy Clayton.  Okay.  Now, let's talk about, you were talking about some, where he would

Williams - Cross

get really mad and his face would get really red. Okay. Do you remember the first time you saw him get a really red face and get really mad?

A. When my mother abused him.

Q. Okay. Now, your other brothers and sisters, isn't it true that she also beat all of y'all?

A. She beat all of us, but she didn't beat us like she beat him.

Q. Okay. But she was physically abusive with everybody --

A. Not with everybody.

Q. -- and he was the worst.

A. No, ma'am, I have to correct, not with everybody.

Q. Okay. So who did she leave out?

A. With the whippings?

Q. Uh-huh.

A. Well, she --

Q. Who did she not whip?

A. Well, my little brother Anthony, because he was retarded. She didn't whip him.

Q. Okay. So if you're retarded, you don't get whipped. Okay. What else?

A. Well, all us got whipped.

Q. Okay.

A. But Alfred got the most of it.

Q. He got the most?

A.    The most abused, yeah.

Q.    Right.  Okay.  And when the others would get whipped, did people's faces get red and they get all upset about it?

A.    If you had a mother like I did whip you, you would make faces too.

Q.    And please don't think I'm being disrespectful about your abuse.

A.    Oh, I'm just telling you how I feel, though.

Q.    I know.  I know.

A.    I'm just telling you how I feel.

Q.    I know, and please do.

A.    And how it is.  Oh, I don't have a problem with it.

Q.    I'm sorry.  I know this is painful.

A.    I'm just telling you the truth.

Q.    I know.

A.    Okay.  Very painful.  I don't even like to think about it.

Q.    So, but did everybody that got whipped like that get red in the face?  Did everybody that got whipped -- I mean, I realize, we'll pull aside the fact that his was much more stringent discipline, but didn't everybody get red in the face and upset when they would get whipped?

A.    Yeah, because of how my mama used to whip us.

Q.    Right.

A.    Anything, broom, her hand, anything she put her hand on.  Extension cord, yeah.  Belts, buckles.

Q.   Did she ever burn y'all with anything?  Would she burn you?

A.   I don't know about burning us, no.

Q.   Okay.  Now, these rages, were they the same all the way through, the way that he would react to anger?  Now, knowing that you only got to see him on the weekends, okay, but did you notice any change, or did he always react the same to anger or to situations like abuse?

A.   What I noticed -- like I say I'm the oldest.  We was coming up, my brother, to me, for what I see how my mother used to treat him, to me he got that way, how she used to do him --

Q.   Okay.

A.   -- for what I see.

Q.   Ms. Claudia, how -- I mean, Ms. Williams.

A.   Uh-huh.

Q.   I'm sorry, Mrs. Williams, how many of Alfred's wives were also friends with you?

A.   Friends?

Q.   That would come and talk to you.

A.   We used to talk, uh-huh.

Q.   Yeah.  And so the first wife was whom?

A.   Sheila was the first one.

Q.   All right.  And would Sheila complain to you that he was mean to her?

A.   Not all the time.  Not all the time.

Q.   But sometimes she would tell you that he was mean to her?

A.   Sometime.

Q.   Okay.

A.   Not all the time.

Q.   And did he ever hit Sheila, do you know?  Did Sheila ever tell you that?

A.   Yeah.

Q.   Was she afraid of him?

A.   No, she wasn't afraid of him.  I don't think she was afraid of him, no.

Q.   But he hit her?

A.   Every now and then.  My husband hit me.  The honest truth. I mean, you know, not hard, but --

Q.   Yeah, and you don't have to take that either.

A.   No, it's not to kill me.  You know, sometime we get in it, you know, and --

Q.   Yeah, but you don't have to take that.

A.   Well, I know that.

Q.   You realize that.

A.   I know that.  But it happens.  I think every marriage you might have a little issues going on, but it happens.

Q.   All right.  Now, his second wife, did she come and talk to you?  Who was his second wife?  Was that Gaynell?

A.   I think so, yeah.

Q.   And did Gaynell tell you that he hit her?

A.    No.  She never told me that.

Q.    Okay.  Was Gaynell afraid of him?

A.    No.

Q.    Did Gaynell leave him constantly?

A.    I don't know if she constantly leave.  I don't know that.

Q.    Okay.

A.    I don't know that.

Q.    And what was the third wife?  Do you know who the third wife was?

A.    Robin, I think.

Q.    All right.  And Robin confided in you.  Is that correct?

A.    Yeah, uh-huh.

        MS. LARIN:  Objection, Your Honor.  This is getting really beyond the scope, and none of this is in dispute.

        MS. BOOTH:  Your Honor, my contention is that he is a sociopath.  And in that way, I'm trying to give a different take on why he acted the way he did.  They're trying to prove that there's some, he's not responsible for any of his actions because he was hurt as a child.  And although I agree he was hurt as a child, I have a different take and a different theory that I'd like to put before the Court, number one, and that's our response.

        MS. LARIN:  I think, Your Honor, that should really come through an expert witness.  The fact that these women had, that there was a volatile relationship and violent relationship

with the wives and girlfriends is already --

THE COURT:  Overruled.

MS. LARIN:  -- in the record.

THE COURT:  Overruled.

BY MS. BOOTH:

Q.  The three-wheeler accident, did his rages get any worse after the three-wheeler accident?  Did they get any less?  Or was there no change at all?  Or it just wasn't any milestone at all?

A.  To me, after the accident, look like he got worser to me, for what I see, you know, after he -- after he had injured his self real bad.

Q.  Uh-huh.

A.  Yeah.

MS. BOOTH:  Could I have just a second, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

BY MS. BOOTH:

Q.  When Mr. Bourgeois was in the hospital with the three-wheeler accident, did you go and visit him?

A.  A couple times.

Q.  Okay.  And when you went to visit him, if I remember correctly, the injuries were a broken leg, I think, and a ripped scrotum.  Is that right?

A.  I don't remember all, you know, all was wrong with him,

but I know that --

THE COURT:  For who?  I'm sorry.

MS. BOOTH:  Mr. Bourgeois.

THE COURT:  Okay.

MS. BOOTH:  On the three-wheeler.

BY MS. BOOTH:

Q.   And when you went to -- did you go right after it happened?

A.   When he got in the accident?

Q.   Yes, sir -- yes, ma'am.

A.   Well, when he got hurt, when he first did it, I was there on the scene.

Q.   Oh, okay.

A.   Before the paramedics get there.

Q.   Okay.

A.   I had seen it.

Q.   Okay.

A.   I was there first.  Because I thought he was dead.

Q.   And did he appear to be in a lot of pain?

A.   Oh, he was uncon -- I thought he was dead.

Q.   Okay.

A.   Because I tried to, you know, I was trying to wake him up, but he was unconscious.

Q.   Okay.

A.   And I said, I just thought --

Q.   Now, let me ask you that.

A.   Yes, ma'am.

Q.   He was unconscious.  Did you ever tell anybody that?

A.   Yeah, I did.

Q.   Who did you tell?  Did you tell some of the investigators over here?

A.   What, on this side?

Q.   Yes, ma'am.

A.   Uh-huh.  And your side, too, I had told them that.

Q.   Who did you tell?

A.   One of the ladies.  They came and asked me about the accident.  I think it was --

Q.   When was this?  This was after the trial.  Correct?

A.   Yeah, I think so.

Q.   Okay.  So after the trial is when you first told that you were on the scene and that you had to shake him.  Is that right?

A.   Yeah, to try to wake him up.

Q.   Now, did he wake up when the ambulance drivers got there?

A.   Not for what I see, because he was unconscious.

Q.   Okay.  And so when you got to the hospital, was he in a coma for one or two weeks, or three weeks?

A.   I didn't go to the hospital right away.

Q.   Okay.

A.   You know.  I don't know that part.

Q.   Okay.  So when did you go to the hospital?

A.   It had to be probably three or four days after I went and seen him in the hospital.

Q.   Okay.  And how was he doing?

A.   Not good to me, from what I seen.

Q.   Okay.  So what do you mean?  What do you mean he wasn't doing good?

A.   He was in a lot of pain.  Like he was in and out of it, you know, he --

Q.   And so you were talking to him?

A.   No, there wasn't no talking, because he was in a lot, you know, he was in a lot of pain.

Q.   Okay.  So they were giving him pain medication?

A.   Yeah, and he was hook up to a lot of tubes and stuff.

Q.   Uh-huh.  And they had to operate on his leg?

A.   I think so, ma'am.

Q.   Okay.  But he was not in a coma?

A.   Well, when I talked in there, like I say, he was unconscious.  He's, you know, he wasn't talking or nothing when I seen him, when I went and looked at him.

         THE COURT:  Well, was he asleep or in a coma?

         MS. LARIN:  Objection, Your Honor.

         THE COURT:  To my question?

         MS. LARIN:  Oh, I -- I think that it's pretty clear that she said she (sic) was unconscious, so whether it's asleep

or in a coma, all she saw was that he was not responsive.

THE COURT:  Do you know whether he was asleep or in a coma?

MS. LARIN:  She's not a doctor.

THE WITNESS:  From what I see, he was out.

THE COURT:  Okay.

THE WITNESS:  What I see.

BY MS. BOOTH:

Q.  When, were you ever -- you spoke to Mr. Bourgeois about the fact that he was beating Robin, didn't you?

A.  I did.

Q.  You talked to him and tried to smooth things over with him, didn't you?

A.  What you mean, Ms. Patti?

Q.  I mean, you had conversations with, after Robin told you that and showed you bruises on different occasions, that he had made on her body, you knew that he was beating her.  Right?

A.  Sometime.

Q.  And you had conversations with him about that, didn't you?

A.  No, not -- to him?  To Alfred?

Q.  Uh-huh.

A.  No.

Q.  Didn't you ever try to calm him down when he was upset? Didn't you have conversations with him?

A.  Yeah, talking to him, you know.

Q.    Okay.

A.    Like try to talk.

Q.    And was he ever sorry?  Did he ever show any lack of, I mean, did he ever show any remorse about hitting Robin?

A.    Yeah, he showed it, yeah.

Q.    What would he say?

A.    He didn't say.  He just was, like I say, he had a rage about his self.  You know, he didn't say too much.

Q.    Okay.

A.    And I say, "Alfred," you know, I know you got problems with Robin.  Y'all need to communicate and try to talk," you know, like that.

Q.    Uh-huh.

A.    Try to talk to him.

Q.    Right.  Okay.  And his relationship with AB1994, did you ever see him go into a rage about AB1994?  Or how did he treat AB1994?

A.    I never seen him whip AB1994.  He used to fuss at her when she was real bad.

Q.    Now --

        MS. BOOTH:  I guess that's all I have, Your Honor. Thank you.

        THE COURT:  Thank you.  Anything further?

        MS. LARIN:  Just one question, Your Honor.

        THE COURT:  Go right ahead.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One question, Mrs. Williams.

A.   Okay.

Q.   On February 25th, you were interviewed by, over the phone,
by Mr. Bierbaum.

A.   Uh-huh.

Q.   And I'd like to just show this.  This is Petitioner's 57,
and this is, Mr. Bierbaum wrote notes about his conversation
with you.  In that conversation, he asked you whether Alfred
was abused.

A.   Yes, he did.

Q.   Do you recall having a conversation that he asked you
whether Alfred was abused?

A.   Yes, I remember.

Q.   And you told him, as is shown in these notes, that Alfred
got the most beatings.

A.   Yes, ma'am.

Q.   Do you remember that conversation?

A.   Yes, ma'am.

        MS. LARIN:  Okay.  Thank you, Your Honor.  I have no
further questions.

        THE COURT:  Thank you.

        MS. BOOTH:  Well, Your Honor --

                    RECROSS-EXAMINATION

BY MS. BOOTH:

Q.   I think this is a wonderful exhibit, because you also say there that he was hard-headed, that he didn't listen.  Isn't that correct?

A.   Ma'am, that --

Q.   I know, but didn't you say that?

A.   I'm going to answer your question.

THE COURT:  No, no.

THE WITNESS:  Oh, I'm sorry.

BY MS. BOOTH:

Q.   Did you, didn't you say that?

THE COURT:  This is the way it goes.  He asked -- just a moment.

THE WITNESS:  Okay.

THE COURT:  She asks questions, and you answer.

THE WITNESS:  Okay.  Yes, ma'am.  I'm sorry.

BY MS. BOOTH:

Q.   And in that, when you said he got the most whippings, then you said, "And he was hard-headed and he didn't listen."  Isn't that also what you said?

A.   But ma'am, that's not a cause for your mama to whip you like my mother did.  There's no reason for any mother -- I have kids, and I don't whip my children like that.  And that's how I feel about it.  There's a way to whip a child.  My mother didn't have no compassion against my brother.  And that's the

honest truth.

Q.   Or any compassion against the rest of you, except for the one that was mentally retarded.

A.   That's not true.

Q.   Correct?

A.   That's not true.  That's not true.

Q.   Well, the only one that didn't get whippings was the one that was mentally retarded.  Correct?

A.   Yeah, all us got whipping, but we didn't get whipped --

Q.   You all got whippings, except for Anthony.  Right?

A.   Right, because he was retarded.

Q.   That's right.

        MS. BOOTH:  That's all I have, Your Honor.

        THE COURT:  Anything further?

        MS. LARIN:  No.  No, Your Honor.

        THE COURT:  Thank you, ma'am.  You may stand down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Call your next witness.

        MS. LARIN:  The next witness would be Ms. Beverly Frank.

        BEVERLY FRANK, PETITIONER'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MS. LARIN:

Q.   Just be careful about the microphone.  Okay.  Good morning, Mrs. Frank.

A.    Good morning.

Q.    Can you please state your name for the record?

A.    Beverly Clayton Frank.

Q.    And are you related to Mr. Bourgeois?

A.    No, I'm not.

Q.    How do you know him?

A.    My grandmother raised, helped raise Alfred.

Q.    Can you please move forward a little into the microphone?

A.    Sure.

Q.    Okay.  How do you know Mr. Bourgeois?

A.    My grandmother helped raise Alfred.

Q.    Okay.  And where was this?

A.    This was in Paulina, Louisiana.

Q.    And where exactly in Paulina?

A.    The Bend Lane, they call it.  It's a small community.

Q.    Okay.  Where did your mother live in comparison to Alfred's mother?

A.    My grandmother?

Q.    Your grandmother.  I'm sorry.

A.    My grandmother lived about maybe four houses from Alfred mom.

Q.    And did you live on Bend Lane?

A.    Yes.

Q.    When did you live there?

A.    As a child I lived there, until I was a teenager.

Q.   Okay.  Let's backtrack.  Can you tell us what year you were born?

A.   I was born in 1948.

Q.   1948.  And so you moved off of Bend Lane probably around, when do you think, '63?  '64?

A.   Yes.  I was in high school.

Q.   Okay.  And where did you move?

A.   To Lutcher, Louisiana.

Q.   Okay.  And this was all basically before Alfred was born?

A.   Correct.

Q.   Okay.  How often did you visit your grandmother?

A.   At least about two or three times a week, and sometimes on weekends.

Q.   And was there a time that Mr. Bourgeois moved in with your grandmother?

A.   He was about seven years old when he moved in with my grandmother.

Q.   Okay.  And how often would you see him there?

A.   Basically two or three times a week, because that's when I would go to my grandmother and run errands for her, go and see her, check on her.

Q.   Okay.  And about how much time did you spend with Alfred there?

A.   I would be at my grandmother all day, because she was the type of person if you go and visit her, she didn't like an hour

visit, she would make you stay, tell you, "Well, you don't need to go right now."  You know, "You stay here.  Keep me company," or whatever.  So I was practically there all day when I would go.

Q.   And about how old were you at this time?

A.   I was, I would say, just before maybe my teenage years.  I had started seeing, well, seeing Alfred around that time.

Q.   Okay, wait.  Backtrack.  You -- Alfred was seven years old when he moved in with Ms. Mary.  Correct?

A.   Yes.

Q.   So he, that would have been about 1971, '72.

A.   Correct.

Q.   '71.  So how old were you then?

A.   I was --

Q.   Sorry to make you do math.  It seems like you would have been about 23 or 24 years old.

A.   I was 23.  I'm about to say that.  I was 23.  I had just gotten married, and I was between jobs, so I used to go to my grandmother a lot during that time, because I was job hunting.

THE COURT:  What time period?  What time period was that?

THE WITNESS:  I'm trying to think.  I was 23 years old --

BY MS. LARIN:

Q.   When did you get married?  When did you get married?

A.   Twenty-three.

Q.   What year was that?

A.   1971.

Q.   Okay.

A.   Uh-huh.

Q.   And --

          THE COURT:  So how long were you out of a job?

          THE WITNESS:  For several months.

          THE COURT:  Okay.  So during that period, you were there more?

          THE WITNESS:  Yes, because I ran --

          THE COURT:  Was it over the winter or the summer or --

          THE WITNESS:  I'm trying to think.  It was more the summer, because I got married in August of '71, and going into the fall, in other words.

          THE COURT:  So he was at school during the days?

          THE WITNESS:  Yes.

          THE COURT:  Okay.

BY MS. LARIN:

Q.   Okay.  So I'm going to try to focus you on that time.

A.   Uh-huh.

Q.   There's a lot of markers for that time.  You got married, Alfred moved into your grandmother's house.

A.   Right.

Frank - Direct

Q.   And you were spending more time than usual at your grandmother's house around that time.

A.   Yes, because I wasn't working.  I was out of work.

Q.   But even throughout your life, it sounded like you spent, you were at your grandma's house on a very regular basis.

A.   We were very close, my grandmother and I.

Q.   Okay.

A.   Very, very close.

Q.   Okay.

        THE COURT:  Was there another granddaughter living with her?

        THE WITNESS:  Brundrick (phonetic), yes, she was there for a while.

        THE COURT:  Okay.  And how old was she when Mr. Bourgeois was there.

        THE WITNESS:  I don't remember at the time exactly the age she was, but she was there.

        THE COURT:  Okay.

BY MS. LARIN:

Q.   Was she actually living there, or was she around a lot, or you don't --

A.   She was actually, my grandmother help raised her, because my aunt work in New Orleans, and my grandmother helped raise her also.

Q.   Okay.

THE COURT: Was she older than Mr. Bourgeois?

THE WITNESS: Yes, she was a little older.

THE COURT: How much older? Do you know?

THE WITNESS: No, I don't.

THE COURT: Okay.

BY MS. LARIN:

Q. Is she younger or older than you?

A. She's younger than me.

Q. Okay. And can you describe some of the impressions you had of Alfred when he was around age seven spending time at your grandmother's house?

A. Alfred -- my grandmother took Alfred under her wing, and she treated Alfred like she treated us, her grandkids, and she doted over her grandkids, all of her grandkids. She loved all of us. And she treated him no differently. But she brought Alfred in more or less because Alfred was really mistreated by his mom. We saw a lot of abuse. And my grandmother just took him under her wing to stay with her.

Alfred played with my little cousins, and he was slow. He couldn't grasp the things, like talking about, like games they played, but they took a lot of time with him. She made sure of that. And we just took time with him, as an individual, you know, and she treated him like he was one of us.

Q. Okay. Can you tell us about, other than games, is there anything else that you noticed that he was slow at for his age?

A.   He, at the age of about nine, he couldn't count money.
And I realized that.  My grandmother sold candy for a little
vendor, and she made freeze cups, what we call, like little
frozen cups.  She would sell them.  And when she would ask
Alfred to go and get a freeze cup for one of the kids in the
neighborhood or some of the kids that would come there to spend
their little change, he would -- he couldn't count the money
back.  So it was always --

        MS. BOOTH:  Your Honor, I'm sorry, I'm just going to
interrupt just for a second, because I need to know a time
frame on this.

        THE COURT:  What time are we talking about?

        MS. BOOTH:  What are we talking about, as far as age
and counting money?

        MS. LARIN:  She said age nine.

        THE WITNESS:  I said age nine.  Age nine.  He
couldn't count -- that's when I realized he couldn't count
money, because he would go and get the candy, and my
grandmother would either, she would tell me, "Watch the change,
you know, count the change for him.  He can't count."  And she
would ask us to try and help him to understand how to count the
money back to the individual if they were giving change.  He
couldn't count.  And you know, he just couldn't.  And we would
try very hard to help him in every way that we could, you know,
to understand.

BY MS. LARIN:

Q.   Is there any other examples you can think of of areas of his life that he had difficulty or seemed slow?

A.   Dressing himself, it was always an issue of dressing himself when I was there.  He was putting on the wrong color socks, I mean, you know, mismatched socks, or he couldn't tie his shoes at all, you know.  It was -- I don't know if he -- he must have been up in, really up in age when he learned to tie his shoes, because I can remember he never learned how to tie his shoes.  And buttoning his shirt, it always would be like one, one would be the opposite and wouldn't be, like, you know, the top button wouldn't be matching with the other one.

Q.   Uh-huh.

A.   And she'd make him take it a-loose.  You know, she would have that patience.  She would make him take it a-loose, or she would ask us to take it a-loose, let him start again.  Let him learn how to button his shirt.

Q.   Uh-huh.

A.   Put his belt on right, and missing the holes in the belt, you know, putting the belt on.

Q.   So let's break this down.  With the difficulties with dressing, the buttons and the belt, do you know around what age he was when he had this trouble?

A.   He was young.  He was, starting at about seven, he really couldn't dress himself.  I was mean, I was there.  I noticed

it, he couldn't dress himself --

Q.   Do you know if he --

A.   -- properly.

Q.   -- ever did learn?  Do you know when he learned how to --

A.   I saw it at the age of nine and ten, and he still was having difficulties dressing himself.

Q.   Okay.  And you said that your grandmother would make him, you said, take it a-loose.  You mean do it again?

A.   Undo it and, or either she would make us undo his shirt and tell him, "Now, do it again."

Q.   Uh-huh.

A.   "And start again, buttoning your shirt," you know.  My grandmother went to church a lot, so you know, it was a thing of him getting dressed, you know, and on his own.  And she tried to make him, teach him how to do it on his own.

Q.   Okay.  And did she have to do that with other areas of his life, really kind of have him repeat things?

A.   Yes.

Q.   Can you think of some of those things?

A.   Well, it was, like explaining himself, he couldn't really explain himself real well.  And she would tell him, you know, "Take your time."  You know, but it was a thing of not being able -- he stuttered a lot, and it was a thing of not being, just to explain his self, you know, if he wanted to do something.

Q.    Uh-huh.

A.    But she had that patience.  She sat and she actually would tell him, "Take your time.  You know, go slow.  You can do it."  And he still would have difficulties.  But she never held that against him.

Q.    And did Alfred help your grandmother around the house?

A.    Yes, she did.  My grandmother was crippled in one leg, and she had to walk with a cane.  And there was no, per se, running water to a tub.  It was a galvanized tub, and she would heat the water like on a stove or whatever.  And she would have him to put -- she would put the cold -- hot water in.  She would have him help maybe put the cold water in.  Poor thing, he would waste it all over the floor, so it was a thing of mopping it up after, you know.

     But she would, he would -- and even if she sent him to the kitchen to get something, she had to explain to him, "Alfred, go to the kitchen, go to the cabinet, go to the right-hand side of the cabinet.  You're going to see a box of crackers.  Please get it for me."  He didn't know his right from his left.  So it was like, "Go to this side and get the box of crackers."  And sometimes he would come back with the wrong thing, and she would say, "That's not right.  Go back.  And the box is yellow," or whatever.  Or explain to him what he had to look for.  But sometime he had difficulty, so we just would get up and go get it.

Q.   Uh-huh.  And your grandmother had some sort of disability?

A.   Yes, she did.

Q.   So was he there to help her in any way with the disability or --

A.   Oh, yes.  Yes.  I mean, some days my grandmother, it would be hard for her to get up and walk because of the arthritis in her legs.

Q.   Uh-huh.

A.   So he would, you know, she would ask him to get a glass of water for her.

Q.   Uh-huh.

A.   Get her medicine off the kitchen table, things of that nature.

Q.   Okay.

A.   Things like that.  He helped her a lot.

Q.   Do you remember if Alfred was teased as a child by the other children?

A.   Alfred was teased a lot.  He used to come home crying from school, being teased by the kids at school a lot, because he couldn't grasp the, like the games or other things that was going on around him, you know, with his classmates.  And he used to cry a lot.  Some of the kids in the neighborhood, one or two of them would tease him, but not -- but because of a close-knit neighborhood, they knew that he was pretty slow and that they would take, some of them, most of them would take

time with him.

Q. Okay. And did anyone from the Defense team, from Mr. Bourgeois's Defense team, an investigator or a lawyer, talk to you before his trial?

A. Before today?

Q. Yeah, before his actual trial, which was in 2004.

A. No.

Q. Did anyone come and --

A. No.

Q. -- talk to you? You're aware your brother was a witness at trial?

A. Yes, Herman Clayton.

Q. But they never came and talked to you?

A. No.

Q. If they had come and talked to you, would you have given them this information, and would you have been willing to testify at his trial?

A. Oh, yes, I would.

Q. Okay. And I'm going to mark this document as Petitioner's 45. Can you see this?

A. I need my glasses.

Q. I can hand you a copy. I'm sorry, I don't have another copy right now. Can you -- do you recognize this document?

A. Yes.

Q. I'll show you, it's three pages. And at the bottom is --

oops, sorry.  Is that your signature?

A.   Yes, it is.

Q.   Okay.  And can you tell us what this is?

A.   Declaration/Affidavit of Beverly Frank.  It's exactly the statement that I made.

Q.   And you were interviewed by someone from my office?

A.   Yes.

Q.   Do you know who that was?

A.   I can't recall the name right now.

Q.   A woman or a man?

A.   It was a lady.

Q.   A lady.  Okay.  And you told her about this information?

A.   Yes.

Q.   Then she came back and showed you this document, and you read it over?

A.   Correct.

Q.   And is everything in this document true and correct, to the best of your knowledge?

A.   Yes, it is.

        MS. LARIN:  I'd like to offer this declaration, Petitioner's 45, Your Honor.

        THE COURT:  Ms. Booth.

        MS. BOOTH:  It's cumulative, Your Honor, but --

        MS. LARIN:  The doctors relied on it, so that's why I'd like to offer it.

MS. BOOTH:  I don't know that that makes it admissible, Your Honor, but -- just the fact that somebody else relied on it.  She's testified to the things that are in there.  It seems like to me that it's just redundant.

THE COURT:  So your objection is?

MS. BOOTH:  Why would you -- I really don't have one.  You know what I mean?

THE COURT:  There you go.

MS. BOOTH:  There we go.

MS. LARIN:  Thank you.

THE COURT:  Petitioner's 45 is admitted.

MS. BOOTH:  I can be led, Your Honor.  I can be led.

MR. WISEMAN:  I like that objection.

THE COURT:  If you would have said hearsay, I might have thought about it.

MS. BOOTH:  Yeah, well, she's already testified to the hearsay anyway.

MS. LARIN:  That's not quite -- I'm sorry.  Almost.

THE COURT:  I know that.  It's quite all right.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  You all tell me when you're ready for a break also.

MS. LARIN:  I'm skipping a lot of things.  I think we've covered a lot of things already.  So I'm going to --

BY MS. LARIN:

Q.   Can you just tell us briefly, what do you do for a living?

A.   Can I tell you what?

Q.   What you do for a living.  What is your occupation?

A.   I've just recently retired in March.

Q.   And what were you -- what was your --

A.   I was an administrative assistant for St. John Parish President's Office.

Q.   Okay.

MS. LARIN:  One second, Your Honor.

THE COURT:  Yes.

(PAUSE.)

BY MS. LARIN:

Q.   How long were you working in the county government?

A.   Twenty-two years.

Q.   Okay.

MS. LARIN:  Thank you, Your Honor.  I have no more questions.

THE COURT:  Thank you, ma'am.  Do we want to take a break now before the cross?

MR. WISEMAN:  Oh, that's fine with us.

THE COURT:  Ms. Booth?

MS. BOOTH:  No.

THE COURT:  You want to go ahead?

MS. BOOTH:  Yeah.  But I'll stop --

THE COURT:  Okay.

MS. BOOTH:  You know --

THE COURT:  No, you tell me.

MS. BOOTH:  No, I'm ready to go, Judge.

THE COURT:  Well, go then.

MS. BOOTH:  Yes, ma'am.

CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good morning, Ms. Frank.

A.   Good morning.

Q.   I wanted to ask you about some time frames here and some about your family relationships.  Do you know a person by the name -- well, let me ask you, your father was Herman Clayton. Is that correct?

A.   That's correct.

Q.   And did he have any brothers?

A.   Yes, he did.

Q.   And what were their names?

A.   We had Esau, Jacob, John, Harry, James, and their sister Frances.

Q.   Now, during the time period that Mr. Bourgeois was living at your house, at your grandmother's house, did any of those men come regularly to the house?

A.   Her sons visited her often, yes.

Q.   All right.  And were any of them raping Mr. Bourgeois?

A.   I don't have knowledge of that.  I don't know.  I wouldn't

Frank - Cross

know.

Q.   Okay.  So you've never heard that one of your uncles was coming every day and sexually assaulting Mr. Bourgeois at your grandmother's house.

A.   I have no knowledge of that, no.

Q.   Okay.

THE COURT:  Well, have you ever heard that one of them was a pedophile?

THE WITNESS:  I knew that one of them was living a gay life.

THE COURT:  Was gay?

THE WITNESS:  Yes.

THE COURT:  Well, but does that make him a pedophile?

THE WITNESS:  I -- I don't know.

BY MS. BOOTH:

Q.   Does that make him a child molester?

A.   Not really.  Not to me.

Q.   Okay.

THE COURT:  Which one was that?

THE WITNESS:  Jacob Clayton.

THE COURT:  Okay.  But not -- never mind.  Go ahead.

BY MS. BOOTH:

Q.   Okay.  And so you never heard that.  All right.

A.   No.

Q.   Now, let's go on.  Now, when he came to live with your

grandmother, he was seven.

A.   Uh-huh.

Q.   And you've testified earlier that at seven, he had a difficult time getting himself dressed neatly.

A.   Yes.

Q.   But he put on his own underwear.  Right?

A.   Yes.

Q.   And he put on his own blue jeans.

A.   Yes.

Q.   And he put his socks and shoes, although the socks didn't match, he put on his socks and shoes, and he put on a shirt, although he didn't button it correctly.  Right?

A.   Uh-huh.

Q.   And so basically your complaint is to the neatness of the dressing, not the fact that he could dress himself.

          MS. LARIN:  Objection, Your Honor --

BY MS. BOOTH:

Q.   Is that right?

A.   No.

          MS. LARIN:  -- she's not complaining about anything.

          THE WITNESS:  There, at times --

BY MS. BOOTH:

Q.   Your observation, I'm sorry, not complaint.  Excuse me.

A.   Okay.  No --

          THE COURT:  Is that better?

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Okay.

THE WITNESS:  It wasn't a neatness thing, it was a thing of him doing it right, not be able to understand how it's properly done.  He might have had a jacket --

BY MS. BOOTH:

Q.   Well, that's your interpretation --

A.   Yes.

Q.   -- of a little --

THE COURT:  Don't interrupt her, please.

MS. BOOTH:  I'm sorry.

BY MS. BOOTH:

Q.   But that's your interpretation of a seven-year-old boy buttoning his shirt.  Right?

A.   Buttoning his shirt, putting on his clothes.

Q.   Now, you said that during a period of time you didn't have a job.  How long a period of time was it that you were spending a lot of time at your grandmother's house?

A.   Well, it was -- I was out of a job for several months.

Q.   Okay.

A.   So I went up there at least three, three times a week, sometime on weekends, because I would run errands for her.

Q.   Okay.

A.   I had free time.  I would run errands and go to the store.

Q.   So we would say that five times -- let's just give it a

big number.  So maybe five times a week, for how many months?

Several months?  Three?

A.    Yes.

Q.    So that's three times -- five times four would be twenty,

and three times twenty would be sixty.  So during a three-month

period, you may have been at your mother's house -- your

grandmother's house sixty times.  Right?

A.    That's about right.

Q.    And then after that, you were employed.  And obviously you

had a very important job, and you were employed full-time.  Is

that right?

A.    Well, at that, when I -- I was working that job, it wasn't

with the Parish.  It was with Shell Oil Company.

Q.    Oh, okay.  And so that was a full-time job.  Correct?

A.    That's correct.

Q.    And you worked all day long.

A.    Yes.

Q.    And you were married then.  That was --

A.    Correct.

Q.    You had just gotten married.  And where did you live?  How

far did you live from your grandmother?

A.    Hmm, I would say about several miles from my grandmother.

Maybe about ten miles.

Q.    Okay.

A.    At the most.

Q.    So then after those, that three-month period, then how often do you think that you may have visited your grandmother?

A.    About three times a week.

Q.    Okay.  And what --

A.    In the afternoons.

Q.    In the afternoons.

A.    Uh-huh.

Q.    And so that would be at periods of time, like when you're talking -- what do you mean in the afternoons?

A.    I would get off at 4:30 in the afternoon.

Q.    Okay.

A.    And about 6:00 o'clock, I would go and visit my grandmother.

Q.    Okay.

A.    And I did that because I was at home by myself.  My husband was working night shifts, strictly night shifts.

Q.    Okay.  And that went on for about how long?

A.    Hmm, that went on for quite a while.  I would say maybe a couple of years I used to do that.

Q.    Okay.  So then we get up to two years.  And then after two years, did you have -- I mean, this may sound presumptuous, but were there any children involved with your life then?

A.    No.  I adopted my son, it might have been three or four years after I was married.

Q.    Okay.

A.    Uh-huh.

Q.    So for two years, you were going pretty often to --

A.    Yes.

Q.    -- your -- and then what happened after that?  Did you change jobs or your --

A.    I worked with Shell for about 13 years.

Q.    Uh-huh.

A.    And then I was out of work for a little while, for a couple of months, and then I went to work for the Parish.

Q.    Okay.

A.    And I worked for them 22 years.

Q.    And so is it -- it's fair to say, isn't it, that after the first three months, and then maybe a couple of years, so that would have been about two-and-a-half years, then your contact over at your grandmother's house got a little less than what it had been.  Isn't that --

A.    Yes.

Q.    That's -- okay.  So basically, from about seven to about nine-and-a-half, you would have had contact, more contact with Mr. Bourgeois?

A.    I did.

Q.    Okay.  And then after nine-and-a-half, it kind of changed.

A.    I saw him very little after that.

Q.    Okay.  Very little after that.

A.    Uh-huh.

Q.   So basically your exposure to him was from seven to nine-and-a-half.

A.   Yes.

Q.   And during that period of time, there was time for your grandmother to work her magic from seven to nine-and-a-half. Right?

A.   Well, she took time with him.

Q.   And in your observation, did Mr. Bourgeois return the affection that he had for your mother?

A.   Yes, he did.  It was like a safe haven for him at my grandmother's house, because he was mistreated at his mom's house.  So that was a safe haven.  She was the one that, that did the hugging and the, you know what I'm saying, and the loving.  And she treated him just like she treated us.  He was no different.  It was like he was her grandchild.

Q.   So if he were to have said, if there's a recording of him talking about Ms. Mary and saying that while he lived for (sic) her, that she was disabled, and that he would help her take a bath, and that he would help her get around --

A.   He didn't help her take a bath.  He only helped her put the water in the tub.

Q.   Okay.  Well, but I'm telling you, if he said that he helped her take a bath, helped her get around.  He didn't wipe her butt -- and I'm using his words, okay -- but that he did pretty much everything else for her, that she cooked and that

he learned to cook from her, and that she used great big pans --

A.    Uh-huh.

Q.    -- that he would have to carry around or help her with, that he went outside and would take the stuff that had to be sold, he would take that.  That's fair, right?

A.    Yes.

Q.    That he would do the yard work at her house, that he mowed her lawn, that he kept the area outside of the house.  Okay.  And do you know that he continued through high school while he lived with your grandmother?

A.    The times that I went, he was there, and off and on that I would see him.  And he would still do a lot of things around the house to help her.

Q.    Right.  And do you know why he left Ms. Mary's house and why he didn't live there any more?

A.    I don't really know why he left.  I never questioned it, why he left.  All I know, you know, he had gotten older, and he was spending time at his mom's house more, started spending time there, and I really don't know.

Q.    All right.  So the arrangement that they had, Ms. Mary loving him, and he being helpful to Ms. Mary, was a very good arrangement.  Is that correct?

A.    Yes.  Yes.

Q.    Okay.  Now, after that time, have you had any contact with

him?

A.    After that time, when he got older, we had family functions and he was at all of our family functions, whether it was a birthday party or picnic or death in the family, he was there.

Q.    All right.  And did you know by then that he had become an over-land, cross-country truck driver?

A.    I knew he was a truck driver, yes.

Q.    And did you know that he bought a home and that he had married several times?

A.    I knew he had bought a house, but you know, it was later on when I found that out, that he had bought a house.

Q.    Okay.  And so when did you find that out?  Was that before or after the trial?

A.    No, that was before the trial.

Q.    Oh, okay.

A.    Yeah.

Q.    Okay.  And did you know that he had purchased a vehicle, that he had purchased cars?

A.    No.

Q.    That he owned a motorcycle?

A.    No.

Q.    Did you know his children's names?

A.    No.  I knew of them, but I didn't know his kids' names.

Q.    All right.  Did you know what his job, what his employers

or the companies that he worked for, what they thought of him?

A.    No.

Q.    All right.  So basically, your contact that you could testify to just goes straight to seven to nine-and-a-half?

A.    Uh-huh, yes.

Q.    And then as, when he got older, coming to some of the family, or coming to the family gatherings.

A.    Yes.

Q.    All right.  And I guess it would be fair to say that you were very proud of what your grandmother had accomplished, in that he was a truck driver now, he had a way to support himself.  Were these things that you were proud of?

A.    I was proud that he had made a life for himself, yes.

Q.    All right.  And was he the only child from that family to come and live with your grandmother?

A.    He was the only one out of that household, yes.  I don't remember any other that came there, only him.

Q.    You didn't know that Claudia Williams lived with your grandmother?

A.    Well, Claudia I knew was there off and on.  And I didn't have much contact with Claudia --

Q.    Okay.

A.    -- as I did with Alfred.

Q.    So you weren't visiting your grandmother during the period of time that Claudia was living there?

Frank – Cross

A.   Claudia was there, but it wasn't -- in other words, I didn't come in contact with Claudia a whole lot.

Q.   Okay.

A.   I know she used to sleep there sometimes, but I didn't come in contact with her as much.

Q.   Now, would you say that his relationship with your grandmother was good?

A.   Very good.

Q.   Would you say that his relationship with you is good?

A.   Yes, it was, pretty much.

Q.   And did you ever bring over your new husband to your grandmother's house?  I was just wondering.

A.   My husband worked at night, and he didn't visit that much during that time.

Q.   Did your mama ever come over to the house?

A.   Yes.

Q.   And how was your mama with him?

A.   Very fine.  Very good.

Q.   Okay.  And so you think your relationship with his, with your mama was good?

A.   Yes.

Q.   Okay.  And did, when you would do things, when your mother -- when your grandmother, I'm sorry, would do things for him, did he seem appreciative?

A.   Very.

Frank - Cross

Q.   And so would he hug her and say, "Thank you," or in his way -- is that what would happen?

A.   He would hug her, just like we would, all of us would.

Q.   Okay.  And did he say -- did he actually say the words, "Thank you"?

A.   He would tell her "Thank you."  And sometime he would forget and she would remind him what you're supposed to say.  That's my grandmother.

Q.   Did he ever, did he ever tell your grandmother or did your grandmother ever tell you, did he ever say, "I'm lonely.  I'm sad.  I'm happy"?

A.   No.

Q.   "I'm --"

A.   Sometime he would hug her, he would hug her, go up to her and hug her, and she would hug him back.  And she would just tell him, "You're going to be all right.  It's going to be okay."  Especially if he had visited his mom, and quite -- sometime he would go and visit his mom, and when he would come back, he would be sort of in a depressed mood.

Q.   Uh-huh.

A.   And he would hug my grandmother.  And she'd hug him back and kiss him back.

Q.   Do you know whether or not he considered like Michelle and Lloyd and Claudia, his siblings, his friends?

A.   I would think he would.

Q.   And did you find that during the period of time that you had to observe him, that seven through nine-and-a-half, that he was consistent with the friendship or the feeling that he had with that group of his friends?

A.   Just as I said, Alfred was pretty slow in grasping things, as far as games, and he was kind of shy in making friends.  But with my siblings, in other words, my cousins, they took time with him to share things with him, to teach him how to do things.

Q.   Uh-huh.

A.   And it was just a close-knit, you know, of being there and holding him out a hand to try and show him, you know, "This is how it goes.  This is what to do."  But that's the way we were raised --

Q.   Right.

A.   -- as kids.  My grandmother and my parents, that's the way they raised us, not to look down on a person, but to help him. And that's what we did.

Q.   Did you, would he -- did he enjoy when y'all would be together?  Did y'all ever tease him lightly or make jokes and --

A.   That was a no-no.

Q.   I mean, not teasing, no.  Say things that were funny, watch cartoons, or do anything that --

A.   We would watch, yeah, they would watch television.  Yes,

he would watch, my little cousin and them, with all of us, he would watch.

Q.   And what was good during that time?  Mighty Mouse?  Or am I too old?  I mean, you know, whatever.

A.   I don't remember --

Q.   Yeah.

A.   -- during that time.

Q.   Yeah, but did he enjoy --

A.   Watching cartoons.

Q.   Could he laugh at the cartoons and, you know --

A.   Yes.

Q.   -- enjoy things like that?

A.   Yes.

Q.   Now, did you ever see him, during that period of nine, seven to nine-and-a-half, if Ms. Mary got up and she maybe needed a little assistance, or she wobbled or anything like that, was he ever attentive to her, like if she needed assistance or something?

A.   Well, if she would get up and she would, just as I said, she walked with a cane, and sometimes she would tell him, "I need help."

Q.   Okay.

A.   Especially if she sit too long and arthritis would set in --

Q.   Uh-huh.

A.   -- she would tell him, "Alfred, I need help."  And he
would get up to help her.

Q.   Uh-huh.  Did he, did he ever get to the point during that
period of time where you would come to the house and he would
say, "Hey, you want some water," or "We have cookies"?  Did he
ever get to that point?

A.   No.  No.

Q.   Okay.  I guess he didn't -- he didn't ever have any money
or anything.

A.   No more than change that my grandmother would give him.
Because just as I said, she sold candy, and she sold like
freeze cups, and she would put money in his pocket, especially
on Sundays to go to church.

Q.   Uh-huh.

A.   Because she believed in putting money in church.  And if
you were with her, you put money in church.  So she would make
sure before she would leave home, she would put change into his
pocket and tell him, "Alfred, don't forget, you have to put --"
sometimes she would have to remind him, take the money out of
his pocket, put it in church in the basket.

Q.   Now, let's talk about church.  Did you go to the same
church they went to?

A.   I was Catholic, but my dad was Baptist, and I went to the
same church.  I would go to church quite often with my
grandmother.  I was the one that followed her to church a lot.

Q.   Okay.  So you went to Evergreen?  Is that it?

A.   Ever -- my family belonged to Evergreen Baptist Church.
But just as I said, my mother's kids were Catholics.  My daddy
was a Baptist.  And he belonged to Evergreen Baptist Church.
He was the director of the youth choir, my dad.

Q.   Oh.

A.   And my grandmother was the mother of the church.  And by
that I mean she was the oldest member of the church.

         THE COURT:  Is that where Mr. Bourgeois went?

         MS. BOOTH:  Your Honor, I'm going to need a break.

         THE COURT:  All right.

         MS. BOOTH:  I need to take a break.

         THE COURT:  Well, then, I guess we'll just take a
break.  We'll take a 15-minute break.  Thank you.  You can
stand down.

         THE WITNESS:  Okay.

   (Recess from 10:08 a.m. to 10:09 a.m.)

         MS. BOOTH:   -- that Mr. Bourgeois is saying is her
father that sexually assaulted him (inaudible.)

         MS. LARIN:  Not saying that.  Her father is not
Raymond Adam.

         MS. BOOTH:  I know her father is not Raymond Adam,
but I know that her father is the youth, is the choir director.
And I think that I remember him saying that the choir
director --

MS. LARIN:  No, it was the Sunday school teacher.

MS. BOOTH:  Well --

THE COURT:  I thought he said Sunday school teacher.  But ask her.

MS. BOOTH:  But it was at different places, Your Honor.  And that's the problem, that he's made different statements about who abused him.  Sometimes he said the choir director.

THE COURT:  I understand.  I don't --

MS. BOOTH:  Sometimes he said that --

THE COURT:  I don't know.  All I saw in the videos, and I haven't seen Price 1 and 2 --

MS. BOOTH:  Right.

THE COURT:  -- he said Sunday school teacher.  I don't know about choir directors.

MS. LARIN:  And the last witness said Sunday school teacher too.

MS. BOOTH:  Well, I know, but she didn't say that was the one that -- I mean, I have heard him say that it was his choir director also, in another statement.  And I just have to figure out which statement that is.  And I don't want to hurt this -- to ask that question of this woman, Your Honor, unless I --

THE COURT:  Well, I figured that's why you wanted a break, but I can't help you there.

Frank - Cross

MS. BOOTH:  I know you can't.  I'm just telling you why I wanted a break.

MS. LARIN:  So I -- are you trying to prove that he was sexually abused?

MS. BOOTH:  No.  I'm trying to prove that he's said it now after he's been convicted.

MS. LARIN:  Right, but --

MS. BOOTH:  That's what I'm -- that's where I'm going with this, is not that it's true, but that he said it after he got convicted.

MS. LARIN:  Okay.  So he said it was Raymond Adam.

MS. BOOTH:  No, he says that there were two people. One of them was Ms. Clayton's son.

MS. LARIN:  Right.

MS. BOOTH:  And one of them was, at one point, one statement he said that it was the choir director.  In another statement he said that it was the Sunday school teacher.  And my question is --

MS. LARIN:  Okay.  Well, I never heard the choir director.

MS. BOOTH:  Okay.  Well, I have.  And that's why I just, because I --

THE COURT:  Well, you just need to ask her.

MS. BOOTH:  Okay.  I figured there's been so much ugly, I didn't want to spread any more around, Judge.

THE COURT:  Well --

MS. BOOTH:  Yeah.

THE COURT:  Now we're off the record.  Wait -- yes, sir?

MR. ABREU:  I was just trying to figure out how long our break was, Your Honor.

THE COURT:  You're down to about two minutes now, I know.

MR. ABREU:  There you go.  All right.

(Recess from 10:11 a.m. to 10:25 a.m.)

THE COURT:  Y'all can be seated.  Could the witness -- could you come back to the stand, please, ma'am?  Y'all can be seated.

MS. BOOTH:  (Clearing throat.)  That didn't sound good.

THE COURT:  No.

BY MS. BOOTH:

Q.   We were talking about the Evergreen Baptist Church, and you were telling me that your father was the choir director.

A.   He was over the youth choir for a while.

Q.   Youth choir.  And did the youth choir practice?

A.   Yes.

Q.   And were you part of the youth choir?

A.   No.

Q.   Okay.  Did you ever go to any of the practices?

A.    Maybe one or two.

Q.    Do you know whether or not Alfred Bourgeois was in the youth choir?

A.    I don't remember.

Q.    Now, your father didn't also teach Sunday school, did he?

A.    No, huh-uh.

Q.    Okay.  And do you know who taught Sunday school?

A.    No, I don't recall at the time.

Q.    Have you ever heard that Alfred claims that he was being sexually assaulted during choir practice by the -- by his Sunday school teacher?  That this was actually going on during choir practice?

A.    I have no knowledge of that, no.  I don't know anything about it.

Q.    During that period of time, from seven to nine-and-a-half with your grandmother, did you see any changes in Mr. Bourgeois as far as his, you know -- and I know you're not a doctor, but I'm just, as a mother, could you look at him and say, maybe his happiness level went up a little when he was with your grandmother?

A.    My grandmother house was a safe haven for him, because he was abused by his mother.  I mean, I actually saw him getting spankings, whippings with a belt.  I saw where she had actually sit and just picked at his nose until it bleed.  I mean, these were things that I witnessed myself.

Q.   And so your grandmother's house was a safe haven.

A.   Yes.

Q.   If you heard that Mr. Bourgeois said that he was being raped nightly in your grandmother's house, what do you have to say about that?  Have you ever heard that?

A.   I never heard it.

Q.   All right.

THE COURT:  Who was it that was, he says was doing that?

MS. BOOTH:  Mrs. -- he didn't say the first name, but it was Ms. Mary Clayton's son.  And as she testified, there were many different sons.

BY MS. BOOTH:

Q.   So you never heard that?

A.   No.

Q.   Do you know who lived across the street from your grandmother's house?

A.   I can't recall at the time and remember.  I remember Miss, a lady they called Miss Mud (phonetic) that lived right in front of her.  And across the street, I can't remember who was the family that was across the street.

Q.   Do you think if your grandmother would have thought that Alfred was being raped in her very house, that she would object to that?

A.   Oh, yes, she would.  Oh, yes.

MS. BOOTH:  I pass the witness, Your Honor.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One more question.

A.   Okay.

Q.   Or one more group of questions.  You were asked on cross about what age Alfred had trouble putting his clothes on and doing it right.  And when you observed Alfred, were you also observing other children around the same, that were around the same age as Alfred?

A.   My little cousins and them were there all the time.  My grandmother had a house full all the time, you know, cousins coming in and out.  And they can do things on their own, dress themselves, comb their hair, put their shoes on, tie their tennis shoes, but he couldn't do it.

Q.   And you had noticed that Alfred couldn't?

A.   He struggled.

Q.   Even compared to his peer group.

A.   He struggled.

MS. LARIN:  Okay.  That is my last question, Your Honor.

THE COURT:  Thank you, ma'am.

MS. LARIN:  Thank you.

THE COURT:  Anything further, Ms. Booth?

MS. BOOTH:  No.  No, ma'am.

THE COURT:  Thank you, ma'am.  You may stand down.

THE WITNESS:  All right.

MS. LARIN:  We'll call Brenda Goodman, Your Honor.

BRENDA GOODMAN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good morning, Ms. Goodman.

A.   Good morning.

Q.   Can you please state your name for the record?

A.   Brenda Clayton Goodman.

Q.   Can you spell your last name, please?

A.   G-O-O-D-M-A-N.

Q.   Okay.  And it sounds like your voice is being picked up by the mike, which is good.  Just be careful not to lean, touch the microphone.  Okay?

And are you related to Alfred Bourgeois?

A.   I'm not.

Q.   How do you know him?

A.   My grandmother.

Q.   Who is that?

A.   Mary Clayton.

Q.   What about your grandmother?

A.   My grandmother raised Alfred.

Q.   Okay.  And can you just tell us what year you were born?

THE COURT:  Her full name again?

MS. LARIN:  Oh, the grandmother's full name?  What was your --

THE COURT:  This lady.

THE WITNESS:  Brenda Clayton Goodman.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   And can you please tell us what year you were born?

A.   1952.

Q.   Which would make you about 12 years older than Mr. Bourgeois, Alfred Bourgeois.  And did you live on the Bend?

A.   Yes, I did.

Q.   Can you just briefly describe the Bend for us?

A.   The Bend is basically a one-way street.  Everyone that lives there is basically related or some sort of way intertwined.  We all kind of grew up together.  It was very poor.  Farming.  As a girl, you attended school, and in the evening, your chores was either to clean what they call shallots, it's green onions, or strip tobacco, go in the fields, then you go into school, come back and basically everybody kind of played together.

Q.   Okay.  And when you say "one-way street," do you mean a one-lane street?

A.   One-lane.

Q.   Because the cars actually went two different ways, but --

A.   Two different ways, yes.

Q.   But it's a small street?

A.   It was a very small street, uh-huh.

Q.   Did you know what house Alfred Bourgeois's mother lived in?

A.   Yes.

Q.   And can you kind of describe it for us?

A.   A very small three bedroom home, living room, one bath, a little small concrete front porch, but it was a screened-in back porch.

Q.   Okay.  And when you say "small," is there any way you could -- I mean, you realize there were seven children living in that home.

A.   Right.

Q.   Did that size house seem like it would be crowded?

A.   It was crowded.  The whole house wasn't big as this courtroom.

Q.   Okay.  And can you tell us a little bit about Alfred's mother, please?

A.   Eunice, she had, I know, five kids maybe back to back.  She had a lot of children.  Growing up, every time I saw her, she was pregnant.  She dranked.  She drank excessively.  She dranked a lot.

Q.   Okay.

A.   Dranked excessively.  She would curse the kids all the

time.  She was overwhelmed, frustrated all the time.  She couldn't remember things.

Q.    What do you mean by that?

A.    Like if you would say, you know, Eunice, such-and-such about the kids or whatever, she couldn't remember.  And I don't know, I guess it was contributed to her drinking, because she just really was forgetful.  And I could remember my mom and my grandmother having to remind her of stuff all the time.

Q.    Like what kind of things?  Do you know?

A.    "Make sure you send the kids to school.  Make sure," you know, just things that was important in life regarding raising her children.  They would have to remind her.

Q.    So in your small community, did she kind of stand out in these ways?

A.    I think, when you say "stand out," I think everybody kind of supported the fact that she had all these babies and they had to help her with these babies.

Q.    Okay.

A.    And the drinking.

Q.    Do you know what she drank?

A.    Beer.

Q.    Mostly beer?

A.    Uh-huh.

Q.    Would you see, did it seem like she would get intoxicated?

A.    Yes.

Q.   Do you know how often she would drink?

A.   Every day.

Q.   Did you know Anthony Ferdinand, the fourth child, Eunice's fourth child?

A.   NeNe?  Yes.

Q.   Is that what you called him, NeNe?

A.   Uh-huh.

Q.   And can you describe how Eunice took care of him?

A.   Well, taking care of NeNe for Eunice was very overwhelming.  The kids would -- basically Alfred would have to like pitch in.  She would make him sit there and watch him.  He couldn't walk, and it was a child that just sat in the middle of the floor.  He could not talk, couldn't do anything for himself.  And so basically everybody had to watch him, change his diapers.  If you went over to visit, that was part of your job as well, to help groom, take care, do whatever you could do while you was there, pick up clothes, do whatever.  Because it was overwhelming.  She had all these children.

Q.   Uh-huh.

A.   And NeNe, of course, was an exceptional child, retarded, couldn't walk or talk.

Q.   Right.  He had -- it's already on the record that he had cerebral palsy.

A.   Well, yeah.  We didn't know.  That's what we called it.

Q.   Okay.  What did you call it?

A.    Retarded.

Q.    Retarded.  Okay.  So did you notice anything special about Alfred and his functioning?

A.    Alfred was slow and --

MS. SALINAS:  Your Honor, I'm going to object.  She's asking, she's not putting a time frame as to when this would have occurred.  If she could set the timing.

MS. LARIN:  Okay.

THE COURT:  What are you -- yes, just do the timing.

MS. LARIN:  Let's step back.  Okay.

THE COURT:  Thanks.

BY MS. LARIN:

Q.    So you were born in 1952.  Alfred was born in 1964.  So you guys are 12 years apart.

A.    Uh-huh.

Q.    Did you always live on the Bend?

A.    Yes.

Q.    Was there --

A.    My grandmother raised -- yes.

Q.    Was -- so explain that.  You lived on the Bend.  Did you ever move out of the Bend?

A.    Yes, I did.

Q.    When did you --

A.    When my mom -- at 13.

Q.    Okay.

A.   Thirteen, between thirteen and fifteen, but it was -- I moved when my mom got married, but it was back and forth.  And our family is very close, so it was an everyday thing.  We'd come to see our grandma every day.  We all went to the same church.  On weekends, it was at my grandma's house.  On Fridays, at grandma's house.  So it was, you moved, but it was never a leaving.

Q.   Right.

A.   And then grandma and Alfred would come and spend time at my mom's house.

Q.   Okay.  When he was older.  I mean --

A.   Right.  Well, growing up, yeah.

Q.   Okay.  So let's get a time frame then.  You lived in the community until you were about 13, when about Alfred was born, and as a baby.  And then you moved to Lutcher, but you were still in the community every weekend at least, and most days.

A.   Right.

Q.   Is that what you're saying?

A.   Right.

Q.   Okay.  Just establishing when you had the chance to observe Alfred.

A.   Right.

Q.   So let's talk about, you said that you thought Alfred was slow.  Can you pick a time, an instance that you could say, you know, an example, and we'll try to see about how, what age he

was for that example.

A.    Between six, seven years old.

Q.    So pick something that you thought he was slow at.

A.    Putting his shoes on the right feet.

Q.    Okay.

A.    He would always have his shoes on the wrong foot.  Not tying his shoes.  She had to say, "Alfred, where is your --" you know, you had to remind him to put his socks on with his shoes, if, you know --

Q.    And this was when he was living with your grandmother?

A.    Right.  And growing up, we didn't have very much, and so you had dress socks and you had school socks.

Q.    Uh-huh.

A.    And so you would tell Alfred to go put on his socks, and so he couldn't distinguish the dress socks from the school socks.  He would just go put on a pair of socks.  And, you know, "No, that's your dress socks."  He'd put the dress socks on with tennis shoes.

Q.    Right.

A.    Right, so --

Q.    Do you know about what age that was happening?

A.    It had to be around eight-ish, nine-ish.

Q.    Okay.  So you see the problem -- what you did is exactly right.  We need to keep going back to what age things happened at.

A.    Right.

Q.    Were there any other examples of things that he had difficulty with?

A.    If my grandma would say, "Alfred, go in the room and get such-and-such.  Go in the room and get such-and-such."  And he would repeat, "Go in the room and get such-and-such."  "Yeah, Alfred."  And he just standing there.  "Alfred, get such-and-such."  "Where is it?"  You couldn't say, "Turn to your right."  You had to say, "Go on the side where the bed is. Look to this and get this."

Q.    Uh-huh.

A.    You had to just really spell it all the way out, until he had his hands on it.  "Okay.  Bring me that."

Q.    Uh-huh.

A.    And that's how --

Q.    And would he be able to do that, follow those directions?

A.    Right.  He was just -- he was always preoccupied, just could not follow instructions.

Q.    Okay.  And what, around what age was that?

A.    Eight-ish, nine-ish, ten-ish.

Q.    So let's just narrow it down.  It seems like around eight to ten, when Alfred was around eight to ten, that's when you have the clearest memory of this time.  Right?

A.    Of -- yeah.

Q.    So let's just keep talking about age eight to ten for now.

A.   Okay.  Well -- okay.

Q.   No, we can broaden it out.  Let's keep talking.  What else did he have some difficulties with?

A.   I could remember him being smaller, and we would go to grandma's.  Everybody would eat out of a plate, but he had a tin plate, and it was because like just taking his plate from wherever to the table, sometimes he would let the plate fall, and it would break.  So she had him conditioned to eat out of a tin plate --

Q.   Okay.

A.   -- where it wouldn't break.

Q.   And did she have to do that with the other children?

A.   No.

Q.   Did you ever see if he had any problems expressing himself or communicating?

A.   Yes.  He stuttered.  Is that a term?

Q.   Yes.

A.   Yeah, he stuttered.  Okay.

Q.   Did he have any problems grooming himself?

A.   Yes.  He did have problems grooming his self.  You would say, "Alfred, put your shirt on."  Alfred may button his shirt, but the first button was the third hole.  He would put the third hole on the first button, something of that nature.  And you know, the shirt just wasn't even or level.

Q.   Right.

A.   Or whatever.  He don't put all the belt in all the loops --

Q.   Uh-huh.

A.   -- you know, of his pants.  Never, you know, you'd tell him, "Alfred, put your shirt in your pants," or whatever.  "Alfred, you forgot to put your T-shirt on.  Put your T-shirt on before you put your --"

Q.   Right.  And what would your grandmother do when she saw --

A.   Just show, try to help him do it, show him how to do it.

Q.   And did Alfred have chores at your grandmother's house?

A.   Yes.

Q.   Can you tell me what type of things she would have Alfred do?

A.   Well, back in the late '60s, the early '70s, after --

Q.   Okay.  Let's see.  Okay.  He moved into Ms. Mary's house around '71, we think.

A.   It was after a hurricane.  I know it was after one of the hurricanes.

Q.   Okay.  Okay.

A.   Because we lost our house on two hurricanes.  My grandma lost her house on two hurricanes.

Q.   Uh-huh.

A.   And this last hurricane, and that's why I say it was around the '70s somewhere.

Q.   Yeah.

A.    And they rebuilt their house because they couldn't -- it didn't have a sewer.  So he was responsible for taking the pot that you do your waste or whatever in, to the outhouse.

Q.    Okay.

A.    He was responsible for -- she -- well, she was crippled. She really couldn't get, you know, in a tub, per se.  But the tub we had was like a foot, it was a long, oblong tub.  He was responsible for filling that up with water, helping her take her bath.  And then when she finished taking her bath, he had to take bath in the same water, then throw the water out, because there was no sewer.

Q.    Right.  Okay.  And so he would fill the tub with water?

A.    Right.

Q.    Did he ever have any difficulties with any of his chores?

A.    Yes.  He would spill water on the floor, and you know, that was a problem, because she had to, they had to mop it up and what have you.  Every night it was, you know, the same thing, until they got money enough and my uncles had money enough to hook the sewer.  Because we were poor.  We didn't have no sewer.

Q.    Uh-huh.

A.    And this was like in the '70s.

Q.    Okay.  Were you aware of the abuse that Alfred suffered as a child?

A.    Yes.

Goodman - Direct                142

Q.    And you touched on this briefly, but can you talk a little bit more about how Eunice treated Alfred?

A.    Eunice would curse Alfred.

Q.    Uh-huh.

A.    She would beat him.  She picked in his nose.  His nose would stay bloody all the time.  Now, I don't understand why, you know, but she would just pick in his nose till it would just bleed all the time.

Q.    And did he --

A.    And she was more harder on him than the other kids.  I don't know why, but she would just excessively curse him out all the time.  And that was, I think, why my grandmother felt the need to have to do something to help.

Q.    And did Alfred ever tell you about any other abuse that he suffered?

A.    Yes.

Q.    Can you tell us about that?

A.    My grandmother youngest son was a twin, and Alfred told me that my uncle, who loved, you know, we loved him, but my family never accepted the fact that my uncle was homosexual.

Q.    Uh-huh.

A.    And my uncle raped Alfred.  Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him.

Q.    Okay.

A.    And I had to take care of him.  I was the one that was taking care of the uncle with the AIDS.

THE COURT:  When in time did he tell you this?

THE WITNESS:  Ma'am?

THE COURT:  When did Mr. Bourgeois tell you this?

THE WITNESS:  I can't remember age, but I do remember when I discovered my uncle had AIDS was in the late '80s.  And when I had to take him home to take care of him was in '92.  He contracted pneumonia, and he had -- they was letting him out of Charity Hospital, and they sent him home with an open tube.  And so I had to be educated on how to take care of him, because my daughter, she was born in '92, and she wasn't a year old yet when I had to bring her home to my two-bedroom apartment.  And so I had to give him, me and my children had to sleep in one room.  I have another son, had to sleep in one room, and the uncle, I had to put him in the room.  Well, Alfred would come to see about him, because Alfred, they all raised him.

MS. LARIN:  Uh-huh.

THE WITNESS:  And so then there was this dark thing, and I couldn't tell my family, because I was already dealing with how to educate these older people on the uncle had AIDS, and his partner had died of AIDS a couple of months before they discovered he had the AIDS.  And so that's what I was dealing with.  So I just said, "Okay, Alfred."  You know, it was too

much for me.  But he did --

BY MS. LARIN:

Q.    It was around that time that he told you?

A.    Right.  Right.

        MS. LARIN:  One moment, Your Honor.  I have no further questions, Your Honor.

        THE COURT:  Thank you.

                        CROSS-EXAMINATION

BY MS. SALINAS:

Q.    Good morning, Ms. Goodman.

A.    Good morning.

Q    Beverly Franks, what is her relationship to you, Ms. Goodman?

A.    Cousin.

Q.    Cousin?

A.    Cousin.

Q.    Cousin.  And you stated, I believe you testified that you grew up in the Bend.

A.    Uh-huh.  Yes, ma'am.

Q.    And when did you leave -- you moved when you were 13 years old.

A.    See, you all calling it "move."  My mom got married when I was 13 years old.  And she moved to Lutcher, Louisiana.

Q.    Okay.

A.    And that's about maybe ten or eleven, twelve at the most

miles.  And so I stayed with my grandmother a while, and when I wanted to have my way, to get things done, I moved with my mother.

Q.   Okay.

A.   But it wasn't a move like -- I'm in both places.

Q.   Well, where did you go to school when you were 13 years old?

A.   Had to be right, what ninth grade?  Cypress Grove.

Q.   In Lutcher?

A.   That's in Lutcher.  But it wasn't no restrictions.  You can catch the bus.

Q.   Okay.  But you went to school at Lutcher when you were 13.

A.   Yes, ma'am.

Q.   You weren't there at the Bend going to school in that area, where the school is there.

A.   There was no school in the Bend.  There was never a school.

Q.   In Paulina?

A.   I didn't go to Paulina Elementary.  During the time I went to school, there was St. Martin.  There was no -- it was a little room that we went to school in St. Martin as for elementary school.

Q.   Okay.  So before the age of 13, where did you attend school?

A.   A little while at St. Martin and a little while at Cypress

Grove Elementary.

Q. And you were living with whom when you, up until the age of 13?

A. My grandmother.

Q. You lived in Ms. Mary's house, Mary Clayton's house?

A. That's where I was raised.

Q. You lived there. Do you know Beverly Franks? You said you know Beverly Franks.

A. Yeah, Beverly is my cousin. That's my grandmother's son's daughter.

Q. And did she live with Ms. Mary?

A. She lived with her parents, who live at the head of the street, at the head of the Bend Lane.

Q. Okay.

A. But living was like, if dark caught you -- I mean, if it was dark and it was -- she slept there. I mean, we all lived together. You have to understand --

Q. Okay. Let me --

A. -- the family tradition.

Q. And, Ms. Goodman, you're telling me that Ms. Franks is, she is -- Ms. Clayton is her grandmother as well.

A. Yes, she is.

Q. And in Ms. Clayton's house, up until the age of 13, who besides yourself was living in Ms. Mary's house?

A. My mother.

Q.    And who is that?

A.    Frances Clayton Sanders.

Q.    Okay.  And who else?

A.    My Uncle Jake when he came.

Q.    I'm sorry, who?

A.    Jake Clayton.

Q.    Jay (sic)?

A.    That's -- yeah.  Esau, when he came, everybody.

Q.    And Jay (sic) Clayton is your grandmother's --

A.    My brother, Leroy Shiloh.

Q.    Leroy?

A.    Uh-huh.

Q.    That's your what, your brother?

A.    My brother.  Yeah, he went off to -- my brother is about eight or -- between -- he may be ten years older than me.  So like when he finished school, he went off to Arizona State.  So I don't remember after that.

Q.    Now, Leroy is older than you or younger than you?

A.    Older.

Q.    Older.  So Jay (sic) Clayton is your brother as well?

A.    No.

Q.    Jay (sic) Clayton is Ms. Mary's son.

A.    A twin, yeah.  That's the baby boy.

Q.    He's a twin to whom?

A.    Esau.

Q.   He's Ms. Mary's twin?

A.   No.

Q.   Okay.  Who is Ms. -- who is Jay (sic) Clayton?

A.   Mary's son, baby son.

Q.   Okay.  I thought you said a twin.

A.   He is a twin.

Q.   And who's the twin?

A.   Esau.

Q.   Esau.  Okay.  And Leroy -- and Jay (sic) and Esau, are they older than you?

A.   Uh-huh, yes, ma'am.

Q.   Go in the family order of your siblings for me, would you, please?

A.   I don't have but one brother.  That's Leroy.

THE COURT:  She said --

MS. SALINAS:  Okay.

THE COURT:  Just start at the oldest child, I think.

THE WITNESS:  For Ms. Mary?

THE COURT:  Please.

THE WITNESS:  Okay.  Charles Clayton; Harry Clayton, deceased; Frances Clayton Sanders, that's my mother; then Herman Clayton is Beverly's father; Ernest Clayton, deceased; I don't know who is the oldest between James and John, but there is a John Clayton and James Clayton.

BY MS. SALINAS:

Q.   Okay.  Now, up until the time --

A.   Have you got nine names?

Q.   Oh, I'm sorry.

A.   How many names have you got?

Q.   Three, four, five, six, seven.

A.   Seven, okay.  You got James, John, Herman, Harry, Ernest -- have you got Ernest?

Q.   Yes.

A.   There's nine of them, eight boys and one girl.

Q.   Okay.  And these are Ms. Clayton's sons -- I mean family members.

A.   Yes, ma'am.

Q.   Her children.

A.   Yes, ma'am.

Q.   And up until the age of 13, you said that you, along with your mother, Frances, and whom else were living with Ms. Mary?

A.   Leroy was raised in the house, and then he went off to school.

Q.   Okay.  Is that it?

A.   In between times, if my Uncle Jake didn't have a place, he was there.  But he lived in New Orleans.

Q.   Okay.

A.   But if he was -- didn't have a place to live.

Q.   Okay.  And that was it?

A.   Yeah.  My grandma house was, it wasn't a big house, but it

was the big house.  Everybody lived there.

Q.   How many bedrooms did it have?

A.   There was a living room, two bedrooms, a bath in between, a kitchen.

Q.   Okay.  Now --

A.   Front porch.

Q.   Okay.

A.   We slept on the front porch, too.  It was a closed-in front porch, so you could sleep on the front porch.

Q.   Okay.  And you stated that Mr. Bourgeois came to live at your grandma's house when he was how old?

A.   Had to be between -- he had been coming around since he was about -- she took up with him, he had to be about five or six.

Q.   You think he was five or six?

A.   Yeah.  I mean --

Q.   Okay.  And Beverly Franks, did she spend time with -- did she live in the house, Ms. Mary's house?

A.   Okay, ma'am, she lived with her parents.

Q.   Uh-huh.

A.   Which was at the head of the street.

Q.   Right.

A.   And then other uncles lived behind, and we all lived on the same street.

Q.   Okay.

A.    And so if dark caught you there, you slept there.  If it was raining -- but she didn't, she had to go and see about every day if she had to take her to the store or whatever, because she was driving.  She would drive, so she helped take her to the store, help her get groceries.  Everybody had their own little chores to do for grandma.  Somebody had to iron.  Somebody had to do, you had your chores.  You grew up -- we grew up being responsible.  And that's how she taught us to be responsible, because we had to do things for her.  She was the chief.

Q.    Okay.  But let me go back.  But what I wanted to make clear with you is that Ms. Franks didn't live in the house for any period of time for more than if she got caught in the middle of the night.

A.    Right.

Q.    Is that correct?  Is that your answer?

A.    Right.  Right.  Or you know, if you wanted to stay at grandma two, three, four days, that was fine.  Not just her.  There were other cousins.  There was 80 or something of us.

Q.    Okay.

A.    You know, and if 20 felt like staying there overnight, that's what happened.

Q.    Okay.  But I'm trying to get you -- I'm asking you if you knew at any point in time when she lived for an extended period of time other than for an overnight stay or two or three days,

did she ever stay for an extended period of time, for months at a time, at your grandma's house that you're aware of?

A.   Not that I'm aware of.

Q.   Okay.

A.   But I still don't think you understand what "staying" is.

Q.   Okay.  And you testified earlier that you could see -- let me ask you this before I ask you anything else.  You said you all actually left your grandma's house when you were about 13 years old.

A.   My mom got married.

Q.   Right.  And you and your mom --

A.   And I was both places, my mom, my grandma, my uncle.  We was just one big family.  But then eventually --

Q.   But you had a place where you had a bed, where you had your clothes, where you would stay.  Where was that, when you were 13?

A.   Both places.  Both places.

Q.   Well, you went to school in Lutcher, though.

A.   That was okay.

Q.   Okay.  Did you stay there at Lutcher for five days, and then you came home on the weekends to your grandma's house?  Are you saying, are you testifying that you did that every day?

A.   Right.  It just depends on where I wanted to stay at the time.  I catched the bus and go to Paulina and the Bend Lane, or I stayed at my mom and walked down the street to school.  It

just depends.

Q.   Okay.

A.   If you tell me what you're trying to get to, I can try to help you a little bit better.

THE COURT:   Okay, listen.  The way this works -- if you don't understand the question, that's okay.  But if you can't answer the question, that's okay.  But she asks the questions, and you answer them.  It's not that she's trying to get at anything.  Okay?

THE WITNESS:   Okay.

BY MS. SALINAS:

Q.   Okay.  And when your mother married and you left the house for a while from Ms. Mary's, did Leroy go with you?

A.   No, ma'am.  He was already gone.

Q.   Leroy was gone, okay.

(Counsel conferring off the record.)

BY MS. SALINAS:

Q.   Now, you mentioned that -- you were asked about, to describe instances when the Defendant, Mr. Bourgeois, was slow. Do you recall that question?

A.   Yes, ma'am.

Q.   And you said that, well, he couldn't -- he had trouble putting on his shoes when he was six years old.

A.   Yes, ma'am.

Q.   So where were you when you were 18 years old?

A.   Eighteen years old, back and -- Southern University at one time, at one point.  Community Action --

Q.   And Southern University is where?

A.   Baton Rouge.  But I was home every day, and then I worked for St. James Parish Community Action.

Q.   Okay.  So you're saying that when you were in college you would come back to Ms. Mary's house?

A.   Or my mom.  I didn't stay on campus.

Q.   Okay.

THE COURT:  How far was it from your school to your home?

THE WITNESS:  From Paulina to Baton Rouge, maybe 30, 35 miles.

THE COURT:  Thank you.

THE WITNESS:  It was a bus that would take us.

THE COURT:  Well, that was convenient.

THE WITNESS:  Yes, ma'am.

THE COURT:  You could study both ways.

THE WITNESS:  Yes, ma'am.  We leave home like 5:00 o'clock in the morning and come back in the evening to school -- from school.

BY MS. SALINAS:

Q.   So you went 5:00 in the morning to 8:00?

A.   No, not 8:00.  Huh-uh.  The bus would get back to Lutcher around -- it was still daytime.  In the fall, it may be getting

dark.  But it was still like 6:00, 5:30, 6:00 o'clock.

Q.    Okay.  So you were gone from the house from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.    Right.

Q.    And -- okay.  So during that time frame, you obviously didn't get to see the Defendant.

A.    Not while I was in school, no.

Q.    Okay.

A.    But when I worked for Community Action, I would check in on my grandmother.  I did like outreach social work for Community Action.

Q.    And what year was that?

A.    That was in '70, '71, '72.

Q.    '72?

A.    '71 through '72.  From '70, because I, at one point I stopped going to school all day, and then I would take some evening classes, where I would catch a ride to school.

Q.    Okay.

A.    And I was working during the day.

Q.    Now, you mentioned that the Defendant had some problems with grooming himself.  Was he able to put on his under clothing by himself?  He was able to put on his underwear by himself?

A.    I assume so, yes.

Q.    Well, you lived in the house.  I'm asking you.

A.   My grandmother -- my grandmother would supervise, making sure he had on everything that he was supposed to have on. I --

Q.   But as far as you know, he could put on his under clothing, he could put on his socks.  Correct?

A.   You had to tell him to put his socks on.  The shoes wouldn't be on the right foot.

Q.   Okay.

A.   Wouldn't be tied.  We help him -- now, I can remember helping him, everybody pitched in helping him try to tie his shoes, teaching him how to tie his shoes.

Q.   Let me ask you something.  Going back to you when you first testified, you stated -- you were talking about the Defendant's mother.  You mentioned that she drank, and that she drank a lot, and that she was intoxicated every day.  Do you recall that?

A.   Yes, ma'am.

Q.   And you said that as far as Anthony was concerned, everybody that went over there had to do something, had to help out.

A.   Yes, ma'am.

Q.   And at that time, the Defendant, Mr. Bourgeois, was living with his mother, was he not?

A.   Yes, ma'am.

Q.   And he would help out, too, wouldn't he?

A.    As far as making sure he -- because --

Q.    Like picking up trash or helping get the diapers for the baby.  He would do stuff like that.

A.    Yes.

Q.    Okay.  And --

A.    Whatever you tell him to do.  He -- Alfred was a person you had to tell him what to do.  It just wasn't -- he wouldn't just like pick up on his own and --

Q.    And that's when he was six years old.

A.    Right.

Q.    You would have to direct him to pick this up or put the sock on this other foot.  Correct?

A.    Yes, ma'am.

Q.    Okay.  But Alfred did that.

A.    Yes, ma'am.

Q.    He could get it accomplished.

A.    Yes, ma'am.

Q.    Okay.  And you gave -- you were interviewed by individuals from Mr. Bourgeois's legal team.  Correct?

A.    Yes, ma'am.

Q.    And you were interviewed, and you gave them a statement?  You talked to them?

A.    Yes, ma'am.

Q.    And in your statement, you told them that in your opinion that all of Eunice's children were slow.

A.    Yes, ma'am.

Q.    Including Claudia Williams?

A.    Yes, ma'am.

Q.    Lloyd Ferdinand?

A.    Yes, ma'am.

Q.    And who are his siblings?  Can you rattle off who the Defendant's siblings are?

A.    I had more contact with Claudia, Lloyd, Alfred.  I kind of vaguely remember Claude.  Claude was drowned.  I don't remember a whole lot.  But I remember Claudia.  I remember NeNe.

Q.    Okay.

A.    And I remember, of course, Alfred.

Q.    Did Claudia ever live with Ms. Mary?

A.    No, ma'am.

Q.    Never?

A.    Not that I recall.  But every --

Q.    Okay.  I'm just asking you if you recall.

A.    No, ma'am.

Q.    And now when the Defendant lived with your, Mr. Bourgeois lived with your grandmother, grandmother, he -- you testified earlier that he would do things like help her with her bath. Right?

A.    Yes, ma'am.

Q.    He would get the bath water and take it to the tub and pour it into the tub?

A.    Yes, ma'am.

Q.    And he would help her get out of the tub?

A.    Yes, ma'am.

Q.    And your grandma helped him to learn how to cook?

A.    I don't know about that cooking stuff.  No.

Q.    You don't know whether or not she taught him to cook?

A.    Huh-uh.

Q.    You never saw him cook at your grandma's house?

A.    I never saw him cook, no.

Q.    But you're 12 years older than Mr. Bourgeois.  Correct?

A.    Yes.  That's the age.

Q.    And you basically left when you were 13, so he was still a baby.  So, and then you went off to college.

A.    I didn't go off to college.

Q.    Well, you went to college.  You were in school from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.    For about a semester, yeah.

Q.    Okay.  Your grandma used to make candy and stuff --

A.    Yes, ma'am.

Q.    -- for the neighborhood and she would sell that?

A.    Pies, uh-huh.

Q.    And the Defendant, Mr. Bourgeois would help her with preparing those candies and fixing the pans and --

A.    Right.  Yeah, that was something all of us liked to do. So all of us kind of grew up putting the flour in the pan.

Q.    Okay.

A.    She may have let us roll the dough out, because you have to roll the dough to put the --

Q.    Right, and do that.  And Mr. Bourgeois would help do that, too, wouldn't he?

A.    I never saw it.

Q.    Okay.

A.    You know, like she would give you the pan to eat the cake mix.  That was a big deal.  Whoever got there first --

Q.    Got to lick the spoon?

A.    To eat the -- yeah, to lick the spoon and get the cake mix.  That part.  I think the older ones, we did more of the rolling the dough and the flour or whatever.  He might have just stood by playing.

Q.    And you saw the Defendant, he would help your grandma, and he would keep the grass, yard clean for Ms. Mary?

A.    I don't know.  The grass was more raking the yard.  There was more dirt than grass.

Q.    Okay.  But keeping up the outside?

A.    You had to keep the trash --

Q.    Keeping track of the yard, Mr. Bourgeois would do that for Ms. Mary?

A.    I don't recall.

Q.    You don't recall if he would do that?

A.    Huh-uh.

Q.   Okay.  Now, did you ever attend church when you were living at Ms. Mary's house?

A.   Yes, ma'am.  There was just one --

Q.   What church did you attend?

A.   Evergreen Missionary Baptist Church.

Q.   Did Mr. Bourgeois go with you to that church, attend church with you?

A.   He didn't go with me, but he attended church.

Q.   Okay.  Do you know whether or not he went to Sunday school?

A.   That was a must.  We all went all day.

Q.   When did you quit having contact with your grandma?

A.   I never quit having contact with my grandmother.  I moved to Florida in about '72, because they was asking for students to go to University of Florida, black students, so I moved there to try to get into the University of Florida.

Q.   Okay.

A.   But I would come home holidays, during the summer, and Alfred was there.

Q.   Okay.  He would be there at your grandmother's house?

A.   Yes, ma'am.

Q.   Did you -- you said it was, the community was a big community there, big -- and everybody would play together out in the street?

A.   It's not a big community.

Q.   Well, it's a small community --

A.   But -- yeah.

Q.   -- few houses there in this acre of land or two acres of land.  Everybody would play out in the streets?

A.   Yes, ma'am.

Q.   And Mr. Bourgeois would play out in the streets with his siblings?

A.   Yes, ma'am.

Q.   Did Mr. Bourgeois go back and forth between his mom's house and your grandma's house?

A.   Yes, ma'am.

Q.   Okay.  And was that on a daily basis?

A.   I would assume.  I mean, I couldn't say every day --

Q.   Well, you lived in the house until you were 13.?

A.   Yeah.

Q.   And then you said you moved out, and coming back and forth until the time you went to college.

         THE COURT:  How much older are you than Mr. Bourgeois?  Do you know?  How old are you?

         THE WITNESS:  I'm 57.  And he is --

         MS. SALINAS:  I believe she's 12 years older.

         THE COURT:  Okay.

BY MS. SALINAS:

Q.   And did you ever see Mr. Bourgeois playing in the playground or out in the street with his siblings?

Goodman - Cross

A.   Yeah, I've observed him playing.

Q.   Okay.  Let me get this straight.  When you were 13 and you and your mom, your mom got married, you moved a little bit -- you were still back and forth between your grandma's, but you weren't actually in the house every single day.  Is that correct?

A.   Just about every day, because we would make sure we saw her every day.

Q.   Okay.

A.   But whether I slept there every day or slept at my mom's every day, that's what -- I can't tell you.  I can't remember.  I can't tell you how many days at my mom and how many days.  But you know, there was both houses.

Q.   When you left to go to college, how old was Mr. Bourgeois?  Do you recall?

A.   Huh-uh.

Q.   Okay.

A.   He was young.

Q.   How young?  You said you left to Florida back in 1972?

A.   However old that would make him be.

Q.   Okay.  So he was about eight years old, is the last time that you actually had day-to-day contact with him?

A.   No.

Q.   Between the hours of 5:00 in the morning to 6:00 in the afternoon?

A.   Maybe.  But I would still come back home back and forth.
Somebody die, you come home.

Q.   Right.  But it wasn't on a --

A.   Come holidays --

Q.   Okay.  But Ms. Goodman, what I'm giving you is that when
he was eight years old, you were in Florida, University of
Florida.  Correct?

A.   Yeah.

Q.   And you were in school between the hours of 5:00 and 6:00
p.m., 5:00 a.m. in the morning to 6:00 p.m.

A.   In Florida?  Or in Baton -- in Louisiana?

Q.   Well -- okay.  When you were in Florida, what were your
school hours?

A.   Well, in Florida, I didn't get into the University of
Florida until I started working for Legal Services.  And that's
how I got in there doing some training through Legal Services
in the paralegal studies.

Q.   Okay.  Before you went to Florida, you said you were in
Baton Rouge?

A.   Right.

Q.   University of Baton Rouge?

A.   Right.

Q.   And that was in what year?

A.   In '70.

Q.   In 1970.

A.   Right.  And I went there a semester on the bus every day, then I started working in 1970 as well for St. James Parish Community Action.

Q.   Okay.  And then you left in '72 to Florida?

A.   Yes, ma'am.

Q.   Okay.  So when you were at Baton Rouge, the Defendant was six.  And when you left to University of Florida, the Defendant was eight.

A.   Yes.

Q.   So you had that contact.  You kind of had some loss of contact between six and eight.  And then thereafter, after eight.

A.   There was never a loss of contact.

Q.   Okay.  Daily contact, you know, 24 hours.  Not like the way it was when you were living there, from the time you were born till the age of 13.

A.   Yes, ma'am.

Q.   That's what I'm trying to get at.

A.   Yes, ma'am.

Q.   Okay.  And in your statement that you gave, you were visited by the legal defense team back in 2007.  Do you recall that?

A.   Yes, ma'am.

Q.   And you signed a declaration.

A.   Yes, ma'am.

Q. And you were asked to describe the Defendant's behavior and everything you observed about the Defendant. Correct?

A. Yes, ma'am.

Q. And in your statement, did you ever tell anybody about the sexual abuse of Alfred Bourgeois?

A. Not until recently.

Q. But you didn't -- when the legal team went and they had you fill out and sign declaration, you didn't tell them about the sexual abuse?

A. I don't recall. Is it on the statement?

Q. It's on the statement.

A. Okay.

Q. Would you like to see the statement?

A. No, ma'am.

THE COURT: Would it help you to refresh your memory if you saw it?

THE WITNESS: Yes, ma'am.

THE COURT: Would you hand it to her, please?

MS. SALINAS: Yes, Your Honor.

THE WITNESS: Thank you.

(PAUSE.)

THE WITNESS: You said it was on the statement?

MS. SALINAS: I'm sorry?

THE WITNESS: It's on here?

BY MS. SALINAS:

Q.   It's not on there?

A.   No.

Q.   No, you didn't tell them about it.

A.   No.

Q.   And you knew at that time when they visited you that they wanted you to tell them everything about the Defendant, they were investigating, trying to get some mitigation evidence for Mr. Bourgeois?

A.   Repeat that.  I'm sorry.

Q.   That they were trying to find out if anything had been going on in his background, if he was suffering an abuse.  They asked you about those questions, did they not?

A.   Yes.  Yes.

Q.   And you didn't tell them about sexual abuse.

A.   No.

Q.   This is the first time you've told them about the sexual abuse?

A.   You mean today or --

Q.   Yes.

A.   No.  I -- we discussed it.

Q.   When the legal team, the defense legal team went to go talk to you back in 2007, you told them --

A.   I don't recall if I did in 2007.  I don't recall.

Q.   When you --

          MS. SALINAS:  We offer into evidence Government's

Exhibit Number 202, Your Honor.

THE COURT:  Any objections?

MS. LARIN:  Well, what's the basis, Your Honor?

THE COURT:  I'm sorry, I can't hear you.

MS. LARIN:  What is the basis of --

THE COURT:  I can't hear you.

MS. LARIN:  Oh, I'm sorry, Your Honor.  What is the basis of offering it into evidence?

THE COURT:  What is your objection?

MS. LARIN:  I think that her testimony is --

THE COURT:  What is your legal objection?

MS. LARIN:  Our legal objection is it would be hearsay, and she testified.

THE COURT:  Sustained.

BY MS. SALINAS:

Q.   Ms. Goodman, when exactly did you tell the legal defense team that Mr. Bourgeois had been sexually abused by one of your relatives?

A.   I don't recall the date and time.

Q.   Well, was it a month ago?  Was it two months ago?  Was it a year ago?

A.   It wasn't a year ago.

MS. LARIN:  Objection, Your Honor.  This has been asked and answered.  She says she doesn't recall if she told --

MS. SALINAS:  Your Honor, I'm trying to get --

THE COURT: Overruled.

MS. SALINAS: A time frame.

THE WITNESS: I don't recall.

THE COURT: Was it before or after his, Mr. Bourgeois's conviction?

THE WITNESS: Before or after -- I don't recall.

THE COURT: Okay.

THE WITNESS: It wasn't before the conviction, because I wasn't even involved before the conviction.

BY MS. SALINAS:

Q. So do you think it would have been more than a year ago that you told them that?

A. Ma'am, no disrespect, I just do not recall.

Q. Okay. So --

A. I mean --

Q. All right. Now, you talked about the chores that the Defendant would do. One of them was filling the tub, when you were living there, and you said something about you all had a second house that didn't have any plumbing, and that occurred in the early '70s. Do you recall that?

A. Uh-huh.

Q. And so that would make Mr. Bourgeois about six years old.

A. Uh-huh.

Q. So you're complaining that he was spilling water --

THE COURT: I'm sorry. You have to answer with

words.

THE WITNESS:  Yes, ma'am.

BY MS. SALINAS:

Q.   So your main complaint about that he wasn't doing chores completely or doing them right was that he was spilling water on the floors.

A.   Yes, ma'am.

Q.   Okay.  And did that upset you?

A.   No.

Q.   Would you expect that a six-year-old would not be able to be very careful when they're pouring water into a tub?

A.   Yes, no, yes.

Q.   Okay.  Do you know about Mr., where Mr. Bourgeois went after he left your grandma's house?

A.   When she died?  Or --

Q.   How old was he when she died?

A.   I don't know how old he was when she died.

Q.   What year was that?

A.   She died in '82 or '83, because my son was like around six-ish.  Six-ish.  Around six.

Q.   So he was about 18 years old?

A.   Yes.

Q.   And where did he go after that?  Do you know?

A.   I don't know where he went as a permanent address.  I know he would be to my Uncle Jake's sometimes.  He would be to my

Uncle Esau in New Orleans sometimes.  But what was his permanent address, I don't know.  But he would stay with different relatives.

MS. SALINAS:  Your Honor, I again would like to reoffer Ms. Goodman's statement.  The purpose of us offering this is not the truth of the matter, but in fact to show instead that she did not mention the sexual abuse in the statement.  It's to impeach her testimony, Your Honor.  It's offered to show conflict.

MS. LARIN:  Object.  Can I respond, Your Honor?

THE COURT:  Yes.

MS. LARIN:  What might be in the statement, she says she doesn't recall what she told the investigator, if she told or not.  So just because whether it's in the statement or not doesn't mean that's the, it represents everything --

THE COURT:  I'm sorry.  Which investigator is this? Yours?

MS. LARIN:  My investigator.

THE COURT:  Okay.  Well, surely your investigator would have written it down if she had said it.

MS. LARIN:  Well, apparently it was missed, if it was said at all, so --

MS. SALINAS:  Your Honor, their whole premises of this case or this trial is to show that the Defendant was sexually abused by not only one, but two individuals.  That's a

very important piece of information.  And also it asked her to certify that the facts are true and correct.  And it's not in here.  And it's not hearsay, Your Honor.

MS. LARIN:  So you're using -- can I respond?

THE COURT:  Yes.

MS. LARIN:  Using the statement to prove something that wasn't said is a little --

THE COURT:  Tell me what your objection is.

MS. LARIN:  It's hearsay.  It's a negative hearsay, what she didn't say hearsay.

MS. SALINAS:  Well --

THE COURT:  Overruled.  Thank you.  It's admitted. Number what?

MS. SALINAS:  202, Your Honor.

THE COURT:  202's admitted.

MS. SALINAS:  May I have just a moment, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

MS. SALINAS:  No further questions, Your Honor.

THE COURT:  Anything further?

MS. LARIN:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   There were some conversations about conversations you had with Alfred's lawyers or defense teams.  Do you recall if you

had any contact or conversation with anyone that was working to represent Alfred Bourgeois prior to his trial in 2004?

A.    No, ma'am.

Q.    No one contacted you?

A.    No, ma'am.

COURT RECORDER:  I can't hear her.

THE WITNESS:  No, ma'am.

THE COURT:  She said "no."

THE WITNESS:  No, ma'am.

BY MS. LARIN:

Q.    And if someone had contacted you and interviewed you, would you have testified consistent to what you are testifying to today?

A.    Yes, ma'am.

Q.    One other question, Your Honor -- I mean, Mrs. Goodman.

THE COURT:  You can question me if you want.

BY MS. LARIN:

Q.    There were some questions about what chores he had, Mr. Bourgeois had, and what he was able to do.  Did you ever have the opportunity to observe Mr. Bourgeois in comparison to other children his age?

A.    Yes, ma'am.

Q.    Who were those -- I mean, you don't need to name them all, but what children would you compare him with?

A.    Cousins, people in the neighborhood, because my

grandmother was like a neighborhood big mama.

Q.   Uh-huh.

A.   So everybody played in the yard.  Everybody played in the house.  And so -- and Alfred went through a period of even just being in the house, you know, he just sometimes couldn't interact.

Q.   With the other children?

A.   Yes, ma'am.

Q.   And why wouldn't he be able to interact?  What do you mean by that?

        MS. SALINAS:  Calls for speculation, Your Honor.  Objection.

BY MS. LARIN:

Q.   What did you observe?  What do you mean when you say he wasn't able to interact?

A.   Like to play, you know, like kids was playing certain games that might have required an intelligence of instructions or doing things.  He just couldn't get it, something like that.

Q.   So in comparison to other children his age, what would you say his functioning was?

A.   Question again?

        MS. SALINAS:  Objection, Your Honor.  She's not an expert in this field.

        MS. LARIN:  When you -- I can withdraw that question and restate it.

THE COURT:  Go ahead.

BY MS. LARIN:

Q.    When you observed him and you could see what he could do and what other children could do, did you notice a difference?

A.    Yeah.  Yes, ma'am.

Q.    And what was that difference?

A.    Just take a simple thing as riding a bike.  I don't even know if he ever learned how to ride a bike, from when I was around.

THE COURT:  Well, he drove a truck later on, so --

THE WITNESS:  Right.  But a bike, you know, certain things --

BY MS. LARIN:

Q.    As a child, he couldn't do --

A.    Right.

MS. LARIN:  Okay.  I have no more questions, Your Honor.

MS. SALINAS:  I have a few.

REDIRECT EXAMINATION

BY MS. SALINAS:

Q.    Mrs. Goodman, are you telling me that if you would have testified in court back in 2004, you would have told them about the sexual abuse of Mr. Bourgeois?

A.    I would have.

Q.    But you didn't mention it in your 2007 statement.  You

didn't tell anybody about, when they interviewed you in 2007?

MS. LARIN:  Objection.

THE WITNESS:  Maybe in our culture, that was a dark thing.

BY MS. SALINAS:

Q.   So the answer is you wouldn't have testified to it then.

A.   I would have testified, yes, ma'am.

Q.   You would have testified at Court, but you wouldn't put it in your statement.

MS. LARIN:  Objection.

THE COURT:  I guess the point is, you had to tell somebody first before you would be called to testify.  And it's something you didn't want to talk about.  Is that right?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MS. SALINAS:

Q.   And you just mentioned that the Defendant couldn't ride a bike.  Do you know if anybody spent any time trying to teach Mr. Bourgeois to ride a bike?

A.   Well, it definitely wasn't my grandmother, because she was crippled.  She couldn't even teach me how to ride one.

Q.   Right.  And if his family members weren't helping him, it takes a while before a child learns how to ride a bike. Wouldn't you agree with that?  You've got to spend time. Someone's got to be behind you.  Someone's got to be walking

behind you.  Mr. Bourgeois did not have that, did he?

A.   No.

Q.   So it's not really surprising that he didn't know how to ride a bike, is it?

A.   Is that a --

Q.   Is it?

A.   Would that be a surprise?

Q.   Yes, if no one is teaching you how to do that at the age of five?

A.   I guess I don't know how to answer your question.

Q.   Okay.  Well, then I'll move on if you don't know how to answer that question.  Do you realize that Mr. Bourgeois, when he was -- later on in life was able to buy his own house?  Were you aware of that?

A.   No, ma'am.

Q.   Do you know he was able to purchase vehicles on his own?

A.   No, ma'am.

Q.   You didn't know that?  Did you know his house had a swimming pool?

A.   No, ma'am.

         MS. LARIN:  Objection, Your Honor.

BY MS. SALINAS:

Q.   Okay.  Do you know that he was able to --

         THE COURT:  Just a moment.

         MS. SALINAS:  I'm sorry, Your Honor.

MS. LARIN:  This is all very far beyond the scope of the examination.

MS. SALINAS:  Well, Your Honor, it goes to the things that he can do.  She's implying that he couldn't do anything as a child.  I'm just asking her what she knows about him as an adult.

MS. LARIN:  This is as an adult, and --

THE COURT:  Overruled.

MS. LARIN:  -- nothing was discussed --

THE COURT:  Thank you.

BY MS. SALINAS:

Q.   Do you know that he was able to get jobs when he left Ms. Mary's house?

A.   I know he drove truck.

Q.   You knew he drove an 18-wheeler.  Do you know that that in itself is a difficult thing to do?  Would you agree that driving an 18-wheeler and being able to maneuver an 18-wheeler is a difficult job?

MS. LARIN:  Objection, this calls for speculation.

BY MS. SALINAS:

Q.   Okay.  You don't know?

A.   No, I don't know.

Q.   Do you know he had a motorcycle and could drive a motorcycle?

A.   No, ma'am.

Q.   Okay.

MS. SALINAS:  I have no further questions, Your Honor.

MS. LARIN:  No further questions, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

MR. WISEMAN:  Your Honor, we're going to call Dr. Mark Cunningham.

THE COURT:  Thank you.  What do you want?

MR. WISEMAN:  I'm just saying that Dr. Cunningham at some point later in his testimony is going to want to show something from his computer, so I'm just wondering if we should plug it in now or wait for the lunch break.  I doubt we'll get to it before lunch.

THE COURT:  What do you think?  Let's wait.  We can set it up now.  Okay.

(Witness sworn.)

MR. ROBERTS:  Your Honor, I just want to note that Dr. Cunningham has apparently taken a whole stack of stuff with him to the stand.  I kind of just --

THE COURT:  Have you seen everything he's using there?

MR. WISEMAN:  I don't know if Mr. Roberts can answer that, but I can tell the Court that everything Dr. Cunningham has has been provided to the Government.

THE COURT:  Okay.  Thank you very much.

MR. WISEMAN:  Dr. Cunningham, just one -- oh, don't touch the microphone.  That's what I was about to tell you.

THE COURT:  Please don't --

MR. WISEMAN:  I was about to tell him.

THE COURT:  Ms. Gano, why don't you fix it.  I can see he's going to have to -- he's going to fiddle with it.

MR. WISEMAN:  He's a fiddler.

THE WITNESS:  Thank you.

MR. WISEMAN:  I was about to tell you, Dr. Cunningham, please be mindful of the microphone.

THE WITNESS:  Yes, sir.

MR. WISEMAN:  Because it goes into Ms. Gano's ears and causes her quite a bit of discomfort.

THE WITNESS:  Yes.

MARK CUNNINGHAM, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Can you state your name for the record, please?

A.   Mark Douglas Cunningham.

Q.   All right.  And I'm putting up on the overhead projector a document marked P-7.  And do you recognize that?

A.   Yes, sir.  That was my curriculum vitae as of July 19th, 2010.

MR. WISEMAN:  Your Honor, I would offer the curriculum vitae into evidence.

THE COURT:  Number?

MR. WISEMAN:  P-7.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-7 is admitted.

BY MR. WISEMAN:

Q.   Dr. Cunningham, what we've been doing, as the Judge is obviously now going to look at your CV, so rather than go through the more obvious stuff, I'm going to ask you some particular things about your background.  You're a psychologist?

A.   That's correct.

Q.   And do you have a specialty in psychology?

A.   Yes, sir, clinical and forensic psychology.

Q.   And in that field of forensic psychiatry, do you have a further specialty?

A.   Within the field of forensic psychology, I have a specialization in capital sentencing determinations, including mitigation and violence risk assessment for prison.

Q.   Okay.  And with respect to each of those two subspecialties --

THE COURT:  I'm sorry.  That was P-7 or P-12?

MR. WISEMAN:  P-7.

THE COURT:  P-7 is admitted.  Thank you.

BY MR. WISEMAN:

Q.    Within the two subspecialties you just mentioned, do you, have you lectured widely on both those topics?

A.    Yes, sir.

Q.    And would that be to professional organizations?

A.    Yes, sir.

Q.    Universities?

A.    Yes, sir.

Q.    Have you published articles in peer-reviewed journals on those two topics?

A.    Extensively.

Q.    And have you published chapters in books --

A.    Yes, sir.

Q.    -- on those subjects?

A.    Yes, sir.

Q.    Have you testified as an expert in capital sentencing in state courts?

A.    Yes, sir.

Q.    Approximately how many times?

A.    Approximately 100 times.

Q.    And would that be trial level courts?

A.    Yes, sir, in sentencing phase.  I've also testified in post-conviction and federal habeas in addition to that.

Q.    Okay.  And approximately how many times have you testified about these matters in federal court?

A.    Approximately 60 federal capital sentencing proceedings.

Q.   And between trial and post-conviction, what would the

breakdown be?  What's the percentage of your court work is

trial and what percentage is post-conviction?

A.   All of the cases that I described were at trial.  Perhaps

10 percent, 15 percent of my work is in post-conviction or

federal habeas.

Q.   As a forensic specialist in capital sentencing, do you

make it your business to read and keep up with the United

States Supreme Court and Circuit Court decisions with respect

to the psychological aspects of mitigation evidence?

A.   Yes, sir.

          MR. WISEMAN:  Your Honor, I would offer

Dr. Cunningham as an expert in forensic psychology and in the

psychological aspects of capital case mitigation, including the

standard of care, from a psychological perspective, not a legal

perspective.

          THE COURT:  Any objection?

          MR. ROBERTS:  That's a long statement, Your Honor.

I'm trying to process it.  I know he's an expert in --

          THE COURT:  What do you mean standard of care?

          MR. ROBERTS:  Yes.

          MR. WISEMAN:  Perhaps if I ask the witness, he can

describe that.

          THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Doctor, when I just used the phrase "standard of care," what does that mean to you in your specialty?

A.   Well, it has two relevant meanings.  One of those is a best practices standard.  Another is what is considered to be customary and adequate at a capital sentencing.

Q.   And when you say "adequate," again, you mean from a psycho-legal, as opposed to a legal perspective.  You're not here as an expert in the law.

A.   That's correct.

MR. WISEMAN:  With that qualification, I'll renew my offer.

MR. ROBERTS:  I object to that, him being qualified as a standard of care, Your Honor.  Every case is different.  There's no way you can have a standard of care in a case process.

MR. WISEMAN:  Your Honor, the ABA guidelines as the Supreme Court has endorsed would differ with Mr. Roberts.  There's very much a standard of care.  It's published by the ABA.  The Supreme Court has endorsed it numerous times in Wiggins, Rampilla (phonetic), more recently in Van Hook.

THE COURT:  Tell me again what standard of care is, Dr. Cunningham.

THE WITNESS:  Yes, ma'am.  The standard of care has two definitions, as I would understand it.

THE COURT:  Okay.

THE WITNESS:  One of them is a best practices recommendations.  In other words, there's not a --

THE COURT:  Meaning in what?  Best practices in psychology or --

THE WITNESS:  Yes, ma'am, best practices for mental health evaluations.

THE COURT:  Okay.

THE WITNESS:  That phase.  There's not a published standard of care by the American Psychological Association.  There are best practices that have been articulated in the scholarly literature.  There is also what is regarded as customary, necessary, as reflected in trainings for psychologists and for attorneys.

THE COURT:  I don't -- this is the deal.  I don't think it matters whether I qualify him, accept him as a best practices.  He can testify about it.

MR. ROBERTS:  Okay.

MR. WISEMAN:  Well, I --

THE COURT:  Is that all right?

MR. WISEMAN:  As long as we can have opinions on --

THE COURT:  So he can be an expert forensic psychologist.

MR. WISEMAN:  That works for me.

THE COURT:  Okay.

MR. WISEMAN:  With that --

THE COURT:  Since I'm not familiar with it, I'm sorry.

MR. WISEMAN:  Oh, no.  That's quite all right.

THE COURT:  Okay.

MR. WISEMAN:  I hope by the end of his testimony you will be.

THE COURT:  I will be.  Thank you.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Dr. Cunningham, I want to direct your attention to June 30th, 2003, and ask you if you were contacted with respect to the United States of America versus Alfred Bourgeois.

A.   Yes, sir, I was.

Q.   And by whom were you contacted?

A.   I received an e-mail from John Gilmore on that date.

THE COURT:  What date?

THE WITNESS:  June the 30th, 2003.  8:20 p.m.

BY MR. WISEMAN:

Q.   I'm putting up on the overhead a packet of 38 pages in length.  It's Exhibit P-8, and ask you if you, at least for the moment, recognize that top page.

A.   Yes, sir, I do.

Q.   Okay.  And what do you recognize it as?

A.   This is the e-mail that I received from John Gilmore in the evening of June 30th, 2003.

Cunningham - Direct                        187

Q.   And just to be clear, because we're going to be referring to a number of e-mails in your testimony, this e-mail did not come from you to me.  I mean, I didn't get these e-mails from you, is your understanding?

A.   That's correct.

Q.   All right.  Where do you understand I got them from?

A.   It's my understanding that you got those from Mr. Gilmore.

Q.   Okay.  And why is it that, or do you have your own access to e-mails relevant to this case?

A.   No, sir.

Q.   Okay.  Now, what, in essence, is Mr. Gilmore asking you in this e-mail?  What was your understanding of the request?

A.   He is inquiring about whether I could be retained to assist the Defense in providing capital sentencing evaluation of Alfred Bourgeois.

Q.   And --

THE COURT:  Are you going to offer this so it can be part of the record?

MR. WISEMAN:  Oh, absolutely.  Yes.

THE COURT:  What's the number?

MR. WISEMAN:  It is P-8.

THE COURT:  P-8.  Any objection?

MR. ROBERTS:  No, Your Honor.

THE COURT:  P-8 is admitted.

MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  I want to direct your attention to the --

THE COURT:  I'm just worried when I'm looking at them that somebody's going to forget to offer it.

MR. WISEMAN:  Oh, no.

THE COURT:  Okay.

MR. WISEMAN:  I hope I don't.

BY MR. WISEMAN:

Q.   Where I put my finger, it says, "I have requested" --

THE COURT:  Can you zoom, can you zoom into that a bit, please, sir?

MR. WISEMAN:  Sure.  Is that better?

THE COURT:  Thank you very much.

BY MR. WISEMAN:

Q.   Okay.  Where it says, "I have requested" --

A.   Yes, sir.

Q.   What is he asking you if you're able to do?

A.   He is inquiring whether I could accept an appointment as a mitigation expert, with a fee that would potentially be in the $25,000 range.

Q.   Okay.  And does he offer you any information about the current, the then current state of the mitigation case?

A.   Yes, sir, he does.

Q.   And what is he telling you?

A.   He describes, four lines from the bottom of that

paragraph, "We do not expect to be successful, mainly because we have developed very little mitigating evidence."

Q.   Okay.

A.   "It's a catch-22 situation.  We don't get a mitigation expert unless they seek the death penalty.  We don't have much mitigation evidence to dissuade the council because we don't have anyone trained to do it."

Q.   Okay.  And when he used --

THE COURT:  I'm sorry, but I think he was talking about then, persuade the Attorney General's council.

MR. WISEMAN:  That was my next question.

THE COURT:  Not to -- that was my understanding of where they were at the time.

MR. WISEMAN:  That was my very next question.

THE COURT:  They wanted information to send -- everybody has to file all these briefs, as you know.

MR. WISEMAN:  To the committee in Washington.

THE COURT:  With the Attorney General in Washington.

MR. WISEMAN:  Right.

THE COURT:  Whatever their council is.  And he wanted to head off the death penalty --

MR. WISEMAN:  Exactly.

THE COURT:  -- before it got to the death penalty.

MR. WISEMAN:  Precisely.

BY MR. WISEMAN:

Q.   And is that your understanding of what he meant by council, Dr. Cunningham?

A.   Yes, sir.

Q.   Okay.

THE COURT:  Okay.  So we're all on the same page.

MR. WISEMAN:  Absolutely.  Not only on the same page, the same sentence.

THE COURT:  Thank goodness.

MR. WISEMAN:  Okay.

THE COURT:  Paragraph, page.

BY MR. WISEMAN:

Q.   Now, does he also tell you that he, "As it stands now, my client will receive the death penalty if convicted"?

A.   That's what he says.

Q.   Okay.  Did you respond to that e-mail?

A.   Yes, sir, I did.

Q.   All right.  And I'm going to turn the page to the -- turn the exhibit to the next page.

THE COURT:  And that is Exhibit Number.

MR. WISEMAN:  P-8.

THE COURT:  Any objection to the admission of P-8?

MR. WISEMAN:  I think we already did that.

THE COURT:  We did that?

MR. WISEMAN:  Yeah.

THE COURT:  P-8 is admitted.  Thank you.

MR. ROBERTS:  Your Honor, apparently, I mean it's an exhibit that's got multiple documents within it.  It's one --

THE COURT:  Oh, okay.

MR. WISEMAN:  Yes.

THE COURT:  That, okay, the e-mail and the response are one, P-8.

MR. WISEMAN:  Right.  There's 30 --

THE COURT:  Sorry.

MR. WISEMAN:  Just to be clear for the record, there are --

THE COURT:  Thirty pages?

MR. WISEMAN:  -- 38 pages to this exhibit.

THE COURT:  Thank you.  Go ahead.  I'm slow myself sometimes, so --

MR. WISEMAN:  That's -- I'll leave that alone.

THE COURT:  You're a smart man.

MR. WISEMAN:  Sometimes.

BY MR. WISEMAN:

Q.   Did you respond to him on July the 1st?

A.   Yes, I did.

Q.   Okay.  And that would be the e-mail from Mark Cunningham, time 8:57 a.m.?

A.   That's correct.

Q.   Okay.  Why don't you tell us -- actually, because of its significance, why don't you read to us what your response was,

starting at the beginning.

A.    Yes, sir.  7/1/03.  "Mr. Gilmore, Thank you for your interest in retaining me in U.S. v. Alfred Bourgeois.  While I would be quite willing to consult with you regarding mitigation, my schedule would not allow me to adequately perform this evaluation and prepare my testimony by mid September, given the status of the mitigation case, as it appears from your description.  I do not know how far along you are in investigating and developing a comprehensive psychosocial history."

Q.    Why don't you stop there.  I want to ask you a question about what you mean there.  What is, in our, in your field, I should say, what is the -- is a comprehensive psychosocial history a term of art?

A.    Yes, sir.

Q.    And what does it mean in your field?

A.    That means that historical information is gathered that would allow the identification of a broad spectrum of potential adverse developmental factors.  That investigation would take a history back to the grandparents on either side of the family and include all the aunts and uncles and all the first cousins. It would include -- and with the history taken on those individuals, it would include exploration of relationship stability, psychological disorders, substance abuse histories, domestic violence, family dysfunction, child neglect, children

out-of-wedlock, any processes that would identify generational family dysfunction, pathological scripts or life patterns within the family system, genetic predispositions for personality disorder or psychological disorder, genetic predispositions for substance abuse issues.

Q.   So I guess the word "comprehensive" then has a significant meaning in this context.

A.   Yes, sir, it does, as well as a very extensive developmental history, and history of relationships and interactions and influences that were on the Defendant's life in terms of his immediate family and his personal experience, as well as this family constellation.

Q.   Okay.  And included in the development of that comprehensive psychosocial history, does that require the gathering of pertinent records?

A.   Yes, sir, it does.  An attempt is made to gather virtually every piece of paper that was created in the Defendant's life.

Q.   Okay.  Why don't you then continue reading.  You stopped at "comprehensive psychosocial history."

A.   "Typically, a specialized mitigation investigator/social worker is appointed to collect medical, school, social service, mental health, juvenile, military and other records.  This investigator also intensively interviews immediate and extended family, as well as friends, teachers, co-workers and other third parties.  The investigator provides summaries of the

third party interviews and develops" -- it says "of," it should be "a" -- "time line of events regarding the Defendant.  As a psychologist, I would then analyze these records and conduct more strategic interviews in person or by telephone with the parties, the mitigation investigator has interviewed.  If this comprehensive mitigation investigation has been completed, please advise me, as this will impact on my availability."

Q.   All right.  Why don't you stop there and let me ask you a couple of questions.  Are you drawing a distinction in that part you just read between the role of the mitigation specialist and the consulting psychologist?

A.   Yes, sir, I am.

Q.   Okay.  And correct me if I'm wrong, just to move this along, the mitigation specialist does the initial interviews, gathers the pertinent records, gives them to you as the psychologist.  You evaluate them and decide on what further steps should be taken?

A.   That's correct.  Then there is a continuing interaction.  As I review those and begin my own interviews, I will have suggestions about additional persons that need to be interviewed or additional investigations that need to be undertaken.  The investigator finds those people, seeks those records, comes back to me.  So there is a reciprocal -- there is a feedback loop that's going on as this mitigation psychosocial history is being developed.

Q.   Okay.  And is the paradigm you've just laid out here with regard to the role of the mitigation specialist and the psychologist and the feedback and the sort of relationship, is that endorsed in the literature, as well as in the ABA standards?

A.   Yes, sir.

Q.   I should say the ABA guidelines, to be more precise.

A.   Yes, sir.

Q.   Why don't you read that last paragraph, and then we'll move on.

A.   "If such a comprehensive mitigation investigation has not been completed, then I would suggest that you seek a continuance, particularly in light of the recent Wiggins decision.  Because the relevant records are often time consuming to identify and retrieve.  And because conducting the third party interviews are similarly time consuming, the investigation alone cannot typically be performed in the time between now and trial.  This investigation needs to be completed before the psychologist begins the large part of his/her evaluation."

Q.   All right.  I think we can stop there.  The remainder you're offering to suggest mitigation specialists to Mr. Gilmore?

A.   That's correct.

Q.   Okay.  Now, just so we're clear here, you're saying that

the time between July 1st and what was then the mid September trial date, two-and-a-half months, was inadequate, in your view, to start and complete both the mitigation investigation as well as for you to perform your role.

A.    That's correct.

Q.    And was there any way, in your view, that that, those functions could be performed in anywhere near two-and-a-half months?

A.    No, sir.

Q.    And in fact, how much time would you ordinarily -- and I realize things can be fluid -- but in the ordinary course, how much time would you like to have in order to see this process play out?

A.    I think I requested at least six months and said that if the mitigation investigation was undertaken aggressively, that I could be ready with my part by January.  It is often impossible to do an adequate mitigation investigation in six months because of difficulties with retrieving records and that sort of thing.  So it's not uncommon for there to be at least a year between the beginning of the mitigation investigation and the trial.

Q.    Okay.  And if you look at what I've put up now rather crooked, this is Page 4 of Exhibit 8, and actually it starts on Page 3 -- no, I'm sorry.  Where does it start?  There's no date to this e-mail, it seems, is the problem.  But you're

responding at the top there, says, "I could be ready for trial beginning in mid January, assuming an investigator began aggressively working on the social history."

A.    Yes, sir, that's in response to his e-mail below, who's asking me when I might be available.

Q.    That's quite right.  Okay.  So again, so the record's clear, what you're telling Mr. Gilmore here is that you'd be happy to do the job.  You would require till mid January, but only if a mitigation specialist was aggressively investigating Mr. Bourgeois's background.

A.    That's correct.

Q.    All right.  I want to bring to your attention Page 11 of this exhibit.  And could you just summarize what you're telling Mr. Gilmore in this July 9th, 2003, e-mail?

A.    Yes, sir.  This is in response to his July 9th inquiry that is just below my own.  It's shown at the very bottom of the screen, original message, John Gilmore.  He's asking for suggestions for an investigator.  He says, "We have an investigator working on guilt/innocence, and I would prefer someone specialized in developing mitigation evidence."

I then provided him with six individuals that I knew of with federal capital case experience and five individuals with state capital case experience.

Q.    Okay.  And one of them is Lisa Milstein?

A.    That's correct.

Q.   Okay.  And she ultimately, to your knowledge, was retained through the Court's appointment process by Mr. Gilmore and Mr. Tinker?

A.   That's my understanding, yes.

Q.   Okay.  I don't see Gerald Bierbaum on this list.  Do you know how he ultimately came to be involved in the case?

A.   It's my understanding he had some professional affiliation with Lisa Milstein, but I don't know apart from that.

Q.   Okay.  I want to show you -- take this exhibit off for a moment, and put up what's been marked as Petitioner's 151, that's 1-5-1, and ask you if you recognize this document.

A.   Yes, sir.  That is the billing statement of my work in this case.

Q.   All right.  And for the record, it's five pages in length. Does that billing statement represent -- I'm going to use the word "significant" -- activities you performed in this case?

A.   Yes, sir.

Q.   Is it a contemporaneous record that you maintained in the course of your work in this case?

A.   Yes, sir.  I maintain production sheets each day that I am completing as the day proceeds, or if I'm in the midst of travel, at least that evening.

          MR. WISEMAN:  Excuse me for a moment, Your Honor.

          THE COURT:  Certainly.

     (PAUSE.)

BY MR. WISEMAN:

Q.   I want to show you another exhibit that's been marked as P-167.

MR. WISEMAN:  By the way, Mr. Roberts, I incorrectly told you that was 166.  It's 167.

BY MR. WISEMAN:

Q.   Do you recognize this document?

A.   Yes, sir, I do.

Q.   And I'm just going to turn the page, and it's got a second sheet that says, "Bourgeois relevant Daily Messages"?

A.   Yes, sir.  Those are two different documents.

Q.   Okay.  And why don't you explain what each of them are.

A.   My office began using in 2004 a contact management software called ACT!, A-C-T-exclamation point.  My administrative assistant staff would make entries into ACT! under the case, the relevant case.  Actually, I think it's keyed to the primary attorney in the case.  And these reflect a printout of those ACT!-related entries that were made in this case.

Q.   Okay.  And Your Honor, I would offer at this time --

THE COURT:  Any objection?

MR. ROBERTS:  Your Honor, I'd like to know a little bit more, because it looks like a computer-generated document. I have no idea of the reliability --

THE COURT:  Would you like to take him on voir dire

for a moment?

MR. ROBERTS:  Yes, Your Honor.

VOIR DIRE EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document --

THE COURT:  Would you stand by the microphone, please.

MR. ROBERTS:  Sorry, Your Honor.

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document is -- actually came into your presence.

A.   Yes, sir.  My office uses a computer software program called ACT! to manage contacts and our interactions with those contacts.

Q.   Who produced this document?

A.   This is produced by my administrative staff at that time. The very first entry that has the initials MBC would have been completed by my wife, Melinda Britain Cunningham.  The second entry that's initialed TL, that stands for Tammy Lam.

Q.   That's one problem I have with the document.  There's nothing on there that would differentiate this from any document that someone sat down and typed out.  So how am I supposed to be able to determine that this is accurate and this is all of the notes that came out of your computer?

A.    I requested that my staff -- I didn't think about ACT!

until yesterday.  I requested of them, "Retrieve any entries out of ACT! that we may have regarding the Bourgeois case."  This was e-mailed to me.

Q.   So you didn't even produce this yourself.

A.   No, sir, I don't interact with the ACT! software.  That's done by my administrative staff.

Q.   And the document on the second page that has a list of messages and references, do you know how that was produced?

A.   Yes, sir.  Each day my office provides me with summary information of the day's activities.  We call that Daily Messages.  I'm often out of town, and that's a way of me keeping up with what's happening in the office.

Also yesterday I requested of my staff to go back through Daily Messages that we may still have in our Outlook files from that period of time.

Q.   So they could have actually missed some of the messages?  They just sent you the messages they could find?

A.   They retrieved the messages that they could find.

MR. ROBERTS:  Your Honor, I don't know that it's accurate.  I mean, I'm not going to -- I don't have any problem with him testifying to it, but I'm a little concerned of the authenticity of the information on it, so, and as far as it being complete information.

MR. WISEMAN:  Let me ask a couple of follow-up questions, if I might.

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Dr. Cunningham, when you received this document, did you sort through it and remove any information from it?

A.   No, sir, I did not.

Q.   Does your staff routinely and in the regular course of your business maintain these types of documents?

A.   Yes, sir, they did, and they advise me --

THE COURT:  Well, Page 1 they just created.

MR. WISEMAN:  Well, they maintained it in the computer, I think, is what he said.

THE WITNESS:  Page 1 is a printout.  It's a document that exists in the computer.  This is just a printout of all the notes under ACT! for this case.

BY MR. WISEMAN:

Q.   Are they altered in any way from the way they appear on the computer?

A.   No, sir.

Q.   Other than the way they're laid out on the page?

A.   No, sir.

MR. WISEMAN:  Your Honor, I think this is, it's a business record.  It's a contemporaneous record.

THE COURT:  It's not really contemporaneous.  I'm not understanding.

MR. WISEMAN:  Well, it's contemporaneous at the time

it was made.  I mean, obviously the printout happened yesterday.

THE COURT:  Well, the search was made.

MR. WISEMAN:  Correct, and was printed out yesterday. But when it's put into the computer, it's put in as a contemporaneous record.  I think Mr. Roberts --

THE COURT:  How do you know that?

MR. WISEMAN:  He just told us.

THE COURT:  Okay.

MR. WISEMAN:  And I think Mr. Roberts' position really goes to a question of weight, not admissibility.

THE COURT:  I think you're right.  P-167 is admitted.

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  Don't say that.

MR. WISEMAN:  Oh, okay.

THE COURT:  That's all right.

MR. WISEMAN:  It's a bad habit.

THE COURT:  Well, I know.  I wish you lawyers would never say that.

MR. WISEMAN:  Your Honor, I understand the point.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   Dr. Cunningham, between P-151 and P-167, and I'm going to ask you this with a qualification, I mean, I expect you've thought thoughts about this case, you may have, you know,

written a note some place or another, but do these two documents reflect the significant, substantial tasks and actions you took in regard to your involvement in this case? Long question.

A.   The billing statement, the notations in ACT!, the notations in Daily Messages were contemporaneously prepared at that time, indicating significant contacts.  There are other contacts, in terms of brief phone calls, that sort of thing that occurred, that did not make it onto the billing statements, for example, that are alluded to in the Daily Messages or in ACT!, for example.

Q.   And so let me just ask, a quick phone call about what time should I be there, that's not going to make it on the billing statement?

A.   Yes, sir, that's correct.  It could be longer than that. It could be three or four minutes, and I simply didn't bill for that time.

Q.   Okay.  So then your answer, with that qualification, is "yes" or "no" to my question?

A.   Yes, sir, that's correct.  That is my best recollection of the substantial activities that occurred.

Q.   Okay.  I want to now show you an entry from the Court's docket --

MR. WISEMAN:  Your Honor, I --

THE COURT:  You know, we're at 12:00 o'clock.

MR. WISEMAN:  Oh.

THE COURT:  Is this a good time to break?

MR. WISEMAN:  Oh, sure, if the Court likes, we can do that.

THE COURT:  We'll do that.  Would you call the next case, please?

THE CLERK:  Yes, Your Honor.

THE COURT:  1:00 o'clock.

MR. WISEMAN:  1:00 o'clock.

THE COURT:  Is that all right?

THE CLERK:  Yes.

THE COURT:  1:00 o'clock.

(Recess from 12:02 p.m. to 1:02 p.m.)

THE COURT:  Okay.  Good to go.

MR. WISEMAN:  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Dr. Cunningham, when we broke, I was about to ask you about an entry on the Court's docket.

MR. WISEMAN:  And Your Honor, for purposes of this examination, I'm going to be referring to certain entries in the Court's docket that we printed out on September 15th of this year, just for some historical perspective.  The docket --

THE COURT:  You want documents to be printed out?  Or what are you --

MR. WISEMAN:  I just printed it out for my purposes.

THE COURT:  Okay.

MR. WISEMAN:  I can mark it.  I assume there's no need to do that, since -- unless you want it.

THE COURT:  No.

MR. WISEMAN:  No?  Okay.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Dr. Cunningham, the document reflects that on --

THE COURT:  I was just going to show you how to do it.

MR. WISEMAN:  Oh, no, no.  We're very good with PACER.

BY MR. WISEMAN:

Q.   September -- I'm sorry -- July 16, 2003, Docket Entry 74 reflects that Ms. Booth for the Government announced that the Government will seek the death penalty.  And then two days later, September (sic) 18th, there's a scheduling order, and it's Docket Entry 76, setting trial for February 16th, 2004.  I just want you to keep those dates in mind.

A.   I'm sorry, can you tell me again when the case was set for trial in February?

Q.   Sure.  February 14th it was set for trial.  And that happened on July the 18th --

A.   Yes, sir.

Q.    -- 2003.

A.    Yes, sir.

Q.    I seem to have misplaced the marked exhibit.

MR. WISEMAN:  Your Honor, I seem to have misplaced the marked exhibit of P-8, which is the e-mails.  With the Court's permission, I'm going to use my copy, which unfortunately is marked up, but I'll --

THE COURT:  P-8?

MR. WISEMAN:  P-8.

THE COURT:  It was admitted.  Do you have it, Ms. Scotch?

MR. WISEMAN:  Oh.  Oh, we found it.  Thank you.

BY MR. WISEMAN:

Q.    Page 4 of P-8 -- I'm sorry -- all right, Page 15 of P-8, I'm going to put that up on the screen.  And I want to direct your attention to the e-mail dated 7/25/2003.  And is Mr. Gilmore giving you some advice with respect to this, your involvement in this case?

A.    Yes, sir.

Q.    And what is he telling you?

A.    He's advising me that there is a reciprocal discovery that has had a deadline identified for mid December --

Q.    Okay.

A.    -- to disclose my information.

Q.    And before that, he's telling you that the Judge has

agreed, Judge Jack agreed to appoint you to the case, trial was reset for February 2004. And of course, we just went through the docket which indicated that it's February 14th. And he advises you the reciprocal discovery date in December?

A.   Yes, sir. He has a -- also identifies he has a call in to Charlotte Holdman, who is a mitigation investigator. We're now 25 days into the correspondence that I had with him on July the 1st, indicating that if the mitigation investigation proceeded aggressively and immediately, I could be ready in January. So we've already lost 25 days, and there's not yet apparently an, a mitigation investigator on board.

Q.   Okay. I want to take you back then to your invoice. By the way, your invoice is dated April 30th, 2007. Can you explain that date?

A.   Yes, sir. That's the date that this copy was printed. The nature of the software is that when you go in and print a bill, it prints it with that date, not the date of the original billing.

Q.   Okay. And I want to direct your attention to between July the 9th, 2003, and January 22nd, 2004. The invoice reflects what activity during that period of time?

A.   There's no activity that I billed for. There were some brief telephone conferences that occurred, but there was no billable activity.

Q.   And I want to take that exhibit off and put back up 167,

and I want you to focus on the entry --

THE COURT:  Could you zoom that so we can all read it?

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q.   -- the entry that's dated 11/17/03.  Can you read that to the Court?

A.   Yes, sir.  "Called Douglas Tinker.  He said they have a few investigators working on getting information.  Will send records to us sometime in December, hopefully no later than mid December.  Attorneys are aware of the previous time line and are working with Judge to get a continuance/extension."

Q.   Okay.  Now, there's a few things in that I want to cover. The previous e-mail advised you there would be a reciprocal discovery deadline of mid December, and this document is telling you that Mr. Tinker said he's hoping to get you records in December.  Would that have been, in your view, a sufficient amount of time to process the records, do what you need to do, and produce a report for discovery?

A.   No, sir.

Q.   Were you under the impression, in reading this, that a continuance at that point from what is now the February 2004 trial date was likely?

A.   Yes, sir.

Q.   And why in that e-mail did you make note that the

attorneys are aware of the previous time line you had provided to them that you required for your work?

A.    I don't understand the question.

Q.    Sure.  In this note, you say that attorneys are aware of the previous time line.

A.    This is a note that was created by Tammy Lam, my administrative assistant.

Q.    Okay.

A.    This is a call she initiated, and she is simply reporting the contents of that.  And as we have a case file, we identify deadlines that may be present so that we're keeping up with those.  So that's part of why she's initiating this call, is that deadline is rapidly approaching, and we have received nothing at all at that point.

Q.    Now, up to that point, and by "that point" I mean the last date we were talking about, which was 11/17/03, had you yet met Mr. Bourgeois?

A.    No, sir.

Q.    And had you, as yet, engaged in any interviewing the potential witnesses?

A.    No, sir.

Q.    Processing any information relevant to the case?

A.    No, sir.

Q.    And why, for all three of those things, why weren't you doing anything?

A.   I had received no records from Defense Counsel or from the mitigation investigators.  I had received no summaries of mitigation investigation interviews.  I had no psychosocial history that would provide a narrative summary of the mitigation themes that had been developed of Mr. Bourgeois's background.  I had no detailed and annotated time line to orient me to the case.  I was delaying my own interviews of Mr. Bourgeois and third parties until I had receipt of those materials, so that those interviews could progress in the most efficient and effective fashion.

Q.   So basically, you had nothing to do at that point.

A.   I suppose I could have initiated an interview of Mr. Bourgeois in the absence of having any background information whatsoever.

Q.   And would that be your standard practice?

A.   No, sir.

Q.   And is that an advisable practice?

A.   It's not the best practice.

Q.   And why not?

A.   The more information that the psychologist has in advance, the better able the psychologist is to detect if the report that the Defendant is giving is discrepant with other records or with other reports, either that the Defendant is exaggerating background factors, which happens less often, or is providing a, an overly sanitized and positive report of his

family experiences and background, which occurs more often.

If I already know the history that's been provided by records and by other interviews, then as I ask the questions, I know what to zero in on, what to obtain more information about. I'm better able to challenge discrepancies as they occur.

Q.   Let's now look at Page 20 of the e-mail packet, P-8.  And I want you to read for the Court that e-mail dated December 1st, 2003, 12:36 p.m.

A.   "Dear Mr. Gilmore:  Could you please kindly provide update to the above case, as I am in the process of reviewing and scheduling Dr. Cunningham's trial reports, time line and travels.  Thank you, and kind regards, Tammy."  That's Tammy Lam, who is my administrative assistant.

Q.   Okay.  And I'm going to turn to the previous page, which is 19, and ask you to read Mr. Gilmore's response, which came about 14 minutes after the first e-mail.  That will be right there.

A.   "Dear Mr. Gilmore:  Thanks for the update.  We will pencil into our calendar --"

Q.   You know what, let me stop you, because I've been reading this out of order, and that's my fault.  Oh, I see what it is. Okay.  I want you to read the e-mail that starts December 1st, 2003, 12:43 p.m., which actually is contained on the next page right there, "I am trying."

A.   Yes, sir.  "I am trying to get a continuance.  The case is

currently set for trial on February 16th.  However, the mitigation investigators say that they will not be finished by then."

Q.    Okay.  And finally with this section, if you could tell us what Ms. Lam then replies to Mr. Gilmore, and that would be the 12:50 response.

A.    "Dear Mr. Gilmore:  Thanks for the update.  We'll pencil into our calendar and would appreciate further update to this case.  FYI, we have yet to receive any records/information/ materials for Dr. C to begin working on the report.  Thank you and regards, Tammy."

Q.    Okay.  So we are now at December 1st of 2003, and I take it from that exchange that you still have nothing.

A.    That's correct.

Q.    I'm going to put up for you a document which is marked Defendant's P-140 -- I'm sorry -- Petitioner's 144, which is a motion that was docketed in this court on December 9th, 2003.  It's captioned "Motion for Continuance."  I want to read the operative portion of the two sentences and ask you a question.

On the first page, it says, "Defendant's Attorney, John Gilmore, has been informed by the mitigation investigators, Lisa Milstein and Gerald Bierbaum, that they cannot properly complete their investigation of this case until August 2004."

And my question to you, sir, is were you consulted by Mr. Gilmore as to the actual filing of this motion?  I know he

told you he was thinking about asking for a continuance.  Did

he call you up and say, "I'm filing this motion, and we're

asking for August"?

A.    Not that I recall.

Q.    Now, I want to show you another motion that was docketed

or filed in this court -- it doesn't have a docket stamp on it,

but it's dated December 16th, 2003.  It's Petitioner's 72, and

it says, "Motion to Withdraw, Motion for Continuance."

       And what it says in the operative portion on Page 1 is

that the Defendant filed a motion for continuance alleging that

the mitigation investigators could not complete their

investigation till August of '04.  Defendant -- Attorney

Gilmore contacted the investigators Bierbaum and Milstein --

I'm paraphrasing -- informed them the Court would not extend

the deadline.

       "The investigators informed Gilmore that they would

suspend work on their other investigations and concentrate on

completing their investigation on this case.  The investigators

have assured Counsel that their work will be completed in time

for the February trial setting," closed quote.

       And my question to you is were you consulted on whether at

that point you could be ready for trial in February and the

December discovery deadline, given the then current state of

the mitigation investigation?

A.    No, sir.

Q.   And did Mr. Gilmore call you up and say, "I'm filing this motion to withdraw the motion for continuance, and can you be ready?"

A.   Not that I recall.  I don't have a recollection of being informed that there was a motion to withdraw the request for continuance.

THE COURT:  Could you have been?

THE WITNESS:  It's conceivable.  I remember becoming increasingly concerned and panicked in December and January about the absence of any materials in my possession.  So I can't imagine that I would assure them, yes, I can be ready, when I had nothing in my possession as of the 1st of December.

BY MR. WISEMAN:

Q.   I want to put up for you again, and hopefully that will assist with your response to the Court's last question.  This is 167.  It's your, the first page of your ACT! sheet, A-C-T.  Is there any indication that you received such a call from Mr. Gilmore or Mr. Tinker in December of '03, other than the one of 12/1 indicating the trial set for 2/16?

A.   No, sir.  I might also -- I don't have a copy of this in front of me.  I might also look at the daily messages calendar.

Q.   I'm going to give you that next.

A.   Yes, sir.

Q.   And in fact, on 12/1/03, Mr. Gilmore's e-mail indicated to you, the trial was still proceeding in February, according to

the sheet.

A.    Yes, sir, but they're working on getting a continuance.

Q.    Working with the Judge, I think, was the --

A.    Yes, sir.

Q.    And do you see anything in the relevant daily messages -- there's nothing from December of '03.  Is that right?

A.    That's correct.  I think that's a function, though, that as far as we could go back in our system was January.

Q.    Oh, is that right?

A.    Yes, sir, in terms of retrieving Outlook messages.

Q.    I'm glad you clarified that.  Thank you.

      All right.  I want to bring you back to your invoice and ask you if you can tell the Court the date on which you, if you can tell the Court, and if so, what date that you first received any mitigation information in this case.

A.    January 31st, 2004.

Q.    And how do you know that?

A.    I billed for 80 minutes for review of mitigation interview summaries.  At that time I was, as I have said, extremely concerned about the receipt of those.  And my recollection is I reviewed them immediately upon receipt.

Q.    Okay.  And can you make any determination -- that doesn't say what you received or, you know, what type of information, but can you make any judgment from the fact that you billed for 80 minutes as to the number of interview summaries that were

sent to you?

A.    It certainly would have been more than three or four.  I'm not only reviewing these, but I am trying to analyze and understand their significance as well.  You know, in 80 minutes, given the very brief nature of many of these summaries, I anticipate that I could have gotten through ten or twelve of them.

Q.    Okay.  So anywhere from three to a dozen, depending on which ones they were and the information in them?

A.    Yes, sir, that's correct.

Q.    Okay.  Now, this is at this point about two weeks before the initial start of trial, 2/14.

A.    Yes, sir.

Q.    Of course, trial started a little later than that, but at that point, it was still set for 2/14.  I take it from your prior testimony that two weeks is not an adequate amount of time for you to begin to do what you needed to do?

A.    That's correct.

Q.    And was it even a close call?

A.    No, sir.

Q.    I'm going to show you a new document.

        MR. WISEMAN:  Your Honor, I'm going to offer these, subject to -- well, initially I'm just going to ask for him to look at it, but I'm telling the Court that I'll offer these eventually through Mr. Bierbaum or Mr. Gilmore.

BY MR. WISEMAN:

Q. These are e-mails that came from Mr. Bierbaum's file, and they are to you and other people involved in the case. It's marked at Petitioner's 60. And for the record, it is 16 pages in length.

I want to direct your attention to this first one, which is dated January 30th, 2004. And if you'll just read us where it says, "Dear Dr. Cunningham."

A. Yes, sir. "Here's a bunch of material from Bourgeois's case. Please call me when you get a minute so we can set up a meeting between you, Dr. Holden, Mr. Tinker and Mr. Gilmore. I'll send this in sections so it won't clog up your e-mail server. Some of these are in WP, Word Perfect. Let me know if you can't convert them, and I'll do it here."

So I stand corrected. I received those on January the 30th. I reviewed them on January 31st.

Q. Okay. Do you have any independent recollection of why you didn't review them the minute you got them?

A. No, sir. I would have to go back and look at the day sheet from that day to see what other tasks I was involved in or if I was even in town.

Q. I'm going to put up another document now which is marked as Petitioner's 165. Have you seen this document before?

A. Yes, sir, I have.

Q. And can you describe what it is?

A.    Yes, sir.  This is a chronological listing of the mitigation investigation interviews that were conducted by Lisa Milstein and Gerald Bierbaum.  The date in the left-hand margin reflects either the date that the interview content specifies the interview was done, or it specifies the date that the interview summary was typed up, because a number of those interview summaries only have the date that the summary is prepared, do not have the date of the actual interview.

Q.    Are you confident that the date column does not reflect the date you received these things?

A.    Yes, sir.

Q.    Is there any error?  And in particular I want to refer to the very first entry, 10/23/2002.

A.    Yes, sir.  That wasn't in 2002.  That was in 2003, as I understand it.

Q.    All right.  So the summary itself was incorrectly dated?

A.    That's correct.

Q.    Okay.  Now, did you compile this document?

A.    No, I did not.

Q.    All right.  Did I provide it to you -- it's three pages in length -- and ask you to compare it with the interview summaries that you may have had in your possession?

A.    Yes, sir, you did.

Q.    Okay.  And when I say "in your possession," I mean ones that were sent to you.

A.    That's correct.

Q.    Are there any on this list that you determined from a review of your file that you have not, that you never received from trial counsel or his mitigation specialists?

A.    Yes, there are.

Q.    And which three are those?

A.    Well, there are two of those.

Q.    I'm sorry, two.

A.    There is the Gaynell Collins, dated 1/15/04.  I don't find that in my files.  And there is Gaynell James and Anthony Belvin, dated 1/16/04.  I don't find that one in my files.

Q.    So that's two people on one summary?

A.    Yes, sir.

Q.    Okay.  Other than that, though, does this document, is it an accurate summary of what you received, from who you received it -- I should -- withdraw that.  What you received, who conducted the interview, and either the date of the interview or the transcription of the interview?

A.    Yes, sir.  This is consistent with what's on those documents that I was provided.

Q.    Okay.  Thank you.  Now, let me put this back up.  I took it away a little too soon.  I want to draw your attention to Page 2, and in particular, ask you to look above the date of 2/3/04.  So that would be starting at 1/29/04.  And tell the Court if this is the totality of what you had received by, at

most that you received by January 31st of 2004.

A.   Yes, sir.  That reflects the most that I could have received if every interview that had been done prior to that time I was provided by Gerald Bierbaum.

Q.   And you have no way of determining if you actually received all of these things before 2004?

A.   That's correct.

Q.   I'm sorry, before January 30th of 2004.

A.   I don't know that I received all of these documents in that first shipment on January the 30th, 2004.

Q.   Okay.  And again, your invoice reflecting 80 minutes makes you think you received somewhere between three and a dozen of them?

A.   Well, there were certainly more than three.  I would anticipate in the neighborhood of eight to fourteen --

Q.   Okay.

A.   -- for that amount of time.

Q.   All right.  So --

A.   I don't think I could have gotten through all of these in 80 minutes.

Q.   Okay.  "All of these" meaning all of the ones from before?

A.   The ones that had been done up to January the 30th.

Q.   All right.  Now, I want you to put on your standard of care hat and ask you, with trial two weeks away, can you describe the state of the mitigation investigation and your

ability to perform your role, given the most you could have had as of January 31st, 2004?

A.   The state of the investigation was abysmal.  The summaries that I was provided were in most instances superficial and incomplete, reflecting little generational family history and little in the way of development of information.

     For example, the summary that I was provided, based on the interview of his mother, was about two-thirds of a page, and that's not single-spaced.  That's almost as if every sentence is a separate paragraph.

Q.   And who --

A.   And so it's the most fragmented of information.

Q.   Who conducted that interview, according to the summary that was provided to you?

A.   That was conducted by Lisa Milstein.

Q.   Okay.  As you began to review these and start to compare them to each other and begin to make some inquiries of your own, did you notice errors within the summaries that were provided to you?

A.   Yes, sir, I did.

Q.   And give the Court an example or two of what you were finding that caused you to conclude that there were some errors.

A.   The interview that Ms. Milstein did of Lloyd Ferdinand, Jr., who's a maternal half-brother, the interview summary is

dated November 25th, 2003, reported that their stepfather, Godfrey -- this says "Godfer Rickson," which is also incorrect -- was killed in a motor vehicle accident while intoxicated.

That simply is not part of the history of this case. There are subsequently other individuals who refer to him still being alive, that he separated from Eunice but is still living.

THE COURT:  This is the person you recommended?

THE WITNESS:  It was one of the names that I provided, yes, ma'am.

BY MR. WISEMAN:

Q.   That's a pertinent question, Dr. Cunningham.  Did you subsequently come to learn of certain difficulties Ms. Milstein was having in her personal life at this time?

A.   I was advised of that by Gerald Bierbaum.

Q.   And we're going to have Mr. Bierbaum here, and he can certainly be cross-examined, and we won't offer this for the truth, but just to give the Court a sense of where we're going. What did you learn?

A.   My recollection was he described that she was having difficulties with cocaine abuse.

Q.   And you didn't know that at the time, I take it?

A.   No, sir.

Q.   Can you think of any other errors that you began to see in that material?

A.    Yes, sir.  There was an interview that was done of Michelle Warren, who is a maternal half-sister, on February the 3rd, 2004, reporting an incident when Michelle was age 16 that Alfred lost it and was hitting her over and over.  I interviewed Michelle Warren, and she advised me that he only hit her a single time.

There was a interview summary that was done by Gerald Bierbaum of Alfred Sterling, who's the biological father.  This is a March the 2nd, 2004 interview that reported that Alfred Sterling, Sr. had 25 years of service in the U.S. Army. Actually, it's his son, Alfred Sterling, Jr. who has 25 years of service in the military.  Again, a pretty significant error as we're talking about a critical individual in Alfred Bourgeois's life, his biological father.

Q.    All right.  Now, let me ask you, as you began to use these materials and discovered certain errors in them, what did that do to your ability to rely on them and how did it affect your schedule?

A.    Well, I was already concerned about the inadequacy of detail and development of history in these interviews.  Now there are also fundamental errors of fact, so that I have -- my confidence that I could independently rely on these was significantly reduced.  Both because of that inadequacy of depth, as well as fundamental errors, I realized that I was going to have to interview individuals and primarily rely on my

own findings, that I couldn't rely on the history that they provided.

Even things like, there was another one, an interview of Keith Rixner, who is a maternal half-brother, they describe Keith as listing his siblings in order.  The order is wrong that the siblings are in.  And so I --

THE COURT:  Did you point that out to the attorneys?

THE WITNESS:  Did I not have contact with the attorneys.  I told Gerald Bierbaum early on --

THE COURT:  Okay, well, this is --

THE WITNESS:  -- that I was greatly alarmed.  And when I came out from my interviews --

THE COURT:  Well, this seems to be a failure of the mitigating investigators, not the attorneys.

MR. WISEMAN:  Well, Your Honor, I think we're going to tie that together, and I think you'll --

THE COURT:  Rather quickly.

MR. WISEMAN:  Well, absolutely.

THE WITNESS:  All right.  Let me clarify.  My recollection is that I advised the attorneys of this when I came out to meet with them --

BY MR. WISEMAN:

Q.   That was my next topic.

A.   -- in early February, when I came out to interview Alfred Bourgeois, that I was concerned about the reliability of the

interviews that Lisa had done.

THE COURT:  Did you say exactly why?

THE WITNESS:  My recollection is that I gave details about that.  I know that I told Gerald Bierbaum that.

THE COURT:  Is there some indication on your ACT! that you did that?

THE WITNESS:  No, ma'am.  The ACT! are not entries that I make.  Those are entries that my assistants make.

THE COURT:  Okay.  So you could receive phone calls without having it entered.  Is that right?

THE WITNESS:  That's correct.

THE COURT:  Okay.  I just want to make sure. Everything is not recorded there, which is why Mr. Roberts was objecting to it.

MR. WISEMAN:  Yeah, and we, I think, qualified initially that it doesn't have every single phone call.

BY MR. WISEMAN:

Q.   Let me ask you this, Dr. Cunningham.  If an entry involved a phone call of some substance, 20 minutes, 30 minutes, would you have indicated that on your invoice?

A.   Typically.

Q.   Okay.  I mean, you don't work for free, but it's a matter of some degree of time.

A.   That is correct.

Q.   On the contrary, a quick phone call is not going to get

reflected.

A.   It may.  A phone call of greater length is almost certain to be reflected.  But briefer phone calls, even ten minutes, I might not make note of.

Q.   Okay.  I want to, in response to the Judge's question about advising the attorneys and your response that you didn't have much contact with them, I want you to look back at 167, and it's the entry dated 2/3/04.  And I'll zoom it so we can see it better.  All right.  And it's the 2/3/04 entry.  And what does that say?

A.   2/3/04.  "Bourgeois:  Bierbaum wants MDC to come for team meeting.  Looking at 2/12 or 2/13."  That's a follow-up from an earlier attempt to schedule a team meeting about 12 days earlier.

Q.   Okay.  And that would be the --

A.   Ten days earlier.

Q.   -- 1/21 entry?

A.   Yes, sir.

Q.   Why don't you read that for the Court?

A.   "Bourgeois:  Provided Bierbaum 1/26 as the date for MDC to be in Corpus Christi for a one-day team meeting.  However, he came and indicated that date is not good for the attorneys; therefore, he would have to come back to us an alternate date."

Q.   Okay.  I'm going backwards here.  Why don't you read the one above that, which is the initial e-mail about a team

meeting.

A.   "Bourgeois:  Gerald Bierbaum called.  He's trying to schedule a team meeting for next week.  He wants MDC to be in Corpus Christi sometime next week for a one-day team meeting. Voir dire begins February 8th, evidence on March 8th or 10th, MDC to testify about March 15 for one day."

Q.   Now, if -- well, let me ask you this.  Prior to this, these three entries you just read, is there anything in your, either of these exhibits that reflects an attempt on the part of the lawyers to conduct a team meeting?

A.   No, sir.

Q.   All right.  And did you in fact have any type of a team meeting with any of the lawyers up until the date of these entries?

A.   No, sir.

Q.   Given the state of the investigation, did you go through any type of decision-making process as to what your alternatives were, given the situation you were in?

A.   Yes, sir.

Q.   And tell the Court what that process was.

A.   My thought process was that there were no, there were no good alternatives, that if I withdrew because we're now on the eve of trial, that I would be abandoning this case.  On the other hand, if I proceeded, this was exactly what I was trying to avoid in the beginning when I declined a retention, unless

there was a period of time that would allow it to be done correctly. And so my perception was that there was no good alternative and that I did not, I didn't feel like it was appropriate to abandon Mr. Bourgeois. The last communication that I had had was that this trial date could not be moved.

Q. Did you, after making a decision to stick with the case, despite your concerns, what was the next thing that you did of any consequence in the case?

A. Schedule an interview trip --

Q. All right.

A. -- to come into Corpus to interview Mr. Bourgeois and meet with the attorneys.

Q. Do you recall when that interview happened?

A. Yes, sir. That interview occurred on February the 7th, 2004.

Q. I want to show you Page 2 of Petitioner's 151, which is your invoice. And is that activity reflected on your invoice?

A. Yes, sir, it is.

Q. All right. And so it appears that you traveled on 2/6, and on 2/7 you got to Corpus Christi. Describe the events of that day, as you recall them.

A. I'd been advised that Mr. Bourgeois would be available for me to begin my interview process early that morning of February the 7th, and so came to the courthouse for that purpose. I was advised that he was not here but was en route. I then went

back to the hotel and began to do telephone interviews of third

parties, so as to make use of that block of time.

I did that up until the conclusion of my interview of

Lloyd Ferdinand, Jr., the half-brother.  I finished with him at

about 11:15 in the morning, as I recall.  The next -- I started

my interview of Mr. Bourgeois at 2:10.  And so between the

hours of 11:15 and 2:10, I went to the attorney's office, met

with them.  I think that we went to lunch.  Then I went back to

the --

Q.   Let's stop at that meeting --

A.   Yes, sir.

Q.   -- for a moment, just so I can ask you about the meeting.

That was the first time you met either of the lawyers face to

face?

A.   That's correct.

Q.   Were you able to have a substantive conversation about the

case at that point in time with them?

A.   I wouldn't describe it as substantive, in that I did not

yet have a lot of information.  I had not yet met

Mr. Bourgeois.  I had very little in the way of records and had

only fragmented and inadequate mitigation interview summaries

that had been provided to me.  So I had an emerging hypothesis.

I was in a position to describe the nature of the things that I

usually will look at and how that will be presented, either in

mitigation or in terms of violence risk assessment.  But case

specific information was limited.

Q.    Okay.  And let me just ask you, if you had gotten these, what you've described as inadequate interview summaries 90 days earlier, so let's say instead of January 30th, you would have gotten them November 30th -- is that 90 days?  Let's say November 30th.  Would you have been able at that point to make known to the mitigation specialist, this is not adequate, I need this, I need that, I need more, I need more depth?  Could you have corrected the problem?

A.    Yes, sir.  You're describing a 60-day period of time.

Q.    Sixty-day, right.

A.    If I had gotten it 60 days, then yes, sir.  As I looked at that, I would have described the inadequacy that it represented.  Again, when the summary of the interview with mother is like half a page, that is on its face inadequate.  But I did communicate to Gerald Bierbaum my concern with the depth of the interviews, as well as how few there were.

Q.    All right.  And that would have been at that point into early February?

A.    Yes, sir.

Q.    Okay.  So you met Mr. Bourgeois then for the very first and only time, I take it, on February 7th, 2004?

A.    That's correct.

Q.    And we're now a week before the then set date for trial?

A.    That's correct.  I interviewed him for five-and-a-half

hours.

Q.   And subsequent to your interview, did you send a communication to Mr. Gilmore or Tinker with regard to aspects of that interview?

A.   Yes, sir, I did.

Q.   Let me put up for you what's been marked as Petitioner's Exhibit 1, ask you if you recognize that.

A.   Yes, sir, I do.

Q.   And what is that?

A.   This is a letter dated February the 10th, 2004, which is three days following my interview of him.  This describes my recommendations for a neurological evaluation, as well as a neuropsychological evaluation of him.

Q.   Okay.  Let me just ask you, while we've got you here, what's the distinction, in your mind, between a neurological evaluation and a neuropsychological evaluation?

A.   Yes, sir.  A neurological evaluation is one that's performed by a neurologist, by a physician who specializes in neurology.  And it would be focused on looking at the physical integrity and status of the patient's nervous system, reflexes and that sort of thing.

     The neuropsychological evaluation is done by a neuropsychologist.  That's a psychologist with specialized training in neuropsychology or brain behavior relationships.  And the neuropsychologist uses standardized assessment

techniques that measure this person's functioning, their brain expression in visual spatial memory concentration, executive functioning and judgment, compares it against a normative sample, so that you're able to identify what practical deficits are present in this person's brain functioning as it's expressed in capabilities that are determined or mediated by the brain.

Q.   And one more question on that.  Is it, in your experience and knowledge, possible to see dysfunction in neuropsychological testing that would not appear in a neurological evaluation?

A.   Yes, sir, that's correct.  You can have deficits that appear in the neuropsychological assessment that are not apparent in that gross physical examination that's done by a neurologist.

In other words, as you think about a neurological evaluation, that has several components to it.  One is the physical examination and history taking that's done by the neurologist.  Another component is for there to be imaging studies that are done of the brain, either CT scans or MRIs that look at the anatomical structure of the brain, or EEGs that look at the electrical output of the brain, or PET scans that look at the metabolism of the brain as it's engaged in various tasks.

Those are all different components of a neurological

evaluation, distinct from a neuropsychological assessment.  And each of those may show deficits that are not apparent in one of the other assessments.

Q.    Okay.  That's satisfactory.  Thank you.  Now, in this letter that you sent on February 10th, 2004, what are the reasons that you cite for the need, in your view, to have a neurological and neuropsychological evaluation done of Mr. Bourgeois?

A.    There were several rationales.  Those that are specific to him include what was described to me as a significant head injury that occurred in approximately 1984, when a 3- or 4-wheeler that he was driving collided with a telephone pole.

The second aspect was a history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage.

Then there's also significant literature that identifies that there is a disproportionate incidence of neurological insults, neurological examination findings and neuropsychological deficits among violent offenders.  And so as a broad principle, these sorts of assessments are recommended in capital cases.

In his case, there were particular factors present from the interview that I did and from the third-party interviews

that I thought made that particularly indicated in his case.

Q.    Did you warn Counsel in regard to this evaluation that Mr. Bourgeois is not or was not, in your view, a reliable historian?

(PAUSE.)

Q.    Let me, while you're looking at that, let me show you an e-mail.  Let me show you an e-mail.  I think I may have been confused as to where that warning would have been.  I'm going to show you -- I'm going to show you Page 21 of Exhibit P-8.  Was this the e-mail that covered the letter that you just identified as P-1?

A.    Yes, sir, that's correct.

Q.    Okay.  And why don't you read that to the Court.

A.    "John," referring to John Gilmore, "please find attached in Word my rationale, recommendations for a neurological workup on Alfred Bourgeois.  Please emphasize to the neurologist and neuropsychologist who may be retained to perform these evaluations that Alfred is not a reliable historian regarding his medical or psychological, parenthesis, rage, parenthesis, history.  Accordingly, they may wish to contact his older sister Claudia for this information.  Please advise me if you require additional input or assistance on this issue."

Q.    Okay.  And my question then is what did you base your -- I'm calling it a warning -- but your suggestion that Mr. Bourgeois is not, in your view, at the time a reliable

historian?

A.    There were several features of the interview with him that caused me to think he was not a reliable historian.  He described to me regarding the 3-wheeler accident that he had an initial loss of consciousness for a couple of hours, and then was in a coma in the hospital for several months.  Then he revised that to being in a coma for one month.

When I interviewed family members about this, Claudia specifically, she recalled that he had a loss of consciousness but was not in a coma in the hospital.  In a --

Q.    Let me just ask you, when you conducted your interview of Mr. Bourgeois on February 7th of 2004, had you been provided with any hospital records with regard to any aspect of Mr. Bourgeois's life?

A.    Not that I recall.

Q.    Keep going.

A.    Regarding an injury to his nose, in his February 4th interview with Gerald Bierbaum and Mr. Tinker, he said his nose had been injured when his mother slapped him off the swing.  And then the mother told the doctor that he had hurt himself playing.

When I interviewed him three days later, he told me that his nose was broken when his mother hit him with a mop handle for lying in telling her of the sexual abuse that he said was perpetrated by Jacob Clayton, who he identified --

MR. ROBERTS:  Your Honor, may I just inquire what the witness is reading from?  I can't --

THE COURT:  What are you reading from?

THE WITNESS:  This is a summary of those discrepancies that I prepared.

THE COURT:  Since when?

THE WITNESS:  About four days ago.

MR. WISEMAN:  Why don't you show it to Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Please be careful of the microphone.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  Second page?

THE WITNESS:  Yes, sir.

MR. ROBERTS:  Can we get a copy of this?

MR. WISEMAN:  Absolutely.

BY MR. WISEMAN:

Q.   Did you prepare those documents for purposes of your testimony today?

A.   Yes, sir, I did.

Q.   Have you provided me with a copy of them?

A.   Yes, I have.

Q.   You have?

A.   Well, we discussed them.  I don't recall if I gave you a copy of them or not.

Q.   I'd love to have a copy.

MR. WISEMAN:  Does the Court want us to get a copy now, or can we keep going and get it for cross?

THE COURT:  Do whatever you want to do.

MR. WISEMAN:  Okay.  Why don't we keep going and we'll make a copy for Mr. Roberts for his cross-examination, if that's all right.

BY MR. WISEMAN:

Q.   Why don't you give us another example of why you believed he was not an accurate historian.

A.   I was describing the February 7th --

Q.   Yes, that's right.

A.   As I interviewed him about how his nose came to be injured, he said that his mother hit him with a mop handle for lying in telling her about the sexual abuse he said was perpetrated by Jacob Clayton, who he identified as a gay son of Mary Clayton, the woman, elderly woman that he had gone to live with.

He described that his mother told the doctor that he had fallen off a swing, when he said they didn't even have a swing. About three days before, he said that his mother had slapped him off the swing.  And then that he had injured himself playing is what she had said.

In that same interview on February the 7th, he described that he played high school football in ninth and tenth grades. When I asked him if he lettered, he did not understand that

concept of what that meant to letter, which suggested to me someone who in fact had not been involved in high school athletics. Michelle, his maternal half-sister, did not recall him playing sports in school or football in high school.

My interview, he told me that he had never touched a drop of alcohol. He had never tasted alcohol. When I responded a little incredulous at that, that he had never even tasted it, he then modified it that in 1994 he drank a daiquiri a month, but then modified that to say, so that was like two or three times in his life, and then that he drank amaretto and pineapple twice in 2000.

Q. So let me ask you, as a general matter, when you see these type of discrepancies -- and let's take the biggest one, the alleged coma that I think we all agree didn't occur, do you chalk that up to the subject being a liar, a malingerer, or something else?

A. There can be a lot of reasons why the person doesn't give you a correct report. The bottom line is I can now not rely on the things that he tells me, without corroboration, because now I don't know which part of that is an accurate report and which part may not be correct.

Q. Let me ask you a more precise question then. There's been some suggestion in these proceedings that Mr. Bourgeois's report of his coma was a malingering attempt to exaggerate his, you know, potential deficits or reasons why he'd have deficits.

Did you necessarily conclude, when you learned that there was no coma --

MR. ROBERTS:  Your Honor, I'm going to object.  I don't remember any testimony that has gone that direction.

MR. WISEMAN:  Well, that's not the Government's position?  Your Honor, I think the Government's position is that he lied about the coma to make up about a brain injury he didn't have.  If that's not their position, I would be happy to move on.  I'm assuming that combined with the Court's concerns about malingering that we need to address that issue.  And I think this expert can shed some light on whether it's necessarily a sign of malingering.

MR. ROBERTS:  I certainly don't have any problem with him testifying about whether he believes that would be a sign of malingering or not, but the qualifying question or the way that he phrased the question I object to again.

MR. WISEMAN:  Well, I'll ask it more simply.

BY MR. WISEMAN:

Q.   Do you think that that necessarily is a sign of malingering?

A.   No, sir, not -- not in the broader context.  He was describing a history of himself as being unimpaired.  He's describing things like playing football in high school, being highly coordinated.  His presentation generally was representing that he was highly competent and capable and

socially adept.  He didn't report that he was having rage attacks.  He was denying that he had temper-related problems.

And so his, his reports are fanciful in some respects. They generate additional attention for him.  They may have some additional drama associated with them, but they, they do not appear to be connected to any representation of himself as being impaired.

Q.   And how does one in your position then try to get to the bottom of what is the truth about a person who tells you something like that, that isn't necessarily corroborated?  What do you do with that information?  How do you proceed?

A.    I may describe that history in my testimony, with the caution that this is solely relying on his self-report.  And he has told me other things that are not true, when I try to compare them.  I wasn't there.  I don't know what happened. But this incident is, in this case, it's clearly inconsistent with the medical records that I eventually reviewed that talk about him being awake and alert in the hospital, following his surgery for this accident.

So I may say I can't corroborate it.  I may limit my testimony to what I can obtain from third parties or only the part that third parties could also corroborate.

Q.   Okay.  Before I ask the next question, I just want to note that Docket Entry Number 196 of 2/25/2004 indicates that jury selection is completed and the jury is sworn.  It says, "Jurors

sworn," to be more precise.

So on that date, 2/25/04, what was the state of the mitigation investigation?  Had it progressed?  And if so, to what degree and -- well, why don't you see if you can answer that much.

A.   Well, it was still in a very rudimentary position.  At this point, I had at least interviewed him.  I had recommended neurological and neuropsychological assessment, although the findings of those were not yet available to me.  I had performed some interviews myself of third parties and more interviews were being provided to me by the mitigation investigator.  So it was progressing, but it was still painfully inadequate.

Q.   Had you at that time, as of 2/25/04 received a comprehensive social history, as you had indicated initially would be required?

A.   I received it at about -- well, I received a chronology and social history at about that time, because I have a note on my bill that I reviewed mitigation interview summaries and chronology on February 27th, 2004.

Now, the narrative summary that I was provided was just over half a page in length.  And the chronology that I was given only had one, two, three, four, five entries up to his graduation from high school.

Q.   And --

A.   So it starts at his birth, and there are five entries from birth to graduation from high school.  It contains no generational history whatsoever, and only the most fragmented chronology in terms of the critically important first 18 years of his life.

Q.   And did you -- how much time did you spend reviewing those materials on February 27th, 2004?

A.   I spent 18 minutes.  That likely included interview summaries in addition to the chronology and narrative summary.

Q.   So my initial question was had you received a comprehensive social history, and what would your answer to that be?

A.   I had not yet reviewed it.  It would have been received close to that --

Q.   Well, did you consider the materials you received on February 27th to be a comprehensive social history?

A.   No, sir.  It was a chronology entitled "Narrative Summary."  It was not a comprehensive summary.

Q.   Okay.  From the time of your first contact with Mr. Gilmore on June 30th of '03, until the time the jury was sworn on February 25th, '04, had you had any discussions with Counsel about the direction that the mitigation investigation was taking or your ideas about what direction it should take?

A.   I don't recall that I had up to that time.

Q.   Okay.  And so the February 7th meeting in their office

does not meet that description?

A.    No, sir.  That would have involved the most rudimentary of discussions, in that I had relatively little information at that time and had not yet seen him myself.  I would have discussed violence risk assessment perspectives with them at that time, because that information is primarily demographic in nature, in terms of the factors that are associated with violence in prison.

    I would have described to them emerging themes from the limited mitigation investigation interviews that I had, but would not have been in a position at that point to have described in a definitive way the direction that I would identify mitigations proceeding.

Q.    And same question with regard to the mitigation specialists.  From the time that they first became involved in the will time the jury was sworn, had you had any face-to-face meetings with them?  I know there was discussion about a team meeting.  Did you ever sit down with them and say, "What have we got?  Where are we going?  What do we need to do?"

A.    No, sir.

Q.    Did you do that on the phone?

A.    There were telephone conferences.  They were of limited duration.

Q.    Is this lack of contact and -- well, withdraw that.  Would you agree that this was a lack of coordination between the

members of the defense team?

A.    Yes, sir.

Q.    And is that lack of contact and coordination a departure, in your experience, from the standard of care in capital mitigation?

MR. ROBERTS:  Objection, Your Honor.

MR. WISEMAN:  I'll withdraw the standard of care.

BY MR. WISEMAN:

Q.    Is it at variance with your experience in regards to the proper preparation of a capital mitigation investigation?

MR. ROBERTS:  Objection, Your Honor.  I'm not sure there's a -- I mean, in his opinion -- again, it goes back to the fact that every case is different in how a case is proceeded.  So I don't have a problem with his expertise in mitigation, but I do have a problem with this question.

MR. WISEMAN:  Your Honor, I thought we had agreed, or you had ruled, I should say --

THE COURT:  Overruled.

MR. WISEMAN:  Thank you, Your Honor.  Oh, I'm sorry. I said it again.  I'm learning.  It's hard to teach an old dog new tricks.

THE COURT:  Tell me about it.

THE WITNESS:  This did not reflect good practice, in my view.

BY MR. WISEMAN:

Q.   And when you train people and lecture on these topics, do you lecture them about the need for coordination?

A.   Yes, sir.

Q.   And is that consistent with the ABA guidelines?

A.   Yes, sir.

Q.   And with Supreme Court precedent?

A.   Yes, sir.

Q.   I want to show you the two reports which you provided to Counsel in this case.  First one is P-2.  It's dated February 25th, '04.  Do you recognize that as the first report you provided?

A.   Yes, sir, I do.

Q.   Okay.  And I'm going to turn the page, and I'm going to -- it's a two-page report?

A.   Yes, sir.

Q.   Okay.  And is a sparse -- oh, that's my characterization.  Is a report of that size typical for your practice?

A.   This is shorter than the typical report would be.

Q.   And what was the reason that it was short?

A.   My own investigation was still at a rudimentary stage.

Q.   And you provided a second report also dated February 25th, and is P-3 that report?

A.   Yes, sir.

Q.   And what does that address?

A.   This addresses the violence risk assessment for prison.

Q.   And I want to turn your attention now to the neurological, or I should say the neuropsychological evaluation you had requested.  Did you eventually receive a report by a Dr. Weiner?

A.   Yes, sir, I did.

Q.   Doctor, I'm showing you what's been already admitted before the Court as Exhibit P-29.  Is that the cover page of the neuropsychological evaluation done by Dr. Weiner of Mr. Bourgeois?

A.   Yes, sir, it is.

Q.   And the date of the report is March the 3rd?

A.   Yes, sir.

Q.   And showing you again your invoice, you reviewed that report on March the 4th, 2004?

A.   That's correct.

Q.   Now, the docket reflects that March the 4th, 2004, was the third day of trial.  And that's Docket Entry 213.  Did you consider the information contained in Dr. Weiner's report to be of value for mitigation case?

A.   Yes, sir.

Q.   And just, we've heard a lot about neuropsychological reports and evaluations.  Why don't you just give us a real brief reason for why you thought it had value as mitigating evidence?

A.   Yes, sir.  It describes his general intelligence as being

deficient.  It also describes cerebral dysfunction.  It describes that cerebral dysfunction would result in his handling stress more poorly.  From a -- in terms of its evidentiary value that Alfred Bourgeois has something wrong with his brain that would result in his having poor judgment and poor response to stress or could contribute to rage attacks, is a very important alternative explanation for his conduct, as opposed to his having a malignantly evil heart.

Q.   And in your experience in capital mitigation preparation and presentation, is evidence of that type offered in capital cases?

A.   Yes, sir.

Q.   Has the Supreme Court endorsed that concept?

A.   Yes, I understand.

Q.   And do you teach that concept?

MR. ROBERTS:  Your Honor, I'm just -- just one question.  I mean, he's not a legal expert.  He said in his statements, he's not an attorney.

THE COURT:  Sustained.  Keep away from those statements, Counsel.

MR. WISEMAN:  Sure, Your Honor.

BY MR. WISEMAN:

Q.   Did you subsequently -- well, withdraw that.  Did you prepare a PowerPoint presentation that you had hoped to show to the jury in this case?

A.   Yes, sir, that would accompany my testimony in this case.

THE COURT:  When did you prepare that?

THE WITNESS:  That preparation began on about March the 15th.  It was --

THE COURT:  Of what year?

THE WITNESS:  2004.  And was revised up to --

THE COURT:  After the trial?

THE WITNESS:  Well, yes, ma'am.

MR. WISEMAN:  Your Honor --

THE WITNESS:  March the -- I prepared my report on February the 25th.  I was noticed that I was being called to testify imminently, and so I then prepared demonstrative exhibits to accompany my anticipated testimony.  As I recall, the first presentation, and I may have --

BY MR. WISEMAN:

Q.   Well, let me put it up for you.

A.   Let me refer to my bill, and it will likely reflect when I began to do that.

Q.   Why don't you do that.

THE COURT:  Okay.  When were you told you were not going to be called?

THE WITNESS:  I was told on the day of trial.  I was here in court, and the second day, I observed the testimony all day Monday.  Tuesday, about midday, after the Government rested, I was advised that I would not be called.

THE COURT: And who told you that?

THE WITNESS: Both Defense Counsel were present, along with Gerald Bierbaum.

THE COURT: And why did they tell you you weren't going to be called?

THE WITNESS: The -- they said that they thought the information had been provided by Dr. Estrada, and they were concerned with what might be put on in rebuttal.

MR. WISEMAN: In regards to rebuttal --

THE COURT: So what day were you told that?

THE WITNESS: I was told that on March the 23rd, 2004.

THE COURT: All right. Thank you.

BY MR. WISEMAN:

Q. With regard to being told about rebuttal, were you advised that the Government had had Mr. Bourgeois evaluated by a neuropsychologist?

A. I was not.

Q. And were you advised by Counsel that the Government had had him evaluated by any other mental health professional other than Dr. Estrada?

A. I was not.

Q. Did you -- were you provided any detail about this purported rebuttal evidence?

A. No, sir.

Q.    I wanted to --

A.    It was not a discussion.  They simply advised me, "We've decided we're not going to call you."

Q.    Okay.  What I put up now is marked as P-4.  Do you recognize the cover sheet of that?

A.    Yes, sir, I do.

Q.    And what is it?

A.    This is the printed paper copy of the slides that I prepared to accompany my testimony, as well as draft questions that the attorneys could utilize to elicit the information on those slides.

Q.    Okay.  For the record, this is a 26-page exhibit.

A.    Yes, sir.  This one refers to the adverse developmental factors or mitigating factors.

Q.    I want to put up another larger PowerPoint, which is marked as Petitioner's 5.  Do you recognize that document?

A.    Yes, sir.  This is another PowerPoint file that I created to accompany my testimony regarding violence risk assessment for prison, and it also is accompanied by draft questions that I could be asked.

Q.    And for the record, this is a 65-page PowerPoint presentation.  So you provided to Counsel two PowerPoints, along with suggested questions for your examination.

A.    That's correct.

Q.    Did you annotate additionally those slides --

THE COURT:  Are you going to offer those?

MR. WISEMAN:  Oh, yes.  Yes.  We're going to go through them in a moment.  I'll offer them right now --

THE COURT:  Why don't you offer them now as we go along.

MR. WISEMAN:  Sure.  I'd offer 4 and 5.

THE COURT:  P-4 and 5?

MR. ROBERTS:  Your Honor, I know that Dr. Cunningham -- we're not going to object to them, but I wanted to clarify.  I know that Dr. Cunningham had two different presentations.  One was a very long one.  I think it was about eight hours.  And another one was a shorter one, about four hours.  And I didn't know if these were the two of those or if they were two separate ones.  I don't remember.

BY MR. WISEMAN:

Q.   Are these the two PowerPoints you prepared for Counsel in this case?

A.   Yes, sir, they were.

Q.   Did you prepare other ones other than these two?

A.   No, sir.  I updated the mitigation slides, even after I got here to Corpus Christi, as I continued to work on them.  But that is what was provided to Counsel.

Q.   Okay.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  Sorry.  P-4 and 5 --

MR. WISEMAN:  P-4 and 5.  P-4 is --

THE COURT:  -- are admitted.

MR. WISEMAN:  -- is the mitigation one, and P-5 is the risk assessment one.

BY MR. WISEMAN:

Q.  By the way, did you anticipate that they were going to take 12 hours to go through the two of them?

A.  No, sir.

Q.  I want to show you another document.  This is P-9.  Do you recognize that?

A.  Yes, sir, I do.

Q.  And what is that document?

A.  That's a qualifying examination that -- a draft qualifying examination that I prepared for Counsel should they decide to use it to orient them to my qualifications.

Q.  Okay.  And for the record, this is 16 pages in length.

MR. WISEMAN:  I would offer that as well, Your Honor.

THE COURT:  P?

MR. WISEMAN:  P-9.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-9 is admitted.

BY MR. WISEMAN:

Q.  All right.  I want to talk now about what the Judge started to question you about, and that is your actual arrival in this courthouse, or in this city back in March of '04.  What

day did you arrive in Corpus Christi?

A.    I actually arrived on March the 21st, 2004.

Q.    And what day of the week was that?

A.    Sunday.

Q.    I'm sorry?

A.    Sunday.

Q.    And what did you do when you got here?  You checked into the Omni?

A.    Yes, sir.

Q.    And Bayfront or Marina?

A.    I don't recall.

Q.    Okay.

A.    But the receipts --

Q.    There are differences.

A.    The receipts are on the bill.

Q.    And --

        THE COURT:  You couldn't get in there?

        MR. WISEMAN:  Oh, no, we did.  It's actually a lovely, lovely place.  I'm enjoying a good night's sleep the four hours I'm there.

BY MR. WISEMAN:

Q.    What did you do when you finished checking in?

A.    I called Mr. Tinker on his cell phone to leave a message that I was in town and was available to meet with him.  I then left my hotel room and took my cell phone with me.

Q.   And where did you go?

A.   I went to a fitness center in the hotel to work out.

Q.   And --

A.   I assumed he was interviewing other witnesses, since a voice mail picked up my message.

Q.   Okay.  And did you hear back from him subsequent to leaving that message?

A.   Yes, sir, I did.

Q.   And when did you hear from him?

A.   When I came back to my hotel room, the message light was blinking on the hotel phone.  It was a message from him indicating that since I had not been in my room when he called, that he was going to his residence outside, some distance from Corpus Christi, and would not be meeting with me that day.

Q.   Had you anticipated a meeting that day to begin to prepare?

A.   Yes, sir.

Q.   When is the next time you saw or spoke to either lawyer?

A.   I next came to court on Monday morning.

Q.   And what did you do in court?

A.   I observed the Government's case and indicated my availability for conference.

Q.   And in particular, did you observe Dr. Estrada's direct examination?

A.   Yes, I did.

Q.   And after court that day, what did you do?

A.   I met with Mr. Tinker.

Q.   And what was the purpose of that meeting?

A.   To prepare my testimony.

Q.   And where did the meeting take place?

A.   The meeting took place in the hotel bar.

Q.   At the Omni?

A.   Yes, sir.

Q.   And approximately how long did the meeting last?

A.   About 45 minutes.

Q.   And --

THE COURT:  Or how many drinks?

THE WITNESS:  I had no --

THE COURT:  I'm just kidding.  Just kidding.

BY MR. WISEMAN:

Q.   And what did you discuss with Mr. Tinker?  Or what observations did you make as well?

A.   Mr. Tinker seemed completely unfamiliar with the PowerPoint files that had been provided to him.  For example, as I was going over the mitigation adverse development related materials, he said, "Well, what about the violence risk assessment?  Are you not going to testify about that?"  And I said, "Yes, sir, there is a whole section of the binder that you've been provided that reflects slides addressing that and the direct exam -- suggested questions for direct exam that

would elicit that testimony."  That was an indication to me that he had not gotten that far in the materials I provided to even know what I was prepared to address.

Q.   And were you present in court on the 23rd at about 8:19 a.m. when Mr. Tinker addressed the Court with respect to your testimony?

A.   I don't recall.

Q.   Well, let me read you what he said and ask you if it refreshes your memory.  This is at Page 4, starting at Line 20.

Mr. Tinker:  "Your Honor, it's my attitude, not necessarily the rest of our group, that we're going to rest, depending on how Dr. Estrada goes when we question him.  I started to say I'm going to pass him" --

Your Honor says, "You're on the record.  You want to go off the record?"

Mr. Tinker says, "That's all right.  No, that's all right."

And he continues to say, "And so I'm going to -- and that's not the consensus particularly of Dr. Cunningham, and I don't think that's maybe of John" -- I presume meaning Gilmore -- "or Mr. Bourgeois.  What I'd like to have to do is to take after, after they rest -- they say they're going to rest after Estrada -- I think it would just save a whole lot of time if we could convince them what to do, and because I don't think we ought to go forward just because stuff is lying

around."

And just skipping down a few lines, the Court says, "Mr. Tinker, you have to evaluate the pros and cons of what goes into that."

And he responds, "That's right. For instance" -- and he says, "Let me talk," which I mean someone must have been interrupting him. He said --

THE COURT: That would have been Ms. Booth.

BY MR. WISEMAN:

Q. He said, "He would say things," referring to you, Dr. Cunningham, "he would talk about how many people in the penitentiary, are in the penitentiary, and that there are only 10 percent commit murders." And that's the end of the -- oh, and then he says, "Well, I think, why the hell would I want the jury to know that?"

So does it appear to you from that passage I read that Mr. Tinker was particularly familiar with your mitigation presentation?

A. No, sir. That doesn't reflect that he was familiar with the mitigation presentation or the actual content of the risk assessment information that I was prepared to provide. I don't recall hearing that discussion in the courtroom.

Q. Okay. And I take it from your answer that you had -- that he somewhat mischaracterized your risk assessment presentation?

A. Yes, sir, he did.

Q.    I'd like to now, if we could, go through not both presentations, but I'd like to quickly go through the mitigation presentation, which is the 26 slide one, and just -- the Court's heard a lot about concepts that are in there from other witnesses.  So I just want you to highlight for the Court what you would have said had you been called.

A.    Yes, sir.  If we proceed through it briefly, then that will be an abbreviation of what I would have said.

Q.    I fully appreciate -- believe me, I'd love to hear it all, and I'd like to hear it twice.  But we, you know, we have other witnesses we have to get to.

A.    Yes, sir.  Could I have the screen, please?

THE COURT:  It's that right there.

THE WITNESS:  Yes, ma'am, I was waiting for the exhibit to come up.

MR. WISEMAN:  I think you have to --

THE COURT:  You're supposed to do that yourself.

THE WITNESS:  I did that earlier.  I can certainly do it again.

(PAUSE.)

THE WITNESS:  Can you send it again?

THE COURT:  Try F3.

THE CLERK:  Yes.

THE COURT:  Okay.

THE WITNESS:  Should I proceed?

Case 2:02-cr-00216    Document 597    Filed 11/05/10 in TXSD    Page 260 of 446
Cunningham - Direct
260

BY MR. WISEMAN:

Q.   Yes.  Why don't you proceed at your pace, and if I have any questions, I'll jump in.

A.   Yes, sir.  In this case, I identified several of what I would characterize as adverse developmental factors or damaging factors, in other words, factors that injured him psychologically or in terms of his brain functioning.

The first was an overwhelmed family system that he was a part of.  And in looking at that system, Eunice, his mother, and Lloyd Ferdinand, who is the biological father of his oldest three siblings, had three children then divorced.  Soon after, Eunice had Anthony by another man.

THE COURT:  You don't need to read it to us.

THE WITNESS:  Yes, ma'am.

MR. WISEMAN:  Yeah, you know.

THE COURT:  I mean, I can read this myself.

BY MR. WISEMAN:

Q.   We've heard this history.  Why don't we -- why don't you just give us a quick summary of what's on each slide.  For example, here you could say, "An overwhelmed family system."

A.   Yes, sir, Eunice was --

THE COURT:  Why don't you move on to the next one.  I just read it.

BY MR. WISEMAN:

Q.   Okay.  The Court's read it.

A.   He was abandoned by his father.

THE COURT:  I read that one.

THE WITNESS:  He had no significant --

THE COURT:  Okay.  Next.  Okay.

BY MR. WISEMAN:

Q.   And let me stop you at this point.  What would you have been saying about these features that you identify as an overwhelmed family system and --

A.   I would have described these things in anecdotal detail to educate the jury about the family system and the nature of the stresses that were impinging on it and how that impacted on the quality of nurturing and care that he received.  He's a product of this family system and the quality of childhood nurturance that he receives depends on who these people are who are his parents.  That has genetic implications, modeling implications and psychological experience implications.

Q.   All right.  Why don't you go to the next slide?

THE COURT:  So what does that mean?  It doesn't sound good to me.  Mischievous and sneaky, didn't listen --

THE WITNESS:  No, ma'am.

THE COURT:  -- couldn't focus, always got into things, impulsive, took things from store, got in trouble at school, frequent fights, tantrums when whipped, fabricated stories, rage attacks.  So next, next, you're going to explain all this.  Right?

BY MR. WISEMAN:

Q.   Yeah, could you tell the Court why that's mitigating?

A.   Yes, sir.  These are indications that he was psychologically damaged from an early age.

THE COURT:  Well, is there any way you're going to fix that?  Is there any way to treat that or fix it?

THE WITNESS:  Yes, ma'am.  You can treat that by providing a highly structured environment.

THE COURT:  Like prison.

THE WITNESS:  Like prison.  You can also treat that, depending on the nature of the disorder that's identified, by anticonvulsant medications that may have an anti-rage effect, by --

THE COURT:  Well, you're not a physician or a neuropsychologist, are you?

THE WITNESS:  No, ma'am, I'm a clinical and forensic psychologist.

THE COURT:  Okay.

THE WITNESS:  I'm familiar with ADHD.  That's a part of clinical psychology, as are the treatment modalities.  In this case, this isn't just ADHD, but instead is a broader inhibition difficulty that he has.

BY MR. WISEMAN:

Q.   And let me ask you, as opposed to offering a treatment for these problems, does it offer the jury a psychological

explanation to the offense?

A.   Yes, sir, it does.  And it identifies that these are characteristics that are even part of his nervous system and neuro development from an early age, that this isn't just a function of somebody with intact capabilities who makes an evil choice to sadistically abuse a child, that this is somebody who's had historical psychological and developmental problems that are even reflected in behaviors that connect to brain functioning.

Q.   And is this the type of material that you train people to consider presenting in capital mitigation?

A.   Yes, sir.

Q.   All right.  Why don't you go to the next slide.

A.   This is part of the implication of these things.  Whether you're talking about neurobehavioral disinhibition or attention deficit hyperactivity disorder.  These, the symptoms that are being described by the family have implications for both of those.

Q.   Okay.  Go on.

A.   He was also subjected to emotional rejection and abuse.

Q.   And by that you mean the abuse history that you discovered?

A.   That's correct.

Q.   And we've heard a lot about this, so --

A.   And this being the emotional aspect of that, not physical

abuse at this point, but emotional abuse, which is as injurious or does greater psychological damage to the child than the whelps or bruises on their skin.

Q.   Okay.  Go on.

A.   He was in fact subjected to physical abuse as well.  And these are a few of the anecdotal expressions of that.  There is a literature that describes a significantly increased likelihood of criminal violence from individuals that are maltreated as children.  It's a longitudinal study published by Witham and colleagues, that identifies that children with histories of maltreatment are three times as likely to be arrested for violence as adults.

There's also a longitudinal study published by Thorndike under sponsorship of the U.S. Department of Justice that identifies a markedly increased violent outcome as the types of violence within a family increase.

Of those types, there's spouse abuse, child abuse, and a climate of violence and hostility.  As each type is added on, the percentage of kids who end up being violent themselves steadily increases.

Q.   And --

A.   So this helps make the nexus of that "so what" question.  So he was mistreated as a child, so what does that have to do with his being violent as an adult?  And that research establishes that nexus.

Cunningham - Direct

Q.   And in offering this type of evidence, in your experience, is there a connection between this and an attempt to reduce the Defendant's moral culpability for his crime?

A.   Yes, sir.  Moral culpability from a psychological standpoint being based on the idea of what raw materials did you bring to your choices.  The greater the psychological or neurological damage or deficient intelligence, then the materials that this person brought to his or her choices are reduced, and their moral culpability is correspondingly lessened, for the same action.

Q.   Okay.  Why don't you go on.

A.   There is also historical susceptibility to rage attacks, and these are some of the descriptions that were provided by the family members.  In other words, the abuse of this child and the rage that those injuries reflect wasn't restricted just to this relationship but in fact has a long-standing history to it and also has implications that suggest some neurological substrate to it.

Q.   Okay.  Why don't you go on.

A.   This is a metaphor or a model that I developed to try to explain the interaction of these factors.  As I viewed Alfred Bourgeois, he was like a pressure cooker.  And within that pressure cooker, there is this history of an overwhelmed family system, observed domestic conflict, physical abuse, father abandonment and emotional rejection.  Those are all the legacy

of this childhood that he's carrying with him.

Now, he keeps a lid on this most of the time, and that lid is comprised of some pro-social related things of being a hard worker and maintaining steady employment, being involved with his children, being a caring uncle.

Now, even in the presence of those things, when under stress, when you heat this up a little bit, particularly the --

THE COURT:  Did you know about -- were you told about the nephew he dangled over the, by his feet over the bridge?

THE WITNESS:  I saw that in the transcript, Your Honor.  I did not have knowledge of that otherwise.

THE COURT:  Okay.

THE WITNESS:  In the heat of a relation --

THE COURT:  Do you think it might have looked bad with your "caring uncle" comment?

THE WITNESS:  Well, it isn't that he is either a caring uncle or he's not.  There's both things.  There are many witnesses that described him exhibiting caring behaviors toward them.  There are also reports of his terrifying these children and doing things that put them at risk, or even other reports of prior abuse.

Both of those things are Alfred Bourgeois.  It isn't that one is true and one is false.  They both reflect ways of his dealing with his nieces and nephews.

THE COURT:  Does this look like the same symptoms as

a sociopath?

THE WITNESS:  No, ma'am.  Someone who's a sociopath tends not to maintain long -- well, "sociopath" is an antiquated term.  We now use the term "psychopath."

THE COURT:  Psychopath, fine.  Same thing, right?

THE WITNESS:  Well, it is somewhat different in its development, but they reflect somewhat the same concept. Somebody who's psychopathic tends to maintain a parasitic lifestyle.  In other words, they are living off of and exploiting others.  Alfred Bourgeois has maintained employment.

They tend to drift from place to place, without roots and relationships, almost like a carny.  Now, Alfred Bourgeois has short-term relationships.  He has trouble sustaining them, but he does sustain relationships.  He has maintained some degree of involvement with children, as opposed to just fathering them, moving across the country and going on.

Now, there are --

THE COURT:  Which children did you think he maintained a relationship, besides the one he murdered?

THE WITNESS:  Well, his daughter Bethany described feelings of attachment to him and recalled positive experiences with him.  As I recall, his son AW1988 described that.

THE COURT:  And you talked to them or --

THE WITNESS:  Yes, ma'am.  I talked to Bethany --

THE COURT:  Okay.

THE WITNESS:  -- about her experiences with him, as well as nieces and nephews of his.  And the aunts and uncles that also describe, or his siblings that also described him having good relationships with many of the children in the family.

BY MR. WISEMAN:

Q.   Dr. Cunningham, let me ask you --

THE COURT:  Did you know about the trial testimony of AB1994 and her mother, about how Robin Bourgeois and Mr. Bourgeois did not share a bed together, but he shared a bed with AB1994 and would lock the door every night to go in and sleep with her?

THE WITNESS:  I have read that.  I was not aware of that at the time of my testimony.  I've read that since.

BY MR. WISEMAN:

Q.   Well, at the time of your nontestimony?

A.   My nontestimony.  At the time of my --

THE COURT:  Well, I know, but these are, these are -- anyway, these are things that might be used to call into question his --

MR. WISEMAN:  Oh, sure.

THE COURT:  - his --

MR. WISEMAN:  And if he had --

THE COURT:  You know, when lawyers make a tactical decision sometimes, it doesn't mean that -- you had to know

Mr. Tinker. When he said they were going to testify that 10 percent of people in there being murderers, he was, he was probably -- Ms. Booth, you know this -- making an excuse to me about why he wasn't going to call somebody that we had spent a lot of money on.

MR. WISEMAN: Your Honor, I did not --

THE COURT: That does not mean he hadn't read the report. It did not mean that he had disregarded what Mr. Cunningham said. He probably saw the substantial pitfalls in putting on this type of testimony.

MR. WISEMAN: Well, Your Honor, we're going to certainly cover that in Mr. Gilmore's testimony.

THE COURT: I expect that quickly.

MR. WISEMAN: In Mr. Gilmore's testimony.

THE COURT: I expect you to move right along here.

MR. WISEMAN: Oh, absolutely.

THE COURT: Move beyond the pressure cooker.

MR. WISEMAN: You don't want the pressure cooker?

THE COURT: I'm a little tired of the pressure cooker.

MR. WISEMAN: I thought it was a square head with small ears.

THE COURT: I really appreciate that. I thought it was a king.

MR. WISEMAN: Okay.

BY MR. WISEMAN:

Q.   Dr. Cunningham, we're going to have to move beyond the pressure cooker.  Do you have other slides relevant to --

THE COURT:  Apparently he's got 12 hours' worth.

MR. WISEMAN:  No, he doesn't.

THE COURT:  Oh, okay.

MR. WISEMAN:  He said it was considerably less.  And I think --

THE COURT:  How many hours does he have?  How many slides do you have?

BY MR. WISEMAN:

Q.   How many more?

A.   There are about three or four more regarding mitigation, and then there is a separate file regarding violence risk assessment.  Violence risk assessment file is about 50 or so slides.  This --

Q.   Why don't we move on with the -- and finish up the mitigation PowerPoint and then move to risk assessment briefly.

A.   Yes, sir.

Q.   Do you have any more mitigation slides that are not using the pressure cooker metaphor?

A.   Yes, sir.  There is also some research that I retrieved regarding the extent of domestic and child abuse, including fatal child abuse in our society and also risk factors for that and how those match up against Alfred Bourgeois.

Q.    Okay.

A.    This describing the very large number of women who seek assistance --

THE COURT:  What does that have to do with this case?

THE WITNESS:  To the extent that Mr. Bourgeois is someone who batters and that he is among millions of men in the United States who engage in that conduct, then his singular malevolence in terms of making him a candidate for the death penalty is somewhat reduced by a recognition, at least in terms of domestic violence, that this is a widespread, tragic but widespread dysfunction in our society.

BY MR. WISEMAN:

Q.    Dr. Cunningham, I want to ask you a question about this --

THE COURT:  I can see -- I'm sorry, Mr. Wiseman -- why that slide would not have wanted to, Mr. Tinker would not have wanted that particular slide to reach the jury.

MR. WISEMAN:  Your Honor, I don't have the benefit of knowing Mr. Tinker.

THE COURT:  No, I'm talking about that.  That would have probably offended most people on the jury, I have to tell you.  Ms. Booth, what do you think?

MS. BOOTH:  I think it's horrible.  I can't believe -- I can't believe an expert would even speak like that.

THE COURT:  I can't either.  So move on to this next

category.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, the information that you were seeking to offer about Mr. Bourgeois's positive relationships, were you seeking to offer that as evidence of the positive relationships per se or as a way to explain how he kept himself --

THE COURT:  Could you let him testify, Mr. Wiseman?

BY MR. WISEMAN:

Q.    -- intact?

THE COURT:  Just ask him why he was going to do that.

BY MR. WISEMAN:

Q.   Okay.  Why were you going to do that, Dr. Cunningham?

A.   The graphic was identifying how he kept a lid on --

Q.   Okay.

A.   -- in his attempts to proceed with his life in ways that did not -- to try to keep a lid on the issues that he's carrying.

Q.   Okay.  I have another question now.  Your testimony is somewhat divergent.  On the one hand, you're telling us that this mitigation case was a disaster.  You didn't have the time to work it up in the way that you thought it needed to be, you didn't have the materials.  And yet you were coming to court prepared to offer what you could.  How do you reconcile what appear to me at least to be somewhat divergent views of this

case?

A.   I don't understand the question.

Q.   You didn't have enough time to do the case.

A.   That's correct.

Q.   Yet you were purporting to have valuable --

THE COURT:  To be fully prepared.

BY MR. WISEMAN:

Q.    -- valuable information to provide.

A.   Yes, sir.  It wasn't -- it's not a function of either having nothing, no observations, or being fully prepared.  I was partially prepared, and gathered information to describe this.

THE COURT:  Twelve hours of prepared.

THE WITNESS:  No, ma'am.

THE COURT:  That's pretty prepared.

THE WITNESS:  No, ma'am.  I never represented that my testimony would take 12 hours.

MR. WISEMAN:  Mr. Roberts said that, Your Honor.  Dr. Cunningham never said that.

THE COURT:  Oh, okay.  I thought he said there was six hours of one and four of another.

MR. WISEMAN:  No, no.  How many hours --

THE COURT:  And I thought actually you said the same thing.

MR. WISEMAN:  Oh, no.

THE COURT:  That you weren't actually going to put on -- or eight hours in one and four of another.

MR. WISEMAN:  No, what I was saying was that Mr. Roberts' suggestion that it was that long is ridiculous, and I would never think that I was going to get 12 hours from Your Honor to put on a PowerPoint, nor do I think Dr. Cunningham thought that.

THE COURT:  Well, how much time would it have taken to put all of your evidence on that you had?

THE WITNESS:  Two to three hours.

THE COURT:  Okay.

THE WITNESS:  As I was -- as I was --

THE COURT:  With 50 slides, you could put 50 slides on in --

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Many of them are graphic models that are --

THE COURT:  Okay.

THE WITNESS:   -- slides that proceed pretty rapidly. As I would be meeting with -- my hope was to meet with Mr. Tinker.  These are proposed exhibits.  This is proposed information.

THE COURT:  Thank you.

THE WITNESS:  If there's a slide that doesn't, that he thinks is not going to be information he wants to present to the jury, if he doesn't want them to have information about the

extent of domestic violence or child abuse, then that slide would not be included in the testimony.  That's a function of what we would be meeting about.  Let's talk about -- these are the things that I could potentially speak to.  Is that testimony that you desire to elicit?

BY MR. WISEMAN:

Q.   And in your experience in presenting these types of presentations to Counsel, do you typically sit down with them and have a discussion about it?  Do they ask you questions about it?  Do they, you know, engage in a deliberative process with you about what to present and what not to present?

A.   Yes, sir.  It begins before I ever arrive.  These materials were provided to him in advance, so that there could be consideration and discussion about them before I ever came.  Certainly, there was lots of time on Sunday to talk about those, or early Monday morning, or Monday evening to go over these slides and discuss them and identify what were concepts that were consistent with the mitigation themes that he was emphasizing and which were not.

Q.   Okay.  And I take it that discussion never happened.

A.   That's correct.

Q.   Now, the PowerPoint with regard to risk assessment's now in evidence.  Could you just summarize for us -- and I know that's hard on such a complex topic -- but do the best you can to, you know, what would you have told the jury about risk

assessment?

A.   I would have told them that risk assessments for prison are best based on this person's personal track record in confinement and on group statistical data on how capital offenders and murderers and inmates behave in prison.

In terms of that latter approach, that group statistical data, the research demonstrates that the seriousness of the offense that sends someone to prison is not a good predictor of who is seriously violent in prison and that the overwhelming majority of capital murderers, if sentenced to life in prison, never engage in serious violence.

And so that typical assumption that a murderer must be worse in prison is not supported by the data.

THE COURT:  Well, if we have data about how he behaved in the local jail, would that give us some indication?

THE WITNESS:  Yes, ma'am, if we look at his personal track record, either in terms of personally perpetrated misconduct in jail -- I was provided with no disciplinary write-ups that were made against him.

THE COURT:  Were you provided with the information that he allegedly tried to hire a hit man to kill several of the witnesses?

THE WITNESS:  Yes, ma'am.  That's another part of the risk assessment that I was prepared to address.  There's one part that addresses the likelihood that he will personally be

violent against inmates or staff in prison.  That's one assessment.  A second assessment involves his risk of ordering violence in the community from prison.  And then there's a third component which are what interventions are available within the Bureau of Prisons, either to limit his ability to personally perpetrate violence against inmates and staff or to order violence in the community.  And those are all areas that I was prepared to address.

BY MR. WISEMAN:

Q.   And were you going to address the differences between the Nueces -- I'm not sure I'm pronouncing that correctly.

THE COURT:  You did.

MR. WISEMAN:  Okay.

THE COURT:  It's Spanish.

BY MR. WISEMAN:

Q.   Okay -- County Jail and the Federal Bureau of Prisons?

A.   Yes, sir.

Q.   And their ability to maintain a safe environment?

A.   Yes, sir.

THE COURT:  Well, he got a guard to carry messages, allegedly, back and forth between himself and an alleged hit man.  Are you aware of that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Are you aware that on, actually on death row in Terra Haute that he did the same thing?

THE WITNESS:  I've read a report describing not that he was hiring a hit man --

THE COURT:  No, no, no.

THE WITNESS:  -- from Terra Haute, but that he had --

THE COURT:  He had schmoozed a guard and --

THE WITNESS:  Yes, ma'am.  As I understand it, the guard was approaching inmates.  But there was a relationship that developed where she was carrying messages --

THE COURT:  For him.

THE WITNESS:  -- to family members away from the prison.

THE COURT:  Right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, we're almost to the end here.  I wanted to ask you if my office provided you from 2007 onward with additional materials about the case.

A.   Yes, sir.

Q.   And did those additional materials add to your, what would now be your presentation of the case?  Or let me ask it differently.  If you had these materials back in 2004, could you have incorporated them and added to your conclusions and your mitigating opinions?

A.   Yes, sir.  They would have supported additional adverse developmental factors in his background.

Q.   All right.  Can we just tick them off rather quickly --

THE COURT:  You may.

BY MR. WISEMAN:

Q.   -- and if I have any questions about them, I'll jump in?

A.   Yes, sir.  A genetic predisposition to personality disorder; corruptive paternal modeling of promiscuity and reproductive irresponsibility; corruptive maternal modeling of neglect, abuse and scapegoating; borderline personality features; deficient intelligence and potential mental retardation; mother's inadequacy and potentially deficient intellect; inadequate primary attachment; rejection by the legitimate paternal siblings; peer rejection and isolation; additional information regarding maternal rejection and expulsion, expulsion; additional information regarding emotional neglect and particularly supervisory neglect.

Q.   Okay.  And I take it from your response that those are all additional mitigating features that help to reduce, in your view, moral culpability?

A.   That's correct.

Q.   I wanted to ask you two more things, and I think I'll be done.  We had a witness this morning, Claudia Williams, testify that she had related some stories of abuse to the trial investigators, Mr. Bierbaum, I believe, but that she held back on relating other ones, because it was a difficult topic for her to discuss.

THE COURT:  And I think she said because her mother

was still alive, which was a big thing.

MR. WISEMAN:  Yeah, yeah.

BY MR. WISEMAN:

Q.   And when a mitigation investigation is done properly and extensively and thoroughly, how does it try to overcome that type of a problem?

A.   The mitigation investigator spends a good deal of time in person with the family, which works to develop trust and rapport with them, and increases their ability to disclose sensitive information.  That's a time-intensive process of developing that relationship.  It's not one that can typically be achieved over the phone or on brief interview.

Q.   Okay.  And we also had another witness this morning, Brenda Goodman, who testified to an admission -- I don't know if that's the right word -- but a statement Mr. Bourgeois made to her before the offense that he had been raped by a man.  And she didn't reveal -- she wasn't spoken to at the time of trial.  She revealed it to our investigator -- I'm sorry, I'll take that back -- she didn't apparently reveal it to our investigator in 2007, but she talked about it on the witness stand.

How do you get through to people and get them to open up about that type of information?

MR. ROBERTS:  Your Honor, I think I -- I'm going to object in a general nature.  I mean, I think he, as a

psychologist, he's going to have to say he has to talk to an individual and figure out what that individual does. So I would object to him being able to describe how to get through people in general.

THE COURT: Go ahead.

THE WITNESS: The capabilities and experience of the examiner have something to do with it, the interviewer, in terms of instilling trust in the people that you're talking to. Part of it is in that time to build rapport. Some of it comes from interviewing other individuals and learning about it from them, so that when you then make inquiry of this person, you already know something about it.

THE COURT: Do you, would you consider that Mr. Wiseman's office has a very good mitigation investigator?

THE WITNESS: I would assume so. I don't know her personally, or him personally.

MR. WISEMAN: You know, Your Honor, I --

THE COURT: I mention that, because even yours didn't get that information.

MR. WISEMAN: Yeah, and you know what I was going to say in response?

THE COURT: Tell me something.

MR. WISEMAN: Not that I'm a witness, but we had this case with four months left to go on the statute of limitations. And I felt at the time that our investigation wasn't as strong

as it ought to have been.

THE COURT:  Could have been.

MR. WISEMAN:  And we've since tried to beef it up, but I think it's regrettable that the amount of time he had to spend with Ms. Goodman in 2007 didn't elicit that important information.  And as the chief --

THE COURT:  Well, I mean, here we are in 2010, and this is the first time she's ever mentioned it.

MR. WISEMAN:  No, it wasn't the first time.  She's told us about it since.  It's not in her declaration.  But as the chief of the unit, I take some personal responsibility that when I signed on to this case and agreed like Dr. Cunningham did to do it on the quick, that we miss some stuff.  And I regret that.

THE COURT:  Well, you've been on it for three years, so I don't think you've been forced to do it quickly.

MR. WISEMAN:  No, but the filing of the petition --

THE COURT:  Okay.

MR. WISEMAN:  -- and getting the affidavits was done, and that's our trial date.  The limitations date is our trial date.  Have to have everything done by then.

Dr. Cunningham, I think I --

THE COURT:  Well, you've done a wonderful job.

MR. WISEMAN:  Well, I appreciate that, Your Honor, but --

THE COURT:  It's the truth.

MR. WISEMAN:  -- but you know, we're human beings, and we make mistakes, you know.

Dr. Cunningham --

THE COURT:  Well, I think that's what this is all about.

MR. WISEMAN:  What's that?

THE COURT:  I think that's what this issue is, is what I was saying.

MR. WISEMAN:  Well, that's true.

Dr. Cunningham, I'm done.  Thank you very much.

THE WITNESS:  Thank you.

MR. ROBERTS:  May we have a brief break, Your Honor?

THE COURT:  Yes.

MR. WISEMAN:  And I'm going to want to offer my exhibits, the ones that weren't.  Let me pull that together.

THE COURT:  We'll do that right now.  Or you want to do it when we come back?

MR. WISEMAN:  Let me do it after the break.

THE COURT:  Okay.

MR. WISEMAN:  So we can pull it together.

THE COURT:  Fifteen?

MR. ROBERTS:  Great, Your Honor.

(Recess from 2:54 p.m. to 3:11 p.m.)

MR. WISEMAN:  Your Honor, if I could -- my intention

was to offer everything that I used.  So let me just list the numbers, and if anything hasn't been formally offered, I'll offer it now.

THE COURT:  Okay.

MR. WISEMAN:  P-1, 2, 4 and 5, 7, 8, 9, 10, 60 --

THE COURT:  16?

MR. WISEMAN:  60, 6-0.  That's the Bierbaum e-mails. 72, 144, 167.

THE COURT:  167's in.  So is 8.

MR. WISEMAN:  Okay.

THE COURT:  And so is 7.

MR. WISEMAN:  151.

THE COURT:  So is 9.

MR. WISEMAN:  165, and 130.

THE COURT:  Any objections, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  P-1, 2, 4, 5, 7, 8, 9, 10, 60, 72, 144, 151, 165 and 130 are admitted.  Go ahead, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE CLERK:  What about 167?

THE COURT:  I didn't -- yeah, 167.

THE CLERK:  Okay.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Good afternoon, Dr. Cunningham.

A.   Good afternoon.

Q.   It's been six years, and you're finally getting to testify in this case.

A.   I will come to the stand and testify when I'm called, sir. It's not that I have an agenda, but I'm available if I'm called.

THE COURT:   I think he was making a little joke.

THE WITNESS:   Yes, ma'am.

THE COURT:   Lighten up.

BY MR. ROBERTS:

Q.   We know it's a serious situation, but there are, I just want to say that as I've listened to your testimony, it strikes me as you're very, very focused when you get called to a case. Would that be correct?

A.   Yes, sir, I think that it is.  I'm concerned with doing a good job.

Q.   You've been an expert in this field, you've been testifying in federal courts for a long time.  Is that right?

A.   Yes, sir, 15 years.

Q.   What drew you in to becoming an expert in this field that you're in now?

A.   I was called about providing testimony in a case in Texas. It was a case having to do with violence risk assessment, which is a special issue here in Texas.  I did a literature search on the methodology of how you go about a scientifically grounded

risk assessment and began to retrieve base rate data, which is the group data that identifies rates and correlates of violence in prison, and applied that methodology in a capital case.

I then began to get called by other cases to make similar application of that science. I then began to do research in that area. And so essentially, it grew as I did research and published and as I was called upon to do work in other cases. It was not by design. It simply occurred as a growth from that area of practice.

Q. And the growth has occurred really on the defense side. You've testified almost exclusively for the defense. Is that correct?

A. I've never been called by the prosecution in a capital case.

Q. That's kind of a roundabout way of answering my question. But I mean, the fact is that you spend -- about 75 percent of your income is derived from doing these kind of cases. Is that right?

A. In any given year, someplace between 60 and 75 percent of my income is derived from capital cases at one stage or another.

Q. Okay. And you're quite experienced in how -- you're quite experienced in watching cases go forward. And I think you, I believe you've done well over 450 forensic evaluations for cases. Is that what your resumé says?

A.   The resumé doesn't describe that, I don't think.  My total forensic experience in terms of number of cases is probably in excess of 500.  I've testified in about 160 trial level capital cases.  I may have been involved in as many as 100 more, where I was not called to testify, either it pled out along the way, or for whatever reason I was not called.

Q.   But you're not a legal scholar.  Correct?  You didn't go to law school?

A.   I did not go to law school.  I am a forensic psychologist, and I'm a student of case law and psycho-legal conceptualizations.  So I know a lot more about it than a layman, and even than a general psychologist.  But I did not go to law school.

Q.   And do you spend time reading the ABA Journals and the things that are produced by the American Bar Association?

A.   As they relate to capital cases, I do.  And as landmark case law or important case law regarding capital litigation is published, I try to keep up with that.

Q.   Now --

A.   Again, likely not as thoroughly as an attorney, but I try to attend to that.

Q.   You said you've been doing this for about 15 years, you've been a forensic evaluator in courts, mostly, I mean, all for the defense, as far as your record goes.  But --

A.   No, sir.  That mischaracterized my experience.  I've been

involved in capital cases for 15 years.  I've been doing forensic-related cases for about 30 years.  Didn't do a capital case until 15 years ago.  I've been called by the defense and the state in other cases.  I've only been called by the defense in capital cases.

Q.   Thanks for clarifying that.  I guess my question was really getting to, it's my understanding that for years you were called because of a head injury being involved in the case.  Is that -- it is my understanding that if there was a head injury and there was some possibility that the head injury contributed somehow to the behavior of an individual, that Dr. Cunningham was the person to call.  Is that inaccurate? You're shaking your head no.

A.   No, sir, that's inaccurate.  I don't know that I have ever been called in a case, in a civil case, for example, that involved a head injury and the implications that that had.

Q.   And let me reclarify.  I didn't say civil.  I just said -- and in fact, I was specifically referencing criminal defense cases, where you were called because someone had a head injury and you were going to tie that into some type of imperfect brain or some kind of brain defect.  Is that not accurate?

A.   No, sir, that's not accurate.  I don't know that I have addressed head injuries apart from a mitigating factor in capital cases, and that typically accompanied by a neuropsychological evaluation.

Q.   Okay.  In this case, there was, at least at first, there was a Dr. Weiner who thought there was a head injury, and you discussed that at length with Mr. Wiseman earlier.  You were present when Dr. Estrada testified.  Correct?

A.   Yes, I was.

Q.   And you were aware that the United States was prepared to cross you when you took the stand for the defense if they in fact called you, were you not?

A.   The Government always cross-examines.  Well, there was one case where they said, "Pass the witness" this last year.  But otherwise, the Government -- I'm always cross-examined.  That's not a new thing.

Q.   I guess my question is, were you aware that we had a psychiatrist and a psychologist standing by to address issues of mitigation when you -- in rebuttal?  Were you aware of that?

A.   No, sir.

Q.   Were you aware -- do you remember the name John Shaw?

A.   I do know the name of John Shaw.  He's an administrator with the Bureau of Prisons and on occasion is called --

Q.   Were you aware that in 2000 --

A.   -- as a rebuttal witness.

Q.   I'm sorry.  Were you aware that in 2004 that he had created a PowerPoint slide and that we were going to address many of the issues you discussed about the murders in prisons after you testified?  Were you aware of that?

A.    I had not seen his 2004 slide presentation.

Q.    Well, my question is whether you were aware that we were going to use John Shaw and his presentation in response to your testimony.

A.    I don't recall seeing John Shaw here or knowing who the Government had retained.

Q.    Okay.  Fair enough.  You were on the witness stand actually in this case in this courtroom on March 22nd, 2004, where there was a discussion between you and the Judge, Defense Counsel and myself with regard to what portion of the PowerPoint you were actually going to present.  Do you recall that discussion?

A.    No, sir.

Q.    You don't?  I only have a portion of the transcript.  The proceedings began that day at 8:30 in the morning.  But when you were on the witness stand --

        MR. WISEMAN:  What page are you on, Mr. Roberts?

        MR. ROBERTS:  It's on page, it's the first page -- it's actually Page 2, because the first page is the caption of the case.  But it's the Transcript of Sentencing Hearing, Day 1, March 22nd, 2004.

BY MR. ROBERTS:

Q.    And Mr. Tinker was telling the Court that when he had talked with you outside, that you said that the direct would only be a couple of hours, maybe a little longer.

And then the Court says, "Okay.  So it's not a point -- or are you doing a PowerPoint?"  And she asked you the question directly.

And you said, "Yes, ma'am, I would intend to."

So you don't have a recollection of that discussion or being on the witness stand?

A.   No, sir.  I may have been in the gallery when the Court inquired, but I don't recall taking the stand.

Q.   Actually, this Court usually doesn't question people from the gallery, but --

A.   It's conceivable that I was called to the stand.  I don't recall being sworn or being on the stand in that case.

Q.   Okay.

MR. WISEMAN:  Your Honor, the record should reflect that he was not sworn.

MR. ROBERTS:  And I don't have a problem with that, Your Honor.  There was just a --

BY MR. ROBERTS:

Q.   Let me just ask you that if you were on the witness stand and if the record, the transcript reflected that in the discussion with me that Judge Jack indicated that we would be able to impeach you by bringing in our expert about Bureau of Prisons, rather than excluding your testimony about the Bureau of Prisons, would you have recalled that discussion?

A.   I might or might not.  I wouldn't have regarded that as

unusual for the Government to call Mr. Shaw or someone else from the Bureau of Prisons about their experience of violence in prison or other issues.

Q.    And in fact, Mr. Shaw often -- or Mr. Shaw is known to testify about the number of murders that take place in prison; is he not?

A.    He has provided that testimony.

Q.    Okay.  So if you took the stand, regardless of what percent, whether it was 2 percent or 10 percent or Mr. Tinker was incorrect, you're aware that if we had brought John Shaw in, more than likely we would have been addressing how many murders take place in the prison facility.

A.    Yes, sir.  We both would have addressed that and would have been using the same statistics.  That rate is about five per hundred thousand inmates annually in the Bureau of Prisons. If you go to the U.S. Penitentiaries and you do a three or four-year average, which he might be speaking to, then your rate's going to be about twenty to twenty-five per hundred thousand inmates per year.

Q.    And that's your opinion.  You don't know whether or not that coincides with what Mr. Shaw would say, do you?

A.    Well, actually I have some familiarity with that.

        THE COURT:  Well, he just said he looked it up.  I mean, surely you look it up at the same place, wouldn't you think?

THE WITNESS: Yes, ma'am. And I've read transcripts of his testimony.

BY MR. ROBERTS:

Q. Okay. So earlier, you heard the state -- Mr. Wiseman read from a transcript that Mr. Tinker was concerned that the jury would hear that 10 percent or some number like that, that the jury would hear that 10 percent or less people in jail actually still commit murders. And he was concerned about the jury hearing that.

THE COURT: I thought he was talking about 10 percent of people in prison are murderers.

MR. ROBERTS: Well --

THE COURT: I probably misunderstood that.

BY MR. ROBERTS:

Q. Either way, you heard that Mr. Tinker was concerned about the jury hearing about murders in relation to confined facilities, did you not?

A. I heard that he was talking about a 10 percent number, which is at least ten-fold higher than the actual incidence on a lifetime basis.

THE COURT: He's not talking about -- I thought he was talking about the number of murderers in prison.

THE WITNESS: Yes, ma'am. But state prison, it's going to be about 12 percent. And then federal prison has a lower percentage, because of the different mix of offenses.

But there are people convicted of murder in prison.

BY MR. ROBERTS:

Q.   And there are also people in prison that commit murders while they're in prison, are there not?

A.   Yes, sir.  That's that rate that's about five per hundred thousand inmates annually for the Bureau of Prisons as a whole. It occurs, but it's extraordinarily infrequent.

Q.   And it happens in high security and medium security, low security and minimum security; does it not?

A.   I don't know that there are reports in minimum security. It may be on occasion that's occurred.  Most of the murders occur in medium or high security.

Q.   So if Mr. Tinker was concerned that they would hear that a certain percentage of inmates continue to commit murder, would that be something that you expect Mr. Shaw might have testified about?

A.   Well, it would have been a very important issue to clarify for the jury.  Research shows that jurors think there's about a 50 percent likelihood that their capital offender will kill again in prison.  The follow-up data says that's an overestimate by 50 to 250-fold.  So it's critically important that the jury hear the actual number, so as to dispel the very gross exaggeration that they have in their mind upon being confronted with this particular offender.  That's some of the information I would have liked to have clarified and explained

to Mr. Tinker had we had more than 40 minutes and he have some familiarity with the information that I had.

THE COURT:  Well, you don't know that he didn't have familiarity with your information.  You had sent it to him in advance.

THE WITNESS:  Well, yes, ma'am.  He asked me, "Are you going to testify anything about violence risk assessment?" He had in his possession in that notebook 60 slides with direct.  When I turned to it in his notebook, he looked surprised, as if this is the first he had seen of it.  So in fact, it was very clear that he was unfamiliar with it.

BY MR. ROBERTS:

Q.   How many times have you testified in federal capital cases now?

A.   About 60.

Q.   How many current cases are you handling?

A.   I don't know the answer to that.

Q.   You don't know the number of cases you currently have?

A.   No, sir.  Sometimes I'll be contacted when a case could be two years ago, and they say, "We'd like for you to work on this," and then I never hear anything again, and we telephone them, and they say, "Oh, we settled that a year ago.  Sorry we didn't call you."

And so I may have a case that we've started a case sheet on that I get no, there's no subsequent follow-up on.  They're

just trying to save a place in line.

Q.   So if they don't follow up with you, then you turn around and follow up with them?

A.   After a while, yes, sir.

Q.   After a while.

A.   If there's a trial date that we have, then we're going to follow up with them as we see that, you know, coming within being months and months away.  They may not have a trial date. And so then we may only contact them, you know, six months might go by between contacts, because there wasn't a trial date that was set.

Q.   We saw the e-mails earlier on your direct examination with regard to your being contacted initially, and then you turn around and telling them, telling the defense team that they hadn't submitted stuff to you yet.  When you get involved in a capital case, you take on a very important role.  Is that correct?

A.   Potentially, yes, sir, depending on the role that I'm assigned within that case.  But any consultation in a capital case is important.

Q.   Well, in your statement, you talk about how important it was for Mr. Tinker and Mr. Gilmore to pretty much follow your advice.  I mean, you say in Paragraph 4 that you were retained by Mr. Gilmore and Tinker, that you were first contacted on June 30th, 2003.  You testified to that already.  Correct?

A.    Yes, sir.

Q.    That you responded on July 1st, 2003, and that's when you suggested that the defense hire a mitigation specialist.  Is that correct?

A.    Yes, sir.  That's correct.  I have no expertise in gathering records.  And it's much too expensive to have me out in the field trying to chase people down.

Q.    Are you aware of exactly when Mr. John Gilmore was actually appointed to start handling Alfred Bourgeois's case?

A.    No, sir.

Q.    If the record of the trial reflected December 20th, 2002, would you have any issue with that date?

A.    I have no knowledge one way or the other.  I don't know whether to have issue or not.  I simply don't know when he was appointed.

Q.    But you do know that he contacted you on June the 30th, 2003.

A.    That's correct.

Q.    Do you know when the United States issued a notice that it would be proceeding with the death -- with making this a capital case and pursuing the death sentence?

A.    Only from what Mr. Wiseman described sometime in mid June that a notice was provided.

Q.    I think it would --

A.    I mean, mid July, rather.

Q.    July 25th, 2003.  Does that ring a bell?

A.    I don't have documentation of that.  That would simply be from his reference.

Q.    Okay.  So let's assume for the sake of this discussion that you were contacted June 30th of the sentence of, or that the United States notice occurred on July 25th, less than a month later.  And do you know when Doug Tinker was actually appointed to begin assisting in this case?

A.    No, sir.

Q.    Let's assume for the sake of the record, and I think the record will reflect this, that it was July 25th, 2003, the same day the notice for the pursuit of the sentence of death was issued.

        MR. WISEMAN:  Your Honor, I'm sorry to interrupt Mr. Roberts, but I think it's important to be accurate with the dates here.  The docket of the Court says the notice of intent to seek the death penalty was formally filed July 23rd.  However, the Government announced before Your Honor in open court on July the 16th, Docket Entry 74, that they would be seeking the death penalty.  They had been authorized to seek it.  Your Honor told them to file a formal notice.  And that marks the date when the Court indicated you would start to gear up the case as a capital one.

        MR. ROBERTS:  That's fine, Your Honor.

BY MR. ROBERTS:

Q.    The point is that all this occurred right around the time that you were actually contacted on June the 30th, 2003.  So you're telling us you were not aware that your contact was almost simultaneous with the case, the United States beginning to seek the sentence of death?  You were not aware of that?

A.    Well, yes and no.  The initial correspondence with Mr. Gilmore indicated his expectation that this was a capital case, that discussions had been occurring with your office or with Justice about whether it would go capital.  He anticipated that under the current status of the case that Mr. Bourgeois would receive the death penalty.

The timing of the formal notice that was announced in court or that your office provided, I don't have knowledge of when that occurred, except by what you've just described.

Q.    Okay.  Well, you do have knowledge of when you suggested that Ms. Milstein be contacted.  And when did you suggest that again?

A.    I provided a list of about 11 individuals on July the 9th, 2003, at Mr. Gilmore's request.  She was among the 11 individuals, in the second tier, next to the last.

Q.    I'm showing you what's been marked as Petitioner's Exhibit 165.

A.    Yes, sir.

Q.    Can you read for us what happened on October 23rd, 2002?

A.    That indicates first interview in person Alfred Bourgeois

conducted by Milstein and Bierbaum.

Q.   So it appears that someone by the name of Milstein and Bierbaum interviewed Alfred Bourgeois as early as October 23rd, 2002.

A.   No, sir.

Q.   Do you know whether that's the same Milstein?

A.   I believe that that date is in error.  I think that date should actually reflect 2003, not 2002.  And that was clarified by Mr. Wiseman in my direct exam.

Q.   Okay.

A.   Since she was not involved in the case in 2002, and I'm -- she's one of the names that I provide, I don't know how she could get there with Bierbaum to be doing an interview in October of 2002.

Q.   I was kind of curious about that myself.  And I didn't hear the clarification, so I stand corrected.

Let me refer you to another exhibit.  Actually it is your exhibit.  This is Petitioner's Exhibit 8.  And this is the list of e-mails that you had discussed earlier.  Correct?

A.   That's correct.

Q.   I'm turning to what appears to be Page 15 at the bottom on this exhibit.

A.   Yes, sir.  Let me turn to that.  I have that.

Q.   Okay.  I believe you've already read this, but I just want to, I want to ask you about another response here, and that is

July 25th, 2003, it says -- this is John Gilmore responding to you and saying, "The Judge has agreed to appoint you in our case."

So when you talked about the dates a while ago about the dates of when the notice to proceed with the seeking the death sentence was issued, and it was in, towards the end of July 25th. So John Gilmore actually has informed you on July 25th, 2003, that the Judge has finally appointed you to the case.

So that's the first time that you were officially, at least with regard to the Court having appointed you, that's the first time that you were officially working on the case. Is that correct?

A.    That's correct.

Q.    You made several statements -- I want to get back to another statement here, but I want to just -- on your declaration to this Court in 2007, you made a statement about your concerns about John Gilmore not really knowing how to proceed with the mitigation expert. Do you remember making comments to that extent?

A.    You may need to direct me to a paragraph.

Q.    I will.

A.    Yes, sir. That's in Paragraph 8, based on a December 1st, 2003, communication. It's an e-mail that he had with our office.

Q.    Looking at your statement, your --

THE COURT:  Can you zoom that up?  I can't see it.

MR. ROBERTS:  Oh, Your Honor, this is not, we're not -- I'm going to refer to another page here, but I'm actually looking at his declaration which has not been offered yet.

BY MR. ROBERTS:

Q.   And it's an 18-page -- you gave a declaration on May -- you signed it on May the 11th, 2007.  It's an 18-page document.

A.   That's correct.

Q.   Okay.  And in that statement, you're referring to Paragraph 8, where you talked about Mr. Gilmore responding about how he was not really sure how this thing works and did not know if he should be providing me with information or if the mitigating investigators should be providing this information to me directly.

And you said, "This again reflected a lack of familiarity with the functions of Defense Counsel in preparing for a capital case."

Is that your opinion?

A.   For capital sentencing.  Yes, sir, that did point to a lack of familiarity.

Q.   Let me --

A.   And I'd be glad to explain --

Q.   Well, let me invite you to --

A.   -- why I made that assumption.

Q.   Let me have you look at an e-mail, another e-mail correspondence between you, Mr. Gilmore and your office actually.  Referencing again the Petitioner's Exhibit 8.  And I'm referring to the middle.  This is Page 19 of this exhibit --

A.   Yes, sir.

Q.   -- where on December the 1st, 2003, John Gilmore e-mailed to Tammy Lam -- and you said Tammy Lam is a member of your office?

A.   She's an administrative assistant in my office.  That's correct.

Q.   And she is the person that you trust to e-mail and correspond with attorneys on cases you're assigned to?

A.   To do status checks in terms of where we are with deadlines and update them with materials and that kind of thing.  Not to handle matters of substance.

Q.   Okay.  But here is an e-mail that John Gilmore had sent to Tammy.  And read what that is.  What is John Gilmore asking her?

A.   He said -- this was in response to her e-mail saying, "We have yet to receive any records, information, materials for Dr. C to begin working on this report."

     MR. ROBERTS:  Objection, nonresponsive, Your Honor.

     THE COURT:  Sustained.

BY MR. ROBERTS:

Q.   I ask you to read the portion of what John Gilmore is asking.

A.   Yes, sir.  It says, "Tammy, I'm not -- I'm really not sure how this works.  I've worked with mitigation experts before, but never with dedicated mitigation investigators.  Do they provide information to Dr. Cunningham, or do I?  My understanding was that Lisa Milstein and Gerald Bierbaum were to generate the basis for the doctor's report.  Let me know if you need something from me."

Q.   Did Tammy respond to him?

A.   She did.

Q.   She responded to Mr. Gilmore?

A.   No, she responded to me.

Q.   She forwarded it to you.

A.   There's an e-mail to me.

Q.   She forwarded the e-mail to you.

A.   That's correct.

Q.   And asked you to -- and asked whether you would like to respond to this or whether she should follow up with Gilmore and asked you to advise.

A.   That's correct.

Q.   These are your documents and your e-mails.  Where's the e-mail that responds to John Gilmore with regard to his question about who should provide the investigators with information?  Where is that e-mail?

A.   I don't have any of the e-mails from that era in my files. There's apparently not an e-mail of response in John Gilmore's file.

Q.   So in December the 1st at least, John Gilmore asked your office who's supposed to be coordinating with the two investigators, and who's supposed to -- at least it appears that he thought the investigators were supposed to be coordinating directly with you, doesn't it?

A.   Yes, sir.  That's part of his lack of familiarity with capital case preparation.

THE COURT:  Well, did you write to him back and tell him who was going to be doing it?  That's the question.

THE WITNESS:  I don't recall, ma'am.

THE COURT:  Well, that's kind of a biggy, isn't it?

THE WITNESS:  Not necessarily, ma'am.  It's not my job to determine whether the attorney knows about how a capital case works or not.  I'm retained by him to provide a function, not to direct the case or to ensure its quality control.

BY MR. ROBERTS:

Q.   That's interesting.  You're not to direct the case.  Well, why in your declaration do you state, in Paragraph 5, "I explained that the performance of an adequate forensic psychology evaluation required a comprehensive" -- and you go on and you basically tell them that you're outlining how they're supposed to take care of the case, in your statement

and here in this court.  And now you're telling us that that's not your role?

THE COURT:  And he prepared all the questions to be asked by the attorneys.

MR. ROBERTS:  Thanks, Your Honor.  I was getting there.  I was getting there, Your Honor.

THE COURT:  Sorry.

BY MR. ROBERTS:

Q.  I mean, Dr. Cunningham, you're the expert.  You're the person that they went to --

THE COURT:  I think I got it, unless you need something more on the record.

MR. ROBERTS:  No, Your Honor, I'll move to something else.

THE WITNESS:  I'll be glad to respond, if that's a question.

BY MR. ROBERTS:

Q.  Do you know how many capital trials that Mr. Gilmore had been involved in?

A.  I do not know.

Q.  Do you know how many capital trials Doug Tinker had been involved in?

A.  No, sir.

Q.  Did you ask?

A.  No, sir.

Q.   Did you know Mr. Bierbaum?

A.   I did.

Q.   You did.  You knew of him?

A.   Yes, sir.

Q.   Does he do an adequate job on investigating cases?

A.   I only have limited familiarity.  This was one of the last cases that I worked on him with.  I did not think this job was adequate.

Q.   You didn't think he did an adequate job on this case.

A.   That's correct.

Q.   So he failed the Defense Counsel in this case, did he not?

        MR. WISEMAN:  He wasn't Defense Counsel, Your Honor.

        THE COURT:  That isn't what he said.  Do not comment unless it's by way of an objection, please.

        MR. WISEMAN:  That was an objection.  I thought he said --

        THE COURT:  That is not what he said.

        MR. WISEMAN:  Then I stand corrected.

        THE COURT:  Yes, you do.  And you should sit that way as well.  Thank you.

        THE WITNESS:  I would ask, I guess answer that question yes and no.  The responsibility for the mitigation case does not reside with the mitigation investigator.  It resides with Defense Counsel, who's responsible for all areas of the case strategy and preparation.

BY MR. ROBERTS:

Q.    In your opinion.  Correct?

A.    Yes, sir.  That's my understanding and my opinion.  And if --

Q.    They -- did the --

A.    That's a function that is continuously monitored by Defense Counsel.

Q.    In your opinion.

A.    Yes, sir.  So that when you get to that --

Q.    But didn't the Defense Counsel hire you to assist them --

        THE COURT:  I got that.  I got that.  This is --

        MR. ROBERTS:  Yes, Your Honor.

        THE COURT:  I got this figured out, I think.

        MR. ROBERTS:  All right, Your Honor.

BY MR. ROBERTS:

Q.    I just want to comment, in your statement you also say -- you also comment on the fact that the defense were having a problem arranging the evaluation with Dr. Weiner.  You comment that they were having a problem with Dr. Weiner.  And I can refer you to that paragraph, too, if you'd like.

A.    In Paragraph 10, Mr. Tinker had, or Mr. Gilmore had described that they were having difficulty scheduling that.

Q.    With Dr. Weiner?

A.    That's correct.

Q.    And that was one of the experts they were relying on also.

Correct?

A.   That's correct.

MR. ROBERTS:   Your Honor, I just need to take a moment.   I'm going past some of the questions because I understand you already understand some of the issues I was going to cover.

BY MR. ROBERTS:

Q.   Let me move to your Paragraph 14 in your statement, where you liken Alfred Bourgeois's psychological makeup to a pressure cooker, kind of the same thing that you put on your screen -- on your PowerPoint.  Do you see that?

A.   Please direct me to a paragraph.

Q.   It's Paragraph 14.

A.   You'll have to direct me to pressure cooker.  I don't see that in the paragraph.

(PAUSE.)

Q.   I'm sorry, it's Paragraph 33.  You were prepared to analogize Mr. Bourgeois's functioning for the jury in order to help them understand, appreciate what made him behave violently and believe Mr. Bourgeois's psychological makeup can be likened to a pressure cooker.  That's your opinion.  Correct?

A.   Yes, sir.  I believe that's an analogy that is descriptive.

Q.   Okay.  Lower down, you said that his -- just a few sentences down from that, you say, "However, his background and

psychological makeup always made him predisposed toward impulsivity and violence."  That's your opinion?

A.    Yes, sir, if at large in the community.

Q.    That's what you were going to tell the jury?

A.    Yes, sir.  And that's reflected in his history, that there were recurrent instances of impulsive violence in the community and other impulsive decisions as well.

Q.    You were actually, to use your word on Page 9 of your statement, you were actually flabbergasted when they told you they were not going to use you as an expert.  Is that correct?

A.    I was very surprised.  You'll have to point out "flabbergasted" to me.

Q.    Page 9, Paragraph 17.

A.    Oh, page -- Paragraph 17.  I'm sorry.  I was looking at Paragraph Number --

Q.    I said -- no, I said Page 9.  Sorry.

A.    Yes, I was flabbergasted that they would not be calling me as a witness.

Q.    And it never occurred to you that Mr. Tinker might not want the jury to know this pressure cooker information or that people might be actually still committing murders while they're in jail?

A.    No, sir.  That's -- I think that's not a correct characterization.  I have prepared many perspectives --

Q.    I just asked you a question about whether you, that ever

occurred to you.

A.   It never occurred --

MR. WISEMAN:  Who cares if it occurred to him?
Objection, Your Honor.  It doesn't -- it's irrelevant.

THE COURT:  What's the legal objection?

MR. WISEMAN:  It's irrelevant whether it occurred to
him.

THE COURT:  Overruled.

BY MR. ROBERTS:

Q.   You were --

A.   Yes, sir, I was flabbergasted that he would not be calling
a mental health expert to describe the developmental history
and the relationship that developmental history had to violent
behavior, including the nature of the behavior involved in this
offense.  I was flabbergasted that the jury was not going to
hear that capital offenders are not more violent in prison than
other offenders, and that the Bureau of Prisons has significant
capability to restrain those individuals.

MR. ROBERTS:  Object to that --

THE WITNESS:  I was very surprised that --

MR. ROBERTS:  -- as nonresponsive, Your Honor.

THE COURT:  Sustained.  I think we should make note
that this witness seems to be very angry.

MR. ROBERTS:  Yes, Your Honor.  May I have just a
moment --

MR. WISEMAN:  Your Honor, I take issue with that characterization.

THE COURT:  I do not.  I'm the fact finder, and I'm going to make a record of it.

MR. WISEMAN:  Right, and I think --

THE COURT:  So you can sit down, and you can continue.

MR. WISEMAN:  I thought he said he was finished.

MR. ROBERTS:  Your Honor, can I just have a moment with Counsel?

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

(Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, I have one more question, maybe two.

BY MR. ROBERTS:

Q.   Dr. Cunningham --

A    Yes, sir.

Q    -- do you know what the defense was at trial?  What was their theory?

A.   My understanding is he was asserting his innocence at trial.

Q.   And do you think that all of the information that you were providing with regard to him, why he committed such a heinous act, would be inconsistent with a defense of innocence?

A.   Yes, sir, it's inconsistent with his -- well, it's -- it explains his other conduct prior to this.

Q.   But you would agree it's inconsistent with a defense of innocence.

A.   Yes, sir.  If the defense is attempting to hold to an assertion that he is innocent of this offense, then they would not want to put on any information at all from any source, including Dr. Estrada or anybody else that he had anything damaging in his background at all.  Now, that's a high, extremely high risk decision to make, in light of the jury's verdict and in light of the evidence in this case.

Q.   You have some familiarity with the legal process.  Do you -- are you aware that it's the Defendant's right to decide whether he wants to plead guilty or innocent?  Were you aware of that?

A.   Yes, sir.  I understand that a Defendant has a right to plead.

MR. ROBERTS:  Thank you, Your Honor.  We have nothing else.

MR. WISEMAN:  Your Honor --

THE COURT:  You may proceed.

MR. WISEMAN:  Yes, Your Honor.  I have an application before I proceed.  Your Honor's obviously the fact finder --

THE COURT:  Mr. Wiseman, ask questions, or this will be concluded.

MR. WISEMAN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Dr. Cunningham, have you testified before in capital cases in mitigation where the Defendant has maintained his innocence?

A.   Yes, sir.

Q.   How many times?

A.   I can't give you a number.  Many cases had a sentencing phase, I mean a guilt phase characterized by the defense asserting innocence at the guilt phase, followed by a sentencing phase that accepted the jury's verdict and provided mitigation and violence risk assessment perspectives.

Q.   So testifying in a case where the Defendant maintains his innocence is not unusual in your field?

A.   That's correct.

Q.   It's common?

A.   Yes, sir.

Q.   I want to refer you back to P-8 that Mr. Roberts may have inadvertently misrepresented what was going on there.  This is an e-mail of February 18th.  This is Page 28 of the exhibit.  It says, "Dear Dr. Cunningham:  The Judge has ordered disclosure in the form of a written report of every matter we intend to have you testify to."

     It goes on to talk about the report.  It says, "We're having problems scheduling the neuropsychologist.  We had it

set up, but the Marshals didn't follow through.  Now it looks
as if it may not get done.  We are making a record and
objecting."

A.    Yes, sir.

Q.    Does that comport with your recollection of what happened?

A.    Yes, sir.

Q.    It wasn't Dr. Weiner's fault, as far as you know?

A.    No, sir.

Q.    Mr. Roberts asked you -- Mr. Roberts asked you about your
declaration and your, in particular, Paragraph 5, that you
believed that Mr. Gilmore was inexperienced with regard to
working in this setting with mitigation specialists.  And you
gave an opinion in response to that, that I think Mr. Roberts
said, "That's your opinion, that Counsel is responsible."

      My question is, what's the basis for your opinion?

A.    My understanding of the ABA standards and guidelines, that
Defense Counsel is responsible for the orchestration and
presentation at all stages of trial.

Q.    When we first talked about this e-mail packet, I thought
it was your testimony that you don't have access to any of the
e-mails from this period of time.

A.    That's correct.

Q.    Explain to the Court why that is.

A.    In the last six years, there have been a number of
instances where there was a change in computers, that the

Outlook files were not transferred, as well as a theft of a

computer, that deprived me of access to historical Outlook

files.

Q.   So is, in your view, the absence of an e-mail responding

to Mr. Gilmore in regard to his December 1st, 2003, "How does

this work?" e-mail, does that mean that you didn't respond, or

you don't see a response in this packet?

A.   I don't see a response in that packet.  If Mr. Gilmore's

files are intact, then -- his Outlook files, then I would

expect that the response would be there.  I don't have any way

of knowing the completeness of his files.

Q.   Mr. Roberts asked you about being impeached by Mr. Shaw.

Did Mr. Tinker ever, or Mr. Gilmore ever say to you, "They're

going to bring in this Shaw guy.  What would you say in

response to his impeachment?"

A.   No, sir.

Q.   The Government has talked about some phantom psychologist

and psychiatrist they had at the ready to rebut whatever it is

you were going to say.  Did Mr. Gilmore or Mr. Tinker ever

discuss that with you and say, "What could they possibly say,

and what would you respond?"

A.   No, sir.

          MR. WISEMAN:  Your Honor, at this time I would ask

for disclosure, which has yet to occur, of the names of the two

mental health people the Government says they had, what they

knew, what they were going to say, so I can have a proper opportunity to examine this witness as to what his response would be.  I'm actually somewhat surprised that I'm hearing about this for the first time at this late date.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Yes, Your Honor.  We had given Doug Tinker and John Gilmore a lengthy resumé from Park Dietz, about 65 pages, that we were going to bring Park Dietz in.  And there was another member of his -- there was a female, I can't remember her name actually, but we had contacted her and she was prepared to come in, depending on where the evidence went with regard to a brain defect.  So we had given that information to Doug Tinker and John Gilmore.  It was -- it should have been contained within the information, particularly the lengthy CV, within this information they got.  Obviously, we weren't planning on bringing that in here, so it had no basis for this --

MR. WISEMAN:  Your Honor, I would ask for further disclosure as to what information the Government provided to Park Dietz and this other person as to, you know, whether they did any evaluations, whether they reviewed materials.  I mean, just invoking the name Park Dietz is not a strategic reason for not calling an expert in the case.  I need to know what he knew, what was told to Counsel, and if Counsel acted on it.

THE COURT:  Well, you -- I thought you had all of

Tinker and Gilmore's files.

MR. WISEMAN:  I have not seen anything relevant to Park Dietz or --

THE COURT:  You didn't see the 65-page --

MR. WISEMAN:  I do not recall seeing it.  There's no material --

THE COURT:  Are you saying you don't have it or you don't recall it?

MR. WISEMAN:  I don't recall it.  There's 12,000 pages, so I guess it's possible it's in there.

THE COURT:  Well, I mean, that's --

MR. WISEMAN:  But even if the resumé is in there, my point is still that just invoking the name is not, would not provide Counsel with a strategic reason for not calling an expert.  We need to know if this expert Park Dietz reviewed anything, if he had any opinions.  Because then Counsel should have said to Mr., Dr. Cunningham, "Look, they're going to bring in Park Dietz, and he's going to say X, Y and Z.  What are you going to say about that?"  And without that information, I think it's a red herring.  And it's extra red, and it's a rather large herring.

MR. ROBERTS:  Your Honor, all I -- I mean, we spent some time on the phone.  We e-mailed them the information that we had with regard to the case.  We sent that to Park Dietz. And all I can tell you is that we informed that it was

rebuttal, so there was no report.  There was nothing that was -- we just told them that if they got into the area of trying to limit his violent nature, that we would be, you know, we would be prepared to rebut if they got into that area.

MR. WISEMAN:  Your Honor, Federal Rule 12.2, Federal Rule of Criminal Procedure requires in a capital case that if the Government is engaging in any type of mental health evaluations or analysis that they not only disclose it to the defense, but they have to segregate the prosecution team from that information, because the case might not ever get to a penalty phase.

So what we have here is a situation where the Government is violating that rule.  We have a very serious matter.  I think I have to get Mr. Dietz, Dr. Dietz in here, and whoever else he was working with, find out what they were told, what they told the Government.  For all we know, they gave the Government opinions that were improperly provided.  And this opens up a rather large can of worms.

Now, of course, if the Court wants to find that Counsel did not rely on this abstract invocation of Park Dietz's name --

THE COURT:  Well, I thought you were going to have Mr. Gilmore in here.  You can find that out yourself.

MR. WISEMAN:  Well, I'll find out what Mr. Gilmore knows about it, but that doesn't mean that the Government told

Mr. Gilmore everything they knew.  And it doesn't mean the Government didn't violate 12.2.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, there was no, there was no -- there was simply a communication made on the United States' part, with Park Dietz asking what, if anything, that they would comment on if Dr. Cunningham presented the evidence that we thought they were --

THE COURT:  Well, apparently Mr. Tinker and Mr. Gilmore were satisfied --

MR. ROBERTS:  We told, we gave them --

THE COURT:  -- with that representation.

MR. ROBERTS:  Yes, Your Honor.  We gave them the CV and said, "Look, depending on what he says, we're going to bring this person in to rebut."

THE COURT:  "And this is what he's going to say."

MR. ROBERTS:  And we thought that there was going to be some argument about the brain injury, was one of the -- was the primary area we were going to get into, was the fact that he had lied already and that we didn't have a brain injury.  But it was my understanding that some of the brain injury defect issue was going to go towards the future dangerousness issue.  We brought Dr. Estrada in.  There was no witness.  There was no due process violation.  It was simply a decision that Doug Tinker and John Gilmore made with regard to what's

the best way to proceed in the case.

THE COURT:  Okay.

MR. WISEMAN:  It's actually an Eighth Amendment violation and rule of criminal procedure violation.

THE COURT:  Okay.

MR. WISEMAN:  But that's beside the point.

THE COURT:  You're overruled.  Continue on with your questioning, please.

MR. WISEMAN:  Actually, I'm done with my questioning.  Thank you, Your Honor.

THE COURT:  Thank you, sir.  Anything further, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may stand down.  Call your next witness.

MS. LARIN:  Your Honor, I call Carl Henry, please.

CARL HENRY, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good afternoon, Mr. Henry.

A.   Good afternoon.

Q.   Would you please state your name for the record?

A.   Carl Kevin Henry.

Q.   And I know you have a plane to catch, so I'm going to try my best to talk fast.  Okay?

A.    Okay.

Q.    How do you know Mr. Bourgeois?

A.    He's a relative, first cousin of mine.

Q.    And did you grow up with him on Bend Lane?

A.    Yes, I did.

Q.    And what is your date of birth?

A.    August the 8th, 1963.

Q.    So you are a little less than a year older than him.

A.    Yes.

Q.    About the same age.  Can you briefly just describe what you observed about Mr. Bourgeois's family life as a child?

A.    Well, he wasn't had, afforded a -- I can't find the word for it -- but as most kids, as I had growing up, you know, trips and things like that, that I had the pleasure of doing with my parents.  His family did, but he didn't have the luxury of taking part in some of the family outings that was, that his family took part in.  And in some ways, he was, you know, left behind on a lot of things.

Q.    And why, why do you think that is?

A.    Well, his mother had a resentment from him, due to his father and her and a relationship that was a one-night relationship, and it didn't work out.  And you know, she kind of held him, you know, took the misery of her, that relationship out on him.

Q.    Did you see any evidence of abuse by her, by his mother to

Alfred?

A.   Yes, I did.

Q.   What did you observe about Mr. Bourgeois's school achievement as a child?  How did he do in school?

A.   Well, he didn't -- he wasn't on the average, like the other kids.  He had -- the other kids had several classes that they would go to, you know, as part of their schooling.  But you know, and a lot of kids would tease him because he had, he stayed in this one class all day.  You know, it was considered -- it's called Title I now, but it's just another, sort of say upgrade name for special education.

Q.   Okay.  And do you have any knowledge whether he ever failed any grades?

A.   Yes.

Q.   And what --

A.   I think it was the third grade he failed.  He went to summer school that year.  He advanced -- through summer school, he advanced to fourth grade.  And he failed again in the fourth grade.  And his mother didn't let him go to summer school this time.  He stayed back.

Q.   So he had to repeat the fourth grade?

A.   The fourth grade, yeah.

Q.   And you went to the same school as he did?

A.   No.

Q.   You did not go to the same school?

A.    No, I didn't go to the same school.

Q.    So how do you know this information?

A.    Well just, I spent most of my weekends, and he and I, we talked.  You know, we're relatives, but we were like brothers, we were like two brothers, because we shared a lot of time together during the summers.  And on summers, when I would go out there, the first time he was in summer school, and I asked him, I said, "Are you going to go to" he said, "No, my mom told me I can't go."  She said, "I failed.  I'm going to have to take my punishment.  That's being kept back.  I'm not going to go forward."

Q.    Okay.  Did you notice any other problems, any other areas where Mr. Bourgeois was not able to achieve, as a child?

A.    Well, he was slow when -- bicycle riding, board games that we would play.  A lot of activities that we played, you know, he was a little slow, you know, as far as like when new games would come out and we'd play them, you know, he would have a little trouble catching on to it.  You know, and bicycle riding, you know.

Q.    Uh-huh.  Okay.  Quickly moving forward, moving on, did you have any part to play in Mr. Bourgeois later becoming a truck driver?

A.    Yes, I did.

Q.    And can you please describe that for us?

A.    Okay.  At the time when Alfred was hired at Schwegmann

Supermarket, I was the dispatcher, dispatcher in charge. And he, once he got hired, he came over and he informed me, he said he had just got a job on, and he liked the big trucks, and he wanted to drive it. At that time he was hired as a porter in the warehouse department, and I instructed him, I said, "Well, you need a little time on the job, and you know, I'll put your name on the list, and just do what you got to do, stay out of trouble, work hard, come to work every day, and you know, when something comes available, you'll get that shot."

Q.   Okay.  And so then he moved over to the trucking end?

A.   Yeah, we had an opening came about, and at that time I became assistant manager over transportation.  We had, an opening came for the buggy, what we call our buggy truck.  And that position was given to him to be a buggy, buggy retriever.

Q.   Can you tell me -- do you know another word for "buggy"?

A.   Basket, shopping cart.

Q.   Okay.

A.   Okay.

Q.   So what was the buggy truck?

A.   Okay.  The buggy truck, that person, their job was every morning, they would go out, they would be assigned a store, one of the stores.  They would check in with that store manager.  That store manager would then take one of his employees from within the store to accompany Mr. Bourgeois.  They would canvas the neighborhood with a trailer on the back of the truck,

picking up baskets.  That's all they would do, just canvas the neighborhood.

Some residents would call in and say, "I got one of your shopping carts on my street.  I need you to come and get it." That's what they would do.  And he would -- him and the person from the store would ride around, and when they get a load, they'll go bring it back to the store and go out again.  That was his job throughout the day.  And at the end of the day, he would come back in.

Q.   Okay.  And can you tell a little, tell us a little bit about the process of training Alfred to promote through the trucks and learn how to drive the trucks?

A.   Okay.  The first position, the entry position was, like I said, the buggy truck.  That was basically a Ford, Chevy, just a standard pickup truck, long bed pickup truck, automatic transmission.  You would just drive around canvassing the neighborhoods.  And then from that we put you onto what's called a bobtail truck, which is a van, a van truck, some of them refrigerated, where you would go from the warehouse to a store delivering goods.

We started him on that position, and he had a few problems, so we brought him back to the buggy position.  And the person that was on the buggy truck, we moved him forward, and I gave him some personal insight as to what he needed to do in order to excel at that position.

When the position became available again, we put him on it again, and we let him rode with somebody so he can get the full understanding as to how that position operates, where you go from the warehouse to the store, get the merchandise, bringing it back and forth.

So he rode with somebody for -- I'm trying to -- he rode with somebody for a while, a Mr. Andrew Jefferson for a while, till he was the senior buggy -- senior stake driver. He rode with him a while till Mr. Jefferson felt he was comfortable with him doing it. So that's when we released him. But he mainly drove from the warehouse to the store, back to the warehouse, from the warehouse to a store, back to the warehouse.

Q.   Now, this method of letting him move onto the next truck and then having to bring him back, was that, was that a sign to you that he was having some difficulties learning?

A.   Yeah. Whenever, when we put somebody on a particular truck, if the instructor said, that's training them, said, "Okay, they're able to go," we'll put them on a trial period. And you know, being in the grocery business, we have a time frame, and we need to get goods from Point A to Point B in a timely manner. And if it's a problem where you're having a little trouble, you know, understanding and getting the freight moved, the goods moved, then we, you know, my manager said, "Hey, we're having problems. You know, it's taking too long to

get this there," or "Where is he at?"  You know, so we brought him back, put him on the buggy truck, let him did that. Because after he got that down, he was good at it.  And he had somebody there with him constantly to help him, you know, with the neighborhood and everything like that.

So we brought him back.  And when the position came open again, we put him back on the truck again, and we trained him with somebody, and we said, we want him to specifically learn to go from Point A to Point B, Point A to Point B, and just show him.  And that's what we did.

Q.   Okay.  And did it take Alfred longer to learn how to drive?  Is what you're telling us, is that a longer process --

A.   Yes.

Q.   -- than what other people took --

A.   Yeah.

Q.   -- to learn how to drive?

A.   On average, once you move from the buggy truck to the van truck, you know, it usually takes a week to two weeks to grasp the concept.  It took him, you know, it took him longer than that.  Matter of fact, like I said, we brought him back to the buggy truck, and then we reintroduced it to him later.  At a later time --

Q.   Okay.

A.   -- we introduced it to him again.

Q.   And were there any other limitations to what, in Alfred's

Q.   job performance?  Did he have some other problems on the job that you recall?

A.   Well, we had forms that had to be filled out, where you, when you go to the store, you know, the managers and everybody, the clerks would have to sign off on what you're bringing them. And from time to time, we would have signatures that, you know, was left out.  Mileages on the fuel report at the end of the day, maintenance sheets, you know, he required extra help with that.

You know, when he fuel up his truck in the evening, you know, he would sometimes forget to put the mileage, how much fuel he put in there, you know.

Q.   And who would give him that extra help?

A.   I would help him.

Q.   And what exactly did you do to help him with those forms?

A.   What I did, I made him a master sheet.  I said, "Okay, this is your master sheet.  Before you bring the paperwork to me, I want you to make sure your sheet has something on every line that I gave you."

Q.   Okay.  And you had mentioned that you had had him go from Point A to Point B --

A.   Yeah.

Q.   -- point A to Point B.  Why did you have to do that?  What do you mean by that?

A.   Well, we had -- we had three trucks, and we had three of

those type trucks.  And some of the trucks may leave in the morning, and we wouldn't see them till the end of the shift. Those were the more seasoned drivers that we felt comfortable with.  We just let them run from store to store.

We also had one truck, the truck that Mr. Bourgeois drove. We had that one scheduled to come back so that we can give specific instructions as to what we want him to do, so we can, you know, being that we had problems with him grasping the system, we wanted to closely monitor and observe what he's doing to make sure that we get what we wanted done, properly and in a timely manner.

So we would basically send him to the store, have him come back.  You know, when he get to the store, he would call us, "I'm here.  This is what I -- I'm finished this.  What y'all want me to do?"

"Come on back to the warehouse."

Q.   Okay.

A.   "Call me when you get to the warehouse."

Q.   Did you ever try to give him a task that was more than Point A to Point B and have him, you know, do three or four things in sequence?  Was he able to do that?

A.   It was tried a couple of times.  But we had, you know, problems with the wrong merchandise being delivered to the wrong store, you know, so we went to the one -- we put him back on the, just straight A, Point A to Point B.

Q.   So if he's making these sorts of mistakes, why didn't Mr. Schwegmann just say, "Let him go"?

A.   That's not the way Mr. Schwegmann operates.

Q.   Can you tell us a little bit about how Mr. Schwegmann operated?

A.   Mr. Schwegmann was one, he had himself a brother that was mentally handicapped, and he had -- he felt he had an obligation to help someone that needed help that was willing to work and willing to learn and just at least show the initiative that they wanted to do good.  And he was willing, you know, he was willing to give that extra training.  He didn't want us to fire somebody.  He wanted us to spend that extra time to try and help them, so that they can, you know, succeed in that job.

You know, when he hired truck drivers, he didn't want the truck drivers that had been out there driving 10, 15 years.  He wanted somebody that never drove.  Everybody he hired, from the manager, meat cutter, anybody, he trained them how to do that position.  He didn't hire anybody -- none of his managers were hired off the street.  They all went through the ranks.  I started out at Schwegmann in high school working part-time and just moved up the ranks.  That was his philosophy.

Q.   And were there other drivers there that had limitations in some way?

A.   We had some older drivers that had, you know, limitations, and we did pretty much the same thing with them, because they

had -- some of them had been there since the company started. They couldn't read well. They couldn't write well. So you know, we reached out and we tried to help everybody. That's just the way he wanted us to do it.

Q.   Okay. So when Alfred moved on to the bigger trucks, he had to do more paperwork, I would imagine.

A.   That's correct.

Q.   Did he receive help from anyone else in those areas?

A.   When Alfred, when he got ready to train on the big trucks, we assigned him to the senior driver, Mr. Calvin Cryer. He's deceased now. But Calvin Cryer was one of the drivers that started out with Schwegmann. Didn't have much education, couldn't read well, and he took Alfred in and he trained him how to do things the way he did it. And one of the reasons why we assigned him to Mr. Cryer, because we know Mr. Cryer, they could work together because they was pretty much on the same, same level as far as communicating. They communicated well. When Alfred was on the flat, the van truck, he and Calvin would talk, and Calvin would take up a little time with him, and he would kind of -- Calvin understood what he was going through, because Calvin was pretty much limited himself. So he took Alfred in and he trained him on the trucks. And it took him a little longer to get the training, and Calvin didn't turn him loose till he felt he was confident enough to handle the truck safely.

Q.   And how about when he got to the stores, did he need help on the other end?

A.   When he got to the stores, being that he worked with Mr. Calvin, Mr. Calvin had a philosophy, the way he did business --

MS. BOOTH:  Your Honor, I'm going to object, because I don't think he could testify to what happened at the other stores unless he was there.  That, I mean, we're getting really far away, and we're talking about, in response to the question, Mr. Calvin's philosophy.  And the question was asked what happened at the other stores.  So there's my objection.  It's too far, Your Honor.

THE COURT:  Would there be a legal objection in there?

MS. BOOTH:  It would be a legal objection as to him speculating as to what would have happened at the other places when they got there, and he wasn't there.

MS. LARIN:  Could I lay a foundation, Your Honor?

THE COURT:  Yes.

BY MS. LARIN:

Q.   Did you ever see Alfred at the other end at the stores?

A.   I've had opportunities to go to some of the other stores and observe him at the store.  I've talked with some of the shipping clerks at the store that informed me of, you know, because we as managers, we have to go out and do random

observations of the employees as to what they're doing and ask questions.  And I've had the opportunity to go to some of the other stores.  That's where I learned the concept that he was doing was the concept --

Q.    That you would like to talk about.

A.    -- that Mr. Calvin was doing.

Q.    Okay.

A.    It was the same -- it was identical.

Q.    And what was that?  What would they do at the stores?

A.    Mr. Calvin, what he did, because he was limited, he made everybody like him.  He made everybody love him.  And by that, whenever he would go to a store, if it was the shipping clerk's, if it was her birthday, he would bring her a cupcake, he would bring her breakfast, or he would bring her lunch.  And when he came, he got royal treatment, because he would bring them a gift, or if it was their birthday, he would bring them a card, you know.

Q.    And when you say "royal treatment," what do you mean?  What would they do?

A.    When he pulled up, he didn't have to do anything.  They made sure his paperwork was correct.  They made sure his loads, everything was taken off properly.  He didn't even have to unload his truck.  They got one of the dock hands to unload his truck for him.  And they would make sure if he had something to pick up, it was on the truck, the truck was properly loaded, it

was sealed, decaled and everything.

Q.   And was this the same for Alfred, Alfred did this?

A.   Yeah.

Q.   Was Alfred ever a dispatcher at Schwegmann's?

A    No.

THE COURT:  Could you call people by their last names, please?

MS. LARIN:  I'm sorry.  I'm so used to -- I'm sorry.

BY MS. LARIN:

Q.   Was Mr. Bourgeois ever a dispatcher as Schwegmann's?

A.   No.

Q.   And why not?

A.   That wasn't his job function.  The way dispatchers were chosen, they chose them by their leadership quality, their motivation and they're able to interact with the employees, to lead them.

Q.   And would Alfred have qualified for that job at that time?

A.   No.

Q.   Do you know where Alfred went in his career after he left Schwegmann's?

A.   After he left Schwegmann, he went to work for Matlack.

Q.   And after that, did you keep track of Alfred's career in any way?

A.   Not during the time, during his tenure at Matlack, I didn't keep track of his career.  The last company he worked

for, U.S. Express, you know, I had the chance to spend some time with him, and you know, take a trip with him to the company headquarters one time.

Q.   And when was that, approximately?

A.   I want to say 2002.  I'm not sure.  I don't want to --

Q.   Okay, but --

A.   I don't want to say, give a date and it's not the correct date, but --

Q.   Okay.

A.   -- we had, I had the opportunity -- he was with U.S. Express, and he wanted me to join their team, and he asked me to take a ride with him to Birmingham to company headquarters. I said, "Well, I just can't up and go like that."  He called the people and they said, "Yeah, bring him."

Q.   Okay.

A.   So I traveled with him to Birmingham, to their regional -- I think that was their regional headquarters.

Q.   And you think this was some time around 2002?

A.   Yes.

Q.   And you drove with him in the truck?

A.   He drove to Hattiesburg, and at that point, from Hattiesburg, I drove into Birmingham for him.

Q.   Okay.  And did that truck have any special technology?

A.   The truck had one of the newly installed, it's a QUALCOMM satellite system that's used to track trucks and to keep in

contact with them.  He had one of those systems in his truck.

Q.    And were you able to watch Alfred use that system?

A.    Yeah, if you call it --

Q.    Can you describe that, please?

A.    We were driving, right before I took over driving for him, we were driving into, I think that was Hattiesburg where I took over.  And the red light came on, and I said, "The red light came on."  He said, "Oh, they trying to reach me."  I said, "Well, are you going to" -- he said, "No, it don't come on while you're driving.  You have to pull over."  I said, "Are you going to pull over?"  He said, "No, I'm not going to pull over.  When I let you drive, I'll pull over and see what they want."

So when we pulled over at the truck stop, I said, "I want to see how this thing works.  This is something new.  It's nice, computer in the truck."  He said, "I'm not going to use that.  I'm going to go call them."  And that's what he did.  He went and called the dispatcher.

Q.    Okay.

A.    And they wanted to find out if he wanted to take another run, but he told them that, "No, I'm coming in with my cousin."  He told them, "Y'all are supposed to talk with him, and then I'm supposed to have another load going back to Louisiana."  And that was that, you know.

Q.    Uh-huh.  When you -- did you have any interaction with any

other people that worked at that company when you got to Alabama?

A.   Yeah.  We got to Alabama, we got there early that morning, so they hadn't got there yet, and around 8:00 o'clock, we went there, and I met with the officials there.  There was an orientation class.  I took the orientation class.  And right after the orientation, when they broke for lunch, Alfred asked me to come with him to join him for lunch.  He was taking a couple of the dispatchers out to lunch, you know, for being nice to him and, you know, that was his -- he was treating them to lunch.  So we took them out to lunch.

Q.   And when you say, "for being nice to him," what do you mean by that?

A.   Helping him -- he said they help him out with his paperwork, you know, keep him on, you know, making sure that, you know, he had the loads that he wanted and that, you know, they made sure his paperwork, if there was a problem or anything, they interceded for him.

Q.   So Alfred is what they call an over-the-road trucker?

A.   Yes.

Q.   And do you know what kind of routes -- I always say the word wrong.

A.   Routes.

Q.   -- routes he drove?

A.   He ran a dedicated route.

Q.    What is a dedicated route?

A.    A dedicated route is, for instance, you would go -- his route that he had, he would go to Chalmette, Louisiana, to Domino Amstar Sugar Refinery, pick up liquid material to make Coke, Coca-Cola beverages, and go to Atlanta, to their -- to their manufacturing warehouse, just drop that off.  And then just back and forth.

Q.    So that's an example of a dedicated route?

A.    That's a dedicated route.  You run that route.  That's the only thing he does.

Q.    Okay.  And so your, that's your understanding of most of his career, he was driving dedicated routes.

A.    Yes.

Q.    Would Alfred ever admit he was having any difficulties to you?

THE COURT:  Please call him by his name.

MS. LARIN:  I'm so sorry.  Would Mr. Bourgeois -- it's been a long day, Your Honor.

BY MS. LARIN:

Q.    Would Mr. Bourgeois ever admit to having any difficulties or weaknesses to you?

A.    No, not really.  He was pretty much a proud guy.  And he wanted everybody to feel he was on the same playing field that he was on.  Now, you know, when I would get the paperwork, and if something wasn't right, I would call it to his attention.

He said, "Oh, man, I forgot. I was thinking about this. I was, you know, you know, trying to get off, you know, and tie," you know, but he wouldn't just come out to me and say, "Hey man, I have a problem. Can" -- you know. He wanted to be independent, you know, be on the same level as the other drivers.

Q. Okay. And what is your profession right now, your occupation right now?

A. Okay. I'm employed with RSC Equipment Rental. I'm the inside sales manager. My job title is inside sales. I also do all the training for the employees. I'm the defensive driving training. I also train all employees and potential and current customers how to drive scissorlift, forklifts, manlift. Anything that we have, I have to train new employees how to operate it and certify them that they can operate it before we allow them to operate them on their own.

Q. And you testified at the penalty phase of Mr. Bourgeois's trial?

A. Yes, I did.

Q. And it came out at trial that you had a prior conviction, or some prior convictions?

A. That's correct.

Q. And had you told trial counsel or anyone from the defense team about those prior convictions before you testified?

A. On initial visit when they came to visit me on my job, I

asked them would that be a problem with me going, because of that. And they told me, "Hey, it's been a while. You've fulfilled all your obligations. You haven't had any problems with the law. You know, you've been an upstanding citizen. You know, everybody's entitled to one mistake, you know, and it's evident that you, you know, you've made your corrections and you're doing what you have to do." It wouldn't be a problem.

Q. Okay. Who was it that you talked to about this?

A. Mr. Bierbaum.

Q. And when you said he came out to your job, this was in Louisiana?

A. He actually came and visited me --

Q. Okay.

A. -- on my place of employment --

Q. Okay.

A. -- when he came to talk to me about the trial.

MS. LARIN: No more questions, Your Honor.

THE COURT: Thank you, ma'am.

CROSS-EXAMINATION

BY MS. BOOTH:

Q. Hello, Mr. Henry.

A. Hi.

Q. You have been consistently here for Alfred, haven't you?

A. Yes.

Q.   You came and you got beat up the last time because of your convictions.  Right?

A.   That's correct.

Q.   And, but didn't you testify that your convictions were expunged?  Isn't that what you told the Court?

A.   I was misinformed when I told them that.  That was in error.

Q.   Okay.  But hadn't you told the Defense Counsel that your criminal history had been expunged?

A.   No.  When Mr. Bierbaum came, I told -- when he came to my job, I informed him that I had the convictions --

Q.   Uh-huh.

A.   -- and that I fulfilled all my obligations to the Court.

THE COURT:  Well, why did you say you were misinformed about them being expunged?

THE WITNESS:  Well, I was in the process, and they told -- what the Court had told me, that once I complete my probation and everything, that it would -- the interpretation they gave me, that it would automatically be expunged, under -- I can't think of the plea agreement that they did.

THE COURT:  Okay.  So you thought they were expunged?

THE WITNESS:  Yes.  Yes, ma'am.  I thought they were expunged.

BY MS. BOOTH:

Q.   All right.  And you had told that to Mr. Tinker, hadn't

you?

A.   I can't remember Mr. Tinker.

Q.   Do you remember --

THE COURT:  Well, one of the lawyers for Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  Do you remember telling him that?

THE WITNESS:  No.  The only person I talked to, I told Mr. Bierbaum --

THE COURT:  Okay.

THE WITNESS:  -- that -- he and I had talked in detail about that when he came to my job.

THE COURT:  And you told him they had been expunged.

THE WITNESS:  And I told -- yeah.  I said, "I fulfilled my obligations, and that upon completion of my probation and everything, my court obligation, that it would be expunged."

THE COURT:  Thank you, sir.

BY MS. BOOTH:

Q.   And that's exactly what you testified to in the courtroom the last time.  And you were the police officer that had the three convictions for fraud.  Right?

A.   Insurance fraud, that's correct.

Q.   Insurance fraud.  Okay.  Now, but back to what I was talking about, you have been consistently there for your

Henry - Cross

cousin, haven't you?

A.   Him and all my employees.

Q.   All right.  But I mean you are -- so you were born in 1965?

A.   1963.

Q.   '63.  And he was born in 1964.  So y'all are about a year apart.  Right?

A.   Okay.

Q.   Okay.  And when you were growing up, did you live in The Bend?

A.   On the weekends and during the summer.

Q.   Okay.  And when is it that you first met Alfred?  How old was he?  Was he living at his mom's house, or was he living somewhere else?

A.   Well, I'm not going to say when I first met him, because I've known him all my life.

Q.   Okay.

A.   So I can't say when I first met him.

Q.   So you knew him, and y'all were, I guess you were friends --

A.   Peas in a pod.

Q.   Peas in a pod, that's good, when he was living with his mother.

A.   That's correct.

Q.   And do you remember if he moved somewhere else?

A.   Yes.

Q.   And where did he move to?

A.   He moved with Ms. Mary Clayton.

Q.   All right.  Now, I believe you testified before that, I mean about that before, and why was it that Alfred ended up over at Ms. Mary's?

A.   Alfred ended up with Ms. Mary because as a child in the community she observed, seen and was privy to the abuse that he was subjected to with his parents.

Q.   Uh-huh.

A.   So she took him in.

Q.   Now, do you remember testifying about this before?

A.   Yeah.

Q.   All right.  And do you remember saying that, yes, when someone, when Mr., I believe it was Mr. Gilmore asked you, "Do you recall a time when he went to live with someone else?"  That was the question.

     Do you remember saying, "Yes, as there was an elderly lady in the community.  She goes by the name of Ms. Mary Clayton.  When she got up in age, she couldn't care for herself.  So at that point in time, she asked Eunice, could one of her daughters come and live with her to help her, help assist her, and you know, bathing and making sure that she took her medicine and eating and stuff like that.  And none of the daughters wanted to go.  So Alfred's mother, Eunice, insisted

that he go.  So you know" -- and then you went on to tell how, at 5:00 in the evening, when the other kids were out playing or doing stuff, Alfred was stuck over at Ms. Mary's helping her.

A.    Yeah.

Q.    Now, is that true?

A.    That's correct.

Q.    Okay.  And when he was -- did you ever visit him at Ms. Mary's?

A.    Uh-huh.

Q.    Okay.  Do you know how old he was when he went to Ms. Mary's?

A.    I think seven.

Q.    Okay.  So he was seven, and he was put over at Ms. Mary's house to take care of an elderly lady.

A.    To assist her.

Q.    To assist her, right.

A.    Yeah.

Q.    Did she have any problems with any of her legs?

A.    Yeah, one of -- she damaged -- one of her legs was injured in a car accident.  On her way to church, she was sitting on the tailgate of the truck.  A guy made a sudden stop, and she damaged her leg.  And she didn't want to go to the doctor.  And as a result, she had trouble with one of her legs.

Q.    All right.  And so in this house where he lived starting at seven, did they have running water?  Or did they have to

bring water in to take a bath?

A.    I can't -- I can't answer that, because I can't be for sure.  I mean, that was a while back.

Q.    Right.  Right.  You were, like what, eight years old --

A.    Eight years old.

Q.    -- when he moved there?

A.    Yeah.

Q.    So you two guys are first graders.

A.    Yeah.

Q.    And you're visiting on the weekends and in the summers.  Right?

A.    Yes.

Q.    And so what are the things that he would do?  You said that he would make sure that she got her medicine?

A.    Yeah.

Q.    And make sure that she ate?

A.    She had her food there, and he would make sure that she had her food.  He didn't cook.

Q.    Uh-huh.

A.    He didn't say, "Okay, you need to take two prescriptions of this."

Q.    Uh-huh.

A.    He would make sure -- she would say, "Get that pill bottle there for me," and he would do it in that sense.

Q.    Okay.

A.   He didn't -- when I said "care" --

Q.   Uh-huh.

A.   -- he was there, more or less there.  If she fall, she had somebody there to get help.

Q.   Okay.  And did he help her to take her to the bathroom so she could bathe?

A.   No.  To my knowledge, no.

Q.   Okay.  All right.  So bathing and making sure she took her medicine.  So you didn't -- okay.  But you did testify to that earlier.

A.   When I said "bathing," he may have ran her water.

Q.   Okay.

A.   You know, that's -- typically, that can be described as assisting her taking a bath.

Q.   Right.  Right.  Now, did Ms. Mary cook?

A.   To my knowledge, yeah.  She baked pies, she baked cakes. I mean, she was the baker lady.

Q.   All right.  Did she sell things out in the community?

A.   Yeah.

Q.   And did Alfred help her take those things out there and sell them?

A.   He would carry the bags that she had the pies in, and when she get to the church, some of the church sisters would help her with the pies and everything.

Q.   Okay.  And how about her house, who kept her yard?  Isn't

Henry - Cross

that something that Alfred did?

THE COURT:  Please call him by his last name.

MS. BOOTH:  I'm just as bad --

THE WITNESS:  Ms. Clayton.

BY MS. BOOTH:

Q.   Isn't that something that Mr. Bourgeois did?

A.   As he got older.

Q.   Uh-huh.

A.   As he got older, we all did.  We cut grass, you know, and stuff like that.

Q.   Right.  Normal stuff that boys do?

A.   Yes.

Q.   Cut the grass, take out the trash.  Right?

A.   Yeah.

Q.   Now, Alfred has beautiful green eyes, doesn't he?

A.   Well, I'm a man --

Q.   Oh, okay.

A.   -- I'm not going to say he got beautiful green eyes.

Q.   As Alfred got older, he was an attractive male to the girls, wasn't he?

A.   Well, I'm going to let you say that.

Q.   So as -- sorry.  You got me there.  I have to back up a little.

A.   Take your time.

THE COURT:  You got her all flustered there.

MS. BOOTH:  I'm all flustered.

BY MS. BOOTH:

Q.   Okay.  Now, when he was young, seven and eight, and you were his buddy, and you were talking about the school situation, you didn't go to the school he went to, did you?

A.   No.

Q.   All right.  And you never helped him with his homework or anything like that.  Seven- and eight-year-old boys don't get together to tutor, do they?

A.   No.

Q.   No, didn't think so.  Now, as he got older and you were working for Schwegmann's, and you actually got him the job. Right?

A.   No, he got the job himself.  I --

Q.   He got the job by himself?  Okay.

A.   He was hired -- he went, put the application in, to my knowledge.  Got hired as a porter.

Q.   Okay.

A.   And he wanted to get on the trucks.  He was fascinated by it.

Q.   Okay.  Now, do you know how old he was when he did this? Was he still in high school when he did this?

A.   No, because you had to be at least 18 -- I think it's 21 now -- but back then, before they grandfathered everybody in, you had to be at least 18 to hold a chauffeur's license.

Q.   Okay.

A.   To my knowledge.

Q.   And so if I had an application that he filled out and it said that he started there in '85, in, you know, June of '85, that would have made him probably about 19.  Was that about the time you remember him working there?

A.   Could be.

Q.   Okay.  And how long did you -- did you work there the whole time that he worked there?  Or did you move on to another job?

A.   I think he left before I did.

Q.   Okay.  And when you were -- and if I have a thing that says here that he worked there for about five years, that would have been to about 24, would you have any problem with that estimation?  So from 19 to 24, he worked at Schwegmann's?

A.   Okay.

Q.   Okay.  And during that period of time, 19 years old, you start him driving the -- what was it called, the buggy car?

A.   Well, he didn't start --

Q.   No, he started as a porter, right?

A.   As a porter, yeah.

Q.   But when you got him to the buggy, to the buggy, that was just a pickup with a trailer on it?

A.   With a trailer on the back, yeah.

Q.   Okay.  So he was driving a pickup truck that had a

trailer.

A.    Yeah.

Q.    And he had a driver's license to do that?

A.    Driver's license, yeah.

Q.    Wow.  And driving a trailer is not as easy as it sounds, is it?  Because you have to maneuver one vehicle while you're anticipating the moves of another part of that vehicle.  Isn't that correct?

A.    Yeah.

Q.    Okay.  Now, so then he moved up to a van.  Is that what you called it?

A.    Yes.

Q.    And is that -- when you say a van, is that like a minivan, a van like that?  Or are we talking about like an 18-wheeler?

A.    It's not an 18-wheeler.

Q.    It's a little bit --

A.    It's pretty much like a stake body truck --

Q.    Okay.

A.    -- with a closed body on it.

Q.    All right.  And then you put everything in the back.

A.    Put everything in the back.

Q.    Okay.  And that was -- how old would he have been when he started doing that?  Twenty?  Twenty-one?

A.    Twenty, twenty-one maybe.

Q.    Okay, 21.  And then he -- and you said that he did that

for about five years, and working with Mr. Calvin, and he learned how to schmooze the girls, right, with the cupcakes and the birthday remembrances. Right? So we have Alfred pulling into these --

THE COURT: He's shaking his head yes. He's not responding, but --

BY MS. BOOTH:

Q. Right. So we have Alfred with these pretty green eyes going into these, going into the different --

THE COURT: Mr. Bourgeois.

MS. BOOTH: Mr. Bourgeois. I'm sorry.

BY MS. BOOTH:

Q. -- with these pretty green eyes, driving into the stores to make deliveries, with cupcakes, remembering birthdays, and so he's having an easier time with his loading and unloading. Right?

A. That's right.

THE COURT: Sorry?

THE WITNESS: That's correct.

THE COURT: Okay. Can you hear him, Ms. Gano?

COURT RECORDER: Just barely, Your Honor.

THE COURT: Okay. Can you move up, please?

THE WITNESS: Sure.

THE COURT: Put your right arm on the shelf in front of you.

THE WITNESS:  Okay.

THE COURT:  And it makes you go right into the microphone.

THE WITNESS:  Oh, okay.

THE COURT:  Thank you, sir.

THE WITNESS:  How's that?

THE COURT:  Perfect.

BY MS. BOOTH:

Q.   That's good.

A.   Okay.

Q.   Now, did you help him get a job with Poole Trucking Lines?

A.   No.

Q.   All right.  Now, Poole Trucking Lines, that's the big 18-wheelers.  Right?

A.   Yeah.

Q.   All right.  And you didn't help him.  He got that all by himself.

A.   To my knowledge.  I didn't -- the last company, like I said earlier, that I know he worked with was Matlack, and after that was U.S. Express.

Q.   Right.  Did you know that he also got a job at Eagle Motor Lines?

A.   No.

Q.   All right.  Did you know that he had -- you said that he had a designated route there to Birmingham.  Right?

A.    That's with U.S. Express.

Q.    With U.S. Express.  Do you know that he traveled all over the United States?  In fact, he fathered the child that was murdered down in Livingston, Texas.  Did you know that?

A.    I didn't know where that -- you know, at that point I kind of lost contact with him, because I had moved on and he had moved on.  I was spending less time in the country because I was doing things in New Orleans, so I kind of lost track with him for a while.

Q.    Yeah.  Well, he seemed to be doing pretty well, didn't he?

A.    Well, I can't answer that because, like I said, I had lost contact with him, you know.

Q.    Did you ever visit the home that he bought?

A.    I visited the home -- I think that was the home, for a bachelor party for one of his brothers.  I think that was the home.  It was a home in LaPlace.  I know that.

Q.    A home in LaPlace.  Did he have a swimming pool when you were there?

A.    I don't know.  I didn't go in the backyard.

Q.    So you didn't know he had a swimming pool?

A.    No.

Q.    All right.  Did you know that he owned a motor bike?

A.    I heard.

Q.    Okay.  Did you know -- and he rode that thing around.  Did you hear about that?

A.    I heard.

Q.    Okay.  And he had a sports car at one point, didn't he?

A.    I don't know about that.

Q.    Did you hear about that?  Okay.  So when is the last time really, Mr. Henry, that you really had any good contact with him?  Was it like up to Schwegmann, and then y'all kind of lost contact?

A.    When he left Schwegmann, you know, he pretty much went on his own and was doing his thing, and I was pretty much doing my thing.  And we kind of connected back.  I mean, we would see each other occasionally at church, because you know, if he was home, he was at church on Sundays.  So we got the chance to talk, you know, on Sundays at church, you know briefly, you know, but it was never nothing about business or anything or what you're doing.  It was just casual conversation.  You know, we'd talk, we'd be talking about, and we kind of connected back when he was with U.S. Express.

Q.    Okay.  And let me -- and so at that point, he was trying to get you a job.  Right?

A.    Yeah.

Q.    Okay.  Now, Jacob Clayton, do you know who that is?

A.    A lot of the Claytons -- like you called him Jacob Clayton.  I may not know him by Jacob Clayton.  You got -- he has a nickname.  All of them have nicknames, so you've got to give me the nicknames, because I was real small when they were

pretty much around.

Q.    Okay.  And how were Ms. Clayton's family?  Were they nice to you?  Were they a nice group of people?

A.    The daughters.  I didn't meet many of her sons.

Q.    Okay.  Now, did you -- you said you were at church.  Did you go to Evergreen Baptist Church?

A.    That's correct.

Q.    Okay.  And did you go to Sunday school?  Because y'all are about the same age.

A.    That's correct.

Q.    Did you sing in the choir?

A.    Sang in the choir.  Still do.

Q.    Okay.  And did Mr. Bourgeois sing in the choir?

A.    For a time, yeah.

Q.    All right.  Now, do you have good memories of the time that you spent at Evergreen Baptist Church?

A.    Fond memories.

Q.    Fond memories.  Would you consider that place a safe place to go to?

A.    I consider every church a safe place to go to.

Q.    Okay.  So if I told you that your Sunday school teacher was raping Alfred, what would you say about that?

A.    Well, it didn't happen at church.

Q.    Okay.  What if I told you he said it happened during choir practice?

A.   Well, I would have to -- I don't know.  But I'm saying it didn't happen, you know, during Sunday school.  Choir rehearsal, that's something else.  But it didn't happen during Sunday school.

Q.   Okay.

MS. BOOTH:  You know, Judge, could I just have a minute?  I don't think I have much more.

THE COURT:  Yes, ma'am.

(PAUSE.)

MS. BOOTH:  I have nothing further, Your Honor.

THE COURT:  Thank you.  Anything further?

MS. LARIN:  Very briefly.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   In part, just to clarify the record, you trained Mr. Bourgeois, or you saw Mr. Bourgeois being trained at Schwegmann's, and what -- can you just tell us, he started on the buggy truck, and then did he learn all the trucks?

A.   He went on the buggy truck.  Like I said, he, we moved him up to the bobtail truck, we called it, the bobtail truck.  He didn't do well on that.  We put him back on the buggy truck.  Then we moved him to the -- when another position came available, we tried him again on the bobtail truck, and we kept him on Point A to Point B, Point A to Point B.

Q.   And then did he eventually learn how to drive an

18-wheeler while he was at Schwegmann's?

A.  Yeah, Mr. Calvin, we put him under the tutelage of Mr. Calvin, and he trained him how to drive the tractor-trailers.

Q.  Okay.  And there was a brief mention about a license.  And at the time that Mr. Bourgeois was learning how to drive trucks, what type of license was required?

A.  It was a chauffeur's driver's license.

Q.  And that's not the same thing as a CDL today.  Correct?

A.  No.  It was before the CDL license was introduced.  A chauffeur's license was something that was done on a statewide level.  And after so many accidents and everything, the federal government learned that drivers were going, if they get a DWI in Louisiana, they would drive 40 miles into Mississippi and get another driver's license.  And they would continue their career.  So that's brought on the concept we're going to make it so we can track all these drivers, make sure that they all was on the same playing field.  So they made -- that's how the CDL came about.

Q.  Okay, great.  And there was one other mention that, talking about yard work and stuff, and talking about what all the normal kids did in the neighborhood.  Would you have characterized Mr. Bourgeois as normal as far as his abilities when he was a child?

A.  No.

Q.   And what would you say?

A.   Well, he, you know, he didn't learn how to, when most kids were learning to ride a bike, he still hadn't grasped the concept.  My parents bought us a bike.  It was a bike with two seats, so on weekends, me and Alfred, we would ride that bike, you know, because he would always ride on the back with me.  And we would, it made him seem normal, he was all with the other kids riding.  But because he didn't, he was still yet hadn't learned how to fully ride the bike by himself.

          MS. LARIN:  Okay.  Thank you.  No further questions.

          THE COURT:  Thank you.

          MS. BOOTH:  I don't have anything further, Your Honor.

          THE WITNESS:  Thank you all.

          MS. LARIN:  Thank you.

          THE COURT:  Thank you, sir.  Call your next witness.

          MR. McHUGH:  Donald Reese.

          MR. WISEMAN:  Your Honor, while we're waiting for the witness, could I advise the Court that during this last witness's testimony, I conducted a computer search of the file that was provided to us by Mr. Gilmore, and there is no resumé or CV from Park Dietz in it.  Moreover, there's no communication in it that I could find from the Government with regard to --

          THE COURT:  So you're complaining that the Government

failed an obligation during the trial?

MR. WISEMAN:  Well, I have two complaints, or two issues.  One is I don't know what the Government told Mr. Gilmore or Mr. Tinker with regard to Park Dietz.  If there was a written communication of some sort, I would like to receive it.

My second complaint, which may or may not be one --

THE COURT:  Well, if there's a written communication, you got it in Tinker and Gilmore's file.

MR. WISEMAN:  Well, that's what I'm saying --

THE COURT:  If it's not there, then it wasn't a written communication.

MR. WISEMAN:  Well, that's my request, is there a communication that the Government might have that -- you know, I don't know that Mr. Gilmore's file is in perfect shape.  I mean, it was given to us.  We scanned it, and I don't know that it has everything.  So if they have a communication, I would ask that it be produced so I can see what they told him.

My other complaint, which is a possible one, it's not an actual one yet, is this question about Rule 12.2, but that depends on what they had Park Dietz do.  And I don't know that either at this point.  So I don't actually have a complaint.  But I'd like to see what they told Mr. Gilmore at this point.

THE COURT:  Okay.  Now, I'm just going to suggest for everybody here, I think we're all aware that Mr. Bourgeois is

fighting for his life, and we all recognize the solemnity of these matters and the advocacy of both sides.  I suggest, however, that you make a conscious effort to do this as smoothly as possible.  To be disrespectful to the Court never advances the cause of your client.  So be very careful with that.

So call your next witness.

MR. McHUGH:  Donald Reese, Your Honor.

(Witness sworn.)

MR. McHUGH:  Good afternoon, Mr. Reese.  I just want to caution you at the outset, please do not touch the microphone.

THE WITNESS:  Okay.

MR. McHUGH:  You can lean into it with your right hand --

THE COURT:  But you probably should lean up just a little bit more, so we can hear you better.  Actually, I haven't heard you at all, but --

THE WITNESS:  How is that?

THE COURT:  You might want to lean your right arm on the shelf, and then you're right there in the microphone.  Is that going to be uncomfortable for you?

THE WITNESS:  I can deal with it, I think.

THE COURT:  All right.  Thank you, sir.  Go ahead.

DONALD REESE, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Can you state your name for the record?

A.   Donald Howard Reese.

Q.   Mr. Reese, how old are you?

A.   Forty-nine.  I just made a birthday.  I'm sorry.

Q.   Okay.  And where do you reside?

A.   In New Orleans.

Q.   Okay.  And how are you presently employed?

A.   As a driver, truck driver.

Q.   Okay.  And for what company?

A.   A company called Neff Rentals.

Q.   Okay.  And --

          MS. SALINAS:  I'm sorry.  I couldn't hear him, Your
Honor.

          MR. McHUGH:  I'm sorry.

          THE WITNESS:  A company called Neff Rentals.

BY MR. McHUGH:

Q.   Okay.  So you drive a truck for Neff Rentals.  Is that
right?

A.   Yes.

          THE COURT:  N-E-F-F?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Thank you, sir.

BY MR. McHUGH:

Q.   Okay.  Do you know the Defendant, Mr. Alfred Bourgeois?

A.   Yes.

Q.   Okay.  And how did it happen that you came to first meet him?

A.   Employed at Schwegmann's.  That's where I came to know Mr. Bourgeois.

Q.   Okay.  And where is Schwegmann's located?

A.   St. Rose, Louisiana.

Q.   Okay.  And what type of company is that?

A.   It's a -- well, now it's -- it was a chain grocery store that's no longer in existence.  It went under.

Q.   What type of position did you have with Schwegmann's?

A.   I drove trucks there.

Q.   Okay.  And how about Mr. Bourgeois?

A.   He was also employed as a driver.

Q.   Okay.

A.   When I knew him.

Q.   So would it be fair to say you guys were co-workers?

A.   Yes.

Q.   Okay.  Now, did there come a time when you were working at Schwegmann's and Mr. Bourgeois was working at Schwegmann's where there was a change in the rules concerning taking a test for a commercial driver's license?

A.   Yes.  While I was employed there, the federal government employed CDL, commercial driver's license.  Anyone driving had

to have a CDL.  Prior to it, basically anyone who wanted to drive a truck just had to apply for a chauffeur's license.

Q.   Okay.  And so to get the CDL, what did you have to do?

A.   Take the test that they came out with.

Q.   And did that apply to all of the drivers at Schwegmann's?

A.   Yes.  Yes, it did.

Q.   Okay.  And do you recall, can you recall an incident or a time where prior to the taking of the test that yourself, other employees, including Mr. Bourgeois, received copies -- received a copy of the test prior to the test being taken?

A.   Yes.  Yes, they --

Q.   Can you describe that for Her Honor?

A.   Well, basically when the system was employed, they wanted everyone to make sure that they complied with the changes.  And in order to do so, we had some people that, you know, management felt kind of iffy if they would be able to adhere to the new regulations by passing, you know, the new test.  So it was a test that was floating around that everybody just knew that this was copies of the original test --

Q.   Okay.

A.   -- that you had to take.

Q.   When you say "they were concerned," who is "they"?  The company?

A.   The supervisor.  I can't say the company as a whole, but you know, the management who was over us, you know, was

concerned about he had to fill voids if all these drivers didn't pass this test.

Q.   Okay.  And did the drivers talk among themselves --

A.   Yes.

Q.   -- about how to get a copy of this test?

A.   Yes.  Yes, sir.

Q.   And do you recall that Mr. Bourgeois was part of those conversations?

A.   Well, he was part of the employment there with us, and everybody was there, you know, including myself, so --

Q.   Okay.  Now, moving on from that incident, did you eventually leave Schwegmann's?

A.   Yes, I did.

Q.   Okay.  And where did you go?

A.   I went to a company called Matlack.

Q.   Okay.  And what did you do for Matlack?

A.   Drove trucks.

Q.   Okay.  And while employed at Matlack, did Mr., did you again run into Mr. Bourgeois?

A.   Yes, I did.

Q.   Okay.

A.   Yes.

Q.   And by the way, are you friends with Mr. Bourgeois, or were you co-workers?

A.   Just co-workers.

Q.   Okay.  And so how did you run into him at Matlack?

A.   Unbeknowing to me, I'm thinking Alfred had to leave before I did and went over there.  I didn't know he had left.  But in the system, I found out that the guys at Matlack told me, "Okay, well, I see you have one of your co-workers over here." I'm like, "Well, who is that?"  And they say, "Alfred Bourgeois"  I say, "Oh, okay, Bourgeois."  I said, "Okay."  And so I found out, that's how I found out.  He didn't tell me that he was going over there.

Q.   So it was a coincidence --

A.   Exactly.

Q.   -- that you both ended up at the second company, Matlack.

A.   Right.

Q.   Is that right?

A.   Right.

Q.   Okay.  And did there come a point when you were employed at Matlack where you actually worked closely with Mr. Bourgeois?

A.   Yes.  They actually put us together as a team, and I guess that the reason why, because he and I both came from the same place, and we ended up at the same place.  But you know, it was just a coincidence.

Q.   Now, when you say "a team," did they have a term for that, as far as what you --

A.   "Team drivers," that's it.

Q.    So it was called "team drivers"?

A.    Yes.

Q.    So were you both driving the same truck?

A.    Yes.  We were both assigned to the same truck.

Q.    Okay.  And I want to focus you in on that part of your employment with Matlack when you were working with Mr. Bourgeois.  Do you recall an incident where Mr. Bourgeois had trouble with the console of the truck, as far as the buttons?

A.    Yes.  The very first day he and I were assigned to the truck, I thought it odd, for me, you know -- this is the first time that I really came that close with him as a working, you know, partner, companion, well, whatever you call it.  And he was just in the truck just clicking buttons, you know, like click, click, wonder what happens if I do this, do this, do this.  And I just thought it was odd.  And he hit a switch for something that's called a brake retarder.  I found out after he hit the switch what it was.  I didn't know prior to.  And he couldn't, you know, explain or tell me exactly what it was he had done.  And I wasn't watching him, so I didn't know what it was that he did.  And so I'm figuring, okay, something's wrong with the truck, we done did something, and I thought we got it out of whack or tored up or something.  So I said, "Well, let's -- since it is driveable, let's drive it to the mechanic shop and ask them to take a look at it."  And on our way over

there, he kept, you know, he finally told me, "Well, I kept messing with the buttons over there, so I'm going to just start doing this, doing this, doing this."  And so eventually, he hit the right button, and the truck, you know, began to drive properly again.

Q.   Was the truck able to drive properly after he had hit the button the first time?

A.   Well, if you knew what it was that he had done, once you engaged this button, well, then you have to change your procedure of the way you drive the truck, okay.  And I didn't know that the truck was, you know, equipped with this button.  He didn't know it.  So I guess we both trying to figure out what's going on.  But at this particular time, he was in the driver's seat, and I was like in the back.  So I didn't know what was going on.  So I said, "Okay, well, you get out of the seat.  I'll take over, and I'll drive it to the maintenance shop," which is right there in the yard, you know, so -- but in the process of doing that, he was like, "Well, I know I kept doing some of these buttons here, you see," and so that's what he just, I guess just kept messing with it.

I kept saying, "Well, leave them alone.  Let's get to the shop."  But he apparently hit the right button and the truck started driving like it was supposed to.  I went to the maintenance shop anyway and asked the mechanics, you know, there what took place, what happened when he was hitting these

series of buttons.  And that's when the mechanic explained to me about the engine retarder button that he had hit.

Q.   Okay.  And after you finally get out of the, you get on the road, you're driving with him now as a team driver, did you consider Mr. Bourgeois someone who talked a lot?

A.   Yes, extremely.

Q.   Can you describe that for Her Honor?

A.   Well, for me, it's like this is my first experience as a team driver.  And the way it was explained to me in the process of the short training period, that while I'm behind the wheel, well, the guy that's working with you should be in the bunk resting, so that when you get tired, he should be fresh to go behind the wheel.  Bourgeois just kept talking, you know.  I'm like, "Well, man, I need you to, you know, go to sleep, you know, do something.  You know, take a nap."  But he just constantly kept talking.  I said, "Well, if you're not ready to rest, I'll let you drive, okay, and I'll go to sleep."  Okay?  And so we did that.  So I let him drive.  But when I get behind the wheel, he still wants to talk.  So you know, it's like -- eventually he would nap in the passenger's seat.  But as far as to stretch out and actually rest like he should, you know, to be fresh as a fresh driver, he didn't really do that, per se.

Q.   And where would you normally stretch out?  Would it be in the passenger's seat or somewhere else?

A.   No, in the -- I'm sorry -- in the back.  There was like a

sleeping, little couch I guess you could say, bed, bunk, in the, behind the seat where you could stretch out the length of the truck. As far as length-wise, it would be from the driver's seat all the way over to the door of the passenger's seat. But it would be behind the little wall that would give you some kind of semi-privacy.

Q. And so are you saying that he would not go back there, he would just sit in the passenger's seat?

A. For most of the time, yes, he would be in the passenger's seat.

Q. And he would keep talking until he fell asleep?

A. He would keep talking. And when he realized he was not talking, he would wake up and talk some more.

Q. Okay. So I guess you would characterize this as he was talking a lot more than normal?

A. Yeah.

Q. Constantly talking?

A. Yeah, yeah, yeah.

Q. Okay. Now, did there come a time that you got lost when Mr. Bourgeois was driving on a trip to Canada?

A. Well, yes. This happened so long ago. Basically, we were supposed to be going to Canada, okay. And the last I can remember is telling him, "Okay, Bourgeois, when we get here, we go north on 75." Okay. And so I took it that he understood what was going on. I mean, you know, I just figured, hey, this

is Bourgeois.  You know, he's a full grown man, and I just told

him, "Okay, we're going north."  So I go to sleep --

Q.    And where would 75 have taken you if you had --

A.    Oh, I'm sorry, it would have taken us up through Michigan

all the way up to Canada.

Q.    Okay.

A.    Okay, where we would finish our, you know, that particular

leg of that run.

Q.    Okay.

A.    But for whatever reason, I woke up and I'm like, I'm

getting up out of a daze, and I didn't really, you know, let

him know that I was really awake at that time, and I looked and

I'm saying, wait a minute.  It's 56 miles from New York.  I

said something's wrong with this.  So I asked him, "Where are

we at, Bourgeois?"  And he kind of like grumbled, "I don't

know.  I don't know."

     I'm like, "What you mean you don't know, man?  You're

driving.  You've got to know where we're at."

     And so at this time I fully awoke and found out that we

had passed up I-75.  So I said, "Now we got to turn around,

okay, and make up ground."  We went, I mean, just using for

instance, if I went 200 miles out of the way, now I got to go

back another 200.  So that's 400 miles.  We should have been at

our destination by then.  You know?  And that was like one of

the first incidents that I had that kind of -- well, actually

the second one.  The one in the yard I really didn't, you know, count that one, but --

Q.   Okay.  And then did there come another time, another incident with, where he was driving where you were asleep and you woke up and found yourself in a situation?

A.   Yes.  That's -- I guess that was the straw that broke the camel's back for me.  I mean, it's like -- I was in the sleeper again, letting Bourgeois drive, you know, by himself while I'm supposed to be asleep.  And I woke up to -- I don't know if everyone in here is familiar with bulk trailers at that time.  It was like a big old bore, or imagine like a two liter Coca-Cola bottle, okay, that half full, okay.  And if you shake it, it creates a slosh.

Q.   You're talking about the load in the back?

A.   The load in the back of the trailer that we were carrying.

Q.   Okay.

A.   And I say that so that, to let you know that if you come to a red light and if you stop, okay, all of a sudden, well, the slosh of that liquid product is going to rush up against the front part of the trailer, okay, the container, and it's going to make you have a hard bump, boom, like somebody run into the back of you if you're sitting at a red light.

So, well, I'm in the sleeper asleep, and all of a sudden it's like I get this big old hard ba-bump, and it like throws me forward.  So I'm asleep, and I think, okay, well, we're at a

red light.  So all of a sudden, we get another one.  And it's like boom, and now it's knocking me back the other way.  I'm saying, wait a minute, what's going on.  So I asked Alfred, "What's going on, man?"  And again, I get this grumbling noise, okay.

So another ba-bump comes, so now I'm saying this is not fair to me.  So I say, "Okay, hold up."  I stick my head out the little curtain so I could see where we're at --

Q.   Now, when you say "the little curtain," are you in that sleeping compartment?

A.   I'm in the sleeping compartment, yes, that separates us, you know, the little resting area.

Q.   So you're looking into the cab of the truck now?

A.   Yeah, yeah.  I'm in the little resting area.  So I'm like I'm peeping through the curtain.  And if you look a certain height, you can peep out, and I can look in both mirrors to see exactly what he's looking at from the driver's seat in both mirrors.  So I look to the right, and I'm like, that's not good.  It's odd.  You know, I'm like, why are we so close to the grassy area here?

So I said, "What's going on, Bourgeois?"

Then he finally say, "Okay, I'm stuck."

So I said, "Well, put the truck in park.  Let me see what's going on."

So I get out, look and I shake my head, and I say, "Oh

Lord," to myself.  And I look in the back, I get out, and I walk around the truck.  Okay.  I looked in the inside of the, well, Tennessee, it was in Tennessee -- and I know a lot of people say the hills of Tennessee, but it looked like a mountain to me.  It was a mountain.  This is how scared I was.  And the rear part of the trailer, okay, was in the ditch, okay, along the wall of the mountain.  I walk across the street, and I look across the top of the street, and I see nothing but pine trees, the top of pine trees, and I said to myself, I can't -- I can't do this no longer, you know.  This is the last -- and from that point, every time I got the telephone, I started whining to the dispatcher or crying, and you know, telling him "Hey, you know, I need to go home, I need to do this, I need to get out."  I just, you know, I didn't want to put the bad mouth on Alfred.  I didn't want to tell them why I wanted to get out of this truck.  I didn't want this man to lose his job, you know, because of, you know, the incident that took place while I was with him.

Q.   So in other words, you get out of that situation where the truck is hanging on the cliff of a --

A.   Yes, yes.

Q.   -- of a hill, the hill --

A.   I got out and I took over, and I maneuvered the truck to get it out of the situation and --

Q.   And then did you drive the truck all the way home?

A.    No.  We drove, drove to the plant and made the delivery, where the dispatcher had told me to get out of the truck.

Q.    And then how did you get home?

A.    Well, what happened, I asked Bourgeois, I said, "Bourgeois, the dispatcher's going to call," I said, "but you tell them I left the plant walking."

Okay.  And what happened was I got out of the plant, and from that point, Bourgeois took the truck.  And I went to a little corner grocery store, called my wife and told her I needed to get me a Western Union to the nearest bus station, Greyhound bus station.  And I called the bus station, and that was the last I saw of Alfred.  I hadn't seen him since.

Q.    And that was decades ago?

A.    Oh, yes.  That was a long time ago.

Q.    And that's the last time you've ever seen him?

A.    Right.

Q.    And so you took a bus home, rather than ride in the truck with him?

A.    Yes.  I took a Greyhound bus home.

Q.    Okay.  And this particular time frame that we're talking about, the incident in the lot of the company, the incident driving to Canada by way of New York, and the incident where you're hanging over the edge of the hills in Tennessee, how long a time frame are we talking that you --

A.    Approximately about three weeks, a three-week time frame,

yes.

Q.   So this all occurred within three weeks?

A.   Oh, yes.

Q.   And then by that point, you'd had enough.

A.   That was it.

Q.   And one final question, or one final area, I should say. Did you ever notice during this three-week time frame when you would go out on the road whether Mr. Bourgeois prepared properly or was able -- prepared properly for more than one day out on the road, if you guys were going for a couple-day trip?

A.   Well, to me, it was like no, he didn't, because the stuff he carried was in like a little bitty small, I guess at this time it would be the equivalent of like a little bitty Wal-Mart bag.  And to me, that wasn't --

Q.   And when you say "the stuff he carried," what do you mean?

A.   Just whatever his items were, his toiletries, whatever he had in his bag, I mean, you know --

Q.   Did he bring enough clothes?

A.   Not to me, no.  To me, he didn't.  Compared to me, I came -- I would come on with a carry-on suitcase and my little overnight bag for my toiletries and all that stuff.

Q.   And would you prepare the amount of clothes you'd bring --

A.   Yes, I would.

Q.   -- in conjunction with --

A.   I mean, I would take at least a week's supply of clothes,

I mean, because that's -- they told us, you know, in training, you know, you always -- you never know how long you're going to be out there, so you always be prepared to be gone for a while.

Q.   And did you believe that Mr. Bourgeois was also doing that, or was he doing something different?

A.   I believe he was doing something different, because I never saw a suitcase.  I mean, you know, I figure, hey, we're in the truck together, so I bring my suitcase in, where's yours, you know?  And all he had was a --

THE COURT:  Well, what was he doing?

THE WITNESS:  He had a little -- I'm sorry?

THE COURT:  What was he doing?

THE WITNESS:  He just had a little bag, as far as --

BY MR. McHUGH:

Q.   When you say "a little bag," do you mean like a little plastic shopping bag, something like that?

A.   Basically that's all I can remember, yeah.  That's all I can remember, just a little bitty plastic like Wal-Mart bag or something like that.

MR. McHUGH:  If I could just have a moment, Your Honor.

(PAUSE.)

MR. McHUGH:  That's all I have, Your Honor.

THE COURT:  Thank you.  Ms. Salinas.

MS. SALINAS:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. SALINAS:

Q.   Good afternoon, Mr. Reese.

A.   How you doing?

Q.   You stated that you worked with the Defendant over at Schwegmann's.  Is that correct?

A.   Yes, ma'am.

Q.   How long did you stay at Schwegmann's?

A.   How long did I stay there?

Q.   Uh-huh.

A.   Approximately five to seven years I did.

Q.   Do you know how long Mr. Bourgeois stayed at Schwegmann's?

A.   No, I do not.

Q.   Okay.  So how long of a time were you with Mr. Bourgeois at Schwegmann's?

A.   I could say maybe in the neighborhood of two to three years.

Q.   Two to three years?  Okay.  And Mag Light (sic), you said you went from Schwegmann's, you then moved on to Mag Light -- or I don't know if I'm pronouncing it correctly.

A.   Yes.  Matlack, yes.

Q.   And for you, would you say that was kind of a step up in your career, moving on to Mag Light?

A.   Well, it was an attempt for me to step up, yes, it was.

Q.   Okay.  Because they paid better, they had better benefits

Reese - Cross

and stuff like that?

A.   They had the benefits, but the pay wasn't as great.  The pay was about equal.

Q.   The pay was equal.  So then why would you say this was a move up for you or a step up for you?

A.   Because at that time I was having additions to my family. I knew at Schwegmann's that they had already told me what the pay scale was, so I was looking for other opportunities to increase my pay scale.  By going to Matlack, I was supposed to obtain better pay, but which, you know, it really didn't.

Q.   Okay.  And as a matter of fact, I think you testified that Mr. Bourgeois actually beat you along the career move.  He was at Mag Light before you were.

A.   Well, according to what I remember about the so-called union thing, okay, they told me that Bourgeois had one day seniority over me.  And in order to get one day seniority over me, that mean he had to start before I did, you know.  So --

Q.   Well, Schwegmann's is not -- is it connected to Mag Light?

A.   No, it's not.

Q.   So you could go to any other company you wanted to go to. You could apply for any other company as a truck driver.

A.   Yes, I could, yeah.

Q.   Okay.  And so Mr. Bourgeois moved on before you did.

A.   I would say.  I'm guessing.  You know.

Q.   Well, when you got to Mag Light, didn't you testify that

Mr. Bourgeois was already there?

A.  I testified that Mr. Bourgeois had one day seniority over me, yes.

Q.  At Mag Light?

A.  Yes.

Q.  Okay.  So he was there.  And you said that they put you all to drive together.  So when you're describing this incident about you all being in the truck and he's pushing the buttons, you didn't know the buttons, and Mr. Bourgeois had only one day prior to you of knowing what the buttons were.  Correct?

A.  Yes.  But what it was is -- I can't testify to him being in this particular truck before me, but it was my first time in the truck, and --

Q.  Okay.  So both of you had had approximately one day in the truck.  He may have had two days in the truck.

A.  No.  The truck was just, say okay, all right, this was a Freightliner truck.

Q.  Uh-huh.

A.  The truck that I was trained in was a Mack truck.

Q.  The truck that you were trained in when you were at Mag Light, or are you talking about --

A.  At Matlack.

Q.  Okay.

A.  At Matlack.  We're talking about Matlack now.

Q.  Right.

A.   It was a Mack truck.

Q.   Okay.

A.   Okay.  So they put us in the truck together.

Q.   Right.

A.   Okay, at the same time.

Q.   Right.

A.   So they trained us on a Mack truck, but they put us in a Freightliner truck.

Q.   Okay.

A.   Okay.  Basically it's like, okay, this is the truck you all are going to be driving.

Q.   Okay.  So you were both unfamiliar with the buttons that were in the Freight (sic) truck.

A.   I can't say we were both.  I can say I was unfamiliar.

Q.   Okay.  But I just want to make clear what you said that Mr. Bourgeois had only been there a day more than you had been.

A.   According to the --

Q.   Okay.

A.   -- guy that they told me about the seniority, yeah.

Q.   Okay.  So that's all I was saying is that you would agree that the buttons were pretty familiar -- were pretty unfamiliar to both of you.

A.   Well, I can say they weren't familiar to me.

Q.   Okay.  That's all right.  And matter of fact, he got that problem fixed out in a few minutes.  Right?  You said he hit

the right button and it got straightened out?

A.   I guess after I chastised him, well, yes, if you want to say something like that.

Q.   Okay.  And kind of like when you get a new car and you're pushing all the buttons to figure out how things work?

A.   No, I don't do that for a new car.

Q.   Oh, not for you.  I was just saying --

A.   Okay, yeah.

Q.   -- Mr. Bourgeois's behavior was like people when they get a new car --

A.   Well, people I don't know --

Q.   -- trying out the buttons?

A.   I don't know that.  I mean --

Q.   That's not unheard of.  Right?  You've heard of people doing that, playing with the buttons, saying, "Hey, let me see what this one does, and let me see what that one does."

A.   Not with that expensive vehicle, no.

Q.   No?

A.   No.  I mean, you don't just go around pressing buttons on $100,000 vehicle without knowing what they're for.

Q.   Okay.  Okay.  But that's one way to find out how they do.  Right?

A.   Like I said --

Q.   Well, you said that after --

A.   I wouldn't do it.  I wouldn't do it.

Q.   Okay.

A.   In other words, before I knew or tampered with something, I would like to know what it is I'm tampering with.

Q.   Okay.  But you would agree that everybody has their own way of learning how to handle things or how to learn things.  Correct?

A.   Sure, people do things different from what you do, yes.

Q.   Right.  Not everyone does things the way you do.

A.   Right.

Q.   Doesn't mean that they're doing it wrong or incorrectly?

A.   It doesn't mean that they're doing it right either.

Q.   Right.  Now, you stated that he talked a lot, he liked to talk a lot.  Is that correct?

A.   Yes.

Q.   But when he was behind the wheel, you never said anything, or according to your testimony that I heard when you were asked about his behavior when he was driving, you never, you didn't describe any instance when he fell asleep when he was driving.  Correct?

A.   I was asleep myself, so I never knew what was going on.  That's why I was scared.

Q.   Okay.  But certainly if he had fallen asleep, you would have felt the jerking movement --

A.   I can't say that, ma'am.  I mean, you know --

Q.   Okay.

A.    -- people nod off, you correct yourself, you wake, I don't know.

Q.    And, but you're driving an 18-wheeler.  Correct?

A.    I'm not -- at that time I wasn't driving.  I was asleep.

Q.    The vehicle you were in, Mr. Reese, with Mr. Bourgeois was an 18-wheeler.

A.    Yes.

Q.    And you can feel the maneuvers in an 18-wheeler.

A.    Not necessarily.  You can go off the line and not know it.

Q.    Okay.

A.    You can get behind the wheel and go off the line and not know it, and you're driving.

Q.    Okay.

A.    It depends on the road.

Q.    Where were you all going when you were driving for Matlack?

A.    Jesus, that was over 20 years ago.  I really couldn't tell you.

Q.    So it wasn't --

A.    All I can tell you the specific incident, because it was like, hey, a slap in the face.

Q.    Well, let me ask you this, were you traveling all over the United States?

A.    We didn't have enough time.  Only had three weeks.  I mean, we were obligated with the company because they told us,

yes, you will be going all over the United States.  And in that three-week period of time frame, I said I could not go do that.

Q.    Okay.  And you've already said that, so just listen to my question.

A.    Okay.

Q.    In the three weeks that you were driving with Mr. Bourgeois, where did you all go?

A.    That was over 20 years ago, I really couldn't tell you.  I really couldn't.

Q.    Did you go out of state?

A.    We went to Canada once that I can remember, because we finally did get to Canada.  I think we may have went into -- I really can't tell you.  Chicago maybe.  I don't know.  At this point I would be guessing.

Q.    So it wasn't, they weren't the same, you weren't making the same trip back and forth.

A.    No.  Oh, no, no, no, no, no, no.

Q.    Okay.

A.    It wasn't dedicated, no.

Q.    Okay.  And you were describing something about when you're in Tennessee, and I don't know if I can draw on this board, but you mentioned you were talking about how the tractor was on the -- the trailer was on the side of the road, the cliff?

A.    Yes.  It was somewhere in Tennessee, yes, it was.

Q.    Okay.  And I don't know -- so there's a road -- let me

see.  There's a mountain.  Right?

A.    Okay.

Q.    And then there's a road where you drive.  Right?

A.    I'm listening, yes.

Q.    And then there's more mountains as you go in Tennessee.

A.    Okay.

Q.    And you said that the trailer was on the side of the mountain.  And then you walked over and you could see the trees.

A.    Yes, the top of the trees, yes.

Q.    So it wasn't really hanging off the cliff.  You were over here in the ditch, you said.

A.    Exactly.  In the ditch, and the tractor was headed toward the cliff, yes.

Q.    Okay.  So now when you all are truck drivers, there are numerous truck stops throughout the United States, right, where truck drivers stop, they get refreshment, they can take a shower?

A.    Yes.

Q.    That kind of stuff?

A.    Yes.

Q.    And you can actually even wash your clothes at some of these truck stops?

A.    Yes, you can.  Yes.

Q.    And did y'all do that?

A.   I didn't, no.  I didn't.  I mean, because what I would do, I would take ample enough clothes that I would hope that I wouldn't run out, okay.

Q.   Okay.

A.   But in the event that I did, now, I guess you can say eventually I would.  But I think that I can remember.  I can't say I did, no.

Q.   Okay.

A.   I can't say I did.

Q.   And that's because that's how you prepare.  You like to take a lot of clothes just in case.

A.   Yes.

Q.   Like I pack.  Just in case.

A.   I don't know how you pack, but that's how I do.

Q.   Okay.  And there are some people, who Mr. Bourgeois may not have wanted to be a big packer like you, and a washateria at a truck stop would take care of his problem, wouldn't it?

A.   I guess.  I don't know.

        MS. SALINAS:  Okay.  I have no further questions for this witness, Your Honor.

        THE COURT:  Thank you.  Anything further, sir?

        MR. McHUGH:  Just briefly.  But the training that had --

        THE COURT:  Could you come to the microphone --

        MR. McHUGH:  Oh, I'm sorry.

THE COURT:  -- please, sir?

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   But the training that you had with this company was to bring more than one night's worth of clothing.  Is that fair to say?

A.   Yes.  In other words, the guy that trained me told me, "Hey, when you guys hit the road, you never know how long you're going to be gone, so you need to bring ample enough stuff with you."

Q.   Okay.  So by Mr. Bourgeois bringing a plastic bag with a small amount, one set of clothes, is that --

MS. SALINAS:  I'm going to object to that.  He never said he had one set of clothing, Your Honor.  He just said he had a small bag and never testified to how much was in that bag.

THE COURT:  Sustained.

BY MR. McHUGH:

Q.   Could you tell how much clothes he had?  Did he have four nights' clothing like you?

A.   He -- no.  Basically if I had -- well, I know for a fact that we had to stay in the hotel one time, and he kind of like, to me, I thought it was gross, but he washed his underwear, you know, with just regular hand soap and just like hung them out over the room.  So I just took for granted that the only thing

he had in the bag was underwear.

MR. McHUGH:  Thank you.  I have nothing further.

MS. SALINAS:  I have a few more questions.

RECROSS-EXAMINATION

BY MS. SALINAS:

Q.  Mr. Reese, do you know whether or not Mr. Bourgeois had the kind of money you did or whether or not he didn't have enough money to --

MR. McHUGH:  Objection, beyond the scope.

THE COURT:  Overruled.

BY MS. SALINAS:

Q.  -- to be carrying all that clothes?

A.  No, I do not know.

Q.  Okay.  And I want to go back to something I had forgotten about.  You were talking about the fact that the drivers at Schwegmann somehow got the answers to the driving test.

MR. McHUGH:  Objection, Your Honor, beyond the scope.

MS. SALINAS:  Your Honor --

THE COURT:  Overruled.

BY MS. SALINAS:

Q.  Do you remember that?

A.  Would you ask the question again?

Q.  You talked about that the drivers somehow got information, the answers to the test so they could pass and get their CDL's.

A.  Yes.

Q.   And --

A.   Okay.  It was -- in other words, when I got the information, it was supposedly an alleged test that if you take this piece of paper here and just remember these questions, this will be the test, so you don't have to worry about what the test is, just remember the answers.

Q.   Did you do that?  Did somebody give you the answers?

A.   I seen the paper, yes, I did.

Q.   Did you do that?

A.   No, I didn't --

Q.   Did you memorize the answers?

A.   -- because that had no significance to me because of the fact that at that point what I was doing with my chauffeur's license, the test wouldn't help me at all.

Q.   Okay.  So do you know whether or not Mr. Bourgeois at that time had the chauffeur's license?

A.   Strongly I would say yes.

Q.   He had his license --

A.   I would say yes.  In order for you to drive a truck at Schwegmann, you had to have a chauffeur's license, yes.

Q.   So he already had that test.

A.   I'm sorry?  I thought you said chauffeur's license.

Q.   He had already taken -- so then he had to take the test to get the CDL.  Is that what you're saying?

A.   In order for him to move on, yes.

Q.   Okay.  And you're saying it was the answers to that test that everybody had.

A.   I -- all right.  I'm not exactly sure.  All I know is that the test that was presented to me was floated around the shop.  Everybody had it, you know, everybody had to get it, this, that and the other.

Q.   Oh, okay.  So let me get this straight.  So you can't tell the Court that Mr. Bourgeois did what you described.

A.   I can't tell that he didn't.  Are you saying --

Q.   You can't tell this Court --

THE COURT:  Did he -- what she's asking you is do you have any information that Mr. Bourgeois got the answers in advance to any test he took?

THE WITNESS:  Yes.  I would say he did.

THE COURT:  How do you know that?

THE WITNESS:  Well, because everybody did.

THE COURT:  Well, do you have personal knowledge that Mr. Bourgeois did that?  Did you see him with them?

THE WITNESS:  Personal knowledge?

THE COURT:  Yes.  That's what -- that's the only thing you can testify to.

THE WITNESS:  No, no.  I can't really personally say that yes --

THE COURT:  Thank you.

MS. SALINAS:  I have no further questions, Your

Honor.

THE COURT:  Anything further?

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You may -- I'm sorry.  I can't hear you.

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  You stand up -- you all have a little problem on this side.  Stand up when you address the Court, please.

MR. McHUGH:  I apologize, Your Honor.  Nothing further.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MS. LARIN:  Your Honor, we would call Mr. Murray Bourgeois.

MR. ROBERTS:  Your Honor, just for the record, I'm going to hand Mr. Wiseman Park Dietz's CV, John Shaw's CV, and a presentation that John Shaw had prepared for us at trial that we never used.

THE COURT:  Do you have a copy?

MR. ROBERTS:  I'm giving him a copy -- I'm giving them the -- oh, a copy for the Court?

THE COURT:  No, I meant for you.

MR. ROBERTS:  We've got copies electronically, Your

Honor.

THE COURT:  Okay.

MURRAY BOURGEOIS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.  Good afternoon, Mr. Bourgeois.

A.  Good afternoon.

Q.  Can you please state your name for the record?

A.  Murray Bourgeois.

Q.  And can you tell us what year you were born?

A.  1952, September 7th.

Q.  And are you related to Mr. Bourgeois?

A.  Yes, I am, second cousin.

Q.  To Mr. Alfred Bourgeois?

A.  Second cousin.

Q.  Second cousin.  What does that mean?  Who's related to who?

A.  That means that his mother and my daddy was first cousins. His mother daddy and my daddy's daddy were brothers.

Q.  Okay.  And did you grow up on The Bend?

A.  All my life.

Q.  And can you describe The Bend to us?

A.  I guess you could say one of these places that --

THE COURT:  Is he going to have a different description than everybody else?

MS. LARIN:  Well, I'm trying to get -- I'll try to move on.

THE COURT:  Okay.

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.  Can you tell us the families, how the families were related on The Bend?

A.  Well, I guess you could say there was kind of like maybe two or three families that was kind of like closely related.

Q.  Okay, and --

A.  But they was more or less, they controlled the whole Bend Lane.

Q.  Okay.  And are the houses on The Bend, are they old?

A.  Oh, yeah.

Q.  How old?

A.  All of them.  For example, the house I was born and raised in, I'm 58, so that house got to be 120 years old at least.

Q.  When you say "born," you mean born in --

A.  I was born in the house.

Q.  Okay.  And would it be safe to say that some of these, that these families have been living together on The Bend all the way back to slave time?

A.  Right, all their lives.

Q.  All, I mean, all the generations have been living back --

A.  Right, uh-huh.

Q.   Okay.  And you lived on The Bend, and at some point, were you a part of the Armed Services?

A.   Yeah, United States Marine Corps.

Q.   And when was that?

A.   From December 29th, 1971, to January 21st, 1974.

Q.   And did you serve overseas?

A.   Yeah.  The last of the Vietnam Conflict.

Q.   So in '71 when you left, Mr. Alfred Bourgeois would have been about seven, turning seven, or six -- six to seven?

A.   Somewhere around in there.

Q.   And when you came back, he was about ten.

A.   Uh-huh.

Q.   All right.

        THE COURT:  You have to answer with words, sir.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Thank you.

BY MS. LARIN:

Q.   And do you have any recollection of Mr. Bourgeois when he was age six and under, before you left to go in the Marines?

A.   Yeah.  Well, he was a kid that was a lot younger than me. But from time to time we would go by their house, playing ball in the yard, and you know, I would see him.

Q.   And was there anything that stood out to you about him?

A.   Yeah, he got mistreated, treated different more than the rest of his sisters and brothers.

Q.   And how did you --

THE COURT:  Did you see that?

BY MS. LARIN:

Q.   Did you see that?

MS. LARIN:  Thank you.

THE COURT:  I'm sorry.

THE WITNESS:  Yes, ma'am.

MS. LARIN:  I'm slowing down.  Sorry.

THE COURT:  I'm sure that was going to be next.

THE WITNESS:  Yes, ma'am, I did.  Well, from time to time, you would see, you know, after he would have gotten a beaten or whatever, he would have red -- he light complected already, he would have red whelps on him.

BY MS. LARIN:

Q.   This is what you saw on Alfred?

A.   Oh, yeah, yes, ma'am.

Q.   And why do you think it was more significant abuse than what might have been happening to his brothers and sisters?

A.   I don't know really all the details, but I know for sure he was always treated different.  He was always treated different.  And he was abused more than the rest.

Q.   Okay.  And do you recall his mother, Ms. Eunice Bourgeois?

A.   Yeah.

Q.   And are you aware if she tended to drink alcohol?

A.   Yes, ma'am.  She drank every day.

Q.   Okay.  So let's fast-forward to when you returned from your time in the service.

A.   Uh-huh.

Q.   This time Alfred is about ten years old.  Did you move back to The Bend?

A.   Yeah, I moved back home.  I was back home.

Q.   Okay.  And did you have that opportunity to observe Alfred in those years after your return?

A.   Yes, ma'am.  He was kind of hanging around the shop doing, helping, you know, with mechanic work, trying to do mechanic work like Lloyd and myself and my dad.

Q.   Okay.  So "the shop," you mean a mechanic shop?

A.   Yeah, mechanic shop.

Q.   Okay.  And you worked, you spent time at least and worked on cars in this mechanic shop?

A.   Right.

Q.   And who else spent time there?

A.   Lloyd.

Q.   Lloyd is --

A.   And -- Lloyd is Alfred's brother.

Q.   Okay.

A.   And Alfred, you know.  He was there sometimes.

Q.   Okay.  So why was Lloyd -- what relationship did you have with Lloyd that's different than everybody else?

A.   Well, Lloyd looked up on me almost like a big brother

image.

Q.   And did Lloyd move into your family's house at some point?

A.   Yeah.  When I had to go to the service, Lloyd moved in with my grandparents and my mother and dad.

Q.   Okay.  And so your father was in the mechanic shop?

A.   Right.

Q.   And Lloyd, and you would spend some time there, and you would see Alfred there.

A.   Right.

Q.   Okay.  And were you trying to teach Alfred how to work on cars?

A.   Yeah.  Every time we'd get some project going on, we would try to, you know, fill him in on it to try to teach him a few things.  But he couldn't grasp none of that.

Q.   Okay.  What do you mean -- well, give us some examples of, you know, what would he not be able to do to help.

A.   Well, if we was working on taking a starter off a car, and I told him, say, "Go catch me that 9/16 wrench" or "that half-inch socket," he didn't know what I was talking about.

Q   And then if you showed him, the next day would he know?

A.   Hmm, not really.  He'd forget.

Q.   Okay.  So do you know, was this for any lack of interest on Alfred's, Mr. Bourgeois's part?

A.   Well, he was trying to, you know, he would try, but he was slow to catch on.  This mechanic thing was like too fast of a

pace for him.

Q.   Okay.  Even -- when you say "this mechanic thing," even the identification of different tools.

A.   Right.  Right.

Q.   So you were not talking about, you know, taking apart an engine and putting it back together again.

A.   Oh, that would never happen.

Q.   Okay.  That would never happen?

A.   No.

Q.   Okay.  Were you aware when Mr. Bourgeois started driving an 18-wheeler?

A.   Well, I wasn't around when he first started.  Later on when he started coming around.  But when he first started, he was having a lot of trouble.

Q.   And --

A.   Because one of his good friends, Wardell, used to ride with him.  He used to come back and tell us stories, how "Man, you don't want to ride with Alfred.  When Alfred make a right-hand turn, everything on the corner come with him, garbage can, trees, stop sign, the front of somebody car, he going to hit it."

Q.   But it's your understanding as he grew older and had more experience, he improved as a driver?

A.   Somewhat, you would say.

Q.   Okay.  Was there anything -- and you did have some contact

with Alfred in his adult years?

A.   Yeah.

Q.   About how often would you see him, do you think?  This is, you know, twenties, thirties.

A.   Oh, not too often, because he worked a lot.  I worked a lot.  Because he used to like to wrestle.

Q.   Oh, really?

A.   Yeah.

Q.   Okay.  Was there anything unusual you noticed about Alfred in those years?

A.   Well, that he -- well, he was slower than most of the guys, you know, catching on to a lot of things.  So you know, well, and like I mentioned to him all the time how some people --

MS. BOOTH:  Your Honor, I've got to object.  I'm sorry.  Yes, sir, I'm sorry, I didn't mean to be disrespectful to a Marine, but there's been a lot of testimony here, and there's no time period.  I need a time period what we're talking about.

THE COURT:  Can you do that, please?

MS. LARIN:  Yes.  All I did narrow it down to was like when he was in his twenties and thirties, but --

THE COURT:  When who was --

MS. LARIN:  If you could narrow it down more than that, that would be helpful.

THE COURT:  When who -- "he," who's the "he"?

MS. LARIN:  Mr. Bourgeois.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  Twenties and thirties?

MS. LARIN:  When he was an adult, is what I meant.

THE COURT:  Okay.

BY MS. LARIN:

Q.   But if you could narrow it down to a time that you're speaking about, that would be very helpful.

A.   The time that --

Q.   You said it struck you that he seemed slow, even as an adult.

A.   Right.  But well, I would consider him a young man at the time.  I wouldn't know no specific age.  Maybe early twenties, something like that, that you know, he was slower than most people.  You know, he couldn't grasp things like other people did.  You know, kind of uncoordinated.  He used to try to do things like we'd do, like ride motorcycles and stuff like that, but he couldn't catch on to that.

Q.   Do you remember a time, any trouble specifically that he had in riding his motorcycle?

A.   Well, he had one particular incident that he borrowed this guy 3-wheeler, and he told the guy he could ride it.  Well, the guy that -- told him, said, "Look, man, I don't think so."

"Oh, man, I can ride it.  I can ride it.  I can ride it."

He took off going down the street.

Q.   This is Bend Lane?

A.   Down Bend Lane.

Q.   Uh-huh.

A.   And ran smack into a telephone pole.  They had to take him to the hospital.

Q.   Is there --

A.   Yeah, he got seriously hurt.

Q.   And would you have -- is it pretty hard to run into a telephone pole?

A.   Well, the part of the 3-wheeler he didn't know is like the steering is not really so much in the steering.  It's kind of like -- excuse my French -- the cheek of your butt, that's part of your steering.  And he didn't know that.  Something that slow.  I mean, he wasn't used to riding it.  He wasn't familiar with it.  And if you'll just turn your, you know, shift your weight, that would steer the bike.

Q.   And he just --

A.   But he didn't know that.

Q.   Okay.

A.   He just took for granted, he saw other people doing it, I'd do it, Lloyd do it, and the other guys do it, and it looked simple.  It looks simple if somebody else is doing it.  But if you try it, it ain't that simple.

Q.    Okay.  And --

        MS. LARIN:  One second, Your Honor?

        THE COURT:  Yes, ma'am.

    (PAUSE.)

BY MS. LARIN:

Q.    So do you have any information, do you think Mr. Bourgeois could fix a lawn mower?  Was he able to do that when you were working with him in the mechanic shop?

A.    Absolutely not.  No, ma'am.

Q.    Why are you so sure?

A.    I think he would try and try to make an attempt, but he just didn't have the mechanical skills to do that.

        MS. LARIN:  Okay.  Okay, thank you, Your Honor.  I have no more, no further questions.

        THE COURT:  Thank you, ma'am.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good afternoon.  My name is Patti Booth, and I just want to get the time line kind of --

A.    Okay.

Q.    -- a little clearer for me.  First of all, Mr. Murray, you were born in '52.  Is that correct?

A.    Yes, ma'am.

Q.    So you are 12 years older than Mr. Bourgeois, Mr. Alfred Bourgeois.

A.   Uh-huh.

Q.   All right.  And do you know if he always lived with his mother or if he lived with someone else when he was growing up?

A.   No, as a kid growing up, he used to live with Ms. Mary Clayton, that used to live in the back of the land, an elderly lady.

Q.   Okay.  And Ms. Clayton, I think you gave a statement on it.  Why is it that Mr. Alfred Bourgeois went to live with Ms. Mary?

A.   I'm not really sure.  I believe because of the environment that he was in, and they was really trying to get him -- Ms. Mary really felt sorry for him, and she was trying to get him out of that environment.  He was, you know, by being abused and I guess she feel, felt like she could give him a better home.

Q.   And was Ms. Mary frail?

A.   Ma'am?

Q.   Was Ms. Mary frail?

A.   Frail?

Q.   Frail.  That's what's in your statement, "frail," that Ms. Mary was frail.  Do you remember giving this statement?

A.   Ms. Mary was kind of handicapped because she had --

Q.   Okay.  So frail isn't your word --

A.   Yeah.

Q.   -- right?

A.    No, she was --

Q.    Okay.

A.    -- I guess you would say handicapped, because she walked with a stick.

Q.    Right.

A.    Kind of limped.

Q.    But I have a declaration in front of me that you signed. I think --

        MS. BOOTH:  Could I approach the witness, Your Honor, and just show it to him?

        THE COURT:  You want to show him --

        MS. BOOTH:  Oh, this is going to be hard.  You know I'm challenged here.  Is it okay if I just show him his --

        THE COURT:  Yes.  It may be quicker.

        MS. BOOTH:  Thank you, Judge.  Yes, it will be.

BY MS. BOOTH:

Q.    Is this your pretty handwriting right there?

A.    That's it.

Q.    All right.  And do you recognize this document?

        THE COURT:  But you have to question from the podium.

        MS. BOOTH:  Yes.  Yes, sir -- yes, ma'am.

        THE COURT:  Please.

BY MS. BOOTH:

Q.    And do you recognize that you signed an affidavit, a declaration for the Public Defenders?

A.   Yes, I did.

Q.   Okay.  But the word "frail" was not your word?

A.   My -- maybe they might have misunderstood me.  "Frail," what would I be -- because it actually, what type of person is Ms. Mary?

Q.   Uh-huh.

A.   Ms. Mary was an elderly lady.  She was, I would say handicapped maybe you would say.

Q.   Did she have any problem with her legs?

A.   She was crippled.

Q.   Okay.

A.   Well, I don't know what happened to her leg, but she used to walk with a stick, with a limp.

Q.   All right.

A.   So that was her condition.  But I mean, she got around everywhere she wanted to go.

Q.   And do you remember telling the Public Defenders that Ms. Mary was the mother of the church?

A.   Right.

Q.   And that she didn't have a husband?

A.   Right.

Q.   And that Alfred's mom said that he had to stay with her because Ms. Mary was frail -- or your word is "handicapped" now.  Right?

A.   That's right.

Q.   Okay.  So did you ever visit with Alfred when he was at the home of Ms. Mary?

A.   No, I didn't.

Q.   Okay.  Now, if you said that you went to serve in Vietnam in 1971 and you didn't come back till 1974, about 1971 is when Alfred would have been about six.  Do you know when Alfred went to live with Ms. Mary?

A.   I couldn't say specifically.  All I knew, it was when he was a young kid.  I couldn't give you no age time frame.  I couldn't really say for sure.

Q.   Okay.  But you were living in LaPlace, or I mean -- excuse me -- you were living on The Bend when he was living with Ms. Mary?

A.   Yes, ma'am.

Q.   All right.  And now you talked about the fact that he would come to the shop and y'all would try to include him --

A.   Uh-huh.

Q.   -- in repairing cars.  Was this before or after you went to Vietnam?

A.   Before and after.

Q.   Before and after.  So when he was coming in the shop, he was about five years old?

A.   Yeah.

Q.   And you were trying to teach him tools and things?

A.   Uh-huh.

Q.    Okay.  And he was having a difficult time with it?

A.    Well, you're not really expecting him to fix something.

Q.    Right, oh, no.

A.    No.

Q.    Just go get that.  Right?

A.    Yeah, "I need you to go get this," "Go get that."  You know, like the first stage of learning.

Q.    Right.  And so at five years old, he was having a difficult time remembering tools.  And those are -- would you agree with me that being -- that it is a gift to be able to work in mechanics, that not everybody has it?

A.    Yeah.

Q.    And are you, is your testimony that Mr. Bourgeois did not have that particular gift?

A.    Right, because he was kind of slow of learning.  Well, you wouldn't judge that when he was five years old.

Q.    Uh-huh.

A.    You would kind of give him that judgment on that later on in life --

Q.    Okay.

A.    -- when he's still trying to do the same thing, you know, and he really can't achieve it.

Q.    Okay.  So when you came back from Vietnam, he was around ten.

A.    Uh-huh.

Q.    And --

        THE COURT:  You have to answer with words.  I'm

sorry, sir.

        THE WITNESS:  I'm sorry, ma'am.  Yes, ma'am.

BY MS. BOOTH:

Q.    Okay.  And so did you, did he come to the shop then when

he was ten?

A.    Yes, ma'am.

Q.    All right.  And you said that Lloyd was better at it, but

do you know how much older Lloyd is than Mr. Alfred Bourgeois?

A.    I'm not really sure, but he's older.

Q.    Yes, sir.  If I told you it was about four or five

years --

A.    Yeah, that sound about right.

Q.    And so it might make a difference that Mr. Bourgeois

having a little more trouble, and if he didn't have the gift,

and you compare that to somebody that's five years older and

somebody -- did Lloyd have the gift?

A.    Lloyd, he learned along the way.

Q.    Uh-huh.

A.    I mean, he didn't know mechanic work.  He was like, you

know, he came up working with my dad, working with myself.

Q.    Uh-huh.

A.    And he learned along the way.  But he learned at a young

age, you know, as he came along.

Q.   And it seems like you're very proud of Lloyd and all that he's accomplished.

A.   Yes, ma'am.

Q.   All right.  And now with Alfred, do you know what age he was when he moved away from Ms. Mary?

A.   I'm not specifically sure.

Q.   Did you know that he had to live here and live there and really didn't have any support system, any clear support system when he was still in high school?

A.   No, I'm not aware of that.

Q.   Okay.  Did you know that he got his first job over at -- and I'm going to mispronounce it -- Swaggart's, Swiggerd's?

A.   Schwegmann's.

Q.   Schwegmann's, Schwegmann's -- by going in and applying and getting the job himself?  Did you know that?

A.   I knew he worked at Schwegmann's.  I didn't know all the details.  I knew he worked there, though.

Q.   All right.  And did you know that he worked his way up from a buggy driver -- and I said it wrong.  It's a buggy -- buggy, buggy truck, buggy something, to driving the big truck?  Did you know that he worked his way up when he worked at that store, or worked for that company?

A.   I'm not really sure.

Q.   Okay.  Did you know that he got his CDL and he began to be an over-the-road trucker and that he would drive as far up as

Canada and down through Texas and Birmingham, and he's been all over the United States driving a great big truck?

A.    Well, I knew he, that's what he did for a living, more or less.  But I couldn't say, you know, how far he went --

Q.    Okay.

A.    -- how far he drove.

Q.    But you knew that he did that for a living.

A.    Right.

Q.    Now, you testified earlier, which -- about his wreck on a 3-wheeler.  He was 19 when that happened.  Right?

A.    I'm not really sure what his age was.  I wouldn't be so sure.

Q.    Okay.

A.    But he was a teenager, early twenties for sure.

Q.    Okay.  And he had never been on a 3-wheeler, had he, when he took this little drive?

A.    I don't know the whole story.  I know he -- well, he asked the guy to take a ride.  He told the guy that he could ride it.

Q.    Uh-huh.

A.    But that was the detail that came back to me.  So I said, "Well, he told you he could ride it?"  I say, "I never saw him ride a 3-wheeler before."

Q.    Okay.  So he just was pretty adventurous and took a ride on this 3-wheeler and didn't know to move his --

A.    Yeah.

Q.   -- back side.  Right?

A.   Right.

Q.   Okay.  So, and you testified that it's harder than it looks to do that.  Right?

A.   No, it's not that simple.

Q.   Okay.

A.   But if you did it once, you could do it a thousand times.

Q.   Okay.  But if you hadn't done it before, you could end up on a telephone pole.  Right?

A.   You're in a world of trouble.

Q.   All right.  So when he was with Ms. Mary, was that a good time for him?  Do you think that she treated him properly?  Or you don't know?

A.   I couldn't say for sure, but I mean, just looking at the situation, I would say it was a good time for him.

Q.   Okay.

A.   It seemed to be.

Q.   Did you go to the Evergreen Baptist Church?

A.   Do I ever go?

Q.   Did you go during that period of time when he was younger, when you were back from Vietnam?

A.   No, very seldom.

Q.   Okay.  So you didn't know the Sunday school teacher there or anything, did you?

A.   Most of the Sunday school teacher was -- well, some of the

people that was living the land, like this girl, Vanessa Scott, and people like that, and I knew that from hearing them talk about it.  Going out there often, I wasn't one of the members.

Q.   Okay.  Did you know Ms. Mary's sons, Jacob --

A.   Yeah.

Q.   -- different --

A.   Yes, ma'am.

Q.   Okay.  And did Alfred tell you that Ms. Mary's sons were raping him every day?

A.   I never heard that one.

Q.   Okay.  Did he ever tell you that the Sunday school teacher raped him at church during the choir meetings?

A.   I didn't know that either.

          MS. BOOTH:  Okay.  That's all I have, Your Honor.

          THE COURT:  Anything further?

          MS. LARIN:  Yes.  Your Honor, I would like to mark Petitioner's statement marked P-40 and admit it into evidence, if there's no objection.

          THE COURT:  It's already marked, isn't it?

          MS. LARIN:  It is marked.  I'd like to offer it.

          THE COURT:  Okay.  Then you want to offer it?

          MS. LARIN:  Yes.

          MS. BOOTH:  I have no --

          THE COURT:  P-40?

          MS. BOOTH:  Is that the --

MS. LARIN:  P-40, Petitioner's 40 is the --

MS. BOOTH:  It has two pages.

MS. LARIN:  It is.  I lost --

MS. BOOTH:  That's fine.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, I hate to be fussy, but --

THE COURT:  Since when?

MS. BOOTH:  Yeah.  It's, he's -- it's just cram-packed with hearsay, even hearsay from the legal team.  I mean, you know, it's --

THE COURT:  So that's your objection?

MS. BOOTH:  That's my objection.

THE COURT:  Sustained.

MS. LARIN:  Could I respond?

THE COURT:  Sure.

MS. LARIN:  We would like to offer it because the doctors did rely on it when they were making their opinion, so --

THE COURT:  Sustained.

MS. LARIN:  Okay.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   And one other question, following up on the legal team, did anyone from Mr. Bourgeois's legal team, defense team, prior to the trial in 2004 approach you and talk to you about

Mr. Bourgeois's background?

A.   No, ma'am.

Q.   That's a very long question.  Did you speak to anyone from Mr. Bourgeois's legal team in 2004?

A.   No, ma'am.

Q.   Or 2003?

A.   No, ma'am.

Q.   All right.  Is the first time you talked about Mr. Bourgeois's background in relation to his case when people from my office approached you?

A.   Yes, ma'am.

Q.   Okay.  If trial counsel, as we call it, if the legal team at trial had spoken to you in 2004, would you have testified at his trial if they had asked?

A.   Restate that for me.

Q.   Sorry.  I'm so not speaking well right now.  If they had asked you to testify at his trial, consistent to what you did today, would you have testified at Mr. Bourgeois's trial?

A.   Yes, I would have.

          MS. LARIN:  Okay.  Thank you.  I have no further questions.

          THE COURT:  Thank you.  Anything further?

          MS. BOOTH:  No, Your Honor.

          MR. McHUGH:  Dr. Dailey.

          MR. ROBERTS:  Your Honor, can we take a brief recess?

I need to, I want to find out -- Dr. Senn is here, and we need to maybe talk about some logistics, and I'd like to have Dr. Senn at the table.

THE WITNESS:  Excuse me, ma'am?

MR. ROBERTS:  Oh.

THE COURT:  Can we finish this witness?

MR. ROBERTS:  I thought it was finished.

THE COURT:  Is he finished?  Okay.

MS. LARIN:  Yes.

MR. ROBERTS:  Sorry, Your Honor.

THE COURT:  How late do y'all want to go tonight?

MR. WISEMAN:  Your Honor, we certainly appreciate the Court's accommodation, and we're willing and ready to go as long as the Court's able.  I understand there are personnel considerations, so you tell us.  But we do have witnesses and they're ready to go.

(Court and Clerk conferring off the record.)

MR. ROBERTS:  Could we take a brief recess to run out and --

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

(Recess from 5:54 p.m. to 6:01 p.m.)

MR. ROBERTS:  Your Honor, for the record, Dr. Senn is now sitting at the table --

THE COURT:  All right, thank you.

MR. ROBERTS:  -- with the United States, and Dr. Moore has taken a back seat to the galley.

THE COURT:  Call your next witness.

MR. McHUGH:  Dr. Dailey.

(Witness sworn.)

THE COURT:  How many witnesses do you all have, Mr. Roberts?

MR. ROBERTS:  Your Honor, we have 16 on our list.

THE COURT:  Okay.  How many are you going to call?

MR. ROBERTS:  At least 15.

THE COURT:  Okay.  Go ahead.

JON CURTIS DAILEY, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Dr. Dailey, how are you presently employed?

THE COURT:  Could you ask him his full name, please?

MR. McHUGH:  I'm sorry.

BY MR. McHUGH:

Q.   May you state your full name for the record?

A.   Yes.  It's Jon, no H, J-O-N, Curtis Dailey.

Q.   And Dr. Dailey, I just wanted to caution you, try and avoid touching the microphone in any way, even with your hand --

A.   Okay.

Q.   -- because it creates a loud noise.

How are you presently employed?

A.    I currently am employed by Aspen Dental in Bangor, Maine.

Q.    And what do you do at Aspen Dental?

A.    I function as a general dentist there.

Q.    Okay.  And are you board certified in any dental specialties?

A.    Yes, in prosthodontics and also in forensic dentistry.

Q.    Okay.  And are you a member of any professional societies?

A.    Yes.  I'm sorry, yes.  American Academy of Forensic Sciences, American Society of Forensic Odontology, the American Board of Forensic Odontology, the American Board of Prosthodontics.

        MR. ROBERTS:  Your Honor, we'll stipulate to his expertise.

        MR. McHUGH:  Okay.  And just one or two more questions, Your Honor.

BY MR. McHUGH:

Q.    Have you previously testified as an expert in the area of forensic odontology and bite mark analysis?

A.    Yes, I have.

Q.    Okay.  And I'm going to show what has been marked as P-98.

        THE COURT:  Is this his CV?

        MR. McHUGH:  Yes.

        THE COURT:  Do you want to offer it?

        MR. McHUGH:  Yeah, I was going to offer it, yes, Your

Honor.

THE COURT:  P what?

MR. McHUGH:  P-98.

THE COURT:  That's admitted.

MR. ROBERTS:  No objection.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.   And just for the record, it lists --

THE COURT:  Well, could you just show it to me?

MR. McHUGH:  Is it not -- there we go.  Oh, the actual hard copy?

THE COURT:  Do you need to ask him questions off of it?

MR. McHUGH:  No.

THE COURT:  Okay.  I'll just read it then.

BY MR. McHUGH:

Q.   And Dr. Dailey, have you ever been a member of the Armed Forces?

A.   Yes, I have.

Q.   Okay.  Could you describe for us your Armed Forces background?

A.   I was a dentist in the United States Army Dental Corps for almost 26 years, retired as a full colonel.

Q.   Okay.  And from when to when?

A.   Essentially 1980 to 2004, 2005.

Q.   Okay.  So in 2005, you retired from the military as a colonel.  Is that right?

A.   That's correct.

Q.   Okay.  And were you also a consultant in October, back in 2002, 2003, were you also a consultant to the Armed Forces Institute of Pathology?

A.   Yes, I was.

Q.   Okay.  In the summer of 2002, were you contacted concerning the matter of United States versus Alfred Bourgeois?

A.   Yes, I was.

Q.   Okay.  And by whom were you contacted?

A.   Special Agent Brady.

Q.   Okay.

THE COURT:  Special Agent who?

THE WITNESS:  Brady.

BY MR. McHUGH:

Q.   Okay.  And do you recall what you were asked to do in this matter?

A.   They asked me to look at some pattern injuries in photographs and compare them to stone dental models of the possible biters.

Q.   Okay.  And I am going to put on the ELMO a document that is marked P-39 (sic).  And do you recognize this document?

A.   Yes, I do.

Q.   And is this a report that you prepared outlining what you

received and what you did in this matter initially?

A.    Yes, it is.

Q.    What's the date of that?

A.    29 September 2002.

Q.    Okay.  And I am going to turn -- can you say who the names of the -- you mention that you had gotten stone dental casts. What were the names of the individuals that you got?

A.    You can see them enumerated there in 2B, Alfred Bourgeois, Robin Bourgeois, and AB1994.  And I apologize if I mispronounced those.

Q.    Okay.  And did you conduct a comparison of the stone casts versus the photographs that you had received?

A.    I did.

Q.    Okay.  And I'm going to turn to the second page of that P-139, and I'm going to ask you, could you state for the Court what you concluded as a result of your analysis?

A.    Well, I could not rule in or rule out any of the three people whose dental models I looked at as possible biters.  And the reasons were that the pattern injury in the photographs was rather diffuse, meaning it wasn't a good representation of the teeth that had created the pattern injury.  And --

Q.    Is that in Point Number 1 of your report?

A.    Yes.

Q.    Okay, on Page 2.  Go ahead.

A.    And some of the photographs, the way the pattern injury

was positioned in the photographs, didn't allow it to be -- I didn't consider it to be good quality evidence.

Q. Okay.

A. And then the, in some of the photos, the ruler or the scientific scale that is used in the photograph that allows an examiner later on to size those photos as life-size wasn't close to the pattern injury, or it was in a different plane. In other words, geometrically, it was above or below where the pattern was made on the tissue when the photo was made.

And also the size and the sort of the, if you think about the arrangement of the teeth, in the three sets of stone dental models, the arch size of the two dental arches, the upper arch and the lower arch, when you look at stone dental models and you put them next to each other, it creates sort of an elliptical shape. And the size of those three shapes, between the three different people, was not dramatically different. And the arrangement of their teeth was not dramatically different to allow me to make determinations of any one of them with the pattern in the photograph.

Q. So would another way of saying, on Point 4, is that the three stone casts that you received were very similar, as far --

A. Yes.

Q. Okay. And did you ever become aware that these three individuals were related?

Dailey - Direct                                        424

A.   Only by looking at their names.

Q.   Okay.  And so did you, as a result of your conclusions,

did you prepare this report and provide it to the Government?

A.   I did.

Q.   Okay.  And do you remember, did you provide it to the

individual who you named that had provided you the photographs?

Or did you provide it to the lawyers for the Government?

A.   Well, since -- I'm trying to remember back to 2002.  But

since it's addressed to Special Agent Brady, I think I sent it

to him directly.

Q.   Okay.  Now, did there come a point -- and that's, I'm done

with P-139 at this time.  Did there come a time when you

received additional information concerning this case?

A.   Yes, several months later.

Q.   Okay.  And in fact, I'm going to show you what has been

marked as P-140.  And do you recognize that?

A.   Yes.  That's a --

Q.   Okay.  What is that?

A.   That's a report I wrote in July of '03.

Q.   I'm sorry?

A.   That's a report that I wrote back to Special Agent Brady

back in July of 2003.

Q.   And why did you generate this report?

A.   As it says, I received additional photographs to evaluate

to see if there was additional evidence contained in those

photographs that might help me have a different opinion.

Q.    And did those photographs involve some enhancements?

A.    Yes.  Dr. Oliver, whose name is mentioned there, had provided a CD with some images that he had attempted to enhance digitally.

Q.    And these enhancements in these photographs we're talking about were all photographs of what were purported to be bite marks on the decedent's body.  Is that right?

A.    Correct.

Q.    Okay.  And so had you ever seen these type of enhancements that you received from Dr. Oliver before?

A.    Not this particular type.

Q.    And what was different about them?

A.    Well, I had never seen this, he called it, I believe, a lofting procedure, where digitally they enhanced the images to give them, with the hope that it would bring out more detail.

Q.    Okay.

A.    But I had never seen that particular technique and the way he described it to me.

Q.    Okay.  And at that time, this is July of 2003, approximately how many forensic bite mark comparison cases had you been involved in?

A.    I think I have it mentioned in here.  I don't remember off the top of my head.  150, something like that.

Q.    Okay.  And after you viewed these enhanced images, did you

come to a conclusion as a result of reviewing those images?

A.    My original conclusions did not change.

Q.    Okay.  And is that in fact listed in P-140?

A.    Correct.

Q.    Okay.  And so the same four points that you described back in September of, your September of 2002 report were the same four points that you described in the July of 2003 report.  Is that right?

A.    Yes.

Q.    Okay.  Now, did you ever speak -- did you then speak with the prosecutor in the case, recall speaking to the prosecutor in the case after that second report was prepared?

A.    Yes.

Q.    Okay.  Can you tell us who you spoke with?

A.    Attorney Patti Booth.

Q.    Okay.  What do you recall about that phone conversation?

A.    Well, she had gotten my report from Special Agent Brady, and she was upset because I, my conclusions were still the same after I had additional evidence to look at.

Q.    Okay.  And what do you -- do you recall anything particular about that phone call?

A.    I recall a lot about that particular phone call.

Q.    And can you tell us what you recall?

A.    Well, primarily I recall that she was quite upset, and she told me that Mr. Bourgeois was a very bad man, and that I

should be able to help with this case, and that if I couldn't, she would find someone who would. And then she hung up on me.

Q. Okay. Did she actually say "goodbye" and hung up, or --

A. No. She just hung up the phone.

Q. Okay. And did that stand out in your forensic practice, a conversation of that nature?

A. Yes. I had never been treated like that in my entire professional life.

Q. And in this particular case, you actually were retained by the Government because of the fact that you were a consultant, you were a retained consultant to the Armed Forces Institute of Pathology. Is that right?

A. That's my understanding of why they called me to begin with, yes.

Q. Okay. Dr. Dailey, were you ever contacted by anybody from Mr. Bourgeois's defense team at the time of his trial, 2002, 2003, 2004?

A. No, I was not.

Q. Okay. Had you been contacted by somebody from his trial, such as an investigator or a trial attorney, would you have testified -- would you have testified in his trial if you had been called to do so?

A. Yes, I would have.

Q. And would you have testified consistently with your testimony that you have here today, that you've given here

today?

A.    Yes, I would have.

          MR. McHUGH:  Your Honor, may I just have a moment to review my notes?

          THE COURT:  Yes, sir.

     (PAUSE.)

          MR. McHUGH:  Your Honor, I would move in or ask to be moved in the exhibits which are P- -- I'm sorry.  Your Honor has my marked copy of the CV.  I think it's 96.

          THE COURT:  98.  I've already admitted it.

          MR. McHUGH:  Yes, P-98 and P-139 and P-140.  And I have no further questions.

          THE COURT:  Any objections?

          MR. ROBERTS:  No, Your Honor.

          THE COURT:  P-139 and 140 are admitted.  Cross-examination?

          MR. ROBERTS:  Your Honor, could I have just a moment?  I'm looking for a document.

     (PAUSE.)

          MR. ROBERTS:  Your Honor, I would like to offer some of Government's exhibits at this point in time, so that I could use them as I --

          THE COURT:  And what are they?

          MR. ROBERTS:  They are Government Exhibit 172, 173, 174, and 71 and 72.  Sorry to take them out of order.

THE COURT:  Any objection?

MR. McHUGH:  I understand they're just being offered at this time, but I don't --

THE COURT:  Yes.

MR. McHUGH:  I don't anticipate an objection to offering them.

THE COURT:  Okay.  Government's 172, 173, 174, 71 and 72 are admitted.

MR. ROBERTS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.  Dr. Dailey, I just want to understand.  I am interested in this.  You got involved in this case because you were in the military, did you not?

A.  Well, I was in the military at the time that it occurred, but I was involved because I was a consultant for bite marks for the Armed Forces Institute of Pathology.

Q.  Right.  And are you aware that the medical examiner in this case was a military member?  Did you know that?

A.  Not that I'm aware of, no.

Q.  Okay.  Do you recall that this case was referred to you by the Naval Criminal Investigation Service, NCIS?

A.  I think that's how Special Agent Brady got in touch with me.

Q.  In fact, Special Agent Brady worked for the NCIS, does he

not?

A.    I don't recall off the top of my head, but I had his address on there, if that's what it says and that's who he worked for.

Q.    Okay.  Your first letter that was referenced earlier, Petitioner's 139, that was in 29 September 2002, and your conclusion in that was that you could not rule in or out any of the three individuals.  Is that correct?

A.    Yes.  That was my conclusion.

Q.    So if you were called in to testify to a jury, you would basically say, "I can't exclude anybody, but I also can't say that it's one of the three people."  That's all you would be able to say.  Correct?

A.    Yes.

Q.    Okay.  Same thing when -- do you remember how you were contacted when you -- how you were contacted with regard to when you were going to be mailed Dr. Oliver's photographs?

A.    I don't remember the time line on that, no.

Q.    Do you remember how you were contacted?

A.    No, not at this time.

Q.    Did you know that they were coming from a Dr. Oliver?

A.    Yes, I did know that.

Q.    Okay.  Did you know what Dr. Oliver's role was?

A.    He was enhancing some images, or he had a technique for enhancing images.

Q.   Did you have any questions with the way, I mean, his enhancement of those images when you received them?

A.   I did, and I talked to him on the phone.

Q.   You did talk to him?  You chose only four photographs out of the enhancement.  Was there any particular reason you just decided to use -- how many did he send you?

A.   I don't recall, off the top of my head.

Q.   It was like over 30 or something like that?

A.   I don't recall.

Q.   You don't recall?  Let's see.  I think you put it in your report.  If I could have Exhibit P-140.

     (PAUSE.)

Q.   Dr. Dailey, I'm showing you what is marked as Petitioner's Exhibit P-140.

A.   Okay.

Q.   Let's zoom in instead of out.  Do you see where the sentence begins, "I had selected four photographs"?

A.   Yes.

Q.   "From the 30 photographs originally sent to me last year for evaluation for Dr. Oliver to enhance."

     So you selected four out of approximately 30 photographs?

A.   I did.

Q.   Okay.  Any reason you chose not to look at the other photographs?

A.   Well, I looked at all of them.  What it says in that

statement was I chose the four that I felt if image enhancement would be of any value, it would be those four.

Q.   Do you recall -- you do recall the call from Patti Booth. You told us that a few minutes ago.

A.   Yes.

Q.   Do you recall her asking you to also consider the other 26 photographs in that phone conversation?

A.   I don't remember that conversation, no.

Q.   You don't remember that?  And do you remember telling her, no, you've done enough on the case?

A.   No, I don't remember that either.

Q.   All right.  If you called somebody and asked them to do a little bit more investigation on something that you were looking into and they refused to do any more, you know, is it possible that you might get a little upset?

A.   I don't recall ever refusing to do anything in this case.

Q.   You don't recall it.

A.   No.

Q.   Okay.  Do you recall -- do you recall when you got the phone call from Patti Booth?

A.   I don't remember the exact day.  I was teaching a class for general dentistry residents at Fort Carson, Colorado, at the time.

Q.   I think you said in your declaration that the phone call came in on a lunch break.

A.    Yes.

Q.    Were you rushed?  Did you have to get back to teaching your course when you received the phone call?

A.    No.  We were on lunch.

Q.    You were on lunch?  Did it take away from your lunch when she called you?

A.    No.  I don't usually eat lunch when I'm teaching a course.

Q.    You don't each lunch at all when you're teaching a course?

A.    I don't usually.  I prepare the afternoon session when I'm -- students are out of the room.

Q.    Okay.  So if Ms. Booth had called you and asked you to consider the other photographs before making a final decision, you would have done that?

A.    If they had sent me more photos, I would have looked at more photos.

Q.    You received 30 photographs, and you only chose four.

A.    I chose the four that I thought would be able to be enhanced and paragraphs reveal some additional evidentiary detail.

Q.    Okay.  Do you know who Dr. David Senn is?

A.    Yes, he's sitting right there.

Q.    Sitting right where?

A.    Right there at that table.

Q.    Sitting at the prosecution table?

        MR. ROBERTS:  Let the record reflect he's correctly

identified Dr. Senn, Your Honor.

          MR. WISEMAN:  Is that an in-court ID?

BY MR. ROBERTS:

Q.   What I want to know is, have you ever had -- have you had

a chance to review Dr. Senn's report of April 20th, 2010?

A.   I have never seen any product of Dr. Senn's work.

Q.   Okay.  Have you ever seen Dr. Senn's CV?

A.   Have I seen his CV?  No, I've never seen his CV either.

Q.   Do you have any question, any reason to question his

expertise in the area of forensic odontology?

A.   No.  He's another forensic dentistry expert, yes.

Q.   He's well recognized nationally, isn't he?

A.   I think so.

Q.   He actually teaches people to be forensic odontologists,

right?

          MR. McHUGH:  Your Honor, I'm going to object to the

relevance.

          THE COURT:  Overruled.

BY MR. ROBERTS:

Q.   He even teaches forensic odontology to others who want to

become part of forensic odontology.  Correct?

A.   Yes.  He's one of many people who teach in forensic

dentistry.

Q.   Did you ever get a chance to look at the forensic

odontology report that Dr. Senn prepared for trial?

A.    No, I did not.

Q.    Okay.

MR. ROBERTS:  Your Honor, may I have just a moment?

THE COURT:  Yes, sir.

(PAUSE.)

BY MR. ROBERTS:

Q.    You stated in your direct testimony that when you looked at the teeth, the bite marks, you didn't see any difference between the three individual biters, did you, in their -- maybe I'm stating it wrong, but the, I guess in the alignment of their anterior view?  Did you see any difference in the set?

A.    You're misinterpreting what I said.

Q.    Okay.

A.    What I said --

THE COURT:  Okay.  All you do is just answer the question.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  "Yes" or "no."

THE WITNESS:  Please restate the question.

BY MR. ROBERTS:

Q.    In your direct testimony, you said that the three molds appeared to be similar.  Am I -- is that correct?

A.    They were all different.  I'm sorry, Your Honor.  No, that's not the way I said it.

Q.    Okay.  Well, tell me what you, what your -- when you

looked at these, you were not able to include or exclude any.

But then you also, I thought you also testified that they all

appeared to be, the alignment appeared to be similar.

A.   It wasn't dissimilar enough that you would be able to, in

a pattern injury, make an interpretation of one versus the

other.

Q.   Not even on the anterior view of the three sets of the

teeth?

A.   On the --

Q.   Let me show you --

        THE COURT:   How many views did you look at when you

came to your conclusion?

        THE WITNESS:   I looked at everything I listed in my

report, Your Honor.

BY MR. ROBERTS:

Q.   Let me show you what's been marked as Government Exhibit

71, and I'll show you the front page of Dr. Senn's forensic

odontology report.  And I'm showing you what is the mold for

Alfred Bourgeois, and I'll ask you just to look -- would that

be the anterior view?

A.   Yes.

Q.   Okay.  I ask you to look at that and tell me if that looks

similar to the mold for AB1994.  Is that the anterior mold?

A.   Yes.

Q.   Does that look similar to the first mold we looked at?

A.    Not in that perspective that you're looking at straight, looking at the person straight on like that.

Q.    Okay.  What about the one below, that is labeled Robin Bourgeois"?  Is that the anterior view?

A.    Yes.

Q.    Does that look similar to the other two teeth?

A.    Not from that perspective.

Q.    Okay.  So you looked at it from some other perspectives in reaching your conclusion?

A.    The statement that I made related to the spatial arrangement of the teeth, as that when you look down on the biting surfaces of the teeth, the arch form, the arch width are similar enough between the three arch, the three individuals, their arch size, if you will, and the teeth that are present are similar enough that they don't allow any discernment between the pattern that's represented in the photographs because the pattern is not a good representation of any of those sets of teeth.

Q.    Okay.

        MR. ROBERTS:  Your Honor, I'd like to approach the witness and hand him Government Exhibit 172.

        THE COURT:  I recall that you all, Ms. Booth did disclose to the defense that, what this witness, his opinion.

        MR. ROBERTS:  Yes, Your Honor.

        THE COURT:  Is that -- that's right, Ms. Booth?

MS. BOOTH:  Yes, Your Honor, it is.

THE COURT:  Okay.  Along with your opinion of his opinion.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Uh-huh.

MR. ROBERTS:  Your Honor, I'd like to show the witness Dr. Senn's report, and the report is six pages, and I'd like the witness to be able to --

THE COURT:  Sure.

MR. ROBERTS:  -- to read through that real quick.

THE COURT:  Sure.

MR. ROBERTS:  May I approach the witness?

BY MR. ROBERTS:

Q.   I hand you what's marked as Government Exhibit 172.  And you've never seen this exhibit before, but I'd like you to look through and tell me if you can identify whether or not that is from someone you recognize.

A.   Do you want me to sit here and --

Q.   I would.

A.   -- read the whole thing?

THE COURT:  Yes.

THE WITNESS:  And review it and --

BY MR. ROBERTS:

Q.   Yes, I would.  And I'd like you to read it, and I'd like you to tell me if there's anything in his report that you

disagree with.

(PAUSE.)

A.   So what was your question to me then?

Q.   My question was simply, is there anything in that report that you would professionally disagree with?

A.   Well, since I am not at the luxury of having all these different images that Dr. --

THE COURT:   Okay.  Just listen to the question and answer, please, sir, "yes"or "no" or you can't answer.

THE WITNESS:   I can't answer your question.

BY MR. ROBERTS:

Q.   Okay.  I'll retrieve that document.  What is it that you would need in order to make a conclusion?

A.   Well, I would need the actual hard copies of everything that Dr. Senn looked at and probably a similar amount of time that he needed for his analysis to look at the evidence that he had that I didn't have.

Q.   Did you look -- in looking at that report, did it seem to be that there was something in there that you didn't have?

A.   Well, maybe I misspoke there.  I guess he -- I don't know which images he's relating to when he's saying Image AA, BB, DD, whatever at this particular point in time.

Q.   I understand.  Let me ask you one more area real quick. You retired from the military, did you not?

A.   I'm sorry?

Q.   You retired from the military?

A.   Yes, I did.

Q.   That's a pretty important date, isn't it?

A.   Yes.

Q.   It was important in your life?  Did you have any kind of a reception or anything?

A.   Not that particular day.  Earlier in the month of December I did.

Q.   I just noticed earlier you had a problem remembering whether it was 2004 or 2005.  I wondered if you remember now when you actually retired from the military.

A.   Well, the problem with that is that the Army wants you to retire at the end of the fiscal, or the calendar year.  Your effective retirement date is 31 December, but you actually go on the retirement rolls on 1 January.  So that's why it was '04 or '05.

Q.   Oh, I understand.  And in your report, you say that you retired December 31, 2004.  But you might have still be on the rolls until 2005?

A.   It's on the next day of the next year, it kicks in that way.

Q.   Okay.  The only reason I bring that up is because you actually were in a military -- were you active duty, full time active duty?

A.   Yes.

Dailey – Cross                441

Q.   So you were in a military status the entire time you were doing the work on this case?

A.   Yes.

Q.   And it's my understanding that you actually submitted a bill to the U.S. Attorney's Office for some portion of -- to be reimbursed for some portion of the work you did in this case.

A.   Not for any of my time, which was on the Government's dime.  I submitted a bill for the hard copy materials I had to buy in order to analyze this, because the Government would not buy them for me --

Q.   And did you --

A.   -- at my place, you know, at my duty station.

Q.   And do you recall any discussions with anyone in the U.S. Attorney's Office asking if there was some way for them to allow you to be hired on after your military ended so that you could be paid for this role as an expert witness?

A.   No, I've never --

Q.   Do you remember any conversation like that?

A.   -- had that conversation, that I recall.

          MR. ROBERTS:  Your Honor, may I have just a moment?

          THE COURT:  Yes, sir.

     (PAUSE.)

          MR. ROBERTS:  I don't have anything else at this time, Your Honor.

          THE COURT:  Thank you.  Anything else?

MR. McHUGH:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   Dr. Dailey, just a couple of questions.  Counsel asked you that if you were called to testify at Mr. Bourgeois's trial by his trial counsel, you would have given the conclusions that you could not exclude or include any of the three stone casts that you received.  Is that right?

A.   Yes.

Q.   You would also have been able to testify to the four reasons why you were not able to make that determination.  Is that right?

A.   Correct.

Q.   And those four reasons have to do with the quality of the evidence that you received in the photographs.  Is that correct?

A.   Yes.

Q.   Okay.  And the conclusions that you were able or not able to draw from them.  Is that right?

A.   Yes.

Q.   Okay.  And Counsel talked to you about that you only reviewed four photographs in your second report with Dr., that you received from Dr. Oliver.  But if your first report indicates that in the summer of 2002 you had reviewed 30 photographs, would that be accurate?

A.    Yes.

Q.    Okay.  So in fact, you reviewed what appears to be at least 30 photographs, plus four additional enhanced images, so some 34 photographs, or enhanced images and copies of photographs.  Is that right?

A.    Yes.

Q.    Okay.  And lastly, that report that was handed to you, Government's Exhibit 172, that's dated April 20th, 2010.  And did you read that report that was just handed to you?

A.    I've never seen that before.

Q.    Okay.  Well, it also included -- it was essentially Dr. Senn's rebuttal to Dr. Bowers' report.  Is that correct?

A.    It looked that way, from what I read.

Q.    Okay.  So in addition -- so if Counsel was asking you whether you can agree to anything in there, in addition to seeing the materials that Dr. Senn had, you would also want to see the report of Dr. Bowers.  Is that correct?

A.    The one he referenced, yes.  I haven't seen it either.

MR. McHUGH:  Okay.  Thank you.  I have no further questions, Your Honor.

THE COURT:  Thank you.  Anything further?

MR. ROBERTS:  Nothing further, Your Honor.

THE COURT:  All right.  You may stand down and we'll --

THE WITNESS:  Thank you, Your Honor.

THE COURT:  -- come back at 9:15 in the morning.

MR. ABREU:  Your Honor, may I approach?  Or may I be heard?

THE COURT:  Yes, sir.

MR. ABREU:  And I stepped out, and I apologize, I stepped out of the room before right at the end of the planning session, but is 9:15 the earliest we can start?  And the only reason I ask is because a witness, one of my expert witnesses has a flight at 10:45.

THE COURT:  Yes.  9:15 is the earliest we can start. Thank you.

MR. ABREU:  Thank you, Your Honor.

(Proceedings concluded at 6:38 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter _____     November 5, 2010 _____
Molly Carter                          Date

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CLAUDIA WILLIAMS | 3 | 48 | 89 | 89 |
| BEVERLY FRANK | 91 | 107 | 129 | |
| BRENDA GOODMAN | 130 | 144 | 172 | 175 |
| MARK CUNNINGHAM | 180 | 200 (Voir Dire) | | |
| | 202 | 284 | 314 | |
| CARL HENRY | 321 | 341 | 358 | |
| DONALD REESE | 362 | 379 | 389 | 390 |
| MURRAY BOURGEOIS | 394 | 404 | 415 | |
| JON DAILEY | 418 | 429 | 442 | |

EXHIBITS:                                                          RECEIVED

PX-1:   CUNNINGHAM LETTER TO GILMORE 2/10/04 . . . . . .      284

PX-2:   CUNNINGHAM LETTER TO GILMORE 2/25/04 . . . . . .      284

PX-4:   CUNNINGHAM MITIGATING FACTORS POWERPOINT . . . .      253

PX-5:   CUNNINGHAM RISK ASSESSMENT POWERPOINT . . . . .       253

PX-7:   CUNNINGHAM CURRICULUM VITAE  . . . . . . . . . .      181

PX-8:   E-MAIL FROM CUNNINGHAM . . . . . . . . . . . . .      187

PX-9:   PROPOSED DIRECT EXAMINATION OF CUNNINGHAM  . . .      253

PX-10:  CUNNINGHAM MEMORANDUM TO FILE 3/24/04 . . . . .       284

PX-45:  BEVERLY FRANK DECLARATION . . . . . . . . . . .       105

EXHIBITS: (CONTINUED)                                      RECEIVED

PX-56:  CLAUDIA WILLIAMS DECLARATION . . . . . . . . .        48

PX-60:  E-MAILS FROM BIERBAUM . . . . . . . . . . . . .      284

PX-72:  WITHDRAWAL OF MOTION FOR CONTINUANCE 12/16/03 .      284

PX-98:  DAILEY CURRICULUM VITAE . . . . . . . . . . . .      420

PX-130: CUNNINGHAM MATERIALS RELIED UPON . . . . . . .       284

PX-139: 9/29/02 REPORT OF DR. DAILEY . . . . . . . . .       428

PX-140: 7/14/03 REPORT OF DR. DAILEY . . . . . . . . .       428

PX-144: MOTION FOR CONTINUANCE 12/9/03 . . . . . . . .       284

PX-151: CUNNINGHAM INVOICE TO GILMORE 4/30/07 . . . .        284

PX-165: INVESTIGATION TIME LINE . . . . . . . . . . .        284

PX-166: BOURGEOIS FAMILY . . . . . . . . . . . . . . .         8

PX-167: BOURGEOIS NOTES FROM ACT! . . . . . . . . . .        203

                    ----------------

GX-71:  DR. SENN'S REPORT . . . . . . . . . . . . . .        429

GX-72:  DR. CHRZ'S REPORT . . . . . . . . . . . . . .        429

GX-172: DR. SENN'S REPORT  . . . . . . . . . . . . . .       429

GX-173: DR. SENN CURRICULUM VITAE . . . . . . . . . .        429

GX-174: DR. SENN BIOGRAPHICAL INFORMATION . . . . . .        429

GX-202: BRENDA GOODMAN DECLARATION . . . . . . . . . .       172