IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *    CRIMINAL ACTION
                                   *
          PLAINTIFF,               *    CR-C-02-216(1)
                                   *
VS.                                *
                                   *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *    SEPTEMBER 22, 2010
                                   *    9:25 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *


     PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 3
   (TESTIMONY OF JOHNSON AND KEEL PREVIOUSLY TRANSCRIBED)

          BEFORE THE HONORABLE JANIS GRAHAM JACK
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

          (APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:            MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
             MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

2

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 9:25 a.m.)

(Call to Order of the Court.)

THE COURT:  All right.  Mr. Wiseman, I received both your filings.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  And first, I want to make it clear about Dr. Cunningham.  He was not being ridiculed.  I was stunned actually that he would put on as some evidence, some mitigating evidence that domestic violence is widespread, as if that was some mitigating evidence for this type of crime, which I do not find it to be.

And second, you have been rude and abrasive, and there's no need for it.  It does not serve your client well.  And maybe this is the way you practice, but I'm going to ask you to tone it down.

MR. WISEMAN:  I appreciate that.

THE COURT:  I'm going to give you all the rest of the day.  We will go until we're finished with your case.

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  All night if we have to.  I just -- I've got substitutes coming in for these two people.

MR. WISEMAN:  We appreciate that.  Thank you.

MS. BOOTH:  Your Honor --

THE COURT:  And I might mention, Mr. Wiseman, if you'd be a little more efficient in the presentation of your

evidence and pick your witnesses a little more carefully, you could have been done by now.  So go ahead, Ms. Booth.

MS. BOOTH:  Your Honor, I became aware -- I just wanted to alert the Court to the fact and I wanted to tell the Marshals that we have subpoenaed Lloyd Ferdinand, and he is --

THE COURT:  Thanks for telling us in advance.

MS. BOOTH:  He is -- it was a, a decision that we made last week to try to get him.  In fact, he was served, I believe, yesterday, to get him here, because we found in looking through his statement, he denied making the statement that has been -- that was in the Petitioner's brief, complaint. And so because of that, we felt like we had to bring him out here.

So he's here.  He is at the hotel.  We've alerted the Marshals to where he's staying and given his cell phone number.

THE COURT:  Thank you.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Is he going to be in and out rather quickly?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  All right.  Call your next witness.

MR. ABREU:  Good morning, Your Honor.  We would call Dr. Elizabeth Johnson.

(Stopping at 9:28:10 a.m.)

(TESTIMONY OF ELIZABETH ANN JOHNSON PREVIOUSLY

TRANSCRIBED.)

(Beginning at 11:52:40 a.m.)

THE COURT:  Do you all want to break for lunch and come back in an hour?  Or do you want to go forward with more witnesses?

MR. WISEMAN:  Your Honor, I have what I believe will be a relatively quick witness.

THE COURT:  Then call them.

MR. WISEMAN:  Okay.  George Holden, please.

MR. ROBERTS:  Your Honor, we might be able to make this even shorter.  We're going to object to the necessity of his testimony because essentially there was an entire Daubert hearing in which Dr. Holden gave the Court what he was going to testify about, and there was a lot of discussion there, and I've read his statement, and there's really nothing new that he's going to talk about that I can tell, unless there's some proffer that -- I don't see the need for Dr. Holden to even come in.

THE COURT:  Did I exclude him as a witness?

MR. ROBERTS:  You did, Your Honor.

MR. WISEMAN:  You excluded him, Your Honor, at the guilt phase on the issue of premeditation under Rule 704.

THE COURT:  Right.

MR. WISEMAN:  I'm going to be offering him or am offering him as a penalty phase witness on the question of the

psychological explanations for what Mr. Bourgeois did.

Now, I appreciate we have offered quite a bit of evidence on that.  I also want to --

THE COURT:  How long is this -- are you sure this is going to be quick?

MR. WISEMAN:  Well, I'm going to make it quick.  I can't account for the Government, but I'll be --

THE COURT:  Okay.  He wasn't offered in the sentencing phase.

MR. ROBERTS:  He was not, Your Honor.  But on the transcript of the Daubert hearing, there was an explanation of what he would testify about, and you even commented to Mr. Tinker that if he wanted to bring him back in, he could for sentencing for that very purpose.  So you have all the information before you, but I would just -- I don't think it's necessary, but I just --

THE COURT:  Let's do it, but do it quickly.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Remember, today you've got to finish your case.

MR. WISEMAN:  I appreciate that, and I --

THE COURT:  Can you do that?

MR. WISEMAN:  I'm sorry?

THE COURT:  Can you finish your case today?

MR. WISEMAN:  We are going to do our level best, and

I appreciate the Court's accommodation.

(Witness sworn.)

THE COURT:  I mean, sometime you need to get on to Gilmore rather quickly.  Is that right?

MR. WISEMAN:  I'm sorry?

THE COURT:  I said sometime you need to call Mr. Gilmore rather quickly.

MR. WISEMAN:  Yes, Your Honor.  My colleague just made the suggestion, we'd be happy to proffer his affidavit.  If the Government wants to cross-examine him, that's fine with us.

THE COURT:  What do you think?

MR. ROBERTS:  I was just --

MR. WISEMAN:  Let me just make one qualification to that, Your Honor.  I have about three minutes of questioning about his interaction with Mr. Tinker.

MR. ROBERTS:  Let's just go forward.  I'd rather just do that.

THE COURT:  Okay.  Why don't you read the affidavit, somebody read it while you're doing this.  Give him the oath again, Ms. Gano.  I'm sorry I interrupted you.

GEORGE WALKER HOLDEN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Please watch the microphone.

A.   Okay.

Q.   We're going to try to move very quickly through this.  Is this your CV, Petitioner's 21?

A.   Yes.

COURT RECORDER:  Could I have his name?

THE COURT:  Your name, sir?

BY MR. WISEMAN:

Q.   I'm sorry.  What's your full name?

A.   George Walker Holden.

Q.   And was the exhibit I just showed you your CV?

A.   Looked like one of my more recent ones.

THE COURT:  What's the number?

MR. WISEMAN:  P-21.  I would offer it into evidence.

THE COURT:  P-21.  Any objection?

MR. ROBERTS:  Not to the CV, Your Honor.

THE COURT:  P-21 is admitted.

BY MR. WISEMAN:

Q.   Professor Holden, tell the Court what you do for a living, and we know you're a psychologist, so just tell us briefly your specialty.

A.   I'm trained as a developmental psychologist, and my areas of expertise are parenting and family violence and the intersection of those two.

Q.   And in that regard, you research, do literature research and publications in that area?

A.   Yes.

Q.   I want to show you what's been marked as Petitioner's 18A.
Do you recognize that document?

A.   Yes, I do.

Q.   Okay.  It says, "Enclosed --" this is from Mr. Tinker to
you on November 21st, '03.  It says, "Enclosed please find an
order of the Court appointing you, a summary of the incident,
the autopsy report, DNA evidence and a neuropathology report
and a disk of autopsy photos."

     The second page is the Court's order indicating you were
appointed by Judge Jack on the 10th of October 2003.  Does that
comport with your recollection?

A.   Yes, sir.

          MR. WISEMAN:  Your Honor, I would offer this document
into evidence.

          MR. ROBERTS:  No objection, Your Honor.

          THE COURT:  What is it?

          MR. WISEMAN:  18A.

          THE COURT:  P-18A is admitted.

BY MR. WISEMAN:

Q.   I'm putting up what is 19.  Did you receive those
materials from Mr. Tinker that I just described?

A.   Yes, I did.

Q.   Okay.  And you wrote a report, or by way of letter to
him -- actually that's the wrong one.  Excuse me.  You wrote a

report to Mr. Tinker, which is marked as P-18?

A.    Yes.

Q.    And it's dated December 19th, 2003?

A.    Correct.

Q.    And in that report, you say at the beginning that, "I've now had a chance to go through the box of material regarding the Alfred Bourgeois case, and what was sent was only a limited amount of useful information for me to form an impression of the case."  Do you recall saying that?

A.    Yes, I do.

Q.    And at the end of the report, on Page 3, you say, "I have a number of questions that might be helpful to have answered." You go on to explain those questions as being relevant to Mr. Bourgeois's upbringing and childhood.

A.    Yes.

Q.    Did you ever get answers to the questions that you posed in Exhibit 18?

A.    No, I did not.

Q.    From Mr. Tinker?

A.    No.

Q.    Or from anyone related to the trial defense?

A.    Not at that time.

        MR. WISEMAN:  Your Honor, I would offer P-18 into evidence.

        THE COURT:  Any objection?

MR. ROBERTS:  No, Your Honor.

THE COURT:  P-18 is admitted.

BY MR. WISEMAN:

Q.   You subsequently wrote a second report, which is P-19. And that's dated February 25th, 2004.  Do you see that?

A.   Yes.

Q.   And what's your opinion in that report?

A.   Well, my opinion that was concerning the issue of premeditation.

Q.   And in a nutshell, you indicated, based on the materials you reviewed, that you at the time did not think Mr. Bourgeois premeditated this killing.

A.   Correct.

MR. WISEMAN:  Your Honor, I'd offer P-19.

THE COURT:  Any objection?

MR. ROBERTS:  No, Your Honor, I'm not going to object to the document.

THE COURT:  P-19 is admitted.

BY MR. WISEMAN:

Q.   You subsequently appeared before Judge Jack on March the 1st, 2004.  Do you roughly recall that?

A.   Yes.

Q.   And prior to your appearance, did you have any meeting with Mr. Tinker or any other member of the defense team to discuss the opinions regarding premeditation?

A.   No, I did not.

Q.   And I take it you had no additional information provided to you between the date of the report and the time of your March 1st testimony.

A.   No.

Q.   What do you recall the purpose of that hearing to be?

A.   Well, as I recall, it was to see whether my testimony would be admissible to the Court.

Q.   And was that in the penalty phase or the guilt phase?

A.   That was in the --

Q.   Guilt?

A.   Well, it was before, so it was the guilt phase, yeah.

Q.   And do you recall being asked many questions by Judge Jack, as well as the prosecution, with respect to an assumption that you were making that Mr. Bourgeois committed the offense?

A.   It's sort of vague, my recollection of it, but yes, uh-huh.

Q.   And do you recall Judge Jack making comments, or actually rulings that the question of premeditation in the guilt phase was an issue for the jury?

A.   Yes, I do.

Q.   And you in fact were not permitted to testify in the guilt phase for those reasons.

A.   Yes, I do.

Q.   Or for that reason.  All right.  I want to just read to

you -- well, actually, let me ask you this. Did you ultimately in that hearing acknowledge, during the questioning from Judge Jack, that you did not have all the facts necessary to render an opinion on premeditation?

A.   Yes.

MR. WISEMAN:   All right.  And for the record, Your Honor, that's Page 49 of the proceedings.

BY MR. WISEMAN:

Q.   And at the end of the hearing, did you actually admit to Judge Jack that at that time you could not provide an opinion at all with respect to premeditation?

A.   Yes, I think I did.

Q.   And that was because you, it had been pointed out to you through the various questioning that you didn't have adequate information.

A.   Right.  Correct.

Q.   And do you recall Judge Jack at one point in the proceedings telling Mr. Tinker that while you could not testify in the guilt phase, you might be a suitable penalty phase witness, and everyone should think about that?

A.   Yes.

Q.   Subsequent to your appearance before Judge Jack on March 1st, 2004, did you ever hear again from Mr. Tinker?

A.   No, I did not.

Q.   Did you hear from anybody else relevant to the defense

team?

A.   No.

Q.   And I want to shift ahead to 2007.  Did you get contacted by myself and Ms. Larin from my office?

A.   Yes.

Q.   And did we meet with you?

A.   Yes.

Q.   And you -- subsequent to that meeting, we provided you with a wealth of material about Mr. Bourgeois's background and upbringing?

A.   Yes.

Q.   And that included psychological reports?

A.   Yes.

Q.   Two neuropsych reports?

A.   Yep.

Q.   Many lay declarations?

A.   Yes.

Q.   And was that the kind of information you were looking from when you asked Mr. Tinker back in 2003 for additional information?

A.   Yes.  That was much more helpful in understanding --

Q.   Did we answer your questions?

A.   Yes.

Q.   Okay.  And as a result of that, did you complete a declaration for us, which is Petitioner's 20?

A.    Yes, I did.

Q.    All right.  And just for the record, is that the document?

A.    Yes.

MR. WISEMAN:  Okay.  Your Honor, at this time I would offer the declaration in evidence as comprising the remainder of my direct examination and pass the witness for cross.

THE COURT:  Did I admit that?

MR. WISEMAN:  20?  I don't think you admitted 20.

THE COURT:  Are you offering 20?

MR. WISEMAN:  I'm offering 20.

THE COURT:  Any objection?

MR. ROBERTS:  Your Honor, could I just make sure that the witness has actually reviewed it and that all the --

THE COURT:  Yes.

MR. ROBERTS:  -- information is actually his information --

THE COURT:  Yes.

MR. ROBERTS:  -- and that nothing else was typed?

THE COURT:  Yes.

MR. ROBERTS:  Did you read the document?  I'm sorry.

THE WITNESS:  Yes.  My declaration?

MR. ROBERTS:  Yes.

THE WITNESS:  Yes.

MR. ROBERTS:  Did you type the document yourself?

THE WITNESS:  No, I did not type it.

MR. ROBERTS:  Who typed it for you?

THE WITNESS:  I presume, well, from the defense office.

MR. ROBERTS:  You presume from the defense office? Do you know who typed the document?

THE WITNESS:  I do not.

MR. ROBERTS:  But you did read every paragraph?

THE WITNESS:  Several times.

MR. ROBERTS:  And every statement in there is your own conclusions, your own opinions?

THE WITNESS:  Yes.  I'm very comfortable with everything that I've declared there.

MR. ROBERTS:  Okay.  We have no objection to the document, Your Honor.

MR. WISEMAN:  And just for clarification, we didn't type this --

THE COURT:  P-20?

MR. WISEMAN:  P-20.

THE COURT:  P-20 is admitted.

MR. WISEMAN:  We didn't type this in front of you, did we?

THE WITNESS:  No.

MR. WISEMAN:  We sent it to you in the mail?

THE WITNESS:  Yes.

MR. WISEMAN:  Nothing further.

THE COURT:  All right.  Go ahead.

MR. ROBERTS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Holden, when did you come into contact with Mr. Tinker?  Was it on the days that you sent these letters, or was it prior to that?

A.   What do you mean in contact with?

Q.   Sorry, just did Mr. Tinker -- just tell us how you first were contacted --

A.   Okay.

Q.   -- with regards to this case.

A.   As I recall, he telephoned me at my office sometime during that fall before I wrote the initial December letter.

Q.   And when he contacted you, do you recall whether he told you someone referred you to him, or how did he get your name?

A.   I believe so, yes.

Q.   Do you know how he got your name?

A.   I think it was through the Texas Defenders Association, whatever that is.  John Nyland --

Q.   Okay.

A.   -- if that name rings a bell to you.

Q.   No, that name doesn't ring a bell to me, but I do remember when you testified, and from your information you've provided, you said that you didn't, you actually had not been in court

very often.

A.    Correct, yes.

Q.    So this was something that was relatively new for you?

A.    Yes.

Q.    Did you tell that to Doug Tinker when he contacted you?

A.    I believe I did.

Q.    You think you told him that you're not very familiar with going to court and testifying?

A.    I believe so, yes.  Any time a attorney has contacted me about testifying in court, I am very quick to say, "This is not something I enjoy doing, and I haven't done it very much."

Q.    You don't like being around us?

A.    Nothing personal, but --

        MR. WISEMAN:  Speak for yourself, sir.

        THE WITNESS:  I prefer to be in the classroom.

        MR. ROBERTS:  Well, let me ask you --

        THE COURT:  Would you rather have a root canal?

BY MR. ROBERTS:

Q.    What I recall and what is reflected in your statement was that you intended on coming in and talking about this concept of filicide and the fact that a parent will often kill their child in one of these rage kind of scenarios.  Is that right?

A.    Yes, I was going to talk about filicide, yes.  I don't know how much extra detail I provided, but yes.

Q.    We covered a lot of the portion of what you're going to

testify back on March the 1st, 2004, didn't we?

A.    Yes.

Q.    And in the end, essentially you were going to turn to the jury, it was going to be your opinion, you were going to turn to the jury and say, "Alfred Bourgeois killed his daughter because he was exercising under one of the concepts of this filicide theory," and then you were going to explain how that family situation caused him to react that way.  Is that how you were going to approach the case?

A.    I was going to talk about -- well, it's hard for me to recollect my mindset back then, because we know that memory is reconstructive, rather than reticle (phonetic).  There's a lot of good psychological research on that.  So would you like me to say now how I would present it to the jury?

Q.    No, I'm not interested in how you would present it now.  What I'm interested in is what you intended to do and what you were informing this Court at that time.

A.    Well, I just said, it's hard to remember exactly how I was going to present it, but --

            THE COURT:  Well, then if you can't, you can't.

            THE WITNESS:  I mean, I could make a stab at it, if you --

            THE COURT:  No, I don't think that's really what we have in mind here.

            THE WITNESS:  Okay.

Holden – Cross
20

THE COURT:  If you can't remember and you don't know what you were going to say, we'd just better move on.  And is your affidavit, your declaration based on what you'd say now and not what you knew back then?

THE WITNESS:  The 2007 affidavit?

THE COURT:  Yes, the declaration.

THE WITNESS:  Declaration is --

THE COURT:  What you knew in 2007?

THE WITNESS:  Has -- that was based on additional information that I received, yes.

THE COURT:  Okay.  But it wasn't based on what you knew at the time --

THE WITNESS:  No.

THE COURT:  -- of the trial.

THE WITNESS:  Correct.

THE COURT:  Okay.  Anything else?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Why?

MR. ROBERTS:  Sorry?

THE COURT:  Why would there be more?

MR. ROBERTS:  I wanted to ask one more question, Your Honor.  Your Honor, I have no more questions.

THE COURT:  That's a good thing.

MR. WISEMAN:  I certainly do not.

THE COURT:  I think that's wise.  Would you stand

down, please, sir.

Now -- what?

MR. ABREU:  Just standing, Your Honor.

THE COURT:  Just standing.  I think it's time, we'll break for lunch, and we'll come back at 10 after 1:00.

(Recess from 12:09 p.m. to 1:13 p.m.)

THE COURT:  Would you call your next witness?

MR. McHUGH:  Your Honor, I just had one thing I wanted to bring to the Court's attention.

THE COURT:  Okay.

MR. McHUGH:  We had issued orders or motions to Your Honor for issuance of subpoenas for a couple of witnesses for today, and they had not appeared.  We wanted to -- and it's a bit of a problem for us that we do need these witnesses here. Their names are Darrick Moore, William May, I'm sure Your Honor's familiar with, Orlando Campos --

THE COURT:  Well, did you ever serve William May?

MR. McHUGH:  I believe that the Marshals did.  The point was that we had issued, asked Your Honor's --

THE COURT:  Has Bill May been served?

MR. SNIDER:  Your Honor, I personally worked that one, and it was unable to serve.

THE COURT:  Okay.

MR. SNIDER:  We were unable to serve that one.

THE COURT:  So who else?  Darrick Moore?

MR. McHUGH:  Darrick Moore, Bill May, Orlando Campos and Timothy Allen.  Those four are the four that we're going to need service on through the Marshals, a compulsory process of some type at some time.

THE COURT:  Well, if you can't give them an address for Bill May, I can't help you there.

MR. McHUGH:  I thought we had an address, but I'll check on that.  I thought there was an address.

THE COURT:  No, you had an old address, and I told Mr. Wiseman that you could reach him, if he was still alive -- the last I heard he was in --

MR. McHUGH:  Right.

THE COURT:  -- an intensive care unit in Dallas.  His wife was named Nina May, and she lives on Topeka.

MR. McHUGH:  Right.

THE COURT:  Now, you all have to find an address.  We can't --

MR. McHUGH:  Okay.

THE COURT:  -- compulsory do anything.  I mean, you've obviously not checked that out.

MR. McHUGH:  I think we've done some legwork on that.  I can advise the Court of that at an appropriate time.  I just wanted --

THE COURT:  This is the time.

MR. McHUGH:  Okay.  Then may I confer?

THE COURT: Yes.

(Counsel conferring off the record.)

THE COURT: When did you find out these people weren't here? I mean, this is -- your time deadline was over at noon today.

MR. McHUGH: Well, we've been waiting --

THE COURT: You've been waiting for them?

MR. McHUGH: I mean, I've talked to our investigator, Ms. Tucker, and I said, you know, "Roam the hallways, check at the front." She's been doing that throughout --

THE COURT: It's a little late to demand attendance from people that you were -- it's 1:15 on Wednesday. The time that I gave you was till noon today to present your case. It's a little late to talk about compulsory process.

MR. McHUGH: Well, I wanted to bring it to the Court's attention, you know --

THE COURT: Well, you should have brought it in a timely fashion.

MR. McHUGH: May I advise, or consult --

THE COURT: Surely you subpoenaed these people for Monday.

MR. McHUGH: I believe that the notice of subpoena was for today, because we knew this was the day that we would be presenting them. I can check with the Marshals.

THE COURT: That's a little irresponsible.

(PAUSE.)

THE COURT:  Call your next witness.

MR. McHUGH:  Jennifer Valdez, who was served by the Marshals and was transported here by the Marshals.

On one other matter, Your Honor --

THE COURT:  Would you administer the oath?

THE CLERK:  Yes, Your Honor.

(Witness sworn.)

MR. McHUGH:  Just for the Court's information, Your Honor, we have noticed Mr. Gilmore to be here at 2:30.

JENNIFER VALDEZ, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Could you state your name for the record?

A.   Jennifer Valdez.

Q.   Ms. Valdez, I'm going to ask you, first of all, please try not to touch the microphone, or don't touch the microphone, I guess I should say.

A.   Okay.

Q.   Because any touching of the microphone makes a loud noise.

Can you tell us where you were living back in 1995?

A.   I lived in Corpus Christi, and then I moved to Houston, Texas.

Q.   Okay.  And back in 1995 on one of your visits back to Corpus Christi, did you meet a gentleman by the name of Adam

Longoria?

A.    I did.

Q.    Okay.  And did you begin a relationship with him?

A.    We were talking, yes.

Q.    If you could --

A.    Yes, we were talking.

Q.    Okay.  And did there come -- when you say you were talking, it was, you were --

A.    Well, I lived in Houston, so we were just like over the phone type thing until I moved here.

Q.    Okay.  And after you moved here, did there come a time that he got arrested and locked up for a DUI, driving under the influence charge?

A.    Yes.

Q.    Okay.  And did there come a time after he got locked up for the driving under the influence charge that the relationship developed further and you eventually married Mr. Longoria?

A.    Yes.

Q.    Okay.  What day do you recall that was?

A.    I married him on January 10th of 2003.

Q.    Okay.  And after you got married to him, did there come a time that you found out that you were in fact pregnant?

A.    Yes.

Q.    Okay.  And after you found out that you were pregnant, did

something happen to Mr. Longoria?

A.    Two days after I found out I was pregnant --

THE COURT:  Mr. Who?

MR. McHUGH:  Longoria.

THE COURT:  Okay.

THE WITNESS:  Two days after I found out I was pregnant, he was arrested for a bank robbery.

MR. McHUGH:  Okay, and --

THE COURT:  For what?

THE WITNESS:  Bank robbery.

THE COURT:  Okay.

BY MR. McHUGH:

Q.    And was he the father of the child?

A.    Yes.

Q.    Okay.  And so was -- he was arrested for bank robbery.  Was he incarcerated pending trial?

A.    Yes.

Q.    Okay.  And did you have communications with him during his incarceration pending trial?

A.    Yes.

Q.    Okay.  And did he tell you about what he was doing with his case, this bank robbery case?

A.    Yes, he did.

Q.    And what did he tell you?

A.    He told me that he was planning on trying to make a deal

so he can get out early to be with me and the baby.

Q.   And did he say who he was making the deal with?

A.   The prosecutors that he was talking to.

Q.   Okay.  And did he tell you this on one occasion or more than one occasion?

A.   He told me several times on the phone and through letters.

Q.   Okay.  And did you save these letters?

A.   I did for a while, and then later, when I got a new boyfriend, he made me throw out all my stuff that I had from him, letters and everything.

Q.   Okay.  And now did you eventually have this baby?

A.   Yes.

Q.   Okay.  And what date was that?

A.   January 21st of 2004.

Q.   Okay.  And that was a girl or a boy?

A.   A girl.

Q.   Okay.  That was Mr. Longoria's daughter?

A.   Yes.

Q.   Okay.

         THE COURT:  It's Mr. Longoria, not Langoria.

         MR. McHUGH:  I'm sorry, Longoria.

BY MR. McHUGH:

Q.   Now, after he got locked up for the bank robbery, did you speak with the detectives that were handling the matter?

A.   Yes, I did.

Q.   And what did they tell you about the arrest and about Mr. Longoria?

THE COURT:  Why are we hearing all this?

MR. McHUGH:  Your Honor, this goes to our Brady claim.

THE COURT:  Well, why don't you ask Mr. Longoria about it?

MR. McHUGH:  Well, he -- I should mention, Your Honor, he's in -- we'll get to that in about three minutes, but he's another person that we have subpoenaed also.

BY MR. McHUGH:

Q.   So did you speak with the detectives about Mr. Longoria?

A.   Yes, I did.

Q.   What did they tell you?

A.   They had told me that he had lied to me about a lot of stuff, including his criminal records and being involved in a prison gang.

Q.   Okay.  And that was while he was awaiting trial on his bank robbery?

A.   Yes.

Q.   Okay.  Did Mr. Longoria tell you what he thought he was facing as far as a possible prison sentence?

A.   He had told me he was looking at 25 to life.

Q.   Okay.  Now, after a certain time, while he's awaiting trial, did you and your father find something out about

personal checks that you had?

A.   Yes.  Soon after he got arrested, I noticed we were getting notices from the place that he had written hot checks under my name and my dad's name.

Q.   Okay.  And by "he," who do you mean?

A.   Adam.

Q.   Okay.  And now, since that time, back in 2004, has Mr. Longoria been incarcerated?

A.   He just recently got incarcerated again.

Q.   Okay.  Well, did you get notice that he had been released?

A.   Yes.  I'm on the victim services list, and they notified me about two months ahead of time that he was being released, and then again right after he was released, and then I got notified again that he was incarcerated again.

Q.   Okay.  Well, when did you get notice that he was -- did you get -- why are you a victim, if you were his wife?  Why would you be on the victims' list?

A.   While he was locked up during the bank robbery sentence, he was calling and making threats to me and my family.

Q.   Okay.  And so the victims' coordinating services here in Texas notified you that he was being released.  And when was he released?

A.   May 29th of this year.

Q.   Okay.  And as a result of him being released, did you take any action?

A.    I moved me and my daughters out of Corpus.

Q.    And why did you do that?

A.    Because I didn't want him to find us.

Q.    Okay.  And now you say that he, you heard that he had been locked up again.  What were you informed?

A.    I was informed that he was being charged with murder of a 14-year-old in Kansas.

Q.    Okay.  And when did you get -- you were informed of that just recently?

A.    Just a couple of weeks ago.

        MR. McHUGH:  If I may just check, Your Honor.

     (PAUSE.)

        MR. McHUGH:  That's all I have, Your Honor.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q.    Good afternoon, Ms. Valdez.  You testified I guess basically that you think that Mr. Longoria is a liar.  Is that correct?

A.    I know he is.

Q.    Okay.  And so you think the things he told you about he's working with his lawyer and that he's trying to work out a deal, those could be things that are also considered lies?

A.    They could be.

Q.    Okay.  So you don't know what the truth is of what Mr. Longoria has told you.

A.   I just know what he's told me.

Q.   Okay.

THE COURT:  But you don't know if -- the point is, you don't know if any of that's true or not.

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

MS. SALINAS:  Okay.  Could I have just a moment, Your Honor?

THE COURT:  Yes, ma'am.

MS. SALINAS:  I have no further questions of this witness, Your Honor.

THE COURT:  Thank you.

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

MR. McHUGH:  At this time, Your Honor, the Defense would call Dr. Michael Bowers.

Your Honor, as to your question about Mr. Longoria, I think the Marshals might be better able to speak to that, but we did also issue a motion for Your Honor to issue a subpoena. Due to his incarceration in the State of Kansas for --

THE COURT:  Is he here?

MR. SNIDER:  Your Honor, I'd have to find out.  I don't think so.  We did get a subpoena.  The gentleman's in custody, so it usually requires a writ for those, and we --

THE COURT:  Did you ask for a writ to be issued for

somebody in custody?

MR. McHUGH:  Well, Your Honor, he had just recently been reincarcerated, so I know that we filed the motion for the subpoena.  I don't know if we followed up with a writ.

THE COURT:  Well, a subpoena doesn't work if somebody's in custody.  If you knew he was in custody, you have to issue, ask for a writ.  And you did not do that?  Is that correct?

MR. McHUGH:  I can't speak to that.  I'm not sure.

THE COURT:  Well, find out.

MR. McHUGH:  I will.

THE COURT:  Right now.

MR. McHUGH:  Right now?

THE COURT:  Yes.

MR. McHUGH:  And what is the question, Your Honor, did we request a writ?

THE COURT:  Did you request a writ when you found out he was in jail, or in prison?  Apparently you knew that, because this lady testified to it.

(Counsel conferring off the record.)

MR. McHUGH:  We did not, Your Honor.

THE COURT:  Okay.  I also heard from the Marshals that even though, if you recall, Mr. Wiseman, I told you that Mr. May was living in Dallas last I heard -- correct?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  -- that you still had the Marshals serve the local address where he was not.  Did you know that?  According to the Marshals.

MR. WISEMAN:  I did not know that.

THE COURT:  Okay.  In fact, did I not do everything I could to help you find Mr. May?

MR. WISEMAN:  You were extraordinarily helpful.

CHARLES MICHAEL BOWERS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Good afternoon, Dr. Bowers.

A.   Good afternoon.

Q.   Can you state your name for the record?

THE COURT:  Please do not touch the microphone.

MR. McHUGH:  I was getting to that.

THE COURT:  I told you all, before any of your witnesses got up here, to inform them all, do not touch the microphone.  It goes directly into this lady's ears and gives her deafness.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Go ahead.

THE WITNESS:  Charles Michael Bowers.

BY MR. McHUGH:

Q.   And what is your present occupation, Dr. Bowers?

A.   I'm a dentist.

Q. And do you also work as a medical examiner?

A. I have a contract, contractual arrangement as a Deputy Medical Examiner with the Ventura County Medical Examiner's Office.

Q. Okay.

A. I'm responsible for dental evidence that's brought into the coroner's office in that county in California.

Q. Okay. And Dr. Bowers, are you a member of any professional societies?

A. Yes, I am. I'm a member of the American Academy of Forensic Sciences, a diplomate of the American Board of Forensic Odontology, member of International Association of Identification as a certified crime scene analyst.

Q. Okay. And have you published textbooks, journals, scholarly articles in the field of forensic odontology and photo imaging and enhancement?

A. Yes, I have.

Q. And have you provided expert testimony in the area of forensic odontology, bite mark analysis and photo imaging and enhancements in state or federal courts?

A. Yes, in state courts.

Q. Okay.

MR. McHUGH: And Your Honor, at this time I'm going to --

BY MR. McHUGH:

Q.    Dr. Bowers, can you identify what's been marked as P-96?

A.    That's my curriculum vitae.

MR. McHUGH:  I'm going to offer that at this time, Your Honor.

THE COURT:  What number is it?

MR. McHUGH:  P-96.

THE COURT:  Any objection?

MR. ROBERTS:  No, Your Honor.

THE COURT:  P-96 is admitted.

MR. McHUGH:  At this time, Your Honor, I would offer Dr. Bowers as an expert in the area of forensic odontology, bite mark analysis and forensic photo imaging and enhancement.

MR. ROBERTS:  Your Honor, the United States has no objection to him as an expert in forensic odontology.  We are not convinced that he is an expert in the other field.

THE COURT:  May I see his CV, Ms. Cayce?  P-96.

MR. ROBERTS:  To expedite it a little bit, Your Honor, we're aware he published a book on the use of photography, but it was self-published, and it's our understanding that there's no peer review of it.

THE COURT:  There was no what?

MR. ROBERTS:  No peer review of his --

THE COURT:  Okay.

MR. ROBERTS:  -- his book.

MR. McHUGH:  And I can go into a little bit more voir

dire in that area.

THE COURT:  Go ahead.

BY MR. McHUGH:

Q.   Dr. Bowers, Counsel has mentioned that you've published a book in the area of photo enhancements and imaging.  Have you also taught training courses in photo imaging and enhancement?

A.   Yes, I have.

Q.   Okay.  And have you presented workshops in the area of photo imaging and enhancements?

A.   Yes.

Q.   And are you a certified crime scene analyst, which includes analyzing autopsy photos?

A.   Yes.

Q.   And you've also, as I had previously questioned you, presented expert testimony in this area, this specific area that Counsel's objecting to?

A.   Yes.

MR. McHUGH:  With that, Your Honor, I would ask that he be qualified.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Just because he's presented expert testimony doesn't make him an expert, Your Honor.  I still have a concern that what he is relying upon is self --

THE COURT:  Do you want to take him on voir dire?

MR. ROBERTS:  Sure, Your Honor, I'll ask him a few

questions on that.

THE COURT:  Would you be seated, please, sir.

MR. McHUGH:  Oh.

VOIR DIRE EXAMINATION

BY MR. ROBERTS:

Q.  Dr. Bowers, do you have a copy of your CV in front of you?

A.  No, I do not.

MR. ROBERTS:  May I have the exhibit, please?  Or the Judge is still using it?  May I approach the witness, Your Honor?  I'm going to ask him to show us on here what of his information would, is he referring to.

THE COURT:  Fine.

BY MR. ROBERTS:

Q.  I'm handing you what's marked as P-96.  Dr. Bowers, I'd ask you to identify what in your CV actually makes you an expert in the photo imaging area.

A.  Certainly.  To start out with --

Q.  If you'll refer to the page, I'll put it on the overhead.

A.  Very good.  Let's go Page 4.  Specifically, these are peer-reviewed articles that I have published or co-authored. Item 3, myself and another individual, Journal of Forensics Science Review, 2002, Photographic Evidence Protocol Using Digital Imaging Methods, and you can read the --

Q.  Did that article deal with enhancements?

A.  No, it did not.

Q.   Okay.

A.   It had to do with photographic issues regarding --

Q.   Can we move to something that deals with enhancements, please?

A.   Okay.   Actually in the review articles, none.

Q.   None?

A.   In the chapters in books or periodicals --

Q.   What page is that?

A.   I'm sorry, Page 3.

Q.   Oh, we're going backwards.   Okay.

A.   Go back one.   Under books, as you described as self-published, there's a small entry about enhancements.

Q.   Which book is that?

A.   That would be -- I'm sorry.   That's Number 2.

Q.   Number 2?

A.   Digital Analysis of Bite Mark Evidence.

Q.   This is the book that you self-published?

A.   Yes.

Q.   Who were the peer reviews of that?

A.   No peer review.

Q.   No peer reviews, okay.   Something else?

A.   In the realm of teaching and training, I'm not even sure if that's on this CV.   Let's see.   On Page 7, 2001-2002, that second from the top.

Q.   This one right here --

A.    Yes.

Q.    -- I'm pointing out on the overhead?

A.    Yes.   That Outline of Forensic Dentistry, that was done and enhancement was discussed.

Q.    How much of the enhancement was discussed at that?

A.    Oh, I have no compilation of percentages.

Q.    Just a small portion of the presentation?

A.    Well, it was small in regards that there were a lot of other issues involved and presented by me.   It would be considered a section of it.

Q.    And it was presented by you?

A.    Yes.

Q.    Okay.   And was it based on your book that you self-published?

A.    And my experience involving use of Photoshop and --

Q.    It's primarily Photoshop?

A.    As a user of Photoshop, yes.

Q.    As a user of Photoshop?

A.    Yes.

Q.    So is most of your experience related to the use of Photoshop and how that, Photoshop can be used to enhance?

A.    That's a substantial part of it.   And regarding training and knowledge, I've written --

Q.    Is it self-taught information where you're using Photoshop yourself and you're teaching yourself?

A.   Well, I'm not talking about teaching myself.  I'm talking about what I --

Q.   Well, I'm talking about teaching yourself, because I'm trying to find out --

A.   Okay.

Q.   -- if you actually are an expert in enhancements, or if you're just somebody that's used enhancements.  And I don't have a problem with you testifying about how you've used it.

A.   I understand.

Q.   But I do have, you know, you're here as an expert, and I haven't seen anything in your CV nor have I heard anything yet that convinces me that you have expertise in enhancements.

A.   The initial exposure I had with the use of digital methods was by a number of weekend courses in my town in Ventura, put on by I think the junior college.

Q.   And what were those courses?

            THE COURT:  On Photoshopping?

            THE WITNESS:  On Photoshop, like Photoshop for Dummies type of program, where they start you off using Photoshop --

            MR. ROBERTS:  Your Honor, I don't --

            THE WITNESS:  And from that point --

            MR. ROBERTS:  I would object to him being an expert in this area, Your Honor, but I don't have a problem with him testifying about his own use as a lay witness in that area.

THE COURT:  I'll sustain that.

MR. ROBERTS:  Thank you.

MR. McHUGH:  Your Honor, I guess I would also just ask if the Court would consider that he is an expert in digital imaging.  There was a number of articles that he pointed to that are peer-reviewed --

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, I'm not sure to what extent digital imaging is going to be impacted in the testimony.  I've looked at his, the statement that he's provided to the Court.  The declaration he provided goes into a lot of, it focuses on enhancement in Dr. Bowers' -- Dr., not Bowers, Dr. Oliver's information, and that's what I would object to him being able to testify as an expert on.

THE COURT:  Sustained.

MR. McHUGH:  Well, if I may respond, Your Honor, Dr. Bowers, I'm sorry, Dr. Oliver --

THE COURT:  Could you move on, please?

DIRECT EXAMINATION (Continued)

BY MR. McHUGH:

Q.   Are all the opinions you will give here today stated to a reasonable degree of scientific certainty?

A.   Yes.

Q.   Okay.  Dr. Bowers, can you tell us what is forensic odontology?

A.   It's the application of dental science and dental therapeutics to the law.

Q.   And in forensic odontology, are there specific subspecialties?

A.   Yes.  Besides forensics, there's -- I'm sorry.  Ask the question one more time.

Q.   Within the forensic odontology, are there specific subspecialties?

A.   Yes.  Human identification of generally deceased remains is one section.  That's -- and the second section is bite mark analysis.  Third would be personal injury, assessment of injuries in civil cases.  And the fourth is malpractice --

Q.   Okay.

A.   -- investigations as an expert witness.

Q.   And in your practice, have you had experience with all four of these areas?

A.   Yes.

Q.   Okay.  And bite -- I want to focus here today on bite mark comparison.  Is it different from the other subspecialties that you just mentioned?

A.   Yes, it is.  The difference is the others have a considerable amount of, they're all involving quality of care, treatment, therapeutics.  They have a considerable amount of scientific research and dental acceptance.  Bite marks is considerably different.  Bite marks have to do with taking

images of teeth, placing them over two dimensional photographs of skin injuries.

Q.　Okay.　And does bite mark comparison rely on some assumptions?

A.　Yes, it does.

Q.　Okay.　And can you just at this time in your examination just list a couple of those assumptions that it relies upon?

A.　Assumption one is that the dental profile of each individual is different from everyone else's.　That's defined in, by dentists as being unique.　And the second is that uniqueness is expressible in terms of its, the impression on skin.　So skin is determined to be, the assumption is reliable substrate or a reliable surface that will reflect the uniqueness of the biter.

Q.　Okay.　And in your opinion, have any of these assumptions been supported by, empirically, by reliable scientific inquiry?

A.　Supported, no.

Q.　Okay.　If it's not based on reliable scientific inquiry, then what is it based on?

A.　It's a practitioner-determined basis, meaning that it's been in use for many years and there's decades of judicial acceptance of those practitioners.

Q.　Okay.　Now, I'd like to turn your attention to the National Academy of Science.　Can you just tell us what that is, the National Academy of Science?

A.   It's a scientific group.  The academies encompass medicine, science, and other disciplines.  Their existence is via a mandate with the United States Congress.

Q.   Okay.  And is it, would you say, the Congress' arm as to, or Congress' ability to investigate sciences, when they have questions concerning science?

A.   That's their historically, role.

Q.   Okay.  And it's been around since the time of Abraham Lincoln.  Is that right?

A.   Quite a history, yes.

Q.   Okay.  And would you agree with this description of the National Academy of Science, that it's the most prominent objective and impartial scientific organization in the United States, if not the world?

A.   That's been in place and the opinion for decades.

Q.   Okay.  And I think you mentioned it's -- now, the reason I'm asking you about the National Academy of Science is because, did they prepare a report concerning forensic evidence in 2009?

A.   Yes.

Q.   Okay.  And was this report ordered as a mandate of Congress?

A.   Yes, it was.  A judicial subcommittee requested --

Q.   Okay.

A.   -- the report.

Q.    And in fact, are opinions from the National Academy of Science considered authoritative by courts throughout this country, including the United States Supreme Court?

A.    Their expertise is unrivaled, and they're accepted.  Their opinions are accepted.

Q.    Okay.  Now, before I get into the report, I wanted to go over a exhibit that was presented to me in completion this morning, prepared by Dr. Senn, who is the Government's expert in this matter.

            MR. McHUGH:  And Your Honor, that was previously marked as P-123.  I received a complete copy of it from Mr., from the Government.  I forget exactly who provided it to me, but this morning.  So I'm going to go over that with Dr. Bowers right now.

            MR. ROBERTS:  Your Honor, if I might interject.  We would ask that both the document that they submitted first and this complete document that we have provided be also received into the record.

            MR. McHUGH:  I have no objection to that, Your Honor.

            MR. ROBERTS:  We had marked a copy as Government Exhibit 204, if I might move that into the -- offer that, Your Honor.

            THE COURT:  Government's Exhibit 204 admitted.

            MR. ROBERTS:  Thank you, Your Honor.

BY MR. McHUGH:

Q.   Now, I'm showing you what has been marked as Government Exhibit 204.  Do you recognize this, sir?

A.   Yes.

Q.   Okay.  And did I show you this today?

A.   Yes.

Q.   Okay.  And does this appear to be a presentation by Dr. David Senn to the National Academies?  And I'm going to show you Page Number 2 and the date of that.

A.   I'm familiar with this.

Q.   Okay.  And it's dated April 23rd, 2007.  Is that correct?

A.   Correct.

Q.   Okay.  Now, I'm going to go through a number of pages with you concerning this exhibit.  Was this a presentation that was made to the National Academies prior to the issuance of their 2009 report?

A.   To my knowledge, yes.

Q.   Okay.  Now, do you see that, sir, where it says, "State of the art"?

A.   Yes.

Q.   Okay.  And at the bullet point, the second bullet point, it says, "Seek second opinions from the independent blinded competent forensic odontologist."  Do you see that?

A.   Yes.

Q.   Okay.  Now, I just wanted to discuss with you for a minute what that means, a blinded analysis.  In the world of forensic

odontology, what does that mean to you?

A.   Blinded means that the examiner, the dental examiner that's evaluating the relevant evidence doesn't know any of the circumstances regarding either the case itself, circumstantial evidence, about suspects, any determination of names on the evidence that he receives.

Q.   Okay.

A.   Things like that.

Q.   So in other words, when the examiner gets the material to examine, they're not to know who's the suspect, who's not the suspect, things of that nature.

A.   Yes.

Q.   Okay.  In this particular case, if Dr. Senn testified to Mr. Bourgeois's jury that the molds he received, the tooth molds actually had the names of each of the individuals, Alfred Bourgeois, AB1994, and Robin Bourgeois, would that be considered a blind study or analysis?

A.   No.

Q.   Now, I'd like to show you what is a page from the PowerPoint presentation, and you could just read that for the record, please.

A.   "What are the major problems in the scientific foundation, methods and practice?"

Q.   Okay.  And the very next page of this PowerPoint presentation by Dr. Senn, and what does he identify as a major

problem?

A.    "The uniqueness of the human dentition has not been scientifically established."

Q.    Okay.  So my first question to you is, do you agree with that?

A.    Yes.

Q.    Okay.  And in fact, that's what you were talking about is one of the assumptions, that bite mark comparison is reliable.

A.    Exactly.

Q.    Okay.  And in 2009, you've reviewed the NAS report concerning forensic odontology.  Is that right?

A.    Yes.

Q.    Okay.  Does the NAS report agree with this?

A.    Exactly agree.

Q.    Okay.  So if Dr. Senn testified -- I'm going to read to you from Mr. Bourgeois's transcript.  And you've reviewed Dr. Senn's testimony at Mr. Bourgeois's trial.  Is that right?

A.    Yes.

Q.    Okay.  So in 2007, the PowerPoint presentation says, "The uniqueness of human dentition has not been scientifically established."  If Dr. Senn testified, "Every person's teeth are unique.  The arrangement, the number, the situation that may have happened to your teeth from the day you were born is different for every person.  Even identical twins' teeth are different one from another.  And it's those differences that

allow us to analyze the patterns that those teeth can create to try to determine which person may or may not have made a specific bite -- made a specific mark."  Would you agree with that testimony, first of all?

A.   No.

Q.   Okay.  And in fact, would you agree that that testimony at Mr. Bourgeois's trial in 2004 is specifically in contradiction with this slide of Dr. Senn's?

A.   It's an inconsistent statement, yes.

Q.   Okay.  I'm going to show you, I believe it's the next page of the PowerPoint presentation.  And can you read that?

A.   "The ability of the dentition, if unique, to transfer a unique pattern to human skin and maintain that uniqueness has not been scientifically established."

Q.   Okay.  Now, what does that mean?  Have you seen that issue -- have you seen that forensic odontology issue before?

A.   That's -- this issue has been around for decades.

Q.   Okay.  And do you agree with that?

A.   I definitely agree with it.  It is -- the skin qualities to transfer patterns, to reflect patterns has not been established.

Q.   Okay.  And did the NAS report in 2009 specifically agree with that?

A.   Yes.

Q.   I'm going to show you the next page in Dr. Senn's

PowerPoint presentation.  And if you could read that for the record, please.

A.   "A clear statement of the type, quality and number of class and individual characteristics or other features required to indicate that a bite mark has reached a threshold of evidentiary value has not been established."

Q.   Okay.  And my question to you is, do you agree with that?

A.   Yes.

Q.   Okay.  And by the way, these are being labeled by Dr. Senn as called -- what's the very top of that slide?

A.   "Major Problems."

Q.   Okay.  And in fact, in two -- this is a 2007 presentation to the NAS.  Did the NAS agree with this in their 2009 report?

A.   Yes.  Dr. Senn was the major contributor to the committee's findings.

Q.   Okay.

A.   He spoke in front of the committee.

Q.   Okay.  I'm going to show you the next slide.  Can you read that?

A.   "Major Problems.  Forensic odontology certifying organizations have not created or administered bite mark analysis proficiency tests for their board certified members."

Q.   Okay.  And my question to you is, do you agree with that?

A.   Yes.

Q.   Okay.  And again, was that something that was taken into

consideration by the NAS and agreed with in their 2009 report?

A.   Yes.

Q.   Show you the next slide.  If you could read that for the record, please.

A.   "Major Problems.  The ability to analyze and interpret the scope or extent of distortion of bite mark patterns on skin has not been demonstrated."

Q.   First of all, do you agree with that?

A.   That's the subject of recent research, and the research findings indicate that the extent of distortion of bite mark patterns on human skin is extensive.

Q.   Okay.  And in fact, in this particular case, that's what the analysis by Dr. Senn and Dr. Chrz was done, was bite marks on human skin.  Is that right?

A.   Yes.

Q.   Okay.  And did the NAS agree with this?

A.   Yes.  Distortion was a major category of their concerns of bite mark analysis flaws.

Q.   Okay.  Another page from the PowerPoint presentation of Government witness, Dr. Senn, if you could read that.

A.   "Major Problems.  The effect of that distortion on comparison modalities is not fully understood and has not been quantified."

Q.   Now, that's referring to the slide that you just looked at.  Is that right?  The one concerning distortion on human

skin?

A.   Yes.   This is a second issue regarding distortion, has to do with comparison methods and distortion's effect on bite mark opinions basically and the methods used to determine them.

Q.   Okay.

A.   And it's not been quantified.

Q.   Okay.  And now, when you say, "It's not been quantified," obviously if it hasn't been quantified in 2007 when Dr. Senn presents it, and if the -- well, did the NAS agree with that?

A.   Yes.

Q.   Okay.  Then obviously it was not quantified in 2004 at the time of Mr. Bourgeois's trial.  Is that fair to say?

A.   Correct.

Q.   Then there's the next slide.  It's kind of a break in the slide presentation, and it's discussing about research questions.  Is that right?

A.   Yes.

Q.   Okay.  Would you read that?

A.   "What research questions do you think need to be answered?"

Q.   Okay.  Next page, what does that say?

A.   "Research Questions.  Is the dentition of each human unique?"  Second bullet point, "Do teeth transfer their distinctive characteristics to human skin and maintain and express the uniqueness?"

Q.   Okay.  So essentially Dr. Senn is advising the National
Academy of Science that more research needs to be done in these
areas.  Is that a fair characterization of that slide?

A.   Definitely.

Q.   And did the NAS agree with that?

A.   Yes, they did.

Q.   Okay.  And if you could look at this research question.

A.   "Research Question.  Are the currently recommended
analysis and comparison methods sufficient?"

Q.   Okay.  And so is that a statement or a representation by
Dr. Senn with his PowerPoint that there needs to be more
research into the area of comparison methods as to whether
they're sufficient?  Is that right?

A.   Yes.  It falls in that category.

Q.   And you would agree with me that that's what was done in
this case, a comparison of bite marks from skin to molds.  Is
that right?  And when I say "this case," Mr. Bourgeois's case.

A.   Yes.  That's exactly what occurred in Bourgeois.

Q.   Okay.  Now we're going to look at some conclusions that
Dr. Senn presented to the NAS, and if you could just read that.

A.   "Conclusions.  The scientific basis for associating
unknown biters to tooth marks or bite marks must be
established."

     Second.  "Currently, the association of one individual in
an open population to a bite pattern on human skin to a

reasonable dental, medical, or scientific certainty based on pattern analysis alone cannot be scientifically supported."

Q.    Okay.  And did the NAS agree with that?

A.    They did.

Q.    Okay.  Now, I have one final conclusion that was presented by Dr. Senn to the NAS, and I'd ask you to read that.

A.    "Conclusions.  In a closed or limited population cases, it may be possible to associate a biter and the bite marks with reasonable dental, medical or scientific certainty for that limited population."

Q.    Okay.  Now, that conclusion, what I wanted to ask you about that is, did the NAS agree with Dr. Senn on that conclusion concerning the value of bite mark analysis with a closed or a limited population?

A.    No, they did not.

Q.    Okay.  And I guess at this time I'm going to show you what we had previously marked as P-141.

        MR. McHUGH:  And Your Honor, this is a very lengthy document, so I just pulled out the part that deals with forensic odontology.

BY MR. McHUGH:

Q.    But if you could identify the cover page of this.

A.    Strengthening Forensic Science in the United States, a Path Forward.

Q.    And what is this?

A.    This is the NAS report --

Q.    Okay.  So this is the --

A.    -- on certain aspects of forensic science.

Q.    So now when we talk about that last conclusion that Dr. Senn presented to the NAS concerning limited populations, what is -- tell us what that is, the limited populations versus the open population of the prior slide that the NAS did agree with.

A.    Closed population is where the odontologist is told that there is a finite number of suspects, and the comparison is based on that outside determination or outside circumstance, and the comparison is done with that number established by an outside authority.

Q.    Okay.  And is that in fact exactly what happened here, where there were three models, bite marks -- what would you call -- what were those things called?  Those bite, casts or --

A.    Dental casts.

Q.    Okay.  And where there were three dental casts provided to Dr. Senn and Dr. Chrz, is that the type of closed or limited population analysis that you're talking about?

A.    Exactly, yes.

Q.    Okay.  And in fact, I'm going to -- I'm not going to obviously ask you to cite chapter and verse from the NAS report, but I'm going to read to you a portion of it and ask you if you agree with it concerning closed population.  So if

you could listen, sir.

MR. McHUGH:  And Counsel, that's on Page 174.

BY MR. McHUGH:

Q.    "As with other experience based forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases in which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence."  Do you agree with that statement in the NAS report?

A.    Yes.

Q.    And is that what happened in this case as far as the closed or limited number of models?

A.    Yes.

Q.    And the NAS says that it has the potential for a large bias.  Is that right?

A.    Correct.

Q.    Dr. Bowers, would that bias be increased if the person who did the evaluation --

MR. ROBERTS:  Objection, Your Honor, leading.

THE COURT:  Sustained.

BY MR. McHUGH:

Q.    What would the effect be on the person, on that finding by the NAS if the person who did the evaluation actually had the names of the individuals on the back of the casts?

A.   Well, it makes it difficult to develop equal examination of the evidence, names and associated information regarding the case.  And this is an example of that.

Q.   Would the ability to be unbiased be lessened or would it increase the fact -- the potential for bias, I guess is a better way to put it?

A.   It's clear -- yes.  It's clear in the literature that bite mark analysis is a subjective application of opinion.

Q.   And not just in the literature, but the NAS took that into account.  Is that right?

A.   They certainly did, yes.

Q.   Okay.  In fact, do you agree with this from the NAS report concerning controlled or limited analysis of bite marks?  And I'm reading from the NAS at Page 174.

     "Even when using the guidelines, different experts provide widely different results and a high percentage of false positive matches of bite marks using controlled comparison studies."  Do you agree with that, sir?

A.   Yes.

Q.   Okay.  And is that again talking about the type of comparison that was done in this case?

A.   Exactly.

Q.   Now, do you agree with this statement from the NAS report? "Bite mark comparison" --

     MR. McHUGH:  I'm sorry, Counsel, Page 173.

BY MR. McHUGH:

Q.   "Bite mark comparison is often used in criminal prosecutions and is the most controversial of the four areas of forensic odontology.  There is continuing dispute over the value and scientific validity of comparing and identifying bite marks."  Do you agree with that, sir?

A.   That's definitely a fact.

Q.   And from the NAS report, I'll ask you if you agree with this, the findings in the report.  "More research is needed to confirm the fundamental basis for the science of bite mark comparison."

A.   It's been that way for many, many years.  Yes.

Q.   Okay.  So you do agree with that?

A.   Yes.

Q.   And then do you agree with this?  "The committee," meaning obviously the NAS committee, and I'm reading from the report, "received no evidence of an existing scientific basis for identifying an individual to the exclusion of all others.  That same finding was reported in a 2001 review which revealed a lack of valid evidence to support many of the assumptions made by forensic dentists during bite mark comparisons."  Do you agree with that, sir?

A.   Yes.

Q.   And is that the -- is that touching on the assumptions that we talked about at the beginning of your presentation

about bite mark comparison?

A.    It's more than touching.  It's directly responding to those assumptions.

Q.    Okay.  If I just may have a minute.  And do you agree with this finding by the NAS or this statement in their report?  "Bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and the swelling and healing.  These features may severely limit the validity of forensic odontology."

A.    That's exactly -- that's a very accurate statement of that problem.

Q.    Okay.  And so do you agree with that?

A.    Yes, I do.

Q.    And then, now the NAS actually took into consideration -- by the way, you said you were a member of the American Board of Forensic Odontologists.  Is that right?

A.    Yes.

Q.    And did the NAS take into consideration guidelines that had been promulgated by the American Board of Forensic Odontologists?

A.    They reviewed them.

Q.    Okay.  And do you agree with this statement?  "The American Board of Forensic Odontology guidelines do not indicate the criteria necessary for using each method, including computer enhancement and/or digitalization of the

bite marks to determine whether the bite mark can be related to a person's dentition and with what degree of probability."

A.   There's no support for bite mark opinions based on probability.  There's no instructions in the guidelines regarding how you reach your conclusions.

Q.   Okay.

A.   It's generally a list of terms.

Q.   So if I'm reading this correctly, and obviously you're the expert, the NAS took into consideration the guidelines that have been in effect with the ABFO --

MR. ROBERTS:  Objection, Your Honor.  He's testifying.  He's just trying to restate what the witness has already said.

THE COURT:  Sustained.  Can you get on to some questions and answers, please, besides you testifying?

BY MR. McHUGH:

Q.   How has the --

MR. McHUGH:  Can I use ABFO as the American Board of Forensic Science?  It might move a little faster.

THE COURT:  Anything that would move this faster.

MR. McHUGH:  I'll try.

THE COURT:  You don't think you've made your point already?  What more did you want him to say?

MR. McHUGH:  I have a few more, I have some more stuff here, Your Honor, but I have an outline and I'm following

along.

BY MR. McHUGH:

Q.   How has the ABFO responded to the NAS report?

A.   They haven't responded to the NAS report's detailed review of bite mark analysis.

Q.   Okay.  Dr. Bowers, have you been involved in a number of exoneration cases?

A.   Yes.

Q.   Okay.  And approximately how many?

A.   Six.

Q.   And what do all of these cases have in common?  I'm sure there's a couple of things, but what do you find relevant that they all have in common?

A.   Bite mark analysis was a feature of the trial.

Q.   And who had the bite mark analysis been done by in each and every case?

A.   Each of the cases I was involved in, they were members of the --

THE COURT:  Did you -- are you going to compare this to some kind of exoneration?

MR. McHUGH:  No, Your Honor.  It goes to support, you know, as to our challenge as to Daubert whether or not this is supported within the scientific community, generally accepted, things of that nature.

THE COURT:  Was there a Daubert challenge?

MR. McHUGH:  That's our claim, that there was not.

THE COURT:  Was there a Daubert challenge at trial?

MR. McHUGH:  That's our claim, there was not.

UNIDENTIFIED SPEAKER:  No, Your Honor.

MR. McHUGH:  Our claim is that Counsel was ineffective for not bringing a Daubert challenge, Your Honor.

THE COURT:  With him?

MR. McHUGH:  With Dr. -- with any expert, Your Honor.

THE COURT:  Okay.  Go ahead.

BY MR. McHUGH:

Q.   Were the six exoneration cases you worked on, some of these preceded Mr. Bourgeois's trial.  Is that correct?

A.   Yes.

Q.   Okay.  And they all had in common, I believe you testified to, that they all had bite mark analysis.  Who -- were the members, were the individuals who identified the bite marks members of the American Board of Forensic Odontology?

A.   Yes.

Q.   Moving along.  Dr. Bowers, are you aware of any empirical or scientific studies which support the basic premises which underline bite mark comparison?

A.   No.

Q.   Okay.  Have the methods used to utilize bite mark comparisons been tested --

A.   Um --

Q.   -- sufficiently for scientific reliability?

A.   Not for scientific reliability.

Q.   Okay.  Have the methods used to individualize bite mark evidence been tested sufficiently to be reliable scientifically?

A.   No support for that either.

THE COURT:  Okay.  Did you know that nobody testified that these bite marks belong to anybody?  Don't look to him.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  Nobody identified these bite marks as coming from a person, from a particular person.

THE WITNESS:  In the exoneration case?

THE COURT:  No, I'm talking about in this, in the trial that I had.  Did you know that?

THE WITNESS:  No.

THE COURT:  Okay.  Would that make a big difference to you?  All this was was a rule out case, could you rule out this person or that person.

THE WITNESS:  Oh, I -- I understand.

THE COURT:  A child versus an adult kind of thing.

THE WITNESS:  I'm aware of the fact that there was not a positive identification --

THE COURT:  Right.

THE WITNESS:  -- from bite marks, yes, ma'am.

THE COURT:  And that's what you're talking about.

Your exoneration cases had positive identifications, I assume?

THE WITNESS:  Not necessarily, Your Honor.

THE COURT:  What did they have?

THE WITNESS:  I know of one specifically that was a positive identification.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, just reflecting back, just to make sure the Court is aware, Dr. Chrz testified that there was a probable, that there was --

THE COURT:  Sorry.  I thought somebody testified that they couldn't rule out Mr. Bourgeois, but he --

MR. ROBERTS:  Dr. Senn did testify that way, Your Honor.  But then there was Dr. Chrz that said, came in and --

THE COURT:  Okay.  Somebody, this one, this gentleman testified that he couldn't rule out Mr. Bourgeois, but because of the teeth, wherever they were placed, he could rule out the child, AB1994.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  AB1994, and could rule out Mrs. Bourgeois.

MR. ROBERTS:  Yes, Your Honor.  That's what Dr. Senn testified to.  Just for clarity, Dr. Chrz came in after Dr. Senn testified and --

THE COURT:  But there were only three possibilities of people in the truck that it could have been.

MR. ROBERTS:  That's exactly correct.

THE COURT:  Right?

MR. McHUGH:  Yes, exactly.

THE COURT:  Okay.

MR. McHUGH:  And --

THE COURT:  So, I think that was the point is that you could rule out the child with the size of the bite mark.

MR. McHUGH:  Right, but --

THE COURT:  And Ms. Bourgeois had a particular -- didn't she have something weird with her teeth?

UNIDENTIFIED SPEAKER:  I could answer, but that's not my --

MR. ROBERTS:  Your Honor, can I have just a moment?

THE COURT:  Yes.

MR. McHUGH:  What I was going to ask Dr. Bowers is Dr. Senn testified -- there was, as I went through in the closed surveys where you only provide a limited number and you exclude two and you don't exclude one, is in effect an identification of the --

THE COURT:  Well, you just said there were only three possible people that could have done it in the truck.

MR. McHUGH:  I -- I didn't say that.

THE COURT:  Yes, you did.  You --

MR. McHUGH:  That was what was presented to the experts.

THE COURT:  You agreed -- all right.  Never mind.  Go ahead.

MR. McHUGH:  If that's -- what I meant was that was what was presented to these experts, three specific casts, dental casts.

THE COURT:  And of course, there was the testimony of the child that he was biting her all the time, which was significant, whether or not you had an expert to talk about bite marks.

MR. McHUGH:  Well, Your Honor --

THE COURT:  Did you know that?

THE WITNESS:  I don't know the testimony, Your Honor.

THE COURT:  Okay.

THE WITNESS:  I did not --

THE COURT:  Nobody told you that?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.  Does that make a difference?

THE WITNESS:  I mean -- no, ma'am, to my opinion, no.

THE COURT:  Okay.  I mean, it was apparently an eyewitness to the biting.

THE WITNESS:  Thank you.

BY MR. McHUGH:

Q.   And you're aware of, in your exoneration cases, where there's been confessions and things of that nature, and it turned out that the person --

MR. ROBERTS:  Objection, Your Honor, leading.

THE COURT:  Sustained.

MR. McHUGH:  May I move on, Your Honor?

THE COURT:  I wish you would.

MR. McHUGH:  Okay.  Well --

BY MR. McHUGH:

Q.   Have the methods used in bite mark analysis, in your opinion, Dr. Bowers, been generally accepted as reliable in the relevant scientific community?

A.   I'm sorry, could you say that one more time?

Q.   Sure.

THE COURT:  Are they any good?  Giving bite mark testimony, is it worth anything in the scientific community?  That's what you asked.  Right?

THE WITNESS:  The scientific community -- and I'm including the NAS committee and the established -- their published opinion stated that it's not scientific and wouldn't pass a Daubert challenge.

THE COURT:  Thank you.

BY MR. McHUGH:

Q.   Okay.  Now --

THE COURT:  But that's a legal conclusion of the dentist.

THE WITNESS:  And the NAS report, yes, Your Honor.

THE COURT:  Okay.  Well, that has nothing to do with

the law, though.

THE WITNESS:  Yes, ma'am.

THE COURT:  I mean, that's their opinion.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  Thank you.

MR. McHUGH:  Right.  But what I was going through, Your Honor, without asking him the ultimate conclusion concerning Daubert, was obviously following along the Daubert factors.  And obviously that is based in science.

THE COURT:  You've done this brilliantly, but I think you should move on.

MR. McHUGH:  I'm moving on to my next area, which is the bite marks in this case.  So getting away from the Daubert issues, moving on --

THE COURT:  Why talk to him about the bite marks if he's saying it's not a scientifically approved thing?

MR. McHUGH:  Well, Your Honor, because the issue is not just should Counsel have brought a Daubert challenge --

THE COURT:  Okay, but if he --

MR. McHUGH:  -- but also had they --

THE COURT:  Had he and failed --

MR. McHUGH:  Well, no, had he, would he have been successful, what's the prejudice factor?  So I wanted to go into the issues into this case as to --

THE COURT:  How could he possibly know what the

prejudice is if he doesn't know the evidence?

MR. McHUGH:  Well, he's reviewed the evidence, the same as --

THE COURT:  He just said he didn't know that there was an eyewitness on the bite.

MR. McHUGH:  Well, Your Honor, as to science, and I think Dr. Senn would agree with this, eyewitnesses and extra testimony concerning confessions or eyewitnesses, a scientist looks --

THE COURT:  Do you know what the evidence was in this case, all of it?

THE WITNESS:  I've read the autopsy report, ma'am.

THE COURT:  No, do you know what the evidence is, all the witnesses that testified about --

THE WITNESS:  Oh, not at all.

THE COURT:  -- what he did to this child?

THE WITNESS:  No.

BY MR. McHUGH:

Q.    And is that something, as a scientist presenting an objective opinion, that you would want to know?

A.    I would not want to know.  My opinion is based just on the dental aspect.

Q.    Okay.  So in this particular case, did I provide you with a copy of the autopsy photos -- I'm just going to list this, and if I didn't, I'll ask you at the end to tell me what I

didn't provide you -- the autopsy photos, the enhanced images of the autopsy photos, as well as the bite marks by Dr. Oliver, the 35 millimeter prints of the autopsy photos and bite marks, Dr. Oliver's report, scans of the teeth, Dr. Chrz and Dr. Senn's report, Dr. Dailey's report, and the NCIS report. Did I provide you with all those materials?

A.   Yes.

Q.   Okay.  And do you have an opinion, based on what you've reviewed, whether this was a case that was particularly appropriate or inappropriate for a bite mark comparison?

A.   My opinion is that I actually agree with Dr. Dailey that the evidence available was incapable of rendering an opinion.

Q.   Okay.  And as a result of the evidence or the materials that I sent you, did you prepare some overlays?

A.   Yes, I did.

Q.   Okay.  If I may just put these on the screen, I'll start with the -- is that an overlay you prepared?

MR. McHUGH:  And Your Honor, for the record, this is marked P-16 -- P-116.

THE COURT:  Do you want to offer it?  Or is it part of a group?

MR. McHUGH:  Well, there's a couple of pages to it. I'll go through the couple of pages --

THE COURT:  Okay.

MR. McHUGH:  -- and then I'll offer it.

BY MR. McHUGH:

Q.   Is that the first --

A.   Yes.

THE COURT:  I'm sorry, I just think it's a peculiar thing to do.  If you're already showing them to me, you ought to offer them.

MR. McHUGH:  I'm offering them --

THE COURT:  And which I keep saying that.

MR. McHUGH:  -- but I thought when I offer them, I have to give them to you.  And I only have -- these are clear plastic, so I wanted to keep them here.  But I will offer them. I will be offering them.

MR. ROBERTS:  Your Honor --

MR. McHUGH:  I offer them.

THE COURT:  Okay, you don't have to give them to me. P what?  P what?

MR. McHUGH:  This is P-116.

THE COURT:  P-116.

MR. McHUGH:  Yes.

THE COURT:  Any objection?

MR. ROBERTS:  Well, Your Honor, I don't know yet, because we're not sure what these relate to.  We just know we were given a bunch of overlays, and we don't know if they relate to this case or if they're something else.

THE COURT:  Okay.

MR. McHUGH:  Oh, no, if I have a moment to --

THE COURT:  Never mind.

MR. McHUGH:  -- lay a foundation.

THE COURT:  Go ahead.

BY MR. McHUGH:

Q.   Do these relate to this case?

A.   Yes.

Q.   Okay.  The first --

THE COURT:  How?

MR. McHUGH:  They're overlays he created from the photo images he received and things of that nature that I just went off, list that I provided to him.  So --

MR. ROBERTS:  I have no objection, Your Honor.

THE COURT:  Wait a minute.  P --

MR. McHUGH:  P-116.

THE COURT:  116 is admitted.

BY MR. McHUGH:

Q.   This first overlay, did you prepare this?

A.   Yes, I did.

Q.   Okay.  And what is that an overlay of?

A.   It's an overlay taken from the models of Robin.

Q.   Okay.  Then I'm going to show you the green over -- I'm taking that off -- the second page of P-116.  Is that an overlay that you prepared?

A.   Yes.  That's taken from the dental models of AB1994.

Q.   Okay.  And then the third page --

A.   I'm sorry.  No, I'm sorry.  That's Alfred.

Q.   Okay.  And then the third overlay that I'm providing to you, or that is part of P-116, did you prepare that?

A.   Yes.

Q.   Okay.

A.   And that is AB1994.

Q.   Okay.  Now, after you prepared those overlays, did you then prepare another document that put all the overlays together?

A.   Yes.

Q.   Okay.  And that's the fourth page of 116.  Now, Doctor, can you tell us, were you able to draw any conclusions as a result of this analysis that you performed concerning the ability to exclude or include or identify any of the potential bite marks?

A.   Yes.  This goes to the issue of how different the three individuals' incisal edges of their teeth and their arch shapes are.

Q.   Yes.

A.   And doing an overlay comparison like this for visual purposes indicates that the similarities are significant.  Visually, looking at the models, the dental models of the teeth even say that they're all different in terms of the arrangement.  There is considerable overlap between all three

individuals, since both the upper arch, which is towards the top of the -- and then along the lower. In coupling that similarity with the lack of detail and nondistinct aspect of the bite mark renders, shows that there's a significant difference in my opinion versus Dr. Senn's because of the strong similarities between all three individuals.

Q. And would those similarities prevent you from drawing a conclusion as far as excluding or including or identifying?

A. That's half of it. And the other one is the aspect of the skin injury itself.

Q. And what can you further tell us about that?

A. And the skin injury didn't show any dental detail to the resolution necessary to individuate, include or exclude any of these three people.

Q. And isn't that, those two points exactly what Dr. Dailey had mentioned in his report, the similarities?

A. Yes.

Q. And also the quality of the marks on the skin?

A. Yes. Just an aside, one of these persons, one of these three is genetically related to the other two. The representation of these three statistically, or in a shape analysis, would indicate that they're very close together.

Q. Okay. Now, what are the differences between your overlays and the overlays that Dr. Senn had prepared?

A. My overlays were established looking at the models and

recording the full mesial distal width of the teeth.  That's the side-to-side width, also the full representation of the biting edges of the teeth.  Dr. Senn's overlays seemed to be a partial selection of certain aspects of various teeth of all individuals.  And that is, actually goes to what the NAS said regarding multiple methods available to the dentist in these, in this type of case, is that there's multiple methods used.  I used one method that included all the dental, all the tooth outlines, and Dr. Senn used a different method.

Q.   So when you say you used all --

A.   Or reached a different opinion and operated the, created a different example of the outlines of the teeth.

Q.   Okay.  And the, when you say you used all of the tooth versus not using all the tooth, is that what you're saying Dr. Senn did?

A.   Yes.  This is an example.  My representation is the full perimeter outline of, say, a cuspid.

Q.   Okay.

A.   And Dr. Senn's representation of the cuspid, one of the cuspids, upper cuspids, I believe, on Mr. Bourgeois was it was a little halo just around the tip of the tooth.  It wasn't the full, full width of the tooth.  And that's a considerable difference.

Q.   Okay.  So based on your review of the materials that I provided you, based on your review of the overlays that you

prepared, were you able to draw a conclusion as to the ability to include, exclude or identify?

A.   I had no opinion on -- I had no ability to include or exclude any of them.

Q.   And that would be exactly what Dr. Dailey found.  Is that right?

A.   Yes.

MR. McHUGH:  Your Honor, at this time I do have some questions concerning the photo images that Dr. Bowers reviewed. I would ask that I be allowed to ask these questions, and the Court give it the weight that it considers, given that he's here today to testify, and I would ask that the Court permit me to ask these questions concerning the digital analysis and enhancements of the photos.

MR. ROBERTS:  Your Honor, again, I would only -- I would object to any expert aspect of it.

THE COURT:  I'm not necessarily accepting it as expert.

MR. ROBERTS:  I understand, Your Honor.

THE COURT:  It can go to the weight of the evidence.

MR. McHUGH:  Thank you.

THE COURT:  But he can talk about it.

MR. McHUGH:  Oh, I'm sorry.  Thank you, Your Honor. I'm going to --

THE COURT:  You need to move this along.

MR. McHUGH:  I only have a few more minutes, Your Honor.

THE COURT:  You said that half an hour ago.

MR. McHUGH:  I mean it this time.  And I'm handing up for the Court P-116.

THE COURT:  Oh, by the way, Darrick Moore was a bad address.  The U.S. Marshals made four attempts, talked to the manager -- I assume that's the manager of some complex.  The manager says he doesn't live there.  William May, as we know, is a bad address.  Orlando Campos, bad address.  Folks that live there have lived there since June.  They don't know who he is.  Tim Allen is in custody, and they're going to bring him over when you're ready to talk to him.

MR. McHUGH:  Thank you.

THE COURT:  And probably give him a standby attorney.

MR. WISEMAN:  Thank you, Your Honor.

MR. McHUGH:  Doctor --

THE COURT:  Because I don't know what you're asking him.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.   Dr. Bowers, did you review the images that were digitally compressed or digitized by Dr. Oliver and then enhanced by Dr. Oliver?

A.   Yes.

Q.    Okay.  And did you also review the original copies of the 35 millimeter prints?

A.    Yes.

Q.    Okay.  And when I'm talking about these photographs, I'm talking about the autopsy photographs, as well as the bite mark portions of the autopsy photographs.  Is that -- do you understand my question?

A.    Yes, I understand that.

Q.    Okay.  Did you review the protocols that Dr. Oliver used to enhance the images?

A.    Yes, I did.

Q.    And did you review the protocols that Dr. Oliver used to digitize these photographs?

A.    I was, I read a report that stated how he scanned, the fact that he scanned the original photographs.

Q.    Okay.  And Dr. Oliver testified that he used a JPEG form of compression.  Are you familiar with JPEG?

A.    Yes.

Q.    And is that a lossy form of compression?

A.    Yes.  Lossy means that as the image is opened and closed, the compression program actually loses detail of the image. Concerns about lossy compression has been around for about, as long as I've been involved in digital, using digital methods for about 10 years.

Q.    Okay.  And maybe I misspoke when I said Dr. Oliver used.

I don't know from his testimony whether he used it or he was provided it in that form.  But in any event --

A.   Oh, I see.

Q.   But in any event, the form that he used for his analysis was a lossy compression.

A.   Right.  The protocol is to use them in TIFF, called lossless.

Q.   Lossless?

A.   Yes.

Q.   And are you also aware that there's FBI guidelines of working groups that indicate that if you are using the images, the digital images for purposes of analysis of impressions, that lossless (sic) compression, such as JPEG, should not be used.  Are you aware of that, sir?

A.   I have for many years.

Q.   Okay.  And, sir, what can you say about the digitized and enhanced images that you viewed that had been prepared by Dr. Oliver?

A.   His methods are unvalidated for forensic comparison purposes.

          MR. ROBERTS:  Objection, Your Honor.  I don't think -- he's not an expert, and I would object --

          MR. McHUGH:  I'd ask the Court --

          MR. ROBERTS:  -- to his ability to comment on an opinion on someone that was qualified as an expert.

THE COURT:  Sustained.

MR. McHUGH:  I'd ask the Court to take the evidence -- I know I'll have an opportunity to cross-examine Dr. Oliver concerning --

THE COURT:  Okay.  Go ahead.  Go ahead.

BY MR. McHUGH:

Q.    You may answer now.

A.    Although Dr. Oliver provided an extensive literature list concerning the program he used, there's no forensic validation that studied or tested his methods relating to comparisons.

Q.    Okay.  And the protocol that he provided that was listed in Dr. Senn's April 2010 report, was there any of the articles that Dr. Oliver listed specifically dealing with that protocol, From Digitization to The Claw Enhancements?  Any of the articles specifically deal with that?

A.    I couldn't find any articles in the forensic disciplines that related to his program.

Q.    Okay.  And the effects that these enhancements had on the photographs, can you give your opinion as to that, sir?

A.    His use of this program was uncontrolled, meaning that there's no, no limit to what he used in terms of enhancement.

Q.    Parameters?

A.    The parameters or the distortion, or the additional, addition of pixel values to the entire photograph resulted in known objects, such as hands, gloved hands, and non-injury

areas to all look the same.  So by control, it seemed to have no, no limits.  It was, in terms of his establishing locations of wounds, it seemed to be arbitrary.  The images themselves, in general, seemed to be arbitrary alteration.

Q.   And you've used, and I -- you've used Photoshop, I believe you testified on direct.  Is that correct?

A.   Yes.

Q.   Was this anything close to a use of Photoshop, as far as its effect on the images?

A.   There's strong parallels between the two.

Q.   But was it limited to what Photoshop can do, or did it go to a different level as far as --

A.   In my opinion, there is no level to it.  It's simply a simple series of changes to the image that went beyond acceptable levels.

Q.   Okay.  And are you aware of any known potential rates of error or standards that control Dr. Oliver's protocols that he utilized in this case?

A.   Well, that's just the point, there aren't any.  Digital enhancement standards at this point are actually quite lax, even with the study working groups that they've established.

MR. McHUGH:  Okay.  And I'll -- and with that, Your Honor, I have nothing further to ask of Dr. Bowers.

THE COURT:  Thank you.  Mr. Roberts?

MR. ROBERTS:  Your Honor, first I would like to offer

Government Exhibit 172A.  It is a -- it is actually an appendix or an addendum that was noted in Dr. Senn's April 2010 report, but it wasn't actually attached, and so now I've offered it, and I've provided a copy to the Defense.

MR. McHUGH:  Thank you.

(PAUSE.)

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Good afternoon, Dr. Bowers.

A.   Good afternoon.

Q.   Are you all right there?  You were bending over to the other side.

A.   Oh, I'm just relaxing.  I'm fine.

Q.   Okay.  Now, I know that you studied psychology, dental surgery, medicine, and you actually have a law degree also. And you told us earlier that what you do now is your occupation now is a dentist, and you said contractual, contractual person as a Deputy Medical Examiner?

A.   Yes.  Would you like -- do you have a question?  I can -- should I explain it better?

Q.   I'm just asking you, I listed all these things you've studied --

A.   Yeah.

Q.   -- what you told us.  Is it correct that you only, your source of income right now is as a dentist and as a contractual

Deputy Medical Examiner?

A.    In regarding my source of income --

Q.    Yes.

A.    -- I practice four days a week in my 30-year-old dental practice.  I receive a small case-by-case stipend or payment from the Medical Examiner's Office whenever I do a case.  And then, of course, I have income from my forensic casework.

Q.    Okay.  Let's -- that's what I want to talk about really --

A.    Sure.

Q.    -- is your forensic casework.  When did you -- what was the first time you ever testified in a case?

A.    I'd have to guess.  Sometime in the '80s.

Q.    How many cases have you testified in?

A.    I don't have a -- I don't have a complete list of all of them.

Q.    Well, let me focus you, as a forensic odontologist --

A.    Uh-huh.

Q.    -- how many cases have you testified in?

A.    I have no idea.  Probably 30.

Q.    So earlier when you said, you said six, you --

A.    That was in --

Q.    -- was that a mistake on your part?

A.    That was not -- I didn't test -- the six I listed were not cases I testified in.  I was involved in the, generally the post-conviction appellate process.

Q.   Okay.

A.   Those aren't cases that I testified in.

Q.   All right.

THE COURT:  So you've never testified in an exoneration case?

THE WITNESS:  I was at a -- I've been at one -- I'm --

THE COURT:  Did you ever testify?

THE WITNESS:  Actually, I have, yes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   Would that be the Frimpong case?

A.   No.

Q.   No?  It's a different case?

A.   Yeah.

Q.   What case was that?

A.   It's the State of California versus Richards.

Q.   Okay.  Now, you said you're a diplomate in the American Board of Forensic Odontology.  You also know that Dr. Senn is a diplomate, a member of that as well.  Right?

A.   I know that very well.

Q.   Do you know any -- is there anyone else in the courtroom that's a member of that organization?

MR. McHUGH:  Objection, relevance, Your Honor.

THE COURT:  I'm sorry, I can't hear you.

MR. McHUGH:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  The gentleman in the well-fitting suit in the back is Franklin Wright.

BY MR. ROBERTS:

Q.   And what is his role?

A.   He's a forensic dentist.

Q.   Is he the president of that organization?

A.   As you say, he certainly is.

Q.   Okay.  And it's my understanding within the last couple of years, you have actually started testifying in cases on forensic odontology, and two of those includes the California versus Frimpong case, and one is Alabama versus Ramirez-Vite, or Vite?

A.   Vite.

Q.   Vite.

A.   Yes, I've testified in both.

Q.   Okay.

A.   One pretrial, one post-trial.

Q.   All right.  To your knowledge, do you know any other forensic odontologist who is testifying anywhere in the United States and saying that bite mark evidence is not reliable in the courtroom?

A.   I haven't had any conversations with anyone that has said that within the organization.

Q.   Okay.  Listen to my question closely, because I'm asking you, do you know of anybody else, as a forensic odontologist, who's testifying that bite mark evidence is not reliable?

A.   Not to my knowledge.

Q.   And to your knowledge, has bite mark evidence ever been excluded in any case?

A.   Excluded, no.

Q.   Okay.  Now, you've written several books and articles, many of those with -- I'm going to name three people that I recognize, is Peter Bush, Dr. Mary Bush and a Dr. David Sheets. Do you recognize those names?

A.   I recognize those names.  What are you saying my role is with them?

Q.   I thought you had written books and articles with them and you were familiar with their familiarity with the area of forensic odontology.

A.   Some of that aspect is true.  I'm familiar with them.  I haven't written -- they've written a chapter for me in a currently published book.

THE COURT:  Have you ever used bite marks in an exoneration case or testified in one?

THE WITNESS:  Yes, ma'am, that one exoneration case of State v. Richards.

THE COURT:  Well, what did you testify, that they didn't match?

THE WITNESS:  I testified that the injury that was, that was determined at the original trial to be a bite mark was not a bite mark.  That was my opinion.

THE COURT:  So you used it as an area of expertise to identify or not identify bite marks?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  I thought you said it wasn't scientifically reliable.

THE WITNESS:  The NAS report says, and I agree, that it's reliable for exclusion purposes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   Let's talk about the NAS report for a minute.  You actually wrote -- you wrote an article that relied upon Workshop 4 as a basis for what you determined was an error rate.  Is that right?

A.   I wrote an article that reviewed Workshop 4 and presented two statements of, or two separate analyses of that workshop.

Q.   And your article related to Workshop 4 was relied upon significantly by the NAS opinion you've been talking about, wasn't it?

A.   Well, that -- yes, it -- I don't know how important it was to them.  That particular article was --

Q.   You don't know how important it was?

A.   I don't know how -- it was referenced.  The article

actually is a treatise of 100 pages.  I'm not aware of what portion they used or what portion they didn't.

Q.   Okay.  I'm going to go back, because I want to get simply, are you -- is it your opinion that bite mark evidence, in general, can be used to identify someone that bites, if it's in a controlled population?

A.   No.

Q.   Can you identify somebody?

A.   No.

Q.   No.

A.   I do not.

Q.   Is it your opinion that bite mark evidence can be used in a controlled population to exclude people from being a biter?

A.   What do you mean by controlled?

Q.   You told us what controlled --

THE COURT:  Well, he's saying if there are three, if there are only three possible people that have done it or only four possible, and three of them are infants, and one of them's an adult, could you figure that one out?

THE WITNESS:  No, ma'am.

BY MR. ROBERTS:

Q.   You wouldn't be able to do that?  Let me give you a hypothetical.  You're an expert in this area.  Let's say we have a female that's in a confined area.  Let's just say she's in jail.  And you have two males in the cell, and one male,

Male A has really bad crooked teeth, large wide bite.  Male B has perfect, straight teeth, with a narrow arch.  Later the lady is discovered dead, with a bite mark on the flat part of her shoulder.  Would you, as a forensic odontologist, be able to identify the biter in that circumstance?

A.   That's insufficient evidence.

Q.   I asked you --

A.   I'm sorry, the details you're giving me isn't sufficient to really render an opinion at this time.  I tell you my opinion, what my statement to the investigators would be --

Q.   No, my question is real --

A.   Okay.

Q.   -- real simple --

A.   Well, I wouldn't be able to --

Q.   -- Dr. Bowers.

A.   -- render an opinion on that, sir.

Q.   If this lady had a bite mark in her, and there was only these two people in a controlled environment, you're telling us these two people, one with really bad crooked teeth, and one with straight, perfect, narrow teeth, if those were the only two people in your controlled environment, you would not be able to render an opinion?

A.   No, based on the variability of the skin, I would not be able to.

Q.   Okay.  That would be an example of a closed population,

though, wouldn't it?

A.   Closed, open, it would be the same opinion.

Q.   Okay.  You talked a lot about the information in the NAS report, and you talked about blinded, and you explained to us what that meant, and you had some concerns with Dr. Senn's knowledge of the three molds in this case.  Is that what I -- did I remember that correctly?

A.   Yes, sir.

Q.   Okay.  And you were discussing this idea of being blinded and going into this blinded, not knowing who the person is that they're trying to identify.  Were you aware that Dr. Chrz, when he did his subsequent review, had no knowledge of which of the three individuals was accused?  Were you aware of that?

A.   No, I did not.  One point regarding blinding, generally it --

Q.   Well --

A.   -- there's multiple -- to be blunt, if I could make a statement about blinding.

        MR. ROBERTS:  Well, Your Honor, my question was pretty straightforward.

        THE WITNESS:  Okay.

        THE COURT:  Could you please answer the question, sir, if you can.

        THE WITNESS:  Yes, ma'am, of course.  Yes, ma'am.  Thank you.

THE COURT:  Go ahead.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.    You provided a number of documents to the Defense

Counsel --

A.    Yes.

Q.    -- in preparation for your testimony, didn't you?

A.    Yes, sir.

Q.    And you provided one document that was similar to

Government's 204.

A.    Looks the same to me.

Q.    How many pages --

A.    At least that page does.

Q.    How many pages did you provide to the Defense?

A.    I don't know the number actually.  Could you tell -- could

you refresh my memory?

Q.    Does 15 sound familiar?

A.    Well, I'll take your word for it.

Q.    And --

MR. McHUGH:  Your Honor, if I just may, for

clarification purposes, these were provided as exhibits that we

were going to use during our presentation.  Certainly I didn't

present the Government with the entire, or I tried to limit

what we were going to --

THE COURT:  What is your legal objection, please?

MR. McHUGH:  Just for clarification, I was providing that to the Government, not Dr. Bowers, as to what I would be using in my examination of Dr. Bowers.  So I just wanted to make that clear for the Court and Counsel.

THE COURT:  Thank you so much.  Go ahead.

BY MR. ROBERTS:

Q.   Dr. Bowers, did you provide the entire PowerPoint slide to the Defense team?

A.   Yes.

Q.   You did.  You provided them all 48 slides?

A.   Yes.

Q.   So you would be --

A.   No, I'm sorry.  I misspoke.  I gave them just the 15.

Q.   The 15 that you wanted them to see.  Correct?  Let me -- I'm going to go through some of these slides that --

MR. McHUGH:  And I'd also object, Your Honor, because this is the witness, Dr. Senn, who we did not have notice of for this hearing.  And we were provided with the full set of slides this morning.  And as the Court is aware, I objected to that at the beginning of this hearing that we weren't able to investigate Dr. Senn --

THE COURT:  What is your objection, please?

MR. McHUGH:  Well, he's impeaching, attempting to impeach Dr. Bowers with the fact that we weren't able to get all the materials concerning Dr. Senn, and we didn't have

notice of Dr. Senn until Thursday before the hearing started. We --

THE COURT:  I didn't understand that.  What are you doing?

MR. McHUGH:  We provided those exhibits weeks before that.

THE COURT:  I'm sorry.  Mr. Roberts?

MR. ROBERTS:  Your Honor, are you asking for a response or --

THE COURT:  Yes.

MR. ROBERTS:  Okay.  The document that the Defense provided us was 15 pages.  We contacted Dr. Senn and asked him to look at this and tell us whether that was the complete information, and Dr. Senn sent us the 48-page presentation, which I then went to Defense Counsel and said, and asked, "How did you get this document?"  And he told me that it was sent to him by Dr. Bowers.  And I asked if he knew that there was a longer presentation and did he have the full presentation.  So my question to Dr. Bowers is why he only gave him 15.  Why didn't he give him the whole presentation?

THE COURT:  Overruled.  Go ahead.

BY MR. ROBERTS:

Q.   Why did you not give him the entire presentation?

A.   Because I had a specific use for those 15 pages.

Q.   And your 15 pages did not include any of the conclusions

that Dr. Senn made, did it?

A.    It included -- I really can't recall.  I know I sent the pages that regarded, regarding his Major Problems section, and I was going to use it to parallel what the NAS adopted saying that Dr. --

Q.    Let me point out one page --

A.    Let me finish, please.

              THE COURT:  Excuse me.

              MR. ROBERTS:  It's actually non --

              THE COURT:  Go ahead, Mr. Roberts.

              MR. ROBERTS:  It's actually nonresponsive, Your Honor.

              THE COURT:  Sustained.

              MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.    I'm showing you Government's Exhibit 204.  You might recall that Defense Counsel showed you a couple of the conclusion pages.  And I'll just show you those.  He showed you this page that talked about the scientific basis for associating unknown biters.  But he didn't happen to show you this page, so I'd like you to look at that page.

      "Bite mark analysis is too important and valuable to the investigation and adjudication of certain crimes to be discounted or overlooked."

      And then the second bullet says, "The use of bite mark

analysis to exclude suspects is powerful and important."

You didn't provide that to the Defense, did you?

A. No, I did not.

Q. And that's one of the conclusions that Dr. Senn made in his presentation, in addition to the other conclusions, isn't it?

A. Yes, it is.

Q. If I remember right, you provided maybe about another 10 or so documents to the Defense so that they would understand odontology better?

A. Approximately, yes.

Q. Do you know if any of those were incomplete?

A. Incomplete in whose opinion?

Q. Well --

A. Yours or mine?

Q. To the same extent that you only provided 15 pages of a 48-page document, were any of the other documents that you provided to the Defense incomplete?

A. I haven't studied them for what would, I would consider to be incompleteness.

Q. So the answer is you don't know?

A. I know what -- I don't know actually, yes. The -- I could give a review of what I sent, and it was complete scientific articles. Would you like me to make a best of my memory statement to you regarding that?

Q.    No, actually I'm going to move on to another question.

A.    Okay.

Q.    The overlays that you used, that you referred to and that have been offered, those would be considered two-dimensional reviews.

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    What is your opinion on three-dimensional features and using three-dimensional features on a bite mark to analyze it?

A.    Three-dimensional overlays in three dimension versus two dimension relating to dental individuality, meaning match rates, there's more information in three-dimensional scanning --

Q.    Okay.  So the -- in this particular case, with these particular molds, would it have been helpful to apply a three-dimensional view of these to determine whether or not they are actually distinct bite marks?

A.    I'm sorry.  You're talking about the molds and the bite marks together?

Q.    Yes.  I'm talking about use of three-dimensional --

A.    Dimensional --

Q.    -- features in evaluating bite mark evidence.  You only testified earlier to a two-dimensional aspect.

A.    Yes.

Q.    I'm asking you about your opinion on three-dimensional use.

A.    Actually, I've never -- I've never done a three-dimensional comparison.  In my opinion --

Q.    Well, what would a three-dimensional --

A.    -- you'll get more dental information off of casts most likely, in terms of two-dimensional.  Regarding the bite mark, three-dimensional won't help.

Q.    I want to understand this.  You said you've never done a three-dimensional?

A.    Three-dimensional analysis, in my, to my knowledge, is a digital analysis using 3D scanning.  Is that what you're talking about?

Q.    I don't know.  You're the expert.  You tell me --

A.    Well, I'm telling you I've never used --

Q.    -- what is three-dimensional analysis?

A.    What I'm asking, what I'm answering to you is that I've never done a 3D digital analysis of, using dental models.

Q.    Have you ever seen a bite mark case that's had a three-dimensional aspect to it?

A.    Have I ever seen -- you know, actually I have never seen a case that had three-dimensional characteristics.

Q.    Okay.  And that's actually what you testified to in the State of Alabama versus Ramirez-Vite.  Correct?

A.    Thank you.

Q.    Is that what you --

A.    Yes.

Q.    That's correct?  Okay.

A.    I mean --

Q.    Do you recognize this book, Forensic Dental Evidence --

A.    Yes.

Q.    -- An Investigator's Handbook?

A.    Yes.

Q.    How do you know this book?

A.    My name's on the front cover, which --

Q.    It sure is.  What did you do with this book?

A.    Is that the first or second edition?

Q.    It's the second edition.  What did you do with regard to this book?

A.    I was an editor and coauthor.

Q.    Do you remember a Chapter 5 that dealt with forensic dental evidence?

A.    Yes, I do.

Q.    Okay.  I'm going to show you what is Page 20 -- sorry -- Page 120 in Chapter 5.

A.    Okay.

Q.    And this, let me refer back actually to the first of the chapter.  Sorry about these pictures.  They're not really pretty.  But this is the beginning of Chapter 5, Page 93.

A.    Uh-huh.

Q.   And that's your name right there?

A.   Yes.

Q.   Did you write this chapter?

A.   Yes.

Q.   And --

          THE COURT:  What's that called?

          MR. ROBERTS:  It is the Forensic Dental Evidence,

Second Edition.

          THE COURT:  What's the chapter called?

          MR. ROBERTS:  The chapter is called Forensic Dental

Evidence, Your Honor.  Let me make sure that that's not the

chapter name maybe.  It is called Recognizing, Documenting

Evidence, Collection and Interpretation of Bite Mark Evidence.

          THE COURT:  Okay.

BY MR. ROBERTS:

Q.   And Page 120, can you read Figure 29?

A.   Yeah, I can.

Q.   What does that say?

A.   It says, "This bite mark contains three-dimensional

features that could be preserved with impressions taken with

proper dental materials."

Q.   Hmm.  I guess that's different than what you just

testified to.  Correct?

A.   Yeah.  I never did a dental comparison with that case.

But I have -- that's the one three-dimensional case that I've

seen.  Sorry.

Q.    Okay.  Now, in Dr. Senn's report -- which you've read, correct?

A.    Yes.

Q.    And it's Government Exhibit 71.  He said -- and not the report from April of 2010, but the one he did for trial --

A.    Yes.

Q.    -- when he found that he could not exclude Alfred Bourgeois.  Do you remember his opinion about that?

A.    Yes, he could not exclude.

Q.    And he referred to spatial relationships and variations in the positions of specific anterior teeth.  Do you remember him referring to that?

A.    Relationships in the bite mark?

Q.    Yes.

A.    Is that the context of --

Q.    Yes.

A.    Yes, I do recall that.

Q.    Okay.  And we showed pictures to Dr. Dailey, and I can pull them out again and show you, but do you recall looking at the anterior teeth of these three individuals and determining from a three-dimensional aspect whether or not there's a distinctive difference in those?

A.    You see, pictures aren't three-dimensional.  It's a two-dimensional representation of the front of the teeth.

Q.   I'm asking you to apply a three-dimensional analysis instead of your two-dimensional analysis you used a little bit earlier.

A.   A three-dimensional analysis, using the outside of the teeth or the cheek side of the teeth with the bite mark?  I can't --

Q.   I'm simply asking you, if you apply a three-dimensional analysis and you look at those photographs and you look at photographs of the moldings, can't you distinctively see differences in the three, those three bite marks?

A.   On the outer surfaces of the teeth, they all appear different.

Q.   Okay.  Let me ask you about, although you're not an expert in the area of enhancement, did you coauthor a, an article called Digital Analysis of Bite Mark Evidence?

A.   Yes.  It's a handbook.

Q.   It's a handbook?

A.   Yeah.

Q.   Do you recall in that, in a chapter on detecting and correcting angular distortion --

A.   Yes.

Q.   -- stating that Photoshop can help for evidence, but the evidence you reviewed is not ideal in terms of camera angles and scale placements and exposures?

A.   I generally recall that, yes, having written that, yes.

Q.   So in Dr. Senn's response, or Dr. Senn's report --

A.   Right, the second one.

Q.   -- in April of 2010 this year, when he commented on that, that was an accurate statement, that you --

A.   He copied it quite well.

Q.   Okay.  I want to talk for a minute, because it's very important, I think, in this area of the ABFO and the Bite Mark Workshop 4, because you rely on that in your opinion in this case, and you relied heavily on it throughout your testimony, don't you?

A.   Throughout what testimony?

Q.   Well, the testimony that you've had in other cases.  I mean, you're talking about proficiency testing, are we not?

A.   Validity testing and proficiency testing, there's two layers of concern I have, and proficiency testing is one of them.

Q.   Okay.  Tell --

        THE COURT:  I guess what he's trying to say is if -- your whole field of expertise is forensic odontology.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  And you say it's completely worthless in testifying.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q.    And if I might, you -- what is proficiency testing?

THE COURT:  I think you can probably move on, don't you think?

MR. ROBERTS:  Okay, Your Honor, but can I show him this one statement, because this is --

THE COURT:  Yes.

MR. ROBERTS:  -- quite interesting.

BY MR. ROBERTS:

Q.    This is the one you agreed to just a little while ago. "Forensic odontology certifying organizations have not created or administered bite mark analysis proficiency tests for their board certified members."  And you agreed with that statement just a few minutes ago, didn't you?

A.    Yeah, I did.

Q.    And in fact, the whole premise of Workshop No. 4 and your concern with them is that they didn't have a proficiency -- there was a concern about proficiency testing.  But that Workshop 4 really was not a proficiency testing, was it?

A.    Oh, this argument's been going on for eleven years.  The proficiency testing -- it was certainly an attempt at a proficiency test originally.

Q.    The Forensic Odontology Certifying Organization, that includes ABFO, does it not?

A.    Yes.

Q.    And have they -- what has ABFO said about --

A.    That workshop?

Q.    -- the workshop, and whether --

A.    Quite a bit, quite a bit.

Q.    Whether it's a proficiency test or not --

A.    Quite a bit.

Q.    -- what have they said?

A.    They published an article doing a statistical review of the data from that workshop, and their outcomes were published. Later --

Q.    Okay.  Let me show you what was marked as --

A.    -- they published a retraction of that article, which is now their position.

Q.    Okay.  Have you seen what -- this is Government Exhibit 172.  It's the ABFO position paper on bite mark evidence --

A.    Uh-huh.

Q.    -- and their, on Workshop 4.  And they state, quite simply, "This workshop was not designated to be a proficiency examination."  Have you seen this paper?

A.    Most of it, yes.

Q.    That's kind of different than what you agreed to earlier about that, the slide in this, isn't it?

A.    The slide?

Q.    The slide that you agreed to that you said that they had not --

A.    Right.

Q.    -- that forensic odontology has not created or administered bite mark --

A.    At the time, in 1999, it was I think a very good effort. It certainly had the intention of being a proficiency test. There was --

Q.    Let me ask you --

A.    The arguments back and forth have a lot to do with the design. I think the organization needs to establish a new version of proficiency testing.

Q.    I think everybody in the AF -- would you agree that everybody in the AFBO (sic) and all the forensic odontologists agree that this field of bite mark evidence and its use in courtroom or use for identification still needs to be reviewed and continued to be considered with regard to how well it's performed?

A.    The organization certainly feels that way, and there's improvement that needs to be made.

Q.    Okay.

A.    That's what we all agree on, about the only thing.

Q.    But you still believe that Workshop No. 4 was a proficiency testing?

A.    From the documents at the time, yes.

Q.    And that's different than what the AFBO (sic) believes?

A.    Yes, sir.

Q.    Okay. Let me ask you about the Frimpong case and then ask

you about the Alabama v. Ramirez-Vite, and then I'll be done.
Has receiving income from your testimony, or receiving income
from your role as a forensic odontologist ever affected your
opinion in any case?

A.   No.

Q.   Okay.  In the Frimpong case, you recall that that was a
rape of a woman?

A.   Yes.

Q.   And there were bite marks on this woman, were there not?

A.   Yes.

Q.   And who was -- was it Frimpong that was accused?
Obviously his name's in the case number.  Was it Frimpong that
was originally accused of raping the woman?

A.   Yes.

Q.   And when you were approached, when you first were
approached in this case, they didn't have money, no one had
money to pay you, but they asked you to do an analysis of the
bite marks.  Is that right?

A.   That's incorrect.

Q.   That is incorrect?  Did they pay you -- did they offer to
pay you right up front?

A.   I was contacted by an attorney --

         THE COURT:  Okay, listen to the question.

         THE WITNESS:  Yes.

         THE COURT:  Did anybody offer to pay you up front?

THE WITNESS:  Up, in advance?

THE COURT:  Yes.

THE WITNESS:  Oh, no.

THE COURT:  Okay.  Move on then, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.   But you agreed to analyze the information, and you concluded that you -- you concluded that it was a bite mark, but you could not exclude Frimpong.

A.   No.

Q.   You didn't?  Oh.  Do you remember your testimony?

A.   Yes, I do.

Q.   Are you telling us that first of all, when you first testified in the case, are you telling us that you were able to exclude someone?  When you first testified?

A.   Yes.

Q.   You were?

A.   First -- I've only testified once at a post-conviction hearing.

Q.   This case, I'm going to show you the caption, People versus Frimpong, California.  And you were being questioned by a Mrs. Baron in that case?

A.   Yes, uh-huh.

Q.   And in that case, you were asked a question about whether --

THE COURT:  We can't see that.

MR. ROBERTS:  I'm sorry, Your Honor.  I'm trying to get, let me, I'm going to --

THE COURT:  Center it.

MR. ROBERTS:  I'm going to pull this thing off here, so it will be easier.  Sorry.  It's awful thick, Your Honor.

BY MR. ROBERTS:

Q.   Okay.  I've highlighted a few places here in yellow.  But you were asked about, you were hired, you first registered an opinion that it was just a bite mark.  You remember her asking you that question?

A.   I sure do not.

Q.   You don't?

A.   No.

Q.   But you did testify that you agreed with that, that you had --

A.   Well, we need to slow down here a little bit.  Let me finish reading this.  The question was, "Well, you were hired because you, you first registered an opinion that" --

Q.   Do you need to see the entire transcript so you can verify that this is your testimony?

A.   Sure.

Q.   All right.

A.   I'm not quite -- I would like to read that, yes.  Thank you.

THE COURT:  So your whole specialty is never any good in criminal law of any kind?

THE WITNESS:  The forensic specialty?

THE COURT:  Yeah, forensic odontologist.

THE WITNESS:  Ma'am, the book -- thank you for the question.  The book that he held up, my position in that book is bite marks are excellent to recognize, to document and for investigators to sample DNA from the area.

THE COURT:  Okay.  So you can recognize -- so they're good to say, "This is a bite mark," and to get DNA from the tooth, or from the saliva if it's fresh.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  And Your Honor, what I'm about to show is from his testimony in Frimpong, he actually testified, under oath, that he could exclude the Defendant Frimpong, after he sat here and told us he can't do that.

THE COURT:  I know.  I saw that.  So show it to him and see what that means.

MR. ROBERTS:  Yes, Your Honor.

THE WITNESS:  Oh, I don't -- fine.  You clarified it for me.  Yes, I did -- I don't need to see it.

BY MR. ROBERTS:

Q.   Now you remember?

A.   Yes.

Q.   Okay.

A.    Yes, I did exclude Frimpong.

THE COURT:  Because he had no teeth.  No?

MR. ROBERTS:  And no bite mark.

THE WITNESS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.    But you didn't exclude him first.  At the first time you evaluated it, you couldn't exclude him.

A.    That was -- that was Ray Johanson's opinion.

Q.    I'm sorry, the testimony says it's yours.  Do I need to show you that?

A.    That says something different.  No, I saw it on the screen.  That's fine.

Q.    You first testified that you could not exclude Frimpong. And then later, when the Defense was able to come up with money, you came back in and you testified that you could exclude Frimpong.

A.    I never first testified.  I only -- I never testified --

Q.    Okay.  Well, first, let's clarify this.  Did you --

A.    I never testified at the trial.

Q.    Did you give --

THE COURT:  Okay, wait, wait, wait.  What he's saying is when you were first approached, did you say that you --

MR. ROBERTS:  Could not exclude anyone.

THE COURT:  -- could not exclude anybody?

THE WITNESS:  No.

MR. ROBERTS:  You didn't say that?

THE COURT:  Okay.  Well, that's what it says in the testimony.

THE WITNESS:  Yes, it certainly does.  I'm sorry.

THE COURT:  It does say that.

THE WITNESS:  Yes, it does, ma'am.  Yes.

THE COURT:  Speak up.

THE WITNESS:  Yes, Your Honor, it does say that.

THE COURT:  And then later, the intimation was, later when the Defendant's paid you money, you were able to say, "I can positively exclude Frimpong as the biter."

THE WITNESS:  I've --

THE COURT:  Do you remember that?  Because that's what the transcript says.

THE WITNESS:  Right.  The connection of those two didn't occur.

MR. ROBERTS:  Okay.

THE COURT:  Okay.  So there's no connection between the money and the testifying.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   But you did at first testify you could not exclude Frimpong, and you later testified that you could exclude him.

A.   I never testified --

Q.   I'm sorry.  You know what, you're right.

THE COURT:  It's not testifying.

MR. ROBERTS:  It's not testifying.  It's my fault for saying the wrong word.

THE COURT:  So be very specific here.

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.   You gave an opinion initially --

A.   Out of court.

Q.   -- after reviewing --

A.   Out of court?

Q.   Out of court.

A.   Okay.

Q.   Reviewing the evidence, you gave an opinion, and you were not being paid at the time, that you could not exclude Frimpong.

A.   I did not.

Q.   You did not do --

A.   I did not originally render an opinion saying I could not exclude Frimpong.

Q.   Okay.

THE COURT:  Okay.  Well, that's not what that transcript shows.  Is that right?

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  So your testimony --

THE COURT:  So you're saying your testimony, your

actual testimony was incorrect?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   So you testified incorrectly in California under oath?

A.   Taking the face value of that transcript, that was not a correct statement.

Q.   Okay.  And you were under oath, were you not, when you were testifying in that case?

A.   I certainly was.

Q.   Okay.  Do you know whether or not the Judge ultimately found you to be a credible witness in that case?

A.   The Judge didn't pick my opinion as being credible, didn't.

Q.   Did not?

A.   Did not.

Q.   In fact, let's -- I'd like to show you what's Page 411, and just so you know, I highlighted the case against Frimpong. And this is the Judge's opinion, where the Judge said, "The question becomes, what about Dr. Bowers' testimony that Mr. Randall," who's the one you ultimately identified as a possible source of the bite mark.  And the Court said, "I did not find Dr. Bowers' testimony on that issue to be credible." So you agree that the Judge found you not to be credible?

A.   That was in the appellate statement.  The Judge agreed

with the prosecution.  The Frimpong --

Q.    Okay.  My sole question is --

A.    Okay, fine.

Q.    -- did the Judge find you to be not credible?

A.    He did not agree with -- he did not agree with my opinion.
That's quite obvious.  That's all I know about the Judge.

            MR. ROBERTS:  I'm sorry, Your Honor, I was going to
move on, but there is one more, I just, I can't --

            THE COURT:  You've got something else?

            MR. ROBERTS:  I do, Your Honor.  I asked him about
the financial situation.

            THE COURT:  I got that.

            MR. ROBERTS:  And there's a part here in the case,
and I was just curious -- it's so thick.

            THE COURT:  You keep clipping and unclipping there.

            MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.    On Page 119 --

A.    I'm sorry.  What case is this?

Q.    This is the Frimpong still.

A.    Frimpong, yes, sir.

Q.    I'm just going to show you, the question, from Ms. Baron
was, "Was it more to your benefit financially after you had
registered the opinion on December the 21st that was favorable
to Mr. Frimpong?"

And you said, "I provided a service that was asked of me, and I am getting paid for it, just like you are rendering a service and getting paid, Counselor."

And it's, "Dr. Bowers," the Court said, "just answer the question."  So --

THE COURT:  I sympathize.

BY MR. ROBERTS:

Q.   You do remember that testimony?

A.   Vividly.

Q.   In the Alabama case, you were asked about this same testimony, and that just happened in June of this -- July of this year.  Correct?

A.   Yes, sir.

Q.   You actually explained or tried to explain why you changed your opinion.  Do you remember giving an explanation in the Alabama case as to why you changed your opinion?

MR. McHUGH:  Your Honor, that's a mischaracterization of the Alabama testimony, and I object.

THE WITNESS:  I have --

THE COURT:  I don't know what it is.  We'll have to find out.  So I'm going to overrule your objection, subject to reconsideration as things progress.

THE WITNESS:  I'm sorry.  You asked me if I remembered my testimony?

BY MR. ROBERTS:

Q.   What I'm asking you is do you remember, when you were
testifying in the Alabama case, do you remember being asked
about the Frimpong case?

A.   In general, yes, I remember that.

Q.   And do you remember a question posed to you -- let me find
it here.  This is just so you can see it up at the front page,
State of Alabama versus Ramirez-Vite.  On Page 108, you were
asked some questions about the role of bite mark analysis.  And
then they mentioned the case that you had testified a few years
ago in California.  And they asked you if anything about your
opinion in that case or the science of a bite mark analysis had
changed, and that's your answer.  Could you read that out to
us?  Can you see it well enough?

A.   Um --

Q.   Starting with the "A."

A.   Below, on Line 3?  On Line 3?

Q.   Line 3, correct.

A.   Okay.  Okay.  The question is has anything regarding my
opinion on bite mark analysis changed.

     "Well, the inclusion/exclusion I did was done as an
example -- well, the evidence, the way I analyzed it was
attempted to show the jury -- the jury -- that the bite mark
evidence was ambiguous.  The orientation where you placed the
teeth were compelling to more than just one orientation,
meaning if you determine upper teeth in one area, the lower

teeth in the other, you could reverse it, and at the same time get a better match with it than an individual that was not on trial.  That was the reason I did that."

Q.   And when you said, "I did that," what were you referring to?

A.   That I had formed an opinion of the orientation of the teeth to the bite mark that was different than the dentist --

Q.   Than your first opinion?

A.   -- at the trial.

Q.   Okay.  And you actually -- did you actually invert the bite mark so that you could then reach a conclusion?

A.   No.  Inversion is not the proper term.

Q.   You didn't do that in that case?

A.   No.

Q.   Well, what is the proper term?

A.   It's called move it, the teeth 180 degrees counter clockwise, reversing the upper -- reversing the upper teeth/lower tooth orientation that the State odont had used at trial.  So that's what I did.

Q.   Dr. Bowers, if I understand your testimony correctly, bite mark evidence is still an area in forensics that is going through review, and it still may not be completely up to the same level of scientific --

THE COURT:  He said it's just plain old not reliable.

MR. ROBERTS:  That's what he says, Your Honor.

THE COURT:  So let's move on.

MR. ROBERTS:  Okay.  What I wanted to ask him is --

THE COURT:  There's no misunderstanding that one.

MR. ROBERTS:  Yes, Your Honor.  Just my final question.

BY MR. ROBERTS:

Q.   While you believe that it's unreliable, a lot of that is based on the fact that it depends on the person doing the test as to what the outcome is and how their level of integrity is in order to make sure it's a reliable outcome in the bite mark evidence analysis.

A.   That's one of the variations is inter-examiner differences.

Q.   Okay.

A.   Different results from different people.

Q.   Do you have any reason to question the integrity of Dr. Senn and his reason for finding conclusions in this case?

A.   Absolutely not.

Q.   Okay.

MR. ROBERTS:  That's all I have, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  You worried?

THE COURT:  Do you have more?

MR. McHUGH:  Yeah, not too much.

THE COURT:  Okay.

MR. McHUGH:  A couple of areas.

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   Dr. Bowers, you were questioned about your testimony under oath in the Frimpong case, where there was a mistake that you recognized here today that you testified --

A.   Yes.

Q.   -- concerning whether you had rendered an opinion at one point and then changed the opinion.  When you reviewed the opinion of Dr. Senn in this case, Bourgeois, where he was under oath and he said, "All bite marks are unique, including identical twins," he was under oath at that time.  Isn't that right?

A.   Yes, sir.

Q.   And in front of the NAS, the National Association of Sciences, he took a different opinion, is that right, where he says, "Uniqueness has not been scientifically validated"?

A.   Yes.

Q.   Okay.  Counsel talked to you about the possibility that money may somehow affect your opinion.  Well, wouldn't it be fair to say that if bite mark testimony, you as a forensic odontologist, is not accepted in court, that that would be, have a negative impact on you and other forensic odontologists who get paid to come into court and testify?

A.   We wouldn't have jobs.

Q.   Okay.

THE COURT:  But you can keep coming in and testifying that your services are not any good.

BY MR. McHUGH:

Q.   Well, my -- if it's determined by courts that bite mark is not admissible, then it wouldn't be in court, and you wouldn't need to come in and rebut it, would you?

MR. ROBERTS:  Objection, leading.

THE COURT:  Don't bother.  Go on.

BY MR. McHUGH:

Q.   The Counsel questioned you about this debate, eleven-year debate about whether 1999 was a proficiency test and whether it wasn't.

A.   Uh-huh.

Q.   You identified it in 1999 as a proficiency test, but in fact you identified it as a proficiency test that was showing that there was not a good rate of success for forensic odontologists.  Is that right?

A.   Accuracy was average, and error rates were too high.

Q.   So whether you call it proficiency or you call it what the ABFO called it, at that time you were both saying that, whether it was proficiency or accuracy, it was inadequate to substantiate and rely upon in 1999.  Is that right?

A.   At one point, we both agreed on that.

Q.   And now Dr. Senn and the NAS also has agreed that there's

not enough proficiency testing for reliability of forensic

odontologists' bite mark comparison identification.  Is that

right?

A.    That's correct, meaning that the testing would support

reliability of our opinions.

Q.    Okay.  And Counsel showed you a book that was written that

he quoted from it, and what was the title of that book?  Do you

recall?

A.    Forensic Dental Evidence, An Investigators' Handbook.

Q.    And that's a big difference, isn't it?  That book was

written as a guide for investigators.  Is that right?

A.    The whole intention of that book was to inform evidence

technicians and BI people to what the physical characteristics

were of bite marks and all the various types of bite marks they

needed to, they needed to -- that might be good if they knew

what it looked like in inanimate objects, where they could

possibly collect saliva.  And so it was definitely a CSI

technician point of view.  I didn't get into legalities --

Q.    Right, and --

A.    -- for obvious reasons.

Q.    And you would agree with me, as Her Honor questioned you,

there's a big difference between use of bite mark forensic

odontologists to investigate such, but as opposed to admission

into a trial.  Is that right?

A.    The tooth --

THE COURT:  I don't understand what you're saying.

BY MR. McHUGH:

Q.   Well, the NAS says that it can be used for purposes of excluding.  And that would be something that you could rely on for purposes of investigation.  Is that fair to say, in looking for DNA?

A.   Yeah, investigatory --

THE COURT:  Well, why couldn't you testify to that?  You just said it wouldn't be admissible at trial.

MR. McHUGH:  All other aspects, identification, inclusion, things of that nature, the NAS -- what I'm saying is there's a difference between relying on something for purposes of investigation, as opposed to admissibility in court.

THE COURT:  Could you let him testify?

BY MR. McHUGH:

Q.   That's my question, is there a difference?

A.   Yes, sir.  The difference is just like polygraph tests being used during investigations prior to trial.  The physical aspects of bite mark analysis would aid the police.

Q.   And that's what that book that you're writing about, where you're talking about how this can be a valuable tool is a book written for investigators.  Is that right?

A.   Yes, it is.

Q.   Okay.

THE COURT:  Well, investigators that can't testify.

MR. McHUGH:  It happens all the --

THE WITNESS:  No.

THE COURT:  Okay.  Let's -- are you done?

MR. McHUGH:  Just let me review, Your Honor.  I think I might be.

BY MR. McHUGH:

Q.   Oh, Counsel talked to you about the fact that you didn't provide me with the entire PowerPoint presentation of Dr. Senn. Well, when I provided you with the materials that the Government provided to me, for purposes of this hearing, did I provide you with the NAS report?

A.   Yes.

Q.   Well, as coming from the Government?

A.   Yes.

Q.   You got a copy of the --

THE COURT:  Okay, don't ask him 15 times.  Could we go with the first answer, even if you don't like it.

MR. McHUGH:  I'm not -- well, I'm just saying --

THE COURT:  Move on, please.

BY MR. McHUGH:

Q.   You got a copy of the --

THE COURT:  Please, sir, move on.

BY MR. McHUGH:

Q.   Counsel gave you an example of somebody in a closed cell, with a highly unique set of teeth.

A.    Uh-huh.

Q.    Counsel did not talk to you about the issue of whether uniqueness in teeth can be analyzed from skin.  Is that right?

A.    That's right, he did not.

Q.    And the reason that you would have problems making that identification is because of what we've testified, or what you've testified here today about the variability in skin and the lack of reliability.  Is that right?

A.    Skin is unpredictable.

Q.    And then the slide that Counsel questioned you about, about "Bite mark analysis is too important and valuable to investigation and adjudication of certain crimes to be discounted or overlooked," the NAS did not include that in their report, that part of Dr. Senn's presentation, did they?

A.    No.

        MR. McHUGH:  I have nothing further, Your Honor.

        THE COURT:  Thank you, sir.  Mr. Roberts?

        MR. ROBERTS:  No questions, Your Honor.

        THE COURT:  Thank you, sir.  You may stand down. Call your next witness.

        MR. WISEMAN:  Mr. Gilmore.

        THE COURT:  Okay.  Thank you.

        MR. McHUGH:  Oh, Your Honor, I would just ask to move my exhibits.  I have to get that PowerPoint together because it was slipping around.

THE COURT:  That would be good.  Is that an exhibit?

MR. McHUGH:  Yes.

THE COURT:  Would you give it to Ms. Scotch?

MR. McHUGH:  Yes, Your Honor.

MR. ROBERTS:  Your Honor, also just to -- I don't recall if you -- I know you accepted 204, but I don't know about 172A.

THE COURT:  Government's 172 is admitted, if there are no objections.  What else?  172A.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And the deposition?  Did you offer Frimpong?

MR. ROBERTS:  I did not, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Gilmore, could you come forward, please, sir?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Would you administer the oath.

(Witness sworn.)

THE WITNESS:  Your Honor, may I take my briefcase with me?

THE COURT:  Absolutely.  Everybody else has taken at least three.

THE WITNESS:  Okay.

JOHN GILMORE, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.    Mr. Gilmore, good afternoon.  I appreciate your showing up, and I'm sure you know you're not supposed to touch the microphone?

A.    I'm not going to touch the microphone.  I've never testified in federal court before, so --

Q.    Well, okay.  But you've been in this courtroom.

A.    Yes.

Q.    Could you state your name for the record, please?

A.    John Gilmore.

Q.    And what's your relationship to the case of United States versus Alfred Bourgeois?

A.    I was appointed to represent Mr. Bourgeois in I think July of 2002.

Q.    I want to put up for you on the overhead what's been marked as Petitioner's 83, ask you if you recognize that document.

        THE COURT:  Could you zoom that in so we can see what it is?

        MR. WISEMAN:  Sure.  Is that good, Your Honor?

        THE COURT:  Thank you.

BY MR. WISEMAN:

Q.    Do you recognize that, sir?

A.    Yes.

Q.    And what do you recognize it to be?

A.   It looks like a response affidavit saying that I've never been found to be ineffective.

Q.   Okay.  And that's in this case it was filed?

A.   I can only see part of it.

Q.   Okay.  I'll move it down a bit.

A.   Yes.

Q.   Okay.  So that's the affidavit you filed in this case?

A.   Yes.

Q.   And that was at the direction of Judge Jack?

A.   To tell you the truth, I can't remember, but --

THE COURT:  I can't either.

MR. WISEMAN:  I think the record will show that it was at the Court's direction.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Is that your signature on the last page?

A.   Yeah, that's it.

Q.   And it's four pages, attached are the summaries, and the PACER printout says Page 4 of 5.  I can't locate a fifth page.

A.   Okay.

Q.   Now, when you completed this declaration, it was a declaration in response to the allegations in the petition that my office filed on behalf of Mr. Bourgeois?

A.   I believe so.  I don't have any independent recollection of preparing that affidavit or signing the affidavit.

Q.   Well, let me ask you to read it to yourself, if I can.

MR. WISEMAN:  May I approach the witness, just so he can see it?

THE COURT:  Can't you put it on the overhead document camera?

MR. WISEMAN:  Well, each page?

THE COURT:  Oh, that's okay.  Give it to him.

MR. WISEMAN:  Okay.

(PAUSE.)

THE WITNESS:  Okay.  I recall it.

BY MR. WISEMAN:

Q.   Okay.  And that's a sworn declaration?

A.   Yes.

Q.   And you -- it's notarized on the last page?

A.   Yes.

Q.   And given the seriousness of the issues before the Court, I would imagine you took some time in giving some thought to the responses that you gave?

A.   Yes.

Q.   You reviewed the petition and then responded to the allegations in it?

A.   Yes.

THE COURT:  Have we finished with the experts, by the way?

MR. WISEMAN:  Uh --

(Counsel conferring off the record.)

MR. WISEMAN:  There's one more I'm calling.

THE COURT:  Okay.  Who is that?

MS. LARIN:  Mr. Keel.

MR. WISEMAN:  Oh, that's right, Mr. Keel.

MS. LARIN:  Alan Keel.

MR. WISEMAN:  Regarding DNA.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   Do you recall, Mr. Gilmore, that the Government filed a motion to compel you to complete this declaration?  I mean, I don't want to test your memory, but the record reflects --

A.   You're talking about two years ago.

Q.   I appreciate that.  Docket Entry 435 is an unopposed motion to compel trial Defense Counsel to file responsive affidavits by the USA.  That was filed on 7/31.  And subsequently, you completed this declaration.

A.   Somebody asked me to do it or told me to do it, and I did.

Q.   All right.  Yeah, I think the Judge told you --

A.   Okay.

Q.   -- and the Government asked you.

A.   Okay.

Q.   Do you recall at that time Mr. Douglas Tinker was your co-counsel in this case?

A.   That's correct.

Q.    And he was affiliated with your law office in some way?

A.    We officed together.

Q.    And at about the same time that you completed this declaration, do you recall Mr. Tinker having completed certain interrogatories that were provided to him by the Government?

A.    I think he had, I think he had answered some questions prior to him being diagnosed with the, with cancer.  And then I think we attempted to answer some interrogatories after his surgery.

Q.    Okay.  And just so we move along in an orderly way here, this is P-82.  Does this appear to you to be the interrogatories responded to by Mr. Tinker?  Would you recognize his signature?

A.    I'd recognize Doug's signature, yes.

Q.    Let me turn to the last page.  That's Page 13.  Does that appear to be Mr. Tinker's signature?

A.    That's his signature after he had surgery, yeah.

Q.    If I told you that the record shows that these were the Government's interrogatories and that regrettably he became too ill to respond to the ones propounded by my office, does that refresh your memory?

A.    I remember going over to his house and speaking with him, and I think it was your interrogatories, and going through them with him, and I was going to write down his responses, but he was unable to remember.  I don't think he could remember any of

the answers.

Q.   And I know we all know it, but just for the purposes of the record, he passed away a couple of years ago?

A.   That's correct.

Q.   You described attempting to assist him to complete the interrogatories my office propounded.  Did you similarly assist him in responding to the Government's?

A.   I remember doing it one time.  I remember asking, doing it one time.  And that was sitting at his kitchen table.

Q.   Did you discuss with him his views of the issues that were presented in our petition?

A.   I believe we spoke about them when you filed the petition.

          MR. WISEMAN:  Your Honor, at this time I would offer in evidence P-82, which is Mr. Tinker's response to the Government's interrogatories, as well as --

          THE COURT:  Any objection to P-82?

          MS. BOOTH:  None at all.

          MR. WISEMAN:  And we would --

          THE COURT:  P-82 is admitted.

          MR. WISEMAN:  All right.  We would offer P-83, being Mr. Tinker's sworn declaration.

          THE COURT:  P-83?

          MR. WISEMAN:  I'm sorry, Mr. Gilmore's.

          MS. BOOTH:  No objection.

          THE COURT:  Mr. Gilmore.  P-83 is admitted.

MR. WISEMAN:  Thank you, Your Honor.

BY MR. WISEMAN:

Q.   I just want to put up for you for a moment what's been marked as P-81.  And I have to acknowledge that I am unclear if that's been admitted.

THE COURT:  Pardon?

MR. WISEMAN:  The sheet that I received from Ms. Scotch does not show this has been admitted, although I thought I had admitted it.

THE COURT:  P-81?

MR. WISEMAN:  Yes.

THE COURT:  P-81's admitted.  How's that?

MR. WISEMAN:  Okay, great.

BY MR. WISEMAN:

Q.   Do you recognize this document, sir?

A.   Um --

Q.   From the 12,000 pages that were in your file?

A.   I really don't, to tell you the truth.

Q.   Okay.  Well, you see it's --

A.   I see my name on there.  It's Hunter --

Q.   Okay.  It's Hunter Medical Services.

A.   Okay.

Q.   Billed to John Gilmore.

A.   Okay.

Q.   And it's regarding Mr. Bourgeois.  You see that?

A.   Yes.

Q.   Okay.  And are these records that were obtained in the course of your representation?

A.   I assume that they were.

Q.   Okay.  And you see the date of invoice, 2/20/04?

A.   Okay.  Yes, I do.  I see that.

         MR. WISEMAN:  Thank you, sir.  I have no other questions.

         THE COURT:  Ms. Booth?

         MS. BOOTH:  I have a few.

         THE COURT:  Somehow I knew you would.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good afternoon, Mr. Gilmore.

A.   Hello, Ms. Booth.

Q.   I'd like to ask you where you graduated from law school.

A.   St. Mary's University in San Antonio.

Q.   And how long have you been practicing law?

A.   Since November of 1979.

Q.   And in November of 1979, what was your first job?  What did you do first?

A.   I was kind of an independent, like hung out my shingle and started practicing law.

Q.   And did you, were you a prosecutor?

A.   I was a prosecutor.  I was hired as a prosecutor for San

Patricio, Aransas, Bee, Live Oak and McMullen County in I think June of 1982.

Q.   And how long were you a prosecutor?

A.   Twelve years.

Q.   And during that period of time, how many Defendants do you think that you came in contact with as a prosecutor?

A.   Oh, thousands.  Twelve years?  Thousands.

Q.   And did you ever come in contact with people or Defendants that you believed that might be in some way mentally retarded?

A.   Yes.

Q.   On one or many occasions?

A.   Several occasions.

Q.   All right.  And when you would identify them as mentally retarded, were there actions that you would take as a prosecutor?

A.   Well, you know, if there's a psychiatrist whose opinion I respected or a mental health expert whose opinion I respected, I would take the appropriate action, whatever that might be. If you're asking me specifically about any case, I don't recall, but --

Q.   Okay.  Now, after you were a prosecutor, what did you do?

A.   I went to work as a criminal defense lawyer.

Q.   All right.  And when you were a prosecutor, did you ever handle death penalty cases?

A.   I prosecuted two death penalty cases.

Q.    Okay.  And now as a defense attorney, how long have you been a defense attorney?

A.    Since 1994.

Q.    Have you ever handled death penalty cases?

A.    I've handled several death penalty cases.

Q.    And when you say several, is that three or is that eight or is that ten?

A.    I'm trying to think back, Ms. Booth.  I think it's been over ten, probably eleven death penalty cases.

Q.    All right.

A.    That started out as death penalty cases.  Three tried to conclusion as death penalty cases.  Others were resolved without --

Q.    You were able to get pleas for your people?

A.    Get pleas, or in the middle of the trial have the prosecutor realize that they couldn't prove their case, things like that.

Q.    All right.

A.    And I've tried probably about ten non-death capital cases.

Q.    And how many cases do you think that you've tried just in all types of felony or misdemeanor cases since you've been just a defense attorney?  Do you have a number?

A.    I probably average, I was trying to think the other day, I probably average about 20 trials a year, so --

Q.    All right.  And in fact, let me ask you, like in 2000,

weren't you named the Criminal Defense Lawyers' Attorney of the Year?

A.    Yeah, for Nueces County, yes.

Q.    Okay.  And then in 2008, weren't you named the Criminal Defense Lawyers' Lawyer of the Year?

A.    Yes.

THE COURT:  Doesn't Ms. Booth call you Atticus Finch?

THE WITNESS:  Yes, Judge.  I'm sorry.

THE COURT:  Wasn't there -- seems like there was a time, Mr. Gilmore, somewhere during the trial that I put on the record how many death penalty cases you have tried and how many Mr. Tinker had tried, because the two of you have tried more than anybody in the surrounding area.

THE WITNESS:  That's correct, Judge.

THE COURT:  And I can't remember how many Mr. Tinker had.  Significantly more than you.

THE WITNESS:  He had probably twice as many, maybe more than that.

THE COURT:  Do you know if Mr. Tinker knew anything about DNA?

THE WITNESS:  Mr. Tinker was probably the leading expert in at least this part of the country on DNA.

THE COURT:  The reason I mention that is that there was a DNA expert that testified that he didn't seem to know anything about DNA.

THE WITNESS:  Well, that would be incorrect.  He tried numerous cases involving DNA evidence.

BY MS. BOOTH:

Q.   Now, how did Mr. Tinker get appointed to this case?

A.   Mr. Tinker volunteered to help me try the case because it was apparent from the beginning that this was going to be a difficult case.  He volunteered to help and came in, and Judge Jack appointed him.

Q.   Now, if you would -- if Judge Jack would have said, "Mr. Gilmore, you get to pick whoever you want from any area that I have authority to appoint," who would you have picked?

A.   Well, Douglas Tinker.

THE COURT:  I think that's kind of what happened, wasn't it?

THE WITNESS:  Yes.

THE COURT:  You kind of roped him into it, and I appointed him.

THE WITNESS:  I got him roped into it.  Now I'd pick Jimmy Granberry, but --

BY MS. BOOTH:

Q.   And so I believe, do you remember being in the courtroom when the Judge, she talked about that question about how many cases, death penalty cases you two may have tried between each other?  And do you remember the number of 25 being thrown around?

A.   That could possibly be, yes.

Q.   Okay.  And Mr. Tinker, do you remember him being named by the State Bar as the Criminal Defense Attorney of the Year for the State of Texas?

A.   I think it was in 1995.

Q.   All right.  Do you remember him receiving an award -- and let me ask you, did Mr. Tinker keep a vitae?

A.   No.

Q.   And --

THE COURT:  I couldn't even get him to do a bill.  Remember that, Mr. Gilmore?

THE WITNESS:  Yes, I do, Judge.

BY MS. BOOTH:

Q.   How many times do you think that he spoke, just in the State of Texas for the State Bar in different continuing legal education programs?

A.   Hundreds.

Q.   Hundreds?

A.   Hundreds.

Q.   All right.  And was he asked to speak out of the state, where the state would have conventions in other locations?

A.   For the National Criminal Defense Lawyers' Association, yes, he would.

Q.   All right.  And do you remember a few years ago when he was named by some criminal defense lawyers' association to be

one of the top ten criminal defense lawyers in the nation?

A.   Yes.

Q.   All right.  Now, since you've been a defense attorney, how many -- could you give me a number of how many Defendants that you've actually defended?

A.   It's got to be in the thousands.  I can't tell you exactly.  I don't keep statistics or anything like that.

Q.   Okay.  And have you, in that thousand of people that you've dealt with, have you ever come in contact with Defendants that were mentally retarded?

A.   I have.

Q.   And what do you do when you come in --

THE COURT:  Could you speak up just a little bit, Mr. Gilmore?

THE WITNESS:  I'm sorry, Judge.

THE COURT:  Ms. Cayce, can you hear Mr. Gilmore all right?

THE WITNESS:  Should I pull the --

MS. BOOTH:  But you cannot touch --

THE WITNESS:  I can't touch it?

MS. BOOTH:  No.

THE WITNESS:  I've been trying to scoot up so I can --

THE COURT:  You know, I've been telling people if they'll just put their right arm on the shelf there, it leans

you right into the microphone.

THE WITNESS: Okay. How's that?

THE COURT: Thank you, sir.

THE WITNESS: There.

BY MS. BOOTH:

Q. Now, when you would come in contact with the Defendants that were mentally retarded, what would be your practice? What do you do when a person that's been accused of a crime comes to you and they present to you as mentally retarded?

A. Get a mental health expert to do an evaluation.

Q. All right. Has this happened on one or more than that occasions?

A. You know, there's issues involving competency, there's issues involving insanity and mental retardation. If you're just keeping it to the mental retardation, you know, it's probably around ten maybe.

Q. Okay. If we're making it broader than that, for people that have insanity issues or competency issues, how many Defendants do you think you've come in contact with that kind of --

A. I'd say it's around 50 maybe.

Q. And do you know a person by the name of Alfred Bourgeois?

A. I know Mr. Bourgeois.

Q. And were you appointed by this Court to represent Mr. Bourgeois?

A.    I was.

Q.    Do you remember when you were appointed by this Court?

A.    I remember where I was when I got the phone call from Judge Jack, yeah.

Q.    Okay.  And do you remember it being in the end of 2002?

A.    I thought I was appointed in July of 2002.

Q.    Okay.

A.    That's -- I found my time records, or at least a partial of my time records, and it looked like my first entry was July of 2002.

Q.    Well, let me ask -- in 2002?  Well, when you got appointed to represent Mr. Bourgeois, did you go and see him?

A.    You know, the 2002 may be inaccurate, because I think Judge Jack made us submit interim billing, and so I --

           THE COURT:  I did, because I was having a hard time getting bills from Mr. Tinker.

           THE WITNESS:  Yeah.  So the 2002 may not be accurate.

           MS. BOOTH:  Your Honor, I would ask the Court to take judicial notice of its docket and of all the records that pertain to the appointment of Mr. Tinker and Mr. Gilmore.

BY MS. BOOTH:

Q.    And in that, well, let me just ask you, after you got appointed to Mr. Bourgeois, did you go and see him?

A.    Yes.

Q.    And when you went to see him and you spoke to him, how did

he present himself?

A.    I didn't detect any -- if you're talking about mental health-wise --

Q.    Uh-huh.

A.    -- I didn't notice any problems.

Q.    And when you were first appointed to Mr. Bourgeois, were the charges at that time on Mr. Bourgeois, or do you remember, were they a capital murder case?

A.    No.

Q.    Do you remember what he was first charged with?

A.    I believe it was second degree murder.

Q.    And when you went to speak to Mr. Bourgeois, had you -- the first time you spoke to him, had you looked at the evidence before that?  Or did you look at it after you spoke to Mr. Bourgeois?

A.    That's six years ago.

Q.    Right.

A.    I can't remember.

Q.    Right.

A.    I'm sure that I knew something about the case before I went to talk to him.

Q.    All right.  Did you ever -- during that period of time, did you ever recommend to Mr. Bourgeois that he try to involve himself in a plea of guilty?

A.    I did.  And you know, I think the first time I met

Mr. Bourgeois was in the courtroom.  I think the Judge substituted me in on the case.

THE COURT:  For the Public Defender, I did.

THE WITNESS:  For Mr. Gonzalez.

THE COURT:  Because they couldn't do capital -- it looked like it was going to be a capital case, and I think our Public Defenders do not do capital cases.

THE WITNESS:  Right.  And I think Mr. Gonzalez-Falla had a conflict.  He had represented one of the inmates who was going to testify against Mr. Bourgeois.

MS. BOOTH:  There was a conflict, Your Honor.

THE WITNESS:  It was a conflict.

THE COURT:  You know, I don't know, because the local Federal Public Defender's office played a role in finding habeas counsel.

MS. BOOTH:  Uh-huh.

THE COURT:  So I didn't think there was a conflict, but I guess there must have been.

MR. WISEMAN:  Your Honor, I can clarify it if you want me to.

THE COURT:  Tell me that.

MR. WISEMAN:  My understanding is that there was a conflict.  That's why they got off of this case.  I do believe the Court is correct that they do not do capital habeas cases, I believe.

THE COURT:  They don't do capital habeas, but I didn't think they did capital murder cases either.  Maybe -- maybe they do.  But I've never --

MS. BOOTH:  Your Honor, we developed a witness that had been represented --

THE COURT:  And this was only the second one in the Southern District of Texas, if I recall.  So there wasn't a wealth of --

THE WITNESS:  But in answer to your question, yes --

THE COURT:  -- federal people to do those.

THE WITNESS:  Oh, sorry, Judge.

THE COURT:  Sorry.  You started out by saying --

THE WITNESS:  To answer your question, yes, I did discuss a plea with Mr. Bourgeois before the case was sent up to decide whether or not it was going to be a capital case.

BY MS. BOOTH:

Q.   All right.  And I guess I just better go ahead and ask you this now.  What was the theory of Mr. Bourgeois's defense in this case?

A.   That his wife committed the crime.

Q.   And did he maintain that from the time you met him until you finished representing him?

A.   Yes.

Q.   Was there ever any waver in that particular defense?

A.   No.

Q.   Now, with that in mind, did you develop your strategy on this case, based on that?

A.   That's what we built our case around.

Q.   Now, if the docket showed that you filed over 46 different types of documents in this case, would you have any problem with that?

A.   No.

Q.   All right.

THE COURT:  Does that include the applications for all these different experts that I granted?  Because those were ex parte, and I don't know, I'm sure they were entered --

MS. BOOTH:  I don't know if all of them are included, Your Honor.  I do not know that.

THE COURT:  Okay.

MS. BOOTH:  But at least that many.

BY MS. BOOTH:

Q.   And let me ask you, did you ever, in your dealings with Mr. Bourgeois, ever have any indication, ever even have a, any kind of thought that he might be mentally retarded?

A.   No.

Q.   All right.  Did he, when you represented him, did he assist you in your representation?  Did he give you suggestions on witnesses to call or addresses or where to find people?

A.   He was very active in the defense team.  Very active.

Q.   All right.  And in fact, is that what you called him, part

of the defense team?

A.   Yes.

Q.   Is that how y'all worked together?

A.   Yes.  He knew all the people that were involved.  He gave us names and telephone numbers of everybody that we should contact.

THE COURT:  For mitigation people?

THE WITNESS:  For mitigation and for guilt/innocence.

THE COURT:  Okay.

BY MS. BOOTH:

Q.   And let me ask you, did he ever write you any letters or send you any instructions on what you were supposed to do?

A.   A few, yes.

Q.   And did you turn all of that information over to the Public Defender?

A.   I kept every letter that Mr. Bourgeois sent me, and I think the Public Defender's Office came in and either took them or copied everything.

Q.   All right.  I want to start with Government's, what I've marked as Government's Exhibit Number 179.  I'd like to preview it to the witness to see if he --

THE COURT:  We're not previewing anything.

MS. BOOTH:  Okay.

THE COURT:  We haven't been doing that.  Do you mind?

MR. WISEMAN:  Oh, go right ahead.

MS. BOOTH:  And you --

THE COURT:  I mean, I won't look at it till it's admitted.

MR. WISEMAN:  Oh, you can look at it.

THE COURT:  Okay.

MS. BOOTH:  Well, in the interest of time, I have Government's Exhibit Number 178 all the way to Government's Exhibit Number 200, which are letters that were written by Mr. Bourgeois to Mr. Gilmore, giving him instructions.  Do you have any objection to those?

MR. WISEMAN:  No objection at all, Your Honor.

THE COURT:  Government's Exhibits 178 to 200 are admitted.

BY MS. BOOTH:

Q.  All right.  So let's look at Government's Exhibit Number 79 (sic) and just read for the Court that first line.

THE COURT:  Well, wait a minute.  I did 178 through 200.

MS. BOOTH:  Right.  But I'm starting with 179, a little bit out of order.

THE COURT:  I thought you said 79.  I beg your pardon.

MS. BOOTH:  Sorry.

THE WITNESS:  She did, Judge.

BY MS. BOOTH:

Q.   What does it say there?

A.   It says, "I, Alfred Bourgeois, have every intention of winning my case.  I have been falsely arrested, and please take your time and read this letter real well.  This will explain how we can win this case in the death of my child, JG1999."

Q.   And then it goes on --

A.   Yes.

Q.   -- to give you more instructions.

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   Okay.  I want to draw your attention to Government's Exhibit Number 178, Mr. Gilmore.  Is this another letter that you received?

A.   Yes.

Q.   And for the record, this letter is one, two, three, four, five, six, seven, eight, nine, ten, eleven pages long.  And would you read the first line of this letter?

A.   "Mr. John Gilmore, I, Alfred Bourgeois, have gone through this entire discovery package, and I've been mailing you back in part one by one.  I've reached the very last, and Mr. Gilmore, go through" something.

          THE COURT:  Can you zoom that in a bit, Ms. Booth?

          THE WITNESS:  It's hard to read that.  "Go through what all I have understood in the reports, everything I

underlined.  I, Alfred Bourgeois, never told super liar" -- no, super --

THE COURT:  Zoom in a bit more, please.

THE WITNESS:  -- "super liar agent Michael Harris," Harness?  I don't know.

BY MS. BOOTH:

Q.  Okay.  So he gave you, he told you right there and he goes on for eleven pages explaining that he's gone through the discovery package.

A.  Yes.

Q.  And with that letter, did you receive a DEA-6, where he withdrew and -- I mean, not a DEA-6, a 302 from the FBI where he went through and explained to you everything that he did not say and instructions on what, with underlining, instructions on what he wanted you to do?

A.  Yes.

Q.  Okay.  I want to draw your attention to this document, which is a 302 from the FBI, where it speaks about a, the search warrant that was done, and then goes through.  It is one, where he underlines what he didn't say, and he comments on the 302s, two, three, four, five, six, seven, eight, nine pages.  And on the last page, if you would just read that first line, where he starts to write.

A.  "Everything I have underlined I never told the FBI.  On June 27th, 2002, at about 8:30 p.m., FBI Agent Michael" -- and

I can't read that name.

THE COURT:  Harris?

THE WITNESS:  Harris.

BY MS. BOOTH:

Q.   That's it.

A.   -- "got a phone call from another agent from the hospital where my wife and the rest of the family was.  After the phone conversation, Michael Harris told me to -- told me turn around, put the handcuffs on me, and another agent brought me to Nueces County Jail.  I, Alfred Bourgeois, never read my rights or told why I was being handcuffed."

Q.   Okay.  Stop right there.  In this, he's giving you ammunition for a motion to suppress.  Is that correct?

A.   That's correct.

Q.   All right.

THE COURT:  Did you ever see Mr. Bourgeois write?

THE WITNESS:  Did I ever witness him --

THE COURT:  Right.  Did he write you messages in court and --

THE WITNESS:  While we were in trial, he frequently passed notes to me.

THE COURT:  Was he quick in writing, or was he just laborious, slowly, one word after another?  Or just regular?

THE WITNESS:  I don't have a recollection, Judge.  I know that he passed numerous notes to me, Judge.  That's --

THE COURT:  Well, actually, I saw him writing notes. I didn't see anything unusual about it.

THE WITNESS:  I didn't notice anything unusual.

THE COURT:  Okay.

THE WITNESS:  Nothing stands out.

BY MS. BOOTH:

Q.   All right.  And let's go to Government's Exhibit Number 180, and Mr. Gilmore, if you could read that first part of that letter, if you can see -- I'm sorry.  There we go.  Can you see that?

A.   "Dear Mr. Gilmore, I want a copy of your strategy on my case.  I would like to know how you plan to attack my case and what you think the outcome will be.  I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position," I guess, "regarding to my trial."

Q.   Okay.  Now, and then it goes on to give you a few more instructions.

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And then there is -- this particular dialogue and letter goes, we have three pages.  It appears to have more, not to have been finished on that third page, but --

A.   Yeah.

Q.   -- this is all we have.  Let's see.  And that was Government's Exhibit Number 180.  If we look at Government's Exhibit Number 181, again he's going through the reports that were written by the FBI underlining different things and highlighting different things.  And then at the back, which is the fourth page, what does he tell you?

A.   "I signed two labels for two vials of blood on July 17th, two thousand and" -- looks like one.  "There is a vial of blood missing.  I, Alfred Bourgeois, know what I" -- I don't know what that word is.

Q.   Well, so he's commenting on the collection of blood evidence that was taken from him.  Is that correct?

A.   That's correct.

Q.   All right.

        MR. WISEMAN:  What exhibit was that, ma'am?

        MS. BOOTH:  This was 181.

        MR. WISEMAN:  Thank you.

BY MS. BOOTH:

Q.   Now, let's look at 182.  I know this is tedious.  I'm not going to ask you to read the whole letter.  But it's another letter that was written by -- two, three, four, five, six, seven, eight -- eight pages, with a copy of the envelope, where he sent it to you at your office, Government's Exhibit Number 82 (sic) -- let me pull this down -- and can you read me that first line?

A.    "Attention, Mr. John Gilmore.  In my discovery package, I was reading Anthony Dumas," I guess, who --

Q.    Oh, no, you skipped a line.  Sorry.

A.    Oh, yeah.  "I was reading through the report that my wife, Robin Bourgeois, gave a statement, Anthony Dumas" -- I think that's his name -- "who moved in with me in the middle of March 2002.  I noticed through reading the statement he gave FBI Agent that he said he saw me beat my daughter, JG1999."

Q.    Okay, now, stop right there.  In this, he's telling you that he's gone through the discovery package, and now he's commenting on more of the statements.  Did you give the witness statements to the Defendant?  Did you let him read what all the witnesses were saying about him?

A.    I believe he had a lot of the material before I came in on the case.  But yeah, if -- I gave them to him.  I gave him everything that I had.

Q.    And did he comment on most every single witness?

A.    Yes.

Q.    And let me ask you about witnesses.  In this, when you tried the case in chief, did Mr. Bourgeois help you decide, you and Mr. Tinker, what witnesses were going to be called?

A.    Well, he's the one that proposed the witnesses to begin with.  If you're talking about the lay witnesses or --

Q.    I'm talking about lay witnesses, I'm talking about expert witnesses, and we're going to talk about that in just a minute.

A.    Okay.

Q.    But I'm talking about the people that you called or didn't call.  Did he have a say or give you direction on who he wanted in the trial?

A.    We always discussed the witnesses with Mr. Bourgeois.

Q.    Okay.  And I want to ask you now about, in the middle of these letters, so we'll just kind of break this up, about Dr. Estrada.  Who's Dr. Estrada?

A.    Dr. Carlos Estrada is a psychiatrist here in Corpus Christi.

Q.    And have you -- has he been involved in cases where you have actually involved him, hired him on one or many occasions?

A.    First of all, he's the only psychiatrist that I deal with in my practice.

Q.    And why is that?

A.    Because I trust him.  I trust him.  He is -- you want me to tell you what I told you last night?

Q.    Yes.  Tell me what you said.

A.    He is not a prostitute.  He is not a prostitute.  He will tell you the truth.  If he -- I do a lot of sexual assault cases, and he will call a --

Q.    In fact, isn't that your specialty right now?

A.    Well, I don't want to say that.

Q.    I mean, isn't that where you've been -- you've done a lot of cases lately in that area?

A.    I do a lot of sexual assault cases, yes.

Q.    Okay.

A.    And Dr. Estrada is the only person I deal with in those cases.

Q.    And why do you hire him on those kind of cases?

A.    You know, when I -- he'll call a pedophile a pedophile.  I mean he will.  And he's trained in that area.  That's -- I think he was either an instructor or something at the Menninger Clinic, which has to do with sexual behavior.

       THE COURT:  Mr. Roberts, would you put that paper down, please?

       MR. ROBERTS:  Okay, yes.

BY MS. BOOTH:

Q.    So he is a person that you trust.  Now, he wasn't hired by you for this case, was he?

A.    Well, he was the -- I had a psychiatric evaluation, I asked for a psychiatric evaluation at first, and he was the doctor that I suggested do it, and he did an evaluation of Mr. Bourgeois.

Q.    And after he did that evaluation of Mr. Bourgeois, did he give you a report?

A.    Yes.

Q.    And did you rely on that report?

A.    Yes.

Q.    Now, how many reports -- how many times have you -- do you

even have a number on how many times you've relied on expert opinion of Dr. Estrada?

A.    Um --

Q.    Do you know?

A.    I don't know.  It's a lot.  I mean he's the only psychiatrist that I employ.

Q.    And has that been just in 2002, or how far back does this go that you employ Dr. Estrada?

A.    Since 1994, since I started in criminal defense.

Q.    Okay.  I'm sorry, I didn't hear you.  How long have you been using Dr. Estrada or employing him for his services?

A.    Since 1994, 1995.

Q.    Oh, okay.  I'm sorry, I didn't hear that.  And in this case, he gave you a report.  And in that report, didn't it say that Mr. Alfred Bourgeois was above average intelligence?

A.    I recall that.

Q.    And did you have any reason to doubt that assessment?

A.    No.

Q.    All right.  And during the trial, did Dr. Estrada, was he then hired by the United States to sit in the courtroom?

A.    To my dismay, yes, he was.

Q.    To your dismay.  And --

          THE COURT:  Do you want to say why that was?

BY MS. BOOTH:

Q.    And why was that?

THE COURT:  I was asking you, Ms. Booth.

MS. BOOTH:  Oh, why was it -- why was he hired?

THE COURT:  By the Government.

MS. BOOTH:  I can't remember the strategy we had at the time, Your Honor.

THE COURT:  I assumed it was the same reason Mr. Gilmore hired him.

MR. WISEMAN:  Your Honor, I --

MS. BOOTH:  We -- I want to be able to say this right.

THE COURT:  I thought you all agreed early on that he was both, the best for both of you.

THE WITNESS:  Well, we had no problem with him for us.

THE COURT:  Do you remember that?

MS. BOOTH:  Oh, yeah.

THE COURT:  Or am I making that up?

MS. BOOTH:  No, they came on the record, and we -- when we said that we were going to have him here, they didn't oppose him sitting in the courtroom the entire time.  The --

MR. WISEMAN:  Your Honor, if I could jump in for a moment.  My understanding from reading the record is that --

THE COURT:  What did it say?

MR. WISEMAN:  Yeah, it -- and I don't know it all, but this part says that Ms. Booth first, or the Government

first retained him with the idea that he would sit through the trial and be available to them.  Subsequently, when Mr. Gilmore asked for a competency evaluation, the Defense and the Prosecution agreed --

THE COURT:  Agreed, okay.

MR. WISEMAN:  -- to use him, even though he had already been the Government's expert.  I think that's what the record shows.

THE COURT:  Yeah.  But I mean, I don't --

MS. BOOTH:  I don't remember that.  I thought that they hired him first, and then we agreed to have him.

THE COURT:  I thought there was an agreement on the competency for Dr. Estrada between both sides.

MS. BOOTH:  Uh-huh.  Well, yeah, we agreed that he was --

THE COURT:  He, just also for the record, when we have competency hearings, he is the most, of all the psychiatrists in town, he's the one that the Government and the Defense agree on almost uniformly, for the same reason, I think, that Mr. Gilmore has expressed.

BY MS. BOOTH:

Q.   Now, did you have any reason to doubt his opinion?

A.   No.

Q.   And did you rely on that in your, when you dealt with Mr. Bourgeois?

A.    Yes.

Q.    Okay.  Now, let's go to the next one, Government's Exhibit Number 183.  And you want to read into the record the first, the first line?

A.    "Mr. Gilmore, FBI has in my property two telephone books, a burgundy 5K7" --

Q.    Could that be 5 by 7?

A.    5 something -- "and an orange 5 by 7 telephone book" -- oh, telephone book, okay -- "with some contacts and phone numbers.  Some of my witnesses can help me in this case."

Q.    Okay.  So does it appear that he's having any problem remembering the things that he was carrying with him at the time, the size of them, the color of them?

A.    No.

Q.    What they contained?

A.    No.

Q.    Okay.  Government's Exhibit Number 84 (sic).  And for the record, Government's Exhibit Number 83 (sic) is one, two, three, four, five, six pages of a letter to Mr. Gilmore and instructions on what to do with this case.

         MR. WISEMAN:  Excuse me, Ms. Booth.  Your Honor, I have the information the Court was just asking about.  The transcript of December the 10th, 2003, at Page 11, Ms. Booth is mentioning that they have listed Dr. Estrada as an expert for the Government.  That was the proceeding in which the Court was

addressing whether to provide a competency evaluation and who would do it.

THE COURT:  Okay.  Thank you.

MR. WISEMAN:  Sorry for the interruption.

THE COURT:  Go ahead, Ms. Booth.

MS. BOOTH:  And Your Honor, at this time I would urge that the Court accept the, and take as evidence in this case all of the evidence and all of the testimony in the prior case.

THE COURT:  Well, that's what I do.

MS. BOOTH:  Yes, Your Honor.  I wanted to -- and if I have been saying Government's Exhibit Number 84 or 81, I've meant 181 and 184.

BY MS. BOOTH:

Q.   So, and then we go to, let's see, Government's Exhibit Number 185, and would you read the first little sentence on that?

THE COURT:  Well, you want to zoom it a little bit more?  You just push -- show her, Mr. Roberts.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  There you go, Ms. Booth.  You've got it.

MS. BOOTH:  I got instructions earlier today on how to do it.

THE WITNESS:  You need to push it over just a little bit more.

"Mr. Gilmore, all this underlined, I, Alfred

Bourgeois, I" -- something -- "not once opened my mouth during this transport."

BY MS. BOOTH:

Q.   And then this is a 302 that he has made annotations on, a 302 that was written by the FBI.  Is that correct?

A.   I don't know what a 302 is, but it's --

Q.   Oh, it's a report by the Federal Bureau of Investigation.

A.   Okay.

Q.   Authored by Matthew Desmond and Robert Andrews.  So he seems to have the ability to read, comprehend, and then annotate on different things that he reads, doesn't he?

A.   Yes.

Q.   All right.  Government's Exhibit Number 86 (sic), which would be quite a feat for a mentally retarded person, wouldn't it?  Government's Exhibit Number 186, could you read the first line on that?  No, probably not.

A.   "Hello, Mr. John Gilmore.  I have been trying to get" --

Q.   Hold on.  I'm trying to -- okay.

A.    -- "through to warden.  Counselor said he's calling" --

BY THE COURT:

Q.   You skipped a line, Mr. --

THE COURT:  Unzoom it just a --

THE WITNESS:  It's kind of hard to --

THE COURT:  -- just a touch.

THE WITNESS:  -- to read a moving document,

Ms. Booth.

THE COURT:  It's a good thing you don't have migraines.

BY MS. BOOTH:

Q.   Okay.

A.   "I have been trying to get through this prison system to get a phone call to you, and for some reason" -- I guess that's reason -- "the call, last I heard is your office would not get back with them.  This is what I need.  You filed motions for me a while back during my trial to get some evidence the U.S. Government was holding for me.  I have my Sprint cell phone, about $2,000 worth of clothes" -- something, looks like white -- "refrigerators" --

Q.   Okay.  You can stop right there.  What he's doing is he's asking you to --

MR. WISEMAN:  Your Honor, I'm going to object to Ms. Booth characterizing what he's doing.  The document speaks for itself.

MS. BOOTH:  This is cross-ex, Your Honor.

THE COURT:  Overruled.

BY MS. BOOTH:

Q.   And here it appears he's telling you he wants a motion filed so that he can get his property back.  Isn't that right?

A.   That's correct.

Q.   That's what he's telling you.

A.   Yes.

Q.   Okay.  Government's Exhibit Number 187, is this another letter written to you, a one-page letter written to you giving you some instructions?

A.   It appears to be, yes.

Q.   All right.

A.   I don't know how many pages it is, but I see the first page.

Q.   It is -- it's one page that we have, and then the receipt of the mail.  On Government's Exhibit Number 188, can you read that?

A.   "Mr. John Gilmore, you know who would be a big help to this case?  Stacy Williams, who you have address on the reports that FBI took.  Stacy Williams was from my house May 15th, 2002, all the way to May 27th, 2002."  I guess that's a two.

Q.   All right.  So we'll stop right there.  Again, this is a one, two-page letter.  And even in the first, the very first line, he is giving you directions and giving you suggestions on how to conduct his case.  Is that correct?

A.   Yes.

Q.   Okay.  Government's Exhibit Number 189, can you read that?  Just the first line.

A.   "Attention, Mr. Gilmore.  On this report that FBI took from this forklift driver, Adolfo Yzaguirre" -- I think I pronounced that right -- "at the Navy Base, there is a lot of,

a lot that I noticed the FBI Agent who wrote this report has left out, to their advantage."

Q.   All right.  Again, he's giving you his opinion on the report.  He's obviously read the report and the statement of Mr. Yzaguirre, and he is commenting on it and giving you suggestions.  Correct?

A.   Appears to be, yes.

Q.   Mr. Gilmore, I want to show you Government's Exhibit Number -- and Government's Exhibit 89 (sic) is one, two, three, four, five pages long, isn't it?

A.   It is.

Q.   Government's Exhibit Number 190 is one, two, three pages long.  Would you read the first?

A.   "Mr. John Gilmore, as you and I spoke on January the 2nd, 2003, in Corpus Christi, Texas, we spoke on the issues of my daughter, AB1994, in foster care, about the stool issue FBI are coming up with I molested my child in the anal area.  My daughter, AB1994, JG1999" -- is that --

Q.   Uh-huh.

A.    -- "nor any of my kids have ever been molested by me or no one."

Q.   All right.  And now he is remembering that he spoke to you on a certain date, and he's talking to you about issues?

A.   Yes.

Q.   Okay.  Government's Exhibit Number 191, which is a one,

two, three, four, five, six-page letter.  And could you read this?

A.    From Alfred Bourgeois, and he's got his CID number, or whatever number that is.  "Mr. Gilmore, I need copies of suppress evidence in my case.  I need copies of my log book of different places I went from May 31st, '02, to June 27th, '02. I need copies of the 12-pack of the different places I took my family, like camping sites, water parks, several museums, state parks, dinosaur deserts, beaches, et cetera, throughout parts of the United States."

Q.    All right.  Certainly doesn't have a problem with recall there, does he?

A.    No, if --

Q.    Sorry?

A.    If that's accurate, then he doesn't have a problem with recall.

Q.    And Government's Exhibit Number --

        THE COURT:  Did you find him to be a good historian when you visited with him?

        THE WITNESS:  Very, very good, Judge.

        THE COURT:  Okay.

BY MS. BOOTH:

Q.    Government's Exhibit Number 192, which is a two-page letter written by Mr. Bourgeois, I'd ask you to read the first line of this one.

A.    "Mr. Gilmore, I remember in court on February the 12th, 2003, you said you had my briefcase.  I'm curious about if the FBI went in and tampered with some personal records I had that's important to me.  The listed items I'm concerned about, a personal file in a tan manila folder with" something "belonging to Robin Bourgeois, says 505 St. Andrews, LaPlace, 70069, with three Polaroid pictures of Robin coming out, a black limo, a letter written by Robin to another man saying she was pregnant for another man inside this diary with the three pictures."

Q.    All right.  So he is giving you, asking you for something and implying that the FBI has tampered with evidence.  Is that correct?

A.    That's what it appears.

Q.    All right.  Government's Exhibit Number 194, which is a one, two-page letter, there are four pages attached, because it includes the envelope, and could you read the first line of this letter, Mr. Gilmore?

A.    "Mr. Gilmore, upon these paper is where Mr. Jose Gonzalez-Falla filed papers to get the results from Children's Hospital of New Orleans, Louisiana, when Robin Bourgeois, my wife, I, Alfred Bourgeois, and Stacy Williams took my daughter, JG1999, to the hospital to be checked out for the blood of my wife -- or for the blood my wife Robin Bourgeois found coming out of my daughter vaginal."

Q.   All right.  And in this, does it seem that he remembers

things that have happened in the past, both in Louisiana, with

his attorney?

A.   Yes.

Q.   All right.  No problem with recall there?

A.   It doesn't appear, if that's accurate, yes.

Q.   Government's Exhibit Number 195, is this a letter written

to you back in 2002?

A.   Yes.

Q.   And would you read the first line, please?

A.   "Mr. John Gilmore, can you please see that my children get

the enclosed envelope by Christmas time for me, please.  Inside

the enclosed envelope is a handkerchief I drew for AB1994 and

AB2001 when I know they are in the care of Child Protection of

Corpus Christi, Texas, upon my" -- I don't know.  That's messed

up.  It may be arrival, I don't know, on something 27, 2002.

"May God bless you, and thank you very much.  Merry Christmas

to you and your staff."

Q.   All right.  Government's Exhibit Number 196, which is a

one, two, three, four, five, six-page letter, with instructions

at the very top on how you're to proceed with this document.

Can you read that?

A.   "Please read carefully.  Very, very important."  And he's

got an asterisk.  "Mr. Gilmore or Mr. Tinker, as we were in

court on January the 16th, '04, heard Mr. Tinker speak about my

deceased daughter, JG1999's head trauma," I guess "and I have some information that FBI Agent Michael Harris or whoever has my records, that this is, that was in my briefcase," something, "my arrest."

Q.   Okay.  So here we have him instructing you on what to do. He's got information that the FBI Agents took.  I mean, you know, any problem with understanding the direction he's giving you?

A.   No.

Q.   Okay.  Now, let's see, Government's Exhibit Number 197, can you read the first line of this one?

A.   Yes.  Do you want me to read it?

Q.   Yes, sir.

A.   Okay.

Q.   Please read it.

A.   "Mr. Gilmore, I, Alfred Bourgeois, need two favors of you. I need you to call my employment at R. E. Garrison in" -- something -- "Alabama, ask for a guy by the name of Billy Erskine.  I, Billy are really close to" -- I don't know what that word is -- "really close to each other."

THE COURT:  Can you zoom that in just a little bit, Ms. Booth?

THE WITNESS:  "Are really, really close to each other."  Maybe that's what it says.  "Really, really close with each other.  Have Billy Erskine in the recruiting department go

to R. E. Garrison lot and take some pictures of the inside of the sleeper of an empty Peterbilt truck.  I need the sleeper area.  If you want, you can get pictures of the whole inside, but the sleeper area is important.  Billy Erskine in recruiting keeps throw-away cameras he supplies all drivers with, and Billy Erskine would do anything for me."

BY MS. BOOTH:

Q.   Okay, now stop.

A.   Okay.

Q.   Do you remember during the trial that it was in, I mean during the preparation for this that we were trying to get pictures, or we got pictures of the inside of the cab of the 18-wheeler to use as evidence?

A.   I remember seeing pictures of them, yes, of it.  I remember going out to the Naval Air Station and viewing it myself and taking pictures myself.

Q.   All right.  And he's asking here for you to go to another 18-wheeler and get pictures of the inside cab.

A.   Yes.

Q.   And that is a three-page letter written to you with instructions on what to do in his case.  Right?

A.   Yes.

Q.   All right.  I want to show you Government's Exhibit Number 198 and ask you if you could read the first line of that one.

A.   Do you want me to read the top part or just the body of

the letter?

Q.    Well --

A.    "Certified copy" --

Q.    Start at the top, where he wrote "certified copy."

A.    "Certified copy," something file, "Page 1 for my appeals." And I really can't read that.  This something -- "Notarized this 7th day of June 2005," something notary, "Victoria" -- well, I can't read.  Something "County."  Something --

            THE COURT:  Move it over a little bit, Ms. Booth.

BY MS. BOOTH:

Q.    Okay.  Is that better?

A.    It's not better.  Well, I mean, it's better position-wise, but I can't read --

Q.    Well, if you can't read that part, don't worry.

A.    I can't read what that says.

Q.    Could you just read the first line of the letter that he wrote to you?

A.    "Mr. John Gilmore, I, Alfred Bourgeois" -- and he has his, it's either a CID number or his FBI number or whatever -- "need a favor and asking you for two things that's bothering me that I personally need you to look into.  On the record on June 27th, '02, the very day my baby JG1999 was unconscious -- look, I remember this like yesterday -- I was interviewed approximately 3:30 p.m. by Corpus Christi, Texas, by child services agents, which was two female ladies.  Now, these two

ladies were first on the crime scene that actually went inside my 18-wheeler from the front to the back of inside my cab.  I mean, they went through my big rig to make (sic).  Only one thing -- to make.  Only one thing was found" --

Q.   Could it be "to the max"?

A.   "To the max," okay.  It could be, yes.  "Only thing was found that I got questioned about was an empty urine bottle at this time was by my driver's seat."

Q.   All right.  So he's remembering two things that he wants you to check into.

A.   Yes.

Q.   Okay.  Now Government's Exhibit Number 199 --

THE COURT:  What does it say, if one of the kids -- right next after that.  What's the next sentence?

BY MS. BOOTH:

Q.   What's the next sentence?

A.   "Empty" -- I ended off --

THE COURT:  If one of the --

THE WITNESS:  "Well, I explained how we drive sometimes in" --

THE COURT:  Rural areas.

THE WITNESS:   -- "rural areas.  If one of the kids gots to use the restroom" -- something about "JG1999 potty and pour it into an empty jug and later thrown out at the first truck stop or rest area I get to."  That's -- is that it?  Or

you want me to read more?

THE COURT:  That's it.  Sorry.

THE WITNESS:  Okay.

THE COURT:  I just wondered what that meant.

BY MS. BOOTH:

Q.   How about Government's Exhibit Number 199, which is a one, two, three, four, five, six, seven-page, seven, eight, nine-page letter that's written to you?  Now, about this I want to ask you a question.  During the period of this time, you said that the theory of the case was that Robin did it.

A.   Yes.

Q.   And during this case, was Mr. Bourgeois, on many occasions, was giving you, trying to give you evidence that would smear Robin Bourgeois, wasn't he?

A.   That was -- yes.

Q.   And did he attempt to smear her by some kind of insurance fraud when their house was broken into?  Do you remember that?

A.   I seem to recall that, yes.

Q.   All right.  I want to call --

THE COURT:  Wasn't that something about $5,000?

BY MS. BOOTH:

Q.   I want to call your attention to this --

THE COURT:  She took a check, was it 5,000?  No, 10,000.  Okay.

MS. BOOTH:  4600.

BY MS. BOOTH:

Q.   Would you look at Government's Exhibit Number 199, and could you read at the top of this page, start with "Only one page this time."

A.   "Only one page this time.  The rest is items Robin claimed got stolen when she filed that false insurance claim.  Mr. John Gilmore, I put a list together of all the things my wife was selling and claim stolen out of my house upon my arrest on June 27th, 2002.  I have records of everything I had before married to Robin Bourgeois.  As I talked to my brother Lloyd back around November, he says State Farm said Robin got a girlfriend, which is named in her statement, Donna Leonard, to make up a power of attorney saying I gave her permission.  Lloyd Ferdinand, my brother, informed me that Robin Bourgeois, my wife, filed a $10,000 claim, which she received $4600 already.  Mr. Jose Gonzalez called State Farm in LaPlace where I lived and stopped the remaining check by Lloyd calling my" -- K attorney?  X attorney -- "X attorney, Mr. Jose Gonzalez.  Mr. Gilmore, this is why I took this letter to Robin.  She, my wife didn't put a damn thing in my house, forged my name while I was in jail, didn't give or send me a dollar.  Now you see why I'm so mad.  I collect old antique cars, too, big 18-wheelers.  My wife give my favorite all to Ms. Donna Leonard grandson.  That grandson then claimed to State Farm."

Q.   All right.  Does he have any problem with sequencing and

telling the story of what's happened?

A.    No.

Q.    All right.  For the record, this is a one, two, three, four, five, six, seven-page document.  Government's Exhibit --

MR. WISEMAN:  What's the exhibit up there now, ma'am?

MS. BOOTH:  This is 199.

THE COURT:  Any objection to -- oh, I've got that admitted.  Never mind.

MS. BOOTH:  They're already -- they're already in, Your Honor.

THE COURT:  Through 200.

BY MS. BOOTH:

Q.    All right.  And I think the Judge asked you if, during the trial, and I asked you that question before, during the trial if he was sending you instructions on what to do, on questions to ask.

A.    Yes.

Q.    Okay.  Now, in this case, the Judge allowed you to hire a investigator.  Is that correct?

A.    Yes.

Q.    And did y'all, did you and Mr. Tinker hire a man by the name of Mr. Doug Tenore?

A.    Yes.

Q.    All right.  And the Judge allowed you to hire a mitigation specialist.  Isn't that correct?

A.   That's correct.

Q.   And his name was Dr. Cunningham?

A.   Mark Cunningham, yes.

Q.   Mark Cunningham.  And the Judge also allowed you to hire mitigation investigators.  Is that correct?

A.   That's correct.

Q.   And they -- was that, that was a Mr. Bierbaum and a Ms. Milstein.  Is that correct?

A.   That's correct.

Q.   Now, had you ever -- and the death penalty cases that you had been in and that Mr. Tinker had been in were all state death penalty cases, weren't they?

A.   That's correct.

Q.   Now, in the state court, are you allowed such expenses, this many expenses?

A.   No.

Q.   All right.  And even in this case, besides your own investigator and your mitigation specialist and your two mitigation investigators, she still allowed you to have a jury selection expert.  Is that correct?

A.   That's correct.

Q.   That sat with y'all during jury selection?

A.   She did, yes.

Q.   All right.  Did she even pay for new clothes for the Defendant?  Did you buy new clothes and submit a bill?

A.   Yes.

Q.   And in fact, that was addressed here in the courtroom, where Mr. Bourgeois said his clothes didn't fit any more. Isn't that right?

A.   I remember him being happy about the clothes.  He wanted to wear them after he got out.

Q.   All right.  Do you remember him asking the Marshal, could he keep the clothes if he won the case?

A.   Yes, I remember that.

Q.   All right.  And you actually went out and purchased him some shirts, and didn't the Marshals show up with jackets and --

A.   After I purchased the initial jacket and slacks, I think the Marshals came up with different clothes for him to wear every day of the trial.

Q.   So the Judge also provided that he could look like a person that was presenting himself for trial in a very dignified manner?

A.   I dressed him like a Marshal.

Q.   Okay.  Did you --

        THE COURT:  What does that mean?

     (Laughter.)

BY MS. BOOTH:

Q.   How did you -- did you do that on purpose?  Did you want to make him look a certain way?  Did you want to give him an

opportunity to --

A.   I just, that's what I bought him.  That's --

Q.   Okay.  So you're not qualified as an expert on clothing.
Right?  No?  Okay.

THE COURT:  He looks all right to me.

MS. BOOTH:  He looks fine, yes.

THE WITNESS:  My wife dressed me.

BY MS. BOOTH:

Q.   Now, let me ask you, so all of those things were allowed,
and that was -- that's much more than you've ever been allowed
in state court, isn't it?

A.   You know, yeah, that is more than we've ever been allotted
in state court, yes.

Q.   And I believe there was some evidence that was testified
to yesterday about Mr. Cunningham, and I think that that
evidence showed -- do you have any problem with the fact that
you may have contacted Mr., Dr. Cunningham June the 30th of
2003?

A.   I've read the e-mails that I had printed out, and I did
make the initial contact with Dr. Cunningham.

Q.   Now, on Dr. Cunningham, that was June the 30th of 2002.
Had the case even been certified yet?

A.   I don't remember.  I don't remember.  I knew that it was
heading that way, and I knew it was going to be a trial.

Q.   All right.  And why did you know it was going to be a

trial?

A.    Because Mr. Bourgeois refused to talk about pleading.    He maintained his innocence all through the trial, all through the case.

Q.    Let me ask you, in the plea bargaining procedure, did you try on one or numerous occasions to offer him, to talk him into trying to plead guilty in this case?

A.    Well, I recall doing it one time and receiving pretty much the final answer, you know, that it was not going to be a plea. And I think Mr. Tinker tried to talk to him also.

Q.    All right.    Let me ask, let's go back and talk about Dr. Cunningham.    Dr. Cunningham was the mitigation specialist, and did you deal mostly with him or did Mr. Tinker deal with him?

A.    Initially, I dealt with him via e-mail and maybe phone conversations.    I think I dealt with him regarding mitigation investigators, but --

Q.    And mitigation, where did you get Milstein and Bierbaum?

A.    From Dr. Cunningham.    He provided a list of possibles. And I tried, he suggested one in particular.    I tried to get her.    She wasn't available.    And somehow ended up with -- Lisa Milstein was on the list, and I don't know where Mr. Bierbaum came from.

Q.    All right.

A.    He may have come with her.    I mean, he may have just come

with her.  But he's an attorney, I believe.

Q.    He was an attorney.  So you had an attorney investigator?

A.    Yes.

Q.    As your investigator.

A.    Right.

Q.    Okay.  And did you depend on them to get that work done?

A.    Yes.

Q.    All right.  And Dr. Cunningham, do you remember Mr. Tinker, do you remember anything else about dealing with him during the fall of 2003?

A.    The only thing I remember is he wasn't going to be available the first trial setting.  I think we had a trial setting in September, and he wasn't going to be available, and he suggested other people that might be able to help us.  Then we were able to get the case continued, and he agreed to be the mitigation expert.

Q.    And the mitigation investigator, which he had suggested, that's the person y'all asked for the Court to hire.  Is that correct?

A.    That's correct.

Q.    Now, I'm going to go right through Mr. Cunningham, Dr. Cunningham, which is going to take us through the end, then I'm going to have to go back to pretrial stuff.  But Dr. Cunningham, did he, toward the end of the trial, was Mr. Tinker dealing with him?  Do you remember having -- first

of all, do you remember having a meeting with Mr.,
Dr. Cunningham to plan your strategy?

A.    Yes.

Q.    Okay.  And do you remember having a meeting with
Dr. Cunningham that was during or shortly before your
presentation of evidence on the penalty phase?

A.    I remember having a meeting with Dr. Cunningham in my
office.  He had a notebook that contained images from a
PowerPoint presentation.

Q.    Who was there?  Who was there at the meeting?

A.    Mr. Tinker and I were there.

Q.    And how long was this meeting?  Do you remember?

A.    It was, I want to say it was over an hour, couple of hours
maybe.

Q.    Okay.  And so did he take you through, did he show you a
PowerPoint presentation, or did he take you through this
presentation?

A.    He took -- he had a loose leaf notebook, and he had the
images in it, and he showed us.  And I remember seeing like a
pressure cooker and arrows pointing to the pressure cooker
showing it.

        THE COURT:  We've all seen that now.

        THE WITNESS:  Okay, Judge.

BY MS. BOOTH:

Q.    And after you had this meeting, did Dr. Cunningham tell

you what he would testify to?  Did he present you with any questions that you could ask him about this presentation?

A.  I believe so, but that -- we split responsibilities on this case, and Mr. Tinker dealt with the experts.  And so I remember there being a list of questions, but I don't recall what it was.

Q.  All right.

A.  Exactly what it was.

Q.  Oh, and let's talk about Mr. Tinker.  I want to go back and, was Mr. Tinker a defense attorney's defense attorney?  If you got in trouble, would you go to Mr. Tinker?

A.  I'd hire Mr. Tinker, yes.

Q.  All right.  And was he a -- was he prissy?

THE COURT:  Or Mr. Granberry.

THE WITNESS:  Or Mr. Granberry, yes.

BY MS. BOOTH:

Q.  Was he a person that would act like, shucks, I'm a --

THE COURT:  I'm sorry, I forgot Mr. Jimenez in the back there.

BY MS. BOOTH:

Q.  -- I am -- underestimate me, underestimate me, and then I'm going to get ya?  I mean, was --

A.  No, he was very aggressive.

Q.  Okay.  And was he a kind of a free soul and kind of avant-garde?  Maybe that's not a good word.  You describe

Mr. Tinker to me.

A.   He's the best lawyer I've ever met.  I mean, that's all I can tell you.  He's an outgoing, very personable person.

Q.   Successful lawyer?  Successful criminal defense attorney?

A.   Very successful.

Q.   Did he take cases here that nobody wanted and were afraid to touch?

A.   Yeah, and in particular the Yolanda Saldivar case.

Q.   And did he get death threats for --

A.   Yeah.  Unfortunately, I was in the office with him at that time.  Yes.

Q.   All right.  Now, after you sat and you had this presentation presented to you and Mr. Tinker, did you and Mr. Tinker talk about the presentation?

A.   Yes, we did.

Q.   And what did you think about what Mr., what Dr. Cunningham was going to put on?

A.   Didn't fit with our defense.

Q.   It didn't fit with your defense?

A.   Right.

Q.   And did you go and take this book and take it and talk to Mr. Bourgeois about it?

A.   I recall having the notebook and talking to Mr. Bourgeois, and I think that we did it at counsel table.  I don't think it was taken to downstairs when he was downstairs.  It seems like

it was in court.

Q.   Okay.  And when you showed it to Mr. Bourgeois, did he have any reflection on it?  Did he make a statement as to this presentation?

A.   Well, his position all along was that he did not commit the crime.  And so specifically what did he say?  I just remember we told him that we didn't think we were going to call Dr. Cunningham, and he did not oppose that.  And we told him why, because his theory of the mitigation part of the case didn't jive with our theory of defense.

Q.   Did he make some kind of statement to the effect that, "This means that Dr. Cunningham's saying I'm guilty"?

A.   It's something to that effect.  I can't remember exactly what was said.  But I, you know, explained to him that that's what those arrows meant that he had all the pressure on him, and that's why he exploded and did this.

Q.   And after you explained that to him, did he want to present Dr. Cunningham?

A.   He agreed with our assessment.

Q.   All right.  Now, there's an allegation that a witness was called, Carl Henry.  And Carl Henry had, when he testified, it came out in cross-examination that he had several convictions for fraud, and it didn't go well.  Carl Henry, why did y'all call Carl Henry?  Did Mr. Bourgeois ask to have him called?

A.   We didn't, we didn't contact any witness from LaPlace or

any witness that he was familiar with, without his direction.

He gave us direction to talk to these people.

Q.   All right.

THE COURT:  Did he tell you who he wanted contacted?

THE WITNESS:  Yes.  He told me, he communicated mostly on the witnesses, Judge, with Doug Tenore.  I can recall, you know, I don't know if we get into hearsay or not, but Mr. Tenore said that Mr. Bourgeois had names and phone numbers memorized.

BY MS. BOOTH:

Q.   And let me ask you, on some of the people that Mr. Bourgeois told you to go to and speak to, did you -- was what they were saying not good for your defense?

A.   We brought down -- I think we spoke with over 50, at least through the investigators, spoke with over 50 people.

Q.   And let me ask you, during the trial, did you rent a room, a little conference room over in the hotel that's next to here?

A.   We got a small conference room and then a bigger room.  We had all the witnesses in the big room, and then we'd take them individually into the conference room and talk to them individually.

Q.   And how many witnesses do you think were there when you did that?

A.   I don't remember.  It was a lot.  It took most of the day talking to them.

Q.   Okay.  And after you went through this group of witnesses, is that when you decided, after talking, decide which ones to call?

A.   We make a decision, you know, how they're going to present in court and whether or not they have relevant evidence, whether or not they've got too much baggage in terms of prior convictions, things like that.

Q.   All right.  Did you know that Carl Henry had three convictions for --

A.   Specifically --

Q.   Did you know that he testified that his cases were expunged?

A.   I don't even remember the nature or the content of his testimony, Ms. Booth.  I do remember being surprised at one witness who had convictions that we weren't aware of, so --

Q.   But was that the witness that Mr. Bourgeois wanted you to call?

A.   Yes.

Q.   And Mr. Tenore would be able to tell the story of how many exactly witnesses were brought in for you to talk to?

A.   I believe he -- he arranged for most of the witnesses to be here.

Q.   Okay.  And let me ask you about that PowerPoint presentation.

        THE COURT:  From Dr. Cunningham?

MS. BOOTH:  From Dr. Cunningham.

BY MS. BOOTH:

Q.   What did Mr. Tinker think of that PowerPoint presentation?

A.   He didn't like it.

Q.   All right.  Now, how did Dr. Cunningham take the fact that he was not going to be asked to come in and testify?

A.   He was very angry.

Q.   And then a couple of years later, did he send you a letter asking you to write him a recommendation because he was up for an award?

A.   He asked me to write a recommendation for him for something.  I can't remember.  And I can't remember whether it was a letter or an e-mail.  He has my e-mail address.  He asked me to write a letter for him, and I didn't do it.

Q.   Okay.

THE COURT:  You did not?

THE WITNESS:  I did not.

BY MS. BOOTH:

Q.   And why didn't you do it?  Did he act professional when you told him that you were not going to allow him to testify?

A.   If you tell a professional witness that you're not going to use them, you know, he should be professional about it, and he wasn't.

THE COURT:  What about the -- did Mr. Gilmore know about the problems you had with the one who wanted to get a job

with the Government, the bite guy?

MS. BOOTH:  Oh, Mr. Dailey.

BY MS. BOOTH:

Q.   You knew that Dr. Dailey, in fact, you had a copy of the report that Dr. Dailey had done on the four, on the bite marks. Do you remember that?

A.   I remember a report, but that was Mr. Tinker's part of the case, so --

Q.   Okay.  Do you remember why, or do you have any recollection of why Mr. Dailey, Dr. Dailey wasn't called?

A.   I have no recollection.

Q.   All right.  And we've talked about Mr. Tinker, but Mr. Tinker, do you remember the day he died?

A.   Of course.

Q.   And what date was that?

A.   Do I remember the date, or the day?  I remember spending all day Sunday with him, and through the night, and he died Monday morning.  I don't remember the exact date, but --

Q.   Okay.  And he died of cancer.  Isn't that right?

A.   That's correct.

Q.   And Mr. -- and I know that Mr. Wiseman didn't mean to imply that it was because it was defense interrogatories that he didn't answer, but I just wanted you to answer that.  If Mr. Tinker would have had a choice whether to answer the ones for the Government or the ones for the defense, do you have an

opinion which ones he would have answered?

A.   He would have answered the ones for the defense.

Q.   And --

THE COURT:  He didn't, if I recall, he didn't want to answer anything from you.

MS. BOOTH:  And did -- well, I'm not going to ask that question.

THE COURT:  Better not, whatever it is.

MS. BOOTH:  Yeah, or I'll get in trouble.

THE COURT:  Wasn't Mr. Tinker's theory that he wasn't going to help anybody prove that he was not ineffective?

THE WITNESS:  That's correct.  That's his position that he's taken that --

THE COURT:  It was steadfast through his career.

THE WITNESS:  It was.

BY MS. BOOTH:

Q.   And if he would have had an opportunity to come in here today, he would have testified that he was incompetent and --

THE COURT:  He wouldn't have done that, I don't think, would he, Mr. Gilmore?

THE WITNESS:  I don't think he would say he was incompetent, but he would have been --

THE COURT:  He wasn't going to help you prove that he was not incompetent.

THE WITNESS:  Yeah.

THE COURT:  That was sort of his M.O. throughout his legal career.

THE WITNESS:  That's right.  And he would do anything he could to save Mr. Bourgeois's life.

THE COURT:  Yes.

BY MS. BOOTH:

Q.   Oh, videotape.  Do you know about a videotape that was prepared by the mitigation specialist, Mr. Bierbaum?

A.   I remember the videotape.  I remember the conversations about the videotape.  I may have seen a little bit of it, but I believe that Mr. Tinker is the one that had it.  And I remember y'all -- I remember talking about it.

Q.   Do you remember me being with Mr. Tinker and begging him to play that videotape for the jury?

A.   I remember the conversations about the videotape, yes.  I do remember that.

Q.   That had been prepared by the mitigation specialist?

A.   Right.

THE COURT:  I'm sorry.  Who wanted that played?

MS. BOOTH:  The Government did, Your Honor.

THE COURT:  Oh, okay.

BY MS. BOOTH:

Q.   And Mr. Tinker refused to play it?

A.   He told me he wasn't going to play it, so --

Q.   Do you know the content of that video?

A.    It had something to do with a graveyard of abused children, or something to that effect, or unwanted children. Something to that effect.

Q.    Okay.  Did Mr. Bourgeois ever tell you that he was mentally retarded?

A.    No.

Q.    Did Mr. Bourgeois ever tell you that he wanted you to claim that he was a sexually abused child?

A.    I know that there were some allegations concerning that and the way he was treated as a child.

Q.    Uh-huh, but did he ask you --

A.    I don't remember.

Q.    -- or tell you anything like that?

A.    I don't remember.  I knew that that was a part of the investigator's work product.

Q.    But it hadn't come from Mr. Bourgeois, had it?

A.    I don't think it came from Mr. Bourgeois.

        THE COURT:  Would you have asked him about those kind of things in interviewing him?

        THE WITNESS:  I might have, Judge.  I probably would have.  I just, it's six years ago.  It's hard for me to remember.

BY MS. BOOTH:

Q.    Okay, Dr. Johnson.  You remember Dr. Johnson?

A.    I never had any direct contact with Dr. Johnson, but I did

talk to Mr. Tinker several times about Dr. Johnson. He was very upset with Dr. Johnson.

Q. Why is it that he hired Dr. Johnson or wanted Dr. Johnson?

A. I think he went to a seminar and she spoke, and he was impressed with her and went up and contacted her after the seminar and told her about this case, and then arranged to have her hired.

Q. And it wouldn't surprise you that there was --

A. He may have paid for her out of his own pocket. I'm not sure. But -- and then sought reimbursement. I don't know. I don't remember if she was appointed by the Court or not.

Q. Okay. And did you, do you remember -- I mean, would it surprise you if there had been evidence that during the month of July that there had been many phone call -- I mean, during the month of January of 2004, that Mr. Tinker had had numerous contacts with her, and then there was no more contact after the end of January?

A. I remember -- I don't know about the contacts he had with her before, but I remember towards trial date, he was very upset with her, because she would not talk to him. She would not communicate with him.

Q. And at what point did he find out that she wasn't doing her own testing?

A. I don't remember. I just --

Q. Okay.

A.    I just remember him being angry.

Q.    Did he find out that she wasn't doing her own testing, that she was outsourcing it to another lab?

A.    I don't know.

Q.    Okay.  Did he express -- oh, and let me ask you this.  Did Mr. Tinker ask her for a written report?

A.    I believe he did.

Q.    And was he upset that all he got was a handwritten fax note?

A.    That's what I remember, Ms. Booth.  He was upset that he didn't get a formal report.

Q.    A formal report.

A.    Yes.

Q.    Okay.  Your mitigation investigators, how would you rate them in performance?  Did you have difficulty getting in contact with them?  Did they do what they were supposed to?

A.    I really didn't have a whole lot of contact with them, other than -- I know Mr. Tenore spent a lot of time with them.

Q.    Uh-huh.  So --

A.    I initiated the contact with them.  They came down and talked to me.  We discussed the case.  They sent me reports telling me what they wanted to do, about how much time it was going to take to do it, about how much the expense was going to be.  I remember that.  I remember dealing mostly with Ms. Milstein, but it seemed like I dealt with her more than I

did Mr. Bierbaum.

Q.   All right.  And do you know when they finally delivered their report?

A.   No.

Q.   And were you hoping they would -- they were channeled to Dr. Cunningham?  Is that correct?

A.   I thought I made inquiries of Dr. Cunningham as to how this was supposed to work, whether they were supposed to report this to him, since he was going to testify, or to both of us. I think I made inquiries about that.

Q.   Do you remember getting a satisfied response, a satisfying response from --

A.   At this point I don't recall getting a response from Dr. Cunningham.

Q.   Okay.  And you'd never had that luxury in state court. Right?

A.   I've had mitigation experts --

MR. WISEMAN:  Your Honor, objection.  It's not a luxury, it's a constitutional right.

MS. BOOTH:  And that being said, yes.

BY MS. BOOTH:

Q.   Did you have the opportunity to have a mitigation specialist along with mitigation investigators?

A.   Not in state court, no.

Q.   Okay.

A.    I've had mitigation experts, but not a dedicated mitigation expert.

Q.    Okay.  Now, before this case became certified as a death penalty case, did you go to Michael Shelby in Houston and ask that it not proceed as a death penalty case?

A.    Yes.

Q.    Did you have a teleconference with the Capital Crimes Counsel to ask them not to certify this as a death penalty case?

A.    Yes.

MS. BOOTH:  If I might have just a moment, Your Honor.

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, is there any way we could have a short break?

THE COURT:  Yes.  But can I ask you something before we take a short break?  Was there any, any indication that this event did not occur on the Navy Base?  Didn't Mr. Bourgeois testify that it occurred on the Navy Base?  She fell out of the truck on the Navy Base?

THE WITNESS:  Yes, I believe that's correct, Judge.

THE COURT:  Was there any controversy about that anywhere?

THE WITNESS:  You know, getting probably confused by

the writ and the, what I knew before and during the trial, but I don't recall there being any, any discussion about that.

THE COURT:  Any controversy of any kind?

THE WITNESS:  No.  I don't recall.  I just --

THE COURT:  Okay.

BY MS. BOOTH:

Q.   In a statement that your Defendant gave one of the law enforcement, didn't he say that she was sitting on his lap singing the ABCs when they drove into the --

THE COURT:  Navy Base.

MS. BOOTH:  -- Navy Base?

MR. WISEMAN:  Your Honor, I'm going to object to the question.  My understanding that the Court's ruling in April was that that claim was not going to be the subject of an evidentiary hearing.

THE COURT:  Oh, I thought it was.

MR. WISEMAN:  Oh, no.  Oh, no.

THE COURT:  Okay.  Never mind.

MR. WISEMAN:  Yeah.  I mean, we've got lots to put on, if you want to make it an issue.

THE COURT:  No, that's fine.

MR. WISEMAN:  Take us another two weeks to do it.

THE COURT:  No, no.  No, we don't need that, thank you very much.

MR. WISEMAN:  Teasing.  Teasing.

MS. BOOTH:  So we have a break?

THE COURT:  We've got a break.

MS. BOOTH:  Fifteen minutes?

THE COURT:  Fifteen.

MS. BOOTH:  Yes, ma'am.

THE COURT:  Then how many more witnesses do you have?

MR. WISEMAN:  We have Mr. Bierbaum, we have Alan Keel, and we have Kerry Brown.

THE COURT:  Three?

MR. WISEMAN:  Three.

THE COURT:  And then you're done?

MR. WISEMAN:  Yes.

THE COURT:  Okay, thank you.

MR. WISEMAN:  On our direct case.

THE COURT:  Pardon?

MR. WISEMAN:  On our direct case.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, we'd like to release Dr. Senn --

MR. WISEMAN:  Oh, right.  I'm sorry, Your Honor. There's a prisoner we'll call, this Allen fellow who was writted in.

THE COURT:  Right.

MR. ROBERTS:  We'd like to release Dr. Senn from our witness list.  He's on our witness list.  I don't want to tell

him to go unless the Defense is aware that we're going to release him and we're not going to call him any more.

THE COURT:  Any objection?

MR. McHUGH:  The only objection -- not an objection, but I was provided with the Government's copy of his PowerPoint, and I just want to make sure that that will be moved into evidence.  That's the one that I relied upon.

MR. ROBERTS:  It's already in evidence, I believe, Your Honor.

MR. McHUGH:  Okay.

THE COURT:  Okay.  Then he is released, if there are no objections.

MR. ROBERTS:  Thank you, Your Honor.

(Recess from 4:48 p.m. to 5:05 p.m.)

THE COURT:  Are you all ready?

MS. BOOTH:  Yes, Your Honor.

CROSS-EXAMINATION (Continued)

BY MS. BOOTH:

Q.   Okay, Mr. Gilmore, I just have a few more questions to ask you about.  I want to talk to you about the -- you said that the split of the work was done where Mr. Tinker dealt with the experts.  That's right.  Right?

A.   That's right.

Q.   Okay.  And do you remember having any discussions with Mr. Tinker regarding filing Daubert motions or anything about

the digitally enhanced photos or the bite marks?

A.    I thought we had a few Daubert hearings, or Daubert, however it's pronounced, but we had a -- I seem to remember having more than one.  But I don't recall specifically what the subject matter was.

Q.    Okay.  Now, there has been -- do you know a person by the name of Ross Griffin?

A.    I represented him in a conspiracy case, marijuana conspiracy case.

Q.    Okay.  And he wasn't called in this case, was he?

A.    Not that I recall.

Q.    Okay.  Why didn't you, or do you remember, did you or Mr. Tinker not object when Mr., Dr. Estrada commented on how the Defendant seemed like he was part of the defense team, like one of the lawyers over at the table, or he seemed indifferent, and like one of the lawyers?  Except I don't believe the lawyers were indifferent.  Do you remember Dr. Estrada making that comment?

A.    Oh, I remember the comment.  I can't remember why I didn't object.  I don't think he was my witness.  I think he was Doug's witness, but --

Q.    Okay.

THE COURT:  I think he was a Government witness, wasn't he?

THE WITNESS:  No, but Doug was going to cross him, so

he would have objected.

BY MS. BOOTH:

Q.    Okay.  Well, could it have been considered a compliment that he was, that he looked like one of the lawyers, or not?

A.    The indifferent part wasn't a compliment.  That wasn't a compliment at all.

Q.    Okay.  Now, Orlando Campos, do you remember who Orlando Campos was?

A.    I think I had two, three trials, including this one, three trials involving Orlando Campos.

Q.    Okay.  Can you explain for the record what, about those three trials involving --

A.    Two of them, one of them was a mistrial, and the other one was a trial to the conclusion.  It was a murder case out of Bee County that was change of venue to Aransas County and then eventually tried in Victoria County.

Q.    Okay.

A.    He was testifying against my client.

Q.    He was testifying against your client?

A.    Yes.

Q.    And in fact, you cross-examined him extensively as to that when you got him in here.  Right?

A.    I seem to recall that, yes.

Q.    And what did you -- after he testified against your client, did he then recant what he had testified to?

A.    Um --

Q.    Or do you remember?

A.    I remember there was a recantation by a lot of -- there were three guys, or three or four guys that testified against my client in that case, and they were waffling back and forth. I think in the end, he did testify against my client, but I think in the mistrial, he recanted.

Q.    Okay.  And how about Adan, Adam Longoria?  Adam Longoria, do you know who he was?

A.    Adam Longoria was involved in another capital case that I had.  And I may be wrong about this, but I believe he testified against my client.  I believe he was a jailhouse snitch, what I consider --

        THE COURT:  Did you ever represent him?

        THE WITNESS:  No, ma'am.

        THE COURT:  Did you ever represent the other guy that you talked about?  Who was the other one?

        MS. BOOTH:  Orlando Campos.

        THE COURT:  Did you ever represent him?

        THE WITNESS:  No, Judge.

BY MS. BOOTH:

Q.    And as far as Darrick Moore is concerned, do you know who Darrick Moore was?

A.    I don't remember.

Q.    Do you remember there being an African American gentleman

Gilmore - Cross
201

that came in here and testified about what he had heard Mr. Bourgeois say while Mr. Bourgeois was in the cell with him?

A.    I remember quite a few people coming in and testifying to that, things like that.  But I, in particular, not Mr. Moore.

Q.    All right.  Mr. Moore, I will tell you this, Mr. Moore was a witness that the United States had offered a 5K departure to. Does that refresh your memory?

A.    I think I cross-examined every witness about their motivation for testifying and what type of, either a sentence reduction or a recommendation they were going to get from the Government.  So if he testified, I asked him about it.

Q.    And it wasn't a surprise to you that federal defendants would come in and testify for 5K departures, would it?

A.    I've had a couple do that myself, so --

Q.    All right.  I wanted to ask you just one last question, if the reason that Dr. Cunningham was not allowed to testify in the sentencing phase had anything to do with Mr. Tinker fearing that we -- fearing the Government, or fearing anything that we might do to him if he put somebody on.

A.    Mr. Tinker wasn't afraid of you.

Q.    And the decision not to put on Dr. Cunningham rested in a group decision?  That's correct?

A.    It was a group decision.  Doug and I had pretty much decided after we saw the PowerPoint presentation, the notebook, that he wasn't going to work with our case.

Q. And you had been, we had been in trial since what date? Do you remember?

A. It was a long time. It seems like we started in February maybe --

Q. Uh-huh.

A. -- and ended in March.

Q. And you were sitting at the, over here at a table for the defense facing the jury. Isn't that correct?

A. Actually, I think I spent most of my time sitting on the other side of counsel table. I believe that I would, or was permitted to go talk to Mr. Bourgeois on occasion, but for security reasons, I sat on the other side of the table.

Q. All right.

A. But I generally face straight ahead or towards the jury.

Q. Okay. And so, but you had an opportunity to watch the jury while different pieces of evidence were being put on. Right?

A. I always watch the jury, yes.

Q. All right.

        MS. BOOTH: I pass the witness, Your Honor.

        THE COURT: Thank you.

    (Counsel conferring off the record.)

                    REDIRECT EXAMINATION

BY MR. WISEMAN:

Q. Mr. Cunningham --

A.    Gilmore.

Q.    Mr. Gilmore.  I'm sorry.

A.    Yes.

Q.    I've been hearing Cunningham.  This is -- you're a unique witness so far in this case.  The Government has asked you many more questions than the Defense so far, so I'm going to have to try --

A.    I have a feeling that that's going to change.

          THE COURT:  That's about to change.

BY MR. WISEMAN:

Q.    Yeah, I've got to try to even it up a little bit.  I'm at a little bit of a disadvantage.  Who's Mr. Granberry?

A.    He's my friend.  He's a lawyer.

          THE COURT:  He was sitting back there.

          MR. WISEMAN:  Oh.

          THE WITNESS:  There he is, right there.

          THE COURT:  In fact, he's right there.

          MR. WISEMAN:  Oh.

          THE COURT:  In the blue tie.

          MR. WISEMAN:  What's his connection to this?

          THE WITNESS:  We're friends.

          THE COURT:  He's an observer.

          THE WITNESS:  He's a friend.

          MR. WISEMAN:  Oh, okay.

          THE WITNESS:  He's a lawyer.  He's a friend.

BY MR. WISEMAN:

Q.   Is he your lawyer?

A.   Is he my lawyer?

Q.   Yeah.

A.   He's not my lawyer.

Q.   Okay.

A.   I mean, if I needed a lawyer, I'd hire him, but he's not my lawyer.  I don't need, think I need a lawyer in this case.

Q.   I was just curious.

A.   Yeah.

Q.   Did I hear you --

          THE COURT:  Have you got yours here?

          MR. WISEMAN:  What's that?

          THE COURT:  Have you got one here, Mr. Wiseman?

          MR. WISEMAN:  Oh, I've got a whole bunch of them, each one more fierce than the one before.

BY MR. WISEMAN:

Q.   Mr. Gilmore, did I hear you say that you spoke with Ms. Booth last night?

A.   Yes.

Q.   Okay.  And when you spoke with her, about how long did that conversation go on for?

A.   Through dinner time.  I was hungry.  It was probably, from the time that you guys got out of court, I had to drive from Portland over here, so I probably made it over here about 7:30,

and spoke with her till about 9:00 o'clock.

Q.    And during that conversation, did she ever use the word "angry"?

A.    She might have.

Q.    And did she use it in relationship to Dr. Cunningham?

A.    She might have.

Q.    And did she tell you that the Judge had mentioned that during the proceedings?

A.    She might have, yes.

Q.    Might have?  Or it sounds like she did?

A.    She did.

Q.    She did.

A.    She did.

Q.    Okay.  Did she tell you anything else about what transpired in these proceedings?

A.    No.

Q.    That's the only thing?

A.    No --

        THE COURT:  Well, independently, did you think Dr. Cunningham was angry with you?

        THE WITNESS:  Dr. Cunningham was very angry at us, Judge.

BY MR. WISEMAN:

Q.    So she didn't relate any other facts as to what was going on in this entire hearing?

A.   No.  I think that came up when I was talking about how angry he got when we told him that he wasn't going to testify. And I think she just related that to me.

Q.   In your declaration, you start out by saying that you have never been found or adjudicated ineffective in any case.

A.   Not that I can remember.

Q.   Okay.  I'm just curious, why did you put that in there? What relevance does that have to the issues in the petition?

THE COURT:  Well, you're just -- you're accusing him of being ineffective in this case.

MR. WISEMAN:  Certainly.

THE COURT:  So wouldn't that be relevant?

MR. WISEMAN:  Habit?  Practice?  I don't see the relevance.  I was just wondering what the witness', the witness was thinking at the time.

THE COURT:  Sure.

THE WITNESS:  I don't know.  Maybe I got a sample from somebody.  I don't know.

BY MR. WISEMAN:

Q.   Okay.  Do you feel you're here to defend yourself?

A.   No.  I'm here to tell the truth.

Q.   Have you ever made a mistake in your practice?

A.   Oh, I've made mistakes in my practice.

Q.   Can you sit here and comprehensively tell the Court that you performed flawlessly in this case?

A.    No.

Q.    You made mistakes.

A.    I made mistakes in this case probably.

Q.    I understood you to say that you did not use Dr. Cunningham in this case because you felt that his PowerPoint and his overall presentation was inconsistent with your defense that Mr. Bourgeois didn't commit the offense?

A.    That was the main reason.  And we weren't impressed with him, to tell you the truth.  We had dealt -- I think Mr. Tinker had met with him on one occasion before, but when it came time to make the decision what to do in the case, we decided that we weren't impressed with him.  And -- okay.

Q.    And in your declaration, at Page 3, referring to Dr. Cunningham, you say, "The problem, in our perspective, was that Mr. Bourgeois denied he committed the crime and throughout the trial, including his allocution to the jury" --

          THE COURT:  Could you zoom that in just a tad?

          MR. WISEMAN:  Oh, absolutely.

          THE WITNESS:  Yeah, I --

BY MR. WISEMAN:

Q.    "And Dr. Cunningham's explanation," meaning his presentation, "conflicted with Mr. Bourgeois's defense."

A.    That's right.

Q.    And that's what's in your declaration --

A.    Yes.

Q.    -- as to your reason.

A.    Yes.

Q.    Could you explain to me, sir, why, if -- well, withdrawn.
I don't expect you to go through it in any detail, but let me
see if we can, you know, just do it right quick.
Dr. Cunningham was going to talk about the effects of an
abusive childhood?

A.    I believe he was, yes.

Q.    Among other things.

A.    Yes.

Q.    Okay.  And that was, that presentation was somehow
inconsistent with the defense that you had put forward, "I
didn't do it, I'm not guilty."

A.    What relevance did that have to if he didn't do it.

Q.    I'm wondering if you can explain the reason then that in
your closing argument at penalty phase -- this is at the
proceedings of March 24th, 2004, at Page 47 -- and you say,
"And his mother singled him out for abuse."  And before you
answer that, let me give you another sampling.

      This is Mr. Tinker's closing argument, at Page 59.  Let me
put this up.  It might be a little easier for the Court.  "He
wouldn't even admit to Dr. Estrada, and Dr. Estrada told you
this, that he had been abused as a child.  He told Dr. Estrada
that he had a great home life.  And if you recall, that's the
kind of psychological problem Mr. Bourgeois had.  You have the

right to conclude that he lied to you. You have a right to conclude that."

And then in the next paragraph, "Dr. Estrada tells you that he grew up in a society where it was accepted conduct to hit children with items, sticks, switches, electrical cords. He grew up in an environment in which whipping apparently is accepted for the men."

And finally, on the next page, "I'm telling you that," meaning this evidence about abuse, "that's the kind of rearing Alfred Bourgeois had, and that's why he's here today."

Can you explain why Mr. Tinker and yourself argued abuse as an explanation if it was inconsistent with the defense?

A. Was that me or Mr. Tinker?

Q. That's Mr. Tinker.

A. That's Mr. Tinker? Because he elicited that testimony from Dr. Estrada, I believe, and then we elicited it from maybe some of the witnesses. I mean, that's --

Q. Right. So it was --

A. Dr. Cunningham -- the main part of Dr. Cunningham's testimony was going to be that Alfred did it, but he did it because of all these pressures that were on him. I don't think we were going to be able to keep him from saying that part. I guess we could have, but we elicited that testimony from Dr. Estrada, and I thought Dr. Estrada was effective for us. And we made a decision --

Q.   I appreciate that point.

A.   Yeah.

Q.   But my question is, in what way did Dr. Estrada's testimony about abuse as a reason for Alfred Bourgeois having committed the offense differ from Dr. Cunningham's testimony, purported testimony, that Mr. Bourgeois did it because of his history of abuse?

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   You would agree, it's somewhat inconsistent with what's in your declaration?

A.   It's -- yeah.  I mean, my declaration deals mostly with the stress that was put on Mr. Bourgeois that caused him to commit this offense.  That's the main reason we didn't call Dr. Cunningham, because Mr. Bourgeois denied committing the offense.

Q.   But you argued it to the jury, nonetheless.

A.   We didn't argue that.  We argued about his abusive history, past history.

Q.   Oh, I see.

A.   Yeah.

Q.   So you, you --

     THE COURT:  Were you finished answering, Mr. Gilmore?

     THE WITNESS:  I'm finished, Judge.

MR. WISEMAN:  I'm sorry if I cut him off, Your Honor.

BY MR. WISEMAN:

Q.   So you're drawing a distinction then between abuse as a mitigating factor and abuse which leads to stress and rage and the commission of the offense?  Is that a distinction you're drawing?

A.   I guess.

Q.   Okay.  Where did you derive that distinction from?

A.   I don't recall.

Q.   Did you -- I'm sorry?

A.   I don't recall.  I'm telling you that we made a decision not to call Dr. Cunningham.  We weren't impressed with Dr. Cunningham.  We didn't particularly think he was going to impress the jury, and we did not like his presentation.  That's a decision that, you know, that trial lawyers make all the time.

Q.   Did you speak with Dr. Estrada at any point -- he was available for you to talk to during the proceedings, I believe.

A.   Yeah, Dr. Estrada and Mr. Tinker spoke several times.

Q.   Did you or Mr. Tinker or both of you together ever have a discussion with Dr. Estrada where he drew the distinction between abuse as a mitigating factor and abuse which leads to rage and other mental health problems as an explanation for the offense?

A.   I don't recall.

Gilmore - Redirect                    212

Q.   You've testified that -- well, you read a lot of letters to the Court.  Is it your view from those letters that they appear to be, for lack of a better word, normal sounding?

A.   I wouldn't say so much normal sounding.  He's -- he was very obsessed with the case, as he should have been, and he was very persistent in making his point of view known.  And he wrote lengthy letters.  And I mean, that's all I can say.  I have clients who don't bother me at all, let me run the case myself, and then I have clients who direct me in the --

Q.   We've received a few of those lengthy letters ourselves.

A.   Yes.

Q.   Ms. Booth was asking you about whether they showed good sequencing, ability to relate a story.  Do you recall those questions?

A.   Yes.  He -- well, the parts that she had me read were sequenced, but he rambled a lot in his letters.

Q.   Did you generally find your communication with him to be not particular extraordinary in any way?  And by that, I mean, he didn't seem unusual?  He didn't seem mentally ill?

A.   I never detected that.

Q.   I'm wondering if you -- I'm going to put this up on the overhead.  It's marked as Petitioner's 145.  It's a motion that was filed in court, Defendant's motion for mental health evaluation, was filed on December 5th, 2003.  I believe it's got your signature on the second page.

Paragraph 4 says, "Defense Counsel have each visited with the accused on many occasions, have communicated with him by phone and have corresponded with him in writing."

A.    Yes.

Q.    "Counsel have observed highly unusual, often bizarre behavior, have listened to abnormal conversations and have noticed an unusual writing style."  And you've already talked about the writing style being a little rambling.  What kind of unusual, bizarre, abnormal conversations did you have with Mr. Bourgeois?

A.    I don't recall.  I really do not recall.

Q.    All right.  I can take it from the fact that your signature is on the pleading filed in this Court --

A.    If I filed it, I meant it.

Q.    Okay.  Whose job is it, in your view, or at the time of these proceedings, I guess, is the more accurate question.  Whose job was it, in your view, to ensure that the mitigation specialists were properly performing their function?

A.    Well, in the division of duties, Mr. Tinker was responsible for that part of the case.  If we're talking about the mitigation experts and the mitigation investigators, Mr. Tinker.  The lay witnesses were mine.

Q.    Okay.  And I actually meant more generally.  It's the lawyers' job, in your view?

A.    Oh, the lawyers, yes.

Q.   So you hire these folks.  They work for you.  Your job is to --

A.   Right.

Q.   -- ensure that they're doing their job.

A.   Yes.

Q.   You've testified that you didn't see any evidence of mental retardation in your encounters with Mr. Bourgeois.  And I know you've relied in part on Dr. Estrada's view that he had an above average intelligence.  I'm wondering, in your interactions before the encounter with Dr. Estrada, Mr. Bourgeois's encounter, what were you basing your view on that he did not appear to have mental retardation or low intelligence?

A.   What did I base it on?  My conversations with him.

Q.   Okay.  What kind of conversations does a person have if they're mentally retarded?  How do they present?

A.   I don't know.

Q.   So it was just sort of a gut feeling you had?

A.   Just a gut feeling.

Q.   And do you recall that a neuropsychologist named Dr. Weiner was retained by the Defense, and he evaluated Mr. Bourgeois?

A.   Yes.  I remember that he was one of our potential witnesses.

Q.   Right.  And he diagnosed Mr. Bourgeois with a number of

things, but the one I wanted to ask you about was he diagnosed him with a mild cerebral dysfunction.  Do you know how a person presents with that condition?

A.   No.

Q.   Did you ever ask, or did Mr. Tinker ever ask, to your knowledge, Dr. Weiner what that is?

A.   No.  I don't know.  Doug -- Mr. Tinker dealt exclusively with Dr. Weiner.  I never met Dr. Weiner.

Q.   Well, Dr. Weiner's testified that neither did Mr. Tinker. Did you ever have a phone call with him?

A.   Not that I recall.

Q.   Do you recall if Dr., if Mr. Tinker had a phone call with him about the results of his evaluation?

A.   I don't know.

Q.   There's been evidence in these proceedings that Mr. Bourgeois suffers from a borderline personality disorder. Do you know what that is?

A.   A borderline personality disorder?

Q.   Yes.

A.   Well, I have a general idea what it is.

Q.   Okay.  Do you know how a person who suffers from it would present?

A.   No.

Q.   Did you ever discuss that potential with any of the mental health folks that you engaged in this case?

A.    I didn't.

Q.    Do you know if Mr. Tinker did?

A.    I don't know.

Q.    When Mr. Bourgeois wrote the letter to you about the missing blood vial, did you launch an investigation into that?

A.    It's been six years.  I don't know --

Q.    You didn't, did you?

A.    -- I can't remember.  Hmm?

Q.    You'd remember if you investigated whether the --

A.    I can't remember everything that I did back then.

Q.    Okay.

A.    I can't --

Q.    I'm trying to refresh your memory, if I can.  If you had thought that the FBI had tampered with evidence and had somehow taken a blood vial in this case, where DNA was an issue, you don't think you'd remember that?

A.    I don't recall.

Q.    Okay.

A.    I mean, I don't recall making an issue out of it.  I don't recall it.

Q.    Did you take that complaint from Mr. Bourgeois, that allegation, I should say, seriously?

A.    I don't remember reading that letter.  You know, I read the letter here today, but I don't recall that letter.

Q.    Were allegations like that of evidence tampering and a

frame, were they sort of a consistent part of Mr. Bourgeois's presentation?

A.   It was a consistent theme in his letters and his conversations.

Q.   Okay.  And did you accept that?  Did you believe it?

A.   That's what I presented to the jury.  I mean, that's --

did I believe it?  Are you asking me if I believed --

Q.   Yeah.

A.   -- if he was telling the truth?

Q.   Yeah.

A.   No.

Q.   Were those types of letters and conversations among the ones that you described to the Court in the motion for an exam that he was bizarre in his presentation?

A.   Would you rephrase the question?  I didn't --

Q.   Sure.  I'm wondering if these allegations he was making about a frame-up and tampering of evidence, does that fit into the category of his communications that you characterized to the Court in the motion as bizarre.

A.   Yeah, probably.  He was obsessed with Robin and the bad things she was doing to him, and it was hard to keep him on track sometimes.

Q.   That exhibit that the Government put up, 198, was the letter that said, "Certified copy, notarized."

A.   Yeah.

Q.   And in fact, it appears that it was notarized.  Just for the record, what's the purpose of notarization of a document?

A.   Swearing to telling the truth.

Q.   And to identify you as the person who signs the document?

A.   Yes.

Q.   Okay.  Did you have any doubt that Mr. Bourgeois had signed that letter?

A.   I'd recognize his handwriting.

Q.   And the tone?

A.   Yes.

Q.   Okay.

A.   Well, that was his handwriting.  I mean --

Q.   Do you know what masking is, in the context of mental retardation?

A.   I have no idea.

Q.   I've met Dr. Estrada on a number of occasions now, and he's truly a wonderful fellow and a skilled practitioner --

         THE COURT:  Do you want to just -- do you want to just ask the question --

         MR. WISEMAN:  Sure, sure.

         THE COURT:  -- instead of testifying, please.

         MR. WISEMAN:  Absolutely, Your Honor.

BY MR. WISEMAN:

Q.   And I think you said that he's highly credentialed and you rely on him?

A.    Yes.

Q.    What -- if I told you that he opined in this case that he did not believe that the jury was provided with an accurate and complete picture of Mr. Bourgeois's mental health profile, would you disagree with that?

A.    No.  I mean, if that's what he said --

Q.    Well --

A.    -- I trust him.

Q.    So you don't disagree with his opinion?

A.    I don't disagree with him.

Q.    You saw the e-mails between yourself and Dr. Cunningham?

A.    I read them, yes.

Q.    And was that last evening?

A.    Yes.

Q.    Ms. Booth showed them to you?

A.    Yes.

Q.    Did she describe at all Mr., Dr. Cunningham's testimony about them?

A.    No.

Q.    She just gave them to you to read?

A.    She gave me a bunch of stuff.  I had a stack that thick of stuff to read last night.

Q.    Okay.  Are you aware, from reading that, that Dr. Cunningham's office wrote to you in December of '03 and reminded you -- you, not Mr. Tinker -- that they still had

received no materials?

A.   I -- but if you show it to me, I'll -- I mean, I didn't memorize them.  I read them.

Q.   This is Exhibit P-8, Page 19.  "FYI" -- this is from Ms. Lam, who is identified as Dr. Cunningham's assistant.  John Gilmore, December 1st, 2003.  "FYI, we have yet to receive any records, information, materials for Dr. Cunningham to begin working on the report."

A.   I see that, and I see that I responded to her, asking how it works and whether they were supposed to report to him or to me.

Q.   Okay.  So he was appointed to this case sometime in the summer, telling you he needed some time to get ready?

A.   Correct.

Q.   Okay.  And I think on your cross-examination, you said that he told you he couldn't be available for trial in September.  Would it be more accurate that he told you that the investigation would take longer than that amount of time, from --

A.   My recollection --

Q.   Yes.

A.   -- is that he told me that he had a conflict.  And it may not have been the September date.  We had several -- this case lasted quite a while.  We had several dates set, and the case was reset.  But the first time I contacted him, I believe that

he said that he had a conflict for the September date.  That's my --

Q.    Well, let's clarify that then.

A.    Okay.

Q.    This is Page 2 of P-8.  "Because the relevant records are often time consuming to identify and retrieve, and because conducting the third-party interviews are similarly time consuming, the investigation alone cannot typically be performed in the time between now, July 1st, and trial," which at that discussion here is mid September.

So essentially, he's telling you, you know, it's not that I'm unavailable, but I can't, you can't pull it together in two-and-a-half months.

A.    I can only tell you, yeah, that's what he's saying here. I just recall at first he was suggesting that we hire another mitigation expert because he had a conflict.  Whether it was for the September setting or a prior setting, I can't recall.

Q.    Okay.  Were you --

A.    So, but it sounds like he's saying here that we can't get the investigation done soon enough for the September setting, and so we asked for a continuance.

Q.    Okay.  And you got that continuance until February.

A.    Yes.

Q.    Okay.  And do you recall having filed a motion before Judge Jack on December 9th, 2003, in which you said, "The

mitigation specialists can't get their work done," and you referred specifically to Bierbaum and Milstein, and that they wouldn't be ready until August of 2004.

A.   I may have.  If it's, if I filed it, then that's what I was -- yeah.

Q.   This is P-72.  Sorry for the writing on that.  Oh, I'm sorry.  That's the wrong document.  All right.  You don't dispute that it was filed.

Dr. Cunningham presented his invoice, explained it to the Court yesterday, and indicated that he didn't receive his first bit of mitigation information until January the 30th of 2004, which at that point was two weeks before trial.

A.   If that's what he testified to, then that's --

Q.   Okay.  Assuming that that's the truth and that the Court finds that to be the truth, do you have any explanation as to why six months passed without him receiving any information at all relevant to the mitigation investigation?

A.   The only thing I can tell you is that Dr. Cunningham recommended the mitigation investigators to us, and I was making inquiries as to who do they report to?  Do they report to you?  Do they report to us?  Or do they report to both of you -- both of us?  I don't -- I don't know.

Q.   You don't have an explanation?

A.   I don't recall.

Q.   Oh, okay.  Now, your answer seems to suggest that you

didn't get an answer to your questions to whom they report to?

A.   I don't recall getting an answer.

Q.   Okay.  When you didn't get an answer, assuming you didn't, did you say, "Well, hold it a minute.  I'm the lawyer here. It's our job to make sure this gets done.  What's going on? Who's reporting to whom?  When is this work going to get done?" Do you recall having a discussion like that?

A.   I don't recall.

Q.   Okay.  You would agree, though, that ultimately it was the responsibility of you and Mr. Tinker to ensure that this work got done in an appropriate, timely and accurate manner?

A.   We were responsible, yes.

Q.   Dr. Weiner testified this week that when he went in to see Mr. Bourgeois on February 28th, that's already into trial, jury selection had already been completed, that you gave him or Mr. Tinker gave him no records.

A.   I didn't contact Dr. -- is it Weimer or Weiner?

Q.   Weiner.

A.   Weiner.  I didn't contact Dr. Weiner.  I didn't have any discussions with him at all.

Q.   Well, given Mr. Tinker's representation, as I gather -- I unfortunately didn't know the man very well.  I met him a couple of times.  But do you have any explanation for the Court at all as to why he would not, assuming Dr. Weiner accurately recounted, why Mr. Tinker wouldn't have provided him with

hospital records, for example?

A.    I don't have any explanation.  I don't -- I don't know.

Q.    You would agree, though, that Counsel in a capital case should give their expert relevant records?

A.    Yes.

Q.    Dr. Cunningham told you that?

A.    Yes.

Q.    You didn't need Dr. Cunningham to tell you that.  You knew that.  Right?

A.    I know.  Yes.

Q.    So that seems to be one of the, maybe one of the mistakes you made in this case?  "You" being you and Mr. Tinker together.

A.    The Defense team?

Q.    Yeah.

A.    If the medical records weren't provided and they were requested, then we made a mistake.

            THE COURT:  With Dr. Cunningham?

            MR. WISEMAN:  I'm sorry?

            THE COURT:  Dr. Cunningham?

            THE WITNESS:  Dr. Weiner.

            MR. WISEMAN:  Dr. Weiner.

            THE COURT:  Dr. Weiner?

            MR. WISEMAN:  Yes.

            THE COURT:  Oh, okay.

BY MR. WISEMAN:

Q.   This is Exhibit 61, Petitioner's 61, and it's a packet of memoranda from Mr. Bierbaum to, in this case, it says to John Gilmore.  Okay.  And I want to turn to a particular page.  All right.  You see here on Page 18, it says, "Records"?

A.   Yes.

Q.   I just want to find a page where the, this particular memorandum starts.  Just give me a moment.

MR. WISEMAN:  I'll admit the exhibit, Your Honor, so you'll be able to review it in full.

BY MR. WISEMAN:

Q.   But this is Page 4.  It's a memorandum from Gerald Bierbaum, John Gilmore, November 11th, 2003.  And this is a plan, investigative plan for the Bourgeois case.

A.   Yes.

Q.   And on Page 18, he says, "A thorough mitigation investigation consists of reviewing all papers."  He goes on to say, talk about different kinds of records that should be reviewed.  And Alfred's medical records on Page 19, it says, "Alfred claims he was in a coma for a motorcycle accident.  We need to request the River Parish Hospital records, as well as records of Alfred's birth.  Now, that's in November, the packet of records I showed you at the beginning of my examination indicate he received those on February 20th.  Do you have any explanation to offer as to why you, the collective "you,"

didn't get those records from November until almost -- well,

till the time the trial had started?

A.   I don't have any recollection.

Q.   Does that mean you have no explanation?

A.   If I don't recall, then I can't explain it.

Q.   Okay.  You would agree that that doesn't seem, that

doesn't seem like good practice, does it, to wait that long

with trial impending and your mitigation specialist saying,

"Look, I need this stuff"?  Waiting -- I mean, that's not

right, is it?

A.   It's not right.

         MS. BOOTH:  The only thing I'm going to object to is

a false characterization of the evidence as far as the records.

There was an invoice issued in February, on February the 20th,

I believe.  That's the invoice date.  I don't believe that

that's the date, there's any proof on what date those records

came into the attorney's office, Your Honor.

         MR. WISEMAN:  I think it goes to the weight of it,

Your Honor.  I mean, you can make an inference that he received

them on the date that the invoice says here are the records.

In fact --

         MS. BOOTH:  Unless there is a page that shows the

envelope, where it was actually received into the office.

         MR. WISEMAN:  It's the exhibit at the bottom.  The

invoice says that there are 101 pages.  It doesn't admittedly

say that they're attached, but I think Your Honor can draw the inference that the invoice came with 101 pages.  And I therefore don't think it's an admissibility issue but one of weight.

THE COURT:  Go ahead.

MR. WISEMAN:  Thank you, Your Honor.

BY MR. WISEMAN:

Q.   My question was, that doesn't seem right to you, does it? It seems like bad practice.

A.   If they requested the records and we didn't get them to them on time, then it seems like bad practice.  I mean, I can't recall why the records weren't obtained.  I don't remember.

Q.   I understand.  I have a few questions about Mr. Longoria. If you were aware that Mr. Longoria was offered a consideration in state court in return for his testimony against Mr. Bourgeois, is that something you would have used to cross-examine him?

A.   Of course.

Q.   Were you ever made aware, in regard to Mr. Longoria, that Ms. Booth wrote a letter on his behalf to the Texas Board of Pardons and Paroles after trial?

A.   I don't recall.  I don't think I knew that.

MR. WISEMAN:  If I could just have a moment, Your Honor.  I think I might be done.

(PAUSE.)

MR. WISEMAN:  That's all I have.  Thank you, sir. Oh, Your Honor -- I'll offer them through Mr. Bierbaum.  Never mind.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, I'd just like to point out for the record, so it's clear, the date that the Hunter Medical Systems issued their invoice was February the 20th.  There's no indication here that this got to the lawyers -- there's no indication what time it got -- it's 101 pages that was sent, and there's no, there's no indication when it actually got to the attorneys.

THE COURT:  I agree with you.

MR. WISEMAN:  Can I ask a follow-up in regard to that, Your Honor?

THE COURT:  Yes.

MR. WISEMAN:  Do you have any recollection of receiving these records?

THE WITNESS:  None at all.

MR. WISEMAN:  And if, in fact, the invoice came at about the time of the records --

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes.

THE COURT:  You don't know that, so move on from something else.

MR. WISEMAN:  Okay.  That sounds fine.

MS. BOOTH:  He can be dismissed, Your Honor.

THE COURT:  Are you finished?

MS. BOOTH:  I don't have any other questions.

THE COURT:  Thank you, Mr. Gilmore.  You're excused.
Call your next witness.

MS. LARIN:  Your Honor, I'd call Mr. Kerry Brown.

(PAUSE.)

THE COURT:  Would you -- I've got Mr. Jimenez here
standing by.  Would you mind calling the inmate?

MR. WISEMAN:  Oh.

MS. LARIN:  Mr. Brown has trial tomorrow and is
trying to get back tonight, so I was hoping to get him on his
plane.  I mean, it's -- you get to choose.

THE COURT:  Well, I'm worried about Mr. Jimenez, too,
so we're going to do Mr. Jimenez's client next.

MS. LARIN:  That's fine.

MR. McHUGH:  Your Honor, I spoke with Mr. Jimenez
during the break, and he was going to go down and talk to his
client, and then he was going to -- and talk to us about
whether we could go speak to him.  So I told him that, you
know, as soon as the witness was done, I would talk to him.  So
I'll do that now.  But we do need an opportunity --

THE COURT:  Have you talked to him, Mr. Jimenez?

MR. JIMENEZ:  I have talked to him, Your Honor.

THE COURT:  And?

MR. JIMENEZ:  He wants to testify.

THE COURT:  Okay.

MR. McHUGH:  So if we may just have an opportunity to go down and talk to him briefly, and then we'll be ready to go. And Mr. Jimenez --

THE COURT:  Okay.  Make it quick.

MR. McHUGH:  Thank you.

THE COURT:  I'll give you ten minutes, fifteen, then come back up and we'll put that on.

MR. McHUGH:  We will do so.

THE COURT:  Go ahead.

MS. LARIN:  Would you like me to start this next --

THE COURT:  Yes.  Go ahead.

MS. LARIN:  Okay.

THE COURT:  Come forward, please, sir.

KERRY BROWN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good evening, Mr. Brown.  Can you please state your name for the record?

A.   Kerry Dion Brown.

Q.   And just so you know, please do not touch the microphone in any way.

A.   Okay.

MS. LARIN:  Your Honor, just to state on the record,

Mr. Brown is Mr. Bourgeois's former lawyer, and Mr. Bourgeois

has waived any attorney-client privilege.

BY MS. LARIN:

Q.   Mr. Brown, where do you practice?

A.   I practice in St. John the Baptist Parish out of LaPlace,

Louisiana.

Q.   And what do you do?

A.   I have a private practice under my name, Kerry D. Brown,

L.L.C., where I do personal injury, family and business law.

And I'm also a prosecutor for the City of St. John the Baptist.

And I'm a Felony Division B prosecutor.  I am the drug court DA

for the parish, and also I'm the parish attorney tied to the

council, the parish council.

Q.   You're a busy guy, very busy man.

A.   I try, try to stay busy.

Q.   Okay.  And in your county, just to clarify, the District

Attorney's work, you can have a part-time office as a District

Attorney?

A.   Yeah.

Q.   Okay.

A.   I mean most, honestly, we have several -- we only have two

full-time assistants in the D.A.'s office in St. John the

Baptist Parish.  That is the elected official, and also he has

one attorney that has been appointed full-time attorney.  I

know he -- but our warrants are part-time warrants, though.

They're not for full time.

Q.   And you actually ran for District Attorney a few years ago.  Correct?

A.   I did, in October of 2008.

Q.   How much of the vote did you get?

A.   I think it was a 44-50 -- I don't remember the total number, but it was --

        MS. BOOTH:  Your Honor, I'm going to object to the relevance of this line of questioning.

        THE COURT:  Sustained.  Would you please get to the point of him testifying?

BY MS. LARIN:

Q.   And in 2001, what were you doing?

A.   I was a criminal defense attorney at that time, as well as had my private practice.  But I was on the opposite side of the criminal field.

Q.   And did you have the opportunity to represent Mr. Bourgeois?

A.   I did.  I did.  I represented him in several matters.  He came to me more so -- I knew him through his wife.  Robin and I, we'd known each other since middle school, through junior high, through high school.  And so I met him through Robin.

Q.   Okay.  And just briefly, can you list the legal matters that Mr. Bourgeois was facing at the time?

A.   He, well, he had -- he had a couple of issues.  He had

family matters tied to -- you know, he came to me pretty much, I had a criminal hearing over in Edgard, and I was handling a case out there.  Once I walked out into the foyer, he and Robin were there, and they told me he had an issue tied to Robin's mother, and there was another issue tied to the limousines, with Al's limos, that Robin, I think, was dealing with, but he may have been brought into it.  And when he came to my office, he was dealing with, you know, he had his business or his trucking business and other issues that he was dealing with that.  You know, he just pretty much put everything out there.

So the very first day I met him, it was more of a shotgun type, it was everything that he was dealing with.  And subsequent, following our first meeting, he and I met.  I advised him to come back once he made a couple of hauls, or whatever he did, come back, and then we spoke specifically on issues tied to his family, tied to a child support issue that he was dealing with.  But he had several child support issues that he was dealing with.  The most recent one had come up out of the case with a young lady out of Texas.

Q.   Okay.  And at that first meeting, how did he present himself?

A.   Mr. Bourgeois was always someone who, I mean, he was very well dressed, very well groomed.  However, he was always someone who I believed, he sort of like wanted to maybe let you know everything he had.  I mean, he did share with me, you

know, he had his home, he had vehicles, motorcycle, he had all these things he shared with me. And unfortunately for me, of course, in private practice, you know, I do that. I usually require information on who they are more so to find out whether or not they can afford the services that they are about to retain me for.

But Mr. Bourgeois pretty much shared with me all of his issues. And I noticed, in my office, where we were at that time, he didn't, he didn't stay seated. Mr. Bourgeois actually stood most of the time, and he walked from one end of the room to the other end of the room to my office area. And it gave me the impression that he obviously was trying to make certain that I knew that he was in control of our situation.

And I say, well, but it wasn't an issue much at that time. Subsequently, it became to be more of an issue as to the more appointments we had, it spilled over into all of my other appointments. And so it really created some issues over time.

Q. Meaning he would take up too much time? Is that what you meant? He would take up more time than you had allotted for his meeting?

A. Absolutely, yes. Yes.

Q. And did his behavior seem unusual to you? Is that what you're trying to say, partly?

A. To me it was. I mean, in my office, I control and I dictate what happens in my office. I mean, I tell them all the

time, "You come to me, you get my time.  I'll give it to you.  But this is what I'm giving to you."  I control what happens with my time in my office.  And I noticed that with Mr. Bourgeois, it was a little more complicated for me to manage and control my time.

Q.   And did you subsequent -- you kind of hinted at this, but you subsequently learned that all the money he said he had, he actually did not have?

A.   I learned it very quickly, when my first retainer payment didn't come in when it was supposed to come in.  And I knew that he was on the road at the time, and -- but I knew that, yeah, he didn't necessarily have -- if he did have it, he wasn't coming in my office towards the services that were needed immediately.  It did come subsequently, but I believe he had to go maybe and -- I don't know if he spoke with a brother or spoke with a family member or somebody who did help him to pay the initial retainer, but he did not have -- if he had the house, car and all the things he had and all the things that he had acquired, maybe that's where his money was, but it definitely wasn't in his bank account with his ability to retain me for the services that he needed at that time.

Q.   And did you later learn that he actually was having some problems with debt?

A.   Yes, I did, because again, as he began coming to me, the more I began to get to know him, the more I realized he had

other obligations in the form of child support that he was paying. I knew that he was obviously -- I think he had a new truck at that time, and it was a very nice truck. However, when -- you know, I was no expert tied to how people manage their business, but I knew that with my smaller business owners, usually when they come to me, I create their -- I help them to create their L.L.C.s, I get their EIN numbers for them, and usually with those guys, I'm usually trying to do things to help them to manage their finances, more so, so that in the event they need their attorney, they will be able to pay their attorney.

But I saw with Mr. Bourgeois that he did not have a very good control over what was going out and what was coming in. And only because he, again, when he was on a haul, he came back, he was paid, but he was completely broke when he was paid on whatever. Now, I didn't know what other issues he had in his life, but I knew that he wasn't managing that side well enough.

Q. And did you try to discuss this kind of thing with him about making a plan for his business?

A. I did. But again, again in private practice, the purpose of that plan was to make certain that if you're going to retain your attorney, to be able to afford him.

Q. Uh-huh.

A. I mean, so I did sit down with him and go over what he was

dealing with. And when I asked him concerning his, you know, where he was going, when he was coming back, at one time I know he was leaving and going out west, and you know, he left the office. I want to say a few days later, we ended up getting a, well, maybe about a week-and-a-half later, we got a postcard. He knew that I graduated from the University of Utah, so he had traveled through Salt Lake and had sent me a postcard from Salt Lake, letting me know, okay, this is where I am. Which I must be honest with you, I've never had my clients send me postcard, I mean, to say this is where I am. But he did it, came back and he told me where he was, what he did.

And then again when we looked at, okay, I know you want to talk, however, there is a retainer that was required at that time. I think it was maybe $1500 or so at that time, and he couldn't afford it. And so that's when I tried to say, okay, let's try to maybe back it up a little smaller steps for you, maybe to help you realize what costs you have that you could probably eliminate. And you know, once I got into that, that's when I realized he probably was in over his head.

Q. And did you, when you say in over his head, were you able to convey to him, could he understand taking these smaller steps that you're trying to tell him about --

A. I think he, I mean, if he could understand what I was saying, yes, he understood what I was saying. But to be honest with you, he was dealing with a lot of issues. And he

understood when I was talking to him about his business.  But what I got from his mouth was everything tied to his family and his problems.  And that's where -- that's why most of our time was lost in our initial meetings, because he was so preoccupied with other issues that he couldn't focus on -- I mean, I was trying to make sure that he would at least, if I'm dedicating this time, you've got to be able to pay for it, okay, and --

Q.   So you're saying one thing to him, and what is he saying back to -- you're saying, "Hey, don't forget, you need to make some money and pay me," and what is he saying back to you?

A.   I wasn't so superficial.  I mean, but --

Q.   Right.  Of course.

A.   But I was definitely --

Q.   And in summary.

A.   Yeah, I was pretty much letting him know that, hey, look, this is your obligations.  This is where you are and where you're going.  How much -- you know, count the miles, look at the distance, gas is whatever, you know, your lodging. Consider whatever.  While I'm doing that, he's dealing with issues tied to his family, his wife and her issues that she had with the gentleman that I know that he had come in contact with Mr. Al Teabolt.

Q.   You mean, when you say "he's dealing with," you mean he's speaking with you?  He's talking about his wife?

A.   He is.

Q.   And what --

A.   I'm saying --

Q.   Can you just briefly tell us what exactly he was so upset about, about his wife?

A.   I mean, he had learned, or he -- I don't know how soon it was from my timing meeting with him, but I know that he knew that Robin a relationship with another man, who was from St. John the Baptist Parish who had a limousine company.  His name was Al Teabolt.  And this gentleman strongly resembled, strongly resembled Alfred.  And I know Robin, he had learned of it, and this guy had the exact opposite relationship with Robin's family than Mr. Bourgeois had, because Robin's mother and the family took Al in, where they didn't take Mr. Bourgeois in.

Q.   And Mr. Bourgeois was upset about this?

A.   He was pissed off.  Yeah, he was.

Q.   How could you tell that he was upset?

A.   Sorry, Judge, but he -- because he told me.  I mean --

Q.   He would talk about it?

A.   Yeah.  He pretty much expressed his frustrations.

Q.   And did he tell you details about what had gone on between Mr. Teabolt and Mrs. Bourgeois?

A.   He shared with me what his wife had shared with him.

Q.   And what, I mean, you don't need to get into details but --

MS. BOOTH:  Your Honor, I just want to know the relevance of mental illness or mental retardation, where does this fit in?  The conversations he had with his attorney about his wife cheating on him?

THE COURT:  Please, could you move on to something relevant, please?

MS. LARIN:  But I would like to respond, because if it's not relevant, I will stop.  The reason we are having Mr. Brown testify is because we were under the impression that Your Honor would like to hear from people that the doctor spoke to and relied upon.  And we were trying to provide a broad view of what the doctors heard.  I know that it -- I mean, I understand that some of this stuff you have heard before, so -- this, for example, Mr. Brown was a source of the stressors --

THE COURT:  Could you just make it quickly, whatever it is, make it very quickly?

BY MS. LARIN:

Q.   Okay.  We will try to make it quick, Mr. Brown, to talk about the stressors that Mr. Bourgeois was undergoing when you knew him in 2001, 2002.

A.   Okay.

Q.   Okay.

A.   He was dealing with the fact that he knew that his wife had gone through every potential sexual experience that she could have experienced with him with this man also.  He was

also trying to balance the child support issues that he was dealing with and also the fact that he had a new home, or excuse me, a new truck that obviously he was kind of heavy on the regular note, whatever the payment was. He had a company he was working for, but because of the issues tied to his wife and his family, he wasn't focusing on his hauls that would get him to and from different points. And whenever he would go wherever he was going, I'm not sure how he navigated whatever he did, but I knew that it was, when he came back, he was, it appeared to be more in debt than he was when he left.

Q.   Okay.

A.   And I believe that he was trying to balance the issues with the home and keeping that close to him while on the road.

Q.   And just one more thing. Did you also notice evidence of, besides the stressors that you noticed he was going through and the obsession over Robin's infidelities, did you notice that, any times that Alfred had trouble understanding or making poor decisions?

A.   I mean, what I would call, I mean, I was --

Q.   You're not an expert. This is just --

A.   Keep in mind -- yeah. Keep in mind, when I met him, I mean, I had two offices, okay, and I was balancing staff in two offices, and I was taking whatever limited time I had right there to make sure I could put it towards productive cases. What I began recognizing is that Alfred honestly is a very nice

person.  He was somebody who I believed wanted to have complete control over everything.  And because that he wanted -- because of the fact that he, I don't know if it was because he grew up that way or because of how he wanted to run his life, but he told me about money that he spent on his home, for example, in the location where his home was.

It's a nice, it's a nice -- upgrades, he put marble, he put a pool, put all this stuff in this home, but the reality was that the home was maybe worth maybe $90,000 at that time.  And he spent probably two-thirds of the value of the home in improvements that didn't add square footage to the home and didn't do anything with the property.  The property may have been worth maybe 15 to $20,000 at that particular time.  He was sharing with me all the things that he was doing.  And to me, I realize, I mean, it could have been simply being misguided.  It could have been trying to keep up with whatever.  But the bottom line is that he made poor decisions, to me, that I said it doesn't make any sense to do that.  If you have that money, put it towards -- you can put it towards something that would actually return something for you.  And that's what I would sit down and try to plan out for him.  But the reality is that he couldn't, I mean, he wasn't paying much attention to what I was saying to him, you know.

Q.   And just briefly, you were involved in the custody arrangement that brought the victim to Mr. Bourgeois's -- into

Mr. Bourgeois's custody.  Correct?

A.    Yes.

Q.    I know that you obviously did not intend for what happened to have happened.

A.    Oh clearly, no.  He came to me telling me that another, another issue came up.  And I think it -- I think maybe Texas may have picked up a child support, or maybe the mother of this particular child was receiving some sort of assistance from the State of Texas, or Texas may have picked up the support obligations and said, "Okay, who's the father?"  She named him.  He received notice.  I'm not sure if he was already placed on something, but I know he did come to me, letting me know that this is another issue I'm dealing with.  And so the bottom line, you know, he was telling me initially how Robin was completely unfaithful, when in actuality, it appears that Robin was, you know, doing the same thing he was.

MS. BOOTH:  And again, Your Honor, I'm going to object to relevance.

THE COURT:  Can you get to something here --

MS. LARIN:  I'm trying.

THE COURT:  -- that is relevant --

MS. LARIN:  I'm trying to get there.

THE COURT:  -- quickly?

MS. LARIN:  Okay.

BY MS. LARIN:

Q.   And you had an occasion -- how did it come about that the custody arrangement was made?  Do you know?  Did you --

A.   Yes.

Q.   What did you do?

A.   He came to me.  I told him, "Well, there's an option.  You know, I'm not licensed in Texas, so I cannot go to Texas.  However, I can communicate with the mother to see whether or not she would be willing to work something out with you."  And that's exactly what I did.  He gave me that -- I believe he may have given me her telephone number.  I did call her, but I told him, I said, "I can only do a document here to where she would have comfort in knowing where her child would be, and that she would be able to --"

THE COURT:  I'm sorry.  You called the mother directly?

THE WITNESS:  Yes, I did.

THE COURT:  Knowing she was represented with the Attorney General?

THE WITNESS:  The mother was not represented with the Attorney General.

THE COURT:  Who was representing her when she filed suit?

THE WITNESS:  The mother didn't file suit, from what I understood.  That child support obligation, whenever the AG's office gets involved, their interest is tied to the child, not

to the mother.  And it's quite like in my state, or in Louisiana, because I currently do all --

THE COURT:  Whoa.

THE WITNESS:  -- the child support obligations here.

THE COURT:  Okay.

THE WITNESS:  But that, the idea was that she was saying that she wanted her payments --

THE COURT:  Didn't the Attorney General file suit?

THE WITNESS:  I have no -- I'm not sure.

MS. LARIN:  I believe, Your Honor, it was -- according to Mr. Brown, it was related to some Government assistance she was applying for.

THE COURT:  That's, in Texas.

MS. LARIN:  Yes, yes.

THE COURT:  When you owe, when you're getting Government assistance, the Attorney General makes you file an affidavit of who the father is, and they file on her behalf for child support.

MS. LARIN:  Oh.  I thought Mr. Brown said it was on the child's behalf.

THE COURT:  No, it's --

MS. LARIN:  It's on the mother's?

THE WITNESS:  Yeah, my appreciation, Your Honor, may I --

MS. LARIN:  Might be a state difference or something.

MS. BOOTH:  But it's not relevant to this.

THE COURT:  No, but I was just curious.

THE WITNESS:  Well, I mean part, if I might --

THE COURT:  Okay.  No, just wait for the questions, please, sir.

THE WITNESS:  Okay.

BY MS. LARIN:

Q.   And you spoke to Ms. Harrison, and can you just tell us briefly, and we're going to move on.

A.   She was -- okay.  I spoke with her, letting her know, I mean, that Alfred is a client of mine.  I said, you know, "Alfred" -- I think they had, I don't know if they had an arrangement that he was paying her or that she wanted $200 a month.  For some reason that number sticks out.  I made the arrangements, said, "Here's the deal.  He would like to go ahead and make whatever payments."  However, he also wanted to share time with his child.  And she was fine with him saying, okay, well, if he wanted to have the child during the summer, then that's perfectly fine.

I said, "Okay, well, all I'm going to do is draw this document up."  I said, "You have every right to go ahead and consult with whoever you want to consult with on your end."  I notarized Alfred's signature from this side right here, and I told him he'll have to get it to her.  And at that point, I didn't have any further contact with her.

Q.   Okay.  And then at some point you were brought to testify potentially as a witness at this trial by the Defense?

A.   I was.  I was here.  I was here.  Yes, yes, I was.

Q.   And did you ever meet with Mr. Tinker or Mr. Gilmore?

A.   No, I -- you asked me before, and the truth is, I don't know.  I knew that there was a gentleman here who everyone in the hotel was telling me had just gotten off, I guess he was a defense attorney who had just gotten a cop killer off.  That's what the people were telling me at the hotel.  I didn't have any interaction at that point.  I know I did speak with Mr. Gerald.

Q.   Bierbaum?

A.   Gerald Bierbaum.  I did speak with him.  But as far as speaking with the attorneys, I don't remember the direct conversation that I would have had with the attorneys.  I did speak with Gerald, though.

Q.   Okay.

         MS. LARIN:  Okay.  I pass the witness, Your Honor.

         THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good afternoon.

A.   Good afternoon.

Q.   I should say evening.

         THE COURT:  Night.

MS. BOOTH:  Night.

BY MS. BOOTH:

Q.   So basically, if you were brought in here to testify at the trial, you could testify that he was overbearing.  Correct?

A.   He was.

Q.   That he was jealous of his wife.  Right?

A.   (No response.)

Q.   That -- right?

THE COURT:  I'm sorry.  Answer, please.

BY MS. BOOTH:

Q.   Yes or no.

A.   Yes.

THE COURT:  Sorry?

THE WITNESS:  Yes.

BY MS. BOOTH:

Q.   Yes?  That he had a bunch of children that he was not paying his child support on.  You could testify to that, too.  Right?

A.   Yes, that's another way to put it, yeah.

Q.   Yes.  You could testify that you represented him on a case where he beat the hell out of his mother-in-law.  Right?

A.   I did defend him on that charge also.

Q.   Okay.  And you could testify that he was charged in a case where, of destruction of property.  Right?

A.   He was, yes.

Brown - Cross

Q.   And so -- well, let me just ask you, you're a prosecutor, you're a lawyer?

A.   Yes.

Q.   You've probably tried many cases.  Right?

A.   I have.

Q.   Would you bring in a witness to testify that your Defendant, if he was saying that he was innocent, would you bring in witnesses to testify that, number one, he was jealous, overbearing, owed everybody child support, beat up his mother-in-law, and then he was, destroyed property?  Would you bring somebody in to testify to that?

A.   See, I have the benefit, honestly --

Q.   Would you?  Would you?  Just answer my question.

A.   I would, only because I had the benefit of knowing all of the details on all of those cases.  I mean, the issue with the mother-in-law --

Q.   Uh-huh.

A.   -- that wasn't --

Q.   So you're going to come in, when he's charged with a murder case, and you're going to try to say -- oh, didn't he hit her with a lamp and break it?  Wasn't she bruised tremendously on her shoulders?

A.   Yeah, see, that's --

MS. LARIN:  Objection, Your Honor.  I feel like this might be berating a little bit.

THE COURT:  Take it down.

THE WITNESS:  Well, honestly, see, I --

THE COURT:  Go ahead.  Answer the question.

THE WITNESS:  That was not conclusively --

THE COURT:  Okay.

THE WITNESS:  That was not there.

THE COURT:  Okay.

THE WITNESS:  I mean, the evidence that the --

THE COURT:  Okay.  Answer the question "yes" or "no," if you can.

THE WITNESS:  Yeah.

BY MS. BOOTH:

Q.   Just "yes" or "no."  Would you bring somebody in to testify to all those things?

A.   If they were true, yeah.  I mean, whether -- there would be no sense in it.

THE COURT:  Was he convicted?

THE WITNESS:  No.

THE COURT:  Okay.

THE WITNESS:  No, he wasn't.  And that's the whole issue.

BY MS. BOOTH:

Q.   Well, are you going to testify he's jealous of his wife?

A.   Yeah.

Q.   You're going to testify that he owed everybody child

support?

A.   Yes.

Q.   You're going to testify that he didn't pay his child support.  You're going to testify that he's charged in two other offenses.

A.   Yes.

THE COURT:  He's saying, nodding his head to all those things.

THE WITNESS:  Yes, yes.

MS. BOOTH:  Okay.

THE WITNESS:  I'm saying "yes" as well.

MS. BOOTH:  Okay.  I pass the witness, Your Honor.

THE WITNESS:  Yeah.

THE COURT:  Okay.  Anything else?

MS. LARIN:  No, Your Honor.

THE COURT:  Thank you.  I'm sorry?  You all really need to learn to stand up --

MS. LARIN:  I'm sorry.

THE COURT:  -- on your side.  Thank you.  You may stand down.

THE WITNESS:  Thank you.

MR. McHUGH:  Call Timothy Allen, Your Honor.

(Witness sworn.)

THE COURT:  Mr. Allen, you know I've appointed you a standby attorney that you've talked to.  Is that correct?

THE WITNESS:  Yes, ma'am.

THE COURT:  Would you like him standing by you, or out there?

THE WITNESS:  No, I'm all right.

THE COURT:  Okay.  Thank you, sir.

MR. McHUGH:  Mr. Allen, before I even ask you your name, I just want to let you know, please don't touch the microphone.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  That's unlikely.

MR. McHUGH:  If only you could lean into it.

THE COURT:  Thank you.

TIMOTHY ALLEN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Could you state your name for the record?

A.   Timothy Lynn Allen.

Q.   Okay.  And Mr. Allen, are you presently incarcerated?

A.   Yes, sir.

Q.   Okay.  And where are you incarcerated?

A.   Three Rivers Medium FCI Facility in Three Rivers, Texas.

Q.   And that's a Federal --

A.   Federal prison.

Q.   -- Bureau of Prisons?  Okay.  And why are you incarcerated?  What was your charge?

A.    Felon in possession of firearm.

Q.    Okay.  So a 922(g)?

A.    Yes, sir.

Q.    Okay.  And I want to bring your attention to the summer of 2003.  Were you incarcerated at that time in the Nueces County Jail in Corpus Christi?

A.    Yes, sir.

Q.    Okay.  And was that also for the felon in possession charge?

A.    Yes, sir.

Q.    Why would you have been in a county facility at that time?

A.    I can't hear you.

Q.    Do you know why you were in a county facility for a charge?  Had it, was it county or was it a federal charge at that time?

A.    Oh, when I got arrested, it was just a felon in possession.  The Feds hadn't picked it up yet.

Q.    Okay.  And so subsequent to your arrest, was it adopted by the Feds?

A.    Yes, sir.

Q.    By the federal government?

A.    Yes, sir.

Q.    Okay.  Okay.  And so you were in the county facility in the summer of 2003, Nueces County.  Is that right?

A.    Yes, sir.

Q.   Okay.  During your time at the Nueces County prison, did you meet an inmate by the name of Alfred Bourgeois?

A.   Yes, sir.

Q.   Okay.  And did you have contact with him while you were in that prison?

A.   Yes, sir.

Q.   Okay.  And did you have conversations with him while you were in that prison?

A.   Yes, sir.

Q.   What was the nature of your contact?  Where would you meet him?

A.   We'd have little church services.  We'd get in there and talk about scriptures and stuff, you know, trying to --

Q.   Okay.

A.   -- give good information and stuff, mainly spiritual.

Q.   Okay.  Did Mr. Bourgeois, during the time that you spoke with him, during the summer of 2003, did he ever make any type of admissions to you about his case that he was incarcerated for?

A.   No, sir.

Q.   Okay.  During your time that you were incarcerated at the Nueces County prison the summer of 2003, did you also meet an individual by the name of Darrick Moore?

A.   Yes, sir.

Q.   Okay.  And did you also have daily conversations or, you

know, conversations with him on an interim basis while in custody?

A.   Yes, sir.  We were in the same cubicle area.  We stayed in the same cubicle area.

Q.   Okay.  And did he express to you any type of worry about the sentence that he was --

THE COURT:  I'm sorry.  Is Darrick Moore going to be here?  I mean, how are we getting this in?

MR. McHUGH:  Well, this goes to the Brady claim, Your Honor.  It's not -- it's not as if this was a trial testimony, as far as -- it goes to the Brady claim.

THE COURT:  What is the Brady claim?

MR. McHUGH:  That there were promises made to the individuals that did testify at trial that was not disclosed. And this is evidence of that.  So that's what this goes towards.

THE COURT:  The Government will have to --

MS. SALINAS:  We would be objecting to anything he would be saying about Mr. Moore or Mr. Longoria, Your Honor, because it would be considered hearsay.

MR. McHUGH:  Well, Your Honor --

THE COURT:  Sustained.

MR. McHUGH:  If I may respond?

THE COURT:  Sustained.

MR. McHUGH:  It goes to the state of mind of

Mr. Moore, which is highly relevant.  The Brady claim is not a claim that we would be asking to be admitted at trial.  It's a claim here in the 2255 context.  And Mr. Moore's state of mind is certainly circumstantial evidence as to this issue that the Government has denied, whether or not he was promised a deal.  And his statements to that effect, I think, are highly relevant to Your Honor's decision as to the merits of that claim.  And that's why we're offering it.  I'd ask that we be permitted to present the testimony.  And if the Court finds that it's inadmissible for some reason, the Court can just discard it.

THE COURT:  I just did.  Now move on.

MR. McHUGH:  Well, Your Honor, that was the -- he's here to testify as to, that Mr. Moore told him that he was --

THE COURT:  I'm sorry.  I'm not accepting that. Thank you.

MR. McHUGH:  Can I --

THE COURT:  And you're not going to be able to testify to it.

MR. McHUGH:  Well, I didn't mean to -- can I make a proffer?

THE COURT:  Let me tell you this.  You do that one more time, and I may hold you in contempt.  This is several times you've done that.  You may not.  You may not testify. And that's the way it goes.

MR. McHUGH:  May I make a proffer as to his

testimony, Your Honor?

THE COURT:  Thank you.  Are we finished with him?

MR. McHUGH:  If the Court is denying my --

THE COURT:  Okay.  You can stand down.  Call your next witness.

MR. WISEMAN:  Gerald Bierbaum.

MR. JIMENEZ:  May I be excused, Your Honor?

THE COURT:  Thank you, Mr. Jimenez.

GERALD BIERBAUM, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Good evening, Mr. Bierbaum.  Could you state your name for the record?

A.   I'm Gerald Bierbaum.

Q.   And I told you on the way up not to touch the microphone.

A.   Correct.

THE COURT:  Thank you, Mr. Wiseman.

MR. WISEMAN:  You're welcome, Your Honor.

BY MR. WISEMAN:

Q.   What do you do for a living, sir?

A.   I'm an Assistant Federal Defender for the District of Nevada.

Q.   And do you have a particular specialty there?

A.   I'm in the Capital Habeas Unit.

Q.   All right.  And that's the, a sister office of the office

I work for?

A.    Yeah.  I think yours is the CDO, but yeah.

Q.    We both work for Capital Habeas Units?

A.    Right.  Correct.

Q.    I want to direct your attention to the summer of 2003.
How were you employed at that time?

A.    I was in private practice.  I was working as a mitigation
specialist and as a lawyer.

Q.    And briefly describe your history as a mitigation
specialist.  When did it start?  When did you become a lawyer
and when did you go to full-time law practice?

A.    I started, I interned for the ACLU in Los Angeles on the
death penalty project in 1994 to early '95.  I came back to
Houston.  I grew up in Houston.  I came back to Houston, and I
got hired at the Texas Resource Center in March of '95.  I
think they were defunded in September of '95, and you know,
everybody went their own way.  And then I started as a private
investigator and mitigation specialist from probably like June
of '96, maybe earlier '96, all the way through until I took the
position as an Assistant Federal Defender in Nevada in August
of '05.

Q.    And do you know a woman named Lisa Milstein?

A.    I do.

Q.    And how do you know her?

A.    She was -- she officed with Mike Charlton and myself from

1996 till about right around the time of the Bourgeois trial, maybe a little -- maybe a month or so after.

Q.    And did you have a business relationship with her?

A.    Yeah.  When she got appointed, or when she got hired to work up capital trials, I worked most of those trials with her, or writs.

Q.    And how did you and she divide your work on those cases?

A.    Largely, I had other cases, too.  I was working for a lady named Tina Frances, so my investigative services were largely owed to Tina Frances.  When Lisa got appointed or got a job, I would help her read the records, identify who to talk to, what to talk to them about, you know, help her decide where to send records requests, and kind of read and edit her reports largely.

Q.    And was that the arrangement that you -- well, withdrawn.  Were you eventually authorized by this Court under the Criminal Justice Act to perform mitigation specialist services for Mr. Bourgeois?

A.    Yes.

Q.    And that would have been in, around the summer of 2003?

A.    Yes.

Q.    And at that time, were your arrangements with Ms. Milstein -- well, was she appointed as well?

A.    Yes.

Q.    And did you work that case, at least in theory, the way

you had worked your previous cases?

A.    It was, we were supposed to work it in that manner, yes.

Q.    I want to show you what's been previously marked as Petitioner's Exhibit 165.  You didn't create this document, did you?

A.    No.

Q.    Did you have a chance to review it before today?

A.    I've seen it.

Q.    Okay.

A.    I don't know that I reviewed it closely, but I've seen it.

Q.    What do you understand it to reflect?

A.    The progression of reports that were written and sent to either Mr. Gilmore or Dr. Cunningham or somebody, or maybe both of them, somebody on the team.

Q.    Okay.  And this date up on top here, did I show you the particular report that's referenced there?

A.    Yeah, I've seen that report.  I mean, I think I generated that report.

Q.    Okay.  Do you agree that that's the correct date?  Or was it 2003?

A.    No, I'm sure it was 2003.  I mean --

Q.    You weren't on the case in two thousand --

A.    No, I don't think -- no.

Q.    Did you interview Mr. Bourgeois along with Ms. Milstein shortly after being appointed?

A.   Yes.

Q.   And did you generate a memoranda about that interview?

A.   Yes, I believe I did.

Q.   And among other things, did you make any observations or write anything down about this coma that he claimed to have suffered?

A.   I'm sure I did.  If he had spoken about it, if it was of substance, we wrote it down.  I wrote it down.

Q.   And did you then tell or relate that fact to either Mr. Gilmore or Mr. Tinker?

A.   Sure.  All of our reports were forwarded to Mr. Gilmore and Mr. Tinker.  I believe they were e-mailed mostly to Mr. Gilmore, because Mr. Tinker didn't check his e-mail and didn't communicate in that way.

Q.   Did I also show you what's been marked as P-81, prior to your testimony today?

A.   I have seen that before, yes.

Q.   Okay.  The date of the invoice on these records is 2/20/04.  Do you recall when you first saw those records?

A.   I do.  We were up here, or I was up here, I think, to help decide who to subpoena for the punishment phase.  It might have been one trip before that.  And I found the parish hospital records on Mr. Gilmore's desk as I was making a phone call.

Q.   And do you recall when that would have been?

A.   I don't remember the date, no.

Q.   Okay.  Was it close in time to the trial proceedings?

A.   Yes.  Yes.  I mean, we had asked for the records ages before, and I was surprised that they were there, and we hadn't -- I hadn't seen them.

Q.   Just to be as precise as we can, was it during the guilt phase of the trial that you think you saw them?  Or was it later than that or earlier?

A.   I would --

Q.   Using the guilt phase as a reference point.

A.   I wasn't down here -- I would guess it was during the guilt phase.  I wasn't down here, I wasn't in the courtroom for the guilt phase.  I think Mr. Tenore was assisting during the guilt phase.

Q.   So it would have been late in the guilt phase?

A.   I would guess.

Q.   Were there any other instances of your seeing things for the first time after you -- well, did you ever think that Counsel had things relevant to the mitigation phase that you hadn't seen in a prompt fashion?

A.   Oh, surely.

Q.   Okay.  And can you tell the Court what instances that would be?

A.   The one that stands out the most, I think, was actually during the punishment phase, there was a psychological evaluation from Mr. Bourgeois's interview with the police, with

the Sheriff maybe in one of the parishes in Louisiana.  And that was something that we had, we had been going after that file and trying to collect all of his records, every record that we knew about, and I was surprised that that was on counsel table and we had never seen it.

Q.   And what was your understanding of -- well, describe for the Court the processes you understood of who would identify the records to be sought, whose responsibility you understood it to be to get them, and once they were received, how were they supposed to be distributed?

A.   Well, we were, I mean, Lisa and I largely identified which records might be available.  We had done many capital trials before.  And so I think I went through and searched and found the custodian of records' name and address for each entity that we were seeking records from.  It's my memory that I provided that to Deana, who was the paralegal in Mr. Gilmore's office, and she was going to, you know, actually issue the records requests or the subpoena, and some of them required money, and so she would issue them a check.  And then the records would come back to her office to be distributed to all of us.  I mean, that's how I thought it was going to work.

Q.   All right.  And so your understanding was it was not your responsibility to actually write the letters requesting the records?

A.   I think we had a discussion about that, and it was going

to flow through, because some of them required funds, you know, required records search checks and things like that. And it was my understanding it was going to flow through Mr. Gilmore's office, in order to keep a central repository of the records as well.

Q. Referring back to this packet of hospital records, P-81, are you aware if and when they were provided to Mark Cunningham?

A. If I didn't have them -- if I would have got them, I would have summarized them and sent them to them relatively quickly. So if Mr. Gilmore's office possessed them, you know, I don't know when they went to Mr. Cunningham or if they did.

Q. In creating such a summary, would you have made note of the 1993 motor vehicle accident wherein Mr. Bourgeois went to the hospital and complained that he hit his head on the steering wheel of his 18-wheeler?

A. Oh, absolutely. Yeah, because I remember he got, we picked up that he got sued in Louisiana over a similar accident, and that's in the chronology that we developed.

Q. And why would you have noted that?

A. Because it's a header injury -- a head injury, and it's, you know, could be causing neurological damage or -- I'm not a doctor, but you note every time something like that happens, and you provide it to your expert.

Q. And I take it from your answer that that's potential

mitigating evidence?

A.    Absolutely.

Q.    Were you aware of whether Dr. Weiner ever got those records?

A.    I don't believe he did, but I mean, once again, I didn't distribute them to him.

Q.    I want to put this summary, P-165, back up.  And I notice that in January, the interviews seem to stop being done by Milstein and begin to be done by Bierbaum, or Bierbaum and Milstein.  Do you have any recollection, and can you explain to the Court if you do, why that shift happened?

A.    I do have a recollection.  In the short form, the work wasn't getting done, and the quality of work wasn't getting done.  We weren't receiving the same quality of work that we had from Ms. Milstein in the past.

Q.    And --

A.    And on top of that, just the number of witnesses we had identified, probably half or two-thirds of them hadn't been spoken to yet.

Q.    And when did you first begin to notice that the work was not up to the standards you would come to expect?

A.    I would think in, you know, that early winter or late fall, right around that same time.

Q.    And what led you to the conclusion that the work was not up to standard?

A.   The interviews were far too brief, and you know, there wasn't enough detail.  The interview reports weren't detailed.  There wasn't follow-up.  It wasn't the same type work that we have done in the past.

Q.   And did you, do you recall Ms. Milstein having gone to New Orleans to do this investigation?

A.   She made a couple of trips that I didn't in the fall, or maybe one in the fall and one early winter, early December.

Q.   And that was the trips that produced these particular summaries?

A.   Yes.

Q.   Did you come to learn a reason or potential reason for this decline in her work?

A.   I did afterwards.  I didn't when this was going on.  If I would have known later on what I knew, we would have stopped and, you know, maybe replaced her or whatever.

Q.   Did you have a discussion with Ms. Milstein about this decline and the reasons for it?

A.   Around this time, we had several discussions about the interviews need to get done, and they need to be done appropriately, and we've got to get this data, and you know this thing is going to trial in March or February, or whenever it was.  You know, the urgency of the work was building.

Q.   And did she have a response for you about why the work hadn't been done?  Did she dispute it?

A.   She was -- no.  She was, at that time she was telling me that she had neurological problems and that she had had seizures and that she was going for medical tests, and you know, there were a series of different, I guess excuses is the best word.

Q.   And did you report this problem to either of the lawyers or to Dr. Cunningham?

A.   Well, it was -- I think it was fairly apparent from the interviews that were going out, you know, that we were going to shift gears, or that I was going to pick up and try to get the rest of it done myself.

THE COURT:  Well, who did you tell that to?  Did you tell anybody that she was having problems?

THE WITNESS:  No, I wouldn't tell anybody that she's having medical problems, no.

BY MR. WISEMAN:

Q.   Did you subsequently --

THE COURT:  Well, did you tell any of those, either of the attorneys that her work was not up to par?

THE WITNESS:  We had discussions that we, some of these people would, I think, be reinterviewed and that I would pursue the rest of it.  I don't know that --

THE COURT:  Who did you discuss that with?

THE WITNESS:  Either Mr. Gilmore or Mr. Tinker.

THE COURT:  Did you discuss it at all with

Dr. Cunningham?

THE WITNESS:  I had three telephone conversations with Dr. Cunningham, and he had pointed out some errors in some of the interview reports.

BY MR. WISEMAN:

Q.   Did you subsequently have a discussion with Ms. Milstein post-trial as to what was actually going on in her life?

A.   Subsequently, I would say probably late spring or early summer, she came into the office one morning when I was heading up to Polunsky, and she just looked just horrible.  And you know, I got my stuff and left, and I got out to the freeway and turned around and decided I had to come back and say something. So I -- I'm not her father or whatever, but I finally came back and told her, you know, that --

MS. BOOTH:  Your Honor, I'm going to object to any hearsay.

THE WITNESS:  Okay.

MS. BOOTH:  What he said to her certainly is admissible.  But any kind of conversation they had, this is hearsay.  Ms. Milstein could have been subpoenaed by the Defense if they wanted this information out.

THE COURT:  Sustained.

MR. WISEMAN:  Your Honor, I would submit that it is a statement against interest that Ms. Milstein's going to, that Mr. Bierbaum is going to reveal that she had broken the law.

THE COURT:  Okay.  You know what?

MR. WISEMAN:  And I don't want to go into detail obviously, but --

THE COURT:  You just did.

MR. WISEMAN:  Well, I --

THE COURT:  You know, and I'm going to warn you all one more time.  Do not testify in this case.

MR. WISEMAN:  I didn't mean to, and I apologize, Your Honor.

THE COURT:  One more time you do this, and there will be sanctions.

MR. WISEMAN:  Yes, Your Honor.  But my objection --

THE COURT:  So that is not happening.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  So go on to something else.  You want Ms. Milstein here, you get her here.

MR. WISEMAN:  Well, how do --

THE COURT:  Her state of mind is not relevant here. Now, move on.

MR. WISEMAN:  Your Honor, if I could just ask, how can I make a response to a hearsay objection when I believe it's against penal interest without telling the Court what the alleged violation of the law is?  I'm not sure I -- I didn't mention the specific violation, but I'm not sure how I can possibly do that.

THE COURT:  Well, what relevance would it be anyway?

MR. WISEMAN:  Well, I would propose to the Court that this witness is going to tell the Court why the investigation wasn't getting done.  If the Court doesn't want to hear that, then I guess it's not relevant, but --

THE COURT:  Well, what is the relevance of it?

MR. WISEMAN:  As to why it wasn't getting done?

THE COURT:  Yes.  I mean, what is the relevance?

MR. WISEMAN:  Well, I assume that the Court --

THE COURT:  I mean, everybody's -- you know, several people have testified that the mitigation experts did not do their job.

MR. WISEMAN:  Right.  And I think -- I would think the Court is going to make some credibility findings about who is being truthful.

THE COURT:  Well, Ms. Milstein is not here.

MR. WISEMAN:  No, that's true --

THE COURT:  So I'm not going to make a credibility finding about her.  I can make one about him, however.

MR. WISEMAN:  Right.  But you can make a credibility finding about his relating the conversation he had that was against Ms. Milstein's penal interest.

THE COURT:  No.  I'm not -- this is ridiculous, Mr. Wiseman.  Move on.

MR. WISEMAN:  I think it's a legal argument, Your

Honor.

THE COURT:  I have just ruled.

MR. WISEMAN:  Okay.

THE COURT:  This is another one of your problems.  I have ruled.  Move on.  It is late at night.  I'm really tired of this.

MR. WISEMAN:  Yes, ma'am.

THE COURT:  So when I rule, I don't expect any more arguments.

BY MR. WISEMAN:

Q.   Mr. Bierbaum, do you recall any time in December of 2003 being contacted by Mr. Gilmore or Mr. Tinker with respect to a motion for continuance that they were in the process of putting together and filing with the Court?

A.   I don't recall that.  They could have talked to Ms. Milstein.

Q.   Do you recall having a discussion with either of them subsequent to the filing about whether you were going to be dropping all of your other work and focusing solely on this case because Judge Jack was not going to grant a continuance?

A.   I recall being informed that the case was going to go to trial in late February or early March, and being really concerned that the work hadn't been done.

Q.   Right.  Okay.  I appreciate that.  My specific question is, were you consulted by --

MS. BOOTH:  He answered, Your Honor.

MR. WISEMAN:  I have a different question.

MS. BOOTH:  He didn't like the answer.

MR. WISEMAN:  No, I have a different question.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Were you consulted by Counsel with regard to whether you could drop all of your other work and focus solely on his case?

A.   I don't recall that.

Q.   Do you recall when Dr. Cunningham came to Corpus Christi for this case?

A.   I recall being aware that he was coming to Corpus Christi. I don't think I was here the first time he evaluated Mr. Bourgeois.

Q.   Okay.  I should have been more precise.  Were you here when he came here for his purported penalty phase testimony?

A.   Yes.

Q.   Do you recall when he got here in relation -- the penalty phase started on a Monday.  Do you recall when he got here?

A.   I think he got here Sunday afternoon, and I got here Sunday evening.

Q.   And do you recall any meeting taking place between Dr. Cunningham, yourself and the two defense team, two defense attorneys?

A.   I wasn't part of that meeting, no.

Q.   Do you know if such a meeting took place?

A.   I assume it did.  It was, I've heard reports about it, that --

Q.   And what was your understanding of what the result of that meeting was?

A.   That it was very brief, and the trial counsel wasn't really very aware of what Mr. Cunningham, Dr. Cunningham wanted to do.

MS. BOOTH:  And Your Honor, and I want to know where -- he's testifying to what?  Did he see the meeting?  Did he speak to someone?  What's going on here?  He is asking for an impression.  Where is this coming from?

BY MR. WISEMAN:

Q.   That's my next question.  How do you know?

A.   Dr. Cunningham told me about the meeting.

Q.   And were you around on the day that trial counsel told Dr. Cunningham he wasn't going to testify?

A.   Yes.

Q.   Were you ever involved, or are you aware of any meeting ever between trial counsel and Dr. Weiner?

A.   I wasn't present for any meeting like that.

Q.   Do you know of any meeting?

A.   I don't know of any, no.  I don't recall any off the top of my head.

Q.   Were you -- just a moment.

MR. WISEMAN:  If I could just have a moment, Your Honor?

THE COURT:  Yes, sir.

(PAUSE.)

BY MR. WISEMAN:

Q.   Just one more area, Mr. Bierbaum.  In your interview with Mr. Bourgeois, interviews -- you did more than one, I take it?

A.   I think I interviewed him, formally interviewed him twice.

Q.   And in those interviews, did you ever learn from him that he claimed to have been abused as a child?

A.   During the second interview, he discussed that.

Q.   Okay.  And you related --

THE COURT:  I'm sorry.  I didn't hear the response.

THE WITNESS:  During that second interview, he discussed that.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   And did you relate that to trial counsel?

A.   I wrote a report, yeah.

THE COURT:  Can I ask what kind of abuse he described to you?

THE WITNESS:  He had been kind of the, the stepchild of the family.  His mom had picked on him, had made him, you know, clean up after everybody and wear the hand-me-down clothes, and she gave him beatings far more frequently than all

the other kids.  And it was, you know, from my memory, it was kind of open hand, kind of not spankings, but beatings as a child.

I remember specifically, I don't think it was -- he confirmed, and then somebody else had talked about how his mom used to have these really long fingernails, and she would pick his nose really hard until it was bleeding both inside and out.

BY MR. WISEMAN:

Q.   And did you hear similar reports from other lay witnesses that you had interviewed?

A.   Yes.

Q.   And did you share that with Counsel?

A.   Yeah, any time I interviewed somebody, I wrote a report and passed it along to either Counsel, or Counsel and the experts.

Q.   Do you have any recollection of the name Park Dietz in this case?

A.   I do.  I vaguely remember that either Mr. Tinker or Mr. Gilmore had mentioned that the state had been talking about calling Park Dietz.  I took that and went and collected a couple of his transcripts and just, you know, tried to have the material available for them to review, should we have to deal with him.

Q.   Did you ever see any written materials generated by Dr. Dietz, regarding this case?

A.   No.

Q.   Do you recall Counsel telling you anything about specifics that Dr. Dietz would come in here and rebut?

A.   No.

Q.   Do you recall any detail at all, other than name, the invocation of the name Park Dietz?

A.   No.

Q.   Do you recall any discussions with Counsel about their concerns about Park Dietz?

A.   I think we just weren't, you know, they weren't familiar with what he had to offer, who he was, or I think they were familiar with his reputation, but not his manner of testifying or subject area or --

Q.   Okay.

        MR. WISEMAN:  That's all I have.  Thank you, sir.

                  CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Hi, Mr. Bierbaum.

A.   Hello.

Q.   My name is Patti Hubert Booth.  And I want to ask you a few questions.  Okay?

A.   Okay.

Q.   Okay.  You were a lawyer back then when you were working with Ms. Milstein?

A.   Yes, sir -- yes, ma'am.

Q.   Okay.  And so -- and she wasn't.  Right?

A.   Correct.

Q.   Now, when you were working on this case, how many cases had you worked on with death penalty, in this kind of mitigation, when you took this case?

A.   How many capital trials had I worked on?

Q.   Uh-huh.

A.   Probably 15 or 20.  A bunch.

Q.   Okay.  So you were pretty much an expert.  Right?

A.   I was a mitigation specialist.  I wasn't, you know --

Q.   Okay.

A.   -- a trial expert.  I hadn't actually tried one.  I hadn't been a lawyer five years.

Q.   Okay.  And can you tell me what date it was that y'all finally turned over your product to the defense attorneys?

A.   I have -- I think we sent them an e-mail, just as they were being created.  I can't tell you that we turned over this report on that day, but I can tell you that as soon as I wrote the report and read it, we e-mailed it out to trial counsel.

Q.   So if I had an e-mail from you dated January the 30th of 2004, where you're sending Dr. Cunningham, here's a bunch of material for the Bourgeois case, okay, and we need to set up a meeting, would January the 30th have been the date that you turned over that information to Dr. -- and it looks like you copied John Gilmore and Douglas Tinker.  Could that have been

the day that you turned over the --

A.   Yes.  I mean, that's how we, that's how I distributed reports was through the e-mail.

Q.   Okay.  So those reports didn't get to those lawyers until January the 30th.  Right?

A.   I wouldn't be sure that they didn't get to Mr. Gilmore.  I would -- I think that was probably when we were given the green light to give stuff to Dr. Cunningham.

Q.   Okay.  Well, this says that it's going to Dr. Cunningham and it's going to John Gilmore.

A.   I would be, I would CC Mr. Gilmore and Mr. Tinker to show them what I'm sending to Dr. Cunningham.

Q.   Okay.  And so, and I want to ask you another question about, you testified that you -- you weren't here for the guilt/innocence phase.  Right?

A.   Correct.

Q.   So you came down for the death penalty part, and you came on that Monday.  Right?  I mean on that Sunday evening.

A.   I believe so, yes.

Q.   So that would have been March the 21st.  You know that date?

A.   I do not, no.

Q.   So was that the date -- when was it that you were at Mr. Gilmore's office and you saw those medical records on his desk?

A.    I came down -- I came down several times.

Q.    Uh-huh.

A.    Probably in that spring.  I came down maybe on the day they argued guilt to help decide who was going to be subpoenaed for the punishment phase.

Q.    Okay.  And that was after the trial was already over.

A.    I think it was the day they argued guilt.

Q.    Okay.  The day they argued guilt.

A.    It's the day before the subpoenas went out for the punishment phase.  We came down and ran through the list and decided who we were going to subpoena for the punishment phase.

Q.    Okay.  Now, tell me all the things that you did for this case.  How many people did you talk to and write a report on?

A.    Any witness I spoke to, I wrote a report on.  I mean, I don't have --

Q.    How many?

A.    I don't have a running tally.  I would guess between, I personally spoke to, I guess, between 15 to 20 maybe.

Q.    All right.  And would you consider your mitigation team there that you were working, did you consider yourself pretty much a high quality producer?

A.    We had been in the past, yes.

Q.    Okay.  And in fact, if you were a attorney that was doing a death penalty case, would you have hired you for a mitigation investigator?

A.   Yeah, I suppose.  I mean, I don't know.

Q.   Okay.  And would you expect to depend on your mitigation investigator to get the stuff to the attorney?

A.   If a mitigation -- usually trial counsel and a mitigation investigator sit down together and decide who's going to be interviewed, and then yeah, the mitigation person has got to go out and actually do the interview, write the report and send it.

Q.   And didn't that happen?  Didn't you sit down with Mr. Gilmore or Mr. Tinker, I don't know which one, and present them with a plan of what you had planned to do?  In fact, isn't that a Petitioner's exhibit?

A.   I don't know if it's a Petitioner's exhibit.  Yeah, initially, we usually start with an investigative plan.

Q.   All right.

A.   That was usually the first document that's created.

Q.   And do you remember when you did that?

A.   I do not.

Q.   Okay.  And you said you were a little disappointed with the way the reports were going.  Did you ever call Mr. Tinker or Mr. Gilmore, and say, "Look, you know, I'm really not happy with what Milstein's doing, and you know, her work is slipping.  I'm sorry I haven't gotten this stuff to you.  I know it's late"?  Did you ever have that conversation with them?

A.   I had conversations with them.  I don't know if it had

that quality or that tenor but --

THE COURT:  With who?

MS. BOOTH:  With Mr. Gilmore and Mr. Tinker.

BY MS. BOOTH:

Q.  So they didn't know that you were having a problem.
Right?

A.  They didn't know what kind of problems she was having.

Q.  Okay.  Well, obviously it's your problem, too, because
you're working with her.  Right?

THE COURT:  They were a team.

MS. BOOTH:  They were a team.

BY MS. BOOTH:

Q.  I mean, you were a team.  Right?

A.  Well, yeah, there was a whole trial team involved, yes.

Q.  Yeah, but you were the team, you and Ms. Milstein.

THE COURT:  There was what involved?

THE WITNESS:  A whole trial team involved.

THE COURT:  Okay.

THE WITNESS:  There usually is in a capital case.

THE COURT:  Well, everybody needs to be informed,
don't they?

THE WITNESS:  Yes.

MS. BOOTH:  Well, you're a lawyer --

THE COURT:  Sorry?

THE WITNESS:  I'm sorry?

THE COURT:  Doesn't everybody need to be informed?

THE WITNESS:  Yes.

BY MS. BOOTH:

Q.   When did you present them with your final product, your trial notebook?

A.   I put it together -- I don't recall the date it went out. It was, I think it was maybe ten days before voir dire, a week before voir dire.  I don't recall the date it went out.

Q.   Ten days what?

A.   Before voir dire, or maybe a week before voir dire.  I don't recall the date it went out.

Q.   Okay.  So if voir dire began in February, February the 17th, so you would have gotten it to them February the 7th?

A.   Possibly.

Q.   So this date of finally getting the reports out on the 30th of January is not that far off.  Right?

A.   It's not that far from February 7th.

Q.   So you were hired in October and did not present a trial notebook or your product to the attorneys until around February the 7th?

A.   If that's the date that it shows that, you know, that's when the trial notebook was sent, that's when it was sent.

Q.   Okay.  Now, when you met with Mr. Bourgeois, okay, did he give you the names of people to go and talk to?

A.   Certainly.

Bierbaum - Cross
283

Q.   Okay.  And did he give you phone numbers and addresses where you could locate them?

A.   I don't recall if he gave me phone numbers and addresses or not.

Q.   Okay.  And you said you talked to him, what was it, four times?

A.   No, I talked to him several times.  I formally interviewed him and wrote reports twice.

Q.   Okay.  And when you would meet with him, did he give you issues that he wanted addressed?

A.   We had discussed his case.  He would probably talk about things that he was interested in, and we discussed his case and discussed the development of the mitigation and how that would work.

Q.   All right.  And he sent you to the different relatives that he wanted.  Right?

A.   We probably asked him who he grew up with and where he grew up and things like that, and we would listen to his familial background and takes note from that.

Q.   And how about Mr. Kerry Brown, his attorney, how did he get to him?

A.   We learned about him through, either through talking to, you know, his, one of the sisters or maybe even through Mr. Bourgeois.  I don't remember how I got his name, but --

Q.   Now, did you have a hard time when you spoke to

Mr. Bourgeois about him giving you directions?  Was it -- was he clear when he spoke to you about who he wanted you to talk to and any other information he wanted you to look at?

A.   I don't recall having discussions like that with him.  I would sit and listen to him and have him tell me about his life story, where he grew up, how he grew up, the things that had happened to him, and I would take notes and kind of develop a plan from that.  I don't remember him telling me go see this --

THE COURT:  Who said he had names and phone numbers?

MS. BOOTH:  Mr. Gilmore and --

THE COURT:  Said that he gave names and phone numbers to Mr. Bierbaum, didn't he?  Do you remember that?

THE WITNESS:  I don't recall him -- I would have asked him for names of family members in discussing his background.  I don't recall sitting down saying -- I don't want to mislead the Court or anybody.  I don't recall sitting down saying, "Who should I go talk to," and listening to his answers.  That's not how that interview would work.

THE COURT:  Okay.  But did he give you phone numbers?

THE WITNESS:  It's very possible he did.

BY MS. BOOTH:

Q.   After you spoke to him and you got those things, did you go tell anybody, "I think he's retarded"?

A.   No, I don't recall saying that.

Q.   Okay.  And if you would have sat down with him -- I mean,

you've done this how many times before this, 25 times before this?  If you would have sat down with him and had a conversation with him and thought he was retarded, would you have passed that message on to someone?

A.   What I would have done is probably suggested, you know, very strongly suggested we have him evaluated by either a neurologist or a neuropsychologist or something like that.  I mean, I'm not a doctor.  I don't get to say these guys are retarded or not.  And surprisingly or not, I've had clients that I thought were average before --

Q.   Okay.

A.   -- who weren't.  So I wouldn't have passed that judgment.

Q.   But you wouldn't have passed that information on to anyone that you had that feeling?

A.   I would have suggested that we get him evaluated in some manner.  I wouldn't have decided he was retarded or not, because I've been --

THE COURT:  Well, did you do that in this case?

THE WITNESS:  Did I ask that he be evaluated?

THE COURT:  Yes.

THE WITNESS:  I think we suggested that he needed to be evaluated.

BY MS. BOOTH:

Q.   No -- now, and why was that?

A.   Because --

Bierbaum - Cross

Q.   Not for mental retardation.

A.   Right, because of the other signs of, neurological signs.

Q.   Because of the accident that he reported to you he had. Right?

A.   It was that and other --

Q.   It was a head injury.  Right?

MR. WISEMAN:  Your Honor, can the witness answer the question?

THE COURT:  Let -- yes.

MS. BOOTH:  I'm sorry.

THE COURT:  Ms. Booth, let him continue, please.

THE WITNESS:  It was that and other things.  I thought there were other signs of neurological dysfunction.

BY MS. BOOTH:

Q.   All right.  Did you think he was retarded?

A.   I wouldn't have passed judgment on that.  I mean, I --

THE COURT:  Okay.  This is, could you -- did you? Yes or no.  You passed judgment on head injuries and other things.

THE WITNESS:  No, I collected symptoms and decided that we should probably have him evaluated.

THE COURT:  Well, I know.  Did you collect any symptoms of mental retardation?

THE WITNESS:  I don't remember noting any at that point.

THE COURT:  Okay.  I mean, that really was the question.

BY MS. BOOTH:

Q.   Now, Mr. Bierbaum, did you prepare a video that you gave to Mr. Tinker?

A.   Mr. Tinker gave me a big box of home videos, and we went and edited some of those together at a studio that he organized or that he provided, and we edited clips.  I watched all of those videos.

Q.   Right.

A.   And we edited those clips together into one big video.

Q.   And when you gave the finished product to Mr. Tinker, did he view it?

A.   I --

Q.   Did you see him view it?

A.   No, I didn't see him view it.

Q.   Did he ever give you any feedback on what he thought about --

MR. WISEMAN:  Your Honor, I don't know why the prosecution is screaming at the witness.

THE COURT:  Take it down, Ms. Booth.  You're right.

MS. BOOTH:  Thank you, Your Honor.  I'm just dramatic when I get hungry.

THE COURT:  Did you want a peanut butter break?

MS. BOOTH:  I need one, Judge.  I think I'd be much

nicer if I wasn't so hungry.

THE COURT: Well, just don't gnaw on the witness.

MS. BOOTH: Sorry, Mr. Bierbaum.

THE WITNESS: That's all right.

MS. BOOTH: But he seemed to be taking it well. It only bothered Mr. Wiseman.

THE COURT: Well --

MR. WISEMAN: I'm a more sensitive fellow.

THE COURT: It is a little loud for all of us.

BY MS. BOOTH:

Q. Okay. Mr. Bierbaum -- I forgot what I was going to ask you now. Oh, the video, the video. So you're the person that manufactured, that put those clips together?

A. I went through, I looked at all of the home videos that were in the box that Mr. Tinker provided, and I identified the clips that were ultimately on the finished product.

Q. And did Mr. Tinker give you any feedback about what he thought about that video?

A. He thought the jury might be offended by it.

Q. Do you remember what clips you put on it?

A. I do not, no.

Q. Okay.

A. I remember it made me sick watching the shakiness of it over and over again. It gave me huge vertigo.

THE COURT: The what?

THE WITNESS:  The camera, it was a hand-held camera, and it would shake and bounce --

THE COURT:  Okay.

THE WITNESS:  -- constantly.

BY MS. BOOTH:

Q.   Do you know who was doing the videoing that was shaking when they were doing it?

A.   I think most of them were made by Mr. Bourgeois.  I think some of them were made by his wife or other persons in the family.

Q.   Well, if he was in the video speaking, and you could see his hands, obviously he wasn't doing the videoing.  Right?

A.   Well, yeah, they were home videos that were taken from his house that were of him and his family, I believe.

Q.   Did Mr. Bourgeois go over his theory of the case with you?

A.   I don't recall right off the top of my head.  I mean, yes, we discussed the case and what happened and the offense and all that.  I don't recall him, you know, getting down to a level of strategy in the courtroom or anything.

Q.   Okay.  But he maintained his innocence the entire time.

A.   Yes.

Q.   And did he blame his wife for the murder?

A.   Yes.

Q.   And was that consistent every single time you talked to him?

A.    No, there was nothing consistent every time I talked to him.

Q.    What?

A.    There was nothing consistent every time I talked to him.

Q.    So he changed his -- every time you talked to him, did he maintain his innocence?

A.    Yes.

Q.    And every time you talked to him, did he maintain that it was his wife that did it?

A.    To the best of my knowledge, it was a story that was similar to that.

THE COURT:  What do you mean?

THE WITNESS:  I mean, when you talk to Alfred, you would learn a little bit about this and a little bit about that.  And the next time you'd learn a little bit different about this and a little bit different about that.  So the things I learned from him weren't consistent, and it wasn't like other Defendants who would repeat the same stories every time you talk to them.  It wasn't that type of situation.

BY MS. BOOTH:

Q.    Well, did you feel like he was lying to you?

A.    Not necessarily.  I just think the stories were different.

THE COURT:  What does that mean when people tell you several different stories about the same event?

THE WITNESS:  It could mean a host of different

things.  It could mean they're not having clear memories.  It could mean they're not organizing things as you or somebody educated would.  It could mean, you know, that they've been thinking about it or they've been on the phone with somebody and heard a fact that now that's in the story you're getting now.  It could mean a lot of different things.

MS. BOOTH:  I don't have anything further, Your Honor.

MR. WISEMAN:  Just a few, Your Honor, and I'll --

THE COURT:  Yes, sir.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Could his different stories be the product of a mental illness?

MS. BOOTH:  Your Honor, he's asking --

THE WITNESS:  I suppose they could.  I'm not an expert.

MS. BOOTH:  -- him to testify about a mental health issue.

THE COURT:  He just said --

MS. BOOTH:  Okay.

THE COURT:  -- he wasn't an expert.

MR. WISEMAN:  That's a good answer.

THE COURT:  I'll let Mr. Winestein testify.

MR. WISEMAN:  Wiseman.

THE COURT:  I'm sorry.  Mr. Wiseman.

MR. WISEMAN:  Okay.

THE COURT:  Too much Milstein.

BY MR. WISEMAN:

Q.   How do you know if a person's mentally restarted?  You, as a mitigation specialist.

A.   A psychologist or a neuropsychologist tells me.

Q.   Okay.  And when you told Mr. Gilmore and Mr. Tinker about the coma from the 18-wheeler accident -- from the 3-wheeler accident back in November, is that something that you would then want to turn over to a neuropsychologist or a psychologist to evaluate?

A.   Absolutely.  I mean, that would make us go and ask, you know, all of the questions about neurological symptoms that, you know -- when you sit down and talk to somebody, you usually just try to get them to open up and try to get the information flowing.  And you write it down the best you can in a coherent way.

If we suspect there's, or if I have reason to suspect there's neurological damage, I'll ask about the neurological type symptoms, did they have black outs, you know, could they remember things, did they function like other children.  You know, so that would cause the interview, I would make sure that we covered those areas every time we talk to somebody, regardless of what else they were telling us about.

Q.   And if you turned this information over to a psychologist who suspected mental retardation, would that involve an additional investigation into deficits?

A.   Oh, it certainly should.

Q.   Okay.  And eventually Mr. Bourgeois was seen by a neuropsychologist, Dr. Weiner.  Right?

A.   I believe so.

Q.   Okay.  That happened during trial?

A.   Or shortly before.

Q.   Okay.  And do you recall that Dr. Weiner reported an IQ of 76, which he subsequently revised to 75 based on a --

THE COURT:  Okay.  Mr. Wiseman, he's not an expert.

MR. WISEMAN:  Okay.  I just want to know, if he had known about it, would he have made any recommendation to the defense team.

BY MR. WISEMAN:

Q.   When you saw Dr. Weiner's report -- did you see Dr. Weiner's report eventually?

A.   I believe I did.

Q.   Okay.  When you saw that IQ, did you tell anything or do anything relevant to the investigation?

A.   If I saw the IQ and it was 75 or 76, we would have been discussing mental retardation.

Q.   And do you have any understanding or explanation for why that discussion and investigation didn't happen?

A.    No.  I don't recall going back and looking at adaptive deficits or seeking out information about adaptive deficits.

Q.    Did the timing of the report in relationship to the trial, which was either about to start or had already started, did that influence the ability to conduct a full-blown mental retardation investigation?

A.    Yeah, it would have impacted it.  I mean, had we decided to pursue mental retardation, we could, we might could have stopped everything and reinterviewed everybody.  I don't know.

Q.    Okay.  Was time a factor?

A.    I mean, it would have been a very brief kind of cursory kind of investigation, but --

Q.    Was time a factor, is my question.

A.    Sure.

Q.    Just to be clear, would you have ever sent anything to Dr. Cunningham without first getting approval from one of the defense attorneys?

A.    No, because that would wind up being the basis of the expert's opinion, and that's open to the public.  And you know, the trial counsel's got to decide, or at least have some, you know, up or down on whether or not this information should go out.

Q.    All right.  So that was your understanding with Mr. Gilmore and Mr. Tinker?

A.    That was just a standard way of operating, that you know,

anything you send to an expert could wind up being the basis of an opinion, could be subject for cross-examination. Trial counsel should be aware of what's going out.

Q. Okay. Have you been on defense teams other than this one that, in your view, were dysfunctional?

A. Sure.

Q. And in those instances --

THE COURT: I'm sorry. Is he testifying this was a dysfunctional defense team?

MR. WISEMAN: Oh, I didn't mean to suggest that. I'm asking other than this case, and excluding --

THE COURT: I thought that's what you were saying.

MR. WISEMAN: Oh, I didn't mean to. Leaving this case --

MS. BOOTH: And Your Honor, how can he testify? Is he an expert as to --

MR. WISEMAN: You just said he was.

MS. BOOTH: -- evaluating different defense teams? No, I never said he was a lawyer, he could give a review of a lawyer's team. No, I never said that. And I don't know how he could testify to that.

THE COURT: Is that something you feel comfortable testifying about?

THE WITNESS: I'm not sure what I'm being asked.

THE COURT: Okay.

MR. WISEMAN:  May I maybe ask the question?

THE COURT:  Then go ahead.

MR. WISEMAN:  Thank you.

BY MR. WISEMAN:

Q.  If you've been on defense teams that were dysfunctional --

THE COURT:  Wait a minute.  Do you know what a dysfunctional defense team is?

THE WITNESS:  I know what a functional defense team is.  I know that we had achieved several life sentences on several different trials.

BY MR. WISEMAN:

Q.  Did you consider this --

MS. BOOTH:  Well, excuse me, Your Honor.  You cannot make an evaluation of a good defense lawyer based on the, if his client gets convicted or not, or what the penalty is or not.  That's in the jury's purview.  You can be the greatest lawyer in the world, win or lose.

MR. WISEMAN:  And I think, I totally agree with what Ms. Booth is saying.  Let me see if I can cut to the chase here.

MS. BOOTH:  How could he be an expert --

THE COURT:  Are you putting him up as some kind of expert in a legal team?

MR. WISEMAN:  I'm just asking his experience.  Ms. Booth was suggesting in her cross-examination questions

that somehow it was the mitigation specialist's fault that the work, the ultimate work product wasn't produced.  It's our position that it's Defense Counsel's job.  I'm simply asking this witness, in his experience, who pulls it together when things aren't working?

BY MR. WISEMAN:

Q.   Can you answer that question?

THE COURT:  Well, why would -- I'm sorry, but you're assuming something isn't working.

MR. WISEMAN:  Well, I'll ask that question.

BY MR. WISEMAN:

Q.   Did you think this was a functional defense team?

MS. BOOTH:  How could he answer that question, Your Honor?

MR. WISEMAN:  Well --

THE COURT:  I don't think he's qualified to do it, if that's what you're saying, so --

MS. BOOTH:  No.  He is not -- that's my objection.

THE COURT:  So move on to something else.

MR. WISEMAN:  Okay.

THE COURT:  That's kind of the ultimate issue for me, isn't it?

MR. WISEMAN:  I'm sorry?

THE COURT:  Isn't that kind of the ultimate issue for me?

MR. WISEMAN:  As a matter of law.  But as a matter of fact, I think --

THE COURT:  Okay.  Just go on, please.

MR. WISEMAN:  Well, you asked me a question.  I was just --

THE COURT:  No, please go on.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Ms. Booth asked you about discussions of strategy with Mr. Bourgeois.  When you're dealing with a capital defendant preparing his mitigation case, do you typically -- you accept input, obviously, from that person.  Correct?

A.   Yes.

Q.   Okay.  Do you necessarily guide your mitigation investigation by the wishes of the capital defendant?

A.   Absolutely not.

Q.   And why not?

A.   More often than not, they're very damaged individuals. They have a lesser capacity to think things through.  It's just, you don't produce solid investigations by limiting yourself to their desires.

Q.   And did you think Mr. Bourgeois was that type of individual?

A.   To some degree.

MS. BOOTH:  He's already told us he can't testify,

because he's not a mental health specialist, on whether there's any symptoms of MR, if there was any inabilities.  I mean, he --

THE COURT:  So what is it you want him to say?

MR. WISEMAN:  If, in his estimation as a mitigation specialist, Mr. Bourgeois was a damaged individual whom he wouldn't rely on to guide his investigation.  Seems like a reasonable question.

THE COURT:  I thought he said he wasn't qualified to talk about damage or mental health or --

MR. WISEMAN:  Well, I don't think he can make a diagnosis, but he can tell, I think, or maybe we should ask him the difference between a high functioning or a damaged individual.

THE COURT:  You mean mental retardation?

MR. WISEMAN:  I didn't say that.

THE COURT:  Okay.  Well, that's what I'm hearing. But he said he couldn't, he didn't see any signs of that in Mr. Bourgeois.  So --

MR. WISEMAN:  Well, I don't want to argue with the Court about what the testimony was, but I --

THE COURT:  Did you see any, I thought you said you didn't see any signs of mental retardation in Mr. Bourgeois. Not that you're an expert.

THE WITNESS:  Yeah, I think I -- I thought I said

that I wouldn't have diagnosed him and that I would have pursued, had we been aware that that was an avenue of, that was an available avenue, we would have pursued some different investigation.

THE COURT:  Actually not.  Ms. Gano, you want to read that back -- play it back, when I asked him if he had any indication that Mr. Bourgeois was mentally retarded.  Any "symptoms," I think, was the word.

(PAUSE.)

COURT RECORDER:  I'm not exactly sure where that is, Your Honor.  Can I just start somewhere?

THE COURT:  Sure.  It's somewhere where Ms. Booth was examining.

COURT RECORDER:  Oh.

MS. BOOTH:  When I was loud.

COURT RECORDER:  Okay.

THE COURT:  Before the loud.

MR. WISEMAN:  That won't narrow it down.

THE COURT:  Well, there never was a before the loud.

(PAUSE.)

(Proceedings played back as follows:)

THE WITNESS:  -- "other signs of neurological dysfunction."

BY MS. BOOTH:

Q.   "All right.  Did you think he was retarded?

A.   "I wouldn't have passed judgment on that.  I mean, I --

THE COURT:  "Okay.  This is, could you -- did you?  Yes or no.  You passed judgment on head injuries and other things.

THE WITNESS:  "No, I collected symptoms and decided that we should probably have him evaluated.

THE COURT:  "Well, I know.  Did you collect any symptoms of mental retardation?

THE WITNESS:  "I don't remember" --

(Playback stopped.)

THE COURT:  That was it.

(Proceedings played back as follows:)

THE WITNESS:  -- "noting any at that point.

THE COURT:  "Okay.  I mean, that really was the question."

(Playback concluded.)

THE COURT:  Okay.

COURT RECORDER:  That's all.

THE COURT:  That's it.  He said, "I don't remember any."

MR. WISEMAN:  Right, "any signs or symptoms."

THE COURT:  Pardon?

MR. WISEMAN:  I think the answer was --

THE COURT:  "Any signs or symptoms."

MR. WISEMAN:  "Signs or symptoms," right.

THE COURT:  So what else would you be looking for?

MR. WISEMAN:  Well, you want me to answer?  Or can I ask him?  Mr. Bierbaum --

THE COURT:  I thought that kind of covered the gamut.

BY MR. WISEMAN:

Q.   Mr. Bierbaum, my questions are, I have two more questions for you, and hopefully no subparts.  Can you look at a person and necessarily tell if they're mentally retarded, you as a mitigation specialist?

A.   No.

Q.   All right.  Obviously some people you can look at and say, "Oh, my God, they're incredibly impaired.  We've got to do something.  He's drooling.  He's, can't utter a word."  Right?

A.   You can look at someone and identify Down syndrome or fetal alcohol syndrome or something like that.

Q.   Okay. All right.  So in the absence of your ability --

THE COURT:  You can look at somebody and identify fetal alcohol syndrome?

THE WITNESS:  In the classic full-blown FAS, yes.  They have a depressed face, and their eyes are fuller -- farther apart, and they have no philtrum.  There are physical signs on a child that's less than four years old of fetal alcohol syndrome.

THE COURT:  So you are an expert in these things.

THE WITNESS:  No, but I know what to look for to hand

over to --

THE COURT:  Okay.

THE WITNESS:  -- mental health experts.

MR. WISEMAN:  Your Honor, I think there's some confusion in the use of the term "expert."  He's expert at what he does, but he's not an expert that testifies.

THE COURT:  Well, that remains to be seen.  But go ahead.

MR. WISEMAN:  Fine.  I think Ms. Booth said he was expert in what he does.

THE COURT:  I think I get to determine that, though.

MR. WISEMAN:  Well, you certainly do.  I just --

THE COURT:  Go ahead.

MR. WISEMAN:  If Ms. Booth says it, it must be so.

THE COURT:  Not necessarily.  I've disagreed with her on many occasions.

MR. WISEMAN:  Okay.

MS. BOOTH:  But I appreciate the compliments from Mr. Wiseman.

THE COURT:  That's true.

MR. WISEMAN:  So --

THE COURT:  You can actually get a copy of that transcript.

MS. BOOTH:  Yes, Your Honor.

BY MR. WISEMAN:

Bierbaum - Redirect
304

Q.   In the absence of outward signs of mental retardation, how do you, how do you figure it out?

A.   First, you have some kind of indicator, some kind of, you know, school performance, low IQ test, something, and then you kind of -- then I would kind of work backwards and do the investigation on adaptive deficits.  You know, was he able to function?  Was he able to count change?  Could he get from A to B?  Could he function independently as an adult?  Could he, did he do his chores?  Could he cook a meal?  Could he be trusted to go, when he was little, go to the store and get what he's asked for and bring back change.  Adaptive deficits are largely things that are failures to function.

Q.   Okay.

A.   And you kind of --

Q.   I think you said you saw an IQ score that would have caused you to suggest such an investigation in this case.

A.   Towards the end of the --

Q.   Of the case.

A.   Of the investigation, I believe.

Q.   Last question, which is how we got into this little mess here.  Did you think, leaving the MR aside, did you think Mr. Bourgeois was a high functioning individual, or did you think he was a damaged individual?

          MS. BOOTH:  Again, I'm going to object.

          THE COURT:  I don't understand what that means.

MR. WISEMAN:  Damaged?

THE COURT:  Yes.

BY MR. WISEMAN:

Q.   Do you think he suffered from mental health problems?

A.   I thought there were some mental health problems, but I'm not a psychologist.  I can't say it was this or that or that. I -- he had function poorer -- more poorly than other Defendants I had served.

Q.   Okay.

THE COURT:  In what fashion?

THE WITNESS:  Keeping information together, being able to tell coherent stories from one time to another, being able to --

THE COURT:  Mr. Gilmore said that he gave you actual, he had memorized phone numbers of witnesses that he wanted you to contact.

THE WITNESS:  Being able to -- well --

THE COURT:  Did he do that?

THE WITNESS:  If Mr. Gilmore says that, then possibly he did.  I don't remember that happening.

MR. WISEMAN:  No, I'm done.  That was your question.

THE COURT:  Okay.

MR. WISEMAN:  Thank you, sir.

RECROSS-EXAMINATION

BY MS. BOOTH:

Q.   So when was this you saw Wiener's -- I mean Dr. Weiner's neurological evaluation that --

A.   I want to say it was maybe when we came up to, or when I came up to help subpoena witnesses for the punishment phase.

Q.   Okay.  So it was already after the trial.

A.   I believe.  Or the trial was winding down.

Q.   And you were aware that an EEG had been done on Mr. Bourgeois and that it was normal.

A.   I vaguely remember that, sitting here now.

Q.   Okay.

A.   Yes.

        MS. BOOTH:  That's all I have, Your Honor.

        MR. WISEMAN:  I just have another hour.  No, I'm teasing.

        THE COURT:  Go right ahead.

        MR. WISEMAN:  We're done with this witness, Your Honor.

        THE COURT:  All right.  Thank you, sir.  You may stand down.  Call your next witness.

        MR. ABREU:  Your Honor, I am happy to say that our last witness is Mr. Alan Keel.

        THE COURT:  Okay.  Do you need me?

        MR. ABREU:  I will say that Mr. Dowd and I are going to be the only two, the two most reasonable people in this courtroom, and we've worked out an agreement, an agreement

that's going to speed us through this --

THE COURT:  Well, I appreciate that compliment.

MR. ABREU:  So -- how about you, Ms. Salinas?

MS. SALINAS:  I do.  Thank you so much.

MR. WISEMAN:  Can I --

THE COURT:  We're the unreasonable people.

MR. ABREU:  At this hour, everybody seems unreasonable, Your Honor.

MR. WISEMAN:  Your Honor, can I just alert the Court that we're going to have a couple of housekeeping matters, as far as exhibits?

THE COURT:  Such as?  Have you got the -- do you need to -- while you're waiting for this last one --

MR. WISEMAN:  Well, that's what I was going to -- we can do it now or we can do it later.  Looks like the witness is here.

THE COURT:  Is this a bite person?

MR. ABREU:  It's a p30 DNA person.

THE COURT:  Oh, okay good.  Thanks.

MR. ABREU:  Thank you.

MR. DOWD:  Judge, could we take about a 10-minute break?

THE COURT:  Yes.

MR. DOWD:  Thank you.

(Recess from 7:14 p.m. to 7:18 p.m.)

THE COURT:  What happened to Mr. Dowd?  Is he there?  Mr. Dowd, are you there?

MR. ROBERTS:  He's here.

THE COURT:  Okay.

MR. DOWD:  I'm ready, Your Honor.

THE COURT:  Would you administer the oath, Ms. Gano, please.

THE CLERK:  Yes, Your Honor.

(Stopping at 7:18:35 p.m.)

(TESTIMONY OF CHARLES ALAN KEEL PREVIOUSLY TRANSCRIBED.)

(Beginning at 8:23:25 p.m.)

MR. WISEMAN:  Your Honor, can we use this time --

THE COURT:  Yes.

MR. WISEMAN:  -- for some other stuff?

THE COURT:  Absolutely.

MR. WISEMAN:  First, on behalf of all of us, I want to say thank you to the Court and to the Court's staff for accommodating us in this way.

THE COURT:  You're welcome.

MR. WISEMAN:  Mr. Bourgeois --

THE COURT:  My time is your time.

MR. WISEMAN:  Yes.  Mr. Bourgeois also wanted me to thank the Court for permitting that visit yesterday.  It meant a lot to him.

We've got a number of exhibits.  P-37 through P-55 --

THE COURT:  P-37 through P-55.

MR. WISEMAN:  -- right, are all lay declarations that I would offer, not for the truth of the matter --

THE COURT:  Ms. Booth?

MR. WISEMAN:  But because the doctors relied upon them.

MS. BOOTH:  Your Honor, they are full of hearsay. And I object to every single one of them.

MR. WISEMAN:  Your Honor, I --

MS. BOOTH:  They did not bring the witnesses here to testify, and they're just hoping to admit these hearsay statements without letting us have an opportunity to cross-examine them.  And so I object to them.

MR. WISEMAN:  I'm not sure Ms. Booth understood my application.  I'm not offering them for the truth.  The doctors relied on them, and I simply --

THE COURT:  Well, if they're not truthful, then they didn't rely on good information.

MR. WISEMAN:  Well, Your Honor, the other point here is that the Court, in our April 20th, 2010, argument on the scope of the hearing told us rather clearly to keep the number of lay witnesses to a minimum.  I think we talked about four to six.  We wound up calling seven.  So I mean, if we called all of these people, we'd be here another week.  And so we were trying to meet the Court's requirements as best we could,

time-wise.

THE COURT:  Well, that doesn't mean you can offer hearsay and get it admitted.

MR. WISEMAN:  No, no, but I'm not offering them for the truth.  In cases such as this, it is quite typical for doctors to rely on lay reports.  Obviously, I'm not suggesting that they are being offered for the truth, but when a -- if the doctor relied on them, I think the record should have some indication of what it is they're relying on.  That's all it is. It's not at all being offered for the truth of any of the matters asserted.

When we write briefs in this case, I think it's important to say, well, the doctor relied on this, and this says X, and if it's not in the record, then how can we make argument about what they relied on?

THE COURT:  What if it's not the truth?  Then what's the point?

MS. BOOTH:  And see, if they don't bring these witnesses, Your Honor, I don't get to find out -- in talking -- I have one witness we're going to bring tomorrow that said that's not what he said, that the declaration that was presented to him that he signed was not what he said.  So I don't know.  I haven't had an opportunity to speak to all these people.  I don't know.  And therefore, it's hearsay, and I object to it.

MR. WISEMAN:  Well, I don't really understand how it's hearsay if I'm not offering it for the truth, but that's another matter.

THE COURT:  Sustained.

MR. WISEMAN:  Yes, Your Honor.  A related application is we have P-110 --

THE COURT:  You know, Mr. Wiseman, on that matter --

MR. WISEMAN:  Yes.

THE COURT:  -- what the doctor says they relied upon is that.  I mean, this is just bolstering the doctor's testimony.  The doctor testified "I relied on these people saying these things."  They did, they testified to that, did they not?

MR. WISEMAN:  Oh, yes.  I mean --

THE COURT:  So that's that.  I mean, that's all you need, I would think.

MR. WISEMAN:  I just think it's a more --

THE COURT:  I'm not saying you, that you gave them false information, but we can't say it's true information, but the doctor's testimony speaks for itself.

MR. WISEMAN:  All right.  I just think it's a more efficient way to proceed, but I understand the Court's point.

Another application I have is with regard to P-110, the declaration of Brenda Goodman.  I also have a declaration from her, P-170, in which she indicates that she could not make

this hearing, although we had requested her to come, although we didn't subpoena her, because her husband --

THE COURT:  But I let people appear by deposition, you know.  You can do all those kind of things.

MR. WISEMAN:  All right.  I mean, I --

THE COURT:  And it would have been very efficient, you know, for you all to take these depositions of everybody, wherever they were.

MR. WISEMAN:  It's a rather late-breaking development.  But I would offer the explanatory declaration, as well as the --

THE COURT:  Would you like to take her deposition and supplement this record with it?

MR. WISEMAN:  Yes.

THE COURT:  As long as Mr. Bourgeois does not have to be there?

MR. WISEMAN:  He doesn't have to be there.

THE COURT:  Then you can do that.  Can you do it --

MS. BOOTH:  So does this mean the United States is going to have to go to Louisiana?

THE COURT:  No.

MR. WISEMAN:  No, this is --

UNIDENTIFIED SPEAKER:  It's Mitchell.

MS. BOOTH:  Oh, she's in Houston.  I'm just asking.

MR. WISEMAN:  Yes.

THE COURT:  You can do that by video deposition remotely.  I mean --

MR. WISEMAN:  You know what, I misspoke.

THE COURT:  -- Mr. Wiseman can do it in Philadelphia. You can be here, and you can do the whole thing by video.

MR. WISEMAN:  I misspoke, Your Honor.  It was Claudia Mitchell who lives in Houston, not Brenda Goodman.

THE COURT:  Where does Brenda Goodman live?

MS. BOOTH:  Brenda Goodman testified.

MR. WISEMAN:  Yeah, I'm not interested in Brenda Goodman.  I misspoke.

THE COURT:  Okay.

MR. WISEMAN:  It's Claudia Mitchell, who is in Houston.  And we'll take her deposition, and we'll notice --

THE COURT:  Can you do it by video conferencing, so everybody can be in their place, wherever they are?

MR. WISEMAN:  We will look into that and do as best we can, yes.

THE COURT:  Okay.  It just, it's so expensive to go --

MR. WISEMAN:  No, I --

THE COURT:  And I'll be glad to let you supplement the record.  And actually with any of these declarants, if you want to do the same thing.

MR. WISEMAN:  Oh.

THE COURT:  As long as they're subject to cross-examination.

MR. WISEMAN:  Sure.

THE COURT:  And nobody has to go to Louisiana to find them.

MR. WISEMAN:  Okay.

THE COURT:  Put them in a video conference center.

MR. WISEMAN:  All right.

THE COURT:  And do it.

MR. WISEMAN:  All right.  We'll speak with the Government about that.

THE COURT:  But I'm going to give you one -- I'm going to give you till November 15th to do that.

MR. WISEMAN:  Okay.  That's more than fair.

THE COURT:  To supplement the record.

MR. WISEMAN:  More than fair.  Thank you.

THE COURT:  I thought so.

MR. WISEMAN:  Yes.  A couple of exhibits I neglected, or we neglected -- actually, I think it's all me -- to offer.  P-157 is the order appointing Dr. Weiner.  It's a part of the Court's record.

THE COURT:  Is the what?

MS. BOOTH:  No objection.

THE COURT:  P-157 is admitted.

MR. WISEMAN:  All right.  158 is one of the charts

that, about the WAIS scoring that the doctors referred to, and I should have offered it.

THE COURT:  Right.  Any objection to that, Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  P-158 is admitted.

MR. WISEMAN:  P-3 is a letter from Dr. Cunningham to John Gilmore, dated 2/25.  I believe we referred to it, and I neglected to offer it.

THE COURT:  Ms. Booth?

MS. BOOTH:  And what was that?  I'm sorry.

MR. WISEMAN:  P-3.

THE COURT:  P-3.

MS. BOOTH:  Written by Cunningham?

MR. WISEMAN:  Cunningham to Gilmore.

MS. BOOTH:  No problem.  No objection.

THE COURT:  P-3 is admitted.

MR. WISEMAN:  All right.  Just one more, a couple more things.  I shouldn't say one.  I'm really reluctant to ask this.  I was just wondering what the Court's intentions are with regard to Friday?  Is there going to be a Friday?

THE COURT:  There's going to be a Friday.

MR. WISEMAN:  Okay.  And are we going to be here on Friday?  I mean, that's fine.

THE COURT:  I thought I'd give -- I've given you three days.  I thought I'd give the Government two days.  I

suspect --

MR. WISEMAN:  Yes.

THE COURT:  -- that they're not going to need it.  So you have your rebuttal witnesses.  See if you can get together with them --

MR. WISEMAN:  Okay.

THE COURT:  -- about how much time they're going to need.

MR. WISEMAN:  So it's going to be some point on Friday.  We just have to make our plans.

THE COURT:  So that gives you a full week.  It will be -- it's going to be all of Friday.

MR. WISEMAN:  All of Friday.

THE COURT:  I will give you all of Friday.

MR. WISEMAN:  Okay.

THE COURT:  And I intended to give it to the Government, but then I figured that you need rebuttal.

MR. WISEMAN:  Okay.

MS. BOOTH:  Judge, I have a couple of things that --

THE COURT:  How many -- how much rebuttal, do you think?

MR. WISEMAN:  Oh, I'm not sure at this moment.  Frankly, I was worried about getting our direct case on, so I really haven't been thinking about rebuttal.

THE COURT:  Well, you did it.

MR. WISEMAN:  We did it.  And that's great.  I've got a document on this flash drive that is from Dr. Estrada's file that shows the date that Ms. Booth retained him.  And how about if I print it out and offer it tomorrow as 171?

THE COURT:  That's fine.

MR. WISEMAN:  Okay.

THE COURT:  Now --

MR. WISEMAN:  The last thing I --

THE COURT:  Since it's 8:30 tonight -- I'm going to let you finish, but --

MR. WISEMAN:  Yeah.

THE COURT:  -- what time do y'all want to start back in the morning?

MR. WISEMAN:  It's up to the Government.

MS. BOOTH:  Oh, Judge, whatever time you need us here.  We're good.  We've got things to do if you want to start a little later, or we can be here whenever you want.

THE COURT:  Well, you've got a long way home and --

MS. BOOTH:  Yeah, I do.

THE COURT:  How about 9:00 o'clock?  Is your husband still here?

MS. BOOTH:  Yeah.

THE COURT:  I'm sorry, Ms. Booth.

MS. BOOTH:  I know.

THE COURT:  Okay.  Let's make it 9:00 o'clock.

MR. WISEMAN:  Okay.  Thank you.  That's all I have then.

THE COURT:  Anything further?

MS. BOOTH:  From the United States, Your Honor.

THE COURT:  Yes.

MS. BOOTH:  We're going to offer Government's Exhibit Number 73, which is the --

MR. WISEMAN:  Oh, we already offered that.

MS. BOOTH:  Okay.  Well --

MR. WISEMAN:  I mean, we offered that as --

THE COURT:  Government's 73 is admitted.

MS. BOOTH:  Government's 176, 177 -- oh, and it's 200.

MR. WISEMAN:  No objection to any of those.

THE COURT:  200 I admitted.  176 and 177 --

MS. BOOTH:  Yes.

THE COURT:  -- is admitted, Government.  Have we got all the exhibits before everybody leaves, Ms. Scotch?

THE CLERK:  I just need to check.

(PAUSE.)

THE COURT:  Ms. Scotch is going through the exhibits to make sure we have everything.

MS. BOOTH:  Mr. Roberts was asking if we get two days, then when does the rebuttal time come in?  And I said, "Well, that's Friday night, between 5:00 and 10:00."

THE COURT:  Yes.  I mean, I'm assuming that you're really not going to need two days.

MR. ROBERTS:  I'm thinking that's probably correct.

THE COURT:  So I'm going to give him what's left. And I will not go late Friday night.

MR. ROBERTS:  We'll stay longer Friday to, so they don't get extra time on their case.

THE COURT:  I think we'll be okay.  I think we should be okay, and still give them no more than two hours for rebuttal.

MR. ROBERTS:  Very good.

MR. WISEMAN:  And we may not have any, Your Honor.

THE COURT:  You may not have any, but you've got it anyway.  We can do it, you know, from 4:00 to 6:00 on Friday, if we're running late.

MR. DOWD:  Judge, I solved the mystery of the (inaudible.)

THE COURT:  Oh, okay.  Tell me.

MR. DOWD:  And this, I got this from --

THE COURT:  Are you all satisfied?

MR. ABREU:  I'll know when I get back to my room and look at my stack, Your Honor, but I was under the impression -- I must have misunderstood, potentially -- that there were written notes that someone was taking as this examination is proceeding forward that were not disclosed.

THE COURT:  Okay.

MR. ABREU:  My understanding is that this is what they were talking about.  A couple of the sheets I have seen.  One of them I'm not sure I have.  But I will check and I'll confer with Mr. Dowd and let the Court know.

THE COURT:  All right.  We're -- are we done?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Did you give him a set of those?

MR. DOWD:  I'll make a copy downstairs.

THE COURT:  All right.  Thank you all very much.  You're excused.

(Proceedings concluded at 8:34 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    November 5, 2010
Molly Carter                        Date

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GEORGE WALKER HOLDEN | 7 | 17 | | |
| JENNIFER VALDEZ | 24 | 30 | | |
| CHARLES MICHAEL BOWERS | 33 | 37 (Voir Dire) | | |
| | 41 | 82 | 119 | |
| JOHN GILMORE | 125 | 133 | 202 | |
| KERRY BROWN | 230 | 247 | | |
| TIMOTHY ALLEN | 252 | | | |
| GERALD BIERBAUM | 257 | 276 | 291 | 305 |

EXHIBITS:                                                          RECEIVED

PX-3:  2/25/04 LETTER FROM CUNNINGHAM TO GILMORE . . . .    315

PX-21:  GEORGE W. HOLDEN CURRICULUM VITAE . . . . . . . .      8

PX-18:  12/19/03 LETTER FROM HOLDEN TO TINKER . . . . .     11

PX-18A:  11/21/03 LETTER FROM HOLDEN TO TINKER . . . . .      9

PX-19:  2/24/03 LETTER FROM HOLDEN TO TINKER . . . . . .     11

PX-20:  GEORGE W. HOLDEN DECLARATION . . . . . . . . . . .     16

PX-81:  HOSPITAL RECORDS, RIVER PARISHES HOSPITAL . . .    132

PX-82:  TINKER'S RESPONSE TO GOVERNMENT INTERROGS . . .    131

PX-83:  JOHN GILMORE DECLARATION . . . . . . . . . . . .    131

PX-96:  CHARLES MICHAEL BOWERS CURRICULUM VITAE . . . .     35

PX-116:  PHOTO OVERLAYS OF BITE MARKS . . . . . . . . . .     72

EXHIBITS:  (CONTINUED)                                    RECEIVED

PX-157:  ORDER APPOINTING DR. WEINER . . . . . . . . . . .    314

PX-158:  CHART REGARDING WAIS TEST . . . . . . . . . . . .    315

                    _____

GX-73:  INTERROGATORIES FOR DOUGLAS TINKER . . . . . . . .    318

GX-172A:  APPENDIX TO DR. SENN 04/10 REPORT  . . . . . . .    125

PX-176:  LETTER FROM BOURGEOIS TO BIERBAUM . . . . . . . .    318

PX-177:  LETTER FROM BOURGEOIS TO BIERBAUM . . . . . . . .    318

GX-178 to 200:  LETTERS FROM ALFRED BOURGEOIS TO GILMORE    147

GX-204:  4/23/07 SENN PRESENTATION . . . . . . . . . . . .     45