IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *    CRIMINAL ACTION
                                   *
          PLAINTIFF,               *    CR-C-02-216(1)
                                   *
VS.                                *
                                   *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *    SEPTEMBER 24, 2010
                                   *    8:26 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * *


PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 5
(TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED)

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:              MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 8:26 a.m.)

(Call to Order of the Court.)

THE COURT: Are you all ready to begin?

MR. WISEMAN: Yes, Your Honor.

MR. ROBERTS: Your Honor, we have one bit of administrative.

THE COURT: Okay.

MR. ROBERTS: Matter. The United States has decided that we're not going to call Dr. Oliver. We don't believe there's any evidence with regard to enhancements to rebut. And so we would like to release Dr. Oliver.

THE COURT: Mr. Wiseman?

MR. McHUGH: Well, Your Honor, we had, through Dr. Bowers, we had attempted to put in expert testimony concerning the photo imaging enhancements, digitization and enhancements, and that was denied. We were going to call Manfred Shenk in our case, but in an attempt to streamline, we were going to use Dr. Bowers. So at this point, I guess we're left to supplement with Manfred Shenk, who was on our original witness list. At that point, I believe the Government would be calling Dr. Bowers. But I thought that we had talked about doing it by way of deposition. So --

THE COURT: Doing what?

MR. McHUGH: Doing each witness by way of -- supplementing by November 15th.

THE COURT:  No, I was talking about those, the people in Louisiana, the --

MS. BOOTH:  The lay witnesses, Your Honor?

THE COURT:  The lay witnesses.

MR. McHUGH:  Well, then we would be asking then to cross-examine Dr. Oliver.  I mean, that would be our --

THE COURT:  Well, he's not going to be here.  Did you have him under subpoena?

MR. McHUGH:  We don't.  He was on the Government's witness list, and that was what we relied upon.  But again --

THE COURT:  But you did your case in chief already.  It's done.

MR. McHUGH:  I understand that, Your Honor.  But pursuant to the Court's order, I believe, back in the April conference, was to streamline.  And so we went with Dr. Bowers, who in his report had given a critique as to the photo enhancements.  Then when we called -- and we thought we would use him.  And then during his examination, I was going to have him say he relied on Cherry Biometrics with this Manfred Shenk's report, and move that in by that way, which I thought we were in compliance with the Court's order.

But when the Court didn't have him found as an expert, qualified as an expert --

THE COURT:  The Photo Shop guy?

MR. McHUGH:  Dr. Bowers.

THE COURT:  Yeah, the Photo Shop person.

MR. McHUGH:  But he had published in the Journal of Forensic Science on digital imaging, just not enhancement.  He had written a book on enhancement.  And so half of what Dr. Oliver is going to testify is digital imaging.  The second half is enhancement.  And so that was our intent was to streamline, as I thought it was in compliance with Your Honor's order, which was have him cite to --

THE COURT:  No, you were going to have the Photo Shop guy be the expert on digital enhancing.

MR. McHUGH:  And in his report, he did do that.  And I was going to, rather than call Mr. Shenk, have him say he reviewed Mr. Shenk's report, which is Cherry Biometrics, and have that moved in.  But obviously when that didn't go through with him being qualified as an expert, I didn't do that.  And then I thought, well --

THE COURT:  Well, do you have another expert?

MR. McHUGH:  Manfred Shenk from Cherry Biometrics. But obviously, we didn't have him here because we thought we were going to proceed by way of having Dr. Bowers incorporate his report, which I thought was in compliance with the Court's order.

THE COURT:  So who did you want to leave?

MR. ROBERTS:  Your Honor, it was Dr. Oliver.  He's the -- he was the person who testified at trial about the

enhancements, and they've challenged him, but Dr. Bowers really didn't say anything that we thought we need to rebut, so we didn't -- we're not going to put him on.

MR. WISEMAN:  Your Honor --

MR. McHUGH:  He didn't say -- he did comment on the photos, first of all.  He said that he thought that the photos were not reliable, as a layperson, because of obviously the Court's ruling.  But again, what I would express to the Court was it was Dr. Bowers in his report, in compliance with Rule 26, did comment on the enhancements and the imaging and the fact of Cherry Biometrics.  So we were going to try and streamline by using just Dr. Bowers and move in Cherry Biometrics' report, which is Manfred Shenk.  We didn't get that far because of the fact that Dr. Bowers was objected to as far as his expertise.  So that would be an issue that we would be asking just to supplement instead of bringing Manfred Shenk concerning the enhancements.

THE COURT:  The digital enhancements?

MR. McHUGH:  Yes, that Dr. Bowers was not able --

THE COURT:  Now, which digital enhancements are you talking about?

MR. McHUGH:  There's autopsy photos and the bite mark photos.  It's all done by Dr. Oliver.  They were all done by Dr. Oliver.  And we were going to have Dr. Bowers not only talk about forensic --

THE COURT: Okay. Wait a minute. Dr. Bowers was a psychologist?

MR. McHUGH: Forensic odontologist. But he also has published in the area of digital imaging and Journal of Forensic Science and has a book published in enhancements. So Dr. Oliver's testimony covers two things, digital enhancements -- I'm sorry -- digital compression and then enhancements. And Dr. Bowers was not permitted to testify as to either.

THE COURT: Well, why don't you find somebody that is an expert in that and just do -- I'll allow you to supplement with a deposition.

MR. McHUGH: And that's what I -- we have him. It's Cherry Biometrics, Manfred Shenk. And that's what we would ask the Court to be -- leave to do. And we will do that.

MR. ROBERTS: Your Honor, I guess the point is that they had an opportunity to put their case on. They rested. They had a chance. They could have requested that even before they rested, but they didn't.

THE COURT: Okay. I'm not going to hold them to -- I understand that. I'm not going to hold them to technicalities when it's this kind of a case. So I'm going to let him supplement. Again, the rules of the deposition are -- I'm not paying, I'm not going to authorize payment for anybody to fly anywhere. Put them in a video conference room. You all appear

by however it is you appear and depose them that way.  Okay?

MR. ROBERTS:  Your Honor, if I may, that puts us in a particular difficult situation, because we would bring Dr. Oliver in to respond to what their case is.

THE COURT:  Depose him.

MR. ROBERTS:  So, and we have Dr. Oliver here now, but then obviously we have to wait to see what they say and so --

THE COURT:  Okay.  I agree with you.  Do them both.  But just do all that by November 15th.

MR. ROBERTS:  Your Honor, as far as other evidence or the other depositions --

THE COURT:  And I agree with you 100 percent, Mr. Roberts.  If this were a normal civil case, I would just say, "It's over, forget about it."  But obviously there's more at stake than money damages or something like that.

MR. ROBERTS:  Ms. Booth would like to ask you about the clarification of the rest of the witnesses before this November 15th --

THE COURT:  Yes.

MS. BOOTH:  Yes, Your Honor.  The way we understand your ruling is that -- and I would like to have a name, because you see, it looks like they're getting a lot of do-overs here.  And so I want to know --

THE COURT:  They are.

MS. BOOTH:  Yeah.  I want to know.  This is like the fourth do-over from the beginning.

THE COURT:  And that's correct.

MS. BOOTH:  I'd like to know exactly who it is that they're going to call from Louisiana.

THE COURT:  Who are you going to call?  What witness?

MS. BOOTH:  Exactly the names.

MR. WISEMAN:  Yes, Your Honor, I'm not prepared at this moment to give you the precise names.  We'll give it to you by the end of the day, if that's acceptable.

THE COURT:  That's good.  By the end of the day is fine.

MS. BOOTH:  Well, what the problem is, Your Honor, is that we're the Respondents.  I mean, we're only addressing what they put before the Court.  And there have been many issues that they've -- and I'm not going to point them out.

THE COURT:  No, I got it.  We're moving --

MS. BOOTH:  So we don't want to be caught in a -- I'm not going to say any more.

THE COURT:  With your scarf down.

MS. BOOTH:  Pardon?  Number two, Lloyd Ferdinand that we have on our witness list, we will not be calling Mr. Ferdinand.  Number two --

THE COURT:  Can you get him an earlier flight out?

MS. BOOTH:  We're doing the best we can, Judge.

We're working with the Marshals.  We will not be calling Douglas Tenore.  We don't believe that that's necessary.  Or Angela Lockett-Sampson.  She was a custodian that we didn't need.

THE COURT:  Okay.  You know what, I want the name by 11:00 o'clock.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Because then they have to decide whether they want Dr. Oliver here or not.

MR. WISEMAN:  Yes, ma'am.

MS. BOOTH:  And we have to decide what it is we -- we know what we need to respond to as far as what's been on put on by the Defense.

THE COURT:  Okay.  Look, if you all want to call Dr. Oliver, call Dr. Oliver, and then you can avoid the depositions.  Right?

MR. McHUGH:  Your Honor, we know the name.  It's Manfred Shenk, from Cherry Biometrics.  He was on our original list.  And that's who we'd be deposing.  And we have no objection --

THE COURT:  Well, why didn't you have him here?

MR. McHUGH:  As I had indicated --

THE COURT:  The streamlined doesn't make any sense.  Why didn't you have him here?

MR. McHUGH:  Because Dr. Bowers, in his report,

had --

THE COURT:  The Photo Shop guy, okay.

MR. McHUGH:  -- had reviewed Cherry Biometrics, had also given digital enhancement expert testimony, you know, in his report and had commented on all the photographs.

THE COURT:  Had he ever been qualified as an expert in digital enhancement?

MR. McHUGH:  Well, he had been --

THE COURT:  Ever?  I'm just asking you, in any court.

MR. McHUGH:  I believe so.

THE COURT:  Where?

MR. McHUGH:  He said state court.  I didn't ask him what state court, but I asked him, has he ever been called as an expert to testify, and I listed all of them, including photo --

THE COURT:  Yeah, but not digital enhancement.  You asked him about the main thing he was testifying about.

MR. McHUGH:  I believe I did ask, and that's when I got the objection from the Government.  And so what my intention was with Dr. Bowers was to go into all of that and save the time of the Court and say that he relied on Cherry Biometrics' report, which he had done.  We didn't get that far. So Your Honor, at this time we would be wanting to call Manfred Shenk from Cherry Biometrics, and we would be happy to do it by way of deposition.  I don't think it's lengthy testimony.  And

obviously, I know the Government has an opportunity to rebut that with Dr. Oliver.

THE COURT: Okay. I want him in the next two weeks, you to depose him in the next two weeks, so they have a chance to respond.

MR. ROBERTS: Your Honor, Dr. Oliver is not scheduled to leave until tomorrow morning. If he is released, we could get him on a noon flight and actually --

THE COURT: He's being released.

MR. ROBERTS: He is released? Okay. Thank you, Your Honor. And if we had, if they present something that we need to rebut, then we can do --

THE COURT: Absolutely.

MR. ROBERTS: Thank you, Your Honor.

MR. WISEMAN: May I proceed, Your Honor?

THE COURT: Yes. Thank you.

MR. WISEMAN: Your Honor, yesterday you asked us to provide the Court with an outline or some evidence as to when the mitigation specialists were advised of Mr. Bourgeois's childhood abuse. We -- I won't represent that this is a complete accounting, but over the evening, we extracted several pages from Petitioner's Exhibit 61, which the Government has, and we've marked it as Petitioner's 61A. And for the record, that would be Page 1 and 2, 24 through 28, 29, 30, 32.

MS. BOOTH: And this is from which document?

MR. WISEMAN:  61.  36, 37, 38 and 39.  And all of these are memoranda or other documents that Mr. Bierbaum collected indicating childhood abuse from a variety of sources.  And I would offer that up to the Court for the Court's consideration.  I'd offer it into evidence, I guess, is more properly it.

MR. DOWD:  And these are offered as the basis for Mr. Bierbaum's analysis, not for the truth of the matter?

MR. WISEMAN:  Well, I'm not sure, because the Judge asked us a question, and it's offered to respond to that question.

THE COURT:  What?

MR. WISEMAN:  You asked us to provide you with information relevant to when and where Mr. Bierbaum heard about the childhood abuse.  This document responds to that question, in part.  You know, so I don't know how the Court wants to consider it.  I'm simply trying to respond.

THE COURT:  Why don't you just tell me what you have.

MR. WISEMAN:  Yeah, it's there.  I mean, there's a number --

THE COURT:  Just tell me.

MR. WISEMAN:  Oh, I could read it.  I mean, it's --

MS. BOOTH:  It's -- he caught more whippings than the rest.

MR. WISEMAN:  Oh, I mean, that's one line from many

pages.

MS. BOOTH:  Yes.

MR. WISEMAN:  On January 9, 2004, prior Counsel, Jose Gonzalez-Falla --

THE COURT:  Falla.

MR. WISEMAN:  I'm sorry, Falla.  January 9th, 2004, he wrote to Mr. Bierbaum and he told him that he had a July 24th, 2002, phone call with Mr. Ferdinand, Lloyd Ferdinand, who said, quote, Alfred was abused as a child.  Mr. Ferdinand said his mother used a belt and an extension cord to discipline Alfred.  And so Mr. Bierbaum had that, and it's notable that Mr. Falla did that in 2002 in the summer, right away.

There's a memorandum of February 4th, 2004, from Mr. Bierbaum, an interview of Mr. Bourgeois, where he extensively outlines Mr. Bourgeois's reports of abuse.

MS. BOOTH:  Well, and I think it's important, that, Judge, you hear what abuse we're talking about.  It's not --

MR. WISEMAN:  Well, I could read the whole document if the Court wants me to.

THE COURT:  No, just tell me what abuse you're talking about.

MS. BOOTH:  Highlight it.

MR. WISEMAN:  Physical abuse.

THE COURT:  No, read what it says.

MR. WISEMAN:  Sure.  "Alfred" -- this is Mr. Bierbaum

reporting. "Alfred got whipped with extension cords or belts, whatever other implement was handy." He quotes Mr. Bourgeois, "Mom always beat me with my clothes off."

"Alfred thought his siblings didn't see very many of his beatings, but they could always hear the beatings if they were home.

"In addition to beatings, Eunice would slap Alfred when she was within reach. She slapped him when picking his nose. She cleaned his nose for cutting his hair. Mom didn't slap the other siblings.

"Alfred recalled one instance where he was swinging in a swing, and mom was standing beside him. Without any warning, quote, she back slapped me off the swing, closed quote. I'm sorry, I couldn't figure out what I had done, closed quote. Alfred had gone to the hospital to have doctors burn something inside my nose to stop his nose from bleeding over this incident.

"Alfred as a child was required to wear a bald head. Mom would shave his head whenever his hair got too long. She made him wear a bald head constantly as a child. Mom had long fingernails. When Alfred was little, she would constantly pick his nose in a very aggressive manner.

"Alfred was singled out by -- singled out of the siblings for punishment, mistreatment. Alfred alone of the siblings was never allowed to go anywhere. Quote, I couldn't

go to the beach or anywhere.  If they got to go, I never did.

"Mom never bought Alfred any toys or new clothes or anything.  Quote, when I was with her, I didn't know what a toy was.  Mom just wouldn't buy me anything.

"Alfred thought his mom treated him like a girl regarding chores and household duties."

I'm going on to the next one.  There's more, but that will give the Court a flavor.  This is a interview of February 25th, 2004, Bierbaum, of Nicole Ferdinand.  This is Page 30 of the exhibits.

"Alfred's mom, the woman that raised Nicole, quote, treated him different than the rest of the children, closed quote.  Alfred told Nicole about the things that his mom did to him.  Nicole mentioned that Eunice used to beat him with an extension cord and tried to cut his fingers with a can knife.  Nicole believed Alfred when he told her about these things, because quote, I could just see the redness come in his eyes, you know."  And then she goes on to say, "Alfred, quote, been through a lot when he was coming up."

February 25th memorandum Gerald Bierbaum to Counsel, in a second interview with Claudia Williams, "Claudia told me that Alfred, quote, used to get the most whippings.  She, mom, really beat him a lot, closed quote.  He was one of the, quote, hard-headed ones, end quote, didn't listen a lot, so mom would whip him really good.

"Claudia was reluctant to talk about her mom, but she would admit that Alfred wasn't treated like the other siblings. Claudia said she never knew him to whip his kids. He never whipped none of his kids like he got whipped."

Moving on to another February 26th, 2004, memo from Bierbaum to Counsel. This is an interview of Alton Preston. "Alfred told Alton about his mom singling him out and not liking him because he looked like his dad, and his dad didn't stay around. Alton did recall that Alfred was, quote, raised up by Ms. Mary. Ms. Mary was the only woman that Alfred thought cared for him."

Let me see if there's anything else in here. That's all from this exhibit, Your Honor. Well, actually, there's one more. March 3rd, 2004, again from Bierbaum to Counsel, and this is an interview of Harry, quote, Slick, closed quote, Bourgeois. His statements regarding Eunice and Alfred.

"Alfred's mama didn't do shit for him. All her kids raised they-self. It was like he didn't have no mama. She has half-ass retarded, close the quote. Eunice, quote, didn't look out too close for none of them, closed quote. She would party or run around, never seemed to mind the kids like a mom should. Whenever she was paying attention to Alfred or Lloyd, she was, quote, always trying to put a broomstick on his ass or something.

"Harry said he put his, quote, shoes on Alfred's feet

because his mama wouldn't give him shit.  Harry knew that Alfred went to live with Ms. Clayton about 700 to 1,000 yards from mom's home, because, quote, her mom -- her, (his mom) and Alfred could never make it, closed quote.  Mom constantly fussed and beat Alfred.  They couldn't get along at all.  Quote, she never did him right.  Quote, Alfred was like a stray sheep going from place to place looking for someone to take care of him."

So, I mean, that's what we came up with overnight. There's more and --

THE COURT:  Thank you.

MR. WISEMAN:  Okay.  Is the Court going to accept the document or is --

THE COURT:  Well, I just accepted what you said.

MR. WISEMAN:  All right.

THE COURT:  That was, I thought that was easier.

MR. WISEMAN:  Okay.  That's fine.

THE COURT:  That's what you wanted me to hear anyway.

MR. WISEMAN:  Correct.

THE COURT:  Okay.

MR. WISEMAN:  Good morning, Dr. Price.

THE WITNESS:  Good morning.

MR. WISEMAN:  I have to catch my breath.  Oh, yes, Your Honor, we filed a motion over evening --

THE COURT:  Oh, I couldn't open it.  What did it say?

MR. WISEMAN:  I took so much time preparing it.

THE COURT:  I'm sorry.

MR. WISEMAN:  Your Honor, we have moved to strike a -- thank you, Mr. Roberts.  Your Honor, Mr. Roberts has been kind enough to give me a copy to hand up to the Court.

(PAUSE.)

THE COURT:  I thought you brought up with the cross-examination about the organic --

MR. WISEMAN:  Yes, and my application is limited to portions of his -- well first of all, it was the direct examination --

THE COURT:  You're the one who brought it up.

MR. WISEMAN:  No, no, it was the direct examination of Dr. Price --

THE COURT:  Okay.

MR. WISEMAN:  -- in which he commented on two tests and appeared to apply some norms that none of that was in his report.  He doesn't mention the word "brain damage."  There was nothing in his report about these norms.

THE COURT:  Okay.

MR. WISEMAN:  And I'm simply unprepared to confront him on those issues.  It's very complicated.  I don't even know what he's talking about.  And I would need to -- you know, our experts are long gone.  We tried to reach them last night, were unsuccessful.  And I think this is exactly a paradigmatic

example of what the rule is designed to prevent.  Our witnesses are gone, and he's giving an opinion I can't confront.  And again, it's limited to just those two areas, categories --

THE COURT:  Mr. Dowd?

MR. DOWD:  Your Honor, the -- obviously Counsel was aware that this was an issue.  His experts testified that Mr. Bourgeois suffered from organic brain damage, and they were relying on the psychological testing to do that.  So obviously this is not a surprise for the Defense.  That's the point of their case.  Dr. Price is merely critiquing their experts' claims about the basis and the reliability of their testimony.

Now, Dr. Price, a complaint is made that he didn't describe the norms that he used to critique that Dr. Gelbort's conclusions, but he's here for cross-examination, and he's already been cross-examined on that.  So I don't see any surprise to the Defense since it was part of their case in chief.

MR. WISEMAN:  Your Honor, I was dumbfounded, befuddled, completely surprised by that testimony.  The word "brain damage" does not appear in his report.  He doesn't discuss it.  He discusses his IQ.  He discusses his personality disorders.  He discusses adaptive deficits.  That's all he discusses.  Obviously, brain damage is an issue in this case, and had we been aware that he was going to critique those tests, we would have been prepared to confront him on it.  I am

not.  I can't ask him questions about it, because I don't know, I don't know what he's talking about.  I'm not an expert in that particular area.  Or I'm not expert, I should say, in that particular area.

So I am truly at a loss to confront this witness on those two discrete issues.  Now, if it gets --

THE COURT:  I don't know why, though, because you put on your own experts about it.

MR. WISEMAN:  But they didn't put on any testimony about norms.  They applied a different set of norms than the ones he's talking about, and it's a complicated --

THE COURT:  Well, just ask him about the norms.

MR. WISEMAN:  But I don't know what to ask him even. I mean, I could say, "What norms did you apply?"  But then when he gives me an answer, I have no way to test that answer.  You know, I'd have to go to the books and the literature.  I'd have to see what he's talking about.

You know, I would think at a minimum, and I hate to go to the well too often here, but I think --

THE COURT:  One more deposition?

MR. WISEMAN:  Well, you know, on those two discrete issues at some point, I think, would be fair.  I can't imagine it would be very long, but I think that would be appropriate and by video.

THE COURT:  Okay.

MR. WISEMAN:  All right, thank you.

THE COURT:  Go ahead.

RANDALL PRICE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Good morning again, Dr. Price.  I want to talk a little bit with you initially about borderline personality disorder. I'm going to try -- I'm not going to try.  I'm not going to intentionally repeat myself from yesterday.

You would agree that a borderline personality disorder is, manifests in instability in relationships and marked impulsivity?

A.   I would.

Q.   And the person with the borderline personality disorder is driven by a real or a perceived need to avoid abandonment?

A.   Yes.

Q.   And the origins of borderline is quite often because the person, him or herself was abandoned in childhood?

A.   Yes.

Q.   And that's what happened to Mr. Bourgeois?

A.   Yes.

Q.   It could also be caused by a trauma history like the one Mr. Bourgeois has.

A.   Yes.

Q.   And the impairments in the relationships typically cause a

fluctuation between idolization and demonization of the particular person with whom the subject's in relationship with.

A.    Yes.

Q.    And under stress, significant stress, those with a borderline personality disorder can compensate into dissociative states.  Do you agree with that?

A.    Yes, it's possible.

Q.    Okay.  And under that stress, they can also undergo psychotic episodes?

A.    Yes, it's possible.

Q.    And in fact, the concept of borderline, or the origins of the diagnosis were that it used to be considered borderline schizophrenic, hence the name borderline.

A.    I would have a different explanation for the word, the reason it's called a borderline.  But it does border on psychotic disorders, as well as other kinds of disorders.

Q.    Now, the Government brought in a number of lay witnesses, as I mentioned yesterday, that testified that they knew Mr. Bourgeois for years, and he never seemed to, you know, have that fluctuation.  He was always just a real gregarious, pleasant fellow.  You would agree that the rages and the dissociation and the psychosis that the DSM talks about with respect to borderline personality disorder are manifested in the relationships that the subject has with intimate people in his life?

A.    Yes.

Q.    Like wives?

A.    Yes.

Q.    Girlfriends?

A.    Yes.

Q.    Lovers?

A.    Yes.

Q.    Okay.  So it's not inconsistent with a borderline personality disorder that Mr. Bourgeois presented well to nonintimate people he knew.

A.    It is not inconsistent.

Q.    On your administration of the DSM structured interview, he responded to a number of questions in which he endorsed borderline questions.

A.    Yes.

Q.    All right.  So for example, you asked him, "Do you do -- do things seem strange to you when you're under stress?"  And he said, quote, Like a circus in my head, closed quote.  Would you consider that an endorsement of a borderline symptom?

A.    Yes.  I don't remember the word "circus."  Is that what you said?

Q.    Yeah, yes, "Like a circus in my head."  That's how I heard it.  I have to admit I had a hard time with the dialects and accents.  But that's how I made it out.  Does that have a dissociative flavor to it?

A.   I don't know.  It has a decompensation flavor to it, under stress.

Q.   Okay.  It's certainly on a continuum towards dissociation, wouldn't you agree?

A.   You know, I don't recall that comment.

Q.   Well, assume it's there.

A.   And it was that it's like a circus in his head?

Q.   "In my head," when he's under stress.

A.   I don't know that I would say that's an indication of a dissociation.  But it's an indication of disturbance in thinking under stress.

Q.   Okay.  And you would agree that it's on a continuum towards dissociation; may not be quite there, but it's heading in that direction?

A.   I don't know.  I wouldn't conceptualize it like that.

Q.   Okay.  You also endorsed that he has suffered black-outs under stress?

A.   Yes.

Q.   And is that consistent with dissociation?

A.   Yes.

Q.   Why don't you explain to the Court briefly what dissociation is.

A.   It's where the person is out of touch with reality.  They -- it's like they see themselves behaving, kind of looking down at themselves, they're not aware of their surroundings as

much as if they were in an intact mental state at the time.

Q.   And it's not psychosis.  Correct?

A.   No, it's not psychosis.

Q.   But it shares at least the feature of being out of touch with reality?

A.   Yes.

Q.   And he also endorsed the concept that he is paranoid while under stress.

A.   Yes.

Q.   But in that section, he denied suicidality or self-harm. Right?

A.   Yes.  As I recall, if you could direct me to the section --

Q.   Oh, okay.

A.   -- that you're talking about.

Q.   It should be in your data.  You know, I think I may have gotten it off the tape, but I -- Page 8 or 9 of your, let's see, of that instrument.

Well, let's assume, for purposes of the question, that he said that to you in that section that's reflected on the tape. I mean, I don't have the reference right here.  If I'm wrong about that, Her Honor will certainly know that.

I want to talk about the MMPI that was administered to him in 1985 when he applied for the Sheriff's Department job.  Do you recall that document?

A.   Yes, I do.

Q.   I'll put it up on the screen.  It's Petitioner's 58.  It's dated May 22nd, 1985.  And in fact, Mr. Bourgeois was administered an MMPI when he applied for that job.  Is that right?

A.   That's correct.

Q.   And an MMPI is probably the most long-standing and reliable of the paper and pencil personality tests?

A.   Yes, that's correct.

Q.   And it's over 500 questions?

A.   Yes.

Q.   And significantly, it contains, is it three or four validity scales?

A.   Well, there are now more than that.  At the time this was administered, there were at least three.  There were others that were used.  But there were three main ones, yes.

Q.   All right.  So the point being that the test is designed then and now to sort out people who are exaggerating symptoms?

A.   Yes.

Q.   And it's considered quite reliable in that respect?

A.   Yes, it is.

Q.   In fact, some people use it as a malingering tool, among other things.

A.   Well, it has validity scales that allow us to tell if the person is trying to look bad or look good.

Q.    Okay.

A.    And so it's used for that, as well as personality.

Q.    Okay.  And in regard to personality, it's got, I think --
I don't know what it had then, but somewhere in the
neighborhood of nine or ten personality scales?

A.    Yes.

Q.    Hypochondriac, depressed, paranoid.  Right?

A.    There were nine primary clinical scales.

Q.    Okay.  And one of those clinical scales is, reflects
sociopathic behavior.

A.    Um --

Q.    Scale 6.  Right?

A.    Actually it's Scale 4.

Q.    4?  Okay.  I'm sorry.

A.    But yes, there is one --

Q.    Okay.

A.    -- that does reflect that.

Q.    And you've seen the report of the administration of the
MMPI that's contained in this document.  There's no indication
that either Mr. Bourgeois malingered on this test?

A.    There is no indication that he malingered.  That's
correct.

Q.    And there's no report that he presented at all elevated on
the antisocial scale?

A.    Not in the interpretation that's given.  I didn't see

the --

Q.   The data?

A.   -- the actual test, but not in --

Q.   We don't have the data, so we're left with the report.  It does indicate moderate -- possible problems, I should say, in social facility, possible problems in overall adjustment, and possible problems in stress tolerance.  Correct?

A.   In his interpretation of the MMPI, it does reflect that, yes.

Q.   Were these computer-scored back then?

A.   Could be.

Q.   This is on Page 2.  It says, "He," Mr. Bourgeois, "appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals.  He appears to be somewhat anxious and nervous at times and appears to worry excessively.  His self-esteem does not appear to be very good, as he indicated during the interview he presents himself as a very traditional and moralistic individual."

Now, what I wanted to ask you about that is we've heard testimony, I think you heard it yesterday, that he was very ambitious at his jobs?

A.   Yes.

Q.   Okay.  So that's consistent with what the MMPI is reporting.  It also says, "He lacks the ability to achieve some goals."  Is that consistent, using your phrase, with a

diagnosis of mental retardation, inability to achieve goals?

A.   Well, sure, depending on what the goals are, yes.

Q.   Okay.  His anxiety and nervousness and excessive worry are all consistent with an adult survivor of childhood abuse.

A.   Among other things, yes.

Q.   Okay.  And low self-esteem is also consistent with an adult survivor of childhood abuse.

A.   Among other things, yes.

Q.   So if this document were presented to you pretrial in a capital case with this document and those reports of anxiety and inability to achieve goals and excessive worry, would that pique your interest in exploring the origins for those conditions?

A.   Yes.

Q.   Okay.  You'd want to look into it.

A.   I think it would be something, as a psychologist, that I would want to look into.

Q.   On the next page, in the Summary and Conclusions section, it says, "He seems to be a rather moralistic individual, who believes in right and wrong; however, he shows feelings of inadequacy and problems in evaluating self-worth.  He shows very strong ambition, but it is not clear what he wants or how to get it."

     And again, those observations are, the inadequacy is consistent with childhood abuse?

A.    Well, it's not inconsistent with childhood abuse.  That wouldn't alert me to childhood abuse from that summary and conclusion.

Q.    You'd want to look into why he feels inadequate.  Could be a lot of explanations, one of which is childhood abuse.

A.    That's correct.

Q.    And in combination with the things we just talked about on the previous page, it certainly presents a curious package of symptoms you'd want to explore.

A.    Yes.  He was found by this industrial psychologist to not be suitable to be a police officer.  I think I would want to find out why.

Q.    Okay.

MR. WISEMAN:  Your Honor, I'm not sure we've offered this, but I would offer it at this time, P-58.

THE COURT:  Any objection?

MR. DOWD:  No, Your Honor.

THE COURT:  P-58 is admitted.

