UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                        :

UNITED STATES OF AMERICA,     :       No. Cr-C-02-216
                        :       No. Cv-07-223

          Respondent,     :   Honorable Janis Graham Jack,
                        :           U.S.D.J.

         -against-       :

ALFRED BOURGEOIS,      :    Electronically Filed

          Petitioner.      :
_____  :

**PETITIONER'S RENEWED MOTION TO AMEND
AND
SUPPLEMENT TO CLAIM IV
OF HIS *MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255*
AND
CONSOLIDATED MEMORANDUM OF LAW[1]**

Petitioner, Alfred Bourgeois, through counsel, renews his motion to amend

Claim IV and pursuant to this Court's Order also supplements that claim, as follows.

**Background**

1.     Pending before the Court is Petitioner's *Motion for Relief Pursuant to 28*

*U.S.C. Section 2255*.  This Court heard evidence on September 10 and 20-24, 2010.

---

[1]All emphasis is added unless otherwise indicated.  Transcripts of the trial and section 2255 hearing are cited by "Tr." followed by the date and a page cite.

Three depositions have been completed pursuant to this Court's authorization in order to further complete the record.[2]

2.     Petitioner raised as a ground for relief an allegation that his trial counsel ineffectively failed to challenge the Government's evidence that semen was recovered from the rectum of JG-1999.  See Claim IV, *Petition*.  Specifically, Petitioner alleged that counsel ineffectively failed to challenge the FBI's assertion that a positive p30 test, alone, despite overwhelming evidence to the contrary (a negative acid phosphatase (AP) test, negative smear slide sperm search, negative microscopic pellet sperm search, negative autosomal DNA test, negative Y chromosomal DNA test (YSTR), and no sign of physical trauma to JG-1999), could support a claim that "semen" was detected.

3.     During the evidentiary hearing on this claim, the Government revealed **for the first time to undersigned counsel** the existence of a document, identified and admitted at the hearing as Petitioner's Hearing Exhibit, P-179 (a copy is attached to this pleading).  This document was not in the file provided to undersigned counsel by trial counsel; it was not among the documents sent to trial counsel's DNA expert, Dr. Elizabeth Johnson – even though counsel sent to her a variety of other documents relevant to these issues – nor did trial counsel make reference to this document in his

_____

[2]Petitioner has taken the depositions of Dr. Price, Dr. Oliver and Manfred Schenk.

cross-examination of FBI serology and DNA witnesses at trial, when it would have been only logical for him to have utilized this document. Based on these factors, discussed in detail herein, it is apparent that P-179 had never before been disclosed to the defense.

4.      Shortly after this document came to undersigned counsel's attention on September 23, 2010 during the course of the evidentiary hearing, Attorney Abreu advised the Court that Petitioner would be filing a motion to amend the Section 2255 Motion to include a new claim that the Government's non-disclosure of this critical document violated Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

5.      Without hearing argument and without any written submission, this Court denied Petitioner's oral motion to amend the petition and announced that it would not permit an amendment because such an amendment would be "futile" because, in the Court's view, Petitioner had not demonstrated non-disclosure of the document.[3] Tr.

_____

[3]The Court's decision to deny amendment on the ground of futility, without affording an opportunity for Petitioner to prove non-disclosure of P-179, was an abuse of discretion and error. Fed.R.Civ.P., Rule 15 provides the standard governing a motion for leave to amend. Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Jamieson By and Through Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir. 1985). Failure to abide by this Rule can constitute an abuse of discretion. Indeed, in Jamieson, the Court of Appeals explained that where resolution of factual issues is essential to the proper evaluation of the issues before the court, amendment should be freely allowed:

9/24/10, 60-63.

