UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

GOVERNMENT'S RESPONSE TO BOURGEOIS' MOTION TO AMEND AND PROPOSED AMENDMENT TO HIS MOTION PURSUANT TO 28 U.S.C. SECTION 2255

I.

On November 18, 2010, Bourgeois filed the above Motions. The court ordered the Government to respond within ten days. The government files this response to Bourgeois' subject motions. Bourgeois seeks to amend his original Section 2255 Motion by supplementing Claim IV to include an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

As the government advised Counsel for Bourgeois at the time of the evidentiary hearing, the government is unopposed to Bourgeois' Motion to Amend, but contests and denies his Amended Claim of an alleged *Brady* violation, or ineffective assistance of Trial Counsel, and demands strict proof thereof.

II.

Background

The government relies upon the sworn affidavit of Debora Hohle, a legal administrative specialist and litigation support staff member of the U.S. Attorney's Office, Corpus Christi Division, who is knowledgeable about the matters involved herein (Attached as Government's Exhibit 1). Ms. Hohle was Office Manager at the time of the trial, and was directly and indirectly involved in preparing and providing discovery materials to both trial and habeas defense counsel. The government further relies upon the FBI Lab Protocols of 2002 and 2010, quoted by Bourgeois herein.

The document alleged to have been withheld from trial counsel, identified as Petitioner's 179 (P-179), is a single page from the more than 350 page FBI Lab Report. As demonstrated by the attached affidavit, the assigned Trial AUSA requested the FBI lab report from the FBI in October, 2003, in preparation for trial. As per the packing slip, it appears the FBI shipped the materials to the government on, or shortly after, October 29, 2003. The materials received from the FBI Lab included the more than 350 page FBI Lab Report (including P-179), photos and a cd containing additional materials. As per office procedure, the FBI Lab Report was copied in preparation for discovery. Multiple copies would have been made during this time: a copy for the defense, as well as several working copies for the

prosecution.

On November 7, 2003, a staff member from Douglas Tinker's (Trial Defense Counsel) Office received and signed for discovery materials, which included a copy of the FBI Lab Report. The Lab Report provided to the defense was 358 pages long, with one duplicated page. The question of whether these discovery materials contained the subject document (P-179) will be addressed shortly as the relevant events are unfolded.

Following Bourgeois' conviction and the filing of the subject Section 2255 Motion, present Counsel reports that Trial Counsel provided Bourgeois' § 2255 Counsel with a reported 12,000[1] pages of materials utilized by Trial Counsel, including discovery materials received from the government. Present Counsel reports, that on the basis of several computer word searches, that the missing document (P-179) was not within the documents received from Trial Counsel. Present Counsel for Bourgeois provided a copy of these 12,000 pages to the government in discovery. The government reports that the missing document (P-179) is not within the 12,000 pages provided by the Public Defender to the government. Significantly, although the government provided 357 pages of Lab Report to Trial

_____

[1] Although the parties refer to the number as 12,000 in discussions with the court, the exact number is reported to be 11,611.

-3-

Counsel on November 7, 2003, only 354 pages of Lab Report are contained within the 12,000 pages Trial Counsel provided to § 2255 Counsel, and which were later provided to the government.

Pursuant to discovery in preparation for the instant § 2255 proceeding, the government sought to provide present Counsel with a copy of the FBI Lab Report on April 10, 2010. From the time of the original trial to the time of the Section 2255 Motion, the government retained what it believed to be several complete copies of the FBI Lab Report. Unfortunately, and inadvertently, the set of copies of the Lab Report chosen recently to provide copies of the Lab Report to present Counsel, although 365 pages, did not contain P-179.

A review of the five sets of copies of the FBI Lab Report retained by the government from the time of the original prosecution to the present reveals that three of the sets of copies contain P-179, while in two of the sets, P-179 is missing. The two sets missing P-179 are AUSA working copies. As the attached affidavit reveals, the multiple sets of copies of the Lab Reports were kept together and were accessible to the three Trial AUSAs, as well as their litigation and support staff.

