IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,       *    CRIMINAL ACTION
                               *

       PLAINTIFF,            *    CR-C-02-216(1)
                               *

VS.                            *

                             *    CORPUS CHRISTI, TEXAS

ALFRED BOURGEOIS,          *    DECEMBER 1, 2010
                             *    2:27 P.M.

       DEFENDANT.           *
                             *

* * * * * * * * * * * * * * * * * *


TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:       MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:         MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES: (CONTINUED)

FOR THE DEFENDANT: MR. VICTOR JULIO ABREU
MR. MICHAEL WISEMAN
OFFICE OF THE FEDERAL PUBLIC DEFENDER
601 WALNUT STREET
THE CURTIS CENTER, SUITE 545
PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 2:27 p.m.)

(Call to Order of the Court.)

THE DEFENDANT:  Yes, ma'am.  At the time that I wrote the letter, I was very angry, because I didn't think I got a fair --

MR. ROBERTS:  Your Honor, the Government is all on the phone as well.

THE COURT:  Yeah.  Well --

THE CLERK:  I was told by the Defense Counsel that everything had been resolved in that regard.

MR. WISEMAN:  Yes, Your Honor.  This is Michael Wiseman.  What Mr. Bourgeois was about to tell you was that he has calmed down a bit since he wrote the letter.  He signed a document today which we can present to the Court, if the Court likes, indicating he wants us to stay on the case.

THE COURT:  Is that right, Mr. Bourgeois?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  Okay.  Then we'll go on to the next matter.

THE CLERK:  Would you like for me to call the case?

THE COURT:  Yes.

THE CLERK:  Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MR. ABREU:  Good afternoon, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. DOWD:  Mark Dowd for the United States, Your Honor.

THE COURT:  Okay.  There are several motions pending.  There's a motion to take Bill May's deposition and Bill May's client, former client's deposition.  Is that right?

MR. ABREU:  That is correct, Your Honor.  Those are pending.

THE COURT:  Who's speaking?

MR. ABREU:  This is Mr. Abreu, and I'll identify myself from now on, Your Honor, when I speak.

THE COURT:  Okay.  Thank you.  Well, the problem -- of course, the Government's opposed.  And the problem with that is that when you all first filed the ex parte subpoena for Bill May, I immediately contacted you and said, "He's not at that address.  He lives out of town.  And I've got his ex-wife's address, and you can contact her there for his new address in the Dallas area."  And you all assured me that you had your own way to find these things and didn't need that.

So a month and a half later, you still didn't find

him.  You didn't call his ex-wife, and you didn't make any effort to do that.

MR. ABREU:  Your Honor, unfortunately Mr. McHugh, who has been dealing with this --

THE COURT:  Your name, please?

MR. ABREU:  This is Victor Abreu, Your Honor. Unfortunately, Mr. McHugh, who's been dealing with this issue directly, could not be with us today.  We would --

THE COURT:  Well, I spoke directly with Mr. Wiseman at the time.

MR. ABREU:  Regarding where she might be located, and I think Mr. Wiseman did pass that information on to our investigator, who did take some efforts to try and locate --

THE COURT:  No, actually I said, "Do you want his ex-wife's name and her address?  If so, Ms. Scotch has it. Please call her if there's any problem."

And he said, "Oh, we've got a great investigator. It's not going to be a problem."

MR. ABREU:  Well, I think that he did find her, Your Honor.  I don't think that that was the problem.  I think she, at first, was reluctant to provide definitive information to our investigator.  But I think in the end they did find her.

THE COURT:  Well, and the other thing I said is that we've had him appear from that place in Dallas, and we had his address, if you wanted us to look it up.  And nobody asked us

to do that.  So that ship has sailed.

MR. ABREU:  Can I make just a brief request, given what Your Honor is saying?  This is what I was going to request regarding all the motions, as a matter of fact.  The Government filed, night before last, several responses Your Honor had ordered to our motions.  And what we were asking for, we would ask for just a couple of days to file or reply to those motions.  And perhaps --

THE COURT:  Let me tell you this.

MR. ABREU:  Yes.

THE COURT:  It's over with Bill May.  I told you exactly how we could, I could help you find him.  We can look it up in our records, because we did a video deposition of him from a place in Dallas a year or two before.  I told you immediately, contacted you immediately when the ex parte motion to depose Bill May was filed, or subpoena him was filed, that he was not at that address, and he wasn't --

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I think the problem from --

THE COURT:  You remember all that, Mr. Wiseman.

MR. WISEMAN:  I'm sorry?

THE COURT:  You remember all that.

MR. WISEMAN:  Well, I certainly remember that part. Unfortunately, Mr. McHugh, who was actually dealing with Mr. May and Mr. Longoria couldn't be with us this afternoon.

He actually has things to say in response.  Unfortunately, I don't know what those things are.  And that's why we would want --

THE COURT:  Well, I don't know what he could say in response, when you never called us back.  We had his address --

MR. WISEMAN:  Right.  As Mr. Abreu --

THE COURT:  -- from the video deposition.

