Jan Leestma                                    January 10, 2011

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS


UNITED STATES OF AMERICA,          )

                    Respondent,    )    No. Cr-C-02-216

        -against-                  )    No. Cv-07-223

ALFRED BOURGEOIS,                  )

                    Petitioner.    )


            The videotaped videoteleconference

 deposition of JAN E. LEESTMAN, M.D., called for

 examination, taken pursuant to the Federal Rules of

 Civil Procedure of the United States District Courts

 pertaining to the taking of depositions, taken

 before ANNE E. FOGARTY, a Notary Public within and

 for the County of Cook, State of Illinois, and a

 Certified Shorthand Reporter, CSR No. 84-3870, of

 said state, at Suite 1200, 311 West Monroe Street,

 Chicago, Illinois, on the 10th day of January, A.D.

 2011, at 12:48 p.m.

Jan Leestma                                                    January 10, 2011

                                                                            2

PRESENT:

        UNITED STATES ATTORNEY'S OFFICE,

        (919 Milam, Suite 1500,

        Houston, Texas 77002,

        713-567-9810), by:

        MR. TONY R. ROBERTS,

        tony.roberts@usdoj.gov, and

        MR. MARK M. DOWD,

            appeared via videoteleconference on

            behalf of the Respondent;


        FEDERAL COMMUNITY DEFENDER OFFICE,

        Capital Habeas Unit,

        (Suite 545 West - Curtis Building,

        Independence Square West,

        Philadelphia, Pennsylvania 19106,

        215-928-0520), by:

        MR. VICTOR ABREU,

        victor_abreu@fd.org,

        MS. ELIZABETH LARIN and

        MR. MICHAEL WISEMAN,

            appeared on behalf of the Petitioner.

3

ALSO PRESENT:

      MR. JOSEPH ELSEY, Videographer,

          Esquire Deposition Solutions.

REPORTED BY:  ANNE E. FOGARTY, CSR No. 84-3870.

Jan Leestma                                    January 10, 2011

THE VIDEOGRAPHER:  Good afternoon.  We are going on the video record at 12:48 p.m.

This is Tape 1 to the videotaped deposition of Dr. Jan Edward Leestma in the matter of United States of America versus Alfred Bourgeois being heard before the U.S. District Court for the Southern District of Texas, Case No. CR-C-02-216 and CV-07-223.

This deposition is being held at 311 West Monroe Street, Chicago, Illinois, on January 10, 2011.  My name is Joseph Elsey, and I'm the videographer.  The court reporter is Anne Fogarty.

Counsel, will you please introduce yourselves and affiliations and the witness will be sworn.

MR. ABREU:  Good afternoon.  Victor Abreu on behalf of Mr. Bourgeois.

MS. LARIN:  And Elizabeth Larin on behalf of Mr. Bourgeois.

MR. WISEMAN:  And Michael Wiseman for Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts for the United States.

Jan Leestma                                        January 10, 2011

5

MR. DOWD:  Mark Dowd for the United States.

(WHEREUPON, the witness was duly sworn.)

MR. ABREU:  And just before we begin, Tony, Mr. Roberts, my understanding is that any objection will be made contemporaneously during these proceedings; is that correct?

MR. ROBERTS:  Correct.

MR. ABREU:  You ready, Tony?

MR. ROBERTS:  We're ready.

JAN E. LEESTMA, M.D., called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ABREU:

Q.    Good afternoon, Dr. Leestma.  Could you please tell us how you're currently employed?

A.    I am employed, self-employed as a consultant in forensic neuropathology and have been for -- full-time, more or less, for about the past four or five years, but before that 25 years doing this same kind of work.

(WHEREUPON, a certain document was marked Defendant's Deposition

Jan Leestma                                          January 10, 2011

6

Exhibit No. 1, for identification,
as of 01/10/2011.)

BY MR. ABREU:

Q.    Let me show you what I am now marking as Defense Exhibit No. 1 and ask you if you recognize that particular document.

A.    I do.

Q.    What is that document?

A.    That is a current curriculum vitae.

MR. ABREU:  Okay.  Mr. Roberts, do you have a copy?

MR. ROBERTS:  I have the copy that you sent me.

MR. ABREU:  Yeah.

MR. ROBERTS:  If you could tell me how many pages you got there.

MR. ABREU:  Sure.

I have eight pages.

MR. ROBERTS:  That's consistent with mine.

MR. ABREU:  Last dated as of November 2010, Tony.  Mr. Roberts, sorry.

MR. ROBERTS:  Yes.  That's consistent as well.

MR. ABREU:  Okay.

Jan Leestma                                    January 10, 2011

7

BY MR. ABREU:

Q.    Dr. Leestma, we're going to be brief on qualifications and your background, but could you please just highlight your educational background for us, please.

A.    Sure.  I graduated from college in 1960, Hope College in Holland, Michigan, a premed major, chemistry and biology.  I then attended the University of Michigan School of Medicine in Ann Arbor from 1960 to '64 graduating with a doctor of medicine degree.  I then pursued my postgraduate education in pathology, University of Colorado Medical Center in Denver.  The first two years there, '64 to '66, were spent doing anatomic or general pathology residency.  That was followed by one year of neuropathology training in Colorado.  I then transferred for my last year of neuropathology training to the Albert Einstein College of Medicine in the Bronx, New York, and completed that in 1968.

Then entered the military service, U.S. Air Force Medical Corps, as a captain and was assigned to the Armed Forces Institute of Pathology at Walter Reed Army Medical Center in Washington, DC, where I remind for three years, assigned first

Jan Leestma                                          January 10, 2011

8

to the genitourinary pathology branch of AFIP and then two years in the neuropathology branch, before being honorably discharged in 1971 with the rank of major, U.S. Air Force Medical Corps.

Then you want my -- the remainder of my professional career?

Q.    Yeah.  Well, you indicated that you were now working as a private --

A.    Yeah.

Q.    -- consultant in the field of forensic pathology.  Can you tell us a little bit about what you did before that?

A.    Oh, sure.  I -- when I left the service I came to Chicago and joined Northwestern University Medical School's faculty as an assistant professor in pathology and neurology and the chief of neuropathology services.  Continued at Northwestern until, let's see, when was it, it was -- well, 1981, having then taken a sabbatical leave to the Karolinka, K-a-r-o-l-i-n-s-k-a, Institute in Stockholm, Sweden, as a guest researcher for a year.

In '82 when I came back to Chicago I transferred to the Northwestern Children's Hospital as the chief of neuropathology, and at that time

Jan Leestma                                    January 10, 2011

9

then as associate professor with tenure.

I stayed at Northwestern until 1985 when I went to the University of Chicago as a full professor of pathology and neurology and associate dean in the medical school and division for life sciences.

In the course of these activities I also attended the J.L. Kellogg Graduate School of Management and received the equivalent now known as an MBA degree, it was Master of Management then. That was in 1986.

In 1987 I joined the Chicago Institute of Neurosurgery and Neuroresearch as an associate medical director and neuropathologist, and I remind with that organization until it -- until I retired, essentially, from hospital practice, and that would have been in the early part of the year 2000, 2001, something like that.

I then had a number of other opportunities that I was working with in a part-time basis.  One with Cook County Medical Examiner's Office for about 11 years in the '70s and early '80s as a neuropathology consultant and assistant medical examiner there.  I've had other consulting

situations as well, but since about 2003, 4, 5, something like that, I've essentially been retired from academic practice and hospital practice and have concentrated on my consulting practice.

Q. Okay. And in your capacity as a forensic neuropathologist have you worked on cases for both the defense and the prosecution?

A. Yes, I have.

Q. And are you currently involved in cases for both the defense and the prosecution?

A. Correct.

Q. Have you published in the field of neuropathology and forensic neuropathology?

A. Yes, I have.

Q. Can you delineate some of that for us, please.

A. The most recent would be a book called Forensic Neuropathology which was published in 2009 by Taylor and Francis. This would be a second edition of that book, the prior one was done about 20 years before that. The most recent is a contribution to a book called Sudden Death in Epilepsy, Forensic and Clinical Issues, and I was one of the editors and contributing authors to that

Jan Leestma                                    January 10, 2011

11

book.  The lead editor was Lathers, L-a-t-h-e-r-s, Schraeder, S-c-h-r-a-e-d-e-r, and then eventually myself.  And that was just published in 2010.  That would be my 105th publication.

Q.    And are you -- do you hold any professional memberships or affiliations at the moment related to forensic neuropathology?

A.    Yes.  I'm a member of the American Association of Neuropathologists, and I have been a member of that organization for probably close to 30 years now.  I'm also a fellow with the American Academy of Forensic Sciences and have been a member of that organization for six or eight years now.

Q.    I noticed in your CV an affiliation with the Juvenile Protective Association of Chicago?

A.    Yes, that's correct.

Q.    Can you tell us what that organization is?

A.    The JPA, as it's known locally, is a social welfare agency serving by direct social services and other means the families of neglected and abused children with the goal of trying to maintain the family structure and working with the courts as well as the Department of Children and

Family Services to try to help these disturbed families. And I've been on the board of directors there for probably 25 years now.

Q. Have you been qualified as an expert in the field of neuropathology?

A. Yes. In the court systems my count is about 40 states, in Canada, as well as the United Kingdom.

Q. And when you say 40 -- okay.

And that's been in the field of neuropathology. How about in the field of forensic neuropathology?

A. That's usually what it works out to be, but I'm usually qualified as a neuropathologist and then sometimes they add the other descriptive.

MR. ABREU: At this time I would offer Dr. Leestma as an expert in the field of neuropathology.

Mr. Roberts, you have any questions on voir dire?

MR. ROBERTS: No.

MR. ABREU: Or voir dire, sorry. I forgot -- I'm not in Texas anymore.

MR. ROBERTS: Either way we don't have any

13

questions on voir dire.

MR. ABREU:  All right.

BY MR. ABREU:

Q.    Dr. Leestma, were you asked to consult on the case of the United States against Alfred Bourgeois?

A.    Yes, I was.

Q.    And what were you asked to do in that particular case?

A.    I was basically asked to take a look at the case materials and try to determine what happened and when to the decedent, Jakarenn Gunter.

Q.    Okay.  And in your capacity in that particular case did you review any materials?

A.    Yes, I did.

Q.    What materials did you review?

A.    These are written down in my report and they have --

Q.    Let me -- before we go any further, let me mark that, if I can, what I'm now marking as Defense Exhibit No. 2, and just ask you to quickly identify that particular document.

                (WHEREUPON, a certain document was
                marked Defendant's Deposition

Jan Leestma                                                January 10, 2011

14

Exhibit No. 2, for identification,

as of 01/10/2011.)

BY THE WITNESS:

A.    Yes.  This would be an appended final report of my findings and analysis on this case dated January 7 or 9, as the case may be, 2011.

MR. ROBERTS:  I'm sorry.  Why would it be dated January 7 or 9?  I only have a January 9.

THE WITNESS:  Yeah.  I --

MR. ROBERTS:  I'm sorry, I only have a January 7.

THE WITNESS:  Okay.  I think it would be -- let me explain that.  These would be exactly the same report, one would probably have been printed on January 7, and the artifact of my word processing program is it changes the date every time I print one off.  So I didn't notice that.

MR. ABREU:  Mr. Roberts, I will forward you a copy of this January 9 report and you can compare it to the January 7 report, if you would like.

MR. ROBERTS:  Okay.

MR. ABREU:  Can we -- there is no way to do that by e-mail right now.  Tony, I'll send you a copy, okay?

Jan Leestma                                    January 10, 2011

15

MR. ROBERTS:  All right.

MR. ABREU:  I can attest it's the same exact document just printed on two different dates.

MR. ROBERTS:  Well, I want to reserve my -- any objections to the document until I see and compare and make sure it's the exact same thing.

MR. ABREU:  Absolutely.  Let me mark -- Dr. Leestma has a copy that has January 7 on it and I will mark that version as well, Tony, so we have them both.

MR. ROBERTS:  All right.

MR. ABREU:  I will mark that as Defendant's Exhibit 2A.

(WHEREUPON, a certain document was marked Defendant's Deposition Exhibit No. 2A, for identification, as of 01/10/2011.)

BY MR. ABREU:

Q.    Let me just ask Dr. Leestma:  Is that the same document that you saw that was Document No. 2, Defendant's Exhibit 2?  Is it a similar document, should I ask?

A.    It looks the same.

I'm going to take that off, that's my

16

airline schedule.  I don't know how that got on there.  That's not important.

Let's see here.  Yes, I cannot pick up any difference there.  I think this is simply the date relating to when it was printed, that's all.

MR. ABREU:  Okay.  Well, now both documents, Defendant's Exhibit 2 and 2A, will be part of the record.

MR. ROBERTS:  Okay.

BY MR. ABREU:

Q.    So, Doctor, could you now tell us the list of materials you reviewed in relation to this particular case?

A.    Sure.  The so-called direct appeal opinion by Mr. Bourgeois.  Trial testimony transcripts and opening statement of Booth; EMT Burgess; Dr. Benton; Dr. -- or McLaughlin; Dr. Kuffel; K-u-f-f-e-l; Dr. Rouse, R-o-u-s-e; Dr. Oliver; Dr. Senn, S-e-n-n; Dr. Chrz, C-h-r-z; Dr. Akhtar, A-k-h-t-a-r; Beckett, B-e-c-k-e-t-t. Transcript of April 20, 2010, hearing before Judge Jack, J-a-c-k.  Forensic odontology reports of Dr. Senn, S-e-n-n, and Dr. Chrz, C-h-r-z.  Autopsy report of Dr. Rouse.  Neuropathology report of

Jan Leestma                                    January 10, 2011

17

Dr. Kagan, K-a-g-a-n, Hallet, H-a-l-l-e-t.  I think it is supposed to be two Ts.  Affidavit of Dr. Spitz, S-p-i-t-z.  The visceral autopsy slides from Wilford Hall Medical Center.  Medical records and reports relating to Jakarenn Gunter, G-u-n-t-e-r.  A CT scan disk of the child Gunter.  Brain autopsy slides and photographs.  Autopsy photographs.  Copy of handwritten notes of U.S. Attorney with respect to Dr. Rouse R-o-u-s-e.

Q.    And upon completion of your review of those materials I take it is when you prepared your report?

A.    Yes, that's true.

Q.    And that is a report that has been identified as Defendant's Exhibit 2 and/or 2A?

A.    Yes, correct.

Q.    In the first line of your report you note that at -- and I'll read it.  "At your request I now offer an appended report to the original report of December 15, 2010, because I have received information that was not available at the time of the original report."

Is there a separate report related to December 15, 2010?

Jan Leestma                                          January 10, 2011

18

A.    Essentially no.  This is -- I mean, there was a prior report in which it has essentially everything that is in this one but some disclaimer saying I haven't gotten all the material, therefore my report -- I reserve the right to append it and change it.  That's about the only difference.

Q.    And do you recall what additional materials you were specifically waiting?

A.    Yes.  I was waiting the brain autopsy slides and some photographs.  And I don't remember whether the CT scan had come at that time or not.  It was the last couple of things on that list.

Q.    Okay.  So this particular report Defendant's 2A and 2 -- I'll just call it Defendant's Exhibit 2 -- was completed after you reviewed those additional materials that you were --

A.    That's right.

Q.    -- relating to us?

A.    I had the complete file, as far as I knew, and at that time everything I needed.

Q.    And do you recall what date, was that the January 7 date that was completed?

A.    Yeah.  It would have been -- yeah. That's right.

Jan Leestma                                      January 10, 2011

19

Q.    Now, you indicated that you reviewed the testimony of Dr. Elizabeth Rouse from trial; is that correct?

A.    I did.

Q.    And upon reviewing that particular testimony what is your understanding of her testimony regarding the cause of death and the timing of the cause of death?

A.    With -- let me take the second first. The timing issues were estimates, as I recall, within some days or longer of the death of this particular child, that there were conditions ongoing in this child that were responsible and that it wasn't pinned down to a specific time by hour but indicated -- Dr. Rouse indicated some time frames.

Her conclusion I may not use the right word, the exact words, but essentially inflicted blunt force trauma to the head with subdural hematoma as the cause of death.

Q.    Okay.  What is a subdural hematoma?

A.    This is a collection of blood beneath the dural membrane of the covering of the brain but above the brain.  So it represents blood collecting in a potential space in the dura.

Jan Leestma                                    January 10, 2011

20

MR. ROBERTS:  I'm sorry.  Dr. Leestma, I can't tell if you're actually reading something or if you're actually testifying because you're looking down.

THE WITNESS:  No, no.  No, I'm not reading anything.

MR. ROBERTS:  I'm just trying to make sure since I'm not in the room if you're reading something that I know what it is.

THE WITNESS:  No, no.

MR. ABREU:  Let me -- and also let me clarify, he's just looking down, he's not reading anything, Mr. Roberts.

MR. ROBERTS:  Okay.  Thank you.

MR. ABREU:  Sure.  And the only thing in front of him right now is his own report, but he's not reading that.

THE WITNESS:  I got to look somewhere and that was where it was.  I can look at you.

BY THE WITNESS:

A.    All right.  Let's see.  Where I was?

BY MR. ABREU:

Q.    You were explaining, Doctor, what a subdural hematoma is.

Jan Leestma                                    January 10, 2011

21

A.    Yes.  Okay.

A subdural hematoma is blood collecting in the lower level of the dura above the brain, and that's basically it.

Q.    Okay.  And the dura being what, just so we're clear?

A.    Okay.  The dura is part of the so called meninges of the brain, and it is a parchment-like membrane about the thickness of a file card, but much more flexible, that's approximated to the undersurface of the skull.  And beneath that particular membrane is another one technically still part of the dura called the arachnoid membrane, and that is a very thin, translucent one about the thickness of Saran Wrap, or food wrap.  And blood collecting between those two membranes is a subdural.

Q.    And so just to make clear.  A subdural hematoma exists between the dura and what we would call the skull?

A.    The arachnoid.

Q.    The arachnoid?

A.    Correct.  If it is -- if it were blood as you described there beneath the skull but above

22

the dura, that would be called an epidural hematoma, and there is not one of those in this case.

Q.    Okay.  Are there different types of subdural hematomas?

A.    Yes.  There are somewhat arbitrary designations of these, so-called acute, subacute and chronic subdural hematomas, and this relates to their relative time of duration.

Q.    So can you explain just the difference quickly.

A.    Okay.  If somebody fell down or was struck or whatever and developed an acute subdural hematoma, these usually develop at least some times within minutes, sometimes within hours of an injury, and that would by all rights be called by a surgeon, a pathologist or a radiologist, three different perspectives there, an acute subdural hematoma. Now, that remains in that so-called acute phase for several days.  Each of these disciplines might have different definitions in how they make that diagnosis.  So acute is an arbitrary designation from zero to three or four, five days, or something like that in existence.

A subacute subdural then picks up where

Jan Leestma                                        January 10, 2011

23

that one leaves off, five days up to about ten days or two weeks, at which time there are different components that are present, healing is going on. It has many different characteristics.  That would be a subacute subdural.

And then from about ten days to two weeks on, onward, it would be referred to as a chronic subdural hematoma.

Q.    So the term "acute" as it is used in this particular field refers to the recency of the hematoma, not necessarily the gravity of the hematoma?

A.    That's true.  It's strictly a time of duration, time of existence measurement, which I hasten to add, again, is something somebody arbitrarily defines.  And they can define what they go into that, but it is still an arbitrary designation.

Q.    Now, upon your review of the materials in this particular case, did you determine a cause of death?

A.    Yes.

Q.    And what did you determine the cause of death to be?

Jan Leestma                                              January 10, 2011

24

A.    The cause of death in this child was increased intracranial pressure which had its consequences causing her to remain comatose, nonresponsive, nonbreathing, and ultimately destroyed the circulation of the brain so that she essentially became brain dead.

Q.    Okay.  Before we talk about what might have caused the intracranial pressure, the increased intracranial pressure, can you just briefly describe what you mean by intracranial pressure?

A.    Okay.  Sure.  If I were to drill a hole through my scalp into the skull and actually put a pressure measuring device there, which can be done, neurosurgeons do it all the time, one would get a measurement of about either five to ten millimeters of mercury.  This is the equivalent of about the pressure in a large vein in your body.  It can be measured in other ways but that's usually what it is.  Under ten millimeters of mercury is the normal range, and probably the upper normal range of intracranial pressure.

Q.    Okay.  Before I forget I know that you had mentioned earlier that Dr. Rouse gave estimates about -- or what you reviewed and referred to as

Jan Leestma                                      January 10, 2011

25

estimates about the timing of the injury.  Do you recall what the estimates she gave were?

A.    From many hours, days, sometimes a week. It varied depending on how the question was asked to her, as I recall.  So it was not a precise hour or interval but a range of times.

Q.    Now, getting back to the intracranial pressure which you determined to be the cause of death, what in your opinion caused the increased intracranial pressure in this particular case?

A.    Okay.  Several things.  One of them would be the subdural hematoma that was present. Though this, in my view, is a rather minor component of the intracranial pressure increase because of the relatively small volume estimated of that subdural hematoma.

Q.    Let me just ask you.  When you say small volume, can you describe what the volume was that was reflected in the materials you reviewed?

A.    The only estimate of volume that I recall seeing was in the autopsy report in which the volume of the hematoma was estimated to be about two milliliters.  My own examination of the photographs showing the subdural led me to believe it's probably

Jan Leestma                                          January 10, 2011

26

a bit more than that, but not markedly much more.
So that's a relatively small volume subdural
hematoma.

Q.    Okay.

A.    You want me to go on with the --

Q.    Yeah.  With the causes of the
intracranial pressure.

A.    Okay.  Probably the most significant are
injuries to the brain, which I consider to be due to
venous thrombosis; that is, clotting of cerebral
vein, veins, and the superior sagittal sinus.

MR. ROBERTS:  I'm sorry.  Could you spell
that, venous what?

THE WITNESS:  Okay.  The superior, that's
common spelling; sagittal, s-a-g-i-t-t-a-l, midline,
meaning; sinus, s-i-n-u-s.

BY THE WITNESS:

A.    And this is a large venous channel that
is within the dura coming from the front -- under
the skull, the full length of the skull underneath,
and ultimately draining blood from the brain into
the jugular system and back to the main circulation.

And there was a thrombosis, a clotting
of that structure which led to infarctions in the

27

brain and cerebral edema and bleeding.

BY MR. ABREU:

Q.    Let me just stop you for a second and ask you if you could tell us when you say infarctions what do you mean by those?

A.    Well, there are two kinds of infarcts, generally.  One in which arterial blood supply is interfered with such that a part of the body, the brain or the heart or whatever, doesn't receive its blood supply and then it is injured because of that. It dies.

