IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *      CRIMINAL ACTION
                                   *
          PLAINTIFF,               *      CR-C-02-216(1)
                                   *
VS.                                *
                                   *      CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *      JANUARY 13, 2011
                                   *      7:55 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * *


          PARTIAL TRANSCRIPT OF MISCELLANEOUS HEARING
             (TESTIMONY OF DR. ROUSE AND ARGUMENTS)

          BEFORE THE HONORABLE JANIS GRAHAM JACK
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

          (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:            MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)

FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 7:55 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 10:40:00 a.m.)

ELIZABETH ROUSE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Rouse, for the record, you are testifying by telephone.  Where are you located today?

A.   I'm located in Bethesda, Maryland.

Q.   Okay.  What is your capacity out in Bethesda, Maryland, right now?

A.   I'm an assistant professor of pathology at the Uniformed Services University of the Health Sciences, Medical School.

THE COURT:  Sorry.  You know what, could you -- Dr. Rouse, could you give us your full name, please?

THE WITNESS:  Oh, it is Elizabeth Aldrich, A-L-D-R-I-C-H, Rouse, R-O-U-S-E.

THE COURT:  Thank you very much.

BY MR. ROBERTS:

Q.   And are you the same Dr. Rouse that testified at the trial of United States versus Alfred Bourgeois back in 2004?

A.   Yes, I am.

Q.   And have you -- you've had an opportunity to review the transcript of Dr. Leestma's deposition?

A.    Yes, I have.

Q.    Have you also had an opportunity to review the report that Dr. Leestma prepared that was dated June -- January 7th, 2011?

A.    Yes.

Q.    Okay.  The pages that you have on the transcript, I'm going to reference some pages, and I just want to make sure that we're going to be on the same pages.  So --

A.    Okay.  I have it in front of me.

Q.    You know, how many pages does your transcript show, as far as --

A.    The one I have has four to a page, and they are numbered, little numbers on each of the four.  So I go through -- at the end, it's all kinds of words and numbers, but it ends with 106.

Q.    Okay.  So for instance, on Page 24 of the transcript, at the very top of that page, there's an "A," and it says, "The cause of death in this child was increased intracranial pressure"?

A.    "Pressure," yes.

Q.    Okay.  I want to ask you about that statement from Dr. Leestma.  First of all, did you see that, such a conclusion in his report from the 7th of January?

A.    No, he does not.  He talks in the report about my findings, talks about Dr. Kagan-Hallet's report, his examination, he reviews the slides.  He does not actually render an opinion as to the cause of death, in his opinion.

Q.   Then further on in his, in the transcript on Page, Page 25, there's a question that is asked of him, the first full question, it says, "Now, getting back to the intracranial pressure" --

A.   Yes.

Q.   And then the question is, "What is your opinion, what, in your opinion, caused the increased intracranial pressure in this particular case?"  Do you see that?

A.   Yes.

Q.   And his answer was, "Several things.  One of them would be the subdural hematoma that was present."

A.   Yes.

Q.   And then he states, "In my view, it's a rather minor component."  I'd ask you for a minute to comment on that testimony.

A.   Yes.  Well, the -- and this will refer back to some of Dr. Kagan-Hallet's original review.  But the child has, if we step back, kind of away from the ages, if the child has blunt force injuries of the head, which is where the head impacts something else or something else impacts the head, but there's a transition of force between the head and another object.  And we have evidence of this by the bruises on the scalp, which is blood, you know, contact site.  We have injury evidence in the brain.  Now, again, we'll step away and not talk about the dates of those injuries.

The injuries, when an object hits the brain, forces are transmitted.  And that force causes destruction over a wide range of area.  You know, a very narrow object hitting the head would cause a narrower -- but the damage, the force is transmitted into that brain tissue.  And it causes destruction certainly or damage, perhaps more in one area, but then there's ill-defined damage that extends out.

And then in the brain, the brain responds to trauma in different ways.  For one thing, the brain is encased in the bony skull.  So as, in normal tissue, when the tissue is damaged, at the cellular level, the membranes of the cells are damaged and fluid starts leaking in and it swells.  In the brain's case, when the brain starts swelling, it's encased in bone, and so it can't expand.  When it starts swelling, it basically starts compressing itself.  You know, there's not the room for expansion.  And we call that edema.  That's fluid coming through.

From the beginning, Dr. Kagan-Hallet, at death, the child had marked, you know, had mild to moderate cerebral edema.  That's swelling of the brain.  That was throughout the brain, not just under those areas of bruising.  But that indicates diffuse damage.

To kind of tie it to a more recent event, that's what the representative that was just shot, Giffords, they removed part of her skull to relieve that pressure.

Q.    You're referring now to the incident that happened in Arizona?

A.    So -- yes.  Yes.  I mean, that's been in the news a lot. But that's -- the brain swells, it's encased in the bone.

The other thing is there's bleeding that has occurred in this child from that blunt force injury to the head.  And that, the bleeding occurs because with the transmission of forces, blood vessels are damaged and blood starts leaking out.

In this case, she has an accumulation of subdural hemorrhage, which is blood in the subdural space, which Dr. Leestma speaks at length about what the subdural space is. She also has subarachnoid hemorrhage, which is beneath the arachnoid level.

Okay.  In the hospital when she first came in, she had subarachnoid hemorrhage, so that's a more recent bleeding, fresh blood in the subarachnoid space, as well as the subdural.

I agree with Dr. Leestma, the subdural is a small -- you know, space-wise, it was not a large collection of blood.  But there are other injuries to the brain that are all causing, that are -- there are other markers of injury to the brain. The actual neurons and tissue of the brain itself was damaged. There's swelling of the brain, which is also -- you know, the swelling itself causes damage.

So you have a complex constellation of things going on in response to that injury.  And so I don't think you can say the,

just the intracranial pressure is what's caused -- that's one of the physiologic responses that led to her death. That's a --

Q. Let me ask you about --

A. That's a physiologic event, like bleeding out the increased cranial pressure. The subdural contributed to it, you know, the mechanical space the blood was taking up. The damage to the brain and the swelling of the brain all contributed to that increased cranial pressure.

There is a thrombus. There is evidence of blood clotting. That can come about, just as the brain is damaged, the blood flow is impaired.

Q. Let me stop you there for just a minute --

A. I'm sorry?

Q. -- and ask you a quick question about --

A. Certainly.

Q. Because Dr. Leestma obviously refers to this in very strong terms. On Page 26 --

A. Okay.

Q. -- of his testimony --

A. Yes.

Q. -- he mentions, and it's the second A, in other words the second answer, with regard to the causes of the intracranial pressure, and Dr. Leestma says, "Probably the most significant are injuries to the brain, which I consider to be due to the

venous thrombosis, that is, clotting."

First of all, did you see anything in his January 7th, 2011, report that contained that conclusion?

A. It's -- he mentions that there is a thrombus. I mean, that's a blood clot in that vascular space, the sagittal sinus. On -- I'm looking. On Page 3 of his report, the second -- I'm sorry -- the bottom of Page 2, he talks about, at the very end, "In addition, I found a thrombus in the superior sagittal sinus, which was not attached to its wall, and another thrombus which was lying free. Clearly pre-mortem showed fibrin, layering and peripheral cellular, indicating it was attached to the wall of the sinus." He felt it was days, perhaps a week from death.

Q. Did he mention anywhere that --

A. And then later on he talks about --

Q. Can you hear me, Dr. Rouse?

A. Oh, yes. I'm sorry.

Q. Okay. Sorry. I was just asking, you mentioned, you referenced that paragraph on the bottom of Page 2 and top of Page 3. Anywhere in this report where he said it's the most significant part of the --

A. No. That's what I'm saying. He mentions it, I thought, another time, but again does not -- let's see. I'm trying to -- I don't want to miss --

Q. I can lead you, the last time that I see it is at the

bottom of that Page 3, the very bottom paragraph.

A.   Yeah, "The child may have had a coagulopathy, which appears to have included a sagittal sinus thrombosis and possibly cortical venous infarctions.  These processes could have resulted in death at any time."  So no, he's clearly not saying it's a predominant finding.  There's other evidence of trauma that is much more pronounced in this child's brain.  Dr. Kagan-Hallet talks about other findings that are much more pronounced than his report does.

The sagittal sinus, I don't disagree with that at all, that there is a thrombus.  I think that is a reflection of the injuries that have occurred to the brain.  As the brain is swelling, as the child is hospitalized, with, you know, organ system failure, blood flow is slowing down.  As blood flow slows down, it clots.  That's one of the things that can lead to blood clotting is stasis, or slowing of the blood.

This child, the brain has enough changes to easily understand why a thrombus could occur in the sagittal sinus.  I don't think the thrombus alone is a significant injury to the brain.  I think it's in response to the other injuries to the brain.

Q.   Now, he, on Page 38 of Dr. Leestma's testimony -- I'll give you a chance to turn there.

A.   Yes.

Q.   The first answer discusses, I guess, some of your

conclusions, and he says that you concluded that "contusion infarcts, meaning physical trauma caused these."  I guess we need to go back to the, some of the infarcts that he was referring to.

A.   Within the brain.  These are in the, these are all speaking of brain infarcts, yes.

Q.   And then he says --

A.   Sinus contusion infarcts.

Q.   Okay.  And he says he's unconvinced of that and thinks these are due to the venous infarctions.  Can you comment on that?

A.   Well, first of all, I alone am not, I'm not the only one calling them contusion infarcts.  Dr. Kagan-Hallet uses that term.  And "contusion" means bruised or impact.  Contusion is a blunt force.  So she's not available to speak now, but she felt they were resultant of trauma, as a neuropathologist.  I have experience in neuropathology, but I am not a board certified neuropathologist, so I wouldn't -- the other thing, this child has evidence of blunt force injury to the head.  There are bruises of the head, there's bleeding in the head, there's multi-focal swelling.  There's tearing -- he doesn't even mention, I don't see where he mentions the tearing of the myelin and the axonal body.  That's sheering of the fibers in the brain.  These are all traumatic.  The thrombus could not have caused all of those other things.  You would not get the

bruising from the thrombus.  You would not get the myelin tearing.  You would not get the hemorrhage in the retina.  The whole constellation is of trauma to the brain.

The military uses the term now, you know, "Total Brain Injury," TBI.  I mean, this is -- this child has microscopic evidence of trauma to the brain.  It shows up differently in different tissues.  In the white matter of the brain, there's swelling.  There's infarcts.  In the, you know, subdural space, there's a collection of blood.

You know, we see microscopically different manifestations, but it's all due to trauma.  Trauma explains all of the findings.  I don't see anything described by any of the neuropathologists, Dr. Leestma or Dr. Kagan-Hallet, or on my own examination, anything that was not explained by trauma.

For example, there was not a tumor of the brain.  There was not, you know, there was nothing there that cannot be explained by the trauma to the brain.

Q.   Did you recall that some other doctor had done a physical examination on this child just over a month before the child was killed?

A.   I believe the child was seen when she left the mother and grandmother's residence, shortly after that time frame.

Q.   And do you recall -- did you, were you presented at any time with any evidence that this child, JG1999, the victim in this case, had any kind of bleeding disorder?

A.   No.   By familial reports, her development was all normal, up until the time she left her biological mother's home.  And that examination, I believe it was an emergency room, but certainly it was by physicians.  They all gave no indication of any bleeding disorders, any marks on her body, any history of bleeding.  They gave her a completely normal physical exam.

Q.   And would you have expected -- and I'm probably going to destroy this, but a coagulopathy and a venous infarction to have shown up in a full medical examination of a small child?

A.   You would expect to see findings.  There would often either be a history of bleeding episodes, bleeding into joints. Kids, toddlers when they're learning to walk, they bang around and bump and fall.  They bleed into joints.  Family history of bleeding disorders.

The other thing, she was also hospitalized prior to her death and had a lot of blood work drawn during those several days that she survived.  There was no evidence of any bleeding disorder at that time.  She did not bleed around her catheter site.  She did not bleed into her bladder.  You know, there was no evidence of a coagulopathy in this child, medically.

Q.   Now, on Page 46 of Dr. Leestma's testimony, he mentions your testimony about the retinal bleeding and that you had said that it was of the magnitude of a car accident.  And then he said he did not agree with you.  Can you comment on that as far as from your perspective?

A.   We see -- my understanding, again this is, you know, an ophthalmic, an ophthalmologist may be able to give you more specific, as far as pounds, you know, pounds of pressure or sheering type injuries.  But we do not see in minor trauma, you know, kids on the playground, bumping around, minor injuries, children do not get retinal hemorrhages.  If you looked at kids, you know, playing sports, those type of injuries.

I have seen retinal hemorrhages in people that have been victims of car accidents.  You know, things where there is a tremendous transmission of forces, they get retinal hemorrhages.

Clearly, there's different, you know, whether it's a sheering, a rotational injury, are indicative of -- you know, different forces transmitted result in retinal hemorrhages. You know, the retinal hemorrhages are nice, you can see them on exam.  It's really the only part of the brain you can visualize, you know, in the physical exam.  And so we can see that in living victims as well as at autopsy.  And like I said, minor trauma typically does not cause bleeding in the retina. Retinal hemorrhages indicate significant force.

Q.   Okay.  I'm going to back up in Dr. Leestma's testimony just a minute to Page 32, because he was asked several questions, both about your testimony and placing a date and time or age on the injuries.  And then he was asked if he could do so.  And I'll direct your attention to the question at the

top of Page 32 in his testimony, where he's asked, "In this particular case, given the information that you had available to you at the time, were you able to date or age this particular process of the venous thrombosis?"  Do you see that question?

A.    Yes.

Q.    And he says, "Yes, some aspects."  And then just below that, he begins to talk about the blood clot and it being just a -- he discusses that.

I wanted to ask you, first of all, about your response to that, in the sense of him being able to identify the timing of the -- the timing of the blood clot versus the timing of other recent bleeding.

THE COURT:  Are you differentiating here, Mr. Roberts, between the venous thrombus and the subdural hematoma and the subarachnoid hematoma?  Can you tell us, can you walk us through each one of these, Dr. Rouse --

THE WITNESS:  Well --

THE COURT:  -- and how you can age --

THE WITNESS:  Well, to the best of my ability, certainly.  When we're looking at dating, I think there are many, there are many physiologic factors that go into how the tissue responds after an injury.  And that's what we use to date.

You know, we know when an injury occurs, as healing

occurs, there is an orderly process that occurs.  You know, the blood cells, they start deteriorating, they break down.  You know, there are facts well-known.  So the order of things is, we can go through and say this is more recent than this one or not.

The difficulty lies in how the body responds to those injuries.  The length of time varies widely, depending on physiologically the condition of that person.  And in this child, she was on life support, on a ventilator, you know, a lot of physiologic derangement in her last few days.  So I don't think you can use -- you know, I think that's just kind of, to me, throws in a margin of error with the timing, because her response, her body's healing was not normal in the last few days.

THE COURT:  How long did she live when she got to the hospital?

THE WITNESS:  I believe it was -- let me see.  I was going to say that it was -- that's well documented in the record.  She was found unresponsive on the 27th.  Okay.  It was actually just the following day, the 28th.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, if I could also clarify, I believe that the record shows she died approximately 25 hours after Mr. Bourgeois allegedly entered the base.

THE COURT:  Thank you.

MR. WISEMAN:  If you look at the time.

THE WITNESS:  When looking -- again, kind of backing up on this child, she has many injuries of many, many ages, on different parts of her body.  Unfortunately, we cannot, with medical certainty, get down very close on the aging of any of the injuries.

We can, however, put them in categories of things that are more chronic, they're healing.  The body is clearly healing in response to this injury.  And some of those are where there's scarring.  You know, that clearly takes weeks for a scar to develop.

Other things show more along the time frame of about a week.  And when I say, "a week," seven days, ten days.  I can't differentiate between those two.  But you know, clearly a few days have passed from the time of injury.

And then she also has injuries that appear to have been in the last day or two.  And you know, one to three days.  I don't think you can distinguish between one day and two days, particularly when her last day was very altered.

THE COURT:  Can I ask you, though, to walk us through the aging or nonaging of the venous thrombosis versus the subdural hematoma?

THE WITNESS:  Okay.  So -- yeah, so that's kind of the spectrum.  Working through her, let's start with the head injuries.  The scalp injuries, the bruising, which as we call

it subgaleal hemorrhage, that means bruising of the scalp --

and contusion is the same as a bruise -- those are recent.  And

I would say within days.  There's fresh blood in those bruises

of the scalp.  And they indicate an impact site.

As you move into the subdural hematoma, she has both.

She has evidence of organization, which is where, you know, the

blood vessels are coming in, the fibrin is laying down.

There's organization.  And Dr. Kagan-Hallet, and I would agree

with this, said approximately ten days.  I like, you know, like

I said, I would go the week to ten days.  I think, you know,

it's not -- there clearly is evidence in her hematoma of an

injury older than two to three days.  However, she also has

evidence of recent bleeding in that hematoma.  And Dr. Leestma

refers to this as well.

So she has acute, meaning -- like I said, I use the

two to three days for "acute" -- as well as one week old.  And

that fits with other injuries on her body.  She had some that

are weeks and months old.

As you go to the thrombus, that appears I think all

within a few days.

THE COURT:  What does that mean, "a few days"?  Like

the time --

THE WITNESS:  One to three days.

THE COURT:  One to three days?

THE WITNESS:  Is what I would range.  I would not,

with medical certainty, give any narrower than that.

THE COURT:  Okay.  Can I ask you another question?  And I'm sure you'll be asked at some point --

THE WITNESS:  Right.  Certainly.

THE COURT:  -- how you came up with that one to three-day time period on the venous thrombosis.  But I noticed in Dr. Leestma's -- I guess neither one of you are pediatricians.

THE WITNESS:  No.

THE COURT:  But just from somebody who has a minimal amount of medical knowledge, the brain fills the skull in an infant and toddler.  Is that correct?

THE WITNESS:  Correct.  I mean, there is fluid, cerebral spinal fluid in their membranes.

THE COURT:  No, I meant, in contrast to us older people, that the brain is shrinking, and there's a lot of extra room in there.

THE WITNESS:  Yes, exactly.  People with Alzheimer's have tremendous shrinking of the brain.

THE COURT:  Right.  But I mean, just as we get older, our brain shrinks.  And so you can have, at my age, at 64, a subdural hematoma that doesn't do to you what a, it would do to a toddler.

THE WITNESS:  Correct, yes.

THE COURT:  Is any of that in play here?

THE WITNESS:  Yes.  I mean, that's -- I don't --

THE COURT:  Because there's no room in a toddler's skull for that kind of thing, is there?

THE WITNESS:  Particularly when she's also getting other swelling in the brain, because that injury to her head was multiple areas.  She has multiple impact sites all over her scalp.  So her brain suffered contusions, blows, transmission of force, to the brain tissue, multiple areas of the brain. Those are all starting to swell.  She's getting hemorrhage.  So that further decreases the room that's available.

THE COURT:  Thank you.

THE WITNESS:  And that's going to slow down the blood flow.  That easily explains the formation of a thrombus.  You know, it's all a constellation of injury that is acutely going on two to three days, on top of previous injury a week prior.

THE COURT:  Go ahead, Mr. Roberts.  Also, one more thing.

THE WITNESS:  Certainly.

THE COURT:  Dr. Rouse, have you got Dr. Leestma's deposition in front of you?

THE WITNESS:  Yes, I do.

THE COURT:  Would you look at the question at the bottom of 89 and his response at the top of 89 -- 88, the bottom of 88, the question by Mr. Roberts, and his response at the top of 89.

THE WITNESS:  Okay, 88.  "An acute," okay, "24-hour may show no healing or very" -- okay.  I'm sorry, the question -- the last question on 88?

THE COURT:  The question on Page 88, Line 18.

THE WITNESS:  Yes, so -- (Reading.)  Yes.

THE COURT:  Do you agree with that?

THE WITNESS:  Wait a minute.  She's routine for six weeks, and then someone sees an acute --

We can pinpoint within broad categories which are the more recent injuries, which are the older injuries, which are the very old injuries, but we can't pinpoint them.

MR. ROBERTS:  Can we clarify that she's reading the same question?

THE COURT:  Pardon?

MR. ROBERTS:  Would you like to clarify that she's actually reading the same --

THE COURT:  She is.  She read it out loud, half of it.

THE WITNESS:  Yes.  I guess it's, I mean, clearly the multitude of injuries makes this a complex picture.  We can categorize the injuries into, you know, ones that appear to be six weeks old, you know, five, six weeks old, to some that are, like I said, a week old, some that are days old.  You know, days, weeks or months.  We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date.

That is beyond medical --

BY MR. ROBERTS:

Q.    And Dr. Rouse, because of that, is there a -- what importance do you, as a medical examiner, place upon when a victim decompensates or place upon surrounding factual circumstances that are recorded to you in assessing when an injury occurred and when a death occurred?

A.    Well, certainly the circumstances help place how significant the injury is in resulting in the death.  For example, this child has evidence of brain injury that is a week old.  By all accounts, she was functioning neurologically fairly normally during that week.  She was conscious, talking, walking.

     She has evidence microscopically of recent injury, days.  At a point on the 27th, clinically her neurologic status changed abruptly.  She lost consciousness, was no longer walking, talking.  That fits very well microscopically with the acute injuries.  The timing fits well.

     If you have -- certainly people survive with neurologic injuries.  They reach a point, another injury added on top of that certainly can push them over to where it is nonsurvivable.

     And so in this case she has a multitude of injuries.  In determining the significance of each of them, clearly she tolerated and was alive, physiologically tolerated the earlier injuries.  They did not result in her immediate death.  At some

point an acute injury, an injury occurred that caused her to decompensate.

Q.   Well, if you have hypothetically --

A.   The brain was not able to tolerate that amount of swelling.  She lost consciousness.

Q.   So hypothetically, if you had a -- if you were presented with a situation or a case where a child had both chronic, older and acute recent injuries, both of which may have contributed to a fatal injury and death, and you were presented with evidence or information that the child was active, singing ABCs just prior to the most recent injury, and then went limp immediately after that injury, would that play any role in making a determination in your --

A.   Absolutely.  We --

        MR. WISEMAN:  Objection, Your Honor.  Objection.  I think that hypothetical misstates the evidence.

        THE COURT:  Could you say it again?

        MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.   I said if, hypothetically, if you had a victim who had both chronic older injuries and acute injuries, and that both of those contributed to her death, how much more would it play, would it be important to know information such as a child is active, singing her ABCs, just before the most recent injury, and then thereafter becoming immediately limp when they are

injured in a subsequent, recent injury?

MR. WISEMAN:  Same objection, Your Honor.

THE WITNESS:  We -- may I answer?

THE COURT:  Overruled.

THE WITNESS:  Yes, we would use the clinical evidence tremendously.  We'd never, or hope to never do the autopsy in a vacuum.  And we pull in clinical information and correlate it, and correlate her injuries, what we're seeing on the body with what was happening physiologically.  And absolutely the, when the time of the neurologic impairment would absolutely be taken in light of what we see microscopically.  And that is standard practice.  All autopsies, we use all the available information that we have at the time of the autopsy.  We look at the investigation, we review the medical records prior to performing the autopsy, because we look at all the microscopic and gross findings in light of the clinical scenario, what was going on with that individual.

BY MR. ROBERTS:

Q.   On Page 66 --

A.   Absolutely, because the significance, certainly many injuries can be tolerated.  There are certain ones that absolutely cannot be tolerated, are not compatible with life.  Sometimes it's a cumulative effect, and there's injury and injury and injury, and then it reaches a point where that last little extra bit of bleeding is what pushes it over to a

nonsurvivable incident.

Q.   On Page 66 of Dr. Leestma's deposition, the very last two sentences on that page.

A.   66, yes.

Q.   He's asked about a statement that actually does appear in his report, where it says --

MR. WISEMAN:  Your Honor, I'm going to object to the characterization by Mr. Roberts.

THE COURT:  Would you restate that, please?

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.   I'm referring to, on Page 66, Dr. Rouse, to a statement that appears in the report and that Dr. Leestma actually testified to regarding that, "It cannot be known if the acute component contributed or caused the death."  Do you see that?

A.   Wait a minute.  On Page 66?

Q.   At the very bottom of Page 66.

A.   Oh, "But then you state it cannot be known if the acute component contributed or caused the death."

Q.   Right.  And then, and then he, on Page, at the top of 67, his answer is "That's right."  And then I ask, I ask him immediately thereafter, "Is that excluding eyewitness testimony?"

And his answer is "Basically, yes.  I'm just looking at medical evidence."

Is that, in your opinion, is that possibly why there's a distinction between your conclusions and Dr. Leestma's conclusions?

A.    Well, I disagree with that statement.  As a forensic pathologist, witness accounts, certainly we take into account all the investigative information.  Some we discount, some does not fit, some fits.  I mean, but we consider all the information that's available.  And certainly it is only logical that the timing, if there is a newer injury and then an immediate physiologic response in the body, that they are tied together temporally, that one caused the other.  That is a logical conclusion.  And we would, we certainly look at the medical evidence, but that is always looked at in conjunction with clinical evidence, with eyewitness statements, with medical records, physicians' previous examinations.  We would pull that all together to come to our conclusion.

Q.    Okay.  I'm going to maybe go back just a little bit more to Page 47 of Dr. Leestma's deposition.

A.    47?  Yes.

Q.    And he's being questioned by Mr. Abreu, and there's a list of time factors there at the bottom.  It says, "Taking into account the evidence" -- it's halfway down -- "Taking into account the evidence in this particular case that Mr. Bourgeois and his family arrived on the naval base station sometime -- actually, the evidence at trial is that he arrived at 10:03

a.m. on the morning of June 27, 2008."

Dr. Leestma then says, "Okay."

Then Mr. Abreu continues, "And that 911 was called at 11:45 a.m. on the same day."

Dr. Leestma then says, "Okay."

Then Mr. Abreu continues, "And that she died approximately, approximately 24 hours later at 11:05 a.m. June 28."

A.   Yes.

Q.   And then we go to Page 48, where Dr. Leestma says, "That's my understanding."

Then he is asked a question, "Is what you observed about the subdural hematoma consistent with an injury that was inflicted within the 24-hour period that she was on the Corpus Christi Naval Air Station?"

And Dr. Leestma answers, "No."

How would you respond to that question?

A.   I would say yes, there is.  I mean, he even describes in his following answer the two components to the subdural, chronic and then the acute.  And I would argue that the acute does not conflict with occurring 24 hours prior to her death.

Q.   And let me ask this to you, just to clarify.  The fact that the child died at that time didn't mean that you immediately began the autopsy on the child.  Is that correct?

A.   Correct.  The autopsy was not performed till the following

day.

Q.   Okay.

A.   However, bleeding would not continue after death, once the blood pressure stopped.  So --

Q.   So --

A.   That delay, the delay from the time of death to autopsy, we're moving into the realm of decompositional changes, and this child was refrigerated.  That was not an issue. Decomposition was not significant.

Q.   But when you're estimating back a day or two or three, does it take into account the day that, between the time of death and the autopsy?

A.   No.  We would be taking out that day.  Because the physiology stopped at the time of death.

Q.   Okay.  And I want to just reference a couple of pages in your testimony.  Did you have a chance to -- do you have your testimony in front of you?

A.   I have it in front of me.  And I have reviewed it.  I have not read every sentence, but I have it in front of me and I've reviewed it, yes.

Q.   Okay.  I wanted to reference Page 130.

A.   Page 130.

        MR. WISEMAN:  I don't have a 130.

        THE WITNESS:  I'm sorry, I didn't print it, so it's a little -- okay.  130, yes.

BY MR. ROBERTS:

Q.   Defense asks -- this is not important to you, but just for clarification of the record, there were multiple transcriptions of your testimony.  And so I'm going to refer to two separate pages --

A.   Okay.

Q.   -- when I mention this.  On the bottom of what, in one record, is Page 130 is also the bottom of Page 19 in a different docket and different volume.

A.   Okay.

Q.   This is all on day 5, March 8, 2004, when you testified in Corpus Christi.  And what I'm going to reference, what I want to reference is I had asked you a question during your direct examination, towards the bottom of that page.  Were you able to determine how recent or late these injuries may have been, after looking at the photos?  And -- I'm sorry.  I'm going to read the whole question.

A.   Yes.

Q.   "Are you able to, in looking at these photos and during your examination, were you able to determine how recent or late these injuries may have been?"

     And you responded, "These all appear to be what would, what we would call recent injuries."  And then you go on, and there's almost half a page there of you discussing the different colorations of the injury and stuff.

