UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____ :
UNITED STATES OF AMERICA,              :              No. Cr-C-02-216
                                       :              No. Cv-07-223
              Respondent,              :     Honorable Janis Graham Jack,
                                       :              U.S.D.J.
       -against-                       :
                                       :
ALFRED BOURGEOIS,                      :            Electronically Filed
                                       :
              Petitioner.              :
_____ :

### PETITIONER'S POST-ARGUMENT SUBMISSION

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Alfred Bourgeois

Dated:      February 1, 2011
            Philadelphia, Pennsylvania

PRELIMINARY STATEMENT

Following the conclusion of the evidentiary hearing and oral argument on January 13, 2011 the Court invited Petitioner to submit briefing by February 1, 2011 on any of the issues before the Court.[1]

Petitioner submits this brief addressing two issues: 1) the Court's lack of jurisdiction (2255 Motion, Claim III); and 2) aspects of penalty phase ineffectiveness (2255 Motion, Claim II).[2]

**Claim III.   This Court Lacks Jurisdiction; Counsel Ineffectively Failed to Challenge the Court's Lack of Jurisdiction and the Government Failed to Prove Jurisdiction by Sufficient Evidence.**

This Court has expressed skepticism as to the merits of this claim: "I don't like this argument, Mr. Wiseman. I think you need to move on . . . I told you from the beginning that was the weakest argument – I have heard in a long time.  It has not strengthened as time has gone on." Tr. 1/13/11, 133.  Counsel accept responsibility for their failure to clearly articulate the merits, and attempt to do so again.

---

[1] Transcripts are cited as "Tr." followed by a date and page reference.  All emphasis is supplied unless otherwise noted.

[2] Counsel's choice to address just these two issues in this brief is not a waiver of any other issue before the Court.  Petitioner continues to press those other issues, but does not address them here, only because counsel believe that they have already been adequately addressed.

1

In addition to counsel's lack of clarity, the Court's observation that it did not see the merits of this claim must be evaluated against the backdrop that Petitioner has not been afforded a full hearing on it.  This Court initially denied Petitioner a hearing on this claim – allowing a hearing on every other claim in the § 2255 Motion. It permitted limited discovery in the form of the deposition of Dr. Leestma.  Due to difficulties in securing the autopsy slides – which the Court insisted must be reviewed by Petitioner's expert – that deposition was only conducted on January 10, 2011.  The Government then moved to permit testimony from Dr. Rouse.  This was done by telephone and without provision of a report.  And, as shown below, it was done without Dr. Rouse having a recollection of critical facts.

In Petitioner's view he has presented a compelling if not meritorious claim even with the limited process afforded to him.  However, should this Court still believe that this claim is meritless, the Court should grant Petitioner's motion, filed today, seeking to reopen the hearing for full evidentiary development.

Counsel appreciate that this Court remains convinced that Mr. Bourgeois horribly abused the victim and caused her death.  The only tragedy worse than the death of the victim in this case, would be for this Court to permit the execution of an individual over whom it has no jurisdiction.  Indeed, historically even when the Writ of Habeas Corpus was most truncated in its scope, it covered instances in which a

2

court lacked jurisdiction to try the prisoner.  See, Franks v. Magnum, 237 U.S. 309 (1915) (expanding scope of Writ from whether court had jurisdiction over prisoner to other constitutional violations for which the prisoner had no remedy).

Mr. Bourgeois continues to deny responsibility for the death.  However, for purposes of the following analysis, this Court may accept that Mr. Bourgeois committed the acts that led to his daughter's death.  The question raised by this claim is whether the Government proved beyond a reasonable doubt that Mr. Bourgeois and the victim were on the grounds of the Corpus Christi Naval Air Station (CCNAS) at the time of the infliction of the proximate cause of death.  The Government failed in this regard; trial counsel ineffectively failed to challenge this essential element of the offense and this Court lacks jurisdiction – this is plain and simple.

A.      The Law.

The Government must prove every element of an offense beyond a reasonable doubt.  Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Gaudin, 515 U.S. 506, 510 (1995); United States  v. Booker, 543 U.S. 220 (2005); In re Winship, 397 U. S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

The jurisdictional requirement that the murder be committed "within the special

3

maritime and territorial jurisdiction of the United States" is an element of the federal crime of murder.  See 18 U.S.C. §1111(b).  Additionally, 18 U.S.C. § 3236 states that murder is "committed at the place where the injury was inflicted . . .  which caused the death, without regard to the place where the death occurs."[3]

There is little law interpreting § 3236 in circumstances like those present in this case, i.e., when the deceased  suffers blows and injuries both on and off federal lands. Counsel have done exhaustive research and present the following as the only relevant authority. The Court of Appeals for the Eighth Circuit utilizes a "proximate cause" analysis.  Under this approach, federal jurisdiction is dependent on a demonstration beyond a reasonable doubt that the injury that was the proximate cause of the death was struck on federal lands.  See S1-8thCirPJI Modern Federal Jury Instructions-Criminal, § 6.18.1111§ 6.18.1111 Introductory Comments to Homicide Instructions:

> Federal jurisdiction under 18 U.S.C. §§ 1111 and 1112 ultimately depends on the location of the offense. The location is determined by where the injury was inflicted or other means employed which caused the death, without regard to where the death actually occurred. 18 U.S.C.

