UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

GOVERNMENT'S RESPONSE TO PETITIONER'S
POST-ARGUMENT SUBMISSION AND
OPPOSITION TO MOTION TO REOPEN EVIDENTIARY HEARING

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this Response to

Petitioner's Post-Argument Submission.  This response includes the government's

opposition to Petitioner's Motion to Reopen the Evidentiary Hearing.

On January 13, 2011, at the close of oral argument on Petitioner's Motion filed

pursuant to 28 U.S.C. § 2255, this Court invited the parties to file written summations

of their analysis of the evidence and law as to Bourgeois's § 2255 claims.  Petitioner

filed his summation on February 1, 2011. The government's response is currently due on February 18, 2011.

## I. Background

This Court held an evidentiary hearing in September 2010 to address a number of issues raised in Petitioner's 2255 Motion. This Court initially limited the hearing to four days – two and a half days for Petitioner and one and half days for the government – and excluded some issues from the evidentiary hearing because those issues could be adequately decided on the record. However, this Court generously and repeatedly expanded the time and manner in which Petitioner could present evidence and make the record. This Court permitted Petitioner to depose a number of witnesses both before and after the evidentiary hearing. Moreover, after concluding that Petitioner's challenge to the original jurisdiction of the underlying prosecution did not warrant or necessitate an evidentiary hearing, this Court went out of its way to permit Petitioner to make a record of Petitioner's challenge to the jurisdiction. This included permitting the deposition of Dr. Leestma on January 10, 2011; a deposition that solely addressed the jurisdictional issue.

The government participated in the deposition with very minimal opportunity to prepare for the cross examination of the expert witness. Dr. Leestma's report was provided to the government on Friday, late in the afternoon, January 7, 2011. Thus,

the government had less than three days to review Dr. Leestma's highly technical testimony. Nevertheless, had Dr. Leestma testified consistent with and within the confines of his submitted report, it is likely that the government would not have found it necessary to request any rebuttal from Dr. Rouse. However, Dr. Leestma made conclusions that were not contained in his written report, and provided testimony that was inconsistent with standard processes of routine medical examinations. Because Dr. Leestma diverted from his written report, the government requested permission to have Dr. Rouse's telephonic testimony at the hearing on January 13, 2011.

This Court permitted Dr. Rouse to testify by telephone on January 13, 2011. During direct examination, the government limited its questions to Dr. Rouse by focusing upon specific testimony presented by Dr. Leestma and asking Dr. Rouse to comment on that testimony. One key distinction between Dr. Leestma and Dr. Rouse's testimony was Dr. Leestma's myopic focus upon the "medical evidence" to the exclusion of any circumstances reported by witnesses regarding when the victim decomposed. Based upon just the medical evidence, Dr. Leestma claimed the fatal injuries could not have occurred when the victim was on the Naval Station. Contrarily, Dr. Rouse testified that there were injuries that were one to three days old, and that non-medical evidence indicated that the victim decomposed after fatal injuries were inflicted while Petitioner was apparently located on the Naval Station.

II.  Opposition to Motion to Reopen the Evidentiary Hearing

The government opposes Petitioner's motion to reopen the evidentiary hearing. This Court has given Petitioner a great deal of latitude in presenting evidence in support of Petitioner's many issues.  This Court initially ruled that Petitioner's jurisdictional challenge did not merit an evidentiary hearing.  However, this Court ultimately permitted Petitioner to present some evidence in support of its jurisdictional challenge.  Petitioner claims that the "deposition and testimony of Dr. Leestma and Rouse raise additional questions about this Court's lack of jurisdiction." (Petitioner's Motion to Reopen, p. 2).  To the contrary, Dr. Rouse's testimony at trial and testimony on January 13, 2011, conclusively support a finding that proper jurisdiction lies with this Court.

> [the victim] has injuries that fit with the timing she was on the [military] base.  The description by witnesses of what occurred on the [military] base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course.

(Dr. Rouse's Testimony, January 13, 2011 Transcript, p. 32).  While Dr. Rouse was not able to pin-point the exact time of any specific injury sustained by the victim based solely upon the medical evidence, neither Dr. Rouse nor the jury were required to ignore the eye-witness testimony of what occurred at the final stop on the Naval Base in reaching a conclusion that the fatal injury occurred on the Naval Base.

4

As with many other issues during the course of this habeas process, Petitioner's counsel seeks to have this Court view evidence narrowly based upon a defense expert's opinion but without reference or reliance upon other contextual evidence. Petitioner's counsel then asks this Court to reach conclusions that are contrary to the great weight of the evidence. Dr. Leetsma's conclusions should be disregarded by this Court because he refuses to consider anything other than the medical condition of the child's brain in reaching his conclusion that the fatal injury could not have occurred when the victim was on the Naval Station. Moreover, there is a serious question about Dr. Leetsma's credibility due to his admitted "equivocation" between his conclusions espoused during his deposition and the statements within his report. (Dr. Leetsma's Deposition Testimony, pages 83-84). Ultimately, Dr. Leetsma testified that there was not "sufficient scientific evidence to conclude that the child ... died as a result of an injury that was inflicted on the naval base," but he would not consider anything other than the medical evidence in making his decision. Dr. Leetsma's testimony alone might cause a jurist to question whether this Court has sufficient jurisdiction. However, when Dr. Leetsma's opinion is placed in context with the remaining record evidence in this case, and in light of Dr. Rouse's rebuttal to Dr. Leetsma's conclusions, the answer to the question of jurisdiction becomes

clear. Petitioner has not sufficiently established a basis to reopen the evidentiary hearing. As such, his motion to reopen should be denied.

### III. Response to Petitioner's Jurisdiction Issue

As Petitioner notes, this Court has expressed "skepticism" regarding the merits of Petitioner's challenge to jurisdiction. That skepticism is well founded as the substance of this claim originally rested upon Petitioner's misapplication of a few words in a neurology report that was not even entered into evidence at trial. Now, Petitioner encourages this Court to analyze this single issue from a premise that is wholly contrary to the defense theory of the case; "for purposes of the following analysis, this Court may accept that Mr. Bourgeois committed the acts that led to his daughter's death." (Petitioner's Post-Argument Submission, p.4). It is not clear whether Petitioner himself would actually agree with counsel's submission considering that Petitioner has always maintained that he did not injure his daughter. In any event, it is not intellectually honest to suggest that certain facts should be altered in order to accurately evaluate a specific legal claim that rests among many other legal claims. However, that is essentially how Petitioner approaches every issue raised in his 2255 Motion. He desires this Court to consider his claims in light of only part of the evidence on many issues, and now, he asks this Court to invert his prior position in order to frame his issue in a manner that he deems to present a better

context in which to prevail on his jurisdictional claim. The government suggests that this Court consider this issue, and every other issue, in light of the entire evidence to reach the appropriate and accurate conclusions upon the record as a whole.

The record as a whole establishes that Petitioner murdered his daughter within the special maritime and territorial jurisdiction of the United States. The case law in this Circuit appears to only require the jurisdictional element to be established by a preponderance of the evidence. *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993). Dr. Rouse performed the autopsy and determined that the injuries that caused the child's death were all "recent." Dr. Rouse testified at trial and reconfirmed during the January 13, 2011 hearing that the child's injuries and cause of death were consistent with the witness account of Petitioner slamming the child's head against the window in his truck four times. The chronology of events immediately after Petitioner's final assault on the child only permit one conclusion; that the final assault occurred while Petitioner was parked at the warehouse on the Naval Station. There is no evidence suggesting that Petitioner drove his truck another inch after committing the final assault. As such, the evidence at trial firmly established the jurisdictional element and nothing Petitioner has presented in his instant motion proves otherwise.

Petitioner cites the government's closing argument as evidence that the government failed to prove the jurisdictional element. Importantly, counsel's closing argument itself does not qualify as "evidence." In any event, Petitioner's analysis of the government's closing argument as a trial theory reveals a fundamental flaw in how the Federal Public Defender has approached many issues in this Motion. While clearly advancing very intellectual and theoretical points in his arguments, Petitioner's counsel does not account for foundational trial litigation techniques. For instance, he asserts that the government's argument that the killing was a "systematic execution" somehow excludes a conclusion that the "fatal blows were struck on federal land." However, it is common for trial counsel in closing argument to rely upon clear inferences from the evidence and to focus upon the issues that are being contested. It is very common for a trial attorney to mention only some elements of a crime and not argue about elements that are either conceded by the defendant or clearly established by the evidence. That is exactly what occurred here.

Even if the government was required to address every element in its closing argument, there is a portion of the closing rebuttal argument that impliedly addresses the jurisdictional element. In the closing rebuttal argument, the government articulated the manner of death reminding the jury how the defendant held the child up and slammed her into the window four times, she went limp and they exit the

truck. [Trial Transcript, March 16, 2004, DOC 339, p53]. Because the evidence demonstrated that the only time Petitioner and his daughter exited the truck after the fatal blows was on the Naval Station, this argument impliedly includes an argument that the fatal blows occurred on the Naval Station.

Petitioner then adds an argument that this Court expressly prohibited during the habeas hearings. At the January 13, 2011 hearing, Mr. Wiseman attempted to cross examine Dr. Rouse with the government's work-product notes. (Hearing Transcript, Jan 13, 2011, p. 50-51). Notwithstanding this Court's clear ruling, Mr. Wiseman has now attached those very notes to his pleading and asks this Court to inquire about why the prosecutor's notes state "If incident occurred off mil base - NO Jurisdiction!." Mr. Wiseman's attempt to side step this Court's clear ruling is highly inappropriate. The work product of an attorney is rarely permitted to be used as evidence, and even when admitted, it is only admitted for very limited purposes. Here, the referenced and quoted statement is nothing more than an accurate statement - the federal government would not have jurisdiction in this case if the fatal blows occurred off the Naval Base. Counsel's submission of this document is an attempt to bring evidence into the record that was specifically denied by this Court at the hearing. That document proves nothing with regard to Dr. Rouse's testimony and ability to date the fatal injury.

9

Petitioner claims that Dr. Rouse "assiduously avoided ever attempting to date the fatal blows." (Petitioner's Post-Argument Submission, p.7). She did not avoid it. First, defense counsel at trial did not identify the jurisdiction as an issue to be challenged at trial. Petitioner claims that is ineffective assistance of counsel. The government responds that jurisdiction was not an issue because the evidence as a whole firmly established jurisdiction, and defense counsel are not constitutionally required to raise frivolous claims. Secondly, Dr. Rouse did testify that the injuries were "recent" and averred that the witness testimony of how the child was killed inside the truck while parked on the Naval Station is consistent with the fatal injuries. During the January 13, 2011 hearing, Dr. Rouse acknowledged that the medical evidence alone enabled her to only pin-point the timing of those fatal injuries to one to three days prior to the victim's death. However, Dr. Rouse answered affirmatively when asked if what could be observed about the subdural hematoma is "consistent with an injury that was inflicted within the 24-hour period that [the victim] was on the Corpus Christi Naval Air Station." (Transcript from January 13, 2011 hearing, p. 27). Dr. Rouse's testimony is substantive evidence affirming that this Court has proper jurisdiction in this case.

