IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| UNITED STATES OF AMERICA, | * | CRIMINAL ACTION |
|---|---|---|
| | * | |
| PLAINTIFF, | * | CR-C-02-216(1) |
| | * | |
| VS. | * | |
| | * | CORPUS CHRISTI, TEXAS |
| ALFRED BOURGEOIS, | * | JANUARY 13, 2011 |
| | * | 7:55 A.M. |
| DEFENDANT. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *


PARTIAL TRANSCRIPT OF MISCELLANEOUS HEARING
(PORTIONS NOT PREVIOUSLY TRANSCRIBED)

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                          MS. ELSA SALINAS
                          OFFICE OF THE U.S. ATTORNEY
                          800 NORTH SHORELINE, SUITE 500
                          CORPUS CHRISTI, TEXAS 78401

                          MR. TONY R. ROBERTS
                          MR. MARK MICHAEL DOWD
                          OFFICE OF THE U.S. ATTORNEY
                          P. O. BOX 61129
                          HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:           MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 7:55 a.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MS. LARIN:  Elizabeth Larin for Mr. Bourgeois.

MR. ABREU:  Good morning, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

MR. McHUGH:  Good morning, Your Honor.  Jim McHugh on behalf of Mr. Bourgeois.

MS. BOOTH:  Patti Hubert Booth for the United States of America.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MR. DOWD:  Mark Dowd for the United States, Your Honor.

THE COURT:  I'm glad it's even here, four and four, so -- so is this -- whose witness is this?

MR. McHUGH:  It's mine, Your Honor.

THE COURT:  Mr. Abreu -- I mean, sorry, got it wrong -- Mr. McHugh.

MR. ROBERTS:  Your Honor, I was just wondering, is

Mr. Bourgeois on the phone?

THE COURT:  No.  We just said -- Mr. Wiseman gave the authority to go forward without him being on the phone.  I think they don't let him on till 8:00 o'clock.

MR. ROBERTS:  Oh, all right.

THE COURT:  And Ms. Scotch is outside working on that right now.

MR. ROBERTS:  I just wanted to make sure.  Thank you.

THE COURT:  Go ahead.

MR. McHUGH:  Petitioner would call Mr. William May.

THE COURT:  Would you administer the oath, Ms. Gano?

THE CLERK:  Yes, Your Honor.

(Witness sworn.)

THE COURT:  Hold on.  I think Mr. Bourgeois is with us now.  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am.  Good morning.

THE COURT:  Okay.

THE DEFENDANT:  How are you doing?

THE COURT:  Good morning.  Thank you, sir.  You may proceed, sir.

MR. McHUGH:  Thank you, Your Honor.

WILLIAM EDWARD MAY, JR., PETITIONER'S WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Can you state your name, please, for the record?

A.   William Edward May, Jr.

Q.   And Mr. May, I'm drawing your attention back to 2003 and 2004.  How were you employed?

A.   I was an attorney in private practice.

Q.   And what type of law did you practice?

A.   Criminal law.

Q.   And was that, were you 100 percent criminal law?

A.   That's all I did, 100 percent of my time.

Q.   Okay.  And in the course of your employment back in 2003 and 2004, did you come to represent an individual by the name of Adam Longoria?

A.   I did.

Q.   And do you recall the charges that he was facing?

A.   I'm sorry, I couldn't understand you.

Q.   Okay.  Do you recall the charges that he was facing?

A.   Yes.  He had a aggravated robbery charge, which grew out of a bank robbery, and he also had a pending revocation of probation, based on that same offense.

Q.   Okay.  And were these state charges?

A.   Yes.

Q.   Okay.  And were they from Nueces County?

A.   Yes.

Q.   Now, were you familiar with the term, under the Texas Penal Code, of "habitual offender"?

A.   Yes.

Q.   Okay.  Can you just describe for us what that means as far as penalties and punishment that a certain Defendant may have if they were considered a habitual offender?

A.   Well, in this case, he had a offense of aggravated robbery, which is a first degree felony.  And a first degree felony that is enhanced with a habitual allegation, as in this case, it raises the minimum punishment from a minimum of five years to a minimum of twenty-five years, making the range of punishment from twenty-five years minimum to a maximum of life imprisonment.

Q.   And when you say "minimum," do you mean a mandatory minimum of 25 years?

A.   Yes.

Q.   Okay.  And in fact, when you entered your appearance and reviewed the file, did you determine whether the State of Texas was considering Mr. Longoria a habitual offender for the bank robbery case?

A.   Yes.

Q.   Now, during your representation --

THE COURT:  Well, had he been indicted as a habitual offender, Mr. May?

THE WITNESS:  I believe he had been.

THE COURT:  Okay.

BY MR. McHUGH:

Q.   And during your representation of Mr. Longoria, did you

have occasion to speak with Ms. Patti Booth?

A.   Yes, I did.

Q.   Okay.  What do you recall about that conversation?

A.   The first conversation was when Ms. Booth called me and asked permission to talk to my client, Mr. Longoria, about being a witness in the Bourgeois case.

Q.   Okay.  And was that a telephone conversation?

A.   Yes.

Q.   Okay.  And after this conversation, did you speak with your client, Mr. Longoria?

A.   Yes, sometime later.

Q.   Okay.  And what do you recall about that conversation?

A.   It was a conversation, it was very brief.  It was -- he was calling me on the telephone at the office, and he told me he was going -- he had talked to the --

MR. DOWD:  Judge, I'm going to object.

THE WITNESS:  -- FBI and Patti Booth and that --

THE COURT:  Excuse me.  Just a moment.

THE WITNESS:  -- he was going to be available as a witness --

THE COURT:  There's an objection, Mr. May.  Mr. May, there's an objection.

THE WITNESS:  Excuse me?

THE COURT:  There's an objection.  Just one moment.

MR. DOWD:  Your Honor, I would object.

THE WITNESS:  I'm sorry.

THE COURT:  I think we're on kind of a delay, so I'm sorry to be rude about it, so I have to jump right in. Mr. Dowd?

THE WITNESS:  That's all right.

MR. DOWD:  Your Honor, I would object to any hearsay statements from Mr. Longoria, and I would like to confirm that the privilege, Mr. Longoria has waived his privilege to share this confidential information with, you know, with anybody else.

MR. McHUGH:  If I may respond, Your Honor?

THE COURT:  Yes.

MR. McHUGH:  As to the privilege, we did -- first of all, Mr. Longoria did execute a waiver, which I provided to Mr. May.  Second of all, he actually executed an affidavit in this case, Mr. Longoria, and spoke freely about all his dealings with the Prosecution and Defense, and that was filed with the Court.  So I don't think -- if there was a privilege, it has been waived by Mr. Longoria.  And I provided that to Mr. May.

Also, Your Honor, as to the hearsay, I would cite the Court to Rule 801(d)(1), which is prior statement by a witness. And I suggest to the Court that under that rule this would not be considered hearsay.  Mr. Longoria did testify under oath as the --

THE COURT:  Hold on.  Mr. Dowd?

MR. DOWD:  Judge, I would suggest that absent Mr. Longoria's testimony here, he's not a witness in this case.

THE COURT:  He's never been a witness, I don't think.

MR. McHUGH:  Yes, he was, Your Honor, at trial.

THE COURT:  Oh, he was a witness at the, at the trial.

MR. McHUGH:  And that simply is what we're focused on and --

THE COURT:  Okay.  Go ahead.

BY MR. McHUGH:

Q.  Mr. May, you may finish your answer concerning what you recall about your conversation with Mr. Longoria.

A.  As I said, it was fairly brief, and he advised me he was going to be a witness and that he hoped that Ms. Booth would eventually give him some benefit from that.  And I told him that in my experience, that generally you would get some benefit from that, but what it would be, I had no way of knowing and we'd just have to wait and see, since she was not a state court prosecutor.

Q.  So would it be fair to say you advised him to cooperate with Ms. Booth?

A.  He had already made that decision.

Q.  Okay.  And did you agree with that decision in your conversation with him?

A.    At that -- I believe he had already talked to them, even before I ever found out about it.  But I did agree that that was a fairly logical thing for him to do under the circumstances.

Q.    Okay.  Now, after the conversation that you had with Mr. Longoria, did you in fact file a continuance of your matter, your state court matter with Mr. Longoria, as a result of his involvement in the federal matter of Mr. Bourgeois?

A.    Yes.

Q.    And why --

A.    I did.

Q.    Why did you do that?

A.    Well, one, I generally don't want to go to trial when a guy has that much evidence against him, and any opportunity to postpone a trial where he would lose and go to prison, I would usually take.  And in this case, since he was going to be testifying in federal court, I thought that was a good reason to postpone the case, so that I could acquire the records from the court reporter after he testifies, in case I had to show that to a Judge, namely the State Court Judge, and demonstrate that he had testified in federal court, and of what value his testimony had been.

Q.    Now, and was the matter in fact continued, the state court matter?

A.    Yes, it was.

Q.   Okay.  And was it continued until after Mr. Bourgeois's participation -- I'm sorry -- Mr. Longoria's participation in the Bourgeois matter, his testimony?

A.   Yes, it was.

Q.   Okay.  Now, did in fact Mr. Longoria go to trial on this matter?

A.   Did he go to trial?

Q.   Yes, sir.

A.   No.  I mean, in a sense, I guess.  He had a guilty plea.

Q.   But he -- so he pled guilty.  Is that right?

A.   Yes.

Q.   Okay.  Can you describe for us what took place as you recall on the day of the guilty plea?

A.   When I went into court, I approached the state court prosecutor, James Sales.  I asked him if he had had a chance to talk to Patti Booth about the case.  He said that he had.  I asked him what he was going to recommend.  He told me seven years on each case, concurrent with one another, and that he would be willing to drop it down to five years if Mr. Longoria testified against a different Defendant in a potential state court case.  I can't recall who that target was.  And I conveyed that to Mr. Longoria, and he accepted the offer.

Q.   And did in fact Mr. Longoria then enter his plea in front of Judge Rose Vela?

A.   Yes.

Q.   And do you recall, in fact, did the Court go along with this plea negotiation?

A.   Yes.

Q.   Mr. May, after this hearing in front of Judge Vela in state court, were you ever made aware by Ms. Booth that she had written a letter on behalf of your client, Mr. Longoria, to the Texas Board of Pardons and Paroles concerning parole for, in support of parole for Mr. Longoria?

A.   I wasn't in any way involved in that, but you did show me an -- or a statement that concerned that.

Q.   Well, my question was, were you ever made aware by Ms. Booth that she had written a letter on behalf of your client, years later, a couple of years later, after the matter was resolved in front of Judge Vela, concerning his parole from the Texas Department of Corrections?

A.   Yes.  Yes, I was.

Q.   Ms. Booth provided you with a copy of that letter?

A.   No.

Q.   Okay.  So --

          THE COURT:  The question was, Mr. May, did Ms. Booth ever tell you this?

          THE WITNESS:  Oh, no.  No.  I never talked to Ms. Booth about that.

          MR. McHUGH:  No further questions, Your Honor.

          THE COURT:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Please.

CROSS-EXAMINATION

BY MR. DOWD:

Q.  Good morning, Mr. May.

A.  Good morning, Mr. Dowd.

Q.  The state habitual offender charges against Mr. Longoria, is it unusual to, for the state to waive those charges, to drop the habitual offender allegation?

A.  Not unusual at all.

Q.  Okay.  Have you ever -- have you ever pled any of your clients guilty under the habitual offender statute?

A.  Never.

Q.  So you've always been able to get those charges dropped?

A.  That's correct.  It's a really good, you know, threat against a Defendant to get him to enter a plea.  But it seldom ends up with a person getting a life sentence or getting a -- pleading guilty and getting a minimum 25.

Q.  All right.  And when you talked to Mr. Longoria after he had been interacting with the Government, AUSA Patti Booth, he indicated to you that he was hoping for a benefit?  That's what he indicated?

A.  That's correct.

Q.  Okay.  And did he ever indicate to you that -- I mean, at this point, did he indicate to you that he had a quid pro quo

with Patti Booth, a firm cooperation agreement?

A.   No, he never did.

THE COURT:  Sorry?

THE WITNESS:  No.

THE COURT:  Well, did you ever have any information from Ms. Booth that she was going to do something for your client?

THE WITNESS:  He never indicated to me that he had any agreement --

THE COURT:  No, Ms. Booth, did she -- did Ms. Booth ever indicate to you that she was going to do anything beneficial for your client in return for his testimony?

THE WITNESS:  No.

THE COURT:  Isn't that about it, Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Oh, one other thing.

BY MR. DOWD:

Q.   Are you familiar with the antipsychotic medication that Mr. Longoria was on?

A.   No.

Q.   Did you ever find him --

A.   I wasn't aware he was on any until I read some of the affidavits in this case, Mr. Longoria's affidavit in particular.

Q.   All right.  And in your discussions with Mr. Longoria, did you ever find him to be incoherent or, you know, less than

cognizant of what was going on or faulty memory, et cetera, et cetera?

A.   He seemed to be perfectly coherent and knew what was going on and didn't have any problems.

Q.   All right.  Thank you, Mr. May.

A.   I was very surprised by the affidavit.

Q.   Thank you, Mr. May.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Thank you.  Anything further?

MR. McHUGH:  No, Your Honor.

THE COURT:  Thank you very much, Mr. May.  It was good to see you again, and we'll conclude this.

THE WITNESS:  Thank you, Your Honor.  I appreciate it.

THE COURT:  Would you send Ms. Thompson?  Thank you.

Next witness?

MR. WISEMAN:  Yes --

MR. McHUGH:  James Sales, Your Honor.

THE COURT:  Thanks.

MR. McHUGH:  He's right outside.

THE COURT:  Okay.

JAMES SALES, PETITIONER'S WITNESS NO. 2, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Good morning, Mr. Sales.

A.   Good morning, sir.

Q.   Can you state your name for the record?

A.   James Sales.

Q.   Mr. Sales, how are you presently employed?

A.   The border prosecutor in the Bee County District Attorney's Office.

Q.   And in 2003 and 2004, how were you employed?

A.   As a gang prosecutor in Nueces County District Attorney's Office.

Q.   And at that time, 2000 --

THE COURT:  Where are you now, by the way?

THE WITNESS:  Border prosecutor over in Bee County, under Martha Warner.

THE COURT:  Thank you.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Would you mind leaning into the microphone?  But don't touch it.

THE WITNESS:  Ah.

