UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,

                  Respondent,

      -against-

ALFRED BOURGEOIS,

             Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:

No. Cr-C-02-216
No. Cv-07-223
Honorable Janis Graham Jack,
U.S.D.J.


Electronically Filed

**PETITIONER'S REPLY TO THE
GOVERNMENT'S RESPONSE TO PETITIONER'S
POST-ARGUMENT SUBMISSION AND
OPPOSITION TO MOTION TO REOPEN EVIDENTIARY HEARING[1]**

On February 1, 2011, pursuant to the Court's order, Petitioner filed his *Post-Argument Submission* (document # 649) (hereafter *Post-Argument Submission*, cited as *PAS*). On that same day he separately filed a *Motion to Reopen Evidentiary Hearing on the Question of this Court's Jurisdiction and Motion for Limited Pre-Hearing Discovery* (document # 648) (hereafter, *Motion*). After two unopposed motions for extensions of time, on February 18, 2011, the Government filed its *Response to Petitioner's Post-Argument Submission and Opposition to Motion to*

---

[1]All emphasis is supplied unless otherwise noted. The citations used in the *Post-Argument Submission* are used here.

1

*Reopen Evidentiary Hearing* (hereafter, *Response*).  Petitioner files this *Reply*.

**Claim III.    Jurisdiction.**

**A.    Petitioner's Seven Points.**

In his *Post-Argument Submission*, after reviewing the relevant trial evidence, Petitioner summarized seven gaps in the Government's proof regarding jurisdiction (*PAS*, 18-21).  In a *Response* that is long on rhetoric and surmise, but short on substance, the Government fails to meaningfully respond to Petitioner's seven points.  Petitioner will demonstrate how the Government has either not responded at all to Petitioner's seven points, or else how the response obfuscates rather than clarifies the issues.  The Government's *Response* thus highlights that Petitioner is entitled to relief, or at a minimum, a full and proper hearing on this claim.

The Government's *Response* is rife with generalities and conclusory statements.  Whereas Petitioner provided a detailed, line-by-line, analysis of the evidence, the Government's has failed to engage the actual evidence presented at trial.  See e.g. *Response*, 7 ("The record as a whole establishes that Petitioner murdered his daughter within the special maritime and territorial jurisdiction of the United States" **without discussing the record evidence**); 5-6 (asserting that the jurisdiction question becomes "clear" when Dr. Rouse's opinion is viewed against the "record evidence" **without discussing the record evidence)**; 9 ("the evidence

demonstrated that the only time Petitioner and his daughter exited the truck after the fatal blows was on the Naval Station" **without identifying the evidence**); 10 ("evidence as a whole firmly established jurisdiction" **without identifying the evidence**).

For the first time in this litigation, the Government also resorts to *ad hominen* attacks on counsel.  See e.g. *Response*, 6 (referring to Petitioner's arguments as "not intellectually honest to suggest that certain facts be altered"); 6 (critiquing Petitioner's approach and suggesting that is "essentially how Petitioner approaches every issue raised in his 2255 Motion"); 8 (an aspect of Petitioner's argument "reveals a fundamental flaw in how the Federal Public Defender has approached many issues in this Motion . . . Petitioner's counsel does not account for foundational trial litigation techniques.").  While counsel's skins are thick, they point out these attacks because the instant claim requires a searching review of the evidence – generalizations, impugning motives and *ad hominem* attacks do not substitute for such a review.  Petitioner would submit that the Government has resorted to this tact because an actual discussion of the evidence would confirm Petitioner's entitlement to relief or a hearing.

**Point 1 (*PAS 19*).**  Petitioner has argued that there is no evidence showing that the blows described by AB1994 were struck on the grounds of the Corpus Christi

Naval Air Station (CCNAS) (*PAS*, 19).  Petitioner challenged the Government to point to evidence to the contrary, id., "It would be incumbent on the Government in its responsive submission to pinpoint precisely how they proved that the family was on the grounds of the CCNAS during the events recounted in AB1994's trial testimony."  The Government did not even attempt to meet this challenge.  Their twelve page response on this issue fails to point to a single piece of trial evidence, or even FBI 302 reports, contradicting Petitioner's point.  With one exception, the Government fails to cite to a single fact from the trial record to refute this Point.[2]

The Government's failure to meet this challenge means only one thing: Petitioner is correct – there was no evidence presented at trial to show that the family was on the CCNAS at the time that the blows described by AB1994 were struck.  Thus, taking the Government's proof as true, no rational fact finder could have found the element of jurisdiction.  See Jackson v. Virginia, 443 U.S. 307 (1979).

