not available at the time of appeal. His cumulative-error claim (claim thirteen) asks the Court to take into consideration issues that he properly raised for the first time in his Motion to Vacate. The Court, therefore, finds that a procedural bar only forecloses consideration of Bourgeois' ninth, eleventh, and part of his third claims.

A procedural bar is not insuperable. An inmate may overcome the procedural bar by (1) demonstrating "cause" for not raising the issue on direct appeal and "actual prejudice" resulting from the error or (2) showing that he is "actually innocent" of the crime for which he was convicted. *See United States v. Frady*, 456 U.S. 152, 157 (1982); *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000); *United States v. Flores*, 981 F.2d 231, 234-37 (5th Cir. 1993).[24] Bourgeois does not claim to be actually innocent. Instead, Bourgeois argues that he can overcome any procedural bar because appellate counsel's failure to raise the defaulted issues amounts to ineffective assistance. As the Court will discuss at greater length with respect to Bourgeois' related substantive ineffective-assistance-of-appellate-counsel claim (claim twelve), he has not shown that his appellate counsel violated his constitutional rights by omitting any issue on appeal. The Court, therefore, finds that a procedural bar forecloses relief on Bourgeois' ninth, eleventh, and part of his third claim. Given the severity of the sentence Bourgeois faces and the importance of ensuring the fundamental fairness of capital trials, however, the Court will briefly address the merits of the procedurally barred claims in their respective order.

---

[24]     Bourgeois also argues that the International Covenant on Civil and Political Rights (ICCPR) trumps the American judicial system's procedural-bar jurisprudence. Bourgeois has not pointed to any authority forgiving procedural deficiencies based on that, or another, international treaty. The Supreme Court has found that other international treaties do not preempt the operation of procedural bars. *See Medellin v. Texas*, 552 U.S. 491, 512 (2008); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006).

41

## ANALYSIS

### I.    Bourgeois' Alleged Mental Retardation (claim one)

Bourgeois alleges that mental retardation precludes his execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). No mental health professional identified Bourgeois as mentally retarded until after he received a death sentence. Up to that point, Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies. Bourgeois graduated from high school at age 18, with the only record of his grades showing B's, C's, and D's. He worked for many years as a long-haul truck driver. He bought a house, purchased cars, and handled his own finances. IQ testing before trial resulted in low scores, but one expert nonetheless described his intelligence in a manner inconsistent with mental retardation. Trial counsel's extensive interaction with Bourgeois did not hint that he was mentally retarded. Bourgeois' trial testimony, long colloquies with the Court, and detailed writings never called into question his intellectual functioning.

Bourgeois now claims that the accomplishments of his life mask an intellect falling within the lowest two percent of the population. According to Bourgeois, his loved ones always considered him to have low intelligence. He owed his academic grades and high school graduation to social promotion, not intellectual competency. Success, such as it came to him, only resulted from significant support and assistance from others. Through his life, Bourgeois purportedly compensated for his low intelligence by subtly eliciting the help. However, no one ever tested Bourgeois for mental retardation until the Government charged him with capital murder. Until after he received a death sentence, Bourgeois allegedly hid his mental deficiencies and gave the appearance of operating with adequate intelligence. This left his current attorneys with the task of trying to prove his mental retardation through retroactive assessment – something the psychological profession did not design its tests to do.

42

Bourgeois has amassed lay accounts and expert opinions to support his claim that he falls within the category of offenders the Supreme Court intended to exempt from execution. He also argues that trial counsel provided deficient performance by failing to recognize and develop evidence of his mental retardation. The Government has responded with significant evidence showing that, while Bourgeois' intellectual functioning maybe below normal, he is not mentally retarded. A full review of the evidence and applicable law demonstrates that Bourgeois' *Atkins* claim is without merit.

### A.    Background of Bourgeois' *Atkins* claim

Bourgeois claims both statutory and Constitutional law precludes his execution. In *Atkins*, the Supreme Court found under the Eighth Amendment's "evolving standards of decency" review that "death is not a suitable punishment for a mentally retarded criminal." *Atkins*, 536 U.S. at 321. Even before *Atkins*, however, the Federal Death Penalty Act of 1994 mandated that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C.A. § 3596(c).[25] "The only substantive change . . . ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (i.e., constitutional) that bars their execution." *United States v. Webster*, 421 F.3d 308, 311 (5th Cir. 2005).[26]

---

[25]    A dearth of jurisprudence exists with regard to *Atkins* cases under the FDPA. Federal cases do not meaningfully distinguish *Atkins* cases under the FDPA from those originating in state court. The Court, therefore, will look to death penalty cases arising from state jurisdictions, which federal courts evaluate whether a judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1).

[26]    In the memorandum of law supporting his section 2255 motion, Bourgeois argues that his history of mental problems should prevent his execution. (DE 402 at 15). In other words, Bourgeois asks the Court to extend *Atkins* beyond prohibiting the execution of the mentally retarded to anyone with mental illness. The Fifth Circuit has found that, absent any indication of insanity, the Constitution does not prevent the execution of mentally ill inmates. *See ShisInday v.*

(continued...)

The *Atkins* Court, however, approached the new constitutional constraint on executions with caution. While acknowledging that prevalent societal norms protected the mentally retarded, the Supreme Court left the contours of that new exemption murky. The *Atkins* Court conceded that "[t]o the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." 536 U.S. at 317. Instead of creating a bright-line test to determine intellectual ineligibility for death, the Supreme Court "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within *Atkins*' compass." *Bobby v. Bies*, ___ U.S. ___, 129 S. Ct. 2145, 2150 (2009) (quotation omitted); *see also Moore v. Quarterman*, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he *Atkins* Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").

Accordingly, a " welter of uncertainty follow[ed] *Atkins*" because "the Supreme Court neither conclusively defined mental retardation nor provided guidance on how its ruling should be applied to prisoners already convicted of capital murder." *Bell v. Cockrell*, 310 F.3d 330, 332 (5th Cir. 2002). Time has produced a patchwork of judicial standards, all informed to a greater or lesser extent by the psychological profession's understanding of mental retardation. This case, like many following in *Atkins*' wake, depends on the interplay between constitutional law and psychological science.

The psychological profession generally agrees as to what standards govern a diagnosis of mental retardation, though the experts in this case have differed drastically in their application of

---

[26]      (...continued)
*Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007). Bourgeois has not alleged that he is incompetent for execution, and nothing in the record at this point suggests a similar mental condition. Bourgeois has not shown that this Court should extend the *Atkins* decision to mentally ill death row inmates.

those standards. Two sources provide equally valid definitions of mental retardation. The *Atkins* Court relied on the definition provided by the American Association on Mental Retardation ("AAMR"), which is now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by *significantly subaverage intellectual functioning*, existing concurrently with *related limitations* in two or more of the following applicable *adaptive skill areas*: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests *before age 18*.

*Atkins*, 536 U.S. at 309 n.3 (quoting AMERICAN ASSOCIATION OF MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) ("AAMR 9th")) (emphasis added).[27] In addition to the AAMR, the *Atkins* Court also referenced the American

---

[27]    The *Atkins* Court relied on the AAMR 9th edition's understanding of mental retardation. In May 2002, the AAMR released a 10th edition that slightly modified its definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR 10TH at 1 (10th Ed. 2002). The AAIDD has recently published an 11th edition of the manual, with the following definition: "Intellectual disability is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." AAIDD 11th at 1. The definition now includes five "assumptions":

> (1) limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture;
>
> (2) valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors;
>
> (3) within an individual, limitations often coexist with strengths;
>
> (4) an important purpose of describing limitations is to develop a profile of needed supports; and

(continued...)

45

Psychiatric Association's ("APA") definition of mental retardation. *See Atkins*, 536 U.S. at 309 n.3

(quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)

("DSM-IV-TR"). The APA definition states

> The essential feature of Mental Retardation is *significantly subaverage general intellectual functioning* (Criterion A) that is accompanied by *significant limitations in adaptive functioning* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur *before age 18 years* (Criterion C).

DSM-IV-TR at 41 (emphasis added). Together, the APA and the AAIDD standards for mental

retardation thus contain three indispensable criteria for arriving at a diagnosis of mental retardation:

(1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive

skill areas; and (3) manifestation of those limitations before age 18. *See Clark v. Quarterman*, 457

F.3d 441, 446 (5th Cir. 2006).[28]

---

[27]    (...continued)
(5) with appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve.

*Id.* Dr. Swanson and Dr. Moore relied on the 11th edition. Dr. Price relied on the DSM-IV definition, but mentioned the AAMR 9th standards. Dr. Gelbort did not specifically assess for adaptive deficits, but mentioned a standard similar to the 10th or 11th editions. The experts did not describe any meaningful distinction between the various editions as to the substance of what constitutes mental retardation. Dr. Price explained that the 11th edition is "a restatement of the same thing" without "significant differences." (DE 595 at 282). To date, the Fifth Circuit "has never distinguished between" the various editions of the psychological manual. *Moore v. Quarterman*, 342 F. App'x 65, 72 n.6 (5th Cir. 2009). The Court will generally refer to the 11th edition when referring to the evidence in this case, but will also occasionally mention the earlier editions under which significant *Atkins* jurisprudence has developed.

