him for many years. Their descriptions of his work ability ranged from being a competent truck driver (DE 595 at 7) to an "above-average driver" (DE 595 at 59) to one of the "top two or three drivers" (DE 595 at 62) to one who customers often complimented and requested (DE 595 at 75-77, 114). Bourgeois completed entries in his log book satisfactorily (DE 595 at 60, 85) and examined his load slips for accuracy (DE 595 at 184). He could figure out how many miles he had traveled and how many more he could travel in order to comply with regulations. (DE 595 at 18). One witness assured that Bourgeois knew how to work the onboard computer because he was the only one in the truck at times. (DE 595 at 100).[61] He did not just travel dedicated routes but navigated throughout the nation without apparent difficulty. (DE 595 at 93-94).[62] In fact, one witness described him as an "overachiever." (DE 595 at 113). His appearance and grooming were beyond presentable, but noteworthy. He had a "very professional appearance." (DE 595 at 149). In short, none of the Government's witnesses suspected that Bourgeois had mental impairments. The Court found each of the Government's witnesses to be credible, reliable informants of Bourgeois' abilities as an adult.

### 3.    Bourgeois' Adaptive Abilities

The evidentiary hearing and record create a complex picture of Bourgeois' life, resulting in an entangled mosaic of strengths and limitations. Without question, Bourgeois' life manifested some level of difficulty at certain points in his life. This Court's task in reviewing *Atkins* second prong is to decide whether, on a global level, those problems amount to significant deficits in adaptive

---

[61]    After the murder Bourgeois told FBI agents that "the trucking company could see his location and send him messages via his computer, and he could send messages back to them via computer." (DE 344 at 181).

[62]    Dr. Price's videotaped examination showed that Bourgeois could use a map to navigate.

functioning. As previously mentioned, this Court's review differs from that employed by the psychological community. The Court looks at the underlying credibility of the witnesses who reported about Bourgeois' scores on the ABAS and Vineland. Also, the Court compares the alleged deficiencies against his whole life experience.

In some respects, Bourgeois is a subject whose precise faculties are difficult to pin down. Bourgeois' narcissistic tendencies make him exaggerate his abilities and present himself as more capable than he is. He overestimates what he can do and likes to present himself in the best possible manner. Dr. Swanson correctly noted that "he wants to present well, he presents very well." (DE 594 at 101). Bourgeois' narcissism may mask impairments and camouflage poor adaptive skills. At the same time, exaggeration of weaknesses gives a distorted view of his complete capacities.

One persistent problem in this case has been that Dr. Swanson took at face value statements made about Bourgeois' abilities without assessing them for credibility, testing them for validity, or weighing them against things known about his life. As previously noted, some of the witnesses who testified in the evidentiary hearing lacked a reliable ability to remember credibly events that transpired many years before. Also, the inherent desire to save a loved one from a death sentence can alter recollections in his favor. Dr. Swanson's failure to test the validity of the lay interviews highlights the challenge in adjudicating *Atkins'* second prong and makes her conclusion that he had adaptive deficits not credible. Unlike Bourgeois' experts, the Court cannot rely on his scores from his expert's adaptive-limitations testing because the witnesses could not accurately report his abilities.

A fuller examination of Bourgeois' life calls into question the testimony implying that he had severe impairments as a child. The tenuousness of the evidence supporting his claim of having deficient adaptive functioning becomes evident when considering the three areas that Dr. Swanson

82

identified as supporting a diagnosis of mental retardation: functional academics; social/interpersonal skills; and health and safety).[63]

*Conceptual Domain - Functional Academics* Dr. Swanson based her opinion of Bourgeois' aptitude in functional academics on his scores on the Woodcock-Johnson and on her lay interviews.[64] The experts debated whether his scores on the Woodcock-Johnson supported a diagnosis of mental retardation. Dr. Moore explained that most of his scores on that test were not low enough to indicate mental retardation.[65] Bourgeois scored low on some areas, but also in the high school range for spelling and reading. The testing provided a mixed picture of Bourgeois' mental abilities, but on the whole, he scored in a range above that signaling significant impairment. His testing on other instruments such as the WRAT-III confirmed that, while his scores in arithmetic dropped to the threshold allowable for mental retardation, the remainder of his scores were in the high school proficiency range.[66] Test scores did not persuasively show that Bourgeois had adaptive deficits.

---

[63]    Because her evidentiary hearing testimony mentioned that she found adaptive deficits, but did not extensively discuss which factors supported each category, the Court's discussion also relies on Dr. Swanson's supplemental report.

[64]    Dr. Swanson opined that the DSM-IV-TR's functional academic skill area overlaps with the AAIDD's conceptual domain. (PX-33 at 3).

[65]    Dr. Moore explained that "a person with mental retardation is significantly impaired. Generally about two standard deviations below the mean. And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below." (DE 599 at 108). Most of Bourgeois' scores were at 80 or above, though five subparts were at 70 or below (brief math, story recall, applied problems, and story recall delay).

[66]    Dr. Weiner and Dr. Gelbort administered the Wide Range Achievement Test-III (WRAT-III). Dr. Gelbort testified that the Woodcock-Johnson "is much more in depth and gets at the same stuff, but with a lot more accuracy and validity [that the WRAT-III], because it's looking at a deeper level." (DE 560 at 43). On both tests, Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth or sixth grade level in arithmetic. Dr. Swanson relied
(continued...)

83

Lay depictions of Bourgeois' schooling should bolster his scoring on objective testing. As explained in her supplemental report, Dr. Swanson based her finding of functional academics on the following factors:

- individuals said that Bourgeois failed a grade early in school;

- others helped him with his elementary school homework, but he did not seem to understand the concepts;

- in elementary school he received speech therapy;[67]

- he relied on others for help, including in high school he had others do his homework;

- others helped him complete job applications;

- he received written answers to driver's licence examinations beforehand;

- he had difficulty managing and understanding money.

(PX-33 at 3).

The evidentiary hearing testimony, however, failed to verify or support most of those factors. Some testimony suggested that Bourgeois was held back a grade in elementary school. Even so, the record leaves silent whether this was because of mental retardation, another learning disability, or even absenteeism. The unavailability of educational records hampered a probing look into his school years, but existent material shows that he graduated from high school with adequate grades. While testimony suggested that he may have been held back from one grade, his unstable home life does not preclude excessive absences, the hampering effects of a deprived home environment, or a general

---

[66]  (...continued)
on the low score in arithmetic to find deficits in functional academics.

[67]  Dr. Swanson never explained how speech therapy necessarily showed mental retardation instead of some other impairment.

lack of effort from being the cause for that decision.

The record now before the Court does not suggest that Bourgeois did not earn the admittedly low, but not failing, grades he attained in high school. No one testified that Bourgeois needed assistance with homework in high school. Bourgeois graduated from high school with all passing grades. His school records do not show any accommodation for mental retardation and no one testified that he did not earn the grades he received. Even taking into account the testimony that he had problems learning in the early years, no one testified about his ability to perform in high school, the only period for which records remain.[68]

Also, Dr. Swanson opined that she had received information from Donald Resse, a former coworker, that Bourgeois had received the answers to the driver's licence exam beforehand. (DE 594 at 162). However, Mr. Reese testified that it was common for applicants to have the answers beforehand, but he had no personal knowledge that Bourgeois had received help. (DE 597 at 392). Dr. Swanson assumed that Bourgeois had cheated on his driver's licence exam, but did not explore whether the facts would prove that supposition. Dr. Swanson also assumed that his employer recruited him because he was mentally retarded, though she admitted that she did not have any personal information that it was so. (DE 594 at 95).

