UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : |  |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____   :

**PETITIONER'S MOTION PURSUANT TO F.R.CIV.P. 59(E)
TO ALTER OR AMEND JUDGMENT**

Petitioner, Alfred Bourgeois, through undersigned counsel, moves pursuant to

F.R.Civ.P. 59 (e), to alter or amend the judgment.  In support he states the following.[1]

**INTRODUCTION**

On May 19, 2011 the Court entered judgment against Petitioner with respect

to his Motion pursuant to 28 U.S.C. § 2255 (document # 661).

Petitioner moves for relief from the judgment because of serious, substantial

---

[1]Transcripts of prior proceedings are cited as "Tr." followed by the date of the proceeding and a page number.  The Court's *Memorandum and Opinion* (document # 660) is referred to as *Opinion* is cited as *Op.*, followed by a page cite to the Westlaw version, 2011 WL 1930684 (S.D. Texas. May 19, 2011).  All other citations are either self explanatory or are explained.  All emphasis is added unless otherwise indicated.

and troubling errors of law and fact in the Court's *Opinion*.

During oral argument on Petitioner's § 2255 Motion, the Court acknowledged its difficult challenge to "step-back" from the disturbing nature of this case:

Counsel:   And the other set of cases I provided Your Honor is that you can't, you can't substitute your judgment about what you would have done –

Court:   I agree with you 100 percent. And you know, this, it's very difficult to be in –

Counsel:   Sure.

Court:   – this kind of a position and having watched the trial. So last night several times when I was watching some of these videos that were very disturbing, I kept saying, I kept thinking, "Remove, step back and remove yourself." ... Because . . . It's a different process. That's all.

\*                              \*                              \*

Court:   But I need to go back over each of the things, each of the testimonies and determine whether, whether I feel that it was good or bad, whether they should have at least been explored in front of the jury. And I don't have any problem doing that. . . .And that's, to me, what my charge is. . . .I just hope I can do it right.

Tr., 1/13/11, 93-94.

Regrettably, and for the reasons that follow, this Court failed to step-back from the case.  This is evidenced by a plethora of instances where the Court engaged in a subjective analysis of the evidence presented at the evidentiary hearing and compared

it to its subjective analysis of the trial evidence, such analysis being based on **the Court's subjective views**.[2] This not only shows a failure to conduct a fair and detached review of the post-conviction evidence, i.e., an objective analysis of the evidence, it violates clear and controlling law respecting a post-conviction court's duty in assessing evidence.[3]

---

[2]The Court's Opinion is laced with such subjective and improper analysis of the evidence – for example: *Op.*, 60: "**From this Court's own observations**, Dr. Cunningham would not have been a good witness for the defense."; *Op.,* 61: "The **Court's observation** of the trial landscape and the jurors' reaction to evidence provides a vantage point to consider the effect any proposed testimony would have"; *Op.*, 64: "The jury would respond to the information in much the same way as Dr. Gelbort . . ." *Op.*, 68: "At any rate, **this Court's observation** in the two times he has appeared before the Court was that a reasonable attorney would not have called him. **His testimony came off as** academic, speculative, and untethered to the facts of the crime. ... The Court's observations assure that trial counsel did not render deficient performance in not calling Dr. Holden as a punishment phase witness."; *Op.,* 79: "Had trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors."; *Op.,* 87: "In particular, the Court's observation of Mr. Keel and Dr. Johnson showed that they would not be persuasive witnesses before the jury. They identified the same errors in the testing that the trial counsel had, yet bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault."

[3]Petitioner's claims all sound in ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668 (1984) and its progeny eschew subjective findings by the post-conviction court. See Hill v. Lockhart, 474 U.S. 52, 60 (1985) (Strickland analysis "should be made objectively, without regard for the 'idiosyncracies of the particular decisionmaker'" (quoting Strickland, 466 U.S. at 695). In Strickland itself, the post-conviction judge found no prejudice based upon his own opinion of what the evidence showed, and the Supreme Court held that his opinion was "irrelevant to the prejudice inquiry." Id., 466 U.S. at 700. The question is not what this Court thought of the post-conviction evidence or of a comparison of this evidence with the trial

Against this backdrop of inappropriate subjective analyses permeating the Court's resolution of this matter, Petitioner seeks relief because of additional legal and factual errors made with respect to the following claims for relief:

Claim II.[4]    Counsel were Ineffective For Failing to Investigate and Present Mitigating Evidence in the Penalty Phase of Trial;

Claim III.    The Court did not Have Jurisdiction over Petitioner and Counsel Ineffectively Failed to Challenge the Lack of Jurisdiction;

Claim IV.    Counsel Ineffectively Failed to Challenge Evidence of Sexual Assault; and

Claims V & VI.    Counsel Ineffectively Failed to Challenge the Use of Digitally Enhanced Photos.

In the event that the Court does not alter the judgment to award relief on the four above-enumerated claims for relief, Petitioner alternatively requests that the Court alter the judgment to permit a Certificate of Appealabilty (COA) as to each claim, pursuant to 28 U.S.C. § 2253(c).  In the last section addressing Petitioner's entitlement to a COA, he will explain how the Court misapprehended the law relevant

---

presentations (or non-presentations of evidence).  Instead, the question is an objective one – did counsel perform deficiently and if so, is there a reasonable probability of a different outcome.

[4]Petitioner identifies the Claims using the same numbering as used in the § 2255 Motion.

to COA.

## STANDARD GOVERNING RULE 59(E)

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment. White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 450 (1982) (internal quotation marks omitted). Rule 59(e) "is properly invoked to correct manifest errors of law or fact." In re Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir. 2002). A district court has broad discretion to grant a motion to alter or amend judgment. Lavespere v. Niagra Mach. & Tool Works, 910 F.2d 167, 174 (5th Cir. 1990) (overruled on other grounds). Moreover, Rule 59(e) does not set forth any particular grounds for relief. Id. Rather, Rule 59(e) relief is appropriately considered after weighing relevant circumstances on a case-by-case basis. Id.

Petitioner submits that with respect to each of the claims discussed herein, the Court has committed either factual or legal errors that should result in the amendment of the judgment.

## CLAIM II.   INEFFECTIVE ASSISTANCE AT PENALTY PHASE.

There is little to any dispute that Alfred Bourgeois was a traumatically physically and sexually abused child;[5] that he has borderline level of intelligence, i.e., borderline mental retardation[6]; organic brain damage,[7] and suffers from a host of resultant psychological impairments,[8] including Borderline Personality Disorder,[9] post-traumatic stress disorder and a paranoid-delusional process. Although **virtually none of this evidence was presented to the sentencing jury** – the only aspects of

---

[5]The Government's experts agreed that Petitioner was terribly abused and that this abuse had an impact on his emotional development and mental illness. For instance, Dr. Price testified that much of Mr. Bourgeois' instability is traceable to his lifetime of abuse, deprivations, neglect and parental abandonment. Tr. 9/23/10, 232, 239.

[6]See Tr. 9/23/10, 239-40 (Dr. Price agreeing that Bourgeois is in the borderline level of intellectual functioning).

[7]See Tr. 11/10/10, 26 (deposition of Dr. Price: "I would agree that these scores [Dr. Weiner's] on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction."). Thus, the Court erred when it wrote that Dr. Price did not agree that Mr. Bourgeois was intellectually impaired. *Op.*, 66.

[8]See e.g. *Op*. 46, n. 78 ("While some expert witnesses focused on Bourgeois' impaired ability to control impulses, they attributed that deficit to other psychological deficiencies, rather than mental retardation.")

[9]Again, the Government's experts do not dispute this diagnosis. See Tr. 9/23/10, 232 (Dr. Price agreeing with Petitioner's experts that Bourgeois' Borderline Personality Disorder exists and derives from his abusive childhood); Tr. 9/24/10, 155-56 (Dr. Moore agreeing that Petitioner has a Borderline Personality Disorder and that it "drives" his conduct).

this litany of mitigating factors that the jury heard was Dr. Estrada's "assumption" that Mr. Bourgeois was abused as a child – the Court has fashioned a narrative excusing counsel's abject failure to conduct a constitutionally adequate mitigation investigation or to present this overwhelming mitigating case for life. To excuse these failures, the Court has ignored evidence that did not fit within the narrative and drew unwarranted and repeated inferences against Petitioner's case at virtually every juncture. Whereas the Court ascribed shrewd strategic calls made by counsel, a full review of the facts relevant to this claim shows, not shrewd decision making, but a dysfunctional defense effort.

At the core of the Court's findings about counsel's ostensible tactics, is the question of the timing of the mitigation investigation. The Court found that counsel made a "probing effort to investigate mitigating evidence." *Op.,* 54. The Court stated that "While the defense team **delayed part of their investigation somewhat**, the Court is more concerned with the results than the timing of their efforts." The Court also notes that Williams v. Taylor, 529 U.S. 362 (2000) – while finding counsel who commenced an investigation on the eve of trial were constitutionally inadequate – did not set "pre-appointed" time lines for when a mitigation investigation should commence. *Op.*, 54. That is true, but only as far as it goes. As the full narrative of the mitigation investigation shows, and as AMERICAN BAR ASSOCIATION GUIDELINES

7

FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, February 2003, 31 Hofstra L.Review 913 (2003) (hereafter, ABA Guidelines) counsels, a constitutionally adequate mitigation case cannot be put together on the eve of trial.[10]  Yet, what this Court concludes was a "partial delay of the mitigation investigation" was in reality an abject failure to conduct a proper and timely investigation, with resulting prejudicial results.   And while the Court understandably is more concerned with the "results," the Court failed to appreciate that the timing has an effect on the results, as shown below.

A prime example of the last minute nature of the investigation relates to trial counsel's testimony that counsel interviewed "as many as fifty" potential mitigation witnesses "prior to the punishment phase." These so-called interviews occurred when the witnesses were in Corpus Christi for the penalty phase and took place in a hotel conference room.  While it may have been "prior" to the start of the penalty phase, the interviews occurred on the Sunday before the Monday, March 22, 2004 start of

---

[10]See ABA Guidelines at 967-68 ("recent studies indicate that several **thousand** hours are typically required to provide appropriate representation"); at 1002 (team defense approach allows attorneys to delegate "**time consuming** tasks to skilled assistants"); at 1022 ("penalty phase preparation **requires extensive and generally unparalleled investigation**"); at 1022 ("**The mitigation investigation should begin as quickly as possible**, because it may affect the investigation of the first defenses. . . , decisions about the need for expert evaluations . . ."); at 1025 ("corroborating information from multiple sources – **a time consuming task** – is important . . .").

the penalty phase proceedings. If counsel's testimony is taken as true, the defense team individually interviewed fifty (50) witnesses over the course of a day. Although there was no precise testimony about how long the day was, if one assumes a 10 hour day (or 600 minutes), this would average to about 12 minutes per interview – hardly the constitutional talisman for mitigation investigation.

Yet, this Court also found that some of the mitigation witnesses were reluctant to discuss abuse visited upon Petitioner by his mother, while his mother was still living. *Op., 56.* Obviously, that reluctance would not be overcome by sporadic interviews with a mitigation specialist, culminating in a 12 minute session with counsel on the eve of the penalty phase.[11]

So, timing is important – not because of artificial deadlines – but because of the labor intensive and time consuming nature of this endeavor. With this in mind, Petitioner reviews the actual and full facts related to the failure to conduct a timely and therefore proper mitigation investigation. Petitioner also discussed the negative

---

[11]Petitioner's Exhibit 165 shows that Claudia Williams, whom the Court offered as an example of a witness who was reluctant to discuss her mother's brutality while she was still alive (but see Tr. 9/24/10, 16 (Ms. Williams acknowledging her mother's abuse of Petitioner)), was interviewed by Ms. Milstein on November 25, 2003, by telephone by Mr. Bierbaum on February 25, 2004 and by Mr. Bierbaum again on March 2, 2004. Given what trial counsel had learned about Mr. Bourgeois' abuse (see e.g. Tr. 9/24/10, 13-18 (trial investigative memos showing that they had uncovered significant abuse)), they were obliged to spend additional time with the witnesses to overcome any reluctance to discuss Mr. Bourgeois' mother's cruelty.

impact of counsel's delay.

This Court found that counsel made early efforts to construct a mitigation case, even before the Government provided notice that this would be a capital case. *Op.*, 49. They contacted Dr. Cunningham in June, 2003. The Court appointed Dr. Cunningham on or about July 25, 2003 with the trial scheduled for February, 2004, and with a discovery deadline of December, 2003. See email from Mr. Gilmore to Dr. Cunningham, July 25, 2003. The Court correctly notes that Dr. Cunningham's office contacted trial counsel by email on December 1, 2003 to advise them that he had yet to receive any information from the mitigation investigators. *Op.*, 50.

**Fact:**[12]   From the time of Dr. Cunningham's appointment to the case on July 25, 2003 through December 1, 2003 – a period of just over four months – Dr. Cunningham was provided with no information about Mr. Bourgeois from the mitigation specialists. Thus, while the Court notes that counsel had seven months in which to conduct the investigation, over half of it was squandered with virtually no mitigation-related activity being conducted.

This period of squandered time was also reflected in Dr. Cunningham's invoice, which showed that he billed for no activity between July, 2003 and January 22, 2004. Tr. 9/21/10, 208.

The Court also neglected to note counsel's belief that they would be obtaining a continuance of the trial from February, 2004 as reflected in Mr. Gilmore December 1, 2004 email response to Dr. Cunningham. Tr.

---

[12]In this section, Petitioner's uses the designation of "Fact" as a shorthand for facts that were overlooked and apparently ignored by the Court in the timing narrative, which of course provides grounds for reconsideration of the Judgment.

9/21/10, 213.

The Court found that the mitigation investigators met with Mr. Bourgeois on October 23, 2003.  *Op.*, 49.

**Fact:**  Counsel allowed almost three of the seven pre-trial months to elapse without **insisting** that their specialists meet their client.

The Court states: "In the weeks after the first meeting, the investigators interviewed several individuals." *Op.*, 50.

**Fact:**  In reality on January 30, 2004 Dr. Cunningham finally received his first mitigation interview summaries.  Judging from the fact that he billed for 80 minutes to review and analyze them, he believed that he would have received between three and twelve such summaries.  Tr. 9/21/10, 217-18.  Thus, with trial now less than three weeks away, Dr. Cunningham was finally given some materials that he had been requesting for months.

The Court noted that Dr. Cunningham provided a summary of his opinions to trial counsel who provided them to the Government.  *Op.*, 52.[13]

**Fact:**  The summary was presented on February 25, 2004 (see Petitioner's Exhibit 2), **after voir dire commenced** and just one business day before the start of testimony at the guilt phase and well after the initial discovery cutoff of December, 2003 (see, email from Gilmore to Cunningham, July 25, 2003, Petitioner's Exhibit 8).

