IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     DECEMBER 14, 2009
                                   *     1:15 P.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *


                  TRANSCRIPT OF TELEPHONE CONFERENCE

          BEFORE THE HONORABLE JANIS GRAHAM JACK
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208


                  (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
          CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:   (CONTINUED)


FOR THE DEFENDANT:         MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 1:15 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States.

THE COURT:  Could you speak up, Mr. Roberts?

MR. ROBERTS:  Yes, Your Honor.  Tony Roberts for the United States.

THE COURT:  Thank you.

MS. SALINAS:  Elsa Salinas for the United States.

MS. BOOTH:  Patti Booth for the United States.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

THE COURT:  Okay.  As you know, the Government wants me to inspect Mr. Bourgeois's outgoing mail that's going to a lawyer in Mississippi.

Mr. Roberts, Ms. Booth, Ms. Salinas, have you contacted that lawyer now that you know what it's for?

MS. BOOTH:  No, I did not.  I did verify that it is a lawyer.  I did not make any contact.  I understand that Mr. Bourgeois is representing himself.

THE COURT:  Right.  So that's not anything privileged when it gets to her.

MS. BOOTH:  So I'm worried about -- I understand it's a very big package that he's prepared, and our whole concern

was that threats or attempts to contact or intimidation, all of those things can, to the untrained eye --

THE COURT:  Well, I'm concerned about it for this.  I think you need to contact the lawyer, because if I recall, that was the lady who was an object of possible murder for hire.  Do you remember that?

MS. BOOTH:  Oh.

MS. SALINAS:  Oh, my gosh.

THE COURT:  And I'm very much worried that her address is in those documents some place.

MR. WISEMAN:  I'm sorry, Your Honor, this is Michael Wiseman.  Is the Court saying that the lawyer was the object of murder for hire?

THE COURT:  No, the wife.

MR. WISEMAN:  Oh, the wife.  Okay, okay, yeah.

THE COURT:  And I'm worried, you know, now he's at least got a state.  You know, if we're to accept those threats as, give some credibility to those past threats, I'm real -- I'm more concerned about that than what's in the box.

MS. BOOTH:  Okay.

THE COURT:  And I don't see any reason, Ms. Booth, why you can't subpoena those documents once they land on a lawyer's desk.

MS. BOOTH:  Yes, ma'am.

THE COURT:  Ms. Salinas and Mr. Roberts?

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Mr. Wiseman, what is -- I don't mean to tell people how to try their case, but I am, I do have a legitimate concern about the lady.

MR. WISEMAN:  No, I understand, Your Honor.  Yeah, I, you know --

THE COURT:  She was going in the Witness Protection Program, I think.

MS. BOOTH:  Uh-huh.

MR. WISEMAN:  Robin Bourgeois.

MS. BOOTH:  Right.

MR. WISEMAN:  Right.  My understanding, Your Honor, is that she filed a divorce proceeding against Alfred Bourgeois --

THE COURT:  Yeah, but you usually -- you usually put your address in there.  Even so, if it was in the State of Mississippi, all those things are going to be public record.

MR. WISEMAN:  Right.  But we -- I'm just trying to think back now.  He forwarded those papers to us when they first came in to him, expecting that we would represent him. I, of course, had to explain to him that I am not a, nor anyone in my office is in Mississippi.

THE COURT:  Yeah, I can't find this, Mr. Wiseman, but I remember he communicated with me from Terre Haute, saying he wanted me to appoint him a lawyer to get a divorce from her.

MR. WISEMAN:  I see.

THE COURT:  I don't know what happened to that correspondence.

MR. WISEMAN:  I don't know --

THE COURT:  My administrative assistant is still looking for it.  I sent it back to him and said, you know, "I don't appoint lawyers for that purpose."  But I'm trying to find the letter so that everybody can have it, the one that he originally sent to me.  And of course, I don't know what's in that packet, Ms. Booth, but I --

MS. BOOTH:  Yes.

THE COURT:  -- and Mr. Roberts and Ms. Salinas, but I would assume that those documents might aid you in his now expression of mental retardation.

