# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 5, 2013

Lyle W. Cayce
Clerk

No. 11-70024

UNITED STATES OF AMERICA,

Clerk, U.S. District Court
Southern District of Texas
FILED

AUG 0 8 2013

David J. Bradley, Clerk of Cour.

Plaintiff - Appellee

v.

ALFRED BOURGEOIS,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:07-CV-223

Before KING, JOLLY, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Alfred Bourgeois, a federal prisoner sentenced to death for the murder of his young daughter on the grounds of a military base, requests a certificate of appealability (COA) authorizing him to appeal the district court's denial of his motion to vacate his conviction and sentence under 28 U.S.C. § 2255. For the reasons that follow, we conclude that Bourgeois has not made a substantial showing of the denial of a constitutional right and we therefore DENY his application for a COA.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-70024

## I. FACTS AND PROCEDURAL HISTORY

Bourgeois, a truck driver, was indicted on July 25, 2002, and charged with murdering his two-and-one-half-year-old daughter on the grounds of the Corpus Christi Naval Air Station (CCNAS), where he was making a delivery. In October 2002, the district court appointed John Gilmore to represent Bourgeois.[1] Gilmore had experience in capital cases, both as a prosecutor and as defense counsel. In February 2003, the district court authorized the defense to hire an expert pathologist and to hire Doug Tenore as an investigator. Later, the court authorized the defense to hire additional experts, including a DNA expert, a polygraph expert, a mitigation expert, two mitigation investigators, a neurologist, a neuropsychologist, a jury-selection expert, a psychologist specializing in family violence and parent-child relationships, bite mark experts, and a "battered baby" expert.

---

[1] The Federal Public Defender's Office represented Bourgeois initially but was allowed to withdraw because of a conflict of interest.

No. 11-70024

A superseding indictment in July 2003 alleged all four of the statutory intent elements[2] and three statutory aggravating factors for the death penalty.[3] Immediately thereafter, the district court appointed Douglas Tinker as co-counsel and ordered that his appointment was retroactive to his first appearance in the case, as a volunteer, on April 10, 2003.  Tinker had represented over a dozen clients facing a death sentence.[4]

---

[2] The statutory intent elements are that Bourgeois

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2).

[3] The statutory aggravating factors are (1) that Bourgeois "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim"; (2) that he "committed the offense after substantial planning and premeditation to cause the death of a person"; and (3) that "[t]he victim was particularly vulnerable due to . . . youth or infirmity."  18 U.S.C. § 3592(c)(6), (c)(9), (c)(11).

[4] The district court stated in its § 2255 opinion that in 1995, the Criminal Justice Section of the Texas Bar named Tinker Outstanding Criminal Defense Lawyer of the Year, that Tinker was well known in the legal community as a "defense attorney's defense attorney," and that his experience with cases involving genetic material had earned him the reputation as a DNA expert. The district court explained that it appointed Gilmore and Tinker because they had extensive experience, sterling character, and were among the most zealous, competent attorneys in the local bar. The court stated that its familiarity with their efforts, in this case and others, reinforced the strong presumption that their attention to certain issues to the exclusion of others reflected trial tactics rather than neglect.

No. 11-70024

Jury selection began on February 9, 2004. The guilt-innocence phase of trial began on March 2 and ended on March 16. The government presented the following evidence at the guilt-innocence phase.

The victim, JG,[5] was born on October 5, 1999, and lived in Texas with her mother, Katrina Harrison.[6] In April 2002, a paternity test established that Bourgeois was JG's biological father. At that time, Bourgeois was married to Robin Bourgeois (Robin). He and Robin had a seven-year-old daughter, AB1994, and a one-year-old daughter, AB2001. After a court ordered Bourgeois to pay child support for JG,[7] Bourgeois and Harrison agreed that he could take custody of JG for the summer. Medical and photographic evidence established that JG was a healthy, happy child when she left her home with Bourgeois on May 16, 2002.

The family stayed at the Bourgeois residence in LaPlace, Louisiana, from May 16 until May 28, when they left for Alabama, where Bourgeois had an orientation for his new truck-driving position. When they left Alabama, the family stayed in the 18-wheeler truck, night and day, until June 27, 2002, when they arrived at the CCNAS. Bourgeois forced JG to spend almost every moment of the last six weeks of her life on a potty chair, both at their residence[8] and

---

[5] The victim was referred to as "JG1999" throughout the district court proceedings. We will refer to her in this opinion as "JG."

[6] Harrison was murdered on December 19, 2002, hours after government agents had spoken to her on the telephone. The man responsible for her murder was caught, confessed, and killed himself in prison.

[7] Bourgeois took his teenaged niece to Texas for the custody and support hearing, and planned to tell the judge that she was his daughter and that she had kidney problems, so that the judge would order less child support for JG.

[8] In a search of Bourgeois's home after he was arrested, the FBI found a dent in the bedroom wall, where JG's potty had been located. Swabs taken from reddish brown stains on the bedroom wall and in the bathroom were later determined to contain JG's blood.

No. 11-70024

while the family traveled throughout the country in his 18-wheeler.[9] Throughout the time that JG was in his custody, Bourgeois relentlessly tortured JG by biting her all over her body, burning her, whipping her with belts, extension cords, and his hands, beating her with a baseball bat, shoes, and other objects, duct-taping her mouth,[10] and forcing her to drink his urine from a jug that he kept in his truck. The government presented graphic photographic and testimonial evidence of this abuse,[11] including from Bourgeois's wife and daughter, AB1994,[12] who witnessed much of it. Witnesses testified that

---

[9] Robin testified that when JG would fall asleep and fall off the potty chair, Bourgeois would make her get back on the potty. She said that Bourgeois referred to JG as a "bitch" and "a little mother f***er."

[10] Robin testified that JG had trouble breathing when Bourgeois taped her mouth and that the skin around JG's mouth became irritated from the tape and the alcohol that was used to remove the adhesive when the tape was removed.

[11] In the first photograph of JG with her father, taken the first time he met her, her eyes are filled with tears. Photographs taken while the family was traveling depict JG wearing sunglasses and socks. Robin testified that JG wore sunglasses because her eyes were bruised and wore socks to cover the injuries to her feet, which were too swollen to wear shoes. During the entire time the family was traveling, however, Bourgeois sent postcards to JG's biological mother, pretending that JG was having a wonderful time.

[12] AB1994, who was nine years old at the time of trial, testified that JG's hands and feet were pretty when she came to them, but got ugly from her dad biting them, and that JG wore socks because "she was bitten all up, and her feet looked real bad." A nurse who examined JG at the hospital on June 27, 2002, testified that they could not insert a needle or IV through JG's hands because they were so swollen and "very hard, like rockish." FBI Special Agent Megan Beckett testified that JG's hands and feet were unlike anything she had ever felt on a human being – cold and hard and swollen. AB1994 testified that her father bit JG "all over," including on the top of her head and on her back, and that JG bled when he bit her. AB1994 told the jury that she saw her father whip JG with a belt and an extension cord, saw him tape her mouth, and witnessed him making JG drink his urine. She said that JG had black eyes from being hit by her father. AB1994 testified that her father told her it was her (AB1994's) fault that he was hurting JG. AB1994 also testified that she witnessed her father beating her mother and her grandmother. However, he never bit or hit AB1994 or AB2001.

