No. 11-70024

and (2) the positive p30 test results did not necessarily equate to positive results for semen. The court stated: "Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter."

Noting that Bourgeois did not call any witnesses at the evidentiary hearing to criticize Dr. Benton's observations of trauma and did not question Dr. Rouse about her sexual assault examination, the district court concluded that Bourgeois had not shown that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony, had not shown that Dr. Benton's specialized knowledge about childhood sexual abuse and prior treatment of JG did not provide sufficient support for his expert opinion, and had relied on the unproven speculation that Dr. Rouse would not defer to Dr. Benton's observations.[26] The court pointed out that, unlike Dr. Rouse, Dr. Benton could comment on the condition of JG's genital area over time and could compare the autopsy photographs with those he had taken when he examined JG a little over a month before her death. The court found that, at best, Bourgeois had shown that experts could disagree on how to interpret the evidence collected during the autopsy.

The district court also pointed out that trial counsel challenged the evidence of sexual trauma in cross-examining McLaughlin, the nurse who examined JG the day after her death. Further, in closing arguments, Tinker stressed that "they found no evidence of trauma to the rectum or genitalia when

---

[26] The district court also stated that Bourgeois relied on Dr. Spitz's affidavit in which he stated that Dr. Rouse, who performed the autopsy and took photographs, was in a much better position than Dr. Benton, who only looked at the photographs, to determine whether there was sexual trauma. The court found that Dr. Spitz was not a credible expert and that his affidavit did not "necessarily eviscerate Dr. Benton's interpretation of the evidence." In his reply brief, Bourgeois asserts that he never relied on Dr. Spitz's opinion for lack of trauma; that Dr. Spitz was not presented at the § 2255 hearing; and that his credibility is not at issue.

41

No. 11-70024

they examined this child at the hospital." The district court held that Bourgeois had not adduced any evidence or testimony during the post-conviction proceedings that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Therefore, the court held that he failed to show that counsel performed deficiently in not challenging Dr. Benton's testimony about sexual trauma.

The district court held that although trial counsel did not call Dr. Johnson as a witness, it was evident that he was familiar with her report and had used it to prepare for cross-examination. The court added that trial counsel did not leave the forensic testimony about sexual assault unrebutted: cross-examination of Dr. Benton focused on whether the p30 test was susceptible to false-positive results, Zervos and Onorato were asked whether substances other than semen could cause a positive result on the p30 test, and Zervos acknowledged on cross-examination that she did not know if digested food could contain p30 – a factor that Dr. Johnson's testimony would have refuted if she had been called. The court noted that trial counsel's questioning and argument also highlighted that the government's experts observed no sperm and that the absence of sperm caused the government experts to recommend DNA testing. The court concluded that trial counsel's questioning introduced doubts that could not have been raised by expert testimony, such as that digested food could contribute to the positive p30 results.

The district court acknowledged, however, that expert testimony could have provided some benefit to the defense: Dr. Johnson's testimony would have been valuable in showing that the weak positive results obtained by the government should have compelled it to perform the more-confirmatory sperm search. However, Dr. Johnson's testing did not completely discount the possibility that Bourgeois sexually assaulted JG: Dr. Johnson acknowledged that a weak positive result indicates the amount, not the presence, of PSA,

42

which was consistent with the testimony of government expert Conway that a "weak" p30 result does not question the identification of the substance as semen, but only the amount of semen that is detected.

The court also noted that the testimony of Bourgeois's experts at the § 2255 hearing would only have re-confirmed that a substance containing PSA, foreign to JG's body, was found in JG's rectum: Dr. Johnson agreed that because the blood on JG's underwear tested negative for p30, JG's blood could be ruled out as the source of the positive p30 result. Bourgeois's other expert, Keel, could not conclusively identify a substance naturally occurring in a two-year-old girl that would contain p30 and stated that he did not know if a toddler could produce p30. There was no evidence to suggest that the p30 came from amniotic fluid, breast milk, or female urine.

The district court relied on the testimony of the government's expert, Conway, that the only substance other than semen that contains PSA at a level near that which could trigger a positive reaction is breast milk. Because there was no evidence that breast milk could have been in JG's rectum, the district court was persuaded by Conway's testimony that "if the PSA test was positive, they can be assured that that came from semen."

The district court concluded that, considered in the context of the trial and post-conviction record, the testimony from Dr. Johnson and Keel did not show that trial counsel were ineffective in relying on cross-examination to challenge the government's forensic evidence. The court stated that, given the complex scientific issues at play, and the fact that Bourgeois's experts questioned, but did not conclusively eliminate, the possibility of sexual assault, he failed to show that using experts to highlight that information would have swayed the jury. The court therefore held that it was a reasonable tactical decision for trial counsel to utilize Dr. Johnson's expertise to assist on cross-examination of the

government's experts, without calling her as a witness to confirm the presence of semen.

Based on its observations of their testimony, the district court also found that Keel and Dr. Johnson would not have been persuasive witnesses because they identified the same errors in testing that trial counsel had identified but got bogged down with fine distinctions that did not completely discount the possibility of sexual assault. The court concluded that a reasonable trial attorney could be concerned that a prolonged attack, without a clear-cut resolution, could make a minor, but highly inflammatory, issue a much more prominent feature in the jury's deliberation.

The court also held that Bourgeois failed to show a reasonable probability of a different result at the punishment phase had trial counsel disputed the sexual-assault evidence in the manner he proposed in the § 2255 proceedings. Even if trial counsel could have shown that there was no semen on the rectal swabs and that Dr. Benton incorrectly identified sexual trauma, and performed deficiently by failing to do so, there was other evidence that hinted that Bourgeois committed improprieties on his daughters (JG and AB1994) when he spent nights locked in a bedroom alone with them. The court also pointed out that an aggressive challenge to the sexual assault evidence could have opened the door to additional prejudicial evidence that trial counsel had successfully prevented the prosecution from presenting, including evidence that witnesses had seen Bourgeois "French kiss" AB1994, that he would have her sit on his lap inappropriately, and that he treated her like a mature adult. The court concluded that the evidence of sexual abuse was an inflammatory, but not decisive or pronounced, factor in both phases of the trial and the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois had sexually assaulted JG. The court held that the sexual abuse evidence did not substantially affect the factors the jury had to consider reaching

44

No. 11-70024

a verdict as to his guilt. With respect to the punishment phase, the court held that although the sexual abuse evidence made Bourgeois seem more selfish, uncaring, and inhuman, even if trial counsel had conclusively rebutted the government's evidence of sexual abuse, the jury nevertheless had heard graphic testimony about how Bourgeois viciously abused JG in numerous other ways. Accordingly, the government's brief mention of sexual assault in the punishment phase closing argument was only another reminder that JG bore the signs of her father's abuse throughout the rest of her body. The court acknowledged that although evidence of sexual abuse could unduly inflame a jury in other circumstances, the evidence of Bourgeois's abusive and violent tendencies prevented any reasonable likelihood that jurors would have reacted differently in the punishment phase had they heard the evidence of sexual abuse.

e.

No reasonable jurist could debate the district court's assessment of this claim. The evidence Bourgeois presented in the § 2255 proceeding was no more effective at removing the possibility that Bourgeois sexually assaulted JG than the evidence his counsel elicited at trial. As the district court noted, the § 2255 evidence established, at best, that experts could disagree about whether there was evidence of trauma to JG's genital area. Although it would have been helpful to the defense if Dr. Rouse had testified that she did not observe any genital trauma at the autopsy, defense counsel challenged the evidence of sexual trauma in cross-examining Nurse McLaughlin, and in closing arguments, trial counsel reminded the jury that no evidence of trauma was found when JG was examined. Such testimony by Dr. Rouse would not, however, have rebutted Nurse McLaughlin's testimony that it is common to find no trauma even when there has been sexual abuse and that the absence of trauma does not mean that there was no penetration or Dr. Benton's testimony about the difficulty of

45

No. 11-70024

detecting sexual assault in children because they heal quickly and often there is no physical evidence when they are examined.

