No. 11-70024

alive at the time of trial, family members did not want to talk about the way the mother treated Bourgeois. She denied having heard that Ms. Clayton's son was a pedophile and had raped Bourgeois but said that she heard, from a family member, that a homosexual Sunday-school teacher had raped Bourgeois. She testified that she was present when Bourgeois had the three-wheeler accident and that he was unconscious for days.[45] She admitted that she knew that Bourgeois had hit his wives.

Ms. Clayton's granddaughter, Beverly Frank, testified that Ms. Clayton took Bourgeois in because he was mistreated by his mother. She said that she witnessed Bourgeois's mother whipping him with a belt and saw where the mother had picked at Bourgeois's nose until it bled. On cross-examination, she testified that Ms. Clayton's sons visited Ms. Clayton often while Bourgeois was living there but denied knowledge that any of them raped Bourgeois. She knew that one of them, Jacob, was "living a gay life," but said that did not make him a child molester. She testified that her father was the church choir director and denied knowledge of Bourgeois claiming to have been sexually assaulted during choir practice.

Another of Ms. Clayton's granddaughters, Brenda Goodman, testified that Bourgeois's mother drank alcohol excessively; was overwhelmed, frustrated, and neglectful; cursed and beat Bourgeois more than her other children; and picked at his nose, which stayed bloody all the time. Goodman testified that after they discovered that her Uncle Jake had AIDS, Bourgeois told her that her uncle had raped him. She described it as a "dark thing" that she could not tell her family, and admitted that she did not tell anyone about it until recently. Although

---

[45] The medical records of Bourgeois's three-wheeler accident on July 17, 1984, reflect that he tore his scrotum, broke his leg, and had surgery on his leg. The records state: "neuro signs OK"; "[n]ot knocked out"; and "Neurological: Within normal limits." There is no indication from the medical records that he lost consciousness.

81

No. 11-70024

Bourgeois's habeas investigators asked her about abuse in his background, she did not report it to them and did not mention it in her 2007 statement to them.

Bourgeois's cousin, Carl Henry, testified that Bourgeois's mother resented Bourgeois because she had a one-night relationship with his father and it did not work out. He testified that he saw evidence of Bourgeois's mother's abuse but did not provide specific details. On cross-examination, he said that Bourgeois was not raped at church during Sunday school but he did not know about choir rehearsal.

Another cousin, Murray Bourgeois, testified about Bourgeois's mother's abuse of him and her alcohol consumption. On cross-examination, he testified that Bourgeois lived with Ms. Clayton because she felt sorry for him and was trying to get him out of his abusive environment. He denied hearing that Ms. Clayton's sons were raping Bourgeois or that the Sunday school teacher raped him at church during the choir meetings.[46]

Kerry Brown, Bourgeois's lawyer in Louisiana, testified that Bourgeois had several child-support issues during the summer of JG's murder; that Bourgeois was having problems with debt but made poor decisions about money; and that Bourgeois was distressed by the knowledge of his wife's adulterous affair. On cross-examination, Brown admitted that if he had testified at trial, he could have said that he was defending Bourgeois on a charge that he had beaten his mother-in-law and that Bourgeois was overbearing, jealous of his wife, had a bunch of children he was not paying child support for, and had been charged with destruction of property.

Mitigation investigator Bierbaum testified at the evidentiary hearing and described his and Milstein's investigative efforts. He stated that he did not see

---

[46] As the district court observed, the testimony was inconsistent as to whether Ms. Clayton rescued Bourgeois from an abusive atmosphere or whether his mother sent him to serve as a care giver to the elderly, physically-impaired woman.

No. 11-70024

Bourgeois's hospital records until trial and expressed his belief that the medical record of a 1993 accident where Bourgeois went to the hospital and complained that he hit his head on the steering wheel of his 18-wheeler is potential mitigating evidence. On cross-examination, Bierbaum testified that he thought Bourgeois showed signs of neurological dysfunction but did not remember noting any symptoms of mental retardation.

In an affidavit and testimony at the § 2255 hearing, trial counsel Gilmore stated: When he met with Bourgeois he did not notice any mental health problems. In his dealings with Bourgeois he never had any indication or thought that Bourgeois might be mentally retarded. He did not recall what "highly unusual, often bizarre behavior, abnormal conversations, and unusual writing style" he was referring to in his motion for a mental-health evaluation prior to trial.[47] He had no reason to doubt Dr. Estrada's assessment that Bourgeois was of above-average intelligence. Bourgeois was very active in the defense team: he provided names and telephone numbers of persons to be contacted for mitigation as well as guilt-innocence; provided instructions to counsel in letters; and frequently passed notes to them at trial. He and Tinker always discussed the witnesses with Bourgeois and did not contact any witness without Bourgeois's direction. Bourgeois refused to talk about pleading guilty and maintained his innocence throughout the case. Gilmore praised Tinker, describing him as the best lawyer he has ever met.

With respect to the decision not to call Dr. Cunningham as a witness, Gilmore stated: He met with Tinker and Dr. Cunningham in his office, before the defense punishment case, where Dr. Cunningham showed them a notebook

---

[47] The record reflects that at a hearing on December 10, 2003, the district court questioned why the defense was asking for a mental examination after defense counsel had stated, repeatedly, that there was no competency or sanity issue. Gilmore responded that when the mitigation experts began interviewing Bourgeois and going over the materials, particularly the letters that Bourgeois had written, they felt that it was necessary.

