# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : |  |
|  | : | Honorable Janis Graham Jack, |
|  | : | Senior U.S.D.J. |
| v. | : |  |
|  | : | **CAPITAL CASE** |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |
|  | : |  |

## SECOND MOTION TO VACATE SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

Peter Walker
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Peter_Walker@fd.org
Victor_Abreu@fd.org

Counsel for Petitioner

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... i

JURISDICTIONAL STATEMENT ......................................................................... 1

INTRODUCTION ................................................................................................... 1

PROCEDURAL HISTORY..................................................................................... 2

GROUNDS FOR RELIEF ...................................................................................... 3

I.      Petitioner's Execution is Prohibited by the Eighth Amendment and the Federal Death Penalty Act Because He Is intellectually disabled............................................ 3

     A.      Background: *Atkins v. Virginia* and *Moore v. Texas.* ................................3

     B.      Mr. Bourgeois Is Intellectually Disabled under Current Clinical Standards. ...................8

         1.      Deficits in Intellectual Functioning. .................................................. 8

         2.      Deficits in Adaptive Functioning........................................................ 11

         3.      Risk Factors for Intellectual Disability.............................................. 23

         4.      Age of Onset. ....................................................................................... 28

         5.      Conclusion. .......................................................................................... 28

II.      Mr. Bourgeois' § 2255 Motion Satisfies the Requirements of 28 U.S.C. § 2255(h)(2).... 30

     A.      This Motion Meets the Requirements Set Forth by § 2255(h)(2). ...................................30

         1.      *Atkins* established a new rule of constitutional law that was made retroactive on collateral review........................................................ 30

         2.      The new rule established in *Atkins* was previously unavailable to Mr. Bourgeois. ......................................................................................... 31

     B.      The Bar Against Successive Petitions Raising Claims Presented in a Prior Petition Does Not Apply to Prisoners in Federal Custody..................................................42

CONCLUSION......................................................................................................... 43

Petitioner-Movant Alfred Bourgeois, a prisoner in the custody of the United States sentenced to death and housed at the United States Penitentiary, Terre Haute, Indiana, submits this protective second motion for post-conviction relief under 28 U.S.C. § 2255 asking this Court to vacate his death sentence. In support of this motion, Mr. Bourgeois states the following:

## JURISDICTIONAL STATEMENT

Upon the Fifth Circuit's approval of Petitioner's pending Application to File Second or Successive Petition Pursuant to 28 U.S.C. § 2255(h), this Court will have jurisdiction under 28 U.S.C. §§ 2244 and 2255.

## INTRODUCTION

1.    In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. Yet for the next fifteen years, the jurisprudence of the Fifth Circuit Court of Appeals established a legal regime under which individuals who qualified as intellectually disabled according to prevailing diagnostic standards were nevertheless denied *Atkins* relief. On March 28, 2017, the United States Supreme Court decided *Moore v. Texas*, 137 S. Ct. 1039 (2017), which invalidated the way that many courts, including those in the Fifth Circuit, assessed intellectual disability under *Atkins*. In so doing, the Court rendered relief available to a category of prisoners for whom *Atkins* was previously unavailable, including Petitioner.

2.    Applying the current clinical standards mandated by *Moore*, Mr. Bourgeois is indisputably intellectually disabled. Qualified experts have administered numerous objective tests, the results of which place Mr. Bourgeois well within the range of intellectual disability in terms of both intellectual functioning and adaptive behavior. These test results are confirmed by multiple lay witness reports and documentary evidence. It is also clear that Mr. Bourgeois'

1

disabilities onset prior to the age of eighteen. Applying current clinical standards, Mr. Bourgeois is ineligible for the death penalty and his sentence must be vacated.

## **PROCEDURAL HISTORY**

3.      In 2004, following a jury trial before the Honorable Janis Graham Jack of the United States District Court for the Southern District of Texas, Mr. Bourgeois was convicted of one count of first-degree premeditated murder, 18 U.S.C.A. § 1111(a). After a sentencing hearing, the jury returned a verdict of death on March 24, 2004 and Mr. Bourgeois was formally sentenced to death by this Court on the same date.[1] The Fifth Circuit upheld the conviction and sentence on direct appeal. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005).

4.      On May 15, 2006, Mr. Bourgeois filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C.A. § 2255. He raised fifteen claims, including that he was intellectually disabled and that his death sentence was unconstitutional pursuant to *Atkins*. This Court denied the motion and declined to certify any issue for consideration by the appellate court. *United States v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684 (S.D. Tex. May 19, 2011) (hereinafter "*Bourgeois*"). The Fifth Circuit likewise refused to issue a certificate of appealability ("COA") on any issue. *United States v. Bourgeois*, 537 F. App'x 604 (5th Cir. 2013). Based on the Fifth Circuit's precedent at the time, which controlled this Court's resolution of his intellectual disability claim, Mr. Bourgeois did not seek a COA on his *Atkins* claim.

5.      Mr. Bourgeois now applies to file a second or successive motion under § 2255(h)(2). Pursuant to §§ 2255(f) & (h), this application is timely as it is filed within one year of the date that *Atkins* relief became available to Petitioner through the ruling announced in *Moore*.

---

[1] Due to a procedural irregularity that is immaterial to any claim made herein, Petitioner's sentence was vacated and reimposed on March 25, 2004.

## GROUNDS FOR RELIEF

I.  **PETITIONER'S EXECUTION IS PROHIBITED BY THE EIGHTH AMENDMENT AND THE FEDERAL DEATH PENALTY ACT BECAUSE HE IS INTELLECTUALLY DISABLED.**

6.      The Eighth Amendment prohibits the execution of a person with intellectual disability. *Atkins*, 536 U.S. at 321. Even before *Atkins*, the Federal Death Penalty Act prohibited the execution of intellectually disabled offenders in federal prosecutions. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."). As detailed below, Mr. Bourgeois is intellectually disabled and thus he may not be executed.

A.      **Background:** *Atkins v. Virginia* **and** *Moore v. Texas.*

7.      In *Atkins*, the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of mentally retarded individuals. As the Court explained, "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S. at 306.[2] The Court based its judgment, in part, on the fact that "the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 315-16.

---

[2] *Atkins* used the term "mental retardation," which was the most current name at the time. Since *Atkins* was decided, the diagnosis of mental retardation has been renamed to intellectual disability. In *Hall*, the Supreme Court acknowledged this change in nomenclature and referred to the diagnosis of mental retardation as intellectual disability. *Hall v. Florida*, 134 S. Ct. 1986 (2014). Accordingly, this motion uses the term intellectual disability. However, the term "mental retardation" or "mentally retarded" is also used in its historic context relevant to this case.

3

8.      *Atkins* referred to the prevailing clinical definitions as helpful in the task of determining whether an individual should be exempted from the death penalty. *Id.* at 308 n.3, 317. The Supreme Court cited the definition for intellectual disability established by the American Association on Mental Retardation, which has since been renamed the American Association on Intellectual and Developmental Disabilities ("AAIDD"). The Supreme Court also cited the definition outlined by the American Psychiatric Association ("APA"), which has most recently been set forth by the *Diagnostic and Statistical Manual of Mental Disorders – 5th Edition* ("DSM-5").

9.      Despite the *Atkins* Court's reliance on current diagnostic criteria in discussing intellectual disability, many courts fashioned non-clinical standards for assessing whether a defendant was entitled to *Atkins* relief, rejecting medical consensus in favor of "lay perceptions of intellectual disability." *Moore*, 137 S. Ct. at 1051. The Supreme Court invalidated this practice with its decision in *Moore*, instructing the lower courts that they do not have "unfettered discretion to define the full scope of the constitutional protection." *Id.* at 1052-53. Specifically, in *Moore*, the Court rejected the Texas Court of Criminal Appeals' ("CCA") reliance on the so-called *Briseno* factors[3] to define intellectual disability. In so doing, however, the Court also rejected broader practices applied by other courts, including the Fifth Circuit Court of Appeals, the jurisprudence of which controlled this Court in ruling on Mr. Bourgeois' initial *Atkins* claim asserted in 2006.

10.     First, the *Moore* Court faulted the CCA's approach to assessing the petitioner's intellectual functioning. It began by explaining that, "where an [intelligence quotient, or IQ]

---

[3] The *Briseno* factors are a set of seven evidentiary guidelines first adopted by the CCA in 1992 for purposes of assessing intellectual disability. *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

4

score is close to, but above, 70, courts must account for the test's 'standard error of measurement.'" *Moore*, 137 S. Ct. at 1049 (citing *Hall*, 134 S. Ct. at 1995, 2001). Given that Moore had an IQ score of 74, his intellectual functioning should have been viewed as somewhere in the range of 69 to 79. *Id.* Yet the CCA disregarded the lower end of that range based on "factors unique to Moore." *Id.* The *Moore* Court flatly rejected this approach, holding: "we *require* that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id.* at 1050 (emphasis added). Like the CCA, the Fifth Circuit's pre-*Moore* jurisprudence held that courts are "not required to find [an individual] to be mentally retarded merely because the low end of [the] confidence band was below 70," but rather may "make a flexible determination" as to whether the individual had "significantly subaverage general intellectual functioning." *Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006); *see also Bourgeois*, 2011 WL 193064 at *26 ("When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the Fifth Circuit has denied relief when the evidence more persuasively suggests that, notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval.").

