# EXHIBIT 1

Case 2:02-cr-00216 Document 397-2 Filed 05/15/2007 Page 183 of 191

# WAIS-R RECORD FORM

WECHSLER ADULT INTELLIGENCE SCALE—REVISED

NAME AB 2.28.03

ADDRESS

SEX ____ AGE 34 RACE ____ MARITAL STATUS ____

OCCUPATION ____ EDUCATION ____

PLACE OF TESTING ____ TESTED BY ____

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | RAW SCORE | | | | | | | | | | | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | VERBAL TESTS | | | | | | PERFORMANCE TESTS | | | | | |
| | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | |
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | 32-33 | 57-61 | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | 11-12 | 23-26 | 28-29 | 48-52 | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | 13 | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | 9-10 | 20-28 | 6-7 | 11-13 | 11-13 | 11-12 | 6-7 | 14-19 | 21-23 | 37-43 | 6 |
| 5 | 6-8 | 8 | 14-19 | 5 | 8-10 | 7-10 | 8-10 | 3-4 | 8-13 | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | 5-7 | 2 | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | 6-8 | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

*Clinicians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to connect them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | | | |
| Date of Birth | | | |
| Age | | | |

## SUMMARY

| | Raw Score | Scaled Score | |
|---|---|---|---|
| **VERBAL TESTS** | | | |
| Information | 6 | 5 | 4 |
| Digit Span | 10 | 6 | 7 |
| Vocabulary | 21 | 6 | 6 |
| Arithmetic | 6 | 6 | 6 |
| Comprehension | 8 | 5 | 5 |
| Similarities | 8 | 5 | 6 |
| **Verbal Score** | | 33 | |
| **PERFORMANCE TESTS** | | | |
| Picture Completion | 7 | 4 | 6 |
| Picture Arrangement | 2 | 4 | 5 |
| Block Design | 13 | 5 | 7 |
| Object Assembly | 8 | 2 | 3 |
| Digit Symbol | 58 | 10 | 11 |
| **Performance Score** | | 25 | |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 33 | 76 |
| PERFORMANCE | 25 | 76 |
| FULL SCALE | 58 | 75 |

THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, INC.

Copyright © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright © by The Psychological Corporation. No part of this form may be copied by any process without permission. All rights reserved.
Printed in U.S.A.

9-991829

# EXHIBIT
# 2

## DECLARATION OF DONALD E. WEINER, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Donald E. Weiner, Ph.D. do hereby declare and certify that the following is true and correct.

1. I am a licensed psychologist with a specialty in neuropsychology. I am licensed to practice in Texas, and I maintain an office in Corpus Christi. I was contacted by trial counsel for Alfred Bourgeois and asked to conduct a neuropsychological test battery on him. I recall that my name was given to these lawyers (Mr. Tinker and Mr. Gilmore) by Carlos R. Estrada, M.D., with whom I have worked in the past.

2. I also recall that there was great time urgency to their request. I was told that the trial had either started or was about to start and that the testing had to be done immediately. Due to the time constraints, I conducted my testing on a weekend (Saturday February 28, 2004), which is contrary to my custom. I gave priority to this request and generated my report on March 3. A copy of my report is attached to this statement. In more ideal circumstances, I would have perhaps conducted more testing and would certainly have sought outside sources to develop Mr. Bourgeois' psycho-social history. This was impossible given my limited time.

3. As my report indicates, Mr. Bourgeois was impaired on a number of test instruments. The most notable finding was on the Category Test, which is a sub-test of the well known Halstead-Reitan battery. His score of 94 errors is significantly impaired. This score is notable because it shows deficits in his ability to function with new information and in unfamiliar settings. As I noted in my report, "Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions." In fact, I believe given his results that his judgement was

1

significantly impaired. Although I have limited experience with capital sentencing, it would seem to me that this finding is mitigating.

4.     I would also note that Mr. Bourgeois scored a 76 on the WAIS-R IQ test. This places him in range of borderline intellectual functioning and is itself a significant finding.

5.     Although in my view my report presented important findings regarding Mr. Bourgeois' neuropsychological profile, I was not called as a witness at trial. As I understood the situation, the lawyers were concerned that my conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of my report. From a neuropsychological perspective, the reason that Mr. Bourgeois' brain is impaired is not nearly as critical as the fact that it is impaired. My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage.

6.     Even though Mr. Bourgeois may not have been accurate in his factual reporting, there was no sign that he malingered on the testing. Mr. Bourgeois' pattern of responses on all of his tests demonstrate that he was making a valid effort. This was not a "Fake Bad" result. In fact, I administered a standardized test to detect malingering called the Test of Memory Malingering (or TOMM). This test has two trials with 100 total questions. Mr. Bourgeois scored 47 on the first trial and a perfect 50 on the second. Because the test is essentially an easy set of tasks, and the subject is not told that it tests for malingering, it is expected that even impaired individuals will do quite well. When a person does poorly, malingering can be suspected. His scores of 47 and 50 are well within the standardized range showing that there was no malingering. The lawyers did not ask me about the significant finding that he applied a solid effort in the testing.

7.     The fact that Mr. Bourgeois misrepresented his own social history is also significant from a psychological standpoint. First, it is an example of his poor social judgment: lying to a

2

defense expert was not in his best interest.  Second, it is possible that Mr. Bourgeois actually believed his own stories.  This would be a significant finding that would impact my diagnosis. Unfortunately, I was not given very much information regarding Mr. Bourgeois' history or personality.  In addition, the time constraints made it impossible for me to do more than administer the battery of neuropsychological tests. I was therefore unable to offer further explanation for Mr. Bourgeois' behavior.

I hereby certify that the above facts and opinions are correct to the best of my knowledge.

_Donald E. Weiner, Ph.D._

Dated:          Corpus Christi, Texas
                May 10, 2007

3

## DONALD E. WEINER, Ph.D., FICPP, FPPR, P.C.
Psychologist
5934 South Staples, Suite 206
Corpus Christi, Texas 78413

Telephone: (361) 994-0387
Board Certified, Diplomate-Fellow in Psychopharmacology of the
Prescribing Psychologists' Register, Inc. and the International College of Prescribing Psychologists
FACAPP -Founding Fellow of the American College of Advanced Practice Psychologists
FSMI -Board Certified, Diplomate-Fellow in Serious Mental Illness

## NEUROPSYCHOLOGICAL EVALUATION

**NAME:** Alfred Bourgeois       **DATE TESTED:** 2-28-04
**DOB:** 6-20-64                 **DATE OF REPORT:** 3-3-04
**AGE:** 39
**SEX:** Male

### REASON FOR REFERRAL:
Mr. Bourgeois was referred for a neuropsychological evaluation to determine whether or not he has brain damage.

### BACKGROUND INFORMATION:
Mr. Bourgeois is currently being tried for capital murder. The present evaluation was conducted at the Federal Courthouse. The nature and purpose of the evaluation was explained to Mr. Bourgeois, and he consented to be tested. Mr. Bourgeois grew up in Louisiana. He denies any history of serious illnesses. Injuries include a broken nose when he was in elementary school, a three-wheeler accident in 1984 that resulted in his being in a coma for 1-2 months and being out of work for a year after this accident, and a truck accident in 1989 in which he broke his right collarbone and his left arm. Mr. Bourgeois stated that he became aggravated more easily after the 1984 accident, and this problem has continued up until the present. Mr. Bourgeois is not on any medication at the present time.

Mr. Bourgeois completed high school and about two months of college. He worked as an auxiliary deputy for a sheriff's department, and he has worked as a truck driver for the remainder of his work years. He made B's and C's in high school and was in all regular classes. He has three living brothers, one deceased brother, and two sisters. His parents were never married. He has a son 22 and a daughter 20 by two different woman, a daughter 16 by a previous marriage, and a daughter 9 by his current marriage of 7 ½ years. Mr. Bourgeois is charged with the death of his two-year-old daughter by his present marriage.

## TESTS ADMINISTERED:
Wechsler Adult Intelligence Scale – Revised
Wide Range Achievement Test – Third Edition
Halstead-Reitan Neuropsychological Test Battery for Adults
Test of Memory Malingering
Clinical Interview

## MENTAL STATUS:
Mr. Bourgeois was very cooperative during the testing and he appeared motivated to give his best performance. The present test results are believed to be a valid indication of his current level of neuropsychological functioning. His mood was neutral with appropriate affect. He reports some problems falling asleep. He has a history of migraine headaches. His appetite is poor, and he eats because he has to. He reports a 63-pound weight loss since his arrest 20 months ago. He has stomach cramps and diarrhea at times. He reports some dizziness. He denies any perceptual problems. He did not have problems with concentration in the past, but has had concentration problems since his arrest. He has a history of memory problems. He states that his wife has told him that he has sleep apnea. He describes himself as verbally outspoken when upset. He reports having felt depressed since his wife had an affair. He filed for divorce and then came back to his wife. He has been married four times.

Mr. Bourgeois has suicidal thoughts but states that he would not try to kill himself. He stated that he did attempt suicide 3-4 months after his arrest. He worries about his nine-year-old daughter who is in foster care. He denies any auditory or visual hallucinations but after his arrest for a period of time he heard voices and saw things.

Mr. Bourgeois denies any history of alcohol or drug abuse.

## TEST RESULTS AND INTERPRETATION:

### Wechsler Adult Intelligence Scale – Revised:
Mr. Bourgeois achieved a Verbal IQ of 76, a Performance IQ of 76, and a Full Scale IQ of 76, all of which are in the borderline range of intellectual functioning. His subtest scores are as follows: (note that the age equivalent scores are shown in parentheses after each subtest score)

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 5 (4) | Picture Completion | 4 (6) |
| Similarities | 5 (6) | Digit Symbol | 10 (11) |
| Arithmetic | 6 (6) | Picture Arrangement | 4 (5) |
| Vocabulary | 6 (6) | Block Design | 5 (7) |
| Comprehension | 5 (5) | Object Assembly | 2 (3) |
| Digit Span | 6 (7) | | |

When compared with individuals in his age range on the verbal subtests Mr. Bourgeois

exhibited low average abilities in short-term auditory memory and mild deficits in long-range retention for specific facts and information, abstract reasoning, numerical computation, verbal expression, and social judgment. On the performance subtests he exhibited average abilities in visual motor memory and speed, low average abilities in non-verbal concept formation, mild deficits in distinguishing essential from non-essential details and non-verbal visual sequencing, and a significant deficit in assembling an object from its parts.

**Wide Range Achievement Test – Third Revision:**
Mr. Bourgeois achieved the following scores:

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Reading | 96 | high school |
| Spelling | 106 | high school |
| Arithmetic | 81 | sixth |

Mr. Bourgeois is functioning at the expected level for a high school graduate in reading and spelling. Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities.

**Halstead-Reitan Neuropsychological Test Battery for Adults:**
This battery is very sensitive to cerebral dysfunction. It consists of several individual tests which measure the following areas: abstraction and concept formation, motor functions, sensory functions, visual spatial skills, verbal abilities, incidental memory, alertness and concentrated attention, and general indicators of the level of cerebral functioning. A review of Mr. Bourgeois' performance on this battery shows indications of mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex. This cerebral damage is likely due to the injuries sustained in the three-wheeler accident which took place in 1984, resulting in a coma lasting one to two months. Mr. Bourgeois' score of 33 on the neuropsychological deficit scale is in the mild range of impairment. His score of 0.86 on the impairment index indicates that nearly all portions of the battery which contribute to this index were in the impaired range, although some tests were only slightly impaired.

On the Aphasia screening test, Mr. Bourgeois exhibited constructional dyspraxia (having difficulty copying a geometrical design). This is a right cerebral indicator. On the sensory perceptual examination, he made a large number of errors bilaterally on the fingertip number writing perception test. This finding is consistent with bilateral posterior cerebral damage, with greater right posterior cerebral damage, given the fact that he made many more errors with his dominant left hand.

On the strength of grip test, Mr. Bourgeois' grip strength was somewhat weaker than expected with his nondominant right hand. He reports having arthritis in both hands, with more arthritis in his right hand and this finding may be due to his arthritis. His finger tapping speed was adequate bilaterally.

Mr. Bourgeois exhibited impairment on the Seashore rhythm test, which measures alertness and concentrated attention for non-verbal auditory stimuli. He exhibited impairment on two tests which serve as general indicators of the overall level of cerebral functioning. His time of one minute and thirty-three seconds on the Trailmaking test, part B is in the brain-damaged range. He had a very poor score of 94 errors on the Category test, which is a measure of learning in a new and unfamiliar learning situation. Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions.

Mr. Bourgeois had significant impairment on the Tactual Performance Test, which is a spatial problem-solving task. His total time of nearly twenty-seven minutes is well into the brain-damaged range. He had a poor score on a test measuring incidental spatial memory. His performance was slower than expected with his dominant left hand, and his poor performance on the Tactual Performance Test combined with adequate performance on the finger-tapping test indicates greater posterior cerebral damage.

**Test of Memory Malingering:**
Mr. Bourgeois' performance was well within normal limits and shows no indications of malingering.

## DIAGNOSTIC IMPRESSION:

Axis I        :        294.9, Cognitive Disorder – Mild cerebral damage with moderate posterior cerebral damage

## SUMMARY AND CONCLUSIONS:
Mr. Bourgeois is a thirty-nine year old male whose overall level of intellectual functioning is in the borderline range. He shows no indications of having any specific learning disabilities. Neuropsychological test results reveal overall mild cerebral impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident which took place in 1984, resulting in a coma lasting 1-2 months. A test of malingering shows no indications that Mr. Bourgeois was malingering, and the present test results are believed to be a valid indication of his overall level of cerebral functioning. Mr. Bourgeois shows some symptoms of depression, including poor sleep, poor appetite with significant weight loss, a previous suicide attempt, and current suicidal thoughts with no active suicidal intention. Mr. Bourgeois stated that he has become aggravated more easily since the 1984 accident, and his performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions.

Don Weiner, Ph.D.
Psychologist

# EXHIBIT
# 3

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PURSUANT TO 28 U.S.C. § 1746

I, Michael Gelbort, Ph.D., do hereby declare and verify as follows:

1.          I am a licensed clinical psychologist, specializing in neuropsychology. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology at Texas Tech University in 1984. I completed a post-doctoral fellowship in neuropsychology and medical psychology at the Rehabilitation Institute of Chicago in Chicago, Illinois, in 1985. I subsequently served as the Chief Psychologist, then Director of Psychology at the Institute for Rehabilitation and Research in the Medical Center in Houston, Texas. I was also on staff at Baylor College of Medicine and engaged in private practice, concentrating on psychological and neuropsychological evaluations. After four years in those endeavors I returned to Chicago to pursue private practice with privileges at several hospitals. My current practice concentrates on psychological and neuropsychological evaluation and diagnosis. I also do extensive forensic work in the civil and criminal law fields. I am licensed to practice in three states and have been qualified as an expert in neuropsychology in courts in many states and federal district courts.

2.          I have been asked by counsel for Mr. Alfred Bourgeois to conduct a neuropsychological evaluation of him in connection with federal capital case. In preparation for this evaluation, I was provided with and reviewed extensive background materials, including a report of an evaluation conducted on Mr. Bourgeois by Donald Weiner, Ph.D. in 2004.