BY MR. WISEMAN:

Q.    By the way, Dr. Price, were you ever permitted to review Dr. Moore's report --

A.    Yes.

Q.    -- in this case?

A.    Yes.

Q.    Okay.  Now, leaving aside the question that Her Honor has

indicated we can take a deposition on, there are a few things in your report that -- I'm sorry -- a few things in your testimony yesterday on direct that weren't exactly in your report.  Is that right?

A.    That's correct.

Q.    Okay.  And I take it that your testimony about those things that aren't in your report came up as a result of your meeting with Government Counsel, going through your report and discussing it.

A.    They, those things came up with my review of the work of the neuropsychologist in this, in continuing to analyze all the information in this case, not as a result of meeting with --

Q.    Okay.

A.    -- the Government.

Q.    I misunderstood.  I probably didn't phrase that well.

        MR. DOWD:  Your Honor, I'd ask that the witness be permitted to finish his answer.

        THE COURT:  Go ahead, sir.  Complete your answer.

        THE WITNESS:  I was just clarifying that those opinions did not come as a result of meeting with the Government's attorneys.

BY MR. WISEMAN:

Q.    And I didn't mean to suggest that they did.  My question, inartfully posed, was the way in which you were able to testify about it is you told the Government lawyers in meetings that

you had this additional information to offer.  Didn't just spontaneously appear.  Right?  You said to them, "Hey, I could talk about some other things that aren't in my report."

A.    Well, I was asked questions about --

Q.    Okay.

A.    -- those things, and I had developed it.  And at some point, I told them what I thought of the neuropsychological data.

Q.    Yeah.  I'm not even talking about that at this point.  I'm just talking about generally.  So the point of my question here is that you sat down and you had a long conversation with the Government attorneys -- on more than one occasion?

A.    Well, yes.

Q.    How many times did you meet with them?

A.    I had a long -- excuse me?

Q.    How many times did you meet with them?

A.    Well, the discussion of that --

Q.    I'm not talking about neuropsychology.  I'm just talking about generally, how long did you -- how many times did you meet with the Government attorneys about your findings in this case?

A.    I had one telephone conversation.

Q.    How long did that last?

A.    Between two and three hours.

Q.    Okay.  And how long did the personal meetings last?

A.   On Tuesday evening, maybe a half hour.  Wednesday evening, again, maybe that long or an hour.

Q.   Okay.  So you altogether communicated either in person or on the phone about five hours with the Government lawyers?

A.   I think that would be approximate, yes.

Q.   Your article that we talked about yesterday says, quote, Every capital defense should begin with a biopsychosocial history, closed quote.  And that's on Page 116.  What does that mean?

A.   A complete life history should be conducted by someone to begin an investigation into the records that could be obtained.

Q.   And sources of information in addition to records?  Individuals?

A.   Yes.

Q.   And is it important, in your view, to have that biopsychosocial history early in the development of the mitigation case?  The earlier the better?

A.   Well, I think that's true about any information, yes.

Q.   Yeah, okay.  I mean, as a consulting forensic psychologist, you wouldn't be pleased to receive this information two weeks before a trial started, would you?

A.   I would not.

Q.   How long do you think you'd need, or what do you typically require in terms of receiving this type of information?  Four-and-a-half months?  Five months?  Three months?

A.    I don't have a certain time frame, just --

Q.    Okay.

A.    I mean, every case is different.

Q.    Okay.  You've heard me rattling off all those reports of abuse in that document that I just read to Judge Jack.  If you were provided information like that by a mitigation specialist, would you recommend a neuropsychological battery?

A.    Well, if there was other information, possibly.  But just from what you read, I certainly would recommend a psychological evaluation by someone who was an expert in child abuse.  I didn't hear anything in that, in those documents that you read, about a head injury.  But certainly the abuse would be investigated.

Q.    Okay.  Do you agree that brain dysfunction can be caused by severe and prolonged childhood abuse, even in the absence of a blow to the head; just the stress caused by that kind of abuse?

A.    You know, I do not at this time.  That is an area of some research of late, but I don't think, in my opinion, we're at the place to say that stress in childhood -- or in adulthood -- there's also the idea that individuals with PTSD, that it may alter brain functioning.  But I think that's in the beginning of the research, and I wouldn't ascribe that that was what was going on at this time.

Q.    And if you were provided information about abuse that

contained information about blows to the head, would that cause you to recommend a neuropsychological battery?

A.   Yes.

Q.   You testified on direct examination that you, that Mr. Bourgeois gave concrete responses to a number of the proverbs you administered.

A.   Yes.

Q.   And to be clear, the purpose of administering proverbs in a, in this setting, is to measure abstract thinking versus concrete thinking.

A.   Yes.

Q.   And so a concrete person has trouble interpreting the proverbs.

A.   That's correct.

Q.   All right.  And abstract thinking is a frontal lobe function, isn't it?

A.   Yes, pretty much.

Q.   And to be more precise, when you said he had trouble with them, he really gave no responses at all to any of them, except "Don't count your chickens before they hatch," and "I'll cross that bridge when I get to it."  Do you remember that?  Any other ones he was dumbfounded by.  He didn't respond.

A.   That's correct.

Q.   So he was pretty impaired on proverbs, wasn't he?

A.   He was very quick to say he had no idea what they meant.

Q.   In your experience as a clinician and as a forensic psychologist, could you tell the Court why survivors of abuse or witnesses of childhood abuse within the family are sometimes reluctant to disclose it?

A.   Well, it's especially true with sexual abuse, and they feel often that they were compliant and that in some way they caused it, they allowed it to happen, they were a confederate in the instances, and they're ashamed of it.

Q.   And that's true to some degree as well with regard to physical abuse?

A.   Yes.

Q.   People are ashamed.

A.   Yes, often.

Q.   And they want to deny that they were abused.

A.   Yes.

Q.   And it's often painful for people, witnesses as well as victims, to discuss it.

A.   That's correct.

Q.   Psychologically painful.

A.   Yes.

Q.   It causes distress.

A.   Yes.

Q.   Now, as a practitioner, how do you break through that reluctance?  What do you do?  When you're sitting down with someone that you suspect is abused, how do you get them to open

up?

A.    Development of rapport, trust, showing signs of acceptance, indicating that if it did happen, that you wouldn't blame them for it.  The trust and rapport.

Q.    Okay.  And that's a time-consuming process, I take it?

A.    It can be.

Q.    Okay.  It doesn't often happen on the first visit or the second visit?

A.    Well, I wouldn't say that.  But it, you know, sometimes with some individuals it takes time.  Sometimes it's relatively quick, if you -- if it's the right situation, the right person.

Q.    Okay.  It can go either way.

A.    Yeah.

Q.    Okay.  Now, in your clinical practice, do you, have you ever treated someone who was the survivor of childhood abuse?

A.    Yes.

Q.    And do you have any experience where, you know, I gather 45-minute sessions are typical and 50-minute sessions that you have with folks?

A.    What's the question?  I'm sorry.

Q.    When you sit down with a clinical patient, in a therapy session, is it typically 45, 50 minutes?

A.    Yes.  I don't do treatment at this time, but I understand that's still kind of the standard.

Q.    You used to do treatment, though.

A.    Yes.

Q.    Okay.  And in your experience, have you had patients who took several of those sessions to finally open up and discuss it?

A.    I have had that experience, yes.

Q.    Now, I take it that a psychologist is far more skilled, in theory -- I'm sure you are, but I'm just saying hypothetically -- than a mitigation specialist to go through that process.  You have the expertise.

A.    Well, I mean, I think there's a lot of people able to do that.  A lot of people that I've worked with that were mitigation specialists were trained as psychiatric social workers.  They were quite, quite capable of that as well.

Q.    Okay.  But as a general proposition, you would agree that a licensed, trained psychologist, who teaches psychology to psychiatrists, like yourself, is probably better skilled to get the person to open up.

A.    Well, as a generalization, psychologists with that kind -- with experience in doing that are likely pretty good at doing that.

Q.    Now, you know Mark Cunningham, don't you?

A.    Yes.

Q.    And you've been on both sides of cases with him?

A.    Yes.

Q.    Okay.  Do you think he's skilled in the ability to, you

know, break through and open up people who might be reluctant

to talk about abuse?

MR. DOWD:  Your Honor, can we narrow down the, what

the doctor's basis for this opinion would be?

MR. WISEMAN:  Well, if you know.

MR. DOWD:  Knowing him and working with him, I don't

know the extent of his contact and knowledge of

Dr. Cunningham's abilities.

MR. WISEMAN:  Yeah, and that's a fair point, Your

Honor.

BY MR. WISEMAN:

Q.   If you know, Doctor.  And if you do, tell us how you know.

A.   Well, I do know.

Q.   Okay.

A.   And I have worked with him, as you said, on the same side

and opposite side.  I've reviewed his work on many occasions

and have conducted evaluations with him.  So I do know.  And he

is a person that is skilled in that area.

Q.   And I'm sure there are occasions when you don't agree with

his views in a particular case, but as a general proposition,

he's a practitioner with integrity?

A.   Yes.

Q.   And honesty?

A.   Yes.

Q.   Have you ever known him to get angry?  Over a case, that

is.

A.    Frustrated, a little impatient, like maybe all of us have been, but I've never seen him angry.

Q.    You've never refused to work with him because he's an angry guy?

A.    No.

THE COURT:  Who are we talking about?

MR. WISEMAN:  Dr. Cunningham.

THE COURT:  Were you in here when he testified?

THE WITNESS:  I was.

THE COURT:  Pardon?

THE WITNESS:  I was.

THE COURT:  What do you think?

THE WITNESS:  I think he got frustrated.  I think he was upset.  And I think he has been in this case, from what I have heard and read.

BY MR. WISEMAN:

Q.    In what respect?

A.    Well, that he thought he should have testified.

Q.    Because he had something to say.

A.    That's what he thought, yes.

Q.    When you were given Mr. Bourgeois his mental status exam, I think you started out by explaining to him that it was a means of taking his temperature.  You remember that?

A.    Yes.

Q.   And what did he respond?

A.   That he didn't understand what -- I was saying, I just want to see if you're all right to be here.  It's kind of like taking your temperature.  And he thought it was going to be some kind -- or he said that he didn't want any kind of medical procedure, like a shot.

Q.   Well, actually, that's pretty close.  I have -- I noted that he said -- and the Court, of course, will review the tape. He said, "There won't be any needles, will there?"  You remember that?

A.   Okay.  I said "shot."  He said "needles."

Q.   Yeah, okay.

A.   Yeah.

Q.   So the point being, he totally missed the boat on that. Right?  He didn't catch your meaning?

A.   Right.

Q.   Okay.  You used a metaphor, and he interpreted it about as concretely as a person could?

A.   That's correct.

Q.   And you said yesterday that he doesn't test well.  You remember that?

A.   Yes.

Q.   Okay.  So this is an example where we're not talking about testing.  Right?  You're just talking to the guy, and he gives a response that's as concrete as any of the proverbs that you

tested him on.  Right?

A.    Yes.

Q.    So you can derive from that concrete response that his performance on proverbs isn't because he doesn't test well, it's because he's concrete.

A.    I would say that he's concrete, yes.

Q.    He talked about the anniversary of the death of his daughter.  Do you remember that?  Getting upset at that time.

A.    Yes.

Q.    I think he said it's like a few days away.

A.    Yes.

Q.    Do you remember him saying that in a few days, it's going to be the four-year anniversary?

A.    Well, I don't remember the number of years.

Q.    Okay.  Again, the tape will decide.  But assuming he said four years, that would put the death at 2006.  And of course, the death was in 2002.  Is that some evidence of his mental functioning, that he would be off on such an -- a fact that's so important to him by double?

A.    And evident of my dysfunction, because I didn't pick up on that.

Q.    You didn't pick up on it.  All right.  Well, if the psychological shoe fits.

      Did you notice on the tape at the beginning that he seemed rather interested in communicating to you that he wasn't --

that the crime, to the extent it occurred, didn't happen on the Naval Air Base?

A.   Yes.

Q.   Do you remember when he said he doesn't understand why he's being charged with this by the State of Texas?

A.   No, I don't remember that.

Q.   Well, assume that's what he said, because it's on the tape.  I mean, obviously, he's not being charged by the State of Texas.  He's being charged by the United States of America. Is that right?

A.   That's correct.

Q.   Okay.  So that kind of fundamental misstatement of who the folks who are prosecuting him now eight years into this case again shows a level of impairment and dysfunction.  He's wrong about a very important fact in his life.

A.   Well, he's wrong.  Not every error that someone makes is a sign of some kind of global impairment.  I mean --

Q.   No, of course not.

A.   -- we all make errors.  And if -- and that is a mistake in his thinking if he thinks --

Q.   Okay.

A.   -- that the State of Texas is prosecuting him.

Q.   Now, getting back to this idea that he doesn't test well, would you agree it's possible that he doesn't test well because he's got all the deficits we've been discussing, the low

intelligence, the impulsivity, the borderline personality disorder?  I mean, can't those all contribute to his inability to test well?

A.    Yes.

Q.    So inability to test well is not an excuse for a practitioner to throw out all this psychological, neuropsychological testing.  Right?

A.    No.  I don't think you should throw out the testing.  I think that you'd put it in context and compare it to other information that you have about the person's life, and you do look at effort.

And I think a person with poor educational experiences, you start bringing out tests, and sometimes that, they just think, "Oh, this is like when I was back in school, and I never liked taking tests then," and so that contributes to it as well.

Q.    Okay.  You mentioned that he has an easier time -- and I'm paraphrasing here -- talking about himself than taking the tests.  Is that right?

A.    Yes.

Q.    Okay.  Now, you would agree that he told you a lot of information during your nine hours that you absolutely have no way to verify, one way or the other.

A.    I have no way to verify some of the things he said.  That's correct.

Q.   So for instance, when he says he had a big gumbo pot, you don't know if that's true.

A.   Right.

Q.   You don't know if he can cook gumbo.

A.   That's correct.

Q.   You don't know if he can cook a Pop Tart.

A.   I don't know.

Q.   Okay.  And you have no way of determining whether he had a secret bank account in Memphis to hide money from his wife.  You've never seen bank records for that, have you?

A.   No.

Q.   All right.  So when you've got a person who puffs and exaggerates and wants to look good, and you have no collateral information to verify his claims, you sort of have to rely more on testing than when you have a reliable accurate historian, don't you?

A.   Well, and collateral information that is available and information from other people and from records, et cetera, all of that.  Yes, you do.  I think the point is, to me, as a forensic evaluator, that you don't want to rely solely on self-report.

Q.   Right.  Especially with Mr. Alfred Bourgeois.

A.   And he's one of the ones I would not want to rely solely on self-report.  I could say that as a generalization, that I am uncomfortable with relying on self-report.  I just evaluated

someone that had a doctorate that didn't tell me some very significant information.

Q.   Okay.  Yeah.  And so when Dr. Estrada reported that Mr. Bourgeois reported that he had an idyllic childhood, I mean, in a case like this, you wouldn't just say, "Well, okay, that's the beginning and end of, you know, what his childhood was like."  I mean, you'd want to look past that.

A.   Yeah, I would want to have other information in any forensic evaluation, other than self-report.

Q.   Now, you said yesterday something like when he came back on the second day, he seemed interested in telling you that he really doesn't read as well as he may have indicated the day before.  And I think you described that as he was trying to fix a slip that he had made, words to that effect.

A.   Well, I think he had thought about that and wanted to clarify what he thought I thought.

Q.   Okay.  And you would agree, of course, as we discussed, that if you want to use the phrase "slipped," I mean, he slipped quite a bit in this, in terms of giving you information that made him look good.  I think you testified that he wanted to look good.

A.   Oh, what's the question?  I'm sorry.

Q.   Sure.  If you want to use the term "slipped," to describe Mr. Bourgeois's comments to you on that day, you would agree that he slipped quite a bit in this interview, because he

disclosed lots of information that made him look really good.

A.    And information that made him look bad, too.

Q.    Right.  He gave you a bunch of information, some good and some bad.

A.    That's correct.

Q.    Okay.

      (Counsel conferring off the record.)

BY MR. WISEMAN:

Q.    Dr. Estrada reported that Mr. Bourgeois has above average intelligence, and I think you indicated that -- well, he, do you recall that he reported that, above average intelligence?

A.    I do.

Q.    And there was no indication that any psychological, psychometric testing was done to provide him a basis for that opinion.

A.    That's correct.

Q.    Because he didn't wait to see what Dr. Weiner's results of the IQ testing were.  He just kind of made an assess, a clinical assessment in that setting and arrived at that conclusion.

A.    Yes.

Q.    Okay.  And I think you agree that he was clearly wrong in that regard.  Right?  I mean, Mr. Bourgeois is nowhere near above average intelligence.

A.    That's correct.

Q.   He's not average.  He's not low average.  He's either borderline or mild mentally retarded.

A.   Yes, that's --

Q.   On IQ testing.

A.   Yes, that's correct.

Q.   Now, you don't teach your psychiatrists to opine about intelligence in a death penalty case without psychometric testing, especially when a subject, who we all agree is, presents far better than he actually is.  That's not good practice, is it?

A.   No, it's not good practice.

Q.   You were discussing his facility and familiarity with the Bible.  Do you recall that?

A.   Yes.

Q.   Were you aware that Judge Jack, from the time of this trial, has put in place a communication limitation order, and as a result of that, Mr. Bourgeois is not permitted phone calls or mail communication with anyone but his legal team?

A.   I am aware of that.

Q.   We get all those long letters now.  And that as a result, he doesn't have access to funds and such, other than what his legal team might be able to provide.

     If the Bible is the only thing, the only book he has to read, does that -- and he's in isolation pretty much 24 hours a day, seven days a week, would you agree that his familiarity

with the Bible, with a sixth grade reading level, which is what I think he has, based on the testimony, that it doesn't add a whole --

MR. DOWD:  Your Honor, I think Counsel's testifying.

MR. WISEMAN:  I'm sorry, you're right.

MR. DOWD:  That's not in the record.  I would ask that that --

MR. WISEMAN:  I withdraw that.  I withdraw it.  I went too far there.

BY MR. WISEMAN:

Q.   The point being, if all he's doing is reading the Bible, you would agree that his facility, his familiarity with it doesn't really, isn't really inconsistent with mental retardation.  He's sitting with this book day after day, reading it over and over again.

A.   Well, I think that it's inconsistent with mental retardation, to be able to read and understand and conceptualize some of the things that he was able to talk about, yes.

Q.   You said that he wrote his paragraph for you in a, quote, normal amount of time.  You would agree that there's no -- you weren't using any standardization when you opined that it was normal.  I mean, you don't have a chart that says this is how long it should take a person to write a paragraph.

A.   No, I don't.  That was a subjective interpretation on my

part.

MR. WISEMAN:  All right.  I think that's all I have, Your Honor.  Thank you, Dr. Price.

THE COURT:  Thank you, sir.  Anything further?

MR. WISEMAN:  Oh, you know what, Your Honor?  I missed one question.  I'm sorry.

THE COURT:  Go right ahead.

MR. WISEMAN:  I reminded myself.

BY MR. WISEMAN:

Q.  You talked about his lack of adaptive -- to the extent you agree there's any lack of adaptive skills, they may be better attributed or caused by his cultural deprivation, something like that.

A.  I believe I testified that some of the problems that had been interpreted as being adaptive behavior deficits, in my opinion, are consistent with a personality disorder rather than mental retardation.

Q.  Right.  I get that.  But I thought you also said that some of these deficits could be attributable to a cultural deprivation, his impoverishment, his poverty, his lack of education, things like that.

A.  Well, as I recall, when you and I were discussing the impoverishment and the lack of cultural enrichment, that was in relationship to his low intelligence.

Q.  I thought you had said it on direct.  But in any event,

you would agree that according to the 11th edition of the AAIDD manual, that risk factors for intellectual disability can include impaired child giving (sic) interaction, lack of adequate stimulation, family poverty, chronic illness in the family, things of that nature.  So environmental factors can contribute to a person's development of MR.

A.    Yes.  And it's, that's -- I think what I was saying, it said there that intellectual deficits can be attributed to that.

Q.    Okay.

A.    And I totally agree with that.

Q.    Okay.

A.    Absolutely.

MR. WISEMAN:  All right.  That's all.  Thank you, sir.

MR. DOWD:  Your Honor, I don't have any redirect, but I did want to clarify with Dr. Price, for purposes of Mr. Wiseman's motion for deposition, what norms he did use to evaluate Dr. Weiner and Gelbort's evaluation of the Trail Making Test in 2004 and 2007, as well as the category, his evaluation of Dr. Weiner's conclusions based on the category test.  And I would just like to clarify that for the record.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. DOWD:

Q.    What were the norms that you employed in evaluating those opinions by Dr. Gelbort and Dr. Weiner regarding the Trail Making and the Category Test?

A.    Yes.  They are the published age and education norms for neuropsychological tests, compiled by Dr. Robert Heaton, H-E-A-T-O-N.

Q.    All right.  For both analyses?

A.    Yes.

         MR. DOWD:  That's all I had, Your Honor.  I just wanted to clarify that.

         MR. WISEMAN:  I have nothing further, Your Honor.

         THE COURT:  Thank you, sir.  You may stand down. Call your next witness.

         MR. DOWD:  May Dr. Price be released, Your Honor?

         THE COURT:  Any objection?

         MR. WISEMAN:  I'm sorry, I didn't hear that.

         MR. DOWD:  I asked if Dr. Price could be released.

         MR. WISEMAN:  Oh, absolutely.

         MR. DOWD:  Thank you, Your Honor.  We call Jerrilyn Conway, Your Honor.

         MS. BOOTH:  And Judge, while we're waiting for the witness to come in, a little earlier from a Defense Exhibit -- I mean Petitioner's Exhibit Number 61, when you asked Mr. Wiseman to read from the reports to talk about the abuse that was stated, I feel like I need to add a line or two --

THE COURT:  Go ahead.

MS. BOOTH:  -- to where he was reading.  He read off of Petitioner's Number 61 that "Mom never bought Alfred any" --

MR. WISEMAN:  What page, please?

MS. BOOTH:  That is Page 2.  "Mom never bought Alfred" -- and this is Alfred speaking to the --

MR. WISEMAN:  Page 2 of where?

MS. BOOTH:  Of 61.

MR. WISEMAN:  I know, but there's a lot of Page 2s.  It's a compilation of --

MS. BOOTH:  Well, I'm reading, okay, 004582, your Bates stamp.

MR. WISEMAN:  Okay.

MS. BOOTH:  And he read that "Mom never bought Alfred any toy or new toys or anything.  'When I was with her, I didn't know what a new toy was.  Mom just wouldn't buy me anything.  I don't remember Mama never buying me anything.'  He never had any new clothes during the time he lived with his mother.  His brothers got the new clothes.  He got the hand-me-downs.  And he used to sneak clothes from his brothers outside and change after he had left for school.  His mom wouldn't let him wear anything nice, so he would have to leave the house, then change into his brother's clothes.  'I was the black sheep of the family.'  Alfred thought his mom treated him like a girl regarding chores or household duties.  Alfred was

the only boy that mom made wash the dishes after supper or help put all the clothes on wash day.  Alfred often had to do the girls' chores when his brothers were never made to do the girls' chores.  'I got treated like a girl.'"

MR. DOWD:  Your Honor, may I step out for about two minutes while Mrs. Booth is conducting --

THE COURT:  You all can keep going in and out, as long as somebody's here from each side.

MS. BOOTH:  Okay.  I just wanted to add that to the reading, Your Honor.

MR. WISEMAN:  And I have no objection to that.  In fact, I would renew my offer to just let the Court have the packet, and you can read it at your leisure and --

THE COURT:  Okay.  Any objection to --

MS. BOOTH:  Not at all, Your Honor.

THE COURT:  What's it called?

MR. WISEMAN:  61A.

THE COURT:  P-61A is admitted.

MS. BOOTH:  It's Alfred Bourgeois's statement.  So it's --

THE COURT:  Is it labeled on there that it's his statement?

MR. WISEMAN:  Well, there's a number of statements, as I read to the Court, including his.

THE COURT:  Oh, okay.  Okay.  That's a packet of

statements.

MR. WISEMAN: A packet of statements.

THE COURT: Got it. Okay.

MR. ROBERTS: Your Honor, just so -- excuse me -- so I can clarify, we had a whole list of exhibits that we were going to put into evidence with Dr. Oliver. They are obviously now, we're not going to offer them, so our exhibits are going to, just so the record's clear, we're going to have some that are -- we do have some that are listed in the high numbers of the 100s and 200s -- and the low numbers of the 200s. And there's going to be a big gap between some of our exhibits. But we would have the opportunity to put those on, if necessary, on the deposition --

THE COURT: Yes.

MR. ROBERTS: -- if necessary? Thank you, Your Honor. And the next witness is -- Mark Dowd.

(Witness sworn.)

MR. DOWD: Ms. Conway, do not touch the microphone.

THE WITNESS: Thank you.

(Stopping at 9:38:05 a.m.)

(TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED.)

(Beginning at 12:13:00 p.m.)

MR. ABREU: Your Honor, may I offer Petitioner's Exhibits? There are one or two that I needed to make a copy of, and I'll provide to Ms. -- they were -- oh, I'm sorry.

Petitioner's 179, Your Honor.

THE COURT:  Any objection?

MR. DOWD:  179, no objection, Your Honor.

THE COURT:  P-179 is admitted.

MR. ABREU:  And I do have a motion, Your Honor, with regard to this particular claim, whenever the Court's ready.

THE COURT:  Which claim?

MR. ABREU:  The alleged semen claim.

THE COURT:  Okay.

MR. ABREU:  As Your Honor is aware -- or I don't know if Your Honor is aware -- but there's been some back and forth regarding what documents were produced at what time in regards to time of trial.  This document, Petitioner's 179, which I questioned Ms. Conway about, is a document, as I've noted before, I had never seen before.

Certainly, there was no testimony at the time of trial regarding very weak, very weak, or weak.  And certainly Mr. Tinker didn't ask any questions reflective of the fact that he had that particular document at the time.

THE COURT:  Well, you don't have any evidence that he didn't.

MR. ABREU:  No, no, I'm not saying that yet.

THE COURT:  Okay.

MR. ABREU:  We're trying to figure this out right now.  And Ms. Johnson did not have that particular document at

the time, as she testified.  She had no information regarding the strength of the tests.

My understanding is that the Government went back and did a review of -- let me just also say, to preface that, that I have searched all of our 12,000 pages that we received from trial counsel, which we then re-provided to the Government.  I have searched those 12,000 pages for this one document, and this one document does not exist in those 12,000 pages.  That still leaves a possibility that it somehow got removed between the time it got from trial counsel to us.

My understanding is that the Government has gone back and reviewed how these files came into existence.  Apparently, the FBI sent them to the Government back at the time of trial.  The Government then produced three copies, one of which was sent to trial counsel, which is the one that we eventually ended up with, I presume, because it's not in that one either, and --

MR. DOWD:  Which one?

THE COURT:  Wait a minute.  So P-179 trial counsel had at the time of trial.

MR. ABREU:  No.  We don't know that yet.  And, but let me say this.

THE COURT:  I thought you said --

MR. ABREU:  No.

MR. DOWD:  I can clarify, Your Honor.

THE COURT:  Okay, Mr. Dowd.

MR. DOWD:  This is what I understand happened.  I wasn't here at the trial time, but the FBI shared their entire lab file with the Government.

THE COURT:  Okay.

MR. DOWD:  We took that and made three copies.  One copy we sent to Mr. Tinker.

THE COURT:  Okay.

MR. DOWD:  Two copies, we kept.  One just as a standby copy.  The other is part of the working file.  We've gone back, once this came up yesterday, we went back and looked at our original FBI file, the one that was provided to the Government, and this document, P-179, is in there.

THE COURT:  Okay.

MR. DOWD:  We went to the next copy of our FBI file, which is the copy we're preserving, and it's in that copy as well.  We went, then went to the third copy, which is the, or what was part of our working file, and it's not contained in that working file.  Other documents are contained in there. There's several other documents from the FBI file which are also not contained in that third working file.

So what I believe -- what I believe is that we made the copies of the original FBI file.  That document was in there, because it's in one of our copies.

THE COURT:  Okay.

MR. DOWD:  One of our copy files.  So that's why I believe it went to Mr. Tinker, because if the copier made one copy, then it would have made the three copies.  If two pages stuck together, we wouldn't have any copies of this page in any of our copied files.  So it's our position that Mr. Tinker got it, on that basis.

MR. ABREU:  Are you finished?

MR. DOWD:  I'm finished.

MR. ABREU:  And our contention, Your Honor, is that there is a working copy that does not contain this particular document, and that the files that were sent to Mr. Tinker could just have easily have come from that particular copy that didn't contain this, and that the evidence presented at trial, and Mr. Tinker's questioning at the time of trial, which the Court can go back and take a look at, is reflective of him not having received this, in conjunction with the testimony of Ms. Johnson.

So our motion, Your Honor, is to amend the claim as currently written to include a component alleging the violation of Brady versus Maryland for the Government's failure to disclose this particular document, P-179, Your Honor.

THE COURT:  Okay.  And that's the evidence that you've got to support that?

MR. ABREU:  Well, there's more in the record, which we'll cite to you when we come back and address this in

argument or in, I mean, I can make other -- I just don't know the entire record cold of every question Mr. Tinker asked, and I would like to show that to the Court at some point.

MR. DOWD: Judge, I have one more clarification.

THE COURT: Yes, sir.

MR. DOWD: Actually, the file that was digitized and sent to the present defense team, unfortunately, was made from --

THE COURT: The working file.

MR. DOWD: -- our working file.

THE COURT: Okay.

MR. DOWD: And I can verify that that's the file that was used unfortunately to --

THE COURT: And you got your working file from the original one that had it in there?

MR. DOWD: We got the working file from the original one that had it in there, but unfortunately people have gone in and placed documents in there that shouldn't be in there and have removed documents that should be in there. So we have a secondary copy file, which is complete, and it mirrors the original FBI file. And that document is in our --

THE COURT: And that's the one you used to make the extra copies?

MR. DOWD: No. We used the working file to provide the Public Defender with the FBI file. That's why it's not in

their file.

THE COURT:  No, no, I'm talking about the trial team.

MR. DOWD:  Oh, the trial team --

THE COURT:  What file did you use?

MR. DOWD:  We took the original FBI file and we made three copies.  We sent one copy to Mr. Tinker.  We kept one, and we kept that one in pristine condition.

THE COURT:  Okay.

MR. DOWD:  That one contains this document.

THE COURT:  Okay.

MR. DOWD:  That's why I believe Mr. Tinker got his.

MR. ABREU:  Your Honor, our contention is that in the context of the questions that Mr. Tinker was asking -- and Your Honor can go back and look at the transcript.

THE COURT:  I have looked at that.