6.      Petitioner submits that the Court should reconsider that decision.  As set forth in the body of this document, non-disclosure is evident based on the trial record, the pre-trial discovery provided by the Government and by the events that transpired at the hearing.  Petitioner herein makes the showing of non-disclosure that he would have made had the Court not made its oral ruling prohibiting amendment. Alternatively, should the Court remain unconvinced that Petitioner has demonstrated non-disclosure of P-179, Petitioner would move to conduct deposition(s) of the person or persons who were responsible for the ostensible trial level non-disclosure.  To date,

---

We do not hold that Rule 15(a) requires the district court in every case to grant leave to amend when the amended complaint states a cause of action. ... However, where, as here, the only proffered justification for denial is futility, the determination that the complaint is legally sufficient and not cumulative deprives the district court of all "substantial reason" to deny leave and severely restricts its discretion to do so. In such a case, leave to amend should be granted. Justice requires no less.

Id., 1211.

Here, Petitioner's motion to amend based on the Government's suppression of exculpatory evidence is "legally sufficient" and "not cumulative."  This Court should allow amendment to consider this claim.  This is particularly so when the basis for finding futility has not yet been the subject of adversarial testing.  As shown, infra, the Court did not permit Petitioner the opportunity to prove non-disclosure, although Petitioner submits that non-disclosure is plain on the current record.  Therefore, the Court cannot deny amendment without permitting further factual development on this question.

the record is devoid of any such evidence.  Jamieson, 772 F.2d at 1211.

**Structure of this Submission**

7.      Petitioner seeks to accomplish several things in this submission and accordingly offers this statement regarding structure.

8.      First, he will explain the critical nature of P-179 as a factual matter. Whether viewed through the prism of Brady or Strickland ineffectiveness, this document was, or would have been, highly material to trial counsel's efforts to show that semen was not recovered from JG-1999 rectum.  Second, he will set forth the facts showing non-disclosure of this document.  Should the Court remain unconvinced regarding non-disclosure, Petitioner will alternatively propose brief and truncated discovery to resolve this question.  Third, he will supplement the ineffective assistance of counsel claim with respect to P-179 and the other documents and proofs that counsel failed to effectively utilize.  Fourth, he will explain that the failure to disclose this document was material under Brady and its progeny, or alternatively, that trial counsel's deficient failure to use the document if in fact is was disclosed, caused Petitioner prejudice.[4]

---

[4]The Fourth Section will address Brady materiality and Strickland prejudice because the Supreme Court has held that these two questions are co-extensive.  Kyles v. Whitley, 514 U.S. 419, 436 (1995).

PART ONE

**EXHIBIT P-179 FURTHER PROVES THAT SEMEN WAS NOT PRESENT IN THE RECTUM OF JG-1999.**

9.      P-179, entitled "P30 Test Results" indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were "very weak, very weak and weak," respectively.  Within the context of the issues before the Court these results are highly relevant and extraordinarily exculpatory as to guilt and punishment.

10.      FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

FBI Procedures, admitted at hearing as Exhibit P-180.

11.      Thus, in this case, because the previously undisclosed P-179 reveals "borderline levels of p30," (weak to very weak), the FBI was required to confirm the presence of any alleged semen through the identification of spermatozoa – not solely a p30 test.  Notably, no sperm were ever detected in this case.  Indeed, the smear slide which was inspected by the FBI was NEGATIVE for the presence of any spermatozoa.  The microscopic sperm searches conducted **on all three swabs** by Technical Associates at the request of Dr. Elizabeth Johnson were also NEGATIVE for the

presence of spermatozoa.

12.    P-179, in conjunction with the FBI's own serology protocols, P-180, demonstrate that the Government's evidence that semen was definitively detected in the rectum of JG-1999 was scientifically unsupportable.

## PART TWO

**P-179 WAS NOT DISCLOSED TO TRIAL COUNSEL. SHOULD THE COURT REMAIN UNCONVINCED DESPITE THE OVERWHELMING EVIDENCE OF NON-DISCLOSURE, PETITIONER SEEKS FURTHER FACTUAL DEVELOPMENT.**

13.    It is manifest that P-179 was not disclosed to trial counsel.  That P-179 was not provided to the defense at the time of trial is clear from the trial record, the post-conviction evidentiary hearing testimony and the pre-hearing discovery conducted by Petitioner and the Government.  This fact is shown by the following:

A.    P-17 is not among the almost 12,000 pages that were disclosed to undersigned counsel by Mr. Tinker and Mr. Gilmore.  As the Court knows, that Bate-stamped file was provided to the Government.  Neither undersigned counsel nor the Government have located P-179 in the Gilmore/Tinker file.