As the undersigned was assigned to handle the serology issues for the Section 2255 evidentiary hearing, the undersigned had direct discussion regarding discovery with present Counsel (Abreu). The undersigned provided Counsel with the present

FBI Protocol as well as that for 2002 (applicable at the time of the initial lab testing), for the particular lab procedures conducted, and relevant articles provided by the FBI regarding the procedures performed and the interpretation of these procedures. The undersigned also directed the FBI Lab Forensic Examiner and expert witness in the § 2255 hearing, Jerrilyn Conway, to discuss with Counsel any questions he may have regarding the FBI Lab Protocols, the procedures performed by the FBI herein and the significance of the lab results. This telephone conversation between Counsel and Ms. Conway occurred well prior to the evidentiary hearing.

In preparation for the evidentiary hearing involving Bourgeois' Section 2255 Motion, the FBI expert assigned to the case, Jerrilyn Conway, alerted the undersigned to P-179 and discussed the significance of it. Ms. Conway advised that P-179 was contained in the original FBI Lab Report, of which she had recently obtained a copy. During the testimony of Bourgeois' serology expert, Dr. Elizabeth Johnson, the undersigned broached the significance of P-179 with her. Dr. Johnson testified that she was unaware of P-179. At which point, Counsel for Bourgeois suggested that he was unaware of P-179 as well.

The court directed the parties to further investigate the matter. Later that day, Counsel for Bourgeois reported that the missing document was not within the 12,000 pages of material received from Trial Counsel. The government explained that it

believed it had provided Trial Counsel with the complete Lab Report, including P-179, as it appears in several of the government's sets of copies of the Lab Report. The government reasoned then and reasons here that, as the missing document appears in several sets of the Lab Report copies, its absence in two sets would not have been the result of a copier malfunction. Rather, the record suggests that the missing P-179 document was removed by staff during trial preparation, and not returned to the respective set of copies. The government provided a copy of the Lab Report to Trial Counsel within several days of receiving the Lab Report from the FBI. This copy set was not part of the government's working file. It was provided to Trial Counsel long before government Counsel began accessing the remaining copy sets in trial preparation.

The fact the missing document was not within the 12,000 pages Trial Counsel provided to § 2255 Counsel does not demonstrate it was absent from the copy of the Lab Report provided by the government to Trial Counsel. Although the government provided Trial Counsel with 357 pages of FBI Lab Report, only 354 pages of Lab Report appear in the 12,000 pages of materials supplied by Trial Counsel.

III.

Significance of P-179

The government contests several of Bourgeois' characterizations within his

subject Motion.  Bourgeois suggests the FBI's 2002 serology Protocols (P-180),

"demonstrates that the Government's evidence that semen was definitively detected

in the rectum of JG-1999 was erroneous, and as Petitioner has alleged in Claim IV,

scientifically unsupportable".   This conclusion is diametrically contrary to the

credible testimony of the government's forensic expert, Jerrilyn Conway, and

misconstrues the FBI Serology Protocol on this issue (Conway testimony, p. 83-84).

The protocol for sperm searches in the FBI Laboratory is outlined in the 2002

protocol as well as the 2010 protocol.  Bourgeois provides the court a partial quote

from Chapter 11 of the FBI Protocol in Paragraph 9 of his subject motion.  The full

quote from the Protocol demonstrates the proper context.

See (PROCEDURE FOR THE MICROSCOPIC IDENTIFICATION OF

SPERMATOZOA, 2002, p.11-1):

> "Attempts to identify human semen in some categories of evidence must
> be approached through an identification of spermatozoa rather than by
> detection of human semen-specific proteins, such as p30.   These
> categories would include smear slide material submitted by contributors;
> unusual stain materials that defy attempts toward solubilization of
> protein components; and stain extracts that possess borderline levels of
> p30."