MR. WISEMAN:  Right.  As Mr. Abreu said, though, I don't think that was the particular problem.  And I honestly don't know, sitting here right now, what the problem is.  But we would like an opportunity to just present a short reply on that issue.  Obviously, on the other motions, which are more significant in terms of their complexity --

THE COURT:  And I can't remember -- Ms. Scotch, can you look on the docket and see when that first ex parte motion to subpoena Bill May was filed?  Because that was when we called Mr. Wiseman about it.

THE CLERK:  Yes.  I'll look that up right now.

THE COURT:  Thanks.  And all this conversation was unknown to the Government, but it should be known at this point.  And I would --

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I remember the day.  It was when we were in your courtroom for the April 20th argument about the scope of the hearing.

THE COURT:  Right.  That was the April 20th --

MR. WISEMAN:  Or maybe it was the day that we did Mr., Dr. Gelbort actually.

THE COURT:  No, I asked to follow up on that.  We'll look and see, but I think it was the April hearing.  It was whenever you filed it.

MR. ABREU:  It would have been after the April hearing, I believe, Your Honor.

THE COURT:  Okay.  Well, let's see when it was filed.

(PAUSE.)

THE CLERK:  The subpoena order that was signed for Mr. May, that was signed on September the 3rd.  But I know that we talked about that at, on one of the last days of the evidentiary hearing, which that was in September.

THE COURT:  Well, no, we talked about it before September.  No, we talked about it when it was filed.

MR. ABREU:  This is Victor Abreu, Your Honor.  I think it might have actually come up, and I was not present, but I remember Mr. Wiseman talking to us about it when he returned from --

MR. WISEMAN:  Yes.

MR. ABREU:  -- having taken Dr. Gelbort's deposition, which would have been --

THE COURT:  Right, in court, because it was around that time.  You filed it in September.  We heard -- we had a September hearing with the doctor.

MR. ABREU:  I think it was September 10th or so, Your Honor.

THE COURT:  Yeah.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I don't think we're debating any question about the Court having been extremely accommodating --

THE COURT:  No, no, I know that.

MR. WISEMAN:  -- and trying to assist us.

THE COURT:  I understand that.

MR. WISEMAN:  Right.  Our point is that the member of our team who has information to make our point is not on the phone.  He was at the prison today visiting with Mr. Bourgeois.

THE COURT:  Well, I understand that.

MR. WISEMAN:  So we're just at a disadvantage.

THE COURT:  Can't you reach him by cell phone?

MR. WISEMAN:  I expect he's en route home right now.  You know, he was at the prison and is now coming back.  I don't honestly know where he is.  I mean, we've been e-mailing each other trying to coordinate the time for this call, and he hasn't responded.  So I can only assume he hasn't been getting the e-mails.  He does have a BlackBerry, but he's en route.

MR. ABREU:  He may be mid-flight, for all we know.

MR. WISEMAN:  Yeah, yeah, exactly.  So, you know, in regard to the May/Longoria matter, we just want to put our position on paper so that the record's complete for --

THE COURT:  I assumed you did when you wanted to take it out of time.  And the Longoria --

MR. WISEMAN:  Well, I understand, but --

THE COURT:  The Longoria guy, he has been in the Bureau of Prisons for some time, or at least in a prison, and it requires a writ to get him here, you know, when you -- in March I told you that.

MR. WISEMAN:  Right.  Again, I think Mr. McHugh is handling him, and I don't know what the back and forth was and what he knew and when he knew it, and so I'm --

THE COURT:  It doesn't matter.  I know what you all knew and when you knew it.  And what you did with the information is something else.  But we had Mr. May's address. And I told you we would search for it and get it for you if you needed it.  And you told me, Mr. Wiseman, if there was any problem at all, you would get back to me.

Now, here we are in December, when I want to set the final arguments hearing, and you want to do more depositions. And I can understand the doctor thing.  You can do that one. But not the May and Longoria one.  That was well within -- you know, this has got, I have given you incredible amounts of time and leeway to do this.  And that time is now up.

So the question remains when can you do the, take the testimony of the doctor?

Oh, and by the way, I'm allowing you to amend for the

Brady deal, because I figure we had it at the hearing anyway.

MR. ABREU: I missed the last part, Your Honor. This is Victor Abreu. Because you figured what? I'm sorry.

THE COURT: I'm allowing you to amend to add the other point in the 2255 for -- I think it was a Brady claim, wasn't it?

MR. ABREU: Yes, Your Honor.

THE COURT: Yeah. You know, because we tried it anyway.

MR. ABREU: And so we could present argument at that time, at the appropriate time?

THE COURT: Absolutely.

MR. ABREU: Okay.

MR. WISEMAN: Your Honor --

THE COURT: I mean, you know, I feel like we had, we tried it during the hearing.