Another kind would be what I'm talking about here is a venous infarct, meaning obstruction of the draining veins of an organ such that blood comes into that organ but can't get out.  And that may result in rupture of veins, it may result because there is no blood flow in that circumstance, death and infarction of brain tissue with the attendant complications of that problem.

Q.    And when you say cerebral edema, do you mean swelling?  Is that what edema means?

A.    Well, edema -- yes, it does result in swelling of the brain, but that comes about because basically water is not being compartmentalized as it

Jan Leestma                                    January 10, 2011

28

should and leaks out of the capillary bed of the brain into the brain, and it can do that on the basis of many different things.

Q.   Getting back to the venous thrombosis which you identified, is that in your opinion the primary cause of the intracranial pressure?

A.   It is -- yes.  If we're dealing about primary processes, yes, I would say that that is certainly the more important one.

Now, I'd hasten to add that once this child decompensated and couldn't breathe on her own anymore, that adds an additional load to the brain itself.  Meaning that circulation, oxygenation of the blood is altered, and that will cause brain swelling too.  So at the end result of it it's a component of several different things.

Q.   Okay.  And if I could summarize those, and you can tell me if I'm missing something, the --

MR. ROBERTS:  I think I'll object to your summary and let the doctor testify.

MR. ABREU:  I'll ask it and then you can object when I ask the question.

BY MR. ABREU:

Q.   In terms of the intracranial pressure,

Jan Leestma                                        January 10, 2011

29

what you've identified thus far, and you can tell me if I'm missing anything, is the venous thrombosis?

A.    Yes.

Q.    The subdural hematoma?

A.    Correct.

Q.    And the decompensation that occurred post-injury?

A.    Which resulted in circulatory embarrassment and probably not enough oxygen in the blood reaching the brain.

Q.    And when I say post-injury, I'm referring to the intracranial pressure and edema that you've described?

A.    Correct.

Q.    Did you have an opportunity to review the slides, and we'll call them the Kagan-Hallet slides that we all were waiting for for so long?

A.    That's right.  I did.

Q.    How many slides did you receive?  What did you specifically receive, should I ask?

A.    Okay.  Let me get my log of that.

I received five microscopic slides.

Q.    In your report you indicated that there were six microscopic slides.

Jan Leestma                                    January 10, 2011

30

A.    That's erroneous.  The only images I have are five and I don't know where the six came from.

Q.    So that's just an error in your report?

A.    That's an error, yeah.

Q.    Okay.  And what did you do with those slides upon your receipt?

A.    Well, when I got them I took them to my Xerox machine, put them down on the copy machine, made an image of what those labels were.  Went to my microscope and began to look at those slides under the microscope noting my contemporaneous comments beside those slide images.  And in the process made a number of photographs, photomicrographs of those slides, I believe nine in number.

Q.    Let me go back, because I just realized I neglected to ask you about the thrombosis which you identified as the primary cause of the intracranial pressure.

Is there a way to should I say date or age when that particular process began?

A.    Yes, from several different modalities.  The first might be clinically, for which I don't have a lot of information but I'm just talking in

31

the ideal sense.  If in the case of a child the child displayed irritability, nausea, vomiting, lethargy, excess sleepiness, seizures, a bunch of activities like that, while in and of themselves those are rather nonspecific findings, against later information those could be important in aging and dating a process because you could say there was something going on here which subsequently turned out to be XYZ and that can give you information.

The second kind of thing would be a neuroimaging study, like a CT scan or an MRI.  This can give you a view of what's going on inside the head and can help you sometimes in aging and dating. It's not as precise as would be desired, but it can give you information.

And then we go to, in this particular case, the autopsy which provides the actual tissue to be examined and there are means by which pathologists can look at, for example, a subdural hematoma and put some aging and dating on it.  The hemorrhage, a blood clot, can be aged and dated within some limits.  Looking at the brain itself, if there is a brain injury there is a time course of events that are played out microscopically and those

Jan Leestma                                    January 10, 2011

32

too can give you rather precise information about the age and date of the lesions.

Q.    Okay.  And in this particular case given the information that you had available to you at the time, were you able to date or age this particular process of the venous thrombosis?

A.    Some aspects of it, yes.

Q.    What was your estimation of that?

A.    Okay.  First of all, we have a microscopic tissue slide of the superior sagittal sinus of the dura in which there is a blood clot present.  That blood clot contains some recent and preserved red blood cells, but most of it is a degenerate clot.  In other words, the red cell elements have deteriorated, other blood clot elements, namely fibrin, f-i-b-r-i-n, have replaced that.  And then there are some cellular reactions within that clot and at the margin of it that tell us that this clot has been there for some days and at one point may have been not in the section we see but upstream or downstream attached to the wall of the sagittal sinus and inciting a reaction there.

So this gives us -- the recent red blood cells could be anywhere two to three days from the

Jan Leestma                                          January 10, 2011

33

time of death.  The blood clot itself is probably more than that, several days.  And that's about as good as we can do with that particular component.

Q.    When you say slides, do you mean that was one of the Kagan-Hallet slides?

A.    That's right.  Let's see if there is a block number on this thing.  No, they didn't measure, they didn't mention -- they didn't assign a separate number to it, but there is one slide that contains two fragments of dura, one of which contains this thrombus that I'm talking about.

Q.    Do the Kagan-Hallet slides also reveal the subdural hematoma that both -- that Dr. Rouse testified about?

A.    Correct.

Q.    What else do those slides reveal?

A.    Those particular slides showed a blood clot and a reaction on top of it.  Namely, there are some relatively preserved red blood cells that could be a few days of age from death and a layer of reactive cells on top of that that indicate the healing process, and those vary in thickness and character such that one can say they're certainly present a week or more, and in some areas might be

Jan Leestma                                          January 10, 2011

34

ten days to two weeks from death.

Q.    Is that specifically related to the thrombosis?

A.    No.  Well, I mean, it may have been caused by the thrombosis, but this is blood in the subdural space that is undergoing healing and reaction and that's what I'm replying to.

Q.    That's what I wanted to clarify, whether the discussion you talked about -- what you mentioned about the healing process, whether it was in relation to the thrombosis or something else?

A.    It is something else.  This is the actual subdural clot.

Q.    And -- so I guess you kind of got a little bit ahead of me which is why we missed each other.  The slides also show the subdural hematoma?

A.    Yes, they do.

Q.    Okay.  And the process which you just described, or the information you just described about the healing, that was related to the subdural hematoma?

A.    Yes.

Q.    Can you just repeat, because I was behind, what in your best estimation the age of that

Jan Leestma                                          January 10, 2011

35

particular process as reflected in those slides is?

        A.    Okay.  The estimate of the age of the healing of the subdural hematoma, or the reaction that we're talking about, on the order of ten days to two weeks.  And I don't disagree with Dr. Hallet's estimate of it, that would be about right.

        Q.    And when you say you don't disagree with Dr. Hallet's estimate of it, I take it that's from your review of her report?

        A.    Correct.

                    (WHEREUPON, a certain document was
                    marked Defendant's Deposition
                    Exhibit No. 3, for identification,
                    as of 01/10/2011.)

BY MR. ABREU:

        Q.    Let me show you what I am marking as Defense Exhibit No. 3 and I ask you if you recognize that particular document?

        A.    Yeah, I do.  This is the neuropathology consulting report by Dr. Kagan-Hallet, and the date of that report is 9/17/02.

        MR. ABREU:  Mr. Roberts, do you have a copy of that?

Jan Leestma                                          January 10, 2011

36

MR. ROBERTS:  Yes, I do.

BY MR. ABREU:

Q.    And your findings regarding that particular subdural hematoma, is that consistent, or consistent with what Dr. Hallet reported --

A.    Yeah.

Q.    -- in her report of 9/17/02?

A.    Yes.

MR. ABREU:  Can I have just a moment?  I'm asking and there's no judge in the room.

MR. WISEMAN:  I'm sure Judge Jack would give you all the time you need.

(WHEREUPON, a short pause was had.)

BY MR. ABREU:

Q.    Let me ask you about Dr. Hallet's report.  She mentions on Page 2 regarding -- the section says Neuropathologic Diagnosis.

A.    I see that.

Q.    Okay.  She then mentions "Cerebral edema, mild to moderate, hemorrhagic necrosis of cerebellar tonsillar tips, (right), subdural hematoma, mostly recent, minimal organization (approximately ten days' duration)."

Could you tell us what the term -- what

Jan Leestma                                    January 10, 2011

37

medical term -- the medical term "minimal organization" means, from a medical perspective I should say?

A.   Well, let me back up one moment and say when you have blood in the subdural compartment it incites a chemical reaction that the body and the dura respond to.  They bring in cells, essentially to try to get rid of that blood, and other cells wake up and become activated to try to wall that off, eventually to dissolve that blood clot and heal it, and that is the process called organization.

And under the microscope we can look at what cellular constituents are there, how many of them, how much, how extensive, and make some estimates on the age of that subdural hematoma. This is based on some work that comes from a long time ago, 1936, but never mind, it's never been supplanted, and it's the road map that most pathologists use to make estimates of this sort.

So that's what we're talking about.

Q.   Okay.  And further down she mentions, "Cerebral white matter: Organized contusion infarcts (seven plus days' duration)."

A.   Right.

Jan Leestma                                         January 10, 2011

38

Q.    Are those the same infarcts that you noticed or that you described when you reviewed the slides?

A.    Yes.  I would say -- I would use different terms.  She says contusion infarcts, meaning that physical trauma caused these.  I am unconvinced of that.  I think these are due to venous infarctions due to the cerebral venous thrombosis that I've talked about, which she does not mention.

MR. ABREU:  Let me show you what I'm now marking as Defendant's Exhibit 4, is that correct, and Defendant's Exhibit 5 and ask you to identify those documents.

(WHEREUPON, certain documents were marked Defendant's Deposition Exhibits No. 4 and 5, for identification, as of 01/10/2011.)

BY THE WITNESS:

A.    Both 4 and 5 are prints that I made from a computer disk that contained the CT radiographic study done on June 27, 2002.  The time is listed as 1807 hours on that date.

Jan Leestma                                    January 10, 2011

                                                           39

BY MR. ABREU:

        Q.    That was at Driscoll Children's
Hospital?

        A.    It was.

        Q.    And that CT scan was done by Driscoll
Children's Hospital?

        A.    Apparently so.

        Q.    Of Jakarenn Gunter?

        A.    Say again.

        Q.    Of Jakarenn Gunter?

        A.    Yes.  That's the name all of this
material, all of this information appears on the
actual images.  I took -- selected a couple of them
from this disk and caused them to be printed out,
and these are the exhibits that we have before me.

        MR. ABREU:  And, Mr. Roberts, do you have a
copy of those?

        MR. ROBERTS:  I do not, not in front of me.

        MR. ABREU:  All right.  Well, we have them
here, but I don't know how helpful that is.  They're
part of the materials that were sent to Dr. Leestma
in the beginning of case.

        MR. ROBERTS:  Can you tell me -- can you tell
me where in his report he refers to those CT scans,

Jan Leestma                                      January 10, 2011

40

because there is nowhere in his report that actually refers or says that he's going to rely on those, other than the fact that he looked at them.

MR. ABREU:  I think that's what it says, that he looked at them and he reviewed them.

MR. ROBERTS:  Right.  But you're about to give me testimony that is not included in his report with regard to the CT scans, and I'm going to object to that.  I'm not prepared to address that, it's not in his report anywhere.

MR. ABREU:  It is something that he relied on and something that he can talk about and is the basis -- one of the bases of his conclusion regarding the thrombosis and the subdural hematoma.  So your objection is noted.

MR. ROBERTS:  Well, I think I'm going to -- I'll let you go ahead.

MR. ABREU:  Okay.

BY MR. ABREU:

Q.    Doctor, is the venous thrombosis that you mentioned and testified to previously reflected in those particular CT scans?

A.    Maybe.

Q.    What do you mean by that?

Jan Leestma                                    January 10, 2011

41

A.    At the posterior part of the --

MR. ROBERTS:  I'll object to testimony based on a maybe, unless he's medically -- has some kind of medical probability that they're there, I'm going to object to that testimony.

MR. ABREU:  I'll rephrase the question.

BY MR. ABREU:

Q.    Doctor, can you explain why you -- explain -- how about this, just explain your answer for us.

A.    Sure.  There is a finding present in the two panels that I have, Exhibit 4 and 5, in which a sort of a Y-shaped structure in the posterior part of the brain image that probably represents the superior sagittal sinus and that should be filled with completely white density, which is blood.  It appears that it is not, it appears somewhat gray, and that may indicate a so-called radiological sign known as the empty delta sign in which one is looking at a blood clot that has aged and doesn't contain as much red blood cells as other parts of the study.  And this may represent an actual view of the thrombus in the superior sagittal sinus.  This is -- I'm well aware of the difficulty in being

Jan Leestma                                              January 10, 2011

42

absolutely certain about this from this study.
That's a well-known radiological problem and that's
why I couch my answer in that sort of indeterminate
way.  It may represent --

MR. ROBERTS:  I just want to be clear that
my -- I'm sorry, Doctor.  I thought you were
finished.

THE WITNESS:  That's all right.

MR. ABREU:  He is finished now, Mr. Roberts.

MR. ROBERTS:  I just want to be clear that I
still object to the testimony.  I don't think the
rephrasing of your question changed the fact that
this is not in his report.

MR. ABREU:  Let me refer -- Mr. Roberts, if I
can, I think to take care of your question I think
it does refer to it in his report, let me just find
it real quick.  Just give me a second to find my
copy of the report.

Mr. Roberts, if you go to Page 3 of his
report, third paragraph -- second full paragraph on
that page but third paragraph on that page.  Last
sentence starts, "My examination of the CT scans
reveals a relatively small recent subdural along the
falx, mostly posteriorly along with some mixed

Jan Leestma                                    January 10, 2011

43

density material that probably represents the older component of the subdural mentioned above."

MR. ROBERTS:  All right.  I was aware of that part but I wasn't relating his testimony to that, so that clarifies.

MR. ABREU:  Okay.  Thank you, Mr. Roberts.

BY MR. ABREU:

Q.    Doctor, I guess my reading of that also answers my next question, which is whether the subdural hematoma is reflected in those particular scans?

A.    Yes, it is.

Q.    Okay.  Could you describe for us what those scans reveal about any particular swelling in the brain related to this particular child?

A.    Okay.  Both of them reveal the fact that the brain is, colloquially, tight up against the undersurface of the skull.  That there is very little, if any, overlying cerebral spinal fluid, which would have a black color density to it. That's gone.  The brain completely fills the cranial space.

Furthermore, the ventricles of the brain are smaller than would normally be the case, which

Jan Leestma                                                    January 10, 2011

44

further indicates a sign of increased intracranial pressure and absorption of cerebral spinal fluid to make way for the swelling.

Q.    And just Mr. Roberts doesn't have it in front of him, what is it about those photographs that shows you, in fact -- if you could just describe what you're looking at that shows that for us.

A.    Okay.  The skull is depicted in these studies as a white rim.  Underneath that there should be a black rim showing the convolutions of the brain or outlining them, and that would represent the normal cerebral spinal fluid that overlies the cerebral hemispheres.  That's gone. The brain has swollen to obliterate that fluid-filled space.  It does that because the brain is swollen and there is most likely increased intracranial pressure driving that.

Q.    The subdural hematoma which you indicated was present or visible in those CT scans, in your opinion is that -- is that hematoma large enough to cause all of the swelling that's visible in those CT scans?

A.    In my opinion no.

Jan Leestma                                              January 10, 2011

45

Q.    Is the venous thrombosis that you testified about in your opinion large enough to cause the swelling that's visible in that -- in those CT scans?

A.    It's certainly capable of it, and I believe that to be the most reasonable explanation. Plus the additive effect of what was going on when the child was hospitalized.

Q.    Let me ask you about did you -- any retinal bleeding, did you read anything regarding retinal bleeding in this particular child?

A.    Yes.

Q.    Did you review the testimony of Dr. Akhtar who described the retinal bleeding?

A.    I did, and it was described clinically.

Q.    Okay.  Do you have an opinion, Doctor, regarding whether the retinal -- what the cause of the retinal bleeding in this particular case was?

A.    Yes, I do.

Q.    What is that opinion?

A.    It's a consequence of the increased intracranial pressure this child had.

Q.    Can you describe or explain, I should say, what you mean by that?

A.    Okay.  As we asked sometime back what intracranial pressure was, I said the normal would be under ten millimeters of mercury, or thereabouts. That is also the pressure that veins have in them. If the pressure environment inside the cranial cavity is greater than that, it has the potential and consequence of impeding venous outflow from the optic nerve and eye.  Meaning that blood is coming into the eye by the arterial tree and it can't get out because the venous outflow tract is obstructed because of the pressure, and that causes backup of blood and rupture into the retina and in the optic nerve sheath.

Q.    Dr. Rouse testified at trial, and I believe it's in the transcript at Pages 58 and 59, that the retinal bleeding is not likely -- is not likely to have occurred, the retinal bleeding that was present in this particular case was not likely to have occurred without an impact in the magnitude of a car accident.  Do you agree with, Dr. Rouse?

A.    No, I don't.

Q.    Can you tell us why?

A.    First of all, physical forces generally do not and cannot cause the kind of retinal bleeding

Jan Leestma                                           January 10, 2011

47

we see here.  They can certainly lead to it if you have a car crash and a giant subdural or tremendous cerebral edema, that's going to produce intracranial pressure which can produce the retinal hemorrhages. But directly as a result of physical forces, that would not be acceptable or is not scientifically proven.

MR. ABREU:  Just a moment, please.

(WHEREUPON, a short pause was had.)

BY MR. ABREU:

Q.    Let me just ask a couple questions. Doctor, we just have a few more questions and then --

Now taking into account the evidence in this particular case that Mr. Bourgeois and his family arrived on the naval base sometime -- actually, the evidence at trial is that he arrived at 10:03 a.m. on the morning of June 27, 2008.

A.    Okay.

Q.    And that 911 was called at 11:45 a.m. on that same day.

A.    Okay.

Q.    And that she died approximately 24 hours later at 11:05 a.m. June 28.

Jan Leestma                                        January 10, 2011

48

A.    That's my understanding.

Q.    Okay.  Is what you observed about the subdural hematoma consistent with an injury that was inflicted within the 24-hour period that she was on the Corpus Christi Naval Air Station?

A.    No.

Q.    What -- can you explain that, please.

A.    Well, there are two components to the subdural hematoma.  The chronic component, which we've already discussed, aged and dated ten days to two weeks before this incident.  The fresh blood or more recent blood cannot be accurately aged and dated within about three days, two days from the time of death.  So it is possible that some blood that is in this compound subdural hematoma came during the time period you just discussed, but there is absolutely no way I can tell you if that happened.

Q.    Within three days?

A.    I cannot.

Q.    Okay.  Does the new blood prove that there was injury on the base itself?

A.    No.

Q.    Why not?

Jan Leestma                                          January 10, 2011

49

A.    Simply because we have no reliable means to age and date it.  If we could say this blood is one or two hours old, or whatever the time frame, critical time frame is, then I could answer that question.  The problem is we don't have the technique, technology and knowledge to be able to do that.  Our knife is -- our window is a couple of days and cannot be improved upon.

Q.    Can a previously existing subdural hematoma or chronic subdural hematoma bleed without additional injury?

A.    Yes, it can.

Q.    Is the intracranial pressure that you identify as the cause of death in this particular case, can that be the result of a head injury that occurred on the military base within that 24-hour period that we described in the previous question?

A.    It could have -- it could represent a component of this problem.  Again, I can't assess what percentage that might be or even if it occurred.

Q.    Okay.  What about the thrombosis that you identified?

A.    The thrombosis antedates this whole

business by several days.

Q.    Yes.  I was asked if you could explain what you mean by "this whole business"?

A.    Well, I mean the collapse and decompensation of this child that was discovered at the naval base and leading to the hospitalization and then ultimately the child's death 24 hours or so later.  The thrombosis antedates that whole business, that whole process by several days most likely.

Q.    Lastly, Doctor.  Based on everything that you saw that was presented at trial that you reviewed is there sufficient scientific evidence to conclude that the child, Jakarenn Gunter, died as a result of an injury that was inflicted on the naval base?

A.    No.

Q.    Can you again just briefly describe why?

A.    First of all, the aging and dating of the acute component of the subdural we have imprecision there, we can't do any better than a couple of days.  Meaning if -- I couldn't tell you whether a red blood cell in that clot came five minutes before the heart stopped in this child or

Jan Leestma                                                    January 10, 2011

51

two days before.  I can't.  I can't do it.  So that limits that.

We have other processes that are involved in this child.  The older component of the subdural.  The cerebral thrombosis clearly predates the arrival of this child at the naval base.  The bruising on the scalp and so forth and so on, of which there are a number of them, all of those have both acute and chronic components and the issue is the same.  I can't tell you if bleeding that is there of an acute nature or recent nature precisely when it occurred or how it occurred.

MR. ABREU:  Can we just take a two-minute break, five-minute break?

MR. ROBERTS:  Make it ten.

MR. ABREU:  Ten minutes, Tony?

MR. ROBERTS:  Just take ten.

MR. ABREU:  Okay.

THE VIDEOGRAPHER:  Going off the video record at 1:45 p.m.  This is the end of Tape No. 1.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER:  Going back on the video record at 1:53 p.m.  This is the beginning of Tape No. 2.

Jan Leestma                                    January 10, 2011

52

MR. ROBERTS:  Are we on?

THE VIDEOGRAPHER:  Yes, we are.

MR. ROBERTS:  Okay.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.    Dr. Leestma, I want to start with some of your CV because I noticed in here that you've been quite a few different places and -- but you indicated to us that you kind of retired around 2000, 2001 from, and I think you said from hospital-type work; is that correct?

A.    Yes.  The -- because of the closing of a couple of hospitals, there would be a couple of different dates there.  I think in just checking my CV, the last major contact I had with my Chicago Institute of Neurosurgery group was in 2003.  I ceased activity with that organization at that time. I had a brief return to hospital practice at the Children's Memorial Hospital for two years between 2003 and 2005 on a part-time basis, and then when that engagement ended with their full time neuropath person coming then I retired for good from that.

Q.    And during your career did you -- did you actually perform autopsies?

Jan Leestma                                        January 10, 2011

53

A.    Sure.

Q.    Since 2001 how many autopsies have you performed?

A.    Probably none.

Q.    Probably none or -- I'm sorry, probably none?  I don't understand that answer.

A.    I don't think that -- I could during the period of 2003 to 5 at the Children's Hospital I may have been involved in some autopsies there supervising residents.  Senior staff people generally do not do the autopsies, they supervise them, and I would have probably done that.  That's why I don't have a record of it and I don't remember.