A.   Yes.

Q.   And then I ask you at the end another question.  "Would that be consistent with injuries in the past few days?"  And you said, "Yes."

Dr. Leestma commented that you weren't able to age the injuries any more than just these general statements.  Is there a reason for that?

A.   Well, I think, I think medically within a few days is as accurate as you can get.  I mean, I don't think you can, with medical accuracy, get narrower than a few days window of an injury.  And they -- there is good literature to support that, for example, bruises, the accuracy is limited in how closely we can age them.  There are so many different physiologic events for why, how quickly -- this is referring to bruises -- how quickly they break down.  The hydration status of the person, if the person has a fever, the age of the person.  Children heal differently than adults.  There are many, many variables.  So, you know, certainly if we -- you know, really the only way to accurately follow would be to have a videotape of when the injury occurs and see the progression of the tissue.

Looking back, we can only get within, you know, a window.  And there are clearly injuries that are days.  I agree microscopically we can get a little more accurate.  There are some that appear to be a week to ten days old.  And then clearly there are older injuries, the healing scars.

I feel within medical certainty that is as accurate as you can get, time line, on these injuries.

Q.   One last question.  On Page 50 of Dr. Leestma --

A.   Page 50 of that testimony or --

Q.   No, I was about to tell you.  On Page 50 of Dr. Leestma's testimony.

A.   Oh, okay.

Q.   Go back to that one.  Right in the middle of that page. Just tell me when you get there.

A.   Oh, yes, I'm here.

Q.   Okay.

A.   "Lastly, doctor" --

Q.   Yes, "Lastly, Doctor, based on everything that you" -- well, this was a question posed to Dr. Leestma.  And it says, "Lastly, Doctor, based on everything that you saw that was presented at trial that you reviewed, is there sufficient scientific evidence to conclude that the child, JG1999, died as a result of an injury that was inflicted on the naval base?"

He answers, "No."

How would you answer that question?

A.   I would -- the -- medically, certainly, I cannot say whether it was on the naval base or just off the base.  And I can't get within that hour of, that window of hours of an injury.  But her injuries, her --

MR. WISEMAN:  I'm going to object to any testimony

beyond the medical opinion, Your Honor.  She said, "Medically I can't."  She's about to give another answer.  I'm not sure she's competent to give another answer.

THE COURT:  Overruled.  I'll hear it.  And if it's not any good, I won't pay any attention to it.

THE WITNESS:  Okay.  I'm just going specifically on the question.  It says, "Died as a result of the injury that was inflicted on the naval base."  Time-wise we put it, she has injuries that fit with the timing she was on the medical (sic) base.  The description by witnesses of what occurred on the medical (sic) base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course.

I cannot narrow the injuries down to, I think you said she came on the base at 11:04 -- I'm sorry, the timing when she came on the base.  What pages are those on when they arrived on the base?  Okay.  They arrived on the base at 10:03 in the morning of June 27th.  There's no medical way to determine whether that injury was at 9:03 or 10:30.  We cannot get that narrow as far as when the injury occurred.  And that's where putting it together with the witness reports that she was conscious and awake at the time she was coming onto the base, injuries were described, an incident was described, and then she clinically decompensated, that corresponds with the injuries that we saw in autopsy.  And that is what caused her

death.

MR. ROBERTS:  Your Honor, we don't have any further questions at this time.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Good morning, Dr. Rouse.  My name is Michael Wiseman, and I'm one of Mr. Bourgeois's attorneys.  I'm going to ask you some questions.  I think it's important to be extra precise here.  So when you use the term "a few days," do you use that in the common parlance of "a few" being three?

A.   I would say anywhere from one to three.

Q.   Okay.  So when you use "few," you really mean three, one through three?

A.   One to three.  And I don't think, like I said, you cannot get narrower than that.

Q.   Okay.

A.   It's clearly beyond a few hours.  It appears to be less than a week.

Q.   Now, you used a phrase that I wrote down that, I think you said that the victim here in total suffered from a whole brain trauma.  Is that the phrase you used?

A.   Yes.  She has evidence of diffuse, meaning multifocal, multiple areas of injury to her brain.

Q.   And I think some of the injuries you've indicated are a

week to ten days old?

A.   The subdural shows evidence of organization, which I would concur is a week to ten days of duration.  Minimal organization is how Dr. Kagan-Hallet described it.

Q.   And what you're calling the more recent injuries, the best you can do is tell us one to three days?

A.   Yes.  And that's for the more recent blood.

Q.   Okay.  Now, were you aware, when you rendered your opinions at trial -- and for the Court's purposes, I'm referring here to the Fifth Circuit opinion in this case, at Page 503 of the official report -- that, this is a quote, "He hit her in the head with a plastic baseball bat so many times that her head," quote, "was swollen like a football," closed quote.  Were you aware of that information at the time of your trial testimony?

A.   Yes, I was.

Q.   Okay.  And do you know when, in relationship to the child's death, she was beaten so badly that her head was swollen like a football?

A.   I would have to look at the record.  Off of the top of my head, I don't recall the timing.

THE COURT:  Are you talking about two separate instances, Mr. Wiseman, or the one she just said she was aware of?

MR. WISEMAN:  The one I just mentioned, that her head

was swollen like a football.

THE COURT:  Well, that, she just said she was aware

of that before her trial testimony.  Are you talking about

another one where she was --

MR. WISEMAN:  No, I'm talking about that one.

THE COURT:  The plastic baseball bat --

MR. WISEMAN:  Right.

THE COURT:  -- and the swelling.

MR. WISEMAN:  Right.

THE COURT:  Okay.  She said she was aware of that.

MR. WISEMAN:  That's right.

BY MR. WISEMAN:

Q.   And my next question was, how soon before the child's death that injury was sustained.

A.   How far before her death --

Q.   Yes.

A.   -- was the injury sustained?

Q.   Right.

A.   I would have to refer to the records.  I don't have her, I don't have all the investigative information with me.  I can take a look.

Q.   Okay.  Are you, do you recall that the beatings with the plastic bat occurred prior to the arrival on the Naval, on the Naval Air Station?

THE COURT:  Well, why don't you just tell her when --

THE WITNESS:  That was the report.

THE COURT:  What was the day that that alleged to have occurred?  It was a week or two before this, wasn't it?

MR. ROBERTS:  Yes, Your Honor.  It was --

THE COURT:  Substantially before.  Not just a moment before they got to the Navy Base.

MR. WISEMAN:  If the Court observes that as the case, then I'm satisfied --

THE COURT:  No, no, no.  I'm relying on my distant memory.

MR. WISEMAN:  Oh, okay.

THE COURT:  So you need to tell me if you all have information.

MR. ROBERTS:  Well, Your Honor, my recollection is that, I mean, because these, all these things happened over the six-week period, and the Bourgeois family were taking pictures and stuff, we don't have an exact date and time of when this particular incident happened.  It was just, there were so many of them that were testified about.  And then, of course, Alfred Bourgeois himself told people in jail that he had done these kind of things.  And so there was no date or time around that.  And I don't think we could actually narrow it down to a specific week.

THE COURT:  I just saw, I remembered somebody saying at some point he did the following, during the six weeks

period, and I guess I thought if it was right before the Navy Base, driving in, that somebody would have mentioned it.

MR. ROBERTS:  I think, Your Honor, our recollection is that AB1994 herself --

THE COURT:  She did.

MR. ROBERTS:  -- recalled having the bat.  And then he threw the bat out the window after the incident, or some sort, something of that nature.

THE COURT:  Have you got it in the trial transcript?

MR. WISEMAN:  I have it in AB1994's testimony.  She doesn't give a specific day.  I want to get the best reference I can.  Okay.  On questioning from Ms. Booth, at Page 16 of her testimony, she says that she found this bat, and it was in, while they were in Louisiana.

THE COURT:  It was in what?

MR. WISEMAN:  While they were in Louisiana --

THE COURT:  Yes.

MR. WISEMAN:  -- that she found the bat.  And then she's questioned about did anything bad happen with the bat, and she goes on to say how her father beat the victim with the bat.

BY MR. WISEMAN:

Q.   The venous thrombosis that Dr. Leestma discussed in his testimony, do you consider that to be the cause of death?

A.   Not in isolation, no.

Q.   And you didn't mention that particular condition in either your autopsy report or in your trial testimony?

A.   Not in isolation.  I called the cause of death a closed head injury, which encompasses a constellation of findings.  A closed head injury, as opposed to an open head injury, where there's skull fractures, penetration.  And --

Q.   Right.  You -- I'm sorry.  Go ahead.

A.   So I called it a closed head injury, with a subdural hematoma, because that is, was clearly evident.  There are many findings in the brain, axonal swelling, myelin tears.  I mean, there is a constellation of injuries that all fall under the blunt force closed head injury.

Q.   Okay.  You --

THE COURT:  I guess what you're talking about, I mean, the way I understand it is just a long time of injuries, six weeks worth of injuries.  When they occurred, we don't know, but there was certainly a trial finding that the coup de grâce occurred at the Navy station, when Mr. Bourgeois testified that she fell out of the truck on her head, and AB1994, however, testified that she was smashed against the window of the truck.

So it's a combination of all these events that ended in a single coup de grâce.  Is that your understanding?

THE WITNESS:  Are you speaking to me?

THE COURT:  Yes.

THE WITNESS:  Yes, yes, I would agree.  She had a multitude of injuries, the relative role of which I don't think you can dissect out.  But clearly that last injury pushed it till the brain could no longer compensate and resulted in her death.

BY MR. WISEMAN:

Q.   Doctor, Dr. Rouse, let's take a hypothetical.  Let's remove what the Court just called the coup de grâce of this being smashed against the windshield of the truck.

THE COURT:  I guess I said that because I thought that that was kind of the jury finding, after listening to the testimony.

MR. WISEMAN:  Well, right.  It was, in our view, the uncontested jury finding, because Counsel didn't explore any of these issues.

THE COURT:  I understand.  Thank you.

BY MR. WISEMAN:

Q.   Now, Doctor, let's take hypothetically a situation where you remove that hitting that AB1994 testified about.  Is it possible that a person with a constellation of injuries that this victim had would have died when she died anyway?  In other words, the bleeding, the swelling, all the things going on in her brain, could that have killed her on the naval base, even if this particular injury didn't get inflicted?

A.   You would have expected a different scenario, where she

would have had more symptoms leading up to the death, nausea, vomiting, being somnolent, sleepy, head -- you know, older people describe headaches, that she would have been irritable. There would have been signs, as she was incurring increasing intracranial pressure.

Q.   And if I told you that the record --

A.   -- rather than a very abrupt change.  You also have the acute bruising.  You cannot ignore the scalp hemorrhage, which are impact sites on the head, meaning her head hit -- either something hit her head or her head hit something.

Q.   And those you can't --

A.   -- around those same times.  So that cannot be -- those are impact places on the head, and that clearly identifies there is head trauma that occurred about the time of death, or about the time of the --

Q.   Okay, but those -- I'm sorry.  I keep interrupting you.  I can't see you, so it's hard to know when you're done.

THE COURT:  Well, wait till she stops talking, and then you can talk.

MR. WISEMAN:  Okay.

THE COURT:  That's a clue.

BY MR. WISEMAN:

Q.   Are you finished?

A.   Yes.

Q.   The injuries to the scalp you agree at trial were a few,

quote-unquote, days old.  Do you recall that testimony?

A.   They were recent hemorrhage, yes.

Q.   Right.  Did you use the word "few"?

A.   I believe there were times I used "few" and "recent."
Again, I would put them in the one to three-day range.

        MR. WISEMAN:  Just bear with me, Your Honor.  My
computer shut off.

        THE COURT:  No problem.  I feel your pain.

        MR. WISEMAN:  The Government will stop at nothing.

        THE COURT:  I know it.  It's a conspiracy.

        MS. BOOTH:  Well, Judge, he knows it's not me because
I don't know how to turn one on.

        THE COURT:  Are you serious, Ms. Booth, you don't use
a computer?

        MS. BOOTH:  Yes, I do.

        THE COURT:  Oh, okay.

        MS. BOOTH:  But not very well.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Okay.  On Page 20 of your trial testimony, just so we --

        THE COURT:  Is your computer back up?

        MR. WISEMAN:  Yes.

        THE WITNESS:  On Page 20.  I start at Page 92.

BY MR. WISEMAN:

Q.   All right.  Well, I guess jump ahead 20.

A.    To 112?  Page 112?  I'm going with the numbers at the top of the page.

Q.    Yes.

A.    Right-hand corner.

Q.    Well, I can read it to you.

      Question:  "And so this, your finding would be consistent with injuries in the past few days?"

      Answer:  "Yes."

      That would be Lines 8 through 10.  And the context is you're discussing the injuries to the scalp.

      So at the time of trial, you pinpointed, as best you coul, the scalp injuries to a few days.

A.    Correct.

Q.    If I were to tell you that the medical records from Driscoll Hospital showed that the victim was vomiting at the time she was brought in, or immediately before, would that change your response to the hypothetical with respect to whether there were clinical signs of decompensation?

A.    Vomiting is a sign of increasing -- is a sign of head trauma, clearly.  In a child that had an incident a week prior, and then was slowly succumbing to it, I would have expected symptoms for days prior to their final decompensation.

Q.    Okay.  And do you know for a fact that there weren't such symptoms?

A.    By report, the child was walking, talking, functioning

normal, by account.  All of the accounts I read, that the child was functioning at her normal level.

Q.    And whose accounts were these?

A.    I read the available investigative information.  I would have to refer to that to give actual quotes from it, but their description of their travels and the toilet training issues and whatnot.  There are photographs, and again I don't know the exact dates on all of those, but I do not recall any evidence of significant neurologic impairment prior to --

Q.    Right, and -- I'm sorry.  Go ahead.

A.    -- the day they drove onto the naval base.

Q.    And you would agree that you're relying on the absence of reports of what you're calling clinical signs of neurological decompensation.

A.    We use the physical findings in conjunction with the investigative information.

Q.    Right, and --

A.    Pull the two together, view each in light of the other.

Q.    Okay.  And my question, though, is you're relying on an absence of reports from lay people about clinical neurological findings.

A.    The witness descriptions -- and again, I would have to refer to those.  I'm speaking completely in a vacuum, not having any of those in front of me.  There, I believe there are fairly precise accounts of her doing activities of daily

living, functioning, neurologically normal.  She was conscious prior to driving onto the base.

Q.    Right.  And --

A.    The information that was provided.  Again, I would have to go back and could provide those for you if --

Q.    Again, in my hypothetical, if a person is succumbing to neurological damage, at some point they're going to be, go from conscious to unconscious.  Would you agree?

A.    Yes.

Q.    And the fact that she at some point became unconscious on the naval base does not by itself mean that she succumbed as a result of a particular injury.  You're making that conclusion, but it doesn't necessarily follow to a degree of medical certainty.  Is that right?

          THE COURT:  I'm not understanding --

          THE WITNESS:  There are recent bruises that indicate something happened to her head at that time.

BY MR. ABREU:

Q.    Right, which could be three days old.

A.    There's impact, recent impact to her head and a clinical decompensation.

Q.    Right.  And the clinical, the injuries that you just discussed could be up to three days old.

A.    The scalp, they're recent.  We cannot pinpoint them any, with medical accuracy.  You cannot narrow the window of when

those occurred.

Q.    Okay.  You met with --

A.    If she died from an injury that the insult that occurred a week prior, again, yes, at some point you would go from conscious to unconscious.  But you would anticipate days of symptoms prior, lethargy, not eating, vomiting for several days' duration, you know, that you would anticipate a constellation of symptoms.

Typically also it would be, the loss of consciousness would be closer to the insult, not a week later.  Typically it may be a day or two, but you would expect it to occur more recently and with symptoms in the intervening period.

Q.    You would agree that at the time of her death, her brain was severely swollen?

A.    Yes.  She had mild to moderate cerebral edema.

Q.    And the CAT scan report from Driscoll Hospital refers to a severe edema?  Are you aware of that?

A.    Yes.

Q.    And edema is -- well, is edema the medical terminology that we use for swollen, swelling?

A.    Yes, yes, fluid that is into the cells is edema.

Q.    All right.  Do you have any explanation for why Dr. Kagan-Hallet called it mild to moderate, and the Driscoll CAT scan referred to it as severe?

A.    I think those are, there's overlap, and those are broad

terms.  I cannot obviously speak for Dr. Kagan-Hallet.  She sees cases of people that die from the injuries.  Certainly in the hospital they would be looking at the majority of people that are at that time alive.  That's purely speculating on the difference.  But that is a -- that's not a, that is somewhat of a subjective assessment of a finding.  It's not a measurable, you know, 3 centimeters, 6 centimeters.  It is a global description of the amount of edema.  And I would attribute differences to a neuropathologist and a radiologist are looking at different, using different terminology, using different references.

Q.   Doctor, I'm going to put up on the overhead screen here something you obviously won't be able to see.

THE COURT:  Has that been admitted?

MR. WISEMAN:  Not yet.  So can I put it up on the overhead or put it up on --

THE COURT:  Well --

MR. ROBERTS:  Your Honor, I'm going to --

THE COURT:  Don't hold it up until it's been admitted.  I mean, she can't see it, and I'm not going to look at it until it's been admitted.

MR. WISEMAN:  Well, that's a good point.

MR. ROBERTS:  That's been admitted?

MR. WISEMAN:  No.

MS. BOOTH:  No, no.  And she's not going to look at

it.

MR. WISEMAN:  Do you object?

MR. ROBERTS:  Yeah, I do object.  They're my notes.

MR. WISEMAN:  Yeah.

MR. ROBERTS:  Yeah, unless you can tell me why my notes need to go into the record.

BY MR. WISEMAN:

Q.   Dr. Rouse, did you meet with Mr. Roberts prior to your testimony at trial?

A.   I believe we did, yes.

Q.   And how -- did you meet on one occasion or more than one occasion?

A.   I would have to refer to records.  I'm not --

Q.   Do you recall having a discussion with him about the jurisdictional questions related to your testimony?

A.   Jurisdiction is something we take into account, you know, in many phases in the autopsy and the investigation.  I don't recall what discussions I had specifically with Mr. Roberts versus other attorneys versus the NCIS agents.  But yes, jurisdiction had been discussed, prior to -- or was discussed prior to my testimony.

Q.   Okay.  And your understanding is that as a federal medical examiner, your involvement in the case required, all things being equal, that there be federal jurisdiction, or at least ostensible federal jurisdiction?

A.    That is our usual rule, by the U.S. code.

Q.    And your understanding further is that for there to be federal jurisdiction for you to get involved, the fatal injury has to have occurred on, within the special maritime and territorial jurisdiction of the United States?

A.    There are a variety --

MR. ROBERTS:  Your Honor, I object.  It calls for a legal conclusion.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q.    Well, was that an issue that you ever talked with United States attorneys prior to your getting involved in the case?

MR. ROBERTS:  Objection, Your Honor.  There's no --

THE COURT:  Sustained.

MR. WISEMAN:  Your Honor, I've got a page of notes which Mr. Roberts was good enough to share with us months ago which indicates that a conversation with the witness, they discussed these topics.  I would offer the page of notes to show that this was an issue of concern to the Government and to the witness, and to find out what discussions may have been had pursuant to that concern.

MR. ROBERTS:  Your Honor, my response to that would be I wouldn't have any problem with the Court viewing the document, of course, so you could make this determination, but there's nothing in my notes that indicate the word

"jurisdiction."  They simply are my notes interpreting what the witness is telling me while I'm writing.  And I think it's entirely inappropriate to question a witness based on my notes.

THE COURT:  Sustained.  Just ask her if she had any questions about where the death occurred, if Mr. Roberts discussed it with her.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.  Did Mr. Roberts and you have a discussion with respect to where the fatal injury --

THE COURT:  The importance, the importance of where the death occurred.  How about that?  Does that do what you want?

MR. WISEMAN:  Well, I'm not entirely sure what I want.

THE COURT:  Well, there you have it.

BY MR. WISEMAN:

Q.  Did you have a discussion with Mr. Roberts prior to your testimony as to where the fatal injuries occurred in this case?

A.  I cannot recall precisely, I mean, this many years later, who discussions were with.  Like I said, those issues are routinely discussed.  Jurisdiction becomes an issue from the time I first received a call about the death, working closely with NCIS, working with the local authorities.  I mean, we delineate jurisdictional issues prior to performing the

autopsy.  I don't recall what specific discussions I had with Mr. Roberts prior to my testimony.

Q.   All right.  Would it refresh your recollection if I told you that Mr. Roberts wrote a note that has a --

THE COURT:  Hold up.

MR. ROBERTS:  Objection.

THE COURT:  Sustained.

MR. WISEMAN:  Well, then I would offer the notes into evidence, Your Honor.  I'm trying to refresh the witness's recollection with a document.  It's a prior statement of the witness.

THE COURT:  She -- you don't have any indication that she knows anything about the document.

MR. WISEMAN:  It's -- Mr. Roberts just told you that these are his notes of his conversation with her --

THE COURT:  No.

MR. WISEMAN:  -- therefore, it's a prior statement of the witness.

THE COURT:  Okay.  It's not a prior statement of her. It's Mr. Roberts' statement, period.

MR. WISEMAN:  He just told you it was him writing down what she said.

THE COURT:  No, he didn't say that.

MR. WISEMAN:  I thought that's what he said.

MR. ROBERTS:  I said it's my interpretation of what

the witness is saying.

THE COURT:  Yeah, that's not the same thing.

BY MR. WISEMAN:

Q.   Do you agree, Doctor, that blood does not communicate easily between the brain and the retina?

A.   Blood communicates via blood vessels through those tissues.  As far as bleeding outside of the vascular space?

Q.   That's what I meant.  I'm sorry.

THE COURT:  You mean, you're talking about loose blood?

MR. WISEMAN:  Loose blood, yes.

THE COURT:  Not in vessels.

MR. WISEMAN:  Yes.

THE WITNESS:  No.  I mean, there -- the optic nerve is leaving the brain.  It's going back and fanning out in the retina.

BY MR. WISEMAN:

Q.   And do you also agree then that retinal bleeding can be a result of intracranial pressure that Dr. Leestma discussed in his deposition?

A.   Um --

THE COURT:  That what?  I'm sorry.  Would you say that again?  I didn't hear it.

MR. WISEMAN:  That retinal bleeding can be the result --

THE COURT:  Thank you.

MR. WISEMAN:  -- of intracranial pressure.

THE WITNESS:  Yes, I would not disagree that it can be the result of that.  That would -- I would refer to an ophthalmic pathologist.

MR. WISEMAN:  Your Honor, I'm going to ask the Court, since I didn't have the benefit of the report, just to have a few minute break to consult with my colleagues before I wrap up.

THE COURT:  Sure.

MR. WISEMAN:  Thank you.  Can we --

THE COURT:  Well, do you want to go outside?

MR. WISEMAN:  Yeah, that sounds good.

THE COURT:  That's fine.

MR. WISEMAN:  Okay.

MS. BOOTH:  Judge, would it be okay if we just like stopped for lunch and they could do it during their lunch hour?

MR. ROBERTS:  That way they don't have to rush.

MR. WISEMAN:  We're going to be done with her --

THE COURT:   I hate to keep her waiting during our lunch hour.

MS. BOOTH:  Oh, okay.  Yes, I forgot about her.

THE COURT:  I was thinking about her, not us.

MS. BOOTH:  Sorry, Dr. Rouse.

THE WITNESS:  Oh, that's okay.

THE COURT:  Of course, she can actually eat while she's, while we're doing this, and we wouldn't know the difference.

COURT RECORDER:  Off the record?

(Off the record from 11:50 a.m. to 11:53 a.m.)

MR. WISEMAN:  Thank you for that accommodation, Your Honor.

THE COURT:  Certainly.

BY MR. WISEMAN:

Q.   I have one more question, Dr. Rouse.  Did you meet with a Dr. Oliver prior to your testifying in this case at the time of trial?

A.   Bill Oliver?

Q.   Yeah.

A.   Yes.

Q.   You did meet with him?

THE COURT:  Yes.  She said, "Yes."

MR. WISEMAN:  All right.  Nothing else.  Thank you.

THE COURT:  Anything further, Mr. Roberts?

MR. ROBERTS:  We have nothing further, Your Honor.

THE COURT:  All right.  Thank you very much, Dr. Rouse, for accommodating us with your schedule.  You're excused.

THE WITNESS:  Okay.  Thank you very much.  Bye-bye.

THE COURT:  Okay.  Now do y'all want to break for

lunch, or do you want to start --

MR. WISEMAN:  I think we could probably use a short break maybe, like 40 minutes.

THE COURT:  You all tell me.

MR. WISEMAN:  Yeah, I understand.

THE COURT:  I have my lunch brought in.

MR. WISEMAN:  You do?

THE COURT:  So y'all are the ones who are having to go out and schlep around and --

MR. WISEMAN:  Schlep around?  Now I feel like I'm an old man.

THE COURT:  Sorry.

MR. WISEMAN:  1:00 o'clock will do fine with us. 1:00 o'clock?  Okay.

THE COURT:  1:00?

MR. WISEMAN:  1:00?

THE COURT:  No, you tell me.

MR. WISEMAN:  1:00.

THE COURT:  Forty minutes is fine.

MR. WISEMAN:  1:00.  1:00.

THE COURT:  1:00, going once --

MS. BOOTH:  The United States would ask for 1:00.

THE COURT:  1:00 o'clock then.  Thank you.  We're going to be finished for you to leave here at 3:30?

MR. WISEMAN:  I hope so.

THE COURT:  Okay.

MR. WISEMAN:  That's our hope.

MR. ROBERTS:  In that case, we'll argue --

THE COURT:  Mr. Bourgeois, are you on the phone?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Ms. Scotch, would you make arrangements for him to be back on the phone at about five of 1:00?

THE CLERK:  Yes, and I don't want him to hang up yet.

THE COURT:  Don't hang up yet, Mr. Bourgeois.

THE DEFENDANT:  Yes, ma'am, Your Honor.

(Court and Clerk conferring off the record.)

(Recess from 11:55 a.m. to 12:51 p.m.)

THE COURT:  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.  Thank you.  We're about to get started in a few minutes, and just wanted to make sure you were with us.

THE DEFENDANT:  Yes, ma'am, Your Honor.

MS. BOOTH:  Judge, I think we need to -- the way that we're going to argue, I hope you don't have any problems with it.  We're going issue by issue.  But the way that they broke their issues down and the way that we broke our issues down kind of, so it's going to be -- it's a good thing you're very, very bright, because --

THE COURT:  I'm not feeling it today.

MS. BOOTH: Because all of us are going to be arguing different, different points. And they kind of lap over each other.

THE COURT: I wondered if we could -- okay. It wouldn't be helpful then when Ms. Larin does mental retardation, and somebody responds to that?

MS. BOOTH: Not --

MR. ROBERTS: Yeah, that --

MS. BOOTH: That one is okay. Right.

MR. ROBERTS: No, they're all like that.

THE COURT: Could we do that? Would you all mind?

MR. WISEMAN: No, that's what we anticipated.

THE COURT: Okay.

(Counsel conferring off the record.)

THE COURT: Are we finished?

MS. BOOTH: I still think it's going to be a little fuzzy.

THE COURT: That's all right. That's what I love about the FT, whatever, FTR Gold, is that I can listen to it late at night and hear the whole thing over again when I'm --

MS. BOOTH: Oh, isn't that fun?

THE COURT: -- coming up with something.

MS. BOOTH: You can't get it to go in your car, though.

THE COURT: No, thank God.

MS. BOOTH:  See, and that's a -- well, that used to work.

MR. ROBERTS:  Except for when you're traveling to Victoria.

MS. BOOTH:  Yeah, well it used to work for me because I could try a case and then listen to the tapes.

THE COURT:  Actually, I can burn a CD and put it in the car.  I'm just not of that mind.

MS. BOOTH:  Okay.

THE COURT:  Are we ready?

MR. WISEMAN:  Yeah.

THE COURT:  Is it okay?  Would you like to begin?

MR. WISEMAN:  We can get started, yeah.

THE COURT:  Is it okay with you all if we do one issue at a time?

MR. WISEMAN:  Yeah, yeah.

THE COURT:  And we're starting the mental retardation?

MS. LARIN:  Yes.

THE COURT:  Okay.

MS. LARIN:  Good afternoon.

THE COURT:  Start at the beginning where you were doing the do-over.

MS. LARIN:  Okay.

THE COURT:  Tell me again the factors.

MS. LARIN:  Okay.

THE COURT:  I know I've had them out of Atkins, but I want to do it again.