---

[3]In United States v. Bell, 993 F.2d 427, 429 (5th Cir. 1993), the Fifth Circuit Court of Appeals held that the jurisdiction element of the federal homicide statute had to be proven only by a preponderance of the evidence.  This holding, however, has been directly questioned, although not overruled, by three post-Apprendi decisions. See, United States v. Reff, 479 F.3d 396,400 (5th Cir. 2007); United States v. Bailey, 169 Fed. Appx. 815, 821 (5th Cir. 2006); United States v. Perrien, 274 F.3d 936, 939, n.1 (5th Cir. 2001).  This is an academic point because the Government's proof in this case does not even meet the lower preponderance standard.

§ 3236; <u>United States v. Parker</u>, 622 F.2d 298, 302 (8th Cir.), <u>cert. denied</u>, 449 U.S. 851 (1980) . **If injuries are inflicted both outside and inside the federal boundary, the Eighth Circuit adopts a proximate cause analysis and requires the government to prove beyond a reasonable doubt that the victim died as a proximate result of the injuries inflicted within the federal boundary**. Id.

<u>United States v. Parker</u>, 622 F.2d 298 (8th Cir. 1980) (adopting proximate cause of death as the test when injuries contributing to death were struck on and off federal land).  Despite this being a claim in this Section 2255 case for years, the Government has offered no contrary authority.

### B.    The Facts.

As the following review shows, jurisdiction was assumed by the Government, the Court and unfortunately defense counsel.  While assumed, it was never proven.

### 1.    The Government's Trial Theory.

In its arguments to the jury, the Government never affirmatively or actually argued that the fatal blows were struck on federal land, or, more to the point, that the proximate cause of death were blows struck on federal lands.  To the contrary, it portrayed the death of the victim as resulting from a "systemic execution" that occurred over time, and not from a single set of blows that occurred on the grounds of the CCNAS.  <u>See</u> Tr. 3/16/02, 13 ("Ladies and gentlemen, ten injuries a day [for 30 days], a **systematic execution** of a baby. And that's what it was. A **systematic**

5

**execution**."); at 14 (same); at 16 ("This was a systematic execution. And not even --
and **not even a sterile, clean execution by a shot**. No, no, no, no, this was a torture,
**day by day**."); at 51 ("a **systematic murder** of a little child").  In fact, one can scour
the Government's guilt phase closing arguments in vain in search of even a hint of
an attempt to prove that the fatal blows were struck on federal land – there is none.
The only reference to the element of jurisdiction is the following:

> The last element that we have to prove is that it happened on a Special
> Territorial or Maritime Jurisdiction of the United States and that was
> because it was on the Navy base. That's why we had the FBI
> investigating and the Naval Criminal Investigative Service, and the
> Medical Examiner came from the Army.

Id., at 10.  This is nothing more than an attempt at boot-strapping.  Obviously, federal
jurisdiction is not established simply because the Government called in the FBI and
the Army Medical Examiner – that simply means that the body was discovered on
federal lands, and that all concerned authorities jumped to a conclusion about
jurisdiction.

This Court must ask why, if jurisdiction was so clear, did the Government shy
away from discussing it in its closing argument?  And, if it were so obvious, why did
Dr. Rouse (the Government's expert medical examiner) so carefully stay away from
testimony about it (discussed below).  And, this Court must ask why Government
counsel wrote a note to himself when he met with Dr. Rouse stating: "*If incident

occurred off mil base - <u>NO Jurisdiction</u>!*" (emphasis and capitalization in original)[4]

The Government, the Court and trial defense counsel assumed that there was jurisdiction in this case.  That was an erroneous assumption and it was never proven.

### 2.    Dr. Rouse's Testimony.

In her trial testimony, Dr. Elizabeth Rouse (the Medical Examiner) assiduously avoided ever attempting to date the fatal blows.  Petitioner has found nothing in her trial testimony which even attempts to do so, and he defies the Government to point to evidence to the contrary.  There is none – her testimony assumed that the proximate cause of death was inflicted on federal lands, but she never testified to that effect.

In her post-conviction testimony Dr. Elizabeth Rouse indicated that she could only date the victim's more "recent" injuries [the ostensible fatal blows] to within one to three days.  <u>See</u> Tr. 1/13/11, 33, 34 (Rouse can only date the "more recent injuries" to one to three days before death).  Indeed, Dr. Rouse agreed with Dr. Leestma's opinion that one cannot medically date the injuries with any greater precision.  In response to the Court's question, she particularly agreed with Dr. Leestma's deposition testimony that the injuries could not be dated.  Tr. 1/13/11, 20-21 ("clearly

---

[4]This document was provided by the Government to counsel on April 19, 2010 and was attached as an Exhibit to *Petitioner's Unopposed Motion for an Additional Thirty Days to Submit Evidence in Support of Claim III to His Motion for Relief Pursuant to 28 U.S.C. Section 2255* (document # 604).

the multitude of [old and new] injuries makes this a complex picture.  We can categorize the injuries into [] ones that appear to be six weeks old, you know, five, six weeks old, to some that are, like I said, a week old, some that are **days** old. . .  We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date. . .").