Petitioner also asserts that Dr. Rouse was not able to recall what other witnesses confirmed that the child was conscious and awake prior to the fatal blows

10

that caused the child to clinically decompose.   (Petitioner's Post-Argument Submission, p.9).   Petitioner asserts this failure to identify such witnesses as a foundational reason for reopening the evidentiary hearing.  However, the government again notes that it was Petitioner himself that testified under oath that the child was singing her ABC's immediately prior to the fatal blows.  While Petitioner's counsel suggests that reliance upon Petitioner's testimony is weak, it is precisely such statements from Petitioner that likely caused the defense counsel at trial to believe that jurisdiction was not an issue.  In any event, there is no apparent reason for Petitioner to fabricate the statement that the child was singing her ABC's while Petitioner was broken down on the Naval Station.  Absent a good reason to reject such a statement, it can be some evidence that a medical examiner could consider in attempting to determine when a victim might have clinically decomposed.

Petitioner claims there were other blows that could have caused death. (Petitioner's Post-Argument Submission, p. 16).  However, there was no evidence that the victim both became immediately unconscious, limp, or had a "sad face," and died within the following 24 hours after any other blow.  Petitioner again relies upon Dr. Leestma's testimony and attempts to discredit the testimony of Petitioner's then 9-year-old daughter.  The government has already addressed the credibility issues of Dr. Leestma; his testimony is not reliable in reaching a sound conclusion with regard

to which injuries actually were fatal.  While Petitioner does not credit the testimony of Petitioner's then 9-year old daughter, the jury clearly found the 9-year-old daughter very credible.  She testified that when Petitioner was slamming the victim against the window, the victim was "making a like real, real sad face." (Trial Transcript, March 4, 2004, DOC 245, p.39).  When the government later characterized this as the victim going limp, it was simply a fair comment on the evidence.  It is not unreasonable to conclude that the 9-year-old's description of a "real, real sad face" was simply her way of saying "the child went limp."  Clearly, the testimony that described the victim after the "sad face" established that the victim was limp and clinically decomposed.

Petitioner's entire argument can be summed up as the government failed to prove its case with absolute certainty.  It is understandable to some extent that any reasonable jurist would prefer to be absolutely certain about every fact and element of every offense, particularly when a sentence of death is involved.  However, the government is not required to prove it's case to an absolute certainty.  It is rare to have an eye-witness to a murder, and perhaps even more rare to have a 7-year-old witness a murder by her father of her sister and be articulate enough at the age of 9 to testify about the event.  The evidence does not satisfy every aspect to an absolute certainty, but the evidence strongly and sufficiently established that Alfred Bourgeois committed premeditated murder when he slammed his two-year-old daughter into the

window area of his truck while he was parked and preparing to unload his truck on the Corpus Christi Naval Air Station.  As such, this Court should reject Petitioner's jurisdictional challenge in this case, both substantively and with regard to the ineffective assistance allegation.

IV.  Response to Petitioner's Ineffective Assistance Issue

A.      Factual Background Regarding Mitigation

An understanding of the factual background in developing and presenting mitigation evidence on behalf of Mr. Bourgeois is critical to evaluating Trial Counsel's performance.

B.      Pre-Trial Preparation

The record establishes Counsel moved quickly to initiate a mitigation investigation.  Counsel initially contacted Dr. Mark Cunningham (mitigation expert) on June 30, 2003. (Evidentiary Hearing, Gilmore testimony, p. 177; Cunningham testimony, p. 186). Trial Counsel were not permitted to actually hire a mitigation expert until after the government announced they were seeking the death penalty. (Evidentiary Hearing, Cunningham testimony, p. 189).  The government first gave that notice on July 16, 2003. (Evidentiary Hearing, Cunningham testimony, p. 206; Doc. 74).   Dr. Cunningham recommended Lisa Milstein (Milstein) as a mitigation investigator. (Evidentiary Hearing, Gilmore testimony, pp.178-79, 222; Cunningham

testimony, p. 197). Milstein brought Gerald Bernstein on to assist her. (Evidentiary Hearing, Cunningham testimony, p. 198).

As Dr. Cunningham's curriculum vitae demonstrates, he is a highly experienced mitigation expert. Lisa Milstein's resume is also impressive, demonstrating years of mitigation investigation training and experience, as well as lecturing on mitigation and other capital punishment topics in North America as well as in Europe. (Milstein resume). As well as being an experienced mitigation investigator, Gerald Bierbaum was also an attorney, experienced in death penalty cases. (Evidentiary Hearing, Bierbaum testimony, pp. 257-58, 277). Once Trial Counsel were authorized, Counsel quickly hired Milstein and Bierbaum in the Summer of 2003. (Evidentiary Hearing, Bierbaum testimony, pp. 259-60). On July 18, 2003, the court's scheduling order set a trial date for February 16, 2004. (Evidentiary Hearing, Cunningham testimony, p. 206). According to Dr. Cunningham, mitigation investigations commonly take a year to complete. (Evidentiary Hearing, Cunningham testimony, p. 196). Dr. Cunningham opined that this seven month period would barely be enough time to complete a comprehensive mitigation investigation, and only if the investigation was pursued aggressively. (Evidentiary Hearing, Cunningham testimony, p. 196). Dr. Cunningham outlined the

vast scope of the comprehensive inter-generational investigation necessary. (Evidentiary Hearing, Cunningham testimony, pp. 192-95).

C.     Mitigation Investigation

Despite being hired in mid-Summer of 2003, Milstein and Bierbaum didn't interview Mr. Bourgeois for Mr. Bourgeois's first formal interview regarding mitigation matters until October 23, 2003. (Evidentiary Hearing, Cunningham testimony, pp. 299-300; Bierbaum testimony, pp. 259-60). Although noting he was not a mental health expert, Bierbaum did not notice any symptoms or indications that Mr. Bourgeois was mentally retarded. (Evidentiary Hearing, Bierbaum testimony, p. 284-86). During this all-important first formal interview, Mr. Bourgeois denied he suffered child abuse of any kind. Mr. Bourgeois did, however, report a head injury from a motorcycle accident in 1984, which resulted in his being in a coma for as long as three months. (Evidentiary Hearing, Bierbaum testimony, p. 261). This coma claim was repeated by Mr. Bourgeois to Dr. Cunningham on February 7, 2004. (Evidentiary Hearing, Cunningham testimony, pp. 234-36, 239-41). The coma claim was corroborated by Claudia Williams, Mr. Bourgeois's sister. (See: Evidentiary Hearing testimony of Williams, pp. 83-87.) This head injury/coma revelation was a critical lead and would have guided the mitigation investigation. (Evidentiary Hearing, Bierbaum testimony, p. 264).

It turned out to be a false-alley. This coma report was ultimately wholly refuted by medical records obtained by the government shortly before trial. (Tinker Interrogatories # 3; Evidentiary Hearing, Cunningham testimony, p. 241). Mr. Bourgeois maintained this ruse throughout the mitigation investigation. Dr. Weiner, hired to perform a neurological evaluation of Mr. Bourgeois, relied upon the coma claims in making his neurological assessments of Mr. Bourgeois. (Evidentiary Hearing, Dr. Weiner's testimony, p. 210-11). His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury. The fact that the head injury and coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have been as a mitigation witness. The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (Tinker Interrogatories, #3). Understanding the damage of exposing the jury to the coma fabrication, the defense decided not to call Dr. Weiner. (Id.).

Mr. Bierbaum's perception of Mr. Bourgeois was consistent with that of Counsel Gilmore, a highly experienced and esteemed defense attorney, experienced with mentally retarded clients (Evidentiary Hearing, Gilmore testimony, pp. 134, 136-39, 142, 145, 212, 214), who likewise never saw any indication that Mr. Bourgeois was mentally retarded.

16

These defense death penalty practitioners' view was further corroborated by the conclusions of Dr. Estrada, a well-respected psychiatrist, who had performed a competency and a psychological evaluation of Mr. Bourgeois pre-trial, and noted Mr. Bourgeois's "above-average intelligence and memory". (Dr. Estrada Deposition p. 46). These initial evaluations of Mr. Bourgeois's intelligence were important as it guided the focus and scope of the mitigation investigation.

The mitigation investigation appears to have progressed slowly from the outset. Despite having been hired in mid-Summer, a review of the emailed mitigation reports reveals that it was not until November 11, 2003, that Gerald Bierbaum communicated the "Investigative Plan" to Trial Counsel. And, it was not until a March 17, 2004 email from Mr. Bierbaum to Trial Counsel, that Mr. Bierbaum identified a series of educational, employment, medical, government and financial records needed for the investigation. This is not to say that Mr. Bierbaum was wholly at fault. He was not the primary investigator. He was brought on by Milstein, who was the primary investigator. We know now the reason the mitigation investigation became woefully behind schedule and had been terribly neglected by December, 2003. Milstein reportedly developed a serious personal problem, and fundamentally failed to perform her duties. (Evidentiary Hearing, Cunningham testimony, p. 211). When Bierbaum expressed his dismay over the lack of progress and the sub-standard quality of work

being performed by Milstein, Milstein came up with excuse after excuse, even claiming she was suffering from a neurological condition and was undergoing medical treatment. (Evidentiary Hearing, Bierbaum testimony, pp. 266-67). None of this was ever communicated to Trial Counsel, an extraordinary circumstance with which Trial Counsel were saddled. Although Dr. Cunningham complained of the quality of the mitigation interviews and reports immediately to Bierbaum, he didn't alert Trial Counsel of the sub-standard quality of the mitigation reports until February 7, 2004. (Evidentiary Hearing, Cunningham testimony, pp. 225, 231, 307). Despite the delay and substandard quality of the mitigation investigation to date, Dr. Cunningham decided not to proceed with his investigation or interview with Mr. Bourgeois until the mitigation investigators report was finished. (Evidentiary Hearing, Cunningham testimony, p. 211).

As the trial approached, and the mitigation investigators reported the investigation was not complete and would need six additional months, Trial Counsel approached the court for a continuance, which was rejected. (Evidentiary Hearing, Cunningham testimony, pp. 209, 213-15). The mitigation investigation was completed expeditiously thereafter. Both investigators noted the reluctance of family members to discuss childhood abuse by Mr. Bourgeois's mother. (Mitigation Reports to Counsel).