THE COURT:  We have electronic recording, and it really makes this horrible noise in her ear.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

BY MR. McHUGH:

Q.   Mr. Sales, at the time in 2003 and 2004, how long had you been a prosecutor with the Nueces County office or with any

office?

A.    Since 1994.

Q.    Okay.  Now, did you receive an e-mail from me or from my office which contained some court files concerning an individual by the name of Adam Longoria?

A.    No.

Q.    Okay.  I have some documents that I'll use to refresh your recollection.

A.    Okay.

Q.    Do you recall back in 2003 prosecuting a man by the name of Adam Longoria for a bank robbery at the Bank of America at 5875 Weber Road in Corpus Christi?

A.    Some details, yes, sir.

Q.    Okay.  And do you recall that Mr. Longoria, at the time of that bank robbery, was also on probation in Nueces County for child endangerment and evading arrest?

A.    I don't recall that.

Q.    Okay.  Now, do you recall if Mr. Longoria, at the time of the bank robbery, when he was charged was a habitual offender?

A.    Without having the records in front of me from seven years ago, I do not recall his criminal history, sir.

Q.    Okay.

        MR. McHUGH:  May I approach, Your Honor?

        THE COURT:  Please.  Well, you can do that right there on the --

MR. McHUGH:  Okay.  P-187 is the --

THE COURT:  If you want to square it up, look in your monitor right there.

MR. DOWD:  Your Honor, may I get a copy of those documents?  Those were just in the large packet that was sent to us.

THE COURT:  Do you have copies of those documents?

MR. McHUGH:  I do.

MR. DOWD:  Thank you.

BY MR. McHUGH:

Q.  I'm showing you what's been marked as P-187.  Can you just take a moment to review that, see if that refreshes your recollection concerning Mr. Longoria.

A.  I can see the first enhancement paragraph, but I cannot see the second one.

Q.  Okay.  I'll slide it up.

A.  I can see burglary of a habitation and escape is his two priors.

Q.  Okay.  And I'm going to turn the page of P-187.

A.  Yes, sir, that would make him a habitual felony offender.

Q.  Okay.  And is this in fact the matter that you said you recall the grand jury indicting concerning Mr. Longoria, the May 30th bank robbery?

A.  That would certainly, yes, appear to be the robbery.

Q.  Okay.  Now, if I may, sir, a habitual offender under the

Texas Penal Code, what does that mean as far as a Defendant's enhancements at sentencing?

A.    Twenty-five to ninety-nine years or life, $10,000 fine, if the enhancements are found to be true.

Q.    Okay.  And so his -- he would be facing a mandatory minimum of 25 years?

A.    If he was convicted of the underlying offense, yes, sir.

Q.    Okay.  Now, do you recall who Mr. Longoria's attorney was?

A.    No.

Q.    If I suggested to you it was William May, would that ring a bell to you?

A.    It could have been Bill May.

Q.    Okay.  Now, do you recall Mr. May filed a continuance of your trial in your matter for purposes of Mr. Longoria's testimony in a federal matter?

A.    No.

Q.    Okay.

A.    Mr. May was constantly filing continuances in state court. I don't have specific recollection.

Q.    Okay.  Let me show you another document previously marked as P-104.  Can you see that, sir?

A.    It's a little blurry, but I can make it out.

Q.    Okay.  And --

        THE COURT:  Have you got it focused?

        MR. McHUGH:  I guess I shouldn't put it there.

THE COURT:  Do y'all not have this stuff in Philadelphia?

MR. McHUGH:  Some courtrooms do.

MR. WISEMAN:  We use stone tools, Your Honor.

MR. McHUGH:  Some courtrooms do.

MR. WISEMAN:  Stone tools.

THE COURT:  I'm so glad to hear it.

MR. WISEMAN:  Could we possibly get that turned on?

THE COURT:  Huh?  Pardon?

MR. WISEMAN:  Could we get that turned on so we can see?

THE COURT:  Well, it hasn't been admitted.

MR. WISEMAN:  Oh, I'm sorry.  Okay.

THE COURT:  That's the secret.

MR. WISEMAN:  That's the secret.

THE COURT:  It just goes from there to there.

MR. McHUGH:  Although, Your Honor, I will say that I talked to Mr. Dowd and he said --

THE COURT:  Well, why don't you offer it?

MR. McHUGH:  -- he had no objection to these --

MR. DOWD:  No objection, Your Honor.

THE COURT:  So what are the numbers?

MR. McHUGH:  The first one was P-187.

THE COURT:  P-187 --

MR. McHUGH:  And this is now 104.

THE COURT:  -- P-104 are admitted.  Now they're on.

BY MR. McHUGH:

Q.   So Mr. Sales, can you take a moment to review that and --

THE COURT:  Okay, that's really blurry.  Focus it up, please, sir.

MR. McHUGH:  I'm not sure how to focus it.

THE COURT:  Ms. Scotch, would you show him how to do that?  You -- oddly enough, you push the button that says "focus."

MR. McHUGH:  I never would have thought of that.

(PAUSE.)

BY MR. McHUGH:

Q.   Now, have you been able to review that document, Mr. Sales?

A.   I'm halfway through Paragraph 2.

(PAUSE.)

A.   I am through the word "Counsel."

(PAUSE.)

A.   Yes, sir.

Q.   Okay.  And I'm just going to show you the third page of the document.  Actually it's the second page, Roman Number III, and the Certificate of Service indicates that it was served on you, is that right, on March 23rd?

A.   What that indicates is that it was served on the District Attorney's Office.

Q.   Addressed to you?

A.   It's addressed to me.  Undoubtedly it was put in the file.

Q.   Okay.  And is this something in your normal custom and practice that you certainly would have reviewed as you're prosecuting Mr. Longoria?

A.   Probably not.  If Mr. May told me he needed a continuance, I probably would simply have said, "No problem, Bill."

Q.   Okay.  And does it refresh your recollection that Mr. Longoria was in fact involved in the matter of United States versus Alfred Bourgeois?

A.   I was handling four District Courts at the time, prosecuting murders, capital murders, aggravated robberies, drive-by shootings.  I did not pay any attention to -- did not know who Mr. Bourgeois was, did not know what he was accused of, and had other pressing matters, sir.

Q.   But my question was, does this refresh your recollection as to the fact that there was a continuance filed because of Mr. Longoria's involvement in a federal matter?

A.   I'm not trying to be difficult with you, sir.  It would -- if it --

         THE COURT:  It's just a "yes" or a "no."

         THE WITNESS:  No, it does not.

         THE COURT:  Okay.

         MR. McHUGH:  Okay.

         THE COURT:  Moving along.

BY MR. McHUGH:

Q.   Yes.   Now, do you recall how this matter was resolved, the matter of the State of Texas versus Adam Longoria?

A.   It would help to see a plea agreement.

Q.   Okay.

A.   No, I do not recall the specific numbers.

Q.   What I was going to suggest is I have the transcript from the plea and revocation hearing that I was going to -- and it's quite brief.

A.   That would help, sir.

       MR. McHUGH:  So this is P-188, Your Honor, and I would offer it.

       MR. DOWD:  No objection, Your Honor.

       THE COURT:  P what?  I'm sorry.

       MR. McHUGH:  P-188, Your Honor.  I'm sorry.

       THE COURT:  P-188 is admitted.

BY MR. McHUGH:

Q.   Do you see that, sir?

A.   Yes, sir.

Q.   Okay.  Does that appear to be a transcript of the State of Texas versus Adam Longoria, dated the 19th of April 2004?

A.   I cannot see the date.

Q.   Oh, I'm sorry.

A.   Yes, sir, it does.

Q.   And in front of Judge Rose Vela?

A.   Yes, sir.

Q.   I'm going to turn to Page 3 of that document and have you review that.

A.   I am through Line 20.

Q.   Okay.  So does that refresh your recollection that there was in fact a plea as well as a revocation proceeding at that time?

A.   Yes, sir.

Q.   And revocation proceeding would be a violation of probation.  Is that fair to say?

A.   Yes.

Q.   Okay.  And do you see on Line 9 and 10 that you indicated that you would waive the enhancement paragraphs?

A.   Yes.

Q.   Okay.  I'm going to show you another document, P-189. Take a moment to review that, sir.

     (PAUSE.)

A.   Yes, sir.

Q.   Now, can you describe for the Court, with your years of experience, what in fact that indicates to you?  What is that document?

A.   That would be the, generally the second exhibit we offer into evidence after a plea agreement.  It is a confession and stipulation as to the evidence that we would have presented against Mr. Longoria.  That is what he is judicially confessing

to.  We obviously struck through the enhancement paragraph to allow us to reach a plea agreement below the 25-year minimum.

Q.   Now, is that you that would actually strike through that, or would that be -- there's initials there, but I couldn't quite tell whose they were.

A.   Those are my initials, "JS, III."

Q.   Okay.  So would it be fair to say that that's where you struck the enhancement paragraph as far as the stipulation at the sentencing?

A.   Yes, sir.

Q.   Okay.

MR. McHUGH:  Your Honor, I would offer P-189 and the transcript, P-188 at this time.

MR. DOWD:  No objection, Your Honor.

THE COURT:  P what?

MR. McHUGH:  P-188 is the transcript and P-189.

THE COURT:  Both are admitted.  Thank you.  Don't forget to give these to the clerk when you're finished with them.

MR. McHUGH:  I shall.

THE COURT:  Thank you.

BY MR. McHUGH:

Q.   Going to turn back to the transcript, Page (sic) 188.  I just ask you to read Lines 9 through 13, if you can.

A.   Silently or out loud, sir?

Q.    No, no, to yourself.  I just have a question about that.

A.    Yes, sir.

Q.    And could you just tell us, from reviewing that, those lines of this, what was the -- what were the charges that Mr. Longoria was on probation for?  Do you see that in Line 11?

A.    Well, evading arrest or detention would be a misdemeanor, unless it was with a vehicle, and endangering a child.

Q.    Okay.  Now I'm going to turn to Page 6 of this document, and it's going to continue on Page 7.  Does this refresh your recollection as to -- if you could start with the indication that the Defendant has entered his plea at the bottom of the page, and then your comments to the Court, your statements to the Court, and then I'm going to flip the page and you can continue reading that.

A.    Yes, sir.

Q.    Okay.  And continuing on to Page 7, top.

      (PAUSE.)

            THE COURT:  Mr. Bourgeois, are you still there?

            THE DEFENDANT:  Yes, ma'am.

            THE COURT:  Okay.  I just want to make -- I'm going to check with you every now and then to make sure you're still on the line.

            THE DEFENDANT:  Yes, ma'am.

BY MR. McHUGH:

Q.    Now, have you had a chance to review that, Mr. Sales?

A.   Yes, sir.  I was just getting down to Lines 21, 22 and 23.
Yes, sir.

Q.   I just want to ask you more about the top of the page, as
far as your recommendation to the Court.

A.   Yes, sir.

Q.   Does this refresh your recollection as to what you
recommended to the Court?

A.   Yes, sir.

Q.   And what was that?

A.   Looks like a seven-year prison sentence to run
concurrently, the revocation and the robbery charge.

Q.   Okay.  Now, Mr. Sales, at the time of this revocation and
plea and the litigation of this Longoria matter, were you
familiar with who Ms. Patti Booth was?

A.   Yes.

Q.   Did you know her?

A.   I knew of her.  I knew of her, yes.

Q.   Okay.  Did you speak with her about Mr. Longoria's matter
before he entered his plea -- oh, I'm sorry.  And the date of
this transcript was April 19th of 2004.  Is that right?

A.   Yes, sir.

Q.   At the bottom -- okay.  So my question is, did you speak
with Ms. Patti Booth about this matter before the entry of his
plea on -- Mr. Longoria's plea on April 19th of 2004?

A.   I don't think so.

Q.    You say you don't think so.  Is it possible you could have?

A.    I have talked to Ms. Booth off and on over the years.  I do not remember ever specifically talking to her regarding this Defendant, Mr. Longoria.

Q.    So you're not sure if you did or you didn't.

A.    If it is something that I would have done as a plea bargain, that should have been in the plea bargain agreement. I do not have a specific memory of talking with Ms. Booth regarding Mr. Longoria.

Q.    If it was an oral plea agreement, then obviously it would not have been able to appear in the written plea agreement.  Is that fair to say?

A.    Something that important I would have written down, sir.

Q.    Okay.  And did you ever speak with a individual by the name of Megan Beckett, a case agent, an FBI Agent concerning this matter, prior to Mr. Longoria's plea?

A.    I know Agent Beckett.  I do not recall ever talking to Agent Beckett regarding Mr. Longoria.

Q.    Okay.  Do you recall speaking with anybody in any way about the Bourgeois matter before Mr. Longoria entered his plea?

A.    No.

Q.    Did you receive any type of communication, so in other words I've been asking you about speaking with individuals

concerning the Bourgeois matter.  Now I'm more specifically asking, did you receive -- or less specifically -- any type of communication from anybody relating to Mr. Longoria and his testimony in the Bourgeois case prior to him entering his plea, Mr. Longoria that is?

A.   Not that I remember, sir.

Q.   Okay.  Now, I wanted you to look at Page 7, and we're -- Page 7 at the bottom.  Do you see that?

A.   Yes, sir.

Q.   And it indicates that if Mr. Longoria -- this is Mr. May speaking in open court -- if Mr. Longoria is a witness in another case, then they would approach the Court to reduce the seven-year sentence to five years.  Is that right?

A.   I cannot see the --

Q.   I'm going to turn the page, but --

A.   All I see is "seven-year sentence."

Q.   Okay.  Right at the top there.

A.   Okay, sir.

Q.   Okay.  Now, does that refresh your recollection as to whether or not Mr. Longoria had been a witness in a case that was the basis of his plea agreement?

A.   I believe at the time that I was involved with the Raza Unida prison gang, that the case in reference was against Gabriel Ramos.  And what ended up happening is Mr. Longoria ended up testifying against me for the Defense, rather than for

me.

Q.    I've got to clarify that.  When you're talking about the Gabriel Ramos matter, are you talking about the additional state court matter that would reduce it to five, or are you talking about, would be the first matter that led to the seven-year plea agreement?

A.    It's --

MR. DOWD:  Well, Your Honor, I think the witness has testified there was no first matter that led to the seven-year plea agreement.

MR. McHUGH:  I want to clarify that.  I'm not sure what he's talking about.

BY MR. McHUGH:

Q.    So do you understand our question?

THE COURT:  Why don't you say it again, because I didn't get it.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.    You talked about the Gabriel Ramos matter.  Was that the matter that we're talking about as far as Mr. Longoria having further consideration, reducing the seven years to five years?