Instead of citations to evidence, the Government, as noted, resorts to

---

[2]Quite literally, the only trial fact cited by the Government does not address the location of the family when the arguably fatal blows were struck, but rather attempts to show that the blows that were struck were the proximate cause of death. *Response*, 12, citing Tr. 3/4/2004 (AB1994 describing the "real sad face" following infliction of the blows.  This cite has nothing to do with the location of the family when these blows were struck.  To the extent it can be seen as supporting the Government's contention that these blows were the proximate cause of death, they are addressed below in regard to Point 3.

generalities, rhetoric and misdirection.  For instance, the Government suggests that counsel "seeks to have this Court view evidence narrowly . . . [and] to reach conclusions that are contrary to the great weight of the evidence." *Response*, 5.  This response does not further the inquiry.  The Government does not recite or even point to **any trial evidence**, much less the "great weight of the evidence."  While accusing Petitioner of urging a "narrow view" of the evidence, at least Petitioner has engaged the actual evidence.  And, in actuality, Petitioner has not suggested that the Court view the evidence narrowly.  To the contrary, in his submission he has reviewed **all of the evidence** presented at trial, and even evidence that was available but not presented, e.g. FBI 302 reports.  The evidence as a whole fails to show that the truck was on the CCNAS at the time of the blows described by AB1994.

In another example of misdirection in lieu of a discussion of the evidence, the Government characterizes Petitioner's argument as being "wholly contrary to the defense theory of the case" and stating "It is not clear whether Petitioner himself would actually agree with counsel's submission considering that Petitioner has always maintained that he did not injure his daughter." *Response*, 6. This assertion intentionally misdirects the Court and squarely ignores the governing law.   This claim is governed by Jackson v. Virginia, 443 U.S. 307 (1979), see *Petitioner's Memorandum in Support of § 2255 Motion* at 27.  Under Jackson, the Court is

5

required to view the evidence in a light most favorable to the Government.  Id., at 319.  Thus, any petitioner asserting a Jackson sufficiency claim **must** accept – for argument's sake – the Government's proof and demonstrate that even taking it as true, that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." id.  That is what Petitioner did in his *Post-Argument Submission*.

In a related vein, and in an apparent excuse for failing to meet its burden of proving the element of jurisdiction, the Government argues that jurisdiction was not an issue in dispute at trial. *Response*, 10 ("defense counsel at trial did not identify the jurisdiction as an issue to be challenged at trial").  The Government knows better.  Absent a stipulation from the defense (not present in this case), it must prove every element of an offense regardless of whether it is "in dispute at trial."  That has been the law for forty years.  In re Winship, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").  And, in any event, the Government acknowledged that it had the burden to prove this element at trial. Tr. 3/16/04, 10 ("**The last element that we have to prove** is that it happened on a Special Territorial or Maritime Jurisdiction of the United States and that was because it was on the Navy

base").[3]

In another effort at misdirection the Government miscasts Petitioner challenge as relating to the credibility of AB1994. The Government states "While Petitioner does not credit the testimony of Petitioner's then 9-year old daughter, the jury clear found the 9-year old daughter very credible." *Response*, 12. This is simply inaccurate. Petitioner assumed all of the testimony was true (*PAS*, 12-14 reviewing the evidence in detail), as he must under <u>Jackson</u>. He does not challenge her credibility in this claim. He challenges the Government's failure to prove an element of the offense. Petitioner certainly does not blame that on AB1994.

**Point 2 (*PAS, 19*).** Petitioner has also shown that there is **no evidence** establishing that the proximate fatal blows were **not** struck **off of the grounds** of the CCNAS. Again, the Government does not take on Petitioner's challenge to identify the evidence that blows were not struck off the CCNAS. In an implicit acknowledgment that AB1994's testimony alone is not sufficient, the Governments cites and relies on Dr. Rouse's recent testimony and her reliance on **multiple witness statements** to demonstrate that the blows were struck on the CCNAS. *Response* 4, <u>quoting</u> Rouse's hearing testimony, Tr. 1/13/11, 32 ("the description by witness**es**

---

[3]As pointed out in the *Post-Argument Submission*, this is all that the Government said about jurisdiction in its closing argument. *PAS*, 6, <u>citing</u> Tr. 3/16/02, 10.

[plural] of what occurred on the base"). Yet, every witness, with the exception of AB1994, describes events occurring after the infliction of the allegedly fatal blows. In the final analysis, the Government is forced to rely on AB1994, who, as Petitioner has shown, did not testify that the truck was on the CCNAS when the allegedly fatal blows were struck.