[28]    Because the witnesses referred to the AAIDD by both its current and former names, the Court will also do so interchangeably. The AAIDD currently uses the term "intellectual disability" instead of mental retardation. *See* AAIDD 11th at xvi. The APA, however, has not yet adopted the term "intellectual disability" and the current diagnostic manual still contains the phrase
(continued...)

Courts have uniformly accepted this tripartite formulation for deciding whether an inmate qualifies for *Atkins* protection. Yet courts have also struggled to guarantee that convicted capital murderers who claim to be mentally retarded are evaluated in a nonarbitrary manner. An examination for mental retardation, and particularly the adaptive-skills component of that inquiry, involves the subjective evaluation of skills, aptitudes, and life experiences. Transposing the psychological community's understanding of mental retardation unto the legal context amplifies the subjectivity of this analysis.

Here, as in most *Atkins* cases, equally qualified experts have examined Bourgeois and his life and reached drastically different professional opinions about his intellectual functioning. *See Wiley v. Epps*, 625 F.3d 199, 215 (5th Cir. 2010) (noting that most *Atkins* cases involve "essentially a battle of the experts, who gave competing opinions as to [an inmate's] IQ and intellectual functioning"). As will be discussed below, Bourgeois' experts conclude that he is mentally retarded. The law, however, has not completely turned the question of eligibility for execution over to the psychological community. *See Clark*, 457 F.3d at 445 (recognizing that the Supreme Court in *Atkins* did not hold that courts "*must* track the approach of the [AAIDD] or the APA exactly"). The law observes that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior, [and] on cure and treatment[.]" *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985); *see also Jones v. United States*, 463 U.S. 354, 365 (1983) ("The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of

---

[28]   (...continued)
"mental retardation." To preserve continuity with existing jurisprudence, the Court will use the term "mental retardation" throughout this Memorandum and Order.

judgment.").[29] The *Atkins* decision did not delegate to psychologists the determination of whether an inmate should not face execution, but left the contours of the constitutional protection to the courts. Thus, psychology informs, but does not determinatively decide, whether an inmate is exempt from execution. *See Hall v. Quarterman*, 534 F.3d 365, 395 (5th Cir. 2008) (observing that federal courts cannot "commit the ultimate decision of mental retardation to the experts" alone).

With those principles in mind, the Court turns to the expert and lay evidence relating to mental retardation.[30]

---

[29] The psychological community's understanding of mental retardation is evolving. The few short years since the *Atkins* decision has seen change in the definition of mental retardation, renovation of the name of the most prominent advocacy organization, and even abandonment of the very term mental retardation. Adoption of the phrase "intellectual disability" is only the most-recent terminology in the psychological community's developing understanding of mental retardation. *See* AAIDD 11th at 7-11 (outlining the various definitions of and terms for mental retardation used by the mental health community in the last century). As the AAIDD observed in the 10th edition of its guidebook:

> The field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying. For example, we are in the midst of discussions about the nature of intelligence; the relationship between intelligence; the implementation of the supports paradigm; the best way to conceptualize disabling conditions; the impact of consumer and reform movements; and the effects of terminology upon individual lives.
>
> This state of flux is both frustrating and challenging. It is frustrating because it prohibits one from relying on past language, definitions, and models of mental retardation that can be a source of stability and permanence to some. However, the state is also challenging, as it provides the opportunity to incorporate the current and evolving understanding of the condition of mental retardation and the factors that influence the lives of people in their societies. Whether perceived from a positivistic or social perspective, the condition of mental retardation is being thought of differently today throughout the world.

AAMR 10th at xii.

[30] An inmate bears the burden of proof on his *Atkins* claim and must prove the existence
(continued...)

48

## B.    Intellectual Functioning

To qualify for a diagnosis of mental retardation, an individual must first show significantly substantial limitations in intellectual functioning.  The psychological profession uses a Full-Scale IQ score "of about 70 or below (approximately 2 standard deviations below the mean)." as the key indicator of intellectual ability.  *Atkins*, 536 U.S. at 309 n.5.  Because IQ tests typically have a standard error of measurement (also called a "confidence interval" or "confidence band"), a base IQ score actually represents a range that could be five points higher or lower.  Thus, the psychological profession accepts 75 as a qualifying score for a diagnosis of mental retardation.  *See* DSM-IV-TR at 41-42; *Clark*, 457 F.3d at 445.  A higher IQ score signifies borderline intellectual functioning, not mental retardation.[31]

---

[30]    (...continued)
of mental retardation.  *See Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) (holding that a habeas petitioner generally has "[t]he burden of demonstrating that a constitutional violation occurred").  Yet neither *Atkins* nor the Federal Death Penalty Act clarify what standard governs mental-retardation claims.  Circuits have held that the Constitution prohibits the application of a beyond-a-reasonable-doubt standard to *Atkins* claims.  *See Hill v. Schofield*, 608 F.3d 1272, 1278-82 (11th Cir. 2010); *Webster*, 421 F.3d at 311.  Under 18 U.S.C. § 4241, district courts generally resolve matters regarding mental illness and competency under a preponderance-of-the-evidence standard.  Some state courts have adopted a similar standard in adjudicating *Atkins* claims.  *See Webster*, 421 F.3d at 312 (reviewing state cases).  Others, however, require a defendant to prove mental retardation by clear and convincing evidence.  *See State v. Grell*, 135 P.3d 696, 523 (Ariz. 2006).  The Fifth Circuit has, in another context, questioned whether "'some heightened standard of proof might apply to sentencing determinations which bear significantly on the severity of sentence.'" *United States v. Greer*, 158 F.3d 228, 240 (5th Cir. 1998) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 248 (1998)).  For instance, a defendant has the burden of proving the affirmative defense of insanity under a clear-and-convincing evidence standard.  *See* 18 U.S.C. § 17.  While the application of a stringent burden of proof in *Atkins* cases would impose "a significant risk of an erroneous determination," *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996), this Court need not decide which standard governs Bourgeois' claim.  As the Court will discuss at length above, Bourgeois has not shown mental retardation even if he must only meet a preponderance-of-the-evidence standard.

[31]    The APA recognizes four categories of mental retardation: mild, moderate, severe, and profound.  *See* DSM IV-TR at 42-44.  Individuals with IQ scores between 55 and 70 – around
(continued...)

*1.      Bourgeois' IQ Scores*

The record contains two IQ scores for Bourgeois, both of which potentially qualify him for a diagnosis of mental retardation. One week before trial, Dr. Donald Weiner, a psychologist, administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") test to Bourgeois. Bourgeois obtained a Verbal Score of 76, a Performance Score of 76, and a Full Scale score of 75 on the WAIS-R.[32] The WAIS-R, however, was not the most-current version of the Wechsler. By the time of trial, that test was outdated, the up-to-date testing instrument being the Wechsler Adult Intelligence Scale-III (WAIS-III).[33] Dr. Weiner's purpose in examining Bourgeois, however, was not to diagnose or rule out mental retardation; the defense retained him to identify neurological deficits. (DE 594 at 267). Dr. Weiner chose to administer the outdated test because more research

---

[31]      (...continued)
85% of the mentally retarded population – are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. *See also* AAIDD11th at 32 (observing that between 75% to 89% of the population with mental retardation is mildly mentally retarded). The law has not drawn a distinction between these categories of mental retardation for the purpose of *Atkins* protection.

[32]      Due to a transcription error, Dr. Weiner initially recorded the Full-Scale score as 76. Dr. Weiner explained in the evidentiary hearing:

> [T]his report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.

(DE 594 at 219). At the time of trial, this error made little difference because Dr. Weiner "wasn't asked to do an assessment for mental retardation." (DE 594 at 263).

[33]      Federal courts have recognized the WAIS-III as a "gold standard" testing instrument. *See Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009). A fourth version of the Wechsler, the WAIS-IV, is the currently updated test. No expert has administered the WAIS-IV to Bourgeois.

was available linking WAIS-R scores to neurological deficiencies than was available for the WAIS-III. (DE 594 at 218, 263, 251).[34]

Dr. Michael Gelbort performed the only psychological testing intended to assess whether Bourgeois has substantial limitations in intellectual functioning. Bourgeois' current attorneys did not ask Dr. Gelbort to make a final diagnosis of mental retardation, only to evaluate his intellectual capacity. (DE 560 at 78). In 2007 Dr. Gelbort administered the WAIS-III, with Bourgeois obtaining a Verbal Score of 67, a Performance Score of 78, and a Full Scale Score of 70. Bourgeois' Full Scale IQ scores facially make a diagnosis of mental retardation possible.

Bourgeois relies on the naked IQ scores to satisfy *Atkins*' first prong. Bourgeois called Dr. Gelbort in the evidentiary hearing to explain the results of his examination. Dr. Gelbort testified that:

> Mr. Bourgeois is of limited intellectual ability. He comes out – he tests out pretty much in the borderline to mildly defective range. He shows indication of difficulties, ... of having frontal lobe impairments, that he did take the tests as requested and put forth good effort. His learning is problematic, especially when he has to understand conceptually the information being presented to him. So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

---

[34] On some subtests of the WAIS-R, Bourgeois exhibited "low average abilities," in others, average. He only exhibited "a significant deficit in assembling an object from its parts." Dr. Weiner also administered the Wide Range Achievement Test, Third Edition ("WRAT-III"). Bourgeois WRAT-III scores showed higher aptitude. Bourgeois obtained high-school equivalent scores in reading and spelling, but only at the sixth-grade level for arithmetic. Dr. Weiner opined that Bourgeois "is functioning at the expected level for a high school graduate in reading and spelling. Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities." However, in his videotaped examination by Dr. Price, Bourgeois seemed able to do mental mathematical computations adequately. Notwithstanding his low scores on the WAIS-R, Dr. Weiner opined that, while his "overall level of intellectual functioning is in the borderline range," he "shows no indications of having any specific learning disabilities."