In addition, while considering that Bourgeois had problems with money Dr. Swanson did not consider the whole of his financial dealings. Dr. Swanson looked at a limited amount of information

---

[68] Dr. Swanson apparently selected evidence that supported her conclusion that Bourgeois had mental retardation, but never probed that information for validity or reliability. For instance, she never explored the extent to which Bourgeois needed help in school and how long that need persisted. Claudia Williams testified that Bourgeois had problems doing his homework in elementary school and he "was very slow. You had to constantly show him what to do and how to do it." (DE 597 at 17, 27). But Ms. Williams was confused about when she helped, what she helped with, and how much help he needed. On cross-examination, Ms. Williams testified that Bourgeois received better grades than she did in high school. (DE 597 at 62).

suggesting that Bourgeois made poor financial decisions. (DE 594 at 163-64). In her supplemental report, Dr. Swanson listed the information she relied upon to find an inability to manage finances: Bourgeois' brother "provided him a lot of assistance in financial matters. He had signed a lease that had put him in considerable debt on this truck that he had. He had fallen behind on paying on his house. He owed money on credit cards." (DE 594 at 164). But it was evident that Dr. Swanson had not looked at all his financial deals nor factored into her consideration his whole abilities. She saw how he meticulously tracked his financial affairs, as later explained by Dr. Moore. (DE 599 at 133-38). She watched his interview with Dr. Moore in which he elaborated on how he successfully operated in the trucking industry. (DE 594 at 163). She heard how Bourgeois blamed his financial misfortunes on Robin Bourgeois' overspending. (DE 594 at 163, 174). Dr. Swanson, however, only factored into her analysis at information that suggested poor money skills without probing the reliability of the information before her, the etiology of the alleged problems, whether financial difficulties came from mental retardation or other factors, or strong indications that Bourgeois understood how to handle money. Bourgeois was not a financial genius, but the evidence did not persuasively demonstrate that mental retardation was to blame for his money problems. Dr. Price credibly thought that "[l]iving beyond his means and being in financial trouble is more likely related to his personality disorder, especially his impulsivity and sense of entitlement." (GX-1 at 9). Bourgeois' money management showed "a personality disorder trait or . . . a maladaptive personality trait," not mental retardation. (DE 595 at 223).

Dr. Swanson's reliance on Bourgeois' writing ability to show adaptive deficits exemplifies her myopic review. For instance, Dr. Swanson included her observations of how long it took Bourgeois to write a paragraph as an indicator of deficits. (DE 594 at 50-51, 54). She felt that he took an unreasonable amount of time to write, but would not factor the content of his writing into

86

her analysis. When the Government challenged her conclusions, Dr. Swanson became defensive and would not accommodate any information that disproved her conclusions. Dr. Swanson admitted that the content of his letters provided "an example that does not support [her] conclusion," but did not revise her conclusion on that basis. In another example, Dr. Swanson assumed that Bourgeois had difficulty understanding and managing money because he made unwise financial deals, (DE 594 at 163), although he assiduously maintained his checking account. Dr. Swanson opined that it "took [Bourgeois] much, much longer than it did the typical person" to learn to drive a truck, but he did learn and apparently did it with adequate proficiency. (DE 594 at 100). Cherry-picking information in isolation limits the data from which an expert draws conclusions, thus guiding the analysis.[69] Choosing narrowly the information that experts will consider leads them toward a conclusion that may not represent the inmate's full abilities.

Dr. Moore, on the other hand, took a full range of behavior into consideration when evaluating informal accounts for adaptive deficits. Dr. Moore criticized picking out individual and isolated problems because "[w]hen we look at adaptive functioning, we're looking at far more broad-based than that." (DE 599 at 206). According to Dr. Moore, Bourgeois' letter writing discounted adaptive deficits. (DE 599 at 13). Factors such as his fastidious record keeping, cogent letter writing, competent spelling, and others signal that insufficient evidence supports a finding of deficits in functional academics. Dr. Swanson lessened her credibility when she only focused on information supporting mental retardation without giving weight to or reconciling factors that disproved her conclusions.

---

[69] In fact, Dr. Swanson later refused to factor Bourgeois' long colloquies with the Court because "you can't use . . . one comment or conversation to infer and make a total global assessment of someone's adaptive abilities." (DE 594 at 179). In fact, she herself based her finding of adaptive deficits on selected, isolated information without considering the whole.

*Practical Domain - Health and safety* Dr. Swanson based her finding of deficits in the practical domain on Bourgeois' work history. She claimed that he has "profound delays in learning new skills." (PX-33 at 3). According to her, Bourgeois only got his first job because of his mental retardation . She related that he took longer than most to learn how to drive a commercial truck and was "sheltered at one trucking job by a relative who held a supervisory position[.]" (PX-33 at 3). Even later, he had difficulty driving and often got lost, ran over things, and received speeding tickets. He relied on others to navigate the roadways. Through his decades as a truck driver, "he would ask people to join him on his over the road jobs so that they could help him with directions and other tasks." (PX-33 at 4).

The testimony from the evidentiary hearing did not confirm that Bourgeois received his first job because of mental retardation.[70] While possibly showing that it took him longer to learn skills, the abundant evidence before the Court shows that Bourgeois was not only competent in his work skills, but he excelled at his employment.[71] While he initially had problems at his first job, he learned to drive different kinds of trucks and mastered driving tractor-trailers. (DE 597 at 358-59). Dr. Swanson never interviewed any of the witnesses who testified about Bourgeois' successful

---

[70]     Dr. Swanson assumed that Ms. Mary got Bourgeois first job. (DE 594 at 93). The testimony was mixed about whether Bourgeois got his first job on his own. Only Ms. Williams, who provided less-than-believable testimony otherwise, said that her husband got him the job. *Compare* DE 597 at 43 *with* DE 597 at 350. Mr. Henry did not testify that retardation played any part in Bourgeois' hiring, his duties, accommodations made for him, or other employment decisions.

[71]     Dr. Swanson also mentioned that Bourgeois had problems tying shoes, counting money, and riding a bike. Testimony about Bourgeois' impeccable dress and ability to maintain his own finances when older undercut the testimony about his inability to dress properly or count money when young, even if it may have taken him longer to do so as a youth.

decades as a truck driver.[72]   Dr. Moore explained that his employment as a truck driver was inconsistent with mental retardation: "This isn't a simple repetitive job that he went to in a factory putting lids on widgets, but a job that had him going out and around the country, living, at least driving independently, picking up loads, taking care of his self-care during that period, interacting with people across a lot of different certainly social styles, as we move across the country." (DE 599 at 133).

Dr. Swanson also found deficits in the APA's related area of health and safety. Dr. Swanson based her finding that he met the health and safety prong on specious evidence. For instance, she found that Bourgeois "had problems keeping himself safe" and mentioned how he "drove himself into a pole, causing himself serious injury." (PX-33 at 4). While Murray Bourgeois testified that Bourgeois had crashed an ATV, his testimony attributed the accident more to unfamiliarity than mental impairment. Dr. Swanson also relied on other unsafe practices, speeding tickets, and his getting lost as a support for her conclusion. She ignored, however, the fact that he drove a tractor-trailer across the country for decades without a major accident. His work put him on the roadways continually and the testimony did not indicate that he had ever crashed, caused a major accident, or received anything but minor injuries himself from carelessness. Given his long and successful history as a truck driver, Dr. Swanson's finding of adaptive deficits based on his work history lessens

---

[72]   Testimony from Donald Resse included incidents where Bourgeois was lost or confused while driving, though he complained that since "[t]hat was over 20 years ago" he could not remember some specifics. (DE 597 at 386). What Dr. Swanson did not figure into her analysis was the decades afterward that Bourgeois apparently worked as a truck driver without significant difficulty. Even the trial testimony showed Bourgeois maneuvering about the country with an able understanding of direction and an apparent comprehension of how to perform his job effectively. Bourgeois' many years successfully performing his job duties undercut Mr. Reese's testimony. Other witnesses described Bourgeois' employment skills in a way that precluded blaming the problems Mr. Reese identified on mental retardation.

her credibility and implies that she only searched for information that would support her conclusion.

*Social Domain - Social/interpersonal skills* Finally, Dr. Swanson weakly found deficits in Bourgeois' social skills. Dr. Swanson listed Bourgeois talkativeness, which according to her made him "absolutely unable to participate in a two-way conversation" as the primary basis for this diagnosis. (PX-33 at 4; DE 594 at 166-67). Dr. Swanson saw it as a deficit, mainly because he dominated conversations. (PX-33 at 4). Dr. Price saw Bourgeois' loquacious nature, "the gift of gab," as a positive factor. (GX-1 at 8). This Court communicated with Bourgeois many times during the trial. As the record of those colloquies amply shows, Bourgeois may be talkative, but he can engage in the give-and-take of normal conversation without any hint of impairment.[73] This Court's observation of Bourgeois, both in the courtroom and in his video recordings, does not suggest any impairment in the social domain.