The Court states: "The guilt/innocence phase began on March 1, 2004.  As the

---

[13] The Court notes that Dr. Cunningham provided two letters summarizing his views, one related to mitigation and the other to future dangerousness.  While the Court critiqued his vews on future dangerousness, *Op.* 107-08 & n. 91, Petitioner has never contended that counsel were ineffective for not utilizing Dr. Cunningham with respect to the question of future dangerousness.

11

punishment phase approached, trial counsel began to choose which mitigating witnesses would testify."

**Fact:**     The Court's belief that this was an orderly and deliberate review of what mitigating evidence to investigate and present is belied by, among other things, the testimony of Dr. Cunningham and Gerald Bierbaum. See Tr. 9/21/10, 218 (Dr. Cunningham testifying that from January 30, 2004 to the commencement of trial was inadequate to construct a proper mitigation case, "not even a close call."); id., at 222 ("the state of the investigation was abysmal. The summaries I was provided were in most instances superficial and incomplete."; Tr. 9/22/10, 262 (Bierbaum testifying that he did not receive requested mitigation records "until late in the guilt phase"); id., at 262-63 (Bierbaum saw a psychological evaluation on Mr. Bourgeois for the first time "on counsel table" during the penalty phase); id., at 265-67 (Bierbaum explaining the flaws in Lisa Milstein's initial memos and his finding out that she was undergoing personal issues, including "neurological problems" which impacted her work); id., at 271 (Bierbaum: "I recall being informed that the case was going to go to trial in late February or early March and being really concerned that the work hadn't been done").

Of particular note, as of January 30, 2003, Dr. Cunningham had never evaluated Mr. Bourgeois, because best practices require obtaining background information about the defendant **before** commencing such an evaluation, and of course he had only obtained the first of such information on January 30. Tr. 9/21/10, 217.

The Court also did not mention that Dr. Cunningham noted that the summaries he received on January 30, 2003 contained errors, which meant that he could not rely on them. Tr. 9/21/10, 223, 224 ("I was already concerned about the inadequacy of detail . . . in these interviews. Now there are also fundamental errors of fact, so that . . . my confidence that I could independently rely on these was significantly reduced. Both because of that inadequacy of depth, as well as fundamental errors, I realized that I was going to have to interview individuals and primarily rely on my own findings, that I couldn't rely on the history they had

12

provided."); see also Tr. 9/22/10, 265-67 (Bierbaum testifying that the memos produced by Ms. Milstein were not up to her usual standard).

The Court stated that Mr. Gilmore never received an answer to his question to Dr. Cunningham in which Gilmore asked whether the mitigation information should go to him directly or to the lawyers. *Op.*, 50.

**Fact:**     Mr. Gilmore testified correctly that the responsibility for managing the case and insuring that materials were obtained and provided to the proper people at the correct time remained with him and Mr. Tinker. Tr. 9/22/10, 223[14]

With regard to the December 2003 motion to continue, the Court observed, "Trial counsel informed the Court that the mitigation investigators 'cannot properly complete their investigation of this case until August, 2004.' . . . The Court expressed concern that the mitigating investigators had delayed their efforts to that point. The Court cautioned the defense that a failure to get the investigation 'done in a timely

---

[14]See also ABA Sponsored, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, 36 Hofstra Law Review 677, 680 (2008):

Counsel have a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; **and to supervise and direct the work of all team members**. Counsel must conduct such investigation of the background, training and skills of the team members as will determine that they are competent and must ensure on an ongoing basis that their work is of high professional quality. . . .**All members of the defense team are agents of defense counsel.**

manner' was 'very close to bad faith.'" *Op.*, 50.

**Fact:**          Dr. Cunningham testified that his assistant spoke with Mr. Tinker on November 17, 2003 and was told that the "attorneys are aware of the previous time line and **are working with the judge to get a continuance."** Based on that phone call, Dr. Cunningham believed that a continuance was "likely." Tr. 9/21/10, 208-09. At the time of that phone call, in fact the "investigators" had interviewed only **one** person. See Petitioner's Exhibit 165.

And, as noted above, counsel conducted their mass interview of potential mitigation witnesses for the first and only time on the eve of the penalty phase and for, what was likely, at most, an average of 12 minutes.

This fuller narrative shows a very different picture from that which the Court set forth in its *Opinion*. It is against this backdrop of last minute, rushed and incomplete investigation, that this Court next found a variety of alleged tactical and strategic reasons for counsel's penalty phase presentation. Again, the full facts and relevant law, tell a very different story.

**Dr. Cunningham.** The Court explained that trial counsel chose not to call Dr. Cunningham as a witness at the penalty hearing because his mitigation theory "conflicted with Bourgeois' chosen defense. Trial counsel discussed [Bourgeois'] abused childhood **as sympathetic, not explanatory or as a justifying factor**. *Op.*,

14

60.[15]   The Court cites a portion of counsel's closing to the jury to support this distinction between "sympathy" and "explanatory," but this distinction makes no sense in the context of counsel's overall penalty phase theory as reflected in their

---

[15]As explained, this distinction is not supported by the record.  In any event, counsel have an obligation not just to garner sympathy, but to provide  "reasons," if they are available, to demonstrate why the jury should vote for life as a "reflection of a reasoned moral responses," as the Supreme Court has stated:

> Underlying Lockett [v. Ohio, 438 U.S. 586 (1978)] and Eddings [v. Oklahoma, 455 U.S. 104 (1982)] is the principle that punishment should be directly related to the **personal culpability** of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, **evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems**, may be less culpable than defendants who have no such excuse. . .   Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the **defendant's background, character, and crime.**

Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (internal quotation marks and citations omitted).  And, as the Fifth Circuit has emphasized, this duty is even more important when the facts of the offense, as the Court has found here, are "atrocious," *Op.*, 70. See Walbey v. Quarterman, 2009 WL 113778, *8, 309 Fed.Appx. 795 (5th Cir. Jan. 19, 2009) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. ... **To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge** .... Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely **egregious, heinous, and shocking facts**. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.")

closing argument.

Clearly counsel was seeking to **explain** Petitioner's conduct based on the stressors he was facing in combination with his life history. While some of this mitigation had a sympathetic quality to it, counsel was presenting it as an explanation. The Court's finding to the contrary is unsupported by the record.

Counsel began their closing by reciting some of Petitioner's life history, including his child hood abuse. Tr. 3/24/03, 47 ("his mother singled him out for abuse"). Immediately after reviewing these details about his background, including his abuse, counsel told the jury "these things are offered to you not as an excuse for committing this crime, but to try to help you understand his **mindset.** . . **we're all capable of doing bad things in the right circumstances**." Id., 48. Obviously counsel was using portions of Petitioner's background, that could garner sympathy, to explain Petitioner's "mindset."[16] The erroneous distinction between seeking

---

[16]In this context, counsel's statement that these factors are not an "excuse" for his having committed the offense is a reference to a legal excuse, i.e. a defense to the crime. See e.g. McKoy v. North Carolina, 494 U.S. 433, 441 (1990) ("in Eddings [v. Oklahoma, 455 U.S. 104 (1982)], the sentencing court had ruled that it was precluded [] from considering evidence of the defendant's troubled childhood and emotional disturbance. The State Court of Criminal Appeals affirmed, holding that such evidence was irrelevant to mitigation because it **did not support a legal excuse from criminal liability**. This Court reversed on the ground that such evidence was undoubtedly relevant to mitigation **even if it did not excuse** the defendant's conduct.")

sympathy and explaining the conduct is repeated throughout the summation of both lawyers. See also id., 48 ("at the time that this incident occurred, **these factors** came into play along with his **current situation** (counsel having just told the jury that the "current situation included the long truck ride, the potty spilling, his wife's infidelity and his financial difficulties); id., at 50 ("**these factors** all came together and Mr. Bourgeois snapped"); id., 50 ("if you believed he did it, it was not a premeditated act"); at 49 ("Something happened in [sic] that trip.  if you believe that he did it this, something happened during that trip that brought all these factors together and caused him to snap.").

The Court's conclusion that the abuse was offered only to garner sympathy and not to explain, viz, mitigate the offense, is simply not supported by counsel's theory as articulated in the closing.  Counsel was arguing that there was an explanation for why Mr. Bourgeois snapped – counsel had the correct theory, they simply had no evidence (aside from Dr. Estrada's set of assumptions) upon which to support the theory.

Similarly, counsel squarely offered Dr. Estrada's assumptions as a basis to mitigate the offense, and not simply to garner sympathy.  Mr. Tinker explained the importance of Dr. Estrada's testimony: "And Dr. Estrada concluded from what happened [with respect to the offense] that Alfred Bourgeois was abused as a child."

17

Tr. 3/24/04, 58. This is a direct link between Mr. Bourgeois assumed childhood abuse and the reasons that he "snapped." Similarly, Mr. Tinker told the jury that Mr. Bourgeois "grew up in an environment in which whipping apparently is accepted for the men. They could – if they thought their wives or girlfriends got out of hand, they'd hit them. I'm not telling you that because I think it's good, I'm not telling you that because – because I think its proper; I'm telling you that because that's the kind of rearing Alfred Bourgeois had and that's why he is what he is today." Id., 59-60.[17]

The Court's conclusion that counsel did not offer abuse evidence because it conflicted with the defense is also belied by Mr. Gilmore's *Response Affidavit* (Petitioner's Exhibit 83). In it, he explained his view of Dr. Cunningham's theory,

---

[17]In another example of this Court's incomplete treatment of these issues, it faulted Dr. Cunningham's proposed testimony that said essentially the same thing that Mr. Tinker told to the jury. This Court said:

> Other aspects of his [Cunningham's] testimony would offend jurors. In one portion of his proposed testimony, he would have told jurors to excuse Bourgeois' repeated fierceness against women because domestic violence is a common, and in his view, apparently accepted feature of society. Jurors may be expected to react with revulsion to that information.

*Op.*, 60, n. 103. It is incumbent upon this Court, if it does not grant the requested relief to explain – if it can – this discrepant treatment of the very same concepts, one expressed by attorney Tinker, and the other by Dr. Cunningham. More to the point, the Court would need to explain why counsel chose not to put Dr. Cunningham on the witness stand to provide the very same theory that counsel argued.

which sounds very much like the theory the defense presented, *sans* any evidence:

> I believe an accurate summary of Dr. Cunningham's proposed testimony to be that Mr. Bourgeois had numerous factors influence him at the time of the killing, which explained and somewhat mitigated his actions. Among these factors, were his upbringing as a child; his mental problems; his economic situation and the instability of his marriage, caused by the discovery that he had a child out of wedlock, which was order to pay support for; taking the family on the cross-country trip, forcing them to spend long periods of time in a confined space. All of these issues supposedly came to boil, causing Mr. Bourgeois to commit the murder.

Pet. Ex. 83, page 3. Reading this, one would imagine that counsel would have been eager to use Dr. Cunningham, or to present the components of his theory, e.g. the abuse evidence and notion that Mr. Bourgeois exploded (to use Dr. Cunningham's pressure cooker analogy). Indeed, Dr. Cunningham's pressure cooker sounds very much like Mr. Gilmore's repeated references to Mr. Bourgeois having "snapped."

Mr. Gilmore, however, explained why they decided not to use Dr. Cunningham:

> The problem, in [sic] our perspective, was that Mr. Bourgeois denied that he had committed the crime and throughout the trial, including his allocution to the jury [sic]. Dr. Cunningham's explanation conflicted with Mr. Bourgeois' defense.

Id. This explanation, adopted by the Court simply rings hollow when one examines Mr. Tinker and Mr. Gilmore's closing arguments. They offered childhood abuse as part of an explanation for Mr. Bourgeois' conduct – plain and simple. This Court's

19

findings to the contrary are not supported by the record.[18]

**Brain Damage.** The Court stated: "counsel must approach the decision whether to present evidence of brain damage with careful deliberation." *Op.*, 141. This is true, which is why counsel performed abysmally in their dealings with Dr. Weiner.

Dr. Weiner testified that after he submitted his report, there was no further contact with counsel reflected in his billing and he recalled none, with the exception of a brief phone call. Tr. 9/20/11, 242-43. Dr. Weiner recalled that the only contact between he and counsel was the phone call – likely from Mr. Tinker – that was of less than five minutes in duration. During this call, there was no discussion of his report or of his findings or conclusions. His invoice for services reflected no contact with counsel subsequent to the generation of his report. Id., 243. Instead of a discussion about his report, the phone call with counsel "was more of a statement . . . that because Mr. Bourgeois had given me incorrect, inaccurate and not factual information about the coma, they felt that my report would not be useful and weren't going to use

---

[18]This Court noted: "once supported by an adequate investigation, counsel's selection of a strategy is unchallengeable." (citing cases, internal quotation marks omitted). *Op.*, 61, n. 107. That is absolutely true. However, the question raised by Mr. Gilmore *Response Affidavit* and evidentiary hearing testimony, and comparing it to what actually occurred at trial, is whether he is being accurate in his recollection of what his alleged strategy actually was. Petitioner submits that he was not.

it in any way." Id., 244, 242.  Counsel never asked Dr. Weiner about whether Mr.

Bourgeois' comments about having been in a coma had an impact on his testing or

on his opinions.  Id.  Had counsel asked, Dr. Weiner:

> would have said that the actual test results appear to be valid and there
> was no evidence of malingering and that the results showed that there
> was brain damage . . . that regardless of the cause was he has some brain
> damage.

Tr. 9/20/11, 244.

And, because counsel never consulted with Dr. Weiner about any aspect of his

evaluation, they were not in any position to consider the various points that the Court

says should have gone into their alleged strategic calculus not to use this evidence:

> Evidence of mental and neurological conditions is double-edged: while
> it can create jury sympathy, it can equally bolster the Government's
> claim of future dangerousness by showing poor ability to control
> impulses and learn from past mistakes.  The Fifth Circuit defers to
> counsel's strategic decision not to present such double-edged mitigation
> evidence.  With the surety of presenting Dr. Weiner's testimony would
> reveal Bourgeois' **manipulation**, the credible testimony that he applied
> the **wrong norms**, and the **marginal benefit** to the defense,[19] trial
> counsel's decision not to adduce evidence of neurological impairment

---

[19]Evidence of brain damage is not "marginal." Sears v. Upton, 130 S.Ct. 3259
(2010) (discussing significant mitigating value of organic brain damage); Porter v.
McCollum, 130 S.Ct. 447, 451 (2009) ("Porter presented an expert in
neuropsychology [] who had examined Porter and administered a number of
psychological assessments [and] concluded that Porter suffered from brain damage
that could manifest in impulsive, violent behavior."); Rompilla v. Beard, 545 U.S.
374 (2005) (Rompilla "suffers from organic brain damage, an extreme mental
disturbance significantly impairing several of his cognitive functions.").

21

is not <u>Strickland</u> deficient performance.