MS. BOOTH:  Yes, ma'am.

THE COURT:  And I'm most concerned actually that you contact the lawyer in Mississippi and see exactly if there's any way he could determine, from the pleadings she sent to him, where this woman and her child live.

And I realize, until the response was filed, you all didn't know whether this was his lawyer or her lawyer.

MS. BOOTH:  Right.

THE COURT:  And as long as it's her lawyer, it puts a whole different cast on what you have available to you.

MS. BOOTH:  I didn't -- our concern was we didn't do

anything improper.  We just wanted to alert the Court and have the Court --

THE COURT:  Well, if you, if you -- this is my -- if you want somebody to look through those, I think you ought to be looking through them, and you ought to get them from the lawyer in Mississippi.

MS. BOOTH:  Yes, ma'am.

THE COURT:  If you have to ask her, you know, pay her to Xerox them or whatever you need to do, and also to see how safe that lady is --

MS. BOOTH:  Yes, ma'am.

THE COURT:  -- and her child, who both testified, as you know, against Mr. Bourgeois.  And his hope, of course, is to have a retrial.  Right, Mr. Wiseman?

MR. WISEMAN:  Well, sure.  Sure.  That's his hope.

THE COURT:  So I guess nobody thought about that, so I call that to your attention.

Now, if you can't get those documents that way, I will entertain, I'll just deny this without prejudice at the moment and see if you can get those documents another way for other reasons.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  And if you can't, I'll look into this again.  I actually thought about one of you all contacting the Mississippi lawyer and putting her on the phone, on this phone

conference.

MS. BOOTH:  Hmm.

THE COURT:  So you've looked through these documents, Mr. Wiseman?

MR. WISEMAN:  I'm sorry, Your Honor?

THE COURT:  You've looked through these documents?

MR. WISEMAN:  No.  I have no idea what's in them.

THE COURT:  Oh, okay.

MR. WISEMAN:  Mr. Abreu spoke to Counselor English from Terra Haute and told, was told what is represented in our response, that there does not appear to be contraband, and they do appear to be related to the divorce proceeding.

THE COURT:  Well, I don't have a clue what it is, and none of us do actually.

MR. WISEMAN:  Yeah.  I guess logistically, I'm not sure -- because if the prison's holding on to the documents, the Mississippi lawyer doesn't have them right now, so maybe the appropriate thing to do would be to have the prison allow them to be sent, and take it from there.

THE COURT:  Well, I want to hear from Ms., I want Ms. Booth to give us a written update, or Mr. Roberts, or whoever is lead -- I thought Ms. Booth was lead counsel before, Ms. Salinas.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Just file a notice with the Court whether

or not these are going to be, documents are going to be available to you from this lawyer in Mississippi or not. If not, well, I'm not going to let them be mailed without further review, I think. I may ask Mr. Wiseman to review them, as an officer of the Court, and report back.

MR. WISEMAN: I would very much like to review them.

THE COURT: The issue is twofold: One, it may have something to do with competency -- it's threefold -- two, there may be some contraband combination. I think that probably that the U.S. Attorney thought that this was his lawyer. And in the past, he has sent contraband letters, already posted, to his lawyers for, to be forwarded. And third is the safety of this woman and her daughter. And so I need assurances on all three of those levels before the documents are sent on to the Mississippi lawyer.

MR. WISEMAN: Well, Your Honor, if I could suggest if the Court wants to direct the counselor at Terra Haute to simply make a copy of the package, send one copy to the Government, one copy to me, we could all look through them and --

THE COURT: Well, that's fine. I thought you didn't want anybody to look at them.

MR. WISEMAN: Well, I can't stop the Government from subpoenaing them, once they --

THE COURT: Well, if you want to make a copy, that's

fine with me, too.  I guess somebody would have to pay the Bureau of Prisons to do that.  Right?

MS. BOOTH:  Well, Your Honor, if they could, if there's possibly a way that they could send the package to the U.S. Attorney's Office, we would make two packages, and then send them on to the, with -- and then alert the Court as to what, if it would be -- we'll ask the Court if we might send them on to the attorney.