5

No. 11-70024

Bourgeois had wished for JG's death because he did not want to have to pay child support for her and that he had made plans for disposing of her body.[13]

The government presented medical evidence that JG had over 300 injuries, including at least ten different head injuries. The medical examiner, Dr. Elizabeth Rouse, found that the ultimate cause of death was "an impact to the head resulting in a devastating brain injury." AB1994 testified that after JG spilled the contents of her potty chair in the cab of the truck on the CCNAS, Bourgeois spanked JG and then held her by the shoulders and slammed her head into the window of his truck. Dr. Rouse testified that the injuries she observed in the autopsy were consistent with having been caused by the events that AB1994 described.

After Bourgeois struck JG's head, he and AB1994 got out of the truck. Robin testified that she was asleep when they arrived at the CCNAS warehouse and that when she awoke, she found JG lifeless. According to Robin, Bourgeois took JG from the truck and laid her on the pavement beside it. Robin and AB1994 both testified that he told them to tell anyone who asked that JG had fallen out of the truck. Although they complied initially, the story did not hold up for long because the doctors who treated JG immediately realized that her severe injuries could not have been caused by a fall from the truck.

---

[13] Robin testified that she told Bourgeois many times that he was going to end up killing JG. When she asked Bourgeois what he was going to say if he killed her, Bourgeois said that he was going to throw her out of the truck into the woods and then go to a truck stop and report that she had been kidnaped. AB1994 testified that her father would put JG on the steering wheel when he was driving and tell her that she made him want to kill her. She testified further that she heard her dad say that when JG died, he would take her to the swamp and leave her there.

6

No. 11-70024

Numerous witnesses testified to Bourgeois's callous indifference to JG's critical injuries.[14] They said that he seemed to be more concerned with arranging to pick up and deliver his next load.

A doctor testified that he observed evidence of sexual trauma in the photographs of JG taken during the autopsy. There was also evidence that semen was found on rectal swabs collected after JG died.

After Bourgeois was arrested and incarcerated, he made incriminating statements to relatives, friends, and other inmates. Three inmates who had been incarcerated with Bourgeois prior to trial testified that Bourgeois told them that he killed his daughter and was going to make it look like an accident and that he described JG as a "bad child" who "used to shake her butt all the time."[15]

Bourgeois was the only witness for the defense at the guilt-innocence phase. He testified that he never harmed JG, never touched her inappropriately in a sexual way, and did not cause her death. On cross-examination, he told the jury the same story he had told investigators: that JG fell from the truck. When the prosecutor asked him about JG's numerous injuries, he had implausible explanations for how she sustained each one. He accused the witnesses who had testified against him of lying and said that he was upset and "highly hurt" by the loss of his baby.

In closing arguments, defense counsel blamed Robin for the murder and abuse of JG. Counsel also argued that if the jury believed Robin, AB1994, and the inmates, there was no evidence of premeditation. After deliberating for less than two hours, the jury found Bourgeois guilty of premeditated murder.

---

[14] FBI Special Agent Michael David Harris, who interviewed Bourgeois on June 27, testified that Bourgeois stated that the doctors had told him that they had done just about everything they could do for JG and that he did not want "it" to suffer. Agent Courtney Scharn also testified that Bourgeois referred to JG as "it."

[15] One of the inmates testified that Bourgeois described how JG fell about ten feet at a dinosaur park and laughed as he said, "That f***ing baby's head got as big as a watermelon."

No. 11-70024

The punishment phase began on March 22 and ended on March 24, 2004. The jury had to find that Bourgeois intentionally killed JG. The government alleged as statutory aggravating factors that (1) Bourgeois committed the offense in an especially heinous, cruel, or depraved manner that involved torture and serious physical abuse; (2) he committed the offense after substantial planning and premeditation; and (3) JG was particularly vulnerable because of her youth. The government alleged the following non-statutory aggravating factors: (1) Bourgeois is likely to commit criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of others; and (2) he caused injury, harm, and loss to JG's family.

The defense alleged the following statutory mitigating factors by a preponderance of the evidence: (1) Bourgeois had an impaired capacity to understand the wrongfulness of his conduct; (2) he was under unusual and substantial duress; (3) he did not have a significant prior history of other criminal conduct; (4) he committed the offense under severe mental or emotional disturbance; and (5) other relevant information. As non-statutory mitigating factors, the defense alleged that (1) Bourgeois had been abused as a child; (2) other persons who may be culpable in the offense may not be punished; (3) he was under stress from family and economic factors; and (4) at the time of the offense he was driving across the country with three children and one other adult in the cab of an 18-wheeler truck.

At the punishment phase, the government presented testimony from Bourgeois's ex-wives, girlfriends, acquaintances, children, and jailhouse informants about his abusive and violent history. The government also presented evidence that Bourgeois had attempted to hire an inmate, whom he believed to be a hit man, to kill family members who were going to testify

8

No. 11-70024

against him.[16] Government expert psychiatrist Dr. Carlos Estrada testified that Bourgeois had a narcissistic personality disorder and that he was likely to be violent in the future. Defense counsel's cross-examination of Dr. Estrada brought out some mitigating evidence about Bourgeois's abusive childhood and the stress that he was under at the time of the murder.

Bourgeois's sister and cousin testified for the defense that Bourgeois's mother singled him out for abuse and sent him to live with an elderly neighbor, Mary Clayton. Ms. Clayton's grandson also testified about Bourgeois's mother's abuse. Bourgeois testified, expressing sympathy to JG's family and sorrow for the loss of JG, but continued to blame Robin.

After five and one-half hours of deliberation, the jury found that the government had proven all of the statutory and non-statutory aggravating factors and that Bourgeois had shown two mitigating factors: six jurors found that he was under stress and all found that he was driving across the country in a truck with three children and one other adult in the cab of an 18-wheeler truck. The jury unanimously found that the aggravating factors outweighed the mitigating factors and recommended a death sentence.

Trial defense counsel, Gilmore and Tinker, represented Bourgeois on direct appeal. This Court affirmed the conviction and sentence, and the Supreme Court denied certiorari. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005), *cert. denied*, 547 U.S. 1132 (2006).

In May 2007, Bourgeois filed a motion for relief pursuant to 28 U.S.C. § 2255, raising fourteen grounds for relief. Bourgeois filed a motion for an evidentiary hearing and the district court held oral argument on the motion in April 2010, to designate the issues to be resolved at a hearing. Although the district court initially limited the evidentiary hearing to four days and excluded

---

[16] Although the district court did not allow the jury to hear it, the prosecutor, the FBI case agent, and the trial judge (all female) were among those Bourgeois wanted to have killed.

9

No. 11-70024

some issues from the hearing because they could be adequately decided on the record, it later expanded both the time and the manner in which Bourgeois could present evidence. The court conducted a week-long evidentiary hearing in September 2010, heard additional testimony at other times, and allowed the parties to present videotaped depositions of other witnesses as well as affidavits. Trial counsel Tinker was terminally ill during the § 2255 proceedings, and the district court allowed the parties to question him through interrogatories. Although he answered the government's interrogatories, his condition worsened before he was able to answer the interrogatories propounded by Bourgeois's counsel. He died on November 10, 2008.