No reasonable jurist could debate the district court's decision that trial counsel did not perform deficiently in relying on cross-examination to challenge the prosecution's forensic evidence. On cross-examination in the § 2255 proceeding, Dr. Johnson acknowledged that a stronger color on a p30 test indicates a larger quantity of p30 than a weaker color but that a weaker color still discloses the presence of p30. Dr. Johnson was not aware of any studies showing that p30 could be found in girls of JG's age, and Keel did not know whether a toddler could produce p30. Critically, the testimony of Bourgeois's experts at the § 2255 hearing failed to establish that any of the bodily fluids identified by Dr. Johnson and Keel, other than semen, contain p30 at levels high enough to trigger a positive p30 test result.

Finally, no reasonable jurist would debate the district court's conclusion that Bourgeois was not prejudiced. The district court applied the correct standard of prejudice, stating in the first sentence of its discussion that "Bourgeois must also show a reasonable probability of a different result had trial counsel vigorously attacked the evidence of sexual assault." Dist. Ct. Op. at 180. In the light of the medical and photographic evidence of JG's torture, abuse, and the fatal blows to her head, corroborated by the testimony of AB1994 and Robin, as well as the evidence of premeditation demonstrated by the unfounded reports to CPS, the post cards sent to JG's biological mother, and Bourgeois's statements to Robin about what he would do when he killed JG, there is not a reasonable probability that the outcome of the guilt-innocence phase of the trial would have been different, even if trial counsel had done everything Bourgeois contends they should have done. And, considering the graphic evidence of Bourgeois's vicious torture of JG during the final weeks of her life, culminating in the brutal bashing of her head in the presence of his seven-year-old daughter, there is no

46

reasonable probability that a juror would not have found that the government had proved the statutory aggravating circumstance that the murder was committed in a heinous, atrocious, or depraved manner, even if trial counsel had rebutted the evidence of sexual assault in the manner Bourgeois contends they should have done. Furthermore, as the district court pointed out, it is likely that if counsel had challenged the sexual-assault evidence in the manner that Bourgeois suggests they should have done, it could have opened the door to additional prejudicial evidence.[27]

## 2. Ineffective Assistance - Mitigating Evidence

Bourgeois's final COA request is for his claim that trial counsel rendered ineffective assistance at the punishment phase by failing to present mitigating evidence of his impoverished background, dysfunctional family, physical abuse, sexual abuse, Borderline Personality Disorder (BPD), brain damage, low intelligence, and the stress that he was under at the time of the murder.

a.

We begin by describing the events leading up to the trial and the evidence presented at the punishment phase of the trial.

Defense counsel retained Dr. Mark Cunningham as an expert witness on mitigation evidence and the risk of violence in prison society. Pursuant to Dr.

----

[27] In his reply brief, Bourgeois asserts that the allegations of his sexual misconduct with AB1994 emanated from Robin, who lied about the circumstances of JG's death and testified to avoid prosecution. He states that none of his children, including his two other daughters, have ever alleged that he engaged in sexually-inappropriate behavior. He thus contends that the presentation of evidence to support counsel's attempted arguments that there was no semen and no sexual assault would not have highlighted the issue any further and would not have opened the door to any excluded evidence. No reasonable jurist could debate the district court's conclusion to the contrary, and the record supports that conclusion. The transcript reflects that at a hearing on the admissibility of evidence that Bourgeois may have engaged in inappropriate conduct of a sexual nature with AB1994, the district court was unchallenged by trial counsel when it commented that "everybody in this room knows what was going on with Mr. Bourgeois and AB1994. . . . One can only imagine, when Robin was locked out of the bedroom, and AB1994 was sleeping in there with him, what was going on."

No. 11-70024

Cunningham's recommendation, defense counsel retained mitigation specialist, Lisa Milstein and her associate, Gerald Bierbaum.

Milstein and Bierbaum interviewed Bourgeois on October 23, 2003. In that interview, Bourgeois denied child abuse. He reported a head injury from a three-wheeler accident in 1984, and said that he was in a coma for three months. The mitigation investigators also learned that when he was six or seven years old, Bourgeois moved in with an elderly neighbor, Mary Clayton, with whom he lived until her death when he was a teenager.

In December 2003, defense counsel filed a motion for a mental-health evaluation of Bourgeois because they had "observed highly-unusual, often bizarre behavior, . . . listened to abnormal conversations, and . . . noticed an unnatural writing style."  The parties agreed to have Dr. Carlos Estrada examine Bourgeois, and the examination was conducted on December 26, 2003.[28]

Dr. Estrada submitted a report of his evaluation on January 20, 2004. Dr. Estrada reported that Bourgeois had denied any history of childhood physical or sexual abuse, neglect, or trauma but that he suffered a broken leg, broken nose, and concussion from a 1984 motorcycle accident and broke a collar bone in a 1989 accident when he fell asleep behind the wheel of a pick-up truck.  Dr. Estrada found that Bourgeois "appears to have an above average intelligence and memory and an average knowledge commensurate with his level of education and experience."[29] He found that Bourgeois's "thought processes show no thought disorder, no delusions, no hallucination, no obsessions, and no

[28] Trial counsel wanted to retain Dr. Estrada as a mental-health expert, but he had already been retained by the government.  Trial counsel had worked with Dr. Estrada previously and considered him to be a trusted, candid witness.

[29] Bourgeois untruthfully told Dr. Estrada that he had attended college for two years and had worked as a police officer.  At a hearing on April 10, 2003, Bourgeois told the district court that he had attended college for two years.  At his arraignment on the second superseding indictment on July 25, 2003, Bourgeois stated that he had attended college for one year.

48

compulsions." He stated that Bourgeois "has a very clear recollection of the events before, during the incident, and afterwards"[30] and was "able to remember and describe the details and postulate alternative theories for his defense; none of which involves disturbed mental status." Dr. Estrada reviewed taped telephone conversations Bourgeois had with family members and others and stated that they "reveal a clearcut understanding of the events that led to the death of the daughter and a clear understanding of the evidence against him that reveals no altered mental status at the time, no presence of delusions, and no presence of irrational thinking or irrational behavior or inability to know right or wrong."

Defense counsel also retained Dr. George W. Holden, a psychologist who specialized in family violence and parent-child relationships. In a letter report dated December 19, 2003, Dr. Holden stated that Bourgeois did not intend to kill JG, but was merely punishing her for making a mess and was trying to teach her a lesson so she would not spill the contents of her potty in the future. He stated that Bourgeois's fatigue and lack of attachment to JG probably contributed to his overreacting and being especially brutal to JG, and that Bourgeois was also stressed by traveling in a confined space with four other people, including three young children. Dr. Holden stated that toilet training incidents are a common cause of physical abuse and that what Bourgeois did to JG is "largely understandable and not uncommon, just a more extreme case with a tragic end." In a supplemental letter report dated February 25, 2004, Dr. Holden stated that

---

[30] Bourgeois told Dr. Estrada that as he started to unload the truck at the CCNAS, he found JG lying on the pavement by the side of the passenger door of his truck unconscious and foaming from the mouth. He proclaimed his innocence and insinuated that Robin was to blame because she could not get over the jealousy of him having JG as a result of an extramarital affair. He offered two theories for how JG was fatally injured: (1) she was playing and may have fallen out of the truck or (2) Robin might have accidentally hurt her when pulling her from the front seat to the back of the cabin, hitting her head and causing the unconsciousness, and then JG fell through the door.

No. 11-70024

when a child dies during the course of discipline, it is much more likely that the parent did not intend to seriously injure, let alone kill, the child. He stated that what probably happened was that, in a fit of rage over the spilled potty, Bourgeois lost control of himself and, in the course of administering physical discipline, fatally injured JG.

The mitigation investigators interviewed dozens of witnesses in the two months prior to jury selection, including Bourgeois's siblings and other family members as well as friends of Bourgeois and several members of Ms. Clayton's family.

On January 30, 2004, about two weeks before trial, the mitigation investigators furnished reports to Dr. Cunningham and trial counsel. Upon receiving the reports, Dr. Cunningham complained to Bierbaum about the quality of the mitigation interviews and reports.