No. 11-70024

of his proposed PowerPoint presentation as well as a list of proposed questions for counsel to ask him. After Dr. Cunningham's presentation, Gilmore and Tinker discussed it. Tinker did not like the PowerPoint presentation. They both thought Dr. Cunningham's testimony would conflict with Bourgeois's defense that he did not commit the crime. In addition, "we weren't impressed with him, to tell you the truth." They also did not think Dr. Cunningham was going to impress the jury. Tinker told Gilmore that he thought it would be more effective to develop mitigation evidence through Dr. Estrada than through Dr. Cunningham. After comparing what Dr. Cunningham could offer with Dr. Estrada's testimony, Gilmore and Tinker decided not to call Dr. Cunningham as a witness. They also discussed Dr. Cunningham's proposed presentation with Bourgeois and explained that Dr. Cunningham thought he exploded and committed the murder because he had a lot of pressure on him. Bourgeois agreed with counsel's assessment and their decision not to call Dr. Cunningham as a witness. The decision not to call Dr. Cunningham was a group decision. Dr. Cunningham was very angry that he was not going to be asked to testify and did not accept the decision in a professional manner. They elicited testimony from Dr. Estrada that mirrored the main part of Dr. Cunningham's proposed testimony – that Bourgeois did it but he did it because of all these pressures that were on him. Dr. Estrada was effective for the defense. With respect to the alleged inconsistency with the innocence defense in closing argument, Gilmore stated that they argued about Bourgeois's abusive history but did not argue that it caused him to commit the offense.

Gilmore testified about mitigating evidence as follows: He and Tinker and the investigators spoke with over fifty people. During the trial, they rented a conference room and talked to the witnesses individually; it took most of the day. They based the decision whether to call witnesses on how the witnesses would present in court, whether they had relevant evidence, and whether they had too

84

No. 11-70024

much baggage in terms of prior convictions. Gilmore knew that there were some allegations about childhood sexual abuse but he did not think it came from Bourgeois. He probably would have asked Bourgeois about those kinds of things, but did not remember whether he had done so.

Gilmore did not disagree with Dr. Estrada that the jury was not provided with an accurate and complete picture of Bourgeois's mental health profile.

c.

The government presented Tinker's answers to interrogatories as an exhibit in the § 2255 proceedings. Tinker stated: Gilmore was in charge of coordinating the investigation of the availability of non-expert defense witnesses and presenting their testimony at trial, and Tinker was in charge of dealing with the government's expert witnesses and obtaining and presenting rebuttal expert testimony. They made the majority of trial decisions jointly. In preparing for trial, they discussed and investigated the propriety of a defense based on Bourgeois's mental functioning, and that is why they had Bourgeois evaluated by Dr. Estrada. Dr. Estrada found that Bourgeois was of above-average intelligence, was competent to stand trial, and sane at the time of the offense. Some of the information gathered by the defense mitigation investigators might have helped the defense, but other information would have had a negative impact on their case. He had a neurological examination of Bourgeois done because there was a claim that Bourgeois had been in an accident and had been in a coma. He did not recall the examination resulting in any information that would have been helpful at trial. Furthermore, the government had informed the defense that it had medical records that proved that Bourgeois was never in a coma and that he only sustained broken bones in the accident. Based on the information he and Gilmore had, from experts and family members, they were unaware that Bourgeois was mentally retarded or near retardation level.

The government also relied on two expert witnesses: Dr. J. Randall Price, a neuropsychologist, and Dr. Roger Byron Moore, Jr., a forensic psychologist.

Dr. Price expressed the following opinions in his report:

> Mr. Bourgeois does not warrant a diagnosis of mental retardation. He does, however, have a Personality Disorder, Not Otherwise Specified, with predominately narcissistic, borderline, anti-social, and paranoid traits and features. He is grandiose, preoccupied with himself, has a sense of entitlement, and is arrogant. He has avoided real or perceived abandonment by others, experiences identity disturbance, and has a history of inappropriate, intense anger. He has failed to conform to social norms and has engaged in repeated deceit. He is impulsive, irritable, and aggressive. He is suspicious of others, reads meaning into benign events, and reacts angrily to perceived attacks on his character or behavior. He views himself as a victim. Available indicators of measured intelligence fall in the range of the upper limits of mild mental retardation to the lower limits of borderline intellectual functioning. However, he does not evidence significant deficits in adaptive functioning in adulthood. The difficulties in life experienced by Mr. Bourgeois are associated with his disordered personality structure rather than with mental retardation.

At the evidentiary hearing, Dr. Price testified that it would be of concern for malingering that Bourgeois lied to Dr. Weiner about being in a coma and that it was corroborated by Bourgeois's sister. According to Dr. Price, the ability to make up such a story and coordinate its telling with another person is consistent with a personality disorder or with an attempt to manipulate the results of the evaluation.

Dr. Price did not disagree that Bourgeois has features of BPD, which is an unstable personality, and that some people with unstable personalities act out in angry and aggressive ways that are not normal. He acknowledged such behavior by Bourgeois but stated that he thinks it is not organic but is associated with Bourgeois's unstable personality. He stated further that Bourgeois's plan to have people killed would not be consistent with a rage

disorder or a mini-psychotic episode; instead, it would be consistent with antisocial psychopathic traits and features. Dr. Price pointed out that Bourgeois's impulsivity is selective and does not pervade all areas of his life.

Dr. Price testified that there is not a neuropsychological test that isolates the frontal lobe of the brain and, therefore, both Dr. Gelbort and Dr. Weiner were wrong when they localized the deficits in different parts of Bourgeois's brain. Dr. Price concluded that Bourgeois's problems are personality trait issues and not organic brain dysfunction or mental retardation.