11.    Second, the *Moore* Court found that the CCA had "overemphasized Moore's perceived adaptive strengths" – *e.g.*, he "lived on the streets, mowed lawns, and played pool for money" – when "the medical community focuses the adaptive-functioning inquiry on adaptive deficits." *Moore*, 137 S. Ct. at 1050. Like the CCA, the Fifth Circuit expressly held prior to *Moore* that "evidence of a strength in a particular area of adaptive functioning *necessarily shows* that the defendant does not have a weakness in that particular area." *Clark*, 457 F.3d at 447

5

(emphasis added); *see also Bourgeois*, 2011 WL 193064 at \*44 ("The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses.").

12.     Third, the *Moore* Court criticized the CCA for finding that risk factors for intellectual disability somehow "detracted from a determination that [Moore's] intellectual and adaptive deficits were related." *Moore*, 137 S. Ct. at 1051. Contrary to the CCA's findings, the Supreme Court explained that one's traumatic experiences from childhood "count in the medical community" and "[c]linicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Id.* Again, the Fifth Circuit, prior to *Moore*, engaged in the practice that *Moore* discredited. *See, e.g., Long v. Davis*, 663 F. App'x. 361, 366 (5th Cir. 2016), *vacated by Long v. Davis*, 138 S. Ct. 72 (2017) ("True, Long demonstrated some adaptive deficiencies. . . . Still, Long did not show that these adaptive deficiencies were related to his alleged intellectual disability . . . . Instead, the evidence suggested any adaptive behavior deficits were the result of drug use, behavioral problems, lack of motivation, and a dysfunctional family environment."); *see also Bourgeois*, 2011 WL 193064 at \*44 ("To the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse."); *id.* ("To the extent that Bourgeois showed problems in his life, such as in functional academics, the evidence does not unquestionably place the blame for those deficiencies on mental retardation.").

13.     Finally, the *Moore* Court found that the standard applied by the CCA had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled by laypeople. *Moore*, 137 S. Ct. at 1051-52. The Court explained:

6

> As we instructed in *Hall*, adjudications of intellectual disability should be "informed by the views of medical experts." That instruction cannot sensibly be read to give courts leave to diminish the force of the medical community's consensus. Moreover, the several factors *Briseno* set out as indicators of intellectual disability are an invention of the CCA untied to any acknowledged source. Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseno* factors "creat[e] an unacceptable risk that persons with intellectual disability will be executed." Accordingly, they may not be used, as the CCA used them, to restrict qualification of an individual as intellectually disabled.

*Id.* at 1044 (alteration in original) (citations omitted). Pre-*Moore*, the Fifth Circuit also ruled out claims of intellectual disability based on the fact that the petitioner could engage in certain tasks inconsistent with the layperson's understanding of the capabilities of an intellectually disabled individual. *See, e.g., Webster v. United States*, 421 F.3d 308, 313 (5th Cir. 2005) (rejecting § 2255 petitioner's *Atkins* claim based on evidence that petitioner "has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the 'home' he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math"); *see also Bourgeois*, 2011 WL 193064 at *37, 41-43 (rejecting Petitioner's *Atkins* claim based in part on the fact that he "maintained his checking account," displayed "fastidious record keeping" and "competent spelling," currently "excels" at "writing [his] ABC's," and "drove a tractor-trailer across the country for decades without a major accident"); *id.* at *30 ("Notably, this Court's interactions with Bourgeois have provided an important point of observation. . . . The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses, . . . Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive.").

7

14. In short, *Moore* holds that courts are constitutionally required to apply current clinical standards when adjudicating intellectual disability claims. Applying such standards here, Mr. Bourgeois meets the definition of intellectual disability and is thus ineligible for execution.

**B.   Mr. Bourgeois Is Intellectually Disabled under Current Clinical Standards.**

15. Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court in *Moore*, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age 18 ("prong three"). *See* DSM-5 at 33; *Intellectual Disability: Definition, Classification, and Systems of Supports – 11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD-2010") at 5. Mr. Bourgeois satisfies each of these prongs.

**1.   Deficits in Intellectual Functioning.**

16. Under the classification schemes outlined by the APA and the AAIDD, deficient intellectual functioning is defined as an IQ of approximately 70 with a confidence interval derived from the standard error of measurement ("SEM") taken into consideration. Because a 95% confidence interval on IQ tests generally involves a measurement error of five points, at a minimum, scores up to 75 also fall within the mental retardation range. The DSM-5 states:

> Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally + 5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 ± 5).

DSM-5 at 37; *see also Diagnostic and Statistical Manual of Mental Disorders – 4th Edition* ("DSM-IV-TR") at 41-42 (indicating that IQ scores of 75 and below satisfy prong one of the intellectual disability diagnosis).

17. Similarly, the AAIDD stated in 2002:

8

> The 2002 [American Association of Mental Retardation] System indicates that the SEM is considered in determining the existence of significant subaverage intellectual functioning (see above boxed statement). In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error.

*Mental Retardation: Definition, Classification, and Systems of Support (10th Ed.)*, American Association on Mental Retardation (2002) ("AAIDD-2002") at 58-59; *see also* AAIDD-2010 at 36 (finding the consideration of the standard error of measurement or "SEM" and reporting an IQ score with a confidence interval deriving from the SEM to be critical considerations in the appropriate use of IQ tests). However, both the APA and the AAIDD have rejected fixed cutoff points for IQ in the diagnosis of intellectual disability, as IQ scores are approximations of intellectual functioning. *See* DSM-5 at 37; AAIDD-2010 at 40.

18.    IQ scores must also be corrected for the Flynn Effect. The Flynn Effect reflects a well-established finding that the average IQ score of the population increases at a rate of 0.3 points per year or 3 points per decade. Accordingly, the AAIDD states that best practices require that any IQ score be corrected downwards at a rate of 0.3 points per year since the test was normed. *See User's Guide: Mental Retardation, Definition, Classification and Systems of Supports*, 10th Ed., AAIDD (2007) ("AAIDD-2007"), at 20-21; AAIDD-2010 at 37 (same); *User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports*, AAIDD (2012) ("AAIDD-2012") at 23 (same); McGrew, K., *Norm Obsolescence: The Flynn Effect*, The Death Penalty and Intellectual Disability, AAIDD (2015) at 160-166 (same). The APA also recognizes the Flynn Effect's ability to affect test scores. DSM-5 at 37. Indeed, the Psychological Corporation, which publishes the Wechsler tests that Mr. Bourgeois was administered, first acknowledged the existence of the Flynn Effect and its inflation rate of 0.3 points per year in 1997. Technical Manual, Wechsler Adult Intelligence Scale, the Psychological Corporation 8-9 (3d ed. 1997).

9

19.    Mr. Bourgeois' IQ has been tested on two occasions. In both instances, Petitioner's intellectual capacity tests in the intellectually disabled range.

20.    First, one week prior to trial, on February 28, 2004, Petitioner was evaluated by neuropsychologist Dr. Donald E. Weiner. Petitioner obtained a full-scale IQ of 75[4] on this administration of the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"). *See* Exh. 1 (Dr. Weiner Score Sheet from WAIS-R); Exh. 2 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/3/04). Although Mr. Bourgeois' results on Dr. Weiner's test administration put him in the range of intellectual disability, this score overestimates his actual IQ due to the Flynn Effect. Dr. Weiner used the WAIS-R in assessing Mr. Bourgeois' intelligence, despite the availability of the re-normed and updated Wechsler Adult Intelligence Scale-III ("WAIS-III").[5] The WAIS-R was normed in 1978.[6] Because the WAIS-R was normed twenty-six years prior to its administration to Mr. Bourgeois, Dr. Weiner's evaluation must be adjusted to take into account the fact that the population as a whole experiences gains in IQ testing over time. Appropriately adjusted, Mr. Bourgeois' 2004 IQ score is more accurately reflected as a score of 68. *See* Exh. 3 (Declaration of Dr. Michael M. Gelbort at ¶ 5).

21.    Second, in preparation for Mr. Bourgeois' initial habeas petition, Dr. Michael Gelbort conducted extensive psychological and neuropsychological testing that yielded even further evidence demonstrating Petitioner's intellectual disability. These results include an IQ of

---

[4] This score was reported as a 76 in Dr. Weiner's report, however this was a typographical error. The data sheet has the score as 75. *See Bourgeois*, 2011 WL 193064 at *37, at *25 (noting the discrepancy and the fact that Dr. Weiner clarified that the error during the evidentiary hearing).

[5] The fact that the WAIS-R had been replaced by the WAIS-III at the time of its administration in this case does not make it invalid. Rather, the testing was valid but the scoring should have been modified in accordance with the Flynn Effect.

[6] Norming is a statistical term to describe how the creators of a given test are able to assign percentile ranks to given scores.