3.          I met with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana in April 2007. I administered a number of standardardized intelligence, achievement and neuropsychological tests. The results of my testing shows the following:

**Wechsler Adult Intelligence Scale III** (age corrected subtest-scaled scores)

1

| | | | | |
|---|---|---|---|---|
| Vocabulary | 4 | Picture Completion | 5 |
| Similarity | 4 | Digit Symbol | 11 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 8 | Matrix Reasoning | 5 |
| Information | 4 | Picture Arrangement | 5 |
| Comprehension | 3 | | |

Verbal IQ:        67
Performance IQ:   78
Full Scale IQ:    70

**Trail Making Test**

Part A    30 seconds with 1 error    (deficient)
Part B    78 seconds with 0 error    (borderline deficient)

**Lateral Dominance**

Left side dominant with some ambidextrous signs

**Grip Strength**

Essentially equal bilaterally

**Sensory exam**

mild tactile higher level suppressions

**Category Test**

80 errors                    (moderate impairment)

Wide Range Achievement Test – III (standard score followed by percentile)

| | Standard Score | Percentile | Grade Equivalent |
|---|---|---|---|
| Reading | 85 | 16 | High School |
| Spelling | 100 | 50 | High School |
| Arithmetic | 74 | 4 | Grade 5 |

2

**Wechsler Memory Scale - III**

Logical Memory I - mild impairment
Visual Immediate Memorization - mild impairment
Verbal Immediate Memorization - mild/moderate impairment
Visual Memory I - moderate impairment
Logical Memory II - mild/moderate impairment
Visual Long-term recall - moderate/severe impairment

**Conclusions and Analysis**

4. The testing I administered was valid. Mr. Bourgeois gave a sincere effort. His results on my testing are quite similar to the testing administered by Dr. Weiner, indicating no malingering. His pattern of responses on all of the testing I administered are consistent with valid effort. For example, he performed relatively well in the early rounds of the tests, when the principles are very straightforward. As the tests became more difficult, he began to falter. This pattern reflects valid effort.

5. Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The score of 76 must be understood and considered in perspective and application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration) is utilized to do so. In this instance, the WAIS-R was normed in 1978 and administered in 2004. Therefore, a "deduction" of 7.8 is warranted (26 years x .3 per year = 7.8). As such, the computed score of 76 would actually reflect in intellectual quotient value of 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted IQ score of 68 and the recent measured score of 70 obtained with the current version of the WAIS on my test administration.

6. I have not formally assessed Alfred Bourgeois' adaptive functioning. However,

3

my review of Mr. Bourgeois' history shows many of the tell-tale signs of adaptive skills deficits. For instance, he has had difficulty in maintaining social relationships. He has had difficulty with managing the affairs of everyday life, including money issues. He has a skewed view of himself in relationship to the rest of the world. These reports are indicative of impairment in the social and conceptual realms of adaptive functioning.

7.        Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobe abilities. This is most prominently evidenced by his impaired performance on the Category Test. This test is one of the most sensitive to both whole-brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is also supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

8.        I have reviewed Dr. Weiner's report. While our tests results are, for all intents and purposes, congruent, he concludes that Mr. Bourgeois' brain damage is localized in the posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming, for argument's sake, that Mr. Bourgeois has only damage to his posterior brain, there is still clear evidence of impairment of and impact on his executive functioning. Accordingly, wherever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension, and Trails B, demonstrate that his executive function is impaired.

9.        Executive functions act, in part, as the "brakes" for a person's actions. When there is impaired executive function, the individual may and often acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one

4

considers the abusive childhood that he experienced. The adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid with his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

10.        I understand that there is some disagreement over the etiology of Mr. Bourgeois' impairments. Dr. Weiner believed that they are due to a motor vehicle accident, and there is some question as to whether Mr. Bourgeois actually suffered a head injury in that accident. In a forensic setting, etiology is sometimes important. For example, in personal injury cases (e.g., subsequent to an auto accident) it is important to know if the damage identified by the neuropsychologist was due to the accident because that determination is relevant to whether the negligent party owes damages. However, in the criminal law setting, what is of significance is whether the deficits predate the event for which the individual has been accused rather than what is the proximate cause of the impairments. To be sure, it is helpful in deciding whether to conduct testing to know whether there are indicators of brain damage, such as child abuse or a head injury. However, neuropsychologoical testing results indicating dysfunction "stands on their own." Even in the absence of a determination of cause, this testing shows whether an individual's brain is intact or impaired. I am confident in stating that Mr. Bourgeois' impairments exist, even if the etiology is not completely clear.

I hereby declare and certify that the above facts and opinions are true and correct under penalty of perjury.

Michael M. Gelbort, Ph.D.

Dated: Chicago, Illinois

11 May, 2007

5

# EXHIBIT
# 4

## DECLARATION AND AFFIDAVIT OF VICTORIA SWANSON, Ph.D. PURSUANT TO 28 U.S.C. § 1746

Victoria Swanson, Ph.D., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. I am a clinical psychologist. I obtained my doctorate in school psychology from Louisiana State University in 1999. My primary area of practice is providing psychological services and behavioral consultation to individuals with mental retardation and developmental delays, and to public and private providers of services to this population. I also provide services to children and adolescents with severe behavior disorders and significant academic challenges. I have done this work through my private practice since 2000.

2. For my entire professional career I have been responsible for identifying and providing services to people with mental retardation. Before I entered into private practice, I served as the Director of Psychological Services at Southwest Louisiana Developmental Center in Iota, Louisiana; in that capacity, I managed the delivery of services to approximately 150 mentally retarded individuals living in publicly funded residential facilities and supportive living placements. I have worked with mentally ill and developmentally delayed individuals since 1973. I have worked as a social worker, a psychological examiner, a school psychologist, and an administrator. From 2003 to 2005, I served as the President of the National Psychology Division of the American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly the American Association on Mental Retardation (AAMR)). I have been qualified as an expert in psychology and as an expert in field of Mental Retardation multiple times in several jurisdictions. Most of my forensic practice centers in Louisiana. However, I have also been qualified as an expert in Alabama, Georgia, and Mississippi. My curriculum vitae is attached.

3.      I was asked by counsel to Alfred Bourgeois to conduct testing to determine his level of adaptive functioning as a child and to discern whether he qualifies for a diagnoses of mental retardation.  To accomplish this task, I have reviewed voluminous background materials about Mr. Bourgeois provided to me by counsel, including reports by psychologists and psychiatrists, affidavits by neighbors and relatives, and intelligence testing by Dr. Weiner and Dr. Gelbort.  The most recent neuropsychological evaluation reveals a full scale IQ of 70 on the WAIS-III, and Dr. Weiner's scoring (adjusted for the Flynn effect) also places him in the range of mental retardation.

4.      After reviewing these materials, in March, 2009, I administered the Vineland-II Adaptive Behavior Scale to Mrs. Beverly Frank.  Based on my review of materials and preliminary interview of Mrs. Frank, I learned that she is the granddaughter of Mary Clayton.  Mary Clayton was not related to Alfred Bourgeois, but was a member of his community and an elder in his family's church.  Due to the mistreatment she witnessed being perpetrated against Alfred at his home, Mrs. Clayton took Alfred into her home and cared for him as if he were her own child.  Mrs. Frank was a young adult at the time and visited her grandmother and Alfred almost daily.  She observed Alfred and several of her nieces and nephews near in age to Alfred, and therefore was able to report both Mr. Bourgeois' adaptive ability and compare his functioning to his peers.  Accordingly, she was a prime subject to whom to administer the Vineland–II instrument.

5.      Mr. Bourgeois scored a 66 on the Vineland- II.  On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization.  These scores place him well within the range of mental retardation in the sphere of adaptive deficits.  They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

6.      Based on my review of the records and my own testing, it is my opinion to a

reasonable degree of psychological certainty that Mr. Bourgeois is an individual with mental retardation.

7.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Victoria Swanson, Ph.D.

DATE: 6/8/09

# EXHIBIT
# 5

**SWANSON & SWANSON CONSULTATION**
**P.O. BOX 80966**
**LAFAYETTE, LOUISIANA 70598**

Victoria Swanson, Ph.D.
LA Licensed Psychologist #864
National Health Service Provider in Psychology #50400
Voice: (337) 258-7754   FAX: (337) 232-1688
Email: VSwanson1@aol.com

Terry D. Swanson, M.S.
Examiner, Behavior Analyst
Voice: (337) 258-6099   FAX: (337) 232-1688
Email: TSwanson1@aol.com

August 12, 2010

Elizabeth Larin, Esq.
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
Suite 545 West- Curtis Building
Independence Square West
Philadelphia, PA 19106

Re Alfred Bourgeois

Dear Ms. Larin:

At your request I write to supplement the declaration I provided you in June, 2009, summarizing my opinion that Alfred Bourgeois is a person with mental retardation. This opinion was based on my testing of Mr. Bourgeois, my review of records and reports regarding Mr. Bourgeois, and my administration of adaptive deficit testing to Beverly Frank, the grand-daughter of Mr. Bourgeois' care giver in childhood.

Based upon my supplemental work on this case, my opinion remains unchanged.[1]

As in my initial declaration, I have used the widely accepted definition of mental retardation that requires significantly sub-average intellectual functioning as measured on individually administered standardized intelligence testing (generally, an IQ no higher than 70-75), significant deficits in adaptive functioning and onset before age 18.

1.      **Significantly Subaverage Intellectual Functioning**

Mr. Bourgeois possesses the intellectual deficits for a diagnosis of mental retardation. His IQ has been tested at a high of 75 (Dr. Weiner) and a low of 70 (Dr. Gelbort). Although Dr. Weiner administered an outdated test (WAIS R), both tests are acceptable for making a diagnosis.[2]

I have reviewed the raw data underlying each test and conclude that each was properly administered and accurately scored. His scores within the margin of error on tests properly administered and accurately scored years apart by two different testers, eliminates any suggestion that these scores are malingered or are in any way unreliable.

---

[1] A comprehensive list of all of my sources is attached.

[2] Although Dr. Weiner's score of 75 placed Mr. Bourgeois within the range of substantial intellectual deficits, I also base my opinion in this regard on the widely accepted and scientifically valid Flynn Effect, under which his score would be adjusted to about an 68.

1

Since it is acceptable to rely on previously administered testing for which I have been provided the underlying raw data, I have not performed additionally testing of Mr. Bourgeois intellectual functioning. I have noted that the Government's experts also have not administered additional IQ testing, despite having had the opportunity to do so.

## 2. Adaptive Deficits.

In order to meet the second prong of the diagnostic criteria for mental retardation, a person must exhibit significant deficits in functioning in one of the three domains listed by the AAIDD, or in two of the ten domains listed by the APA.

The American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly, the American Association on Mental Retardation) encourages the use of standardized tests to assess adaptive functioning. Accordingly, prior to reaching the opinion set forth in my initial declaration, I administered the Vineland-II test for adaptive deficits to Mrs. Beverly Frank. The Vineland-II is the most reliable tool to measure adaptive functioning, in part because it is given in an interview format, which eliminates some errors that tend to occur with other popular testing instruments. I also administered the ABAS to Mrs. Frank. Results on both tests showed Mr. Bourgeois to have significant adaptive deficits.

The AAIDD also recommends that when making a retrospective assessment, such as in this case, that in addition to standardized testing, the evaluator obtain and consider multiple sources of data. It particularly encourages input from multiple knowledgeable informants. It is especially important that the evaluator attempt to secure such data from people, like Ms. Frank, who were in a position to observe the subject extensively, across multiple settings, over a long period of time. Such informants can also be supplemented with informants who had less ideal opportunities to observe, or who only observed the subject in one setting.

Therefore, since my last report, I have spoken with several such informants. In particular, I have spoken with Claudia Williams (maternal sister), Michelle Armont (paternal sister), Murray Bourgeois (maternal cousin), Carl Henry (maternal cousin and former co-worker), Lloyd Ferdinand (maternal brother), Donald Reese (former co-worker), Gwendolyn Thomas Smith (special education teacher in Lutcher, LA), and Fred Thompkins (former co-worker)

These interviews have given me additional insight into Mr. Bourgeois' functioning, and support my opinion that Mr. Bourgeois exhibited significant deficits in his adaptive functioning throughout his childhood and into adulthood. Mr. Bourgeois is significantly deficient under the rubric adopted by the AAIDD (which requires significant deficits in at least one of the three areas of functioning – conceptual, social, and practical), and under the definition endorsed by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Test Revision (DSM-IV-TR) (which requires significant deficits in two of ten listed skill areas). I have found that Mr. Bourgeois has significant deficits in all three realms listed by the AAIDD, and in at least three of the ten skill areas listed by the DSM (functional academics, health and safety, and social/interpersonal).

In reaching my opinion, I also considered that adaptive functioning means "independent" functioning; i.e. the measurement of adaptive functioning must consider one's functioning without support (such as that provided by family, co-workers, or girlfriends), and must take into account instances where the subject received supports. I also considered that the key inquiry is how the person functions within the community, and not in a structured setting such as a prison.

It is apparent from my interviews with Mr. Bourgeois' family, friends, and co-workers, that Mr. Bourgeois relied on the support of others in order to perform routine daily life activities.

2

Conversely, his ability to function independently was significantly impaired.

**Deficits in the Conceptual Domain.** Mr. Bourgeois exhibits significant deficits in the conceptual domain. As demonstrated through the neuropsychological testing and through my own observations and evaluations, Mr. Bourgeois is deficient in his ability to absorb and understand information. He is significantly impaired in his ability to solve problems. He has a primitive understanding of current and historical events. He has difficulty understanding and managing money (a deficit that corresponds with difficulties in both the conceptual and the practical domains of functioning). Accordingly, Mr. Bourgeois is significantly impaired in the conceptual domain of adaptive functioning as described by the AAIDD.

Under the DSM's rubric, Mr. Bourgeois is significantly deficient in **Functional Academics**, a skill area that overlaps with the AAIDD's conceptual domain. Mr. Bourgeois' scores on standardized tests administered by me places him in the deficient range of academic functioning. Mr. Bourgeois was examined with the Woodcock-Johnson Third Edition Tests of Achievement (WJ-III) to determine current academic functioning as well as validate the consistently low academic functioning noted by individuals who knew him well throughout his life. The WJ-III (Mean, 100; SD, 15) is a wide range, comprehensive set of individually administered tests for measuring cognitive abilities, scholastic aptitudes, and achievement. The test assesses a wider range of academic areas at a greater depth than any other standardized, individually administered, academic battery currently available. The WJ-III is nationally standardized on subjects aged 24 months to 95 years of age, and is considered the "gold standard" for assessing academic abilities. Although Mr. Bourgeois attended four years of high school, his scores on the W-J-III are in the range of mental retardation.

Although no school records are available from his elementary years, reports indicate that Mr. Bourgeois failed a grade in early elementary school and that he participated in speech therapy. Reporters also advise that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money.

As is typical of individuals with mild mental retardation, Mr. Bourgeois relied on others to help him complete tasks that required functional academic skills. Reporters indicate that he routinely relied on classmates to complete his homework in high school. He completed job applications with the assistance of others. I have also learned that he was provided answers to some written tests required to obtain a drivers license.

Mr. Bourgeois' deficits in functional academics/conceptual skills is further evidenced by his difficulty in understanding and managing money. This is borne out by my interviews with informants and a review of documents regarding his finances.

**Deficits in the Practical Domain.** Mr. Bourgeois' history is significant for profound delays in learning new practical skills. For example, co-workers reveal that while a typical person would require four to six weeks to learn how to drive a commercial truck, Mr. Bourgeois took almost nine months to accomplish this task. He was sheltered at one trucking job by a relative who held a supervisory position, who allowed him the time and opportunity to be trained as a truck driver while under his employ.

However, friends and family report that even after Alfred started driving a truck, he continued to misjudge his surroundings and had many incidents where he ran over mailboxes, frequently got lost while on route to his destination, had multiple speeding tickets, and injured

3

himself on – and off – the job.