MR. ABREU:  Oh, I'm sorry.  And if you look at all the questions he's asking all the witnesses, for somebody who's trying to disprove that this is a positive test for p30 and semen, it would seem obvious to me that if he had this document, he would then be arguing that it was very weak, very weak, or weak, and bringing that out with the witnesses.  And in fact, if he did not -- if he had, if he had that particular document and didn't use it, that would only strengthen our ineffectiveness claim.  So it's either a Brady claim or it's an ineffectiveness claim.  Either way, Your Honor.  But I would

say it's good evidence of a Brady claim.

THE COURT:  I'm not going to allow you to amend for the Brady claim, because I think that's futile.  There's no evidence that they didn't get it.  In fact, there's evidence that they did.  But if you want to use it for ineffective, you can use it for ineffective.

Okay.  Move along.

MR. ABREU:  I'm just going to take a second to collect my documents here, Your Honor.

THE COURT:  You all want to have lunch?  Okay.  Oh, we've got noon settings.  Sorry.

Okay.  So we're going to break for lunch, come back at 1:30.  How many more witnesses?

MR. ROBERTS:  Well, Your Honor, we were going to offer a bunch of documents.  And if those documents came in, we would only have one more witness.

THE COURT:  Dr. Moore?

MR. ROBERTS:  Yes.

THE COURT:  Okay.

MR. ROBERTS:  But if they don't just allow it in, we've got to offer them through the witness, Your Honor.

THE COURT:  Well, talk to them over the lunch time.  Y'all share lunch and visit.

MR. ROBERTS:  Yes, Your Honor.

(Recess from 12:21 p.m. to 1:35 p.m.)

THE COURT:  Thank you.  You may be seated.  Would you call your next witness.

MR. ROBERTS:  Yes, Your Honor.  Before we do that, there's a couple of evidentiary issues.

THE COURT:  Okay.

MR. ABREU:  Your Honor, there actually are a couple.  And if I may, may I ask a point of clarification of the Court's earlier ruling --

THE COURT:  No.

MR. ABREU:  -- regarding -- a point of clarification?

THE COURT:  No.  Go ahead and -- what else do you have?

MR. ABREU:  There's another matter, Your Honor.

MR. ROBERTS:  I believe the Defense wanted to offer an exhibit.

MR. McHUGH:  Your Honor, yes.  I would ask that -- there's a Government Exhibit that was marked as Government Exhibit 169 prior to the -- I'm sorry -- prior to the hearing, and I'd be asking if -- the Government has indicated they're not offering as part of their case in chief, and I'd be asking if we could have it moved in as a Defense Exhibit.  Our next Number would be 182.  It's a document provided to us from the Government.  It's a letter from Ms. Patti Booth to the Texas Board of Pardons and Paroles.  It's relevant to our Brady claim concerning Mr. Longoria.

MS. BOOTH:  Your Honor, there is no evidence to proceed on that.  And I did provide it to them.  And we intended, if we had to defend that issue, we were going to defend it.  It wasn't addressed.

THE COURT:  So their objection -- your objection?

MS. BOOTH:  Is that their case is closed, Your Honor.

THE COURT:  Sustained.

MS. BOOTH:  Thank you.

MR. ROBERTS:  Your Honor, I have several Government exhibits that I'd like to offer at this time, and I've already showed it to the Petitioner.  That would be Government Exhibit 27, which is a letter by --

THE COURT:  Just call them out.

MR. ROBERTS:  Okay, Your Honor.  Government Exhibit 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41 and 43.

MR. WISEMAN:  And we have no objection.

THE COURT:  I'm sorry, after 39 there was what?

MR. ROBERTS:  I'm sorry, Your Honor.  39, 40, 41, we're skipping 42, but we have 43.

THE COURT:  43.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Government's Exhibits 2 through 41 are admitted -- 27 through 41 are admitted, and 43.

Call your next witness.

MR. ROBERTS:  Your Honor, the United States calls Dr. Moore.

THE COURT:  Could you come forward, please, sir.

(Witness sworn.)

MR. ROBERTS:  And Dr. Moore, you've been present throughout these proceedings.  So, Your Honor, I can assure you that he's more afraid of touching your mike than anything else.

THE COURT:  Good.

MR. ROBERTS:  And we've talked about it several times.  So you've been warned, Dr. Moore.

ROGER BYRON MOORE, JR., GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Moore, could you state your full name for the record, please?

A.   Roger Byron Moore, Jr., Ph.D.

Q.   Can you tell us the city and state where you reside?

A.   Cary, North Carolina.

Q.   What is your role, what is your role here in this case?

A.   I am a clinical and forensic psychologist who was asked to do an evaluation in relation to mental retardation with Mr. Bourgeois.

Q.   Did you prepare a curriculum vitae and provide that to the United States?

A.   Yes, sir.

Q.    I'm showing you what's been marked as Government Exhibit 17, and I'll ask --

THE COURT:  Any objection?

MR. WISEMAN:  No objection to it being moved in.

THE COURT:  Government's Exhibit 17 is admitted.  You can still refer to it if you want.

BY MR. ROBERTS:

Q.    Also, did you prepare a list of your history of testimony and depositions since January of 2006?

A.    Yes, sir.

Q.    I'm showing you what's marked as Government Exhibit 18. Do you recognize that?

A.    Yes, sir.

Q.    Is that what you prepared?

A.    Yes, sir.

MR. ROBERTS:  I offer that, Your Honor.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry, Number what?

MR. ROBERTS:  It's Government Exhibit 18.

THE COURT:  Government's 18 is admitted.

MR. ROBERTS:  Your Honor, I'm going to go ahead and hand the CV to the -- I'll hand it in so the Court has a copy of that.

BY MR. ROBERTS:

Q.    Dr. Moore, can you tell us, what is your area of

expertise?

A.   It's clinical and forensic psychology.

Q.   And how did you come to be experienced in that area?

A.   Through education and experience.  I have two master's, a Ph.D. and two post-docs.

Q.   Tell us what those degrees are in.

A.   My bachelor's degree is in psychology.  My first master's is in mental retardation and developmental disabilities.  My second master's is in clinical, and my doctorate is in clinical.  The two post-docs are in, one's in cognitive research and therapy and the other is, was a behavioral sciences fellowship.  Basically it's behavioral medicine.

Q.   And do you have a subspecialty?

A.   Well, I work with mental retardation, clinical issues and forensics.  Within my general practice, I see a wide range of patients.

Q.   You mentioned several areas that you, in your education.  Do you have a specific education that you, that would qualify you as an expert in the mental retardation assessments?

A.   Yes, sir.

Q.   What would that be?

A.   I have a master's degree in mental retardation and developmental disabilities, and I have additional training and work experience in working with a population of -- with mental retardation, referred to as intellectual disabilities now.

Q.   Could you please tell Judge Jack what your experience is with IQ testing?

A.   My experience with IQ testing goes back to the earliest stages of my master's training.  So I guess we began being trained in intellectual assessment back in about '85, '86, somewhere along there.

THE COURT:  Where is East Carolina University?

THE WITNESS:  It's in Greenville, North Carolina, ma'am.

THE COURT:  Thank you.

BY MR. ROBERTS:

Q.   What about your experience in assessing adaptive functioning?

A.   That, too, began back in that program at East Carolina.  But the training in assessment has continued throughout the training programs noted here.  That was ongoing at the time of my training.

Q.   How many times have you testified in any kind of hearing?

A.   In any kind of hearing, it would be over a thousand.

Q.   And I know you have some experience in, I think you called it the Panel of Medical Experts that is ran through the Office of Hearings and Appeals?

A.   Yes, sir.  I'm on the Panel of Medical Experts that's maintained by the Office of Hearings and Appeals with the Social Security Administration.

Q.   Does that have any relevance to mental retardation or assessment?

A.   It does.  The Social Security Administration has a couple of programs, Title 2 and Title 16, which are disability programs.  And people can apply for funding basically under that, receive disability payments.  And one of the areas under which they can obtain disability is mental retardation.

Q.   In the criminal context, now I'm going to move to the criminal context and ask you, have you testified for both Defense and Government in the criminal context for forensic psychology with mental retardation as the focus?

A.   Yes, sir.

Q.   And how many times do you think, in the criminal context, that you testified in a case either for the Government or the Defense?

A.   In the criminal context, it's probably been about a dozen or so.  And then there have been some civil cases as well.

Q.   And is there a percentage that you can break down of how many times you've been asked by a Defense to assist their trial team versus how many times you've been asked by the Government to assist their trial team?

A.   I would say at this point the ratio is probably 80/20.  About 80 percent of the time or so, I've been with the Government, and about 20 percent of the time with the Defense.  But then again, as we get into civil cases, those numbers

switch a bit.

Q.   Tell us what the numbers are for civil cases.

A.   Probably closer to 70/30.

Q.   And what is the focus of those civil cases?  Is it obtaining benefits and services?

A.   No, sir.  That would be cases where, for example, somebody has been in an automobile accident and there's post-traumatic stress from that, or there were a number of cases where persons with intellectual disabilities, the contention had been that they had been abused within an institutional setting, and I was helping to establish evidence that they had experienced emotional trauma from that.

Q.   In the cases that you've testified in, have you been qualified as an expert in clinical and forensic psychology and also in mental retardation assessments?

A.   Yes, sir.

Q.   Have you ever been denied qualifications as an expert in those instances?

A.   No, sir.

        MR. ROBERTS:  Your Honor, we would proffer Dr. Moore as an expert in clinical and forensic psychology and in the field of mental retardation assessment.

        MR. WISEMAN:  May I inquire, Your Honor?

        THE COURT:  I'm sorry?

        MR. WISEMAN:  May I inquire?

THE COURT:  About?

MR. WISEMAN:  Qualifications.

THE COURT:  Oh, on voir dire.  You can take him on voir dire, sure.

VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Moore.

A.   Good afternoon.

Q.   I noticed on your curriculum vitae on Page 4 that you list as a publication "Modification of Individual Scores, IQ Scores" -- that says "in," I guess that should be "is" -- "Not Accepted Professional Practice."  And that's a publication that you did in psychology of mental retardation and developmental disabilities.  What's that article about, briefly?  I mean, what --

A.   I'm sorry, I don't have that publication in front of me. But that's not a peer-reviewed article.  Let me be clear about that.  When I list publications, I just simply have listed articles or things that have been written, some in peer-review journals, some not.  But in case, in this context someone needs to be able to pull out things that I've written.  That was a letter to the newsletter that is put out by the Division 33 from the American Psychological Association, which is the division on intellectual disabilities, and the letter had to do with my disagreement in applying the Flynn Effect modification

to the actual scores on IQ tests.

Q.   And is this the letter?  My scratch is on there, but is that the letter to the editor?

A.   Yes, sir, it is.

Q.   Did you have anything to do with the submission of these photographs in that particular publication of Division 33?

A.   No, sir.

Q.   How about those?

A.   Did I have anything to do with the submission of the photographs?

Q.   Yeah.  I mean, you submitted a letter to the editor.  I wondered if you sent any pictures.

A.   Oh, no, sir.

Q.   Oh, okay.  Just the letter.

A.   Yes, sir.

Q.   Okay.  Did I hear you say that you've testified about post-traumatic stress disorder from automobile accidents?

A.   Yes, sir.

Q.   And finally, when was the last time you were retained by Defense Counsel in an Atkins situation?

          THE COURT:  So what does this have to do with the qualifications?

          MR. WISEMAN:  You know what, you're right.  It doesn't.

          THE COURT:  Thank you.  Would you proceed.

MR. ROBERTS:  May he be accepted as an expert in these fields, Your Honor?

THE COURT:  Any objection?

MR. WISEMAN:  No objection.

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

DIRECT EXAMINATION (Continued)

BY MR. ROBERTS:

Q.  Dr. Moore, did you prepare a report about everything that you did in this case?

A.  Yes, sir.

Q.  Does your report accurately reflect your analysis and your conclusions from this case?

A.  Yes, sir.

Q.  Have you had a chance to review that report?

A.  Yes, sir.

Q.  In fact, you made several corrections, typographical errors and other things a couple of times in putting this particular report together.  Is that correct?

A.  Yes, sir.

Q.  Okay.  I'm showing you what's marked as Government Exhibit 15.  Does that look like the first page of your forensic psychological evaluation?

A.  Yes, sir.

MR. ROBERTS:  This is a 21-page document, Your Honor.

I would offer Government Exhibit 15.

MR. WISEMAN:  Your Honor, I would have no objection if the witness could identify the places where he's made changes, because it's a long document.  And although Mr. Roberts provided it to me, I haven't had a chance to figure out what's different.

MR. ROBERTS:  It might be easier, Your Honor, just to have him testify about what changes you made.

BY MR. ROBERTS:

Q.   Were they substantive changes or just typographical errors?

A.   Typographical errors in general.  There was one place where I had misworded where the phrase was "at least two standard deviations below the mean," which was a phrase we're very, it's been very commonly used throughout the statistics work that I've done and whatnot.  And I needed to change that to "approximately two standard deviations below the mean."  So literally it was a single word change.  I did that in two places, where I --

MR. WISEMAN:  With that, I have no objection, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. ROBERTS:  May the exhibit be admitted, Your Honor?

THE COURT:  Exhibit Number?

MR. ROBERTS:  15, Government Exhibit 15.

THE COURT:  Government's 15 is admitted.

BY MR. ROBERTS:

Q.   Dr. Moore, did you also have to prepare an addendum to your exhibit?

A.   Yes, sir.

Q.   To your report?  Why did you have to prepare an addendum?

A.   The report was due on a Friday, and about a little after 9:00 o'clock the preceding night before it was due, but after the report had been written, I received about 95 pages worth of materials from Dr. Swanson, which I had not seen before.  And so I didn't have time to review those and integrate them into the report.  It was due the next day.

Q.   Show you again Government Exhibit 15, your report.  Is that noted on this report anywhere?

A.   Yes, sir, it is.

Q.   Where is it noted?

A.   It was a footnote.  Off of the date of the report, there's a footnote sign at the bottom.  It indicates the reasons that the addendum would be submitted.

Q.   You're referencing Footnote 1?

A.   Yes, sir.

Q.   Where it says, "The current author received 95 pages of materials," and then it continues?  And did you have a chance to review all those documents, and does the addendum that you

prepared accurately reflect your review and your analysis and your conclusions of the documents you received from Dr. Swanson?

A.    Yes, sir.

Q.    I'm showing you what's marked as Government Exhibit 16, Forensic Psychological Report Addendum.  Is that the document you prepared?

A.    Yes, sir.

Q.    It is a one, two, three-page document.  Is that your signature on the last page?

A.    Yes, sir.

MR. ROBERTS:  Your Honor, I'd offer the addendum, Government Exhibit 16 at this time.

THE COURT:  Any objection?

MR. WISEMAN:  Your Honor, I'm not sure.  The addendum I have is on letterhead, and the document Mr. Roberts put up is not.  I'm assuming it's the same document.  I'm not sure it is, though.

MR. ROBERTS:  I'll give it to Defense Counsel to review, Your Honor.

(PAUSE.)

MR. WISEMAN:  What Mr. Roberts just handed me is what I previously had, but I'm not sure that's what he put up on the screen.  So if he's offering what's marked as 16, I have no objection.

THE COURT:  Which are you doing?

MR. ROBERTS:  Your Honor, I'm going to substitute the -- it was my copy that I had put the evidentiary mark on, so I'm going to substitute that and ask Dr. Moore if he can --

THE COURT:  Okay.

MR. ROBERTS:  -- see this.  And I will change the exhibit number.

BY MR. ROBERTS:

Q.   Doctor, as Mr. Wiseman correctly pointed out, the one I put up did not have a letterhead on it.  This document has a letterhead on it.  Is that from your business?

A.   Yes, sir.

Q.   And is this addendum, the one with the letterhead on it, is it the exact, as the copy that you reviewed earlier?

A.   Yes, sir.

Q.   And again, it's a three-page document, with your signature on the last page?

A.   Yes, sir.

Q.   And that signature is the exact same as, and as far as the date and the signature block area?

A.   Yes, sir.

MR. ROBERTS:  Your Honor, at this time I would offer the corrected addendum with the letterhead.

MR. WISEMAN:  No objection.

THE COURT:  Government's 16 is admitted.

BY MR. ROBERTS:

Q.   Dr. Moore, did you also have an opportunity to interview Alfred Bourgeois at the end of June 2010?

A.   Yes, sir.

Q.   The Government has offered and the Court has accepted Government Exhibits 19, 20, 21 and 22.  They are purported to be videotapes of your interview with Alfred Bourgeois.  Have you had a chance to observe those?

A.   Yes, sir.

Q.   Are they accurate and depict the interview you had with Mr. Bourgeois?

A.   Yes, sir.

Q.   Do you recall when you were first contacted in this case?

A.   I believe it was in July of 2009.

Q.   Do you recall the context in which you were contacted and what you were asked to do?

A.   I believe it was you, Mr. Roberts, who contacted me by telephone to talk a little bit about the matter at hand, perhaps about my availability, but I think even more so just asking a little bit about these types of situations.

Q.   What was your understanding at that time as to why you were being asked to evaluate the evidence in this case?

A.   To see, or to obtain my take on whether there was evidence that Mr. Bourgeois was mentally retarded, at a sort of a first glance level, if you will.

Q. Do you recall, I mean, obviously you accepted the opportunity to review the evidence in this case. Do you recall what we sent to you?

A. There was a CD that had a substantial amount of material, trial data, declarations, testing, et cetera.

Q. Government's Exhibit 15 has a list of the materials that you reviewed on the first page. I ask you just to glance down that real quick. And I'll also ask you to look at the second page. It says, "Materials Reviewed Continued."

A. Yes, sir.

Q. Did you actually review all that information?

A. Yes, sir.

Q. Did you read all the transcripts?

A. Yes, sir.

Q. After you read all the transcripts, do you recall having additional conversations with myself or other members of the trial team?

A. Yes, sir.

Q. And what exactly did we ask you to perform, as far as your role in this case?

A. In general, you asked for me to perform an assessment of whether Mr. Bourgeois was mentally retarded or not. And as we went further in the case, my role became somewhat more refined.

Q. Did we ask -- you heard Dr. Price testify a little earlier about splitting up of duties. Can you tell the Court kind of

how that came about?

A.    Yes, sir.  There were two of us who had been contacted on the case who had expertise in this area, and determined that it would be beneficial to divide the duties to be able to take care of them more efficiently.  And so Dr. Price did more of the intellectual component, and I focused more on the adaptive functioning component.

Q.    I want to talk to you about some general terms and concepts first.  Obviously I'm not going to waste the Court's time going into detail about every concept in this, but there are some things that are important, so let me draw your attention on your, in your report.  You did two addendums, did you not -- or appendixes, didn't you?

A.    Yes, sir.

Q.    Do you recall what Appendix A and Appendix B are?

A.    Yes, sir.

Q.    Can you briefly summarize for the Court what addendum -- what Appendix A, the importance of Appendix A?

A.    Yes, sir.  There are two definitions of mental retardation that are primarily described at this point in time, one of them from the DSM-IV-TR, the Diagnostic and Statistics Manual, the other which has been promulgated by the AAIDD.

And it was my understanding -- one of the first questions always asked or that I always ask in these types of matters, because the definition of mental retardation under Atkins was

left to the states, is what's the prevailing definition?  And my understanding was that with current case law in this matter, it would be the definition that's currently denoted in the DSM-IV-TR.  And so I wrote my report based on that, but included as Appendix A how the data would be interpreted under the definition that's currently put forth by AAIDD.

Q.  Yeah, we've heard some testimony earlier, I'm showing you now what is Page 20, what is Page 20 of Government Exhibit 15. And I'm going to ask you, draw your attention to -- we heard testimony from Dr. Swanson and I asked her some questions about the different categories of domains and the ten domains.  You say in your letter here that the DSM-IV focuses on deficits in two or more of ten specified domains, whereas the AAIDD focuses on three broad domains.  Is that what you mean when you say there's actually two different kind of competing definitions for what we define in the area of adaptive functioning for mental retardation?

A.  Yes, sir.  Yes, sir.

Q.  So if someone reads this Appendix A, they would be able to understand kind of how the definition of mental retardation is kind of working its way out in your professional capacity and in the legal setting?

A.  Yes, sir.

Q.  You had an opportunity to review Dr. Swanson's adaptive deficit analysis.

MR. ROBERTS:  And if I could retrieve Petitioner's Exhibit 33.

(PAUSE.)

BY MR. ROBERTS:

Q.   I'm showing you what's Petitioner's Exhibit 33, Ms. Swanson's consultation.  It's dated August 12, 2010.  Did you have an opportunity to review this document?

A.   Yes, sir.

Q.   And you were sitting in here for Dr. Swanson's testimony?

A.   Yes, sir.

Q.   And in general, I don't want to get into the details of her conclusions yet, but in general, with regard to the two areas, these two separate areas of the DSM-IV and the AAIDD's definitions, I'm showing you on Page 3 of her report, which of those two definitions did she apply in her analysis?

A.   It appears that she applied the one of three, the three broad domains, but she also included bold and underlined sub-domains, if you will, from the two of ten.  So the two of ten is somewhat noted in there, but it appears that she's broken down her report in general by the three broader domains.

Q.   Can you tell from her report which of the two definitions she's actually relying upon?

A.   I believe she's relying on, or it appeared to me, from her report, that she was relying on the one of three.

Q.   I want to talk for just a minute about intellectual

functioning.  And we know that Dr. Price pretty much covered that area.  But do you have any significant expertise or experience with the Flynn Effect?

A.    Yes, sir.

Q.    Tell the Court a little bit about your understanding of the Flynn Effect.

A.    The Flynn Effect is based on a collection of research studies that Dr. Flynn had pulled together where he had made the observation that when newer tests are normed and there's reliability checks with previous versions of the same test or groups are tested over time with the same test, that there are changes in the population means on those.

And in general, through the 20th century, those population means tended to rise.  And so at a general level, the Flynn Effect refers to changes at a population level on -- in performance on IQ measures over time.  By and large, they have been in an upward direction, not exclusively.  They've fallen over a relatively wide range.

He then took the next step and said if there is -- let's just for ease sake say that there is a three-point rise, and there were ten years between when one test was standardized and the other test was standardized, then divide the three points by ten, and it would be approximately three points per year that the population performance is changing.

There is a controversy over whether that's exactly what it

means. What we do know is that the farther a test gets from its norming date, the less reliable the standardization is, because populations change in various ways.

The contention that it's a steady rise or that it is at a specific rate would certainly be -- that it's a steady rise would be controversial. That it is at exactly the same rate I think would be extremely controversial, because we see very different rates when different tests are compared to each other.

Q. Let me ask you if you wrote about that in your report, and --

THE COURT: Okay. So it's like almost comparing apples and oranges then to compare one test with another test?

THE WITNESS: Yes, ma'am. The rise of, or the change in scores has been shown to differ by test, subtest, population, age, culture --

THE COURT: Okay.

THE WITNESS: -- intellectual level.

BY MR. ROBERTS:

Q. In that regard, first of all, did you -- I'm showing you what's marked Government Exhibit 15. It's Page 8 of your report. And it appears to me that you wrote a good bit on that, of the Flynn Effect aspect in your report.

A. Yes, sir.

Q. Okay. I want to show you what is marked only for

identification purposes as Government Exhibit 207.  At the top

of this, it's convergent evidence for the WAIS-III.  You gave

me this document.  It's out of what publication?

A.    The WAIS-III manual.

Q.    Okay.  Does this document help you in any way describe

some of the concerns about the Flynn Effect?

A.    Yes, sir.

Q.    Okay.  Can you please describe that for us?

A.    Well, for example, on this document, this is the type of

data that Flynn uses to describe -- as support for his effect.

And what's happened here is this is a reliability study.  So

whenever a new IQ test comes out, one of the things that's done

is to compare it with existing IQ tests as a check of its

validity.  And so the new test and the old test are

administered to people in a counter-balanced manner, and then

the scores compared to look for a convergence of data, if you

will.  And this would be the exact data that Flynn used.

     And in this particular case, the part that he would use

would be the full scale IQ, under the WAIS-R, of 105.8, and

the --

Q.    Where exactly is that on the document?  You can actually

touch the screen and it will make some marks.

A.    Well, right here is the --

Q.    You can also erase it by going down to the bottom right

corner.

A.   I tell you what, how about if I just -- it's right here. I'm sorry, ma'am.  That part that it says "clear"?  Oh, gotcha. Bottom left corner.  I gotcha.

So if we look right here at this line, which says "Full Scale IQ Score," we've got the full scale IQ score for the WAIS-R population right here, and we've got the full scale IQ score for the WAIS-III right here.  That's right here.  And so at 105.8 on the WAIS-R, 102.9 on the WAIS-III.  And so what Flynn would do is subtract 102.9 from 105.8, and then he would divide that by the number of years between when the WAIS-R was standardized and the WAIS-III was standardized, and that's where he would get his rate.  In this particular case, it winds up being about .171 points per year.

Q.   And you heard Dr. Gelbort's testimony.  What rate did he apply?

A.   He applied .3.

Q.   And how is that different from what you were saying?

A.   Well, the rate of change is somewhat in contention. The .3 is often cited.  AAIDD actually notes .33.  The actual rate is, again, it varies across any number of different aspects.  In fact, Flynn has testified that it may be 2.5 or .3.  There's been, again, variability around the particular number to be applied.

Q.   Let me ask you -- I want to remove Government Exhibit 207 for identification and ask you, have you ever seen scores

adjusted, in a clinical setting, to account for the Flynn Effect?

A.   No, sir.

Q.   You are aware of my questioning of Dr. Gelbort with regard to applying or using the Flynn Effect in a court only.  Have you read that testimony?

A.   Yes, sir, I have.

Q.   Because you weren't actually present for his testimony.  It was on earlier this month.

A.   That's correct.

        MR. WISEMAN:  Your Honor, I think the record would reflect that Dr. Moore was present for a good part of Dr. Gelbort's testimony.

        MR. ROBERTS:  That's correct.

BY MR. ROBERTS:

Q.   Let me just clarify.  You had to leave early.  You were not able to hear the end of his --

        THE COURT:  He left at 4:00, and we finished about 6:40 that night.  And we started at --

        MR. WISEMAN:  3:00 o'clock.

        THE COURT:  -- I think about 3:00 o'clock.  So he was here for just a fragment of his testimony, less than a third.

BY MR. ROBERTS:

Q.   And were you able to hear my interaction with him about his application of or using the Flynn Effect?

A.    I read it.  It was after I had left.

Q.    My question to you is, he seemed to have some problem with my use of the term "applying" or "using" as it related to the Flynn Effect.  And my question to you is, was I misusing the terms with regard to the Flynn Effect?

A.    No, sir.  Those were the appropriate verbs to use.  "Did you apply it?"  "Did you utilize it?"  "Did you correct the scores for it?"  Those are the verbs that would be used.

Q.    Okay.  Let me ask you this.  Is the Flynn Effect a concept that is widely accepted across the psychological field?

A.    I think it depends what you mean by the Flynn Effect.  If what you mean by the Flynn Effect is that the norming, the reliability of the norming tends to decrease over time, I think that's widely accepted, and was I think widely accepted before Flynn came along, but he certainly has brought it onto the fore.

      If you're referring to whether scores should be adjusted based on the Flynn Effect, that would be significantly controversial.

Q.    In fact, you made a comment about that on Page 8.  I'm showing you what's Government Exhibit 15, Page 8, and I'm pointing right in the middle of the page, where it says, "In sum, it is not professionally accepted practice to alter obtained IQ scores for the Flynn Effect or any other factors."

      That's still your belief?

A.   That's correct.  When we obtain IQ scores, we report the scores that are obtained, and then in our narrative indicate if there are factors that would affect the validity or the reliability of those scores.

Q.   Now, the Petitioner did a very nice chart comparing Dr. Weiner's scores in the WAIS-IV -- I'm sorry -- the WAIS-R that he applied in 2004 or gave in 2004, and the WAIS-III that Dr. Gelbort gave in 2007.  So I'm showing you what's marked as Petitioner's Exhibit 155.  And we've heard testimony and noted the differences on the scoring.  What I wanted to ask you is in your assessment of all of the data that you've seen in this case, what is the significance of the decrease on the verbal IQ of Dr. Gelbort's versus the increase on performance in Dr. Gelbort's testing?

A.   What was notable to me about this -- and in just a moment I'm going to ask you, can you put the other chart back up on to the screen, but just for a moment, if we'll look at here in the verbal, we've got a 76 versus a 67.  So on the WAIS-R, he scored a 76, and on the WAIS-III, a 67.  And down here, he scored a 76 on the performance and a 78 on -- I'm sorry -- a 76 on the performance of the WAIS-R and a 78 on the performance of the WAIS-III.  And then a five point difference down here, the full scale.

So he went down by nine points on the verbal, up by two points on the performance.  And then overall, down five points

on the full scale.

If you could put that other chart up for me.

Q.   Would it be this chart?

A.   Yes, sir.

Q.   Okay.  You can clear those dots.  Government Exhibit 207 I'm showing you again, which is marked for identification only, and how does that chart help you in explaining his scoring?

A.   Well, what was striking to me is that his verbal IQ dropped by nine points.  But if we look in general, when one compares the WAIS-R to the WAIS-III, we'd only expect about a point drop.  And when we look at the performance, his score went up by two.  But what we would have expected, in general, in a population level, would have been for it to drop by about four points.

So the difference of five points versus an expected difference on the full scale of three points or so, that's not so striking to me, when it got collapsed.  But what was really strange to me was when we would have expected the verbal to have gone down a tad, it went down a lot.  And we would have expected the performance to have gone down a moderate amount, but it went up a bit.

So there are two things about that that stood out to me. First of all, this is one of the reasons that we don't apply something like the Flynn correction to individual scores, because we see right here his very performance on the verbal

and performance aspects are different from the trends that we would expect.

The second part that was striking to me about it is the one thing that I think everyone would agree on is that his verbal skills are his strength. And to have them drop by nine points, that's a significant drop. That's a notable drop.

Q. Again, and that's, when you say nine points, you're talking about the 67 he scored when Dr. Gelbort gave him the WAIS-III versus the 76 he scored when Dr. Weiner gave him the WAIS-R?

A. Yes, sir.

Q. Now, what may be a little confusing, and it was to me, I know, when we first started discussing this, is that you're actually still using the WAIS-R to some extent, and yet it's your professional opinion that the WAIS-R should have never been given. Is that right?

MR. WISEMAN: Objection to leading, Your Honor.

MR. ROBERTS: It's just a foundation question, Your Honor.

THE COURT: Overruled.

BY MR. ROBERTS:

Q. So you really -- so I guess my question is, why would you continue to point to the scoring on the WAIS-R if, in your opinion, and you've said so in your report, the WAIS-R is really invalid as a scoring mechanism?

A.    I was very struck by the use of the WAIS-R at that time. The WAIS-III had been out for about six years at that point.