B.    Mr. Tinker provided his trial DNA expert, Dr. Elizabeth Johnson, with the discovery that was provided to him by the Government.  P-179 was not included in the materials that Mr. Tinker provided to her.  By itself, this strongly supports Petitioner's view that the document was not disclosed by the Government to trial counsel.

C.    Mr. Tinker did not use P-179 at points of his examinations of witnesses during which it would have been expected and logical

that competent counsel would have used it.

These points are addressed in detail below.

### The Trial Record

14.    At trial, FBI serologist Caroline Zervos and DNA analyst Anthony Onorato testified that the results of the p30 testing conducted by the FBI on Q5-Q7 were positive.  Tr., 3/5/04, 87 (Zervos); id., 118, 128-29 (Onorato).  At no time did either FBI witness state that the actual results, reflected in P-179, were "very weak," "very weak" and "weak."  See generally Tr., 3/5/04 see also testimony of Jerrilyn Conway, Tr., 9/24/10, 68 (Q: Do you recall in your review of the trial transcript whether Carolyn Zervos or Anthony Onorato ever mentioned that the results were very weak, very weak and weak? A: I don't think that they did").  Additionally, at no time did trial counsel, Mr. Tinker, ask an single question or make any argument which reflected his knowledge of the results of the FBI p30 testing set forth in P-179.  See generally Tr., 3/5/04, even though he was cross examining the Government's witnesses in an attempt to show that semen was not present.

### Evidentiary Hearing Testimony

15.    Dr. Elizabeth Johnson's evidentiary hearing testimony also makes clear that she was **not** provided P-179 at the time of her consultation with trial counsel or at any time thereafter.

16.     Petitioner asked Dr. Johnson to explain the significance between the "weak positive" result she obtained using the Seratec card and the "positive result" obtained by the FBI using the ABA card.  NT 9/22/10 at 18.  Had Dr. Johnson or Petitioner ever previously seen P-179, these questions would have been irrelevant because P-179 indicates that both tests obtained "weak" to "very weak" positive results.[5]

17.     Dr. Johnson first learned that the FBI had obtained a "weak" positive result when she was asked the significance of that result on cross-examination by the Government at the section 2255 hearing:

Q:      And what was Mr. Tinker supposed to draw from the Fact that your, the FBI had a weak positive on the p30 test? You look –

A:      Okay.

Q:      **You look surprised**.

A:      **The FBI did not report a strength of their test.  They just reported it positive.**

Q:      Oh.  Did you look – you didn't look at the FBI raw data?

A:      There is no raw data on the ABA test card.  They should have made photographs –

---

[5]Dr Johnson went on to explain why a positive p30 test, let alone a "weak" positive result, without any other evidence was <u>not</u> indicative of the presence of semen. Tr., 9/22/10, 18-19.

Q:    On p30?

A:    Right.

Q:    Oh, ABA card.  I'm sorry. Go ahead.

A:    They – any decent laboratory would photograph the results, and they did not.  And there is no way for me to review the actual test itself.  It's just a notation, a note in a worksheet.

Q:    So you weren't provided any information regarding the FBI test which resulted in a weak positive?

A:    They recorded it as positive.  **They didn't note that it was weak**.

Q:    Okay.

A:    **So I have no way of determining it was very positive or weak positive**.

Id., 78-79.  Dr. Johnson's "surprise" about the FBI's "weak" positive result prompted an objection by Petitioner and a renewed request for any all information contained in the FBI file.

> MR. ABREU:  Your Honor, may I object at this moment ... And make a request here?  I personally, Your Honor, have not seen the FBI's raw data.  The witness has indicated that she's never seen the raw data.  I want to know if there in fact is raw data that we should be looking at and whether in fact the FBI did have a weak positive.  I know I've made a request for that information but I have not seen that.
>
> * * *
>
> I know we don't have anything that says weak positive.  All we have is a check mark on a test that says it was positive.  That's the only thing we've ever seen, the only thing we've ever provided to Ms. Johnson.