This statement identifies the types of evidence that are not suitable for protein

(P-30) detection, such as smear slides (the stain is on a glass slide and not on material

that can be cut and extracted). The borderline levels of P-30 refers to samples that are

negative with the P-30 test but that can still be searched for sperm. It does not require that the FBI test stains with weak P-30 results for sperm. Here, the P-30 was contained within swabs obtained at autopsy.

In the current FBI protocol, the language is even more specific (Procedures for the Microscopic Identification of Spermatozoa, Sero111-3.doc, Issue Date 02/08/10, p.1 of 16):

> "Identification of human semen can be accomplished by either the observation of a human spermatozoon (i.e., sperm cell) or by the immunologic detection of the soluble plasma protein, prostate-specific antigen (PSA) present in seminal plasma, also known as P30."

Also see (p.12 of 16):

> "10.2   While the absence of intact human spermatozoa indicates that no semen was detected on an item, the failure to detect intact spermatozoa in biological material is not the basis for a conclusive determination that human semen was not present."

And see (p. 13 of 16):

> "10.4    Because the cellular structure of human spermatozoa is susceptible to damage from the uncontrolled conditions to which a semen stain may be exposed between the time of its disposition and the time of its collection, the sensitivity of microscopically based methods of semen detection may be reduced for a particular specimen. For this reason, microscopic smear searches are generally conducted on smear slides submitted as items of evidence (i.e., vaginal smear slide, oral smear slide, etc.) only when prostate specific antigen (PSA) testing of that slide's corresponding evidence specimen (i.e., vaginal swab, oral swab, etc.) does not detect human semen or if such specimens are not available for PSA testing. Similarly, smear slides are generally not

prepared in the Laboratory and searched from evidence items amenable to PSA tsting for the presence of human semen (i.e., vaginal swab, oral swab, etc.).”

Though the language of the current protocol is more specific and contains more information and detail, it is the same practice the FBI was using in 2002 and the interpretation of the test cards is the same.

The government contests Bourgeois' claim that the FBI's Protocols suggest that the P-30 test as performed in this case is not a "confirmatory" test for semen. Again this claim is diametrically contrary to the testimony of the government's forensic expert, Jerrilyn Conway, and misconstrues the FBI Serology Protocol on this issue. Ms. Conway testified that the P-30 test used herein was a "qualitative" test, the weakness of the positive result only suggests the limited amount of P-30 present, it does not question the presence of P-30 (Conway's testimony, p. 13-14).

The FBI Protocol directly refutes Bourgeois' claims. See p. 6-2 of that protocol (PROCEDURE FOR HUMAN SEMEN IDENTIFICATION BY THE ONESTEP ABAcard® PSA TEST):

"1.      POSITIVE FOR PRESENCE OF SEMEN: A pink line has developed in both the "T" test area and the "C" control area of the OneStep ABACard®."

Additionally, see: the current protocol (Procedures for Human Semen Identification by the Prostate Specific Antigen Test, Sero105-3.doc, Issue Date:

02/08/10, p.19 of 24):

> "10.2   A faint positive result indicates that semen is present on an item. The faint nature of the positive results is recorded in the case work documentation to capture semi-quantitative information that may be of value in determining what, if any, additional tests are conducted on a stain (i.e., DNA testing, etc.) and/or the amount of stain consumed for such a test(s)."

Also see: (p.19 of 24):

> "10.4   Because PSA may be present in male body fluids at levels detectable by the PSA test card but at concentrations less than that present in human semen (by several orders of magnitude), these test procedures are designed to desensitize the PSA test card by reducing the mass of recovered PSA applied to it. Using these procedures, only levels of PSA present in human semen will yield a mass of PSA (after procedural dilution) that when applied to the PSA test card will remain sufficiently high to give a positive test result."

The designation of "weak" or "very weak" in the raw data of a positive P-30 test result in no way demeans the positive result, it is only intended to alert the forensic examiner as to whether the sample represents a good candidate for additional testing, such as a DNA test.