MR. WISEMAN: Your Honor, this is Michael Wiseman. I think we appreciate the ability to amend, or the Court's ruling on amendment. But from our perspective, given the Government's response, we think there is a little bit more hearing that's required on that, either by deposition or in court hearing. And we were going to put that forth --

THE COURT: You can do it at the time of arguments. You know, that's it. I mean, I have the affidavit from Ms. Hohle.

MR. WISEMAN:  Do we not get to cross-examine?

THE COURT:  You can put her on the stand.  You can put her on the stand when we have the final arguments hearing.

MR. WISEMAN:  Okay.

THE COURT:  And that's what you want to do.  Right?

MR. ABREU:  That's what I understood, Your Honor.

THE COURT:  Yeah.  I'm not accepting affidavits from anybody else.  That's only reasonable.

MR. WISEMAN:  Exactly.

MR. ABREU:  That's right.  That's fair.  Okay.  Thank you, Your Honor.

THE COURT:  The U.S. Attorney should make her available at the closing arguments hearing.  So the only other issue then, as I understand from the Government's response -- now I have forgotten the name of the doctor.

MR. ABREU:  His name is Dr. Leestma, Your Honor.

THE COURT:  Okay.

MR. ABREU:  May I quickly address that point, Your Honor?

THE COURT:  Yes.

MR. ABREU:  This is Victor Abreu, obviously.  Just one point of clarification, Your Honor, and I wanted to make sure the Government Counsel was aware of that.  And I think that they would agree with this, that, you know, there is somewhat of a little bit of congestion or confusion about

whether their, our motion was unopposed or not.  And I just wanted to clarify that that was certainly not intentional and that it was based on my reading of what Your Honor had said in --

THE COURT:  I don't have any problem with that.  I understood the response --

MR. ABREU:  Okay.  I just wanted to make sure that everybody was aware that I wasn't --

THE COURT:  No.

MR. ABREU:  -- trying to misrepresent what the Government --

THE COURT:  No.

MR. ABREU:  -- was opposed or unopposed to.

THE COURT:  No.  Those are the kind of things that are just misunderstandings, miscommunications.

MR. ABREU:  Okay.  Thank you.

THE COURT:  So I didn't want to delay the hearing for another 30 days.  I would like you to get the deposition done ASAP.

MR. ABREU:  Yes.

THE COURT:  When can you get it done?

MR. ABREU:  I think that -- here's the only thing we're waiting for, Your Honor.  There are slides that Dr. Kagen-Hallet, who is now deceased, relied on.  There were specific brain slides.  Those, for some reason, were not

included in the package of slides that were previously sent to Dr. Leestma.

We could probably do a deposition now, but to do as thorough a job as Your Honor wanted us to have done regarding everything you wanted our new doctor to look at, it would be best if he could look at those brain slides as well.

THE COURT:  Where are those slides?

MR. ABREU:  They were not with that particular package, and I was hoping perhaps Mr. Roberts could speak with Dr. Rouse, the autopsy doctor.  Perhaps she knows.

THE COURT:  I wanted to have the hearing to see if Mr. Roberts, Ms. Booth, Ms. Salinas, Mr. Dowd has some kind of update on where those slides were.

MR. ABREU:  And we had tried previously in the past to speak directly to Dr. Rouse, and she wouldn't speak to us. And I understand her point.

THE COURT:  That's okay.

MR. ABREU:  Right.  So, but I know --

THE COURT:  So let's -- who has a response on the Government's side about the slides?

MR. ROBERTS:  Your Honor, this is Tony Roberts for the United States.  This is the -- I thought that the autopsy slides were all sent after the last time when we had this, when we had a discussion during the evidentiary hearing.  So actually, it's a surprise to me actually to know that they have

not received all the autopsy slides at this point.

MR. ABREU:  Let me just clarify the point.  All the autopsy slides were sent except -- and that's what our motion says -- except the brain slides that were separately reviewed by Dr. Kagen-Hallet, not Dr. Rouse.

THE COURT:  Can you track those down, Mr. Roberts?

MR. ROBERTS:  I will make every effort, Your Honor.  The neurologist, Ms. Kagen-Hallet, is now deceased.  And as has been represented to the Court from the Federal Public Defender, someone else has actually looked at those slides and sent some information on to them.  But I was not aware until this point that the actual brain slides were not sent.  So I will track that down and --

THE COURT:  I tell you what, why don't you look that up and file an advisory for the Court -- let's see, today's Wednesday -- by Friday at noon.

Now it's possible, Mr. Abreu and Mr. Wiseman, that those things are gone.

MR. ABREU:  It's possible.  And then we would like to proceed on the deposition without them, Your Honor.

THE COURT:  Okay.  Because we need to know rather quickly, because I'd like to set a date --

MR. ABREU:  Right.

THE COURT:  -- in December.  You all need more frequent flier miles, Mr. Wiseman and Mr. Abreu.

MR. WISEMAN:  Oh, I just can't wait to get them.

THE COURT:  I know.  I know.  I'd like to do this in December.

MR. ABREU:  A date in December, Your Honor?

THE COURT:  I would like a date in December.  Tell me -- now you made me feel bad, without even saying anything.

MR. ABREU:  And I'll tell you why that is, only, Your Honor, because I have a, my family is headed to visit my parents in Florida from December 21st through the 29th.

THE COURT:  And this is Mr. --

MR. ABREU:  Abreu, Your Honor.

THE COURT:  Okay.  Well, let's see if we can do it before then.

MR. ROBERTS:  Your Honor, this is Tony Roberts --

MR. WISEMAN:  Now you're going to hear some moans from Mr. Roberts.

THE COURT:  Who's moaning now?

MR. ABREU:  I think everybody was collectively moaning.

MR. WISEMAN:  Mr. Wiseman's moaning.  I've got a Third Circuit argument, followed by a filing deadline on the 13th, so I've got --

THE COURT:  And?

MR. WISEMAN:  -- nothing, I can't even think about it till, you know, after the 13th.  And that doesn't give us much

time to get ready.

THE COURT:  So?

MR. ROBERTS:  Your Honor, this is --

THE COURT:  I'm sorry, Mr. Wiseman.

MR. WISEMAN:  I'm sorry?

THE COURT:  I can't help but tease you.  I'm sorry.

Okay.  Look, everybody, we're going to do this in mid-January.  We'll pick a date.

MR. WISEMAN:  Excellent.

THE COURT:  Now, this is -- two other things.  You want to get the information from Mr. May that he, his client, Longoria, was offered a deal?

MR. WISEMAN:  Correct.

THE COURT:  Is that it?

MR. WISEMAN:  Yes.

MR. ABREU:  That's correct, Your Honor.

THE COURT:  Do you need Longoria for that, or can you do it with May?

MR. WISEMAN:  I think we could do it with May.  I believe.  What do you think, Mr. Abreu?

MR. ABREU:  If the Court is denying Longoria, we certainly will try to do it with Mr. May.

THE COURT:  Well --

MR. WISEMAN:  Mr. Abreu is more practical than --

THE COURT:  I thought I already heard from

Mr. Longoria at some point.

MR. WISEMAN:  No.

MR. ABREU:  No, you have not, Your Honor.

THE COURT:  Okay.

MR. ABREU:  Mr. Longoria is the gentleman who's in -- gentleman I say -- the person who was in prison in Kansas awaiting murder charges.

MS. SALINAS:  This is Elsa Salinas, Your Honor.  You heard from his girlfriend in the --

THE COURT:  I heard from his girlfriend at the trial.

MS. BOOTH:  No.  No.  That was Orlando Campos' girlfriend.

MS. SALINAS:  Oh, I'm sorry.

MS. BOOTH:  What you've seen are letters that he wrote.

MS. SALINAS:  That's right.

THE COURT:  Mr. Longoria.

MS. BOOTH:  That are in the pleadings.

MR. WISEMAN:  That's correct, Your Honor.

MS. SALINAS:  That's correct.

THE COURT:  So why don't we do -- and if you can do it -- and Mr. Abreu's going to do it.  Right?

MR. ABREU:  Mr. McHugh will.  But I will -- one of us will do it, Your Honor.

THE COURT:  I want it done by the 15th.  And this is

the only way I will authorize it.  Mr. May goes to a video conference center.  You all do it in your offices, by however you want to do it, or wherever your nearest video conference center is.

MR. WISEMAN:  Okay.  And I'm missing an important detail, which was the date.

THE COURT:  I'm sorry?

MR. WISEMAN:  I'm missing an important detail, the date.

THE COURT:  By the 15th of December.

MR. WISEMAN:  Okay.

THE COURT:  The U.S. Attorneys have video conferencing in Houston.  They have video conferencing in our courthouse.  You can use that.  But I think actually you may have to, we have to worry about whether they can all interface, okay, so you may have to go to a video conference center.

Now, the last time we did this with Mr. May, he actually went -- he appeared by video conference in the courtroom.  He went to the federal courthouse in Dallas.

MR. ABREU:  Okay.

THE COURT:  Now, I can do that if you want him to appear in January.

MS. BOOTH:  I thought this had to be done by December the 15th.

THE COURT:  Well, if you want a deposition of him in

advance, it has to be done by December 15th.  If you just want him to appear by video deposition, he can go to a federal courthouse, and we can hook it up in my courtroom for the arguments.

MR. WISEMAN:  So we could do his testimony at the same time as we do the argument.  Okay.

THE COURT:  Which do you want to do?

MR. WISEMAN:  I think the latter sounds better.  This is Michael Wiseman.

THE COURT:  Well, it should be cheaper.

MR. WISEMAN:  Be cheaper, and I think -- I don't know what Mr. McHugh's schedule is.  It may be pressing him to get it done next week.

MR. ABREU:  I think it might also be more convenient for --

THE COURT:  I thought we went over this during the trial, though.  Wasn't Mr. Longoria, didn't he appear at the trial?

MR. ABREU:  At the trial in 2003?  Yes.  He was present at the -- in 2004.  He was present at trial, Your Honor, not at the hearing in 2010.

THE COURT:  Yeah, I know.  But weren't these questions asked of him in 2003?

MR. ABREU:  Oh, no, Your Honor.  These are somewhat different.  They're based on a post-trial letter that was

written on his behalf.

THE COURT:  By Ms. Booth?

MS. BOOTH:  Uh-huh.

MR. ABREU:  By the Government, Your Honor.

THE COURT:  But I remember, I thought we talked about this at the time, that -- I thought Ms. Booth actually came forward and said, "I want you to know that this is what may happen."

MR. ABREU:  I don't believe that's the case, Your Honor.

MS. BOOTH:  On Orlando Campos --

THE COURT:  Is that the one?

MS. BOOTH:  Orlando Campos, I believe the record's going to show that he was going to ask for us to write a letter, we might write a letter.  I think that was on the record.  I don't remember exactly how it was.

THE COURT:  Okay.

MS. BOOTH:  We made no promises to Mr. Adam Longoria. None.  But subsequent, years -- I guess it was -- there's a letter in there that says, "I know you promised me nothing," but he wrote like a month after the trial.

THE COURT:  Right.

MS. BOOTH:  "But would you let my wife visit?"  Well, we made no, you know, nothing happened.

Then I was approached, I think, by Chris Gale and

asked if I would write a letter for his parole was coming up. And at that point I said, "Okay, I will." And I just wrote a letter saying, "He asked for nothing, and we promised him nothing, but he did testify honorably."

THE COURT:  Okay.

MS. BOOTH:  And that's all that's in the letter.

THE COURT:  Okay.

MR. ABREU:  I think the question before the Court is whether there were some implicit promises that were made and whether some other post-testimony action was taken on his behalf or, you know --

MS. BOOTH:  No, there wasn't.

MR. ABREU:  -- born out.

MS. BOOTH:  Nothing.

MR. ABREU:  Well, I guess that's the issue for the Court.  And that's why we want him to testify.

THE COURT:  I know, but is Mr. May going to say that he thought that you were going to do something?

MR. ABREU:  I missed that, Your Honor.  I'm sorry.

THE COURT:  Have you -- you've talked to Mr. May. Has he said that he thought that Ms. Booth was going to do something before he testified?

MR. ABREU:  That is what his affidavit reflects.

MS. BOOTH:  No, that's not what his affidavit said.

MR. ABREU:  Let me -- Ms. Booth, Ms. Booth --

MS. BOOTH:  His affidavit said he spoke to Jimmy Sales.

MR. ABREU:  Ms. Booth, Ms. Booth --

THE COURT:  Okay.

MS. BOOTH:  Let's get this straight.

MR. ABREU:  I don't have his affidavit in front of me.

MS. BOOTH:  Okay.

MR. ABREU:  Mr. McHugh is not on the phone.  And I'm trying to go by my best of recollections here.  The allegation is that there was a benefit that was received that was not revealed to the jury.  That is the issue before the Court. That's what we're trying to get --

MS. BOOTH:  But don't represent that that's what Bill May said, because that's not what's in your affidavit.

MR. ABREU:  I'm going to pull it up right now.

MS. BOOTH:  Right.

MR. ABREU:  I'm going to pull it up.

MS. BOOTH:  Your affidavit says he talked to Jimmy Sales.

MR. ABREU:  And what does that mean?

THE COURT:  Jimmy Sales was in the District Attorney's Office.

MS. BOOTH:  Was in the District Attorney's Office.

THE COURT:  Not in the U.S. Attorney's Office.

MS. BOOTH:  Right.

THE COURT:  I just remember something about this, I guess just from reading your 2255.

MS. BOOTH:  Right.  Right.  There's letters in there from -- and then there's a letter from him in 2007, Adam Longoria, from prison, saying that I never wrote a letter for him, that if I didn't get him out, that he was going to tell everybody that he lied at the trial.

THE COURT:  Okay.

MS. BOOTH:  And that letter's in there.

MR. ABREU:  I have Mr. May's affidavit --

MS. BOOTH:  He didn't know that I had written that --

MR. ABREU:  I have Mr. May's affidavit up, Your Honor -- it's Victor Abreu -- and I can read it if the Court would like.

THE COURT:  Okay.  Go ahead.

MR. ABREU:  I just pulled it up.  "I'm presently retired from the practice of law and residing in Corpus Christi, Texas.  In 1978 I was admitted to practice law in the State of Texas."

THE COURT:  Well, skip down to the good part.

MR. ABREU:  All right, let's see.  "On November 13th, 2003, after my appearance on behalf of Mr. Adam Longoria, Mr. Longoria was in custody in Nueces County prison, charged with aggravated robbery."

THE COURT:  When did he enter an appearance?

MR. ABREU:  Say again, Your Honor?

THE COURT:  When did you say he entered an appearance?

MR. ABREU:  November 13th, 2003.

THE COURT:  And when was the trial for Mr. Bourgeois?

MS. BOOTH:  January of 2004.

THE COURT:  Okay.  Keep going.

MR. ABREU:  "On that charge, Mr. Longoria was facing a mandatory sentence of 25 years to 99 years."  Then it gives the case number.  "Mr. Longoria, at the time of the robbery offense, was three months into a 10-year probation sentence arising in Nueces County from a plea of guilty of evading arrest or detention using a vehicle and for endangering a child."  It gives the case number to that as well.

"This probationary sentence resulted only after the State had agreed to waive the habitual offender mandatory sentencing enhancement.

"I knew, based on these two cases, that Mr. Longoria was facing a life sentence, or the equivalent, if he had been convicted of bank robbery.  Mr. Longoria's defense to the bank robbery was that he did it but was forced to do it by members of a gang he belonged to, the Texas Syndicate.  I knew this would be a very difficult defense to prevail upon in front of a jury.

"At some point in the winter or spring of 2004, Mr. Longoria advised that he was considering cooperating with the FBI against Mr. Alfred Bourgeois in his federal capital case.  I then recalled receiving a telephone call from AUSA Ms. Patti Booth.  She asked if it would be okay to speak with Mr. Longoria, and I granted her permission to do so.

"Sometime after the phone call with Ms. Booth, Mr. Longoria told me that he had, in fact, spoken with Ms. Booth.  He was expecting that she would help him after his testimony in the Bourgeois case.  I told him that in my experience, if he testified well in the Bourgeois case, he could expect to get some type of benefit in the Nueces County case.

"Mr. Longoria testified against Mr. Bourgeois in his federal capital case in March 2004.

"On April 19th, 2004, I appeared in Nueces County Court.  Mr. Longoria's robbery case and his probation violation were" -- something is crossed out -- "were listed for disposition that day.

"I spoke with the State Prosecutor Jimmy Sales and asked him if he had spoken with Ms. Booth.  He told me that he had spoken to her.  Assistant District Attorney Sales dropped the habitual offender mandatory aspects of the robbery case and offered Mr. Longoria a seven-year sentence on the robbery case and a seven-year sentence on the probation violation case.

These sentences were to run concurrently.  He also offered to reduce the sentence even further to five years if Mr. Longoria cooperated as a witness in a state case in the next 30 days.

"The main reason for Mr. Sales dropping the habitual offender mandatory aspects of the robbery case and offering Mr. Longoria a total of seven years incarceration was because of his conversation with Ms. Patti Booth and his testimony in the Bourgeois case."

THE COURT:  Okay.  That is --

MR. ABREU:  "I hereby certify."  That's what Mr. Bill May would say.

THE COURT:  Okay.  Let me tell you, that's too many hearsays.  That's too many hearsays to go through.  Maybe you want to depose Jim Sales, or Sells, or Sales.

MS. BOOTH:  Uh-huh.

THE COURT:  That would probably be more to the point.

MR. ABREU:  Well, we would choose to do both, Your Honor.  And I, going back to my earlier point, I don't think I misrepresented anything.  Just on my recollection, I think that the implication is that there was a deal in place.

THE COURT:  No, I don't believe that.

MS. BOOTH:  No.

THE COURT:  I don't see that from that.  I don't see that from the affidavit.  But I can tell you this -- and he testified in front of me under oath that there was no deal in

place.  He's written a letter saying there was no, that is Longoria, that there was no deal in place.

What you can do -- where is Mr. Sales?  Is it Sells or Sales?

MR. ABREU:  I think he also wrote a subsequent letter that said that there was a deal in place.

MS. BOOTH:  No.  He wrote a subsequent letter saying that --

THE COURT:  I know.  You've already said.

MS. BOOTH:  -- if I didn't do something for him, that he would say that he lied at the trial.  That's what --

MR. ABREU:  That's the third, I think that's the third letter -- or affidavit, I'm sorry.  That was the third letter, but he wrote an affidavit that was different.

THE COURT:  Ms. Booth --

MR. WISEMAN:  Mr. Abreu, isn't there the letter from Ms. Booth to the probation or parole authorities?  That's also --

MS. BOOTH:  Yes.  And that's --

THE COURT:  She's already said that.

MS. BOOTH:  Yes.

MR. ABREU:  That's part of the record.

THE COURT:  Let me ask you this.  Wait, wait, wait. Ms. Booth, one more time --

MS. BOOTH:  Yes, ma'am.

THE COURT: -- where is Mr. Sales? Or Sales.

MS. BOOTH: Mr. Sales, I believe, is a Prosecutor for Bee County, with Martha Warner. And he may be starting back over at Nueces with the new D.A., Mark Skurka.

THE COURT: Oh, okay. All right. Is that new District Attorney, he's in now. I saw it in the paper. Right?

MS. BOOTH: Well, he'll start in January.

THE COURT: No, not the new District Attorney in Nueces County. He started now.

MS. BOOTH: Oh, did he?

THE COURT: Yes.

MS. BOOTH: Okay. I haven't read the papers.

THE COURT: Yeah. No, no, no. The paper said he got sworn in a week or so ago.

MS. BOOTH: Okay.

THE COURT: So he's there.

MS. BOOTH: And Ms. Jimenez is out. Okay.

THE COURT: Well, I don't know if she's out, but she's no longer District Attorney.

So then why don't you bring Sales to the thing, too.

MR. WISEMAN: Okay.

THE COURT: I was asking Ms. Booth. I thought --

MR. WISEMAN: Oh. I didn't know if you wanted us to issue a subpoena or --

THE COURT: Either one of you can do it. But get May

and Sales.  May can appear by video conferencing from a district, from a federal courthouse.

Ms. Scotch, do you remember how we did that last time?  Ms. Scotch?  Uh-oh.

MS. BOOTH:  Uh-oh.

THE CLERK:  I'm sorry, Judge.  What did you just ask me?

THE COURT:  Do you remember how we had Mr. May up here last time from a courthouse in Dallas?

THE CLERK:  I know that he appeared by video conference, and he went to, he offered to -- it was a, I think it was a -- he offered to go to Dallas, to the courthouse and appear, and they just set it up for us through the District Court.

THE COURT:  Okay.  So Ms. Thompson can set that up?

THE CLERK:  Yes.  We just need to contact the Federal District Court over there.  And if they've got availability, they should be able to accommodate that.

THE COURT:  Okay.  So y'all need to set that up with Mr. May.  Mr. Wiseman?

MR. WISEMAN:  Yes.

THE COURT:  And I'll tell you the truth, Mr. Wiseman, I don't think I would benefit from hearing from Mr. Longoria with what's going on in --

MR. WISEMAN:  I think, I think we would be satisfied

with Mr. May and Mr. Sales.

THE COURT:  Okay.

MR. WISEMAN:  I think that would, under the circumstances, I think that would make sense.

THE COURT:  And so, Ms. Scotch, what we want is a day in January.

MR. ROBERTS:  Your Honor, this is Tony Roberts.  Can we just go back to Dr. Leestma for a minute?  Because as we noted in our response, we don't have a report from him yet.  We don't have a CV.  We don't have a Rule 26 disclosure.  And you've given them until December the 15th to do a deposition.

THE COURT:  No, I want that done even quicker.  I was talking about Bill May.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  But I think before we set that up -- and if we have to get on a conference call again, we'll do it tomorrow or the next day, any time -- I want you to file by noon on Friday the status of those brain slides.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And then I think we can expect, all of us, after he, the expert has had an opportunity to look at those brain slides -- he can't file a report if he doesn't have the brain slides.

MR. ABREU:  That's what we're trying to get to, Your Honor.

THE COURT:  But I think, Mr. Wiseman and Mr. Abreu, you can at least file a CV.

MR. ABREU:  That's fine, Your Honor.

THE COURT:  With the U.S. Attorney.  And a list of other cases he's testified in, that kind of thing.

MR. ABREU:  Your Honor, what I had previously suggested to Mr. Roberts was certainly I would provide him with all Rule 26 disclosures and a full report, as soon as that stuff was, the additional slides were, if still available, provided, so he could provide a report.

THE COURT:  Okay.  Well, you can do -- you can do everything but the report.

MR. ABREU:  Before any deposition, certainly with enough time before any deposition.

THE COURT:  You can do -- let me explain.  You're going to do that, you're going to file by Friday noon his CV, all the prior cases he's testified in, everything but his report without the brain slides.  Now, if we find out Friday at noon that there are no brain slides, then he can file a report by next Friday, a week from Friday.

MR. WISEMAN:  That's fine.  I think Mr. Abreu --

MR. ABREU:  I'm just taking notes.  Sorry.

MR. WISEMAN:  Yeah, okay.

MR. ABREU:  I'm just writing so I don't forget anything.

THE COURT:  Ms. Scotch, do we have Mr. Cutler on the line?

THE CLERK:  Oh, yes.

THE COURT:  Okay.  Mr. Cutler, are you there?  Ms. Scotch?

MR. CUTLER:  Yes, Judge.

THE COURT:  Oh, good.  Is that you?  Okay.

MR. CUTLER:  Yes.

THE CLERK:  How much time were we looking at setting aside?

THE COURT:  I'll give them half a day.  Pick a time in January.

THE CLERK:  Do you want that morning time, since they would be coming in the day before?

THE COURT:  What do you all want?  Morning?  You'll be here the night before; is that right?

MR. WISEMAN:  Well, if we're going to do witnesses, it would make more sense to do the argument in the afternoon. We could do the witnesses in the morning.

THE COURT:  No.  You're going to do the whole thing in the morning.

MR. WISEMAN:  The whole thing?

THE COURT:  The whole thing.

MR. WISEMAN:  I thought there was going to be a morning for each claim.  I'm kidding, Your Honor.

THE COURT:  I know that.

MR. WISEMAN:  Isn't it wonderful that I can maintain some sense of humor?

THE COURT:  I appreciate it.  I really do, Mr. Wiseman.  I thought you might have lost your sense of humor after your last visit.

THE CLERK:  I was looking at January the 19th.

MR. WISEMAN:  Ooh.  You know, that's the one day I was going to ask not to give us, because I have a hearing in Philadelphia that day.  I'm good any other day of the month.

MS. BOOTH:  Couldn't we do it at the beginning of the month, Your Honor?

THE CLERK:  January the 13th?

THE COURT:  13th.  Is there a Friday?

MR. WISEMAN:  That's fine for --

THE CLERK:  That's a Thursday.

MR. ABREU:  13th is fine.

THE COURT:  Mr. Roberts?  Ms. Booth?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Ms. Booth?  Ms. Salinas?

MS. BOOTH:  I guess that's fine.

THE COURT:  What's wrong, Ms. Booth?

MS. BOOTH:  Oh, I have a -- well, I've got several set for trial in January, and my husband comes home in January, and I was just --

THE COURT:  When in January?

MS. BOOTH:  January the 15th through the -- and I -- but you know, we'll do it.

THE COURT:  Well, wouldn't you like to have this over with?

MS. BOOTH:  Yeah.  I'm just worried about -- but we'll just do it.  I'll just -- we'll just do it on the 13th.

THE COURT:  Okay.  Now, let's get this straight about Mr. Bourgeois's presence.  Are you satisfied -- you had earlier said you didn't need him here at all.  But now that there's going to be evidence presented, would you like him on the phone for that portion?

MR. WISEMAN:  Yes, Your Honor.  I assume that's --

THE COURT:  So we'll do the evidence first.  We'll start at 8:00 in the morning --

MR. WISEMAN:  Okay.

THE COURT:  -- Ms. Scotch?

THE CLERK:  Yes, Your Honor.

THE COURT:  And we'll do the evidence first, and then arguments after that.  We have, we discovered -- actually, I don't think it matters.  You all know the situation at Terra Haute, which I just found out about today.  You have to really reserve far in advance the phone lines that are not recorded.  And we thought we were going to have an ex parte hearing that we wanted nonrecorded today.  But I don't think we'll have the

same issue, because you don't mind if this hearing is recorded by the prison system, since it's going to be public anyway.

MR. WISEMAN:  No.

THE CLERK:  And I'm sorry, Your Honor.  This is a legal line.  They did -- they were able to give me a non, an attorney line.

THE COURT:  Okay.  Well, it doesn't matter, Ms. Scotch.  I don't want -- there's no reason to tie up an attorney line from another attorney and another client if we can do it on the recorded line.  I don't think it's going to matter.  Mr. Wiseman, what's your thoughts?

MR. WISEMAN:  Whatever's convenient for the Court and the prison system.  Doesn't matter to us.

THE COURT:  Well, I was thinking actually of the convenience of the other inmates and the lawyers.

MR. WISEMAN:  Yeah, well everybody.

THE COURT:  Because I think that unless there's something you want to discuss privately with your client, I think that we can do this and still have him present, if that's okay with you, if you consider that present.

MR. WISEMAN:  Yeah.  I think for these purposes, that would be --

THE COURT:  Okay.

MR. WISEMAN:  -- that would be fine.

THE COURT:  Yeah, and we'll do it on a recorded call,

so that it doesn't -- they apparently have very limited nonrecorded phone lines.

MR. WISEMAN:  Yeah.

THE COURT:  So are we set okay for that, Ms. Scotch, so you can notify the prison that we need him on a -- a recorded phone line is fine at that time.

THE CLERK:  Yes, Your Honor.

THE COURT:  And I picked 8:00 o'clock in the morning, Mr. Wiseman and Ms. Booth, Roberts, Dowd, Salinas, Abreu, because Indiana is an hour later, and it's easier for us to work that in at 8:00 o'clock our time, be free for him to have his roll call and lunch later in the morning.

MR. ABREU:  That's certainly fine for me, Your Honor. This is Victor Abreu.

THE COURT:  Okay.  We're all done.  We're set.

MR. WISEMAN:  Okay.  I appreciate it, Your Honor.

MR. DOWD:  Your Honor, Mark Dowd.  I had one question about the argument.  Will the Court be permitting the Government attorneys to break up the argument into four, into the four parties, the four lawyers?

THE COURT:  You can do it any way you want.

MR. DOWD:  Okay, Judge.

MR. ABREU:  We would certainly have the same request, Your Honor, on that.

THE COURT:  Same way with the Movant.  Absolutely.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  And we'll go Point 1, and then respond, Point 2, then respond, that sort of thing?

MR. WISEMAN:  Yes.  That sounds good.

THE COURT:  Okay.  Anything else?

MR. WISEMAN:  Not from Petitioner, Your Honor.

MR. ROBERTS:  Not from the United States, Your Honor.

THE COURT:  Okay.  Thank you all very much.  You're excused.

(Proceedings concluded at 3:03 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    December 29, 2010
Molly Carter                        Date