Q.    Okay.  But I noticed in your -- one thing that I didn't see in your CV was any list of cases that you testified on.  Earlier in your testimony you mentioned the fact that -- you were asked a question about how you testified for both the defense and government.  Why don't you tell us how often you've testified for -- how many cases have you testified for a prosecutor, as a witness that's been called as a prosecutor?

MR. ABREU:  Let me just put an objection on

54

the record regarding the question.  The list of cases was provided to the government through Rule 26 disclosures, so the government has been provided a list of cases.

MR. ROBERTS:  We've been provided a list of the cases that he's testified on?

MR. ABREU:  Yes, Mr. Roberts, in Rule 26 disclosures.  They were provided actually weeks and weeks ago.

MR. ROBERTS:  Okay.  It wasn't included in the information.  I just asked him -- I said it wasn't included on his CV.

MR. ABREU:  Oh, that's true.  It's not on his CV, but it's a separate list that you were provided previously.

MR. ROBERTS:  Right.  So I'm asking him about the time he's testified.

BY MR. ROBERTS:

Q.    So you said earlier you've testified for both the government and the defense.  So how many times have you testified for the government?

A.    The most recent one, let me put it this way -- and I'm guessing because I don't have that document in front me.  But late '90s I testified

55

twice for the District Attorney in San Diego on a
child abuse case there that came to trial twice.  I
testified both times.  And that would be --

Q.    In late '90s?  I'm sorry, in the late
'90s?

A.    Yeah.  '97, '98 maybe.

Q.    That would have been the case of People
v. Johnson?

A.    Yes, that's the one.  Correct.

Q.    All right.

A.    And that would be the last time probably
I testified for the prosecution.  I am currently
engaged by the prosecutor locally on a couple of
homicide cases, which have not come to trial yet and
I haven't been disclosed.

Q.    Okay.  I understand -- I know next week
you're going -- or later this week you're going to
Hawaii to testify on a case?

A.    Yes.

Q.    And I guess there was apparently a
conflict with you being able to be available for us
this Thursday because you're supposed to testify in
that case on Thursday?

A.    That's right.  I'm leaving on a plane

Jan Leestma                                           January 10, 2011

56

tomorrow morning to fly to Honolulu to give testimony in that case.

Q.    Okay.  And I'm kind of looking at your statement that you said that you're a consultant now.  So all of your time, all the income that you're drawing right now is from testifying as an expert witness in cases?

A.    Well, testimony may not culminate -- you know, result in every case.  My earned income -- I have retirement income, but it has nothing to do with any of this.  My earned income has to do with professional consulting on cases like this and others, civil and criminal matters.

Q.    I've got a list of about ten cases that you testified in in 2010?

A.    Yeah.

Q.    And all of those were for the defense; is that correct?

A.    You have the advantage of me.  I'll trust you with what you say.  That's likely true.  Criminal cases for sure it would be defense.  If there was a civil trial in there, it would be a 50/50 chance whether I was retained by the defendant or the plaintiff.

Q.    Okay.  And then I'm looking at 2009 and there is -- I think there are about six cases listed here and they were all for the defense.  One medical malpractice case --

A.    Correct.

Q.    -- but all the times in a criminal matter you were testifying for the defense.

A.    That would be --

Q.    Does that sound correct?

A.    That's my best recollection also.

Q.    And then 2008 I've got a list of about nine cases and all of them for the defense, unless -- except for medical malpractice cases.  So every time you were involved in a criminal matter you're all testifying for the defense in 2008, does that sound right?

A.    That would be a fair statement historically, sure.

Q.    And I've got about seven cases listed in 2007 that seems to follow the same pattern where mostly for the defense -- all for the defense except for one civil case.  That sound about right?

A.    That would be the pattern.  And most of the criminal cases are child abuse cases and the

58

issues that are involved I'm offering defense opinions on those.

Q.    You just reminded me of something.  I want to finish this thought before I go to that issue, though, but it looks like in '06 you testified in about 13 cases and in '05 it was about 18, and it seems like the numbers were closer to like 15 and 20 up until 2007.  Do you have any reason why the cases have decreased?

A.    No.  I think some of it might be that I just didn't want to do as many cases, I wanted to take some time off.  I have no other explanation for it.

Q.    Well, you would agree, wouldn't you, that these cases take a lot of time, they take a lot of time reviewing the documents.  I mean, it's pretty -- even six cases a year is a considerable load to keep up with the actual facts and the evidence in a case, wouldn't you?

A.    I think that's a fair statement, yes.

Q.    What I'm curious about on your CV, you mentioned the Juvenile Protection Association of Chicago, are those cases generally about abused and neglected children where you were working with those

Jan Leestma                                        January 10, 2011

59

families?

     A.     I'm not directly working with them.  I'm on the board of directors and have had various involvements with that organization over the years. But that would be the focus of what they do, direct social services to those kinds of families and sometimes acting as a friend of the court or a mediator or what have you with the court system.

     Q.     I'm just curious about your statement in your direct testimony about maintaining the family structure.  Is it the goal of that organization to keep the family together even if the child is being adduced and neglected?

     A.     No.  This is -- obviously the safety of the child is foremost.  The goal is to try to maintain the family unit and restore it to some sort of level of functioning so that that's possible and they go to great lengths to do that.  But the primary focus is the safety of the child, and if the social workers and the team feel that the child is in danger, of course they're going to recommend that the child be taken out.

     Q.     Okay.  I just -- because the only thing you mentioned was maintaining family structure so I

just was curious if there was another aspect to what you did with them?

A.    No.  It's not the end of the day, it's the goal, and they've been remarkably successful at that over the years.  But obviously if a child is in danger and they feel that that is so, then that isn't going to be possible.

Q.    The book that you published in 2009 that you're the author of, is that -- since you haven't done any autopsies in a while is that more of a theoretical book for practitioners to consider or is it more of a practical --

A.    It's all of those things.  It represents 40 years in the business and collected materials and experience over that time as well as the literature and scholarship.  The fact that I'm not doing autopsies doesn't -- hasn't changed in a long time. I haven't been doing them because that hasn't been my job.  But the material there is current and represents the work of myself and others.

Q.    When you were testifying on direct examination you were asked a question about what you were asked to do in this case, and you stated you were asked to try to determine what happened and

Jan Leestma                                          January 10, 2011

61

when it happened.  Did anyone talk to you about the importance of that in this case?

A.   Well, sure.  This is -- like many of these, aging and dating of the process is an important forensic aspect of the case because it may have importance with an accused individual or other things that are important in the adjudication of the case.  So that's what I was asked to do and I did.

Q.   If I understand correctly, many of your -- much of your testimony in some of the other cases where you were working where there is a defendant accused of a murder one of the -- one of the ways that your testimony is utilized is to establish that the time of death was done at a time different than when the defendant could have done it.  Is that accurate?

A.   That often comes up.  This case is not dissimilar from many of them that I'm involved with that the whole issue is when did some process happen given external history, stories, whatever, and how can looking at the objective case of evidence, that is the autopsy the slides, the scans and things that can't be changed by anybody, how can I answer questions or can I answer some of those questions.

Jan Leestma                                            January 10, 2011

62

That's generally what I do.

Q.    One of the issue about how Jakarenn died you mentioned that it was the pressure, and you would agree, would you not, that there's -- I mean, there are various aspects that happen to an individual, not particularly in this case, I'm not getting into the details of this case yet.  I'm just talking about in general when someone dies from pressure on the cranium, it -- I mean, it can be -- those pressures can be caused from various aspects, correct?

A.    Sure.  It can have many causes. Anything that changes the intracranial pressure volume dynamic or teeter-totter can have profound effects, and ultimately intracranial pressure is a very, very common mechanism by which death occurs in head trauma cases.

Q.    Do you recall how many head injuries that Jakarenn actually had?

A.    That becomes a matter of argument.  Now, you speak of -- if we're talking about scalp --

Q.    Well, let me --

A.    Scalp --

Q.    If you don't mind, let me rephrase the

Jan Leestma                                          January 10, 2011

63

question again, then.

A.    Okay.

Q.    Because you're exactly right.  I'm not asking you about an opinion, I'm asking you about what the evidence presented.  Do you recall what the evidence in this case showed as to the number of head injuries to Jakarenn?

A.    In terms of impacts to the scalp, that could be a point of some argument.  There certainly is a large area of impact, a couple of centimeters or so in diameter about where I'm indicating, upper right side of the scalp.  There are -- there's another one behind I believe the right ear and that represents another impact site.  There are a number of scalp bruises in the posterior part of the scalp; it's difficult to tell when those occurred or how they occurred.  So one could say does this represent a separate incident or a collective of one event that may have had multiple impacts.  I think -- I can't globally answer that.  I can say there are estimates that are there, some -- but then we could argue about does that really represent an impact site, and there are some of them that are difficult in that regard.

Jan Leestma                                            January 10, 2011

64

Q.    Well, would you agree that medical examiners and pathologists sometimes are at a disadvantage when they're -- when they're conducting an examination because all they can look at is what happened to the individual and they don't know what witnesses observed and sometimes they're at a disadvantage for trying to figure out the cause of death?

A.    Oh, that is true, but it's a question of objective evidence versus, quote, anecdotal evidence, which may or may not be appropriate. the -- the bottom line is the forensic pathologist has to take a look at what's before him or her, and then other questions then can come.  If there is a scenario saying an individual hit this person 20 times on the head and there is one impact site, obviously there is going to be a disparity there. But the final thing comes from -- and the big power comes from the objective evidence that here is what we see physically and then that has to be evaluated against historical accounts or witnesses or whatever.

Q.    Did you -- did you identify -- do you remember -- did you actually read all of Dr. Rouse's

65

testimony in this case?

A.    Yes.  I have that transcript, I went through it, I can't for a moment replay it for you, but I did look at it, yes.

Q.    Did you read her report sentence by sentence, her autopsy report?

A.    I did, yes.

Q.    And did you identify anything in her autopsy report that you think was incorrect?

A.    Well, let me look at it a moment and --

Okay.  We can start on the first page. Closed head injury, (a) multiple areas of subgaleal hemorrhage, I don't agree with that.

Ten impact sites identified.  That we might part company on as to what represents a qualified impact site or not.  We might argue with that.

The right subdural hematoma recent with minimal organization.  I think there is a lot more than minimal organization and healing going on there, and it probably would be more appropriate to describe this as an acute or recent and chronic subdural hematoma.

Q.    Let me ask you about that real quick,

too, because I think that you hit on an important aspect.  The fact that there is acute, which means recent, and chronic, which means older injuries --

A.    Right.

Q.    -- makes it -- I mean, it makes it more difficult to be able to parcel out when -- what injury is what and what actually caused whatever ultimately resulted from the injuries; is that correct?

A.    That's a fair estimate, yes, it does.

Q.    In your report you actually acknowledge that there was recent bleeding --

A.    Of course.

Q.    -- do you not?

A.    Yeah.  Sure.  Of course.

Q.    And I think you even say that the recent -- I'm looking for the part that I recall you saying where it recently -- I think it's Page 2, the first full paragraph, second actual paragraph.  And you acknowledge that the bleeding could have appeared immediately before the child died or up to two to three days previously.  But then you state that it cannot be known if the acute component contributed or caused the death?

Jan Leestma                                           January 10, 2011

67

A.    That's right.

Q.    Now, is that -- is that excluding what any eyewitness might have seen?  I mean, you're not considering what an eyewitness, you're just looking at the medical evidence?

A.    That's right.  Just looking at the medical evidence.

Q.    But the evidence -- you mentioned the phrase earlier about decomposition.  Or decompensated?

A.    Right.

Q.    Tell us -- I mean, I think I understand what decompensated means with relation to looking at somebody that's just injured, but tell me in your terms what that means from a pathologist.

A.    Okay.  When I was referring to it, I think we're on the same page here.  When a child decompensates, let's make it two cases, this is a child who would then become unresponsive eventually, perhaps lethargic, sleepy or irritable, and then by decompensating I'm talking about becoming unconscious and usually quitting breathing and in need then of immediate medical assistance and resuscitation.

Jan Leestma                                        January 10, 2011

68

Q.    And so if someone standing there watching an individual get assaulted and they immediately go limp, isn't that a part of the determination and assessment that a pathologist or a medical examiner would want to know and apply to the determination of the cause of death?

A.    Well, that certainly would be a witness account, and you usually have subsidiary evidence adding to that by an emergency team or a doctor or nurse or somebody who responds and says this child at this about time quit breathing and fell apart.

Q.    Now, you mentioned the -- some of the subdurals and some of the injuries being on the right side back of the child's head and up around the ear area where some of the -- or some of the subdural hematoma was, and that was where a good portion of the recent bleeding was, was it not?

A.    The skin or scalp impact back behind the ear looks like it has age on it.  Microscopic examination of that also sustains that, that there is a chronic component to that.  The association with the subdural, where the impact sites are on the scalp, does not necessarily correlate with where the subdurals are inside the head, so they could be due

Jan Leestma                                        January 10, 2011

69

to the same event or it might be due to some --
another one.

Q.    Were you aware that there was actually a
witness to when this injury took place?

A.    I'm told there is.

Q.    And were you aware that that witness
actually testified that the defendant, Alfred
Bourgeois, grabbed the child and slammed her -- the
child's facing her, so the right side of her head is
facing the outside, and that child was slammed up
against the inside of the cab three or four times?
Are you aware of that?

A.    Yes.

Q.    And the testimony was, and I think you
wrote it in your report, that the child then went
limp immediately thereafter?

A.    That's what was reported and testified
to, I understand.

Q.    And if that was accurate, based on your
expertise as a pathologist, wouldn't that play an
essential role in your determination as to what the
cause of death was?

A.    Those kinds of bits of information are
interesting and important and need to be evaluated

Jan Leestma                                          January 10, 2011

70

against the objective evidence that is found at
autopsy and in other things that can't be changed.
To take any witness account as the absolute truth
and completely authoritative, I've learned a long
time ago that this -- you have to be very careful
there.  It may have happened that way, and it may
not have happened that way too.  So to make that --

Q.    Doctor --

A.    -- trump the objective evidence, that
isn't what I do.  I have to keep with the objective
evidence in front of me and take these things into
account which may be or may not be completely --
complete, correct or true.

Q.    Okay.  I'm going to ask you the question
again, sir.

A.    Sure.

Q.    I think it's pretty straightforward.  If
that were given to you as evidence in the case,
you're the pathologist and/or the medical examiner,
would that not play a vital role in your
determination -- I'll take the word "vital" out.
Would that not play a role in your determination in
evaluating the cause of death?

A.    It plays a role but it's not the last

Jan Leestma                                          January 10, 2011

71

word.

Q.    Okay.  Can you think of any reason why a seven-year-old would make something like that up --

MR. ROBERTS:  Objection.  Objection, that's irrelevant.

BY MR. ABREU:

Q.    I'm going to ask you to answer the question.  My response to that is it's not irrelevant because a medical examiner -- you're telling me that you would --

MR. ABREU:  It also calls for speculation.  I'm sorry, go ahead, finish your point and then I'll object.

MR. ROBERTS:  My point is that if a medical examiner is going to factor in the witness statements then it does become a factor as far as relevance and credibility.

MR. ABREU:  Well, it also goes -- it's speculative and it asks the doctor to speculate about another witness's motives.

MR. ROBERTS:  Understood.

BY THE WITNESS:

A.    My answer to that is I don't know what to make of those things.  I think you have to say,

Jan Leestma                                    January 10, 2011

72

all right, this is a set of historical facts which may or may not be complete or correct for a variety of reasons.  And the pathologist then has to look at what they've got in front of them and say what matches up, what can I tell, what can't I tell, and what limit do I have on my opinion in that regard. And that's part of the problem of going backward from the objective evidence to create a scenario and see if it matches up, it may be very, very difficult and subject to error and interpretive problems.

BY MR. ROBERTS:

Q.    Just so I might point out, on the first page of your report you state that the -- down the -- it's the first full paragraph after your list of 13 things that you considered.  You state that on the morning of July 27, 2002.  Is that another error, typo in your report?

A.    I think I'm confused here.  Ask the question again.  It's all right.

Q.    The statement that -- I mean, you say that you thought the incident occurred in July. Basically my question is were you aware it occurred in June?

A.    Well, those were the dates that I'm

Jan Leestma                                    January 10, 2011

73

aware of.  July 27 is when this man was -- had his family there at the naval base and allegedly these events occurred.

Q.   Okay.  So that's -- your statement is you believe it all occurred in July?

A.   Well, I don't know whether I believe it or not.  Those are facts that were presented to me in multiple documents, the autopsy report and so forth.  I have no reason to question that.

Q.   And you also, in your report, that same paragraph, you note that "Bourgeois was reported to have slammed the child's head against a window in the truck" --

A.   Yep.

Q.   -- "and the dashboard.  After this occurrence the child was said to have become limp and unconscious."  Are you telling us and telling our judge that you would -- you would not consider that -- that statement and that piece of evidence in your determinations?

MR. ABREU:  Objection, that's not what the witness has stated.

BY THE WITNESS:

A.   I'm just listing in my report what was

Jan Leestma                                    January 10, 2011

74

immortalized in the case record.  Whether those facts are true or not, I cannot say for a variety of reasons.  I'm not saying they didn't happen, I just cannot verify that objectively, independently with the material I have.

BY MR. ROBERTS:

Q.    Could -- in your opinion could a two-year-old child who suffered a fatal blow that's going to result in a hematoma, subdural hematoma that kills the child, would that child be able to continue to walk, talk, sing and function in a normal manner as people observe them?

A.    I'm assuming this is a hypothetical question then, correct?

Q.    It is a hypothetical question.

A.    Well, we have to define what a fatal blow is.  There are circumstances in which a child may suffer an injury and be out and essentially on their way to dying relatively immediately.  There are other circumstances in which an injury later proves to be fatal, sometimes minutes, hours, days or more.  So it's not a simple problem that I can answer easily.

Q.    If the evidence that was presented to

Jan Leestma                                          January 10, 2011

75

you was that the last physical assault to the child's head occurred -- if the last physical impact to the child's head -- let's just say not the last, we're going to take two separate incidents.

If you were given evidence that the last time the child's head was impacted in an assaulted manner and had any major impact was three days out from going to the hospital, and then the child is on a base and singing ABCs, moving around like a normal two-year-old would, and then subsequent to that, within an hour, the child's head is slammed against the inside of a cab four times and the child goes limp, would that have any impact on your conclusion of what injury would have caused the death?

A.    If we're simply looking at the historical account, I'm sure that can make sense. The problem, and it comes to me, is looking backwards what injuries that I can see in the microscopic slides and photographs in this child that are unequivocally caused on the morning of July 27, 2002, I can't tell you. All of the ones that were sampled histologically have age on them.

There is also recent hemorrhage in some of these impact sites. Did that come as a

Jan Leestma                                        January 10, 2011

76

consequence of just the process or is that a result of some impacts that occurred on the 27th, I can't tell you that.

What you say may be true.  I just can't verify it.

Q.    Okay.  I want to go to the last, Page 3 of your report and the last paragraph on that report.  You've got a couple statements in there I want to ask you about.

Third line down towards the end you say that it cannot be determined -- let me back up.  I'm going to read the whole sentence.  It's the third sentence starting at the beginning.  "The subdural hematoma's cause is likely physical trauma but it cannot be determined whether this was inflicted or accidental."

A.    Correct.

Q.    What do you mean?  What do you mean it cannot be determined whether it is inflicted or accidental?

A.    If you gave me a microscopic slide and photographs of the subdural hematoma and you said I want you to tell me how this occurred, I can tell you physically how it occurred but I have no way to

Jan Leestma                                                        January 10, 2011

77

determine whether this was an inflicted injury or one that occurred in a fall or an accident.

Q.    So again --

A.    I can't do it.

Q.    -- this is -- this paragraph has nothing to do with the evidence in the case, it has only to do with the medical examination that you were conducting?

A.    Exactly.  It's the objective evidence of looking at the material that I know something about and can opine about.  I cannot -- the test is doing just what I've suggested.  Show me a case, give me no facts at all, and let me see what I can come up with.  And to be able to come up with an inflicted subdural versus an accidental one there is no way I can do it.

Q.    Okay.  I just want to clarify that, that your report is excluding the evidence in the case and just looking at medical evidence?

A.    I'm confining it to what I can deal with, which is the objective evidence of the autopsy and the other materials that can't be altered or changed by anyone.

Q.    Okay.  Down -- I note just a few

Jan Leestma                                    January 10, 2011

78

sentences down from that, and I can count them for you, the sentence that starts with "impact."

A.   We're on that last paragraph, right?

Q.   We're going to stay in that paragraph for a few minutes, please.

A.   Okay.  That's fine.

Q.   Okay.  So we're on the sentence that starts with "impact," period, and it says "Nevertheless."

A.   I'm struggling to find that.

Q.   It's about midway down.

A.   Okay.

Q.   It has got the word "impact," period, and "Nevertheless."

MR. DOWD:  The line, not the sentence.

BY THE WITNESS:

A.   Oh, yes.  I see it.  Okay.  Right.

BY MR. ABREU:

Q.   It says, "Nevertheless, it appears that the child's condition deteriorated after the reported incident in the father's truck."

A.   Yes.

Q.   Was that -- so that's a statement that you accepted?

Jan Leestma                                          January 10, 2011

79

A.    I haven't accepted it, I'm just simply saying that was what was reported and at this point I have no reason to doubt that that occurred.  It's just that I can't turn around and say, yes, I see that in my material.

Q.    Do you have -- did you have any evidence or any indication or anything through your medical information that you reviewed that indicated to you the child's condition deteriorated and went all the way to decompensated any time before the incident on the base?

A.    I don't have any information about that. I have some information that the child had been ill and there were some problems, but in terms of decompensating, becoming unconscious and unresponsive I have no information about that.

Q.    Help me out with that.  You said you have some information the child may be ill.  What are you referring to?

A.    It's my understanding that the child had been ill.  There had been vomiting.  The child apparently at some point was reported to have drunk her own urine because she was hungry or thirsty. And, you know, it sounds to me like this child had

Jan Leestma                                    January 10, 2011

80

been ill in some fashion prior to this incident.

Q.    You understand -- you understand that the child was forced to drink urine by the defendant, right?

A.    I do not know that.

MR. ABREU:  I would object, Your Honor.

Sorry.  I would object.  There are two different portions of testimony.  There's testimony that the child drank her own urine on her own -- drank his urine, I'm sorry, on her own.  And then when confronted there's additional evidence that then she was forced to drink additional urine. That's correct.

MR. ROBERTS:  Well, I'll let the record speak for that --

MR. ABREU:  Absolutely.

MR. ROBERTS:  -- and the Judge knows the record.

BY MR. ROBERTS:

Q.    Let me move to this area on this paragraph where you say, "The brain lesions range from possibly a few days in age to days to weeks old."

A.    Yes.

Jan Leestma                                    January 10, 2011

81

Q.      So you're including all the chronic and the acute injuries and you're saying that they range from a few days to a couple of weeks?

A.      That's right.

Q.      And you understand that -- well, earlier you were asked a question about the fact of the child dying, or the child being brought on to the base and then within a day dying, but you understand it was a couple of days before the autopsy was done because the child was moved to another place, right?

A.      Yes.  I know there was a delay there.

Q.      So then you come to this point, and this is really -- I want to go back to your testimony before we read the next sentence, because you told us that it was your belief that the cause of death was increased intracranial pressure, right?

A.      Yes, correct.

Q.      You gave us -- you actually said there were three causes but you only listed two of them. And you said one of them, one of the causes was a subdural hematoma, but you said that was a small volume so you kind of discounted that?

A.      Yes, that's correct.

Q.      Then you went to this idea that I

Jan Leestma                                    January 10, 2011

82

believe was this venous infarctions?

        A.    Yes, I did.

        Q.    That was the second cause, and you said that was a primary cause of this child's pressure on the brain, on the cranium?

        A.    I believe that was certainly the more impressive one and quantitatively the more serious.

        Q.    Okay.  In your report the only time that you mentioned this venous infarctions, and I may be saying that wrong.

              Infarctions, thanks.  Mark Dowd is better at pronouncing these words than me.

              The only time you mention that is here in this last sentence in your entire report.  So does -- what I'm asking is it appears to me that the conclusions you make on the venous infarctions relates to the coagulopathy; is that right?

        A.    Yes.  But I hasten to point out that I did discuss this business of a clot on the bottom paragraph of Page 2 and --

        Q.    I understand that.  I'm sorry, I did note that the thrombus was noted up there and the lot, but you're not saying the clot, the blood clot was the pressure, are you?

Jan Leestma                                        January 10, 2011

83

     A.     It's indicative of a disorder of coagulation that then leads to venous infarction and the edema and swelling and other things that attend that.

     Q.     Well, I noticed in your testimony that you said -- I mean, you sounded very certain that this existed in this child and it was the primary cause of death, but in your report you say the child may have had?

     A.     Oh, I don't know.  Oh, well, all right.  In terms of --

     Q.     Between the time you've done your report and the time you're testifying all of a sudden you've become more firm in this conviction.  Why?

     A.     The child has a thrombosis in a structure that is dangerous to be thrombosed.  It usually comes from some disorder of blood coagulation, largely dehydration, there may be other factors.  In terms of a measurable coagulopathy, in other words, clinical blood studies to show that, I don't have those and I don't know -- it's probably why I was somewhat equivocating there.  But you can't change the objective finding.  There it is.

     Q.     Okay.  So I just want to clarify.

Jan Leestma                                           January 10, 2011

84

You've gone away -- now in your testimony you've gone away from the may have to you're absolutely sure that this existed in this child?

A.    This particular lesion exists.  Whether this child has a demonstrable, measurable coagulopathy is another matter.  I don't have anymore information and that's probably why I equivocated there.

Q.    And in your -- I mean, isn't that basically a bleeding disorder?

A.    Coagulopathy can be bleeding or clotting or both, so it's a general term of some disorder of blood clotting.

Q.    Would you expect that kind of thing to be found in a detailed medical examination of a child?  If the doctor was trying to do a thorough examination of the child, would you expect that to be identified and notated in the child's records?

A.    It can be identified, and in fact children who are in the state this child was in, comatose, nonbreathing on a respirator, virtually all of them are coagulopathic at that particular time and that can be measured clinically by doing blood tests.

Jan Leestma                                                January 10, 2011

85

Q.    Can it also be observed because the blood will just come right out of the catheters?

A.    It can.  Sometimes the manifestation of this externally is that there is oozing around every IV site and every catheter.  I don't know that that occurred in this case.

Q.    You say in your -- going back to the first page of your report that you read Dr. Benton's testimony?

A.    I must have.  I don't have any recollection right now of it, but I did look at it, yes.

Q.    Dr. Benton was a doctor in Louisiana. Does that refresh your memory at all?

A.    It does not.

Q.    Dr. Benton was a doctor that did a full examination on this child in May before any injuries were placed on this child.  Does that remind you of anything?

A.    What you say may be correct.  I simply don't recall.

Q.    Well, I'm sorry, Doctor, I was just asking -- I mean, you said -- you listed the trial testimony transcripts of Dr. Benton, so I'm trying

86

to figure out if you actually read Dr. Benton's testimony and understood that he performed a full examination on this child?  Do you know that?

A.    I simply don't recall.  I got that material, I must have looked at it, I don't have any independent recollection of what that contained right now.

Q.    Well, are you knowledgeable about pediatricians and the fact that a pediatrician giving an examination to a child would be able to catch something like this if the doctor is giving a thorough examination of the child?

MR. ABREU:  I going to object.  It goes beyond what the scope of what the doctor was asked to do, which was determine what in his opinion was the cause of death and the timing of any injuries related to the cause of death as presented through the government's witnesses.  Dr. Benton did not testify regarding the cause of death at any point, and so my objection is on that basis, the relevance of Dr. Benton's testimony to the cause of death.

MR. ROBERTS:  My response is that Dr. Leestma has stated that the cause of death was primarily related to this venous infarction and that a doctor

Jan Leestma                                    January 10, 2011

87

giving an examination should have been able to find that, and we have medical evidence that contradicts that.  So I'm asking --

MR. ABREU:  Well -- I'm sorry.

MR. ROBERTS:  My response is --

MR. ABREU:  Finish your point.  Sorry, Tony. Finish your point.

BY MR. ROBERTS:

Q.    Well, I'm just going to say -- my question is are you aware that Dr. Benton did a full evaluation of this child in May on the same year?

A.    I am, and I don't recall what the content of that was.  That doesn't speak to what is going on proximate to the decompensation and death in this child.  I would not expect, unless this child had hemophilia or some other problem like that, that any abnormality of coagulation would have been detected months before.

MR. ROBERTS:  Let me just have a moment to confer with counsel.

THE VIDEOGRAPHER:  Do you want to go off?

Going off the video record at 2:37 p.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER:  Back on the video record at

Jan Leestma                                          January 10, 2011

88

2:41 p.m.

BY MR. ROBERTS:

Q.    Dr. Leestma, it's accurate, is it not, that even a child that -- let's just say that Jakarenn had no other injuries, no other head injuries except for what happened on the base. Let's say she didn't have all the chronic, she only had acute.  She's injured, she ends up the hospital a day later before she dies, and then the autopsy is done a day or two later.  You would still expect to see some healing because of the fact that she was there and she was still alive for a day, it just wouldn't be extensive healing, correct?

A.    That's right.  A 24-hour-old injury may show virtually no healing or the very early beginning of healing-type reactions.  What you say is correct.

Q.    So I guess what's really difficult about this case is that this child was routinely beaten for six weeks, and of course we have -- for hypothetical purposes someone observes this child get slapped upside of a cab four times and then we've got both acute and chronic, so it makes it very difficult to -- for you all -- for you as a

Jan Leestma                                         January 10, 2011

89

pathologist or even a medical examiner to pinpoint exactly which injury occurred when.  Is that basically true?

        A.    Yes.  That's a fair statement of the problem.

        MR. ROBERTS:  All right.  I don't really have any other questions.

                    REDIRECT EXAMINATION

BY MR. ABREU:

        Q.    The question that the prosecutor or the government just asked you regarding the problem in dating a particular injury in this particular case, was that something from your recollection that was covered in Dr. Rouse's testimony?

        A.    Only in general terms in terms of her estimates, it wasn't very specific, in other words, days and some of them to weeks.  And I don't think that question was answered in her testimony.

        Q.    Do you recall her being asked by the government or by defense counsel whether it was a problem to date these particular injuries?

        A.    I don't recall a question of that kind.

        Q.    Do you recall any testimony by her to the extent that dating these kinds of injuries is a

Jan Leestma                                        January 10, 2011

90

problem and can be a problem?

MR. ROBERTS:  I'm going to object.  The record is going to show what was asked.

MR. ABREU:  Very true.  I'll move on, Tony.

BY MR. ABREU:

Q.    The government asked you about cases you've testified in before in terms of your testimony for the defense or the prosecution; is that correct?

A.    Yes, they did.

(WHEREUPON, a certain document was marked Defendant's Deposition Exhibit No. 6, for identification, as of 01/10/2011.)

BY MR. ABREU:

Q.    Let me show you what I've marked as Defense Exhibit No. 6 and ask you if you recognize that particular document?

A.    Yes.  This is a -- what shall I call it?  A spreadsheet that I've created to keep track of my cases because of federal requirements since 1992.

MR. ABREU:  And just for clarity sake, Tony, that is the same document that was provided to you through Rule 26 disclosures.

Jan Leestma                                            January 10, 2011

91

BY MR. ABREU:

Q.    The cases that are listed on that particular document, those are cases that you've been retained in?

A.    Those are cases only in which I gave sworn testimony.

Q.    Okay.

A.    So it would be an incomplete listing of my entire case work because many of those things may not have culminated in sworn testimony.

Q.    And so I guess my question is are there cases, and obviously based on what you just said, are there cases where you are consulted but don't provide testimony?

A.    Absolutely.  In fact, that's more common than not.

Q.    And that is sometimes in the cases where you work for the defense?

A.    It could be -- yes.  For anyone.

Q.    And on occasion that's because you don't have information that's helpful for the defense?

A.    Or the prosecution.  That may be true that the retaining counsel feels that they don't wish to use my testimony or the content of my

Jan Leestma                                          January 10, 2011

92

opinion for what they do.  Or the case gets settled, pled out, otherwise goes away so I never end up testifying.

Q.    In this particular case when you were retained by Mr. Bourgeois's defense team you were not asked to opine on the credibility of any lay witness; is that correct?

A.    No.

Q.    Were you asked to opine on the credibility of any witness?

A.    No.

Q.    What were you asked to do, just repeat it, please.

A.    To simply try to figure out what happened to this child and if possible to put it against the time frame.  When.

Q.    Let me ask you to take a look at the autopsy report, which I don't have in front of me. I don't know what the exhibit number is.  Actually, the autopsy report was not marked.

A.    No.

Q.    But you made reference to it earlier.

MR. ABREU:  Mr. Roberts, do you have a copy of the autopsy report, Dr. Rouse's?

Jan Leestma                                    January 10, 2011

93

        MR. ROBERTS:  I do.

BY MR. ABREU:

        Q.    Let me ask you, Doctor, what date is the autopsy that occurred in this particular case, if you look at --

        A.    The autopsy was done on 29 June 2008.

        Q.    Okay.  So earlier when Mr. Roberts was asking you about your report which indicates that the autopsy took place in July and that the child was alive in July, is that an error on your part?

        A.    Well, I'm confused.  The events on the naval base and so forth were reported to me to be in July.  The autopsy obviously can't antedate that, so I don't know which is correct.  I mean, the 28 June time of death, and I have it in my mind and records that it's 28 July.  So somebody's wrong.

        Q.    Does that make any difference regarding your conclusions in this particular case?

        A.    No.  That -- it's simply an error somewhere, maybe on my part.

        Q.    Assuming the facts as described to you by the government in terms of what happened on the military base as testified to at the time of trial regarding the child being hit against the truck, the

Jan Leestma                                          January 10, 2011

94

window of the truck as described by the government, if it did happen as described, and assuming that to be true, does that change your opinion about the cause of the death in this particular case?

A.    No.

Q.    Does that change your opinion about the age of the processes that led to the cause of death in this particular case?

A.    No.  I can't do any better than what I've done.  And it doesn't change anything.

Q.    And when you say you cannot do any better, is there something that another pathologist can do better?

A.    I seriously doubt it.

Q.    And why is that?

A.    I don't know anyone who has a magical formula to break down into smaller increments this two- to three-day acute injury scenario.  Red blood cells just don't change over that period of time. It's at the three-day mark and beyond that they begin to undergo some changes.  The inflammatory reactions that can occur with an impact to the scalp, or any other place, are so variable between individuals that I know of no reliable reproducible

scale that someone can use.  That means they may have opinions on this matter, but I don't know of any reliable method that can sharpen our razor, so to speak, or turn up the power of the microscope to answer these kinds of question.

Q.    Okay.  Let me just ask you very briefly about the thrombosis and the infarct that the government also asked about and we asked about.  Are those two different things, because I'm confused a little bit about that?

A.    Well, I think they're linked up.  In other words, the -- by looking at the clot I can't tell you what it did except where it is, it's the sagittal sinus, and there are then corresponding lesions in the cerebral cortex that show a necrotizing or infarctive process that is in the process of resolving itself, of healing.  There are inflammatory cells there, there are capillaries that are proliferating.  Those things take time and that's where I'm coming back to this time frame of a week or two weeks' duration of some of these injuries.

Q.    And, again, is that one of the sources of the intracranial pressure that you describe?

Jan Leestma                                           January 10, 2011

96

     A.    Yes.

     Q.    The government asked you about Dr. Benton's testimony, if you recall reading Dr. Benton's testimony.

     A.    I must have.  I simply can't play it back for you right now.  I'm not sure what's in it.

     Q.    If the record reflects that Dr. Benton performed a sexual assault -- he did an examination -- let's say he just did an examination for sexual assault on the child.  Would you expect him to have done any testing for -- to identify a thrombosis as you've described during the course of a sexual assault examination?

     A.    That would not normally be a part of it. If there were any suspicion of a bleeding disorder, bruisability, blood clots some place, of course it would have been appropriate.  But for the context you're talking about I would not expect him to do that.

     Q.    The government asked you about whether you were aware that the autopsy took place a day after she died, I think was the question.  When do these processes that we see, the healing and changes that we see and that you've testified about, when do

Jan Leestma                                                 January 10, 2011

97

they stop occurring?

   A.    They basically stop within a short, a very short period of time after the heartbeat ceases and the pulse is gone and there is no blood pressure anymore.

   Q.    At the time of death?

   A.    Yeah.  I mean, we argue about what is the time of death.  Well, basically it's when the brain dies.  But in the clinical sense when the heart ceases to function and there is no resuscitation or artificial support for that, that's the time of death.  At that point cellular processes wind down over a period of minutes or hours.  And then the body is usually refrigerated, which stops virtually everything else.  So the delay of a couple of days in an autopsy probably has little or no meaning for the questions we're trying to answer here.

   Q.    And, lastly, the government asked you regarding whether a child who had suffered an injury that led to this type of subdural hematoma could have acted normally for several days before dying. Is that possible?

   A.    Sure.  A subdural hematoma is

Jan Leestma                                          January 10, 2011

98

essentially silent until some volumetric change occurs that overrides the ability to compensate for it and/or the volume gets large enough that the child can't compensate anymore.  And I don't think either of those processes are evident in this particular case.  So a child can have a subdural, be cranking along as far as anybody knows completely normally, and when symptoms appear it's due to volumetric change far exceeding what we see here.

MR. ABREU:  That's all I have.

RECROSS-EXAMINATION

BY MR. ROBERTS:

Q.    First of all, Doctor, I want to ask about your report.  I guess you had -- you had a portion of your report completed by December 15th and I think you testified earlier that you had given that report to the public defender?

A.    Yeah --

Q.    The December 15?

A.    -- my first draft was December 15, but it clearly didn't have the brain slides, I didn't have autopsy photographs, I think, and therefore in that report I said this is an interim or, what shall I say, a tentative report and I reserve the right to

Jan Leestma                                          January 10, 2011

99

then append it later when I have this information.

Q.   And did you make any conclusions in that report?

A.   I probably did.  They're very similar to what we have here.  I was making use of Dr. Hallet's verbal descriptions of what she said she found in the subdural hematoma as to age.  I had said in that draft I can't confirm these things because I haven't looked at the slides yet, and when I did then obviously I could and no disagreement there.

MR. ROBERTS:  As an aside, I'm going to request that the defense provide a copy of the report that was submitted on December 15 since the only report I've received to date was the one given to us on Friday, January 7.  So I will request that on the side.

BY MR. ROBERTS:

Q.   Moving on to the second issue.  I want to ask you, we went over this list.  I also have a very lengthy list and several pages of cases you've testified in.  Do you make the same amount per hour on each case that you testify on?

A.   No.

Q.   What is your normal rate per hour?

Jan Leestma                                        January 10, 2011

100

A.    My rate that I quote people without any other negotiation or any other information is out-of-court work, case preparation and all of that $400 per hour, sworn testimony $600 per hour.  That is subject to negotiation and sometimes limitation by whoever is retaining me.  There may be a government limit, there may be a cap, or whatever it is.  At that point I chose then to decide whether I'm going to do it under those circumstances or not.  Occasionally I will do a pro bono case with no recompense at all.

Q.    Let me ask you about -- I want to go back to the autopsy.  And I notice there is a -- you all mentioned the -- referencing the autopsy report and the report by the neuropathology consultation. I noticed that the date of the cut of the neuropathologist was not until July 1?

A.    That's what it says, yes.

Q.    Would -- if the brain had been cut on any earlier or closer to the date of actual death would that have revealed anything different than what you found out later on?  Would it be better to have it cut earlier?

A.    Actually this is sort of quick.  If in

Jan Leestma                                          January 10, 2011

101

fact the autopsy was done on the 29th, this mean the brain was cut a couple days later.  That usually means that it didn't have a chance to fix in formaldehyde very long.  Usually I would expect it to be two, three weeks, or a month later.  I don't know why it occurred in this case, but never mind that, it did.

Q.    Okay.  But that doesn't change the -- by getting it quicker doesn't change any of your ability to assess the -- whether it's acute versus chronic and which one --

A.    No, that wouldn't affect this at all. Those processes stop when the child died and nothing would really change that.

Q.    One last question, and that goes back to Dr. Benton.  I know you don't recall all of the testimony that he provided, but on Page 29 of his testimony he states that he gave a physical exam that is a head-to-toe physical -- he gave a physical exam and his physical exams are head-to-toe physical exams.  Now, does that sound like to you that it's just a sexual assault examination?

A.    I don't know.  I don't know what he -- you know, what would be a normal so-called sexual

Jan Leestma                                                January 10, 2011

102

assault exam.  I would imagine any physician would be ill-advised to simply look through the drinking straw at the only thing there.  They should do a physical exam of the child, and how extensive it is I can only speculate.  But he must have examined this child a little bit more than simply the genital area.

Q.   Okay.  With your experience on the Juvenile Protection Association of Chicago, I mean, have you seen children that have been brought in where alleged negligence is involved, do the physicians just limit their examinations of those children?

A.   Well, I'm not usually involved on the day-to-day cases that come through except as they might be presented at a conference or, you know, when the board meets and an ideal case is presented or a recent one is presented.  So I don't know what the normal ebb and flow of those things is.

MR. ABREU:  It's probably a little unfair since you're not a pediatrician, so I'll pass the witness.

THE WITNESS:  I am not a pediatrician, never have been.

Jan Leestma                                        January 10, 2011

103

MR. WISEMAN:  Would you like to be?

THE WITNESS:  Never will be.

MR. ABREU:  Mr. Roberts, we have no further questions on this side either.

MR. ROBERTS:  All right.  We're -- we don't have any further questions either.  Correct, Mark?

MR. ABREU:  We'll see you on Thursday.

MR. ROBERTS:  All right.

MR. ABREU:  Thank you, Mark.

THE VIDEOGRAPHER:  Going off the video record at 2:59 p.m.  This is the end of Tape No. 2.

FURTHER DEPONENT SAITH NAUGHT.

104

STATE OF ILLINOIS )

) SS:

COUNTY OF C O O K )

I, ANNE E. FOGARTY, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter, CSR No. 84-3870, of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my

Jan Leestma                                              January 10, 2011

105

hand of office at Chicago, Illinois, this 11th day of January, 2011.

                        Notary Public, Cook County,
                        Illinois.
                        My commission expires 7/31/12.


CSR Certificate No. 84-3870.

Jan Leestma                                      January 10, 2011

106

EXAMINATION

WITNESS                                    EXAMINATION

JAN E. LEESTMAN, M.D.

        By Mr. Abreu                              5

        By Mr. Roberts                            52

        By Mr. Abreu                              89

        By Mr. Roberts                            98


                        E X H I B I T S

NUMBER                                    MARKED FOR ID

Defendant's Deposition Exhibit

        Exhibit No. 1                             6

        Exhibit No. 2                            14

        Exhibit No. 2A                           15

        Exhibit No. 3                            35

        Exhibit No. 4                            38

        Exhibit No. 5                            38

        Exhibit No. 6                            90

Jan Leestma

January 10, 2011
107

**A**

**A.D**
1:19

**ABCs**
75:9

**ability**
98:2 101:10

**able**
32:5 49:6
55:21 66:6
74:10 77:14
86:10 87:1

**abnormality**
87:17

**ABREU**
2:18 4:17
5:4,9,15 6:3,
10,14,17,20,
23 7:1 12:16,
22 13:2,3
14:18,22
15:2,7,12,18
16:6,10
20:11,15,22
27:2 28:21,23
35:16,23
36:2,9,14
38:11 39:1,
16,19 40:4,
11,18,19
41:6,7 42:9,
14 43:6,7
47:8,10
51:13,16,18
53:24 54:7,13
71:6,11,18
73:21 78:18
80:6,16 86:13
87:4,6 89:9
90:4,5,15,22
91:1 92:23
93:2 98:10
102:20 103:3,

7,9 106:4,6

**absolute**
70:3

**Absolutely**
15:7 42:1
48:17 80:16
84:2 91:15

**absorption**
44:2

**abuse**
55:2 57:24

**abused**
11:22 58:23

**academic**
10:3

**Academy**
11:12

**acceptable**
47:6

**accepted**
78:24 79:1

**accident**
46:20 77:2

**accidental**
76:16,20
77:15

**account**
47:14 68:8
70:3,12 75:16

**accounts**
64:21

**accurate**
61:16 69:19
88:3

**accurately**
48:12

**accused**
61:6,12

**acknowledge**
66:11,20

**acted**

97:22

**acting**
59:7

**action**
104:23

**activated**
37:9

**activities**
9:7 31:4

**activity**
52:17

**actual**
31:17 34:13
39:13 41:22
58:18 66:19
100:20

**acute**
22:6,12,17,
18,21 23:9
50:20 51:9,11
65:22 66:2,23
81:2 88:8,23
94:18 101:10

**add**
12:15 23:15
28:10

**adding**
68:9

**additional**
18:7,16 28:12
49:11 80:11,
12

**additive**
45:7

**address**
40:9

**adds**
28:12

**adduced**
59:13

**adjudication**
61:7

**advantage**
56:19

**affect**
101:12

**Affidavit**
17:2

**affiliation**
11:14

**affiliations**
4:15 11:6

**AFIP**
8:1

**afternoon**
4:1,17 5:16

**age**
30:21 32:2,5
33:20 34:24
35:2 37:15
49:2 68:19
75:22 80:22
94:7 99:7

**aged**
31:21 41:20
48:10,12

**agency**
11:20

**aging**
31:6,13,20
50:19 61:4

**ago**
37:17 54:9
70:5

**agree**
46:20 58:14
62:4 64:1
65:13

**ahead**
34:15 40:17
71:12

**Air**
7:21 8:4 48:5

**airline**
16:1

**Akhtar**
16:20 45:14

**A-k-h-t-a-r**
16:20

**Albert**
7:18

**ALFRED**
1:7 4:5 13:5
69:7

**alive**
88:12 93:10

**alleged**
102:11

**allegedly**
73:2

**along**
42:23,24 98:7

**already**
48:10

**ALSO**
3:1 9:7 11:11
20:11 33:12
34:16 43:8
46:4 57:10
68:20 71:11,
18 73:10
75:23 85:1
95:8 99:19

**altered**
28:14 77:22

**AMERICA**
1:4 4:5

**American**
11:8,11

**amount**
99:21

**analysis**
14:5

**anatomic**

7:14

**and/or**
17:15 70:19
98:3

**anecdotal**
64:10

**Ann**
7:10

**ANNE**
1:15 3:22
4:12 104:4

**another**
21:12 27:12
60:1 63:13,14
69:2 71:20
72:16 81:10
84:6 94:12

**answer**
41:9 42:3
49:4 53:6
61:23,24
63:20 71:7,23
74:23 95:5
97:17

**answered**
89:18

**answers**
43:9

**antedate**
93:13

**antedates**
49:24 50:8

**anybody**
61:23 98:7

**anymore**
12:23 28:12
84:7 97:5
98:4

**anywhere**
32:24 40:10

**apart**
68:11

**Apparently**
39:7 55:20
79:22

**appeal**
16:14

**appear**
98:8

**appeared**
2:9,22 66:21

**appears**
39:12 41:17
78:19 82:15

**append**
18:5 99:1

**appended**
14:4 17:19

**apply**
68:5

**appropriate**
64:11 65:21
96:17

**approximated**
21:10

**approximately**
36:23 47:23

**April**
16:21

**arachnoid**
21:13,21,22

**arbitrarily**
23:16

**arbitrary**
22:5,21 23:17

**Arbor**
7:10

**area**
63:10 68:15
80:20 102:7

**areas**

33:24 65:12

**argue**
63:22 65:16
97:7

**argument**
62:20 63:9

**Armed**
7:22

**Army**
7:23

**around**
52:9 68:14
75:9 79:4
85:4

**arrival**
51:6

**arrived**
47:16,17

**arterial**
27:7 46:9

**artifact**
14:15

**artificial**
97:11

**aside**
99:11

**asked**
13:4,8,10
25:4 46:1
50:2 53:19
54:11 60:22,
23,24 61:8
81:6 86:14
89:11,19
90:3,6 92:6,
9,12 95:8
96:2,20 97:19

**asking**
36:10 54:16
63:4 82:15
85:23 87:3
93:8

**asks**
71:19

**aspect**
60:1 61:5
66:2

**aspects**
32:7 62:5,10

**assault**
75:1 96:8,10,
13 101:22
102:1

**assaulted**
68:2 75:6

**assess**
49:19 101:10

**assessment**
68:4

**assign**
33:8

**assigned**
7:22,24

**assistance**
67:23

**assistant**
8:15 9:23

**associate**
9:1,4,13

**Association**
11:9,15 58:22
68:21 102:9

**assuming**
74:13 93:21
94:2

**attached**
32:21

**attend**
83:3

**attendant**
27:19

**attended**
7:8 9:8

**attest**
15:2

**Attorney**
17:9 55:1
104:20,21

**ATTORNEY'S**
2:2

**author**
60:9

**authoritative**
70:4

**authors**
10:24

**autopsies**
52:24 53:2,9,
11 60:10,17

**Autopsy**
16:23 17:3,7
18:9 25:21
31:17 61:22
65:6,9 70:2
73:8 77:21
81:9 88:9
92:18,20,24
93:4,6,9,13
96:21 97:16
98:22 100:13,
14 101:1

**available**
17:21 32:4
55:21

**aware**
41:24 43:3
69:3,6,12
72:22 73:1
87:10 96:21

___

**B**

___

**B**
106:9

**back**
8:22 25:7

Jan Leestma

26:22 28:4 30:16 37:4 46:1 51:22 68:14,18 76:11 81:13 85:7 87:24 95:20 96:6 100:13 101:15

**background**
7:3,4

**backup**
46:11

**backward**
72:7

**backwards**
75:18

**base**
47:16 48:22 49:16 50:6,16 51:6 73:2 75:9 79:11 81:8 88:6 93:12,23

**based**
37:16 41:2 50:11 69:19 91:12

**bases**
40:13

**basically**
13:10 21:4 27:24 72:22 84:10 89:3 97:2,8

**basis**
9:21 28:3 40:13 52:20 86:20

**beaten**
88:19

**Beckett**
16:20

**B-e-c-k-e-t-t**
16:20

**becoming**
67:21 79:15

**bed**
28:1

**began**
30:11,21

**beginning**
39:22 51:23 76:13 88:16

**behalf**
2:10,22 4:18, 19

**being**
4:6,9 8:3 21:5 27:24 41:24 55:21 59:12 68:13 81:7 89:19 93:24

**belief**
81:15

**believe**
25:24 30:15 45:6 46:15 63:13 73:5,6 82:1,6

**beneath**
19:21 21:11, 24

**Benton**
16:17 85:13, 16,24 86:18 87:10 96:7 101:16

**Benton's**
85:8 86:1,21 96:3,4

**beside**
30:13

**best**
34:24 57:10

**better**
50:21 82:12 94:9,12,13 100:22

**between**
21:16,19 52:19 83:12 94:23

**beyond**
86:13 94:20

**big**
64:18

**biology**
7:8

**bit**
8:11 26:1 34:15 95:10 102:6

**bits**
69:23

**black**
43:20 44:11

**bleed**
49:10

**bleeding**
27:1 45:10, 11,14,18 46:16,17,24 51:10 66:12, 20 68:17 84:10,11 96:15

**block**
33:7

**blood**
19:21,23 21:2,15,23 26:21 27:7, 10,14,17 28:14 29:10

31:21 32:11, 12,13,15,23 33:1,17,19 34:5 37:5,8, 10 41:16,20, 21 46:8,12 48:11,12,14, 21 49:2 50:23 82:23 83:17, 20 84:13,24 85:2 94:18 96:16 97:4

**blow**
74:8,17

**blunt**
19:18

**board**
12:2 59:3 102:17

**body**
24:17 27:8 37:6 97:14

**bono**
100:10

**book**
10:17,20,22 11:1 60:8,11

**Booth**
16:16

**both**
10:7,10 15:10 16:6 33:13 38:20 43:16 51:9 53:19 54:20 55:3 84:12 88:23

**bottom**
64:12 82:19

**BOURGEOIS**
1:7 4:5,18, 20,22 13:6 16:15 47:15 69:8 73:11

**Bourgeois's**
92:5

**Brain**
17:7 18:9 19:22,23 21:3,8 24:5,6 26:9,21 27:1, 9,18,23 28:2, 12,14 29:10 31:22,23 41:14 43:15, 17,21,23 44:12,15,16 80:21 82:5 97:9 98:21 100:19 101:2

**branch**
8:1,2

**break**
51:14 94:17

**breathe**
28:11

**breathing**
67:22 68:11

**brief**
7:2 52:18

**briefly**
24:9 50:18 95:6

**bring**
37:7

**Bronx**
7:19

**brought**
81:7 102:10

**bruisability**
96:16

**bruises**
63:15

**bruising**
51:7

**Building**

Jan Leestma

2:14

**bunch**
31:3

**Burgess**
16:17

**business**
50:1,3,9
60:14 82:19

**C**

**C**
104:3

**cab**
69:11 75:12
88:22

**call**
18:14 21:20
29:16 90:19

**called**
1:11 5:12
10:17,22
21:7,13 22:1,
15 37:11
47:20 53:23

**calls**
71:11

**came**
8:14,22 30:2
48:15 50:23
55:2

**Canada**
12:7

**cannot**
16:3 46:24
48:12,20 49:8
66:23 74:2,4
76:11,15,19
77:11 94:11

**cap**
100:7

**capable**
45:5

**capacity**
10:5 13:13

**capillaries**
95:18

**capillary**
28:1

**Capital**
2:13

**captain**
7:21

**car**
46:20 47:2

**card**
21:9

**care**
42:15

**career**
8:6 52:23

**careful**
70:5

**Case**
4:7 13:5,9,
11,14 14:5,6
16:13 22:2
23:20 25:10
31:1,17 32:3
39:22 43:24
45:18 46:18
47:15 49:15
55:2,7,18,23
56:2,9 57:4,
22 58:19
60:23 61:2,5,
8,17,21 62:6,
7 63:6 65:1
70:18 74:1
77:6,12,18
85:6 88:19
89:12 91:9
92:1,4 93:4,
18 94:4,8
98:6 99:22
100:3,10

101:6 102:17

**cases**
10:6,9 53:17,
21 54:2,4,6
55:14 56:7,
12,14,21
57:2,12,13,
19,24 58:6,9,
11,15,17,23
61:11 62:17
67:18 90:6,21
91:2,3,5,12,
13,17 99:20
102:15

**catch**
86:11

**catheter**
85:5

**catheters**
85:2

**cause**
19:7,8,19
23:20,23 24:1
25:8 28:6,14
30:18 44:22
45:3,17 46:24
49:14 64:7
68:6 69:22
70:23 76:14
81:15 82:3,4
83:8 86:16,
17,19,21,23
94:4,7

**caused**
24:8 25:9
34:5 38:6
39:14 62:10
66:7,24
75:14,20

**causes**
26:6 46:11
62:12 81:19,
20

**causing**
24:3

**cavity**
46:6

**ceased**
52:17

**ceases**
97:3,10

**cell**
32:14 50:23

**cells**
32:13,24
33:19,21
37:7,8 41:21
94:19 95:18

**cellular**
32:17 37:13
97:12

**Center**
7:13,23 17:4

**centimeters**
63:10

**cerebellar**
36:21

**cerebral**
26:10 27:1,20
36:19 37:22
38:8 43:19
44:2,13,14
47:3 51:5
95:15

**certain**
5:23 13:23
15:14 35:12
38:15 42:1
83:6 90:11

**certainly**
28:9 33:23
45:5 47:1
63:9 68:7
82:6

**Certificate**

105:10

**Certified**
1:17 104:6

**certify**
104:7

**chance**
56:23 101:3

**change**
18:6 83:23
94:3,6,10,19
98:1,9 101:8,
9,14

**changed**
42:12 60:17
61:23 70:2
77:23

**changes**
14:16 62:13
94:21 96:23

**channel**
26:18

**character**
33:23

**characterist
ics**
23:4

**checking**
52:14

**chemical**
37:6

**chemistry**
7:8

**Chicago**
1:19 4:10
8:14,22 9:3,
12 11:15
52:15 58:23
102:9 105:1

**chief**
8:16,24

**child**

17:6 19:12,13
24:1 28:11
31:1,2 43:15
45:8,11,22
50:5,14,24
51:4,6 55:2
57:24 59:12,
15,19,20,22
60:5 66:21
67:17,19
68:10 69:8,
10,15 73:16
74:8,10,17
75:8,12,19
79:13,18,20,
21,24 80:3,9
81:7,10 83:7,
8,15 84:3,5,
16,17,20
85:17,18
86:3,10,12
87:11,15,16
88:4,19,21
92:15 93:9,24
96:10 97:20
98:4,6 101:13
102:4,6

**children**
11:22,24
58:24 84:20
102:10,13

**Children's**
8:23 39:2,6
52:19 53:8

**child's**
50:7 68:14
69:9 73:12
75:2,3,6,11
78:20 79:9
82:4 84:18

**chose**
100:8

**Christi**
48:5

**chronic**
22:7 23:8
48:9 49:10
51:9 65:22
66:3 68:21
81:1 88:7,23
101:11

**Chrz**
16:19,23

**C-h-r-z**
16:19,23

**circulation**
24:5 26:22
28:13

**circulatory**
29:8

**circumstance**
27:17

**circumstance
s**
74:17,20
100:9

**Civil**
1:13 56:13,22
57:22

**clarifies**
43:5

**clarify**
20:11 34:8
77:17 83:24

**clarity**
90:22

**clear**
21:6,18 42:5,
10

**clearly**
51:5 98:21

**Clinical**
10:23 83:20
97:9

**clinically**

30:23 45:15
84:23

**close**
11:10

**Closed**
65:12

**closer**
58:7 100:20

**closing**
52:12

**clot**
31:21 32:11,
12,14,15,18,
19 33:1,18
34:13 37:10
41:20 50:23
82:19,23
95:12

**clots**
96:16

**clotting**
26:10,23
84:11,13

**coagulation**
83:2,18 87:17

**coagulopathi
c**
84:22

**coagulopathy**
82:17 83:19
84:6,11

**collapse**
50:4

**collected**
60:14

**collecting**
19:23 21:2,16

**collection**
19:21

**collective**
63:18

**college**
7:6,7,18

**colloquially**
43:17

**color**
43:20

**Colorado**
7:12,16

**comatose**
24:3 84:21

**come**
18:11 55:14
64:14 75:24
77:13,14
81:12 85:2
102:15

**comes**
27:15,23
37:16 61:17
64:18,19
75:17 83:17

**coming**
26:19 46:8
52:22 95:20

**commencement**
104:8

**comments**
30:12

**commission**
105:7

**common**
26:15 62:16
91:15

**COMMUNITY**
2:12

**company**
65:15

**compare**
14:19 15:6

**compartment**
37:5

**compartmenta
lized**
27:24

**compensate**
98:2,4

**complete**
18:19 70:13
72:2

**completed**
7:19 18:15,22
98:15

**completely**
41:16 43:21
70:4,12 98:7

**completion**
17:10

**complication
s**
27:19

**component**
25:13 28:16
33:3 43:2
48:9 49:19
50:20 51:4
66:23 68:21

**components**
23:3 48:8
51:9

**compound**
48:15

**computer**
38:21

**concentrated**
10:4

**concerning**
104:10

**conclude**
50:14

**conclusion**
19:16 40:13
75:13

Jan Leestma

conclusions
82:16 93:18
99:2
condition
78:20 79:9
conditions
19:12
conducting
64:3 77:8
confer
87:20
conference
102:16
confining
77:20
confirm
99:8
conflict
55:21
confronted
80:11
confused
72:18 93:11
95:9
consequence
45:21 46:7
76:1
consequences
24:3
consider
26:9 60:11
73:18
considerable
58:17
considered
72:15
considering
67:4
consistent
6:19,22 36:4,
5 48:3

constituents
37:13
constitutes
104:15
consult
13:4
consultant
5:19 8:10
9:23 56:4
consultation
100:15
consulted
91:13
consulting
9:24 10:4
35:21 56:12
contact
52:15
contain
41:21
contained
38:21 86:6
contains
32:12 33:10,
11
contemporane
ous
30:12
contemporane
ously
5:6
content
87:13 91:24
context
96:17
continue
74:11
Continued
8:17
contradicts

87:2
contributed
66:24
contributing
10:24
contribution
10:22
contusion
37:22 38:5
conviction
83:14
convolutions
44:11
Cook
1:16 9:21
104:5 105:5
copy
6:11,12
14:19,24 15:8
17:8 30:9
35:23 39:17
42:18 92:23
99:12
Corps
7:21 8:4
Corpus
48:5
correct
5:7,8 10:11
11:16 17:16
19:3 21:23
29:5,14 33:15
35:11 38:12
52:11 55:9
56:18 57:5,9
62:11 66:9
70:13 72:2
74:14 76:17
80:13 81:17,
23 85:20
88:13,17 90:9
92:7 93:14
103:6

correctly
61:9
correlate
68:23
corresponding
95:14
cortex
95:15
couch
42:3
couldn't
28:11 50:22
Counsel
4:14 87:20
89:20 91:23
104:20,21
count
12:6 78:1
County
1:16 9:21
104:3,5 105:5
couple
18:12 39:13
47:11 49:7
50:22 52:13
55:13 63:10
76:8 81:3,9
97:15 101:2
course
9:7 31:23
59:21 66:13,
15 88:20
96:12,16
COURT
1:1 4:6,12
12:6 59:7,8
Courts
1:13 11:24
covered
89:14

covering
19:22
cranial
43:21 46:5
cranium
62:9 82:5
cranking
98:7
crash
47:2
Cr-C-02-216
1:5 4:7
create
72:8
created
90:20
credibility
71:17 92:6,10
criminal
56:13,21
57:6,14,24
critical
49:4
C R O S S -
EXAMINATION
52:4
CSR
1:17 3:22
104:6 105:10
CT
17:6 18:11
31:11 38:21
39:5,24 40:8,
22 42:22
44:20,23 45:4
culminate
56:8
culminated
91:10
curious
58:21 59:9

Jan Leestma

60:1

**current**
6:9 60:19

**currently**
5:17 10:9
55:12

**curriculum**
6:9

**Curtis**
2:14

**cut**
100:16,19,23
101:2

**CV**
11:14 52:7,15
53:16 54:12,
14 58:21

**Cv-07-223**
1:6 4:8

**D**

**danger**
59:21 60:6

**dangerous**
83:16

**dashboard**
73:15

**date**
14:16 16:5
18:21,22
30:20 32:2,5
35:21 38:23
49:2 89:21
93:3 99:14
100:16,20

**dated**
6:20 14:6,8
31:21 48:10,
13

**dates**
15:3 52:14
72:24

**dating**
31:7,13,20
50:19 61:4
89:12,24

**day**
1:19 47:21
60:3 81:8
88:9,10,12
96:21 105:1

**days**
19:11 22:19,
22 23:1,6
25:3 32:19,24
33:2,20 34:1
35:4 48:10,
13,19 49:8
50:1,9,22
51:1 66:22
74:21 75:7
80:22 81:3,9
89:17 97:16,
22 101:2

**days'**
36:23 37:23

**day-to-day**
102:15

**DC**
7:24

**dead**
24:6

**deal**
77:20

**dealing**
28:7

**dean**
9:5

**Death**
10:22 19:7,8,
11,19 23:21,
24 24:1 25:9
27:18 33:1,20
34:1 48:14
49:14 50:7

61:14 62:16
64:8 66:24
68:6 69:22
70:23 75:14
81:15 83:8
86:16,17,19,
21,23 87:14
93:15 94:4,7
97:6,8,12
100:20

**decedent**
13:12

**December**
17:20,24
98:15,19,20
99:13

**decide**
100:8

**decompensate
d**
28:11 67:10,
13 79:10

**decompensate
s**
67:18

**decompensati
ng**
67:21 79:15

**decompensati
on**
29:6 50:5
87:14

**decompositio
n**
67:9

**decreased**
58:9

**defendant**
56:23 61:12,
15 69:7 80:4

**Defendant's**

5:24 13:24
15:12,15,21
16:7 17:15
18:14,15
35:13 38:12,
13,16 90:12
106:11

**DEFENDER**
2:12 98:17

**Defense**
6:5 10:7,10
13:21 35:18
53:20 54:20
56:17,21
57:3,7,12,
15,21 58:1
89:20 90:8,17
91:18,21 92:5
99:12

**define**
23:16 74:16

**defines**
23:16

**definitions**
22:20

**degenerate**
32:14

**degree**
7:11 9:10

**dehydration**
83:18

**delay**
81:11 97:15

**delineate**
10:15

**delta**
41:19

**demonstrable**
84:5

**density**
41:16 43:1,20

**Denver**

7:13

**Department**
11:24

**depending**
25:4

**depicted**
44:9

**DEPONENT**
103:12

**deposition**
1:11 3:3 4:4,
9 5:24 13:24
15:15 35:13
38:16 90:12
104:12,17
106:11

**depositions**
1:14

**describe**
24:9 25:18
43:13 44:7
45:23 50:18
65:22 95:24

**described**
21:24 29:13
34:19 38:2
45:14,15
49:17 93:21
94:1,2 96:12

**descriptions**
99:6

**descriptive**
12:15

**designation**
22:21 23:18

**designations**
22:6

**desired**
31:14

**destroyed**
24:5

**detailed**

Jan Leestma                                          January 10, 2011

114

84:15

**details**
62:7

**detected**
87:18

**deteriorated**
32:15 78:20
79:9

**determinatio
n**
68:4,6 69:21
70:21,22

**determinatio
ns**
73:20

**determine**
13:11 23:20,
23 60:24 77:1
86:15

**determined**
25:8 76:11,
15,19

**develop**
22:13

**developed**
22:12

**device**
24:13

**diagnosis**
22:21 36:17

**diameter**
63:11

**didn't**
14:17 33:7,8
53:16 58:11
74:3 88:7
98:21 101:3

**died**
47:23 50:14
62:2 66:21
96:22 101:13

**Diego**
55:1

**dies**
27:11 62:8
88:9 97:9

**difference**
16:4 18:6
22:9 93:17

**different**
15:3 22:3,16,
20 23:2,4
28:3,16 30:22
38:5 52:8,14
61:15 80:8
95:9 100:21

**difficult**
63:16,23 66:6
72:9 88:18,24

**difficulty**
41:24

**dire**
12:20,22 13:1

**DIRECT**
5:14 11:20
16:14 59:5,10
60:21

**direction**
104:14

**directly**
47:5 59:2
104:22

**director**
9:14

**directors**
12:2 59:3

**disadvantage**
64:3,7

**disagree**
35:5,8

**disagreement**
99:10

**discharged**
8:3

**disciplines**
22:19

**disclaimer**
18:3

**disclosed**
55:15

**disclosures**
54:3,8 90:24

**discounted**
81:22

**discovered**
50:5

**discuss**
82:19

**discussed**
48:10,16

**discussion**
34:9

**disk**
17:6 38:21
39:14

**disorder**
83:1,17
84:10,12
96:15

**disparity**
64:17

**displayed**
31:2

**dissimilar**
61:18

**dissolve**
37:10

**DISTRICT**
1:1,2,13 4:6,
7 55:1

**disturbed**
12:1

**division**
9:5

**doctor**
7:10 16:11
20:23 28:20
40:20 41:8
42:6 43:8
45:16 47:12
50:11 68:9
70:8 71:19
84:16 85:13,
16,22 86:11,
14,24 93:3
98:13

**document**
5:23 6:6,8
13:22,23
15:3,5,14,
20,22 35:12,
19 54:24
90:11,18,23
91:3

**documents**
16:6 38:14,15
58:16 73:8

**doesn't**
27:9 41:20
44:4 60:17
87:13 94:10
101:8,9

**doing**
5:21 7:14
60:16,18
77:11 84:23

**doubt**
79:3 94:14

**DOWD**
2:8 5:1 78:15
82:11

**down**
13:17 19:14
20:4,12 22:11
30:9 37:21

72:13 76:10
77:24 78:1,11
94:17 97:13

**downstream**
32:21

**Dr**
4:4 5:16 7:2
12:17 13:4
15:8,19
16:17,18,19,
20,23,24
17:1,3,9
19:2,15 20:1
24:23 33:13
35:6,9,21
36:5,15 39:21
45:14 46:14,
20 52:6 64:24
85:8,13,16,
24 86:1,18,
21,22 87:10
88:3 89:14
92:24 96:3,4,
7 99:5 101:16

**draft**
98:20 99:8

**draining**
26:21 27:14

**drank**
80:9,10

**drawing**
56:6

**drill**
24:11

**drink**
80:3,12

**drinking**
102:2

**Driscoll**
39:2,5

**driving**
44:18

Jan Leestma                                    January 10, 2011
                                                            115

**drunk**
79:22
**due**
26:9 38:7,8
68:24 69:1
98:8
**duly**
5:2,12 104:9
**dura**
19:24 21:3,5,
7,13,19 22:1
26:19 32:11
33:10 37:7
**dural**
19:22
**duration**
22:8 23:14
36:23 37:23
95:21
**during**
5:6 48:16
52:23 53:7
96:12
**dying**
74:19 81:7,8
97:22
**dynamic**
62:14

——— **E** ———

**E**
1:11,15 3:22
5:11 104:4
106:3,9
**Each**
22:19 34:15
99:22
**ear**
63:13 68:15,
19
**earlier**
24:23 53:17
54:19 67:9

81:5 92:22
93:7 98:16
100:20,23
**early**
9:17,22 88:15
**earned**
56:9,11
**easily**
74:23
**ebb**
102:19
**edema**
27:1,20,21,
22 29:12
36:20 47:3
83:3
**edition**
10:20
**editor**
11:1
**editors**
10:24
**education**
7:12
**educational**
7:4
**Edward**
4:4
**effect**
45:7
**effects**
62:15
**eight**
6:18 11:13
**Einstein**
7:18
**Either**
12:24 24:15
98:5 103:4,6
**elements**
32:15,16

**ELIZABETH**
2:20 4:19
19:2
**ELSEY**
3:2 4:11
**e-mail**
14:23
**embarrassmen
t**
29:9
**emergency**
68:9
**employed**
5:17,18
**employee**
104:19,20
**empty**
41:19
**EMT**
16:17
**end**
28:15 51:20
60:3 76:10
92:2 103:11
**ended**
52:21
**ends**
88:8
**engaged**
55:13
**engagement**
52:21
**enough**
29:9 44:22
45:2 98:3
**entered**
7:20
**entire**
82:14 91:9
**environment**

46:5
**epidural**
22:1
**Epilepsy**
10:23
**equivalent**
9:9 24:16
**equivocated**
84:8
**equivocating**
83:22
**erroneous**
30:1
**error**
30:4,5 72:10,
17 93:10,19
**Esquire**
3:3
**essential**
69:21
**essentially**
9:16 10:2
18:1,2 19:17
24:6 37:7
74:18 98:1
**establish**
61:14
**estimate**
25:20 35:2,6,
9 66:10
**estimated**
25:15,22
**estimates**
19:10 24:23
25:1,2 37:15,
19 63:21
89:16
**estimation**
32:8 34:24
**evaluated**
64:20 69:24

**evaluating**
70:23
**evaluation**
87:11
**event**
63:18 69:1
**events**
31:24 73:3
93:11
**eventually**
11:2 37:10
67:19
**evidence**
47:14,17
50:13 58:19
61:21 63:5,6
64:10,11,19
67:5,7,8 68:8
70:1,9,11,18
72:8 73:19
74:24 75:5
77:6,9,18,
19,21 79:6
80:11 87:2
**evident**
98:5
**exact**
15:2,6 19:17
**exactly**
14:13 63:3
77:9 89:2
**exam**
101:18,20
102:1,4
**examination**
1:12 5:14
25:23 42:22
60:22 64:4
68:20 77:7
84:15,17
85:17 86:3,
10,12 87:1
89:8 96:9,13

Jan Leestma                                              January 10, 2011

                                                                    116

101:22 104:9
106:1,2

**examinations**
102:12

**examined**
5:13 31:18
102:5

**examiner**
9:24 68:5
70:19 71:9,15
89:1

**examiners**
64:2

**Examiner's**
9:21

**example**
31:19

**exams**
101:20,21

**exceeding**
98:9

**excess**
31:3

**excluding**
67:2 77:18

**Exhibit**
6:1,5 13:21
14:1 15:13,
16,21 16:7
17:15 18:15
35:14,18
38:12,13
41:12 90:13,
17 92:19
106:11,12,
13,14,15,16,
17,18

**Exhibits**
38:17 39:15

**existed**
83:7 84:3

**existence**

22:23 23:14

**existing**
49:9

**exists**
21:19 84:4

**expect**
84:14,17
87:15 88:10
96:10,18
101:4

**experience**
60:15 102:8

**expert**
12:4,17 56:7

**expertise**
69:20

**expires**
105:7

**explain**
14:13 22:9
41:8,9 45:23
48:7 50:2

**explaining**
20:23

**explanation**
45:6 58:12

**extensive**
37:14 88:13
102:4

**extent**
89:24

**external**
61:20

**externally**
85:4

**eye**
46:8,9

**eyewitness**
67:3,4

————————
——— **F** ———
————————

**facing**

69:9,10

**fact**
40:3 42:12
43:16 44:6
53:18 60:16
66:2 81:6
84:19 86:9
88:11 91:15
101:1

**factor**
71:15,16

**factors**
83:19

**facts**
58:18 72:1
73:7 74:2
77:13 93:21

**faculty**
8:15

**fair**
57:17 58:20
66:10 89:4

**fall**
77:2

**falx**
42:24

**families**
11:21 12:2
59:1,6

**family**
11:23 12:1
47:16 59:10,
12,16,24 73:2

**far**
18:19 29:1
71:16 98:7,9

**fashion**
80:1

**fatal**
74:8,16,21

**father's**
78:21

**Federal**
1:12 2:12
90:21

**feel**
59:20 60:6

**feels**
91:23

**fell**
22:11 68:11

**fellow**
11:11

**fibrin**
32:16

**f-i-b-r-i-n**
32:16

**field**
8:10 10:12
12:5,10,11,
17 23:10

**figure**
64:7 86:1
92:14

**file**
18:19 21:9

**filled**
41:15

**fills**
43:21

**final**
14:4 64:18

**find**
42:16,17
78:10 87:1

**finding**
41:11 83:23

**findings**
14:5 31:5
36:3

**fine**
78:6

**finish**

58:4 71:12
87:6,7

**finished**
42:7,9

**firm**
83:14

**first**
5:12 7:13,24
17:17 19:9
30:23 32:9
46:23 50:19
65:11 66:19
72:12,14 85:8
98:13,20

**five**
5:21 22:22
23:1 24:15
29:22 30:2
50:23

**five-minute**
51:14

**fix**
101:3

**flexible**
21:10

**flow**
27:17 102:19

**fluid**
43:19 44:2,13

**fluid-filled**
44:16

**fly**
56:1

**focus**
59:5,19

**FOGARTY**
1:15 3:22
4:13 104:4

**follow**
57:20

**followed**
7:15

Jan Leestma                                                    January 10, 2011
                                                                           117

**follows**
5:13

**food**
21:15

**Force**
7:21 8:4
19:18

**forced**
80:3,12

**Forces**
7:22 46:23
47:5

**foregoing**
104:12

**foremost**
59:15

**forensic**
5:19 8:10
10:6,13,18,
23 11:7,12
12:11 16:22
61:5 64:12

**forget**
24:22

**forgot**
12:22

**formaldehyde**
101:4

**formula**
94:17

**forth**
51:7 73:9
93:12

**forward**
14:18

**found**
70:1 84:15
99:6 100:22

**four**
5:21 22:22
69:11 75:12

88:22

**fragments**
33:10

**frame**
49:3,4 92:16
95:20

**frames**
19:15

**Francis**
10:19

**fresh**
48:11

**Friday**
99:15

**friend**
59:7

**front**
20:15 26:19
39:18 44:5
54:24 70:11
72:4 92:18

**full**
9:3 26:20
42:20 52:21
66:19 72:14
85:16 86:2
87:10

**full-time**
5:20

**function**
74:11 97:10

**functioning**
59:17

**further**
13:19 37:21
44:1 103:3,6,
12

**Furthermore**
43:23

___ G ___

**gave**

24:23 25:2
76:21 81:18
91:5 101:18,
19

**general**
7:15 62:8
84:12 89:15

**generally**
27:7 46:23
53:11 58:23
62:1

**genital**
102:6

**genitourinary**
8:1

**getting**
25:7 28:4
62:7 101:9

**giant**
47:2

**give**
31:9,12,15
32:1 36:11
40:6 42:17
56:1 77:12

**given**
32:3 61:20
70:18 75:5
98:16 99:14
104:15

**gives**
32:23

**giving**
86:10,11 87:1

**globally**
63:20

**go**
13:19 23:17
26:5 30:16
31:16 40:17
42:19 58:4

59:18 68:3
71:12 76:6
81:13 87:21
100:12

**goal**
11:22 59:11,
15 60:4

**goes**
71:18 75:12
86:13 92:2
101:15

**going**
4:2 7:2 15:24
23:3 31:8,12
40:2,8,16
41:4 45:7
47:3 51:19,22
55:17 59:21
60:7 64:17
65:20 70:14
71:7,15 72:7
74:9 75:4,8
76:12 78:4
85:7 86:13
87:9,14,22
90:2,3 99:11
100:9 103:10

**gone**
43:21 44:14
84:1,2 97:4

**Good**
4:1,17 5:16
33:3 52:22
68:16

**gotten**
18:4

**government**
53:20 54:2,3,
20,21 89:11,
20 90:6 93:22
94:1 95:8
96:2,20 97:19
100:7

**government's**
86:18

**grabbed**
69:8

**Graduate**
9:8

**graduated**
7:6

**graduating**
7:10

**gravity**
23:11

**gray**
41:17

**great**
59:18

**greater**
46:6

**group**
52:16

**guess**
34:14 43:8
55:20 88:18
91:11 98:14

**guessing**
54:23

**guest**
8:21

**Gunter**
13:12 17:5,6
39:8,10 50:14

**G-u-n-t-e-r**
17:6

___ H ___

**H**
106:9

**Habeas**
2:13

**Hall**
17:4

Jan Leestma                                      January 10, 2011
                                                             118

Hallet
17:1 36:5

H-a-l-l-e-t
17:1

Hallet's
35:6,9 36:15
99:5

hand
105:1

handwritten
17:8

happen
61:19 62:5
74:3 94:2

happened
13:12 48:18
60:24 61:1
64:5 70:6,7
88:6 92:15
93:22

hasn't
60:17,18

hasten
23:15 28:10
82:18

haven't
18:4 55:15
60:9,18 79:1
99:8

Hawaii
55:18

head
19:18 31:13
49:15 62:17,
18 63:7 64:16
65:12 68:14,
24 69:9 73:12
75:2,3,6,11
88:5

head-to-toe
101:19,20

heal

37:10

healing
23:3 33:22
34:6,10,20
35:3 65:20
88:11,13,15
95:17 96:23

healing-type
88:16

heard
4:6

hearing
16:21

heart
27:9 50:24
97:10

heartbeat
97:3

held
4:9

help
12:1 31:13
79:17

helpful
39:20 91:21

hematoma
19:19,20
20:24 21:2,19
22:1,13,17
23:8,11,12
25:12,16,22
26:3 29:4
31:20 33:13
34:16,21 35:3
36:4,22 37:15
40:14 43:10
44:19,21
48:3,9,15
49:10 65:18,
23 68:16 74:9
76:22 81:21
97:21,24 99:7

hematomas

22:4,7

hematoma's
76:14

hemispheres
44:14

hemophilia
87:16

hemorrhage
31:21 65:13
75:23

hemorrhages
47:4

hemorrhagic
36:20

her
19:6,16 24:3
25:5 28:11
35:10 36:7
64:13 65:5,6,
8 69:8,9
79:23 80:9,10
89:15,18,19,
23

hereby
104:7

herein
5:12 104:11

hereto
104:22

hereunto
104:24

highlight
7:4

histological
ly
75:22

historical
64:21 72:1
75:16

historically
57:18

history
61:20

hit
64:15 66:1
93:24

hold
11:5

hole
24:11

Holland
7:7

homicide
55:14

Honolulu
56:1

Honor
80:6

honorably
8:3

Hope
7:7

Hospital
8:23 9:16
10:3 39:3,6
52:18,19 53:8
75:8 88:8

hospitalizat
ion
50:6

hospitalized
45:8

hospitals
52:13

hospital-
type
52:11

hour
19:14 25:5
75:11 99:21,
24 100:4

hours
22:14 25:3
38:23 47:23
49:3 50:7
74:21 97:13

Houston
2:4

hungry
79:23

hypothetical
74:13,15
88:21

I

ID
106:10

idea
81:24

ideal
31:1 102:17

identificati
on
6:1 14:1
15:16 35:14
38:18 90:13

identified
17:15 28:5
29:1 30:18
49:23 65:14
84:18,19

identify
13:22 38:13
49:14 64:23
65:8 96:11

ill
79:13,18,21
80:1

ill-advised
102:2

Illinois
1:16,19 4:10
104:1,6

Jan Leestma                                                    January 10, 2011
                                                                          119

105:1,6

**image**
30:10 41:14

**images**
30:1,13 39:13

**imagine**
102:1

**immediate**
67:23

**immediately**
66:21 68:3
69:16 74:19

**immortalized**
74:1

**impact**
46:19 63:10,
14,22 64:16
65:14,16
68:18,22
75:2,7,13,24
78:2,8,13
94:22

**impacted**
75:6

**impacts**
63:8,19 76:2

**impeding**
46:7

**importance**
61:2,6

**important**
16:2 28:9
31:6 61:5,7
66:1 69:24

**imprecision**
50:21

**impressive**
82:7

**improved**
49:8

**incident**

48:11 63:18
72:21 78:21
79:10 80:1

**incidents**
75:4

**incites**
37:6

**inciting**
32:22

**included**
40:7 54:10,12

**including**
81:1

**income**
56:5,9,10,11

**incomplete**
91:8

**incorrect**
65:9

**increase**
25:14

**increased**
24:2,8 25:9
44:1,17 45:21
81:16

**increments**
94:17

**Independence**
2:15

**independent**
86:6

**independentl**
**y**
74:4

**indeterminat**
**e**
42:3

**indicate**
33:21 41:18

**indicated**

8:7 19:1,15
29:23 44:20
52:9 79:8

**indicates**
44:1 93:8

**indicating**
63:11

**indication**
79:7

**indicative**
83:1

**indirectly**
104:22

**individual**
61:6 62:6
64:5,15 68:2

**individuals**
94:24

**infarct**
27:13 95:7

**infarction**
27:18 83:2
86:24

**infarctions**
26:24 27:5
38:8 82:1,9,
11,16

**infarctive**
95:16

**infarcts**
27:6 37:22
38:1,5

**inflammatory**
94:21 95:18

**inflicted**
19:17 48:4
50:15 76:15,
19 77:1,14

**information**
17:21 30:24
31:6,9,15
32:1,4 34:19

39:12 54:11
69:23 79:8,
12,13,16,18
84:7 91:21
99:1 100:2

**injured**
27:10 67:14
88:8

**injuries**
26:9 62:18
63:7 66:3,8
68:13 75:18
81:2 85:17
86:16 88:5,6
89:21,24
95:22

**injury**
22:14 25:1
31:23 48:3,22
49:11,15
50:15 65:12
66:7 69:4
74:18,20
75:14 77:1
88:14 89:2,12
94:18 97:20

**inside**
31:12 46:5
68:24 69:11
75:12

**Institute**
7:22 8:20
9:12 52:16

**interested**
104:22

**interesting**
69:24

**interfered**
27:8

**interim**
98:23

**interpretive**
72:10

**interval**
25:6

**intracranial**
24:2,8,9,10,
21 25:7,10,14
26:7 28:6,24
29:12 30:19
44:1,18 45:22
46:2 47:3
49:13 62:13,
15 81:16
95:24

**introduce**
4:14

**involved**
10:9 51:4
53:9 57:14
58:1 61:18
102:11,14

**involvements**
59:4

**irrelevant**
71:5,9

**irritability**
31:2

**irritable**
67:20

**issue**
51:9 58:5
61:19 62:2
99:18

**Issues**
10:23 19:10
58:1

**IV**
85:5

———————
J
———————

**J.L**
9:8

**Jack**
16:22 36:11

Jan Leestma                                                    January 10, 2011
                                                                           120

J-a-c-k
16:22

Jakarenn
13:12 17:5
39:8,10 50:14
62:2,19 63:7
88:5

JAN
1:11 4:4 5:11
106:3

January
1:19 4:11
14:6,8,10,
15,19,20 15:8
18:22 99:15
105:2

job
60:19

Johnson
55:8

joined
8:14 9:12

JOSEPH
3:2 4:11

JPA
11:19

Judge
16:21 36:10,
11 73:18
80:17

jugular
26:22

July
72:16,21
73:1,5 75:21
93:9,10,13,
16 100:17

June
38:22 47:18,
24 72:23
93:6,14

just

5:4 7:4 11:3
13:21 15:3,19
18:14 20:7,12
21:5,18 22:9
24:9 25:17
27:3 30:4,16,
24 34:18,19,
23 36:9 41:9
42:5,10,16,
17 44:4,6
47:8,11,12
48:16 50:18
51:13,17
52:14 53:24
54:11 58:3,11
59:9,23 60:1
62:7 67:4,6,
14 72:12
73:24 74:3
75:3 76:1,4
77:12,17,19,
24 79:1,4
83:24 85:2,22
87:9,19 88:4,
12 89:11
90:22 91:12
92:12 94:19
95:6 96:9
101:22 102:12

Juvenile
11:15 58:22
102:9

—————————
        K
—————————

K
104:3

Kagan
17:1

K-a-g-a-n
17:1

Kagan-Hallet
29:16 33:5,12
35:21

Karolinka

8:20

K-a-r-o-l-i-
n-s-k-a
8:20

keep
58:18 59:12
70:10 90:20

Kellogg
9:8

kills
74:10

kind
5:22 27:12
31:10 34:14
41:3 46:24
52:9 56:3
81:22 84:14
89:22

kinds
27:6 59:6
69:23 89:24
95:5

Kingdom
12:8

knew
18:20

knife
49:7

know
16:1 20:9
24:22 30:2
39:20 55:16
56:9 64:5
68:5 71:23
73:6 77:10
79:24 80:5
81:11 83:10,
21 85:5 86:3
92:19 93:14
94:16,24 95:2
101:6,16,23,
24 102:16,18

knowledge
49:6

knowledgeabl
e
86:8

known
9:9 11:19
41:19 66:23

knows
80:17 98:7

Kuffel
16:18

K-u-f-f-e-l
16:18

—————————
        L
—————————

labels
30:10

large
24:17 26:18
44:21 45:2
63:10 98:3

largely
83:18

LARIN
2:20 4:19

Last
6:20 7:17
18:12 42:21
52:15 55:11
70:24 75:1,2,
3,5 76:6,7
78:3 82:14
101:15

Lastly
50:11 97:19

late
54:24 55:4

later
31:5 47:24
50:8 55:17
74:20 88:9,10

99:1 100:22
101:2,5

Lathers
11:1

L-a-t-h-e-r-
s
11:1

lay
92:6

layer
33:20

lead
11:1 47:1

leading
50:6

leads
83:2

leaks
28:1

learned
70:4

least
22:13

leave
8:19

leaves
23:1

leaving
55:24

led
25:24 26:24
94:7 97:21

Leestma
4:4 5:11,16
7:2 12:17
13:4 15:8,19
20:1 39:21
52:6 86:22
88:3

LEESTMAN
1:11 106:3

Jan Leestma                                         January 10, 2011
                                                                  121

**left**
8:13

**length**
26:20

**lengths**
59:18

**lengthy**
99:20

**lesion**
84:4

**lesions**
32:2 80:21
95:15

**less**
5:20

**lethargic**
67:20

**lethargy**
31:3

**let's**
8:18 16:3
20:21 33:6
67:18 75:3
88:4,7 96:9

**level**
21:3 59:17

**life**
9:5

**likely**
44:17 46:16,
17,18 50:10
56:20 76:14

**limit**
72:6 100:7
102:12

**limitation**
100:5

**limits**
31:22 51:2

**limp**
68:3 69:16

73:16 75:13

**line**
17:17 64:12
76:10 78:15

**linked**
95:11

**list**
16:12 18:12
53:16 54:1,4,
5,14 56:14
57:11 72:14
99:19,20

**listed**
38:22 57:2,19
81:19 85:23
91:2

**listing**
73:24 91:8

**literature**
60:15

**little**
8:11 34:15
43:19 95:10
97:16 102:6,
20

**load**
28:12 58:18

**locally**
11:19 55:13

**log**
29:21

**long**
29:17 37:16
60:17 70:4
101:4

**longer**
19:11

**look**
13:10 20:18,
19 30:11
31:19 37:12
64:4,13 65:4,

10 72:3 85:11
92:17 93:5
102:2

**looked**
40:3,5 86:5
99:9

**looking**
20:3,12 31:22
41:20 44:7
56:3 57:1
61:21 66:17
67:4,6,13
75:15,17
77:10,19
95:12

**looks**
15:23 58:5
68:19

**lot**
30:24 58:15
65:19 82:23

**Louisiana**
85:13

**lower**
21:3

─────────
        **M**
─────────

**M**
2:8

**M.D**
1:11 5:11
106:3

**machine**
30:9

**magical**
94:16

**magnitude**
46:19

**main**
26:22

**maintain**
11:23 59:16

**maintaining**
59:10,24

**major**
7:7 8:4 52:15
75:7

**making**
99:5

**malpractice**
57:4,13

**man**
73:1

**Management**
9:9,10

**manifestatio
n**
85:3

**manner**
74:12 75:7

**map**
37:18

**margin**
32:18

**MARK**
2:8 5:1 13:20
15:7,9,12
82:11 94:20
103:6,9

**marked**
5:24 13:24
15:15 35:13
38:16 90:12,
16 92:20
106:10

**markedly**
26:1

**marking**
6:4 13:20
35:17 38:12

**Master**
9:10

**matches**

72:5,9

**material**
18:4 39:12
43:1 60:19
74:5 77:10
79:5 86:5

**materials**
13:11,14,16
16:12 17:11
18:8,16 23:19
25:19 39:21
60:14 77:22

**matter**
4:4 37:22
57:7,14 62:20
84:6 95:2

**matters**
56:13 104:11

**MBA**
9:10

**McLaughlin**
16:17

**mean**
18:1 24:10
27:5,21 33:4
34:4 40:24
45:24 50:3,4
58:16 62:4,9
66:5 67:3,12
72:20 76:18
83:6 84:9
85:23 93:14
97:7 101:1
102:9

**meaning**
26:16 27:13
28:13 38:6
46:8 50:22
97:17

**means**
11:21 27:21
31:18 37:2
49:1 66:2,3

Jan Leestma

67:13,15 95:1
101:3

**measurable**
83:19 84:5

**measure**
33:8

**measured**
24:18 84:23

**measurement**
23:14 24:15

**measuring**
24:13

**mechanism**
62:16

**mediator**
59:8

**Medical**
7:13,21,23
8:4,15 9:5,
14,21,23 17:4
37:1,2 41:4
57:3,13 64:1
67:5,7,23
68:5 70:19
71:9,14 77:7,
19 79:7 84:15
87:2 89:1

**medically**
41:3

**Medicine**
7:9,11,18

**meets**
102:17

**member**
11:8,10,12

**memberships**
11:6

**membrane**
19:22 21:9,
12,13

**membranes**
21:16

**Memorial**
52:19

**memory**
85:14

**meninges**
21:8

**mention**
33:8 38:10
82:13

**mentioned**
24:23 34:10
40:21 43:2
53:18 58:22
59:24 62:3
67:8 68:12
82:9 100:14

**mentions**
36:16,19
37:21

**mercury**
24:16,19 46:3

**method**
95:3

**MICHAEL**
2:21 4:21

**Michigan**
7:7,9

**microscope**
30:11,12
37:12 95:4

**microscopic**
29:22,24
32:10 68:19
75:19 76:21

**microscopica
lly**
31:24

**midline**
26:15

**midway**
78:11

**Milam**
2:3

**mild**
36:20

**military**
7:20 49:16
93:23

**milliliters**
25:23

**millimeters**
24:15,19 46:3

**mind**
37:17 62:24
93:15 101:6

**mine**
6:19

**minimal**
36:22 37:1
65:19,20

**minor**
25:13

**minutes**
22:14 50:24
51:16 74:21
78:5 97:13

**missed**
34:15

**missing**
28:18 29:2

**mixed**
42:24

**modalities**
30:22

**moderate**
36:20

**moment**
11:7 36:9
37:4 47:8
65:3,10 87:19

**Monroe**
1:18 4:10

**month**
101:5

**months**
87:18

**morning**
47:18 56:1
72:16 75:20

**most**
10:17,21 26:8
32:13 37:18
44:17 45:6
50:9 54:22
57:23

**mostly**
36:22 42:24
57:21

**motives**
71:20

**move**
80:20 90:4

**moved**
81:10

**moving**
75:9 99:18

**MRI**
31:11

**multiple**
63:19 65:12
73:8

**murder**
61:12

**must**
85:10 86:5
96:5 102:5

**myself**
11:3 60:20

_____ **N** _____

**name**
4:11 39:11

**namely**
32:16 33:18

**nature**
51:11

**NAUGHT**
103:12

**nausea**
31:2

**naval**
47:16 48:5
50:6,15 51:6
73:2 93:12

**necessarily**
23:11 68:23

**necrosis**
36:20

**necrotizing**
95:16

**need**
36:12 67:23
69:24

**needed**
18:20

**neglected**
11:21 30:17
58:24 59:13

**negligence**
102:11

**negotiation**
100:2,5

**nerve**
46:8,13

**neuroimaging**
31:11

**neurology**
8:16 9:4

**neuropath**
52:21

**Neuropatholo
gic**
36:17

**neuropatholo**

Jan Leestma                                          January 10, 2011

123

**gist**
9:14 10:6
12:14 100:17

**Neuropatholo
gists**
11:9

**neuropatholo
gy**
5:19 7:16,17
8:2,17,24
9:23 10:13,18
11:7 12:5,11,
12,18 16:24
35:20 100:15

**Neuroresearc
h**
9:13

**neurosurgeon
s**
24:14

**Neurosurgery**
9:13 52:16

**never**
37:17 92:2
101:6 102:23
103:2

**Nevertheless**
78:9,14,19

**New**
7:19 48:21

**nine**
30:15 57:12

**nonbreathing**
24:4 84:21

**nonresponsiv
e**
24:4

**nonspecific**
31:5

**normal**

24:19,20
44:13 46:2
74:12 75:9
99:24 101:24
102:19

**normally**
43:24 96:14
97:22 98:8

**Northwestern**
8:14,17,23
9:2

**Notary**
1:15 104:4
105:5

**notated**
84:18

**note**
17:18 73:11
77:24 82:22

**noted**
40:15 82:22

**notes**
17:8

**nothing**
56:10 77:5
101:13

**notice**
14:17 100:13

**noticed**
11:14 38:2
52:7 53:15
83:5 100:16

**noting**
30:12

**November**
6:20

**nowhere**
40:1

**number**
9:19 30:14,15
33:7,9 51:8
63:6,14 92:19

106:10

**numbers**
58:7

**nurse**
68:10

—————————
O
—————————

**O**
104:3

**object**
28:19,22 40:8
41:2,5 42:11
71:13 80:6,7
86:13 90:2

**objection**
5:5 40:15
53:24 71:4
73:21 86:20

**objections**
15:5

**objective**
61:21 64:10,
19 70:1,9,10
72:8 77:9,21
83:23

**objectively**
74:4

**obliterate**
44:15

**observe**
74:12

**observed**
48:2 64:6
85:1

**observes**
88:21

**obstructed**
46:10

**obstruction**
27:13

**obviously**
59:14 60:5

64:17 91:12
93:13 99:10

**occasion**
91:20

**Occasionally**
100:10

**occur**
94:22

**occurred**
29:6 46:17,19
49:16,21
51:12 63:16,
17 72:21,22
73:3,5 75:2
76:2,23,24
77:2 79:3
85:6 89:2
93:4 101:6

**occurrence**
73:16

**occurring**
97:1

**occurs**
62:16 98:2

**odontology**
16:22

**offer**
12:16 17:19

**offering**
58:1

**OFFICE**
2:2,12 9:22
105:1

**Oh**
8:13 54:13
64:9 78:17
83:10

**Okay**
6:10,23 10:5
12:9 13:13
14:12,21,24
16:6,9 18:13

19:20 20:14
21:1,5,7
22:3,11 24:7,
11,22 25:11
26:4,8,14
28:17 29:21
30:6 32:3,9
34:18 35:2
36:19 37:21
40:18 43:6,
13,16 44:9
45:16 46:1
47:19,22
48:2,21 49:22
51:18 52:3
53:15 54:10
55:16 56:3
57:1 59:23
63:2 65:11
67:16 70:14
71:2 73:4
76:6 77:17,24
78:6,7,12,17
82:8 83:24
91:7 93:7
95:6 101:8
102:8

**old**
49:3 80:23

**older**
43:1 51:4
66:3

**Oliver**
16:19

**once**
28:10

**ones**
75:21

**ongoing**
19:12

**onward**
23:7

**oozing**

Jan Leestma

85:4

**opening**
16:16

**opine**
77:11 92:6,9

**opinion**
16:15 25:9
28:5 44:21,24
45:2,16,20
63:4 72:6
74:7 86:15
92:1 94:3,6

**opinions**
58:2 95:2

**opportunities**
9:20

**opportunity**
29:15

**optic**
46:8,12

**order**
35:4

**organ**
27:14,15

**organization**
9:15 11:10,
13,17 36:22
37:2,11 52:17
59:4,11
65:19,20

**Organized**
37:22

**original**
17:19,22

**outcome**
104:23

**outflow**
46:7,10

**outlining**
44:12

**out-of-court**
100:3

**outside**
69:10

**over**
59:4 60:5,15
94:19 97:13
99:19

**overlies**
44:14

**overlying**
43:19

**overrides**
98:2

**oxygen**
29:9

**oxygenation**
28:13

---
**P**
---

**Page**
36:16 42:19,
21 65:11
66:18 67:17
72:13 76:6
82:20 85:8
101:17

**pages**
6:16,18 46:15
99:20

**panels**
41:12

**paragraph**
42:20,21
66:19 72:14
73:11 76:7
77:5 78:3,4
80:21 82:20

**parcel**
66:6

**parchment-
like**

21:8

**part**
9:17 16:7
21:7,13 27:8
39:21 41:1,13
43:4 63:15
65:15 66:17
68:3 72:7
93:10,20
96:14

**particular**
6:6 13:9,14,
22 16:13
18:13 19:5,12
21:12 23:10,
20 25:10
30:21 31:16
32:3,5 33:3,
17 35:1,19
36:4 40:22
43:10,14,15
45:11,18
46:18 47:15
49:14 84:4,22
89:12,21
90:18 91:3
92:4 93:4,18
94:4,8 98:6

**particularly**
62:6

**parties**
104:21

**parts**
41:21

**part-time**
9:20 52:20

**pass**
102:21

**pathologist**
22:16 64:12
67:15 68:4
69:20 70:19
72:3 89:1

94:12

**pathologists**
31:19 37:19
64:2

**pathology**
7:12,15,22
8:1,11,16 9:4

**pattern**
57:20,23

**pause**
36:13 47:9

**pediatrician**
86:9 102:21,
23

**pediatricians**
86:9

**Pennsylvania**
2:16

**people**
53:10 55:7
74:12 100:1

**percentage**
49:20

**perform**
52:24

**performed**
53:3 86:2
96:8

**period**
48:4,16 49:17
53:8 78:8,13
94:19 97:3,13

**person**
52:22 64:15

**personal**
104:14

**perspective**
37:2

**perspectives**
22:17

**pertaining**
1:14

**Petitioner**
1:8 2:22

**phase**
22:18

**Philadelphia**
2:16

**photographs**
17:7,8 18:10
25:23 30:14
44:5 75:19
76:22 98:22

**photomicrographs**
30:14

**phrase**
67:9

**physical**
38:6 46:23
47:5 75:1,2
76:14 101:18,
19,20 102:4

**physically**
64:20 76:24

**physician**
102:1

**physicians**
102:12

**pick**
16:3

**picks**
22:24

**piece**
73:19

**pinned**
19:14

**pinpoint**
89:1

**place**
69:4 81:10

Jan Leestma                                                January 10, 2011
                                                                       125

93:9 94:23
96:16,21
104:18

**placed**
85:18

**places**
52:8

**plaintiff**
56:24

**plane**
55:24

**play**
69:20 70:20,
22 96:5

**played**
31:24

**plays**
70:24

**please**
4:14 5:17
7:4,5 10:16
47:8 48:7
78:5 92:13

**pled**
92:2

**plus**
37:23 45:7

**point**
32:20 63:9
71:12,14
72:12 79:2,22
81:12 82:18
86:19 87:6,7
97:12 100:8

**portion**
68:17 98:15

**portions**
80:8

**possible**
48:14 59:17
60:7 92:15
97:23

**possibly**
80:22

**posterior**
41:1,13 63:15

**posteriorly**
42:24

**postgraduate**
7:11

**post-injury**
29:7,11

**potential**
19:24 46:6

**power**
64:18 95:4

**practical**
60:12

**practice**
9:16 10:3,4
52:18

**practitioner
s**
60:11

**precise**
25:5 31:14
32:1

**precisely**
51:11

**predates**
51:5

**premed**
7:7

**preparation**
100:3

**prepared**
17:11 40:9

**PRESENT**
2:1 3:1 23:3
25:12 32:12
33:24 41:11
44:20 46:18

**presented**
50:12 63:5
73:7 74:24
86:17 102:16,
17,18

**preserved**
32:13 33:19

**pressure**
24:2,8,9,10,
13,17,21
25:8,10,14
26:7 28:6,24
29:12 30:19
44:2,18 45:22
46:2,4,5,11
47:4 49:13
62:3,9,13,15
81:16 82:4,24
95:24 97:4

**pressures**
62:10

**pretty**
58:17 70:17

**previous**
49:17 104:8

**previously**
40:21 49:9
54:15 66:22

**primarily**
86:23

**primary**
28:6,8 30:18
59:19 82:4
83:7

**print**
14:16

**printed**
14:14 15:3
16:5 39:14

**prints**
38:20

**prior**

10:20 18:2
80:1

**private**
8:8

**pro**
100:10

**probability**
41:4

**probably**
11:10 12:3
14:14 24:20
25:24 26:8
29:9 33:1
41:14 43:1
53:4,5,12
55:11 65:21
83:21 84:7
97:16 99:4
102:20

**problem**
27:19 42:2
49:5,19 72:7
74:22 75:17
87:16 89:5,
11,21 90:1

**problems**
72:10 79:14

**Procedure**
1:13

**proceedings**
5:7 104:16

**process**
30:13,21 31:7
32:6 33:22
34:10,18 35:1
37:11 50:9
61:4,19 76:1
95:16,17

**processes**
28:8 51:3
94:7 96:23
97:12 98:5
101:13

**processing**
14:15

**produce**
47:3,4

**professional**
8:6 11:6
56:12

**professor**
8:15 9:1,4

**profound**
62:14

**program**
14:16

**proliferatin
g**
95:19

**pronouncing**
82:12

**prosecution**
10:7,10 55:12
90:8 91:22

**prosecutor**
53:22,23
55:13 89:10

**Protection**
58:22 102:9

**Protective**
11:15

**prove**
48:21

**proven**
47:7

**proves**
74:21

**provide**
91:14 99:12

**provided**
54:2,3,5,8,
14 90:23
101:17

Jan Leestma                                              January 10, 2011
                                                                    126

**provides**
31:17

**proximate**
87:14

**Public**
1:15 98:17
104:4 105:5

**publication**
11:4

**published**
10:12,18 11:3
60:8

**pulse**
97:4

**purposes**
88:21

**pursuant**
1:12

**pursued**
7:11

**put**
24:12 30:9
31:20 53:24
54:22 92:15

——— **Q** ———

**qualificatio ns**
7:3

**qualified**
12:4,14 65:16

**quantitative ly**
82:7

**question**
25:4 28:22
41:6 42:12,15
43:9 49:5,17
53:19 54:1
60:22 63:1
64:9 70:14
71:8 72:19,22

73:9 74:14,15
81:6 87:10
89:10,18,22
91:11 95:5
96:22 101:15

**questions**
12:19 13:1
47:11,12
61:24 64:14
89:7 97:17
103:4,6

**quick**
42:17 65:24
100:24

**quicker**
101:9

**quickly**
13:21 22:10

**quit**
68:11

**quite**
52:8

**quitting**
67:22

**quote**
64:10 100:1

——— **R** ———

**R**
2:6

**radiographic**
38:21

**radiological**
41:18 42:2

**radiologist**
22:16

**range**
24:20 25:6
80:21 81:2

**rank**
8:3

**rate**

99:24 100:1

**razor**
95:3

**reaching**
29:10

**reaction**
32:22 33:18
34:7 35:3
37:6

**reactions**
32:17 88:16
94:22

**reactive**
33:21

**read**
17:18 45:10
64:24 65:5
76:12 81:14
85:8 86:1

**reading**
20:2,5,8,12,
17 43:8 96:3

**ready**
5:9,10

**real**
42:17 65:24

**realized**
30:16

**really**
63:22 81:13
88:18 89:6
101:14

**reason**
58:9 71:2
73:9 79:3

**reasonable**
45:6

**reasons**
72:3 74:3

**recall**
18:7,21 19:10
25:2,5,21

62:18 63:5
66:17 85:21
86:4 87:12
89:19,22,23
96:3 101:16

**receipt**
30:7

**receive**
27:9 29:19,20

**received**
9:9 17:20
29:22 99:14

**recency**
23:10

**recess**
51:21 87:23

**recognize**
6:5 35:18
90:17

**recollection**
57:10 85:11
86:6 89:13

**recommend**
59:21

**recompense**
100:11

**record**
4:2 16:8
51:19,23
53:13 54:1
74:1 80:14,18
87:22,24 90:2
96:7 103:10
104:15

**records**
17:4 84:18
93:15

**R E C R O S S -
EXAMINATION**
98:11

**red**
32:13,14,23

33:19 41:21
50:23 94:18

**REDIRECT**
89:8

**reduced**
104:14

**Reed**
7:23

**refer**
42:14,16

**reference**
92:22

**referencing**
100:14

**referred**
23:7 24:24

**referring**
29:12 67:16
79:19

**refers**
23:10 39:24
40:2

**reflected**
25:19 35:1
40:21 43:10

**reflects**
96:7

**refresh**
85:14

**refrigerated**
97:14

**regard**
40:8 63:24
72:6

**regarding**
19:7 36:3,16
40:14 45:10,
17 54:1 86:19
89:11 93:17,
24 97:20

**related**

Jan Leestma                                          January 10, 2011
                                                               127

11:7 17:23
34:2,20 43:15
86:17,24

**relates**
22:7 82:17

**relating**
16:5 17:5
18:18 43:4

**relation**
16:12 34:11
67:13

**relative**
22:8 104:19,
20

**relatively**
25:15 26:2
33:19 42:23
74:19

**relevance**
71:17 86:20

**reliable**
49:1 94:24
95:3

**relied**
40:11

**rely**
40:2

**remain**
24:3

**remainder**
8:5

**remains**
22:18

**remarkably**
60:4

**remember**
18:10 53:14
64:24

**remind**
7:24 9:14
85:18

**reminded**
58:3

**repeat**
34:23 92:12

**rephrase**
41:6 62:24

**rephrasing**
42:12

**replaced**
32:16

**replay**
65:3

**replying**
34:7

**report**
13:17 14:5,
14,19,20
16:24 17:12,
14,17,19,20,
22,23 18:2,5,
13 20:16
25:21 29:23
30:4 35:10,
21,22 36:7,16
39:24 40:1,7,
10 42:13,16,
18,20 65:5,6,
9 66:11 69:15
72:13,17
73:8,10,24
76:7,8 77:18
82:8,14 83:8,
12 85:8
92:18,20,24
93:8 98:14,
15,17,23,24
99:3,13,14
100:14,15

**REPORTED**
3:22 36:5
69:17 73:11
78:21 79:2,22
93:12 104:13

**Reporter**
1:17 4:12
104:6

**reports**
16:22 17:5

**represent**
41:22 42:4
44:13 49:18
63:17,22

**represents**
19:23 41:14
43:1 60:13,20
63:14 65:15

**reproducible**
94:24

**request**
17:18 99:12,
15

**requirements**
90:21

**researcher**
8:21

**reserve**
15:4 18:5
98:24

**residency**
7:15

**residents**
53:10

**resolving**
95:17

**respect**
17:9

**respirator**
84:21

**respond**
37:7

**Respondent**
1:5 2:10

**responds**
68:10

**response**
71:8 86:22
87:5

**responsible**
19:13

**restore**
59:16

**result**
27:16,22
28:15 47:5
49:15 50:15
56:9 74:9
76:1

**resulted**
29:8 66:8

**resuscitatio
n**
67:24 97:11

**retained**
56:23 91:4
92:5

**retaining**
91:23 100:6

**retina**
46:12

**retinal**
45:10,11,14,
17,18 46:16,
17,24 47:4

**retired**
9:15 10:2
52:9,22

**retirement**
56:10

**return**
52:18

**reveal**
33:12,16
43:14,16

**revealed**
100:21

**reveals**
42:23

**review**
13:14,16
17:10 23:19
29:15 35:10
45:13

**reviewed**
16:12 18:16
19:1 24:24
25:19 38:2
40:5 50:13
79:8

**reviewing**
19:5 58:16

**rid**
37:8

**right**
13:2 14:23
15:1,11 18:5,
17,24 19:16
20:16,21
29:18 33:6
35:7 36:21
37:24 39:19
40:6 42:8
43:3 54:16
55:10,24 56:6
57:16,22
63:3,12,13
65:18 66:4
67:1,6,11
68:14 69:9
72:1,19 78:3,
17 80:4 81:4,
10,16 82:17
83:10 85:2,11
86:7 88:14
89:6 96:6
98:24 103:5,8

**rights**
22:15

**rim**

44:10,11

**road**
37:18

**ROBERTS**
2:6 4:23 5:5,
8,10 6:10,12,
15,19,21,22
12:19,21,24
14:7,10,18,
21 15:1,4,11
16:9 20:1,7,
13,14 26:12
28:19 35:23
36:1 39:16,
18,23 40:6,16
41:2 42:5,9,
10,14,19
43:3,6 44:4
51:15,17
52:1,3,5
54:5,7,10,
16,18 71:4,
14,21 72:11
74:6 80:14,
17,19 86:22
87:5,8,19
88:2 89:6
90:2 92:23
93:1,7 98:12
99:11,17
103:3,5,8
106:5,7

**role**
69:21 70:20,
22,24

**room**
20:8 36:10

**Rouse**
16:18,24 17:9
19:2,15 24:23
33:13 46:14,
20

**R-o-u-s-e**
16:18 17:9

**Rouse's**
64:24 89:14
92:24

**routinely**
88:19

**Rule**
54:2,7 90:24

**Rules**
1:12

**rupture**
27:16 46:12

---
**S**
---

**S**
106:9

**sabbatical**
8:19

**safety**
59:14,19

**sagittal**
26:11,15
32:10,22
41:15,23
95:14

**s-a-g-i-t-t-a-l**
26:15

**SAITH**
103:12

**sake**
90:22

**sampled**
75:22

**San**
55:1

**Saran**
21:15

**saw**
15:20 50:12

**saying**
18:4 64:15

66:18 74:3
79:2 81:2
82:10,23

**says**
36:17 38:5
40:2,4 68:10
78:8,19
100:18

**scale**
95:1

**scalp**
24:12 51:7
62:21,23
63:8,12,15
68:18,23
94:23

**scan**
17:6 18:11
31:11 39:5

**scans**
39:24 40:8,22
42:22 43:11,
14 44:20,23
45:4 61:22

**scenario**
64:15 72:8
94:18

**schedule**
16:1

**scholarship**
60:16

**School**
7:9 9:5,8

**School's**
8:15

**Schraeder**
11:2

**S-c-h-r-a-e-d-e-r**
11:2

**sciences**
9:6 11:12

**scientific**
50:13

**scientifical
ly**
47:6

**scope**
86:14

**second**
10:19 19:9
27:3 31:10
42:17,20
66:19 82:3
99:18

**section**
32:20 36:17

**see**
8:18 15:5
16:3 20:21
32:20 33:6
36:18 47:1
53:16 64:20
72:9 75:18
77:13 78:17
79:4 88:11
96:23,24 98:9
103:7

**seeing**
25:21

**seen**
67:3 102:10

**seizures**
31:3

**selected**
39:13

**s e l f -
e m p l o y e d**
5:18

**send**
14:23

**Senior**
53:10

**Senn**
16:19,23

**S-e-n-n**
16:19,23

**sense**
31:1 75:16
97:9

**sent**
6:12 39:21

**sentence**
42:22 65:5,6
76:12,13
78:2,7,15
81:14 82:14

**sentences**
78:1

**separate**
17:23 33:9
54:14 63:18
75:4

**serious**
82:7

**seriously**
94:14

**service**
7:20 8:13

**services**
8:17 11:21
12:1 59:6

**serving**
11:20

**set**
72:1 104:24

**settled**
92:1

**seven**
37:23 57:19

**seven-year-
old**
71:3

**sexual**

96:8,10,13
101:22,24

**shall**
90:19 98:23

**sharpen**
95:3

**sheath**
46:13

**short**
36:13 47:9
97:2,3

**Shorthand**
1:17 104:6

**show**
6:4 34:16
35:17 38:11
77:12 83:20
88:15 90:3,16
95:15

**showed**
33:17 63:6

**showing**
25:24 44:11

**shows**
44:6,7

**side**
63:12 68:14
69:9 99:16
103:4

**sign**
41:18,19 44:1

**significant**
26:8

**silent**
98:1

**similar**
15:21 99:4

**simple**
74:22

**simply**
16:4 49:1

75:15 79:1
85:20 86:4
92:14 93:19
96:5 102:2,6

**sing**
74:11

**singing**
75:9

**sinus**
26:11,16
32:11,22
41:15,23
95:14

**s-i-n-u-s**
26:16

**sir**
70:15

**site**
63:14,23
64:16 65:16
85:5

**sites**
65:14 68:22
75:24

**situations**
10:1

**six**
11:13 29:24
30:2 57:2
58:17 88:20

**skin**
68:18

**skull**
21:11,20,24
24:12 26:20
43:18 44:9

**slammed**
69:8,10 73:12
75:11

**slapped**
88:22

**sleepiness**

31:3

**sleepy**
67:20

**slide**
30:13 32:10
33:9 76:21

**slides**
17:3,7 18:10
29:16,17,19,
22,24 30:7,
11,15 33:4,5,
12,16,17
34:16 35:1
38:3 61:22
75:19 98:21
99:9

**small**
25:15,17 26:2
42:23 81:21

**smaller**
43:24 94:17

**so-called**
16:14 22:6,18
41:18 101:24

**social**
11:20 59:6,20

**Solutions**
3:3

**somebody**
22:11 23:15
67:14 68:10

**somebody's**
93:16

**somewhat**
22:5 41:17
83:22

**somewhere**
20:18 93:20

**sorry**
6:21 12:22
14:7,10 20:1
26:12 42:6

53:5 55:4
71:12 80:7,10
82:21 85:22
87:4,6

**sort**
37:19 41:13
42:3 59:16
100:24

**sound**
57:9,16,22
101:21

**sounded**
83:6

**sounds**
79:24

**sources**
95:23

**SOUTHERN**
1:2 4:7

**space**
19:24 34:6
43:22 44:16

**speak**
62:21 80:14
87:13 95:4

**specific**
19:14 89:16

**specifically**
18:8 29:20
34:2

**specified**
104:18

**speculate**
71:19 102:5

**speculation**
71:11

**speculative**
71:19

**spell**
26:12

**spelling**

26:15

**spent**
7:14

**spinal**
43:19 44:2,13

**Spitz**
17:3

**S-p-i-t-z**
17:3

**spreadsheet**
90:20

**Square**
2:15

**SS**
104:2

**staff**
53:10

**standing**
68:1

**start**
52:6 65:11

**starting**
76:13

**starts**
42:22 78:2,8

**State**
1:16,18 66:22
72:13,15
84:20 104:1,
5,7

**stated**
60:23 73:22
86:23

**statement**
16:16 56:4
57:17 58:20
59:9 72:20
73:4,19 78:23
89:4

**statements**
71:16 76:8

Jan Leestma                                            January 10, 2011

130

**STATES**
1:1,4,13 2:2
4:5,24 5:1
12:7 13:5
101:18
**Station**
48:5
**stay**
78:4
**stayed**
9:2
**stenographic
ally**
104:13
**Stockholm**
8:21
**stop**
27:3 97:1,2
101:13
**stopped**
50:24
**stops**
97:14
**stories**
61:20
**straightforw
ard**
70:17
**straw**
102:3
**Street**
1:18 4:10
**strictly**
23:13
**struck**
22:12
**structure**
11:23 26:24
41:13 59:11,
24 83:16

**struggling**
78:10
**studies**
44:10 83:20
**study**
31:11 38:22
41:22 42:1
**subacute**
22:6,24 23:5
**subdural**
19:18,20
20:24 21:2,
17,18 22:4,7,
12,17,24
23:5,8 25:12,
15,24 26:2
29:4 31:19
33:13 34:6,
13,16,20 35:3
36:4,21 37:5,
15 40:14
42:23 43:2,10
44:19 47:2
48:3,9,15
49:9,10 50:20
51:5 65:18,23
68:16,22 74:9
76:13,22
77:15 81:21
97:21,24 98:6
99:7
**subdurals**
68:13,24
**subgaleal**
65:12
**subject**
72:10 100:5
**submitted**
99:13
**subsequent**
75:10
**subsequently**
31:8

**subsidiary**
68:8
**successful**
60:4
**Sudden**
10:22 83:13
**suffer**
74:18
**suffered**
74:8 97:20
**sufficient**
50:13
**suggested**
77:12
**Suite**
1:18 2:3,14
**summarize**
28:17
**summary**
28:20
**superior**
26:11,14
32:10 41:15,
23
**supervise**
53:11
**supervising**
53:10
**supplanted**
37:18
**supply**
27:7,10
**support**
97:11
**supposed**
17:2 55:22
**Sure**
6:17 7:6 8:13
15:6 16:14
20:7,15 24:11
36:11 41:11

53:1 56:21
57:18 61:3
62:12 66:15
70:16 75:16
84:3 96:6
97:24
**surgeon**
22:15
**suspicion**
96:15
**sustains**
68:20
**Sweden**
8:21
**swelling**
27:21,23
28:15 43:14
44:3,22 45:3
83:3
**swollen**
44:15,17
**sworn**
4:16 5:3,13
91:6,10 100:4
104:10
**symptoms**
98:8
**system**
26:22 59:8
**systems**
12:6

_____
_____ **T** _____

**T**
106:9
**take**
13:10 15:24
17:11 19:9
35:9 42:15
51:13,17
58:12,15
64:13 70:3,
11,21 75:4

92:17 95:19
**taken**
1:12,14 8:19
59:22 104:17
**taking**
1:14 47:14
**talk**
24:7 40:12
61:1 74:11
**talked**
34:9 38:9
**talking**
27:12 30:24
33:11 35:4
37:20 62:8,21
67:21 96:18
**Tape**
4:3 51:20,23
103:11
**Taylor**
10:19
**team**
59:20 68:9
92:5
**technically**
21:12
**technique**
49:6
**technology**
49:6
**t e e t e r -
t o t t e r**
62:14
**tell**
5:17 6:15
8:11 11:17
16:11 20:2
27:4 28:18
29:1 32:18
36:24 39:23
46:22 48:17
50:22 51:10

Jan Leestma

53:20 63:16 67:12,14 72:5 75:21 76:3,23 95:13

**telling**
71:10 73:17

**ten**
23:1,6 24:15, 19 34:1 35:4 36:23 46:3 48:10 51:15, 16,17 56:14 65:14

**tentative**
98:24

**tenure**
9:1

**term**
23:9 36:24 37:1 84:12

**terms**
28:24 38:5 63:8 67:15 79:14 83:11, 19 89:15 90:7 93:22

**test**
77:11

**testified**
5:13 33:14 40:21 45:2 46:14 53:17, 19,21,22 54:6,17,19, 21,24 55:3,12 56:15 58:6 69:7,17 90:7 93:23 96:24 98:16 99:21

**testify**
28:20 55:18, 22 86:19 99:22 104:10

**testifying**
20:3 56:6 57:7,15 60:21 83:13 92:3

**testimony**
16:15 19:2,6, 7 40:7 41:2,5 42:11 43:4 45:13 53:18 56:2,8 59:10 61:10,13 65:1 69:14 80:8 81:13 83:5 84:1 85:9,24 86:2,21 89:14,18,23 90:8 91:6,10, 14,24 96:3,4 100:4 101:17, 18 104:15

**testing**
96:11

**tests**
84:24

**TEXAS**
1:2 2:4 4:7 12:23

**Thank**
20:14 43:6 103:9

**thanks**
82:11

**themselves**
31:4

**theoretical**
60:11

**thereabouts**
46:3

**thereafter**
69:16 104:13

**therefore**
18:4 98:22

**thickness**
21:9,15 33:22

**thin**
21:14

**thing**
15:6 20:15 31:10 33:7 53:16 59:23 64:18 84:14 102:3

**things**
18:12 25:11 28:3,16 60:13 61:7,22 70:2, 11 71:24 72:15 83:3 91:9 95:9,19 99:8 102:19

**think**
14:12 16:4 17:1 28:19 38:7 40:4,16 42:11,15 52:10,14 53:7 57:2 58:10,20 63:19 65:9,19 66:1,16,18 67:12,17 69:14 70:17 71:2,24 72:18 89:17 95:11 96:22 98:4, 16,22

**third**
42:20,21 76:10,12

**thirsty**
79:23

**thorough**
84:16 86:12

**thought**
42:6 58:4 72:21

**three**
7:24 22:16,22 32:24 48:13, 19 66:22 69:11 75:7 81:19 101:5

**three-day**
94:18,20

**thrombosed**
83:16

**thrombosis**
26:10,23 28:4 29:2 30:17 32:6 34:3,5, 11 38:9 40:14,20 45:1 49:22,24 50:8 51:5 83:15 95:7 96:12

**thrombus**
33:11 41:23 82:22

**Thursday**
55:22,23 103:7

**tight**
43:17

**time**
8:24 12:16 14:16 17:21 18:11,20 19:14,15 22:8 23:2,13,14 24:14 31:23 32:5 33:1 36:12 37:17 38:22 48:14, 16 49:3,4 52:17,21 54:17 55:11 56:5 57:14 58:12,15,16 60:15,17

61:14 68:11 70:5 75:6 79:10 82:8,13 83:12,13 84:23 92:16 93:15,23 94:19 95:19, 20 97:3,6,8, 12 104:18

**times**
22:13 25:6 54:21 55:3 57:6 64:16 69:11 75:12 88:22

**timing**
19:8,10 25:1 86:16

**tips**
36:21

**tissue**
27:18 31:17 32:10

**together**
59:12

**told**
69:5 81:14

**tomorrow**
56:1

**tonsillar**
36:21

**TONY**
2:6 4:23 5:4, 9 6:21 14:23 15:9 51:16 87:6 90:4,22

**tony.roberts**
**@usdoj.gov**
2:7

**top**
33:18,21

**towards**

Jan Leestma

76:10

**track**
90:20

**tract**
46:10

**training**
7:16,18

**Transcript**
16:21 46:15
65:2 104:12

**transcripts**
16:16 85:24

**transferred**
7:17 8:23

**translucent**
21:14

**trauma**
19:18 38:6
62:17 76:14

**tree**
46:9

**tremendous**
47:2

**Trial**
16:15 19:2
46:14 47:17
50:12 55:2,14
56:22 85:23
93:23

**truck**
73:13 78:21
93:24 94:1

**true**
17:13 23:13
54:13 56:20
64:9 70:13
74:2 76:4
89:3 90:4
91:22 94:3
104:15

**trump**
70:9

**trust**
56:20

**truth**
70:3 104:10

**try**
12:1 13:11
37:8,9 59:15
60:24 92:14

**trying**
11:22 20:7
64:7 84:16
85:24 97:17

**Ts**
17:2

**turn**
79:4 95:4

**turned**
31:8

**twice**
55:1,2

**two**
7:13 8:2 15:3
17:2 21:16
23:2,6 25:22
27:6 32:24
33:10 34:1
35:5 41:12
48:8,11,13
49:3 51:1
52:19 66:22
67:18 75:4
80:7 81:19
88:10 95:9,21
101:5

**two-**
94:18

**two-minute**
51:13

**two-year-old**
74:8 75:10

**type**
97:21

**types**
22:3

**typewriting**
104:14

**typo**
72:17

---
**U**
---

**U.S**
4:6 7:21 8:4
17:9

**ultimately**
24:4 26:21
50:7 62:15
66:8

**unconscious**
67:22 73:17
79:15

**unconvinced**
38:7

**Under**
24:19 26:19
30:11 37:12
46:3 100:9
104:14

**undergo**
94:21

**undergoing**
34:6

**underneath**
26:20 44:10

**understand**
53:6 55:16
61:9 67:12
69:18 80:2
81:5,8 82:21

**understanding**
5:5 19:6 48:1
79:20

**Understood**
71:21 86:2

**undersurface**
21:11 43:18

**unequivocally**
75:20

**unfair**
102:20

**Unit**
2:13 59:16

**UNITED**
1:1,4,13 2:2
4:5,23 5:1
12:7 13:5

**University**
7:9,12 8:14
9:3

**unless**
41:3 57:13
87:15

**unresponsive**
67:19 79:16

**upper**
24:20 63:11

**upside**
88:22

**upstream**
32:21

**urine**
79:23 80:3,9,
10,12

**use**
19:16 37:19
38:4 91:24
95:1 99:5

**usually**
12:13,14
22:13 24:18
67:22 68:8
83:17 97:14
101:2,4
102:14

**utilized**
61:13

---
**V**
---

**v**
55:8

**variable**
94:23

**varied**
25:4

**variety**
72:2 74:2

**various**
59:3 62:5,10

**vary**
33:22

**vein**
24:17 26:11

**veins**
26:11 27:14,
16 46:4

**venous**
26:10,13,18
27:13 28:4
29:2 32:6
38:8 40:20
45:1 46:7,10
82:1,9,16
83:2 86:24

**ventricles**
43:23

**verbal**
99:6

**verify**
74:4 76:5

**version**
15:9

**versus**
4:5 64:10
77:15 101:10

**via**
2:9

Jan Leestma                                         January 10, 2011

133

**VICTOR**
2:18 4:17

**victorabreu@**
**fd.org**
2:19

**video**
4:2 51:19,22
87:22,24
103:10

**Videographer**
3:2 4:1,12
51:19,22 52:2
87:21,24
103:10

**videotaped**
1:10 4:3

**videotelecon**
**ference**
1:10 2:9

**view**
25:13 31:12
41:22

**virtually**
84:21 88:15
97:15

**visceral**
17:3

**visible**
44:20,22 45:3

**vitae**
6:9

**vital**
70:20,21

**voir**
12:20,22 13:1

**volume**
25:15,18,20,
22 26:2 62:14
81:22 98:3

**volumetric**
98:1,9

**vomiting**
31:2 79:21

---
**W**
---

**waiting**
18:8,9 29:17

**wake**
37:9

**walk**
74:11

**wall**
32:21 37:9

**Walter**
7:23

**want**
8:5 15:4 26:5
42:5,10 52:6
58:4,11 68:5
76:6,9,23
77:17 81:13
83:24 87:21
98:13 99:18
100:12

**wanted**
34:8 58:11

**Washington**
7:23

**wasn't**
19:14 43:4
54:10,11
89:16

**watching**
68:2

**water**
27:24

**way**
12:24 14:22
30:20 42:4
44:3 48:17
54:23 70:6,7
74:19 76:24
77:15 79:10

**ways**
24:18 61:13

**week**
25:3 33:24
55:16,17
95:21

**weeks**
23:2,7 34:1
35:5 48:11
54:8,9 80:22
81:3 88:20
89:17 101:5

**weeks'**
95:21

**welfare**
11:20

**we'll**
29:16 103:7

**well-known**
42:2

**went**
9:3 30:10
65:2 69:15
79:9 81:24
99:19

**We're**
5:10 7:2 21:6
28:7 35:4
37:20 62:21
67:17 75:4,15
78:3,4,7
97:17 103:5

**West**
1:18 2:14,15
4:10

**we've**
48:10 54:5
88:23

**whatever**
22:12 27:9
49:3 61:20
64:22 66:7

100:7

**WHEREOF**
104:24

**WHEREUPON**
5:2,23 13:23
15:14 35:12
36:13 38:15
47:9 51:21
87:23 90:11

**whether**
18:11 34:8,10
43:9 45:17
50:23 56:23
73:6 74:1
76:15,19 77:1
84:4 89:20
96:20 97:20
100:8 101:10

**white**
37:22 41:16
44:10

**whoever**
100:6

**whole**
49:24 50:3,8,
9 61:19 76:12
104:10

**Wilford**
17:4

**wind**
97:13

**window**
49:7 73:12
94:1

**WISEMAN**
2:21 4:21
36:11 103:1

**wish**
91:24

**within**
1:15 19:11
22:14 26:19

31:22 32:18
48:4,13,19
49:16 75:11
81:8 97:2
104:5

**witness**
4:15 5:2,12
14:3,9,12
20:5,10,18,
20 26:14,17
38:19 42:8
53:22 56:7
68:7 69:4,6
70:3 71:15,22
73:22,23
78:16 92:7,10
102:22,23
103:2 104:9,
24 106:2

**witnesses**
64:6,21 86:18

**witness's**
71:20

**word**
14:15 19:17
70:21 71:1
78:13

**words**
19:17 32:14
82:12 83:20
89:16 95:12

**work**
5:22 37:16
52:11 60:20
91:9,18 100:3

**worked**
10:6

**workers**
59:20

**working**
8:8 9:20
11:23 58:24
59:2 61:11

Jan Leestma                                              January 10, 2011
                                                                     134

**works**
12:13

**wouldn't**
58:14,19
69:20 88:13
101:12

**Wrap**
21:15

**written**
13:17

**wrong**
82:10 93:16

**wrote**
69:15

──────── **X** ────────

**X**
106:9

**Xerox**
30:9

**XYZ**
31:9

──────── **Y** ────────

**Yeah**
6:14 8:7,9
14:9 18:23
26:6 30:5
35:20 36:6
55:6 56:16
66:15 97:7
98:18

**year**
7:16,17 8:21
9:17 58:17
87:11

**years**
5:21 7:13,24
8:2 9:22
10:21 11:11,
13 12:3 52:19
59:4 60:5,14

**Yep**

73:14

**York**
7:19

**yourselves**
4:15

**Y-shaped**
41:13

──────── **Z** ────────

**zero**
22:22

──────── **0** ────────

**01/10/2011**
6:2 14:2
15:17 35:15
38:18 90:14

──────── **'** ────────

**'05**
58:6

**'06**
58:5

──────── **1** ────────

**1**
4:3 6:1,5
51:20 100:17
106:12

**10**
4:11

**1003**
47:18

**105th**
11:4

**10th**
1:19

**11**
9:22

**1105**
47:24

**1145**
47:20

**11th**
105:1

**1200**
1:18

**1248**
1:20 4:2

**13**
58:6 72:15

**14**
106:13

**145**
51:20

**15**
17:20,24 58:8
98:19,20
99:13 106:14

**1500**
2:3

**153**
51:23

**15th**
98:15

**18**
58:7

**1807**
38:23

**19106**
2:16

**1936**
37:17

**1960**
7:6,10

**1968**
7:19

**1971**
8:3

**1981**
8:18

**1985**
9:2

**1986**
9:11

**1987**
9:12

**1992**
90:21

──────── **2** ────────

**2**
13:21 14:1
15:21 16:7
17:15 18:14,
15 36:16
51:24 66:18
82:20 103:11
106:13

**20**
10:21 16:21
58:8 64:15

**2000**
9:17 52:10

**2001**
9:17 52:10
53:2

**2002**
38:22 72:16
75:21

**2003**
10:1 52:16,20
53:8

**2005**
52:20

**2007**
57:20 58:8

**2008**
47:18 57:11,
15 93:6

**2009**
10:18 57:1
60:8

**2010**
6:20 11:3

16:21 17:20,
24 56:15

**2011**
1:20 4:11
14:6 105:2

**215-928-0520**
2:17

**237**
87:22

**24**
47:23 50:7

**241**
88:1

**24-hour**
48:4 49:16

**24-hour-old**
88:14

**25**
5:21 12:3

**259**
103:11

**26**
54:2,7 90:24

**27**
38:22 47:18
72:16 73:1
75:21

**27th**
76:2

**28**
47:24 93:14,
16

**29**
93:6 101:17

**29th**
101:1

**2A**
15:13,16 16:7
17:15 18:14
106:14

──────── **3** ────────

Jan Leestma

**3**
35:14,18
42:19 76:6
106:15
**30**
11:11
**311**
1:18 4:10
**35**
106:15
**38**
106:16,17

_____ **4** _____

**4**
10:1 38:12,
17,20 41:12
106:16
**40**
12:7,9 60:14
**400**
100:4

_____ **5** _____

**5**
10:1 38:13,
17,20 41:12
53:8 106:4,17
**50/50**
56:23
**52**
106:5
**545**
2:14
**58**
46:15
**59**
46:15

_____ **6** _____

**6**
90:13,17
106:12,18

**600**
100:4

_____ **'** _____

**'64**
7:10,14
**'66**
7:14

_____ **7** _____

**7**
14:6,8,11,
15,20 15:8
18:22 99:15
**7/31/12**
105:7

_____ **'** _____

**'70s**
9:22

_____ **7** _____

**713-567-9810**
2:5
**77002**
2:4

_____ **'** _____

**'80s**
9:22
**'82**
8:22

_____ **8** _____

**84-3870**
1:17 3:22
104:7 105:10
**89**
106:6

_____ **9** _____

**9**
14:6,8,19
**9/17/02**
35:22 36:7

**90**
106:18

_____ **'** _____

**'90s**
54:24 55:4,5

_____ **9** _____

**911**
47:20
**919**
2:3

_____ **'** _____

**'97**
55:6

_____ **9** _____

**98**
106:7

_____ **'** _____

**'98**
55:6