MS. LARIN:  So there are three prongs of the mental retardation definition.  The first is significantly subaverage IQ.  The second are deficits in adaptive functioning, and there's kind of two tests for that.  I'll talk about that.  And the third is onset of these symptoms before the age of 18.  And this definition has been accepted by the courts.

An important factor in this case to consider is that the definition of mental retardation is not a definition of exclusion.  The DSM states the diagnostic criteria for mental retardation do not exclude -- do not include an exclusion criteria.  Therefore, the diagnosis should be made that whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder.

This means that as long as Mr. Bourgeois meets this three-prong test, he is mentally retarded.  He can still have other mental health problems, even many other mental health problems.  The presence or absence of other mental health problems does not change the fact that he is mentally retarded.

So the real debate in this case, in my opinion, is in regards to the question of adaptive deficits.  So I want to start my argument there.  There are two definitions or tests for deficiencies in adaptive deficits.  One, under the DSM, you

have to have deficits in two of ten areas.  And under the AAIDD, you have to have deficits in at least one of three domains.

And in this case --

THE COURT:  Wait a minute, the DSM, two out of ten, and what's the other one?

MS. LARIN:  One of three domains.

THE COURT:  By what?

MS. LARIN:  That's by the AAIDD, formerly the AAMR.

THE COURT:  Got it.

MS. LARIN:  In this case, Dr. Victoria Swanson tested and interviewed Mr. Bourgeois, interviewed eight people who knew about his functioning and his environment, and administered two retrospective tests of adaptive function regarding Mr. Bourgeois's functioning as a child.

In addition to having over 35 years experience of working exclusively in the field of mental retardation, Dr. Swanson was an excellent expert in this case because she's familiar with the local school system and the local supports and local culture.

In her considered opinion, Mr. Bourgeois meets both tests of adaptive deficits.  He has significant deficits in all three domains listed by the AAIDD.  That's conceptual, social and practical.  And under the DSM's rubric, Dr. Swanson opined that Mr. Bourgeois is significantly impaired in functional

academics, health and safety, and social interpersonal skills.

Dr. Swanson's opinion came under attack on several fronts during the course of this hearing, and I'd like to talk about those.

THE COURT:  Thank you.

MS. LARIN:  However, in sum, the attack was that according to the Government's experts, Mr. Bourgeois does not present himself as someone who is mentally retarded, and therefore cannot be mentally retarded.

The Government's response fails --

THE COURT:  And I understand.  I would think that you would be able to compensate in one area to hide the other areas --

MS. LARIN:  Yes.

THE COURT:  -- in many areas.

MS. LARIN:  And that's what Dr. --

THE COURT:  For instance, if we just deal with him in the verbal situation, and he seems very outstanding in verbal situation, it doesn't necessarily mean that we've ever, that I've ever observed him anything other than verbal communications, which are apparently pretty good, you know, from writing letters to me.  So I am interested in what you have to say about how you can mask that.

MS. LARIN:  Okay.

THE COURT:  But go ahead with your presentation.

MS. LARIN: Okay. Well, first, it's important to understand that the ability to mask certain deficits does not mean you're not mentally retarded. And that's why I went into the important precept that adaptive skill limitations often coexist with strengths. And that's why the DSM says you only need to be deficient in two of ten areas. You can be strong in eight areas, as long as you meet the other two prongs of the test and you're weak in two areas, significantly deficient in two areas.

THE COURT: What areas did she say he was deficient in under the DSM?

MS. LARIN: She listed functional academics, health and safety, and social interpersonal skills. And Dr. Moore agreed that you can be weak in two areas and strong in eight areas and still meet the definition for mental retardation.

THE COURT: Sorry, functional, academic, health and safety and --

MS. LARIN: Social interpersonal.

THE COURT: Thank you. So that's three out of ten?

MS. LARIN: Three out of ten. In this case, it seems clear that Mr. Bourgeois demonstrated relative strengths in the area of work. He presents well due to his loquacious manner, and he has a real ability to spell. These three relative strengths, however, do not, under the definition, overcome his significant deficits in intelligence and adaptive functioning.

The second debate presented was the question of how best to do a retrospective assessment of adaptive functioning. I hope this Court will consider that Dr. Swanson oversaw the most correct and accurate retrospective assessment possible under the circumstances, while the Government's expert, Dr. Moore's, was unreasonably truncated, failed to follow known best practices in the field, and focused on a time period that had little relevancy to the question of Mr. Bourgeois's mental retardation.

In addition to conducting a thorough evaluation of Mr. Bourgeois himself to assess his current adaptive functioning, including a skills test and a broad spectrum academic test, Dr. Swanson also interviewed eight people from Louisiana to help her learn about Mr. Bourgeois's developmental years.

Dr. Swanson chose Ms. Frank to complete a thorough assessment using two different instruments to measure adaptive functioning. Dr. Swanson decided Ms. Frank was an ideal respondent, because first, she was not close to Mr. Bourgeois and had had little to no relationship with him since he was a young child, thereby lessening the opportunity for bias.

Second, she had at one point served as sort of an assistant caregiver role to Mr. Bourgeois. And so she had a broad understanding of his abilities as a child.

And third, Ms. Frank had a clear and strong

recollection of Mr. Bourgeois's functioning at a certain specific age, age seven.

Dr. Swanson explained the difficulties of doing a retrospective evaluation of adaptive functioning.  However, she was impressed with Ms. Frank's ability to recall and her unbiased approach.

Dr. Swanson completed a Vineland using an interview type format, which allowed the doctor and the informant to have a dialogue and allowed, in Dr. Swanson's opinion, a more full and complete picture.

THE COURT:  You know, to me, it's not whether these witnesses were believable or their empiric evidence was credible, but whether or not this should have been brought to the attention of the jury, that it's a contrasting opinion.  No matter whether it's correct or not correct or what I believe is correct, it's just that you're saying this should have been explored and brought to the jury.

MS. LARIN:  Yes.  I agree, it should have been brought to the jury.  And I think that if you're looking at the question that way, Ms. Frank would have been a good witness for the jury.

THE COURT:  I'm not sure about that, because I remember the cross-examination on all of these witnesses that were brought in.  But the point is not necessarily -- well, you just feel that a bigger effort should have been made in all of

the areas that you've brought up, besides the mental retardation, all of them.

MS. LARIN:  Speaking of a bigger effort, Dr. Swanson didn't just stop with Ms. Frank.  She interviewed seven more people to learn about Mr. Bourgeois's functioning.  She visited his area where he grew up.  She visited his school and spoke to a special ed teacher who had knowledge about the lack of supports that were available to him when he was a child.  She talked to people who had worked with him when he first learned how to drive a truck.

And although she decided that none of them had a sufficient level of understanding or memory or broad enough experience with Mr. Bourgeois to complete a formal assessment, she was able to rely on them for small pieces of information to develop a large picture of his development and how he was able to learn or not learn.

And she learned from them that he did have significant difficulties, especially in areas like learning to drive, help with job applications, paperwork, bills, laundry, food preparation, the simple skills of life.

THE COURT:  I didn't know he had troubles with bills. I didn't remember that one.

MS. LARIN:  She said that he --

THE COURT:  Can you give me an example?

MS. LARIN:  Well, she said that he had to rely on his

brother to help with the bills and his wives, and that's what his sister Claudia had said. So -- she was specifically asking about bills, which is why I --

THE COURT: Okay.

MS. LARIN: Dr. Swanson's assessment followed the best practices, as delineated by the office of both the ABAS, the ABAS, and the Vineland. On the contrary, Dr. Moore performed a more truncated and focused evaluation, one that served to point out Mr. Bourgeois's strengths and ignored his weaknesses. This is not the appropriate method for evaluating adaptive functioning.

Dr. Swanson explained that practitioners, when presented with a low IQ, as in this case, must evaluate the client's weaknesses. When presented with an apparent strength, the doctor is expected to probe that area of functioning to learn how the person acquired his skills and if he did so with supports. And Dr. Moore failed to follow these recommendations.

Dr. Moore's assessment notably failed to rely on the input of any of Mr. Bourgeois's relatives. Dr. Moore interviewed two family members, one in the presence of Counsel and one out of the presence of Counsel. He administered the ABAS to one sister, but determined that -- and refused to rely on the test results. The other sister, admittedly a poor historian, refused to take the test.

After these two interviews, Dr. Moore did not attempt to make any further investigation into Mr. Bourgeois's childhood. He did not talk to anyone from the school system, for example. He did not speak to anyone who knew him when he was learning how to drive. He did not speak with any of his neighbors.

He did interview Mr. Nate Banks, who, according to the Government, grew up with Mr. Bourgeois. However, the Government did not call Mr. Banks to testify at the hearing, so we were not able to test his credibility as far as his recall to Mr. Bourgeois's functioning at the age of 18.

The remainder of Dr. Moore's assessment centered on interviews of former co-workers of Mr. Bourgeois in the latter part of his career as a truck driver. These informants admittedly knew Mr. Bourgeois in a limited area of his life and only as an adult. As such, they are not appropriate respondents under the best practices for retrospective evaluations of this developmental disorder.

Further, the authors of the ABAS, as published in ABAS 2 Clinical Use and Interpretations, their chapter on its use in the retrospective evaluation, recommend that the ABAS be given in an interview format when used in a retrospective evaluation, and that respondents only be asked to answer questions for areas of functioning that they have a clear knowledge and memory of.

Dr. Moore violated the recommendations of these authors by having the respondents complete the survey on their own and by having them answer questions in areas where they clearly had little to no knowledge.  In some areas, the informants indicated that they had to guess on more than 50 percent of their responses, and some up to 100 percent of their responses.

By all accounts, these test scores cannot be considered reliable.  At best, these respondents reveal what most of us could guess at, that Mr. Bourgeois has an area of strength in the area of work, specifically truck driving.  This strength, we know, cannot protect him from the diagnosis of mental retardation.  No matter the level of functioning Mr. Bourgeois displayed in the work domain, it does not erase the fact that he's significantly impaired in the domains of functional academics, health and safety, and social skills.

The final area --

THE COURT:  I watched last night an hour of him and his social skills with a big group of people.

MS. LARIN:  Oh, you did?

THE COURT:  It was one of the exhibits.

MS. LARIN:  A video?

THE COURT:  The video.

MS. LARIN:  He's a loquacious person.

THE COURT:  Didn't seem to be any problem with

interacting with the guests that he had.

MS. LARIN:  Well, I think that there is evidence in this case that he has significant problems in, especially with new people, they talked about a lot, in the family arena.  He has a different sort of problem in the social arena --

THE COURT:  Thank you.

MS. LARIN:  -- with intimate friends, but might not present as a problem.

THE COURT:  Thank you.

MS. LARIN:  A final area of dispute concerned the etiology of some of Mr. Bourgeois's recognized deficits.  As the Government identified, the million dollar question, in the direct of Dr. Price, "That's the million dollar question, Doctor.  How can we determine what the source, whether the problems he displays are symptomatic of mental retardation or are the result of a personality disorder?"

Dr. Price noted in his report and testimony that while Mr. Bourgeois may have some areas of relative weakness, he believed that they were better explained by Mr. Bourgeois's personality disorder and not by mental retardation.  This, however, ignores the precept and the DSM's directive that mental retardation is not a diagnosis of exclusion.  In other words, it doesn't matter what the cause of the deficit --

THE COURT:  You can have lots of other things besides mental retardation.

MS. LARIN:  Right.  And it doesn't matter what causes the deficit.  As long as it existed prior to the age of 18, or had its onset prior to the age of 18, it counts as a deficit for the diagnosis of mental retardation.

So in this case, even if it was a personality disorder that led to these deficits, it still counts for mental retardation.  And considering that Dr. Price testified that this personality disorder was a pervasive developmental problem -- I don't know if he used the word "developmental," but it's a pervasive problem that's been long standing in his life, I argue that that means it counts and probably had its onset prior to the age of 18, and it would meet the criteria.

Moving on to intellectual functioning, I think those are the three main debates about --

THE COURT:  Can I ask you about the mental retardation?  This was my concern, you know, about the significantly subnormal IQ.

MS. LARIN:  Uh-huh.

THE COURT:  I may have misinterpreted the whole thing, so you all have to explain it to me.  But when I saw Dr. Price's, the addition of his deposition --

MS. LARIN:  Uh-huh.

THE COURT:  -- he told the Court and the examiner that he applied the Heaton norms --

MS. LARIN:  Uh-huh.

THE COURT:  -- that the trial psychologist did not apply Heaton norms, because one of the Government's witnesses said he was kind of low functioning.

MS. LARIN:  Right.

THE COURT:  And the Heaton norms were demographic. And I can't remember, I'm missing one of them.  One of them was age, gender, education and race.  I think those were the four.

MS. LARIN:  Uh-huh.

THE COURT:  And that he did not apply race in Mr. Bourgeois because he relied on self-reporting as to what the race was, and Mr. Bourgeois reported that he was mixed race, which, as we know from the testimony, caused him significant problems as a child.

So the question you're asked, "Well, if you had applied the African American, the fourth part in the Heaton norms," and he said, "Well, he would have had a normal IQ."  I think I'm using the right words.

So wait -- so I'm looking and thinking while I'm listening to this, watching it last night, if he was raised in an African American family --

MS. LARIN:  Uh-huh.

THE COURT:  -- which all of his family was, except for Mr. Bourgeois, who was -- I think his father was white and his mother was black.  Is that right?

MS. LARIN:  I think his father was creole.

THE COURT:  Okay, creole.  I don't know what that means.

MS. LARIN:  Right.

THE COURT:  I thought it was a way of talking and not a --

MS. LARIN:  I thought it was a type of food.

THE COURT:  I don't know.  That's true.  And that his mother was African American.  But all of his siblings were African American, and he lived in an African American home, didn't have any contact with his father, whatever he was, till much later in his life.  Went to an African American school, had African American teachers, lived in an entirely African American community.

Then, and I'm listening to this, and whoever was the cross-examiner said, "Yes, you know, look at these factors."  And Dr. Price said, "Yes, I should have applied --" that would be appropriate then to apply the fourth prong of the Heaton norms to look at his intelligence.

MS. LARIN:  Uh-huh.

THE COURT:  When he did that, it turns out he was normal.  So I -- now, this is where I'm confused, because I don't think I heard it.  I kept listening to it over and over again.  But I thought the Government examined him then to say -- because the trial psychologist did not use the Heaton norms.  They said go back and use the Heaton norms with this

data that trial psychologists presented.  And if you do that, what happens?  And I thought they said -- I thought he said that it comes out normal.  Who was the examiner in that, Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  That's my memory as well.

THE COURT:  And I thought that can't be.  And so I kept listening to it over and over again.  And I thought that's what he said.  You asked him to apply --

MR. DOWD:  Apply.

THE COURT:  -- the Heaton norms --

MR. DOWD:  Yes, Your Honor.

THE COURT:  -- with race --

MR. DOWD:  Right.

THE COURT:  -- to the data.

MR. DOWD:  I think he did it both ways.

THE COURT:  He did it both ways --

MR. DOWD:  With and without.

THE COURT:  -- with no race and with race.

MR. DOWD:  Right.

THE COURT:  And if he applied the race, he turns out not to have a subclinical IQ, or whatever it is, a significantly -- that he's like 95 to 100.

MR. DOWD:  That was my understanding as well.

MS. LARIN:  If I could respond.

THE COURT:  That's what I want you to do.

MS. LARIN:  Okay.  The Heaton norms and the question of Heaton norms were not about the intelligence tests.  They were about the Halstead-Reitan neuropsychological test that looks at the question of brain damage and brain functioning.  And so there's, I mean, there's obviously an overlap regarding the etiology --

THE COURT:  Okay.

MS. LARIN:  -- of mental retardation, but --

THE COURT:  So then he -- because he had first testified that he had -- he was, in the initial 2255, that he had the symptoms of brain damage.

MS. LARIN:  Right.

THE COURT:  Which turns out not to be correct --

MS. LARIN:  Well --

THE COURT:  -- if he applies the African American prong of the Heaton norms.

MS. LARIN:  My recollection is that it was only on the categories test, which is one subtest of the Halstead-Reitan.  My recollection, it was in Dr. Gelbort's administration of the categories test --

THE COURT:  Okay.

MS. LARIN:  -- that the answer actually changed from below, from deficient to average.

THE COURT:  Okay.

MS. LARIN: But that Dr. Weiner's Halstead-Reitan still showed plenty of deficiencies, but Mr. Wiseman's going to talk about that because it's not directly related to the intelligence question, because the neuropsych Halstead-Reitan is really about brain damage and not one of the prongs of the mental retardation test. So the IQ test --

THE COURT: But see, I thought he was saying that was the contributing factor to why he thought he was mentally retarded.

MS. LARIN: Dr. Price? I mean --

THE COURT: Because I guess I -- I may have this wrong also, but I thought, and I'll look at it again --

MS. LARIN: Uh-huh.

THE COURT: -- with what you've explained to me --

MS. LARIN: And there's a -- I encourage you to look at, one of the exhibits charts out the --

THE COURT: Okay.

MS. LARIN: -- you know, using race and not using race. Or it's actually the white norms versus the black norms.

THE COURT: Right. And I can't -- and I agree with Dr. Price.

MS. LARIN: Yes.

THE COURT: It sounded to me more reasonable to apply the African American.

MS. LARIN: Right.

THE COURT:  That fourth deal.

MS. LARIN:  Uh-huh.

THE COURT:  He kind of left out any race --

MS. LARIN:  Right.

THE COURT:  -- if I recall.  But then if you add back in Caucasian, it did this.  If you add back in African American, it did this.  But I thought that was what Dr., one of the doctors at the 2255 said that they thought that was the origin of his mental retardation, that the, some of the other categories could have been faked, but this one could not.

MS. LARIN:  It's true that brain damage is an etiological factor of mental retardation, but it's not the only one, so there's also prior childhood, lack of schooling.  Those are all considered etiologies.  You know, in utero sort of effects.  There's no real -- no one really knows what causes mental retardation.  It does support, I think brain damage supports a claim of mental retardation, but it's not considered --

THE COURT:  I got it.

MS. LARIN:  -- one of the prongs.

THE COURT:  I understand exactly.

MS. LARIN:  And I also encourage you to look at that again, because like I said, my recollection is it really, he only really in the end made a correction on one subtest, where he found him to be normal on one of the subtests.

THE COURT:  Okay.

MS. LARIN:  And actually Dr. Weiner's tests were still significantly impaired.

THE COURT:  Okay.

MS. LARIN:  So one of Dr. Gelbort's tests, the result was changed.

THE COURT:  Thank you.

MS. LARIN:  But to intellectual functioning, which is often, you know, conflated with kind of brain functioning in general, but they're actually two separate things and they have two separate tests.  And the IQ test goes to intellectual functioning.  And that's the first prong of the definition of mental retardation.  And it's a pretty straightforward prong.  It relies on a test result.

THE COURT:  Has the Fifth Circuit recognized, or the Supreme Court recognized the use of -- you know, usually the theory is you have to have an IQ test very early in life to be mentally retarded, and you can maybe raise it as time goes on.  But once it's set at mental retardation, considering whatever factors are -- so your people went back and used a retrospective way to diagnose mental retardation --

MS. LARIN:  Uh-huh.

THE COURT:  -- or adaptive deficits in various areas.  Has that been recognized anywhere in the circuit law?

MS. LARIN:  Yeah, I mean, that's basically the only

way to do it in an Atkins case, because you're presented with a Defendant, usually post age 18, and you have to do a retrospective analysis.

THE COURT:  But I thought we talked about that that was used in some places, but not in this type of -- am I wrong about that?

MS. LARIN:  No, I think a retro -- usually the only question of retrospective analysis is regarding adaptive functioning.

THE COURT:  Okay.

MS. LARIN:  And that's kind of been the debate.

THE COURT:  Is that recognized by the Fifth Circuit?

MS. LARIN:  That has been recognized, yes.  I mean, there's -- it's a judgment that you need to make, whether you credit the adaptive functioning deficits that we presented. That's my understanding of the Fifth Circuit law.

THE COURT:  Okay.

MS. LARIN:  And you can rely on the experts, but it's in the end your decision.  But it's definitely, the analysis and the process of going back to someone's childhood and researching this the way you did is --

THE COURT:  Thank you.

MS. LARIN:  -- the accepted way to do it.

THE COURT:  Okay.

MS. LARIN:  Whereas intelligence tests, there's clear

law that says you don't need a specific IQ pre-18, IQ score pre-18, because there's an assumption that IQ is relatively stable over the course of someone's life, and if anything, it might increase.

THE COURT:  Right.

MS. LARIN:  So you can rely on your IQ that you get --

THE COURT:  That's why we heard testimony about people that decreased it when it was, he tested out in the 80s or something.

MS. LARIN:  Right.  I think I know what you're talking about.

THE COURT:  The what effect?  What was the effect? What's it called?

MS. LARIN:  The Flynn Effect.

THE COURT:  Flynn Effect.  Thank you.

MS. LARIN:  Yeah.  And that's to the question of using outdated norms and -- which were used in this case, but fortunately for my argument, it didn't really matter.

THE COURT:  Okay.

MS. LARIN:  Because even the outdated norms showed him to be in the range of mental retardation.

THE COURT:  Thank you.

MS. LARIN:  So in other cases, that's a much bigger issue.

Here, even under the outdated norms, he scored at a 75, which is within the accepted range under Atkins for mental retardation.  And all the experts --

THE COURT:  I just thought it was supposed to be under 75.  Not?

MS. LARIN:  It's 70 to 75 --

THE COURT:  Okay.

MS. LARIN:  -- is what it says, so I don't know how you want to interpret that, but --

THE COURT:  I got it, whether it's to 75 or through 75.

MS. LARIN:  Right.  Exactly.  You'll have to decide.

THE COURT:  Okay.

MS. LARIN:  My understanding is 75 is an accepted number in the range.

THE COURT:  Okay.  Thank you.

MS. LARIN:  And all of our experts agreed on my review of the testimony from the hearing that that was probably an overestimate.  They all agreed the Flynn Effect is kind of an accepted phenomenon, and so --

THE COURT:  I don't think the Fifth Circuit has accepted it.

MS. LARIN:  I don't think so either, but --

THE COURT:  Okay.

MS. LARIN:  Well, they haven't said they disagreed

with it, but they haven't said --

THE COURT: Okay.

MS. LARIN: -- "We're accepting it." But the experts agree, you know, it's a phenomenon that happens, it's just how you should, whether you should rely on it and how much weight you should give it. But generally it's accepted that that's probably an overestimated score, 75. That's an overestimate of his actual IQ.

THE COURT: Thank you.

MS. LARIN: And I'd also wanted to just point out that the Government did not take the opportunity to retest Mr. Bourgeois's IQ. And so you're left with the numbers 75 and 72, that I think are ample proof that we have met the first prong of the definition of mental retardation, of significantly subaverage intellectual functioning.

THE COURT: Thank you.

MS. LARIN: And finally, the last prong is onset prior to age 18. And I've already basically touched on this.

THE COURT: The retrospective.

MS. LARIN: Right, because Dr. Swanson really did a thorough, did a lot of research into his functioning prior to the age of 18. And she found that there were significant deficits. If anything, he's improved since childhood, and that he had many more deficits as a child, including, you know, dressing himself, taking, doing basic things that other

children can do, he had trouble with.  And so I think we've met the third prong of onset prior to the age of 18.

THE COURT:  Thank you very much.

MS. LARIN:  Thank you very much, Your Honor.

THE COURT:  Who's going to respond to this point?

MR. ROBERTS:  I am, Your Honor.  Good afternoon, Your Honor.

THE COURT:  It's still good afternoon.  Thank you.

MR. ROBERTS:  It's still good afternoon.  Obviously the Petitioner has the burden here.  And they presented a case, I think you'll hear from most of us on the Government's side that it appears to us that they, that there are a number of expert witnesses out there that are specialists in this specific area, to the exclusion of additional, of all the evidence that you would consider normally, who have the ability to look at a certain area and reach a finding that would benefit a Defendant in a particular situation.

And what we believe happens, I mean, we're certainly in agreement that, of the three aspects of the test.  What I would ask the Court to do is to look closely at Dr. Moore's report, because he -- not only his first report, but his supplemental report, which is Government Exhibit 15, the original report, and 16 is the addendum.  And Dr. Moore addresses both the two different types of analyzing adaptive functioning and also addresses some of the concerns with the

status of the law, in the sense of what actually the definition of mental retardation is.  But his explanations are far better than anything I'm going to be able to say, so I'm going to rely on that.

What I would like to point out, with the intellectual functioning, we are stuck with a test of 75.  And if we didn't have a test of 75, we wouldn't even be discussing this, for the most part.  So because they have a test of 75, we're not going to argue or address the issue of intellectual functioning that much.

We really, it would have been best for us to have a new test.  But even our experts, and I think their experts agree, that after someone tests a certain number of times, they start to get the idea down, and subsequent tests are not often as correct as earlier tests.

And so for whatever, you know, for the various reasons and the various things that happened in this case, we have a test that's 75.

I think what the evidence showed, from our perspective, is we, the Flynn Effect is something that has been developed and applied only in a courtroom setting.  It's not applied by psychologists or psychiatrists when they're trying to evaluate their patients.  And so it is certainly a litigation tool to try to lower scores and enable people to apply this defense to them, or this aspect of mental

retardation.

At the same time, we noticed as we examined the experts in this area on intelligence functioning that malingering tests were not always applied the way they should have so we could determine whether or not Alfred Bourgeois's test scores were accurate and ultimately reflected a correct score, whether it was 75 or whether it's the 70 that Dr. Gelbort actually came to. So I guess I misspoke earlier when I said "75." We've got a test of 70 from Dr. Gelbort also.

So we're dealing with a situation where this Court is confronted with this concept of Flynn Effect and this concept of malingering that may or may not reveal to us the actual score. I'm not sure the Court has enough information to make a final determination. All we know is that the scores that exist currently put him in a range of borderline intelligence functioning.

And so we move on to the adaptive functioning and the onset before age of 18. Those two prongs of this test take on more significance. In the adaptive functioning area, Dr. Swanson was the primary witness that was presented to this Court in this area. And what was very intriguing about that is that Dr. Swanson actually had two reports.

I don't know if the Court remembers, but there was a report that was done before Dr. Swanson, or Dr. Moore tried to

do an assessment. And Dr. Swanson's initial report, I actually believe the first report was not offered by the Petitioner. But the supplemental report was offered by Petitioner at, it was Petitioner's Exhibit 33. It was a supplemental report.

When Dr. Swanson took the stand and testified, she was relying completely on that supplemental report and how she set out the different areas where there was deficiencies and why she came to the conclusion that there was mental retardation.

Well, when she was confronted with the fact that she did a report in June of '09 and that, and that was offered as Government Exhibit 175, she had to acknowledge that in the report, the first report that she did in June of '09, it lacked any of those findings.

And in fact, she didn't -- I don't know if the Court remembers exactly or not, but Judge, she did her report in June of '09. Then we got Dr. Moore involved in the case, and he suggested that he needed to go out and interview witnesses in order to do a correct adaptive functioning.

He goes to Louisiana and is confronted with the Petitioner's Counsel at the very first time he tries to go and meet with a family member. And at that point in time, Dr. Moore realized that it was going to be very difficult to get accurate readings from these family members.

And when he was confronted with the fact that these,

that the Counsel was going to be at the other interviews, he did decide to stop that and go to those other people that might be more objective.

And so, you know, the statement a few moments ago that Dr. Moore failed to talk to family members, well, there was a reason he didn't talk to any more family members.  He had several of them set up to interview them that day.

Ultimately, he was able to get four people that he spoke to and did testing on.  They're all reflected in his report.  And Mr. Banks is a very important individual, because he is one of the few that actually knew Alfred Bourgeois in any significant fashion at or before the time he was 18.  And so it was during the high school time.  And that was very important, as Dr. Moore pointed out, to understanding the third prong about the onset with the age of 18.

Dr. Moore and Dr. Price both approached this case with trying to ascertain whether or not Alfred Bourgeois fit the definition of mental retardation.  Both of them have a long video recording, long interview.  And in the end, both of them came back and said he does not fit in any of the categories of mental retardation that they could apply.

So Nathan Banks, his assessment and his ratings, as you look through that, through the evidence presented in Dr. Moore's report, really indicates that there was no onset, if there was any mental retardation and adaptive functioning,

failed in any of the areas that are, that were considered.  The onset before the age of 18 just doesn't exist in this case.

The family members that were brought in --

THE COURT:  I remember.

MR. ROBERTS:  -- most of them --

THE COURT:  I know.

MR. ROBERTS:  -- and the co-workers that came in were very clear about his ability to function.  And so it's our belief and our contention that they have not met the requirements to establish mental retardation.

THE COURT:  Thank you.  Next point, Petitioner?

MR. WISEMAN:  Good afternoon, Your Honor.  I sent the Court a list of cases last night with all the points and authorities.

THE COURT:  Oh, yes.  I haven't read them.  I'm sorry.

MR. WISEMAN:  Yeah.  It's just a list of some parentheticals.  But the reason I sent them to you is that in trying to structure and think through what to say here today, I just kept thinking to myself, this is the quintessential case of ineffective assistance of counsel at penalty phase, and the seven or eight cases from the Supreme Court of the United States I provided you, and that smaller number of cases from the Fifth Circuit --

THE COURT:  I've read the memo, but not the cases.

MR. WISEMAN:  Oh, yes.  Right.

THE COURT:  Okay.

MR. WISEMAN:  I understand that.  But you know, when you look at them, you know --

THE COURT:  But it popped up on my screen between reading, watching the depositions of the other --

MR. WISEMAN:  Yeah, they all say "Alfred Bourgeois" on them.  I mean -- and I'm going to get into this in more detail, but you know, this case has all the elements of all of those Supreme Court cases.  You know, in the last ten years, the United States Supreme Court has decided five cases in this one area.  And they all sound like Bourgeois.  They're all cases that meet the elements, or I should say Mr. Bourgeois meets the elements of them.  And I'll talk about them.

Before getting into the specific evidence, though, I just want to comment on what I call the Columbo factor, or to give proper deference to Mr. Dowd, when he was examining Dr. Johnson, the DNA one, he characterized Mr. Tinker as having a sort of a Columbo-like persona, was referring to the television detective, you know, appears to be fumbling about, but in reality is, everything is for a purpose and --

THE COURT:  I got it.

MR. WISEMAN:  -- and he's quite bright.  I wasn't sure if you knew the story.  You know, and --

THE COURT:  I couldn't stand that series, by the way.

MR. WISEMAN:  I didn't like it myself, personally.

THE COURT:  And I liked Mr. Tinker very much.

MR. WISEMAN:  But I guess the point is that, you know, it sort of couples with this notion that, you know, Mr. Tinker is a legend.  I, unfortunately, only got to meet him a couple of times before he passed.  He seemed like a wonderful fellow.  But you know, it leaves us in a very difficult position, because then anything he did that's correct on its face, he did a good job.  And anything he did that's apparently incorrect on its face, well, he was still doing a good job, because he's like Columbo.  And it leaves us kind of wrestling with a ghost, in quite a literal sense.  And I'm not sure if that analysis really is useful.

THE COURT:  Obviously, I didn't use that one.

MR. WISEMAN:  Okay.

THE COURT:  I mean, I don't intend to, because I --

MR. WISEMAN:  All right.  Well, that's comforting.

THE COURT:  I did not find that to be flattering or truthful.

MR. WISEMAN:  Okay.  Well, that's --

THE COURT:  Either one.  So we can move on from Columbo.

MR. WISEMAN:  Excellent.  Excellent.  Strickland, of course, guides this Court's inquiry of deficient performance and prejudice.  At this point the case is 25 years old.  It's

quite familiar.  It's deficient performance, Counsel's presentation, although an objective stand, the reasonableness, prejudice has been characterized as not a stringent burden for us to meet.  We have to show that there's a reasonable probability of a different outcome.  A reasonable probability is one that undermines confidence.  And in a death penalty case, in a way jurisdiction like the Federal Death Penalty Act, Wiggins, at 537, of the decision says that if even one juror would have been persuaded to vote differently --

THE COURT:  I have read some of the cases on other occasions while we've been doing this, but I didn't read them last night.

MR. WISEMAN:  Okay.  No, I'm just, you know, just so I know the Court's --

THE COURT:  Mr. Bourgeois, are you still here?

THE DEFENDANT:  Yes, ma'am, Your Honor.

MR. WISEMAN:  I know the Court's going to, you know, go through all this, and I just wanted to, you know, put that out there so you'll have it for handy reference later.

So what types of unpresented mitigating evidence do we have here?  And here's where I think we have such a strong overlay with the cases that I filed with the Court.  We have abuse evidence, evidence of vicious childhood abuse.  And you know, that comes from several places.

We have red flags about that abuse.  I think we, I

remember vividly standing before Your Honor reading to you memos which subsequently were admitted into evidence -- I believe it was Petitioner's 61.  These were investigative memos written by Mr. Bierbaum to Mr. Tinker and Mr. Gilmore.  And you know, in them it's, you know, one after the other after the other accounts of Mr. Bourgeois being savagely abused by his mom and others.

We've got -- and by the way, that was admitted on Day 5, at Page 55 of the transcript.

We've got evidence of organic brain dysfunction.  I'm going to talk a little bit about the whole Heaton business and what that's about.

We certainly maintain Mr. Bourgeois is mentally retarded, and Counsel were ineffective for not exploring, presenting that.  But even if the Court makes a finding that he's not mentally retarded, they have a person who is of low intelligence.  Those IQ scores are clearly, at best, in the borderline range.  Every expert, both sides, agreed that at a minimum he had a low intelligence.  And again, the cases I presented, Your Honor, say the low intelligence is a mitigating factor that ought to be presented.

In this case, we also have a severe and crippling borderline personality disorder.  Dr. Price, in my examination of him, told this Court just how devastating that could be.  He agreed that Mr. Bourgeois had it.  Dr. --

THE COURT:  Yeah, but he also told me that that was the same thing that was consistent with being a sociopath.

MR. WISEMAN:  Well, you know, we're going to -- I'm going to talk about sociopathy in a second, but, you know --

THE COURT:  I knew you would.

MR. WISEMAN:  Yeah.  You know, a lot of things -- you know, lots of people drink Coca-Cola.  That doesn't mean all people who drink Coca-Cola are the same in other ways.  I mean, it's -- I'm not sure the logic plays out.  He may have features that are antisocial, but he is not an antisocial personality.  He's never been diagnosed as such.  And I'm going to get to that as well.  I'm just giving you the broad categories here.

The, Dr. Moore agreed with Dr. Price, borderline is here.  It's present.  And I would add that they all agree to the presence of all these mitigating facts.  This was not a dispute about --

THE COURT:  But the problem, when you make a legal decision as an attorney, about what to put on and whatnot to put on, is that going to do more prejudice to the jury --

MR. WISEMAN:  Sure.

THE COURT:  -- saying that this is a very dangerous person --

MR. WISEMAN:  Sure.

THE COURT:  -- by putting on that kind of evidence. So that's something I'm not really impressed with.

MR. WISEMAN:  Okay.  Well, I'm hopefully going to turn that around as well.

So basically I counted up, we have undisputed evidence from nine mental health experts that Mr. Bourgeois was abused as a child, has organic brain dysfunction, low intelligence, and suffers from a crippling borderline personality disorder.

Now, none of the experts who testified or who have ever evaluated Mr. Bourgeois have diagnosed him as having an antisocial personality disorder.  The closest anyone comes is Dr. Price, who said he has some antisocial features.  All of my clients have antisocial features.  They're on death row.  You know, they stand convicted of having done obviously bad things.

THE COURT:  Heinous, heinous acts.

MR. WISEMAN:  Right.  And let me --

THE COURT:  And the funny thing I always thought of when I was a defense attorney is the more heinous the act, the less likely a jury would find them insane actually.

MR. WISEMAN:  Well, insanity, of course, is a different --

THE COURT:  I know that.  And we're not here on that.

MR. WISEMAN:  Yeah, right.

THE COURT:  But I just thought it was --

MR. WISEMAN:  You know, one of the cases I provided to you is a Fifth Circuit case called Walbey versus Quarterman.

And it speaks to the question Your Honor just posed.  It says, "Texas' next argument, that Walbey suffered no prejudice because the brutality of the crime eclipses any mitigating evidence, is a nonstarter."

"To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge."

"Almost without exception, the cases we see in the conviction of a capital crime have produced the death sentence, are extremely egregious, heinous and shocking facts."

And you know, Henry, which is also a Texas case, talks about what Your Honor has posed as a dual-edged sword.  And I did not hear or read any explanation from either Tinker, Mr. Tinker or Mr. Gilmore, that those are the reasons they didn't put this stuff on.

And the other set of cases I provided Your Honor is that you can't, you can't substitute your judgment about what you would have done --

THE COURT:  I agree with you 100 percent.  And you know, this, it's very difficult to be in --

MR. WISEMAN:  Sure.

THE COURT:  -- this kind of a position and having watched the trial.  So last night several times when I was watching some of these videos that were very disturbing, I kept

saying, I kept thinking, "Remove, step back and remove yourself."

MR. WISEMAN:  Uh-huh, uh-huh.

THE COURT:  Because --

MR. WISEMAN:  Yeah.

THE COURT:  It's a different process.  That's all.

MR. WISEMAN:  Yeah.  Yeah.  And I think I remember quite clearly during the September hearing me having a bit of a hissy fit, one of several, I imagine, where Your Honor posed the same question.  I think I, in my little outburst, I said something like "The more horrible the facts, the more the need to present these types of mitigating factors, as it shows the jury why people behave in that way."

And Dr. Price, who's worked both sides of this issue --

THE COURT:  Well, you and I are in agreement on that. It's just, I guess my finding will have to do with whether this was a strategic decision by the attorneys --

MR. WISEMAN:  Right.

THE COURT:  -- that would inflame, these people would inflame the jury.  And some of them would have, I think.  But I need to go back over each of the things, each of the testimonies and determine whether, whether I feel that it was good or bad, whether they should have at least been explored in front of the jury.  And I don't have any problem doing that.

MR. WISEMAN:  Yeah.  And it will be --

THE COURT:  And that's, to me, what my charge is.

MR. WISEMAN:  Absolutely.  We would agree that's your charge.

THE COURT:  I just hope I can do it right.

MR. WISEMAN:  I think what you're going to find, though, is there's no reason given, either in Mr. Tinker's interrogatory answers or Mr. Gilmore's declaration or his testimony, where he said, "I didn't want to put that on because."  There's other reasons, Mr. Gilmore said it was inconsistent with his --

THE COURT:  Take a break.

(Recess from 1:38 p.m. to 1:43 p.m.)

THE COURT:  Sorry.

MR. WISEMAN:  So this question about malingering, I know it came up a few times during the --

THE COURT:  Yes.

MR. WISEMAN:  -- the hearing.  And you know, I think we can put it to rest.  Dr. Weiner gave a malingering instrument called the Test of Memory Malingering.  And it was really a very simple test, and it's designed so that a person should get like basically 47 out of 50 at a minimum on each try.  And my recollection is that Mr. Bourgeois scored almost perfectly on it.

So for Mr. Bourgeois to have malingered -- and it's

used primarily as a test of whether you're malingering about your memory.  But the point is, you know, Mr. Bourgeois could have done that.  So he's sitting there taking this set of tests, and he gets the Test of Memory Malingering, and he scores almost perfectly, if not perfectly.  You know, for him to be malingering --

THE COURT:  I forgot what perfect means.

MR. WISEMAN:  Perfect means --

THE COURT:  Perfect means 100 percent malingering?

MR. WISEMAN:  No.  Perfect means he got everything right.  They're easy questions.  So if you get them a lot wrong, you're malingering.

THE COURT:  Okay.  I got it.

MR. WISEMAN:  Right.  And he got them all right.  So he would have to have known that that's a malingering test and to do really well on that but not do well on the IQ testing.

THE COURT:  Okay.

MR. WISEMAN:  And I, you know, that to me puts it to rest.  No doctor whose ever evaluated Mr. Bourgeois from either side has said he's a malingerer.  There's no evidence that he's malingering.

I know Your Honor made some observations about him filling out some of the --

THE COURT:  I can't help but notice, you know, his communications to me verbally and in writing have been very

sophisticated.

MR. WISEMAN:  Yeah.  But I think, you know, that's why we have tests, because you know, the tests are scientific, as opposed to anecdotal.  And that's the difference.

THE COURT:  But some of the tests are just for courtroom and not necessarily for treatments or regular evaluations.

MR. WISEMAN:  Oh, they're diagnostic.  I mean, they're clinical tests that are used in a forensic setting.

So you know, I think the other -- and I know -- I'm not sure how impressed you are with this fact, but you know, as someone who works with these tests on a regular basis, the fact that he would score so closely on two sets of IQ tests, three years apart, is phenomenal.  I mean, Einstein couldn't malinger at that well.  You would have to be a genius to malinger that well.  And whether Mr. Bourgeois is mentally retarded or not, I think we could all agree he's not a genius.  Sorry, Mr. Bourgeois.

THE COURT:  I understand that.  But I'm just -- sometimes I'm not sure I'm really impressed with IQ scores that are taken at this age, at the age of Mr. Bourgeois, two, three, four years or whatever.  I'm more impressed with what his, probably the retrospective studies were, to find out what it was at the time he was growing up.

MR. WISEMAN:  But that's on a different topic.  We're

dealing just with the -- I mean, I'm dealing globally with malingering.  I think the fact that he scored so closely on IQ tests by itself three years apart is a strong indication that he's not malingering on the testing.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.  Dr. Price's deposition, just going to try to clear up a little bit more --

THE COURT:  Please.

MR. WISEMAN:  -- Ms. Larin.  What Dr. Price did was he, the whole reason for that deposition was that he applied the Heaton norms, two of the subtests, the Halstead-Reitan battery, which is not an IQ set.

THE COURT:  Okay.  Tell me about Halstead-Reitan. Tell me again, because I obviously missed that.

MR. WISEMAN:  All right.  Halstead, Halstead-Reitan battery is the gold standard neuropsychological battery.  It's composed of seven tests, seven main tests with a variety of subtests, yields about a dozen scores, something in that category.

Two of the subtests are Categories, and I believe Finger Tapping that Mr., or that Dr. Price -- Trails.  I'm sorry.  Right.  Categories test and Trails test are the two that were the subject of the controversy that led to the deposition.

At the end of the day, what Dr. Price testified to

is, on Page 26 of his testimony, he said, quote, "I would agree that these scores on the tests that were administered" -- and he's referring to the Halstead, not just the two tests -- "that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction."

That was in response to my question of "Did the whole set of scores show the profile of a person who has brain dysfunction?"  That was his answer.

THE COURT:  Okay.  But then on cross-examination they talked about what part of the Halstead norms did you apply, what is it composed of.

MR. WISEMAN:  Right.

THE COURT:  And he did not apply the ethnic and/or race.

MR. WISEMAN:  But this was in response to my question of application of the Halstead norms -- of the Heaton norms.  By the way, it was their witness.  I was cross-examining.  They were redirecting.

THE COURT:  Oh, I didn't know -- I didn't know that.  Okay.

MR. WISEMAN:  Yeah, the deposition was a continuation.

THE COURT:  I thought you called him.

MR. WISEMAN:  No, no, no.  He's their witness.

That's why this is such an important answer.

THE COURT:  Got it.  Okay.

MR. WISEMAN:  Right.  He's their witness.  I was continuing my cross in that deposition.  They redirected.

So bottom line was he's a little less impaired if you apply the race norms aspect of Heaton.

THE COURT:  He said he was normal.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  Wasn't less impaired.  He was normal.

MR. WISEMAN:  Yeah, he's, right, less impaired overall.  He's normal on that one test.

THE COURT:  Right.

MR. WISEMAN:  Okay.  But he's still, the overall profile of the Halstead-Reitan, is of a person who is impaired.

THE COURT:  See, I didn't get that from the deposition.

MR. WISEMAN:  Well, Page 26.

THE COURT:  I'll read it again.  I'll read it again.

MR. WISEMAN:  Okay.  Okay.  Dr. Moore --

THE COURT:  Or watch it again.

MR. WISEMAN:  Watch it again, right.  Watch it and read it.

THE COURT:  Pardon?

MR. WISEMAN:  Watch it and read it, because -- I'm just teasing.

THE COURT:  Well, I'm wondering, I couldn't find the video last -- no, I watched the video last night at the office till about 7:30.  Then I took all the rest of them home.

MR. WISEMAN:  Yeah, yeah.  So, you know, getting back to these cases.  You know, in Williams -- and this deals with the question of, you know, who puts on this stuff?  Does it really mitigate?  You know, Williams, we're dealing with childhood abuse, family dysfunction, organic brain dysfunction, low intelligence.  Alfred Bourgeois.

Wiggins, 2003, physical and sexual childhood abuse, family dysfunction, cognitive dysfunction, emotional disturbance, that's Bourgeois.  The emotional disturbance, of course, is the borderline personality, which all the doctors agreed, ours and theirs, was as a result of his childhood abuse and his parental abandonment.  His mother abused him and emotionally abandoned him by her treatment.

Smith v. Texas, IQ score of 78 is mitigating evidence that should be presented.

Rompilla, which I was fortunate enough to have done the evidentiary hearing in, in state court, we have organic brain dysfunction, low intelligence, childhood abuse, family dysfunction.

Porter versus McCollum, 2009, abusive childhood, impaired mental capacity, mental health impairments.

This last year, Sears v. Upton, cognitive

impairments, physical and sexual abuse, family dysfunction.

United States Supreme Court says this is stuff you put on. This is quintessential mitigation in a capital case. All the -- everyone's doing it. You know, use the adage, all the kids are doing it. This is the stuff you put on in a case like this.

Lewis v. Dretke --

THE COURT: You know, when you first -- that's why I appointed these two guys, because they had more experience than anybody in the area. And everybody knows that when you get a death penalty case appointed to you, the very first thing you start doing is preparing for mitigation.

MR. WISEMAN: Sure.

THE COURT: Guilt or innocence is usually a far gone conclusion.

MR. WISEMAN: Right.

THE COURT: Which is why I started giving them experts --

MR. WISEMAN: Yes.

THE COURT: -- over and over and over again.

MR. WISEMAN: You gave them everything they asked for and then some. And you didn't get your money's worth. And you want to know something else? On December 10th, 2003, there was a motions hearing you conducted in response to a motion for continuance. Go read it. Go read it again. You took their

heads off, because they came in here with their mitigation people --

THE COURT:  I did.  I remember exactly.

MR. WISEMAN:  -- who had been working for months, months and months and months.

THE COURT:  And they said they weren't quite ready. I said, "Huh-uh, that's not going to work."

MR. WISEMAN:  "That's not going to work.  And you know, you're responsible.  You're the ones who are responsible."

And you know, leaving aside what Dr. Cunningham ultimately would have said, forget his opinions.  As a fact witness, he laid out a documented history in which he was asked to work on the case for about a year.  He had nothing two weeks before trial.

THE COURT:  Oh, please don't talk about Dr. Cunningham.  Anybody else but him.

MR. WISEMAN:  Okay.  Dr. Yamamoto was working on this case for a year, and -- but the point being, Judge, he had nothing.  None of the work was done two weeks before trial. You look at Williams v. Taylor, 2000, one week before trial is when Counsel began to prepare penalty phase.  That was deficient.

And when you say, how could Mr. Tinker and Mr. Gilmore, who are nice fellows, they're good lawyers, you

know, we're not here to trash them, how could they let this happen?  This train ran off the rails.  And how did it get off the rails?  You know, the mitigation people had their problems. They weren't properly supervised.

And you know, it's interesting, Ms. Booth made a, asked the question of Mr. Gilmore in his examination, you know, "Is this the first time that you've had" -- I guess she used the term -- "luxury of mitigation speciality?"  And he said, "Yeah.  I never get that in state court."  Well, maybe that was the problem.  He just didn't know how to manage this, you know, set of specialists to get the result he needed.

The bottom line was Dr. Weiner did his evaluation after trial started.  That's outrageous, I mean, to do a neuropsychological evaluation after trial starts.  He gets a score of 75, which if you know anything about this area, is significant.  At a minimum, the Supreme Court says that's mitigating.  And Mr. Tinker never met with him.  He spoke to him for three minutes on the phone, according to Dr. Wiener.

So it was a failure to investigate that aspect.  And you know, I think that's symbolic of the kind of, you know, how this thing got off the rails.  And you know, again, we're not here to impugn anyone's integrity, or you know, call them names.  These are just facts that are in the record.

Let's see, I'm getting down to the end here.  I think Your Honor gets a lot of these points.  Oh, you know,

Dr. Estrada, I think, just needs a brief comment.  I mean, you know, he is an interesting fellow, also very likable fellow.  Ms. Larin and I met with him on a number of occasions.

You know, he maybe had the best perspective of anyone, because he sat through the whole trial, did the evaluation.

THE COURT:  He did.

MR. WISEMAN:  He was the professional.  And his conclusion, which wasn't shaken during his examination, was that the jury didn't hear the real story.  The jury heard his surmise about abuse.  The jury never heard actual evidence about the abuse.  And Lewis v. Dretke, which I provided to you, talks about presentation of skeletal childhood abuse being deficient.  Here, you don't even have a skeletal presentation.  You have supposition and surmise.

And so he feels, you know, professionally in his opinion, he was the Government's expert, he was your expert in this case, that the jury --

THE COURT:  He was the Defense expert, too.

MR. WISEMAN:  Well --

THE COURT:  Oddly enough, they both, the Government and the Defendants agreed to have --

MR. WISEMAN:  He wore many hats.  And I'm not disputing that.  But the point is, he started out retained by Ms. Booth.  He then examined for competency at the Court's

request.

THE COURT:  Right.

MR. WISEMAN:  He opined --

THE COURT:  Well, that's I guess what everybody agreed to, was to use him --

MR. WISEMAN:  Yes.

THE COURT:  -- for the competency.

MR. WISEMAN:  Right.  He didn't evaluate him for mitigation, however.

THE COURT:  No.

MR. WISEMAN:  Right.  So you know, that wasn't done, you know, by him.  But you know, he's, his opinion in the deposition was that the jury didn't hear the real mitigation in this case.  So prejudice is built in.  The jury didn't hear the real mitigation.  That's the Eighth Amendment gold standard.  And if that's the Eighth Amendment gold standard, you have to say, "Why did these lawyers not put this stuff on?  I gave them tens of thousands of dollars.  They had all this wonderful stuff to put on."  At a minimum, the IQ score.  Put on the IQ score.

Yeah, you know, I know what the answer is.  Mr. Bourgeois lied about being in a coma.  But that doesn't excuse you from sitting down with the experts.  They spent hours with Dr. Moore.  They spent hours with Dr. Price.  Mr. Tinker never spent a minute with Dr. Weiner.  He talked to

him on the phone.

Never sat down and said, "Okay, even if Mr. Bourgeois lied about being in a coma, are these test results valid?" Of course, Dr. Weiner would have said, "Yes, they are." And you know, that's just not proper performance in a capital case, with all respect, of course, to Mr. Tinker.

Let me just end with a couple more words about this whole idea that's in Mr. Gilmore's affidavit that he filed with the Court and we introduced into evidence during his examination. He said, "We didn't put on childhood abuse because it was inconsistent with the guilt phase." Now, first of all --

THE COURT: I know there's case law about that.

MR. WISEMAN: Yeah.

THE COURT: Move on.

MR. WISEMAN: Move on. All right. Excellent. I don't even have to talk about it. And the case law is in my favor.

THE COURT: It is.

MR. WISEMAN: You admit that?

THE COURT: I do. I admit it.

MR. WISEMAN: Okay. Excellent. And I'll say one more thing. He talked about abuse anyway. So it wasn't even a very insightful response on his part.

THE COURT: He did talk about abuse. Dr. Estrada

talked about abuse.

MR. WISEMAN:  Right.  And you know, Mr. Tinker said that the Weiner evaluation, in his response to the Government's interrogatories, evaluation did not result in any useful information.  That's just not correct.  That's, you know, I don't know what he was remembering at that point.  Obviously he was at the end of his life.  His memory may not have been perfectly lucid at that point.  But obviously an IQ score of 75, organic deficits is very useful, as Dr. Price attested to in his examination.  There again, the Government's witness.

So I think that's all I have.  And I appreciate the Court listening and picking up on that --

THE COURT:  Who's going to respond to that?

MS. BOOTH:  First, Your Honor, I'd like to talk about the standard, which says, "To succeed on a claim like this of ineffective assistance of counsel, a Petitioner must first show that the Counsel's performance fell below an objective standard of reasonableness.  The reasonableness of the Counsel's challenged conduct must be judged on the facts of the particular case, viewed as of the time of the Counsel's conduct, and after, the review in court must strongly presume that the Counsel has exercised reasonable professional conduct."

What I want to do, when I speak to you about ineffective assistance of counsel --

THE COURT:  Yeah, I was going to say -- I didn't want to upset Mr. Wiseman, because he gets kind of upset -- that it's not for the attorneys Tinker or Gilmore to put on evidence of why they made their decisions.  I am to presume that they used, that their decisions were exercised as reasonable Counsel would do, and that they had, that they made strategic decisions not to put on Witness A, B, C or D.

MS. BOOTH:  And in this case --

THE COURT:  And the other problem is, is that I don't -- I can't remember, you can help me with it, Mr. Wiseman or Ms. Booth.  Did Mr. Bourgeois tell anybody about sexual abuse as a child?  See, he told Dr. Estrada that he had an idyllic childhood.

MS. BOOTH:  Prior, no.  Prior, no.

THE COURT:  Okay.  Do you have any information to that effect, that he told anybody prior to trial?

MS. BOOTH:  That Bourgeois did, Alfred Bourgeois.

THE COURT:  That Bourgeois -- that he had been --

MR. WISEMAN:  He told about physical abuse to Mr. Bierbaum.  He did not talk about sexual abuse to Mr. Bierbaum.

THE COURT:  Okay.  Thank you.

MS. BOOTH:  Severe discipline is what he talked about.

THE COURT:  Okay.

MS. BOOTH:  I think it's important, Judge, and you were here during those weeks, to remind us all -- and Defense Counsel weren't here -- that Mr. Tinker and Mr. Gilmore knew the jury that they had picked.  They knew the World War II veteran.  They knew the 4-H lady that had her daughter in the county show.  They knew the Texas Aggie that was Catholic that had the problem with the death penalty.  They knew to whom they were speaking.

And not only did they know that, but they -- there was a cadence and a theater in this courtroom that was going on during the trial that's not accurately reflected in the, in the record anywhere.  There's no one but you, Your Honor, that can remember and make your decision based on what was happening in the courtroom.

No one, nowhere in the record does it show how beautiful the witness, the child witness that came in here and testified was, the beautiful black child with the pink bow in her hair and the pink dress.  And when she spoke about the horrible things that her father did to her sister.  No -- that's not figured in here anywhere.

And so the theater that was happening and the decisions that were being made, the strategic decisions that were being made by Defense Counsel have to be looked at in that light also.

Nowhere in the record does it reflect how they sat

protectively by the Defendant, and how the Defendant looked, how Mr. Gilmore had taken great care to be sure that he looked -- well, he said, I think he testified he dressed him like a Marshal.

And the demeanor of the Defendant, when he sat in the courtroom, very, a very strong force. At that time he was probably about 40 pounds heavier, a handsome man, in good shape, very strong presence in the courtroom. Those are the things that are not reflected. And only this Court can remember those things.

I want to talk just a minute about Dr., I mean about John Gilmore and Douglas Tinker, about how both of these men have been practicing law, Gilmore 30 years, Tinker -- Lord, I don't know how many years. And both of these men have been prosecutors. Both of these men have been recognized by their colleagues as great lawyers. Not once, but on many occasions, Mr. Tinker being selected as one of the ten most, ten best criminal defense attorneys in the United States. Mr. Gilmore being, two times, in 2000 and 2008, being the outstanding criminal lawyer in the Nueces County --

THE COURT: Criminal defense lawyer.

MS. BOOTH: Criminal defense lawyer. So I want the record to be clear on those types of things, and to evaluate what's happening with those things in mind.

These men, and Mr. Gilmore testified, if you multiply

it out, he's probably tried about 600 cases, and a very successful man. In fact, during voir dire, I would remind the Court, that there were numerous people in here that knew Mr. Gilmore and Mr. Tinker and about their abilities in the courtroom. I mean, it really was prejudicial to the Government, there was so much good press going on for the defense attorneys.

THE COURT: But if I recall, I didn't give y'all any strikes, I gave them all to the Defendants.

MS. BOOTH: Yes. Right. And so these type of things, the relationship -- and the Court watched it clearer than I did. I tried to keep an eye on it, because the prosecution sat with our back to the jury. And Mr. Gilmore and Mr. Tinker were looking right at the jury. And the Defendant was looking right at the jury. And the Court can remember the, Mr. Tinker was engaging with the jury. Mr. Gilmore a little more proper, but Mr. Tinker was engaging with the jury.

THE COURT: You know what I remember about Mr. Tinker in this case, not just his performance, which I thought was superb, and I do -- and I'll relook, I'm not going to ignore your arguments on this or the case law. But one time we came in and Mr. Bourgeois could do nothing but complain about Mr. Tinker. And when he -- I don't remember what the occasion was, but it was just, he was -- and you know, when I was a defense attorney in those kind of, it just floored me. I was

hurt. And it affected the way I looked at my client later sometimes. I pretended to do well. But he didn't miss a beat. Mr. Tinker did not miss a beat. He never criticized his client. He said, "Well, the reason he's saying that is" A, B and C, "and we're going to take care of it, and he's a good man," and you know, all those things. I just thought he was so outstanding in believing in his client. And --

MS. BOOTH: And the --

THE COURT: So I'll never forget that.

MS. BOOTH: So those kind of things don't come out on paper. And the strategy here, as Mr. Gilmore testified, and in the very limited interrogatories that we have from Mr. Tinker, we know that the strategy here was that Mr. Bourgeois did not kill this child; his wife did. And that strategy held through the trial on the merits and on the penalty phase, that he did not do it. So everything was pointed, every strategic decision was pointed in that way.

Now, we know from the record, from the evidentiary hearing, and the Court will remember from being in the courtroom and watching the Defendant, and there was even testimony from Dr. Estrada that the Defendant acted more like a part of the defense team, which he was as being the Defendant, but acted in a very professional manner.

We know from the record that there were numerous letters of instruction that were read here in the evidentiary

hearing, that Mr. Bourgeois was giving to his attorneys on what witnesses to call, on decisions, on pieces of evidence, on questions of motion to suppress, on different venue questions. The instructions were very, were voluminous, first of all, and they were very compelling, attention drawn to different compelling issues that needed to be addressed in the trial.

There was, from Mr. Gilmore, when I asked him, "How many Defendants have you come into contact with since you've been a lawyer for 30 years?"  So many Defendants.  And I asked him, "Did you ever have any question as to whether or not Mr. Bourgeois was mentally retarded?"  There was absolutely no indication that that would happen.

Now, let's talk about that, because the only doctor that had him before the trial ever started, I guess when he was virgin territory, was Dr. Estrada.  Now, we know Dr. Estrada is the only specialist that's been brought in here that's both a medical doctor, a psychiatrist, and a -- and a testing psychologist.  He is the only one.  And he had -- and he has not recanted the fact that Mr. Bourgeois is above average intelligence.

When they asked him about that in the deposition, he said, "Well, looking at that score of 75, that's why there's going to be different areas that's adapted that you need to address, because in effect, those IQ scores, that testing can be ineffective."  I mean, it can be wrong.

And his dealing with Mr. Bourgeois gave him the opinion that he was above average intelligence.  And he never recanted that.  He was the first doctor, the most qualified doctor, and that was his opinion.

Now, he also had an opportunity to observe Mr. Bourgeois like nobody else did.  He had him in a testing situation.  He got to see him when he was here in trial.  He got to hear him testify.

Now, that's the other thing I want to bring up.  The jury heard the testimony.  The jury got to see how he answered my question, how Mr. Bourgeois tried to turn questions around, how he answered the questions quickly, how different -- how he responded to different pictures of the baby.  They got to see and make their own evaluation.

So that doctor, Dr. Estrada, got to see him.  Then he got to see him when the jury was out, which is even more telling.  He got to observe him here when the jury goes out and he's talking to his lawyers and it's an informal setting.  And Dr. Estrada has never recanted the fact that he believes that this Defendant is above average intelligence.

Okay.  Now, it is clear that Defense Counsel are allowed to rely on the opinion of their experts.  And what did we hear from John Gilmore was the fact that he had used Dr. Estrada since 1994.  He doesn't even know how many cases. And the reason that he has used him -- and it's obvious,

because both the prosecution and the defense agree to use Dr. Estrada in this trial, that there's confidence on both sides of the street. I think Mr. Gilmore said that he wasn't a whore. That's the way he explained Dr. Estrada. He called them like he saw them.

Now, later we find out that Dr. Estrada believes that he could have possibly testified that he was narcissistic, borderline personality disorder, which would equal the fact that he would be prone to rages and could just fly off the handle like that. I mean, there's a lot of bad things that would be coming from that diagnosis.

So, let me back up. That is the doctor that had, that evaluated Mr. Bourgeois before there was any indication or any reason for Mr. Bourgeois to be one way or the other. Before he was enlightened on what could happen if you had a brain disorder.

Now, Dr. Weiner came in and did some testing on Mr. Bourgeois. And Mr. Bourgeois lied to him about his medical history. Mr. Bourgeois had pretty much lied to Dr. Estrada about part of his family history.

There is -- what would be expected of a Defense Counsel? I mean, how is he supposed to know that the information that is being relayed from his client to a professional that can help him is not going to be true? As it stood at that time, Gilmore and Tinker had to work from what

their client was relating to them.

Now, all of this talk of abuse, all of this that's come out years later didn't come out at that time. And why didn't it come out at that time? It didn't come out because Bourgeois lied. It didn't come out because Mama Bourgeois was still alive, and nobody wanted to say much, bad stuff about Mama Bourgeois.

And at that time, if you remember, Your Honor, the family was split. The family was split on how they felt about what was going on. In fact, it was Mr. Bourgeois's sister that came in here and testified, and it was very damning information.

THE COURT: Claudia?

MS. BOOTH: Claudia testified that he had said that she better go get her black dress on. There was all kinds of bad information that came from the family.

So although years later, now that Mr. Bourgeois has gotten the death penalty and it's a very horrible situation, we've got witnesses coming out, now that they know it's important that he be mentally retarded, that he be, that there be mental problems with him, everybody's coming out of the wood work.

THE COURT: And who was the woman that testified that he was a very poor student, and she had to help him, and Mr. Bourgeois made no Fs, and she made all the Fs?

MS. BOOTH:  Right.  I think that -- was that Ms. Frank?

THE COURT:  That was Ms. -- no, I don't think so.

MR. ABREU:  That was Claudia.

THE COURT:  No.

MS. BOOTH:  No, it wasn't Claudia.

THE COURT:  It wasn't a sister.

MS. BOOTH:  It may have been some other, but it wasn't his sister.  It was not Claudia.

THE COURT:  It is?

MS. BOOTH:  But anyway -- which Claudia, though?  There were two Claudias?  There was a Claudia Mitchell and another Claudia.

THE COURT:  *I, Claudius*.

MR. ABREU:  It was Claudia Mitchell, Your Honor.

THE COURT:  Claudia Mitchell.  Okay, not the sister.

MR. ABREU:  It was his sister who was also --

MS. BOOTH:  No, but that's a half-sister.  That's not the Claudia that came in.

THE COURT:  Yeah, there were two sisters -- right.

MS. BOOTH:  That's not the Claudia that came in and testified at the trial.

THE COURT:  Yes, I know.

MS. BOOTH:  That was a half-sister.

THE COURT:  There was another one that came in and

talked about the tutoring.  And when Ms. Booth cross-examined her -- that was one of the witnesses that Ms. Swanson used, I think.

MS. BOOTH:  Right.

THE COURT:  She didn't?  Never mind.

MS. BOOTH:  I need to go back and say that there, some of the efforts that Mr. Gilmore and Mr. Tinker took when they -- Mr. Gilmore was appointed by this Court because he had done at least ten to fifteen capital cases.  Mr. Gilmore testified that, when I asked him, "If you could pick anybody out, anywhere down here that the Judge could appoint, who would you pick to be your co-counsel?"  Of course he said, "Mr. Tinker."  Mr. Tinker's tried, in between the two men, probably there have been 25 capital murder cases that have been tried.

As soon as Mr. Gilmore got appointed and they knew which direction this case was going in, he tried --

THE COURT:  Because it was a while before the Justice Department certified it as a death penalty case.

MS. BOOTH:  Right.

THE COURT:  And as soon as that happened -- even before that happened, I said, "Mr. Gilmore, who do you want if it comes back like this?"  And he said, "Mr. Tinker."  I said, "Well, you'll get him."

MS. BOOTH:  And then he went and tried to secure

Mr. Cunningham as the mitigation specialist.  And then he was able to, which he's never had before, mitigation investigators, got to -- and he asked, the testimony was he asked Dr. Cunningham for names.  And those names came from Dr. Cunningham.  So that's when he hired Milstein, and Bierbaum kind of came along with Milstein.

So then they went and tried -- Mr. Tinker went and tried to get a semen expert, which he had seen Dr. Johnson testify, I mean, at a seminar and was impressed with her.  His affidavit talks about how many times he tried, or his interrogatories, how he tried to get in touch with her and had a very difficult time.

And then when we see this, what is it, two-page report that she handwritten and fast --

THE COURT:  From Vail or something?

MS. BOOTH:  Yes.

THE COURT:  From a ski resort.

MS. BOOTH:  You can see that Mr. Tinker was having problems.  And we were on a schedule.  This is not like the Public Defenders here have years to go out and they, of course they have a stable of experts that they use in all of -- like he says, everybody's doing it.  He has a stable.  Hindsight is very, very clear.  He has a stable of experts that he can bring in here.

But at the time, at the time Mr. Tinker was securing

the type of expert that he could get, with his mitigating --

they got a mitigation specialist. They got a mitigation, two

mitigation investigators, their semen expert. They hired, they

got Dr. Estrada to do the thing. They went, and then

Dr. Weiner came in later as a reference from Dr. Estrada.

They also, the Court allowed them to get a voir dire

specialist who came in and sat with them during voir dire and

helped them pick their jury. So they were --

THE COURT: That's the one I thought looked old, and

she came up afterwards and told me that her mother had gone to

high school with me.

(Laughter.)

MS. BOOTH: Not a good day.

THE COURT: It was not a good day for me.

MS. BOOTH: No, it's not a good day.

THE COURT: And she said her mother said "hello."

MS. BOOTH: So they filed over 46 different

documents, thousands of hours that they spent here in the

courtroom, and not, and in preparation of this case, and not

presenting the Court with full bills, I will --

THE COURT: Yeah, I do want to -- I'll tell you on

the record that Mr. Tinker's bills will never reflect the

amount of hours he put in. He would go for months, and every

time he would come in, I would say, "You've got to get -- "No,

I don't want to do this. Forget about a bill." "Mr. Tinker,

get me a bill."  And it was very, very difficult.  And I know he spent many, many hours that he never put on his hourly rate, because he told me that, and because that's how he -- lots of times, he just never turned in bills for court appointed things.  I said, "This is way too much for you to do."

He didn't have, as you know -- you all didn't know him -- but he didn't have a high regard for money.  He lived for years on a boat and used the marina shower and was not remotely concerned.

MS. BOOTH:  Now, I want to talk about Mr. Gilmore, and I'm sorry, I'm kind of distracted, about why he didn't ask for any kind of mental retardation, feel the need to go forward with that.  First of all, because he's -- the law allows him to rely on the expert that he's using.  Second of all, because he was dealing with the Defendant.  He was receiving instructions from the Defendant.  He was understanding that this man had been driving a huge tractor-trailer for 17 years.  All of those things indicating to him that there was no need to make that kind of request.

Now, why -- the testimony of why Dr. Cunningham wasn't used, if -- and I take exception with the way they, the way that Mr. Wiseman talked about the fact that they used the information that he was abused anyway.  Judge, what they were trying to do, and it's clear in the record, is never -- and even when they argued punishment, they never, ever, ever

admitted that Mr. Bourgeois was in any way guilty of this crime, always deflecting it on the wife, on Robin.

THE COURT:  Well, I do --

MS. BOOTH:  However, they did want a little bit of sympathy for him.  So, but they knew, sitting here in front of this jury, how far that was going to go.

THE COURT:  But there is case law that even if your defense is always that someone else did it, it doesn't excuse you from putting on mitigation evidence at the time of the sentencing.

MS. BOOTH:  What if you have a client that's telling you, "No, I don't want that kind of evidence on"?  And that's what the testimony was.  Mr. Bourgeois was driving this bus.  He was driving this bus.  He told them which witnesses he wanted called.  In fact, there were -- you know, he is the one that, the testimony was, wanted -- I believe it was his cousin to come in and testify, had to have his cousin come testify.  And that was the one that had three convictions for fraud.  But he insisted that that man be called.

Any mistake that was made was made because Mr. Bourgeois wanted it done.  And he had a right, it was a capital murder case, to make those kinds of request of his Counsel.  And that's what makes this claim of mental retardation absolutely so unbelievable; no matter what some test says.  Every day, dealing with this man, the Court got to

see him, the jury got to see him and hear him.  Dr. Estrada got to see him, hear him, listen to him, observe him.

THE COURT:  Yeah, I had said earlier in these proceedings I thought his demeanor was --

MS. BOOTH:  Certainly not the demeanor of someone with diminished capacity.

THE COURT:  It wasn't that.  It was that his demeanor, and Mr. Wiseman said he would explain all that, but his demeanor, he didn't seem at all concerned when those horrible pictures of his, of JG1999 were shown.  And the, and the testimony went on about how her skin was thickened like old leather.

MS. BOOTH:  From the biting.

THE COURT:  And her -- anyway.

MS. BOOTH:  And Judge, the powerful impact of the seven-year-old testifying -- well, she was seven when it happened -- of the nine-year-old --

THE COURT:  I think she was nine when she testified.

MS. BOOTH:  -- when she testified, testifying about watching her father bite her baby sister.  That kind of testimony, if Mr., you know, you can understand why Mr. Tinker and -- Mr. Tinker specifically, did not want to put a boiling pot in front of the jury for punishment.  He had a World War II veteran.  He had an Aggie.  He had women from farm areas.  That was not going to fly.  And those -- and Mr. Tinker knew that.

He had done this hundreds and hundreds of times, tried cases and been -- he's renowned for being successful.

So to go back now -- and the problem that I have with --

THE COURT:  And to second guess, that's -- I'm not supposed to second guess every strategic -- I am to assume that what they did was correct and understand that there may have been very good reasons not to put on some of this evidence.

When I heard some of these witnesses testify, I would never have put them on.  I would never have put on Dr. Cunningham.  And I can almost imagine, I can almost imagine Mr. Tinker talking to Mr. Cunningham and saying, "Say what?  What are you thinking?  We're not putting on this four-hour PowerPoint presentation."

And Mr. Cunningham, in spite of Mr. Wiseman filing a motion to protest, Mr. Cunningham was one angry witness.

MS. BOOTH:  And it's obvious why Mr. Tinker wouldn't want to put him on.

THE COURT:  He was angry.  He was angry that he didn't get to get on the stand and do his deal.

MS. BOOTH:  And he was probably angry he didn't get a recommendation from Mr. Gilmore either, and Mr. Gilmore testified to that.

THE COURT:  He didn't.  Next point?  Are you still with us, Mr. Bourgeois?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.

MR. WISEMAN:  On this jurisdiction question, I think the Court is certainly aware that the Government has the burden at trial to prove that the fatal blow was struck within the special maritime and territorial jurisdiction of the United States, which in this case means the Naval Air Station. They've got to prove this element of the crime beyond a reasonable doubt.  They've got to prove that element of the crime beyond a reasonable doubt, whether it's contested or not.

We cited -- there's not a lot of law on this issue. We cited the only case that we could find that was related to it, United States versus Parker, 622 F2d 298, an Eighth Circuit case from 1980, which says that the analysis there is not one of whether the, whether a blow struck on, or an injury inflicted on the territory of the United States contributed to death.  It's got to be whether it was the proximate cause of death.

I think what we heard between Dr. Leestma and Dr. Rouse, we have agreement between the experts that the best they could do was to date the most recent injuries to one to three days, which means that from a scientific perspective, there is a lack of proof beyond a reasonable doubt that the injuries were inflicted at the Naval Air Station.

Of course, that's against the backdrop of the victim

having had, by all accounts, many, many weeks of abuse, having a globally impaired brain as a result of the abuse, having a severely edemic brain as a result of the abuse.

And so what it really boils down to then is the question of why is the Government so sure that the fatal blow was struck on the grounds of the Naval Air Station?  And I think there you have to look at the testimony of AB1994, who was identified at trial as "AB1994."  And her testimony in total says that he, meaning Mr. Bourgeois, took her, the victim, by the shoulders and he started hitting her head on the window.  And that's all she said.  There's no description of force.  There's no description of -- I think she responds that, to a leading question, which you know, with a child witness is understandable that it would be leading, but she responded to a leading question that it was maybe four times.

There's no connection between the time at which that injury was alleged to have been inflicted and when she went unconscious.  Her testimony is that after the, after the blows were struck -- or this is at Page 39 of her testimony, starting at Line 22.

Question:  "Let me ask you, you said she was making a sad face.  Was she awake or was she asleep?"

Answer:  Quote, "I don't know, I don't know.  I don't remember if her eyes were opened or closed.  But if I'm not mistaken, I think they were closed."

Question:  "Okay.  And so he told you to do what?"

"To put her right next to me."

"Were her clothes on?"

"Yes."

And then Line 11 on Page 40, "And when she was on the chair with you, was she awake or was she asleep?"

"She was awake, and then she just fell asleep."

So there's not the causation that Mr. Roberts implied in his questioning of Dr. Leestma that we have this, you know, clearly brutal force being inflicted at that moment, led by the instantaneous collapse of the victim.  It's just not in that testimony.  You can read it upside, you know, read it in and out.  It's not there.

Now, you know, we presented this claim as both a claim of insufficient evidence and as a claim of ineffective assistance of counsel, for not challenging the jurisdiction.  And I think that, you know, as the Court I hope appreciates, this is a serious question.  I don't think this is a question that's easily answered, because the science doesn't allow it to be easily answered.

We've got two experts who are giving, you know, Dr. Leestma literally wrote a book, wrote the book, one of the books on this topic, giving a rather, you know, credible account of what the science says.  And Dr. Rouse didn't disagree with the science.  She's relying on her conclusion on

what she's calling clinical presentations.

Now, what are the clinical presentations?  We're dealing with, you know, Alfred Bourgeois, Robin Bourgeois, and a seven-year-old.  Those are the people who are going to be reporting what the clinical presentations were.

AB1994 Bourgeois told many stories.  She told what she later said was a lie her father told her to tell, that she fell off the truck.  And I --

THE COURT:  Actually, Mr. Bourgeois said that to the people who came on the Navy station, that she had just fallen off the truck.

MR. WISEMAN:  Right.  But my point is that AB1994 told a number of different versions of this.  And I'm not impugning her.  She's a child.  I mean, you know, I have my own.  I understand, children are children.  But that's not the kind of witness you want to hang federal jurisdiction on.

THE COURT:  You don't have any children that have been through what AB1994's been through.

MR. WISEMAN:  Lord knows, of course not.  I mean, you know, and I'm not arguing with that.  All I'm saying is that, you know, as an objective fact finder looking at reliance on a seven-year-old who's been through this kind of trauma, whose mother is a suspect, as she was at some point, whose mother told a number of different stories, I don't think you can rest federal jurisdiction on their failure to report clinical signs

of neurological deterioration.

This is a real issue.  And whether you think the evidence was sufficient or not, I think that's a close call, and I would point out Dr. Rouse at trial never dated the injuries.  This was all assumed.

Look at Ms. Booth's closing argument at Page 10, where she talks about federal jurisdiction.  All she says is, "This happened, this happened on the Navy Base."  That's all she says, because it was just sort of assumed.

This child's obviously horribly abused.  She collapsed on a Navy Base, without question, and conclusions were led to, I would submit, as to what the proximate cause was.  And there's a real question about whether the proximate cause were the blows to the head allegedly inflicted by Mr. Bourgeois --

THE COURT:  So you concede that she collapsed on the Navy Base?

MR. WISEMAN:  Well, I don't think there's any doubt about that.

THE COURT:  Okay.  Well, I didn't think so either.

MR. WISEMAN:  Yeah, yeah.  I don't think there's any doubt about that.

Now, Your Honor, I can see whoever's going to get up and respond saying --

THE COURT:  And she literally died in the children's

hospital, not in the Navy Base.

MR. WISEMAN:  I'm sorry?

THE COURT:  She died in the children's hospital.

MR. WISEMAN:  Yes, of course, the next day.  Correct.
I can see the argument being made, this isn't the kind of fight
you want to have in front of the World War II vet or the farm
lady or whatever.

THE COURT:  But it's a legal issue that could have
been brought up.  I understand that exactly.

MR. WISEMAN:  There you go.  It's a pretrial issue.
And as a pretrial issue, it's a serious issue.  I think it
could have led to plea negotiations, if it had been presented
pretrial.

THE COURT:  I don't know about that, but I can tell
you that it would be very difficult to bring it up legally when
your client has told everybody there at the Navy Station that
she fell out of the truck.  I think that would be difficult,
that she fell out of the truck on the Navy Base.

MR. WISEMAN:  I don't see where that would
necessarily -- and obviously you're the fact finder, but I
don't see where that cuts against the science that says you
can't date the injury to the Navy Base, and relying on this --

THE COURT:  I didn't hear any science that couldn't
do that.  But I'm talking about when you've got the
eyewitnesses there that said this is what happened, including

your client.

MR. WISEMAN:  Oh, that she, you know -- look, let's assume Mr. Bourgeois, for this argument, let's assume Mr. Bourgeois inflicted the injuries that AB1994 testified to, and the child collapsed.  That doesn't speak to the question of whether the injuries he inflicted were the cause of the collapse, the proximate cause of the collapse.  That question is a scientific one.  Even if you assume Dr. Rouse is correct, you need to look at clinical presentations --

THE COURT:  Well, but the abuse that killed this child began in Louisiana.

MR. WISEMAN:  Exactly.

THE COURT:  And continued -- and I agree with that.

MR. WISEMAN:  Right.

THE COURT:  And continued all the way through.  But the coup de grâce was administered on the Naval Air Station, the way I understand.

MR. WISEMAN:  We don't know that.

THE COURT:  All I know is what I heard your client say and what AB1994 testified to.  And your client said it occurred that she fell out of the truck on her head on the Navy Base.

MR. WISEMAN:  Yeah, so he's covering for having inflicted an injury on the naval base.  And that still doesn't mean that the injury he's covering for was the proximate cause

of death.  There's no scientific evidence that proves that.

THE COURT:  I don't like this argument, Mr. Wiseman. I think you need to move on.  And arguing with me is not going to help.  I've got all your written, unless there's something new, other than what's in your written.

MR. WISEMAN:  I was simply making my argument.  I'm sorry if the Court doesn't --

THE COURT:  No, no, no, I don't agree with you.

MR. WISEMAN:  All right.

THE COURT:  I just don't.  I told you from the beginning that was the weakest argument --

MR. WISEMAN:  Yeah.

THE COURT:  -- I had heard in a long time.  It has not strengthened as time has gone on.

MR. WISEMAN:  I have to say I'm surprised to hear that, but so be it.

THE COURT:  I understand that.  Thank you.  But I'll hear a response from the Government, short.

MS. SALINAS:  Yes, Your Honor.  Your Honor, the Government disagrees with the Defense Counsel's assessment that there was no testimony regarding the cause of death of this child.  And the Court did hear the testimony from all the witnesses, did get to hear AB1994's testimony about what occurred on that particular day, June 28th.  Where the record reflects that she said that her daddy got so angry that JG1999

had dropped, spilled over the potty, that he grabbed her and hit her head against that window and against the dashboard.

And I believe the testimony also says that she says afterwards that her body became limp, and she also mentions, and the Defense forgot to mention to the Court, that AB1994 states that white fluid started coming out of her mouth at that time. And immediately afterwards, her father concocts a story, and she sees her father putting the child on the floor -- on the ground, right by the trailer.

And so we also disagree with the fact, the conclusions by Dr. Rouse. Dr. Rouse was told, given, "Would it help you in your determination of trying to time these, the cause of death, that you had the testimony of AB1994?" And she said, "Of course it would," because they don't take these medical evaluations or examinations without looking at what occurred.

And she stated that the information she had about what had occurred, which is that which is testified by AB1994, were her dad grabbed her, and in his anger, thrust her against the window; that the recent hematoma, the recent bleeding, the acute bleeding was, did not conflict, she said, with the child's death within 24 hours.

And so even though medically she's saying she can't say it happened within one to three days, she only has a window of one to three days, she stated that given what that child

said, that the acute hemorrhaging does not conflict with the child's death within 24 hours of being on that base. And so we argue that jurisdiction is and was on the naval air base.

And Your Honor, I have nothing further on that issue of jurisdiction.

THE COURT: All right. Thank you. Next issue?

MR. ABREU: Good afternoon, Your Honor. I'll be discussing Claim 4 of the petition, which deals with trial counsel's ineffectiveness of failing to present evidence to rebut the allegation of sexual assault, sexual abuse and semen that was detected in the child victim, Your Honor.

Let me just start by talking briefly about something that Ms. Booth brought up, which was Dr. Johnson. And Ms. Booth alluded to, to an allegation that Dr. Johnson was late in getting her report in, and she was somehow hard to reach, and that Counsel, that that might account for why Counsel didn't use her.

Now, that was certainly stated in Mr. Tinker's interrogatory, and I'll deal with that in a second. But let me just point out that on February 17th, 2004, the Government filed in District Court, Document Number 187, not their first, not their second, but their third motion for reciprocal discovery requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norris (phonetic) and Dr. Donald Weiner.

Now, are we to believe that every single one of those doctors who they're requesting third, for the third time summaries from or reports from were all late?  I think at some point we have to put the responsibility on Counsel for getting those reports in on time, Your Honor.  And that's what we have with Dr. Johnson.

In addition, just a month before that, Mr. Tinker told the Court, and I quote, regarding Dr. Johnson's report, "As soon as she gets it and has an opportunity to test it, and I think she'll be prompt, she's been good about talking to me about issues."  That's what Mr. Tinker told the Court.  "She's been good about talking to me about issues."

So this notion that she was somehow hard to reach and that's why she didn't get a report in time, I think, is fallacious, Your Honor.

The question, as I began, is what evidence Counsel could have presented to rebut the evidence.  And first let me just briefly talk about what the evidence of sexual assault was.  One, you had Dr. Scott Benton, who testified that he had previously observed the, JG1999 in Louisiana, I believe, and subsequently viewed autopsy photos.

And what he testified was that when he first examined her, she didn't appear to have any evidence of sexual assault to her genitalia.  But when he examined her subsequently through autopsy photographs, she appeared to have contusions or

bruising in the genitalia.  That was his testimony on 3/5/04, Pages 43 to 46.

THE COURT:  I'm sorry, who testified to that?  I forgot.

MR. ABREU:  Dr. Scott Benton, Your Honor.

THE COURT:  Okay.  Thank you.

MR. ABREU:  Yes, Your Honor.  In Counsel's possession at that particular time, Your Honor, was Dr. Rouse's autopsy report.  And what does Dr. Rouse's autopsy report say?

THE COURT:  Would you turn that back on?  What's wrong?

MR. ABREU:  Is it on, Your Honor?

THE COURT:  It's coming.  Apparently it went to sleep.

MR. ABREU:  It reads, Your Honor, and I'm in the third paragraph under the, on Page 3, "External Examination," last couple of sentences, which start, "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic."

Trial counsel had in their possession at that time --

THE COURT:  I can't read that.  Would you blow that up a little bit higher --

MR. ABREU:  Yes, Your Honor.

THE COURT:  -- more, please, sir.

MR. ABREU:  Let me zoom then focus.  Am I in the right part?  Yes.  Is that clear, Your Honor?  And it simply starts with "The external genitalia."

THE COURT:  Thank you.

MR. ABREU:  Thank you, Your Honor.  So this document was in trial counsel's possession at the time.  And despite the fact that Dr. Benton was testifying to what he thought he observed on autopsy photographs, you have a report from the person who did the actual autopsy that shows no evidence of sexual trauma.  And despite having this particular report and despite the fact that Dr. Rouse testified at trial, trial counsel asked not a single question of Dr. Rouse regarding evidence of sexual assault that she might have observed.  Not a single question was asked.  The report was never introduced.

Here's an opportunity for Counsel, without the need of an expert.  The Government had already presented an expert. She was sitting right here on the witness stand.  All you have to do is ask her a couple of questions, and directly we're refuting Dr. Benton's testimony that he saw evidence of sexual assault in photographs of the autopsy.

The evidence of sexual assault, Your Honor, was also presented through alleged testimony regarding, or I should say through testimony of alleged semen that was recovered, said to be recovered from JG1999's anus, Your Honor.

There are two components.  One has come up more recently, which is I guess the Brady aspect of this particular claim.  And maybe what I'll do is I'll address that first and then discuss the ineffectiveness angle to the claim, Your Honor.

To prove a Brady violation, Your Honor, what we've got to establish are two things.  One, that you have the failure to disclose a document, and two, that that particular document was material.  And if I can, let me just start with whether the document was material.  And by that, I mean how the document was important and how it could have been used.  And then I'll discuss nondisclosure and whatever evidence there is of nondisclosure.

The document that we're talking about that is in question here, Your Honor, is Document P-179.  I'll just grab that.

THE COURT:  The one that said "weak," and they didn't --

MR. ABREU:  Very.  Very.  That's absolutely right, Your Honor.

THE COURT:  Yes.  A weak positive or something, very weak.

MR. ABREU:  Q5, Q6 and Q7, which are the three individual rectal swabs that were taken.

THE COURT:  Yes, sir.

MR. ABREU:  They all test positive.  And then in the remarks, they indicate "very weak," "very weak," and "weak."

Now, why is that particular finding important?  At trial, there was no evidence about weak, very weak or weak.  It was just an allegation that they were positive.  Well, why is that important?  Why is the strength or, of those particular tests important?  It's important, Your Honor, because when you have borderline activity of p30 -- and let me just remind the Court what p30 is.  This was a test for p30, that particular protein which is found, which is prevalent in semen, but is also found in additional substances --

THE COURT:  Right.

MR. ABREU:  -- including female serum, female urine, amniotic fluid, male urine, to name some of those particular substances where it's found.

When you have borderline levels of p30, it requires the FBI to take specific action to confirm the presence of semen.  And what does the FBI manual, which was admitted as Petitioner's 180, say it requires the FBI do?  I'll read Chapter 11, Your Honor.

"Attempts to identify human semen in some categories of evidence must," I'll repeat, "must be approached through an identification of spermatozoa, rather than by detection of human specific protein, such as p30s.  These categories include smear slide materials submitted by contributors, unusual stain

materials that defy attempts towards the soluzation (phonetic) of protein components, and -- and here's the relevant part -- and stain extracts that possess borderline levels of p30."

So what do we have in this case?

MR. DOWD:  Your Honor, I just want to make sure I preserve my objection.  I believe this is outside the scope of their 2255 allegation.  And I made an objection at trial, but I want to make sure I preserve that, that this is beyond the grounds that they initially alleged.

MR. ABREU:  I don't even begin to understand how that's possible.  Our allegation is that trial counsel failed to present available evidence that would have refuted that this in fact was semen, that there was a sexual assault.  This is the FBI manual, which in fact goes directly to --

THE COURT:  Mr. Dowd?

MR. DOWD:  And this is not one of the grounds that they listed in their 2255.  It's an attempt to expand the grounds of ineffective assistance that they've alleged, and they're not allowed to do that.

THE COURT:  I thought that they didn't get -- it was that they didn't get an expert on this.

MR. DOWD:  Didn't use Dr. Johnson.  But this was not one of the basis of the failing; had nothing to do with the FBI lab protocols.  It was that they had Dr. Johnson available. They didn't use her to confront this testimony from Dr. Benton

and about the PSA and the lab results from the FBI.  It had nothing to do with the FBI protocol, lab protocol.

MR. ABREU:  Your Honor, the allegation is that Counsel failed to rebut the evidence.  Dr. Johnson was one means --

THE COURT:  Why don't you read me that --

MR. ABREU:  -- by which he could have --

THE COURT:  Why don't you read me that allegation completely?

MR. ABREU:  Which allegation, Your Honor?

THE COURT:  Not the Brady, which was 179.

MR. ABREU:  Okay.

THE COURT:  That was a Brady.  I let you amend to add that.

MR. ABREU:  Correct.

THE COURT:  Right?

MR. ABREU:  Correct.

THE COURT:  But the one about the semen expert.

MR. ABREU:  I'll read it from our memorandum of law, Your Honor, I guess is what we --

THE COURT:  No, no the memorandum of law; the petition.

MR. DOWD:  No, not the memorandum of law; the 2255, Judge.

THE COURT:  The petition.

MS. BOOTH:  Yeah.

MR. ABREU:  Well, I'm confused by that allegation. Are they saying that we didn't challenge -- let me pull up the --

THE COURT:  Could you just, could you read the petition, Mr. Dowd?

MR. DOWD:  Judge, I don't have it.  It's this thick, and I didn't bring it.  I have a -- I have a summary that I prepared, and that's why I noted that this was outside the --

THE COURT:  Okay.  Hold on.  Let me get it.

MR. DOWD:  -- the scope of their complaint.  I can summarize it, Your Honor.

MR. ABREU:  I'll read it.  I'll read it.  I have it now, right now.

THE COURT:  Wait, wait.  Let me get it.

MR. ABREU:  Very first paragraph reads as follows, Your Honor.  In the heading, "Trial counsel were ineffective" --

THE COURT:  Let me, let me follow it.

MR. ABREU:  Oh, I'm sorry.  You have it.

THE COURT:  Hold on.

MR. ABREU:  Oh, I didn't know you had it.  I'm sorry, Your Honor.

THE COURT:  Wait a minute.  I know I told you to read it.  Now I've got it.

MR. ABREU:  Okay.

(PAUSE.)

THE COURT:  Okay.  Overruled.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  I just have to check.

MR. ABREU:  So I'm going to just get back to the Brady allegations quickly, then I'll move over to the IAC allegation, because they do overlap a little bit, Your Honor.

So as I was saying, what the manual requires the FBI to do when you have borderline levels of p30 is confirm the presence of semen through the identification of spermatozoa. And what do we know in this particular case?  That every attempt to search for spermatozoa was negative.

THE COURT:  Where did you get that?

MR. ABREU:  I'm sorry, Your Honor?

THE COURT:  Did you get, did you put that in through an expert?

MR. ABREU:  Yes.

THE COURT:  Okay.

MR. ABREU:  Through the Government's expert, Ms. Conway, Your Honor.

THE COURT:  Okay.  I couldn't remember that particular line.

MR. ABREU:  Yeah, I read it.  It's in the transcript through testimony of Jerrilyn Conway, the Government's expert,

Your Honor.

THE COURT:  Well, I remember testifying that it could show up in many other things.

MR. ABREU:  That is correct, Your Honor.  And that is actually a point in our allegation as well, if you look at the petition in the memo of law, where we argue that at trial, if you look at the Government's experts at trial, they were Caroline Zervos, again Dr. Benton, and Mr. Onorato.  And the three of them, Your Honor, testified about where p30 is supposedly detectable.

And if you look at each of their testimony, none of them identified the female fluids that we were talking about, or any female fluids, except Dr. Benton who said, "And sometimes possibly breast milk."  But none of them said female urine or female serum.  And Ms. Conway --

THE COURT:  I thought -- wait a minute.  We did talk -- yeah, there was something about that, that the female urine had to be of a mature female, like from menarche on, I thought.

MR. ABREU:  No, there was no -- there was no testimony about that, Your Honor.

THE COURT:  I thought that's what she said.

MR. ABREU:  Your Honor asked a couple --

THE COURT:  Are you positive?

MR. ABREU:  I'm sorry.  I'm sorry I interrupted.

THE COURT:  No, no.  You're positive?

MR. ABREU:  Yes.  Your Honor asked a couple of questions about whether there's some hormonal connection to --

THE COURT:  Right.

MR. ABREU:  -- to --

THE COURT:  So I was testifying.

MR. ABREU:  And as I remember specifically, Ms. Johnson testified and said, "There's been no specific studies on children or not children."

THE COURT:  Got it.

MR. ABREU:  Right?  "But we know that it's present in female" --

THE COURT:  So she, no one testified that it could be present in a child this age?  What I'm saying is there are no studies that show that --

MR. ABREU:  That's absolutely correct.

THE COURT:  Okay.

MR. ABREU:  No one's tested if p30 is present in a child of this --

THE COURT:  Okay.  So that was why, in my mind, I ruled out that it could have been her urine.  It could have been his urine that she was drinking.

MR. ABREU:  And I guess I should address that as well, Your Honor, because what Dr. Johnson testified to was that when you have, as you have in this particular case, as a

scientist, you have -- here's what you're faced with.  You're faced with a very weak positive p30 against two negative acid phosphatase tests, another enzyme that's present in semen.  They tested for those.  Those were negative.

THE COURT:  Actually, I think the PSA is more, is -- was an advance on alkaline phosphatase.

MR. ABREU:  I don't know if it was an advance.  It's different, testing for two different things.

THE COURT:  I know, but it is still a more sophisticated test.

MR. ABREU:  It's more sensitive now, and I'll say why.

THE COURT:  Yes.

MR. ABREU:  It's more sensitive, because acid phosphatase is present at higher levels in a lot of other fluids, in female fluids included.  All right?  So when you have a positive acid phosphatase, you can't be certain that it's semen, because it's present in high, high levels in other things as well.  P30 --

THE COURT:  But the P, the p30 is much more sensitive to just --

MR. ABREU:  Correct.

THE COURT:  -- semen or the prostate -- whatever comes out of the prostate.

MR. ABREU:  I would say more sensitive, and I would

not say just what comes out of the prostate.

THE COURT:  I understand that.

MR. ABREU:  Okay.

THE COURT:  But that's why when males get tested for their PSA --

MR. ABREU:  Absolutely.

THE COURT:  -- they no longer do the alkaline or the acid phosphatase from the '70s.

MR. ABREU:  Absolutely.

THE COURT:  It's a PSA.

MR. ABREU:  That's absolutely true.  And as a matter of fact --

THE COURT:  Not that it's exclusive for that, but I'm just saying --

MR. ABREU:  Correct.  And when p30 was first named, they named it Prostate Specific Antigen.

THE COURT:  PSA.

MR. ABREU:  And the reason that's a misnomer is because it's not specific to the antigen --

THE COURT:  Or the prostate.

MR. ABREU:  -- to the prostate, and not specific to males.

THE COURT:  I've got it.

MR. ABREU:  Okay.

THE COURT:  There's another one about to come out, by

the way.

MR. ABREU:  A new test?

THE COURT:  A new test, more specific even than for prostate cancer, out of Johns Hopkins.  I read about it.

MR. ABREU:  Okay.  So as I was saying, Your Honor, so what it requires them to do is to, is to identify through spermatozoa.  And when you have no spermatozoa detected in the microscopic smear slide that's created, no spermatozoa detected in the microscopic searches that were conducted by Dr. Johnson and Technical Associates, no male DNA in the autosomal DNA test that was conducted, no male DNA in the Y chromosomal test that was conducted, no A, no AP or p30 activity in the underwear of JG1999, no AP or p30 activity in the potty in which she was sitting and going in.  When you have all these negatives against this one, these weak positive p30s, a scientist has to ask themselves -- and this is what Dr. Johnson said -- what might have caused this particular positive p30 test.

And one of the things she was prepared to testify, as reflected in the note she sent Mr. Tinker about what she was prepared to testify about, was that it could have been microbial bacteria that caused a positive reaction.

Now, the Government asked their expert, Ms. Conway, whether that was possible, and she cited a study that said, well, they tested for some microbes, bacteria in this, and none of them tested positive for p30.  We asked her on cross about

it, and that particular study tested for seven different bacteria, rectal bacteria and whether they reacted with a p30 test.

I then asked her, "Well, how many bacteria would you expect to find?"  She goes -- I said, "Hundreds?"  And she said, "No, not, definitely not hundreds.  I don't know."

Well, I would ask Your Honor to just do a quick search yourself.  And Your Honor, I asked Mr. Keel about Wikipedia at one point.  "Sir, how many different bacteria are present inside a rectum?"  There are hundreds of bacteria in a rectum.  And each one of those carries hundreds of different proteins within them.

What we know about --

MR. DOWD:  Judge, I'm going to object.  I think we're going outside the record here.  Counsel's asking to do additional research.

THE COURT:  Well, I think we were both interested in this, so we can, you can move on.

MR. DOWD:  Okay.

THE COURT:  You are outside the record.

MR. ABREU:  We're making argument based on inferences from the record.  So here we are.

THE COURT:  A quick recovery.

MR. ABREU:  There we go.  Let me just say why, another reason why P-179 is important, Your Honor.  And Your

Honor may recall this particular chart, which was also used with Ms. Conway, the Government's expert. And it's also from the FBI lab manuals. And what it seems to indicate, and I hope I can get it close enough to show.

THE COURT: You can.

MR. ABREU: Okay. Is --

THE COURT: A little bit closer.

MR. ABREU: Okay. A little bit closer. When you have the test -- let me go back a little bit and move it down. When you have testing for semen, you have --

THE COURT: Oh, that's good.

MR. ABREU: Yeah. When you have swabs that you're testing for, you, as she testified and as the other experts testified, you test to, you do, you conduct a p30 examination. Correct? That's what it says you do. You come from swabs straight down to p30 examination. If it's positive, you conclude -- this is according to the FBI -- you conclude your search and you identify it and you write it down. If it's negative, you conduct a smear slide search for sperm.

Well, the argument Counsel could have made if he had P-179 and the weak positives that are reflected there, is that if the FBI was so certain they had positives in this particular case, why would they not stop their search right now, with that positive? Instead, they searched the smear slide, which is what Caroline Zervos, the FBI expert, testified she did. She

tested the smear slides.

So Counsel could have made an argument that the FBI was not sure they had positive p30 activity in this particular case because they took additional steps to try to confirm the presence of semen, in contravention of what their own manual says they're supposed to do.

So for those two reasons, P-179 that shows the weak activity of p30, is a material document.  We have a question about whether that document was disclosed to trial counsel or not, whether we have that question.

I would submit, Your Honor, that the fact that it is not -- and maybe a little bit of history of how this even came to be.  Dr. Johnson was on cross-examination by the Government when he asked, Mr. Dowd asked her about weak activity.  And she made a comment to the extent of "I don't remember seeing anything that indicated weak activity."  I at that point said, "Your Honor, I have not seen anything that said weak activity either."

So at that point the Government said that they would look into this matter further.  And then P-179 was turned over. And I said I had never seen that document before.  And the Government then put a couple of things on the record about why they believed that document hadn't been turned over.

Well, we know that that document was not in the materials that was turned over to us.

THE COURT:  But it doesn't mean that Mr. Tinker and Mr. Gilmore didn't get it.

MR. ABREU:  It doesn't conclusively mean that, but it's evidence of that and evidence of the fact that it's not in the page, the 12,000 pages that were turned over to, in those documents as well.

Now, obviously they put on testimony here today about how those particular documents were transferred to, to trial counsel.  But the one thing we know is that there's no definitive evidence that that particular document was transferred over.

But that -- put that aside.  Let's say the Court wants to make a finding that it was in fact disclosed.  We would obviously say it wasn't, but let's say the Court wants to make that finding.  Then we have a clear case of ineffective assistance of counsel, because for the same reasons I just told the Court P-179 was material, for a Brady claim, it's prejudicial for Counsel not to have used that particular document to make those same arguments that I just made.

THE COURT:  So whatever, whether they had it or they didn't have it --

MR. ABREU:  Either way.

THE COURT:  -- it's still ineffective assistance of counsel.

MR. ABREU:  Absolutely, Your Honor.  Absolutely.  Let

me just grab something, if I can, Your Honor.

THE COURT:  How many years have y'all been working on this case?

MR. ABREU:  We, I believe we were appointed in 2007, Your Honor.

THE COURT:  Okay.  And this is 2011.

MR. ABREU:  It is.  It is.

The evidence, Your Honor, at trial regarding the semen, specifically the semen, came from -- or p30, I should say, let me just talk about p30.  And that came from, again, Dr. Benton, Ms. Zervos and Mr. Onorato.

What trial counsel tried to establish, if you look at the transcript of March 16th, 2004, he tried to establish that in fact there was no sexual assault because there was no evidence of semen in this particular case.  When Counsel tried to make that argument that there is no evidence of semen --

THE COURT:  Sperm.

MR. ABREU:  Of semen, he specifically said.  And if you look at the transcript.

THE COURT:  Okay.

MR. ABREU:  March 16th, I made a note of it.  I don't know if I have it actually, but I could probably get it.  March 16th of '04, Mr. Tinker is making argument at closing and says to the extent that there's no semen in this case.

The Court stops him at that point -- and we cited

this in our brief, Your Honor, the reply brief.  The specific cite is there and the page is there so Your Honor can go there and take a look at that moment.

The Court stops him and says, "Stop right there, Mr. Tinker.  There is evidence that there was semen.  The FBI testified that there was semen detected through p30."

All right?  So we know that trial counsel was trying to prevent that evidence from being presented and thought it was important to refute that particular evidence.  The problem was that trial counsel did not put on any evidence to refute that particular allegation, and Your Honor's correctly pointed out, "You haven't put on anything that says this wasn't semen.  They said it was.  You've put on nothing to refute that."

Well, there was evidence that Counsel could have presented to refute that particular testimony.  We know that Dr. Johnson was appointed by the Court and approved for by the Court, at the court expense.  We know that Dr. Johnson is an expert who was at the time living in California and did send the report from Colorado.  But again, I read for the Court the instance of trial counsel assuring the Court that she had been prompt in her response.

There was also some questions asked of Dr. Johnson where she said, "No one told me a report was due by March 1st -- by February 26th."  Her report is dated March 1st.  "No one told me that it was dated -- due by February 26th," as the

Court had ordered.  "If someone had told me that, of course I would have got it to him sooner."

And here's an important point, Your Honor.  If I, as a trial attorney, know that the Government is going to present evidence that there's semen present in the rectum of a two-year-old, and I have an expert who's going to say that it isn't, that there's not sufficient evidence to say that it is semen, I don't care if my report's a week old.  I don't care if it's a month old.  I'm going to come to the Court and I'm going to say, Your Honor, "My report is late.  I know it's late.  But this is incredibly important evidence that has to be presented to this jury."  Mr. Tinker never did that in this particular case.  Even if it was one day late, he never did that.

And the reason we presented Mr. Keel, Your Honor, is to show that Dr. Johnson was not alone in her opinions.  This was not something that was just some cockamamie new idea she came up with herself that it might not be semen.  There were other experts who would have agreed.  So if he didn't like Dr. Johnson, if he decided not to use Dr. Johnson, if she was late, other experts were available.  This is an incredibly important point.

Let me go there for a second.  The Court has said that sitting here and just reading documents a couple, last night, you had to remind yourself to take a step back and not get personally involved.

THE COURT:  It is difficult when you tried the case. I think it's difficult when you tried the case and you, you know, approve all these experts and --

MR. ABREU:  I don't disagree that it's difficult. And I can't --

THE COURT:  Besides, it was a horrible case to sit through.

MR. ABREU:  I --

THE COURT:  And it's difficult for me just to hear it again actually.

MR. ABREU:  Let me say that --

THE COURT:  As it is, I'm sure, for the other people that sat through the trial.

MR. ABREU:  It's very difficult.  It's a difficult factual case, an emotional case.  And I can't imagine, you know, evidence that is more prejudicial than evidence that a man was anally raping his two-year-old daughter before he murdered her.  It's hard to imagine evidence that's more prejudicial than that.

You know, there's a gut, there's a palpable, there's a physical reaction that experienced judges, court personnel, defense attorneys get when you hear this evidence.  I can't imagine a jury of twelve lay people hearing that particular evidence and hearing that testimony, and that not being the end of this particular case.

THE COURT:  I can understand your saying that.  But I can also tell you that hearing all the rest of the evidence about the abuse, how he went, took AB1994 in the bedroom night after night and locked the door and stayed with her overnight -- none of us liked Ms. Robin Bourgeois, by the way -- it was very, very disturbing evidence.  Everything about the case was disturbing.  And put that in perspective, it may not have been the most telling part of the evidence, is all I'm saying.

MR. ABREU:  It was --

THE COURT:  So I mention that to you so you can argue with me about that.

MR. ABREU:  Yeah.  It was concrete, physical evidence of an alleged sexual abuse.  Everything else was innuendo, insinuation.  Nothing concrete like an FBI Agent getting on the stand and saying, "We found semen in this baby's rectum."

And I recall Ms. Booth's words during the penalty phase closing arguments.  "What did she feel like when he put his filthy semen in that baby?"

THE COURT:  I remember her closing arguments exactly.

MR. ABREU:  That may even be word for word what she said.  "Filthy semen in that baby."  That's what that evidence was.  That's how damaging that particular evidence was.

THE COURT:  She does have a way with words.

MR. ABREU:  The evidence, Your Honor, was damaging at

trial at the guilt phase.  But it was also particularly damaging at the penalty phase.  And let me just explain that, those two separate things.

The defense at trial, as Ms. Booth just admitted, or not admitted, as she just stated, I should say, was that Robin Bourgeois inflicted this, these injuries on this particular child.  Whether we, anybody here today agrees with that defense or thinks that defense was a good idea is irrelevant.  That was the defense Mr. Tinker and Mr. Gilmore presented.  And as such, it was incumbent of them to deal with any evidence that would significantly undermine that particular defense.

Here you have the only man who was alleged to have the opportunity to have sexually abused this particular child.  The Government's saying that you have semen in her rectum.  Well, any particular defense that you had to say "it wasn't me; it was my wife" at that point, is completely obliterated by this particular evidence.  So Mr. Tinker and Mr. Gilmore were obliged to do what they could to counter that evidence, to refute that evidence.  And they had the opportunity to do so.

At the penalty phase, Your Honor, where the jury is dealing with life and death decisions, and when the question is, is there a reasonable probability that one juror, one juror might have said, "I'm not going to vote to have this man executed; I think life without parole, the rest of his life in prison is sufficient punishment," if one juror had believed

that he had not been anally raping his two-year-old daughter, there is a reasonable probability, there is much more than a reasonable probability that one juror would have taken a step back and said, "Life without parole is sufficient." Prejudice I think in this case for not challenging this evidence is probable.

I want to come back to just one quick point, Your Honor, on whether in fact this was semen or not semen. And then I'm going to sit down because I've been talking for a long time.

Ms. Conway, the FBI Agent, testified that the FBI's methods of testing for p30 prevent the identification of any other substance other than semen. Now, we submitted with our Brady amendment several manuals from other laboratories. One in particular, Your Honor, to take note of is a Department of Public Safety, the Texas Department of Public Safety's own forensic crime lab procedures.

And what do they say when they have p30? I'll read it. I'll put it up. I think I highlighted. It will make it harder to read.

THE COURT: That's all right.

MR. ABREU: I'll just zoom it a little more out.

THE COURT: Why don't you read it to me?

MR. ABREU: I'll read it.

THE COURT: Thank you.

MR. ABREU:  It says, "P30 is considered to be the presumptive test for semen.  The presence of p30 indicates but does not confirm the presence of semen.  Semen can only be confirmed by the presence of spermatozoa."  That's what the Department of Public Safety says when it comes to p30.

What does the California Department of Justice or Bureau of Forensic Services say about it?  "When you have, when you have a negative acid phosphatase test," as we do in this particular case, "when you have negative microscopy for sperm," as we do in this case, "but a positive p30," as we do in this particular case, "you can say that p30 was detected."

And what does that mean?  You go down, right down to the bottom here, and I will read that word for word for the Court.  "For p30 immunoassay cards, a positive result alone, without sperm or AP results, would allow you to make the statement of p30 was detected.  However, your report should include a statement that explains that other body fluid may react with these test scores.  The immunoassay cards are very sensitive and can detect p30 at very low levels that may be present in body fluids other than seminal fluid."  That's California's Forensic Lab manual.

If the FBI had a particular method for detecting semen using p30 that was so foolproof, why aren't they sharing it with California?  Why aren't they sharing it with the Texas Department of Public Safety?  Don't they want to solve crimes?

I'm assuming they do.  Why aren't these other labs relying on this supposedly foolproof method?  The answer is, there is no foolproof method.  That's the answer.

When you have a positive p30, in light of all these other negatives, you have to look at the surrounding evidence.  And all the surrounding evidence, all the surrounding physical evidence, all the surrounding science evidence was all negative in this particular case.

Lastly, Your Honor, let me just point the Court, we cited the case of Sofar v. Dretke in our pleading.  But I want to point the Court to a District Court opinion from the District of New Mexico.  And I have provided the Government with a copy, but I'd like to have the Court, the Court to have a copy, and just hand it --

THE COURT:  Why don't you just give me the cite?

MR. ABREU:  Well, I don't --

THE COURT:  I've got it all on Westlaw.

MR. ABREU:  I have it -- I don't have it.  I can get it.  I don't --

THE COURT:  Or Lexus Nexus.  I've got it all.

MR. ABREU:  Maybe somebody can look it up for me.

THE COURT:  I just have a particular dislike of somebody handing me cases.

MR. ABREU:  You do, okay.

THE COURT:  So I don't want you to -- continue on

that.

MR. ABREU:  I will tell you what the case says, and then we'll --

THE COURT:  But if you don't have a cite, then I'll take the case.

MR. ABREU:  Okay.  Well, we -- it's a slip opinion.

THE COURT:  It just slipped up some place?

MR. ABREU:  It slipped up.  Well --

THE COURT:  Okay.  Hand it to Ms. Scotch, and I'll be pleased to see it.

MR. ABREU:  And obviously it's not, it's not binding on the Court.  It's --

THE COURT:  Obviously not.

MR. ABREU:  Obviously not.  Correct.  Okay.

THE COURT:  But that's okay.  Sometimes it's good to see reasoning that makes sense.

MR. ABREU:  The case I was going to talk about is Theodore Largo's case, and I came across this case because it's one of the cases that Ms. Conway had been testifying in previously and it came across in her Rule 26 disclosures.  And I did a little research, and I came across the case of Theodore Largo, United States of America versus Theodore Largo's case.

In Mr. Largo's case, he was charged with sexually assaulting a young boy.  And the eyewitness testimony in Mr. Largo's case was that, I believe it was that his own sister

came in and saw Mr. Largo in a bedroom with his pants down around his waist, on top of a young boy.

THE COURT: Ankles.

MR. ABREU: Ankles. On top of a young boy, using provocative gestures under covers of a bed. The Government charged him with sexual assault. The testimony in that particular case was -- the question was whether there was actual penetration to prove the sexual assault.

The evidence was a positive p30 test alone. Again, you had no semen, you had no, no sperm detected. You had none of the other things that might confirm the presence of semen. All you had was a positive p30. That's all you had.

Counsel in that particular case, trial counsel brought a Daubert challenge saying, "You can't confirm semen on a positive p30 test alone." Judge Judith Herrera in the District of New Mexico, although she allowed the testimony to go forward under Daubert, because the FBI was able to qualify their methods for how they did it, she made this conclusion.

She said, "However, while the Defendant provides a compelling argument for the sole, that the sole use of a faint positive," just as we have here, "a faint positive reading for p30 on an anal swab as a confirmatory test for the presence of semen may be questionable, under Daubert's general rule calling for their admissibility, the Court cannot say these findings are so unreliable they must be excluded."

What I want the Court to take note of is that another Court has found the very test that we're talking about here to be questionable, just as counsel, trial counsel could have presented to the jury that it's questionable, that it might not be. And that's where Counsel was ineffective.

Counsel had an opportunity to present that this evidence was questionable, and trial counsel should have presented it.

And I guess let me just close by addressing Mr. Tinker's and Mr. Gilmore's interrogatories on this particular matter. And I have heard the Court say that the Court has to assume that they were acting effectively and that they had strategic reasons for the decisions that they made. That may be the case where you have no reasons on the record, Your Honor. Here we have reasons on the record. Trial counsel has told us the reason they didn't call Dr. Johnson. And I go back and I ask the Court to look at Dr. Johnson's testimony, look at Mr. Keel's testimony, look at Dr. Johnson's report about what she could have said back at the time of trial.

They've told us that the reason they didn't call Dr. Johnson was because she didn't have her own lab and her report was late. Well, I've already addressed the fact that her report was allegedly late.

She didn't have her own lab, Your Honor --

THE COURT: Pardon?

MR. ABREU:  They also said because she didn't have her own lab is why they didn't call her.

THE COURT:  Well, she didn't do the tests herself. That was the problem.

MR. ABREU:  Correct.  That was a problem to them. Let me just point out that Caroline Zervos, who testified for the FBI at trial, didn't do her own testing.  She testified to the tests that were done by scientists at the FBI lab, at her direction.

THE COURT:  Well, but that's different.  Ms. Johnson didn't have any direction, the way I understood it.

MR. ABREU:  Yes, she did.  I'm sorry, Your Honor. She was affiliated with Technical Associates in California, and she directed the --

THE COURT:  I thought she just sent the samples someplace else and did not direct the tests.  I didn't hear evidence about that.

MR. ABREU:  No.  She -- they were done at her direction.  And as a matter of fact, if you go back to Ms. Conway's testimony, we admitted the reports from Technical Associates that were sent back to Ms. Johnson that was at her direction.  And that would be there and that will be shown.

Mr. Onorato, who testified, did not do his own testing.  The person that the Government called at the 2255 hearing, Ms. Conway, she testified about the results at the

hearing.  Not only didn't she do the testing, she wasn't even the person who testified at trial.  Those people didn't even come to testify.

So the idea that just because she didn't do the testing herself, but directed others to do it, is no reason not to have called this particular witness, Your Honor.

And so the Court, dealing with these particular, specific information from trial counsel about why they didn't use Ms. Johnson, the Court has to decide whether that decision was reasonable.  And when you weigh the evidence that could have been presented with the prejudicial weight of the evidence that did come in of the semen, those decisions not to present Ms. Johnson or any other expert to refute this evidence was not reasonable.  Thank you, Your Honor.

THE COURT:  Thank you, sir.  Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Thank you.

THE COURT:  How many more points are to be argued?

MR. WISEMAN:  I think three more after this is done.

THE COURT:  How long is that going to take you?

MR. McHUGH:  Your Honor, I think I probably --

THE COURT:  I'm just worried, Mr. Wiseman, about your plane.

MR. WISEMAN:  Oh, yeah.  Well, don't worry about that.  I appreciate it, though.

MR. McHUGH:  We can probably be done in 15 minutes.

THE COURT:  Okay.

MR. WISEMAN:  Thank you.

MR. DOWD:  Your Honor, I'm going to address these one by one.

THE COURT:  Okay.  Just make it rather quickly, please, if you can.

MR. DOWD:  I'll move through this, Judge.

THE COURT:  Thank you.

MR. DOWD:  First of all, the nature of this claim is failure to call the available scientific witnesses, or witness.  And here the only available scientific witness available to Counsel was Dr. Elizabeth Johnson, who they had hired and paid to do this analysis and to be their expert.  Not Dr. Blake, not Dr. Spitz (phonetic), not Mr. Keel.  Those were not available to them.  So that's the analysis the Court should make.

So the first question goes to Dr. Johnson's reliability, availability, dependability.  And you heard John Gilmore testify at the evidentiary hearing that Dr. Johnson had been unavailable and undependable to the attorneys pretrial, and that the lawyers had lost confidence in her.

Indeed, the report that she sent, which they had to hound her for and sent to them, faxed to them from Colorado only four days before the hearing, is a handwritten note that she admitted that she had made from memory, not even with the file with her.  She was in Colorado on other matters.

So I know Counsel said that no matter what, he would have submitted this to the Court, but I mean frankly, I would be embarrassed to submit something like this to the Federal Court in a death penalty case.  But be that as it may, Dr. Johnson demonstrated that she was not a reliable source of an expert for trial counsel.

As to the -- now, they used, Doug Tinker did the best he could with what Dr. Johnson supplied him.  He cross-examined Government expert witnesses with Dr. Johnson's report, and after talking to Dr. Johnson.

But -- now addressing the probable impact of Dr. Johnson's testimony, her testimony at the evidentiary hearing, if that's any guide, it wouldn't have impacted the trial, the trial results.  Dr. Johnson's own PSA test for the rectal swab resulted in a weak but positive result.  This was the same as the FBI lab result, essentially confirming the FBI lab results.

Dr. Johnson's statistical analysis of the amount of semen to be expected was exposed by Jerrilyn Conway, the Government's serology expert from the FBI, as simplistic and unreliable.

Dr. Johnson's conclusions about the absence of any identifiable sperm in proving or disproving the positive PSA results was rebutted by Jerrilyn Conway.

Dr. Johnson's level of preparation, if the

evidentiary hearing is any guide, was suspect.  Although she proposed that female urine could have been the source of the positive PSA results, both in her report and on the stand, I think the Court asked if there had been any studies as to whether or not the urine of prepubescent or small girls could trigger a PSA or could, you know, could contain PSA.  And Dr. Johnson said that, no, there had been no studies on little girls.

But my memory of the testimony at that hearing was that Ms. Conway corrected that and said that there had been a study on little girls, and that PSA had been discovered but at levels so infinitesimal that it would in no way be able to trigger a positive PSA result.

But I think the most critical contribution Dr. Johnson would have made at trial would have been a negative contribution.  Again, based on her testimony at the evidentiary hearing, Dr. Johnson would have eliminated the victim's blood or serum as a potential source for the positive PSA results from the rectal swab.

Dr. Johnson testified -- if the Court remembers, that there was another swab taken from blood found in the little girl's underwear.  And that was, as Counsel has now conceded, that was negative for PSA.  So I asked Dr. Johnson, "Well then, if that's negative for PSA, then therefore we can conclude that this little girl's blood could not be the source of a positive

PSA from the rectal, from the rectal swabs?"  And she agreed. So I don't think her contribution would be very positive or favorable to Mr. Bourgeois.

And even without Dr. Johnson, Mr. Tinker was able to get the FBI serology expert, Caroline Zervos, to concede that she didn't know if digested animal protein could trigger a positive PSA result, which I thought was a very, very damaging to the Government's case, and very helpful to Mr. Bourgeois.

Now, as far as the issue about the inability to, the fact that the lab was not able to identify male DNA from this swab, this positive swab, that the AP test was negative, does not suggest that the PSA result was unreliable.  And this is disputed by Jerrilyn Conway.  The AP test is an enzyme, enzyme identification test, and it's only positive if the enzyme is still active, which would be very doubtful if spent any time in a rectum.  That's why the PSA test is a confirmatory test, not the AP test.

Now, I'll move on, unless the Court has any questions about that aspect, I'll move on to the Brady claim.  Now, the Court has heard testimony that the Government received 358 pages of the FBI lab report on, shortly after October 29th, perhaps November 1st, 2003, and that 358 pages were provided to the Defense as the FBI lab report copy on November 7th, one week.

And the fact that the P -- and P-179 appears in the

original set of the Government copy of the FBI lab report. That's the basis of the Government's belief that the preponderance of the evidence suggests that the trial defense attorneys in fact got a copy of P-179 in their discovery on November 7th of '03.

The fact that they don't appear in the 12,000 pages that Mr. Tinker shared with the Public Defender two years ago is not dispositive, because there are at least five other pages from that 358-page FBI lab report which are not contained within the 12,000 pages, as well as other discovery materials that had been supplied to Doug Tinker. I mean, that's the basis for that.

Now, going on to the, if the Court finds that, in fact, that P-179 was not provided to the Defense on November 7, 2003, the Government would argue that such, such a violation would not impact the conviction.

Let me first note that no deliberate Brady violation has been alleged or demonstrated. If any Brady violation occurred, it was inadvertent. And I want to remind the Court that it was the Government, during the evidentiary hearing with Dr. Johnson on the stand, who first broached the existence of P-179. When I asked Dr. Johnson what difference would it make, the FBI lab results indicated a very weak and weak positive result on the, on this particular swab. And at that point, she was surprised, and so, you know, I think that that speaks to

the inadvertence of any violation and also the Government's good faith during the hearing and during the prosecution.

Now, as to the impact of 179 on the trial, as Jerrilyn Conway testified, a very weak or weak positive finding on a p30 or PSA test is still a positive finding of semen. The weakness of the finding reflects the amount, as Jerrilyn Conway testified, reflects the amount of semen found, not whether it's semen or something else.

The fact that they have the notation "weak" is to alert the lab technicians that that sample would not be a good candidate for further testing, like DNA testing. That's the reason that they designate "weak" or "very weak." So I don't see how the, trying to impeach the lab results with the weak finding would have impacted the verdict. And again, Dr. Johnson found the same result, a weak, a weak result.

The other evidence before the Court further diminishes -- diminishes the significance of P-179. And again, I cite to the Court the fact that Dr. Johnson essentially eliminated the potential of the little girl's blood or serum as being a possible source of the rectal swab positive PSA.

And that was really the only other alternate source, other than Mr. Bourgeois's semen, in play at trial. Amniotic fluid, as Counsel's indicated --

THE COURT: Breast milk, yeah.

MR. DOWD: -- urine, breast milk, none of those

things, the testimony is that none of those things could possibly have triggered a positive PSA in these rectal swabs.

So, you know, I don't see that this would have been a game changer or would have affected the verdict.  And the burden is that, you know, if this testimony could, any reasonable likelihood have affected the judgment of the jury.  And I don't see how that's been demonstrated.

As far as some of the things that were argued earlier, I think that covered them.  I think it's important to note that even in those other sources of PSA, urine, et cetera, et cetera, Jerrilyn Conway testified clearly that those are only detectable present at levels way below the threshold that would trigger a positive PSA.

THE COURT:  Thank you.

MR. DOWD:  So thank you, Your Honor.

THE COURT:  In conclusion?

MR. McHUGH:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, just so it's clear, I don't directly supervise Mr. McHugh.

THE COURT:  Okay.

MR. WISEMAN:  So I don't want him to feel rushed on my account.

MR. McHUGH:  No, I don't feel rushed at all.  Your Honor, I'm going to discuss --

THE COURT:  Well, could I rush you?  Go ahead.

MR. McHUGH:  Mr. Wiseman said, "I don't feel rushed."

THE COURT:  Okay.

MR. McHUGH:  I'm going to discuss Claims IV -- I'm sorry -- Claims V, VI, and VII --

THE COURT:  Okay.

MR. McHUGH:  -- the bite mark, the photo imaging and the final Brady claim.  Your Honor is aware that the bite mark testimony came in by the Government in the form of two experts.  It was mentioned by Ms. Booth, both in her opening and closing statements at the guilt phase, but as importantly, if not more importantly, it was mentioned by Ms. Booth in her penalty phase closing argument four times concerning the bite marks.  And this supported the aggravator that the murder was involved torture and serious physical injury, which goes together with Mr. Brady's argument concerning the semen, because Ms. Booth said, "He left his signature on her with his bite -- with his teeth and his semen."  And that was specifically at the penalty phase.

And I'd ask the Court to consider the case law is clear that you look at the performance of Counsel cumulatively at the penalty phase.  And not only does Counsel, as Mr. Wiseman argued, have the affirmative duty to present mitigating evidence, but as far as myself and Mr. Abreu are concerned, Counsel has a duty to rebut the aggravating circumstances that are presented by the Government at penalty

phase.

In this particular case, as to the bite mark, the Defense did not do that. As I mentioned, the Government had two experts, Dr. Senn and Dr. Chrz. In the Government, when the Government started out the investigation of the bite marks in this case, the first person that they presented, or that they contacted was Dr. Dailey. Dr. Dailey testified live here during the 2255 hearing. He did not testify at the trial.

And the reason he did not testify at the trial, Your Honor, is because he was twice given photographs and molds by the Government. And on both occasions prior to trial, he said, "I cannot include or exclude any of the three molds." And the molds were Robin, AB1994, and the decedent -- or I'm sorry -- the Defendant.

And Dr. Dailey, those two reports were provided to the Defense, prior to trial. They didn't have to go out and search for an expert. They simply had to subpoena Dr. Dailey. Dr. Dailey would have been an incredibly powerful witness for the Defense at guilt and certainly at penalty. Dr. Dailey was --

THE COURT: Of course, there was the testimony of AB1994 --

MR. McHUGH: Yes.

THE COURT: -- that her father bit JG1999.

MR. McHUGH: And that's what I -- I anticipated that

question.  That's a very good question from the Court.  What I would say to that --

THE COURT:  Finally somebody's saying that's a good question.

MR. McHUGH:  What I would say to that is, Your Honor, that the -- that testimony, as Mr. Wiseman touched on, was testimony from a witness that was seven years old, that was conflicted between her mother being a suspect, her father being a suspect, the fact that for a long time prior to trial, she had given inconsistent statements.  So how credible was that testimony?  In fact, we don't even have to guess, because the Government did not rely on that testimony.  The Government went out and got two experts, actually three, if you count Dr. Dailey.  So the Government did not rely on that testimony, as far as bite mark, because of the nature of that testimony.

And what do we have?  So we know that the Defense knows that they're coming forward with these experts.  And the case law is extensive when you talk about the power of an expert witness.  Now you don't have to rely on somebody who could be shading the truth --

THE COURT:  Do you, are you going to make any further argument, Mr. Wiseman?

MR. WISEMAN:  No, sir -- no, ma'am.  Sorry.

THE COURT:  Why don't you just, we'll send you a CD of the rest of the arguments, and why don't you go, get your

plane.

MR. WISEMAN:  Well, I think I have a few minutes. I'll stay.  I appreciate the Court's concern.  I do.

THE COURT:  I am concerned, for your wife.

MR. WISEMAN:  Well, yeah, and you don't even know the half of it.

THE COURT:  She might have more fun without you, but that's neither here nor there.

Okay.  Go ahead.

MR. McHUGH:  So I hope that addresses the Court's question, as far as the reliance on the civilian.  But the Government -- or I'm sorry, the Defense knew in advance that the Government was presenting these expert witnesses, which the Government can argue are objective.  The Government can argue are not biased in any way against any of the people that are in the case, when you're considered all family members that are, these witnesses were talking about.

And so here they have Dr. Dailey.  Dr. Dailey's presumably the Government's first choice, because it's the first person they contact.  He's a colonel in the United States Army at this time, and he's employed with the Armed Service Institute of Pathology.  And so what kind of a witness would that have been for the Defense if they simply had subpoenaed him?  I don't have to explain that to the Court.

With Dr. Dailey, not only did he not come to a

conclusion, include or exclude, but he gave four specific facts. It's in his report. He said that the bite marks were diffuse in the pictures, that the marker on the photographs was disturbed, that there was a ruler in a different spatial area, and that the three individuals' dentition was all very similar.

Now, Your Honor, think about that. Dr. Chrz testified, he was the most compelling of the bite mark witnesses, if you'll say, as far as how far he went with his conclusion. He actually identified Mr. Bourgeois as the probable biter. Well, Dr. Dailey would have absolutely rebutted Dr. Chrz.

Patti Booth argued, Ms. Booth argued the signature, that this is his signature. Dr. Dailey would have absolutely rebutted that.

Dr. Senn was the second of them. He said, "You can't ex- -- you can exclude Robin and you can exclude AB1994, but you can't exclude Alfred, or the Defendant."

THE COURT: Mr. Bourgeois.

MR. McHUGH: Yes. Well, think about that, Your Honor. Certainly Dr. Dailey would have rebutted that. Okay? More importantly, or as importantly, as we've heard here throughout the time, the Defense here was that Robin was the person who was abusing the decedent. And here, Dr. Dailey is saying, "You can't exclude her. You can't exclude Robin." So that would have certainly supported the defense, both at his

guilt phase and at the penalty phase.

Your Honor, under Strickland, Wiggins, the ABA guidelines, the Fifth Circuit and Sofar --

THE COURT:  There will be no talking about Mr. Wiseman.

MR. WISEMAN:  That includes you.

MS. LARIN:  That's for later.

THE COURT:  Absolutely.

MR. McHUGH:  The Defense has a duty, in a capital case, to consult with experts and to retain experts to rebut Government experts, and especially that duty is heightened at the penalty phase here.

And what I suggest to the Court is there can be no explanation why you would not call Dr. Dailey in a case like this where he has all these credentials and was actually retained by the Defense.

Your Honor, I'm moving on now from the Defense's failure to present evidence.  I'd also like to touch on the fact that the Defense failed to limit the Government's expert as far as the Daubert challenge and things of that nature.

They did not litigate a Daubert challenge concerning bite mark.  I suggest to the Court had that been done, they could have precluded -- certainly Dr. Chrz, as I said to the Court, was the -- had gone the furthest in his review of the bite marks.  And they certainly would have prevented,

eliminating Ms. Booth's comments that there was a signature left there, and I suggest also could have precluded the testimony of Dr. Senn.

You heard the testimony here of Dr. Bowers.  Now I'm going to the Daubert.  Dr. Bowers testified with Dr. Senn seated at counsel table for the Government.  And Dr. Bowers went through his testimony, and I think what's most telling or one of the things that's most telling is all the things that he said that Dr. Senn had concluded when he presented to the National Academy of Sciences in 2007, and Dr. Senn did not get up on the stand and rebut this in any way.

And what he indicated was that -- this is Dr. Senn's presentation to the NAS -- that the uniqueness of human dentition has not been established.  So if it hasn't been established in 2007, it certainly wasn't established at the time of this trial.  The ability of dentition, even if it were unique, to transfer to skin has not, has not been established. That clear statement -- and this is when we kind of went over this in Federal Court about fingerprints -- a clear statement of the type, quality and the number of classic individual characteristics or other features required to indicate that a bite mark has reached a threshold of evidentiary value has not been established.

So the -- also, forensic odontologists certification organizations have not created or administered bite mark

analysis proficiency tests for board certified members.  These are touching right directly on the Daubert factors.  The ability to analyze and interpret the scope and extent of distortion of bite mark patterns on skin has not been demonstrated.  And the effects of distortion on comparison or modalities is not fully understood and has not been quantified.

This is all stuff that Dr. Senn, the Government's expert, would have conceded had they been questioned in a Daubert motion.  Certainly if he's saying it in 2007 to the National Academy of Sciences, he's going to say it in 2004.  Because if it's not in 2007, it certainly wasn't in 2004.

So with what you hear from the Government's expert about Dr. Senn, it would have knocked out Dr. Chrz, because Dr. Senn is saying you can't make an identification -- and that's exactly what Dr. Senn did, or Dr. Chrz did.

Also, there's this issue about a closed sample.  Dr. Senn received a closed sample.  And by that, I think the Court's aware of just three molds, and said, "Make your conclusions based on this."  And again, Dr. Senn had testified that that is not the way to do it.  You -- or I'm sorry -- the National Academy of Sciences have found you don't want to use a closed sample.

THE COURT:  What do you mean, like a lineup?  You take --

MR. McHUGH:  No, I think --

THE COURT:  -- twenty people, strangers?

MR. McHUGH:  Yes -- well, the way to do a lineup, the correct way to support, even a photo lineup, is to make sure you tell the --

THE COURT:  No, I know that.  But tell me about the dentition.

MR. McHUGH:  Okay.  Well, what I wanted to say about the dentition is I merely just want to read to you from the National Academy of Sciences report.  It says, "As with other experience-based forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence."

So that's what I wanted to get at is --

THE COURT:  You mean limited number of people?

MR. McHUGH:  Yes.

THE COURT:  Dentitions?

MR. McHUGH:  In this case, I --

THE COURT:  Well, that's -- I'm sorry, but that's ridiculous.

MR. McHUGH:  Well --

THE COURT:  In this case, there are three, you know, there are four people locked in a truck going across the country.  And they're the only ones -- no one ever testified

that anybody was exposed to this child other than Robin Bourgeois; the sister, AB1994; Mr. Bourgeois.  And obviously we don't think she bit herself.

MR. McHUGH:  Right.  I understand that, Your Honor.

THE COURT:  So there are only the three people that could be excluded.

MR. McHUGH:  Right, but when you --

THE COURT:  Or included.

MR. McHUGH:  But when you provide them with a limited number and ask them to provide their analysis from that is what I'm saying.  There was no testimony whatsoever that they said it could be none of them, it could be one of the three.  When you provide that limited, on an experience basis, what they're saying is it leads to the false, to misidentifications.

THE COURT:  Well, but when they say, "These two can be excluded and this one can't," it means maybe the whole rest of the world can't be excluded.

MR. McHUGH:  If they had been cross-examined in that way, I suggest to you that's right, Your Honor.  That would be, that would be the way to go about it.  But they were not asked that question.

THE COURT:  Well, I can see why, since there were only three, you know, three people in the truck all this time.

MR. McHUGH:  Well, again, Your Honor --

THE COURT:  There's no indication other than they

spent some time with another couple, who actually, one of those people came and testified at trial, I think --

MR. McHUGH:  Right.

THE COURT:  -- that they were astonished at the treatment of the child, or at the condition of the child.  And Mr. Bourgeois said that was all the natural mother's fault.

MR. McHUGH:  And what I would also want to really focus the Court in on again is, but even if you, if you take that position, Robin is one of the people that the Defense, or the person the Defense is pointing the finger at, which is in that three.  And to not cross-examine Dr. Senn about that or present Dr. Dailey, guilty phase and certainly at penalty phase, is really a critical deficiency.

So, Your Honor, that's my position as far as the bite mark claim is concerned.  It's, why not present Dr. Dailey and why not present a Daubert challenge?  And all the argument I had on Daubert comes from Dr. Senn, the Government's own -- or the Government's own expert.

I would suggest to the Court Dr. Bowers' testimony is also very important in this.  I know the Court heard the testimony.  I'm talking about something that's obviously not even contested, Dr. Senn's.

So moving on to the Dr. Oliver and the photo imaging, Your Honor, what we know about that -- and this is similar to Mr. Abreu in a sense, is we're not, in this particular case, we

don't need to --

THE COURT:  Let me tell you my thought on this, so you can --

MR. McHUGH:  Sure.

THE COURT:  -- direct your attention toward it, is that Dr. Oliver and Mr. Shenk were talking about apples and oranges.  Mr. Shenk's whole testimony said he relied on the fact that Dr. Oliver gave his testimony based on the digital enhancements, when actually, when it was clarified, Dr. Oliver gave his testimony based on comparing the two and making sure they were similar.  Just one of them was blown up.  That, so that's my take on it.

MR. McHUGH:  Okay.

THE COURT:  So if I'm wrong, straighten me out here.

MR. McHUGH:  Okay.  If I may --

THE COURT:  You may.

MR. McHUGH:  -- I just wanted to talk about the deficient performance part in that, because I think that's important for the Court in this particular case.  And I think it's record based.

You had a situation, and this is in our brief, where Mr. Tinker was provided clearly with these enhanced images, I think approximately a year before the trial, a good bit of time before the trial.  And he stated on the record that he had not, never seen any enhancements of this nature, that this was not

something he understood.

And then the Court asked him, "Well, are you going to file" -- and during the trial -- "are you going to challenge this with a Daubert?"  And he said, "No."  And then after that is when he saw one for the first time.  And so there's no possibility that he could have made a reasonable strategic decision not to file a Daubert challenge, when he --

THE COURT:  Without knowing what he had to say?

MR. McHUGH:  Without knowing what this was all about.

THE COURT:  I thought he had a written report.

MR. McHUGH:  He had a PowerPoint presentation that had been presented to the Defense --

THE COURT:  Okay.

MR. McHUGH:  -- for a year before, but Mr. Tinker said he had not looked at it.  That's what he said on the record.  So I'll let the record speak for itself.  But I know we've briefed that in our petition, in our memorandum of law.

Also on this point, Your Honor, if they had talked to Dr. Dailey going back to the forensic odontologist, he, too, said at the hearing that he was provided with Dr. Oliver's enhanced images.  He had done 150 cases, and he had never seen anything like this before.  So if they had talked to Dr. Dailey, Mr. Tinker would have also known that this is fertile grounds here for a Daubert challenge.

Now, when we look, when you're talking about

Mr. Shenk and Mr., Dr. Oliver, when you're talking about apples and oranges, I believe, in the deposition of Dr. Oliver, he said he relied on both, the enhanced images and -- and he couldn't tell, he didn't remember which ones were which.  So I think if the Court will look at the record, on direct --

THE COURT:  You really did a good deposition of him.

MR. McHUGH:  I'm sorry?

THE COURT:  I thought you did such a good job with him.

MR. McHUGH:  Thank you, Your Honor.

The direct, he said that.  He said, "Yeah, I didn't rely on them, and you know, I looked at the original images."  But then on cross-examination, further on into the deposition, I believe that he does say, "Yes, I did rely on both to make my conclusions."  So I don't think it's apples and oranges, because I think Mr. Shenk was talking about the enhanced images.

So let me get into what Mr. Oliver, Dr. Oliver conceded.  Your Honor, could I use the ELMO just briefly?

THE COURT:  Sure.

MR. McHUGH:  Okay.  Well, this was --

THE COURT:  This is clear.

MR. McHUGH:  This is 181, which is the protocol that Dr. Oliver said that he utilized.  And this, of course, was talked about at the deposition.  So I just wanted the Court to

see it.  This was provided by Dr. Senn when he looked at Dr. Oliver's photographs.

So when I talked to Dr. Oliver -- and again, this is the Government's expert conceding this -- I said, "Please tell me" -- you have these seven steps.  I said, "Please tell me any peer-reviewed articles that discuss your protocol."  And at the very top he says --

THE COURT:  None.  It hadn't been peer-reviewed.  I remember that.

MR. McHUGH:  Never peer-reviewed.  So he finally conceded at the deposition, after much questioning.  He also said that, "Oh, by the way, that's -- those seven steps, you can do that in any order you want.  You can just pick whichever order you want."

He also talked about that there was no test for error rating.  He says he was not aware of any type of testing for error rate.  He told us --

THE COURT:  Yeah, I remember that.

MR. McHUGH:  He told us he created his own software.  Of course it's not in the protocol.

THE COURT:  That had not been peer-reviewed.

MR. McHUGH:  Not peer-reviewed.  He created it when he was in graduate school.  Had no name to it.  He had never sold it to the public.  He never tested it, except himself.  He was the person that calibrated it.  No one checked for

calibrations.  He chose the parameters to use.  He did -- despite when I confronted him with some SWGIT guidelines, which is an acronym for the Scientific Working Group on Imaging Technologies that he was a member of, and in fact held high positions of, that you're supposed to document your steps and save your intermediate images.  He didn't do any of that.

Despite the FBI standard operating procedures of the minimum standards that you're supposed to save your steps and document your procedures and save your intermediate photos for evidentiary use, he didn't do that either.

And he also conceded, Your Honor, that in 2003, he described his protocol as nontraditional use, which because it was -- there's traditional photo imaging and nontraditional.  His, he conceded, was nontraditional.  And he conceded in 2003, use of nontraditional enhancement techniques are subject to challenges of general acceptance.

When you look at all those factors, Your Honor, I suggest if a Daubert challenge had been brought for Dr. Oliver, this Court would have granted that, would have granted that challenge.

Now, we get into the apples and oranges, Your Honor.  You talk about the Dr. Oliver would say, "Well, I told the jury to make their own decision, to look, to go back and look at the original photos."  But what did he tell us at the deposition?  Well, actually, the photos that the jury looked at, or what I

was telling them were the originals were in fact not the originals. They were digitally -- they were digitized enhancements, or I don't want to say enhancements, digitized versions of the photographs, the 35 millimeter photographs. And how were they digitized? At least some of them, the ones he got from Dr. Rouse --

THE COURT: With his process.

MR. McHUGH: -- with -- not with his, no, because the enhancement --

THE COURT: Oh, that's right, the JPEG --

MR. McHUGH: And the lossy. Correct. So before we even get to the enhancements, he received from Dr. Rouse JPEG digitized photographs that had been, used lossy compression. Here again, he conceded that when you use JPEG, accuracy is lost. There's a variation in colors.

What could be more important when you're trying to determine whether bruising exists and scarring exists and injuries exist? Reduces detail and creates artifacts. And of course, the Court's aware that, you know, basically that's something that wasn't in the original photograph.

He also conceded, as did Mr. Shenk, you know, stated on direct and he was challenged on direct, but then Dr. Oliver agreed with Mr. Shenk, that when you take that, you further put it into a PowerPoint presentation, the PowerPoint presentation can cause detail loss and accuracy loss.

All of these things are going on, and he's telling the jury and he's telling us that "Don't worry about what I did, because I always told the jury to go back to the original." And in fact, the original was not what he was telling the jury. It was the digitized versions.

So I would suggest to you, Your Honor, that when you look at that, Dr. Oliver, had he been challenged and questioned like he was in that deposition, he would have had significant issues as far as Daubert is concerned, certainly in 2004.

Furthermore, his presentation in this courtroom was not accurate. He told the jury they were looking at the originals, "and that's why you don't have to worry about what I say, because the jury makes the decision, because I told them to look at the originals." He didn't provide them with the original. He misled the jury.

That's what I have as far as the photo enhancements is concerned, Your Honor.

Moving on to my final piece of this claim is the Claim VII, which is the Brady claim. Your Honor, I would like to talk about two parts of that claim, Mr. Longoria and Mr. Campos. Mr. Campos, as we've alleged in our petition, testified at guilt and penalty. And again, I ask the Court to consider, this is two separate questions. Is it impact, is it material for purposes of guilt phase, and then cumulatively is it material for purposes of penalty phase.

Mr. Campos testified that he was promised nothing, that he got nothing, that there was nothing that could be done for him, that he had a state case.  Well, Ms. Booth testified today that she promised to write a letter for him.  She never did.  But she promised to write a letter for him.  So I suggest to you --

MR. DOWD:  I want to object.  I think that's a misconstruction of the evidence.

THE COURT:  She didn't say when she promised.  Would you like her to clarify that?

MR. McHUGH:  Sure.

THE COURT:  Ms. Booth?

MS. BOOTH:  Would I clarify?  Sure.  I realized when I was reading the record from the trial that at some point, and I don't remember if it was at penalty or if it was at -- that on -- when I was asking him questions here, I said something like, "Do you -- you know, the only thing I could do for you would be like to let the authorities know of your cooperation," or something like that.  But it was on the record.  And that's when I remembered it is when, for that particular situation, that I did, for Orlando, do that.  It was on the record.

MR. McHUGH:  I guess my question is, may I just --

THE COURT:  Go ahead --

MS. BOOTH:  I'm under oath.

MR. McHUGH:  You stated earlier today that you had

promised to write a letter.

MS. BOOTH:  No, I said -- I clarified it.  I said I either -- I did something, and it's in the record.  And that's what I was trying to tell you.

THE COURT:  She, I think -- you and I both thought the same thing, that she said she meant that she was going to write a letter for Mr. Campos.

MR. McHUGH:  Right.

MS. BOOTH:  Yeah.

THE COURT:  And you didn't do it.

MS. BOOTH:  Right.  Well, I said -- and there's something in the record.  I think if we go back, I said I was going to do something.  But I was just reflecting what I had read in the record.

THE COURT:  Oh, okay.  So whatever it is, she's saying, was in the record.

MS. BOOTH:  Was in the record, right, on trial.

MR. McHUGH:  So you're saying that you never had any discussions with Mr. Campos any time --

THE COURT:  No, she did.

MS. BOOTH:  No.

MR. McHUGH:  -- before trial, I was going to say, or before his testimony?

MS. BOOTH:  Mr. Campos, before -- and this is what I've said all along.  If I said it in the courtroom, I did it.

For the two that got 5K, 5K.  For Mr. Campos, I think I made the question -- look at the record, but it says something like, you know, "The only thing I could possibly do for you is just tell the authorities" -- because he was already sentenced -- "that you cooperated or that you testified."

THE COURT:  And that was a state thing?

MS. BOOTH:  And that was a state thing, right.

THE COURT:  Okay.  And then she forgot to do it.

MS. BOOTH:  Right.

MR. McHUGH:  I understand that.

MS. BOOTH:  He was -- yes.

THE COURT:  So now we got it straight.

MR. McHUGH:  Okay.  So I guess if I could just clarify one thing, prior to his testimony, not on the record, had you ever discussed with him writing a letter or doing anything on his behalf?

MS. BOOTH:  If I said it in the courtroom, I had asked -- told him.

MR. McHUGH:  You told him before the trial.

MS. BOOTH:  Right.  Right.  And anything I told him, I asked him in the courtroom.

THE COURT:  See?

MR. McHUGH:  So there we have it, Your Honor.  So it was before his testimony.

THE COURT:  Moving right along, yes.

MS. BOOTH:  Yes.

MR. McHUGH:  So --

THE COURT:  But she disclosed it on the record.

MR. McHUGH:  Well, the record speaks for itself.

THE COURT:  Right.

MR. McHUGH:  But this was --

MS. BOOTH:  Right.  Whatever it --

MR. McHUGH:  So we know that, I know earlier today, I believe, and obviously we have a record, that she said she had promised to write him a letter, in comparison --

THE COURT:  Or something.

MS. BOOTH:  Or something.

THE COURT:  Or called.  Now it turns out to be --

MS. BOOTH:  Whatever it --

THE COURT:  -- calling the state authorities.

MS. BOOTH:  Right.  And it's in the record.

THE COURT:  Did you tell the Defense Counsel that?

MS. BOOTH:  It was in the record.

THE COURT:  Oh, okay.

MS. BOOTH:  It was in the record.  I said it in front of the jury.

MR. McHUGH:  Was that as a result of Mr. Campos asking you?  Or did you just offer this to him prior to trial?  Prior to his testimony?

THE COURT:  Can I say what I think she said, and --

MS. BOOTH:  It's in the record, whatever --

MR. McHUGH:  No, because we're talking about prior to trial, which she's now said that she told him before, off the record.

THE COURT:  "That the only thing she could do for you --"

MS. BOOTH:  Uh-huh.

THE COURT:  Tell us again, Ms. Booth.

MS. BOOTH:  I think we need to get the transcript up, because when I had Orlando Campos on the stand, I said --

THE COURT:  Well, wait a minute.  What he's asking is what did you tell him before trial, Mr. Campos.

MS. BOOTH:  Okay.  I brought them out one at a time. And if you remember, I went out and talked to them first and they came back.

THE COURT:  Right.

MS. BOOTH:  Whatever I said, like there was two 5K departures.  And with Orlando Campos, who was totally different than --

THE COURT:  Because he had already been sentenced. He was in state custody.

MS. BOOTH:  Right, right.  And he had a three-year-old or a four-year-old, that he had called us because he had a three or four-year-old, that if it got abused like this child got abused, you know, that's why he came in.

And he --

THE COURT:  Okay.  So what did you tell him before --

MS. BOOTH:  Whatever it says on the record.  "The best thing I could do for you would be to tell the authorities that you cooperated here."

THE COURT:  You told him that before trial?

MS. BOOTH:  Yes.

MR. McHUGH:  I would just ask for --

THE COURT:  But I mean, just before you called him?  Or you motioned back to the cell here.  You told him that right before the cell?

MS. BOOTH:  I told -- I only talked to Mr. Campos, I think, two times.  And if I -- and that's why I've been saying all along, if I said it on the record, that's what I told him.

THE COURT:  Okay.

MS. BOOTH:  Because it was different with each Defendant.

THE COURT:  Okay.

MS. BOOTH:  I mean, they were all different spots.

MR. McHUGH:  And I just have a question, Your Honor, to follow up.  When you talked to him outside the courtroom prior to his testimony, when you told him that, did he -- was that as a result of him asking you or --

MS. BOOTH:  Oh, he asked me for nothing.

MR. McHUGH:  He didn't say --

MS. BOOTH:  Mr. Campos came in because he had heard what Bourgeois had said and had listened to Bourgeois saying these things in the jail and was repulsed.

MR. McHUGH:  So --

MS. BOOTH:  And he had, he told me and he told the FBI that he had a small girl child, and if those kinds of things happened to her -- because the really bad things that happened that Mr. Bourgeois said, or that the Defendants, I mean the cooperating Defendants told me he said the Judge would not let us get in, like that he enjoyed --

THE COURT:  I wouldn't.

MS. BOOTH:  -- popping the butts of small children, that, all of those things about raping children, she did not let us get in.  And so those were other things that these guys could have testified to, which the Judge limited out.

MR. McHUGH:  So I guess my question would be is --

MS. BOOTH:  Well, that's why Orlando came to us.

MR. McHUGH:  Right.

MS. BOOTH:  Because he was repulsed at Bourgeois.

MR. McHUGH:  Well, then --

THE COURT:  So back to the question.

MS. BOOTH:  Yeah.

MR. McHUGH:  Right.  So then why did you -- so you're saying you just brought this up on your own about what you could do.

MS. BOOTH:  Right.  No.  Orlando never asked me for anything.  He never asked me for anything.

MR. McHUGH:  So why did you tell him that?

MS. BOOTH:  I was impressed with Orlando Campos.

MR. McHUGH:  Okay.  So --

MS. BOOTH:  You know, I mean, "There's nothing" -- I think it's more, "There's nothing I can do for you.  I mean, the best that I could do for you would be to tell somebody you cooperated."  I think that's what it says on the record.  Doesn't it?  What does it say?

THE COURT:  Have you got it?

MS. LARIN:  It says, the question is, "And are you just hoping that we will relay to authorities that you came in and testified in a murder case?"

THE COURT:  Oh, would you mind coming up to the microphone?

MS. LARIN:  Oh, I'm sorry.

THE COURT:  I am so sorry.

MS. LARIN:  Here, let's use this one.  It says, "And are you just hoping that we will relay to authorities that you came in and testified in a murder case?"  And he replies, "Yes, ma'am."

MR. McHUGH:  I guess my, my question would be is, what made you think he was hoping prior to his testimony?

MS. BOOTH:  Well, I probably -- I told him that.  I

can tell you that.  If I -- that's -- if I told him that, that I would tell the authorities that he came in, that's what I would ask when he came in here.

MR. McHUGH:  So he didn't express to you a hope. That was your assumption?

MS. BOOTH:  No, that was my assumption that he would, yeah.  And I had told him the only thing I can do for you is this.

MR. McHUGH:  And that was done off the record?

MS. BOOTH:  What?  That was done when I was with him.

MR. McHUGH:  Okay.

MS. BOOTH:  When I met with him.

MR. McHUGH:  So --

THE COURT:  Are you ready to go on?

MR. McHUGH:  Yes, Your Honor.

THE COURT:  Thank you.

MR. McHUGH:  So again, I would argue that Mr. Campos was talked to prior to his testimony.  And I think that's very significant in this case, an inducement.  It does not have to be a promise.  I think the Court's well aware of the law of Brady.  And I also --

THE COURT:  Well, but the Defense Counsel knew about it.

MR. McHUGH:  Well, the Defense Counsel didn't know that there was this discussion in the back.  I know that wasn't

disclosed to the Defense.

THE COURT:  Well --

MS. BOOTH:  Oh --

THE COURT:  Ms. Booth?  Ms. Booth, you can respond.

MS. BOOTH:  I feel, I know that I -- if I said it on the record, I told them that I was going to say that.  I know that I did.

THE COURT:  Okay.

MS. BOOTH:  Because I was very careful about that.

MR. McHUGH:  Okay.

THE COURT:  So that's all we can say on that.

MS. BOOTH:  Uh-huh.

MR. McHUGH:  Then you know, Your Honor, obviously I'm hearing this for the first time, but obviously my first thought then is, well, that goes further to the ineffectiveness claim, because the Defense Counsel being told this and Mr. Gilmore, who the Government is arguing to you --

THE COURT:  Well, what is he supposed to say about that?

MR. McHUGH:  Well, obviously he could talk about inducement.  And I, and this dovetails nicely with Mr. Longoria, where he, as Ms. Booth, an experienced prosecutor said, he inferred to her that he was looking for --

THE COURT:  It didn't really say -- she didn't really say that.  It was lighter than that.

MR. McHUGH:  The point was she, as an experienced prosecutor, knew what he was getting at, and she gave him A to Z about what she thought about that.  And she's not going A to Z unless she knows where he's going with that.  So --

THE COURT:  No, no, no, she didn't say that.

MR. McHUGH:  But I can tell you --

THE COURT:  She said under no -- well, never mind. Move on.

MR. McHUGH:  Okay.

THE COURT:  The record is what it is.

MR. McHUGH:  Right.  But I will --

THE COURT:  And Mr. Wiseman's gone, so we don't have to worry about you hurrying.

MR. McHUGH:  But what I would like to say is, you know, the Government's talking about Mr. Gilmore.  He was the one that was handling these witnesses, how he has all these years of experience.  Well, to take Mr. Longoria, who by the way, Your Honor, I'm sure the Court remembers, he only testified at penalty phase.  So he's just a penalty phase Brady claim, and of course --

THE COURT:  I do remember.

MR. McHUGH:  Okay.  What Mr. Gilmore could have done with that knowledge that Mr., that Ms. Booth was aware that she got the impression that Mr. Longoria was looking for something, and in fact that's so far from how the testimony came in at

trial, that Mr. Longoria was just doing this out of the kindness of his heart and that he was just volunteering for nothing, in fact, that the letter to the Texas Board of Paroles said he didn't offer, or I didn't offer, he didn't request. That's what was, that was what was portrayed. But that's not what was -- that's not what the truth is. And the truth, what Mr. Gilmore could have done with that, I think, would be significant. And Mr. Longoria's testimony was very damaging. The Court remembers what he testified to.

THE COURT: Okay. Move on. We've covered that.

MR. McHUGH: Okay. So now, so we talk about that as far as this is inducement, does not need to be a promise. There's a lot of talk about promise. Let's look at what evidence we did present as far as the Brady claim.

First of all, Jennifer Valdez is Mr. Longoria's wife. She testified that Mr. Longoria told her that he was getting a deal in this case.

THE COURT: I don't think -- did I let her testify to that?

MR. McHUGH: Yes.

THE COURT: What's that noise?

MS. BOOTH: It's a radio.

MR. McHUGH: Maybe it's the prison.

MR. ROBERTS: Oh, it's at the prison. Sounds like it's at the prison, Your Honor.

THE COURT:  Oh, Mr. Bourgeois, is there noise where you are?

THE DEFENDANT:  Ma'am?

THE COURT:  Was there any background noise where you were?

THE DEFENDANT:  Yeah.  He was just checking to see if I was still on the phone.

THE COURT:  Oh, okay.  Thank you.

THE DEFENDANT:  Sorry about that, ma'am.

THE COURT:  Sorry.  We heard, we thought a radio had come on or something.

THE DEFENDANT:  Yeah, that was him.  He thought the phone had cut off.

THE COURT:  Thank you, sir.

THE DEFENDANT:  Thank you, Your Honor.

MR. McHUGH:  I think where the Court had limited the testimony concerning Brady was the prisoner witness whose name I don't recall, who testified during the 2255 as to -- but it wasn't dealing with Mr. Longoria.  But I believe Ms. Valdez was permitted to testify.

THE COURT:  She didn't testify at trial.

MR. McHUGH:  No, no, no.

THE COURT:  Okay.  That's what I'm talking about.  I wouldn't have let her testify to that at trial.

MR. McHUGH:  Well --

THE COURT: Not that it was offered.

MR. McHUGH: I think it's very, very important for the Court, when looking at this Brady claim --

THE COURT: Look, as far as I'm concerned, that was all hearsay.

MR. McHUGH: Okay. Well --

THE COURT: I'm not going to take that seriously, just like I told you there's no point in bringing Mr. Longoria. He's told me one story under oath, and it's not going to be real helpful to hear another one.

MR. McHUGH: Okay. And then I think the Court heard today the testimony of Bill May. He filed a continuance.

THE COURT: I heard the testimony of Bill May. I know exactly what he said.

MR. McHUGH: Okay. And so we also know, when we're looking at the evidence, what Mr. Longoria got. Mr. Longoria got an incredible deal. He was facing 25 to life, mandatory minimum. He got seven years, and violated his probation.

THE COURT: I don't have any evidence from anybody that anybody offered him a deal. Nobody offered Mr. May a deal. Nobody offered Mr. Sales a deal. No one put any pressure on any, any of those people.

MR. McHUGH: Well --

THE COURT: So that's it.

MR. McHUGH: What I would say is that's not it for

one point, and that point is the fact that we do know that Ms. Booth said that her impression was that Mr. Longoria had inferred that he was looking for a favor.

THE COURT:  Move on from there.

MR. McHUGH:  Okay.  I just wanted to --

THE COURT:  Don't argue that any more.

MR. McHUGH:  I just wanted to --

THE COURT:  I'm done with that.

MR. McHUGH:  And Your Honor, I believe -- let me just -- that's all I have.

THE COURT:  Very good.  Thank you, sir.

MR. ROBERTS:  Your Honor, I'm going to argue, I'm going to address the bite mark issue, and then Mr. Dowd is going to address the Dr. Oliver and the Brady issue.

THE COURT:  Thank you.

MR. ROBERTS:  Your Honor, Dr. Senn and Dr. Chrz are solid witnesses.  I mean, they're here in trial.  There's no -- Dr. Senn's report actually was offered into evidence without objection from the Petitioner.

THE COURT:  Well, I think that's what they're -- I think -- well, anyway.

MR. ROBERTS:  It was during Dr. Bowers' testimony --

THE COURT:  The Petitioners are complaining that trial counsel did not get any witnesses to rebut that.  That's the complaint.  Not that Dr. Senn was a bad witness or that the

other guy was a bad witness, just that there was an alternative available to the Defendants that they didn't use.

MR. ROBERTS:  And the alternative available was Dr. Dailey.

THE COURT:  Yes.

MR. ROBERTS:  And we know -- we saw Dr. Dailey.  They described him as someone that could bring in good evidence. And I would strongly disagree with that.  When we saw Dr. Dailey, he had an issue with Ms. Booth that they had discussed on the phone.  He was more interested in being paid.

THE COURT:  He wanted to be paid, and he was a Government employee.

MR. ROBERTS:  Yes.

THE COURT:  It was not a helpful thing to have.  He did.  Don't -- nobody shake their heads no.  That's what happened.  Ms. Booth said, "Didn't you ask me for X amount of money?"  And he didn't deny it.  And she told Mr. Tinker that, didn't you, Ms. Booth?  You said that to me.

MS. BOOTH:  Yes.  Oh, yeah.  Mr. Tinker knew.

THE COURT:  So Mr. Tinker wasn't going to go there either.

MR. ROBERTS:  They were --

THE COURT:  And that just wasn't going to happen.

MR. ROBERTS:  And then, of course, the last part with Dr. Dailey is he refused to review all the photos.  He only

reviewed the photos he wanted to review.  And so Dr. Dailey --

THE COURT:  The big issue was the money.  He wanted to be paid for his testimony, and he was a federal employee that was not supposed to be paid for that.

MR. ROBERTS:  Yes, Your Honor.  And so that --

THE COURT:  So she had to, Ms. Booth had to report that to Mr. Tinker and Mr. Gilmore.  And Ms. Booth decided she did not want anybody of that, in that category to testify, which is certainly reasonable.  And Mr. Tinker knew about it.  And it's certainly reasonable to know why they didn't call him.

MR. ROBERTS:  And then --

THE COURT:  So I think we can move on to the next argument.

MR. ROBERTS:  Dr. Bowers?  You want to talk about him?

THE COURT:  Not really, but go ahead.

MR. ROBERTS:  I was just going to remind you that we showed that he had gave different testimony in Alabama and California, so I think that's --

THE COURT:  In fact, he was not qualified as an expert some place, wasn't he?

MR. ROBERTS:  We -- yes.  He tried to qualify as an expert in enhancement, and we showed that he had no expertise in that area, at least nothing that had been peer-reviewed.  So you denied his --

THE COURT:  He was the Photo Shop guy.

MR. ROBERTS:  He tried to be the expert in that, but he also came in as a, he was a dentist and odontologist.

THE COURT:  A dentist who had gone to Photo Shop classes.

MR. ROBERTS:  Yes, Your Honor.  And then --

THE COURT:  Go ahead.

MR. ROBERTS:  -- taught himself --

THE COURT:  Moving on to the next.

MR. ROBERTS:  I was just -- as with the mental retardation issue, this is really a situation of your credibility determination on the experts.  And we just believe that our experts that presented evidence was reliable, and what they had in rebuttal was not.

THE COURT:  Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Your Honor, with your permission, I'll start with the challenge to Dr. Oliver.  It's alleged that they were ineffective for failing to litigate a Daubert challenge to Dr. Oliver's testimony.

And if the Court recalls, Mr. Tinker had questions about Dr. Oliver's testimony and asked for a hearing outside the presence of the jury.  An extensive hearing was conducted, in which Dr. Oliver explained his methods and what he intended to demonstrate.

And basically, he was hired to identify and count the

number of injuries on the child, to demonstrate these injuries to the jury.  He put together a PowerPoint presentation, put the original autopsy photographs, reformatted them into a PowerPoint presentation, which necessarily caused his originals --

THE COURT:  Well, don't you have -- I mean, you have to put in the originals into a scanner.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And sometimes the -- even if they're taken with a digital camera --

MR. DOWD:  That's correct.

THE COURT:  -- the pixels on the digital camera are not necessarily going to be the same when you blow them up to another pixel?

MR. DOWD:  That's correct.

THE COURT:  Isn't that what the deal is?

MR. DOWD:  I'm not an expert, Your Honor, but I do understand that when you change the -- you have to change the format from 35 millimeter film --

THE COURT:  I always think of Jimmy Stewart.  Was it that, the movie the pixilated Mr. Smith goes to Washington or something?

MR. DOWD:  Mr. Smith goes to Washington, yes, Your Honor.

THE COURT:  When those, the older women came in and

testified he was pixilated?

MR. DOWD:  I don't recall that, Your Honor.

THE COURT:  Well --

MR. DOWD:  Wonderful memory.

THE COURT:  Every time I see pixels, I think of that movie.

MR. DOWD:  And to do that, he necessarily had to change the format to fit into the PowerPoint presentation.  And that actually caused a loss of detail, so that the autopsy originals, when compared to Dr. Oliver's new originals in the PowerPoint, Dr. Oliver's new originals had a loss of detail, so that injuries on the original autopsy photographs would be less visible on Dr. Oliver's original, what he described throughout the trial as the originals.  He was referring to his originals in the PowerPoint presentation.

But I think there's just a fundamental disagreement about the point of Dr. Oliver's testimony.  He, he, throughout his testimony, I read his testimony, he kept telling the Court and the jury, "If I identify an injury on here on the enhanced image that I'm making here, don't believe me unless you go back to the original and you can identify it on the original.  Then, you know, count that injury, or believe that there's an injury there."

THE COURT:  There were so many injuries that were reported at the autopsy.

MR. DOWD:  Hundreds.

THE COURT:  I mean hundreds of cords, cord injuries, or something that would be compatible with a cord.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Burn marks on her.

MR. DOWD:  On --

THE COURT:  Her feet were thickened.  It was just unbelievable.

MR. DOWD:  Cigarette burns.

THE COURT:  Yes.

MR. DOWD:  But the enhanced photos were never presented, never described as the original.  And they were always just used as a demonstrative aid for the jury.  And so that's, I mean, that's the key to the case.  If Dr. Oliver was trying to demonstrate that these enhanced versions accurately depicted the original photographs, then we would have a, we would have a Daubert challenge.

THE COURT:  I thought the Petitioner just said that they showed bruises that weren't there on the original.

MR. DOWD:  Well, they said that what Dr. Oliver did is first he lost detail when he reduced the image --

THE COURT:  And then he enhanced it.

MR. DOWD:  -- and then he enhanced it, which created false detail and false coloring.  And that's true.  But what doctor, the way Dr. Oliver described it is he said, "Look, I'm

just doing this as a demonstrative aid.  I can take the original autopsy photos" --

THE COURT:  I didn't think it showed bruising, because the child was African American, and it was very difficult.

MR. DOWD:  Right.

THE COURT:  What it showed, if I recall, were the cord marks and the burn marks.

MR. DOWD:  Right.

THE COURT:  And the blows to her head.

MR. DOWD:  And bruising.

THE COURT:  And some bruising, but not much.

MR. DOWD:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  And some fresh scrapes on her head, the impact, as Dr. Rouse said.

MR. DOWD:  Yes, Your Honor but as Dr. Oliver described it, he said, "What I was trying to demonstrate would be the same as if I had come in on the original autopsy photographs and drew arrows to a particular spot and said, 'If you can see an injury there, there's an injury.  There's where I believe an injury was.'"  Instead of doing that, he enhanced the photographs to create, you know, color distinctions.

THE COURT:  I understand.  Anything else on that issue?

MR. DOWD:  I would suggest that under, as far as

applying a Daubert challenge to it, as a demonstrative aid, as demonstrative evidence and not as, what's the word, direct evidence, it doesn't have the same Daubert standard.  As long as it's reliable, then it's admissible.

So I'll leave that, and I'll move to the Brady violation, which won't take -- I think Ms. Booth has covered it, but I mean, the basic thing is Longoria swore at trial he didn't have a deal with the Government.  Four days after --

THE COURT:  I don't think we need to do anything more with that.

MR. DOWD:  Okay.  Okay.  I'll pass.

THE COURT:  The only thing I'd like to ask you all is one more shot at this, does anybody want to summarize what they, in some kind of written filing at all, about one more time what you think that has been shown during the hearing?  Other than -- you've had your closing arguments.

MR. ABREU:  Your Honor, I --

THE COURT:  If you want to let me know -- I tell you what.  Why don't you let me know --

MR. ABREU:  Your Honor, is it possible that we can have just a brief conversation with Mr. Wiseman and get back to the Court tomorrow for --

THE COURT:  That's what I was going to say.  Why don't you let me know.  You can let me know on Monday if you want.

MR. ABREU: That would be fine, Your Honor. Thank you very much.

THE COURT: Oh, no. Tuesday.

MR. ABREU: Tuesday, yes. By Tuesday, we'll let the Court know if that's going to be necessary or not.

THE COURT: Call Ms. Scotch and call somebody in the U.S. Attorney's Office. And if you want to do another written filing, I would be glad to see what you think in writing is the summary. You know, mind you, I will have this recording that I can listen to any time.

MR. ABREU: Right.

THE COURT: And then I'll give you two weeks, each of you, if you want it.

MR. ABREU: We'll certainly talk about that.

THE COURT: What do you think, Mr. Roberts, Mr. Dowd, Ms. Salinas, Ms. Booth?

MR. ROBERTS: I mean, I think at this point the Court has got so much information already that I'm not sure that we would --

THE COURT: I just want to offer it just in case --

MR. ROBERTS: Sure.

THE COURT: -- there's something else out there that I have not paid proper attention to.

MR. ROBERTS: I would say this, the United States, since they have the burden, if they have the desire to submit

something, we would just like a chance to respond to that.

THE COURT:  Okay.  I'll give them two weeks from Tuesday if they decide to do it, and give y'all ten days from their response.

MR. ROBERTS:  That should be fine, Your Honor.

THE COURT:  And then I also want to tell you something else, now that Mr. Wiseman's gone.  I so appreciate how you all have conducted yourselves in what I think is an extremely difficult job for both sides.  Not easy, and to see how the Petitioners' attorneys have really thrown their hearts into this and their best efforts is very, very impressive.  And for the Government, I think you all did an excellent job at trial, and you've done an excellent job here.  And it's a pleasure for me.  I think good lawyers make Judges better.  So I thank you all for your briefs, your arguments, the way you've presented your evidence.  Just don't tell Mr. Wiseman.

MR. ABREU:  I do want to thank the Court for hearing us, and I certainly want to thank Your Honor for the hospitality, and certainly the Court personnel.

THE COURT:  They're great.

MR. ABREU:  Really amazing at all times.  Always.  So thank you so much.

THE COURT:  You know Ms. Scotch has a, we finally got her a court BlackBerry, and she --

MR. ABREU:  That's the --

THE COURT:  But when she leaves here, she forwards her office phones to her BlackBerry.

MR. ABREU:  Well, I do recall there was a, I think a Saturday afternoon, and I sent an e-mail, and she was in D.C. with her children, and she was responding.  I said, "You're on vacation.  Cut it out."

THE COURT:  Well, actually, she was at a court -- she was our representative to a court deal in the Fifth Circuit, so --

MR. ABREU:  Well, thank you, everybody.

THE COURT:  Thank you all very much.

MR. ROBERTS:  Thank you, Your Honor.

MR. DOWD:  It's been a privilege and a pleasure.

THE COURT:  Good to see you all again.  Did you have something, Mr. Roberts?

MR. ROBERTS:  You still have Mr. Bourgeois on the phone?

THE COURT:  Mr. Bourgeois?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  All right, you're excused.  Thank you.

THE DEFENDANT:  Thank you.  God bless you.

(Proceedings concluded at 4:16 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    January 27, 2011
Molly Carter                        Date

INDEX

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ELIZABETH ROUSE | 3 | 33 | | |

ARGUMENTS ON CLAIM I:
        BY MS. LARIN  . . . . . . . . . . . . . . . . . . . .   58
        BY MR. ROBERTS  . . . . . . . . . . . . . . . . . . .   81

ARGUMENTS ON CLAIM II:
        BY MR. WISEMAN  . . . . . . . . . . . . . . . . . . .   86
        BY MS. BOOTH  . . . . . . . . . . . . . . . . . . . .  108

ARGUMENTS ON CLAIM III:
        BY MR. WISEMAN  . . . . . . . . . . . . . . . . . . .  126
        BY MS. SALINAS  . . . . . . . . . . . . . . . . . . .  133

ARGUMENTS ON CLAIM IV:
        BY MR. ABREU  . . . . . . . . . . . . . . . . . . . .  135
        BY MR. DOWD . . . . . . . . . . . . . . . . . . . . .  168

ARGUMENTS ON CLAIMS V, VI & VII:
        BY MR. McHUGH . . . . . . . . . . . . . . . . . . . .  175
        BY MR. ROBERTS  . . . . . . . . . . . . . . . . . . .  207
        BY MR. DOWD . . . . . . . . . . . . . . . . . . . . .  210