Given the inability to date even the more recent injuries with greater precision, Dr. Rouse testified that her conclusion that the fatal blows were struck on the grounds of the CCNAS are based on anecdotal reports of the victim's functioning just before her arrival at the CCNAS, on the description of the blows she received and her subsequent deterioration.   Id., 22 ("by all accounts, she was functioning neurologically fairly normally during that week.   She was conscious, talking, walking); see also, id., 24:

> [W]e would use the clinical evidence tremendously. We'd never, or hope to never do the autopsy in a vacuum. And we pull in clinical information and correlate it, and correlate her injuries, what we're seeing on the body with what was happening physiologically. And absolutely the, when the time of the neurologic impairment would absolutely be taken in light of what we see microscopically. And that is standard practice. All autopsies, we use all the available information that we have at the time of the autopsy. We look at the investigation, we review the medical records prior to performing the autopsy, because we look at all the microscopic and gross findings in light of the clinical scenario, what was going on with that individual.

\*\*\*

8

I would -- the -- medically, certainly, **I cannot say whether it was on the naval base or just off the base**. And I can't get within that hour of, that window of hours of an injury. But her injuries . . . [t]ime-wise we put it, she has injuries that fit with the timing she was on the medical (sic) base. The description by witnesses of what occurred on the medical (sic) base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course. I cannot narrow the injuries down to, I think you said she came on the base at 11:04 -- I'm sorry, the timing  when she came on the base. What pages are those on when they arrived on the base? Okay. They arrived on the base at 10:03 in the morning of June 27th. **There's no medical way to determine whether that injury was at 9:03 or 10:30.** We cannot get that narrow as far as when the injury occurred. And **that's where putting it together with the witness reports that she was conscious and awake at the time she was coming onto the base, injuries were described, an incident was described, and then she clinically decompensated, that corresponds with the injuries that we saw in autopsy. And that is what caused her death**.

Tr. 1/13/11, 31-3.

Counsel have conducted an exhaustive search of the trial transcript and of the FBI 302 reports.  Contrary to Dr. Rouse's assumptions made in her post-conviction testimony, there is **no support**, anecdotal or otherwise, showing that the victim was "conscious, walking, talking" but suffered a rapid deterioration as a result of blows received on the CCNAS.[5]

While there were some witness accounts at trial about the victim's condition

---

[5]AB1994 provided some testimony about these issues – discussed below – but it came no where close to providing the types of information that Dr. Rouse assumed in her post-conviction testimony.

**weeks** before her death, there was **no** evidence regarding her functioning and condition in the days immediately preceding her arrival on the CCNAS – such evidence being the basis for Dr. Rouse's opinion.  There was no evidence showing that the victim was functioning "normally" within the last days of her life.  While there was not much showing that she was impaired in her last days, there is some evidence showing impairment during the time frame in question.  The Bourgeois family visited with the Banks on June 9, 2002 – 16 days before death.  Tr. 3/9/04, 105.  Mrs. Banks testified that the the child "didn't hardly say anything" Id., 126, a sign that one would think would interest Dr. Rouse.

Even if one uses the outside date of ten to fourteen days before death as having relevance to the clinical picture ostensibly used by Dr. Rouse, there was no testimony describing the victim's condition, functioning or clinical picture, one way or the other.

In the absence of such clinical signs upon which to rely, the Government relies on two accounts to support its post-conviction position on jurisdiction.  Those accounts are reviewed here.

        a.        **The Trial Testimony of AB1994.**

AB1994 was the only witness to the alleged delivery of the allegedly fatal blows.  The portion of her testimony that addresses the events on the day that the

victim was taken to the hospital begins with the Government asking her if the truck was neat on that day.  Tr. 3/4-5/04, 33-34, L 25, 1-2.[6]  She was next asked if she recalled her father getting lost, although there was no description of whether they were on or off base at that time. Id., 34, L 20-21.  She was asked if the truck "stalled" to which she replied that it "stopped."  Id., L 22-25.  AB1994 clearly did not recall that the truck "stalled" and was restarted by being "jump-started."   She denied that they had a "problem" starting it (i.e., they were not jump-started).  Id., 35, L 1-8.  See also, id., 36, 10-11 ("Q: Do you remember anybody helping you start the truck? A: No.").  The lack of testimony regarding getting a jump start is important, as the Government relied upon the jump start as a reference point for the truck being on the CCNAS.

In the next question and answer the witness recalled that they went to a "loading dock" Id., 35, L 9-10.  However, there was no attempt to establish that the dock was on the grounds of the CCNAS, and since the truck made the earlier stop at Ingelside – and possibly others –  that is an important omission in the proof.

Although AB1994 testified that her father asked for directions, there was no testimony provided by the Government that Mr. Bourgeois only asked for directions

---

[6]Petitioner cites the separately transcribed volume of testimony of AB1994 which is dated March 4-5, 2004 starting at 8:19 a.m.  For precision, Petitioner also cites the lines of testimony, which are preceded by the letter "L."

while on the Naval Base, and therefore this testimony also does not establish that they were on the base at that time.  Id., 36, L 2-7.  As noted, AB1994 never testified that they were on the base when directions were sought.

Thus far in her testimony, there was no indication that the truck was on the grounds of the CCNAS.  The questioning then turned to the alleged incident in which Mr. Bourgeois struck the alleged fatal blows.  AB1994 testified that the potty tipped and her father became "mad."  Id., 36, L 12-25.  He stopped the truck.  He told AB1994 to give the baby to him.  He was mad and yelling, although the witness did not recall what he was saying .  Id., 37, L 8-16.  Her mother and other sister were sleeping at this time.  Id., 38, L 8-13.

Next, she indicated that her father took off the baby's pants and began to "spank" her.  Id., 38, L 16-17.  She then indicated that Mr. Bourgeois "took her by her shoulders, and he started hitting her head on the window."  Id., 38 L25, 39, L1.  He hit the back of her head on the window.  Id., 39, L 2-5.  He did this "four" times.  Id., 40, L 21-24.[7]  The baby had a "sad" face while this was happening.  Id., 39, L 14-

_____

    [7]AB1994's testimony about the head banging is contradicted by the account provided to Special Agent Beckett.  In her report of July 15, 2002 at 4, Agent Becket wrote:

    In an interview of the Bourgeois' 7 year old daughter by Child Protective Services on June 28, 2002, she stated that on the morning in question (June 27, 2002), she and J.G. had been sitting in the front

15.  She denied that anything was coming out of the baby's mouth while she was being banged against the window.  Id., 41, L 2-3.[8]

AB1994 said that he father told her to then take her, put her pants on and put her "right next to my seat."  Id., 39, 20-21.

The Government then attempted to show that the victim was rendered unconscious at that time – it was unable to do so:

Q:      . . . you said she was making a sad face.  Was she awake,
          or was she asleep?

A:      I don't know.  I don't know.  I don't remember if her eyes were
          open or closed, but if I'm not mistaken I think they were closed.

Q:      Okay.  And so he told you to do what?

A:      Put her right next to me.

Q:      Okay.  Now, were her clothes back on?

A:      Yes.

---

passenger seat of the truck when her father, who was driving, stopped for directions.  J.G. was sitting on her potty, moved a little bit, and accidentally spilled the contents of the potty.  Her father became upset, grabbed J.G. and pulled her across his lap, face down.  He began whipping J.G. until she started 'drooling' out of her mouth and nose.

[8]She did indicate that "white stuff" was "just blowing out" of her mouth while her mother was doing CPR (Id., 41, L 3-6), but there was no attempt on the part of the Government to draw a temporal connection between when and where the blows were struck and where the CPR was performed.

13

Q:     Okay.  Who put them on her?

A:     My dad.

Q:     And, 'put her right next to you,' what does that mean?

A:     Like this is my chair, and then I had to let her get on my chair with me.

Q:     And when she was on the chair with you, was she awake or was she asleep?

A:     **She was awake**, and then she just, like, fell asleep.

Id., 39 L 22 - 25, 40 L 1 - 13.

Without next establishing how much time elapsed, or what the location was of the truck, the witness next testified that Mr. Bourgeois got out of the truck to "make sure it's the right place" Id., 40, L 16-17.  Again, there was no indication that the truck was on federal lands at this point.  Nor was any attempt made to show how much time passed from the head banging incident to when Mr. Bourgeois got out of the truck to "make sure it's the right place."

    **b. Clinical Signs Before the Blows: Reliance on Mr. Bourgeois' Admission that the Baby was Singing her ABC's.**

In the absence of any evidence, testimony or 302 reports showing the clinical condition of the baby in the days just before her death and before she went unconscious, the Government relied in the post-conviction proceedings on the alleged

14

fact that she was singing her ABC's immediately before the head blows were struck. This, or course, was offered to show that the victim went from an intact clinical state, to unconscious, as a result of the blows. This is an ultra-thin reed upon which to rely.

The Government asked Dr. Jan Leestma, Petitioner's post-conviction expert, and Dr. Rouse, hypothetical questions that included an assumption that the child went from singing her ABC's to "going limp." Tr. 1/10/11, 75 (Leestma); Tr. 1/13/11, 22-23 (Rouse).[9]

What the Government left out of each hypothetical, or in its argument to the Court, is that the only evidence that the child was signing her ABCs just before the blows were struck, was from Mr. Bourgeois. Tr. 3/10/04, 51. Mr. Bourgeois' testimony in this regard is hardly the type that this Court should feel confident in relying upon. Leaving aside all questions of credibility, it is quite vague and does not

_____

[9]Petitioner objected to the hypothetical question asked of Dr. Rouse on the ground that it assumed an incorrect fact. Id., 22. As the review of AB1994's testimony demonstrates, there was no evidence presented that the victim went "limp" immediately after the blows to the head, as the Government suggested in its hypothetical. To the contrary, AB1994 was clear on this point – she did not go limp: "**She was awake**, and **then** she just, like, fell asleep." Id., 40, L 12-13.

It is true that Robin Bourgeois described the child as "limp" when she awoke on the naval base and found her unconscious. Tr. 3/2-3/04, 133. However, as noted above, the Government failed to show that the child went limp after the blows testified to by AB1994. Obviously, the victim went limp at some point. But, the Government's burden was to show that she did so in immediate response to the blows – it did not carry that burden.

even remotely suggest that the victim was actually signing anything.  The testimony in its entirely was: "Me, her [JG1999], AB 1994, we were singing ABC's. And I had AB 2001 on one lap, on the lap that was, I think closer to the door."  Not the quality of testimony upon which to hinge a federal capital conviction.

The Government also offered similar testimony through two FBI agents.  <u>See</u> Tr. 3/9/04, 186 (FBI Agent Harris testifying that Mr. Bourgeois had the baby on his lap and she was singing ABC's while he was broken down); Tr. 3/10/04, 100 (FBI Agent Scharn, same).

While it is clear that these statements from Mr. Bourgeois to the FBI agents were admissible as admissions, counsel find it extraordinary that the Government would even remotely credit this obvious attempt by Mr. Bourgeois to deflect culpability, <u>e.g.</u> the child was fine, she was singing her ABC's, in view of its refusal to believe any other aspect of his testimony.  If the Government believes this, it must explain why this is accurate and the remainder of his testimony is a lie.

### C.    Other Potential Blows that Could have Caused Death.

Dr. Rouse testified that the victim suffered from "total brain injury" Tr. 1/13/11, 12.  She described that the child had "diffuse, meaning multi-focal, multiple areas of injury to her brain.  <u>Id.</u>, 33.  And, as noted above, even the most recent injuries could – from purely a medical perspective – have been up to three days old.

16

Given this timing, FBI 302 reports demonstrate a number of other potential causes of death.  This Court should reopen the hearing as Petitioner has requested, so that Dr. Rouse and Dr. Leestma can opine upon the significance of the following evidence of the victim's clinical presentation in the days before her death and on other potential blows that could have caused her death.  Based on Dr. Rouse's testimony, such evidence could be significant in determining whether the blows were struck days before the victim was on the naval base.

 Robin Bourgeois was interviewed on June 28, 2002 and reported that "Two night prior to the incident (06/26/02), Robin witnessed Alfred hit JaKareen across the side of her head with his leather sandal that had thick rubber soles."

An FBI 302 dated July 2, 2002 indicates that Robin "first saw the scab on Ja'Kareen's forehead about two weeks before she died. They had been in a park in California."   Mr. Bourgeois driver's log shows that the family was in California as late as June 21, 2002.

The same report indicates that "A couple of days before Ja'Karenn died, they were in Pensacola, Florida.  While in the Air and Space museum there, Alfred commented on how slow Ja'Kareen was walking." Although Robin believed that this was due to the sores on her feet, difficulty in moving could be the type of clinical sign that Dr. Rouse would have considered.  <u>See</u> Tr. 1/13/11, 22 ("she was conscious,

17

talking, **walking** . . .).  Evidence that she had difficulty walking could have been a positive neurologic sign.

In a March 27, 2003 FBI 302 report, Robin reported that "approximately three weeks before Ja'Karenn's death. Alfred Bourgeois hit Ja'Kareen hard enough to render her unconscious for several minutes."  Although Robin recalled that this event happened "approximately three weeks" before death, the statement was provided almost a year later and her recollection of the date of the incident could well be off. A head injury with a loss of consciousness so close in time to the death would likely be of interest to the doctors.

There is also the evidence that Mr. Bourgeois beat the child with the baseball bat so hard that he head blew up like a football or watermelon.  United States v. Bourgeois, 423 F.3d 501, 503 (5th Cir. 2005).  Although AB1994 failed to provide even an approximate date or location of when this occurred, Tr. 3/4-5/04, 16-17, Robin Bourgeois indicated that the family was in California at the time of the beatings with the bat.  Tr. 3/2-3/04, 36.  As noted above, Mr. Bourgeois' log showed that the family was in California as late as June 21, 2002 – just days before the death.

### D.    Gaps in the Government's Proof.

The gaps in the Government's proof regarding jurisdiction fall into a number of categories, summarized here.

- Even assuming that AB1994 testified accurately, and accepting that the blows she described were the proximate cause of death, there was no evidence presented that the blows were struck on federal lands.  The Government cannot "assume" away this lack of proof.  It would be incumbent on the Government in its responsive submission to pinpoint precisely how they proved that the family was on the grounds of the base during the events recounted in AB1994's trial testimony.  Petitioner's counsel have been through the record and they have found no such connection.  To the contrary, the exacting review of her testimony done above, shows that this is a real gap in the proof.

- Given the lack of proof that the blows were struck on the base, there is nothing to suggest that the blows were not struck off-base, and the victim later collapsed on the base.  This was a conclusion that Dr. Rouse could only exclude by reliance on AB1994 flawed testimony and the non-existent clinical picture.

- There is no evidence as to the force used by Mr. Bourgeois when he struck the child's head against the window.   Absent this evidence, it is pure speculation to conclude the blows described by AB1994 were sufficient to cause a sub-dural hematoma and death – even assuming that everything else said by AB1994 fits the Government's theory.  The Government's use of the phrase that the "child went limp"  in its expert hypothetical questions is a misrepresentation of AB1994's

19

testimony.  She never testified that the child went limp.  She testified that she was awake and, at an undetermined time and location, she went to sleep.

- There is no evidence that the victim's mental state was altered immediately after the blows to the head were struck.  As noted above, there is no evidence showing that she went limp or was unconsciousness on the grounds of the Air Station.  AB1994's testimony did not establish this link.

- There is an almost complete absence of clinical signs showing that the victim was intact immediately before the blows against the window – leaving aside Mr. Bourgeois vague and self-serving statements that she was singing her ABC's.

- Dr. Rouse's reliance on the lack of reporting of clinical signs of deterioration from lay people (one of whom was seven years old, and two of whom were suspected of complicity in the offense) in the days before the death, is of no probative value.

- The Government cannot rely on the fact that, in its view, Mr. Bourgeois made up the story that the baby fell from the truck.  This does not even remotely mean that the death was caused by blows struck on the base.  At most it means that the baby lost consciousness on the base.  It says nothing about where the blows were struck.  In arguing that the killing was premeditated, the Government told the jury that "when his wife asked him, what are you going to say when this baby dies?  He had an answer

20

like that, well, we're going to say, we're going to throw her on the side of the road. And the little girl just flipped to the side of the road that's swamp. And then we're going to drive to the next station." Tr. 3/16/04, 10. If this was the Government's theory, then it makes perfect sense that the baby lost consciousness off the base, and the plan was to dump her by the side of the truck when the family got to the base.

## Conclusion

When Dr. Rouse was asked by undersigned counsel the basis for her conclusion that the fatal blows were struck on federal land, she responded:

> There are photographs, and again I don't know the exact dates on all of those, but I do not recall any evidence of significant neurologic impairment prior to – the day they drove onto the naval base. . . . The witness descriptions – and again, I would have to refer to those. I'm speaking completely in a **vacuum**, not having any of those in front of me. There, I believe are fairly precise accounts of her doing activities of daily living, functioning neurologically normal.

Tr. 1/13/11, 43. Expert testimony on such an important question should be taken in a "vacuum." Counsel should have had the chance to test the expert's opinion by having her identify which lay accounts, which photos and which witness description s support her view. Counsel have tried to find them, and they are lacking. At a reopened hearing, counsel would expect the Government to provide whatever accounts it has to Dr. Rouse so that she can have some evidence to fill the vacuum.

This is not an easy issue. It is not easy for the lawyers and it is not easy even

21

for the experts.   Dr. Rouse testified that the victim had a "multitude of injuries mak[ing] this a complex picture.   Tr. 1/13/11, 21. Despite the complexity, the Government seeks easy answers.  But, hopefully counsel have been able to show that this is a serious question.   It is deserving of full evidentiary development.   The witnesses should appear.  The parties should review full reports.  The Court should be able to ask questions.   The experts should be able to pinpoint precisely what anecdotal evidence they rely upon.  They should be shown all relevant photographs illustrating the condition of the victim in the days leading up to her death.  On the current record, this Court cannot remain confident that jurisdiction was or is established.  The Court should either grant relief on this issue, or, at a minimum, grant Petitioner's accompanying motion to reopen the hearing.

In the final analysis, this cannot be an easy issue for the Court.  Recognition of the validity of this claim could mean that this Court would have to order the release of a person who has been condemned for a brutal act – albeit to be prosecuted by the appropriate entity that actually has jurisdiction.  This Court does not need counsel to remind it of its duty to uphold the Great Writ of Habeas Corpus and to grant relief from unconstitutional confinement when such is warranted.  Petitioner has confidence that this Court will do its duty.

**Claim II.   Ineffective Assistance of Counsel for Failing to Present
Extant Mitigating Evidence.**

In order to meet the <u>Strickland v. Washington</u>, 466 U.S. 688 (1984) standard

for ineffective assistance of counsel, Petitioner must demonstrate deficient

performance and prejudice.  As noted during the argument, Mr. Bourgeois' history

of childhood sexual and physical abuse, low intelligence, organic brain dysfunction

and other psychological deficits are the types of mitigating evidence that are

commonly found presented in these cases.  As Petitioner's *Points and Authorities* –

submitted on the eve of argument – shows, this type of evidence is required to be

presented by the United States Supreme Court.  The Court appeared to agree with

counsel that prejudice was clear in this case.  In apparent response to counsel's

argument that counsel are required to present such evidence in the mitigation phase

of trial, the Court indicated that it would have to decide whether counsel had strategic

reasons for their decisions.  Tr. 1/13/11, 94 ("Well, you and I are in agreement on

that.  It's just, I guess my finding will have to do with whether this was a strategic

decision by the attorneys").

Accordingly, Petitioner will limit his submission to the question of deficient

performance.  Before addressing that, however, counsel believe it appropriate to

remind that Court that it promised that in evaluating Petitioner's contention that Mr.

Gilmore and Mr. Tinker were ineffective in the penalty phase, it would not require counsel to "box with a ghost," Tr. 1/13/11, 88. The Court also agreed that it would not view Mr. Tinker as a so-called "Colombo" type figure – one for whom apparent lapses in performance or judgment were in reality stratagems. Id. 87-88.

While this Court articulated its view that it must therefore judge Mr. Tinker and Mr. Gilmore's actual performance in this case based on the record, counsel feel particularly obliged to address this point in response to the Government's oral argument. During that argument, it, in effect, told this Court that its decision making can start and stop with the fact that Mr. Tinker and Mr. Gilmore were and are wonderfully talented attorneys who knew exactly what they were doing, and that they had a reason for everything, even if that reason is not apparent from the record:

> I think it's important, Judge, and you were here during those weeks, to remind us all -- and Defense Counsel weren't here -- that Mr. Tinker and Mr. Gilmore knew the jury that they had picked. They knew the World War II veteran. They knew the 4-H lady that had her daughter in the county show. They knew the Texas Aggie that was Catholic that had the problem with the death penalty. They knew to whom they were speaking.
>
> And not only did they know that, but they -- there was a cadence and a theater in this courtroom that was going on during the trial that's not accurately reflected in the, in the record anywhere. There's no one but you, Your Honor, that can remember and make your decision based on what was happening in the courtroom.
>
> And so the theater that was happening and the decisions that were being

24

made, the strategic decisions that were being made by Defense Counsel
have to be looked at in that light also.

Tr. 1/13/11, 110.

The Government's argument is improper in multiple respects. It assumes a
level of competence in this case that is not based on counsel's actual actions in this
case. Moreover, even assuming that counsel may have performed appropriately in
court –which Petitioner certainly does not concede – so-called "courtroom theater"
does not even begin to tell the story of counsel's lapses leading up to the start of the
trial.

Current counsel instead will review just one aspect of trial counsel's actual,
documented failure to perform effectively in pre-trial investigation of the penalty
phase. This review will put the lie to the Government's contention that counsel had
a firm grip on the events swirling around them. It will show that rather than being
shrewd tacticians, they were not in control of the events surrounding the development
of mitigating evidence.

Counsel well understand that this Court was not impressed with Dr.
Cunningham. However, **counsel wish to be clear:** the following narrative is based
on documents maintained by Dr. Cunningham and on proceedings in this Court.
Indeed, the bulk of the evidence showing these lapses came from the mouth of this

25

Court.  The lapses that are apparent have nothing to do with the substance of Dr. Cunningham's opinions.

Dr. Cunningham was first contacted by Mr. Gilmore by email on June 30, 2003.  Mr. Gilmore asked about retaining him for the Bourgeois trial that was then set for mid-September.  Exhibit P - 8, p. 1.

Dr. Cunningham responded by email on July 1.  Among other things he advised Mr. Gilmore that he could not be ready by mid-September, "given the status of the mitigation case as it appears from your description."  Id., p. 2.  He cautioned Mr. Gilmore that it is often "time consuming" to secure the relevant records and to conduct the appropriate mitigation investigation, and he further advised him that he could not even begin to perform his function as a consulting psychologist, until that investigation were complete.  Id.

Mr. Gilmore next contacted Dr. Cunningham by email on July 7, 2003 to advise him that he was preparing a motion for continuance and asking when he could be ready for trial.  Dr. Cunningham responded that he could be ready by mid-January, 2004.  Exhibit P - 8, p. 4.

Dr. Cunningham next provided Mr. Gilmore with suggestions for mitigation specialists on July 9 (Exhibit P - 8, p. 11).

On July 18, 2003, the Court set a new trial date of February 14, 2004 (docket

entry # 76).  Dr. Cunningham was not advised of this date until he received an email on July 25, 2003.  Exhibit P – 8, p. 15.

Despite requiring from July to January to be prepared (six months), counsel took no action with respect to Dr. Cunningham until January 22, 2003.  This fact is demonstrated by Dr. Cunningham's invoice (Exhibit P 151, p. 1)

According to Dr. Cunningham's records, his assistant called Mr. Tinker on November 17, 2003.  Exhibit P - 167.  Mr. Tinker advised "that they have a few investigators working on getting information.  Will send records to us sometime in December, hopefully no later than mid-December."   Presumably because this representation was contrary to the prior schedule worked out between Dr. Cunningham and counsel, the doctor's assistant made the following additional notation: "Attorneys are aware of the previous timeline **and are working with judge to get a continuance/extension.**"  This was not true.  As the following events show, counsel had not yet sought a continuance, and they certainly were not "working" with the Court on this topic.

On December 1, 2003 Dr. Cunningham's assistant email Mr. Gilmore asking for an update.  Exhibit P -8, p. 20.  Mr. Gilmore responded that he was "trying to get a continuance" and that the case was then set for trial for February 16.  He also reported to Dr. Cunningham that "the mitigation investigators say that they cannot be

finished by then." Id.  Dr. Cunningham's assistant responded, thanking Mr. Gilmore

for the update and stating "FYI, we have yet to receive any

records/information/materials for Dr. C to begin working on his report."  P - 8, p. 19.

Thus, from June 30 through December 1, 2003 (**five months**), neither Mr. Gilmore,

Mr. Tinker, nor either of the mitigation specialists had provided **any information** to

Dr. Cunningham.  This aspect of the case was no further along than when counsel

first contacted Dr. Cunningham.

In the meantime, on December 9, 2003 trial counsel filed a Motion to Continue.

Exhibit P – 144.  Counsel advised the Court that the mitigation specialists, Ms.

Milstein and Mr. Bierbaum, could not complete their mitigation investigation until

August, 2004, some six months later than the then current trial date of February,

2004.

In response to the Motion, the Court convened a hearing the next day.  It asked

the very appropriate question: "I want to know why they've delayed so much after I

appointed them some eight, nine months ago?" Tr. 12/10/03, 4.  The Court then

demanded that the mitigation specialists appear to explain themselves:

> I want him here. I'm not going to your representation because I'm going
> to tell you right now; **your representations have been untruthful** in
> the past about when the mitigation experts would be prepared. So I'm
> going to only hear from them and why it is they're do dilatory. So, if you
> want a continuance, that's the only way you're going to get one.

In October, and they'd already been working for a month, you told me it would be six months which would put us a month after the trial date. I said to Mr. Tinker, they've got to be ready by February 8th and he said,"I will get them ready." I had already appointed them several months prior to that. . . **I've given you numerous extensions and it's not going to happen again. These people have been appointed for many, many months. Now, I want to know -- I find this very close to bad faith**.

Id., 5.  The Court went on:

I authorized their hiring with the understanding that it would take "X" amount of time. And then we came back in October and here it's six more months which would have made it -- they were already working on it a month at that time. It was the end of October that Mr. Tinker and Mr. Gilmore came in.  It would have made it the end of March and I said that is not acceptable. They've got to be finished by trial. And Mr. Tinker said, "I will get them finished by trial." And I've got to rely on you to pick the experts of your choosing and have them work with the Court's Order. I've just got to be able to rely on you all to do that.

\* \* \*

In your Motion in August the 12th , 2003, you said that Ms. Milstein and Mr. Bierbaum had already had an initial interview with your client. And I'll have to look back at the record on the 14th when we had the expert Ex-Parte hearing but I feel that you assured me that it was not going to interfere with the trial date at that time. And, now, in October, you told me it would take them six months. And I said get it done in five and you said it would be done. And, now, you're saying all of a sudden that they need until next August without any evidence whatsoever. So that's not going to happen today. So your Motion for Continuance is denied.

Id., 14, 16-17.

Counsel agreed to withdraw the continuance motion and did so on December

29

16, 2003.  Exhibit 72.  Without referencing the fact that the investigation was already well behind the schedule that counsel agreed to with Dr. Cunningham, they assured the Court in the Motion to Withdraw Motion for Continuance, that the work would be complete.

Neither the emails, Dr. Cunningham's invoice nor his ACT sheet (Exhibit 167) show any further contact between Dr. Cunningham and counsel until January 21, 2004.  The first indication that Dr. Cunningham received anything from the mitigation specialists or from counsel is a invoice entry for January 31, 2004 indicating that he spent 80 minutes reviewing mitigation summaries.

Thus, despite this Court's accommodation of counsel's request for two mitigation specialists and Dr. Cunningham, and despite counsel's understanding with Dr. Cunningham that he would require months to prepare, he did not receive any mitigation summaries until two weeks before the scheduled start of trial.  The Supreme Court has held that when counsel leave themselves such a truncated period of time to prepare a complex mitigation investigation, they perform deficiently. Williams v. Taylor, 529 U.S. 529, 535 (2000).

This Court needn't search for strategic reasons for counsel's penalty phase failures.  The reasons are obvious – counsel were not properly prepared.  Despite the Court's admonitions and observations, counsel continued to drag their feet and the

mitigation investigation continued to founder. Despite authorizing tens of thousands of dollars in expert expenditures; despite giving counsel numerous continuances of the trial date; notwithstanding counsel's repeated assurances that they would be ready on the Court's schedule, counsel dropped the ball.  They were not prepared timely.

That is why counsel did not have Mr. Bourgeois seen by Dr. Weiner, the neuropsychologist until **after trial started.**  That  is why counsel relied on Dr. Estrada's speculation that Petitioner was an abused child, instead of presenting the multitude of witnesses that were available in the Courthouse and ready to testify. See Exhibit P – 61, containing summaries of the witnesses were could have testified to the abuse.  And that is why Dr. Estrada, who all concerned have lauded as a fair, objective and learned mental health professional opined:

> I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions.  Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Exhibit P – 11.  See also, Tr. 9/10/2010, 18-20 (same).

## CONCLUSION

For all of the above reasons, those presented in all prior written submissions, oral arguments, based upon the evidence presented at trial and in the Section 2255 proceedings, and based upon the entire record of these proceedings, Petitioner requested that he be granted the relief he requested in the Section 2255 Motion. Alternatively, he requests that the Court re-open the evidentiary hearing with respect to Claim III, as requested in the contemporaneously filed motion.

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Alfred Bourgeois

Dated:        February 1, 2011
              Philadelphia, Pennsylvania

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 1st day of February, 2011 the foregoing has been served upon the following persons by filing the same with the Court's ECF Filing System:

Tony Roberts
Patti Booth
Mark Dowd
Elas Salinas-Patterson

/s/ Michael Wiseman

Michael Wiseman

33