D.      The Penalty Phase

Following Mr. Bourgeois's conviction, the court conducted the penalty phase of the trial. In addition to the hideous facts offered at the guilt phase, the government offered other substantial evidence in support of the alleged aggravating factors, devastating to Mr. Bourgeois defense.  The jury heard Mr. Bourgeois physically beat his mother-in-law in front of toddlers. (Penalty Phase, Day 1, pp 35-38).  He beat his numerous wives regularly. (Penalty Phase, Day 1, pp 44, 48, 61-63, 99-102; Day 2, pp. 81, 82, 87).  He engaged in sadistic bullying of young children relatives. (Penalty Phase, Day 1, pp 50-56).  He physically abused toddler relatives. (Penalty Phase, Day 1, pp  70-74, 78 (3 year old girl); 82-84, (3 or 4 year old son)).  He attacked a U.S. Marshal, while in custody. (Penalty Phase, Day 1, pp  109-13).  He pulled gun on his aunt & cousin, threatening to kill them (Penalty Phase, Day 1, pp. 115-17, 123-24). He was seen to be indifferent to the victim. (Penalty Phase, Day 1, p.  134).  He hired a prisoner, he believed to be a hitman to kill family members, who offered evidence against him: (Penalty Phase, Day 1, pp  155-62;  Cousin Lisa Monroe; (Penalty Phase, Day 1, pp 156-57, 162, 189, 196-99; Day 2, 81, 83; Robin Bourgeois; (Penalty Phase, Day 1, pp  161-62; Gaynelle Collins Bourgeois). Finally, the victim's family impact testimony was nothing short of heart-wrenching. (Penalty Phase, Day 1, pp 220-41).

Equally damaging was evidence that Mr. Bourgeois possessed some level of

business acumen and financial aptitude. (Penalty Phase, Day 1, pp 197-205). The Trial Counsel were diligent throughout the proceedings, objecting to prejudicial or inadmissible evidence. (Penalty Phase, Day 1, pp. 132, 137, 158, 160, 164, Day 2, p. 76-78).

Dr. Carlos Estrada, Board certified Psychiatrist, (Penalty Phase, Day 1, p. 252) with a Fellowship in mental retardation, p. 257, trained in psychoanalysis, pp. 256-59, with special expertise in child abuse, has conducted numerous evaluations for this court, pp. 260-263. Dr. Estrada conducted an extensive background investigation on Mr. Bourgeois, p. 275. On direct examination, Dr. Estrada noted the lack of corroboration of Mr. Bourgeois's report that he had been in a coma as a result of the 1984 accident. (Penalty Phase, Day 1, pp. 275-76). Dr. Estrada administered the MMPI personality test, conducted a clinical interview, and reviewed available collateral sources for the risk assessment. (Penalty Phase, Day 1, p. 278). Dr. Estrada spent over three hours interviewing Mr. Bourgeois, and conducted a thorough psychiatric risk assessment of Mr. Bourgeois. (Penalty Phase, Day 1, pp. 252, 269, 272). Dr. Estrada reviewed statements by many of the witnesses who testified at trial, pp. 269, 270, including family members, who reported Mr. Bourgeois's abuse at the hands of his mother, rejection and abandonment; he reviewed 4 letters Mr. Bourgeois wrote to Robin Bourgeois, Anthony Dumas, and Sherry Smith. (Penalty Phase, Day

1, p. 271).  Dr. Estrada listened to several recorded telephone conversations of Mr. Bourgeois. (Penalty Phase, Day 1, p. 271). Dr. Estrada observed Mr. Bourgeois throughout the trial, (Penalty Phase, Day 1, pp. 252, 272), collecting any additional information available on Mr. Bourgeois, including the psychological reports of Drs. Weiner and Cunningham[1], (Penalty Phase, Day 1, p. 272), and the psychological report from a Sheriff's Office job application, when Mr. Bourgeois was 23 years old. (Penalty Phase, Day 2, pp. 18-19).

> "My conclusions are that he meets a number of specific items that have been found associated with violence, and they include items in his background that we found, sadly enough, repeatedly occurring in children, and then leading to violence as adults. Particularly, we've found that being a subject of rejection, neglect, and abandonment, bing a survivor of actual physical or sexual or emotional abuse have a very high predisposition for violence as adults." .... So in terms of the background, I found these 5 elements of the background that Mr. Bourgeois shares with a group of individuals that show violent behavior as adults.  In terms of his personality, we look for 3 things in the assessment of personality. Number one, we look for items that will decrease the capacity for self-control, such as ... poor intelligence or judgment or poor control of emotions, whether its due to illness or to alcohol or to mental retardation ..."

(Penalty Phase, Day 1, pp.282-84).

---

[1]  Upon hearsay objection, Dr. Estrada was ordered not to refer to Dr. Weiner's report, which had been excluded for all purposes. (Penalty Phase, Day 2, pp. 25-33), or to any aspects of Dr. Cunningham's report, which relied upon Dr. Weiner's report, specifically including allegations of sexual abuse of Mr. Bourgeois.

Dr. Estrada made several other damaging assessments of Mr. Bourgeois, "Mr. Bourgeois has the characteristics that in psychiatry we call a narcissistic personality disorder" ... an individual whose basic motivation in life is the aggrandizing of his self-esteem and importance". (Penalty Phase, Day 1, p. 284). "On the basis of the assessment of the background factors and his personality factors, my opinion is that Mr. Bourgeois has a much higher tendency toward violence than an ordinary person." (Penalty Phase, Day 1, p. 285). "Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim." (Penalty Phase, Day 1, p. 286), even avoiding eye contact with his own 7 year old daughter. (Penalty Phase, Day 2, pp. 63-64).

On cross-examination, Trial Counsel essentially used Dr. Estrada effectively to analyze mitigation evidence known to him to the advantage of Mr. Bourgeois. On the basis of all the information obtained, Dr. Estrada concluded that Mr. Bourgeois was not truthful with him, when Mr. Bourgeois denied he had not been abused as a child. (Penalty Phase, Day 2, pp. 17, 22). Dr. Estrada noted that Mr. Bourgeois was vague and reluctant to discuss his childhood. However, after listening to the trial witnesses, Dr. Estrada concluded Mr. Bourgeois had been neglected by his parents, rejected by them, and abused by his mother, (Penalty Phase, Day 2, pp. 22-24, 44)

an illegitimate child, abandoned by his father, p. 24, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 48).

Dr. Estrada explained that these factors did not excuse what Mr. Bourgeois had done, but provided a psychological explanation for what he had done. (Penalty Phase, Day 2, p. 24). Dr. Estrada explained that Mr. Bourgeois's narcissistic personality disorder was consistent with Mr. Bourgeois's childhood abuse and abandonment. (Penalty Phase, Day 2, p. 44). Dr. Estrada noted that Mr. Bourgeois was not a sociopath. (Penalty Phase, Day 2, p. 66).

Dr. Estrada explained that Mr. Bourgeois's reaction to the death of the victim (aloof, unemotional and otherwise preoccupied) is consistent with someone who abuses children and who has been abused themselves. (Penalty Phase, Day 2, pp. 36-39). Dr. Estrada explained that he had been hired by the government to evaluate whether Mr. Bourgeois's abuse of the victim was consistent with someone who had been abused as a child. Dr. Estrada testified that he had concluded that Mr. Bourgeois's abuse of the victim was wholly consistent with Mr. Bourgeois being abused as a child.

Dr. Estrada explained the psychological dynamic of the events resulting in the death of the child. At the time of the murder, Mr. Bourgeois was under a number of stresses: (1) his affair and his wife's discovery of his illegitimate child, (2) financial

stress, (3) serious marital problems with his wife, (4) and the confined space of the truck cab over a long period of time. One minor event of the toilet spilling triggered an "explosion of anger" by Mr. Bourgeois against the child. (Penalty Phase, Day 2, p. 41). Dr. Estrada explained that Mr. Bourgeois's violence was centered in intimate family settings, and opined that Mr. Bourgeois will adjust well in custody. (Penalty Phase, Day 2, p. 67). Dr. Estrada's opinion adopted many of the findings of Dr. Cunningham, albeit in a shortened presentation, and without the pressure-cooker depiction. (Evidentiary Hearing, Cunningham testimony, pp. 261-75, 309-10). Although Dr. George Walker Holden was not permitted to testify regarding premeditation, Dr. Estrada's psychological explanation of how the murder occurred as the result of stressors culminating in Mr. Bourgeois's "explosion of anger" co-opted Dr. Holden's conclusion that the crime was not premeditated. (Evidentiary Hearing, Holden testimony, p. 11).

Trial Counsel then offered testimony that Mr. Bourgeois had been abused as a child. Carl Henry, a close cousin, testified Mr. Bourgeois was abused by his mother. (Penalty Phase, Day 2, p. 113). She whipped him with an extension chord. (Penalty Phase, Day 2, p. 115). And she hit him in the head with a telephone. (Penalty Phase, Day 2, p. 115). He testified that Mr. Bourgeois had been teased about having no father. (Penalty Phase, Day 2, p. 116). The Reverend Clayton (son of Mary

Clayton, with whom Mr. Bourgeois lived from pre-adolescent until the age of 16) testified Mr. Bourgeois had been abused by Mr. Bourgeois's mother. (Penalty Phase, Day 2, pp. 123, 125).

The mitigation evidence from family members that Mr. Bourgeois had been abused was not without cost. Even defense mitigation witnesses from the family were aware of allegations that Mr. Bourgeois beat young children. (Penalty Phase, Day 2, pp. 106-08, 110). In reading the mitigation reports there was more than suspicion that Mr. Bourgeois sexually molested young relatives.

Counsel developed any favorable evidence available; that Mr. Bourgeois was a hard-working man, and a good provider, and that sometimes times were happy and good. (Penalty Phase, Day 1, pp. 65, 103-04; Day 2, p. 46).

On Day 3, against his Counsels' advice, Mr. Bourgeois addressed the jury and proclaimed to the jury that he was innocent, that someone else had killed the child. (Penalty Phase, Day 3, p. 5).

V.  Legal Analysis and Argument

A.    Preliminary Analysis:

There are several arguments Habeas Counsel has made which should be considered prior to evaluation of the substantive legal issues:

25

(1) To the extent Habeas Counsel argues that the court should not consider Trial Counsel's experience, courtroom skill or performance, the government disagrees. The court does not make its evaluation of ineffective assistance of counsel in a vacuum. The court should properly consider the considerable experience and courtroom skill of Counsel in its ineffective assistance evaluation.

This highlights the limitations of evaluating an attorney's performance by reading a sterile record. Appellate courts concede the limitation of the written record in making credibility determinations, which they leave to the jury or the trial court, because the appellate court was not there to see the presentation of the witnesses. It also ignores the membership of the jury, who will decide the case. There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. *Rogers,* 13 F.3d at 386; *see also Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir.2004), *cert. denied,* 544 U.S. 952, 125 S.Ct. 1703 (2005). "The presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." *Callahan v. Campbell,* 427 F.3d 897, 933 (11th Cir.2005).

(2) Habeas Counsel argues that, "Childhood sexual and physical abuse, low intelligence, organic brain dysfunction and other psychological deficits are the types of mitigating evidence that are commonly found presented in these cases".... "[T]his

type of evidence is required to be presented by the United States Supreme Court".

At oral argument Counsel used the analogy, "All the kids are doing it [presenting this type of mitigation evidence] ".   To the extent Habeas Counsel seeks to classify certain mental or psychological conditions as mitigation evidence *per se*, and which should automatically be offered into evidence, the government disagrees, views any such argument overly simplistic and contrary to the prejudice analysis required by *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052 (1984).

Each case, and each counsel's performance is judged on its own merits. Counsel may well be justified in not introducing "mitigating" evidence. "The Sixth Amendment entitles criminal defendants to the " 'effective assistance of counsel' "- that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441 (1970)). That standard is necessarily a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (2009) (quoting *Strickland*, 466 U.S., at 688-689, 104 S.Ct. 2052).  "There is no checklist for judicial evaluation

of attorney performance. Instead, the performance inquiry is on "whether counsel's assistance was reasonable considering all the circumstances" because no checklist for counsel's conduct "can take into account ... the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Woods v. Thaler*, 2010 WL 4272751, 7 (5th Cir. 2010) (quoting *Strickland,* at 688-89.   Notwithstanding the constitutional stature of appropriate mitigating evidence in a capital case, counsel's failure to develop or present mitigating background evidence is not per se deficient performance. *Moore v. Johnson*, 194 F.3d 586, 615-22 (5th Cir. 1999), See *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361 (1997); *West*, 92 F.3d at 1408; *King v. Puckett*, 1 F.3d 280, 284 (5th Cir.1993). To the contrary, a considered strategic or tactical decision not to present mitigating evidence that is made after a thorough investigation of the law and facts relevant to all plausible lines of defense is presumed to be within the wide range of professionally reasonable assistance defined by *Strickland*, 104 S.Ct. at 2066; *Whitley*, 977 F.2d at 158; *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir.1989) (counsel's decision not to present mitigating evidence is entitled to deference when based upon an informed and reasoned practical judgment). Stated differently, *Strickland* requires that

28

we defer to counsel's decision not to present mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense. *Strickland* does not, however, require deference to decisions that are not informed by an adequate investigation into the controlling facts and law. *Whitley*, 977 F.2d at 157-58; see also *Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir.1994) (counsel's strategic decision entitled to deference because supported by an adequate investigation which included contact with at least 27 people); *Drew*, 964 F.2d at 423 (counsel's strategic decision entitled to deference because counsel made "reasonable inquiries" into Drew's mental state); *Wilkerson*, 950 F.2d at 1064-65 (affording strategic decision deference where record established the counsel retained an investigator to explore whether mitigating evidence relating to defendant's background or mental ability was available); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *McCoy*, 874 F.2d at 964 (finding scope of investigation reasonable where counsel investigated possibility of mitigating evidence by interviewing everyone on a list provided by the capital defendant and determined none of them had anything good to say about the defendant). Similarly, *Strickland* does not require deference to those

decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose. See *Strickland*, 104 S.Ct. at 2061 ("Counsel may not exclude certain lines of defense for other than strategic reasons."); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir.1996) (explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant), *cert. denied*, 519 U.S. 1120, 117 S.Ct. 968 (1997); *Whitley*, 977 F.2d at 158 ("Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and just plain omissions has echoed in the judgments of this court.") (footnote omitted); *Bell v. Lynaugh*, 828 F.2d 1085, 1090 (5th Cir.1987) (when counsel makes an informed and considered decision not to present mitigating evidence, the issue becomes whether the decision was reasonable ); *Mattheson*, 751 F.2d at 1439-40 (explaining strategic purpose motivating counsel's decision to exclude evidence of mental impairment from sentencing phase); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir.1984) (explaining basis of counsel's considered decision to limit investigation by excluding implausible lines of mitigating evidence).

(3)    Habeas Counsel argues the more heinous the facts, the more necessary mitigation evidence.  Again, the government disagrees with this simplistic analysis. As discussed above, whether to offer mitigation evidence is a complex evaluation by

Counsel, governed by much more than the heinous nature of the crime. The issue is governed by the *Strickland* analysis.

Granting the obvious motivation to offer psychological or mental health explanations for the crime to humanize the defendant and to counter any conclusion that the defendant is simply evil, the court must still consider whether such mitigation was credible, reasonably available, and would be effective in countering the conclusion the defendant simply acted upon evil impulses.

B.      Petitioner's burden:

1).   Counsel's standard of performance under *Strickland* and its progeny.

In a capital sentencing proceeding, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 239 F.3d 683, 688 (5th Cir.2001) (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir.1983)). Like any claim of ineffective assistance of counsel, we scrutinize the reasonableness of counsel's investigation in light of all relevant circumstances and give deference to counsel's decision to pursue a sound trial strategy. But in explaining how to assess investigation choices in *Wiggins v. Smith,* the Supreme Court noted: "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins,* 539 U.S. at 521-22 (quoting *Strickland,* 466 U.S. 690-91).

Did Counsel Conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances"?

The record establishes that Counsel moved quickly to initiate a mitigation investigation. Counsel initially contacted Dr. Mark Cunningham (mitigation expert) on June 30, 2003. (Evidentiary Hearing, Gilmore testimony, p. 177). Dr. Cunningham recommended Lisa Milstein (mitigation investigator). (Evidentiary Hearing, Gilmore testimony, pp.178-79, 222). Despite being hired in mid-Summer of 2003, Milstein and Bierbaum didn't interview Mr. Bourgeois for Mr. Bourgeois's first formal interview regarding mitigation matters until October 23, 2003. (Evidentiary Hearing, Cunningham testimony, pp. 299-300; Bierbaum testimony, pp. 259-60). Although noting he was not a mental health expert, Bierbaum did not notice any symptoms or indications that Mr. Bourgeois was mentally retarded. (Evidentiary Hearing,

Bierbaum testimony, p. 284-86). During this all-important first formal interview, Mr. Bourgeois did not report any child abuse. *Galloway v. Thaler*, 344 Fed.Appx. 64, 68-69, 2009 WL 2873910, 3 (5th Cir. 2009) (Petitioner failed to disclose sexual abuse to his attorneys despite their efforts to talk with him). This Court has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 251-53 (5th Cir. 2002), *Soria v. Johnson,* 207 F.3d 232, 250-51 (5th Cir.2000); *West v. Johnson,* 92 F.3d 1385, 1408-09 (5th Cir.1996).

Mr. Bourgeois did, however, report a head injury which resulted in his being in a coma for two or three months in 1984. (Evidentiary Hearing, Bierbaum testimony, p. 261; Cunningham testimony, p. 234-36). The coma claim was corroborated by Claudia Williams, Mr. Bourgeois's sister. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

This head injury/coma revelation would have guided the mitigation investigation. It turned out to be a false-alley. This coma report was ultimately wholly refuted by medical records obtained by the government shortly before trial. (Interrogatories of Tinker, # 3; Evidentiary Hearing, Cunningham testimony, pp. 239-41). Mr. Bourgeois maintained this ruse throughout the mitigation investigation. Dr.

Weiner relied upon the coma claims in making his neurological assessments of Mr. Bourgeois. His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury. The fact that the coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have as a mitigation witness. The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (See Tinker Interrogatories, # 3). *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (would have been impeached on cross-examination with information that Smith and his mother had provided earlier to medical personnel and probation officers (regarding his head injury ...). So long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than lack of investigation, "those questions are even less susceptible to judicial second-guessing." *Johnson v. Cockrell*, 306 F.3d at 251-53 (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999)).

In addition to greatly undermining Dr. Weiner's findings, the impeaching evidence would have had an additional damaging impact on Mr. Bourgeois's case. It would have exposed Mr. Bourgeois and his sister as liars and successful manipulators of psychological experts, further compromising any beneficial psychological findings or presentation. See, e.g., *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2474 (1986), *Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010

WL 28524, 3 (5th Cir. 2010) (unused mitigation evidence would have corroborated state's portrayal of Basso as a malingerer, manipulator and liar). Counsel made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense. Indeed, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness". *Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) *(quoting Crane v. Johnson,* 178 F.3d 309, 314 (5th Cir.1999)).

This coma false-alley was the product of Mr. Bourgeois, who fabricated the claim. In no way does responsibility for this misdirection of the mitigation investigation or the compromising of Dr. Weiner's findings accrue to the mitigation investigators or to Counsel. *Moody v. Polk*, 408 F.3d 141, 148-49 (4th Cir. 2005) (erroneous psychological report direct result of Petitioner's dishonesty, and not ineffective assistance of counsel), *Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999).

Mr. Bierbaum's perception was consistent with that of Counsel Gilmore, a highly experienced and esteemed defense attorney experienced with mentally retarded clients (Evidentiary Hearing, Gilmore testimony, pp. 134, 136-39, 142, 145, 212, 214), who likewise never saw any indication that Mr. Bourgeois was mentally

retarded.  Although not mental health experts, Counsel may reasonably rely upon their own perceptions regarding their client's level of intelligence, and it may reasonably guide their trial strategies. *Riley v. Dretke*, 362 F.3d 302, 306-07 (5TH Cir. 2004) (Furthermore, because his own impressions led Wright to believe that Riley was not mentally retarded, Wright reasonably believed that the jury could have reached the same conclusion), *Boyd v. Johnson*, 167 F.3d 907, 910-11 (5TH Cir. 1999) (The evidence of Boyd's retardation must be considered in tandem with the impressions that he gave the attorneys. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.... In particular, what investigation decisions are reasonable depends critically on such information." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Boyd's attorneys testified that they did not believe Boyd was retarded, based on their observations and interactions with him, and the district court found this testimony to be credible).

These death penalty practitioners' view was corroborated by the conclusions of Dr. Estrada, a well-respected psychiatrist, who had performed a competency and a psychological evaluation of Mr. Bourgeois, and noted Mr. Bourgeois's above average intelligence level. (Dr. Estrada's Deposition, p. 46). These initial evaluations of Mr. Bourgeois's intelligence were important as it guided the focus and scope of the mitigation investigation.   In all, Trial Counsel and the mitigation investigators

interviewed more than 50 witnesses, at least once, in pursuit of beneficial mitigation evidence. (See Penalty Phase, Day 3, pp. 14-15; Evidentiary Hearing, Gilmore testimony, p. 184).

Both mitigation investigators observed in their reports to Trial Counsel that Mr. Bourgeois's family members were reluctant to discuss any child abuse by Mr. Bourgeois's mother. This reluctance diminished following the mother's death, which occurred following the trial but prior to this proceeding. (Evidentiary Hearing, Cunningham testimony, p. 279-80).

The record demonstrates Counsel conducted a reasonably substantial, independent investigation into potential mitigating circumstances.

Did Counsel place any limitation on the mitigation investigation? There's no indication in the record that Trial Counsel limited the mitigation investigation. As will be discussed, the mitigation investigators worked semi-autonomously from Trial Counsel, pursuing leads as they developed.

Trial Counsel did decide not to put certain mitigation evidence gathered before the jury. A critical factor guiding these decisions was Mr. Bourgeois unwavering defense that he did not commit the crime, rather that his wife committed the crime. (See Penalty Phase, Day 3, pp. 23-24; Evidentiary Hearing testimony, Gilmore, pp. 144-45, 178, 183). Mr. Bourgeois provided Trial Counsel with explicit instructions

to pursue this line of defense throughout the trial. (Evidentiary Hearing testimony, Gilmore, pp. 149-74). Mr. Gilmore testified they didn't put on some of the psychological testimony because it presumed that Mr. Bourgeois had committed the offense, a position completely contrary to Mr. Bourgeois's guilt phase defense. Mr. Bourgeois concurred with Trial Counsel's decisions in this regard. (Evidentiary Hearing testimony, Gilmore, pp. 182-83).

Although Habeas Counsel seems to argue that a conflict between the guilt defense and mitigation defense is irrelevant in evaluating Trial Counsel's decision not to offer such conflicting mitigation evidence, the ABA Guidelines and relevant caselaw is contrary to Habeas Counsel's position. The ABA Guidelines[23], which

---

[2] AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES.

[3] *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S., at 688, 104 S.Ct. 2052. We have since regarded them as such. See *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029 (2000). *Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009).

Habeas Counsel has cited repeatedly to the court, counsel that a unified defense should be pursued and maintained.

> "Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. [FN255] At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory [FN256] that will be reinforced by its presentation at both the guilt and *1048 mitigation stages. [FN257] Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." 31 Hofstra L. Rev. 913, 1047 -1048 (Summer2003).

> "The Importance of an Integrated Defense During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." [FN272] Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. [FN273] First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma. [FN274] But whether or not the guilt phase defense will be that the defendant did not *1060 commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase. [FN275]".

31 Hofstra L. Rev. 913, 1059-60 (Summer2003). See: *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990), "It was clearly within the "wide range of professionally competent assistance" for Ryan to choose not to present a psychiatric defense theory that could conflict with his alibi defense and his mitigation based on Harris's alleged remorse and his abusive childhood. It is also acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion."

Here, Trial Counsel, with Mr. Bourgeois's concurrence, decided not to call Dr. Cunningham.  One of the factors guiding this decision was the premise of Dr. Cunningham's prepared presentation that Mr. Bourgeois had committed the crime. Another reason was the government had an expert from the Bureau of Prisons, who would have countered Dr. Cunningham's prison risk assessment relating to murders committed in prison by capital prisoners. (Evidentiary Hearing, Cunningham testimony, pp. 289-95). This strategic decision was reasonable under the circumstances and consistent with Mr. Bourgeois's instructions to Counsel.

Habeas Counsel argues that the development and presentation of the mitigation evidence was wholly compromised by Trial Counsel's failure to supervise and coordinate the mitigation investigation, resulting in a fatally flawed and untimely investigation.  Habeas Counsel argues the email traffic between the mitigation

investigators and Trial Counsel demonstrate Trial Counsel were deficient in supervising the mitigation investigators.

Although Habeas Counsel argues that Trial Counsel were ignorant as to the process and mechanics of developing mitigation evidence, the record rebuts this claim. Trial Counsel were both highly skilled death penalty practitioners. They were well aware of the importance of mitigation evidence and its presentation. Habeas Counsel points to some confusion between Trial Counsel, the mitigation specialists and Dr. Cunningham regarding whether the specialists were to send their reports directly to Dr. Cunningham or through Counsel. In one email between Counsel and Dr. Cunningham's assistant, Counsel seemed unsure whether the specialists would forward the mitigation reports directly to Dr. Cunningham. (Evidentiary Hearing, Cunningham testimony, pp. 303-08). Counsel asked Dr. Cunningham's assistant if the mitigation reports would be sent directly to Dr. Cunningham. Although the assistant forwarded Counsel's email to Dr. Cunningham, there's no indication that either Dr. Cunningham or the assistant responded to Counsel's question. (Id.). This confusion does not suggest Counsel were unaware of the substance of the mitigation investigation process, but perhaps of the procedure normally used by Dr. Cunningham and the specialists he recommended. Contrary to Dr. Cunningham's conclusion that Trial Counsel were unfamiliar with mitigation investigations on the basis of this

subject email, Dr. Cunningham's instructions to Trial Counsel would suggest that the mitigation reports would flow directly to Dr. Cunningham, without the supervision of Counsel.    In Dr. Cunningham's Declaration (Doc. 397-1, p. 112 of 191), Dr. Cunningham reported that he explained to Mr. Gilmore the role of the mitigation specialists, "I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line.  My own interviews and evaluation could not reasonably begin prior to this investigation".

The undersigned has reviewed the correspondence with reports offered at the evidentiary hearing between the investigators, Dr. Cunningham and Trial Counsel. Some of the correspondence went directly from the investigators to Dr. Cunningham; some of it went from the investigators directly to Trial Counsel; and some went to both Dr. Cunningham and to Trial Counsel.  The correspondence further reveals how off-schedule the investigation became.  It appears it was not until November 11, 2003, that Gerald Bierbaum communicated the "Investigative Plan" to Trial Counsel,

42

despite having been hired in mid-Summer. And, it was not until a March 17, 2004 email from Mr. Bierbaum to Trial Counsel, that Mr. Bierbaum identified a series of educational, employment, medical, government and financial records needed for the investigation. The undersigned has not detected any delay to the investigation due to lack of instructions from Trial Counsel.

The record suggests Trial Counsel acted diligently and reasonably regarding the mitigation investigation. The government has a fundamental disagreement with the apparent position of Habeas Counsel in regards to the proper role of Trial Counsel in relation to the duties of the mitigation specialists. In an attempt to insure easy coordination between Dr. Cunningham and the mitigation investigators, Counsel asked Dr. Cunningham to recommend mitigation experts. Counsel contacted and hired the expert recommended by Dr. Cunningham. It turned out that the main mitigation investigator was apparently experiencing a serious personal incapacity, who wholly neglected her duties in this case, which caused the lengthy delay in completing the mitigation investigation. Here, Counsel hired a mitigation expert and two mitigation investigators at least seven months before the trial. The investigators obtained their leads directly from Mr. Bourgeois. The mitigation report was not completed until two weeks before the trial due to the incapacitation of one of the mitigation investigators.

Habeas Counsel's theory of ineffectiveness of counsel in this regard depends upon laying 100% of the blame for the problematic mitigation investigation on Trial Counsel, under the theory that Counsel was responsible for supervising the mitigation experts and monitoring their duties. This is an over-simplistic evaluation of the roles of the various members of a defense team in a death penalty case. The ABA presumes Counsel will rely upon the expertise of the psychological experts, including mitigation investigators. Counsel will be busy preparing the legal and factual aspects of the defense and should rely on the psychological experts to prepare their parts in the defense.

> "As reflected in Guideline 4.1 and the accompanying commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines. [FN168] The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case, increases efficiency by allowing attorneys to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case, [FN169] improves the relationship with the client and his family by providing more avenues of communication, and provides more support to individual team members." (Emphasis added).

31 Hofstra L. Rev. 913, 1002 (Summer2003).

> "Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews."(emphasis added).

31 Hofstra L. Rev. 913, 1020 (Summer2003)

.... "As noted supra in the text accompanying note 103, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures [childhood sexual abuse], is invaluable in conducting this aspect of the investigation".(emphasis added).

31 Hofstra L. Rev. 913, 1022-26 (Summer2003).  See: *Harris v. Vasquez*, 949 F.2d

1497, 1525 (9th Cir. 1990),

"It is certainly within the "wide range of professionally competent assistance" for an attorney to rely on properly selected experts. Harris has not alleged any facts showing that Ryan should not have chosen the two psychiatrists who assisted the defense, or that Ryan had any reason to believe the defense psychiatrists were incompetent, or that their credentials were deficient in any way. As we have stated above, there is no evidence in the record regarding the two defense psychiatrists work or opinions other than Ryan's conclusory, self-serving declaration. It does not indicate that Ryan, untrained in psychiatry, questioned or should have questioned the competence of the psychiatrists or should have chosen a different defense at the guilt or penalty phase."

 See: *Clark v. Mitchell*, 425 F.3d 270, 285-90 (6th Cir. 2005),

It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals.[FN5] This conclusion is *286 supported by this court's decision in *Campbell,* 260 F.3d at 555-56. In *Campbell,* a defendant seeking habeas relief alleged that his counsel was ineffective for failing to suspect that he may have "suffered from [post-traumatic stress disorder] based on the facts and circumstances of his case." *Id.* at 555. This court rejected the defendant's argument, relying heavily on the fact that counsel had the defendant examined by a trained psychologist who failed to detect evidence of the defendant's possible mental disorder. *Id.* at 555-56. The court noted that there was "no evidence that [the trained psychologist] was incompetent,

or that [counsel] had any reason to question [the expert's] professional qualifications." *Id.* at 555. Thus, the court found that "it was objectively reasonable for ... counsel to rely upon [the trained psychologist's] diagnosis and ... trial counsel's failure to independently diagnose PTDS was not unreasonable." *Id.*

It is critical to understand that the errors of psychological experts are not automatically attributable to counsel.  Additionally, there is no constitutionally recognized right to effective experts.  See: *Skaggs v. Parker*, 235 F.3d 261, 265, 268 (6th Cir. 2000), counsel retained an individual as their psychological expert from recommendations of colleagues, without conducting an independent investigation into the expert's legitimacy.  The expert turned out to be a charlatan, who testified in a manner seriously damaging to the defense.  The 6th Circuit found counsels' performance in this regard was not ineffective assistance.  See: *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998), "The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate. *See Harris v. Vasquez,* 949 F.2d 1497, 1518 (9th Cir.1990); *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990). Furthermore, it would undermine the finality of criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended. *Harris,* 949 F.2d at 1517-18; *Silagy,* 905 F.2d at 1013".  See: *Wilson v. Greene*, 155 F.3d

396, 401 (4ᵗʰ Cir. 1998), "This circuit consistently has "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel." *Pruett v. Thompson,* 996 F.2d 1560, 1573 n. 12 (4th Cir.1993); *see also Poyner v. Murray,* 964 F.2d 1404, 1418 (4th Cir.1992); *Waye v. Murray,* 884 F.2d 765, 766-67 (4th Cir.1989) (per curiam). For example, the defendant in *Waye* claimed that his psychiatrist had not performed adequately because he had failed to emphasize Waye's diminished capacity in his trial testimony. We rejected this claim and observed: [i]t will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require". 884 F.2d at 767.  See:  *Moody v. Polk*, 408 F.3d 141, 150 (4ᵗʰ Cir. 2005), "That the content of the outline itself was not consistent with Moody's present wishes is no fault of trial counsel. Dr. Noble, not trial counsel, had ultimate responsibility for his own expert report. And Dr. Noble informed trial counsel when he faxed them the outline that "I will be doing my own last revisions and additions later this morning." J.A. 294. Counsel bears no responsibility for Dr. Noble's failure to finalize his outline

in a form that did not include information about which he had doubts. To the extent that Moody raises a claim that Dr. Noble was ineffective, we reject that claim because we have consistently " 'rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel.' " *Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998); *see also Thomas,* 170 F.3d at 472".

A review of the mitigation reports suggest the investigators operated fairly independently, without ongoing supervision from Trial Counsel, as the ABA Guidelines presume. Mr. Bierbaum repeatedly noted the legal and strategic significance of evidence and information uncovered and appears to offer advice to Trial Counsel and to Dr. Cunningham regarding its significance, admission, and its presentation in mitigation. Mr. Bierbaum did not appear to be in need of supervision from Trial Counsel.

Habeas Counsel complains, "the train was off the rails", as far as the mitigation investigation, due to the lack of supervision by Counsel. Borrowing Counsel's analogy, the government agrees that in December, 2002, when Trial Counsel approached the court for a continuance in order to permit the completion of the mitigation investigation, "the mitigation investigation was off the rails". Unbeknownst to Trial Counsel, and therefore unbeknownst to the court, one of

mitigation investigators was operating under a serious personal incapacitation. That's the reason the "ox was in the ditch".  In response to the concerns of Mr. Bierbaum that the investigation was way behind schedule, Ms. Milstein claimed she had a neurological condition, which prevented her from completing her duties.   The other investigator, although fully aware of Milstein's wholly deficient performance, declined to share this fact with Trial Counsel, believing it to be a medical problem. Yet somehow Habeas Counsel argues the sole responsibility for the breakdown in the mitigation investigation was the Trial Counsel's "lack of supervision".  Again, the ABA Guidelines suggest these mitigation specialists are semi-autonomous professionals, responsible for conducting the mitigation investigation independently, to free Trial Counsel to handle other aspects of the case. Milstein's resume suggest the relative independence of the role she offered. What supervision by counsel were these professional experts lacking?  The experts were aware of the trial setting, of their need to complete their work.  The experts received their initial leads directly from Mr. Bourgeois, and developed other leads through their investigation. A personal incapacitation by a mitigation investigator could not be reasonably anticipated by Trial Counsel.  Mr. Bourgeois fails to demonstrate Trial Counsel acted unreasonably in failing to identify and correct the underlying problem with the mitigation investigation.

49

Habeas Counsel argues Trial Counsel's failure to supervise the mitigation investigators and coordinate their work delayed the completion of the mitigation investigation and thus compromised Dr. Weiner's presentation, resulting in Counsel deciding not to call Dr. Weiner.

The government suggests Trial Counsel decided not to call Dr. Weiner for a different reason.  As the government has explained above, Counsel hired Dr. Weiner for a neurological evaluation of Mr. Bourgeois. Dr. Weiner relied upon Mr. Bourgeois's claim of a 1984 head injury producing coma in making his neurological assessments of Mr. Bourgeois. (Evidentiary Hearing, Dr. Weiner's testimony, pp. 209-12). His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury.  The fact that the coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have as a mitigation witness. The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (See Tinker Interrogatories, # 3).  *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (would have been impeached on cross-examination with information that Smith and his mother had provided earlier to medical personnel and probation officers (regarding his head injury ...).  So long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than lack of investigation, "those questions

are even less susceptible to judicial second-guessing." *Johnson v. Cockrell*, 306 F.3d at 251-53 (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999)).

In addition to greatly undermining Dr. Weiner's findings, the impeaching medical evidence would have had an additional damaging impact on Mr. Bourgeois's case. It would have exposed Mr. Bourgeois and his sister as liars and successful manipulators of psychological experts, further compromising any beneficial psychological findings. See, e.g., *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2474 (1986), *Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010 WL 28524, 3 (5th Cir. 2010) (unused mitigation evidence would have corroborated state's portrayal of Basso as a malingerer, manipulator and liar).  Counsel made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense.  Trial Counsel's rationale not to call Dr. Weiner had nothing to do with the delay in the completion of the mitigation investigation.

This coma false-alley was the product of Mr. Bourgeois, who fabricated the claim. In no way does responsibility for this misdirection of the mitigation investigation or the compromising of Dr. Weiner's findings accrue to the mitigation investigators or to Counsel. *Moody v. Polk*, 408 F.3d 141, 148-49 (4th Cir. 2005) (erroneous psychological report direct result of Petitioner's dishonesty, and not

ineffective assistance of counsel), *Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999).

Counsel made a reasonable decision under the circumstances not to call Dr. Weiner, intending to elicit mitigation evidence through Dr. Estrada, a government and court hired expert, who had been consulting with the defense throughout the prosecution.

Habeas Counsel argues that the email traffic between Trial Counsel and the mitigation investigators demonstrates Trial Counsel was deficient in failing to get the mitigation investigation report to Dr. Cunningham in a timely manner. This deficiency compromised Dr. Cunningham's preparation, resulting in a presentation/report found unacceptable by Counsel.

The mitigation investigation report didn't get to Dr. Cunningham in a timely manner, not because Trial Counsel failed to send it, but because the mitigation investigators failed to finish it in a timely manner. Again, the shortcomings of the mitigation investigators are not automatically attributable to Trial Counsel.

Additionally, as discussed above, Dr. Cunningham's proposed presentation presumed Mr. Bourgeois committed the offense, contrary to Mr. Bourgeois's position throughout the trial.  The decision not to call Dr. Cunningham was made in consultation with Mr. Bourgeois.  Trial Counsel noted they decided not to call Dr.

Cunningham because they were not impressed with Dr. Cunningham, nor with his Powerpoint presentation with the pressure cooker, or with his statistical analysis and conclusions re: the prospect of future dangerousness. (Evidentiary Hearing, Gilmore testimony, pp. 180-83, 207-11). Trial Counsel provided additional thoughts on not calling Dr. Cunningham. (Evidentiary Hearing, Day 2, p. 5). "He would ... he would say things ... he would talk about how many people are in the penitentiary and how ... and that there are only 10 % commit murders. Well, I think why the hell would I want the jury to know that?"

The strategy of Trial Counsel during the penalty phase was to avoid, as much as possible, an obvious conflict between Mr. Bourgeois's position at the guilt stage, that Robin Bourgeois killed the child, and risk further alienating the jury, but to provide a psychological explanation for what the jury found Mr. Bourgeois to have done, which supported a sentence of life imprisonment. This was the best defense strategy reasonably available to Trial Counsel. As in the guilt stage, Trial Counsel argued the evidence of premeditation was insufficient and did not support a death sentence.

Assuming the additional evidence of child abuse and the evidence of sexual abuse obtained post-conviction by Habeas Counsel is true[4], which the government does not concede, the issue remains whether it was reasonably available to Trial Counsel at the time of the trial. The record suggests not. Trial Counsel's ability to present this information and other mitigation evidence was compromised by various factors: the family's reluctance to relate the extent and degree of child abuse by Bourgeois's mother, while the mother was still alive (Bourgeois's mother died following the trial); Trial Counsel was saddled with a mitigation specialist who, unbeknownst to Trial Counsel, to Dr. Cunningham, who recommended her, and to the court, was a cocaine addict, who explained her failure to make progress on the mitigation investigation with one false excuse after another; Trial Counsel were confronted with "dual sword" dilemma regarding Dr. Weiner's planned testimony and psychological conclusions, in that Dr. Weiner's report and conclusions relied upon the fabricated report by Mr. Bourgeois and his sister Claudia Williams, that Mr. Bourgeois had a head injury resulting in a coma for at least a couple weeks; neither Mr. Bourgeois nor Trial Counsel were comfortable with Dr. Cunningham as a witness or with his Powerpoint presentation, which effectively conceded Mr. Bourgeois

_____

[4] The government is not inferring that the opposing Counsel would knowingly present information it does not believe to be true, rather, the government is suggesting that family members and friends may color their reports in an effort to save the life of their relative.

committed the murder, contradicting the defense Mr. Bourgeois insisted upon that Robin Bourgeois committed the murder; and supplemental evidence of child abuse to Mr. Bourgeois likely would open the door to additional negative evidence that Mr. Bourgeois abused young children.

Counsel sought to avoid the negative impact occasioned by Drs. Weiner and Cunningham's testimony by developing mitigation presentation through Dr. Estrada. Trial Counsel provided Dr. Estrada with Dr. Weiner's report, which discussed Mr. Bourgeois's childhood physical and sexual abuse. The government had provided Dr. Estrada with Dr. Cunningham's report, which likewise discussed Mr. Bourgeois's physical abuse. Rather than calling Drs. Weiner and Cunningham, Trial Counsel decided to use Dr. Estrada, with whom Counsel had a long-standing relationship and with whom Counsel had been consulting throughout the prosecution. This was a reasonable course under the circumstances as they existed. Strategic decisions after reasonable evaluation are virtually unchallengeable. Dr. Estrada discussed the child abuse reportedly suffered by Mr. Bourgeois, and provided a meaningful psychological explanation for Mr. Bourgeois's abusive behavior and for the murder. Although perhaps not as detailed or lengthy as would Dr. Cunningham's presentation, Dr. Estrada's testimony did not share the drawbacks of Dr. Cunningham's and Dr. Weiner's presentations. As the ABA Guidelines discuss, presenting mitigation

evidence in light of an alibi guilt defense requires some level of subtlety. This Circuit has recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant. See, e.g., *Andrews*, 21 F.3d at 623 n. 21. In at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase.

> "[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts ... about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility ... to some degree would eliminate the influence of such doubts." 758 F.2d, at 247-248 (J. Gibson, J., dissenting) (citations omitted).

*Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 1769 (1986).

At the penalty phase, Trial Counsel argued that the government had not proven premeditation during the guilt phase, an indirect challenge to the guilty verdict, designed to invoke any residual doubt about the guilt verdict. Dr. Estrada's presentation in the penalty phase bolstered this argument.

As Trial Counsel presented a substantial mitigation presentation through Dr. Estrada, Habeas Corpus Counsel is placed in the position of demonstrating the presentation was insufficient. His burden of persuasion increases with the substance

of the mitigation evidence and testimony presented. *See, e.g., Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (stating that the deferential review mandated by *Washington* requires courts to be "particularly wary" of claims that counsel failed to present "enough" evidence on a certain issue); *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999) ("Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing."); *Prejean v. State,* 889 F.2d 1391, 1398-99 (5th Cir.1990) ("Although it is possible that [trial counsel] could have produced more of the same type of [mental capacity] evidence ... such detail is not required by [ *Washington*]."); *see also Wilson v. Ozmint,* 352 F.3d 847, 861-62 (4th Cir.2003) (finding counsel's decision not to present additional mitigating evidence reasonable in light of counsel's belief that "their best mitigation evidence had been presented," and "that the additional evidence would only have detracted from the power of the mitigation evidence that they had already presented").

2). Cases Cited in Mr. Bourgeois's Summation

Most of the cases cited by Habeas Counsel are easily factually distinguishable from the instant case.

(1)   *Walbey v. Quarterman,* 309 Fed. Appx. 804 (5th Cir. 2009): Habeas Counsel cited *Walbey* for the proposition that despite heinous nature of the crime, you must offer mitigation. In *Walbey*, Counsel permitted the grandmother to offer a false and uncorrected view of the mother as benign, although Walbey's mother provided Walbey a tortuous upbringing.  Counsel failed to prepare defense psychologist to testify. The government elicited damaging opinion testimony as to aggravating factors... from a woefully unprepared defense psychologist.   *Walbey* is distinguishable. In *Walbey*, the state's only argument regarding the prejudice prong was that the heinous nature of the crime trumped any error. The court rejected this argument, noting all death row crimes are heinous, thus rendering the prejudice analysis a hollow act. Here, in *Bourgeois*, as outlined above, there are many reasonable reasons Trial Counsel determined not to offer the specific mitigation evidence.

(2).   *Wiggins v. Smith,* 539 U.S. 510, 524, 525, 123 S.Ct. 2527 (2003): Habeas Counsel cites *Wiggins* for the proposition that physical abuse, sexual abuse, family dysfunction, cognitive dysfunction, emotional disturbances, and Borderline Personality Disorder constitute mitigation evidence, and that Counsel's decision to forego a mitigation presentation was ineffective assistance of counsel.

"Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. *Id.,* at 487....  Despite these well-defined [ABA] norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.... The scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records. The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.... As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background. 164 F.Supp.2d, at 559. Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless".

Distinguishable:   In *Wiggins*, counsel failed to pursue mitigation evidence with no reasonable reason not to pursue the mitigation evidence.  Here, Counsel did pursue mitigation evidence, and presented significant mitigation evidence and psychological testimony in support of mitigation.

(3).   *Smith v. Texas,* 550 U.S. 297, 127 S.Ct. 1686 (2007): Habeas Counsel cites *Smith* for the proposition that a 78 IQ is mitigation evidence.  Distinguishable: In *Smith*, the court gave a "nullification instruction" effectively limiting the jury's

ability to consider Smith's 78 IQ. This was not an ineffective assistance analysis, it was an 8th Amendment evaluation.

(4).  *Rompilla v. Beard*, 545 U.S. 374, 391-92, 125 S.Ct. 2456 (2005): Habeas Counsel cites *Rompilla* for the proposition that organic brain dysfunction, low intelligence, childhood abuse, and family dysfunction represent mitigation evidence, and failure to offer these in mitigation was ineffective assistance.  In *Rompilla v. Beard*, the evidence which counsel failed to uncover and present-despite the fact that the prosecutors provided defense counsel with the file including the evidence-showed that: during Rompilla's childhood he was beaten by his father with fists, straps, belts and sticks; that Rompilla's father locked him and his brother in a wire mesh dog pen that was filthy and excrement-filled; and that Rompilla grew up in a home with no indoor plumbing and was not given proper clothing by his parents.

Distinguishable: In *Rompilla* the mitigation evidence was delivered on a silver platter and counsel still neglected to put it on. Here, Counsel worked desperately to obtain mitigation evidence, and despite numerous obstacles presented a meaningful mitigation case.

(5).  *Porter v. McCollom,* 130 S.Ct. 447 (2009): Habeas Counsel cites *Porter* for the proposition that childhood abuse, impaired mental capacity, and mental health

impairments represent mitigation evidence, and failure to offer these in mitigation was ineffective assistance.

> "Although Porter had initially elected to represent himself, his standby counsel became his counsel for the penalty phase a little over a month prior to the sentencing proceeding before the jury. It was the first time this lawyer had represented a defendant during a penalty-phase proceeding. At the postconviction hearing, he testified that he had only one short meeting with Porter regarding the penalty phase. He did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family. In *Wiggins v. Smith,* 539 U.S. 510, 524, 525, 123 S.Ct. 2527 (2003), we held counsel "fell short of ... professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. Here, counsel did not even take the first step of interviewing witnesses or requesting records. Cf. *Bobby v. Van Hook,* --- U.S. ----, ----, 130 S.Ct. 13, 18-19 (2009) (holding performance not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources); *Strickland,* 466 U.S., at 699, 104 S.Ct. 2052 ("[Counsel's] decision not to seek more character or psychological evidence than was already in hand was ... reasonable"). Beyond that, like the counsel in *Wiggins,* he ignored pertinent avenues for investigation of which he should have been aware. The court-ordered competency evaluations, for example, collectively reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's "over-disciplin[e]." Record 902-906. As an explanation, counsel described Porter as fatalistic and uncooperative. But he acknowledged that although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview.  Counsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment. *Wiggins, supra,* at 534, 123 S.Ct.

2527. Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation. See *Rompilla, supra,* at 381-382, 125 S.Ct. 2456.

Distinguishable: In *Porter*, there was a gross failure by counsel to pursue any mitigation evidence at all. Again, here Counsel pursued mitigation evidence diligently, and presented a meaningful mitigation case.

(6).    *Sears v. Upton,* 130 S.Ct. 3259 (2010): Habeas Counsel cites *Sears* for the proposition that cognitive impairment, physical/sexual abuse, and family dysfunction constitute mitigation evidence, and failure to offer these in mitigation was ineffective assistance. In *Sears*, the lower court found that counsel conducted a constitutionally deficient investigation into potential mitigation evidence of a brutal childhood. The lower court found that counsel did present mitigation evidence, that Sears came from a privileged background and was unlikely to re-offend, which defense was reasonable on the basis of the mitigation evidence counsel uncovered. The Supreme Court found however that the lower court failed to properly apply *Strickland*'s prejudice analysis as it relied too heavily on its conclusion that the mitigation defense presented was reasonable. The government disagrees with the holding in *Sears* and suggests that the dissent in *Sears* makes much more sense. *Sears* is also distinguishable. In *Sears*, Counsel ignored indications that considerable

mitigation evidence in the form of cognitive impairment, physical/sexual abuse, and family dysfunction existed, opting to present evidence of an idyllic childhood. Again, here Counsel pursued mitigation evidence diligently, and presented a meaningful mitigation case.

(7).    *Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003):  Habeas Counsel cites *Lewis* for the proposition that significant physical abuse, and family dysfunction constitute mitigation evidence, and failure to offer these in mitigation was ineffective assistance.

> "In its current state, the record does not reveal whether defense counsel conducted an investigation into Lewis's childhood abuse and, if so, whether such investigation was sufficient under the aforementioned standards.... First, the testimony of Lewis's sisters is remarkably consistent. Each testified that their (and Lewis's) father beat all of them with extension cords, switches, sticks, or anything else within his reach. They testified further that he regularly made them undress, then whipped them in the area of their genitals, and that this conduct occurred at least every other day. According to Lewis's sisters, all of the children lived in constant fear of their father's rages, particularly when he was unable to get the drugs to which he was addicted.

> Each of Lewis's sisters testified that she attended his trial, but added that counsel never asked her to testify. Tammy Lewis testified further that defense counsel did not make an effort to speak with her; and that, despite her indication to counsel that she was willing to testify, counsel never followed up and never called her to the stand."

Distinguishable: In *Lewis*, there was a gross failure by counsel to pursue any mitigation evidence at all. Again, here Counsel pursued mitigation evidence diligently, and presented a meaningful mitigation case.

(8). *Williams v. Taylor*, 529 U.S. 362, 395-397, 120 S.Ct. 1495, 1514-15 (2000). Habeas Counsel offers *Williams* for the proposition that childhood abuse, family dysfunction, organic brain dysfunction, low intelligence represent mitigation factors, and failure to offer these in mitigation was ineffective assistance of counsel. Additionally, that late development of mitigation evidence constituted ineffective assistance of counsel as failure to conduct an independent investigation into mitigation matters. In *Williams*,

> the record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. *Id.,* at 207, 227. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings,[FN19] that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.
>
> The home was a complete wreck.... There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over

the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash.... The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them.... The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." App. 528-529. Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. *Id.,* at 595. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Id.,* at 569, 588. Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison. *Id.,* at 563-566.

"[A] s the Federal District Court correctly observed, the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate**1515 that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background. See 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980). Id.

Distinguishable: Here, rather than ignoring obvious mitigation evidence readily available, Counsel hired mitigation experts seven months before trial, and pursued mitigation evidence diligently. In *Bobby v. Van Hook*, 130 S.Ct. 13, 18 (2009), the Supreme Court found that beginning their mitigation investigation 5 weeks before the

65

trial began reasonable performance. "And they looked into enlisting a mitigation specialist when the trial was still five weeks away". *Id*. Here, Counsel hired a mitigation expert and two mitigation specialists seven months before trial. Either Counsel or the investigators had interviewed over 50 witnesses in preparation for the penalty phase. Any delay or misdirection in the mitigation investigation was the fault of the mitigation investigators and Mr. Bourgeois, and not Trial Counsel. Here, Counsel presented a meaningful mitigation defense under the circumstances existing at the time. Trial Counsel's decisions and actions were reasonable under the circumstances. Mr. Bourgeois fails to demonstrate constitutionally deficient performance.

The cases cited by Habeas Counsel are distinguishable as they generally involve counsel who completely failed to investigate or present any mitigation evidence at all, despite obvious leads and sometimes declining to put on obvious mitigation evidence presented to them on a silver platter, and without any reasonable basis, or benefit to the defendant, to take such action.

The government believes the instant case is much more similar to that of the cases cited herein *supra,* and to the following cases: *Tucker v. Johnson*, 242 F.3d 617, 622 -624 (5th Cir. 2001), where additional mitigating evidence, including

evidence of physical and sexual abuse, was insufficient to establish ineffective assistance of trial counsel. The trial testimony that Tucker had been removed from the custody of his mother demonstrated Tucker's home environment. Further, some of the newly proffered evidence arguably would have been aggravating as opposed to mitigating. For instance, a psychologist who examined Tucker wrote that there was a "psychological time bomb" in Tucker that "detonated" at the time of the murder. This is similar to the psychological evaluation of Mr. Bourgeois. Even giving proper consideration to the "quality and volume of the additional mitigating evidence." *Neal v. Puckett,* 239 F.3d 683, 694 (5th Cir.2001), the court declined to find ineffective assistance of counsel. See also, *Cardenas v. Cockrell*, WL 24057305, 16-17 (S.D.Tex.,2003), where Cardenas minimized counsel's efforts to provide a workable punishment phase defense. In the state *habeas* proceedings trial counsel submitted affidavit evidence indicating substantial investigation into possible avenues of mitigation. Trial counsel interviewed family members and friends, hired an investigator, and relied on the assistance of a competent psychological expert. In the state *habeas* evidentiary hearing, trial counsel testified about the efforts made to avoid a death sentence. The record demonstrates that trial counsel made a significant effort to mitigate against a sentence of death, notwithstanding strong evidence showing Petitioner's future dangerousness. Again, arguing that counsel should have

put on a stronger case in mitigation creates a difficult burden for the Petitioner. *Tucker v. Johnson,* 242 F.3d 617, 622 (5th Cir.), *cert. denied,* 533 U.S. 972, 122 S.Ct. 18 (2001), *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250 (2001); *see also Smith v. Cockrell,* 311 F.3d 661, 669 (5th Cir.2002). The 5th Circuit found that Cardenas failed to overcome the "the 'strong presumption' that a counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell,* 535 U.S. at ----, 122 S.Ct. at 1854 (quoting *Strickland,* 466 U.S. at 689). Here, there's no evidence that Trial Counsel shirked their duty to investigate possible mitigating evidence...." *Johnson v. Cockrell,* 306 F.3d 249, 252 (5th Cir.2002). By way of contrast, those cases in which the Supreme Court and the Fifth Circuit have recently granted habeas relief for counsel's ineffectiveness in the punishment phase have resulted from counsel's failure to make any meaningful investigation or to present any significant case in mitigation. *See Williams,* 529 U.S. at 395 (granting habeas relief when the defense's case in mitigation only relied on the fact that the defendant "turned himself in, altering the police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that"); *Lockett,* 230 F.3d at 711 (holding in a pre-AEDPA case that the "record

68

overwhelmingly points to the conclusion that Lockett's counsel did little work in investigating possible bases for a *sentencing* defense for Lockett."); *Moore,* 194 F.3d at 617 ("To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial."). "In assessing counsel's performance [at the sentencing phase], we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal,* 286 F.3d at 237.  Here, Trial Counsel conducted a dedicated and meaningful mitigation investigation and presented a meaningful mitigation defense under the circumstances. See also, *Parr v. Quarterman*, 472 F.3d 245, 256-58 (5th Cir. 2006).  Where the mitigation defense was not as effective as it might have been.  The jury did hear meaningful mitigation evidence.  Further, the State's case on punishment was strong. In addition to the facts of the crime, the State presented evidence of Parr's prior convictions for burglary and assault, Maria Cervantes testified that Jimenez told her that he and Parr shot Malek in the back of the head twice and planned to kill the children but the gun "messed up," and Parr's parole officer testified that Parr was on parole from the Texas Youth Commission when this crime was committed. The district court correctly concluded that Parr could not show prejudice and thus, was not

entitled to relief on this ground.  See, *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), *Dowthitt v. Johnson*, 230 F.3d 733, 743-47 (5th Cir. 2000) (cold-blooded nature of crime suggested additional mitigation would not have changed the verdict). *Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010 WL 28524, 3 (5th Cir. 2010) (Her trial counsel decided against presenting evidence of sexual abuse Basso suffered as a child, because of the similarity of it to the abuse Basso and her co-defendants inflicted on Musso), *Wesbrook v. Thaler*, 585 F.3d 245, 253 (5th Cir. 2009) (failing to secure additional expert testimony regarding frontal lobe impairments is not an objectively unreasonable application of *Strickland.)*.

If the court finds Trial Counsel deficient in any manner, Mr. Bourgeois must also demonstrate prejudice under *Strickland* and its progeny.

3).  Prejudice

"When considering *Strickland* prejudice, we review "the totality of  the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the evidence in aggravation." ("[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence."). ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and

mitigating circumstances did not warrant death." *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009).

Habeas Counsel offers Dr. Estrada's evaluation that the jury didn't get a complete picture of Mr. Bourgeois's mental health profile. "There is a reasonable and not particularly controversial mental health explanation for his actions". Providing this psychological explanation would have refuted the government's theory that Mr. Bourgeois was a monster who acted upon evil impulses.

The jury heard highly aggravating circumstances and considerable mitigation evidence. The question becomes, would the mitigation evidence and "revised" psychological opinions developed post-conviction, which were reasonably available to Trial Counsel, together with that offered at trial have convinced a single juror that the total mitigation evidence outweighed the aggravating factors, including the heinous nature of the crime.

There is some indication that the supplemental mitigation evidence has recently become available due to the death of Mr. Bourgeois's mother, and was not reasonably available at the time of trial. Claudia Williams testified at the Evidentiary Hearing in September, 2010, that some information regarding child abuse by Mr. Bourgeois's mother was not shared with investigators because of the shame of it and the fact that

their mother was still alive at the time of the trial. (Evidentiary Hearing, testimony of Claudia Williams, pp. 50-53). Brenda Goodman conceded she didn't share information regarding the sexual abuse of Mr. Bourgeois until recently, because she didn't want to talk about it earlier. (Evidentiary Hearing, Goodman testimony, p. 176). Such supplemental evidence should be discounted to the extent it was not reasonably available to Trial Counsel. Likewise, the opinions of the newly hired psychological experts were not reasonably available to Trial Counsel.

Would the supplemental mitigation evidence occasion the admission of damaging evidence? The evidentiary hearing suggests that additional mitigation evidence would have been a mixed bag, with the very same witnesses confirming that Mr. Bourgeois abused children himself, confirmed numerous episodes of violence by Mr. Bourgeois, and questioning the recent allegations of the sexual abuse of Mr. Bourgeois. (Evidentiary Hearing, testimony of Claudia Williams, pp. 53-54, 73-77; testimony of Brenda Goodman, pp. 166-69, 176; GX 202). As to the psychological opinions suggesting that the murder resulted from a build up of pressures on Mr. Bourgeois, and an "explosion of anger" without premeditation, there was evidence in the trial record suggesting premeditation. There was particularly damaging testimony at trial from Mr. Bourgeois's sister, Claudia Williams, in which Mr.

72

Bourgeois directed her, on June 23, 2002 – several days before the murder, to get her black dress out. (Trial testimony, Day 6, pp. 161-65). This evidence strongly suggested premeditation, and would serve to temper the value of the "pressure cooker" analysis.

Additionally, to a large degree, the supplemental mitigation evidence would be cumulative to that offered at trial. At trial, Dr. Estrada concluded Mr. Bourgeois had been neglected by his parents, rejected by them, and abused by his mother, (Penalty Phase, Day 2, pp. 22-24, 44) an illegitimate child, abandoned by father, p. 24, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 48). The supplemental mitigation reportedly added sexual abuse and increased the level of physical abuse, abandonment and rejection previously known to Dr. Estrada. (Dr. Estrada's Deposition, p. 21, 26-27). Dr. Estrada's opinion did not change from the trial to the time of his deposition in 2010. The new material "confirmed some of the suspicions or professional guesses that I had ...." . (Dr. Estrada's Deposition, p. 15, 19, 21). "[W]e are splitting hairs here about narcissistic borderline. The fact is whatever we call it, my opinion at the time that I testified and is documented and my opinion now, which has been reinforced with the new documentation that I have received, is that Mr. Bourgeois suffered from a condition that under frustration or stress results in

violence and that this – as a result of this tendency, he became violent continuously through a manner of six weeks against the child that led to her death." (Dr. Estrada's Deposition, p. 69, see also, pp. 37, 39). Essentially, the supplemental mitigation evidence bolstered Dr. Estrada's opinion that he gave at trial. *Cardenas v. Cockrell*, WL 24057305, 16-17 (S.D.Tex.,2003).

Finally, the heinous nature of the crime, overwhelming evidence of aggravating factors, and the incremental nature of the supplemental mitigation evidence makes it doubtful that it would have impacted the sentence of death. *Strickland*, 104 S.Ct. at 2071 (finding no prejudice where state's overwhelming presentation of evidence relating to aggravating factors supporting imposition of death penalty); *Jones v. Johnson*, 171 F.3d 270 (5th Cir.1999) (finding no prejudice where the brutal and lengthy nature of the murder, the defendant's confessions, and the lack of other mitigating evidence required the conclusion that counsel's failure to present the proposed evidence would not have made any difference with respect to the outcome of the sentencing phase), *Sharp v. Johnson*, 107 F.3d 282 (5th Cir.1997) (finding no prejudice where horrendous nature of crime and circumstances would have overwhelmed mitigating evidence identified by defendant). *See Andrews,* 21 F.3d at 624 (concluding that the failure to introduce mitigating evidence, which included

evidence of mental retardation, did not prejudice defendant because of the cold-blooded nature of the crime); *King v. Puckett,* 1 F.3d 280, 285 (5th Cir.1993) (concluding "that the failure to offer mitigating evidence in the form of King's diminished mental capacity" did not affect "the outcome of his sentencing."); *Glass v. Blackburn,* 791 F.2d 1165, 1170-71 (5th Cir.1986)(finding no prejudice from counsel's failure to introduce mitigating evidence because the murder was calculated and cold-blooded).

## VII. Conclusion

Petitioner has not established a need to reopen the evidentiary hearing to further consider his jurisdictional issue. Indeed, the record evidence sufficiently and convincingly establishes that the victim was fatally injured on the Naval Station. Federal jurisdiction exists, and the case was properly tried before this Honorable Court. Likewise, the Petitioner has failed to establish ineffective assistance in any regard. Defense counsel performed admirably and within the Constitutionally mandated parameters. While present counsel have demonstrated that they would have likely presented the case in a much different manner than counsel of record at trial, it is clear that the trial defense counsel relied upon the experts they retained and

presented an adequate mitigation case that remained consistent with Petitioner's claim of innocence.  Thus, this Court should deny Petitioner's claims in all regards.

Respectfully submitted,

JOSÉ ANGEL MORENO
United States Attorney

TONY R. ROBERTS
Assistant United States Attorney

MARK DOWD
Assistant United States Attorney

ELSA SALINAS
Assistant United States Attorney

    s/ *Patti Hubert Booth*
PATTI HUBERT BOOTH
Assistant United States Attorney
Federal Bar No. 19500
Texas Bar No. 00791593
800 N. Shoreline Blvd., Suite 500
Corpus Christi, TX 78402
PH:  (361) 888-3111
Fax: (361) 888-3200

<u>CERTIFICATE OF SERVICE</u>

I, Patti Hubert Booth, Assistant United States Attorney, do hereby certify that a copy of the above Response to Petitioner's Post-Argument Submission was emailed and placed in the mail on February 18, 2011, via certified mail, return receipt requested to:

Michael Wisemen
Victor Abreu
James McHugh
Maureen Kearney Rowley
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106

_s/ Patti Hubert Booth_
PATTI  Hubert BOOTH
Assistant United States Attorney