A.    I believe that that is correct, sir.

Q.    Okay.

A.    And I believe that it's Gabriel Ramos.  There were a bunch of those fellows that we were pursuing at the time.

Q. Okay. And now refreshing your recollection concerning this plea agreement for the seven years and your recommendation, Mr. Sales indicates -- I'm sorry -- Mr. May indicates, if Mr. Longoria is a witness in another case. You understand that? Do you recall whether he was, what the first case was? When Mr. May's indicating he's a witness in another case, do you recall what the -- or does this refresh your recollection as to what the first case would have been?

A. If I could have the document --

Q. I'm sorry.

A. -- in front of me, that would help.

Q. And I also would remind you about the continuance that Mr. May filed, which is P-104 concerning the Bourgeois case.

A. The "another case" is referring to my state case, sir.

Q. I understand that. But my question is if you're having another case, does that refresh your recollection of whether there was a first case that Mr. Longoria was a witness in?

A. In other words --

THE COURT: I don't know what you're talking about. Do you know what he's talking about?

THE WITNESS: I know what he's trying to say, Your Honor, but I disagree --

THE COURT: Well, why don't you just figure out what the answer is supposed to be and say it.

THE WITNESS: Yes, Your Honor. It's another case

from the one that was before the Court in the plea.

BY MR. McHUGH:

Q.    Okay.

A.    A case other than the Adam Longoria case, which my interpretation or my remembering is the Gabriel Ramos case.

Q.    Okay.  Now, do you recall, sir, why you dropped the habitual offender 25-year mandatory minimum in this case?

A.    We had a bank robbery with no weapon.  It was a note.  He had a defense of duress, that there was another gang member present that was forcing him to commit the robbery.  He had been stabbed at least 25 to 30 times in his back prior, that seemed to me consistent with a possible duress defense.  I know Mr. May is a very talented attorney, very amicable, could get juries to believe the sob stories, so I thought in the interest of justice, it's better to get something than nothing.  And without a weapon being used, seven years felt like a fair recommendation, as opposed to possibly getting an acquittal.

Q.    So you do remember some significant facts about this case?

A.    I remember Adam Longoria, because of the 25 to 30 stab wounds in the back, yes, sir.

Q.    Okay.  Well, and you just don't remember Adam Longoria.  You actually remember various facts about this case.

A.    Yes.

Q.    When was the last time you reviewed the facts of this case?

A.    I haven't seen the file in seven years.

Q.    Okay.  Did anybody talk to you about the case recently?

A.    No.

Q.    Did you meet with anybody from the Government concerning your testimony today?

A.    I have --

Q.    Or talk to anybody?

A.    I have talked to them over the phone for probably two to three minutes.

Q.    Okay.  Was that about the facts of the case or just about your appearance?

A.    Just about being here.

Q.    Would you say scheduling issues?

A.    What did I remember.  And I specifically asked for copies of the plea agreement, copies of the transcript to help me refresh my memory prior to testifying.

Q.    And were you provided with any documents?

A.    No, sir, I was not.

Q.    Okay.  Now, so you're saying you thought it was better to get something than nothing.  Well, do you also remember that you had eyewitnesses that identified Mr. Longoria in the bank, victims in the bank?

A.    No, sir.

Q.    Do you also recall that you had a surveillance tape that Mr. Longoria was on while robbing the bank?

A.    I would believe that Ms. Bernal on the indictment's probably the bank teller at the time.  So it's reasonable to conclude that she in fact identified him.  But her identification of him would not preclude the duress defense, as she was not in the vehicle and was probably unaware of his gang affiliation or association.

Q.    Were you also aware that the demand note you had processed had a fingerprint from Mr. Longoria, a positive match on his left thumb?

A.    Yes, sir.  I think there was very little doubt that he was the one in the bank and that he had written the note.  That did not preclude the possible duress defense or --

Q.    And would you agree with me that the surveillance tape indicated that he was the only one in the bank as part of this robbery?

A.    I honestly don't remember if there was anyone else.  It seems to me there was someone in the vehicle, but obviously the camera would only reflect who was in the bank.

Q.    Okay.  So if I understand correctly, you had a fingerprint, a surveillance tape.  You had a Mirandized confession from Mr. Longoria, is that right, that he robbed the bank?

A.    I don't remember that.

Q.    Okay.

A.    I'll take you at your word, sir.

Q.   And you also had a positive identification from the bank teller, and it's your recollection that you were going to take what you could get?

A.   Yes.

Q.   Because you were concerned about a duress defense.  Is that right?

A.   That is correct, sir.

Q.   And you're aware that Mr. Longoria had just been placed on probation for the car endangerment of the child only a few months before this bank robbery.  Is that right?

A.   No, I don't recall that, sir.

Q.   Okay.

A.   I don't recall when he was placed on probation.

Q.   Now, I'm going to show you what's been marked as Government Exhibit 169.  Take a moment to review that.

THE COURT:  I'm sorry, is that admitted?

MS. BOOTH:  That hasn't been admitted.

MR. DOWD:  Your Honor, if that's not in evidence, I would object to Counsel showing that to the witness.

MR. McHUGH:  Well, it's --

THE COURT:  Well, it's not in evidence.  He can show it -- I'm not looking at it.

MR. DOWD:  Okay.

THE COURT:  It's off the screen for me.

MR. DOWD:  Yes, Your Honor.

BY MR. McHUGH:

Q.   I'm showing you what's been marked as Government Exhibit 169.  And can you read that, sir?  I'm not sure the focus is working.

THE COURT:  Ms. Scotch, could you figure the focus again?

MR. McHUGH:  I think I've got it now, Your Honor.

THE WITNESS:  It's still a little blurry, sir.

BY MR. McHUGH:

Q.   Does this appear to be a letter written on Department of Justice letterhead from Ms. Booth dated February 9th, 2006, to the Texas Board of Pardons and Paroles?

A.   Yes, sir.

Q.   Okay.  Is it concerning a recommendation for Mr. Longoria for -- in support of his request for parole, in the first paragraph?

A.   Yes, sir.

Q.   Okay.  Now, in this matter, with your many years of experience as a prosecutor, would you expect to be consulted if another prosecutor, whether it be state or federal, was going to write a letter of recommendation for the parole -- for parole for one of the Defendants that you had prosecuted?

A.   No, sir.

Q.   You would not expect to be consulted?

A.   No, sir.  I do not consult the U.S. Attorney's Office when

I make recommendations for my state cases.  If I'm not involved in their prosecution, I do not consult them.  I make my own decisions.

Q.   No, I understand that.  But I mean, if you prosecute a Defendant in state court --

A.   Yes, sir.

Q.   -- and an individual, Mr. Longoria, is serving a state sentence, and another prosecutor from another, say from your office or from another county or from the federal government was going to recommend parole in your case, not one of their cases, in your cause, would you expect to be consulted in your years of experience?

A.   My years of experience, sir, the federal government tends to do what they want to do without consulting the state.

Q.   Okay.  So it's your testimony that you would not expect to be consulted by Ms. Booth concerning Mr. Longoria's parole in your matter.

A.   Correct, sir.

Q.   Now, were you aware that Mr. Longoria was released in May of 2010?

A.   I had no idea.

Q.   Were you ever made aware by the Government that he was subsequently arrested for capital murder of a young girl in Kansas?

A.   Lord have mercy.  No, I had no idea.

Q.    Okay.  If you were aware of this letter concerning Mr. Longoria, would you have written your own letter opposing it?  And when I say "this letter" I mean P-169.

A.    No.

Q.    And why not, sir?

A.    During that time, I was extremely busy with my own cases. My plate was full, sir.  I did not have extra time to be writing such letters.

Q.    Okay.

        MR. McHUGH:  If I may just have a moment, Your Honor?

        THE COURT:  Yes.

    (PAUSE.)

        MR. McHUGH:  Your Honor, at this point I would move in the exhibits, including -- offer, including Government 169, and I believe my other exhibits have already been admitted.

        THE COURT:  I'm sorry, what other exhibit did you say?

        MR. McHUGH:  I believe the only -- I move in all my exhibits.

        THE COURT:  Okay.

        MR. McHUGH:  I believe the only one that I haven't moved in, though, however, is Government 169.  So I'm asking the Court --

        THE COURT:  Government 169?

        MR. DOWD:  Judge, we would object.  I don't think

he's provided any authentication for that.

MR. McHUGH:  Your Honor, this is a letter that was provided to us by the Government.  It's on United States Justice Department -- it's premarked by the Government as an exhibit in this hearing.  It deals specifically with Mr. Longoria, and it's signed by Ms. Patti Booth.  I think this is clearly a document that the Court can take as authentic, or a copy thereof.

THE COURT:  Okay.  Is this the letter to the Board of Paroles?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Okay.  I'll admit that, if you can tie it up to something that happened before his testimony.

MR. McHUGH:  Well, I'm done with my questioning from this --

THE COURT:  Okay.  Thank you.  Oh, sorry.  Examination?

MR. DOWD:  No questions, Your Honor.

THE COURT:  Okay.  Did Ms. Booth ever tell you that she had made a deal with Mr. Longoria and she wanted you to give him some reduction?

THE WITNESS:  No, Your Honor.

THE COURT:  You're positive?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

MR. McHUGH:  Your Honor, concerning the letter, I think I can meet the Court's threshold for admission.  The letter --

THE COURT:  You're excused.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  He's excused?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Can we release him from his subpoena to go back to work?  You know where you -- do you have a cell phone?

THE WITNESS:  In my car, Your Honor, yes.

THE COURT:  Would you give Mr. Dowd the cell phone number.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Just in case something comes up and we need to talk to you again.

THE WITNESS:  Yes, Your Honor, I will.

THE COURT:  Thank you, sir.

THE WITNESS:  Good to see you, Your Honor.  Thank you.

THE COURT:  Good to see you.  Are you going to come back to this area, Mr. Sales?

THE WITNESS:  I live in Corpus Christi, Your Honor.

THE COURT:  Well, I meant --

THE WITNESS:  I'm hoping to be invited back to this

area.

THE COURT:  That's what I was wondering.  The tides of fortune change, you know.

THE WITNESS:  Yes, they do, Your Honor.

MR. McHUGH:  As to the Court's threshold for admission of this document, the document itself talks about Mr. -- and talked about prior to his testimony in the Bourgeois matter.  The document itself references Mr. Longoria's conduct before, during and after.  So --

THE COURT:  All I'm saying is if you've got some evidence to show that Ms. Booth promised him something before he testified, I'll listen to it, not some post testimony, something that she felt obligated to do, because she's like that.

MR. McHUGH:  Well, what -- and my argument to that is the letter itself states Mr. Longoria testified without any benefit being offered, requested or given.  That's going towards prior to his testimony.

THE COURT:  Okay.

MR. McHUGH:  So as far as the Court's --

THE COURT:  So there was nothing offered to him?

MR. McHUGH:  According to the letter, but I certainly think that there --

THE COURT:  Well, what do you want it to prove, just part of it?  Part of your -- what do you want it to prove?

MR. McHUGH:  I think, this letter --

THE COURT:  I'll admit it.  I'm just going to admit it.

MR. DOWD:  Yes, Your Honor.

THE COURT:  It's Exhibit Number what?

MR. McHUGH:  Government 169.

THE COURT:  Are you going to offer it as a Movant's Exhibit?

MR. McHUGH:  Sure.  We'll make it P -- I'm up to --

THE COURT:  Are we doing Ts or Ps?

MR. McHUGH:  P as in Petitioner.

THE COURT:  Okay.  Thank you.  I thought you said T.

MR. McHUGH:  I'm up to 189, so I will also identify it as P-190.

THE COURT:  P-190 is admitted.

MR. McHUGH:  I'm going to hand up the copies of everything I just referenced.

THE COURT:  Thank you very much.

(PAUSE.)

MR. WISEMAN:  Your Honor, I believe that concludes Petitioner's witnesses, and we would rest at this time.

THE COURT:  All right.

MR. DOWD:  Your Honor, my first witness is not here.  It's Debbie Hohle.

MS. SALINAS:  I will go get her, Your Honor.

MR. DOWD: Thank you.

THE COURT: Where's Ms. Booth?

MR. DOWD: Ms. Booth stepped out. She's looking for a piece of evidence, Your Honor.

THE COURT: Floating in the hallway?

MR. DOWD: Yes, Your Honor.

THE COURT: Okay.

(PAUSE.)

MR. DOWD: Stand and be sworn, please.

DEBRA HOHLE, GOVERNMENT'S WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. DOWD:

Q. Ms. Hohle, be careful not to touch the microphone.

A. Yes.

Q. But lean in toward it so we can hear you. Would you state your full name, please, and spell your last name?

A. Debra Hohle, last name is spelled H-O-H-L-E.

Q. And how are you employed, Ms. Hohle?

A. I'm an employee at the Corpus Christi Division of the U.S. Attorney's Office.

Q. Okay. You're leaning to the -- lean toward the microphone. There you go.

THE COURT: If you just put your right arm on that, then you're right there. Thank you, ma'am.

BY MR. DOWD:

Q.   And describe your present duties.

A.   My current title is Administrative Legal Specialist.  I work with trial support and automation, and I do some of the LECC activities.

Q.   Law Enforcement Coordinating Committee activities?

A.   Yes.

Q.   All right.  And how long have you worked for the U.S. Attorney in Corpus Christi?

A.   I began in August of '90 with the U.S. Attorney's Office.

Q.   All right.  And in what capacity did you begin working there?

A.   As a legal assistant.

Q.   All right.  And then at some stage, you were promoted?

A.   Yes.  I became the office manager in approximately '96.

Q.   Okay.  In what capacity did you work for the U.S. Attorney in the year 2003?

A.   I was the office manager.

Q.   All right.  In 2003, were you fully familiar with the practices and procedures of the Criminal Division here in Corpus Christi?

A.   Yes, sir.

Q.   All right.  And did your duties in 2003 include working on the Bourgeois prosecution?

A.   I assisted in the trial prep with indirect and direct methods.

Q.   Okay.  Indirect in what way?

A.   In supervising other staff.

Q.   Okay.  And you actually had hands-on involvement yourself?

A.   Yes, sir.

Q.   Okay.  And what role did you play?  Witness preparation?  Document control, what --

A.   As the closer -- as we got closer to trial date, I began very actively working with witnesses in getting preparation of the files to be brought over to court.

Q.   Okay.  And in 2003, did the Corpus Christi Criminal Division have set practices and procedure for providing discovery material to Defense Counsel?

A.   Yes.

Q.   All right.  And what was that practice or procedure?

A.   At the direction of the AUSA, we would make packages for defense, and then there was a receipt as we made those packages for delivery that they would sign off on.

Q.   Okay.  And directing your attention to the prosecution of Mr. Bourgeois, were those standard practices and procedures followed in that case as well?

A.   Yes.

Q.   Okay.  There were no special procedures put into place for Mr. Bourgeois's case?

A.   No.

Q.   In addition to providing discovery under those standard

practice and procedures, was discovery provided to Defense Counsel in a more informal way as circumstances dictated?

A.    Yes.

Q.    In what way was that done?

A.    When the Counsel or the AUSAs assigned to the case would have meetings with Defense Counsel or informal, a court hearing, sometimes documents would exchange that wouldn't necessarily be through the receipt format that we would utilize when support staff handed out the discovery.

Q.    Documents would be provided in the courtroom or --

A.    Yes.

Q.    -- in conference room in the U.S. Attorney's Office?

A.    Yes.

Q.    All right.  But as far as the formal discovery procedures, normally the record would be made, notations in the file or some record would be made as far as providing discovery to the defense?

A.    Yes.  Yes.

Q.    And what records would be created?

A.    We would create what we call a discovery receipt in the office, and then it would be signed by whoever received those documents --

Q.    Okay.

A.    -- from the Defense Counsel's office.

Q.    All right.  And there's an issue here in the court

regarding a missing document in the FBI lab report, which has been identified as Petitioner's Exhibit 179.  Are you familiar with that document and this issue?

A.    Yes.

Q.    You've been investigating this matter since September?

A.    Yes.

Q.    All right.  And did you look through the U.S. Attorney's Office files, criminal file and discovery file in investigating this matter?

A.    Yes.

Q.    Okay.  Now, these files that you, that you've been referring to and looking through, these are the -- these are our official files that are kept by the U.S. Attorney's Office staff with some intent that they be reliable and reflect what was happening in a case and what was done in a particular case?

A.    Yes.

MR. ABREU:  Your Honor, I would object to the characterization of the evidence -- of the files.

MR. DOWD:  I'm just asking her to describe the files she was looking through to investigate this matter, Your Honor.

THE COURT:  Overruled.  I didn't understand the legal objection, so --

MR. ABREU:  Well, I think my objection was that he was asking her to draw conclusions about the files and the purpose of how they're kept, Your Honor.

THE COURT:  Well, if she's in charge of them, I think she can do that.  Go ahead.

MR. DOWD:  Let me direct your attention --

THE COURT:  Is that what you testified to?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  You're charged with keeping the files in order?

THE WITNESS:  Yes, I assist in maintaining the files, yes.

THE COURT:  All right.  Go ahead.

BY MR. DOWD:

Q.   Let me direct your attention to a particular item of discovery in the Bourgeois case, the FBI lab report.  Do you know when the FBI lab report was sent by the FBI to the U.S. Attorney's Office?

A.   I know that we have, with the lab report, there was a packing slip that the date on the packing slip was the 29th of October.  And on that packing slip, it indicates that the FBI sent it via FedEx.  So with that, I cannot articulate the actual day that it entered our office, but since the packing slip's the 29th, and generally FedEx is either, they can do second day, first day, it would have been within the next couple of days of that date.

MR. DOWD:  All right.  Your Honor, may I show something to the witness?

THE COURT: That hasn't been admitted? Wait. I'm sorry.

MR. DOWD: It has not been admitted, Your Honor.

THE COURT: Okay.

BY MR. DOWD:

Q. Ms. Hohle, let me show you what's -- oops -- let me show you what's been marked as Government's Exhibit Number 1 in this hearing --

THE COURT: Now, who's going to take this witness on cross-examination? If you would like to come up and look at that, if you have not seen the document --

MR. ABREU: I've seen it, Your Honor, and if it makes it easier, there's no objection to these documents. I've seen them in advance. So that might make things easier for --

THE COURT: What are the numbers?

MR. DOWD: 1, 2 and 3, Your Honor.

THE COURT: Government's 1, 2 and 3 --

MR. DOWD: Uh-huh.

THE COURT: -- are admitted. Is that right, Mr. Abreu?

MR. ABREU: Yes, Your Honor.

THE COURT: No objection to the admission.

BY MR. DOWD:

Q. And let me just show you so we can identify the document for the Court. I'm showing you what's been marked as

Government's Exhibit Number 1, with a date of October 29th.

A.  Yes.

Q.  On the top left.  Is this the document you're referring to?

A.  Yes, sir.

Q.  All right.  Where was -- where did you locate this document?

A.  That document is, was with what I have file folder marked "original."  It was within that packet.

Q.  All right.  And this reflects that the FBI has prepared this lab report file for shipping to us --

A.  Yes, sir.

Q.  -- on October 29th of '03.  Is that right?

A.  The packing slip was dated the 29th of '03, and the shipping method was FedEx.

Q.  All right.  You estimated it would get to the other attorney's office within a couple of days?

A.  Yes.

Q.  Okay.  Do you know what day of the week October 29th, '03 was?

A.  I looked at a calendar.  It was a Wednesday.

Q.  You looked at a perpetual calendar?

A.  Yes.

Q.  And it was Wednesday?  Okay.

         THE COURT:  What's a perpetual calendar?

MR. DOWD:  Goes back to, in perpetuity.

THE COURT:  Okay.

BY MR. DOWD:

Q.  Is that what you did?

A.  Yes.

Q.  Okay.

A.  I actually looked on my cell phone calendar and went all the way back to '03 --

Q.  Okay.

A.  -- to see what day of the week it was.

THE COURT:  You just pulled up a calendar for '03.

THE WITNESS:  Yes, ma'am.

MR. DOWD:  Yeah, I was --

THE COURT:  Okay.

MR. DOWD:  -- trying to add a little, you know --

THE COURT:  I appreciate --

MR. DOWD:  Jazzing it up, you know.

THE COURT:  Thank you.  You don't want to confuse the pitiful Judge, though.

MR. DOWD:  Sorry about that.

BY MR. DOWD:

Q.  And do you know when the FBI --

THE COURT:  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.

BY MR. DOWD:

Q.   Do you know when the FBI lab report file was received at the U.S. Attorney's Office?

A.   I can't tell you the actual date it was, entered our office, no.

Q.   Okay.  Now, can you describe to the Court what materials were received, were contained within this FBI lab report file?

A.   Within the file, it had the packing slip documents, there was a correspondence, the first page, which also indicated, and there was a CD with it.

Q.   All right.

A.   And then there was also some original film product with that particular packet.

Q.   All right.  And were you able to copy the CD that came from the FBI?

A.   No.  There was a special proprietary software on that CD, and at the time we did not have the capability and the urgency, that particular CD was given to Defense.

Q.   Okay.  So then -- so the original CD was simply handed over to the Defense?

A.   Yes.

Q.   All right.  Let me --

        THE COURT:  That came from the FBI?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  And did you print out your stuff off,

from that CD?

THE WITNESS:  No, we did not, because it had proprietary software, so the disk, when we got it, and we were trying to urgently give it in discovery, we just gave them the disk.

THE COURT:  Well, how did you get your stuff back?

THE WITNESS:  The packet with FBI file had pages plus the disk.  So when we copied, we just gave that one disk, because at the time our system software would not allow us to copy the disk, so we didn't have the capability.

THE COURT:  Okay.

THE WITNESS:  So we gave the paper product and copy, and we just gave them the CD.

THE COURT:  Okay.

BY MR. DOWD:

Q.   Let me show you what's been marked as Government Exhibit Number 2 and ask you if you can identify this.

A.   That is the face sheet of the lab report, as received, which references the CD.

Q.   All right.  This is already admitted.  Does the U.S. Attorney's Office --

THE COURT:  So it's possible that that document was not on the CD but was in the paper copy?

MR. DOWD:  We'll get to that, Judge.

THE COURT:  Okay.

BY MR. DOWD:

Q.    And does the U.S. Attorney's Office file suggest how many pages the FBI lab report was?  Not counting the CD, but how many paper, sheets of paper the -- was contained in the FBI lab report?

A.    358 pages.

Q.    Okay.  And this, as you've indicated, it includes not just scientific findings, but some correspondence relating to the sending of the lab report, packing slip?

A.    Correct, the correspondence and the packing -- the packing slip isn't included in the quantity of 358 pages.  The correspondence --

Q.    Oh, the correspondence --

A.    -- and the scientific documents with it.

Q.    Okay.  Now, was the FBI lab report an original itself, or was it simply just a Xerox copy made by the FBI and sent to us?

A.    It did not appear to be original documents.  They appeared to be copies --

Q.    Okay.

A.    -- that were sent to us.

Q.    All right.  Now, in making copies for the Defense, or providing discovery to the Defense, would the Defense simply be given a copy of what we received?

A.    Yes.

Q.    Okay.  And was that done in this case?

A.    Yes.

Q.    Were you able to determine who in the U.S. Attorney's Office made a copy of the FBI lab file?

A.    No, I couldn't -- there is no identification of which person made that copy or made the copies.

Q.    And do we know how many copies of the FBI lab report were initially made?

        THE COURT:  You mean copies of the paper copy?

        MR. DOWD:  Copies of the paper documents.

        THE COURT:  Okay.  Thank you.

        THE WITNESS:  Being initially made in trial preparation.

BY MR. DOWD:

Q.    Well, no, being initially made at the onset to provide to the Defense.

A.    I would say initially the one copy they were given.

Q.    Okay.

A.    Because of trying to get it to them quickly.

Q.    All right.

        THE COURT:  Okay.  Let me say -- let me ask again.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  You gave them the CD directly from the FBI?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  And you gave them a paper copy of all the

papers?

THE WITNESS:  That the FBI had sent us, yes.

THE COURT:  Okay.

BY MR. DOWD:

Q.   Now, does the U.S. Attorney's Office file reflect how many documents were provided to the U.S. -- to the Defense?

A.   The discovery receipt indicates 358 pages.

Q.   All right.  Let me show you what's been marked as Government's Exhibit Number 3.  Is this the document you're referring to?

A.   Yes.

Q.   All right.  And toward the lower left, it says, "Documents, 358 pages."  That's how you concluded that?

A.   Yes.

Q.   Okay.  So we received 358 pages, and we -- on, in early November '03, and we provided 358 pages to the Defense on November 7th of '03?  Is that correct?

A.   Yes.

Q.   Okay.  And in the U.S. Attorney's -- does the file reflect that this document, P-179, was within the documents received from the FBI as part of this 358 pages?

A.   Yes.

Q.   Okay.  Where was this FBI lab report stored in the U.S. Attorney's Office during the period that it was -- from the period it was received from the FBI in early November to

November 7th when it was copied and sent to the Defense team?

A.    There was a designated trial prep room for that case.

Q.    Okay.  How many AUSA's were assigned to the Bourgeois prosecution?

A.    Three.

Q.    And what was the practice of providing copies of investigative material such as the FBI lab report to the AUSAs? Was it -- did everybody get everything?

A.    No.  Every product wasn't copied multiple times for every AUSA.  Sometimes they would want specific copies or we would, depending on what the product was.

Q.    So that was done piecemeal, according to what was requested?

A.    Yes.  As to the AUSA requests, yes.

Q.    Do you know in early 2003 at what stage was the prosecution of Mr. Bourgeois?

A.    I know that there was a status hearing in mid October.

Q.    Which triggered the --

A.    I believe in the status hearing in -- there were discussion of experts and notes and product that needed to be turned over, if I remember, from -- I looked at the docket, and that was my recollection.  I think the 24th, there was a status hearing, I believe.

Q.    Okay.  But there was nothing happening between November 1st and November 7th, as far as --

A.    No.  Not in the docket, no.

Q.    Related to this document?

A.    No.

Q.    Okay.  All right.  Now, how many copies of the FBI lab report does the U.S. Attorney have in its office now?

A.    Five.

Q.    Okay.  And are these five copies in the same condition they were in as of September of 2010 at the time of the evidentiary hearing in this case?

A.    Yes.

Q.    Okay.  When this became an issue?

A.    Yes.

Q.    Okay.  Now, do you know which set of the five copies represents the original copy sent to us by the FBI?

A.    The one that I say is the original on it for trial prep, I have a sticker that has the word "original" on it, plus that particular set has the original film that the FBI sent, the actual microfilm of -- I'm not sure what they are, but they have that, so that's why I say that it is, and the packing slip was with that particular grouping.

Q.    And that's why you believe that to be the original set?

A.    Yes.

Q.    And how many pages does that original set contain?

A.    That set's the 358 pages.

Q.    Okay.  And do you think that most reliably represents what

was sent by the FBI?

A.   Yes.

Q.   Okay.  Does this set, this original, this set you're calling the original set contain P-179?

A.   Yes.

Q.   Okay.  What other set of our copies are you the most familiar with?

A.   I'm familiar --

Q.   The four other copies?

A.   I'm familiar with all of them.

Q.   Which two did you have the most involvement with?

A.   Which -- the most involvement?

Q.   Yeah.

A.   Well, I prepared files -- when we came to trial, I can tell you that I brought three sets over for trial, and then there --

Q.   Three sets being?

A.   Being what I consider the original, my secondary trial set, and the witness set.

Q.   So you had the original, then you had what would be a copy of the original, and then you had another copy of the original which, which you had for the witness file?

A.   We would put with the witness folders.

Q.   Okay.  And do you know the purpose of the last two copies?

A.   I would -- AUSA working copies, whatever distinction they

had in their product, or in that sense, sometimes the attorneys had their own copies.  That would be my assumption of what those were.

Q.   Okay.  And that's why you believe those would be the AUSA working copies?

A.   Yes.

Q.   And of these four copies we have, do you know when and how they were made?

A.   No.

Q.   Okay.  We don't know by whom within the office.  Is that right?

A.   No, I don't.

Q.   And of these four copies of the original, that you have, how many of those four copies contain the P-179 document?

A.   Besides the original, my secondary original and my witness set have the P-179 document.

Q.   Okay.  So the two that you've referred to as the AUSA working copies don't contain the P-179?

A.   No, they don't.

Q.   Okay.  Are any of the five sets exact duplicates of another set?

A.   No.

Q.   Okay.  Are any of them almost exactly, contain the same documents?

A.   There's variances, but they're all off within -- you might

go 349 to 360 with documents that have been added or whatever.

Like the working files have different documents.  But after

time, none of them are exactly every page per page the same.

Q.　All right.  And the AUSA working copies, do they contain

additional pages not contained in the original and the two

other reliable sets?

A.　Yes.

Q.　How do you account for this?

A.　As working copies, the extra documents are subpoena copies

and things which would have dealt with witnesses, whoever was

dealing with that for dates of the courts and their trial

subpoenas, and fax cover sheets.

Q.　Are there any documents that were created after November

7th, 2003, that have been placed in any of these copy sets?

A.　One of the documents is a subpoena that has a date of '04.

I think it was February '04, but --

Q.　Okay.  And this case has progressed through trial, direct

appeal, now on 2255 since 2003.

A.　Yes.

Q.　So these files were available for an access, accessible by

all the lawyers and the staff members during that period?

A.　Yes.

Q.　Okay.  Now, these additional documents you've described

and correspondence, subpoenas, et cetera, do you know if any of

these additional documents found their way to Mr. Tinker that

weren't in the original 358?

A.    Yes.

Q.    Okay.  And how do you know that?

A.    The items received, that we received from the Public Defender's Office included some of those pages in their version of the documents from Mr. Tinker's office.

Q.    So that we got, when we got the 12,000 pages from the Federal Public Defender --

A.    Yes.

Q.    -- and they had received those 12,000 pages from Mr. Tinker --

A.    That's my understanding.

Q.    -- as the documents in the underlying criminal case?

A.    That's my understanding, yes.

Q.    You've identified that there are some additional documents that did, that were supplied to Mr. Tinker that weren't contained in this original 358 pages?

A.    Yes.

Q.    Okay.  And were any of those documents that you're referring to post, dated after November 7, 2003?

A.    I think the one document, the subpoena, the '04 subpoena, I believe, was in that also.

Q.    Okay.  And that related to the FBI lab report materials?

A.    It was to one of the chemists, or one of the lab --

Q.    And that was dated after November 7th, 2003.

A.    Yes.

Q.    Yet it was still contained in Mr. Tinker's file.

A.    Yes.

Q.    Okay.  Now, of the 358 pages that were provided to Mr. Tinker on November 7th, 2003, did all 358 of those pages -- I'm referring to our original set -- were all of those included in the 12,000 documents that Mr. Tinker shared with the Public Defender and the Public Defender shared with us?

A.    There are approximately five or six pages different that I don't think -- well, ask me -- I'm not quite sure.

Q.    All right.  Of the 358 pages in our original set --

A.    Uh-huh.

Q.    -- that were provided to Mr. Tinker on November 7, 2003 --

A.    Uh-huh.

Q.    -- did any of those documents, do any of those documents not appear in the 12,000 pages Mr. Tinker shared with the Public Defender and then --

A.    Yes.

Q.    -- we since had access to?

A.    Yes.

Q.    Okay.  And that's the five or six you were describing?

A.    Five or six pages, yes.

Q.    Okay.  So not all the pages that were provided to Mr. Tinker in '03 were turned over to the Public Defender in the 12,000 pages?

A.    In what they gave us back, correct.  There's five or six that we would have given that are not in those documents.

Q.    And P-179 is one of those documents?

A.    Yes.

Q.    Okay.  But there's four or five others?

A.    Yes.

Q.    Okay.  Do you know if there's any other discovery materials that were provided to Mr. Tinker that don't appear in those 12,000 pages?

A.    I know a lot of the photos, like the autopsy are something very distinctive that were not in those, that came back to us, in that set of documents.

Q.    Okay.  And then last year you were asked to make a copy of the FBI lab report for the Federal Public Defender in this, in this lawsuit?

A.    Yes.

Q.    Okay.  Do you know which set of copies you used to make copies for them?

A.    It was one of them in the green file jacket, which in hindsight appears to be one of the AUSA working copies.

Q.    Okay.  And that did not contain -- or how did that happen?  What?

A.    Going --

Q.    Describe the circumstances of doing that.

A.    Basically going through the material, as things were

identified, I had three stacks of lab report files placed on the table, in the order I took them out of the box.  And as it was said, this is determined, we need to give a copy of that, so scan it.  The one file happened to be the top file, which is just what I picked up, and scanned that particular file.

Q.   Okay.  So that was just an inadvertent --

A.   Just happenstance it was the top file jacket.

Q.   Okay.  And you believed that to be a full copy of the FBI lab report?

A.   Yes.

Q.   Okay.  But as a matter of fact, it did not contain P-179?

A.   No, it did not.

Q.   Okay.  And now we obtained an additional copy of the FBI lab report at the time of the September 2010 evidentiary hearing?

A.   Yes.

Q.   Okay.  And does that latest FBI lab report file, does that exactly match the lab report file that they provided back in 2003?

A.   No.

Q.   What's different?

A.   Within their file, there's also some correspondence and e-mails that would not have been in the file at the time they gave it to us for presentation for discovery, internal e-mails.

Q.   Okay.  So their file was continued to be supplemented --

A.    Yes.

Q.    -- as time went on?

A.    It appears so, yes.

MR. DOWD:  All right.  I believe that's all I have, Your Honor, if I could just have one moment.

THE COURT:  Yes, sir.

(Counsel conferring off the record.)

BY MR. DOWD:

Q.    And just to reiterate, when you made a copy for the Public Defender, you didn't use the original set; you used one of the AUSA working copies?

A.    Yes.

MR. DOWD:  That's all I had, Your Honor.  Pass the witness.

THE COURT:  Thank you, sir.  Mr. Abreu?

MR. DOWD:  Oh, could I have one more question, Your Honor?

THE COURT:  Yes, sir.

MR. DOWD:  I'm sorry.

BY MR. DOWD:

Q.    In evaluating these, in evaluating these files and determining that there's four, five or six pages in our original FBI lab report set of copies and don't appear in the 12,000 pages, you worked up some kind of a little chart.  Is that right?

A.    Yeah.  Yes.

Q.    And let me show you what's been marked as Government's Exhibit Number 4.

      MR. DOWD:  I'm not offering this, Your Honor, but I just want to see if Ms. Hohle can identify this.

BY MR. DOWD:

Q.    Is this the chart you used to --

A.    Yes.

Q.    -- to determine that what was in the, our original file did not appear in the 12,000 pages?

A.    Yes.

Q.    Okay.

      MR. ABREU:  By the way, Your Honor, we have no objection to that document.

      MR. DOWD:  Well, we'd offer it, Judge, Number 4.

      THE COURT:  Government's 4 is admitted.

BY MR. DOWD:

Q.    Let me just, for the record, so that it's clear, which column -- across the top, it says -- on the far left it says, "Received Public Defender," and there's a list, a column of numbers.  What do those numbers relate to?

A.    The 12,000 pages received from the Public Defender's Office utilizes Bates stamps.  That's their Bates stamp number.

Q     Okay.  And this next column, "Provided Public Defender."

A.    That was my scanned version, and that's my Bates stamp

number.

Q.     Okay.  So that was the, from the working copy?

A.     That was the scan, yes.

Q.     Okay.  And then A, you have -- in the next column, you have "A, 366 working."

A.     The A and B are what were in the green file folders that would have been my identification of working copies.

Q.     That you referred to earlier as the AUSA working copies?

A.     Yes, uh-huh.

Q.     And then "Gray Folder -- C, 358, Gray Folder," what is that?

A.     The gray folder is the one that has a Post-it note that I had put on at trial that says "Original," and it's the one that has the original film.

Q.     Okay.

A.     So I, that appears to be the original.

Q.     Okay.  So the C reflects what you've discussed as the original --

A.     Yes.

Q.     -- file.  And then D?

A.     Is the secondary trial copy that we made for trial.

Q.     You described -- and then E?

A.     Is my witness file set.

Q.     Okay.  And where there's letters, for example, going down the C column, there's letters, either Y or N.  What do those

refer to?

A.    It's matching the sets of documents that yes, that page was in there or no, it was not in there.

Q.    Okay.  And again, which of these refers to the 12,000 pages?

A.    The very first column.

Q.    The very first column.  Okay.  And so where -- skipping down about one-third of the way, where there appears an N in that first column, and going across to C, there's a Y.  You're trying to say that that document appears in the gray folder with our original copy, but does not appear in the 12,000 pages.  Is that right?

A.    Yes.

Q.    So that's the key to reading this document?

A.    Yes.

        MR. DOWD:  Okay.  That's all I had, Your Honor.  I'll pass the witness.

        THE COURT:  Thank you.

    (Counsel conferring off the record.)

                    CROSS-EXAMINATION

BY MR. ABREU:

Q.    Good morning, Ms. Hohle.

A.    Hi.

        MR. ABREU:  Your Honor, may I proceed?

        THE COURT:  Please.

MR. ABREU:   Thank you.

BY MR. ABREU:

Q.   Ms. Hohle, so we can agree that P-179 is not a part of the documents that were sent to us in relation to the discovery proceedings here in the 2255?

A.   For the evidentiary hearing, no, sir, they were not -- it was not.

Q.   And we can also agree that P-179 is not part of the 12,000 documents that were exchanged on our part to you?

A.   No, it was not in the 12,000 that you sent to us.

Q.   And we can also agree that P-179 is not, according to your own calculations, in one, two, three of -- two of the working copies, what you call working copies?

A.   Correct.

Q.   And on direct appeal, that there are often or sometimes informal exchanges of materials between the prosecutors and Defense Counsel?

A.   Yes.

Q.   Do you recall that?

A.   Yes.

Q.   Do you have any specific recollection of P-179 being exchanged through any of these informal processes in this case?

A.   That specific page, no.

Q.   Okay.  And you have no documentation about any sort of informal changes, or any formal exchanges of P-179

specifically?

A.    I would say yes, I do, when we gave the receipt for the original set, P-179 was in that and it was handed to their office, so I would say yes.

Q.    Okay.  We've talked about that.  But that, that particular exchange does not mention P-179 specifically.

A.    No, because P-179 wasn't an identifiable item at that time --

Q.    Okay.

A.    -- as far as that number, if that's --

Q.    Well, that specific document, it just talks about 358 pages is all.

A.    Yes.

Q.    Okay.  Now, you indicated that when the exchange first took place, the Government kept the paper copy and gave a CD to the Defense.

A.    The --

Q    I --

A    -- original -- okay, originally received from the lab was a CD, correspondence, cover sheet and the pages.  We didn't print pages.  It came in the package.

Q.    I see.

A.    The CD, I personally can't tell you what was on it, other than what was described in the correspondence.  Because of the limitations of our system and being able to download the

proprietary software, because of expediency, we just gave them the disk and the pages contained within the packet received from the FBI.

Q. So both were given to them, the pages and the CD?

A. Yes.

Q. And again, you've already stated that you're not aware of whether P-179 was a part of the CD.

A. I have no -- I could not tell you physically the items on the CD personally.

Q. Did the Defense have the proprietary software to open the CD?

A. It was on the disk that they could download it if they chose.

Q. But you chose not to?

A. We -- with the limitations of our system and IT capability at that time, no, we didn't -- we did not load it.

Q. Now, you indicated that the reason you believe P-179 was part of the original 358 pages that were transferred over to trial counsel is because the page numbers match up, 358 pages in your, what you call the original, 358 pages given to trial counsel.

A. The quantity of pages, yes.

Q. Okay. When the copy was made for trial counsel, do you have any written documentation about how many copies had been made prior to that copy being made for trial counsel?

A.    I have no documentation, but the copy made for trial counsel would have been made immediately and given at that time.  Because of the proximity, it was given to them on the 7th, the next Friday.  Our AUSAs didn't make, as far as I know, did not make multiple, five, six copies at that time.  At that time we made one to get it to them immediately.

Q.    Okay.  But you don't remember that specifically.  You're saying that's what you believe happened.

A.    In the manner and practice that we would in the date time frames and getting it in, yes.

Q.    Okay.  So it's possible that in fact multiple copies were made, and you just don't recall that.

A.    That's a possibility.

Q.    Okay.  At the time that the copies were provided to trial counsel, the 358 pages, were they Bates stamped?

A.    No.  At that time our system didn't allow, or we didn't utilize that system of documentation as we do now.

Q.    Let me show you what Mr. Dowd and the Government previously marked as Government's Exhibit Number 4 and previously admitted Government's Exhibit Number 4.

A.    Yes.

Q.    That's the chart that you prepared.  Is that correct?

A.    Yes.

Q.    And C, or Column C, 358 Gray Folder, is that the original?

A.    Yes.

Q.   Okay.  I'm curious why or how the original does not contain pages that are contained in the remainder of the copies.

A.   Through --

MR. DOWD:  Of which copies, Your Honor?

BY MR. ABREU:

Q.   Well, I'll go down to, a little past halfway down Column C, there's an N listed in one, two, three, four, five, six, seven -- seven different documents that appear not to be in the originals, original one, original two, but do appear to be in the remaining copies, B, A, Public -- Provided Public Defender, and Received Public Defender.

A.   And without having them in front of me, I believe those are the internal correspondence and subpoenas and fax sheets that would not have been in my trial copies that were in some of the working copies.

Q.   Okay.

A.   That's my --

Q.   Okay.  Thank you.  And then regarding, on Page 2, you indicate that there are several duplicates, right?  If I'm looking at 2977, that's a duplicate?

A.   From your -- from your scans, there were a couple of misfeeds that y'all counted as Bates stamps, and a couple of duplicates, which in discovering and counting pages, that's how I identified if you had a page that looked like a duplicate.

Q. Okay. Now, from the original 358 pages, you have no way of telling us at this point of the ones that were provided to trial counsel at the time whether that particular packet of 358 pages contained duplicates?

A. I would say because my original, which is the gray, I actually have marked that in that original there's one set that's a duplicate that's the same duplicate within my trial sets.

Q. But you don't know, and my question is, you provided 358 pages. You don't know if the original had -- if the second of the copies, of the set you provided to trial counsel also contained duplicate pages that equal the number of 358?

A. I didn't make the copy myself, so no.

Q. The working copies are made for the U.S. Attorneys?

A. Within the attorneys' preference or style, many times copies are made for whatever material they want to work and utilize.

Q. There were three -- Mr. Dowd, the Government asked about that there were three U.S. Attorneys working on the case at the time?

A. Yes.

Q. Were there only two working copies that were produced?

A. Mr. Roberts was in Houston, so a lot of times the large mass material wasn't necessarily shipped. If he had working copies there, I have no clue if he did or didn't. I would not

assume necessarily, because he would come down here to work on that product, so that's why I would have two working folders potentially.

Q.   So the two here would have been for Ms. Booth and Ms. Salinas?

A.   Yes.

Q.   Okay.  And P-179 is not in either one of those two?

A.   No.

Q.   Are those the sets that they used to come to court with, the attorneys themselves, the working copies?

A.   I can't say "yes" or "no" to that.  I would not assume so. I would assume that the folders that I prepared for trial, the gray and the secondary original and my witness would have been what was utilized at trial because that's what I had downstairs that I would bring up as they needed it.

        MR. ABREU:  May I have a moment, Your Honor?

        THE COURT:  Yes, sir.

    (PAUSE.)

BY MR. ABREU:

Q.   I just wanted to make sure that this is clear, because apparently it's not, it wasn't.  Of the 358 pages that were sent and copied for trial counsel --

A.   Okay.

Q.   -- you cannot be sure that P-179 was a part of that particular set?

A.    If you're asking me what I think, I would say yes, it is.

Q.    I'm not asking you what you think.  I'm asking you, can you tell me that you definitively know that P-179 was part of that particular set?

A.    I didn't make the copy myself, but still I would say yes, it was, because of the packing and the material and what I've got marked as "original" that's contained in there.

Q.    Okay.  And that's just based again on number to number comparison?

A.    Yes.

Q.    Okay.  You indicated that somebody else made the copies?

A.    I don't know what person made them within the office.  The trial -- people assisting the AUSA at that time, I do not know who personally physically made the copies.

Q.    Do you often sometimes make copies yourself of documents?

A.    Yes, I do.

Q.    And you're aware that sometimes misfeeds happen?

A.    Yes, I am.

Q.    Sometimes double pages go through and a single page might not be copied?

A.    Yes, I am.

            MR. ABREU:  May I have just one moment, Your Honor?

            THE COURT:  Yes, sir.

      (Counsel conferring off the record.)

BY MR. ABREU:

Q.   I just have one additional question, if I may.  Is it regular practice at the U.S. Attorney's Office to make a comparison after, after copies are provided to trial counsel, to make sure that the same pages were provided from those received in your office?

A.   Is it regular practice?  When I prepare product, I compare as a general rule, what I do -- I now Bates stamp, so therefore that comparison is done automatically because of the new methods.  But at that time we didn't have that structure, so I cannot tell you a count per page per page was done on every copy that was made.

            MR. ABREU:  Okay.  That's all I have, Your Honor.

            THE COURT:  Thank you.

            MR. DOWD:  Nothing further, Your Honor.

            THE COURT:  Thank you, ma'am.  You may stand down.

            MR. ABREU:  I just want to make sure I get the right documents here.

            THE COURT:  Thanks.

        (Counsel and clerk conferring off the record.)

            THE COURT:  Ms. Booth?

            MS. BOOTH:  Yes, Your Honor.

            THE COURT:  Just for the record, I know you argued it, but I want to ask you myself, did you -- could you come up to the microphone?

            MS. BOOTH:  Yes, Your Honor.

THE COURT:  You know the witness, is it Adam Longoria?

MS. BOOTH:  Yes, I do.

THE COURT:  Did you promise him anything or even hint that he might get some benefit for, for his testimony in the Bourgeois trial before or after?

MS. BOOTH:  Never, Your Honor.  He contacted the FBI.  He said that he had information.  As a result of that, I found out that his attorney was Bill May.  I called Bill.  I said, "Mr. May, this guy is calling us from the jail.  Is it okay if we talk to him?"  FBI went and spoke to him.  He never asked for anything.

Now, I will tell you that during the trial, right before we put him on, we were downstairs, and he said something to the effect about "Is this going to help me or anything like that?"  And I said, "Let me tell you something.  If you're going to start talking about that, I'm not going to talk to you.  You came to us.  You told us that you had information, and you know, this is what we're doing.  You know?  I'm not offering you anything.  And I want that clear."

Now, and I -- and that's what I remember.

THE COURT:  Okay.  Anybody want to cross-examine her, now that I've called her up?  You're welcome to do that.

(Counsel conferring off the record.)

MR. McHUGH:  Ms. Booth, was, when Mr. Longoria --

THE COURT:  Do you want me to put her under oath?

MR. McHUGH:  Sure, I mean if that's --

THE COURT:  Would you put her under oath, please?
Ms. Scotch, would you administer the oath?

THE CLERK:  Yes, Your Honor.

THE COURT:  Ms. Booth.

MS. BOOTH:  Yes, Your Honor.

(Witness sworn.)

MS. BOOTH:  You want me to sit up here, Judge?

THE COURT:  Go ahead, and then I'm going to ask
you --

MR. WISEMAN:  Ms. Booth, don't touch the microphone.

MS. LARIN:  She doesn't need a microphone.

THE COURT:  She doesn't need a microphone.

MS. BOOTH:  I don't know how to focus the thing, so
don't feel bad, Mr. McHugh.

THE COURT:  Okay.  Ms. Booth, let me just ask you,
now that you're under oath, do you incorporate everything you
just told me as true and correct --

MS. BOOTH:  Yes, Your Honor.

THE COURT:  -- now that you're under oath?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.  I always kind of like to just jump
to the deal, so --

MR. ROBERTS:  Your Honor, if I may, before we begin,

I'm confident the Court is aware that usually when an AUSA is called to the stand, there's regulation, that kind of thing. So I would just ask that the Federal Public Defender be aware that there's --

THE COURT:  I don't know about these regulations, so tell me.  I've never had this happen before, so --

MR. ROBERTS:  Well, there are regulations that are in place that if a Government employee is called to testify and they are going to be asked to speak about things in their official capacity, particularly if they're going to be asked about records, it has to be -- it would actually have to be submitted to Washington, D.C., to get prior approval for them. I'm just asking --

THE COURT:  Okay.

MR. ROBERTS:  -- just for the purposes, particularly --

THE COURT:  Let me just tell you this, that your examination of her will be limited to what I just asked her. Okay?

MR. ROBERTS:  And that's all I was asking, Your Honor.

THE COURT:  Is that all right?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Can you do that, sir?

MR. McHUGH:  I will try, Your Honor.

THE COURT:  Okay.  Well, do you want to ask her where she lives and what she had for --

MR. McHUGH:  No.

THE COURT:  Okay.

MS. BOOTH:  And Judge, while we're waiting, can I make another little statement?

THE COURT:  Well, go right ahead.

MS. BOOTH:  Well, Your Honor, after this case was over, a few days after the conviction was had, we received a letter, it came --

THE COURT:  Was this after the sentencing or after --

MS. BOOTH:  This was after sentencing.

THE COURT:  Okay.

MS. BOOTH:  After sentencing.  I think it was March the 27th, I'm not real sure.  And I think we finished on March the 24th.  But anyway, it was shortly after this, Mr. Adam Longoria wrote a letter to -- and it went to Megan, and it was addressed to me, too, I believe, to Megan Beckett who was the FBI Agent, and it said something to the effect, "Congratulations."  Then it said, "I know that you have promised me nothing," something to this effect, "but I just had a new baby, or I wanted to see my baby, and I was just wondering if maybe you could like make a call for me."  It was something like that.  And of course, we did nothing.  But we did get that letter from him acknowledging, and I've just sent

Ms. Hohle out to get it, acknowledging that he was promised nothing.

Now, subsequent to that, years later, he was not represented by Bill May, he was represented by Chris Gale, and I'm not for sure, but Chris Gale called me on the phone, and Chris said -- this was years later -- and he said, "Hey, Patti, remember Adam Longoria?  I represent him on a civil case."  I think he said that, something like that.  And he said, "Would you mind writing a letter to the Parole Board?"  This was like 2005, 2006, may have been 2007.  I don't know.  But it was years later.

And I said, "Well, I will write what he did.  You know?  I will tell you that I believe that, you know, he called the FBI, he reported that Mr. Bourgeois wanted to kill the Federal Judge, three witnesses."  Plus, what didn't come out is he wanted to kill the Federal Judge, the federal agent, Megan Beckett, and myself.

We had a hearing on that, Judge, if you remember, where a record was made that we didn't really consider that a serious threat, and we were ready to go forward.

But that had been, I believe, the reason that he had come forward is because when you start naming wanting to kill the Feds, everybody over in prison knows that's a pretty serious situation.

So that's why he called the FBI and told them that he

wanted to talk to them.  We did not seek him out.  And then we went and talked to him.  Nor did we promise him anything.  I felt like it was his civic duty to do what he was doing.

And we did have two other witnesses that we had cooperation agreements with, which we disclosed, which were Derrick Moore, and I believe Wylie Taylor, and we were offering them time off.  I mean, they were hoping to get 5K departures, and we put that on the record.  If there would have been any deal, we would have put it on the record.

THE COURT:  Now, having said that, do you have questions?

MR. McHUGH:  Yes, I do, Your Honor.

PATTI HUBERT BOOTH, GOVERNMENT'S WITNESS NO. 2, SWORN

CROSS-EXAMINATION

BY MR. McHUGH:

Q.   Good morning, Ms. Booth.

A.   Good morning.

Q.   Ms. Booth, the conversation that you described for Judge Jack with her original questions, was it in the cell room downstairs?

A.   No, it was not.

Q.   Where did it take place?

A.   I think -- I think that it was in grand jury.  And I believe Bill May was there.

Q.   So that was the conversation where you're saying he asked

you how this --

A.   It was veiled.  It was veiled.  He didn't -- it was really, it was like a hint.  And that's the only time that even came -- it was kind of like a hint.  It wasn't like --

Q.   Well, what do you recall?

A.   And I can't remember, but that stuck out in my mind, because I immediately went, "Hey, buddy," and I told him, I said, "No, now, if we're going to be talking about that, we're -- that is not part of this."

Q.   And why did you say that?

            THE COURT:  And she was --

            THE WITNESS:  Because I didn't want any --

            THE COURT:  She would probably say that.

            THE WITNESS:  I didn't want any question about his motive or my motive for him testifying.

BY MR. McHUGH:

Q.   Okay.  Well, his motive, he asked you or hinted to you that he was looking for some help.  Is that right?

A.   It was a hint.  It was a nuance that I'm smart enough to realize when I'm starting to get nuances.  And that had never come up.  And I had spoken to him numerous -- well, I say numerous, maybe two or three times before, and we had always -- we always start up the thing, "Now you know, why are you coming to do this?"  And, "Well, you know, I have this information." I said, "You know I'm not promising you anything.  I'm not --

there is nothing you're going to get out of this deal" --

Q. Okay. But he --

A. -- "but a feeling of self-worth."

Q. Okay. But he then did ask you how this would help him.

A. He didn't -- well, and I'm telling you, I cannot remember the words. It was a nuance. It was not a direct, "What are you going to" -- quid pro quo. It was like a nuance of -- and I got the impression that maybe he was -- that's when I went, "Hey."

Q. But it was enough for you, as an experienced prosecutor --

A. Uh-huh.

Q. -- to get the impression that he was looking for something from you, or he was going to ask you --

A. He was hinting.

Q. He was hinting at it?

A. He was hinting. And I think that I nipped it in the bud.

Q. Okay. And -- so that's right. It created a response from you to nip it in the bud. Is that right?

A. Right. And --

Q. Did you --

A. -- I know now that I didn't know before, in looking at this -- see, I didn't know -- I knew that he had been stabbed for testifying in the prison, that he had witnessed a murder, and that he had been stabbed 27 times, or I thought it was 32 times he had been stabbed. And so in my mind, I thought well,

this would be a good person to put on, because obviously he's testified, he knows what can happen to him. And so, you know, he would be a good witness.

Q. Okay. Let me just stop you there.

A. Okay.

Q. The stabbed 27 times --

THE COURT: Good luck.

BY MR. McHUGH:

Q. The stabbed 27 times, Mr. Sales referred to that this morning. Is that what you're talking about?

A. Yes.

Q. Okay.

A. Yes.

Q. Now, that had nothing to do with his bank robbery. He wasn't stabbed in the course of the bank robbery. I think that had been previous to the bank robbery.

A. No, he had witnessed a murder in the prison and testified against a gang. And that's -- I prosecute all the gang violence stuff now out of the prison, and that was a pretty brave thing for him to do.

Q. Okay. But what I just wanted to clarify was, that had nothing to do --

THE COURT: It's all clarified.

MR. McHUGH: Okay. The stabbing that occurred --

THE COURT: It's all clear. It's all clear.

THE WITNESS:  That is what gave him the creds.  You see, that is why Mr. Bourgeois went to him is because Bourgeois thought he was a big -- they were in this special cell.

THE COURT:  Okay.  Okay.  Enough.

THE WITNESS:  Okay.

MR. McHUGH:  Okay.  Now, Ms. Booth.

THE COURT:  Let's do this real quickly.

BY MR. McHUGH:

Q.  When you got this nuance, this hint, enough that it created that response in you, did you tell Mr. Tinker or Mr. Gilmore about that statement that you had heard from Mr. Longoria?

THE COURT:  Okay.  I know you're doing this for me and for the record, but I don't see any benefit to doing that, that question.  I don't see why she would feel obligated to say that if she didn't promise him anything.

MR. McHUGH:  Well, Your Honor, I think the state of mind of the witness would be certainly fertile ground for Mr. Gilmore, as he's an experienced cross-examiner of these snitches, as he indicated --

THE COURT:  I thought you're saying they're incompetent.

MR. McHUGH:  Mr. -- as to the cross-examination of the snitches --

THE COURT:  Okay.

MR. McHUGH: -- Mr. Gilmore --

THE COURT: Okay.

MR. McHUGH: -- testified that he had done this many times --

THE COURT: Okay.

MR. McHUGH: -- in his interrogatories.

THE COURT: Okay. She didn't tell him. So go ahead.

THE WITNESS: No, I didn't.

BY MR. McHUGH:

Q. Okay. So you gave him that response, and you didn't tell them. Now, let's talk about Mr. Sales. You knew who he was at the time of the --

A. Uh-huh.

Q. -- the trial. Had you met him, face to face?

A. Yeah, I had seen -- Mr. Sales had been beaten in the courtroom prosecuting gang cases. Everybody knew who Mr. Sales was. He's a hero, a legend.

Q. Okay. And did you speak to him prior to his, the entry of the guilty plea by Mr. Longoria?

A. Yeah, I do remember. And let me tell you, I remember -- I don't know, I think that -- I don't know who called who, but the way it usually works, when a state case -- for me, because I used to be a state prosecutor, and my husband was a state prosecutor at this time. If I'm going to approach a Defendant as a witness in the state court, what I do is I called Mr. May

and asked for permission, because he was the attorney then, and I may have called Jimmy first and said -- to find out who the attorney was, and I'm going to, I'm going to talk to the guy. And I remember saying that I'm going to -- I may use him as a witness, but I don't want anything for it. I don't want anything for him, I don't want anything for it. I mean, I think that I had a two-minute conversation with Jimmy Sales.

Q. Okay. And did you have a conversation with Mr. Sales after Mr. Longoria testified in the Bourgeois trial?

A. Okay, I only had one conversation with Jimmy, and I don't remember exactly when it was. I could tell you that.

Q. So it could have been after.

A. I don't know. It could have been. But the usual way that I do it is I call him first just out of courtesy, just to say I'm going to be, you know, doing it. But it could have been after. It could have -- you know, I have thought about that conversation, because Jimmy doesn't remember. I mean, obviously he didn't remember talking to me. But I had a short conversation with him sometime, before, after, and during -- because all this happened, you've got to understand, all this happened very quick. He showed up as a witness right before we started. We started voir dire, and we were in the middle of everything. So I don't know exactly when I made a call.

Q. Okay. Now --

A. Or he -- see, I don't know if I called him, he called me.

I know that I had a short conversation with him.  And as I thought about it, I thought about it for weeks, it may have been after.  It may have been before.  It was a courtesy call.

THE COURT:  It may have been after the trial, it may have been before the trial or during the trial.

THE WITNESS:  I don't --

THE COURT:  But it was one conversation.

THE WITNESS:  One conversation, short.  I don't -- and I --

THE COURT:  I think we've got it.

THE WITNESS:  Yeah.

BY MR. McHUGH:

Q.   And do you recall if -- you're saying that it could have been after the trial.  Would it have been fair to believe that you would have reported to Mr. Sales that in fact his Defendant, the person he's prosecuting, Mr. Longoria, had testified on behalf of Mr. Bourgeois?

A.   If I talked to him afterward, of course I'd say that.

Q.   And in your letter that's been marked as P-190, you said that this was courageous and this was very admirable conduct by Mr. Longoria.  Is that right?

A.   That's -- whatever I said in the letter, I meant.  I didn't lie.

Q.   And it would be fair to think that you would have said the same thing to Mr. Sales if you talked to him after the trial,

since you told the Texas Probation and Parole Board, you would have told Mr. Sales the same thing.  Is that fair?

A.   Yeah, that's fair.  I mean, that's the way I felt about it.

Q.   Okay.  And --

A.   But that letter had nothing to do with anything except that Chris Gale called me, asked me -- and I think it was Chris Gale, called me and said, "Would you mind writing a letter for his parole?"  And I'll tell you this, he didn't get parole because of my letter, I want you to know that.  It didn't help.

Q.   Well, Ms. Booth, at the time of the trial, how long had you been a federal prosecutor, in 2004?

A.   Well, since 1989.

Q.   Okay.  So that -- so you were aware at the time of trial that even though a witness -- you've dealt with all types of witnesses, the federal witnesses and the state witnesses in your trials.  Is that right?

A.   Yes, sir.

Q.   Okay.  And you were aware at the time of trial that even though Mr. Longoria was a state prisoner and you're a federal prosecutor, that you could, down the road, write a letter on his behalf, as you did, to the Texas Board of Pardons and Paroles?  Is that fair to say?

          THE COURT:  Okay --

          THE WITNESS:  That I could write a letter?

MR. McHUGH:  Yes.

THE COURT:  Okay --

THE WITNESS:  See, the way I --

MR. McHUGH:  For the Defendant.

THE COURT:  Okay, look.  Look, this is the deal.  She didn't -- she says she didn't promise him anything.

MR. McHUGH:  I understand.

THE COURT:  She wrote something later.  Of course you're aware that you can do something down the road, but get to the point of whether or not that would have influenced his testimony.

BY MR. McHUGH:

Q    Okay.  You were aware -- were you aware --

THE COURT:  If he wasn't aware that she was going to do anything for him, how could that influence his testimony?

MR. McHUGH:  Well, if I just may have some leeway, I just want to establish the first point.

THE COURT:  How long are you going to do this?

MR. McHUGH:  Two to three minutes, Your Honor, on this point.  And I assure you --

THE WITNESS:  And what year was it that I wrote that letter in?  Because the trial finished in 2004 --

BY MR. McHUGH:

Q.   And the letter is dated February 9th, 2006.

A.   Okay.  So it was a couple of years later.

Q.   Okay.  So what I'm saying is obviously, as the Judge has indicated, at the time of the trial in 2004, you had been a federal prosecutor for a good period of time.  You were aware at that time that you could help a state prisoner by writing a letter to the Texas Board of Pardons and Paroles.  Is that right?

A.   I don't know if it would help them.  In fact, my -- and I want to be quite honest with you, the state -- listening to Jimmy today, it sounded a little bit differently, like he could change a sentence down to five years or something.  When I prosecuted in state court, there were no downward departures. There were no, there were no 5K or Rule 35 where you could come back later.  I was not aware of that.  The only thing that I, in my mind, thought that I could do was possibly just tell them, you know, so that they would know he --

Q.   And they could take it -- and the reason you'd tell them --

A.   Uh-huh.

Q.   -- was they would take it into consideration at his plea and sentencing, charge bargaining and the sentence.  Is that fair to say?

A.   Um --

Q.   Could.

A.   Well, I knew that, I guess I knew that I could -- now, what was the question again?

Q.    Okay.

A.    Because I didn't ask -- the issue here is I never asked for any help for him, nor did I promise him any help.

Q.    I understand.

A.    And that's it.  I know from dealing with confidential informants, I know from dealing with Defendant witnesses that you have to be very clear on the bargaining situation.

Q.    Okay.  But there was no written plea agreement in this case with Mr. Longoria, like there were with the other snitch witnesses.

A.    Well, I don't know.  And it wouldn't make any --

Q.    No, I'm talking about --

A.    It wouldn't make any difference if it was written or not.  If I told somebody that I was going to -- and I did, before I came up here, I never had a written plea agreement, nor did I write down 5K departures.  I just told the Defendant I would do it, and I did it.

Q.    Okay.

A.    So written or oral makes no difference to me.

Q.    Well, why in this case would it be different?  Two of the witnesses that were in federal custody, you --

THE COURT:  Okay.  Those were federal Defendants.

MR. McHUGH:  Right.

THE COURT:  This is a state Defendant.  She has no authority over the state Defendants.

MR. McHUGH:  But she --

THE COURT:  So that's the big difference.  If you're trying to make a record for me --

MR. McHUGH:  Okay.

THE COURT:  -- you need to get to something that's going to help me.

MR. McHUGH:  Okay.  I just --

THE COURT:  This is not at all helpful.

MR. McHUGH:  I just want to get into the one question about Ms. Booth's --

THE COURT:  Just ask one question then.

BY MR. McHUGH:

Q.   Okay.  Were you aware -- you would agree with me at the time of this trial that you could help Mr. Longoria by advising Mr. Sales -- not promising him you could help him -- by advising Mr. Sales what he had done in your case and prior to his plea and sentencing.

A.   I wasn't going to do it, though.  I mean, I wasn't.  That never, that never entered to my mind.

Q.   I understand that.

THE COURT:  Okay.  Move on.  Move on.

BY MR. McHUGH:

Q.   Okay.  You were also aware --

THE COURT:  Listen to me.

MR. McHUGH:  I'm trying, Your Honor.

THE COURT:  Move on.

MR. McHUGH:  I'm trying.

BY MR. McHUGH:

Q.   And you were also aware at the time of this trial, Mr. Bourgeois's trial, that you could also write a letter to the Parole Board.  Is that fair to say?  For a state prisoner?

A.   Oh, yeah, I know I could do that.

Q.   So if at the trial you asked Mr. Longoria, "And you understand that there's no way that I can help you in your state case, no way that I can help you in your state case" --

A.   Did I say it twice, or are you saying it twice?

Q.   I'm saying it twice.

A.   Okay.  Just wanted to know.

Q.   And he answered, "I understand fully," would that be an accurate question, that there's no way that you can help him in the state case?

THE COURT:  Okay, look.  I've got the transcript.  I know that.  I understand your point.  Are you done?

MR. McHUGH:  Let me just --

BY MR. McHUGH:

Q.   Did you consult with Mr. Sales prior to writing the letter to the Parole Board?

A.   Absolutely not.

Q.   Why not, if he's the prosecutor in this case of Mr. Longoria?

A.   Absolutely -- because -- I just didn't.  That was something that his defense attorney called me, and I, I felt like I had a, you know, I could do --

Q.   An obligation?

A.   No, not an obligation.

Q.   You felt like you had a what?

A.   I just felt like I could do it, so I did it.  I thought about it, and I said, "Well, you know, he didn't get anything for this, and you know, I'm just going to tell the Parole Board what he did."

Q.   Do you recall your conversation with Mr. May?

A.   Which conversation with Mr. May?

Q.   About this, about Mr. Longoria.  Did you have more than one?

A.   Oh, I don't know.  You know, I may have.  At that time Bill was practicing here.  He was here every day.  I mean, not every day, but he was here a lot.  And we would have had a lot of, a lot of contact.

     But I called him, asked him permission to talk to his client because his client had called FBI.  And I know that I had that conversation with Bill about this case.

Q.   Okay.  And do you recall any additional conversations with Mr. May about this case?

A.   Directly?  No.  No.  I may have talked to him about it.  I can't tell you I didn't, because that was I don't know how many

years ago, and we were together all the time.  I mean, he might have been in here on another case at the same time --

THE COURT:  I guess the question is, did you promise Mr. May you'd do anything for Mr. Longoria?

THE WITNESS:  No, absolutely not.

THE COURT:  Move on.

BY MR. McHUGH:

Q.   Did you indicate, not promise --

A.   No.  No.  No.

Q.   Let me ask the question.

A.   Okay.

Q.   Did you indicate in any way to Mr. May that you would report what Mr. Longoria had done to his state court prosecutor?

A.   No.  Bill May pretty much wiped his hands of this.

Q.   What do you mean by that?

A.   Well, Longoria had called us.  I just called Mr. May as a courtesy.  I mean, you know, and I was talking to the witness.  This wasn't part of -- I don't know, I just got the impression Bill May gave us full reign on it because his client had already decided he was going to do it.

Q.   Okay.  But I'm talking after that initial conversation, you said you had all these many conversations in the federal building.

A.   Uh-huh.

Q.   Did you ever indicate to Mr. May that if Mr. Longoria cooperated and testified against Mr. Bourgeois, as you wrote in your letter to the Parole Board, that this would be something that you would report to the state prosecutor?

A.   I don't think we ever had that conversation.  He -- you know, no.

Q.   Did you feel you needed to have that conversation with Mr. May?

A.   No, I did not feel like it, because Mr. Longoria was coming in, he approached us.  He was coming in because he had seen something very bad.  And I think he really liked the attention, too, of being -- because Mr. Bourgeois thought he was a hit man.

Q.   Okay.  But you also would agree with me that in your dealings with witnesses that testified, it is very common for the witness to want something in return for their testimony?

A.   Oh, yeah.  Definitely.

Q.   And in fact, it's your testimony that Mr. Longoria did in fact bring that up to you at least one time.  Is that right?

A.   He hinted.  He didn't bring it up directly, but I got, I got just a feeling, and I just nipped it in the bud.  And let me tell you what, Bill May was in that room when we did that conversation.  If it would have been anything, he would have told you.

Q.   Okay.  And Mr. May at the time was a very experienced

practitioner.  Is that right?

A.    Uh-huh, yeah.

Q.    Okay.  And he certainly would have known that a prosecutor can report, even though they don't promise, they certainly can, down the road, report what a certain witness did.  It's done all the time.  Isn't that right?

A.    Sure.

Q.    Okay.  And now did you tell Mr. May that you had written a letter to the Parole Board?

A.    No.  Nor did I give a copy.  And that's why you, when Adan Longoria gave you a statement, he said that I didn't write one for him.  And the reason that -- if you look at your -- you presented a letter from, or an affidavit from Longoria saying that I promised to do it and I didn't do it.

Q.    Right.

A.    Okay.  That, I believe, is because Chris Gale called me and asked me if I would do it.  And I told Chris, "You know, I think I will."  But I told Chris at that time that I don't give copies of these letters.  I don't want a Defendant walking around with a letter from Patti Booth, Patti Hubert Booth that says, you know, they did anything.  I simply --

Q.    Why not?

A.    Because if they --

        THE COURT:  That's obvious.  Move on.  That's obvious to me.

THE WITNESS:  So I sent the letter --

THE COURT:  It should be obvious to you as well.

THE WITNESS:  I sent the letter to the Parole Board. I did not send a copy to Chris Gale.  I did not give a copy to the Defendant.  Only to the Parole Board.  And then we have a copy.  And that was it.  Chris called me, asked me if I would --

THE COURT:  Okay.  I got it.

THE WITNESS:  Okay.

THE COURT:  What else?

BY MR. McHUGH:

Q.   Why wouldn't you send a copy to his lawyer that had requested it?

THE COURT:  Okay.  Look, move on.

THE WITNESS:  I just --

THE COURT:  We're not going to go into her thought process on this.  Move on.  You're way out of the point.

MR. McHUGH:  If I may just have a moment, Your Honor.

THE COURT:  Please.

(Counsel conferring off the record.)

MR. McHUGH:  That's all I have, Your Honor.

THE COURT:  Thank you.  You can stand down, Ms. Booth.

MR. DOWD:  Your Honor, may I just have one issue with Ms. Booth?

THE COURT:  Okay.  Sorry I ever opened this door.

THE WITNESS:  Who gets to cross me, Judge?  Whose witness am I?  Do I have to be crossed by everybody?

THE COURT:  I don't know, but --

(Witness bumps microphone.)

THE COURT:  Oh, my gosh.

THE WITNESS:  I'm sorry, Velma.

THE COURT:  You tried to tell her, Mr. Wiseman.

REDIRECT EXAMINATION

BY MR. DOWD:

Q.   Ms. Booth, let me show you what's been marked as Government's Exhibit Number 5 --

A.   That's it.

Q.   -- and ask if you can identify this.

A.   Yes.  That is the letter, 3-28, yeah, that came right after we finished the trial.  It was a letter from Mr., Mr. Adan Longoria.  And this is the letter, the congratulatory letter that he sent.  And then he said --

Q.   And toward the bottom --

MR. DOWD:  Well, we'd offer Number 5 into evidence, Your Honor, rather than testifying from it.

THE COURT:  Any objection?

MR. McHUGH:  Let me just have a moment, Your Honor.

(PAUSE.)

MR. McHUGH:  No objection, Your Honor.

THE COURT:  Government's 5 is admitted.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.   Toward the bottom of the letter, does Mr. Longoria suggest that, or concede that "You all owe me nothing"?

A.   Right.  He says, "I do understand that you owe me nothing, but it wouldn't" --

THE COURT:  "But."

THE WITNESS:  -- "hurt to ask.  Please take this into consideration on my family's behalf.  Well, I want to thank you for your time on this matter.  Again, thank you."

And I got the letter, and I told Megan that we'd take no action on it.  And we didn't.  That was it.

BY MR. DOWD:

Q.   All right.  And --

A.   But that shows his state of mind four days after the case is over.

Q.   And in relation -- in relation to your letter to the Texas Board of Pardons and Paroles in 2006, when did Chris Gale call and ask for that letter?

A.   That was before I wrote it.

Q.   Well --

A.   I don't --

Q.   Well --

THE COURT:  After the trial, but before you wrote it.

THE WITNESS:  Right.  Right.  It was after the trial, but before I wrote it.  And it was very close in time.

BY MR. DOWD:

Q.   Close in time to your actually writing the letter?

A.   Right.  Right.

Q.   Okay.  And there was no anticipation of filing that --

A.   No.

Q.   -- letter on his behalf at the time of the Bourgeois trial or your discussions with Mr. Longoria?

A.   No.

THE COURT:  Had you ever done that for a state Defendant?

THE WITNESS:  I've never done that before, Judge.

THE COURT:  Okay.

THE WITNESS:  And in fact, I feel bad because I told Orlando Campos that I would write one for him, and that was on the record, but I didn't write it.

MR. DOWD:  Okay.

THE WITNESS:  I forgot.

MR. DOWD:  That's all I have, Your Honor.

THE COURT:  Anything further?

MR. McHUGH:  Yes.

THE COURT:  I was afraid of that.

THE WITNESS:  I know.

RECROSS-EXAMINATION

BY MR. McHUGH:

Q.   So you told Mr. Campos that you would write, what, a letter to the --

A.   I think something, there's something in the record about that -- not a letter, that I would make his cooperation known, and I didn't.

Q.   Known to who?

A.   And I felt bad about that.  I forgot about Orlando.

Q.   Okay.  Now, this letter that --

A.   He was not a squeaky wheel.

Q.   Was Mr. Longoria a squeaky wheel?

A.   Obviously.  You brought -- I mean, here we go.  He's -- he wrote a letter three days after the trial and brought -- and I remembered him again.  This -- go ahead.

Q.   What did you mean by "squeaky wheel"?  Someone who's bothering you, asking you for things?

        THE COURT:  Obviously.  Move on.

BY MR. McHUGH:

Q.   Okay.  This letter --

        THE COURT:  He's still squeaking.

BY MR. McHUGH:

Q.   Government Exhibit 5 --

A.   Uh-huh.

Q.   -- March 28th, 2004, Mr. Longoria's telling you that you didn't promise him anything or "You don't owe me nothing."  Is

that right?

A.   Right.

Q.   You would agree with me that that letter was written after you had told him that "No, no, no, no, you can't bring that stuff up."  Is that right?

A.   It was after the trial was over.  The trial was over, I believe, on March the 24th.  So this letter came in four days after the trial was over.

Q.   So after you had read him the riot act, he wrote this letter.  Is that fair to say?

A.   Read him the riot act?  I mean, a week --

Q.   Well, what do you call it, when you had told -- you told him --

A.   I told him, "No, we're not going to talk about -- I mean that's not what we're talking about.  If you want to talk about that, we're out of here."

Q.   Right.  And so he knew when he wrote this letter what you were --

A.   That he wasn't going to get anything.

Q.   Well, he knew that you didn't want to hear that from him.  Is that right?

A.   No.  He knew that he had been promised nothing and that we owed him nothing, and that's what he put.

Q.   Okay.  Well --

A.   That was it.  That was the end of it.

Q.   All right.  But we would agree that that conversation you had with him was before he put this into writing.  Is that right?

A.   Sure.

Q.   Okay.  By the way --

A.   It was before he testified.

Q.   Who did he write the letter to?  You?  Or did he write it to someone else?

A.   It was, I told you, Megan Beckett, the FBI Agent.  And then in there he talked about Patti and Megan.

Q.   Okay.  But he didn't say that "Patti owes me nothing," did he?

A.   The Government owes him nothing.

Q.   Okay.  That's your interpretation of it.

A.   Yes, sir, that is.

          THE COURT:  Anything else?

          MR. McHUGH:  That's all I had, Your Honor.

          THE COURT:  Thank you.

          MR. DOWD:  Nothing further, Your Honor.

          THE COURT:  You can stand down.

          MR. WISEMAN:  All right, Your Honor.

          THE COURT:  Are we done?

          MR. WISEMAN:  I think except for Dr. Rouse.  I spoke to Mr. Roberts and --

          THE COURT:  Oh.

MR. WISEMAN:  Our suggestion, I think jointly, was that we move right into argument until Dr. Rouse is available.

THE COURT:  Well, you don't have a written report and --

MR. WISEMAN:  Oh, well that's another matter, I'm assuming she's testifying, but --

THE COURT:  You didn't get your written report, and I read last night the deposition of Dr. Leestma.

MR. WISEMAN:  Leestma.

THE COURT:  And I also watched the deposition of the second one of Dr. Price, you know, the one that was taken post --

MR. WISEMAN:  Yes.

THE COURT:  -- hearing.  And I, let's see, I watched last night the Alfred Bourgeois Exhibit 41 and 43 and the Manfred Schenk deposition.

MR. WISEMAN:  Yes.  Your Honor, I think, you know, we would, as I've said in my response to the Government's motion, call Dr. Rouse.  We'd like her to testify.  All I was suggesting, even though it was borderline, prefer to have at least something.  All I was going to suggest was that we start the argument on the other issues.

THE COURT:  Sure.

MR. WISEMAN:  And then when Dr. Rouse is available, we can hear from her.

THE COURT: That's fine.

MR. WISEMAN: Just so the Court knows, at least what our intentions are, unless Your Honor has different questions or concerns, we'd be happy to address them, but we're going to address the first seven claims of the petition. The others, we think, are legal argument and --

THE COURT: Would you all like to take a ten-minute break before we begin that?

MR. WISEMAN: Yeah. I was just going to give you a preview of what you're going to get.

THE COURT: Go ahead. Give me a preview. Tell me what you're going to tell me, then tell me, then tell me what you said.

MR. WISEMAN: Okay.

THE COURT: Right? Aren't those the rules?

MR. WISEMAN: Ms. Larin is going to start off discussing the mental retardation claim.

THE COURT: Okay.

MR. WISEMAN: I will discuss the ineffective assistance of counsel and penalty phase, as well as the jurisdiction claims to Claim III. Mr. Abreu is going to do Claim IV, which is the whole sexual assault claim, along with the amendment, P-179 claim. And then Mr. McHugh is going to discuss claims V, VI and VII, which relate to the bite marks, photo enhancements and the Brady issues that you'll be hearing

about this morning.

THE COURT:  Thank you.

MR. WISEMAN:  So ten minutes?

THE COURT:  What do y'all think?  Ten minutes?  Is that enough?  Okay.

MR. ABREU:  I could use it, Your Honor.

THE COURT:  All right.

MR. ABREU:  Thank you, Your Honor.

(Recess from 10:07 a.m. to 10:34 a.m.)

THE COURT:  Go ahead now.  Thank you.

MS. LARIN:  Good morning, Your Honor.  As we have done --

THE COURT:  When I get a call from a senator, I always talk.

MS. LARIN:  That's a good idea.  As we have demonstrated through the hearing, Mr. Bourgeois is a mentally retarded person, and as such is not eligible for the death penalty.  As Your Honor is aware, the definition of mental retardation involves three prongs, significantly subaverage IQ, deficits in adaptive functioning, and onset of these symptoms before the age of 18.  This definition is used by both the DSM and the AIDDD and has been recognized in Atkins and in the courts.

The definition of mental retardation is not a definition of exclusion.  DSM-IV, at Page 47, specifically

states, "The diagnostic criteria for mental retardation do not exclude an exclusion criteria -- do not include an exclusion criteria.  Therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder."

This means that as long as Mr. Bourgeois meets this three-pronged test, he is mentally retarded.  Mr. Bourgeois can still have other mental health problems, even many other mental health problems.  The presence or absence --

THE COURT:  Just a moment.  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.  I just, I'm going to check on you periodically.  Go ahead.  I'm sorry.

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  We had a break, and I thought I'd double check.

MR. ROBERTS:  Your Honor, since you took a quick break, this is perfect timing.  We got a note from Dr. Rouse.  Could I update the Court on the status, and then we could --

THE COURT:  Yes.

MR. ROBERTS:  -- tell her when she would be ready?

THE COURT:  Sorry.

MS. LARIN:  That's fine.

MR. ROBERTS:  Sorry.

MS. LARIN:  No, you're fine.

MR. ROBERTS:  Dr. Rouse is standing by right now, although she could have a report ready by 2:00 p.m.  I guess she'll explain to us why it's not before now.  And she just asked what time would you like her to be available to testify.

THE COURT:  Mr. Wiseman, this is up to you.  Do you want her testifying without a written report?

MR. WISEMAN:  I think I would rather do that.

THE COURT:  Are you going to call her?

MR. WISEMAN:  I think it's their witness.

MR. ROBERTS:  Yes, Your Honor.  We can call her.

THE COURT:  Okay.

MR. ROBERTS:  And so if you would like -- I didn't understand.  Do you want to wait till 2:00 to get --

MR. WISEMAN:  No, no, I think we should proceed without the report.

THE COURT:  Right now?

MR. WISEMAN:  Well, why don't we let Ms. Larin finish.

THE COURT:  Well, I don't want to interrupt her proceeding.  But on the other hand, I don't want to lose the elusive Rouse.

MS. BOOTH:  Right.

MR. WISEMAN:  All right.  Let's do it now.

MS. LARIN:  I'll do a do-over.

THE COURT:  You can do it all over again.

MS. LARIN:  Okay.  Thank you, Your Honor.

THE COURT:  Because you know what, I was searching around while you were talking for my note pad.

MS. LARIN:  Okay.

THE COURT:  So I'll feel better with my note pad in front of me.  Thank you.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Does she call -- has she called on the meet me line?

MR. ROBERTS:  We can have her call on the meet me line, Your Honor.  We'll -- I sent her that by e-mail.

THE COURT:  Is she there?  All she needs to do is call in.

(Counsel conferring off the record.)

THE COURT:  Ms. Scotch, make sure you've got the right -- Ms. Hohle, call out the number.

MS. HOHLE:  693-6425?

THE COURT:  Yes.  361.

MR. ROBERTS:  Your Honor, in the -- during the deposition, there were some exhibits that were submitted, one of which was the report from Dr. Leestma.  And I know the Court received that, because the defense had -- Mr. Wiseman had filed that.

THE COURT:  Oh, Ms. Scotch, would you get me my

notebook on that deposition?  Thanks.

MR. ROBERTS:  And so I'm going to reference that with the report and the transcript of that during Dr. Rouse's testimony.

THE COURT:  Say that again.

MR. ROBERTS:  I'm going to --

THE COURT:  You're going to give her that -- we're going to be using those during Dr. Rouse's testimony?

MR. ROBERTS:  I'm going to reference the transcript --

THE COURT:  Okay.  Then I want to get them right in front of me.

MR. ROBERTS:  -- and the report.  Yes, Your Honor.

THE COURT:  I thought the most significant part for y'all's information, and you can tell me if I'm wrong, or argue differently, was the bottom -- I don't have it in front of me -- but it's the bottom of Page 88 and the top of Page 89.

MR. WISEMAN:  I'm sorry.  I missed the beginning.

THE COURT:  Bottom of Page 88, top of Page 89.

MR. WISEMAN:  Of Dr. --

THE COURT:  Leestma's.  How do you pronounce that?

MR. WISEMAN:  Leestma.

THE COURT:  Leestma, his deposition.

MR. WISEMAN:  And what about the top and the --

THE COURT:  I thought that was the most significant

part, bottom of 88, top of 89.  I'm going to have it in front of me in just a moment.  Yep, that's it.

DR. ROUSE:  Hello?

THE COURT:  Dr. Rouse?

DR. ROUSE:  Yes.  This is Dr. Rouse speaking.

THE COURT:  Oh, good.  Hold on.  We're going to call you in a moment.

DR. ROUSE:  Okay.  Thank you.

THE COURT:  Mr. Roberts, who wants to -- who's going to take her?

MR. ROBERTS:  Yes, Your Honor, I'll -- we call, United States calls Dr. Rouse.

THE COURT:  Would you give her the oath, please, Ms. Scotch?

THE CLERK:  Yes, Your Honor.

(Excerpt stopping at 10:40:00 a.m.)

(TESTIMONY OF DR. ROUSE PREVIOUSLY TRANSCRIBED.)

(CLOSING ARGUMENTS PREVIOUSLY TRANSCRIBED.)

(Proceedings concluded at 4:16 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    February 22, 2011
Molly Carter                        Date

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM EDWARD MAY, JR. | 4 | 13 | | |
| JAMES SALES | 15 | | | |

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEBRA HOHLE | 43 | 69 | | |
| PATTI HUBERT BOOTH | 78 | 84 | 103 | 105 |

ARGUMENTS ON CLAIM I:
    BY MS. LARIN  . . . . . . . . . . . . . . . . . . . . . 111

EXHIBITS:                                                 RECEIVED

PX-104:  MOTION FOR CONTINUANCE IN LONGORIA CASE  . . .     21

PX-187:  INDICTMENT IN LONGORIA CASE  . . . . . . . . . .   21

PX-188:  TRANSCRIPT OF 4/19/04 PLEA AND REVOCATION

         HEARING IN LONGORIA CASE . . . . . . . . . . . .   23

PX-189:  CONFESSION & STIPULATION IN LONGORIA CASE  . .     25

PX-190:  LETTER TO BOARD OF PARDONS AND PAROLES . . . .     42

GX-1:  FBI LAB REPORT FILE SHIPPED 10/29/03 . . . . . .     49

GX-2:  FACE SHEET OF FBI LAB REPORT . . . . . . . . . .     49

GX-3:  DISCOVERY RECEIPT  . . . . . . . . . . . . . . .     49

GX-4:  CHART PREPARED BY DEBRA HOHLE  . . . . . . . . .     67