**Point 3 (*PAS, 19-20*).**   Petitioner has shown that even assuming AB1994's testimony to be true, there was no evidence presented to show that the blows she described were the proximate cause of death.  The Government relies on AB1994's testimony that the victim had a "sad" face while she was being hit.  *Response*, 12. This fails to make the needed connection.  As Petitioner showed in his *Post-Argument Submission*, there was no evidence presented that the victim went "limp" after the blows or was unconscious.  *PAS*, 12-14.  The fact that a two year had a sad face while being struck is not probative of whether the blows described by AB1994 were fatal – any baby that is struck will have a sad face and such a face hardly means that the blows were fatal.  Indeed, AB1994 used the word "sad" to describe two other events, neither of which had to do with the infliction of fatal blows.  Tr. 3/4-5/04, 41 (describing Robin as "sad" because of fear she would go to jail); at 45 (describing herself as "sad" after her sister was taken to the hospital).

Faced with these realities, and because there is no evidence at all that the child

"went limp," the Government says, "It is not unreasonable to conclude that the 9-year-old's description of a "real, real sad face" was simply her way of saying "the child went limp." *Response*, 12. This argument strains credulity and speaks for itself. But, the Government says, "clearly, the testimony that described the victim after the 'sad face' established that the victim was limp and clinically decomposed [sic]."[4] This is fantasy. AB1994's testimony – detailed and recited line-by-line in Petitioner's *Post-Argument Submission* (*PAS*, 10-14) – shows nothing of the sort. The witness said nothing more than at some undetermined time after the allegedly fatal blows were struck that "she [the victim] was awake, and then she just, like, fell asleep." There is nothing in this testimony to support a conclusion that the child "clinically decomposed."

**Points 4 & 5 (*PAS*, 20).** Dr. Rouse recently testified that because she could not precisely date when the fatal injuries were inflicted, she relied on the change in the victim's clinical signs and a lack of reported clinical symptoms in the days before her death, to support her belief that the blows were struck on federal land. Counsel indicated in its *Post-Argument Submission* that an exhaustive search of the record fails to reveal any support whatsoever for this alleged change in clinical presentation.

---

[4]Throughout its submission, the Government may have mistakenly used the word "decomposed" when it may have meant to say "deteriorated," "decompensated" or "declined." For sake of clarity, Petitioner will use the Government's word.

*PAS*, 8-9.

Stripped of the probative value of AB1994's "sad face" testimony, and left with only its far-fetched interpretation that "sad face" really meant "went limp," the Government is left only with Petitioner's testimony that the child was singing her ABCs before she was found unconscious outside of the truck. *Response*, 11-12. Petitioner has already argued the utter absurdity of relying on this one piece of Petitioner's testimony, while considering the remainder of his testimony to be lies. *PAS*, 14-16. However, in view of the Government's dogged reliance on this testimony as the basis for Dr. Rouse's conclusions, she must be confronted on it at a hearing. She would have to demonstrate that she was 1) aware of this alleged fact before trial; 2) that she actually credited it in arriving at her opinion; and 3) it was a significant contributor to her opinion. This is yet another reason to conduct a hearing on this issue and test the Government's reliance on this testimony.

**Point 6 (*PAS, 20*).** Petitioner contends that Dr. Rouse's reliance on the lack of reports from lay people of clinical signs that the victim deteriorated before arriving at the CCNAS is not supported by the record. The Government fails to respond to this point.

**Point 7 (*PAS*, 20-21).** Petitioner argued that the Government could not rely on the fact that Mr. Bourgeois made up the story that the victim fell from the truck.

It has not relied on this fact in its *Response*.

### B.     The Expert's Opinions.

Dr. Leestma and Dr. Rouse agreed that the fatal injuries cannot be dated by them, or any expert, with any greater precision than one to three days before death.[5]

The experts, however, disagreed on the value of the non-medical evidence, i.e. the accounts of lay witnesses as to the events leading up the victim's death as such relates to whether the injuries were inflicted on the CCNAS.  The Government identified this disagreement: "One key distinction between Dr. Leestma and Dr. Rouse's testimony was Dr. Leestma's myopic focus upon the 'medical evidence' to the exclusion of any circumstances reported by witnesses regarding when the victim decomposed." *Response*, 3.  However, this disagreement is important only if the witness reports demonstrate that the victim "decomposed" on the grounds of the CCNAS as a result of the blows that were struck on the CCNAS.  As Petitioner has shown, however, there was no trial evidence (or FBI 302 reports) showing a decline

---

[5]Significantly, Dr. Rouse also agreed with Dr. Leestma's opinion that the victim had a thrombosis in the sagital sinus. Tr. 1/13/11, 8-9, 10 ("The sagittal sinus, I don't disagree with that at all, that there is a thrombus."). Dr. Rouse also agreed with Dr. Leestma that the thrombosis contributed, at least partially, to death. Id., 37-38. Dr. Rouse also acknowledged that she did not mention the thrombosis in her trial testimony or autopsy report. Id., 38. Had her current opinion regarding the thrombosis been discussed in her autopsy or in her trial testimony, trial counsel would have had yet another reason to vigorously challenge jurisdiction.

in her condition that occurred while on the base that are based on lay reports. And, the Government has offered none in response to Petitioner's *Post-Argument Submission*. Thus, this alleged credibility gap would only be important if the Government cited the evidence relied upon by Dr. Rouse. Because the Government has not proffered or cited this evidence, there is simply no material dispute between the experts.[6]

---

[6]The Government complains Dr. Leestma went beyond his report during his deposition testimony, and they did not have sufficient time to prepare. *Response*, 3. Petitioner disagrees with this statement as Dr. Leestma did not testify beyond the scope of his report. In any event, there is much irony to this complaint – at least Dr. Leestma furnished a report. While Petitioner does not fault Dr. Rouse for not having time to prepare a report, he should not be made to suffer inasmuch as he has been requesting her testimony throughout the conduct of this litigation. See Transcript of Oral Argument, 4/20/10, 45 (Petitioner: "[we are] curious that the Government has not got a declaration from Dr. Rouse rebutting our claim"); at 46 (Petitioner: "We are going to present expert testimony, we expect Dr. Rouse will be here."); at 51(Petitioner: "it seems pretty plain to us that at a minimum Dr. Rouse needs to explain why that right-sided subdural hematoma, which she said was the cause of death, didn't, happened on the Naval base."); at 55 (Petitioner: "I want Dr. Rouse here. I want to talk to Dr. Rouse. I want to cross-examine her, as trial counsel should have cross-examined her, about what the cause of death was and when it happened . . .").

The last minute production of Dr. Rouse for telephonic testimony and without provision of a report are further reasons to reopen the hearing, discussed below at Part D.

### C.    Government's Closing Argument.

Petitioner has pointed out that in its closing argument, the Government failed to even argue or point out evidence that the fatal blows were inflicted on federal land. Instead, the Government spoke to the jury about a "systemic execution" that occurred over a period of time. *PAS*, 5-6.  In response, the Government says that its closing argument is not evidence, and that Petitioner's counsel's position results from a "fundamental flaw in how the Federal Public Defender has approached many issues in this Motion.  While clearly advancing very intellectual and theoretical points . . . Petitioner's counsel does not account for foundational trial litigation techniques." *Response*, 8.  The Government continues, that using such "foundational techniques" it is "common" for lawyers to only focus on contested issues.  Id.

The Government's suggestion that undersigned counsel fail to understand or appreciate "foundational trial technique" is patronizing and more importantly is simply not so.[7]  Petitioner's counsel have not merely advanced "intellectual and theoretical" arguments – they have reviewed the facts and applied the law – that is what lawyers do!  Obviously, what is said in closing argument is not evidence, however, a "prosecutor's closing argument to the jury and post trial representations

---

[7]Three of Petitioner's four attorneys each have extensive trial experience in both state and federal criminal trial courts, in **addition** to their post-conviction capital experience. They fully understand the "foundations" of trial technique.

13

to the court are the most accurate assessment of the evidence the government produced at trial," Kamienski v. Hendricks, 332 Fed.Appx. 740, at *9 (3d Cir. 2009) (granting relief on Jackson claim).  Petitioner is confident that if the prosecution could have argued that the evidence demonstrated that the fatal blow was struck on federal land, it would have said so to the jury.  It did not argue this point because it knew the evidence did not support it.[8]

---

[8]These problems are reflected in Mr. Robert's handwritten note, referenced in the *Post-Argument Submission* at 7.  In response to these notes, the Government attempts to minimize their significance.  The Government says that the notes are an accurate statement of the law.  *Response*, 9.  That is largely true (although the notes do not address the question of proximate cause), however, what the Government fails to mention is the highlighting and capitalization that demonstrates a concern on the Government's part.  The Government also ignores that these notes were taken during the preparation of its witness.  The fact that counsel generated this note about jurisdiction and then avoided asking the witness about it, is strong proof that the Government knew that jurisdiction was problematic.

Respecting the notes, the Government also says that they are protected by the work-product privilege.  Id.  However, Mr. Robert's provision of these notes to counsel on April 19, 2010 constituted a waiver of the privilege.  Indeed, the reported cases on work-product all address whether a party is entitled to receive discovery **before it has been produced**.  Here, the discovery is already in Petitioner's hands and therefore the privilege is waived.  Even if the privilege is not waived, the work-product privilege is a qualified privilege.  United States v. Nobles, 422 U.S. 225, 239 (1975).  It must yield upon a showing of "necessity or justification".  8 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2022, p. 324 (2d ed.1994).  One can scarcely imagine a more compelling circumstance justifying and necessitating the use of Mr. Robert's notes.  To be clear, these notes were taken when he interviewed Dr. Rouse pre-trial and they discussed jurisdiction.  Thus viewed, these notes are not protected at all, but constitute disclosable evidence under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny.  Had these notes been disclosed to

14

**D.      The Need to Reopen the Hearing and Permit Discovery.**

Petitioner has not had a hearing on this issue.  He was denied a hearing by this Court following the April 20, 2010 argument on the scope of the evidentiary hearing. Instead of a hearing, the Court permitted Petitioner to proffer by declaration any expert evidence in support of this claim.  Tr. 4/20/10, 55.  The Court made clear that any such expert proffer must include a review of the autopsy slides, as well as other trial testimony.  After retaining Dr. Leestma, he conducted his initial review and also indicated his desire to review the autopsy slides.  Petitioner requested them from the Government on June 11, 2010.  It took from then until early January for the Government to locate the slides and for the custodian of the slides to produce them. These events are detailed in a series of motions filed by Petitioner, or jointly.  See *Petitioner's Unopposed Motion for Subpoena Duces Tecum*, filed September 3, 2010 (document # 550); *Petitioner's Unopposed Motion to Continue Time for Taking a Deposition of Dr. Leestma*, filed November 14, 2010 (document # 604); *Petitioner's Unopposed Motion for Subpoena Duces Tecum,* filed December 3, 2010 (document # 617); *Petitioner's Unopposed Motion for Subpoena Duces Tecum*, filed December 8, 2010 (document # 618); and *Joint Motion to Continue Hearing and Argument*,

---

trial counsel, there is a reasonable probability that they too would have challenged jurisdiction.

filed January 4, 2011 (document #633).

Because of the above-cataloged difficulties, Petitioner was not able to depose Dr. Leestma until January 10, 2011. After his deposition, the Government presented Dr. Rouse via telephone and without provision of a report. Without a report, counsel were not able or prepared to present the witness with photographs or witness statements that may have impacted her reliance on the so-called "clinical picture" of the victim before and after the allegedly fatal blows. This was not a proper or full hearing.

In response to these facts the Government points out that the Court has accommodated Petitioner with regard to **other issues**. *Response*, 2. That is true. The Court granted Petitioner additional hearing time in order to accommodate unavailable witnesses and others who could not be scheduled within the time allotted. Petitioner was and remains appreciative of those accommodations. However, those have nothing to do with Petitioner's legal entitlement to an evidentiary hearing regarding a § 2255 claim.

28 U.S.C. § 2255(b) sets forth the standard governing when a hearing is appropriate and required:

> Unless the motion and the files and records of the case conclusively
> show that the prisoner is entitled to no relief, the court shall . . . grant a
> prompt hearing thereon [and] . . . make findings of fact and conclusions

16

of law with respect thereto.

The Court of Appeals for the Fifth Circuit has strictly construed this language, holding that an evidentiary hearing is required "[i]f the district court cannot resolve the allegations without examining evidence beyond the record." United States v. Smith, 915 F.2d 959, 964 (5th Cir. 1990); Byrne v. Butler, 845 F.2d 501, 512 (5th Cir. 1988) ("If the petitioner's allegations cannot be resolved absent an examination of evidence beyond the record, a hearing is required"); Martinez v. Dretke, 111 Fed.Appx. 224, 229 & n.15 (5th Cir. 2004) (applying same standard in section 2254 case).

Given Dr. Rouse's inability during her January, 2011 testimony to identify which witnesses upon which she relied to arrive at her conclusion, a hearing is required on this question. A hearing is also required because of the improper hypothetical question posed by the Government to both Dr. Leestma and Dr. Rouse that the victim went "limp." Petitioner objected to this question because there was no evidence that the victim went limp, and the Government has now acknowledged as much.

A hearing is also required regarding the ineffective assistance of counsel claim related to jurisdiction. Neither Petitioner nor the Government questioned Mr. Gilmore about it because it was not within the scope of the hearing that the Court

ordered.  Further, the Government failed to propound interrogatories to Mr. Tinker on this topic, despite its propounding a significant number of others.  In short, trial counsel have not been heard from on this topic.

A hearing is further required because of the following **proffer**.  In a meeting attended by current counsel (Wiseman, Abreu and McHugh) in trial counsel's offices on or about February 1, 2008, current counsel questioned Mr. Tinker and Mr. Gilmore about their failure to challenge jurisdiction.  Mr. Tinker responded that he did not challenge jurisdiction because it was his belief that federal jurisdiction existed if JG-1999 was found unconscious at the Corpus Christi Naval Air Station, regardless of where the fatal injury was inflicted.  At a hearing, Petitioner will question Mr. Gilmore about his recollection of that conversation and will produce contemporaneous notes taken by counsel showing that Mr. Tinker made this statement.

The Government has also failed to respond to Petitioner's request to provide him with an opportunity to inspect the photographs it seized from Petitioner. Petitioner believes that these photos may shed light on the victim's condition in the days leading up to her death and therefore on the question of jurisdiction.  Petitioner is entitled to confront Dr. Rouse with the photos and witness statements to test the reliability of her reliance on the victim's clinical presentation to date the fatal blows.

**Claim II.    Ineffective Assistance of Counsel for Failing to Present Extant Mitigating Evidence.**

The Government's 65 page submission on this claim contains multiple errors and mistatements of law.  Petitioner replies to the most egregious.

**A.    The Responsibility for Managing the Mitigation Investigation Rests Solely with Counsel.**

Conceding, as it must, that the mitigation investigation fell far short of what the Eighth Amendment requires of capital counsel, the Government seeks to shift responsibility from counsel to the mitigation specialists and Dr. Cunningham.  This effort fails.[9]  The responsibility belongs to counsel alone.

The Government relies, in part, on the AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, FEBRUARY, 2003 (hereafter, ABA Guidelines),[10] to support a number of its positions, including that counsel may rely on their experts and

---

[9]See e.g. *Response*, 42 (noting that the mitigation investigation was "off schedule"), 52 ("the mitigation investigation report didn't get to Dr. Cunningham in a timely manner, not because Trial Counsel failed to send it, but because the mitigation investigators failed to furnish it in a timely manner.  **Again, the shortcoming of the mitigation investigators are not automatically attributable to Trial Counsel**.")

[10]The ABA Guidelines are published at 31 Hofstra Law Review 913 (2003) and are available on line at http://www.americanbar.org/advocacy/other_aba_initiatives /death_penalty_representation/resources.html.

mitigation specialists and are not responsible for their overall supervision. *Response*, 44 ("Habeas Counsel's theory of ineffectiveness of counsel in this regard depends upon laying 100% of the blame for the problematic mitigation investigation on Trial Counsel, under the theory that Counsel was responsible for supervising the mitigation experts and monitoring their duties.").[11]

There is no doubt that while a lawyer should rely on experts in the area of their expertise, as the ABA Guidelines advise, nothing in them or anywhere else – and certainly nothing cited by the Government – absolves capital counsel from monitoring and supervising the progress of those employed by counsel to conduct the mitigation investigation. See ABA Sponsored, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, 36 Hofstra Law Review 677 (2008) (hereafter, ABA Mitigation Guidelines).[12] The ABA Mitigation Guidelines require capital counsel to assemble and rely on a host of

---

[11] Again, there is irony in the Government's argument. It seeks to excuse trial counsel's failure to supervise and manage the mitigation case because counsel must rely on their experts. However, when it came time to listen to their experts, counsel either failed entirely to meet with them at all (Dr. Weiner), or only had truncated communications with them (Dr. Cunningham). The same is true for counsel's interactions with Dr. Johnson, related to the DNA claims before the Court. The Government cannot have it both ways.

[12] Available on line at http://www.americanbar.org/advocacy/other_aba_ initiatives /death_penalty_representation/resources.html.

experts, however, the duty to supervise, monitor and direct the work of these experts never shifts from counsel:

> Counsel has a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; **and to supervise and direct the work of all team members**. Counsel must conduct such investigation of the background, training and skills of the team members as will determine that they are competent and must ensure on an ongoing basis that their work is of high professional quality. . . .**All members of the defense team are agents of defense counsel.**

ABA Mitigation Guidelines, Guideline 4.1 B & C, 36 Hofstra Law Review 677, 680 (2008).

In an example of the Government's failure to hold counsel accountable, it states that trial counsel acted diligently regarding the mitigation investigation. *Response*, 43. How can that be when their mitigation specialists did not even visit Mr. Bourgeois until four months after they were retained? *Response*, 15. It was counsel's job to make sure that these "agents" saw their client. And, if for whatever reason, these agents could not do their job, it was up to counsel to secure others.

In another example, the Government asserts that counsel were "saddled" with Lisa Milstein's unavailability to perform work. The Government says that her failures to perform were never "communicated to Trial Counsel." *Response*, 18. This is extraordinary. As the weeks turned into months, and the work was not getting

done, counsel had an obligation to inquire and to insure that it would be done and done well.  If some extraordinary reason prevented the work from being completed, counsel were obliged to report that to the Court.  Had counsel done so, the motions hearing of December 10, 2003 (referenced at *PAS*, 28-30) may well have ended differently.  In fact, when the Court demanded to hear about the delay from the mitigation specialists themselves (where presumably some of Ms. Milstein's problems may have come to light), counsel instead withdrew the motion for a continuance.

The Government seeks to lay blame on Dr. Cunningham for counsel's failures.  They say that Dr. Cunningham failed to alert trial counsel to the flaws in the mitigation work until February 7, 2004.  *Response*, 18.  However, the record shows that Dr. Cunningham did not **receive a single piece of mitigation work** until one week earlier.  Tr. 9/21/10, 216 (Dr. Cunningham testifying that he received the first mitigation information from the investigators on January 31, 2004).  Dr. Cunningham moved swiftly to alert trial counsel – it was counsel that were not properly performing their roles.

### B.   The Coma.

The Government relies heavily on Mr. Bourgeois' report that he had been in a coma for weeks as a result of a three wheeler accident.  *Response*, 15, 16, 20, 33-35,

22

50, 51, 54.  According to the Government, this false claim was "relied upon" by Dr. Weiner in "making his neurological assessments" *Response*, 16.  This is false.  Dr. Weiner testified that his neuropsychological testing, showing that Mr. Bourgeois had "mild brain impairment," Tr. 9/20/10, 239, was valid, and the fact that Mr. Bourgeois may have lied about the coma was not relevant to the validity of his results, or his scientific conclusions.  Id., 244 ("I would have [told trial counsel] that the actual test results appear to be valid and that there was no evidence of malingering and that the results showed that there was brain damage which was not caused, at the time I didn't know because I thought he had been in a coma, that regardless of what the cause was he has some brain damage.") Dr. Weiner never had the chance to tell this to counsel because counsel never met with him.  In a brief phone call – so brief that Dr. Weiner did not bill for it – counsel told him that they were not going to call him at trial because of the coma story.  Counsel never asked him about the basis for his conclusions and whether he could offer valid and helpful testimony, notwithstanding the alleged falsehood told by Mr. Bourgeois.  Id., 243.[13]

Moreover, Dr. Weiner testified that when he evaluated Mr. Bourgeois (after

---

[13]Counsel's brief phone call with Dr. Weiner stands in bold contrast to the **five hours** that Dr. Price spent with the Government lawyer's outside of court preparing the case (Tr. 9/24/10, 33-34), and the five days he sat with Government counsel during the hearing.

trial already commenced), he was provided **with no collateral information.** Id., 241 ("I only knew what he [Petitioner] told me").  This means that counsel failed to provide this expert with the hospital records that showed that the coma story was false.  Had Dr. Weiner had these records, he would have been able to question Mr. Bourgeois about the coma, and he would have learned that he was not in a coma.  Id., 210.  Significantly, Dr. Weiner would have also learned from these hospital records that while Mr. Bourgeois did not suffer a coma, he did suffer from a different head injury that could have contributed to his organic brain dysfunction.  Id.

Counsel deficiently failed to provide these records to Dr. Weiner.  Had they done so, the coma story would have been put to rest, and the expert would have seen a different head injury.  See Rompilla v. Beard, 545 U.S. 374 (2005).  In Rompilla counsel failed to review a court file that contained aggravating evidence that the prosecution told them would be used against their client.  They failed to ever look at the file.  Had they done so, they would have not only seen the aggravating evidence, but a wealth of leads to discovering mitigating evidence.  This is analogous to Petitioner's situation.  Trial counsel never provided the medical records to Dr. Weiner.  Had they done so, he would have seen that the coma was not verified, but he would have also learned of a different mitigating fact – the 1993 head injury. Rompilla rejected the argument that the petitioner there could not benefit from the

unexpected mitigating evidence contained in the unreviewed file:

> The dissent would ignore the opportunity to find this evidence on the ground that its discovery (and the consequent analysis of prejudice) "rests on serendipity," *post,* at 2476.  But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents;  and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.

Rompilla, 545 U.S. at 391, n. 8.

### C.     Mr. Bourgeois Was Abused.

The Government states:

> During this all-important first formal interview [Bierbaum's], Mr. Bourgeois did not report any child abuse. *Galloway v. Thaler*, 344 Fed.Appx. 64, 68- 69, 2009 WL 2873910, 3 (5th Cir. 2009) (Petitioner failed to disclose sexual abuse to his attorneys despite their efforts to talk with him). **This Court** has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 251-53 (5th Cir. 2002), *Soria v. Johnson,* 207 F.3d 232, 250-51 (5th Cir.2000); *West v.Johnson,* 92 F.3d 1385, 1408-09 (5th Cir.1996).

*Response*, 33.[14]  While, like many adult survivors of childhood abuse, Mr. Bourgeois

did not freely discuss this distressing chapter of his life, the abuse itself was no secret.

**Every mental health professional** who has examined Mr. Bourgeois in this litigation

– pre trial and in post-conviction – has concluded that he was abused.  Moreover, the

---

[14]The Government's reference to "This Court" shows that at least this portion of its brief was lifted from a different, Fifth Circuit, appellate brief.

memos that were generated by the mitigation specialists demonstrate that there is no question but that Mr. Bourgeois was so abused, and that Mr. Bourgeois did report much of the abuse to the investigators.  These reports of abuse are reflected in investigative memos.  See Tr. 9/24/10, 12-18 (Wiseman reading memos into record); 53 (Ms. Booth reading others) and 55 (Court admitting memos into evidence, as Exhibit 61-A).

> **D.     Counsel Were Not Excused for Failing to Present the Extant Mitigating Evidence Because it Conflicted with the Guilt Phase Defense.**

The Government insists that trial counsel were excused from presenting the extant mitigating evidence that was within their reach, because doing so conflicted with the guilt phase defense that Mr. Bourgeois did not commit the offense. *Response*, 37-40.  In support of this argument, the Government provides a lengthy block quote from the ABA Guidelines.  *Response*, 39. What this section of the commentary to the Guidelines says is that counsel should attempt to reconcile the guilt and penalty phase defenses so as to reduce the risk that the defense team will lose credibility with the jury.  So, for instance, the commentary advises presentation of guilt phase defenses that "seek to reduce the client's culpability for the crime . . . rather than to deny involvement altogether."  ABA Guidelines, commentary, quoted by Government, *Response*, 39.   The ABA Guidelines go on to tell capital counsel

what they must do when circumstances are such that they cannot mesh the guilt phase and penalty phase presentations – that advise is not to throw in the towel and present nothing:

> But whether or not the guilt phase defense will be that the defendant did not commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase.

Id.

The notion that counsel did not present the mitigating evidence because such a presentation would have conflicted with the guilt phase defense, is a red-herring. Not only do the Guidelines say so (see above), trial counsel themselves tried to present and argue some of the types of mitigating evidence that is being put forward by undersigned counsel. They simply did a poor job of it because the actual mitigation investigation had long before run off the rails. See Tr. 9/22/10, 208-210 (Mr. Gilmore acknowledging that he and Mr. Tinker argued abuse even though they claimed to not have wanted to present it because it conflicted with the guilt phase defense of "I didn't do it.").

### E.   Only Counsel's Actual Reasons for their Actions are Worthy of Consideration.

The Government continues to insist that this Court may judge counsel to be effective based on their reputation. *Response*, 26. The Government urges the Court

to consider counsel's experience and skill.  In a similar vein, the Government offers any number of alleged strategic reasons for counsel's actions or omissions, which are not supported by any statements ever made by counsel.  E.g., *Response*, 40 (suggesting that counsel did not call Dr. Cunningham because his presentation assumed that Petitioner's committed the offense), 56 (suggesting that counsel did not present mitigation through Dr. Cunningham or lay witnesses because they chose to rely on "residual doubt").   However, these positions are contrary to Supreme Court authority and other authority, which say that a prosecutor may not conjure, and courts may not find, strategic reasons for counsel's actions or omissions that counsel have not endorsed.  Wiggins v. Smith, 539 U.S. 510,  526-27 (2003) (unreasonable for court to invoke a "strategy" for counsel that was inconsistent with counsel's actions at trial); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (under Strickland, courts cannot use hindsight to supply a strategy for counsel); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not" (citing Strickland; Kimmelman)).

WHEREFORE, for all of the above reasons, and based upon the record of these proceedings, Petitioner requests that the Court grant the relief requested in the § 2255 Motion, or alternatively that the Court grant Petitioner the evidentiary hearing and discovery he has moved for.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner
Alfred Bourgeois

Dated:          February 23, 2011
                Philadelphia, Pennsylvania

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 23rd day of February, 2011 the foregoing has been served upon the following persons by filing the same with the Court's ECF Filing System:

Tony Roberts
Patti Booth
Mark Dowd
Elas Salinas-Patterson

/s/ Michael Wiseman

Michael Wiseman