(DE 560 at 29).[35] Dr. Gelbort's testimony did not address whether Bourgeois' life manifested intellectual deficiencies outside of the testing context. He explained: "when I'm basing an assessment of their intellect, I'm going to use my intellectual tests" and not factor in information such as whether Bourgeois' interactions with the Court manifest mental retardation. (DE 560 at 134).

### 2.    Legal Evaluation of Intelligence in Atkins Cases

Even though Bourgeois' testing has twice resulted in scores that possibly qualify him for mental retardation, the law has not recognized an IQ score below 75 as automatically meeting the significantly substantial limitations prong. Atkins itself did not establish a cut-off IQ score that exempts inmates from execution. Much of the case law since Atkins has focused on inmates who score in the borderline area around 70. While the Fifth Circuit has specified that "mental retardation can be found in range of 70-75," Moore v. Quarterman, 342 F. App'x 65, 68 n.5 (5th Cir. 2009) (emphasis added), all cases in which the Fifth Circuit has found that an inmate warrants Atkins relief have involved at least one base score below 70 without adjustment. See Thomas v. Quarterman, 335 F. App'x 386, 388 (5th Cir. 2009) ("[S]ubaverage intellect . . . is typically established . . . a score of 70 or below.").[36]

---

[35]    Dr. Gelbort did not administer any formal instrument to assess whether Bourgeois was malingering. (DE 560 at 113). Dr. Gelbort based his opinion that Bourgeois put forth good effort based on "how the data line[d] up," both internally and in comparison to Dr. Weiner's testing, because "there's good consistency across time." (DE 560 at 31-32, 34).

[36]    The Fifth Circuit has only granted relief on Atkins claims in three cases, and each presented at least one score below 70. See Wiley v. Epps, ___ F.3d ___, 2010 WL 4227405, at * 7 (5th Cir. 2010) (noting a childhood score of 68); Moore v. Quarterman, 342 F. App'x 65, 68 (5th Cir. 2009) (finding significantly subaverage intellectual functioning with IQ scores ranging from 66 to 76); Rivera v. Quarterman, 505 F.3d 349, 361 (5th Cir. 2007) (finding mental retardation with scores as low as 66). In each of those cases, the AEDPA's deferential standard did not constrain the

(continued...)

As previously mentioned, psychology does not look at IQ as a fixed point, but as existing along a range. The confidence interval associated with WAIS-R and WAIS-III scores means that a given score may actually represent an IQ five points higher or lower. *See Clark*, 457 F.3d at 444.[37]

---

[36]    (...continued)
federal analysis. Most often, the Fifth Circuit has denied relief when an inmate has IQ scores both under and over 70. *See Hall v. Thaler*, 597 F.3d 746, 746-47 (5th Cir. 2010) (scores ranging from 67 to 84); *Thomas v. Quarterman*, 335 F. App'x 386, 388-89 (5th Cir. 2009) (three IQ tests scoring 67, 75, and 77); *Rosales v. Quarterman*, 291 F. App'x 558, 561 (5th Cir. 2008) (a pre-*Atkins* score of 82 and a post-*Atkins* scores of 61 and 73); *Moore v. Quarterman*, 517 F.3d 781, 784 (5th Cir. 2008) (finding no mental retardation with full-scale IQ scores of 63, 68, 72, 76, and 76); *Morris v. Quarterman*, No. 07-70012 (5th Cir. Apr. 17, 2008) (pre-*Atkins* score of 97 and post-*Atkins* scores of 53 and 64); *Perkins v. Quarterman*, 254 F. App'x 366, 369 (5th Cir. 2007) (scores ranging from 66 to 80); *Taylor v. Quarterman*, 498 F.3d 306, 307-08 (5th Cir. 2007) (pre-*Atkins* score of 75 and post-*Atkins* scores of 65 and 69); *Woods v. Quarterman*, 493 F.3d 580, 585-86 (5th Cir. 2007) (pre-*Atkins* scores of 78 and 80 and post-*Atkins* score of 68); *Clark v. Quarterman*, 457 F.3d 441, 445-46 (5th Cir. 2006) (pre-*Atkins* score of 74 and post-*Atkins* scores of 65 and 68). The Fifth Circuit has also denied relief when an inmate's scores all fall above 70. *See Pierce v. Thaler*, 604 F.3d 197, 214-15 (5th Cir. 2010) (WAIS-III score of 70); *Williams v. Quarterman*, 293 F. App'x 298, 310-11 (5th Cir. 2008) (three different IQ tests scoring a 70 or 71); *Eldridge v. Quarterman*, 325 F. App'x 322, 325 (5th Cir. 2009) (scores ranging from 72 to 112).

[37]    Bourgeois asks the Court to treat his results on the WAIS-R as much lower than the raw full scale score of 75 based on a phenomenon known as the Flynn Effect. "The Flynn Effect . . . posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time." *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The AAIDD 11th edition advises that "best practices require *recognition* of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD 11th, at 37 (emphasis added). All the experts who testified in the evidentiary hearing agreed that the Flynn Effect is a phenomenon that exists in IQ scores throughout society, but they disagreed about whether the general elevation of IQ scores over time requires adjustment of individual test results. For instance, Dr. Swanson testified that the Flynn Effect would place Bourgeois' scores to a "true score . . . somewhere between 68 and 70," (DE 594 at 37), but qualified that the Flynn Effect was "not relevant" in "this particular case because the scores are there . . . they are the scores we are looking for in an *Atkins* case." (DE 594 at 35). Yet she also explained that "[t]here's two large schools of thought on that. The [AAIDD] . . . say[s] you should adjust the individual score. The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet." (DE 594 at 36). Dr. Weinsten would have applied the Flynn Effect to his scores. Dr. Weiner explained that, "since that WAIS-R has older normative data[,] . . . his true IQ is probably four or five points lower than that." (DE 594 at 222-23). Nevertheless, Dr. Moore explained that adjusting IQ scores based

(continued...)

53

The psychological profession allows any score falling along that range to qualify for a diagnosis of mental retardation. Accordingly, psychologists generally do not question whether an inmate's true IQ falls in the higher or lower end of that range. Indeed, with the main purpose of most IQ testing being to qualify an individual for needed supports or services, the mental health community has little reason to question the results of IQ testing.

Courts, however, endeavor to determine whether a borderline score represents an intelligence capacity above or below the mental-retardation threshold. In the legal context, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the Court decides. *See Clark*, 457 F.3d at 444 (citing *United States v. Webster*, 162 F.3d 308, 351-52 (5th Cir. 1998)). In oral argument, Bourgeois' attorneys conceded that this Court must look at the IQ scores but then reach its own determination of whether he has significantly subaverage intelligence (DE 646 at 79-80). Federal law does not require a court "to find [an inmate] to be mentally retarded merely because the low end of [his] confidence band was below 70, just as it would not be required to find that [he] could be executed on the basis that the high end of this band fell above 70." *Clark*, 457 F.3d at 446. When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the

---

[37]    (...continued)
on the Flynn Effect is "significantly controversial." (DE 599 at 89). In another case, a district court found credible Dr. Moore's testimony that "he had only observed the IQ score adjusted downward for the Flynn effect in evaluations done by the defense in mental retardation hearings." *Sasser v. Hobbs*, ___ F.Supp.2d ___, 2010 WL 4569870, at *13 (W.D. Ark. Nov. 3, 2010). Here, Dr. Swanson conceded that the term "Flynn Effect is primarily used in a courtroom setting," (DE 594 at 156), and the Government argued that it is "[a] litigation tool to try to lower scores and enable people to apply [the *Atkins*] defense to them[.]" (DE 646 at 82). Nevertheless, the Fifth Circuit has not adopted the Flynn Effect "as scientifically valid," *Maldonado*, 625 F.3d at 238 (citing *In re Salazar*, 443 F.3d 430, 433 n. 1 (5th Cir. 2006)). The testimony in this case did not persuasively show a consensus among psychologists that would require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ Score.

Fifth Circuit has denied relief when the evidence more persuasively suggests that, notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval. *See Clark*, 457 F.3d at 446.

Here, two factors suggest that Bourgeois' IQ score does not fall in the lower end of the confidence interval. First, the circumstances do not suggest that Bourgeois' testing resulted in a valid measure of his intellectual abilities. Second, a full review of Bourgeois' life signals that he has not suffered the impairment associated with mental retardation and that he functions at the highest end of the confidence interval, if not even higher. The evidence before the Court shows that it is much more probable that Bourgeois' true IQ exists above the threshold cutoff for mental retardation.

3.    *Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the Confidence Interval*

The Government primarily rebutted Dr. Gelbort's testimony through Dr. Price who examined Bourgeois in 2010.[38] Because he worried that videotaping his administration of psychological testing

---

[38]    In addition to those two witnesses, others briefly testified about Bourgeois' IQ scores. For instance, Dr. Moore primarily testified about Bourgeois' adaptive behaviors, but agreed with Dr. Price that the scores on WAIS subtests were "puzzling" when compared to his life and aptitudes. (DE 599 at 100). Dr. Swanson did not question the results of the IQ testing as a precursor to a diagnosis of mental retardation. Dr. Toomer only affirmed that the IQ scores qualified him for a diagnosis of mental retardation (DE 594 at 324) Dr. Toomer said: "I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion[.]" (DE 594 at 324). Dr. Estrada opined that he would put no credence on the IQ test results, but would base his whole mental-retardation opinion of adaptive deficits. Dr. Swanson found no errors in the administration of the IQ tests. She also observed that the two administering experts "noticed no signs of malingering and they felt he had put forth good effort." (DE 594 at 30). Comparing the subtests between the two IQ test administrations, Dr. Swanson observed that the "scores are fairly consistent across administrations." (DE 594 at 31). Insofar as other experts had observed some strengths in his testing, Dr. Swanson opined that "it's not atypical for a person with mental retardation to have a strength . . . in one area[.]" (DE 594 at 34). Dr. Swanson opined that "Mr. Bourgeois . . . functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely
(continued...)

55

would compromise its integrity, Dr. Price did not give Bourgeois any normed IQ test but still performed a probing psychological examination. Dr. Price agreed that with Dr. Gelbort on some important issues, such as that Bourgeois' test results placed him in the borderline deficient range for intellectual functioning. (DE at 595 at 238). Also, Dr. Price agreed with Dr. Gelbort that Bourgeois did not malinger during his testing. (DE 595 at 258). Dr. Price, however, did not agree that Bourgeois was eligible for a formal diagnosis of mental retardation. Dr. Price credibly testified that aspects of Bourgeois' testing, such as his ability to concentrate for a length of time, was inconsistent with mental retardation. (DE 595 at 201). Dr. Price found it discrepant "to be able to read and understand and conceptualize some of the things that he was able to talk about[.]" (DE 599 at 50). Importantly, Dr. Price credibly explained that Bourgeois' "cognitive abilities exceed his measured cognitive intelligence." (DE 595 at 215).

Dr. Price did not trust that the IQ testing adequately measured Bourgeois' intelligence. Psychology recognizes that an individual's performance and intentions may influence testing results. Various factors may cause artificially low scores on the WAIS testing instrument. *See Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) ("[T]he WAIS-III manual instructs that an artificially low score may result from, among other factors, '[c]ultural or linguistic discrepancy from the test standardization table, distractability, anxiety, deafness, poor motivation or inadequate persistence[.]'"). While IQ scores should represent an accurate measure of the inmate's intellectual functioning, the Fifth Circuit has routinely weighed IQ scores against factors such as an inmate's poor performance during testing and whether the scores adequately comport with other information

---

[38]   (...continued)
low cognitive ability. That criteria I think is clearly met." (DE 594 at 39).

about his intelligence.[39]

Although none of the experts accused Bourgeois of outright malingering on his IQ test, a lack of malingering does not mean that other factors may not have compromised the validity of his test results. Dr. Price credibly provided two reasons to believe that Bourgeois' IQ scores may not reflect his true level of intellectual functioning. As Dr. Price explained, "I would not say that it's malingering. I would say that it's not putting forth full effort and carelessness." (DE 595 at 210); *see also* DE 595 at 225 (explaining that "it's not intentionally trying to get the wrong answer on easy things, it's just not trying" and is "careless, sub optimal effort, not putting forth good effort, with not trying hard").

Bourgeois is apparently an individual who does not perform well on standardized testing instruments. Dr. Price suggested that Bourgeois' idiosyncratic abilities may have caused the testing to underestimate his intellectual level:

---

[39]     Several Fifth Circuit cases have refused to credit IQ scores when the evidence suggested that an inmate had malingered or not put forth his best effort. *See Esparaza v. Thaler*, ___ F. App'x ___, 2010 WL 4559214 at *6 (5th Cir. 2010) (finding "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence."); *Eldridge*, 325 F. App'x at 325 (refusing to honor a score of 72 as a predicate for mental retardation when the expert who administered the test failed to assess for malingering or a lack of effort, to consider possibilities other than mental retardation for the test results, and relied on limited information about the inmate's background); *Williams*, 293 F. App'x at 311 (refusing to credit IQ scores when the record suggested that the inmate had malingered and "the evidence as a whole . . . was inconsistent with a finding of mental retardation."); *Moore*, 517 F.3d at 784 (refusing to find mental retardation after tests showing 63, 68, 72, 72, 76 and 76 because of "other expert indicating that [the inmate]  did not suffer from such functioning and he underperformed on at least some of the tests); *Woods*, 493 F.3d at 586-87 (emphasizing earlier, higher IQ scores when the later scores were less reliable and the inmate has "a motivation to score poorly"); *Clark*, 457 F.3d at 445 (finding that state court's determination was not unreasonable when it refused to credit an IQ score when the inmate "had motivation to lower his scores deliberately"). The Fifth Circuit has also refuse to find adaptive deficits when, notwithstanding an IQ score of 64, the inmate "appeared to be poorly motivated and may have exaggerated his deficits." *Moreno*, 450 F.3d at 164.

he, like a number of different kinds of people, doesn't test well. I mean he doesn't, it's harder to get him involved in objective testing. It's very easy to get him involved in talking about himself, his life, his situation. It's easy to engage him there. It's even difficult to . . . disengage him from doing that. But objective testing, he kind of shuts down a little bit.

(DE 595 at 202). Bourgeois' inability to test well could be because he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation." (DE 595 at 216). Poor testing taking skills could have caused Bourgeois to underperform on the psychological testing, thus giving an incorrect interpretation of his intellectual ability. *See Esparaza v. Thaler*, ___ F. App'x ___, 2010 WL 4559214 at *6 (5th Cir. 2010) (finding that an inmate's low IQ scores did not amount to subaverage intellectual functioning after testimony that the inmate had "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence.").

In a related vein, some of the experts suggested that Bourgeois may have not put forth his best effort during the examinations. Dr. Price explained that a lack of effort is "a response style that can invalidate the results. It's more difficult to assess. It's less severe. It's present in a lot of cases for a lot of reasons other than the intentional . . . feigning or gross exaggeration of a condition for an external incentive." (DE 595 at 258).[40] This Court's observations match Dr. Price's opinion.

---

[40] Dr. Price elaborated:

Effort and response style are on a continuum. At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive. At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be. . . . So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end,

(continued...)

58

Even independent of the expert testimony, this Court finds that Bourgeois did not put forth his best effort in the psychological testing. The Court has viewed many hours of video from the examination by Dr. Price and Dr. Moore. Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation. Certain features of Bourgeois' examination suggest he underperformed on the psychological testing. For instance, when the examiner was in the room, Bourgeois answered questions sluggishly. Yet when he was unobserved, Bourgeois moved through the answers quickly. In another example, Bourgeois took an unreasonably long amount of time to compose a paragraph at Dr. Price's request. (PX-159). Dr. Swanson considered the time which he took to write as indication of mental retardation. (DE 594 at 55). Nevertheless, the speed in which he wrote that paragraph contrasts sharply with his voluminous amount of writings each of which, if written at that pace, would have taken days to finish.[41]

---

[40]    (...continued)
whether malingering comes closer to that. Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

(E 595 at 259-60).

[41]    Moreover, Dr. Swanson looked at the "overall grammar and syntax of" the statement and found that "it would be similar to someone who is third grade." (DE 594 at 136). The paragraph read:

> I Alfred Bourgeois strongly believe without a shadow of a doubt that I have been framed and railroaded by Rush of Judgement and have been wrongfully convicted of a crime that was fought by vengeance. I believe this child [JK1999] was not murdered, and without a doubt was not injured in the State of Texas nor on federal land. I believe Robin M. Bourgeois is assaulted my belovth baby long before arriving in Texas or long before on the naval ground. This case is tainted and fabricated.

(PX-159). Dr. Swanson' s testimony in that regard is not credible as the content of the paragraph
(continued...)

59

This was possibly not a conscious behavior. Nevertheless, with an awareness that the results of the IQ testing would affect his death eligibility, Bourgeois certainly had reason to put lackluster effort into his testing. The Court finds highly credible Dr. Price's testimony that Bourgeois underperformed on his testing. Bourgeois' performance on the testing instruments does not indicate that his actual IQ score should fall at the lower, rather than higher, end of the confidence interval.

This finding harmonizes with a broader review of how Bourgeois' level of intelligence has manifested itself throughout his life.[42] Even when an inmate scores within the range psychology has set for a diagnosis of mental retardation, the Fifth Circuit has reviewed the whole record to decide if an inmate has exaggerated his deficits or if the circumstances of his life are inconsistent with mental retardation. *See, e.g., Moreno v. Dretke*, 450 F3d 158, 165 (5th Cir. 2006) (finding a post-*Atkins* score of 64 did not meet *Atkins*' first prong). The most perplexing feature of Bourgeois' intellectual testing is that his abilities seem to surpass that anticipated by his IQ score. Dr. Price testified that it was "very unusual" that the results of academic achievement scores administered by Dr. Gelbort, Dr. Weiner, and Dr. Swanson which mostly showed high-school age proficiency were higher than his IQ scores. (DE 595 at 270). Nonetheless, Bourgeois' experts placed his intellectual functioning as equal to that of a child. A disconnect exists between the level at which Bourgeois' experts said he could function and what he could actually do. Reviewing Bourgeois' life, independent of the psychological test results, should manifest a markedly low level of intelligence. Bourgeois' life, however, contradicts such pervasive mental impairment; Bourgeois' behavior and

---

[41]        (...continued)
and complexity of thought transcend what society expects of the average third grader.

[42]        This review does not conflate the *Atkins* prongs, but recognizes that a person whose IQ falls within the lowest two percent of the population should manifest commensurate impairments throughout their life. Intelligence of that low level should be obvious.

characteristics are inconsistent with an IQ that would fall below 70. *See Williams v. Quarterman,* 293 F. App'x 298, 309-11 (5th Cir. 2008) (looking at "the evidence as a whole-including [the petitioner's] performance in the classroom and on standardized achievement tests, his writing ability, and the opinions of numerous witnesses who did not believe that [he] was retarded" in deciding that his "IQ scores [were] not an accurate indication of his intellectual functioning").

A persistent feature of the testimony from Bourgeois' experts was a failure to consider fully his alleged intellectual limitations against the whole background of his life. While testimony from various individuals questioned his intellect when younger, those who knew him as an adult did not suspect that he was mentally retarded. Bourgeois graduated from high school,[43] worked for years as an over-land trucker,[44] bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment. With respect to his employment and other areas, Bourgeois' experts apparently believed that he only performed his job with a system of supports in place. The testimony before the Court did not support that conclusion. Rather, Dr. Price credibly explained that "it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation." (DE 595 at 208).

Courts routinely review an inmate's written correspondence for indicia of mental impairment.

---

[43]     Bourgeois has at times claimed to have gone to college, though the record has never substantiated his claims. Ms. Armont, however, told Dr. Moore that he had attended college classes. (DE 599 at 158-59).

[44]     The AAIDD 11th particularly notes that an employment history is not consistent with mental retardation, but the kind of work Bourgeois did possibly is. "Although it is true that people with [mental retardation] who have higher IQ scores are more likely to be employed than people with lower IQ scores, their employment rate (27.6%) is far below the national average in the general community (75.1%) and more often consists of part-time work in entry-level service jobs, with low wages and minimal benefits." AAIDD 11th at 157.

61

*See Maldonado*, 625 F.3d at 243; *Eldridge v. Quarterman*, 325 F. App'x 322, 326 (5th Cir. 2009). The record contains numerous items written by Bourgeois. *See, e.g.*, GX-23 through 27, 32, 33, 176 through 200. Bourgeois' extensive writings, while not polished masterpieces, certainly do not contain indicia of gross mental impairment. Dr. Price credibly described his writings: "[T]hey are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes. He can express himself in complete thoughts, and very detailed complete thoughts." (DE 595 at 220). Dr. Moore explained:

> He certainly appears to be able to use written communication effectively. . . . [C]ertainly the vocabulary is good. The ideas are complex. The sentences are often compound. He's able to follow a flow of thought, communicate his ideas effectively. He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

(DE 599 at 139).[45] Bourgeois' writings show an ability to observe the world around him, process relevant information, form strategy, and communicate his thoughts to others. His letters exceed the complexity and sophistication expected of someone operating at a grade-school level. Bourgeois' own writings discount the possibility that he is mentally retarded.

Notably, this Court's interactions with Bourgeois have provided an important point of observation. *See Esparaza*, ___ F. App'x at ___, 2010 WL 4559214, at *6 (denying an *Atkins* claim when "[t]hroughout his trial testimony, [Esparza] furnished coherent, even combative testimony fully

---

[45]     A brief sample from correspondence early in this case exemplifies his lack of mental retardation. He instructed trial counsel: "I, Alfred Bourgeois, have every intention of winning my case. I have been falsely arrested, and please take your time and read this letter real well. This will explain how we can win this case in the death of my child, [JG1999]." (DE 598 at 148). In another letter he asked: "Dear Mr. Gilmore, I want a copy of your strategy on my case. I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position, regarding to my trial." (DE 598 at 151).

responsive to both his own trial counsel's and the prosecutor's questions and demonstrated a detailed understanding of the testimony and other evidence introduced during his capital murder trial."). During trial, Bourgeois communicated with the Court on several occasions. The Court viewed his testimony before the jury in both phases of trial. The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child. He completely understood the proceedings against him, intelligently assessed the circumstances he faced, actively participated in his defense, formulated strategy, intelligibly communicated his version of events, cogently answered questions put to him, and otherwise appeared to have an adequate level of intelligence. Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive.[46]

This does not mean that Bourgeois has high, or even necessarily average, intelligence. True, his intellectual ability was bewildering. He scored low on the testing, but exhibited many obvious intellectual aptitudes. For example, Dr. Estrada's pre-trial report – made without the benefit of any direct examination for mental retardation – commented that Bourgeois was of above-average intelligence. Dr. Price disagreed, opining that Bourgeois' verbal abilities and social skills give off the impression that he is smarter that he is. Bourgeois' ability to appear intelligent likely stems from his narcissism and desire to look good.[47] But Dr. Swanson's testimony that Bourgeois has

---

[46]   Over the 17 years that the undersigned has presided on the bench, more than 4,750 criminal defendants have come before the Court, almost all of whom the undersigned has interviewed for signs of incompetency or other mental impairment. This experiences informs the Court's lay assessment that, until it became expedient to avoid execution, Bourgeois never manifested any indication of mental retardation.

[47]   A constant theme throughout the evidentiary hearing was that, as a narcissist,
(continued...)

"extremely low cognitive ability" and functions in about the "lowest two percent of the population"

seems ludicrous when looking beyond his IQ scores. (DE 594 at 39). The testimony finding no

disconnect between his test scores and his life lacked credibility. He does not operate as a child.

In the end, "[t]he calculation of a person's IQ score is imprecise at best and may come down

to a matter of the examiner's judgment." *Wiley v. Epps*, 625 F.3d 199, 215 (5th Cir. 2010). The

Court does not invalidate or ignore Bourgeois' IQ test scores, but finds that a fuller view of his

abilities does not correspond to a finding of significant intellectual limitations. This is not a case

where a man's life depends on a few points' difference in test results. As the Court will discuss

below, Bourgeois' functional ability and healthy adaptive skills are inconsistent with mental

retardation. Even assuming that Bourgeois has low intelligence, his ability to function independently

---

[47]    (...continued)
Bourgeois would make himself look better than he was. Dr. Gelbort explained:

> The narcissism oftentimes coupled with what I'm calling low intellect, because that's what I believe is here, you get individuals who are trying to cover or mask or hide their deficiencies. And one of the ways they do that, especially when you have a gregarious narcissistic person who talks a lot, is that they try to steer conversations or they tell you what they want to know, or more often than not, they tell you what they know about or what they think they know about, rather than just simply answering questions.

(DE 560 at 65). Dr. Price, however, credibly described how Bourgeois'

> presentation was not consistent with mental retardation. The most similar thing to that that is talked about in the literature often is this idea of the cloaking of competence or masking where a person with limited intellectual abilities will say they can do things that they can't. His, in my opinion, really exceeded that and had a different flavor to it in that it was, I mean he would admit when he couldn't do something but he certainly wanted to impress. And his history and the records, I see that that's been a style of his, to impress others that he's very successful and has been – even though he has been occupationally. It was, it went beyond the cloaking of competence.

(DE 595 at 205).

64

in society contradict the modifier in *"significantly* subaverage intellectual functioning" as a distinctive feature of mental retardation. The question of whether he has significantly substantial limitations in intellectual functioning is not close. The Court finds that Bourgeois has not met the first prong of the mental-retardation analysis.

### C.    Significant Limitations in Adaptive Skill Areas

While failing to meet one prong of the *Atkins* analysis dooms Bourgeois' claim, in the interest of justice the Court will address the other requirements for a diagnosis of mental retardation. As Dr. Estrada explained, "the IQ . . . [is] like a snapshot of the individual function at one given point in time." (PX-163 at 72). Psychology, thus, relies on "adaptive skill areas" or "adaptive functioning," *Atkins*, 536 U.S. at 318, as an "assessment of the way the person deals with the real issues in their life," (DE PX-163 at 72). The AAIDD defines deficits in adaptive skill areas as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group[.]'" *Maldonado*, 625 F.3d at 241 (quotation omitted). Or, in other words, "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR at 42 (quoted in *Wiley*, 625 F.3d at 216).

The AAIDD and APA definitions for mental retardation both break the adaptive-limitations inquiry into subcategories of deficiencies. The AAIDD evaluates "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." AAMR 11th at 1.[48]   The APA looks for "significant limitations in at least two of the following skill areas:

---

[48]    The AAIDD 11th gives examples of multidimensional representative skills within
(continued...)

65

communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV-TR at 41. While collapsing the adaptive deficits into distinct subgroups, the APA and AAIDD approaches apparently capture the same range of functional aptitude.

Both Dr. Swanson and Dr. Moore formally measured Bourgeois' adaptive functioning, though other experts touched on the same inquiry informally. Psychologists look to multiple sources for data about an inmate's adaptive abilities. Psychology prefers that "adaptive deficits . . . be 'determined by clinical assessment and, usually, standardized scales[.]'" *Maldonado*, 625 F.3d at 241 (quotation omitted). Other sources of information, such as lay accounts of an individual's aptitude, educational history, and vocational records, also contribute to the adaptive functioning analysis. Both Dr. Swanson and Dr. Moore augmented the results of their psychological testing by interviewing several people who knew Bourgeois.[49] In addition, Dr. Swanson relied on her own "informal functional assessments" of Bourgeois' ability to perform certain tasks. (DE 594 at 23).

Dr. Swanson found that Bourgeois possessed deficits in all three of the AAIDD domains and three of the skill areas (health and safety, functional academics, and social/interpersonal skills) from the DSM-IV-TR. Dr. Swanson concluded that these functional deficits were present in Bourgeois'

---

[48]   (...continued)
the three categories: (1) conceptual skills involve "language; reading and writing; and money, time, and number concepts"; (2) social skills mean "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoid being victimized, and social problem solving"; and (3) practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD 11th at 44.

[49]   Dr. Swanson also interviewed Claudia Williams (maternal sister); Michelle Armont (paternal sister); Murray Bourgeois (maternal cousin); Carl Henry (maternal cousin and former co-worker); Lloyd Ferdinand (maternal brother); Donald Reese (former co-worker); Gwendolyn Thomas Smith (special education teacher); and Fred Thompkins (former co-worker). (PX-33 at 2).

66

youth and persisted into adulthood.  She attributed his apparently competent life skills to support from others.  Dr. Moore, however, used similar methods and still concluded that Bourgeois did not have deficits in any adaptive skill area.

Before turning to the evidence, the Court notes the difference between the legal and psychological inquiries into possible mental retardation.  The mental health community ignores an individual's strengths when looking at adaptive functioning.  For instance, Dr. Swanson testified that "in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone couldn't have a strength as well." (DE 594 at 17-18).  In fact, the 11th edition of the AAIDD manual has  expressly adopted as an underlying "assumption" in the definition of mental retardation that "within an individual, limitations often coexist with strengths." AAIDD 11th at 1.[50]  The mental health profession looks only at what an individual cannot do, presumably as a function of its role in providing support and services to impaired individuals.

The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. *See Williams*, 293 F. App'x at 314; *Clark,* 457 F.3d at 447; *Webster*, 421 F.3d at 313.

---

[50]     Dr. Swanson testified that when a psychologist encounters a strength

> in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a unique opportunity as a child.

(DE 594 at 18). Dr. Swanson acknowledged that she looked for strengths in Bourgeois' life, but only did so to see if he has had a unique opportunity to become competent in that area or had supports that would allow him to succeed  (DE 594 at 18).  Positive abilities did not influence her to weigh the influence of negative ones.

The subjective *Atkins* question is not myopic and must take into account the whole of an individual's capabilities. The law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability to communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, and to have healthy relationships with others. Accordingly, the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals.

To that end, the federal inquiry probes more deeply the accuracy of the reported deficiencies and aims to put them into context. Thus, for example, a declaration in which someone has cherry-picked a few incidents where an inmate exhibited maladaptive behavior may be sufficient to diagnose mental retardation, but the law will seek to verify the described incidents and to understand if they represent a pervasive disability. The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies. This review includes information about an inmate's positive adaptive ability after his eighteenth birthday.

With the holistic nature of the federal review of *Atkins* claims in mind, the Court turns to Bourgeois' arguments that he has deficits in adaptive functioning.

### 1. *Assessment by Testing Instruments*

The experts in this case used three testing instruments to assess Bourgeois' functional adaptive skills. Dr. Swanson gave Bourgeois the Woodcock-Johnson Test of Cognitive Abilities "which is a battery of academic tests, as well as tests for listening comprehension, oral expression." (DE594 at 23). Also, experts used what Dr. Swanson described as "two gold standards for adaptive assessments": the Vineland Adaptive Behavior Scale, Second Edition ("VABS-II" or "Vineland") and the Adaptive Behavior Assessment System, Second Edition ("ABAS-II"). (DE 594 at 42). These tests decide, through a series of ratings, the extent to which an individual can do certain

68

things. Psychologists can administer these tests to the inmate himself or to a reporting party who has sufficient familiarity with the inmate to assess his abilities. To that end, Dr. Swanson administered the VABS-II and the ABAS-II to one person, Beverly Frank, who knew Bourgeois as a youth.

Dr. Moore had four people who knew Bourgeois as an adult answer questions from the ABAS-II: Michelle Armont (a childhood friend), Rhonda Davis (co-worker), Danny Clark (co-worker); and Nathaniel Banks (childhood friend). Both Dr. Swanson and Dr. Moore asked the reporting individuals to fill out the VABS-II and the ABAS-II which, through a long series of questions, explored Bourgeois' proficiency at certain activities.

Experts in *Atkins* cases measure retrospectively what an inmate could do at a given point in time, often decades before. Here, for example, Dr. Swanson asked reporting individuals to recount what aptitudes Bourgeois had in his young childhood, nearly thirty years earlier. Dr. Swanson and Dr. Moore came to diametrically opposed conclusions about Bourgeois' abilities, confirming that "[t]he assessment of adaptive functioning deficits is no easy task." *Wiley*, 625 F.3d at 217. *Atkins* has made that inquiry a particular challenge for the mental health practitioners. Designers intended that the testing instruments which measure adaptive skills would make a co ntemporaneous assessment of functioning. By definition, psychology's conceptualization of mental retardation centers on the formative period, which ends for their purposes on an individual's eighteenth birthday. Yet the Constitution prohibits infliction of a death sentence before age 18, *see Roper v. Simmons*, 543 U.S. 551 (2005), ensuring that observations in an *Atkins* case will take place after the developmental period. As Dr. Swanson explained, the *Atkins* inquiry asks the psychological profession to do something its testing instruments were never designed to do: make a retrospective evaluation of an individual's adaptive behavior. (DE 594 at 193).

Caution attends undue reliance on those backward-glancing assessments. The retrospective

69

review assumes that those reporting on an inmate's past adaptive abilities can provide competent, honest, and objective observations of his abilities. Thus, the AAIDD 11th Edition warns to use respondents who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." AAIDD 11th at 47. Care must be taken to extract information from those with sufficient familiarity and understanding to provide reliable data. The professional organizations recommend "that because the adaptive functioning assessment typically takes the form of interviewing third-parties, the respondent should be someone who is well acquainted with the subject's behavior over an extended period, such as a parent, teacher, or direct-service provider." *Wiley*, 625 F.3d at 218 (quoting AAMR 10th ed. at 85). Also, as became a concern in this case, the responder should be one with sufficient age, maturity, and understanding during the time period they observed the inmate to provide a reliable assessment of their behavior. To that end, the AAIDD 11th instructs "for clinicians to assess the reliability of any respondent providing adaptive behavior information." AAIDD 11th, at 47.[51]

The process also assumes that time has not dimmed accurate memory. For instance, the experts administering the standardized assessment tests turned the reporting individual's attention to a specific point in the developmental period, highlighting attendant concerns about memory loss and other factors which degrade the reliability of information. As Dr. Moore explained, "the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is." (DE 599 at 197). The testing performed by Bourgeois' experts asked people to look back over decades to evaluate what Bourgeois could do at a young age. Time blurs memories,

---

[51]    Dr. Swanson agreed that the adaptive-deficits tests were normed for retrospective evaluations, their reliability in that capacity is unknown, and thus their results should be interpreted with caution. (DE 594 at 145).

relationships may taint perspective, and a lack of contemporaneous accounts degrades reliability. This concern becomes particularly important when, knowing that their information may make a difference between life and death, mental health professionals ask loved ones to look back decades and evaluate an individual's aptitudes.

While psychology has apparently tried to provide its practitioners a means to ascertain intelligence retrospectively, *see* AAIDD 11th at 95-96, mental retardation as understood by *Atkins* complicates the traditional methods of the mental health community. To that end, Dr. Swanson acknowledged that the reliability of using the adaptive-functions measures in a retrospective evaluation was unknown and that caution should attend reviewing the results. (DE 594 at 145).

a. The Woodcock-Johnson

Dr. Swanson administered the Woodcock-Johnson to assess whether Bourgeois had deficits in the functional academic or conceptual categories. She explained that the "Woodcock-Johnson would meet the gold standard of an academic achievement test. It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas." (DE 594 at 44). As a result of his Woodcock-Johnson scores, Dr. Swanson determined that Bourgeois lacked adaptive skills in two subcategories of the AAIDD's conceptual domain. She testified that, in the functional academic category, his scoring showed the intelligence of an elementary school child: "His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation." (DE 594 at 58). In oral communication, she opined:

> [I]n that test you give them oral comprehension and other tests that probe for oral language and listening comprehension. On . . . the first two broad cluster scores . . . . his scores . . . were at the third grade level and the fourth grade level. Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual.

71

(DE 594 at 58-59). Because Dr. Swanson explained that individuals with mental retardation may "function overall at about as high as a sixth grade level," (DE 594 at 45), she opined that his lowest scores on the Woodcock-Johnson indicated impairments in the conceptual adaptive domain under the AAIDD and the functional academics area of the APA.

Nevertheless, Dr. Swanson conceded on cross-examination that Bourgeois scored well in several areas of the Woodcock-Johnson. (DE 594 at 143-44). In essence, she focused on his areas of weakness without fully considering his strengths. Dr. Moore described Bourgeois' scores: "By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in." (DE 599 at 109). Based on Bourgeois' scores which generally fell outside the impaired range, Dr. Moore disagreed that Bourgeois' Woodcock-Johnson scores indicated global adaptive deficits. He testified that, "in comparison to the general population," Bourgeois was not impaired. (DE 599 at 108-09).

b.      The ABAS-II and the Vineland

Dr. Swanson administered the ABAS-II and the VABS-II to Ms. Frank, asking her to focus on Bourgeois' adaptive abilities when he lived with her grandmother, Ms. Mary, at age seven. Dr. Swanson's testing served as the basis for other experts to find adaptive deficits. Dr. Cunningham, for instance, accepted Dr. Swanson's testing as a valid measure of Bourgeois' abilities. Based on several answers on the ABAS-II and the Vineland, the Court questions whether Ms. Frank could accurately assess Bourgeois' aptitudes. As discussed below, Ms. Frank's answers suggest that Dr. Swanson should have exhibited more care in selecting her only informant.

Dr. Swanson characterized Ms. Frank as a "prime subject to whom to administer the Vineland-II instrument." (GX-175 at 2; DE 459 at 28). Interestingly, Dr. Swanson did not select an informant who lived with Bourgeois or knew him for a long period of time. Ms. Frank is

approximately sixteen years older than Bourgeois.[52]   She moved away from the Bend – the

community Bourgeois grew up in – when she was a teenager, but "came in daily to check with her

grandmother.  She sometimes stayed at night with her grandmother." (DE 594 at 68).  Her daily

observation, however, only lasted for several months while she was unemployed. (DE 597 at 94-95).

Dr. Swanson selected as an informant someone who only saw Bourgeois daily for only a brief period

when he was a young child.

Dr. Swanson testified that, in her opinion, Ms. Frank "got to observe her grandmother as she

was working with him, so she had direct knowledge on a daily basis of how he met these different

skills." (DE 594 at 72).  In a supplemental report, Dr. Swanson described Ms. Frank as someone

who was "in a position to observe [Bourgeois] extensively, across multiple settings, over a long

period of time." (PX-33 at 2).[53]  However, Ms Frank's limited contact with Bourgeois during a brief

period of his youth constrained her ability to answer questions reliably.  Dr. Swanson conceded that

the best practice would have been to pick an informant who could assess the inmate nearer his

eighteenth birthday. (DE 594 at 147, 155).  Still, she thought that Ms. Frank could answer her

---

[52]      Dr. Swanson asked Ms. Frank to evaluate Bourgeois for the time period when he was
seven years old.  Dr. Swanson erroneously assumed that Ms. Frank was a teenager when she
observed Bourgeois, (DE 594 at 72), when she was actually in her early twenties.  Bourgeois was
seven years old when he moved in with Ms. Mary, making Ms. Frank about 23 or 24.  She had
moved away from the community before Bourgeois was born.  However, she would visit her
grandmother "two or three times a week, and sometimes on weekends" but visited her more
frequently when she was out of work. (DE 597 at 93, 95).  Ms. Frank had contact with Bourgeois
for about two years. (DE 597 at 113).  After that, she only saw him occasionally. (DE 597 at 117).

[53]      Still, Dr. Swanson testified that she "had a lot of concerns on whether Ms. Franks was
a good informant or not and how much she would remember[.]" (DE 594 at 73).  Dr. Swanson
seemed to base her conclusion that Ms. Franks was a reliable informant on the fact that she answered
all the questions on the ABAS-II.  After finding that Ms. Franks could answer all the questions on
the ABAS-II, she administered the Vineland. (DE 594 at 73).  The Vineland produced scores in "the
mild deficit range[.]" (DE 594 at 75).

questions most clearly. (DE 594 at 147).

Ms. Frank's assessment of Bourgeois' abilities presumed a confidence in her memory that negated the decades since she had observed him. Ms. Frank answered questions on the testing without making any guesses at how Bourgeois could function. Dr. Moore found it "surprising . . . that she was able to recall back to that and not guess on anything." (DE 599 at 222). The conflicting answers she gave suggest that Ms. Frank could not reliably assess Bourgeois' adaptive abilities. For instance, on the Vineland Ms. Frank reported that Bourgeois could not even hold a fork at age seven, which indicates a degree of impairment far greater than that even suggested by his low IQ scores. In contradiction, on the Vineland Ms. Frank said he could correctly hold a fork. (DE 594 at 152).[54] She reported on the ABAS II that Bourgeois could not form a sentence using nouns and verbs. Aside from indicating that she could not properly assess Bourgeois, this answer conflicted with her answer on the Vineland that he could form proper sentences. (DE 594 at 153-54). In her evidentiary hearing testimony, Dr. Swanson acknowledged these problematic answers but explained that they would not weigh against using Ms. Frank as an informant. The best Dr. Swanson could say is that it would be more reliable to have had more than one reporting individual, and preferably someone who knew Bourgeois along a variety of settings closer to age 18. (DE 594 at 155).

Dr. Moore also administered the ABAS-II, but did so to multiple respondents. Dr. Moore explicated: "we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome. So we want to make sure we get good and objective data. And in a forensic setting, that becomes even more of a challenge." (DE 599 at 104). His focus, however, was not on Bourgeois' childhood; Dr. Moore

---

[54]    While Dr. Swanson did not rely in the ABAS-II in her report, her evidentiary hearing testimony treated the results from both testing instruments as valid.

selected respondents who observed Bourgeois both closer to age 18 and when he was older. Dr. Moore explained that he selected informants who had "known Mr. Bourgeois over a fairly extended period – in this case, I was trying to look for, you know, a number of years – and they had been able to spend social time with him, had seen him on a more casual basis[.]" (DE599 at 174). Because Dr. Moore doubted the validity of the results on the ABAS-II from two of the four informants he selected,[55] he only based his assessment on the information provided by Michelle Davis and Nathaniel Banks.

Ms. Davis was a dispatcher at the trucking company where Bourgeois worked for years. She "and her family had known [Bourgeois] for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that." (DE 599 at

---

[55]    Dr. Moore discounted the results he obtained from Ms. Armont. He explained: "In looking at the results of the ABAS that Ms. Armont had completed, there were significant questions about validity of that measure. I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified." (DE 599 at 118). Ms. Armont claimed that Bourgeois was so debilitated that he could not perform functions which the record amply proved that he could do. Dr. Moore suggested that someone had instructed her to answer the questions in a way that would make Bourgeois seem retarded. (DE 599 at 188). Dr. Moore testified: "And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that. He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark. He was in the significantly impaired range for Ms. Armont." (DE 599 at 131). Dr. Moore also discounted the scores from Bourgeois' co-worker for fifteen years, Danny Clark. Dr. Moore explained: "Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores." (DE 599 at 123). Specifically, he made too many guesses about Bourgeois' abilities. (DE 599 at 165). Mr. Clark, however, testified in the evidentiary hearing. From his testimony, he obviously never considered Bourgeois mentally retarded. He described Bourgeois as a competent driver, neat and clean in his appearance, polite, and in other ways much different than the severely impaired individual described by Dr. Swanson. Dr. Moore also attempted to administer the ABAS-II to Claudia Williams, but "she decided not to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother." (DE 599 at 119).

174). Ms. Davis' answers on the ABAS-II resulted in generally average or above average score.[56]

Ms. Davis testified in the evidentiary hearing. She was a friendly, credible witness who seemed to have fond remembrances of Bourgeois. She testified that nothing hinted that he was mentally retarded or even slow. (DE 595 at 151, 184).

Mr. Banks did not testify in the evidentiary hearing. Dr. Moore explained that Mr. Banks "was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from – well, knew him throughout his life, but had ongoing contact with him until he was about 18." (DE 599 at 196).[57] Dr. Moore relied on Mr. Banks because "it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened." (DE 599 at 216). Importantly, Dr. Moore asked Mr. Banks to assess Bourgeois age right at about 18. Mr. Banks' assessment was somewhat lower than the others Dr. Moore used, but that suggested "an upward course of improvement in adaptive functioning." (DE 599 at 218). Even so, Mr. Banks only rated Bourgeois below average in two areas, the rest being average or above average. (DE 599 at 218).[58]

---

[56]     While Ms. Davis made many guesses on the ABAS-II, Dr. Moore opined that it did not invalidate her scoring because "she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items. But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there. So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue." (DE 599 at 126).

[57]     Mr. Banks testified in the guilt/innocence phase that Bourgeois and his family visited before the murder. Mr. Banks described JG1999 as sad and bruised. Bourgeois told him that he natural mother neglected her and her mother's boyfriend abused her. (DE 344 at 109-111).

[58]     In the evidentiary hearing, Bourgeois objected to any discussion of Nathaniel Banks' ABAS-II responses because the Government did not call him as a witness. (DE 599 at 120-21). The Court sustained that objection. (DE 599 at 121). Bourgeois, however, later opened the door to

(continued...)

Dr. Moore's ABAS-II testing generally resulted in scores falling within the average range, with only a few in the below-average category. None of the responses in Dr. Moore's testing suggested significant impairment. In Dr. Moore's opinion, Bourgeois' "adaptive functioning was generally in the skill level expected of the average adult male." (GX-15 at 12). Dr. Moore's testimony, which the Court still must approach with caution because of its retrospective focus, more credibly measured Bourgeois' functioning. As discussed below, the lay testimony that came before the Court amply supported the conclusions from Dr. Moore's testing.

2.    *Lay Accounts of Bourgeois' Functioning*

Standardized testing instruments cannot provide the only data for finding functional adaptive deficits. The AAIDD 11th instructs that "[o]btaining information from multiple respondents and other relevant sources (e.g., school records, employment history, previous evaluations) is essential to providing corroborating information that provides a comprehensive picture of the individual's functioning." AAIDD 11th, at 47.[59] Dr. Swanson provided a supplemental declaration after she interviewed several informants. (PX-33). From those interviews, she painted the picture of Bourgeois as a profoundly impaired individual. She described Bourgeois as a "significantly deficient" person who relied on "family, friends, and co-workers . . . in order to perform daily life activities." (PX-33 at 2). Of those informants, Claudia Williams, Beverly Frank, Brenda Goodman,

---

[58]    (...continued)
consideration of Mr. Banks' responses by asking Dr. Moore about them. (DE 599 ay 198, 215).

[59]    "If adaptive behavior assessment are used and reported in the records reviewed, clinicians should weigh the extent to which (a) multiple informants were used and multiple contexts samples; (b) that limitations in present functioning were considered within the context of community environments typical of the individual's age peers and culture; (c) important social behavioral skills, such as gullibility and naïveté, were assessed; (d) behaviors that are currently viewed as developmentally and socially relevant were included; and (e) adaptive behavior was assessed in reference to typical and actual functioning in the community." AAIDD 11th, at 46.

Carl Henry, Murray Bourgeois, and Donald Resse testified in the evidentiary hearing. A review of the evidentiary hearing testimony confirms that Dr. Swanson should have more critically examined the data upon which she based her conclusions. The testimony from Bourgeois' witnesses was as follows:

- Bourgeois' sister Claudia Williams could provide broad outlines showing that he had a difficult childhood, but she was not a good historian. To some extent, her confusion was understandable. She was young when she interacted with Bourgeois and was asked to evaluate his aptitude based on her childhood observations.[60] Her testimony showed that she had unreasonable expectations about the tasks Bourgeois should have been able to perform as a child. For example, Ms. Williams expected Bourgeois to clean the bathroom by himself at age four. (DE 597 at 29-30). She described how, when she was about twelve, she would occasionally help him with his Kindergarten homework because he was "very slow." Her assistance, though, consisted of mostly helping him "writing [his] ABC's," a skill that the experts agree he excels at now. (DE 597 at 36-38, 58-59). Unlike some other witnesses, Ms. Williams observed Bourgeois near the end of the developmental period. Bourgeois moved in with Ms. Williams when he was "probably about 18 or 19, something like that." (DE 597 at 39). Dr. Swanson primarily used Ms. Williams' account from that time period to assume that Bourgeois would "rely on [Ms. Williams] for cooking and washing his clothes and things like that." (DE 594 at 91). It was not clear, however, that Bourgeois was incapable of performing those actions; it was clear from her testimony that Ms. Williams was the one in the house that cooked. (DE 597 at 64). She reported that by then Bourgeois dressed himself and had good hygiene. (DE 597 at 40-41). In all, her testimony, while somewhat confused, suggested that any gross impairment in Bourgeois' youth did not extend into his later teenage years.

- Beverly Frank provided detailed testimony about Bourgeois. As previously noted, she observed him as a youth when she, in her twenties, visited her grandmother's house. Ms. Frank explained that he was slow and had problems understanding the games played by the other children. (DE 597 at 98). She identified problems he had at about age seven such as counting

---

[60]     The Government's objection to her testimony summarized the inherent problems with relying on her as a reliable witness: "Your Honor, I'm going to object. She's asking for some kind of retroactive interpretation of a 12-year-old, that's how old she would have been . . . How can she make, how can she make that opinion? I mean, it's ludicrous, a 12-year-old, from the eyes of a 12-year-old, and what is she now? At least 39." (DE 597 at 31).

change, dressing in mismatched clothing, and properly buttoning a shirt. (DE 597 at 98-99, 109-10). She, however, did not have contact with him as he aged.

- Brenda Goodman, another of Ms. Mary's granddaughters who was 12 years older than Bourgeois, also testified. Ms. Goodman moved away from the Bend around the time of Bourgeois' birth, but would visit regularly. She testified that when young Bourgeois could not put his shoes on the right feet, wear appropriate clothing, button his shirt, or follow directions well. (DE 597 at 138-39). He had problems communicating because he stuttered. (DE 597 at 139). She, however, also testified that Bourgeois would "pitch in" to help with his brother who had cerebral palsy. (DE 597 at 134). Her testimony, nevertheless, did not address Bourgeois' functioning closer to the end of the developmental period.

- Donald Reese, a co-worker from when Bourgeois first began driving, testified about events that led him to question Bourgeois' intelligence. However, he could not provide specific information that conclusively pointed to mental retardation. For example, Dr. Swanson relied on Mr. Reese to assume that Bourgeois only secured his driver's licence by obtaining the exam answers beforehand. Mr. Reese related that many drivers cheated on the examination for their chauffeur's licence, however he had no personal knowledge if Bourgeois cheated. (DE 597 at 391-92). Dr. Swanson relied on Mr. Reese to show Bourgeois' alleged difficulty in operating a truck independently. For example, Mr. Reese said on the first day he and Bourgeois were assigned as team drivers, Bourgeois got in the cab and began pushing buttons randomly until he found one to make the truck go. (DE 597 at 368-69). However, from his testimony it became clear that he did not know if Bourgeois had been trained on that particular truck. Mr. Reese himself did not know what all the buttons did. (DE 597 at 380-83). Mr. Reese described two occasions in which Bourgeois became lost, one of which landed the trailer in a ditch. (DE 597 at 371-75). He also suspected that Bourgeois did not prepare properly for a three-week route (DE 597 at 377-78), but did not specifically testify that he had problems with hygiene. Mr. Reese's testimony added little to the question of whether Bourgeois is mentally retarded.

- Bourgeois' cousin, Carl Henry, testified that he had problems as a child learning new games and riding a bicycle. (DE 597 at 324, 360). After Bourgeois had already been employed at his first job, Mr. Henry played some part in Bourgeois getting a position to drive a "buggy truck" that picked up shopping carts in local neighborhoods. Mr. Henry did not describe any problems Bourgeois had in performing that job. When they moved him up to a delivery truck, but "he had a few problems," so they moved him back to the buggy truck. (DE 597 at 326). With additional training, however, he moved back to the delivery truck. (DE 597 at 327). Mr. Henry, however,

still had to help Bourgeois fill out forms. (DE 597 at 329). Years later, when Mr. Henry drove with Bourgeois he noticed that he would not use the new communication system in his truck, but would call the dispatcher instead. (DE 597 at 337). He still then had others help with his paperwork. (DE 597 at 338). This testimony, however, conflicted with that from the Government's witnesses who said that Bourgeois could perform all the duties of a truck driver without assistance.

- Murray Bourgeois testified how, when he returned from military service and his cousin was ten, Bourgeois hung around his mechanic's shop but he could not grasp how to work on cars. (DE 597 at 399). He explained that Bourgeois was "slow to catch on. This mechanic thing was like too fast of a pace for him. (DE 597 at 399-400). He testified that Bourgeois had problems when first driving an 18-wheeler and was unsafe. (DE 597 at 400). As an adult, Bourgeois was " slower than most of the guys, you know, catching on to a lot of things." (DE 597 at 401). One time, Bourgeois claimed to be able to ride a three-wheeler ATV, but crashed it. (DE 597 at 402-03). His testimony, however, only showed that Bourgeois "wasn't used to riding it." (DE 597 at 403, 413).

Taken together, the testimony about Bourgeois' childhood and young adulthood suggests that he was slower than other youth, but the reliability of those accounts are impaired somewhat by a failure to have age-appropriate expectations for his behavior. Most of the impairments described consisted of difficulty learning new concepts or activities. For instance, Mr. Henry described how Bourgeois had some difficulty learning to drive some vehicles, but he obviously became proficient with time. Bourgeois succeeded when given more time or training. While Murray Bourgeois still considered him slow, he could obviously learn to operate competently in society. Bourgeois' childhood friends and his relatives testified that he was slow as a youth, but the information was mixed as he got older.

The Government's witnesses described competent adaptive abilities as an adult. The Government called Danny Clark, Robert Patterson, William Shots, Christopher Key, and Rhonda Davis as witnesses to describe Bourgeois' aptitudes as an adult. Each of the Government's witnesses knew Bourgeois in the work context, some of whom had worked for the same trucking company as