In the end, Dr. Swanson failed to make a full review of available evidence relating to Bourgeois' adaptive abilities. To the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse. Dr. Swanson did not explore whether or not his childhood problems found their root in substantial mental impairment.

Nothing suggested that deficiencies endured into maturity.[74] Dr. Moore more credibly

---

[73]    Dr. Swanson also mentioned how Bourgeois' family "tolerated [his] odd manner" and how he had "informal supports to help him initiate and maintain any semblance of relationships." (PX-33 at 4). The record simply did not bear out these extreme statements.

[74]    Of the DSM-IV-TR's three areas, Dr. Swanson only found conclusive evidence of one as Bourgeois aged. She testified that there was "firm evidence of conceptual deficits persisting into adulthood." (DE 594 at 105). While she saw "problems in his practical skill[s]," she explained that they were not "sufficient deficits that would qualify in the area of practical." (DE 594 at 104). She saw "a lot of deficits in the area of social" which merged with his personality disorder, but

(continued...)

explained: "while his functioning may have been relatively impaired in his early childhood, he appears to have developed greater independence of functioning by the time he finished high school." (GX-15 at 16).[75] Bourgeois operated with remarkable competency in the free world for one with low IQ scores. A broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable. To the extent that Bourgeois showed problems in his life, such as in functional academics, the evidence does not unquestionably place the blame for those deficiencies on mental retardation, instead of on a failure to exert sufficient effort, possibly in conjunction with additional psychological or behavioral problems. Bourgeois has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation. The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

## D.    Manifestation of Limitations Before Age 18

The evidence before the Court failed to point to any pronounced intellectual impairment before Bourgeois' eighteenth birthday. Bourgeois has not shown that he is now, was at the time of the crime, or was during the developmental period, mentally retarded. Some evidence indicated that

---

[74]    (...continued)
seemed more unsure of whether they were significant deficits. (DE 594 at 104-06).

[75]    Dr. Estrada explained: "I have seen reports from his school indicating very low performance, reports from family members and friends indicating that he was slow to understand things, had difficulty making correct decisions, et cetera, et cetera. And I have also read reports and information of being able to take care of business and good reports, so I have had a mixed review regarding his cognitive capacities throughout his life." (PX-163 at 32). Again, the record "gives a mixed picture of good things, bad things" but Bourgeois clearly "had a good adaptive capacity in many areas of functioning." (PX-163 at 37). Dr. Estrada blamed other psychological issues, like rage episodes, for the problems in Bourgeois' life.

91

Bourgeois was a slow learner and took additional time to complete tasks while young. The Court, however, must balance that information against indications that mental retardation did not plague his youth.

As previously discussed, problems with time and perspective plague the most-developed lay testimony about his intellectual functioning as a youth. The evidence may show some problems before Bourgeois eighteenth birthday, but does not convincingly point to a diagnosis of mental retardation before that point in time.[76] The Court finds that Bourgeois has failed to meet all three prongs of the *Atkins* analysis.

### E.    Trial Counsel's Failure to Develop Evidence of Mental Retardation

In conjunction with his *Atkins* claim, Bourgeois faults defense counsel for not developing evidence of his alleged mental retardation at the time of trial. Evidence of possible mental retardation would play two roles in the sentencing phase. First, mental retardation could preclude a death sentence under the FDPA, 18 U.S.C.A. § 3596(c), and *Atkins*. Second, trial counsel could develop evidence of Bourgeois' possible mental retardation as testimony to mitigate against a

---

[76]    Even to the extent that Bourgeois has shown some signs of intellectual disability, his claim to have suffered traumatic brain injury hampers his *Atkins* claim. According to Dr. Moore, the brain injuries Bourgeois' allegedly suffered cloud the question of pre-adult mental retardation:

> But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change. And to me, that would create a snag or a difficulty to being able to extrapolate those scores back. We don't know whether those head injuries would have led to a decrease in his IQ functioning. And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change. So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.

(DE 599 at 145-46). Bourgeois' medical records, however, did not substantiate his claim to have had head injuries that put him a coma, calling into question the severity of any alleged head trauma.

sentence of death. While the Court has explicitly found that Bourgeois is not mentally retarded, that ultimate conclusion would not foreclose counsel from presenting the same information to show that Bourgeois has below average or low intelligence.

"Mental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues." *Bies*, ___ U.S. at ___, 129 S. Ct. at 2153. Even when an inmate has valid IQ scores suggesting low intelligence, an attorney faces difficult questions when deciding whether to present such evidence to the jury because "[b]orderline retardation is not always viewed as a mitigating circumstance." *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004). *Atkins* recognized that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321; *see also Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation . . . is a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because "'the upper borderline of mild retardation' does not amount to 'any significant organic damage or mental illness.'" *Riley*, 362 F.3d at 307 (quoting *Smith v. Black*, 904 F.2d 950, 977-78 (5th Cir. 1990)).

The Court finds that trial counsel did not violate Bourgeois' constitutional rights by not investigating Bourgeois' mental retardation further. Trial counsel initially withheld any judgment about Bourgeois' level of intelligence until after Dr. Estrada's testing. (DE 388 at 7). However, Mr. Gilmore testified in the hearing that he never thought that Bourgeois was mentally retarded. (DE 598 at 145). Bourgeois was "very active in the defense team." (DE 598 at 145). Bourgeois wrote his attorneys detailed letters giving them precise instructions on the handling of his defense. He even asked his attorneys to provide him a copy of their defense strategy in written form. (DE 598 at 151).

93

He informed his attorneys which witnesses he wanted to testify. (DE 598 at 154). Bourgeois gave him no reason to question Dr. Estrada's statement that he had above-average intelligence. (DE 598 at 156). Mr. Tinker explained: "Based on the information we had, from experts and family members, we were unaware that Mr. Bourgeois was mentally retarded, or near retardation level." PX-82 at 9).

Dr. Weiner's testing resulted in an IQ score that on its face fell within the range eligible for a diagnosis of mental retardation. The purpose of Dr. Weiner's testing, however, was to identify neurological deficits. He did not test for mental retardation, and thus did not encourage counsel to investigate that possible defense further. Dr. Weiner explained why he did not investigate Bourgeois' intellectual functioning:

> Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

(DE 594 at 267).[77]

Even though trial counsel did not seek expert assistance in that regard, Mr. Gilmore testified that he was left "just a gut feeling" that he was not mentally retarded. (DE 598 at 214). The evidence adduced after trial has shown that, had trial counsel chosen that defense strategy, the resultant information would not have excluded Bourgeois from execution. As discussed at greater length with respect to Bourgeois' failure-to-present-mitigating-evidence claim, reliance on evidence of a low IQ alone would not have brought about a reasonable probability of a different result. Bourgeois cannot show *Strickland* deficient performance or actual prejudice on trial counsel's failure

---

[77]    Mr. Tinker dealt with Dr. Weiner exclusively. (DE 598 at 215).

to argue that Bourgeois is mentally retarded.

### F.    Conclusion of Bourgeois' *Atkins* Claim

This Court has afforded Bourgeois a full and fair opportunity to show whether mental retardation precludes his execution. A holistic review of Bourgeois' life does not manifest the characteristics that *Atkins* identified as making mentally retarded offenders less culpable:

> Because of [mentally retarded offenders'] impairments . . . by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins*, 536 U.S. at 318 (footnote omitted). Bourgeois' life indicates that he can communicate effectively, learn from experience, and engage in logical thinking.[78] Bourgeois' intellectual and adaptive functioning, while possibly low, does not bear the characteristics that would render his sentence a cruel and unusual punishment. The Court finds that Bourgeois has not shown by a preponderance of the evidence that he is mentally retarded. This Court denies Bourgeois' first ground for relief.

## II.    Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim two)

Bourgeois' second ground for relief faults trial counsel's preparation and presentation of evidence to mitigate against a punishment of death. The importance of mitigating evidence in a capital case cannot be gainsaid. A capital sentencing jury must have the opportunity to consider "relevant facets of the character and record of the individual offender or the circumstances of the

---

[78]    While some expert witnesses focused on Bourgeois' impaired ability to control impulses, they attributed that deficit to other psychological deficiencies, rather than mental retardation.

95

particular offense" including "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263-64 (2007) ("[B]efore a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense.").

Capital defense attorneys carry a heavy burden in identifying and developing evidence to mitigate against a sentence of death. *See Florida v. Nixon*, 543 U.S. 175, 191 (2004). Nevertheless, "[t]rial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance" if based on reasoned strategic decision making. *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008); *see also Villegas v. Quarterman*, 274 F. App'x 378, 382 (5th Cir. 2008); *Riley v. Cockrell*, 339 F.3d 308, 316-17 (5th Cir. 2003); *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999); *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997). Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be" or "require defense counsel to present mitigating evidence . . . in every case," *Wiggins*, 539 U.S. at 533-34, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)) Bourgeois alleges that trial counsel did little to explore his background and gave the jury only a thumbnail sketch of the available evidence.

As previously discussed, Bourgeois' trial attorneys presented the jury with some information about his background. Bourgeois now argues that "the jury in this case was not provided with the true, accurate and available mitigating evidence" about (1) childhood physical abuse; (2) childhood

96

sexual abuse; (3) cognitive impairments, including borderline mental retardation and organic brain damage; (4) current mental disorders such as borderline personality disorder; and (5) mental health evidence about how his abusive childhood influenced his adult behavior. (DE 396 at 18-20). Bourgeois claims that trial counsel should have built a sturdier case against a death sentence through both lay witnesses and expert assistance.

The Court has before it an ample view of available evidence and counsel's decision making. Bourgeois supported his Motion to Vacate with declarations from numerous individuals attesting to the difficult circumstances in his childhood. He selected a few of those individuals to testify in the evidentiary hearing. Coupled with that information, mental health experts testified about the lingering psychological effects of his childhood and other mental problems. The Court has provided Bourgeois a full and fair opportunity to present evidence on this claim. The Court will now review the standards governing defense attorneys' representation, pre-trial efforts, selection of lay witnesses, use of expert witnesses, and finally the cumulative effect of their choices.

## A.    The *Strickland* Standard

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* established a familiar two-pronged analysis under which a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, an inmate must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.[79] In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, and courts afford counsel a "strong presumption of competence[.]" *Cullen v. Pinholster*, ___ U.S. ___, ___ S. Ct. ___, 2011 WL 1225705, at *16 (2011); *see also Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 742 (2011) ("[S]ubstantial deference must be accorded to counsel's judgment[.]"); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (recognizing the "heavy measure of deference to counsel's judgments"). Even when the record fails

---

[79]    Movant extensively argues that trial counsel's representation fell short of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("Guidelines"). Recent Supreme Court precedent has relied on the Guidelines as a useful measure of what activities a reasonable attorney should engage in when representing a capital defendant. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 524; *see also Strickland*, 466 U.S. at 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"). Nevertheless,

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract from the overriding mission of vigorous advocacy of the defendant's cause.

*Strickland*, 466 U.S. at 688-89. The Supreme Court has not held that the guidelines are a checklist to effective representation. Guidelines established by professional organizations do not supplant, but rather inform, *Strickland*'s penetrating performance and prejudice inquiry. *See Wiggins*, 539 U.S. at 521; *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000).

to explain all of trial counsel's decision making, as it does in some places here, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quotation omitted); *see also Gentry*, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Strickland*, 466 U.S. at 690 (stating that counsel is "strongly presumed" to make decisions in the exercise of professional judgment).[80] In assessing an attorney's performance with respect to a capital sentencing proceeding, courts "look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal*, 286 F.3d at 237.

To establish actual prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534. The Court does not consider prejudice in a vacuum. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

---

[80]    The Court has before it an incomplete account of the efforts by trial counsel, the investigators, and the expert witnesses to advert a death sentence. Gaps exist in the record, partially owing to Mr. Tinker's passing, partially due to the nature of the information submitted. For instance, Mr. Gilmore's testimony clearly showed that Mr. Tenore played an important part in the defense team and interacted regularly with the mitigation investigators, but his entire role cannot be ascertained from the material. (DE 598 at 192). Some email communications between the defense team members are before the Court, but many are one-sided, without responses, and capture only a portion of an obviously on-going conversation. Nevertheless, the record provides a sufficient basis to decide "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [his client's] background was itself reasonable." *Wiggins*, 539 U.S. at 523.

A court reviewing for error under *Strickland* recognizes that the years that have passed may distort the landscape as viewed through trial counsel's eyes. *See Harrington v. Richter*, ___ U.S. ___, ___ S. Ct. ___ (2011) ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."); *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight [and] to reconstruct the circumstances of counsel's challenged conduct[.]"). Thus, an ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90; *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 790 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.").

**B.    Trial Counsel's Investigation and Preparation of Mitigating Evidence**

Bourgeois claims that trial counsel's investigation was too hasty, too superficial, and too truncated to pass constitutional muster. This Court has already briefly recounted trial counsel's case at the penalty phase. From the transcript alone, it is obvious that this is not a case where defense counsel completely abandoned the heavy duty to investigate and present mitigating evidence. The Court, however, will discuss at length trial counsel's efforts to build an effective punishment defense.

*1.    Counsel's Early Efforts to Prepare a Mitigation Defense*

Early on, Bourgeois established himself as the one who would guide his defense, as evinced by a letter he wrote to trial counsel: "Dear Mr. Gilmore, I want a copy of your strategy on my case.

100

I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position regarding to my trial." (GX-180). Bourgeois, who was "very active in the defense team," decided that the defense's theory would be that "his wife committed the crime" and never wavered from that defense. (DE 598 at 144-45). Accordingly, trial counsel "built [their] case around" that theory. (DE 598 at 145).

Contemplating that Bourgeois' chosen defensive theory would not be greeted with success, his attorneys began preparing a mitigation case before the Government certified that it would seek a death sentence. The defense first retained the services of Doug Tenore as an investigator. Mr. Gilmore retained Dr. Cunningham who advised him to secure the assistance of a mitigation investigator.[81] At Dr. Cunningham's recommendation, Lisa Milstein and Gerald Bierbaum joined the defense team.

After the Government gave notice that this would be a capital case, the Court set jury selection to begin on February 12, 2004. Trial counsel had seven months to prepare for trial. From the outset, defense counsel pursued both lay witnesses and expert assistance. While the mitigation investigators delayed the beginning of their investigation into lay witnesses, this is certainly not a case where the defense "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009).

The mitigation investigators met with Bourgeois for the first time on October 23, 2003. (PX-

---

[81]    Mr. Gilmore sent Dr. Cunningham an email on July 25, 2003, informing him of his appointment. He described how "[t]he case was reset to February 2004, to allow you to gather information for your evaluation." He told Dr. Cunningham that he had contacted an investigator for "your investigation." The record does not contain any communication from Dr. Cunningham clarifying the relationship he expected between the attorneys, the investigators, and the experts.

101

165; DE 351 at 12). Throughout the investigators' interaction with Bourgeois, he was extremely useful but also paradoxically deceptive. Mr. Gilmore explained that Bourgeois "gave [them] names and telephone numbers of everybody that [they] should contact." (DE598 at 146). Testimony from the evidentiary hearing showed that Bourgeois himself communicated with the investigator, Mr. Tenore, about the individuals who could provide information. (DE 598 at 184). Bourgeois, however, also provided misinformation. Bourgeois, for instance, untruthfully told his attorneys that he had been in an accident on a three-wheeled ATV and had been in a coma for two months. He exaggerated the successes in his life. Bourgeois' dishonesty hampered the defense's development of evidence.

In the weeks after the first meeting, the investigators interviewed several individuals.[82] Their efforts, however, were not universally expeditious. On December 1, 2003, Dr. Cunningham's office sent the defense attorneys an email inquiring about the status of the mitigation investigation. Dr. Cunningham's office then informed counsel that they had not yet received any information from the mitigation investigators. Counsel immediately responded and indicated that the mitigation experts had requested more time to prepare, which would require a trial continuance. Counsel asked Dr. Cunningham for clarification on whether the mitigation investigators should feed him information or whether it should go to both of them. The record does not contain a response from Dr. Cunningham. (DE 598 at 193).

At the recommendation of the mitigation investigators, on December 9, 2003, defense counsel filed a motion for a continuance to allow them more time to explore Bourgeois' background.

---

[82]   In October 2003, the defense informed the Court that their mitigation investigators had started interviewing witnesses and had been in Corpus Christi the week before. (DE 351 at 17).

(DE 134).[83] By this point, the mitigation investigators had already interviewed several of Bourgeois' relatives. (PX-165). Trial counsel informed the Court that the mitigation investigators "cannot properly complete their investigation of this case until August, 2004." (DE 134). The Court held a hearing on December 10, 2003. (DE 358). The Court expressed concern that the mitigating investigators had delayed their efforts to that point. The Court cautioned the defense that a failure to get the investigation "done in a timely manner" was "very close to bad faith." (DE 358 at 4).[84] The Court told the defense that the mitigation investigation "had to be finished by trial." (DE 358 at 14).

In the same hearing, the parties discussed the appointment of expert witnesses. The Court has already appointed experts to explain why Bourgeois killed and whether he premeditated the murder.[85] The defense wanted to retain Dr. Estrada as a mental-health expert. To trial counsel's

---

[83] That same day defense counsel filed a motion for a psychological examination because they observed "highly unusual, often bizarre behavior, listened to abnormal conversations, and . . . noticed an unnatural writing style[.]" (DE 132 at 1). Around this same time, trial counsel even requested, and received, funds to employ a jury selection specialist. (DE 129). Also, they had experts look at the bite-mark and DNA evidence.

[84] Bourgeois emphasizes the concerns this Court expressed in that hearing as evidence that trial counsel's mitigation investigation fell below acceptable standards. Bourgeois' motion for a continuance, however, has to be considered in the context of that time. Trial counsel assured the Court that the mitigation investigators could complete their investigation in five months before the February 2004 trial setting. Trial counsel's motion asking for an additional lengthy amount of time came before the Court at the same time as serious concerns arose about the safety of witnesses. Bourgeois had, through correspondence, threatened to kill witnesses. At least one had been killed. The Court told defense counsel: "I have to believe the past representation of [the Government] that every month delayed puts these witnesses in danger." (DE 358 at 14). This Court had to balance security concerns against the period needed for an adequate investigation. As the Court informed trial counsel: "this may be a matter of life and death for many people besides your client." (DE 358 at 101).

[85] The defense sought the assistance of other experts whose participation in the defense do not play a major role in the instant proceeding. For instance, trial counsel also secured the help
(continued...)

103

"dismay," Dr. Estrada was already retained by the Government. (DE 598 at 156; DE 118; DE 358 at 11). By the time of trial, Mr. Gilmore had worked with Dr. Estrada for a decade and considered him a trusted, candid witness. (DE 595 at 154-57). Trial counsel believed that they could still get the information they needed on cross-examination. While the Government expressed concern that the motion for a mental-health evaluation was only a delay tactic by the defense (DE 132), the parties agreed to have Dr. Estrada examine Bourgeois. (DE 135, 149).

After the December 10th hearing, trial counsel moved to withdraw its request for a continuance. (DE 145). Trial counsel informed the Court that the mitigation investigators had said "they would suspend their work on other investigations and concentrate on completing their investigation on this case." (DE 145 at 1). The mitigation investigators "assured counsel that their work [would] be completed in time for the February trial setting." (DE 145 at 1).

---

[85]     (...continued)
of Dr. Joseph C. Rupp, a forensic pathologist, to testify about whether the forensic evidence suggested that Bourgeois committed a premeditated killing. (DE 350 at 82). The Court would not allow Dr. Rupp to testify in the guilt/innocence phase and questioned its relevance to the punishment proceedings. (DE 350 at 91-92). Trial counsel chose not to call Dr. Rupp as a witness. Trial counsel had retained a jury selection specialist. (DE 129). On October 10, 2003, the Court appointed Dr. George W. Holden to provide psychological explanation for Bourgeois' crime, focusing on "provid[ing] the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter." (PX-20 at 1). Trial counsel provided Dr. Holden a "box of material" relating to Bourgeois' background. After reviewing the available material, Dr. Holden provided an explanation for the murder: Bourgeois was upset about the potty training failure, was stressed from living with his family in the truck, and had little attachment to the victim. Dr. Holden suspected that Bourgeois had been abused as a child and thus learned that violence was an appropriate parenting technique. Dr. Holden explained that, "although this is evidently a case of horrible child physical abuse, it appears to be largely understandable and not uncommon – just a more extreme case with a tragic end." (DE 397, Exhibit 9). Dr. Holden filed an addendum letter on February 25, 2004, in which he addressed his opinion as to whether Bourgeois premeditated the killing. (DE 397, Exhibit 10). In a March 1, 2004 hearing, the Court found that Dr. Holden could not provide a physiological justification for the murder in the guilt/innocence phase. (DE 350 at 69).

### 2.    *Preparations Before the Guilt/Innocence Phase*

As the trial date neared, the defense ramped up efforts to prepare a mitigation defense. The mitigation investigators began interviewing witnesses in earnest, contacting dozens of individuals in the two months left before jury selection began. (PX-165). Mr. Bierbaum "spent a significant amount of time in Louisiana." (DE 342 at 16). Before trial, the mitigation investigators would interview each of Bourgeois' siblings (except the one who suffers from cerebral palsy). The investigators spoke with several members of Ms. Mary's family, long-time friends of Bourgeois, and other family members. Their investigation would inform decisions made by trial counsel and the defense experts.

On January 20, 2004, Dr. Estrada submitted a forensic evaluation finding Bourgeois competent to stand trial and sane at the time of the offense. Importantly, Dr. Estrada found that Bourgeois "appears to have an above average intelligence and memory and an average knowledge commensurate with his level of education and experience." (DE 152 at 6). Dr. Estrada found that he could "remember and describe the details and postulate alternative theories for his defense; none of which involves disturbed mental status." (DE 152 at 7). Also, Dr. Estrada's review of taped telephone conversations with family members showed "no altered mental status at the time, no presence of delusions, and no presence of irrational thinking or irrational behavior or inability to know right and wrong." (DE 152 at 7).[86]

---

[86]    Bourgeois gave Dr. Estrada some untruthful information. He claimed to have attended Louisiana State University for two years and to have worked as a police officer. Importantly, Dr. Estrada reported that "[h]e denies any history of childhood abuse, physical or sexual, neglect or trauma." (DE 152 at 4). Other information, such as his employment history with trucking companies, was correct. Dr. Estrada made observations about Bourgeois' presentation. He found him "alert, attentive, well-oriented to the four spheres . . . . His thought processes show no thought disorder, no delusions, no hallucination, no obsessions, and no compulsions. " (DE 152 at
(continued...)

105

On January 21, 2004, Mr. Gilmore told the Court that the defense was "still in the process of investigating mitigating evidence" and was still waiting for a final report from the mitigation investigators. (DE 389 at 8-9). The next few weeks included frequent communication between the mitigation investigators and Dr. Cunningham. On January 30, 2004, mitigation investigators sent Dr. Cunningham and trial counsel "a bunch of material from Bourgeois' case" and expressed a desire to set up a meeting. (PX-60 at 1). Still, the mitigation investigation continued. In a subsequent email, the mitigation investigator advised that there remained "about 10 more probab[l]e witnesses and about 20 more witnesses to contact." (PX-60 at 2). Dr. Cunningham's records also show continual phone calls and correspondence with the defense team throughout February and March. (PX-151).[87] Mr. Bierbaum created a memorandum recording the results of a lengthy interview he and Mr. Tinker conducted with Bourgeois in late January, 2004. The memorandum records significant details about the abuse Bourgeois' mother heaped on him, along with other significant mitigating circumstances. (PX-61).

In early February, trial counsel got authorization for Dr. Cunningham to come to Corpus Christi. Dr. Cunningham interviewed Bourgeois, met with trial counsel, and made his own phone calls to potential witnesses. (PX-151). Dr. Cunningham interviewed Bourgeois for 5½ hours. He also described conducting "extended telephone interviews" with Bourgeois' older siblings.[88] From

---

[86]     (...continued)
6).

[87]     For instance, the defense asked Dr. Cunningham for advice about what questions to ask prospective jurors (PX-60 at 5), promised to send him photographs of Bourgeois and video tapes (PX-60 at 6), and updated him on additional interviews and investigation (PX-60 at 8-12).

[88]     Despite characterizing the interviews as "extended" in 2004, Dr. Cunningham now downplays the information he solicited and blames others for what he later considered to be
(continued...)

106

that investigation, Dr. Cunningham became concerned that Bourgeois had a history of rage episodes that could be related to a traumatic brain injury he reportedly suffered. Four days later, Dr. Cunningham advised counsel to have a neurological evaluation performed to provide explanatory and mitigating evidence about Bourgeois' behavior. He also advised counsel to obtain Bourgeois' medical records, which trial counsel had already ordered.[89] Nothing suggests that Dr. Cunningham expressed any contemporaneous concern that insufficient time remained to be ready for trial. (DE 182).

The defense team formed strategy through emails, including correspondence with Dr. Cunningham, on how to deal with trial matters such as Bourgeois' choice to testify. (PX-60 at 16). The defense scheduled another meeting and requested Dr. Cunningham's presence telephonically. (PX-60 at 14). Trial counsel also asked Dr. Cunningham to provide a summary of his findings and opinions regarding possible mitigation evidence. (PX-2, 3). In a short letter Dr. Cunningham listed "a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood," including: abandonment by his father,

---

[88]   (...continued)
inadequate preparation:

> Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner, and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred. Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

(DE 397, Exhibit 6).

[89]   On January 29, 2004, the defense filed a motion for a subpoena requesting medical records for Bourgeois, his mother, his wife, and his daughters. Trial counsel received Bourgeois' medical records in late February. (PX-81).

emotional rejection and abuse, physical abuse, the death of his older brother, and rage attacks related to a head injury. (PX-2). Dr. Cunningham also pointed to "pro-social patterns and positive relationship patterns" including a good work history, that he "[w]as an involved father who provided economic support as well relationship [sic] to his children," and "[d]isplayed an ongoing interest in and was a constructive influence on his nieces and nephews."[90] Dr. Cunningham also gave trial counsel a separate letter describing his opinion of whether Bourgeois would be a risk of committing violent acts while incarcerated. (PX-3). Dr. Cunningham's report seemed detached from Bourgeois' record of misconduct after his arrest.[91] Additionally, Dr. Cunningham compared Bourgeois to studies of life-sentenced capital inmates. He observed that most life-sentenced capital inmates had a 20-30% risk exists for acts of assaultive violence and an 8-10% chance of "a more chronic violence problem" in prison. Dr. Cunningham thought that Bourgeois' incarceration history would reduce

---

[90]    Dr. Cunningham's conclusions seem detached from the facts of this case considering that the Government would argue that Bourgeois reluctance to support more children played into his murder. Also, the Government would use Bourgeois' abusive treatment of a nephew as an aggravating factor.

[91]    By this point, Bourgeois had threatened to kill several individuals before trial, had been prohibited from communicating with anyone other than his attorneys but still smuggled out letters nonetheless, had threatened to assault jailors, and lunged at a Federal Marshal. Bourgeois' threats and violence required him to be isolated from all other inmates. Dr. Cunningham told trial counsel that "it is my understanding that Mr. Bourgeois has not engaged in any assaults on inmates or staff and further that he has received few if any disciplinary write-ups." Dr. Cunningham recognized that Bourgeois had made threats of inflicting some violence from prison, but stated that "the credibility of these reports has not been determined." Dr. Cunningham disregarded Bourgeois' ability to order any violence from prison because, in his opinion, he lacked sufficient financial resources or ties to organized criminal groups to carry them out. He also expressed confidence that, "should the Department of Justice conclude that there is good cause to fear Mr. Bourgeois' violent reach, special conditions of confinement can be brought to bear that would restrict and monitor his communications," without recognizing that Bourgeois had already bypassed similar conditions before trial. Dr. Cunningham cannot blame trial counsel or mitigation experts for his misunderstanding about the heightened security due to Bourgeois' threats and violence. He had already interviewed Bourgeois in jail, witnessed his level of security, and, with his professed expertise in incarceration, should have recognized the exceptional efforts made to isolate Bourgeois.

his own risk to around one or two percent. Dr. Cunningham emphasized that Bourgeois age, work history, and "continuing relationships with family members" would further reduce his likelihood of violence.

Jury selection began on February 19, 2004. Trial counsel continued preparing expert testimony for trial. At Dr. Cunningham's recommendation, trial counsel explored whether neurological issues contributed to Bourgeois' crime. (PX-1). Trial counsel had received court funds to employ a neurologist to perform an EEG and other studies to investigate Bourgeois' rage episodes. (DE 182). The results of the EEG did not reveal any abnormalities. On February 28, 2004, Dr. Donald Weiner performed a neuropsychological evaluation of Bourgeois that found him in the "impaired range, although some tests were only slightly impaired."[92] His performance on other parts of the test suggested results consistent with individuals who "have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions."

Jury selection ended on February 25, 2004. The guilt/innocence phase began on March 1, 2004. As the punishment phase approached, trial counsel began to choose which mitigating

---

[92]    Bourgeois told Dr. Weiner that he had been in a three-wheeler accident in 1984 which resulted in "his being in a coma for 1-2 months." Bourgeois' performance on neurological testing suggested "mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex . . . likely die to the injuries sustained in the three-wheeler accident[.]" Dr. Weiner administered for tests: the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"); the Wide Range Achievement Test-Third Edition ("WRAT-III"); the Halstead-Reitan Neurological Test Battery for Adults, and the Test of Memory Malingering. Dr. Weiner found no evidence of malingering and believed that his test results were "a valid indication of his current level of neuropsychological functioning." (DE 391, Exhibit 16). As previously mentioned, Bourgeois relies on Dr. Weiner's testing to support his *Atkins* claim. Dr. Cunningham's billing records show that he reviewed Dr. Weiner's neurological report on March 4, 2004. (PX-151 at 3; DE. 597 at 248). It is telling, given his knowledge of Dr. Weiner's results, his expertise, and his own personal interaction with Bourgeois, that Dr. Cunningham never recommended that the defense pursue mental retardation as a mitigation defense.

witnesses would testify. The investigators and attorneys had contacted "over 50 people" to discuss mitigating evidence. (DE 598 at 184).[93] The mitigation investigators had provided trial counsel detailed summaries of their interviews with possible witnesses and with Bourgeois himself. (PX-61 at 24-39). The record plainly shows that the mitigation investigators had already pursued various avenues of investigation and interviewed many family members. After Bourgeois' conviction, trial counsel informed the Court that they were meeting with witnesses and would let the Court know who they planned to call. (DE 347 at 99).

Despite the defense efforts, not everyone was willing to testify on Bourgeois' behalf. Bourgeois family did not all look favorably on the prospect of testifying. His ex-wives and others still feared him. Others felt constrained in talking about his childhood because they did not want to disparage his still-living mother. Mr. Tinker explained: "My recollection is that information was gathered that might have helped our case, but that other information gathered would have a negative impact on our case. I don't recall the specifically [sic] what the information was, but I recall family members being split on the issue." (PX-82 at 9).

Prior to the punishment phase, trial counsel met with a large group of family members – possibly as many as fifty – and interviewed them personally. Mr. Gilmore explained in the evidentiary hearing:

| The Government: | And let me ask you, on some of the people that Mr. Bourgeois told you to go to and speak to, did you – was what they were saying not good for your defense? |
|---|---|
| Mr. Gilmore: | We brought down – I think we spoke with over 50, at least through the investigators, spoke with over 50 people. |

---

[93] One time line records interviews by the mitigation team with nearly 40 individuals, and some were interviewed multiple times. (PX-165). At trial, Mr. Tenore testified in a hearing that they had contacted "probably over 50" potential witnesses. (DE 342 at 15).

| | |
|---|---|
| The Government: | And let me ask you, during the trial, did you rent a room, a little conference room over in the hotel that's next to here? |
| Mr. Gilmore: | We got a small conference room and then a bigger room. We had all the witnesses in the big room, and then we'd take them individually into the conference room and talk to them individually. |
| The Government: | And how many witnesses do you think were there when you did that? |
| Mr. Gilmore: | I don't remember. It was a lot. It took most of the day talking to them. |
| The Government: | Okay. And after you went through this group of witnesses, is that when you decided, after talking, decide which ones to call? |
| Mr. Gilmore: | We make a decision, you know, how they're going to present in court and whether or not they have relevant evidence, whether or not they've got too much baggage in terms of prior convictions, things like that. |

(DE 598 at 184-85). Trial counsel sorted through those and chose to call only ones whose testimony would help more than it hurt.

But trial counsel did not make those decisions unilaterally. Mr. Gilmore testified that the trial attorneys "always discussed the witnesses with Mr. Bourgeois." (DE 598 at 154). For instance, Bourgeois insisted that his defense call his cousin as a witness, even though he had prior convictions. (DE 598 at 185).

With that background, the defense decided to present its mitigating case through the cross-examination of one expert witness and the somewhat-brief testimony of three lay witnesses. Because Dr. Cunningham's proposed testimony "did not fit with [the chosen] defense," (DE 598 at 182), they decided not to have him testify. To recount the punishment-phase defense briefly, cross-examination of Dr. Estrada established that Bourgeois "had suffered neglect and rejection, and there was some

111

physical abuse by his mother." (DE 341 at 23). In fact, his mother singled him out for abuse. (DE 341 at 24). That abusive background contributed to Bourgeois' own abuse of children. (DE 341 at 47). Also, violence in Bourgeois' past caused him to be violent when under stress. Specifically, heavy stress around the time of the murder caused Bourgeois to explode in anger at JG1999. (DE 341 at 41). Three lay witnesses, Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry, and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses explained that Bourgeois "suffered a lot of abuse" and received many "whippings" from his mother including with "the extension cord from the fan." (DE 341 at 113-14, 125). For instance, witnesses described how his mother cruelly cleaned his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). Neighborhood children, and even his own siblings, teased him, primarily because his father was not around. (DE 341 at 116). Bourgeois developed problems with anger and would "get[] red in the face," but his sister could usually calm him down. (DE 341 at 100).

Trial counsel's closing argument discussed mitigating factors in Bourgeois' background. Trial counsel highlighted abuse from his mother and teasing from his siblings.[94] Trial counsel

---

[94]　　Trial counsel stated:

The things that we have shown you about Alfred Bourgeois, knowing that you feel that he's guilty of this crime, are that Alfred is a 38-year-old man who was born in Louisiana, the product of a relationship, his mother and father weren't married. He has 22 siblings. His brothers and sisters that he lived with made fun of him because he never saw his father. His father had a one-night stand with his mother and then left and didn't support him until sometime when he was in high school, when he made contact with him. And his brothers and sisters made fun of him. And his mother singled him out for abuse. So much so that he went to live with Miss Mary, the elderly lady, to get away from his mother. And despite the fact that the Government may have you say he would – may want you to believe that he was doing that for his own convenience, he sacrificed to go and live with Miss Mary to

(continued...)

112

claimed that, with the lingering effects of childhood and stress swirling about him, Bourgeois just "snapped" and "it got out of hand and it ended up killing her. That's not to excuse his behavior; it's to – in an attempt to try to explain what happened." (DE 342 at 50).

### 3.    Trial Counsel Made a Constitutionally Sound Investigation

With that background in mind, the Court finds that counsel made a probing effort to investigate mitigating evidence. While the defense team delayed part of their investigation somewhat, the Court is more concerned with the results than the timing of their efforts. Bourgeois draws the Court's attention to *Williams v. Taylor*, 529 U.S. 362 (2000), for the proposition that "[t]he Supreme Court has held that when counsel leave themselves such a truncated period of time to prepare a complex mitigation investigation, they perform deficiently." (DE 649 at 30). The Supreme Court, however, has never set a minimum length of time necessary for an adequate mitigation investigation. In fact, recent Supreme Court cases focus on whether the scope of the investigation was broad enough and the inquiry deep enough, not whether the attorneys met some pre-appointed time line.

Of particular importance, the Supreme Court has found no error where trial counsel began preparing much earlier than the "week before the trial" as in *Williams*. In *Bobby v. Van Hook*, 130 S. Ct. 13, 18 (2009), the Supreme Court found it "simply incorrect" to refer to a mitigation investigation started much later than the one in the instant case as "last minute." The defense in *Van*

---

[94]    (...continued)
take care of her. And he stayed with her until her death. And then after that, he did not want to go back home. You heard Michelle Armont testify that he didn't want to go back, that he didn't want to go back because of the way that his mother treated him.

(DE 342 at 47).

*Hook* contacted their lay witnesses early and often. They were in touch with their expert witnesses more than a month before trial, and they met with the other for two hours a week before verdict. The *Van Hook* defense tried to enlist a mitigation specialist five weeks before trial. The Supreme Court found that this mitigation investigation did not amount to deficient performance. *See Van Hook*, ___ U.S. at ___, 130 S. Ct. at 18. The defense team in this case began its probing investigation even earlier than the attorneys in *Van Hook*.

The time line Bourgeois submitted into evidence amply shows that the investigators began interviewing witnesses months ahead of trial. (PX-165). They turned over information to the defense team and to Dr. Cunningham with increased regularity as the trial neared, but certainly well before the beginning of the guilt/innocence phase. The defense sought the assistance of several expert witnesses whose efforts informed their decision making. While some decisions were made as the penalty phase drew nearer, the evidence before the Court shows that the defense team amassed much of the evidence well before trial. With the possible exception of Dr. Weiner's evaluation that the Court will discuss below, Bourgeois simply fails to prove the trial counsel's investigation was not done quickly enough. With that in mind, the Court turns to Bourgeois' allegation that trial counsel failed to adduce sufficient evidence from lay and expert witnesses.

## C.     The Unpresented Evidence

Bourgeois faults counsel for not presenting (1) additional information about childhood physical and sexual abuse; (2) testimony that he suffers from borderline personality disorder; (3) evidence that he suffers from brain damage; and (4) evidence that he did not premeditate the killing. In reviewing those allegations, the Court keeps in mind that each category of evidence Bourgeois faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also*

114

*Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). On one hand "it might well have helped the jury understand [the defendant], and his horrendous acts," but on the other "might not have made [him] any more likable to the jury[.]" *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3264 (2010). Worse, the "double-edged" nature of the evidence may have militated in favor of finding that Bourgeois was a future danger to society. *Cantu v. Thaler*, ___ F.3d ___, 2011 WL 222986 at *5 (5th Cir. 2011); *Woods v. Thaler*, ___ F.3d ___, 2010 WL 4272751 at *12-13 (5th Cir. Oct. 25, 2010); *Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010); *Martinez v. Quarterman*, 481 F.3d 249, 254 (5th Cir. 2007); *Bryan v. Gibson*, 276 F.3d 1163, 1178 (10th Cir. 2001); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994). Trial counsel's decisions must be weighed with the recognition that the evidence Bourgeois faults them for not adducing was not exclusively mitigating. Courts defer to counsel's strategic decisions, and especially so when the withholding of beneficial information staves off the disclosure of harmful information.

### 1. Lay Witnesses

Bourgeois has provided declarations from many individuals to support his claim that counsel did not give the jury a full view of his background. The defense team spoke with many of those individuals. Many of those who were not interviewed were distant relations or friends.[95] For instance, Bourgeois' section 2255 motion relies on affidavits from three second cousins, the friend

---

[95] The trial team apparently never contacted: his sister-in-law Anita Ferdinand; his second cousin Murray Bourgeois; his maternal uncle Wilmer Bourgeois; a former girlfriend's friend Lawanda Cook; Ms. Mary's granddaughter Beverly Frank (though the investigators spoke with her father); his second cousin Allen Henry; his second cousin Jersey Henry; his second cousin Yvonne Robinson Joseph; his sister-in-law Jevona Jeanette Rixner; a former neighbor Louis Russell, Jr.; and a former girlfriend Ivy Thomas. While their statements say that the defense never contacted them, the Government had subpoenaed his cousin Isaac Bourgeois III and his sister-in-law Anita Ferdinand to testify at trial.

of a former girlfriend, and a neighbor from decades past. Also, the trial team never spoke with two

of Ms. Mary's granddaughters, though the records from the mitigating investigators show they spoke

with other members of the Clayton family.

The Court placed no limitation on Bourgeois' ability to call witnesses in the evidentiary

hearing to testify about the failure-to-present-mitigating-evidence claim.[96] Bourgeois chose only to

present testimony from Claudia Williams, Beverly Frank, Brenda Goodman, Carl Henry, Donald

Reese, Murray Bourgeois, and Kerry Brown. Most of those witnesses were not unfamiliar to the trial

team. The mitigating experts repeatedly interviewed Claudia Williams. Dr. Cunningham himself

interviewed her more than once. She and Carl Henry testified at trial. Dr. Cunningham, and possibly

other members of the defense team, interviewed both Carl Henry and Kerry Brown. While trial

counsel and the mitigation investigators did not include the granddaughters of Ms. Mary (Beverly

Frank and Brenda Goodman) in their investigation, they interviewed other members of Ms. Mary's

family.

Bourgeois primarily relies on the witnesses' testimony to show an abused childhood, sexual

abuse, and low intelligence. The evidentiary hearing testimony about his abused childhood followed

familiar territory, but also introduced some new information. Ms. Williams provided compelling

broad outlines that Bourgeois had a difficult childhood, one without nurturing or love on the part of

---

[96]    In a court date before the evidentiary hearing, counsel for Bourgeois informed the Court that the defense would limit the number of lay witnesses it would call: "We have proffered 23 declarations. I don't think we have to call 23. Perhaps we can pick our best ten and proffer the remaining 13. And we will try to cover different areas so the Court's not seeing the same thing." (Transcript of hearing held on April 20, 2010, DE 496 at 39). The Court provided Bourgeois a full and fair opportunity to substantiate his claim that trial counsel should have called additional witnesses in the penalty phase of trial. (DE 576 at 55-61). Bourgeois has not given the Court any indication that the declarants he did not call as witnesses would have provided some critical, but missing, piece of information. The Court assumes that their testimony would have followed similar themes as the live testimony Bourgeois presented.

his mother.  She remembered severe whippings that left Bourgeois bloody.  She explained that her mother beat Bourgeois "constantly."  (DE 597 at 14).  She also recounted one time that her mother cut off the tip of Bourgeois' finger with a meat cleaver because he would not eat his mother's cooking.  (DE597 at 14).  She explained: "My mother did Alfred some wrong things, bad things."  (DE 597 at 14).  Ms. Mary's granddaughter, Beverly Frank, provided credible testimony insofar as she had insight to Bourgeois' home life.  She explained why Ms. Mary took Bourgeois in: "she brought Alfred in more or less because Alfred was really mistreated by his mom.  We saw a lot of abuse.  And my grandmother just took him under her wing to stay with her."  (DE 597 at 97).  Another of Ms. Mary's granddaughters, Brenda Goodman, described Bourgeois' mother as "overwhelmed, frustrated all time" and neglectful because of her alcohol abuse.  (DE 597 at 132-33).

Bourgeois' cousin Carl Henry provided some context for Bourgeois' mothers abuse: "his mother had a resentment from him, due to his father and her [had] a relationship that was a one-night relationship, and it didn't work out."  (DE 597 at 322).  Without providing specifics, he testified that he had observed abuse.  (DE 597 at 322-23).  Bourgeois' cousin Murray Bourgeois explained that he "got mistreated, treated different more than the rest of his sisters and brothers."  (DE 597 at 396).  He was "abused more than the rest" and would "from time to time . . . have red whelps on him."  (DE 597 at 397).

These witnesses' testimony, however, came with caveats.  For example, Ms. Williams was confused, easily led by attorneys' questioning, and not a good historian.  On cross-examination she admitted that she had talked to the mitigation investigators several times before trial, but had never conveyed the story about Bourgeois' mother cutting off the tip of his finger or that she whipped him with an electrical cord until he bled.  (DE 597 at 51).  She explained: "the reason why I didn't say, because it was sad.  I was ashamed of my mother."  (DE 597 at 51).  She said that, because her

117

mother was still alive during the time of trial, family members did not want to talk about the way she treated Bourgeois. (DE 597 at 52). The witnesses had not only seen Bourgeois being abused, but had seen him abuse others. Ms. Williams explained that she knew that Bourgeois himself beat his other wives and children. (DE 597 at 54). She told FBI agents before trial that she was sure Bourgeois was capable of killing Robin and that "Alfred knew the difference between right and wrong, and he made the choice to kill JG1999." (DE 597 at 54-55).

With regard to his abused childhood, this is not a case where the defense attorneys "failed to pursue known leads" or "ignored . . . useful information[.] *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009). The trial investigators made a wide-ranging investigation that uncovered information about Bourgeois' abusive childhood.[97] Each of the four witnesses that trial counsel called in the punishment phase described his abused childhood. Even so, Bourgeois claimed not to have been abused and his family was hesitant to discuss the abuse until his mother died. While mostly ambiguously discussing "whippings," (DE 341 at 135), witnesses still specifically mentioned: (1) that Bourgeois received more abuse than others; (2) this abuse included being "whipped . . . with an extension cord"; (3) his mother routinely picked at his nose with her long fingernails; and (4) the abuse was continual. Trial counsel presented the same type of evidence relating to child abuse that Bourgeois has adduced in these proceedings.[98]

---

[97] Bourgeois now complains that the Government at trial disputed the accuracy of the accounts that Bourgeois' mother abused him, hoping that additional witnesses would have shored up the jury's confidence in that mitigation theory. The Government questioned the reliability of the testimony concerning abuse because Bourgeois himself lied to Dr. Estrada about his homelife (DE 342 at 59) Dr. Estrada concluded that he had lied about his childhood (DE 341 at 17, 22-23).

[98] In many respects, Bourgeois' abuse of JG1999 mirrors that which he claimed to have experienced. Of his children. Bourgeois singled out JG1999, his "outside child" for abuse. Like his mother, he beat her with extension cords, continually picked at open wounds, and otherwise

(continued...)

118

The Fifth Circuit has refused to find *Strickland* error when trial counsel presented similar mitigating evidence, even if only in outline form, at trial. *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006). This Court "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). Here, the defense presented evidence of the same nature as that has developed after trial. To whatever extent the trial testimony lacked the depth exhibited by Bourgeois' post-trial evidence, the breadth of testimony about his abused child hood is nearly identical. The trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions as they would if they had before them the entirety of the mitigating evidence developed after trial. With regard to the evidence of Bourgeois' abused childhood, "[i]t must be conceded that the jury was presented a clear, if not fully portrayed, picture of [Bourgeois'] life." *Neal*, 286 F.3d at 243. "[T]hough perhaps not as effectively as it might have been, the jury did hear [the child-abuse] evidence." *Parr*, 472 F.3d at 258.[99]

---

[98]        (...continued)
maltreated her. Bourgeois excluded JG1999 from family activities. Bourgeois' childhood abuse came full circle, but manifested itself in cruelty and savagery that culminated in murder. Dr. Estrada's testimony sufficiently blamed Bourgeois' violence as an adult on his childhood abuse. Further discussion would only have emphasized that Bourgeois was like his mother, only much worse.

[99]        Moreover, Bourgeois was forty years old at the time of trial. The jury may have come to the conclusion that as Bourgeois "aged and became more chronologically removed from his
(continued...)

119

Low intelligence and sexual abuse were the main areas in which the evidentiary hearing testimony exceeded the outlines counsel drew at trial. The most troubling allegation Bourgeois makes is that trial counsel failed to investigate whether he was sexually abused by two men, one a son of Ms. Mary and the other the church choirmaster. Testimony from the evidentiary hearing could not credibly validate those allegations. Murray Bourgeois, Ms. Williams, and Mr. Henry had never heard that Bourgeois had been sexually assaulted. (DE 597 at 57, 74-76, 357-68, 414). Mr. Henry expressed skepticism that it happened as Bourgeois now alleges. (DE 597 at 357-58). Only Ms. Goodman could provide any testimony about Bourgeois' claiming to have been sexually abused. She explained: "[M]y uncle raped Alfred. Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him." (DE 597 at 142). Even then, her testimony is somewhat suspect because it was based solely on what Bourgeois told her; no other witness could corroborate that he had been sexually assaulted. In fact, witnesses expressed surprise and disbelief that Bourgeois had experienced sexual abuse, particularly at the hand of the church choirmaster.

Even Ms. Goodman was hesitant to divulge that information until late in the legal process. Although Bourgeois' post-conviction investigators asked Ms. Goodman questions about abuse in Bourgeois' background, she did not report it in her initial statement and had only mentioned it recently. (DE 597 at 167). Her reluctance to tell others about what she described as a "dark thing" that she "couldn't tell [her] family" gives no confidence that she would have relayed the information to counsel. (DE 597 at 143). The Fifth Circuit refused to hold "attorneys responsible for introducing

---

[99]    (...continued)
difficult childhood and traumatic experiences . . . his troubled background would exercise a lesser degree of influence over his actions, thereby rendering him less of a future danger." *Coble v. Quarterman*, 496 F.3d 430, 447 (5th Cir. 2007).