*Op.*, 67.   Aside from the facts that counsel never learned about how the "manipulation" effected the testing, or what norms were used, or the extent and impact of Dr. Weiner's findings on Mr. Bourgeois behavior, there is much wrong with this Court's statement that requires reconsideration of this Court's judgment. Since counsel never consulted with Dr. Weiner, they were never in a position to learn anything about his conclusions.   And, as <u>Strickland</u> teaches:

> In rejecting Strickland's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;  and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances . . .'

<u>Wiggins v. Smith</u>, 539 U.S.510, 522 (2003), <u>quoting</u>, <u>Strickland</u>, 466 U.S. at 690.

Here, counsel could not possibly have a reasonable tactic for not meeting with an expert hired at court expense to review their findings and to make a "fully informed and strategic" decision about whether to use him.  <u>United States v. Jones</u>, 287 F.3d 235, 331 (5th Cir. 2002), <u>cited</u> by the Court at *Op.*, 61, n. 107.  Therefore counsel could not have made a reasonable judgment not to meet with this expert and

learn of his results.

There is also a timing component to counsel's ineffective failure to present Dr. Weiner's findings. Counsel failed to present Dr. Weiner with the medical records that they belatedly obtained in late February, 2004 (after the commencement of trial).[20] Tr. 9/20/10, 207. These records (Petitioner's Exhibit 81) showed that although Mr. Bourgeois was not in a coma from the three-wheeler accident, that he did suffer other head injuries, documented in the records, which could have caused the type of brain damage identified in Dr. Weiner's testing. Tr. 9/20/10, 246. And, if Dr. Weiner had adequate time to conduct a full evaluation, he would have also been able to present to counsel a "psychological explanation" for what this Court has concluded was a "manipulation" regarding the coma.[21]

_____

[20]See *Op.*, 51, n.89 (counsel filed for subpoena for the medical records on January 29, 2004 and received the records in late February, 2004). Notably, Mr. Bierbaum advised counsel to obtain these records as early as November 11, 2003. Tr. 9/22/10, 225-26 – evidence of further wasted time by a dysfunctional defense team.

[21]The Court says that Mr. Bourgeois was "extremely useful but also paradoxically deceptive" in his dealings with counsel. Op., 102. However, there are psychological explanations for why a person with Mr. Bourgeois' constellation of mental health deficits are not "good historians." While deceit is certainly one possible explanation for the assertion about being in a coma, and other perceived lies that the Court may believe were told by Petitioner, brain damaged, personality disordered, traumatized and psychologically impaired people, often do not relate the truth on account of their condition. See e.g. Tr. 9/10/10, 57 (Dr. Gelbort explaining how a subject's impairments can shade their view of what is true, and their ability to relate accurate information).

As noted, there is a timing aspect to counsel's failure to properly utilize Dr. Weiner. Dr. Weiner testified that he was asked to conduct the evaluation with a "tight time line" and because his schedule was booked, he performed it on a weekend, which is contrary to his practice.   Under the circumstances, he said it "was a rush job." The evaluation was done on Saturday March 1, after trial had commenced. Tr. 9/20/10, 204-06.

Thus, counsel waited until after the start of trial to have a neuropsychological evaluation done. They failed to provide their expert with any documents about their client, including medical records demonstrating a head injury. They then failed to consult with their expert to learn about his results, to ask pertinent questions, or to make a truly informed decision about whether to call him as a witness.

**Dr. Estrada.** The Court spends much time explaining that Dr. Estrada's post-conviction opinion was not really any different than what was presented at trial. *Op.*, 61-65. In the end, the Court concludes that Dr. Estrada had the "tools" at trial to reach the same conclusions that he did in his post-conviction testimony. Thus, the Court discredited Dr. Estrada's testimony that he stood by his § 2255 declaration when he said: "I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile." Tr. 9/10/10, 18.

That would be an odd result, inasmuch as both sides agreed that Dr. Estrada was a pre-eminent expert; both sides agreed to have him evaluation Mr. Bourgeois for competency; he became a Court expert in this case on that question and Mr. Gilmore sung his praises in his testimony, Tr. 9/22/10, 154 (Mr. Gilmore testifying that Dr. Estrada is the only expert he uses in his practice, because he "trusts" him; he is "not a prostitute" but will "tell you the truth"). The more reasonable conclusion for the Court to have drawn is that based on all of the information presented to him in post-conviction, **including the fact that Mr. Bourgeois was badly abused as a child – a fact that he was not privy to at trial** – that Mr. Bourgeois had a Borderline Personality Disorder, which combined with his other deficits mitigated the offense.

**Remaining Points.** There are several other areas in which the Court made serious errors of law and fact.

**Dual Edged Sword.** The Court variously excuses counsel's failure to investigate or present mitigating evidence because some of the evidence had an aggravating, as well as a mitigating quality. While such a dual edged sword analysis is proper for determining prejudice from counsel's **informed** decision not to present mitigating evidence, such a dual edged sword analysis has no place in deciding deficient performance **when counsel has not done the investigation**. See discussion of Strickland deficient performance, immediately above. Thus, when the Court

25

repeatedly says that "no reasonable attorney" would want to put on evidence of Borderline Personality Disorder, organic brain dysfunction or low intelligence because of its potentially aggravating quality, such analysis is a non-starter if the lawyer never investigated the area in question.[22]  Here, having never consulted with Dr. Weiner, counsel effectively did not "investigate" the results of his testing and therefore any decision was not informed.

Moreover, when it comes to low intelligence and intellectual impairments, the Supreme Court has often cited these factors as mitigating.  See Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death."); Williams v. Taylor, 529 U.S. 362, 398 (2000) (same).

Finally, the Court's determination that Strickland error cannot be found because counsel presented **some** mitigating evidence at trial is also contrary to clear Supreme Court authority.  Specifically, the Court's holding that because broad contours of Mr. Bourgeois' childhood abuse were presented to the jury, and that the post conviction testimony differs in these areas in depth, but not breadth, see Op., 119, requires reconsideration.

---

[22]See Op., 58 (no reasonable attorney would put on evidence of Bourgeois' intellectual limitations); at 62 (same for Borderline Personality Disorder);

In Williams v. Taylor, 529 U.S. 362, 398 (2000), the Court held that counsel's deficient investigation prejudiced Williams because the "graphic description of Williams childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded' might well have influenced the jury's appraisal of his moral culpability."

In Wiggins v. Smith, 539 U.S. 510, 535 (2003), Wiggins' history of abuse, neglect and abandonment, as well as his "diminished mental capacities," was "powerful" evidence of the sort "relevant to assessing a defendant's moral culpability." The Court found that had the jury heard the "nature and the extent," *id* at 535, of the abuse suffered by Wiggins and had the jury been able to put the details of Wiggins' "excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537.

In Porter v. McCullum, 130 S. Ct. 447, 449 (2009) (per curium), the Court concluded that counsel's failure to investigate and present mitigating evidence that "described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity" was prejudicial. The evidence the Court found persuasive included lengthy descriptions of his "horrible family life" and detailed testimony

27

regarding Porter's military service in the Korean War, including discussion of particular battles in which Porter was engaged. Porter's jury, however, did not hear this detailed and descriptive testimony. This Court therefore concluded that jurors "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." Id., at 454.

Trial counsel presented a small fraction of Petitioner's life story and omitted any compelling or descriptive details. Counsel failed to convey the nature and extent of the trauma, neglect and privation Petitioner suffered and they failed to present any testimony regarding Petitioner's significant mental impairments, including borderline intellectual functioning and brain damage. The Court's conclusion that counsel was not ineffective because, although the testimony was lacking in detail, the jury heard that Mr. Bourgeois was abused as a child, stands in direct conflict with the relevant decisions of the United States Supreme Court.

Moreover, as a factual matter, post conviction counsel presented testimony on several additional areas of mitigation in addition to childhood abuse, including: childhood sexual abuse, neglect, and abandonment, low intelligence, brain damage, and a debilitating personality disorder, that were never presented to the jury. As described above, the Court erroneously dismissed this aspect of Petitioner's claim by stating that reasonable counsel might not have chosen to present this evidence. The

Court's invocation of a strategic reason where none existed violates precedent.  The Court is not at liberty to create strategic reasons, the Court must only consider counsel's stated reasons.  See Wiggins, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (under Strickland, courts cannot use hindsight to supply a strategy for counsel).

### CLAIM III.  JURISDICTION.

Because the Court has also made significant errors of law and fact with respect to the question of jurisdiction, Petitioner also seeks reconsideration of the denial of relief.

  **A.**  **The Court's Conclusion about Jurisdiction Disregards the Actual Cause of the Victim's Death.**

The Court has found that the fatal blows were delivered on the naval base. This conclusion ignores the scientific data first reported by the Government's neuropathologist that showed that the actual cause of death was brain injuries sustained 7– 10 days prior to the victim's death.

  **1.**  **The expert testimony at trial misled the jury regarding the timing of the fatal injuries.**

Dr. Rouse testified at trial regarding the cause of death. According to Dr. Rouse, the victim had multiple "recent" bruises on her scalp. Tr. 3/8/04, 131. However, according to Dr. Rouse's testimony, the cause of death was "bleeding and hemorrhage within her brain, what's called a subdural hematoma." Tr. 3/8/04, 132; *Op.*, 72.

The Court recognizes that Dr. Rouse "did not discuss the age of the intercranial features, particularly the subdural hematoma." *Op.*, 72. What the Court fails to note is the fact that Dr. Rouse's trial testimony misled the court and the jury about the timing of the fatal injuries. Her testimony attributes the fatal hemorrhage within the victim's brain to the "recent" bruises seen on the scalp. She states: "These bruises did not result in the death. But what they indicate is the mechanism of what ultimately caused the injury in her head. What she actually died from is the forces that were transmitted on the brain. That's what resulted in her death. But these are markers for how that force, how those injuries occurred." Tr. 3/8/04, 131-132; *Op.*, 72.

This testimony directly contradicts the neurophathologist's report, ordered by Dr. Rouse, showing that the fatal brain injuries were at least 7– 10 old. In her trial testimony, Dr. Rouse explained that she sent the slides of brain tissue to the neuropathologist to "confirm that there was extensive injury in the brain which would

30

have resulted in her death." Tr. 3/8/04, 170.  However, Dr. Rouse misleadingly failed to explain that the neuropathologist concluded that the fatal brain injury was incurred 7– 10 days prior to death.  Scientific evidence available at trial proves that the recent bruising could not be the "markers" of what caused of the fatal injury.  The timing of these two injuries, the bruises and the intercranial injury, do not coincide.

Dr. Rouse continued in her deception when she testified that AB1994's testimony about a beating she witnessed shortly before her sister went to the hospital could "explain the injuries that were seen on the child."  Tr. 3/8/04, 171; *Op.*, 73.  In fact, the description of a beating close to the time of death could only be consistent with the recent bruises found on the child, and could not describe the forces that led to the actual cause of death – the pre-existing subdural hematoma and intercranial injury.

Dr. Rouse misled the jury when she failed to acknowledge that the fatal brain injuries she discussed were actually 7 – 10 days old.  Although Dr. Rouse testified that she had requested that a neuropathologist examine the brain tissue slides to "confirm that there was extensive injury in the brain which would have resulted in her death," Tr. 3/8/04, 170, Dr. Rouse did not testify in detail about the results of the

neuropathologist's examination, and the Government failed to ask her about them.[23]
The neurophathological findings alone give rise to reasonable doubt that the fatal
blows were inflicted on the navy base.

> **2.     The Court's reliance on AB 1994's testimony to establish the timing of the fatal blows is not supported by the evidence**.

AB1994 testified at trial that her father hit his daughter's head against the
window of the cab of the truck.  However, her testimony quite literally does not state
the these blows were inflicted on the base.   See Tr. 3/4-5/04, 39-40 (testimony of
AB1994).  More importantly, even if the blows she witnessed were inflicted on the
base, they could not have been the cause of the fatal subdural hematoma.  This, of
course, is because the fatal injuries, as revealed on the autopsy brain slides and
reported in the neuropathological report, were inflicted at least a week prior to
Petitioner's entry onto the naval base.

The Court discounts the Petitioner's expert opinions because they do not rely
on AB1994's testimony regarding Petitioner's actions on the day she collapsed.[24]

---

[23] It is notable that Dr. Rouse herself has never examined the brain slides
herself, but relied on specialist to do so.

[24]There is irony to the Court's view that Dr. Leetsma was not worthy of belief
because he did not consider the lay testimony in his opinion.  Yet, when Petitioner
attempted to secure discovery of the photos seized from Petitioner (see Petitioner's
*Motion for Discovery* (document # 648), which could shed light on whether the

However, the experts did not rely on AB1994's testimony because her testimony is not relevant to the fatal injuries and it is vague in the extreme. The brain slides examined by the Government's expert Dr. Kagan-Hallet pre-trial, and then again by Petitioner's expert pursuant to this Court's discovery order, reveal that the fatal blows pre-dated Petitioner's entry on the base. The question of whether or not the experts relied on or reviewed AB1994's testimony regarding her father's actions on the day they were on the base is therefore not dispositive or even relevant. The Court's discounting of the expert opinions because they are purely a review of the scientific data rather than the trial testimony is unreasonable. The scientific evidence that was not utilized by trial counsel is the pertinent piece of evidence regarding this claim. As will be discussed below, the Court's unreasonable discrediting of expert opinions is especially unreasonable in this case, where an evidentiary hearing was not granted. Further hearing would allow Petitioner the opportunity to present more evidence about the "context" of the fatal injuries.

### 3.    Trial counsel were ineffective for failing to challenge jurisdiction.

Counsel failed to use the neuropathologist report to challenge the jurisdictional element of the crime. The findings in this report explain that the fatal injuries pre-

---

victim was showing signs of decompensation prior to entering federal lands, the Court denied that *Motion*. *Op.*, 111 (denying outstanding motions).

existed Petitioner's entry on the base. This report would have challenged Dr. Rouse's unsupported implication that the blows AB1994 witnessed were the fatal blows, and that they occurred on federal land. The report was available and counsel had no reason for failing to either call Dr. Kagan-Hallet or another neuropathologist to testify, or to use the report to cross examine Dr. Rouse regarding the timing of the fatal brain injury. Alternatively, counsel could have raised this issue in a pre-trial motion or in a motion for acquittal after the Government had presented its case in chief. Counsel failed to even question Dr. Rouse about the cause of death or the time of the fatal injury.

The Court's conclusion that counsel might have chosen not to present this evidence because it might have lessened their credibility in the eyes of the jury, *Op.,* 79, is flawed. First, the Court has not provided Petitioner with the opportunity to present testimony about trial counsel's strategy, if any, about this claim, because the Court did not permit a hearing on it. Second, the Court's reasoning goes against basic rules of legal advocacy: in any case, but especially in a capital murder case, reasonable counsel would hold the Government to its burden of proof beyond a reasonable doubt regarding every element of the crime. Petitioner is aware of no precedent stating that counsel should not hold the prosecution to its burden of proof on every element of the offense.

Counsel's deficient performance prejudiced Petitioner.  Counsel's failure to challenge jurisdiction undermined the adversarial process; the Government should have been held to its standard of proof to this basic element of the crime.  If Dr. Kagan Hallet's findings had been introduced at trial, it is more than likely that the jury would not have determined that the fatal blows were inflicted on the navy base.

**B.     The Court Erred When it Denied Petitioner a Hearing and Complete Discovery on this Claim.**

The Court denied an evidentiary hearing on this claim, but allowed limited discovery and subsequent supplementation of Petitioner's claim via deposition.  The Court required that Petitioner's expert evaluate the autopsy slides reviewed pre-trial by Dr. Kagan-Hallet (now deceased) that form the basis of her opinion that the fatal brain injuries were 7– 10 days old.  Tr. 4/20/10, 61-62.  Petitioner retained Dr. Leetsma, a neuropathologist, to review the slides, which were belatedly provided by the Government, and write a report.  Dr. Leetsma was eventually deposed, belatedly, then, the Government was granted permission to "rebut" Dr. Leetsma's deposition. The Government was able to present this rebuttal even though their expert, Dr. Rouse, never completed a report, the Government said was forthcoming, regarding her rebuttal testimony.

In the end, as the Court notes, Petitioner was only allowed "limited factual

development of this claim." *Op.*, 74. This limitation violates the 28 U.S.C. § 2255, which governs here, and is unreasonable. Under Section 2255 (b), "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." The Fifth Circuit has held that where the allegations in the Section 2255 motion are not negated by the record, the district court must hold an evidentiary hearing. United States v. Briggs, 939 F.2d 222, 228 (5th Cir. 1991) (evidentiary hearing required when evidence that existed at the time of trial that, if true, might support the petitioner's constitutional claim). Indeed, Petitioner's allegations are supported by the evidence of the Government's own neuropathological findings, the facts of which are misrepresented by Dr. Rouse's testimony at trial. A full evidentiary hearing and discovery (such as that which was denied by the Court) was warranted. This Court should amend its judgment to afford Petitioner the hearing to which he was entitled.

The Court notes that the Government's own expert failed to testify conclusively regarding the timing of the fatal injuries at the trial. *Op.*, 73. Instead, as discussed above, the expert misled the jury by making an unfounded connection between the "recent" bruises and the subdural hematoma that she knew predated Petitioner's entry on the naval base. The Government's expert still has not definitively dated the fatal

36

injury.   On rebuttal, Dr. Rouse vaguely testified that death was caused by "trauma, swelling, the thrombus,[25] and the subdural hemotoma." Tr. 1/27/11, 8; *Op.*, 76.  This testimony remains vague as far as timing the fatal injury and, in addition, does not comport with her trial testimony.

Further, the expert testimony leaves open questions regarding the timing of the fatal injuries that can only be answered through further testimony.  For example, in her testimony rebutting Dr. Leetsma, Dr. Rouse testified that she did not believe the victim had a pre-existing brain injury because she did not exhibit "signs [that ] she was incurring increasing intercranial pressure." Tr. 1/13/11, 60; *Op.*, 76.  Putting aside the fact that this testimony is not credible because the neuropathological findings prove that the victim had already suffered a brain injury prior to her entry on the naval base, the testimony calls for further evidence.  Dr. Leetsma also commented that more information regarding the child's clinical state leading up to her death would help confirm more exactly the timing of the fatal injuries.  See Tr. 1/10/11, 30-31.  If granted a hearing, Petitioner would present witnesses to describe the victim's symptoms of brain injury prior to her entry on the base.  At a minimum, they would produce the results of the discovery, including photos showing the victim's condition

---

[25]Notably, Dr. Rouse had never mentioned a thrombus prior to its identification by Dr. Leestma,

in the days leading up to her death.

In the end, then, this Court still has not discerned the timing of the fatal injuries. No Government expert has testified with specificity about the timing question. Instead, the Government's expert misled the court and the jury at trial by stating that the recent bruises caused what is revealed in a pre-trial report to be an older injury. Dr. Rouse has not completely corrected that testimony and instead continues to vaguely skirt around the question of timing. In other words, the Government still has not met its burden of proof beyond a reasonable doubt regarding jurisdiction. A conviction based on faulty testimony about an element of the crime violates Due Process. In re Winship 397 U.S. 358, 364 (1970) ("Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

The Court's conclusion that trial counsel might have made a strategic decision to not question the Government's expert about the timing of the fatal blows and/or to not present the testimony of Dr. Kagan Hallet or another neuropathologist to challenge jurisdiction is yet another example of the Court ascribing trial strategy where none existed, and is especially inappropriate where no hearing has been granted to elicit evidence about counsel's strategy. In this case, because no hearing was granted, Petitioner has not been given the opportunity to question trial counsel

about their awareness of the jurisdiction question or any strategic reason for their failure to challenge jurisdiction.[26]  Imputing a strategic reason to counsel's failure, while denying Petitioner the opportunity to offer evidence on the issue, violates Section 2255's requirement that a hearing be granted.  Further hearing would prove that counsel's failure to use readily available evidence from the Government's own scientist to credibly challenge a basic element of the Government's case was ineffective under Strickland.

## CLAIM IV.  COUNSEL INEFFECTIVELY FAILED TO CHALLENGE EVIDENCE OF SEXUAL ASSAULT.

As the Court's *Opinion* acknowledges, in his "challenge" to the alleged sexual assault and semen evidence, counsel:

- did not, on cross-examination, challenge Dr. Benton's alleged observations of vaginal trauma in the autopsy photos;

- did not, elicit from Dr. Rouse, who performed the autopsy and took the photos relied on by Benton, that she found no evidence of vaginal or anal trauma;

---

[26]Mr. Tinker told undersigned counsel that he never challenged jurisdiction because of a misunderstanding regarding federal law regarding jurisdiction.  He told counsel that he never raised the claim because he thought that federal jurisdiction was founded if the victim died on federal lands.  Petitioner has proffered this fact to the Court and counsel have offered their contemporaneous notes of this conversation.  See *Petitioner's Reply to the Government's Response to Petitioner's Post-Argument Submission and Opposition to Motion to Reopen Evidentiary Hearing* (document # 657) at 18.

- did <u>not</u> present any expert to rebut the alleged vaginal trauma observed by Dr. Benton;

- did <u>not</u> present any expert testimony to rebut Dr. Benton's testimony that p30 is <u>only</u> found in semen and breast milk;

- did <u>not</u> present any expert testimony to rebut the testimony of FBI serologist Caroline Zervos that p30 is <u>only</u> found in peripheral male blood and male urine;

- did <u>not</u> present any expert testimony to rebut the testimony of FBI forensic DNA examiner Anthony Onorato that the <u>only</u> place, outside of male semen that P30 could be found, is in the blood of males with prostate cancer;

- did <u>not</u> question either FBI expert about FBI protocol which <u>required</u> the observation of sperm (<u>none were observed in this case</u>) to confirm the presence of semen when a p30 test is, <u>as it was in this case</u>, "weak" to "very weak" positive;[27]

- did <u>not</u> present any expert testimony to rebut the allegation that a positive P30 test, <u>alone</u>, was definitive for the presence of semen.

Nevertheless, the Court credits counsel for sufficiently challenging the alleged

sexual assault evidence and in particular, the semen evidence. <u>See</u> <u>e.g.</u> *Op.*,81 (On

cross-examination of Dr. Benton, "counsel focused on the reliability of p30 testing");

<u>id.</u> ("Cross-examination [of FBI agent Zervos] probed whether anything other than

---

[27]Although the Court denied Petitioner's claim that the Government suppressed evidence that the FBI's testing for p30 revealed a "weak" to "very weak" positive results, the Court did find that the FBI's testing, as well as the defense expert's testing, resulted in weak to very weak positives. *Op.*, 84 n. 137.

prostate proteins could result in a positive p30 test"); id. at 82 ("On cross-examination [of FBI agent Onorato] ... Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA"); id. (the defense's closing argued that there was "no evidence of trauma to the rectum or genitalia when they examined the child at the hospital," and "no evidence of semen ... being found on this child").

Notably, however, the Court's *Opinion* omits the relevant transcript pages showing that the Court sustained the Government's objection and rebuked counsel for arguing that there is "no evidence of semen" because counsel **failed to present evidence that there was no semen.**

Indeed, the <u>un-cited</u> transcript lines and pages <u>immediately</u> following those cited by the Court reveal that counsel's <u>attempt</u> to argue "no evidence of semen" prompted the following exchange:

Ms. Booth: Your Honor, I have to object. That is a mischaracterization of the evidence.

Court: **That is sustained**.

Mr. Tinker: The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth: I have to object, your Honor.

Mr. Tinker [sic]: Let me see counsel at side bar.

(Begin bench conference at 9:40 a.m.)

Court:          **The test was positive for semen.**  They sent it off for an extra DNA test.  That came back no DNA from your client.  Don't refer again, there was –

It is not the same thing.  **There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child.  it was –**

**That is what the expert testified to, there was seminal fluid found in her anus.  What they couldn't identify because it was degraded, was the DNA.  There was no question of the expert testified. They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:     I didn't do that on purpose – we got over here and I said, I object.  And you said, why do you –

Court:          What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA.  It was too degraded.

Mr. Tinker:     You said, why do you object that it was negative and so I said, okay, it was negative.  But I didn't know (inaudible).  Well anyway, I'm just saying –

Court:          (Inaudible) that there was DNA that came back no – they couldn't find DNA.  They could only find JG-1999's DNA.

Mr. Tinker:     But I didn't do that on purpose, Judge.

Court:          But you've said it several times (inaudible) that there was another test they could have done to

42

identify the seminal fluid. . . Don't put emphasis on it because they don't have to believe what the experts say.

Tr 3/16/04, 43-45. Thus, the record actually reflects that although, by focusing on the rectal semen and p30 evidence on cross-examination of the Government's witnesses, counsel recognized the significance and highly prejudicial nature of that evidence, counsel's attempt to challenge the semen evidence was not only unsuccessful, **but not even allowed**, because counsel presented **no** evidence in support of his challenge.

Nevertheless, the Court concluded that Petitioner cannot succeed on his claim that trial counsel should have presented expert testimony to undercut the evidence of sexual abuse, because trial counsel would have to "eviscerate the effect" of both Dr. Benton's conclusion upon review of the autopsy photos, and the positive P30 test results. *Op.*, 82. "Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter." Id.

The Court's reasoning is flawed in two ways. First, as will be described below, counsel has presented evidence that shows trial counsel was ineffective for failing to use readily available evidence to undermine **both** Dr. Benton's testimony and the impact and significance of the p30 test results.

Second, the Court mis-stated the standard by which ineffectiveness claims must

43

be evaluated.  The Court's language essentially imposed a new and higher bar to proving prejudice in ineffectiveness claims.  The statement that counsel would have had to "eviscerate" the evidence presented by Government witnesses in order to succeed on a Strickland claim is directly contradicted by clearly established federal law.  Far from having to show that counsel could have "eviscerated" the Government's evidence, Petitioner need only show that, absent trial counsel's ineffectiveness, there is a "a reasonably probability that... the result of the proceeding would have been different." Strickland at 694; Williams at 405-406 ("requirement that the prisoner establish by a preponderance of the evidence that the result of his criminal proceeding would have been different... would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different.").

**Dr. Benton's Testimony**.  In defense of trial counsel's failure to rebut Dr. Benton, the Court asserts that Petitioner failed to present post-conviction evidence challenging Dr. Benton's observations of alleged sexual abuse. *Op*., 83 ("Bourgeois did not call any witness in the evidentiary hearing to criticize Dr. Benton's observations); id. ("Bourgeois has not presented any evidence showing that Dr.

44

Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony... he has not shown that Dr. Benton's specialized knowledge about childhood abuse and prior treatment of JG-1999 did not provide sufficient support for his expert opinion"); id., at 84 ("On post-conviction review, Bourgeois has not adduced any evidence or testimony that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Bourgeois has not shown that trial counsel performed deficiently in addressing Dr. Benton's testimony").  The Court is wrong.

Indeed, unlike trial counsel, Petitioner has presented much more than an "essence" of evidence.  Petitioner has presented significant scientific evidence, all of which was available to trial counsel, that would have completely undermined Dr. Benton's testimony.

As the Court noted, Dr. Rouse specifically found that "[t]he external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**.  **The Hymen is present and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic.**"  Although Dr. Rouse's finding would have directly rebutted Dr. Benton's alleged observations, counsel, inexplicably, neglected to elicit this information from Dr. Rouse on cross-examination.  Had counsel elicited this information from Dr. Rouse, he could have

45

argued to the jury that her live, contemporaneous observations, as the person **who actually performed the autopsy and took the autopsy photos** Dr. Benton relied on to make his observations, are more accurate and credible than Dr. Benton's.

Contrary to the Court's *Opinion*, Petitioner need not have presented Dr. Rouse's testimony at the post-conviction hearing to establish that this evidence was available to trial counsel and that Dr. Rouse, had she been questioned at trial, would have testified consistent with her own autopsy report. Indeed, if she had not, Dr. Rouse, who the Government so heavily relied on, and continues to rely on, to establish cause of death; age, timing, extent, nature and location of injuries; intent; and the alleged "barrage of abuse," *Op.*, 80, would have been impeached and her credibility undermined. Thus, even though she was not likely to deviate from her report at trial, if she had, counsel would have been in a win-win situation – If she adopted her report, counsel could have argued that her observations trump Dr. Benton's, and if she denied her report, counsel could have argued that she, a key Government witness, was not credible. Accordingly, counsel could have had no tactical or strategic basis for failing to elicit the extremely helpful findings of no observable sexual trauma from Dr. Rouse's autopsy report to rebut Dr. Benton.

Moreover, at the post-conviction hearing, Petitioner also presented the Driscoll Children's Hospital, Sexual Abuse Nurse Examiner's (SANE) reports, which also

46

indicate that there was no evidence of sexual abuse.  See P-152 at 4 ("Vulva Labia Majora – No trauma notes, Vulva Labia Minora – No trauma noted, Hymen – No trauma noted ... Perineum – No trauma noted, Anus – No sphincter tone, No trauma noted); id. at 9 ("The hospital's SANE department was consulted as well.  The patient had a sexual abuse examination that was normal and showed no evidence of any sexual abuse").[28]  Although, as the Court noted, *Op.,* 84, counsel questioned SANE nurse McLaughlin about her findings of no abuse, had counsel also elicited Dr. Rouse's findings, he could have argued that two experts, a forensic pathologist and a SANE nurse specifically trained to look for evidence of sexual abuse, who unlike Dr. Benton, actually examined JG-1999 at the time of death, both determined that there was no evidence of sexual trauma.  This too would have undermined Dr. Benton's testimony.  However, because counsel failed to elicit Dr. Rouse's specific findings, as a specialist in identifying and determining the pathology of injuries, that there was no evidence of sexual assault at the autopsy, the jury was left lacking significant evidence that would have severely undermined Dr. Benton's testimony.

Dr. Benton's "specialized knowledge" about sexual abuse in living children did not make him an expert in post-mortem identification of sexual trauma to the vagina

---

[28] Defense counsel failed to offer the Sexual Abuse Examiner's Report, indicating no evidence of sexual trauma, into evidence.

47

or anus – particularly from photographs.  That was however, forensic pathologist Dr. Rouse's area of expertise, and she conducted the autopsy and made first hand observations of no trauma to the vagina or anus of JG-1999.  Thus, contrary to the Court's *Opinion*, Petitioner has established that Dr. Rouse's observations of no trauma, in conjunction with the SANE nurse's observations, are more valid than Dr. Benton's and has shown that Dr. Benton's area of expertise did not provide sufficient basis to discount Dr. Rouse's autopsy findings.  See *Op.,* 83 ("Bourgeois has not presented any evidence showing that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony... he has not shown that Dr. Benton's specialized knowledge about childhood abuse and prior treatment of JG-1999 did not provide sufficient support for his expert opinion").

The Court's *Opinion* also noted that the "bulk of Benton's testimony about sexual assault did not focus on external observations, but on the possibility that the FBI had detected semen in her rectum." *Op.*, 81.  Specifically, Dr. Benton testified about the possibility of finding semen in a sample without sperm.  He explained the physiological reasons why some men produce semen without sperm.  Tr. 3/5/04, 50-51.  He also testified that the components of semen are much more stable than sperm; that sperm die relatively quickly, making them harder to find. Id., at 51.  His testimony also erroneously stated that p30 can only be found in the human male

prostate  and in the lactating breast of women.  Id.,at 53; *Op.*, 81.

However, while asserting that Petitioner relied solely on the supposedly discredited opinion of Dr. Spitz,[29] and presented no post-conviction evidence to rebut Dr. Benton, the Court ignores Petitioner's post-conviction evidence from experts, Dr. Elizabeth Johnson and Charles Alan Keel, directly rebutting Dr. Benton's testimony regarding the alleged semen.[30]  This expert testimony would have directly rebutted

---

[29]Dr. Spitz did not testify at Petitioner's § 2255 hearing, nor was his affidavit proffered in support of this claim at the hearing.

[30]In a footnote, the Court took note of both Dr. Johnson's and Mr. Keel's testimony, disputing Dr. Benton's contention that sperm is easily degradable. Op., 87 n.143.  However, the Court – without explanation – credited Ms. Conway's testimony, and concluded that Dr. Johnson and Mr. Keel merely "bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault." Id. at 87.  There is no explanation for the Court's dismissal of Dr. Johnson's and Mr. Keel's expert opinions relating to the survivability of sperm and given the frequent exonerations on the basis of DNA testing of decades old  sperm, it is Ms. Conway's testimony which should be questioned.  *See, e.g.*, the case of Thomas McGowan, released in 2008 after DNA testing of sperm collected 23 years earlier "showed that the sperm cells collected from the victim's body during her hospital examination could not have come from" him, *Know the Cases: Thomas M c G o w a n ,    T h e    I n n o c e n c e    P r o j e c t ,* http://www.innocenceproject.org/Content/Thomas_McGowan.php (last visited Jun. 16, 2011); Curtis McCarty, exonerated in 2007 after DNA testing "on sperm recovered from the victim's body" 20 years earlier "showed that the sperm did not match McCarty," *Know the Cases: Curtis McCarty*, **The Innocence Project**, Curtis_McCarty.php (last visited Jun. 16, 2011); Charles Chatman, released in 2008 after DNA testing of sperm collected 26 years earlier excluded him as a match, *Know the Cases: Charles Chatman*, *The Innocence Project*, /Content/Curtis_McCarty.php (last visited Jun. 16, 2011); Larry Peterson, exonerated in 2006 after DNA testing of sperm collected 18 years earlier showed that "Peterson

Dr. Benton's testimony about the degradation of semen and sperm.

In response to questioning regarding the persistence, survivability, and detectability of sperm, Dr. Johnson testified as follows:

Q:          Okay.  And are there – let me just follow up on the Judge's question.  Are there circumstances where in fact sperm and/or male DNA are located years after an offense – or years after it's been discovered, let me ask that.

A:          Yes, decades.  Sperm are incredibly tough and durable.

Q:          What do you mean by that?

A:          They are so durable they have an extra reinforcing protein that is so hard to break open that we have to add an extra chemical to the test reaction in the laboratory to break them open.

---

was excluded as a contributor of any and all of the biological evidence," *Know the Cases: Larry Peterson*, **The Innocence Project** http://www.innocenceproject.org /Content/Larry_Peterson.php (last visited Jun. 16, 2011); Leo Waters, exonerated in 2003 after testing on sperm collected 22 years earlier showed that he "was excluded as a potential contributor of the spermatozoa," *Know the Cases: Leo Waters,* **The Innocence Project**,  Content/Leo_Waters.php (last visited Jun. 16, 2011)**;** Robert Miller, exonerated in 1998 after DNA testing on sperm collected 10 years earlier excluded him "as [a] possible contributor of the genetic material,"*Know the Cases: Robert Miller*, **The Innocence Project**,  **Content/Robert_Miller.php (last visited Jun. 16, 2011); Calvin Willis, released in 2003 after DNA testing on sperm collected 17 years earlier showed that Willis "was excluded form being a contributor to any of the samples,"**Know the Cases: Calvin Willis, T**he Innocence Project**, http://www.innocenceproject.org /Content/Calvin_Willis.php (last visited Jun. 16, 2011); Rickie Johnson, released in 2008 after "mini-STR DNA testing was performed on the sperm from the perpetrator of the crime," collected 25 years earlier, and "the results proved that Johnson could not have been the attacker," *Know the Cases: Rickie Johnson*, The Innocence Project, http://www.innocenceproject. org/Content/Rickie_Johnson.php (last visited Jun. 16, 2011).

Court:      And so someone testified at trial that sperm would have suffered degradation over that time period

Witness:    I think that was Dr. Benton's testimony.

Court:      Yes.

Witness:    That was totally erroneous.

Court:      Okay.

Witness:    Sperm are very durable.  They can be found in decomposing bodies 30 days after, you know –

Court:      Well, I read about how they, you know, the Innocence Project and what have you, and they come up with the old DNA from – but I guess I assume that that was stored like in a rape kit that was done pretty quickly or –

Witness:    there is evidence being analyzed in cold cases that are decades old.  And again, decomposing bodies that have been burned, sperm have been detected in the vaginal canals of these bodies.

Court:      Okay.  So days isn't old?

Witness:    Weeks, months –

Court:      Okay.

Witness:    – years.

Q:    [A]nd I was going to ask you about Dr. Benton's testimony specifically.  Was his testimony regarding the persistence of sperm accurate, in your estimation?

A:    No, it was not.

Q:    The survivability of sperm?

A:   No, it was not.

Tr. 9/22/10, 14-16.   Subsequently, during questioning regarding Dr. Benton's testimony about substances where p30 has been detected, Dr. Johnson testified as follows:

Q:   Let me read you this portion of Mr., of Dr. Benton's testimony.  "And more specific, a confirmatory test is called Prostate Specific Antigen, also known as a p30 assay.  And this is confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily fluids, including animal bodily products, except in male prostate and with one exception, human breast milk."  Do you recall that testimony?

A:   Yes, I do now.

Q:   Okay.  Was Mr. (sic) Benton's testimony complete regarding where p30 has been located?

A:   It was not.

Q:   And had you been called as a witness in 2004, would you have been able to testify regarding the accuracy of that testimony?

A:   Yes, I would have.

Tr. 9/22/10, 32-33.

Petitioner also presented evidence from Forensic Scientist, Examiner and Criminalist Charles Alan Keel to rebut Dr. Benton's testimony.[31]   Regarding Dr

---

[31]The parties agreed to expedite the proceedings by admitting Mr. Keel's report, subject to cross-examination, as the substantive evidence he would provide at the post-conviction hearing.  Tr. 9/22/10, 126.

Benton's trial testimony, Mr. Keel specifically stated:

> Contrary to the testimony of Dr. Benton, semen is the suspension of sperm cells in seminal fluid, not merely a product of the prostate gland without sperm.  Neither is the fluid portion of semen merely a product of the prostate gland, but a complex mixture of fluids from the seminal vesicles, the prostate gland, thebulbourethral glands, and other minor glands (urethral and preputial). Neither does the prostate contribute the majority of the liquid of seminal fluid. The seminal vesicles contribute 65-70%, the prostate 25-30%, and the other contributions are 2-5%. Of the prostate gland's contribution, only about 1% is protein including acid phosphatase and p30/ PSA. Semen is produced in a cascade reaction at orgasm. The vas deferens contract forcing sperm, which have been stored in the epididymis, up to the ampullae (top end) of the vas deferens.The sperm then pass through ducts into the urethra where they are mixed with the fluids from the seminal vesicles, the prostate, and bulbourethral glands forming semen which is then ejaculated. [See Boron, et al, 2005; *Medical Physiology:* Elsevier / Saunders]

> Also contrary to the testimony of Dr. Benton, "pre-ejaculate" fluid is the product of the bulbourethral glands, not the prostate gland, and it typically comprises less than 1% of semen. As the product of the bulbouretheral glands and not the prostate, it is likely that this fluid does not contain any more p30/ PSA than might be detected in the peripheral blood of a male. The claim by Dr. Benton that one might be detecting only "pre-ejaculate" or bulbourethreal fluid as semen, collected from an environment such as the rectum, is patently absurd to a knowledgeable scientist. But this claim went totally unchallenged, thereby misleading the jury. While there is a "cleansing" of the urethra and some potential lubrication for the foreskin/ glans penis by this bulbourethral gland product, this "pre-ejaculate" fluid's primary function is to increase the mobility of sperm in the vagina and cervical mucus.

> Dr. Benton described other possible ways in which semen might be void of semen: vasectomy, temporary pathology or illness, or multiple ejaculation. Clearly, vasectomy is not in play here, as Bourgeois had an infant child even younger than Gunter and there is no indication of this

surgery after the conception of this child. Also, since Bourgeois had at least three known children, and was apparently healthy at the time of this incident, there is no reason to believe he might be azoospermic or even oligospermic as the result of temporary illness. How often Bourgeois might have ejaculated resulting in a reduced sperm count prior to the alleged sodomy is not known, but the entire family of five had been on the road together in the cab of the tractor-trailer for the last 22 days of Gunter's life. Given that about 2,000 sperm mature every second in normal spermiogenesis, and that the volume of semen is reduced proportionately to the number of sperm per unit volume, Benton's claim of the detection of normal semen void of sperm by chance is also patently absurd.

9/24/07 Forensic Science Associates Report at 19-20

*                              *                              *

The absence of sperm from a suspected semen source, who by default had to be Alfred Bourgeois, who by all evidence was a normal semen producer, together with the absence of any male DNA from the suspected semen on the Gunter rectal swabs in separate DNA analyses by the FBI and Orchid Cellmark, should have given any scientist pause in offering this questionable semen finding to a jury. However, this finding was even further perverted before the jury by Dr. Benton's "confusion" of the concept of sperm persistence with viability, a concept in which any physician in his position should be well versed.

The Persistence of Semen: Seminal Fluid versus Sperm

Dr. Benton testified that sperm degrade much more quickly than the fluid component of semen, especially in the rectal environment. This is diametrically untrue. As testified to by Benton, it is true that sperm will lose their motility and cease to respire as living cells within hours of ejaculation. They also easily "loose their little tails". But contrary to Benton's testimony, the persistence, as opposed to viability, of sperm cells is dramatically longer than that of the soluble constituents of semen, including acid phosphatase and p30. The soluble components of semen are subject to the same diluting forces and environmental

54

conditions as are sperm wherever the semen is deposited. In a dry, cool environment semen (both the fluid and cellular components) will persist for decades, if not longer. In a moist environment, however, sperm cells will persist much longer than the fluid component of semen. This is because sperm cells are equipped with a specialized cell membrane that makes them much more highly resistant to degradation and assimilation by normal metabolic mechanisms than are free dissolved proteins like acid phosphatase and p30 and even epithelial and white blood cells. As described previously, we exploit the hardiness of the sperm cell membrane and its resistance to degradation. We digest away non-sperm cells and soluble protein with an exogenous proteinase in order to then isolate the sperm from those soluble proteins and non-sperm cells. Further, because they are particulate, we can concentrate them into a small volume via centrifugation, thereby dramatically increasing the opportunity to recover and observe them. We can enhance that observational capacity by staining the cell debris with different stains that not only distinguish sperm from non-sperm cells, but also distinguish the unique morphological characteristics of the sperm cell. Because of this, Dr. Benton's claims that the detection of normal semen in the absence of sperm by mechanisms other than aspermia is most sensitive and uncommon, and that one might be able to detect seminal fluid in one area that is void of sperm because of chance, are ludicrous to any knowledgeable forensic scientist.

The ability to recover semen, and hence, sperm, from body orifices depends on several factors, but mostly on the passage of ante-mortem time and the physical activity of the "victim". Semen will be rapidly cleared from living body orifices by gravity drainage, natural dilution and metabolic mechanisms, and environmental conditions. But semen, and particularly sperm, deposited in a body orifice at about the time of death will persist even beyond initial decomposition stages. Sperm numbers sufficient for robust DNA analysis are recovered from buried bodies and bloated bodies that have washed up on shore. Semen associated with a body in a cold or winter environment will persist even longer. Thus, completely contrary to Dr. Benton's testimony, it is unexpected to detect semen in the absence of sperm. One should be able to concentrate, isolate, stain, and identify sperm from semen dilutions

> that are beyond the detectable limits of the soluble protein components; therefore, it is axiomatic that whenever the soluble components of semen are detectable, sperm should be easily detected. While it is possible to have sperm whose DNA is degraded beyond detection limits, the sperm cells themselves will maintain their integrity and be readily identifiable.[32]   Assays such as acid phosphatase and p30, which are convenient and relatively specific, are used to focus an investigation for semen. But one should never rely upon any single result except the observation of sperm as an unequivocal identification of semen. If semen was truly detected in this case by P5A assay, sperm should have been observed and a typable quantity of sperm DNA should have been recovered from it.

Id. at 25-27.  On cross examination, Mr. Keel also testified that Dr. Benton provided "either false or completely ignorant" testimony.  Tr. 9/22/10, 136.  See also id. at 149 (rebutting Dr. Benton's definition of "semen"); id. at 150 ("Dr. Benton simply said that semen is the product of the prostate gland.  And that's nowhere near the truth"); id. at 155 ("the suggestion [from Benton] that you might be detecting only pre-ejaculate fluid in the environment from the rectum is just patently absurd"); id. at 156 ("Dr. Benton is suggesting that something that comprises less than 1 percent of the total volume of semen is what was actually – might have been picked up on the rectal swab, and that's what the p30 result came from.  And that's ridiculous.  That's like taking a drink of coffee and not getting any caffeine").

---

[32]For example, microscopic slide smears with semen that have been treated with caustic dyes during staining and/or excess heat during fixing will reveal normal sperm cells but the sperm DNA may be degraded.

Dr. Johnson's and Mr. Keel's testimony was not the only evidence Petitioner

presented at the § 2255 hearing in rebuttal of Dr. Benton's trial testimony. Indeed,

as the Government's own expert Jerrilyn Conway conceded:

Q:    Did you review the testimony of Dr. Scott Benton in this case?

A:    I did.

Q:    I refer Counsel to the transcript from the same day , March 5th of '04, at Page
      22, regarding this paragraph noting right here in the middle that start, "And a
      more specific." "And more specific, a confirmatory test is called Prostate
      Specific Antigen, also known as a p30 assay. And this is confirmatory test for
      the presence of semen, because it doesn't exist anywhere else in bodily fluids,
      including animal bodily products, except in male prostate and with one
      exception, human breast milk." Did you read that testimony?

A:    I did.

Q:    You would agree that that is also incorrect?

A:    It is.

Tr. 9/24/10, 45. Thus, just as Petitioner presented evidence to rebut Dr. Benton's

observations from autopsy photos of alleged sexual trauma, Petitioner also presented

evidence to rebut Dr. Benton's testimony about the confirmation of semen and p30.

Indeed, in light of all the evidence Petitioner did present from Dr. Rouse's autopsy

report, Dr. Elizabeth Johnson, Alan Keel, and even Government expert FBI Agent

Conway, the Court's finding that Petitioner relied solely on Dr. Spitz and presented

no evidence to rebut Dr. Benton is plainly wrong. On the contrary, Petitioner

presented overwhelming evidence in rebuttal of Dr. Benton's testimony about the prevalence of prostate specific antigen in humans, as well as the specificity and limitations of the P30 test.   All of which was available to trial counsel.  Petitioner's post-conviction evidence stands in stark contrast to the evidence presented at trial in rebuttal of Dr. Benton's testimony – eight questions, within two transcript pages of testimony from Nurse McGlaughlin.

Although Petitioner has completely undermined Dr. Benton's testimony, Petitioner need only establish evidence that counsel could have presented to undermine Benton and create reasonable doubt regarding Petitioner's guilt.  If trial counsel had effectively presented Dr. Rouse's findings and if he had presented the testimony of qualified experts to discuss the limitations of PSA testing, the jury would have rejected the Government's claim that Petitioner sexually assaulted his daughter.  Without this highly inflammatory finding, there is a reasonable likelihood that the outcome of this case, either at the guilt or penalty phase would have been different.

**Forensic evidence of semen**.  As the Court noted, the Government presented testimony at trial from Dr. Benton, FBI forensic serology examiner, Caroline Zervos, and FBI forensic DNA examiner Anthony Onorato, alleging that the presence p30 in swabs from JG-1999's rectum, <u>alone</u>, confirmed the presence of semen. Op. at 81-82.

In support of that proposition, at Petitioner's § 2255 hearing, the Government presented the testimony of forensic examiner Jerrilyn Conway. See Tr. 9/24/10. Petitioner addressed Dr. Benton's inaccurate and incomplete testimony about p30 above, and will now address the Government's remaining evidence and witnesses.

At trial, in an attempt to show that the positive p30 could have resulted from something other than semen, on cross-examination, counsel inquired of Caroline Zervos and Anthony Onorato whether p30 had been detected in substances other than semen. *Op.,* 81-82. Ms. Zervos testified that p30 could only be found in peripheral male blood and male urine and Mr. Onorato testified that the only place, outside of male semen that p30 could be found, was in the blood of males with prostate cancer. Id.. Both denied p30 could be found in any female fluids. Id. On cross-examination, trial counsel also elicited from agent Zervos that she "didn't know whether things in food might cause" a false positive p30 test, *Op.,* 81, and from agent Onorato, that FBI testing for sperm and male DNA was negative. Id. at 82.

On the basis of this cross-examination of Government witnesses, the Court concluded that counsel's performance was not deficient for failing to present rebuttal expert testimony because, "[w]ithout calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois Motion to Vacate." *Op.*, 86. Again, the Court is wrong.

Clearly, counsel's cross-examination of Zervos and Onorato was intended to elicit evidence of other substances where p30 may be detected, including female fluids, and that the sperm and DNA tests were negative, in order to allow him to argue that the positive p30 was the result of something other than semen and that the negative sperm and DNA result confirmed the absence of semen. In fact, as stated above, counsel attempted to argue that there was "no evidence of semen." *Op.,* 82. However, also as stated this Court sustained the Government's objection and precluded counsel's argument that there was "no semen" because counsel failed to present any evidence that there was no semen. See Tr. 3/16/04, 43-45.      I      n contrast, in post-conviction, Petitioner presented significant scientific evidence to support his assertion that there was "no semen" – all of which, was available to trial counsel. Dr. Elizabeth Johnson testified that had she been called as a witness in Petitioner's 2004 trial, she would have testified consistent with her March 1, 2004 report to Mr. Tinker that:

- unlike the FBI, she conducted and acid phosphatase test for semen and a microscopic sperm search, and both were negative;

- p30 has been detected in substances other that semen and female fluids in particular, including female urine and female serum;

- because p30 has been detected and is not only produced in the male prostate, the term prostate specific antigen for p30 is a misnomer;

60

- if the FBI's positive p30 test were the result of semen, as many as 500 sperm would be observable, and none were observed here; and,

- the p30 test she conducted resulted in a "weak positive," which could be caused by rectal bacteria and not semen.

Tr. 9/22/10, 22-26. Additionally, Dr. Johnson testified that despite the p30 result "taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on Y chromosome testing, that is was not reasonable to conclude that there was semen present on the swabs." Id. at 19; 120-21. Although counsel knew the evidence Dr. Johnson could provide at trial, and attempted to establish these same points on cross-examination, he failed to do so and thus, none of this evidence was presented to the jury.

Similarly, post-conviction evidence from Alan Keel established that in his opinion, "there is no proof of semen being detected [ ] in the evidence that was presented at trial," Tr. 9/22/10, 127; you can't rule out that P30 may be present in a toddler as a function of their own biology because "every cell in every person's body possesses two copies of the gene that produces p30," id. at 129; p30 assay may react to a protein which is not p30, id. at 129-30; sperm cells die but persist, id. at 132; if the positive p30 was caused from semen, sperm should have been detected, id. at 133; the fact that there was no semen in JG-1999's underpants is another "red flag"

61

against a conclusion that semen was present, id. at 167; that "there's no semen on these swabs," id at 169. See also 9/24/07 Report of Forensic Science Associates. Again, none of this evidence was presented by trial counsel.[33]

While acknowledging that "expert testimony certainly could have provided some benefit to the defense, Op. at 86, the Court nevertheless discounts the value of Dr. Johnson's testimony. According to the Court, "the value of Dr. Johnson's testimony [regarding the "weak positive" p30 test result she obtained] would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search." Additionally, the Court found that because Dr. Johnson also obtained a positive p30 test result, albeit a 'weak positive", "Dr. Johnson's testimony [ ] did not completely discount the possibility that Bourgeois sexually assaulted his daughter." Id.

On the other hand, the Court credited the Government's post-conviction expert, Jerrilyn Conway's testimony that "a week positive result means there is limited PSA present, which means there is a limited amount of semen present," id.,

And, that "if the PSA test was positive, they can be assured that that came from

---

[33]The evidence counsel could have presented stands in stark contrast to the evidence counsel did elicit at trial. See e.g. Op., 81 ("Mr. Tinker expressed that he 'got more than he wanted' from Ms. Zervos because she 'didn't know whether things in food might cause' a false positive"). Notably, no expert has ever opined as much.

semen." Id. at 87.[34]   The Court's acceptance of Ms. Conway's testimony over Dr. Johnson's is misplaced for several important reasons.

First, the **primary** value of Dr. Johnson's testimony is not related to what additional testing it would have prompted the Government to undertake. *Op.,* 86. The value in Dr. Johnson's proposed testimony is derived from the fact that Dr. Johnson conducted additional testing (acid phosphatase and microscopic sperm search), all of which was negative, and that in conjunction with the FBI's negative results on the smear slide sperm search, autosomal DNA and the incredible sensitive Y chromosomal DNA search, she would have testified that there was an insufficient basis to conclude that the "weak positive" p30 test result was the result of semen – thus, there was no semen. Tr. 9/22/10, 120-21. See also Tr. 9/22/10, (Mr. Keel) ("there is no proof of semen being detected [ ] in the evidence that was presented at trial"). Thus, contrary to the Court's opinion, *Op.,* 86, had counsel presented Dr. Johnson, he could have argued that she completely discounted the possibility that JG-1999 was sexually assaulted because Dr. Johnson had established that there was no scientific basis to assert that semen had been found and thus, in combination with the

---

[34]The Court inexplicably found the defense experts too technical, which could turn off jurors. *Op.*, 87, but did not make the same finding for the Government's equally technical witnesses, i.e., Zervos, Onorato, Conway.  Any fair reading of Petitioner's experts shows that they were no more "technical" than the Government's.

conclusions in Dr. Rouse's autopsy report and the SANE nurse examination reports, there was no scientific basis to conclude that any sexual assault had taken place.  As previously stated, trial counsel attempted to make this argument but was precluded by the Court because he presented no evidence to support the foundation of such an argument  – that there was no semen.  See Tr. 3/16/04, 43-45.

Second, the significance of the more confirmatory sperm search the FBI would be compelled to undertake with a "weak positive" p30 test result should not be so readily discounted.  Op. at 86.  Although, at trial, the Government's evidence only alleged that their p30 testing was positive, in actuality, the testing results on the three rectal swabs (Q5-Q7) was "very weak, very weak and weak," respectively.  See P-179; Tr. 9/24/10, 67-68.  These results are extremely important.

Indeed, in addition to supporting the credibility and validity of Dr. Johnson's testing, who also achieved a "weak positive," FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

See P-180.  Thus, because the Government's actual p30 test results as set forth in P-

179 reveals "borderline levels of p30," (weak to very weak), the FBI was <u>required</u> to confirm the presence of any alleged semen through the identification of spermatozoa – not solely a p30 test.  Notably, <u>no</u> sperm were ever detected in this case.  Indeed, the smear slide which was inspected by the FBI was <u>NEGATIVE</u> for the presence of any spermatozoa.   The microscopic sperm searches conducted <u>on all three swabs</u> by Dr. Elizabeth Johnson and Technical Associates were also <u>NEGATIVE</u> for the presence of spermatozoa.  <u>See</u> Tr. 9/22/10 (testimony of Dr. Elizabeth Johnson).

Based on the actual "very weak" to "weak" results it is the credibility and reliability the Government's witnesses, not Dr. Johnson, that should be questioned. Indeed, the FBI's very own protocols contradict the Government's experts allegations that "a week positive result means there is limited PSA present, which means there is a limited amount of semen present," <u>id.</u>, and, that "if the PSA test was positive, they can be assured that that came from semen." <u>id.</u> at 87.  In other words, if a weak positive p30 test always confirms the presence of semen, why does the FBI protocol mandate the observation of sperm to confirm semen? The answer, as Dr. Johnson and Mr. Keel stated, is that a "weak positive" does <u>not</u> confirm the presence of semen.

Had counsel presented an expert witnesses, provided them with P-179 and the

FBI manuals available at the time of trial,[35] He could have argued that contrary to the trial testimony from Caroline Zervos, Anthony Onorato and Dr. Benton, based on their own protocols, the FBI, like the defense expert, could <u>not</u> conclude that semen was present on the basis of a "weak" to "very weak," "borderline" p30 test result. Moreover, counsel could have argued that because in this case, as his expert had testified, all sperm searches and additional testing, including acid phosphatase, autosomal DNA and Y chromosome DNA were negative, there was insufficient basis to conclude that semen was present. In other words, counsel could have argued, as he attempted but this Court precluded, that there was no semen detected on the JG-1999 rectal swabs. The Court's opinion does not discuss the "value" of this potential evidence and these arguments and they cannot be discounted.

The Court also finds it "problematic" that unlike the Government's expert, Ms.

---

[35]This Court has already ruled that the Government did not fail to disclose P-179 to the defense at the time of trial. *Op.*, 84, n. 137. Thus, P-179 was available to trial counsel. Similarly, the 2002 FBI manual in effect at the time of trial was provided to post-conviction counsel by the Government upon request and would have presumably have been provided to trial counsel, <u>had he asked</u>. Even without an expert, it is inconceivable that counsel, in possession of P-179 and its "weak" to "very weak" p30 results, would not have used it to challenge the Government's semen contention. Indeed, counsel could simply have argued that the jury should not accept "weak and "very weak" results as the equivalent of a "positive" result. At a minimum, he could have cross-examined Ms. Zervos and Mr. Onorato with P-179 and argued that their failure to reveal the actual results as "weak" and "very weak" diminished their credibility. Counsel failing in these regards support Petitioner's claim of deficient performance.

Conway, Dr. Johnson did not, allegedly, discuss the levels at which PSA occurs in substances other than semen. Op. at 87.  Here, again, the Court ignores the actual record.  As Dr. Johnson testified:

Q:    Let me refer you now to Page 3.[36]  Can you tell us what that is?

A:    Yes.  This is a page from a publication, and it lists a table with various substances, including semen, but other substances in which PSA has been found, and their concentrations.

Q:    Okay.  And those are some of the same fluids that we've discussed already.  Correct?

A:    Yes, it is.

Q:    And I'm looking at some of those concentrations, and I'm curious about whether the concentrations listed there are sufficient to react and cause a positive p30 test on a card, on a test card.

A:    Well, the limited detection of the ABA card –

Q:    Yes.

A:    – is 4 nanograms per mil –

Q:    Okay.

A:    – and 2 nanograms per mil for the Seratec card.  So some of them are. I mean, some of them are greatly – breast milk, greater than 101 case. Some of them are not meeting that limited detection, but some are.

Q:    Okay, And let me ask you – well, let me read you something from the

_____

[36] Page 3 refers to the third page of the report Dr. Johnson provided to trial counsel.

results and discussions and ask you if you agree or disagree with that particular statement. It says, "It is now quite clear that the term Prostate Specific Antigen is a misnomer. Although present in greater amounts in seminal deposits, its presence has been detected in a variety of other body fluids." Do you agree with that?

A:   Yes.

Q:   Okay. You've told us that already. Down, down to the bottom. "Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present, or the survivor is menstruating, blood may be present on the vaginal swabs or on the stains in the underwear. When an extract is prepared from the strains on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the strain is from female urine or serum?" Do you agree or disagree with that statement?

A:   I agree that there is cause for concern and to consider these factors.

Q:   Okay. And had you been called at trail in 2004, would you have testified consistent with the information that's contained on Page 3 of this document that you sent to Mr. Tinker?

A:   Yes

Tr. 9/22/10, 25-26; See also Tr. 9/22/10, 118-20.

Thus, the Court appears to have accepted Ms. Conway's testimony without consideration of the evidence that Dr. Johnson provided which directly refutes Ms. Conway.

The Court has blindly accepted the Government's witness without

68

acknowledgment that significant portions of the scientific community, including other law enforcement agencies, disagree with Ms. Conway and the FBI on whether the p30 assay can react with substances other than semen and whether a positive p30 test, alone, can confirm the presence of semen. Id.; see also Texas Department of Public Safety, DNA-04-09, p.1 ("P30 Identification ... p30 is considered to be a **presumptive** test for semen. The presence of p30 indicates, **but does not confirm** the presence of semen. Semen can **only** be confirmed by the presence of spermatozoa");[37] California Department of Justice Bureau of Forensic Services, Biology Technical Procedures, p. 51 ("Section 4 – Semen ... for p30 immunassay cards, a positive result **alone** (without sperm or AP results) will allow you to make the statement of 'p30 detected.' **However, your report should include a statement that explains that the other body fluids may react with these test cards**. The immunoassay cards **are very sensitive** and can detect p30 at very low levels that may

---

[37]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel who stated that a p30 test can be used in conjunction with other evidence to indicated the presence of semen but the only stand alone confirmatory test for semen was the identification of spermatozoa. See e.g. P-88, 2007 Report of Forensic Science Associates, 20 (" And since sperm are only found in semen, the observation of sperm is proof of the presence of semen. In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen"). In this case, all searches for the presence of spermatozoa were negative.

be present in body fluids **other than seminal fluid**"), attached;[38] 2005 Seratec Card Protocol, p.3 ("**inconclusive**: Due to the increase in sensitivity using Seratec seminal fluid (PSA) test, **the analyst is advised to have a second positive test result before confirming seminal fluid is present** in a stain extract (e.g. positive AP test, spermatozoa observed in the pellet, or male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec PSA card, the conclusion for this situation would be 'seminal fluid **could not be confirmed**.'").[39]

Indeed, even the FBI own protocol manual in effect at the time of Petitioner's trial conflicts with Ms. Conway's testimony. See P-180, FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), 11("Attempts to identify human semen in some categories of evidence **MUST** be

---

[38]Likewise, in this case, the acid phophatase (AP) test and the sperm searches were negative. Thus, unlike the FBI, the California protocols do not permit the confirmation of semen with a positive p30 test alone and certainly not with "very weak, very weak, weak" results.

[39]The Seratec Card test is now used by the FBI to test for p30 and was substituted for the ABA card after accuracy problems were detected with the ABA card – the card used in this case. Tr. 9/24/10, 76-78. Thus, even the protocols by the manufacturer of the presumably more accurate Seratec test card now used by the FBI, cautions that a positive test card alone, does not confirm the presence of semen. The other tests that Seratec advises a forensic analyst should consider in conjunction with their test card (AP test, identifiable sperm or male DNA), were ALL NEGATIVE in Mr. Bourgeois case.

approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30. These categories would include ... stain extracts that possess **borderline levels of p30**").[40]

Moreover, although the Court cites counsel's cross-examination of Ms. Zervos and Mr. Onorato, regarding substances where p30 has been detected, what the Court's opinion notably failed to acknowledge was that both Agents Zervos' and Onorato's testimony on this point was demonstrably <u>wrong</u>, and counsel could have proven it.

Contrary to Ms. Zervos' and Mr. Onorato's trial testimony, p30 had not only been detected in semen, peripheral male blood, male urine, and the blood of males with prostate cancer.   As Dr. Johnson testified:

> Q:   Is [Ms. Zervos' testimony regarding where p30 may be located accurate? Or complete? Let me ask you that.
>
> A:   It's not complete.
>
> Q:   Okay.  Because you've already testified that it could be found in these [ ] other substances.
>
> A:   Yes.
>
> Q:   Had you been called as a witness at the time of trial, would you have been able to address Ms. Zervos' testimony that p30 is only found in male peripheral blood and semen?

---

[40]Thus, the FBI's very own protocols require the identification of sperm to confirm the presence of semen when, <u>as in this case</u>, you have borderline levels of p30.  The two separate sperm searches conducted in the case were negative.

A:   Yes, I would have.

Q:   Did you also review the testimony of Mr. Onorato?

A:   I did.

***

Q:   Was Mr. Onorato's testimony about where p30 might be located complete?

A:   It was not.

Q:   Had you been called as a witness in 2004, would you have been able to address Mr. Onorato's testimony regarding where p30 could be located?

A:   Yes, I would.

Tr. 9/22/10, 29-32.

Indeed, as the Government's own expert, Jerrilyn Conway, conceded during Petitioner's § 2255 hearing, at the time of Petitioner's trial in 2004, studies had been published identifying the presence of P30, albeit at lower levels, in other fluids, including female fluids. Tr. 9/24/10, 39-45. As Agent Conway also conceded, contrary to the testimony of Agents Zervos and Onorato, p30 has been detected in male urine, female urine, female serum, amniotic fluid, breast milk, the serum of boys, and the serum of girls. Id. at 39-40. Thus, Agent Zervos and Onorato's testimony was incorrect and incomplete. Id. at 40 (testimony of Agent Conway) ("Q: Did you read in Ms. Zervos' testimony where she testified that PSA or p30 has not been detected in any female fluids ... That would be incorrect? A: It is, yes"); id. at

72

42 (regarding testimony of Onorato) ("Q: That's not a complete listing of all the fluids where p30 has been found either.  Is that correct? A: It's not no").

Contrary to the Court's opinion, because counsel did <u>not</u> elicit what he intended from Ms. Zervos and Mr. Onorato about substances, other than semen which contain p30, counsel's reliance on cross-examination was insufficient and the decision <u>not</u> to call an expert was <u>not</u> reasonable.  <u>See</u> Op. at 81 ("In a discussion with the Court, Mr. Tinker expressed that he 'got more than he wanted' from Ms. Zervos..."); <u>id.</u> at 86 ("Without calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois' Motion to Vacate); id. (...an attorney's decision to attack the Government's expert witness on cross-examination rather than calling additional experts can be reasonable performance").[41]

The Court's reliance on trial counsel's elicitation of DNA results from Mr. Onorato in support of counsel's performance is also misplaced.  Op. at 82. ("Also,

---

[41]Moreover, contrary to the Court's opinion, trial counsel's use of Dr. Johnson's report during cross-examination of Government witnesses actually supports's Petitioner's claim of deficient performance.  Indeed, counsel's "use" of Johnson's report shows that counsel considered the information she provided him in her report, which she could have provided at trial, valuable to the defense. Thus, because his cross-examination of Government witnesses failed to elicit the helpful information contained in her report, Dr. Johnson should have been presented at trial. <u>See</u> *Op.*, 85 ("respondents persuasively argues that, although trial counsel did not call Dr. Johnson as a witness, the flow of his questioning suggests that he used her report to prepare for cross-examination").

Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA"). The record actually reflect that trial counsel objected when the Government sought to elicit testimony from Mr. Onorato that additional, more sensitive Y chromosomal DNA testing had been performed by Orchid Cellmark on behalf of the Government and that those result were negative for male DNA.[42] Tr. 3/5/04, 132-34. Indeed, after the Court rightfully asked counsel, "[d]on't you want that evidence. What harm could it be for your client?" Mr. Tinker responded, "I didn't think about that." Id. at 133. Clearly, counsel had either never seen the Orchid Cellmark results, even though they were provided in pre-trial discovery, or had failed to understand their beneficial significance. In either scenario, counsel's objection to the Y chromosome DNA results highlights his poor performance – the jury learned that Y chromosome DNA testing was negative in spite of, not because of counsel's cross-examination or performance.[43]

**Counsel's "strategy."** The Court's opinion also makes references to counsel's strategy regarding the failure to present expert testimony to rebut the allegations of

---

[42] At the time of trial, Orchid Cellmark had the capability to perform the more sensitive Y chromosome DNA testing which the FBI lab could not perform.

[43] This too contradicts the Courts finding that counsel did not need to present expert testimony because his "questioning manifested a familiarity with the issues presented in Dr. Johnson's report..." Op., 86.

sexual assault and semen. However, the Court's *post hoc* creation of strategic basis for counsel's inaction does not comport with counsel's actual, stated basis for failing to present expert testimony. In his interrogatories propounded by the Government, Mr. Tinker stated that he did not "utilize [Dr. Johnson's] services" because he had trouble "getting her to return phone calls," "she did not have her own lab," and she "did not do the testing I requestedin a timely fashion." P-Ex82, 14.

However, just as the record does not support the Court's stated strategy for Mr. Tinker's failure to call Dr. Johnson or any expert at trial, Mr. Tinker's reasoning is also not supported by the record. Although Dr. Johnson's report was submitted to counsel after the Court imposed deadline for disclosing expert reports, this fact only highlights counsel's deficient performance. Indeed, it was counsel's responsibility to insure that all expert reports were submitted in a timely manner and Dr. Johnson was not the only expert for which counsel neglected to obtain a timely report. See Tr. 2/25/04, 135-48 (discussing counsel's failure to secure and disclose expert reports from Dr. Rupp, Dr. Holder and Dr. Weiner); see also *Government's **Third** Motion for Reciprocal Discovery, 2/17/04* (requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norton, and Dr. Donald Weiner) (emphasis added). Moreover, any allegation that Dr. Johnson is at fault for the late disclosure because she was uncommunicative with

counsel is belied by the record.  On January 16, 2004, just a month and half before she submitted her report to counsel, Mr. Tinker expressly told the Court that Dr. Johnson has been prompt in her work and good at communicating with counsel.  Tr. 1/16/04, 34-35 ("As soon as she gets it and has an opportunity to test it, and I think she'll be prompt.  She's been good about talking to me about issues").

Moreover, as Dr. Johnson testified, Mr. Tinker never made her aware of the Court imposed deadline for expert reports and if he had, she would have complied with any court imposed deadline.  Tr. 9/22/10, 27. See also P-168 (12/31/03 fax from Dr. Johnson to Mr. Tinker indicating she tried unsuccessfully to reach Mr. Tinker after completing her review of Mr. Bourgeois' case); Tr. 9/22/10, 19-20 (same); see also Tr. 924/10, GX-206 (Technical Associates report faxed from Dr. Johnson to Mr. Tinker on 2/26/04, before Court's 3/1/04 deadline for the production of expert reports).

Finally, as has already been discussed at the hearing, the fact that Dr. Johnson did not "have her own lab" should not have been preclusive.   The Government's experts also do not complete their own testing, but only analyze the results.  This separation between technician and analyst is typical of laboratories in most fields of forensic science.

**Prejudice**.   The Court begins its denial of relief by stating that "[t]he

possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case." Op at 80.  The Court erred.  On the contrary, evidence that Mr. Bourgeois allegedly sexually assaulted and anally raped his two year old daughter was not merely inflammatory, it was highly inflammatory and extremely prejudicial.  The Government's trial theory alleged that JG-1999 was killed as part of a systematic pattern of "abuse" and "torture."  Indeed, in an apparent contradiction, just two paragraphs after stating the evidence was not essential, the Court acknowledged that "[t]he forensic evidence allowed the Government to prove that the murder was only the culminating event in a barrage of abuse that also contained a sexual component." Id. Of this alleged "barrage of abuse," it is difficult to conceive of evidence more inflammatory and prejudicial than the alleged sexual assault and anal rape of a two year old girl by her own father – "inflammatory" is, to say the least, an understatement.

Moreover, a finding of sexual assault by the jury all but insured that counsel's chosen defense, that Robin Bourgeois was the actual perpetrator of the abuse on JG-1999,[44] failed.  The alleged vaginal trauma and presence of semen – which, among

---

[44]See e.g. Tr. 3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to make it clear.  Mr. Tinker and my position is that Alfred Bourgeois did not kill this child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the

those with access to the child – could only have been perpetrated by Petitioner, completely undermined Mr. Bourgeois' defense. Thus, contrary to the Court's finding, the evidence of sexual assault was highly inflammatory and essential to the conviction and sentence of death secured by the Government.

For this reason, counsel had an obligation to investigate, develop and present evidence to rebut the alleged sexual assault. In this regard, counsel failed to live up to their obligation.

Nevertheless, the District Court concludes that Petitioner was not prejudiced by counsel's ineffectiveness. The District Court's prejudice analysis warrants reconsideration. On its face, it is clear that reasonable jurists could differ regarding the prejudice caused by counsel's ineffectiveness in this arena. The Court states "the evidence of sexual abuse was an inflammatory, but not decisive, factor in both phases of trial. *Without much question*, Bourgeois' sexual abuse of his daughter did not substantially impact the factors the jury had to consider reaching a verdict as to his guilt ... The Court's review of the trial and the evidentiary hearing testimony indicates that he has not shown a reasonable probability of a different result had trial counsel's efforts disputed the sexual-assault evidence." Op. At 88.

---

idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby").

Additionally, the Court applies the wrong test in considering prejudice.  The Court notes that "the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter." Id. Once again, the Court is holding Petitioner to the wrong standard.  Petitioner on post conviction must show a reasonable likelihood of a different result.  In this case, Petitioner must show that, had counsel performed effectively, the jury may have rejected the evidence of sexual assault, which would have changed the result of either the guilt or penalty phase of trial.

The Court concedes that "certainly similar information could unduly inflame a jury in other circumstances."  Id. However, the Court believes that "Bourgeois' abusive and violent tendencies prevent any reasonable likelihood that jurors would have reacted differently in the punishment-phase had they not known that Bourgeois had raped his daughter." Id.  Here, the Court is replacing her own subjective views on the subject into the prejudice determination, something strictly prohibited by Strickland. 466 U.S. at 695 "assessment of prejudice ... should not depend on the idiosyncracies of the particular decisionmaker."  See Claim II, supra.

In addition, the Court's no-prejudice in the penalty phase determination fails to assess the totality of the mitigation evidence presented both at trial and in the post conviction proceedings.  The question of prejudice must be viewed cumulatively,

meaning that this Court must consider the post-conviction evidence presented to support a case for mitigation when considering the impact of Petitioner's claim of ineffectiveness for failure to rebut evidence of sexual assault. Williams, 529 U.S. at 397 ("prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence.")

Certainly, as this Court recognizes, Petitioner has presented ample evidence to raise a doubt about the presence of sexual assault in this case. It is hard to believe that the specter of the sexual assault of a two year old did not have a significant impact on the jury's determination at both the guilt and penalty phases of trial. The Court's denial of this claim and denial of COA on this claim warrants reconsideration. Reasonable jurists could disagree regarding the prejudice to Petitioner due to counsel's ineffective handling of the evidence of sexual assault at trial.

**CLAIMS V & VI.   DIGITALLY ENHANCED PHOTOGRAPHS.**

The Court concluded that Petitioner has not met his burden to prove that counsel were ineffective under Strickland for failing to prevent the use of digitally altered autopsy photographs. *Op.*, 90. The Government inappropriately relied on the digitally altered and enhanced photographs that were modified by its expert, Dr.

Oliver. These photographs were used throughout the course of Dr. Oliver's, Dr. Senn's, and Dr. Chrz's testimony. The Court concluded at the time of trial that Dr. Oliver's enhancements were meant as a "demonstrative aid" and an "aid to the jury." *Op.*, 92. However, the Court was unaware at the time that both sets of Dr. Oliver's photographs were digitally altered, not just the ones that were labeled "enhanced." Trial counsel failed to investigate the unreliable methods used by Dr. Oliver in both digitalizing and enhancing the autopsy photographs. Counsel further failed to lodge a <u>Daubert</u> objection to the use of unreliable, enhanced images throughout the trial. No reliable science exists to ensure the reliability or accuracy of these enhanced and altered photographs. Their prejudicial weight cannot be overstated.

### A.   Facts

Dr. Oliver testified at trial as a forensic pathologist. His testimony specifically focused on the pattern evidence of abuse found on the victim's body. In preparation for his testimony, Dr. Oliver prepared a PowerPoint presentation of the autopsy photographs. To aid the jury, Dr. Oliver presented three photographs for each single autopsy photograph he relied upon. Tr. 3/8/04, 9. All three photographs were digitized. The first was labeled the "original" un-enhanced image. He also showed the jury two other enhanced images with varied levels of alterations. <u>Id</u>. In presenting this evidence, Dr. Oliver actually states that the "original" images were "digitized at

81

600 DPI on a. . . scanner, and then, of course downsized to fit onto the PowerPoint." Tr. 3/8/04, 19. Trial counsel did not probe further into Dr. Oliver's use of the digitized "originals" as a basis for his report.

Consequently, these digitized scans were inappropriately misrepresented to the jury as "originals" through PowerPoint, not as digitally altered photographs. Tr. 10/28/10, 92. At deposition, Dr. Oliver conceded: (1) that there was loss of detail in scanning the digital images; (2) that the digitized images were presented as "originals" to the jury even though they had been altered by the scanning process; (3) that conversion of the images for PowerPoint presented a degree of unreliability before the jury; (4) that PowerPoint is not a "good program" to display the measurement of injuries; and (5) that he relied on digitalization compression technology despite its degree of inaccuracy. Tr. 10/28/10, 96.

Nor did counsel challenge the methodology Dr. Oliver used in "enhancing" the photographs. Dr. Oliver conceded that there's no method available by which to measure the reliability of the altered or enhanced photographs. Id., at 24. Further, he conceded that his most basic methods, the use of JPEG to digitize photographs, does not comport with the FBI's minimum guidelines for the use of film technology in evidence. Id., at 74-77. Instead, he used the "de facto" standard for film technology in pathology, which is the use of JPEG. Id., at 77-78. All of these

statements render Dr. Oliver's methods unreliable, and do not comport with Daubert.

The impact of these altered photos, both the "originals" and the "enhanced" versions, cannot be overstated.  For instance, Dr. Chrz reached is conclusions based on images he received from Dr. Senn, who in turn received images from Dr. Oliver, who relied on Dr. Rouse's autopsy photos.  Tr. 3/4/08, 317.  Significantly, Dr. Senn and Dr. Chrz both relied on Dr. Oliver's digital distortions and accordingly, their conclusions should not have been admissible.

Despite the multiple layers of unreliable evidence used by Government experts, trial counsel failed to investigate the experts' methodology.  Although counsel voir dired Dr. Oliver, he failed to probe the underlying reliability of the "original" photographs nor explore the reliability of the "enhanced" images.

## B.   Deficient Performance.

The Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), govern the admissibility of expert testimony. In prior submissions, Petitioner has alleged that the fairness of his trial was fundamentally undermined by his counsel's failure to lodge a Daubert challenge to preclude the Government's use of unreliable and enhanced damaging photographs at trial.  At bottom, the Court's view that counsel could not have succeeded in preventing the presentation of these harmful images and testimony through a Daubert motion, is

erroneous.

Counsel's failure to challenge the enhanced photographs under <u>Daubert</u> was deficient. Dr. Oliver's methodology in enhancing the photographs clearly did not meet the standards for scientific evidence set forth under <u>Daubert</u>. <u>Daubert</u> directs that an expert must show that his methods are reliable. To test reliability, a court must look at factors like rates of error, technical standards, test-ability, and peer-review. <u>Id.</u> Dr. Oliver's methods have not been tested, have not been examined for rates of error, do not meet comparable standards in other areas of forensic science, and have not been peer reviewed.

The Court erroneously dismissed Petitioner's arguments as simply a "highly technical challenge" to the reliability of Dr. Oliver's conclusions. *Op.*, 93. The Court further erred in finding that Dr. Oliver did not rely on altered photographs in coming to his conclusions. <u>Id.</u> This, now, has been proven to be untrue. The Court also fails to acknowledge that two other experts, Dr. Senn and Dr. Chrz likewise relied on Dr. Oliver's altered photos.

The Court also fails to acknowledge that Petitioner's complaint was not only that the experts used unreliable methodology in coming to their conclusions (because the photographs they relied on had been altered in an unscientific manner), but also that the experts used unreliable methodology in presenting their evidence to the jury.

Petitioner contends that <u>Daubert</u> could have been used to preclude both 1) the experts' conclusions based on unreliable evidence and 2) the experts' testimony that presented unreliable and misleading photographs to the jury. Counsel should have made a <u>Daubert</u> objection on both fronts.

The Court's endorsement of the Government's attempts to limit the harm of the unreliable evidence at trial by calling it a demonstrative aid not only is erroneous, since the unreliable photographs did inform the experts' opinions, but is unavailing. <u>Daubert</u> is not limited to evidence that formed the basis of expert opinions. It applies to any evidence used by the scientists at trial, as well.

### C.   Prejudice.

The Court has reasoned that "any alleged error by trial counsel by not litigating a Daubert challenge did not call into question the fundamental fairness of either phase of trial." *Op.*, 93. Petitioner respectfully disagrees for the following reasons.

The Court's prejudice analysis is flawed because a court must consider the totality of evidentiary errors presented to the judge or jury. <u>Strickland</u>, 466 U.S. at 695-96. Further, the <u>Strickland</u> also explained that while some errors are insignificant, others may "alter[] the entire evidentiary picture." This Court has stated that, "removing the digital enhancements from the evidentiary equation would not have measurably changed the case before the jury." *Op.*, 93. However, <u>Strickland</u>

adheres to "an objective standard of reasonableness," in determining deficient performance and prejudice. Wiggins v. Smith, 539 U.S. 510, 521 (2003). The focus of the inquiry to be addressed should be whether the evidentiary picture was altered. That is not even a close call. The Court's admission of such damaging evidence undoubtedly distorted the jury's understanding of the extent of the injuries.

The Court concluded that Petitioner was not prejudiced because the photographs labeled "enhanced" were not provided to the jury during their deliberations. *Op.*, 90. However, this ignores the impact the photos had on the jury throughout the trial. The jury was never informed that one set, labeled "originals," had been altered. The jury was, disastrously, directed by Dr. Oliver to rely on these photographs as originals, a label we now know was false.

Further, the Court's conclusion that Petitioner was not harmed by the use of the set of photographs labeled "enhanced" as "demonstrative aids" is also erroneous. To whatever extent the images were used as a "demonstrative aid," the value of such egregiously unreliable images were minimal compared to their prejudicial effect to jurors. The Court inappropriately de-emphasized the highly inflammatory nature of the altered photographs shown to jurors. To the extent that the "enhanced" photographs were not used as a basis on which experts formed an opinion, their probative value is even further diminished in comparison to their prejudicial impact.

86

Additionally, the <u>Daubert</u> inquiry is not foreclosed simply because the set of photos labeled "enhanced" were not the basis of the Dr. Oliver's conclusions. <u>Daubert</u> 509 U.S. at 584. Instead, the reviewing court should go further into the <u>Daubert</u> inquiry as to the scientific validity and evidentiary reliability of Dr. Oliver's digital enhancement process since the presentation was displayed to jurors, causing prejudice. <u>Id.</u> at 590.

Because the digitized enhancements were so drastically altered, the images became egregiously unreliable evidence to present before a jury, even as an demonstrative aid. The unreliable enhanced photographs caused prejudice to the petitioner because they inflamed the jury against him. As such, trial counsel was deficient for not raising a Daubert challenge to prevent such prejudicial evidence.

For these multiple reason, trial counsel was deficient for failing to raise a clearly meritorious Daubert challenge to the use of enhanced and altered photographs at the trial. Petitioner should be granted relief under the claims discussed above.

### RECONSIDERATION OF THE DENIAL OF A CERTIFICATE OF APPEALABILITY

At the conclusion of its 225 page slip *Opinion* the Court states that Petitioner has "raised many issues requiring serious judicial consideration." This Court has provided such consideration, albeit, committing the multiple above-described errors, and counsel appreciate that consideration. However, the denial of a Certificate of

87

Appealability (COA) under these circumstances simply violates the governing law. When a petitioner raises "many issues requiring serious judicial consideration" that requires such detailed and indepth analysis, it is difficult to fathom that he has also not met the criteria for obtaining a COA on at least one or more of those issues.

The Court has cited Slack v. McDaniel, 529 U.S. 473, 484 (2000) and the statute, 28 U.S.C. § 2253, for the proposition that Petitioner may only obtain a COA if he "has made a substantial showing of the denial of a constitutional right." *Op.*, 111. However, that is only part of the standard, and in invoking only that portion, the Court has overlooked the various Petitioner-friendly aspects of the law governing COA. Petitioner herein reviews that law and shows why he is entitled to further review.[45]

--------

[45]28 U.S.C §2253 states, in relevant part:

(a)    In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(B)    the final order in a proceeding under § 2255.

(c)(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of

Under the "substantial showing of the denial of a constitutional right" standard of 28 U.S.C. §2253(c)(2), a petitioner need only "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (internal citations and quotation marks omitted).

The Barefoot standard was reaffirmed in Slack v. McDaniel, 529 U.S. 473, 484 (2000) and in Miller-El v. Cockrell, 537 U.S. 322 (2003). Miller-El, reaffirmed that a COA should be allowed when the Petitioner's case is "debatable," or the issues could be "resolved in a different manner," or when the case "deserve[s] encouragement to proceed further." See id. at 336.

Petitioner submits that the issues described herein are certainly debatable – the Court could not and did not summarily dismiss them (with the partial exception of the jurisdiction claim for which Petitioner was not provided a full hearing). The Court heard days of testimony, and wrote two hundred and twenty five pages to address them. Certainly, in those pages, this Court took on the "debate." Moreover, while this

the constitutional right.

(c)(3) The certificate of appealability under the paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

Court has yet to be convinced of the merits of any of Petitioner's claims, given this Court's treatment of the issues, it cannot say that "jurists of reason" could not resolve them differently.

And, in that regard, Miller-El is significant. It states that "a COA does not require a showing that the appeal will succeed.":

> The holding in Slack would mean very little if appellate review were denied because the prisoner **did not convince a judge**, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner has already failed in that endeavor.
>
> * * *
>
> **We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.**

Miller-El, at 336-38 (internal quotation marks and citations omitted).

In capital cases, "the nature of the penalty is also a proper consideration in determining whether to issue a certificate of appealability." Barefoot, 463 U.S. at 893. Because this case involves the death penalty, "any doubts as to whether a certificate of appealability should issue must be resolved in [Mr. Bourgeois'] favor." Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir. 2006); Morris v. Dretke, 379 F.3d 199,

204 (5th Cir. 2004), citing <u>Hernandez v. Johnson</u>, 213 F.3d 243, 248 (5th Cir. 2000).

This Court's extensive *Opinion* highlights the fact that Petitioner has raised non-frivolous, substantial claims and arguments as to which Petitioner should be permitted a COA. Indeed, sprinkled through the *Opinion* are suggestions that Petitioner's claims are not frivolous, but are debatable. <u>See</u> <u>e.g.</u>, *Op.*, 86 (with respect to DNA claim: "Validating trial counsel's cross-examination through expert testimony certainly could have provided some benefit to the defense"); <u>id.</u>, ("expert testimony certainly could have provided some benefit to the defense"); <u>id.</u>, at 87 (with respect to DNA claim: "here the forensic evidence of sexual assault was not of the strongest sort").

In <u>Jeffries v. Barksdale</u>, 453 U.S. 914, 916 (1981) (J. Rehnquist dissenting) former Chief Justice Rehnquist noted the legislative history of § 2253 – which as <u>Slack</u> indicates remains materially unchanged except for the change of name from the former Certificate of Probable Cause to appeal. He wrote: "The legislative history of 28 U.S.C. § 2253 and its predecessors demonstrates the clear congressional purpose to impose the certificate-of-probable-cause requirement as a means of terminating **frivolous appeals** in certain habeas corpus cases." Petitioner has not presented frivolous issues, as evidenced by this Court's treatment of them, and its extensive opinion about them. Nor would his appeal of them be frivolous. This Court cannot

and should not rule that each of the four claims discussed herein are "frivolous" – the record demonstrates otherwise.

### REQUEST FOR RELIEF

Petitioner respectfully requests that the Court:

1.      Order the Government to Respond to this Motion;

2.      Permit Petitioner to file a Reply Memorandum;

3.      Entertain oral argument on this Motion;

4.      Alter or Amend its Judgment to award relief to Petitioner by vacating his convictions or sentences on each of the above described grounds, individually or collectively; or,

5.      Should the Court not grant Petitioner relief from his convictions and sentence, then Petitioner requests that the Court award a COA as to each of the four claims described herein, or as to any of them individually.

Respectfully Submitted

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
Elizabeth Larin
James J. McHugh, Jr.
Assistant Federal Defenders
Capital Habeas Corpus Unit
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 – West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner,
Alfred Bourgeois

Dated:        June 16, 2011

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 16th day of June, 2011 I served the foregoing on the following by filing the same with the Court's ECF filing system and by email:

Tony Roberts, Esq.
Patti Booth, Esq.
Mark Dowd, Esq.
Elsa Salinas-Patterson, Esq.

/s/ Michael Wiseman

Michael Wiseman