THE COURT:  Either way.  It can go directly to Mr. Wiseman, and he can make copies, or directly to you, and you can make copies, which I'm going to leave this up to Mr. Wiseman as to what his preference is.

MR. WISEMAN:  I'll contact Mr. English and represent that the Court would like them to send the documents to me. I'll immediately copy them, send them to the Government, and you know, we'll take it from there, if they're --

THE COURT:  And then would you wait, please, before forwarding on to the Mississippi lawyer?  Somebody needs to contact --

MR. WISEMAN:  I'll wait for direction.

THE COURT:  -- the Mississippi lawyer, though, so he doesn't get a default, you know what I mean?

MS. BOOTH:  I will call Angela Sampson.  That's the attorney.

THE COURT:  And tell her what the entire issue is.

And I want you, Ms. Booth, to get from her whatever documents she's filed on behalf of Ms. Bourgeois.

MS. BOOTH:  Uh-huh.

THE COURT:  Because I'm concerned it's going to have an address.

MS. BOOTH:  An address.

THE COURT:  It may be, it may be bad enough that he's got a state, if, if his allegations, the allegations are to be believed.  And I have no choice but to give them credence at this time for her protection.

MS. BOOTH:  Well, I'm also concerned, Your Honor, that these documents, if he is representing himself pro se, could definitively answer the question of mental retardation or not.

THE COURT:  Well, I think I've already made that point.

MS. BOOTH:  So these would be the ultimate answer and extremely important evidence for the Government.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  I don't dispute that they may have probative value.  I -- having read stacks and stacks of Mr. Bourgeois's writings, I would disagree that they would be the definitive answer.  But we'll leave that for another date.

THE COURT:  Well, I've read quite a bit of his -- I know that he has had correspondence with me.

MR. WISEMAN:  Yeah.

THE COURT:  And I do think that that type of thing is evidence as to competence.

MR. WISEMAN:  Yeah.  I don't dispute it has some probative value.  I just don't know that it --

THE COURT:  And I, and this is the way I want to do this, Mr. Wiseman.  I hesitate to put you in a position also of doing something that's against your client's interest.  So I'm going to ask you to go through these documents, copy everything, send it to the U.S. Attorney.  If you think that there's something that would compromise your client's interests, we're going to have to talk about it.

MR. WISEMAN:  Okay.  I --

THE COURT:  Because it's not -- if he was sending it to some stranger in Mississippi, it doesn't have any attorney-client privilege or any whatever, but I guess there's a self-incrimination issue that he's already waived by posting it.  What do you think?

MR. WISEMAN:  Your Honor, I --

MS. BOOTH:  That would be my --

MR. WISEMAN:  I guess the bottom line is by, right, by sending it to a third party, I don't know that he has any privilege as to those particular documents.  But rather than discussing it in a vacuum, why don't we see what they are.  And if --

THE COURT:  All right.  Well then we'll talk -- we'll just save that for another day.  I don't want to over analyze, but I am --

MR. WISEMAN:  Yeah.

THE COURT:  -- concerned about, about that issue as well.

MR. WISEMAN:  Yeah, I appreciate the Court's pointing that out.  All right.  So I will tell Mr. English, Counselor English to forward the documents to me, with the Court's direction.  And as soon as I get them, I will have them copied and sent on.

THE COURT:  And I have your representation that you'll copy everything?

MR. WISEMAN:  Oh, absolutely, Your Honor.

THE COURT:  All right.  Anything further?  Does that satisfy you, Government?

MS. BOOTH:  And I will contact Ms. Sampson to find out what the status of that lawsuit --

THE COURT:  Well, get a copy of that petition from her, please.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Anything else?

MR. ROBERTS:  Your Honor, I just -- Tony Roberts for the United States -- I was just wondering if there was any update on the discovery that we had asked about before.  And I

understand that Mr. Wiseman had sent it, but I had not seen anything arrive yet.  So I was just curious if there was an update on that.

MR. WISEMAN:  You haven't gotten the documents?

MR. ROBERTS:  No, I have not.

THE COURT:  Well, where are they?  I thought that was a couple of months ago.

MR. WISEMAN:  Yeah, I mean, we overnight mailed them.

MS. BOOTH:  Are we talking about the boxes?

MR. WISEMAN:  Yes, the boxes.

MS. BOOTH:  Oh, yeah, the boxes are here.

MR. WISEMAN:  Yeah.  Are you talking about the in-camera documents, Mr. Roberts?

MR. ROBERTS:  Yes.  I was talking about those as well.

MR. WISEMAN:  Right.  I owe the Court an additional submission on that, which I hope to make by Thursday.

THE COURT:  Mr. Wiseman, can you and I have an ex parte discussion about this also?

MR. WISEMAN:  Sure, absolutely.

THE COURT:  I've got a courtroom full of people right now.

MR. WISEMAN:  Yeah, yeah.  Your Honor, what I was going to suggest is if it would be convenient, I could have that additional submission to you on Thursday, and then perhaps

there may or may not be a need for an additional discussion.

THE COURT:  All right.  That will be fine then. Perhaps we can schedule another conversation in the future. You know I record all these ex parte conversations, so they're in the record.

MR. WISEMAN:  Yes, of course.

THE COURT:  Let me ask you then, are you all ready to set a hearing, an evidentiary hearing?

MR. WISEMAN:  Yes, we -- Plaintiffs certainly are. Petitioner certainly is.  We would need to have, you know, for logistical reasons, a bit of time, but --

THE COURT:  Yeah, I promised the Marshals at least a two-month heads up on this.

MR. WISEMAN:  Yeah.

THE COURT:  Because he'll have to be housed again in the federal courthouse.  Can you all give me some indication of how long -- I can give you a date now.  I was thinking April.

MR. WISEMAN:  April?  Um --

THE COURT:  Is that too far away?

MR. WISEMAN:  No, no, no.  I'm just thinking, I have quite a few moving parts here that I need to get in place, and I was not prepared to, today, to talk about specific dates.  I think, if I could suggest that determining the scope of the hearing might make picking a date a little easier, just because we'll know how many days we're going to need and which

witnesses we'll need, I think maybe -- well, my suggestion, Your Honor, as long as we're talking --

THE COURT:  Well, the whole issue really is whether or not his attorneys were -- failed in their obligation to him to give him a proper defense.

MR. WISEMAN:  That's one way of putting it, but then there's multiple components to that claim of ineffective --

THE COURT:  I thought they all, don't they all -- oh, okay.  I see what you mean.

MR. WISEMAN:  If --

THE COURT:  I had forgotten about the bite mark thing.

MR. WISEMAN:  My hope would be to have an actual argument on our, the scope of the hearing, where we could go claim by claim and articulate our respective positions as to why we're entitled to a hearing.  And then at the end of that, the Court could say, "Okay, hearing is granted on these claims, not granted on other claims," and then we would be in a position to actually pick a date for the hearing.  So I think we could schedule that argument for soon.

THE COURT:  Do y'all want to do that in person?

MR. WISEMAN:  I would prefer to do that in person, yes.

THE COURT:  I would think so.

MR. WISEMAN:  Yeah.

THE COURT:  Besides, I haven't met you.

MR. WISEMAN:  That's right.  That's another reason, right.

THE COURT:  Why don't we do that then.  Why don't we set aside a morning in April to do that.

MR. WISEMAN:  That sounds fine.

THE COURT:  Am I going to be expecting some further briefing on these issues?  I thought I remembered everything except for the bite marks having to do with refusing to put on evidence or not putting on evidence as to his mental ability, whether it's competence or retardation or that sort of thing, some kind of mitigating evidence.

MR. WISEMAN:  Well, there's mitigating evidence.  There's also the question about the time of death, whether it was on federal property or not.  So there are, again, I'm not prepared to go through it all, but there are a number of issues that we think are hearing-worthy.

I was just wondering, I can't recall, did the Government ever respond to our discovery motion?  I think they were waiting for our discovery to get to them, and so I think that's still outstanding, a response to our motion for a hearing and discovery.  But other than that, I think the case will be ready for an argument on the scope of the hearing.

MR. ROBERTS:  That's correct, Your Honor.  We had, we were prepared to submit a response to their discovery and their

request for a hearing, and then we had, you instructed us to wait until such time as they turned over (inaudible) to us so that we could address the retardation claims.

So we have not actually filed the response to their discovery request. We're kind of waiting on this, the remaining discovery and the writings of Alfred Bourgeois in response to this. And there are a couple of issues that we could, that could turn on whether or not, what type of experts we might, each side might need. So an argument sounds like a good idea, that we could address Brady issues, some other issues that the Court might decide to resolve on the record instead of needing witnesses.

THE COURT: All right. Well, maybe you all could, in preparation for that, just give me a brief status report about what, from the Government anyway, what evidence, what issues you think could be resolved on the record, as it stands, and which you believe need further development with a record, with a hearing.

MR. ROBERTS: Okay, Your Honor. Do you want that right now?

THE COURT: How about a month?

MR. ROBERTS: Okay. I can certainly file something within a month that articulates that and --

THE COURT: What do you think, Mr. Wiseman?

MR. WISEMAN: Sure. I mean, we've already moved for

a hearing and --

THE COURT:  Well, I'm going to give you a hearing, I just don't know how much of a hearing.  I anticipate, I guess, the hearing would be on mental health issues only.

MR. WISEMAN:  Right.  I guess what I'm thinking is that we've articulated our view as to what we should get a hearing on.  They need to respond to that.  So rather than a status, perhaps we can have their response.  And then we'll know what's in controversy and we could address that at the hearing --

THE COURT:  Okay, that would be fine.

MR. WISEMAN:  -- at argument.

THE COURT:  And I just, if I put the burden on the Government to at least give me a status update as to what they think should, what they agree should have a hearing and what they disagree, then you could respond to that.

MR. WISEMAN:  Okay.  I guess I would just like an opportunity to reply to whatever they have to say about what's --

THE COURT:  Of course.

MR. WISEMAN:  -- entitled to a hearing.

THE COURT:  I was just trying to figure out what they, what they would concede needs a hearing.

MR. WISEMAN:  Okay.  Well, that's --

MR. ROBERTS:  Your Honor, I can tell you on the

record right now -- Tony Roberts for the United States -- I can tell you on the record right now that our -- we believe that you could actually resolve all of the issues on the matters that have been submitted, after --

THE COURT:  You know, and you may very well be right, but I'm not going to do that.

MR. ROBERTS:  I understand, Your Honor.

THE COURT:  Sorry.

MR. ROBERTS:  I anticipated that.  But that's going to be part of our submission.

THE COURT:  And I appreciate that.  But I can tell you that it just seems to be only fair that they be allowed to develop a record in this area.

MR. ROBERTS:  And actually, I actually agree with that, Your Honor.  I think my initial submission was that in all likelihood, there probably, it probably is the fairest approach of due process to have the hearing on the, particularly on the mental health aspect, since it wasn't --

THE COURT:  And whether or not there was retardation issues, those kind of things.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And you know, Mr. Wiseman, what I was concerned about on the mental retardation issues?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  I don't know, I want to give you a

heads-up about what I was thinking, because I have actually granted a writ of habeas corpus from a state capital inmate on that, on the issue of mental retardation.

MR. WISEMAN: Uh-huh.

THE COURT: And I looked at the, at that time, and I'm sure you know very well better than I do the standards laid out by -- and they're supposed to be state by state, but this is not going to be state by state -- but what constitutes mental retardation, when the tests have to be given, and it has to be established before a certain very young age, like 10, something like that.

MR. WISEMAN: I believe it's 18.

THE COURT: Pardon?

MR. WISEMAN: By the age of 18.

THE COURT: Okay. But I don't know if you have any of those records. I haven't seen them.

MR. WISEMAN: Oh, the records -- believe we have proof that we can offer --

THE COURT: Pardon?

MR. WISEMAN: -- through the records.

THE COURT: Pardon?

MR. WISEMAN: I mean, go to a school district that maintains records certainly for that long, if they had them at all, but --

THE COURT: You don't -- I'm sorry, so you have no

records?

MR. WISEMAN:  We have no school records that we've --

THE COURT:  Okay.  And the reason I asked that, it just puts you, a very, I think, a difficult burden on you to do that, when he's tested at this age after a capital murder conviction.  And that's what I understood you had.

MR. WISEMAN:  Yeah.  Your Honor, this is a very complicated set of issues to address.  And I just, I'm fearful that we're addressing --

THE COURT:  Well, that's why I wanted you to be able to develop it in person.

MR. WISEMAN:  Yeah, exactly.

THE COURT:  But I wanted to tell you my concerns in that area, which I'm sure you share.

MR. WISEMAN:  Yeah.  No, I -- we have some obstacles, but we also think we can overcome them.

THE COURT:  Anything else?

MR. WISEMAN:  I guess I'm not sure where we stand.  We're going to wait for the Government's status slash response in about a month?

MR. ROBERTS:  Well, were you still going to submit -- you were going to submit something this Thursday, you said, with regard to the in camera documents.  Are you still going to --

MR. WISEMAN:  Yeah.  That's going to be a sealed

submission regarding those documents.

MR. ROBERTS:  And that was, if I understood right, that was so that Judge Jack could review those documents and determine if any of those should be turned over to the United States.

MR. WISEMAN:  Exactly.  There's 22 pages, I believe, in controversy.

MR. ROBERTS:  So if those documents were then turned over to the United States, they would then become part of our reply.

MR. WISEMAN:  Exactly.

MR. ROBERTS:  And so I can prepare a response leaving --

THE COURT:  Mr. Wiseman, I'm having a hard time with that.  Maybe we can have another ex parte conversation after you file your documents.

MR. WISEMAN:  Sure.  Okay.

THE COURT:  Anything else?

MR. WISEMAN:  Nothing from me, Your Honor, Michael Wiseman.

MR. ROBERTS:  Nothing from the United States, Your Honor.

THE COURT:  All right.  So where we are is waiting for the Government to file a response, which they need your discovery for, Mr. Wiseman, which they've had almost all of it

but 22 pages for a couple of months now, I think.  And you can always file a supplemental response if I let you have these other 22 pages, Mr. Roberts.

But, and then you all in a month, the U.S. Attorney is, you're going to file sort of a status update to tell me what items you think can without a doubt be resolved without further development on the, as to a hearing, and which items you think you would concede anyway that might be appropriate for a hearing.

MR. ROBERTS:  Okay.

THE COURT:  And then you'll respond a couple of weeks later, Mr. Wiseman?

MR. WISEMAN:  Yes, that sounds fine.

THE COURT:  And then I'll give you a date in the future -- I'm not going to do it now, but maybe we'll get together by phone another time to set up sort of an oral arguments kind of a thing is what you anticipate?

MR. WISEMAN:  That sounds great.

THE COURT:  And then what issues remain, if any, will be set for a hearing.  Is that okay?

MR. WISEMAN:  Yes, that sounds great.  Thank you.

THE COURT:  All right.  Thank you all very much. You're excused.

MR. ROBERTS:  Your Honor, can I clarify one matter?

THE COURT:  Wait, wait, wait.  Yes.

MR. ROBERTS:  Just, I just want to make sure, are you expecting two responses from the United States, one with regard to their motion, and then another status update?

THE COURT:  Yes, sir.  Mr. Wiseman, are you still there?

MR. WISEMAN:  Yes, I am.

THE COURT:  Okay.  Yes, sir.

MR. ROBERTS:  All right, Your Honor.  We'll get that response submitted as soon as possible.

THE COURT:  Thank you very much.

MR. ROBERTS:  Thank you.

MR. WISEMAN:  Thank you.

THE COURT:  Bye.

(Proceedings concluded at 1:40 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    September 26, 2011
Molly Carter                        Date