In May 2011, in a careful and comprehensive opinion, the district court denied § 2255 relief and also denied Bourgeois's request for a COA. *Bourgeois v. United States*, No. C-07-CV-223 (S.D. Tex. May 19, 2011) (hereinafter Dist. Ct. Op.). The district court denied Bourgeois's motion to alter or amend the judgment on June 17, 2011. Bourgeois filed a timely notice of appeal and now requests a COA from this court for three claims:[17]

---

[17] Bourgeois did not request a COA for the remaining claims he raised in his § 2255 petition. Those claims are: (1) Bourgeois is mentally retarded, making him ineligible for execution; (2) trial counsel ineffectively failed to present evidence of mental retardation at the punishment phase; (3) Bourgeois's conviction violates due process because the fatal injury occurred outside the territorial jurisdiction of the United States; (4) trial counsel ineffectively failed to challenge the admissibility of testimony concerning bite marks; (5) trial counsel ineffectively failed to challenge the admissibility of testimony about digitally enhanced autopsy photographs; (6) the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois; (7) trial counsel labored under a conflict of interest because of representation of clients associated with this case; (8) the prosecutor engaged in misconduct by making improper argumentative statements at both phases of trial; (9) trial counsel ineffectively failed to rebut evidence of Bourgeois's indifferent demeanor at trial; (10) a witness improperly relied on Bourgeois's interactions with counsel as a basis to formulate an adverse opinion about him; (11) appellate counsel ineffectively failed to advance several claims; (12) the cumulative effect of the claimed errors resulted in a constitutional violation; and (13) the method by which the government would carry out Bourgeois's execution violates the Constitution.

10

No. 11-70024

(1) the district court erred in dismissing, without an evidentiary hearing, his claim that trial counsel were ineffective for failing to challenge jurisdiction;

(2) trial counsel were ineffective at both phases of trial for failing to present available expert testimony to rebut the government's assertion that JG was sexually assaulted; and

(3) trial counsel provided ineffective assistance during the punishment phase by failing to pursue and present mitigating evidence of his life history of abuse, neglect and abandonment, personality disorder, cognitive deficits, and the combined impact of his mental-health problems.

"This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA." *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006) (citing 28 U.S.C. § 2253(c)(1)(B)). To obtain a COA, Bourgeois must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this Court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. This Court cannot deny a COA because it believes that Bourgeois ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a

11

No. 11-70024

death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alterations omitted) (internal quotation marks omitted).

Having reviewed the briefs, the district court's thorough and well-reasoned opinion, and the entire voluminous record before this court pursuant to the framework established by the Supreme Court in *Miller-El*, we conclude that Bourgeois is not entitled to a COA. The district court did not abuse its discretion by declining to conduct a full evidentiary hearing on Bourgeois's claim that his trial counsel were ineffective in failing to challenge federal jurisdiction. Further, no reasonable jurist would debate the district court's resolution of Bourgeois's ineffective assistance claims, and the issues he seeks to raise on appeal are not adequate to deserve encouragement to proceed further. We therefore DENY Bourgeois's request for a COA for the reasons that follow.

## II.  DISCUSSION OF CLAIMS

### A.  Denial of Evidentiary Hearing on Ineffective Assistance in Failing To Challenge Federal Jurisdiction

Bourgeois argues that the district court should have conducted an evidentiary hearing on his claim that trial counsel rendered ineffective assistance by failing to challenge federal jurisdiction with available medical evidence that JG manifested physical, neuropsychological, and behavioral indications of significant brain injury prior to entering the CCNAS, and expert testimony interpreting that evidence, to counter the government's assertion that her fatal injuries were inflicted on federal property. Bourgeois contends that effective counsel would have investigated and presented evidence that the fatal blows to JG's head were delivered prior to her arrival at the CCNAS, based on medical evidence that she suffered head injuries seven to ten days prior to her death and lay witness testimony about her impaired behavior and injured appearance prior to her arrival at the CCNAS. Bourgeois asserts that if he had

12

No. 11-70024

been granted an evidentiary hearing, he also would have presented evidence that (1) trial counsel Tinker told habeas counsel, in a meeting on February 1, 2008, that he never investigated or challenged jurisdiction because he misunderstood the law and thought federal jurisdiction was established if the decedent was found unconscious on federal land; and (2) notes taken by one of the prosecutors prior to trial show that the prosecutor thought the existence of federal jurisdiction was in question.

The government had the burden of proving, as an essential element of the crime, that the murder occurred "[w]ithin the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). The "special maritime and territorial jurisdiction of the United States" includes lands reserved or acquired for the use of military facilities. *Id.* § 7. It is undisputed that the CCNAS is a place within the special maritime and territorial jurisdiction of the United States. Jurisdiction is determined by "the place where the injury was inflicted[] . . . without regard to the place where the death occur[red]." *Id.* § 3236. Thus, to establish the jurisdictional element of the crime, the government had to prove that Bourgeois caused JG's fatal injuries on the CCNAS. The jury was instructed that it must find jurisdiction beyond a reasonable doubt.[18]

A district court must grant an evidentiary hearing in a § 2255 proceeding "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Bourgeois asserts that the government's evidence at trial proved, at most, that the fatal injuries *might have* occurred at the CCNAS. He argues that an evidentiary hearing was

---

[18] Although our precedent requires that jurisdiction be proven by a preponderance of the evidence, *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993), the jury was instructed, without objection from the government, that it had to find jurisdiction beyond a reasonable doubt. The government does not challenge the applicability of that standard of proof.

No. 11-70024

required because he proffered evidence in the § 2255 proceedings that JG's fatal injuries *did not* occur at the CCNAS, thus creating a factual dispute.

1.

In her trial testimony, Bourgeois's daughter, AB1994, described the events that led up to JG's death as follows: On the day that JG went to the hospital, June 27, 2002, JG was sitting on the potty. Her dad got lost and the truck stopped. After the truck started back up, JG was still on the potty, wiggling around. The potty tipped over. Her dad got mad and stopped the truck. He told AB1994 to give JG to him and she did. He took JG's pants off and he started spanking her. Then he took her by the shoulders and he started hitting the back of her head on the window, about four times. AB1994 said that she saw JG making a "real, real sad face." Her father put JG's pants back on and told AB1994 to take her. AB1994 said that JG "was awake, and then she just, like, fell asleep." Her dad got out of the truck to make sure it was at the right place, and then she got out of the truck to help him back the truck up to the loading dock at the warehouse. AB1994 said that when she got back in the truck, she saw Robin administering CPR to JG. She testified that her dad then put JG on the ground beside the truck and that JG looked "dead, sleeping." Then her dad made up a story that JG fell from the truck, so that he and her mom would not have to go to jail.

Robin testified at trial as follows: the Bourgeois family left their home in LaPlace on the afternoon of June 26 and arrived at Ingleside Naval Station at about 4:00 or 5:00 a.m. on the morning of June 27. They parked across the street until they could unload around 7:00 a.m. When she went to sleep, while they were waiting to unload at Ingleside, JG was on her potty in the back of the truck. When she awoke, the truck was at the CCNAS. JG was sitting straight up in the passenger's seat, limp and unresponsive, and her heart was beating very fast. Robin tried to administer CPR, then blew the horn on the truck until Bourgeois

14

came. She asked him what he had done to JG and told him that JG was dying. When she told him he needed to get JG to the emergency room, Bourgeois responded that he would take her after his truck was unloaded.

Employees on Ingleside Naval Station testified that they spoke with Bourgeois when he stopped there to make a delivery on the morning of June 27. None of them saw any indication that JG had suffered any fatal injuries during their interactions with Bourgeois. The evidence showed that Bourgeois left Ingleside and arrived at the CCNAS in about the time it would take to drive there directly, without stopping. Two individuals who worked at the CCNAS testified about their interactions with Bourgeois that morning when he stopped to ask for directions and for assistance when his truck broke down on the CCNAS, prior to his arrival at the warehouse where he was to make a delivery. Neither of them observed anything that would indicate to them that JG was injured. The CCNAS warehouse supervisor testified that when Bourgeois arrived at the warehouse, he went inside the trailer to inspect the load and while he was inside the trailer, there was a shaking movement that he assumed was from the cab of the truck. Another CCNAS warehouse employee testified that when he drove into the trailer on the forklift, the trailer moved a little bit.

Michael Boyd of the Corpus Christi Fire Department, who responded to the CCNAS in the ambulance, testified that JG was not breathing when they got to the scene. William Guy Smith, operations manager for the Navy Exchange at the CCNAS, testified that he took Bourgeois to the hospital. While he was there, the doctors told the family that when JG arrived at the hospital, she did not have a heartbeat and that it took them 10-12 minutes to get her heart beating.

According to Bourgeois's own testimony on cross-examination, JG was alive when he drove onto the CCNAS. He testified that when his truck broke

No. 11-70024

down on the CCNAS, he, JG, and AB1994 were singing ABCs.[19]  He said that when he got the truck started, JG was sitting on her potty in the sleeper, getting her hair combed by Robin.

Dr. Rouse, who performed the autopsy on JG on June 29, 2002, testified for the prosecution that JG's death was caused by closed head injuries resulting from tremendous forces applied to her brain.  JG had ten bruises on her head, each of which indicated where something hit her or she hit something.  All were recent injuries, within a few days, with red, fresh blood.  Dr. Rouse observed the following factors:  (1) a subdural hematoma ("where blood has leaked, and that indicates where tremendous forces have been applied to the brain, resulting in her death"); (2) a subarachnoid hemorrhage ("which is blood over the actual surface of the brain"); (3) swelling of the brain; (4) hemorrhage along the optic nerve; and (5) hemorrhage on the back of the retina on both eyes.  Dr. Rouse testified that a scenario in which JG was grabbed by the shoulders, by an adult, and then repeatedly slammed into a truck window "could certainly explain the injuries that were seen on the child."

Slides of JG's brain tissue were sent to Dr. Kathleen S. Kagan-Hallet, an associate professor of pathology with the University of Texas Health Science Center in San Antonio, for microscopic examination.  Dr. Kagan-Hallet's report was incorporated into Dr. Rouse's autopsy report.  In the portion of her report entitled "microscopic findings and comments," Dr. Kagan-Hallet noted older injuries and some "in a stage of early organization."  In the section entitled "neuropathologic diagnosis," she noted a "history of head trauma" and described a "right subdural hematoma, mostly recent, minimal organization

---

[19] FBI Agent Harris testified that when he interviewed Bourgeois on June 27, while JG was in the hospital, Bourgeois told him that JG had been sitting in his lap singing her ABCs while he was sending a message to dispatch that his truck was broken down on the CCNAS.

No. 11-70024

(approximately 10 days' duration)." She also noted "Cerebral white matter. Organized contusion infarcts (7+ days' duration), myelin tearing and axonal bodies."

Dr. Akhtar, the pediatric intensive-care physician who saw JG in the emergency room on June 27, testified that JG was limp and not breathing on her own. He observed blood behind her eyes and called in a retina specialist. He stated that blood in the retina is a sign of severe trauma to the head. According to Dr. Akhtar, the kind of damage he saw – blood behind the eyes, blood in the brain, and edema to the brain – could not have been caused by a fall from a height of five to seven feet. Dr. Kuffel, an ophthalmologist and retina specialist, testified that he observed multiple, massive hemorrhages all over the backs of both of JG's eyes, consistent with life-threatening trauma. When asked if the injuries he observed were consistent with someone holding the child by the shoulders and slamming her head into a window four or five times, he answered, "Yes. Definitely."

> In closing argument, the prosecutor only briefly mentioned jurisdiction:

> The last element that we have to prove is that it happened on a Special Territorial or Maritime Jurisdiction of the United States and that was because it was on the Navy base. That's why we had the FBI investigating and the Naval Criminal Investigative Service, and the Medical Examiner came from the Army.

Defense counsel did not refer to jurisdiction in their closing arguments.

2.

Although the district court concluded that an evidentiary hearing was not necessary for this claim, it nevertheless permitted Bourgeois to present considerable evidence in support of it, including the report and deposition testimony of Dr. Jan Leestma, a forensic neuropathology consultant. Dr. Leestma's report did not answer the "critical question . . . of when the fatal head injuries to the child were caused" and did not specify a cause of death. Although

17

No. 11-70024

he acknowledged that JG's condition deteriorated after the reported incident in Bourgeois's truck, he suggested that some of JG's brain injuries – specifically "a coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions" – may have "resulted in the child's death at any time with or without any new episode of trauma."

In his deposition, Dr. Leestma testified that JG's death was caused by increased intracranial pressure caused by venous thrombosis – clotting of the cerebral veins and the superior sagittal sinus. He stated that the thrombosis antedated JG's collapse and decompensation at the CCNAS by several days and that it led to infarctions in the brain and cerebral edema and bleeding. He acknowledged that the blood clot in the sagittal sinus contained some recent red blood cells that could be two to three days from the time of death but stated that the blood clot itself was probably several days older than that. It was his opinion that the retinal bleeding was caused by increased intracranial pressure and not by physical forces or impact and that the subdural hematoma observed by Dr. Rouse was not consistent with an injury that was inflicted while JG was on the CCNAS. However, he acknowledged that there are two components to the subdural hematoma: (1) the chronic component, which was 10 days to 2 weeks before JG's death; and (2) an acute component, the fresh blood, which cannot reliably be aged and dated more precisely than within about two to three days from the time of death. He opined that it cannot be known if the acute component contributed to or caused JG's death and that a child who had suffered an injury that led to this type of subdural hematoma could have acted normally for several days before dying. He also testified that a pre-existing subdural hematoma can bleed without additional injury. Dr. Leestma admitted that the intracranial pressure could have resulted from a head injury that occurred on the CCNAS but stated that what percentage that might be, or even if it occurred, cannot be assessed. He concluded that there was insufficient scientific evidence

18

No. 11-70024

presented at trial to conclude that JG died as a result of an injury that was inflicted on the CCNAS. Dr. Leestma's opinion about when and where the fatal injuries occurred was based *solely* on the medical evidence; he did not consider any eyewitness testimony or any other circumstantial evidence that would have put JG's injuries in context.[20]

The government presented the testimony of Dr. Rouse in rebuttal, by telephone. She testified that trauma explained all of the autopsy findings. She agreed with Dr. Leestma that there was a thrombus in the sagittal sinus but said that it could not have caused the tearing of the myelin and the axonal bodies, which are all traumatic. She explained that one of the difficulties of dating injuries is that the time varies widely, depending on the physiological condition of the person. JG was on life support and her body's healing was not normal. According to Dr. Rouse, JG's scalp injuries and bruising were recent – within days, and there was fresh blood in the scalp bruises, which indicated an impact site. Dr. Rouse acknowledged that, as Dr. Kagan-Hallet found, part of the subdural hematoma was approximately 10 days old. However, she pointed out that Dr. Kagan-Hallet also saw evidence of an acute component – recent bleeding in that hematoma.[21]

Dr. Rouse agreed with Dr. Leestma that the medical evidence, alone, cannot be used to determine the exact date of JG's fatal brain injury. However, Dr. Rouse testified that it is necessary to consider the medical evidence along with the witness reports that correspond with the injuries seen in the autopsy

---

[20] In the appendix to his § 2255 motion, Bourgeois submitted an affidavit of forensic pathologist, Dr. Werner Spitz, who disagreed with AB1994's testimony that JG's head was struck multiple times on the interior of the vehicle and concluded that the autopsy findings "place in question causation of the injuries and their timing." The district court found that Dr. Spitz's affidavit was not credible because he dismissed AB1994's testimony without having viewed her in court.

[21] Dr. Kagan-Hallet died after the trial and prior to the § 2255 proceedings.

19

to determine what caused JG's death. Dr. Rouse concluded that JG suffered injuries that fit within the timing that she was on the CCNAS and that the description by witnesses of what occurred on the CCNAS "certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course."

At the evidentiary hearing, during Gilmore's testimony, the district court asked him if there was any indication that the fatal injury did not occur on the CCNAS and whether Bourgeois had testified that it occurred there. Gilmore stated that he did not recall there being any discussion about that or any controversy.

3.

The district court, comparing the testimony of Dr. Leestma and Dr. Rouse, found that the most important disagreement of the experts was whether the medical findings must be considered in the light of other evidence. Dr. Leestma did not take into account any testimony about the circumstances of JG's death, such as AB1994's testimony. Dr. Rouse, however, testified that professionals use the circumstances surrounding the death to inform their medical findings. Dr. Leestma's refusal to consider anything but the medical evidence made his conclusions less credible to the district court. The district court found that the trial testimony was consistent with Dr. Rouse's explanation at the evidentiary hearing that a complex series of injuries caused JG's death. The district court also found that Dr. Rouse's testimony harmonized with testimony from other medical experts who examined JG before she died and found that she bore signs of recent trauma when she arrived at the hospital.

The district court also relied on AB1994's testimony, observing that AB1994 was a highly-credible witness who convincingly described, to the best of her ability and beyond expectations for her young age, what her father had done to her little sister. The court also noted that AB1994's testimony was consistent

No. 11-70024

with the accounts of the CCNAS employees who spoke with Bourgeois when he stopped to ask for directions and for help in re-starting his truck and whose descriptions of their encounters with Bourgeois suggested that JG had not yet suffered a life-threatening injury. The court stated that Bourgeois's and AB1994's actions in the hour leading up to the murder, as described by those who came into contact with them, did not even suggest the urgency that they showed once it became clear that JG was dying. The district court also pointed out that Bourgeois's own testimony, as well as his statements to the FBI at the time, placed the fatal injury on federal property.

The district court concluded that Bourgeois had failed to show that trial counsel had any basis to raise a reasonable doubt about the location of the killing. The court observed that trial counsel were aware, before trial, that the forensic evidence could be interpreted in such a manner that the fatal injury could have occurred more than two days before JG's death but that, if they had tried to argue insufficiency of the evidence of jurisdiction, they might have lessened their credibility with jurors.

4.

No reasonable jurist could debate the district court's decision to limit the evidentiary hearing on the issue of whether counsel rendered ineffective assistance by failing to present medical evidence to challenge the basis for federal jurisdiction. Although the district court did not allow a full evidentiary hearing on this claim, the court nonetheless permitted Bourgeois to present considerable evidence, including expert testimony, to support his claim. Bourgeois claims that if he had been given a hearing, he would have presented evidence about Tinker's alleged misunderstanding of the law and would have questioned the prosecutor about his notes from the interview with Dr. Rouse. He has not identified any other evidence, beyond that which he was allowed to

No. 11-70024

present in the § 2255 proceedings, that he would have presented at a full evidentiary hearing.

The record supports the district court's observation that trial defense counsel were aware, before trial, that the forensic evidence, considered in isolation, could be interpreted in such a manner that the fatal injury could have occurred more than two days before JG's death. At a hearing on March 1, 2004, the prosecutor stated that a doctor was going to testify that JG was brain dead when picked up by the ambulance at the CCNAS. Tinker responded, "A doctor will also testify that it could have occurred more than two days before." Tinker's statement indicates that he understood the law and is evidence that he made a strategic decision not to challenge jurisdiction. The prosecutor's notes that Bourgeois relies on state: "*If incident occurred off mil base - NO jurisdiction!*" Those notes prove nothing more than that the prosecutor was aware of what needed to be shown to establish jurisdiction.

The record also supports the district court's conclusion that Bourgeois's reliance on Dr. Kagan-Hallet's description of the subdural hematoma as being of "approximately 10 days' duration" is misplaced. Dr. Kagan-Hallet and Bourgeois's own expert, Dr. Leestma, as well as the medical examiner, Dr. Rouse, all found that the subdural hematoma had two components: (1) a chronic component, that was approximately ten days old; and (2) an acute component, fresh blood, that was one to three days old. Dr. Rouse testified that the fresh blood, as well as the other recent injuries JG suffered, were all consistent with eyewitnesses' descriptions of the events on the CCNAS. Bourgeois's argument improperly discounts AB1994's testimony, which the district court found credible. Thus, although the medical evidence did not establish conclusively that Bourgeois fatally injured JG on the grounds of the CCNAS, there was, as the district court noted, considerable circumstantial evidence that Bourgeois administered the fatal blows to JG while they were on the CCNAS.

No. 11-70024

Bourgeois criticizes the district court for relying on his trial testimony that JG was singing her ABCs on the grounds of the CCNAS when his truck broke down. However, that is what Bourgeois told the investigators while JG was still in the hospital and he repeated it when he testified at trial. Trial counsel obviously were aware of Bourgeois's statements to the investigators and his testimony, as well as the other eyewitness testimony and substantial circumstantial evidence that JG was fatally injured on the CCNAS, and reasonably could have decided not to challenge jurisdiction.

Because Bourgeois has failed to demonstrate the existence of a contested fact issue with regard to whether trial counsel's decision not to challenge the evidence that the fatal injury occurred on federal land was unreasonable or that Bourgeois was prejudiced by their decision, no reasonable jurist could debate the district court's decision not to expand further the evidentiary hearing to address this issue. *See Hall*, 455 F.3d at 519. Accordingly, Bourgeois is not entitled to a COA for this claim.

## B. Ineffective Assistance of Counsel Claims

We now turn to consider Bourgeois's ineffective assistance of counsel claims. These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed, Bourgeois had to

> show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

No. 11-70024

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (citations omitted) (internal quotation marks omitted).

With respect to the duty to investigate,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91; *see also Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). The Supreme Court recently stated that these three post-*Strickland* cases, each of which

24

No. 11-70024

granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789-90 (2011). Bourgeois's trial counsel were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

> To demonstrate prejudice, Bourgeois
>
> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

"When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* When considering the prejudice prong, the district court's task was "to evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. at 397-98.

### 1.  Failure To Present Expert Testimony To Challenge Sexual-Assault Evidence

25

No. 11-70024

Bourgeois requests a COA for his claim that trial counsel ineffectively failed to present expert testimony to counter the government's evidence (1) that JG suffered trauma, consistent with sexual assault, and (2) that swabs from her rectum were positive for p30, a protein indicating the presence of semen.

a.

In its opening statement at the guilt-innocence phase of trial, the prosecution stated that expert testimony would establish that "there was seminal fluid in the rectum of that baby." At trial, the government presented evidence that JG slept with Bourgeois and AB1994 in the master bedroom, with the door locked, while Robin and AB2001 slept in another room. In addition, the government presented evidence that Bourgeois tried to obtain custody of JG by claiming that her mother had mistreated her. Shortly after JG came to live with the Bourgeois family, Bourgeois and Robin noticed that JG was bleeding from her vagina. Bourgeois told Robin that someone had told him that one of JG's mother's boyfriends had attempted to sexually molest JG. They took JG to Child Protective Services (CPS) in Louisiana, where they reported that JG might have been molested before they took custody of her and that JG was not being taken care of at her mother's home in Texas.[22] CPS sent them to New Orleans, where Dr. Scott Anthony Benton examined JG and found no evidence of abuse and no explanation for the reported bleeding.

On May 24, 2002, Bourgeois complained to the Texas Department of Family Protective Services that JG's mother and her home were unfit and expressed concern that JG's mother was associated with a rapist. An

---

[22] Dana Banks testified that Bourgeois and his family visited her and her husband in June 2002. While they were there, Bourgeois told her that he had JG because the mother and the mother's boyfriend were abusing her. He told her that JG was molested with a finger and it caused bleeding. Nathaniel Banks, Dana's husband, testified that Bourgeois told him that he had JG because the mother was neglecting her and she had been abused but did not say that she had been sexually abused. Bourgeois testified, on cross-examination, that he thought JG had been molested before he took custody of her.

26

No. 11-70024

investigation was conducted and no evidence was found to support Bourgeois's allegations, which were found to be frivolous and made in bad faith.

The day after her death, JG was examined at the hospital by Carol Ann McLaughlin, a Sexual Assault Nurse Examiner. McLaughlin testified that she did not observe any trauma to JG's genitalia but that it was very common to find no trauma, even when there had been sexual abuse. On cross-examination, the defense elicited more detailed testimony that McLaughlin found no trauma in the genital examination. On redirect, McLaughlin testified that no trauma did not mean that there had been no penetration.

During the autopsy, Dr. Rouse, the medical examiner, conducted a sexual-assault examination and did not observe any external trauma to JG's genital area.[23] Dr. Rouse also took photographs of JG's genital area and swabs from JG's mouth, vagina, and rectum. Slides were made from the swabs, and the slides and swabs were given to the FBI for testing.

The tests conducted by the FBI revealed the presence p30 on three of the swabs taken from JG's rectum during the autopsy, but no male DNA was detected in tests conducted on the swabs. In October 2003, the district court granted defense counsel's motion to appoint a DNA expert, Dr. Elizabeth Johnson. Biological samples were sent to Dr. Johnson for testing in January 2004.

On February 19, Technical Associates, the lab Dr. Johnson used to conduct the tests, reported to her that no acid phosphatase (AP) and no spermatozoa were detected but that weak p30 activity was detected. On February 25, the prosecutor told the district court that the government had not yet gotten Dr. Johnson's report. The court reiterated its previous order that all expert reports,

---

[23] The autopsy report stated: "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic."

27

No. 11-70024

including Dr. Johnson's, must be turned over to opposing counsel by the following day or counsel would be precluded from presenting the testimony of those experts at trial. Tinker stated that he had called Dr. Johnson the previous week and asked for a report. Although defense counsel received the report of Dr. Johnson's laboratory findings on February 26, they did not provide it to the prosecution.

On March 1, 2004, Dr. Johnson, who was in Colorado at the time, faxed Tinker a two-page handwritten summary of her findings and conclusions, which stated:

(1) The FBI did not test the rectal swabs with AP reagent or do a sperm search. They did only a p30 test and a DNA test. The p30 test was positive but there is no indication of male DNA found.

(2) The AP test performed by Technical Associates was negative. A weak positive result was obtained in the p30 test performed by Technical Associates. A microscopic sperm search yielded a negative result.

(3) The FBI's positive p30 result could be a false positive due to bacterial proteins found on the rectal swab. If the p30 positive result was due to the presence of semen, sperm should also be detectable.

(4) The tested sample would be expected to contain 500 sperm, enough to observe microscopically, even if a small portion is used to make a slide, and enough to produce a male DNA result on DNA testing.

Dr. Johnson also sent Tinker an excerpt of an article describing levels of p30 that have been detected in bodily fluids other than semen, including amniotic fluid, breast milk, saliva, female urine, and female serum (blood).

The government used the autopsy photographs and the p30 test results to argue that Bourgeois sexually assaulted JG and called three witnesses: Dr. Scott Anthony Benton, Caroline Zervos, and Anthony Onorato.

28

No. 11-70024

Dr. Benton, the Medical Director of the Children-at-Risk Evaluation Center and Clinical Associate Professor with LSU and Tulane Schools of Medicine, had examined JG on May 21, 2002, after Bourgeois reported to Louisiana CPS that blood had been found in JG's diaper. He testified that he found nothing in that examination that would account for the blood. Although the area surrounding JG's urethra was very red and inflamed when he examined her in May, tests revealed no evidence of blood in the urinary-tract system. However, he stated that a normal physical exam does not preclude there having been a sexual assault a day or two before the exam. Dr. Benton testified that the autopsy photographs of JG taken on June 29, 2002 show blood in the periurethral area of the skin – a bruise, most likely from trauma. In his examination of JG when she was alive, she had inflammation, not a bruise.

Dr. Benton testified further: Sexual assault in children can be difficult to detect because they heal quickly and often there is no physical evidence when they are examined. However, even in the absence of signs of trauma or a report of assault, male sexual assault can be proven through forensic testing: (1) a test for AP, which is a substance predominantly produced in the male prostate and deposited in ejaculation or pre-ejaculation; (2) a test for the presence of the prostatic specific antigen, called p30 or PSA; (3) the "more confirmatory" observation of sperm cells; and (4) Y chromosome DNA analysis. The p30 assay is a "confirmatory" test for the presence of semen because p30 is found only in the male prostate gland and in human breast milk. It is not unusual to identify semen where no sperm are detected, in part because of the low survivability and rapid degradation of sperm. Sperm also would not be found in other circumstances, such as if the man has had a vasectomy, if he only deposits pre-ejaculate fluid, or has been ill. Because sperm rapidly lose their tails and die in a vaginal and rectal environment, "they're very difficult to find, on a rape kit or trace forensic evidence" and "you could still detect semen, but not find sperm."

29

No. 11-70024

On cross-examination, defense counsel did not challenge Dr. Benton's observation of trauma. Instead, the cross-examination focused on the reliability of p30 testing. Dr. Benton testified that although "very low levels of false positives" had been reported with the p30 test, "there is no such thing as 100% accuracy."

FBI forensic-serology examiner Caroline Zervos testified that the FBI Laboratory usually does two-step testing on blood and semen:  first a presumptive test and then a confirmatory test. In this case, they conducted only the confirmatory p30 test for the presence of semen on the swabs taken from JG's rectum. The p30 test was positive for the presence of semen on three of the swabs. On cross-examination, trial counsel asked Zervos whether anything other than prostate proteins could result in a positive p30 test. She responded that other substances could test positive on a p30 test besides PSA, and that the p30 protein has been found in male peripheral blood[24] and male urine, at very low concentrations. She was not aware of p30 being found in female fluids and did not know if anything could be ingested that would have the same kind of reaction in the anal tract. Later, Tinker told the district court that he got more than he wanted from Zervos because she did not know whether substances in food might cause a false positive.

FBI forensic DNA examiner Anthony Onorato testified as follows. In the autosomal STR testing he performed, the only DNA found on the swabs taken from JG's rectum belonged to JG; male DNA was not detected. It is not unusual to detect semen, but not male DNA, on a swab. He recommended Y-chromosome DNA testing, a more sensitive test for the presence of male DNA. Orchid-Cellmark Laboratories conducted Y-chromosome testing on behalf of the FBI,

---

[24] Zervos explained that peripheral blood is blood circulating in the extremities.

No. 11-70024

and no male DNA was detected.[25]  On cross-examination, Onorato testified that Zervos's report revealed that a sperm search conducted by the FBI laboratory was negative for the presence of sperm.  When trial counsel attempted to elicit testimony about other possible sources of the p30 protein, Onorato testified that there are no foods that contain p30, but there are other substances, body fluids, that may contain p30 at very low levels.  The protein is astronomically high in semen, compared to its content in something like male blood, and generally it is only found in male blood when the man has a prostatic malignancy.

In closing argument at the guilt-innocence phase, the prosecutor argued:

> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them.  There was semen in that baby's bottom.  But the swabs were taken at the autopsy and the autopsy was done on June 29th.  The baby was thrown on the side of the truck on June 27th and died on the 28th, two days.  Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly.  But when you get a confirmatory test for semen, you've got semen.  It's an ejaculate from a man, not from a woman, from a man from sexual arousal.  And that's what we know.

> The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show.  You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes?  I said [was] that Vaseline?  No, we don't have Vaseline in the truck.

> What is so bad about having Vaseline?  I thought that was interesting.  It's a lubricant.  Why would you have to deny that?

---

[25] Bourgeois asserts that trial counsel's objection when the government sought to elicit testimony from Onorato that Y-chromosomal DNA testing had been performed by Orchid Cellmark on behalf of the government and that those results were negative for male DNA demonstrates either that trial counsel had never seen the Orchid Cellmark results, even though they were provided in pretrial discovery, or that he failed to understand their beneficial significance.

No. 11-70024

The defense closing argument highlighted the weaknesses in the evidence of sexual assault. Tinker pointed out that the prosecutor did not "talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital." Tinker reminded the jury that the DNA test was negative and that the government's testing should have "no reliability as far as your decision making in this case" because the government's evidence of sexual assault rested on "nothing but insinuations since that test for the semen, the advanced test, I don't know what it's called, was negative. There's no evidence of semen being found on this child." The district court sustained an objection to the argument that there was no evidence of semen.

The prosecution did not present any additional evidence of sexual assault in the punishment phase. In its initial closing argument at the punishment phase, in discussing the statutory aggravating factor (whether the defendant committed the offense in an especially heinous, cruel, or depraved manner and whether it involved torture and physical abuse), the prosecution did not mention sexual assault or the evidence of semen. During its final closing argument at the punishment phase, the prosecution mentioned the evidence of semen twice. First, in discussing videotapes depicting Bourgeois laughing while tormenting children, the prosecutor asked: "Was he laughing when he beat JG1999 to death? Was he laughing when he bit her, or he burns her, or he put his filthy semen in her little body?" Second, in arguing that Bourgeois had not shown remorse, the prosecutor stated:

> The defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. His signature with his teeth marks and his semen is all in that baby.

b.

32

No. 11-70024

Bourgeois argues that trial counsel should have (1) challenged Dr. Benton's alleged observations of genital trauma in the autopsy photographs; (2) elicited testimony from Dr. Rouse, who performed the autopsy and took the photographs relied on by Dr. Benton, that she found no evidence of vaginal or anal trauma; and (3) presented the Sexual Abuse Nurse Examiner reports that support Dr. Rouse's conclusion that there was no evidence of vaginal or anal trauma.  He contends further that trial counsel should have challenged the government's forensic evidence that semen was detected on the swabs by calling Dr. Johnson to testify that (1) because all of the other tests for semen yielded negative results, a positive p30 test, alone, is inadequate to establish the presence of semen; (2) p30 is found in many bodily fluids other than semen; (3) the "very weak" and "weak" p30 results could have been the result of rectal bacterial contamination on the swabs or even JG's own biology, not semen; (4) if semen had been present, sperm would have been detected, and it was not; and (5) contrary to Dr. Benton's testimony, sperm cells do not easily die and rapidly degrade.  Bourgeois contends that trial counsel also should have presented (1) evidence that the FBI's protocols, as well as protocols from other law-enforcement crime labs and the manufacturer of the p30 test used by the FBI, require that "borderline" p30 results, such as the "weak" and "very weak" positive results obtained in the FBI tests, be confirmed through the identification of sperm; and (2) expert testimony that even after three more specific and sensitive sperm searches were conducted, no sperm were detected on any of the swabs that allegedly contained semen.

Bourgeois argues that the district court's post hoc creation of a strategic basis for counsel's failure to present expert testimony is inconsistent with Tinker's explanation that he did not call Dr. Johnson as a witness because he had trouble getting her to return telephone calls, she did not have her own lab, and she did not do the testing he requested in a timely fashion.  Bourgeois

No. 11-70024

contends further that Tinker's explanation is inconsistent with his statement to the district court on January 16, 2004, that Dr. Johnson had been prompt in her work and good at communicating with him. Bourgeois argues that the fact that Dr. Johnson's report was submitted to counsel after the court-imposed deadline for disclosing expert reports serves only to highlight Tinker's deficient performance because it was Tinker's responsibility to make sure that all expert reports were submitted in a timely manner. He maintains that, in any event, Tinker should have requested leave of court to present Dr. Johnson's testimony.

Bourgeois maintains that if trial counsel had presented evidence that there was no semen in JG's rectum and no physical evidence of sexual assault, there is a reasonable probability that at least one juror would have refused to return a guilty verdict or would have chosen to spare his life. He asserts that, in addition to the obvious inflammatory nature of the evidence of sexual abuse, that evidence effectively negated the guilt phase defense – that Robin had abused and murdered JG. He contends that this evidence also prejudiced him at the punishment phase because it was used to support the statutory aggravating circumstance that the murder was committed in a heinous, atrocious, or depraved manner. He asserts that because no evidence is more inflammatory and prejudicial than the alleged sexual assault and anal rape of a two-year-old girl by her own father, any reasonable juror would have weighed this evidence in its deliberations and likely found it impossible to grant mercy. Finally, Bourgeois argues that the district court applied the wrong standard in assessing prejudice: He did not need to show that counsel could have "eviscerated" or completely "eliminated" the government's evidence of sexual assault.

No. 11-70024

c.

In the § 2255 proceeding, Bourgeois presented the declaration and testimony of Dr. Johnson. In her declaration, Dr. Johnson stated that if she had been called as a witness at trial, she would have testified that:

(1) There was insufficient scientific evidence to conclude that the substance on the swabs was semen, and four scientific tests (AP, p30, sperm search, STR DNA testing and Y-chromosome DNA testing) were negative for the presence of male fluids or male cells.

(2) The weak positive p30 result should not be considered conclusive in the light of numerous contradictory tests.

(3) The government's evidence regarding the alleged semen was erroneous and scientifically unsubstantiated.

(4) Dr. Benton's testimony about sperm was erroneous.

(5) Spermatozoa are very durable and do not easily degrade; they can be easily detected microscopically; their abundance in seminal fluid facilitates microscopic detection even after the tail is lost; and they can be found for up to six days in the vaginal tract of a living female.

At the evidentiary hearing, Dr. Johnson testified that if she had been called as a trial witness, she would have testified consistently with the summary report that she faxed to trial counsel on March 1, 2004. Further, she would have testified that, despite the weak positive p30 result, "taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." She explained that although p30 is referred to as prostate specific antigen (PSA), it is a protein that is found in abundance in human seminal fluid and in lesser concentrations in other fluids – amniotic fluid, breast milk, male urine, male and female serum, and some female urine.

35

No. 11-70024

Dr. Johnson testified that the testing she had done was completed at the end of January 2004. She claimed that she was not aware of the February 26 deadline for expert reports and said that if Tinker had made her aware of it, she would have sent her report on time. She was critical of Tinker, stating that he was not well-versed in semen and DNA detection and that although she tried to bring him up to speed, she got the impression that he still did not grasp the concepts that well.

Dr. Johnson characterized Dr. Benton's trial testimony that sperm might not have been found because it could have degraded as "totally erroneous" because sperm are incredibly tough and very durable, have been located decades after an offense, and can be found in decomposing bodies 30 days after death.

On cross-examination, Dr. Johnson acknowledged that a stronger color on a p30 test indicates a larger quantity of p30 than a weaker color but that a weaker color still discloses the presence of p30. She also conceded that if the test card used by the FBI was sensitive down to one half of a nanogram, that would throw her numbers off, by eight-fold, with respect to the amount of sperm that would be expected to be detected. However, she said that sperm still should be able to be detected.

Dr. Johnson testified that she did not know what was present in the serum and urine of a two-year-old because none of the studies involve children. She conceded, however, that if the blood found on JG's underwear was tested and was negative for p30, that is an indication that her blood did not contain p30 and could be eliminated as the source of the positive p30 result. She testified that breast milk could be digested and trigger a positive p30 result, prompting the district court to point out that there was no evidence that JG had ingested any breast milk. On redirect examination, Dr. Johnson stated that she was not aware that JG had ingested male urine prior to her death and that might have impacted the test.

36

No. 11-70024

Bourgeois also presented in the § 2255 proceeding a report and testimony from forensic criminalist Charles Alan Keel, who stated that: (1) the government's proof of the presence of semen was inadequate and flawed and should never have been offered as evidence by scientists; (2) Dr. Benton's testimony was false or, at best, erroneous, and many of his statements are "patently absurd" and "ludicrous"; (3) sperm is the only definitive proof of the presence of semen from a forensic specimen in the criminal-justice context; (4) there is no proof of semen being detected in the evidence that was presented at trial; (5) if the positive p30 test result was caused by semen, male DNA should have been detected; (6) if the positive p30 test result was caused by semen, sperm should have been detected because a positive p30 test result cannot reliably predict the presence of semen without the presence of sperm; (7) sperm cells die but can still be detected; (8) the fact that there was no semen found in JG's underpants is another red flag against a conclusion that semen was present; and (9) there is no semen on the swabs. When the district court asked Keel whether a toddler would produce p30, he replied that he did not know.

The government presented Tinker's answers to interrogatories, explaining why he did not call Dr. Johnson as a witness at trial:

> I had met Dr. Johnson at a seminar and was very impressed with her presentation. I spoke with her afterward about helping us with Mr. Bourgeois' case. I had a great deal of problems getting her to return my phone calls. I learned, during my dealings with her that she did not have her own lab. She did not do the testing I requested in a timely fashion and, therefore, we did not utilize her services.

The government also presented Gilmore's affidavit, in which he stated that Tinker dealt with Dr. Johnson exclusively and that Tinker told him about problems getting Dr. Johnson to communicate and to make herself available to perform the testing he had asked her to do. Gilmore testified at the § 2255 evidentiary hearing that Tinker was very upset with Dr. Johnson toward the

No. 11-70024

trial date because she would not talk to him.  Tinker was also upset that she faxed him a handwritten note, not a formal, written report as he had requested.

Finally, the government presented a letter report and the testimony of FBI forensic examiner Jerrilyn Conway, in which she stated:

(1) Zervos's and Onorato's decisions to not conduct the AP test is consistent with the policies and practices of the FBI lab.  The FBI lab does not conduct AP testing in suspected semen samples from body orifices because of the possibility of contamination from vaginal secretions that also contain AP and because AP usually is not detectable after fourteen hours.

(2) The FBI uses the p30 test to determine whether semen is present.

(3) Although PSA has been found in bodily fluids other than semen (female urine, female serum, amniotic fluid, breast milk, and the serum of boys and girls), the FBI lab's PSA test includes dilution steps to ensure that only semen can produce a positive result, making the test confirmatory for the presence of semen.  Technical Associates, the lab used by Dr. Johnson to perform her tests, stated in the report submitted to Dr. Johnson that the p30 test is a confirmatory test for semen.

(4) The complete article containing the page Dr. Johnson faxed to Tinker regarding other substances that would trigger a positive PSA result describes experiments that the authors conducted to determine whether female urine and female blood would give a positive result on the PSA test.  The authors eliminated those substances as potential positive triggers and verified the reliability of the PSA test with respect to both female urine and female serum. Further, the concentration levels described on the page sent to Tinker by Dr. Johnson refer to undiluted substances containing PSA, which is not the dilution level that would be tested in a PSA test.  Applying the dilution levels that the test requires and that the FBI used in this case, none of the substances listed would have produced a positive PSA result.  The only one that would be close

38

No. 11-70024

would potentially be breast milk, but it would not be expected to give a positive result. Ingestion of male urine would not be expected to produce a positive PSA result on a rectal swab because the digestive system would have broken down the protein to the point that it would not be detected.

(5) A study published in a British journal in 2004 determined that the level of PSA in girls' serum is .004 nanograms per mil, which could not trigger a positive PSA result, even if undiluted. Further, the PSA test of blood on JG's underwear was negative, so her blood could be eliminated as the source of the positive PSA result from the rectal swab.

(6) The weak positive p30 result in this case means that there is a limited amount of PSA present, which means there is a limited amount of semen present. The term "weak" does not call into question the results; it only refers to the amount of semen that is detected. The p30 test is a qualitative test. If it is positive, then PSA is present, and it is present at a level that semen can be concluded to be on the swab.

(7) Because of the confirmatory nature of the PSA test, the decisions to not conduct a microscopic search for sperm by Zervos and Onorato is consistent with the policies and practices of the FBI Lab.

(8) The FBI protocol is to only identify a sperm cell if the head, midpiece, and tail are all intact. The survivability of a sperm cell within a live rectum is limited. Most of the studies show that sperm cells can only be identified after maybe 24 hours, sometimes longer in cervical samples.

(9) Dr. Johnson's calculations regarding the amount of sperm that she would expect to be detected do not take into account the natural variability of both PSA and sperm within a semen sample. Further, Dr. Johnson's calculations were based on a sensitivity of 4 nanograms per mil, which is what the PSA test manufacturer guarantees. The FBI's validation, however, found that the cards used in this test were sensitive down to about .5 nanograms per

No. 11-70024

mil, which would reduce Dr. Johnson's calculations by a factor of 8. Thus, sperm that could be expected to be detected on that sample range from 1 to 1,000.

(10) Studies have shown that PSA from seminal fluid can be detected in the absence of AP activity, identifiable spermatozoa, or even male DNA.

When asked how she could explain positive p30 results, a negative AP result, and the inability to identify any sperm cells, Conway responded that the sample was a limited one that had potentially been degraded; the AP could have degraded to a point that it was not detectable; and the sperm cells either may not have been deposited in abundance because of the natural variation in the semen or there could have been a limited number, and they also would have been degraded.

On cross-examination, Conway testified that the FBI's position is that despite all the other negative tests, the p30 test alone confirms the presence of semen. She conceded that studies existing at the time of trial in 2004 had identified the presence of low levels of PSA in female fluids and that Zervos's trial testimony that PSA had not been detected in female fluids was incorrect. She also conceded that Onorato did not give a complete list of all the fluids where p30 has been found and that Dr. Benton incorrectly testified that p30 does not exist anywhere else in bodily products except the male prostate and human breast milk. She conceded that evidence of sperm potentially can be found after they lose their tails; it depends on how many there are and whether the biologist can recognize them. She stated that the position of the FBI is that its dilution steps ensure that only semen can produce a positive PSA result, making the test confirmatory for the presence of semen. That dilution process eliminates a possibility of anything else reacting with the card.

d.

The district court began by observing that, to succeed, Bourgeois had to prove that (1) Dr. Benton was incorrect in his physical observations of trauma