On February 4, 2004, Bierbaum wrote a memo regarding a lengthy interview of Bourgeois that he and Tinker had conducted on January 29. That memo records details about Bourgeois's abuse by his mother, including being tied to a chair by his wrists, naked, and being whipped with an extension cord and being stripped down in the bathtub and whipped again the next day. His mother continued to administer severe beatings when he visited his home after he had moved in with Ms. Clayton. His mom always beat him with his clothes off. She shaved his head bald and she had long fingernails that she used to pick in his nose in an aggressive manner. Bourgeois also reported that he and Robin argued a lot about money, were about to lose their house in the summer of 2002, and he was behind in making payments on the car and all the credit cards.

On February 7, about a week before trial, Dr. Cunningham conducted a five-and-one-half-hour interview of Bourgeois.[31]   He also conducted extended

_____

[31] He also met with trial counsel and, for the first time, complained to them about the quality of the mitigation investigators' work.

telephone interviews of Bourgeois's older siblings. In a letter report dated February 10, Dr. Cunningham stated that he had learned that Bourgeois had suffered a serious head injury in 1984, when a three-wheeler he was driving collided with a telephone pole. Claudia Williams, Bourgeois's older sister, reported to Dr. Cunningham that Bourgeois was unconscious for a number of hours following this accident and did not regain consciousness until after hospitalization and surgery. Williams and her husband also told Dr. Cunningham that Bourgeois experienced recurrent "rage" episodes, accompanied by violent assaults and verbal aggression, observed from his early childhood but which worsened in severity following the head injury. Dr. Cunningham recommended that trial counsel obtain a comprehensive neurological and neuropsychological evaluation of Bourgeois.

In a report dated February 25, 2004, Dr. Cunningham listed "a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood," including Bourgeois's abandonment by his father, emotional rejection and abuse, physical abuse, the death of his older brother, and a significant head injury and subsequent rage attacks. Dr. Cunningham also noted "pro-social patterns and positive relationship behaviors" including that Bourgeois had maintained continuous employment and was regarded as responsible and hardworking; that he was an involved father who provided economic support as well as relationship to his children; and that he displayed an ongoing interest in and was a constructive influence on his nieces and nephews.

Dr. Cunningham also gave trial counsel a risk-assessment letter dated February 25, describing his opinion that Bourgeois would not present a risk of violence while incarcerated. Dr. Cunningham stated that it was his understanding that despite sharing a common day room or group cell, Bourgeois had "not engaged in any assaults on inmates or staff and further that he has

No. 11-70024

received few if any disciplinary write-ups." He stated that rates of disciplinary infractions and violence in prison are negatively correlated with age and that inmates serving terms of life without parole represent better institutional assault risks than inmates serving parole-eligible terms. He observed that most life-sentenced capital inmates had a 20-30% risk for acts of assaultive violence and an 8-10% chance of a more chronic violence problem in prison. He opined that Bourgeois would have the following probabilities of serious institutional violence across a capital life term:  2% of any serious assault, less than 1% aggravated assault on staff, and less than 0.2% homicide of an inmate. Characteristics that increased Bourgeois's likelihood of a positive adjustment to prison, and reduced his likelihood of perpetrating a serious institutional assault, included his being over age 35 at the outset of his prison term, his history of gainful employment, and his continuing relationships with family members.

Dr. Cunningham acknowledged that Bourgeois had made threats of inflicting violence from prison but stated that "the credibility of these reports has not been determined."  Further, he did not think that Bourgeois had the financial resources or ties to organized criminal groups to order any violence from prison. He also expressed confidence that the Department of Justice could use special conditions of confinement to restrict and monitor Bourgeois's communications so that any risk would be negligible.

Dr. Cunningham prepared two PowerPoint presentations – one for mitigation and one for future risk of violence – and gave trial counsel a binder with the proposed slides. He also prepared questions for counsel to ask him on direct examination. He proposed to testify that adverse factors in Bourgeois's background – an overwhelmed family system, abandonment by his father, difficulty in controlling his impulses from an early age, physical abuse, emotional abuse, abandonment and rejection, and neuropsychological problems including organic deficits and low IQ – were ingredients simmering in a pressure

52

No. 11-70024

cooker, the lid of which blew off as a result of the stress of marital and financial problems.

In his presentation about risk of future violence, Dr. Cunningham proposed to provide general information about behavior in secure environments, including the Bureau of Prisons, and mechanisms available in the prison to control disruptive or violent inmates as well as specific factors that would make Bourgeois less likely to be a threat in prison: his age, his behavior in pre-trial custody, his continuing relationship with family and friends, and his history of employment and stability in the community.

Pursuant to Dr. Cunningham's recommendation, trial counsel obtained court funds to employ a neurologist to perform an EEG and a neuropsychologist, Dr. Donald Weiner, referred to counsel by Dr. Estrada, to evaluate Bourgeois. The results of the EEG did not reveal any abnormalities. Dr. Weiner evaluated Bourgeois on February 28. He reported that Bourgeois's IQ was in the borderline range of intellectual functioning and that Bourgeois did not have any specific learning disabilities. Bourgeois told Dr. Weiner that he had been in a three-wheeler accident in 1984, which resulted in him being in a coma for one to two months. Dr. Weiner stated that neuropsychological test results revealed "mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex . . . likely due to the injuries sustained in the three-wheeler accident." Bourgeois told Dr. Weiner that he has become aggravated more easily since the 1984 accident, and Dr. Weiner found that Bourgeois's performance on one of the tests suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions. Dr. Weiner found no evidence of malingering and believed that his test results were a valid indication of Bourgeois's level of neuropsychological functioning.

No. 11-70024

After the guilt-innocence phase, trial counsel furnished Dr. Weiner's report to the prosecution. In a hearing on March 17, the prosecution stated that Dr. Estrada had reviewed the material and had found serious flaws in Dr. Weiner's methodology. Noting that the EEG had not indicated any evidence of impairment, the prosecution stated that it intended to bring in its own neuropsychologist to test Bourgeois. Trial counsel objected to any additional testing. The court ordered a hearing on Dr. Weiner's proposed testimony to find out what testing he had performed.

In a hearing on March 19, defense counsel informed the court that they had decided not to call Dr. Weiner as a witness. The district court told the defense that if they were not going to call Dr. Weiner as a witness, they could not rely on the results from his testing and that Dr. Cunningham and Dr. Estrada would not be allowed to use Dr. Weiner's report during their testimony.

Before the sentencing hearing began, the district court discussed with Dr. Cunningham his intended PowerPoint presentation. The government wanted to exclude the part of Dr. Cunningham's testimony that discussed the Bureau of Prisons's policies and practices, and the related testimony about how offenders in general behave in prison, and focus instead on Bourgeois's own propensity for violence. The district court refused to limit the scope of Dr. Cunningham's testimony but stated that it would allow the government to call an expert witness to rebut Dr. Cunningham's testimony. The government announced that it intended to call John Shaw from the Bureau of Prisons if the defense called Dr. Cunningham.

At the punishment phase, the government presented the following evidence:

● Bourgeois beat Robin repeatedly, including while she was pregnant.

● Felony charges were pending against Bourgeois as a result of an incident that occurred while Robin was in the hospital giving birth to AB2001,

in which he punched his mother-in-law in the mouth and beat her with a lamp, in the presence of AB1994 and other children.

● At his and Robin's wedding, Bourgeois fought with Robin's brother when the brother warned him not to beat Robin.

● Bourgeois terrorized Robin's adopted brother, who was nine or ten years old and could not swim, by holding him by his feet over the side of a high bridge and over a pier at a boat launch.  On another occasion, Bourgeois repeatedly dunked the boy in the water at the beach until he threw up from swallowing water.  On yet another occasion, Bourgeois grabbed the boy by his ankles and swung him around until his head hit Bourgeois's sleeping dog, which woke up and bit the boy.

● Bourgeois pushed, choked, and argued with his first wife, Sheila Bourgeois, during their four-month marriage and while she was pregnant.  She left him after he pushed her over a chair and she "busted up" her nose.  Their daughter, SB1988, did not want to be alone with Bourgeois.

● Ex-wife Cynthia Bourgeois's daughter shook with fear every time Bourgeois was in her presence.  When the child was three years old, Bourgeois took her to a family gathering and when she returned, she had a "big knot" on her head, walked with a limp, and had a bruise on her back in the shape of a footprint.  She said that Bourgeois had pulled her hair out and put her head in the toilet.

● After divorcing Gaynell Belvin James, Bourgeois took their three-year-old son for the day, and the boy returned very shaky, nervous, and withdrawn, with a large bruise on his thigh.  The child was too afraid to go with Bourgeois again for many years.  When the boy was thirteen years old, Bourgeois took him for what was supposed to be a day but kept him for a more than a month.

● While Bourgeois was married to ex-wife, Gaynell Collins Bourgeois, he had a bad temper and shoved and choked her.

55

● While incarcerated before trial, Bourgeois told a deputy United States Marshal, "If I was going to hit somebody, I would hit you." A couple of weeks later, Bourgeois lunged at the officer.

● Bourgeois's cousin, Isaac Bourgeois, III, got into a fight with Bourgeois over insults to Isaac's mother. Bourgeois bit Isaac's little finger to the bone. The next day, Bourgeois and his brother, Lloyd Ferdinand, confronted Isaac and his mother with guns and threatened to kill them. Then they got in Lloyd's truck, circled around Isaac and his mother, and told them they "could die today." Bourgeois was convicted of disturbing the peace as a result of that incident. Lloyd later apologized, but Bourgeois never did.

● On June 28, 2002, Bourgeois asked an FBI agent who was transporting him from the Nueces County Jail "how that girl [JG] made out."

● Four inmates testified about Bourgeois's incriminating statements and threats he made while they were incarcerated together before trial. Bourgeois knew that Adam Longoria was a member of the Texas Syndicate prison gang. Longoria represented that he was a "hit man." Bourgeois communicated to Longoria that he wanted his cousin, his ex-wife, and his wife killed and gave him their telephone numbers and addresses. He promised that his brother, Lloyd, would give Longoria a $100,000 18-wheeler truck and the names of people for drug runs. Longoria said that Bourgeois told him that he beat JG with a bat and extension cords. Orlando Campos testified that Bourgeois told him that he beat up his wives and ex-girlfriends and that he was going to kill Robin when he got out of prison. Wiley Taylor testified that Bourgeois told him that he was trying to have Robin killed so that she could not testify against him and that he and his brother made most of his money running drugs and illegal aliens. Taylor and Darrick Moore testified that Bourgeois told them he beat his wives and girlfriends.

56

No. 11-70024

● Robin testified that Bourgeois admitted that he did not have a conscience. She read a letter that Bourgeois had written to her uncle, intending that she see it, in which he stated: "in the name of God, Robin['s] days will be short. That niece of yours will have a short life." The letter also stated: "All this shit about extension cord beatings, biting this child, brutalizing this child, your niece told those people all this." On cross-examination, she testified that Bourgeois could not handle the knowledge of her extramarital affair. She also testified that in the summer of 2002, they were having financial problems and he was stressed by finding out that he had another child to support.

● JG's grandmother, Karen Jackson, testified about the impact of losing JG.

● An FBI agent testified that Bourgeois was a liar and was manipulative.

Dr. Carlos Estrada, the psychiatrist who had evaluated Bourgeois prior to trial, testified for the government. Dr. Estrada had interviewed Bourgeois for three hours, reviewed letters that Bourgeois had written, listened to recordings of Bourgeois's taped telephone conversations, and had reviewed statements made by witnesses and family members, who reported that Bourgeois had been rejected and abandoned and that his mother had abused him. He had also observed Bourgeois throughout the trial and had reviewed reports of psychologists who had evaluated Bourgeois.

On direct examination, Dr. Estrada testified that Bourgeois has a number of characteristics that have been found to be associated with violence, such as being the subject of rejection, neglect, and abandonment and being the survivor of physical, sexual, or emotional abuse, all of which can create a very high predisposition for violence as an adult. If those characteristics are coupled with three others – personal use of violence, belonging to a culture of beliefs where violence is accepted, tolerated, or approved, and the presence of previous social interventions regarding the violence – the predisposition for violence as an adult

57

No. 11-70024

is very, very high.  Bourgeois shares these elements with a group of individuals who engage in violent behavior as adults.

In assessing Bourgeois's personality for risk of violence, Dr. Estrada found items that may decrease self-control, items that will decrease the regard and respect and empathy for others, and motivations towards violence.  He found that Bourgeois has characteristics of a narcissistic personality disorder – an individual whose basic motivation in life is the aggrandizing of his self-esteem.  Such individuals need to have continuous positive feedback to their self-esteem and when that is not forthcoming, they feel extremely distressed, depressed, or angry and need to do something to re-establish the sense of being special and better than others.  One of the characteristics of a narcissistic personality disorder is the capacity to give a wonderful first impression.  Individuals with the disorder are lively, likeable, exciting, interesting, and sometimes very persuasive or charismatic.  But during the course of the relationship in the long term, the fact that their interest is almost self-subservient leads to conflict and disappointment with other people.  As a result of disappointment, personal problems are inevitable and result in friction that may lead to the break-up of relationships or businesses or actual violence.

On the basis of his assessment of the background factors and the personality factors, Dr. Estrada's opinion was that Bourgeois has a much higher tendency toward violence than an ordinary person. He observed that Bourgeois's attitude throughout the legal proceedings had been one of a member of the defense team, rather than the defendant or the father of the victim.  He noted that Bourgeois had been very attentive, had made profuse notes, and had been able to discuss and provide assistance to his defense team as needed.  Bourgeois had also given the impression that he was disgusted with the presentation and answers of the witnesses and was not going to let what they said shake or affect

him. Those two characteristics, in Dr. Estrada's opinion, were very consistent with a diagnosis of a narcissistic personality disorder.

At a bench conference following the government's direct examination of Dr. Estrada, Tinker told the court that, depending on how Dr. Estrada's cross-examination went, the defense was going to rest. He noted that this was not the consensus of the rest of the defense team, particularly Dr. Cunningham. He continued: "For instance, he [Dr. Cunningham] would talk about how many people are in the penitentiary and that there are only 10% commit murders. Well, I think why the hell would I want the jury to know that? Maybe it's 3 percent. But still."

Through cross-examination of Dr. Estrada, the defense presented mitigating evidence about Bourgeois's background and the circumstances of the offense. When asked to tell the jury what he knew about Bourgeois's childhood, Dr. Estrada testified that Bourgeois was not truthful about his own abuse as a child and was vague and reluctant to talk about his background. He said that it is not unusual for individuals who abuse their children to gloss over or give excuses for their parents' neglect or abuse. He testified that, based on the testimony of witnesses, there were several indications of neglect and rejection. Tinker stated: "And I want you to understand that as I ask you these questions, I'm not asking these questions to help excuse what he did, but to explain it."

Dr. Estrada testified that Bourgeois was a child from an illegitimate relationship and his real father abandoned him. Further, his mother selected him from among her many children for particular abuse.

When Dr. Estrada mentioned that he had received a report of neuropsychological testing by Dr. Weiner, the court called counsel to the bench. The court stated that Dr. Weiner's report had been excluded from evidence and that no witness had testified that Bourgeois was abused or neglected in any way and asked Dr. Estrada where he got that information. Tinker stated that he

No. 11-70024

would not ask Dr. Estrada to discuss Dr. Cunningham or Dr. Weiner's reports. The court stated that Dr. Estrada should not testify from Dr. Weiner's examination but that it did not see any reason why he could not testify from the information he got from Dr. Cunningham. The prosecutor pointed out that Dr. Cunningham's report contained references to Dr. Weiner's report.

Dr. Estrada testified that the prosecutor had asked him to provide information about the profile of people who abuse their children and that he had responded that people who commit that kind of offense generally were abused themselves. He said that he sent the prosecutor a letter describing the main personality characteristics of an abusive parent: a history of personal use of violence to get their way; a reliance on violence rather than dialogue or conflict resolution to take care of problems; being more concerned about themselves than about other people, more self-centered; expecting a child to conform to their needs, rather than conforming to the needs of the child; and a great difficulty tolerating frustration and stress.

Dr. Estrada stated that at the time of the murder, Bourgeois was stressed because: he had discovered that he had a child as a result of an affair and was very angry about that; he was under financial stress with debts; he had a serious marital problem with his wife and they had been arguing about a number of things, including their mutual affairs; and they were in a confined situation that made any little accident in the toilet the trigger for an explosion of anger that came from a number of different directions and ended up focused on the child.

Dr. Estrada said that during their interview, Bourgeois felt that the times where he was angry and violent with his wives were justified and that he had good reasons to act that way. Dr. Estrada also observed that Bourgeois's friends and relatives did nothing to stop the abuse of his wives or JG because they felt they did not have the right to interfere in the way he was handling his family. That is why Dr. Estrada found that Bourgeois was the product of an

60

No. 11-70024

environment where a certain measure of violence in family relationships, like harsh discipline of children or hitting the wife, is accepted.

When asked whether there was something that could have happened that would have prevented this, Dr. Estrada responded: "Yes, intervention before adulthood." He said that, ideally, such intervention should have occurred while Bourgeois was in elementary school.

Trial counsel tried to get Dr. Estrada to limit his assessment of the risk of future violence to family situations. Dr. Estrada responded that given Bourgeois's background and personality, and the pattern of abusive relationships, the short-term prognosis was that Bourgeois will become violent in a family situation. When asked whether Bourgeois would be a risk for violent conduct in the penitentiary, Dr. Estrada was unable to express a definite opinion without knowing the details of the prison circumstances in which Bourgeois would be confined. Dr. Estrada agreed with trial counsel that, the older a person is, the less likely they are to cause problems, and that there is a lesser degree of all kinds of violent incidents, the higher the supervision available. He also agreed that he would expect a person of Bourgeois's age to able to adjust better in the penitentiary than someone who enters prison as a rebellious youth.

On redirect examination, the prosecutor challenged the basis for Dr. Estrada's impression that Bourgeois had an abusive childhood. Dr. Estrada testified that Bourgeois reported being well cared for as a child and that no one had told him directly that there was any abuse or neglect, but he had read it in reports. He testified that it was his conclusion that Bourgeois is self-centered, angry, and has a high risk towards violence. He observed that when AB1994 approached the witness stand, she tried to establish eye contact with Bourgeois, but Bourgeois avoided eye contact with her. Dr. Estrada also acknowledged that this is not the usual case of child abuse and that he did not hear anything from

No. 11-70024

the evidence that communicated a culture that would allow for the systematic beating and torture and killing of a two-year-old.

On further cross-examination, trial counsel elicited testimony that Bourgeois's avoidance of eye contact with AB1994 could have been an effort not to intimidate her. Dr. Estrada also testified that Bourgeois is not a sociopath and that he believed Bourgeois would adjust well in custody.

At a bench conference, the court stated: "I don't think, Mr. Tinker, you could have hired a better witness for your defense than Dr. Estrada." Later, after the defense rested, the court stated that in cross-examining Dr. Estrada, Tinker essentially got into evidence the reports of both Dr. Cunningham and Dr. Weiner. The defense did not present any expert testimony, but did present the testimony of several lay witnesses.

Michelle Armont, Bourgeois's paternal half-sister, testified that their father had twenty-two children; that Bourgeois came to live with her after Ms. Clayton died; that Bourgeois had a temper, but that usually she could calm him down; that his only problem in school was tardiness; and that she had observed the same type of behavior by Bourgeois that she had observed by her nephew, who had attention deficit disorder. She testified that she assumed that Bourgeois did not move back in with his mother after Ms. Clayton died because they did not have a good relationship at the time; however, she said that Bourgeois and his mother resolved the problem in the end.[32]

Bourgeois's first cousin, Carl Henry, testified that Bourgeois's mother cleaned his nose with her long fingernails, causing a bad sore and a constant bloody nose; that she whipped Bourgeois with an extension cord and threw a telephone receiver at his head; that his mother sent him to live with Ms.

---

[32] The record contains some evidence of an apparent reconciliation between Bourgeois and his mother. In a handwritten letter to Bierbaum and Milstein on February 5, 2004, Bourgeois referred to a fish fry at his mother's home on the day JG was christened.

No. 11-70024

Clayton, but Bourgeois liked living there because Ms. Clayton cared for him better than his mother did; and that Bourgeois was hurt when teased about his father's absence from his life.

Ms. Clayton's grandson, Reverend Herman Clayton, Jr., who grew up in the same neighborhood as Bourgeois, testified that they were raised on a street that housed about thirty poor, black families. He stated that Ms. Clayton asked Bourgeois's mother to allow Bourgeois to live with her and that Bourgeois's mother refused on several occasions, but Ms. Clayton persisted. He said that Bourgeois would hide at Ms. Clayton's when his mother came to look for him. Although he did not witness any abuse, he was told by others that Bourgeois's mother whipped her children, and that she abused Bourgeois and whipped him for things he did not do. On cross-examination, he testified that Ms. Clayton was doing a favor for Bourgeois when she provided a home for him. He explained that Bourgeois's mother could not come to court because she had just come home from the hospital after having a heart attack.

After the defense rested, Bourgeois complained to the district court, outside the presence of the jury, about his lawyers not putting up a fight for him. He reiterated his belief that he had been convicted for something he did not do, based on what Robin's family had said, and complained that his family did not get a chance to testify prior to the punishment phase, when it was too late. The court told Bourgeois that his attorneys had a right to make strategic decisions in his best interest and that they had, in the court's opinion, exercised extremely good judgment. The court then stated that it wanted to make a record of the investigation that was done for Bourgeois. Defense investigator Tenore stated that he had been working on the case since March 2003 and had interviewed over fifty witnesses. Gilmore stated that he had a synopsis of every witness interview. Tenore also stated that mitigation investigator Bierbaum had spent a significant amount of time in Louisiana. The district court noted that it had

No. 11-70024

appointed one case-in-chief investigator, two mitigation investigators, and a mitigation expert as well as a neuropsychologist, a neurologist, a DNA expert, a forensic odontologist, a battered-baby expert, a juror selection specialist, and a polygraph examiner.

Against trial counsel's advice, Bourgeois testified at the punishment phase as follows:

> My sympathy goes out to the soul of JG1999, my baby, her family, my family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for . . . .

> So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.

> I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like that, I'm like that with all my children. And I just feel you all have been wrongfully misled.

> I just think I want to close with that, saying that I love my baby, I love her family, I love my family. And I thank each and every one of you for participating, the lawyers for the job they did, and for everybody that communicated. And God bless all of you all. Thank you.

Gilmore began his closing argument by saying: "It's difficult for me to come up here and argue to you about this punishment and what you're going to do to him knowing that he maintains his innocence, and knowing that you don't

64

No. 11-70024

believe that." After pointing out that Bourgeois's mother singled him out for abuse and that he went to live with Ms. Clayton to get away from his mother, Gilmore stated:

> Now, these things are offered to you not as an excuse for committing this crime, but to try to help you understand his mind set, and trying to help you understand where he comes from. This is – it's not an excuse for him, if you believe he committed this crime, for him doing it. It's something to show you that he's a human being.

Next, he mentioned that Bourgeois was upset about Robin's affair, was having economic problems, and then found out that he had a child from a one-night stand. Then he stated: "Something happened in that trip. If you believe that he did this, something happened during that trip that brought all these factors together and caused him to snap. If you believe he did it, it was not a premeditated act." He pointed out that if a person wants to kill a child of that age, it could be done immediately. Then he stated: "And I think that what happened is that at the Naval Air Station, these factors all came together and he snapped. Intending to discipline her, it got out of hand and it ended up killing her. That's not to excuse his behavior; it's in an attempt to try to explain what happened." He concluded by pointing out that the things Bourgeois had done in the past had been in family situations where emotion was involved and that such circumstances would not exist in the penitentiary; but if they did, the people who run the penitentiary know how to deal with it.

In his portion of the defense closing argument, Tinker told the jury that Bourgeois was an unwanted child in a large family with a mother who abused him. Referring frequently to Dr. Estrada's testimony, he argued that Bourgeois grew up in a society where it was accepted conduct to hit children and wives. Tinker noted that Dr. Estrada had explained that JG "ended up the victim of who he [Bourgeois] ended up because he started out getting abused himself." He concluded: "I hope that helps you out on who it is that they have called on you

65

No. 11-70024

to give the death penalty. There's no evidence he is a danger to anybody other than in the family setting. That's what their expert, Dr. Estrada, said. Dr. Estrada told you that because of his age he's least likely to cause any problem in the penitentiary."

In rebuttal, the prosecutor pointed out the inconsistency between Bourgeois's insistence that he is innocent and the explanations offered by Bourgeois's counsel: "Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever."

After the jury's punishment verdict, the court asked Gilmore if the defense investigated Bourgeois's neighbors, childhood friends, and school and employment records. Gilmore replied: "Yes, Your Honor. Mr. Tenore and Mr. Bierbaum did a fairly thorough investigation. They followed up all the leads. They dealt mostly with Mr. Bourgeois's brother, Lloyd Ferdinand, who directed them to all these people."

b.

In this § 2255 proceeding, Bourgeois argues that trial counsel were ineffective in presenting only a small fraction of his life story and omitting any compelling and descriptive details about his impoverished background,[33]

---

[33] Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one-lane dirt road connecting about twenty homes, representing two or three different family units. The neighborhood was surrounded by sugar cane fields and hemmed in on one side by the River. The families of the Bend had all lived there for five generations or more and could trace their lineage back to "slave time." Most of the homes had been lived in for generations. The Bend was not connected to a sewage line.

66

No. 11-70024

dysfunctional family,[34] physical abuse and neglect,[35] sexual abuse, BPD,[36] brain damage,[37] low intelligence,[38] and the stress he was under during the summer of 2002.[39] According to Bourgeois, counsel's failings were the result of a lack of

---

[34] Bourgeois's mother was an alcoholic; he was the fifth of seven children born to her in less than nine years; his next older brother, Anthony, was born with cerebral palsy, was profoundly retarded, and required significant extra care, for which the family received no outside services; and his mother was overwhelmed by the number of children in her care.

[35] Bourgeois acknowledges that some evidence of childhood abuse was presented at trial but contends that it was not similar to the detailed evidence presented in the § 2255 proceedings and thus the jury did not hear firsthand, detailed accounts of how young Bourgeois was subjected to merciless, chronic, and long-standing physical abuse at the hands of his mother.

[36] Bourgeois argues that evidence that persons with BPD are extremely vulnerable to stress, and tend to experience dissociative and psychotic episodes in which they are unaware of their actions and unable to control their behavior, contrasts greatly with the prosecution's theory at trial, which was that he acted with premeditation when he killed JG in an effort to avoid paying child support. He contends further that the district court erred by concluding that a reasonable attorney could rationally decide not to present evidence of BPD in the light of its "aggravating edge" because (1) trial counsel never offered that explanation; and (2) trial counsel was never able to consider the option of a BPD diagnosis in the first place because they failed to provide Dr. Estrada or any expert with sufficient information about Bourgeois.

[37] Bourgeois contends that if trial counsel had consulted with Dr. Weiner about the substance and basis for his conclusions, and had provided medical records to him, he would have told them that whether Bourgeois had suffered a coma was not crucial to his findings, which were based on neuropsychological testing, and that regardless of the cause, Bourgeois has some brain damage. He also argues that the district court erred by speculating that counsel may have decided not to present evidence of brain damage because neurological conditions are double-edged. He asserts that trial counsel never offered that theory, nor could they, because they failed to prepare and consult with their expert about his findings and conclusions and were therefore not in a position to make an informed decision about the pros and cons of his testimony.

[38] Bourgeois argues that trial counsel ineffectively failed to present evidence that he has, at best, an IQ that is in the range of borderline intellectual functioning. He contends that the district court's subjective view of Bourgeois's testimony and the meaning or significance of his behavior at trial are belied by the testimony of government expert Dr. Price, who acknowledged that, despite Bourgeois's ability to testify and to drive a truck, he functions in the borderline level of intelligence.

[39] Bourgeois contends that trial counsel ineffectively failed to present all of the available evidence that, at the time of the murder, Bourgeois was experiencing stress as a result of his marital difficulties, financial pressures, and legal difficulties.

67

No. 11-70024

preparation rather than a strategic decision. He contends that if trial counsel had conducted their investigation in a timely manner, they would have discovered and addressed any concerns regarding Dr. Cunningham's testimony. Bourgeois contends further that the district court erred by suggesting strategic reasons for counsel's failure to pursue and present certain categories of mitigating evidence because such strategies were either never offered by trial counsel or were not the strategies that counsel stated that they pursued. He asserts that at the punishment phase, trial counsel did not pursue their purported strategy of innocence but instead presented mitigating evidence and argued that Bourgeois's childhood history of abuse and the stress that he was under at the time of the murder explained his actions. In addition, trial counsel asked the jury to find mitigating factors that would have been supported by the lay and expert testimony they failed to present, including: Bourgeois's capacity to appreciate the wrongfulness of his conduct was significantly impaired; he suffered from extreme mental or emotional disturbance; and he was abused as a child.

In support of his claims in the § 2255 proceedings, Bourgeois relied on eight experts and numerous lay witnesses to present the evidence that he claims his trial counsel should have discovered and presented at the punishment phase.

Bourgeois submitted a declaration and the deposition testimony of Dr. Estrada, the government's expert witness at trial. In his declaration, Dr. Estrada stated:

(1) New information provided by Bourgeois's habeas counsel confirmed what he strongly suspected at the time of trial: Bourgeois has a history of family dysfunction and childhood physical and sexual abuse, and he has cognitive deficits that further affect his ability to make good judgments. That history is

68

No. 11-70024

consistent with BPD,[40] which supplements the earlier diagnosis of narcissistic personality disorder.

(2) Bourgeois's abuse and killing of JG is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Bourgeois at the time of the offense. The brutal and bizarre manner of the killing, along with Bourgeois's background and mental health deficits, show that this "was purely a rage killing," born of Bourgeois's lifetime experiences, the psychological effects of those experiences, and his cognitive deficits. In addition, Bourgeois, like many borderline personalities, can decompensate into rageful outbursts when frustrated.

(3) If allowed to rely on Dr. Weiner's report at trial, he would have explained that Bourgeois's cognitive deficits were important factors that mitigate the offense and help explain Bourgeois's violent behavior.

(4) Knowing what he now knows and previously suspected, he does not believe the jury was provided with an accurate and complete picture of Bourgeois's mental-health profile. Although Bourgeois's actions were unquestionably evil, it is equally unquestionable that there is a reasonable and not particularly controversial mental health explanation for his actions.

In his 2010 deposition, Dr. Estrada testified that the sources of BPD include genetics as well as a childhood history of rejection, neglect, and abandonment. He stated that BPD is characterized by unstable relationships, including "episodes of honeymoon, followed by episodes of hate and violence." In addition, persons suffering from BPD are "extremely vulnerable to stress. And during episodes of stress, they are involved in impulsive behavior, behavior

---

[40] At the evidentiary hearing, the prosecutor stated that the government did not dispute the diagnosis of BPD.

No. 11-70024

with very poor judgment, bordering in psychotic, irrational behavior." Dr. Estrada connected Bourgeois's BPD to JG's abuse, stating:

> Under stress, this man went into episodes of rage against this child. He was frustrated. He already was predisposed to some form of inappropriate behavior by the fact that he was under stress, but the inappropriate behavior took both a violent sadistic form and sexual form. . . . This went on for six weeks until the accumulations of all the rages and violence, aggressive behavior toward this little girl caused her death.

He stated that Bourgeois's killing of JG was not premeditated, but resulted from rage and a loss of control. He explained:

> [I]t is clear that under stress his judgment is very poor and that he makes decisions that are driven by impulses and by emotions rather than by reason. And whatever his measured IQ or academic achievement is, his intellectual capacities and his knowledge are put aside by his feelings of rage, and he acts on those feelings in a manner that shows very poor judgment, very poor self-control and no concern about the consequences of his behavior on his life.

Dr. Estrada testified that Bourgeois's rage would impact his executive function and inhibit his judgment, planning, decision making, control of impulses, and management of cause and consequences. He summarized his opinion as follows:

> [T]his man under the serious stress that he was facing, finances, marital problems and being dumped with a new child that he didn't expect and fatherhood, care and financial obligations, under this stress, he reacted in a typical borderline fashion caused by his background of trauma, neglect and rejection by losing control of his anger and torturing, tormenting and abusing this child intermittently throughout six weeks with periods in which he was actually caring and nice to the child in typical borderline fashion that ultimately the abuse caused this child's death. It is my opinion, therefore, that this is not the act of a premeditation.

On cross-examination by the government, Dr. Estrada testified that he had not changed his opinions, expressed at trial, that: (1) Bourgeois is of above-average intelligence and memory; (2) Bourgeois's rage is triggered by interpersonal relationships, especially intimate ones, and such patients do much

No. 11-70024

better in a structured environment where there is no closeness or intimacy; and (3) Bourgeois is prone to violence, is a future danger, and is a self-centered, angry person. He acknowledged that there had been trial testimony about times when Bourgeois was violent outside the context of an intimate relationship. He testified that he still believes Bourgeois is narcissistic, but now has diagnosed him as having BPD as well. He explained, however, that BPD and narcissistic personality are an elaboration of the same issues. He acknowledged that many of the factors he used to diagnose narcissistic personality are the same factors he had used, post-trial, to diagnose BPD. His reassessment of the case, based on the additional information he had been given by Bourgeois's habeas counsel, was that in addition to being a narcissist, Bourgeois has BPD, which explains what he did, but does not make him any less violent.

On redirect examination, Dr. Estrada reiterated that "we are splitting hairs here about narcissistic borderline. The fact is whatever we call it, my opinion at the time that I testified and is documented and my opinion now, which has been reinformed with the new documentation that I have received, is that Mr. Bourgeois suffered from a condition that under frustration or stress results in violence and that this – as a result of this tendency, he became violent continuously through a manner of six weeks against the child that led to her death."

Bourgeois also presented a declaration and testimony from Dr. Cunningham. In his declaration, Dr. Cunningham criticized Bourgeois's trial counsel's efforts to develop mitigating evidence, their lack of a strategy for the punishment phase, and their lack of supervision of the mitigation investigators; stated that trial counsel's cross-examination of Dr. Estrada was inadequate for the jury to appreciate the mitigating quality of Bourgeois's history of abuse; and stated that he was confident that his testimony would have had a significant impact on the jury's sentencing determination and that he was "flabbergasted"

No. 11-70024

when told that he would not be called as a witness. Dr. Cunningham stated further that Bourgeois's rage attacks were consistent with an Intermittent Explosive Disorder, and that Bourgeois's developmental history, along with the emotional instability, relationship devaluation, and rage that almost certainly accompanied his conduct in killing JG, are consistent with BPD.

At the § 2255 evidentiary hearing, Dr. Cunningham complained that he did not timely receive information from the mitigation investigators and complained about the quality of their work. However, he acknowledged that he did not inform defense counsel about his concerns until early February, when he came to Corpus Christi to interview Bourgeois. He also elaborated on his previous criticism of trial counsel.

Dr. Cunningham testified that the symptoms described by Bourgeois's family implicate neurobehavioral disinhibition or attention deficit hyperactivity disorder and are mitigating because they indicate that he was psychologically damaged from an early age but that damage can be treated by providing a highly structured environment, like prison, and with anti-rage medications.

Dr. Cunningham also described his "pressure cooker" theory that he wanted to present at trial: Bourgeois had a historical susceptibility to rage attacks and was like a pressure cooker. Within that pressure cooker, there is a history of an overwhelmed family system, domestic conflict, physical abuse, father abandonment, and emotional rejection. Bourgeois keeps a lid on this most of the time, and that lid is composed of being a hard worker and maintaining steady employment, being involved with his children, and being a caring uncle.[41]

Dr. Cunningham testified further that, based on his research about risk factors for child abuse, to the extent that Bourgeois is someone who batters, he

---

[41] The district court interrupted and questioned him about whether the testimony about Bourgeois dangling his nephew over a bridge would look bad with the "caring uncle" comment.

72

No. 11-70024

is among millions of men in the United States who engage in that conduct. Therefore, his singular malevolence in terms of making him a candidate for the death penalty is somewhat reduced by a recognition, at least in terms of domestic violence, that this is a widespread, tragic dysfunction in our society.[42]

Dr. Cunningham stated that if he had testified at trial, he would have told the jury that risk assessments for prison are best based on the person's personal track record in confinement and on group statistical data on how capital offenders and murderers and inmates behave in prison; that research demonstrates that the seriousness of the offense is not a good predictor of violence in prison; and that the overwhelming majority of capital murderers, if sentenced to life in prison, never engage in serious violence. He said he was prepared to address the evidence that Bourgeois tried to hire a hit man by describing the differences between the Nueces County Jail and the Federal Bureau of Prisons and the latter's ability to maintain a safe environment.

Dr. Cunningham testified that if trial counsel had provided him with the materials provided to him by habeas counsel, those materials would have supported additional adverse developmental factors in Bourgeois's background: a genetic predisposition to personality disorder; corruptive paternal modeling of promiscuity and reproductive irresponsibility; corruptive maternal modeling of neglect, abuse, and scapegoating; borderline personality features; deficient intelligence and potential mental retardation; mother's inadequacy and potentially deficient intellect; inadequate primary attachment; rejection by legitimate paternal siblings; peer rejection and isolation; additional information regarding maternal rejection and expulsion; and additional information regarding emotional neglect and supervisory neglect.

---

[42] The district court interjected that it could see why Tinker would not have wanted to present that testimony to the jury because it probably would have offended most of the jurors.

No. 11-70024

Dr. Cunningham testified that when he interviewed Bourgeois on February 7, 2004, Bourgeois told him that his nose was broken when his mother hit him with a mop handle for lying to her about the sexual abuse that he said was perpetrated by Jacob Clayton, whom he identified as the gay son of Ms. Clayton. This information about Bourgeois's allegation of sexual abuse is *not* in the reports that Dr. Cunningham provided to trial counsel.

On cross-examination, Dr. Cunningham stated that he was not aware that the government had a psychiatrist and a psychologist to testify about mitigation in rebuttal or that John Shaw of the Bureau of Prisons was going to testify in rebuttal about how many murders take place in the prison facility. He also acknowledged that his proposed testimony is inconsistent with a defense of innocence but pointed out that the information elicited from Dr. Estrada on cross-examination at trial was also inconsistent with the innocence defense. He also characterized such a defense as an "extremely high risk decision to make, in light of the jury's verdict and in light of the evidence in this case." During cross-examination, the district court noted for the record that Dr. Cunningham seemed to be very angry.

Bourgeois also submitted a declaration and testimony from Dr. Weiner, who stated that his test results and conclusions prior to trial are valid regardless of whether Bourgeois accurately reported a head injury and a coma and regardless of how the brain damage was caused. He testified that if defense counsel had provided him with Bourgeois's medical records, he would have known that Bourgeois did not suffer a head injury or a coma as a result of the 1984 accident and, if given the opportunity to do more testing, he could have offered a psychological explanation for Bourgeois's lie about the coma.[43] Dr.

---

[43] Dr. Weiner testified that Bourgeois's medical records, which were not provided to him by trial counsel, also contain a report of Bourgeois striking his head in an 18-wheeler accident in July 1993 but he admitted that would not necessarily account for Bourgeois's

No. 11-70024

Weiner said that if he had been called as a witness at trial, he would have testified that the brain dysfunction would impair Bourgeois's cognition so that he may at times perceive things in a distorted way and act in an inappropriate manner; and that brain damage can impair a person's ability to deal with emotions and cause problems with impulse control, ability to make judgments, and judging the future consequences of one's actions.

Bourgeois submitted the declaration and testimony of Dr. Michael M. Gelbort, a clinical neuropsychologist, who evaluated and tested Bourgeois in April 2007. He offered the following opinions:

(1) His test results are similar to Dr. Weiner's results and indicate no malingering. Test results showed Bourgeois's brain functioning is in the impaired range. Bourgeois's score on a cognitive dysfunction test indicated impulsivity, disinhibition, and trouble keeping his actions in line with reasonable thoughts.

(2) Bourgeois's IQ score is in the range of mental retardation. Formal psychometric data does not support Dr. Estrada's assessment of above average intelligence.

(3) Bourgeois's neuropsychological profile shows deficits in frontal lobe abilities, and there is clear evidence of impairment and impact on his executive functioning, which may result in acting impulsively and without forethought. Bourgeois's organic brain damage makes it more difficult for him to deal with emotional disturbance.

(4) Bourgeois's impairment is significant, particularly considering his abusive childhood, because the adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid

---

deficits and there could be other reasons for them, such as his long history of physical abuse.
.

75

No. 11-70024

with Bourgeois's organic deficits, his ability to modulate his conduct is quite impaired.

(5) It is irrelevant whether Bourgeois suffered a head injury as reported by Dr. Weiner because what is significant is that the deficits predated the murder. Bourgeois's impairments exist, even if the cause is not clear. The fact that Bourgeois may not have suffered a loss of consciousness in the three-wheeler accident that Dr. Weiner reported does not affect the validity or significance of Dr. Weiner's testing because one can suffer a traumatic brain injury without a loss of consciousness.

(6) Bourgeois described physical abuse from his mother and sexual abuse.

(7) Bourgeois is rather narcissistic. Dr. Gelbort did not express an opinion about whether Bourgeois is sociopathic although he "would absolutely agree" that many of the behaviors he had seen described can be caused by sociopathic etiology. He elaborated:

> [Bourgeois] says things to cover for himself at times. That's a characteristic of people who have sociopathy. It's also a characteristic, which is I think in this case more central, to someone who has a borderline personality disorder. I don't want them for my neighbor.

On cross-examination, the government pointed out that Dr. Weiner thought there was more posterior impairment than frontal lobe impairment. Dr. Gelbort testified that he would have localized the injury in another part of the brain but that he did not see the source of the impairment as being as influential as its effect. He acknowledged that Bourgeois's EEG was normal and stated that he did not know how to explain Bourgeois's behavior but that one could certainly understand that a brain with limitations and impairments such as Bourgeois's is much more likely to do things that are strange, bizarre, or out of the norm.

As an appendix to his § 2255 motion, Bourgeois presented a declaration from Dr. Holden, who stated that if he had been called as a witness in the

76

No. 11-70024

punishment phase, he would have testified that research reveals that the majority of filicides occur at the end of a disciplinary incident and that, in most cases, the parent does not intend to kill the child; and that Bourgeois's killing of JG was likely a disproportionate rage reaction resulting from stress and frustration.  He opined that Bourgeois was in a violent rage during the incident, stemming from three sources:  (1) his pathological child rearing; (2) the stressors, both immediate and distal, that he was suffering at the time; and (3) his organic deficits and impaired cognitive functioning.  Dr. Holden concluded that his testimony could have helped the jury understand that Bourgeois's behavior fits a common pattern of abuse and that his acts of violence, although cruel, are actually common in cases of severe child abuse.  He stated that if called as a witness at the sentencing phase, he could have (1) helped the jury place this awful crime in the context of family violence; (2) reviewed the neuropsychological and psychosocial factors that pre-disposed Bourgeois to violence against children; and (3) explained that Bourgeois's actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control. Habeas counsel offered Dr. Holden's declaration in lieu of his testimony at the § 2255 evidentiary hearing.

Bourgeois also submitted the declaration of forensic psychiatrist Dr. Robert L. Sadoff, who evaluated Bourgeois and found that Bourgeois has four prominent features that affect his ability to function: (1) a history of significant childhood physical and sexual abuse; (2) significant, debilitating personality disorders, including BPD; (3) clinically significant organic brain damage; and (4) an IQ in the range of mild mental retardation.  He noted that at the time of the crime, Bourgeois was under a great deal of stress from driving cross country in the cab of a tractor trailer, sharing close quarters with a family of five, including two children still in diapers, financial problems, and his wife's recent infidelity.

No. 11-70024

As a result of this combination of severe psychosocial stressors and neuropsychological deficits, Dr. Sadoff stated that Bourgeois had great difficulties coping and he responded with repeated impulsive acts that eventually led to the tragic death of JG.

Bourgeois also presented the declaration and testimony of Jethro W. Toomer, Ph.D., a clinical and forensic psychologist who evaluated Bourgeois and administered psychological personality tests. He expressed the following opinions:

(1) Bourgeois is a deeply troubled and impaired individual with precarious psychological functioning, he suffers from the lasting impact of savage childhood sexual and physical abuse, he has impaired intelligence, he has organic brain impairments which impact his ability to control impulses, make judgments, and predict the consequences of his actions, and his psychological functioning deteriorates during times of stress. When Bourgeois has acted in a rageful manner, he was likely acting out of mini-psychotic episodes secondary to his BPD. Bourgeois is not a sociopath.

(2) Results of psychological tests indicate that Bourgeois suffers from a delusional paranoid disorder, post-traumatic stress disorder, and a combination of schizoid, narcissistic, and borderline personality disorders. Individuals suffering from BPD manifest mini-psychotic episodes caused by stress or cues in the environment that serve as catalysts for unresolved emotional issues. There is evidence that Bourgeois has undergone such mini-psychotic states throughout his life. Bourgeois was experiencing numerous stressors at the time of the murder: financial hardship, child custody, the infidelity of his wife, resulting in him being "a time bomb waiting to happen." The mental health explanation for why he was a time bomb is mitigating because the behavior is not necessarily premeditated but is a function of all of his deficiencies.

No. 11-70024

Finally, Bourgeois submitted a declaration and the testimony of clinical psychologist Victoria Swanson, Ph.D., in which she expressed the following opinions: based on testing she conducted, Bourgeois is mentally retarded; and he has more of a borderline than a narcissistic personality disorder, but both disorders are in the same cluster of personality disorders. On cross-examination, she agreed that with the personality disorders that Bourgeois has and the deficits that she observed, it is difficult even for an expert to assess him and therefore, it would be logical for a defense lawyer to rely on the advice of experts when dealing with a difficult assessment.

In the appendix to his § 2255 motion, Bourgeois submitted declarations from many lay witnesses to support his claim that trial counsel were ineffective because they did not give the jury a complete view of his background.[44] The information provided in these declarations may be summarized as follows:

1. Bourgeois's mother drank alcohol heavily and hated Bourgeois because he looked like his father.

2. Bourgeois's mother singled him out for abuse, whipping and beating him more than her other children. She had long fingernails and would pick at his nose until it was bleeding and eventually disfigured. She called him "little yellow bastard." One witness said that she burned Bourgeois with cigarettes.

3. Bourgeois was abandoned by his father.

4. Bourgeois had rages, temper tantrums, and mood swings. He could not control his behavior and calm himself down.

5. Bourgeois was picked on and teased as a child because he was "slow" and because he had light skin and green eyes.

6. The neighborhood where Bourgeois grew up was very poor.

---

[44] Several of the witnesses who submitted declarations had been subpoenaed by trial counsel, and several of them were witnesses at trial.

No. 11-70024

7. Bourgeois was a braggart and liar who exaggerated a lot to impress people and cover up his failures.

8. Bourgeois felt rejected when his mother sent him to live with Ms. Clayton and he was hurt because he missed out on family outings.

9. One of Ms. Clayton's relatives, Michael Clayton, beat Bourgeois up repeatedly.

10. Bourgeois was "slow," "not smart," and "kind of dumb" and had lots of trouble with his school work.

11. Bourgeois could not handle pressure and at the time of JG's death he was under a lot of stress: financial problems, child support payments, the knowledge of his wife's adulterous affair, and the loss of his childhood home in a fire.

12. When Bourgeois was a young boy, his brother Clyde drowned. His brother Anthony was disabled and needed a lot of extra care from their mother.

13. Bourgeois had several accidents, including driving a three-wheeler into a tree and an accident driving a truck.

At the § 2255 evidentiary hearing, Bourgeois presented testimony from several lay witnesses to show mitigating evidence of an abused childhood, sexual abuse, and low intelligence.

Claudia Williams, Bourgeois's oldest maternal half-sister, described how their mother whipped Bourgeois with an extension cord while he stood naked in the tub, leaving him bruised and bloody, and cut off the tip of his finger with a meat cleaver. She stated that Bourgeois had temper fits and bad rages from an early age. On cross-examination, she admitted that she had talked to the mitigation investigators three times before the punishment phase but did not tell them about their mother cutting off the tip of Bourgeois's finger or that their mother had whipped him in the tub with an extension cord until he bled because it was sad and she was ashamed of her mother. Because her mother was still

80