On cross-examination, Dr. Price expressed his opinion that Bourgeois's BPD came from his abusive childhood. He conceded that under significant stress, persons with BPD can decompensate into dissociative states and can also undergo psychotic episodes; and that the rages, dissociation, and psychosis are manifested in the intimate relationships in the subject's life. He acknowledged that Bourgeois has suffered black-outs under stress, which is consistent with dissociation.

Dr. Price testified that Dr. Estrada was wrong in his assessment that Bourgeois has above-average intelligence because Bourgeois is nowhere near that – he is either borderline or mildly mentally retarded on IQ testing. Dr. Price agreed that Bourgeois's low intellectual functioning affects his ability to manage his personality disorders and added that having lower intelligence in general is associated with more aggressive criminal actions because such individuals have problems with judgment and impulse control. Dr. Price testified that he did not think Bourgeois was malingering and he found no indication that Bourgeois suffers from attention deficit disorder. He testified that it is possible that Bourgeois does not test well because of low intelligence, impulsivity, or BPD. He testified further that some of Bourgeois's problems that have been interpreted as being adaptive behavior deficits are consistent with a personality disorder rather than mental retardation.

No. 11-70024

Dr. Price testified that he had no credible evidence that Bourgeois had a brain injury. He conceded that it would be significant from a neuropsychological standpoint that Bourgeois struck his head on a steering wheel in an accident but stated that if there was not at least an alteration in consciousness, it would probably be insignificant.

Dr. Price testified that he did not diagnose Bourgeois as having an antisocial personality disorder, although Bourgeois does have some sociopathic features. He agreed that Bourgeois's anxiety, nervousness, excessive worry and low self-esteem, observed by a psychiatrist when he applied for a sheriff's deputy job in 1985, are all consistent with an adult survivor of childhood abuse.

The government's other expert, Dr. Moore, evaluated Bourgeois for mental retardation, focusing on adaptive functioning. In his report, Dr. Moore stated:

> Mr. Bourgeois had a traumatic, abusive childhood. Multiple mental health experts have indicated that he has Borderline Personality Disorder, and he appears to be appropriately diagnosed as such. Borderline Personality is a disorder that is characterized by frantic efforts to avoid abandonment, intense and unstable interpersonal relationships, impulsivity, emotional instability (inappropriate, intense anger or difficulty controlling anger), and transient, stress-related paranoid thoughts or dissociative episodes. Mr. Bourgeois' abuse history provided the setting conditions that frequently lead to the development of this personality disorder.

> A key issue is whether the symptoms of intense interpersonal relationships, impulsive spending, and emotional volatility are due to cognitive deficits or personality factors. . . . His behavioral style is more reflective of a personality disorder than of a cognitive deficit, and appears to have possibly been fueled by the significant others that he had relationships with, some of whom were reported to be impulsive spenders and emotionally volatile. Bourgeois had adequate adaptive functioning but also displayed maladaptive behaviors reflective of Borderline Personality Disorder.

> He reportedly stuttered as a child and was described as having symptoms consistent with ADHD. He was also described as being somewhat uncoordinated and thus not a good athlete. These factors

88

No. 11-70024

led him to be teased by his peers and, along with the physical, emotional and sexual abuse that he suffered, it appears that his self esteem suffered significantly. It also appears that he developed Borderline Personality Disorder. . . . Neuropsychological testing indicates he has some degree of cognitive impairment. . . . Regardless of his performance on formalized tests of intelligence, his level of adaptive functioning is in line with that expected of his peers and he does not meet the diagnostic criteria for mental retardation.

At the evidentiary hearing, Dr. Moore agreed that Bourgeois is not a sociopath, and agreed that Bourgeois is driven in his conduct primarily by his BPD. He acknowledged that people with BPD are most likely to act out in a rageful or violent way with people with whom they are in a close relationship and that there would not be many of those kinds of relationships in the penitentiary.

d.

The district court, in addressing the ineffective-counsel claim regarding mitigating evidence, described the obstacles trial counsel faced in trying to defend Bourgeois and save his life: First, the horrendous facts made it likely that the jury would not see Bourgeois as a sympathetic defendant. Second, he often provided misinformation to defense counsel, the investigators, and the defense experts, which hampered the development of evidence and made a mitigation defense even more difficult. Bourgeois's untruthful reporting to Dr. Weiner that he had suffered a head injury that caused a coma was a critical lead that guided the mitigation investigation and resulted in several experts reaching unsupportable conclusions. Third, Bourgeois's violent behavior and threats while he was incarcerated before trial impaired his attorneys' efforts to demonstrate that he would not be violent in prison if the jury spared his life. Finally, Bourgeois's unwavering insistence that he did not kill JG compounded the challenges his counsel faced and limited their strategic choices, forcing them

89

No. 11-70024

to sometimes present inconsistent information to the jury as they built their case around the theory, insisted on by Bourgeois, that Robin killed JG. Despite those obstacles, trial counsel developed favorable evidence that Bourgeois was a hard-working man, a good provider, and that sometimes life with him was happy and good.

The district court concluded that trial counsel made a constitutionally-sound investigation, including seeking the assistance of expert witnesses and making a probing effort to investigate mitigating evidence. The court concluded that, with the possible exception of Dr. Weiner's evaluation, Bourgeois had failed to prove that trial counsel's investigation was not done quickly enough.

The district court found that the defense team was familiar with and had spoken with many of the lay witnesses Bourgeois presented at the § 2255 hearing. Many of the lay witnesses trial counsel spoke to were not willing to testify either because they feared Bourgeois or because they did not want to disparage his mother by testifying about childhood abuse. Similarly, the lay witnesses who testified about Bourgeois's personal history at the § 2255 hearing did not provide some of the information they testified about to Bourgeois's mitigation experts prior to trial, and some of them admitted that they would not have been willing to present that testimony at trial in 2004. In addition, some of the defense mitigation witnesses from Bourgeois's family were also aware of damaging information, including allegations that Bourgeois beat young children. The court also pointed out that the mitigation investigators' reports reflect more than suspicion that Bourgeois had sexually molested young relatives. Based upon its review of the whole of the unpresented mitigation evidence, the court concluded that trial counsel did not provide ineffective assistance in the investigation, preparation, or presentation of lay testimony in the punishment phase.

No. 11-70024

After recounting in detail all of the expert assistance that trial counsel secured before the punishment phase, the district court held that defense counsel made strategic decisions to attack the government's evidence through cross-examination rather than by calling experts in an effort to avoid, as much as possible, an obvious conflict between Bourgeois's defense, which blamed Robin for killing JG, and yet still present a psychological explanation of his personality disorder in an effort to obtain a life sentence. In attempting to craft a defense that would remain true to Bourgeois's wishes but still advocate for a sentence less than death, trial counsel had to make hard choices. The court acknowledged that no trial is perfect, that trial counsel made mistakes, and that hindsight and second-guessing might possibly suggest different courses of action. However, focusing on how trial counsel viewed the landscape before them at the time, the court found that trial counsel engaged in reasonable decision making bolstered by a reasonable investigation with regard to the decision not to present expert testimony.

The court held that each category of evidence Bourgeois faulted trial counsel for not presenting carried sharp aggravating factors with its mitigating thrust and that such evidence may have militated in favor of a finding that Bourgeois would be dangerous in the future. Accordingly, the court concluded that trial counsel's decisions had to be weighed with the recognition that the evidence Bourgeois faulted them for not presenting was not exclusively mitigating.

The district court further found that the trial investigators made a wide-ranging investigation that uncovered information about Bourgeois's abusive childhood and presented evidence of the same nature as the evidence developed by habeas counsel. Each of the four lay witnesses that trial counsel called in the punishment phase described his abused childhood. However, Bourgeois claimed not to have been abused, and his family was hesitant to discuss the abuse until

91

his mother died. The court stated that, to whatever extent the trial testimony lacked the depth of Bourgeois's post-trial evidence, the breadth of testimony about his abused childhood is nearly identical. Thus, the trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions that they would have reached if they had before them the entirety of the mitigating evidence of physical abuse developed after trial.

The district court also found that the most troubling allegation Bourgeois made was that trial counsel failed to investigate his allegations of sexual abuse by two men. However, the court found that the testimony at the evidentiary hearing could not credibly validate those allegations. With the exception of Brenda Goodman, none of the other lay witnesses at the § 2255 hearing had heard about it, and the court found Goodman's testimony to be somewhat suspect because it was based solely on what Bourgeois told her, and no other witness could corroborate the allegations. The court concluded that Goodman's reluctance to tell others about a "dark thing" that she could not tell her family gave no confidence that she would have relayed the information to trial counsel. Because trial counsel could not be held responsible for introducing mitigating evidence that their client and other witnesses had failed to disclose, the court held that Bourgeois had not shown that trial counsel were ineffective by not presenting evidence of sexual abuse.

The district court was not convinced that a reasonable attorney would encourage the jury to choose a life sentence based on Bourgeois's intellectual limitations in the light of the fact that the jury was aware that Bourgeois had successfully worked for years as a truck driver, had heard his cogent, descriptive testimony that lacked any sign of mental impairment, and had observed his interaction with counsel and his ability to follow the course of the legal proceedings. Further, the government would have subjected any witness testifying about Bourgeois's low intelligence to the same cross-examination it

conducted at the evidentiary hearing. The court concluded that a reasonable attorney could weigh the probable benefit against the possible loss of credibility and decide not to focus the defense on Bourgeois's low intelligence.

The district court held that trial counsel were not ineffective by failing to present expert testimony from Dr. Cunningham about Bourgeois's abused childhood and its impact on his behavior. The court credited trial counsel's explanation that they decided not to call Dr. Cunningham as a witness because his theory of the case conflicted with Bourgeois's defense that he did not commit the crime. The court found that defense counsel elicited testimony from Dr. Estrada on cross-examination that sufficiently blamed Bourgeois's violence as an adult on his childhood abuse and adequately addressed Bourgeois's decreased threat of violence when incarcerated. The court found that trial counsel discussed Bourgeois's abused childhood and history as a sympathetic, not an explanatory or justifying factor, and that Bourgeois agreed with their decision. The court concluded that further discussion would only have emphasized that Bourgeois was like his mother, only much worse.

The district court rejected Bourgeois's complaints that trial counsel failed timely to provide information to Dr. Cunningham. The court found that the investigators turned over to Dr. Cunningham the results of their investigation well before the guilt-innocence phase started, and there was no evidence that Dr. Cunningham complained contemporaneously to trial counsel about the timing or completeness of that information. In addition, the court found that Dr. Cunningham had interviewed potential witnesses and the record contained no indication that those interviews unveiled a wealth of evidence that the investigators failed to find.

The district court found that trial counsel was familiar with Dr. Cunningham's conclusions and had sufficient communication with him as the trial approached. However, counsel knew that calling Dr. Cunningham would

No. 11-70024

bring along "so many hazards."  The government had informed the court that, if Dr. Cunningham testified about Bourgeois's future danger, the door would be open to harmful evidence that did not come before the jury, including additional information that Bourgeois claimed to have committed another killing, had told people he wanted to kill Robin, had sexually assaulted AB1994, and was cruel to animals.  The district court observed that other aspects of Dr. Cunningham's testimony would have offended jurors, citing as an example his proposed testimony that Bourgeois's repeated violence against women should be excused because domestic violence is a common and accepted feature in society.

The district court also characterized Dr. Cunningham's testimony as being detached from the extensive testimony that the jury had already heard about Bourgeois.  First, Dr. Cunningham's conclusions that Bourgeois was an involved father who provided economic support to his children and that he was a positive influence on his nieces and nephews were at odds with the government's evidence that Bourgeois's reluctance to support more children played a role in the murder and the evidence of Bourgeois's abusive treatment of a nephew.  Second, Dr. Cunningham's assertion that his research proved that Bourgeois was not a violent risk while kept in a highly-structured environment was at odds with the evidence of Bourgeois's actual behavior while incarcerated before trial.  Third, Dr. Cunningham's confidence that prison officials could use special conditions of confinement to restrict and monitor Bourgeois's communications and prevent him from ordering violence from prison, was contradicted by evidence that Bourgeois had already bypassed similar conditions before trial.  The court concluded that, for these reasons, Dr. Cunningham's testimony would seem hollow, and even unbelievable, given the evidence of Bourgeois's vicious nature and that Dr. Cunningham's claim that Bourgeois would not be violent if given a life sentence could offend the jury and lessen trial counsel's credibility.

94

The district court further found that in his evidentiary hearing testimony, Dr. Cunningham bore an arrogant demeanor as he broadly faulted defense counsel's efforts and lauded his own. Noting that Dr. Cunningham was appointed eight months before trial, the court stated that his records showed that he did little, if anything, until the last few weeks before trial. The court also pointed out that he interviewed witnesses, some of whom testified in the evidentiary hearing, and could have secured the information that he claimed went undiscovered by trial counsel.

The district court stated that from its own observations, Dr. Cunningham would not have been a good witness for the defense because (1) his presentation consisted of information he had apparently prepared and used in numerous cases in which he had testified previously; (2) although his speech was generally of a level pitch, his demeanor in the evidentiary hearing was consistently argumentative and condescending in tone and facial expression; and (3) he openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. In sum, he did not appear to the court as an impartial scientific expert, but as someone seeking to advance an agenda.

The district court noted that all of the experts in the § 2255 proceeding who had examined and evaluated Bourgeois agreed that he suffers from BPD and all of them agreed that the disorder caused Bourgeois to be emotionally unstable, impulsive, and to have difficulties in his interpersonal relationships.[48] Although the court acknowledged the difficulty of diagnosing BPD because of Bourgeois's tangled mental-health issues, it concluded that Dr. Estrada had sufficient information prior to trial to diagnose BPD because he knew that Bourgeois had suffered neglect, rejection, and physical abuse at the hands of his

---

[48] The district court stated that Dr. Cunningham's testimony did not discuss BPD. However, he did state in his declaration, described *supra*, that Bourgeois's background and conduct in killing JG are consistent with BPD.

95

No. 11-70024

mother, was aware of Bourgeois's violence toward his wives, and had enough information to diagnose Bourgeois with the closely related disorder of narcissism. The court noted that Dr. Estrada conceded in his post-trial deposition that it was possible that he had sufficient information at the time of trial to have diagnosed BPD and that the "key features of [Bourgeois's] violent actions" had not changed as a result of the information he received after the trial.[49] The district court concluded that trial counsel had placed the building blocks for the diagnosis of BPD before the expert witnesses in compliance with their duty to investigate possible mental illness and that they could not be blamed for the experts' failure to properly diagnose and label Bourgeois's personality disorder.

The district court then addressed whether reasonable trial counsel would present the evidence of BPD if the experts had diagnosed it prior to trial. The court found that Dr. Estrada provided the fullest view into how Bourgeois's BPD affected him and that, in many ways, Dr. Estrada's deposition testimony differed little from the testimony presented at trial by both parties, but particularly by the government, as an aggravating circumstance.[50] The jury heard testimony that Bourgeois had a narcissistic personality disorder, which has in common with BPD the fact that Bourgeois would remain subject to violent rages. Thus, the diagnosis of BPD did not lessen Bourgeois's potential for future violent behavior. The court found it very possible that the jury might view the disorder

---

[49] The district court also found it telling that Dr. Cunningham's report did not mention the possibility of BPD, whereas Bourgeois now claims that the condition should have been abundantly obvious. As noted *supra*, however, Dr. Cunningham's report did mention BPD, although he did not explicitly state that it was his diagnosis.

[50] The district court noted that Dr. Estrada's deposition testimony about BPD was very similar to Dr. Cunningham's "pressure cooker" demonstration and would have raised similar concerns for the defense had it been presented at trial.

No. 11-70024

presented at the § 2255 proceeding as solely aggravating in nature because it could result in the increased likelihood that Bourgeois will act violently again.

The court also found that presentation of evidence that Bourgeois suffered from BPD was problematic for the defense because there was no evidence that BPD is susceptible to treatment. The court pointed to Dr. Estrada's deposition testimony that, although BPD would explain what Bourgeois did, it would not make him less violent in the future. Thus, the same evidence that would explain Bourgeois's violence toward JG would predict violence toward others. The court found that jurors might not have been impressed by knowing the cause of Bourgeois's viciousness; instead, they might conclude that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate. The court therefore concluded that, without some evidence that treatment or confinement would control the effects of his BPD, the jury would be left to assume that Bourgeois's violent acts would persist immutably.

The court characterized the decision whether to present evidence of BPD as a difficult question over which reasonable and seasoned defense counsel could disagree but found that Bourgeois had not sufficiently recognized the aggravating edge of that evidence, the fact that the government used similar evidence against him at trial, and the absence of any testimony about rehabilitation. The court concluded that even if trial counsel had placed the mitigating influence of the BPD diagnosis before the jury, cross-examination would have gone the way it did in the § 2255 hearing, the government would have presented rebuttal evidence similar to Dr. Price's testimony in the § 2255 hearing that the commission of the murder was more a function of antisocial psychopathic traits and features, and the jury would have responded to the information in much the same way as Bourgeois's § 2255 expert, Dr. Gelbort, who said, "I don't want them for my neighbor." Thus, the court held that a

97

No. 11-70024

reasonably-competent attorney could rationally decide not to present evidence of BPD.

The district court held that trial counsel obviously made a strategic decision not to rely on Dr. Weiner's testing because he premised his conclusion that Bourgeois had brain damage on Bourgeois's fabricated claim that he had suffered a coma after a three-wheeler accident. The court stated that although Bourgeois now points to other potential episodes that may have resulted in brain trauma, the fact remains that Dr. Weiner's testimony would have allowed the government to label Bourgeois a manipulator and a liar. With Bourgeois's chosen defense to blame the killing on Robin, and his decision to testify, trial counsel would have incentive to shore up his credibility. The court thus concluded that trial counsel's decision not to call Dr. Weiner, on that basis alone, was reasonable.[51]

The court concluded that in the end, counsel must approach the decision whether to present evidence of brain damage with careful deliberation because evidence of mental and neurological conditions is double-edged: although it can create jury sympathy, it can also bolster the government's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. With the certainty that Dr. Weiner's testimony would reveal Bourgeois's manipulation and lies and the marginal benefit to the defense, the district court concluded that trial counsel did not perform deficiently in deciding not to present evidence of neurological impairment.

---

[51] The court found that additional factors developed in the § 2255 hearing confirmed the wisdom of trial counsel's decision not to call Dr. Weiner as a witness: (1) Bourgeois repeatedly criticized Dr. Weiner for using an outdated IQ test; (2) Dr. Price testified that Dr. Weiner used outdated methodology and that Dr. Weiner's attempt to localize the injury in Bourgeois's brain was an out-of-date approach; (3) Dr. Price credibly testified that Dr. Weiner and Dr. Gelbort failed to apply norms to adjust Bourgeois's raw test scores; and (4) Dr. Price attributed the defects that Dr. Weiner described to a personality disorder, not a brain injury.

No. 11-70024

The district court found that the record does not contain a clear explanation of why trial counsel chose not to call Dr. Holden at the punishment phase to testify that Bourgeois did not commit an intentional or premeditated murder but that in a fit of rage over the spilled potty, Bourgeois lost control of himself and in the course of administering physical discipline, fatally injured JG. However, the court observed that Dr. Holden's opinion was premised on Bourgeois's having committed the murder, a theory incompatible with that chosen by the defense and which would have conflicted with Bourgeois's testimony at the punishment phase. The court also found that Dr. Holden's testimony was academic, speculative, and untethered to the facts of the crime. After seeing how his opinions fared when subjected to scrutiny (as trial counsel did in the hearing regarding the admissibility of Dr. Holden's opinions at the guilt-innocence phase), the court concluded that a reasonable and competent attorney might not have chosen for him to testify. The court observed that, in fact, the government seemed eager for Dr. Holden to testify, knowing how it would benefit the prosecution. The court concluded that its observations assured that trial counsel did not render deficient performance in not calling Dr. Holden as a punishment phase witness.

In addition to holding that counsel did not perform deficiently, the district court also held that Bourgeois was not prejudiced by counsel's decisions regarding the presentation of mitigating evidence. In evaluating prejudice, the court stated that it considered the entirety of Bourgeois's unpresented evidence, along with all of the available evidence, not just that favoring the defense.

The court began by noting that the facts of this case are "atrocious" and that the jury saw Bourgeois as a violent man: Bourgeois committed a horrible murder, preceded by torture, neglect, and abuse of his helpless victim; he was indifferent to JG's injuries, unremitting in his beatings, uncaring about her death, and unremorseful at trial; he bit her, beat her with various objects, and

99

No. 11-70024

probably sexually assaulted her; the government presented significant evidence that the rage he reserved for his young daughter resulted from financial concerns, not psychological conditions; and the episode that resulted in JG's death was not an isolated incident – Bourgeois had been violent in the past and continued his violence while in custody; he had been cruel to children before, beat his wives, assaulted his mother-in-law, threatened jail guards, tried to assault a deputy United States marshal; and had threatened to kill witnesses.

The court pointed out that trial counsel adduced some of the evidence upon which Bourgeois relied on in the § 2255 proceeding: the jury knew that his mother abused, neglected, and abandoned him, and Dr. Estrada's testimony put some of the blame on mental-health issues. The court acknowledged that habeas counsel had presented more nuanced and detailed defensive theories, but concluded that the jury would not have responded more favorably to the additional evidence than it did to the theory defense counsel fashioned to conform to Bourgeois's chosen defense. The court concluded that, given the whole of the evidence, there was no reasonable probability of a different result and thus no prejudice and consequently no cognizable ineffective-counsel claim based on a failure to investigate and present mitigating evidence of Bourgeois's background and mental state and condition.

e.

No reasonable jurist could debate the district court's decision that trial counsel's investigation and presentation of mitigating evidence was not deficient. Further, no reasonable jurist could debate the district court's decision that, considering the totality of the available mitigation evidence presented at trial and in the § 2255 proceeding, weighed against the evidence in aggravation, Bourgeois failed to demonstrate a reasonable probability that he would not have received a death sentence if counsel had presented all of the mitigating evidence that he claims they should have presented.

No. 11-70024

As the district court pointed out in careful detail, trial counsel presented some evidence of Bourgeois's impoverished background, dysfunctional family, abandonment, rejection, physical abuse, and the stress he was under at the time of the murder. The supplemental mitigating evidence developed in the § 2255 proceeding added more details, some of which were not reasonably available to trial counsel because of witnesses' reluctance to disparage Bourgeois's mother while she was still alive. Bourgeois's argument is that counsel should have presented *all* of the details. That is essentially an attack on counsel's strategic choices about what evidence to present. For example, Kerry Brown, Bourgeois's lawyer in Louisiana, was subpoenaed by trial counsel. Although the details he provided in the § 2255 proceedings about the stress that Bourgeois was under in the summer of 2002 might have been helpful, his testimony on cross-examination that Bourgeois had "beat the hell out of his mother-in-law" would not have been helpful to the defense if he had testified at trial.

The record supports fully the district court's finding that trial counsel made a strategic decision not to call Dr. Cunningham as a witness because his testimony would have been inconsistent with the defense theory, they were not impressed with him or his presentation and believed it would be better to elicit the information through cross-examination of Dr. Estrada, and they were concerned with the evidence they expected the prosecution to present in rebuttal. The record also supports the district court's observation that Dr. Cunningham would not have been a good witness for the defense not only because his proposed testimony would have been inconsistent with the defense theory, but also because jurors would likely be offended by his suggestion that Bourgeois's culpability was reduced by the recognition that he is one among millions of men in the United States who engage in domestic violence, which is widespread in our society. Moreover, his testimony about the risk of prison violence would have been rebutted by a government expert and was inconsistent with

101

No. 11-70024

Bourgeois's actual behavior while incarcerated. As the district court noted, trial counsel elicited from Dr. Estrada on cross-examination the most valuable points that Dr. Cunningham would have made: that Bourgeois's background of abuse and neglect reduced his ability to tolerate frustration and the stress that he was under at the time of the murder and that Bourgeois was less likely to be violent in prison because of his age and because of the higher supervision available in prison. Although some of trial counsel's questions to Dr. Estrada were somewhat inconsistent with Bourgeois's theory of innocence, and thus did not fully support that part of trial counsel's rationale for not calling Dr. Cunningham as a witness, the record reflects that Tinker was quite clever in getting much of the mitigating evidence before the jury by asking Dr. Estrada – who was the government's expert – what he had told the prosecution.

The record supports the district court's finding that trial counsel had available to them evidence of brain damage but made a strategic decision not to use it. The defense proposed mitigation factors, filed under seal on March 17, 2004, include the following: (1) "Bourgeois suffers from a brain dysfunction which has impaired his ability to function under duress or extreme stress"; (2) "The stress endured by Bourgeois, combined with his organic brain disorder, played a role in causing the offense"; and (3) "Bourgeois' brain disorder, while not extreme, relates to his character, background, record, and to the circumstances of the offense." Those factors ultimately were not presented to the jury because counsel had decided not to present the testimony of Dr. Weiner. As the district court correctly observed, calling Dr. Weiner as a witness necessarily would have resulted in revealing to the jury that Bourgeois and his sister, Claudia Williams, had not been truthful when they reported that Bourgeois was in a coma after his three-wheeler accident. Furthermore, as the district court noted, the jury might have perceived the evidence of brain damage as solely aggravating because it would have supported a finding that Bourgeois was likely

102

No. 11-70024

to be violent in the future because his brain damage made him impulsive and reduced his ability to control his rages.

Counsel also had available to them, from Dr. Weiner's evaluation, evidence of Bourgeois's low intelligence. However, they were aware, as well, of Dr. Estrada's pretrial evaluation, in which he reported that Bourgeois appeared to be of above-average intelligence. Under these circumstances, and in the light of the jury's knowledge of Bourgeois's reasonable success in his career as a truck driver (he had been driving 18-wheel trucks across the country, working for different corporations for over 15 years), as well as the jury's observations of Bourgeois at trial, counsel reasonably could have decided that presentation of evidence of Bourgeois's low intelligence may well have fallen flat and thus may have undermined counsel's credibility.[52]

The supplemental mitigating evidence developed in the § 2255 proceeding also added evidence of sexual abuse and BPD. The sexual abuse evidence is the most troubling. The district court's finding that the evidence was not reasonably available to trial counsel because no one told them about it is not surprising in the light of the fact that, in closing arguments at the evidentiary hearing, Bourgeois's counsel and the government's counsel agreed that Bourgeois never mentioned sexual abuse to anyone on the defense team before trial. Our review of the record, however, indicates some question as to the accuracy of that representation.

---

[52] Although Bourgeois criticizes the district court's reliance on its own observations of Bourgeois to determine that trial counsel reasonably did not rely on evidence of low intelligence, the record contains numerous instances of interactions between Bourgeois and the court that fully support the district court's observations. For example, at an in camera meeting with defense counsel and Bourgeois on February 25, 2004 (the final day of jury selection) Bourgeois complained to the court about his lawyers. The court told Bourgeois it would not let him fire his lawyers during jury selection, but offered to let him fire them and represent himself. He responded: "Your Honor, I couldn't represent myself. That just wouldn't work."

No. 11-70024

Dr. Cunningham's testimony at the evidentiary hearing indicates that Bourgeois mentioned sexual abuse to him before trial, although Dr. Cunningham did not include that information in his report to trial counsel. The government exhibits at the § 2255 hearing also contain an undated, handwritten letter from Bourgeois to defense mitigation investigator Bierbaum, in which he provides "History on myself Alfred Bourgeois that I couldn't look you eye to eye to tell you." The letter describes in detail Bourgeois's sexual molestation by Ms. Clayton's son, Jacob, as well as by "neighborhood punk" Raymond Adam. Bourgeois also stated in that letter that his Uncle Isaac Bourgeois, Jr. beat up both of the molesters; that he became a police officer for a year so that he could get revenge on his molesters; that he spit in Jacob Clayton's casket when he died in April 2002; and that he caught Raymond Adam in a parking lot about a month before he was arrested, but AB1994 was with him, and that was the only thing that saved Adam. It is not clear from the record whether this letter was provided to trial counsel prior to trial. However, it apparently was available to Bierbaum, a member of the defense team.

Bourgeois's accounts of the alleged sexual abuse are not consistent. Dr. Cunningham testified that when he interviewed Bourgeois on February 7, 2004, Bourgeois told him that his nose was broken when his mother hit him with a mop handle for lying when telling her of the sexual abuse that he said was perpetrated by Ms. Clayton's son, Jacob. Three days earlier, however, in an interview with Bierbaum and Tinker, Bourgeois told them that his nose was injured when his mother slapped him off a swing. Bourgeois reported to Dr. Toomer, who evaluated him for habeas counsel during the § 2255 proceedings, that when he reported to his mother that he was sexually molested by a man in the neighborhood at about age seven, his mother chastised him for lying about it and beat him with a skillet and an extension cord. Bourgeois told Dr. Price, the government's neuropsychologist who evaluated him during the § 2255

104

proceedings, that Ms. Clayton's son, a gay pedophile, sexually abused him during the entire time he lived with Ms. Clayton and that he was also sexually abused by a Sunday school teacher in the church after choir practice, from age six until age fourteen. Gilmore testified in the § 2255 proceeding that he could not recall whether he had asked Bourgeois about sexual abuse but that he probably had done so.

It is not possible to determine from the record whether trial counsel were aware of the sexual-abuse evidence and chose not to present it or whether that evidence was unknown to them, as counsel for both parties represented to the district court at the § 2255 evidentiary hearing. In any event, a rational defense attorney reasonably might have decided not to present the evidence, for at least two reasons. First, if offered as an explanation or excuse for Bourgeois's abuse and murder of JG, it would have been inconsistent with the defense theory. Second, and more important, if offered as grounds for the jury to feel sympathy for Bourgeois and spare his life, the presentation of such evidence might have boomeranged inasmuch as the numerous inconsistencies in the allegations would have been brought out and the jury might well have concluded that the allegations were fabricated.

No reasonable jurist could debate the district court's decision that if trial counsel had obtained and presented the evidence of BPD, it might have done more harm than good because the jury could have perceived such evidence as solely aggravating in that it strongly supported a finding that Bourgeois would pose a risk of future violence. Dr. Estrada's testimony about BPD in the § 2255 proceeding – including the fact that Bourgeois's abuse and killing of JG is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Bourgeois at the time of the offense – is the kind of testimony that a reasonable trial lawyer might well choose not to present. Moreover, Dr. Estrada's § 2255 testimony that

105

No. 11-70024

Bourgeois's BPD caused him to engage in "inappropriate behavior [that] took a violent sadistic form and sexual form" would not have helped the effort to rebut the government's evidence that Bourgeois sexually abused JG.

Contrary to Bourgeois's argument, the district court did not refuse to consider the mitigating value of any evidence that it believed might have an aggravating edge. The court's opinion clearly indicates that the court thoroughly and exhaustively considered the mitigating and aggravating value of all of the evidence, including that which the court found to be double-edged.

Finally, we reject Bourgeois's argument that the district court failed to apply the correct standard of prejudice when it concluded that "the jury" would not have responded favorably to the mitigating evidence presented at the § 2255 hearing. According to Bourgeois, the district court should have instead assessed whether there was a reasonable probability that the new evidence, when considered in totality, would have caused *at least one juror* to strike a different balance. As the government notes, if the additional mitigating evidence would have caused at least one juror to strike a different balance, then it naturally follows that the jury's decision would be a different, due to the requirement of unanimity. In any event, the district court's discussion of prejudice, considered in its entirety, reflects that the court was both aware of, and applied, the correct standard in assessing prejudice. *See* Dist. Ct. Op. at 145-48.

In sum, we conclude that no reasonable jurist would debate the district court's conclusion that Bourgeois was not prejudiced by trial counsel's failure to present the evidence developed by Bourgeois's habeas counsel.

### III. CONCLUSION

Bourgeois has not made a substantial showing of the denial of a constitutional right. The issues he presents are not adequate to deserve encouragement to proceed further, and no reasonable jurist could debate the

106

No. 11-70024

district court's assessment of his claims. Accordingly, Bourgeois's request for a COA is

DENIED.

A true copy
Attest:

Clerk, U. S. Court of Appeals, Fifth Circuit

By _____

Deputy

New Orleans, Louisiana

107

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

August 05, 2013

Clerk, U.S. District Court
Southern District of Texas
FILED

AUG **0 8** 2013

David J. Bradley, Clerk of Court

Mr. David J. Bradley
Southern District of Texas, Corpus Christi
United States District Court
1133 N. Shoreline Boulevard
Corpus Christi, TX 78401-0000

     No. 11-70024,    USA v. Alfred Bourgeois
          USDC No. 2:07-CV-223
          USDC No. 2:02-CR-216

Dear Mr. Bradley:

Enclosed is a copy of an opinion-order entered on 08/05/2013.  We
have closed the case in this court.

We will forward the record on appeal at a later date.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Joseph M. Armato, Deputy Clerk
                    504-310-7651

Enclosure(s)

cc:  Honorable Janis Graham Jack
     Mr. Victor Julio Abreu Jr.
     Ms. Jennifer L. Givens
     Ms. Renata Ann Gowie