70 (Verbal 67 and Performance 78) on the WAIS-III,[7] which was the then-current version of the test given by Dr. Weiner. *See* Exh. 3 (Gelbort Declaration at ¶ 3).

### 2.    Deficits in Adaptive Functioning.

22.    The AAIDD has defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives." AAIDD-2010 at 15. The DSM-5 defines adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5 at 37.

23.    The AAIDD and the APA have indicated that the adaptive deficits prong is satisfied if there is a significant limitation in one of three types of adaptive behavior – conceptual, social, or practical – or in the composite of the individual's adaptive functioning. AAIDD-2010 at 43; DSM-5 at 37.

24.    Skills included in the conceptual realm are: executive functioning (judgment, planning, impulse control, and problem solving), memory, language, functional academic skills, and self-direction. The social realm encompasses skills and characteristics such as: social judgment and competence, interpersonal responsibility, self-esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. The practical realm refers to skills such as: activities of daily living/learning and self-management across life settings, occupational skills, use of money, health and safety, and other self-care skills.

25.    As it is expected that strengths co-exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. "[S]ignificant

---

[7] The WAIS-III "is considered the 'gold standard' of IQ tests and is considered to be the most reliable means of assessing a person's intellectual capacity." *Rivera v. Dretke*, 2006 WL 870927 (S.D. Tex. March 31, 2006).

limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD-2010 at 47. Persons with intellectual disability may have "strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." AAIDD-2002. Accordingly, as explained above, the Court recently found unconstitutional the Texas Criminal Court of Appeals' attempt to overcome deficits with perceived adaptive strengths because "the medical community focuses the adaptive functioning inquiry on adaptive deficits." *Moore*, 137 S. Ct. at 1050 (citing AAIDD-2010, DSM-5, and AAIDD-2002 with approval); *see also* DSM-5 at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning").

26.    While deficits in only one of the three adaptive-skills domains suffices to meet the adaptive deficits prong, extensive lay-witness evidence, records, and psychological testing confirm that Petitioner suffered from significant adaptive deficits before the age of eighteen in all three domains recognized by the AAIDD and the DSM-5.

### a.    Formal testing.

27.    In 2009, clinical psychologist Victoria Swanson, Ph.D., administered the Vineland Adaptive Behavior Scales, 2d Edition ("Vineland-II"), a standardized measure commonly used to evaluate limitations in adaptive behavior. Dr. Swanson, who has spent her career diagnosing and providing services to intellectually disabled individuals and who served as the President of the National Psychology Division of the AAIDD from 2003 to 2005, was eminently qualified to administer this test. *See* Exh. 4 (Declaration of Victoria Swanson, Ph.D. at ¶ 2). She administered the instrument to Petitioner's childhood neighbor Beverly Frank, who, after reviewing the background materials provided by counsel, appeared to Dr. Swanson to be a "prime subject to whom to administer" the test. *Id.* at ¶ 4. Dr. Swanson also administered the

12

Adaptive Behavior Assessment System ("ABAS"), a second commonly used standardized measure of adaptive functions, to Ms. Frank.

28.    Dr. Swanson's testing indicates profound deficits in adaptive functioning in all three of the domains recognized by the AAIDD and the DSM-5 (conceptual, practical, and social), as well as in the composite score of Petitioner's overall adaptive functioning. In all three of those domains and the composite score, Dr. Swanson's testing returned scores that were more than two standard deviations below the mean[8] and well into the impaired range. As she summarizes in her declaration:

> Mr. Bourgeois scored a 66 on the Vineland-II. On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization. These scores place him well within the range of mental retardation in the sphere of adaptive deficits. They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

*Id.* at ¶ 5. The results from the ABAS likewise "showed Mr. Bourgeois to have significant adaptive deficits." Exh. 5 (Supplemental Report of Victoria Swanson, Ph.D. at 2).

29.    Along with the testing administered to Ms. Frank, Dr. Swanson interviewed a number of other individuals who knew Mr. Bourgeois at various points in his life. The information provided by these informants confirmed Dr. Swanson's "opinion that Mr. Bourgeois exhibited significant deficits in his adaptive functioning throughout his childhood and into adulthood." *Id.*

30.    Dr. Swanson also directly tested Mr. Bourgeois to assess his adaptive functioning. She administered the Woodcock-Johnson Third Edition Tests of Achievement ("WJ-III") to Petitioner to "determine current academic functioning." Exh. 5 (Swanson Supplemental Report at 3). Dr. Swanson explained the test and summarized her results as follows:

---

[8] The mean is a score of 100 and one standard deviation is 15 points.

> The WJ-III (Mean, 100; SD, IS) is a wide range, comprehensive set of individually administered tests for measuring cognitive abilities, scholastic aptitudes, and achievement. The test assesses a wider range of academic areas at a greater depth than any other standardized, individually administered, academic battery currently available. The WJ-III is nationally standardized on subjects aged 24 months to 95 years of age, and is considered the "gold standard" for assessing academic abilities. Although Mr. Bourgeois attended four years of high school, his scores on the WJ-III are in the range of mental retardation.

*Id.*

31.    Petitioner's individual achievement test scores on the WJ-III include: story recall at a kindergarten level; applied problem solving at a second grade level; oral comprehension and passage comprehension at a third grade level; writing samples and understanding directions at a fourth grade level; calculation, reading fluency, and writing fluency at a fifth grade level; and math fluency at a sixth grade level. *See* Exh. 6 (WJ-III Score Report). The only tests on which he scored above a sixth grade level – letter-word identification (eighth grade) and spelling (thirteenth grade) – are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher-level thinking.[9] The primary significance of these higher scores, therefore, is that they support Dr. Swanson's conclusion that Mr. Bourgeois was not malingering;

---

[9] In analyzing Petitioner's initial *Atkins* claim in 2011, the court stated that "Bourgeois scored low on some areas, but also in the high school range for spelling and reading." *Bourgeois* at *40. In fact, the only "high school range" score he received was for spelling. His "broad reading score," which is a cluster score measuring several abilities, was at a fifth grade level, as was his reading fluency, as noted above. *See* Exh. 6. Passage comprehension was at a third grade level. *Id.* To the extent the court was referring to Petitioner scoring at an eighth grade level on "letter-word identification," it is worth noting that this score is testing only the subject's ability to "identify[] printed letters and words." Alan S. Kaufman & Elizabeth O. Lichtenberger, *Assessing Adolescent and Adult Intelligence* 575 (2006). It should also be noted that, under current clinical standards, the fact that an adult scores at the eighth grade level in a particular area is not inconsistent with a finding of adaptive impairment. Rather, the DSM-5 instructs that an adult qualifies as mildly intellectually disabled where "abstract thinking, executive function. . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired," without referencing any specific grade equivalency. DSM-5 at 34.

14

he scored well where he could, even if the scores still reflect limited academic functioning for an adult. *See* NT 09/20/10 at 57-58.[10]

32. Finally, Mr. Bourgeois' neuropsychological testing showed significant adaptive deficits. Both Dr. Gelbort and Dr. Weiner note that Mr. Bourgeois' ability to process new information and comprehend new topics is significantly impaired. *See* NT 09/10/10 at 26 (Dr. Gelbort testifying that Petitioner's "learning is problematic, especially when he has to understand conceptually the information being presented to him"); Exh. 2 (Weiner Declaration at ¶ 3) (Mr. Bourgeois has "deficits in his ability to function with new information and in unfamiliar settings"). Testing of his memory shows mild to moderate impairment. Results on the Halstead-Reitan neuropsychological test battery reveal overall brain impairment. Exh. 2 (Weiner Declaration at ¶ 3). These results are consistent with intellectual disability in that they confirm Mr. Bourgeois' impaired ability to comprehend and process information.[11]

### b. Records and lay witness evidence.

33. Records and lay witnesses substantiate the significant adaptive deficits revealed by Dr. Swanson's testing.

### i. Conceptual domain.

**Academic Functioning**

34. One measure of the conceptual domain is academic functioning. Mr. Bourgeois' *Lutcher High School transcript reveals a child with low intelligence who struggled in school. He*

---

[10] Cites to "NT" refer to the Notes of Testimony from the evidentiary hearing held before this Court between September 10, 2010 and September 24, 2010.

[11] Jethro Toomer, Ph.D., also reviewed the results of the neuropsychological testing. Along with his review of Mr. Bourgeois' adaptive functioning, discussed further below, the results of this testing led Dr. Toomer to conclude that Mr. Bourgeois is intellectually disabled. *See* Exh. 7 (Declaration of Dr. Jethro Toomer at ¶ 10).

achieved poor grades across all subjects in high school, with a median score of C to D. In addition, he attended basic level classes. For example, the highest level of math studied was first year algebra. This was only a half credit course taken in his third year of high school, and he obtained a D. *See* Exh. 8 (Lutcher High School Transcript dated 5/24/83).

35.     Due to Mr. Bourgeois' age, no records of elementary school are available. Likewise, there is no record of his achievement on standardized testing. Mr. Bourgeois was raised by a very poor family in a small rural town in Louisiana. There are no records that he was ever tested for special education, or whether such services were even available.[12] However, family members did report to Dr. Swanson that Petitioner failed a grade in elementary school and participated in speech therapy. Exh. 5 (Swanson Supplemental Report at 3). "Reporters also advise[d] that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money." *Id.*

36.     Despite scarce school records, other records exist that confirm that Mr. Bourgeois struggled in the academic realm. For instance, in 1985, Mr. Bourgeois attempted to qualify for permanent employment with the St. John the Baptist Parish Sheriff's Office, but was unable to pass the necessary examinations. His training instructor, Lt. David M. Wilson, described Mr. Bourgeois' conceptual difficulties, noting that Mr. Bourgeois was given two opportunities to pass the firearms test, and he participated in fifty-four hours of training in preparation for the test. In Lt. Wilson's view, Alfred's failure on the firearms test, and his "poor performance

---

[12] The availability of services for Mr. Bourgeois is highly doubtful in light of the fact that his older brother, who suffered from cerebral palsy, did not receive any services in the state of Louisiana until 2001, when he was middle-aged. *See* NT 09/20/10 at 41.

scholastically," made further training "unfruitful and unwarranted." *See* Exh. 9 (Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85).

37.    Mr. Bourgeois also underwent a psychological evaluation pursuant to his application to the St. John the Baptist Parish Sheriff's Office. The resulting report notes that Mr. Bourgeois had to repeat a grade in school. *See* Exh. 10 (Psychological Evaluation by Morris & McDaniel, Inc. dated 5/22/85).

38.    Finally, Petitioner's results on the WJ-III achievement tests confirm his low level of academic functioning. *See supra* Section I.B.2.a; *see also* NT 09/20/10 at 58 (Dr. Swanson testifying that Mr. Bourgeois' "academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation").

## Executive Functioning and Self-Direction

39.    Along with academic functioning, another indicator of deficits in the conceptual domain is limited executive functioning and self-direction. In Mr. Bourgeois' case, such deficits were apparent from a very young age. Family members recall that he was slow to learn and comprehend concepts as a child. He had trouble understanding and following directions. *See* P Exh. 11 (Declaration of Michelle Warren at ¶ 5) ("Alfred had trouble when he was a child. Sometimes he would do just the opposite of what he was supposed to do."); *id.* at ¶ 6 ("Alfred would have trouble listening to directions, so he would mess up more than the rest of us [his siblings] and get beatings more often."); Exh. 12 (Declaration of Lawanda Cook at ¶ 4) ("I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.").

17

40.    Petitioner's childhood neighbor Beverly Frank describes him as a child who could not "catch on to things" and "who had to have the rules explained to him over and over again." Exh. 13 (Declaration of Beverly Frank at ¶ 7). She continued:

> Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.
>
> My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

*Id.* at ¶¶ 7-8.

41.    Likewise, his sister Claudia Williams recalls that Alfred "couldn't learn," no matter that his slowness would get him a beating:

> [Alfred] didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Exh. 14 (Declaration of Claudia Williams at ¶ 5).

42.    These problems continued into adulthood. *See, e.g.,* Exh. 15 (Declaration of Michelle Armont at ¶ 8) ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem."); *id.* ("Things that would be obvious to a normal person were not obvious to Alfred."); Exh. 11 (Warren Declaration at ¶ 16) ("It was like [Alfred] had a block and could not reason things out or change his behavior."); Exh. 16 (Declaration of Ivy Thomas at ¶ 4)

("Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

43.    Mr. Bourgeois' decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions. In the words of his half-sister, Michelle Armont, "Alfred could not consider the consequences of his actions." Exh. 15 (Armont Declaration at ¶ 8).

44.    The results of the neurological testing discussed above confirm these witness reports. In particular, the testing showed that Mr. Bourgeois has difficulty learning, processing new information, and dealing with new situations, as well as problems with his memory. *See supra* Section I.B.2.a. After reviewing this testing, combined with her "own observations and evaluations," Dr. Swanson concluded that "Mr. Bourgeois is deficient in his ability to absorb and understand information" and "is significantly impaired in his ability to solve problems." Exh. 5 (Swanson Supplemental Report at 3).

**Communication**

45.    An individual's ability to effectively communicate also falls within the conceptual domain. Mr. Bourgeois' difficulty with communication is confirmed by his results on the WJ-III, which includes tests for oral comprehension, oral language, and listening comprehension. NT 09/20/10 at 58. Petitioner's scores in these areas were at the third and fourth grade level, or the 9th to 16th percentile. *Id.* at 59. As Dr. Swanson explained, individuals with intellectual disability may "function overall at about as high as a sixth grade level," *id.* at 45, meaning Mr. Bourgeois' scores indicated conceptual impairment.[13]

---

[13] The DSM-IV-TR, which was the most current edition at the time of Petitioner's initial § 2255 proceedings, provided that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth-grade level." DSM-IV-TR at 43. However, the current DSM-5 does not include such a specific cut-off in the description of mild

19

### ii.    Social deficits.

46.    Childhood playmates recall Petitioner's difficulties in the social realm. His family and neighbors remember him as a slow and awkward child who had difficulty playing with the other children and "fitting in." *See* NT 09/21/10 at 98 (Beverly Frank testifying that Alfred could not understand the games played by other children); Exh. 17 (Declaration of Louis Russell, Jr. at ¶ 3) ("Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature."); Exh. 18 (Declaration of Nathaniel Banks at ¶ 3) ("Alfred was a fragile child. He spent a lot of time by himself. People used to pick on Alfred a lot. . . . I just remember Alfred crying at anything. Someone would tease him and he would break down crying. . . . Alfred wasn't any good at sports. He didn't play sports with us.").

47.    Witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments consistent with intellectual disability. *See* DSM-5 at 34 (significant deficits in the social domain include "difficulties regulating emotion and behavior in age-appropriate fashion"); Elaine E. Castles, *We're People First: The Social and Emotional*

---

intellectual disability. Instead, when summarizing the level of functioning necessary for significant impairments in the conceptual domain, it states: "For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function. . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." DSM-5 at 34. By contrast, the sixth-grade cut off is used in the description of moderate intellectual disability. *Id.* at 35. Hence, under current diagnostic standards, the fact that so many of Petitioner's achievement scores fell below the sixth grade level indicates that he is not just mildly intellectually disabled, but falls within the moderate level of severity. *See supra* Section I.B.2.b (discussing Petitioner's scores on the Woodcock-Johnson achievement tests, the vast majority of which fell below sixth grade equivalency).

*Lives of Individuals with Mental Retardation*, at 26 (1996) ("Cognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations.").

48.     Mr. Bourgeois' social abilities did not improve with age. A psychiatric evaluation conducted in 1985, when Petitioner was twenty-one years old, reported that Mr. Bourgeois had problems in evaluating his self-worth and had low self-esteem, consistent with deficiencies in social adaptive functioning. *See* Exh. 10 (Psychological Evaluation).

49.     Mr. Bourgeois also proved unable to maintain a healthy intimate relationship. He was married to four different women. *See* Exh. 19 (Declaration of Kathleen Kaib at ¶¶ 5-12). Consistent with the executive functioning and emotional dysregulation issues discussed above, each marriage was characterized by dysfunction and ultimately failed. *Id.* Indeed, all of his relationships were unstable due to his inability to regulate his emotions. *See id.* at ¶ 4 ("Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.").

### iii.     Practical deficits.

50.     As noted above, as a child, Mr. Bourgeois proved unable to follow simple directions, which implicates both the conceptual and the practical domain. Reporters also told Dr. Swanson that Petitioner "was delayed compared to his peers in learning simple skills like tying his shoes and counting money," and it "took young Alfred much more time than his peers to learn how to ride a bike." Exh. 5 (Swanson Supplemental Report at 4); *see also* NT 09/21/10 at 99 (Ms. Frank testifying that Alfred could not dress himself as a child; he was always putting on mismatched socks and could not tie his shoes or button a shirt even when he was "really up in age"); *id.* at 138-39 (Ms. Frank's sister, Brenda Goodman, corroborating Ms. Frank's account of Petitioner's difficulties dressing himself); *id.* at 324, 360 (Alfred's cousin testifying that young Alfred had difficulty learning new games and how to ride a bike). Mr. Bourgeois was generally

21

described as someone who had to rely on family and friends "in order to perform daily life activities." *Id.* at 2.

51.    As with the other realms, his practical deficits persisted through adulthood. Several reporters recall Alfred's terribly impaired financial abilities. *See* Exh. 15 (Armont Declaration at ¶ 8) ("[Alfred] did not understand that he could not afford the things he bought. . . . He just bought things without understanding how hard it would be to make the payments."). Based on her interviews of Petitioner's family, friends, and co-workers, Dr. Swanson also concluded that Mr. Bourgeois "has difficulty understanding and managing money." Exh. 5 (Swanson Supplemental Report at 3).

52.    These witness reports are corroborated by other evidence. For example, Mr. Bourgeois was sued for failing to comply with the terms of a lease he had made with the Ford Motor Credit Company. In an illustration of his inability to understand his finances, Mr. Bourgeois agreed to lease a $40,000 Ford Explorer. In addition to the price tag being well beyond his means (as evidenced by his default on the agreement and ensuing law suit), the lease agreement shows that he agreed to put down over $9,000 on a lease, and with his monthly payments, he would have paid a total of over $26,000 only to return the vehicle after three years. Similarly, in 2002, the State of Louisiana enacted a lien on Mr. Bourgeois for nonpayment of his 2000 taxes. *See* Exh. 20 (*Ford Motor Credit Company vs. Alfred Bourgeois* Suit on Net (Closed End) Lease filed 4/25/03).

53.    Mr. Bourgeois is also described as oblivious towards safety. Family members and neighbors recall that as a teenager, Alfred drove a four-wheeler "straight into a pole." Exh. 17 (Russell, Jr. Declaration at ¶ 4). *See also* Exh. 14 (Williams Declaration at ¶ 6). An acquaintance later in life, Lawanda Cook, likewise remembers Alfred taking "crazy chances in the truck he

22

drove. . . . [O]ne time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all." Exh. 12 (Cook Declaration at ¶ 3).

### 3.    Risk Factors for Intellectual Disability.

54.    The *scientific community recognizes a number of risk factors associated with intellectual disability*. These factors, categorized as biomedical, social, behavioral, and educational, corroborate an individual's intellectual disability. *See* AAIDD-2010 at 61 ("[T]he impairment of functioning that is present when an individual meets the three criteria for a diagnosis of [intellectual disability] usually reflects the presence of several risk factors that interact over time."). Mr. Bourgeois' diagnosis of intellectual disability is reinforced by the presence of a number of recognized risk factors for intellectual disability in his life history.

**<u>Impaired Parenting</u>**

55.    Mr. Bourgeois was the fifth of seven children born to Eunice Bourgeois. All seven children were born in a time span of under nine years and were conceived by four different fathers. *See* NT 09/21/10 at 6-7; Exh. 21 (Mitigation PowerPoint by Mark D. Cunningham, Ph.D. at 3). Eunice was "overwhelmed" by the number of children in her care. NT 09/21/10 at 133-34; *see also* (Dr. Cunningham testifying that there were indications that Petitioner suffered psychological damage from being raised in an "overwhelmed family system").

56.    Eunice was chronically depressed by the time Mr. Bourgeois was born. She first became depressed when the father of her first three children suddenly abandoned her. Exh. 22 (Declaration of Elnora Bourgeois McGuffey at ¶ 2); Exh. 23 (Declaration of Jersey Henry at ¶ 3). Her depression worsened when her mother died while Eunice was in the hospital delivering

23

her fourth son. Exh. 24 (Wilmer Bourgeois Declaration at ¶ 7). Then, her son Clyde died at the age of twelve when he fell out of a boat and drowned. Exh. 11 (Warren Declaration at ¶ 3).

57.     Eunice was also an alcoholic. *See* NT 09/21/10 at 132-34 (neighbor testifying that Eunice drank "excessively," getting intoxicated "every day"); *id.* at 397 (relative of Eunice testifying that she "drank every day").

58.     According to one family neighbor, Eunice's alcoholism and the stress of raising so many children on her own caused her to forget what "was important in life regarding raising her children," including such basic tasks as sending them to school. *Id.* at 132-33. Family members concurred that Eunice failed to fulfill her role as a parent to Petitioner and his siblings. *See, e.g.*, Exh. 24 (Wilmer Bourgeois Declaration at ¶ 4) ("Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother."); Exh. 25 (Memoranda Generated by Gerald Bierbaum at 39) (quoting Harry Bourgeois, Eunice's cousin, as saying: "Alfred's momma didn't do shit for him. . . . All her kids raised they self. . . . It was like he didn't have no momma.").

**Child Abuse and Neglect**

59.     Numerous witnesses reported that Mr. Bourgeois' mother took out her hard life and troubles on her children, with a special focus on Petitioner. There is no question she physically assaulted her children, but had a special fixation on Mr. Bourgeois. Beverly Frank explains:

> Alfred's mother treated him differently than her other children. She talked to Alfred differently and she treated him differently too. I saw her give her other children money and not give Alfred any money. I also saw her give cookies to her other children and not give Alfred any cookies.
>
> Eunice whipped all her children. She was a single parent for several years and she disciplined the children herself. Eunice would use a switch or anything else she

could get her hands on to whip the children. I know she would whip the children so much that they would have welts on their body. I believe you should never whip a child that much.

Exh. 13 (Frank Declaration at ¶¶ 3-4). Claudia Williams, Petitioner's sister, likewise recounts:

Both those things [*sic*] [losing one child to drowning and having a second who was disabled] took a lot of our mother's attention and may have contributed to the beatings she gave us. . . .

Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Exh. 14 (Williams Declaration at ¶¶ 3-5). *See also* NT 09/21/10 at 14 (Ms. Williams testifying that Alfred's mother once used a meat cleaver to cut off the tip of his finger while the family ate dinner); Exh. 26 (Declaration of Allen Henry at ¶ 3) ("Eunice used to be rough on Alfred. She used to chastise him more than other kids and used to beat him more than the others. . . . Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him."); Exh. 27 (Declaration of Murray Bourgeois ¶ 3) ("Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred."); Exh. 28 (Declaration of Yvonne Robinson Joseph at ¶ 3) ("Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him 'little yellow bastard' and slap him for nothing.").

60.    Ultimately, Mr. Bourgeois was cast out by his mother, who sent him at the age of seven or eight to live with an elderly neighbor, Miss Mary Clayton. *See* Exh. 29 (Declaration of Mark D. Cunningham, Ph.D. at ¶ 23). Even after Miss Mary died, Alfred still was not welcomed home, but instead had to live with his paternal half-sister, Michelle. *See* NT 09/21/10 at 38. As

25

Dr. Toomer explained, "the abandonment that [Mr. Bourgeois] experienced in the family unit by the mother had significant effect and impact on his overall functioning." *Id.* at 288-89.

61.    Meanwhile, Petitioner was completely abandoned by his paternal father, Alfred Sterling, who "*provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois.*" Exh. 29 (Cunningham Declaration at ¶ 19).

## Sexual Abuse

62.    In addition to the parental abuse and neglect Petitioner experienced, he was also a victim of sexual abuse as a child. Specifically, although neighbor Miss Mary's home was intended to be a "safe" place where young Alfred would be spared the abuse from his mother, while there, Alfred was raped over the course of several years by Miss Mary's son. *See* NT 09/21/10 at 142-43; NT 09/20/10 at 292.

## Low Socioeconomic Status

63.    Mr. Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one lane dirt road connecting about twenty homes, representing two or three different family units. NT 09/21/10 at 8-9; *id.* at 395. A family friend who was raised in the same neighborhood described it as consisting of "[p]oor black families." TT 3/23/04 at 121.[14] The neighborhood was surrounded by sugar cane fields, and hemmed in on one side by the river. NT 09/21/10 at 9. The Bend was not connected to a sewage line. *Id.* at 141.

64.    While poverty is itself one social risk factor, low socioeconomic status also *signals the presence of others, including malnutrition, educational inadequacy, insufficient stimulation, and deficient medical and/or educational interventions. See* AAIDD-2010 at 60.

---

[14] Cites to "TT" refer to testimony from the trial held before this Court in March 2004.

Thus, as explained by the government's expert, Dr. Randall Price, Mr. Bourgeois' "lack of education, . . . impoverishment and the lack of cultural enrichment" bore a "relationship to his low intelligence." NT 09/24/10 at 51-52; *see also* NT 09/23/10 at 232 (Dr. Price acknowledging that Mr. Bourgeois' "cultural, spiritual, [and] economic" impoverishment was relevant to "his cognitive intelligence").

**Brain Damage**

65.    According to Dr. Gelbort:

Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobes. This is most prominently evidenced by his very impaired performance on the Category Test. This test is one of the most sensitive to both whole brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

Exh. 3 (Gelbort Declaration at ¶ 7); *see also* NT 09/20/10 at 232-39, 244 (Dr. Weiner testifying that Petitioner's neurological testing showed brain damage); Exh. 30 (Deposition Testimony of Randall Price, 11/10/10 at 26) (government expert Dr. Price testifying: "I would agree that these scores [Dr. Weiner's] on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction.").

**History of Learning Difficulties**

66.    Childhood learning difficulties also constitute risk factors for intellectual disabilities as they correlate with declines in IQ during the developmental period. As discussed above, Mr. Bourgeois is reported to have failed a grade in elementary school and required speech therapy. Exh. 5 (Swanson Supplemental Report at 3). He is also said to have "had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills." *Id.*

**Family Heredity Risk**

67.     Mr. Bourgeois has a family history of intellectual and adaptive impairments. His older brother, Anthony, was born with cerebral palsy. NT 09/21/10 at 10. He was "profoundly mentally retarded and [was] kept hidden in the home." Exh. 29 (Cunningham Declaration at ¶ 18); *see also* Exh. 22 (McGuffy Declaration at ¶¶ 2-4) (describing Anthony as afflicted with life-long developmental problems); *see also* Exh. 14 (Williams Declaration at ¶ 3) ("We lost [brother] Clyde and then our brother Anthony took a lot of extra care due to his disabilities.").

68.     Additionally, Petitioner's mother, Eunice, was described by her brother as "not that smart and slow in understanding." Exh. 24 (Declaration of Wilmer Bourgeois, Sr. at ¶ 3); *see also* Exh. 25 (Bierbaum Memorandum at 39) (quoting Harry Bourgeois, Eunice's cousin, describing Eunice as "half-ass retarded").

### 4.     Age of Onset.

69.     Evidence of Mr. Bourgeois' intellectual disability has existed since his early childhood. As detailed above, interviews of people who have known Mr. Bourgeois since childhood reveal that, throughout his youth and into adulthood, Mr. Bourgeois exhibited intellectual and adaptive impairments that affected all facets of his life. Based on such interviews and other sources, Dr. Swanson concluded that "it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood." Exh. 5 (Swanson Supplemental Report at 4). The various risk factors discussed above also corroborate an onset prior to age eighteen.

### 5.     Conclusion.

70.     For the reasons set forth above, Mr. Bourgeois has established that he is an intellectually disabled person. He suffers from significant deficits in intellectual and adaptive functioning, which have been present since very early in the developmental period.

71.     Like many individuals with intellectual disability, Mr. Bourgeois tried hard to "mask" his deficits. He would lie to cover up his limitations; he didn't want to be revealed as slow or stupid. *See* Exh. 15 (Armont Declaration at ¶ 8) ("Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him."). Aunt Elnora Bourgeois McGuffy recalls:

> Alfred was not as smart as [his brother] Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never know how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that [sic] he was more successful than he was and smarter than he was.

Exh. 22 (McGuffy Declaration at ¶ 7). Nathaniel Banks confirms:

> Alfred wanted to impress people. Alfred lied a lot. I remember that Alfred would say things that you just knew weren't true. I used to work for the sheriff's office. Alfred told people he worked there. He was never a proper deputy. Alfred tried to build himself up – present himself as more than he was. I think Alfred lied so much he started to believe it.

Exh. 18 (Banks Declaration at ¶ 4).

72.     These efforts to "mask" his deficits are a trademark characteristic of intellectual disability. Individuals with intellectual disability are known to try to hide their deficiencies rather than ask for help. This is in part a symptom of impaired problem solving skills. However, it also results from a history of teasing and maltreatment caused by their impairments. Intellectually disabled individuals commonly attempt to "'fake good' so as to hide their [intellectual disability] and try to convince others that he or she is more competent." AAIDD-2012 at 24.

73.     Regardless of how successfully Mr. Bourgeois was able to mask his disability, the evidence discussed above is irrefutable. *See* Exh. 4 (Swanson Declaration at ¶¶ 3, 6) (concluding "to a reasonable degree of psychological certainty that Mr. Bourgeois is an individual with mental retardation").

29

74.     For all of the foregoing reasons, this Court should find Mr. Bourgeois intellectually disabled and categorically ineligible for execution.

## II.     MR. BOURGEOIS' § 2255 MOTION SATISFIES THE REQUIREMENTS OF 28 U.S.C. § 2255(H)(2).

75.     The gatekeeping provision of the Antiterrorism and Effective Death Penalty Act of 1996 allows a federal prisoner to apply to the court of appeals for leave to file a successive § 2255 motion based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). Section 2244(b)(4) provides that, even upon certification by the court of appeals, this Court "shall dismiss any claim presented in a second or successive application" that fails to satisfy these requirements. 28 U.S.C. § 2244(b)(4). *See also Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) ("[S]ection 2255 incorporates 28 U.S.C. § 2244 (b)(4)."). The standard to be applied by this Court is whether the "motion 'conclusively' demonstrates that it *does not* meet AEDPA's second or successive motion requirements." *Id.* (citation omitted) (emphasis added).

### A.     This Motion Meets the Requirements Set Forth by § 2255(h)(2).

#### 1.     *Atkins* established a new rule of constitutional law that was made retroactive on collateral review.

76.     In *Atkins*, the Supreme Court held that the execution of intellectually disabled individuals violated the Eighth Amendment's prohibition against cruel and unusual punishment. *Atkins*, 536 U.S. at 321. Further, "[t]here is no question that *Atkins* created a new rule of constitutional law (i.e., that the intellectually disabled are categorically ineligible for the death penalty), made retroactive to cases on collateral review by the Supreme Court." *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014). This Motion meets the first requirement of § 2255(h)(2).

### 2. The new rule established in *Atkins* was previously unavailable to Mr. Bourgeois.

#### a. Post-*Atkins* jurisprudence in the Fifth Circuit made relief unavailable to some intellectually disabled individuals.

77. The *Atkins* Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences[.]" *Atkins*, 536 U.S. at 317. Post-*Atkins*, the Court of Criminal Appeals of Texas first set forth its standards for determining intellectual disability claims in *Briseno*. The methodology adopted by the CCA divorced the intellectual disability determination from clinical standards and effectively made *Atkins* relief unavailable to petitioners who do not correspond to stereotypes about people with intellectual disabilities. Despite the fact that *Atkins* excluded the entire class of intellectually disabled individuals from death penalty eligibility, *Atkins*, 536 U.S. at 321, the CCA in *Briseno* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty[,]" noting that "[m]ost Texas citizens might agree that Steinbeck's Lennie should, by virtue of his lack of reasoning ability and adaptive skills, be exempt." *Briseno*, 135 S.W.3d at 11-12. With regards to the adaptive deficits prong of *Atkins*, *Briseno* sought to carve out a subcategory of intellectually disabled persons who would be ineligible for the death penalty and instructed courts to consider seven nonclinical factors in determining who would belong in that category.[15] *See Moore*, 137 S. Ct. at 1051 (rejecting *Briseno* factors because *Atkins* bars

---

[15] These seven factors were: "(1) Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination? (2) Has the person formulated plans and carried them through or is his conduct impulsive? (3) Does his conduct show leadership or does it show that he is led around by others? (4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? (5) Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject? (6) Can the person hide facts or lie effectively in his own or

31

execution of anyone "in the *entire* category of [intellectually disabled] offenders") (internal citations omitted) (emphasis in original). In *Moore*, the Supreme Court explicitly rejected this use of non-clinical standards in *Atkins* determinations. *Moore*, 137 S. Ct. at 1053.

78.     The Fifth Circuit's *Atkins* jurisprudence followed *Briseno*, departed from clinical standards, and employed a number of analyses that were specifically rejected by *Moore*. *See Moreno v. Dretke*, 450 F.3d 158, 165 (5th Cir. 2006) (citing to the *Briseno* factors in denying a certificate of appealability on an *Atkins* claim); *Clark*, 457 F.3d at 445-47 (affirming state court denial of *Atkins* relief based on *Briseno)*; *Woods v. Quarterman*, 493 F.3d 580, 586-87 (5th Cir. 2007) (same); *Williams v. Quarterman*, 293 F. App'x 298 (5th Cir. 2008) (same); *Eldridge v. Quarterman* 325 F. App'x 322, 328-29 (5th Cir. 2009); *Thomas v. Quarterman*, 335 F. App'x 386, 389-91 (5th Cir. 2009) (same); *Esparza v. Thaler*, 408 Fed. App'x 787, 790-96 (5th Cir. 2010).

### b.     *Moore* rejected the Fifth Circuit's approach to intellectual disability factors as contrary to *Atkins*.

79.     In *Moore*, the Supreme Court rejected the *Briseno* factors and their departure from the clinical standard as unconstitutional, finding that they were uninformed by medical consensus as set forth by the AAIDD and the APA and created "an unacceptable risk that persons with intellectual disability will be executed." *Moore*, 137 S. Ct. at 1044. The Court noted that the *Briseno* factors largely excluded individuals determined to have mild intellectual disabilities from obtaining relief pursuant to *Atkins. See id.* at 1051. *Moore* further held that state courts are bound by current medical standards in *Atkins* determinations:

---

others' interests? (7) Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Briseno*, 135 S.W.2d at 8.

> States have some flexibility, but not unfettered discretion in enforcing *Atkins'*
> holding. "If the States were to have complete autonomy to define intellectual
> disability as they wished," we have observed, *Atkins* would become a nullity, and
> the Eighth Amendment's protection of human dignity would not become a reality.
> The medical community's current standards supply one constraint on States'
> leeway in this area. Reflecting improved understanding over time, current
> manuals offer "the best available description of how mental disorders are
> expressed and can be recognized by trained clinicians."

*Id.* at 1053. Finally, the Supreme Court rejected a number of broader practices applied by other

courts, including the Fifth Circuit, the jurisprudence of which this Court followed in ruling on

Mr. Bourgeois' initial *Atkins* claim asserted in 2006.

> **i.    Under clinical standards and Moore, an IQ score that falls within the range for intellectual disability meets prong one.**

80.    First, the *Moore* Court faulted the CCA's approach to assessing the petitioner's

intellectual functioning, stating that the CCA was required to move on to the second *Atkins* prong

once Moore had established an IQ within the range of intellectual disability. Moore had an IQ

score of 74, which, "adjusted for the standard error of measurement, yields a range of 69 to 79.

Because the lower range of Moore's score falls at or below 70, the CCA had to move on to

consider Moore's adaptive functioning." *Moore*, 137 S. Ct. at 1049 (citations omitted). Despite

the fact that Moore's score was within the range for intellectual disability, the CCA disregarded

the lower end of range based on "factors unique to Moore." *Id. Moore* flatly rejected this

approach, holding: "we require that courts continue the inquiry and consider other evidence of

intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls

within the clinically established range for intellectual-functioning deficits." *Id.* at 1050 .

        ii.       **Clinical standards and *Moore* bar consideration of adaptive strengths, risk factors, comorbid conditions, and erroneous stereotypes when making a prong two determination.**

81.     *Moore* also rejected the *Briseno* court's approach to prong two, faulting the CCA for "overemphasiz[ing] Moore's perceived adaptive strengths. *Moore*, 137 S. Ct. at 1050. *Moore*, citing to clinical standards, acknowledged that intellectually disabled individuals can demonstrate adaptive strengths which do not preclude them from *Atkins* relief, that "the medical community focuses the adaptive functioning inquiry on adaptive *deficits*" rather than strengths, and rejected the CCA's attempt to use the evidence of strengths to "overcome" the evidence of deficits. *See Moore*,137 S.Ct. at 1050  (citing AAIDD-2010 at 47 and DSM-5 at 33, 38).

82.     *Moore* was particularly concerned with the way *Briseno* "advanced lay perceptions of intellectual disability" by inviting courts to consider questions such as "did those who knew the person  . . . think he was mentally retarded" when deciding prong two. *Moore*, 137 S.Ct. at 1051. Similarly, the Supreme Court rejected the use of commonly held, but erroneous stereotypes surrounding individuals with intellectual disability. *Id.*at 1052 (citing, *inter alia*, AAIDD-2012 at 25-27). *Moore* also rejected the use of risk factors and comorbidities as weighing against a finding of intellectual disability. The Supreme Court explained:

> The CCA furthermore concluded that Moore's record of academic failure, along with the childhood abuse and suffering he endured, detracted from a determination that his intellectual and adaptive deficits were related…. Those traumatic experiences, however, count in the medical community as "*risk factors*" for intellectual disability.

*Moore*, 137 S. Ct. at 1051 (citing AAIDD-11, at 59-60) (emphasis in original).

83.     As to comorbidities, *Moore* made clear that "[t]he existence of a personality disorder or mental-health issue . . . is not evidence that a person does not also have intellectual disability." *Id.* at 1051.

84.    In rejecting the nonclinical approach to intellectual disability employed in the Fifth Circuit, the Supreme Court noted that the flexibility granted to states in enforcing *Atkins* was constrained by "the medical community's current standards" in the exercise of that leeway. *Id.* at 1053. The Fifth Circuit abided by no such constraints, and under the Fifth Circuit's pre-*Moore* jurisprudence, *Atkins'* rule was not available to Petitioner.

> **c.    The Fifth Circuit has already held that *Atkins* was "previously unavailable" prior to *Moore*.**

85.    The Fifth Circuit has recognized that there is a "gray area of previous unavailability despite technical availability." *Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 230-31 (5th Cir. 2017). Mr. Bourgeois falls into that gray area – even though *Atkins* had been decided prior to his initial § 2255 motion and Mr. Bourgeois raised an *Atkins* claim in that motion, the new rule established by *Atkins* was functionally unavailable to him because this Court employed Fifth Circuit precedent that required the use of nonclinical standards that excluded all but the most severely intellectually disabled individuals from relief.

86.    In *Cathey*, the Fifth Circuit determined that *Atkins* was "previously unavailable" to a petitioner who had filed his first habeas petition after *Atkins* was decided because, under the now-invalidated nonclinical standards applied in the Fifth Circuit, he did not qualify as intellectually disabled. *Id.* at 233. IQ tests had shown that the petitioner in *Cathey* had an IQ of 77 at the time of his first petition, while Texas "had declared 70 as the benchmark IQ score" for *Atkins* relief. *Id.* at 232. The Fifth Circuit determined that, in light of his score and the Texas benchmark at the time of his initial petition, an *Atkins* claim was previously unavailable to Mr. Cathey because "a claim must have some possibility of merit to be considered available." *Id.* When this Court denied Mr. Bourgeois' *Atkins* claim in 2011, it was similarly constrained by Fifth Circuit precedent that made *Atkins* relief functionally unavailable to him.

> **d.     This Court relied on nonclinical standards to deny *Atkins* relief in violation of *Moore* and the Eighth Amendment.**

87.     In denying the initial § 2255 petition, this Court, relying on the Fifth Circuit's pre-*Moore* jurisprudence, applied the same non-clinical standards rejected by *Moore* and *Cathey* and rendered *Atkins* relief unavailable to Mr. Bourgeois.

> **i.     The Court's intellectual functioning analysis rested on unscientific bases.**

88.     As discussed *supra*, an IQ score of 75 or below satisfies prong one of *Atkins*. Mr. Bourgeois' only two full-scale IQ scores: a 75 on the WAIS-R and a 70 on the WAIS-III. This Court acknowledged that Mr. Bourgeois' scores qualified him for a diagnosis of intellectual disability, but did not end the inquiry there, as clinical standards required. *Bourgeois*, 2011 WL 193064 at *25. The Court did not "invalidate or ignore" the IQ testing, nor could it as no expert found Mr. Bourgeois to be malingering. Instead, after recognizing that the IQ testing satisfied the clinical standard for prong one, the Court explicitly declined to apply this standard, and instead determined that Mr. Bourgeois' IQ score fell at the high end of the confidence interval. *Id.* This was consistent with the Fifth Circuit's pre-*Moore* jurisprudence, which held that courts are "not required to find [an individual] to be mentally retarded merely because the low end of [the] confidence band was below 70." *Clark*, 457 F.3d at 446; *see also Moreno*, 450 F.3d at 165 (finding that an individual with an IQ score of 68 was not intellectually disabled because, *inter alia*, he "appeared to be poorly motivated and exaggerated his deficits . . . obtained his Graduate Equivalency Degree," and his employer testified that he was intelligent); *Williams*, 293 F. App'x at 309 (disregarding IQ score of 70 where petitioner had demonstrated academic competence and writing ability).

89.     In failing find prong one met where Mr. Bourgeois demonstrated IQ scores within the range for intellectual disability, the Court here claimed that those scores were inconsistent

36

with Mr. Bourgeois' "true IQ" as reflected in the "circumstances" of his testing and "a full review of his life." *Bourgeois*, 2011 WL 193064 at *26. In so doing, the Court was bound by Fifth Circuit precedent. *See id.* ("When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the Fifth Circuit has denied relief when . . . notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval."); *see also id.* (noting that "all cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment") (citations omitted).

90.    In disregarding Mr. Bourgeois' IQ scores, the Court relied on erroneous stereotypes of intellectually disabled people. The Court explained that it "has viewed many hours of video from the examination . . . Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Id.* at *28; *see also id.* at *30 ("The Court had sufficient interactions with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses."). The Court also relied on its determination that: "Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies. He graduated from high school . . . worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances." *Id.* at *22. As discussed below, the Court's determination that any of these factors were inconsistent with intellectual disability is contrary to the medical standards and amounts to reliance on the *Briseno* factors and erroneous stereotypes surrounding intellectual disability, and is accordingly not permitted under *Moore*.

37

91.    The Court relied on some of the adaptive strengths analysis it would also use in deciding prong two, noting that "a disconnect exists between the level at which Bourgeois' experts said he could function and what he could actually do." *Id.* at \*29. According to the Court, the following factors indicated that Petitioner's test scores did not accurately reflect his intelligence:

> [T]hose who knew him as an adult did not suspect that he was mentally retarded. Bourgeois graduated from high school, worked for years as an over-land trucker, bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise *carried himself without any sign of intellectual impairment.*

*Id.* at \*30 (emphasis added).

92.    Mr. Bourgeois, the Court maintained, could not be intellectually disabled, despite what the testing showed, because he did not present himself in the way the District Court thought an intellectually disabled person should present himself. In rejecting the testimony of Dr. Swanson, who said that Mr. Bourgeois had "extremely low cognitive ability," the Court based its determination on the fact that Mr. Bourgeois "does not operate as a child." *Id.* at \*30. Here, too, the Court was acting in accordance with *Briseno* and Fifth Circuit precedent. *Briseno* explicitly instructed courts, when making an *Atkins* determination, to consider factors like whether other people perceived an individual as intellectually disabled. *Briseno*, 135 S.W.3d at 18-19.

### ii.    The District Court's adaptive functioning analysis rested on unscientific bases.

93.    Contrary to clinical standards, under *Briseno* and the Fifth Circuit's precedent, courts in the Fifth Circuit considered petitioners' adaptive strengths and weighed those strengths against a defendant's deficits in determining whether they met prong two of the *Atkins* determination. *See Henderson v. Stephens*, 791 F.3d 567, 568 (5th Cir. 2015) ("Under *Briseno*, the [court] was free to weigh all of the evidence of [petitioner's] limitations . . . although there

38

was evidence in this record indicating that Henderson is intellectually disabled, there was also significant evidence that he is not."); *Clark*, 457 F.3d at 447 (courts may consider adaptive strengths in making intellectual disability determinations because "evidence of a strength in a particular area of adaptive functioning necessarily shows that the defendant does not have a weakness in that particular area").

94.    The Court in this case followed Fifth Circuit precedent by explicitly dismissing the clinical approach to adaptive functioning, stating that:

> the mental health community ignores an individual's strengths when looking at adaptive functioning . . . The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently.

*Id.* at *32 (citations omitted); *see also id.* ("The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies.").

95.    Furthermore, the Court again relied on the fact that Mr. Bourgeois did not fit erroneous stereotypes of intellectually disabled individuals to support the finding that prong two was not satisfied. The Court credited testimony that Mr. Bourgeois was competent at his job, "[h]is appearance and grooming were beyond presentable, [and] none of the Government's witnesses suspected that Bourgeois had mental impairments." *Id.* at *39. In asking whether the Government's witnesses thought Mr. Bourgeois was intellectually disabled, the Court was relying on one of the *Briseno* factors specifically criticized by *Moore*. *Briseno* instructed courts to consider whether "those who knew the person best during the developmental stage – his family, friends teachers, employers, authorities – [thought] he was mentally retarded at that time, and, if so, act in accordance with that determination." *Moore*, 137 S. Ct. at 1051 (citing *Briseno*, 135 S.W.3d at 8). *Moore*, while rejecting *Briseno* in its entirety, singled out that factor for criticism, stating: "[B]ut the medical profession has endeavored to counter lay stereotypes of the

intellectually disabled. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism." *Id.* (citing, *inter alia*, AAIDD-2012 at 25-27).

96.    The Court found it dispositive that Mr. Bourgeois did not *appear* to be intellectually disabled, and relied both on *Briseno* factors and erroneous stereotypes to reach this conclusion. *See Bourgeois*, 2011 WL 193064 at *22 ("Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies.); *id.* (Bourgeois' trial testimony, colloquies with the Court, and writings never called into question his intellectual functioning); *id.* at *28 (noting that Mr. Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts," and produces "voluminous amounts of writing"); *id.* at *29 ("[T]hose who knew [Mr. Bourgeois] as an adult did not suspect that he was mentally retarded."); *id.* (Petitioner "wrote intricate and detailed letters, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment."); *id.* (Government expert opined that having a job as a long-haul trucker was "inconsistent with mental retardation"); *id.* at *30 ("Bourgeois' extensive writings, while not polished masterpieces, certainly do not contain gross indicia of mental impairment."); *id.* ("During trial, Bourgeois communicated with this Court on several occasions . . . Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child."); *id.* at *43 (Mr. Bourgeois was able to become proficient at driving, even though he initially had difficulty); *id.* (describing Mr. Bourgeois' competence at his truck driving job and that this work belied any intellectual disability); *id.* (describing his well-groomed appearance); *id.* ("Bourgeois can engage in the give-and-take of normal conversation without any hint of impairment.").

97.    The Court's reliance on appearances and stereotypes was inappropriate under *Moore* and contrary to current clinical diagnostic guidelines. The Court's reliance on Mr.

40

Bourgeois' verbal abilities to rule out intellectual disability followed one of the *Briseno* factors which, as noted above, were rejected by a unanimous Supreme Court in *Moore*. *See also* AAIDD-2012 at 20 (intellectual disability determinations should not be based on verbal behavior). The District Court's finding that any of the characteristics would undermine a finding of intellectual disability constituted reliance on the commonly held, but erroneous stereotypes which *Moore* rejected. *See* AAIDD-2012 (incorrect stereotypes surrounding individuals with intellectual disability include, *inter alia*, that persons with intellectual disability "look and talk differently from person in the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, and drive cars," "do not (and cannot) support their families," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with their limitations.").

98.     In addition to focusing on Mr. Bourgeois' adaptive strengths, the Court departed from clinical standards by treating risk factors as alternate explanations for Mr. Bourgeois' deficits. Referring to his poor academic performance, the Court theorized that it may have been due to "his unstable home life" or "the hampering effects of a deprived home environment" *Bourgeois*, 2011 WL 193064 at *41; *see also id.* at *44 ("To the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse."). These, however, are all risk factors that support a diagnosis of intellectual disability. As *Moore* explains, an individual's "record of academic failure, along with the childhood abuse and suffering he endured," are "traumatic experiences[that] count in the medical community as '*risk factors*' for intellectual disability. Clinicians rely on such factors as cause to explore the prospect of

intellectual disability further, not to counter the case for a disability determination." *Moore*, 137 S. Ct. at 1051 (citing AAIDD-2010 at 59-60) (emphasis in original).The AAIDD lists "lack of adequate stimulation," "inadequate family support," and "family poverty" as risk factors for intellectual disability. AAIDD-2010 at 60. The Court also noted that Mr. Bourgeois' "school records do not show any accommodation for mental retardation," *Bourgeois*, 2011 WL 193064 at *41, as evidence that he was not intellectually disabled, while "inadequate special education services" is recognized as a risk factor by the AAIDD. AAIDD-2010 at 60.

99.     Similarly, the Court treated comorbidities as alternative explanations to Mr. Bourgeois' deficits, rather than supporting evidence of his adaptive deficits, as is appropriate under clinical standards. As noted *supra*, *Moore* rejected any requirement that defendants prove that adaptive deficits were not related to other mental health issues as "mental-health professionals recognize [that] many intellectually disabled people also have other mental or physical impairments." *Moore*, 137 S. Ct. at 1051 (citing AAIDD-2010 at 58-63; DSM-5 at 40). The Court took the opposite approach to comorbidities, and minimized Mr. Bourgeois' poor adaptive behavior because it was "more likely related to his personality disorder, especially his impulsivity and sense of entitlement." *Bourgeois*, 2011 WL 193064 at *41.

**B.    The Bar Against Successive Petitions Raising Claims Presented in a Prior Petition Does Not Apply to Prisoners in Federal Custody.**

100.    Finally, the successor bar found in 28 U.S.C. § 2244(b)(1) does not apply to federal prisoners. Section 2244 states that a "claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1) (emphasis added). The statute is conspicuously silent on claims presented in petitions brought under § 2255 and, by its plain language, makes clear that Congress intended for that section to apply only to claims brought by state prisoners pursuant to

42

28 U.S.C. § 2254, not to claims brought by federal prisoners, like Mr. Bourgeois, pursuant to § 2255.

101.    Under the rule of statutory construction *expressio unius est exclusion alterius* ("the expression of one thing implies the exclusion of the other"), Congress' specific reference to petitions brought under § 2254 and its simultaneous lack of reference to § 2255 petitions demonstrates that it intended to exclude § 2255 petitions from the successor bar of § 2244(b)(1). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (applying the principle of *expressio unius est exclusion alterius*); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (same); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 187 (1978) (same); *Hodge v. United States Dep't of Justice*, 929 F.2d 153 (5th Cir. 1995) (same). Because the successor bar found in § 2244(b) does not apply to Mr. Bourgeois, he need only demonstrate that he complies with § 2255(h)(2) for this Court to entertain his *Atkins* claim in a second motion.

## CONCLUSION

102.    Mr. Bourgeois' death sentence is unconstitutional in light of the Supreme Court's holding in *Atkins*, as clarified by *Moore*. Because this Motion satisfies the requirements of § 2255(h)(2), this Court must entertain his *Atkins* claim under current clinical standards, as required by *Moore*. Because Mr. Bourgeois is categorically ineligible for the death penalty, his death sentence must be vacated.

43

## REQUEST FOR RELIEF

Wherefore, based on the foregoing, Mr. Bourgeois respectfully requests that the Court grant him the following relief:

(1)     Grant Petitioner leave to amend this Motion, if necessary;

(2)     Direct the government to file an answer;

(3)     Grant Petitioner leave to reply to the government's answer, if any;

(4)     Hold an evidentiary hearing;

(5)     Hold oral argument and such other proceedings as the Court deems appropriate;

(6)     Vacate Petitioner's sentence of death; and

(7)     Grant such other relief as is proper.

Respectfully submitted,

/s/ Peter Walker
Peter Walker
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Peter_Walker@fd.org
Victor_Abreu@fd.org

Counsel for Petitioner

Dated: March 27, 2018

44

## CERTIFICATE OF SERVICE

I, Peter Walker, hereby certify that on the 27th day of March, 2018, I served the foregoing on the following person by first class mail, postage prepaid:

Carmen Castillo Mitchell, Esq.
United States Attorney's Office
1000 Louisiana Street, Suite 2300
Houston, TX 77002-5010

Julie Hampton, Esq.
United States Attorney's Office
800 N. Shoreline Blvd., #100
Corpus Christi, TX 78401

Counsel for Respondent/Appellee

/s/ Peter Walker
Peter Walker