It is apparent from my conversations with people who knew Alfred well, that he would ask people to join him on his over the road jobs so that they could help him with directions and other tasks.

The reporters I spoke with noticed deficits in Mr. Bourgeois' practical skills starting at an early age. For example, he was delayed compared to his peers in learning simple skills like tying his shoes and counting money. It took young Alfred much more time than his peers to learn how to ride a bike.

Under the DSM's rubric, one area of deficit in the practical realm where Mr. Bourgeois was deficient was in **Health and Safety**. Multiple informants and documents review provided me with information about Mr. Bourgeois' significant problems staying safe and his lack of regard for safety. For example, he let his thirteen year old son drive his big rig truck on the highway. One informant described an incident in which he stood up and turned around to talk to her, leaving the driver's seat empty as the truck rumbled down the highway. Still another informant revealed a serious near-accident where Mr. Bourgeois drove a semi-trailer off the road. This same reporter told how Mr. Bourgeois became lost on trips.

A review of Mr. Bourgeois' medical records and driving records also reveals the difficulties Mr. Bourgeois had in keeping himself safe. For example, at the age of 20, Mr. Bourgeois drove himself into a pole, causing himself serious injury. The records show several other incidents that very likely were due to his lack of insight and knowledge about health and safety. Two other accidents while driving a truck sent him to the emergency room, once with a broken arm (his arm got stuck in the driving wheel), and once after he was pinned between a truck and a loading dock.

As noted, his driving record shows multiple tickets for speeding and other infractions. He once was disqualified from driving a truck for 60 days due to serious driving infractions.

**Deficits in the Social Domain/ Social/ Interpersonal Skills**. Although Mr. Bourgeois is verbally loquacious, it is clear that he has deficits in social functioning. All of the reporters and affiants I spoke with told me that Mr. Bourgeois was absolutely unable to participate in a two-way conversation. Mr. Bourgeois tended to talk at people instead of with them. My testing as well as the nueropsyhcological testing done by Drs. Gelbort and Weiner indicates that Mr. Bourgeois is significantly impaired in his ability to process and recall information. This helps explain Mr. Bourgeois' habit of dominating conversations and his inability to adequately participate in the give and take of a normal conversation.

Again, Mr. Bourgeois had informal supports to help him initiate and maintain any semblance of relationships. Family tolerated Mr. Bourgeois' odd manner.

In my view, Mr. Bourgeois is significanlty impaired in the social relam of adaptive functioning under both the AAIDD and the DSM rubrics.

**3. Time of Onset**

Based upon my evaluation of all of these sources, it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood. Documents, testing and information provided to me all show that the above-described deficits in intellect and functioning are life-long.

Please let me know if I can be of any further assistance.

Sincerely,

Victoria Swanson, Ph.D.

4

# EXHIBIT
# 6

SCORE REPORT

Name: Bourgeois, Alfred                         School: n/a
Date of Birth: 08/20/1964                       Teacher: n/a
Age: 45 years, 0 months                         Examiner: Victoria C. Swanson, PhD
Sex: Male
Date of Testing: 08/19/2009

TABLE OF SCORES
*Woodcock-Johnson III Normative Update Tests of Achievement (Form A)*
WJ III NU Compuscore and Profiles Program, Version 3.1
Norms based on age 45-0

| CLUSTER/Test | Raw | W | AE | EASY to | DIFF (based on age) | RPI | SS (68% Band) | | GE |
|---|---|---|---|---|---|---|---|---|---|
| ORAL LANGUAGE (Std) | -- | 494 | 8-6 | 6-5 | 12-9 | 71/90 | 80 | (76-85) | 3.1 |
| LISTENING COMP | -- | 497 | 9-5 | 7-11 | 11-10 | 43/90 | 85 | (83-87) | 4.1 |
| BRIEF ACHIEVEMENT | -- | 515 | 11-7 | 10-3 | 13-5 | 16/90 | 85 | (83-86) | 6.2 |
| TOTAL ACHIEVEMENT | -- | 506 | 10-10 | 9-5 | 12-10 | 32/90 | 81 | (80-82) | 5.4 |
| BROAD READING | -- | 507 | 11-2 | 9-8 | 13-1 | 22/90 | 83 | (81-84) | 5.8 |
| BROAD MATH | -- | 497 | 9-5 | 8-6 | 10-9 | 15/90 | 68 | (66-71) | 4.1 |
| BROAD WRITTEN LANG | -- | 513 | 12-8 | 10-7 | 16-6 | 69/90 | 92 | (90-94) | 7.2 |
| BRIEF READING | -- | 512 | 11-4 | 10-0 | 13-3 | 19/90 | 85 | (83-86) | 5.9 |
| BRIEF MATH | -- | 493 | 9-2 | 8-5 | 10-0 | 5/90 | 70 | (67-73) | 3.8 |
| MATH CALC SKILLS | -- | 507 | 11-1 | 9-7 | 13-5 | 58/90 | 82 | (79-85) | 5.7 |
| WRITTEN EXPRESSION | -- | 500 | 10-3 | 8-8 | 12-6 | 54/90 | 85 | (82-88) | 4.9 |
| ACADEMIC FLUENCY | -- | 502 | 10-11 | 8-11 | 13-4 | 54/90 | 83 | (80-85) | 5.5 |
| ACADEMIC APPS | -- | 489 | 8-7 | 7-10 | 9-8 | 7/90 | 74 | (72-76) | 3.2 |
| Letter-Word Identification | 62 | 530 | 13-5 | 11-11 | 15-2 | 23/90 | 90 | (89-92) | 8.0 |
| Reading Fluency | 43 | 498 | 10-8 | 8-6 | 12-10 | 30/90 | 81 | (78-83) | 5.3 |
| Story Recall | -- | 491 | 6-2 | 3-7 | 10-7 | 70/90 | 66 | (57-76) | K.9 |
| Understanding Directions | -- | 498 | 9-9 | 7-10 | 14-1 | 71/90 | 89 | (85-93) | 4.4 |
| Calculation | 20 | 511 | 10-10 | 9-10 | 12-4 | 44/90 | 82 | (78-86) | 5.5 |
| Math Fluency | 78 | 504 | 11-9 | 8-10 | 15-8 | 70/90 | 82 | (80-84) | 6.3 |
| Spelling | 48 | 539 | 30 | 15-10 | >30 | 89/90 | 99 | (97-102) | 13.0 |
| Writing Fluency | 18 | 504 | 10-8 | 9-2 | 12-6 | 61/90 | 89 | (85-93) | 5.2 |
| Passage Comprehension | 28 | 494 | 8-10 | 7-11 | 10-5 | 16/90 | 80 | (78-83) | 3.5 |
| Applied Problems | 28 | 476 | 8-1 | 7-7 | 8-8 | 0/90 | 63 | (60-66) | 2.8 |
| Writing Samples | 14-C | 497 | 9-9 | 8-1 | 12-6 | 46/90 | 85 | (82-89) | 4.4 |
| Story Recall-Delayed | -- | 483 | 4-3 | <3-5 | 5-9 | 51/90 | 57 | (41-72) | <K.0 |
| Oral Comprehension | 18 | 496 | 9-3 | 8-0 | 10-11 | 19/90 | 83 | (80-86) | 3.9 |

# EXHIBIT
# 7

**DECLARATION OF JETHRO TOOMER, PH.D.**
**PURSUANT TO 28 U.S.C. § 1746**

Jethro Toomer, Ph.D. hereby declares and certifies that the following is true.

1.     My name is Jethro Toomer. I am clinical and forensic psychologist. I am licensed to practice psychology in the State of Florida. I graduated from Temple University in Philadelphia, Pennsylvania with a Ph.D. in Psychology in 1972. I have been retained as an expert by the defense and prosecution, and have been selected as a court expert in a variety of criminal law matters in state and federal courts across the Nation. I am a professor of psychology at the Florida International University and have been since 1980. All opinions set forth in this Declaration are stated to a reasonable degree of psychological certainty. All facts set forth are true to the best of my knowledge.

2.     I have been asked by counsel for Mr. Alfred Bourgeois to conduct a forensic psychological evaluation of him with respect to his capital murder conviction and death sentence arising out of the United States District Court in the Southern District of Texas. In order to prepare for the evaluation and to generate this report, I have reviewed hundreds of pages of records regarding the offense, trial and appeal, as well as numerous background declarations, mental health reports and hospital records. I also conducted a clinical interview with Mr. Bourgeois at the United States Penitentiary at Terre Haute, Indiana on May 2, 2007. During this interview I spent about 4.5 hours with Mr. Bourgeois, which included the administration of psychological personality testing. As a result of my overall evaluation, I have a number of opinions about Mr. Bourgeois.

3.     Mr. Bourgeois is a deeply troubled and impaired individual. He has precarious psychological functioning. His precarious state and deficits are due to a constellation of events and conditions. I will review those in detail, however in sum, he suffers from the lasting impact of

**Declaration of Jethro Toomer, Ph.D.**
**Page 1 of 7**

savage childhood sexual and physical abuse. He has impaired intelligence (IQ scores in the mentally retarded range). He has organic brain impairments which particularly impact on his ability to control impulses, make judgments and predict the consequences of his actions. His psychological functioning deteriorates dramatically from his already deficient baseline during times of stress. Psychological testing (MCMI) suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder. On Axis II, he suffers from a combination of schizoid, paranoid and borderline personality disorders. It is my opinion that when he has acted in a rageful manner, he is likely acting out of mini-psychotic episodes secondary to his borderline personality disorder. I will now review the history and testing that supports these conclusions.

4.      My review of the background materials and interview reveal that Mr. Bourgeois suffered from clinically significant childhood physical abuse and sexual abuse. The materials present a consistent picture of abuse at the hands of his mother, and sexual abuse at the hands of at least one individual in his neighborhood. He described for me maternal abuse that was notable for its severity and random nature. His mother beat him with skillets and broom handles, and did so for no reason, or even when the "provocation" was minimal. While clinically this abuse is of great significance, it was exacerbated by his effective abandonment by his mother. This occurred when he was made to leave the family home to live with an elderly neighbor, Miss Mary. Although it may be intuitive that being removed from mother's home and abuse would be a relief, in reality, it heightened his psychological trauma. It is not disputed within the mental health field that even abused children still cling to the love that they perceive and desire from their parents. Thus, regardless of the significant abuse that he received from his mother, Mr. Bourgeois unquestionably felt that being made to live with Miss Mary was a profound act of abandonment.

**Declaration of Jethro Toomer, Ph.D.**
**Page 2 of 7**

5.      His abandonment was not just physical, but emotional as well.  He related one incident to me when he reported to his mother that he was sexual molested by a man in the neighborhood at about age 7.  Instead of protecting and nurturing her child, his mother chastised him for lying about this incident and beat him with the skillet and an extension cord.  The psychological impact of this event is hard to overstate.  At this point, when he quite naturally turned to his mother to protect him and provide succor, she failed to do so, and instead caused him further physical and psychological pain.

6.      The combination of abuse and abandonment have an exponential impact on a child.  Each are bad singularly – in combination they cause severe psychological impairments.  The effects on Mr. Bourgeois' adult behavior from this combination are evident.  His history is consistent with that of a Borderline Personality Disorder.  This disorder is marked by instability in relationships and impulsive behaviors.  There is no question but that Mr. Bourgeois fits this bill.  The Kaib declaration lays out a classic pattern of borderline-type relationships.  These relationships have a saw-tooth quality.  They begin with great highs, only to dip to great depths when the borderline perceives a slight or frustration with the object of his affection, or when he perceives that he will be abandoned.  In Mr. Bourgeois' case his multiple marriages and relationships have witnessed these highs and lows.  In addition, his impulsive conduct is noted in a variety of spheres including with regard to his purchase of material possessions well beyond his means and his extra-marital affairs.

7.      In the classic borderline personality like Mr. Bourgeois, the individual makes every effort to avoid abandonment, whether it is real or imagined.  Significantly to this case, the perception of abandonment can cause severe behavioral reactions.  The individual will go to extremes to avoid the abandonment that has caused him such great pains in his own past.  They fear loss of control and

<div align="center">

**Declaration of Jethro Toomer, Ph.D.**
**Page 3 of 7**

</div>

will go to extremes to forestall it. When the borderline individual is seeking to avoid such abandonment, and is under great stress, they can experience mini-psychotic episodes. In Mr. Bourgeois' case, it is my opinion that his abusive conduct toward the victim, as well as his other relationships occurred during such mini-states. The only thing that separates Mr. Bourgeois from a full blown psychotic disorder is that he is able to reintegrate himself very quickly after the onset of these mini-episodes.

8.      I also believe that Mr. Bourgeois suffers from a schizoid-type personality disorder. This disorder is marked by the same disruption in interpersonal relations as the borderline disorder, but it different in that it also encompasses gross perceptual and cognitive distortions. My review of the historical record reveals that Mr. Bourgeois has constructed an entire fantasy world to replace the one in which he actually lives. Mr. Bourgeois readily acknowledges the traumas that he has suffered in his life. Yet, despite their obvious impact, he denies that they have effected his life or mental health. Such detachment from traumatic events is typical of a schizoid personality. Similarly, he confabulates and simply makes up much about his life and background. For instance, while admitting that his mother beat him, he maintains that he had a "normal" and "loving" childhood. There exists a profound disconnect between what he has experienced and what he makes of those experiences. Many lay people would label Mr. Bourgeois a liar because of this disconnect. In reality, however, his lies and puffing have a deeply rooted psychological base.

9.      I understand that Mr. Bourgeois scored a 76 in a standardized IQ test at the time of his trial. This test, the WAIS-R was administered in 2004 – at a point in time when it was outdated and had been replaced by the WAIS-III. The intelligence testing community recognizes that as IQ tests approach the end of their useful life, the population as a whole begin to score higher. In effect,

**Declaration of Jethro Toomer, Ph.D.**
**Page 4 of 7**

the population becomes "smarter" on these tests. This effect, known as the Flynn Effect, is widely recognized. Under it, scores are adjusted based on the age of the test that is given. When the Flynn Effect is applied to Mr. Bourgeois' score of 76 in 2004, it should be adjusted down to a full scale IQ of 68, which is within the mentally retarded range. I understand that in recent testing given to Mr. Bourgeois by Dr. Gelbort, he scored a 70 on the current WAIS-III test. This score too is in the range of mild mental retardation.

10.    A diagnosis of mental retardation can be made when an individual has substandard IQ testing (which Mr. Bourgeois has) that is accompanied by significant limitations in adaptive functioning. Mr. Bourgeois meets the adaptive deficit criteria. Background information that has been provided to me indicates that Mr Bourgeois has deficient functioning in all three realms of adaptive behavior: conceptual, social, and practical.

11.    His deficits seem most profound in the social realm. His inability to maintain healthy relationships indicates a significant deficit in his interpersonal functioning. In addition, his wildly inconsistent stories about himself and his own history reveal a deficit in his self-esteem. He has demonstrated difficulty in following simple rules from childhood through adulthood, another aspect of impaired social functioning.

12.    Mr. Bourgeois' history reveals deficits in the conceptual and practical realms as well. Specifically, he has difficulty understanding money concepts. He has a long history of living beyond his means and seems unable to understand simple concepts in his monetary transactions. In the practical realm, Mr. Bourgeois seems especially weak in maintaining his personal safety and maintaining safe environments. Multiple reports show that he had a very weak understanding of safety. He reportedly would turn around while at the wheel of the truck, and did not keep his eyes

**Declaration of Jethro Toomer, Ph.D.**
**Page 5 of 7**

on the road. His hospital records also report multiple MVA's, a sign that he was unable to maintain safety while driving.

13.     I have reviewed the neuropsychological testing done in 2004 and 2007. The results of these batteries demonstrate that Mr. Bourgeois is impaired in the areas of the brain that control impulses and executive decision making. His impaired scores in the Category test in particular demonstrate such impairments.

14.     When Mr. Bourgeois' organic brain impairment and mental retardation are added to his already precarious psychological state, the resulting combination creates a highly volatile personality. Even without his organic deficits and low IQ, Mr. Bourgeois would have a difficult time managing his emotions and behavior. When his low IQ and organic deficits are added, his ability to maintain control drops further. When this individual is placed under stress, such as the type that he was under at the time of the offense, is it no wonder that he lashed out in a such a rageful manner.

15.     There is no question but that Mr. Bourgeois suffers from significant mental health deficits and disturbances. These disturbances significantly impact on his ability to appreciate the criminality of his conduct and to conform his behavior to the requirements of law. Based upon my forensic criminal law experience, these deficits are of the type that would routinely be presented in the mitigation phase of a capital trial. I have reviewed the transcripts of Mr. Bourgeois' trial, and it is safe to say that with the exception of some testimony that he was subjected to childhood abuse, there was scarcely a flavor presented to the jury as to his overall deficits and impairments.

16.     This Declaration contains only a summary of my opinions and findings, and is not exhaustive in that regard.

<div style="text-align:center">

**Declaration of Jethro Toomer, Ph.D.**
**Page 6 of 7**

</div>

I hereby certify that certify that the opinion and facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jethro Toomer, Ph.D.

Dated:      Miami, Florida
             May 9, 2007

# EXHIBIT
# 8

STATE OF LOUISIANA
## DEPARTMENT OF EDUCATION
BATON ROUGE, LOUISIANA
STATE-APPROVED HIGH SCHOOLS

RTIFICATE OF
3H SCHOOL
EDITS

| ME OF STUDENT (Name in full, including middle name) | | Date of Birth | Sex | Race | Date of Graduation |
|---|---|---|---|---|---|
| Alfred Bourgeois | | 7/22/64 | M | B | 5/24/83 |

| ME OF SCHOOL | PARISH | ADDRESS | Zip Code | PHONE NO. |
|---|---|---|---|---|
| Lutcher High | St. James | Lutcher, LA | 70071 | 869-5741 |

TO THE PRINCIPAL: Make for each applicant for graduation duplicate certificates (one white, one pink). Seven days prior to graduation, forward both copies to the State Director of Secondary Education. After approval, one copy will be returned. Please use typewriter.

| st each subject separately as Indicated In state program of studies giving the ct title of subject) | | Year Credit Earned | Number of Weeks | Minutes per Week | Mark Received | Unit Credit | Remarks: Enter the names of schools In which outside cred were earned. |
|---|---|---|---|---|---|---|---|
| ENGLISH | ENGLISH I | 1 | 36 | 300 | C | 1 | |
| | ENGLISH II | 2 | 36 | 300 | D | 1 | |
| | ENGLISH III | 4 | 36 | 300 | D | 1 | |
| | ENGLISH ( Speech I ) | 3 | 36 | 300 | C | 1 | |
| EE ENTERPRISE | Free Enterprise | 2 | 18 | 300 | C | ½ | |
| MATH | Math I | 1 | 36 | 300 | C | 1 | |
| | Math II | 2 | 36 | 300 | D | 1½ | |
| | Algebra I | 3 | 18 | 300 | D | ½ | |
| | Consumer Math | 4 | 18 | 300 | C | ½ | |
| ICIAL STUDIES | CIVICS | 1 | 36 | 300 | C | 1 | |
| | AMERICAN HISTORY | 3 | 36 | 300 | C | 1 | |
| | Economics | 2 | 18 | 300 | D | ½ | |
| | Geography | 4 | 36 | 300 | D | 1 | |
| | Afro Am. History | 4 | 18 | 300 | B | ½ | |
| SCIENCE | Gen. Science | 1 | 36 | 300 | C | 1 | |
| | Biology | 3 | 36 | 300 | D | 1 | |
| HEALTH AND PHY. ED. | H. & P. E. I | 1 | 36 | 300 | B | 1 | |
| | H. & P. E. II | 2 | 36 | 300 | C | 1 | |
| | H & PE III | 3 | 18 | 300 | C | ½ | |
| | H & PE IV | 4 | 36 | 300 | C | 1 | |
| OREIGN LANG. | | | | | | | |
| JOURNALISM | | | | | | | |
| SPEECH | | | | | | | |
| AGRICULTURE BUS./OFFICE DIST. ED. HEALTH OCC. HOME ECON. IND. ARTS T. AND I. VOC. TECH. | Agriculture I | 1 | 36 | 300 | D | 1 | |
| | Basic Drafting | 4 | 36 | 300 | C | 1 | |
| | Independent Living | 4 | 18 | 300 | D | ½ | |
| ART MUSIC SAFETY AND OTHER ELECTIVES | Beg. Band | 2 | 36 | 300 | B | 1 | |
| | General Music | 3 | 36 | 300 | C | 1 | |
| | Art 1 | 4 | 36 | 300 | D | 1 | |
| | | | | TOTAL UNITS | | 22 | |

To the State Director of Secondary Education:
I hereby certify that the above-named student has successfully completed the high school work shown above, and that he has complied with all the requirement: prescribed by the State Board of Elementary and Secondary Education for graduation from a State-Approved High School, and that there is now in my office or file a complete record of this student's work, including a cumulative record of attendance and scholarship.

JBSCRIBED TO THIS 24th DAY OF May 19 83 AT Lutcher LOUISIANA

PPROVED: DIRECTOR OF SECONDARY EDUCATION

SIGNATURE OF SCHOOL PRINCIPAL

# EXHIBIT
# 9

# *Lloyd B. Johnson*

**ST. JOHN THE BAPTIST PARISH**
**SHERIFF AND EX–OFFICIO TAX COLLECTOR**

**P.O. DRAWER Q**                    **PHONE: 652-9581**

**LA PLACE, LOUISIANA 70069-1116**

May 6, 1985

TO:   Sheriff Lloyd B. Johnson
      P. O. Drawer Q
      LaPlace, Loiusiana      70069

RE:   Recruit Alfred Bourgeois

From: Lt. David M. Wilson

On May 6, 1985, Recruit Alfred Bourgeois failed to meet the Police Officer Standards and Training (P. O. S. T.) as pertains to firearms qualifications. Mr. Bourgeois has received fifty-four hours of training and instruction in the use of his service revolver. On April 23, 1985, Mr. Bourgeois was given his first opportunity to qualify. In his effort to qualify Mr. Bourgeois failed to fire the 225 point qualifying average. Mr. Bourgeois score was 178.5 out of a possible 300 points. After his failure to qualify Mr. Bourgeois was given eight (8) additional hours of instruction and training in the use of his service revolver. On May 6, 1985, Mr. Bourgeois was again given the opportunity to fire the P. O. S. T. course for score. On this date Mr. Bourgeois fired a 222.75 average out of 300 points. Note: P. O. S. T. requires a 225 or 75% minimum score to qualify. Mr. Bourgeois has as of this date May 6, 1985, fired one thousand one hundred forty (1,140) rounds of ammunition in his practice sessions and attempts to qualify with his service revolver.

In addition to the time spent firing on the range Mr. Bourgeois had been given five examinations. Four of the five examinations pertained to his firearms training and the fifth test to basic police procedures. Of these five examinations given, Mr. Bourgeois has failed to meet a 70% passing score on two of the five examinations.

Due to Mr. Bourgeois not meeting the P. O. S. T. standards for firearms qualifications and due to his poor performance scholastically, it is my belief that further training would be unfruitful and unwarranted.

It is my opinion that Recurit Alfred Bourgeois not be considered for permanent employment with the St. John the Baptist Parish Sheriff's Office at this time.

Sincerly,

Lt. David M. Wilson
P. O. S. T. Firearms
Training Instructor

# EXHIBIT 10



## Morris & McDaniel, Inc.
### MANAGEMENT CONSULTANTS

formerly
THE PSYCHOLOGICAL SERVICE CENTER
OF NEW ORLEANS, INC.

2918 NAPOLEON AVENUE, SUITE B
NEW ORLEANS, LOUISIANA 70115
(504) 897-0640

MAX H. McDANIEL, Ph.D.
President

DAVID M. MORRIS, Ph.D., J.D.
Vice President

MARILYN K. QUAINTANCE, Ph.D
Vice President of Marketing
Director of Washington Office

THOMAS J. HANNIE, Jr., Ph.D.
Vice President, Clinical Psychology

JOE F. NASSAR, M.P.A.
Vice President of Operations

STAFF CONSULTANTS:
DOUGLAS A. GREEN, M.S.
SHANE PITTMAN
JAN WALKER, M.S.

WASHINGTON D.C. OFFICE:
912 PRINCE STREET
ALEXANDRIA, VIRGINIA 22314
(703) 836-3600

JACKSON OFFICE:
741 NORTH CONGRESS
P.O. BOX 104
JACKSON, MISSISSIPPI 39205
(601) 353-0640

May 22, 1985

## PSYCHOLOGICAL EVALUATION

Name:                         Alfred Bourgeois

Age:                          20 Years

Evaluation Date:              4/12/85

Evaluated By:                 Max H. McDaniel, Ph.D.
                              Douglas A. Green, M.S.

Referred By:                  St. John the Baptist Parish Sheriff's Office

Techniques Utilized:          Background Interview
                              Behavioral Observations
                              Psychological/Social History Questionnaire
                              Minnesota Multiphasic Personality Inventory

### Background Interview and Behavioral Observations

Mr. Alfred Bourgeois was seen at this office for the purpose of determining his psychological adaptability to work as a sheriff's deputy with St. John Parish Sheriff's office. It was learned in a background interview that Mr. Bourgeois was raised by his mother and describes his childhood as happy. He apparently did not get along well with the father. There were six other children in the family.

Mr. Bourgeois reports he graduated from Lutcher High School in 1983. He rates his intelligence as average, but says he did repeat a grade. He says he got mostly C's and does not remember ever getting in trouble while in school.

Mr. Bourgeois says he grew up in a wealthy family and there was little disagreement in the family about financial matters. He says he currently

makes between $15,000 and $20,000 which is a reduction in income during the past two years.

Mr. Bourgeois is presently unemployed. He worked for several years at Winn Dixie while he was in high school and later worked at Delchamps. After high school he got a job with Louisiana Power and Light Company as a meter reader and was there about five and a half months. At that time he was involved in an accident with a three wheeler and was not able to continue working. He was let go since his six months probationary period was not up. He said he enjoyed his job at LP & L and enjoyed the responsibility he had reporting irregularities to the company.

Mr. Bourgeois says he never used illegal drugs and has never used alcohol. He reports no family history with substance abuse and says that he has never used cigarettes. He reports no past health problems other than the accident he had with the three wheeler where he broke his leg. He is not under a physician's care at the present time and is not taking any medication.

Mr. Bourgeois is single and is presently living with his uncle. His family has helped support him since his unemployment ran out following his lay off from LP & L. He says he has never been married, but is the parent of two children.

Mr. Bourgeois says his interest in police work stems from his belief in right and wrong. He says he likes the social contact in police work and feels very strongly about crime in general.

Mr. Bourgeois was on time for the testing session and cooperated well throughout. He seemed reasonably open in discussing acground kground information and overall made an adequate impression.

Test Results

Results of the Minnesota Multiphasic Personality Inventory indicate for the most part that Mr. Bourgeois' scores fall within the normal or acceptable range with two exceptions. He appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals. He appears to be somewhat anxious and nervous at times and appears to worry excessively. His self-esteem does not appear to be very good. As he indicated during the interview, he presents himself as a very traditional and moralistic individual.

The following rating scales are based on research and standard inter- pretation of the Minnesota Multiphasic Personality Inventory. These ratings are based on scale elevations and are considered helpful indices when evaluating an applicant's potential occupational adjustment.

```
*****************************
* Openness to Evaluation *
*****************************
```

| Overly Frank | Quite Open | Adequate | Overly Cautious | Guarded | Indeterminate |
|---|---|---|---|---|---|
| | | --X-- | | | |

```
*****************************
*    Social Facility     *
*****************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | --X-- | | |

```
*****************************
*  Addiction Potential  *
*****************************
```

| Low | No Apparent Problem | Problems Possible | Moderate | High | Indeterminate |
|---|---|---|---|---|---|
| | | | --X-- | | |

```
*****************************
*   Stress Tolerance   *
*****************************
```

| High | Good | Adequate | Problems Possible | Low | Indeterminate |
|---|---|---|---|---|---|
| | | | --X-- | | |

```
*****************************
* Overall Adjustment *
*****************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | --X-- | | |

Summary and Conclusion

In summary, Mr. Alfred Bourgeois is an individual with a short work
experience at Louisiana Power and Light Company as a meter reader who is
interested in becoming a law enforcement officer. He shows some borderline
tendencies toward problems in the psychological area. He seems to be a
rather moralistic individual who believes in right and wrong, however, he
shows feelings of inadequacy and problems in evaluating his self-worth.
He shows very strong ambition, but is not clear about what he wants or how
to get it. These problems are likely to be seem in his behavior as
frequent indecision and an inability to work consistently at one thing.

Recommendations

Mr. Alfred Bourgeois is not recommended for a position with the St. John
Parish Sheriff's Office at this time.

Max H. McDaniel, Ph.D.
Industrial Psychologist

MHM:

# EXHIBIT
# 11

<u>DECLARATION AND AFFIDAVIT OF MICHELLE WARREN</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Michelle Warren, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Michelle Warren.  Alfred Bourgeois is my older brother.  We have the same mother but different fathers.

2.      Our mother had seven children.  Claudia was born first.  Then came Clyde, Lloyd and Anthony.  Alfred had a different father than any of the rest of us.  His father's name is Alfred Sterling.  Our mother was never married to Alfred Sterling.  Keith and I were born after Alfred and we both have the same father, Godfrey Rixner.

3.      Our brother Clyde died when he was just a boy.  He used to spend time with people in Mt. Airy and on the fourth of July he went on a fishing trip with an older man from that area.  He fell out of the boat and drowned.  Our mother felt awful about Clyde for a long time but then she saw him in a dream and after that she got some peace about his death.

4.      Our brother Anthony is handicapped.  He did not learn to walk until much later than normal.  He never learned to say more than a few words.  He always needed a lot of extra care.  He cannot live on his own.  Alfred helped to take care of Anthony and would buy him things.

5.      Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do.  He seemed to need more attention than the rest of us did and sometimes the things he did to get attention just got him in trouble.  Our mother was harder on Alfred than the rest of us.  I remember times I was allowed out but my older brother, Alfred, was not, so I would stay in the house with him.

6.    The children in our house, including Alfred, had a lot of chores to do. Our mother was a fanatic cleaner. There is a character in a movie, Sleeping With The Enemy, who is a fanatic about his house being in order. My mother reminded me of that character. Everything had to be lined up exactly. The cans in the cupboard had to have labels pointing in the right direction. Glasses had to be perfectly lined up. We had to get down on our hands and knees and scrub the baseboards. Every dish that was used had to be immediately washed, dried and lined up where it belonged. We had to wipe our shoes clean before coming into the house. Sometimes we got whippings for messing things up. Other times cleaning was used as a punishment. Alfred would have trouble listening to directions, so he would mess up more than the rest of us and get beatings more often.

7.    I have the tendency to be a fanatic about my house like my mother was. I resist the urge because I believe it is more important for my children to be comfortable and happy in my house than for everything to be perfect. I deliberately put glasses that don't match on one of my shelves so that I won't be like my mother. Alfred wanted a clean house when he was married and this caused some tension in his relationships.

8.    Our mother used to clean Alfred's nose all the time. She would stick her fingers deep inside and this caused sores. She cleaned it so deep, hard and often that the sore wouldn't heal.

9.    Alfred did not play sports in school. He got teased a lot. Sometimes it was because of his looks. He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes". Alfred could not stand to be teased. He would get very mad when kids teased him. I remember telling my older brother Alfred that they were just jealous of his eyes. When he got older he started to realize that girls were attracted to his looks.

10.    When he was a boy, Alfred went to stay with an older woman. Her name was Miss Mary. She needed someone to be there with her and her own family was not providing the help she needed, so Alfred went to live with her. Because she didn't live far from us we still saw Alfred but he was not really a part of the family when he went to live with her.

11.    Alfred had a couple accidents that I can remember. One was very bad. He was riding a three wheeler and slammed right into a tree. Another time he was out of state driving an 18 wheeler and came home in casts and we had to take care of him.

12.    Sometimes Alfred would just "click out". He would be in his own zone. You couldn't get through to him. He would stare off into space, and would not respond to questions or voices. Then he would suddenly snap out of it.

13.    My oldest brother, Lloyd, worked very hard from the time he was a teenager. While Alfred was spending time with Miss Mary, Lloyd used to spend time with our uncle Harry. Harry had a shop and taught Lloyd a lot at a young age about working and repairing cars. Lloyd was able to succeed in whatever he did. Alfred felt like he was compared to his older brother. Alfred tried to be like Lloyd and wanted to be successful like he was but he just wasn't able to do what Lloyd was able to do. He stressed himself out over trying to be like Lloyd. He wanted Lloyd's approval but always ended up feeling second best. My younger brother, Keith, was not like that. He worked hard and was just happy with whatever he was able to achieve.

14.    Alfred had odd rules around the house. He did not want any lights on in the house during the day. He would not let the air conditioner be turned on.

15.    One Christmas when Alfred was an adult he got upset over something minor with our mother. He went into a rant about how unloved and mistreated he felt as a child. He brought

up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him. We all tried to calm him down and told him to just let it go. Our mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

16.    When Alfred got something stuck in his mind it was impossible to redirect him. He would come and ask me for advice but then he could not follow any suggestions I made to him. It was like he had a block and could not reason things out or change his behavior. Sometimes in his dealings with Robin the authorities had to get involved because he could not control his behavior. He was unable to calm himself down.

17.    My daughter and my niece babysat for Alfred's daughter, Alfredesha. They had a hard time keeping her from doing things that weren't safe. Alfredesha made stuff up about the girls being too hard on her. When Alfred came she had fake tears and a made up story to tell him. Alfredesha knew how to put on a show. He believed everything this little girl told him and yelled at my daughter and my niece. We really didn't want to watch Alfredesha after that.

18.    Alfred's wife, Robin, cheated on Alfred while they were married. This really shook my brother up. Alfred just could not handle it. He flipped out. He just kind of went into his own zone. They broke up but then got back together but Alfred could not get over the affair. He thought the second daughter that Robin had was not his. He would bring up the affair over and over. We might be at a family gathering and in front of everyone Alfred would start obsessing about Robin's affair. It would ruin his day and keep the rest of us from having a good time, too. I stopped going to family gatherings because I just didn't want to see Alfred like that.

19.    Robin was very smart. She figured out the code to his phone once so she could check his messages. Robin told Alfred that Al, the man she had the affair with, had a plan to kill Alfred. Alfred was afraid to eat food for a while because he thought he might be poisoned.

20.    I spoke to someone working on Alfred's behalf before his trial. I answered any questions they asked me. I was in Corpus Christi while the trial was going on and I was willing to testify but I was never called into the courtroom to be put on the stand. I would have been willing to testify about all the things in this affidavit if I had been given the chance.

21.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Warren

Dated: 4-25-07

# EXHIBIT
# 12

## DECLARATION AND AFFIDAVIT OF LAWANDA COOK PURSUANT TO 28 U.S.C. § 1746

Lawanda Cook, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Lawanda Cook, and Ivy Thomas is my cousin. I knew Alfred Bourgeois during the time that Ivy and him dated.

2.     From the second I met Alfred I knew that he wasn't right. He always acted crazy and I never could see what my cousin saw in him. You could tell that his mind wasn't all there.

3.     He would take crazy chances in the truck he drove. I remember one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me than he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all.

4.     I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.

5.     I remember one time Ivy was making ox tail for dinner, and Alfred asked us what it was. I thought that was really strange. At first I thought he was kidding us, but it became clear he wasn't joking so I explained to him that ox tail was from a cow. He got all red in the face and looked really upset. Then he asked us well is it an ox or a cow. I was stunned. I kept trying to explain to him that it was the same thing but he insisted that it couldn't be the same.

5.     I always thought that Alfred acted like a child. When Alfred would see something as ordinary as a tree he acted like it was the first time he ever saw it. He had to have seen a tree a million times but he always acted like it was so amazing. It seemed like something a really

young child would do.

6.      No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

7.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Lawanda Cook_
Lawanda Cook

Dated: _5-1-07_

# EXHIBIT 13

<u>DECLARATION AND AFFIDAVIT OF BEVERLY FRANK</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Beverly Frank, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.  My name is Beverly Frank. I grew up in Saint James Parish in Louisiana. I lived

    in Paulina until I was 12 or 13 years old, then my parents moved to Lutcher which

    is only a mile or so away. I now live nearby in LaPlace, Louisiana. I still have

    lots of family who live in Paulina.

2.  My grandmother was Mary Clayton. She was my father, Herman Clayton, Sr.'s

    mother. My grandmother raised Alfred Bourgeois from about the age of eight

    until he was grown. Alfred's mother's name was Eunice Bourgeois. Eunice had

    several children including Alfred. I know Alfred's older brother, Lloyd, and his

    older sister, Claudia. I know their father. He played the organ at Evergreen

    Baptist Church. I know Alfred had a different father than his older brother and

    sister.

3.  Alfred's mother treated him differently than her other children. She talked to

    Alfred differently and she treated him differently too. I saw her give her other

    children money and not give Alfred any money. I also saw her give cookies to her

    other children and not give Alfred any cookies.

4.  Eunice whipped all her children. She was a single parent for several years and she

    disciplined the children herself. Eunice would use a switch or anything else she

    could get her hands on to whip the children. I know she would whip the children

1

so much that they would have welts on their body. I believe you should never whip a child that much.

5. My grandmother saw the way that Eunice mistreated Alfred. She took him in because of the terrible way that Eunice treated Alfred. My grandmother had a good sense of right and wrong and she wanted to help Alfred. She believed that every child deserves love.

6. Eunice used to always mess with Alfred's nose. She would pick his nose and irritate it really bad. I saw Eunice do this to him. She would pick and scratch his nose with her fingernails. I have no idea why she would irritate his nose like that. I never saw Eunice touch her other children's noses. I never saw the other children with irritated noses. Alfred's nose was frequently bleeding. He walked around with cotton or tissue in his nose. Over the years this disfigured Alfred's nose. It wasn't like that when he was little. Alfred would cry a lot and complain that his nose hurt. He wouldn't let anyone touch it. My grandmother used to put Vaseline on his nose to heal it, to soothe it. She did this to offer him some relief. But just as soon as my grandmother had gotten Alfred's nose healed his mother would mess it up again. This upset my grandmother so much. As fast as my grandmother would heal his nose, his mother would mess it up again. That child was afraid to blow his nose. I know that when he was older he had trouble breathing through his nose.

7. Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in

2

little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

8. My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

9. Deep down inside I feel bad for Alfred. I know he suffered hardships as a child. His mother mistreated him and was too harsh in disciplining him. His mother made Alfred feel unwanted within his own family. My grandmother did her best to help Alfred but his mother continued to hurt him.

10. No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

11. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Beverly Frank

Dated: May 9, 2007

3

# EXHIBIT
# 14

DECLARATION AND AFFIDAVIT OF CLAUDIA WILLIAMS

PURSUANT TO 28 U.S.C. § 1746

Claudia Williams, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Williams. Alfred Bourgeois is my brother. I am the oldest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. Tragedy hit our family when we were children. Our brother, Clyde, was drowned on the 4th of July when he was a child. His death effected all of us, including Alfred. Even as a child, Alfred could not take pressure. Having our mother and our whole family grieving over losing Clyde added to the pressures in our house.

3. We lost Clyde and then our brother Anthony took a lot of extra care due to his disabilities. Both those things took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.

4. Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.

5. Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

6. When Alfred was a teenager he had a bad accident right there close to our house. He was riding a four wheeler and ran it right into a big pole. He hit his head, was knocked out and then seemed kind of out of it. After that he seemed nervous and unable to sit still.

7. Alfred sometimes went into a rage and he would seem like a different person. His voice would change and his eyes would turn red. Sometimes he would forget what he had just done. His moods would change till you thought he had a split personality.

8. Alfred didn't get any better at dealing with stress when he got older. He was so stressed when he went on that last truck trip that I was very scared for him. He called and said that he was afraid he was going to hurt himself and implied that I might need to get my black dress out for his funeral. I got Robin on the phone and asked her to keep any weapons away from him because he was suicidal. I was concerned that he was so stressed and depressed that he was going to kill himself.

9. I was called to testify for the prosecution at Alfred's trial. Before I testified they made me look at pictures of the body. I would have testified to the things in this affidavit if I had been asked about them.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Claudia Williams

Dated: 5/10/07

# EXHIBIT
# 15

DECLARATION AND AFFIDAVIT OF MICHELLE ARMONT
PURSUANT TO 28 U.S.C. § 1746

Michelle Armont, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Michelle Armont. Alfred Bourgeois is my brother. We have the same father but different mothers.

2. Our father is Alfred Sterling. Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers. Our father had many outside children. I am the oldest of them. We were not raised by our father and we were not treated the same as the children he had with his wife. The children by his wife basically look down on us and try to deny that we are even any relation to them. If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.

3. Alfred and I both love our father but it is not a nurturing father-child relationship like children need. He did not acknowledge us until we were almost grown. He would say "it's their momma's child". Our father's life has been full of lying, cheating and denial of his children. He did not pay child support for any of us but the youngest, who is now about 13 years old. He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old. When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble. Being treated like that is hurtful to me and it was hurtful to Alfred.

4. When the woman that Alfred stayed with died he did not want to go back to live at his mother's house. He could not live with our father so he came to stay with me. He had a

strong bitterness toward his mother because she treated him so badly. Some days he could not say her name.

5.    Alfred had some serious problems. Aside from being almost ignored by his father most of his life, he was abused by his mother. She caused him so much pain that he was a damaged person because of the abuse that he suffered. It was hard for Alfred to talk about the abuse he went through. Alfred had trouble trusting people. Alfred was similar to my nephew that had ADD. They both had tantrums. Alfred would not be himself when he got angry. He looked different. He told me he blacked out sometimes when he got angry.

6.    I know Beatrice Bourgeois. She is not a stable person. She was well known in the community for being crazy. Anyone that knew her would not trust her or believe what she said.

7.    Robin is a compulsive liar. There was always a lot of drama around Robin and Alfred. I got along with her but if you knew her you knew you could not trust anything she said. I saw Robin and Alfred a couple days before the baby died. They were all lovey-dovey. Robin and I had the kind of relationship that she knew if Alfred gave her any trouble she could come to me and I would help her out

8.    Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him. He did not understand that he could not afford the things he bought and he didn't understand that people would know the things he was telling them were not true. Many women were attracted to Alfred but he could not maintain a relationship. He did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem. The same things caused him financial

problems. He just bought things without understanding how hard it would be to make the payments. Alfred could not consider the consequences of his actions. Things that would be obvious to a normal person were not obvious to Alfred.

9.      I was only contacted a couple days before Alfred's trial. I tracked down the attorney who was representing Alfred and called him to find out what was going on. Then someone called me. The person who talked to me had me confused with someone else. If they had gotten to know Alfred's family they would have known the difference between his mother's children and his father's children. When I was on the stand I was shown horrible pictures of the baby that died. It was the first time I had seen the pictures and it really shook me up. I wish I had been better prepared.

10.     When I saw Alfred in the courtroom he was acting inappropriately. He winked at me during my testimony. He was being very strange.

11.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Armont

Dated: 4/26/07

# EXHIBIT 16

## DECLARATION AND AFFIDAVIT OF IVY THOMAS
## PURSUANT TO 28 U.S.C. § 1746

Ivy Thomas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Ivy Thomas. I dated Alfred Bourgeois from 1995 to 1997.

2.    I live in Birmingham, Alabama and I met Alfred at a friend's wedding. We started dating immediately. I would see Alfred about five times every three months. We would talk on the phone all the time.

3.    When Alfred had a truck load that had to go through Birmingham he would stay with me for a night and some of the next day. We always had such a good time together. Alfred was always very respectful, and kind to me.

4.    Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.

5.    One time I was frying pork chops, and he asked me what they were. I was really surprised that someone as old as he was had never heard of a pork chop. I told him what they were and that it came from a pig. He seemed really confused about that. At first I thought it was a cultural thing like they didn't have them in New Orleans, but he didn't even seem to understand how to cook so I know it wasn't just cultural.

6.    I really thought it was strange that he asked so many questions about cooking. I would think that a grown man would have been around cooking and baking all his life. His interest in my cooking was very childlike.

7.    Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood. He told me that his mother kept all his other siblings but gave him away. Alfred

said that his mom treated him differently than all the other kids and it depressed him. His mom said he looked just like his father, and that is why she hated him so much. One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

8.    I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

9.    No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

10.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Ivy Thomas

Dated: 5/1/07

# EXHIBIT
# 17

## DECLARATION AND AFFIDAVIT OF LOUIS RUSSELL, JR
## PURSUANT TO 28 U.S.C. § 1746

Louis Russell, Jr., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Louis Russell, Jr. I grew up in Paulina, Louisiana. I now live in Baton Rouge, Louisiana.

2. My family lived right next door to Alfred Bourgeois, all his brothers and sisters and his mother, Eunice Bourgeois. We are distant relatives.

3. Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature. At lunch we all tried to make Alfred laugh at the lunch table. We would do it until milk ran out of his nose.

4. I remember when he was a teenager that he was driving a four wheeler near the sugar cane fields. He drove that four wheeler straight into a pole. The whole neighborhood heard it when he hit the pole. We couldn't believe it. He ended up hurting himself pretty bad. I know an ambulance came and took him away.

5. Growing up Alfred was someone with a pretty good temper. Alfred had a slow temper but once it boiled over it was hard to cool down. It seemed like Alfred didn't know how to back down. Alfred would be fighting with someone and getting the better of him but keep on hitting the guy. During these instances Alfred was extremely intense. He didn't respond to verbal requests to stop. Short of physical restraint it seemed Alfred would not stop. I never saw an instance where somebody didn't have to pull him off. He was hard to calm down.

6.    No attorney or investigator ever contacted me and asked me about Alfred when he was on trial.  I would have answered any questions by Alfred's attorney and I would have testified if I had been asked.

7.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Louis Russell, Jr.

Dated:  5/9/07

# EXHIBIT 18

## DECLARATION AND AFFIDAVIT OF NATHANIEL BANKS
## PURSUANT TO 28 U.S.C. § 1746

Nathaniel Banks, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.   My name is Nathaniel Banks. I grew up in Paulina, Louisiana. I now live in

     Bonner Springs, Kansas. I am juvenile probation officer. I am also a pastor at a

     local church in Bonner Springs.

2.   Alfred and I grew up together in Paulina, Louisiana. I know his whole family.

     We lived right in the same little area. We are close in age. I am just a little bit

     younger. We were in the same grade ~~class~~ in school. *NB*

3.   Alfred was a fragile child. He spent a lot of time by himself. People used to pick

     on Alfred a lot. Children sometimes do that. I just remember Alfred crying at

     anything. Someone would tease him and he would break down crying. People

     used to call him names – they called him "white punk". Alfred has a real light

     complexion. Kids used the word punk to mean that he was weak. Alfred wasn't

     any good at sports. *NB He didn't play sports with us.* ~~At recess he wasn't good at those games we played outside.~~

     *In my opinion NB*

4.   Alfred always looked up to his older brother Lloyd. As an adult Alfred has been

     trying to keep up with Lloyd. Lloyd does well for himself. Alfred wanted that for

     himself. Alfred wanted to impress people. Alfred lied a lot. I remember that

     Alfred would say things that you just knew weren't true. I used to work for the

     sheriff's office. Alfred told people he worked there. He was never a proper

     *NB Alfred tried to build himself up present himself*

     deputy. ~~I think Alfred needed to feel important and that is why he lied, to cover~~

     *as more than he was.*

     ~~up his shortcomings.~~ I think Alfred lied so much he started to believe it.

5.    Alfred told me that he was driving an 18-wheeler truck. I didn't believe him.

When he pulled up to my house in his tractor-trailer I was shocked. There was no

_N.B. coordination_

way Alfred had the ~~intelligence~~ and skill to drive that thing. I wondered to myself

who in the world would allow him to drive that truck.

6.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury,

pursuant to 28 U.S.C. § 1746.

Nathaniel Banks

Dated: _5-10-07_

# EXHIBIT
# 19

DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB, M.S.S., M.L.S.P., L.S.W.
PURSUANT TO 28 U.S.C. § 1746

Kathleen Kaib, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Kathleen Kaib and I am employed as an investigator/mitigation specialist with the Federal Community Defender Office, Capital Habeas Unit. I graduated from Bryn Mawr Graduate School of Social Work and Social Research with a Masters degree in Social Service (equivalent to a Masters in Social Work) and a second Masters in Law and Social Policy. I am a licensed social worker in the state of Pennsylvania, and I am a certified domestic violence counselor. I have been in professional contact with and counseled many woman who have been the victims of domestic violence. I have extensive experience with diagnosing and assessment of mental health disorders, symptomatology and assessment of individuals with mental health deficits, including individuals with Borderline Personality Disorder. I also have significant experience in generating social histories.

2.      All of the opinions expressed herein are stated to a reasonable degree of psychological certainly, and all facts are true to the best of my knowledge and recollection.

3.      At the request of Alfred Bourgeois' current lawyers, I interviewed the following women about Mr. Bourgeois: Geralyn Dumas, Sheila Bourgeois, Cynthia Bourgeois, Gaynell Collins, Robin Bourgeois, and Ivy Thomas. I also reviewed the notes of an interview with Gaynell Belvin James which was conducted by my colleague Richard Ruffin, MSW, and I have spoken with Mr. Ruffin about his interview with Ms. James.

4.      All of these women were either married to Mr. Bourgeois or were romantically

1

involved with him. Common to each of these relationships was that they were extremely intense and unstable. In the beginning of each relationship Mr. Bourgeois idealized each woman, and treated them wonderfully, but he quickly switched to devaluing them and ultimately became quite violent and abusive with them. It was readily apparent to me based upon my interviews, that Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.

5.    Mr. Bourgeois's relationship with Geralyn Dumas was the earliest relationship that I investigated. Geralyn and Mr. Bourgeois began a romantic relationship in 1979 and share a daughter, Bethany. In the beginning of their relationship Mr. Bourgeois was very attentive and kind, but this steadily deteriorated. Eventually Mr. Bourgeois demonstrated enormous rage. Geralyn was engaged to Mr. Bourgeois but never married him because he was constantly cheating on her with other women and he would have uncontrollable outbursts of anger. Geralyn maintained sporadic contact with Mr. Bourgeois long after their romantic relationship ended, because they had a child together. Bethany came home from visiting Mr. Bourgeois and reported that he was having sex with women other than his wife while Bethany was in the house.

6.    Gaynell Belvin James was Mr. Bourgeois's next significant relationship after Geralyn. They met in 1982 and she described that the relationship was tempestuous. Soon after they met she got pregnant with their son Anthony. The relationship was very short lived because Mr. Bourgeois became violent and she could not endure his frequent and dramatic mood shifts.

7.    Mr. Bourgeois next married Sheila Bourgeois in 1987, after only a few months of dating. When the relationship was in the very early stages Mr. Bourgeois confided in her that his mother was extremely cruel to him and would abuse him. The relationship was very good while

2

they were dating, but after just a week of marriage he became verbally abusive and violent. Sheila stated that Mr. Bourgeois became extremely jealous and angry. To this day Sheila states that she has no idea how the relationship changed so drastically so quickly. One night Sheila was waiting for Mr. Bourgeois to come home from being out on the road as a truck driver. Mr. Bourgeois walked into the house and immediately began to choke her for no reason, and then just as suddenly as the attack began he walked away and went to sleep. This incident was never acknowledged or explained the next day.

8.      Sheila left Mr. Bourgeois four months after they married because he pushed her over a chair while she was three months pregnant with their daughter, Sherisha. Sheila stated that Mr. Bourgeois cheated on her during their entire marriage, and he did not seem to care about hiding it from her. Sheila stated that Mr. Bourgeois always had to have what his brother Lloyd had even when he could not afford such things. He would spend money on cars, and then they would not have enough money to buy groceries. She stated that he was very reckless with the way he spent money.

9.      In 1991, Mr. Bourgeois married Cynthia Bourgeois. They too only dated for a few months before they were married. During those first few months Mr. Bourgeois "wined and dined her." During this time Mr. Bourgeois confided that his mother physically and verbally abused him. Cynthia never wanted for anything during this period in their relationship and they had a wonderful time together, but after they were married Mr. Bourgeois completely changed. Cynthia said she did not even recognize the man that had, only a few months before, been so good to her. Mr. Bourgeois was extremely verbally abusive to her and he would fly into rages for no apparent reason. When Mr. Bourgeois would start to get upset she could see his eyes

3

cloud over and said it was like she was looking at a different person. Their marriage did not last long because of his rages and jealousy.

10.     Mr. Bourgeois was then married to Gaynell Collins from 1993-1995. Once again, they only dated for a few months before they married. During their courtship Mr. Bourgeois treated her very well and took care of all her needs. Shortly after they were married, Mr. Bourgeois became very violent for no apparent reason. Gaynell noted that it was almost like he had a "split personality." During their marriage Gaynell left him about twenty times. Gaynell stated that she always knew when she would have to leave because she would hear a change in his voice. When he was beginning to enter one of his periods of rage his voice became deeper, and he would glare at her.

11.     While Gaynell was gone, Mr. Bourgeois would call her and try to convince her to come home. He would be really sweet for awhile, and would be attentive to her needs. The sweetness didn't last long and he would ultimately fly into one of his unexplained rages which caused her to leave again.

12.     Gaynell stated that Mr. Bourgeois would blame everyone else for his problems, and he would never take responsibility for anything. One time she said he didn't have enough money to pay the mortgage because he had spent the money on other things. He blamed her for not having enough money and wanted her to get another job. During their marriage Mr. Bourgeois cheated on her with a number of people including his next wife, Robin Bourgeois.

13.     Robin became pregnant with Alfredeisha in 1994 while Mr. Bourgeois was still married to Gaynell. Robin describes their relationship as very good in the beginning but soon after that Mr. Bourgeois devolved into periods of violent behavior. Robin stated that sometimes

4

Mr. Bourgeois would be calmly sitting watching television and then he would jump up and beat her. She never knew what sparked these mood changes. These impulsive, aggressive episodes were very common in their relationship.

14. Robin also stated that Mr. Bourgeois was very jealous. He monitored every move Robin made and would have people spy on her so he would always know what she was doing. Robin stated that Mr. Bourgeois always had to have everything that his brother, Lloyd, had even when he could not afford it. It didn't seem to matter to him that the electricity would be off as long as he had the car he wanted. He was very reckless with money and with regard to his family responsibilities.

15. While Mr. Bourgeois was married to Robin he was dating Ivy Thomas who lived in Birmingham, Alabama. He met Ivy while he was on the road as an over-the-road-truck driver. Ivy dated Mr. Bourgeois from 1995 until 1997 when she discovered he was cheating on her. Ivy describes their relationship as very good. Mr. Bourgeois showered her with expensive gifts, but he would lie to her as well. Ivy feels that Mr. Bourgeois thought he was telling the truth even when his lies were obvious. Ivy stated that Mr. Bourgeois saw things as all good or all bad and he didn't seem to see gray areas in his relationships with other people.

16. Ivy recalled that Mr. Bourgeois revealed physical abuse by his mother, and how hurt he was by her. He told her that his mother sent him to live with someone else, and that depressed him. One of the times Mr. Bourgeois came to visit her he sent her out to the truck to get a present. She noticed a picture of a woman and a baby in his truck and asked him about them. Mr. Bourgeois said they were his sister's friends but Ivy confronted him and he ultimately confessed that it was his baby. He stated that he and Robin had a one night stand. Ivy broke up

5

with him because he was unfaithful. Ivy remembered that he called several times to try to win her back but she was adamant she did not want to be with someone who cheated on her.

17.    This history of tumultuous relationships marked by alternating periods of calm and periods of intense violence are indicators of a Borderline Personality Disorder. In these relationships Mr. Bourgeois married the woman only after a courtship lasting a few months. He formed an immediate and intense attachment to each woman. During the short time they dated he adored them but over time he was unable to continue his unabashed devotion. Instead, he entered into dark periods in which he would devalue and degrade them. In each relationship it is clear that Mr. Bourgeois was very impulsive in the areas of sexual relations, which was very damaging to his relationships and played a major role in their dissolution.

18.    Individuals with a Borderline disorder typically display intense and inappropriate anger directed at loved ones. In almost all of the relationships the women describe Mr. Bourgeois's anger as such. Many of the women stated that they never knew what would set Mr. Bourgeois off and make him so angry. Mr. Bourgeois could not control his anger and would lash out at those closest to him. It is very common in those with Borderline Personality Disorder to have a history of broken marriages because of their inability to have a stable relationship.

19.    A history of abandonment and abuse is often associated with Borderline Personality Disorder. Each of the women relate that Mr. Bourgeois described to them his history of childhood abuse and maternal abandonment. Mr. Bourgeois would tell the women very early on in their relationship and become very emotional as he related the story. Mr. Bourgeois told each woman that his mother hated him because he reminded her of his father, who abandoned her. Mr. Bourgeois stated that he was always treated like an outcast and was eventually sent to

6

live with another woman while the rest of his siblings remained at home. Mr. Bourgeois was abandoned by his father and his mother abused him and then ultimately abandoned him.

20.    Individuals with Borderline Personality Disorder typically do not have the capacity to see people as made up of both good and bad qualities. Mr. Bourgeois saw these women as all good and then all bad. All of the women consistently describe how Mr. Bourgeois would suddenly shift from treating them with love and respect to completely devaluing them by cheating on them or becoming abusive to them. Mr. Bourgeois would become angry with them when they would fail to live up to unrealistic expectations. This would leave the women feeling confused because they did not know what angered him and Mr. Bourgeois feeling abandoned by them. Mr. Bourgeois simply does not have the ability to see any of life's gray areas.

21.    Another key feature in individuals with Borderline Personality Disorder is their unstable self image or sense of self. Mr. Bourgeois displayed this through mimicking his older brother Lloyd. Many of the women Mr. Bourgeois was involved with noted that whatever Lloyd had Mr. Bourgeois had to have. If Lloyd bought a pool Mr. Bourgeois would buy a pool or if Lloyd would embark on a new career path than Mr. Bourgeois would follow him. It seemed as though Mr. Bourgeois did not know who he was without Lloyd's life as a template.

22.    Engaging in risky behaviors is often associated with this personality disorder. I also interviewed, Lawanda Cook, who is the cousin of Ivy Thomas. Lawanda related an experience in which she was riding in Mr. Bourgeois's truck and he got up out of his seat while he was driving to come talk to her. Lawanda completely panicked. Mr. Bourgeois told her that the truck would be fine even though there was no one driving it. She was so afraid that she never got into a truck again. This type of reckless conduct is also indicative of a Borderline Personality

7

Disorder.

23.     Mr. Bourgeois would also spend money excessively.  He would buy cars that he could not afford, and then need his brother to help him out.  His electricity would frequently be turned off because he spent his money on other things.  One of his wives noted that he would fail to pay the mortgage and then blame others for his inability to pay.  The types of risky behavior recounted above, coupled with the fact that he engaged in frequent sexually risky behaviors, highlights the fact that he is impulsive in extremely self-damaging ways. This is another key feature found in individuals with Borderline Personality Disorder.

24.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Kathleen Kaib, MSS, MLSP, LSW

Dated: 5|4|07

8

# EXHIBIT
# 20

FILED FOR RECORD
~~~~~ PARISH, LA.

03 APR 25 PM 12:08

EDWARD L. KINLER, JR.
CLERK OF COURT
BY

FORD MOTOR CREDIT COMPANY

VERSUS

ALFRED BOURGEOIS

28927

NUMBER _____ DIV. "___"

23RD JUDICIAL DISTRICT COURT

PARISH OF ST. JAMES

STATE OF LOUISIANA

SECTION "E"
HON. ALVIN TURNER, JR.
(225) 621-8500

## SUIT ON NET (CLOSED END) LEASE

The petition of FORD MOTOR CREDIT COMPANY, a foreign corporation authorized to do and doing business in the State of Louisiana, with respect represents that:

1.

Defendant, ALFRED BOURGEOIS, Social Security No 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, of the lawful age of majority, is presently domiciled in the Parish of St. James, State of Louisiana.

2.

ALFRED BOURGEOIS, made defendant herein, is justly and truly indebted unto FORD MOTOR CREDIT COMPANY, in the full sum of $5,060.19, together with legal interest from until paid, together with attorney's fees in the amount of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

3.

On January 10, 2001, a Net (Closed End) Lease was entered into between the defendant and the named dealer/vendor, whereby defendant leased, with option to purchase, one certain vehicle more particularly described, and on such terms and conditions as set forth in said Lease, a copy of which is attached hereto and made part hereof by reference.

4.

Said Net (Closed End) Lease was assigned to FORD MOTOR CREDIT COMPANY, plaintiff herein, as shown on the Lease. Said assignment transferred to plaintiff all rights, privileges and remedies available to the original vendor assignor. Lessee, defendant herein, had knowledge of this assignment as evidenced by the Lease.

5.

According to its stated terms, the Net (Closed End) Lease terminates after either a fixed period of time from the date of the Lease if Lessee fails to timely exercise the purchase option, or, upon default of the terms of the Lease. Defendant did not exercise the purchase option and this contract terminated by default.

6.

Despite amicable demand, defendant failed, neglected and refused to make timely payments under this obligation, and the installments are contractually past due, necessitating the placing of this agreement in the hands of an attorney for collection.

7.

Said Net (Closed End) Lease provides that upon default, Lessee, the defendant herein, agreed to "Pay all expenses paid by the Lessor to enforce the Lessor's rights under this Lease, including reasonable attorney's fees as permitted by law..." Reasonable attorney's fee for collection herein is stated to be twenty-five (25%) percent of the principal and interest due and owing.

8.

There is currently due and owing on said account, pursuant to the acceleration clause contained in the Lease, the principal balance of $5,060.19, which may include one or more of the following charges: excess mileage, collision damage, excess wear, unpaid lease payments, unpaid late charges, and/or repossession expenses. All proper credits have been applied for security deposit, sales proceeds (if applicable), and unapplied credits and/or rebates, if any.

9.

Plaintiff further alleges that, to its knowledge, defendant IS NOT now in the military service of the United States government, including the Army, Navy, Air Force, Marine Corps or Coast Guard; nor is defendant believed to be an officer of the Public Health Service detailed with either the Army or Navy, and therefore, defendant is NOT entitled to any of the benefits of the Soldier's and Sailor's Relief Act of the Congress of the United States of America.

WHEREFORE, plaintiff prays for judgment in favor of FORD MOTOR CREDIT COMPANY, and against defendant, ALFRED BOURGEOIS, Social Security No. 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, in the full sum of $5,060.19, plus legal interest from until paid, together with attorney's fees in the sum of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

Plaintiff further prays for all other just and equitable relief as allowed by law.

By Attorneys:

SHOWS, CALI & BERTHELOT, L.L.P.
644 St. Ferdinand Street
P.O. Drawer 4425
Baton Rouge, LA 70821-4425
Telephone: (225) 346-1461

By: _____
E. Wade Shows, #7637

PLEASE SERVE DEFENDANT:

Alfred Bourgeois
3192 Rev Doc Samuel Jones St
Paulina, LA 70763
Social Sec. # 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

THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# EXHIBIT 21

# U.S. v Alfred Bourgeois

## Capital Sentencing – Mitigation

## March 2004

## Overwhelmed Family System

- Eunice and Lloyd Ferdinand had three children and then divorced.

- Soon after Eunice had Anthony by another man – Anthony was mentally retarded and hidden in the home.

- Alfred was father in illicit relationship with Alfred Sterling, who abandoned them and provided no support.

- Two more children were born to Eunice and Godfrey Rixner.

- Eunice and Godfrey had weekend conflicts associated with his drinking.

- Eunice hit Godfrey on occasion.

- Older brother Clyde drowned at age 12.

- Claudia sent to live with her maternal grandmother for two years. Alfred sent to live with an elderly woman in the neighborhood.

Dr. Cunningham, please explain this factor – how was the family system that Alfred grew up in overwhelmed?

How does that impact on a child that grows up in a family system that's overwhelmed?

3

# EXHIBIT
# 22

**AFFIDAVIT / DECLARATION OF ELNORA BOURGEOIS MCGUFFEY
PURSUANT TO 28 U.S.C. § 1746**

Elnora Bourgeois McGuffey, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am the maternal aunt of Alfred Bourgeois. His mother Eunice was my younger sister.

2.      Eunice was married to a man named Lloyd Ferdinand and had three children by him. They lived as a family in Lutcher. It seemed like she was happy, but Ferdinand ran around a lot with other women. Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she was never the same after they divorced. It was like she had something on her mind all the time.

3.      After Eunice divorced from Ferdinand, she and her three children moved back into our parent's house on Bend Road in Paulina. She needed extra help with the kids and got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

4.      Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

5.      When he was young, Alfred had a problem with his sinuses. My sister used to pick his nose with her fingernail, causing it to bleed. All of us use to get after her for picking his nose, but she would just ignore us. She sure dealt with his sinus problem in a strange way.

6.      I lived in Baton Rouge and would visit Eunice in Paulina. I was surprised to find that Alfred was not living with his mother. He was staying with an elderly lady from church. Even though the elderly lady needed help, I never undstood why little Afred stayed with her instead of living with his family.

7.    Alfred's older brother Lloyd was a role model for him. Lloyd was kind of well off and Alfred would always try to do what Lloyd did. Alfred was not as smart as Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never knew how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that he was, more successfull than he was and smarter than he was.

8.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Elnora Bourgeois McGuffey

Dated: May 9, 2007

# EXHIBIT
# 23

## AFFIDAVIT / DECLARATION OF JERSEY HENRY
## PURSUANT TO 28 U.S.C. § 1746

Jersey Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.     I am Alfred Bourgeois' cousin, but he considered me his aunt. I am his mother Eunice's cousin. We lived in Bend Lane in Paulina, La.

2.     My cousin Eunice was a neat freak. She kept her house very clean and you could eat off her floors. Her mother Edna was the same way.

3.     Eunice seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like she was always worried about something. After the divorce, she moved back in with her parents in Paulina.

4.     Eunice let her kids spend time with anyone. She was not discriminating. Her boys would regularly prefer to sleep on the floor in my house than to go home. They would be here late and I was surprised that Eunice never even called to see where they were. Those children rambled from house to house. Clyde was Eunice's son by Ferdinand and he drowned in a spillway when he was out with some people. Eunice was hurt by Clyde's death and I am not sure that she ever recovered from it.

5.     Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it.

6.     Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was be ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids.

7.    Alfred had a problem with telling the truth. He started lying about things when he was in elementary school. Sometimes it was for attention and sometimes it was to make people think that he was more than he was. When he was young, it was pretty easy to catch him in fibs because some of them were so obviously not true. Telling tales became a habit with Alfred as he got older. I oftern wondered if he started to believe his own tales. It was difficult to know how smart he was because he was always exaggerating.

8.    I would have been willing to testify about all the things in this statement.

9.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jersey Henry

Dated: May 10, 2007

# EXHIBIT
# 24

### AFFIDAVIT / DECLARATION OF WILMER BOURGEOIS, SR PURSUANT TO 28 U.S.C. § 1746

Wilmer Bougeois, Sr., pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' maternal uncle. Eunice Bourgeois was my younger sister.

2.      All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

3.      Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

4.      Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

5.      Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her that the boy should not be ripping and running with just anyone.

6.      Lloyd is my sister's olderst living boy. He turned out all right because my daddy, his grandfather, helped raised him. Later, his Uncle Harry taught him about car mechanics. Lloyd was lucky that he had my dad and his uncle around him growing up.

7.      Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward,

she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

8.     After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

9.     Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

10.     In later life, Alfred would drop by my house. I didn't enjoy the visits because of the way he talked. He used to exhggerated things and wanted me to think that he was doing really well. I could understand him pretending that he had more than he did because there were so many things that he didn't have as a child. He grew up poor. The talk that I really didn't like was his saying that everyone was trying to do something to him. He was paranoid. He said that people were always doing this or that to him or talking about him. I listened to him and I could understand it because Alfred had a really hard life growing up.

11.     No attorney or investigator representing Alfred ever spoke to me before or during his trial in Texas. If someone from Alfred's defense team had asked, I would have told them about Alfred and his family and would have been willing to testify in court.

12.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Wilmer Bourgeois, Sr.

Dated: May 9, 2007

# EXHIBIT
# 25



# MEMORANDUM

To: John Gilmore, Douglas Tinker, Bourgeois file

From: Gerald Bierbaum

Date: March 03, 2004

Re: Interview of Harry "Slick" Bourgeois

---

Harry is Alfred's mom's cousin. Harry raised Lloyd from about 10 or 12 years old. Harry had a house and a "shop" about 500 yards from the house where Eunice and her children resided.

Harry spoke to me for about forty minutes while we sat on the tailgate of his truck in front of the house he shares with his son. Harry's house is right next to Lloyd's shop. Harry told me the he spends most nights "tending to," his ex-wife [children's mother] in Reserve because she is ill.

Harry "Slick" Bourgeois
78 y.o. - 03/01/04
(225) 869-8143

*Alfred*

"Alfred tell a lie for every word he say." He was a good boy that wasn't violent or drinking or using drugs but he lied about everything. Harry told me that he was standing there while Alfred was talking to some person that was visiting a neighbor. Alfred was telling the man that the people that were working the land next to the neighborhood were "'renting my land over there.' Alfred didn't own that land." Harry also recalled when Alfred "told my ex - old lady I was going with some girl that I didn't even know. . . .He'd pull a lie out of the clear blue."

Harry thought Alfred "wasn't to solid," and tapped his head but Alfred is "a good working fella. . . . He was a good fella and a good hustler."

Alfred was "good to his kids." Harry never saw Alfred beat or mistreat any child. "He treated 'em all good." When asked if Harry ever knew Alfred to beat his kids, Harry replied "Lord no! Never. Never. He loved them children."

Alfred worked and made good money and never bothered anyone other than telling lies.

Alfred always looked up to Lloyd and tried to keep up with his brother. Lloyd got a Jaguar then Alfred did. Lloyd drove a truck, then Alfred drove a truck.

004591



*Eunice and Alfred*

"Alfred's momma didn't do shit for him. . . All her kids raised they self. . . . It was like he didn't have no momma. . . she was half-ass retarded."

Eunice "didn't look out to close for none of them." She would party or run around and never seemed to mind the kids like a mom should. Whenever she was paying attention to Alfred or Lloyd she "was always trying to put a broomstick on his ass or something."

Harry said that he "put shoes on his [Alfred's] feet" because "his momma wouldn't give him shit."

Harry knew that Alfred went to live with Ms. Clayton [about 700 - 1000 yards from mom's home] because "her [mom] and Alfred could never make it." Mom constantly fussed at and beat Alfred. They couldn't get along at all. "She never did treat him right."

"Alfred was like a stray sheep going from place to place, looking for someone to take care of him."

*Eunice*

Eunice "never had a job in her life."

When Lloyd would tell Daddee about Eunice taking money, the minute Daddee turned his back, she would go to beating on Lloyd and calling him "you dirty no good black bastard."

Eunice was so unpredictable and tough on her kids that Harry knew that Lloyd only felt safe when Lloyd was staying with Harry.

Lloyd doesn't like Eunice even though she is his first cousin.

*Lloyd*

Lloyd, as a ten year old child, "used to put his books down and come work with me in the shop 'til 12:00 or 1:00 at night." Lloyd would come right from school to Harry's shop and help him with the cars.

Lloyd was such a hard worker from 9 or 10 years old that every summer, he'd buy himself a brand new bicycle. When Lloyd started helping Harry around the shop; Harry would pay him little bits of money. Lloyd always ran and gave the money to Daddee to hold for him. Lloyd always had enough money buy the summer to buy a new bike. "He was the only kid in the neighborhood with a brand new bike."

Lloyd was also the only kid in the neighborhood that "was a help to me." He was the only kid

004592

willing to get his hands dirty or greasy and help Harry with the mechanic work.

Lloyd loved his mom's dad "Daddee." Mom would occasionally filch change from Daddee's change bag [Daddee was a vegetable merchant and kept a bag of coins to make change when selling vegetables from his cart]. Mom loved to smoke and would take change to buy cigarettes. When Lloyd saw her doing it, he would tell Daddee. "She would go in that sack and take money to buy cigarettes."

When Lloyd started showing up at Harry's shop, Harry's mom would feed him and let him stay with Harry. Harry was a grown man but the house where Lloyd slept was still his mom's.

Harry claims he bought Lloyd the first car Lloyd owned.

004593

# EXHIBIT
# 26

## AFFIDAVIT / DECLARATION OF ALLEN HENRY
## PURSUANT TO 28 U.S.C. § 1746

Allen Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.    I am Alfred Bourgeois' cousin. My mother is cousins with Alfred's mom Eunice. I grew up with him on Bend Lane in Paulina, La..

2.    When we were growing up, All of Eunice's boys would rather sleep at other people's houses than their own. They would rather lay on the floor at my house than sleep at home. All the boys would go wherever they wanted to go. When night came, Eunice would not call them home or even call to see where they were. Those kids rambled. One of the boys, Clyde, drown when he was spending the 4$^{th}$ of July away from his family. That is what happens when you ramble from house to house.

3.    Eunice used to be rough on Alfred. She used to chastise him more that her other kids and used to beat him more than the others.

4.    There was an older lady from church named Miss Mary that lived on the Bend. She lived alone and Eunice sent Alfred to stay with her. After school, Alfred would play with us, but while we were still playing, Miss Mary would be ready to go home and Alfred would have to go with her. He would be sad when he had to leave us to go in early to take care of Miss Mary. It hurt him to have to live outside of his family.

5.    Alfred was a clumsy kid growing up. He could barely ride a bicycle and we would tease him about being so awkward.

6.    Alfred was kind of dumb, but he tried to hide it by telling tall tales. He would lie to cover up what he didn't know or understand. It was hard to tell exactly what he knew because he exaggerated about himself, but when you really looked into it, the story didn't make any sense. Even though he wasn't smart, he was motivated to measure up to his older brother Lloyd's example. He wanted to be like Lloyd, but couldn't because he just was not bright enough.

7.    Alfred wanted everyone to believe that he knew about cars. His brother

Lloyd was known to be a great mechanic. One time Alfred had a bad engine leak, but still drove the car. We told him that he might hurt the engine, but he drove it anyway. He didn't understand the consequences of the engine problem, but didn't want to admit it.

8.  I was never contacted by Alfred's lawyers or investigator before his trial. If someone had asked, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.  I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Henry

Dated: May 10, 2007

# EXHIBIT
# 27

## AFFIDAVIT / DECLARATION OF MURRAY BOURGEOIS
## PURSUANT TO 28 U.S.C. § 1746

Murray Bourgeois, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.    I am Alfred Bourgeois' cousin. My father was Harry Bourgeois. He and Alfred's mother, Eunice, were cousins.

2.    My family and Alfred's family lived on Bend Lane in Paulina. My Dad started a car repair business on the Bend and he taught me and Alfred's older brother Lloyd how to repair cars. Lloyd caught on quick and eventually took over the garage. My Dad really helped Lloyd get started and now he is a successful businessman.

3.    Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred.

4.    For a long time, Alfred didn't even live in his Mom's house. He lived down the street with an older lady from church. Miss Mary was the Mother of the Church and didn't have a husband. Alfred's Mom said that he had to stay with her because Miss Mary was frail. Even though Miss Mary treated him better than his own mother, Alfred was hurt by being sent out of the family household. By taking care of Miss Mary, Alfred missed a lot of family outings. He didn't feel like he was a full member of the family and it ate away at him inside.

5.    Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life.

6.    Lloyd was Alfred's idol since Alfred didn't grow up with his own dad. Alfred tried to copy everything that Lloyd did. If Lloyd bought something, then Alfred

would try to buy the same thing. If Lloyd started a business, then Alfred would try to start a business. The only problem was that Alfred was not as smart as Lloyd, so Alfred would fail. Still, Alfred kept trying to be like Lloyd.

7.    Alfred would not talk about his problems directly, but you could see them. He always had something to prove and would try to make people believe that he was better than he was. He became known as a braggart who would exagerate or lie on himself in order to impress everybody. He would cover up his failures by telliing tales that he thought made him look good. We used to say that Alfred would lie faster than a horse could trot. I always thought that Alfred's tall tales were related to him being scared as a child.

8.    No one from Alfred's legal team talked to me at the time of his trial. Someone talked to my Dad, Harry Bourgeois, but not me. If they had spoken to me, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Murray Bourgeois

Dated: May 10, 2007

# EXHIBIT 28

## DECLARATION AND AFFIDAVIT OF YVONNE ROBINSON JOSEPH PURSUANT TO 28 U.S.C. § 1746

Yvonne Robinson Joseph, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Yvonne Robinson Joseph. I am Alfred Bourgeois' cousin. My mother, Lovenia Bourgeois Robinson, and his mother, Eunice, were sisters.

2.    I am about eight years older that Alfred. My family lived in Lutcher, but my mother would leave us with the extended family on Bend Road during the day. We spent a lot of time with Alfred's family on Bend Road in Paulina.

3.    Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him "little yellow bastard" and slap him for nothing.

4.    His mother used to mess with Alfred's nose. He always had a big sore on his nose and his mother would put her finger nail on it and make it bleed. Grandfather Isaac used to ask Alfred's mother why she kept messing with that boy's nose. She wouldn't answer.

5    After a while, Alfred lived with an older church lady in Paulina. She took him in because he was being treated so bad by his mother. That old lady treated Alfred better than his own mother.

6.    Even though his mother treated him bad, Alfred was crazy about his momma and always treated her very good.

7.    When I was spending time in Paulina, I thought that Alfred was the nicest one in his family, but I worried about him when he grew up. He was raised around violence and I worried that it might affect him in later life.

8.      No attorney or investigator for Alfred spoke to me before or during Alfred's trial. If anyone would have asked, I would have told them what I knew about Alfred.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: 5/9/07

# EXHIBIT
# 29

## DECLARATION OF MARK D. CUNNINGHAM, PH.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare and certify the following:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in fifteen states including Texas. I received a Bachelor's degree in Psychology from Abilene Christian College with high honors in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I served as active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981. I have maintained a private practice in Texas since 1981. My practice is national in scope.

2.      I am board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). This credential signifies the highest level of expertise and practice in forensic psychology. I have provided forensic evaluation services in over 450 cases. I have particular expertise in the area of capital sentencing issues, including mitigation and violence risk assessment. I have testified as a clinical and forensic psychology expert regarding sentencing issues in approximately 75 state capital cases and 50 federal capital cases at trial, and in numerous cases in post-conviction or federal habeas proceedings. I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in 31 states and Puerto Rico. I have never been denied qualifications as an expert in clinical or forensic psychology.

3.      I am extensively involved in research and the authoring of scholarly publications relevant to capital sentencing issues and death row populations. I have authored or co-authored over

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 1 of 18**

30 scholarly and peer-reviewed papers during the past nine years, including six published in 2006 and six others that are currently "in press." I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12 volume *Handbook of Psychology.*

4.    I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred Bourgeois, as a clinical and forensic psychology expert in his capital trial proceedings in the United States District Court in the Southern District of Texas, Corpus Christi venue. I have been asked by Mr. Bourgeois' current federal defender counsel to provide this Declaration outlining my knowledge of Mr. Bourgeois and my involvement with his case at the trial level.

5.    I was first contacted by Mr. Gilmore on June 30, 2003. At that time, he described that the trial was set for mid-September, and that the defense had "developed very little mitigating evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death penalty if convicted if they were not able to present mitigating evidence. I responded on July 1, 2003, and suggested that the defense hire a mitigation specialist. I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line. My own interviews and evaluation could not reasonably begin prior to this investigation. As neither this investigation nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.

6.    Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 2 of 18**

his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

7.    A four-month continuance was obtained, and funding for a mitigation specialist was secured, and then I agreed to participate as an expert. I advised defense counsel that the mitigation investigation would have to proceed very aggressively in order for me to complete my evaluation and meet a disclosure deadline of mid-December. I understood my general role to be the provision of opinions regarding extant mitigating evidence, as well as Mr. Bourgeois' potential to make a positive adjustment to incarceration (also known as a risk assessment) – each of which are routine considerations in federal capital sentencing.

8.    Gerald Bierbaum and Lisa Milstein were retained as the mitigation specialists. I knew each of them and anticipated that, under the direction and coordination of defense counsel, they would be able to gather the records and conduct the types of third-party interviews that I require. However, it became apparent to me that defense counsel was not adequately monitoring and directing the mitigation investigation. On December 1, 2003, my office advised Mr. Gilmore that I had still not received any records, interview summaries, or investigation reports. Mr. Gilmore responded that he was "really not sure how this works," and did not know if he should be providing me with information or if the mitigation investigators should be providing this information to me directly. This again reflected a lack of familiarity with the functions of defense counsel in preparing for capital sentencing. In my experience, the responsibility for a mitigation investigation cannot be "outsourced" by retaining an investigator. I am also aware that defense counsel customarily reviews

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 3 of 18**

the information gathered by the mitigation investigator prior to providing it to testifying experts to ensure its relevance, reliability and accuracy. Though Mr. Gilmore reported that he was seeking another continuance in the face of the mitigation investigators' report to him that the investigation could not be completed by mid-February, he continued to give little indication of appreciating the time requirements of an adequate capital mitigation investigation.

9.    In my subsequent direct telephone contacts with Gerald Bierbaum in December 2003, I expressed my concern that my own evaluation was being critically compromised by the absence of case information. Mr. Bierbaum indicated that Ms. Milstein had been unable to direct her full attention to the case and that he was having to pick up her slack. Still, interview summaries were not immediately forthcoming. When these summaries were provided and I began to perform my own follow-up interviews by telephone, it quickly became apparent that the history that had been obtained by Ms. Milstein was both inadequate in scope and plagued by fundamental errors of fact. As a result, I could not rely on the investigative memos, and was faced with the necessity of re-interviewing the identified mitigation witnesses and potentially seeking other sources of information as well. Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner, and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred. Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

10.    In addition to conducting interviews and reviewing summaries of interviews, I conducted a clinical interview of Mr. Bourgeois (lasting about 5.5 hours) on February 7, 2004. I

<div align="center">

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 4 of 18**

</div>

reviewed documentary background material about Mr. Bourgeois and the offense. I was given reports generated by Dr. Carlos R. Estrada (Government-retained psychiatrist) and the defense-retained neuropsychologist, Dr. Donald E. Weiner. I would add that counsel had trouble scheduling Dr. Weiner's evaluation. I had recommended a neuropsychological evaluation, and I believe Dr. Estrada did as well, as there were many red flags indicative of potential brain damage in Mr. Bourgeois' background. On February 18, 2004, Mr. Gilmore informed me that he was unsure if the neuropsychological evaluation would be completed in time for trial, as testimony was scheduled to begin in early March, 2004. Eventually, Dr. Weiner was able to conduct his assessment and he generated a report dated March 3, 2004. The last-minute nature of this evaluation was a further indication to me that counsels' preparation of the fast-approaching penalty hearing was proceeding haphazardly.

11.     During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.

12.     The trial commenced in February, 2004 and I recall that the penalty phase started in

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 5 of 18**

mid-March. Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial. We did plan, however, for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd. I arrived at my hotel in the mid-afternoon on March 21, 2004. I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting. Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions. Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone. However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night. I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.

13.    I attended the Court proceedings the next day and observed the Government's examination of Dr. Estrada. His testimony showed that he recognized that childhood abuse can impact adult behavior. I was concerned, however, because Dr. Estrada's presentation did not address this question as it related to Mr. Bourgeois specifically. It also did not address it from a mitigating perspective. Instead, it focused only on why Mr. Bourgeois' history of abuse made him

<p align="center">**Declaration of Mark D. Cunningham, Ph.D.**<br>**Page 6 of 18**</p>

a continuing danger. This turned the mitigating evidence on its head. Instead of mitigating the offense, Mr. Bourgeois' history of savage abuse was used to aggravate.

14.    On cross-examination the defense did not develop and explain that impact from a mental health perspective. As I recall, Dr. Estrada's testimony was limited in this regard to stating only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and had exhibited adult conduct that was consistent with such abuse. I was quite cognizant that testimony elicited from Dr. Estrada was inadequate for the jury to appreciate the mitigating quality of this history of abuse. Rather, if the jury were to recognize and give informed weight to Mr. Bourgeois' background, it had to hear testimony about these developmental experiences in much greater depth, as well as have the benefit of clear and detailed testimony regarding **why** this history mitigates, including the nexus between this history and Mr. Bourgeois' life adjustment and the instant offense conduct. Had defense counsel dedicated time to conference with me, I would have advised them to anticipate this application of developmental history by a Government-retained mental health expert. I also would have equipped them with an understanding of scientifically-informed perspectives and data on violence risk assessment that would have equipped them to debunk the future danger implications advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

15.    A second appointment was made to meet with Mr. Tinker after court that day. Much to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar for about 45 minutes. Mr. Tinker had a drink. It was my distinct impression that he was not particularly interested in my analysis of his client's disorders and deficits. It was obvious from his questions that he had not yet looked at the materials that I sent to him, and he certainly was not familiar with them. To illustrate, while I was discussing the mitigating evidence, he interrupted me

to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series of slides regarding that topic. This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information. Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had already provided to him. When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois. It was not in the trial notebooks that counsel had on their table. Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. As evidenced by counsel not having this assessment in their critical records files, they apparently had not reviewed it or appreciated its implications. Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

16.     In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing.  In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial. Normally, counsel looks to me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case. Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

17.     Despite the brief nature of our hotel-bar "preparations," I was still confident that the

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 8 of 18**

important mitigation and risk assessment perspectives I had developed regarding Mr. Bourgeois would have significant impact on the jury's sentencing determination. Accordingly, I was flabbergasted when, after completing cross examination of Dr. Estrada and after the Government rested, counsel took a break to inform me that they would not be calling me as a witness. This decision was made without consultation or discussion with me.

18.    As noted, there was much to say regarding adverse factors in Mr. Bourgeois' background and the mitigating impact of these factors on his life, the vast bulk of which was not covered by Dr. Estrada. Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred. Mr. Bourgeois was raised in a overwhelmed family system. His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age. Eunice had seven children by four different men. One son was profoundly mentally retarded and kept hidden in the home. One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

19.    The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment. Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support. Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock. Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois.   The effective abandonment by both parents has a significant impact on early child development. The abandoned child is often unable to trust. The child may grow up with an intense fear of abandonment and be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 9 of 18**

20.    Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life.  People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age.  For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

21.    These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses.  Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention.  This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

22.    There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother.  More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois.  Eunice treated Alfred as a scapegoat.  Alfred was blamed when children were hurt in the playing field.  He was beaten more frequently and more brutally than his siblings.  She beat him with belts and extension cords.  These beatings were described as routinely leaving welts and bruises.  Eunice is also described as throwing shoes and other objects at him.  Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

23.    Eunice was also described as emotionally abusing Mr. Bourgeois.  Eunice told Alfred

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 10 of 18**

that he "wasn't worth nothing." Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois. There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes. At age 7-8, Eunice sent Alfred to live with an elderly neighbor, Ms. Mary Clayton. He was as a result excluded from family outings and trips. After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle. This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

24.    As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor. While behavioral impacts can vary, all such victims suffer from psychological consequences. They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions. Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly. In Mr. Bourgeois' case the abuse was severe and long lasting. It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

25.    Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76. Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an IQ score of 68. I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test). The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 11 of 18**

score of 68 in 2004. Both of these scores are in the range of mild mental retardation.

26.    Unfortunately, I was not provided with the IQ information in time to interview family members regarding ways in which Mr. Bourgeois' deficient intelligence was reflected in his practical functioning and day-to-day activities, i.e., whether he functions with significant adaptive deficits.

27.    Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning. Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior. Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

28.    Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage. His siblings recalled that he had "rage attacks" even in his early childhood. These attacks worsened in his teenage years. Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged. They reported that he would often tremble when angry. The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation. He would often have to be physically restrained by others. After the attack, Mr. Bourgeois would appear exhausted. He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

29.    The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well. This includes marked changes in his demeanor, disproportionate responses, inability

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 12 of 18**

to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

30.    The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

31.    As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages. It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter. My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence. This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors. His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control. By any measure, this is mitigating in the context of capital sentencing.

32.    Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts, even though the abuse took place over days and weeks. Due to his deficits, he has

a low tolerance for frustration, which becomes even worse in stressful situations. When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

33.     I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently. I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury. Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring. He was able to maintain almost constant, if not steady, employment. He did his best to provide for his children materially and sometimes even emotionally. However, his background and psychological make-up always made him predisposed toward impulsivity and violence. Generally speaking, he was able to keep the lid on the pot. However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct. These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children. They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.

34.     At the time of the offense, there were many ingredients simmering in the pressure cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 14 of 18**

35.    During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

36.    I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison. In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence. My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department. The methodology and findings of my research are generally accepted by informed forensic psychologists.

37.    Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community. Alfred is 39 years old. Research demonstrates better prison adjustment as inmates get older. Rates of prison infractions are highest for inmates in their early 20's. These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

38.    This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard,

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 15 of 18**

however, that despite this suspicion he at times shared a common day room with other inmates. Significantly, Mr. Bourgeois had no disciplinary write-ups during that time. Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

39.     Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison. Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community. He has generally been gainfully employed as an adult. He is involved in an extensive family system. He attended church. He was an involved father. He provided financial support to his children.

40.     My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors. These studies consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

41.     Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education. The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction; loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of

property; and administrative segregation (solitary confinement). Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious violence is markedly diminished.

42.    As noted above, I have significant experience with capital trials. Drawing on this fund of experience, Mr. Bourgeois' case stands out for the inaccurate and incomplete portrayal of Alfred Bourgeois' functioning presented to the jury. I believe trial counsel did not have an adequate understanding of the significance of mitigating evidence. They did not have a detectable strategy for penalty phase. They did not consult with me, their primary penalty phase witness, to help them develop a strategy or to explain the factors that had been identified from the limited investigation that time press had allowed. In my opinion, the information I would have provided the jury could have significantly impacted their deliberations. Without my testimony, and absent a clear defense strategy at the penalty phase, the jury had virtually no mitigating evidence to consider and no informed mechanism with which to consider his risk of violence in prison in the future.

43.    There is much more detail that I can provide about the facts and opinions expressed in this Declaration. This Declaration presents my views in broad strokes and I would be happy to provide additional details at the request of the Court.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 17 of 18**

I hereby certify that this Declaration is true to the best of my knowledge subject to the penalty for perjury.

Mark D. Cunningham, Ph.D., ABPP

Dated:          May 11, 2007
                College Station, Texas

# EXHIBIT
# 30

186810 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA *
    Respondent, *
against       * No. Cr-C-02-216
           * No. Cv-07-223
ALFRED BOURGEOIS   *
    Petitioner. *


VIDEOTAPED DEPOSITION OF
RANDALL PRICE, PhD

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
Michael Wiseman, Esquire
Federal Community Defender Office
For the Eastern District of Pennsylvania
Defender Association of Philadelphia
601 Walnut Street, Suite 540 West, Curtis Building
Philadelphia, PA  19106


Date       Edith A. Boggs, CSR


11-10-10     HOUSTON, TEXAS


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Randall Price, Ph.D.                                    November 10, 2010

26

brain impairment or lack thereof?

A.   No.

Q.   And looking at the -- the scores reflected on Dr. Weiner's chart -- I'm sorry.  It's not Dr. Weiner's chart.  It's Exhibit 3, which has Dr. Weiner's scores reflected.  Would you agree that that is a profile of a person with -- with brain impairment, applying the Heaton norms?

A.   Well, I would agree that these scores on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction.

Q.   Okay.  And so, leaving aside the issue of localization, you don't disagree with Dr. Weiner's overall conclusion that Mr. Bourgeois, on his testing, came up as a person with organic brain dysfunction?

A.   I -- I don't know.  I didn't do an analysis to arrive at that opinion.  I was instead looking at these scores and comparing them to his IQ.

And so, clinically speaking, when you have someone with low intelligence, it's more difficult to arrive at that opinion, and that would be the problem I would have with it.

Q.   So, is what you're saying that given Mr. Bourgeois' low intelligence, it could be that that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com