Q.    But in answering my question, though, why would you continue to point to the scoring and the actual testing that underlies the score if you think a test is invalid?  Does it help us in any way assess his --

MR. WISEMAN:  Objection to "invalid," Your Honor.  I don't think there was testimony it's invalid.  And if there isn't, he's leading the witness.

THE COURT:  Sustained.

THE WITNESS:  The scores --

MR. WISEMAN:  It's sustained, sir.

MR. ROBERTS:  Let me ask you the question.

THE COURT:  That's the difference, isn't it?  Okay.

MR. WISEMAN:  I thought your words meant something, but that might just be me.

BY MR. ROBERTS:

Q.    My question is with regard to -- do you think it was appropriate for Dr. Weiner to give the WAIS-R in 2004?

A.    I don't think that it was appropriate for him to give the WAIS-R in 2004.

Q.    And you commented on that in your report, did you not?

A.    Yes, sir.

Q.    What did you say in your report?  I'm having a hard time finding it.  Do you remember?

A.    Well, in sum, I thought that it was, that it was inappropriate to have given a test that was that far out of date.  What I actually say is, it's on Page 7, "At the time that Dr. Weiner conducted the assessment, the new edition of the Wechsler scale has been published and in use for over six years.  It's unclear why such an outdated test was utilized."

Q.    Let me just stop you for a second, because I did find Page 7, and I want to zero in, and which sentence were you reading?  Can you point us to the sentence?

A.    Yes, sir.  I started right here.

Q.    Where -- that's where it says, "95 percent confidence intervals" --

A.    No, sir, I mean right there where that "at" is, "at the time" --

Q.    Where the "at" -- okay.  Go ahead.  Tell us what you were saying about Dr. Weiner's use of this test.

A.    So I pick up at, "in use for over six years."

        MR. WISEMAN:  Your Honor, I'm going to object to this testimony.  Dr. Weiner is a neuropsychologist who provided a neuropsychological reason for his administration of the WAIS-R, and that explanation was that it is norm for the neuropsychological deficit scale, the Halstead-Reitan battery, and this witness has not been qualified as a neuropsychological expert, and I don't think he's qualified to offer an opinion on that explanation by Dr. Weiner.

MR. ROBERTS:  Your Honor, I'd be happy to let him question him on his neuropsychological expertise.

THE COURT:  Go ahead.  Would you like to take him on voir dire on that?

MR. WISEMAN:  Well, I didn't hear an offer.

THE COURT:  I didn't either.  Do you want to offer him for that and lay a, you know, ask him the questions?

MR. ROBERTS:  Your Honor, I just actually was asking him his opinion of Dr. Weiner's testimony.  I wasn't really asking him within his expertise.

THE COURT:  Okay.

MR. WISEMAN:  And I was really just objecting.

THE COURT:  Uh-huh, and -- okay.  So --

MR. ROBERTS:  What I'll do --

BY MR. ROBERTS:

Q.   Let me ask you, what -- the question that I began this with is why would someone in your position, with the mental retardation assessment experience that you have, still consider a test, the testing scores, when it was given at a time when it's outdated?  And I meant the testing scores, I meant the underlying testing data versus --

A.   The data is data from a test that had been administered. My concern with it is simply the lowered reliability and validity of the scores.

Q.   Okay.  Let me ask you this, were there any other

achievement testing that Mr. Bourgeois participated in that gives you any insight into his intellectual functioning?

A.    Yes, sir, there was additional achievement tests that would give me an insight into his cognitive functioning.

Q.    What was that?

A.    He was given Wide Range Achievement Test, WRATs, by Dr. Weiner and Dr. Gelbort, and he was given a Woodcock-Johnson by Dr. Swanson.

Q.    And in your report, do you reference where he would score at the grade -- well, let me just show you.  On Page 7 of your report, Government Exhibit 15 again, you note that, at the end of the first full paragraph, on the 2007 achievement testing, Mr. Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth grade level in arithmetic.  What significance is that statement in your report?

A.    That's based on the WRATs that had been administered to Mr. Bourgeois, and it showed a level, particularly in regards to his reading and spelling, that were certainly very strong in regards to the IQ testing, but particularly with the verbal IQ testing.

Q.    I want to move now to the area of malingering, because that's been mentioned quite a bit this week.  Tell us how, in your understanding, how a psychologist attempts to detect malingering when they're giving tests.

A.   Well, there are a number of different ways.  We certainly, you know, watch for physical or behavioral signs that an individual may display, but we also look for patterns in the testing, and we also administer different types of measures that would be suitable to hopefully detect malingering.

Q.   We've heard a little bit of testimony about TOMM.  Is that T-O-M-M?

A.   Yes, sir, the Test of Memory Malingering, the TOMM, created by Dr. Tom Tombaugh.

Q.   And can you tell us a little bit of how easy or hard the TOMM is?

A.   No, the TOMM is a very, very simple test.

Q.   Can you give us an example of some of the questions that might be asked?

A.   Well, it's not so much that there are different questions.  The way the TOMM is set up is that it's based on visual memory.  And so an individual would be shown one at a time about 50 line drawings, like a wheelbarrow or a bucket or whatnot.  And then they would be shown pairs of line drawings, one which they had seen before and one which they had not, and they're asked to identify which one they've seen before, with corrective feedback given.

Q.   And that's just one example --

A.   Yes, sir.

Q.   -- or is that how the whole test is administered?

A.   That's how the whole test is administered.  There are a couple of trials to it.

Q.   And there's been some testimony with regard to areas of which Alfred Bourgeois is unable to perform or perhaps has some deficiencies in these areas.  What was your opinion about his ability to comprehend -- he was given a TOMM in this case, wasn't he?

A.   Yes, sir.

Q.   What was your opinion about his ability to perform on that test?

A.   He did well on the TOMM.  He made 47 of 50 on the first trial and 50 of 50 correct on the second trial.

Q.   So that --

THE COURT:  So what does that mean?

THE WITNESS:  That means that he was correctly, on the second trial, he was correctly identifying each object that he had seen before.  And so it would indicate that -- well, there would be no indication of significant malingering on that test, or there's no indication of malingering.  I'll take the "significant" out.  There's no indication of malingering on that test, on that administration of it.

THE COURT:  So what is it -- so what did he -- what did that measure?

THE WITNESS:  Well, it is an effort test, and one of the things that, one of the characteristics of malingering is

that it's not necessarily a universal phenomenon.  First of all, it's not necessarily a longstanding characteristic.  But also malingering, the symptoms that an individual malingers depend in part on what they're attempting to malinger.  So, for example, if someone is attempting to malinger a psychosis, they might perform well on a test of memory malingering, for example.

And so what this indicates is that in regards to a test of whether he was malingering a memory dysfunction, there didn't appear to be evidence of that.

BY MR. ROBERTS:

Q.   But does that test also show you anything about his ability to understand or follow directions?

A.   Well, it shows his ability to follow directions on it as well.

Q.   You mentioned this idea of not trying hard enough.  So let me ask you, there was a -- when Dr. Price was testifying, Judge Jack had a question to him about what would happen if someone's just not trying hard enough.  I think that was the Judge's words.  When you look at his IQ testing and the questions, the raw data, is there any evidence that you see in there that would communicate to you that Alfred Bourgeois may be -- may not have been trying hard enough in this particular case on the IQ testing?

A.   I have looked and looked at the intellectual

neuropsychological data in this case, and they're puzzling to me.

MR. WISEMAN:  Your Honor, I'm going to object.  He's talking about neuropsychological data.  If he wants to talk about the IQ test, I have no objection.

BY MR. ROBERTS:

Q.  I guess I'm not smart enough, Dr. Moore, to know the difference between the two of them.

A.  There's sort of a blend.

Q.  I do want to -- I do want to get to the -- I believe there are some -- you've indicated that there are some answers that were on the WAIS-R that you found puzzling to you.  Can you give us some specific examples of where you, where there was a question he was asked on the WAIS-R, where you would have thought he should have gotten it correct and he didn't?

A.  Yes, sir.  In looking just at the WAIS-R, there were a couple of items that stood out to me.  Just thinking of a few examples, one would be on the information test.  One of the very early items is "In what direction does the sun rise?"  And I think Mr. Bourgeois answered, "Up in the sky."  And, but --

Q.  Is that a verbal test, or is that a multiple choice test?  How is that --

A.  It's a verbal, it's a verbal test, so --

Q.  In what way?  Is a question posed and someone answers it?  Is that how --

A.    Yes, sir.

Q.    Okay.

A.    And that answer was a bit striking to me, because Mr. --

Q.    Well, that answer is actually correct.  I mean, it's in the sky.  So did he get it right or wrong?

A.    He got it incorrect.

Q.    Why is that?

A.    The correct answer would be "The sun rises in the east."

Q.    And so why is that striking to you with regard to this case and Alfred Bourgeois?

A.    Because Mr. Bourgeois was a long-distance truck driver, driving a route that went from New England to California.  And so driving into the sun, the sun in your eyes, either in the morning or the evening, depending on whether you were driving east or west, that would seem to have been an answer that he would have known more readily than that.

Q.    Was there any other question that just stands out in your mind about, that you thought was a little strange in the answer?

A.    Another one was to name four men that had been President of the United States since, I believe since 1952.  And he provided four names, one of them incorrect, but he didn't name the current or even the most recent President.  It would have been an easy, an easier item than when the test had been normed, because we had had a few more administrations,

governmental administrations, presidential administrations by then.  But he missed the question.  It was a little striking to me that some of the easiest answers would have been the current or past President.  And those weren't included.

Q.   Do you remember which ones he included?

A.   I think Nixon was in there.  I think Roosevelt was in there.  I don't recall whether Kennedy was, and then George Washington was.

Q.   And the question again was to name them, the Presidents since a certain time?

A.   Any four men who had been President of the United States since that time.

Q.   Since what time?  What year?

A.   I think it was 1952.  It's been a while since I've administered a WAIS-R.

Q.   Let me move on to the adaptive functioning area.  In your report, on Page 8, you begin discussing adaptive functioning.  Does your report on that page -- can you show us on that page where you actually attempt to define "adaptive functioning"?

A.   Yes, sir, right here.

Q.   Okay.  Let me ask you about a sentence before that, where you state that intellectual testing seeks to measure what a person has the potential to do, whereas assessment of adaptive functioning seeks to measure what a person typically does. Tell me what exactly you mean by that.

A.    The intellectual functioning is, I guess, seen as a testing of the limits, if you will, how far can a person stretch, how well can they, how well can they maximally do, what's their maximal performance, whereas adaptive functioning is based on what does a person generally do.  That's one of the reasons why in adaptive functioning measures we don't generally come in and give a person items to do, because the contention there would be that the issue is less what they're able to do in a particular setting than what do they generally do in their daily life.

Q.    And when you, the place where you put the dot -- I'm going to move that.  It starts, it's actually the line before that, that says, "According to the DSM-IV."  So is this definition, "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in a particular age group, sociocultural background and community setting."  That's straight out of the DSM-IV?

A.    Yes, sir.

Q.    Is that the definition that you use when you're doing an adaptive functioning assessment?

A.    Yes, sir.

Q.    When you're doing, preparing to assess adaptive functioning, what type of data do you consider?  How do you go about deciding what it is you're going to consider?

A.    I try to get as many records as I can, because I'm trying to get a snapshot of -- actually not a snapshot, an overview of what this person's functioning is like and has been like.  So I'd seek to get employment records, hospital records, if there's been disability applications, school records, whatever records that I can.

Q.    And we heard about -- we've heard testimony about an ABAS and a Vineland.  Are those instruments commonly used in adaptive functioning assessments?

A.    Yes, sir.

Q.    How do you go about selecting the individuals that you might decide to interview?

A.    Well, at a most basic level, we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome.  So we want to make sure we get good and objective data.  And in a forensic setting, that becomes even more of a challenge.

Q.    When you're trying to -- is there a specific word that you use -- or let me just show you, on Page 15, Page 9 of Government Exhibit 15, this is right after, on Page 8, where you were defining "adaptive functioning," you mention a concept of a significant deficit and how it's generally taken to be approximately two standard deviations below the mean.  Is that something you're looking for when you're assessing the testing

of individuals in adaptive functioning?

A.    Yes, sir.

Q.    Can you expound on that a little bit more and help us understand about this two standard deviations below the mean, why that's important?

A.    Most naturally occurring phenomenon fall on a bell-shaped curve of frequency.  So the curve, the frequency curve looks like a bell, and the average is right in the middle, and that's the most common score.  More people have that score than any other.  But most people don't have that score.  Most people differ from the average.

And one standard deviation, or a standard deviation is the average amount that people differ from the average by.  And the bell-shaped curve has some very specific characteristics related to standard deviations in the frequency distribution.

So about 34 percent of the population falls between the mean and positive one standard deviation, and about 34 percent of the population falls between the mean and minus one standard deviation.  So about 68 percent of the population falls between plus and minus one standard deviation.

Another 14 percent fall between one standard deviation and two standard deviations, and about 14 percent between minus one and minus two.  So then about 96 percent of the population falls between minus two standard deviations and positive two standard deviations.

And we consider a person to be significantly subaverage when they are approximately two standard deviations or more below the mean.  In other words, when they're at about the second percentile or below.

Q.    Can you put that in some kind of layman's terms so I can understand?  I mean, is there a numerical value that you can apply to help us understand standard deviations?

A.    I think that's one of the biggest challenges in bringing data into the courtroom is because, as statisticians -- I used to teach statistics -- as statisticians, we get used to weaving all in and out.  To me, I try to keep it a little bit simple.

If we'll think in standard scores, standard scores have a mean of 100 and a standard deviation of 15.  So that's where the IQ of approximately 70 comes into play.  And when we look at other measures that have been standardized on that type of distribution, we can look at scores of about 70 as being our key number.

MR. ROBERTS:  I need to retrieve Petitioner's Exhibit 170.

(Counsel conferring off the record.)

MR. ROBERTS:  Could I have just a moment, Your Honor?  Seems like there's one exhibit that none of the parties have in order.

THE COURT:  Sure.

(Counsel conferring off the record.)

BY MR. ROBERTS:

Q.    Well, I can't find the exhibit right now, but let me ask you if you recall when I was talking to Dr. Swanson and there was a chart that listed the raw data for Beverly Franks.  And it had a bunch of numbers of her -- it had "SS" at the top of the document.  I believe it was Petitioner's Exhibit 171, for identification.  But they said they didn't offer it, so --

MR. WISEMAN:  Mr. Roberts, I think it's a different document.  I can provide it to you.

MR. ROBERTS:  Actually, it's Petitioner's Exhibit 35.  I couldn't find it.  Page 13.

MR. WISEMAN:  I hope the record is reflecting just how overly cooperative I'm being, Your Honor.

THE COURT:  I will make that reflection.

MR. WISEMAN:  Okay, thank you.

THE COURT:  Nothing unusual about it, Mr. Wiseman.

MR. WISEMAN:  I certainly appreciate that.

MR. ROBERTS:  And I will acknowledge it as well, Your Honor.

BY MR. ROBERTS:

Q.    Do you recall when I was speaking, asking Dr. Swanson about the scores that are over here under the SS?

A.    Yes.

Q.    And when we were talking about the scoring, and I had asked her a question, what is your opinion on Alfred

Bourgeois -- well again, let me take this away for a minute, and let's talk about this just a minute.  There's a little confusion about the ABAS and the Vineland, because these are individuals that are taking the test, but they're taking it about someone else.  Is that right?

A.   Yes, sir.

Q.   Okay.  So this raw data that we're looking at in relation to Beverly Franks' testing, these are actually the scores --

MR. WISEMAN:  Your Honor, I would --

MR. ROBERTS:  I'm sorry.

BY MR. ROBERTS:

Q.   I'll ask you.  You tell me, what does "raw data" mean?

A.   This is actually from the Woodcock-Johnson, not from the Vineland or the ABAS.  So this is his achievement testing, not his adaptive functioning testing.

Q.   Okay.  I had asked you earlier about achievement testing. Is there anything significant about the scores under the SS that help us understand anything about Alfred Bourgeois?

A.   Yes, sir.  I believe there is.  Again, what we're looking at is in comparison to the general population, a person with mental retardation is significantly impaired.  Generally about two standard deviations below the mean.  And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below.

And what we see on here is, as we follow down this --

Q.    And you're drawing a line there between --

A.    This line of standard scores --

Q.    Let me just comment for the record, you're drawing a line between the RPI line and -- list, and the SS list?

A.    Yes, sir.

THE COURT:  We're just looking at the SS list of things that may be under 70.  Right?

THE WITNESS:  Yes, ma'am.  I'll take the line off then.  Yes, ma'am.  And so we see the majority of those scores are of 80 or above.  A couple of exceptions, but by and large he's scoring 80 or above on the particular subtests.

BY MR. ROBERTS:

Q.    Does that tell us anything about Alfred Bourgeois's abilities?

A.    Well, it appears that at a global level he is functioning in this test of academic achievement.  By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in.

Q.    Okay.  We're going to -- we'll get more into those in a few minutes.  We'll go back now to your selection of individuals.  Is there anything about the relationship that plays a role in your determination of who you're going to interview?

A.    Yes, sir.  We want to try to find folks who know the

individual well, but we also need to find folks who don't have a vested interest in the case, or are as neutral as possible. And oftentimes that is a significant challenge. The better that a person knows someone, the more likely they are either in a positive or negative way to have a vested interest. And the less vested interest that they have, the likelihood is perhaps the less well that they know the person. And so we're looking at trying to create an optimal balance between those two factors.

Q. Did you select a number of people to interview in this case?

A. Yes, sir.

Q. I'm showing you what's Page 2 of Government Exhibit 15, and it has a list there of interviews conducted. Are those the individuals that you interviewed in this case?

A. Yes, sir.

Q. Which of those did you interview with regard to trying to make you, help you with your adaptive functioning assessment?

A. All of them were in an effort to help with the adaptive functioning assessment, although there were, a subset of those were actually administered adaptive functioning measures to, and those would be Danny Clark, Michelle Armont, Nathaniel Banks, and Rhonda Davis.

Q. When did you schedule your interviews? Do you recall what month and year?

A.    I think it was in -- I think they were actually scheduled in late June of this year and took place in mid July of this year.

Q.    What states did you go to, did you travel to to interview?

A.    Louisiana and Alabama.

Q.    On Page 10 of your report -- I'll show you what's marked as Page 10, or what is Page 10 of Government Exhibit 15, ask you to look, ask you to look over this paragraph, top paragraph and tell me if that is some of the discussion of the people you interviewed in your efforts to do an adaptive functioning assessment.

A.    Yes, sir.

Q.    Who was the first person that you interviewed?

A.    On that trip?

Q.    On that trip.

A.    Michelle Armont.

Q.    All right.  Describe for the Court what happened when you -- how did you arrange this interview, and what happened when you showed up?

A.    The interview had been arranged through the Attorney General's Office, I believe.

Q.    The Attorney General's Office?  Or would it be United States Attorney's Office?

A.    United States Attorney's Office.

Q.    That's all right.  It happens sometimes.

A.    Yeah, I'm sorry.

MR. WISEMAN:  I thought Mr. Holder was involved.

THE COURT:  Definitely.

MR. ROBERTS:  Yes.

THE WITNESS:  I beg your pardon.  Y'all's office.

BY MR. ROBERTS:

Q.    Okay.  That's a good southern expression.  So tell us what happened when you -- you said that our office helped arrange the interview, called ahead.  So what happened?  Did you get a scheduled date for that interview?

A.    Yes, sir, we did.  I think the interview was scheduled for 9:00 or 9:30 in the morning, and at Ms. Armont's house.  And when we arrived at her house, there were already a couple of other individuals present.

Q.    Do you know who those individuals were?

A.    Yes, sir.  I didn't know at the time who they were, but I've come to understand it was Ms. Larin and --

Q.    The co-counsel for the Petitioner?

A.    Yes, sir.

Q.    And who else?

A.    And their investigator.  I'm sorry, I'm not sure what her name is.

Q.    Okay.  And did they, did they explain to you their purpose for being there?

A.    They --

Q.   I'm just asking you, without them telling you, did they explain to you why they were there?

A.   They were I think more explaining to Ms. Hohle from your office --

Q.   You're talking about Debbie Hohle from our office?

A.   Debbie Hohle, yes, from y'all's office.

Q.   Spoke with her?

A.   About why they were there.

Q.   Okay.  I guess my question for you is, did their presence concern you at all about your ability to get an accurate assessment from Michelle Armont?

A.   Yes, sir.  I've never been in a situation before, in all the forensic evaluations that I did, where opposing counsel or an investigator were there unexpectedly.  There's only one situation I ever had where opposing counsel was even there, and it had to do with a very elderly witness, where it was agreed upon in advance that both parties would be there, because we didn't want to unduly burden.

Q.   Do you know what Debbie Hohle -- you said, you mentioned Debbie Hohle's name.  Do you know what her role is at the U.S. Attorney's Office?  Is she an attorney?

A.   No, sir, I don't believe that she is.

Q.   Okay.  Do you know what --

A.   No, sir, she's not.  She seems to make all the travel arrangements and to take care of everything, it seems.

MR. ROBERTS:  Let the record reflect, Your Honor, that --

THE COURT:  That she's fantastic?

MR. ROBERTS:  Yes, Your Honor.  Thank you.  Can I say "thank you" in that instance, Your Honor?

THE COURT:  You can.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.  What was her role in being with you at the actual interviews?  Do you have any -- was she, did she have any role that you know of, other than to --

A.  She had no role in the interviews.  In fact, in all the other interviews that I conducted, she wasn't even present.  They would drop me off at the house.  She and Mr. Dan Smith was driving us.

Q.  And Dan Smith is -- what agency is he with?

A.  He's with the FBI.

THE COURT:  So somebody showed up at his interview?

BY MR. ROBERTS:

Q.  Can you tell her who showed up?

A.  They were there when I got there.

THE COURT:  And you made an appointment with her?

THE WITNESS:  Yes, ma'am.

THE COURT:  To see -- that's Mr. Bourgeois's sister?

THE WITNESS:  Yes, ma'am.

THE COURT:  Did they say what they were doing there?

THE WITNESS:  The indication that I had was that Ms. Armont had contacted the investigator and had asked did she need to have Counsel present, or I'm not sure exactly what it was that was said, and so Ms. Larin was called in, was present to be there.

THE COURT:  So did you get to do your interview?  Or did that compromise it?

THE WITNESS:  Could I have C, both of the above?

THE COURT:  Yes.

THE WITNESS:  I did it.  I was there.  And it certainly gave me significant concerns about the interview. And as we were leaving, we had a whole series of interviews scheduled.  I was doing about five or six.  And the indication to us was that we would be seeing them throughout the day.

And so we made a couple of schedule adjustments, and then wound up going to Alabama to do a different set of interviews.

BY MR. ROBERTS:

Q.  And again, your goal in going out there was what?  Your goal in going to Louisiana to do this interview with Michelle Armont, what was your -- what were you attempting to do?

A.  I was attempting to do an interview with her in regards to Mr. Bourgeois's adaptive functioning and perhaps to administer an ABAS, if I deemed that appropriate.

Q.   And did you actually get to administer the ABAS?

A.   I did.

Q.   Tell, please inform Judge Jack of who was present throughout that interview, and what if any actions they took while they were, while the interview was ongoing.

A.   Well, while the interview was ongoing, we were around a table in her, in her dining room area, me at one end, the investigator at the other, Ms. Larin on one side of the table and Ms. Armont on the other.

And throughout the interview at various points -- Ms. Armont clearly was unsure whether, you know, kind of what the situation here was, if she had somehow done something wrong.  And I think everyone was trying to assure her that she was okay.  But she was certainly, you know, glancing back and forth at the, Ms. Larin.  The investigator was taking notes throughout, and Ms. Larin had a computer and at various points would type in regards to different comments that Ms. Armont made.

And for me, that's a bit of a -- there's a bit of a challenge with that.  Your Honor may have noticed in the interview that I did with Mr. Bourgeois that I wrote virtually the whole time.  And the reason that I do that is whenever I'm taking notes with someone --

THE COURT:  So that he doesn't think that one thing is significant and something else is insignificant.

THE WITNESS:  Yes, ma'am.

THE COURT:  So you keep writing all the time.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   In your report, I'm showing you your report on Page 11, Government Exhibit 15, there's a sentence at the top there. Does that relate to the results of the testing of Ms. Armont and your conclusion as to whether they're reliable or not?

A.   Well, certainly the presence of --

Q.   What I'm referring to right now --

MR. ROBERTS:  I'm sorry, Your Honor.  I'm going to interrupt for a minute.

BY MR. ROBERTS:

Q.   What I'm referring you to right now is just this question. Does this sentence at the top, the very top sentence, does that refer to your -- what does that refer to, this sentence at the top that starts with, "As such," and ends in "validity."

A.   In looking at the results of the ABAS that Ms. Armont had completed, there were significant questions about validity of that measure.  I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified.

Q.   Okay.  Can you explain to the Judge what those concerns are?

A.   Well, during the actual administration of the ABAS -- actually, let me take one step before that.  During the

interview, Ms. Armont seemed to be very tuned in to the issue of mental retardation as a key issue.

Q.   What do you mean by that, she tuned in to the issue?

A.   Well, for example --

THE COURT:  Well, she had been previously coached, is what you're saying?

MR. WISEMAN:  Your Honor, I respectfully object to that characterization that I coached a witness.

THE COURT:  Is that the characterization?

THE WITNESS:  It appeared to me that she was well aware that mental retardation was the issue at hand.

THE COURT:  Okay.  So somebody had told her.

THE WITNESS:  She was aware.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   So, and we're going to -- you've got, on Page 12 of your report, you've got a list of some of the scores.  I'm going to get to that in a minute.  But I want to ask you before we go to that, did you speak to any other family members of Alfred Bourgeois in an attempt to get them to complete any of the ABAS testing?  And if so, what happened?

A.   Yes, sir.  I also went to the home of Ms. Claudia Williams.  She and her --

Q.   Let me stop you there.  Was that prearranged also?  Did you call ahead of time, or did you just show up?

A.    We -- I believe that we called ahead of time.  We were doing -- we did the interview out of order with what had been anticipated.

Q.    Why did y'all decide to do that?

A.    We were seeking -- I was seeking to be able to have an interview with the Respondents without opposing counsel present to be able to do a clinical interview in the way that I generally do a clinical interview.

Q.    And did you get an opportunity to speak with Ms. Claudia Williams?

A.    Yes, sir, I did.

Q.    Were you able to do a, complete an ABAS test with her?

A.    No, sir, I didn't.  We spoke for a while, and I had the ABAS out in front of, or had it there, and Ms. Williams looked through it and very much struggled in terms of, of whether to complete it or not.  She asked --

Q.    I'm sorry.  Did you say "struggled"?

A.    Struggled emotionally in terms of -- I say emotionally, because she sort of teared up.  It was clear in talking about Mr. Bourgeois, it certainly is an emotional situation for her. And she asked, did she have to complete the form.  And I told her, "Of course not."  That was certainly at her option, and she declined to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother.

Q.    You mentioned earlier you had also given an ABAS to Danny Clark, Rhonda Davis and Nate Banks.  I want to ask you about your Appendix B to your report.  Please inform the Judge what exactly Appendix B is and why you had to add that.

MR. WISEMAN:  Your Honor, I'm going to object, although it might be premature, to any reference to Mr. Banks' ABAS.  He, in a sense, has given statements to the Government psychologist.  He's not here for us to examine him as to the veracity of his responses.  I think it's a denial of our right to confront what is in effect a witness against us.

THE COURT:  Who are you talking about again?

MR. WISEMAN:  I'm sorry?

THE COURT:  Who are you talking about again?  Say it again.

MR. WISEMAN:  That would be Mr. Banks.  He's not being produced by the Government as a witness in this case, and I would like an opportunity to ask him about his responses, which the Court permitted us to do with the other ABAS Respondents.

MR. ROBERTS:  Well, Your Honor, my only response to that is that we're going to compare the scores.  We're not going to get into the actual questions of Nate Banks.  But I will get into what his focus was on his test and how those test results affected the assessment.

MR. WISEMAN:  Your Honor, the scores and responses

are based on questions, and I have a right to probe why he gave certain responses, as I did with the other witnesses, when Your Honor approved the bathtub questioning.  I don't see how this is any different.

MR. ROBERTS:  Your Honor, we turned over all the raw data to the Defendant, to the Petitioner, and they have all the information.  And these -- Nate Banks' responses are in the report that is already in evidence.  And the report discusses his scores, and we're not going to get into any actual hearsay. There's nothing going to be offered for the truth of what's asserted, other than to show the same assessment that they've submitted through Beverly Franks, that we've submitted through Armont, Clark and Davis.  So it's really peculiar that they pick Nate Banks out of the whole mess to say they're objecting to his response.

MR. WISEMAN:  Well, he's the only one who's not here. I didn't object to the others.  It is hearsay.  It is being offered for the truth.  If Mr. Banks says Mr. Bourgeois, you know, always grabs hot dogs off of grills or not, I have a right to probe that, and --

THE COURT:  Sustained.

MR. WISEMAN:  I would assume, Your Honor, that portion of the report, referring to Mr. Banks, would also be stricken?

THE COURT:  No.  It's already been admitted.

MR. WISEMAN:  I'm sorry?

THE COURT:  It's already been admitted.

MR. WISEMAN:  Okay.

MR. ROBERTS:  Well, Your Honor, may I just have a point of clarification?

THE COURT:  No.

BY MR. ROBERTS:

Q.   Can you explain for us, Dr. Moore, Appendix B?

A.   Yes, sir.  We've been, or y'all have been referring to Banks.  This was actually in regards to Danny Clark, the Appendix B.  I administered the ABAS to Mr. Clark, and I interviewed him as well.  In fact, I had spoken with him on the phone as well as spoken with him that day.  And after I left with the ABAS, he was on a work break and had kindly agreed to meet us.  We had a relatively short period of time.

     And so after we had left, I looked at his responses and his scores, and they were at odds with how he had described Mr. Bourgeois to me.  And --

Q.   I'm going to stop you for a minute, because it says at the top, "Results from Invalid ABAS."  What does that actually mean?  You may be getting there, but --

A.   Well, as directed by the ABAS manual, when there is a disparity between the scores obtained and the other information, for instance, interview information you get from someone, you need to determine why.  And in speaking to

Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores.

Q.    What did you do in regards to this invalid test result?

A.    I asked him if he would be willing to complete a new ABAS.

Q.    Was he willing to do so?

A.    Yes, sir.

Q.    And did he?

A.    Yes, sir.

Q.    What happened with that test result?

A.    He completed the ABAS.  The problem with the first ABAS, the reason it was invalid was that if he had to guess on an item, that he generally just simply checked a 2.  He checked that he had guessed, but he assessed the level of proficiency at a 2.

Q.    Well, help me understand, what is 2 in the range of the answer?

A.    A 2 would mean that an individual wasn't able to do the item, needed help in doing the item or wasn't -- was able to do it some of the time independently.

Q.    Okay.  Give us one example of an item so we can use that as our point of contact as we discuss this.

A.    Is able to pack clothes independently for an overnight trip.

Q.    So if someone, if he was asked this question on that, if

Mr. Clark was asked this question on that test and his response was what?

A.   He put a 2 and indicated that he had guessed.

Q.   Okay.  And that was on the second test that he took?

A.   That was on the first one.

Q.   Okay.  And why was that, why did you ultimately determine it was invalid?

A.   Because based on the information that he had shared with me, Mr. Bourgeois would have been able to do that type of behavior independently.  The way the measure is set up, you either get a zero, or you can score a 1, 2 or 3.  And some people tend to gravitate, if they don't know an item, to the middle.  "Well, I'll just, I'll give them a 2 on that.  I'm not quite sure."  But the instructions are, based on what you know of the individual, if you have to guess on the item, based on what you know of them in other situations, how would you estimate that he would do, based on that knowledge.

Q.   What is the importance of that column for them checking off "guessing"?

A.   Guessing let's one know that they may not have had the opportunity to specifically observe the individual.  And so that item is an estimate or guess.

Q.   And then Mr. Clark completed the second form, and was that one completed correctly?

A.   No, sir.

Q.    What happened with that?

A.    He went through and he checked the items that -- he filled it out, except the items that he guessed at, he didn't put a numeric score on.  So I contacted him again and said, "Those items where you have checked that you guessed, we actually need for you to make an estimate on there of what your assessment would be."  And so he completed it there.

Q.    Okay.  And I'm showing you what is Page 11 of Government Exhibit 15.  And I believe the second paragraph that starts, "In the assessment of Mr. Banks' adulthood adaptive functioning, Mr. Clark completed two," does that paragraph explain what you were just describing to the Court?

A.    Yes, sir.

Q.    And ultimately, when he completed the second one, after the second contact with him, did you determine whether his scores could be used in the assessment in a way that was reliable?

A.    Yes, sir, it appeared so.

Q.    Because of the objection, I'm not going to go into the specifics of the next paragraph, but that paragraph does refer to Nathan Banks and what, some of the information he gave you. Is that correct?

A.    Yes, sir.

Q.    What about Rhonda Davis', what was -- was there anything about her testing that was interesting?

A.   Yes, sir, there was to me.  I think she was in perhaps even -- she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items.  But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there.  So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue.

Q.   Did you ask her about that?

A.   I didn't ask her about that specifically.  She actually made comments as she went along that let me know kind of how she was doing that.  "Oh, that applies here," or, "Well, he could do such-and-such here."

Q.   Okay.  I'm going to show you again what's Page 11, Government Exhibit 15.  I want to draw your attention to a phrase that you use, and that is, in the last paragraph on that page, you say, "As such, one looks for a convergence of data." Do you see that where you included that in?

A.   Yes, sir.

Q.   Third line down, at the end of the third line.

A.   Yes, sir.

Q.   "Convergence of data."  What exactly are you trying to convey with that phrase, "convergence of data"?

A.   That the more that data from different sources comes together to reflect the same level of functioning, the more confidence that we can have that that data accurately reflects

a valid assessment.

Q.   Now, I've -- as you sat through the trial, did you hear some of the individuals that took these tests, particularly Danny Clark and Rhonda Davis, when they were on the stand, they were questioned about the guessing block.  You've mentioned guessing.  Is that -- tell us, I mean, is that part of the test, or is that something that's really peculiar for someone to check guessing?

A.   It certainly is a part of the test.  People are instructed to complete every item, and some items they may not have had the opportunity to observe.  So they're instructed to indicate if they guessed.

In the administration of the ABAS and the manner that it was standardized, a high number of guesses would be a bit of a flag, because we're looking at, for someone who knows a person across a variety of settings and has ongoing contact with them.

The challenge, again, in a forensic setting and particularly one where there's been some degree of time that's passed is that balance between how much ongoing contact the person has versus the vested interest in the case.

And so in a typical assessment where the ABAS would normally be used, a high number of guesses would be somewhat of a red flag.  In this particular case, it's not unexpected because of the circumstances of the evaluation.

Q.   I'm going to show you what's Exhibit -- Page 12 of

Government Exhibit 15.  And there's a chart here that has the, it's got "Sub-domain," and then it's got "Communication, Community Use, Functioning Academics, Home Living, Health and Safety, Leisure."  What are these categories over here under Sub-domain?

A.   The ABAS-II is broken up in ten sections, and those ten sections correspond to the domains of adaptive functioning identified, for example, by the DSM-IV-TR in regards to the key areas of assessment.  So these are subsections within the ABAS.

Q.   Okay.  Before you, before that table on Page 11 -- and again the table's on Page 12, but at the bottom of Page 11 of Government Exhibit 15, draw your attention to this statement, the very last sentence on this page, "Significantly subaverage functioning would be a score of 4 or below."  Describe for us what that means in relation to the chart that you have on Page 12.

A.   On the chart on Page 12 --

Q.   And I'm putting the chart on Page 12 back up.

A.    -- the scoring for those ten sub-domains has a mean or average of 10 and a standard deviation of 3.  And so a score of 4 would fall at two standard deviations below the mean.  So "significantly below the mean" would be scores of 4 or below.

Q.   And so what does -- you've got this sub-domain you said on this side, and then you've got four names of individuals with years beside them.  What are those names, and what do the years

beside them mean?

A.   The names are the individuals who completed the ABAS, and these are their scores from that ABAS.  And the years beside of them, that's how old Mr. Bourgeois was at the time of their last contact with him upon which the, they were completing the ABAS.

Q.   Okay.

A.   So what I had done was ask them to remember back to his age or remember back to the last time they had ongoing contact with him and to assess his functioning as of that time.

Q.   Now briefly, just so I can understand, I'm going to take that one away.  We're going to come back to that and talk about that, but on Appendix A, you've got an entirely different chart, and it's got different categories over here.  Tell us why you did a different chart on Appendix A.  And Appendix A again is -- well, you tell us why you did a chart, a different chart on this one?

A.   Well, Appendix A is utilizing the AAIDD definition of adaptive functioning deficits.  And so it uses the categories of conceptual, social and practical skills.  In this case, with the standard scores, they have an average of 100 and a standard deviation of 15.  So "significantly below the mean" would be scores of 70 or below.

Q.   Let's go back to the ten sub-domain categories, and tell us what, if anything, is significant about the scoring of these

four individuals as they rated Alfred Bourgeois's performance.

A.   Well, there's pretty close agreement between Davis and Clark, and relatively good agreement with Banks as well.

MR. WISEMAN:  Objection to the reference of Banks, Your Honor.

THE COURT:  Sustained.

BY MR. ROBERTS:

Q.   Okay.  Just go ahead and reference the two that are not there, I mean the other two, Davis and Clark.  We'll just stick with them for now.

A.   Okay.  So there is -- there is significant convergence overall between Davis and Clark.  The agreements were pretty close across domains.

Q.   And versus Armont, tell us about why your, why that one's so different.

A.   Well, the scores that she -- the responses that she gave resulted in extremely low scores, certainly far at odds with that of Ms. Davis and Mr. Clark.

Q.   And again, what is the significance -- on the page prior to this, you said something about the significance of the scoring of 4.  What does a scoring of 4 tell us again?

A.   A score of 4 would be approximately two standard deviations below the mean.

Q.   Same question with regard to this one.  Can you do the comparison between Armont, Davis and Clark?  And tell us what

that information tells us under the AAIDD's definition of adaptive functioning.

A.    Yes.  Again, the scores between Davis and Clark are relatively consistent.  Certainly when you look at the global adaptive composite right here, where one has an overall as a 108, and one -- and the other is a 105, and that's sort of all of it collapsed together, all the domains collapsed together, so it's a global assessment.  And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that.  He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark.  He was in the significantly impaired range for Ms. Armont.

Q.    And in the same way, you've reviewed the information from Dr. Swanson with regard to Beverly Franks?

A.    Yes, sir.

Q.    And do you recall -- well again, I'm going to show you Dr. Swanson's report again, on Page 3, where she begins with the deficits in the conceptual domain.  Does she tell us where the scoring is on this page for Beverly Franks?  Does she give us a numerical number?

A.    I don't see so.

Q.    Do you recall what her data reflected?

A.    On the ABAS for Ms. Frank, the scores were extremely low.

And the ABAS has what's called a high floor, which means that even if you scored -- if I may, a different analogy.  The Wechsler scales also have a very high floor, which means if you missed all the items, you would still wind up with an IQ score in the 40s.  So it doesn't measure all the way down, if you will.  And it's similar with the ABAS.

So her scores were almost as low as you can get.

THE COURT:  So what does that tell you?

THE WITNESS:  It certainly gave me pause on the -- well, that in and of itself raised a question of is he functioning that -- you know, is that really an accurate reflection of his functioning?

THE COURT:  Was it, in your opinion?

THE WITNESS:  No, ma'am, I don't believe so.

THE COURT:  Do you see any evidence, in the hours you've spent on this case reviewing the documents, everything, that Mr. Bourgeois is mentally restarted?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   There was -- earlier there was testimony about you actually contacting people that he worked with and telephone conversations.  Did your conversations with those individuals play any role in your assessment on his adaptive functioning?

A.   Yes, sir.

Q.   Okay.  And you're well aware, he's a truck driver.  Does his truck driving abilities tell us anything about his adaptive functioning?

A.   Well, they certainly feed into that, yes, sir.  Certainly in regards to work-related functioning, but I think even more broadly, the nature of the job itself.  This isn't a simple repetitive job that he went to in a factory putting lids on widgets, but a job that had him going out and around the country, living, at least driving independently, picking up loads, taking care of his self-care during that period, interacting with people across a lot of different certainly social styles, as we move across the country.

Q.   Your report on Page 2, Government Exhibit 15, indicates at the bottom of materials reviewed "contents of briefcase belonging to Mr. Bourgeois."  You had an opportunity to review the contents of the briefcase?

A.   Yes, sir.

Q.   Did you actually see the briefcase, the briefcase itself?

A.   Yes, sir.

Q.   And Government Exhibit 28 is a pretty thick package.  It's 177 pages.  I'm showing you that exhibit, just the first page of that exhibit, Government Exhibit 28.  And it says, "First American Bank."  What was your understanding of -- or did you find this document inside that briefcase?

A.   Yes, sir.

Q.    All 177 pages of it?

A.    I think what I actually found in the briefcase was the items that are photocopied onto that document.

Q.    Let me ask you -- before you testified, I asked you to look through this document and mark certain areas.

A.    Yes, sir.

Q.    So I'm going to refer to the pages that you marked and ask you why you marked those pages.  This would be Page 19 of Exhibit -- Page 19 of Exhibit 28.

A.    I checked that --

Q.    Why did you mark that page?

A.    I'm sorry, sir?

Q.    Why did you mark that page?

A.    I marked that for the notation on there, just as an example, on the outside of each of the envelopes, there was -- or on many, there was this type of notation.  "Checked out and okay by Alfred."

Q.    And do you recognize the handwriting?

A.    That looks like the left-handed slant of Mr. Bourgeois, although I'm not a handwriting expert.

Q.    How would you know that?

A.    I'm sorry?

Q.    How would you know that?

A.    I've seen many of his letters.

Q.    What letters are you referring to?

A.    There were letters to his wife, letters to Mr. Gilmore.
There have been many different letters that he's written that
I've seen.

Q.    What's the -- what, in your opinion, what is the
significance of this notation on this page, this exhibit?

A.    It appears that he's gone through and checked through the
canceled checks that have been sent to him from First American
Bank that covered the periods that are noted up top.  And one
of the other things that makes me think that this may have been
Mr. Bourgeois's handwriting is in his writing, one of the
things he tends to do is use the word T-O-O.  This is spelled
T-O-O instead of T-O.  So when he had "8/29/2000 too
9/27/2000," the spelling error that he makes, or the spelling
error he makes is consistent with what I've seen in other
places.

Q.    Bear with me for just a minute.  I have some of these
turned upside down.  I'm going to show you what's Page 13 of
Exhibit 28.

A.    Yes, sir.

Q.    What do you see on that page?

A.    Again, they were okayed and checked by him.  I'm not sure
whether that's his handwriting there or not.  I can't quite
tell.  There's a left-handed slant.  The typo, the "to" is
spelled correctly there, so I'm not sure whether that's his
handwriting or not.  But someone seems to be indicating that he

had checked and okayed them.

Q.    You marked this page, which is Page 25.  I'll have to zoom out on that.  Page 25, what's significant on this page?

A.    I marked this page because it was just an example of, that he actually appears to be writing a number of the checks.  Again, the distinctive slants.  Not all of these are his.  You can see handwriting in the other direction on some, but some of these are.  I can't quite see on here.  Either on this or some of the other pages, it will actually indicate --

Q.    I can zoom in.

A.    -- accounts that he's writing to.  Right, like I believe this is --

Q.    Tell me which check number.  I'll just go down -- do you have anything --

A.    Well, right here, right here, it looks like an account number on the top at Hibernia Mortgage, for example.  So he's being, he's going through, he's writing a check, and then certainly noting on there a complete, a pretty complete record for himself, what the account is and which payment it is.

Q.    Let me ask you, was there any documents in the briefcase with regard to Hibernia Mortgage?

A.    Yes, sir.

Q.    For the record, I would -- I'm showing you what's been marked as Government Exhibit 34, Government Exhibit 34, and ask you if you recognize that document and the check that was

attached.

A.    I recognize the check.  I'm not sure whether the document was one of the ones that was in that pack.  I mean, I saw hundreds of pages in there.

Q.    Let me move to another, the next document you checked. You've only got a couple more of these, so --

MR. WISEMAN:  Your Honor, I'm going to object to the cumulative nature of this.  I mean, it's apparent that these all show some action on the checking account, which presumably was Mr. Bourgeois, and I don't know what the point in continuing through them is.

MR. ROBERTS:  Your Honor, three more tabs.

THE COURT:  How many more?

MR. ROBERTS:  Just three.

THE COURT:  Okay.  Do them a little quickly.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Or quicker.

BY MR. ROBERTS:

Q.    I'm showing you Page 35, Government Exhibit 28.  What's significant on this page?  Why don't you mark that?

A.    Again, just all check out and okay, so indicating that he appears to have gone through them and been doing some sort of double-checking, whether it's balancing, whether it's confirming against another record or whatnot, I'm not sure. But all checked out and okay.

Q.    One more, Page 55 of Government Exhibit 28.

A.    The same there.  I think there's one more where you actually see check marks on the checks themselves.  That let me know it appears he's going by and actually checking off against a record.

Q.    Let me show you that one real quick, and I'll be done with this exhibit.  Show you what's marked as Government Exhibit -- Page 57 of Government Exhibit 28.  And it's a list of checks and the check marks.  How do you know that's his check mark?

A.    I don't know for certain that that's his check mark, but again, it's a left-handed check mark.

Q.    You mentioned that you had read his letters --

            THE COURT:  Are you going to offer any of those?

            MR. ROBERTS:  I'm sorry, Your Honor?

            THE COURT:  Are you going to offer any of those?

            MR. ROBERTS:  These are Government Exhibit 28.

            THE COURT:  They're already admitted?

            MR. ROBERTS:  They're already in, yes, Your Honor.

            THE COURT:  Okay.

BY MR. ROBERTS:

Q.    You mentioned that you have read his letters.  Do you know how many of his letters you've read?

A.    No, sir, I'm not sure.  But I would think, my estimate would be perhaps a dozen or two, at least.

Q.    And what were the majority that were -- explain to the

Judge the majority of the letters that you reviewed before coming into court.

A.    There were, I think one of them was a letter to Her Honor or to a Judge indicating the need to be able to be in contact with some folks around some of the legal issues that he had going on with the foreclosure of his house.  There were letters to his wife.  There are certainly letters to Mr. Gilmore that we've seen.

Q.    You observed the letters here in court to Mr. Gilmore --

A.    Yes, sir.

Q.    -- that were offered earlier, Government Exhibits 178 through 200?  What, if anything, could you discern with regard to his adaptive functioning from reviewing his letter writing?

A.    Well, I think that there are a couple of things.  He certainly appears to be able to use written communication effectively.  He seems to write in the manner that he speaks.  In other words, the style.  There are some grammatical errors in there, but if you'll read them, hear his voice on the inside, it's literally as if he's writing, speaking as he's reading.  But the language is -- certainly the vocabulary is good.  The ideas are complex.  The sentences are often compound.  He's able to follow a flow of thought, communicate his ideas effectively.  He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

Q.    One more question with regard to Dr. Swanson --

THE COURT:  He also, when I saw you interviewing him, he seemed to be a very good historian.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.  Were there anything else -- what were your general impressions about him when you interviewed him with the Government Exhibits 19 through 22 that reflect your interview? Were there anything in particular that stood out that you thought were, that was specifically relevant to your adaptive functioning assessment?

A.  Well, he was certainly highly verbal.  The fact that he was able to recall specific details both back from apparently his work history -- I don't know that all that he told me was true.  There are times that it appears that he exaggerates or dissimilates, but he certainly provided details around pay rates and things like that that appear to have been confirmed later on by others.

Certainly his ability to follow a flow of thought, his ability to be redirected, his interpersonal skills were notable in terms of how he began very quickly relating things to where I was from.  He asked early on where I was from, and then would relate back to that, in North Carolina.  He called me by name quite a bit throughout, and Dr. Price, remembering back to him.

The level of language that he used, the words that, you know, literally we're talking about the words and concepts,

whether we were talking about things like escrow or people being manipulative or something being deficient or -- you know, he has certainly a notable vocabulary that is generally accurately used.

Q.    And one more question with Dr. Swanson's testing.  You reviewed her raw data, and you heard her testimony.  What is your opinion about how she administered and interpreted the tests that she applied with regard to Beverly Franks?

A.    Well, I think the issue is less with how she administered it, per se, than there was no acknowledgment of the significant violation of the standardization norm, so that the scores would be of highly questionable validity and reliability.  And that part wasn't acknowledged at all.

Q.    And she -- that's the test where she had Beverly Franks refer back to when Alfred Bourgeois was seven.  Did you find anything interesting about her selection of the age of seven?

A.    I did.  If you're going back and interviewing somebody retrospectively, as she noted, one of the challenges is how do you keep them focused on a specific age.  And I think that's a noteworthy challenge.  And in fact, what I do whenever I'm giving an ABAS and have to go back in time or need to, is I have them choose or base it on the last time they saw the individual, instead of trying to pick out a particular age.  I've got two children, and if someone were to ask me how were they, how is one of them functioning at age eight, I would have

a tremendously difficult time picking out their functioning at exactly that age, versus if they said, you know, let's say one had left home for college and I had not seen them after that. I could go back to that last point in time.

So to me, that's one of the challenges to it. She chose seven, which apparently was when he first began to live with Ms. Mary. So she would have been newly getting to know him, and it wouldn't have been the last time that she saw him or the more recent time that she saw him. So we would have wanted to not stretch the memory back as far as possible. We want to try to keep that as close in time, and also to be able to have a specific, a good specific marker for when that time would be.

Also in regards to this, that time point would have been one where he's coming right out of a highly, what seemed, what apparently was a highly dysfunctional family situation. And we would expect there to be all sorts of factors that could be affecting his presentation.

Q.   Let me ask you quickly about Dr. Estrada's testimony, because you were present for the deposition. Was there anything in particular that struck you about Dr. Estrada's testimony that you think is helpful for the Judge in assessing the mental retardation issue that's before her?

A.   Well, he certainly seemed to be tuned into kind of the mixture of data. But the thing, I think, that struck me most with Dr. Estrada is that as a psychologist, I know that the

testing component, the IQ component can be, there is a significant part of the diagnosis of IQ, and that psychiatrists generally don't do IQ testing.

And so we get used to, when they talk about the IQ part of it, then they're sort of shooting off the cuff, if you will, I guess with no disrespect --

THE COURT:  Stepping in your field.

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Well, stepping in our field without perhaps a good knowledge base underneath that.  And my ears certainly pricked up very hard when I realized that Dr. Estrada has a master's in psychology and had administered the IQ test before, so had a --

THE COURT:  And I think he does them in his office also.  He has someone there who administers them, and he reviews them as well.

THE WITNESS:  So that was striking to me.

THE COURT:  At least I've seen him do that on other cases.

BY MR. ROBERTS:

Q.   And that was striking in what way?

A.   It led some, to me, it led some credibility to his observations, because as he noted, the issue with an IQ test is it's a snapshot in time versus the assessment or impression one can get over a longer period of interaction.

Q.   I want to touch just briefly also on his diagnosis of

borderline personality disorder.  In your report, you agree with him --

A.   Yes.

Q.   -- that that's a valid assessment is -- and the reason I want to touch on that, I want to go back to, I want to take that information and ask you about Dr. Gelbort and Dr. Swanson's assessments with regard to how -- did they pay attention to borderline personality disorder and the possibility of it affecting their assessments?  Did I not ask the question artfully?

Let me just ask you this way.  If a psychologist is trying to assess someone for mental retardation and they're doing, whether they're doing IQ testing or adaptive functioning, to what extent should they be paying attention to reactions or -- in their assessment, if someone has borderline personality disorder or other disorders?

A.   Well, I think you have to keep your radar up whenever you're doing an assessment to look for factors that can be affecting functioning or performance in whatever manner.  So is it at a personality level?  Is it at a general health level that day?  Is there a depression or some sort of other Axis I disorder?  So we have to be able to look carefully at other factors that provide a context for understanding the performance that we're getting.

Q.   Now, let's go to the last prong of the mental retardation

test, and that's the onset before the age of 18.  In your opinion, does this record, the record in this case, contain sufficient evidence for you to conclude that Alfred Bourgeois was mentally retarded prior to the age of 18?

A.    No, sir.

Q.    You heard evidence about an alleged head injury that may have happened in '84 or may have happened in '93.  I just want you to quickly, if you could inform the Judge at least with regard to if Alfred Bourgeois even had those head injuries resulting from those accidents in those years, what significance would that be in assessing mental retardation in this case?

A.    One of the implications here, and one can certainly argue over the IQ scores themselves specifically and whether they should, would be adjusted or modified or whatever the circumstance would be.  But the implication seems to be that the IQ scores obtained in the 2004 and 2007 assessments can be extrapolated back to prior to the age of 18, because all things left the same, the IQ is relatively stable across the life span.  But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change. And to me, that would create a snag or a difficulty to being able to extrapolate those scores back.  We don't know whether those head injuries would have led to a decrease in his IQ

functioning.  And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change.  So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.

Q.   And what, in your recollection of the evidence in this case, what age was he when the 1984 accident allegedly happened?

A.   I think he was -- I think it was just after his 20th birthday.  It was right around his 20th birthday.

Q.   Judge Jack asked you this already, but I want to reference this on your report.  Page 17 of the Government's Exhibit 15, you give your conclusion of the, it's a short one.  Would you just read that for the record?

A.   Yes, sir.  "Based on an extensive records review, multiple interviews, and formal assessment of adaptive functioning, it is my opinion, to a reasonable degree of psychological certainty, that Alfred Bourgeois does not meet the diagnostic criteria for mental retardation as that term is defined by prevailing federal law or by current professional standards."

Q.   Final question.  You've been in this -- you've seen the entire trial.

MR. WISEMAN:  Hearing.

BY MR. ROBERTS:

Q.   Good point.  You've been present in the entire hearing.

Moore – Direct
147

A.   Yes, sir.

Q.   You've actually seen additional evidence since you've been here.  Has your opinion changed at all since you observed all of this in the last week?

A.   Not in regards to my conclusions.

Q.   Your conclusions with regard to --

A.   The paragraph that I just read.

THE COURT:  What's the significance -- you remember yesterday when the lady was testifying how much she cared about him?  The one from Birmingham, Alabama, and how friendly he was and you know, I mean, she kind of teared up thinking that he had gotten himself into this horrible situation, that Mr. Bourgeois never looked at her or met her eyes, contact or anything.  What does that mean?  I was interested in that.  Didn't acknowledge her in any way, when she couldn't really say enough good things about him.

THE WITNESS:  My hypothesis on that would be that it may be a reflection of the -- I have two hypotheses.  One is that it may be part of the borderline functioning, where she's gone from being a really close friend who's now turned on him perhaps.  It may be that the emotional flood is so big, I mean, they clearly had a close relationship, and he just sort of shut the emotion out --

THE COURT:  Okay.

THE WITNESS:  -- and sort of dissociated that, or you

know, split off.  Not dissociated, but just sort of, you know, just shut off that emotional side.

THE COURT:  "Dissociative" has another psychiatric or psychological meaning.

THE WITNESS:  Ma'am?

THE COURT:  I said the word "dissociative" has another meaning than what you were saying.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

MR. ROBERTS:  I have no other questions, Your Honor.

THE COURT:  Thank you.  Go ahead, Mr. Wiseman.

MR. WISEMAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Moore.

A.   Good afternoon.

Q.   We're at the home stretch.

A.   Yes, sir.

Q.   I'm going to try to be as quick as I can.  It's getting late, and I know we're all beat.

Judge Jack asked you a question, and you responded, I think you said, "There is no evidence of mental retardation." Is that what you said?  "No evidence of mental retardation"?  I mean, we could read it back.  I wrote it down.

THE COURT:  I thought that's what he said.

MR. WISEMAN:  Yeah, okay, so let's assume --

THE COURT:  I said, "Do you find any evidence of mental retardation in all your interviews," et cetera, et cetera?  And he said, "None" or "No."

BY MR. WISEMAN:

Q.  You would agree that's somewhat of an inaccurate statement.  There is in fact some evidence.

A.  Yes, sir.  My understanding wasn't -- she was asking it at a global level, that did I assess him, did I feel there was --

THE COURT:  And I guess, I guess what you're asking, I'm wondering if he was differentiating between in his mind credible evidence and evidence.

MR. WISEMAN:  Oh, that may be.  That may be.

THE COURT:  And the reason I asked that is he was tearing apart all of those --

MR. WISEMAN:  I just, as I'm sure the Court agrees, we need to be precise here.  So --

THE COURT:  Yes.

BY MR. WISEMAN:

Q.  So we're not dealing with no evidence, we're dealing with some evidence, and you don't think it makes it all the way across the goal line, to use a bad metaphor.

A.  I'll roll along with your metaphor, sir.

THE COURT:  I asked about credible evidence because it seemed to me you were not believing some of these test

results.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  You did not find that credible.

THE WITNESS:  That's correct, ma'am.

THE COURT:  Okay, the WAIS-R and the WAIS-III, or something along those lines.

THE WITNESS:  Well, the WAIS-R and WAIS-III, the issue with those is that they have to be considered, for there to be a diagnosis of mental retardation with IQ scores in that range, there has to be significant deficits in adaptive functioning.

THE COURT:  Okay.

MR. WISEMAN:  So Dr. Moore --

THE COURT:  So that's what you're getting to.

MR. WISEMAN:  Correct.  That's what I --

THE COURT:  Got it.

MR. WISEMAN:  That's what I was wondering about.

BY MR. WISEMAN:

Q.   As Mr. Roberts brought out, you've been here for the whole, the whole thing.  And you've heard all the witnesses, at least all the witnesses related to the mental health issue.  Is that right?

A.   Yes, sir.

Q.   Okay.  And you were here on Tuesday, September 21st, at about 9:35, at least by my estimate, when Ms. Booth stood up

and said the Government concedes that Mr. Bourgeois was abused as a child.  Did you hear that?

A.    Yes, sir.

Q.    And you agree with her.  Right?

A.    I agree that she said and the Government conceded there was abuse of a child.

Q.    Okay.  And you think that's an accurate concession on the Government's part, based on the entire record you've reviewed?

        MR. ROBERTS:  Objection, Your Honor, relevance.

        MR. WISEMAN:  Relevance?

        MR. ROBERTS:  I don't know what his, whether he agrees with our concession or not, I don't know that that has any relevance.

BY MR. WISEMAN:

Q.    Well, I'm asking you if you think the record of this case shows that Mr. Bourgeois was abused as a child.

        MR. ROBERTS:  That's a different question, Your Honor.

BY MR. WISEMAN:

Q.    I think you can answer.

A.    Yes, sir, I think the -- I'm sorry, I wanted to make sure --

        THE COURT:  I got it.

        THE WITNESS:  Okay.

        THE COURT:  Go ahead.  You can answer.

THE WITNESS:  Yes, sir, I think the record does show that.

BY MR. WISEMAN:

Q.   Okay.  And do you agree with the statement that was made at about 9:50 by Ms. Booth that Mr. Bourgeois's a sociopath?

THE COURT:  That what?

MR. WISEMAN:  That Mr. Bourgeois is a sociopath, antisocial.

THE COURT:  Who made that statement?

MR. WISEMAN:  Ms. Booth.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, I'd object that Ms. Booth wasn't a witness in this case, and --

MR. WISEMAN:  Exactly.

THE COURT:  I think actually Mr. Wiseman and Ms. Booth have been witnesses in the case, one way or the other.

MR. WISEMAN:  You've got to throw Mr. McHugh in there, too.

THE COURT:  Oh, definitely.  I don't want to leave him out.

BY MR. WISEMAN:

Q.   Okay.  My point being, sir, you don't think Mr. Bourgeois, based on everything you've seen, is a sociopath.

A.   I don't diagnose him as a sociopath.

Q.   Okay.

A.   I assume that when you say "sociopath," you're referring to antisocial personality disorder.

Q.   Antisocial personality disorder.

A.   I don't think that he meets the diagnostic criteria for antisocial personality disorder.

THE COURT:  What is that?  What is the diagnosis?  I just, see, I'm the one misunderstanding it, because I used that, remember, with the doctor on Friday?

MR. WISEMAN:  No, I remember quite well, yes.  Yes.

THE COURT:  I thought it was somebody -- when he was saying that he didn't have any moral brakes, I thought that's what that meant.

MR. WISEMAN:  I think he said behavioral brakes. There's a difference.

THE COURT:  Well, he couldn't put the brakes on his behavior.

MR. WISEMAN:  Correct.

THE COURT:  I assumed that that meant morally.

MR. WISEMAN:  I --

THE COURT:  As well as rage and all kinds of other things.

MR. WISEMAN:  Right.

THE COURT:  And it was me that first used that term.

MR. WISEMAN:  Correct.

THE COURT:  And I've misused it, apparently.

MR. WISEMAN:  That would be our view with --

THE COURT:  That's fine.

MR. WISEMAN:  -- with respect.

THE COURT:  So what does that mean when they -- were you here when he testified?  Actually, you were not here.  You had already gone.  But I said that behavior, when he says he can't put the brakes on his behavior, I said, "Well, that sounds like a sociopath."  He said, "Yes, it's the same presentation, but a different etiology."  So what does that mean?  If I'm misusing the word wrong, I've got to erase it from my mind quickly.

THE WITNESS:  Well, diagnostically we talk about an antisocial personality disorder.  So I get much more used to talking about, you know, from a clinical perspective, so there's a common term that one is agreeing on.

THE COURT:  Well, I think of a sociopath who has no sense of right and wrong, who is a con person as well, and who has no moral compass.

THE WITNESS:  Yes, ma'am, one who is focused on getting their needs met, with no concern about --

THE COURT:  Well, the doctor did say he tested out as a narcissist, the one from the Friday --

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So what does that mean?  I don't

Moore - Cross

mean the narcissist.  I know what that means.  But the sociopath.  He's not a sociopath, in your opinion?

THE WITNESS:  I don't think that he meets well --

THE COURT:  Or am I saying, using it differently than the right way?

THE WITNESS:  Well, I think you're using the term "sociopath," and I'm not sure how you define that.  I talk in terms of antisocial personality disorder.

THE COURT:  Okay.  I'll tell you where I -- when I was in nursing school, we went to the Patuxent Institute, which was the housing, before the Supreme Court said you can't let -- you've got to evaluate people regularly.  And they had the most brilliant sociopaths in this place that I've ever seen.  Beautiful artists.  They were very talented people.  And they had all been diagnosed as sociopaths.  And so that was my background.  That's why I use the word.

THE WITNESS:  I think in general, when we're talking about a sociopath -- and again, that gets into, I think the definition becomes looser, because it begins to be used by the lay public.  But basically we're talking about somebody who doesn't have a development of conscience.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   And Mr. Bourgeois is driven in his conduct by other factors other than a lack of a conscience.

A.    I believe so.

Q.    And that would be his borderline personality disorder primarily?

A.    Yes, sir.

Q.    And you agree -- I don't want to go through all the stuff I went through yesterday with Dr. Price, but you heard me -- or was that today?  It felt like yesterday.  You heard me go through all the borderline criteria and what it means, and you don't have any quarrel with Dr. Price on any of his testimony with respect to Mr. Bourgeois's borderline personality and what it means.

A.    Not at a global level.  We certainly parse out some details around the psychotic piece of it --

Q.    Okay.

A.    -- and where the definition specifically came from, but no, sir, in general, I don't.

THE COURT:  Did you have an expert testify, Mr. Wiseman, that he was not a borderline --

MR. WISEMAN:  I do not believe so.

THE COURT:  Okay.

MR. WISEMAN:  We've been consistent.

THE COURT:  Has anybody testified to that, that he was not?

MR. WISEMAN:  Um --

MR. ROBERTS:  Not to me knowledge, Your Honor.

THE COURT:  Okay.

MR. WISEMAN:  Maybe we've proven something.

THE COURT:  No, I think you've done an excellent job.

BY MR. WISEMAN:

Q.   I see that you've relied on the DSM-IV-TR as your authoritative source for this evaluation.  Is that right?

A.   Yes, sir.

Q.   Now, you heard Dr. Price talk about the 11th edition of the AAIDD manual, also known as the green book.  You would agree that that's likewise authoritative?

A.   I don't use it for diagnostic purposes, in a clinical sense, but I believe it is an authoritative manual.

Q.   Okay.  And the DSM-IV-TR came out in 2000.  Correct?

A.   Yes, sir.  I'm sorry.

Q.   And that's before the Atkins decision?

A.   That's correct.

Q.   And the green book came out in 2010.  Correct?

A.   Yes, sir.

Q.   All right.  After Atkins, obviously.

A.   Yes, sir.

Q.   And it addresses some of the issues raised by Atkins cases, and by that I mean the retrospective nature of some of these evaluations.

A.   Yes, sir.

Q.   And the DSM just doesn't deal with that.  There's nothing

in the DSM about retroactive or what test to use for it or how to approach them or anything like that.

A.   The DSM doesn't tell how to evaluate.  It tells what the diagnostic criteria would be.

Q.   But for purposes of how to evaluate that, you would agree that as we stand here today, the green book is the authoritative source for how to evaluate.

A.   I think it's a good source.

Q.   Okay.  Well, you've cited its predecessors.  You've cited the 10th edition, you've cited the 9th edition.  Is there something about the 11th edition that you don't like, or is it --

A.   Oh, no, sir.  I simply mean by that that I think the blue, the red, the green books, you know, are certainly important sources, but that there may be other sources of information in the field about how to go about the assessments that would be important as well.

Q.   I'm going to be jumping around here.  I'm trying to be organized, but there's a lot of information.  You say in your report that Mr. Bourgeois went to college.  Other than his self-report, you've seen no document that says he went to college.

A.   While I've not seen any document from a college, at least one of the people that I interviewed indicated that he had been to the community college.

Q.    And who was that?

A.    And --

Q.    Who was that?

A.    Ms. Armont.

Q.    Okay.

A.    And I believe that it may have been indicated on his application perhaps at the Sheriff's Department.  I'm not certain about that.  It seems that there was an application, and it indicated he had had some, he began at the college.

Q.    Now, your report at Page 6 says that the Bureau of Prisons records on Mr. Bourgeois say they gave him a preliminary diagnosis of intermittent explosive disorder, follow-up screening and monthly mental health reviews, noted that there is no evidence of mental illness or distress.  He seems to function adequately.

A couple of questions about that.  Intermittent explosive disorder, you would agree, is -- cannot be diagnosed if the conduct is better accounted for by a borderline personality disorder?

A.    Um --

Q.    Page 667 of the DSM-IV.

A.    I don't have the DSM-IV memorized.

Q.    Well, lucky for you, I happen to have one.

A.    But I certainly wouldn't --

Q.    Let's just --

A.    I wouldn't argue or contend that it doesn't say it.  I'm just trying to in my own head figure out where the rule outs on there are.

Q.    Yes.  It's a big book.  Nobody can remember all of it. I'm putting up for you the diagnostic criteria for intermittent explosive disorder, and you'll see the aggressive episodes are not better accounted for by another mental disorder, and it gives examples, including borderline personality disorder.

A.    Yes, sir.

Q.    Okay.  So the BOP got that wrong.  Right?  It would seem.

A.    I believe they got it wrong because I think he has borderline.  They may say that I was wrong, but I would believe that they would be incorrect with that.

Q.    And you heard me questioning Dr. Price about the people with whom a borderline is most likely to act out in a rageful or violent way would be intimate folks.  Right?

A.    In general.

Q.    Yeah.

A.    And --

Q.    Now, you know --

A.    Far more than in general.  Yes, they would -- I mean, I can certainly, I'm sure, think of exceptions to that, but by and large, it's about people they're in a relationship with.

Q.    Close relationship.

A.    Yes, sir.

Q.   Now, you heard me talk with Dr. Price about Mr. Bourgeois's conditions of confinement at the Terra Haute Penitentiary.  Doesn't seem likely he's got too many intimate folks with whom to act out in those conditions, locked in a cell all day, seven days a week?

A.   I would agree with that, sir.

Q.   Do you agree with the proposition that one should not infer the absence of adaptive deficits by one's verbal ability?  In other words, if someone presents verbally well, you can't put too much stock in that when assessing about the deficits.

A.   One wouldn't base their entire assessment on verbal presentation.

Q.   I've got a white version of the green book.

A.   How did you do that?  Oh, I'm sorry.

Q.   That's all right.  Oh, it's the ABAS manual.

Now I've got the dark version.  I've highlighted a portion of Page 102.  It says, "Do not use past criminal behavior or verbal ability to infer level of adaptive behavior or about having ID," which is their term for MR, mental retardation.

There's a cite, "Discuss two reasons for this guideline.  There is not enough available information, and there is a lack of normative information."  Do you agree with that proposition out of the green book?

MR. ROBERTS:  I just ask you what page that is.

MR. WISEMAN:  I'm sorry, Page 102.

THE WITNESS:  While I agree with that proposition, there are certainly caveats that I would put with that.

BY MR. WISEMAN:

Q.   I mean, and the reason I ask is that, you know, as I went through with Dr. Price, we've got a lot of folks, lay people coming in, and to some degree I think the Court, saying, "Well, he talks so well."  That's of limited use in making this assessment.  Do you agree?

A.   It certainly doesn't capture the entire picture.

Q.   And that's especially true in a case like this, where the person we're dealing with is narcissistic, and I think you used the word "dissimilates," which means he tends to want to make himself look better than he really is.

A.   Yes, sir.

Q.   You heard me discuss with Dr. Price the notion that MR is not a diagnosis of exclusion, that it can become morbidity, with many conditions including borderline personality disorder. You don't have any quarrel with that, do you?

A.   No, sir.

Q.   And you also agree with the proposition that weaknesses can coexist with strengths.

A.   Yes, sir.

Q.   And under your definition, the two of ten definition, he can be strong in eight areas, weak in two, and we win.  Yes?

A.   I'm not sure about the "we."

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   Well, we prove our case.

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   He's mentally retarded.

A.   If a person --

THE COURT:  If you do what?  Say it again.

MR. WISEMAN:  Prove two of ten.

THE COURT:  Two of ten what?

MR. WISEMAN:  Of adaptive deficits.

THE COURT:  Okay.

MR. WISEMAN:  We -- he's mentally retarded.

MR. ROBERTS:  Technically, Your Honor, they still have the third prong they'd have to prove.

MR. WISEMAN:  True.

BY MR. WISEMAN:

Q.   Assuming the other prong is met.

A.   The question is long.  May I repeat my understanding of your question?

Q.   Let me rephrase it.  A person can be mentally retarded and be quite strong in eight of the ten areas, have significant deficits in two of the ten areas, and therefore be diagnosed as

mentally retarded, assuming the first and third prongs are present.

A.    Yes, sir.

Q.    I'm going to put up an exhibit we produced, which I shared with the Government yesterday.  Hmm, this is going to be tough. I wasn't prepared for this technology when we prepared this.

You've had a chance to go through this chart, when it was given to you yesterday?

A.    Yes, I have.

Q.    All right.  And for the record, this is marked as Petitioner's 177.  Does it accurately reflect the number of guesses each of the ABAS Respondents recorded in your testing?

A.    In my testing, yes.  Ms. Banks, I mean, Ms. Franks is not there, but yes.  Yes, sir.

Q.    And it -- we rounded the percentages, but the percentages are approximately correct.  Is that right?  Do you have any quarrel with the arithmetic on this?

A.    No, sir.  I haven't gone through the specific arithmetic, but I don't have a quarrel with that.  I believe that y'all --

Q.    Now, the column that says "Average Number" refers to the table in the ABAS manual that reflects what the mean number of guesses were in each of the scale areas on the ABAS?

A.    Yes, sir.

Q.    Okay.  And are any of them, aside from work, are any of them above one guess per skill area?

A.   No, sir.

Q.   All right.  So when they normed this test, the norm of guesses was .1 in communication, .16 in community use.  So people essentially weren't guessing a whole lot in a normative process for this test.

A.   That's correct.

Q.   Okay.  Now, comparing that to your respondents, we see guesses as high as 100.  So Mr. Davis -- I'm sorry, Ms. Davis guessed 100 percent of the time with respect to leisure, 54 percent with respect to community use.  Home living, 70 percent.  Health and safety, 70.  And I could go on.  The point here is that there's a lot of guesses in your ABAS administration.

A.   Yes, sir.

Q.   And what does the manual say is the number of guesses that should cause the practitioner to be concerned in each skill area?

A.   If the ABAS were being administered in concordance with how it had been standardized, being a contemporaneous administration, one would have a concern with more than, I believe it's four guesses per.

Q.   And after your concern, you're supposed to go back and determine why that person is guessing so much.

A.   Yes, sir.

Q.   Okay.

MR. WISEMAN:  Your Honor, I'd offer this document, 177.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-177 is admitted.  I can read your mind, Ms. Booth.

MR. WISEMAN:  What's she saying?

THE COURT:  I think -- I'm not going to say, because if I'm wrong, I don't want to give anybody a hint of something.  Okay?

BY MR. WISEMAN:

Q.   All right.  I shared this document with you as well yesterday, Petitioner's 176, and this is a --

THE COURT:  Could you zoom it in just a tad?  Thank you, sir.

BY MR. WISEMAN:

Q.   Declaration of Thomas Oakland, Ph.D.  Did you have a chance to review this?

A.   Yes, sir.

Q.   Okay.  And tell the Court who Mr. Oakland is.

MR. ROBERTS:  Your Honor, I object to this statement.  It's hearsay.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q.   Is Mr. Oakland an authority --

THE COURT:  Would you mind taking it down?

MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.    Dr. Oakland is an authoritative source?

A.    On?

Q.    On?

THE COURT:  I just sustained the objection.

MR. WISEMAN:  I put the document down.  I'm asking a separate question about Dr. Oakland.

THE COURT:  An authoritative source on what?

MR. WISEMAN:  On the administration of the ABAS.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q.    Okay.  He wrote the manual.

A.    Yes, sir.

Q.    He designed the test.

A.    I believe one of the folks who designed the test.

Q.    One of two people.  Right?

A.    Yes, sir.

Q.    Okay.  And he -- would you consider him authoritative in the manner in which the test should be applied?

A.    Yes, sir.

MR. WISEMAN:  Your Honor, I would submit to the Court that this is an authoritative source.

THE COURT:  I have already ruled on this.

MR. WISEMAN:  All right.  I was just trying to lay a foundation.

THE COURT:  So please move on.

MR. WISEMAN:  Okay.

THE COURT:  And a foundation for his declaration you have not done.  So move on.  It's not like it's a learned treatise.  Are you finished?

MR. WISEMAN:  Am I finished?

THE COURT:  Yes.

MR. WISEMAN:  With the exam?

THE COURT:  Yes.  Well, you walked away, so I --

MR. WISEMAN:  Oh, no, no.  I was just putting the exhibit down.

THE COURT:  Oh, okay.

MR. WISEMAN:  Goodness gracious, no.

THE COURT:  I was just hopeful.  Are you going to have rebuttal, by the way?

MR. WISEMAN:  I don't think so.

(Counsel conferring off the record.)

THE COURT:  Yes?

MR. WISEMAN:  Well --

THE COURT:  I just want to make time, make sure you have time to do that.

MR. WISEMAN:  Yeah, I mean, we don't have a witness here.  I would like to present Dr. Oakland in rebuttal, but

he's, you know, an elderly fellow who's out of the country, and you know --

THE COURT:  Did you try to take his deposition?

MR. WISEMAN:  Well --

THE COURT:  I'm not going to let you do it now.

MR. WISEMAN:  Well --

THE COURT:  I'm just curious as to why you didn't beforehand.

MR. WISEMAN:  No, we didn't.  I frankly thought his learned --

THE COURT:  Does he live outside the country?

MR. WISEMAN:  No -- no, ma'am.  He lives in Florida.

THE COURT:  Well, that's part of this country.

MR. WISEMAN:  I didn't say he was out of the country. I said he was --

THE COURT:  I thought you said he was out of the country.

UNIDENTIFIED SPEAKER:  He's in Thailand right now.

MR. WISEMAN:  He's out of the country at the moment. He lives in Florida.  He traveled.

THE COURT:  Okay.  But I thought you were saying -- so the reason I asked was that the assumption is that he's too elderly to travel here.

MR. WISEMAN:  No, no, Your Honor.

THE COURT:  And instead, he's out of the country.

MR. WISEMAN:  He's recently retired from his teaching duties at the University of Florida, Tallahassee.

THE COURT:  Well, how elderly is elderly?  I have to get this straight.

MR. WISEMAN:  Significantly older than any of us.

THE COURT:  Uh-huh.

MR. WISEMAN:  Your Honor, I honestly thought a treatise from the -- or a declaration from the person who wrote the manual would be accepted by the Court as an authoritative source.

THE COURT:  Not unless he's -- no.

MR. WISEMAN:  I was wrong.

THE COURT:  If you want to introduce the manual, that's fine.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   The manual says that you should mention in whomever you're reporting about your evaluation --

THE COURT:  Do you have the manual there?

MR. WISEMAN:  Oh, sure.

THE COURT:  Okay.

MR. ROBERTS:  I guess we should clarify what manual, Your Honor.

THE COURT:  What manual is it?

MR. WISEMAN:  I'm sorry.  Let me start over.  I've

been thrown for a loop here.

BY MR. WISEMAN:

Q.   The ABAS manual says that when you have a high number of guesses, four or more, you ought to provide that information with an explanation for its significance to the person to whom you're reporting, in this case the Court.  Do you agree with that?

A.   I'd like to -- I don't have the manual memorized.

THE COURT:  The expert, when I asked your expert on this, Mr. Wiseman --

MR. WISEMAN:  Yes, ma'am.

THE COURT:  Because I understood that none of these tests were designed for what they're being used for in this case.

MR. WISEMAN:  That's right.

THE COURT:  Is that right, Dr. Moore?

THE WITNESS:  Yes, ma'am.

THE COURT:  Pardon?

THE WITNESS:  Yes, ma'am, that's correct.

MR. WISEMAN:  Our view is you don't therefore depart from the manual.  You do the best you can.  And I think my question will make that clear.  At least I hope it will.

THE COURT:  It will.

BY MR. WISEMAN:

Q.   I'm on Page 23 of the manual.  The part that I've

highlighted says, it's regarding scoring of checking.

THE COURT:  Can you read that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.    It says, "Most respondents in the standardization sample guessed three or fewer times.  For each scale area if the respondent guesses four or more items, interview the respondent to determine the reason.  If you decide to continue scoring and interpretation with the current respondent, report the higher number of guesses in all reports, multidisciplinary team discussions, and other venues in which the score may be used to make decisions of the individual."

And my question is, did you in your report make any comment about the high number of guesses?

A.    While I didn't make any comment about the high number of guesses, I tried to highlight the reduced validity and reliability.  To the degree that that should have been in there, I would apologize to the Court and will make sure that those are always in reports in the future.  But I thought the focus on the reduced reliability and validity in noting that we were trying to do a retrospective analysis or assessment kind of made clear that --

Q.    Well, you're relying on your ABAS testing to some degree, aren't you?  I mean, I know you think it's got some flaws, but

you're considering it and relying on it and using it.

A.    Yes, sir.

Q.    And you would agree that it's not entirely forthcoming to not report to the Court, to us -- I mean, you didn't think I was getting your data, and you didn't think it was important to tell me that there was that number of guesses in these, in these administrations?

A.    I would take a bit of umbrage at the implication that I was attempting to mislead you or the Court.  I was entirely aware and certainly confident that the data I obtained would be turned over to your experts, who would be able to make a full assessment of the responses contained therein.

Q.    How did you go about picking your informants for the ABAS testing?

A.    I spoke with, I guess Mr. Bill Shotts initially, who provided me with names of various folks who knew Mr. Bourgeois for, over a long period of time or knew him.  And then I called them individually, and in my conversations attempted to get a bead on who would have known him, both -- as well as possible and across a broader number of situations, recognizing that none of them lived with him or saw him socially, and attempted to balance that out with the possibility of family members.  Although in this context, where I'm working for the Government, that can be a challenging situation for two reasons.  One is sometimes they are reluctant to speak with me, and the second

one is I feel a real difficult challenge asking a family member to complete a measure that could actually come back around and be --

THE COURT:  Harmful to the family member.

THE WITNESS:  Yes, ma'am.

BY MR. WISEMAN:

Q.   Okay.  I guess I really was looking for some different information.  That's my fault.  Once you sat down with a person you identified as a potential informant, how did you make the determination as to whether to administer the ABAS?  You didn't give the ABAS to everybody you talked to.  Right?

A.   No, sir.

Q.   Okay.  So how did you determine if you thought the person was sufficiently reliable to administer the ABAS?

A.   If they had known Mr. Bourgeois over a fairly extended period -- in this case, I was trying to look for, you know, a number of years -- and they had been able to spend social time with him, had seen him on a more casual basis, so that I could get a bit of an idea of how he functioned specifically -- not specifically in the workplace, but at least more casually if they were spending the night in a terminal, or with Ms. Davis, where it appeared that she and her family had known him for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that.

So we tried to, I tried to get folks who knew him a little bit more broadly than someone like Mr. Shotts, for example, who knew him more in a boss/worker relationship, but didn't really, it seemed, sit down to eat with him or spent the night with him at a terminal or whatever.

Q.   Okay.  And so I would take it then that you're looking at two things.  One is the sort of opportunity to observe, as well as the person's apparent reliability as a historian.

A.   Yes.

Q.   You know, if they remember things, things like that.

A.   Yes, sir.

Q.   Now, when you called Ms. Armont up, did you make the call to schedule the appointment, or did someone from the Government's office do that?

A.   Someone from the Government's office did.  I don't believe I spoke with them.

Q.   So someone from the United States Attorney's Office who's trying to defend this capital conviction called --

MR. ROBERTS:  Objection, Your Honor, to the argument nature of his question with regard to --

MR. WISEMAN:  All right.  That's fair.

THE COURT:  Well, it's just us.  It's not a jury.  It doesn't -- he can say whatever he wants pretty much.

MR. WISEMAN:  Oh, really?  Just opened some doors.

MR. ROBERTS:  I just have to defend my office, Your

Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Well, I mean, the point is you had someone from the prosecution call this woman up and say, "We want to come talk to you."  Right?  Something like that.  Okay.

A.   Yeah -- sure.

Q.   Did that person say that an FBI --

THE COURT:  You could just call them "the Respondent."

BY MR. WISEMAN:

Q.   Did someone from the FBI, did you inform or anyone inform Ms. Armont that an FBI Agent was going to be showing up as well?

A.   I'm not sure what Ms. Armont knew in terms of who would be there, but it was my understanding that she had spoken with Mr. Smith on occasion before, and his take on it was that she had been comfortable with him.

Q.   Okay.  So your view then is that Beth Larin, all five-foot-two of her showed up, and that somehow skewed the evaluation, but the agent, who I presume brought his gun, didn't have any effect on the evaluation or couldn't conceivably have had an effect on the evaluation?

A.   The pleasantness --

Q.   Is that your point?

A.   The pleasantness of Ms. Larin or her relatively small stature weren't factors in this.  The FBI Agent stayed outside the door.  He wasn't even in the house.  The issue had to do with the very clear and ongoing display that it was an adversarial process, and again the issue of inadvertent reinforcement of response to --

THE COURT:  I think we can all figure this out.

THE WITNESS:  Thank you, ma'am.

BY MR. WISEMAN:

Q.   Okay.  I just wanted that point to be clear.  It is an adversarial process, and you were there for the adversary.

THE COURT:  Mr. Wiseman, no one has criticized you for having a lawyer there.

MR. WISEMAN:  Okay.  Well, that was not the tenor of the questioning, I thought.

THE COURT:  No.  You have every right to have somebody there.

MR. WISEMAN:  Thank you.

THE COURT:  There's no -- but the question is, and I agree with him, if he says it affected the validity of his testing.

MR. WISEMAN:  Okay.

THE COURT:  And that's okay.

MR. WISEMAN:  Okay.

THE COURT:  It doesn't -- it's neither here nor there

really.

MR. WISEMAN:  Well, and I guess the last question --

THE COURT:  I think you had the right to do that, too.

BY MR. WISEMAN:

Q.   Okay.  The last question I would have is, wouldn't you think the presence of an armed FBI Agent could have an effect on the testing?

A.   It would --

THE COURT:  Well, he said that FBI Agent was outside.

MR. WISEMAN:  Well, Your Honor, inside, outside, the point is he's standing there, he's armed, he's an FBI Agent. You don't think that can have an effect?

THE COURT:  Well, how about affecting the testing of somebody that's on death row?

MR. WISEMAN:  That's the question for the expert.  I mean --

THE COURT:  I know, but I mean all of these things affect the validity of testing, I would assume.  Is that right?

THE WITNESS:  Yes, ma'am.

MR. WISEMAN:  Now --

THE COURT:  I mean, when you're fighting for your life and your defense is mental retardation.

MR. WISEMAN:  That's one of his defenses.

THE COURT:  One of the defenses, and you're being

tested for it after the fact, that would certainly affect -- it

could affect the validity of the testing, could it not?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   I want to talk a little bit about -- just one more

question about the respondents.  Did you try to talk to Beverly

Frank?

A.   No, sir.  I --

Q.   She's the one who came in and testified and to whom

Dr. Swanson administered the Vineland and the ABAS.

A.   Just to be clear in my answer to you, I think she was on

the list of folks that we were going to interview over those

days, but we adjusted the interview schedule.

Q.   Okay.  Did you have any information that -- well, let me

back up a moment.  You understood that Ms. Armont had called my

office and asked for us to be there?  Is that your

understanding of why Ms. Larin and the investigator showed up?

THE COURT:  That was what I understood him to say.

MR. WISEMAN:  Yeah, okay.

BY MR. WISEMAN:

Q.   Did you ask similar information that Ms. Frank had done

the same thing?  I mean, did you expect we were going to be

there, too?  Did you think we were going to be everywhere?

A.   Yes, sir, based on a comment that --

THE COURT:  It's a conspiracy.

THE WITNESS:  -- Ms. Larin had made to Ms. Hohle before we left, along the line, they were speaking, "I guess we'll be seeing you over the, later on today," or whatnot.  We took that to mean that perhaps additional interviews that we would be at, they would also be there.

THE COURT:  I was joking about the conspiracy, by the way.

MR. WISEMAN:  I know.

THE COURT:  Okay.

MR. WISEMAN:  The record should reflect there's been a lot of friendly banter.

THE COURT:  Thank you.

MR. WISEMAN:  Does Your Honor agree?

THE COURT:  I do.  Thank you.

MR. WISEMAN:  I just wanted the record to be clear.

THE COURT:  Without sacrificing the purpose of the hearing.

MR. WISEMAN:  Of course.

BY MR. WISEMAN:

Q.  So as I understand your criticism of Dr. Swanson's interpretation of the Woodcock, which I put up Petitioner's 35 at Page 13, is that you think the Scaled Score column is the relevant one and not the one she relied on, Age and Grade Equivalent.  Is that right?

A.    I think in terms of looking at the definition of mental retardation in terms of two standard deviations below the mean, that is the most relevant number to look at, because that gives us a comparison to his same age to peers.

Q.    Okay.  And two standard deviations below the mean in this case would be 70 or below?

A.    Yes, sir.

Q.    In regard to the Woodcock?

A.    Yes, sir.

Q.    And I think your testimony, which I wrote down was, you said a couple, as in two, of his scores were two standard deviations.  I just want to be clear on this.  We see he's got a 68 in Broad Math.  He's got a 70 in Brief Math.  He's got a 66 in Story Recall.  He's got a 63 in Applied Problems, and a 57 in Story Recall Delay.  So in fact, there are five of his scores that are two standard deviations below the mean.  Is that right?

A.    Yes, sir.  That would be true.

Q.    And if one -- well, let me ask you this, what does the DSM say is the rough grade equivalent for a person with mild mental retardation?  Sixth grade?

A.    The -- I'm sorry.  I didn't mean to interrupt you.

Q.    I interrupted you, but I'll keep going.  It's sixth grade is roughly the upper grade level for a person with mild mental retardation.

A.    I think the way it says it is that folks with mild mental retardation may reach up to about the sixth grade level.  Yes, that's correct.

Q.    Okay.  So when we look at the grade equivalency levels, we see 3.1, 4.1.  We've got one above 6, the 6.2, 5.4, 5.8, 4.1, 7.2.  I mean, going down the line, he's got far more grade equivalents below the sixth grade, doesn't he?

A.    While it's true that he does, I think what's most striking is that with those standard scores, it would also mean that about 10 to 12 percent of the population would have scores, grade equivalents that low as well.

Q.    You're familiar with Muriel Lezak's Neuropsychological Assessment, Fourth Edition?

A.    Yes, sir.

Q.    It's an authoritative source?  It's the bible of neuropsychology?

A.    A bible in what?

          THE COURT:  He said it was a bible of neuropsychology.

BY MR. WISEMAN:

Q.    It's got all the tests, everything in there.

          THE COURT:  Is that right?  That's what you said?

          THE WITNESS:  I didn't think I was allowed to talk about neuropsychology.

          MR. ROBERTS:  Your Honor, is the witness going to be

allowed to talk about neuropsychology now?

MR. WISEMAN:  No, he's going to be able to talk about, if I'm permitted, the Woodcock-Johnson --

THE COURT:  You shouldn't have said that.  Go ahead.

MR. WISEMAN:  -- the Woodcock-Johnson, which is a test he's commented on.

THE COURT:  Thank you.

MR. WISEMAN:  Just have a moment to find the page.

BY MR. WISEMAN:

Q.   I'm going to put up for you -- this book is a little bulky.  I'm going to make Ms. Larin carry it back to Philadelphia.  You see here on Page 665 is the Woodcock-Johnson?

A.   Yes, sir.

Q.   Right?  That's what we're talking about.  And over in the right column, this is at Page 665, there's a discussion about age and education equivalence provided in the test record booklet?

THE COURT:  Could you push it down a little bit --

MR. WISEMAN:  Sure.

THE COURT:  -- so that it's more -- no, I meant flatten it.

MR. WISEMAN:  Oh, flatten it.  It doesn't fit on the ELMO.

THE COURT:  Okay.  It's hard to read the words when

it's not flat.

MR. WISEMAN:  Yeah, I got you.  Okay.

THE COURT:  Well, maybe if you zoom it in a bit, it would be easier.

MR. WISEMAN:  How is that?

THE COURT:  Better.  Much better.  Thank you.

BY MR. WISEMAN:

Q.   It says, "Age and education equivalence are provided in the test record booklet.  Age and education ranges vary from test to test," and it talks about all that.  And down at the bottom here, the part I want to draw your attention to, it says, "Of course, when using the test selectively, scores requiring combinations and comparisons of discrete test scores cannot be obtained.  For most purposes experienced neuropsychologists would be able to rely on the age and education equivalence."  Do you see that?

A.   Yes, sir.

Q.   So isn't Lezak there essentially saying that what's important for assessment purposes are age and grade equivalence, and not standard scores or scaled scores, for experienced folks?

A.   Well, I think it would depend on the context within which the information is being utilized.

Q.   Okay.  But I mean, let's just say, focus on what Muriel Lezak says.  She says that, for experienced practitioners, it's

age and it's grade equivalency that are the most relevant of these measures.

MR. ROBERTS:  Objection, asked and answered.

THE COURT:  It's okay.

THE WITNESS:  Again, I think it has to do with the context.  If the issue were about trying to determine where a person's reading level's set for education and habilitation purposes, I think the grade equivalent would be an appropriate place to be putting the focus.

BY MR. WISEMAN:

Q.   So you agree, disagree with Lezak on that point.  Let's move on to --

MR. ROBERTS:  Your Honor, can the witness be allowed to answer?  He was not --

THE COURT:  Go ahead.

THE WITNESS:  Again, I think it depends on the context.

BY MR. WISEMAN:

Q.   Okay.  Let's move on to the Flynn Effect.  And I don't want to get into a whole big fight about the Flynn Effect, because we could be here, and I do have to get home, as we all do.  I think --

THE COURT:  Are you planning on leaving tonight?

MR. WISEMAN:  Tomorrow.

THE COURT:  Okay.

MR. WISEMAN:  I hope.

BY MR. WISEMAN:

Q.   I'm going to try to characterize the dispute.  You tell me if I'm doing it right, just so we can sort of set the terms. As I understand the dispute, there's this recognized phenomena that norms get outdated, IQ scores tend to drift up a little bit and over-reflect people's true abilities if the norms are kind of old.

A.   Globally, that's correct, with a recognition that in some of the studies that have been used in Flynn, some of the ones in Scandinavian countries, but ones that he's talked about particularly earlier on being some of the most robust data for the Flynn Effect have reversed.  But in general, I would accept that as a baseline --

Q.   Okay.

A.   -- field.

Q.   All right.  And then the dispute, if you will, seems to be between folks, who I gather you're one of, who say, "Well, you know, you don't adjust the score.  You simply make it known that the outdated -- that the score obtained on the outdated test, or the one with the older norms, may be an overestimate of true ability."  Is that the position that you sort of take?

A.   I would say that would be an unreliable, a less reliable estimate.

Q.   Less reliable.  Okay.  And the other side of that

controversy says you actually make an arithmetic adjustment and adjust down the score.

A.   Yes, sir, that's correct.

Q.   Okay.  I want to draw your attention to the green book. At Page 37, weighs in on this controversy.  It says, "Best practices require recognition of potential Flynn Effect when older editions of an intelligence test with corresponding older norms are used in the assessment and interpretation of IQ scores.  Then it refers to the user's guide from 2007.  The user's guide in that context is the user's guide to this manual.  Yes?

A.   Yes, sir.  I'm sorry.

Q.   And it then quotes the user's guide and says, "The main recommendation resulting from this work regarding the Flynn Effect is that all intellectual assessments must use a reliable and appropriately individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norm should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted," closed quote.

So the green book, the most current authoritative post-Atkins statement on Flynn, from this organization, says, "Correct," Doesn't it?

A.   The AAIDD, without doubt, proposes to correct for Flynn, in fact, uses a correction number higher than I see in

virtually any other place.  And the AAIDD espouses how to score a correct IQ test I have a bit of an issue with.  I think they can tell us a lot, a tremendous amount about the diagnosis of mental retardation.  But in terms of how to administer or score an IQ test or what to do with those scores, I have more difficulty with that.

Q.   Okay.  So you disagree with the eleventh edition, the most current authoritative post-Atkins source on assessment of, or application of the Flynn Effect.

A.   Yes.

Q.   I mean, it's not, it's nothing to be ashamed of --

A.   Yes.

Q.   -- but that's your position.

A.   Yes, sir.

Q.   I didn't see anything in your report other than the criticism of Dr. Weiner's using the WAIS-R.  I didn't see any criticism about the way in which it was scored or administered.  I mean, you have no quarrel with that?  Did he make any mistakes?

A.   Right.  Other than that, which I think actually the mistake that I noted in there actually was acknowledging or pulling the score down --

Q.   Oh, really?

A.   -- by a point.  I think it went from a --

Q.   Do tell.

A.    -- a 76 to a 75.

Q.    Oh, okay.  That was the transcription error between the report --

A.    Yes.

Q.    -- and the data.

A.    But there had been the contention in some places, and they couldn't tell where that error was, whether it really should have been a 76 or a 75.  And I believe it should have been a 75.

Q.    Now, you've testified that one of the problems in using these standard measures for assessing adaptive deficits is that there were not norms out there for the application of these tests in a retroactive adaptive deficit situation.  Is that -- am I understanding that?

A.    Yes, sir.

Q.    Okay.

(PAUSE.)

MR. WISEMAN:  Your Honor, you know, I'm missing a document and --

THE COURT:  What you need to do -- oh, you -- okay.

MR. WISEMAN:  I could also use a five-minute break.  I don't want to keep people waiting.

THE COURT:  Okay.  Five minutes.

MR. WISEMAN:  Thank you.

THE COURT:  Ten minutes.

(Recess from 4:42 p.m. to 5:11 p.m.)

THE COURT:  Thank you.  You may be seated.  You may proceed.

MR. WISEMAN:  Thank you, Your Honor.

MS. BOOTH:  Your Honor, before we start, if it's okay, my case agent, Megan Beckett, would it be okay if she left at 5:30?  Could she be released?  Is there any problem with that?

THE COURT:  I've been surprised she was here the whole time.

MS. BOOTH:  She's under two weeks before her due date.  We want to get her back to Philadelphia.

MR. WISEMAN:  I thought I would be done before then.

THE COURT:  Where are you living now?

MS. BECKETT:  Las Vegas, ma'am.

MS. BOOTH:  Oh, okay.

THE COURT:  Oh.

MS. BECKETT:  I have a little bit of a flight tonight.

THE COURT:  You better get on the way before they don't let you fly.

MS. BECKETT:  Yes, ma'am.

THE COURT:  Well, it's good to see you again.

MS. BECKETT:  You too, Judge.  Thank you.

THE COURT:  Bye-bye.

MR. WISEMAN:  And Your Honor, just so the Court and the Court staff know, I don't expect to be more than 30 minutes.

THE COURT:  Thank you.

MR. WISEMAN:  I thought you'd appreciate that.

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   When we broke, Dr. Moore, I was asking you about your concern that there aren't any formal instructions for how to proceed in a retrospective adaptive deficit evaluation.  I just put up on the screen here, just for identification, a document called the Vineland II, Expanded Interview Form Manual, a Revision of the Vineland Social Maturity Scale, and it's got the author's name.  Are you familiar with this document?

A.   Yes, sir.

Q.   Okay.  And this is like -- and you would agree this is an up-to-date addendum to the Vineland II Manual?

A.   Yes, sir.

Q.   And you agree that it's got a chapter on retrospective interviews?

A.   Yes, sir.

Q.   So in fact, there is guidance from the test designers as to how to proceed in a retrospective setting.

A.   I'm not sure that I testified there was no guidance on how to proceed in a retrospective setting.  I think my testimony

was that the tests weren't normed for that situation.

Q.    I'm sorry, I didn't hear the last part.

A.    I don't believe the tests were normed or standardized for that situation.

Q.    But the folks who designed the tests are putting out instructions about how to use them in a retrospective setting.

A.    Yes, sir.

Q.    You saw Claudia Williams testify in the court that first -- she was our first witness, I think, the first witness on the second day.  It's all running together.  But you saw her.  Right?

A.    Yes, sir.

Q.    Okay.  And you asked her to take the ABAS, and she declined.

A.    Yes, sir.

Q.    Okay.  And I presume you interviewed her prior to asking her to take the ABAS, as part of the protocol requires, you interview the person to see what their basis of knowledge is and whether they're a good, reliable informant.

A.    Yes, sir.

Q.    Okay.  And after watching her testimony, did you think she would have been a suitable ABAS informant, in terms of her ability to recall dates?  I thought she said several times to Judge Jack, "I'm not real good with dates.  I can't remember dates."

THE COURT:  I thought she was a poor historian.

MR. WISEMAN:  Yes, that's my point.

BY MR. WISEMAN:

Q.   Did you, do you agree with Judge Jack?

A.   Yes, sir.  Certainly.

Q.   Smart man.  And so Judge Jack had criticized, I think, Dr. Swanson for choosing Beverly Frank over Michelle, over Claudia Williams, and I think you'd agree that Ms. Frank was a much better historian, in fact a pretty good historian in her ability to recall specifics.

A.   She seemed to be a good historian.

Q.   And I thought you had some criticism of Dr. Swanson's going back to age seven, and I thought there were a couple of reasons, but the one I wanted to ask you about was in doing a retrospective analysis, it's important to be able to keep the informant focused on a specific time in order to ensure reliability.  You agree with that?

A.   Yes, sir.

Q.   And so I think with one of your informants, you chose graduation from high school as a point.

A.   With -- that's correct.  With my informants, what I had them utilize was the last date that they had ongoing contact --

Q.   Okay.

A.   -- with the individual, so that it was firmly established for them.

Q.    Okay.

A.    We knew they were giving me the maximal level of advancement that the person had reached.

Q.    All right.  And you'd agree that Dr. Swanson essentially did the same thing when she said to Ms. Frank, "Let's focus on when Alfred came to live with you.  What could he do then?" And that's similar to what you did, in the sense of pinpointing a specific time frame.

A.    Well, there's a similarity in terms of pinpointing a time frame.  The difference for me is that we know there is the end point.  So whatever it was they did, that by the end point they knew how to do that.  In other words, it's their highest level of functioning, versus reaching back to this particular date where she would have had interactions with him perhaps after that as well, and maybe even before then.  I'm not sure whether, why they chose exactly seven.

Q.    And I thought, you know, the record will reflect it, but I thought that Dr. Swanson testified that that was the last date that Ms. Frank had a recollection of Mr. Bourgeois, from around the time that he came to live with her grandmother.

A.    That's not my understanding, sir.  I thought that she said that she knew him from about the age of seven till he was about nine.

Q.    I see.  So given that Ms. Frank hadn't seen Mr. Bourgeois from age nine till she came into this courtroom, you would

agree that that is consistent with -- well, withdraw that.

What's your basis for thinking she's biased?  Or do you think she has a bias for Mr. Bourgeois?

A.   The concern that I had -- well, there are two pieces.  My issue in terms of, or my struggle with Ms. Frank had to do more with the comparison of the Vineland to the ABAS in general, where some of the responses or numbered responses were different.  But secondly, that level of adaptive functioning that she described on the ABAS was --

Q.   Seemed low?

A.   -- seemed low.

Q.   Okay.  But didn't you hear Dr. Swanson testify that's why she followed up with the Vineland, which provides the evaluator an opportunity to clarify and understand responses?

A.   Yes.

Q.   That's a feature of the Vineland that's not present in the ABAS.

A.   Yes, sir.

Q.   All right.  And when she clarified and asked probative questions and clarified questions, in fact, Ms. Franks' ratings went up, still in the significantly deficient range, but they did go up.

A.   Oh, yes, sir.

Q.   And you didn't do that with your ABAS's, because they don't, it doesn't permit it.  It's not part of the test.  You

don't get to clarify and say, "What did you mean by this" and "What did you mean by that?"

A.   That's correct.

Q.   Now, in doing this retrospective analysis, you didn't interview anyone -- you didn't -- well, I'll take that back.  I guess with Ms. Davis, she knew him a little bit before age 18, although it was unclear, I think, how much before 18.  But no other -- I'm getting punchy.  Right, you didn't administer the ABAS to anybody who knew Mr. Bourgeois pre-18 is the point I was trying to ask you about.

A.   It seems like --

        MR. ROBERTS:  Your Honor, I would ask the witness be permitted to speak about Mr. Banks, because he's just asked him --

        THE COURT:  Yeah, go ahead.

        THE WITNESS:  I administered it to Mr. Nathaniel Banks, who was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from -- well, knew him throughout his life, but had ongoing contact with him until he was about 18.

BY MR. WISEMAN:

Q.   Right.  But I thought the date that you asked him to pinpoint was when Mr. Bourgeois was 18, not pre-18.  Did you ask him to recall "What was Mr. Bourgeois like the last day you saw him," which was after his 18th birthday?

A.    My understanding on the dates of that was that it was -- I think it actually wound up being May of that year.  I believe it was just prior to 18.

Q.    We're going to check on that, and I'll move on to something else for now.  But you would agree that it would be helpful in this setting to administer a test to somebody who knew Mr. Bourgeois before he was 18, in meeting the onset criteria.

A.    Well, sir, actually the way that I've addressed this in the past --

Q.    Okay.

A.    The way that I've addressed this in the past, again, the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is. So what's happened in cases where I've worked with is if their adaptive functioning were in the significantly impaired range, in adulthood, and they had significant deficits in intellectual functioning, et cetera, and there was other ancillary data that reflected that the impairment had began before the age of 18, then my recommendation in those cases has been that while it can't be firmly established as an onset prior to the age of 18, it appears from the data that we have that it's likely, you know, the person is currently mentally retarded, and it appears that that's been a condition that had an onset prior to the age of 18.  So I wouldn't have necessarily had to have gone back

and, you know, I certainly don't require IQ testing that sometimes isn't even available in someone prior to the age of 18. And adaptive functioning measures, again, I don't necessarily have an adaptive functioning measure that's completed prior to the age of 18.

Q. Now, I'm putting back up 177, which is the chart outlining the guesses of the respondents. You would agree that with the exception of Mr. Banks, the people who knew Mr. Bourgeois in the work setting guessed zero times. That would be Clark and Davis -- Clark's valid one -- and those two folks guessed far more often in the other areas.

A. Yes, sir, that's correct.

Q. And it's important in doing this assessment to select informants who have good information, good source for information in more than one skill area.

A. Yes, sir.

Q. So you wouldn't want to give it to someone who only knows the subject in terms of home living.

A. Yes, sir, that's correct.

Q. Okay. And yet you'd agree that Davis and Clark really are guessing pretty extremely, except in the one domain where they knew Mr. Bourgeois, which was work.

A. They guessed more in those domains than in the work setting. I would certainly agree with that. I think that their knowledge of him in different settings was such that they

may not have seen him engage in a specific behavior, but from what they knew of him, felt confident in their rating.

For example, Ms. Davis' estimate that he would be able to find a restroom in a public area, that he would appropriately find the restroom, well she said he could, she thought he would be able to consistently do it independently, but she guessed.

Q.   Now, I thought your view was that Mr. Clark checked guesses because -- I'm sorry -- Ms. Davis checked guesses because she didn't actually see him do things, and you thought that was somewhat improper under the protocols.

A.   I'm sorry, I didn't mean to interrupt you.

Q.   Yeah.

A.   Would you say that again?

Q.   Sure.  I thought you were saying that Ms. Davis, her completion of the test, she guessed improperly sometimes because she was interpreting it to mean that if she didn't see him do something, she had to guess.  And you don't agree with that.

A.   Oh, no, sir, I would disagree with your contention there.

Q.   Oh.

A.   I think she absolutely did it correctly.  I think that she was just extremely vigilant to, "If I didn't lay my eyes on him to do it," then she would check a guess.

Q.   Right, okay.

A.   I think she did it appropriately.  I think that most

people completing that form might have been a little less, you know, hyper vigilant to that.

Q.    But you would agree that the instructions said that you should check guess if you've never seen the individual in a situation in which the behavior is needed.

A.    Oh, absolutely.

Q.    What?

A.    I don't think that she mischecked.  I don't think she was in error.  I think she was being very vigilant.

Q.    Okay.  So the point is, is if you don't see the person do something, you're not supposed to speculate.  You just say you guessed.

A.    You are supposed to speculate.

Q.    Right.

A.    You're supposed to speculate and say --

Q.    But you're supposed to check that you guessed.

        THE COURT:  Let him finish answering.

BY MR. WISEMAN:

Q.    I'm sorry.

A.    You are supposed to speculate, but you're supposed to indicate that that speculation, being based on your knowledge of the individual in other situations, was in fact a guess or an estimate.

Q.    Are you familiar with this volume, the ABAS-II, clinical use and interpretation by Thomas Oakland and Patty Harrison?

A.    Yes, sir.

Q.    Okay.  And this is a -- those are the authors of the ABAS test, correct?

A.    Yes, sir.

Q.    And this volume came out, published in 2008?

A.    Yes, sir.

Q.    There's a chapter here on the use of the ABAS in adult forensic settings.  Are you familiar with that, Chapter 20?

A.    I would certainly appreciate the prompts.  Oh, yes.

Q.    You see that?

A.    Yes.  Yes, sir.

Q.    Okay.  In that -- excuse me -- in that chapter, at Page 389, says, "If the focus of adaptive behavior is work, the informant may be a former employer or co-worker, he or she will provide useful information by completing only the work adaptive skill area."  Do you agree with that?

A.    I agree that if they only knew them in work, then in a general guideline, that would be a reasonable contention.  I think the nature of Mr. Bourgeois's work and the nature of the contacts that he had with the informants that were utilized was appropriate because they had somewhat broader contact.

Q.    All right.  Well, let's take Mr. Clark.  I mean, Mr. Clark, I thought his testimony was quite -- oops, I'm sorry -- Mr. Clark's testimony was quite clear that he, you know, other than an occasional meal every other week or so, he

had no other contact with Mr. Bourgeois.  He saw him occasionally in terminals, they'd go out for a bite.  So he really had no -- I mean, would you agree with that characterization?

A.    I would agree that that was the way the testimony was elicited here.  In my interview with him, he indicated they did runs together, they would stay in the terminal spending the night, you know, where everybody would be there in the terminals every night, so he had seen him in that type of circumstance.  They would do cookouts together sometimes there, they would go to the store to buy items, sometimes splitting up when they got there to buy various items, and when they would cook out, sometimes Mr. Bourgeois would do the grill, and sometimes others.  It appeared that there was much more of a social basis, and sometimes after hours they would help other truckers with things, they'd hang out, maybe go work on a CB radio, those types of things.  So --

Q.    So he -- I'm sorry.  Go ahead.  Finish.  I'm sorry.

A.    So what he described to me in the interviews that I had with him was a broader degree of social contact.

Q.    Okay.  So you were told one thing, and Judge Jack was told another thing with respect to the frequency of his contacts and the setting of his contacts.  Would you agree that there's some difference?

A.    I would agree that the interview that I had with him and

the information I got was more broad-based than what he shared here.

Q.   Okay.  And wouldn't you agree that the number of times he's guessing, like for example on every question in leisure, he guessed 100 percent of the time, suggests that he really wasn't a good informant for that skill area?  He just didn't know Mr. Bourgeois in leisure.

A.   That's Ms. Davis, sir.

Q.   Oh, you're right.  Well, let's pick a different one.  Home living, 61 percent guesses.  I mean, that means he didn't know Mr. Bourgeois in home living.

A.   While it indicates he doesn't know him in home living, it doesn't mean that the foundation upon which he was making the guesses were that extreme.  For example, one of them was packing for an overnight trip.  He said, "I saw him and his truck, how things had been packed.  I knew that he was able to pack his own stuff when we were on the road.  I presumed that he was able to pack himself at home, but I didn't actually lay my eyes on him to do so."  So it was a guess, but it certainly appeared to be an informed guess.

Q.   The same section of the ABAS-II book I was just reading to you also -- well, I'll put it up.  It says, "Some informants" -- oops, that's terrible.  "Some informants may have known a Defendant's functioning well in one setting and may be able to provide useful anecdotes, yet not enough is

known to complete all sections of the ABAS-II."  Do you agree with that?

A.   That some informants may not have known an individual enough to be able to, to be able to talk about all settings?

Q.   Right.

A.   Yes, sir.

Q.   Okay.  But they can provide useful anecdotes is what this says.

A.   Yes, sir.

Q.   Okay.  Now, in terms of bias, did you see any bias at all with regard to Donald Reese, who hasn't seen Mr. Bourgeois in 20 years, knew him for two weeks?

A.   He didn't seem --

Q.   He was the guy who was hanging over the cliff in Tennessee?

A.   Yes, sir.  He didn't seem to have the highest opinion of Mr. Bourgeois.

Q.   Okay.  So if anything, he was biased against him.

A.   Yes, sir.  He didn't seem overly impressed with him.

Q.   Okay.  And so that set of anecdotes he related about how Mr. Bourgeois, when he started to drive a new kind of truck, couldn't figure it out that well.  Right?

A.   There was a button that he pushed --

Q.   Right.

A.   -- that he didn't understand what it was the button did.

And then as I understand it, a couple of minutes later, he pushed a button that undid the thing.  So I don't know whether the characterization that he wasn't able to drive the truck well or didn't understand about it was --

Q.   What about the part where they stopped and all the liquid sloshed and Mr. Reese was thrown out of his sleeper compartment and got out of the truck and saw they were in a ditch?

A.   They had run into -- I'm not sure how much you've driven through the mountains of Tennessee or North --

Q.   Never.

A.   To run into the ditch on a mountain in that regards, the way those roads are cut in, is not a real surprising thing. They're fairly narrow, and there's a sharp dropoff on one side. And while I wasn't in that particular site, as he noted, he could look off to the one side and you could see the top of the pine trees.  It's a little disconcerting to drive in those.

Q.   Are you seeking to explain away behavior suggestive of an adaptive deficit?  I mean, the man ran an 18-wheeler off the road.  You don't think that's --

        MR. ROBERTS:  Your Honor, that's argumentative.

BY MR. WISEMAN:

Q.   Do you think that's --

        MR. ROBERTS:  Object.

BY MR. WISEMAN:

Q.    -- significant information?

A.    Do I think the fact that a person in, on mountain roads in that type of an area drove an 18-wheeler into a ditch or went off of the road into a ditch is a sign of an adaptive deficit? That would be an anecdote --

Q.    Some evidence?  Would it be some evidence?

A.    That the man drove the 18-wheeler, or rolled into a ditch on a mountain road like that would be an anecdote.  When we look at adaptive functioning, we're looking far more broad-based than that.  I think that the population of people who have driven off of the road into a ditch would be fairly broad.

Q.    Okay.  Well, you know, maybe it's my fault we're taking this in isolation, but I mean, this man drove tandem for two weeks with Mr. Bourgeois and basically testified he was terrified and got out of the truck and took a bus home.  I mean, that's more than one incident anecdote, isn't it?  They had gotten lost --

A.    He related three.  He said there was --

Q.    Got it.

A.    I'm sorry.  He related three.

Q.    Right.

A.    The one with the button where they had, apparently just learning the truck, the place where he had over shot the highway and was going down a different -- was not taking the road, the highway they were supposed to take, and the episode

in the ditch.

Q.   Right.  And the overall flavor to him was, "Oh, my God, I've got to get out of this truck."

A.   Yes.

Q.   Okay.  So that's more than just an incident.  It's more than just running off the road.  It's a pattern of behavior when Mr. Bourgeois first started driving these trucks that caused this man to be afraid of his ability.

A.   I think he was not only afraid of him.  It sounded like that Mr. Bourgeois with his excessive verbalizations was problematic for him as well.  He sounded, he sounded irritated with him --

Q.   All right, so --

A.   -- to me as well.

Q.   How many in-person meetings have you had with the Government lawyers in this case?

A.   How many in-person meetings?

Q.   Yeah.

A.   Prior to this week?

Q.   Yeah, prior to this week.

A.   Can I carry it back one more and say prior to last week when we were up here for that deposition as well?

Q.   Sure.

A.   Okay.  I think I was only here once --

Q.   Okay.

A.    -- prior to that.

Q.    And how long did you meet with them?

A.    I think I flew in on a Wednesday evening, and we met on Thursday and part of Friday.

Q.    A day-and-a-half.

A.    Yes, sir.

Q.    Okay.  And I think we, you and I bumped into each other when we were checking in for the Gelbort and Estrada portions of these proceedings.  Right?

A.    Yes, sir.

Q.    So you were here a good day ahead of the start of those proceedings.  Right?  I think that was a Wednesday, and you met with the Government on that Thursday.

A.    Yes, sir, that's correct.

Q.    Okay.  So you spent a day-and-a-half before then, spent, I assume, another day with them before the Gelbort, Estrada deposition -- proceedings.

A.    Yes, sir.

Q.    Okay.  And I don't want to -- it's getting late.  I don't want to go through every one of them, but I would assume you've had quite a number of phone calls with the Government, other than logistical phone calls, substantive discussions on the telephone?

A.    I think substantive phone calls, and I would need to check my records on that, but would be three.

Q.   Three.  How many hours or minutes?

A.   Oh, those phone calls would have been an hour.

Q.   An hour, okay.  So sounds like you spent about six, seven hours talking with the Government about the substantive -- did I say six?  My God -- a couple of days and then six or seven hours of phone calls?  Three hours of phone calls.

A.   No, sir.  I thought I said three --

Q.   Three, three.

A.   -- phone calls of an hour --

Q.   That's right.

A.   -- a piece.

Q.   Okay.  I guess the point I'm making, rather clumsily, is you've devoted a lot of time educating the Government lawyers about what you've got to say.  Right?

A.   I don't think that I've spent nearly as much time teaching them about what I have to say than trying to help them understand about the mental retardation issues in general.  And then a reasonable part of that time, particularly while I was on site, was them looking at or dealing with other types of issues as well.  And then if I could be of consultative help with them, then I would.

Q.   And you heard Dr. Weiner's testimony about the amount of time trial counsel spent with him?

A.   I don't recall what that time -- I was in here for it, but I don't recall.  That was not a particular feature I tuned

into.

Q.   I think it was zero.

A.   Okay.

Q.   All right.  So --

A.   Shows why I missed it.

Q.   I just want to cover this chart for a moment.  And I have a feeling it may be too late in the day for me to make any sense of this, but my question -- that's my writing on there, or my scribbles, but my question is, what was the date on which this study was conducted?  The year, not the day, but I mean -- this is comparing WAIS-R with WAIS-III scores.  Right?

A.   Yes, sir.  That's from the WAIS-III handbook.  So the WAIS was published in 1997.  And so the correlational studies probably would have been being done in probably '95 to '97.  I think.  And that's my best guess.  That's when they were norming the test, I believe.

Q.   Okay.  I was just curious about that, because it wasn't apparent on the chart.

     You expressed shock or that you thought it was striking the drop in Mr. Bourgeois's performance on the verbal IQ between the WAIS-R and the WAIS-III.  Do you recall that?

A.   Yes, sir.  I thought that was a notable drop.

Q.   Okay.  Could part of that drop be attributable to the -- by the time he was taking the WAIS-III, he had been on death row for about three years, without appropriate stimulation,

things to challenge his mind?

A.    While that's an interesting hypothesis, I wouldn't particularly ascribe to it.  And I would think that it would be a little notable that his performance would have gone up over that same period and under those same conditions.

Q.    Well, but isn't -- you would agree that Mr. Bourgeois generally performs better on the performance tasks than he does on the verbal.  That's one of his strengths.  Right?  Well, not a strength, but he's relatively better in performance than he is in verbal?

        MR. ROBERTS:  Your Honor, could I have the record reflect that the witness was very puzzled by that question.

        MR. WISEMAN:  I think the witness can say if he's puzzled.  I mean, if he's puzzled, he can say.

        THE WITNESS:  Well, I think that when we think about verbal versus performance, in general, his verbal skills, we look, for example, at the academic functioning.  His verbal skills are a very strong component.  In the testing, the 1994 testing, the --

BY MR. WISEMAN:

Q.    What 1994 testing?

A.    I'm sorry.  Wow, it has been a long day.  The 2004 testing, the verbal and performance were approximately even.  And then there had been the split on the 2007.  In general, it seems to be that his verbal skills, whether spoken or written,

are one of his notable strengths.

Q.   All right.  Leaving aside that disagreement, I mean, verbal skills are going to deteriorate if they aren't used, aren't they?  I mean, if you don't read, if you don't think, if you don't --

A.   While it may --

Q.   -- stimulate your mind, you're going to lose some of that, aren't you?

A.   While it may be that that -- there could be some degree of deterioration over time, I don't believe that he was not speaking at all during that period.  He certainly seemed to be reading the Bible.  A comment that he made in my interview with him that Her Honor would see in the videotape was that he was referring to a new car that had come out that he had seen in the paper.  So it looks like he's got some sort of stimulation, verbal type of stimulation, language stimulation on board.  I wouldn't have expected to see that type of drop.  In fact, vocabulary is one of the most robust measures of intelligence, or aspects of intelligence.

Q.   When Dr. Price -- or withdrawn.  You thought it was notable that when he said the sun rises in the sky that that seemed like a, something he should have gotten --

A.   It was a concrete answer.  And there was an aspect to it that certainly he's concrete.  There are probably better examples than I could have chosen on the fly with that.  Up

in --

Q.   You anticipated my question, which was that's very consistent with his performance on proverbs, his performance on the orientation questions asked by Dr. Price.  Right?

A.   I wouldn't disagree with that.

Q.   Okay.  You said that getting recent Presidents was easy. I mean, it's easy for you, it's easy for me, but it's not necessarily easy for a person who has, at best, a borderline IQ.  Right?

A.   I didn't testify to that.  You did right here, if that's your contention.

Q.   No, I thought I heard you say that you were, noted his failure to cite the Presidents, and you thought that was easy.

A.   My point being --

Q.   It was your word.

A.   I'm sorry.  My point being that you were saying that would be more difficult for a person with borderline.  My contention would be that the current Presidents would be more likely to be learned or seen, because they would be information around them, whether on TV, in conversation, et cetera.  It would have been --

Q.   So he should have named Jimmy Carter over George Washington?  Is that what you're --

A.   Or Bill Clinton.

Q.   What's that?

A.   Or Bill Clinton.  Or George Bush.

MR. WISEMAN:  If I might have a moment, Your Honor.

THE COURT:  Yes, sir.

(Counsel conferring off the record.)

BY MR. WISEMAN:

Q.   Ms. Larin's making me ask you another question.

A.   It's probably because of that whole thing with the interview.

Q.   You would agree, sir, that the DSM clearly requires the administration of a recognized intelligence test to diagnose MR?

A.   Yes, sir.

Q.   Okay.  And achievement tests are not diagnostic in that setting --

A.   Yes.

Q.   -- in that sense.

A.   That's correct.

Q.   All right.  I think I'm done.  Thank you.

A.   You're welcome.

THE COURT:  Thank you.  Anything further?

MR. ROBERTS:  Your Honor, I have just a couple of quick questions, I think.

(Counsel conferring off the record.)

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.    I'm showing you what is Petitioner's Exhibit 177.

MR. ROBERTS:  Your Honor, I would ask that since Banks is listed on this document and they put in this information, that we be allowed to go into the information about Banks on Dr. Moore's report.

MR. WISEMAN:  Your Honor, that chart only talks about guesses.  It doesn't talk about any of the substance of his responses, other than the guessing.  And so I have no objection to them questioning about guessing, but I do object to anything beyond that.

MR. ROBERTS:  I would add two points, Your Honor. One, they mentioned, they asked -- on cross, they asked if he had informed anyone or spoken to anyone with regards to high school information, and they also asked about whether he had administered the test to anyone prior to the age of 18.  And I think the information contained in his report clearly shows that Banks and Alfred Bourgeois went to high school together, and he certainly fits in that category.  I believe they opened the door.

THE COURT:  Yes, sir.

MR. ROBERTS:  Thank you, Your Honor.  I need to retrieve Government Exhibit 15.

BY MR. ROBERTS:

Q.    Dr. Moore, I believe in your report -- showing you Page 10 of Government Exhibit 15.  But you refer to Nathaniel Banks --

I have my finger here on the first full paragraph, about seven lines up from the bottom of the paragraph, where it mentions Nathan Banks is the fourth rater.  Why did you choose Nathan Banks as one of the people, as a rater?

A.   Because the -- I had heard the trans -- I'm sorry, I heard a recording of the telephone call between Mr. Bourgeois and Mr. Banks where it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened.

Q.   Was there anything that Nathan Banks had a base knowledge of that the other raters that you spoke to did not?

A.   He had a base knowledge of his functioning prior to the age of 18.

Q.   In your statement here, you said that he indicated that he grew up with Mr. Bourgeois and knew him from first grade through high school.  Did he tell you anything about their relationship, how often they were together?

A.   He said they were friends.  They saw each other daily, or virtually daily.  They played together.

Q.   When you gave the ABAS to Mr. Banks, did you ask him to focus on the -- when did you, what did you ask him to focus on?

A.   I asked Mr. Banks when it was that he had had last ongoing consistent contact with Mr. Bourgeois.  He indicated that it

was basically just right at the end of high school.  Then after that, they had gone their separate ways.  So I had him to focus on the last dates that they really had close contact, which was at that point near the end of their high school career.

Q.   I'm showing you what's Page 11 of Government Exhibit 15, and I'm referring to the third full paragraph of this document, where it mentions that -- it mentions Nathan Banks again.  And the sentence right here says, "Functioning at approximately the age of 18 was assessed by childhood friend Nathan Banks."  What exactly does that sentence mean?

A.   I believe the date that he was focusing on was May of Mr. Bourgeois's -- May of the year that he turned 18 in June.  So it was just prior to when he turned 18.

Q.   And why was he focusing on that date?

A.   That was the last time that they had had significant ongoing contact.

Q.   And did he tell you -- it says here that he indicated that he knew Mr. Bourgeois well and had strong relations.  Did he talk to you about the -- did he talk to you about how much relations they had?

A.   Recollections?

Q.   His, yes, what their relationship was.

A.   He said that they were really good friends, close friends.  They played together a lot, and that later on after he had moved away, they would see each other.  He came back for

special occasions or graduations.  They'd see each other at times like that.  It sounded like they had a good, close friendship.

Q.   I'm going to show you again the chart that's on Page 12 of your report, Government Exhibit 15.  And now I'm going to ask you to consider Banks' scores and ask you how that affected your assessment of adaptive functioning in this case.

A.   Again, I was looking for data to see if there was convergence.  What's interesting here is Mr. Banks, on assessment, and most of the domains is a little bit lower than Ms. Davis or Mr. Clark.  It appears that Mr. Bourgeois may be on an upward course of improvement in adaptive functioning.  But more importantly, all of the measures -- the question at hand is, are his, is his adaptive functioning significantly below the mean.  And what this says is that those three raters, all would note that his adaptive functioning was above that level, that it was in the below average or higher level.

In fact, Mr. Banks had two where he was below average.  Other than that, it was average or higher in every domain.

Q.   Now, compared to the -- we also have Ms. Armont's information on there, on that chart.  You make a comment here on Page 10, in Government Exhibit 15, about Ms. Armont's testing.  You mention that many of her responses reflected a degree of impairment notably at odds with established functional abilities.  What did you mean by that, compared to

the other tests that you have?

A.    There were responses that she gave indicating that he had an inability to do certain behaviors that the record seemed to clearly indicate that he had the ability not only to do, but to do well.

For example -- and she's assessing him at the age of 31, I believe, and indicated that he would have rarely independently been able to engage in, even when needed, would have rarely independently been able to engage in naming 20 or more familiar objects, telling parents or friends about his favorite activities, relying on himself for travel in the community, such as using a car, writing his own address, including ZIP code, planning ahead for fun activities, having one or more friends, starting back to work willingly after taking a break. It appeared that the functioning that she described was significantly at odds with a multitude of information that I was getting from other sources.

Q.    If Ms. Armont's calculations were correct, what type of mental retardation would we be looking at here with regard to Alfred Bourgeois, just taking her in a vacuum?

A.    Just taking her in a vacuum would have put him, well, certainly into the mild to moderate range.  In fact -- well, in the upper moderate to low mild range of retardation, as it was -- as it used to be denoted.

Q.    And compared to the other information that you got from

the other raters that you got, including Mr. Banks, how did

Ms. Armont's testing compare to the others?

A.    Significantly lower.

Q.    Now, you were given a -- the exhibit I put on, that the

Petitioner gave you, 177, you were given that document earlier

today, were you not?

MR. WISEMAN:  I believe it was yesterday,

Mr. Roberts.

MR. ROBERTS:  I'm sorry?

MR. WISEMAN:  It was yesterday.

MR. ROBERTS:  It was yesterday.  Sorry.

BY MR. ROBERTS:

Q.    When you received that document, did you note that someone

was missing from that with regard to the ABAS?

A.    There was one more person who an ABAS had been

administered.

Q.    Who was that?

A.    That was Ms. Franks.

Q.    And then did you take this, the document that the, that

Mr. Wiseman gave to the United States and then add some numbers

to it?

A.    Yes, sir.

Q.    I'm showing what's been marked as Government Exhibit 208,

and I'll ask you if that is your handwriting.

A.    Yes, sir.

Q.    And were those the numbers that you added?

A.    Yes, sir.

MR. ROBERTS:  Your Honor, I would offer this into the evidence right now, Government 208.

MR. WISEMAN:  No objection.

THE COURT:  Government's 208 is admitted.

BY MR. ROBERTS:

Q.    What is the significance of you adding Franks and all the indicators underneath her, Franks' name?

A.    Those are the number of guesses that Ms. Franks had on the ABAS.  And so if we look at her data, she didn't indicate that she had guessed on any items on the entire measure.

Q.    And did Ms. Franks know -- what did she do with regard to work?

A.    Because of the -- because of his age at when she was filling it out, that was nonapplicable.  It doesn't have a work section.

Q.    Okay.  And to your knowledge, was she around him during his functional academics?

MR. WISEMAN:  Your Honor, objection.  That's a mischaracterization of the skill area.

MR. ROBERTS:  The skill level, it's the third one on the left.

MR. WISEMAN:  No, it's a mischaracterization by saying was she around for his skill, his functional academics.

It's not an event.  It's not like you're going to work.

MR. ROBERTS:  I'll withdraw the question.

BY MR. ROBERTS:

Q.   With regard to any of these areas where she felt, she says she didn't guess at all, what is most striking to you about the fact that she would be able to answer questions without guessing, with regard to Ms. Franks?  Anything?

A.   It was surprising to me that she was able to recall back to that age and not guess on anything.  But what was more striking to me was when Dr. Swanson administered the Vineland to her, there were a number of items -- we've gone through a few of them -- but a number of items where she changed what her assessment was.  And to me, it stood out that here is an individual who's indicating that they're quite sure, they're not needing to guess on any items, and yet when an interview is conducted, we see that their recollection actually changes significantly.

Q.   What about Ms. Armont, with regard to the number of guesses?  There's only one category here where she has guessed at all.  Is there any area in particular with regard to Ms. Armont that is striking in the fact that she says she didn't have to guess in order to answer the questions?

A.   I thought it was striking that she had no guesses in the work domain.

Q.   Why is that?

A.   I don't believe that he and Ms. Armont worked together.

Q.   What does the fact that there are no guesses or very few guesses on one of these ABAS's, when you -- how does that affect your consideration and reliability of the test and the outcome?

A.   Well, what was striking to me about this is the contention has been that if we had a respondent with a high number of guesses, that it renders the assessment invalid.  And my reply to that would be that in general, when we're looking for how an ABAS is generally given, how it's standardized, then that would be a red flag.

     But then in this retrospective assessment, we would expect there to be some guesses.  And ironically the two people who have no guesses, which by the manual would have indicated that that was the most reliable data, are actually the two folks where the data appears to be notably unreliable; Ms. Franks because of -- at least the data on the ABAS, Ms. Franks because her assessment changes when she does the Vineland, and Ms. Armont where there were many items that her assessment was well at odds with, again, a plethora of data to the contrary.

     So while they may have not guessed, the accuracy of their -- that doesn't appear to be an appropriate reflection of the reliability of their data.

Q.   Now, Mr. Wiseman asked you about the people that you used

as raters and the need to get people from more than one skill area.  The list of people that you intended to interview when you first went to New Orleans, did those include a cross-mix of skill area?

A.    They did.

Q.    And had you been able to interview those people without feeling that the interviews were compromised, would you have been able to get people from across skill area?

A.    I would have had the opportunity to assess whether it appeared that they had a reasonable degree of neutrality and would have made good respondents in terms of both neutrality and depth of knowledge.

Q.    There was some discussion on cross-examination about the decrease in the verbal scores and the concern that Mr. Wiseman had about Mr. Bourgeois being in jail for several years and maybe his vocabulary decreasing.  Did you make a note as you watched --

        MR. WISEMAN:  Your Honor, I didn't say anything about vocabulary.  I said his verbal skills.

        MR. ROBERTS:  Excuse me.  I stand corrected.

BY MR. ROBERTS:

Q.    About his verbal skills decreasing, did you make any notations as you watched him during the interview about certain vocabulary words that he used that you thought were interesting?

A.   He did.   He certainly was a highly verbal individual, and his vocabulary was notable:  Escrow, manipulative, deficient. There were many words -- and Her Honor will certainly, I'm sure, note that as she views the tapes, but there were many concepts and -- both concepts and vocabulary words that were used that were notable in their complexity.

Q.   I'm going to put this back up one more time and ask again, these are the ten -- this is Government Exhibit 208 again.  And on the far left side, the list of the -- is that the list of the ten sub-domains?

A.   Yes, sir.

Q.   And my last question to you, Dr. Moore, is, in this case, did you find Alfred Bourgeois significantly deficient in any two of these sub-domains for adaptive functioning assessment?

MR. WISEMAN:  Asked and answered.

THE COURT:  Sustained. I'm sorry.  You know what, ask it one more time, because I don't remember whether he said it or not.  I'm sorry.

MR. WISEMAN:  Believe me --

MR. ROBERTS:  Your Honor, I didn't ask it that -- I didn't ask it that precisely.  I asked him before if he had a general opinion --

THE COURT:  Okay.  Well, ask him -- I've already said you can do it.  Just ask him.

MR. ROBERTS:  I don't even know if I can restate the

question, Your Honor.  I'll try.  It's getting late.

BY MR. ROBERTS:

Q.   In the ten sub-domains that the -- what's the book?

THE COURT:  You said the ten sub-domains of whatever that thing was --

MR. ROBERTS:  Yes, that's about as accurate --

THE COURT:  -- that Mr. Wiseman was talking about.

MR. ROBERTS:  It's the DSM --

THE COURT:  The testing --

MR. ROBERTS:  The DSM-IV.

THE COURT:  The testing --

MR. ROBERTS:  No, Your Honor.  I'm actually talking, focusing on the ten areas --

THE COURT:  Did you find him mentally deficient in any of those ten categories that are used to do adaptive, or is it --

MR. ROBERTS:  Functioning, yes, Your Honor.

THE COURT:  -- functioning adaptation?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

MR. ROBERTS:  That's all I have, Your Honor.

THE COURT:  I think that was sort of the question.

MR. ROBERTS:  That was the effort, yes.

THE COURT:  Mr. Wiseman.

MR. WISEMAN:  Yes, Your Honor.  I'll be brief.

RECROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Did you find any basis for concluding in your review that Beverly Franks or Brenda Goodman were in any way biased towards Mr. Bourgeois?

A.   I'm sorry, sir, would you recollect -- refresh my recollection of who Brenda Goodman is?

Q.   Brenda Goodman was the woman who testified here.

THE COURT:  I know, but which --

MR. WISEMAN:  She was the woman from Florida.  I'm sorry?

THE COURT:  He doesn't remember who she was.  And you know what, I don't either.

MR. WISEMAN:  She was another granddaughter of Ms. Mary, from Florida.

THE COURT:  Right.

MR. WISEMAN:  Testified here, legal services background.

THE COURT:  Right.  None of them were the granddaughter -- let me make sure I've got this right.  The granddaughter who was living there didn't testify.

MS. LARIN:  She has passed away.

THE COURT:  Oh, I'm sorry.  But then she -- that answers my question.

MS. LARIN:  Oh, wait.  The grandmother.  The

grandmother.

THE COURT:  No, the granddaughter that was living with Ms. Mary when --

MS. LARIN:  Do you know, I'm not quite --

THE COURT:  -- Mr. Bourgeois's sister Claudia and Mr. Bourgeois were living there, she wasn't here.

MS. LARIN:  I don't know who that is, because I thought she said Brenda, and I think they might have been talking about the one who was on the stand who was like living in two different homes.

MS. BOOTH:  Wasn't that Vera?

MS. LARIN:  I'm not sure.  Yeah, Vera.

THE COURT:  I thought it was Vera.

MS. LARIN:  I don't know who that was.

MS. BOOTH:  It was Vera.  It was Vera.

THE COURT:  I thought there was a Vera.  I wrote down "Vera."

MS. LARIN:  I don't know who that is, honestly, Your Honor, so --

THE COURT:  Because I thought --

MS. LARIN:  I had never heard that before.

THE COURT:  Okay.  Well, I thought Mr. Bourgeois mentioned a Vera, or I could have misspoken for Mary --

MS. LARIN:  It could be Brenda.

THE COURT:  -- when Dr. Moore talked to him on the

video.  I wrote down a Vera.  But it could have been Mary.

MS. LARIN:  And you know, if I may, Your Honor --

THE COURT:  Please.

MS. LARIN:  One problem is that it seems like a lot of people have nicknames, too.  So that's my best guess is that that might be Brenda, who was in and out of the house.  But I --

THE COURT:  No, it was Claudia Williams said there was someone there, her age, a granddaughter within a year or two of her age --

MS. LARIN:  Yeah, I --

THE COURT:  -- that was living in the house with Ms. Mary when she was living there, when Claudia Williams was living there.

MR. ROBERTS:  Your Honor, I'm just going to say, if all of us are having this many problems figuring it out, I don't think Dr. Moore will be able to --

MS. LARIN:  That is one person who might have possibly been a good respondent that we have not --

THE COURT:  Okay.

MR. WISEMAN:  And the point of my question is --

THE COURT:  Moving along.

BY MR. WISEMAN:

Q.   Beverly Frank took the Vineland after she took the ABAS.  I mean, she hasn't seen Mr. Bourgeois since he was nine years

old.  There's no bias in her responding.  I mean, there's no basis for you to conclude that she's biased, or is there?

A.  I would certainly say there could be a hypothesis to that. It's a close knit community.  He was a grandson-like individual.

Q.  Close knit like the trucking community and Ms. Davis?

THE COURT:  And they were related somehow.  Miss --

MR. WISEMAN:  No, they weren't related.  They weren't related.

THE COURT:  Oh, I'm sorry.  I thought Ms. Mary was a cousin.

MR. WISEMAN:  No, no, no, Beverly -- Beverly Frank was the granddaughter of Ms. Mary.  All right?

THE COURT:  I know that, but I thought --

MR. WISEMAN:  Not related to Mr. Bourgeois.

THE COURT:   -- Ms. Mary was related, a cousin or something, to Mr. Bourgeois's mother.

MS. LARIN:  No.

MR. WISEMAN:  No.

MS. LARIN:  As far as we can tell, back in the family tree, there might, generations ago, be some relation, but that would be like five plus.

THE COURT:  Do you know who was living in the house? A woman named somebody Batiste.

MR. WISEMAN:  I really don't know who was living in

the house.

THE COURT:  It was a Ms. Batiste.

MR. WISEMAN:  All right.  I'll move on.

THE COURT:  Because I remember the name because I --
I just remember the name.

MS. LARIN:  Yeah, right, Judge.

MR. WISEMAN:  I'll move on.

THE COURT:  And we didn't hear from that woman.

MR. WISEMAN:  Correct.

BY MR. WISEMAN:

Q.   Dr. Swanson, in her initial report in 2009, did not rely on Ms. Franks' administration of the ABAS.  Correct?

A.   Yes, sir.

Q.   She relied on the Vineland?

A.   That's -- that's correct.

Q.   Okay.  So when you were responding to questions for Mr. Roberts just now about the ABAS and Ms. Franks and reliance on it, I mean, Dr. Swanson did not rely on that test.  In fact, she had problems with that test.  Right?  She thought it wasn't the way it should be.

A.   She certainly seemed to have more confidence in the Vineland, yes, sir.

Q.   Okay.  Now, back to this 2008 ABAS book, Chapter 20, Page 390 -- maybe I'll put it up so you can read along --

THE COURT:  Claudia Williams said that Ms. Mary was a

cousin to her.

MS. LARIN:  I think that might be -- I don't know what the --

THE COURT:  But that doesn't make her related -- I'm getting this -- I'm getting an e-mail from my law clerk.

MS. LARIN:  I think it's like a saying, as --

THE COURT:  Claudia Williams said that Ms. Mary was a cousin to her, and Claudia Williams is the sister of Mr. Bourgeois.

MS. LARIN:  That's true.

THE COURT:  So I'm just saying, I remembered somehow --

MS. LARIN:  Someone said that.

THE COURT:  -- there was a relationship --

MS. LARIN:  Someone did say that on the record.  I stand corrected.

BY MR. WISEMAN:

Q.   I see you're reading ahead of us.  Let me read it for the record.  "Although the scale may be administered over the telephone or by having the informant read and complete the items, it is preferable to administer the scale in person, in a setting in which the informant is comfortable, such as his or her own home.  First discuss the purposes of the interview, the scoring criteria, the need for accurate information.  Continue by asking the respondent to describe the Defendant's behavior

at home, school, work, a particular age.  The discussion may provide a general understanding of the Defendant's adaptive skills and behavior at that time.  The examiner should continue by reading the items aloud while the informant answers the questions, assisted by knowing the four response options stated above.  Providing these options on a separate card or providing another ABAS grading form may also clarify the items and scoring."

Now, with respect to Mr. Banks, you mailed it to him.  Right?

A.  That's correct.

Q.  You didn't read it to him?

A.  That's correct.

Q.  You weren't there when he took it?

A.  I wasn't there while he took it.  I was available by telephone.

Q.  And the same is -- and in fact, you didn't read the ABAS to any of the respondents you interviewed.

A.  That's correct.

Q.  And so that's in conflict with the preference of this article.

A.  With that article.  I was following the directions of the ABAS manual itself.

Q.  Okay.  Which you acknowledge isn't appropriate necessarily in full, in regard to retrospective.  Right?  I mean, this

chapter is about retrospective.

A.    We've now mixed apples and oranges together, but sure.

Q.    On the next page, it says, "This approach provides" -- "this approach" meaning the reading -- "provides some assurance that the informant understands each item and does not fall into a response bias, e.g. giving the same answer to nearly every item.  Items should be read as they appear, and they may be repeated to assure understanding.  If the informant does not understand the wording, it is permissible to re, paraphrase the item.  However, it is essential not to change the meaning.  A clarification is helpful, but coaching in any form is not permissible."

      Again, you didn't assure understanding, because you didn't read it to the person and gauge their response.  You just let them take it.

A.    I administered it as directed by the administration manual.

Q.    Okay.  Well, you keep up on this stuff.  Right?  You're involved in a lot of Atkins cases.  Right?

A.    Sure.

Q.    And you know about this book?

A.    Yes, sir.

Q.    And you know about the chapter that talks about retrospective?

A.    Yes, sir.

Q.    And it's by the authors who designed the test?

A.    Not -- well, that particular chapter has other authors.

Q.    Not that chapter, but the people who edited this book are, you know --

A.    Yes, sir.

Q.    -- Dr. Oakland and Dr. Harrison.

A.    Yes, sir.

Q.    Okay.  So, I mean, their word is more than just another article out there.  They endorsed this stuff.  They say in a retrospective, you've got to read it.  Right?

A.    Yes, sir.

Q.    Okay.  I just want to be clear on one thing.  When we talk about someone being verbal, talking a lot, saying a lot and sounding like they know something, that's different than having good verbal performance on an IQ test, isn't it?

A.    I'm sorry, did you say "that's different from"?

Q.    Yeah.

A.    Yes, sir.

Q.    Okay.  And so the fact that Mr. Bourgeois has, as I think someone put it, has the gift of gab -- I think maybe that was you.  Was it you or Dr. --

A.    Sounds like something --

Q.    I'm sorry?

A.    Sounds like something I'd say.

Q.    Okay.  The fact that he has the gift of gab doesn't mean

his verbal performance and IQ testing is the same.

A.   While that's true, I think we look at the quality of the

gab that he has the gift of.

Q.   Okay.  All right.

MR. WISEMAN:  That's all.

MR. ROBERTS:  Nothing further, Your Honor.

THE COURT:  No.

MR. ROBERTS:  Nothing further.

THE COURT:  Okay.  Thank you.  You may stand down.

Now, how do you all plan on concluding?

MR. WISEMAN:  Well, we've got our couple of

depositions.

THE COURT:  Okay.

MR. WISEMAN:  And we'll have them submitted to the

Court by November 15th, as per your instructions.

THE COURT:  You want to do -- you want to do

arguments, or do you want to do submission briefs, or how would

you prefer to do this?

MR. WISEMAN:  I guess our preference would be

briefing followed by an argument.

THE COURT:  We could do the argument by telephone, if

you want.

MR. WISEMAN:  Oh, no.

THE COURT:  Okay.

MR. ROBERTS:  We can visit.

THE COURT:  You miss us all here too much?

MR. WISEMAN:  You know what, I don't do well on the phone.

THE COURT:  Okay.

MR. WISEMAN:  I really don't enjoy those times when we've talked on the phone.  I mean not personally for us, but I just feel like the --

MR. ROBERTS:  In that case, Your Honor, I prefer the phone.

THE COURT:  That's fine.

MR. WISEMAN:  Yeah, I don't --

THE COURT:  I was just trying to make it easy on you.

MR. WISEMAN:  No, and I appreciate it.  I know that's what Your Honor meant.  No, I think we'd rather be here for something like that.

THE COURT:  Okay.

MR. WISEMAN:  I think we can excuse Mr. Bourgeois.

THE COURT:  Well, let's wait until -- file the objections.  Also, if you're taking depositions and you have any problems with objections or something, just call me.

MR. WISEMAN:  Okay, as opposed to preserving them on the record.  Okay.

THE COURT:  Yeah, because it just -- if it's something really contentious, let me deal with it.

MR. WISEMAN:  Okay.

MR. ABREU:  And Your Honor, if I may, another housecleaning matter.  As Your Honor recalls, there was the claim related to jurisdiction in this case, whether the murder occurred on the military base or not.

THE COURT:  Right.  I didn't want to hear any --

MR. ABREU:  That's correct.

THE COURT:  -- evidence about that.

MR. ABREU:  That's correct.  At the --

THE COURT:  I had forgotten, however, that I didn't, until Mr. Wiseman told me.

MR. ABREU:  But at the April 20th hearing, Your Honor indicated that we could.  You actually said, "It's absurd, but I understand you have a job to do, so I will let you" --

MR. WISEMAN:  I would have left that out.

MR. ABREU:  I know.  I just wanted to get it in --

THE COURT:  As if I hadn't already made up my mind on that issue.

MR. ABREU:  I wanted to put it in context, though.  "I will let you proffer two affidavits from your doctor.  How is that?"

THE COURT:  From the --

MR. ABREU:  "From a doctor, on the issue of where the cause of death, what the fatal blow was and the timing."

THE COURT:  I said that?

MR. ABREU:  Yes, Your Honor, whether the timing --

I'll direct you to some pages. The discussion started on Page 42 of that transcript, and then it ends for a little while. Then it picks back up I think around 53 or 54. Then on 55 --

THE COURT: Well, do you have the affidavits?

MR. ABREU: I want to explain why that is. Towards the end of that transcript, at the very last page, Your Honor says the following: "May I -- I'm going to make one requirement about the proffer from your expert that wants to talk about the cause of death and the time of death."

"Yes?"

"That he must review both Koufle's (phonetic) testimony, as well as the emergency room doctor."

Immediately upon that, I hired a new expert, who is actually the person who wrote the book called Forensic Neuropathology. I sent him all the testimony. He reviewed it. He then got back to me and said, "You know what, I really want to look at the autopsy slides before I make a decision in this case."

THE COURT: No, this is the time to do it. It's --

MR. ABREU: Well, Your Honor, last week -- let me just explain why it's not happened yet. Mr. Roberts attempted to locate the autopsy slides for some time, and it's not his fault, but he couldn't get in touch with Dr. Rouse. He finally got in touch with Dr. Rouse some time in August. He then notified us where the autopsy slides were. We then filed a

motion with the Court asking for a subpoena for the autopsy slides.

THE COURT:  I did that.

MR. ABREU:  Your Honor just recently signed the subpoena to send the autopsy slides --

THE COURT:  Well, I signed it as soon as you filed it.

MR. ABREU:  That's correct.  The autopsy slides are still being awaited to arrive at our expert's location.  So what I'm saying is that we will endeavor, by the same date, November 15th, to supply those affidavits regarding that issue.

THE COURT:  No, if we're going to do that, we're going to depose them.

MR. ABREU:  That's fine with me, Your Honor.  I want him to look at the slides.  He wants to look at the slides as well.

THE COURT:  I mean, you know, Mr. Bourgeois testified that she fell out of the truck on the Navy Base and died from that.  AB1994 testified that he picked her up and smashed her head against the window, and there was blood, I think, on the inside of the car where that occurred.

MR. ABREU:  And those are certainly issues and --

THE COURT:  So you know, you can re -- I'm just telling you.

MR. ABREU:  I understand.

THE COURT:  I had the advantage of hearing all this before.

MR. ABREU:  I understand.

THE COURT:  And so I'm not going to let them do that without a deposition.

MR. ABREU:  That's fine, Your Honor.

THE COURT:  One more.

Look, this is -- I know that it's difficult for the U.S. Attorney's Office, but this is somebody who's really, you know -- like in the trial, when y'all groaned when I sustained every objection of the Defense --

MS. SALINAS:  Every --

MS. BOOTH:  Every.

MR. ROBERTS:  Your Honor, we never groaned out loud.

THE COURT:  It was like Ms. Booth throwing her head on the table.

MR. ROBERTS:  Oh, Ms. Booth.  I'm sorry.  I'm sorry, we can't help Ms. Booth.

THE COURT:  I mean, I struck every juror that the Defendant wanted to strike, and I don't want to leave -- I don't want to leave anything unturned, any stone unturned in this last effort that he's going to have to present this information, possibly.

MR. WISEMAN:  And Your Honor, on --

THE COURT:  And then from here it goes up, obviously,

to the Fifth Circuit and then the Supreme Court.

MR. WISEMAN:  Do you think the Government will appeal?

THE COURT:  Pardon?

MR. WISEMAN:  You think the Government's going to appeal?

Your Honor, on that note, I do want to thank the Court on behalf of all the folks who have attended on our side, Mr. Bourgeois, and thank the Court staff, who have been incredibly --

THE COURT:  They're great.

MR. WISEMAN:  You've been incredibly courteous, and we appreciate it.

THE COURT:  You're very kind, Mr. Wiseman.  And really, I really enjoy your advocacy.

MR. WISEMAN:  Why, thank you.  Not always evident, but thank you.

(Proceedings concluded at 6:22 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    November 5, 2010
Molly Carter                        Date

INDEX

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RANDALL PRICE | | 22 | 52 | |
| ROGER BYRON MOORE, JR. | 66 | 72 (Voir Dire) | | |
| | 74 | 148 | 214 | 227 |

EXHIBITS:                                                    RECEIVED

PX-61A:  BOURGEOIS STATEMENTS . . . . . . . . . . . . . .    55

PX-177:  COMPARISON . . . . . . . . . . . . . . . . . . .   166

PX-179:  P30 TEST RESULTS . . . . . . . . . . . . . . .     57

                    -----------------------

GX-15:  REPORT OF DR. MOORE . . . . . . . . . . . . . .     76

GX-16:  ADDENDUM REPORT DR. MOORE . . . . . . . . . . .     78

GX-17:  DR. MOORE CV . . . . . . . . . . . . . . . . . .    67

GX-18:  DR. MOORE LIST OF PRIOR TESTIMONY . . . . . . .     67

GX-27:  LETTER BY MR. BOURGEOIS TO ROBIN BOURGEOIS

        IN 1998 . . . . . . . . . . . . . . . . . . . .     65

GX-28:  AMERICAN CHECKING ACCT STATEMENTS FROM 12/27/00

        TO 1/24/02 SEIZED FROM MR.  BOURGEOIS' BRIEFCASE   65

GX-29:  BENEFITS ELECTION PACKAGE SEIZED FROM MR.

        BOURGEOIS' BRIEFCASE . . . . . . . . . . . . .     65

EXHIBITS:  (CONTINUED)                                    RECEIVED

GX-30:  CDL CITATION RECORD SEIZED FROM MR.  BOURGEOIS'

        BRIEFCASE . . . . . . . . . . . . . . . . . .      65

GX-31:  US EXPRESS EXPENSE REPORT SEIZED FROM MR.

        BOURGEOIS' BRIEFCASE . . . . . . . . . . . .      65

GX-32:  CORRESPONDENCE TO KERRY BROWN SEIZED FROM

        MR. BOURGEOIS' BRIEFCASE . . . . . . . . . .      65

GX-33:  CORRESPONDENCE TO MINISTRIES SEIZED FROM

        MR. BOURGEOIS' BRIEFCASE . . . . . . . . . .      65

GX-34:  HIBERNIA MORTGAGE PAYMENT COUPON AND CHECK

        SEIZED FROM MR. BOURGEOIS' BRIEFCASE . . . . .      65

GX-35:  DOT MEDICAL EXAMINATION CERTIFICATE SEIZED

        FROM MR. BOURGEOIS' BRIEFCASE . . . . . . . . .      65

GX-36:  MEDICAL EXAMINATION FOR DRIVER FROM BRIEFCASE .      65

GX-37:  LETTER TO THE COURT FROM MS. BOURGEOIS . . . .      65

GX-38:  SKIPPER TRANSPORTATION APPLICATION FOR DRIVER

        QUALIFICATION . . . . . . . . . . . . . . . . .      65

GX-39:  FORD MOTOR CREDIT APPLICATION . . . . . . . . .      65

GX-40:  LETTER REQUESTING REDUCTION IN CHILD SUPPORT

        PAYMENTS  . . . . . . . . . . . . . . . . . . .      65

GX-41:  BIRTHDAY PARTY VIDEO . . . . . . . . . . . . .      65

GX-43:  DOG VIDEO . . . . . . . . . . . . . . . . . . .      65

GX-58:  LETTER FROM MR. BOURGEOIS . . . . . . . . . . .      31

GX-208:  NUMBER OF GUESSES BY DAVID CLARK . . . . . . .     221