And if that does exist, I would actually like to see that information, Your Honor. That's my request.

Id., 79, 80-81. After further discussion between the parties and the Court about what documents had been provided at the time of trial, Petitioner reiterated what information he was requesting from the FBI and why he believed that information regarding the "weak" positives in P-179 had not been disclosed at the time of trial:

> MR. ABREU: Even if, in fact, the FBI did not photograph these test cards, I don't know if Mr. Dowd is asking questions regarding documents that I still haven't seen, which are whether the FBI recorded a week positive or a regular positive. Again, we've presented evidence that a weak positive versus a positive is relevant. If, in fact, it was a weak positive, I suspect Mr. Tinker would have wanted to use that at trial to say, "This is not necessarily semen because of the weak positive." I suspect that's what he would have tried to use it for. If that's information, I would like to see it. It might implicate Brady. I think I'd like to see that information, Your Honor, from the FBI, if they have bench notes and specific documents related to the testing and the card.
>
> THE COURT: Where did you see it Mr. Dowd?
>
> MR. DOWD: I was told by Ms. Jerrilyn Conway, Your Honor, our expert witness --
>
> THE COURT: And she's going to be here?
>
> Mr. DOWD: She's flying in this afternoon ... Will be here at 3:45. And I understand it was material that had been shared. But that will, I'll be able to put testimony on on that.

Id., 86-87.

18.    Later that night, in response to Petitioner's request, the Government

provided Petitioner with a copy of P-179, and the following day, Petitioner informed

the Court why he believed it had not been produced at the time of trial.

> MR. ABREU:  Last night Mr. Dowd did provide me with this particular document which I will now show the Court.  It relates to Q5, in particular of note, Q5, Q6, and Q7, which are the three swabs which the FBI alleged had tested positive for semen.  As the Court can note, in their notes and remarks it indicates regarding Q5 that it was very weak, Q6 very weak, Q7 weak.  There certainly was no testimony at trial regarding the strength of those tests.  I can assure Your Honor that I have never seen this particular document and that if I had seen it, I most certainly would have used it and I most certainly would have had our experts address the significance of this particular document.
>
> * * *
>
> I think there might be perhaps a contention by the Government at some point that it went directly also from the FBI to Ms. Johnson back at the time of trial; however, Ms. Johnson testified yesterday that she had never seen any notes regarding the strength of the FBI testing, that that information was not something she had ever seen.  And if you look at her report produced in 2004, she indicates a weak positive on our tests but she never makes any indication at that point about whether their test was weak positive or strong positive because she didn't have that information.

Tr., 9/23/10, 40, 43.

### The Discovery Process

19.    The Government's failure to provide P-179 at the time of trial is proven

not only by the trial record and Dr. Johnson's "surprised" hearing testimony, but also

by the post-conviction discovery process.  On September 9, 2009 the Court ordered

Petitioner to produce to the Government every document received from trial counsel's

files.  In compliance, on November 9, 2009 Petitioner provided the Government with everything – 11,611 pages – from trial counsel's file.[6]  However, as the record indicates, P-179 was not part of those thousands of pages.

> MR. ABREU  ... I searched our entire file which was gathered from trial counsel which consists of 12,000 pages, I searched, did an electronic search with the term P30 and I, and this document was not part of those records.  Mr. Dowd also did a search of the files that were disclosed to us in April of this year and that document was not part of those.  They are
>
> MR. DOWD:  Well, we are not sure about that.  We are still doing a search on that, Your Honor.
>
> MR. ABREU:  Right, Your Honor, so it's a document, the documents that we searched are the 12,000 pages that we provided to the Government as part of discovery, so if they want to search that they certainly can search it as well for that document.  And Mr. Dowd is actually correct, they are in the process of checking additionally.  However, when that's complete, Your Honor, I suspect that I will have a motion to amend our claim to include a Brady violation.  And let me just make this clear, I am not saying that Ms. Booth or any member of the U.S. Attorney's Office failed to disclose it to trial counsel, because the information that I have here indicates that Ms. Booth turned over everything that she got from the FBI and I will concede that at this point.  My questions is whether the FBI actually provided the U.S. Attorney's Office with this particular document which I am saying is particularly relevant.  And I also can't imagine Mr. Tinker, or perhaps I can but Mr. Tinker was certainly trying to dispute the evidence of the semen and here he has, here is a document that indicates very weak, very weak and weak,

---

[6]The only documents not provided were about twenty pages which were provided to the Court for in camera review.  The Court sustained Petitioner's privilege arguments and those documents have not been provided.  Counsel represents, and the Court can certainly confirm, that P-179 was not included in the in camera documents.

and I know that that was never used at the time of the trial. So, what I am requesting again, Your Honor, is for the FBI to provide me with a copy of every single document in their file related to the testing of these materials. I would then like to review those documents before Ms. Conway testifies, or any witness for the Government testifies in this particular matter. I should also note that Ms. Conway is not the person who testified at trial, she has never been a part of this case, so I am not sure that she would even know what was turned over at any point, but I would – so for that reason I would really like to see that entire file and I think I am entitled to that file, Your Honor.

Tr., 9/23/10, 41.

20. Subsequently, the Government attempted to showing that P-179 was disclosed. However, that attempt was not done through adversarial testing. Rather, it was done through the unsworn statements of an AUSA Mark Dowd, who did not even have personal knowledge of the relevant facts. Because the Government proceeded through unsworn representations, Mr. Dowd was not subject to cross examination, or to legal objections regarding his basis of knowledge.

21. The Government did not bring any witness who had actual knowledge of the alleged transmission of the document to the defense.

22. After Mr. Dowd's explanation, counsel advised the Court that they would move to amend to include a claim that the Government's failure to provide this document to trial counsel violated Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. The Court immediately said it would not permit amendment because doing

14

so would be "futile." Tr. 9/24/10, 63.

23.   In addition to granting the motion to Amend the pleading, should this Court continue to harbor any doubt about non-disclosure, it should provide Petitioner with the required tools to further prove that the document was not provided to his trial counsel.  First, he should be permitted to depose the person or persons identified by the Government as responsible for the copying and transmission of the FBI documents related to this issue.  Mr. Dowd's unsworn statements are not a sufficient evidentiary basis upon which to conclude whether the document was provided.  Second, he should be permitted to inspect the original FBI file– which to date he has not been permitted to inspect.  The Government has provided him with what purports to be a copy of the file, but has not permitted him to view the original.  If the copy is complete, the Government should have no reluctance to permit inspection of the original. Third, counsel should be permitted to depose those in the FBI who may have been responsible for or have knowledge of the non-disclosure.

## PART THREE

### SUPPLEMENT TO INEFFECTIVENESS CLAIM REGARDING P-179

24.   At trial, Mr. Tinker attempted to argue that there was no evidence that semen had been detected in the rectum of JG-1999. See e.g. Tr. 3/16/04, 43 ('There's no evidence of semen, I suggest to you, being found on this child"). Mr. Tinker,

however, failed to present **any** evidence that "there's no semen," and this Court, appropriately sustained a Government objection to Mr. Tinker's argument. See Tr. 3/16/04, 43-45 ("Ms. Booth: Your Honor, I have to object. That is a mischaracterization of the evidence. The Court: That is sustained ... The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was").

25.    Although, as set forth above, Petitioner believes that P-179 was not disclosed at the time of trial, if P-179 was provided to counsel, they were ineffective for failing to utilize the document and the evidence contained therein, in conjunction with all the other evidence that could have presented, see Claim IV,  to support their argument that no semen was detected in JG-1999's rectum.[7]

26.    Indeed, the FBI's **sole** reliance on the "very weak, very weak and weak" positive p30 results reflected in P-179 would have supported an argument by trial counsel that, in the absence of detectable acid phosphatase, sperm or male DNA, the

---

[7]This Court previously ruled that Petitioner may supplement Claim IV to include an allegation of ineffectiveness regarding P-179.  Tr. 9/24/10, 63 ("I'm not going to allow you to amend for the Brady claim ... But if you want to use it for ineffective, you can use it for ineffective"). Herein, Petitioner only sets forth the facts necessary to supplement Claim IV to in include an allegation of counsel's ineffectiveness for failing to utilize P-179.  Petitioner will set forth all of the evidence of trial counsel's ineffectiveness regarding claim IV which was developed at the evidentiary hearing in the forthcoming post-hearing briefing and oral argument.

Government's allegation that "semen" was detected was scientifically unsupportable. See P-180, FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), 11("Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30. These categories would include ... stain extracts that possess **borderline levels of p30**");[8] see also Texas Department of Public Safety, DNA-04-09, p.1 ("P30 Identification ... p30 is considered to be a **presumptive** test for semen. The presence of p30 indicates, **but does not confirm** the presence of semen. Semen can **only** be confirmed by the presence of spermatozoa"), attached;[9] California Department of Justice Bureau of Forensic Services, Biology Technical Procedures, p. 51 ("Section 4 – Semen ... for p30 immunassay cards, a positive result **alone** (without sperm or AP results) will allow you

---

[8]Thus, the FBI's very own protocols require the identification of sperm to confirm the presence of semen when, as in this case, you have borderline levels of p30. The two separate sperm searches conducted in the case were negative.

[9]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel who stated that a p30 test can be used in conjunction with other evidence to indicated the presence of semen but the only stand alone confirmatory test for semen was the identification of spermatozoa. See e.g. P-88, 2007 Report of Forensic Science Associates, 20 (" And since sperm are only found in semen, the observation of sperm is proof of the presence of semen. In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen"). In this case, all searches for the presence of spermatozoa were negative.

to make the statement of 'p30 detected.'  **However, your report should include a statement that explains that the other body fluids may react with these test cards**. The immunoassay cards **are very sensitive** and can detect p30 at very low levels that may be present in body fluids **other than seminal fluid**"), attached;[10] 2005 Seratec Card Protocol, p.3 ("**inconclusive**: Due to the increase in sensitivity using Seratec seminal fluid (PSA) test, **the analyst is advised to have a second positive test result before confirming seminal fluid is present** in a stain extract (e.g. positive AP test, spermatozoa observed in the pellet, or male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec PSA card, the conclusion for this situation would be 'seminal fluid **could not be confirmed**.'"), attached.[11]

---

[10]Likewise, in this case, the acid phophatase (AP) test and the sperm searches were negative.  Thus, unlike the FBI, the California protocols do not permit the confirmation of semen with a positive p30 test alone and certainly not with "very weak, very weak, weak" results.

[11]The Seratec Card test is now used by the FBI to test for p30 and was substituted for the ABA card after accuracy problems were detected with the ABA card – the card used in this case.  NT 9/24/10, 76-78.  Thus, even the protocols by the manufacturer of the presumably more accurate Seratec test card now used by the FBI, cautions that a positive test card alone, does not confirm the presence of semen.  The other tests that Seratec advises a forensic analyst should consider in conjunction with their test card (AP test, identifiable sperm or male DNA), were ALL NEGATIVE in Mr. Bourgeois case.

27.    Given the extremely inflammatory and prejudicial nature of the alleged "semen" evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and the penalty phases of trial, defense counsel had a duty to use P-179 as part of a challenge to the Government's evidence that "semen" was present and JG-1999 was sexually abused.  Counsel's performance was deficient for failing to utilize P-179 and as a result Mr. Bourgeois was prejudiced.  Strickland v. Washington, 466 U.S. 688 (1984).

## PART FOUR

### P-179 IS MATERIAL TO PETITIONER'S BRADY CLAIM AND DEMONSTRATES STRICKLAND PREJUDICE.

28.    Kyles v. Whitely, 514 U.S. 419 (1995), sets forth the long-standing materiality standard governing non-disclosed exculpatory evidence.   The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434.  Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict or to sustain a death verdict –  "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. Id., at 435 n.8.  Instead, materiality is established when a defendant demonstrates:

> [A] 'reasonable probability' of a different result, <u>and the adjective is important</u>. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

<u>Kyles</u>, <u>id.</u> at 434, <u>quoting</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985); <u>Dickson v. Quaterman</u>, 453 F.3d 643, 647 (5th Cir. 2006) ("Evidence is material under Brady where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different. . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome") (quoting <u>Bagley</u>, 473 U.S. at 682); <u>Graves v. Dretke</u>, 442 F.3d 334, 339-40 (5th Cir. 2006) (same).

29.    <u>Brady</u>'s materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel.  <u>Gonzales v. Quarterman</u>, 458 F. 3d 384, 390 (5th Cir. 2006) ("[th]e test for prejudice under <u>Brady</u> and <u>Strickland</u> is the same").  Accordingly, the <u>Brady</u> materiality inquiry, like the <u>Strickland</u> prejudice inquiry, properly focuses on whether the withheld evidence would have had an effect **on even a single juror**. <u>Wiggins v. Smith</u> , 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); <u>Williams v. Taylor</u>, 529 U.S. 362, 393-95

20

(2000) (ratifying effect on a single juror standard applied by Virginia trial court); Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty"). Thus, if even a single juror reasonably could have found Petitioner not guilty or found a mitigating circumstance that was not found, or might have differently balanced the aggravating and mitigating circumstances, confidence in the outcome is undermined and a new trial and penalty hearing is required.

30.    Obviously, in this case, the evidence of sexual assault upon this child was highly inflammatory. All things being equal, this evidence would have understandably turned any jury against Petitioner. However, in addition to the obvious inflammatory nature of this evidence, it caused specific damage to Petitioner's trial defense. Petitioner's trial theory attempted to show that Robin was the perpetrator. See e.g. Tr., 3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to make it clear. Mr. Tinker and my position is that Alfred Bourgeois did not kill this child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby"). This

theory was obliterated by the allegations of sexual assault and presence of semen, which could only have been perpetrated by Petitioner as the only male reported to have access to the child.    Thus, the semen/sexual assault evidence all but doomed Petitioner's defense.

31.    The evidence of the alleged semen was particularly damaging at sentencing, during the jury's life or death deliberations. Again, in addition to the generally inflammatory and highly prejudicial nature of such evidence, it also supported the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner.  18 U.S.C. § 3592(c)(6).  This evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, Tr. 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").

32.    Moreover, in addition to its support for a specific aggravating circumstances, any reasonable jury would have weighted this evidence in its deliberative weighing process.  See 18 U.S.C. § 3593(e) (jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death").

33.    As set forth in Parts One and Three above, P-179 further undermines the

Government's contention that "semen" was detected.[12]  Had P-179 been disclosed or utilized by trial counsel, there is a reasonable probability that at least one juror would not have convicted Mr. Bourgeois.  Even more so, however, there is a reasonable probability that at least one juror would have believed that Mr. Bourgeois had not sexually assaulted his daughter.  Even if they believed he was guilty of murder and deserved to spend his life in prison, absent the evidence of sexual assault, there is a reasonable probability that at least one juror would not have sentenced him to death. Accordingly, the p30 test results reflected in P-179 were highly material and Petitioner was greatly prejudiced by the Government's non-disclosure.  If P-179 was disclosed, counsel's deficient failure to use the document was highly prejudicial.  Indeed, due to the Government's failure to disclose P-179 and/or trial counsels' ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die – Petitioner was prejudiced.

WHEREFORE, for all of the above reasons and based on the entire record of this matter, the Court should permit Amendment of Petitioner's Section 2255 Motion to include the Ground for Relief set forth herein, that the Government failed to disclose

---

[12] Petitioner will discuss all of the evidence contradicting the Government's assertion that "semen" was detected in post hearing briefing.

P-179 to trial counsel.[13]  Upon permitting such amendment, the Court should permit further development and litigation of this Ground for relief, including further development of the record with respect to the Government's non-disclosure. Additionally, the Court should consider the within Supplement to the existing claim of ineffective assistance of counsel related to Claim IV.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:     Philadelphia, PA
           November 15, 2010

---

[13]The Proposed Amendment is attached here as an Exhibit.

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____

Michael Wiseman