To the extent Bourgeois argues that the negative Acid Phosphatase test conducted by Dr. Elizabeth Johnson 18 months after the autopsy, "the negative smear slide sperm search, negative microscopic pellet sperm search, negative autosomal DNA test, negative Y chromomosomal DNA test, and no sign of physical trauma" challenges the results of the P-30 test, the government contests Bourgeois' claim. Ms.

Conway explained how the subject P-30 test results were reliable in light of the negative results described (Conway testimony pp. 28-29, 31, 50-51).    As Ms. Conway testified, AP deteriorates at a faster rate than PSA, and is typically undetectable under optimal circumstances after 14 hours (Conway's testimony, p. 7-9, 15, 28).   Ms. Conway also challenged Dr. Johnson's mathematical calculations regarding her expectation for finding sperm on the sample (Conway's testimony, p. 16-18). Ms. Conway also testified that the FBI Protocol involving identifying sperm required a finding of an intact sperm, tail and head (Conway's testimony, p. 24, 47), diminishing the significance of the FBI's negative finding of sperm.  Ms. Conway conclusively eliminated the potential for non semen sources to trigger a positive result in the FBI's P-30 test (Conway's testimony, p. 19-27, 41).

IV.

Legal Principles

*Brady* prohibits the Government from suppressing evidence favorable to the accused "where the evidence is material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. When a defendant seeks a new trial on the basis of a *Brady* violation, he must show that "(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material." *United States v. Fernandez,* 559 F.3d 303, 319 (5th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct.

-11-

2783 (2009) (quoting *United States v. Infante,* 404 F.3d 376, 386 (5th Cir.2005)).

Evidence is "material" if there is "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."

*Severns,* 559 F.3d at 278 (citation omitted). A "reasonable probability" is a

probability sufficient to undermine confidence in the outcome. *Id.* (citations omitted).

*United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010). A "reasonable probability"

of a different result is accordingly shown when the government's evidentiary

suppression "undermines confidence in the outcome of the trial." *United States v.*

*Bagley,* 473 U.S. 667-78, 105 S.Ct. 3375, 3381 (1985), *Kyles v. Whitley,* 514 U.S.

419, 433, 115 S.Ct. 1555, 1565 (1995).

As the government has shown above, Bourgeois has not shown that the

government suppressed P-179 or withheld it from Trial Counsel.

Even if the court determined that Trial Counsel did not receive P-179, it does

not represent exculpatory evidence. The "very weak" P-30 finding remains a positive

finding for P-30 (Conway's testimony, p. 13-14, 28-29). It was corroborated by

Bourgeois's expert Dr. Johnson's P-30 test results. The government asserts that the

credible evidence before the court reveals that the positive P-30 test results

established incontrovertably the presence of semen in the victim. The admission of

P-179 at trial would not have refuted the positive P-30 test results. In light of the

-12-

other overwhelming evidence of guilt, the absence of P-179 at trial does not undermine confidence in the outcome of the verdict.

To the extent Bourgeois claims, in the alternative, that Trial Counsel was constitutionally ineffective for failing to utilize P-179 during trial, for the reasons discussed above, he fails to demonstrate the necessary prejudice from such failure. The P-30 test result is a confirmatory test for the presence of semen, and is not impugned by a "weak" or "very weak" designation.

V.

Accordingly, the undersigned moves the court to deny Bourgeois' Amended Claim alleging a *Brady* violation. To the extent Bourgeois alleges in the alternative that Trial Counsel was constitutionally ineffective for failing to utilize P-179 at trial to contest the government's P-30 positive test results, the undersigned moves the court to deny his claim and to enter the attached proposed order.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney


 /s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

**CERTIFICATE OF SERVICE**

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this Response to Bourgeois' Allegation of *Brady* violation has been served by placing it in the United States mail, postage prepaid, on November 29, 2010, addressed to: Mr. Victor Abreu Esq., Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney